*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                 *Do Not Distribute*



FIGURE 4.1-3  Viewshed Analysis for the South Central Lease Group under Alternative 1

BLM_0041431

- McKenna Peak WSA, and

- San Miguel ACEC.

The South Central Group lease tracts would potentially be visible from approximately 47% (3,835 acres or 1,600 ha) of the Tabequache WA; the areas of the WA with potential visibility of the lease tracts are located between 5 and 25 mi (8 and 24 km) of the South Central Group. Views of the lease tracts within the South Central Group are partially or fully screened by the intervening topography and vegetation. Views of the reclamation activities might be limited and likely would include any existing infrastructure, if present within the mine sites. Reclamation activities under this alternative would be expected to cause minimal to weak levels of contrasts for views from this WA.

Drivers along the Unaweep/Tabeguache Scenic and Historic Byway would potentially have views of the South Central Group in locations within the background and "seldom seen" distances, along approximately 15.6 mi (25 km) of the byway. Views of the reclamation activities might be limited and likely would include any existing infrastructure, if present within the mine sites.

Activities conducted under this alternative would be expected to cause minimal to zero contrast levels for views from the byway.

The South Central Group lease tracts would potentially be visible from approximately 3.6% (1,039 acres or 420 ha) of the Dolores River Canyon WSA; these viewing locations are within 0 to 25 mi (0 to 40 km) from the South Central Group. If present, existing infrastructure might be visible from within the WSA. Views of the lease tracts are more likely to occur from elevated locations than from within the canyon. Reclamation activities under this alternative would be expected to cause minimal to weak contrast levels for those views from the WSA.

The South Central Group would potentially be visible from approximately 2.1% (409 acres or 170 km) of the Sewemup WSA. Views of the South Central Group from the WSA are generally partially or fully screened by the intervening mountains. Visibility of this group of lease tracts is likely from the locations within the WSA that are higher in elevation than the lease tracts. Views of the reclamation activities might be limited and likely would include any existing infrastructure, if present within the mine sites. Activities conducted under this alternative would be expected to cause minimal to zero contrast levels for views from within this area.

In addition, the South Central Group lease tracts would potentially be visible from approximately 2.0% (1,302 acres or 530 ha) of the Dolores River Canyon SRMA. The group would be visible from approximately 0.7% (489 acres or 200 ha) of the SRMA in viewing locations within 0 to 5 mi (0 to 8 km) from the lease tracts. Views of the reclamation activities from the SRMA might be limited and likely would include existing infrastructure, if present. Views of the lease tracts are more likely to occur from elevated locations than from within the canyon. Similar to the Dolores River Canyon WSA, reclamation activities under this alternative would be expected to cause minimal to weak levels of contrasts for views from this SRMA.

BLM_0041432

1    The South Central Group lease tracts would be potentially visible from approximately
2  1.1% (217 acres or 88 ha) of the McKenna Peak WSA. These viewing locations are between 15
3  and 25 mi (24 and 40 km) from the South Central Group; these areas are primarily located within
4  San Miguel County. Views of the reclamation activities might be limited and likely would
5  include any existing infrastructure, if present within the mine sites. Reclamation activities under
6  this alternative would be expected to cause minimal to zero contrast levels for views from this
7  SVRA.
8
9    The South Central Group lease tracts would be potentially visible from less than 1%
10  (3 acres or 1.2 ha) of the San Miguel ACEC. Under this alternative, activities would be expected
11  to cause minimal to zero contrast levels for views from this SVRA due to the limited amount of
12  acreage that would have views of the lease tracts.
13
14
15    **4.1.12.6.4  South Group.** Figure 4.1-4 shows the results of the viewshed analysis for
16  lease tracts within the South Group in which reclamation activities would occur; these include
17  Lease Tracts 11, 13, and 15. Views from the following SVRAs could potentially include the
18  South Group:
19
20    •  McKenna Peak WSA,
21
22    •  Dolores River SRMA, and
23
24    •  Trail of the Ancients Byway.
25
26    The three lease tracts within the South Group would potentially be visible from
27  approximately 16.4% (3,267 acres or 1,300 ha) of the McKenna Peak WSA, at distances up to
28  15 mi (24 km) from the lease tracts. Views of the reclamation activities might be limited and
29  likely would include any existing infrastructure, if present within the mine sites. Under
30  Alternative 1, reclamation activities would be expected to cause minimal to weak contrast levels
31  for views from this SVRA.
32
33    Within 5 mi (8 km) of the lease tracts within the South Group, the lease tracts could
34  potentially be visible from approximately 8.7% (5,661 acres or 2,300 ha) of the Dolores River
35  Canyon SRMA; in fact, portions of the SRMA are located within the actual lease tracts,
36  including Lease Tract 13. Between 0 and 25 mi (0 and 40 km), portions of the South Group lease
37  tracts could be visible form from approximately 9.0% (5,899 acres or 2,400 ha) of the SRMA.
38  Views of the reclamation activities might be limited and likely would include any existing
39  infrastructure, if present within the mine sites. For this alternative, mining-related activities
40  would be expected to cause weak to strong contrast levels for views from this SRMA; stronger
41  contrast levels would be expected for views from portions of the SRMA that are located within
42  the South Group; lower contrasts would be expected for views from areas farther from the lease
43  tracts.
44
45
46

BLM_0041433

*Preliminary Draft PEIS*          *PEIS Privileged Information*                *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*



FIGURE 4.1-4  Viewshed Analysis for the South Lease Group under Alternative 1

BLM_0041434

1    The South Group lease tracts would potentially be visible from approximately 7.4 mi
2    (3 km) of the Trail of the Ancients Byway in Utah. This portion of the byway is located within
3    the "seldom seen" distance zone (i.e., between 15 and 25 mi or 24 and 40 km) and is primarily to
4    the west of the lease tracts. The byway generally follows Route 191. Reclamation activities
5    under this alternative would be expected to cause minimal to zero contrast levels for views from
6    along the byway.

7
8    Potential impacts on waste management practices (described in Section 3.13) from waste
9    generated during reclamation activities under Alternative 1 are expected to be small. Waste that
10   could remain on the mine sites would be managed accordingly, and disposal capacity at the
11   permitted landfills or licensed facilities would be adequate to accommodate the waste that would
12   need to be transported off site for disposal.

13
14
15   **4.2  ALTERNATIVE 2**
16
17   As would occur under Alternative 1, a
18   total of about 257 acres (100 ha) would be
19   reclaimed at 10 lease tracts (5, 6, 7, 8, 9, 11, 13,
20   15, 18, and 26). Also similar to what would
21   happen under Alternative 1, the only mining
22   activity to be implemented as part of this
23   alternative would be reclamation.

> Alternative 2: Same as Alternative 1, except once reclamation was completed by lessees, all lands would be restored to the public domain with the approval of BLM and be put under BLM's administrative control, and DOE's uranium leasing program would end

24
25
26   **4.2.1  Air Quality**
27
28   The types of impacts and resulting emissions would be the same as those described for
29   Alternative 1 (Section 4.1.1). Thus, potential impacts on ambient air quality associated with
30   reclamation activities under Alternative 2 would be minor and temporary in nature. In addition,
31   these activities are not anticipated to cause any measurable impacts on regional ozone ($O_3$) or
32   AQRVs at nearby Class I areas. Potential impacts from these activities on climate change would
33   be negligible.

34
35
36   **4.2.2  Acoustic Environment**
37
38   The type of impacts and resulting noise levels would be the same as those described for
39   Alternative 1 (Section 4.1.2). Most residences are located beyond the distances where the
40   Colorado noise limit is reached, but, if reclamation activities occurred near the boundary of
41   Lease Tract 13, noise levels at nearby residences could exceed the Colorado limit.

42
43   It is assumed that most reclamation activities would occur during the day, when noise is
44   better tolerated because of the masking effects of background noise that occurs during daytime.
45   In addition, reclamation activities for ULP lease tracts would be temporary in nature (typically a

BLM_0041435

few weeks to months, depending on the size of disturbed area to be reclaimed). Accordingly, reclamation within the DOE ULP lease tracts would cause some unavoidable but localized short-term noise impacts on neighboring residences or communities. Mitigation measures could be implemented to minimize these potential impacts.

## 4.2.3  Soil Resources

Soil impacts from ground-disturbing activities at the 10 lease tracts requiring reclamation would be the same as those described for Alternative 1 (Section 4.1.3.1).

## 4.2.4  Water Resources

Under Alternative 2, impacts on water resources associated with the reclamation activities would be the same as those described for Alternative 1 (Section 4.1.4).

## 4.2.5  Human Health Impact

Potential human health impacts under Alternative 2 would be the same as those under Alternative 1 (see Section 4.1.5).

## 4.2.6  Ecological Resources

### 4.2.6.1  Vegetation

Impacts on vegetation under this alternative would be similar to those described for Alternative 1.

### 4.2.6.2  Wildlife

There would be no difference in reclamation activities under Alternative 2 than those under Alternative 1 (Section 4.1.6.2). Therefore, the potential impacts on wildlife from reclamation activities would be minor. Long-term impacts on wildlife during BLM's administrative control would depend on the use of the reclaimed areas and could range from negligible (e.g., if no development or other use, other than use as a natural habitat, occurred) to moderate (e.g., if mining occurred once again on the reclaimed areas).

BLM_0041436

### 4.2.6.3  Aquatic Biota

There would be no difference in reclamation impacts under Alternative 2 than those under Alternative 1 (Section 4.1.6.2). Therefore, the potential impacts on aquatic biota from reclamation activities would be negligible. Long-term impacts on aquatic biota during BLM's administrative control would depend on the use made of the reclaimed areas and their proximity to aquatic habitats (particularly perennial water bodies) and could range from negligible (e.g., if no development or other use, other than use as a natural habitat, occurred) or minor to moderate (e.g., if mining occurred on the reclaimed areas, particularly on the reclaimed areas on Lease Tracts 13 or 18, through which the Dolores River and Atkinson Creek, respectively, flow).

### 4.2.6.4  Threatened, Endangered, and Sensitive Species

There would be no difference between Alternative 1 and 2 impacts on threatened, endangered, and sensitive species (Section 4.1.6.4). The potential for impacts on threatened, endangered, and sensitive species from Alternative 2 would be identical to those from Alternative 1 (Table 4.1-9).

## 4.2.7  Land Use

Under Alternative 2, all the ULP lease tracts would be terminated, and DOE would restore the lands to the public domain under BLM's administrative control once reclamation activities were completed. The lands would no longer be closed to mineral entry, and all other activities within the lease tracts would continue. As a result, impacts due to land use conflicts are expected to be small. Impacts related to future activities, such as right-of-way (ROW) authorizations, mining (including uranium mining), or drilling oil and gas wells, would be evaluated under a separate National Environmental Protection Act (NEPA) review.

## 4.2.8  Socioeconomics

Potential impacts on socioeconomics (including recreation and tourism) for Alternative 2 would be the same as those described for Alternative 1 in Section 4.1.8.

## 4.2.9  Environmental Justice

Impacts on environmental justice associated with reclamation activities under Alternative 2 would be the same as those under Alternative 1 as described in Section 4.1.9.

BLM_0041437

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                   *Do Not Distribute*

1   **4.2.10  Transportation**
2
3          No transport of uranium ore would occur under Alternative 2. There would be no
4   radiological transportation impacts, and no changes in current traffic trends near the uranium
5   lease tracts are anticipated.
6
7
8   **4.2.11  Cultural Resources**
9
10         Impacts on cultural resources would be the same as those discussed for Alternative 1 in
11  Section 4.1.11. Alternative 2 impacts would be the same as Alternative 1 impacts, except that
12  after reclamation, all lands would be returned to the public domain and be managed by the BLM
13  rather than DOE. DOE's ULP would end, but uranium mining could continue under BLM
14  regulations and procedures. As they would be from Alternative 1, impacts from Alternative 2
15  would primarily be associated with reclamation activities, and adverse impacts are expected to be
16  limited. Adverse impacts would be possible at the 10 lease tracts where reclamation would need
17  to be conducted; the impacts would depend on the amount of land that was disturbed, the number
18  of historically significant mining features that were demolished, and the number of workers
19  engaged in the reclamation activities.
20
21
22  **4.2.12  Visual Resources**
23
24         Because the primary difference between Alternative 1 and 2 is in the administrative
25  control of the lease tracts, the resulting visual impacts would be similar to those presented in
26  Section 4.1.12.
27
28
29  **4.2.13  Waste Management**
30
31         The potential impact on the ability to manage the waste generated from reclamation
32  activities under Alternative 2 would be the same as that described for Alternative 1 in
33  Section 4.1.13.
34
35
36  **4.3  ALTERNATIVE 3**
37
38         Under Alternative 3, eight mines
39  (two small, four medium-sized, one large, and
40  one very large) with a total surface area of
41  300 acres (120 ha) are assumed to be in
42  operation during the peak year. The three
43  phases involved in uranium mining
44  (exploration, mine development and operations,
45  and reclamation) are evaluated for this

> Alternative 3: DOE would continue the ULP as it existed before July 2007 with the 13 then-active leases, for the next 10-year period or for another reasonable period, and then DOE would terminate the remaining leases.

BLM_0041438

1    alternative. The exploration phase is assumed to require a relatively short duration of time, from
2    2 weeks to a month for each mine. Mine development and operations would be conducted for
3    about 10 years. Reclamation would be conducted within a time frame of 2 to 3 years after
4    operations ceased.
5
6
7    **4.3.1  Air Quality**
8
9
10       **4.3.1.1  Exploration**
11
12       The degree of potential impacts on ambient air quality would vary depending on a
13    number of factors, such as existing road conditions, topography, soil properties, vegetation
14    cover, and meteorological conditions (e.g., wind speed, precipitation). Exploration activities
15    would involve little ground disturbance. The exploration phase is assumed to require a relatively
16    short duration, and a small fleet of heavy equipment along with a small crew would be used. In
17    addition, good industry practices and mitigation measures would be implemented to ensure
18    compliance with environmental requirements. During this exploration phase, air emissions from
19    soil disturbances or engine exhaust would be small, and thus potential impacts on ambient air
20    quality would be minimal and temporary. These activities are not anticipated to cause
21    measureable impacts on regional ozone or AQRVs. Potential impacts from these activities on
22    climate change would be negligible.
23
24
25       **4.3.1.2  Mine Development and Operations**
26
27       During mine development and operations, primary emission sources would include
28    engine exhaust from heavy equipment and trucks, fugitive dust from earth-moving activities,
29    erosion of exposed ground or stockpiles caused by wind, and explosives use (e.g., ammonium
30    nitrate–fuel oil). Engine exhaust emissions from heavy equipment and trucks would include
31    criteria pollutants (such as CO, $NO_x$, $PM_{2.5}$, $PM_{10}$, and $SO_2$), VOCs, and GHGs (e.g., the
32    primary GHG $CO_2$), while soil disturbances and wind erosion would generate mostly PM
33    emissions. Explosive use would also generate all criteria pollutants, VOCs, and $CO_2$, but most
34    explosives produce more CO than any other combustion-related pollutants, and large quantities
35    of PM are generated in the shattering of the rock and earth by explosives. Typically, the amount
36    of fugitive dust emissions (e.g., $PM_{10}$) would be larger during mine development, while the
37    amount of exhaust emissions (e.g., $NO_x$) would be larger during operations.
38
39       Air emissions of criteria pollutants, VOCs, and $CO_2$ from the mine development and
40    operations phase are estimated for the peak year and presented in Table 4.3-1 and compared with
41    emission totals for three counties combined (Mesa, Montrose, and San Miguel), which
42    encompass the DOE ULP lease tracts. Detailed information on emission factors, underlying
43    assumptions, and emission inventories is presented in Appendix C. As shown in the table, total
44    peak-year emission rates are estimated to be rather small, compared with emission totals for all
45    three counties. During mine development, the amount of non-PM emissions would be relatively

BLM_0041439

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*

1   small (up to 0.19%), and $PM_{10}$ and $PM_{2.5}$ emissions would amount to about 1.5% and 0.66%,
2   respectively, of the three-county combined emissions. $PM_{10}$ emissions would result equally from
3   site preparation (44%) and explosive use (43%), followed by wind erosion (13%), but exhaust
4   emissions contribute only a little to total $PM_{10}$ emissions. During mine operations, $NO_x$
5   emissions of 138 tons/yr would be highest, amounting to about 1.0% of three-county total
6   emissions. Most $NO_x$ emissions would be from diesel-fueled heavy equipment, such as heavy
7   trucks, bulldozers, scrapers, or power generators. Potential impacts could be minimized by
8   implementing good industry practices and fugitive dust mitigation measures such as watering
9   unpaved roads, disturbed surfaces, and temporary stockpiles (see Section 4.6). Therefore,
10  potential impacts on ambient air quality would be minor and temporary.
11
12      The three counties encompassing the DOE ULP lease tracts are currently in attainment
13  for ozone (EPA 2011b), and ozone levels in the area approached the standard (about 90%)
14  (see Table 3.1-3). Recently, wintertime ozone exceedances have frequently been reported at
15  higher elevations in northwestern Colorado, northeastern Utah, and southwestern Wyoming.
16  However, ozone precursor emissions from mine development or operations would be relatively
17  small, less than 1.0% and 0.02% of three-county combined $NO_x$ and VOC emissions,
18  respectively, and would be much lower than those for the regional airshed in which emitted
19  precursors are transported and transformed into $O_3$. In addition, the wintertime high-ozone areas
20  are located more than 100 mi (161 km) from the DOE ULP lease tracts and are not located
21  downwind of the prevailing westerlies in the region. Accordingly, the potential impacts of $O_3$
22  precursor emissions from the mine development and operations phase on regional ozone would
23  not be of concern.
24
25      As discussed in Section 3.1, there are several Class I areas around the DOE ULP lease
26  tracts where AQRVs, such as visibility and acid deposition, might be a concern. Primary
27  pollutants affecting AQRVs include $NO_x$, $SO_2$, and PM. $NO_x$ and $SO_2$ emissions from mine
28  development and operations in any peak year would be relatively small (up to 1.0% of three-
29  county combined emissions), while $PM_{10}$ emissions would be about 1.5% of three-county
30  combined emissions. Air emissions from mine development and operations could result in minor
31  impacts on AQRVs at nearby Class I areas, but the implementation of good industry practices
32  and fugitive dust mitigation measures could minimize these impacts.
33
34      Annual total $CO_2$ emissions from mine development and operations were estimated, as
35  shown in Table 4.3-1. $CO_2$ emissions during operations would be much higher than those during
36  mine development. During operations, annual total $CO_2$ emissions would be about 13,000 tons
37  (12,000 metric tons); these accounted for about 0.011% of Colorado GHG emissions in 2010 (at
38  129.3 million metric tons of $CO_2$ equivalent [$CO_2e$]) and accounted for 0.00022% of U.S. GHG
39  emissions in 2009 (at 6,633.2 million metric tons of $CO_2e$ [EPA 2011a; Strait et al. 2007]). Thus,
40  potential impacts from mine development and operations on global climate change would be
41  negligible.
42
43

BLM_0041440

*Preliminary Draft PEIS*      *PEIS Privileged Information*      *May 2012*
*PEIS Team Use Only*              *Do Not Distribute*

1
2    **4.3.1.3  Reclamation**
3
4        The type of impacts from reclamation under Alternative 3 are similar to those described
5    under Alternative 1 (Section 4.1.1). It is also assumed that reclamation activities under
6    Alternative 3 would occur on about 300 acres (120 ha) of surface area at the peak year of
     reclamation.
7
8        Peak-year emissions during the reclamation phase under Alternative 3 are presented in
9    Table 4.3-1. $PM_{10}$ emissions would be highest, accounting for about 0.84% of three-county
10   combined emissions. Among non-PM missions, $NO_x$ emissions from diesel combustion of heavy
11   equipment and trucks would be highest, up to 0.10% of three-county total emissions. Good
12   industry practices and mitigation measures could be implemented to ensure compliance with
13   environmental requirements. Thus, potential impacts on ambient air quality associated with
14
15
16   **TABLE 4.3-1  Peak-Year Air Emissions from Mine Development and Operational and**
17   **Reclamation Activities under Alternative 3[a]**

| Pollutant[b] | Three-County Total[c] | Annual Emissions (tons/yr) | | | | | |
|---|---|---|---|---|---|---|---|
| | | Mine Development | | Mine Operations | | Reclamation | |
| CO | 65,769 | 74.0 | (0.11%)[d] | 64.2 | (0.10%) | 7.0 | (0.01%) |
| $NO_x$ | 13,806 | 26.0 | (0.19%) | 138 | (1.0%) | 14.5 | (0.10%) |
| VOCs | 74,113 | 0.8 | (0.001%) | 13.4 | (0.02%) | 1.4 | (0.002%) |
| $PM_{2.5}$ | 5,524 | 36.4 | (0.66%) | 11.8 | (0.21%) | 26.2 | (0.47%) |
| $PM_{10}$ | 15,377 | 225 | (1.5%) | 22.5 | (0.15%) | 129 | (0.84%) |
| $SO_2$ | 4,246 | 3.1 | (0.07%) | 17.7 | (0.42%) | 1.9 | (0.04%) |
| $CO_2$ | 129.3[e] | 745 | (0.001%) | 13,000 | (0.011%) | 1,356 | (0.001%) |
| | 6,633.2[f] | | (0.00001%) | | (0.00022%) | | (0.00002%) |

[a]  Under Alternative 3, it is assumed that 8 mines (2 small, 4 medium, 1 large, and 1 very large) would be in operation, and a total surface (disturbed area of about 300 acres [120 ha]) would be reclaimed at any peak year.

[b]  Notation: CO = carbon monoxide; $CO_2$ = carbon dioxide; $NO_x$ = nitrogen oxides; $PM_{2.5}$ = particulate matter with a mean aerodynamic diameter of ≤2.5 μm; $PM_{10}$ = particulate matter with a mean aerodynamic diameter of ≤10 μm; $SO_2$ = sulfur dioxide; and VOCs = volatile organic compounds.

[c]  Total emissions in 2008 for all three counties encompassing the DOE ULP lease tracts (Mesa, Montrose, and San Miguel Counties), except for $CO_2$. See Table 3.1-2.

[d]  Numbers in parentheses are percentages of three-county total emissions except for $CO_2$, for which the numbers are percentages of Colorado total emissions and percentages of U.S. total emissions.

[e]  Annual emissions in 2010 for Colorado in million metric tons of $CO_2$ equivalent.

[f]  Annual emissions in 2009 for U.S. in million metric tons of $CO_2$ equivalent.

Source: CDPHE (2011); EPA (2011a); Strait et al. (2007).

18

BLM_0041441

1  reclamation activities under Alternative 3 are anticipated to be minor and temporary in nature.
2  These low-level emissions are not anticipated to cause any measureable impacts on regional
3  ozone or AQRVs, such as visibility or acid deposition, at nearby Class I areas. In addition, $CO_2$
4  emissions during the reclamation phase were about 0.001% of Colorado GHG emissions in 2010
5  and about 0.00002% of U.S. GHG emissions in 2009, respectively (EPA 2011a;
6  Strait et al. 2007). Thus, under Alternative 3, potential impacts from reclamation activities on
7  global climate change would be negligible.
8
9
10  **4.3.2  Acoustic Environment**
11
12      The noise levels generated by heavy construction equipment would vary significantly
13  depending on various factors, such as the type, model, size, and condition of equipment;
14  operation schedule; and condition of the area where work was being done. Not only are there
15  daily variations in activities, but major construction projects are accomplished in several
16  different phases. Each phase has a specific equipment mix, depending on the work to be
17  accomplished during that phase. Any potential impact analysis should be based on typical
18  activities in each phase.
19
20
21      **4.3.2.1  Exploration**
22
23      For the exploration phase, if existing roads did not provide site access, noise sources
24  would include a grader or bulldozer for construction of an access road. Other noise sources
25  would include vehicular traffic for commuting or delivery to and from the site and, where siting
26  could not avoid brush, chainsaws and chippers for brush clearing.
27
28      Most noise-generating activities would occur intermittently during the exploration phase.
29  It is anticipated that all of these activities would be conducted by using only a small crew and a
30  small fleet of heavy equipment and would occur during daytime hours, when noise is tolerated
31  than it is at night because of the masking effect of daytime background noise. Accordingly, it is
32  anticipated that potential noise impacts during the exploration phase on neighboring residences
33  or communities, if any, would be minimal and intermittent.
34
35
36      **4.3.2.2  Mine Development and Operations**
37
38      During this phase, heavy construction and mining equipment would be used.
39  Underground equipment would include loaders, haul or support trucks, and drills, while
40  aboveground equipment would include bulldozers, graders, loaders, haul or support trucks,
41  scrapers, and power generators. During surface-plant area improvements, most activities would
42  occur aboveground. However, most mine development and operational activities would occur
43  above the ground for surface open-pit mines and under the ground for underground mines.
44  Ventilation shafts would also contribute noise during mine development and the operation of
45  underground mines.
46

BLM_0041442

1    Primary sources of noise during this phase would include operation of machinery,
2  on-road and off-road vehicle traffic, and, if necessary, blasting. The average noise levels from
3  typical construction equipment range from 74 dBA for a roller to 101 dBA for a pile driver
4  (impact) at a distance of 50 ft (15 m) (Hanson et al. 2006). In general, the dominant noise source
5  from most construction equipment is a diesel engine without sufficient muffling that is
6  continuously operating around a fixed location or with limited movement. In a few cases, noise
7  generated by pile driving or rock drilling would dominate. Except for pile drivers and rock drills,
8  noise levels for typical construction equipment that would likely be used at the DOE ULP lease
9  tracts range from about 74 to 90 dBA at a distance of 50 ft (15 m) from the construction site.
10
11    To estimate noise levels associated with these activities, a composite noise level of
12  95 dBA at a distance of 50 ft (15 m) from the construction site is conservatively assumed, if
13  impact equipment such as pile drivers or rock drills is not being used. Typically, this level could
14  be reached when several pieces of noisy heavy equipment operated simultaneously in close
15  proximity to each other at peak load.
16
17    When only geometric spreading and ground effects are considered (Hanson et al. 2006),
18  noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from the lease
19  tracts, which is the Colorado daytime maximum permissible limit of 55 dBA in a residential
20  zone. If a 10-hour daytime work schedule is considered, the EPA guideline level of 55 dBA $L_{dn}$
21  for residential areas (EPA 1974) would occur about 1,200 ft (360 m) from the construction site.
22  In addition, other attenuation mechanisms, such as air absorption, screening effects (e.g., natural
23  barriers by terrain features), and skyward reflection due to temperature lapse conditions typical
24  of daytime hours, would reduce noise levels further. Thus, noise attenuation to Colorado or EPA
25  limits would occur at distances somewhat shorter than the aforementioned distances. In many
26  cases, these limits would not reach any nearby residences or communities. However, when
27  construction occurred near the lease tract boundary, noise levels at residences around Lease
28  Tract 13 would exceed the Colorado limit.
29
30    It is assumed that most operational activities would occur during the day, when noise is
31  better tolerated because of the masking effects of background noise during daytime. In addition,
32  mine development activities are temporary (typically lasting only a few months), and they would
33  have some unavoidable but localized short-term noise impacts on neighboring residences or
34  communities, particularly if activities occurred near the residences or communities adjacent to
35  the lease tract boundary.
36
37    During mine operations, heavy-duty trucks would transport uranium ores from ULP lease
38  tracts to either the proposed Piñon Ridge Mill or White Mesa Mill in Utah. These shipments
39  could produce noise along the haul routes. Under Alternative 3, about 1,000 tons per day of
40  uranium ores would be produced. Assuming 25 tons of uranium ore per truck and round-trip
41  travel, the traffic volume would be 80 truck trips per day (40 round trips per day) and 10 truck
42  trips per hour (for 8-hour operation). A peak pass-by noise level of 84 dBA from a heavy-duty
43  truck operating at 55 mi/h or mph (88 km/h) was estimated based on Menge et al. (1998). At a
44  distance of 120 ft (37 m) and 230 ft (70 m) from the route, noise levels would attenuate to 55 and
45  50 dBA, respectively, which are Colorado daytime and nighttime maximum permissible limits in

BLM_0041443

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1   a residential zone. Noise levels above the EPA guideline level of 55 dBA $L_{dn}$ for residential
2   areas would be reached up to the distance of 60 ft (18 m) from the route. Accordingly, Colorado
3   limits or EPA guideline levels would be exceeded within 230 ft (70 m) of the haul route, and any
4   residences within this distance might be affected.
5
6        Depending on local geological conditions, explosive blasting during mine development
7   and operations might be needed. Blasting would generate a stress wave in the surrounding rock,
8   causing ground and structures on the ground surface to vibrate. The blasting also would create a
9   compressional wave in the air (air blast overpressure), the audible portion of which would be
10  manifested as noise. Potential impacts of ground vibration include damage to structures, such as
11  broken windows. Potential impacts of blast noise include effects on humans and animals.
12  Estimates of the potential increases in ambient noise levels, ground vibration, and air blast
13  overpressure and evaluations of any environmental impacts associated with such increases would
14  be warranted at the site-specific project phase if potential significant impacts at the nearby
15  residences or structure are anticipated.
16
17       Blasting techniques are designed and controlled by blasting and vibration control
18  specialists to prevent damage to structures or equipment. These controls attenuate blasting noise
19  as well. Under Alternative 3, there are several residences within 0.5 mi (0.8 km) of the
20  boundaries of some of the lease tracts. The longer distances to off-site residences make
21  additional mitigation unnecessary. However, given the impulsive nature of blasting noise, it is
22  critical that blasting activities be avoided at night and on weekends and that affected
23  neighborhoods be notified in advance of scheduled blasts.
24
25       There are several specially designated areas (e.g., Dolores River Special Recreation
26  Management Area, Dolores River Canyon Wilderness Study Area) and other nearby wildlife
27  habitats around the DOE ULP lease tracts and haul routes where noise might be a concern.
28  Negative impacts on wildlife begin at 55–60 dBA, which correspond to the onset of adverse
29  physiological impacts (Barber et al. 2010). As discussed above, these levels would be limited up
30  to distances of 1,650 ft (500 m) from the mine sites and 120 ft (37 m) from the haul routes.
31  However, there is the potential for other effects to occur at lower noise levels
32  (Barber et al. 2011). To account for these impacts and the potential for impacts at lower noise
33  levels, impacts on terrestrial wildlife from construction noise and mitigation measures would
34  have to be considered on a project-specific basis; these studies would need to consider site-
35  specific background levels and the hearing sensitivity for site-specific terrestrial wildlife of
36  concern.
37
38       In summary, the potential for noise impacts from mine development on humans and
39  wildlife is anticipated near the mine sites and along the haul routes, but impacts would be minor
40  and limited to proximate areas unless the activities occurred near a lease tract boundary adjacent
41  to nearby residences or communities or areas specially designated to be of concern with regard to
42  wildlife, if any. Implementation of good industry practices and coherent noise management plans
43  could minimize these impacts.
44
45

BLM_0041444

### 4.3.2.3 Reclamation

It is assumed that reclamation activities under Alternative 3 would occur over about 300 acres (120 ha) at any peak year. As discussed in Section 4.1.2, noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from the reclamation site, which is the Colorado daytime maximum permissible limit of 55 dBA in a residential zone. If a 10-hour daytime work schedule is considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) would occur about 1,200 ft (360 m) from the construction site. Most residences are located beyond these distances, but if reclamation activities occurred near the boundary of Lease Tract 13, noise levels at the nearby residences could exceed the Colorado limit.

It is assumed that most reclamation activities would occur during the day, when noise is better tolerated than at night, because of the masking effects of background noise in the daytime. In addition, reclamation activities at ULP lease tracts are temporary in nature (typically a few weeks to months, depending on the area size to be reclaimed). Accordingly, reclamation within the DOE ULP lease tracts would cause some unavoidable but localized short-term and minor noise impacts on neighboring residences or communities. The same mitigation measures adopted during the construction phase could also be implemented during the reclamation phase.

## 4.3.3 Soil Resources

Potential impacts under Alternative 3 on soil resources during exploration, mine development and operations, and reclamation are evaluated and discussed in Sections 4.3.3.1 to 4.3.3.3 below.

### 4.3.3.1 Exploration

Exploration activities would involve little or no ground disturbance; therefore, this phase would result in only small or negligible impacts on soil resources. Some ground-disturbing activities, such as vegetation clearing, grading, trenching (and sampling), drilling, and building access roads and drill pads, would occur over small areas and could result in potential impacts on soil resources. Direct adverse impacts from these activities relate mainly to the increased potential for soil compaction, soil horizon mixing, soil erosion and deposition by wind, soil erosion by water and surface runoff, and sedimentation of nearby surface water bodies. The degree of impact would vary among the lease tracts, depending on the activities needed to explore each mine site and on site-specific factors, such as soil properties, slope, vegetation cover, weather conditions (e.g., precipitation rate and intensity, prevailing wind direction and speed), and distance to surface water bodies. However, because exploration activities would occur over relatively small areas and involve little or no ground disturbance, potential impacts associated with this phase are expected to be small. Implementing good industry practices and mitigation measures (Section 4.6) would further reduce the level of adverse impacts associated with these activities.

BLM_0041445

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                 *Do Not Distribute*

#### 4.3.3.2  Mine Development and Operations

Mine development activities could potentially result in significant impacts on soil resources because they would involve ground disturbances that would increase the potential for soil compaction, soil horizon mixing, soil erosion and deposition by wind, soil erosion by water and surface runoff, and sedimentation of nearby surface water bodies on both lease tracts and off-lease land. Ground-disturbing activities would be associated mainly with mine site improvements, such as the construction of buildings (offices and maintenance), utilities, parking areas, service areas (for vehicles and heavy equipment), storage areas (for fuel, chemicals, materials, solvents, oils, and degreasers), discharge/treatment ponds (for mine water discharge), and diversion channels and berms; the use of trucks, heavy earth-moving equipment, and mining equipment; and the construction of various stockpile and loading areas (for waste rock, ore, and topsoil). Off-lease land disturbances would occur on adjacent BLM land and would mainly involve obtaining or improving rights-of way (ROWs) for haul roads and utilities and would be subject to BLM's NEPA process. Potential fuel or chemical contamination could result from the use of trucks and mechanical equipment or fuel storage and handling and from the application of chemical stabilizers to control fugitive dust emissions.

Ground-disturbing activities during the operations period would be associated with the hauling and storing of ore and waste rock and maintenance of storage areas (for ore and waste rock). These activities would result in minor impacts on soil resources when compared to the level of impacts resulting from mine development.

Under Alternative 3, ground disturbance during the peak production year would occur on an estimated 300 acres (120 ha) across 12 lease tracts, mainly during mine development. Impacts associated with this phase are expected to be small to moderate. The degree of impact would vary among the lease tracts, depending on the activities needed to prepare and develop each mine site (because some sites are more developed than others) and depending on site-specific factors, such as soil properties, slope, vegetation, weather, and distance to surface water. Implementing good industry practices and mitigation measures (Section 4.6) would reduce the level of adverse impacts associated with these activities.

#### 4.3.3.3  Reclamation

The types of impacts related to reclamation under Alternative 3 would be similar to those described for Alternative 1 (Section 4.1.3.2); however, ground disturbance would occur over a larger area—an estimated 300 acres (120 ha) across 12 lease tracts—than that for Alternative 1.

### 4.3.4  Water Resources

Potential impacts on water resources are considered for the three phases of mining (exploration, mine development and operations, and reclamation) in Sections 4.3.4.1 through 4.3.4.3.

BLM_0041446

#### 4.3.4.1  Exploration

Exploration activities would involve some land disturbance activities, such as vegetation clearing, grading, drilling, and building of access roads and drill pads, but these activities would occur over relatively small areas. Impacts on water resources associated with runoff generation and erosion would be minor, considering the small spatial extent over which exploration activities would occur.

The drilling of exploration boreholes and wells has the potential to alter the geochemical properties of an aquifer and to provide a connection between disconnected aquifers. Drilling and trenching techniques could introduce drilling muds and oxygen into aquifers, which could alter water chemistry and result in changes in pH and solubility conditions relevant to many metal ions, including uranium (Curtis et al. 2006; National Research Council 2012). The exploratory boreholes or wells could also provide a conduit connection between aquifers that could allow the mixing of water of potentially poorer quality (e.g., higher total dissolved solids [TDS] concentrations) from one aquifer to another (National Research Council 2012). Impacts associated with the drilling of exploratory boreholes and wells can be minimized by using best management practices (BMPs) and standards set forth by the Colorado Division of Water Resources (CDWR 2005). In addition, a substantial number of historical exploration studies have been performed in the Uravan Mineral Belt region (Nash 2002), limiting the amount of exploratory boreholes and wells needed for future mining activities.

#### 4.3.4.2  Mine Development and Operations

Of the three phases evaluated, the mine development and operations phase has the greatest potential to affect water resources, primarily as a result of land disturbance activities, erosion, mine water runoff, the staging of ores and waste rock, alteration of shallow aquifers, use of chemicals, consumptive water use, and wastewater generation. These activities take place over different durations of times, and at different times during the mine development and operations phase, which occurs over a period of about 10 years. It is assumed that during the peak year, a total of 8 mines (2 small, 4 medium, 1 large, and 1 very large) would be in operation across the DOE ULP lease tracts. Assumptions used in the assessment of mine operations are presented in Section 2.2.3.1.

Land disturbance activities associated with mine development and operations include vegetation clearing, grading for surface structures, access road construction or improvements, drainage contouring, detention basin construction, and mine excavation. Assumed total land disturbance during the peak year would be 300 acres (120 ha). These activities would increase erosion and runoff by exposing unconsolidated materials and by compacting soils. Removal of the overburden for surface mines or mine excavation for underground mines would generate unconsolidated materials that would need to be stored at the mine site. The accumulation of unconsolidated material, along with vegetation clearing, would increase the potential for erosion, primarily by flash flooding events (Nash 2002; BLM 2008). Runoff from mine sites has the potential to increase sediment and pollutant loadings to nearby surface waters; pollutants result

BLM_0041447

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1   from sediment-associated compounds, chemical dust control compounds (e.g., magnesium
2   chloride), fuels and other chemicals used in mining, and mineral leachates (National Research
3   Council 2012). In the Uravan Mineral Belt region, runoff from historical mining areas has been
4   shown to have elevated concentrations of arsenic, molybdenum, and selenium, but the amount of
5   runoff was small, resulting in only localized contamination of water quality (Nash 2002).
6
7          Stormwater infrastructure consisting of berms, drainage swales, and detention basins
8   would need to accommodate the permitting requirements for stormwater discharge according to
9   state and federal regulations administered by the Colorado Department of Public Health and
10  Environment (CDPHE). In general, the mine site would be developed to divert upgradient
11  stormwater away from the mine and to collect stormwater generated on site and in detention
12  basins for settling and potential chemical treatment prior to release (DOE 1995; BLM 2008). In
13  addition, stormwater BMPs would be developed to minimize impacts related to stormwater
14  (EPA 2012). While stormwater regulations are typically adequate to accommodate large flooding
15  events, western Colorado has the potential for infrequent and localized flash flooding that could
16  overwhelm even properly designed stormwater infrastructure (Nash 2002).
17
18         Surface and underground mines have the potential to disrupt shallow aquifers by
19  exposing or creating an open cavity within aquifers, which could lower groundwater surface
20  elevations, alter groundwater flow paths, and degrade water quality. Groundwater typically
21  accumulates in underground mines via percolation of shallow groundwater; it could be used to
22  support mine operations, such as drilling and dust control (DOE 1995). The open cavity of a
23  surface or underground mine increases groundwater discharge, which could lower groundwater
24  surface elevations and alter groundwater flow paths. The dewatering effect created by the mine
25  cavity has the potential to disrupt nearby features dependent on groundwater, such as vegetation,
26  springs, and other groundwater users (National Research Council 2012). Estimates of 8 to
27  16 ac-ft/yr were reported for the Whirlwind Mine located on the Colorado–Utah border region of
28  the Uravan Mineral Belt (BLM 2008). In addition to reducing groundwater quantity, surface and
29  subsurface mines can degrade water quality by creating conduits between aquifers with varying
30  chemical characteristics, and they introduce oxygen to reduced environments; this affects the pH
31  and the solubility of metals (National Research Council 2012). Uranium is typically insoluble
32  under the reduced conditions found in aquifers, but it can be mobilized through oxidation to a
33  more soluble form (Curtis et al. 2006). Experiments focused on the leaching of metals from
34  uranium containing sandstones from the Uravan Mineral Belt region suggest that leachates have
35  a neutral pH (thus indicating potential acid mine drainage is not a primary concern); low metal
36  concentrations; and elevated concentrations of arsenic, molybdenum, and selenium (Nash 2002).
37
38         Chemicals used at mining sites are primarily fuels, solvents, oils, and degreasers used for
39  trucks and earth-moving machinery, which can contaminate surface water and groundwater by
40  accidental spills. Impacts associated with the accidental release of chemicals would be
41  minimized through permitting processes with appropriate state and federal agencies and through
42  BMPs.
43
44         Consumptive water use during mine development and operations is primarily for the
45  potable water supply for workers. For Alternative 3, it is assumed that a total of 2,900 gal/d

BLM_0041448

1   (1,100 L/d) would be used by all eight mines operating during the peak year. Since local surface
2   water and groundwater sources are scarce and often of poor quality, it is assumed that the water
3   supply would be trucked to the site from another region and that impacts on the local water
4   supplies would be negligible.
5
6        The wastewater generated during mine development and operations could be classified as
7   sanitary and industrial wastewater. Sanitary wastewater would be collected in portable fixtures,
8   treated off site or in underground septic systems, and released to a subsurface drain field.
9   Industrial wastewater would primarily consist of unused (i.e., not reused for drilling or dust
10  control) groundwater seepage water in the mine and stormwater that was collected on site. These
11  industrial wastewaters would be diverted or pumped into sedimentation basins as mentioned
12  previously for stormwater management. Impacts associated with sanitary and industrial
13  wastewater would be minimized through permitting with appropriate state and federal agencies.
14
15       The potential for impacts on surface water and groundwater in the vicinity of the DOE
16  ULP lease tracts during mine development and operations would result from erosion, runoff, and
17  groundwater-contamination-related causes, and the impacts associated with consumptive water
18  use, chemical spills, and wastewater could be minimized through permitting and BMP
19  implementation. Of the lease tracts considered in Alternative 3, the ones closest to the Dolores
20  River and San Miguel River have the greatest potential for affecting water quality because of
21  their proximity to perennial water bodies. The lease tracts located in the Slick Rock and Uravan
22  lease tract areas are the closest to the Dolores River and San Miguel River, respectively. As
23  discussed in Section 4.2.4, Lease Tract 13 encompasses a 3-mi (5-km) reach of the Dolores River
24  and is where erosion poses the greatest threat to water quality. Impacts associated with
25  groundwater contamination are fairly uniform across the lease tract areas. However, the Paradox
26  lease tract area poses possibly the greatest risk of contaminating locally perched aquifers because
27  of the poorer-quality saline groundwater found in the Paradox Valley (see Section 3.4.2
28  regarding saline groundwater issues in the Paradox Valley).
29
30
31       **4.3.4.3  Reclamation**
32
33       Under Alternative 3, impacts on water resources associated with reclamation activities
34  would be the same as those described for Alternative 1 (Section 4.1.4).
35
36
37  **4.3.5  Human Health**
38
39       The analysis of human health impacts focuses on the consequences from uranium mine
40  development and operations and the reclamation of the lease tracts. Since the drilling conducted
41  during exploration would disturb only small areas and the drill holes would be backfilled in a
42  short period of time (less than a few weeks), it is expected that human health impacts would be
43  minimal and limited to only a few workers.
44
45

BLM_0041449

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                   *Do Not Distribute*

### 4.3.5.1  Worker Exposures – Uranium Miners

As is the case with many other occupations, physical injuries or fatalities could result from uranium mining. According to the data published by U. S. Department of Labor, Bureau of Labor Statistics, in 2010, the fatal occupational injury rate for the mining industry was 19.8 per 100,000 full-time workers (BLS 2011a), and the nonfatal occupational injury and illness rate was 2.3 per 100 full-time workers (BLS 2011b). Assuming the injury and fatality rates for uranium mining are similar to those for other types of mining, during the year of peak operations, there could be 2 nonfatal injuries and illnesses among the 98 workers assumed for this alternative (see Section 2.2.3.1). However, no mining-related fatality is expected among the workers.

Past records and studies on the health of uranium mine workers show that in addition to the physical hazards that are associated with the mining activities, inhalation exposure to radon gas could also cause long-term health risks to uranium miners. Mining for uranium ores would accelerate the release of radon, which can cause lung cancers. In addition to inhalation of radon, uranium miners are also exposed to external radiation when they work close to the mineralized ores that contain the uranium isotopes and their decay products.

The Mine Safety and Health Administration (MSHA) requires that underground uranium mines be monitored for radon levels in air to ensure the safety of mine workers. In 30 CFR Part 57, specific requirements for radon monitoring are included:

> "Where uranium is mined—radon daughter concentrations representative of worker's breathing zone shall be determined at least every two weeks at random times in all active working areas such as stopes, drift headings, travelways, haulageways, shops, stations, lunch rooms, magazines, and any other place or location where persons work, travel, or congregate. However, if concentrations of radon daughters are found in excess of 0.3 WL in an active working area, radon daughter concentrations thereafter shall be determined weekly in that working area until such time as the weekly determinations in that area have been 0.3 WL or less for 5 consecutive weeks."

Mining regulations also require operators to keep records of worker exposures to the decay products of radon gas. Federal regulations governing underground mining also require that workers not be exposed routinely to levels exceeding 1 WL in active work areas.

> An exposure concentration of radon is usually expressed in terms of working level or WL, which is a measure of the release of alpha energy by the short-lived progenies of radon. The exposures are measured in working level months (WLMs). One WLM is equivalent to an exposure of 170 hours to a concentration of 1 WL. An individual worker's exposure must not exceed 4 WLM in any calendar year (30 CFR Part 57).

According to the United Nations Scientific Committee on the Effects of Atomic Radiation (UNSCEAR 2010), among workers involved in nuclear power production, those involved in uranium mining receive the highest collective doses; a significant part of that exposure is from radon inhalation. Over the period of 1985 to 1989, the average radiation

*4-69*

BLM_0041450

1    exposure for monitored uranium mine workers in the United States was 350 mrem/yr;
2    the average radiation exposure for measurably exposed workers was 433 mrem/yr
3    (UNSCEAR 2010). In general, underground miners receive a higher radiation exposure than
4    open-pit miners, because underground cavities accumulate higher radon concentrations than
5    aboveground, open space. According to UNSCEAR (1993), external exposure accounts for 28%
6    of the total dose for underground miners and for 60% for open-pit miners; the inhalation of radon
7    accounts for 69% and 34% of the total dose for underground miners and open-pit miners,
8    respectively; and the inhalation of uranium ore dust accounts for 3% and 6% of the total dose for
9    underground miners and open-pit miners, respectively. Based on the assumptions that the
10   average dose for underground miners is 433 mrem/yr, and based on the distributions of the total
11   dose among different pathways, an LCF risk of $4 \times 10^{-4}$/yr is calculated for an average miner
12   (see Table 4.3-2). This translates to a probability of about 1 in 2,500 of developing a latent fatal
13   cancer through 1 year of radiation exposure.
14
15        Although uranium miners could also incur chemical exposures due to the chemical
16   toxicity of uranium and vanadium, which are present in the uranium ores, the potential risks
17   associated with chemical exposures would be much lower than the risks resulting from exposures
18   to radioactive constituents in the ore materials. This is because the chemical exposures would be
19   caused mainly by inhalation of particulates, and the potential risk associated with this pathway
20   constitutes just a small fraction of the total risk that the miners would incur, as indicated by data
21   presented in Table 4.3-2. Therefore, potential chemical risks for the uranium miners were not
22   calculated.
23
24
25        **TABLE 4.3-2  Radiation Doses and LCF Risks Received**
26        **by Underground Uranium Miners under Alternative 3**

| Radiation Dose | Fraction of Total | Dose (mrem/yr) |
|---|---|---|
| External radiation | 0.28 | 121 |
| Inhalation of radon | 0.69 | 299 |
| Inhalation of particulates | 0.03 | 13 |
| Total | 1 | 433 |

| LCF Risk[a] | Fraction of Total | Risk (1/yr) |
|---|---|---|
| External radiation | 0.19 | 7E-05 |
| Inhalation of radon | 0.79 | 3E-04 |
| Inhalation of particulates | 0.02 | 8E-06 |
| Total | 1 | 4E-04 |

[a]  The LCF risks were calculated with a conversion factor of
$5 \times 10^{-4}$/WLM for the inhalation of radon exposure
(ICRP 2011), and a conversion factor of $6 \times 10^{-4}$/rem for the
external radiation and inhalation of particulates exposure
pathways.

27

BLM_0041451

### 4.3.5.2  Worker Exposure – Reclamation Workers

During the reclamation phase, the major sources of radiation exposure would be the aboveground waste-rock piles accumulated over the operational period. The potential radiation dose that could be incurred by reclamation workers would depend on the size of the waste-rock pile and its uranium content. Because future mining plans are currently not known, the potential radiation exposure of a reclamation worker was estimated on the basis of four varying sizes of waste-rock piles. Detailed discussions on the development of the four hypothetical waste-rock piles are provided in Section 4.1.5 for Alternative 1.

Radiation exposure of an individual worker resulting from performing reclamation activities is expected to be about the same as that analyzed in Section 4.1.5 for Alternative 1. Based on the RESRAD (Yu et al. 2001) analysis, the total radiation dose incurred by a reclamation worker would be about 4.7 mrem regardless of the size of the waste-rock pile. The total dose is estimated on the basis of the assumption that the worker would work 8 hours per day for 20 days on top of a waste-rock pile. The radiation exposure is dominated by the external radiation pathway, which contributes about 96% of the total dose, followed by the incidental soil ingestion pathway, which accounts for about 3% of the total dose. The remaining dose is contributed by exposures from inhalation of radioactive particulate and radon gas. The potential LCF risk associated with this radiation exposure is estimated to be $4 \times 10^{-6}$; i.e., the probability of developing a latent fatal cancer is 1 in 250,000.

In addition to the radiation that is emitted by the uranium isotopes and their decay products in the waste rocks, the chemical toxicity of the uranium and vanadium minerals in the waste rocks could also affect the health of a reclamation worker. The potential chemical risk that a reclamation worker would incur under Alternative 3 is expected to be about the same as that under Alternative 1. Based on the evaluation results for Alternative 1 (Section 4.1.5.1), the total hazard index associated with the chemical exposures would be about 0.043, with 0.041 contributed by vanadium exposure, and 0.002 contributed by uranium exposure. Because the hazard index would be well below the threshold value of 1, potential adverse health effects are not expected for the reclamation worker.

### 4.3.5.3  General Public Exposure – Residential Scenario

A member of the general public who lived near the uranium lease tracts could be exposed to radiation as a result of the release of radon gas and radioactive particulates that contain uranium isotopes and their decay products from mining-related activities. Because the exact locations and size of the mines that would be developed under Alternative 3 are not known at this time, the potential radiation exposure was estimated as a function of distance from the release point of radionuclides, which can be used to estimate the potential exposure of an individual living close to the uranium lease tracts once the location and size of the mine are known. The maximum doses were estimated for four sizes of uranium mines based on the assumptions described in Chapter 2 for Alternative 3.

BLM_0041452

*Preliminary Draft PEIS*                    *PEIS Privileged Information*                    *May 2012*
*PEIS Team Use Only*                              *Do Not Distribute*

1    **4.3.5.3.1  Exposure during Uranium Mine Development and Operations.**
2
3
4         **Exposure to an Individual Receptor.** During the operational phase of underground
5    mining, the major source of radon (Rn-222) emissions to the ambient air is through the exhaust
6    vents of the ventilation systems. Rn-222 emissions from these vents are highly variable and
7    depend on many interrelated factors, including the ventilation rate, ore grade, production rate,
8    age of the mine, size of active working areas, mining practices, and several other variables. In
9    addition to the exhaust vents, Rn-222 is emitted to air from several aboveground sources. These
10   sources are the ore, sub-ore, and waste rock storage piles, as well as the loading and dumping
11   of these materials. Pacific Northwest National Laboratory has estimated that the Rn-222
12   emissions from these aboveground sources are about 2–3% of the emissions from the vents
13   (Jackson et al. 1980.).
14
15        According to the EPA's NESHAP
16   background document (EPA 1989), the
17   aboveground sources also emit radionuclides to
18   air as particulates. The particulate emissions
19   result from ore dumping and loading
20   operations, wind erosion of storage piles, and
21   vehicular traffic. An assessment of the risks
22   from the particulate emissions showed that they
23   were much smaller (a factor of 100 times less)
24   than the risks from Rn-222 emissions. On the
25   basis of this information and the finding from
26   Pacific Northwest National Laboratory,
27   emissions of Rn-222 from the exhaust vents
28   would be the primary sources of radiation
29   exposures for the general public. They are,
30   therefore, the focus of the human health impact
31   analysis discussed in this section.
32
33        Table 4.3-3 presents the radon emission
34   rates assumed for human health impact analysis
35   during mine development and operations. The
36   uranium ore production rates of the four mine
37   sizes are discussed in Section 2. The emission
38   rates of Rn-222 were calculated with the
39   equation developed by EPA (EPA 1985) in a
40   study on the Rn-222 emissions from
41   underground uranium mines, in which the emission rates were found to be proportional to the
42   cumulative production of uranium ores. For the human health impact analysis, an operational
43   period of 10 years was assumed in order to develop the radon emission rates. Since some
44   uranium mines might not be developed immediately after this PEIS is finalized and issued
45   (i.e., 2013) and some might be completed in fewer than 10 years, the estimates of radon emission

> **Comparison of CAP88-PC and COMPLY-R**
>
> CAP88-PC was used for the calculations
> performed for this Draft PEIS to maintain
> consistency in the methodology for evaluating the
> potential radiation exposures to the general
> public, both individually and collectively. The
> COMPLY-R computer code evaluates only radon
> emissions and does not calculate collective
> population exposure. However, a calculation for
> potential individual exposure associated with the
> release of radon during the operation of a small
> underground mine was made by using both
> CAP88-PC and COMPLY-R in order to provide a
> comparison. The radon doses calculated by
> CAP88-PC were smaller than those calculated by
> COMPLY-R for shorter distances (from the
> source or, in this case, the potential mine site), but
> the difference was less with estimates for longer
> distances. This difference was partly due to
> different conversion factors used to convert radon
> levels to effective doses in the calculations. The
> conversion factor used in the CAP88-PC
> calculation is 388 mrem/WLM, while
> COMPLY-R uses a conversion factor of
> 920 mrem/WLM. Details of this comparison are
> discussed in Section D.5.6.

BLM_0041453

*Preliminary Draft PEIS*               *PEIS Privileged Information*               *May 2012*
*PEIS Team Use Only*                        *Do Not Distribute*

1  **TABLE 4.3-3  Radon Emission Rates during the Operational Phase of Mining Assumed for**
2  **Alternative 3**

| Types of Mine | Small[a] | Medium[a] | Large[a] | Very Large[b] | Total |
|---|---|---|---|---|---|
| Uranium ore production per mine (tons/d) | 50 | 100 | 200 | 300 | |
| Cumulative uranium ore production per mine (tons) | 1.20E+05 | 2.40E+05 | 4.80E+05 | 7.20E+05 | |
| Rn-222 emission rate per mine (Ci/yr)[c] | 5.28E+02 | 1.06E+03 | 2.11E+03 | 6.00E+02 | |
| Alternative 3 in peak year of operations | | | | | |
| No. of active mines | 2 | 4 | 1 | 1 | 8 |
| Total Rn-222 emission rate (Ci/yr) | 1.06E+03 | 4.22E+03 | 2.11E+03 | 6.00E+02 | 7.99E+03 |

[a]   Underground mine.

[b]   Open-pit mine.

[c]   The emission rates of radon from underground mines were estimated with the correlation developed by EPA in 1985: Rn-222 emission (Ci/yr) = 0.0044 × cumulative uranium ore production (tons) (EPA 1985). A cumulative period of 10-year was assumed for this calculation. The emission rate from the very large open-pit mine was determined based on the data compiled by the EPA for open-pit uranium mines (EPA 1989).

5  rates based on a 10-year operational period could be higher than the actual emission rates (and
6  the radiation doses) from the underground mine that would be developed. The Rn-222 emission
7  rate for a very large mine (i.e., the existing open-pit mine in Lease Tract 7) is estimated on the
8  basis of the data compiled by the EPA in 1989 (Table 12-7 in EPA 1989) for surface mines. The
9  estimated value is also expected to be greater than the actual emission rate and would similarly
10  provide more conservative dose results.

12      CAP88-PC (Trinity Engineering Associates, Inc. 2007) was employed to obtain the radon
13  levels for the estimates of maximum radiation doses and corresponding LCF risks associated
14  with the emissions of radon from four hypothetical uranium mines. Table 4.3-4 lists the
15  estimated results. The radiation exposures would decrease with increasing distance because of
16  greater dilution in the radon concentrations, which are expressed in terms of WCL and are also
17  listed in Table 4.3-4. The maximum exposure at a fixed distance from the center of each mine,
18  which was assumed to be the emission point for an underground mine, would always occur in the
19  sector that coincides with the most dominant wind direction. In any other sector, the potential
20  exposure would be less than the maximum values. Based on the assumptions discussed in
21  Section 3, the very large open-pit mine would disturb an area of 200 acres (81 ha). On the basis
22  of the assumption that the mining area is 50% of the disturbed area, the area source assumed for
23  the CAP88-PC calculations would be 100 acres (40 ha) and have dimensions of more than
24  1,640 ft (500 m). Therefore, the maximum dose associated with a distance of 1,640 ft (500 m)
25  was not calculated, because no individual would live at this location.

BLM_0041454

*Preliminary Draft PEIS*       *PEIS Privileged Information*       *May 2012*
*PEIS Team Use Only*              *Do Not Distribute*

1   **TABLE 4.3-4  Potential Maxium Radon Levels, Radiation Doses, Radon Concentrations, and**
2   **LCF Risks to a Resident Associated with the Emission of Radon from Four Uranium Mine Sizes**
3   **under Alternative 3**

| | Radiation Dose (mrem/yr) and Radon Level (WL) per Mine Size[a] | | | | LCF Risk (1/yr) per Mine Size | | | |
|---|---|---|---|---|---|---|---|---|
| Distance (m) | Small | Medium | Large | Very Large | Small | Medium | Large | Very Large |
| 500 | 7.83 (0.00065) | 15.66 (0.0013) | 31.32 (0.0026) | —[b] | 1E-05 | 2E-05 | 4E-05 | —[b] |
| 1000 | 5.63 (0.00047) | 11.26 (0.00094) | 22.52 (0.0019) | 9.05 (0.00076) | 7E-06 | 1E-05 | 3E-05 | 1E-05 |
| 1500 | 3.72 (0.00031) | 7.44 (0.00062) | 14.88 (0.0012) | 5.53 (0.00046) | 5E-06 | 1E-05 | 2E-05 | 7E-06 |
| 2000 | 2.67 (0.00022) | 5.34 (0.00044) | 10.68 (0.00089) | 3.72 (0.00031) | 3E-06 | 7E-06 | 1E-05 | 5E-06 |
| 2500 | 2.04 (0.00017) | 4.08 (0.00034) | 8.16 (0.00068) | 2.7 (0.00023) | 3E-06 | 5E-06 | 1E-05 | 3E-06 |
| 3000 | 1.63 (0.00014) | 3.26 (0.00027) | 6.52 (0.00054) | 2.09 (0.00017) | 2E-06 | 4E-06 | 8E-06 | 3E-06 |
| 4000 | 1.22 (0.00010) | 2.44 (0.00020) | 4.88 (0.00040) | 1.53 (0.00013) | 2E-06 | 3E-06 | 6E-06 | 2E-06 |
| 5000 | 0.97 (0.00008) | 1.94 (0.00016) | 3.88 (0.00032) | 1.2 (0.00010) | 1E-06 | 3E-06 | 5E-06 | 2E-06 |

[a]   Radiation dose is on top line, and radon concentration (as working level) is in parentheses below.

[b]   The very large mine, an open-pit mine, was assumed to occupy an area of 100 acres, which is 50% of the assumed disturbed area. A distance of 500 m from the center of the mine would be within the mining area; therefore, the maximum dose associated with this distance was not calculated.

4
5
6        The maximum dose estimates are listed in Table 4.3-4. Based on this table, if the resident
7   lived a distance of 3,300 ft (1,000 m) from the emission point of a small underground mine, then
8   the maximum radiation dose that could be incurred would be about 5.6 mrem/yr, which is 56%
9   of the NESHAP dose limit (40 CFR Part 61) for airborne emissions of radionuclides. If the
10  distance was increased to 6,600 ft (2,000 m), then the maximum exposure would be less than
11  3 mrem/yr. It should be noted that the maximum doses listed in Table 4.3-4 are for a resident
12  living in the most dominant wind direction and were obtained by using the radon emission rates
13  corresponding to an operational period of 10 years. The radiation doses at nondominant wind
14  locations would be less. Likewise, the emission rates for uranium mines developed and operated
15  for fewer than 10 years would be less. If there were one or more uranium mines close to a given
16  residence and they were being operated at the same time, the potential dose that the resident
17  could receive would be the sum of the doses contributed by each mine.
18
19       Based on the maximum doses presented in Table 4.3-4, it is possible that a resident could
20  receive a radon dose of more than 10 mrem/yr, if this resident lived less than 1.6 mi (2.5 km)

BLM_0041455

*Preliminary Draft PEIS*         *PEIS Privileged Information*         *May 2012*
*PEIS Team Use Only*             *Do Not Distribute*

1    from a uranium mine and the residence happened to be located in the dominant wind direction
2    from the emission point. However, the estimates in Table 4.3-4 were obtained by using
3    conservative assumptions; the actual radon dose could be much smaller based on actual radon
4    emission data, since monitoring would be implemented to ensure radiation levels were consistent
5    with requirements.
6
7        The maximum LCF risk for a resident living close to a small underground uranium mine
8    was estimated to range from $1 \times 10^{-6}$/yr at a distance of 3.1 mi (5,000 m) to $1 \times 10^{-5}$/yr at a
9    distance of 0.3 mi (500 m). That is, the probability of developing a latent fatal cancer ranges
10    from 1 in 1,000,000 at a distance of 3.1 mi (5,000 m) to 1 in 100,000 at a distance of 0.3 mi
11    (500 m) from each year of exposure. The probability would increase by a factor of 2 or 4 if the
12    resident lived close to a medium-sized or a large underground mine, respectively.
13
14
15        **Exposure to a Collective Population.** In addition to the residents who lived near the
16    DOE ULP lease tracts, members of the general public who lived further away from the lease
17    tracts could also be exposed to radiation associated with the radon emissions from mining
18    activities, although their exposures would be much lower than those of the nearby residents. The
19    collective exposures of the general public who live within 50 mi (80 km) around the active
20    uranium mines were also estimated with CAP88-PC (Trinity Engineering Associates, Inc. 2007).
21
22        Collective exposures of the general public were estimated for the peak year of operations
23    by using the assumptions described in Chapter 2. To estimate the range of collective exposure,
24    radon emissions from all the underground mines were combined and assumed to be released
25    from a single exhaust vent. This single vent was selected to be at the center of each lease tract
26    group. The lease tracts were divided into four groups for analysis (see the methodology
27    discussed in Section D.5.1).
28
29        In addition to the emissions from underground mining, the collective exposure to the
30    emissions from surface mining was also calculated. Because the only open-pit mine considered
31    in this PEIS is located in Lease Tract 7, when calculating the collective exposure, it was assumed
32    that the emission came from the center of lease tract group 3. The sum of the collective doses
33    from underground mining and open-pit mining were used to approximate the total collective
34    dose during the year of peak operations.
35
36        The collective exposures were estimated by using the population distribution data
37    developed around the center of each lease tract group. The distribution data account for the
38    population living 3.1 to 50 mi (5 to 80 km) from the center. The distribution within the first
39    3.1 mi (5 km) was not utilized for two reasons: (1) the population within 3.1 mi (5 km) could not
40    be determined and distributed as accurately as the population beyond 3.1 mi (5 km), and (2) the
41    population within 3.1 mi (5 km) of the uranium lease tracts is very small. This approach is
42    expected to provide a reasonable estimate of collective exposures.
43
44        Table 4.3-5 presents the collective doses estimated for the peak year of operations under
45    Alternative 3. According to the estimates, the collective dose associated with underground

BLM_0041456

**TABLE 4.3-5  Collective Doses to and LCF Risks to the General Public from Radon Emissions from Uranium Mines under Alternative 3**

| Type of Mining and Location | Collective Dose (person-rem/yr) | Collective LCF (1/yr)[a] |
|---|---|---|
| From underground mines[b] | | |
| Based on the center of group 1[c] | 3.84E+01 | 5E-02 |
| Based on the center of group 2[d] | 2.06E+01 | 3E-02 |
| Based on the center of group 3[e] | 1.04E+01 | 1E-02 |
| Based on the center of group 4[f] | 6.58E+00 | 8E-03 |
| From open-pit mines[g] | | |
| Based on the center of group 3[e] | 8.80E-01 | 1E-03 |
| Total | | |
| Minimum | 7.46E+00 | 1E-02 |
| Maximum | 3.93E+01 | 5E-02 |

[a]  Denotes the number of latent lung cancers that could result from radiation exposure.

[b]  The total radon emission rate from underground mining during the peak year of operations is 7,390 Ci/yr.

[c]  If the emission is from the center of lease tract group 1, the total population between 5 and 80 km is 178,473.

[d]  If the emission is from the center of lease tract group 2, the total population between 5 and 80 km is 86,657.

[e]  If the emission is from the center of lease tract group 3, the total population between 5 and 80 km is 27,062.

[f]  If the emission is from the center of lease tract group 4, the total population between 5 and 80 km is 33,166.

[g]  The total radon emission rate from open-pit mines during the peak year of operations is 600 Ci/yr.

mining ranges from 6.6 to 38 person-rem. The collective dose associated with the one very large open-pit mine is about 0.88 person-rem. Combined, the underground and open-pit mines would result in a total collective dose ranging from 7.5 to 39 person-rem during the year of peak operations. This collective exposure would result in a collective LCF of 0.01 to 0.052. Therefore, no latent cancer fatality would result from the collective exposure to the radon emitted from the 8 uranium mines that would be operated simultaneously during the peak year of operations under Alternative 3. The total populations involved in these estimates range from 27,062 to 178,473, depending on the location assumed for the emission point. If the collective dose is evenly distributed among the population, the corresponding average individual dose would be less than 0.4 mrem during the peak year of operations. In reality, because the active lease tracts (the lease tracts with mining operations) could be spread out among the four lease tract groups rather than

BLM_0041457

1    concentrating in one single group as was assumed for the calculations, the population size within
2    3 to 50 mi (5 to 80 km) of the lease tracts should be greater than the 178,473 used in the
3    calculations. Therefore, the actual average individual dose should be just a fraction of the
4    calculated average value.
5
6
7        **4.3.5.3.2  Accidental Release of Uranium during Operations.** Accidents involving the
8    low-grade uranium ore at a lease tract mine are not expected to result in any significant release of
9    radioactive material that would pose a health risk to the public greater than the risks assessed for
10   routine operations.  Mine operations already involve the movement of large volumes of ore that
11   are open to the environment during the actual mining of the ore (for the open-pit mine),
12   stockpiling, and loading of the haul trucks. In addition, the stony, aggregate nature of the ore
13   precludes any widespread dispersion by air or water. Some dust and fines are present, but their
14   suspension in air is minimized because they are sprayed with water or a similar suppression
15   agent to limit worker exposures and off-site dispersion. Any work at the mines would be isolated
16   from surface water.  Thus, no mining accident would be expected to expose the public or
17   ecological systems to greater amounts of the ore than the amount that occurs during operations,
18   as discussed in this section and Section 4.3.6.
19
20
21       **4.3.5.3.3  Exposure during and after Reclamation.** Residents who live close to a
22   uranium mine during or after the reclamation phase could be exposed to radiation as a result of
23   emissions of radioactive particulates and radon gas from the waste-rock piles left aboveground.
24   The potential radiation dose would depend on the direction and distance between the residence
25   and the waste-rock piles and the emission rates of particulates and radon. The potential range of
26   the radiation dose that a resident would incur under Alternative 3 is expected to be similar to the
27   range of the radiation dose incurred under Alternatives 1 and 2, because the exposures would be
28   dominated by the emissions from the waste-rock pile(s) that is (are) closest to this resident.
29
30       Based on the estimates presented in Section 4.1.5.5, if a resident lived at a distance of
31   1,640 ft (500 m) from a waste-rock pile, the radiation dose he could receive would be less than
32   2 mrem/yr; if the distance was increased to 4,900 ft (1,500 m), the exposure would be less than
33   0.5 mrem/yr. If there were two waste-rock piles nearby, the potential dose this resident could
34   incur would be the sum of the doses contributed by each waste-rock pile. Based on the listed
35   maximum doses in Table 4.1-7, the potential dose incurred by any resident living close to the
36   uranium lease tracts (at a distance of more than 1,640 ft or 500 m) is expected to be much
37   smaller than the NESHAP dose limit of 10 mrem/yr for airborne emissions (40 CFR Part 61).
38   The potential LCF risk would be less than $1 \times 10^{-6}$/yr, which means the probability of
39   developing a latent fatal cancer from living close to the uranium lease tracts for 1 year during or
40   after the reclamation would be 1 in 1,000,000. If a resident lived in the same location for
41   30 years, then the cumulative LCF risk would be less than $3 \times 10^{-5}$. EPA's acceptable risk range
42   is $1 \times 10^{-6}$ to $1 \times 10^{-4}$.
43
44       In reality, it is expected that waste-rock piles would be covered by a layer of soil
45   materials during reclamation to facilitate vegetation growth. Because of this cover, emissions of
46   radioactive particulates would be greatly reduced, if not eliminated completely. Emissions of

BLM_0041458

*Preliminary Draft PEIS*         *PEIS Privileged Information*              *May 2012*
*PEIS Team Use Only*                 *Do Not Distribute*

1  radon from waste-rock piles could continue, although the emission rates would be reduced. In
2  fact, because uranium isotopes and their decay products have long decay half-lives, the potential
3  of radon emissions from waste-rock piles could persist for a very long period of time after the
4  reclamation was completed.
5
6        In addition to radiation exposure, the residents living close to the uranium lease tracts
7  could incur chemical exposures due to the chemical toxicity of uranium and vanadium minerals
8  contained in the waste rocks. Potential chemical exposures would be associated with emissions
9  of particulates and with the inhalation and incidental dust ingestion pathways. The same
10 exposure parameters as those used for radiation dose modeling were used to evaluate potential
11 chemical risks to nearby residents. According to the evaluation results, the total hazard index
12 would be less than 0.02 at a distance of 1,640 ft (500 m) from an extra-large waste-rock pile,
13 with inhalation being the dominant pathway. Because the hazard index is much smaller than 1,
14 potential adverse health effects are not expected to occur to the residents.
15
16
17 **4.3.5.4  General Public Exposures – Recreationist Scenario**
18
19       In addition to the residents who live near the uranium lease tracts and could therefore be
20 exposed to the emissions from the reclaimed waste-rock piles, a recreationist who unknowingly
21 came close to this reclaimed waste-rock pile could also potentially be exposed to radiation. To
22 model the potential radiation exposure, it is assumed the recreationist would camp on top of a
23 waste-rock pile for 2 weeks during each trip. This recreationist could receive radiation exposure
24 through the external radiation and inhalation of radon pathways. Inhalation of radioactive
25 particulates and incidental soil ingestion are excluded because the waste-rock pile is assumed to
26 be covered by 1 ft (0.3 m) of soil materials after the reclamation.
27
28       The potential dose that could be incurred by a recreationist under Alternative 3 would be
29 similar to that under Alternatives 1 and 2. According to the RESRAD (Yu et al. 2001)
30 calculation results, the radiation dose incurred by the recreationist during a 2-week trip would be
31 about 0.28 mrem. About 91% of the radiation dose would be from the external radiation pathway
32 and 9% is from the inhalation of radon pathway (with a radon level of $2.2 \times 10^{-5}$ WL). The
33 corresponding LCF risk that this recreationist would be subject to from each camping trip is
34 about $3 \times 10^{-7}$, with 60% from the external radiation pathway and 40% from the radon
35 inhalation pathway. Therefore, the probability of developing a latent fatal cancer would be about
36 3 in 10,000,000 for each camping trip.
37
38       It should be noted that the above results were obtained based on the assumption that there
39 would be 1 ft (0.3 m) of cover soils on top of the waste rocks. If the thickness of the cover soils
40 was less or if cover soils eroded away, the radiation dose incurred by the recreationist would
41 increase. Without any cover material, the potential radiation dose was estimated to be about
42 9.5 mrem, with a corresponding cancer risk of $8 \times 10^{-6}$. More than 94% of the exposures would
43 result from the external radiation pathway. Potential chemical exposures incurred by the
44 recreationist would be minimal, because the soil materials covering the waste-rock pile would
45 greatly reduce the likelihood of exposures through the inhalation of particulates pathway and

BLM_0041459

1　incidental soil ingestion pathway. Potential exposure to an individual receptor for post-
2　reclamation conditions at the mine sites is discussed in Section 4.1.5.4.
3
4
5　**4.3.6 Ecological Resources**
6
7
8　　**4.3.6.1 Vegetation**
9
10　　　Previous disturbance from exploration or mine development occurred in each of these
11　lease tracts; however, new exploration could occur in either disturbed or undisturbed areas of
12　these lease tracts. Exploration activities generally include drilling one or more bore holes for
13　geologic sampling followed by reclamation of the explored area. Impacts from exploration
14　would result from the disturbance of vegetation and soils as a result of equipment operation. In
15　some areas, the removal of trees or shrubs might be necessary to provide access to sampling
16　locations. Impacts would include compaction of plants and soils and burial of vegetation under
17　waste material. Erosion and sedimentation could occur where soil compaction or loss of
18　biological soil crusts increased surface runoff, loosened soils were not stabilized, or vegetation
19　was removed. Impacts on ephemeral drainages crossed by heavy equipment could result in
20　sediment deposition in downstream areas. Exploration activities are expected to affect relatively
21　small areas at each sampling location, and impacts on vegetation would generally be short-term.
22　The localized destruction of biological soil crusts, where present, would be considered a longer-
23　term impact, particularly where soil erosion had occurred.
24
25　　　Under Alternative 3, it is assumed mine development and operations would occur in the
26　12 lease tracts and ground disturbance would range from 10 acres (4.0 ha) for small mines to
27　20 acres (8.1 ha) for a large mine, with the total being 100 acres (40 ha). In addition, the
28　200-acre (81-ha) open-pit mine at JD-7 would resume operations, resulting in a total of 300 acres
29　(120 ha) of disturbance under Alternative 3. Direct impacts associated with the development of
30　mines would include the destruction of habitats during site clearing and excavation as well as the
31　loss of habitats at the locations of the waste rock disposal area (about one-third of the total area
32　disturbed), soil storage areas, project facilities, and access roads. Stored waste rock could contain
33　up to 0.05% uranium. Based on the assumed concentration of uranium that might be present in
34　the waste rock (23.7 pCi/g), the potential radiation exposure to plants would be below levels of
35　concern. Storage areas for woody vegetation removed from project areas during land clearing
36　would affect additional areas. The lease tracts included in Alternative 3 could support a variety
37　of vegetation types; however, the predominant types would be pinyon-juniper woodland and
38　shrubland and big sagebrush shrubland. Some of the areas affected might include high-quality,
39　mature habitats, which would result in greater impact levels than in previously degraded areas.
40　Direct impacts would primarily affect upland plant communities; however, wetlands present on
41　project sites could also be affected. Federal agencies are required by Executive Order
42　(E.O.) 11990, "Protection of Wetlands," to minimize the destruction, loss, or degradation of
43　wetlands and to preserve and enhance the natural and beneficial values of wetlands. Impacts on
44　jurisdictional wetlands (those under the regulatory jurisdiction of the CWA, Section 404, and the
45　U.S. Army Corps of Engineers [USACE]) would require permitting. Wetlands occur on each of

BLM_0041460

1   the lease tracts included in Alternative 3, as well as in immediate downstream areas. Although
2   streams located within lease tracts, such as the Dolores River (Lease Tracts 13 and 13A) or
3   Atkinson Creek (Lease Tract 18), would not likely be directly affected; indirect impacts could
4   occur. Indirect impacts of mining would be associated with fugitive dust, invasive species,
5   erosion, sedimentation, and impacts due to changes in surface water or groundwater hydrology
6   or water quality.
7
8   Fugitive dust would be generated during site clearing, excavation, processing, and use of
9   access roads. Deposition of fugitive dust could reduce photosynthesis and productivity in plant
10  communities near project areas. Prolonged exposure to fugitive dust could alter a plant
11  community's composition, reducing the occurrence of species less tolerant of disturbance,
12  resulting in habitat degradation. Open-pit mines would generate greater levels of fugitive dust
13  than would underground mines, since most of the project area would consist of exposed soils,
14  rock materials, and operating mining equipment. Because fugitive dust would be produced
15  throughout the life of the project, the deposition of fugitive dust would constitute a long-term
16  impact.
17
18  Disturbed soils could provide an opportunity for the introduction and spread of invasive
19  species or noxious weeds. Seeds of these species could be inadvertently brought to a project site
20  from infested areas by vehicles or equipment used at the site. Invasive species or noxious weeds
21  might also colonize disturbed soils from established populations in nearby areas. Vehicle traffic
22  to and from mine sites might contribute to the spread of seeds of these species, expanding
23  populations along roadways. Invasive species or noxious weeds might alter fire regimes,
24  including increasing the frequency and intensity of wildfires, particularly as a result of the
25  establishment of annual grasses such as cheatgrass. Habitats that are not adapted to frequent or
26  intense fires could experience long-term reductions.
27
28  Soils disturbed by land clearing or excavation might be subject to erosion. Soil erosion
29  might also occur in areas where biological soil crusts have been disturbed by equipment or foot
30  traffic (Belnap and Herrick 2006). The destruction of biological soil crusts could also alter
31  nutrient cycling and availability, reduce water infiltration, reduce germination of native species,
32  and increase the occurrence of non-native species, affecting plant community characteristics
33  (Fleischner 1994; Belnap et al. 2001; Gelbard and Belnap 2003; Rosentreter et al. 2007). Soil
34  compaction from the operation of heavy equipment could reduce the infiltration of precipitation
35  or snowmelt and result in increased runoff and subsequent erosion. Erosion could result in the
36  localized loss of plant communities in areas where topsoil was lost and might include areas
37  outside the mine site. Erosion might result in sedimentation in downgradient upland or wetland
38  habitats and increased sediment deposition in ephemeral drainages or riparian habitats of
39  receiving streams. Effects might include mortality or reduced growth of plants, changes in
40  species composition, or reduced biodiversity. Species more tolerant of disturbance, including
41  invasive species, might become dominant in affected plant communities.
42
43  Changes in surface drainage patterns, such as the elimination of ephemeral drainages or
44  other changes in runoff patterns, could alter hydrologic characteristics of downstream wetland or
45  riparian habitats and could result in changes in plant community composition or distribution.

BLM_0041461

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1   Increases in the volumes or velocities of flows could result in the erosion of substrates or
2   vegetation in downstream habitats, while decreased flows could result in dessication of habitats.
3   Underground mines would be less likely to result in large changes to surface water flow patterns
4   and associated impacts on plant communities than would open-pit mines, which cause extensive
5   modifications to landscape surfaces. Waste rock storage for underground mines, however, could
6   disrupt surface drainage patterns over a large area. Leachate from waste rock storage areas could
7   result in impacts on the quality of surface water or groundwater and affect downgradient
8   habitats. Groundwater pumped from mines could affect habitats receiving surface water flows as
9   a result of reduced water quality or increased flow velocities or volumes.
10
11      Mining operations could affect groundwater flows if excavations intercepted groundwater
12   resources. Reductions in groundwater flows could affect downgradient habitats that depend on
13   groundwater discharges, such as springs, seeps, or within streams with flows supplemented or
14   maintained by groundwater. Plant communities could be degraded as a result of reductions in
15   water availability.
16
17      Reclamation activities under Alternative 3 would be similar to those described for
18   Alternative 1. Upland areas affected by grading would generally consist of previously disturbed
19   areas. Most of the reclamation would be associated with covering the waste-rock pile. Indirect
20   impacts associated with reclamation activities could include the deposition of fugitive dust,
21   erosion, sedimentation, and the introduction of non-native species, including noxious weeds.
22
23
24   **4.3.6.2  Wildlife**
25
26      Potential impacts on wildlife from exploration would primarily result from disturbance
27   (e.g., due to equipment and vehicle noise and the presence of workers). Impacts would generally
28   be temporary and at a smaller scale than those that occur during other phases (i.e., mine
29   development and operations and reclamation). Some mortality to less mobile wildlife could
30   occur at the exploration sites, and vehicles could hit wildlife.
31
32      The following discussion provides an overview of the potential impacts on wildlife that
33   could result from the development and operation of mines. On-site activities could include the
34   (1) placement, construction, and operation of surface components and (2) mine development and
35   operations. Off-site activities could include the construction and use of access roads and utilities,
36   as necessary. The overall impact of mine development and operational activities on wildlife
37   populations at a lease tract site would depend on the types and amounts of wildlife habitat that
38   were affected by a given stressor, the length of time that the effects persisted, and the types of
39   wildlife that occupied the project site and surrounding areas. Impacts on wildlife could occur
40   from (1) habitat disturbance, (2) wildlife disturbance, and (3) wildlife injury or mortality.
41
42
43   **4.3.6.2.1  Habitat Disturbance.** Mine development and operations would affect wildlife
44   through habitat reduction, alteration, and fragmentation. Habitats within the construction
45   footprint of the projects, utility ROWs, access roads, and other infrastructure would be destroyed

BLM_0041462

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1    or disturbed. Direct impacts resulting from mine development could include destruction of
2    habitats from site clearing and excavation, storage of waste rock and topsoil materials, placement
3    of project facilities, development of access roads, and, as necessary, clearing for utility lines. The
4    300 acres (120 ha) disturbed for the eight mine sites is 3.4% of the total acreage of the 12 lease
5    tracts considered under Alternative 3 and 1.2% of the total acreage of DOE's lease program. The
6    remainder of the lease tract areas (excluding areas where access roads and utility corridors could
7    be required) would be undisturbed by mining activities under Alternative 3.
8
9        Habitat reduction could result in a long-term decrease in wildlife abundance and richness
10   within a project area. Species affected by habitat reduction might be able to shift their habitat use
11   for a short period. However, the habitat into which displaced individuals moved might not be
12   able to sustain an increased level of use over the long term. Many of the individuals that would
13   make use of areas adjacent to a development could be subjected to increased physiological stress
14   as a result of complications from overcrowding (e.g., increased competition for space and food,
15   increased vulnerability to predators, and increased potential for the propagation of diseases and
16   parasites) (Edge Environmental, Inc. 2009). Assuming that areas used by wildlife before
17   development were their preferred habitat, an observed shift in distribution because of
18   development would be toward less preferred and presumably less suitable habitats
19   (Sawyer et al. 2006).
20
21       Overcrowding of species such as mule deer (*Odocoileus hemionus*) in winter ranges
22   could cause density-dependent effects, such as increased fawn mortality (Sawyer et al. 2006). All
23   of the Alternative 3 lease tracts and all but Lease Tract 11 are within the winter range for mule
24   deer and elk (*Cervis canadensis*), respectively. Hobbs (1989) determined that the mortality of
25   mule deer does during a severe winter period could double if they were disturbed twice a day and
26   forced to move a minimum of 1,500 ft (460 m) per disturbance. Most mine development would
27   probably occur during warmer seasons, which would minimize disturbance to big game during
28   winter. Mine development would likely not occur during severe winter conditions when impacts
29   on big game would be of most concern (WEST, Inc. 2007). Among the Alternative 3 lease tracts,
30   Lease Tracts 7, 13, 13A, 15, 18, 21, and 25 contain severe winter range for mule deer; while all
31   of the lease tracts except Lease Tract 11 contain severe winter range for elk.
32
33       Although habitats adjacent to a mine site might remain unaffected, wildlife might tend to
34   make less use of these areas (primarily because of the disturbance that would occur within the
35   project site). This impact is an indirect habitat loss and could be of greater consequence than
36   direct habitat loss (Sawyer et al. 2006). A utility line might also lead to a loss of usable feeding
37   areas for those species that avoid the close proximity of these facilities due to their use by
38   predators (BirdLife International 2003). For example, common ravens (*Corvus corax*) and some
39   birds of prey might become more common along utility lines because of the presence of perch
40   and nest sites (Knight and Kawashima 1993). Access road construction could create habitat for
41   species such as the horned lark (*Eremophila alpestris*) that are common along dirt roadways
42   where they can forage on windblown seeds (Ingelfinger and Anderson 2004).
43
44       Mine development and operational activities could also result in increased erosion and
45   runoff from freshly cleared and graded sites. The potential for soil erosion and the resulting

BLM_0041463

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1  sediment loading of nearby aquatic or wetland habitats would be proportional to the amount of
2  surface disturbance, the condition of disturbed lands at any given time, and the proximity to the
3  aquatic or wetland habitats. The potential for water quality impacts during construction would be
4  short term, lasting until disturbed soils materials were stabilized (e.g., from the use of mitigation
5  measures to control erosion or the reestablishment of ground cover). Although the potential for
6  runoff would be temporary, erosion could result in impacts on local amphibian populations,
7  particularly if an entire recruitment class was eliminated (e.g., complete recruitment failure could
8  occur in a given year because of the siltation of eggs or mortality of aquatic larvae). The impacts
9  of sedimentation on amphibians could be heightened if the sediments contained toxic materials
10 (Maxell 2000).
11
12     Habitat disturbance could also facilitate the spread and introduction of invasive plant
13 species by altering existing habitat conditions, stressing or removing native plant species, and
14 allowing easier movement by wildlife or human vectors (Trombulak and Frissell 2000). Wildlife
15 habitat could be adversely affected if invasive vegetation became established in the construction-
16 disturbed areas and adjacent off-site habitats. This could adversely affect wildlife occurrence and
17 abundance.
18
19     Increased human activity could increase the potential for fires. In general, short-term and
20 long-term effects of fire on wildlife are related to impacts on vegetation, which, in turn, affect
21 habitat quality and quantity, including the availability of forage and shelter. Long-term changes
22 in vegetation from a fire (such as loss of sagebrush or the invasion or increase of non-native
23 annual grasses) might affect food availability and the quality and quantity of available wildlife
24 habitats; the changes could also increase the risk from predation for some species (Groves and
25 Steenhof 1988; Sharpe and Van Horne 1998; Lyon et al. 2000b; USDA 2008a,b,c; Hedlund and
26 Rickard 1981; Knick and Dyer 1996; Watts and Knick 1996; Schooley et al. 1996).
27
28     Raptor populations generally are unaffected by, or respond favorably to, burned habitats
29 (Lyon et al. 2000b). In the short term, fires could benefit raptors by reducing cover and exposing
30 prey; raptors might also benefit if prey species increased in response to post-fire increases in
31 forage (Lyon et al. 2000b; USDA 2008d). Direct mortality of raptors from fire is rare (Lehman
32 and Allendorf 1989), although fire-related mortality of burrowing owls (*Athene cunicularia*) has
33 been documented (USDA 2008d). Most adult birds can escape fires, while fires during the
34 nesting season (prior to fledging) might kill young birds, especially of ground-nesting species
35 (USDA 2008d). Fires in wooded areas, such as pinyon-juniper woodlands, could decrease the
36 populations of raptors that nest in these habitats.
37
38     The very large mine site contains mostly barren ground and partially grassed habitats; the
39 other mine sites could be located in areas dominated by pinyon-juniper woodlands and sagebrush
40 habitats. Loss of 300 acres (120 ha) of these habitats spread throughout the lease tracts would be
41 considered a minor to moderate impact, since an abundance of such habitats occurs in the region
42 and since most of the wildlife species that could potentially be affected are habitat generalists
43 rather than habitat specialists.
44
45

BLM_0041464

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1    **4.3.6.2.2  Wildlife Disturbance.** During mine development and operations, wildlife
2    disturbance could be of greater concern than habitat loss (Arnett et al. 2007). The response of
3    wildlife to disturbances caused by noise and human presence would be species-specific.
4    Responses for a given species could be affected by the physiological or reproductive conditions
5    of individuals; their distance from the disturbance; and the type, intensity, and duration of the
6    disturbance. Wildlife could respond to a disturbance in various ways, including attraction,
7    habituation, or avoidance (Knight and Cole 1991). All three behaviors can be considered adverse
8    impacts. Wildlife might cease foraging, mating, or nesting near areas where the disturbance
9    occurred. For example, disturbance near active sage grouse leks could lead to lek abandonment,
10   displacement, and reduced reproduction. In contrast, wildlife such as bears, foxes, and squirrels
11   can habituate to disturbances and might be attracted to human activities, primarily when a food
12   source was accidentally or deliberately made available.
13
14        Regular or periodic disturbance could cause adjacent areas to be less attractive to wildlife
15   and result in long-term reduction of wildlife use in areas exposed to a repeated variety of
16   disturbances such as noise. Principal sources of noise would include vehicle traffic, the operation
17   of machinery, and blasting. The potential effects of noise on wildlife include acute or chronic
18   physiological damage to the auditory system, increased energy expenditures, physical injury
19   incurred during panicked responses, interference with normal activities (e.g., feeding), and
20   impaired communication (AMEC Americas Limited 2005; Larkin 1996; Salt and Hullar 2010;
21   USFWS 2011d). The response of wildlife to noise would vary by species; physiological or
22   reproductive condition; distance; and the type, intensity, and duration of disturbance
23   (BLM 2002).
24
25        Vehicle noise might affect the ability of amphibians to hear calls and locate breeding
26   aggregations (Maxell 2000). However, plasticity in vocalizations could allow maintenance of
27   acoustic communications in the presence of traffic noise (Cunnington and Fahrig 2010).
28
29        Much of the research on wildlife-related noise effects has focused on birds. This research
30   has shown that noise might affect territory selection, territorial defense, dispersal, foraging
31   success, fledging success, and song learning (e.g., Reijnen and Foppen 1994; Foppen and
32   Reijnen 1994; Larkin 1996). Some studies (e.g., Reijnen and Foppen 1994, 1995; Foppen and
33   Reijnen 1994; Reijnen et al. 1995, 1996, 1997) have shown reduced densities of a number of
34   species in forest habitats (26 of 43 species) and grassland habitats (7 of 12 species) adjacent to
35   roads, with effects detectable from 66 to 11,581 ft (20 to 3,500 m) from the roads. Reijnen et al.
36   (1996) identified a threshold effect sound level of 47 dBA for all species combined and of
37   42 dBA for the most sensitive species; the observed reductions in population density were
38   attributed to a reduction in habitat quality caused by elevated noise levels. This threshold sound
39   level of 42 to 47 dBA (which is somewhat below the EPA-recommended limit for residential
40   areas) is at or below the sound levels generated by truck traffic that would likely occur at
41   distances of 250 ft (76 m) or more from the mine area or access roads, or the levels generated by
42   typical construction equipment at distances of 2,500 ft (760 m) or more from the mine site.
43
44        Responses of birds to disturbance often involve activities that are energetically costly
45   (e.g., flying) or affect their behavior in a way that might reduce food intake (e.g., shift away from

BLM_0041465

1  a preferred feeding site) (Hockin et al. 1992). Noise can reduce bird nesting success and alter
2  species interactions, resulting in different avian communities (Francis et al. 2009). On the basis
3  of a review of the literature by Hockin et al. (1992), the effects of disturbance on bird breeding
4  and breeding success include reduced nest attendance, nest failures, reduced nest building,
5  increased predation on eggs and nestlings, nest abandonment, inhibition of laying, increased
6  absence from the nest, reduced feeding and brooding, exposure of eggs and nestlings to heat or
7  cold, retarded chick development, and lengthening of the incubation period. The most adverse
8  impacts associated with noise could occur if critical life-cycle activities were disrupted
9  (e.g., mating and nesting). For instance, disturbance of birds during the nesting season can result
10  in nest or brood abandonment. The eggs and young of displaced birds would be more susceptible
11  to cold or predators.
12
13       During winter, the average mean flush distance for several raptor species was 387 ft
14  (120 m) from people walking and 246 ft (75 m) from vehicles (Holmes et al. 1993). Disturbance
15  from light traffic (e.g., 1 to 12 vehicles per day) during the breeding season might reduce nest-
16  initiation rates and increase distances moved from sage grouse leks during nest site selection
17  (Lyon and Anderson 2003). The density of sagebrush obligate passerines was reduced 39 to 60%
18  within a 328-ft (100-m) buffer around dirt roads with traffic volumes ranging from 10 to
19  700 vehicles/day. However, traffic volumes alone might not explain the observed effect. The
20  birds might also have been responding to edge effects, habitat fragmentation, and increases in
21  other passerine species along the road corridors. Thus, declines might persist even after traffic
22  subsides, lasting until the road areas are reclaimed and fully vegetated (Ingelfinger and
23  Anderson 2004).
24
25       Various adverse effects of noise on raptors occur, but for some species, the effects are
26  temporary, as the raptors habituate to the noise (Brown et al. 1999; Delaney et al. 1999). As
27  reviewed by Hockin et al. (1992), the effects of noise disturbance on bird breeding and breeding
28  success include reduced nest attendance, nest failures, reduced nest building, increased predation
29  on eggs and nestlings, nest abandonment, inhibition of laying, increased absence from nest,
30  reduced feeding and brooding, exposure of eggs and nestlings to heat or cold, retarded chick
31  development, lengthened incubation period, increased physiological stress, increased energy
32  expenditures, habitat avoidance, decreased population or nesting densities, altered species
33  composition, and disruption and disorientation of movements. The most severe impacts
34  associated with noise could occur if critical life-cycle activities were disrupted (e.g., mating and
35  nesting). For instance, disturbance of birds during the nesting season could result in nest or brood
36  abandonment.
37
38       Deer and elk have been reported to respond at a distance of 3,280 ft (1,000 m) or more
39  from roads with more than one vehicle per day (Gaines et al. 2003). However, big game species
40  such as mule deer can habituate to and ignore motorized traffic, provided they are not pursued
41  (Yarmoloy et al. 1988). Harassment, an extreme type of disturbance caused by intentional
42  actions to chase or frighten wildlife, generally increases the magnitude and duration of
43  displacement. As a result, there is a greater potential for physical injury from fleeing and higher
44  metabolic rates due to stress. Bears can habituate to human activities, particularly moving

BLM_0041466

1  vehicles, making them more vulnerable to legal and illegal harvest (McLellan and
2  Shackleton 1989).
3
4  Noise from traffic and other sources can interfere with bat echolocation (Jones 2008),
5  while blasting during mine construction and operations can disrupt roosting bats
6  (Brown et al. 2000).
7
8  Lighting could also disturb wildlife in the mine area. Lights directly attract migratory
9  birds (particularly in inclement weather and during other low-visibility conditions), and they
10  could indirectly attract birds and bats by attracting flying insects.
11
12
13  **4.3.6.2.3  Wildlife Injury or Mortality.** Clearing, grading, mining, mine spoils
14  placement, vehicles, and other mine development and operational activities could result in direct
15  injury to or the death of less mobile wildlife species (e.g., reptiles, small mammals) or those that
16  use burrows or mines. If clearing or other ground-disturbing activities occurred during the spring
17  and summer, bird nests and eggs or nestlings could be destroyed. Although more mobile wildlife
18  species, such as big game and adult birds, can avoid mine development and operation activities
19  by moving to adjacent areas, it is conservatively assumed that adjacent habitats would be at
20  carrying capacity for the species that live there and could not support additional individuals from
21  the mine areas for an extended period of time. As previously mentioned, competition for
22  resources in adjacent habitats might preclude the incorporation of the displaced individuals into
23  the resident populations.
24
25  Direct mortality from vehicle collisions could occur along access and haul roads,
26  especially in wildlife concentration areas or migration corridors. When roads cut across
27  migration corridors, the effects can be dangerous for both animals and humans. No mapped
28  migration corridors for big game species occur on any of the lease tracts (Section 3.6.2.3).
29  Amphibians, being somewhat small and inconspicuous, are vulnerable to road mortality when
30  they migrate between wetland and upland habitats; reptiles are vulnerable on roads they use for
31  thermal cooling and heating. Sage grouse are susceptible to road mortality in spring because they
32  often fly to and from leks near ground level. They are also susceptible to vehicular collisions
33  along dirt roads because they sometimes use them to take dust baths (Strittholt et al. 2000). In
34  general, the species most vulnerable to vehicle collisions are day-active, slow-moving species
35  (Hels and Buchwald 2001). However, road kills rarely cause population-level impacts.
36  Avoidance of habitats near roads, especially due to traffic noise, tends to have a greater
37  ecological impact than does mortality from vehicular collisions (Forman and Alexander 1998).
38  Ore haul truck speeds would generally be slow on county or other dirt roads, which would
39  minimize their potential for colliding with big game.
40
41  Little information is available about the effects of fugitive dust on wildlife; however, if
42  the exposure was of sufficient magnitude and duration, the effects could be similar to those on
43  humans (e.g., breathing and respiratory symptoms, including dust pneumonia). A more probable
44  effect would be the dusting of plants, which could make forage less palatable. The highest rates
45  of dust deposition would generally occur within the area where wildlife would be disturbed by

BLM_0041467

1   human activities (BLM 2004b). Fugitive dust is not expected to result in any long-term
2   individual or population-level effects. Dusting impacts could be potentially more pervasive along
3   unpaved access roads. Use of calcium or magnesium chloride to control road dust could
4   desiccate amphibians crossing roads, while the use of oils could contaminate aquatic habitats
5   (Maxell 2000). Potential effects of radionuclides, which could be associated with dust at mine
6   sites, are discussed later in this section.
7
8        As previously mentioned, increased human activity could increase the potential for fires.
9   While individuals caught in a fire could incur increased mortality, depending on how quickly the
10  fire spread, most wildlife would likely escape by either outrunning the fire or seeking
11  underground or aboveground refugia within the fire (Ford et al. 1999; Lyon et al. 2000a).
12  However, some mortality of burrowing mammals from asphyxiation has been reported (Erwin
13  and Stasiak 1979).
14
15        Overhead utility lines might be required at some mine sites. Some birds, especially
16  raptors, are susceptible to electrocution on power lines. However, the potential for electrocution
17  should be negligible since modern power lines designs minimize such risks (e.g., adequate
18  spacing between conductors and use of appropriate insulation). The potential for bird collisions
19  with utility lines depends on variables such as habitat, relation of the line to migratory flyways
20  and feeding flight patterns, the migratory and resident bird species present, and the structural
21  characteristics of the lines (Beaulaurier et al. 1984). Birds that migrate at night, fly in flocks,
22  and/or are large and heavy with limited maneuverability, are particularly at risk (BirdLife
23  International 2003). Waterfowl, wading birds, shorebirds, and passerines are most vulnerable to
24  colliding with transmission lines near wetlands, while raptors and passerines are most susceptible
25  in habitats away from wetlands (Faanes 1987). Sage grouse and other upland game birds are
26  potentially vulnerable to colliding with utility lines, in part because they lack good visual acuity
27  (Bevanger 1995). Of highest concern with regard to bird collisions are locations where utility
28  lines span flight paths, such as river valleys, wetland areas, lakes, areas between waterfowl
29  feeding and roosting areas, and narrow corridors (e.g., passes that connect two valleys). Young
30  inexperienced birds, as well as migrants in unfamiliar terrain, appear to be more vulnerable to
31  wire strikes than are resident breeders. Also, many species appear to be most highly susceptible
32  to collisions when alarmed, pursued, searching for food while flying, engaged in courtship,
33  taking off, landing, and during the night and inclement weather (Thompson 1978). A disturbance
34  that leads to a panic flight could increase the risk of collision with utility lines (BirdLife
35  International 2003).
36
37        Although they are not immune to collisions, raptors have several attributes that decrease
38  their susceptibility to collisions with utility lines: (1) They have keen eyesight; (2) they soar or
39  fly by using relatively slow flapping motions; (3) they can generally maneuver while in flight;
40  (4) they learn to use utility poles and structures as hunting perches or nests and become
41  conditioned to the presence of lines; and (5) they do not fly in groups (like waterfowl), so their
42  position and altitude are not determined by other birds. Therefore, raptors are not as likely to
43  collide with utility lines except when they are distracted (e.g., while pursuing prey) or when
44  other environmental factors (e.g., weather) increase their susceptibility (Olendorff and
45  Lehman 1986).
46

BLM_0041468

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

Except under unusual circumstances, no electrocution of raptors or other birds would be expected, because the spacing between the conductors or between a conductor and a ground wire or other grounding structure would exceed the wingspan of bald eagles (*Haliaeetus leucocephalus*) and golden eagles (*Aquila chrysaetos*), the largest birds that occur in southwestern Colorado and that perch on transmission line support structures. Although it is a rare event, electrocution can occur during current arcing when flocks of small birds cross an electrical line or when several roosting birds take off simultaneously. This is most likely to occur in humid weather conditions (Bevanger 1995; BirdLife International 2003). Arcing can also occur from the waste streams of large birds roosting on the crossarms above insulators (BirdLife International 2003). The electrocution of other wildlife from contact with electrical lines is even less common; it occurs more often on smaller distribution lines and at substations. Nonavian wildlife species that have been electrocuted on smaller distribution lines and at substations include snakes, mice, squirrels, raccoons, bobcats (*Lynx rufus*), and American black bears (*Ursus americanus*) (Edison Electric Institute 1980; Williams 1990). Among the mammals, squirrels are among the most commonly reported species to be electrocuted because of their inclination to chew on electrical wires. Because electrocution is a relatively rare event, population-level effects are not expected.

The potential effects of electromagnetic field (EMF) exposure on animal behavior, physiology, endocrine systems, reproduction, and immune functions have been found to be negative, very minor, or inconclusive (WHO 2007). Generally, these results are for exposures much higher and longer than would be encountered by wildlife under actual field conditions. Also, there is no evidence that EMF exposure alone causes cancer in animals, and the evidence that EMF exposure in combination with known carcinogens can enhance cancer development is inadequate (WHO 2007).

Utility lines could provide perch sites for raptors and corvids (e.g., ravens, crows, and magpies), thereby increasing predatory levels on other wildlife (e.g., small mammals, gallinaceous birds). Utility support structures could also protect some bird species from mammalian predators, range fires, and heat (Steenhof et al. 1993).

A potential source of injury or mortality to wildlife would include exposure to contaminants such as herbicides, fuel, or other chemicals (e.g., lubricating oils). Potential exposure to chemical materials would most likely occur from a spill. A spill could result in direct contamination of individual animals, contamination of habitats, and contamination of food resources. Potential impacts on wildlife from exposure to fuel spills or accidental releases of other chemicals would vary according to the chemical spilled, volume of the spill, location of the spill, and the exposed species. A spill could have a population-level adverse impact if the spill was very large or if it contaminated a crucial habitat area where a large number of individual animals were concentrated. The potential for either event is very unlikely. In addition, wildlife near the mine sites would be limited, since there would be disturbances there related to mine development and operations, which would thus greatly reduce the potential for wildlife to be there and get exposed to contaminants. Furthermore, a spill prevention and response plan would be required, work crews would be trained in spill response, and materials required for spill

BLM_0041469

1  cleanup would be kept on hand. Prompt spill response should minimize potential impacts on
2  wildlife.
3
4        Mining activity might increase the exposure of wildlife to uranium and other radioactive
5  decay products and to other chemical elements. Negative impacts on terrestrial invertebrates,
6  birds, and mammals from uranium radionuclides occur from 0.2 to 40 mGy/h, 0.14 to
7  40.0 mGy/h, and 0.004 to 40.0 mGy/h, respectively (Hinck et al. 2010). The potential magnitude
8  of impacts would be influenced by life history strategy, habitat requirements, and the mass of the
9  organism (Hinck et al. 2010). Some birds might be at greater risk to radiation exposure than
10  other wildlife due to their foraging and ingestion of grit, which increases the radiation dose
11  (Driver 1994). Species that spend considerable amounts of time underground in caves, mines, or
12  burrows could potentially inhale, ingest, or be directly exposed to uranium and other
13  radionuclides while digging, eating, preening, and/or hibernating. Herbivores could also be
14  exposed by ingesting radionuclides that aerially deposited on vegetation or concentrated in
15  surface waters at or near mine sites (BLM 2011).
16
17        Impacts on wildlife from reclamation activities would be similar to those described for
18  Alternative 1 (Section 4.2.6.2). Reclamation activities would occur in areas previously disturbed
19  by mine development and operations. Mitigation measures used during reclamation would
20  minimize impacts on wildlife consistent with applicable laws and regulations. Wildlife would
21  benefit from habitat development following reclamation activities.
22
23        Under Alternative 3, impacts on wildlife would be largely negligible to minor during site
24  exploration and minor to moderate during mine development, operations, and reclamation. While
25  wildlife impacts would be long term, they would be scattered temporally and, especially,
26  spatially. In general, it is expected that impacts would be largely localized and would not affect
27  the viability of wildlife populations, especially if mitigation measures were used.
28
29        Long-term impacts on wildlife following reclamation of the mine sites would be
30  negligible if no development or other use of the sites (other than that of natural resource
31  protection) occurred.
32
33
34  **4.3.6.3  Aquatic Biota**
35
36        Impacts on aquatic biota from uranium mining could occur from the (1) direct
37  disturbance of aquatic habitats within the footprint of the mine site, (2) sedimentation of nearby
38  aquatic habitats as a consequence of soil erosion from mine areas, and (3) changes in water
39  quantity or water quality as a result of releases of contaminants into nearby aquatic systems.
40  These impacts would primarily occur during the mine development period and throughout the
41  operational life of the mine. In addition, some impacts could continue to occur beyond the
42  operational life of the project.
43
44        Exploration activities would occur in upland areas and not directly within aquatic habitats
45  (including ephemeral drainages). Vehicular traffic could result in rutting and accumulation of

BLM_0041470

*Preliminary Draft PEIS*          *PEIS Privileged Information*                    *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1   cobbles in some stream crossings, which could interfere with both upstream and downstream fish
2   passage in small streams during periods of low flows. Such changes might prevent fish and other
3   aquatic species from moving downstream to deeper waters in summer as upstream habitats dried
4   out. Because of the limited number of perennial streams in the area and the short duration of
5   exploration activities, the crossing of any individual stream in a proposed project area is
6   expected to be infrequent and not a regular event during the duration of this project phase. In
7   some cases, individual streams might be crossed only a single time. As a result, any potential
8   impacts from stream crossings would be short term and localized to individual crossing
9   locations.
10
11      Because of the limited area in which exploration activities would take place, the small
12   amount of soil disturbance that might occur during exploration, and the short duration during
13   which exploration at a particular area would occur, most impacts would be very localized and
14   short term. Potentially affected habitats would likely be smaller, low-order and headwater
15   ephemeral streams. Aquatic biota and habitats in larger surface water bodies, such as the main
16   channels of the San Miguel and Dolores Rivers, are not expected to be affected by site
17   exploration activities.
18
19      Ground disturbance during mine development and operation might increase soil erosion
20   and runoff that could lead to increases in sedimentation and turbidity in downgradient surface
21   water habitats. Increased turbidity might affect foraging and predator avoidance, reduce the
22   oxygen content of the water, interfere with photosynthesis of algae, and interfere with gill
23   function in some invertebrates and fish. Increased sedimentation might foul the eggs and smother
24   the larvae of invertebrates and fish and alter sediment characteristics. Changes in surface
25   drainage patterns could eliminate ephemeral drainages or cause other changes in runoff patterns.
26   Any changes in discharges to springs, seeps, or streams due to groundwater withdrawals could,
27   as a result, affect aquatic habitats.
28
29      Aquatic biota and habitats most likely to be affected during mine development and
30   operations are those associated with small ephemeral drainages. Such habitats might be crossed
31   with some regularity by vehicles. In addition, impacts from soil erosion and accidental releases
32   of regulated or hazardous materials might be expected in ephemeral drainages that most often
33   exhibit no or low volumes and flow. Impacts on aquatic biota and habitats from the accidental
34   release of regulated or chemicals into ephemeral drainages would be localized and small,
35   especially if the response to a release was rapid.
36
37      The accidental spill of uranium or vanadium ore into an ephemeral stream, or more
38   notably a permanent stream or river such as the Dolores or San Miguel River, could pose a
39   localized short-term impact on the aquatic resources. However, the potential for such an event is
40   extremely low. For example, SENES (2009) determined that the frequency of a rollover and/or
41   crash of an ore truck at a water crossing en route to the proposed Piñon Ridge Mill would be
42   $8.4 \times 10^{-5}$/yr. In addition to uranium and vanadium, the ore contains other potentially toxic
43   elements, such as aluminum, arsenic, barium, copper, iron, lead, manganese, selenium, on zinc.
44   Most ore solids would settle in the water body within a short distance from a spill site (Edge
45   Environmental, Inc. 2009). It is expected that expedient and comprehensive cleanup actions

BLM_0041471

would be required under U.S. Department of Transportation (DOT) regulations and an
emergency response plan would be in place for responding to accidents and cargo spills (Edge
Environmental, Inc. 2009). Overall, the potential for impacts on aquatic biota from an accidental
spill would be minor to negligible.

Impacts on aquatic biota and habitats during reclamation should be similar in nature to,
and not greater in magnitude than, impacts that might have occurred from mine development and
operations. In general, impacts on aquatic biota from reclamation activities would be similar to
those described for Alternative 1 (Section 4.1.6.2). Mitigation measures would be implemented
to minimize potential impacts on aquatic resources, consistent with applicable laws and
regulations.

Overall, impacts on aquatic biota are expected to be negligible during site exploration and
minor to moderate during mine development and operations and reclamation. Moderate impacts
would be expected only if mines were located within one or a few lease tracts that were near
perennial water bodies. In general, any impacts on aquatic biota would be localized and not
affect the viability of affected resources, especially if mitigation measures were used.

### 4.3.6.4  Threatened, Endangered, and Sensitive Species

Impacts on threatened, endangered, and sensitive species from uranium mining activities
would fundamentally be similar to, or the same as, those on more common and widespread plant
communities and habitats, wildlife, and aquatic resources (see Sections 4.3.6.1, 4.3.6.2, and
4.3.6.3). However, because of their low populations, listed species would be far more sensitive to
impacts than more common and widespread species. Low population size makes these species
more vulnerable to the effects of habitat fragmentation, habitat alteration, habitat degradation,
human disturbance and harassment, mortality of individuals, and the loss of genetic diversity.
Although listed species often reside in unique and potentially avoidable habitats, the loss of even
a single individual of a listed species could result in a much greater impact on the population of
the affected species than would the loss of an individual of a more common species.

Table 4.3-6 presents the potential for impacts to on threatened, endangered, and sensitive
species under Alternative 3. All 47 species listed in Table 4.3-6 might be affected by program
activities under Alternative 3. Among those species that might be affected are 13 plants, 1 insect,
7 fish, 4 amphibians, 2 reptiles, 12 birds, and 8 mammals. Eleven of these species are listed as
threatened or endangered under the ESA or are proposed or candidates for listing under the ESA:
1 plants, the Colorado hookless cactus; 4 fish, the bonytail chub, Colorado pikeminnow,
humpback chub, and razorback sucker (these four fish species are collectively referred to as the
Colorado River endangered fishes); 4 birds, the Gunnison sage-grouse, Mexican spotted owl,
southwestern willow flycatcher, and western yellow-billed cuckoo; and 2 mammals, the black-
footed ferret and Gunnison's prairie dog. Impacts on these species are discussed next.

BLM_0041472

Preliminary Draft PEIS
PEIS Team Use Only

PEIS Privileged Information
Do Not Distribute

May 2012

1 **TABLE 4.3-6 Potential Effects of the Uranium Leasing Program under Alternative 3 on Threatened, Endangered, and Sensitive Species**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Plants** | | | | |
| Colorado hookless cactus | *Sclerocactus glaucus* | ESA-T | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25, 26, 27 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Dolores River skeletonplant | *Lygodesmia doloresensis* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Eastwood's monkeyflower | *Mimulus eastwoodiae* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Grand Junction milkvetch | *Astragalus linifolius* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25, 26, 27 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |

2

BLM_0041473

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Plants (Cont.)* | | | | |
| Gypsum Valley cateye | *Cryptantha gypsophila* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Helleborine | *Epipactis gigantea* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Kachina daisy | *Erigeron kachinensis* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Naturita milkvetch | *Astragalus naturitensis* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |

*Preliminary Draft PEIS*
*PEIS Team Use Only*

*PEIS Privileged Information*
*Do Not Distribute*

*May 2012*

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Plants (Cont.)* | | | | |
| Paradox breadroot | *Pediomelum aromaticum* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Paradox lupine | *Lupinus crassus* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| San Rafael milkvetch | *Astragalus rafaelensis* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25, 26, 27 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Sandstone milkvetch | *Astragalus sesquiflorus* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |

BLM_0041475

TABLE 4.3-6  (Cont.)

*Preliminary Draft PEIS*
*PEIS Team Use Only*

*PEIS Privileged Information*
*Do Not Distribute*

*May 2012*

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Plants (Cont.)** | | | | |
| Wetherill's milkvetch | *Astragalus wetherillii* | FS-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| **Invertebrates** | | | | |
| Great Basin silverspot butterfly | *Speyeria nokomis nokomis* | BLM-S | All | Potential for negative impact—indirect effects only. Program activities in all Alternative 3 lease tracts could affect this species. This species or its habitat is not expected to occur on any of the lease tracts. Direct impacts to the species or its habitat (riparian areas) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |
| **Fish** | | | | |
| Bluehead sucker | *Catostomus discobolus* | BLM-S; FS-S | All | Potential for negative impact—indirect effects only. Program activities in all Alternative 3 lease tracts could affect this species. Known to occur in the Dolores River. Suitable habitat for this species might occur in the Dolores and San Miguel Rivers, which are downgradient from all lease tracts and intersect Lease Tracts 13 and 13A. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on suitable habitat from water withdrawals, runoff, sedimentation, or fugitive dust deposition might be possible. |

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Fish (Cont.)** | | | | |
| Bonytail chub | *Gila elegans* | ESA-E; CO-E | All | Potential for negative impact—indirect effects only. Program activities in all Alternative 3 lease tracts could affect this species. Suitable habitat for this species does not occur in any of the lease tracts. However, both suitable habitat and designated critical habitat for this species occur within the Colorado River, which is downstream from the Dolores River. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the Dolores River from water withdrawals, runoff, sedimentation, or release of radioactive material fugitive dust deposition might be possible, which might affect the species and its habitat (including designated critical habitat) in the Colorado River. |
| Colorado pikeminnow | *Ptychocheilus lucius* | ESA-E; CO-T | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. Suitable habitat for this species does not occur in any of the lease tracts. However, both suitable habitat and designated critical habitat for this species occur within the Colorado River, which is downstream from the Dolores River. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the Dolores River from water withdrawals, runoff, sedimentation, or release of radioactive material might be possible, which might affect the species and its habitat (including designated critical habitat) in the Colorado River. |

BLM_0041477

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Fish (Cont.)** | | | | |
| Flannelmouth sucker | *Catostomus latipinnis* | BLM-S; FS-S | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. Known to occur in the Dolores River. Suitable habitat for this species might occur in the Dolores and San Miguel Rivers, which are downgradient from all lease tracts and intersect Lease Tracts 13 and 13A. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |
| Humpback chub | *Gila cypha* | ESA-E; CO-T | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. Suitable habitat for this species does not occur in any of the lease tracts. However, both suitable habitat and designated critical habitat for this species occur within the Colorado River, which is downstream from the Dolores River. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the Dolores River from water withdrawals, runoff, sedimentation, or release of radioactive material might be possible, which might affect the species and its habitat (including designated critical habitat) in the Colorado River. |

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Fish (Cont.)** | | | | |
| Razorback sucker | *Xyrauchen texanus* | ESA-E; CO-E | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. Suitable habitat for this species does not occur on any of the lease tracts. However, both suitable habitat and designated critical habitat for this species occur within the Colorado River, which is downstream from the Dolores River. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the Dolores River from water withdrawals, runoff, sedimentation, or release of radioactive material might be possible, which might affect the species and its habitat (including designated critical habitat) in the Colorado River. |
| Roundtail chub | *Gila robusta* | BLM-S; FS-S | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. Known to occur in the Dolores River. Suitable habitat for this species might occur in the Dolores and San Miguel Rivers, which are downgradient from all lease tracts and intersect Lease Tracts 13 and 13A. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |
| **Amphibians** | | | | |
| Boreal toad | *Bufo boreas* | CO-E | 18, 19, 19A, 26, 27 | Potential for negative impact—indirect effects only. Program activities on Lease Tract 18 could affect this species. Suitable habitat for this species is not expected to occur on this lease tract. Direct impacts on the species or its habitat (riparian areas) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| ***Amphibians (Cont.)*** | | | | |
| Canyon treefrog | *Hyla arenicolor* | BLM-S | All | Potential for negative impact—indirect effects only. Program activities on all lease tracts under Alternative 3 could affect this species. Direct impacts on the species or its habitat (canyonlands and riparian areas) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |
| Great Basin spadefoot | *Spea intermontana* | BLM-S | 11, 11A | Potential for negative impact—direct and indirect effects. Program activities in Lease Tract 11 could affect this species. Impacts could occur through direct effects such as those resulting from mortality and habitat disturbance, as well as indirect impacts such as those resulting from water withdrawals, runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Northern leopard frog | *Rana pipiens* | BLM-S; FS-S | 13, 13A, 14, 15, 18, 19, 19A, 24, 25 | Potential for negative impact—indirect effects only. Program activities on Lease Tracts 13, 13A, 15, 18, and 25 could affect this species. Direct impacts on the species or its habitat (riparian areas and water bodies) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |
| ***Reptiles*** | | | | |
| Longnose leopard lizard | *Gambelina wislizenii* | BLM-S | 18, 19, 19A, 20, 24, 26, 27 | Potential for negative impact—indirect effects only. Program activities on Lease Tract 18 could affect this species. Direct impacts on the species or its habitat (riparian areas) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |

BLM_0041480

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Reptiles (Cont.)** | | | | |
| Midget-faded rattlesnake | *Crotalus oreganus concolor* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality and habitat disturbance, as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| **Birds** | | | | |
| Bald eagle | *Haliaeetus leucocephalus* | BLM-S; FS-S; CO-T | 5, 5A, 6, 7, 7, 8, 8A, 9, 13, 13A, 14, 18, 19, 19A, 20, 21, 22, 22A, 23, 26, 27 | Potential for negative impact—direct and indirect effects. Program activities on Lease Tracts 5, 6, 7, 8, 9, 13, 13A, 18, and 21 could affect this species. Direct effects would include disturbance of foraging habitat and the winter concentration areas within the lease tracts. Winter concentration areas along the Dolores River might be directly affected by program activities on Lease Tracts 13 and 13A. Indirect impacts on these winter concentration areas from noise, water withdrawal, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |
| Brewer's sparrow | *Spizella breweri* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of sagebrush habitats, as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |

BLM_0041481

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| ***Birds (Cont.)*** | | | | |
| Burrowing owl | *Athene cunicularia* | BLM-S; CO-T | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitats (sagebrush, shrublands, and grasslands), as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Ferruginous hawk | *Buteo regalis* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitats (sagebrush, shrublands, and grasslands), as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Gunnison sage-grouse | *Centrocercus minimus* | ESA-C; BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitats (sagebrush, shrublands, and grasslands), as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |

BLM_0041482

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Birds (Cont.)** | | | | |
| Mexian spotted owl | *Strix occidentalis lucida* | ESA-T; CO-T | All | Potential for negative impact—indirect effects only. Program activities on all lease tracts under Alternative 3 could affect this species. Direct impacts on the species or its habitat (canyonlands and coniferous forests) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, noise, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |
| Northern goshawk | *Accipiter gentilis* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from disturbance of foraging habitats (sagebrush, shrublands, and grasslands), as well as indirect impacts such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Peregrine falcon | *Falco peregrinus* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of foraging or nesting habitats, as well as indirect impacts such as those resulting from noise runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. Nests near Paradox Valley lease tracts might be indirectly affected by program activities in Lease Tracts 5, 6, 7, 8, and 9. |

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Birds (Cont.)** | | | | |
| Sage sparrow | *Amphispiza belli* | FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of sagebrush habitats, as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Southwestern willow flycatcher | *Empidonax traillii extimus* | ESA-E; CO-E | All | Potential for negative impact—indirect effects only. Program activities on all lease tracts under Alternative 3 could affect this species. Direct impacts on the species or its habitat (riparian woodlands) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, noise, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |
| Western yellow-billed cuckoo | *Coccyzus americanus occidentalis* | ESA-C; BLM-S; FS-S | All | Potential for negative impact—indirect effects only. Program activities on all lease tracts under Alternative 3 could affect this species. Direct impacts on the species or its habitat (riparian woodlands) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, noise, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |
| White-faced ibis | *Plegadis chihi* | BLM-S; FS-S | 13, 13A, 14, 15, and 15A. | Potential for negative impact—indirect effects only. Program activities on Lease Tracts 13, 13A, and 15 under Alternative 3 could affect this species. Direct impacts on the species or its habitat (wetlands and water bodies) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, noise, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible. |

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| ***Mammals*** | | | | |
| Big free-tailed bat | *Nyctinomops macrotis* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect impacts on roosting or foraging habitats such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Black-footed ferret | *Mustela nigripes* | ESA-E; ESA-XN; CO-E | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitat, as well as indirect impacts such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Fringed myotis | *Myotis thysanodes* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect impacts on roosting or foraging habitats such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Gunnison's prairie dog | *Cynomys gunnisoni* | ESA-C; BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitat, as well as indirect impacts such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |

BLM_0041485

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Mammals (Cont.)** | | | | |
| Nelson's bighorn sheep | *Ovis canadensis nelsoni* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from disturbance of habitat, as well as indirect impacts such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Spotted bat | *Euderma maculatum* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect impacts on roosting or foraging habitats such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Townsend's big-eared bat | *Corynorhinus townsendii pallescens* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities in all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect impacts on roosting or foraging habitats such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |

BLM_0041486

**TABLE 4.3-6  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| ***Mammals (Cont.)*** | | | | |
| White-tailed prairie dog | *Cynomys leucurus* | BLM-S; FS-S | 18, 19, 19A, 24, 25, 26, and 27 | Potential for negative impact—direct and indirect effects. Program activities on Lease Tracts 18 and 25 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitat, as well as indirect impacts such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |

[a]   BLM-S = BLM-designated sensitive species; ESA-C = candidate for listing under the ESA; ESA-E = listed as endangered under the ESA; ESA-T = listed as threatened under the ESA; ESA-XN = experimental, nonessential population as defined by Section 10 of the ESA; FS-S = USFS-designated sensitive species.

[b]   Refer to Table 3.6-20 (Section 3.6.4) for a description of species' habitat requirements and potential to occur on or near lease tract areas. Recorded occurrences were obtained as USGS quad-level or township range-level element occurrence records from state natural heritage program offices (CNHP 2011). If available for terrestrial vertebrates, SWReGAP animal habitat suitability models (USGS 2007) were used to determine the presence of potentially suitable habitat in the vicinity of the lease tracts.

[c]   Potential impacts are based on the presence of potentially suitable habitat or recorded occurrences in the vicinity of the Alternative 1 lease tracts. Impacts on species might occur as either direct or indirect effects. Direct effects are considered to be physical impacts resulting from ground-disturbing activities; these include impacts such as direct mortality and habitat disturbance. The impact zone for direct effects does not extend beyond the lease tract boundaries. Indirect effects result from factors including, but not limited to, noise, runoff, dust, accidental spills, and radiation exposure. The impact zone for indirect effects might extend beyond the lease tract boundaries, but the potential degree of indirect effects would decrease with increasing distance from the lease tracts.

[d]   Two mammal species—the Canada lynx (ESA-T) and North American wolverine (ESA-C)—might occur in the project counties. However, suitable habitat for these species does not occur in the vicinity of the ULP lease tracts and is not likely to be affected by ULP activities.

1

1      **4.3.6.4.1 Colorado Hookless Cactus.** The Colorado hookless cactus is listed as
2   endangered under the ESA. This species is endemic to western Colorado in desert shrublands on
3   rocky hills, mesa slopes, and alluvial benches at elevations between 4,500 and 6,000 ft
4   (1,400 and 1,800 m). It is most often found along the Colorado and Gunnison Rivers and their
5   tributaries. Potentially suitable habitat might occur on or in the vicinity of all lease tracts in Mesa
6   and Montrose Counties. Under Alternative 3, ULP activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21,
7   and 25 could affect the Colorado hookless cactus through direct mortality and habitat
8   disturbance, as well as through indirect effects resulting from runoff, sedimentation, dispersion
9   of fugitive dust, and effects related to radiation exposure (Table 4.3-6).
10
11      Predisturbance surveys would be needed to determine the presence of the Colorado
12   hookless cactus and its habitat on the ULP lease tracts. Development of actions to reduce impacts
13   (e.g., reasonable and prudent alternatives, reasonable and prudent measures, and terms and
14   conditions) for the Colorado hookless cactus, including development of a survey protocol,
15   avoidance measures, minimization measures, and, potentially, translocation actions,
16   compensatory mitigation, and the authorization of incidental take permits (if necessary), would
17   require formal consultation with the USFWS under Section 7 of the ESA. Consultation with the
18   CDOW should also occur to determine any state mitigation requirements.
19
20
21      **4.3.6.4.2 Colorado River Endangered Fishes.** Four listed species of fish might be
22   affected by ULP activities under Alternative 3: the bonytail chub, Colorado pikeminnow,
23   humpback chub, and razorback sucker. Each of these fish species historically inhabited
24   tributaries of the Colorado River system, including portions of the Dolores and San Miguel
25   Rivers in the ULP project counties. Current populations of the Colorado River endangered fishes
26   no longer inhabit these rivers in the vicinity of the lease tracts. However, suitable habitat and
27   populations occur in the Colorado River downstream from the Dolores River, which is
28   downgradient from several lease tracts and flows through Lease Tracts 13, 13A, and 14.
29   Designated critical habitat for the Colorado River endangered fishes also occurs in the Colorado
30   River, downstream from the Dolores River. Direct impacts on these species or their habitat are
31   unlikely to occur. However, indirect impacts on the Dolores River from water withdrawals,
32   runoff, sedimentation, or fugitive dust deposition might be possible, which might affect the
33   species and their habitats (including designated critical habitat) in the Colorado River
34   (Table 4.3-6).
35
36      Measures to avoid or minimize groundwater withdrawals to serve ULP activities, along
37   with the implementation of stormwater controls, mine water treatment systems, and other
38   discharge mitigation methods, would reduce impacts of ULP activities on the Colorado River
39   endangered fishes. Development of actions to reduce impacts on the Colorado River endangered
40   fishes, including necessary avoidance and minimization measures, would require formal
41   consultation with the USFWS under Section 7 of the ESA. Consultation with the CDOW should
42   also occur to determine any state mitigation requirements.
43
44

BLM_0041488

1      **4.3.6.4.3 Gunnison Sage-Grouse.** The Gunnison sage-grouse is a candidate species for
2 listing under the ESA. This species occurs in sagebrush-dominated habitats in western and
3 southwestern Colorado. It is known to occupy the western portion of Lease Tract 9, but suitable
4 habitat might occur on or in the vicinity of all ULP lease tracts. Program activities in all lease
5 tracts under Alternative 3 could affect this species through direct effects associated with habitat
6 disturbance, as well as through indirect effects resulting from noise, runoff, sedimentation,
7 dispersion of fugitive dust, and effects related to radiation exposure (Table 4.3-6).
8
9      Predisturbance surveys would be needed to determine the presence of the Gunnison sage-
10 grouse and its habitat (e.g., sagebrush) on the ULP lease tracts. Program activities should also
11 comply with guidelines set forth in the BLM's *Greater Sage-Grouse Interim Management*
12 *Policies and Procedures* (BLM 2011e) and *BLM National Greater Sage-Grouse Land Use*
13 *Planning Strategy* (BLM 2011c). Measures to reduce impacts on this species, including
14 development of a survey protocol, avoidance measures, minimization measures, and, potentially,
15 translocation actions, and compensatory mitigation (if necessary), should be determined
16 following consultation with the USFWS and the CDOW.
17
18
19      **4.3.6.4.4 Mexican Spotted Owl.** The Mexican spotted owl is listed as threatened under
20 the ESA. This species is considered to be a rare migrant in Montrose and San Miguel Counties,
21 Colorado. It inhabits steep canyons often dense old-growth coniferous forests. This habitat does
22 not occur on the ULP lease tracts, but suitable habitat might occur in the vicinity of the ULP
23 lease tracts. Program activities in all lease tracts under Alternative 3 would not be likely to
24 directly affect this species. However, indirect impacts on suitable habitat resulting from noise,
25 runoff, sedimentation, or fugitive dust deposition might be possible (Table 4.3-6). The
26 implementation of best reclamation practices should be sufficient to reduce or minimize indirect
27 impacts on this species. Designated critical habitat for this species does not occur in the vicinity
28 of the ULP lease tracts and is not expected to be affected by program activities.
29
30
31      **4.3.6.4.5 Southwestern Willow Flycatcher.** The southwestern willow flycatcher is
32 listed as endangered under the ESA. This species is considered to be an uncommon breeding
33 resident in San Miguel County, Colorado. It inhabits riparian thickets and riparian woodlands.
34 This species is not known to occur on any of the ULP lease tracts. However, according to the
35 SWReGAP habitat suitability model for this species, potentially suitable summer nesting habitat
36 might occur along the Dolores and San Miguel Rivers, as well as their tributaries, in Mesa,
37 Montrose, and San Miguel Counties. These potentially suitable habitat areas occur in Lease
38 Tracts 13 and 13A, which are being evaluated under Alternative 3. Program activities under
39 Alternative 3 would not be expected to directly affect the southwestern willow flycatcher
40 because direct impacts on this species and its habitat (riparian habitats) would probably be
41 avoided. However, program activities in all lease tracts under Alternative 3 might indirectly
42 affect the southwestern willow flycatcher through impacts resulting from water withdrawals,
43 runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure
44 (Table 4.3-6). Critical habitat for the southwestern willow flycatcher does not occur in the
45 vicinity of the lease tracts and is not likely to be affected.
46

BLM_0041489

1    Measures to avoid or minimize groundwater withdrawals to serve ULP activities, along
2    with the implementation of stormwater controls, mine water treatment systems, and other
3    discharge mitigation methods, would reduce impacts of ULP activities on this species.
4    Development of actions to reduce indirect impacts on the southwestern willow flycatcher,
5    including necessary avoidance and minimization measures, would require formal consultation
6    with the USFWS under Section 7 of the ESA. Consultation with the CDOW should also occur to
7    determine any state mitigation requirements.
8
9
10    **4.3.6.4.6  Western Yellow-Billed Cuckoo.** The western yellow-billed cuckoo is a
11    candidate species for listing under the ESA. It inhabits deciduous riparian woodlands,
12    particularly cottonwood and willow. The western yellow-billed cuckoo is known to occur in
13    Mesa and Montrose Counties as an uncommon summer breeding resident. This species is not
14    known to occur in the vicinity of any of the lease tracts; however, according to the SWReGAP
15    habitat suitability model for the species, potentially suitable summer nesting habitat might occur
16    along the Dolores River in southern Mesa and northern Montrose Counties. These potentially
17    suitable habitat areas do not intersect any of the lease tracts, but they are downslope from
18    Calamity Mesa, Outlaw Mesa, and Uravan lease tracts in Sinbad Valley. Program activities
19    under Alternative 3 are not expected to directly affect the western yellow-billed cuckoo because
20    direct impacts on this species and its habitat (riparian habitats) would probably be avoided.
21    However, program activities at all lease tracts under Alternative 3 might indirectly affect the
22    western yellow-billed cuckoo through impacts resulting from water withdrawals, runoff,
23    sedimentation, dispersion of fugitive dust, and effects related to radiation exposure (Table 4.3-6).
24
25    Measures to avoid or minimize groundwater withdrawals to serve ULP activities, along
26    with the implementation of stormwater controls, mine water treatment systems, and other
27    discharge mitigation methods, would reduce impacts of ULP activities on the western yellow-
28    billed cuckoo. Development of actions to reduce indirect impacts on this species, including
29    necessary avoidance and minimization measures, should be determined following consultation
30    with the USFWS and the CDOW.
31
32
33    **4.3.6.4.7  Black-Footed Ferret.** The black-footed ferret is listed as endangered under the
34    ESA. There are several introduced populations that are listed as experimental and nonessential;
35    however, these populations do not occur in the vicinity of the ULP lease tracts. This species
36    inhabits prairies and shrublands in association with prairie dogs. According to the SWReGAP
37    model, suitable habitat for this species does not occur on or in the vicinity of the ULP lease
38    tracts. However, block clearance surveys for this species have not been conducted in western
39    Colorado (USFWS 2009b) and it might be possible for the species to occur on or near some of
40    the lease tracts that support prairie dog towns. Program activities in all lease tracts under
41    Alternative 3 could affect this species through direct effects associated with habitat disturbance,
42    as well as through indirect effects resulting from noise, runoff, sedimentation, dispersion of
43    fugitive dust, and effects related to radiation exposure (Table 4.3-6).
44

BLM_0041490

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                   *Do Not Distribute*

1    Predisturbance surveys would be needed to determine the presence of the black-footed
2  ferret and its habitat (e.g., prairie dog towns) on the ULP lease tracts. Development of actions to
3  reduce impacts (e.g., reasonable and prudent alternatives, reasonable and prudent measures, and
4  terms and conditions) on this species, including development of a survey protocol, avoidance
5  measures, minimization measures, and, potentially, translocation actions, compensatory
6  mitigation, and the authorization of incidental take permits (if necessary), would require formal
7  consultation with the USFWS under Section 7 of the ESA. Consultation with the CDOW should
8  also occur to determine any state mitigation requirements.
9
10
11    **4.3.6.4.8 Gunnison's Prairie Dog.** The Gunnison's prairie dog is a candidate species for
12  listing under the ESA. This species is known to occur in Montrose and Mesa Counties shrubland
13  habitats at elevations between 6,000 and 12,000 ft (1,800 and 3,700 m). The species is not
14  known to occur on any of the ULP lease tracts. However, according to the SWReGAP habitat
15  suitability model, potentially suitable habitat might occur on and in the vicinity of all lease tracts.
16  Furthermore, information provided by the CNHP (2011b) indicated recorded quad-level
17  occurrences of this species near Wild Steer Mesa, which is near the lease tracts in Paradox
18  Valley and Dry Creek Basin. Program activities in all lease tracts under Alternative 3 could
19  affect this species through direct effects associated with habitat disturbance, as well as through
20  indirect effects resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and
21  effects related to radiation exposure (Table 4.3-6).
22
23    Predisturbance surveys would be needed to determine the presence of this species and its
24  habitat on the ULP lease tracts. Measures to reduce impacts on this species, including
25  development of a survey protocol, avoidance measures, minimization measures, and, potentially,
26  translocation actions, and compensatory mitigation (if necessary), should be determined
27  following consultation with the USFWS and the CDOW.
28
29
30  **4.3.7 Land Use**
31
32    Under Alternative 3, DOE would continue the ULP as it existed before July 2007, with
33  the 13 then-active leases (now 12 leases), for the next 10-year period or for another reasonable
34  period. The lands would continue to be closed to mineral entry; however, all other activities
35  within the lease tracts would continue. Mining activities within the lease tracts would likely
36  preclude some land uses such as recreation or grazing, but because many of the surrounding
37  lands offer opportunities for these activities, impacts due to land use conflicts are considered to
38  be small.
39
40
41  **4.3.8 Socioeconomics**
42
43    The assessment of the socioeconomic impacts of mine development and operations and
44  reclamation under Alternative 3 is based on assumptions discussed in Chapter 2
45  (see Section 2.2.3.1). It is assumed that a total of 8 mines would be in operation in the peak year

BLM_0041491

1   (2 small, 4 medium, 1 large, and 1 very large mine), producing approximately 1,000 tons of
2   uranium ore per day. Development and operational activities would create direct employment of
3   163 people during the peak year and would create additional 113 indirect jobs (see Table 4.3-7).
4   Mining activities would constitute 0.3% of total ROI employment. Uranium mining would also
5   produce $6.5 million in direct income and $4.5 million in indirect income. The operation period
6   is assumed to be 10 years or a reasonable longer period of time.
7
8       As discussed in Section 3.8, the average unemployment rate in the ROI was 9.6% in
9   2010; approximately 10,600 people were unemployed. Based on the number of people that could
10  be available from the unemployed workforce and the ROI's distribution of employment by
11  sector, there could be approximately 2,100 people available for uranium mining and reclamation
12  in the ROI. Based on the available labor supply in the ROI as a whole, the current workforce
13  could meet the demand for labor necessary for mine development and operations and
14  reclamation of 8 assumed mines, in which case, no in-migration of workers or families would be
15  required. However, on the basis of the assumption that some in-migration would occur as a result
16  of uranium mining activities, under this alternative, 87 people would move into the ROI. In-
17  migration of workers would represent an increase in the ROI forecasted population growth rate
18  of 0.04%. The additional workers would increase the annual average employment growth rate by
19  less than 1% in the ROI. The in-migrants would have only a marginal effect on local housing and
20  population and would require less than 1% of vacant owner-occupied housing during mining
21
22
23      **TABLE 4.3-7  Socioeconomic Impacts of Uranium Mining**
24      **Development and Operations and Reclamation in the Region of**
25      **Influence under Alternative 3**

| Parameter | Development and Operations | Reclamation |
|---|---|---|
| Employment (no.) | | |
| Direct | 163 | 31 |
| Indirect | 113 | 13 |
| Total | 276 | 44 |
| Income[a] | | |
| Total | 11.0 | 1.8 |
| In-migrants (no.) | 87 | 0 |
| Vacant housing (no.) | 37 | 0 |
| Local community service employment | | |
| Teachers (no.) | 0 | 0 |
| Physicians (no.) | 1 | 0 |
| Public safety (no.) | 2 | 0 |

[a]   Unless indicated otherwise, values are reported in $ million 2009.

26

BLM_0041492

*Preliminary Draft PEIS*          *PEIS Privileged Information*                    *May 2012*
*PEIS Team Use Only*                   *Do Not Distribute*

1   development and operations. One additional physician, one additional firefighter, and one
2   additional police officer would be required to maintain current levels of service within the ROI
3   as a result of the increased population from in-migrants. No additional teachers would be
4   required to maintain the current student-to-teacher ratio in the ROI.
5
6        Since no in-migrant labor force would be required for mining or reclamation activities,
7   there would be no impacts on the population or public services, including additional community
8   service employment, education expenditures, or public finances. Mining activities would also
9   have no effect on local housing, since there would not be an influx of workers needing rental or
10  owner-occupied housing units, and they would therefore not have an impact on the local
11  occupancy rate either. Impacts on the ROI would be small because employment would be
12  distributed across three counties, and the impact would be absorbed across multiple governments
13  and many municipalities. The employment pool would come from a larger population group than
14  if all employment originated from any one county. It is likely that most mining workers would
15  choose to live in larger population centers within the ROI, such as Grand Junction, Montrose, or
16  Clifton, and commute to mining locations. However, individual municipalities in smaller rural
17  communities might experience a temporary increase in population due to workers if they chose
18  to move to communities closer to mining projects rather than commuting from elsewhere in the
19  ROI. Although there would be only a small number of in-migrating workers from outside the
20  three-county ROI and thus little impact on the ROI as a whole, the impact on individual
21  communities could vary.
22
23       Reclamation of the 12 lease tracts would occur after operations ceased and the leases
24  were terminated. The reclamation period would likely span 2 to 3 years, although only 1 year of
25  reclamation activities would require a workforce. Reclamation would require a direct workforce
26  of 31 people and would create 13 indirect jobs. During reclamation, the required workforce
27  would generate $1.8 million in income. Because of the small number of jobs required for
28  reclamation, the current workforce in the ROI could meet the demand for labor and there would
29  thus not be any in-migration of workers or families or any social impacts on housing, public
30  services, or education expenditures.
31
32
33  **4.3.8.1  Recreation and Tourism**
34
35       As described in Section 3.8.3., the three counties that make up the ROI (Mesa, Montrose,
36  and San Miguel) contain large amounts of public land, both state and federally managed. These
37  public lands include designated wilderness, NCAs, the Colorado National Monument, SRMAs
38  including the Dolores River SRMA, Black Canyon National Park, State Parks, WSAs, and other
39  areas used for recreation. Recreation and tourism are economic drivers in the area, with
40  significant indirect impacts on the local economy. The diverse types of recreation that occur in
41  the area include hunting, fishing, hiking, camping, horseback riding, mountain bike riding,
42  off-highway vehicle (OHV) use, rafting, and cross-country and downhill skiing (BLM 2009).
43  According to the BLM, nearly all public land visitors use vehicles for recreation. For some
44  visitors, their vehicle is just the mode of transportation used to access their recreational activity.
45  For others, vehicle use itself is the activity. The Unaweep/Tabeguache Scenic and Historic

BLM_0041493

1   Byway passes through many towns in the ROI including Nucla, Naturita, Redvale, Norwood,
2   Sawpit, and Telluride.
3
4           Impacts on recreation in the area could occur if there was a negative perception of the
5   area due to uranium mining and its potential impacts on air quality, wildlife habitat, water
6   quality, scenic viewsheds, and local roads from increased truck traffic. Depending on the specific
7   location, visual impacts from mining could prevent people from visiting a particular area. Three
8   of the lease tracts included in this alternative are located within the Dolores Canyon SRMA. In
9   recent years, recreation and tourism have become significant components of the local economy
10  in the ROI. According to a report published by the Sonoran Institute (2009), the most significant
11  changes in the economy in the West over the past 40 years have been a rapid growth in the
12  services economy, the rise in nonlabor sources of income (such as investments, Social Security
13  and Medicare), and the diminished level of jobs and income in the extractive industries
14  (e.g., mining). Increased mining activity in the area could put a strain on local governments from
15  increased road use, traffic safety issues, and potential impacts on public health.
16
17          Tourism is an important component of local economies because it brings in significant
18  income from outside the area. However, economic impacts from the tourism and recreation
19  sector are difficult to quantify because it is served by a wide-ranging array of industries,
20  including restaurants, hotels, retail shops, second homes, and vacation homes. However,
21  Table 4.3-8 tabulates estimates made for the purpose of providing some perspective on the
22  potential impact. If recreation and outdoor areas are the drivers of an area's tourism industry,
23  then the condition of the environment is vital to the success of the industry. It is difficult to
24  estimate the impact of uranium mining on recreation because it is not clear how mining
25  development and operations could affect recreational visitation and nonmarket values (i.e., the
26  value of recreational resources for potential or future visits). While it is clear that some land in
27  the ROI would no longer be accessible for recreation, the majority of popular recreational
28
29
30          **TABLE 4.3-8  Recreation Sector Activity in the Region of Influence,**
31          **2012**

| Type of Activity | Employment | Income ($ million) |
|---|---|---|
| Amusement and recreation services | 753 | 15.6 |
| Automotive rental | 192 | 3.4 |
| Eating and drinking places | 7,565 | 132.2 |
| Hotels and lodging places | 997 | 21.9 |
| Museums and historic sites | 35 | 0.86 |
| Recreational vehicle parks and campsites | 121 | 3.4 |
| Scenic tours | 531 | 26.4 |
| Sporting goods retailers | 942 | 19.0 |
| Total ROI | 11,136 | 222.76 |

Source: MIG, Inc. (2012)

32

BLM_0041494

1   locations would still be available for recreation purposes. Although the impacts of uranium
2   mining on visual impacts is generally minimal, since very few structures are taller than 30 ft
3   (9.1 m), it is possible that mining activities in the ROI would be visible from recreational
4   locations and would thus reduce visitation and possibly affect the economy of the ROI.
5
6        The Uncompahgre BLM Field Office, which includes Montrose County and parts of San
7   Miguel and Mesa County, currently issues approximately 50 commercial permits for activities
8   such as guided fishing, whitewater rafting, vehicle shuttles, big and small game hunting,
9   mountain lion hunting, horseback trail rides, jeep and motorcycle tours, camping, archery
10  tournaments, and mountain bike rides. Developed recreational sites occur mainly along the San
11  Miguel River SRMA and in the Dolores River SRMA (BLM 2012). The number of visitors using
12  state and federal lands for recreational activities is not available from the various administering
13  agencies; consequently, the value of recreational resources in these areas based on the number of
14  recorded visitors is probably underestimated. Because the impact of uranium mining on tourism
15  is not known, this section presents simple scenarios to indicate the magnitude of the economic
16  impact of uranium mining on recreation and tourism; it indicates the impact of a 1%, 5%, and
17  10% reduction in ROI recreational employment. Impacts include the direct loss of recreation
18  employment in the recreation sectors in each ROI, and the indirect effects, which represent
19  the impact on the remainder of the economy in each ROI as a result of a declining recreation
20  employee wage and salary spending and as a result of expenditures by the recreation sector on
21  materials, equipment, and services. Impacts were estimated by using IMPLAN data for each
22  ROI.
23
24        In the ROI, the impacts of uranium mining on recreation would be the loss of 145 jobs
25  with a 1% reduction in recreational employment and an income loss of $3.3 million. There
26  would be 726 jobs lost with a 5% reduction in recreational employment, and a corresponding
27  income loss of $16.7 million. If recreational employment declined by 10%, 1,452 jobs would be
28  lost and there would be a reduction in income of $33.5 million (see Table 4.3-9).
29
30
31  **TABLE 4.3-9  Impacts from Reductions in Recreation Sector Employment Resulting from**
32  **Uranium Mining Development in the Region of Influence, 2012[a]**

| Area Afected | 1% Reduction | | 5% Reduction | | 10% Reduction | |
|---|---|---|---|---|---|---|
| | No. of Jobs Lost | Loss in Income ($ million 2011) | No. of Jobs Lost | Loss in Income ($ million 2011) | No. of Jobs Lost | Loss in Income ($ million 2011) |
| ROI[b] | 145 | 3.3 | 726 | 16.7 | 1,452 | 33.5 |

[a]  The recreation sector includes amusement and recreation services, automotive rental, eating and drinking establishments, hotels and lodging facilities, museums and historic sites, recreational vehicle parks and camp sites, scenic tours, and sporting goods retailers.

[b]  The Colorado ROI includes Mesa, Montrose and San Miguel Counties.

33

BLM_0041495

1    **4.3.9   Environmental Justice**
2
3       In the following sections, potential impacts on environmental justice are assessed for the
4    three phases of mining: exploration, development and operation, and reclamation.
5
6
7    **4.3.9.1   Exploration**
8
9       Mine exploration activities would involve some land disturbance activities, such as
10   vegetation clearing, grading, drilling, and building of access roads and drill pads, occurring over
11   relatively small areas. Impacts on environmental justice would be minor, considering the small
12   spatial extent in which exploration activities would occur.
13
14       Air emissions from fugitive dust and the operation of construction equipment and mine
15   facility equipment are expected to be small. Chemical exposure during exploration would be
16   limited to airborne toxic air pollutants, which would be at less than standard levels and would not
17   result in any adverse health impacts.
18
19       Water consumption from local sources during uranium mining exploration projects is not
20   expected to be large, since water would be trucked in from outside the local area, meaning that
21   no diversion of water from domestic, cultural, religious, or agricultural uses that might affect
22   low-income and minority populations is expected. Potential impacts of exploration on surface
23   water through runoff and on groundwater contamination could be significant in some leasing
24   areas. Short-term soil erosion impacts could occur during exploration. Longer-term erosion
25   impacts associated with runoff before revegetation occurred could affect wildlife and water
26   quality and, with potential sedimentation, recreational fishing, and it could increase the potential
27   for flooding, which could affect subsistence activities.
28
29       Although exploration would introduce contrasts in form, line, color, and texture, as well
30   as an increasing degree of human activity, into landscapes with generally low levels of human
31   activity, dust mitigation would reduce the visual impact of exploration activity, while
32   revegetation programs would reduce the longer-term visual impacts from mine exploration in
33   local communities and religious and cultural sites of importance to low-income and minority
34   populations. Adverse impacts of exploration on property values would likely be small, given the
35   existence of mining in the area, the potential small scale of the proposed mining activities, and
36   the opportunity for lucrative uranium exploration employment in local communities where there
37   are significant low-income and minority populations.
38
39
40    **4.3.9.2   Mine Development and Operations**
41
42       Although there are unique radiological exposure pathways (such as subsistence fish,
43   vegetation, or wildlife consumption or well water use) that could potentially produce adverse
44   health and environmental impacts on low-income and minority populations, no radiological
45   impacts are expected during mine development and operations. Mining facilities would not

BLM_0041496

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                 *Do Not Distribute*

1  produce any significant radiological risks to underground or surface mine workers or any
2  radiological or adverse health impacts on the general public during operations. Air emissions
3  from fugitive dust and the operation of construction equipment and mine facility equipment are
4  expected to be small. Chemical exposure during mine development and operations would be
5  limited to airborne toxic air pollutants, which would be at less than standard levels and would not
6  result in any adverse health impacts.
7
8      Water consumption from local sources during the operation of uranium mining projects is
9  not expected to be large, since water would be trucked in from outside the local area, meaning
10  that no diversion of water from domestic, cultural, religious, or agricultural uses that might affect
11  low-income and minority populations is expected. Potential impacts from mining operations on
12  surface water through runoff and on groundwater contamination could be significant in some
13  leasing areas. Short-term soil erosion impacts could occur during mine development. Longer-
14  term erosion impacts associated with runoff before revegetation occurred could affect wildlife
15  and water quality and, with potential sedimentation, recreational fishing, and it could increase the
16  potential for flooding, which could affect subsistence activities.
17
18      Although mining facilities would introduce contrasts in form, line, color, and texture, as
19  well as an increasing degree of human activity, into landscapes with generally low levels of
20  human activity, dust mitigation would reduce the visual impact of mine development activity.
21  Attempts could be made to choose construction materials that would minimize scenic contrast,
22  and revegetation programs could reduce the longer-term visual impacts from mining sites in
23  local communities and religious and cultural sites of importance to low-income and minority
24  populations. Adverse impacts of uranium mining on property values would likely be small, given
25  the existence of mining in the area, the potential small scale and phased schedule of proposed
26  mining activities, the opportunity for lucrative uranium mining employment, and the higher tax
27  revenues and improved local public service provisions in local communities where there are
28  significant low-income and minority populations.
29
30
31      **4.3.9.3  Reclamation**
32
33      Under Alternative 3, impacts on environmental justice associated with reclamation
34  activities would be the same as those described for Alternative 1 (Section 4.1.9).
35
36      Although potential impacts on the general population could result from exploration, mine
37  development and operations, and reclamation of uranium mining facilities under Alternative 3,
38  for the majority of resources evaluated, impacts are likely to be small. Specific impacts on low-
39  income and minority populations as a result of participation in subsistence or certain cultural and
40  religious activities would also be small. In addition, there are no minority populations, as defined
41  by CEQ guidelines, within the 50-mi (80-km) radius around the boundary of the lease tracts,
42  meaning that any adverse impacts of the ULP would not disproportionately affect minority
43  populations. Because there are no low-income populations within the 50-mi (80-km) radius,
44  there would not be any impacts on low-income populations.
45
46

BLM_0041497

## 4.3.10  Transportation

The transportation risk analysis estimated both radiological and nonradiological impacts associated with the shipment of uranium ore from its point of origin (at one of eight mines) to a uranium mill. Each mine is assumed to be operating on one of the 12 lease tracts considered under Alternative 3. Further details on the risk methodology and input data are provided in Section D.10 of Appendix D.

### 4.3.10.1  General Approach and Assumptions

This PEIS transportation assessment evaluated the annual impacts expected during the peak year of operations when the largest potential number of mines could be operating on the 12 lease tracts considered. The shipment of uranium ore is not assumed over the life of the program because of the uncertainty associated with future uranium demand and mine development.

A sample set of 8 of the 12 lease tracts was evaluated in the transportation analysis to represent operations during the peak year of production. To select lease tracts for the transportation analysis, lease tract locations, lessees, and prior mining operations, if any, were considered. In addition, mill distance and capacity were considered when determining which mill would receive a particular mine's ore shipments. The nearest mill was not always the destination for a given shipment. At the time of actual shipment, factors such as existing road conditions due to traffic, weather, and road maintenance and repairs as well as mill capacity and costs would be among the criteria used to determine which mill would receive a given ore shipment. The intent of the transportation analysis is to provide a reasonable estimate of impacts that could occur. Impacts were also estimated on the basis of the assumption that all shipments would go to a single mill to provide an upper range on what might be expected. Single shipment risks for uranium ore were also determined so that an estimate for any future shipping campaign could be evaluated.

The transportation risk assessment considered human health risks from routine (normal, incident-free) transport of radiological materials and from accidents. The risks associated with the nature of the cargo itself ("cargo-related" impacts) were considered for routine transport. Risks related to the transportation vehicle regardless of type of cargo ("vehicle related" impacts) were considered for routine transport and potential accidents. Radiological cargo-related accident risks are expected to be negligible and were not assessed as part of this analysis, as discussed in Appendix D, Section D.10.1. Transportation of hazardous chemicals was not part of this analysis because no hazardous chemicals have been identified as being part of uranium mining operations.

#### 4.3.10.1.1  Routine Transportation Risk. The nonradiological routine impacts associated with uranium ore transportation would be vehicle-related as a result of the increase in truck traffic on affected routes. A comparison with existing traffic densities was made, and the potential for traffic delays was considered.

BLM_0041498

1    The radiological risk associated with routine transportation would be cargo-related and
2    result from the potential exposure of people to low levels of external radiation near a loaded
3    shipment. No direct physical exposure to radioactive material would occur during routine
4    transport because the uranium ore would be covered by a tarp during transport. No significant
5    unintended releases would occur.
6
7    Collective population radiological risks were estimated for persons living or working in
8    the vicinity of a shipment route (off-link population) and persons in all vehicles sharing the
9    transportation route (on-link population). Collective doses were also calculated for the truck
10    drivers involved in the actual shipment of uranium ore. Workers involved in loading or
11    unloading were not considered in the transportation analysis. The doses calculated for the first
12    two population groups were added together to yield the collective dose to the public; the dose
13    calculated for the truck drivers represents the collective dose to workers.
14
15    In addition to assessing the routine collective population risk, the radiological risks to
16    individuals were estimated for a number of hypothetical exposure scenarios. Receptors included
17    members of the public exposed standing along the roadside, at a nearby residence, or during
18    traffic delays.
19
20
21    **4.3.10.1.2  Accident Transportation Risk.** The vehicle-related accident risk refers to the
22    potential for transportation accidents that could result directly in injuries and fatalities not related
23    to the nature of the cargo in the shipment. This risk represents injuries and fatalities from
24    physical trauma. Route-specific or county-wide rates for transportation injuries and fatalities
25    were used in the assessment, as discussed in Appendix D, Section D.10.4.1.3. Vehicle-related
26    accident risks were calculated by multiplying the total distance traveled by the rates for
27    transportation injuries and fatalities. In all cases, the vehicle-related accident risks were
28    calculated on the basis of distances for round-trip shipment, since the presence or absence of
29    cargo would not be a factor in accident frequency.
30
31
32    **4.3.10.1.3  Transportation Routes.** Ore shipments would travel primarily on Colorado
33    state highways CO 90 and CO 141, depending on the lease tract, if the Piñon Ridge Mill was
34    used to process the ore. Shipments to the White Mesa Mill would use these roads and also
35    US 491 in Colorado and Utah and US 191 in Utah. Table 4.3-10 lists the distances to each mill
36    from all lease tracts that could support mining operations under Alternatives 3 through 5.
37
38
39    **4.3.10.2  Routine Transportation Risk**
40
41
42    **4.3.10.2.1  Nonradiological Impacts.** The estimated number of shipments from the
43    operating uranium mines to the mills during the peak year of uranium mining under Alternative 3
44    would be 40 per day, assuming a combined mill processing capability of 1,000 tons per day as
45    discussed in Section 2.2.3.1 and a truck load of 25 tons. Including round-trip travel, 80 trucks per

BLM_0041499

1
2

**TABLE 4.3-10  Distances from Lease Tracts to Ore Processing Mills**

| Lease Tract | Distance (km) | | Alternative[a] |
|---|---|---|---|
| | Piñon Ridge | White Mesa | |
| 5 | 6.6 | 195.7 | 3, 4, 5 |
| 5A | 7.0 | 196.1 | 4, 5 |
| 6 | 8.1 | 197.2 | 3, 4, 5 |
| 7 | 7.0 | 196.1 | 3, 4, 5 |
| 8 | 9.4 | 198.5 | 3, 4, 5 |
| 8A | 9.4 | 198.5 | 4, 5 |
| 9 | 27.4 | 209.3 | 3, 4, 5 |
| 10 | 99.8 | 107.1 | 4, 5 |
| 11 | 105.5 | 99.7 | 3, 4, 5 |
| 11A | 108.6 | 102.8 | 4, 5 |
| 12 | 107.0 | 103.2 | 4, 5 |
| 13 | 86.0 | 114.8 | 3, 4, 5 |
| 13A | 87.9 | 116.8 | 3, 4, 5 |
| 14 | 87.9 | 116.1 | 4, 5 |
| 15 | 91.7 | 120.5 | 3, 4, 5 |
| 15A | 93.9 | 122.8 | 4, 5 |
| 16 | 96.0 | 105.5 | 4, 5 |
| 16A | 95.2 | 104.9 | 4, 5 |
| 17 | 30.2 | 172.8 | 4, 5 |
| 18 | 43.2 | 204.9 | 3, 4, 5 |
| 19 | 50.5 | 212.3 | 4, 5 |
| 19A | 47.8 | 209.6 | 4, 5 |
| 20 | 47.8 | 209.6 | 4, 5 |
| 21 | 21.6 | 199.7 | 3, 4, 5 |
| 22 | 24.3 | 202.3 | 4, 5 |
| 2A | 26.0 | 204.1 | 4, 5 |
| 23 | 18.4 | 196.4 | 4, 5 |
| 24 | 44.0 | 205.8 | 4, 5 |
| 25 | 42.8 | 204.5 | 3, 4, 5 |
| 26 | 104.5 | 266.2 | 4, 5 |
| 27 | 85.6 | 247.3 | 4, 5 |

[a]  PEIS alternatives that include the lease tract.

3
4
5  day would be expected to travel the affected routes. As listed in Table 3.10-1, the lowest annual
6  average daily traffic (AADT) along any of the routes would be about 250 vehicles per day near
7  Egnar on CO 141. If all 80 trucks per day passed through Egnar, in the extreme case of all
8  shipments going to the White Mesa Mill, this scenario would represent a 32% increase in traffic
9  in this area but an increase of less than 2% at the most heavily traveled location in Monticello,
10  Utah, again if all shipments went to the White Mesa Mill. No additional traffic congestion would
11  be expected in any area, and only about 2 to 3 additional trucks per hour going in each direction
12  would be expected in that extreme case, assuming a 16-hour workday for transport.
13

BLM_0041500

*Preliminary Draft PEIS*               *PEIS Privileged Information*               *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1    For the example case with operations at 8 mines (1 very large, 1 large, 4 medium, and
2    2 small as discussed in Section 2..2.3.1), the total distance traveled by haul trucks during the
3    peak year would be approximately 0.89 million mi (1.42 million km), assuming round-trip travel
4    between the lease tracts and the mills as shown in Table 4.3-11. Using peak-year assumptions of
5    40 shipments a day and 20 days a month, 9,600 round-trips would be expected. According to the
6    Colorado and Utah Departments of Transportation (CDOT and UDOT), the estimated total truck
7    distance traveled of 0.89 million mi (1.4 million km) would be about 7% of the total heavy truck
8    miles travelled (12.7 million mi, or 20.3 million km) along the affected highways in 2010
9    (CDOT 2011; UDOT 2011). In general, actual annual impacts over the course of the ULP could
10   be lower or higher than these impacts, because the shipment numbers are for the estimated peak
11   year and because, for a given lease tract, the ore could be transported to a different mill than that
12   used in the PEIS analysis or because lease tracts other than those used in the sample case would
13   be developed.
14
15   To help put the sample case results in perspective, Table 4.3-11 also lists the total
16   distances that ore would be shipped if all the ore was shipped to one mill or the other. Because of
17   the relative locations of all the lease tracts with respect to the mills, shipping all of the ore to
18   White Mesa Mill (2.08 million mi or 3.2 million km) would represent close to the upper bound
19   for the total distance for all shipments. Shipment of all of the ore to the Piñon Ridge Mill
20   (0.49 million mi or 0.78 million km) would represent close to the lower bound for total distance.
21
22   Most of the distance traveled by the haul trucks would occur on State or US Highways.
23   To access these roads, the haul trucks might travel distances of up to several miles on county and
24   local roads, depending on the location of the lease tract and the location of the mine within the
25   lease tract. Several residences are located near lease tracts along such roads. In those cases, the
26   number of passing haul trucks could range from about 4 to 24 per day, depending on the size of
27   the nearby mine as shown in Table 4.3-12. If hauling were to occur 16 hours per day, then up to
28   one or two haul trucks per hour could pass by on the way to or from the main highway in the
29   case of a very large mine. In addition, some of these residences might encounter local truck
30   traffic for the first time should ore production occur on neighboring lease tracts.
31
32
33   **TABLE 4.3.11  Peak-Year Collective Population Transportation Impacts under Alternative 3**

|  | | Radiological Impacts | | | | Accidents per Round Trip | |
| Scenario | Total Distance (km) | Public Dose (person-rem) | Risk (LCF) | Worker Dose (person-rem) | Risk (LCF) | Injuries | Fatalities |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Sample case | 1,416,000 | 0.11 | 7E-05 | 0.57 | 0.0003 | 0.26 | 0.024 |
| All to Piñon Ridge Mill | 784,000 | 0.061 | 4E-05 | 0.32 | 0.0002 | 0.14 | 0.013 |
| All to White Mesa Mill | 3,231,000 | 0.25 | 0.0001 | 1.3 | 0.0008 | 0.60 | 0.054 |

34
35

BLM_0041501

**TABLE 4.3-12  Potential Haul Truck Traffic on Local Roads**

| Size of Mine | Ore Production Rate (tons/d) | No. of Trucks/d[a] |
|---|---|---|
| Small | 50 | 4 |
| Medium | 100 | 8 |
| Large | 200 | 16 |
| Very large | 300 | 24 |

[a]   Assumes 25 tons of uranium ore per truck and round-trip travel.

**4.3.10.2.2  Radiological Impacts.** Radiological impacts during routine conditions would be a result of human exposure to the low levels of radiation near the shipment. The regulatory limit established in 49 CFR 173.441 (Radiation Level Limitations) and 10 CFR 71.47 (External Radiation Standards for All Packages) to protect the public is 10 mrem/h at 6 ft (2 m) from the outer lateral sides of the transport vehicle. As discussed in Appendix D, Section D.10.4.2, the average external dose rate for uranium ore shipments is approximately 0.1 mrem/h at 6 ft (2 m), two orders of magnitude lower than the regulatory maximum.

**Collective Population Risk.** The collective population risk is a measure of the total risk posed to society as a whole by the actions being considered. For a collective population risk assessment, the persons exposed are considered as a group; no individual receptors are specified. The annual collective population dose to persons sharing the shipment route and to persons living and working along the route was estimated to be approximately 0.11 person-rem for the peak year, assuming about 9,600 shipments for the year for the sample case, as shown in Table 4.3-11. The total collective population dose of 0.11 person-rem could result in approximately $7 \times 10^{-5}$ latent cancer fatality (LCF). Therefore, no LCFs are expected. These impacts are roughly double the impacts if all ore shipments went to the Pinon Ridge Mill and roughly half the impacts that would occur if all ore shipments went to the White Mesa Mill, as shown in Table 4.3-11.

Collectively for the sample case, the truck drivers (transportation crew) would receive a dose of about 0.57 person-rem (0.0003 LCF) during the peak year of operations from all shipments. Again, no LCFs would be expected. For perspective, the collective dose of 0.57 rem (570 mrem) over 9,600 shipments is less than what a single individual would receive in 1 year from natural background radiation (about 310 mrem) and human-made sources of radiation (about 310 mrem/yr).

For scenarios other than those presented in this PEIS, single shipment risks are provided for transporting ore from any of the lease tracts considered in any alternative to the Piñon Ridge Mill (Table 4.3-13) and the White Mesa Mill (Table 4.3-14). In conjunction with Table 4.3-10,

BLM_0041502

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1
2

**TABLE 4.3-13  Single-Shipment Collective Population Impacts from Transporting Ore from Lease Tracts to Piñon Ridge Mill[a]**

| Lease Tract | Radiological Impacts | | | | Accidents per Round Trip | |
|---|---|---|---|---|---|---|
| | Public Dose (person-rem) | Risk (LCF) | Worker Dose (person-rem) | Risk (LCF) | Injuries | Fatalities |
| 5 | 1.0E-06 | 6E-10 | 5.4E-06 | 3E-09 | 2.45E-06 | 2.20E-07 |
| 5A | 1.1E-06 | 6E-10 | 5.6E-06 | 3E-09 | 2.57E-06 | 2.32E-07 |
| 6 | 1.3E-06 | 8E-10 | 6.5E-06 | 4E-09 | 2.99E-06 | 2.70E-07 |
| 7 | 1.1E-06 | 6E-10 | 5.7E-06 | 3E-09 | 2.58E-06 | 2.33E-07 |
| 8 | 1.5E-06 | 9E-10 | 7.6E-06 | 5E-09 | 3.49E-06 | 3.14E-07 |
| 8A | 1.5E-06 | 9E-10 | 7.6E-06 | 5E-09 | 3.49E-06 | 3.14E-07 |
| 9 | 4.2E-06 | 3E-09 | 2.2E-05 | 1E-08 | 1.01E-05 | 9.10E-07 |
| 10 | 1.5E-05 | 9E-09 | 8.1E-05 | 5E-08 | 3.68E-05 | 3.32E-06 |
| 11 | 1.6E-05 | 1E-08 | 8.5E-05 | 5E-08 | 3.89E-05 | 3.51E-06 |
| 11A | 1.7E-05 | 1E-08 | 8.8E-05 | 5E-08 | 4.01E-05 | 3.61E-06 |
| 12 | 1.7E-05 | 1E-08 | 8.6E-05 | 5E-08 | 3.95E-05 | 3.56E-06 |
| 13 | 1.3E-05 | 8E-09 | 6.9E-05 | 4E-08 | 3.17E-05 | 2.86E-06 |
| 13A | 1.4E-05 | 8E-09 | 7.1E-05 | 4E-08 | 3.25E-05 | 2.92E-06 |
| 14 | 1.4E-05 | 8E-09 | 7.1E-05 | 4E-08 | 3.24E-05 | 2.92E-06 |
| 15 | 1.4E-05 | 8E-09 | 7.4E-05 | 4E-08 | 3.38E-05 | 3.05E-06 |
| 15A | 1.5E-05 | 9E-09 | 7.6E-05 | 5E-08 | 3.47E-05 | 3.12E-06 |
| 16 | 1.5E-05 | 9E-09 | 7.8E-05 | 5E-08 | 3.54E-05 | 3.19E-06 |
| 16A | 1.5E-05 | 9E-09 | 7.7E-05 | 5E-08 | 3.51E-05 | 3.16E-06 |
| 17 | 4.7E-06 | 3E-09 | 2.4E-05 | 1E-08 | 1.11E-05 | 1.00E-06 |
| 18 | 6.7E-06 | 4E-09 | 3.5E-05 | 2E-08 | 1.59E-05 | 1.44E-06 |
| 19 | 7.8E-06 | 5E-09 | 4.1E-05 | 2E-08 | 1.86E-05 | 1.68E-06 |
| 19A | 7.4E-06 | 4E-09 | 3.9E-05 | 2E-08 | 1.76E-05 | 1.59E-06 |
| 20 | 7.4E-06 | 4E-09 | 3.9E-05 | 2E-08 | 1.76E-05 | 1.59E-06 |
| 21 | 3.3E-06 | 2E-09 | 1.7E-05 | 1E-08 | 7.98E-06 | 7.19E-07 |
| 22 | 3.7E-06 | 2E-09 | 2.0E-05 | 1E-08 | 8.96E-06 | 8.07E-07 |
| 22A | 4.0E-06 | 2E-09 | 2.1E-05 | 1E-08 | 9.62E-06 | 8.66E-07 |
| 23 | 2.8E-06 | 2E-09 | 1.5E-05 | 9E-09 | 6.78E-06 | 6.10E-07 |
| 24 | 6.8E-06 | 4E-09 | 3.6E-05 | 2E-08 | 1.63E-05 | 1.46E-06 |
| 25 | 6.6E-06 | 4E-09 | 3.5E-05 | 2E-08 | 1.58E-05 | 1.42E-06 |
| 26 | 1.6E-05 | 1E-08 | 8.4E-05 | 5E-08 | 3.86E-05 | 3.47E-06 |
| 27 | 1.3E-05 | 8E-09 | 6.9E-05 | 4E-08 | 3.16E-05 | 2.84E-06 |

[a]   See Appendix D, Section D.10.4, for assumptions.

3
4
5

BLM_0041503

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1
2

**TABLE 4.3-14  Single-Shipment Collective Population Impacts from Transporting Ore from Lease Tracts to White Mesa Mill[a]**

| Lease Tract | Radiological Impacts | | | | Accidents per Round Trip | |
| | Public Dose (person-rem) | Risk (LCF) | Worker Dose (person-rem) | Risk (LCF) | Injuries | Fatalities |
|---|---|---|---|---|---|---|
| 5 | 3.0E-05 | 2E-08 | 1.6E-04 | 9E-08 | 7.22E-05 | 6.51E-06 |
| 5A | 3.0E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.24E-05 | 6.52E-06 |
| 6 | 3.0E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.28E-05 | 6.56E-06 |
| 7 | 3.0E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.24E-05 | 6.52E-06 |
| 8 | 3.1E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.33E-05 | 6.60E-06 |
| 8A | 3.1E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.33E-05 | 6.60E-06 |
| 9 | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.72E-05 | 6.96E-06 |
| 10 | 1.7E-05 | 1E-08 | 8.6E-05 | 5E-08 | 3.95E-05 | 3.56E-06 |
| 11 | 1.5E-05 | 9E-09 | 8.0E-05 | 5E-08 | 3.68E-05 | 3.31E-06 |
| 11A | 1.6E-05 | 1E-08 | 8.3E-05 | 5E-08 | 3.80E-05 | 3.42E-06 |
| 12 | 1.6E-05 | 1E-08 | 8.3E-05 | 5E-08 | 3.81E-05 | 3.43E-06 |
| 13 | 1.8E-05 | 1E-08 | 9.3E-05 | 6E-08 | 4.24E-05 | 3.82E-06 |
| 13A | 1.8E-05 | 1E-08 | 9.4E-05 | 6E-08 | 4.31E-05 | 3.88E-06 |
| 14 | 1.8E-05 | 1E-08 | 9.4E-05 | 6E-08 | 4.28E-05 | 3.86E-06 |
| 15 | 1.9E-05 | 1E-08 | 9.7E-05 | 6E-08 | 4.45E-05 | 4.01E-06 |
| 15A | 1.9E-05 | 1E-08 | 9.9E-05 | 6E-08 | 4.53E-05 | 4.08E-06 |
| 16 | 1.6E-05 | 1E-08 | 8.5E-05 | 5E-08 | 3.89E-05 | 3.51E-06 |
| 16A | 1.6E-05 | 1E-08 | 8.5E-05 | 5E-08 | 3.87E-05 | 3.49E-06 |
| 17 | 2.7E-05 | 2E-08 | 1.4E-04 | 8E-08 | 6.38E-05 | 5.75E-06 |
| 18 | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.56E-05 | 6.81E-06 |
| 19 | 3.3E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.84E-05 | 7.06E-06 |
| 19A | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.74E-05 | 6.97E-06 |
| 20 | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.74E-05 | 6.97E-06 |
| 21 | 3.1E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.37E-05 | 6.64E-06 |
| 22 | 3.1E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.47E-05 | 6.73E-06 |
| 22A | 3.2E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.53E-05 | 6.79E-06 |
| 23 | 3.0E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.25E-05 | 6.53E-06 |
| 24 | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.60E-05 | 6.84E-06 |
| 25 | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.55E-05 | 6.80E-06 |
| 26 | 4.1E-05 | 2E-08 | 2.1E-04 | 1E-07 | 9.82E-05 | 8.85E-06 |
| 27 | 3.8E-05 | 2E-08 | 2.0E-04 | 1E-07 | 9.13E-05 | 8.22E-06 |

[a]  See Appendix D, Section D.10.4, for assumptions.

3
4
5

BLM_0041504

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

all collective population impacts related to any combination and number of ore shipments
between lease tracts and uranium mills can be estimated.

**Highest-Exposed Individuals during Routine Conditions.** In addition to assessing the
routine collective population risk, the risks to individuals for a number of hypothetical exposure
scenarios were estimated, as described further in Section D.10.2.2. The scenarios were not meant
to be exhaustive but were selected to provide a range of potential exposure situations. The
estimated doses and associated likelihoods of LCFs are provided in Table 4.3-15.

The highest potential routine radiological exposure to an individual, with an LCF risk of
$5 \times 10^{-8}$, would be to someone caught in traffic next to a haul truck for up to 30 minutes at a
distance of 3.9 ft (1.2 m). There is also the possibility for multiple exposures in some cases. For
example, if an individual lived or worked near a uranium mill, the person could receive a
combined dose of as much as approximately 0.013 mrem if present for all ore shipments over the
course of the peak year (if all of the ore went to a single mill). This dose is extremely low, about
24,000 times lower than the amount an individual receives in a single year from natural
background radiation (about 310 mrem/yr).

### 4.3.10.3  Transportation Accident

The total distance traveled by haul trucks during the peak year would be approximately
0.89 million mi (1.42 million km) including round-trip travel between the lease tracts and the
mills as discussed in Section 4.5.10.2.1 for the sample case. As shown in Table 4.3-11, potential
transportation accident impacts for the peak year would not include any expected injuries or
fatalities from traffic accidents (risk < 0.5). For perspective, from 2006 through 2010 over the
entire area of the affected counties (San Juan County in Utah and Dolores, Mesa, Montrose, and
San Miguel Counties in Colorado), a total of 21 heavy-truck-related traffic fatalities occurred
(DOT 2010 a–e), representing an average of 4.2 fatalities per year.

**TABLE 4.3-15  Hypothetical Single-Shipment
Radiological Impacts on Individual Receptors**

| Receptor | Dose (mrem) | LCF Risk |
|---|---|---|
| Person at roadside | $1.8 \times 10^{-5}$ | $1 \times 10^{-11}$ |
| Person in traffic jam | 0.089 | $5 \times 10^{-8}$ |
| Resident near route | $1.4 \times 10^{-6}$ | $8 \times 10^{-13}$ |

BLM_0041505

**4.3.10.4  Accidental Release of Uranium during Transportation**

It is expected that the uranium mine operators and their transportation carriers would maintain an emergency response plan for haul truck accidents. Accidental spills of uranium ore would be cleaned up in the shortest possible time by qualified personnel. Uranium ore being transported is treated by U.S. Department of Transportation regulations as a low-specific-activity material. However, because of the low-grade nature of the uranium ore considered in this PEIS (0.2% as $U_3O_8$), an ore spill of the entire shipment (25 tons) would not constitute a reportable quantity for uranium as defined in 49 CFR 172.101.

Impacts on the public and the environment from an accident involving a haul truck carrying uranium ore are expected to be minimal. If a transportation accident occurred and some or all of the uranium ore spilled on the ground, the ore would be completely recovered, loaded onto a truck, and transported to the mill. Because it is low-grade uranium ore and because the ore is of a stony, aggregate composition that would limit any widespread dispersion, there would be no significant impacts on human health or natural resources. Only local disturbance of soil and vegetation might occur as a consequence of spill cleanup.

If a haul truck accident involved spilling ore into a surface water body, adverse radiological impacts on biota would not be expected. First, the nature of the ore—relatively large insoluble chunks of material—would make it more amenable to cleanup from the water body. Second, the low concentrations of hazardous constituents in the ore and their relatively low solubility levels in water would minimize the likelihood of them approaching toxic concentration levels. Third, prompt cleanup of the spill would reduce the time it would take for contaminants to leach into the water. Any finer ore particles would be dispersed by water flow in streams or rivers. In the case of fine particles, more extensive cleanup might be necessary if a sensitive shallow water body such as a pond was involved. The primary impact on water quality from a spill would be a short-term increase in turbidity and total suspended solids (TSP).

**4.3.11  Cultural Resources**

Under Alternative 3, the full range of uranium mining activities (exploration, development, operation, and reclamation) could occur on the 12 lease tracts. In each of these phases, cultural resources could be disturbed as a result of activities in which the ground surface was disturbed, historic structures were damaged or destroyed, or pedestrian and vehicle traffic increased on the lease tracts and their access roads. These activities could also have adverse effects on traditional cultural properties, such as plant and animal species traditionally collected by Native Americans for food, medicine, and ritual purposes, and on sacred or culturally significant places and landforms.

DOE ULP procedures require lessees to prepare and submit exploration and mining plans before starting any surface-disturbing activities or building surface facilities on the lease tract. These plans must undergo a technical review and a review for compliance with lease provisions. As part of that review process, ULP staff conduct a field review to identify areas where

BLM_0041506

1   additional investigations (including cultural resource inventories) are required. If the DOE Office
2   of Legacy Management (DOE-LM) environmental compliance point of contact determines that
3   the plan has the potential to affect historic properties, DOE will begin consultation with the State
4   Historic Preservation Officer (SHPO), tribes, and other concerned parties as required by
5   Section 106 of the National Historic Preservation Act (NHPA) (DOE 2011b). For all new
6   proposed surface disturbances, the lessee is required to perform a cultural resource inventory in
7   accordance with the SHPO's Class III field inventory standards and to provide the results to
8   DOE and the BLM (DOE 2011a). If historic properties are identified, the BLM, as land manager
9   of the lease tracts, must notify the SHPO and consulting parties. A qualified archaeologist or
10  other cultural resource specialist would evaluate the properties for their eligibility for listing on
11  the NRHP. Upon the recommendation of the cultural resource specialist, a final eligibility
12  determination would be made by DOE in consultation with the SHPO, tribes, and other
13  consulting parties. If historic properties were discovered to be within the area of potential effect
14  or areas that potentially could be affected by the undertaking proposed in the exploration and
15  mining plans, DOE would assess the potential for adverse effects. A finding of adverse effects
16  would require additional consultation for methods to resolve adverse effects (DOE 2011b).
17  Adverse effects are often resolved by avoiding and/or protecting the threatened cultural resource.
18  It is not always possible to avoid adverse effects. In these cases data recovery through controlled
19  excavation of an archaeological site, or appropriate recording of historic structures, mitigates the
20  adverse effects by providing a record of the property. In some cases, it might not be possible to
21  mitigate all adverse effects. Native Americans might be opposed to the excavation of prehistoric
22  sites, especially if humans are likely to be buried there.
23
24          Buried cultural remains do not always leave surface indicators. It is possible that even
25  well-executed surveys will not identify all significant cultural resources. DOE-LM procedures
26  require that if an in-process project encounters and will affect a previously unidentified cultural
27  resource or will affect a known historic property in an unanticipated manner, that activity must
28  immediately cease in the area of the discovery. The resource will be protected, and DOE is to be
29  notified. Surface-disturbing activity in the area of the discovery will be halted until DOE makes a
30  decision regarding the disposition of the resource (DOE 2011b).
31
32
33  **4.3.11.1  Exploration**
34
35          The exploration phase is generally limited in time and scope and usually involves
36  minimal surface disturbance. Potential surface disturbance could result from drilling, test holes,
37  small pits to catch cuttings, and the grading of any necessary access roads. Any new roads that
38  would increase access to remote areas would provide easier access to unauthorized artifact
39  collectors. ULP procedures require lessees to prepare and submit exploration plans for review
40  before any surface disturbance takes place. Plans undergo technical review for compliance with
41  lease provisions. As part of that review, ULP staff conduct a field review to identify areas where
42  additional investigations (including cultural resources inventories) are required. For all new
43  surface disturbances, the lessee is required to perform a cultural resources inventory. The
44  inventory must be conducted to meet the SHPO's Class III inventory standards and be provided
45  to both the DOE and the BLM, which is responsible for surface management of the lease tracts

BLM_0041507

*Preliminary Draft PEIS*      *PEIS Privileged Information*      *May 2012*
*PEIS Team Use Only*      *Do Not Distribute*

1   (DOE 2011a). Already approved exploration plans for Lease Tracts 13A, 21, and 25 include
2   drilling from one to two test holes.
3
4          Direct impacts on cultural resources would tend to be limited in the exploration phase.
5   Drilling locations are normally about 15 × 50 ft (4.6 × 15 m), a typical cutting pit would be
6   10 × 10 × 3 ft, and roads are generally less than 20-ft (6-m) wide. Typically, exploration teams
7   use existing access roads when available and drive over land to off-road sites when possible to
8   limit the amount of road cutting necessary. If cultural resources are encountered in the surveys
9   mandated before drilling can occur, the drill site can usually be relocated to avoid the resource.
10  Lessees must consider and plan for reclamation in their exploration and mining plans, and this
11  process encourages them to minimize surface disturbance.
12
13
14          **4.3.11.2  Mine Development and Operations**
15
16          Potential adverse effects on cultural resources from mine development and operations
17  would be similar to those possible during the exploration phase, but on a larger scale. With the
18  exception of a large open-pit mine on Lease Tract 7, which already exists, all of the mining
19  proposed for the lease tracts is expected to be underground. Surface disturbance would include
20  entry portals, inclines, shafts, and adits; associated surface structures including water and fuel
21  tanks, headframes, hoists, and winches; ventilation equipment and de-watering ponds where
22  necessary; parking areas; equipment marshaling yards; and large cleared areas for storing waste
23  rock and surface soil as well as ore. The area taken up by mine development and operations
24  facilities would vary with the size of the mine. On the ULP lease tracts, it is assumed that a small
25  facility area would take up to 10 acres (4.0 ha) and a medium-sized mine would take up to
26  15 acres (6.1 ha). A mine with surface facilities that occupied up to 20 acres (8 ha) would be
27  considered large. The open-pit mine in Lease Tract 7 takes up 200 already-disturbed acres
28  (80 ha). Operation of most mines requires large equipment, but relatively small crews of 5 to
29  8 people. Mine operations could last from about 10 years. Of the lease tracts that would continue
30  under Alternative 3, nine (5, 6, 7, 8, 9, 11, 13, and 18) have existing permitted mines. New
31  surface disturbance would be limited to new mine-related facilities and stockpiling areas. At
32  three lease tracts (13A, 21, and 25), exploratory drilling has been completed and land has been
33  reclaimed, but there are no permitted mines. The specific location of new mines to be developed
34  and operated will not be known until plans are submitted by the lessees to DOE for approval.
35  However, there is likely to be more surface disturbance on these lease tracts as mines are
36  developed and operated. BLM and DOE require that the areas to be developed be surveyed for
37  cultural resources before the ground surface is disturbed. Table 4.3-16 shows the projected
38  number of cultural resources that could be directly affected under the mine development scenario
39  for Alternative 3.
40
41
42          **4.3.11.2.1  Roads.** As discussed in Section 4.11, the Uruvan Mineral Belt has been
43  actively mined for over a 100 years. Mining activity has resulted in the construction of a network
44  of mostly dirt roads providing access to the mines, haul routes, maintenance roads, and roads
45  supporting associated structures. The 9 lease tracts with existing permitted mines are already

BLM_0041508

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                   *Do Not Distribute*

**TABLE 4.3-16  Expected Cultural Resource Sites Expected To Be Directly Affected under Alternative 3**

| Mine Size Category under Alternative 3 | No. of Mines in Each Category | Expected No. of Sites per Category | Total No. of Sites Expected |
|---|---|---|---|
| Small | 2 | 0.8 | 2 |
| Medium | 4 | 1.2 | 5 |
| Large | 1 | 1.7 | 2 |
| Total | | | 8 |

served by access roads. Road construction at these sites would primarily be confined to upgrading existing roads. If new roads either within the lease tracts or providing access to the lease tracts were constructed, cultural resource surveys would first have to be conducted by following BLM regulations and guidelines. The remaining 3 lease tracts have been subjected to exploratory drilling but lack permitted mines. There are access roads serving each of these three lease tracts along with a network of exploration roads. It is likely that these lease tracts could be developed by using mostly existing roads. These might have to be upgraded, and new roads might have to be graded. New roads or road improvements in areas that have not been surveyed would require cultural resource surveys before ground-disturbing activities could begin.

Most roads serving the lease tracts are dirt. Increased traffic during the mine development and operational phases could lead to secondary impacts on cultural resources. Depending on the weather and the proximity of significant cultural resources, they could be affected by traffic vibration and/or fugitive dust. Fugitive dust can have deleterious effects on rock art panels. Vibration can affect built structures. Traffic noise could have a negative effect on areas used for prayer or areas sacred to traditional cultures where solitude is an essential component. Road improvements might render lease tracts more accessible to hunters and other recreational users. An increased human presence renders cultural resources subject to potential trampling, erosion, vandalism, and unpermitted collecting.

**4.3.11.2.2  Support Facility Construction and Operation.** As discussed above, mines already exist in 9 of the lease tracts that would continue under Alternative 3, whereas only exploration has occurred in the remaining 3 lease tracts. While it is possible that new facilities would need to be constructed on the lease tracts with existing mines, it is likely that more construction and ground-disturbing activities would occur where development has only reached the exploration stage. On the other hand, existing mines might be more likely to include historic structures or features than would new mining sites. However, since many mines are short-lived, it is also possible that existing mines might not include any historic structures.[4] The construction and operation of support facilities could adversely affect buried archaeological sites and

---

[4]  Unless extraordinarily significant under Criteria Consideration (g), structures must be at least 50 years old to be considered historically significant.

BLM_0041509

*Preliminary Draft PEIS*                *PEIS Privileged Information*                *May 2012*
*PEIS Team Use Only*                     *Do Not Distribute*

historically important features of existing mines and could be visually and acoustically intrusive to traditional cultural properties. As discussed in Section 3.4.11, the pre-construction and excavation reviews required and the cultural resource surveys required prior to construction or ground-disturbing activities should identify significant cultural properties that would be adversely affected by the proposed actions. Plans would then be modified to avoid or mitigate impacts on cultural resources.

Mine construction and operations would also introduce vehicles, equipment, and workers to the mining areas. Impacts from these sources would be similar to those discussed in the section on roads but would be of longer duration. They would include the introduction of vibration, noise, and fugitive dust. These would be confined to areas directly adjacent to mine openings themselves. The introduction of a long-term workforce would increase the possibility of disturbance of cultural resources by human agency.

### 4.3.11.3  Reclamation

Impacts from the reclamation phase would be the same as those discussed in Section 4.1.10.

## 4.3.12  Visual Resources

Under Alternative 3, exploration, mine development and operations, and reclamation would occur on the 12 lease tracts.

### 4.3.12.1  Exploration

Potential visual impacts that could result from this phase include contrasts in form, line, color, and texture resulting from the following activities: (1) vegetation clearing, (2) exploratory drilling, (3) road construction (if needed), and (4) the presence of workers, personal and commercial vehicles, and construction equipment, along with their associated occasional, short-duration road traffic, parking, and dust.

Minimal vegetation clearance might be needed to establish a drilling location, and some roads might need to be constructed or upgraded, resulting in the clearance of some vegetation. The clearing of the vegetation might expose bare soil, creating a change in the color of the ground surface. This impact would be limited, since a typical drilling location is approximately $15 \times 50$ ft ($4.6 \times 15$ m), and exploratory roadways are generally less than 20 ft (6.1 m) in width. Topsoil from the clearing for both of these features typically would be stockpiled on site for future reclamation, and vegetation clearance would be minimized to the extent possible (DOE 1995).

BLM_0041510

1      Exploratory drill rigs are typically 35 ft (11 m) high. These rigs are used to drill
2  exploratory holes. In some scenarios, small drill rigs that are track- or truck-mounted might be
3  used (DOE 1995). These drill rigs might be visible from within the lease tracts as well as from
4  surrounding lands (Section 4.3.12.4).
5
6      If road upgrading or new road construction was necessary, visual contrasts might be
7  introduced due to changes in form, line, color, and texture. The occurrence of visual impacts
8  would depend on the routes selected relative to surface contours and the widths, lengths, and
9  surface treatments of the existing road network. In addition, if improper road maintenance
10  occurred, it could lead to the growth of invasive species or erosion, both of which could
11  introduce visible contrasts in line, color, and texture, primarily for foreground and near-middle-
12  ground views. If existing or new roads were not utilized when exploration activities were
13  conducted, ruts, windblown dust, and visible vegetation damage could also result from cross-
14  country vehicle traffic.
15
16      Workers, vehicles, and other equipment could be visible in surrounding areas. Depending
17  on site and weather conditions, worker activities, and especially vehicles, could result in visible
18  dust. If proper site sanitation practices were not followed, litter could be visible.
19
20      Visual impacts associated with exploration are generally minor and of short duration due
21  to the quick time frame in which these activities are conducted. Impacts due to road construction,
22  erosion, or other landform alterations or vegetation clearing in arid environments, however,
23  might be visible for extended periods.
24
25
26      **4.3.12.2  Mine Development and Operations**
27
28      Under Alternative 3, mine development and operations could require up to 10 acres
29  (4 ha) of land for small mines, up to 15 acres (6 ha) for medium-sized mines, and up to 20 acres
30  (8 ha) for large mines. Under this alternative, the largest mine site would be located on Lease
31  Tract 7, at which 200 acres (81 ha) are already disturbed from previous activity. An additional
32  100 acres (40 ha) of disturbance could occur at this location. Potential visual impacts that could
33  result from the mine development and operations would include contrasts in form, line, color,
34  and texture resulting from the following activities: (1) vegetation and ground clearing; (2) road
35  building and upgrading; (3) support facility construction; (4) vehicle, equipment, and worker
36  presence and activity, along with their associated vegetation and ground disturbance, dust, and
37  emissions; and (5) lighting.
38
39      Visual impacts resulting from activities associated with mine development and operations
40  would vary in frequency and duration, since this phase can last for 10 years or more.
41
42
43      **4.3.12.2.1  Vegetation/Ground Clearing.** Mine development for underground and
44  open-pit mines would require clearing of vegetation, large rocks, and other objects that have the
45  potential to interfere with the mining activities. The nature and extent of clearing would be

BLM_0041511

1   affected by the requirements of the project, the types of vegetation, and the characteristics of
2   other objects to be cleared. Vegetation clearing and topographic grading might be required for
3   the construction of access roads, maintenance roads, and roads to support associated structures.
4   The removal of vegetation would result in contrasts in color and texture, because the varied
5   colors and textures of vegetation would be replaced by the more uniform color and texture of
6   bare soil. This activity also could introduce contrasts in form and line, depending on the type of
7   vegetation cleared and nature of the cleared surface. The cleared areas likely would be
8   maintained during operation. At this time, vegetation and ground clearance would be anticipated
9   to result in minimal changes as compared to those activities required for the initial site
10  development.

11
12

13  **4.3.12.2.2  Road Building/Upgrading.** While not anticipated, some minor construction
14  of new temporary and permanent access roads and/or upgrading of existing roads to support
15  mining activities might be required during mine development. These activities also might occur
16  on off-lease lands (DOE 1995).

17

18  Road development might introduce strong visual contrasts to the landscape, depending on
19  the routes selected relative to surface contours and on the widths, lengths, and surface treatments
20  of the roads. Upgrades to roadways generally would consist of widening access roads, if
21  necessary, to accommodate construction equipment. This might consist of additional vegetation
22  or ground clearance depending on the location and intended use of the roadway.

23

24  During mine operations, the roadways would need to be maintained in order to
25  accommodate the transportation of the mined material. These activities might consist of minimal
26  grading or removal of overgrowth. The roads would need to be maintained for the life of the
27  facilities, if required for either the open-pit or underground mining methods.

28
29

30  **4.3.12.2.3  Support Facility Construction and Operations.** In addition to the use of
31  roadways, mine development would include the construction and placement of surface plant area
32  improvements (i.e., support facility construction).

33

34  At some of the mining locations, the structures would not be permanent, and in some
35  cases, they would be positioned on previously disturbed land (EFRC and Greg Lewicki and
36  Associates 2008). The presence of these structures could potentially create visual impacts as a
37  result of contrasts in form, line, color, and texture, especially if no infrastructure was in place
38  prior to the start of activities. The impacts from placing temporary structures during mine
39  development would be limited due to the short duration of mine development when compared to
40  the time associated with more permanent structures needed for the operational life of the mine.

41
42

43  **4.3.12.2.4  Vehicles, Equipment, and Workers.** The development of mine sites would
44  require work crews, vehicles, and equipment that could potentially cause visual contrasts in
45  form, line, color, and texture. For instance, traffic associated with workers and large equipment

BLM_0041512

1  (e.g., trucks, graders, excavators, and cranes) would be expected for constructing roads and
2  buildings. The traffic would produce visible activity and could cause visible dust plumes in dry
3  soils. In addition, temporary parking for vehicles would be needed at or near work locations
4  during construction.
5
6      Ground disturbance would produce contrasts of color, form, texture, and line. Any
7  excavating that might be required for building foundations, grading and surfacing roads, clearing
8  and leveling mining areas, and stockpiling soil and ore would damage or remove vegetation,
9  expose bare soil, and suspend dust. Soil scars, exposed slope faces, eroded areas, and areas of
10 compacted soil could result from excavation, leveling, and equipment and vehicle movement.
11 Invasive species might colonize disturbed areas, stockpiles, and compacted areas. These species
12 might be introduced naturally; or in seeds, plants, or soils introduced for intermediate restoration;
13 or by vehicles. In some situations, the presence of invasive species might introduce contrasts
14 with naturally occurring vegetation, primarily in color and texture.
15
16     If proper site sanitation practices were not followed, litter and debris could be visible
17 within and around work sites. Site monitoring and restoration activities could reduce many of
18 these impacts. Other activities during this phase could include bracing and cutting existing fences
19 and constructing new fences to limit or prevent access; providing temporary walks, passageways,
20 fences, or other structures to prevent interference with traffic; and providing lighting in areas
21 where work might be conducted at night.
22
23     Once surface structures were in operation, the nature and extent of visual impacts
24 associated with them would depend in part on the type of mine (i.e., open-pit or underground),
25 the size of the structures, the nature of required clearing and grading, and the types and amounts
26 of materials to be stored for mining activities.
27
28     For instance, open-pit mining generally requires larger surface areas for storage of
29 overburden and waste rock than do underground methods (IAEA 2000). Stockpiles could be
30 visible for the duration of operations. Open-pit mining generally utilizes backhoes, front-end
31 loaders, scrapers, bulldozers, and trucks to move mine-rock waste around the site. In addition,
32 for underground mining, vertical and inclined shafts are equipped with hoists and headframes
33 that protrude above the ground surface. Large surface fans also might be used to assist with
34 underground ventilation (National Research Council 2011). Water also might need to be brought
35 onto the site, if no natural sources were available, and if so, water trucks might be visible
36 (DOE 1995). Stockpiles also could be visible for the duration of operations at these types of
37 mines. Underground mines utilize rubber-tired, trackless mobile equipment to transport waste-
38 rock (DOE 1995).
39
40     The operation of open-pit and underground mines also might create dust, which could be
41 composed of fine particles generated from the mechanical disturbance of rock and soil,
42 bulldozing, blasting, and vehicles travelling on dirt roads. Particles might also be mobilized by
43 wind blowing over ore stockpiles (National Research Council 2011). The suspension and
44 visibility of dust would be influenced by vehicle speeds, road surface materials, and weather
45 conditions (DOE 1995).
46

BLM_0041513

**4.3.12.2.5  Lighting.** It is not anticipated that mine construction would occur at night. However, some outdoor lighting might be necessary for security and safety around the lease tracts. Lighting might be needed around temporary facilities (e.g., construction trailers), parking, and work areas.

During mine operations, exterior lighting might be needed around structures, parking locations, and work areas. Exterior lighting could contribute to light pollution; this type of pollution is caused by outdoor lights that are positioned to face upward or sideways. Any light that escapes upward, unless blocked by an object, will scatter throughout the atmosphere and brighten the night sky. Air pollution particles also might increase the scattering of light at night, just as they affect visibility during the daytime (BLM 2011). Light pollution impacts associated with the reclamation of mining sites might include skyglow, light trespass, and glare. Security and other lighting around and on support structures could also contribute to light pollution.

"Skyglow" is a brightening of the night sky caused by both natural and human-made factors. It decreases a person's ability to see dark night skies and stars, which is an important recreational activity in many parts of the United States, including at BLM and non-BLM lands within the areas include and surround the lease tracts. These types of effects can be visible for long distances. Outdoor artificial lighting can contribute to this effect by directing light directly upward into the night sky and also through the reflection of light from the ground and other illuminated surfaces.

"Light trespass" is the casting of light into areas where it is unneeded or unwanted. Poorly placed and aimed lighting can cause light to spill into areas outside the location needing illumination. While few residences are located within the vicinity of the lease tracts, the light spillage might be noticeable to the travelling public, albeit for a brief duration due to the size of the lease tracts.

"Glare" is the visual sensation caused by excessive and uncontrolled brightness, and, in the context of outdoor lighting, it is generally associated with direct views of a strong light source. Poorly placed and aimed lighting can cause glare, as can the use of excessively bright lighting. In general, any degree of lighting would produce some off-site light pollution, which might be particularly noticeable in dark nighttime sky conditions typical of the settings within the lease tracts. Glare also can be produced from unintentional sources, such as vehicle windshields or metal pieces on structures (BLM 2011).

### 4.3.12.3  Reclamation

See Section 4.1.12 for a discussion of the visual impacts associated with reclamation activities.

BLM_0041514

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*               *Do Not Distribute*

1      **4.3.12.4  Impacts on Surrounding Lands**
2
3          The following analysis provides an overview of the potential visual impacts on those
4      SVRAs surrounding the mining locations under Alternative 3. Because of the number of leases
5      and the potential for increased mining activity, lands outside the lease tracts that have views of
6      the lease tracts would be subject to visual impacts. The affected areas and extent of impacts
7      would depend on a number of visibility factors, viewer duration, and viewer distance.
8
9          Preliminary viewshed analyses were conducted to identify which lands surrounding the
10     four lease groups identified in Section 3.12 might have views of some portions of the various
11     lease tracts. An additional viewshed analysis was conducted for a subset of these groups that
12     would include all of the lease tracts in which reclamation activities would be conducted under
13     Alternative 3 (see Section 4.3.12.1).
14
15         The impact analysis is based on a reverse viewshed analysis for which the methodology
16     is provided in Appendix D. This analysis considers federal, state, and BLM-designated sensitive
17     visual resources. The intent of the analysis is to determine the potential levels of contrasts
18     (i.e., changes in form, line, color, and texture from the existing condition to that under
19     Alternative 3) that would occur as a result of activities on the lease tracts.
20
21         Under Alternative 3, 12 lease tracts would be in operation; these include Lease Tracts 5,
22     6, 7, 8, 9, 11, 13, 13A, 15, 18, 21, and 25. The following analysis provides an overview of the
23     potential visual contrasts expected for those SVRAs surrounding the mining locations. Under
24     this alternative, the lease tracts were analyzed in only three of the four groups: the North Central
25     Group, the South Central Group, and the South Group.
26
27
28         **4.3.12.4.1  North Central Group.** Figure 4.3-1 shows the results of the viewshed
29     analysis for lease tracts within the North Central Group, including Lease Tracts 18, 21, and 25.
30     The following SVRAs might have views of the lease tracts:[5]
31
32         •   Tabequache WA,
33
34         •   Sewemup WSA,
35
36         •   Unaweep/Tabeguache Scenic and Historic Byway,
37
38         •   Dolores River Canyon WSA,
39
40         •   Dolores River SRMA, and
41
42         •   San Miguel ACEC.
43

---

[5]  For the three groups of lease tracts, the SVRAs are presented in descending order, based on the percentage of the
     total acreage or mileage that would have a potential view of the lease tracts.

BLM_0041515



FIGURE 4.3-1  Viewshed Analysis for the North Central Lease Group under Alternative 3

*4-135*

1    Figure 4.3-1 shows the results of the viewshed analysis for the lease tracts within the
2  North Central Group. The colored segments indicate areas in the SVRAs with clear lines of sight
3  to one or more areas within the lease tracts and from which activities conducted within the lease
4  groups would be expected to be visible, assuming the absence of screening vegetation or
5  structures and assuming there would be adequate lighting and other atmospheric conditions
6  would be suitable.
7
8    The lease tracts within the North Central Group would potentially be visible from
9  portions of the Tabequache WA between 5 and 15 mi (8 and 24 km) from the lease tracts. Views
10  of the North Central Group from the WA are partially or fully screened by the intervening
11  mountains and vegetation. The lease tracts would potentially be visible from approximately
12  49.2% (4,031 acres or 1,600 ha) of the WA. Views of the lease tracts would be possible from
13  elevated viewpoints within the WA. Depending on the infrastructure placed within the North
14  Central Group, views of the mine activities and sites might be limited and include the tops of
15  head frames, drill rigs, or other structures, if located on the individual lease tracts. Mine
16  development and operation under Alternative 3 would be expected to cause minimal to weak
17  visual contrast for views from the WA.
18
19    From distances between 5 and 15 mi (8 and 24 km) from the lease tracts, views from
20  approximately 32.2% (6,317 acres or 2,600 ha) of the Sewemup WSA would potentially include
21  the North Central Group. Similar to views from the Tabequache WA, views of the North Central
22  Group from the WSA are generally partially or fully screened by the intervening mountains.
23  Visibility of the North Central Group is likely from the locations within the WSA that are higher
24  in elevation than the lease tracts. Depending on the infrastructure placed within the lease tracts,
25  views of the mine activities and sites might be limited and include the tops of head frames, drill
26  rigs, or other structures. Activities associated with this alternative would be expected to create
27  minimal to weak levels of contrasts for views from the WSA.
28
29    The Unaweep/Tabeguache Scenic and Historic Byway passes between Lease Tracts 18
30  and 25. Lease tracts within the North Central Group would potentially be visible from
31  approximately 43 mi (69 km) of the byway.
32
33    Depending on the infrastructure placed within the lease tracts, the mine activities and
34  sites would be visible to visitors driving along the byway, primarily in the area within Montrose
35  County. Views that are level or looking down onto the lease tracts would likely involve stronger
36  visual contrasts than those that are lower in elevation. Views would include head frames, drill
37  rigs, or other structures, if needed for the mining activities. As such, mine development and
38  operations would be expected to cause minimal to strong visual contrast for views from the
39  byway; however, views from the byway would be of relatively short duration, largely due to the
40  small size of the individual lease tracts within the North Central Group.
41
42    The North Central Group lease tracts would be potentially visible from less than 1% of
43  the Dolores River Canyon WSA (4 acres or 1.6 ha), the Dolores River SRMA (4 acres or 1.6 ha),
44  and the San Miguel ACEC (5 acres or 2.0 ha). Mining-related activities conducted under this

BLM_0041517

1 alternative would be expected to create minimal levels of contrast to no contrasts at all for views
2 from these SVRAs.
3
4
5 **4.3.12.4.2 South Central Group.** Figure 4.3-2 shows the results of the viewshed
6 analysis for portions of the South Central Group, including Lease Tracts 5, 6, 7, 8, and 9. The
7 following SVRAs might have views of the South Central Group:
8
9 • Tabequache WA,
10
11 • Unaweep/Tabeguache Scenic and Historic Byway,
12
13 • Dolores River Canyon WSA,
14
15 • Sewemup WSA,
16
17 • Dolores River SRMA,
18
19 • McKenna Peak WSA, and
20 .
21 • San Miguel ACEC
22
23 The South Central Group lease tracts would potentially be visible from from
24 approximately 46.8% (3,835 acres or 1,600 ha) of the Tabequache WA. Most of this WA is
25 located between 5 and 15 mi (8 and 24 km) from this group of lease tracts within Montrose
26 County. Views of the South Central Group are partially or fully screened by the intervening
27 topography and vegetation. Views of the mine activities and sites within the lease tracts
28 contained within this group might be limited and likely would include the tops of head frames,
29 drill rigs, or other structures, if located within the mine sites. Similar to those impacts
30 experienced from views of the North Central Group, mine development and operations under
31 Alternative 3 would be expected to cause minimal to weak visual contrast for views from the
32 WA.
33
34 The South Central Group lease tracts could potentially be visible from approximately
35 19 mi (30 km) of the Unaweep/Tabeguache Scenic and Historic Byway located east–southeast of
36 the lease tracts, and within the background and "seldom seen" distances (i.e., beyond 5 mi or
37 8 km). Depending on the infrastructure used at each mine site, views of head frames, drill rigs, or
38 other structures might occur. Activities under Alternative 3 would be expected to cause minimal
39 levels of contrasts to no contrasts at all for views from the byway.
40
41 The lease tracts within the South Central Group could potentially be visible from
42 approximately 1.7% (498 acres or 800 ha) of the Dolores River Canyon WSA, in areas between
43 0 and 5 mi (0 and 8 km) from the lease tracts. Between 0 and 25 mi (0 and 40 km), views from
44 approximately 3.6% (1,039 acres or 420 ha) would potentially include the lease tracts. If present,
45 head frames, drill rigs, or other structures might be visible from within the WSA. Views of the
46

BLM_0041518

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*



1

2   **FIGURE 4.3-2  Viewshed Analysis for the South Central Lease Group under Alternative 3**

3

BLM_0041519

1   lease tracts are more likely to occur from elevated locations than from within the canyon. Mine
2   development and operations under Alternative 3 would be expected to cause minimal to weak
3   visual contrast for views from the WSA.
4
5       The South Central Group would potentially be visible from approximately 2.1%
6   (409 acres or 170 ha) of the Sewemup WSA. Within 15 and 25 mi (24 and 40 km) of the South
7   Central Group, views from approximately 2.1% (409 acres or 170 ha) of the Sewemup WSA
8   would potentially include the lease tracts. Views of the South Central Group from the WSA are
9   generally partially or fully screened by the intervening mountains. Visibility of this group of
10  lease tracts is likely from the locations within the WSA that are higher in elevation than the lease
11  tracts. Depending on the infrastructure present on each lease tract, views of the mine activities
12  and sites might be limited and include the tops of head frames, drill rigs, or other structures.
13  Under this alternative, mine development and operations would be expected to create minimal
14  levels of contrasts to no contrasts at all for views from this WSA.
15
16      The South Central Group lease tracts would be potentially visible from approximately
17  2.0% (1,302 acres or 530 ha) of the Dolores River SRMA. Views of the mine activities and sites
18  within the lease tracts contained within this group might be limited and likely would include the
19  tops of head frames, drill rigs, or other structures, if located within the mine sites. Views of the
20  lease tracts are more likely to occur from elevated locations than from within the canyon. Similar
21  to the Dolores River Canyon WSA, mine development and operations would be expected to
22  cause minimal to weak levels of contrasts for views from this area.
23
24      The South Central Group lease tracts would be potentially visible from approximately
25  1.1% (217 acres or 88 ha) of the McKenna Peak WSA; areas with potential views of the lease
26  tracts are in the northern portion of the WSA that is in San Miguel County. The South Central
27  Group lease tracts would potentially be visible from portions of the WSA that are located
28  between 15 and 25 mi (24 and 40 km) from the lease tracts. Views of the mine activities and sites
29  within the lease tracts contained within this group might be limited and likely would include the
30  tops of head frames, drill rigs, or other structures, if present. Mine development and operations
31  under Alternative 3 would be expected to cause minimal levels of contrasts to no contrasts at all
32  for views from this SVRA.
33
34      The South Central Group lease tracts would potentially be visible from less than 1%
35  (3 acres or 1.2 ha) of the San Miguel ACEC. Mine development and operations under
36  Alternative 3 would be expected to cause minimal levels of contrasts to no contrasts at all for
37  views from this SVRA.
38
39
40      **4.3.12.4.3  South Group.** Figure 4.3-3 shows the results of the viewshed analysis of
41  Lease Tracts 11, 13, 13A, and 15 within the South Group. The following SVRAs might have
42  views of the South Group lease tracts:
43
44      •   McKenna Peak WSA,
45
46

BLM_0041520

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*



**FIGURE 4.3-3  Viewshed Analysis for the South Lease Group under Alternative 3**

*4-140*

BLM_0041521

- Dolores River SRMA, and

- Trail of the Ancients Byway.

The South Group lease tracts would be potentially visible from approximately 16.9% (3,372 acres or 1,400 ha) of the McKenna Peak WSA. Areas within the WSA with visibility of the South Group are located between 15 and 25 mi (24 and 40 km) from this group of lease tracts within the western portion of the WSA. Views of the mine activities and sites within the lease tracts contained within this group might be limited and likely would include the tops of head frames, drill rigs, or other structures, if present. Mine development and operations would be expected to cause minimal to weak impacts for views from this SVRA.

Within 5 mi (8 km) of the South Group, the lease tracts would potentially be visible from approximately 9.4% (6,110 acres or 2,500 ha) of the Dolores River Canyon SRMA; portions of the SRMA are within the actual lease tracts, specifically Lease Tracts 13, 13A, and 15. Between 0 and 25 mi (0 and 40 km), views from approximately 9.7% (6,326 acres or 2,600 ha) of the SRMA would potentially include the lease tracts. Depending on the infrastructure placed within the South Group, views of the mine activities and sites would include head frames, drill rigs, or other structures, as well as the actual mining activities. Mine development and operations under Alternative 3 would be expected to cause weak to strong levels of contrasts for views from this SRMA. Stronger appearances of contrasts would occur for views from the SRMA, which are located within the South Group, and the contrasts would lessen as the distance from the lease tracts increased.

The South Group lease tracts would be visible from approximately 7.4 mi (12 km) of the Trail of the Ancients Scenic Byway. The byway is located within the "seldom seen" distance zone (i.e., between 15 and 25 mi or 24 and 40 km). The South Group lease tracts would primarily be visible from portions of the byway that are located to the west of the lease tracts in Utah. The trail's footprint primarily follows Route 191. Mine development and operations would be expected to cause minimal levels of contrasts to no contrasts at all for views from along the trail.

### 4.3.13  Waste Management

Potential impacts on waste management practices (described in Section 3.13) from waste generated during exploration, mine development and operations, and reclamation are expected to be small. As discussed for Alternative 1, waste that was allowed to remain on the mine sites would be managed accordingly, and disposal capacity at the permitted landfills or licensed facilities would be adequate to accommodate the waste that would need to be transported off site for disposal. Because exploration and mine development and operations would be conducted in addition to reclamation under Alternative 3, the waste generated would be more than that generated under Alternatives 1 and 2.

BLM_0041522

## 4.4  ALTERNATIVE 4

Under Alternative 4, it is assumed that a total of 19 mines (6 small, 10 medium, 2 large, and 1 very large) with a total disturbed surface area of 450 acres (180 ha) would be in operation in the peak year. As they were for Alternative 3, the three phases (exploration, mine development and operations, and reclamation) are evaluated here for Alternative 4.

> Alternative 4:  This is the preferred alternative under which DOE would continue the ULP with the 31 lease tracts for the next 10-year period or for another reasonable period.

### 4.4.1  Air Quality

#### 4.4.1.1  Exploration

The types of impacts related to exploration under Alternative 4 are similar to those described for Alternative 3 (Section 4.3.1.1). Exploration activities would occur over relatively small areas, involve little ground disturbance, and require only a small crew and a small fleet of heavy equipment. Thus, potential impacts from this phase on ambient air quality are anticipated to be minimal and temporary.

#### 4.4.1.2  Mine Development and Operations

The types of impacts related to mine development and operations under Alternative 4 are similar to those described for Alternative 3 (Section 4.3.1.2).

Air emissions of criteria pollutants, VOCs, and $CO_2$ from mine development and operations estimated for the peak year are presented in Table 4.4-1 and compared with emission totals for the three counties (Mesa, Montrose, and San Miguel) that encompass the DOE ULP lease tracts combined. Detailed information on emission factors, assumptions, and emission inventories is available in Appendix C. As shown in the table, total peak-year emission rates are estimated to be rather small when compared with emission totals for all three counties. Typically, PM emissions are highest during mine development, while $NO_x$ emissions are highest during operations. During mine development, non-PM emissions would be relatively small (up to 0.42%), but $PM_{10}$ and $PM_{2.5}$ emissions would amount to about 3.0% and 1.3%, respectively, of the three-county total emissions. $PM_{10}$ emissions result would from explosive use (40%) and site preparation (38%), followed by wind erosion (22%), but exhaust emissions would contribute only a little to total $PM_{10}$ emissions. During operations, $NO_x$ emissions of 275 tons/yr would be highest, amounting to about 2.0% of three-county total emissions. $NO_x$ emissions would come mostly from diesel-fueled heavy equipment (e.g., bulldozers or power generators) and trucks. These impacts could be minimized by implementation of good industry practices and fugitive

BLM_0041523

1  **TABLE 4.4-1  Peak-Year Air Emissions from Mine Development, Operational and**
2  **Reclamation Activities under Alternative 4[a]**

| Pollutant[b] | Three-County Total[c] | Mine Development | | Operation | | Reclamation | |
|---|---|---|---|---|---|---|---|
| | | | | Annual Emissions (tons/yr) | | | |
| CO | 65,769 | 165 | (0.25%)[d] | 128 | (0.20%) | 11.1 | (0.02%) |
| $NO_X$ | 13,806 | 57.4 | (0.42%) | 275 | (2.0%) | 22.9 | (0.17%) |
| VOCs | 74,113 | 1.7 | (0.002%) | 26.9 | (0.04%) | 2.3 | (0.003%) |
| $PM_{2.5}$ | 5,524 | 73.4 | (1.3%) | 23.5 | (0.43%) | 49.7 | (0.90%) |
| $PM_{10}$ | 15,377 | 459 | (3.0%) | 45.1 | (0.29%) | 243 | (1.6%) |
| $SO_2$ | 4,246 | 6.9 | (0.16%) | 35.4 | (0.83%) | 3.0 | (0.07%) |
| $CO_2$ | 129.3[e] | 1,601 | (0.001%) | 25,000 | (0.021%) | 2,148 | (0.002%) |
| | 6,633.2[f] | | (0.00003%) | | (0.00042%) | | (0.00004%) |

[a]   Under Alternative 4, it is assumed that 19 mines (6 small, 10 medium, 2 large, and 1 very large) with
      a total disturbed surface area of 450 acres would be in operation or reclaimed in any peak year.

[b]   Notation: CO = carbon monoxide; $CO_2$ = carbon dioxide; $NO_X$ = nitrogen oxides; $PM_{2.5}$ = particulate
      matter with a mean aerodynamic diameter of ≤2.5 μm; $PM_{10}$ = particulate matter with a mean
      aerodynamic diameter of ≤10 μm; SO2 = sulfur dioxide; and VOCs = volatile organic compounds.

[c]   Total emissions in 2008 for all three counties encompassing the DOE ULP lease tracts (Mesa,
      Montrose, and San Miguel Counties), except for $CO_2$. See Table 3.1-2.

[d]   Numbers in parentheses are percentages of three-county total emissions, except for $CO_2$, which are
      percentages of Colorado total emissions (top line) and U.S. total emissions (bottom line).

[e]   Annual emissions in 2010 for Colorado in million metric tons of $CO_2$ equivalent.

[f]   Annual emissions in 2009 for United States in million metric tons of $CO_2$ equivalent.

Sources: CDPHE (2011); EPA (2011a); Strait et al. (2007)

3
4
5  dust mitigation measures (such as watering unpaved roads, disturbed surfaces, and temporary
6  stockpiles). Therefore, potential impacts on ambient air quality would be minor and temporary.
7
8      The three counties encompassing DOE ULP lease tracts are currently in attainment for
9  ozone (EPA 2011b), but ozone levels in the area approached the standard (about 90%) (see
10 Table 3.1-3). Recently, wintertime ozone exceedances were often reported at higher elevations in
11 northwestern Colorado, northeastern Utah, and southwestern Wyoming. However, ozone
12 precursor emissions from mine development and operations would be relatively small, less than
13 2.0% and 0.04% of three-county total $NO_X$ and VOC emissions, respectively, and would be
14 much lower than those for the regional airshed in which emitted precursors are transported and
15 transformed into ozone. In addition, the wintertime high-ozone areas are located more than
16 100 mi (161 km) from the DOE ULP lease tracts and not located downwind of the prevailing
17 westerlies in the region. Accordingly, the potential impacts of ozone precursor releases from
18 mine development and operations on regional ozone should not be of concern.
19

BLM_0041524

As discussed in Section 4.1.4, there are several Class I areas around the DOE ULP lease tracts, where AQRVs, such as visibility and acid deposition, might be a concern. Primary pollutants affecting AQRVs include $NO_x$, $SO_2$, and PM. $NO_x$ and $SO_2$ emissions from mine development activities would be relatively small (up to 2.0%) of three-county total emissions, while $PM_{10}$ emissions would be about 3.0% of three-county total emissions. Air emissions from mine development and operations could result in minor impacts on AQRVs at nearby Class I areas. Implementation of good industry practices and fugitive dust mitigation measures could minimize these impacts.

Annual total $CO_2$ emissions from mine development and operations are estimated, as shown in Table 4.4-1. $CO_2$ emissions during operations would be much higher than those during mine development. During operations, annual total $CO_2$ emissions would be about 25,000 tons (23,000 metric tons), accounting for about 0.021% of Colorado GHG emissions in 2010 at 129.3 million metric tons of $CO_2$ equivalent ($CO_2$e) and 0.00042% of U.S. GHG emissions in 2009 at 6,633.2 million metric tons of $CO_2$e (EPA 2011a; Strait et al. 2007). Thus, potential impacts from mine development and operations phase on global climate change would be negligible.

### 4.4.1.3  Reclamation

The type of impacts are similar to those described for Alternative 1 (Section 4.1.1). It is also assumed that reclamation activities under Alternative 4 would occur over about 450 acres (180 ha) in the peak year of reclamation.

Peak-year emissions during the reclamation phase under Alternative 4 are shown in Table 4.4-1. $PM_{10}$ emissions would be highest, accounting for about 1.6% of three-county combined emissions. Among non-PM missions, $NO_x$ emissions from diesel combustion of heavy equipment and trucks would be highest, up to 0.17% of three-county total emissions. Good industry practices and mitigation measures would be implemented to ensure compliance with environmental requirements. Thus, potential impacts on ambient air quality associated with reclamation activities under Alternative 4 are anticipated to be minor and temporary. These low-level emissions are not anticipated to cause any measureable impacts on regional ozone or AQRVs, such as visibility or acid deposition, at nearby Class I areas. In addition, $CO_2$ emissions during the reclamation phase are about 0.002% and 0.00004% of Colorado GHG emissions in 2010 and U.S. GHG emissions in 2009, respectively (EPA 2011a; Strait et al. 2007). Thus, under Alternative 4, potential impacts from reclamation activities on global climate change would be negligible.

### 4.4.2  Acoustic Environment

Potential noise-related impacts under Alternative 4 are discussed here.

BLM_0041525

**4.4.2.1  Exploration**

The types of impacts related to exploration under Alternative 4 would be similar to those under Alternative 3 (Section 4.3.2.1). Exploration activities occur over relatively small areas, involve little ground disturbance, and require only a small crew and a small fleet of heavy equipment. Accordingly, it is anticipated that potential noise impacts from the exploration phase on neighboring residences or communities, if any, would be minimal and intermittent.

**4.4.2.2  Mine Development and Operations**

The types of impacts related to mine development and operations under Alternative 4 are similar to those under for Alternative 3 (Section 4.3.2.2).

As described in Section 4.3.2.2, noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from the construction site, which is the Colorado daytime maximum permissible limit of 55 dBA in a residential zone. If a 10-hour daytime work schedule is considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) would occur about 1,200 ft (360 m) from the construction site. In addition, other attenuation mechanisms, such as air absorption, screening effects (e.g., natural barriers caused by terrain features), and skyward reflection due to temperature lapse conditions typical of daytime hours would reduce noise levels further. Thus noise attenuation to Colorado or EPA limits would occur at distances somewhat shorter than the aforementioned distances. In many cases, these limits would not reach any nearby residences or communities. However, when construction would occur near a lease tract boundary, noise levels at four residences around Lease Tracts 13, 13A, 16, and 16A would exceed the Colorado limit.

It is assumed that most mine development and operations would occur during the day, when noise is better tolerated because the masking effects of background noise occur more during daytime than at night. In addition, construction activities for DOE ULP lease tracts would be temporary (typically lasting a few months). Construction within the DOE ULP lease tracts would cause some unavoidable but localized short-term noise impacts on neighboring residences or communities, particularly when mining activities occurred near residences or communities adjacent to the lease tract boundary.

During operations, heavy-duty trucks would transport uranium ores from DOE ULP lease tracts to either the proposed Piñon Ridge Mill or White Mesa Mill in Utah. These shipments could produce noise along the haul routes. Under Alternative 4, about 2,000 tons per day of uranium ores would be produced. Assuming 25 tons of uranium ore per truck and round-trip travel, the traffic volume would be 160 truck trips per day (80 round trips per day) and 20 trucks per hour (for 8-hour operation). At distances of 180 ft (55 m) and 350 ft (110 m) from the route, noise levels would attenuate to 55 and 50 dBA, respectively, which are Colorado daytime and nighttime maximum permissible limits in a residential zone. Noise levels above the EPA guideline levels of 55 dBA $L_{dn}$ for residential areas would be reached up to a distance of 94 ft (29 m) from the route. Accordingly, Colorado limits or EPA guideline levels would be exceeded

BLM_0041526

1   within 350 ft (110 m) from the haul route, and any residences within this distance might be
2   affected.
3
4        Depending on local geological conditions, explosive blasting during mine development
5   and operations might be needed. Blasting would generate a stress wave in the surrounding rock,
6   causing vibration of the ground and structures on the ground surface. The blasting also would
7   create a compressional wave in the air (air blast overpressure), the audible portion of which
8   would be manifested as noise. Potential impacts of ground vibration would include damage to
9   structures, such as window breakage. Potential impacts of blast noise would include effects on
10  humans and animals. The estimation of potential increases in ambient noise levels, ground
11  vibration, and air blast overpressure and evaluation of possible environmental impacts associated
12  with such increases would be warranted at the project-specific phase if potential significant
13  impacts at nearby residences or structure were anticipated.
14
15       Blasting techniques would be designed and controlled by blasting and vibration control
16  specialists to prevent damage to structures or equipment. These controls would attenuate blasting
17  noise as well. For the 31 lease tracts evaluated under Alternative 4, there are several residences
18  within 1.0 mi (1.6 km) from the boundaries of the lease tracts to be developed. The further
19  distances of other off-site residences make additional mitigation unnecessary. However, given
20  the impulsive nature of blasting noise, it is critical that blasting activities be avoided at night and
21  on weekends and that affected neighborhoods be notified in advance of scheduled blasts.
22
23       There are several specially designated areas (e.g., Dolores River SRMA, Dolores River
24  Canyon WSA) and other nearby wildlife habitats around the DOE ULP lease tracts and haul
25  routes where noise might be a concern. Negative impacts on wildlife begin at 55–60 dBA, which
26  corresponds to the onset of adverse physiological impacts (Barber et al. 2010). As discussed
27  above, these levels would be limited up to distances of 1,650 ft (500 m) from the mine sites and
28  180 ft (55 m) from the haul routes. However, there is the potential for other effects to occur at
29  lower noise levels (Barber et al. 2011). When these impacts and the potential for impacts at
30  lower noise levels are taken into acount, impacts on terrestrial wildlife from construction noise
31  and mitigation measures would have to be considered on a project-specific basis. Such a
32  consideration should incorporate site-specific background levels and hearing sensitivity for site-
33  specific terrestrial wildlife of concern.
34
35       In summary, potential noise impacts from mine development on humans and wildlife
36  would be anticipated near the mine sites and along the haul routes, but the impacts would be
37  minor and limited to proximate areas unless these activities occurred near lease tract boundaries
38  adjacent to nearby residences or communities or areas specially designated for wildlife concerns,
39  if any. Implementation of good industry practices and coherent noise management plans could
40  minimize these impacts.
41
42

BLM_0041527

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

### 4.4.2.3 Reclamation

The type of impacts would be similar to those described for Alternative 1 (Section 4.2.2). It is also assumed that reclamation activities under Alternative 4 would occur over about 450 acres (180 ha) during the peak year of reclamation.

As detailed in Section 4.1.2, noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from the reclamation site, which is the Colorado daytime maximum permissible limit of 55 dBA in a residential zone. If a 10-hour daytime work schedule is considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) would occur about 1,200 ft (360 m) from the construction site. Most residences are located beyond these distances but, if reclamation activities occurred near the boundary of Lease Tracts 13, 13A, 16, or 16A, noise levels at four residences could exceed the Colorado limit.

It is assumed that most reclamation activities would occur during the day, when noise is better tolerated, because of the masking effects of background noise that occurs more during daytime than at night. In addition, reclamation activities at DOE ULP lease tracts would be temporary (typically lasting a few weeks to months, depending on the size of the area to be reclaimed). Accordingly, reclamation within the DOE ULP lease tracts would cause some unavoidable but localized short-term and minor noise impacts on neighboring residences or communities. The same mitigation measures adopted during the mine development and operations phase could also be implemented during the reclamation phase.

## 4.4.3 Soil Resources

### 4.4.3.1 Exploration

The types of impacts related to exploration under Alternative 4 are similar to those under Alternative 3 (Section 4.3.3.1). Because exploration activities would occur over relatively small areas and involve little or no ground disturbance, impacts associated with this phase are expected to be small.

### 4.4.3.2 Mine Development and Operations

The types of impacts related to mine development and operations under Alternative 4 are similar to those under Alternative 3 (Section 4.3.3.2). Under Alternative 4, ground disturbance during the peak production year would occur on an assumed 450 acres (180 ha), mainly during mine development. Impacts associated with this phase are expected to be small to moderate. The degree of impact would vary among the lease tracts, depending on the activities needed to prepare and develop each mine site (because some sites are more developed than others) and depending on site-specific factors, such as soil properties, slope, vegetation, weather, and

BLM_0041528

distance to surface water. Implementing good industry practices and mitigation measures would reduce the level of adverse impacts associated with these activities.

### 4.4.3.3  Reclamation

The types of impacts related to reclamation under Alternative 4 would be similar to those under Alternatives 1, 2, and 3 (Sections 4.1.3.2, 4.2.3, and 4.3.3.3, respectively). However, ground disturbance would occur over a larger area (assumed to be 450 acres, or 180 ha) than that assumed for Alternatives 1, 2, and 3.

## 4.4.4  Water Resources

### 4.4.4.1  Exploration

The types of impacts related to exploration under Alternative 4 would be similar to those under Alternative 3 (Section 4.3.4.1). Because exploration activities would occur over relatively small areas and involve little or no ground disturbance, impacts associated with this phase are expected to be small.

### 4.4.4.2  Mine Development and Operations

Under Alternative 4, there would be a total of 19 mines operating across the 31 DOE ULP lease tracts, involving a total land disturbance of 450 acres (180 ha) and a consumptive water use of 6,900 gal/d (>6,000 L/d) (Section 2.2.4.1). The types of impacts related to mine development and operations under Alternative 4 would be similar to those described for Alternative 3 (Section 4.3.4.2). The increase in area of surface disturbed under Alternative 4 has the potential to increase impacts associated with erosion; however, the proximity of the lease tract to the Dolores River and the San Miguel River would still be the primary factor governing impacts. The increase in consumptive water use would be negligible because the water is assumed to be trucked in from off site.

### 4.4.4.3  Reclamation

Under Alternative 4, impacts on water resources associated with the reclamation activities would be the same as those under Alternative 1 (Section 4.1.4).

BLM_0041529

Case No. 1:20-cv-02484-MSK   Document 39   filed 04/27/21   USDC Colorado   pg 100 of 470

1    **4.4.5  Human Health**
2
3          Exploration for uranium ores would involve drilling small holes (a few inches in
4    diameter) in the ground and bringing up small amounts of mineralized cuttings, most of which
5    would be placed back to fill the holes. Because the drillings would disturb only small areas and
6    the drill holes would be backfilled in a short period of time (less than a few weeks), potential
7    human health impacts are expected to be minimal and limited to only a few workers. Therefore,
8    the analysis of human health impacts in this section focuses on the consequences caused by
9    development and operations of the uranium mines and the reclamation of lease tracts.
10
11
12        **4.4.5.1  Worker Exposure – Uranium Miners**
13
14         Like many other occupations, uranium mining can result in physical injuries or fatalities.
15   Based on data published by the U.S. Department of Labor, Bureau of Labor Statistics, in 2010,
16   the fatal occupational injury rate for the mining industry was 19.8 per 100,000 full-time workers
17   (FTWs) (BLS 2011a), and the nonfatal occupational injury and illness rate was 2.3 per
18   100 FTWs (BLS 2011b). Assuming the injury and fatality rates for uranium mining are similar to
19   those for other types of mining, during the year of peak operations, there could be 5 nonfatal
20   injuries and illnesses among the 218 workers assumed for Alternative 4. However, no mining-
21   related fatality is expected among the workers.
22
23         In addition to being exposed to physical hazards, uranium miners could receive radiation
24   exposure from mining activities. The radiation exposure to individual miners under Alternative 4
25   would be similar to that under Alternative 3. Monitoring data over the period 1985 to 1989
26   indicated the average radiation exposure for uranium mine workers in the United States ranged
27   from 350 to 433 mrem/yr (UNSCEAR 2010). In general, underground miners receive higher
28   radiation exposure than open-pit miners, because underground cavities accumulate higher radon
29   concentrations than does aboveground open space. According to UNSCEAR (1993), external
30   exposure accounts for 28% of the total dose for underground miners and 60% for open-pit
31   miners; the inhalation of radon accounts for 69% and 34% of the total dose for underground
32   miners and open-pit miners, respectively; and inhalation of uranium ore dust accounts for 3%
33   and 6% of the total dose for underground miners and open-pit miners, respectively. Based on the
34   assumption that the average dose for underground miners is 433 mrem/yr and based on the
35   distribution of the total dose among different pathways, an LCF risk of $4 \times 0^{-4}$/yr is calculated
36   for an average miner (see Table 4.3-2). This translates to a probability of about 1 in 2,500 of
37   developing a latent fatal cancer from 1 year of radiation exposure.
38
39         Although uranium miners could also incur chemical exposures due to the chemical
40   toxicity of uranium and vanadium compounds (also present in uranium ores), the potential
41   hazard associated with chemical exposures would be much lower than the risks resulting from
42   exposures to radioactive constituents in the ore materials. This is because the chemical exposures
43   would be caused mainly by inhalation of particulates, and the potential risk associated with this
44   pathway constitutes just a small fraction of the total risk that the miners would incur, according

BLM_0041530

to the data provided in Table 4.3-2. Therefore, potential chemical risks for the uranium miners were not calculated.

### 4.4.5.2  Worker Exposure – Reclamation Workers

During the reclamation phase, the primary source of radiation exposure would be the aboveground waste-rock piles accumulated over the operational period. The potential radiation dose incurred by reclamation workers would depend on the size of the waste-rock pile and its uranium content. The potential radiation exposure of a reclamation worker was estimated on the basis of four assumed waste-rock pile dimensions corresponding to the four mine sizes assumed. Detailed discussions on the development of the four waste-rock piles evaluated are provided in Section 4.1.5.

The radiation exposure of an individual worker that would result from performing reclamation activities is expected to be about the same as that analyzed in Section 4.1.5 for Alternative 1. Based on the RESRAD (Yu et al. 2001) analysis, the total radiation dose incurred by a reclamation worker would be about 4.7 mrem, regardless of the size of the waste-rock pile. The total dose is estimated on the basis of the assumption that the worker would work 8 hours per day for 20 days on top of a waste-rock pile. The radiation exposure would be dominated by the external radiation pathway, which would contribute about 96% of the total dose, followed by the incidental soil ingestion pathway, which account for about 3% of the total dose. The remaining dose would be contributed by exposures from inhalation of radioactive particulates and radon gas. The potential LCF risk associated with this radiation exposure is estimated to be $4 \times 10^{-6}$; i.e., the probability of developing a latent fatal cancer is about 1 in 250,000.

In addition to the radiation that would be emitted by the uranium isotopes and their decay products in the waste rocks, the chemical toxicity of the uranium and vanadium minerals in the waste rocks could also affect the health of a reclamation worker. The potential chemical risk that a reclamation worker could incur under Alternative 4 is expected to be about the same as that under Alternative 1 (Section 4.1.5.1). The chemical exposure would be well below the threshold values, and potential adverse health effects are not expected for the reclamation worker.

### 4.4.5.3  General Public Exposure – Residential Scenario

The maximum potential radiation exposure for a member of the general public was estimated as a function of distance from the release point of radionuclides, which can be used to estimate the potential exposure of an individual living close to the uranium lease tracts, given the location and size of the uranium mine being operated. The maximum doses were estimated for the four mine sizes assumed.

BLM_0041531

**4.4.5.3.1  Uranium Mine Development and Operations.**

**Exposure to an Individual Receptor.** Based on the discussions in Section 4.3.5.3.1 (for Alternative 3), the primary source of potential human health impacts on the residents who lived near the uranium lease tracts during the operational phase would be the radon gas emitted from mining activities. The analysis of potential radiation exposures to the residents focused on the consequences associated with the release of radon.

For human health impact analysis, the radon emission rates for the three sizes of underground uranium mines assumed were developed by using the equation developed by the EPA (EPA 1985) that correlates the radon emission rate with cumulative uranium ore production. An operational period of 10 years was assumed when developing the radon emission rates. The radon emission rates based on a 10-year operational period were considered to be the upper-bound estimates for underground mines. The radon emission rate for a very large mine (i.e., the existing open-pit mine on Lease Tract 7) was estimated on the basis of the data compiled by the EPA (Table 12-7 in EPA 1989) for surface mines. The estimated value is also expected to be greater than the actual emission rate. The emission rates developed for the four sizes of uranium mines assumed under Alternative 4 would have the same values as those developed under Alternative 3. Therefore, the potential maximum doses would be the same as those listed in Table 4.3-4.

Based on the results in Table 4.3-4, the radiation exposures would decrease with increasing distance because of greater dilution in the radon concentrations. The maximum exposure at a fixed distance from the emission point of an underground mine or from the center of the open-pit mine would always occur in the sector that coincides with the most dominant wind direction. In any other sector, the potential exposure would be less than the maximum values.

As presented in Table 4.3-4, if the resident lived at a distance of 3,300 ft (1,000 m) from the emission point of a small underground mine, the potential maximum radiation dose he could incur would be about 5.6 mrem/yr, which is 56% of the NESHAP dose limit (40 CFR Part 61) for airborne emissions of radionuclides. If the distance increased to 6,600 ft (2,000 m), then the maximum exposure would be reduced to less than 3 mrem/yr. It should be noted that the maximum doses listed in Table 4.3-4 are for a resident living in the most dominant wind direction and were obtained by using radon emission rates corresponding to an operational period of 10 years. The emission rates for uranium mines that have been developed and operated for fewer than 10 years would be less. However, if two or more uranium mines located close to a given residence were being operated at the same time, the potential dose to the resident would be the sum of the doses contributed by each mine.

Based on the listed maximum doses in Table 4.3-4, it is possible that a resident could receive a radon dose of more than 10 mrem/yr if he lived less than 1.6 mi (2.5 km) from the center of a uranium mine and his residence was in the most dominant wind direction from the emission point. However, the results listed in Table 4.3-4 are based on conservative assumptions;

BLM_0041532

1  the actual radon dose could be much smaller if actual data on the radon release were available
2  and considered in the calculations.
3
4         The maximum LCF risk for a resident living close to a small underground uranium mine
5  was estimated to range from $1 \times 10^{-6}$/yr at a distance of 16,000 ft (5,000 m) to $1 \times 10^{-5}$/yr at a
6  distance of 1,600 ft (500 m). That is, the probability of developing a latent fatal cancer ranges
7  from 1 in 1,000,000 at a distance of 16,000 ft (5,000 m) to 1 in 100,000 at a distance of 1,600 ft
8  (500 m) for each year of exposure. The probability would increase by a factor of 2 or 4 if the
9  resident lived close to a medium or a large underground mine, respectively.
10
11
12         **Exposure to a Collective Population.** Collective exposures of the general public living
13  within 50 mi (80 km) of the uranium lease tracts were evaluated by using the same method
14  described in Section 4.3.5.3. The range of the potential collective dose in the peak year of
15  operations can be estimated by summing all the radon emissions from active uranium mines and
16  placing the total emission at the center of each lease tract group.
17
18         Table 4.4-2 lists the estimated Rn-222 emission rates during the peak year of operations
19  under Alternative 4. It was assumed that the active mines would have been developed and
20  operated for 10 years at the peak year of operations. The total Rn-222 emission rate from
21  underground mining was estimated to be about 17,990 Ci/yr, and the estimated Rn-222 emission
22  rate from the very large open-pit mine was 600 Ci/yr.
23
24
25  **TABLE 4.4-2  Radon Emission Rates during the Operational Phase of Mining Assumed for**
26  **Alternative 4**

| Types of Mine | Small[a] | Medium[a] | Large[a] | Very Large[b] | Total |
|---|---|---|---|---|---|
| Uranium ore production per mine (tons/d) | 50 | 100 | 200 | 300 | |
| Cumulative uranium ore production per mine (tons) | 1.20E+05 | 2.40E+05 | 4.80E+05 | 7.20E+05 | |
| Rn-222 emission rate per mine (Ci/yr)[c] | 5.28E+02 | 1.06E+03 | 2.11E+03 | 6.00E+02 | |
| Alternative 4 (peak year of operations) | | | | | |
| No. of active mines | 6 | 10 | 2 | 1 | 19 |
| Total Rn-222 emission rate (Ci/yr) | 3.17E+03 | 1.06E+04 | 4.22E+03 | 6.00E+02 | 1.86E+04 |

[a]  Underground mine.

[b]  Open-pit mine.

[c]  The emission rates of radon from underground mines were estimated by using the correlation developed
     by the EPA in 1985: Rn-222 emission (Ci/yr) = 0.0044 × cumulative uranium ore production (tons)
     (EPA 1985). A cumulative period of 10 years was assumed for this calculation. The emission rate from
     the very large open-pit mine was determined based on data compiled by the EPA for surface uranium
     mines (EPA 1989).

27

BLM_0041533

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1    Table 4.4-3 presents the collective doses to the general public living within 3.1 to 50 mi
2   (5 to 80 km) of the assumed emission points during the peak year of operations under
3   Alternative 4 obtained by using the CAP88-PC code. The estimated collective dose associated
4   with underground mining ranges from 16 to 93.5 person-rem. The estimated collective dose
5   associated with open-pit mining is about 0.88 person-rem. Combined, the underground and open-
6   pit mining would result in a total collective dose ranging from 16.9 to 94.4 person-rem during the
7   peak year of operations. This collective exposure would cause a collective LCF of 0.022 to 0.12.
8   Therefore, no cancer fatality would result from the collective exposure to the radon gas emitted
9   from 19 uranium mines that would be operated simultaneously during the peak year of
10  operations under Alternative 4. The total populations involved in these estimates would range

13   **TABLE 4.4-3  Collective Doses and LCF Risks to the General Public**
14   **from Exposures to Radon Emitted from Uranium Mines during the**
15   **Peak Year of Operations under Alternative 4**

| Radon Emission Source | Collective Dose (person-rem/yr) | Collective LCF (1/yr)[g] |
|---|---|---|
| From underground mining | | |
| Based on the center of Group 1[b] | 9.35E+01 | 1E-01 |
| Based on the center of Group 2[c] | 5.00E+01 | 6E-02 |
| Based on the center of Group 3[d] | 2.53E+01 | 3E-02 |
| Based on the center of Group 4[e] | 1.60E+01 | 2E-02 |
| From open-pit mining | | |
| Based on the center of Group 3[d] | 8.80E-01 | 1E-03 |
| Total | | |
| Minimum | 1.69E+01 | 2E-02 |
| Maximum | 9.44E+01 | 1E-01 |

[a]   The total radon emission rate from underground mining during the peak year
of operations is 17,990 Ci/yr.

[b]   If the emission is from the center of lease tract Group 1, the total population
between 5 and 80 km is 178,473.

[c]   If the emission is from the center of lease tract Group 2, the total population
between 5 and 80 km is 86,657.

[d]   If the emission is from the center of lease tract Group 3, the total population
between 5 and 80 km is 27,062.

[e]   If the emission is from the center of lease tract Group 4, the total population
between 5 and 80 km is 33,166.

[f]   The total radon emission rate from open-pit mining during the PEAK year
of operations is 600 Ci/yr.

[g]   Denotes the number of latent lung cancers that could result from radiation
exposure.

BLM_0041534

1   from 27,062 to 178,473. If the collective dose was evenly distributed among the affected
2   population, the average individual dose would range from 0.48 to 0.94 mrem during the peak
3   year of operations. In reality, because the active lease tracts (the lease tracts with mining
4   operations) would be scattered among the four lease tract groups rather than being concentrated
5   in one single group as they were assumed to be in the calculations, the population size within
6   3.1 to 50 mi (5 to 80 km) of the lease tracts should be greater than 178,473. Therefore, the actual
7   average individual dose should be just a fraction of the calculated values.
8
9
10      **4.4.5.3.2  Reclamation.** Residents living close to a uranium mine could be exposed to
11   radiation as a result of emissions of radioactive particulates and radon gas from the waste-rock
12   piles left aboveground. The potential radiation dose would depend on the direction and distance
13   between the residence and the waste-rock piles and the emission rates of the particulates and
14   radon. The potential range of radiation dose a resident would incur under Alternative 4 is
15   expected to be similar to that estimated for Alternatives 1 and 2, because the exposures would be
16   dominated by the emissions from the waste-rock pile(s) that were closest to this resident.
17
18      Based on the calculation results presented in Section 4.1.5.5, if a resident live 1,600 ft
19   (500 m) from a waste-rock pile, the radiation dose he could receive would be less than
20   2 mrem/yr; and if the distance was increased to 4,900 ft (1,500 m), then his exposure would drop
21   to less than 0.5 mrem/yr. If there were two waste-rock piles nearby, the potential dose that this
22   resident would incur would be the sum of the doses contributed by each waste-rock pile. Based
23   on the listed maximum doses in Table 4.1-7, the potential dose incurred by any resident living
24   close to the uranium lease tracts (at a distance of >1,600 ft or 500 m) is expected to be much
25   smaller than the NESHAPS dose limit of 10 mrem/yr for airborne emissions (40 CFR Part 61).
26   The potential LCF risk would be less than $1 \times 10^{-6}$/yr, which means the probability of
27   developing a latent fatal cancer from living close to the uranium lease tracts for 1 year during or
28   after reclamation would be 1 in 1,000,000. If a resident lived in the same location for 30 years,
29   the cumulative LCF risk would be less than $3 \times 10^{-5}$.
30
31      The waste-rock piles would be covered by a layer of soil or top cover materials during
32   reclamation to facilitate vegetation growth. Because of this cover, emissions of radioactive
33   particulates would be greatly reduced, if not eliminated completely. Emissions of radon from
34   waste-rock piles could continue, although the emission rates would be reduced. However,
35   because the uranium isotopes and their decay products have long decay half-lives, the potential
36   of radon emissions from waste-rock piles could persist for a very long period of time after
37   reclamation was completed.
38
39      In addition to radiation exposure, the residents living close to the uranium lease tracts
40   could incur chemical exposures due to the chemical toxicity of uranium and vanadium minerals
41   contained in the waste rocks. Potential chemical exposures would be associated with the
42   emissions of particulates and come through the inhalation and incidental dust ingestion
43   pathways. By using the same exposure parameters as those used for radiation dose modeling,
44   potential chemical risks to the nearby residents were evaluated. The total hazard index would be
45   less than 0.02 at a distance of 1,600 ft (500 m) from an very large waste-rock pile, with

BLM_0041535

1  inhalation being the dominant pathway. Because the hazard index is less than 1, potential adverse
2  health effects are not expected to occur to the residents.
3
4
5  **4.4.5.4  General Public Exposure – Recreationist Scenario**
6
7      A recreationist who unknowingly comes close to a waste-rock pile could also be exposed
8  to radiation. To model this potential radiation exposure, it is assumed that the recreationist would
9  camp on top of a waste-rock pile for 2 weeks. This recreationist could receive radiation exposure
10  through the external radiation pathway and inhalation of radon pathway. Inhalation of
11  radioactive particulates and incidental soil ingestion were excluded because the waste-rock pile
12  would be covered by 1 ft (0.3 m) of soil materials after reclamation.
13
14      The potential dose that could be incurred by a recreationist under Alternative 4 would be
15  similar to that under Alternatives 1 and 2. The estimated radiation dose incurred by the
16  recreationist during a 2-week trip would be about 0.28 mrem. About 91% of the radiation dose
17  would be from the external radiation pathway, and 9% would be from the inhalation of radon
18  pathway (with a radon level of about $2.2 \times 10^{-5}$ WL). The corresponding LCF risk that this
19  recreationist would receive would be about $3 \times 10^{-7}$, with 60% being from the external radiation
20  pathway and 40% being from the radon inhalation pathway. Therefore, the probability of
21  developing a latent fatal cancer would be about 3 in 10,000,000.
22
23      It should be noted that the above results were obtained by assuming there would be a 1 ft
24  (0.3 m) soil cover on top of the waste rocks. If the thickness of the cover soils was less or the
25  cover soils eroded away, the radiation dose incurred by the recreationist would increase. Without
26  any cover material, the potential radiation dose would be about 9.5 mrem, with a corresponding
27  cancer risk of $8 \times 10^{-6}$. More than 94% of the exposures would result from the external radiation
28  pathway. Potential chemical exposures incurred by the recreationist would be minimal, because
29  the soil materials covering the waste-rock pile would greatly reduce the likelihood of exposures
30  through the inhalation of particulate and incidental soil ingestion.
31
32      Potential exposure to an individual receptor for post-reclamation conditions at the mine
33  sites is discussed in Section 4.1.5.4.
34
35
36  **4.4.6  Ecological Resources**
37
38
39      **4.4.6.1  Vegetation**
40
41      Exploration and development activities could occur on each of the 31 lease tracts
42  included under Alternative 4; however, exploration has been completed on Lease Tracts 13A, 21,
43  24, 25, and 26, and it is likely no further exploration activities will occur on these lease tracts.
44  Previous disturbance from exploration or mine development has occurred in each of these lease
45  tracts except Lease Tracts 14 and 8A. However, new exploration and development could occur in

BLM_0041536

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

either disturbed or undisturbed areas of the lease tracts. Exploration and development on Lease Tracts 14 and 8A would occur in undisturbed habitats.

The types of impacts from exploration, development and operations, and reclamation under Alternative 4 would be similar to those under Alternative 3. Direct impacts associated with the development of mines would include the destruction of habitats during site clearing and excavation as well as the loss of habitats at the waste-rock disposal area, various storage areas, project facilities, and access roads. The lease tracts included in Alternative 4 support a wide variety of vegetation types. The predominant types are pinyon-juniper woodland and shrubland and big sagebrush shrubland. Some of the areas affected might include high-quality mature habitats, resulting in greater impact levels than those that would occur in previously degraded areas. Wetlands occur in most of the lease tracts and might be directly or indirectly affected. Indirect impacts of mining would be associated with fugitive dust, invasive species, erosion, sedimentation, and impacts due to changes in surface water or groundwater hydrology or water quality.

### 4.4.6.2  Wildlife

Impacts on wildlife from exploration, mine development and operations, and reclamation under Alternative 4 would be similar to those under Alternative 3 (Section 4.3.6.2) except that (1) during the peak years of operation, up to 19 mines could be in operation at the same time, and (2) the mines could be located on any of the 31 lease tracts. The 19 mines would include 6 small mines (10 acres or 4.0 ha disturbed per mine), 10 medium mines (15 acres or 6.1 ha disturbed per mine, 2 large mines (20 acres or 8.1 ha disturbed per mine), and 1 very large (200 acres or 8.1 ha disturbed). The 200 acres (81 ha) for the very large mine (JD-7) have already been disturbed (as were 80 acres [32 ha] for topsoil storage and 160 acres [65 ha] for overburden storage area in areas of private property). Therefore, areas of new disturbance could occur at the other 18 mine locations. Mining operations under Alternative 4 would disturb 450 acres (180 ha) of land containing various amounts of upland vegetation. This area of disturbance represents 1.8% of the total acreage of DOE's lease program. The remainder of the lease tract areas (excluding areas where access roads and utility corridors could be required) would be undisturbed by mining activities under Alternative 4.

There would be limited differences in impacts under Alternative 4 compared with those under Alternative 3 (Section 4.3.6.2). However, the potential impacts on wildlife would occur at 11 additional mine sites and affect an additional 150 acres (61 ha) of land on any of the 31 lease tracts rather than just on any of the 13 pre-July 2007 then-active lease tracts. Although exploration, mine development and operational, and reclamation activities are expected to be greater under Alternative 4 than under Alternative 3, impacts on wildlife are still expected to be negligible to minor during site exploration and minor to moderate during mine development, operations, and reclamation. While impacts on wildlife would be long term, they would be scattered temporally and, especially, spatially. In general, impacts would be localized and not affect the viability of wildlife populations, especially if mitigation measures were used.

BLM_0041537

1     Long-term impacts on wildlife following reclamation of the mine sites would be
2  negligible if no development or other use of the sites (other than that of natural resource
3  protection) occurred.
4
5
6  **4.4.6.3  Aquatic Biota**
7
8     Impacts on aquatic biota from mine exploration, development, operations, and
9  reclamation under Alternative 4 would be similar to those under Alternative 3 (Section 4.3.6.3)
10  except that (1) during the peak year of operations, up to 19 mines could be in operation, and
11  (2) the mines could be located on any of the 31 lease tracts. Overall, impacts on aquatic biota are
12  expected to be negligible during site exploration and minor to moderate during mine
13  development, operations, and reclamation. Moderate impacts would only be expected if mines
14  were located within one or a few lease tracts located near perennial water bodies. In general, any
15  impacts on aquatic biota would be localized and would not affect the viability of affected
16  resources, especially if mitigation measures were used.
17
18
19  **4.4.6.4  Threatened, Endangered, and Sensitive Species**
20
21     Under Alternative 4, impacts on threatened, endangered, or sensitive species could result
22  from exploration, mine development and operational, and reclamation activities. The threatened,
23  endangered, and sensitive species evaluated under Alternative 3 (Section 4.3.6.4) would still be
24  considered under Alternative 4. The only difference is that the potential for impacts on these
25  species might be greater because more lease tracts could be developed, representing a greater
26  potential for direct and indirect effects on these species.
27
28     All species evaluated under Alternative 3 have the potential to be affected by program
29  activities under Alternative 4. Potential impacts on these species, as well as potentially
30  applicable avoidance, minimization, and mitigation measures, are identified in Section 4.3.6.4
31  (see Table 4.3-6). In addition to these species, Table 4.4-4 shows there is the potential for
32  impacts on other threatened, endangered, and sensitive species that might be affected by ULP
33  activities on the expanded number of lease tracts under Alternative 4. In total, 52 threatened,
34  endangered, or sensitive species that might be affected by ULP activities under Alternative 4
35  (this includes all species listed back in Table 4.3-6 and listed here in Table 4.4-4). There are five
36  threatened, endangered, or sensitive species that might be affected by ULP activities under
37  Alternative 4 that would not be affected under Alternative 3 (Table 4.3-6). These five species are
38  all BLM-designated sensitive plant species. Impacts on these additional species are presented in
39  Table 4.4-4.
40
41
42  **4.4.7  Land Use**
43
44     Under Alternative 4, DOE would continue the ULP with the 31 lease tracts for the next
45  10-year period or for another reasonable period. A total of 19 mines are assumed to be in

BLM_0041538

1  **TABLE 4.4-4  Potential Effects of the Uranium Leasing Program under Alternative 4 on**
2  **Threatened, Endangered, and Sensitive Species That Would Not Be Affected under Alternative 3[a]**

| Common Name | Scientific Name | Status[b] | Potential to Occur on or near the Following Lease Tracts[c] | Potential for Effect[d] |
|---|---|---|---|---|
| **Plants** | | | | |
| Canyonlands biscuitroot | *Aletes latilobus* | BLM-S | 26, 27 | Potential for negative impact—direct and indirect effects. ULP activities could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Fisher milkvetch | *Astragalus piscator* | BLM-S | 26, 27 | Same as above. |
| Grand Junction suncup | *Camissonia eastwoodiae* | BLM-S | 26, 27 | Same as above. |
| Horseshoe milkvetch | *Astragalus equisolensis* | BLM-S | 26, 27 | Same as above. |
| Osterhout's cryptantha | *Cryptantha osterhoutii* | BLM-S | 26, 27 | Same as above. |

[a]  Threatened, endangered, and sensitive species that might be affected under Alternative 4 include all species that might be affected under Alternative 3, as well as all species presented in this table. See Section 4.3.6.4 and Table 4.3-6 for a discussion and presentation of potential impacts on threatened, endangered, and sensitive species under Alternative 3.

[b]  BLM-S = BLM-designated sensitive species.

[c]  Refer to Table 3.6-20 (Section 3.6.4) for a description of species' habitat requirements and potential to occur on or near lease tract areas.

[d]  Potential impacts are based upon the presence of potentially suitable habitat or recorded occurrences in the vicinity of the Alternative 1 lease tracts. Impacts on species might occur as either direct or indirect effects. Direct effects are considered to be physical impacts resulting from ground-disturbing activities; these include impacts such as direct mortality and habitat disturbance. The impact zone for direct effects does not extend beyond the lease tract boundaries. Indirect effects result from factors including, but not limited to, noise, runoff, dust, accidental spills, and radiation exposure. The impact zone for indirect effects might extend beyond the lease tract boundaries, but the potential degree of indirect effects would decrease with increasing distance from the lease tracts.

3
4
5

BLM_0041539

1 operation during the peak year of ore production. The lands would continue to be closed to
2 mineral entry; however, all other activities within the lease tracts would continue. Mining
3 activities within the lease tracts would likely preclude some land uses such as recreation or
4 grazing, but because many of the surrounding lands offer opportunities for these activities,
5 impacts due to land use conflicts are considered to be small (but greater than those under
6 Alternative 3 because they involve more lands).

7
8

9 **4.4.8 Socioeconomics**

10
11     Mining development and operational activities would create direct employment of
12 333 people during the peak year and would create 188 additional indirect jobs (see Table 4.4-5).
13 Development and operational activities would constitute 0.6% of total ROI employment.
14 Uranium mining would also produce $27.3 million in income. Mine operation is assumed to be
15 10 years.

16
17     As discussed in Section 3.8, the average unemployment rate in the ROI was 9.6% in
18 2010; approximately 10,600 people were unemployed. Based on the number of people that could
19 be available from the unemployed workforce and the ROI's distribution of employment by
20 sector, there could be approximately 2,100 people available for uranium mining and reclamation
21 in the ROI. Based on the available labor supply in the ROI as a whole, the current workforce
22 could meet the demand for labor necessary for mine development and operations and
23 reclamation of 8 assumed mines, in which case, no in-migration of workers or families would be
24 required.

25
26     However, on the basis of the assumption that that some in-migration would occur as a
27 result of uranium mining activities, under Alternative 4, 166 people would move into the ROI.
28 In-migration of workers would represent an increase in the ROI forecasted population growth
29 rate by 0.08%. The additional workers would increase the annual average employment growth
30 rate by less than 1% in the ROI. The in-migrants would have only a marginal effect on local
31 housing and population and would require less than 1% of vacant owner-occupied housing
32 during mine development and operations. One additional physician, one additional firefighter,
33 and one additional police officer would be required to maintain current levels of service within
34 the ROI as a result of the increased population from in-migrants. No additional teachers would
35 be required to maintain the current student-to-teacher ratio in the ROI.

36
37     Since no in-migrant labor force would be required for mining activities, there would be
38 no impact on population or public services, including additional community service employment,
39 education expenditures, or public finances. Mining activities would also have no effect on local
40 housing, because there would not be an influx of workers needing rental or owner-occupied
41 housing units; therefore, these activities would not have an impact on the local occupancy rate.
42 Impacts in the ROI would be small because employment would be distributed across three
43 counties, the impacts would be absorbed across multiple governments and many municipalities,
44 and the employment pool would come from a larger population group than if all employment
45 originated from any one county. It is likely that most mining workers would live in larger

BLM_0041540

1  population centers within the ROI, such as Grand Junction, Montrose, or Clifton, and commute
2  to mining locations. However, individual municipalities in smaller rural communities might
3  experience a temporary increase in population from workers if they chose to move to
4  communities closer to mining projects rather than commuting longer distances. Although there
5  would be no in-migration of workers from outside the three-county ROI and thus little impact on
6  the ROI as a whole, the impact on individual communities could vary.
7
8      Potential impacts during reclamation would be small. The reclamation period would
9  likely span 2 to 3 years, although only 1 year of reclamation activities would require a
10  workforce. Reclamation would require 39 direct jobs and 17 indirect jobs during the peak year
11  for field work and revegetation (see Table 4.4-5). Reclamation would use the existing workforce
12  in the ROI, so there would be no in-migration of workers or families and no impacts on housing
13  or public services.
14
15
16      **4.4.8.1  Recreation and Tourism**
17
18      Potential impacts on recreation and tourism under Alternative 4 would be the same as
19  those under Alternative 3 (see Section 4.3.8.1).
20
21
22      **TABLE 4.4-5  Socioeconomic Impacts of Uranium Mine**
23      **Development and Operations and Reclamation in the Region of**
24      **Influence under Alternative 4**

| Parameter | Development and Operations | Reclamation |
|---|---|---|
| Employment (no.) | | |
| Direct | 333 | 39 |
| Indirect | 188 | 17 |
| Total | 521 | 56 |
| Income[a] | | |
| Total | 27.3 | 2.4 |
| In-migrants (no.) | 166 | 0 |
| Vacant housing (no.) | 69 | 0 |
| Local community service employment | | |
| Teachers (no.) | 0 | 0 |
| Physicians (no.) | 1 | 0 |
| Public safety (no.) | 2 | 0 |

[a]   Unless indicated otherwise, values are reported in $ million 2009.

25
26

BLM_0041541

**4.4.9  Environmental Justice**

**4.4.9.1  Exploration**

The types of impacts related to exploration under Alternative 4 are similar to those under Alternative 3 (Section 4.3.9.1). Because exploration activities would occur over relatively small areas and involve little or no ground disturbance, impacts associated with this phase are expected to be small.

**4.4.9.2  Mine Development and Operations**

Under Alternative 4, there would be a total of 19 mines operating across the 31 DOE ULP lease tracts. The types of impacts related to mine development and operations under Alternative 4 would be similar to those described under Alternative 3 (Section 4.3.9.2), but the increase in the disturbed area under Alternative 4 could potentially increase the impacts.

**4.4.9.3  Reclamation**

Under Alternative 4, impacts on environmental justice associated with the reclamation activities would be the same as those under Alternative 1 (Section 4.1.9).

Although impacts on the general population could be incurred as a result of exploration, mine development and operations, and reclamation of uranium mining facilities under Alternative 4, for the majority of resources evaluated, impacts are likely to be small. Specific impacts on low-income and minority populations as a result of participation in subsistence or certain cultural and religious activities would also be small. In addition, there are no minority populations, as defined by CEQ guidelines (Section 10.1.1), within the 50-mi (80-km) radius around the boundary of the lease tracts, meaning that any adverse impacts from the ULP would not disproportionately affect minority populations. Because there are no low-income populations within the 50-mi (80-km) radius, there would not be any impacts on low-income populations.

**4.4.10  Transportation**

The transportation risk analysis estimated both radiological and nonradiological impacts associated with the shipment of uranium ore from its points of origin at one of the 31 lease tracts to a uranium mill. Further details on the risk methodology and input data are provided in Section 4.3.10.1 and Section D.10 of Appendix D.

The Alternative 4 transportation assessment evaluates the annual impacts expected during the peak year of operations when 19 of the 31 lease tracts could have operating mines. The

BLM_0041542

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1  shipment of uranium ore over the life of the program is not discussed because of the uncertainty
2  associated with future uranium demand and mine development.
3
4      A sample set of 19 of the 31 lease tracts were evaluated in the transportation analysis to
5  represent operations during the peak year of production. As was done for Alternative 3, lease
6  tract selection for the transportation analysis considered the lease tract locations, lessees, and
7  prior mining operations, if any. In addition to a mill's distance, its capacity was also considered
8  when determining which mill would receive a particular mine's ore shipments. Thus, the nearest
9  mill was not always the destination for a given shipment. At the time of actual shipment, factors
10  such as existing road conditions due to traffic, weather, and road maintenance or repair as well as
11  mill capacity and costs would be among the criteria used to determine which mill should receive
12  a given ore shipment. This transportation analysis is intended to provide a reasonable estimate of
13  impacts that could occur. Impacts were also estimated on the basis of the assumption that all
14  shipments would go to a single mill in order to provide an upper range on what might be
15  expected. Single shipment risks for uranium ore shipments are also provided so that an estimate
16  for any future shipping campaign could be evaluated.
17
18      The transportation risk assessment considered human health risks from routine (normal,
19  incident-free) transport of radiological materials and from accidents. The risks associated with
20  the nature of the cargo itself ("cargo-related" impacts) were considered for routine transport.
21  Risks related to the transportation vehicle, regardless of type of cargo ("vehicle related"
22  impacts), were considered for routine transport and potential accidents. Radiological cargo-
23  related accident risks are expected to be negligible and were not assessed as part of this analysis,
24  as discussed in Appendix E, Section E.10.1. Transportation of hazardous chemicals was not part
25  of this analysis because no hazardous chemicals have been identified as being part of uranium
26  mining operations.
27
28
29  **4.4.10.1  Routine Transportation Risk**
30
31
32      **4.4.10.1.1  Nonradiological Impacts.** The estimated number of shipments from the
33  operating uranium mines to the mills during the peak year of uranium mining under Alternative 4
34  would be 80 per day, assuming an ore production rate of 2,000 tons per day, as discussed in
35  Section 2.2.4.1, and a truck load of 25 tons. Including round-trip travel, 160 trucks per day would
36  be expected to travel the affected routes. As listed in Table 3.10-1, the lowest AADT along the
37  route would be about 250 vehicles per day near Egnar on CO 141. If all 160 trucks per day
38  passed through Egnar, in the extreme case of all shipments going to the White Mesa Mill, there
39  would be a 64% increase in traffic in this area, but only a 3% increase at the most heavily
40  traveled location in Monticello, Utah. No additional traffic congestion would be expected in any
41  area, and only about 5 additional trucks per hour would be expected in each direction, assuming
42  a 16-hour workday for transport.
43
44      For the example case with operations at 19 mines (1 very large, 2 large, 10 medium, and
45  6 small, as discussed in Section 2.2.4.1), the total distance traveled by haul trucks during the

BLM_0041543

1  peak year would be approximately 2.1 million mi (3.4 million km), assuming round-trip travel
2  between the lease tracts and the mills as shown in Table 4.4-6. Using peak year assumptions of
3  80 shipments a day and 20 days a month, 19,200 round trips would be expected. The estimated
4  total truck miles traveled of approximately 2.1 million mi or 3.4 million km would be about
5  17% of the total heavy-truck miles traveled (12.6 million mi or 20 million km) along the affected
6  highways in 2010 (CDOT 2011; UDOT 2011). In general, actual annual impacts over the course
7  of the ULP could be lower or higher than these impacts, because the shipment numbers are for
8  the estimated peak year, and, for a given lease tract, the ore could be transported to a different
9  mill than that used in the PEIS analysis, or lease tracts other than those used in the sample case
10  could be developed.
11
12      To put the sample case results in perspective, Table 4.4-6 also lists the total distances that
13  ore would be shipped if all of the ore were shipped to one mill or the other. Because of the
14  relative locations of all of the lease tracts with respect to the mills, shipping all of the ore to the
15  White Mesa Mill (4.2 million mi or 6.75 million km) would represent close to the upper bound
16  for the total distance for all shipments. Conversely, shipment of all of the ore to the Piñon Ridge
17  Mill (1.2 million mi or 1.96 million km) would represent close to the lower bound for total
18  distance.
19
20      As previously discussed in Section 4.3.10.2.1, most of the distance traveled by the haul
21  trucks would occur on State or US Highways. To access these roads, the haul trucks might have
22  to travel distances of up to several miles on county and local roads, depending on the location of
23  the lease tract and the location of the mine within the lease tract. Several residences are located
24  near lease tracts along such roads. In those cases, the number of passing haul trucks could range
25  from about 4 to 24 trucks per day, depending on the size of the nearby mine, as shown in
26  Table 4.3-12. If hauling were to occur for 16 hours per day, then up to 1 or 2 haul trucks per hour
27  could pass by on the way to or from the main highway in the case of a very large mine. In
28  addition, some of these residences might encounter local truck traffic for the first time if ore
29  production occurred on neighboring lease tracts.
30
31
32      **4.4.10.1.2  Radiological Impacts.** Radiological impacts during routine conditions would
33  be a result of human exposure to the low levels of radiation near the shipment. The regulatory
34
35
36  **TABLE 4.4-6  Peak-Year Collective Population Transportation Impacts under Alternative 4**

| Scenario | Total Distance (km) | Radiological Impacts | | | | Accidents per Round Trip | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Public Dose (person-rem) | Risk (LCF) | Worker Dose (person-rem) | Risk (LCF) | Injuries | Fatalities |
| Sample case | 3,418,000 | 0.26 | 0.0002 | 1.4 | 0.0008 | 0.63 | 0.057 |
| All to Piñon Ridge Mill | 1,955,000 | 0.15 | 9E-05 | 0.79 | 0.0005 | 0.36 | 0.033 |
| All to White Mesa Mill | 6,747,000 | 0.52 | 0.0003 | 2.7 | 0.002 | 1.3 | 0.11 |

37

BLM_0041544

1  limit established in 49 CFR 173.441 (Radiation Level Limitations) and 10 CFR 71.47 (External
2  Radiation Standards for All Packages) to protect the public is 10 mrem/h at 6 ft (2 m) from the
3  outer lateral sides of the transport vehicle. As discussed in Appendix D, Section D.10.4.2, the
4  average external dose rate for uranium ore shipments is approximately 0.1 mrem/h at 6 f5 (2 m),
5  two orders of magnitude lower than the regulatory maximum.
6
7
8  **Collective Population Risk.** The collective population risk is a measure of the total risk
9  posed to society as a whole by the actions being considered. For a collective population risk
10  assessment, the persons exposed are considered as a group; no individual receptors are specified.
11  The annual collective population dose to persons sharing the shipment route and to persons
12  living and working along the route was estimated to be approximately 0.26 person-rem for the
13  peak year, assuming about 19,200 shipments for the sample case, as shown in Table 4.4-6. The
14  total collective population dose of 0.26 person-rem could result in approximately 0.0002 LCF.
15  Therefore, no LCFs are expected. These impacts are intermediate between those impacts
16  estimated if all ore shipments went to the Piñon Ridge Mill or to the White Mesa Mill, as shown
17  in Table 4.4-6.
18
19  Collectively for the sample case, the truck drivers (transportation crew) would receive a
20  dose of about 1.4 person-rem (0.0008 LCF) during the peak year of operations from all
21  shipments. Again, no LCFs would be expected. For perspective, the collective dose of 1.4 rem
22  (1,400 mrem) over 19,200 shipments is slightly more than double what a single individual would
23  receive in 1 year from natural background radiation and human-made sources of radiation (about
24  620 mrem/yr).
25
26  For scenarios other than those presented in this PEIS, single shipment risks are provided
27  for transporting ore from any of the lease tracts considered under any alternative to the Piñon
28  Ridge Mill (Table 4.3-13) and the White Mesa Mill (Table 4.3-14). In conjunction with
29  Table 4.3-10, all collective population impacts related to any combination and number of ore
30  shipments between lease tracts and uranium mills could be estimated.
31
32
33  **Highest-Exposed Individuals during Routine Conditions.** In addition to assessing the
34  routine collective population risk, the risks to individuals for a number of hypothetical exposure
35  scenarios were estimated, as described further in Section D.10.2.2. The scenarios were not meant
36  to be exhaustive but were selected to provide a range of potential exposure situations. The
37  estimated doses and associated likelihood of LCFs are discussed in Section 4.3.10.2.2.
38
39
40  **4.4.10.2  Accident Transportation Risk**
41
42  The total distance traveled by haul trucks during the peak year would be approximately
43  2.1 million mi (3.42 million km), including round-trip travel between the lease tracts and the
44  mills, as discussed in Section 4.4.10.1.1 for the sample case. As shown in Table 4.4-6, potential
45  transportation accident impacts for the peak year would not include any expected fatalities and

BLM_0041545

1    would include possibly one injury from traffic accidents. For perspective, over the entire area of
2    the affected counties (San Juan County in Utah and Dolores, Mesa, Montrose, and San Miguel
3    Counties in Colorado), from 2006 through 2010, a total of 21 heavy-truck-related traffic fatalities
4    occurred (DOT 2010a,b,c,d,e), representing an average of 4.2 fatalities per year.
5
6
7    **4.4.11 Cultural Resources**
8
9        Under Alternative 4, the DOE ULP would continue at all 31 lease tracts for the next
10   10-year period or for another reasonable period. All phases of uranium mining activities
11   (exploration, development and operations, and reclamation) would be expected to occur. Impacts
12   would be similar to those discussed in previous cultural resources sections, except they would
13   occur on a larger scale, since they could occur on all lease tracts.
14
15        Impacts from exploration would be expected to be the same as those described in
16   Section 4.3.11.1. They would accrue mostly from exploration test borings and would be minimal
17   within any lease tract. Drill pads are generally small (15 × 50 ft or 4.6 × 75 m), and boring can
18   usually be accomplished with minimal surface disruption. Drilling sites and the proposed
19   locations for any new road construction would have to undergo cultural surveys before any dirt
20   could be moved, and cultural resources would generally be avoided. Secondary impacts from
21   increased access, traffic, and human presence would be similar, but on a larger scale, since three
22   times as many lease tracts would be in play. As listed in Table 4.4-7, an estimated 1,798 cultural
23   resource sites could be exposed to secondary impacts under Alternative 4.
24
25        Impacts from mine development and operations would be similar in nature to those
26   described in Section 4.3.11.2, but once again on a larger scale. They would include disturbance
27   of archaeological sites, damage or demolition of historic structures, damage or destruction of
28   plant or animal resources important to Native Americans, and damage to or disruption of sites
29   sacred or culturally important to traditional cultures. The agents of disturbance would likely
30   include earth-moving activities, demolishing or significantly altering existing structures for mine
31   development, increased human presence, increased access, increased noise, and increased traffic.
32   Based on the average site frequency across all lease tracts and the proposed numbers and sizes of
33   new mines, an estimate of direct impacts was generated and is shown in Table 4.4-7. An
34   estimated 21 cultural resource sites are likely to be affected by the development of mining
35   activities under Alternative 4.
36
37        Impacts from reclamation activities would be the same as those discussed in
38   Section 4.1.11. They include adverse impacts on historically important mining structures and
39   features, ground-disturbing activities if borrowing from undisturbed areas or road construction
40   and improvement occurred, and temporary increases in traffic and human presence. Potential
41   positive impacts from reclamation could include the restoration of habitat for plant and animal
42   resources important to Native Americans, the restoration of solitude, and the elimination of some
43   visual intrusions in places important to traditional cultures.
44
45

BLM_0041546

1
2

**TABLE 4.4-7  Cultural Resource Sites Expected To Be Directly Affected under Alternative 4**

| Mine Size Categories under Alternative 4 | No. of Mines in Category | Expected No. of Sites per Category | Total No. of Sites Expected |
|---|---|---|---|
| Small | 6 | 0.8 | 5 |
| Medium | 10 | 1.2 | 12 |
| Large | 2 | 1.7 | 3 |
| Total | | | 21 |

3
4
5   **4.4.12  Visual Resources**
6
7        Under this alternative, exploration, mine development and operations, and reclamation
8   activities would occur on all of the lease tracts considered in this PEIS. Potential BMPs are
9   summarized in Section 4.6.
10
11
12        **4.4.12.1  Exploration, Mine Development and Operations, and Reclamation**
13
14        Visual impacts generally would be the same under this alternative as those under
15   Alternatives 1 and 3 (see Sections 4.1.12 and 4.3.12). The primary difference would be that
16   activities would occur on all lease tracts. Impacts could result from a range of direct and indirect
17   actions or activities occurring on the lands contained within the lease areas. These types of
18   impacts include the following: (1) vegetation and landform alterations, (2) removal and addition
19   of structures and materials, (3) changes to existing roadways, (4) vehicular and worker activity,
20   and (5) light pollution.
21
22        Visual impacts associated with exploration and mine development and operations were
23   discussed further in Sections 4.3.12.1 and 4.3.12.2. Impacts associated with reclamation
24   activities were discussed further in Sections 4.1.12.1 through 4.1.12.5.
25
26
27        **4.4.12.2  Impacts on Surrounding Lands**
28
29        Under Alternative 4, DOE would continue the ULP at all 31 of the lease tracts for the
30   next 10-year period or for another reasonable period. The following analysis provides an
31   overview of the potential visual impacts on the SVRAs surrounding the mining locations.
32   Because of the number of leases and the potential for increased mining activity, lands outside the
33   lease tracts that have views of the lease tracts would be subject to visual impacts. The affected
34   areas and extent of impacts would depend on a number of visibility factors, view duration, and
35   view distance.
36

BLM_0041547

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*

Preliminary viewshed analyses were conducted to identify which lands surrounding the lease tracts could have views of the mining activities in at least some portion of the four groups. This analysis was based on a reverse viewshed analysis. Appendix E provides an overview of the methodology used to determine which locations are visible within a 25-mi (40 km) distance surrounding the lease tracts. For the purposes of this analysis, the lease tracts were analyzed in four groups, as described in Section 4.12: the North, North Central, South Central, and South Groups. The intent of the analysis was to determine the potential levels of contrasts (i.e., changes in form, line, color, and texture from the existing conditions to those under Alternative 4) that would be present.

4.4.12.2.1  North Group. Views from the following SVRAs would potentially include the lease tracts from the North Group:[6]

- Sewemup WSA,

- The Palisade ONA (an ACEC),

- The Palisade WSA,

- Unaweep/Tabeguache Scenic and Historic Byway,

- Tabeguache WA,

- Dolores River SRMA, and

- Dolores River Canyon WSA.

Figure 4.4-1 shows the results of the viewshed analysis for lease tracts within the North Group. The colored segments indicate areas in the SVRAs with clear lines of sight to one or more areas within the lease tracts and from which mining activities within the lease tracts would be expected to be visible, assuming the absence of screening vegetation or structures, and assuming there would be adequate lighting and other atmospheric conditions.

Within 5 mi (8 km) of the North Group, views from approximately 3% (639 acres or 260 ha) of the Sewemup WSA would potentially include the lease tracts. This WSA is located to the southwest of the North Group. As the distance from the lease tracts increases, views from approximately 38.3% (7,519 acres or 3,000 ha) of the WSA would potentially include the lease tracts. Views of the North Group from the WSA are generally partially or fully screened by the intervening mountains. The visible areas generally are located to the west of the Dolores River. Visibility of the North Group is most likely from the locations within the WSA that are higher in elevation than the lease tracts. Depending on the infrastructure placed within the two lease tracts,

---

[6] For the four groups of lease tracts, the SVRAs are presented in descending order, based on the percentage of the total acreage or mileage that would have potential views of the lease tracts.

BLM_0041548

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*



FIGURE 4.4-1  Viewshed Analysis for the North Lease Group under Alternative 4

BLM_0041549

1    views of the mine activities and sites might be limited and include the tops of head frames, drill
2    rigs, or other structures, if present. Activities conducted under Alternative 4 would be expected
3    to cause minimal to weak contrast levels for views from this WSA.
4
5        Portions of the Palisade ONA ACEC that would potentially have visibility of the North
6    Group lease tracts are located between 5 and 25 mi (8 and 40 km) of the lease tracts. The ACEC
7    is located to the north of these two lease tracts. Within this distance, views from approximately
8    555 acres (220 ha), or 2.3% of the total ACEC, could potentially include the lease tracts. Views
9    of the North Group from the ACEC are generally partially or fully screened by the intervening
10   mountains. Only views from the northernmost portions of the ACEC would potentially include
11   the lease tracts, such as from portions of the ACEC located along the Piñon Mesa. Depending on
12   the infrastructure placed within the two lease tracts, views of the mine activities and sites might
13   be limited and include the tops of head frames, drill rigs, or other structures, if present. As such,
14   activities conducted under Alternative 4 would be expected to cause minimal contrast levels to
15   no contrasts at all for views from this area.
16
17       Between 5 and 15 mi (8 and 24 km) from the North Group, the lease tracts would
18   potentially be visible from approximately 1.5% (387 acres or 60 ha) of the Palisade WSA. The
19   Palisade WSA is contained almost entirely within the Palisade ONA ACEC. As a result, contrast
20   levels for this area would be similar to those described for the ACEC.
21
22       The lease tracts would potentially be visible from less than 1% of the Unaweep/
23   Tabeguache Scenic and Historic Byway, the Tabeguache WA, the Dolores River SRMA, and the
24   Dolores River WSA. Under Alternative 4, mining-related activities in the lease tracts would be
25   expected to cause minimal contrast levels to no contrasts at all for views from these SVRAs.
26
27       Views from portions of the North and South Central Groups also would potentially
28   include lease tracts within the North Group. These locations are within 5 and 25 mi (8 and
29   40 km) of the group.
30
31
32       **4.4.12.2.2  North Central Group.** Figure 4.4-2 shows the results of the viewshed
33   analysis for lease tracts within the North Central Group. Views from the following SVRAs
34   would potentially include the North Central Group:
35
36       •   Tabeguache WA,
37
38       •   Sewemup WSA,
39
40       •   Unaweep/Tabeguache Scenic and Historic Byway,
41
42       •   Dolores River Canyon WSA,
43
44       •   Dolores River SRMA, and
45
46       •   San Miguel ACEC.
47

BLM_0041550

*Preliminary Draft PEIS*          *PEIS Privileged Information*                    *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*



1

2      **FIGURE 4.4-2  Viewshed Analysis for the North Central Lease Group under Alternative 4**

3

BLM_0041551

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*               *Do Not Distribute*

1    The North Central Group lease tracts would be visible from portions of the Tabequache
2    WA. The entire WA is located between 5 and 15 mi (8 and 40 km) of this group of lease tracts
3    within Montrose County. Views of the North Central Group from the WA are partially or fully
4    screened by the intervening mountains and vegetation. The lease tracts would be visible from
5    approximately 58.7% (4,802 acres or 1,700 ha) of the WA. Views of the lease tracts would be
6    possible from elevated viewpoints within the WA. Depending on the infrastructure placed within
7    the North Central Group, views of the mine activities and sites might be limited and include the
8    tops of head frames, drill rigs, or other structures, if located on the individual lease tracts.
9    Activities conducted under this alternative would be expected to cause minimal to weak contrast
10   levels for views from this area.
11
12    The North Central Group lease tracts would be visible from approximately 1.6%
13   (309 acres or 130 ha) of the Sewemup WSA. As the distance from the lease tracts increases,
14   views from approximately 35.4% (6,947 acres or 2,800 ha) of the WSA would potentially
15   include the lease tracts. Similar to views from the Tabequache WA, views of the North Central
16   Group from the WSA are generally partially or fully screened by the intervening mountains.
17   Visibility of the North Central Group is likely from the locations within the WSA that are higher
18   in elevation than the lease tracts. Depending on the infrastructure placed within the lease tracts,
19   views of the mine activities and sites might be limited and include the tops of head frames, drill
20   rigs, or other structures. Activities conducted under this alternative would be expected to cause
21   minimal to weak contrast levels for views from this WSA.
22
23    Drivers along the Unaweep/Tabeguache Scenic and Historic Byway would have views of
24   the North Central Group from locations within the BLM foreground distance of 3 to 5 mi (5 to
25   8 km). Within this distance, views from approximately 22 mi (35 km) of the byway would
26   potentially include the lease tracts. Between 0 and 15 mi (0 and 24 km), views from
27   approximately 36 mi (58 km) would potentially include the lease tracts, and between 0 and 25 mi
28   (0 and 40 km), views from approximately 43 mi (69 mi) would potentially include the lease
29   tracts. The byway passes between Lease Tracts 18, 19, 19A, 20 and Lease Tracts 24 and 25.
30   Depending on the infrastructure placed within the lease tracts, views of the mine activities and
31   sites would be visible for visitors driving along the byway, primarily in the area within Montrose
32   County. Views that are level or looking down onto the lease tracts would involve stronger
33   contrasts than those that are lower in elevation. Views would include head frames, drill rigs, or
34   other structures, if needed for the mining activities. As such, activities conducted under this
35   alternative would be expected to cause minimal to strong contrast levels for views from the
36   byway. However, views from the byway would be relatively short in duration, largely due to the
37   small size of the individual lease tracts within the North Central Group.
38
39    Between 5 and 25 mi (8 and 40 km) from the North Central Group, the North Central
40   Group lease tracts would be visible from approximately 2.9% (860 acres or 350 km) of the
41   Dolores River Canyon WSA. Views of the North Central Group from the WSA are generally
42   partially or fully screened. Scattered portions of the WSA are visible largely as a result of the
43   intervening mesa tops and Paradox Valley. Views of the mine activities and sites within the lease
44   tracts contained within this group might be limited and include the tops of head frames, drill rigs,

BLM_0041552

1    or other structures, if present. Under Alternative 4, activities would be expected to cause minimal
2    to weak contrast levels for views from the Dolores River Canyon WSA.
3
4        The North Central Group lease tracts would be visible from approximately 1.3%
5    (879 acres or 360 ha) of the Dolores River SRMA. Portions of the SRMA with views of the lease
6    tracts are located to the west of Paradox Valley and to the northwest of Lease Tracts 8, 8A,
7    and 9. These locations are near Bedrock, Colorado. Similar to other SVRAs located within 25 mi
8    (40 km) of the North Central Group, views from elevated locations would likely include the tops
9    of head frames, drill rigs, and other structures, if present. Activities conducted under this
10   alternative would be expected to cause minimal to weak contrast levels for views from this
11   SRMA.
12
13       The North Central Group lease tracts would be visible from less than 1% (51 acres or
14   21 ha) of the San Miguel ACEC. Portions of the ACEC with views of the lease tracts are located
15   between 15 and 25 mi (24 and 40 km) of the North Central Group north of Norwood, Colorado,
16   and Route 145. Activities conducted under this alternative would be expected to cause minimal
17   contrast levels to no contrasts at all for views from this ACEC.
18
19       Views from portions of the North and South Central Groups also would potentially
20   include the North Central Group. These viewing locations are within 5 and 25 mi (8 and 40 km)
21   of the North Central Group.
22
23
24       **4.4.12.2.3  South Central Group.** Figure 4.4-3 shows the results of the viewshed
25   analysis for lease tracts within the South Central Group. The following SVRAs might have views
26   of the South Central Group:
27
28       •   Tabequache WA,
29
30       •   Dolores River Canyon WSA,
31
32       •   Dolores River SRMA,
33
34       •   Unaweep/Tabeguache Scenic and Historic Byway,
35
36       •   Sewemup WSA,
37
38       •   McKenna Peak WSA, and
39
40       •   San Miguel ACEC.
41
42   Of these SVRAs, only the Dolores River SRMA and the Dolores River Canyon WSA include
43   lands within 5 mi (8 km) of the South Central Group with potential views of the lease tracts.
44
45

BLM_0041553

*Preliminary Draft PEIS*        *PEIS Privileged Information*        *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*



FIGURE 4.4-3  Viewshed Analysis for the South Central Lease Group under Alternative 4

BLM_0041554

1    The South Central Group lease tracts are potentially visible from approximately 45.7%
2    (3,744 acres or 1,500 ha) of the Tabeguache WA. Most of this WA is located between 5 and
3    15 mi (8 and 24 km) of this group of lease tracts within Montrose County. Views of the South
4    Central Group are partially or fully screened by the intervening topography and vegetation.
5    Views of the mine activities and sites within the lease tracts contained within this group might be
6    limited and likely would include the tops of head frames, drill rigs, or other structures, if located
7    within the mine sites. Similar to those impacts experienced from views to the North Central
8    Group, activities conducted under this alternative would be expected to cause minimal to weak
9    contrast levels for views from this area.
10
11    Between 0 and 15 mi (24 km) from the lease tracts, the South Central Group lease
12    tracts could potentially be visible from approximately 22.2% (6,485 acres or 2,600 ha) of the Dolores
13    River Canyon WSA. These viewing locations are south of Bedrock, Colorado. If present, head
14    frames, drill rigs, or other structures might be visible from within the WSA. Views of the lease
15    tracts are more likely to occur from elevated locations than from within the canyon. Activities
16    conducted under this alternative would be expected to cause minimal to weak contrast levels for
17    views from this WSA.
18
19    The South Central Group lease tracts are potentially visible from approximately 13.7%
20    (8,937 acres or 3,600 ha) of the Dolores River Canyon SRMA. These viewing locations are in
21    those portions of the SRMA within Montrose County, south of Bedrock, Colorado. Views of
22    the mine activities and sites within the lease tracts contained within this group might be limited
23    and likely would include the tops of head frames, drill rigs, or other structures, if located within
24    the mine sites. Views of the lease tracts are more likely to occur from elevated locations than
25    from within the canyon. Similar to the Dolores River Canyon WSA, activities conducted under
26    Alternative 4 would be expected to cause minimal to weak contrast levels for views from this
27    SRMA.
28
29    Drivers along the Unaweep/Tabeguache Scenic and Historic Byway would potentially
30    have views of the South Central Group in locations within the background and "seldom seen"
31    distances, along approximately 19 mi (30 km) of the byway. Views from the byway near the
32    towns of Redvale and Naturita also would likely include the lease tracts within the South Central
33    Group. Depending on the infrastructure used at each mine site, views of head frames, drill rigs,
34    or other structures might occur. Minimal contrast levels to no contrasts at all would be expected
35    to occur for users of the byway.
36
37    The South Central Group lease tracts are potentially visible from approximately 8.0%
38    (1,580 acres or 640 ha) of the Sewemup WSA. These viewing locations are within 15 and 25 mi
39    (24 and 40 km) of the South Central Group. Views of the South Central Group from the WSA
40    are generally partially or fully screened by the intervening mountains. Visibility of this group of
41    lease tracts is likely from the locations within the WSA that are higher in elevation than the lease
42    tracts. Depending on the infrastructure present on each lease tract, views of the mine activities
43    and sites might be limited and include the tops of head frames, drill rigs, or other structures.
44    Activities conducted under this alternative would be expected to cause minimal contrast levels to
45    no contrasts for all for views from this area.
46

BLM_0041555

The South Central Group lease tracts are potentially visible from approximately 3.6% (715 acres or 290 ha) of the McKenna Peak WSA. These locations within the WSA are between 15 and 25 mi (24 and 40 km) from the South Central Group. These viewing areas primarily are located within San Miguel County, with only a small portion within Dolores County. Views of the mine activities and sites within the lease tracts contained within this group might be limited and likely would include the tops of head frames, drill rigs, or other structures, if present. Activities conducted under this alternative would be expected to cause minimal contrast levels to no contrasts at all for views from this SVRA.

The South Central Group lease tracts are potentially visible from less than 1% (21 acres or 8.5 ha) of the San Miguel ACEC. These viewing locations are within Montrose County, north of Norwood, Colorado, along an elevated mountain ridge in the north part of the ACEC. Activities conducted under Alternative 4 would be expected to cause minimal contrast levels to no contrasts at all for views from this SVRA.

Portions of the North Central and South Groups also would potentially include the lease tracts within the South Central Group. These viewing locations are within 5 and 15 mi (8 and 24 km) of the group.

**4.4.12.2.4  South Group.** Figure 4.4-4 shows the results of the viewshed analysis for lease tracts within the South Group. The following SVRAs might have views of the South Group:

- McKenna Peak WSA,

- Dolores River SRMA,

- Cahone Canyon WSA,

- Dolores River Canyon WSA,

- Trail of the Ancients Byway,

- Squaw/Papoose Canyon WSA, and

- Canyons of the Ancients National Monument.

Of these SVRAs, only the Dolores River Canyon WSA includes lands within 5 mi (8 km) of the South Group with potential views of the lease tracts. In addition, Trail of the Ancients Byway is located in Utah.

The South Group lease tracts are potentially visible from approximately 27.2% (5,421 acres or 2,200 ha) of the McKenna Peak WSA. Portions of the WSA with potential views

BLM_0041556

*Preliminary Draft PEIS*         *PEIS Privileged Information*              *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*



**FIGURE 4.4-4  Viewshed Analysis for the South Lease Group under Alternative 4**

BLM_0041557

1  of the lease tracts are between 15 and 25 mi (24 and 40 km) of the lease tracts. Views of the mine
2  activities and sites within the lease tracts contained within this group might be limited and likely
3  would include the tops of head frames, drill rigs, or other structures, if present. Activities
4  conducted under this alternative would be expected to cause minimal to weak contrast levels for
5  views from this SVRA.
6
7          From within 5 mi (8 km) of the South Group, the lease tracts are potentially visible from
8  approximately 12.9% (8,391 acres or 3,400 ha) of the Dolores River Canyon SRMA. In fact,
9  portions of the SRMA are contained within the actual lease tracts, including Lease Tracts 13,
10  13A, and 14. Depending on the infrastructure placed within the South Group, views of the mine
11  activities and sites would include head frames, drill rigs, or other structures, as well as the actual
12  mining activities. Activities under this alternative would be expected to create weak to strong
13  contrast levels for views from this SRMA; stronger contrast levels would occur for views from
14  those areas of the SRMA that were located within the contrast South Group and would lessen as
15  the distance from the lease tracts increased.
16
17          Within the "seldom seen" distance zone (i.e., between 15 and 25 mi or 24 and 40 km), the
18  South Group lease tracts are potentially visible from approximately 794 acres or 321 ha (8.7%)
19  of the Cahone Canyon WSA. Depending on the infrastructure placed within the lease tracts,
20  views might include head frames, drill rigs, or other structures. Activities conducted under this
21  alternative would be expected to cause minimal contrasts levels to no contrasts at all for views
22  from the WSA.
23
24          Between 5 and 25 mi (8 and 40 km) from the South Group, the lease tracts are potentially
25  visible from approximately 4.1% of the Dolores River Canyon WSA. Views of the South Group
26  from the WSA are generally partially or fully screened; they primarily are located within
27  elevated portions of the WSA, near the Slick Rock Canyon. Views of the mine activities and
28  sites might be limited and include only the tops of head frames, drill rigs, or other structures, if
29  present. Activities conducted under this alternative would be expected to cause minimal contrast
30  levels to no contrasts at all for views from the Dolores River Canyon WSA.
31
32          Views from approximately 9.5 mi (15 km) of the Trail of the Ancients would potentially
33  include the South Group. This trail is located within the "seldom seen" distance zone
34  (i.e., between 15 and 25 mi or 24 and 40 km). Viewing locations from the trail that would
35  include views of the lease tracts are mainly to the west of the South Group in Utah. The trail's
36  footprint primarily follows Route 191. Activities conducted under Alternative 4 would be
37  expected to cause minimal contrast levels to no contrasts at all for views from along the trail.
38
39          The South Group lease tracts are potentially visible from less than 1% of the
40  Squaw/Papoose Canyon WSA and the Canyons of the Ancients National Monument. Portions of
41  these SVRAs with potential views of the lease tracts are between 15 and 25 mi (24 and 40 km) of
42  from the South Group. Activities conducted under this alternative would be expected to cause
43  minimal contrast levels to no contrasts at all for views from these SVRAs.
44

BLM_0041558

Portions of the South Central Group also would potentially include views of the lease tracts within the South Group, including Lease Tracts 8, 9, and 17. Viewing locations with this potential are within 5 and 15 mi (8 and 24 km) of from the group.

### 4.4.13  Waste Management

Potential impacts on waste management practices under Alternative 4 would be small and similar to those under Alternatives 1, 2, and 3. The quantity of waste to be managed under Alternative 4 would be slightly greater than the quantity under Alternative 3 for the peak year of mine development and operations.

## 4.5  ALTERNATIVE 5

Under Alternative 5, a total of 19 mines (16 medium, 2 large, and 1 very large) with a total area of 480 acres (190 ha) are assumed to be in operation in the peak year. The same three phases of mining evaluated for Alternatives 3 and 4 are also evaluated for Alternative 5.

> Alternative 5: This is the No Action Alternative, under which DOE would continue the ULP with the 31 lease tracts for the remainder of the 10-year period, as the leases were when they were issued in 2008.

### 4.5.1  Air Quality

#### 4.5.1.1  Exploration

Similar to Alternatives 3 and 4 discussed previously, exploration activities occur over relatively small areas and involve little ground disturbance, a small crew, and a small fleet of heavy equipment. Thus, potential impacts from this phase on ambient air quality are anticipated to be minimal and temporary.

#### 4.5.1.2  Mine Development and Operations

Air emissions of criteria pollutants, VOCs, and $CO_2$ from mine development and operations estimated for the peak year are presented in Table 4.5-1 and compared with emission totals for a combination of the three counties (Mesa, Montrose, and San Miguel) that encompass the DOE ULP lease tracts. As shown in the table, total peak-year emission rates are estimated to be rather small compared with emission totals for all three counties. Typically, PM emissions are highest during mine development, while $NO_x$ emissions are highest during operations. During mine development, non-PM emissions would be relatively small (up to 0.45%), and $PM_{10}$ and $PM_{2.5}$ emissions would be about 3.2% and 1.4%, respectively, of the three-county total

BLM_0041559

1 emissions. $PM_{10}$ emissions would result from explosive use (40%) and site preparation (38%),
2 followed by wind erosion (22%). Exhaust emissions would contribute only a little to total $PM_{10}$
3 emissions. During operations, $NO_x$ emissions of 313 tons/yr are highest, amounting to about
4 2.3% of three-county total emissions. $NO_x$ emissions would mostly come from diesel-fueled
5 heavy equipment (e.g., bulldozers or power generators) and trucks. These impacts could be
6 minimized by implementing good industry practices and fugitive dust mitigation measures (such
7 as watering unpaved roads, disturbed surfaces, and temporary stockpiles). Therefore, potential
8 impacts on ambient air quality would be minor and temporary.
9
10   The three counties encompassing the lease tracts are currently in attainment for ozone
11 (EPA 2011b), but ozone levels in the area approached the standard (about 90%)
12 (see Table 3.1-3). Recently, wintertime ozone exceedances have frequently been reported at
13 higher elevations in northwestern Colorado, northeastern Utah, and southwestern Wyoming.
14 However, ozone precursor emissions from mine development and operations would be relatively
15 small, less than 2.3% and 0.04% of three-county total $NO_x$ and VOC emissions, respectively,
16 and they would be much lower than those for the regional airshed in which emitted precursors
17 are transported and transformed into ozone. In addition, the wintertime high-ozone areas are
18 located more than 100 mi (161 km) from the lease tracts and are not located downwind of the
19 prevailing westerlies in the region. Accordingly, potential impacts of $O_3$ precursor releases from
20 mine development and operations on regional ozone would not be of concern.
21
22   As discussed in Section 4.1.4, there are several Class I areas around the lease tracts where
23 AQRVs, such as visibility and acid deposition, might be a concern. Primary pollutants affecting
24 AQRVs include $NO_x$, $SO_2$, and PM. $NO_x$ and $SO_2$ emissions from mine development and
25 operations would be relatively small, accounting for up to 2.3% of three-county total emissions,
26 while $PM_{10}$ emissions would be about 3.2% of three-county total emissions. Air emissions from
27 mine development and operations could result in minor impacts on AQRVs at nearby Class I
28 areas. The implementation of good industry practices and fugitive dust mitigation measures
29 could minimize these impacts.
30
31   Annual total $CO_2$ emissions from mine development and operations were estimated as
32 shown in Table 4.5-1. CO emissions during operations would be much higher than those during
33 mine development. During operations, annual total $CO_2$ emissions would be about 29,000 tons
34 (26,000 metric tons); they accounted for about 0.025% of Colorado GHG emissions in 2010 at
35 129.3 million metric tons of $CO_2e$ and 0.00048% of U.S. GHG emissions in 2009 at
36 6,633.2 million metric tons of $CO_2e$ (EPA 2011a; Strait et al. 2007). Thus, potential impacts
37 from mine development and operations on global climate change would be negligible.
38
39
40 **4.5.1.3  Reclamation**
41
42   Peak-year emissions during the reclamation phase under Alternative 5 are included in
43 Table 4.5-1. $PM_{10}$ emissions are highest, accounting for about 1.7% of three-county combined
44 emissions. Among non-PM emissions, $NO_x$ emissions from diesel combustion of heavy
45 equipment and trucks are highest, up to 0.18% of three-county total emissions. Good industry

BLM_0041560

1    **TABLE 4.5-1  Peak-Year Air Emissions from Mine Development and Operational and**
2    **Reclamation Activities under Alternative 5[a]**

| Pollutant[b] | Annual Emissions (tons/yr) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Three-County Total[c] | Mine Development | | Operation | | Reclamation | |
| CO | 65,769 | 176 | (0.27%)[d] | 145 | (0.22%) | 11.8 | (0.02%) |
| $NO_x$ | 13,806 | 61.8 | (0.45%) | 313 | (2.3%) | 24.3 | (0.18%) |
| VOCs | 74,113 | 1.9 | (0.003%) | 30.4 | (0.04%) | 2.4 | (0.003%) |
| $PM_{2.5}$ | 5,524 | 78.3 | (1.4%) | 26.7 | (0.48%) | 53.0 | (0.96%) |
| $PM_{10}$ | 15,377 | 489 | (3.2%) | 51.4 | (0.33%) | 259 | (1.7%) |
| $SO_2$ | 4,246 | 7.5 | (0.18%) | 40.1 | (0.95%) | 3.2 | (0.08%) |
| $CO_2$ | 129.3[e] | 1,767 | (0.002%) | 29,000 | (0.025%) | 2,282 | (0.002%) |
| | 6,633.2[f] | | (0.00003%) | | (0.00048%) | | (0.00004%) |

[a]   Under Alternative 5, it is assumed that 19 mines (16 medium, 2 large, and 1 very large) with a total
      area of 480 acres would be in operation or reclaimed in any peak year.

[b]   Notation: CO = carbon monoxide; $CO_2$ = carbon dioxide; $NO_x$ = nitrogen oxides; $PM_{2.5}$ = particulate
      matter with a mean aerodynamic diameter of ≤2.5 μm; $PM_{10}$ = particulate matter with a mean
      aerodynamic diameter of ≤10 μm; $SO_2$ = sulfur dioxide; VOCs = volatile organic compounds.

[c]   Total emissions in 2008 for all three counties encompassing the DOE ULP lease tracts (Mesa,
      Montrose, and San Miguel Counties), except for $CO_2$ emissions. See Table 3.1-2.

[d]   Numbers in parentheses are percentages of three-county total emissions except for $CO_2$, which are
      percentages of Colorado total (top line) and U.S. total emissions (bottom line).

[e]   Annual emissions in 2010 for Colorado in million metric tons of $CO_2$ equivalent.

[f]   Annual emissions in 2009 for U.S. in million metric tons of $CO_2$ equivalent.

Sources: CDPHE (2011); EPA (2011a); Strait et al. (2007)

3
4
5    practices and mitigation measures would be implemented to ensure compliance with
6    environmental requirements. Thus, potential impacts on ambient air quality associated with
7    reclamation activities under Alternative 5 are anticipated to be minor and temporary in nature.
8    These low-level emissions are not anticipated to cause any measureable impacts on regional
9    ozone or AQRVs, such as visibility or acid deposition, at nearby Class I areas. In addition, $CO_2$
10   emissions during reclamation phase were about 0.002% of Colorado GHG emissions in 2010 and
11   0.00004% of U.S. GHG emissions in 2009 (EPA 2011a; Strait et al. 2007). Thus, under
12   Alternative 5, potential impacts from reclamation activities on global climate change would be
13   negligible.
14
15

BLM_0041561

1 **4.5.2 Acoustic Environment**
2
3
4     **4.5.2.1 Exploration**
5
6        Details on activities during the exploration phase are presented in Section 4.3.1.1. The
7 types of impacts related to exploration under Alternative 5 would be similar to those under
8 Alternative 3 (Section 4.3.1.1). Exploration activities would occur over relatively small areas and
9 involve little ground disturbance, a small crew and a small fleet of heavy equipment.
10 Accordingly, it is anticipated that noise impacts from the exploration phase on neighboring
11 residences or communities, if any, would be minimal and intermittent.
12
13
14     **4.5.2.2  Mine Development and Operations**
15
16        As described in Section 4.3.2.2, noise levels would attenuate to about 55 dBA at a
17 distance of 1,650 ft (500 m) from the construction site, which is the Colorado daytime maximum
18 permissible limit of 55 dBA in a residential zone. If a 10-hour daytime work schedule is
19 considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) would occur
20 about 1,200 ft (360 m) from the construction site. In addition, other attenuation mechanisms,
21 such as air absorption, screening effects (e.g., natural barriers caused by terrain features), and
22 skyward reflection due to temperature lapse conditions typical of daytime hours, would reduce
23 noise levels further. Thus noise attenuation to Colorado or EPA limits would occur at distances
24 somewhat shorter than the aforementioned distances. In many cases, these limits would not reach
25 any nearby residences or communities. However, if construction occurred near the lease tract
26 boundary, noise levels at residences around Lease Tracts 13, 13A, 16, and 16A would exceed the
27 Colorado limit.
28
29        It is assumed that most mine development and operational activities would occur during
30 the day, when noise is better tolerated because of the masking effects of background noise,
31 which occurs more during daytime than at night. In addition, construction activities for lease
32 tracts are temporary in nature (typically a few months). Construction within the lease tracts
33 would cause some unavoidable but localized short-term noise impacts on neighboring residences
34 or communities, particularly when construction occurred near the residences or communities
35 adjacent to the lease tract boundary.
36
37        During operations, heavy-duty trucks would be operating to transport uranium ores from
38 lease tracts to either the proposed Piñon Ridge Mill or White Mesa Mill in Utah. These
39 shipments could generate noise along the haul routes. Under Alternative 5, about 2,300 tons per
40 day of uranium ore would be generated. Based on the assumptions that there would be 25 tons of
41 uranium ore per truck and round-trip travel, the traffic volume would be 184 truck trips per day
42 (92 round trips per day) and 23 trucks per hour (for 8-hour operation). At distances of 200 ft
43 (61 m) and 380 ft (116 m) from the route, noise levels would attenuate to 55 and 50 dBA,
44 respectively, which are Colorado daytime and nighttime maximum permissible limits in a
45 residential zone. Noise levels above the EPA guideline level of 55 dBA $L_{dn}$ for residential areas

1    would be reached at a distance of up to 103 ft (31 m) from the route. Accordingly, Colorado
2    limits or EPA guideline levels would be exceeded within 380 ft (116 m) from the haul route, and
3    any residences within this distance might be affected.
4
5          Depending on local geological conditions, explosive blasting during mine development
6    and operations might be needed. Blasting would generate a stress wave in the surrounding rock,
7    causing the ground and the structures on the ground surface to vibrate. The blasting would also
8    create a compressional wave in the air (air blast overpressure), the audible portion of which
9    would be manifested as noise. Potential impacts of ground vibration would include damage to
10   structures, such as broken windows. Potential impacts of blast noise would include effects on
11   humans and animals. The estimation of potential increases in ambient noise levels, ground
12   vibration, and air blast overpressure and the evaluation of any environmental impacts associated
13   with such increases would be warranted at the site-specific project phase if potential significant
14   impacts were anticipated at nearby residences or structures.
15
16         Blasting techniques are designed and controlled by blasting and vibration control
17   specialists to prevent damage to structures or equipment. The controls attenuate blasting noise as
18   well. Under Alternative 5, several residences are within 1.0 mi (1.6 km) of the boundaries of the
19   lease tracts to be developed. Residences at further distances would not require additional
20   mitigation. However, given the impulsive nature of blasting noise, it is critical that blasting
21   activities be avoided at night and on weekends and that affected neighborhoods be notified in
22   advance of scheduled blasts.
23
24         There are several specially designated areas (e.g., Dolores River SRMA and Dolores
25   River Canyon SRA) and other nearby wildlife habitats around the DOE ULP lease tracts and
26   haul routes where noise might be a concern. Negative impacts on wildlife begin between 55 and
27   60 dBA, which corresponds to the onset of adverse physiological impacts (Barber et al. 2010).
28   As discussed above, these levels would be limited up to distances of 1,650 ft (500 m) from the
29   mine sites and 200 ft (61 m) from the haul routes. However, there is the potential for other
30   effects to occur at lower noise levels (Barber et al. 2011). To adequately account for these
31   impacts and the potential for impacts at lower noise levels, impacts on terrestrial wildlife from
32   construction noise and mitigation measures would have to be determined on a site-specific basis,
33   including the consideration of site-specific background levels and the hearing sensitivities of
34   site-specific terrestrial wildlife of concern.
35
36         In summary, potential noise impacts from mine development on humans and wildlife
37   would be anticipated near the mine sites and along the haul routes, but their impacts would be
38   minor and limited to proximate areas unless these activities occurred near the lease tract
39   boundaries adjacent to nearby residences or communities or areas specially designated for
40   wildlife concerns, if any. Implementation of good industry practices and coherent noise
41   management plans could minimize these impacts.
42
43

BLM_0041563

### 4.5.2.3 Reclamation

As detailed in Section 4.1.2, noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from the reclamation site, which is the Colorado daytime maximum permissible limit of 55 dBA in a residential zone. If a 10-hour daytime work schedule is considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) would occur about 1,200 ft (360 m) from the construction site. Most residences are located beyond these distances but, if reclamation activities occurred near the boundaries of Lease Tracks 13, 13A, 16, or 16A, noise levels at nearby residences could exceed the Colorado limit.

It is assumed that most reclamation activities would occur during the day, when noise is better tolerated because of the masking effects of background noise, which is more prominent then than at night. In addition, reclamation activities at lease tracts would be temporary (typically lasting a few weeks to months, depending on the size of the area to be reclaimed). Accordingly, reclamation within the lease tracts would cause some unavoidable but localized short-term and minor noise impacts on neighboring residences or communities. The same mitigation measures adopted during the construction phase could also be implemented during the reclamation phase.

## 4.5.3 Soil Resources

Soil impacts under Alternative 5 for the exploration, mine development and operations, and reclamation phases would be the same as those described under Alternative 4 because DOE would continue the ULP with the 31 lease tracts for the remainder of the 10-year period. The number of mines assumed to be operating at the peak year of ore production would be the same as for the number under Alternative 4, except that a slightly larger surface area would be used for mine development.

## 4.5.4 Water Resources

### 4.5.4.1 Exploration

The types of impacts related to exploration under Alternative 5 would be similar to those under Alternative 3 (Section 4.3.4.1). Because exploration activities would occur over relatively small areas and involve little or no ground disturbance, impacts associated with this phase are expected to be small.

### 4.5.4.2 Mine Development and Operations

Under Alternative 5, there would be a total of 19 mines operating across the 31 DOE ULP lease tracts, with a total land disturbance of 480 acres (190 ha) and a consumptive water use of 7,800 gal/d (>9,000 L/d) (Section 2.2.5.1). The types of impacts related to mine development

BLM_0041564

1   and operations under Alternative 5 would be similar to those under Alternative 3
2   (Section 4.3.4.2). The increase in disturbed area under Alternative 5 might increase the impacts
3   associated with erosion; however, the proximity of the lease tract to the Dolores River and the
4   San Miguel River would be still be the primary factor governing impacts. The increase in
5   consumptive water use would be negligible because it is assumed that the water would be
6   trucked in from off site.
7
8
9   **4.5.4.3  Reclamation**
10
11      Under Alternative 5, impacts on water resources associated with the reclamation
12  activities would be the same as those under Alternative 1 (Section 4.1.4).
13
14
15  **4.5.5  Human Health**
16
17      Similar to Alternatives 3 and 4, for Alternative 5, because the exploration drilling would
18  disturb only small areas and the drill holes would be backfilled in a short period of time (less
19  than a few weeks), potential human health impacts are expected to be minimal and limited to
20  only a few workers. Therefore, the analysis of human health impacts under Alternative 5 focuses
21  on the consequences caused by the development and operations of uranium mines and the
22  reclamation of lease tracts.
23
24
25  **4.5.5.1  Worker Exposure – Uranium Miners**
26
27      On the basis of the data published by U. S. Department of Labor, Bureau of Labor
28  Statistics, in 2010, the fatal occupational injury rate for the mining industry was 19.8 per
29  100,000 full-time workers (BLS 2011a), and the nonfatal occupational injury and illness rate was
30  2.3 per 100 full-time workers (BLS 2011b). Basis on the assumption that the injury and fatality
31  rates for uranium mining are similar to those for other types of mining, during the peak year of
32  operations, there could be 6 nonfatal injuries and illnesses among the 242 workers assumed for
33  mining development under Alternative 5. However, no mining-related fatality is expected among
34  the workers.
35
36      In addition to being exposed to physical hazards, uranium miners could receive radiation
37  exposures from mining activities. The radiation exposures received by individual miners under
38  Alternative 5 would be similar to those under Alternative 3. On the basis of monitoring data for
39  the period 1985 to 1989, the average radiation exposure for uranium mine workers in the
40  United States ranged from 350 to 433 mrem/yr (UNSCEAR 2010). In general, underground
41  miners receive higher radiation exposure than open-pit miners, because underground cavities
42  accumulate higher radon concentrations than aboveground open spaces. According to
43  UNSCEAR (1993), external exposure accounts for 28% of the total dose to underground miners
44  and for 60% to open-pit miners; inhalation of radon accounts for 69% of the total dose to
45  underground miners and for 34% to open-pit miners; and inhalation of uranium ore dust accounts

BLM_0041565

*Preliminary Draft PEIS*                    *PEIS Privileged Information*                    *May 2012*
*PEIS Team Use Only*                              *Do Not Distribute*

for 3% the total dose for underground miners and for 6% to open-pit miners. Based on assumptions that the average dose for underground miners is 433 mrem/yr and that the total dose is distributed among different pathways, an LCF of $4 \times 10^{-4}$/yr was calculated for an average miner (see Table 4.3-2). This translates to a probability of about 1 in 2,500 for a worker to develop a latent fatal cancer through 1 year of radiation exposure.

Similar to Alternative 4, potential chemical risks to the uranium miners were not calculated, because the chemical exposures would be caused mainly by inhalation of particulates, and the potential risk associated with this pathway constitutes just a small fraction of the total risk that the miners would incur.

### 4.5.5.2  Worker Exposure – Reclamation Workers

After mining operations were completed, the disturbed land would be reclaimed. During the reclamation phase, the major sources of radiation exposure would be the aboveground waste-rock piles accumulated over the operational period. The potential radiation dose incurred by reclamation workers would depend on the size of the waste-rock pile and its uranium content. As it was under Alternatives 3 and 4, the potential radiation exposure of a reclamation worker was estimated on the basis of three waste-rock pile dimensions corresponding to the three mine sizes (medium, large, and very large) assumed. A detailed discussion on the development of the three waste-rock piles evaluated is provided in Section 4.1.5.

The radiation exposure of an individual worker that would result from performing reclamation activities is expected to be about the same as that analyzed in Section 4.1.5 for Alternative 1. Based on the RESRAD analysis, the total radiation dose incurred by a reclamation worker would be about 4.7 mrem, regardless of the size of the waste-rock pile, because the external radiation dose, which is the dominant pathway contributing to the total dose, would not vary much between the three mine sizes. The total dose was estimated based on the assumption that the worker would work 8 hours per day for 20 days on top of a waste-rock pile. The radiation exposure would be dominated by the external radiation pathway, which would contribute about 96% to the total dose, followed by the incidental soil ingestion pathway, which would account for about 3% of the total dose. The remaining dose would be from the inhalation of radioactive particulates and radon gas. The potential LCF risk associated with this radiation exposure is estimated to be about $4 \times 10^{-6}$; i.e., the probability of developing a latent fatal cancer is about 1 in 250,000.

Similar to Alternatives 3 and 4, the total hazard index associated with potential chemical exposure is about 0.043, with 0.041 contributed by vanadium exposure and 0.002 contributed by uranium exposure. Because the exposures are well below the hazard index of 1, potential adverse health effects are not expected for the reclamation worker.

BLM_0041566

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1    **TABLE 4.5-2  Radon Emission Rates during the Operational Phase of Mining Assumed for**
2    **Alternative 5**

| Emission Source | Medium[a] | Large[a] | Very Large[b] | Total |
|---|---|---|---|---|
| Uranium ore production per mine (tons/d) | 100 | 200 | 300 | |
| Cumulative uranium ore production per mine (tons) | 2.40E+05 | 4.80E+05 | 7.20E+05 | |
| Rn-222 emission rate per mine (Ci/yr)[c] | 1.06E+03 | 2.11E+03 | 6.00E+02 | |
| Alternative 5 in peak year of operations | | | | |
| No. of active mines | 16 | 2 | 1 | 19 |
| Total Rn-222 emission rate (Ci/yr) | 1.69E+04 | 4.22E+03 | 6.00E+02 | 2.17E+04 |

[a]    Underground mine.

[b]    Open-pit mine.

[c]    The emission rates of radon from underground mines were estimated by using the correlation
developed by the EPA in 1985: Rn-222 emissions (Ci/yr) = 0.0044 × cumulative uranium ore
production (tons) (EPA 1985). A cumulative period of 10 years was assumed for this calculation. The
emission rate from the very large open-pit mine was determined based on data from surface uranium
mines compiled by the EPA in 1989 (EPA 1989).

3
4
5        **4.5.5.3  General Public Exposures – Residential Scenario**
6
7            Members of the general public who live in or around the uranium lease tracts could be
8    exposed to radiation as a result of the release of radon gas and radioactive particulates that
9    contain uranium isotopes and their decay products from mining-related activities. The potential
10   maximum radiation exposure was estimated as a function of distance from the release point of
11   radionuclides. It could be used to estimate the potential exposure of an individual living close to
12   the uranium lease tracts once the locations and scales of uranium mines are known. The
13   maximum doses were estimated for three uranium mine sizes.
14
15
16       **4.5.5.3.1  Uranium Mine Development and Operations.**
17
18
19       **Exposure to an Individual Receptor.** Based on the discussion provided in
20   Section 4.3.5.3.1 under Alternative 3, the primary source of human health impacts on the
21   residents living close to the uranium lease tracts during the operational phase would be the radon
22   gas emitted from mining activities. Therefore, the analysis of potential radiation exposures to the
23   residents focused on the consequences associated with the release of radon.
24
25       For human health impacts analysis, the radon emission rates for underground uranium
26   mines were developed based the equation developed by the EPA (EPA 1985) that correlates the

BLM_0041567

1   radon emission rate with cumulative uranium ore production. An operational period of 10 years
2   was assumed when developing the radon emission rates. The radon emission rates calculated
3   based on this assumption are considered to be the upper bound for underground mines under
4   Alternative 5. The radon emission rate for a very large mine (i.e., the existing open-pit mine on
5   Lease Tract 7), was estimated on the basis of the data compiled in EPA (1989, Table 12-7) for
6   surface mines. The estimated value is expected to be greater than the actual emission rate. The
7   emission rates developed for the three hypothetical mines under Alternative 5 are listed in
8   Table 4.5-2. The total Rn-222 emission rate from underground mining was estimated to be about
9   21,120 Ci/yr, and the estimated Rn-222 emission rate from the very large open-pit mine was
10   600 Ci/yr.
11
12       Table 4.5-3 lists the maximum radiation doses calculated with CAP88-PC at different
13   exposure distances for the three assumed uranium mine sizes. Based on the calculation results,
14   the radiation exposures would decrease with increasing distance because of greater dilution in
15   the radon concentrations. The maximum exposure at a fixed distance from the emission point of
16   an underground mine or from the center of the open-pit mine would always occur in the sector
17   that coincides with the most dominant wind direction. In any other sector, the potential exposure
18   would be less than the maximum values.
19
20       Based on Table 4.5-3, if the resident lived 4,900 ft (1,500 m) from the emission point of a
21   medium underground mine, then the maximum radiation dose he could incur would be about
22   7.4 mrem/yr, which is less than the NESHAP dose limit (40 CFR Part 61) of 10 mrem/yr for
23   airborne emissions of radionuclides. If the distance increased to 8,000 ft (2,500 m), then the
24   maximum exposure would be reduced to about 4.1 mrem/yr. It should be noted that the
25   maximum doses listed in Table 4.5-3 are estimated for a resident living in the most dominant
26   wind direction and were obtained by using the radon emission rates corresponding to an
27   operational period of 10 years. The emission rates for uranium mines that have been developed
28   and operated for less than 10 years would be less; therefore, the potential radon exposures
29   associated with mining would be smaller than those listed in the table. On the other hand, if more
30   than one uranium mine were close to the resident and was being operated at the same time, then
31   the potential dose to the resident would be the sum of the doses contributed by each mine.
32
33       Based on the listed maximum doses in Table 4.5-3, it is possible that a resident could
34   receive a radon dose of more than 10 mrem/yr if he lived less than 1.6 mi (2.6 km) from a
35   uranium mine and his residence was in the most dominant wind direction from the emission
36   point. However, the results listed in Table 4.5-3 were calculated by using conservative
37   assumptions. The radon dose could be much smaller if actual data were available and used in the
38   calculations.
39
40       The maximum LCF for a resident living close to a medium-sized underground uranium
41   mine was estimated to range from $3 \times 10^{-6}$/yr at a distance of 16,400 ft (5,000 m) to $2 \times 10^{-5}$/yr
42   at a distance of 1,640 ft (500 m). That is, the probability of developing a latent fatal cancer
43   would range from about 3 in 1,000,000 at a distance of 16,400 ft (5,000 m) to about 1 in 50,000
44   at a distance of 1,640 ft (500 m) in each year of exposure. The probability would increase by a
45

BLM_0041568

1  **TABLE 4.5-3  Potential Maximum Radiation Doses, Radon Concentrations, and LCF**
2  **Risks to a Resident Associated with the Emission of Radon from Three Uranium**
3  **Mine Sizes**

| | Radiation Dose (mrem/yr) and Radon Level (WL) per Mine Size[a] | | | LCF Risk (1/yr) per Mine Size | | |
|---|---|---|---|---|---|---|
| Distance (m) | Medium | Large | Very Large | Medium | Large | Very Large |
| 500 | 15.66 (0.0013) | 31.32 (0.0026) | —[b] | 2E-05 | 4E-05 | —[b] |
| 1,000 | 11.26 (0.00094) | 22.52 (0.0019) | 9.05 (0.00076) | 1E-05 | 3E-05 | 1E-05 |
| 1,500 | 7.44 (0.00062) | 14.88 (0.0012) | 5.53 (0.00046) | 1E-05 | 2E-05 | 7E-06 |
| 2,000 | 5.34 (0.00044) | 10.68 (0.00089) | 3.72 (0.00031) | 7E-06 | 1E-05 | 5E-06 |
| 2,500 | 4.08 (0.00034) | 8.16 (0.00068) | 2.7 (0.00023) | 5E-06 | 1E-05 | 3E-06 |
| 3,000 | 3.26 (0.00027) | 6.52 (0.00054) | 2.09 (0.00017) | 4E-06 | 8E-06 | 3E-06 |
| 4,000 | 2.44 (0.00020) | 4.88 (0.00040) | 1.53 (0.00013) | 3E-06 | 6E-06 | 2E-06 |
| 5,000 | 1.94 (0.00016) | 3.88 (0.00032) | 1.2 (0.00010) | 3E-06 | 5E-06 | 2E-06 |

[a]  Radiation doses appear on the top line, and radon concentrations in terms of working level (WL) are in parentheses on the line below.

[b]  The very large mine, an open-pit mine, was assumed to occupy an area of 100 acres, which is 50% of the assumed disturbed area. A distance of 500 m from the center of the mine would be within the mining area; therefore, the maximum dose associated with this distance was not calculated.

4
5
6  factor of 2 or 4 if the resident lived close to a medium-sized or a large underground mine,
7  respectively.
8
9
10  **Collective Population Exposure.** Collective exposures of the general public living
11  within 50 mi (80 km) of the uranium lease tracts were evaluated by using the same method as
12  that described in Section 4.3.5.3. The range of potential collective dose at the peak year of
13  operations can be obtained by summing all the radon emissions from active uranium mines and
14  placing the total emission at the center of each lease tract group.
15
16      Table 4.5-4 presents the collective doses obtained by using the CAP88-PC model (Trinity
17  Engineering Associates, Inc. 2007) for the general public living within 3 to 50 mi (5 to 80 km) of
18  the assumed emission points during the peak year of operations under Alternative 5. According
19  to the estimated results, the collective dose associated with underground mining ranges from

BLM_0041569

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                      *Do Not Distribute*

1
2
3

**TABLE 4.5-4  Collective Doses and LCF Risks to the General Public
from Exposures to Radon Emitted from Uranium Mines during the
Peak Year of Operations under Alternative 5**

| Radon Source | Collective Dose (person-rem/yr) | Collective LCF Risk (1/yr)[g] |
|---|---|---|
| From underground mining[a] | | |
| Based on the center of Group 1[b] | 1.10E+02 | 1 |
| Based on the center of Group 2[c] | 5.87E+01 | 8 |
| Based on the center of Group 3[d] | 2.98E+01 | 4 |
| Based on the center of Group 4[e] | 1.88E+01 | 2 |
| From open-pit mining | | |
| Based on the center of Group 3[d] | 8.80E-01 | 1 |
| Total | | |
| Minimum | 1.97E+01 | 3 |
| Maximum | 1.11E+02 | 1 |

[a]  The total radon emission rate from underground mining during the peak year of operations would be 21,120 Ci/yr.

[b]  If the emission was from the center of lease tract Group 1, the total population residing between 5 to 80 km would be 178,473.

[c]  If the emission was from the center of lease tract Group 2, the total population residing between 5 to 80 km would be 86,657.

[d]  If the emission was from the center of lease tract Group 3, the total population residing between 5to 80 km would be 27,062.

[e]  If the emission was from the center of lease tract Group 4, the total population residing between 5 to 80 km would be 33,166.

[f]  The total radon emission rate from open-pit mining during the peak year of operations would be 600 Ci/yr.

[g]  Denotes the number of latent lung cancers that could result from radiation exposure.

4
5
6   18.8 to 110 person-rem. The collective dose associated with open-pit mining is about
7   0.88 person-rem. Together, underground and open-pit mining would result in a total collective
8   dose ranging from 20 to 110 person-rem during the peak year of operations. This collective
9   exposure would cause a collective cancer risk of 0.03 to 0.1. Therefore, no lung cancer would
10  result from the collective exposure to the radon gas emitted from the 19 uranium mines that
11  would be operated simultaneously during the peak year of operations under Alternative 5. The
12  total populations involved in these estimates would range from 27,062 to 178,473 people. If the
13  collective dose was evenly distributed among the affected population, the average individual
14  dose would range from 0.57 to 1.1 mrem during the peak year of operations. In reality, because
15  the active lease tracts (the lease tracts with mining operations) would be scattered among the four

BLM_0041570

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                   *Do Not Distribute*

1  lease tract groups rather than being concentrated in one single group as assumed in the
2  calculations, the population size within 3.1 to 50 mi (5 to 80 km) of the lease tracts should be
3  greater than 178,473. Therefore, the actual average individual dose should be just a fraction of
4  the calculated values.
5
6
7       **4.5.5.3.2  Reclamation.** Residents who lived close to a uranium mine during or after the
8  reclamation phase could be exposed to radiation as a result of emissions of radioactive
9  particulates and radon gas from the waste-rock piles left aboveground. The potential radiation
10  dose would depend on the direction and distance between the residence and the waste-rock piles
11  and the emission rates of particulates and radon. The potential range for the radiation dose to
12  resident under Alternative 5 is expected to be similar to the range under Alternatives 1 and 2,
13  because the exposures would be dominated by the emissions from the waste-rock pile(s) that was
14  (were) closest to this resident.
15
16       According to the calculation results presented in Section 4.1.5.5, if a resident lived
17  1,600 ft (500 m) from a waste-rock pile, then the radiation dose he could receive would be less
18  than 2 mrem/yr. If the distance increased to 4,900 ft (1,500 m), then his exposure would drop to
19  less than 0.5 mrem/yr. If there were two waste-rock piles nearby, then the potential dose that this
20  resident would incur would be the sum of the doses contributed by each waste-rock pile. Based
21  on the listed maximum doses in Table 4.1-7, the potential dose incurred by any resident living
22  close to the uranium lease tracts (at a distance of more than 1,600 ft or 500 m) is expected to be
23  much smaller than the NESHAPS dose limit of 10 mrem/yr for airborne emissions (40 CFR
24  Part 61). The potential LCF risk would be less than $1 \times 10^{-6}$/yr, which means the probability of
25  developing a latent fatal cancer from living close to the uranium lease tracts for 1 year during or
26  after reclamation would be 1 in 1,000,000. If a resident lived in the same location for 30 years,
27  the cumulative LCF risk would be less than $3 \times 10^{-5}$.
28
29       In reality, it is expected that waste-rock piles would be covered by a layer of soil
30  materials during reclamation to facilitate vegetation growth. Because of this cover, emissions of
31  radioactive particulates would be greatly reduced, if not eliminated completely. Emissions of
32  radon from waste-rock piles could continue, although the emission rates would be reduced. In
33  fact, because uranium isotopes and their decay products have long decay half-lives, the potential
34  of radon emissions from waste-rock piles could persist for a very long period of time after the
35  reclamation was completed.
36
37       In addition to radiation exposure, the residents living close to the uranium lease tracts
38  could incur chemical exposures due to the chemical toxicity of the uranium and vanadium
39  minerals contained in the waste rocks. Potential chemical exposures would be associated with the
40  emissions of particulates and result from inhalation and incidental dust ingestion. By using the
41  same exposure parameters as those used for radiation dose modeling, potential chemical risks for
42  the nearby residents were evaluated. According to the evaluation results, the total hazard index
43  would be less than 0.02 at a distance of 1,600 ft (500 m) from an very large waste-rock pile, with
44  inhalation being the dominant pathway. Because the hazard index is less than 1, potential adverse
45  health effects are not expected to occur to the residents.
46

BLM_0041571

#### 4.5.5.4  General Public Exposure – Recreationist Scenario

In addition to the residents who live near the uranium lease tracts and could thus be affected by the emissions from the waste-rock piles left after reclamation was complete, a recreationist who unknowingly got close to a waste-rock pile could also be exposed to radiation. To model the potential radiation exposure, it was assumed that the recreationist would camp on top of a waste-rock pile for 2 weeks during each trip. This recreationist could receive radiation exposure through the external radiation and inhalation of radon pathways. The inhalation of radioactive particulates and incidental soil ingestion pathways were excluded because it was assumed that the waste-rock pile would be covered by 1 ft (0.3 m) of soil materials after reclamation.

The potential dose that could be incurred by a recreationist under Alternative 5 would be similar to that under Alternatives 1 and 2. According to the RESRAD calculation results, the radiation dose incurred by the recreationist during a 2-week trip wold be about 0.28 mrem. About 91% of the radiation dose would come from the external radiation pathway, and 9% would be from the inhalation of radon pathway. The corresponding LCF risk that this recreationist would receive from each camping trip is about $3 \times 10^{-7}$, with 60% being from the external radiation pathway and 40% being from the radon inhalation pathway. Therefore, the probability of developing a latent fatal cancer would be 3 in 10,000,000 for each camping trip.

It should be noted that the above results were obtained based on the assumption that there would be 1 ft (0.3 m) of cover soils on top of the waste rocks. If the thickness of the cover soils was less or if the cover soils are eroded away, the radiation dose incurred by the recreationist would increase. Without any cover material, the potential radiation dose was estimated to be about 9.5 mrem, with a corresponding LCF risk of $8 \times 10^{-6}$. More than 94% of the exposures would result from the external radiation pathway. Potential chemical exposures incurred by the recreationist would be minimal, because the soil materials covering the waste-rock pile would greatly reduce the likelihood of exposure through the inhalation of particulates and incidental soil ingestion.

Potential exposure to an individual receptor for post-reclamation conditions at the mine site is discussed in Section 4.1.5.4.

### 4.5.6  Ecological Resources

#### 4.5.6.1  Vegetation

Exploration and development activities could occur on each of the 31 lease tracts included under Alternative 5. However, exploration has been completed on Lease Tracts 13A, 21, 24, 25, and 26, and it is likely no further exploration activities would occur on them. Previous disturbance from exploration or mine development has occurred on each of these lease tracts except Lease Tracts 14 and 8A; however, new exploration and development could occur in either

BLM_0041572

1  disturbed or undisturbed areas of lease tracts. Exploration and development on Lease Tracts 14
2  and 8A would occur in undisturbed habitats.
3
4        Mine development and operations might include small surface mines. Most new mines
5  are expected to be underground mines. During the peak year, it is assumed that 19 mines would
6  be in operation simultaneously, as is the case under Alternative 4. Development and operations
7  would continue for only 10 years, however, under Alternative 5. Ground disturbance would
8  range from 15 acres (6.1 ha) for medium-sized mines to 20 acres (8.1 ha) for large mines, with a
9  total of 280 acres (113 ha). In addition, the 200-acre (81 ha) open-pit mine (Lease Tract 7) would
10  resume operations, resulting in a total of 480 acres (190 ha) of disturbance under Alternative 5.
11
12        The types of impacts from exploration, mine development and operations, and
13  reclamation under Alternative 5 would be similar to those under Alternative 3. Direct impacts
14  associated with the development of mines would include the destruction of habitats during site
15  clearing and excavation as well as the loss of habitats at the locations of the waste-rock disposal
16  area, various storage areas, project facilities, and access roads. The lease tracts included under
17  Alternative 5 support a wide variety of vegetation types; the predominant types are pinyon-
18  juniper woodland and shrubland and big sagebrush shrubland. Some of the areas affected might
19  include high-quality, mature habitats, resulting in greater impact levels than those in previously
20  degraded areas. Wetlands occur in most of the lease tracts, and they might be directly or
21  indirectly affected. Indirect impacts from mining would be similar to those described for
22  Alternative 3 and would be associated with fugitive dust, invasive species, erosion,
23  sedimentation, and impacts due to changes in surface water or groundwater hydrology or water
24  quality.
25
26
27    **4.5.6.2  Wildlife**
28
29        Under Alternative 5, impacts on wildlife could occur from exploration, mine
30  development and operations, and reclamation on any of the lease tracts for a 10-year period. It is
31  assumed that 19 mines would be developed and in operation at the same time in the peak years.
32  The 19 mines would include 16 medium mines (15 acres or 6.1 ha disturbed per mine), 2 large
33  mines (20 acres or 8.1 ha disturbed per mine), and 1 very large mine (200 acres or 81 ha
34  disturbed). The 200 acres (81 ha) for the very large mine (JD-7) were previously disturbed, as
35  were 80 acres (32 ha) for topsoil storage and 160 acres (65 ha) for overburden storage area in
36  areas of private property. Therefore, areas of new disturbance could occur at the other 18 mine
37  locations (unless mine development occurred at any of the mine locations that would have
38  otherwise been reclaimed under either Alternative 1 or 2). Mining operations under Alternative 5
39  would disturb 480 acres (190 ha) of land containing various amounts of upland vegetation. This
40  area of disturbance represents 1.9% of the total acreage in DOE's ULP. The remainder of the
41  lease tract areas (excluding areas where access roads and utility corridors could be required)
42  would be undisturbed by mining activities under Alternative 5.
43
44        The differences in impacts under Alternative 5 from those under Alternative 3
45  (Section 4.3.6.2) would be few. However, the potential impacts on wildlife would occur on

BLM_0041573

*Preliminary Draft PEIS*            *PEIS Privileged Information*            *May 2012*
*PEIS Team Use Only*                      *Do Not Distribute*

11 additional mine sites and affect an additional 180 acres (73 ha) of land on any of the 31 lease tracts rather than just on any of the 13 pre-July 2007, then-active lease tracts. Although exploration, mine development and operations, and reclamation are expected to be greater under Alternative 5 than under Alternative 3, impacts on wildlife are still expected to be negligible to minor for site exploration and minor to moderate for mine development, operations, and reclamation. While wildlife impacts would be long-term, they would be scattered temporally and, especially, spatially. In general, impacts would be localized, and they would not affect the viability of wildlife populations, especially if mitigation measures were used.

Long-term impacts on wildlife following reclamation of the mine sites would be negligible if no development or other use of the sites (other than that of natural resource protection) occurred.

### 4.5.6.3  Aquatic Biota

Impacts on aquatic biota from exploration, development and operations, and reclamation under Alternative 5 would be similar to those under Alternative 3 (Section 4.3.6.3) except that (1) during the peak years of operations, up to 19 mines could be in operation, and (2) the mines could be located on any of the 31 lease tracts. Overall, impacts on aquatic biota are expected to be negligible during site exploration and minor to moderate during mine development and operations and reclamation. Moderate impacts would be expected only if the mines were located within one or a few lease tracts that are near perennial water bodies. In general, any impacts on aquatic biota would be localized and not affect the viability of affected resources, especially if mitigation measures were used.

### 4.5.6.4  Threatened, Endangered, and Sensitive Species

Under Alternative 5, there would be no fundamental differences between impacts on threatened, endangered, and sensitive species than those under Alternative 4 (Section 4.4.6.4). The potential for impacts on threatened, endangered, and sensitive species under Alternative 5 would be similar to those under Alternative 4 (Section 4.4.6.4).

### 4.5.7  Land Use

Under Alternative 5, DOE would continue the ULP with the 31 lease tracts for the remainder of the 10-year period (as they were when issued in 2008). It is assumed that a total of 19 mines would be in operation during the peak year of ore production. As a result, impacts under Alternative 5 would be the same as those under Alternative 4.

BLM_0041574

### 4.5.8 Socioeconomics

It is assumed that a total of 19 mines would be in operation at the same time in the peak year (16 medium, 2 large, and 1 very large), producing approximately 2,300 tons of uranium ore per day. Development and operational activities would create direct employment of 371 people during the peak year and would generate an additional 193 indirect jobs (Table 4.5-5). Development activities would constitute 0.6% of total ROI employment. Uranium mining would also produce $28.2 million in income.

However, assuming that some in-migration would occur as a result of uranium mining activities, under Alternative 5, 178 people would move into the ROI. In-migration of workers would represent an increase in the ROI forecasted population growth rate of 0.09%. The additional workers would increase the annual average employment growth rate by less than 1% in the ROI. The in-migrants would have only a marginal effect on local housing and population and would require approximately 1% of vacant owner-occupied housing during mining development and operations. One additional physician, one additional firefighter, and one additional police officer would be required to maintain current levels of service within the ROI as a result of the increased population from in-migrants. No additional teachers would be required to maintain the current student-to-teacher ratio in the ROI.

**TABLE 4.5-5  Socioeconomic Impacts of Uranium Mine Development and Operations and Reclamation in the Region of Influence under Alternative 5**

| Parameter | Development and Operations | Reclamation |
|---|---|---|
| Employment (no.) | | |
| Direct | 371 | 38 |
| Indirect | 193 | 25 |
| Total | 564 | 63 |
| Income[a] | | |
| Total | 28.2 | 2.4 |
| In-migrants (no.) | 178 | 0 |
| Vacant housing (no.) | 74 | 0 |
| Local community service employment | | |
| Teachers (no.) | 0 | 0 |
| Physicians (no.) | 1 | 0 |
| Public safety (no.) | 2 | 0 |

[a]   Values are reported in $ million 2009.

BLM_0041575

Since no in-migrant labor force would be required for mining or reclamation activities, there would be no impacts on population, housing, or public services, including additional community service employment, education expenditures, or public finances. Mining activities would also have no effect on local housing, as there would not be an influx of workers needing rental or owner-occupied units, and mining would therefore not have an impact on the local occupancy rate. Impacts in the ROI would be small because employment would be distributed across three counties, because the impact would be absorbed across multiple governments and many municipalities, and because the employment pool would come from a larger population group than if all employment originated from any one county. It is likely that most mining workers would live in larger population centers within the ROI, such as Grand Junction, Montrose, or Clifton and commute to mining locations. However, individual municipalities in smaller rural communities might experience a temporary increase in population from workers if they moved to communities closer to mining projects rather than commuting from longer distances elsewhere in the ROI. Although there would be no in-migration of workers from outside the three-county ROI and thus little impact on the ROI as a whole, the impact on individual communities could vary.

Potential impacts during reclamation would be small. Reclamation would occur after operations ceased. The reclamation period would likely span 2 to 3 years, although only 1 year would require a workforce. Reclamation would require 38 direct jobs during the peak year for field work and revegetation and create 25 indirect jobs (see Table 4.5-5). During reclamation, the required workforce would generate $2.4 million in income. Because of the small number of jobs required for reclamation, the current workforce in the ROI could meet the demand for labor; therefore, there would be no in-migration of workers or families and no social impacts on housing, public services, or education expenditures.

### 4.5.8.1  Recreation and Tourism

Potential impacts on recreation and tourism would be similar to those under Alternative 3 as discussed in Section 4.3.8.1.

## 4.5.9  Environmental Justice

### 4.5.9.1  Exploration

The types of impacts related to exploration under Alternative 5 would be similar to those under Alternative 3 (Section 4.3.9.1). Because exploration activities would occur over relatively small areas and involve little or no ground disturbance, impacts associated with this phase are expected to be small.

BLM_0041576

### 4.5.9.2  Mine Development and Operations

Under Alternative 5, there would be a total of 19 mines operating across the 31 DOE ULP lease tracts. The types of impacts related to mine development and operations under Alternative 5 would be similar to those under Alternative 4 (Section 4.4.9.2).

### 4.5.9.3  Reclamation

Although potential impacts on the general population could be incurred as a result of exploration, mine development and operations, and reclamation under Alternative 5, for the majority of resources evaluated, the impacts would likely be small. Specific impacts on low-income and minority populations as a result of participation in subsistence or certain cultural and religious activities would also be small. In addition, there are no minority populations, as defined by CEQ guidelines (Section 10.1.1), within the 50-mi (80-km) radius around the boundary of the lease tracts, meaning that any adverse impacts from the ULP would not disproportionately affect minority populations. Because there are no low-income populations within the 50-mi (80-km) radius, there would not be any impacts on low-income populations.

## 4.5.10  Transportation

The transportation risk analysis estimated both radiological and nonradiological impacts associated with shipments of uranium ore from their points of origin at one of the 31 lease tracts to a uranium mill. Further details on the risk methodology and input data are provided in Section 4.3.10.1 and Section D.10 of Appendix D.

The Alternative 5 transportation assessment evaluates the annual impacts expected during the peak year of operations when 19 of the 31 lease tracts could have operating mines. Shipment of uranium ore is not presented over the life of the program because of the uncertainty associated with future uranium demand and mine development.

As was done for Alternative 4, a sample set of 19 of the 31 lease tracts were evaluated in the transportation analysis to represent operations during the peak year of production. As was also done for Alternatives 3 and 4, the selection of lease tracts for the transportation analysis considered the lease tract's location, lessee, and prior mining operations, if any. In addition to distance, its capacity was also considered when determining which mill would receive a particular mine's ore shipments. Thus, the nearest mill was not always a given shipment's destination. Later, at the time of actual shipment, factors such as existing road conditions due to traffic, weather, and road maintenance and repairs as well as mill capacity and costs should be among the criteria used to determine the mill for a given ore shipment. This transportation analysis is intended to provide a reasonable estimate of impacts that could occur. Impacts were also estimated on the basis of the assumption that all shipments would go to a single mill in order to provide an upper range on what might be expected. Single shipment risks for uranium ore

BLM_0041577

1   shipments are also provided so that an estimate for any future shipping campaign could be
2   evaluated.
3
4        The transportation risk assessment considered human health risks from routine (normal,
5   incident-free) transport of radiological materials and from accidents. The risks associated with
6   the nature of the cargo itself ("cargo-related" impacts) were considered for routine transport.
7   Risks related to the transportation vehicle, regardless of type of cargo ("vehicle related"
8   impacts), were considered for routine transport and potential accidents. Radiological cargo-
9   related accident risks are expected to be negligible and were not assessed as part of this analysis,
10  as discussed in Appendix D, Section D.10.1. Transportation of hazardous chemicals was not part
11  of this analysis because no hazardous chemicals have been identified as being part of uranium
12  mining operations.
13
14
15  **4.5.10.1  Routine Transportation Risk**
16
17
18        **4.5.10.1.1  Nonradiological Impacts.** The estimated number of shipments from the
19  operating uranium mines to the mills during the peak year of uranium mining under Alternative 5
20  would be 92 per day, assuming an ore production rate of 2,300 tons per day and a truck load of
21  25 tons. Including round-trip travel, 184 trucks per day would be expected to travel the affected
22  routes. As listed in Table 3.10-1, the lowest AADT along the route would be about 250 vehicles
23  per day near Egnar on CO 141. If all 192 trucks per day passed through Egnar, in the extreme
24  case of all shipments going to the White Mesa Mill, there would be a 77% increase in traffic in
25  this area but only a 3% increase in the most heavily traveled location of Monticello, Utah, (again,
26  if all shipments went to the White Mesa Mill). No additional traffic congestion would be
27  expected in any area since there would be only about 5 to 6 additional trucks per hour in each
28  direction, assuming a 16-hour workday for transport.
29
30        For the example case with operations at 19 mines (1 very large, 2 large, and 16 medium-
31  sized), the total distance traveled by haul trucks during the peak year would be approximately
32  2.7 million mi (4.27 million km) assuming round-trip travel between the lease tracts and the
33  mills, as shown in Table 4.5-6. Using peak-year assumptions of 92 shipments per day, 20 days
34  per month, 22,080 round-trips would be expected. The estimated total truck distance traveled of
35  approximately 2.7 million mi (4.27 million km) would be about 21% of the total heavy truck
36  miles traveled (1.3 million mi or 20.3 million km) along the affected highways in 2010
37  (CDOT 2011; UDOT 2011). In general, actual annual impacts over the course of the ULP could
38  be lower or higher than these impacts because the shipment numbers given are for the estimated
39  peak year; because for a given lease tract, the ore could be transported to a different mill than in
40  the one assumed for the PEIS analysis; and because lease tracts other than those used in the
41  sample case could be developed.
42
43        To help put the sample case results in perspective, Table 4.5-6 also lists the total
44  distances that ore would be shipped if all of the ore was shipped to one mill or the other. Because
45  of the relative locations of all of the lease tracts with respect to the mills, shipping all of the ore

BLM_0041578

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*

1    **TABLE 4.5-6  Peak-Year Collective Population Transportation Impacts under Alternative 5**

| Scenario | Total Distance (km) | Radiological Impacts | | | | Accidents Roundtrip | |
|---|---|---|---|---|---|---|---|
| | | Public Dose (person-rem) | Risk (LCF) | Worker Dose (person-rem) | Risk (LCF) | Injuries | Fatalities |
| Sample case | 4,267,000 | 0.33 | 0.0002 | 1.7 | 0.001 | 0.79 | 0.071 |
| All to Piñon Ridge Mill | 2,442,000 | 0.19 | 0.0001 | 0.99 | 0.0006 | 0.45 | 0.041 |
| All to White Mesa Mill | 7,767,000 | 0.60 | 0.0004 | 3.1 | 0.002 | 1.4 | 0.13 |

2
3
4    to the White Mesa Mill (4.9 million mi or 7.77 million km) would represent close to the upper
5    bound for the total distance for all shipments. Conversely, shipment of all of the ore to the Piñon
6    Ridge Mill (1.5 million mi or 2.44 million km) would represent close to the lower bound for total
7    distance.
8
9         As previously discussed in Section 4.3.10.2.1, most of the distance traveled by the haul
10   trucks would occur on State or US Highways. To access these roads, the haul trucks might travel
11   distances of up to several miles on county and local roads, depending on the location of the lease
12   tract and the location of the mine within the lease tract. Several residences are located near lease
13   tracts along such roads. In those cases, the number of passing haul trucks could range from about
14   4 to 24 trucks per day, depending on the size of the nearby mine, as was shown in Table 4.3-12.
15   If hauling occurred 16 hours per day, then up to one to two haul trucks per hour could pass by on
16   the way to or from the main highway in the case of a very large mine. In addition, some of these
17   residences might encounter local truck traffic for the first time if ore production occurred on
18   neighboring lease tracts.
19
20
21        **4.5.10.1.2  Radiological Impacts.** Radiological impacts during routine conditions would
22   be a result of human exposure to the low levels of radiation near the shipment. The regulatory
23   limit established in 49 CFR 173.441 (Radiation Level Limitations) and 10 CFR 71.47 (External
24   Radiation Standards for All Packages) to protect the public is 10 mrem/h at 6 ft (2 m) from the
25   outer lateral sides of the transport vehicle. As discussed in Appendix D, Section D.10.4.2, the
26   average external dose rate for uranium ore shipments is approximately 0.1 mrem/h at 6.6 ft
27   (2 m), which is two orders of magnitude lower than the regulatory maximum.
28
29
30        **Collective Population Risk.** The collective population risk is a measure of the total risk
31   posed to society as a whole by the actions being considered. For a collective population risk
32   assessment, the persons exposed are considered as a group; no individual receptors are specified.
33   The annual collective population dose to persons sharing the shipment route and to persons
34   living and working along the route was estimated to be approximately 0.33 person-rem for the
35   peak year, assuming about 22,080 shipments for the sample case, as shown in Table 4.5-6. The
36   total collective population dose of 0.33 person-rem could result in approximately 0.0002 LCF.
37   Therefore, no LCFs are expected. These impacts are intermediate between the impacts estimated

BLM_0041579

1   if all ore shipments went to the Piñon Ridge Mill or to the White Mesa Mill, as shown in
2   Table 4.5-6.
3
4        Collectively for the sample case, the truck drivers (transportation crew) would receive a
5   dose of about 1.7 person-rem (0.001 LCF) during the peak year of operations from all shipments.
6   Again, no LCFs would be expected. For perspective, the collective dose of 1.7 rem (1,700 mrem)
7   over 22,080 shipments is less than three times the amount that a single individual would receive
8   in 1 year from natural background radiation and human-made sources of radiation (about
9   620 mrem/yr).
10
11       For scenarios other than those presented in this PEIS, single shipment risks were
12   provided for transporting ore from any of the lease tracts considered under any alternative to the
13   Piñon Ridge Mill (Table 4.3-13) and the White Mesa Mill (Table 4.3-14). In conjunction with
14   Table 4.5-6, all collective population impacts related to any combination and number of ore
15   shipments between lease tracts and uranium mills can be estimated.
16
17
18       **Highest-Exposed Individuals during Routine Conditions.** In addition to assessing the
19   routine collective population risk, the risks to individuals for a number of hypothetical exposure
20   scenarios were estimated, as described further in Section E.10.2.2 of Appendix E. The scenarios
21   were not meant to be exhaustive but were selected to provide a range of potential exposure
22   situations. The estimated doses and associated likelihood of LCF estimates were discussed in
23   Section 4.3.10.2.2.
24
25
26       **4.5.10.2  Accident Transportation Risk**
27
28       The total distance traveled by haul trucks during the peak year would be approximately
29   2.7 million mi (4.27 million km), including round-trip travel between the lease tracts and the
30   mills, as discussed in Section 4.5.10.1.1 for the sample case. As shown in Table 4.5-6, potential
31   transportation accident impacts in the peak year would include zero expected fatalities and
32   potentially one injury from traffic accidents. For perspective, over the entire affected counties
33   from 2006 through 2010 (San Juan County in Utah and Dolores, Mesa, Montrose, and
34   San Miguel Counties in Colorado), a total of 21 heavy-truck-related traffic fatalities occurred
35   (DOT 2010a,b,c,d,e), representing an average of 4.2 fatalities per year.
36
37
38   **4.5.11  Cultural Resources**
39
40       Under Alternative 5, impacts would be similar to those discussed in Section 4.4.11,
41   except they would be of shorter duration.
42
43       Impacts from exploration would be expected to be the same as those described in
44   Section 4.3.11.1. They would accrue mostly from exploration test borings and would be minimal
45   within any lease tract. Drill pads are generally small (15 × 50 ft or 4.6 × 15 m) and boring can

BLM_0041580

1   usually be accomplished with minimal surface disruption. Drilling sites and the proposed
2   locations for any new road construction would have to undergo cultural surveys before any dirt
3   could be moved, and cultural resources could generally be avoided. Secondary impacts from
4   increased access, traffic, and human presence would be similar but on a larger scale, since three
5   times as many lease tracts would be in play. As listed in Table 4.5-7, an estimated 1,798 cultural
6   resource sites could be exposed to secondary impacts under this alternative.
7
8       Impacts from mine development and operations would be similar in nature to those
9   described in Section 4.3.11.2 but on a larger scale. They would include disturbance of
10  archaeological sites, damage to or demolition of historic structures, damage to or destruction of
11  plant or animal resources important to Native Americans, and damage to or disruption of sites
12  considered sacred or culturally important to traditional cultures. The agents of disturbance would
13  be likely to include earth-moving activities, activities used to demolish or significantly alter
14  existing structures for mine development, increased human presence, increased access, increased
15  noise, and increased traffic. Based on the average site frequency across all lease tracts and the
16  proposed numbers and sizes of new mines, an estimate of direct impacts was generated. This
17  estimate is provided in Table 4.5-7. An estimated total of 23 cultural resource sites would likely
18  be affected by the development of mining activities under Alternative 5. Impacts from
19  reclamation activities would be the same as discussed Section 4.1.11. They would include
20  adverse impacts on historically important mining structures and features, ground-disturbing
21  activities if borrowing from undisturbed areas or road construction and improvement occurred,
22  and temporary increases in traffic and human presence. Potential positive impacts from
23  reclamation could include restoration of habitats used by plant and animal resources important to
24  Native Americans, the restoration of solitude, and the elimination of some visual intrusions in
25  places important to traditional cultures.
26
27
28  **4.5.12  Visual Resources**
29
30      As indicated in Section 3.5, Alternative 5 would continue the ULP with the 31 lease
31  tracts for the remainder of the 10-year period as the leases were when they were issued in 2008.
32  Under this alternative, all lease tracts would be evaluated with respect to the exploration, mine
33  development and operational, and reclamation phases.
34
35
36      **TABLE 4.5-7  Cultural Resource Sites Expected To Be Directly Affected**
37      **under Alternative 5**

| Size Categories under Alternative 5 | No. of Mines in Each Size Category | Expected No. of Sites by Size Category | Total No. of Sites Expected |
|---|---|---|---|
| Small | 0 | 0.8 | 0 |
| Medium | 16 | 1.2 | 20 |
| Large | 2 | 1.7 | 3 |
| Total | | | 23 |

BLM_0041581

#### 4.5.12.1  Exploration, Mine Development and Operations, and Reclamation

Visual impacts generally would be the same under this alternative as those described in Sections 4.1.12 and 4.3.12. As stated for Alternative 4, the primary difference from Alternative 1 would be that activities would occur on all lease tracts.

Visual impacts associated with exploration and mine development and operations are discussed further in Sections 4.3.12.1 and 4.3.12.2. Impacts associated with reclamation activities are discussed further in Sections 4.1.12.1 through 4.1.12.5.

#### 4.5.12.2  Impacts on Surrounding Lands

Under Alternative 5, DOE would continue the ULP with all 31 of the lease tracts for a 10-year period. Because of the similarities between Alternatives 4 and 5, impacts on surrounding SVRAs under Alternative 5 would be the same as those under Alternative 4. See Section 4.4.12.2 for the analysis of these resources.

#### 4.5.12.3  Potential Mitigation Measures

For a discussion of potential mitigation measures, see Sections 4.1.12.7 and 4.3.12.5. Proposed mitigation measures under Alternative 5 would be the same as those under Alternative 4.

### 4.5.13  Waste Management

Potential impacts on waste management practices under Alternative 5 would be the same as those under Alternative 4.

## 4.6  BEST MANAGEMENT PRACTICES

As discussed in the impacts analyses for the various resource areas for the five alternatives (Sections 4.1 through 4.5), potential impacts could be minimized and/or eliminated if best management practices (BMPs) or mitigative measures were considered during the three mining phases considered in the proposed action. The BMPs are listed below as examples of measures that could be taken to mitigate potential impacts for a given resource area evaluated in this PEIS. DOE would identify required BMPs or mitigative measures for the alternative selected for implementation that would consistent with federal, state, and local requirements.

BLM_0041582

### 4.6.1 Air Quality and Noise

- Implement fugitive dust mitigation measures, such as watering unpaved roads, disturbed surfaces, and temporary stockpiles.

- Conduct surface activities during daytime, if possible.

- Conduct blasting activities during daytime on weekdays.

- Notify area residents of noise-producing activities in advance.

- Prepare noise management plans.

### 4.6.2 Soil Resources

- Minimize the surface footprint of disturbed areas (buildings, service areas, storage areas, stockpile areas, and loading areas) within the lease tracts to the extent possible.

- Minimize the duration of ground-disturbing activities within the lease tracts, especially during periods of heavy rainfall.

- Expand disturbed areas (e.g., rock pile storage areas) incrementally to minimize site disturbance and limit the exposure of soils to wind and water erosion at any given time.

- Avoid areas with unstable slopes, and identify local factors that cause slope instability (e.g., slope angles, precipitation).

- Control and direct runoff from slope tops to settling or rapid infiltration basins (temporarily) until the disturbed slopes are stabilized. Stabilize disturbed slopes as quickly as possible.

- Use existing roads and disturbed areas to the extent possible (before constructing new roads or disturbing new areas).

- Conduct construction activities on the lease tracts over as short a time period as possible once ground disturbance has occurred. If an activity requires an extended schedule, employ measures to limit wind and water erosion during the activity (rather than after the activity), to the extent possible.

- Avoid construction traffic on unpaved surfaces, and reduce speeds to lessen fugitive dust emissions.

BLM_0041583

- Avoid clearing and disturbing sensitive areas (e.g., steep slopes and natural drainages) and other areas outside the construction zone. Clearly delineate the construction zone boundaries on the ground (e.g., through the use of construction fencing).

- Avoid creating excessive slopes during site preparation and construction (e.g., during excavation). Use special construction techniques, where applicable, in areas of steep slopes, erodible soil, and stream channel crossings.

### 4.6.3  Water Resources

- Locate a diversion ditch upstream of the mine site to intercept surface water flow or shallow groundwater and channel it around the site. Tailor the location and length of the ditch to site-specific conditions, taking into account the location of mine waste or tailings piles, the site topography, and surface flow patterns.

- Plug open drill holes and areas around vent shafts to reduce the volume of groundwater entering an underground mine during operations to the extent possible. Use underground sumps to control water flow, as needed.

- Divert water pumped from mines (or drill sites) to a lined sedimentation pond for treatment. Locate settling pond(s) in topographically low areas but not any that are along drainages or near naturally flowing water. The purpose of treatment is to promote the precipitation of heavy metals through oxidation processes like aeration. (Employ this option at sites at which mine drainage is high in total suspended solids.)

- Clean sedimentation ponds regularly, and test sediments and precipitates for proper disposal.

- Locate the ore storage area on topographically high ground so ore does not come into contact with flowing or ponded water. Grade the ore storage area, and construct an earthen berm around it. Divert any runoff from the ore storage area to a sedimentation pond for testing and treatment.

- Locate mine waste-rock or tailings piles on topographically high ground so they do not come into direct contact with flowing or ponded water.

- Contain any runoff from mine waste-rock piles (e.g., divert it to a sedimentation pond) and treat it, as needed.

BLM_0041584

*Preliminary Draft PEIS*
*PEIS Team Use Only*

*PEIS Privileged Information*
*Do Not Distribute*

*May 2012*

1     •   Grade mine waste-rock or tailings piles to create a gently sloping surface;
2         gentle slopes are stable and less susceptible to water and wind erosion.
3

4     •   During reclamation, cap mine waste-rock or tailings piles with topsoil and
5         grade them to promote runoff rather than infiltration. Reestablishing
6         vegetation on graded and capped piles would further reduce the potential for
7         infiltration and would protect the piles from erosion by anchoring the soil.
8

9     •   Identify stormwater control and pollution prevention measures.
10
11

12 **4.6.4 Ecological Resources**
13

14     •   Designate a qualified biologist who will be responsible for overseeing
15         compliance with all mitigation measures related to protecting ecological
16         resources throughout all project phases, including the translocation of plant
17         and wildlife species. Additional qualified biological monitors might be
18         required on site during all project phases.
19

20     •   Minimize the number of areas where wildlife could hide or be trapped
21         (e.g., open sheds, pits, uncovered basins, laydown areas). If a sensitive species
22         is discovered inside a component, do not move that component or, if
23         necessary, move it only enough to remove the animal from the path of
24         activity, until the animal has escaped.
25

26     •   Establish buffer zones around sensitive habitats and project facilities; avoid or
27         modify activities within these areas to the extent practicable.
28

29     •   Minimize increases in the number of nuisance animals and pests in the project
30         area, particularly individuals and species that would affect human health and
31         safety or have the potential to adversely affect native plants and animals.
32

33     •   Site and design mine entrances and activities to avoid direct and indirect
34         impacts on important, sensitive, or unique habitats, including, but not limited
35         to, wetlands (both jurisdictional and nonjurisdictional), springs, seeps, streams
36         (ephemeral, intermittent, and perennial), 100-year floodplains, ponds and
37         other aquatic habitats, riparian habitat, remnant vegetation associations, rare
38         or unique biological communities, crucial wildlife habitats, and habitats
39         supporting sensitive species populations.
40

41     •   Build fences (as practicable) to exclude livestock and wildlife from all mine
42         facilities, including all water sites.
43
44

BLM_0041585

- Design any necessary stream crossings to provide in-stream conditions that maintain the uninterrupted movement and safe passage of fish during all project periods. Limit the removal or deadfall of overhang.

- Design lighting to provide the minimum illumination needed to achieve safety and security objectives. Minimize the amount of off-site lighting. Turn off all unnecessary lighting at night to limit attracting migratory birds or sensitive species.

## 4.6.5 Human Health

- Implement proper worker safety training.

- Provide monitoring consistent with federal, state, and county requirements.

- Ensure an adequate thickness for the top material cover before seeding any waste-rock piles.

- Consider optimal placement of exhaust vents (e.g., place at best height) to reduce potential radon exposure.

## 4.6.6 Transportation

- Provide proper training to drivers on procedures for hauling radioactive, low-specific-activity material.

- Maintain the haul trucks for exclusive use only. Avoid using trucks for cartage of material other than uranium ore unless they have been properly cleaned for unrestricted use.

- Maintain uranium ore in a moist condition before loading it on trucks to minimize inhalation hazards to equipment operators and truck drivers.

- Use tarpaulins or a similar cover on the haul trucks to maintain a complete cover over the cargo area at all times during transport, both when the truck is traveling with a load of uranium ore and when it is returning and empty.

- Minimize tracking of mud and dirt from any mine site onto the local public roads that provide site access.

- Wash truck exteriors before allowing them to leave the mill site after they have delivered a load of ore.

BLM_0041586

- Ensure that uranium ore shipments proceed directly to the mill from the mine location. If there are unforeseen delays or scheduling issues with the mill that need to be resolved, identify locations for potential "safe havens" for temporary wayside parking or storage.

- Ensure that mine and mill operators are aware of the routes used for shipments of uranium ore.

- Maintain an emergency response plan for transportation accidents.

## 4.6.7  Cultural Resources

- Identify and evaluate all historic properties in the area of potential effect (APE).

- Develop a cultural resources management plan (CRMP) that contains protocols that address the following: (1) complying with applicable cultural resource laws during pre-project planning, managing of resources during operations, and considering the effect of decommissioning; (2) inadvertently discovering Native American human remains and funerary items and complying with the Native American Graves Protection and Repatriation Act in consultation with appropriate federally recognized tribes; and (3) avoiding or mitigating negative impacts on historic properties.

- Provide cultural resources training for project personnel on the laws protecting cultural resources, appropriate conduct in the field (such as procedures for the inadvertent discovery of human remains), and other project-specific issues identified in the CRMP.

## 4.6.8  Visual Resources

- Limit travel outside established transportation ROWs.

- Where possible, avoid building structures in visually exposed areas.

- Site projects outside the viewsheds of key observation points (KOPs) or, if this cannot be avoided, as far away from them as possible.

- Site mining facilities and roadways away from prominent landscape features that might be the focus of views.

- Avoid placing of facilities on ridge lines, summits, or other locations where they would be silhouetted against the sky from important viewing locations.

BLM_0041587

- Site facilities and roadways to take advantage of natural topographic breaks (i.e., pronounced changes in slope).

- Minimize the number of structures required.

- Construct low-profile structures whenever possible to reduce the structures' visibility.

- Repeat and/or blend materials and surface treatments (e.g., paint buildings) to correspond with the existing form, line, color, and texture of the landscape.

- Select appropriately colored materials for structures, or apply appropriate stains as coatings, so they blend with the backdrop of the lease tract.

- Use materials, coatings, or paints having little or no reflectivity whenever possible.

- Avoid installing gravel and pavement wherever possible to reduce contrasts in color and texture with the existing landscape.

- Avoid downslope wasting of excess fill material.

- Control litter and noxious weeds by removing them regularly during mine development and operations.

- Undertake interim restoration during the operating life of the mine, as soon as possible after disturbances have occurred.

- Ensure that lighting for structures on the mining sites does not exceed the minimum number of lights and brightness required for safety and security and does not cause excessive reflected glare.

- Use full cut-off luminaires to minimize uplighting; direct lights downward or toward the area to be illuminated.

- Ensure that light fixtures do not spill light beyond the lease tract boundaries.

## 4.7  CUMULATIVE IMPACTS

Potential impacts of the proposed action are considered in combination with the impacts of past, present, and reasonably foreseeable future actions in the region.

Consistent with 40 CFR 1508.7, in this PEIS, a cumulative impact is the impact on the environment that results from the incremental impact of the action when added to other past,

BLM_0041588

1  present, and reasonably foreseeable future actions regardless of the agency (federal or
2  nonfederal) or person that undertakes such actions. A cumulative impacts assessment accounts
3  for both geographic (spatial) and time (temporal) considerations of past, present, and reasonably
4  foreseeable actions. Geographic boundaries can vary by resource area — depending on the
5  amount of time an impact remains in the environment, the extent to which such an impact can
6  migrate, and the magnitude of the potential impact. Although the geographic extent of
7  cumulative impacts may be less for some resource areas, the boundary for this analysis is
8  conservatively defined as 50 mi (80 km) for all resource areas (see Figure 4.7-1). The primary
9  factor considered for the purpose of cumulative impacts analysis for this PEIS is whether the
10 other actions would have some influence on the resources in the same time and space as those
11 affected by the implementation of the proposed action (i.e., continue the ULP for the remainder
12 of the 10-year lease period or for another reasonable period of time).
13
14      The primary uses of land within the immediate vicinity (10 mi [16 km]) of the ULP lease
15 tract area are grazing, wildlife habitat, and uranium/vanadium exploration and development.
16 Most of this land is managed and owned by the BLM. Most of the land within 50 mi (80 km) of
17 the ULP lease tract area is owned by either the federal government or the States of Colorado and
18 Utah. At the time of the preparation of this EIS, no known large actions were being planned on
19 BLM land.
20
21      In the analysis that follows, impacts of the proposed action are considered in combination
22 with the impacts of past, present, and reasonably foreseeable future actions. This section begins
23 with a description of reasonably foreseeable future actions in the area of cumulative effects
24 (see Figures 4.7-1 and 4.7-2), including those that are ongoing, under construction, or
25 planned/proposed for future implementation. In general, past and present actions are accounted
26 for in the affected environment section (Section 3).
27
28
29 **4.7.1 Reasonably Foreseeable Future Actions**
30
31      Reasonably foreseeable future actions within the region of cumulative effects are
32 discussed in the following sections. These actions were identified primarily from a review of the
33 Schedule of Proposed Action for the San Juan National Forest and other relevant documents and
34 data sources (Energy Fuels 2009b; USD 2011b, 2012a). The actions listed are planned, under
35 construction, or ongoing.
36
37
38 **4.7.1.1  Piñon Ridge Mill**
39
40      Energy Fuels plans to begin construction of the Piñon Ridge Mill (in Paradox Valley,
41 between Naturita and Bedrock in Montrose County, Colorado) in 2012 or 2013, pending the
42 outcome of litigation (Energy Fuels 2012d). The Colorado Radiation Control Division issued a
43 final radioactive materials license to Energy Fuels Resources Corporation in March 2011,

BLM_0041589

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*              *Do Not Distribute*



1

2    **FIGURE 4.7-1  Region of Cumulative Impacts for the Proposed Action**

3

BLM_0041590



1

2      **FIGURE 4.7-2  Uranium Mining and Oil/Gas Wells in the Region of Cumulative Impacts**

BLM_0041591

1  following the performance of an environmental impact assessment (CDPHE 2011d). The license
2  application included an Environmental Report, which outlines the proposed action alternatives,
3  affected environment, environmental impacts, and cumulative impacts (Energy Fuels 2009b).
4
5       As the first new domestic uranium mill constructed in 30 years, Piñon Ridge Mill would
6  process uranium and vanadium into uranium oxide concentrate (yellowcake) and vanadium
7  oxide concentrate, respectively, using the solvent extraction process (Energy Fuels 2009b,
8  2012a). The mill is expected to process ore from 5 to 9 mines at any one time, and feeder mines
9  are expected to change over the course of the mill's 40-year lifetime. A surge in uranium
10 exploration, mining, and permitting is anticipated if the mill is constructed, including permitting
11 and development of uranium/vanadium deposits controlled by Energy Fuels (CDNR 2012;
12 Energy Fuels 2009a, 2009b).
13
14      Piñon Ridge Mill would be constructed on approximately 400 acres (162 ha) within an
15 880-acre (356-ha) property; the licensed (restricted) portion of the site would occupy
16 approximately 300 acres (121 ha). Facilities would consist of a stockpile pad, process buildings,
17 administration and maintenance buildings, waste management facilities (such as tailing cells and
18 evaporation ponds), and ancillary facilities. Construction is expected to last for 21 months and
19 employ 125 to 200 workers (at the peak of construction). During operations, the mill is projected
20 to employ approximately 85 people around the clock. Operations are expected to last for 40 years
21 (Energy Fuels 2009b, 2012a).
22
23      Host rock would be mined mostly from existing operations (owned and operated by
24 Energy Fuels) throughout Colorado. Ore would be shipped to Piñon Ridge Mill, stored at the ore
25 stockpile pad, mixed with water to create a fine slurry, and leached with sulfuric acid; resulting
26 in the precipitation of uranium oxide and vanadium oxide concentrates (500 tons per day).
27 Uranium oxide concentrate would be shipped to a conversion plant, while vanadium oxide
28 concentrate would be shipped to a plant that produces ferro-vanadium products (Energy
29 Fuels 2009b).
30
31      Table 4.7-1 summarizes the potential environmental impacts from the proposed Piñon
32 Ridge Mill.
33
34
35  **4.7.1.2  Planned Uranium Exploration**
36
37      Exploration for uranium typically involves the drilling of exploration holes ranging in
38 diameter from 3 to 6 in. (7.6 to 15 cm) and is typically accompanied by construction of sumps
39 (to collect drill cuttings and manage drilling fluids). Monitoring wells might also be required to
40 monitor groundwater quality and depth. Surface disturbance is typically limited. As noted in
41 Section 4.7.2.6, uranium exploration activities are generally short term (BLM 2009b) and are not
42 expected to have significant impacts on the environment or human health.
43
44
45

BLM_0041592

1   **TABLE 4.7-1  Potential Environmental Impacts of the Proposed Piñon Ridge Mill**

| Resource Area | Anticipated Impacts |
|---|---|
| Air quality | Potential non-fugitive emissions would not exceed thresholds for a major source permit or PSD thresholds. Modeling indicates that $PM_{10}$ emissions would not cause exceedance of NAAQS or CAAQS. No significant dust or fume emissions would be expected from routine transportation of uranium ore or hazardous materials. |
| Noise | Estimated maximum noise level at property boundary would be below the most restrictive maximum permissible noise level established by county regulation. |
| Geology and soils | Approximately 415 acres (170 ha) would be disturbed by site development activities. Construction impacts could include erosion of surface water control and settling. Surface disturbances would be stabilized by vegetation during operation. |
| Surface water | Design of the mill, ore pad, tailings cells, and evaporation ponds would result in no off-site stormwater discharge; stormwater runoff from outside the zero-discharge footprint would be controlled using BMPs. Operational impacts could include spread of contamination through facility flooding, erosion of stormwater channels, and reduction of surface water flow to the Dolores River. |
| Groundwater | Primary impacts during operations would be potential depletion of bedrock aquifer by supply wells, potentially affecting other groundwater users (impacts are not quantifiable until site withdrawals begin). Capture of stormwater runoff would limit infiltration or runoff to the Dolores River. Leaks and spills could affect water quality, but containment features and the absence of groundwater below parts of the facility would limit impact. |
| Public health – radiological | Radiological exposures would occur from transportation, on-site storage, and mineral processing operations, as well as via airborne, waterborne, and de minimis pathways. The estimated dose to the maximum exposed theoretical receptor at the site boundary would be 8.21 mrem/yr (including radon), which falls within the applicable regulatory limits of 25 mrem/yr (EPA) and 100 mrem/y (CDNR). The estimated dose to the maximum exposed actual off-site receptor (nearest downwind resident) would be 0.5 mrem/yr. Natural background in the area is 400 mrem/yr. Occupational doses would be expected to be less than 500 mrem/yr. |
| Public health – nonradiological | Chemical and particulate exposures would occur from transportation, on-site storage, and mineral processing operations. Air quality impacts in the area of the facility would be less than levels deemed protective of human health. Occupational exposures to elevated levels of nonradiological contaminants of concern would be unlikely; no significant health impacts from routine operations would be expected. |
| Ecological resources | No federally threatened, endangered, or candidate species were observed during wildlife surveys, and no state species of concern were observed. Four habitats of importance to area wildlife were identified on the project site; Energy Fuels has proposed offsets to the proposed impacts. Indirect impacts could occur from degradation of habitat by the facility and increased traffic. Contents of evaporation ponds and tailing cells could be toxic to invading threatened and endangered species, and the project could hinder reestablishment of Gunnison sage-grouse. No jurisdictional wetlands are located at the site, and no aquatic species or habitats occur at the site. Indirect impacts on vegetation could occur if the project displaces native herbivores or if invasive, non-native species become established in disturbed areas. Soil disturbance, vehicle traffic, and other project activities could promote the spread of invasive plants. Increased traffic and erection of fences would increase the potential for collisions with and mortality of terrestrial wildlife and some threatened and endangered species. Radiation dose rates to plants and animals in the vicinity of the facility would be below recommended limits, and exposures from inhalation would be minimal. Nonradiological impacts on biota would be minimized. |

2

BLM_0041593

**TABLE 4.7-1  (Cont.)**

| Resource Area | Anticipated Impacts |
|---|---|
| Socioeconomics | The project would employ 25 to 45 and 125 to 200 workers during construction of ancillary facilities and the mill, respectively; the mill would employ 85 workers during 24/7 operation. As many as 538 direct and 664 indirect jobs could be created by stimulating regional mining and transportation activities, mainly near the locations of mines expected to provide ore for the mill. Approximately 80% of mill employees would be expected to come from local residents, but the creation of direct and indirect jobs would result in growth of the Nucla/Naturita area and increase the demand for housing in mill- and mine-area communities. Some infrastructure and services might suffer a period of inadequacy, especially during construction. Local employment and housing demand increases would result in greater tax revenues. Future economic downturn is possible due to the variable nature of the resource extraction economy. Influx of construction workers would introduce a transient population and present behavioral concerns. Induced effects of the local employment increase might encourage the development of new businesses; employment decreases could present negative impacts on the community. |
| Recreation and tourism | Increased availability of local services might lead to expansion of recreation and tourism in the area. An association of negative impacts from mining and milling on recreation and tourism has not been demonstrated. |
| Land use | Project site would be unavailable for recreational or range/grazing use during construction and the 40-year operational period. No changes in land use would be expected for existing uranium mines in the region, but operation may result in resumed production of some regional uranium mines on standby. |
| Visual and scenic resources | Construction would not significantly affect the viewshed from Davis Mesa or State Highway 90, and impacts would be temporary. Facility features would be noticeable to travelers on State Highway 90 but would not dominate the view of the casual observer; existing open-pit mine overburden piles, waste-rock dumps, mine buildings, and access roads currently draw attention from State Highway 90. Visual impacts would be most prominent later in the 40-year facility lifetime, when evaporation ponds are completed to full capacity. |
| Transportation | Worker and heavy-truck traffic associated with facility construction and operations could affect area landowners and recreationalists; average daily traffic on State Highways 90 and 141 would increase by 40 and 30%, respectively, during the peak quarter of construction. Ore deliveries, product shipments, and commuting workers would continue to contribute to an increase in traffic over baseline levels, but the impact would be much smaller than it is during construction. CDOT does not consider the increased level of traffic to be large. The condition of certain unimproved roads could worsen from use by increased mill traffic. No significant radiological or nonradiological health impacts would be expected from routine transportation. |
| Cultural and paleontological resources | Project would not be expected to affect any historic properties, and artifact surveys would be expected to continue as the facility is developed. There would be little potential for disturbance of known cultural site or unanticipated discovery during operations. No paleontological resource impacts were identified. |
| Wastewater | Process water would be allowed to evaporate while salts precipitate to the bottom of the lined ponds. A large portion of tailings water would be recovered for reuse in the mill, and all gray water (from showers and sinks) would be recycled as process water; makeup water would represent about 40% of total process flows. |

BLM_0041594

**TABLE 4.7-1  (Cont.)**

| Resource Area | Anticipated Impacts |
| --- | --- |
| Accidents | Transportation accidents involving uranium ore would not be likely to have an adverse impact on biota because of the relatively low toxicity and concentration of hazardous constituents in uranium ore; the primary impact on affected surface water bodies would be a short-term increase in turbidity and suspended solids. |

Source: CDPHE (2011d).

### 4.7.1.3  Coal Mining

The Book Cliff Mine (formerly the Red Cliff Mine) is a proposed underground coal mine located 11 mi (18 km) north of Mack and Loma, Colorado. Proposed by CAM-Colorado, LLC (a subsidiary of Rhino Energy, LLC), the mine would extract low-sulfur coal from existing Federal Coal Leases, potential new leases, and private land within the Cameo Seam. At full production, the mine would be expected to produce 6 to 8 million tons per year; however, production would depend on market demand. The mine would be expected to operate continuously and employ 200 to 250 full-time employees. Within its first five years, the mine would be expected to produce up to 3 million tons per year. The life expectancy of the mine is 30 years (BLM 2009a).

The BLM has prepared a draft EIS for the Book Cliff Mine (Red Cliff Mine 2012; BLM 2009a). Table 4.7-2 summarizes the potential impacts from the proposed Book Cliff Mine. If approved, the project would consist of portal conveyor transfer buildings, fuel oil storage/fueling stations, electrical transformers, a bathhouse/office building, outdoor material storage areas, an equipment shop, a warehouse, a wash bay, covered storage, a sewage treatment plant, a water tank and water treatment buildings, a mine vent fan, noncoal waste storage, rock dust storage, unit train load out, a pump house, a maintenance road, water pipeline and diversion line, coal storage piles, a coal preparation plant, and mine access roads and entry points. In addition, a 14-mi (22-km) dedicated transmission line and a 2-mi (3-km) railroad connection spur would also be constructed. Construction of the mine is anticipated to last 2 years, cost $160 million, and encompass 23,000 acres (9,300 ha) of land (BLM 2009a). Several other coal mines in the region of cumulative impacts are closed or no longer producing. See Section 4.7.2.7 for more information on current coal-mining activities.

### 4.7.1.4  Fry Canyon Mill CERCLA Remediation

Several abandoned/decommissioned uranium mills in San Juan County are listed in the EPA Comprehensive Environmental Response and Liability Act site database (CERCLA), including Fry Canyon Mill (near the Daneros Mine, outside of the region of cumulative impacts).

BLM_0041595

1    **TABLE 4.7-2  Potential Environmental Impacts of the Proposed Book Cliff Mine**

| Resource Area | Anticipated Impacts |
| --- | --- |
| Air quality | Construction and operations could increase the amount of fugitive dust and nitrogen emissions, as well as GHG and $CO_2$ emissions. |
| Noise | During construction, an increase in loud noise from large vehicles and equipment and rock-blasting would be expected. Rock-blasting would be expected to last approximately 6 months and would be heard within a 1,250-ft radius. During operations, noise would not be expected to reach residential areas; however, the new railroad spur would increase train noise, and residents in Mack would hear the train passing and its horn blowing at least 8 times a day. |
| Geology and soils | Construction and operations could aggravate landslides and cause caving or sinkholes, lowering of the surface, and accelerated erosion. Reduction of the ability to recover oil and gas deposits might also occur. Construction and operations would make it difficult to revegetate the surface because of high soil salinity. Runoff from stock and waste piles could increase the corrosive properties of the soil. Mining will likely result in mixed soil horizons. |
| Water resources | Sediment erosion could disturb or reroute surface water flow or drainage and result in the discharge of untreated stormwater into streams. Groundwater could be affected by seepage of water containing salts and metals leached from waste rock. Impacts would be considered minimal if proper water treatment and storage practices were implemented. |
| Occupational health | Workers would have an increased risk of inhalation of toxic dust, on-site traffic and occupational accidents resulting from improper use of industrial equipment, and increased exposure to prolonged noise as well as to extreme temperature fluctuations resulting in body stress, exposure to chemical leaks, rock and roof falls, poor underground and aboveground air quality, injury from rock-blasting, and diseases from inhaling bird and bat excrement. |
| Ecological resources | A total of 237 acres (96 ha) for the mine facility and 213 acres (86 ha) for underlying railroad would be cleared of vegetation. The mine would potentially affect 0.1 acre (0.04 ha) of jurisdictional wetland. Construction and operation would reduce habitat for a number of plant and animal species. Increased traffic might result in increased wildlife collisions and mortality. Increased sediment flow could affect spawning native fish species, such as the round-tailed chub and flannel-mouth sucker. Loss of individuals of several threatened and endangered species could occur; not all species were noted in the project area. If proper wildlife management practices are implemented, this impact would be minimal. |
| Grazing | Approximately 452 acres (180 ha) of livestock forage would be lost for the duration of the project. Additional grazing land could be lost, as shrubbery has increased potential to catch fire from sparks caused by railroad transport. |
| Socioeconomics | Construction and operations would create new jobs, likely resulting in local population increase and a need for additional housing and community services. New businesses might start and established businesses might expand, resulting in increased employment opportunities. Property values might decrease due to proximity to the mine and/or ancillary facilities, but might also increase depending on new development. The influx of business and people has the potential to reduce the "rural" way of life. Industrialization could increase due to the expansion of the railroad. Operations would increase local, state, and federal revenue. |
| Land use | Agricultural land, grazing activities, recreational use, and wildlife habitat would be restricted or unavailable for the duration of the project (approximately 30 years). |

BLM_0041596

**TABLE 4.7-2  (Cont.)**

| Resource Area | Anticipated Impacts |
|---|---|
| Recreation | Construction of the water pipeline, transmission line, and railroad would temporarily limit access to recreational trails located within the North Fruita Desert SRMA and result in visual disturbance from unsightly construction equipment and project areas. Long-term impacts include restricted access to or rerouting of recreational trails, elimination of the mine area for recreational use, and visual disruption from transmission line, railroad, and water pipeline ROW. |
| Visual and scenic resources | Surface disturbance as a result of unsightly construction areas and staging areas would be likely to occur and would be considered temporary. Night lighting during construction and operations would result in night sky disturbance. Construction and operation would result in the alteration of the landscape from mining facilities, the railroad spur, access roads, and the transmission line. |
| Transportation | During construction, traffic along State Highway 139 and at projected railroad crossings might be temporarily obstructed or rerouted for up to 4 weeks. During operations, occasional delays would be anticipated at railroad crossings and near mine entrances or access roads. |
| Cultural resources and paleontology | There would be no direct impacts on cultural resources or Native American religious concerns within the mine footprint. Indirect impacts might occur as a result of the reconfiguration of OHV and recreational trails. Construction and operations would pose a high risk of uncovering or destroying paleontological resources. |
| Hazardous materials | Hazardous materials might result if toxic materials were uncovered or inadvertently produced during the mining process. |
| Utilities | Temporary power outages could occur during construction or maintenance of the transmission line. |

Source: BLM (2009a)

The BLM has determined that site remediation is necessary, but a time frame for CERCLA work is unknown (BLM).


### 4.7.1.5  Reforestation Projects

In August 2009, the Narraguinnep and Bradfield wildfires destroyed nearly 7,500 acres (3,000 ha) of the San Juan National Forest, Mancos/Dolores District (CSFS 2009). The San Juan National Forest, Manco/Dolores District, has proposed to reforest portions of the areas affected by the fire with Ponderosa Pine seedlings. Project implementation will commence in April 2012 (USDA 2011b).

In 2002, the Nizhoni Fire destroyed a ponderosa pine forest in San Juan County, north of Blanding. In 2010, the USDA Moab/Monticello Ranger District proposed to restore ponderosa pine over approximately 2,000 acres (810 ha). The prescribed burns can be used to create open areas and reduce vegetative fuels preceded manual planting. The project was approved in August 2011; current status is unknown.

BLM_0041597

### 4.7.1.6  Western Area Power Administration ROW Maintenance

In 2010, WAPA began developing a plan to proactively maintain 278 mi (450 km) of ROW and access to electrical structures and equipment located within the National Forest Systems in Colorado, Utah, and Nebraska. Unmaintained ROWs pose dangers to the electrical line, surrounding environment, and people living in the area. Vegetation buildup in the ROW can prevent access to the line for repair or maintenance and makes the line more susceptible to damage from wild fires (WAPA 2012a,b).

The proposed plan outlines a phased approach to implement changes to the current program. The short-term phase proposes clearing ROWs of all tall tree species. The mid-term phase intends to manage vegetation threats to structures and conductors, such as the buildup of timber and brush. In the long term, WAPA plans to maintain ROWs to ensure the safety and reliability of electrical service. The plan will include a modified vegetation management program intended to comply with best practices and federal regulations while allowing access to the electrical facilities for regular maintenance (WAPA 2012a,b).

### 4.7.1.7  Reconstruction of the Hanging Flume Replica

Under the Hanging Flume Interpretive Program, the Western Colorado Interpretive Association proposes to build a modern replica of a collapsed section of the original Hanging Flume, north of Nucla. The Hanging Flume site is listed on the NRHP. The BLM completed an environmental assessment in 2009, prior to approval of the first phase of the project (construction of an overlook to replace a graveled parking area above the Unaweep Canyon rim). Reconstruction of the flume is the third phase of the project, which was approved by the BLM in 2011. No new disturbance of cultural resources would be expected, and no Native American religious concerns are known to exist in the area. The project would have no adverse effects on threatened or endangered species or their habitats. The small scale of the project would limit environmental impacts (BLM 2011i). The timeframe of the project initiation and completion is not known.

### 4.7.1.8  Construction of Agricultural Water Facilities (Ditch Bill Easements)

The Colorado Ditch Bill Act of 1986 (Public Law 99-545) authorizes the Secretary of Agriculture to issue permanent easements for water conveyance systems used for agricultural irrigation or livestock watering. Granting easements is not a USDA discretionary decision. An applicant meeting the criteria specified in the act is entitled to an easement, and the decision to grant it does not constitute a federal action subject to NEPA review. However, conditions of the easement (including operations and maintenance) might require NEPA review (USDA 2012b). Similarly, the Moab and Monticello Ditch Bills authorize easements in Utah.

A number of Ditch Bill easement applications occurring within the Grand Mesa, Uncompahgre, San Juan, and Manti-La Sal National Forest administrative areas are currently in

BLM_0041598

the scoping process or on hold (USDA 2012a,c,d). While the granting of the easement is nondiscretionary, NEPA analysis is often performed on a group of easement applications to document any environmental concerns, determine whether there is a need to establish discretionary terms and conditions in an OMP, and for the protection of threatened, endangered, and sensitive species (USDA 2011). The type and magnitude of impacts from Ditch Bill easements depend on the location and nature of the projects. In many cases, a site visit and site-specific impact analysis would be necessary. Impacts representative of those that could occur as a result of the implementation of terms and conditions on a Ditch Bill easement include beneficial actions to improve resource conditions and habitat in easement areas, such as stabilization of ground to prevent erosion and reduce sedimentation in downstream habitats, control of noxious weeds, and protection of cultural resources. Establishment of an OMP would not result in incremental adverse impacts (USDA 2009).

### 4.7.1.9 Other Future Projects

Other proposed or planned activities with the potential to contribute to cumulative impacts relate to utility corridors and ROW maintenance, water use and management, grazing and grazing management, and wildlife management. Some of these projects may not yet have a completed environmental assessment, so environmental impacts have not been quantified.

- Closure and reclamation of the abandoned Vision uranium mine (under NEPA review) (USDA 2012d);

- Closure and reclamation of abandoned coal and uranium mines;

- Continued aerial application of fire retardant on NFS lands (USDA 2011b,d);

- Management of Gypsy Moth, Spruce Beetle, and other insects (USDA 2008, 2012a,c);

- Changes in reservoir operation to help meet flow recommendations for the Gunnison and Colorado Rivers (Montrose County) (DOI 2012);

- Management of existing and proposed utility corridors and gathering pipelines (under NEPA review);

- Wild horse trapping and removal, wildlife habitat improvement, and wildfire fuel reduction (various counties);

- Vegetation and forest (fuels) management (USDA 2011b, 2012c); likely to continue on BLM lands;

- Timber sales and fuels management (three ongoing projects and two planned projects in Dolores and Montezuma Counties) (USDA 2011b);

BLM_0041599

1  　　• Dolores River restoration treatments (BLM 2012);
2
3  　　• Remediation of Moab Uranium Mill tailings (DOE 2005); and
4
5  　　• Revisions to the BLM Field Office Land Management Plan.
6
7
8  **4.7.2  Past and Present Actions**
9
10  　　Some of the activities described in this section are past actions with the potential for
11  future reactivation; they are considered a past action by default.
12
13
14  　　**4.7.2.1  White Mesa Mill**
15
16  　　The White Mesa Mill, located 6 mi (10 km) south of Blanding, Utah, is the only
17  conventional uranium mill currently operating in the United States. The mill precipitates uranium
18  oxide concentrate (yellowcake) and vanadium oxide concentrate from host rock. It is licensed to
19  process 2,000 tons of ore per day and produce 8 million pounds (3.6 million kg) of uranium
20  oxide per year. The mill is also licensed to process and reclaim uranium from alternative feed
21  materials, including uranium-bearing waste materials derived from uranium conversion, metal
22  processing facilities, and U.S. governmental cleanup projects. The mill began processing
23  conventional ore in 2011 after years of processing only alternative feeds (Denison 2012a). In
24  2011, the mill produced approximately 1.0 million pounds (0.45 million kg) of uranium oxide
25  and 1.3 million pounds (0.6 million kg) of vanadium oxide (Dennison 2012b; EIA 2010).
26
27  　　The mill was originally licensed by the National Research Council to Energy Fuels, Inc.,
28  in 1980; the license was renewed in 10-year increments in 1987 and 1997. The State of Utah
29  assumed regulatory oversight in 2004, and the license was reissued in 2005. Denison Mines
30  assumed ownership of the mill in 2006 and submitted an application in 2007 for renewal of the
31  state license (UDEQ 2012; Denison 2012a). Denison possesses 15 license amendments allowing
32  the mill to process 18 different alternative feeds (Denison 2012b). At full capacity, the mill
33  employs approximately 150 people (Denison 2012a). In April 2012, Energy Fuels and Denison
34  Mines announced that all of Denison's mining assets in the United States (including the White
35  Mesa Mill) will be acquired by Energy Fuels (Energy Fuels 2012 [2012a-e]; Denver Post 2012).
36
37  　　Three other uranium mills exist in the United States; all were on standby at the end of
38  2010 (EIA 2011).
39
40  　　Table 4.7-3 summarizes the potential environmental impacts from operation of the White
41  Mesa Mill.
42
43

BLM_0041600

1   **TABLE 4.7-3  Potential Environmental Impacts from Operation of the White Mesa Mill**

| Resource Area | Anticipated Impacts |
|---|---|
| Air quality | Discharge of air pollutants during operation would be minor and the effects negligible. Concentration of particulates and $SO_2/NO_x$ at site boundary would be below air quality standards. |
| Noise | No information was available. |
| Geology and soils | Soils in the project vicinity are normally subject to erosion due to lack of consolidation and poor vegetative cover. Construction and operation of the mill would accelerate wind and water erosion. Total off-site sediment transfer would be reduced as a result of the project. |
| Surface water | There would be minimal impact on surface water resources; there would be no discharge of mill effluents or sanitary wastes on surface waters. |
| Groundwater | Approximately 480 acre-feet per year of groundwater would be drawn from the Navajo aquifer, with no expected effect on the aquifer or other users; the permit allows up to 811 acre-feet per year. Possibility of groundwater degradation would be expected to be remote due to elimination of seepage (by multicomponent lining of tailings cells) and high net evaporation rate in the area. |
| Public health – radiological | Background radiation levels in the area of the mill would increase as a result of continuous but small releases of radioactive material during operation (including uranium, radium, and radon). The calculated dose at the nearest potential residence (from inhalation, external exposure, and consumption of contaminated food products) would be 5.8 millirem per year. The calculated collective dose to population within 50 mi would be 3.4 person-rem per year (compared to 7,500 person-rem per year from natural background). Calculated individual public doses are a small fraction of National Research Council limits in unrestricted areas. Combined occupational exposures for most workers would be expected to be less than 25% of applicable limits. |
| Ecological resources | Construction and operations of the mill would result in loss of habitat for terrestrial biota (vegetation, foraging for wildlife), but loss would be expected to be small and should not significantly reduce the amount of habitat for regional species because of the availability of similar rangeland throughout the region. Impacts of suspended particular matter would be expected to be negligible. Construction noise and increased human activity might cause wildlife to migrate away from the project vicinity. Fence around tailings impoundment would exclude large animals, and the acidity/salinity of the water would make it unattractive for waterfowl. No impacts on endangered plant or animal species would be expected. |
| Socioeconomics | Construction and operations would be expected to employ up to 250 (peak) and 85 workers, respectively. A total population increase of 1,500 to 2,000 would be anticipated (due to milling and associated mining operations, including direct and non-basic sector jobs), along with increased commercial and residential development in neighboring communities. New housing units would be in demand. |
| Land use | A total of 484-acres (200 ha) for the mill, tailings area, and roads would be altered. The 333-acre (135-ha) tailing area might be unavailable for further productive use when the mill area is reclaimed after operations cease, but the land might be returned to former grazing use after radiation levels are reduced to acceptable levels. Land use in surrounding areas might be affected, such as for increased residential and commercial development to serve mill-related population growth and mineral extraction in the vicinity. |
| Visual and scenic resources | Stack emissions would be visible to the public traveling on Highway 163, but they would not be expected to be visible from major recreational areas in the vicinity. |

BLM_0041601

**TABLE 4.7-3  (Cont.)**

| Resource Area | Anticipated Impacts |
|---|---|
| Transportation | Traffic volume on area highways would increase substantially (due to mill employees, new miner employees, new workers in the non-basic sector, and heavy-truck traffic), increasing traffic congestion. |
| Cultural and paleontological resources | Six historical sites were identified by the survey; of the five eligible for inclusion in the NRHP, one would be adversely affected by the mill and would require mitigation. No paleontological resource impacts were identified. |
| Waste and wastewater | A total of 2000 tons per day of waste material (tailings) would be produced, for on-site deposition. Process water (310 gal per minute) would be discharged to the tailings impoundment. No discharge of liquid or solid effluents from the mill/tailings site. |
| Accidents | Accidents relating to mill activities might include trivial incidents (not resulting in radiological release), small and large radiological releases (in comparison to annual releases from normal operation), nonradiological accidents, and transportation accidents. No health impacts on the off-site public would be expected as a result of postulated radiological or nonradiological accidents, and most mill-related transportation accidents. |

Source: National Research Council (1979)

### 4.7.2.2  Uranium Mining

**4.7.2.2.1  Daneros Mine.** The Daneros project, a conventional underground mine initially proposed by Utah Energy Corporation in 2008, is located in Bullseye Canyon, San Juan County. The BLM issued final approval for the mine permit in May 2009 for 7 years of mine operation. Expected to produce 500,000 pounds (23,000 kg) of uranium oxide per year for processing at the White Mesa Mill, the Daneros Mine is the state's first new uranium mine in 30 years. The mine is expected to employ a crew of 8 to 11 employees, working two shifts (BLM 2009b). The mine was acquired by Denison Mines through its acquisition of White Canyon Uranium Ltd. in 2011.

Anticipated adverse environmental impacts associated with the mine project include altered visual resources, dust generation from mining and transportation, particulate and criteria pollutant emissions from fossil fuel combustion, radioactive dust and gas emissions, soils disturbance and vegetation clearing, displacement of desert bighorn sheep and degradation of their habitat, impact on the health of mine workers and the general public from radiation exposure and transportation, and decrease in recreation and tourism recreation. None of these impacts is considered significant. No significant cultural resources were identified in the area of potential effects and no historic properties would be affected. The project would require 5,000 gal (19,000 L) per day of well water for mining and dust suppression and would not be expected to affect existing water rights in Bullseye Canyon. Additional traffic from mining operations would not have a noticeable impact on local roads (BLM 2009b).

Table 4.7-4 summarizes the potential environmental impacts from the Deneros Mine.

BLM_0041602

1  **TABLE 4.7-4  Potential Environmental Impacts of the Daneros Mine**

| Resource Area | Anticipated Impacts |
| --- | --- |
| Air quality | Impacts from mine development could include dust generation, diesel exhaust and release of GHGs, and release of radioactive dust and gases from truck travel on unimproved roads. Radon emission from mine shafts could result in minor air quality impacts, but the low amount of radon would not pose a health risk. With mitigation, operations would not result in exceedance of NAAQS; air quality impacts would be minor and would not violate state or federal standards. |
| Noise | No noise impacts were identified. |
| Geology and soils | No geology or soils impacts were identified. |
| Water resources | Operations would not affect surface water quality. Operations would require 5,000 gal (19,000 L) per day for mining and dust suppression, eventually drawn from a well in the Cutler White Rim aquifer. No drawdown is expected, and existing water rights would not be affected. |
| Human health | Public health impacts from radiation exposure and transportation are expected to be minimal. Radon emissions would quickly disperse, resulting in no impacts on the general public. A post-operation exposure rate of 0.1 mrem/year is estimated for a recreationalist camping on top of the reclaimed waste rock pile for 14 days. |
| Socioeconomics and environmental justice | No socioeconomic or environmental justice impacts were identified. |
| Ecological resources | Increased human activity, traffic, and noise, and removal of habitat might displace the desert bighorn sheep (or disrupt normal movement patterns) during the life of the project. |
| Land use | Access to the mine site would be restricted during the life of mine operations for public safety purposes. After operations, the public would have access to reclaimed waste rock pile. |
| Recreation | No recreational impacts were identified. |
| Visual and scenic resources | No visual and scenic impacts were identified. |
| Transportation | The increased truck traffic from operations (16 round trips per day) would not have a noticeable impact on the level of service for local roads and would not measurably affect traffic flow/patterns. The risk of accidents is expected to be minimal. |
| Cultural resources, Native American concerns, and paleontology | No cultural or paleontological resource impacts were identified. |
| Hazardous materials | No hazardous materials impacts were identified. |

Source: BLM (2009b)

2
3
4

BLM_0041603

1    **4.7.2.2.2  La Sal Mines Complex.** Denison's La Sal Mines complex is a collection of
2    four separate, existing underground uranium mines (Pandora, La Sal, Snowball, and Beaver
3    Shaft) in the vicinity of La Sal, Utah (San Juan County). The complex has been operated since
4    the 1970s and is part of a series of underground mines previously operated by Atlas Minerals and
5    Umetco Minerals. Surface facilities are located on both private and public lands administered or
6    managed by BLM, USDA (USFS), and the State of Utah (CDM 2010). As of 2012, the complex
7    is one of two actively producing mines in the state (Energy Fuels 2009b; UDNR 2012). Ore
8    produced at the complex is shipped to Denison's White Mesa Mill for processing (see
9    Section 5.7.2.1). Denison submitted a request in 2010 to amend its Plan of Operations to include
10   expansion of the Pandora Mine, further exploration activities within the complex, and drilling
11   vent holes on private and public land; these activities were expected to take place in three phases
12   between 2011 and 2030.
13
14
15   **4.7.2.2.3. Whirlwind Mine.** Energy Fuels' Whirlwind Mine is located 5 miles southwest
16   of Gateway in Mesa County, in the Beaver Mining District and spanning the Colorado/Utah
17   border. The mine is comprised of two formerly closed uranium-vanadium mines, the Urantah
18   Decline and Packrat Mines. The mining claim block encompasses 4,890-acres, but the mine is
19   underground, and is permitted for 24 acres of surface disturbance. Surface facilities include two
20   portal areas containing stockpiles, waste rock stockpiles, topsoil stockpiles, a water treatment
21   plant, fuel and oil storage, support buildings, monitoring areas, ventilation shafts, and power
22   drops (BLM 2008).
23
24   BLM completed an environmental assessment for the proposed Whirlwind Mine project
25   in 2008; finding no significant impact on the surrounding area, BLM authorized restoration of
26   the mine and the resumption of ore production. Energy Fuels completed construction of the mine
27   in 2009 but announced late that year that the mine would be put into maintenance status
28   (BLM 2008; Energy Fuels 2012; CDNR 2011).
29
30   The Whirlwind Mine is one of two mines expected to provide ore to the proposed Piñon
31   Ridge Mill (Energy Fuels 2009b; CDPHE 2011d). Ore could also be transported to the White
32   Mesa Mill for processing. If reopened and operating at full capacity, the mine would employ
33   24 workers covering three 8-hour shifts, five days per week. Using the room and pillar mining
34   technique, initial ore production is expected to reach 100 tons per day, increasing to 200 tons per
35   day as market demand increases. Life expectancy of the mine is 10 years (BLM 2008; Energy
36   Fuels 2012c).
37
38   Table 4.7-5 summarizes the potential environmental impacts from the Whirlwind Mine.
39
40

BLM_0041604

1    **TABLE 4.7-5  Potential Environmental Impacts of the Whirlwind Mine**

| Resource Area | Anticipated Impacts |
| --- | --- |
| Air quality | Construction and operation could increase the amount of fugitive dust in the area; however, air quality is not expected to exceed ambient air quality standards. The potential for radon exposure in enclosed spaces exists, but is considered minimal. |
| Noise | An increase in noise is expected from mining operations including the use of ventilation fans and generators, large construction and mining equipment, and rock blasting. A slight increase in traffic related noise is expected three times a day. Noise is not expected to exceed 50 dB outside of the established noise boundary. |
| Geology and soils | The mine will deplete the uranium ore deposit and increase waste rock. Approximately 24 acres of topsoil will be disturbed and saved for reclamation. The potential exists for the mixture of topsoil with waste rock, ore, or soil containing other minerals, which could affect reclamation efforts at the end of the project. |
| Water resources | Groundwater could be affected by the seepage of water from waste rock. Construction of mine and shafts/vents/drill holes may impact aquifers, increase mineral contamination, and mix water sources between aquifers. Sediment erosion could disturb or reroute surface water flow or drainage and result in the discharge of untreated storm water into streams. Fuel, chemical, or ore spills could affect both surface and ground water. Impacts are considered minimal to negligible if proper water treatment, transport, and storage practices are implemented. |
| Human health | With proper implementation of EPA guidelines and MHSA regulations, no impacts to the health of the general public are predicted. |
| Socioeconomics and environmental justice | Operation will create 10 to 24 full-time, year-round jobs, with most positions expected to be filled by local hires. No significant impacts to housing/infrastructure or community services are expected. Operations will result in increased local, state, and federal revenue. An increase in indirect income for local businesses is likely. Property taxes could increase depending on development that occurs as a result of mine operations. No environmental justice impacts were identified. |

BLM_0041605

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

**TABLE 4.7-5  (Cont.)**

| Resource Area | Anticipated Impacts |
|---|---|
| Ecological resources | Approximately 24 acres (10 ha) of plant (mostly piñon) and animal habitat will be disturbed, resulting in a minimal reduction of habitat and food supply. Soil disturbance, foot traffic, and mining equipment could spread invasive plants and noxious weeds; impact is minimal if a proper vegetation management plan is implemented. Fuel, chemical, or ore spills could affect flood plain areas. Increased vehicular traffic may result in wildlife collisions and mortality. Big game may experience an increase in energy exertion during winter months from avoiding vehicular traffic, construction equipment, and mine operations, which could be detrimental to survival. Ore or chemical spillage, water depletion, unexpected water release, and increased sediment flow could affect water flow or contaminate streams and harm aquatic species. Potential impacts to the habitat and food resources of TES species could occur, although the only four sensitive species were noted in the area. Habitats of these species could be directly impacted by operations, fugitive dust, increased traffic, and dust abatement methods. The wild turkey, chucker, black-throated gray warblers, Virginia's warblers, and peregrine falcons were noted in the area, but minimal impacts are anticipated. Impact will be minimal to negligible with proper management practices. No impacts were identified for wilderness areas, wild and scenic rivers, and farmlands. |
| Grazing | There will be no significant impact to the two AUMs located within the two grazing allotments within the project area. |
| Land use | Night lights and noise may disturb the land owner to the northwest. |
| Recreation | An increase in ore-hauling trucks may delay arrival to hiking and biking trailheads. Accidents between ore-hauling trucks and bicyclists and motorcyclists could occur. |
| Visual and scenic resources | The mine can be seen from points of interest such as Palisade WSA and the La Sal Mountains and Foothills; however, the mine does not dominate the view of the casual viewer. |
| Transportation | Increased traffic is expected on local roads. An increase of 14 light-vehicle and 9 heavy-vehicle round-trips are expected per day. |
| Cultural resources, Native American concerns, and paleontology | No impacts to cultural resources or Native American Religious Concerns were identified. However, the potential exists to discover or damage buried deposits that are not readily identifiable. There is some potential to discover or damage vertebrate fossils within the Morrison Formation located within the mine. |
| Hazardous materials | As a result of a chemical, fuel, or oil spill, impacts could occur to a variety of resources. |

Source: BLM (2008)

BLM_0041606

**4.7.2.2.4  Energy Queen Mine.** The Energy Queen Mine (formerly known as the Hecla Shaft) is located in the La Sal Mineral Belt, approximately 3 miles west of La Sal, Utah. The mine was originally owned as a joint venture of Hecla Mining Company and Union Carbide (Umetco Minerals Corporation), operating for four years (1979 to 1983) until it was closed due to a decline in uranium prices. Ownership of the mine was transferred to Energy Fuels in 2006; land and mineral rights are privately owned. In 2007, Energy Fuels began acquiring adjacent and nearby land for exploratory drilling and potential expansion (Peters 2011).

In 2009, Energy Queen Mine was fully permitted by the Utah Division of Oil, Gas, and Mining and San Juan County. The mine shaft is currently flooded and plans are being evaluated to dewater it. In addition, mining facilities, surface facilities, and equipment are currently being evaluated. The existing water treatment plant and settling ponds will need to be replaced prior to reopening the mine. Energy Fuels estimates a 12-month turn-around for mine rehabilitation from dewatering to full production. The mine is expected to produce approximately 200 tons or more of uranium/vanadium ore per day (Peters 2011; Energy Fuels 2012b).

Energy Queen Mine is one of the mines that are expected to provide ore to the proposed Piñon Ridge Mill (CDPHE 2011d). Although environmental impacts would vary for each uranium mining project, potential environmental impacts for a uranium mine can be found in Sections 4.7.2.2.1 and 4.7.2.2.3.

**4.7.2.2.5  Other Uranium Mining and Uranium Exploration.** The Uravan mineral belt in western Colorado includes an estimated 1,200 historic mines, with production dating back to 1948. Total uranium ore production in Colorado was estimated to be over 255,000 pounds in 2005, all originating from four Cotter Corporation mines in the Uravan belt near Nucla and Naturita. The Cotter JD-7 open-pit mine is adjacent to the Piñon Ridge Mill site. All four mines ceased production in November 2005, partly due to high energy costs and the high cost of transporting ore to Cañon City for milling. As of December 2011, Cotter was not seeking to renew its radioactive materials license for the Cañon City mill and had initiated closure of the facility (CDNR 2012).

Denison's Sunday Mines began producing uranium in San Miguel County in 2007; ore from these mines was shipped to the White Mesa Mill in Blanding (see Section 5.7.2.1). Production at these mines ceased in 2009 due to declining uranium prices, but the BLM Tres Rios Field Office is currently preparing an Environmental Assessment for reopening of the complex. Limited uranium production began at Bluerock Energy's J-Bird Mine in Montrose County in 2008, but production ceased when the mine was transferred to Rimrock Exploration and Development. The mine remains in maintenance status and no production is anticipated in the immediate future (CDNR 2011). Bluerock sought approval of a Plan of Operation for Cone Mountain Mine (south of Gateway), but the company ceased development activity later that year (Argus 2008a; Argus 2008b). The Prince Albert (Rimrock), Last Chance (Nuvemco), and Return (Beck) Mines may have had limited production for testing within the last 4 years.

BLM_0041607

1   There are 33 actively permitted uranium mine projects in Colorado, and one new permit
2   under review. No uranium production was reported from 2009 to 2011, and none of the actively
3   permitted mine projects is producing at this time; 24 are in maintenance status, 7 are being (or
4   have been) reclaimed, and two are conducting development activities. In September 2011, all
5   uranium operators were notified of the requirement to submit an Environmental Protection Plan,
6   file for an exemption, or commence final site reclamation by October 2012 (CDNR 2012).
7
8   There are 12 permitted uranium mines in Utah; only 2 (Daneros and La Sal) are actively
9   producing (UDNR, 2012). Several former underground uranium mines are located in the Red
10  Canyon watershed (near the operating Daneros Mine) and other areas of the state that are outside
11  of the region of cumulative impacts. Small, remote, mining operations that have not been
12  reclaimed are not considered to be a significant human health hazard; the impacts on wildlife are
13  minor, and low precipitation levels make it unlikely that hazardous concentrations of radioactive
14  minerals and other compounds would significantly affect local watershed characteristics
15  (BLM 2011j).
16
17  Although environmental impacts would vary for each uranium mining project, potential
18  environmental impacts for a uranium mine can be found in Sections 4.7.2.2.1 and 4.7.2.2.3.
19
20  Uranium exploration (i.e., drilling) activities are generally short-term and are not
21  expected to have direct or cumulative significant environmental or public health effects,
22  provided there are no extraordinary circumstances such as the presence of Federally listed T&E
23  species in the vicinity of the project area; the presence of floodplains or wetlands in the project
24  area that would be affected; the presence of wilderness, wilderness study areas, or National
25  Recreation Areas near the project area; and Native American religious or cultural sites,
26  archaeological sites, or historic properties within the project area (USDA 2011a). Uranium
27  exploration activities typically involve few workers, low traffic volumes, and no emissions
28  (Energy Fuels 2009b).
29
30
31  **4.7.2.3  Coal and Other Mineral Mining**
32
33  The 20-acre New Horizon mine near Nucla is a surface coal mine owned and managed by
34  Western Fuels Association, a not-for-profit, national fuel supply cooperative. The mine is the
35  exclusive coal supplier to the Nucla Station power plant (5 miles north), producing
36  approximately 350,000 to 400,000 tons of coal per year (Tri-State, 2012). The Dakota coal from
37  the mine is higher ash and sulfur than the types of coal mined in other parts of Colorado. The
38  mine employed 23 miners in 2007 (CDNR 2008).
39
40  As of 2010, there were no actively producing Utah coal mines within the region of
41  cumulative impacts (UDNR 2011).
42
43  Although environmental impacts would vary for each coal mining project, potential
44  environmental impacts for a coal mine can be found in Section 4.7.1.3.
45

BLM_0041608

1    Other permitted mining activities in the region of cumulative impacts include
2    sand/gravel, borrow material, sandstone, gold, and quartz/granite (over 4,650 acres or 1,880 ha),
3    as well as copper mining and exploration and limestone quarries (BLM 2011h). The Lisbon
4    Valley Copper Mine resumed operations after receiving BLM approval in 2011 on its revised
5    Plan of Operations.
6
7
8    ### 4.7.2.4  Oil and Gas Exploration and Extraction
9
10    BLM routinely offers land parcels for competitive oil and gas leasing to allow
11    exploration and development of oil and gas resources for public sale. Continued leasing is
12    necessary for oil and gas companies to seek new areas for oil and gas production, or to develop
13    previously inaccessible/uneconomical reserves. In 2010 and 2011, four oil and gas leases were
14    issued within the region of cumulative impacts (by BLM Field Offices), covering a total of
15    approximately 2052 acres of land surface. A total of 3,121 wells are located within the region of
16    cumulative impacts (as shows in Figure 4.7-1a), including wells that are actively producing,
17    shut-in but capable of production, plugged, and abandoned; this total does not include capped
18    wells. The majority of these oil and gas wells were drilled in the 1970s and 1980s (BLM 2010c).
19
20    The type and magnitude of impacts from exploration and future development depend on
21    the location and nature of the proposed exploration and development. As such, specific impacts
22    on some resource areas cannot be predicted at the leasing stage (BLM 2011l). In many cases, a
23    site visit and site-specific impact analysis would be necessary. Although environmental impacts
24    would vary for each oil and gas exploration project, Table 4.7-6 summarizes potential impacts
25    that could occur within the region of cumulative effects during exploration and future
26    development of lease parcels.
27
28    Oil and gas exploration activities are dependent on market conditions. As of January
29    2012, BLM is developing a proposal to revise the 1993 revision of the oil and gas leasing EIS
30    decision to changed conditions, revised leasing stipulations, and land availability (USDA 2012c).
31
32    Gothic shale gas, a potential new gas development play underlying portions of the region
33    of cumulative impacts (including San Miguel and Dolores Counties), has also been recently
34    analyzed as a foreseeable development scenario for oil and gas development within the Paradox
35    Basin (SJPLC 2011).
36
37
38    ### 4.7.2.5  Long-term Grazing Permits and Allotments
39
40    Livestock producers are required to hold a permit/lease to graze livestock on public land.
41    BLM Field Offices administer grazing permits and allotments throughout the region of
42    cumulative impacts (Grand Junction, Uncompahgre, Tres Rios, Moab, and Monticello). Grazing
43    areas in Colorado are generally rough mountainous terrain with steep side slopes and insufficient
44    livestock water or forage, resulting in large areas of grazing allotments that are infrequently or
45    not grazed; this generally lessens adverse impacts on wildlife, soils, and cultural resources. Most
46

BLM_0041609

*Preliminary Draft PEIS*      *PEIS Privileged Information*      *May 2012*
*PEIS Team Use Only*        *Do Not Distribute*

1   **TABLE 4.7-6  Potential Environmental Impacts of Oil and Gas Exploration and Development**

| Resource Area | Anticipated Impacts[a,b] |
|---|---|
| Air quality | Exploration and development of lease parcels could adversely impact local air quality through emission of particulate matter, criteria air pollutants, and GHG from soil/surface disturbance, transportation, engine exhaust, and windblown dust, and emission of VOCs from gas flaring/venting. Generally it is not possible to quantify, but it is unlikely to result exceedance of NAAQ/CAAQ guidelines. Generally it is not possible to quantify the net climate impact from global or local GHG production. |
| Geology and soils | Direct impacts from construction and parcel development include removal of vegetation; disturbance, exposure, compaction, and destabilization of soils; increased susceptibility to erosion; mixing of horizons, and loss of soil productivity, and possible contamination of soils with chemicals or petroleum constituents; the magnitude of disturbance depends on the size of well pads, the type of drilling, and the terrain/slope. Indirect impacts could include increased runoff, erosion, and sedimentation. |
| Surface water | Clearing/grading would alter overland flow and recharge patterns; compaction of soil and reduced infiltration could lead to increased runoff and an increase in the frequency and extent of downstream flooding. |
| Groundwater | Impacts could occur due to failure of well integrity, surface spills, or the loss of process fluids into groundwater; changes in groundwater quality (including cross-contamination of aquifers) could impact downstream users. Development would require use of existing or new water disposal facilities. |
| Human health | Substances emitted and used during exploration and development may pose a risk to human health and the environment. |
| Ecological resources | Direct construction impacts could include removal and loss of vegetation on well pads, pipelines, and roads. Indirect impacts could include creation of environment for invasive species and other noxious weeds to become established, loss of wildlife habitat base and rangeland productivity, and changes in visual aesthetics. Cumulative water depletions from the Colorado River Basin could jeopardize some TES species. If TES species or habitats occur within or near a lease parcel, further impact analysis would be required. Continued development activity would contribute to habitat fragmentation/degradation, noise-related changes in wildlife behavior, displacement into less suitable habitat, disruption of nesting and breeding, and increased vehicle-related wildlife collisions and mortality. If farmlands (prime or unique), areas of critical environmental concern, wilderness and wilderness study areas, wild and scenic rivers, wetlands and riparian zones, and floodplains are within or near a lease parcel, further impact analysis would be required. |
| Socioeconomics and environmental justice | Temporary or permanent employment, rental or purchase of equipment, royalties paid federal and state governments, and other expenditures related to development. Indirect employment opportunities (related to exploration and service support industries) could be created in the region. Environmental justice impacts are not likely due to the remoteness of exploration activities and dispersal of minority and low-income populations throughout affected counties. |
| Transportation | Local roads would be impacted by increased traffic from exploration and production vehicles, equipment, deliveries, and workers. |
| Land use | Development could conflict with other permitted uses, reduce availability of land for recreation or range/grazing use, or affect existing ROWs. Development near a fence or corral could compromise usefulness. |

BLM_0041610

**TABLE 4.7-6  (Cont.)**

| Resource Area | Anticipated Impacts[a,b] |
|---|---|
| Recreation | Areas used for grazing or hunting could experience an increase in activity and noise disturbance. |
| Cultural resources and paleontology | Survey and parcel development (including well pads, access roads, pipelines, and other infrastructure) have the potential to identify or disturb previously unrecorded cultural resource sites, Native American Religious Concerns, and paleontological resources. |
| Visual and scenic resources | Construction and infrastructure could affect landscape character and detract from the undisturbed visual setting. |
| Solid and hazardous wastes | Substances used and emitted in exploration, development, and production may pose a risk to human health and the environment. |

[a]   This table is intended to provide a summary of exploration and development activities and broadly address potential impacts; it is not intended to strictly describe the lease offerings from which they are adapted, nor can all potential impacts be quantified without site-specific analysis.

[b]   Source: (BLM 2011c,k).

allotments have been grazed continuously since implementation of the Taylor Grazing Act (1934), if not earlier (1890) (BLM 2011j).

BLM performs an Environmental Assessment to analyze the impacts of renewing 10-year grazing permits within a given LHA area; only actions necessary to graze livestock are considered (BLM 2011j). Although environmental impacts would vary for each grazing permit, Table 4.7-7 summarizes potential impacts that could occur within the region of cumulative effects during present and future grazing activities.

**4.7.2.6  Power Generation and Transmission**

Owned by Tri-State Generation & Transmission, Nucla Station is a 100-MW coal-fired power plant located just outside of Nucla, Colorado, and the world's first utility-scale power plant to employ atmospheric circulated fluidized-bed combustion. The plant started operating in 1959 as a conventional electric generating station and currently employs 50 people. Between 1985 and 1987, the plant was refitted to employ atmospheric circulating fluidized-bed combustion technology, which removes pollutants inside the coal boiler, resulting in more efficient fuel combustion and reduced emissions. The plant covers 60 acres and draws water from the San Miguel River. The plant receives about sixty 25-ton loads of coal per day from its sole source, the New Horizon Mine (located 5 miles south of the plant (Tri-State 2012a).

Tri-State G&T is also in the process of upgrading its 50-year-old, 69-kV transmission line that supplies secondary power from Nucla Station to the Telluride area. BLM published a Final Environmental Impact Statement in 2001 (66 FR 226, November 23), but this document

BLM_0041611

1    **TABLE 4.7-7  Potential Environmental Impacts of Livestock Grazing**

| Resource Area | Anticipated Impacts[a,b] |
|---|---|
| Air quality | Gaseous emissions and fugitive dust may be produced where livestock gather, but concentrations are expected to rapidly dissipate; grazing is not expected to exceed air quality standards. |
| Geology and soils | Grazing can reduce vegetative cover and biological soil crust (two factors in maintaining soil health and moisture content). Overgrazing removes organic matter that provides nutrients for continued plant growth; soil crust disturbance reduces nutrient cycling, water infiltration, and moisture retention. Reduction of native perennial vegetation can lead to domination of weeds. |
| Water resources | Principal surface water quality concern is accelerated sediment yield from upland soil and stream channel erosion. No impacts on groundwater or water rights were identified. |
| Ecological resources | If farmlands (prime or unique), areas of critical environmental concern, wilderness and wilderness study areas, wild and scenic rivers, wetlands and riparian zones, and floodplains are within or near a grazing allotment, further impact analysis would be required. Reauthorization of grazing permits may or may not include changes to historical levels of grazing use, and would not impair wilderness characteristics or classifications of stream segments eligible for listing as wild, scenic, or recreational. The lack of irrigation and arid climate in the region of cumulative impacts generally prevents soils from being used for private agricultural production; therefore, renewal of grazing permits will not harm the potential for future classification as Prime or Unique farmlands. Grazing may have long-term positive impacts on vegetation and controlling weed infestations. If TES species or habitats occur within or near a grazing allotment, further impact analysis would be required. Grazing may impact migratory birds through disturbance of birds and nests, causing destruction, disruption, or abandonment of the nest and influencing reproductive success; effects are greater for species that nest in vegetation types that are prone to grazing. Grazing is expected to have minimal effect on terrestrial and aquatic wildlife. If riparian areas or known wetlands occur within or near a grazing allotment, further impact analysis would be required. |
| Socioeconomics and environmental justice | No environmental justice impacts are anticipated. |
| Transportation | Grazing permits do not allow for restriction of access to or travel through public lands where legal access currently exists; renewal of grazing permits would have no impact on transportation. |
| Land use | Environmental impact of improvement rangeland management by BLM and grazing permittees is expected to be positive. |
| Recreation | Grazing permits do not allow for restriction of access to or travel through public lands where legal access currently exists; renewal of grazing permits would have no impact on recreational use. |
| Cultural resources and paleontology | Direct impacts could include trampling, chiseling, and churning of soils and cultural features and Native American Religious Concerns; artifact breakage; and impacts from standing, leaning, and rubbing against above-ground features. Indirect impacts could include erosion and potential for unlawful collection or vandalism. Continued grazing in areas of cultural site presence may contribute to substantial ground disturbance and cause irreversible adverse effects to historic properties. Potential for damage to undisturbed paleontological resources is expected to be low, as in situ fossils are seldom encountered in alluvial areas. |
| Visual and scenic resources | Renewal of grazing permits is not expected to result in visual or scenic impacts. |

BLM_0041612

**TABLE 4.7-7  (Cont.)**

| Resource Area | Anticipated Impacts[a,b] |
|---|---|
| Solid and hazardous wastes | Solid or hazardous wastes could be introduced through maintenance of range improvements (e.g., spills of fuels and lubricants from heavy equipment). Improper disposal of solid waste and improper use of hazardous substances (e.g., herbicides and pesticides) could contaminate public land. |

[a]   This table is intended to provide a summary of permitted grazing activities and broadly address potential impacts; it is not intended to strictly describe the permit actions from which they are adapted, nor can all potential impacts be quantified without site-specific analysis.

[b]   Source: BLM 2011j.

was not located. Construction on the 51-mile, 115-kV upgrade began in June 2010; the final phase of construction is scheduled to begin in May 2012 with completion of the project in fall 2012 (Tri-State 2012b). The new line will run in the approximate original alignment of the dismantled line, from the Nucla Substation, west of Naturita, to the Sunshine Substation, southwest of Telluride. Ten miles of the new line will be constructed underground, in response to landowner concerns. Construction of the new line includes modifying the Nucla and Sunshine Substations, replacing the Wilson Mesa Substation, and expanding the Norwood Substation. The San Manuel Power Authority will remove the Oak Hill and Specie Mesa Substations that supported the 69-kV line and reclaim the land (Tri-State 2012b,c).

### 4.7.2.7  Potash Exploration

The BLM Dolores Public Lands Office has received 21 permit applications from RM Potash for potash exploration, affecting 40,000 acres of land in the vicinity of Egnar, Colorado (BLM 2011d). BLM is preparing an environmental assessment to evaluate exploration drilling on some of these applications. After completing the NEPA review, BLM will determine whether the project has an impact on the surrounding environment; the decision is expected in 2012. If the permits are approved, exploratory drilling is expected to last up to four years (BLM 2011d). No leasing or development of potash resources has been proposed.

Potash exploration is also performed on lands administered by the State of Utah (BLM 2011h). Three companies produced approximately 374,000 short tons of potash in Utah in 2010; only one (Intrepid Potash-Moab) produced potash within the region of cumulative impacts (UDNR 2011).

### 4.7.2.8  Lisbon Natural Gas Processing Plant

The Lisbon Gas Plant is located approximately 35 miles south of Moab in San Juan County. Operated by Patara Midstream, LLC, it is a major source of GHG and VOC emissions in

BLM_0041613

1  the region of cumulative impacts. The plant was originally permitted by the Utah Department of
2  Environmental Quality in 2002 (UDEQ 2011).
3
4
5      **4.7.2.9  Paradox Valley Desalinization Plant**
6
7      The Paradox Valley Unit desalinization plant is located on the Dolores River, 7 miles
8  south of Bedrock. Operated by the U.S. Department of the Interior Bureau of Reclamation, the
9  plant prevents natural salt loads in groundwater from entering the Dolores River by intercepting
10 and disposing of brine via deep-well injection. Major facilities include a brine production well
11 field, brine surface treatment facility, and deep injection well (CDPHE 2011d).
12
13
14     **4.7.2.10  Cameo Station Power Plant**
15
16     In 2007, Xcel Energy announced it plans to shut down the 1,100-acre Cameo Station
17 Power Plant (near Palisade, Colorado) by the end of 2010. The plant, fueled primarily by coal
18 from nearby McClane Canyon Mine in Garfield County, operated for 53 years as a coal-fired
19 electrical generation facility until it was determined to be inefficient (KKCO 2007).
20
21     Prior to closing, Xcel Energy partnered with Abengoa Solar to develop a $4.5 million,
22 first-of-its kind experiment in hybrid coal-solar facilities. In 2009, Cameo Station was expanded
23 to include six acres of parabolic trough solar panels and began operating as a hybrid facility in
24 2010. The panels replaced the thermal energy formerly provided by coal combustion.
25 Xcel/Abengoa anticipated that the use of solar panels would reduce the amount of coal used at
26 the facility by 2–3 %, thereby reducing carbon emissions. The year-long experiment had
27 favorable results, but the solar panels didn't generate the projected thermal energy and the
28 project was not as cost affective as anticipated. The facility was closed in 2010 and dismantling
29 began in September 2011 (Xcel 2010; GJSentinel 2011, KREX 2011).
30
31
32 **4.7.3  Cumulative Impacts from the Proposed Action**
33
34     Potential impacts from the preferred alternative in this Draft PEIS are considered in
35 combination with impacts of past, present, and reasonably foreseeable future actions. For this
36 cumulative impacts analysis, past projects are generally assumed to be reflected in the affected
37 environment discussion. The summary of ongoing and planned projects or activities in the region
38 of cumulative impacts is listed in Table 4.7-8. As mentioned previously, the region of cumulative
39 impacts is conservatively assumed to be a 50-mi (80-km) radius. The regions of influence or
40 ROIs for the various resource areas are listed in Chapter 3, and for most of these resource areas,
41 a 25-mi (40-km) radius was identified as the ROI. The analyses for environmental justice and
42 human health addressed a 50-mi (80-km) radius, which is why the region of cumulative impacts
43 was extended to this larger radius.
44
45

1   **TABLE 4.7-8  Summary of Major Projects and Activities in the Region of Cumulative Impacts**

| Project | Summary | Location | Status |
|---|---|---|---|
| *Planned/Future* | | | |
| Piñon Ridge Mill uranium mine | Radiation Control Division approved application; Energy Fuels hopes to begin construction in 2012. | Paradox Valley, 7 mi. E of Naturita (Montrose Co.) | Planned |
| Book Cliff coal mine | Surface mine; proposed by CAM-Colorado. | N of Fruita (Mesa Co.) | Proposed |
| Whirlwind Mine | Underground mine. Permitted in 2008, but went on standby status a few months later. May operate again if economically viable. | Vicinity of Gateway | Planned |
| Uranium/vanadium exploration | Exploratory drilling and accompanying activities. | Various | Planned and ongoing |
| Potash exploration | Exploratory drilling for potash | Various | Under NEPA review |
| Western Area Power Administration ROW maintenance | Vegetation management to protect transmission lines | Montrose Co. Delta Co. San Juan Co. Grand Co. | Under NEPA review |
| Utility corridors | Existing and proposed utility corridors and gathering pipelines through San Juan Public Lands | Dolores Co. Montezuma Co. | Under NEPA review |
| Seismic surveys | Exploratory geophysical seismic survey, including drilling and detonation of explosives underground | Dolores Co. | Under NEPA review |
| Aerial application of fire retardant on NFS lands | Continued aerial application of fire retardant on NFS lands | Various | Under NEPA review |
| Aspinall Unit operations | Reservoir operation changes to assist in meeting flow recommendations for Gunnison and Colorado Rivers | Montrose Co. | Under NEPA review |
| Dolores River restoration treatments | Reduction of tamarisk and other invasive nonnative plant species | Various | Planned |
| Ditch Bill easements | Authorization of agricultural water conveyance facilities | Various | Under NEPA review |
| Hanging Flume Replica construction | Rebuild a collapsed section of original flume on cliff face | N of Nucla | Planned |
| *Present/Past* | | | |
| White Mesa Mill | The only conventional uranium mill currently operating in the country. | 6 mi. S of Blanding | Operational |

BLM_0041615

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                   *Do Not Distribute*

**TABLE 4.7-8  (Cont.)**

| Project | Summary | Location | Status |
|---|---|---|---|
| Uranium mines (CO) | 33 actively permitted mining projects (none actively producing in CO). | Montrose Co. San Miguel Co. Mesa Co. | Various |
| Uranium mines (UT) | Daneros, Energy Queen | San Juan Co. | Operational, inactive |
| Abandoned mine closures | Closure and reclamation of the abandoned uranium and coal mines | Various | Ongoing, planned |
| Remediation of Moab Uranium Mill tailings | Remediation of 130-acre unlined tailings pile | Grand Co. | Ongoing |
| Nucla Station power plant | 100-MW coal-fired power plant; owned by Tri-State Generation & Transmission Assoc. | Nucla | Operational |
| Lisbon natural gas processing plant | Processes natural gas and crude oil from the Lisbon Oil Field | 35 mi. S of Moab | Operational |
| New Horizon coal mine | Surface mine; exclusive coal supplier to adjacent Nucla Station; managed by Western Fuels Assoc. | Nucla | Operational |
| Nucla-Sunshine transmission line ROW amendment | Transmission line upgrade; construction began 2010, completion expected 2012 | Between Nucla and Telluride | Under construction |
| Other mineral mining | Permitted sand/gravel, borrow material, sandstone, gold, and quartz/granite mining | Various | Operational |
| Oil and gas exploration, extraction and transmission | Activity is dependent on market conditions | Various | Various |
| Grazing and grazing management | Renewal of grazing permits, analysis of range management | Various | Ongoing |
| Wildlife | Wild horse trapping/removal, habitat improvement, vegetation management, wildfire fuel reduction | San Miguel Co. Dolores Co. | Ongoing |
| Narraguinnep and Bradfield reforestation | Vegetation management | Dolores Co. | Approved |
| Canyons of the Ancients National Monument | Installation of entrance kiosks | Montezuma Co. | Approved |
| Timber sales/fuel management projects | Three ongoing and two planned | Dolores Co. Montezuma Co. | Present and planned |
| Transportation ROWs | Rights of way to access private property | Montezuma Co. | Various |
| Coal mines | Not producing or closed | Various | Closed |

1

BLM_0041616

1    The major ongoing projects listed in Table 4.7-8 that are related to uranium mining
2    activities proposed under the five alternatives evaluated in this Draft PEIS include (1) the White
3    Mesa Mill; (2) various permitted uranium mining projects in Montrose, Mesa, and San Miguel
4    Counties, none of which are currently actively producing (of the 33 noted on Table 4.7-8, a few
5    of the permits are for mines on the DOE ULP lease tracts); (3) the Daneros Energy Queen mine,
6    which is operational but currently inactive; (4) and ongoing reclamation of abandoned uranium
7    mines (these mines are not on the DOE ULP lease tracts). There are also other projects not
8    related to the uranium mining. These include the operating Nucla Station Power Plant, the
9    Lisbon Natural Gas Processing Plant, the New Horizon coal mine, other mineral mining projects
10   (for sand, gravel, gold, quartz, and granite), oil and gas exploration, transmission line and
11   transportation ROW projects, grazing, wildlife and vegetation management projects, and
12   National Monument improvement projects.
13
14   Several uranium-mining-related projects are also planned, as listed in Table 4.7-8. These
15   include the planned Piñon Ridge Mill and the Whirlwind Mine in Gateway. Other planned or
16   proposed projects include the Bookcliff coal mine near Fruita in Mesa County, a ROW
17   maintenance project for the Western Area Power Administration, reduction of tamarisk and other
18   invasive non-native plant species, and planned restoration of a section of the Hanging Flume
19   located north of Nucla.
20
21   The environmental impacts discussed in Chapter 4 (also summarized in Section 2.4)
22   indicate that potential impacts on the resource areas evaluated for the five alternatives would be
23   small and could be further minimized by the implementation of best management practices or
24   mitigation measures determined in project-specific mine plans. Estimates for potential human
25   health impacts indicate that the emission of radon would be the primary source of potential
26   human health radiation exposure. However, requirements for monitoring and ventilation of mine
27   operations and for worker safety are expected to mitigate potential impacts on human health. The
28   potential radon dose estimates presented in this Draft PEIS were obtained by using a
29   conservative value for the radon emission rate, which is a sensitive input parameter, and by using
30   conservative assumptions with regard to the number of mines that would operate at the same
31   time and the number of years of operation. The actual radon dose could be much lower if
32   measured radon data and the actual number of years of operation were used to obtain the radon
33   exposure estimates.
34
35   Although the various present, ongoing, and planned projects identified in the region of
36   cumulative impacts could contribute to impacts on the various environmental resource areas
37   evaluated, it is expected that uranium-mining-related projects would be most similar with respect
38   to the types of potential environmental impacts that could occur, and most are located closer to
39   (within 25 mi or 40 km) the lease tracts. Available information regarding potential impacts from
40   these various projects is summarized in Sections 4.7.1 and 4.7.2; however, information for most
41   of the projects is either not available or qualitative in nature.
42
43   Potential impacts from the proposed action would generally be small. Those related to
44   noise, land use, soil quality, cultural resources, visual resources, waste management, and
45   environmental justice are considered to be more localized; hence, potential cumulative impacts

BLM_0041617

1   tabulated in Table 4.7-9 focus on air quality, water quality, human health, ecological resources,
2   socioeconomics, and transportation. The potential impacts from the preferred alternative
3   (Alternative 4) are tabulated in Table 4.7-9, along with impacts from several of the major
4   uranium-mining-related projects discussed in Sections 4.7.1 and 4.7.2. Potential impacts from
5   other larger projects (e.g., oil and gas exploration; coal mines) can be gleaned from Tables 4.7-3
6   and 4.7-7.
7
8       It is difficult to determine an overall cumulative impact that incorporates all the potential
9   impacts from the vast number of projects discussed for the region of cumulative impact
10  described in this section. In addition to a lack of information on most of the projects, in many
11  cases, if information is available, it is highly qualitative in nature. When calculation results or
12  estimates are presented (e.g., for air emissions, human health doses, transportation, and
13  socioeconomics in Table 4.7-9), the methodology and associated assumptions used for the
14  calculations could vary and make definitive comparisons or conclusions difficult to make. The
15  potential impacts under the preferred alternative are based on conservative assumptions made for
16  the purposes of the analyses for the Draft PEIS and largely did not take credit for mitigation
17  measures. Hence, it is expected that potential impacts based on implementation of specific
18  projects would be lower than those discussed in Chapter 4 as mitigation measures would be
19  identified as needed. Mining projects for the DOE ULP would be planned and implemented by
20  using best management practices identified, as needed, to prevent or minimize any impacts and
21  meet applicable federal, state, and local requirements.
22
23      Based on the information in Table 4.7-9 and other information presented in Sections 4.7.1
24  and 4.7.2, the potential cumulative impacts on air quality, water quality, ecological resources,
25  socioeconomics, transportation, and human health from uranium-mining-related projects would
26  result in overall impacts that would not exceed applicable standards, with the use of best
27  management practices or mitigation measures. Contributions to environmental impacts from the
28  other non-uranium-related projects are not expected to result in exceedance of applicable federal,
29  state, and local requirements.
30
31

BLM_0041618

1  **TABLE 4.7-9  Potential Impacts of Select Projects Considered with the DOE ULP Proposed Action**

| Resource Area | DOE ULP Preferred Alternative | White Mesa Mill (Present) | Pinon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|
| Air quality | Potential impacts are anticipated to be small, with $PM_{10}$ and $NO_x$ emissions estimated to be no higher than about 3% and 2% of the three-county (Mesa, Montrose, and San Miguel) total, respectively. | Particulate emissions at the site boundary would be below air quality standards. | $PM_{10}$ emissions would not exceed regulatory limits. No significant dust or fume emissions are expected from transportation of uranium ore or hazardous materials. | An increase in fugitive dust would result but would not be expected to exceed ambient air quality standards. |
| Water resources | Proposed ULP activities on some lease tracts have the potential to affect water quality in the Dolores and San Miguel Rivers due to erosion but would be mitigated with implementation of best management practices consistent with regulatory requirements. | There would be a minimal impact on surface water resources. There is no discharge of mill effluents or sanitary wastes to surface waters. | Impacts could include erosion of stormwater channels and reduction of surface water flow to the Dolores River. | Impacts on groundwater and surface water are considered minimal to negligible if proper water treatment, transport, and storage practices are implemented. |
| Human health | Potential radiation dose from radon to a nearby resident located in the most dominant wind direction could exceed 10 mrem/yr based on conservative assumptions and input parameters used for the estimates. As discussed, calculations based on actual measurements or project-specific data or information would result in much lower estimates. | Dose to nearest potential residence was calculated to be 5.8 mrem/yr. | Estimated dose to a receptor at the site boundary is about 8.2 mrem/yr (including radon). Estimated dose to nearest downwind off-site receptor is 0.5 mrem/yr. | No impacts on human health are predicted with proper implementation of EPA guidelines and MHSA regulations |

2

Preliminary Draft PEIS
PEIS Team Use Only

PEIS Privileged Information
Do Not Distribute

May 2012

Preliminary Draft PEIS
PEIS Team Use Only

PEIS Privileged Information
Do Not Distribute

May 2012

**TABLE 4.7-9  (Cont.)**

| Resource Area | DOE ULP Preferred Alternative | White Mesa Mill (Present) | Pinon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|
| Ecological resources | Potential impacts on vegetation would be small to moderate within a 25-mi (40-km) study area. Potential localized impacts on wildlife and aquatic biota would be negligible to moderate and would not affect the viability of the wildlife population. Potential impacts on threatened, endangered, and sensitive species would be small to moderate for the short term and long term. | Loss of habitat for terrestrial biota (including vegetation and wildlife) is expected to be small. Increased human activity might cause wildlife to migrate away from the mill site. No impacts on endangered plant or animal species are expected. | Indirect impacts from vegetation could occur if the project displaced herbivores or if invasive non-native species became established in disturbed areas. No federally threated, endangered, or candidate species were observed during wildlife surveys, and no state species of concern were observed. Four habitats of importance to area wildlife were identified on the project site; contents of evaporation ponds and tailing cells could be toxic to invading threatened and endangered species. | Approximately 24 acres of pinyon and animal habitat would be disturbed, which is considered a minimal reduction of habitat and food supply. Impacts on wildlife are expected to be minimal to negligible with proper management practices. |
| Socioeconomics | About 333 direct and 188 indirect jobs could be created. | About 85 jobs would be created to support operations of the mill. | As many as 538 direct and 664 indirect jobs could be created. Increased availability of local services could lead to expansion of recreation and tourism in the area. An association of negative impacts from mining/milling on recreation and tourism has not been demonstrated | 10 to 24 full-time, year-round jobs could result, with most positions expected to be filled by local hires. |

BLM_0041620

**TABLE 4.7-9  (Cont.)**

| Resource Area | DOE ULP Preferred Alternative | White Mesa Mill (Present) | Pinon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|
| Transportation | Approximately 80 round-trip uranium ore truck shipments would occur per weekday—about 2.1 million mi (3.4 million km), primarily on State Highways CO 90 and CO 141 and on US 141 and US 191. | Traffic volume on area highways would increase substantially, increasing traffic congestion. | Average daily traffic on State Highways 90 and 141 would increase by 40%; CDOT does not consider the increase in traffic to be large. The condition of certain unimproved roads could worsen from use by increased mill traffic | Increased traffic is expected on local roads. Increases of 14 light-vehicle and 9 heavy-vehicle round-trips are expected per day. |

[a] Taken from impacts discussed for the Whirlwind Mine. Impact information is also presented for the Daneros Mine in Table 4.7-5; the report for the Daneros Mine indicated that none of the impacts discussed are considered significant.

1

Preliminary Draft PEIS
PEIS Team Use Only

PEIS Privileged Information
Do Not Distribute

May 2012

BLM_0041621

# 5  APPLICABLE LAWS AND REQUIREMENTS

This chapter presents the laws and other requirements that could affect implementation of the alternatives for managing the ULP described in this Draft PEIS.

A number of federal environmental laws could potentially affect environmental protection, health, safety, compliance, and consultation at the lease tracts discussed in this Draft PEIS. In addition to certain environmental requirements that have been delegated to state authorities for enforcement and implementation, state legislatures have adopted laws to protect health and safety and the environment. County governments often use the powers delegated to them to pass ordinances and plans to protect their citizens and resources. It is DOE policy to conduct its operations in a manner that ensures the protection of public health, safety, and the environment through compliance with all applicable federal, state, and county requirements.

Federal environmental, cultural, and health and safety laws are summarized in Section 5.2; Executive Orders are covered in Section 5.3; and DOE Orders are covered in Section 5.4. State of Colorado potentially applicable laws are listed in Section 5.5; ordinances and plans for Mesa, Montrose, and San Miguel Counties in Colorado, where the lease tracts are located, are presented in Section 5.6.

## 5.1  BACKGROUND

Requirements governing the management of lease tracts for the exploration, mine development and operations, and reclamation of uranium mines arise primarily from the following sources: the U.S. President (in Executive Orders), Congress, DOE, and state and county legislative bodies. In general, federal statutes establish national policies, create broad legal requirements, and authorize federal agencies to create regulations that conform to the statutes. Detailed implementation of these statutes is delegated to various federal agencies such as DOE, the U.S. Department of the Interior (DOI), and the U.S. Environmental Protection Agency (EPA). For many environmental laws under EPA jurisdiction, state agencies may be delegated responsibility for the majority of program implementation activities, such as permitting and enforcement, but the EPA usually retains oversight of the delegated program.

Some applicable laws, such as the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), and the Emergency Planning and Community Right-to-Know Act, require specific reports and/or consultations rather than permits. Other applicable laws, such as the Comprehensive Environmental Response, Compensation, and Liability Act and the Federal Insecticide, Fungicide, and Rodenticide Act, establish general requirements that must be satisfied during site operation and closeout.

Executive Orders establish policies and requirements for federal agencies; their requirements may be applicable to nonfederal entities through contract or lease terms. They do not have the general applicability of statutes.

BLM_0041622

1    State statutes implement and supplement federal laws for protection of air and water
2  quality and may address solid waste management programs, locally rare or endangered species,
3  and local resources with historic and cultural value. County regulations or ordinances are passed
4  to protect county resources and the health and safety of county residents.
5
6    The lease tracts discussed in the PEIS are located on property controlled by DOE, but
7  access to them may be controlled by other agencies of the federal government, such as the
8  U.S. Department of Interior's Bureau of Land Management (BLM). DOE has the authority to
9  regulate some environmental activities and the health and safety aspects of the operations of its
10  nuclear facilities. The Atomic Energy Act (AEA) of 1954, as amended, is the principal authority
11  for DOE's regulatory activities. DOE exercises its regulatory authority primarily through the use
12  of DOE directives and regulations.
13
14
15  **5.2  APPLICABLE FEDERAL LAWS AND REGULATIONS**
16
17    This section describes the federal environmental, cultural, safety, and health laws that
18  could apply to the No Action Alternative and the alternatives for ULP management.
19
20
21    **American Indian Religious Freedom Act of 1978 (42 USC 1996).** This act
22  (abbreviated AIRFA) reaffirms American Indian religious freedom under the First Amendment
23  and sets U.S. policy to protect and preserve the inherent and constitutional right of American
24  Indians to believe, express, and exercise their traditional religions. The Act requires that federal
25  actions avoid interfering with access to sacred locations and traditional resources that are integral
26  to the practice of tribal religions.
27
28
29    **Antiquities Act of 1906, as amended (16 USC 431 to 433).** This act protects historic
30  and prehistoric ruins, monuments, and antiquities, including paleontological resources, on
31  federally controlled lands from appropriation, excavation, injury, and destruction without
32  permission.
33
34
35    **Archaeological and Historic Preservation Act of 1974, as amended (16 USC 469**
36  **to 469c).** This act provides for the preservation of historical and archaeological data (including
37  relics and specimens) that might otherwise be irreparably lost or destroyed as the result of federal
38  actions. Under the law, federal agencies must notify the Secretary of Interior whenever they find
39  that a federal project may cause loss or destruction of significant scientific, prehistoric, or
40  archeological data.
41
42
43    **Archaeological Resources Protection Act of 1979, as amended (16 USC 470 et seq.).**
44  This act requires a permit for any excavation or removal of archaeological resources from federal
45  or American Indian lands. Excavations must be undertaken for the purpose of furthering

BLM_0041623

1   archaeological knowledge in the public interest, and resources removed remain the property of
2   the United States.
3
4
5       **Atomic Energy Act of 1954 (42 USC 2011 et seq.).** The AEA provides the statutory
6   framework for DOE, as the successor agency to the U.S. Atomic Energy Commission, to ensure
7   a supply of domestic uranium adequate to meet the defense needs of the United States. The AEA
8   also authorizes DOE to exercise regulatory authority over activities it conducts or those
9   conducted on its behalf. An extensive system of standards and requirements has been established
10  through DOE directives to protect health and minimize danger to life and property from activities
11  under DOE's jurisdiction.
12
13
14      **Bald and Golden Eagle Protection Act of 1973, as amended (16 USC 668 through
15  668d).** The Bald and Golden Eagle Protection Act, as amended, makes it unlawful to take,
16  pursue, molest, or disturb bald (American) and golden eagles, their nests, or their eggs anywhere
17  in the United States. The DOI regulates activities that might adversely affect bald and golden
18  eagles.
19
20
21      **Clean Air Act of 1970, as amended (42 USC 7401 et seq.).** The Clean Air Act (CAA) is
22  intended to "protect and enhance the quality of the nation's air resources so as to promote the
23  public health and welfare and the productive capacity of its population." Section 118 of the act
24  requires that each federal agency with jurisdiction over any property or facility engaged in any
25  activity that might result in the discharge of air pollutants comply with "all federal, state,
26  interstate, and local requirements" with regard to the control and abatement of air pollution.
27
28
29      Section 109 of CAA directs the EPA to set National Ambient Air Quality Standards
30  (NAAQS) for criteria pollutants. These standards were established for particulate matter (PM),
31  sulfur dioxide ($SO_2$), carbon monoxide (CO), ozone ($O_3$), nitrogen dioxide ($NO_2$), and lead.
32  Section 111 of the CAA requires the establishment of national standards of performance for new
33  or modified stationary sources of atmospheric pollutants, and Section 160 requires that specific
34  emission increases be evaluated prior to permit approval to prevent significant deterioration of
35  air quality. Specific standards for releases of hazardous air pollutants (including radionuclides)
36  are required per Section 112. Radionuclide emissions are regulated under the National Emission
37  Standards for Hazardous Air Pollutants (NESHAP) Program under 40 CFR Part 61.
38
39
40      **Clean Water Act of 1972, as amended (33 USC 1251 et seq.).** This act (abbreviated
41  CWA) provides water quality standards for the nation's waterways, guidelines and limitations
42  for effluent discharges from point-source discharges, and the National Pollutant Discharge
43  Elimination System (NPDES) permit program that is administered by the EPA. Sections 401
44  through 405 of the Water Quality Act of 1987 added Section 402(p) to the CWA, which requires
45  the EPA to establish regulations for permits for stormwater discharges associated with industrial

BLM_0041624

1  activities. Section 404 of the CWA requires permits for the discharge of dredge or fill materials
2  into navigable waters.
3
4
5  **Comprehensive Environmental Response, Compensation, and Liability Act of 1980**
6  **(42 USC 9604; also known as Superfund).** This act (abbreviated CERCLA) provides authority
7  for federal and state governments to respond directly to hazardous substance incidents. The act
8  requires reporting of spills, including radioactive spills, to the National Response Center.
9
10
11  **Endangered Species Act of 1973, as amended (16 USC 1531 et seq.).** The ESA
12  provides a program for the conservation of threatened and endangered species and the
13  ecosystems on which those species rely. The act is intended to prevent the further decline of
14  endangered and threatened species and to restore those species and their critical habitats. Section
15  6 requires federal agencies to ensure that any action authorized, funded, or carried out by them is
16  not likely to jeopardize the continued existence of listed species or modify their critical habitat.
17
18
19  **Emergency Planning and Community Right-to-Know Act of 1986**
20  **(USC 11001 et seq.; also known as Superfund Amendments and Reauthorization Act**
21  **[SARA] Title III).** This Act (abbreviated EPCRA) requires emergency planning and notice to
22  communities and government agencies concerning the presence and release of specific
23  chemicals. EPCRA's provisions help increase the public's knowledge and access to information
24  on chemicals at individual facilities, their uses, and releases into the environment. States and
25  communities can use the information to improve chemical safety and protect public health and
26  the environment.
27
28
29  **Federal Insecticide, Fungicide, and Rodenticide Act (7 USC 136 et seq.).** This act
30  (abbreviated FIFRA) regulates the use, registration, and disposal of several classes of pesticides
31  to ensure that they are applied in a manner that protects the public, workers, and the
32  environment. Implementing regulations include recommended procedures for the disposal and
33  storage of pesticides and worker protection standards.
34
35
36  **Federal Mine Safety and Health Act of 1977, as amended (30 USC 801 et seq.).** The
37  Federal Mine Safety and Health Act authorizes the Secretary of Labor to establish mandatory
38  health and safety standards for mines, including related surface operations. The act defines a
39  mine as "(a) an area of land from which minerals are extracted in nonliquid form or, if in liquid
40  form, are extracted with workers underground, (b) private ways and roads appurtenant to such
41  [an] area, and (c) lands, excavations, underground passageways, shafts, slopes, tunnels and
42  workings, structures, facilities, equipment, machines, tools, or other property including
43  impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to
44  be used in, or resulting from, the work of extracting such minerals from their natural deposits in
45  nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the

BLM_0041625

1  milling of such minerals, or the work of preparing coal or other minerals, and includes custom
2  coal preparation facilities."
3
4
5       **Fish and Wildlife Coordination Act (16 USC 661 et seq.).** The Fish and Wildlife
6  Coordination Act promotes effective planning and cooperation among federal, state, public, and
7  private agencies for the conservation and rehabilitation of the nation's fish and wildlife. The act
8  requires consultation with the U.S. Fish and Wildlife Service (USFWS) and state authorities
9  whenever a federal action involves impounding, diverting, channel deepening, or otherwise
10 controlling or modifying the waters of any stream or other body of water.
11
12
13      **Federal Land Policy and Management Act, as amended (43 USC 1701 et seq.).** This
14 act is the principal law governing how the BLM manages public lands. It guides the BLM in
15 managing, protecting, developing, and enhancing public land and specifically requires the
16 agency to manage public land resources for multiple uses and sustained yield for both present
17 and future generations. The act governs the issuance of rights-of-way (ROWs) on public land
18 and reclamation of public land.
19
20
21      **Noxious Weed Act of 1974, as amended (7 USC 2801 et seq.).** The act authorizes the
22 Secretary of Agriculture to designate plants as noxious weeds by regulation. The movement of
23 all such designated weeds in interstate or foreign commerce is prohibited except under permit.
24 The 1990 amendment requires federal agencies to develop and adequately fund a program for
25 managing undesirable plants in order to control these plants on federal lands under their
26 jurisdiction.
27
28
29      **Migratory Bird Treaty Act of 1918, as amended (16 USC 703 et seq.).** This act, as
30 amended, is intended to protect birds that have common migration patterns between the
31 United States and Canada, Mexico, Japan, and Russia. The act stipulates that it is unlawful at any
32 time, by any means, or in any manner to "kill any migratory bird unless and except as permitted
33 by regulation."
34
35
36      **National Environmental Policy Act of 1969, as amended (42 USC 4321 et seq.).**
37 NEPA establishes a national policy that promotes the awareness of the consequences of human
38 activity on the environment and the consideration of environmental impacts during the planning
39 and decision-making stages of a project. It requires federal agencies to prepare an environmental
40 impact statement (EIS) for "major federal actions significantly affecting the quality of the human
41 environment."
42
43
44      **National Historic Preservation Act of 1966, as amended (16 USC 470 et seq.).** This
45 Act (abbreviated NHPA) provides that sites with significant national historic value be placed on

BLM_0041626

1  the *National Register of Historic Places* (NRHP) maintained by the Secretary of the Interior.
2  Section 106 of the act requires a federal agency to determine whether its proposed undertaking is
3  the type of activity that could affect historic properties. If so, the agency must consult with the
4  appropriate State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Officer. If
5  an adverse effect is found, the consultation often ends with the execution of a Memorandum of
6  Agreement (MOA) that indicates how the adverse effect will be resolved.
7
8
9  **Native American Graves Protection and Repatriation Act of 1990 (25 USC 3001).**
10  This act (abbreviated NAGPRA) establishes a means for American Indians to request the return
11  or repatriation of human remains and other cultural items presently held by federal agencies or
12  federally assisted museums or institutions. The act also contains provisions regarding the
13  intentional excavation and removal of, inadvertent discovery of, and illegal trafficking in
14  American Indian human remains and cultural items. The law requires the establishment of a
15  review committee with monitoring and policy-making responsibilities, the development of
16  regulations for repatriation, and the development of procedures to handle unexpected discoveries
17  of graves or grave items during activities on federal or tribal lands. All federal agencies that
18  manage land and/or are responsible for archaeological collections obtained from their lands or
19  generated by their activities must comply with NAGPRA.
20
21
22  **Noise Control Act of 1972, as amended (42 USC 4901 et seq.).** Section 4 of the Noise
23  Control Act of 1972, as amended, directs all federal agencies to carry out "to the fullest extent
24  within their authority" programs within their jurisdictions in a manner that furthers a national
25  policy that promotes an environment free from noise that would jeopardize health and welfare.
26
27
28  **Occupational Safety and Health Act of 1970 (29 USC 651 et seq.).** This Act
29  (abbreviated as OSHA) establishes standards for safe and healthful working conditions in places
30  of employment throughout the United States. The act is administered and enforced by the
31  Occupational Safety and Health Administration in the U.S. Department of Labor.
32
33
34  **Paleontological Resources Preservation Act (16 USC 470aaa et seq.).** This act
35  promotes the preservation and use of paleontological resources on federal lands by prohibiting
36  the following: (1) taking or damaging paleontological resources located on federal lands without
37  a permit or permission, (2) selling or purchasing such resources received from federal lands, and
38  (3) submitting false records or identification for such resources removed from federal lands.
39
40
41  **Pollution Prevention Act of 1990 (42 USC 13101 et seq.).** This act establishes a
42  national policy for waste management and pollution control. Source reduction is given first
43  preference, followed by environmentally safe recycling, then by treatment, and finally by
44  disposal.
45

BLM_0041627

1    **Resource Conservation and Recovery Act of 1976, as amended**
2    **(42 USC 6901 et seq.).** Under this act (abbreviated RCRA), which amended the Solid Waste
3    Disposal Act of 1965, the EPA defines and identifies hazardous waste; establishes standards for
4    its transportation, treatment, storage, and disposal; and requires permits for persons engaged in
5    hazardous waste activities. Section 3006 of RCRA allows states to establish and administer these
6    permit programs with EPA approval. The Federal Facility Compliance Act of 1992
7    (42 USC 6961 et seq.) amended RCRA to require that all federal agencies having jurisdiction
8    over a solid waste facility or disposal site, or engaged in the management of solid or hazardous
9    waste, are subject to all applicable federal, state, and local laws, regulations, and ordinances
10   addressing solid and hazardous waste.

11
12
13   **Safe Drinking Water Act of 1974, as amended (42 USC 300(f) et seq.).** The primary
14   objective of the Safe Drinking Water Act (SDWA) is to protect the quality of public drinking
15   water supplies and sources of drinking water. The implementing regulations, administered by the
16   EPA unless delegated to states, establish standards applicable to public water systems. These
17   regulations include maximum contaminant levels (including those for radioactivity) in public
18   water systems that have at least 15 service connections used by year-round residents or that
19   regularly serve at least 25 year-round residents.

20
21
22   **Toxic Substances Control Act of 1976 (15 USC 2601 et seq.).** This act (abbreviated
23   TSCA) provides the EPA with the authority to require testing of chemical substances entering
24   the environment and to regulate them as necessary. The law complements and expands existing
25   toxic substance laws such as Section 112 of the CAA and Section 307 of the CWA. TSCA
26   requires compliance with inventory reporting and chemical control provisions of the legislation
27   to protect the public from the risks of exposure to chemicals.

28
29
30   **Wild and Scenic Rivers Act (16 USC 1271 et seq.).** The act establishes a National Wild
31   and Scenic Rivers System and prescribes the methods and standards through which additional
32   rivers may be added to the system. Rivers may be designated by Congress or, under certain
33   conditions, the Secretary of the Interior; designated segments need not include the entire river.
34   Each river is administered by either a federal or state agency; for federally administered rivers in
35   the lower 48 states, the designated boundaries generally average one quarter mile on either bank
36   in order to protect river-related values.

37
38
39   **5.3  APPLICABLE EXECUTIVE ORDERS**
40
41   This section identifies environmental-, health-, and safety-related Executive Orders
42   applicable to the No Action Alternative and the alternatives for managing the ULP discussed in
43   this PEIS.
44
45

BLM_0041628

1    **Executive Order 11514 (Protection and Enhancement of Environmental Quality,**
2    **March 5, 1970), as amended by Executive Order 11991 (May 24, 1977).** This Order requires
3    federal agencies to (1) continually monitor and control their activities in order to protect and
4    enhance the quality of the environment and (2) develop procedures to ensure the fullest
5    practicable provision of timely public information and to ensure that federal plans and programs
6    that might have potential environmental impacts are understood so that the views of interested
7    parties can be obtained.
8
9
10   **Executive Order 11593 (Protection and Enhancement of the Cultural Environment,**
11   **May 13, 1971).** This order directs federal agencies to locate, inventory, and nominate qualified
12   properties under their jurisdiction or control to the NRHP. The federal agencies are also to
13   initiate procedures to provide for the maintenance, rehabilitation, or restoration of sites on the
14   NRHP.
15
16
17   **Executive Order 11988 (Floodplain Management, May 24, 1977).** This order,
18   implemented by DOE in 10 CFR Part 1022, requires federal agencies to establish procedures to
19   ensure that the potential effects of flood hazards and floodplain management are considered for
20   any action undertaken in a floodplain, and that adverse impacts on floodplains be avoided to the
21   extent practicable.
22
23
24   **Executive Order 11990 (Protection of Wetlands, May 24, 1977).** This order directs
25   federal agencies to avoid new construction in wetlands unless there is no practicable alternative
26   and unless the proposed action includes all practicable measures to minimize harm to wetlands
27   that might result from such use. DOE requirements for complying with procedures for reviewing
28   wetlands activity are outlined in 10 CFR Part 1022.
29
30
31   **Executive Order 12088 (Federal Compliance with Pollution Control Standards,**
32   **October 13, 1978, as amended by Executive Order 12580, Superfund Implementation,**
33   **January 23, 1987).** This order directs federal agencies to comply with applicable administrative
34   and procedural pollution control standards established by, but not limited to, the CAA, Noise
35   Control Act, CWA, SDWA, TSCA, and RCRA.
36
37
38   **Executive Order 12656 (Assignment of Emergency Preparedness Responsibilities,**
39   **November 18, 1988).** This order assigns emergency preparedness responsibilities to federal
40   departments and agencies.
41
42
43   **Executive Order 12898 (Federal Actions to Address Environmental Justice in**
44   **Minority Populations and Low-Income Populations, February 11, 1994).** This order requires
45   each federal agency to identify and address any disproportionately high and adverse human

BLM_0041629

1  health or environmental effects of its programs, policies, and activities on minority and low-
2  income populations.
3
4
5      **Executive Order 13007 (Indian Sacred Sites, May 24, 1996).** This order directs federal
6  agencies that are managing federal lands—to the extent that is practicable, permitted by law, and
7  not clearly inconsistent with essential agency functions—to (1) accommodate access to and
8  ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely
9  affecting the physical integrity of such sacred sites.
10
11
12     **Executive Order 13045 (Protection of Children from Environmental Health Risks**
13  **and Safety Risks, April 21, 1997), as amended by Executive Order 13296 (April 18, 2003).**
14  This order requires each federal agency to make it a high priority to identify and assess
15  environmental health risks and safety risks that may disproportionately affect children and to
16  ensure that its policies, programs, activities, and standards address disproportionate
17  environmental health risks or safety risks to children.
18
19
20     **Executive Order 13112 (Invasive Species, February 3, 1999).** This order requires
21  federal agencies to prevent the introduction of invasive species; to provide for their control; and
22  to minimize their economic, ecological, and human health impacts.
23
24
25     **Executive Order 13175 (Consultation and Coordination with Indian Tribal**
26  **Governments, November 6, 2000).** This order requires federal agencies to consult, to the
27  greatest extent practicable and to the extent permitted by law, with tribal governments prior to
28  taking actions that affect federally recognized tribal governments. Federal agencies must also
29  assess the impact of federal government plans, projects, programs, and activities on tribal trust
30  resources and assure that tribal government rights and concerns are considered during the
31  development of such plans, projects, programs, and activities.
32
33
34     **Executive Order 13186 (Responsibilities of Federal Agencies to Protect Migratory**
35  **Birds, January 10, 2001).** This order requires each federal agency that takes actions that have,
36  or are likely to have, a measurable negative effect on migratory bird populations to develop and
37  implement, by 2003, a Memorandum of Understanding (MOU) with the USFWS that promotes
38  the conservation of migratory bird populations.
39
40
41     **Executive Order 13287 (Preserve America, March 3, 2003).** This order requires
42  federal agencies, to the extent practicable, permitted by law, and not clearly inconsistent with
43  essential agency functions, to protect and enhance the care and management of cultural and
44  natural heritage assets in their care.
45

BLM_0041630

*Preliminary Draft PEIS*
*PEIS Team Use Only*

*PEIS Privileged Information*
*Do Not Distribute*

*May 2012*

1   **Executive Order 13423 (Strengthening Federal Environmental, Energy, and**
2   **Transportation Management, January 26, 2007).** This order requires federal agencies to lead
3   by example in advancing the nation's energy security and environmental performance by
4   achieving specific goals in the following areas: energy efficiency, greenhouse gas reduction,
5   renewable energy use, reduction in water consumption, acquisition of environmentally preferable
6   products, reduction in the use of toxic and hazardous chemicals and materials, high-performance
7   and sustainable building, reduction in petroleum use, use of alternative fuels, and electronics
8   management. Federal agencies are also required to maintain cost-effective waste prevention and
9   recycling programs at their facilities.
10
11
12   **Executive Order 13514 (Federal Leadership in Environmental, Energy, and**
13   **Economic Performance, October 5, 2009).** This order builds upon Executive Order 13423 by
14   establishing quantitative goals for water use reduction, waste diversion, and the purchase of
15   environmentally preferable products and services and by requiring that federal agencies develop
16   and achieve agency-specific targets for reducing greenhouse gas emissions.
17
18
19   **5.4  APPLICABLE U.S. DEPARTMENT OF ENERGY DIRECTIVES**
20
21   The AEA authorizes DOE to establish standards to protect health and minimize the
22   dangers to life or property from activities under DOE's jurisdiction. The major DOE directives
23   pertaining to the alternatives in this PEIS are described below.
24
25
26   **DOE Order 144.1, American Indian Tribal Government Interactions and Policy**
27   **(January 16, 2009).** This order communicates departmental, programmatic, and field
28   responsibilities for interacting with American Indian governments; transmits DOE's American
29   Indian and Alaska Native Tribal Government Policy, including its guiding principles; and
30   transmits the framework for implementation of the policy.
31
32
33   **DOE Order 151.1C, Comprehensive Emergency Management System (November 2,**
34   **2005).** This order establishes policy and assigns and describes roles and responsibilities for the
35   DOE Emergency Management System. The Emergency Management System provides the
36   framework for development, coordination, control, and direction of all emergency planning,
37   preparedness, readiness assurance, response, and recovery actions.
38
39
40   **DOE O 232.2, Occurrence Reporting and Processing of Operations Information**
41   **(August 30, 2011).** This Order promotes organizational learning consistent with DOE's
42   Integrated Safety Management (ISM) system goal of enhancing mission safety and sharing
43   effective practices to support continuous improvement and adaptation to change. Such learning
44   should ensure that personnel are informed about events that could adversely affect the health and
45   safety of the public or the workers, the environment, DOE missions, or the credibility of DOE.

BLM_0041631

1     **DOE O 410.2, Management of Nuclear Materials (August 17, 2009).** This order
2 establishes requirements for the life-cycle management of DOE-owned and/or DOE-managed
3 accountable nuclear materials. Uranium is an accountable nuclear material.
4
5
6     **DOE Order 414.1D, Quality Assurance (April 25, 2011).** The order establishes
7 principles to ensure that products and services meet or exceed customers' expectations and to
8 assure the quality of all work.
9
10
11     **DOE Order 420.1B, Facility Safety (December 22, 2005).** This order establishes
12 facility safety requirements related to nuclear safety design, criticality safety, fire protection, and
13 the mitigation of hazards related to natural phenomena.
14
15
16     **DOE O 422.1, Conduct of Operations (June 29, 2010).** This order defines the
17 requirements for establishing and implementing conduct of operations programs at DOE
18 facilities and projects.
19
20
21     **DOE Order 430.1B, Real Property Asset Management (September 24, 2003;**
22 **Change 1, February 8, 2008).** This order establishes a corporate, holistic, and performance-
23 based approach to real property life-cycle asset management that links real property asset
24 planning, programming, budgeting, and evaluation to program mission projections and
25 performance outcomes. This order also identifies requirements and establishes reporting
26 mechanisms and responsibilities for real property asset management.
27
28
29     **DOE O 436.1, Departmental Sustainability (May 02, 2011).** This order defines
30 requirements and responsibilities to ensure that DOE carries out its missions in a sustainable
31 manner that addresses national energy security and global environmental challenges, institutes
32 wholesale cultural change to factor sustainability and greenhouse gas reductions into all DOE
33 corporate management decisions, and achieves the sustainability goals established in its Strategic
34 Sustainability Performance Plan.
35
36
37     **DOE Order 440.1B, Worker Protection Program for DOE (Including National**
38 **Nuclear Security Administration) Federal Employees (May 17, 2007).** This order establishes
39 the framework for an effective worker protection program that reduces or prevents injuries,
40 illnesses, and accidental losses by providing DOE federal employees with safe and healthful
41 workplaces.
42
43
44     **DOE O 450.2, Integrated Safety Management (Apr 25, 2011).** This order ensures that
45 DOE systematically integrates safety into management and work practices at all levels so that

BLM_0041632

1  missions are accomplished efficiently and workers, the public, and the environment are
2  protected.
3
4
5       **DOE Order 451.1B, National Environmental Policy Act Compliance Program**
6  **(October 26, 2000; Change 2, June 25, 2010).** This order establishes internal requirements and
7  responsibilities for implementing NEPA, the Council on Environmental Quality's (CEQ's)
8  regulations that implement the procedural provisions of NEPA (40 CFR Parts 1500–1508), and
9  DOE's NEPA implementing procedures (10 CFR Part 1021). Establishing these requirements
10 and responsibilities ensures the efficient and effective implementation of DOE's NEPA
11 responsibilities by ensuring teamwork, controlling the NEPA process's implementation cost and
12 time, and maintaining quality.
13
14
15      **DOE O 458.1, Radiation Protection of the Public and the Environment (June 6,**
16 **2011).** This order establishes requirements to protect the public and the environment against
17 undue risk from radiation associated with radiological activities conducted under the control of
18 DOE pursuant to the AEA of 1954, as amended.
19
20
21      **DOE O 470.4B, Safeguards and Security Program (July 26, 2011).** This order
22 establishes responsibilities and program planning and management requirements for the DOE
23 Safeguards and Security Program.
24
25
26      **DOE O 474.2, Nuclear Materials Control and Accountability (June 27, 2011).** This
27 order establishes performance objectives, metrics, and requirements for developing,
28 implementing, and maintaining a nuclear material control and accountability program within
29 DOE.
30
31
32 **5.5  STATE OF COLORADO ENVIRONMENTAL LAWS**
33
34      Certain environmental requirements have been delegated to state authorities for
35 implementation and enforcement. It is DOE policy to conduct its operations in an
36 environmentally safe manner that complies with all applicable laws and standards, including
37 state laws. A list of state environmental laws potentially applicable to the No Action Alternative
38 and the ULP management alternatives discussed in this PEIS is provided in Table 5.5-1.
39
40
41

BLM_0041633

1   **TABLE 5.5-1  Potentially Applicable State Requirements**

| Law | Citation | Requirement |
|---|---|---|
| Agreements for Transfer of Functions from Federal Government to State Government | *Colorado Revised Statutes* (CRS), Title 25, "Health," Article 11, "Radiation Control," Section 102, Agreements for transfer of functions from federal government to state government | Authorizes the governor to enter into agreements with the federal government allowing the state to assume responsibilities within the state relating to the protection of persons and property from the hazards of radioactive materials and other sources of radiation. |
| Colorado Air Pollution Prevention and Control Act | CRS, Title 25, "Health," Article 7, "Air Quality Control," Section 101 et seq. | Requires development of an air quality control program in which the benefits of the air pollution control measures utilized bear a reasonable relationship to the economic, environmental, and energy impacts and other costs of such measures. |
| Colorado Mined Land Reclamation Act | CRS, Title 34, "Mineral Resources," Article 32, "Colorado Mined Land Reclamation Act," Section 101 et seq. | Requires permits for new mining operations and establishes procedures for renewals of existing permits; requires an environmental protection plan for uranium mines. |
| Colorado Natural Areas Act | CRS, Title 33, "Parks and Wildlife," Article 33, "Colorado Natural Areas," Section 101 et seq. | Establishes a statewide natural areas program to identify and protect certain natural areas. |
| Colorado Noxious Weed Act | CRS, Title 35, "Agriculture, Article 5.5, "Colorado Noxious Weed Act," Section 111, Cooperation with federal and state agencies | Authorizes local governing bodies of county and municipality governing bodies to enter into cooperative agreements with federal and state agencies for the integrated management of noxious weeds within their respective territorial jurisdictions. |
| Colorado Water Quality Control Act | CRS Title 25, "Health," Article 8, "Water Quality Control," Sections 501–503 | Requires a permit for the discharge of pollutants into any state waters. |
| Colorado Water Quality Control Act | CRS, Title 25, "Health," Article 8, "Water Quality Control," Section 506, Nuclear and radioactive wastes | Requires a permit to discharge, deposit, or dispose of any radioactive waste underground in liquid, solid, or explosive form. |

BLM_0041634

**TABLE 5.5-1  (Cont.)**

| Law | Citation | Requirement |
|---|---|---|
| Hazardous Waste | CRS Title 25, "Health," Article 15, "Hazardous Waste," Part 3, "State Hazardous Waste Management Plan," Section 308, Prohibited acts, enforcement | Prohibits disposal of hazardous waste at unpermitted facilities. |
| Groundwater Use | CRS, Title 37, "Water and Irrigation," Article 90, "Underground Water," Section 107, Application for use of groundwater | Requires anyone desiring to appropriate groundwater in designated groundwater basins to file an application prior to doing so. |
| Historical, Prehistorical, and Archeological Resources | CRS, Title 24, "Government, State," Article 80, "State History, Archives, and Emblems," Part 4, "Historical, Prehistorical, and Archeological Resources," Section 406, Permits | Requires permits for the investigation, excavation, gathering, or removal from the natural state of any historical, prehistorical, and archaeological resources within the state. |
| Maximum Permissible Noise Levels | CRS, Title 25, "Health," Article 12, "Noise Abatement," Section 103, Maximum permissible noise levels | Establishes the dB(A) and time periods that constitute permissible noise levels. |
| Nongame, Endangered, or Threatened Species Conservation Act | CRS, Title 33, "Parks and Wildlife," Article 2, "Nongame and Endangered Species Conservation," Section 101 et seq. | Authorizes regulations that establish (1) limitations relating to the taking, possession, transportation, exportation, processing, sale or offering for sale, or shipment regarding nongame wildlife and (2) a list of those species indigenous to the state determined to be endangered or threatened. |
| Pesticide Act | CRS, Title 35, "Agriculture," Article 9, "Pesticide Act," Section 101 et seq. | Controls the use of pesticides in the state. |
| Pollution Prevention Act of 1992 | CRS 25, "Health," Article 16.5, "Pollution Prevention," Section 101 et seq. | Establishes that the prevention of pollution is preferable to treatment and disposal of toxic substances and is the cornerstone of the future of environmental management. |
| Unmarked Human Graves | CRS, Title 24, "Government, State," Article 80, "State History, Archives, and Emblems," Part 13, "Unmarked Human Graves, Section 1301 et seq. | Establishes the notification requirements upon the discovery of suspected human skeletal remains. |

BLM_0041635

1  **5.6  COUNTY ENVIRONMENTAL ORDINANCES AND PLANS**
2
3      Under Colorado state law, county planning commissions are authorized to make and
4  adopt a master plan for the physical development of the unincorporated territory of the county.
5  The lease tracts that are the subject of this PEIS are located in Mesa, Montrose, and San Miguel
6  Counties. County ordinances, plans, and permit requirements that could apply to the No Action
7  Alternative and the ULP management alternatives in this PEIS are listed in Table 5.6-1.
8
9
10

BLM_0041636

1   **TABLE 5.6-1  Potentially Applicable County Requirements**

| Ordinance/Plan/Permit | Citation | Requirements |
|---|---|---|
| **Mesa County** | | |
| Land Development Code | 2000 Mesa County Land Development Code | Establishes land use regulations and development review and approval procedures; requires permits for surface alterations, utility installation, stormwater construction, and driveways. Section 5.2.13 states that mining and extractive uses shall be subject to the Mesa County Mineral and Energy Resource Master Plan. |
| Update Building, Plumbing, Mechanical, Fuel Gas, Property Maintenance, Residential, Electrical, Energy Conservation Codes | Ordinance 008A | Adopts and slightly modifies the International Building Code and International Residential Code. |
| Noxious Weed Management Plan | Mesa County 2009-204 | Lists the noxious weeds covered by the plan and promotes noxious weed management. |
| **Montrose County** | | |
| Montrose County Zoning Resolution | Montrose County Zoning Resolution | Establishes county land use zones and requirements for those zones. The exploration of mineral resources and mining of minerals (other than sand and gravel) existing as of October 13, 1994, or the subsequent expansion of existing operations within existing property lines, is a use-by-right in the General Agricultural District; new mineral resource development and extraction operations and facilities are a special use within that district.

Applications, a complete site plan, and an impact mitigation plan are required for special uses.

Permits are required for any work performed within the public ROWs of Montrose County and within county road access. |

BLM_0041637

**TABLE 5.6-1  (Cont.)**

| Ordinance/Plan/Permit | Citation | Requirements |
|---|---|---|
| **San Miguel County**<br>San Miguel County Land Use Code | Section 3-1, General | Requires a building permit or exemption to erect, construct, reconstruct, excavate for a foundation, or alter or change the use of any building or other structure or improvements of land. |
| | Section 5-11, Conditional Uses on Federal Lands | Establishes the standards for reviewing mineral exploration and mining on federal land that is subject to federal and state laws and regulations. |
| | Section 5-16, Mining | Contains provisions to mitigate the impacts of mining and protect the health, safety, and welfare of residents and travelers on county roads, streets, and highways used for hauling mined material. |
| | Section 5-321N, Development or Improvement of Roads, Driveways, and Recreational Trails | Requires that any proposed access to a county road must be issued a Driveway Access Permit. |
| | Section 5-607, Sewage Disposal | Requires a permit for new or replaced septic systems. |

1
2

BLM_0041638

1
2
3
4
5
6
7
8
9
10
11
12
13
14

*This page intentionally left blank*

BLM_0041639

# 6  CONSULTATION PROCESS FOR THE DOE ULP PEIS

DOE is complying with Executive Order (E.O.) 13175 and Section 7 of the Endangered Species Act (ESA) by engaging in consultation on a government-to-government basis with Native American tribes and with the U.S. Fish and Wildlife Service (USFWS), respectively. Sections 6.1 and 6.2 below describe the consultation process undertaken to date.

## 6.1  TRIBAL GOVERNMENT TO GOVERNMENT CONSULTATION

As a part of the government's "treaty and trust" responsibilities, the government-to-government relationship was formally recognized by the federal government on November 6, 2000, with Executive Order (E.O.) 13175, *Consultation and Coordination with Indian Tribal Governments*. Also, DOE Order 144.1, *DOE American Indian Policy*, and memos from the DOE Secretary require that DOE consult and coordinate with tribal governments, Native American communities, and tribal individuals whose interests might be directly and substantially affected by activities on the ULP lands. DOE will strive to provide the tribes with sufficient opportunities for productive participation in planning and resource-management decision making. DOE initiated consultation and communication on the Draft ULP PEIS with six potentially affected American Indian tribal governments. The six tribes that have been identified for the PEIS consultation are consistent with the tribes that the DOE Office of Legacy Management (DOE-LM) identified for previous National Environmental Policy Act (NEPA) effort. These six tribes are known to have interests in the area.

On January 9, 2012, DOE initiated this process with a letter inviting the six tribes to engage in consultation with DOE with regard to the proposed action described in this Draft PEIS. Letters were sent to the following people by Mr. David W. Geiser, who is the Director of the U.S. Department of Energy, Office of Legacy Management:

>     The Honorable Elayne Atcitty
>     White Mesa Ute Board Chairperson
>     White Mesa Ute Tribe
>     (White Mesa, Utah)
>
>     The Honorable Pearl Casias
>     Chairwoman
>     Southern Ute Indian Tribe
>     (Ignacio, Colorado)
>
>     The Honorable Irene Cuch
>     Chairperson, Ute Business Committee
>     Ute Indian Tribe
>     (Fort Duchesne, Utah)

BLM_0041640

1  The Honorable Ben Shelley
2  President
3  The Navajo Nation
4  (Window Rock, Arizona)
5
6  The Honorable Leroy Shingoitewa
7  Chairman
8  Hopi Tribal Council
9  (Kykotsmovi, Arizona)
10
11  The Honorable Gary Hayes
12  Chairman
13  Ute Mountain Ute Tribe
14  (Towaoc, Colorado)
15
16  Facsimiles of the letters sent are shown as Figures 6.1-1 to 6.1-6. All the figures in Chapter 6
17  appear at the end of the chapter.
18
19      The following summarizes what has occurred to date with this process:
20
21  •   DOE-LM has sent a letter to invite the tribes for a consultation (as discussed
22      above); however, to date, DOE has not received any responses to this letter.
23
24  •   Follow-up phone calls have been made. None of the tribes have provided any
25      feedback.
26
27  As a next step, a second letter would be sent to accomplish the following:
28
29  •   Re-state of the purpose of the consultation;
30
31  •   Provide an invitation to participate in a conference call to discuss concerns, if
32      any, and
33
34  •   Provide for a path forward that (pending DOE receiving a response or
35      feedback on the letter or conference call) would allow DOE to assume that the
36      level of involvement by the tribes as cooperating agencies was the level of
37      involvement that is desired for interaction on the ULP PEIS process.
38
39
40  **6.2  CONSULTATION WITH THE U.S. FISH AND WILDLIFE SERVICE**
41
42      In the Notice of Intent (NOI; see 76 FR 36097) to prepare the ULP PEIS, DOE stated that
43  it is preparing to enter into consultation with the USFWS, in compliance with Section 7 of the
44  ESA, concerning DOE's management of the ULP. Section 7 of the ESA requires federal
45  agencies to consider the effect of their undertakings on species listed under the ESA and to

BLM_0041641

1  consult with the USFWS to ensure that their action or the actions that they fund, authorize, or
2  permit is not likely to jeopardize the continued existence of any listed species or result in the
3  destruction or adverse modification of critical habitat of such species.
4
5        DOE-LM initiated the informal consultation with a letter from Ms. Tracy A. Ribeiro of
6  DOE-LM to Ms. Patty Gelatt indicating this intent to the USFWS dated November 7, 2011
7  (see Figure 6.2-1). A response from Ms. Pamela Repp of the USFWS was received on
8  November 17, 2011 (see Figure 6.2-2). A meeting between DOE-LM and the USFWS was held
9  in the Grand Junction Office of the USFWS on November 9, 2011. The following summarizes
10 the proceedings of that meeting.
11
12      •   Since the ESA consultation is in support of a NEPA evaluation, the USFWS
13          does not enter into formal consultation until a preferred alternative has been
14          identified. Informal consultation based on current information regarding a
15          preferred alternative can be conducted, and consultation might need to be
16          redone, if later in the PEIS process, the preferred alternative is different.
17
18      •   USFWS will respond in writing to DOE-LM's letter of request to enter into
19          informal consultation with the USFWS. DOE-LM received the response letter
20          from USFWS on November 17, 2011 (Figure 6.2-2).
21
22      •   Prior to the November 9, 2011 meeting, the USFWS had performed a
23          preliminary review of the list of species that was provided on the DOE letter.
24          The USFWS provided initial feedback on which species it determined were
25          not an issue based on the species locales. The USFWS also provided initial
26          feedback on which species DOE-LM should continue to review.
27
28      •   The biological assessment that would be prepared must consider the entire
29          25,000 acres (10,000 ha);
30
31      •   The biological assessment must consider all species listed in the area even
32          those not potentially present.
33
34       In addition to the above discussion, the USFWS also discussed potential activities that
35 could lead to water depletion and, in turn, could adversely affect the four endangered fish species
36 in the Colorado River. The USFWS has determined that there would be no impact on the species
37 and consultation is not required if the water-related activities deplete less than 0.1 ac-ft/yr
38 (32,585 gal/yr) (Figure 6.2-2). Further, water rights have no bearing on water depletion
39 determinations. For the biological assessment, water quality as related to the listed fish species
40 requirements must be evaluated. With regard to water that would be brought onto the ULP lease
41 tracts to assist in mining operations, some public water entities have previously consulted with
42 the USFWS on water depletions. If the ULP lessees obtain water from these public water
43 entities, these volumes do not need to be entered into the total volume counted as water depleted.
44 For water that is removed from the mining operations and then ponded, treated, and released, the
45 water depletions and water quality related to the temporarily ponded water that is extracted from

BLM_0041642

1   the mining operations would need to be evaluated. For the ULP, cumulative depletions for
2   mining actions on all DOE-LM lease tracts should be evaluated.
3
4         Finally, it was agreed at the meeting that DOE-LM would provide the USFWS with a
5   copy of the draft biological assessment for review when available. DOE-LM would also keep the
6   USFWS informed about the PEIS schedule, so that the USFWS could see how the ESA
7   consultation and the biological assessment fit into that schedule.
8
9

BLM_0041643

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*



**Department of Energy**
Washington, DC 20585

January 9, 2012

The Honorable Elayne Atcitty
White Mesa Ute Board Chairperson
White Mesa Ute Tribe
P.O. Box 7096
White Mesa, UT 84511

Dear Chairperson Atcitty:

The purpose of this letter is to communicate the Department of Energy (DOE) Office of Legacy Management's (LM) interest in consulting with the White Mesa Ute Tribe on the DOE *Uranium Leasing Program (ULP) Programmatic Environmental Impact Statement (PEIS)* being conducted following the National Environmental Policy Act (NEPA). DOE-LM currently manages this uranium leasing program and administers thirty-one (31) lease tracts in the Uravan Mineral Belt in southwestern Colorado. Twenty-nine (29) of these lease tracts are actively held under lease. Activities related to these lease sites are being analyzed in the PEIS, as discussed on the dedicated web page <<http://ulpeis.anl.gov/>>.

DOE-LM has already sent a request to your office and to the Vice Chair of the White Mesa Ute Tribe asking if the agency would like to be a cooperating agency during the drafting and review of the PEIS. DOE-LM is interested in identifying the White Mesa Ute Tribe's preferences on a consultation approach for the PEIS other than participation as a NEPA cooperating agency. DOE-LM plans to incorporate the consultation activities into its schedule for issuing the PEIS. DOE-LM is in the early stages of developing the PEIS, with plans to issue a Draft PEIS in 2012 and a Final PEIS in 2013.

As summarized below, consultation activities could include staff-to-staff technical briefings, government-to-government consultations between DOE-LM senior officials and elected Tribal leaders, Tribal Government participation during the development of the Draft PEIS, or other activities that the White Mesa Ute Tribe would like to propose consistent with established policies and protocols. These approaches have been successfully used by DOE and Tribal Governments in developing EIS documents that include Tribal Nation concerns and perspectives.

- Staff-to-staff technical briefings between DOE-LM and Tribal Government representatives can be used to share information, obtain Tribal Government input on technical issues, and identify possible topics for discussion during government-to-government consultations. Tribal officials would be welcome to participate in the technical briefings, although the briefings themselves would not be considered formal consultation.

- Formal government-to-government consultations between senior DOE officials and elected Tribal officials can be conducted at agreed upon points in the PEIS


Printed with soy ink on recycled paper

1

2    **FIGURE 6.1-1  Letter to White Mesa Ute Board Chairperson**
3

*6-5*

process to further ensure that Tribal rights, values, and interests are identified and considered in pertinent decision-making on the ULP activities.

- Participation in the development of the ULP PEIS can include Tribal Nations providing review and comment on the Draft EIS. As mentioned above, DOE-LM has already initiated this process via requests to a Tribal government agency to become a cooperating agency during the PEIS development. This agency has agreed to be a cooperating agency.

I would like to initiate a teleconference with government representatives of the White Mesa Ute Tribe to discuss consultation options. I would appreciate a response as to White Mesa Ute Tribe's interest in participating with DOE-LM in government-to-government consultation by January 31, 2012. If you would like to participate, please provide the dates of your availability in February 2012 with your response. I will send out invitations for our kick-off telephone conference call as soon as we receive this information.

If you should have any questions concerning the ULP PEIS, please do not hesitate to contact me at (202) 586-8324 or Tony Carter at (202) 586-3323, who is LM's Programmatic Headquarters point of contact for Tribal Nations.

Sincerely,

David W. Geiser
Director
Office of Legacy Management

cc:    Thomas C. Pauling, LM
       Tony Carter, LM
       Laura Kilpatrick, LM
       Tracy Ribeiro, LM
       April Gil, LM
       Deborah Sullivan, LM
       David Conrad, CI

1

2    **FIGURE 6.1-1  (Cont.)**

3

BLM_0041645

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                 *Do Not Distribute*



**Department of Energy**
Washington, DC 20585

January 9, 2012

The Honorable Pearl Casias
Chairwoman
Southern Ute Indian Tribe
P.O. Box 737
Ignacio, CO 81137

Dear Chairwoman Casias:

The purpose of this letter is to communicate the Department of Energy (DOE) Office of
Legacy Management's (LM) interest in consulting with the Southern Ute Indian Tribe on
the DOE *Uranium Leasing Program (ULP) Programmatic Environmental Impact
Statement (PEIS)* being conducted following the National Environmental Policy Act
(NEPA). DOE-LM currently manages this uranium leasing program and administers
thirty-one (31) lease tracts in the Uravan Mineral Belt in southwestern Colorado.
Twenty-nine (29) of these lease tracts are actively held under lease. Activities related to
these lease sites are being analyzed in the PEIS, as discussed on the dedicated web page
<<http://ulpeis.anl.gov/>>.

DOE-LM has already sent a request to your office asking if the agency would like to be a
cooperating agency during the drafting and review of the PEIS. DOE-LM is interested in
identifying the Southern Ute Indian Tribe's preferences on a consultation approach for
the PEIS other than participation as a NEPA cooperating agency. DOE-LM plans to
incorporate the consultation activities into its schedule for issuing the PEIS. DOE-LM is
in the early stages of developing the PEIS, with plans to issue a Draft PEIS in 2012 and a
Final PEIS in 2013.

As summarized below, consultation activities could include staff-to-staff technical
briefings, government-to-government consultations between DOE-LM senior officials
and elected Tribal leaders, Tribal Government participation during the development of
the Draft PEIS, or other activities that the Southern Ute Indian Tribe would like to
propose consistent with established policies and protocols. These approaches have been
successfully used by DOE and Tribal Governments in developing EIS documents that
include Tribal Nation concerns and perspectives.

- Staff-to-staff technical briefings between DOE-LM and Tribal Government
  representatives can be used to share information, obtain Tribal Government input
  on technical issues, and identify possible topics for discussion during
  government-to-government consultations. Tribal officials would be welcome to
  participate in the technical briefings, although the briefings themselves would not
  be considered formal consultation.


Printed with soy ink on recycled paper

1

2    **FIGURE 6.1-2  Letter to Chairwoman, Southern Ute Indian Tribe**

3

BLM_0041646

- Formal government-to-government consultations between senior DOE officials and elected Tribal officials can be conducted at agreed upon points in the PEIS process to further ensure that Tribal rights, values, and interests are identified and considered in pertinent decision-making on the ULP activities.

- Participation in the development of the ULP PEIS can include Tribal Nations providing review and comment on the Draft EIS. As mentioned above, DOE-LM has already initiated this process via requests to a Tribal government agency to become a cooperating agency during the PEIS development. This agency has agreed to be a cooperating agency.

I would like to initiate a teleconference with government representatives of the Southern Ute Indian Tribe to discuss consultation options. I would appreciate a response as to Southern Ute Indian Tribe's interest in participating with DOE-M in government-to-government consultation by January 31, 2012. If you would like to participate, please provide the dates of your availability in February 2012 with your response. I will send out invitations for our kick-off telephone conference call as soon as we receive this information.

If you should have any questions concerning the ULP PEIS, please do not hesitate to contact me at (202) 586-8324 or Tony Carter at (202) 586-3323, who is LM's Programmatic Headquarters point of contact for Tribal Nations.

Sincerely,

David W. Geiser
Director
Office of Legacy Management

cc:   Thomas C. Pauling, LM
      Tony Carter, LM
      Laura Kilpatrick, LM
      Tracy Ribeiro, LM
      April Gil, LM
      Deborah Sullivan, LM
      David Conrad, CI
      Michael Olguin

1

2   **FIGURE 6.1-2  (Cont.)**
3

*6-8*

BLM_0041647



**Department of Energy**
Washington, DC 20585

January 9, 2012

The Honorable Irene Cuch
Chairperson, Ute Business Committee
Ute Indian Tribe
P.O. Box 190
Fort Duchesne, UT 84026

Dear Chairperson Cuch:

The purpose of this letter is to communicate the Department of Energy (DOE) Office of Legacy Management's (LM) interest in consulting with the Ute Indian Tribe on the DOE *Uranium Leasing Program (ULP) Programmatic Environmental Impact Statement (PEIS)* being conducted following the National Environmental Policy Act (NEPA). DOE-LM currently manages this uranium leasing program and administers thirty-one (31) lease tracts in the Uravan Mineral Belt in southwestern Colorado. Twenty-nine (29) of these lease tracts are actively held under lease. Activities related to these lease sites are being analyzed in the PEIS, as discussed on the dedicated web page <<http://ulpeis.anl.gov/>>.

DOE-LM has already sent a request to your office and to Mr. Rollie Wilson asking if the agency would like to be a cooperating agency during the drafting and review of the PEIS. DOE-LM is interested in identifying the Ute Indian Tribe's preferences on a consultation approach for the PEIS other than participation as a NEPA cooperating agency. DOE-LM plans to incorporate the consultation activities into its schedule for issuing the PEIS. DOE-LM is in the early stages of developing the PEIS, with plans to issue a Draft PEIS in 2012 and a Final PEIS in 2013.

As summarized below, consultation activities could include staff-to-staff technical briefings, government-to-government consultations between DOE-LM senior officials and elected Tribal leaders, Tribal Government participation during the development of the Draft PEIS, or other activities that the Ute Indian Tribe would like to propose consistent with established policies and protocols. These approaches have been successfully used by DOE and Tribal Governments in developing EIS documents that include Tribal Nation concerns and perspectives.

- Staff-to-staff technical briefings between DOE-LM and Tribal Government representatives can be used to share information, obtain Tribal Government input on technical issues, and identify possible topics for discussion during government-to-government consultations. Tribal officials would be welcome to participate in the technical briefings, although the briefings themselves would not be considered formal consultation.

- Formal government-to-government consultations between senior DOE officials and elected Tribal officials can be conducted at agreed upon points in the PEIS


Printed with soy ink on recycled paper

1

**FIGURE 6.1-3  Letter to Chairperson, Ute Business Committee**

3

BLM_0041648

*Preliminary Draft PEIS*        *PEIS Privileged Information*        *May 2012*
*PEIS Team Use Only*              *Do Not Distribute*

process to further ensure that Tribal rights, values, and interests are identified and considered in pertinent decision-making on the ULP activities.

- Participation in the development of the ULP PEIS can include Tribal Nations providing review and comment on the Draft EIS. As mentioned above, DOE-LM has already initiated this process via requests to a Tribal government agency to become a cooperating agency during the PEIS development. This agency has agreed to be a cooperating agency.

I would like to initiate a teleconference with government representatives of the Ute Indian Tribe to discuss consultation options. I would appreciate a response as to Ute Indian Tribe's interest in participating with DOE-LM in government-to-government consultation by January 31, 2012. If you would like to participate, please provide the dates of your availability in February 2012 with your response. I will send out invitations for our kick-off telephone conference call as soon as we receive this information.

If you should have any questions concerning the ULP PEIS, please do not hesitate to contact me at (202) 586-8324 or Tony Carter at (202) 586-3323, who is LM's Programmatic Headquarters point of contact for Tribal Nations.

Sincerely,

David W. Geiser
Director
Office of Legacy Management

cc:   Thomas C. Pauling, LM
      Tony Carter, LM
      Laura Kilpatrick, LM
      Tracy Ribeiro, LM
      April Gil, LM
      Deborah Sullivan, LM
      David Conrad, CI
      Rollie Wilson

1

2   **FIGURE 6.1-3  (Cont.)**

3

BLM_0041649

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*



**Department of Energy**
Washington, DC 20585
January 9, 2012

The Honorable Ben Shelley
President
The Navajo Nation
P.O. Box 7440
2000 Tribal Hill Drive
Window Rock, AZ 86515

Dear President Shelley:

The purpose of this letter is to communicate the Department of Energy (DOE) Office of Legacy Management's (LM) interest in consulting with The Navajo Nation on the DOE *Uranium Leasing Program (ULP) Programmatic Environmental Impact Statement (PEIS)* being conducted following the National Environmental Policy Act (NEPA). DOE-LM currently manages this uranium leasing program and administers thirty-one (31) lease tracts in the Uravan Mineral Belt in southwestern Colorado. Twenty-nine (29) of these lease tracts are actively held under lease. Activities related to these lease sites are being analyzed in the PEIS, as discussed on the dedicated web page <<http://ulpeis.anl.gov/>>.

DOE-LM has already sent a request to your office, the Supervisory Anthropologist, and the Tribal Historic Preservation Officer asking if the agency would like to be a cooperating agency during the drafting and review of the PEIS. DOE-LM is interested in identifying the Navajo Nation's preferences on a consultation approach for the PEIS other than participation as a NEPA cooperating agency. DOE-LM plans to incorporate the consultation activities into its schedule for issuing the PEIS. DOE-LM is in the early stages of developing the PEIS, with plans to issue a Draft PEIS in 2012 and a Final PEIS in 2013.

As summarized below, consultation activities could include staff-to-staff technical briefings, government-to-government consultations between DOE-LM senior officials and elected Tribal leaders, Tribal Government participation during the development of the Draft PEIS, or other activities that the Navajo Nation would like to propose consistent with established policies and protocols. These approaches have been successfully used by DOE and Tribal Governments in developing EIS documents that include Tribal Nation concerns and perspectives.

- Staff-to-staff technical briefings between DOE-LM and Tribal Government representatives can be used to share information, obtain Tribal Government input on technical issues, and identify possible topics for discussion during government-to-government consultations. Tribal officials would be welcome to participate in the technical briefings, although the briefings themselves would not be considered formal consultation.


Printed with soy ink on recycled paper

1

2      **FIGURE 6.1-4  Letter to President of the Navajo Nation**

3

BLM_0041650

process to further ensure that Tribal rights, values, and interests are identified and considered in pertinent decision-making on the ULP activities.

- Participation in the development of the ULP PEIS can include Tribal Nations providing review and comment on the Draft EIS. As mentioned above, DOE-LM has already initiated this process via requests to a Tribal government agency to become a cooperating agency during the PEIS development. This agency has agreed to be a cooperating agency.

I would like to initiate a teleconference with government representatives of The Navajo Nation to discuss consultation options. I would appreciate a response as to The Navajo Nation's interest in participating with DOE LM in government-to-government consultation by January 31, 2012. If you would like to participate, please provide the dates of your availability in February 2012 with your response. I will send out invitations for our kick-off telephone conference call as soon as we receive this information.

If you should have any questions concerning the ULP PEIS, please do not hesitate to contact me at (202) 586-8324 or Tony Carter at (202) 586-3323, who is LM's Programmatic Headquarters point of contact for Tribal Nations.

Sincerely,

David W. Geiser
Director
Office of Legacy Management

cc:     Thomas C. Pauling, LM
        Tony Carter, LM
        Laura Kilpatrick, LM
        Tracy Ribeiro, LM
        April Gil, LM
        Deborah Sullivan, LM
        David Conrad, CI
        Tony H. Joe, Jr.
        Dr. Alan Downer

1

2    **FIGURE 6.1-4  (Cont.)**

3

BLM_0041651

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*              *Do Not Distribute*



**Department of Energy**
Washington, DC 20585
January 9, 2012

The Honorable Leroy Shingoitewa
Chairman
Hopi Tribal Council
P.O. Box 123
Kykotsmovi, AZ 86039

Dear Chairman Shingoitewa:

The purpose of this letter is to communicate the Department of Energy (DOE) Office of
Legacy Management's (LM) interest in consulting with the Hopi Tribal Council
on the DOE *Uranium Leasing Program (ULP) Programmatic Environmental Impact
Statement (PEIS)* being conducted following the National Environmental Policy Act
(NEPA). DOE-LM currently manages this uranium leasing program and administers
thirty-one (31) lease tracts in the Uravan Mineral Belt in southwestern Colorado.
Twenty-nine (29) of these lease tracts are actively held under lease. Activities related to
these lease sites are being analyzed in the PEIS, as discussed on the dedicated web page
<<http://ulpeis.anl.gov/>>.

DOE-LM has already sent a request to your office and the Directors office asking if the
agency would like to be a cooperating agency during the drafting and review of the PEIS.
DOE-LM is interested in identifying the Hopi Tribal Council's preferences on a
consultation approach for the PEIS other than participation as a NEPA cooperating
agency. DOE-LM plans to incorporate the consultation activities into its schedule for
issuing the PEIS. DOE-LM is in the early stages of developing the PEIS, with plans to
issue a Draft PEIS in 2012 and a Final PEIS in 2013.

As summarized below, consultation activities could include staff-to-staff technical
briefings, government-to-government consultations between DOE-LM senior officials
and elected Tribal leaders, Tribal Government participation during the development of
the Draft PEIS, or other activities that the Hopi Tribal Council would like to propose
consistent with established policies and protocols. These approaches have been
successfully used by DOE and Tribal Governments in developing EIS documents that
include Tribal Nation concerns and perspectives.

- Staff-to-staff technical briefings between DOE-LM and Tribal Government
  representatives can be used to share information, obtain Tribal Government input
  on technical issues, and identify possible topics for discussion during
  government-to-government consultations. Tribal officials would be welcome to
  participate in the technical briefings, although the briefings themselves would not
  be considered formal consultation.

- Formal government-to-government consultations between senior DOE officials
  and elected Tribal officials can be conducted at agreed upon points in the PEIS


Printed with soy ink on recycled paper

1

2   **FIGURE 6.1-5 Letter to Chairman of the Hopi Tribal Council**

3

BLM_0041652

process to further ensure that Tribal rights, values, and interests are identified and considered in pertinent decision-making on the ULP activities.

- Participation in the development of the ULP PEIS can include Tribal Nations providing review and comment on the Draft EIS. As mentioned above, DOE-LM has already initiated this process via requests to a Tribal government agency to become a cooperating agency during the PEIS development. This agency has declined to be a cooperating agency.

I would like to initiate a teleconference with government representatives of the Hopi Tribal Council to discuss consultation options. I would appreciate a response as to Hopi Tribal Council's interest in participating with DOE-LM in government-to-government consultation by January 31, 2012. If you would like to participate, please provide the dates of your availability in February 2012 with your response. I will send out invitations for our kick-off telephone conference call as soon as we receive this information.

If you should have any questions concerning the ULP PEIS, please do not hesitate to contact me at (202) 586-8324 or Tony Carter at (202) 586-3323, who is LM's Programmatic Headquarters point of contact for Tribal Nations.

Sincerely,

David W. Geiser
Director
Office of Legacy Management

cc:     Thomas C. Pauling, LM
        Tony Carter, LM
        Laura Kilpatrick, LM
        Tracy Ribeiro, LM
        April Gil, LM
        Deborah Sullivan, LM
        David Conrad, CI

1

2     **FIGURE 6.1-5  (Cont.)**

3

BLM_0041653

*Preliminary Draft PEIS*  *PEIS Privileged Information*  *May 2012*
*PEIS Team Use Only*    *Do Not Distribute*



**Department of Energy**
Washington, DC 20585

January 9, 2012

The Honorable Gary Hayes
Chairman
Ute Mountain Ute Tribe
P.O. Box JJ
Towaoc, CO 81137

Dear Chairman Hayes:

The purpose of this letter is to communicate the Department of Energy (DOE) Office of
Legacy Management's (LM) interest in consulting with the Ute Mountain Ute Tribe
on the DOE *Uranium Leasing Program (ULP) Programmatic Environmental Impact
Statement (PEIS)* being conducted following the National Environmental Policy Act
(NEPA). DOE-LM currently manages this uranium leasing program and administers
thirty-one (31) lease tracts in the Uravan Mineral Belt in southwestern Colorado.
Twenty-nine (29) of these lease tracts are actively held under lease. Activities related to
these lease sites are being analyzed in the PEIS, as discussed on the dedicated web page
<<http://ulpeis.anl.gov/>>.

DOE-LM has already sent a request to your office, the Tribal Historic Preservation
Officer, and the Ute Mountain Ute Agency asking if the agency would like to be a
cooperating agency during the drafting and review of the PEIS. DOE-LM is interested in
identifying the Ute Mountain Ute Tribe's preferences on a consultation approach for the
PEIS other than participation as a NEPA cooperating agency. DOE-LM plans to
incorporate the consultation activities into its schedule for issuing the PEIS. DOE-LM is
in the early stages of developing the PEIS, with plans to issue a Draft PEIS in 2012 and a
Final PEIS in 2013.

As summarized below, consultation activities could include staff-to-staff technical
briefings, government-to-government consultations between DOE-LM senior officials
and elected Tribal leaders, Tribal Government participation during the development of
the Draft PEIS, or other activities that the Ute Mountain Ute Tribe would like to propose
consistent with established policies and protocols. These approaches have been
successfully used by DOE and Tribal Governments in developing EIS documents that
include Tribal Nation concerns and perspectives.

- Staff-to-staff technical briefings between DOE-LM and Tribal Government
  representatives can be used to share information, obtain Tribal Government input
  on technical issues, and identify possible topics for discussion during
  government-to-government consultations. Tribal officials would be welcome to
  participate in the technical briefings, although the briefings themselves would not
  be considered formal consultation.

 Printed with soy ink on recycled paper

1

2 **FIGURE 6.1-6  Letter to Chairman of the Ute Mountain Ute Tribe**

3

BLM_0041654

*Preliminary Draft PEIS*      *PEIS Privileged Information*      *May 2012*
*PEIS Team Use Only*            *Do Not Distribute*

- Formal government-to-government consultations between senior DOE officials and elected Tribal officials can be conducted at agreed upon points in the PEIS process to further ensure that Tribal rights, values, and interests are identified and considered in pertinent decision-making on the ULP activities.

- Participation in the development of the ULP PEIS can include Tribal Nations providing review and comment on the Draft EIS. As mentioned above, DOE-LM has already initiated this process via requests to a Tribal government agency to become a cooperating agency during the PEIS development. This agency has declined to be a cooperating agency.

I would like to initiate a teleconference with government representatives of the Ute Mountain Ute Tribe to discuss consultation options. I would appreciate a response as to Ute Mountain Ute Tribe's interest in participating with DOE- LM in government-to-government consultation by January 31, 2012. If you would like to participate, please provide the dates of your availability in February 2012 with your response. I will send out invitations for our kick-off telephone conference call as soon as we receive this information.

If you should have any questions concerning the ULP PEIS, please do not hesitate to contact me at (202) 586-8324 or Tony Carter at (202) 586-3323, who is LM's Programmatic Headquarters point of contact for Tribal Nations.

Sincerely,

David W. Geiser
Director
Office of Legacy Management

cc:   Thomas C. Pauling, LM
      Tony Carter, LM
      Laura Kilpatrick, LM
      Tracy Ribeiro, LM
      April Gil, LM
      Deborah Sullivan, LM
      David Conrad, CI

1

2   **FIGURE 6.1-6  (Cont.)**

3

BLM_0041655

*Preliminary Draft PEIS*       *PEIS Privileged Information*       *May 2012*
*PEIS Team Use Only*              *Do Not Distribute*



**Department of Energy**
Washington, DC 20585

November 7, 2011

Ms. Patty Gelatt
Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
Western Colorado Field Office
764 Horizon Drive, Building B
Grand Junction, CO 81506-3946

Subject:  Initiation of Endangered Species Act Informal Consultation for the
Department of Energy's Uranium Leasing Program

Dear Ms. Gelatt:

The U.S. Department of Energy Office of Legacy Management (DOE) is preparing a
Programmatic Environmental Impact Statement (PEIS) to evaluate potential impacts associated
with the management of DOE's Uranium Leasing Program (ULP), under which DOE
administers tracts of land for the exploration, development, and extraction of uranium and
vanadium ores.  The PEIS is being prepared in accordance with the National Environmental
Policy Act of 1969 (NEPA), as amended, following implementing regulations developed by the
President's Council on Environmental Quality in 40 CFR Parts 1500-1508 and DOE's NEPA
implementing procedures provided in 10 CFR Part 1021.  The PEIS will analyze potential
impacts to environmental resources including those involving threatened or endangered species.
The Notice of Intent for the PEIS was published in the Federal Register on June 21, 2011
(76 FR 36097).  Public scoping meetings for the PEIS were conducted on August 8-11, 2011 at
Montrose, Telluride, and Naturita, in Colorado, and at Monticello, in Utah.

DOE's ULP includes tracts of land located in Mesa, Montrose, and San Miguel Counties,
Colorado, that cover a cumulative acreage of approximately 25,000 acres.  The locations of the
ULP lease tracts are shown in Figure 1 of the Attachment.

By this letter, DOE is initiating informal consultation with the U.S. Fish and Wildlife Service
(USFWS) under the provisions of the Endangered Species Act of 1973, as amended (ESA).
DOE has identified a preliminary list of species that may be listed as endangered, threatened, or
species that are proposed or candidates for listing under the ESA that may occur in the counties
where DOE's ULP lease tracts are located (see Table 1 of the Attachment).  In addition, our
preliminary determination indicates that there are no critical habitats on DOE's ULP lease tracts.
The nearest critical habitats are indicated in Figure 2 of the Attachment and are about twenty
miles from the nearest DOE ULP lease tract(s).  DOE requests a letter from your office
concurring with or commenting on this preliminary list and the preliminary determination of
critical habitat locations.  Finally, please provide any other information you consider appropriate
during the consultation process.


Printed with soy ink on recycled paper

1

2    **FIGURE 6.2-1  Letter to U.S. Fish and Wildlife Service Initiating the Informal Consultation**

3

BLM_0041656

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

Ms. Patty Gelatt                              -2-

DOE and its PEIS contractor (Argonne National Laboratory) will be contacting you and members of your staff in the near future to coordinate this effort. DOE looks forward to further consultation and coordinating activities with the USFWS on potential impacts, if any, of the ULP to federally-listed species.

Please do not hesitate to contact me if you have any questions on the ULP project at (970) 248-6621, or by e-mail at Tracy.Ribeiro@lm.doe.gov. Please send any correspondence to:

U.S. Department of Energy
Office of Legacy Management
2597 Legacy Way
Grand Junction, CO 81503

Sincerely,

Tracy A. Ribeiro
Environmental Program Manager

Enclosures

cc w/enclosures:
M. Picel, Argonne National Laboratory (e)
D. Geiser, DOE (e)
L. Kilpatrick, DOE (e)
T. Pauling, DOE (e)
S. Schiesswohl, DOE (e)
E. Cotter, Stoller (e)

ULP webpage
http://ulpeis.anl.gov

**FIGURE 6.2-1  (Cont.)**

BLM_0041657

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                 *Do Not Distribute*

**ATTACHMENTS**



**FIGURE 1 – Location of DOE ULP Lease Tracts in Mesa, Montrose, and San Miguel Counties, Colorado**

1

2    **FIGURE 6.2-1  (Cont.)**

3

BLM_0041658

*Preliminary Draft PEIS*               *PEIS Privileged Information*               *May 2012*
*PEIS Team Use Only*                     *Do Not Distribute*

**TABLE 1 – Species Listed as Endangered or Threatened Under the Endangered Species Act, or Species That are Proposed or Candidates for Listing Under the Endangered Species Act That May Occur in the Counties Where DOE ULP Lease Tracts are Located**

| Scientific Name | Common Name | Status[a] | Counties in Which Species May Occur | Counties in Which Critical Habitat May Occur |
|---|---|---|---|---|
| **Plants** | | | | |
| *Phacelia submutica* | Debeque phacelia | PT | Mesa | |
| *Eriogonum pelinophilum* | Clay-loving wild buckwheat | E | Montrose | |
| *Sclerocactus glaucus* | Colorado hookless cactus | T | Mesa, Montrose | |
| **Invertebrates** | | | | |
| *Boloria acrocnema* | Uncompahgre fritillary butterfly | E | San Miguel | |
| **Fish** | | | | |
| *Gila cypha* | Humpback chub | E | Mesa, Montrose, San Miguel | Mesa[b] |
| *Gila elegans* | Bonytail | E | Mesa, Montrose, San Miguel | Mesa[b] |
| *Oncorhynchus clarki stomias* | Greenback cutthroat trout | T | Mesa | |
| *Ptychocheilus lucius* | Colorado pikeminnow | E | Mesa, Montrose, San Miguel | Mesa[b] |
| *Xyrauchen texanus* | Razorback sucker | E | Mesa, Montrose, San Miguel | Mesa[b] |
| **Birds** | | | | |
| *Centrocercus minimus* | Gunnison sage-grouse | C | Mesa, Montrose, San Miguel | |
| *Centrocercus urophasianus* | Greater sage-grouse | C | Mesa, Montrose, San Miguel | |
| *Coccyzus americanus* | Yellow-billed cuckoo | C | Mesa, Montrose, San Miguel | |
| *Empidonax traillii extimus* | Southwestern willow flycatcher | E | San Miguel | |
| *Strix occidentalis lucida* | Mexican spotted owl | T | Montrose, San Miguel | |
| **Mammals** | | | | |
| *Cynomys gunnisoni* | Gunnison's prairie dog | C | Montrose | |
| *Lynx canadensis* | Canada lynx | T | Mesa, Montrose, San Miguel | |
| *Mustela nigripes* | Black-footed ferret | E | Montrose, San Miguel | |

[a]   C = candidate; E = endangered; PT = proposed threatened; T = threatened.

[b]   Designated critical habitats for these species are located outside the DOE ULP lease tracts (on the Colorado and Gunnison Rivers).

1

2   **FIGURE 6.2-1  (Cont.)**

3

BLM_0041659

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*



**FIGURE 2 — Location of Designated Critical Habitats Relative to the DOE ULP Lease Tracts**

1

2    **FIGURE 6.2-1  (Cont.)**

3

BLM_0041660

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                   *Do Not Distribute*



United States Department of the Interior

FISH AND WILDLIFE SERVICE
Ecological Services
764 Horizon Drive, Building B
Grand Junction, Colorado 81506-3946

IN REPLY REFER TO:
ES/CO: DOE
TAILS: 06E24100-2012-TA-0033



November 16, 2011

Tracy A. Ribeiro
Environmental Manager
US Department of Energy
Office of Legacy Management
Grand Junction, CO  81503

Dear Ms. Ribeiro:

This responds to your November 7, 2011, correspondence regarding the US Department of Energy, Office of Legacy Management (DOE) Uranium Leasing Program (ULP). We understand that you are preparing a Programmatic Environmental Impact Statement to evaluate the potential impacts of the ULP in Mesa, Montrose, and San Miguel Counties, Colorado.

You submitted a preliminary list of federally endangered, threatened, and candidate species that may occur in the counties where DOE's ULP lease tracts are located. We discussed your preliminary species list in our meeting on November 9, and concluded that it is an appropriate list with the following exceptions: 1) remove greater sage-grouse (*Centrocercus Urophasianus*) because this candidate species does not occur in Mesa, Montrose, or San Miguel Counties, and 2) add North American wolverine (*Gulo gulo luscus*) because this candidate species may occur in  Mesa, Montrose, or San Miguel Counties. You should determine what species on the list occur in the ULP areas, or may be affected by the ULP. Your biological assessment should provide an analysis of how the ULP may affect listed species.

One or more candidate species potentially occur within the project area. Federal candidates for official listing as threatened or endangered have no legal protection under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.) (Act). However, it is within the spirit of the Act to consider project impacts to these species.

1

2    **FIGURE 6.2-2  Letter of Response from the U.S. Fish and Wildlife Service**
3

BLM_0041661

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*

In the future, we recommend that DOE and its contractors use our web-based Information Planning and Conservation system (IPAC) (http://ecos.fws.gov/ipac/) to obtain an official species list.  If the Service can be of further assistance, please contact Patty Gelatt at the letterhead address or (970) 243-2778, extension 26.

Sincerely,

Pamela Repp
Acting Western Colorado Field Supervisor

2

1

**FIGURE 6.2-2  (Cont.)**

BLM_0041662

*Preliminary Draft PEIS*
*PEIS Team Use Only*

*PEIS Privileged Information*
*Do Not Distribute*

*May 2012*

1

BLM_0041663

1
2
3
4
5
6
7
8
9
10
11
12                                    *This page intentionally left blank*
13

BLM_0041664

# 7 INDEX

**A**

agriculture
air quality
Alternative 1
    comparison of consequences across alternatives
    description
Alternative 2
    comparison of consequences across alternatives
    description
Alternative 3
    comparison of consequences across alternatives
    description
Alternative 4 (trench, all land sites)
    comparison of consequences across alternatives
    description
Alternative 5
    comparison of consequences across alternatives
    description
American Indian tribes
amphibians
aquatic species

**B**

biological resources
Book Cliff Mine

**C**

climate
contractor disclosure statement
consultation correspondence
criteria pollutants
cultural resources
    approach, assumptions, methodology
cumulative impacts
    approach, assumptions, methodology

BLM_0041665

1   **D**
2
3   Daneros Mine
4   development
5   doses
6
7   **E**
8
9   ecological resources
10          approach, assumptions, methodology
11          comparison of consequences across alternatives
12          impacts under Alternatives 1, 2, 3, 4, 5
13   emissions, *see* pollutant emissions
14   employment
15   endangered species
16   environmental impacts
17          assessment methods
18          under Alternative 1, 2, 3, 4, 5
19   environmental justice
20   exploration
21
22   **F**
23
24   fish
25   Fry Canyon Mill
26   future actions, *see* reclamation
27
28   **G**
29
30   geologic resources
31          approach, assumptions, methodology
32          comparison of consequences across alternatives
33   groundwater
34
35   **H**
36
37   Hanging Flume Replica
38   human health
39          approach, assumptions, methodology
40          comparison of consequences across alternatives
41
42   **I, J, K**
43
44   No entries
45

BLM_0041666

1  **L**
2
3  land use
4        approach, assumptions, methodology
5        comparison of consequences across alternatives
6  latent cancer fatality (LCF)
7  laws
8  lease tracts
9  long-term impacts
10  low-income populations
11
12  **M**
13
14  mammals
15  maps of lease tract sites
16  minority populations
17
18  **N**
19
20  Native Americans
21  NEPA (National Environmental Policy)
22  No Action Alternative
23  noise
24
25  **O**
26
27  operations
28
29  **P**
30
31  Piñon Ridge Mill
32  pollutant emissions
33  population
34  preferred alternative
35  preparers
36  proposed action
37  public scoping process
38  public services
39  purpose and need for agency action
40
41  **Q**
42
43  No entries
44

BLM_0041667

**R**

radiation or radiological doses, *see* doses
radiological impacts
regulations, *see* laws
reptiles

**S**

sensitive visual resource area
short-term impacts
socioeconomic resources
      approach, assumptions, methodology
      comparison of consequences across alternatives
soil resources
special-status species
surface water

**T**

terrestrial ecology, *see* wildlife or vegetation
threatened species
traffic, *see* transportation
transportation
tribal consultations

**U**

ULP
unemployment
uranium

**V**

vegetation, *see* ecology
visual resources

**W**

waste management
water resources
Western Area Power Administration
White Mesa Mill
wildlife, *see* ecology

BLM_0041668

1  wetlands, *see* ecology
2  WIPP Vicinity (Section 1.4.3.7, Chapter 11)
3
4  **X, Y, Z**
5
6  No entries
7
8

BLM_0041669

*Preliminary Draft PEIS*  *PEIS Privileged Information*  *May 2012*
*PEIS Team Use Only*  *Do Not Distribute*

1
2
3
4
5
6
7
8
9
10
11
12
13  *This page intentionally left blank*
14

BLM_0041670

# 8 REFERENCES

Ackerman, D.J., and F.E. Rush, 1984, *Hydrogeologic Reconnaissance of the San Miguel River Basin, Southwestern Colorado*, Open File 84-4133, U.S. Geological Survey.

Acoustical Society of America, 1983, *American National Standard Specification for Sound Level Meters, ANSI S1.4-1983*, New York, N.Y.

Acoustical Society of America, 1985, *American National Standard Specification for Sound Level Meters, ANSI S1.4A-1985 Amendment to ANSI S1.4-1983*, New York, N.Y., June 26.

AEC (U.S. Atomic Energy Commission), 1972, *Leasing of AEC Controlled Uranium Bearing Land, Colorado, Utah, New Mexico*, WASH-1523, Sept.

Allred, T.M., and E.D. Andrews, 2000, *Hydrology, Geomorphology, and Sediment Transport of the San Miguel River, Southwest Colorado*, Water Resources Investigation Report 00-4075, U.S. Geological Survey.

AMA (American Medical Association), 2010, *Physician-Related Data Resources*, Chicago, Ill. Available at http://www.ama-assn.org/cgi-bin/sserver/datalist.cgi.

AMEC Americas Limited, 2005, *Mackenzie Gas Project Effects of Noise on Wildlife*, prepared for Imperial Oil Resources Ventures Limited, July. Available at http://www.ngps.nt.ca/Upload/ Proponent/Imperial%20Oil%20Resources%20Ventures%20Limited/birdfield_wildlife/ Documents/Noise_Wildlife_Report_Filed.pdf. Accessed Feb. 19, 2010.

Anderson, R., and G. Stewart, 2003, *Riverine Fish Flow Investigations*, Federal Aid Project F-289-R6, Colorado Division of Wildlife, Fish Research Section, Fort Collins, Colo., June.

ARB (California Air Resources Board), 2011, *2004 Inventory: Main Speciation Profiles*. Available at http://www.arb.ca.gov/ei/speciate/profphp04/pmprof_list.php. Accessed Dec. 15, 2011.

Argus (Argus Metals Corp.), 2008a, *Bluerock Updates Mining and Development Project Status of US Uranium Mining Operations*, Sep. 22. Available at http://www.bluerockresources.com/s/ NewsReleases.asp?ReportID=320172&_Title=Bluerock-Updates-Mining-And-Development- Project-Status-Of-US-Uranium-Mining. Accessed Feb. 28, 2012.

Argus, 2008b, *Bluerock Receives First Ore Purchase Payment and Continues with Care and Maintainance of US Uranium Mining Operations*, Oct. 31. Available at http://www.bluerock resources.com/s/NewsReleases.asp?ReportID=326342&_Type=News-Releases&_Title= Bluerock-Receives-First-Ore-Purchase-Payment-And-Continues-With-Care-And-Ma. Accessed Feb. 28, 2012.

BLM_0041671

1  Arnett, E.B., et al., 2007, *Impacts of Wind Energy Facilities on Wildlife and Wildlife Habitat*,
2  Wildlife Society Technical Review 07-2, The Wildlife Society, Bethesda, Md., Sept.
3
4  ATSDR (Agency for Toxic Substances and Disease Registry), 2012, *Minimal Risk Levels*
5  *(MRLs)*, Feb. Available at http://www.atsdr.cdc.gov/mrls/pdfs/atsdr_mrls_february_2012.pdf.
6  Accessed March 19, 2012.
7
8  Barber, J.R., et al., 2010, "The Costs of Chronic Noise Exposure for Terrestrial Organisms,"
9  *Trends in Ecology and Evolution* 25(3):180–189.
10
11 Barber, J.R., et al., 2011, "Anthropogenic Noise Exposure in Protected Natural Areas:
12 Estimating the Scale of Ecological Consequences," *Landscape Ecol.* 26:1281–1295.
13
14 Beaulaurier, D.L., et al., 1984, "Mitigating the Incidence of Bird Collisions with Transmission
15 Lines," pp. 539–550 in: *Proceedings of the Third International Symposium on Environmental*
16 *Concerns in Rights-of-Way Management*, A.F. Crabtree (ed.), Mississippi State University,
17 Mississippi State, Miss.
18
19 Belnap, J., et al., 2001, *Biological Soil Crusts: Ecology and Management*, U.S. Department of
20 the Interior, Bureau of Land Management, Technical Reference 1730-2.
21
22 Bevanger, K., 1995, "Tetraonid Mortality Caused by Collisions with Power Lines in Boreal
23 Forest Habitats in Central Norway," *Fauna Norvegica, Series C, Cinclus* 18:41–51.
24
25 BirdLife International, 2003, *Protecting Birds from Powerlines: A Practical Guide on the Risks*
26 *to Birds from Electricity Transmission Facilities and How to Minimise Any Such Adverse Effects*,
27 T-PVS/Inf (2003) 15, Convention on the Conservation of European Wildlife and Natural
28 Habitats, Standing Committee, 23rd Meeting, Strasbourg, Dec. 1–4. Available at http://www.
29 coe.int/T/E/Cultural_Co-operation/Environment/Nature_and_biological_diversity/Nature_
30 protection. Accessed Oct. 23, 2006.
31
32 BLM (Bureau of Land Management), 1984, *Manual 8400—Visual Resource Management*.
33 Available at http://www.blm.gov/nstc/VRM/8400.html. Accessed Dec. 2, 2011.
34
35 BLM, 1985, *San Juan/San Miguel Planning Area, Resource Management Plan*, Montrose
36 District, Sept. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/
37 uncompahgre_field/documents.Par.92100.File.dat/SJSMROD.pdf. Accessed Dec. 12, 2011.
38
39 BLM, 1986a, *Manual H-8410-1—Visual Resource Inventory*. Available at http://www.blm.gov/
40 nstc/VRM/8410.html. Accessed Dec. 1, 2011.
41
42 BLM, 1986b, *Manual 8431, Visual Resource Contrast Rating*. Available at http://www.blm.gov/
43 nstc/VRM/8431.html. Accessed Jan. 30, 2012.
44

BLM_0041672

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                 *Do Not Distribute*

1   BLM, 1987, *Grand Junction Resource Area Resource Management Plan and Record of*
2   *Decision*, Grand Junction District, Colo., Jan. Available at http://www.blm.gov/pgdata/etc/
3   medialib/blm/co/programs/land_use_planning/rmp/archives/grand_junction/rmp_rod_1987.
4   Par.75778.File.dat/GJRMRD.pdf. Accessed Dec. 6, 2011.
5
6   BLM, 1988, *Uncompahgre Basin Resource Management Plan and Environmental Impact*
7   *Statement*, Montrose District, Colo., Uncompahgre Basin Resource Area, Sept. Available at
8   http://www.blm.gov/pgdata/etc/medialib/blm/co/programs/land_use_planning/rmp/archives/
9   Uncompahgre/final_rmp_eis.Par.41451.File.dat/Ubfrmp.pdf. Accessed Dec. 12, 2011.
10
11   BLM, 1995, *Uranium Closure/Reclamation Guidelines*, supplement to the BLM Solid Minerals
12   Reclamation Handbook, BLM Handbook H-3042-1.
13
14   BLM, 2001, *Colorado Water Rights Fact Sheet*. Available at http://www.blm.gov/nstc/
15   WaterLaws/colorado.html.
16
17   BLM, 2007a, "Scenery, Visual Resources, and the Built Environment," Chapter 3.22 in
18   Volume 1 of *San Juan Public Lands Draft Land Management Plan and Draft*
19   *Environmental Impact Statement.* Available at http://ocs.fortlewis.edu/forestPlan/DEIS/
20   pdf/Vol1%20Ch3.22%20Scenery,%20Visual%20Resources,%20Built%20Environment.pdf.
21   Accessed Dec. 6, 2011.
22
23   BLM, 2007b, "Executive Summary," in *San Juan Public Lands Draft Land Management Plan*
24   *and Draft Environmental Impact Statement.* Available at http://ocs.fortlewis.edu/forestPlan/
25   DEIS/pdf/DLMP-DEIS%20Executive%20Summary.pdf. Accessed Dec. 12, 2011.
26
27   BLM, 2008a, *Special Status Species Management*, BLM Manual 6840, Release 6-125,
28   U.S. Department of the Interior, Dec. 12.
29
30   BLM, 2008b, *Final Environmental Assessment for the Whirlwind Mine Uranium Mining Project*,
31   CO-130-2008-024-EA, Grand Junction Field Office, Grand Junction, Colo., and Moab Field
32   Office, Moab, Utah, Sept. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/
33   field_offices/grand_junction_field/PDF.Par.16552.File.dat/WhirlwinMineEAfinal.pdf. Accessed
34   Feb. 22, 2012.
35
36   BLM, 2008w, *Denison Mines (USA) Corp. Sunday Mines Environmental Assessment,*
37   CO-800-2007-104EA, prepared by Denison Mines, Denver, Colo., for U.S. Department of the
38   Interior, BLM Dolores Public Lands Office, Dolores, Colo., Nov.
39
40   BLM, 2009a, *Draft Environmental Impact Statement—Proposed Red Cliff Mine Project*
41   *and Federal Coal Lease by Application*, Jan. 6. Available at http://www.blm.gov/co/st/en/
42   BLM_Programs/land_use_planning/rmp/red_cliff_mine/documents.html. Accessed
43   Feb. 24, 2012.
44

BLM_0041673

1   BLM, 2009b, *Decision Record, Finding of No Significant Impact, and Environmental*
2   *Assessment for the Daneros Mine Project*, Monticello Field Office, May. Available at
3   https://www.blm.gov/ut/enbb/files/Daneros__EA_FONSI_DR_revised.pdf. Accessed
4   Feb. 28, 2012.
5
6   BLM, 2009c, *Uncompahgre Basin & San Juan/San Miguel Resource Management Plan*
7   *Amendments, Environmental Assessment,* DOI-BLM-CO-S050-2008-0064, Nov. Available at
8   http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/
9   ufo_nepa_documents0.Par.55807.File.dat/2008-64-EA%20Field%20Office%20Wide%20
10  Travel%20Amendment.pdf.
11
12  BLM, 2010a, *Uncompahgre RMP Planning*, RMP Planning Fact Sheet 2.1, Uncompahgre
13  Field Office. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/
14  uncompahgre_field/documents.Par.55529.File.dat/UFO%20RMP%20Fact%20Sheet%202.1%
15  20Uncompahgre%20RMP%20Planning.pdf.
16
17  BLM, 2010b, *Visual Resource Management*, RMP Planning Fact Sheet 3.3, Uncompahgre
18  Field Office. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/
19  uncompahgre_field/documents.Par.26470.File.dat/UFO%20RMP%20Fact%20Sheet%203.3%
20  20Visual%20Resource%20Management.pdf.
21
22  BLM, 2010c, *Fact Sheet: Gas Development in the North Fork,* Uncompahgre Field Office.
23  Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/
24  documents.Par.8035.File.dat/North%20Fork%20O&G%20fact%20sheet_final.pdf. Accessed
25  Feb. 28, 2012.
26
27  BLM, 2010d, *Uncompahgre RMP Planning Area, Visual Resource Inventory* (map),
28  Datum: NAD 83, Projection: UTM, Zone 13, Jan. Available at http://www.blm.gov/pgdata/
29  etc/medialib/blm/co/field_offices/uncompahgre_field/maps.Par.56129.File.dat/Map_Visual_
30  Resource_Inventory.pdf. Accessed Dec. 6, 2011.
31
32  BLM, 2010d, *Dolores River Information—Dolores Public Lands Office*, March 25. Available at
33  http://www.blm.gov/co/st/en/fo/sjplc/recreation/sjdolores.html. Accessed Feb. 22, 2012.
34
35  BLM, 2011d, *RMP Planning Calendar,* Resource Management Planning, Resource Management
36  Plan, Grant Junction, Colo., Field Office, U.S. Department of the Interior. Available at
37  http://www.blm.gov/co/st/en/fo/gjfo/rmp.html. Accessed Dec. 6, 2011.
38
39  BLM, 2011d, *Notice of Public Scoping for Potassium Prospecting and Exploration,* Dolores
40  Field Office, June 27 Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/
41  field_offices/san_juan_public_lands/pdf.Par.22579.File.dat/20110624_SIGNED_
42  SCOPING_LETTER_Potash.pdf. Accessed Feb. 22, 2012.
43

BLM_0041674

1  BLM, 2011e, *Greater Sage-Grouse Interim Management Policies and Procedures,*
2  BLM IM 2012-043. Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_
3  Memos_and_Bulletins/national_instruction/2012/IM_2012-043.html. Accessed Feb. 7, 2012.
4
5  BLM, 2011f, *BLM National Greater Sage-Grouse Land Use Planning Strategy,*
6  BLM IM 2012-044. Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_
7  Memos_and_Bulletins/national_instruction/2012/IM_2012-044.html. Accessed Feb. 7, 2012.
8
9  BLM, 2011g, *The National Landscape Conservation System: 15-Year Strategy, 2010–2025,*
10  Report BLM/WO/GI-11/013+6100.
11
12  BLM, 2011h, *Land and Mineral Legacy Rehost 2000 System—LR2000,* last updated Sept. 23,
13  2011. Available at http://blm.gov/lr2000. Accessed Dec. 14, 2011.
14
15  BLM, 2011h, *Environmental Assessment: La Sal No. 2 Uranium Sampling Project,* Moab Field
16  Office, DOI-BLM-UT-Y010-2011-0162-EA. Sept. Available at http://www.blm.gov/pgdata/
17  etc/medialib/blm/ut/moab_fo/ea_postings.Par.74657.File.dat/LaSalNo2EA.pdf. Accessed
18  Feb. 28, 2012.
19
20  BLM, 2011i, *Herd Management Areas and Herd Area Maps by State*, updated Nov. 1. Available
21  at http://www.blm.gov/wo/st/en/prog/whbprogram/herd_management/HMA_and_HA_Maps.
22  html. Accessed Feb. 22, 2012.
23
24  BLM, 2011i, *Determination of NEPA Adequacy: Hanging Flume Replica Construction,*
25  Uncompahgre Field Office, DOI-BLM-CO-S050-2011-0028DNA, Aug. Available at
26  http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/
27  ufo_nepa_documents0.Par.80861.File.dat/11-28%20DNA%20Hanging%20Flume%
28  20Replica%20Construction.pdf. Accessed Feb. 28, 2012.
29
30  BLM, 2011j, *Environmental Assessment: East Paradox LHA Grazing Permit Renewals,*
31  Uncompahgre Field Office, DOI-BLM-CO-S050-2011-0023 EA. Available at
32  http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/
33  ufo_nepa_documents0.Par.26626.File.dat/11-23%20EA%20E_Paradox%20LHA%20
34  Grazing%20Permit%20Renewal.pdf. Accessed Feb. 22, 2012.
35
36  BLM, 2011k, *Environmental Assessment: November 2011 Competitive Oil and Gas Lease Sale,*
37  DOI-BLM-CO-S050-2011-0003 EA, Uncompahgre Field Office. Available at
38  http://www.blm.gov/pgdata/etc/medialib/blm/co/programs/oil_and_gas/Lease_Sale/2011/
39  november_2011.Par.75091.File.dat/UFO_Sale%20NoticeFinal%20EA.pdf. Accessed
40  Feb. 24, 2012.
41
42  BLM, 2011k, *Uncompahgre Field Office Recreation.* Available at http://www.blm.gov/co/st/
43  en/fo/ufo/recreation.html.
44

BLM_0041675

1   BLM, 2011l, *Environmental Assessment for the November 2011 Oil and Gas Lease Sale,*
2   DOI-BLM-CO-130-2011-0043-EA, Grand Junction Field Office, July. Available at
3   http://www.blm.gov/pgdata/etc/medialib/blm/co/programs/oil_and_gas/Lease_Sale/2011/
4   november_2011.Par.35745.File.dat/GJ_Final%20Sale%20EA.pdf. Accessed Feb. 22, 2012.
5
6   BLM, 2011z, *Public Land Statistics—2010,* Vol. 195, Report BLM/OC/ST-11/001+1165, June.
7
8   BLM 2012, *Uncompahgre Field Office Recreation: Visitation and Land Use.* Available at
9   http://www.blm.gov/co/st/en/fo/ufo/recreation.html.
10
11  BLM, 2012, *Environmental Assessment: Dolores River Restoration Treatments,* DOI-BLM-CO-
12  S050-2012-0011 EA, Uncompahgre Field Office, March. Available at http://www.blm.gov/
13  pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/ufo_nepa_documents0.
14  Par.39048.File.dat/12-11%20EA%20Dolores%20RiverRestoration.pdf. Accessed May 8, 2012.
15
16  BLM, 2012w, *Draft Programmatic Environmental Impact Statement and Possible Land Use*
17  *Plan Amendments for Allocation of Oil Shale and Tar Sands Resources on Lands Administered*
18  *by the Bureau of Land Management in Colorado, Utah, and Wyoming,* DOI/DES 12-01,
19  U.S. Department of the Interior, Feb.
20
21  BLM, undated, *A Recreation and Visitors Strategy,* Colorado Recreation Program, Available at
22  http://www.blm.gov/pgdata/etc/medialib/blm/co/programs/recreation.Par.23531.File.dat/
23  Rec%20Strategy.pdf.
24
25  BLS (Bureau of Labor Statistics), 2011a, *Number of Fatal Work Injuries, 1992–2010,*
26  U.S. Department of Labor. Available at http://www.bls.gov/iif/oshwc/cfoi/cfch0009.pdf.
27  Accessed March 13, 2012.
28
29  BLS, 2011b, *2010 Survey of Occupational Injuries & Illnesses, Summary Estimates Charts*
30  *Package,* Oct. 20. Available at http://www.bls.gov/iif/oshwc/osh/os/osch0044.pdf. Accessed
31  March 13, 2012.
32
33  Boardman, R.L., et al., 1957, *Results of U.S. Geological Survey Exploration for Uranium-*
34  *Vanadium Deposits in the Club Mesa Area, Uravan District, Montrose County, Colorado,* Trace
35  Elements Memorandum Report 979, U.S. Geological Survey, May.
36
37  BOR (Bureau of Reclamation), 2009, *McPhee Dam.* Available at http://www.usbr.gov/projects/
38  PrintFacilityAttributes.jsp?fac_Name=McPhee%20Dam.
39
40  BOR, 2011, *Dolores Project.* Available at http://www.usbr.gov/projects/Project.jsp?proj_Name=
41  Dolores%20Project. Accessed Feb. 17, 2012.
42
43  BOR, 2012, *CRBSCP—Paradox Valley Unit—Title II.* Available at http://www.usbr.gov/
44  projects/Project.jsp?proj_Name=CRBSCP%20-%20Paradox%20Valley%20Unit%20-%20
45  Title%20II&pageType=ProjectPage. Accessed Feb. 17, 2012.
46

BLM_0041676

1    Breit, G.N., and J.L. Fisher, 1988, *Variations in the Abundance of Occluded Light Hydrocarbons*
2    *(C1–C5) and Their Relation to Diagenetic Changes, in the Salt Wash Member, Late Jurassic*
3    *Morrison Formation, Slick Rock District, San Miguel County, Colorado*, Open File
4    Report 88-586, U.S. Geological Survey.

6    Brown, B.T., et al., 1999, "The Influence of Weapons-Testing Noise on Bald Eagle Behavior,"
7    *Journal of Raptor Research* 33:227–232.

9    Brown, P.E., et al., 2000, "Evicting Bats When Gates Won't Work: Unstable Mines and
10   Renewed Mining," in K.C. Vories and D. Throgmorton (editors), *Bat Conservation and Mining:*
11   *A Technical Interactive Forum*, U.S. Department of the Interior, Office of Surface Mining; Bat
12   Conservation International; Coal Research Center, Southern Illinois University at Carbondale.

14   Bullock, Jr., J.H., et al., 1989, *Analytical Results and Sample Locality Maps of Stream-Sediment*
15   *and Heavy-Mineral-Concentrate Samples from Dolores River Canyon Wilderness Study Area*
16   *(CO-030-290), Montrose and San Miguel counties, Colorado,* Open-File Report 89-187,
17   U.S. Geological Survey.

19   CDA (Colorado Department of Agriculture), 2010, *Noxious Weed Management Program,*
20   *Colorado Weed Mapping.* Available at http://www.colorado.gov/cs/Satellite/Agriculture-Main/
21   CDAG/1167928184069. Accessed Dec. 21, 2011.

23   CDA, 2011, *Noxious Weed Management Program, Noxious Weed List.* Available at
24   http://www.colorado.gov/cs/Satellite?c=Page&cid=1174084048733&pagename=Agriculture-
25   Main%2FCDAGLayout. Accessed Dec. 21, 2011.

27   CDM (CDM, Inc.), 2010, *Plan of Operations Amendment, Denison Mines (USA) Corp., La Sal*
28   *Mines Complex, San Juan County, Utah,* prepared for Denison Mines (USA) Corp., Nov.
29   Available at http://www.blm.gov/pgdata/etc/medialib/blm/ut/moab_fo/La_Sal_Mines_
30   Complex_Documents.Par.78220.File.dat/La%20Sal%20Mines%20Complex%20Plan%20of
31   %20Operations.pdf. Accessed Feb. 28, 2012.

33   CDMG (Colorado Division of Minerals and Geology), 2002, *Best Practices in Abandoned Mine*
34   *Land Reclamation*, Sate of Colorado, Denver, Colo.

36   CDNR (Colorado Department of Natural Resources), 2008, *Colorado Mineral and Energy*
37   *Industry Activities, 2007,* Colorado Geological Survey. Available at http://geosurvey.state.co.us/
38   SiteCollectionDocuments/EnergyResources/MER_07_FINAL.pdf. Accessed Feb. 22, 2012.

40   CDNR, 2011, *Uranium Mining in Colorado 2011*, Division of Reclamation, Mining, and Safety.
41   June 13.

43   CDNR, 2012, *Uranium Mining in Colorado 2012,* Division of Reclamation, Mining, and Safety.
44   Jan. 13.

BLM_0041677

CDOT (Colorado Department of Transportation), 2011, *DTD DataAccess—Statistics, Maps, and Data—Traffic Data.* Available at http://apps.coloradodot.info/dataaccess/Traffic/index.cfm?fuseaction=TrafficMain&Menu. Accessed Nov. 4, 2011.

CDOT, 2012, *DTD DataAccess—Statistics, Maps, and Data—Traffic Data.* Available at http://apps.coloradodot.info/dataaccess/Traffic/index.cfm?fuseaction=TrafficMain&Menu. Accessed Nov. 4, 2011.

CDOW (Colorado Division of Wildlife), 2011a, *Natural Diversity Information Source Data*, Colorado Department of Natural Resources, Division of Wildlife, Denver, Colo. Available at http://ndis.nrel.colostate.edu/wildlife.html. Accessed Dec. 15, 2011.

CDPHE (Colorado Department of Public Health and Environment), 2003, *Total Maximum Daily Load for Mercury in McPhee and Narraguinnep Reservoirs, Colorado, Phase I*, Technical Report.

CDPHE, 2008, *Total Maximum Daily Load Assessment San Miguel River Segments (cogusm03a, cogusm03b, cogusm06a, cogusm06b) Zinc and Cadmium, San Miguel County, Colorado*, Technical Report, Water Quality Control Division.

CDPHE, 2011a, *2008 Air Pollutant Emissions Inventory*, on-line database, Denver, Colo. Available at http://www.colorado.gov/airquality/inv_maps_2008.aspx. Accessed Nov. 23, 2011.

CDPHE, 2011b, *Air Quality Standards, Designations and Emission Budgets*, 5 CCR 1001-14, Colorado Air Quality Control Commission, Denver, Colo. Available at http://www.cdphe.state.co.us/regulations/airregs/5CCR1001-14.pdf. Accessed Nov. 5, 2011.

CDPHE, 2011c, *Colorado 2010 Air Quality Data Report*, Denver, Colo. Available at http://www.colorado.gov/airquality/tech.aspx. Accessed Nov. 5, 2011.

CDPHE, 2011d, *Energy Fuels Piñon Ridge Uranium Mill License Decision*, Radiation Program, March 7.

CDRMS (Colorado Division of Reclamation, Mining, and Safety), 2011, *Monthly Coal Detail Report, January through December 2010*, Feb. 15. Available at http://mining.state.co.us/Reports/Detail2010.pdf. Accessed Feb. 17, 2012.

CDRMS, 2012a, *Monthly Coal Summary Report, January through December 2011*, Feb. 7. Available at http://mining.state.co.us/Reports/CoalSummary2011.pdf. Accessed Feb. 17, 2012.

CDRMS, 2012b, *County Operator Mining Data (Delta, Dolores, Mesa, Montezuma, Montrose, and San Miguel Counties).* Available at http://mining.state.co.us/County%20Operator%20Mining%20Data.htm. Accessed Feb. 17, 2012.

BLM_0041678

1   CDWR (Colorado Division of Water Resources), 2005, *Rules and Regulations for Water Well*
2   *Construction, Pump Installation, Cistern Installation, and Monitoring and Observation*
3   *Hole/Well Construction,* 2-CCR-402-2, Denver, Colo.

5   CDWR, 2007, *General Information about Well Permits in Division IV,* Jan. 17.

7   CDWR, 2011, *Colorado's Decision Support Systems (CDSS).* Available at http://cdss.state.co.us/
8   Pages/CDSSHome.aspx. Accessed Dec. 23, 2011.

10  CEQ (Council on Environmental Quality), 1997, *Environmental Justice Guidance under the*
11  *National Environmental Policy Act,* Executive Office of the President, Washington, D.C.
12  Available at http://www.whitehouse.gov/CEO/April.

14  Chafin, D.T., 2003, *Effect of the Paradox Valley Unit on the Dissolved-Solids Load of the*
15  *Dolores River near Bedrock, Colorado, 1988–2001,* Water Resources Investigation
16  Report 02-4275, U.S. Geological Survey.

18  Chapman, S.S., et al., 2006, *Ecoregions of Colorado* (color poster with map, descriptive text,
19  summary tables, and photographs; map scale 1:1,200,000), U.S. Geological Survey, Reston, Va.

21  Chenoweth, W.L., 1981, "The Uranium-Vanadium Deposits of the Uravan Mineral Belt and
22  Adjacent Areas, Colorado and Utah," in *New Mexico Geological Society Guidebook*, R.C. Epis
23  and J.F. Callender (editors), 32nd Field Conference, Oct. 8–10, pp. 165–170.

25  Chenoweth, W.L., 1987, "Paradox Valley, Colorado: A Collapsed Salt Anticline," in *Geological*
26  *Society of America Centennial Field Guide—Rocky Mountain Section,* Vol. 2, S.S. Beus (editor).

28  Chronic, H., and F. Williams, 2002, *Roadside Geology of Colorado,* Second Edition, Mountain
29  Press Publishing Co., Missoula, Mt.

31  CNHP (Colorado Natural Heritage Program), 2011a, *Rare Plant Guide List.* Available at
32  http://www.cnhp.colostate.edu/download/projects/rareplants/list.asp?list=master. Accessed
33  Dec. 16, 2011.

35  CNHP, 2011b, *Element Occurrences by Quad.* Available at http://www.cnhp.colostate.edu/
36  download/gis.asp#maps. Accessed Dec. 16, 2011.

38  COGCC (Colorado Oil and Gas Conservation Commission), 2012a, *COGCC Reports Portal—*
39  *Production Data Inquiry for Delta, Dolores, Mesa, Montezuma, Montrose, and San Miguel*
40  *Counties,* State of Colorado Department of Natural Resources. Available at http://cogcc.state.
41  co.us/cogis. Accessed Feb. 17, 2012.
42

BLM_0041679

1  COGCC, 2012b, *Colorado Oil and Gas Information System—Production Data Inquiries for*
2  *T43N, R18W, R19W, and R20W; T44N, R18W, and R19W; T45N, R18W; T46N, R17W; T47N,*
3  *R17W; and T48N, R17W, and R18W*, State of Colorado Department of Natural Resources,
4  Jan. 20.
5
6  Colorado Department of Education, 2011, *Colorado Education Statistics, Class of 2010*
7  *Graduation Data*. Available at http://www.cde.state.co.us/cdereval/rv2010GradLinks.htm.
8
9  Colorado Department of Local Affairs, *Economic Base Analysis—Result*. Available at
10  https://dola.colorado.gov/demog_webapps/eba_parameters.jsf.
11
12  Colorado State Demography Office, 2011, *Population Forecasts—Years (2000 to 2040)*.
13  Available at http://www.colorado.gov/cs/Satellite?c=Page&childpagename=DOLA-
14  Main%2FCBONLayout&cid=1251593346834&pagename=CBONWrapper.
15
16  Corona Research, Inc., 2009, *Colorado State Parks Marketing Assessment: Visitor Spending*
17  *Analysis, 2008–2009*. Available at http://parks.state.co.us/SiteCollectionImages/parks/News/
18  COStateParksVisitorSpendingFinalReport.pdf.
19
20  Countess Environmental, 2006, *WRAP Fugitive Dust Handbook*, prepared for Western
21  Governors' Association, Denver, Colo., Sept. 7. Available at http://www.wrapair.org/forums/
22  dejf/fdh/content/FDHandbook_Rev_06.pdf. Accessed Dec. 15, 2011.
23
24  Cowardin, L.M., et al., 1979, *Classification of Wetlands and Deepwater Habitats of the*
25  *United States*, FWS/OBS-79/31, U.S. Fish and Wildlife Service, Dec.
26
27  Craig, L.C., 1982, *Uranium Potential of the Burro Canyon Formation in Western Colorado*,
28  U.S. Geological Survey Open File Report 82-222.
29
30  CSFS (Colorado State Forest Service), 2009, *Durango District 2009 Annual Report*. Available at
31  http://csfs.colostate.edu/pdfs/FINAL_Durango_AR09.pdf. Accessed Feb. 21, 2012.
32
33  Cunnington, G.M., and L. Fahrig, 2010, "Plasticity in the Vocalizations of Anurans in Response
34  to Traffic Noise," *Acta Oecologica* 36:463–470.
35
36  Curtis, G.P., et al., 2006, "Simulation of Reactive Transport of Uranium (VI) in Groundwater
37  with Variable Chemical Conditions," *Water Resources Research* 42, W04404, doi:10.1029/
38  2005WR003979.
39
40  CWCB (Colorado Water Conservation Board), 2012, *Instream Flow Program*. Available at
41  http://cwcb.state.co.us/environment/instream-flow-program/Pages/main.aspx. Accessed
42  Feb. 17, 2012.
43

BLM_0041680

1   Delaney, D.K., et al., 1999, "Effects of Helicopter Noise on Mexican Spotted Owls," *Journal of*
2   *Wildlife Management* 63(1):60–76. Available at http://www.rmrs.nau.edu/publications/
3   Delaney_1999b/Delaney_1999b.pdf. Accessed Aug. 13, 2009.
4
5   Denison Mines, 2012a, *White Mesa*, Toronto, Ontario. Available at http://www.denisonmines.
6   com/Document/Details/96. Accessed Feb. 21 and May 2, 2012.
7
8   Denison Mines, 2012b, *Denison Outlines 2012 Operating Plans and Releases 2011 Production*
9   *and Sales Volume*, press release, Denison Mines, Toronto, Ontario, Jan. 16. Available at
10  http://www.infomine.com/index/pr/PB148470.PDF. Accessed Feb. 21 and May 2, 2012.
11
12  Denman, A.R., et al., 2003, "Assessment of health Risks to Skin and Lung of Elevated Radon
13  Levels in Abandoned Mines," *Health Physics* 85(6), Dec.
14
15  *Denver Post*, 2012, "Energy Fuels to Buy Utah's White Mesa Uranium Mill," April 18.
16  Available at http://www.denverpost.com/business/ci_20419970/energy-fuels-buy-utahs-white-
17  mesa-uranium-mill#ixzz1uB8OOibc. Accessed May 7, 2012.
18
19  DOE (U.S. Department of Energy), 1995a, *Final Environmental Assessment for the Uranium*
20  *Lease Management Program*, DOE/EA-1037, Grand Junction Projects Office.
21
22  DOE, 1995b, *Finding of No Significant Impact,* Uranium Lease Management Program.
23
24  DOE, 2005, *Remediation of the Moab Uranium Mill Tailings, Grand and San Juan Counties,*
25  *Utah, Final Environmental Impact Statement,* DOE/EIS-0355, July. Available at
26  http://www.gjem.energy.gov/moab/eis/feis.htm. Accessed May 8, 2012.
27
28  DOE, 2007, *Uranium Leasing Program, Final Programmatic Environmental Assessment*,
29  DOE/EA-1535, Office of Legacy Management, July.
30
31  DOE, 2011a, *Uranium Leasing Program Mineral Leasing Procedures Manual,*
32  *LMS/PRO/S04344-0.0*, prepared by S.M. Stoller Corporation for Office of Legacy Management,
33  April 26.
34
35  DOE, 2011b, *Radiation Protection of the Public and the Environment*, Order DOE O 458.1,
36  Office of Health, Safety and Security, Feb.
37
38  DOI (U.S. Department of the Interior), 2012, *Final Environmental Impact Statement, Aspinall*
39  *Unit Operations,* Bureau of Reclamation, Jan. Available at http://www.usbr.gov/uc/envdocs/
40  eis/AspinallEIS/Final%20Volume%20I.pdf. Accessed Feb. 27, 2012.
41
42  DOT (U.S. Department of Transportation), 2010a, *Traffic Safety Facts, Dolores County,*
43  *Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington,
44  D.C. Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/STSI/8_CO/2010/
45  Counties/Colorado_Dolores%20County_2010.HTM. Accessed Jan. 25, 2012.

BLM_0041681

DOT, 2010b, *Traffic Safety Facts, Mesa County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot. gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_Mesa%20County_ 2010.HTM. Accessed Jan. 25, 2012.

DOT, 2010c, *Traffic Safety Facts, Montrose County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot. gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_Montrose%20County_ 2010.HTM. Accessed Jan. 25, 2012.

DOT, 2010d, *Traffic Safety Facts, San Miguel County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot. gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_San%20Miguel%20County_ 2010.HTM. Accessed Jan. 25, 2012.

DOT, 2010e, *Traffic Safety Facts, San Juan County, Utah, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot. gov/departments/nrd-30/ncsa/STSI/49_UT/2010/Counties/Utah_San%20Juan%20County_ 2010.HTM. Accessed Jan. 25, 2012.

DRI (Desert Research Institute), 2011, *RAWS USA Climate Archive.* Available at http://www.raws.dri.edu/. Accessed Dec. 21, 2011.

Driver, C.J., 1994, *Ecotoxicity Literature Review of Selected Hanford Site Contaminants*, PNL-9394, U.S. Department of Energy, Pacific Northwest Laboratory, March.

Edison Electric Institute, 1980, *Compatibility of Fish, Wildlife, and Floral Resources with Electric Power Facilities*, Washington, D.C.

EEI (Edge Environmental, Inc.), 2009, *Piñon Ridge Project Environmental Report, Montrose County, Colorado*, prepared for Energy Fuels Resources Corporation, Lakewood, Colo., Nov. Available at http://www.co.montrose.co.us/DocumentView.aspx?DID=857. Accessed Dec. 23, 2011.

EFR (Energy Fuels Resources Corporation), 2010, *Dolores River Water Quality, 2010 Summary Report,* Uranium Mill Licensing Support, Piñon Ridge Mill, Montrose County, Colo., Dec. 16.

EFRC (Energy Fuels Resources Corporation) and Greg Lewicki and Associates, 2008, *Whirlwind Mine Plan of Operations,* Vol. 1 of 2, prepared for the Bureau of Land Management–Colorado, Grand Junction Field Office, and Bureau of Land Management–Utah, Moab Field Office, March. Available at http://www.uraniumwatch.org/whirlwindmine/ww_planofoperation. 80331.pdf. Accessed Feb. 1, 2012.

BLM_0041682

1   EFRC, 2011, *Application for Approval of Construction, Whirlwind Mine, Mesa County,*
2   *Colorado,* prepared for Region VIII, U.S. Environmental Protection Agency, Denver, Colo., Feb.
3   (revised).
4
5   EIA (U.S. Energy Information Administration), 2010, *2010 Domestic Uranium Production*
6   *Report,* June. Available at http://www.eia.gov/uranium/production/annual/pdf/dupr.pdf.
7   Accessed Feb. 23, 2012.
8
9   Eldred, K.M., 1982, "Standards and Criteria for Noise Control—An Overview," *Noise Control*
10  *Engineering* 18(1):16–23.
11
12  Elliot, J., and K. Defayter, 1986, *Sediment Data Sources and Estimated Annual Suspended*
13  *Sediment Loads of Rivers and Streams in Colorado,* Water Resources Investigations
14  Report 86-4344, U.S. Geological Survey.
15
16  Energy Fuels (Energy Fuels Resources Corporation), 2009a, *Mine Operations Plan: Piñon Ridge*
17  *Mill Facility Montrose County, Colorado,* Aug.
18
19  Energy Fuels (Energy Fuels, Inc.), 2009b, *Piñon Ridge Project Environmental Report,* prepared
20  by Edge Environmental, Inc., Nov.
21
22  Energy Fuels, 2012a, *Piñon Ridge Mill.* Available at http://www.pinonridgemill.com/index.html.
23  Accessed Feb. 21, 2012.
24
25  Energy Fuels, 2012b, *Energy Queen Mine.* Available at http://www.energyfuels.com/
26  projects/energy-queen/index.html. Accessed Feb. 24, 2012.
27
28  Energy Fuels, 2012c, *Whirlwind Mine.* Available at http://www.energyfuels.com/projects/
29  whirlwind/index.html. Accessed February 28, 2012.
30
31  Energy Fuels, 2012d, *Piñon Ridge Mill: Schedule.* Available at http://www.pinonridgemill.com/
32  schedule.html. Accessed May 7, 2012.
33
34  Energy Fuels, 2012e, *Energy Fuels Inc. and Denison Mines Corp. Announce Transaction to*
35  *Create Leading U.S. Uranium Company,* April 16. Available at http://www.energyfuels.com/
36  news/2012/april16-12.html. Accessed May 7, 2012.
37
38  EPA (U.S. Environmental Protection Agency), 1974, *Information on Levels of Environmental*
39  *Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*,
40  550/9-74-004, Office of Noise Abatement and Control, March. Available at http://www.nonoise.
41  org/library/levels74/levels74.htm. Accessed Sept. 26, 2011.
42
43  EPA, 1985, *Draft Background Information Document, Proposed Standard for Radon-222*
44  *Emissions to Air from Underground Uranium Mines,* EPA 520/1-85-010, Office of Radiation
45  Program, Washington, D.C., Feb. 14.

BLM_0041683

1   EPA 1989, *Risk Assessments, Environmental Impact Statement, NESHAPS for Radionuclides,*
2   *Background Information Document-Volume 2,* EPA/520/1-89-006-1, Office of Radiation
3   Programs, Washington, D.C., Sept.
4
5   EPA, 1993, *Diffuse NORM: Waste Characterization and Preliminary Risk Assessment,* Office of
6   Radiation Programs, Washington, D.C.
7
8   EPA 1995, *Compilation of Air Pollutant Emission Factors, Volume I: Stationary Point and Area*
9   *Sources,* AP-42 Fifth Edition, Office of Air Quality Planning and Standards and Office of Air
10  and Radiation, Research Triangle Park, N.C., Jan.
11
12  EPA, 2008, *Technical Report on Technologically Enhanced Naturally Occurring Radioactive*
13  *Materials from Uranium Mining, Volume 1: Mining and Reclamation Background,*
14  EPA 402-R-08-005, Office of Radiation and Indoor Air, Washington, D.C., April.
15
16  EPA, 2011a, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2009,*
17  EPA 430-R-11-005, April 15. Available at http://www.epa.gov/climatechange/emissions/
18  downloads11/US-GHG-Inventory-2011-Complete_Report.pdf. Accessed Nov. 5, 2011.
19
20  EPA, 2011b, *National Ambient Air Quality Standards (NAAQS).* Available at http://www.epa.
21  gov/air/criteria.html, last updated Nov. 8, 2011. Accessed Dec. 15, 2011.
22
23  EPA, 2011c, *The Green Book Nonattainment Areas for Criteria Pollutants.* Available at
24  http://www.epa.gov/oaqps001/greenbk/, last updated Aug. 30, 2011. Accessed Nov. 5, 2011.
25
26  EPA, 2011d, *AirData: Access to Monitored Air Quality Data from EPA's Air Quality System*
27  *(AQS) Data Mart.* Available at http://www.epa.gov/airdata/, last updated Dec. 14, 2011.
28  Accessed Dec. 15, 2011.
29
30  EPA, 2012a, *Integrated Risk Information System (IRIS).* Available at http://www.epa.gov/IRIS.
31  Accessed on March 17, 2012.
32
33  EPS (Economic & Planning Systems), 2010, *Montrose County Socioeconomic Impact Study,*
34  prepared by EPS, Mike Retzlaff, and Lloyd Levy Consulting (EPS #19841), for Montrose
35  County, Colo., March.
36
37  Erwin, W.J., and R.H. Stasiak, 1979, "Vertebrate Mortality during Burning of a Reestablished
38  Prairie in Nebraska," *American Midland Naturalist* 101:247–249.
39
40  Faanes, C.A., 1987, *Bird Behavior and Mortality in Relation to Power Lines in Prairie Habitats,*
41  Fish and Wildlife Technical Report 7, U.S. Department of the Interior, Fish and Wildlife Service,
42  Washington, D.C.
43

BLM_0041684

1   Feeney, D., et al., 2004, *Big Game Migration Corridors in Wyoming*, Wyoming Open Spaces,
2   University of Wyoming, Laramie, Wyo., April. Available at http://www.uwyoedu/openspaces/
3   docs/MigrationCorridors.pdf. Accessed Sept. 26, 2006.
4
5   Finch, W.I., and J.F. Davis, 1985, "Sandstone-Type Uranium Deposits—An Introduction," in
6   *Geological Environments of Sandstone-Type Uranium Deposits*, Report IAEA-TECDOC-328,
7   International Atomic Energy Agency, March.
8
9   Fire Departments Network, 2011, *Colorado Fire Departments*. Available at http://co.fire
10  departments.net/fire/county/Colorado.html.
11
12  Fischer, R.P., and L.S. Hilpert, 1952, *Geology of the Uravan Mineral Belt*, Bulletin 988-A, U.S.
13  Geological Survey.
14
15  Foos, A., 1999, *Geology of the Colorado Plateau*, Geology Department, University of Akron.
16  Available at http://www.nature.nps.gov/geology/education/foos/plateau.pdf.
17
18  Foppen, R., and R. Reijnen, 1994, "The Effects of Car Traffic on Breeding Bird Populations in
19  Woodland. II. Breeding Dispersal of Male Willow Warblers (*Phylloscopus trochilus*) in Relation
20  to the Proximity of a Highway," *Journal of Applied Ecology* 32:95–101.
21
22  Ford, W.M., et al., 1999, "Effects of a Community Restoration Fire on Small Mammals and
23  Herpetofauna in the Southern Appalachians," *Forest Ecology and Management* 114:233–243.
24
25  Forman, R.T.T., and L.E. Alexander, 1998, "Roads and Their Major Ecological Effects," *Annual*
26  *Review of Ecology and Systematics* 29:207–231.
27
28  Francis, C.D., et al., 2009, "Noise Pollution Changes Avian Communities and Species
29  Interactions," *Current Biology* 19:1415–1419.
30
31  Fritz, J.N., 2006, *Potential Traditional Cultural Properties within 38 Uranium Leasing Tracts in*
32  *Southwestern Colorado: A Background Ethnographic Analysis,* prepared for S.M. Stoller
33  Corporation, Grand Junction, Colo., Nov. 1.
34
35  Gaines, W.L., et al., 2003, *Assessing the Cumulative Effects of Linear Recreation Routes on*
36  *Wildlife Habitats on the Okanogan and Wenatchee National Forests*, General Technical
37  Report PNW-GTR-586, U.S. Department of Agriculture, Forest Service, Pacific Northwest
38  Research Station, Portland, Ore.
39
40  GJSentinel *(Grand Junction Daily Sentinel),* 2011, "Knockdown Phase at Cameo Power Plant,"
41  *Grand Junction Daily Sentinel,* Aug. 15. Available at http://www.gjsentinel.com/news/articles/
42  knockdown_phase_at_cameo_power. Accessed Feb. 23, 2012.
43
44  Golder Associates (Golder Associates, Inc.), 2009, *Hydrogeologic Report, Piñon Ridge Project,*
45  *Montrose County, Colorado,* technical report, Exhibit F1 of the Mill License Application.

BLM_0041685

*Preliminary Draft PEIS*  *PEIS Privileged Information*  *May 2012*
*PEIS Team Use Only*  *Do Not Distribute*

Groves, C.R., and K. Steenhof, 1988, "Responses of Small Mammals and Vegetation to Wildfires in Shadscale Communities of Southwestern Idaho," *Northwest Science* 62:205–210.

Hanson, C.E., et al., 2006, *Transit Noise and Vibration Impact Assessment*, FTA-VA-90-1003-06, prepared by Harris Miller Miller & Hanson Inc., Burlington, Mass., for U.S. Department of Transportation, Federal Transit Administration, Washington, D.C., May. Available at http://www.hmmh.com/rail_manuals01fta.html. Accessed Feb. 29, 2012.

Harris, C.M. (editor), 1991, *Handbook of Acoustical Measurements and Noise Control*, 3rd ed., McGraw-Hill Book Company, New York, N.Y.

Hawn, W.S., 2003, *Soil Survey of San Miguel Area, Colorado—Parts of Dolores, Montrose, and San Miguel Counties*, U.S. Department of Agriculture, Natural Resources Conservation Service in cooperation with the Colorado Agricultural Experiment Station, U.S. Department of the Interior, Bureau of Land Management.

Hazel, J.E., 2000, *Sedimentary Response to Intrabasinal Salt Tectonism in the Upper Triassic Chinle Formation, Paradox Basin, Utah*, U.S. Geological Survey Bulletin 2000-F.

Hecker, S., 1993, *Quaternary Tectonics of Utah with Emphasis on Earthquake-Hazard Characterization*, Utah Geological Survey Bulletin 127.

Hedlund, J.D., and W.H. Rickard, 1981, "Wildfire and the Short-Term Response of Small Mammals Inhabiting a Sagebrush-Bunchgrass Community," *Murrelet* 62:10–14.

Hels, T., and E. Buchwald, 2001, "The Effect of Road Kills on Amphibian Populations," pp 25–42.in *Proceedings of the 2001 International Conference on Ecology and Transportation*, C.L. Irwin, et al. (editors), Center for Transportation and the Environment, North Carolina State University, Raleigh, N.C.

Hinck, J.E., et al., 2010, "Biological Pathways of Exposure and Ecotoxicity Values for Uranium and Associated Radionuclides," Chapter D of *Hydrological, Geological, and Biological Site Characterization of Breccia Pipe Uranium Deposits in Northern Arizona*, A.E. Alpine (editor), Scientific Investigations Report 2010-5025, U.S. Department of the Interior, U.S. Geological Survey.

Hite, R.J., and S.W. Lohman, 1973, *Geologic Appraisal of Paradox Basin Salt Deposits for Waste Emplacement*, Open File Report 73-114, U.S. Geological Survey.

Hobbs, N.T., 1989, "Linking Energy Balance to Survival in Mule Deer: Development and Test of a Simulation Model," *Wildlife Monographs* 101:1–39.

Hockin, D., et al., 1992, "Examination of the Effects of Disturbance on Birds with Reference to Its Importance in Ecological Assessments," *Journal of Environmental Management* 36:253–286.

BLM_0041686

Case No. 1:20-cv-02484-MSK   Document 39   filed 04/27/21   USDC Colorado   pg 257 of 470

1  Holmes, T.L., et al., 1993, "Responses of Wintering Grassland Raptors to Human Disturbance,"
2  *Wildlife Society Bulletin* 21:461–468.

4  Horn, J., and S. Moore-McMillian, 2009, *Documentation of Historic Mine Features on*
5  *U.S. Department of Energy Uranium Lease Tracts in Western Colorado: Phase 3, Gateway*
6  *Area, Mesa County, Colorado*, prepared for S.M. Stoller Corporation, Grand Junction, Colo.,
7  Sept.

9  Hunt, C.B., 1974, *Natural Regions of the United States and Canada*, W.H. Freeman and
10  Company.

12  Hurshman, T., 1994, personal communication between Hurshman (Bureau of Land Management,
13  Montrose District Office) and R. Bleil (Rust Geotech), Oct. 17.

15  IAEA (International Atomic Energy Agency), 2000, *Methods of Exploitation of Different*
16  *Types of Uranium Deposits,* IAEA-TecDoc-1174, Sept. Available at http://www-
17  pub.iaea.org/MTCD/publications/PDF/te_1174_prn.pdf. Accessed Feb. 1, 2012.

19  ICRP (International Commission on Radiological Protection), 1991, *Recommendations of the*
20  *International Commission on Radiological Protection*, ICRP Publication 60–1990, Pergamon
21  Press.

23  Information Services, 2001, *Gaining Ground or Shaky Ground? A Detailed Look at Tourism*
24  *Employment in the Southwest Colorado Travel Region*, Final Report, Dec. Available at
25  http://www.scan.org/tourism_report.pdf.

27  Ingelfinger, F., and S. Anderson, 2004, "Passerine Response to Roads Associated with Natural
28  Gas Extraction in a Sagebrush Steppe Habitat," *Western North American Naturalist*
29  64(3):385–395.

31  IUC (International Uranium Corporation), 2003, *Description of the Affected Environment, White*
32  *Mesa Mill, Blanding, Utah, for Transport by Slurry Pipeline and Disposal of the Moab Tailings,*
33  Denver, Colo., May.

35  Ivahnenko, T., and J.L. Flynn, 2010, *Estimated Withdrawals and Use of Water in Colorado,*
36  *2005*, U.S. Geological Survey, Scientific Investigations Report 2010-5002.

38  Jackson, P.O., et al., 1980, *An Investigation of Radon-222 Emissions from Underground*
39  *Uranium Mines*, Pacific Northwest Laboratory, Richland, Wash., Feb.

41  Joesting, H.R., and P.E. Byerly, 1958, *Regional Geophysical Investigations of the Uravan Area,*
42  *Colorado*, U.S. Geological Survey Professional Paper 316-A.

44  Jones, G., 2008, "Sensory Ecology: Noise Annoys Foraging Bats," *Current Biology* 18:1098–
45  1100.

BLM_0041687

1   Kirkham, R.M., and W.P. Rogers, 1981, *Earthquake Potential in Colorado: A Preliminary*
2   *Evaluation*, Colorado Geological Survey, Colorado Department of Natural Resources, CGS
3   Open File Report 78-3.
4
5   KKCO (KKCO NBC 11 News), 2007, "Xcel Officials Want to Shut Down Cameo Power
6   Plant," Nov. 16. Available at http://www.nbc11news.com/home/headlines/11498461.html.
7   Accessed Feb. 24, 2012.
8
9   Klingsporn, K., 2012, "Energy Fuels Announces Merger with Dennison Mines," *Telluride Daily*
10  *Planet*, April 20. Available at http://www.telluridenews.com/articles/2012/04/20/news/
11  doc4f908e676c1d5974831212.txt. Accessed May 2, 2012.
12
13  Knick, S.T., and D.L. Dyer, 1996, "Distribution of Black-Tailed Jackrabbit Habitat Determined
14  by Geographical Information System in Southwestern Idaho," Chapter 3R in Vol. 2 of
15  *BLM/IDARNG Research Project Final Report*, U.S. Geological Survey, Forest and Rangeland
16  Ecosystem Science Center, Snake River Field Station, Boise, Idaho.
17
18  Knight, R.L., and D.N. Cole, 1991, "Effects of Recreational Activity on Wildlife in Wildlands,"
19  in *Transactions of the Fifty-Sixth North American Wildlife and Natural Resources Conference*,
20  R.E. McCabe (editor), Wildlife Management Institute, Washington, D.C., March 17–22,
21  pp. 238–247.
22
23  Knight, R.L., and J.Y. Kawashima, 1993, "Responses of Raven and Red-Tailed Hawk
24  Populations to Linear Right-of-Ways," *Journal of Wildlife Management* 57(2):266–271.
25
26  KREX (KREX NewsChannel), 2011, "Plans Set for Teardown of Cameo Power Plant," Aug. 1.
27  Available at http://www.krextv.com/news/around-the-region/Plans-Set-For-Teardown-of-
28  Cameo-Power-Plant-126550668.html. Accessed Feb. 23, 2011.
29
30  Larkin, R.P., 1996, *Effects of Military Noise on Wildlife: A Literature Review*, Technical
31  Report 96/21, U.S. Army Construction Engineering Research Laboratory, Champaign, Ill.
32
33  Lehman, R.N., and J.W. Allendorf, 1989, "The Effects of Fire, Fire Exclusion, and Fire
34  Management on Raptor Habitats in the Western United States," in *Proceedings of the Western*
35  *Raptor Management Symposium and Workshop, 1987, October 26–28, Boise, Idaho*, Scientific
36  and Technical Series No. 12, National Wildlife Federation, Washington, D.C.
37
38  Lincoln, F.C., et al., 1998, *Migration of Birds*, U.S. Fish and Wildlife Service Circular 16,
39  U.S. Department of the Interior, Washington, D.C. Available at http://www.npwrc.usgs.gov/
40  resource/birds/migratio/index.htm. Accessed Oct. 20, 2006.
41
42  Lyon, A.G., and S.H. Anderson, 2003, "Potential Gas Development Impacts on Sage Grouse
43  Nest Initiation and Movement," *Wildlife Society Bulletin* 31(2):486–491.
44

BLM_0041688

Lyon, L.J., et al., 2000a, "Direct Effects of Fire and Animal Responses," in: *Wildland Fire in Ecosystems: Effects of Fire on Fauna*, J.K. Smith (editor), General Technical Report RMRS-GTR-42-Vol. 1, U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Ogden, Utah. Available at http://www.fs.fed.us/rm/pubs/rmrs_gtr042_1.pdf. Accessed Aug. 14, 2009.

Lyon, L.J., et al., 2000b, "Fire Effects on Animal Populations," in: *Wildland Fire in Ecosystems: Effects of Fire on Fauna*, J.K. Smith (editor), General Technical Report RMRS-GTR-42-Vol. 1, U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Ogden, Utah. Available at http://www.fs.fed.us/rm/pubs/rmrs_gtr042_1.pdf. Accessed Aug. 14, 2009.

Maxell, B.A., 2000, *Management of Montana's Amphibians: A Review of Factors That May Present a Risk to Population Viability and Accounts on the Identification, Distribution, Taxonomy, Habitat Use, Natural History, and the Status and Conservation of Individual Species*, a report (Order Number 43-0343-0-0224) to Northern Regional Office (Region 1), USDA Forest Service, Missoula, Mont., Sept. 20. Available at http://www.isu.edu/~petechar/iparc/Maxell_Mgmnt.pdf. Accessed Aug. 10, 2009.

McAda, C.W., 2003, *Flow Recommendations to Benefit Endangered Fishes in the Colorado and Gunnison Rivers*, final report, Upper Colorado River Endangered Fish Recovery Program, July.

McLellan, B.N., and D.M. Shackleton, 1989, "Immediate Reactions of Grizzly Bears to Human Activities," *Wildlife Society Bulletin* 17:269–274.

Mesa County, 2000, "Introduction," in *Mesa Countywide Land Use Plan, from Issues to Actions*. Available at http://www.mesacounty.us/planning/master-plan.aspx. Accessed Dec. 1, 2011.

Miller, N.P., 2002, "Transportation Noise and Recreational Lands," *Internoise 2002*, Dearborn, Mich., Aug. 19–21, 2002. Available at http://www.hmmh.com/cmsdocuments/N011.pdf. Accessed Dec. 22, 2011.

Montrose County, 2010a, *Montrose County Socioeconomic Impact Study*, Department of Community Development and Board of County Commissioners, March 31.

Moore, S., and J. Horn, 2010, *Documentation of Five Historic Mine Features on U.S. Department of Energy Uranium Lease Tracts in Western Colorado: Phase 2, Uravan/Long Park Area, Montrose County, Colorado*, prepared for S.M. Stoller Corporation, Grand Junction Colo., Jan.

Moore-McMillian, S., and J. Omvig, 2009, *Documentation of Historic Mine Features on U.S. Department of Energy Uranium Lease Tracts in Western Colorado: Phase 1, Slick Rock Area, San Miguel County, Colorado*, prepared for S.M. Stoller Corporation, Grand Junction, Colo., July.

BLM_0041689

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

Morgan, T.A., et al., 2006, *The Four Corners Timber Harvest and Forest Products Industry, 2002*, Resource Bulletin RMRS-RB-7, U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, May.

Mullins, T.E., and V.L. Freeman, 1954, *Lithofacies of the Salt Wash Member of the Morrison Formation*, U.S. Geological Survey Trace Elements Investigations Report 341.

Muth, R.T., et al., 2000, *Flow and Temperature Recommendations for Endangered Fishes in the Green River Downstream of Flaming Gorge Dam*, final report, Upper Colorado River Endangered Fish Recovery Program, Denver, Colo., Sept.

Nash, T., 2002, *Hydrogeochemical Investigations of Historic Mining Districts, Central Western Slope of Colorado, Including Influence on Surface-Water Quality*, U.S. Geological Survey, Digital Data Series DDS-73, Denver, Colo.

National Park Service, 2008, *Colorado National Monument Breaks Visitation Record in 2007.* Available at http://www.nps.gov/colm/parknews/record_breaking_visitation_2007.htm.

National Research Council, 2012, *Uranium Mining in Virginia: Scientific, Technical, Environmental, Human Health and Safety, and Regulatory Aspects of Uranium Mining and Processing in Virginia*, prepublication version, Washington, D.C.

NatureServe, 2011, *NatureServe Explorer: An Online Encyclopedia of Life, Version 7.1*, Arlington, Va. Available at http://www.natureserve.org/explorer. Accessed Dec. 16 and 19, 2011.

NCDC (National Climatic Data Center), 2011a, *Climates of the States (CLIM60): Climate of Colorado*, National Oceanic and Atmospheric Administration, Satellite and Information Service. Available at http://cdo.ncdc.noaa.gov/cgi-bin/climatenormals/climatenormals.pl. Accessed Nov. 5, 2011.

NCDC, 2011b, *Storm Events,* National Oceanic and Atmospheric Administration, Satellite and Information Service. Available at http://www4.ncdc.noaa.gov/cgi-win/wwcgi.dll?wwEvent~Storms. Accessed Dec. 22, 2011.

NCDC, 2011c, *National Climatic Data Center.* Available at http://www.ncdc.noaa.gov/oa/ncdc.html. Accessed Dec. 21, 2011.

NCES (National Center for Education Statistics), 2011, *Search for Public School Districts.* Available at http://www.nces.ed.gov/ccd/districtsearch.

NCRP (National Council on Radiation Protection and Measurement), 2009, *Ionizing Radiation Exposure of the Population of the United States*, Report No. 160, Bethesda, Md.

BLM_0041690

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*

1  NRC (U.S. Nuclear Regulatory Commission), 1979, *Final Environmental Statement Related to*
2  *Operation of White Mesa Uranium Project Energy Fuels Nuclear, Inc.*, May. Available at
3  http://www.radiationcontrol.utah.gov/Uranium_Mills/IUC/Denison_IUC/docs/2009/
4  permitrenewal/e/FINAL%20ENVIRONMENTAL%20STATEMENT%20MAY%201979.pdf.
5  Accessed May 7, 2012.
6
7  NRCS (Natural Resources Conservation Service), 2009, *Soil Survey Geographic (SSURGO)*
8  *Database for Mesa, Montrose, and San Miguel Counties*, Colorado. Available at
9  http://SoilDataMart.nrcs.usds.gov.
10
11  NRCS, 2012a, *Custom Soil Resource Report for Mesa County Area, Colorado; and*
12  *Uncompahgre National Forest Area, Colorado, Parts of Mesa, Montrose, Ouray, and*
13  *San Miguel Counties: Cross Section through Gateway Lease Tracts (Parts 1 and 2)*,
14  U.S. Department of Agriculture, Jan. 9.
15
16  NRCS, 2012b, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores,*
17  *Montrose, and San Miguel Counties: Cross Section through Uravan Lease Tracts (Parts 1*
18  *and 2)*, U.S. Department of Agriculture, Jan. 9.
19
20  NRCS, 2012c, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores,*
21  *Montrose, and San Miguel Counties: Cross Section through Paradox (South) Lease Tracts*
22  *(Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 9.
23
24  NRCS, 2012d, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores,*
25  *Montrose, and San Miguel Counties: Cross Section through Paradox (North) Lease Tracts*
26  *(Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 9.
27
28  NRCS, 2012e, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores,*
29  *Montrose, and San Miguel Counties: Cross Section through Paradox (North) Lease Tracts*
30  *(Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 10.
31
32  NRCS, 2012f, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores,*
33  *Montrose, and San Miguel Counties: Slick Rock Lease Tract 12 (Parts 1 and 2)*,
34  U.S. Department of Agriculture, Jan. 10.
35
36  NRCS, 2012g, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores,*
37  *Montrose, and San Miguel Counties: Cross Section through Slick Rock (South) Lease Tracts*
38  *(Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 11.
39
40  NWCC (National Wind Coordinating Committee), 2002, *Permitting of Wind Energy*
41  *Facilities: A Handbook*, prepared by the NWCC Siting Subcommittee, Aug. Available at
42  http://www.nationalwind.org/assets/publications/permitting2002.pdf. Accessed Sept. 26, 2011.
43
44

BLM_0041691

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1  Olendorff, R.R., and R.N. Lehman, 1986, *Raptor Collisions with Utility Lines: An Analysis*
2  *Using Subjective Field Observations*, prepared by U.S. Department of the Interior, Bureau of
3  Land Management, Sacramento, Calif., for Pacific Gas and Electric Company, San Ramon,
4  Calif., Feb.
5
6  Otak, Inc., 2009, *Visual Resource Inventory*, prepared for U.S. Department of the Interior,
7  Bureau of Land Management, Uncompahgre Field Office, Montrose, Colo., Sept.
8
9  Ott, R., et al., 2010, *Perspectives on Ute Ethnohistory in West Central Colorado,* prepared by the
10  Dominquez Archaeological Research Group, Inc., for the Ute Indian Tribe of the Uintah and
11  Ouray Reservation; Ute Mountain Ute Tribe; Southern Ute Indian Tribe; and for the Bureau of
12  Land Management's Colorado State Office and its Glenwood Springs, Grand Junction, and
13  Uncompahgre Field Offices, Dec. 6.
14
15  Peters (Peters Geosciences), 2011, *Updated Technical Report on Energy Fuels Resources*
16  *Corporation's Energy Queen Project, San Juan County, Utah,* prepared for Energy Fuels, Inc.,
17  March 15.
18
19  Piñon Ridge Mill, 2012, *The Piñon Ridge Mill.* Available at http://www.Piñonridgemill.com/
20  index.html. Accessed Feb. 21, 2012.
21
22  Power Consulting, 2010, *A Socioeconomic Analysis of the Impact of the Proposed Piñon Ridge*
23  *Uranium Project on Western Mesa, Montrose, and San Miguel Counties, Colorado,* prepared for
24  Sheep Mountain Alliance, Dec.
25
26  Red Cliff Mine, 2012, *Red Cliff Mine: EIS Schedule.* Available at http://www.redcliffmine.com/
27  schedule.htm. Accessed Feb. 22, 2012.
28
29  Reed, A.D., and M.D. Metcalf, 1999, *Colorado Prehistory: A Context for the Northern Colorado*
30  *River Basin,* Colorado Council of Professional Archaeologists, Denver, Colo.
31
32  Reed, A.D., 2006, *Class I Cultural Resource Inventory of 38 Department of Energy Uranium*
33  *Lease Withdrawal Areas, Mesa, Montrose, and San Miguel Counties, Colorado,* prepared by
34  Alpine Archaeological Consultants, Inc., Montrose, Colo., for S.M. Stoller Corporation, Grand
35  Junction, Colo., July 6.
36
37  Reijnen, R., and R. Foppen, 1994, "The Effects of Car Traffic on Breeding Bird Populations in
38  Woodland. I. Evidence of Reduced Habitat Quality for Willow Warblers (*Phylloscopus*
39  *trochilus*) Breeding Close to a Highway," *Journal of Applied Ecology* 32:85–94.
40
41  Reijnen, R., and R. Foppen, 1995, "The Effects of Car Traffic on Breeding Bird Populations in
42  Woodland. IV. Influence of Population Size on the Reduction of Density Close to a Highway,"
43  *Journal of Applied Ecology* 32:481–491.
44

BLM_0041692

1  Reijnen, R., et al., 1995, "The Effects of Car Traffic on Breeding Bird Populations in Woodland.
2  III. Reduction of Density in Relation to the Proximity of Main Roads," *Journal of Applied*
3  *Ecology* 32:187–202.
4
5  Reijnen, R., et al., 1996, "The Effects of Traffic on the Density of Breeding Birds in Dutch
6  Agricultural Grasslands," *Biological Conservation* 75:255–260.
7
8  Reijnen, R., et al., 1997, "Disturbance by Traffic of Breeding Birds: Evaluation of the Effects
9  and Considerations in Planning and Managing Road Corridors," *Biodiversity and*
10 *Conservation* 6:567–581.
11
12 Rogers, Z., 2011, personal communication from Rogers (Energy Fuels Resources Corporation,
13 Lakewood, Colo.) to Y.-S. Chang (Argonne National Laboratory, Argonne, Ill.), Nov. 8.
14
15 Rosentreter, R., et al., 2007, *A Field Guide to Biological Soil Crusts of Western U.S. Drylands—*
16 *Common Lichens and Bryophytes*, U.S. Government Printing Office, Denver, Colo.
17
18 RRC Associates and Rees Consulting, Inc., 2011, *Regional Housing Needs Assessment Ouray*
19 *and San Miguel Counties*, Sept. Available at http://www.smrha.org/NeedsAsessment2011.pdf.
20
21 Salt, A.N., and T.E. Hullar, 2010, "Responses of the Ear to Low Frequency Sounds, Infrasound
22 and Wind Turbines," *Hearing Research* 268:12–21.
23
24 Sawyer, H., and F. Lindzey, 2001, *Sublette Mule Deer Study*, Final Report, Wyoming
25 Cooperative Fish & Wildlife Research Unit, Laramie, Wyo., March. Available at
26 http://www.uppergreen.org/library/docs/Muledeerstudy1.pdf. Accessed June 8, 2006.
27
28 Sawyer, H., et al., 2005, "Mule Deer and Pronghorn Migration in Western Wyoming," *Wildlife*
29 *Society Bulletin* 33(4):1266–1273.
30
31 Schooley, R.L., et al., 1996, "Can Shrub Cover Increase Predation Risk for a Desert Rodent?,"
32 *Canadian Journal of Zoology* 74:157–163.
33
34 Scott, R.B., et al., 2002, *Geologic Map of the Grand Junction Quadrangle, Mesa County,*
35 *Colorado*, U.S. Geological Survey Miscellaneous Field Studies Map MF-2363.
36
37 SENES (SENES Consultants Limited), 2009, *Risk Assessment for Proposed Uranium and*
38 *Vanadium Mill at the Piñon Ridge Property*, prepared by SENES Consultants Limited,
39 Englewood, Colo., for Energy Fuels Resources Corporation, Lakewood, Colo., Nov.
40
41 Sharpe, P.B., and B. Van Horne, 1998, "Influence of Habitat on Behavior of Townsend's Ground
42 Squirrel (*Spermophilus townsendii*)," *Journal of Mammalogy* 79:906–918.
43
44 Shawe, D.R., 1970, *Structure of the Slick Rock District and Vicinity, San Miguel and Dolores*
45 *Counties, Colorado*, U.S. Geological Survey Profession Paper 576-C.

BLM_0041693

1   Shawe, D.R., 2011, *Uranium-Vanadium Deposits of the Slick Rock District, Colorado*,
2   U.S. Geological Survey Professional Paper 576-F.
3
4   Shawe, D.R., et al., 1968, *Stratigraphy of Slick Rock District and Vicinity, San Miguel and*
5   *Dolores Counties, Colorado*, U.S. Geological Survey Professional Paper 576-A.
6
7   Simmons, G.C., 1957, *Contact of the Burro Canyon Formation with the Dakota Sandstone, Slick*
8   *Rock District, Colorado, and Correlation of the Burro Canyon Formation*, U.S. Geologic Survey
9   Trace Elements Investigations Report 552.
10
11  Simmons, J.A., et al., 2008, "Forest to Reclaimed Mine Land Use Change Leads to Altered
12  Ecosystem Structure and Function," *Ecological Applications* 18:104–118.
13
14  SJPLC (San Juan Public Lands Center), 2011, *San Juan Public Lands Draft Land Management*
15  *Plan + Draft Environmental Impact Statement: Supplement to the Draft Environmental Impact*
16  *Statement,* Aug. Available at http://ocs.fortlewis.edu/forestplan/supplement/cover.htm. Accessed
17  May 8, 2012.
18
19  Sonoran Institute, 2009, *Uranium Mining, Tourism, and Outdoor Recreation in Gateway,*
20  *Colorado*, July.
21
22  Spears, C.F., and E.V. Kleven, 1978, *Soil Survey of Mesa County Area, Colorado*,
23  U.S. Department of Agriculture, Soil Conservation Service in Cooperation with the Colorado
24  Agricultural Experiment Station, Feb.
25
26  Steele, B.A., 1985, *Preliminary Report on and Measured Sections of the Middle Jurassic*
27  *Entrada Sandstone and Wanakah Formation near Placerville, Southwestern Colorado*,
28  U.S. Geological Survey Open File Report 85-446.
29
30  Steenhof, K., et al., 1993, "Nesting by Raptors and Common Ravens on Electrical Transmission
31  Line Towers," *Journal of Wildlife Management* 57(2):271–281.
32
33  Stoesser, D.B., et al., 2007, *Preliminary Integrated Geologic Map Databases for the*
34  *United States: Central States—Montana, Wyoming, Colorado, New Mexico, North Dakota,*
35  *South Dakota, Nebraska, Kansas, Oklahoma, Texas, Iowa, Missouri, Arkansas, and Louisiana*,
36  U.S. Geological Survey Open File Report 2005-1351, Version 1.2, Dec.
37
38  Strait, R., et al., 2007, *Final Colorado Greenhouse Gas Inventory and Reference Case*
39  *Projections 1990–2020*, Center for Climate Strategies, Oct. Available at
40  http://www.coloradoclimate.org/ewebeditpro/items/O14F13894.pdf. Accessed Nov. 5, 2011.
41
42  Stritholt, J.R., et al., 2000, *Importance of Bureau of Land Management Roadless Areas in the*
43  *Western U.S.A.*, prepared by the Conservation Biology Institute, Corvallis, Ore., for the National
44  BLM Wilderness Campaign. Available at http://www.consbio.org/cbi/projects/blm/ blm.htm.
45  Accessed Jan. 28, 2005.

BLM_0041694

Thompson, L.S., 1978, "Transmission Line Wire Strikes: Mitigation through Engineering Design and Habitat Modification," in *Impacts of Transmission Lines on Birds in Flight: Proceedings of a Conference*, ORAU-142, Oak Ridge Associated Universities, Oak Ridge, Tenn., Jan. 31–Feb. 2, pp. 51–92.

Topper, R., et al., 2003, *Groundwater Atlas of Colorado*, Colorado Geological Survey Special Publication 53.

Tri-State (Tri-State Generation and Transmission Association, Inc.), 2011, *Baseload Resources: Nucla Station*. Available at http://www.tristategt.org/AboutUs/baseload-resources.cfm. Accessed Dec. 23, 2011.

Tri-State, 2012a, *Baseload Resources*. Available at http://www.tristategt.org/AboutUs/baseload-resources.cfm. Accessed Feb. 21, 2012.

Tri-State, 2012b, *Nucla-Sunshine Project*. Available at http://www.tristategt.org/Transmission/Nucla/Nucla-Sunshine-project.cfm. Accessed Feb. 21, 2012.

Tri-State, 2012c, *Phase 2 of Nucla-Sunshine Project On Schedule*. Available at http://www.poweringthewest.org/2011/09/16/phase-2-of-nucla-sunshine-project-on-schedule/. Accessed Feb. 22, 2012.

Trinity Engineering Associates, Inc., 2007, CAP88-PC Version 3.0 User Guide, Cincinnati, Ohio, Dec. 9.

Trombulak, S.C., and C.A. Frissell, 2000, "Review of Ecological Effects of Roads on Terrestrial and Aquatic Communities," *Conservation Biology* 14(1):18–30.

Tweto, O., 1979, *Geologic Map of Colorado (Scale 1:500,000)*, U.S. Geological Survey, prepared in cooperation with the Colorado Geological Survey.

Twitty, E., 2008, *Guide to Assessing Historic Radium, Uranium, and Vanadium Mining Resources in Montrose and San Miguel Counties*, prepared by Mountain States Historical, Boulder, Colo., for Western Colorado Interpretive Association, Delta, Colo., July.

U.S. Bureau of the Census, 2010, *State and County QuickFacts. Colorado*. Available at http://quickfacts.census.gov/qfd/states/08000.html. Accessed Dec. 2, 2011

U.S. Bureau of the Census, 2011a, *County Business Patterns, 2009*, Washington, D.C. Available at http://www.census.gov/econ/cbp/index.html.

U.S. Bureau of the Census, 2011b, *State and County Quickfacts*. Available at http://quickfacts.census.gov/qfd/states/08000.html.

BLM_0041695

1  U.S. Bureau of the Census, 2011c, *USA Counties*. Available at http://censtats.census.gov/
2  usa/usa.shtml.
3
4  U.S. Bureau of the Census, 2011d, *Population Estimates, All Incorporated Places 2000–2009*.
5  Available at http://www.census.gov/popest/data/cities/totals/2009/SUB-EST2009-4.html.
6
7  U.S. Bureau of the Census, 2011e, *American Factfinder*. Available at http://factfinder2.
8  census.gov.
9
10 U.S. Bureau of the Census, 2011f, *American Factfinder, 2005–2009 American Community*
11 *Survey 5-Year Estimates*. Available at http://factfinder.census.gov/.
12
13 U.S. Bureau of the Census, 2011l, *2010 Census Summary File 1: Table P5*. Available at
14 http://factfinder2.census.gov/main.html.
15
16 U.S. Bureau of the Census, 2011m, *2009 American Community Survey 5-Year Estimates*
17 *(2005–2009): Table B17017*. Available at http://factfmder2.census.gov/main.html.
18
19 U.S. Department of Commerce, 2011, *Local Area Personal Income*, Bureau of Economic
20 Analysis. Available at http://www.bea.gov/regional/reis/drill.cfm
21
22 U.S. Department of Justice, 2009a, "Table 10: Offenses Known to Law Enforcement, by State by
23 Metropolitan and Nonmetropolitan Counties, 2009," *Crime in the United States*, Federal Bureau
24 of Investigation, Criminal Justice Information Services Division. Available at
25 http://www2.fbi.gov/ucr/cius2009/data/table_10.html.
26
27 U.S. Department of Justice, 2010, "Table 80: Full-Time Law Enforcement Employees, by State
28 by Metropolitan and Nonmetropolitan Counties, 2009," *Crime in the United States*, Federal
29 Bureau of Investigation, Criminal Justice Information Services Division, Sept. Available at
30 http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2009.
31
32 U.S. Department of Labor, 2010a, *Local Area Unemployment Statistics: County Data*, Bureau of
33 Labor Statistics. Available at http://www.bls.gov/lau/data.htm.
34
35 U.S. Department of Labor, 2010b, *Local Area Unemployment Statistics: State Data*, Bureau of
36 Labor Statistics. Available at http://www.bls.gov/lau/data.htm.
37
38 U.S. Department of Labor, 2011, *Local Area Unemployment Statistics: Monthly County Data*,
39 Bureau of Labor Statistics. Available at http://www.bls.gov/lau/.
40
41 U.S. Department of the Interior, 2011, *Native American Consultation Database*, National
42 NAGPRA Online Databases, National Park Service. Available at http://grants.cr.nps.gov/
43 nacd/index.cfm.
44

BLM_0041696

1  UDEQ (Utah Department of Environmental Quality), 2011, *Title V Operating Permit: Lisbon*
2  *Natural Gas Processing Plant*, Division of Air Quality, Aug. 4. Available at
3  http://168.178.6.8/daq_public_pdfs/120397-10034pmt.20110804.pdf. Accessed Feb. 28, 2012.
4
5  UDEQ, 2012, *Denison/White Mesa Uranium Mill*. Available at http://www.deq.utah.gov/
6  businesses/denison/index.htm. Accessed Feb. 21, 2012.
7
8  UDNR (Utah Department of Natural Resources), 2011, *Utah Mining 2010*, Circular 114,
9  Utah Geological Survey. Available at http://geology.utah.gov/online/c/c-114.pdf. Accessed
10 May 7, 2012.
11
12 UDNR, 2012, *Utah Minerals Program*, Division of Oil, Gas, and Mining. Available at
13 http://linux1.ogm.utah.gov/WebStuff/wwwroot/minerals/mineralsoperatorsbypermit.php.
14 Accessed Feb. 28, 2012.
15
16 UDOGM (Utah Division of Oil, Gas, and Mining), 2012, *Utah Oil and Gas: Annual Production*
17 *Summary—Grand and San Juan Counties*, Department of Natural Resources. Available at
18 http://oilgas.ogm.utah.gov/Data_Center/DataCenter.cfm#production. Accessed Feb. 17, 2012.
19
20 UDOT (Utah Department of Transportation), 2011, *Traffic on Utah Highways, 2010*,
21 Systems Planning and Programming Division, Traffic Analysis Section. Available at
22 http://www.udot.utah.gov/main/f?p=100:pg:0::::V,T:,529. Accessed Nov. 7, 2011.
23
24 UDWR (Utah Division of Wildlife Resources), 2003, *Utah Division of Wildlife Resources*
25 *Statewide Management Plan for Mule Deer*, State of Utah Natural Resources, Division of
26 Wildlife Resources, Salt Lake City, Utah. Available at http://www.wildlife.utah.gov/hunting/
27 biggame/pdf/mule_deer_plan.pdf. Accessed June 12, 2006.
28
29 UDWR, 2008, *Utah Conservation Data Center*, State of Utah Natural Resources, Division
30 of Wildlife Resources, Salt Lake City, Utah. Available at http://dwrcdc.nr.utah.gov/ucdc/
31 default.asp. Accessed Oct. 3, 2008.
32
33 UGS (Utah Geological Survey), 2011, *Utah Mining 2010*, Circular 114, Utah Department of
34 Natural Resources.
35
36 UGS, 2012, *Table 2.8—Coal Production and Recoverable Reserves in Utah by Coal Mine,*
37 *2011–2011*. Available at http://geology.utah.gov/emp/energydata/statistics/coal2.0/pdf/T2.8.pdf.
38 Accessed Feb. 17, 2012.
39
40 UNSCEAR (United Nations Scientific Committee on the Effects of Atomic Radiation), 2010,
41 *Sources and Effects of Ionizing Radiation, UNSCEAR 2008 Report to the General Assembly with*
42 *Scientific Annexes*, Volume 1, United Nations, New York, N.Y.
43
44

BLM_0041697

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1  USDA (U.S. Department of Agriculture), 2007a, *Census of Agriculture: Colorado State and*
2  *County Data, Volume 1, Geographic Area Series,* National Agricultural Statistics Service,
3  Washington, D.C. Available at http://www.agcensus.usda.gov/Publications/2007/Full_Report/
4  Volume_1,_Chapter_2_County_ Level/Colorado/index.asp.
5
6  USDA, 2007b, *Census of Agriculture: Colorado State and County Data*, Volume 1, Chapter 2,
7  *County Level Data, County Summary Highlights: 2007*, National Agricultural Statistics Service,
8  Washington, D.C. Available at http://www.agcensus.usda.gov/Publications/2007/Full_Report/
9  Volume_1,_Chapter_2_County_Level/Colorado/index.asp.
10
11 USDA, 2008, *Gypsy Moth Management in the United States: A Cooperative Approach,*
12 U.S. Forest Service, June. Available at http://na.fs.fed.us/pubs/detail.cfm?id=8523. Accessed
13 Feb. 27, 2012.
14
15 USDA, 2008a, *Fire Effects Information System*, U.S. Forest Service, Rocky Mountain Research
16 Station, Fire Sciences Laboratory. Available at http://www.fs.fed.us/database/feis/index.html.
17
18 USDA, 2008b, "Wildlife Species: *Spermophilus townsendii*," *Fire Effects Information System*,
19 U.S. Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory. Available at
20 http://www.fs.fed.us/database/feis/animals/mammal/spto/all.html.
21
22 USDA, 2008c, "Wildlife Species: *Lepus californicus*," *Fire Effects Information System*,
23 U.S. Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory. Available at
24 http://www.fs.fed.us/database/feis/animals/mammal/leca/all.html.
25
26 USDA, 2008d, "Wildlife Species: Bird Index," *Fire Effects Information System*, U.S. Forest
27 Service, Rocky Mountain Research Station, Fire Sciences Laboratory. Available at
28 http://www.fs.fed.us/database/feis/animals/bird/.
29
30 USDA, 2009, *Environmental Assessment: Operation and Maintenance Plan for Manti–La Sal*
31 *National Forest Ditch Bill Easements,* U.S. Forest Service, Dec. Available at
32 http://www.fs.fed.us/r4/mantilasal/projects/ditch_bill/final_ea_122109.pdf. Accessed
33 Feb. 28, 2012.
34
35 USDA, 2009, *2007 Census of Agriculture—United States, Summary and State Date, Vol. 1*
36 *Geographic Area Series, Part 51*, Report AC-07-A-51, National Agricultural Statistics Service,
37 Dec.
38
39 USDA, 2011a, *Decision Memo: Kimmerle Uranium Exploration Drilling, Manti–La Sal*
40 *National Forest,* U.S. Forest Service, Sept. Available at http://a123.g.akamai.net/7/123/11558/
41 abc123/forestservic.download.akamai.com/11558/www/nepa/78849_FSPLT2_056443.pdf.
42 Accessed Feb. 28. 2012.
43

BLM_0041698

USDA, 2011b, *Schedule of Proposed Actions (SOPA) 10/01/2011 to 12/31/2011, San Juan National Forest,* U.S. Forest Service, Oct. Available at http://www.fs.fed.us/sopa/ components/reports/sopa-110213-2011-10.html. Accessed Feb. 21, 2012.

USDA, 2011c, *Decision Memo: Agricultural Irrigation and Livestock Watering System,* U.S. Forest Service, Oct. Available at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/ stelprdb5343833.pdf. Accessed Feb. 28, 2012.

USDA, 2011d, *Nationwide Aerial Application of Fire Retardant on National Forest System Land: Record of Decision,* U.S. Forest Service, Dec. Available at http://a123.g.akamai.net/7/ 123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/71615_FSPLT2_ 066634.pdf. Accessed Feb. 27, 2012.

USDA, 2012a, *Schedule of Proposed Actions (SOPA) 01/01/2012 to 03/31/2012, San Juan National Forest,* U.S. Forest Service. Available at http://www.fs.fed.us/sopa/components/ reports/sopa-110213-2012-01.pdf. Accessed Feb. 27, 2012.

USDA, 2012b, *Colorado Ditch Bill Act,* U.S. Forest Service. Available at http://www.fs.usda. gov/detail/r2/landmanagement/?cid=STELPRDB5177473. Accessed Feb. 28, 2012.

USDA, 2012c, *Schedule of Proposed Actions (SOPA) 01/01/2012 to 03/31/2012, Grand Mesa, Uncompahgre and Gunnison National Forests,* U.S. Forest Service. Available at http://www.fs.fed.us/sopa/components/reports/sopa-110204-2012-01.pdf. Accessed Feb. 27, 2012.

USDA, 2012d, *Schedule of Proposed Actions (SOPA) 01/01/2012 to 03/31/2012, Manti-La Sal National Forest,* U.S. Forest Service. Available at http://www.fs.fed.us/sopa/components/ reports/sopa-110410-2012-01.pdf. Accessed Feb. 28, 2012.

USFS (U.S. Forest Service), 2005, *Threatened, Endangered, and Sensitive Plants and Animals,* Forest Service Manual (FMS) 2670, U.S. Department of the Interior, Aug. 29.

USFWS (U.S. Fish and Wildlife Service), 1990, *Humpback Chub Recovery Plan,* Denver, Colo. Available at http://ecos.fws.gov/docs/recovery_plan/900919c.pdf. Accessed Nov. 25, 2011.

USFWS, 2002a, *Bonytail (*Gila elegans*) Recovery Goals: Amendment and Supplement to the Bonytail Chub Recovery Plan,* USFWS Mountain-Prairie Region 6, Denver, Colo.

USFWS, 2002b, *Colorado Pikeminnow (*Ptychocheilus lucius*) Recovery Goals: Amendment and Supplement to the Colorado Squawfish Recovery Plan,* USFWS Mountain-Prairie Region 6, Denver, Colo.

USFWS, 2002c, *Razorback sucker (*Xyrauchen texanus*) Recovery Goals: Amendment and Supplement to the Razorback Sucker Recovery Plan,* USFWS Mountain-Prairie Region 6, Denver, Colo.

BLM_0041699

*Preliminary Draft PEIS*          *PEIS Privileged Information*                    *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

USFWS, 2003, *Preliminary Estimates of Waterfowl Hunter Activity and Harvest during the 2001 and 2002 Hunting Seasons, Administrative Report–July 2003*, Division of Migratory Bird Management, Harvest Surveys Section, Laurel, Md.

USFWS, 2009a, *National Wetlands Inventory*. Available at http://www.fws.gov/wetlands.

USFWS, 2009b, *USFWS Block-Cleared Areas for Black-Footed Ferret Surveys in Colorado,* Sept. Available at http://www.fws.gov/mountain-prairie/species/mammals/blackfootedferret/statewide_block_clearance_map_090809_final.pdf. Accessed Feb. 7, 2012.

USFWS, 2011a, *IPaC—Information, Planning, and Conservation System*. Available at http://ecos.fws.gov/ipac/. Accessed Dec. 16, 2011.

USFWS, 2011b, *Critical Habitat Portal, FWS Critical Habitat for Threatened and Endangered Species*. Available at http://criticalhabitat.fws.gov/crithab/. Accessed Dec. 16, 2011.

USGS (U.S. Geological Survey), 2001, *Federally Owned Coal, Federal Lands, and Coal Quality in the Colorado Plateau Region*, FS-001-01, Feb.

USGS, 2003, Physiographic Regions. Available at http://tapestry.usgs.gov/physiogr/physio.html. Accessed Dec. 21, 2011.

USGS, 2004, *National Gap Analysis Program, Provisional Digital Land Cover Map for the Southwestern United States*, Version 1.0, RS/GIS Laboratory, College of Natural Resources, Utah State University.

USGS, 2005a, *Southwest Regional GAP Analysis Project—Land Cover Descriptions*, RS/GIS Laboratory, College of Natural Resources, Utah State University, Logan, Utah.

USGS, 2005b, *National Gap Analysis Project Animal Habitat Models,* Center for Applied Spatial Ecology, New Mexico Cooperative Fish and Wildlife Research Unit, New Mexico State University. Available at http://fws-nmcfwru.nmsu.edu/swregap/habitatreview. Accessed Dec. 20, 2011.

USGS, 2007, *National Gap Analysis Program, Digital Animal-Habitat Models for the Southwestern United States*, Version 1.0, Center for Applied Spatial Ecology, New Mexico Cooperative Fish and Wildlife Research Unit, New Mexico State University. Available at http://fws-nmcfwru.nmsu.edu/swregap/HabitatModels/default.htm. Accessed March 15, 2010, and Dec. 16, 2011.

USGS, 2011a, *Hydrologic Unit Maps*. Available at http://water.usgs.gov/GIS/huc.html. Accessed Dec. 21, 2011.

USGS, 2011b, *National Water Information System (NWIS)*. Available at http://waterdata.usgs.gov/nwis.

BLM_0041700

1   USGS, 2011c, *Circular Area Earthquake Search.* Available at http://earthquake.usgs.gov/
2   earthquakes/eqarchives/epic/epic_circ.php. Accessed Jan. 4, 2011.
3
4   USGS Canyonlands Research Station, 2006, *An Introduction to Biological Soil Crusts.* Available
5   at http://www.soilcrust.org/crust101.htm. Accessed Jan. 11, 2012.
6
7   Utah Department of Transportation, 2012, *Traffic on Utah Highways (AADT).* Available at
8   http://www.udot.utah.gov/main/f?p=100:pg:0:::V,T:,529. Accessed Nov. 7, 2011.
9
10  Utah DEQ (Department of Environmental Quality), 2012, *Denison/White Mesa Uranium Mill.*
11  Available at http://www.deq.utah.gov/businesses/denison/ index.htm. Accessed May 2, 2012.
12
13  Valdez, R.A., et al., 1992, *Dolores River Native Fish Suitability Study*, BIO/WEST Report
14  No. TR-272-02, final report prepared for Utah Division of Wildlife Resources, Salt Lake City,
15  Utah.
16
17  Walker, J.D., and J.W. Geissman, 2009, *Geologic Time Scale*, Geological Society of America.
18
19  WAPA (Western Area Power Administration), 2012a, *Transmission Line Management Issues on*
20  *Forested Rights-of-Way: A Brief Overview*. Available at http://ww2.wapa.gov/sites/western/
21  transmission/infrastruct/Documents/Western-FS-EIS/Projectoverview.pdf. Accessed
22  Feb. 22, 2012.
23
24  WAPA, 2012b, *Proposed Project Description Summary*. Available at http://ww2.wapa.gov/
25  sites/western/transmission/infrastruct/Documents/Western-FS-EIS/projectdescription.pdf.
26  Accessed Feb. 22, 2012.
27
28  Watts, K.R., 2000, *Effects of the Paradox Valley Unit on Dissolved Solids, Sodium, and Chloride*
29  *in the Dolores River near Bedrock, Colorado, Water Years 1988–98,* Water-Resources
30  Investigations Report 00-4011, U.S. Geological Survey.
31
32  Watts, S.T., and S.T. Knick, 1996, "The Influence of Vegetation, Soils, and Disturbance on
33  Townsend's Ground Squirrel Abundance," in *BLM/IDARNG Research Project Final Report,*
34  Vol. 2, U.S. Geological Survey, Forest and Rangeland Ecosystem Science Center, Snake River
35  Field Station, Boise, Idaho.
36
37  Weir, Jr., et al., 1983, *Regional Hydrology of the Dolores River Basin, Eastern Paradox Basin,*
38  *Colorado, and Utah,* Water-Resources Investigations Report 83-4217, U.S. Geological Survey.
39
40  WEST, Inc., 2007, *Wildlife and Habitat Baseline Study for the Whiskey Ridge Wind Power*
41  *Project, Kittitas County, Washington,* prepared for Whiskey Ridge Power Partners LLC, May.
42  Available at http://www.efsec.wa.gov/wildhorse/Supplemental%20EIS/DSEIS/
43  WHISKEYRIDGE_BASELINE%20REPORT_FINAL%20Revision%2008-05-08.pdf. Accessed
44  Aug. 6, 2009.
45

BLM_0041701

Whitfield, M.S., et al., 1983, *Regional Hydrology of the Blanding-Durango Area, Southern Paradox Basin, Utah, and Colorado*, Water Resources Investigations Report 83-4218, U.S. Geological Survey.

WHO (World Health Organization), 2007, *Extremely Low Frequency Fields*, Environmental Health Criteria 238, WHO Press, Geneva, Switzerland.

Widman, B.L., 1997, "Fault Number 2286—Paradox Valley Graben," in *Quaternary Fault and Fold Database of the United States*, U.S. Geological Survey. Available at http://earthquakes.usgs.gov/regional/qfaults. Accessed Dec. 19, 2011.

Williams, R.D., 1990, "Bobcat Electrocutions on Powerlines," *California Fish and Game* 76(3):187–189.

WRCC (Western Regional Climate Center), 1997, *Average Annual Precipitation Colorado*. Available at http://www.wrcc.dri.edu/pcpn/co.gif. Accessed Dec. 21, 2011.

WRCC, 2011a, *Western U.S. Climate Historical Summaries*. Available at http://www.wrcc.dri.edu/Climsum.html. Accessed Nov. 5, 2011.

WRCC, 2011b, *Climate of Colorado*. Available at http://www.wrcc.dri.edu/narratives/COLORADO.htm. Accessed Dec. 21, 2011.

www.nationalparked.net, 2011, *Black Canyon of the Gunnison, Visitation Statistics by Year*. Available at http://www.nationalparked.com/US/Black_Canyon_of_the_Gunnison/Visitation_History.php.

Xcel (Xcel Energy), 2010, *First-ever Solar-Coal Project Is Running,* June 29. Available at http://www.xcelenergy.com/About_Us/Energy_News/News_Archive/First-ever_solar-coal_project_is_running. Accessed Feb. 24, 2012.

Yarmoloy, C., et al., 1988, "Behavior Responses and Reproduction of Mule Deer, *Odocoileus hemionus*, Does Following Experimental Harassment with an All-Terrain Vehicle," *Canadian Field-Naturalist* 102:425–429.

Yu, C., et al., 2001, *User's Manual for RESRAD Version 6*, ANL/EAD-4, Argonne National Laboratory, Argonne, Ill., July.

BLM_0041702

1
2
3
4
5
6
7
8
9
10
11
12
13                         **APPENDIX A:**
14
15          **EXAMPLES OF EXISTING LEASES FOR THE**
16                **URANIUM LEASING PROGRAM**
17
18

BLM_0041703

*Preliminary Draft PEIS*            *PEIS Privileged Information*            *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1
2
3
4
5
6
7
8
9
10
11
12
13                                   *This page intentionally left blank*
14

A-2

BLM_0041704

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1
2        **APPENDIX A:**
3
4        **EXAMPLES OF EXISTING LEASES FOR THE**
5        **URANIUM LEASING PROGRAM**
6
7              Facsimiles of two generic leases are shown in this appendix. The first lease agreement
8        was used for leases prior to May 2008 (i.e., the original leases issued in 1974, and the
9        continuation of those leases up to and including the issuance of new leases for the 13 "active"
10       lease tracts on April 30, 2008). The second lease agreement was used for the competitive bid
11       solicitation process that DOE completed in June 2008 for the remaining lease tracts that were
12       "inactive" at that time. As discussed in Section 1.2.1, the one primary difference between these
13       two lease agreements is the manner in which the production royalty for each lease is calculated.
14       Please note that for both leases, each lessee is required to pay an annual royalty fee, which is
15       basically an annual rent payment, for which the amount is established by DOE and which is paid
16       at the beginning of each lease year just to hold the lease for that year.
17
18             For the "active" leases (see the first lease shown in this appendix [page A-5]), the lessee
19       must pay a production royalty, paid on a monthly basis during periods of active ore production,
20       for ore produced from the lease tract and shipped to a uranium mill or other processing facility.
21       This production royalty is a combination of a "base" royalty, calculated as a three percentage
22       (2%, 10%, and 14%) step-function applied to the value of the ore produced, plus a bid royalty,
23       calculated by applying the lessee's royalty bid percentage to the value of the ore produced. The
24       base royalty is applied to the lease tract's total ore production, and the bid royalty is applied to
25       the lease tract's ore production up to the "bid quantity," which is an amount specified for each
26       lease tract in pounds of uranium produced.
27
28             For the newer leases (see the second lease shown in this appendix [page A-33]), the
29       lessee must pay just the bid royalty, as calculated above; however, the bid royalty is applied to
30       the lease tract's total ore production.
31
32

BLM_0041705

*Preliminary Draft PEIS*  
*PEIS Team Use Only*

*PEIS Privileged Information*  
*Do Not Distribute*

*May 2012*

1
2
3
4
5
6
7
8
9
10
11
12
13    *This page intentionally left blank*
14
15

BLM_0041706

April 2008                                                             DE–RO01–08LM70XXX

URANIUM MINING LEASE
UNITED STATES DEPARTMENT OF ENERGY

THIS LEASE AGREEMENT, effective as of this 30th day of April, 2008, by and between the UNITED STATES

OF AMERICA (hereinafter "Government"), represented by the UNITED STATES DEPARTMENT OF ENERGY

(hereinafter "DOE"), whose principal place of business for the purpose of this Lease is 2597 B ¾ Road, Grand

Junction, Colorado 81503 and _____

whose principal place of business for the purpose of this Lease is

(hereinafter "Lessee"):

WITNESSETH THAT:

DOE represents that it is in possession of certain Government owned uranium mining property in _____

County, _____ more particularly described as Lease Tract C–X–X in Appendix "A" which is attached

hereto and hereby made a part this Agreement (the "Property").

DOE desires that said property be explored, developed, and operated for the production of uranium-bearing ores.

This Lease is authorized by Section 67 of the Atomic Energy Act of 1954, as amended, and is issued pursuant to

the provisions of the DOE's regulations governing the issuance of leases for mining deposits of uranium in lands

held by the DOE (10 CFR Part 760).

NOW, THEREFORE, the parties do hereby agree as follows:

I.   GRANT OF LEASE.

For considerations hereinafter stated and performance by the Lessee of the terms and conditions

hereinafter provided, the DOE does hereby lease the Property to the Lessee, for the purposes of exploring for,

developing, mining, and removing deposits of uranium, vanadium, and associated minerals, the Property described in

Appendix "A", which is attached hereto and hereby made a part hereof, subject to the terms and conditions

hereinafter set forth. The rights hereby granted are limited to exploration, development, mining, and removal of ore

from within the vertical planes of the boundary lines of the Property, and the Lessee shall have no right hereunder to

extend its workings beyond such vertical planes. Access to the Property is not guaranteed by the Government. The

Lessee shall be responsible for securing such access.

II.   TERM. This Lease shall remain in effect for a period of ten (10) years from the aforementioned

effective date, except as it may be sooner relinquished or cancelled pursuant to other provisions of this Lease. Near

— 1 —

1
2

*A-5*

BLM_0041707

April 2008                                                    DE–RO01–08LM70XXX

the end of that 10–year period, DOE will re-evaluate the leasing program to determine if the leases/leasing program should continue.

   III.   <u>DEFINITIONS</u>.  As used herein:

   (a)   The term "Government" means the Government of the United States of America, including its authorized representatives associated with the Uranium Leasing Program.

   (b)   The term "DOE" means the United States Department of Energy, or duly authorized representatives thereof, including the Realty Officer except for the purpose of deciding an appeal under Article XXVII "DISPUTES".

   (c)   The term "Realty Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings.  The term includes certain authorized representatives of the Realty Officer acting within the limits of their authority as delegated by the Realty Officer.

   (d)   The term "associated minerals" means any minerals, other than the minerals covered by this Lease, which are (i) so intermingled with the deposits of the mineral or minerals for which this Lease is issued that separate development is, in the opinion of the Realty Officer, not warranted for mining or for economic reasons, or (ii) of such poor quality and in such small quantity that separate development is, in the opinion of the Realty Officer, undesirable for mining or for economic reasons.

   (e)   The term "applicable statutes and regulations" means all applicable Federal, state, and local statutes, regulations, and standards.  These statutes include but are not limited to, those relating to mine safety; radiation; air, water, and land pollution; disposal of liquid and solid waste; and workmen's and unemployment compensation.

   (f)   The term "Exploration Plan" as described in Article XII "EXPLORATION PLAN" and Appendix "C" means a plan of activity proposed by the Lessee for the purpose of conducting approved operations to explore, test, or prospect for minerals covered by this Lease.

   (g)   The term "Mining Plan" as referenced in Article XIII "MINING PLAN" and Appendix "C" means a plan of activity proposed by the Lessee for the purpose of conducting surface and underground operations to develop or extract the minerals covered by this Lease.

   IV.   <u>GENERAL PERFORMANCE REQUIREMENT</u>.  The Lessee shall conduct all activities in accordance with the terms and conditions of this Lease and with those in 10 CFR Part 760.  Furthermore, the Lessee shall

— 2 —

1
2

BLM_0041708

April 2008                                                              DE–RO01–08LM70XXX

conduct exploration, development, and mining activities on the Property with all reasonable diligence, skill, and care, as is required to systematically advance lease operations toward, and ultimately achieve and maintain, production of uranium ore consistent with good and safe mining practice, and in accordance with market conditions. Reasonable diligence shall be assessed by the Realty Officer at his sole discretion on the basis of the Lessee's ongoing lease activities or the lack thereof.   Site permitting activities and the performance of cultural resource surveys and/or threatened and endangered species surveys shall be accepted by the Realty Officer as evidence supporting reasonable diligence.

   V.   ROYALTIES.  The Lessee shall pay or cause to be paid, as directed by the DOE, the royalties specified in Appendix "B", which is attached hereto and hereby made a part hereof, at the rates and in the manner set forth therein.

   VI.   INTEREST ON OVERDUE PAYMENTS — FORFEITURE FOR NON-PAYMENT.

   (a)   All amounts that become payable by the Lessee to the Government under this Lease shall bear simple interest from the date due until paid unless paid within thirty (30) days of becoming due.  The interest rate shall be established by DOE (on a quarterly basis as required) as the Federal Short-Term Rate (applied to and applicable to the calendar quarter in which the amount becomes due) plus three (3) percent.  The Federal Short-Term Rate is the rate published monthly by the Internal Revenue Service pursuant to Section 1274(d) of the Internal Revenue Code.   Additional interest shall be assessed for each subsequent calendar quarter until the amount is paid.

   (b)   Amounts shall be due at the earlier of the following dates:

      (1)   The date fixed under this Lease.

      (2)   The date of the first written demand for payment consistent with this Lease, including any demand resulting from a default cancellation.

   (c)   Notwithstanding the provisions of paragraphs (a) and (b) of this Article VI, and irrespective of interest payments made by the Lessee to DOE pursuant thereto, the Realty Officer, in his sole discretion, may cancel this Lease for failure by the Lessee to pay the entire principle amount of any annual royalty, base royalty, or bid royalty within sixty (60) calendar days after payment thereof is due from the Lessee to the DOE under the terms of this Lease.  Such cancellation shall be effective upon Lessee's receipt of a written notice thereof from the Realty Officer.  Failure of DOE to exercise its right to cancel shall not be deemed to be a waiver thereof.

— 3 —

1
2

*A-7*

BLM_0041709

April 2008       DE–RO01–08LM70XXX

VII.   USE OF SURFACE.

(a)   Subject to the other provisions of this Lease, the rights granted to the Lessee herein include the right to use so much of the surface of the Property as is required for the exploration for, and development, mining, and removal of ore, including the right to erect such buildings and other structures and install such machinery and other facilities as may be required for such operations; provided, that the Lessee shall recognize existing uses and commitments in the form of grazing, timbering, Bureau of Land Management special use permits, and public recreation, and improvements such as water developments, ditches, roads, trails, pipelines, telephone, telegraph, and power lines, fences, and rights-of-way; and Lessee shall conduct its operations so as to interfere as little as possible with such existing uses and improvements.

(b)   The Property shall at all times be subject to other lawful uses heretofore or hereafter granted by the Government, through any authorized agency; provided, that such uses shall not prevent, obstruct, or unduly interfere with any right granted under this Lease.

VIII.   LEASES FOR OTHER MINERALS.   The granting of this Lease shall not preclude the issuance by the Government of other leases of the Property for the purposes of mining and extracting oil, gas, oil shale, coal, phosphate, potassium, sodium, sulphur, or other minerals which are or may in the future be leasable pursuant to Federal mineral leasing laws; provided, that any such leases hereafter issued shall provide that operations under such leases shall not prevent, obstruct, or unduly interfere with any right granted under this Lease.

IX.   USE OF SALABLE MINERALS.   No salable minerals, such as sand, gravel, or stone, found on the lands leased hereunder shall be used by the Lessee in its operations unless such salable minerals have been purchased from the Government under the provisions of the Materials Act of July 31, 1947, 30 U.S.C. 601, as amended, or from the owner of such salable minerals if other than the Government.

X.   SECURITY AND SAFETY.   The Lessee shall secure and post all areas that might reasonably be considered hazardous to the general public, including, but not limited to ore stockpile areas, loading areas, mining openings, and mine-rock waste piles, in accordance with all applicable statutes and regulations and specific requirements and stipulations set forth in Appendix "C". If necessary, the Lessee agrees to construct fences or other barriers around the perimeter of safety-hazard areas to minimize the potential for intrusion by humans, livestock, and wildlife. Radioactive materials exposed by the Lessee's operation shall be managed to ensure that the exposure of humans and ecosystems is as low as reasonably achievable.

— 4 —

1
2

BLM_0041710

April 2008                                                                 DE–RO01–08LM70XXX

XI.   <u>ENVIRONMENTAL REQUIREMENTS</u>.  The Lessee, at the Lessee's expense, shall comply with all applicable statutes and regulations and abide by the specific requirements and stipulations set forth in Appendix "C", which is attached hereto and hereby made a part hereof.

XII.   <u>EXPLORATION PLAN</u>.

(a)   Prior to commencing any surface-disturbing operations to explore, test, or prospect for minerals covered by this Lease, the Lessee shall file with the Realty Officer three (3) copies of a plan for the proposed exploration activities and shall obtain the Realty Officer's approval of such plan.  The Exploration Plan shall be consistent with the "Notice of Intent to Conduct Prospecting Operations" (hereinafter "Notice") to be filed with the Colorado Mined Land Reclamation Board (hereinafter MLRB) in accordance with "Rule 5" of the "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended.  The Exploration Plan shall include all information required by the "Notice", and in addition, must specifically include the following information:

(1)   A site-specific environmental analysis;

(2)   A description of specific measures to be taken to assure compliance with the requirements of Article XI "ENVIRONMENTAL REQUIREMENTS", including methods of reclamation contemplated by the Lessee; and

(3)   The specific information outlined in Appendix "C" of this Lease.

(b)   All Exploration Plans submitted to the Realty Officer pursuant to this Article XII and all proposed activities contained therein shall be reviewed by DOE in accordance with 10 CFR Part 1021 "National Environmental Policy Act Implementing Procedures".

(c)   If preparation and filing of an Exploration Plan for the entire operation is dependent upon factors which cannot or will not be determined except during the progress of exploration activities, partial plans may be submitted and approved from time to time; <u>provided</u> <u>however</u>, that the Lessee shall not perform exploration activities not described in an approved plan.

(d)   Changes may be made in the approved Exploration Plan by mutual written agreement of the Lessee and the Realty Officer.  Approval is contingent upon the Lessee notifying all other appropriate agencies (as outlined in Appendix "C") of the proposed changes.

— 5 —

1
2

*A-9*

April 2008                                                      DE–RO01–08LM70XXX

XIII.   <u>MINING PLAN</u>.

(a)   Prior to constructing any surface installation or commencing mine development on the leased lands, the Lessee shall file with the Realty Officer three (3) copies of a plan for the proposed mining operations and shall obtain the Realty Officer's approval of such plan. Such mining plan shall be consistent with the "Reclamation Permit Application" (hereinafter "Application") to be filed with the Colorado MLRB in accordance with "Rule 1.4" and "Rule 6" of the "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended. The Mining Plan shall include all information required by the "Application", and in addition, must specifically include the following information:

(1)   A site-specific environmental analysis;

(2)   A description of specific measures to be taken to assure compliance with the requirements of Article XI "ENVIRONMENTAL REQUIREMENTS", including methods of reclamation contemplated by the Lessee; and

(3)   The specific information outlined in Appendix "C" of this Lease.

(b)   All Mining Plans submitted to the Realty Officer pursuant to this Article XIII and all proposed activities contained therein shall be reviewed by DOE in accordance with 10 CFR Part 1021 "National Environmental Policy Act Implementing Procedures".

(c)   If preparation and filing of a Mining Plan for the entire operation is dependent on factors which cannot or will not be determined except during the progress of mining activities, a partial plan may be submitted and approved from time to time; <u>provided</u> <u>however</u>, that the Lessee shall not perform mining activities not described in an approved plan.

(d)   Changes may be made in the approved Mining Plan by mutual written agreement of the Lessee and the Realty Officer. Approval is contingent upon the Lessee notifying all other appropriate agencies (as outlined in Appendix "C") of the proposed changes.

XIV.   <u>PERFORMANCE BOND</u>.

(a)   Upon approval of an Exploration Plan or Mining Plan, and prior to commencing any surface-disturbing operations, the Lessee shall be required to file a suitable performance bond of not less than $_____ with satisfactory surety, payable to the United States Department of Energy. The bond shall be conditioned upon the faithful compliance with all applicable statutes and regulations, the terms and conditions of this Lease, and any

— 6 —

1
2

*A-10*

BLM_0041712

April 2008                                                                 DE–RO01–08LM70XXX

Exploration Plans and Mining Plans, including amendments and supplements thereto, which have been approved by the Realty Officer.

(b)    The Realty Officer shall set the amount of the initial bond and may, from time to time, require an increase or allow a decrease in the amount of the bond, as in his judgment the circumstances may require. In determining the amount of the bond, the Realty Officer shall take into consideration all applicable statutes and regulations and the character and nature of the reclamation requirements of the Lease, including the requirements of any approved Exploration Plans and Mining Plans and partial or supplementary plans, and the estimated costs of such reclamation.

(c)    The Lessee and his sureties shall be liable for any damage to the Government resulting from the Lessee's failure to complete any work required upon the expiration, relinquishment, or cancellation of this Lease.

XV.    INSPECTION.    The DOE reserves the right, through its officers, employees, agents, and contractors, to enter upon the leased property and into all parts of any of Lessee's mines therein at all reasonable times for inspection and other purposes subject to the Lessee's standard operating procedures.

XVI.    GOOD FAITH NEGOTIATIONS.    At the request of the Realty Officer, the Lessee will negotiate in good faith with the DOE to reach an agreement under which the Lessee, for appropriate compensation, would correct undesirable conditions existing on the Property as a result of pre–1974 mining activities and such other conditions that may be identified from time to time by the Realty Officer.    If for any reason, the Lessee is unable to perform the work required to correct such conditions in a timely manner, DOE reserves the right to contract with another entity to enter upon the leased property and perform said work.

XVII.    INDEMNIFICATION OF GOVERNMENT.

(a)    The Government, including its employees, all tiers of contractors, agents, and authorized representatives shall not be responsible for any mechanics' or miners' liens or other liens, encumbrances, or liabilities incurred by the Lessee in connection with the operation of the Property.    The Lessee assumes all responsibility for and will hold the Government harmless from any and all claims and liability of any nature arising from the operation or occupancy of the premises.

(b)    The Lessee agrees to protect and indemnify the Government against any payroll taxes or contributions imposed with respect to any employee of the Lessee by any applicable law dealing with old age pensions, unemployment compensation, accident compensation, health insurance and related subjects.    The Lessee

— 7 —

1
2

*A-11*

BLM_0041713

April 2008                                                                 DE–RO01–08LM70XXX

also agrees, at its own cost and expense, to insure to each person employed in, about, or upon the Property, the

compensation provided for by law with respect to workmen's compensation and employer's liability insurance,

properly safeguarding the Government, including its employees, all tiers of contractors, agents, and authorized

representatives, against liability for injuries to persons, including injuries resulting in death, and loss of and damage

to property in policies and amounts acceptable to the DOE and to furnish to the DOE written evidence of such

insurance.

XVIII.   REPORTING REQUIREMENTS.

(a)   The Lessee shall provide the Realty Officer with copies of all permits and correspondence from

local, state, or other Federal agencies or entities which pertain to the Lessee's activities on the Property.

(b)   The Lessee shall provide to the Realty Officer, within twenty calendar days after the end of each

month, an accurate record of the tonnage and $U_3O_8$ and $V_2O_5$ grades of each lot of ore delivered from the Property to

a mill, buying station, or other purchaser during the previous month, including copies of all settlement sheets

furnished to the Lessee for ores so delivered.

(c)   The Lessee shall provide to the Realty Officer as soon as practicable after the end of each calendar

quarter, the following documents, records, and/or maps:

(1)   A formal (written and signed) summary of all activities conducted on the Property during such

calendar quarter that, among other things, documents the Lessee's reasonable diligence

required by Article IV "GENERAL PERFORMANCE REQUIREMENT".

(2)   A map or maps showing the location of all exploration holes drilled on the Property during

such calendar quarter, together with copies of any logs and assay records applicable to such

drill holes.

(3)   A mine map or maps showing the progress of mining on the Property as of the end of such

calendar quarter.

(4)   Lessee's estimate of the tonnage and $U_3O_8$ and $V_2O_5$ grades of all ores stockpiled on the

Property as of the end of such calendar quarter.

(5)   If no activity occurs on the Property during a calendar quarter, a letter submitted to the Realty

Officer stating that no activity has occurred shall satisfy this reporting requirement.

— 8 —

1
2

*A-12*

BLM_0041714

April 2008  DE–RO01–08LM70XXX

(d)   The Lessee further agrees to provide to the Realty Officer the results of any inspections of Lessee's mines or other facilities located on the Property, conducted by personnel of local, state, or other Federal agencies under applicable statutes and regulations.  Furthermore, the Lessee agrees to notify the Realty Officer of any planned or scheduled inspections to be performed by local, state, or other federal agencies as soon as such schedule is known so that the Realty Officer may participate in said inspection if so desired.

(e)   The Lessee is hereby notified that information obtained by DOE from the Lessee under this section shall be subject to the provisions of the Freedom of Information Act (5 U.S.C. 552).

XIX.   TAXES.  The Lessee agrees to pay when due all taxes lawfully assessed and levied pursuant to state or Federal law upon improvements, output of mines, and other interests, property, and assets of the Lessee in or upon the Property.

XX.   ASSIGNMENT.  The Lessee agrees that no transfer of this Lease, or of any interest therein or claim thereunder, by assignment, sublease, operating agreement, or otherwise, shall occur unless and until approved in writing by the Realty Officer.

XXI.   RELINQUISHMENT OF LEASE.  This Lease may be surrendered by the Lessee upon the Lessee's filing with the DOE, and the Realty Officer's approval of, a written application for relinquishment.  Approval of the application shall be contingent upon the delivery of the Property to the DOE in a condition satisfactory to the Realty Officer, in accordance with the terms of this Lease, and upon the continued liability of the Lessee to make payment of all royalty and other debts theretofore accrued and due the DOE.

XXII.   CANCELLATION OF LEASE.  DOE may cancel this Lease if the Realty Officer determines that the Lessee has failed to comply with any provision of this Lease including reasonable diligence.  Failure of DOE to exercise its rights to cancel shall not be deemed to be a waiver thereof.

XXIII.   DELIVERY OF PREMISES.  At the expiration of this Lease, or upon its earlier relinquishment or cancellation as herein provided, the Lessee shall, within one hundred eighty (180) days or other period mutually agreed to by the Lessee and Realty Officer, surrender the Property in a condition satisfactory to the Realty Officer, and shall, unless otherwise directed by the Realty Officer in writing, remove from the Property at Lessee's expense all structures, machinery, equipment, tools, and improvements placed thereon by the Lessee; provided, that the Lessee shall not remove any timbers or improvements which are determined by the Realty Officer to be required to be left in the mine workings to protect such workings as a mining property.  Furthermore, prior to the surrender of

— 9 —

1
2

BLM_0041715

April 2008                                                          DE–RO01–08LM70XXX

the Property, the Lessee shall remove from the Property at Lessee's expense all stockpiles of ore and/or protore

materials placed thereon by the Lessee and remit the required royalties to DOE in accordance with Article V

"ROYALTIES" and Appendix "B".  Otherwise, the Lessee shall at the Lessee's expense return all stockpiles of ore

and/or protore materials to a suitable location within the underground mine workings on the Property or other

location on the Property as designated by the Realty Officer.

XXIV.    EXAMINATION OF RECORDS.

(a)    The DOE and the Comptroller General of the United States or duly authorized representatives of

either shall, until three (3) years after final payment under this Lease, have access to and the right to examine any of

the Lessee's directly pertinent books, documents, papers, or other records involving transactions related to this

Lease.  The Lessee shall make these records and documents available to the Government, at the Lessee's offices, at

all reasonable times, without any charge.

(b)    The Lessee agrees to include in first-tier subcontracts under this Lease a clause to the effect that the

DOE or the Comptroller General or duly authorized representatives of either shall, until three (3) years after final

payment under the subcontract, have access to and the right to examine any of the subcontractor's directly pertinent

books, documents, papers, or other records involving transactions related to the subcontract.

(c)    The periods of access and examination in paragraphs (a) and (b) above for records relating to (1)

appeals under Article XXVII "DISPUTES", (2) litigation or settlement of claims arising from the performance of

this Lease, or (3) costs and expenses of this Lease to which the DOE or the Comptroller General or duly authorized

representatives of either has taken exception shall continue until such appeals, litigation, claims, or exceptions are

disposed of.

XXV.    OFFICIALS NOT TO BENEFIT.  No member of or delegate to Congress, or resident commissioner,

shall be admitted to any share or part of this Lease, or to any benefit arising from it.  However, this clause does not

apply to this Lease to the extent that this Lease is made with a corporation for the corporation's general benefit.

XXVI.    COVENANT AGAINST CONTINGENT FEES.  The Lessee warrants that no person or selling agency

has been employed or retained to solicit or secure this Lease upon an agreement or understanding for a commission,

percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or

selling agencies maintained by the Lessee for the purpose of securing business.  For breach or violation of this

— 10 —

1
2

*A-14*

BLM_0041716

April 2008                                                                DE–RO01–08LM70XXX

warranty, the Government shall have the right to cancel this Lease without liability, or in its discretion to require the Lessee to pay to DOE the full amount of such commission, percentage, brokerage, or contingent fee.

XXVII.   <u>DISPUTES</u>.

(a)   Except as otherwise provided in this Lease, any dispute concerning a question of fact arising under this Lease which is not disposed of by agreement shall be decided by the Realty Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Lessee.  The decision of the Realty Officer shall be final and conclusive unless within 30 days from the date of receipt of such copy, the Lessee mails or otherwise furnishes to the Realty Officer a written appeal addressed to the DOE.  The decision of the DOE for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.  In connection with any appeal proceeding under this clause, the Lessee shall be afforded an opportunity to be heard, and to offer evidence in support of its appeal.  Pending final decision of a dispute hereunder, the Lessee shall abide by the Realty Officer's decision.

(b)   The provisions of paragraph (a) above does not preclude consideration of questions of law; <u>provided</u>, that nothing in this Lease shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

XXVIII.   <u>HEIRS AND SUCCESSORS-IN-INTEREST</u>.  Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Lease, effective as of the date first above written, intending to be legally bound thereby.

UNITED STATES OF AMERICA
UNITED STATES DEPARTMENT OF ENERGY          _____ (LESSEE)

By  _____          By  _____

Title  _____Realty Officer_____          Title  _____

Date  _____          Date  _____

— 11 —

1
2

*A-15*

BLM_0041717

April 2008                                                      DE–RO01–08LM70XXX

APPENDIX A

DESCRIPTION OF LEASED PROPERTY

The leased property described herein was referred to as "MINING LEASE NO. AT(05–1)–ML–60 8–____"during

the period from 1974 to the enactment of this Lease.

*A full legal description of the lease premises along with all other site-specific and/or lease-specific information will*

*be included in this Appendix "A".*

— A1 —

1
2

*A-16*

BLM_0041718

*Preliminary Draft PEIS*   *PEIS Privileged Information*   *May 2012*
*PEIS Team Use Only*   *Do Not Distribute*

April 2008   DE–RO01–08LM70XXX

### APPENDIX B

ROYALTIES

(a)   At the beginning of each lease year during the term of this Lease, there shall become due and payable to the DOE an annual royalty of $_____. Annual royalties paid pursuant to this article shall be credited against base royalties and royalty bid payments which become payable during the term of this Lease. Annual royalties so paid shall not be refunded upon the expiration, relinquishment, or cancellation of this Lease. Additionally, annual royalty payments made during the lease term of MINING LEASE NO. AT(05–1)–ML–60.8 –C– X–X that have not been applied against past production royalty payments, shall be brought forward and credited against base royalties and royalty bid payments which become payable during the term of this Lease.

(b)   The Lessee agrees to pay to the DOE a base royalty, per dry ton of ore delivered from the Property to a mill or other receiving station, determined as provided in paragraph (h) of this Appendix "B", in the amount of (a) Two percent (2%) of the value per dry ton up to and including a value of Fifty Dollars ($50.00) per dry ton, plus (b) Ten percent (10%) of the value per dry ton in excess of Fifty Dollars ($50.00) per dry ton and up to and including One Hundred Twenty-Five Dollars ($125.00) per dry ton, plus (c) Fourteen percent (14%) of the value per dry ton in excess of a value of One Hundred Twenty-Five Dollars ($125.00) per dry ton.

(c)   The Lessee agrees to pay to the DOE, in addition to the base royalty required to be paid pursuant to paragraph (b) of this Appendix "B", a royalty bid payment, per dry ton of ore delivered from the Property to a mill or other receiving station, in the amount of _____ percent (__%) of the value per dry ton, determined as provided in paragraph (g) of this Appendix "B"; provided, that such royalty bid payments shall not be payable with respect to ores mined from the Property and delivered to a mill or other receiving station after royalty bid payments have been made for ores containing a total of _____ pounds of $U_3O_8$ so delivered by the Lessee from the Property.

(d)   Unless otherwise authorized by DOE in writing, all ores mined from the Property shall be stockpiled on the Property until such time as they are delivered to a mill or other receiving station.

(e)   With respect to ores which are mined from the Property and delivered to a mill or other receiving station which is owned or controlled by the Lessee, the Lessee agrees to make base royalty and royalty bid payments, for all lots of such ore assayed or fed to process during each calendar month, within twenty (20) calendar days after the end of such calendar month. Such base royalty and royalty bid payments shall be treated as provisional payments with respect to any lot of ore for which the DOE requests an umpire assay, and an appropriate adjustment shall be made in

— B1 —

1
2

*A-17*

BLM_0041719

April 2008                                                          DE-RO01–08LM70XXX

the first base royalty and royalty bid payment following Lessee's receipt of the results of such umpire assay for such lot of ore.

(f)   With respect to ores which are mined from the Property and delivered to a mill or other receiving station not owned or controlled by the Lessee, the Lessee agrees:

(1)   That the DOE may receive base royalty and royalty bid payments directly from the owner or controller of the mill or other receiving station to which such ores are shipped by the Lessee if the DOE makes arrangements therefore satisfactory to the Lessee.

(2)   That, in the absence of such arrangements, the Lessee shall make base royalty and royalty bid payments for all lots of such ore assayed or fed to process (includes delivery of such ore to an ore-buying station or sample plant) during each calendar month, within twenty (20) calendar days after payment for such lots is mailed to the Lessee; provided, that an appropriate extension of such twenty (20) day period shall be granted by the Realty Officer for any undue delay in the mails which causes a delay in delivery to the Lessee of payment for such lots of ore.  Such base royalty and royalty bid payments shall be treated as provisional payments with respect to any lot of ore for which the DOE requests an umpire assay, and an appropriate adjustment shall be made in the first base royalty and royalty bid payment following finalization of payment to the Lessee for such ore.

(g)   Payments of base royalty and royalty bid amounts due the DOE shall be deemed to have been made when received at the DOE Legacy Management Office in Grand Junction, Colorado.

(h)   DOE shall establish the prices for uranium and vanadium that shall be used to calculate the fair-market value of lease tract ores.  These prices shall be established on a quarterly basis, on or before the twentieth $(20^{th})$ day after the end of the previous calendar quarter (in January, April, July, and October), and shall remain in effect during the calendar quarter in which they are established.  DOE shall establish these prices as follows:

(1)   Using an Excel spreadsheet, DOE shall monitor, record, and track the spot-market and long-term-market prices for uranium (quoted as dollars per pound $U_3O_8$) as reported weekly in $U_x$ *Weekly*.  The spreadsheet will then (i) automatically calculate the monthly and quarterly arithmetic average prices for uranium (both spot-market and long-term-market), and (ii) automatically calculate a quarterly weighted-average price for uranium by applying the appropriate purchase contract percentages to the respective quarterly average prices.  Using this spreadsheet, DOE shall also monitor, record, and track the Total Purchased (Weighted-Average Price) for uranium as reported annually by the Energy Information Administration in Table S1b. *Weighted-Average Price of Uranium*

— B2 —

1
2

BLM_0041720

April 2008                                                                  DE–RO01–08LM70XXX

*Purchased by Owners and Operators of U.S. Civilian Nuclear Power Reactors (quoted as Dollars per Pound $U_3O_8$ Equivalent).* The spreadsheet will then automatically calculate the arithmetic average between the quarterly weighted-average price for uranium and the Total Purchased (Weighted-Average Price) for uranium. The resulting figure is reported as the annualized quarterly weighted-average price for uranium.

(2)    Using the same Excel spreadsheet, DOE shall monitor, record, and track the market price of vanadium (quoted as dollars per pound $V_2O_5$) as reported twice weekly in *Metal Bulletin (Non-Ferrous Primary Metals, Noble Alloys and Ores, Vanadium pentoxide)*. The spreadsheet will then (i) automatically calculate the monthly and quarterly arithmetic average prices for vanadium, and (ii) automatically apply an adjustment factor of one-half (0.5) to each quarterly arithmetic average price for vanadium. The resulting figure is reported as the adjusted quarterly average price for vanadium.

(3)    Paragraphs (h)(1) and (h)(2) can be summarized by the following three equations:

$$U = (Q_{WA} + TP_{WA}) / 2 \qquad (1)$$

where:

| | | |
|---|---|---|
| $U$ | = | Annualized Quarterly Weighted-Average Price for Uranium |
| $Q_{WA}$ | = | Quarterly Weighted-Average Price for Uranium |
| $TP_{WA}$ | = | Total Purchased (Weighted-Average Price) for Uranium |

$$Q_{WA} = Q_{SM} * P_{SM} + Q_{LTM} * P_{LTM} \qquad (2)$$

where:

| | | |
|---|---|---|
| $Q_{SM}$ | = | Quarterly Arithmetic Average Price for the Uranium Spot Market |
| $P_{SM}$ | = | Purchase Contract Percentage for the Uranium Spot Market |
| $Q_{LTM}$ | = | Quarterly Arithmetic Average Price for the Uranium Long Term Market |
| $P_{LTM}$ | = | Purchase Contract Percentage for the Uranium Long Term Market |

$$V = Q_{WA} * 0.5 \qquad (3)$$

where:

| | | |
|---|---|---|
| $V$ | = | Annualized Quarterly Weighted-Average Price for Vanadium |
| $Q_{WA}$ | = | Quarterly Weighted-Average Price for Vanadium |

(i)    The Lessee shall be notified of these prices (annualized quarterly weighted-average price for uranium and adjusted quarterly average price for vanadium) by formal written correspondence. The Lessee shall use these

— B3 —

1
2

*A-19*

BLM_0041721

April 2008               DE–RO01–08LM70XXX

prices to calculate the fair-market value of the ore in dollars per dry ton (calculated to the nearest cent [$0.01]), for all lots of such ore assayed during any calendar month. This fair-market value shall be determined by:

  (1) Computing the number of recoverable pounds of contained $U_3O_8$ and $V_2O_5$ per dry ton of ore in the lots so assayed by (i) multiplying the total number of pounds of $U_3O_8$ and $V_2O_5$, respectively, contained in the lots of ore so assayed during such calendar month, by factors of 0.96 and 0.79, respectively (the average milling facility's recovery rates for $U_3O_8$ and $V_2O_5$, respectively, as acknowledged by DOE) and (ii) dividing each of the resulting numbers by the total number of dry tons of ore contained in the lots so assayed during such calendar month, and carrying the results to three decimal places for $U_3O_8$ and two decimal places for $V_2O_5$; and

  (2) Adding together the dollar amounts obtained by (i) multiplying the number of recoverable pounds of $U_3O_8$ per dry ton of ore in the lots so assayed by the price per pound of $U_3O_8$ established by DOE and (ii) multiplying the number of recoverable pounds of $V_2O_5$ per dry ton of ore in the lots so assayed by the price per pound of $V_2O_5$ established by DOE.

 (j) For ores that have been mined from the Property and delivered to a mill or other receiving station,, but not assayed or fed to process, the Lessee shall estimate the value of said ores using standard industry practices, and shall make base royalty and royalty bid payments to DOE equal to or greater than 95 percent (95%) of the estimated value of the base royalty and royalty bid payments due to DOE. Such base royalty and royalty bid payments shall be treated as provisional payments with respect to said ores until such time that said ores are assayed or fed to process and the final base royalty and royalty bid payments due to DOE are calculated and final base royalty and royalty bid payments are made.

 (k) If price quotations for vanadium pentoxide become unavailable, the DOE and the Lessee will negotiate to establish a method of determining an appropriate market price per pound of $V_2O_5$ to be used in determining that portion of the value per dry ton of ore attributable to vanadium. Pending agreement on such method, the last prices established by paragraph (h)(2) above shall be used in determining the portion of the value per dry ton of ore attributable to vanadium, for the purpose of computing royalties under this Lease. If the parties fail to reach agreement on an applicable method, the matter shall constitute a dispute to be decided in accordance with the Article XXVII "DISPUTES" of this Lease.

 (l) The parties hereto agree that if the Lessee is paid for any constituent, other than uranium or vanadium, contained in ores mined from the Property, all amounts so paid shall be held in trust by the Lessee for the DOE until

— B4 —

1
2

*A-20*

BLM_0041722

April 2008                                                    DE–RO01–08LM70XXX

the Lessee and the DOE agree upon a base royalty to be paid to the DOE with respect to Lessee's sale of such constituent.

(m)   Consistent with Article XXIII "DELIVERY OF PREMISES", the Lessee agrees, that within one hundred eighty (180) days following the expiration, relinquishment, or termination of this Lease as herein provided, all royalties associated with this lease (annual royalty, base royalty, and bid royalty) shall become due and payable to the DOE.  For ores that have been mined from the Property, but not assayed or fed to process, the Lessee shall estimate the value of said ores using standard industry practices, and shall make base royalty and royalty bid payments to DOE equal to or greater than 95 percent (95%) of the estimated value of the base royalty and royalty bid payments due to DOE.  Such base royalty and royalty bid payments shall be treated as provisional payments with respect to said ores until such time that said ores are assayed or fed to process and the final base royalty and royalty bid payments due to DOE are calculated and final base royalty and royalty bid payments are made.

— B5 —

1
2

BLM_0041723

April 2008                                                        DE–RO01–08LM70XXX

WEIGHING, SAMPLING, AND ASSAYING.

With respect to ores which are mined from the Property and delivered to a mill or other receiving station, the Lessee agrees to the following provisions:

(a)   The Lessee shall weigh, or cause to be weighed, each lot of ore delivered from the Property to its mill or other receiving station and shall furnish the DOE a record of the weight of such lot. The scales used in weighing such ore shall be balanced daily and checked once each week or more often, as appears necessary, by either standard weights or by check-weighing against another scale. Scale platforms will be kept clean and free of the sides of the pit, and the scales shall be inspected and certified every six months by the appropriate entity of the state in which the mill or receiving station is located, if such inspection is available; otherwise, a biannual inspection shall be made by a competent organization which is acceptable to both the Lessee and the DOE.

(b)   The Lessee shall sample, or cause to be sampled, each lot of ore according to standard and accepted practices in ore sampling, and such sampling shall be final and binding on both parties to this Lease. The DOE or its representative may be present at the sampling of such ore. The Lessee shall ensure that moisture determinations are made according to standard practices in ore sampling. The Lessee shall ensure that each final sample is divided into four (4) pulps, one of which shall be promptly furnished to the DOE, one of which shall be retained by the Lessee for assay purposes, and two of which shall be held in reserve by the Lessee for possible umpire analysis. The Lessee shall promptly assay, or cause to be assayed, its pulp for $U_3O_8$ and $V_2O_5$ content and shall transmit the assay results to the DOE, together with weight and moisture certificates for the lot sampled. For the purpose of such reporting, all assays for $U_3O_8$ shall be adjusted to the nearest 0.001% and all assays for $V_2O_5$ shall be adjusted to the nearest 0.01%.

(c)   The DOE may assay its pulps at its own expense. In case of disagreement with the Lessee's assay with respect to either $U_3O_8$ or $V_2O_5$ content, the DOE may, within 30 calendar days after receiving its pulp, mail to the Lessee a written request for an umpire assay. Upon receipt of such written request, the Lessee shall promptly submit one of the pulps held in reserve to an assayer, whom the parties hereto shall agree upon, for umpire assay. With respect to both $U_3O_8$ and $V_2O_5$ content, if the assay of the umpire is within the assays of the two parties, it shall be final. If not, the assay which is nearer to that of the umpire shall

— B6 —

1
2

*A-22*

BLM_0041724

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*              *Do Not Distribute*

April 2008                                                    DE–RO01–08LM70XXX

prevail.  The party whose assay for $U_3O_8$ is further from that of the umpire shall pay the cost of the

umpire's assay.  In the event that the umpire's assay for $U_3O_8$ is equally distant from the assay of each

party, the cost shall be split equally.

(d)   The quantity of ore comprising a lot, as used herein, shall be determined by the Lessee, except that no lot

shall exceed one thousand (1,000) tons of ore except as otherwise agreed in writing by the Realty Officer.

— B7 —

1
2

*A-23*

BLM_0041725

April 2008                                                                        DE–RO01–08LM70XXX

APPENDIX C

1.   SPECIFIC REQUIREMENTS AND STIPULATIONS

The Lessee agrees to comply with all applicable statutes and regulations, including but not limited to the following items:

(a)   Prior to resuming operations on the Property that were previously approved by DOE, the Lessee shall notify the Realty Officer in writing of its intentions to resume such operation and shall include any changes, additions, or modifications to the original plan that are now proposed.  Upon receipt of such notification, the Realty Officer shall review the approved plan along with any new information provided by the Lessee and determine if additional stipulations are warranted.  When all pertinent requirements are satisfied, DOE shall provide the Lessee with a written approval to proceed.

(b)   All existing serviceable improvements not associated with the Lessee's operation, such as fences, gates, cattle guards, roads, trails, culverts, pipelines, bridges, and water development and control structures, authorized for use by the Lessee, shall be maintained in serviceable condition by the Lessee.  Such improvements (if not owned by the Lessee) which are damaged or destroyed by the Lessee's operations shall be replaced, restored, or compensated for by the Lessee.

(c)   The Lessee's operations shall not disturb public land survey corner markers or monuments or Atomic Energy Commission (AEC) survey markers without the prior written approval of the Realty Officer.  Additionally, the Lessee shall pay all costs associated with the surveys required to preserve or reestablish the true point of any such marker or monument and the replacement of such marker or monument.

(d)   Housing and other buildings and support facilities related to community development shall be constructed or located on the Property only upon the prior written approval of the Realty Officer.  In constructing and locating such housing, other buildings, and support facilities, the Lessee shall comply with applicable county planning and zoning regulations, subdivision regulations, and mobile home regulations, and shall furnish evidence of such compliance to the Realty Officer upon request.

(e)   Prior to any surface disturbing activity, the Lessee shall file a "Notice of Intent to Conduct Prospecting Operations" (Notice) or "Reclamation Permit Application" (Application), whichever is appropriate, with the Colorado Mined Land Reclamation Board (MLRB) in accordance with "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended.  All subsequent modifications to the Notice or Application shall be

— C1 —

1
2

BLM_0041726

addressed in accordance with the "Mineral Rules and Regulations" of the Colorado MLRB. The Lessee shall provide the Realty Officer with copies of all pertinent approval documentation including permits issued.

(f) Prior to any surface disturbing activity, the Lessee shall consult with the U.S. Department of Interior—Bureau of Land Management (BLM), the U.S. Department of Interior—Fish and Wildlife Service (USFWS), and/or the Colorado Department of Natural Resources—Division of Wildlife (CDOW), as appropriate, to determine whether threatened or endangered, or sensitive plant or wildlife species occur in the area to be disturbed or whether the agencies have other plant or wildlife concerns in the area to be disturbed. If required, the Lessee shall conduct surveys or provide other documentation to resolve this concern. The Lessee shall provide the Realty Officer with copies of all documents pertaining to this issue.

(g) Prior to any surface disturbing activity, the Lessee shall perform a cultural and historical survey of the area to be disturbed. If cultural or historical resources are found to exist, the Lessee shall consult with the State Historical Preservation Officer for the appropriate measures to be taken. If required, the Lessee shall prepare a mitigation plan to address the protection of the cultural or historical resources. The Lessee shall provide the Realty Officer with copies of all documents pertaining to this issue.

(h) Prior to any surface disturbance activity in a potential floodplain or wetland area, the Lessee shall consult with the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, and the appropriate state agency to determine whether a jurisdictional floodplain or wetland exists in the area to be disturbed. If required, the Lessee shall prepare a Floodplain/Wetlands Assessment that proposes mitigation measures to be taken to resolve this concern. The Lessee shall provide the Realty Officer with copies of all documents pertaining to this issue.

(i) The Lessee shall use existing roads where practicable, and shall conduct activities employing wheel or track vehicles in such a manner as to minimize surface damage. The Lessee shall wash all tracked vehicles or equipment prior to their being mobilized to the Property. The Lessee shall promptly repair any road damage resulting from the Lessee's operations, restoring such road to its previous condition or to a condition acceptable to the Realty Officer. Where existing access roads across the Property are used principally by the Lessee, the Lessee shall construct surface-water control and drainage structures (culverts, water bars, or grade dips) on such roads to minimize erosion. Plans for such structures shall be included in all Exploration Plans and Mining Plans submitted to the Realty Officer pursuant to Articles XII "EXPLORATION PLAN" and XIII "MINING PLAN" hereof, respectively. The Lessee shall construct new roads and trails on the Property only at locations and to specifications

April 2008                                                                DE–RO01–08LM70XXX

approved in advance in writing by the Realty Officer or an authorized representative of the Realty Officer, and shall

construct and maintain such roads and trails in a manner that will minimize channeling and other erosion. The

Realty Officer's approval of plans for new access road construction, culverts, water bars, or grade dips will be guided

by standards established by BLM or the U.S. Department of Agriculture—Forest Service (USFS), where appropriate.

(j)    The Lessee shall conduct all operations so as to protect all natural resources and the environment

including streams, lakes, ponds, waterholes, seeps, and marshes, and protect fish and wildlife resources as required

by applicable laws and regulations. The Lessee shall control all mine wastes, contaminants and pollutants, and

sediments associated with stormwater runoff in accordance with existing regulations, and shall comply with all

environmental regulations regarding discharge into, or degradation of water resources including streams, springs,

stock waters, or groundwater. The Lessee shall not use water from any water source without the written consent of

the person having the rights to the use of such water source.

(k)    Lessee shall keep the clearing of timber, stumps and snags, and any ground cover to a minimum

consistent with the conduct of exploration, development, and mining activities approved hereunder. The Lessee shall

abide by any restrictions concerning the bulk removal of vegetation (primarily piñon pine) that are established by the

Realty Officer. The Lessee shall use due care to avoid scarring or removal of vegetative ground cover in areas not

involved in such operations. Open parks (areas where there is a grass, shrub, and/or sagebrush cover) shall be

disturbed as little as possible. If the shrub or brush cover is too high and must be cleared, it shall be cleared at or

above ground level. The Lessee shall return all disturbed areas to their original condition or a condition acceptable

to the Realty Officer promptly after damage to such areas has occurred and operations under this Lease are no longer

being conducted in the disturbed areas.

(l)    The Lessee agrees that all underground mine openings shall be supported by pillars, timber, or other

ground support devices approved by the Federal or state agencies having jurisdiction over such underground

workings. The Lessee further agrees, during the term of this Lease, to substantially fence or permanently close all

mine openings/portals, subsidence holes, surface excavations, or other workings resulting from the Lessee's

operation that may be considered hazardous to human health or the environment. Such protective measures shall be

maintained in a proper and safe condition during the term of this Lease. Prior to abandoning operations, the Lessee

shall submit a mine-site reclamation plan to the Realty Officer for approval. Such plan shall include the proposed

method(s) of permanent closure for all mine openings/portals including shafts, adits, inclines/declines, ventilation

— C3 —

1
2

BLM_0041728

April 2008                                                                                          DE–RO01–08LM70XXX

shafts, and water discharge points. No underground workings or any part thereof shall be permanently abandoned and rendered inaccessible without the prior written approval of the Realty Officer. All mine-site reclamation shall be performed to the satisfaction of the Realty Officer in accordance with the approved reclamation plan

(m)     Surface drill holes and associated disturbances resulting from exploration or development activities shall be abandoned in accordance with existing regulations and in a manner that will protect the surface. All disturbed areas identified by the Lessee as not being needed for future operational activities shall be promptly reclaimed by the Lessee. The Realty Officer, by written notice to the Lessee, shall designate any other areas where reclamation must be undertaken as a result of disturbances caused by the Lessee's operations.

(n)     If antiquities or other objects of historic or scientific interest, including but not limited to historic or prehistoric features or ruins, artifacts, or vertebrate fossils are discovered by the Lessee in the performance of operations under this Lease, the Lessee shall cease operations in the vicinity of such discovery and immediately take appropriate steps to protect and save such objects of historic or scientific interest and shall notify the Realty Officer of such discovery. The Realty Officer shall assess the values involved and prescribe such protective measures as deemed necessary.

(o)     The Lessee shall make every effort to prevent, control, or suppress any fire in the operating area and to report any uncontrolled fire to the appropriate BLM or USFS official, as designated by the Realty Officer.

(p)     The Lessee shall provide detailed haul route information to the Realty Officer for review prior to commencement of any haul activities. The haul route information shall include, at a minimum, expected routes from the mine site to the proposed mill or other facility accepting material from the mine, expected number of trucks per day, size and approximate weights of the ore being shipped, and expected production rates and mining life timeframes. It is expected that the Lessee will utilize only the specified routing. The lessee shall notify the Realty Officer of any significant changes to the haul route plan.

(q)     The Lessee shall comply with Colorado State Access Code Section 43-2-147(4), C.R.S., and Section 24-4-103., C.R.S., effective 8/31/98. Pursuant to said code, the Lessee may be required to participate in a Highway Access Pre-Consultation meeting with DOE and the Colorado Department of Transportation after the completion and submittal to DOE of the approved permit from the Colorado MLRB. The details provided within the Mining Plan and permit, and the information provided under paragraph (p) above shall be used to determine the need for the Pre-Consultation meeting and to determine the potential impacts to county and state roads, highways and

— C4 —

1
2

BLM_0041729

April 2008                                                                     DE–RO01–08LM70XXX

intersections from the Lessee's operations, and any resulting mitigation requirements from these impacts. Any revisions or amendments to the permit, or any conversion from one permit type to another approved by the Colorado MLRB shall also be provided to the Realty Officer. The permit revision, modification or conversion may be used to determine any additional impacts to the county roads or state highways from the Lessee's operations, and any resulting mitigation requirements from these additional impacts. Access permits required under this requirement shall be provided to the Realty Officer.

(r)    The Lessee shall attend and participate in meetings between DOE and other Federal, state, and local agencies, as required.

(s)    Prior to entry into any existing lease tract mines or mine workings (or the resumption of mining operations therein), where mitigative measures have been previously undertaken to conserve potentially critical habitat for BLM–listed sensitive bat species, the Lessee shall consult with BLM and CDOW to mitigate the impacts of the Lessee's activities to the references bat species.

— C5 —

1
2

*A-28*

BLM_0041730

April 2008                  DE–RO01–08LM70XXX

2. EXPLORATION PLAN FORMAT

It is not DOE's intent to require the Lessee to prepare multiple documents for submittal to the appropriate agencies for review and approval.  Consequently, at the Lessee's discretion, a copy of the "Notice of Intent to Conduct Prospecting Operations" filed with the Colorado MLRB may be submitted to DOE for review and approval.  That document will meet DOE's requirement for submittal of an Exploration Plan providing it contains, at a minimum, the following information:

    a. Map showing general area to be explored

        1. Tentative location of drill holes or other exploration activity

        2. Location of roads (existing and proposed)

    b. Approximate starting date and duration of drilling

    c. Drilling information

        1. Type of drilling and/or other exploration equipment

        2. Size of hole and core, if any, to be recovered

        3. Type of logging

        4. Target horizon and depth

    d. Road construction necessary for exploration

        1. Location of roads and drill sites

        2. Measures to be taken for erosion control

    e. Abandonment

        1. Procedures for plugging drill holes including the disposition of drill hole cuttings

        2. Surface restoration (grading, revegetation, erosion control measures, etc.)

    f. Provisions made to conform with existing state and federal regulations regarding control of fire, pollution of water and air, protection of other natural resources, and public health and safety, both during and upon abandonment of exploration activities

    g. Specific measures to be taken to assure compliance with environmental and surface use stipulations of this Lease including the preparation of a site-specific environmental document that assures compliance with NEPA and other environmental regulations.

— C6 —

1
2

BLM_0041731

April 2008                                                              DE–RO01–08LM70XXX

3.   MINING PLAN FORMAT

It is not DOE's intent to require the Lessee to prepare multiple documents for submittal to the appropriate agencies for review and approval.  Consequently, at the Lessee's discretion, a copy of the "Reclamation Permit Application" filed with the Colorado MLRB may be submitted to DOE for review and approval.  That document will meet DOE's requirement for submittal of a Mining Plan providing it contains, at a minimum, the following information:

a.   Map showing location of:

1.   Ore body and proposed entry

2.   Any new roads required

3.   Mine plant and associated structures and facilities

4.   Waste dumps and ore storage areas

b.   Mining

1.   Initial development plans

A.   Type of entry and haulage method proposed

B.   Stoping method

C.   Estimated rate of daily ore production and mine-life expectations

D.   Provisions to handle mine water

2.   Proposed ventilation and radiation control methods

c.   Surface Plant

1.   Buildings, utility lines, and storage/stockpile areas

2.   Sewage and refuse disposal

3.   Compliance with any applicable county planning and zoning regulations

4.   Compliance with EPA stormwater discharge regulations

d.   Surface restoration plans

1.   Topsoil removal and storage

2.   Grading and backfilling

3.   Control of stormwater runoff

4.   Revegetation (if required)

e.   Abandonment

— C7 —

1
2

BLM_0041732

April 2008                                                    DE–RO01–08LM70XXX

    1.   Permanent closure of all mine openings/portals resulting from, or utilized during, the Lessee's operations.

    2.   Removal of structures and associated features

    3.   Disposition of mine wastes (contouring, leveling, use for backfill, etc.)

f.    Provisions made to conform with existing state and federal regulations regarding control of fire, pollution of water and air, protection of other natural resources, and public health and safety, both during and upon abandonment of mining activities.

g.    Specific measures to be taken to assure compliance with environmental and surface use stipulations of the Lease including the preparation of a site-specific environmental document that assures compliance with NEPA and other environmental regulations.

— C8 —

1
2

*A-31*

BLM_0041733

*Preliminary Draft PEIS*  *PEIS Privileged Information*  *May 2012*
*PEIS Team Use Only*  *Do Not Distribute*

1
2
3
4
5
6
7
8
9
10
11
12
13    *This page intentionally left blank*
14
15

*A-32*

BLM_0041734

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

June 2008                                                                          DE–RO01–08LM70XXX

URANIUM MINING LEASE
UNITED STATES DEPARTMENT OF ENERGY

THIS LEASE AGREEMENT, effective as of this ___ day of _____, 2008, by and between the UNITED

STATES OF AMERICA (hereinafter "Government"), represented by the UNITED STATES DEPARTMENT OF

ENERGY (hereinafter "DOE"), whose principal place of business for the purpose of this Lease is 2597 B ¾ Road,

Grand Junction, Colorado 81503 and _____

whose principal place of business for the purpose of this Lease is _____ (hereinafter

"Lessee"):

WITNESSETH THAT:

DOE represents that it is in possession of certain Government owned uranium mining property in Montrose

County, Colorado, more particularly described as Lease Tract C–X–X in Appendix "A" which is attached hereto and

hereby made a part this Agreement (the "Property").

DOE desires that said Property be explored, developed, and operated for the production of uranium-bearing ores.

This Lease is authorized by Section 67 of the Atomic Energy Act of 1954, as amended, and is issued pursuant to

the provisions of the DOE's regulations governing the issuance of leases for mining deposits of uranium in lands

held by the DOE (10 CFR Part 760).

NOW, THEREFORE, the parties do hereby agree as follows:

I.   GRANT OF LEASE.

For considerations hereinafter stated and performance by the Lessee of the terms and conditions

hereinafter provided, the DOE does hereby lease to the Lessee, for the purposes of exploring for, developing,

mining, and removing deposits of uranium, vanadium, and associated minerals, the Property described in

Appendix "A", which is attached hereto and hereby made a part hereof, subject to the terms and conditions

hereinafter set forth.  The rights hereby granted are limited to exploration, development, mining, and removal of ore

from within the vertical planes of the boundary lines of the Property, and the Lessee shall have no right hereunder to

extend its workings beyond such vertical planes.  Access to the Property is not guaranteed by the Government.  The

Lessee shall be responsible for securing such access.

II.   TERM.  This Lease shall remain in effect for a period of ten (10) years from the aforementioned

effective date, except as it may be sooner relinquished or cancelled pursuant to other provisions of this Lease.

— 1 —

1
2

*A-33*

BLM_0041735

June 2008                                                                 DE–RO01–08LM70XXX

Near the end of that 10–year period, DOE will re-evaluate the leasing program to determine if the leases/leasing
program should continue.

    III.   <u>DEFINITIONS</u>.  As used herein:

    (a)   The term "Government" means the Government of the United States of America, including its
authorized representatives associated with the Uranium Leasing Program.

    (b)   The term "DOE" means the United States Department of Energy, or duly authorized representatives
thereof, including the Realty Officer except for the purpose of deciding an appeal under Article XXVII
"DISPUTES".

    (c)   The term "Realty Officer" means a person with the authority to enter into, administer, and/or
terminate contracts and make related determinations and findings.  The term includes certain authorized
representatives of the Realty Officer acting within the limits of their authority as delegated by the Realty Officer.

    (d)   The term "associated minerals" means any minerals, other than the minerals covered by this Lease,
which are (i) so intermingled with the deposits of the mineral or minerals for which this Lease is issued that separate
development is, in the opinion of the Realty Officer, not warranted for mining or for economic reasons, or (ii) of
such poor quality and in such small quantity that separate development is, in the opinion of the Realty Officer,
undesirable for mining or for economic reasons.

    (e)   The term "applicable statutes and regulations" means all applicable Federal, state, and local
statutes, rules, regulations, and standards as they may be amended or replaced from time to time.  These statutes
include but are not limited to, those relating to mine safety; radiation; air, water, and land pollution; disposal of
liquid and solid waste; and workmen's and unemployment compensation.

    (f)   The term "Exploration Plan" as described in Article XII "EXPLORATION PLAN" and
Appendix "C" means a plan of activity proposed by the Lessee for the purpose of conducting approved operations to
explore, test, or prospect for minerals covered by this Lease.

    (g)   The term "Mining Plan" as referenced in Article XIII "MINING PLAN" and Appendix "C" means
a plan of activity proposed by the Lessee for the purpose of conducting surface and underground operations to
develop or extract the minerals covered by this Lease.

    (h)   Article "Titles and Headings" as used throughout this Lease are inserted for convenience only, and
shall not be deemed to be a part of this Lease or considered in construing this Lease.

— 2 —

1
2

BLM_0041736

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*

June 2008                                                                    DE–RO01–08LM70XXX

IV.   GENERAL PERFORMANCE REQUIREMENT.  The Lessee shall conduct all activities in accordance with the terms and conditions of this Lease and with those in 10 CFR Part 760.  Furthermore, the Lessee shall conduct exploration, development, and mining activities on the Property with all reasonable diligence, skill, and care, as is required to systematically advance lease operations toward, and ultimately achieve and maintain, production of uranium ore consistent with good and safe mining practice, and in accordance with market conditions.  Reasonable diligence shall be assessed by the Realty Officer at his sole discretion on the basis of the Lessee's ongoing lease activities or the lack thereof.  Site permitting activities and the performance of cultural resource surveys and/or threatened and endangered species surveys shall be accepted by the Realty Officer as evidence supporting reasonable diligence.

V.   ROYALTIES.  The Lessee shall pay or cause to be paid, as directed by the DOE, the royalties specified in Appendix "B", which is attached hereto and hereby made a part hereof, at the rates and in the manner set forth therein.

VI.   INTEREST ON OVERDUE PAYMENTS — FORFEITURE FOR NON-PAYMENT.

(a)   All amounts that become payable by the Lessee to the Government under this Lease shall bear simple interest from the date due until paid unless paid within thirty (30) days of becoming due.  The interest rate shall be established by DOE (on a quarterly basis as required) as the Federal Short-Term Rate (applied to and applicable to the calendar quarter in which the amount becomes due) plus three (3) percent.  The Federal Short-Term Rate is the rate published monthly by the Internal Revenue Service pursuant to Section 1274(d) of the Internal Revenue Code.  Additional interest shall be assessed for each subsequent calendar quarter until the amount is paid.

(b)   Amounts shall be due at the earlier of the following dates:

(1)   The date fixed under this Lease.

(2)   The date of the first written demand for payment consistent with this Lease, including any demand resulting from a default cancellation.

(c)   Notwithstanding the provisions of paragraphs (a) and (b) of this Article VI, and irrespective of interest payments made by the Lessee to DOE pursuant thereto, the Realty Officer, in his sole discretion, may cancel this Lease for failure by the Lessee to pay the entire principle amount of any annual royalty, base royalty, or bid royalty within sixty (60) calendar days after payment thereof is due from the Lessee to the DOE under the terms of

— 3 —

1
2

BLM_0041737

June 2008                                                                         DE–RO01–08LM70XXX

this Lease. Such cancellation shall be effective upon Lessee's receipt of a written notice thereof from the Realty

Officer. Failure of DOE to exercise its right to cancel shall not be deemed to be a waiver thereof.

VII . USE OF SURFACE.

(a) Subject to the other provisions of this Lease, the rights granted to the Lessee herein include the right

to use so much of the surface of the Property as is required for the exploration for, and development, mining, and

removal of ore, including the right to erect such buildings and other structures and install such machinery and other

facilities as may be required for such operations; provided, that the Lessee shall recognize existing uses and

commitments in the form of grazing, timbering, Bureau of Land Management special use permits, and public

recreation, and improvements such as water developments, ditches, roads, trails, pipelines, telephone, telegraph, and

power lines, fences, and rights-of-way; and Lessee shall conduct its operations so as to interfere as little as possible

with such existing uses and improvements.

(b) The Property shall at all times be subject to other lawful uses heretofore or hereafter granted by the

Government, through any authorized agency; provided, that such uses shall not prevent, obstruct, or unduly interfere

with any right granted under this Lease.

VIII. LEASES FOR OTHER MINERALS. The granting of this Lease shall not preclude the issuance by the

Government of other leases of the Property for the purposes of mining and extracting oil, gas, oil shale, coal,

phosphate, potassium, sodium, sulphur, or other minerals which are or may in the future be leasable pursuant to

Federal mineral leasing laws; provided, that any such leases hereafter issued shall provide that operations under such

leases shall not prevent, obstruct, or unduly interfere with any right granted under this Lease.

IX. USE OF SALABLE MINERALS. No salable minerals, such as sand, gravel, or stone, found on the

Property shall be used by the Lessee in its operations unless such salable minerals have been purchased from the

Government under the provisions of the Materials Act of July 31, 1947, 30 U.S.C. 601, as amended, or from the

owner of such salable minerals if other than the Government.

X. SECURITY AND SAFETY. The Lessee shall secure and post all areas that might reasonably be

considered hazardous to the general public, including, but not limited to ore stockpile areas, loading areas, mining

openings, and mine-rock waste piles, in accordance with all applicable statutes and regulations and specific

requirements and stipulations set forth in Appendix "C". If necessary, the Lessee agrees to construct fences or other

barriers around the perimeter of safety-hazard areas to minimize the potential for intrusion by humans, livestock, and

— 4 —

1
2

BLM_0041738

June 2008                                                    DE–RO01–08LM70XXX

wildlife. Radioactive materials exposed by the Lessee's operation shall be managed to ensure that the exposure of humans and ecosystems is as low as reasonably achievable.

    XI.   <u>ENVIRONMENTAL REQUIREMENTS</u>. The Lessee, at the Lessee's expense, shall comply with all applicable statutes and regulations and abide by the specific requirements and stipulations set forth in Appendix "C", which is attached hereto and hereby made a part hereof.

    XII.   <u>EXPLORATION PLAN</u>.

        (a)   Prior to commencing any surface-disturbing operations to explore, test, or prospect for minerals covered by this Lease, the Lessee shall file with the Realty Officer three (3) copies of a plan for the proposed exploration activities and shall obtain the Realty Officer's approval of such plan. The Exploration Plan shall be consistent with the "Notice of Intent to Conduct Prospecting Operations" (hereinafter "Notice") to be filed with the Colorado Mined Land Reclamation Board (hereinafter MLRB) in accordance with "Rule 5" of the "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended. The Exploration Plan shall include all information required by the "Notice", and in addition, must specifically include the following information:

            (1)   A site-specific environmental analysis;

            (2)   A description of specific measures to be taken to assure compliance with the requirements of Article XI "ENVIRONMENTAL REQUIREMENTS", including methods of reclamation contemplated by the Lessee; and

            (3)   The specific information outlined in Appendix "C" of this Lease.

        (b)   All Exploration Plans submitted to the Realty Officer pursuant to this Article XII and all proposed activities contained therein shall be reviewed by DOE in accordance with 10 CFR Part 1021 "National Environmental Policy Act Implementing Procedures".

        (c)   If preparation and filing of an Exploration Plan for the entire operation is dependent upon factors which cannot or will not be determined except during the progress of exploration activities, partial plans may be submitted and approved from time to time; <u>provided however</u>, that the Lessee shall not perform exploration activities not described in an approved plan.

        (d)   Changes may be made in the approved Exploration Plan by mutual written agreement of the Lessee and the Realty Officer. Approval is contingent upon the Lessee notifying all other appropriate agencies (as outlined in Appendix "C") of the proposed changes.

— 5 —

1
2

BLM_0041739

June 2008                                              DE–RO01–08LM70XXX

XIII.   UNDERLINE MINING PLAN

(a)   Prior to constructing any surface installation or commencing mine development on the Property, the Lessee shall file with the Realty Officer three (3) copies of a plan for the proposed mining operations and shall obtain the Realty Officer's approval of such plan. Such mining plan shall be consistent with the "Reclamation Permit Application" (hereinafter "Application") to be filed with the Colorado MLRB in accordance with "Rule 1.4" and "Rule 6" of the "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended.  The Mining Plan shall include all information required by the "Application", and in addition, must specifically include the following information:

(1)   A site-specific environmental analysis;

(2)   A description of specific measures to be taken to assure compliance with the requirements of Article XI "ENVIRONMENTAL REQUIREMENTS", including methods of reclamation contemplated by the Lessee; and

(3)   The specific information outlined in Appendix "C" of this Lease.

(b)   All Mining Plans submitted to the Realty Officer pursuant to this Article XIII and all proposed activities contained therein shall be reviewed by DOE in accordance with 10 CFR Part 1021 "National Environmental Policy Act Implementing Procedures".

(c)   If preparation and filing of a Mining Plan for the entire operation is dependent on factors which cannot or will not be determined except during the progress of mining activities, a partial plan may be submitted and approved from time to time, provided however, that the Lessee shall not perform mining activities not described in an approved plan.

(d)   Changes may be made in the approved Mining Plan by mutual written agreement of the Lessee and the Realty Officer.  Approval is contingent upon the Lessee notifying all other appropriate agencies (as outlined in Appendix "C") of the proposed changes.

XIV.   PERFORMANCE BOND.

(a)   Upon approval of an Exploration Plan or Mining Plan, and prior to commencing any surface-disturbing operations, the Lessee shall be required to file a suitable performance bond of not less than $\$$ _____ with satisfactory surety, payable to the United States Department of Energy, and the bond shall be conditioned upon the faithful compliance with all applicable statutes and regulations, the terms and conditions of this Lease, and any

— 6 —

1
2

*A-38*

BLM_0041740

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

June 2008                                                                DE–RO01–08LM70XXX

Exploration Plans and Mining Plans, including amendments and supplements thereto, which have been approved by the Realty Officer.

(b)   The Realty Officer shall set the amount of the initial bond and may, from time to time, require an increase or allow a decrease in the amount of the bond, as in his judgment the circumstances may require.  In determining the amount of the bond, the Realty Officer shall take into consideration all applicable statutes and regulations and the character and nature of the reclamation requirements of the Lease, including the requirements of any approved Exploration Plans and Mining Plans and partial or supplementary plans, and the estimated costs of such reclamation.

(c)   The Lessee and his sureties shall be liable for any damage to the Government resulting from the Lessee's failure to complete any work required upon the expiration, relinquishment, or cancellation of this Lease.

XV.   INSPECTION.  The DOE reserves the right, through its officers, employees, agents, and contractors, to enter upon the Property and into all parts of any of Lessee's mines therein at all reasonable times for inspection and other purposes subject to the Lessee's standard operating procedures.

XVI.   GOOD FAITH NEGOTIATIONS.  At the request of the Realty Officer, the Lessee will negotiate in good faith with the DOE to reach an agreement under which the Lessee, for appropriate compensation, would correct undesirable conditions existing on the Property as a result of pre–1974 mining activities and such other conditions that may be identified from time to time by the Realty Officer.  If for any reason, the Lessee is unable to perform the work required to correct such conditions in a timely manner, DOE reserves the right to contract with another entity to enter upon the Property and perform said work.

XVII.   INDEMNIFICATION OF GOVERNMENT.

(a)   The Government, including its employees, all tiers of contractors, agents, and authorized representatives shall not be responsible for any mechanics' or miners' liens or other liens, encumbrances, or liabilities incurred by the Lessee in connection with the operation of the Property.  The Lessee assumes all responsibility for and will hold the Government harmless from any and all claims and liability of any nature arising from the operation or occupancy of the Property.

(b)   The Lessee agrees to protect and indemnify the Government against any payroll taxes or contributions imposed with respect to any employee of the Lessee by any applicable law dealing with old age pensions, unemployment compensation, accident compensation, health insurance and related subjects.  The Lessee

— 7 —

1
2

*A-39*

BLM_0041741

June 2008                                                                DE–RO01–08LM70XXX

also agrees, at its own cost and expense, to insure to each person employed in, about, or upon the Property the

compensation provided for by law with respect to workmen's compensation and employer's liability insurance,

properly safeguarding the Government, including its employees, all tiers of contractors, agents, and authorized

representatives, against liability for injuries to persons, including injuries resulting in death, and loss of and damage

to property in policies and amounts acceptable to the DOE and to furnish to the DOE written evidence of such

insurance.

XVIII.   REPORTING REQUIREMENTS.

(a)   The Lessee shall provide the Realty Officer with copies of all permits and correspondence from

local, state, or other Federal agencies or entities which pertain to the Lessee's activities on the Property.

(b)   The Lessee shall provide to the Realty Officer, within twenty calendar days after the end of each

month, an accurate record of the tonnage and $U_3O_8$ and $V_2O_5$ grades of each lot of ore delivered from the Property to

a mill, buying station, or other purchaser during the previous month, including copies of all settlement sheets

furnished to the Lessee for ores so delivered.

(c)   The Lessee shall provide to the Realty Officer as soon as practicable after the end of each calendar

quarter, the following documents, records, and/or maps:

(1)   A formal (written and signed) summary of all activities conducted on the Property during such

calendar quarter that, among other things, documents the Lessee's reasonable diligence

required by Article IV "GENERAL PERFORMANCE REQUIREMENT".

(2)   A map or maps showing the location of all exploration holes drilled on the Property during

such calendar quarter, together with copies of any logs and assay records applicable to such

drill holes.

(3)   A mine map or maps showing the progress of mining on the Property as of the end of such

calendar quarter.

(4)   Lessee's estimate of the tonnage and $U_3O_8$ and $V_2O_5$ grades of all ores stockpiled on the

Property as of the end of such calendar quarter.

(5)   If no activity occurs on the Property during a calendar quarter, a letter submitted to the Realty

Officer stating that no activity has occurred shall satisfy this reporting requirement.

— 8 —

1
2

*A-40*

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

June 2008                                                          DE-RO01–08LM70XXX

    (d)   The Lessee further agrees to provide to the Realty Officer the results of any inspections of Lessee's mines or other facilities located on the Property, conducted by personnel of local, state, or other Federal agencies under applicable statutes and regulations. Furthermore, the Lessee agrees to notify the Realty Officer of any planned or scheduled inspections to be performed by local, state, or other federal agencies as soon as such schedule is known so that the Realty Officer may participate in said inspection if so desired.

    (e)   The Lessee is hereby notified that information obtained by DOE from the Lessee under this section shall be subject to the provisions of the Freedom of Information Act (5 U.S.C. 552).

  XIX.   <u>TAXES</u>.  The Lessee agrees to pay when due all taxes lawfully assessed and levied pursuant to state or Federal law upon improvements, output of mines, and other interests, property, and assets of the Lessee in or upon the Property.

  XX.   <u>ASSIGNMENT</u>.  The Lessee agrees that no transfer of this lease, or of any interest therein or claim thereunder, by assignment shall occur within the first 30-month period of this lease. Additionally, no transfer of this lease, or of any interest therein or claim thereunder, by assignment, sublease, operating agreement, or otherwise, shall occur unless and until approved in writing by the Realty Officer.

  XXI.   <u>RELINQUISHMENT OF LEASE</u>.  This Lease may be surrendered by the Lessee upon the Lessee's filing with the DOE, and the Realty Officer's approval of, a written application for relinquishment. Approval of the application shall be contingent upon the delivery of the Property to the DOE in a condition satisfactory to the Realty Officer, in accordance with the terms of this Lease, and upon the continued liability of the Lessee to make payment of all royalty and other debts theretofore accrued and due the DOE.

  XXII.   <u>CANCELLATION OF LEASE</u>.  DOE may cancel this Lease if the Realty Officer determines that the Lessee has failed to comply with any provision of this Lease including reasonable diligence. Failure of DOE to exercise its rights to cancel shall not be deemed to be a waiver thereof.

  XXIII.   <u>DELIVERY OF PREMISES</u>.  At the expiration of this Lease, or upon its earlier relinquishment or cancellation as herein provided, the Lessee shall, within one hundred eighty (180) days or other period mutually agreed to by the Lessee and Realty Officer, surrender the Property in a condition satisfactory to the Realty Officer, and shall, unless otherwise directed by the Realty Officer in writing, remove from the Property at Lessee's expense all structures, machinery, equipment, tools, and improvements placed thereon by the Lessee; <u>provided</u>, that the Lessee shall not remove any timbers or improvements which are determined by the Realty Officer to be required to

— 9 —

1
2

BLM_0041743

June 2008             DE–RO01–08LM70XXX

be left in the mine workings to protect such workings as a mining property.  Furthermore, prior to the surrender of the Property, the Lessee shall remove from the Property at Lessee's expense all stockpiles of ore and/or protore materials placed thereon by the Lessee and remit the required royalties to DOE in accordance with Article V "ROYALTIES" and Appendix "B".  Otherwise, the Lessee shall at the Lessee's expense return all stockpiles of ore and/or protore materials to a suitable location within the underground mine workings on the Property or other location on the Property as designated by the Realty Officer.

XXIV. EXAMINATION OF RECORDS.

(a) The DOE and the Comptroller General of the United States or duly authorized representatives of either shall, until three (3) years after final payment under this Lease, have access to and the right to examine any of the Lessee's directly pertinent books, documents, papers, or other records involving transactions related to this Lease.  The Lessee shall make these records and documents available to the Government, at the Lessee's offices, at all reasonable times, without any charge.

(b) The Lessee agrees to include in first-tier subcontracts under this Lease a clause to the effect that the DOE or the Comptroller General or duly authorized representatives of either shall, until three (3) years after final payment under the subcontract, have access to and the right to examine any of the subcontractor's directly pertinent books, documents, papers, or other records involving transactions related to the subcontract.

(c) The periods of access and examination in paragraphs (a) and (b) above for records relating to (1) appeals under Article XXVII "DISPUTES", (2) litigation or settlement of claims arising from the performance of this Lease, or (3) costs and expenses of this Lease to which the DOE or the Comptroller General or duly authorized representatives of either has taken exception shall continue until such appeals, litigation, claims, or exceptions are disposed of.

XXV. OFFICIALS NOT TO BENEFIT.  No member of or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this Lease, or to any benefit arising from it.  However, this clause does not apply to this Lease to the extent that this Lease is made with a corporation for the corporation's general benefit.

XXVI. COVENANT AGAINST CONTINGENT FEES.  The Lessee warrants that no person or selling agency has been employed or retained to solicit or secure this Lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Lessee for the purpose of securing business.  For breach or violation of this

— 10 —

1
2

BLM_0041744

June 2008                                                    DE–RO01–08LM70XXX

warranty, the Government shall have the right to cancel this Lease without liability, or in its discretion to require the Lessee to pay to DOE the full amount of such commission, percentage, brokerage, or contingent fee.

XXVII.   <u>DISPUTES</u>.

(a)   Except as otherwise provided in this Lease, any dispute concerning a question of fact arising under this Lease which is not disposed of by agreement shall be decided by the Realty Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Lessee. The decision of the Realty Officer shall be final and conclusive unless within 30 days from the date of receipt of such copy, the Lessee mails or otherwise furnishes to the Realty Officer a written appeal addressed to the DOE. The decision of the DOE for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Lessee shall be afforded an opportunity to be heard, and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Lessee shall abide by the Realty Officer's decision.

(b)   The provisions of paragraph (a) above does not preclude consideration of questions of law; provided, that nothing in this Lease shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

XXVIII.   HEIRS AND SUCCESSORS-IN-INTEREST. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

XXIX.   MEMORANDUM FOR RECORDING. If the Lessee so requests, the parties agree to execute a mutually agreeable written memorandum of even date herewith sufficient to be entitled to be recorded under the laws of the State of Colorado, reciting that all of their right, title, and interest in and to the Property is held subject to this Lease, and that DOE has reserved the royalties described in this Lease, which memorandum Lessee may place of record in the appropriate County. Upon termination of this lease, lessee agrees to execute documentation, which will also be recorded appropriately, showing the lease has terminated.

XXX.   NOTICE. Any notice, election, report, or other correspondence ("Documents") required or permitted hereunder shall be in writing and shall be addressed to the party to whom directed as follows:

— 11 —

1
2

*A-43*

BLM_0041745

June 2008                                                                 DE–RO01–08LM70XXX

    (a)  If to Lessee:

        Company Name

        Address (for US Mail **and** parcel delivery)

        City, State, Zip Code

        Attention:

        Telephone:

        Facsimile:

    (b)  If to DOE:

        U.S. Department Of Energy

        11025 Dover Street, Suite 1000

        Westminster, CO 80021-5573

        Attention:  Steven R. Schiesswohl, Realty Officer

        Telephone:  (720) 377–9683

        Facsimile:  (720) 377–3829

Time-sensitive Documents shall be (i) sent by registered or certified United States mail, postage prepaid, return receipt requested; (ii) sent by a reputable overnight courier, or (iii) sent by facsimile transmission with confirmation of receipt.  All other Documents can be delivered or sent as indicated above, or may be sent by regular United States mail.

Either party may, from time to time, change its address for the delivery of future documents hereunder by notice in accordance with this Section XXX.  Except as provided for royalty payments in Appendix "B" paragraph (g), all documents generated in accordance with this Lease shall be deemed complete and effective on the date that the document was issued.

    XXXI.    <u>SURVIVAL</u>.  The following shall survive termination of this Lease:  Articles V, VII (a), X, XI, XIV, XV, XVII, XVIII, XIX, XXII, XXIII, XXIV, and XXX and the Appendices.

<div align="center">— 12 —</div>

1
2

BLM_0041746

June 2008                                                            DE–RO01–08LM70XXX

    IN WITNESS WHEREOF, the parties hereto have executed this Lease, effective as of the date first above

written, intending to be legally bound thereby.

UNITED STATES OF AMERICA
UNITED STATES DEPARTMENT OF ENERGY          _____ (LESSEE)

By   _____        By   _____

Title   _____Realty Officer_____        Title   _____

Date   _____        Date   _____

— 13 —

1
2

BLM_0041747

*Preliminary Draft PEIS*      *PEIS Privileged Information*      *May 2012*
*PEIS Team Use Only*      *Do Not Distribute*

June 2008               DE–RO01–08LM70XXX

## APPENDIX A

### DESCRIPTION OF LEASED PROPERTY

The leased Property described herein was referred to as "MINING LEASE NO. AT(05–1)–ML–60.8–C–X–X"

during the period from 1974 to the enactment of this Lease.

*Lease-specific legal description will be inserted here.*

— A1 —

1
2

*A-46*

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

June 2008                                                                   DE–RO01–08LM70XXX

### APPENDIX B

<u>ROYALTIES</u>

    (a)   At the beginning of each lease year during the term of this Lease, there shall become due and payable to the DOE an annual royalty of $\$$ _____. Annual royalties paid pursuant to this article shall be credited against royalty bid payments which become payable during the term of this Lease. Annual royalties so paid shall not be refunded upon the expiration, relinquishment, or cancellation of this Lease.

    (b)   The Lessee agrees to pay to the DOE a royalty bid payment, per dry ton of ore delivered from the Property to a mill or other receiving station, in the amount of _____ percent (__%) of the value per dry ton, determined as provided in paragraph (g) of this Appendix "B". This royalty shall apply to all ores produced from the Property during the term of this Lease.

    (c)   Unless otherwise authorized by DOE in writing, all ores mined from the Property shall be stockpiled on the Property until such time as they are delivered to a mill or other receiving station.

    (d)   With respect to ores which are mined from the Property and delivered to a mill or other receiving station which is owned or controlled by the Lessee, the Lessee agrees to make royalty bid payments, for all lots of such ore assayed or fed to process during each calendar month, within twenty (20) calendar days after the end of such calendar month. Such royalty bid payments shall be treated as provisional payments with respect to any lot of ore for which the DOE requests an umpire assay, and an appropriate adjustment shall be made in the first royalty bid payment following Lessee's receipt of the results of such umpire assay for such lot of ore.

    (e)   With respect to ores which are mined from the Property and delivered to a mill or other receiving station not owned or controlled by the Lessee, the Lessee agrees:

        (1)   That the DOE may receive royalty bid payments directly from the owner or controller of the mill or other receiving station to which such ores are shipped by the Lessee if the DOE makes arrangements therefore satisfactory to the Lessee.

        (2)   That, in the absence of such arrangements, the Lessee shall make royalty bid payments for all lots of such ore assayed or fed to process (includes delivery of such ore to an ore-buying station or sample plant) during each calendar month, within twenty (20) calendar days after payment for such lots is mailed to the Lessee; <u>provided,</u> that an appropriate extension of such twenty (20) day period shall be granted by the Realty Officer for any undue delay in the mails which causes a delay in delivery to the Lessee of payment for such lots of ore. Such royalty bid

— B1 —

1
2

*A-47*

BLM_0041749

June 2008                                                                DE–RO0I–08LM70XXX

payments shall be treated as provisional payments with respect to any lot of ore for which DOE requests an umpire assay, and an appropriate adjustment shall be made in the first royalty bid payment following finalization of payment to the Lessee for such ore.

(f)    Royalty bid payments due the DOE shall be deemed to have been made when received at the DOE Legacy Management Office in Grand Junction, Colorado.

(g)    DOE shall establish the prices for uranium and vanadium that shall be used to calculate the fair-market value of lease tract ores. These prices shall be established on a quarterly basis, on or before the twentieth (20th) day after the end of the previous calendar quarter (in January, April, July, and October), and shall remain in effect during the calendar quarter in which they are established. DOE shall establish these prices as follows:

(1)    Using an electronic spreadsheet, DOE shall monitor, record, and track the spot-market and long-term-market prices for uranium (quoted as dollars per pound $U_3O_8$) as reported weekly in *$U_x$ Weekly*. The spreadsheet will then (i) automatically calculate the monthly and quarterly arithmetic average prices for uranium (both spot-market and long-term-market), and (ii) automatically calculate a quarterly weighted-average price for uranium by applying the appropriate purchase contract percentages to the respective quarterly average prices. Using this spreadsheet, DOE shall also monitor, record, and track the Total Purchased (Weighted-Average Price) for uranium as reported annually by the Energy Information Administration in Table S1b. *Weighted-Average Price of Uranium Purchased by Owners and Operators of U.S. Civilian Nuclear Power Reactors (quoted as Dollars per Pound $U_3O_8$ Equivalent)*. The spreadsheet will then automatically calculate the arithmetic average between the quarterly weighted-average price for uranium and the Total Purchased (Weighted-Average Price) for uranium. The resulting figure is reported as the annualized quarterly weighted-average price for uranium.

(2)    Using the same electronic spreadsheet, DOE shall monitor, record, and track the market price of vanadium (quoted as dollars per pound $V_2O_5$) as reported twice weekly in *Metal Bulletin (Non-Ferrous Primary Metals, Noble Alloys and Ores, Vanadium pentoxide)*. The spreadsheet will then (i) automatically calculate the monthly and quarterly arithmetic average prices for vanadium, and (ii) automatically apply an adjustment factor of one-half (0.5) to each quarterly arithmetic average price for vanadium. The resulting figure is reported as the adjusted quarterly average price for vanadium.

— B2 —

1
2

*A-48*

BLM_0041750

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                      *Do Not Distribute*

June 2008                                                          DE-RO01–08LM70XXX

(3)   Paragraphs (g)(1) and (g)(2) can be summarized by the following three equations:

$$U = (Q_{WA} + TP_{WA}) / 2 \qquad (1)$$

where:

| | | |
|---|---|---|
| U | = | Annualized Quarterly Weighted-Average Price for Uranium |
| $Q_{WA}$ | = | Quarterly Weighted-Average Price for Uranium |
| $TP_{WA}$ | = | Total Purchased (Weighted-Average Price) for Uranium |

$$Q_{WA} = Q_{SM} * P_{SM} + Q_{LTM} * P_{LTM} \qquad (2)$$

where:

| | | |
|---|---|---|
| $Q_{SM}$ | = | Quarterly Arithmetic Average Price for the Uranium Spot Market |
| $P_{SM}$ | = | Purchase Contract Percentage for the Uranium Spot Market |
| $Q_{LTM}$ | = | Quarterly Arithmetic Average Price for the Uranium Long Term Market |
| $P_{LTM}$ | = | Purchase Contract Percentage for the Uranium Long Term Market |

$$V = Q_{WA} * 0.5 \qquad (3)$$

where:

| | | |
|---|---|---|
| V | = | Annualized Quarterly Weighted-Average Price for Vanadium |
| $Q_{WA}$ | = | Quarterly Weighted-Average Price for Vanadium |

(h)   The Lessee shall be notified of these prices (annualized quarterly weighted-average price for uranium and adjusted quarterly average price for vanadium) by formal written correspondence.  The Lessee shall use these prices to calculate the fair-market value of the ore in dollars per dry ton (calculated to the nearest cent [$0.01]), for all lots of such ore assayed during any calendar month.  This fair-market value shall be determined by:

(1)   Computing the number of recoverable pounds of contained $U_3O_8$ and $V_2O_5$ per dry ton of ore in the lots so assayed by (i) multiplying the total number of pounds of $U_3O_8$ and $V_2O_5$, respectively, contained in the lots of ore so assayed during such calendar month, by factors of 0.96 and 0.79, respectively (the average milling facility's recovery rates for $U_3O_8$ and $V_2O_5$, respectively, as acknowledged by DOE) and (ii) dividing each of the resulting numbers by the total number of dry tons of ore contained in the lots so assayed during such calendar month, and carrying the results to three decimal places for $U_3O_8$ and two decimal places for $V_2O_5$; and

(2)   Adding together the dollar amounts obtained by (i) multiplying the number of recoverable pounds of $U_3O_8$ per dry ton of ore in the lots so assayed by the price per pound of $U_3O_8$ established by DOE and

— B3 —

1
2

*A-49*

BLM_0041751

June 2008                                                                DE–RO01–08LM70XXX

(ii) multiplying the number of recoverable pounds of $V_2O_5$ per dry ton of ore in the lots so assayed by the price per pound of $V_2O_5$ established by DOE.

(i)   For ores that have been mined from the Property and delivered to a mill or other receiving station, but not assayed or fed to process, the Lessee shall estimate the value of said ores using standard industry practices, and shall make royalty bid payments to DOE equal to or greater than 95 percent (95%) of the estimated value of the royalty bid payments due to DOE.  Such royalty bid payments shall be treated as provisional payments with respect to said ores until such time that said ores are assayed or fed to process and the final royalty bid payments due to DOE are calculated and final royalty bid payments are made.

(j)   If price quotations for vanadium pentoxide become unavailable, the DOE and the Lessee will negotiate to establish a method of determining an appropriate market price per pound of $V_2O_5$ to be used in determining that portion of the value per dry ton of ore attributable to vanadium.  Pending agreement on such method, the last prices established by paragraph (g)(2) above shall be used in determining the portion of the value per dry ton of ore attributable to vanadium, for the purpose of computing royalties under this Lease.  If the parties fail to reach agreement on an applicable method, the matter shall constitute a dispute to be decided in accordance with the Article XXVII "DISPUTES" of this Lease.

(k)   The parties hereto agree that if the Lessee is paid for any constituent, other than uranium or vanadium, contained in ores mined from the Property, all amounts so paid shall be held in trust by the Lessee for the DOE until the Lessee and the DOE agree upon a base royalty to be paid to the DOE with respect to Lessee's sale of such constituent.

(l)   Consistent with Article XXIII "DELIVERY OF PREMISES", the Lessee agrees, that within one hundred eighty (180) days following the expiration, relinquishment, or termination of this Lease as herein provided, all royalties associated with this Lease (annual royalty, base royalty, and bid royalty) shall become due and payable to the DOE.  For ores that have been mined from the Property, but not assayed or fed to process, the Lessee shall estimate the value of said ores using standard industry practices, and shall make royalty bid payments to DOE equal to or greater than 95 percent (95%) of the estimated value of the royalty bid payments due to DOE.  Such royalty bid payments shall be treated as provisional payments with respect to said ores until such time that said ores are assayed or fed to process and the final royalty bid payments due to DOE are calculated and royalty bid payments are made.

— B4 —

1
2

*A-50*

BLM_0041752

*Preliminary Draft PEIS*          *PEIS Privileged Information*                    *May 2012*
*PEIS Team Use Only*                 *Do Not Distribute*

June 2008                                                                 DE-RO01–08LM70XXX

WEIGHING, SAMPLING, AND ASSAYING.

With respect to ores which are mined from the Property and delivered to a mill or other receiving station, the Lessee agrees to the following provisions:

(a)   The Lessee shall weigh, or cause to be weighed, each lot of ore delivered from the Property to a mill or other receiving station and shall furnish the DOE a record of the weight of such lot. The scales used in weighing such ore shall be balanced daily and checked once each week or more often, as appears necessary, by either standard weights or by check-weighing against another scale. Scale platforms will be kept clean and free of the sides of the pit, and the scales shall be inspected and certified every six months by the appropriate entity of the state in which the mill or receiving station is located, if such inspection is available; otherwise, a biannual inspection shall be made by a competent organization which is acceptable to both the Lessee and the DOE.

(b)   The Lessee shall sample, or cause to be sampled, each lot of ore according to standard and accepted practices in ore sampling, and such sampling shall be final and binding on both parties to this Lease. The DOE or its representative may be present at the sampling of such ore. The Lessee shall ensure that moisture determinations are made according to standard practices in ore sampling. The Lessee shall ensure that each final sample is divided into four (4) pulps, one of which shall be promptly furnished to the DOE, one of which shall be retained by the Lessee for assay purposes, and two of which shall be held in reserve by the Lessee for possible umpire analysis. The Lessee shall promptly assay, or cause to be assayed, its pulp for $U_3O_8$ and $V_2O_5$ content and shall transmit the assay results to the DOE, together with weight and moisture certificates for the lot sampled. For the purpose of such reporting, all assays for $U_3O_8$ shall be adjusted to the nearest 0.001% and all assays for $V_2O_5$ shall be adjusted to the nearest 0.01%.

(c)   The DOE may assay its pulps at its own expense. In case of disagreement with the Lessee's assay with respect to either $U_3O_8$ or $V_2O_5$ content, the DOE may, within 30 calendar days after receiving its pulp, mail to the Lessee a written request for an umpire assay. Upon receipt of such written request, the Lessee shall promptly submit one of the pulps held in reserve to an assayer, whom the parties hereto shall agree upon, for umpire assay. With respect to both $U_3O_8$ and $V_2O_5$ content, if the assay of the umpire is within the assays of the two parties, it shall be final. If not, the assay which is nearer to that of the umpire shall

— B5 —

1
2

BLM_0041753

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

June 2008                                                          DE–RO01–08LM70XXX

prevail.  The party whose assay for $U_3O_8$ is further from that of the umpire shall pay the cost of the umpire's assay.  In the event that the umpire's assay for $U_3O_8$ is equally distant from the assay of each party, the cost shall be split equally.

(d)   The quantity of ore comprising a lot, as used herein, shall be determined by the Lessee, except that no lot shall exceed one thousand (1,000) tons of ore except as otherwise agreed in writing by the Realty Officer.

— B6 —

1
2

*A-52*

BLM_0041754

June 2008                                                           DE–RO01–08LM70XXX

APPENDIX C

SPECIFIC REQUIREMENTS AND STIPULATIONS

The Lessee agrees to comply with all applicable statutes and regulations, including but not limited to the following items:

(a)   Prior to resuming operations on the Property that were previously approved by DOE, the Lessee shall notify the Realty Officer in writing of its intentions to resume such operation and shall include any changes, additions, or modifications to the original plan that are now proposed.  Upon receipt of such notification, the Realty Officer shall review the approved plan along with any new information provided by the Lessee and determine if additional stipulations are warranted.  When all pertinent requirements are satisfied, DOE shall provide the Lessee with a written approval to proceed.

(b)   All existing serviceable improvements such as fences, gates, cattle guards, roads, trails, culverts, pipelines, bridges, and water development and control structures, authorized for use by the Lessee, shall be maintained in serviceable condition by the Lessee.  Improvements damaged or destroyed by the Lessee's operations shall be replaced, restored, or compensated for by the Lessee.

(c)   The Lessee's operations shall not disturb public land survey corner markers or monuments or Atomic Energy Commission (AEC) survey markers without the prior written approval of the Realty Officer.  Additionally, the Lessee shall pay all costs associated with the surveys required to preserve or reestablish the true point of any such marker or monument and the replacement of such marker or monument.

(d)   Housing and other buildings and support facilities related to community development shall be constructed or located on the Property only upon the prior written approval of the Realty Officer.  In constructing and locating such housing, other buildings, and support facilities, the Lessee shall comply with applicable county planning and zoning regulations, subdivision regulations, and mobile home regulations, and shall furnish evidence of such compliance to the Realty Officer upon request.

(e)   Prior to any surface disturbing activity, the Lessee shall file a "Notice of Intent to Conduct Prospecting Operations" (Notice) or "Reclamation Permit Application" (Application), whichever is appropriate, with the Colorado Mined Land Reclamation Board (MLRB) in accordance with "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended.  All subsequent modifications to the Notice or Application shall be

— C1 —

1
2

BLM_0041755

June 2008　　　　　　　　　　　　　　　　　　　　　　　DE–RO01–08LM70XXX

addressed in accordance with the "Mineral Rules and Regulations" of the Colorado MLRB. The Lessee shall

provide the Realty Officer with copies of all pertinent approval documentation including permits issued.

(f)　Prior to any surface disturbing activity, the Lessee shall consult with the U.S. Department of Interior—

Bureau of Land Management (BLM), the U.S. Department of Interior—Fish and Wildlife Service (USFWS), and/or

the Colorado Department of Natural Resources—Division of Wildlife (CDOW), as appropriate, to determine

whether threatened or endangered, or sensitive plant or wildlife species occur in the area to be disturbed or whether

the agencies have other plant or wildlife concerns in the area to be disturbed. If required, the Lessee shall conduct

surveys or provide other documentation to resolve this concern. The Lessee shall provide the Realty Officer with

copies of all documents pertaining to this issue.

(g)　Prior to any surface disturbing activity, the Lessee shall perform a cultural and historical survey of the

area to be disturbed. If cultural or historical resources are found to exist, the Lessee shall consult with the State

Historical Preservation Officer for the appropriate measures to be taken. If required, the Lessee shall prepare a

mitigation plan to address the protection of the cultural or historical resources. The Lessee shall provide the Realty

Officer with copies of all documents pertaining to this issue.

(h)　Prior to any surface disturbance activity in a potential floodplain or wetland area, the Lessee shall consult

with the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, and the appropriate state agency

to determine whether a jurisdictional floodplain or wetland exists in the area to be disturbed. If required, the Lessee

shall prepare a Floodplain/Wetlands Assessment that proposes mitigation measures to be taken to resolve this

concern. The Lessee shall provide the Realty Officer with copies of all documents pertaining to this issue.

(i)　The Lessee shall use existing roads where practicable, and shall conduct activities employing wheel or

track vehicles in such a manner as to minimize surface damage. The Lessee shall wash all tracked vehicles or

equipment prior to their being mobilized to the Property. The Lessee shall promptly repair any road damage

resulting from the Lessee's operations, restoring such road to its previous condition or to a condition acceptable to

the Realty Officer. Where existing access roads across the Property are used principally by the Lessee, the Lessee

shall construct surface-water control and drainage structures (culverts, water bars, or grade dips) on such roads to

minimize erosion. Plans for such structures shall be included in all Exploration Plans and Mining Plans submitted to

the Realty Officer pursuant to Articles XII "EXPLORATION PLAN" and XIII "MINING PLAN" hereof,

respectively. The Lessee shall construct new roads and trails on the Property only at locations and to specifications

— C2 —

1
2

BLM_0041756

June 2008                                                                    DE–RO01–08LM70XXX

approved in advance in writing by the Realty Officer or an authorized representative of the Realty Officer, and shall construct and maintain such roads and trails in a manner that will minimize channeling and other erosion. The Realty Officer's approval of plans for new access road construction, culverts, water bars, or grade dips will be guided by standards established by BLM or the U.S. Department of Agriculture—Forest Service (USFS), where appropriate.

(j)     The Lessee shall conduct all operations so as to protect all natural resources and the environment including streams, lakes, ponds, waterholes, seeps, and marshes, and protect fish and wildlife resources as required by applicable statutes and regulations. The Lessee shall control all mine wastes, contaminants and pollutants, and sediments associated with stormwater runoff in accordance with existing regulations, and shall comply with all environmental regulations regarding discharge into, or degradation of water resources including streams, springs, stock waters, or groundwater. The Lessee shall not use water from any water source without the written consent of the person having the rights to the use of such water source.

(k)     Lessee shall keep the clearing of timber, stumps and snags, and any ground cover to a minimum consistent with the conduct of exploration, development, and mining activities approved hereunder. The Lessee shall abide by any restrictions concerning the bulk removal of vegetation (primarily piñon pine) that are established by the Realty Officer. The Lessee shall use due care to avoid scarring or removal of vegetative ground cover in areas not involved in such operations. Open parks (areas where there is a grass, shrub, and/or sagebrush cover) shall be disturbed as little as possible. If the shrub or brush cover is too high and must be cleared, it shall be cleared at or above ground level. The Lessee shall return all disturbed areas to their original condition or a condition acceptable to the Realty Officer promptly after damage to such areas has occurred and operations under this Lease are no longer being conducted in the disturbed areas.

(l)     The Lessee agrees that all underground mine openings shall be supported by pillars, timber, or other ground support devices approved by the Federal or state agencies having jurisdiction over such underground workings. The Lessee further agrees, during the term of this Lease, to substantially fence or permanently close all mine openings/portals, subsidence holes, surface excavations, or other workings resulting from the Lessee's operation that may be considered hazardous to human health or the environment. Such protective measures shall be maintained in a proper and safe condition during the term of this Lease. Prior to abandoning operations, the Lessee shall submit a mine-site reclamation plan to the Realty Officer for approval. Such plan shall include the proposed method(s) of permanent closure for all mine openings/portals including shafts, adits, inclines/declines, ventilation

— C3 —

1
2

BLM_0041757

June 2008        DE–RO01–08LM70XXX

shafts, and water discharge points. No underground workings or any part thereof shall be permanently abandoned and rendered inaccessible without the prior written approval of the Realty Officer. All mine-site reclamation shall be performed to the satisfaction of the Realty Officer in accordance with the approved reclamation plan.

(m) Surface drill holes and associated disturbances resulting from exploration or development activities shall be abandoned in accordance with existing regulations and in a manner that will protect the surface. All disturbed areas identified by the Lessee as not being needed for future operational activities shall be promptly reclaimed by the Lessee. The Realty Officer, by written notice to the Lessee, shall designate any other areas where reclamation must be undertaken as a result of disturbances caused by the Lessee's operations.

(n) If antiquities or other objects of historic or scientific interest, including but not limited to historic or prehistoric features or ruins, artifacts, or vertebrate fossils are discovered by the Lessee in the performance of operations under this Lease, the Lessee shall cease operations in the vicinity of such discovery and immediately take appropriate steps to protect and save such objects of historic or scientific interest and shall notify the Realty Officer of such discovery. The Realty Officer shall assess the values involved and prescribe such protective measures as deemed necessary.

(o) The Lessee shall make every effort to prevent, control, or suppress any fire in the operating area and to report any uncontrolled fire to the appropriate BLM or USFS official, as designated by the Realty Officer.

(p) The Lessee shall provide detailed haul route information to the Realty Officer for review prior to commencement of any haul activities. The haul route information shall include, at a minimum, expected routes from the mine site to the proposed mill or other facility accepting material from the mine, expected number of trucks per day, size and approximate weights of the ore being shipped, and expected production rates and mining life timeframes. It is expected that the Lessee will utilize only the specified routing. The lessee shall notify the Realty Officer of any significant changes to the haul route plan.

(q) The Lessee shall comply with Colorado State Access Code Section 43-2-147(4), C.R.S., and Section 24-4-103., C.R.S., effective 8/31/98. Pursuant to said code, the Lessee may be required to participate in a Highway Access Pre-Consultation meeting with DOE and the Colorado Department of Transportation after the completion and submittal to DOE of the approved permit from the Colorado MLRB. The details provided within the Mining Plan and permit, and the information provided under paragraph (p) above shall be used to determine the need for the Pre-Consultation meeting and to determine the potential impacts to county and state roads, highways and

— C4 —

1
2

BLM_0041758

*Preliminary Draft PEIS*
*PEIS Team Use Only*

*PEIS Privileged Information*
*Do Not Distribute*

*May 2012*

June 2008                                                                 DE–RO01–08LM70XXX

intersections from the Lessee's operations, and any resulting mitigation requirements from these impacts. Any

revisions or amendments to the permit, or any conversion from one permit type to another approved by the Colorado

MLRB shall also be provided to the Realty Officer. The permit revision, modification or conversion may be used to

determine any additional impacts to the county roads or state highways from the Lessee's operations, and any

resulting mitigation requirements from these additional impacts. Access permits required under this requirement

shall be provided to the Realty Officer.

   (r)   The Lessee shall attend and participate in meetings between DOE and other Federal, state, and local

agencies, as required.

— C5 —

1
2

BLM_0041759

June 2008                                                                    DE–RO01–08LM70XXX

EXPLORATION PLAN FORMAT

It is not DOE's intent to require the Lessee to prepare multiple documents for submittal to the appropriate agencies for review and approval. Consequently, at the Lessee's discretion, a copy of the "Notice of Intent to Conduct Prospecting Operations" filed with the Colorado MLRB may be submitted to DOE for review and approval. That document will meet DOE's requirement for submittal of an Exploration Plan providing it contains, at a minimum, the following information:

a.  Map showing general area to be explored

  1.  Tentative location of drill holes or other exploration activity

  2.  Location of roads (existing and proposed)

b.  Approximate starting date and duration of drilling

c.  Drilling information

  1.  Type of drilling and/or other exploration equipment

  2.  Size of hole and core, if any, to be recovered

  3.  Type of logging

  4.  Target horizon and depth

d.  Road construction necessary for exploration

  1.  Location of roads and drill sites

  2.  Measures to be taken for erosion control

e.  Abandonment

  1.  Procedures for plugging drill holes including the disposition of drill hole cuttings

  2.  Surface restoration (grading, revegetation, erosion control measures, etc.)

f.  Provisions made to conform with existing state and federal regulations regarding control of fire, pollution of water and air, protection of other natural resources, and public health and safety, both during and upon abandonment of exploration activities

g.  Specific measures to be taken to assure compliance with environmental and surface use stipulations of this Lease including the preparation of a site-specific environmental document that assures compliance with NEPA and other environmental regulations.

— C6 —

1
2

BLM_0041760

June 2008                                                       DE–RO01–08LM70XXX

MINING PLAN FORMAT

It is not DOE's intent to require the Lessee to prepare multiple documents for submittal to the appropriate agencies for review and approval. Consequently, at the Lessee's discretion, a copy of the "Reclamation Permit Application" filed with the Colorado MLRB may be submitted to DOE for review and approval. That document will meet DOE's requirement for submittal of a Mining Plan providing it contains, at a minimum, the following information:

a. Map showing location of:

    1. Ore body and proposed entry

    2. Any new roads required

    3. Mine plant and associated structures and facilities

    4. Waste dumps and ore storage areas

b. Mining

    1. Initial development plans

        A. Type of entry and haulage method proposed

        B. Stoping method

        C. Estimated rate of daily ore production and mine-life expectations

        D. Provisions to handle mine water

    2. Proposed ventilation and radiation control methods

c. Surface Plant

    1. Buildings, utility lines, and storage/stockpile areas

    2. Sewage and refuse disposal

    3. Compliance with any applicable county planning and zoning regulations

    4. Compliance with EPA stormwater discharge regulations

d. Surface restoration plans

    1. Topsoil removal and storage

    2. Grading and backfilling

    3. Control of stormwater runoff

    4. Revegetation (if required)

— C7 —

1
2

BLM_0041761

June 2008                                                    DE–RO01–08LM70XXX

   e.  Abandonment

      1.  Permanent closure of all mine openings/portals resulting from, or utilized during, the Lessee's operations.

      2.  Removal of structures and associated features

      3.  Disposition of mine wastes (contouring, leveling, use for backfill, etc.)

   f.  Provisions made to conform with existing state and federal regulations regarding control of fire, pollution of water and air, protection of other natural resources, and public health and safety, both during and upon abandonment of mining activities.

   g.  Specific measures to be taken to assure compliance with environmental and surface use stipulations of the Lease including the preparation of a site-specific environmental document that assures compliance with NEPA and other environmental regulations.

— C8 —

1

BLM_0041762

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                 *Do Not Distribute*

1
2
3
4
5
6
7
8
9
10
11
12
13                        **APPENDIX B:**
14
15        **SUMMARY OF THE PUBLIC SCOPING PROCESS FOR THE ULP PEIS**
16
17
18

BLM_0041763

*Preliminary Draft PEIS*  
*PEIS Team Use Only*

*PEIS Privileged Information*  
*Do Not Distribute*

*May 2012*

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  *This page intentionally left blank*  
14

BLM_0041764

# APPENDIX B:

## SUMMARY OF THE PUBLIC SCOPING PROCESS FOR THE ULP PEIS

## B.1  INTRODUCTION AND BACKGROUND

The U.S. Department of Energy (DOE) issued the Notice of Intent (NOI) to prepare the Uranium Leasing Program (ULP) Programmatic Environmental Impact Statement (PEIS) on June 21, 2011 (see Volume 76 of the *Federal Register:* 76 FR 36098). It issued a supplement on July 21, 2011 (76 FR 43678) that announced four public scoping meetings and extended the scoping period through September 9, 2011.

The issuance of the NOI marked the start of the National Environmental Policy Act (NEPA) process for the ULP PEIS that includes opportunities for public participation. This appendix presents a summary of the comments that were received during the scoping period of June 21 through September 9, 2011, for consideration in preparing the Draft PEIS. All comments, regardless of how they were submitted, were given equal consideration in the development of this Draft PEIS.

## B.2  SCOPING PROCESS

The NOI and Notice of Scoping Meetings identified three methods by which the public could provide scoping comments or suggestions on the ULP PEIS:

- In person at public scoping meetings,
- By electronic mail (email) and regular mail, and
- By electronic comment submittal through the project web site.

DOE conducted scoping meetings for the ULP PEIS at the four locations and on the dates shown in Table B-1. The number of people who attended these meetings is also presented in Table B-1. Meetings were held in Montrose, Naturita, and Telluride, Colorado, and in Monticello, Utah. Each meeting started at 5:30 with registration to provide oral comments, and a brief presentation was given by DOE at 7:00 p.m. In addition to presenting verbal comments at the scoping meetings, stakeholders could also email comments, send comments by mail, or could fill out a comment form at the scoping meetings or on the project web site (http://ulpeis.anl.gov/).

During the scoping period, a total of 287 unique comment documents were received from individuals, organizations, and government agencies that addressed the scope of the ULP PEIS. A "comment document" can be a written document (web form or comment form that was distributed at the scoping meetings or by mail), an email submission, or an oral presentation given during a scoping meeting that provides comments on the scope and content of the ULP PEIS. A single comment document may contain multiple comments on one or more issues. There

BLM_0041765

1 were 61 comment documents provided through the scoping meetings, 164 emails and letters, and
2 62 comment forms submitted through the project web site. Among the 287 comment documents
3 received, 8 were from federal, state, or local government agencies; 6 were from environmental
4 groups; and the remainder were from individuals or other organizations. Comment documents
5 were received from 13 states; however, approximately 88% of the comments were from
6 Colorado communities or communities near the DOE ULP lease tracts.

7
8
9 **B.3  SUMMARY OF SCOPING COMMENTS**
10
11     All public scoping comments were reviewed and considered in determining the scope for
12 this Draft PEIS. Table B-2 summarizes the public scoping comments that were considered to be
13 within the scope of the Draft PEIS. Those that were considered outside the scope are summarized
14 in Table B-3. The rationales for the determinations are also presented in both tables.

15
16
17          **TABLE B-1  Public Scoping Meeting Locations,**
18          **Dates, and Attendance**

| Location | Date | No. in Attendance |
|---|---|---|
| Montrose, Colorado | August 8, 2011 | 65 |
| Telluride, Colorado | August 9, 2011 | 85 |
| Naturita, Colorado | August 10, 2011 | 51 |
| Monticello, Utah | August 11, 2011 | 1 |
| Total | | 202 |

19
20
21

BLM_0041766

1   **TABLE B-2  Public Scoping Comments Considered To Be within the Scope of the PEIS**

| Public Scoping Comment | Rationale |
|---|---|
| **1. Alternatives** | |
| 1A.  Support for Alternative 1. | Alternative 1 is included in the range of reasonable alternatives that are evaluated in the Draft PEIS. Under this alternative, all the existing leases (there are 29) would be terminated, and reclamation would be completed on disturbed areas that remained on the lease tracts. DOE would continue to manage the withdrawn land but would not lease the land for uranium mining. |
| 1B.  Support for Alternative 5 because uranium is a clean nuclear energy source that can be mined safely. Some commenters urged DOE to continue the leasing program as it was before the preparation of the PEIS, arguing that companies and individuals should have the right to mine and produce uranium and vanadium just as companies extract coal and other resources such as natural gas. | Alternative 5 is included in the range of reasonable alternatives that are evaluated in the Draft PEIS. Under this alternative, all 31 lease tracts are evaluated for potential exploration, mine development and operations, and reclamation. The 29 leases that were signed in 2008 would have expired in 2018, but these leases have been placed on hold for the duration that it would take to complete this PEIS. The leases would be extended for a duration equivalent to the time taken to complete the PEIS (e.g., if 3 years were added, the end date for the leases would be 2021). |
| 1C.  Alternatives should include these: maintaining current withdrawals without issuing leases, expanding the lease program without issuing leases, issuing leases only on the previously active tracts for the purpose of reclamation, issuing fewer leases requiring interim reclamation, and requiring additional lease stipulations for protection of public lands. | Currently, 29 leases exist (this has been the case since 2008); however, a situation in which current withdrawals would be maintained without issuing leases would occur under Alternative 1. Reclamation that was needed would also be done as part of Alternative 1. Current leases include adequate stipulations providing appropriate protection of public lands. |
| 1D.  An Alternative that stipulates protection of the Dolores River and San Miguel River watersheds. Lease tracts in the Dolores River Canyon should be withdrawn from the ULP (i.e., Slick Rock Lease Tracts 13, 13A, and 14). | Leases for Lease Tracts 13 and 13A have been in existence since 1974 and still currently exist (they have existed since 2008). Lease Tract 14 (Tracts 14-1, 14-2, and 14-3) is not presently leased. There is currently a requirement for future uranium mines on all three lease tracts to be at least 0.25 mi (0.40 km) from the Dolores River. As discussed in the rationale for 1C, Alternative 1 would result in the currently withdrawn lands being maintained by DOE without leasing for uranium mining. |
| 1E.  An alternative to keep the lease tracts in place but to prohibit any further mining or exploration until reclamation has been completed on existing or old leases. | DOE believes that the range of reasonable alternatives evaluated in the Draft PEIS addresses this concern. Under Alternatives 1 and 2, the existing leases would be terminated, and reclamation would be conducted. In addition, all legacy mine sites located on the DOE lease tracts have been reclaimed. |
| 1F.  Vacate all leases and re-bid them with both a royalty component and a performance-based component. | DOE's ULP incorporates a royalty component that is inherently performance-based. The option of vacating or terminating all leases is incorporated in Alternatives 1 and 2. |

2

BLM_0041767

**TABLE B-2  (Cont.)**

| Public Scoping Comment | Rationale |
|---|---|

**2.  Impact Analysis**

2A.  Cultural resources must be adequately studied, documented, and protected. DOE is encouraged to work closely with local Native Americans familiar with surrounding anthropological resources and cultural artifacts. Archaeological surveys should be conducted where future mining and disturbances might occur, and all recorded sites must be evaluated for significance. An antiquities preservation plan should be prepared for unavoidable impacts.

The analysis of cultural resources discussed in the Draft PEIS for the five alternatives evaluated addresses this concern. DOE initiated government-to-government consultation with six tribes. The status of these consultations to date is summarized in Chapter 6 of the Draft PEIS. The Draft PEIS does identify archaeological surveys to be conducted on a project-specific basis as exploration and mine development plans are submitted to DOE for approval. The preparation of an antiquities preservation plan and other plans would be done as consistent with requirements.

2B.  Consider negative impacts on tourism, recreation, and property values, and the overall impact on local the economy and land use in surrounding communities. There is concern that uranium mining could create a boom-and-bust economy.

The impacts analysis for socioeconomics addresses this concern.

2C.  Estimate the number and types of jobs to be created under each alternative, and how each alternative might impact the number of employees needed from outside the region. The concern is that uranium mining would not provide many jobs, and that those jobs would be available only for the short term.

Same as 2B.

2D.  Evaluate impacts of uranium mining on water quality. Many commenters were concerned with the impacts on downstream water users. They thought that downstream water quality should be included in the impact analysis, and that water use for uranium mining and milling should be included in the analysis.

The impacts analysis for water resources addresses potential impacts on water quality from the proposed action (i.e., from exploration, mine development and operations, and reclamation). Uranium ore milling or processing is outside the scope of the proposed action and was not evaluated. However, potential impacts from the proposed action were considered in terms of cumulative impacts, along with the consideration of potential impacts evaluated for the proposed Piñon Ridge Mill and the White Mesa Mill.

2E.  Include best management practices to minimize stormwater runoff as well as a mitigation measure that would require all vent shafts to be grouted where they intercept aquifers.

Best management practices or mitigation measures are discussed in the Draft PEIS under the impact analyses for specific resource areas as examples of how potential impacts evaluated in Chapter 4 could be further minimized or mitigated. A summary of these example mitigation measures is also presented in Section 4.6. Final mitigation measures would be determined in the approved mine plans.

BLM_0041768

**TABLE B-2  (Cont.)**

| Public Scoping Comment | Rationale |
|---|---|
| 2F.  Provide description of uranium mining activities and a realistic estimate of activities that will occur on lease tracts until the end of the 10-year time frame. | Since project -specific mine plans were not submitted by the lessees prior to the start of the preparation of this Draft PEIS, assumptions were developed to simulate realistic but upper-bound mining scenarios (covering, for example, how many mines would operate at the same time, the size of the mines, tonnage produced per mine, amount of water used, number of workers, and types of equipment used). These assumptions provided the basis for the impacts evaluation discussed in Chapter 4 of this Draft PEIS, providing reasonable upper-bound estimates for consideration. These assumptions are discussed in Chapter 2 of this Draft PEIS. |
| 2G.  DOE should undertake its duties under Section 7 of the Endangered Species Act (ESA). The PEIS must fully address impacts on native fish, on aquatic species and riparian habitat, and on the river corridor. The PEIS should exclude development on all designated critical habitat areas. Species downstream from the lease tracts on the Colorado River should be included in the analysis of biological resources. The PEIS should fully survey the area for rare and imperiled species and should include an ecosystems services analysis of the Dolores River watershed. | DOE is engaged in consultation with the USFWS per Section 7 of the ESA. A biological assessment is also being prepared as part of this consultation. This Draft PEIS evaluates potential impacts on ecological resources in the area of the lease tracts, as well as on the threatened and endangered species identified through consultation with the USFWS. |
| 2H.  Include impacts from the release of radioactive and other toxic materials into the atmosphere from mining and milling operations. | The Draft PEIS addresses the potential impacts from the release of material associated with the ore production. The potential impacts of milling operations are outside the scope of the proposed action but are addressed as part of the cumulative impacts analysis in Section 4.7. |
| 2I.  Evaluate the amount of disturbed land that will be a source of increased fugitive dust. There is high potential for air toxicity affecting a widespread area as a result of any weather events that would involve high winds over a dry desert. DOE should identify air emissions, evaluate adverse National Ambient Air Quality Standards (NAAQS) impacts on any federal Class I or sensitive Class II areas (Colorado National Monument), and include plans to control dust. | The analysis for air quality included in this Draft PEIS addresses this concern. |
| 2J.  Evaluate impacts from the release of radon gas and radioactive particulates from mine openings and radon vents; also determine the emissions from mine operations and the impacts on air, climate change, soils, water, and vegetation. | The analysis for potential human health impacts addresses potential impacts from radon gas and uranium on workers and members of the general public within a 50-mi (80-km) radius. Potential impacts on air, climate change, soils, water, and vegetation are addressed in Chapter 4. |

BLM_0041769

**TABLE B-2  (Cont.)**

| Public Scoping Comment | Rationale |
|---|---|
| 2K.  Address the long-term impacts on human health, livestock, and wildlife, including food sources, both locally and regionally, due to mining and milling activities. The PEIS must consider health effects of mining and milling, including cancer incidence, on the human population in towns neighboring the mining operation, workers, and local residents. | The analyses of impacts on human health and ecological resources address the concern about potential impacts from mining operations. The analysis of human health impacts in Chapter 4 considers the population within a 50-m (80-km) radius of the lease tract areas. The analysis for potential impacts on ecological resources addresses resources in the three counties that encompass the 31 lease tracts and those on the Dolores, San Miguel, and Colorado (for threatened and endangered species only) rivers. The potential impacts from milling are addressed in the cumulative impacts section in Section 4.7. |
| 2L.  Describe the impacts from the increased use of area roads, as well as mitigation measures for traffic. The PEIS should evaluate potential adverse impacts on public health and safety, the risk of collisions with wildlife, and the effects on the environment from increased truck traffic that would pass through the Curecanti National Recreation Area. The PEIS should also analyze potential impacts of ore haul routes next to rivers and streams. | The analysis for transportation impacts from hauling ore from the DOE ULP lease tracts is discussed in Chapter 4 of this Draft PEIS. This analysis provides an estimate of the potential increase in the number of truck trips on the haul routes to the two mills (proposed Piñon Ridge Mill and the White Mesa Mill). Mitigation measures are discussed in Section 4.6 of this Draft PEIS. Any potential impacts on streams or rivers would result from an ore spill following a transportation accident, as discussed in Section 4.3.10.4 of this Draft PEIS. The Cotter Corporation uranium mill in Cañon City, Colorado, is not discussed in this PEIS because it is currently inoperable, and Cotter Corporation has notified the Colorado Department of Public Health and Environment that the radioactive materials license for the mill will not be renewed. Accordingly, U.S. Highway 50, through the Curecanti National Recreation Area, is no longer a ore haulage route. |
| 2M.  Address the impacts from erosion by wind and rain runoff. The PEIS must identify, review, consider, and reference all state geological studies and U.S. Geological Survey (USGS) studies of the Uravan mineral belt and surrounding areas. | Potential erosion impacts are evaluated in this Draft PEIS. Relevant USGS studies, reports, and papers were reviewed to support the discussion and analyses presented in this Draft PEIS. |
| 2N.  Consider the environmental sensitivity of Conservation Areas of the Colorado Natural Heritage Program, Areas of Critical Environmental Concern (ACECs), and Special Recreation Management Areas (SRMAs) in the Dolores River Canyon. Development in the three Wilderness Study Areas (WSAs) and 10 Citizen Wilderness Proposals in the affected area should be excluded. The PEIS should consider the views from the Dolores River Canyon at each lease location. There is a concern about the visual impacts that would result from ore trucks traveling along Highway 141, which has been designated the "Unaweep-Tabeguache Scenic and Historic Byway." | The analysis for visual resources addresses the potential impacts on views from sensitive areas, such as the Dolores River Canyon and the Unaweep-Tabeguache Scenic and Historic Byway. |

BLM_0041770

**TABLE B-2  (Cont.)**

| Public Scoping Comment | Rationale |
|---|---|
| 2O.  Any aboveground equipment that makes noise louder than 75 dB that is located within 1 mi (1.6 km) of the Dolores River or any residence should be limited to operating only from 10 a.m. to 6 p.m. on weekdays, and all aboveground blasting anywhere should be limited to between 10 a.m. and 6 p.m. only on weekdays. The PEIS must assess the impacts of noise from intake and exhaust vent fans. The PEIS must include an assessment of the effects from noise on insects, birds, mammals, animal hunting habits, animal mating and reproduction, recreation, grazing, and human habitation. | Any mine plans that would be approved would include measures for mining activities to meet applicable federal, state, and local requirements, including any requirements regarding noise. It is expected that most mining activities would occur during daytime hours on weekdays, as suggested. The analysis of potential noise impacts in Chapter 4 of this Draft PEIS addresses potential impacts from the equipment used, including impacts from intake and exhaust vent fans. The analysis for potential impacts on ecological resources also addresses noise. The responses of wildlife to noise would vary by species; the individual's physiological or reproductive condition; distance; and the type, intensity, and duration of the disturbance. Excessive noise levels can alter wildlife habitat use and activity patterns (e.g., exacerbating fragmentation impacts), increase the animals' stress levels, decrease their immune response, reduce reproductive success, increase predation risk, degrade communication, and cause hearing damage. Generally, deleterious physiological responses to noise occur at exposure levels of 55 to 60 dB(A) or more, although other potential impacts on wildlife would occur at lower levels. Noise levels tend to be lower than this exposure level at distances of more than 1,000 ft (300 m) from the noise source. With the exception of blasting, rock drilling, or pile driving, typical noise levels for heavy equipment range from 75 to 90 dBA at a distance of 50 ft (15 m). If only geometrical spreading and ground effects (among noise attenuation mechanisms) are considered, and if an upper range of 90 dBA is assumed, a noise level of 55 dBA would occur at about 1,100 ft (340 m) from the noise source. |
| 2P.  Assess topsoil required for reclamation, assess gaps in reclamation soil requirements and availability, and determine the impacts if there was an insufficient amount of topsoil. | Mine plans are required to address reclamation procedures, and they address topsoil material needed for covering the waste-rock pile and other disturbed surfaces. The source of this top cover material is typically soil material removed from the lease tracts during the course of mine development and operations and retained on the site for subsequent use during the reclamation phase. |
| 2Q.  Consider the proximity to the Dolores River and whether a 0.25-mi (0.40-km) buffer from the Dolores River and Calamity Creek should be supported. All water rights associated with the lease tracts should be considered in the PEIS, as well as a requirement for monitoring wells to be established around the perimeter of each lease tract. | Currently, a 0.25-mi (0.40-km) buffer from the Dolores River is being observed as far as the placement of new uranium mining operations on the DOE ULP lease tracts. The analysis for water resources in Chapter 4 focuses on the potential impacts on water quality, since the amount of water needed for the proposed action would be trucked onto the lease tracts and therefore supplied by the vendors used for this service. Therefore, a discussion on water rights was not considered. Requirements for monitoring wells and other requirements will be addressed by DOE and other regulatory agencies as mine plans are submitted for approval. |

BLM_0041771

**TABLE B-2  (Cont.)**

| Public Scoping Comment | Rationale |
|---|---|
| 2R.  Assess the practice of ore stockpiling at the lease tracts and its impacts. This should include the amount of stockpiled ore, the radioactive and nonradioactive constituents of the stockpiled ore, the estimated length of time the ore will remain at the sites, and environmental impacts. | The ore that would be generated is not expected to be stockpiled for any great length of time that would adversely affect human health and the environment. It is expected that stockpiled ore would not remain at the mine sites for long periods of time due to Colorado State regulations prohibiting such. The continual existence of ore stockpiles during active mining operations is to be expected; it gives the mining companies and their ore transportation contractors flexibility to operate in an efficient manner. |

**3.  Tribal Concerns**

| | |
|---|---|
| 3A.  Address any associated environmental and spiritual impacts on all downstream Native American Nations. Must engage in Section 106 consultation. | The consultation with the Colorado State Historic Preservation Officer (SHPO) with regard to cultural resources would be conducted when project-specific information was submitted by the lessees to DOE for approval. |

**4.  Policy and Regulatory Issues**

| | |
|---|---|
| 4A.  Adequate nuclear fuel supplies are available for the U.S. nuclear power industry for the foreseeable future. The development of western Colorado uranium reserves should be given a low priority until there is a clear need for a domestic nuclear fuel supply. | DOE has prepared this Draft PEIS consistent with the purpose and need for agency action discussed in Chapter 1. |
| 4B.  DOE should collaborate with other agencies, including the Colorado Division of Reclamation and Mining Safety (CDRMS), BLM, and EPA. | DOE is collaborating with various agencies on this PEIS process. Section 1.9 presents a list of the cooperating agencies and the commenting agencies. |
| 4C.  There is a lack of oversight and safeguards, and penalties to companies are not high enough to assure environmental compliance or adherence to current safety laws on reclamation. | DOE's approval of mine plans would be contingent on the fact that these plans contained appropriate and adequate measures for the protection of human health and the environment. The leases specify conditions that must be met by the lessees. |
| 4D.  The PEIS is redundant and repeats the efforts of numerous other environmental assessments performed by both private mining companies and governmental agencies in or adjacent to the DOE lease tracts. | DOE has prepared this Draft PEIS consistent with the purpose and need for agency action discussed in Chapter 1. This Draft PEIS addresses the range of reasonable alternatives for the management of the DOE ULP consistent with NEPA requirements. |
| 4E.  Local governments requested that affected counties be given an opportunity to meet with DOE separately from the public scoping meetings that were held. | DOE invited the Montrose, Mesa, San Miguel, and San Juan County Commissions to participate as cooperating agencies for the preparation of this PEIS, and they agreed. |
| 4F.  Requests were received to hold meetings in other locations, such as Canon City, Gateway, and Grand Junction, as well as with the White Mesa Ute Indian Community and in Blanding, Utah. | Public comment hearings for the Draft PEIS will be held in Grand Junction in addition to Montrose, Naturita, and Telluride, Colorado. It is felt that public hearings at these four locations would give interested members of the public adequate opportunities to participate in a meeting format. |

BLM_0041772

**TABLE B-2  (Cont.)**

| Public Scoping Comment | Rationale |
|---|---|
| 4G.  The review and approval process should include a project-specific NEPA review for each proposed mining operation. The PEIS should include site-specific mitigation measures in addition to general mitigation measures. | Section 1.6 of this Draft PEIS contains a discussion of the NEPA process that would be conducted once project-specific mine plans were submitted by the lessees to DOE for approval. Examples of mitigation measures that could be implemented to minimize potential impacts are listed in Section 4.6. Site-specific and project-specific mitigative measures would be specified in the approved mine plans and associated documentation. |
| 4H.  Include a history of the compliance of existing lease holders with their lease agreements and applicable statutes and regulations. It should also include DOE or BLM lease and mine inspection reports. | A brief summary of the mining history that has occurred on the DOE ULP lease tracts is provided in this Draft PEIS in Chapter 1. DOE enforces the requirements stipulated in the leases, and to date, no outstanding issues exist. |

**5.  Mining Methods**

| | |
|---|---|
| 5A.  In assessing the environmental impacts, the PEIS should consider what traditional mining methods or methods should be used (e.g., should both the in-situ leaching and the in-situ recovery methods be allowed, or should the method used be limited to one or the other?). | This Draft PEIS evaluated underground and surface open-pit mining methods. The in-situ leaching method was not evaluated because it is not considered to be a viable option due to the location of the ore in "dry" sedimentary strata (see 6A below). |

**6.  Uranium Resources**

| | |
|---|---|
| 6A.  Most of the uranium resources in the Colorado Plateau province of western Colorado are located in sedimentary strata, where the distribution of ore is scattered and patchy. This results in large volumes of low-grade radioactive mine waste. | The location of ore described (i.e., in sedimentary strata) is precisely why the underground mining method and, to a lesser extent, the surface open-pit method are more practical methods for extracting the ore. These methods do result in waste rock (defined as containing less than 0.05% of uranium) that is partially placed back into the mine workings or reclaimed as a pile that is contoured to be consistent with its surroundings, covered with available topsoil material, and seeded (or revegetated). This approach has been proven to be an acceptable and protective means of managing the waste rock that is an unavoidable by-product of uranium mining. |

1
2
3

BLM_0041773

1    **TABLE B-3  Public Scoping Issues Considered To Be Out of the Scope of the PEIS**

| Public Scoping Comment | Rationale |
|---|---|
| **1. Alternatives** | |
| 1A.  Because of unstable uranium markets and the uncertainty regarding future commercial development of nuclear power facilities, uranium should be preserved for the future use of the American people until it becomes critical for national strategic energy purposes. | The timing of uranium mining for the purposes described does not meet the purpose and need for DOE's action. |
| 1B.  Investigate the economic feasibility of renewable and alternative energy development. | The evaluation of renewable and alternative energy development does not meet the purpose and need for DOE's action described in Chapter 1 of this Draft PEIS. |
| 1C.  Include an alternative that requires old, inactive, and/or abandoned mines to be reclaimed before new leases are granted or any new mines are established. | DOE has reclaimed all abandoned mines within its purview. The 29 leases that currently exist have been in place since 2008, and all mining activities are currently on-hold until the completion of this PEIS process. |
| 1D.  Analyze a no-action alternative that would allow the 1995 leases to lapse with no reclamation conducted. | The option of not performing reclamation when leases lapse or are terminated is not consistent with the requirements of the leases or the ULP. |
| 1E.  Incorporate into the reclamation goals or standards the option of developing brownfields at some mines, so that the reclaimed land can be used for renewable energy production. | The development of brownfields is outside the scope of this Draft PEIS and does not meet the purpose and need for DOE's action described in Chapter 1. |
| **2. Impacts Analysis** | |
| 2A.  Analyze the economic benefits of fully reclaiming and rehabilitating all federal and state lands in the Uravan Mineral Belt and compare that to the economic benefit of maintaining the existing uranium leases over the next 5 years. | The economic studies suggested are outside the scope of this Draft PEIS. They do not meet the purpose and need for DOE's action described in Chapter 1. |
| 2B.  Analyze the costs to local and state governments to develop and maintain roads and develop and operate other infrastructure to support any future increase in uranium mining and milling activities. | An analysis of the costs to local and state governments to maintain roads to support an increase in uranium mining activities is outside the scope of this Draft PEIS. It does not meet the purpose and need for DOE's action described in Chapter 1. |
| 2C.  A market analysis should be conducted to determine how much uranium should be put on the market now versus in the future, when prices might be higher. | A market analysis for determining the optimal time for uranium ore to be generated relative to uranium ore prices is outside the scope of this Draft PEIS. It does not meet the purpose and need for DOE's action described in Chapter 1. |

2

BLM_0041774

1
2
3
4
5
6
7
8
9
10
11
12
13 **APPENDIX C:**
14
15 **EMISSION INVENTORIES, COSTS, AND OTHER ESTIMATES**
16 **USED AS A BASIS FOR THE ULP PEIS IMPACT ANALYSES**
17
18

BLM_0041775

*Preliminary Draft PEIS*
*PEIS Team Use Only*

*PEIS Privileged Information*
*Do Not Distribute*

*May 2012*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

*This page intentionally left blank*

BLM_0041776

*Preliminary Draft PEIS*  *PEIS Privileged Information*  *May 2012*
*PEIS Team Use Only*  *Do Not Distribute*

**APPENDIX C:**

**EMISSION INVENTORIES, COSTS, AND OTHER ESTIMATES**
**USED AS A BASIS FOR THE ULP PEIS IMPACT ANALYSES**

This appendix is a compilation of the emission inventories, cost assumptions and estimates, equipment and materials utilized, and workforce estimates used as the basis for the impact analyses conducted for this Draft PEIS. Estimates of waste volumes (other than those for the waste-rock piles) are also provided. Section C.1 presents information to support the analyses for the mine development and operations phase. Section C.2 presents similar information for the reclamation phase. Similar assumptions or estimates were not developed for the exploration phase since the activities involved in this phase are expected to be smaller than those presented here for the latter two phases.

## C.1 MINE DEVELOPMENT AND OPERATIONS

Under Alternatives 3 through 5, mine development and operations are assumed to occur on the lease tracts being evaluated in this Draft PEIS. Under Alternative 3, Lease Tracts 11, 13, 13A, 15, 5, 6, 7, 8, 9, 18, 21, and 25 are evaluated for potential uranium mining. Leases for these lease tracts were held in 2007 by Gold Eagle Mining, Inc., and Cotter Corporation. Lease tract 7 was composed of two tracts (7 and 7A) in 2007 but has since been combined into one least tract. Hence, for the purposes of this PEIS, Alternative 3 evaluates 12 lease tracts. Alternatives 4 and 5 evaluate all 31 lease tracts for potential future mining activities. Tables C.1-1 through C.1-13 tabulate various information developed for use as the basis for the impact analyses presented in Section 4 of the Draft PEIS.

**TABLE C.1-1  Number of Mines**
**Considered per Mine Size and Alternative[a]**

| Mine Size | Alt. 3 | Alt. 4 | Alt. 5 |
|-----------|--------|--------|--------|
| Small | 2 | 6 | 0 |
| Medium | 4 | 10 | 16 |
| Large | 1 | 2 | 2 |
| Very large | 1 | 1 | 1 |

[a]  Alternatives 1 and 2 are not presented in the table because they do not involve potential future mines to be developed.

BLM_0041777

1
2

**TABLE C.1-2  Estimated Mine Development Materials and Labor Time per Mine Size**

| Cost Element | Amount per Mine Size | | | |
|---|---|---|---|---|
| | Small | Medium | Large | Very Large |
| Labor (person-hours) | 5,015 | 7,584 | 11,500 | 14,671 |
| Steel (tons) | 400 | 528 | 695 | 816 |
| Lumber (1,000 board feet) | 92 | 120 | 153 | 177 |
| Fuel (gal) | 4,981 | 7,663 | 11,494 | 14,559 |
| Lubricant (gal) | 1,250 | 1,750 | 2,750 | 3,500 |
| Explosives (tons) | 186 | 249 | 333 | 395 |
| Electricity (kiWh) | 41,000 | 61,000 | 102,000 | 132,000 |

3
4
5
6

**TABLE C.1-3  Estimated Mine Development Materials and Labor Time per Alternative**

| Cost Element | Amount per Alternative | | |
|---|---|---|---|
| | Alt. 3 | Alt. 4 | Alt. 5 |
| Labor (person-hours) | 67,000 | 144,000 | 159,000 |
| Steel (tons) | 4,400 | 9,900 | 10,600 |
| Lumber (1,000 board feet) | 1,000 | 2,200 | 2,400 |
| Fuel (gal) | 67,000 | 144,000 | 159,000 |
| Lubricant (gal) | 16,000 | 35,000 | 38,000 |
| Explosives (tons) | 2,100 | 4,700 | 5,000 |
| Electricity (kWh) | 580,000 | 1,232,000 | 1,375,000 |

7
8

BLM_0041778

1
2

**TABLE C.1-4  Number of Workers per Mine Size and Worker Salary per Labor Category**

| Labor Category | No. of Workers per Mine Size | | | | Individual Annual Salary with Overhead and Profit ($) |
| | Small | Medium | Large | Very Large | |
|---|---|---|---|---|---|
| Mine workers | 6 | 10 | 16 | 50 | 81,250 |
| Mechanic | 0.1 | 0.1 | 0.1 | 0.1 | 81,250 |
| Geologist | 0.1 | 0.1 | 0.1 | 0.1 | 137,500 |
| Surveyor | 0.1 | 0.1 | 0.1 | 0.1 | 81,250 |
| Engineer | 0.1 | 0.1 | 0.1 | 0.1 | 81,250 |
| Environmental specialist | 0.1 | 0.1 | 0.1 | 0.1 | 75,000 |
| Other administrative support (e.g., accountant) | 0.1 | 0.1 | 0.1 | 0.1 | 83,333 |
| Totals | 6.6 | 10.6 | 16.6 | 50.6 | |

3
4
5
6

**TABLE C.1-5  Annual Worker Salaries per Labor Category and Mine Size**

| Labor Category | Salary per Mine Size ($) | | | |
| | Small | Medium | Large | Very Large |
|---|---|---|---|---|
| Mine workers | 487,500 | 812,500 | 1,300,000 | 4,062,500 |
| Mechanic | 8,125 | 8,125 | 8,125 | 8,125 |
| Geologist | 13,750 | 13,750 | 13,750 | 13,750 |
| Surveyor | 8,125 | 8,125 | 8,125 | 8,125 |
| Engineer | 8,125 | 8,125 | 8,125 | 8,125 |
| Environmental specialist | 7,500 | 7,500 | 7,500 | 7,500 |
| Other administrative support (e.g., accountant) | 8,333 | 8,333 | 8,333 | 8,333 |
| Totals | 541,458 | 866,458 | 1,353,958 | 4,116,458 |

7
8

BLM_0041779

1          **TABLE C.1-6  Number and Cost of Capital Equipment Units per Mine Size**

| Items Assumed | Small | Medium | Large | Very Large | Unit Cost ($) |
|---|---|---|---|---|---|
| **Underground equipment** | | | | | |
| Diesel skid steer loaders – 2-yd$^3$ capacity | 1 | 2 | 3 | –[a] | 55,000 |
| Diesel trucks (buggies) – 5- to 10-ton capacity | 2 | 4 | 8 | – | 77,800 |
| Development drill – Jumbo | 1 | 1 | 1 | – | 55,000 |
| Production drills – Jacklegs | 3 | 6 | 9 | – | 300 |
| Exploration drills – Longhole | 1 | 1 | 2 | – | 82,000 |
| Diesel boss buggies and utility vehicles | 2 | 3 | 4 | – | 12,200 |
| **Surface Equipment** | | | | | |
| Front-end loader – 2- to 3-yd$^3$ capacity | 1 | 1 | 1 | 1 | 342,000 |
| Loaders – 8- to 10-yd$^3$ capacity | – | – | – | 3 | 123,000 |
| Backhoe/skid loader or excavator | 1 | 1 | 1 | 1 | 157,000 |
| Highway haul trucks – 22- to 24-ton capacity | 2 | 2 | 3 | – | 599,000 |
| Dump truck – 12 yd$^3$ | – | – | – | 3 | 200,000 |
| Bulldozer – 200 hp | 1 | 1 | 1 | – | 315,000 |
| Bulldozer – 400 hp | – | – | – | 3 | 625,000 |
| Motor grader – 140 hp | 1 | 1 | 1 | 1 | 160,000 |
| Flat-bed trailer with tractor or 1-ton vehicle | 1 | 1 | 1 | – | 10,000 |
| Maintenance truck | – | – | – | 1 | 158,000 |
| Pickup truck – ¾ ton (four-wheel drive) | 1 | 1 | 2 | 4 | 30,000 |
| Snow plow | 1 | 1 | 1 | – | 62,000 |
| Power generators | 1 | 1 | 2 | – | 79,950 |
| Scraper | – | – | – | 4 | 77,200 |
| Truck – 60 or more tons | – | – | – | 4 | 599,000 |

Number of Units per Mine Size[a]

[a]   A dash indicates none.

2
3

*C-6*

1     **TABLE C.1-7  Total Capital Equipment Costs ($ 2009) per Alternative**

| Items Assumed | Alt. 3 | Alt. 4 | Alt. 5 |
|---|---:|---:|---:|
| **Underground equipment** | | | |
| Diesel skid steer loaders – 2-yd$^3$ capacity | 715,000 | 1,760,000 | 2,090,000 |
| Diesel trucks (buggies) – 5- to 10-ton capacity | 2,178,400 | 5,290,400 | 6,224,000 |
| Development drill – Jumbo | 385,000 | 990,000 | 990,000 |
| Production drills – Jacklegs | 11,700 | 28,800 | 34,200 |
| Exploration drills – Longhole | 656,000 | 1,640,000 | 1,640,000 |
| Diesel boss buggies and utility vehicles | 244,000 | 610,000 | 683,200 |
| **Surface equipment** | | | |
| Front-end loader – 2- to 3-yd$^3$ capacity | 2,736,000 | 6,498,000 | 6,498,000 |
| Loaders – 8-to 10-yd$^3$ capacity | 369,000 | 369,000 | 369,000 |
| Backhoe/skid loader or excavator | 1,256,000 | 2,983,000 | 2,983,000 |
| Highway haul trucks – 22- to 24-ton capacity | 8,985,000 | 22,762,000 | 22,762,000 |
| Dump truck – 12 yd$^3$ | 600,000 | 600,000 | 600,000 |
| Bulldozer – 200 hp | 2,205,000 | 5,670,000 | 5,670,000 |
| Bulldozer – 400 hp | 1,875,000 | 1,875,000 | 1,875,000 |
| Motor grader – 140 hp | 1,280,000 | 3,040,000 | 3,040,000 |
| Flat bed trailer with tractor or 1-ton vehicle | 70,000 | 180,000 | 180,000 |
| Maintenance truck | 158,000 | 158,000 | 158,000 |
| Pickup truck – ¾ ton (four-wheel drive) | 360,000 | 720,000 | 720,000 |
| Snow plow | 434,000 | 1,116,000 | 1,116,000 |
| Power generators | 639,600 | 1,599,000 | 1,599,000 |
| Scraper | 308,800 | 308,800 | 308,800 |
| Truck – 60 or more tons | 2,396,000 | 2,396,000 | 2,396,000 |
| Total | 27,862,500 | 60,594,000 | 61,936,200 |

2
3

BLM_0041781

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1          **TABLE C.1-8  Estimated Total Capital Costs ($ 2009) per Mine Size**

| Cost Element | Small | Medium | Large | Very Large |
|---|---|---|---|---|
| Equipment purchase | 2,727,000 | 2,951,000 | 4,121,000 | 6,486,000 |
| Labor | 242,000 | 366,000 | 555,000 | 708,000 |
| Steel | 232,000 | 306,000 | 403,000 | 473,000 |
| Lumber | 23,000 | 30,000 | 38,000 | 44,000 |
| Fuel | 13,000 | 20,000 | 30,000 | 38,000 |
| Lubricant | 5,000 | 7,000 | 11,000 | 14,000 |
| Explosives | 124,000 | 166,000 | 222,000 | 263,000 |
| Tires | 9,000 | 14,000 | 20,000 | 26,000 |
| Construction materials | 223,000 | 317,000 | 451,000 | 554,000 |
| Electricity | 4,000 | 6,000 | 10,000 | 13,000 |
| Total direct costs | 3,602,000 | 4,183,000 | 5,861,000 | 8,619,000 |
| | | | | |
| Contractor's overhead and profit (6%) | 216,000 | 251,000 | 352,000 | 517,000 |
| Subtotal contractor's costs | 3,818,000 | 4,434,000 | 6,213,000 | 9,136,000 |
| Contractor's bond (1%) | 38,000 | 44,000 | 62,000 | 91,000 |
| Total contractor's field cost | 3,856,000 | 4,478,000 | 6,275,000 | 9,227,000 |
| Construction management (10%) | 386,000 | 448,000 | 628,000 | 923,000 |
| Total field costs | 4,242,000 | 4,926,000 | 6,903,000 | 10,150,000 |
| Architecture/engineering costs (25%) | 1,061,000 | 1,232,000 | 1,726,000 | 2,538,000 |
| Subtotal | 5,303,000 | 6,158,000 | 8,629,000 | 12,688,000 |
| Program management (6%) | 318,000 | 369,000 | 518,000 | 761,000 |
| Total capital costs | 5,621,000 | 6,527,000 | 9,147,000 | 13,449,000 |

2
3

BLM_0041782

1          **TABLE C.1-9  Estimated Total Capital Costs ($ 2009) per Alternative**

| Cost Element | Alt. 3 | Alt. 4 | Alt. 5 |
|---|---|---|---|
| Equipment purchase | 27,863,000 | 60,595,000 | 61,937,000 |
| Labor | 3,213,000 | 6,934,000 | 7,681,000 |
| Steel | 2,565,000 | 5,732,000 | 6,174,000 |
| Lumber | 246,000 | 555,000 | 593,000 |
| Fuel | 174,000 | 375,000 | 414,000 |
| Lubricant | 64,000 | 138,000 | 152,000 |
| Explosives | 1,396,000 | 3,108,000 | 3,359,000 |
| Tires | 118,000 | 257,000 | 283,000 |
| Construction materials | 2,717,000 | 5,958,000 | 6,524,000 |
| Electricity | 57,000 | 121,000 | 135,000 |
| Total direct costs | 38,413,000 | 83,773,000 | 87,252,000 |
| | | | |
| Contractor's overhead and profit (6%) | 2,305,000 | 5,026,000 | 5,235,000 |
| Subtotal contractor's costs | 40,718,000 | 88,799,000 | 92,487,000 |
| Contractor's bond (1%) | 407,000 | 888,000 | 925,000 |
| Total contractor's field cost | 41,125,000 | 89,687,000 | 93,412,000 |
| Construction management (10%) | 4,113,000 | 8,969,000 | 9,341,000 |
| Total field costs | 45,238,000 | 98,656,000 | 102,753,000 |
| Architecture/engineering costs (25%) | 11,310,000 | 24,664,000 | 25,688,000 |
| Subtotal | 56,548,000 | 123,320,000 | 128,441,000 |
| Program management (6%) | 3,393,000 | 7,399,000 | 7,706,000 |
| Total capital costs | 59,941,000 | 130,719,000 | 136,147,000 |

2
3
4          **TABLE C.1-10  Estimated Emissions during Mine Development per Alternative**

| | Alt. 3 | | Alt. 4 | | Alt. 5 | |
|---|---|---|---|---|---|---|
| Criteria Pollutant | Total Emissions (tons) | Peak-Year Emissions (tons/yr) | Total Emissions (tons) | Peak-Year Emissions (tons/yr) | Total Emissions (tons) | Peak-Year Emissions (tons/yr) |
| Total hydrocarbons (THC) | 0.8 | 0.8 | 1.8 | 1.8 | 2.0 | 2.0 |
| Reactive organic compounds (ROCs) | 0.8 | 0.8 | 1.7 | 1.7 | 1.9 | 1.9 |
| Nitrogen oxides ($NO_x$) | 26 | 26 | 57 | 57 | 62 | 62 |
| Sulfur dioxide ($SO_2$) | 3.1 | 3.1 | 6.9 | 6.9 | 7.5 | 7.5 |
| Carbon monoxide (CO) | 74 | 74 | 165 | 165 | 176 | 176 |
| Total suspended particulates (TSP) | 262 | 262 | 520 | 520 | 554 | 554 |
| Particulate matter ≤10 μm ($PM_{10}$)[a] | 225 | 225 | 459 | 459 | 489 | 489 |
| Particulate matter ≤2.5 μm ($PM_{2.5}$)[b] | 36 | 36 | 73 | 73 | 78 | 78 |
| Carbon dioxide ($CO_2$) | 745 | 745 | 1,601 | 1,601 | 1,767 | 1,767 |

[a]   Assumes that the construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions).

[b]   Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$.

5
6

**TABLE C.1-11  Types and Amounts of Wastes Generated during Mine Development per Alternative**

| Waste Category | Waste Generated (gal) per Alternative | | |
|---|---|---|---|
| | Alt. 3 | Alt. 4 | Alt. 5 |
| Sanitary[a] | 136,000 | 292,000 | 322,000 |
| Other | 60,000 | 130,000 | 143,000 |

[a] Amount of sanitary waste was estimated based on total construction workforce.

**TABLE C.1-12  Total Worker Annual Wages per Mine Size and Alternative**

| Mine Size | Wages ($) per Alternative | | |
|---|---|---|---|
| | Alt. 3 | Alt. 4 | Alt. 5 |
| Small | 1,082,917 | 3,248,750 | 0 |
| Medium | 3,465,833 | 8,664,583 | 13,863,333 |
| Large | 1,353,958 | 2,707,917 | 2,707,917 |
| Very large | 4,116,458 | 4,116,458 | 4,116,458 |
| Total | 10,019,167 | 18,737,708 | 20,687,708 |

BLM_0041784

1    **TABLE C.1-13  Estimated Air Emissions during Mine Operations per Alternative**

| | Alt. 3 | | Alt. 4 | | Alt. 5 | |
|---|---|---|---|---|---|---|
| Criteria Pollutant | Total Emissions (tons) | Peak-Year Emissions (tons/yr) | Total Emissions (tons) | Peak-Year Emissions (tons/yr) | Total Emissions (tons) | Peak-Year Emissions (tons/yr) |
| Total hydrocarbons (THC) | 14.0 | 14.0 | 28.0 | 28.0 | 31.6 | 31.6 |
| Reactive organic compounds (ROCs) | 13.4 | 13.4 | 26.9 | 26.9 | 30.4 | 30.4 |
| Nitrogen oxides ($NO_x$) | 137.7 | 137.7 | 275.5 | 275.5 | 313.1 | 313.1 |
| Sulfur dioxide ($SO_2$) | 17.7 | 17.7 | 35.4 | 35.4 | 40.1 | 40.1 |
| Carbon monoxide (CO) | 64.2 | 64.2 | 128.4 | 128.4 | 145.1 | 145.1 |
| Total suspended particulates (TSP) | 32.4 | 32 | 64.8 | 65 | 74.1 | 74 |
| Particulate matter ≤10 μm ($PM_{10}$)[a] | 22.5 | 23 | 45.1 | 45 | 51.4 | 51 |
| Particulate matter ≤2.5 μm ($PM_{2.5}$)[b] | 11.8 | 11.8 | 23.5 | 23.5 | 26.7 | 26.7 |
| Carbon dioxide ($CO_2$) | 13,000 | 13,000 | 25,000 | 25,000 | 29,000 | 29,000 |

[a]   Assumes that construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions).

[b]   Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$.

2
3
4    **C.2  RECLAMATION**
5
6         The reclamation phase would be conducted under each of the five alternatives evaluated
7    in the Draft PEIS. Tables C.2-1 through C.2-6 tabulate the information developed as basis for the
8    impact analyses discussed in Chapter 4. The basis for the values used in Table C.2-1 are as
9    follows. The basis for the estimates is that it would take 3 months per mine site for a team to
10   complete reclamation. Under Alternatives 1 and 2, 10 mine sites would be reclaimed (9 plus
11   JD-7).
12
13        It is assumed that the construction period for some of the locations toward the north
14   would be shorter because of snow (i.e., field work could only be conducted for 9 months out of
15   the year). Therefore, it is assumed that it would take 27 months total to complete 9 mine sites.
16   Employing three teams would enable the reclamation to be completed within a year.
17
18        Assumptions under Alternative 3 would be the same as those under Alternatives 1 and 2
19   because essentially the same number of mines would be reclaimed.
20
21        Assumptions under Alternatives 4 and 5 would be the same since the number of mines
22   would be the same (19 mines; or 18 mines JD-7) = 19 mines × 3 months = 57 months.
23   Five teams are assumed three teams would be able to work for 12 months as opposed to only
24   9 months, because they would be working at the southern lease tracts; thus, three teams
25   × 12 months = 36 months, plus two teams × 9 months = 18 months, for a total of 54 months.
26

BLM_0041785

1
2

**TABLE C.2-1  Assumed Reclamation Workforce per Labor Category, Team, JD-7 Mine, and Alternative**

| Labor Category | No. of Workers per Team[a] | No. of Workers for JD-7 Mine | Total No. of Workers per Alternative | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Alts. 1 and 2[b] | Alt. 3[c] | Alt. 4[d] | Alt. 5[e] |
| Foreman | 1 | 1 | 4 | 4 | 6 | 6 |
| Equipment operator | 3 | 10 | 19 | 19 | 25 | 25 |
| Truck driver[f] | 1 | 2 | 5 | 5 | 7 | 7 |
| Electrician/mechanic[g] | 0 | 1 | 1 | 1 | 1 | 1 |
| Total | 5 | 14 | 29 | 29 | 39 | 39 |

[a]  Other than for work on JD-7 open-pit mine.

[b]  Three teams plus the JD-7 team.

[c]  Three teams plus the JD-7 team.

[d]  Five teams plus the JD-7 team.

[e]  Five teams plus the JD-7 team.

[f]  Also assumed to operate equipment.

[g]  Assumed for very large mine (JD-7) reclamation only.

3
4

BLM_0041786

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1    **TABLE C.2-2  Assumed Total Reclamation Costs ($ 2009) per Alternative**

| Cost Element | Alts. 1 and 2 | Alt. 3 | Alt. 4 | Alt. 5 |
|---|---|---|---|---|
| Remove aboveground structures | 0 | 62,085 | 136,157 | 149,067 |
| Seal portal(s) | 2,300 | 11,500 | 9,200 | 6,900 |
| Establish 3:1 slopes | 447,621 | 522,514 | 783,771 | 836,023 |
| Pock areas of steep slope to reduce future erosion | 486,831 | 568,286 | 852,429 | 909,257 |
| Spread available topsoil over pocking | 58,009 | 67,714 | 101,571 | 108,343 |
| Cut and fill and water bars on access road | 153,906 | 179,657 | 269,486 | 287,451 |
| Revegetate slope and access road | 1,297,055 | 1,514,072 | 2,271,108 | 2,422,515 |
| Place obstruction boulders at access entrance | 306 | 2,448 | 5,814 | 5,814 |
| Replace ore in mine | 0 | 17,963 | 35,925 | 41,314 |
| Remove 18 in. of subsurface from ore pad area | 0 | 131,680 | 263,360 | 302,864 |
| Rip compacted areas | 59,427 | 69,370 | 104,055 | 110,992 |
| Spread topsoil over disturbed areas | 40,072 | 46,776 | 70,164 | 74,842 |
| Backfill sedimentation pond | 28,122 | 32,827 | 49,241 | 52,524 |
| Seal ventilation shafts (72-in. diameter) | 8,519 | 68,152 | 161,861 | 161,861 |
| Seal power drop holes | 254 | 2,032 | 4,826 | 4,826 |
| Remove power drops | 469 | 3,752 | 8,911 | 8,911 |
| Rip vent and power drop pads | 8,327 | 9,721 | 14,581 | 15,553 |
| Push topsoil over vent and power pads | 3,955 | 4,616 | 6,925 | 7,386 |
| Revegetate area around vent and power drop pads | 60,917 | 71,109 | 106,664 | 113,775 |
| Conduct initial site mobilization | 4,984 | 39,872 | 94,696 | 94,696 |
| Conduct secondary seeding mobilization | 1,838 | 14,704 | 34,922 | 34,922 |
| Total direct costs | 2,662,912 | 3,440,851 | 5,385,668 | 5,749,837 |
| | | | | |
| Contractor's overhead and profit (6%) | 160,000 | 206,000 | 324,000 | 345,000 |
| Subtotal contractor's costs | 2,822,912 | 3,646,851 | 5,709,668 | 6,094,837 |
| Contractor's bond (1%) | 28,000 | 37,000 | 57,000 | 62,000 |
| Total contractor's field cost | 2,850,912 | 3,683,851 | 5,766,668 | 6,156,837 |
| Construction management (10%) | 285,000 | 368,000 | 577,000 | 616,000 |
| Total field costs | 3,135,912 | 4,051,851 | 6,343,668 | 6,772,837 |
| Architecture/engineering costs (25%) | 784,000 | 1,013,000 | 1,587,000 | 1,693,000 |
| Subtotal | 3,919,912 | 5,064,851 | 7,930,668 | 8,465,837 |
| Program management (6%) | 235,000 | 303,000 | 476,000 | 508,000 |
| Total reclamation costs | 4,155,000 | 5,368,000 | 8,406,000 | 8,974,000 |

2
3

BLM_0041787

**TABLE C.2-3  Assumed Equipment for Reclamation Activities per Mine Size and Alternative**

| Items Assumed | Small | Medium | Large | Very Large |
|---|---|---|---|---|
| **Alternatives 1 and 2** | | | | |
| Bulldozer – 310 hp | 3 | 0 | 0 | 0 |
| Diesel skid steer loaders – 2-yd$^3$ capacity | 2 | 0 | 0 | 0 |
| Motor grader – 140 hp | 1 | 0 | 0 | 0 |
| Excavator – 125 hp | 3 | 0 | 0 | 0 |
| Front-end loader – 2- to 3-yd$^3$ capacity | 0 | 1 | 1 | 1 |
| Grass drill and seeder | 2 | 0 | 0 | 0 |
| Dump trucks – 12 yd | 1 | 0 | 0 | 0 |
| Flat-bed trailer with tractor or 1-ton vehicle | 1 | 0 | 0 | 0 |
| Pickup truck – ¾ ton (4 wheel drive) | 0 | 0 | 0 | 0 |
| **Alternative 3** | | | | |
| Bulldozer – 310 hp | 1 | 1 | 1 | 2 |
| Diesel skid steer loaders – 2-yd$^3$ capacity | 1 | 1 | 1 | 2 |
| Motor grader – 140 hp | 1 | 1 | 1 | 1 |
| Excavator – 125 hp | 1 | 1 | 1 | 3 |
| Front-end loader – 2- to 3-yd$^3$ capacity | 0 | 1 | 1 | 1 |
| Grass drill and seeder | 1 | 1 | 1 | 2 |
| Dump trucks – 12 yd | 1 | 1 | 1 | 1 |
| Flat -bed trailer with tractor or 1-ton vehicle | 1 | 1 | 1 | 1 |
| Pickup truck – ¾ ton (4 wheel drive) | 0 | 1 | 1 | 2 |
| **Alternative 4** | | | | |
| Bulldozer –310 hp | 1 | 2 | 1 | 2 |
| Diesel skid steer loaders – 2-yd$^3$ capacity | 1 | 1 | 1 | 2 |
| Motor grader – 140 hp | 1 | 1 | 1 | 1 |
| Excavator – 125 hp | 1 | 2 | 1 | 3 |
| Front-end loader – 2- to 3-yd$^3$ capacity | 1 | 1 | 1 | 1 |
| Grass drill and seeder | 1 | 1 | 1 | 2 |
| Dump trucks – 12 yd | 1 | 2 | 1 | 1 |
| Flat-bed trailer with tractor or 1-ton vehicle | 1 | 1 | 1 | 1 |
| Pickup truck – ¾ ton (four-wheel drive) | 1 | 2 | 1 | 2 |
| **Alternative 5** | | | | |
| Bulldozer – 310 hp | 0 | 2 | 1 | 2 |
| Diesel skid steer loaders – 2-yd$^3$ capacity | 0 | 2 | 1 | 2 |
| Motor grader – 140 hp | 0 | 1 | 1 | 1 |
| Excavator – 125 hp | 0 | 3 | 1 | 3 |
| Front-end loader – 2- to 3-yd$^3$ capacity | 0 | 2 | 1 | 1 |
| Grass drill and seeder | 0 | 2 | 1 | 2 |
| Dump trucks – 12 yd | 0 | 3 | 1 | 1 |
| Flat-bed trailer with tractor or 1-ton vehicle | 0 | 1 | 1 | 1 |
| Pickup truck – ¾ ton (four-wheel drive) | 0 | 2 | 1 | 2 |

BLM_0041788

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1          **TABLE C.2-4  Assumed Mine Reclamation Materials per Alternative**

| Items Assumed | Amount of Materials per Mine Size | | | | |
|---|---|---|---|---|---|
| | Small | Medium | Large | Very Large | Total |
| **Alternatives 1 and 2** | | | | | |
| Diesel fuel (gal) | –[a] | – | – | – | 81,000 |
| Oil and grease (gal) | – | – | – | – | 3,200 |
| Water (gal) | – | – | – | – | 136,250 |
| Grass seed (40 lb/acre) (tons) | – | – | – | – | 5.1 |
| Hay, delivered (1 ton/acre) (tons) | – | – | – | – | 257 |
| **Alternative 3** | | | | | |
| Diesel fuel (gal) | 9,000 | 29,000 | 12,000 | 72,000 | 122,000 |
| Oil and grease (gal) | 400 | 1,700 | 900 | 3,700 | 6,700 |
| Water (gal) | 29,000 | 53,400 | 29,000 | 112,400 | 224,000 |
| Grass seed at 40 lb/acre (tons) | 0.4 | 1.2 | 0.4 | 4.0 | 6 |
| Hay, delivered at 1 ton/acre (tons) | 20 | 60 | 20 | 200 | 300 |
| **Alternative 4** | | | | | |
| Diesel fuel (gal) | 28,000 | 71,000 | 22,000 | 72,000 | 193,000 |
| Oil and grease (gal) | 1,600 | 4,000 | 1,400 | 3,700 | 10,700 |
| Water (gal) | 48,600 | 99,900 | 38,800 | 112,400 | 300,000 |
| Grass seed (40 lb/acre) (tons) | 1.2 | 3.0 | 0.8 | 4.0 | 9 |
| Hay, delivered (1 ton/acre) (tons) | 60 | 150 | 40 | 200 | 450 |
| **Alternative 5** | | | | | |
| Diesel fuel (gal) | 0 | 111,000 | 22,000 | 72,000 | 205,000 |
| Oil and grease (gal) | 0 | 5,900 | 1,400 | 3,700 | 11,000 |
| Water (gal) | 0 | 151,200 | 38,800 | 112,400 | 302,000 |
| Grass seed (40 lb/acre) (tons) | 0.0 | 4.8 | 0.8 | 4.0 | 9.6 |
| Hay, delivered (1 ton/acre) (tons) | 0 | 240 | 40 | 200 | 480 |

[a]   Dash indicates not available.

2
3

BLM_0041789

1
2

**TABLE C.2-5  Assumed Total Air Emissions (tons) during
Reclamation**

| Criteria Pollutant | Alts. 1 and 2 | Alt. 3 | Alt. 4 | Alt. 5 |
|---|---|---|---|---|
| Total hydrocarbons (THC) | 1.0 | 1.5 | 2.4 | 2.5 |
| Reactive organic compounds (ROCs) | 1.0 | 1.4 | 2.3 | 2.4 |
| Nitrogen oxides ($NO_x$) | 10 | 14 | 23 | 24 |
| Sulfur dioxide ($SO_2$) | 1.3 | 1.9 | 3.0 | 3.2 |
| Carbon monoxide (CO) | 4.6 | 7.0 | 11.1 | 11.8 |
| Total suspended particulates (TSP) | 163 | 157 | 286 | 305 |
| Particulate matter ≤10 μm ($PM_{10}$)[a] | 138 | 129 | 243 | 259 |
| Particulate matter ≤2.5 μm ($PM_{2.5}$)[b] | 28 | 26 | 50 | 53 |
| Carbon dioxide ($CO_2$) | 902 | 1,356 | 2,148 | 2,282 |

[a]  Assumes that the construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions).

[b]  Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$.

3
4
5
6

**TABLE C.2-6  Wastes Generated during
Reclamation per Alternative**

| Waste Category | Alts. 1 and 2 | Alt. 3 | Alt. 4 | Alt. 5 |
|---|---|---|---|---|
| Sanitary (gal)[a] | 61,000 | 126,000 | 158,000 | 154,000 |
| Other (gal) | 27,000 | 56,000 | 70,000 | 68,000 |

[a]  Amount of sanitary waste was estimated based on the total reclamation workforce.

7

BLM_0041790

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1
2
3
4
5
6
7
8
9
10
11
12
13                          **APPENDIX D:**
14
15            **IMPACT ASSESSMENT METHODOLOGIES**
16

BLM_0041791

1
2
3
4
5
6
7
8
9
10
11
12          *This page intentionally left blank*
13

BLM_0041792

# APPENDIX D:

# IMPACT ASSESSMENT METHODOLOGIES

This appendix summarizes the methodologies used in evaluating the various environmental resource areas discussed in this programmatic environmental impact statement (PEIS). The environmental resource areas evaluated are as follows:

- Air quality,
- Acoustical environment,
- Geology and soils,
- Water resources,
- Human health,
- Ecological resources,
- Socioeconomics,
- Environmental justice,
- Land use,
- Transportation,
- Cultural resources,
- Visual resources, and
- Waste management.

In addition to the above resource areas, the U.S. Department of Energy (DOE) has evaluated cumulative impacts that could result from implementation of the Uranium Leasing Program (ULP) proposed action in combination with past, present, and planned activities (including federal and nonfederal activities) at or in the vicinity of the DOE ULP lease tracts.

## D.1  AIR QUALITY

Potential air quality impacts under each alternative were evaluated by estimating air pollutant emissions from two phases: (1) mine development and operations and (2) reclamation. (Air emissions from the exploration phase were not estimated because of its short duration and the negligible amount of emissions it would generate in comparison with the other phases.) Air emissions of criteria pollutants, volatile organic compounds (VOCs), and carbon dioxide ($CO_2$, a primary greenhouse gas [GHG]) that would result from the activities associated with engine exhaust and fugitive dust emissions from heavy equipment and vehicles, wind erosion from the disturbed areas, and explosives use were estimated. Air emissions from traffic due to workers commuting were not included because only a small number of workers would be involved (typically 12 to 24 people are involved) and the amount of any associated emissions would thus be small in comparison to the amount of air emissions generated from heavy equipment and other related activities. Detailed emission inventory tables, including data on emission factors, activity levels, fugitive dust control efficiencies, and total emissions, are presented in Appendix C.

BLM_0041793

1    To arrive at the annual emissions, emission factors for each activity were multiplied by
2  activity-level data and the estimated number of items of equipment required for development,
3  operations, and reclamation. Emission factors available in the standard references were used for
4  these estimates. Except for the following, emission factors were taken from the WebFIRE
5  database (EPA 2012a)

7    • For operations under average conditions, an emission factor of 0.22 tons per
8      acre-month was used for uncontrolled emissions of particulate matter of less
9      than or equal to 10 $\mu$m ($PM_{10}$) (Jones & Stokes Associates 2007). $PM_{2.5}$
10      emissions were assumed to be 21% of $PM_{10}$ emissions (AQMD 2012).

12    • For wind erosion, an emission factor of 0.38 tons per acre-yr was used for
13      uncontrolled emissions of total suspended particulates (TSP). $PM_{10}$ and $PM_{2.5}$
14      emissions were assumed to be 50% and 7.5%, respectively, of TSP emissions
15      respectively (EPA 2012b).

17    • For blasting, emission factors of 92 and 10 lb/ton for uncontrolled emissions
18      of $PM_{10}$ and $PM_{2.5}$, respectively, were used (QDEH 1999).

20    • For diesel combustion from heavy equipment, an emission factor of
21      22.23 lb/gal for carbon dioxide ($CO_2$) emissions was used (EPA 2004).

23    For operations and wind erosion, a fugitive dust control efficiency of 50% was assumed
24  by spraying water on the exposed area twice a day. Projected activity-level data were based on
25  assumptions discussed in Chapter 2 for the alternatives and also described in Appendix C.

27    The significance of project-related emissions with regard to overall air quality was
28  determined by comparing estimated annual project-related emissions of criteria pollutants and
29  VOCs with annual emissions in the three counties that encompass the DOE ULP lease tracts
30  (Mesa, Montrose, and San Miguel Counties) in 2008 and by comparing annual project-related
31  emissions of $CO_2$ with annual GHG emissions in Colorado in 2010 and in the United States in
32  2009 (CDPHE 2011; EPA 2011, Folga 2012; Strait et al. 2007).

## D.2  ACOUSTIC ENVIRONMENT

37    Potential noise impacts under each alternative were assessed by estimating the combined
38  noise levels from noise-emitting sources associated with ULP activities, then performing noise
39  propagation modeling. These levels were compared with the Colorado noise limit and the
40  U.S. Environmental Protection Agency guideline level to estimate the distance from the noise
41  source area or haul routes at which noise would attenuate to these limits or guideline levels.

43    Primary sources of noise over the life of ULP activities would include operations of
44  aboveground and underground heavy equipment, on-road and off-road vehicle traffic, and, if
45  necessary, blasting. The average noise levels from typical construction equipment range from

BLM_0041794

1  74 dBA for a roller to 101 dBA for a pile driver (impact) at a distance of 50 ft (15 m)
2  (Hanson et al. 2006). In general, the dominant noise source from most construction equipment is
3  the diesel engine, which is continuously operating around a fixed location or has limited
4  movement. In a few cases, noise generated by pile driving or a rock drill would dominate. Except
5  for pile drivers and rock drills, noise levels for the type of construction equipment that would
6  probably be used at the ULP sites range from about 74 to 90 dBA at a distance of 50 ft (15 m).
7  To estimate noise levels associated with ULP activities, a composite noise level of 95 dBA at a
8  distance of 50 ft (15 m) from the mine site was conservatively assumed, if noisy equipment
9  (such as pile drivers or rock drills) was not being used. Typically, this level could be reached
10  when several pieces of noisy heavy equipment were operating simultaneously near each other at
11  peak load. For impact analysis along the haul routes, a peak "pass-by" noise level of 84 dBA
12  from a heavy-duty truck traveling at 55 miles per hour (55 mph or 88 km/h) was estimated
13  (Menge et al. 1998).
14
15      Several important factors affect the propagation of sound in the outdoor environment,
16  such as source characteristics, geometric spreading, ground effects, air absorption,
17  meteorological effects (due to turbulence and variations in vertical wind speed and temperature),
18  and screening by topography, structures, dense vegetation, and other natural or human-made
19  barriers. At this programmatic level, no detailed information (e.g., types and capacities of heavy
20  equipment, work schedules, specific locations of projects) was available, so screening-level
21  estimates were made by considering only geometric spreading and ground effects, as shown here
22  (Barry and Reagan 1978; Hanson et al. 2006):
23
24      $L_p = L_{p,ref} - (20 + 10\ G) \log_{10} (D/D_{ref})$ for point sources and
25
26      $L_p = L_{p,ref} + 10 \log_{10} (N\pi D_{ref}/(5280 \times ST)) - (10 + 10\ G) \log_{10} (D/D_{ref})$ for line sources,
27
28  where
29
30      $L_p$     = A-weighted sound pressure level at a given distance (dBA),
31      $L_{p,\ ref}$ = A-weighted sound pressure level at a reference distance (dBA),
32      $G$     = Ground factor that accounts for ground effects (unitless),
33      $D$     = Distance from the noise to the receptor (ft),
34      $D_{ref}$   = Reference distance (ft; assumed to be 50 ft or 15 m),
35      $N$     = Number of vehicles per hour,
36      5,280 = Conversion factor from miles to feet,
37      $S$     = Average vehicle speed (mph) (assumed to be 55 mph of 88 km/h), and
38      $T$     = Time period over which noise level is computed (assumed to be 1 hour).
39
40      For hard ground, $G = 0$. For soft ground, $G$ depends on the effective path height ($H_{eff}$), as
41  follows:
42
43      $G = 0.66$ if $H_{eff}$ is < 5 ft (or 1.5 m),
44      $G = 0.75 (1 - H_{eff}/42)$ if $H_{eff} \geq 5$ ft and < 42 ft, and
45      $G = 0$ if $H_{eff} \geq 42$ ft (or 13 m).

BLM_0041795

1   The ground was assumed to be soft for this analysis based on the land cover around the ULP
2   lease tracts. The effective path height ($H_{eff}$) is the average of the source height and the receptor
3   height. The source height for heavy equipment was assumed to be 7.9 ft (2.4 m), which is the
4   average height of drivetrain and exhaust contributions (Wayson 1993). The receptor height was
5   set at 5 ft (1.5 m), which is the approximate height of human ears from the ground.
6
7          Noise levels at receptor locations were estimated by using the above formulas. Day-night
8   average noise levels ($L_{dn}$ or DNL) were derived by assuming a work schedule of 10 hours per
9   day. For ULP activities, the distances where noise levels reach the Colorado daytime maximum
10  permissible limit of 55 dBA[1] and the EPA guideline level of 55 dBA $L_{dn}$ for residential areas
11  (EPA 1974) were estimated. In addition, the number of residences within this distance range
12  were counted, based on the assumption that the ULP activities would occur at the ULP lease tract
13  boundaries. During operations, the distances at which noise levels from heavy-duty trucks along
14  the haul routes would approach the Colorado limit and EPA guideline were estimated.
15
16         There are several specially designated areas (e.g., Dolores River Special Recreation
17  Management Area [SRMA], Dolores River Canyon Wilderness Study Area [WSA]) and other
18  nearby wildlife habitats around the DOE ULP lease tracts and haul routes where noise might be a
19  concern. Negative impacts on wildlife begin between 55 and 60 dBA, which corresponds to the
20  onset of adverse physiological impacts (Barber et al. 2010). Distances up to the lower threshold
21  level from the mine sites and from the haul routes were estimated to identify the range of noise
22  impacts on wildlife.
23
24
25  **D.3 GEOLOGY AND SOILS**
26
27         The geologic setting was established for the ULP lease tracts based on a review of aerial
28  maps, topographic maps, geologic maps, and the scientific literature. Geologic map data
29  (shapefiles) were obtained from the U.S. Geological Survey (USGS; see Stoeser et al. 2007).
30  References to the geologic time scale were based on the age ranges compiled by Walker and
31  Geissman (2009).
32
33         The impact assessment for soil resources relied on field observations, consultations with
34  DOE ULP management staff, and reviews of the academic and professional literature to
35  characterize site-specific soil conditions and identify the types of impact-producing activities
36  related to mining within the lease tracts.
37
38

---

[1]  Colorado Revised Statutes, Title 25, "Health," Article 12, "Noise Abatement," Section 103: "Maximum
permissible noise levels are source-oriented regulations (e.g., daytime level shall not exceed 55 dBA at 25 ft or
more from the residence's property boundary)." For this analysis, the Colorado limit for residential areas was
applied as a receptor-oriented regulation (e.g., daytime level shall not exceed 55 dBA at a residence) like other
noise guidelines or regulations.

BLM_0041796

1   Soil conditions within each of the ULP lease tracts were characterized by using
2   customized map data from the U.S. Department of Agriculture (USDA) Natural Resources
3   Conservation Service's (NRCS's) web soil survey (NRCS 2012) as a starting point and
4   supplementing it with information provided by state and local agencies, as available. Data on
5   various factors, such as soil texture and composition, parent materials, landforms on which the
6   soils developed, drainage class, permeability, surface runoff potential, rutting potential, whole
7   soil erodibility factor (K factor), wind erodibility group/index, and land classification, were
8   gathered to gain a general understanding of the soil's susceptibility to impacts that could result
9   from ground-disturbing activities. Information on special soil features, such as biological crusts,
10  was also obtained. Chapter 3 of the Draft PEIS (on the affected environment) provides general
11  soil maps and map unit descriptions for each of the four lease tract areas (Gateway, Uravan,
12  Paradox Valley, and Slick Rock). These maps are based on the soil units delineated on county
13  soil surveys at scales of 1:12,000 to 1:100,000 (USDA 1999). The types of potential soil impacts
14  are described in detail in Section 4.2.3.1, and information on the areas of potential disturbance
15  (subject to these impacts) is provided in the soil resources discussion under each alternative in
16  Chapter 4.
17
18
19  **D.4  WATER METHODOLOGY**
20
21  The analysis of water resources considered impacts on surface water features and
22  groundwater within the ULP lease tracts, the surrounding valleys, the entire groundwater basins,
23  as well as upstream/upgradient and downstream/downgradient valleys and groundwater basins
24  (if it was determined that there was connectivity and the potential for indirect impacts). The
25  surface water features considered were streams, lakes, wetlands, surface springs and seeps,
26  ephemeral washes/drainages, dry lakes, and floodplains.
27
28  Impacts on surface water and groundwater resources were mainly related to the alteration
29  of natural hydrologic conditions (e.g., surface runoff, infiltration, and groundwater
30  recharge/flow), degradation of water quality, and water usage. The assessment of impacts related
31  to hydrologic alterations and water quality was performed by using a variety of data sources
32  (e.g., geologic maps, aerial photographs, professional reports on standard mine practices, and the
33  scientific literature) to characterize water features and exercising professional judgment to
34  identify potential direct and indirect impacts from mining operations. For impacts related to
35  water usage, it was assumed that a small mine would use 500 gal/d (1,900 L/d), a medium-sized
36  mine would use 1,000 gal/d (3,800 L/d), a large mine would use 3,000 gal/d (11,000 L/d), and a
37  very large mine would use 2,000 gal/d (7,600 L/d). Consumptive water use during mine
38  development and operations was mainly for the workers' potable water supply.
39
40
41  **D.5  HUMAN HEALTH RISK**
42
43  Potential human health impacts were analyzed for the mine development and operations,
44  reclamation, and post reclamation phases. With regard to the exploration phase, any impacts that
45  might result during that phase were expected to be minimal, because exploratory drillings would

1  disturb only small areas, and because most of the mineralized cutting excavated from drilling
2  would be placed back to fill the drill holes. Furthermore, the exploration phase would last for
3  only a short period of time (i.e., a few weeks); therefore, potential impacts would be limited to
4  only a few workers. For these reasons, potential human health impacts associated with
5  exploratory drillings are not analyzed in the PEIS.
6
7
8  **D.5.1  Impact Assessment for the Operational Phase**
9
10  For this phase, potential impacts were analyzed for the workers and the general public
11  living near the uranium lease tracts as well as within 50 mi (80 km) around the lease tracts.
12  Because the impacts would primarily result from radiation exposures, they (especially radon
13  exposures) were the focus of the analyses conducted for this phase.
14
15  Potential impacts assessed for the workers (i.e., uranium miners) included physical
16  hazards and radiation exposures. Physical hazards included nonfatal injuries and illnesses as well
17  as fatal injuries. Statistical data for the mining industry published by the U.S. Department of
18  Labor, Bureau of Labor Statistics (BLS 2011a,b) were used for assessing physical hazards. The
19  potential radiation exposures of the workers, on the other hand, were assessed by using historical
20  data compiled by the United Nations Scientific Committee on the Effects of Atomic Radiation
21  (UNSCEAR 2010).
22
23  Radiation exposures of the general public would result primarily from radon emissions
24  from the exhaust vents of the uranium mines. The radon emission rates for three hypothetical
25  underground mines whose sizes ranged from small to medium to large were estimated on the
26  basis of their respective uranium ore production rates, as assumed in the working assumptions.
27  According to EPA (1985), the radon emission rate for an underground mine correlates linearly
28  with the cumulative uranium ore production. To obtain radon emission rates, an operational
29  period of 10 years was assumed for the uranium mines under consideration when assessing
30  human health impacts under Alternatives 3 and 4. An operational period of 7 years was assumed
31  when assessing impacts under Alternative 5. These time periods correspond roughly to the
32  expected lengths of the uranium leasing programs proposed for the different alternatives in the
33  PEIS. The emission rates from the same mines would be less if the operational period was
34  shorter. An emission rate of 600 Ci/yr was assumed for a very large open-pit mine, which,
35  according to the working assumptions, would be located on Lease Tract 7. This 600 Ci/yr
36  emission rate was determined based on the emission rates of actual open-pit mines compiled by
37  the EPA in its background report on National Emission Standards for Hazardous Air Pollutants
38  (NESHAP) and is at the upper end of the emission rates for the open-pit mines included in the
39  report (EPA 1989a).
40
41  The computer code, CAP88-PC (Trinity Engineering Associates, Inc. 2007), which is
42  supported and maintained by the EPA for use to demonstrate compliance with regulations, was
43  employed to estimate radon concentrations at various downwind locations. Potential maximum
44  radiation doses resulting from radon emissions associated with different sizes of uranium mines
45  were calculated. These calculation results were tabulated as functions of the distance from the

BLM_0041798

1   emission point and used for inferring the potential radiation dose to an individual living close to
2   the ULP lease tracts.
3
4       The collective dose to the general public living within 50 mi (80 km) around the lease
5   tracts was also calculated by using CAP88-PC (Trinity Engineering Associates, Inc. 2007).
6   However, rather than using the radon emission rate from a single uranium mine, the total radon
7   emission rate from all the uranium mines that would be operated at the same time was used.
8   Because the actual number of mines that would be operated at any time is not known, potential
9   human health impacts were analyzed only for the peak year of operations as defined in the
10  working assumptions (PEIS Chapter 1). It is expected that potential collective exposures in any
11  other year would be lower than those estimated for the peak year of operations. Because the
12  exact locations of the active mines during the peak year of operations are not known, the
13  potential range of the collective dose was inferred by placing the radon emission point at four
14  alternate locations. These four alternate locations were selected to be the center points of four
15  lease tract groups, which were formed by aggregating the uranium lease tracts whose geographic
16  locations are close to each other. Figure D.5-1 depicts the four lease tract groups used for
17  analyzing the population exposure. Population distributions within 50 mi (80 km) around the
18  center of each lease tract group were developed by using 2010 Bureau of the Census data.
19
20
21  **D.5.2  Impact Assessment for the Reclamation Phase**
22
23      For the reclamation phase, potential human health impacts were analyzed for the
24  reclamation workers and the general public living close to the uranium lease tracts. Both
25  chemical and radiological risks were analyzed. The radiation sources of concern were the
26  uranium isotopes and their decay products contained in the waste-rock piles. In addition to
27  emitting radiation, the uranium compounds could also pose chemical hazards to human health.
28  The vanadium content in the uranium ores is about 5 to 10 times higher than the uranium
29  content. As a result of intermixing from mining, the waste-rock piles could also contain
30  vanadium, which, if inhaled or ingested, could have deleterious effects on human health.
31
32      The reclamation workers were assumed to incur radiation exposures from working on top
33  of the waste-rock pile through three pathways: external radiation, inhalation of radioactive dust
34  particles and radon, and accidental soil ingestion. The exposures were analyzed by using
35  Version 6.5 of the RESRAD computer code (Yu et al. 2001). For chemical exposures, the
36  potential exposure pathways considered were inhalation of dust particles and incidental soil
37  ingestion. The EPA guidance on human health risk assessment (EPA 1989b) was followed to
38  evaluate the potential chemical risks that could result from exposures to uranium and vanadium
39  compounds.
40
41      The general public living near the uranium lease tracts would incur radiation and
42  chemical exposures through the airborne release of particulates from the waste-rock piles. In
43  addition, the release of radon could add to the potential radiation exposure. The emission rate of
44  radon was calculated by using Version 6.5 of the RESRAD code (Yu et al. 2001). To analyze

BLM_0041799

*Preliminary Draft PEIS*     *PEIS Privileged Information*     *May 2012*
*PEIS Team Use Only*     *Do Not Distribute*



**FIGURE D.5-1  Schematic Presentation
of the Uranium Lease Tract Groups**

potential radiation exposures of reclamation workers, RESRAD calculated the radon flux from
the surface of a waste-rock pile, which was multiplied by the surface area of the waste-rock pile
to obtain the radon emission rate. The release rate of dust particles was calculated based on an
emission factor representing wind erosion of active storage piles in coal mining (EPA 1995). The
emission factor for the storage piles in coal mining was reduced by a factor of 10 to reflect the
characteristics of rock fragments in the waste-rock piles. It is assumed that the suspension of
particulates caused by the wind blowing over the surfaces of hard waste-rock piles would be
much lower than the suspension of particulates from the surface of storage piles in coal mining.

On the basis of the emission rates of radon and particulates that were calculated by the
methods discussed in the preceding paragraph, concentrations of radon, uranium isotopes and
decay products, total uranium, and vanadium at various downwind locations from the emission
point were obtained by using CAP88-PC (Trinity Engineering Associates, Inc. 2007). These
concentrations at downwind locations were then used to infer potential radiation and chemical
exposures for an individual living close to the uranium lease tracts during the reclamation phase.

BLM_0041800

**D.5.3  Impact Assessment for Post Reclamation Phase**

The receptor considered for post reclamation phase human health impact analysis was a recreationist who unknowingly entered the uranium lease tract area. It was assumed that the recreationist would camp on top of a waste-rock pile for 2 weeks. Potential impacts would result from the inhalation of radon diffusing out from the waste-rock pile and the external radiation emitted by radionuclides contained in the waste-rock pile. The RESRAD code was used for dose calculations. Because it is expected that a layer of soil materials would be spread on top of the waste-rock pile to facilitate the growth of vegetation, it was assumed that any direct contact by humans with uranium and vanadium minerals contained in the waste rocks would be unlikely, that chemical exposure would therefore not occur, and that there would also not be any radiation exposure resulting from the inhalation of radioactive particulates or incidental soil ingestion.

The residents living close to the uranium lease tracts could still be exposed to radon emitted from the waste-rock piles. However, because of the cover soils spread on top of the waste-rock piles, the emission rate of radon would be reduced. As a result, the potential dose incurred by a resident after the reclamation phase would be less than the dose that the resident would incur during the reclamation phase.

**D.5.4  Parameter Values Used for Modeling Potential Radiation and Chemical Exposures**

For the impact analyses, a resident living close to or within 50 mi (80 km) of the uranium lease tracts was assumed to be at his residence for 350 days per year and to spend 8 hours outdoors and 16 hours indoors each day. Because the windows and doors of the residence would be closed most of the time, a dust or radon filtration factor of 0.4 was assumed (i.e., the indoor radon or airborne particulate level was assumed to be 40% of the outdoor level). The average inhalation rate was assumed to be 8,000 m$^3$/yr (the default value used in CAP88-PC), while the average soil ingestion rate was assumed to be 100 mg/d.

For reclamation workers, an exposure duration of 20 days was used for impact analyses. The inhalation rate was assumed to be 8,000 m$^3$/yr, and the soil ingestion rate was assumed to be 100 mg/d. As was assumed for the recreationist who camps on a waste-rock pile, an exposure duration of 2 weeks was assumed. The individual was assumed to have the same inhalation and soil ingestion rate as a reclamation worker.

For modeling radon emissions from a waste-rock pile, an emanation factor of 0.15 was assumed based on experimental measurement data taken from rock samples (Ferry et al. 2002; Sakoda et al. 2010). The RESRAD default value of $2 \times 10^{-6}$ m$^2$/s was assumed for the radon diffusion coefficient, while the porosity in a waste-rock pile was assumed to be 0.2.

For CAP88-PC analysis, the emission of radon from an underground mine was modeled as a stack source, with a release height of 3 ft (1 m) and a diameter of 6.0 ft (1.8 m), taken from the diameter of the ventilation shaft in the *Final Environmental Assessment for the Whirlwind Mine Uranium Mining Project* (BLM 2008). An exit velocity of 16 ft/s (5 m/s) was assumed for

BLM_0041801

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                   *Do Not Distribute*

1  the gas escaping from the exhaust vents. This exit velocity was obtained by considering the
2  average ventilation rate in an underground mine, the number of exhaust vents, and the diameter
3  of the exhaust vents. An average annual precipitation of 1 ft/yr (0.32 m/yr), ambient temperature
4  of 50°F (10°C), and absolute humidity of 8 g/m$^3$ were selected to reflect site-specific conditions.
5  An average mixing height of 4,900 ft (1,500 m), considering both morning and afternoon
6  conditions, was also assumed for the analyses. For the analysis involving an open-pit mine, the
7  emission of radon was assumed to come from an area source that occupied 100 acres (40 ha)—or
8  50% of the disturbed area—according to the working assumptions (Chapter 1). The release
9  height was 0 ft (0 m), and there was no plume rise for release from the open-pit mine.
10
11

12  **D.5.5 Dose Conversion Factors and Toxicity Values**
13

14       The exposure concentration of radon is usually expressed as a working level (WL), which
15  is a measure of the release of alpha energy by the short-lived progenies of radon. The exposures
16  are measured in working level months (WLMs). One WLM is equivalent to an exposure of
17  170 hours to a concentration of 1 WL. UNSCEAR recommends that an exposure of 1 WLM
18  corresponds to 506 mrem of effective dose for workers (UNSCEAR 2008, 2010). For the general
19  public, the corresponding effective dose of an exposure of 1 WLM is about 388 mrem
20  (UNSCEAR 2008). The difference in the conversion from WLM to effective dose used for
21  workers and the conversion used for the general public lies in the different inhalation rates
22  considered for the conversion. The International Commission on Radiation Protection
23  (ICRP 2011) indicates that, based on the pooled results from studies of radon-exposed miners, a
24  lifetime excess risk of $5 \times 10^{-4}$ per WLM should be used for estimating radon progeny-induced
25  lung cancer.
26

27       Potential radiation doses resulting from exposures to uranium isotopes and their decay
28  products were calculated by using the ICRP 60-based dose conversion factors for inhalation and
29  ingestion. The corresponding cancer risks were calculated by using the slope factors obtained
30  from Federal Guidance Report No. 13 (Eckerman et al. 1999).
31

32       Potential chemical risks that could result from exposures to uranium and vanadium
33  compounds were assessed by comparing the estimated exposures with threshold values. The
34  threshold values used are reference concentrations (RfCs) for inhalation exposures and reference
35  doses (RfDs) for ingestion exposures. The Rfd used for assessing risks associated with vanadium
36  exposure is 0.009 mg/kg-d , obtained from the EPA Integrated Risk Information System (IRIS)
37  for $V_2O_5$ (EPA 2012c). The Rfc used is 0.0001 mg/m$^3$ from the Agency for Toxic Substances
38  and Disease Registry (ATSDR 2012). Because no Rfc value is provided in IRIS or the Health
39  Effect Assessment Summary Tables (HEASTs) for vanadium, the minimum risk level (MRL)
40  proposed by the ATSDR for chronic exposure was used as a surrogate for Rfc. The Rfc used for
41  assessing risks associated with uranium exposure is 0.0008 mg/m$^3$ (ATSDR 2012), which is the
42  MRL proposed by ATSDR for chronic exposure to insoluble uranium compounds. The Rfd used
43  for uranium is 0.003 mg/kg-d, obtained from the IRIS database (EPA 2012c).
44

BLM_0041802

1    **D.5.6  Comparison of CAP88-PC Results and COMPLY-R Results**
2
3          According to Title 40 in the *Code of Federal Regulations* (40 CFR Part 61), emissions of
4    Rn-222 to the ambient air from an underground uranium mine must not result in any member of
5    the general public receiving in any year an effective dose of 10 mrem/yr or greater. Owners or
6    operators of uranium mines may use COMPLY-R (EPA 1989c) or a model equivalent to
7    COMPLY-R, provided they have received approval from EPA headquarters, to demonstrate
8    compliance with this requirement. The CAP88-PC computer code (Trinity Engineering
9    Associates, Inc. 2007) was selected and used for conducting analyses in the PEIS because it has
10   been supported and maintained by the EPA and used extensively in human health risk
11   assessments for evaluating potential radiation exposures resulting from airborne emissions of
12   radionuclides, including radon. The emissions considered by CAP88-PC can originate from point
13   sources, such as the exhaust vents of underground uranium mines, or from area sources, such as
14   the waste-rock piles accumulated from uranium mining activities. In addition to being used to
15   estimate the radiation dose to an individual, CAP88-PC can also be used to estimate the
16   collective dose to a population living or working around the emission sources. Consistency in the
17   methodology was maintained by applying CAP88-PC to evaluate the potential exposures of the
18   general public, both as individual members and collectively, associated with the different phases
19   of uranium mine operations considered in the PEIS.
20
21          Here in this section, the calculation results of CAP88-PC and COMPLY-R associated
22   with the release of radon during the operation of a small underground uranium mine (which was
23   defined by the working assumptions described in Chapter 2 of the PEIS) are compared. This
24   small uranium mine was assumed to produce 50 tons of uranium ore per day, with an annual
25   production rate of 12,000 tons/yr (10,800 metric tons/yr). The mining activities were assumed to
26   have been conducted for 10 years. Based on the equation proposed by the EPA (EPA 1985) that
27   correlates the radon emission rate with the cumulative uranium ore production, a radon emission
28   rate of 528 Ci/yr was calculated. The volumetric flow rate from the exhaust vent was calculated
29   to be 450 ft$^3$/s (12.72 m$^3$/s), corresponding to an exit speed of 16 ft/s (5 m/s) and a diameter of
30   5.9 ft (1.8 m) as used in the CAP88-PC analysis. The vent was assumed to be vertical and had a
31   height of 3.3 ft (1 m) above the ground. Both the ambient temperature and the temperature of the
32   exhaust stream were 50°F (10°C). By using the joint frequency data (Rogers 2011) collected
33   from a 3.3 ft high (10 m high) meteorological tower installed by Energy Fuels Resources
34   Corporation in the proposed Piñon Ridge Mill site in Montrose County, Colorado, the frequency
35   and average wind speed in each of the 16 directional sectors were calculated (Table D.5-1).
36   These data represent the site-specific conditions from April 2008 to March 2011.
37
38          Table D.5-2 compares the maximum radon doses calculated with CAP88-PC and those
39   calculated with COMPLY-R at different distances from the radon emission point. The radon
40   doses calculated with CAP88-PC were much smaller than those calculated with COMPLY-R for
41   shorter distances, but the difference became smaller as the distance increased. According to the
42   user's guide (EPA 1989c), COMPLY-R uses a conversion factor of 920 mrem/WLM to convert
43   radon exposures to effective doses, and, by default, a receptor was assumed to spend 75% of the
44   exposure time indoors. For the CAP88-PC results, an updated conversion factor of
45   388 mrem/WLM (UNSCEAR2008) was used, and a receptor was assumed to spend 16 hours

BLM_0041803

1
2
3

**TABLE D.5-1  Meteorological
Data Used in the COMPLY-R
Calculations**

| Wind from | Frequency | Speed (m/s) |
|---|---|---|
| N | 0.026 | 2.63 |
| NNE | 0.015 | 1.98 |
| NE | 0.015 | 1.53 |
| ENE | 0.018 | 1.43 |
| E | 0.04 | 1.7 |
| ESE | 0.137 | 2.16 |
| SE | 0.139 | 2.01 |
| SSE | 0.054 | 2.01 |
| S | 0.047 | 3.47 |
| SSW | 0.077 | 5.02 |
| SW | 0.07 | 4.54 |
| WSW | 0.061 | 3.1 |
| W | 0.07 | 2.58 |
| WNW | 0.094 | 2.41 |
| NW | 0.09 | 2.87 |
| NNW | 0.047 | 2.85 |

4
5
6
7
8

**TABLE D.5-2  Comparison of the Radon Doses
Calculated by CAP88-PC and Those Calculated
by COMPLY-R**

| | Radon Dose (mrem/yr) | | |
|---|---|---|---|
| Distance (m) | CAP88-PC | COMPLY-R | Ratio[a] |
| 500 | 7.8 | 35.7 | 4.56 |
| 1,000 | 5.6 | 12.0 | 2.13 |
| 1,500 | 3.7 | 6.5 | 1.75 |
| 2,000 | 2.7 | 4.3 | 1.61 |
| 3,000 | 1.6 | 2.5 | 1.53 |
| 4,000 | 1.2 | 1.7 | 1.39 |
| 5,000 | 1.0 | 1.3 | 1.34 |

[a]   The ratio is calculated as COMPLY-R divided by
CAP88-PC.

9
10
11

BLM_0041804

1    indoors and 8 hours outdoors each day for 350 days per year at the same location. Furthermore,
2    the indoor radon level was assumed to be 40% of the outdoor level; both levels were calculated
3    by CAP88-PC. If the same exposure-to-dose conversion factor is used in both sets of
4    calculations, the radon dose calculated with COMPLY-R is greater than that calculated with
5    CAP88-PC if the exposure distance is less than 4,900 ft (1,500 m). However, at 4,900 ft
6    (1,500 m) or more, the radon dose calculated with COMPLY-R is smaller than that calculated
7    with CAP88-PC.
8
9
10   **D.6  ECOLOGICAL RESOURCES**
11
12
13   **D.6.1  Vegetation**
14
15        This section describes the methodology used to evaluate potential impacts on vegetation
16   within the potentially affected area of the ULP lease tracts.
17
18
19        **D.6.1.1  Vegetation Included in the Assessment**
20
21        Vegetation considered in the assessment included plant communities that were associated
22   with the ecoregions and land cover types mapped for the potentially affected area (see data
23   sources below). Habitats associated with wetland types, or other water-dependent habitats,
24   known to occur in the potentially affected area were also included.
25
26
27        **D.6.1.2  Affected Area**
28
29        The affected area considered in this assessment included the areas of direct and indirect
30   effects. The area of direct effects was defined as the area that would be physically modified
31   during project development (i.e., where ground-disturbing activities would occur). The area of
32   direct effects encompassed the entire lease tracts, which included all project components and
33   access roads.
34
35        The area of indirect effects was defined as the area where ground-disturbing activities
36   would not occur but that could be indirectly affected by activities in the area of direct effects.
37   This indirect effects area was defined as the area outside the lease tracts but within 5 mi (8 km)
38   of the tract boundary. The area of indirect effects could be affected by project activities in the
39   area of direct effects related to groundwater withdrawals, surface runoff, dust, and accidental
40   spills. The distance from the lease tract boundary used to define this area of indirect effects was
41   based on professional judgment and was considered sufficiently large to bound the area that
42   would potentially be subject to indirect effects. The potential magnitude of indirect effects would
43   decrease with increasing distance from the lease tract.
44
45

BLM_0041805

*Preliminary Draft PEIS*        *PEIS Privileged Information*        *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*

**D.6.1.3  Data Sources**

The types of data used to determine the known or potential presence of plant communities in the vicinity of the DOE ULP lease tracts were collected from various sources and at different geographical and organizational levels. Sources of information included, but were not limited to, the following:

- Level III and Level IV ecoregions (Chapman et al. 2006);

- Gap analysis programs—Southwest Regional Gap Analysis Project (SWReGAP) (USGS 2004, 2005);

- State noxious weed lists; and

- National Wetlands Inventory (USFWS 2009).


**D.6.1.4  Analysis Approach**

Plant communities that were known to occur or could potentially occur within the affected area were included in the impact analysis. A landscape-level analysis was used to determine impacts by quantifying the total number of acres of each land cover type, encompassing a range of similar plant communities, within the area of direct effects.

The magnitudes of impacts on plant communities would depend on the locations of projects, project-specific designs, the mitigation measures applied (including avoidance, minimization, and compensation), and the statuses of plant communities in project areas.

The analysis of impacts on environmental resources from mining and reclamation activities was based, in part, on a set of assumptions regarding site preparation and reclamation activities. These assumptions were based on management practices at existing mines and current DOE guidance and were used for the evaluation of impacts at the programmatic level.

The actual extent of land disturbance within the footprint of any mine site would be specified in a detailed plan. However, to ensure an upper-bound assumption for the impact analyses, the entire project area was assumed to be cleared of all vegetation during site preparation. Development and operations were assumed to continue for 8 to 15 years. Ground disturbance was assumed to range from 10 acres (4 ha) for small mines to 20 acres (8 ha) for a large mine. In addition, the very large, 200-acre (80-ha) open pit mine at JD-7 was assumed to resume operations under some of the alternatives.

It was assumed that immediately following the decommissioning of a mine, land surfaces would be recontoured to the greatest extent feasible. The operator would subsequently establish vegetation on the waste-rock area and other disturbed areas. It was assumed that reclamation activities would occur over a 2-year period and would include grading to create landforms

BLM_0041806

conforming with the surrounding area, application of topsoil, and seeding. The seed mix would be approved by DOE, in consultation with the BLM, for use in reclamation of all lease tracts. The desired plant community at each mine site would depend on site-specific conditions and would be determined on a case-by-case basis. The final determination of successful vegetation establishment would be made by the State of Colorado. It might be that follow-up activities would be required to correct deficiencies in community composition or cover.

### D.6.2  Wildlife And Aquatic Biota

Potential impacts on wildlife and aquatic biota considered mine development and operations, and reclamation on terrestrial and aquatic species and their habitats at and in the vicinity of the lease tracts. Direct and indirect impacts on ecological resources were evaluated on the basis of:

- The quality and quantity of habitats present,

- The potential magnitude of changes to habitat quality and quantity,

- The season when impacts could occur,

- The expected duration of impacts,

- The sensitivity of biological resources that could be affected by changes in habitat quality or quantity, and

- The rarity and importance of affected resources.

Impacting factors considered in evaluating impacts from mining in the lease tracts included these:

- Habitat loss, modification, and fragmentation;

- Barriers to movement;

- Changes in stream flow and water quality;

- Erosion and sedimentation;

- Air quality and fugitive dust;

- Introduction of invasive species;

- Exposure to contaminants (including radionuclides);

BLM_0041807

*Preliminary Draft PEIS*   *PEIS Privileged Information*   *May 2012*
*PEIS Team Use Only*   *Do Not Distribute*

1 • Mortality and injury, and

3 • Noise and disturbance.


**D.6.2.1  Wildlife**

This section describes the methodology used to evaluate impacts on wildlife known to occur, or for which suitable habitat could occur, within the potentially affected area of the ULP lease tracts.


**D.6.2.1.1  Wildlife Species Included in the Assessment.** Wildlife species considered in the assessment included representative amphibian, reptile, bird, and mammal species. Representative species were selected among those species known to occur, or for which potentially suitable habitat occurs, within the lease tract areas. To a large extent, the selection of representative species was based on whether a species (1) has key habitats within or near the lease tracts, (2) is important to humans (e.g., big game, small game, and furbearer species), (3) is representative of other species that share predominant habitats found in the lease tracts; (4) could make use of lease tract mines (e.g., bats), or (5) has some type of regulatory protection (e.g., Migratory Bird Treaty Act). To the extent practicable, representative species included wildlife species whose range included the three-county study area or at least extended throughout the region for all or most of the lease tracts.


**D.6.2.1.2  Affected Area.** For the wildlife impact assessment, the affected area included that portion of Mesa, Montrose, and San Miguel Counties that encompassed the lease tracts.


**D.6.2.1.3  Data Sources.** The types of data used to determine the known or potential presence of wildlife species and life history information on the species were collected from various sources and at different geographical and organizational levels. The most current, location-specific data at the highest resolution were used whenever available. Sources of information included, but were not limited to, the following:

• Colorado National Heritage Program (CNHP 2009) and Colorado Division of Wildlife (CDOW 2011);

• Gap analysis programs—SWReGAP (USGS 2004, 2005, 2007); and

• NatureServe (2011).

BLM_0041808

**D.6.2.1.4 Analysis Approach.** Because of the uncertainty regarding species distributions and the inherent challenges involved with tracking wildlife species in a lease tract area, a conservative approach was used to determine the potential for species to occur on or in the vicinity of the lease tracts. The identification of potential wildlife species in the general area of the lease tracts was based on (1) county-level occurrences, (2) locations of species observations as determined by Colorado's wildlife and/or natural heritage agencies, and (3) occurrences of identified land cover for the species listed by SWReGAP (USGS 2005).

Spatial data provided by state natural heritage and regional gap analysis programs were used to determine whether potentially suitable habitat occurred in the affected area. Gap analysis program data consisted of vertebrate animal land cover models. When maps of key habitats for a big game or game bird species (e.g., crucial winter range) were available, the acreages of those habitats within each of the lease tracts were determined by using ESRI ArcGIS Version 9 software.

A landscape-level analysis was used to determine impacts by quantifying the total acreage of potentially suitable habitat for representative species within the lease tracts relative to the total acreage of potentially suitable habitat potentially affected by each leasing alternative.

With regard to the assessment of vegetation, relative impact magnitude categories were based on Council on Environmental Quality (CEQ) regulations for implementing the National Environmental Protection Act (NEPA; see 40 CFR 1508.27). They were as follows:

- *None:* No impacts are expected.

- *Small:* Effects would not be detectable or would be so minor that they would neither destabilize nor noticeably alter any important attribute of the resource. (For this analysis, impacts were considered small if ≤1% of identified habitat for a representative species would be lost in the region of influence.

- *Moderate:* Effects would be sufficient to alter noticeably but not destabilize important attributes of the resource. (For this analysis, impacts were considered moderate if ≥1% but <10% of identified habitat for a representative species would be lost in the region.)

- *Large:* Effects would be clearly noticeable and sufficient to destabilize important attributes of the resource. (For this analysis, impacts were considered large if 10% or more of identified habitat for a representative species would be lost in the region.)

Actual impact magnitudes on wildlife species would depend on the locations of projects, project-specific designs, mitigation measures applied (including avoidance, minimization, and compensation), and statuses of the species and their habitats in the project areas.

BLM_0041809

### D.6.2.2  Aquatic Biota

This section describes the methodology used to evaluate direct and indirect impacts on aquatic habitats and biota known to occur on or within the potentially affected area of the ULP lease tracts.

**D.6.2.2.1  Affected Area.** For the aquatic biota impact assessment, the affected area is similar to that for the wildlife assessment (see Section D.6.2.1.1).

**D.6.2.2.2  Analysis Approach.** Aquatic habitat and communities were assessed by first determining the perennial and intermittent/ephemeral surface water features (streams and other water bodies) within or adjacent to the lease tracts. The occurrences of surface water features were based on data from the U.S. Geological Survey (USGS) national atlas (http://nationalatlas. gov/mapmaker) and available reports.

Descriptions of aquatic communities within the aquatic habitats were derived from state records, reports conducted on aquatic systems in the lease tract area, and existing NEPA documents for the lease tract area. For many of the ephemeral/intermittent washes and rivers, no data were available. Many of the surface water features in the lease tracts are ephemeral and are not expected to contain aquatic habitat or biota. However, with sufficient frequency and flow, ephemeral or intermittent surface water may contain a diverse seasonal community of opportunistic species or habitat specialists adapted to living in temporary aquatic environments. Such specialists may be present in a dormant state even in dry periods. Therefore, aquatic biota could be present at least temporarily. Also, mining activities could affect permanent water features located near some of the lease tracts. To better resolve whether aquatic habitat and biota are present within or near a lease tract, site-specific surveys of aquatic communities are presumed to be required prior to mine development.

It was assumed that impacts on aquatic habitat and communities could potentially result from direct disturbance; surface water and groundwater withdrawals; and changes in water, sediment, and contaminant inputs to surface water features. Based on best professional judgment, much greater weight was given to the magnitude of direct effects, because those effects would be difficult to mitigate. The potential for indirect impacts on surface water outside the lease tracts was evaluated on the basis of their proximity and connectivity to surface water inside the lease tracts. In most cases, it was assumed that mitigation would reduce most indirect effects to negligible levels. Actual impacts on aquatic habitat and biota would depend on the locations of mines relative to surface water, mine-specific designs, and mitigation measures applied (including avoidance, minimization, and compensation). Mitigation was considered if there was a potential for impacts on aquatic habitat and biota.

BLM_0041810

**D.6.3  Threatened, Endangered, and Sensitive Species**

### D.6.3.1  Species Included in the Assessment

Potential impacts on threatened, endangered, and sensitive species were evaluated in a manner similar to that used for plant communities and habitats and wildlife and aquatic resources (D.6.1 and D.6.2), and impacts from mine development and operations, and reclamation on these species and their habitats at and in the vicinity of the lease tracts were considered. The following types of species were evaluated in the PEIS as threatened, endangered, or sensitive species:

- Species listed as threatened or endangered under the Endangered Species Act (ESA), or that are proposed or candidates for listing under the ESA;

- Species that are listed by the BLM as sensitive;

- Species that are listed by the U.S. Forest Service (USFS) as sensitive; and

- Species that are listed as threatened or endangered by the state of Colorado.

Data used to determine baseline conditions and evaluate impacts of the ULP on threatened, endangered, and sensitive species were obtained from these sources:

- USFWS Information, Planning, and Conservation (IPaC) System (USFWS 2011a);

- USFWS Critical Habitat Portal (USFWS 2011b);

- NatureServe Explorer (NatureServe 2011);

- Colorado Natural Heritage Program Rare Plant Guide (CNHP 2011a);

- Colorado Natural Heritage Program element occurrence records (CNHP 2011b);

- Colorado Division of Wildlife Natural Diversity Information Source (CDOW 2011); and

- SWReGAP (USGS 2007).

**D.6.3.2  Affected Area.** The affected area includes areas that may be directly or indirectly affected by activities conducted under the ULP. The area of direct effects for threatened, endangered, and sensitive species includes that portion of Mesa, Montrose, and San Miguel Counties that intersect the lease tracts. The area of indirect effects for threatened,

BLM_0041811

1  endangered, and sensitive species encompasses a larger area that includes habitats that could be
2  affected by indirect factors including, but not limited to, groundwater withdrawal; changes in
3  water quality, sedimentation, and erosion; dispersion of contaminants (including radionuclides);
4  and fugitive dust dispersion. The spatial extent for the area of indirect effects was qualitatively
5  defined based on the species' biology and potential mechanisms of impacts. For example, the
6  areas of indirect effects for aquatic species are generally larger than those for terrestrial species.
7  The magnitude of indirect impacts decreases with increasing distance from the lease tracts.
8
9
10  **D.6.3.3  Analysis Approach.** Because of the uncertainty regarding species distributions
11  and the inherent challenges involved with tracking species in the lease tract area, a conservative
12  approach was used to determine the potential for species to occur on or in the vicinity of the
13  lease tracts. The identification of potential threatened, endangered, and sensitive species in the
14  general area of the lease tracts was based on (1) county-level occurrences, (2) locations of
15  species observations as determined by Colorado wildlife and/or natural heritage agencies, and
16  (3) occurrences of potentially suitable habitat for the species listed by SWReGAP (USGS 2007).
17
18  Spatial data provided by the CNHP and SWReGAP were used to determine whether
19  potentially suitable habitat occurred in the affected area. The SWReGAP habitat suitability
20  models consisted only of vertebrate animal land cover models.
21
22  A spatial analysis was performed by using ESRI ArcGIS 10 software to determine the
23  intersections of the ULP lease tracts with CNHP element occurrences and SWReGAP habitat
24  suitability models. Based on this analysis, a determination was made regarding the species'
25  known or potential occurrence on the lease tract. A lack of data did not preclude a species from
26  potentially occurring in a given area. In cases where there was a lack of CNHP records or
27  SWReGAP habitat suitability models for a species, modeled land cover types were used to
28  determine the potential suitability of the affected area with regard to what is known about the
29  species' biology and habitat preferences.
30
31  Relative impact magnitude categories were based on CEQ regulations for implementing
32  NEPA (40 CFR 1508.27) and were as follows:
33
34  •  *None.* No impacts are expected.
35
36  •  *Small.* Effects would not be detectable or would be so minor that they would
37     neither destabilize nor noticeably alter any important attribute of the resource.
38
39  •  *Moderate.* Effects would be sufficient to alter noticeably but not destabilize
40     important attributes of the resource.
41
42  •  *Large.* Effects would be clearly noticeable and sufficient to destabilize
43     important attributes of the resource.
44

BLM_0041812

1   Actual impact magnitudes on threatened, endangered, and sensitive species would depend
2   on the locations of projects, project-specific designs, and mitigation measures applied (including
3   avoidance, minimization, and compensation.
4
5
6   **D.7  LAND USE**
7
8   The area of analysis focused on public and private lands within a 25-mi (40-km) radius of
9   the ULP lease tracts. Existing right-of-way (ROW) authorizations and land designations under
10  BLM's lands and realty program were identified (including specially designated lands with
11  wilderness characteristics). Other information on agriculture, livestock grazing, wild horses and
12  burros, mineral resources (and mining), oil and gas leasing, timber harvest, and recreation were
13  obtained from federal and state sources. Major sources of information included (1) BLM's
14  resource management plans, the national landscape conservation system, public land statistics,
15  and the Land and Mineral Legacy Rehost 2000 system (LR2000); (2) USDA's 2007 census of
16  agriculture and resource bulletins; and (3) various reports and database searches from web sites
17  sponsored by the Colorado Department of Natural Resources (CDNR), Colorado Division of
18  Reclamation Mining and Safety (CDRMS), Colorado Oil and Gas Conservation Commission
19  (COGCC), Utah Geological Survey; Utah Division of Oil, Gas, and Mining.
20
21  The impacts analysis for land use considered issues such as land use conflicts within the
22  lease tracts (e.g., mining, oil and gas leasing, livestock grazing, and recreation), whether or not
23  lease tracts would be open to mineral entry (under the various alternatives), and visual impacts at
24  specially designated lands. The main factors considered as part of the land use impacts analysis
25  were the (1) proximity of lease tracts to specially designated areas, (2) nature of the resources
26  and resource values present within the proximate specially designated areas, and (3) quality of
27  the view of the lease tracts from these areas.
28
29
30  **D.8  SOCIOECONOMICS**
31
32  The analysis of socioeconomic impacts from the mining activities at the DOE ULP lease
33  tracts assessed impacts in a region of influence (ROI). The ROI includes Mesa, Montrose, and
34  San Miguel Counties in Colorado, in which the majority (up to 90%) of employees for the DOE
35  ULP proposed mines would reside. The ROI includes county governments, city governments,
36  and school districts. The assessment of the impacts from mining at the DOE ULP lease tracts
37  covered impacts on employment, income, population, housing, community services, and traffic.
38
39
40  **D.8.1  Regional Employment and Income**
41
42  The assessment of impacts from mining activities on regional employment and income
43  was based on the use of regional economic multipliers in association with project expenditure
44  data for the mine development and operations phase and reclamation phase. Multipliers captured

BLM_0041813

1　the indirect (off-site) effects of on-site activities associated with mining operational and
2　reclamation activities. Data on expenditures were derived from numerous sources.
3
4　　　　Cost data for each cost category were then mapped into the relevant North American
5　Industry Classification System (NAICS) codes for use with multipliers from an IMPLAN model
6　specified for each state (MIG 2011). IMPLAN input-output economic accounts show the flow of
7　commodities to industries from producers and institutional consumers. The accounts also show
8　consumption activities by workers, owners of capital, and imports from outside the region. The
9　IMPLAN model contains 528 sectors representing industries in agriculture, mining, construction,
10　manufacturing, the wholesale and retail trade, utilities, finance, insurance and real estate, and
11　consumer and business services. The model also includes information for each sector on
12　employee compensation; proprietary and property income; personal consumption expenditures;
13　federal, state, and local expenditures; inventory and capital formation; and imports and exports.
14
15　　　　Impacts on employment were described in terms of the total number of jobs created in the
16　ROI in the peak years for mine development and operations and reclamation. The relative impact
17　of the increase in employment in the ROI was calculated by comparing the total mining
18　employment (without considering USL-related activities), over the same period, with the
19　employment that was assumed in order to estimate the number of jobs created by USL mine
20　development, operations, and reclamation activities. Impacts were expressed in terms of the
21　percentage point difference in the average annual employment growth rate with and without the
22　DOE ULP mining and reclamation activities. Forecasts were based on data provided by the
23　U.S. Department of Commerce.
24
25
26　**D.8.2  Population**
27
28　　　　An important consideration in the assessment of the impacts from DOE ULP mining and
29　reclamation activities was the number of workers, families, and children who would migrate into
30　the ROI, either temporarily or permanently. The capacity of regional labor markets to supply a
31　sufficient number of workers in the occupations required for mining and reclamation is closely
32　related to the occupational profile of the ROI and occupational unemployment rates. To estimate
33　the in-migration that would occur to satisfy direct labor requirements, the analysis developed
34　estimates of the available labor in each direct labor category based on ROI unemployment rates
35　applied to each occupational category. In-migration associated with indirect labor requirements
36　were derived from estimates of the available labor supply in the ROI economy as a whole that
37　would be able to satisfy the demand for labor by industry sectors in which mining and
38　reclamation spending initially occurred. The national average household size (2.6) was used to
39　calculate the number of additional family members who would accompany direct and indirect
40　in-migrating workers. Based on other analyses of energy project labor in-migration (Fahys-
41　Smith 1983), it was assumed that 28% of the workers in-migrating into each ROI would bring
42　their family members with them.
43
44　　　　Impacts on population were described in terms of the total number of in-migrants arriving
45　in the ROI in the peak year(s) of DOE ULP mining and reclamation. The relative impact of the

BLM_0041814

1    increase in population in the ROI was calculated by comparing total DOE ULP in-migration over
2    the period in which mining and reclamation was assumed to occur with baseline ROI population
3    forecasts over the same period. Impacts were expressed in terms of the percentage point
4    difference in the average annual population growth rate with and without the DOE ULP mining
5    and reclamation activities. Forecasts were based on data provided by the Colorado State
6    Demography Office.
7
8
9    **D.8.3  Housing**
10
11        The in-migration of workers occurring during mine development and operations has the
12   potential to affect the housing market in the ROI. The analysis considered these impacts by
13   estimating the increase in demand for rental housing units in the peak year(s) of operations and
14   reclamation that would result from the in-migration of both direct and indirect workers into the
15   ROI. The impacts on housing were described in terms of the number of rental units required in
16   the peak year of operations. The relative impact on the existing housing in the ROI was
17   estimated by calculating the impact of mining-related housing demand on the number of vacant
18   rental housing units in the peak year of operations.
19
20
21   **D.8.4  Community Services**
22
23        In-migration associated with mining activities could translate into an increased demand
24   for educational and public services (schools, police, firefighters, health services, etc.) in the ROI.
25   Impacts of mining activities on community service employment were also calculated for the ROI
26   in which the majority of new workers would locate. The analysis used estimates of the number of
27   in-migrating workers and families to calculates the number of newly sworn police officers,
28   firefighters, and general government employees who would be required to maintain the existing
29   levels of service for each community service. Calculations were based on the existing number of
30   employees per 1,000 persons for each community service. The analysis of the impact on
31   educational employment estimated the number of teachers in each school district who would be
32   required to maintain existing teacher-student ratios across all student age groups. Information on
33   existing employment and levels of service was collected from the individual jurisdictions
34   providing each service.
35
36
37   **D.8.5  Recreation**
38
39        Mining activities could have impacts on recreation. Providing quantitative estimates of
40   these potential impacts is difficult as it is unclear how mining operations and reclamation would
41   affect visits by recreationists. An approach to quantify the magnitude of the potential impacts to
42   the economy (for tourism and recreation) was developed for this Draft PEIS in order to provide
43   some perspective. The approach examined the impact of a 1%, 5%, and a 10% reduction in ROI
44   employment and income in the recreation sector. Impacts were estimated by using IMPLAN data
45   for the ROI (MIG 2011). Impacts on employment were described in terms of the total number of

BLM_0041815

1  jobs that would be lost in the ROI from a reduction in the recreation sector. The relative impact
2  of the decrease in employment in the ROI was calculated by comparing total recreation
3  employment over the period assumed for the proposed mining activities with recreation
4  employment forecasts for the ROI (without the proposed action) for the same period.
5
6
7  **D.9  ENVIRONMENTAL JUSTICE**
8
9       Exploration, mine development and operations, and reclamation of uranium mines at the
10  DOE ULP lease tracts could affect environmental justice if any adverse health and
11  environmental impacts resulting from any phase were significantly high and if these impacts
12  would disproportionately affect minority and low-income populations. If the analysis determined
13  that health and environmental impacts were not significant, there could not be any
14  disproportionate impacts on minority and low-income populations. If the analysis determined
15  that those impacts were significant, disproportionality would be determined by comparing the
16  proximity of any high and adverse impacts with the locations of low-income and minority
17  populations.
18
19       The analysis of environmental justice issues associated with the development of uranium
20  facilities considered impacts within the proposed leasing areas and an associated 50-mi (80-km)
21  radius around the boundary of the proposed leasing areas. The geographic distributions of
22  minority and low-income groups in the 50-mi (80-km) radius was based on demographic data
23  from the U.S. Bureau of the Census (2011a,b). The following definitions were used to define
24  minority and low-income population groups:
25
26       •    *Minority.* Persons are included in the minority category if they identify
27            themselves as belonging to any of the following racial groups: (1) Hispanic,
28            (2) Black (not of Hispanic origin) or African American, (3) American Indian
29            or Alaska Native, (4) Asian, or (5) Native Hawaiian or Other Pacific Islander.
30
31            Beginning with the 2010 Census, where appropriate, the census form allows
32            individuals to designate multiple population group categories to reflect their
33            ethnic or racial origin. In addition, persons who classify themselves as being
34            of multiple racial origins may choose up to six racial groups as the basis of
35            their racial origins. The term minority includes all persons, including those
36            classifying themselves in multiple racial categories, except those who classify
37            themselves as not of Hispanic origin and as White or "Other Race"
38            (U.S. Bureau of the Census 2011a).
39
40            The CEQ guidance proposed that minority populations should be identified
41            where either (1) the minority population of the affected area exceeds 50%, or
42            (2) the minority population percentage of the affected area is meaningfully
43            greater than the minority population percentage in the general population or
44            other appropriate unit of geographic analysis.
45

BLM_0041816

The PEIS applied both criteria in using the U.S. Bureau of the Census data for census block groups, wherein consideration was given to minority populations that were both greater than 50% and 20 percentage points higher than they were in the state (the reference geographic unit).

- *Low-Income.* These are individuals who fall below the poverty line. The poverty line takes into account family size and the ages of individuals in the family. In 2009, for example, the poverty line for a family of five with three children younger than 18 was $26,023. For any given family below the poverty line, all family members are considered as being below the poverty line for the purposes of analysis (U.S. Bureau of the Census 2011b).

## D.10  TRANSPORTATION

This section provides the methodology and key input parameters used for the transportation risk analysis performed in support of the ULP EIS. The methodology followed the common approach identified in DOE (2002). The analysis evaluated the transportation of mined uranium ore from the lease tracts to the uranium mills. Transportation impacts were estimated for shipment by truck because historically, all such shipments in the area have been by truck. Shipment by rail would not be practical because there are no rail lines located at or near any of the lease tracts or the uranium mills.

### D.10.1  Overview

The transportation risk assessment considered human health risks from routine (normal, incident-free) transport of radiological materials and from accidents. The risks associated with the nature of the cargo itself ("cargo-related impacts") were considered for routine transport. Risks related to the transportation vehicle regardless of type of cargo ("vehicle related impacts") were considered for potential accidents. Radiological cargo-related accident risks were not assessed as part of this analysis, as discussed in Section D.10.1.2. The transportation of hazardous chemicals was not part of this analysis because no hazardous chemicals have been identified as being part of the uranium mining operations.

#### D.10.1.1  Routine Transportation Risk

The radiological risk associated with routine transportation would be cargo-related and result from the potential exposure of people to low levels of external radiation near a loaded shipment. No direct physical exposure to radioactive material would occur during routine transport because the uranium ore would be covered by a tarp during transport. No significant unintended releases would occur.

BLM_0041817

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                      *Do Not Distribute*

### D.10.1.2  Accident Transportation Risk

The cargo-related radiological risk from transportation-related accidents would come from the potential release and dispersal of radioactive material into the environment during an accident and the subsequent exposure of people through multiple exposure pathways (e.g., exposure to contaminated soil, inhalation, or the ingestion of contaminated food). However, the bulk of the uranium ore would be in cobbles and stones, with an approximate uranium concentration range of about 0.2% $U_3O_8$ by weight, which would minimize the potential for any significant release of uranium to the surrounding air, soil, or water. Thus, the radiological accident transportation risk from the shipment of uranium ore was not evaluated.

"Vehicle-related accident risks" refer to the potential for transportation-related accidents that would result in injuries and fatalities caused by physical trauma unrelated to the cargo.

## D.10.2  Routine Risk Assessment Methodology

The RADTRAN 5 computer code (Neuhauser and Kanipe 2003; Weiner et al. 2006) was used in the routine risk assessment to estimate the radiological impacts on collective populations. RADTRAN 5 was developed by Sandia National Laboratories to calculate population risks associated with the transportation of radioactive materials by truck, rail, air, ship, or barge. The code has been used extensively for transportation risk assessments since it was originally issued in the late 1970s as RADTRAN (RADTRAN 1) and has been reviewed and updated periodically. RADTRAN 1 was originally developed to facilitate the calculations presented in NUREG-0170 (NRC 1977).

### D.10.2.1  Collective Population Risk

The radiological risk associated with routine transportation would result from the potential exposure of people to low-level external radiation in the vicinity of loaded shipments. Even under routine transportation, some radiological exposure could occur. Because the radiological consequences (dose) would occur as a direct result of normal operations, the probability of routine consequences is taken to be 1 in the RADTRAN 5 code. Therefore, the dose risk is equivalent to the estimated dose.

For routine transportation, the RADTRAN 5 computer code considers major groups of potentially exposed persons. The RADTRAN 5 calculations of risk for routine highway transportation include exposures of the following population groups:

- *Persons along the route (off-link population).* Collective doses were calculated for all persons living or working within 0.5 mi (0.8 km) of each side of a transportation route. The total number of persons within the 1-mi (1.6-km) corridor was calculated separately for each route considered in the assessment.

BLM_0041818

- *Persons sharing the route (on-link population).* Collective doses were calculated for persons in all vehicles sharing the transportation route. This group included persons traveling in directions that were the same as or opposite to the direction in which the shipment was going, as well as persons in vehicles passing the shipment.

- *Persons at stops.* Collective doses can be calculated for people who might be exposed while a shipment was stopped en route. For truck transportation, these stops would include those for refueling, food, and rest. Truck stops were not considered in this PEIS because of the relatively short shipment distances being considered.

- *Crew members.* Collective doses were calculated for truck drivers involved in the actual shipment of material. Workers involved in loading or unloading were not considered in the transportation analysis.

The doses calculated for the first three population groups were added together to yield the collective dose to the public. The dose calculated for the fourth group represents the collective dose to workers.

The RADTRAN 5 calculations for routine doses generically compute the dose rate as a function of distance from a point source or line source (Neuhauser and Kanipe 2003). Associated with the calculation of routine doses for each exposed population group are parameters such as the radiation field strength, source-receptor distance, duration of exposure, vehicle speed, stopping time, traffic density, and route characteristics (such as population density). The RADTRAN manual contains derivations of the equations used and descriptions of these parameters (Neuhauser and Kanipe 2003).

### D.10.2.2  Highest-Exposed Individual Risk

In addition to assessing the routine collective population risk, the risks to individuals receiving the highest impacts were estimated for a number of hypothetical exposure scenarios by using the RISKIND model (Yuan et al. 1995; Biwer et al. 1997). Receptors included members of the public exposed while standing along the route, during traffic delays, or while living near a facility, as summarized in Table D.10-1.

RISKIND was used to calculate the dose to each individual considered for an exposure scenario defined by an exposure distance, duration, and frequency specific to that receptor. The distances and durations of exposure were similar to those given in previous transportation risk assessments (DOE 1995, 1996, 1997, 1999, 2011). The scenarios were not meant to be exhaustive but were selected to provide a range of potential exposure situations.

BLM_0041819

1

**TABLE D.10-1  Individual Exposure Scenarios**

| Receptor | Exposure Event |
|----------|----------------|
| Person at roadside | 2 m |
| Person in traffic jam | 1.2 m for 30 minutes |
| Resident near route | 30 m |

The RISKIND external dose model considers direct external exposure and exposure from radiation scattered from the ground and air. RISKIND was used to calculate the dose as a function of distance from a shipment on the basis of the dimensions of the shipment (millirem per hour for stationary exposures and millirem per event for moving shipments). The code approximates the shipment as a cylindrical volume source, and the calculated dose includes contributions from secondary radiation scattering from buildup (scattering by the material contents), cloudshine (scattering by the air), and groundshine (scattering by the ground). As a conservative measure, credit for potential shielding between the shipment and the receptor was not considered.

**D.10.3  Accident Assessment Methodology**

"Vehicle-related accident risk" refers to the potential for transportation accidents that could directly result in injuries and fatalities not related to the nature of the cargo in the shipment. This risk represents injuries and fatalities from physical trauma. Route-specific rates or countywide average rates for transportation injuries and fatalities were used in the assessment (see Section D.10.4.1.3). Vehicle-related accident risks were calculated by multiplying the total distance traveled by the rates for transportation injuries and fatalities. In all cases, the vehicle-related accident risks were calculated on the basis of distances for round-trip shipments, since the presence or absence of cargo would not be a factor in accident frequency.

**D.10.4  Input Parameters and Assumptions**

The principal input parameters and assumptions used in the transportation risk assessment are discussed in this section. These shipments are subject to regulation by the U.S. Department of Transportation (DOT) and other entities, as appropriate. The Hazardous Materials Transportation Act of 1975, as amended in Volume 49 of the *United States Code* (49 USC 5105 et seq.), requires DOT to establish regulations for safely transporting hazardous materials (including radioactive materials) in commerce. Title 49 of the CFR contains DOT standards and requirements for packaging, transporting, and handling radioactive materials for all modes of transportation. DOT's hazardous materials regulations (HMRs) on the transportation of hazardous and radioactive materials can be found in 49 CFR Parts 171–180. With regard to natural uranium ore, it is classified as a low-specific activity (LSA) material with no activity limit and no specific packaging requirements, as covered under 49 CFR Part 173

BLM_0041820

1  (Shippers – General Requirements for Shipments and Packagings). Requirements for motor
2  carrier transportation can also be found in 49 CFR Parts 350–399.
3
4
5  **D.10.4.1  External Dose Rate**
6
7          For input to RADTRAN and RISKIND calculations, the dose rate at a distance of 7 ft
8  (2 m) from the side of a uranium ore haul truck was estimated to be approximately 0.1 mrem/h.
9  An ore content of 0.2% $U_3O_8$ by weight was modeled by using the MicroShield code
10  (Grove 2006) with 25 tons of ore.
11
12
13         **D.10.4.2  Route Characteristics**
14
15         Uranium ore shipments would travel from the lease tracts to a uranium mill for
16  processing. These shipments would not necessarily go to the mill that is nearest to a given lease
17  tract. At the time of actual shipment, many factors (e.g., existing road conditions, traffic,
18  weather, road maintenance or repairs, and mill capacities and costs) would be the criteria used to
19  determine which mill should receive a given ore shipment. The transportation route selected for a
20  shipment determines the total population of potentially exposed individuals and the expected
21  frequency of transportation-related accidents.
22
23
24         **D.10.4.3  Routine Impacts**
25
26         For truck transportation, the route characteristics most important for a risk assessment
27  include the total shipping distance between each origin site and destination site and the
28  population density along the route. Shipping distances between the lease tracts and the proposed
29  Piñon Ridge Mill and White Mesa Mill are presented in Section 4.10.1.3 and Table 4.3-10.
30
31         The population density in the uranium lease tract area is very low, less than one person
32  per square kilometer in most locations. Higher population densities are encountered in the small
33  towns of Naturita, Colorado, and Monticello, Utah—the only population centers along any of the
34  potential uranium shipment routes. For the PEIS analysis, representative unit risk factors were
35  developed on a per-kilometer basis for the collective population and worker (truck driver) doses.
36  These factors were calculated by assuming that the longest potential route would be used.
37
38         For the lease tracts and uranium mills under consideration, the longest route is 266 km
39  (165 mi). It goes from New Verde Mine on Lease Tract 26 to White Mesa Mill. The route runs
40  from New Verde Mine on local roads to State Highway (SH) 141, then through Naturita,
41  traveling south to US 491, west into Utah to US 191, through Monticello, and south on US 191
42  to the White Mesa Mill. This route uses roads typical of most potential routes and runs through
43  both rural and populated areas representative of the region. Population densities at the lease tract
44  level from the 2010 Census were used in RADTRAN 5 to estimate the collective population
45  risks along the route. The average collective dose to the public from uranium ore in the region

BLM_0041821

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1  was estimated to be approximately $1.54 \times 10^{-7}$ person-rem/km. The average dose to a truck
2  driver was estimated to be approximately $8.08 \times 10^{-7}$ rem/km.
3
4
5  **D.10.4.4  Injury and Fatality Rates**
6
7        Injury and fatality rates for use in estimating potential injuries and fatalities from truck
8  accidents during the shipment of uranium ore were developed by using route-specific and
9  county-specific data. The injury and accident fatality rates used in the analysis were
10  $1.85 \times 10^{-7}$/km for injuries and $1.66 \times 10^{-8}$/km for fatalities. These rates were generated based
11  on injuries, fatalities, and vehicle miles traveled reported by the Colorado Department of
12  Transportation (CDOT) for the years 2002 through 2007 for SH 90, SH 141, and SH 491
13  (CDOT 2002, 2003, 2004, 2005, 2006a, 2007a) in the vicinity of the lease tracts and along any
14  potential route to either of the two uranium mills considered. These rates are high for heavy truck
15  travel because they include all vehicle types. For comparison, a rate of $1.80 \times 10^{-8}$/km for
16  fatalities was estimated from data on all large-truck vehicle miles (CDOT 2006b, 2007b, 2008,
17  2009, 2010) and all traffic fatalities (DOT 2010a,b,c,d) in Dolores, Mesa, Montrose, and
18  San Miguel Counties for the years 2006 through 2010. This second value is in relatively good
19  agreement with (within <10% of) the value of $1.66 \times 10^{-8}$/km for fatalities for all vehicles on the
20  roads considered in the analysis.
21
22        For Utah, injury and fatality rates were derived from the available data for 2005 through
23  2009 for San Juan County, Utah. Data on vehicle miles traveled in the county for all vehicles
24  were used in conjunction with the number of injuries and fatalities recorded (Utah 2005, 2006,
25  2007, 2008, 2009) to obtain rates of $2.77 \times 10^{-7}$/km for injuries and $2.41 \times 10^{-8}$/km for fatalities.
26  Because these rates included contributions from vehicles other than heavy trucks as well as all
27  roads in the county and not just US 491 and US 191 on the route to the White Mesa Mill (which
28  represent relatively short distances), the Colorado injury and fatality rates were used for the
29  analysis of all shipments to White Mesa Mill.
30
31
32  **D.11  CULTURAL RESOURCES**
33
34        The following procedures were employed to estimate the potential impacts of the
35  alternatives proposed in the PEIS. The process began with reviewing available documentation of
36  known cultural resources, including archaeological sites, historic structures, and traditional
37  cultural properties. It began with a Class I cultural resource review of the lease tracts conducted
38  by Alan Reed in 2006, the ethnographic background study and potential for traditional cultural
39  properties analysis of the lease tracts conducted by J.N. Fritz in 2006, and the discussion of the
40  historic mines on the lease tracts by E. Twitty in 2008. Information on cultural resource surveys
41  conducted within the tracts since 2006 was obtained as geographic information system (GIS)
42  layers from Colorado's Office of Archaeology and Historic Preservation (OAHP). For purposes
43  of comparison, GIS data were also obtained for a 15-mi (24-km) buffer surrounding the lease
44  tracts. Since some lease tracts were closer than 15 mi (24 km) from the Utah border, buffer
45  information was requested from the Utah State Historic Preservation Office (SHPO) as well. The

BLM_0041822

1    data obtained from the Colorado OAHP and the Utah SHPO was used to update the description
2    of known cultural resources within the lease tracts.
3
4         The most recent GIS data from the OAHP were used to compare the number of acres
5    surveyed within each lease tract with the area of each lease tract, to determine the percentage of
6    each lease tract that had been surveyed. Then, for purposes of analysis, the lease tracts were
7    grouped into the four proximity-based clusters used for visual resource analysis: North, North
8    Central, South Central, and South. The total acreage surveyed and the number of sites recorded
9    were tallied for each cluster and used to determine site densities for each cluster. Assuming that
10   the site densities in the unsurveyed areas would be similar to those of the surveyed areas for each
11   cluster, the number of potential sites was projected for each cluster.
12
13        Two types of potential impacts were considered. Direct impacts are those in which the
14   resource is directly destroyed, altered, or damaged by mining operations. Impacts such as
15   vandalism and unpermitted collecting are considered indirect when they do not result from
16   mining itself or the construction of access roads to the mines but are instead the result of
17   increased human presence due to mine operations or increased access due to the construction of
18   or improved maintenance on roads to the mines. Based on the site density within each cluster and
19   the number of acres that would be disturbed by a mine in each mine category (small, medium,
20   large, and very large), the number of sites likely to be directly affected by a mine in each
21   category was projected. Under each alternative, a different number of small, medium, large, and
22   very large mines would be likely to be developed. The number of direct impacts was projected
23   for each alternative, based on the acreage likely to be disturbed. For indirect impacts, it was
24   assumed that all the sites projected for each cluster would have the potential to be indirectly
25   affected. These were, of course, projections only. Pedestrian surveys would be necessary to
26   determine the actual locations of sites. The number of sites directly affected could be reduced by
27   changing the location of mining activities.
28
29        The GIS data from the Colorado OAHP does not identify traditional cultural properties.
30   Unless already documented, the presence of such properties can only be determined by
31   communications with the relevant cultural groups. Federally recognized Native American tribes
32   are being contacted, but to date, none of them have identified any culturally important properties
33   on or near the lease tracts.
34
35
36   **D.12  VISUAL RESOURCES**
37
38        The visual impact analysis for this PEIS utilizes distance zones specified within the
39   Bureau of Land Management's (BLM's) visual resource management (VRM) system to identify
40   potentially sensitive visual resource areas (SVRAs) that might be affected by one or more of the
41   five alternatives. In order to assess these impacts, reverse viewshed analyses were conducted to
42   identify which lands surrounding the lease tracts would have views of infrastructure and
43   activities in at least some portion of the lease tracts. Reverse viewshed analyses were conducted
44   for Alternatives 1, 3, and 4. A separate analysis was not conducted for Alternatives 2 and 5 due
45   to the similarities in the visual impacts associated with, respectively, Alternatives 1 and 4.

BLM_0041823

One of the primary components considered in conducting this analysis was the impact of distance on determining what could be seen from within a lease tract. The distance between the viewer and the mining activities (during exploration, mine development and operations, and reclamation) that are the source of visual contrast is a critical element in determining the level of perceived impact. For this analysis, the BLM distance zones in the VRM system were utilized. These zones are as follows:

- *Foreground–Middleground* (0 to 5 mi or 0 to 8 km). This zone includes areas where management activities may be seen in detail. For instance, the outer boundary of this distance zone is defined as the point where the texture and form of individual plants are no longer apparent in the landscape.

- *Background* (5 to 15 mi or 8 to 24 km). This zone includes the area beyond the foreground–middle ground up to 15 mi (24 km) and includes the area where some detail beyond the form or outline of the project is visible. For example, vegetation should be visible at least as patterns of light and dark.

- *Seldom seen* (beyond 15 mi or 24 km). This zone includes areas beyond 15 mi (24 km) (BLM 1986).

A GIS-based impact analysis was used to identify locations within the SVRAs from which some portions of the lands containing the lease tracts would be visible. Assuming an unobstructed view of the ULP lease tract, viewers in these areas would be likely to perceive some level of visual contrast from the mining activities.

The "spatial analyst extension" of the ESRI ArcGIS 10 software was used to calculate viewsheds. (A viewshed is an area of landscape that is visible to the human eye from a fixed vantage point.) The viewshed analyses determined the potential visibility of the four lease tract groups or portions of these groups from lands within 25 mi (40 km). Viewshed calculations were performed by using National Elevation Data (NED) 10-meter DEM with the earth curvature set to a refractivity coefficient of 0.13.

Since each of the four groups or a portion of the groups of lease areas represents a large geographic area rather than specifically located points, a grid-based sample of points was used to calculate visibility.

Viewsheds were calculated based on an assumed height of 30 ft (9 m) to represent the mining sites and 5 ft (1.5 m) to represent the observer height.

The selected SVRAs included in the analysis were as follows:

- National Parks, National Monuments, National Recreation Areas, National Preserves, National Wildlife Refuges, National Reserves, National Conservation Areas, National Historic Sites;

BLM_0041824

1     • Congressionally authorized Wilderness Areas;

3     • Wilderness Study Areas;

5     • National Wild and Scenic Rivers;

7     • Congressionally authorized Wild and Scenic Study Rivers;

9     • National Scenic Trails and National Historic Trails;

11     • National Historic Landmarks and National Natural Landmarks;

13     • All-American Roads, National Scenic Byways, State Scenic Highways, and BLM-designated and U.S. Forest Service-designated Scenic Highways and Byways;

17     • BLM-designated Special Recreation Management Areas; and

19     • Areas of Critical Environmental Concern (ACECs) designated because of outstanding scenic qualities.

While the viewshed analysis showed areas that may be subject to visual impacts from mining-related activities conducted within the lease tract areas, the actual acreage that would be affected would likely be smaller than that indicated by the analysis, because of potential screening of views of the lease tract areas by vegetation or structures. The viewshed analyses also did not account for the heights of vegetation or existing structures that might screen views. The analyses conducted for this PEIS were limited to data available in GIS format at the time of analysis. They did not analyze any of the additional scenic resources that exist at the national, state, and local levels. Furthermore, although a GIS-based analysis is capable of having extremely high spatial accuracy, it is limited by the accuracy of the data used in the analysis, which were obtained from many sources and are subject to error.

After the GIS-based analysis was completed, views to the lease tracts from the SVRAs were simulated by using Google Earth software. Keyhole Markup Language (KML) files of the lease tracts and the SVRA boundaries were imported from ArcGIS. Analysts then selected a variety of viewpoints within the SVRAs that were depicted as having potential views of the lease tracts. The intent of this analysis was to evaluate the apparent size and viewing angle of the lease tracts from a potential viewing location and thereby determine the potential level of contrast that could be observed from the various activities associated with each alternative.

BLM_0041825

## D.13  WASTE MANAGEMENT

Wastes (other than waste rock) generated during the three phases of uranium mining (exploration, mine development and operations, and reclamation), such as liquids and solids from the treatment of water, spent oil, grease, and lubricant, and other trash were evaluated in terms of how these additional waste would affect the existing practices or availability of the disposal capacity for similar waste.

## D.14  CUMULATIVE IMPACTS

The methodology for cumulative impacts analysis is consistent with guidance provided by the Council on Environmental Quality (CEQ 1997; Connaughton 2005). It includes defining the region of cumulative impacts; identifying past, present, and reasonably foreseeable projects and activities (federal and nonfederal) within the region; summarizing the impacts associated with those projects and activities (if available); and determining the magnitude and significance of the cumulative impacts.

The region of cumulative impacts was defined as 50 mi (80 km) for all resource areas, which is considered conservative for most resource areas. Past, present, and reasonably foreseeable projects and activities within the region of cumulative impacts were identified from a variety of sources, including NEPA assessments performed by various federal and state agencies for nearby projects. Projects and activities within the region of cumulative impacts were also identified by using NEPA registers from regional BLM field offices and schedules of proposed actions from nearby National Forests.

## D.15  REFERENCES FOR APPENDIX D

ATSDR (Agency for Toxic Substances and Disease Registry), 2012, *Minimal Risk Levels (MRLs) February 2012*. Available at http://www.atsdr.cdc.gov/mrls/pdfs/atsdr_mrls_february_2012.pdf. Accessed March 19, 2012.

AQMD (South Coast Air Quality Management District), 2012, *Particulate Matter (PM) 2.5 Significance Thresholds and Calculation Methodology*. Available at http://www.aqmd.gov/ceqa/handbook/PM2_5/PM2_5.html. Accessed Feb. 24, 2012.

Barber, J.R., et al., 2010, "The Costs of Chronic Noise Exposure for Terrestrial Organisms," *Trends in Ecology and Evolution* 25(3):180–189.

Barry, T.M., and J.A. Reagan, 1978, *FHWA Highway Traffic Noise Prediction Model*, FHWA-RD-77-108, prepared for the Federal Highway Administration, Washington, D.C., Dec.

Biwer, B.M., et al., 1997, *RISKIND Verification and Benchmark Comparisons*, ANL/EAD/TM-74, Argonne National Laboratory, Argonne, Ill., Aug.

BLM_0041826

1  BLM (Bureau of Land Management), 1986, *Visual Resource Inventory,* BLM Manual Handbook
2  8410-1, Release 8-28, U.S. Department of the Interior, Washington, D.C., Jan.
3
4  BLM, 2008, *Final Environmental Assessment for the Whirlwind Mine Uranium Mining Project,*
5  Grand Junction Field Office, Grand Junction, Colo., and Moab Field Office, Moab, Utah, Sept.
6
7  BLS (Bureau of Labor Statistics), 2011a, *Number and Rate of Fatal Occupational Injuries, by
8  Industry Sector, 2010.* Available at http://www.bls.gov/iif/oshwc/cfoi/cfch0009.pdf. Accessed
9  March 13, 2012.
10
11 BLS, 2011b, *2010 Survey of Occupational Injuries & Illnesses, Summary Estimates Charts
12 Package*, Oct. 20. Available at http://www.bls.gov/iif/oshwc/osh/os/osch0044.pdf. Accessed
13 March 13, 2012.
14
15 CEQ (Council on Environmental Quality), 1997, *Considering Cumulative Effects under the
16 National Environmental Policy Act,*" Jan.
17
18 Chapman, S.S., et al., 2006, *Ecoregions of Colorado* (color poster with map, descriptive text,
19 summary tables, and photographs; map scale 1:1,200,000), U.S. Geological Survey, Reston, Va.
20
21 CEQ (Council on Environmental Quality), 1997, *Environmental Justice Guidance under the
22 National Environmental Policy Act,* Executive Office of the President, Washington, D.C.
23 Available at http://www.whitehouse.gov/CEO/April.
24
25 Connaughton, J.L., 2005, letter on "Guidance on the Consideration of Past Actions in
26 Cumulative Effects Analysis" from Connaughton (Chairman, Council on Environmental Quality)
27 to Heads of Federal Agencies, June 24.
28
29 CDOT (Colorado Department of Transportation), 2002, *Crashes and Rates on State Highways,
30 2002*, Traffic Safety and Traffic Engineering Branch, Accident Management Unit.
31
32 CDOT, 2003, *Crashes and Rates on State Highways, 2003*, Traffic Safety and Traffic
33 Engineering Branch, Accident Management Unit.
34
35 CDOT, 2004, *Crashes and Rates on State Highways, 2004*, Traffic Safety and Traffic
36 Engineering Branch, Accident Management Unit.
37
38 CDOT, 2005, *Crashes and Rates on State Highways, 2005*, Traffic Safety and Traffic
39 Engineering Branch, Accident Management Unit.
40
41 CDOT, 2006a, *Crashes and Rates on State Highways, 2006*, Safety and Traffic Engineering
42 Branch, Accident Management Unit.
43

BLM_0041827

CDOT, 2006b, *Roadway Statistics, 2006 State Highway Statistics—Daily Vehicle Miles of Travel (DVMT) for All Trucks by County.* Available at http://apps.coloradodot.info/dataaccess/ Statistics/dsp_folder/Roadway/2006/2006TruckDVMTbyCounty.htm. Accessed Jan. 25, 2012.

CDOT, 2007a, *Crashes and Rates on State Highways, 2007*, Safety and Traffic Engineering Branch, Accident Management Unit.

CDOT, 2007b, *Roadway Statistics, 2007 State Highway Statistics—Daily Vehicle Miles of Travel (DVMT) for All Trucks by County.* Available at http://apps.coloradodot.info/dataaccess/Statistics/ dsp_folder/Roadway/2007/2007TruckDVMTbyCounty.htm. Accessed Jan. 25, 2012.

CDOT, 2008, *Roadway Statistics, 2008 State Highway Statistics—Daily Vehicle Miles of Travel (DVMT) for All Trucks by County.* Available at http://apps.coloradodot.info/dataaccess/Statistics/ dsp_folder/Roadway/2008/2008TruckDVMTbyCounty.htm. Accessed Jan. 25, 2012.

CDOT, 2009, *Roadway Statistics, 2009 State Highway Statistics—Daily Vehicle Miles of Travel (DVMT) for All Trucks by County.* Available at http://apps.coloradodot.info/dataaccess/Statistics/ dsp_folder/Roadway/2009/2009TruckDVMTbyCounty.htm. Accessed Jan. 25, 2012.

CDOT, 2010, *Roadway Statistics, 2010 State Highway Statistics—Daily Vehicle Miles of Travel (DVMT) for All Trucks by County.* Available at http://apps.coloradodot.info/dataaccess/Statistics/ dsp_folder/Roadway/2010/2010TruckDVMTbyCounty.pdf. Accessed Jan. 25, 2012.

CDOW (Colorado Division of Wildlife), 2011 *Natural Diversity Information Source*, Colorado Department of Natural Resources, Division of Wildlife, Denver, Colo. Available at http://ndis. nrel.colostate.edu/index.html. Accessed Dec. 15, 2011.

CDPHE (Colorado Department of Public Health and Environment), 2011, *2008 Air Pollutant Emissions Inventory*, online database, Denver, Colo. Available at http://www.colorado.gov/ airquality/inv_maps_2008.aspx. Accessed Nov. 23, 2011.

CEQ (Council on Environmental Quality), 1997, *Environmental Justice Guidance under the National Environmental Policy Act,* Executive Office of the President, Washington, D.C. Available at http://www.whitehouse.gov/CEO/April.

Chapman, S.S., et al., 2006, *Ecoregions of Colorado* (color poster with map, descriptive text, summary tables, and photographs; map scale 1:1,200,000), U.S. Geological Survey, Reston, Va.

CNHP (Colorado Natural Heritage Program), 2009, *Summary of Services.* Available at http://www.cnhp.colostate.edu/. Accessed Sept. 9, 2009.

CNHP, 2011a, *Colorado Natural Heritage Program – Rare Plant Guide List.* Available at http://www.cnhp.colostate.edu/download/projects/rareplants/list.asp?list=master. Accessed Dec. 16, 2011.

BLM_0041828

1  CNHP, 2011b, *Colorado Natural Heritage Program – Element Occurrences by Quad.* Available
2  at http://www.cnhp.colostate.edu/download/gis.asp#maps. Accessed Dec. 16, 2011.
3
4  DOE (U.S. Department of Energy), 1995, *Department of Energy Programmatic Spent Nuclear*
5  *Fuel Management and Idaho National Engineering Laboratory Environmental Restoration and*
6  *Waste Management Programs Final Environmental Impact Statement*, DOE/EIS-0203-F, Office
7  of Environmental Management, Idaho Operations Office, Idaho Falls, Id., Apr.
8
9  DOE, 1996, *Final Environmental Impact Statement on a Proposed Nuclear Weapons*
10  *Nonproliferation Policy Concerning Foreign Research Reactor Spent Nuclear Fuel, Appendix E:*
11  *Evaluation of Human Health Effects of Overland Transportation*, DOE/EIS-0218F, Vol. 2,
12  Assistant Secretary for Environmental Management, Washington, D.C., Feb.
13
14  DOE, 1997, *Final Waste Management Programmatic Environmental Impact Statement for*
15  *Managing Treatment, Storage, and Disposal of Radioactive and Hazardous Waste*,
16  DOE/EIS0200-F, Office of Environmental Management, Washington, D.C.
17
18  DOE, 1999, *Final Programmatic Environmental Impact Statement for Alternative Strategies for*
19  *the Long-Term Management and Use of Depleted Uranium Hexafluoride*, DOE/EIS-0269, Office
20  of Nuclear Energy, Science and Technology, Germantown, Md., Apr.
21
22  DOE, 2002, *A Resource Handbook on DOE Transportation Risk Assessment*,
23  DOE/EM/NTP/HB-01, prepared by Transportation Risk Assessment Working Group Technical
24  Subcommittee for DOE, Office of Environmental Management, National Transportation
25  Program, Albuquerque, N.M., July.
26
27  DOE, 2011, *Draft Environmental Impact Statement for the Disposal of Greater-Than-Class-C*
28  *(GTCC) Low-Level Radioactive Waste and GTCC-Like Waste*, DOE/EIS-0375-D, Office of
29  Environmental Management, Washington, D.C., Feb.
30
31  DOT (U.S. Department of Transportation), 2010a, *Traffic Safety Facts, Dolores County,*
32  *Colorado, 2006–2010*, National Highway Transportation Safety Administration,
33  Washington, D.C. Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/STSI/
34  8_CO/2010/Counties/Colorado_Dolores%20County_2010.HTM. Accessed Jan. 25, 2012.
35
36  DOT, 2010b, *Traffic Safety Facts, Mesa County, Colorado, 2006–2010*, National Highway
37  Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.
38  gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_Mesa%20County_2010.
39  HTM. Accessed Jan. 25, 2012.
40
41  DOT, 2010c, *Traffic Safety Facts, Montrose County, Colorado, 2006–2010*, National Highway
42  Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.
43  gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_Montrose%20County_2010.
44  HTM. Accessed Jan. 25, 2012.
45

BLM_0041829

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1   DOT, 2010d, *Traffic Safety Facts, San Miguel County, Colorado, 2006–2010*, National Highway
2   Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.
3   gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_San%20Miguel%20County_
4   2010.HTM. Accessed Jan. 25, 2012.
5
6   Eckerman, K., et al., 1999, *Cancer Risk Coefficients for Environmental Exposures to*
7   *Radionuclides*, EPA 402-R-99-001, Federal Guidance Report No. 13, prepared by Oak Ridge
8   National Laboratory for U.S. Environmental Protection Agency, Office of Radiation and Indoor
9   Air.
10
11  EPA (U.S. Environmental Protection Agency), 1974, *Information on Levels of Environmental*
12  *Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*,
13  550/9-74-004, Office of Noise Abatement and Control, March. Available at http://www.nonoise.
14  org/library/levels74/levels74.htm. Accessed Sept. 26, 2011.
15
16  EPA, 1985, *Draft Background Information Document, Proposed Standard for Radon-222*
17  *Emissions to Air from Underground Uranium Mines*, EPA/520/1-85-010, Office of Radiation
18  Programs, Washington, D.C., Feb. 14.
19
20  EPA, 1989a, *Risk Assessments, Environmental Impact Statement, NESHAPS for Radionuclides,*
21  *Background Information Document—Volume 2*, EPA/520/1-89-006-1, Office of Radiation
22  Programs, Washington, D.C. Sept.
23
24  EPA, 1989b, *Risk Assessment Guidance for Superfund, Vol. I: Human Health Evaluation*
25  *Manual (Part A), Interim Guidance*, EPA/540/1-89/002, Office of Emergency and Remedial
26  Response, Washington D.C.
27
28  EPA, 1989c, *User's Guide for the COMPLY-R Code (Revision 1)*, EPA 520/1-89-029, Office of
29  Radiation Programs, Washington, D.C., Oct. Available at http://www.epa.gov/radiation/neshaps/
30  subpartb/.
31
32  EPA, 1995, *Compilation of Air Pollutant Emission Factors, Vol. I: Stationary Point and Area*
33  *Sources*, AP-42 Fifth Edition, Office of Air Quality Planning and Standards and Office of Air
34  and Radiation, Research Triangle Park, N.C., Jan.
35
36  EPA, 2004, *Unit Conversions, Emissions Factors, and Other Reference Data*, Nov. Available at
37  http://www.epa.gov/cpd/pdf/brochure.pdf. Accessed Feb. 24, 2012.
38
39  EPA, 2011, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2009*,
40  EPA 430-R-11-005, April 15. Available at http://www.epa.gov/climatechange/emissions/
41  downloads11/US-GHG-Inventory-2011-Complete_Report.pdf. Accessed Nov. 5, 2011.
42
43  EPA, 2012a, *Search WebFIRE*. Available at http://cfpub.epa.gov/webfire/. Accessed Jan. 27,
44  2012.
45

BLM_0041830

1   EPA, 2012b, Section 11.9, "Western Surface Coal Mining (10/98)," and Section 13.2.4,
2   "Aggregate Handling and Storage Piles (11/06)," in Volume 1, "Stationary Point and Area
3   Sources," of *Compilation of Air Pollutant Emission Factors, AP 42*, Fifth Edition. Available at
4   http://www.epa.gov/ttnchie1/ap42/. Accessed April 4, 2012.
5
6   EPA, 2012c, *Integrated Risk Information System (IRIS)*. Available at http://www.epa.gov/IRIS.
7   Accessed March 17, 2012.
8
9   Fahys-Smith, V., 1983, "Migration of Boom-town Construction Workers: The Development of
10   an Analytic Framework," *Environmental Geochemistry and Health* 5:104–112.
11
12   Ferry, C., et al., 2002, "An Experimental Method for Measuring the Radon-222 Emanation
13   Factor in Rocks," *Radiation Measurements* 35:570.
14
15   Folga, S., 2012, intraoffice communication from Folga to Y.-S. Chang (Argonne National
16   Laboratory, Argonne, Ill.), Feb. 24.
17
18   Grove, 2006, *MicroShield User's Manual Version 7*, Grove Software Inc., Lynchburg, Va.
19
20   Hanson, C.E., et al., 2006, *Transit Noise and Vibration Impact Assessment*,
21   FTA-VA-90-1003-06, prepared by Harris Miller Miller & Hanson Inc., Burlington, Mass., for
22   U.S. Department of Transportation, Federal Transit Administration, Washington, D.C., May.
23   Available at http://www.hmmh.com/rail_manuals01fta.html. Accessed Feb. 29, 2012.
24
25   ICRP (International Commission on Radiological Protection), 2011, "ICRP Publication 115:
26   Lung Cancer Risk from Radon and Progeny," *Annals of the ICRP* 40(1).
27
28   Jones & Stokes Associates, 2007, *Software User's Guide: URBEMIS2007 for Windows,*
29   *Version 9.2, Emissions Estimation for Land Use Development Projects*, prepared for South Coast
30   Air Quality Management District, Diamond Bar, Calif., Nov. Available at http://www.urbemis.
31   com/software/download.html. Accessed Feb. 24, 2012.
32
33   Menge, C.W., et al., 1998, *FHWA Traffic Noise Model® Technical Manual*, FHWA-PD-96-010
34   and DOT-VNTSC-FHWA-98-2, prepared by U.S. Department of Transportation, John A. Volpe
35   National Transportation Systems Center, Cambridge, Mass., for U.S. Department of
36   Transportation, Federal Highway Administration, Washington, D.C., Feb.
37
38   MIG (Minnesota IMPLAN Group, Inc.), 2011, *IMPLAN Version 3 Software System,* Hudson,
39   Wisc. Available at http://implan.com/V4/Index.php.
40
41   NatureServe, 2011, *NatureServe Explorer—An Online Encyclopedia of Life*. Available at
42   http://www.natureserve.org/explorer/. Accessed Dec. 16, 2011.
43
44   Neuhauser, K.S., and F.L. Kanipe, 2003, *RADTRAN 5 User Guide*, SAND2003-2354, Sandia
45   National Laboratories, Albuquerque, N.M., July.

BLM_0041831

NRC (U.S. Nuclear Regulatory Commission), 1977, *Final Environmental Statement on the Transportation of Radioactive Material by Air and Other Modes*, NUREG-0170, Washington, D.C.

NRCS (National Resources Conservation Service), 2012, *Soil Taxonomy, A Basic System of Soil Classification for Making and Interpreting Soil Surveys*, USDA Handbook 436, 2nd Edition, U.S. Department of Agriculture. Available at http://websoilsurvey.nrcs.usda.gov/app/HomePage. htm. Accessed Jan. 10, 2012.

Rogers, Z., 2011, personal communication from Rogers (Energy Fuels Resources Corporation, Lakewood, Colo.) to Y.-S. Change (Argonne National Laboratory, Argonne, Ill.), Nov. 8.

QDEH (Queensland Department of Environment and Heritage), 1999, *Emission Estimation Technique Manual for Explosives Detonation and Firing Ranges*, March. Available at http://www2.unitar.org/cwm/publications/cbl/prtr/pdf/cat5/fexplos.pdf. Accessed April 4, 2012.

Sakoda, A., et al., 2010, "Difference of Natural Radioactivity and Radon Emanation Fraction Among Constituent Minerals of Rock or Soil," *Applied Radiation and Isotopes* 68(12):2452.

Stoeser, D.B., et al., 2007, *Preliminary Integrated Geologic Map Databases for the United States—Central States: Montana, Wyoming, Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Iowa, Missouri, Arkansas, and Louisiana*, Open File Report 2005-1351, Version 1.2, original file updated in Dec. 2007, U.S. Geological Survey. Available at http://pubs.usgs.gov/of/2005/1351/index.htm.

Strait, R., et al., 2007, *Final Colorado Greenhouse Gas Inventory and Reference Case Projections 1990-2020*, Center for Climate Strategies, Oct. Available at http://www.coloradoclimate.org/ewebeditpro/items/O14F13894.pdf. Accessed Nov. 5, 2011.

Trinity Engineering Associates, Inc., 2007, *CAP88-PC Version 3.0 User Guide*, Cincinnati, Ohio, Dec. 9. Available at http://www.epa.gov/radiation/assessment/CAP88/index.html# version3.

UNSCEAR (United Nations Scientific Committee on the Effects of Atomic Radiation), 2008, Annex E, "Sources-to-Effects Assessment for Radon in Homes and Workplaces," in *Effects of Ionizing Radiation*, UNSCEAR 2006 Report to the General Assembly, with Scientific Annexes, United Nations, New York, N.Y.

UNSCEAR, 2010, *Sources and Effects of Ionizing Radiation*, UNSCEAR 2008 Report to the General Assembly, with Scientific Annexes, Vol. 1, United Nations, New York, N.Y.

U.S. Bureau of the Census, 2011a, *2010 Census Summary File 1: Table P5*. Available at http://factfinder2.census.gov/main.html.

BLM_0041832

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1  U.S. Bureau of the Census, 2011b, *2009 American Community Survey 5-Year Estimates*
2  *(2005–2009): Table B17017*. Available at http://factfinder2.census.gov/main.html.
3
4  USDA (U.S. Department of Agriculture), 1999, *Soil Taxonomy—A Basic System of Soil*.
5
6  USFWS (U.S. Fish and Wildlife Service), 2009, *National Wetlands Inventory*, U.S. Department
7  of the Interior, Washington, D.C. Available at http://www.fws.gov/wetlands.
8
9  USFWS, 2011a, *IPaC—Information, Planning, and Conservation System*. Available at
10  http://ecos.fws.gov/ipac/. Accessed Dec. 16, 2011.
11
12  USFWS, 2011b, *Critical Habitat Portal*, FWS Critical Habitat for Threatened and Endangered
13  Species. Available at http://criticalhabitat.fws.gov/crithab/. Accessed Dec. 16, 2011.
14
15  USGS (U.S. Geological Survey), 2004, *National Gap Analysis Program, Provisional Digital*
16  *Land Cover Map for the Southwestern United States*, Version 1.0, RS/GIS Laboratory, College
17  of Natural Resources, Utah State University. Available at http://earth.gis.usu.edu/swgap/
18  landcover.html. Accessed March 15, 2010.
19
20  USGS, 2005, *National Gap Analysis Program, Southwest Regional GAP Analysis Project—Land*
21  *Cover Descriptions*, RS/GIS Laboratory, College of Natural Resources, Utah State University.
22  Available at http://earth.gis.usu.edu/swgap/legend_desc.html. Accessed March 15, 2010.
23
24  USGS, 2007, *National Gap Analysis Program, Digital Animal-Habitat Models for the*
25  *Southwestern United States. Version 1.0.* Center for Applied Spatial Ecology, New Mexico
26  Cooperative Fish and Wildlife Research Unit, New Mexico State University. Available at
27  http://fws-nmcfwru.nmsu.edu/swregap/default.htm. Accessed Dec. 16, 2011.
28
29  Utah (State of Utah), 2005, *Utah Crash Summary, 2005*, Department of Public Safety. Available
30  at http://publicsafety.utah.gov/highwaysafety/1997-2005.html. Accessed Feb. 10, 2012.
31
32  Utah, 2006, *Utah Crash Summary, 2006*, Department of Public Safety. Available at
33  http://publicsafety.utah.gov/highwaysafety/1997-2005.html. Accessed Feb. 10, 2012.
34
35  Utah, 2007, *Utah Crash Summary, 2007*, Department of Public Safety. Available at
36  http://publicsafety.utah.gov/highwaysafety/1997-2005.html. Accessed Feb. 10, 2012.
37
38  Utah, 2008, *Utah Crash Summary, 2008*, Department of Public Safety. Available at
39  http://publicsafety.utah.gov/highwaysafety/1997-2005.html. Accessed Feb. 10, 2012.
40
41  Utah, 2009, *Utah Crash Summary, 2009*, Department of Public Safety. Available at
42  http://publicsafety.utah.gov/highwaysafety/1997-2005.html. Accessed Feb. 10, 2012.
43
44  Walker, J.D., and J.W. Geissman (compilers), 2009, *Geologic Time Scale*, Geological Society of
45  America, Cambridge University Press.

BLM_0041833

1   Wayson, R.L., 1993, "Sound Fundamentals, Part 2," *The Wall Journal*, Sept./Oct.
2
3   Weiner, R.F., et al., 2006, *RadCat 2.3 User Guide*, SAND2006-6315, Sandia National
4   Laboratories, Albuquerque, N.M, Oct.
5
6   Yu, C., et al., 2001, *User's Manual for RESRAD Version 6*, ANL/EAD-4, Argonne National
7   Laboratory, Argonne, Ill., July. Available at http://web.ead.anl.gov/resrad/RESRAD_Family/.
8
9   Yuan, Y.C., et al., 1995, *RISKIND —A Computer Program for Calculating Radiological
10  Consequences and Health Risks from Transportation of Spent Nuclear Fuel*, ANL/EAD-1,
11  Argonne National Laboratory, Argonne, Ill., Nov.
12

BLM_0041834

*Preliminary Draft PEIS*  *PEIS Privileged Information*  *May 2012*
*PEIS Team Use Only*  *Do Not Distribute*

1
2
3
4
5
6
7
8
9
10
11
12
13 **APPENDIX E:**
14
15 **SPECIES ACCOUNTS FOR SPECIES LISTED UNDER**
16 **THE ENDANGERED SPECIES ACT**
17

*E-1*

BLM_0041835

*Preliminary Draft PEIS*  
*PEIS Team Use Only*

*PEIS Privileged Information*  
*Do Not Distribute*

*May 2012*

1
2
3
4
5
6
7
8
9
10
11
12
13 *This page intentionally left blank*
14
15

BLM_0041836

# APPENDIX E:

# SPECIES ACCOUNTS FOR SPECIES LISTED UNDER
# THE ENDANGERED SPECIES ACT

This section presents information on all species listed under the Endangered Species Act (ESA), including those that are proposed or are candidates for listing and that may occur in the region of the U.S. Department of Energy (DOE) Uranium Leasing Program (ULP) lease tracts. Species accounts are presented for those species that may occur in the affected area of one or more of the lease tracts. The species accounts include information on the life history, ecology, listing history, and threats to conservation for each species. Species accounts are presented by taxonomic group (plants, invertebrates, fish, amphibians, reptiles, birds, and mammals) and alphabetically, by common name, within each taxonomic group.

## E.1  PLANTS

### E.1.1  Clay-loving Wild Buckwheat

The clay-loving wild buckwheat (*Eriogonum pelinophilum*) is a long-lived, low-growing (only 5–10 cm high), rounded subshrub that has dark green, inrolled leaves that are needlelike in appearance and clusters of white- to cream-colored flowers. It is pollinated by more than 50 species, including native bees and ants. Flowering occurs from late May to early September, and individual flowers only last for fewer than 3 days (USFWS 2009a).

The clay-loving wild buckwheat is endemic to the rolling clay hills and flats next to Delta and Montrose, Colorado. It grows in whitish, alkaline, clay soils of the Mancos shale formation that are relatively barren of vegetation at elevations ranging from 5,180 to 6,446 ft (1,579 to 1,965 m). It occurs in the greatest density and frequency away from other shrubs. It is found within swales or drainages that are moister than surrounding areas. Plants sometimes associated with the clay-loving wild buckwheat include mat saltbrush, black sagebrush, shadscale, and Gardner's saltbrush (USFWS 2009a).

The clay-loving wild buckwheat was listed as Endangered on July 13, 1984; approximately 120 acres (48.6 ha) in Delta County, Colorado, were also designated as critical habitat on that date (USFWS 1984). The current range of the clay-loving wild buckwheat is roughly 576 acres (233 ha) (USFWS 2009a). The size of the current clay-loving wild buckwheat population is roughly 278,000 individual plants (USFWS 2009a).

The greatest threat to the clay-loving wild buckwheat is habitat loss and fragmentation from urban development (NatureServe 2012). Potential threats that may be associated with ULP activities include surface disturbance from the construction of facilities and roads, as well as from increased vehicle traffic and human presence. Other threats include agricultural

BLM_0041837

1  development, nonnative invasive plants, livestock use, oil and gas development, and herbicide
2  use (USFWS 2009a).
3
4
5  **E.1.2  Colorado Hookless Cactus**
6
7          The Colorado hookless cactus (*Sclerocactus glaucus*) was previously part of a larger
8  complex of *S. glaucus*; however, this complex was split into three distinct species in 2009. All
9  three species are listed as threatened under the ESA (USFWS 2009b). The Colorado hookless
10  cactus is a barrel-shaped cactus that ranges from 1.2 to 4.8 in. (3.0 to 12.2 cm) tall. The stem is
11  ribbed with hooked spines radiating out from areoles along the ribs. It produces pink to violet
12  bell or funnel-shaped flowers and short barrel-shaped fruit from April to May (USFWS 2010a).
13  After blooming, the cactus may shrink below the ground or become a dull grayish-green color,
14  making the plant very hard to identify.
15
16          The Colorado hookless cactus is endemic to western Colorado in Delta, Montrose, Mesa,
17  and Garfield counties. Its range is estimated to be around 1,700 to 2,099 mi$^2$ (2,736 to
18  3,378 km$^2$) (USFWS 2010a; NatureServe 2012). The total known population is estimated to
19  consist of more than 19,000 plants (USFWS 2010a). There are currently two population centers
20  of the Colorado hookless cactus that may be morphologically and genetically distinct. The two
21  populations are on the alluvial river terraces of (1) the Gunnison River, and (2) the Colorado
22  River and in the Plateau and Roan Creek drainages (CNHP 2011; USFWS 2011a).
23
24          Populations are most often found on alluvial benches along the Colorado and Gunnison
25  rivers and their tributaries at elevations ranging from 3,937–6,562 ft (1,200–2,000 m). The
26  Colorado hookless cactus prefers gravelly or rocky surfaces on river terrace deposits and lower
27  mesa slopes (NatureServe 2011). It is more abundant on south-facing slopes. Populations have
28  also been found in big sagebrush-dominated sites and in transition zones from sagebrush to
29  pinyon-juniper communities (USFWS 2011a).
30
31          The Colorado hookless cactus was listed as threatened on November 13, 1979
32  (USFWS 1979). A recovery plan for the Colorado hookless cactus was created on April 14, 2010
33  (USFWS 2010a) that identified the following recovery needs: (1) surveying to document
34  populations and suitable habitat accurately, (2) protecting and restoring habitat and corridors to
35  provide connectivity, and (3) protecting individual plants from direct and indirect threats.
36
37          Potential threats that may be associated with ULP activities include surface disturbance
38  from the construction of facilities and roads, as well as from increased vehicle traffic and human
39  presence. Activities associated with mining can fragment and destroy the Colorado hookless
40  cactus's habitat. Roads and associated infrastructure can disturb individual plants and habitat.
41  The potential increase in the use of access roads by off-road vehicles increases erosion, fugitive
42  dust, soil compaction, and sedimentation and can crush the cacti. Dust accumulation on the cacti
43  can lead to a decrease in plant growth and water use efficiency. Increased erosion, soil
44  compaction, and sedimentation can kill the cacti. An increase in human presence could lead to
45  the illegal collection and loss of individual plants. Additional threats to the Colorado hookless

BLM_0041838

1   cactus include livestock grazing, which occurs on 94% of the potential habitat of the Colorado
2   hookless cactus, as well as competition with invasive weed species (USFWS 2010a).
3
4
5   **E.1.3  Debeque Phacelia**
6
7          The Debeque phacelia (*Phacelia submutica*) is a low-growing annual herb with small
8   white, tube-shaped flowers hidden within leaves (USFWS 2011b). Stems are usually 0.8 to 3 in.
9   (2.0 to 7.6 cm) long and are deep red and covered in stiff hairs. Leaves are also covered with stiff
10  hairs, are reddish when mature, and are egg shaped. The Debeque phacelia shows yearly
11  variation in its abundance as a result of environmental factors, such that in 1 year, no plants may
12  grow and yet thousands may grow the next. Seeds can remain dormant for up to 5 years. The
13  plant flowers between late April and late June and sets seed from mid-May through late June
14  (USFWS 2011b).
15
16         Habitat requirements of the Debeque phacelia include clay soils from the Atwell Gulch
17  and Shire members of the Wasatch Formation with little other vegetation (generally less than
18  10% plant coverage) at elevations ranging from 5,080 to 7,100 ft (1,548 to 2,164 m). The shrink-
19  swell action of clay soils are essential to the species, because seed banks are maintained in cracks
20  formed in the soil. It has been associated with other plants including cheatgrass, pointed
21  gumweed, Gordon's buckwheat, Nuttall's poverty weed, and tufted evening primrose. Although
22  it can be found on slopes ranging from flat to 42 degrees, it is generally found on moderately
23  steep slopes, benches, and ridge tops adjacent to valley floors (USFWS 2011b).
24
25         The Debeque phacelia was listed as threatened on August 26, 2011 (USFWS 2011c);
26  24,987 acres (10,112 ha) were proposed as critical habitat in Mesa and Garfield counties in
27  Colorado on July 27, 2011 (USFWS 2011b). There are currently nine known populations of the
28  Debeque phacelia. It is estimated that the current population size may be as large as 68,000 when
29  climatic conditions are favorable (USFWS 2011b). The estimated total number of plants ranges
30  from 7,767 to 68,371 per year (USFWS 2011c). The current range of the Debeque phacelia is
31  centered in De Beque, Colorado, in Mesa and Garfield counties. A polygon around all nine
32  populations of the Debeque phacelia covers 86,230 acres (34,896 ha), within which 625.2 acres
33  (253.3 ha) are actually occupied by the plants (USFWS 2011b).
34
35         Potential threats to the Debeque phacelia that may be associated with ULP activities
36  include surface disturbance from the construction of facilities and roads, as well as from
37  increased vehicle traffic and human presence. The disturbance of seed banks from within the soil
38  would be detrimental to the Debeque phacelia (NatureServe 2012). Other threats include
39  livestock grazing and oil and gas development (USFWS 2011c).
40
41

BLM_0041839

1   **E.2  INSECTS**
2
3
4   **E.2.1  Uncompahgre Fritillary Butterfly**
5
6        The Uncompahgre fritillary butterfly (*Boloria acrocnema*) is an insect that has a
7   wingspan of 0.8 to 1.2 in. (2 to 3 cm). Males have rusty brown wings with crisscrossed black
8   bars. Females have lighter wings. The hind wing has a white jagged bar dividing the brown inner
9   half and the purple-grey outer surface. The body is brownish black. Females lay eggs on snow
10  willow, and the larvae feed on that plant. Adults consume nectar from a range of flowering
11  alpine plants. The butterfly has a biennial life history where eggs laid in 1 year will be
12  caterpillars the following year and would mature into adults the following year. Adults live only
13  1 to 2 weeks (USFWS 2011d).
14
15       Habitat requirements for this species include the snow willow (*Salix nivalis*) for food and
16  shelter at elevations above 12,402 ft (3,780 m) on northeast-facing Alpine slopes in the San Juan
17  Mountains of southwestern Colorado (USFWS 2011d; NatureServe 2012).
18
19       The Uncompahgre fritillary butterfly was listed as an endangered species on June 24,
20  1991 (USFWS 1991a). A recovery plan was finalized on March 17, 1994 (USFWS 1994a).
21  Currently, 11 known colonies of the butterfly exist (USFWS 2009c). Only 3 of those colonies are
22  monitored, and the current population size of those colonies is estimated to be between 3,400 and
23  23,000 (USFWS 2011d). The overall population size is currently unknown. The current range is
24  estimated to be 62 to 155 mi$^2$ (100 to 250 km$^2$) (NatureServe 2012).
25
26       The only current threats to the Uncompahgre fritillary butterfly are minor and include
27  collection by people and habitat degradation from the widening of hiking trails and from sheep
28  grazing (USFWS 2011d). Potential threats that may be associated with ULP activities include
29  habitat disturbance from the construction of facilities and roads, as well as from increased
30  vehicle traffic and human presence.
31
32
33  **E.3  FISH**
34
35
36  **E.3.1  Bonytail Chub**
37
38       The bonytail chub (*Gila elegans*) is a species of fish in the family *Cyprinidae*. It is
39  endemic to the Colorado River Basin. This species has a very slender, round, and long caudal
40  peduncle; a subterminal mouth; and fins that are large and falcate. Adults have a relatively flat,
41  concave head and a smooth dorsal hump and back. Young fish are typically silver-gray with
42  white bellies. Adults have a dark olive back that contains small iridescent highlights
43  (Mueller 2006). Adults grow to be about 21.6 in. (55 cm) in length and weigh 2.4 lb (1.1 kg)
44  (USFWS 2002a). Hatchery-reared bonytail chub became sexually mature after 2 years

BLM_0041840

1  (NatureServe 2012). Although the diet of the bonytail chub is unknown, it is hypothesized that
2  the eat insects, fishes, and plants (NatureServe 2012).
3
4  The historic range of the bonytail chub is unknown because it was extirpated from many
5  areas before surveys were conducted; however, it was common in the warm-water reaches of
6  larger rivers from Mexico to Wyoming (USFWS 2002a). Currently, no self-sustaining
7  populations of bonytail chub exist in the wild, and only a small number of adults exist in the wild
8  in Lake Mohave and Lake Havasu and in the Green River and upper Colorado River subbasins
9  (USFWS 2002a). The current population size is estimated to be between 1 and 1000 individuals
10  (NatureServe 2012). Although hatchery-reared adults have been released into rivers in the upper
11  basin, results indicate low survival and no reproduction or recruitment (USFWS 2002a).
12
13  In addition, while the habitat requirements of the bonytail chub are uncertain, it has been
14  observed in pools and eddies on main stem rivers. Habitats necessary for conservation of the
15  bonytail chub include river channels and flooded, ponded, or inundated riverine habitats
16  (USFWS 2002a). Bonytail chubs in rivers probably spawn in spring over rocky substrates, and
17  spawning in reservoirs has been observed over rocky shoals and shorelines (USFWS 2002a).
18  Spawning was observed to occur in June and July at water temperatures of about 64°F (18°C)
19  (USFWS 1994b). It is hypothesized that flooded bottomland habitats are important as nursery
20  habitats for young (USFWS 2002a).
21
22  The bonytail chub was listed as an endangered species on April 23, 1980 (USFWS 1980).
23  Approximately 312 mi (502 km) of river in the Colorado River Basin were designated as critical
24  habitat for the bonytail chub on March 21, 1994. The critical habitat spans 5 states and includes
25  portions of the Colorado, Green, and Yampa Rivers in the Upper Basin and the Colorado River
26  in the Lower Basin (USFWS 1994b). A recovery plan was approved on August 1, 2002
27  (USFWS 2002a).
28
29  Potential threats to the bonytail chub that may be associated with ULP activities include
30  impacts to water quality and water withdrawals. Uranium mining can contaminate surrounding
31  water with high levels of ammonia and uranium, which can bioaccumulate in fish species (Karp
32  and Metzler 2006; Fresques 2008; Metzler et al. 2008). The toxicity of uranium mine tailings has
33  been shown to be devastating to aquatic life in the Colorado River system (USFWS 1990). The
34  effects of ammonium include reduced growth rate, reduced gamete production, body deformities
35  and malformations, and degenerative gill and kidney appearance and function. Mining activities
36  may also increase the amount of sediment in the river (Leyda 2011). A catastrophic tailings pile
37  failure could bury important nursery areas and destroy other fish habitat. Water depletions
38  associated with uranium mining may contribute to the destruction or adverse modification of
39  designated critical habitat for the bonytail chub (USFWS 2011e). Other threats include stream
40  alteration, competition with and predation by introduced species, and pollution.
41
42

BLM_0041841

1 **E.3.2  Colorado Pikeminnow**
2
3 The Colorado pikeminnow (*Ptychocheilus lucius*) is a species of fish in the family
4 *Cyprinidae*. It is a long-distance migrator (average of 409 mi [658 km]) that reaches a maximum
5 length of 5.9 ft (1.8 m) and a weight of 79 lb (36 kg) and can live for more than 40 years
6 (USFWS 2002b). It is an elongated fish with a greenish, slender body with gold flecks on the
7 dorsal surface. The mouth is large and nearly horizontal, with slender teeth (USFWS 2007).
8 Reproduction occurs after 5 to 7 years (NatureServe 2012). Juveniles feed mainly on
9 zooplankton and insect larvae, whereas the larger fish (greater than 4 in. [10 cm]) feed mainly on
10 other fish (USFWS 2007; NatureServe 2012). Spawning occurs in river canyons when water
11 flows decline from June to August and when water temperatures are between 64 and 73°F
12 (18 and 23°C) (USFWS 1994b, 2002b). The optimal temperature for egg hatching is 68°F (20°C)
13 (NatureServe 2012). Adult habitats after spawning include pools, deep runs, and eddies
14 maintained by high spring flows. Larvae drift downstream to nutrient-rich nursery backwaters
15 (USFWS 2002b). Young of the year prefer shallow, ephemeral backwaters along the shore with
16 little or no current and silt or sand substrates (NatureServe 2012; USFWS 2007). When juveniles
17 reach about 8 in. (20 cm) in length, they prefer deeper water with a faster velocity
18 (USFWS 2007). During the winter, adults are most common in shallow, ice-covered shorelines
19 (USFWS 1994b). Temperature tolerances range from less than 50°F to 95°F (10°C to 35°C)
20 (USFWS 2007).
21
22 The Colorado pikeminnow is endemic to the Colorado River Basin. Although it was
23 extirpated from the Lower Basin in the 1970s, experimental introductions have been made into
24 the Verde River since the 1980s. Currently, three wild, reproducing populations occur in the
25 Green River, San Juan River, and upper Colorado River subbasins. Current population estimates
26 are 6,600 to 8,900 total for the three populations (6,000 to 8,000 in the Green River; 600 to
27 900 in the upper Colorado River; and 19 to 50 in the San Juan River) (USFWS 2002b).
28
29 The Colorado pikeminnow was listed as an endangered species on March 11, 1967.
30 Approximately 1,148 mi (1,848 km) of river in the Colorado River Basin were designated as
31 critical habitat for the Colorado pikeminnow on March 21, 1994. The critical habitat spans
32 3 states and includes portions of the Colorado, Green, Yampa, White, and San Juan rivers in the
33 Upper Basin (USFWS 1994b). An original recovery plan was approved on August 28, 2002, and
34 the current recovery goals were approved on July 27, 2006 (USFWS 2002b).
35
36 Potential threats to the Colorado pikeminnow that may be associated with ULP activities
37 include impacts to water quality and water withdrawals. Uranium mining can contaminate
38 surrounding water with high levels of ammonia and uranium, which can bioaccumulate in fish
39 species (Karp and Metzler 2006; Fresques 2008; Metzler et al. 2008). The toxicity of uranium
40 mine tailings has been shown to be devastating to aquatic life in the Colorado River system
41 (USFWS 1990). The effects of ammonium include reduced growth rate, reduced gamete
42 production, body deformities and malformations, and degenerative gill and kidney appearance
43 and function. Mining activities may also increase the amount of sediment in the river
44 (Leyda 2011). A catastrophic tailings pile failure could bury important nursery areas and destroy
45 other fish habitat (USFWS 2002b). Water depletions associated with uranium mining may

BLM_0041842

1   contribute to the destruction or adverse modification of designated critical habitat for the
2   Colorado pikeminnow (USFWS 2011e). Other threats include stream alteration from dams,
3   competition with and predation by introduced species, and pollution.
4
5
6   **E.3.3  Greenback Cutthroat Trout**
7
8       The greenback cutthroat trout (*Oncorhynchus clarki* ssp. *stomias*) is a species of fish in
9   the family *Salmonidae*. It is one of the most colorful subspecies of cutthroat trout
10  (USFWS 1998). This species is characterized by dark, round spots on the sides and tail and two
11  colorful blood-red stripes on each side of the throat under the jaw (USFWS 2011f). Mature males
12  have crimson red along the ventral region during spawning season (USFWS 1998). The diet of
13  the greenback cutthroat trout includes mainly aquatic and terrestrial insects, but they are also
14  opportunistic feeders (USFWS 2009d; Coleman 2007). Males spawn at age two and females
15  reach sexual maturity when they reach a length of about 7 in. (18 cm) (usually after their third or
16  fourth summer) (USFWS 2011f; Coleman 2007). They spawn in spring or early summer
17  depending on the elevation. Females dig redds in the gravel bed of streams where they deposit
18  eggs. Spawning occurs when water reaches about 41 to 46°F (5 to 8°C) (Coleman 2007). Larger
19  females can lay up to 6,000 eggs (USFWS 2009d).
20
21       Although the historic range of the greenback cutthroat trout is not known, it is
22  hypothesized that all mountain and foothill habitats of the South Platte and Arkansas River
23  drainages in Colorado were included (USFWS 2009d). Only nine naturally occurring populations
24  are known to have persisted; however, many additional populations have been established in
25  lakes and streams with introductions (USFWS 1998). The most stable population occurs in
26  Rocky Mountain National Park (NatureServe 2012). Currently, 145 populations, in 141.5 mi
27  (227.7 km) of streams and 412 acres (166.74 ha) of lakes, have been documented within the
28  greenback's historic range (USFWS 2011f).
29
30       Habitat requirements of the greenback cutthroat trout differ with as it moves through its
31  life stages. Juveniles need the protective cover and low velocity flow found in side channels and
32  small tributaries; spawning occurs in riffles with clean gravel; over-wintering fish prefer deep
33  water, low-velocity flow, and protective cover; and adults prefer slow water areas for resting and
34  fast water areas for feeding, with protective cover from boulders, logs, overhanging vegetation,
35  or undercut banks (USFWS 2009d). Greenbacks also usually require clear, cold, well-
36  oxygenated water (USFWS 2009d).
37
38       The greenback cutthroat trout was listed as an endangered species in 1973 and was
39  reclassified to a threatened species on April 18, 1978 (USFWS 1978). A recovery plan was
40  approved on March 1, 1998 (USFWS 1998). Critical habitat for this species has not been
41  designated.
42
43       Potential threats to the greenback cutthroat trout that may be associated with ULP
44  activities include impacts to water quality and water flow. Uranium mining can contaminate
45  surrounding water with high levels of ammonia and uranium, which can bioaccumulate in fish

BLM_0041843

*Preliminary Draft PEIS*          *PEIS Privileged Information*                    *May 2012*
*PEIS Team Use Only*                  *Do Not Distribute*

1  (Karp and Metzler 2006; Fresques 2008; Metzler et al. 2008). Eggs of greenback cutthroat trout
2  did not survive in a stream with increased levels of heavy metals (USFWS 1998). The effects of
3  ammonium include reduced growth rate, reduced gamete production, body deformities and
4  malformations, and degenerative gill and kidney appearance and function. Mining activities may
5  also increase the amount of sediment in the river (Leyda 2011). Water depletions associated with
6  uranium mining may contribute to the destruction or adverse modification of habitat for the
7  greenback cutthroat trout (USFWS 2011f). Other threats include removal of riparian habitat;
8  logging; grazing; road and trail construction and use; and recreational vehicle use, fire, and
9  diversion of streams for agricultural or municipal purposes (USFWS 2009d).
10
11
12  **E.3.4  Humpback Chub**
13
14         The humpback chub (*Gila cypha*) is a freshwater fish species in the family *Cyprinidae*.
15  This species is less than 19.7 in. (50 cm) in total length. It has silvery sides and a brown back.
16  Adults have a distinctive dorsal hump, a long snout, and small eyes. Humpback and roundtail
17  chubs can look very similar, and the young in particular do not possess easily identifiable
18  morphological differences (USFWS 1990). The humpback chub reproduces from May to July
19  depending on the location. Spawning occurs when water temperatures near 68°F (20°C) and
20  spring water flows are at their highest (USFWS 1994b). Both the young and adults are bottom
21  feeders and consume mainly insects and other invertebrates, although they occasionally also
22  consume algae and fish.
23
24         The humpback chub is found in river canyons in a variety of habitats, including in pools,
25  riffles, and eddies. They have also been found near boulder-strewn canyons, travertine dams,
26  rocky runs, riffles, and rapids (USFWS 1994b). Adult humpback chub inhabit deep (1 to 15 ft
27  [0.3 to 4.6 m]), swift-river regions (0–6 in./s or 0–15 cm/s) but also use microhabitats with low-
28  velocity water. The young are generally found in shallower areas (i.e., in depths of less than
29  9.8 ft [2.9 m]).
30
31         The humpback chub is endemic to the Colorado River Basin and is presently restricted to
32  remote, white water canyons. Manmade alterations to the Colorado River may have caused the
33  humpback chub to disappear from certain areas before its presence was documented
34  (USFWS 1990). Because of this uncertainty, the historical distribution of the humpback chub is
35  not well known, although the earliest known record of the species is from the Grand Canyon and
36  dates from around 4,000 B.C. (USFWS 1990, 1994b).
37
38         The humpback chub was listed as an endangered species on March 11, 1967. An original
39  recovery plan was approved on August 22, 1979, and the current *Second Revised Recovery Plan*
40  was approved on September 19, 1990 (USFWS 1990). Approximately 379 mi (610 km) of river
41  in the Colorado River Basin was designated as critical habitat for the humpback chub on
42  March 24, 1994. The critical habitat spans three states and includes portions of the Colorado,
43  Green, and Yampa rivers in the Upper Basin and the Colorado and Little Colorado rivers in the
44  Lower Basin (USFWS 1994b). The largest remaining population of humpback chub in the

BLM_0041844

*Preliminary Draft PEIS*  *PEIS Privileged Information*  *May 2012*
*PEIS Team Use Only*  *Do Not Distribute*

1 Colorado River Basin occurs in the Little Colorado and Colorado rivers in the Grand Canyon
2 (USFWS 1994b).
3
4     Potential threats to the humpback chub that may be associated with ULP activities
5 include impacts to water quality and water withdrawals. Uranium mining can contaminate
6 surrounding water with high levels of ammonia and uranium, which can bioaccumulate in fish
7 (Karp and Metzler 2006; Fresques 2008; Metzler et al. 2008). The toxicity of uranium mine
8 tailings has been shown to be devastating to aquatic life in the Colorado River system
9 (USFWS 1990). The effects of ammonium include reduced growth rate, reduced gamete
10 production, body deformities and malformations, and degenerative gill and kidney appearance
11 and function. Mining activities may also increase the amount of sediment in the river
12 (Leyda 2011). Water depletions associated with uranium mining may contribute to the
13 destruction or adverse modification of designated critical habitat for the humpback chub
14 (USFWS 2011e). Other threats include stream alteration, competition with and predation by
15 introduced species, and pollution.
16
17
18 **E.3.5  Razorback Sucker**
19
20     The razorback sucker (*Xyrauchen texanus*) is a species of fish in the family
21 *Catostomidae*. This species has a long, high hump behind the head. The head and body are dark,
22 and the sides are brownish and fade to a yellowish-white abdomen. It reaches lengths of 36 to
23 39 in. (91 to 99 cm) and weighs up to 12 lb (5.4 kg) (USFWS 2007). The diet of adults includes
24 planktonic crustaceans, diatoms, filamentous algae, midge larvae, and detritus.
25
26     Habitat requirements of the razorback sucker in rivers include deep runs, eddies,
27 backwaters, and flooded off-channel environments in spring; runs and pools often found in
28 shallow water and associated with submerged sandbars in summer; and low-velocity runs, pools,
29 and eddies in winter (USFWS 2002c). Adults may travel long distances to spawning sites, and
30 spawning usually occurs in rivers over gravel, cobble, or sand substrates during spring runoff at
31 temperatures greater than 57°F (14°C) (USFWS 1991b, 2002c). Spawning can also occur over
32 rocky shoals and shorelines. Young razorback suckers require nursery environments with quiet,
33 warm, and shallow water, such as tributary mouths, backwaters, or inundated floodplain habitats
34 in rivers, and coves or shorelines in reservoirs (USFWS 2002c).
35
36     The razorback sucker is endemic to the Colorado River Basin. The historic range of the
37 razorback sucker extended through 3,500 mi (5,633 km) of the Colorado River basin throughout
38 Arizona, California, Colorado, Nevada, New Mexico, Utah, Wyoming, Baja California Norte,
39 and Sonora of Mexico (USFWS 1991b). Currently, the razorback sucker only inhabits about
40 25% of its historical range (750 mi [1,207 km]) in the upper Colorado River basin
41 (USFWS 1991b, 2002c). Most wild fish are now found in Lake Mohave, which represents the
42 largest population within the lower basin (USFWS 2007). This population has dropped from
43 60,000 in 1991 to 9,000 in 2000 (USFWS 2002c). Razorback suckers are currently found in
44 small numbers in the Green River, upper Colorado River, and San Juan River subbasins; lower

BLM_0041845

*Preliminary Draft PEIS*　　　　　*PEIS Privileged Information*　　　　　*May 2012*
*PEIS Team Use Only*　　　　　　　*Do Not Distribute*

1　Colorado River; reservoirs of Lakes Mead and Mohave; and in small tributaries of the Gila River
2　subbasin (USFWS 2002c).
3
4　　　The razorback sucker was listed as an endangered species on October 23, 1991.
5　Approximately 1,724 mi (2,774 km) of river in the Colorado River Basin was designated as
6　critical habitat for the razorback sucker on March 21, 1994. The critical habitat spans 6 states and
7　includes portions of the Green, Yampa, Duchesne, Colorado, White, Gunnison, and San Juan
8　rivers in the Upper Basin and portions of the Colorado, Gila, Salt, and Verde rivers in the Lower
9　Basin (USFWS 1994b). A recovery plan was approved on August 28, 2002 (USFWS 2002c).
10
11　　　Potential threats to the razorback sucker that may be associated with ULP activities
12　include impacts to water quality and water withdrawals. Uranium mining can contaminate
13　surrounding water with high levels of ammonia and uranium, which can bioaccumulate in fish
14　species (Karp and Metzler 2006; Fresques 2008; Metzler et al. 2008). The toxicity of uranium
15　mine tailings has been shown to be devastating to aquatic life in the Colorado River system
16　(USFWS 1990). The effects of ammonium include reduced growth rate, reduced gamete
17　production, body deformities and malformations, and degenerative gill and kidney appearance
18　and function. Mining activities may also increase the amount of sediment in the river
19　(Leyda 2011). A catastrophic tailings pile failure could bury important nursery areas and destroy
20　other fish habitat (USFWS 2002c). Water depletions associated with uranium mining may
21　contribute to the destruction or adverse modification of designated critical habitat for the
22　razorback sucker (USFWS 2011c). Other threats include stream alteration, competition with and
23　predation by introduced species, and pollution.
24
25
26　**E.4  BIRDS**
27
28
29　**E.4.1  Gunnison Sage-Grouse**
30
31　　　The Gunnison sage-grouse (*Centrocercus minimus*) is one of two sage grouse species in
32　the family *Phasianidae* (the other sage grouse species is the greater sage-grouse
33　[*C. urophasianus*]). The Gunnison sage-grouse weighs about a third less than the greater sage-
34　grouse; however, the males of both species possess conspicuous filoplumes and yellow-green air
35　sacs on the chest during the breeding season. Sage grouse gather on leks during the spring where
36　males establish territories and strut for approximately 6 weeks. Sage grouse are polygamous, and
37　males do not provide any parental care. The majority of females establish nests within 2 mi
38　(3.2 km) of an active lek. Gunnison sage-grouse have an average clutch size of 6.8 eggs and have
39　one of the lowest nest success rates of all upland game bird species (ranging from 10% to 63%)
40　(Gunnison Sage-Grouse Rangewide Steering Committee 2005).
41
42　　　Sage grouse are typically found in large expanses of sagebrush-dominated habitats.
43　Various habitats, such as riparian meadows, agricultural lands, and native grasses and forbs, are
44　also used if intermixed with sagebrush (USFWS 2010b). The Gunnison sage-grouse relies
45　heavily on sagebrush for nesting, shelter, and food throughout the year. Although forbs and

BLM_0041846

1   insects are eaten during the summer and early fall, its diet consists entirely of sage brush during
2   the winter (USFWS 2006a).
3
4          Gunnison sage-grouse historically occupied 21,370 mi$^2$ (34,392 km$^2$) throughout
5   southwestern Colorado, northwestern New Mexico, northeastern Arizona, and southeastern Utah
6   (USFWS 2006a). Currently, only seven widely scattered and isolated populations occur in
7   Colorado and Utah, occupying 1,511 mi$^2$ (2,432 km$^2$) in Gunnison Basin, San Miguel Basin,
8   Monticello–Dove Creek, Piñon Mesa, Crawford, Cerro Summit–Cimarron–Sims Mesa, and
9   Poncha Pass (USFWS 2010b). Gunnison sage-grouse now occupy about 10% of the habitat that
10  existed before the arrival of European settlers (BLM 2010). The breeding population size was
11  estimated to be fewer than 4,000 individuals in 2000, with the largest population (2,000 to
12  3,000 individuals) occurring primarily in Gunnison and Saguache counties, Colorado. The
13  remaining seven populations have fewer than 300 breeding individuals (NatureServe 2012).
14
15          The Gunnison sage-grouse became a candidate for federal listing on September 28, 2010
16  (USFWS 2010b). The listing of this species was determined to be warranted but was precluded
17  by higher-priority listing actions. The USFWS assigned a listing priority number of 2 to this
18  species because threats have a high magnitude and are imminent.
19
20          The main threat to the Gunnison sage-grouse is the fragmentation and degradation of
21  sagebrush habitats resulting from conversion to cropland, energy development, and urban
22  development (NatureServe 2012). Potential threats that may be associated with ULP activities
23  include direct habitat loss, fragmentation, and degradation, as well as direct disturbance of nests
24  or leks. Mining may result in abandoned mining pits, mining infrastructure, access roads, and
25  overburden placement in sagebrush habitats. Fragmentation of these habitats could force sage-
26  grouse to choose less optimal habitats. Construction of any substantial structure or road, as well
27  as use of access roads, can cause increased deposition of dust on plants and invasion of
28  nonnative plants, potentially effecting sagebrush distribution. Increased noise and traffic from
29  human presence may also lead to a disruption of normal grouse behavior and productivity
30  (Gunnison Sage-Grouse Rangewide Steering Committee 2005). Other threats include fencing
31  (increases mortality due to collision and increased perch sites for nest predators), fires (increases
32  weeds and degrades suitable habitat), and domestic grazing (changes plant communities and
33  soils) (USFWS 2010b).
34
35
36  **E.4.2  Mexican Spotted Owl**
37
38          The Mexican spotted owl (*Strix occidentalis lucida*) is one of three subspecies of the
39  spotted owl (*S. occidentalis*) (USFWS 2011g). They are medium-sized owls without ear tufts
40  (USFWS 2011g). They have dark eyes and an ashy-chestnut brown body with white and brown
41  spots on their abdomen, back, and head (USFWS 2011h). Wing and tail feathers are dark brown
42  with lighter brown and white bars (USFWS 2011g). Young owls less than 5 months old have a
43  downy appearance. Subadults (5 to 26 months) look like adults, but have pointed tail feathers
44  with a white terminal band. Adult tail feathers have rounded tips and the terminal band is mottled
45  brown and white (USFWS 2011g). Females are generally larger than males (USFWS 2011h).

BLM_0041847

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

1    Although most Mexican spotted owls are nonmigratory, some individuals migrate to lower
2    elevations during the winter (USFWS 2011g). The diet of the Mexican spotted owl mainly
3    consists of small and medium-sized rodents; however, they also consume bats, birds, reptiles,
4    and arthropods (USFWS 2011g).
5
6         The habitat requirements of the Mexican spotted owl include forested mountains and
7    canyonlands. Forests used by the Mexican spotted owl are generally uneven-aged and
8    multistoried and have high canopy cover. Larger trees (with an average diameter of 24 in.
9    [61 cm]) are usually chosen for nesting sites. In canyonlands, important features for the Mexican
10   spotted owl include steep canyon walls with isolated pinnacles and rims with large vertical cliffs.
11   The canyon habitats also often include a variety of desert scrub and riparian vegetation
12   communities. Cliff faces contain numerous caves and ledges that create protected microsites for
13   nesting and roosting (USFWS 2011g). Foraging occurs in a wide range of habitats, including in
14   managed and unmanaged forests, pinyon-juniper woodlands, mixed-conifer and ponderosa pine
15   forests, cliff faces and terraces between cliffs, and riparian zones.
16
17        Mexican spotted owls rely on existing structures for nesting (e.g., nests built by other
18   birds on cliffs, debris platforms in trees, and tree cavities). Courtship begins in March, with
19   females laying one to three eggs in late March or early April; and then incubation lasts about
20   30 days (USFWS 2011g).
21
22        The current range of the Mexican spotted owl is nearly the same as the historical range
23   and is estimated to include 12,427–1,553,428 mi$^2$ (20,000–2,500,000 km$^2$) across Utah,
24   Colorado, Arizona, New Mexico, the western portions of Texas, and several states in Mexico
25   (NatureServe 2012; USFWS 2011g).
26
27        The Mexican spotted owl has experienced a long-term population decline of 30% to 50%
28   (NatureServe 2012). Currently, 1,301 owl sites (used repeatedly by a single or a pair of owls for
29   nesting, roosting, or foraging) are known in the U.S. portion of the owl's range (USFWS 2011g).
30   The current population size is estimated to be 1,000 to 2,500 individuals. A little more than half
31   of the U.S. population occurs in the Upper Gila Mountains Recovery Unit in Arizona and
32   New Mexico. Many populations occur in isolated mountain ranges separated by large areas of
33   unforested land (NatureServe 2012).
34
35        The Mexican spotted owl was listed as threatened on March 16, 1993 (USFWS 1993). A
36   draft recovery plan was made available for comment on June 28, 2011 (USFWS 2011g). [move
37   to follow chronol. order, as per others?] Approximately 4,633,065 acres (1,874,935 ha)
38   [4.6 million acres (1.9 million ha)?] of critical habitat was designated in Arizona, Colorado,
39   New Mexico, and Utah on June 6, 1995. The designated critical habitat was changed first on
40   February 1, 2001 (USFWS 2001a) and again on August 31, 2004 (USFWS 2004). Currently,
41   critical habitat includes approximately 8.6 million acres (3.5 million ha) of habitat in Arizona,
42   Colorado, New Mexico, and Utah (USFWS 2004).
43
44        The greatest threat to the Mexican spotted owl has been loss of habitat resulting from
45   even-aged timber management (NatureServe 2012). Potential threats that may be associated with

BLM_0041848

*Preliminary Draft PEIS*          *PEIS Privileged Information*          *May 2012*
*PEIS Team Use Only*                *Do Not Distribute*

1  ULP activities include increased mortality, loss or fragmentation of habitat, and a reduced ability
2  to hunt. Increased vehicle traffic associated with mining operations could increase the number of
3  owls killed from colliding with vehicles. The construction of mining facilities and access roads
4  could remove or fragment the Mexican spotted owl's habitat. Recent research on acoustic
5  predators (bats and owls) shows that even low levels of traffic noise will mask the rustling
6  sounds of rodents and reduce the ability of the owls to hear them. The noise of the mine
7  operations may have a similar effect and prevent the owls from catching prey (Leyda 2011).
8  Other threats include forest fires, predation, starvation, disease, and parasites (USFWS 2011g).
9
10
11 **E.4.3  Southwestern Willow Flycatcher**
12
13      The southwestern willow flycatcher (*Empidonax traillii extimus*) is one of four willow
14 flycatcher subspecies (*E. traillii*). The subspecies are distinguished by subtle differences in color,
15 morphology, and habitat use (USFWS 2002d). The southwestern willow flycatcher is less than
16 6 in. (15 cm) in length; weighs about 4 oz (12 g); and has a brownish-olive body, whitish throat,
17 pale olive breast, pale yellow belly, and two light wing bars (USFWS 2002d, 2011i;
18 NatureServe 2012). The bill is depressed and wide at the base (NatureServe 2012). The birds eat
19 mainly insects, including wasps, bees, moths, caterpillars, and butterflies, although they will
20 sometimes eat berries as well (NatureServe 2012).
21
22      The southwestern willow flycatcher is a neotropical migrant that travels from breeding
23 grounds in the United States to wintering grounds in Central and South America
24 (USFWS 2005a). Essential habitat includes forested wetlands or scrub-shrub wetlands for
25 breeding, foraging, migrating stopovers, dispersing, and shelter (USFWS 2005a). The species
26 breeds in southern California, southern Nevada, southern Utah, southern Colorado, Arizona, and
27 New Mexico from sea level to around 8,000 ft (2,438 m) above sea level. Nesting occurs
28 primarily in dense swampy thickets of willow, buttonbush, tamarisk, vines, or other plants from
29 6.5 to 98 ft (2 to 30 m) in height (NatureServe 2012; USFWS 2005a). Nesting has been observed
30 in patches ranging from 0.25 to 173 acres (0.1 to 70 ha) (USFWS 2005a). Nesting occurs from
31 early June through the end of July. The clutch size is usually 3 or 4, and both parents take care of
32 the young (NatureServe 2012).
33
34      Although the current range of the southwestern willow flycatcher is similar to the
35 historical range, suitable habitat within that range has been greatly reduced (USFWS 2002d).
36 The current range is estimated to be 12,427–1,553,428 mi$^2$ (20,000–2,500,000 km$^2$), and the
37 population is found in relatively small, isolated, and widely dispersed locales
38 (NatureServe 2012). In 2000, 53% of the southwestern willow flycatchers were distributed
39 across only 10 sites (USFWS 2002d). The population has experienced a long-term decline of
40 30% to 50%, and the population was estimated to be between 1,200 and 1,300 pairs
41 (NatureServe 2012).
42
43      The southwestern willow flycatcher was listed as an endangered species on March 29,
44 1995 (USFWS 2002d). A Recovery Plan was approved on August 30, 2002 (USFWS 2002).
45 Approximately 599 river mi (964 river km) were designated as critical habitat for the

BLM_0041849

1 southwestern willow flycatcher on July 22, 1997 (USFWS 1997). On October 19, 2005, the
2 designated critical habitat was amended and now includes 737 mi (1,186 km) of critical habitat
3 (USFWS 2005a). The currently designated critical habitat includes portions of Arizona,
4 California, Nevada, New Mexico, and Utah.
5
6        The greatest threat to the southwestern willow flycatcher is loss or degradation of riparian
7 habitat (USFWS 2002d). Potential threats to the southwestern willow flycatcher that may be
8 associated with ULP activities include facility construction, water withdrawal, and increased
9 human presence. Direct habitat loss may occur from the construction of mining facilities and
10 access roads. Reduction of water in riparian habitats degrades habitat that is essential to the
11 southwestern willow flycatcher habitat. Human disturbances at nesting sites resulting from
12 human presence or traffic noise may result in nest abandonment (USFWS 2011i). Additional
13 threats include fire, livestock grazing, and brood parasitism by the brown-headed cowbird
14 (USFWS 2002d).
15
16
17 **E.4.4  Western Yellow-Billed Cuckoo**
18
19        The western yellow-billed cuckoo (*Coccyzus americanus occidentalis*) is one of two
20 subspecies of yellow-billed cuckoo (*C. americanus*). The western yellow-billed cuckoo is around
21 12 in. (31 cm) in length with a slender, long-tailed profile (USFWS 2009e). It is brownish above
22 and white below, with rusty-colored flight feathers. The upper mandible of the bill is black, and
23 the lower mandible is yellow. The underside of the tail has pairs of large, white spots
24 (USFWS 2011j).
25
26        The breeding habitat for the western yellow-billed cuckoo consists of large tracts of
27 deciduous riparian woodland, especially dense stands of cottonwood and willow, although
28 desirable breeding habitat can also include mesquite and salt-cedar, in some areas. Nests are
29 placed in dense cover of trees, shrubs, or vines; near water; and generally 4.9 to 42.6 ft (1.5 to
30 13 m) above ground. Dense understory foliage appears to be an important factor in nest-site
31 selection, while cottonwood trees are an important foraging habitat (USFWS 2009e).
32 Nonbreeding habitats include various types of forest, woodland, and scrub (NatureServe 2012).
33
34        The western yellow-billed cuckoo arrives on breeding grounds in the United States from
35 late May to June and begins fall migration to South America from August to late September
36 (Wiggins 2005). While they are courting females, the males will often carry a food item to offer
37 the females during copulation (Wiggins 2005). Clutch size varies from 1 to 5 eggs; and both
38 parents build the nest, incubate the eggs, and feed the young. They feed primarily on slow-
39 moving insects including grasshoppers, caterpillars, and beetles (Wiggins 2005).
40
41        The western yellow-billed cuckoo, which historically had bred throughout most of
42 western North America, is now extirpated in western Canada, Washington, and Oregon—and
43 now is rare and patchily distributed throughout most of the United States west of the Rocky
44 Mountains. In western Colorado, the western yellow-billed cuckoo, which was never common in
45 that area, appears to be disappearing (Wiggins 2005).

BLM_0041850

1      It is estimated that there could be less than 2,000 breeding pairs across the entire range
2  for the western yellow-billed cuckoo. It is estimated that this breeding population has declined
3  by at least 90% since the end of the 19th century (NatureServe 2012).
4
5      The western yellow-billed cuckoo became a candidate for federal listing on October 30,
6  2001 (USFWS 2001b). The listing of this species was determined to be warranted but was
7  precluded by higher-priority listing actions. The U.S. Fish and Wildlife Service (USFWS)
8  assigned a listing priority number of 3 to the western Distinct Population Segment that occurs in
9  Washington, Oregon, California, Idaho, Nevada, Montana, Wyoming, Utah, Arizona, Colorado,
10 New Mexico, Texas, British Columbia, and Mexico.
11
12      Potential threats to the western yellow-billed cuckoo that may be associated with the ULP
13 activities include loss or fragmentation of breeding habitat due to the construction of facilities or
14 roads. Increased noise from human presence and vehicle traffic may also affect the western
15 yellow-billed cuckoo. The western yellow-billed cuckoo was ten times more likely to be present
16 at sites far (i.e., greater than 2,297 ft [700 m]) from roads with heavy traffic than at sites near
17 (i.e., less than 820 ft [250 m]) to roads with heavy traffic (Goodwin and Shriver 2011). Other
18 threats include use of pesticides and loss or degradation of habitat as a result of grazing and river
19 management (NatureServe 2012).
20
21
22 **E.5  MAMMALS**
23
24
25 **E.5.1  Black-Footed Ferret**
26
27      The black-footed ferret (*Mustela nigripes*) is the only ferret species native to North
28 America. It is brownish in color with a slightly paler belly and black facemask, legs, and tip of
29 tail (NatureServe 2012; USFWS 2003). It is around 23.6 in. (60 cm) in length and weighs up to
30 2.4 lb (1.1 kg) (USFWS 2003). In captivity, the black-footed ferret reproduces in March and
31 early April, and the gestation period is around 45 days. The average litter size is 3.5, and young
32 disperse in the fall. Some females can reproduce as yearlings. Black-footed ferrets are nocturnal
33 and can remain inactive for up to 6 days during the winter. Their main food item is prairie dogs,
34 but ground squirrels, rabbits, deer mice, voles, pocket gophers, birds, and insects are also
35 sometimes consumed (NatureServe 2012; USFWS 1988).
36
37      Historically, the black-footed ferret's range extended throughout Arizona, Colorado,
38 Kansas, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas,
39 Utah, Wyoming, Alberta, and Saskatchewan. The current range is estimated to be between
40 62 and 155 $mi^2$ (100 and 250 $km^2$) (NatureServe 2012). The black-footed ferret relies on prairie
41 dog colonies for food, shelter, and denning and thus has only been found in the vicinity of black-
42 tailed prairie dog, white-tailed prairie dog, and Gunnison's prairie dog colonies (USFWS 2003).
43 By the early 1970s, the black-footed ferret was near extinction as a result of the intentional
44 poisoning of and introduction of disease to prairie dogs (USFWS 2003). Remaining ferrets were
45 used for captive breeding, and a few reintroductions have successfully established reproducing

BLM_0041851

1   populations (NatureServe 2012). The population size is now estimated to be between 250 and
2   1,000 individuals (NatureServe 2012). In late 2005, 400 reintroduced individuals were alive in
3   the wild (NatureServe 2012).
4
5       The black-footed ferret was listed as an endangered species on March 11, 1967
6   (USFWS 2001e). A Recovery Plan was approved on August 8, 1988 (USFWS 1988). The
7   species may be extirpated from the State of Colorado, with the exception of reintroduced
8   populations in the northwestern portion of the state (CDOW 2012; USFWS 2012). Black-footed
9   ferrets were released in the Wolf Creek Management Area in Moffat and Rio Blanco counties in
10  Colorado between 2001 and 2006 (BLM 2008). These populations are considered to be
11  experimental, nonessential populations under Section 10(j) of the Endangered Species Act.
12  While it is unlikely that these species will occur in the affected areas of the ULP lease tracts, the
13  area of western Colorado containing the ULP lease tracts has not been block-cleared for black-
14  footed ferrets (USFWS 2012).
15
16      Black-footed ferret habitat is the same habitat used by prairie dogs and includes
17  grasslands, steppe, and shrub steppe. Prairie dog holes serve as resting and birth sites. Between
18  99 and 148 acres (40 and 60 ha) of prairie dog colony are needed to support one ferret
19  (NatureServe 2012).
20
21      Potential threats to black-footed ferrets or their habitat associated with the ULP activities
22  may include increased mortality resulting from collision with vehicles and loss of habitat
23  stemming from the construction of mining facilities and access roads. Other threats include
24  prairie dog poisoning and shooting, canine distemper, sylvatic plague, and predation
25  (USFWS 1988).
26
27
28  **E.5.2  Canada Lynx**
29
30      The Canada lynx (*Lynx canadensis*) is a medium-sized cat reaching 30–35 in. (76–89 cm)
31  in length and weighing 18–23 lb (8–10.4 kg). They have large feet; long legs; tufts on their ears;
32  and short, black-tipped tails. During the winter, their fur is dense and is grayish-brown mixed
33  with buff or pale brown on the back; and grayish-white on the belly, legs, and feet. During the
34  summer, their fur is more reddish to gray-brown (USFWS 2011k). They prey on snowshoe hares;
35  but if hare densities are low, they will prey opportunistically on other small mammals (like red
36  squirrels, flying squirrels, ground squirrels, porcupines, beavers, mice, voles, shrews), birds
37  (grouse), and fish (USFWS 2009f, 2011k). Home ranges are generally between 19 and 134 mi$^2$
38  (31 and 216 km$^2$) (USFWS 2009f). Breeding occurs in March and April for yearling females,
39  with litter sizes averaging three to four kittens. The male does not help with rearing young
40  (NatureServe 2012).
41
42      Habitat requirements of the Canada lynx include boreal forests, deciduous temperate
43  forests, and subalpine forests that experience cold winters with deep, fluffy snow for extended
44  periods. Hunting occurs in forests with dense understories. Denning occurs in forests where
45  woody debris, such as logs and windfalls, provide protection for kittens (USFWS 2009f). The

BLM_0041852

1   lynx density in the contiguous United States is lower than it is in Canada because of a smaller
2   and patchier habitat range and an increased rate of competition for food (USFWS 2009f). Canada
3   lynx in the contiguous United States occur in forested portions of Colorado, Idaho, Maine,
4   Michigan, Minnesota, Montana, New Hampshire, New York, Oregon, Utah, Vermont,
5   Washington, and Wisconsin. Although a lack of historic or current lynx data for the contiguous
6   United States makes it difficult to determine population estimates or trends for this region, it is
7   estimated to be fewer than 2,000 (USFWS 2000; NatureServe 2012). Their current range
8   (including Alaska and Canada) is estimated to be greater than 1,553,428 mi$^2$ (2,500,000 km$^2$)
9   [1.5 million mi$^2$ (2.5 million km$^2$)] (NatureServe 2012).
10

11         The Canada lynx was listed as a threatened species on March 24, 2000 (USFWS 2000).
12   On December 17, 2009, the Canada lynx became a candidate for federal listing in New Mexico,
13   with a listing priority number of 12 because they are regularly and frequently crossing the state
14   boundary between Colorado and New Mexico, leaving them without federal protection
15   (USFWS 2009g). A recovery plan was outlined on September 14, 2005 (USFWS 2005b).
16   Approximately 2,963 mi$^2$ (4,768 km$^2$) were designated as critical habitat for the Canada lynx on
17   November 9, 2006 (USFWS 2006b). On February 25, 2009, additional critical habitat was
18   designated, bringing the total designated critical habitat to 62,765 mi$^2$ (101,010 km$^2$) in Maine,
19   Minnesota, Montana, Wyoming, Idaho, and Washington (USFWS 2009f).
20

21         Given the species' preference for high-elevation coniferous forests, it is unlikely that the
22   Canada lynx will occur in areas of direct ULP activity. Previous threats to this species include
23   loss or alteration of habitat because of climate change, timber harvest, and human recreation
24   (USFWS 2009f, NatureServe 2012).
25
26

27   **E.5.3 Gunnison's Prairie Dog**
28

29         The Gunnison's prairie dog (*Cynomys gunnisoni*) is a large rodent that occurs from
30   central Colorado to central Arizona, including in small portions of northwestern New Mexico
31   and southeastern Utah. The species is divided into mountain and prairie populations, which are
32   separated by mountain ranges that almost completely limit prairie dog movement between
33   populations. Genetic testing is currently being conducted to determine whether montane and
34   prairie Gunnison's prairie dogs are populations or subspecies (USFWS 2011l). The Gunnison's
35   prairie dog is darker overall and has less striking facial markings than does the white-tailed
36   prairie dog. It reaches a length of 11.8–15.4 in. (30–39 cm) and a weight of 0.6–3 lb (0.3–1.4 kg)
37   (Seglund and Schnurr 2010). Females reproduce as yearlings, whereas only a quarter of males
38   reproduce as yearlings (NatureServe 2012). Polygamous mating usually occurs in April and
39   May, and one litter with an average litter size of 6 is produced per year (USFWS 2011; Seglund
40   and Schnurr 2010; NatureServe 2012). Colonies consist of 50 to 100 individuals. Only 50% of
41   females survive their first year, and less than 15% survive to their second year. Their diet
42   consists mainly of grasses, forbs, sedges, and shrubs, although insects are also consumed. Prairie
43   dogs can exhibit months'-long periods of inactivity during winter, and individuals in some parts
44   of the range hibernate (NatureServe 2012).
45

BLM_0041853

1   Habitat requirements for the Gunnison's prairie dog include level to gently sloping (less
2   than 30%) grasslands and semidesert or montane shrublands at elevations of 6,004–12,008 ft
3   (1,830–3,660 m) in high mountain valleys and plateaus. Burrows require well-drained soils and
4   are usually found on slopes or in hummocks (Seglund and Schnurr 2010; NatureServe 2012;
5   USFWS 2011l). The montane portion of their habitat comprises about 40% of the total potential
6   habitat (USFWS 2008a).

8   The Gunnison's prairie dog has experienced a long-term population decline of 30% to
9   70% throughout its range. The current distribution is estimated to be between 100 and 8,000 mi$^2$
10   (161 and 12,875 km$^2$) in Arizona, Colorado, New Mexico, and Utah (USFWS 2011l). From
11   1916 to 2008, the habitat occupied by the Gunnison's prairie dog declined from 60,273 mi$^2$
12   (97,000 km$^2$) to 845–1,243 mi$^2$ (1,360–2,000 km$^2$). Only 3.6% of potential habitat is occupied in
13   the montane portion of the range. The montane population of prairie dogs no longer has the
14   metapopulation structure necessary to recover from catastrophic events because of their small
15   population size and isolation in montane habitats (USFWS 2011l). The current total population
16   size for prairie and montane populations is estimated to be between 100,000 and 1,000,000
17   (NatureServe 2012).

19   The Gunnison's prairie dog became a candidate for federal listing on February 5, 2008
20   (USFWS 2008a). The listing of this species was determined to be warranted but was precluded
21   by higher-priority listing actions. The USFWS originally assigned a listing priority number of
22   2 to the species because threats have a high magnitude and are imminent (USFWS 2008a). On
23   December 10, 2008, the listing priority was changed to 3 because listing of the Gunnison's
24   prairie dog is warranted but precluded only in the montane region of its range within Colorado
25   and New Mexico (USFWS 2008b).

27   The greatest threat to the Gunnison's prairie dog is the sylvatic plague
28   (NatureServe 2012). Potential threats to the Gunnison's prairie dog that may be associated with
29   the ULP activities include construction and the presence of infrastructure and traffic, which
30   could result in highly fragmented habitats (Seglund and Schnurr 2010). Other threats include
31   predation and human chemical control and shooting (USFWS 2011l).

### E.5.4  North American Wolverine

36   The North American wolverine (*Gulo gulo luscus*) is a subspecies of the wolverine
37   (*G. gulo*), which has a Holarctic range. It is the largest terrestrial member of the weasel family,
38   with adult males weighing 26–40 lb (12–18 kg) and females weighing 18–26 lb (8–12 kg). It has
39   a similar appearance to a small bear with a bushy tail; round head; short, rounded ears; small
40   eyes; and claws used for digging and climbing (USFWS 2010c). It is a dark brown color with a
41   paler head and two broad yellowish stripes running from the shoulders and joining on the rump
42   (NatureServe 2012).

44   The North American wolverine breeds at 2 years of age from late spring to early fall and
45   has an average of 3.4 kits per litter. Because of high rates of spontaneous abortion, rates of

BLM_0041854

1  successful reproduction are among the lowest for mammals. Gestation lasts 30–40 days.
2  Wolverines are opportunistic feeders that primarily consume carrion but will also eat small
3  animals, birds, fruits, berries, and insects. They naturally occur at low densities ranging from
4  1 wolverine per 40 to 209 mi$^2$ (65 to 337 km$^2$) (USFWS 2010c). The home range of a wolverine
5  can range from 62 to 559 mi$^2$ (100 to 900 km$^2$) (USFWS 2011m).
6
7          Habitat requirements for the North American wolverine include 4.9 ft (1.5 m) of snow to
8  excavate natal dens. Rocky sites such as north-facing boulder talus and subalpine cirques in
9  forest openings above 8,202 ft (2,500 m) are selected for dens. Wolverines occur within a wide
10  variety of cold habitats that receive enough winter precipitation. Their range includes alpine,
11  boreal, and arctic habitats, such as boreal forests, tundra, and high-elevation alpine regions
12  (USFWS 2010c).
13
14          The North American wolverine occurs throughout Alaska, Canada, and high-elevation
15  habitats of Washington, Idaho, Montana, Wyoming, California, and Colorado. The current
16  population of the North American wolverine in the contiguous United States is estimated to be
17  between 250 and 300 with the largest population occurring in the Northern Rocky Mountains. It
18  is believed that wolverines were entirely or nearly extirpated from the contiguous United States
19  in the first half of the 20th century, and currently functioning populations have reestablished in
20  two regions: the North Cascades in Washington and the northern Rocky Mountains in Idaho,
21  Montana, and Wyoming. Wolverines are also present in the southern Rocky Mountains and the
22  Sierra Nevada Mountains; however, reestablishment of populations has not occurred in those
23  areas yet (USFWS 2010c).
24
25          The North American wolverine became a candidate for federal listing on December 14,
26  2010 (USFWS 2010c). This decision was reached after several status reviews arose because of
27  complaints and lawsuits filed by environmental groups after the initial USFWS decision in 2003
28  that listing was not warranted (NatureServe 2012). In 2010, the listing of this species was
29  determined to be warranted but was precluded by higher-priority listing actions. USFWS
30  originally assigned a listing priority number of 6 to the species because threats have a high
31  magnitude but are not imminent (USFWS 2011m).
32
33          The main threat to the North American wolverine is habitat loss due to climate change
34  (USFWS 2011m). Other threats include loss of habitat due to human activities such as winter and
35  summer recreation, housing and industrial development, and extractive industry such as logging
36  (USFWS 2010c). Given the species' preference for high elevation forested areas, it is unlikely
37  for the North American wolverine to occur in areas of direct ULP activity.
38
39
40  **E.6  REFERENCES**
41
42  BLM (Bureau of Land Management), 2008, *A Review of Black-Footed Ferret Reintroduction in*
43  *Northwest Colorado, 2001–2006*, Technical Note 426, Aug.
44

BLM_0041855

1   BLM, 2010, *Sage-Grouse and Sagebrush Conservation.* Available at http://www.blm.gov/wo/
2   st/en/prog/more/sage_grouse_home2.html. Accessed Nov. 28, 2011.
3
4   CDOW (Colorado Division of Wildlife), 2012, *Natural Diversity Information Source, Black-*
5   *Footed Ferret* (Mustela nigripes). Available at http://ndis.nrel.colostate.edu/wildlifespx.asp?
6   SpCode=050120. Accessed April 17, 2012.
7
8   CNHP (Colorado Natural Heritage Program), 2011, *Endangered Species Act Listed Plants,*
9   *Colorado hookless cactus.* Available at http://www.cnhp.colostate.edu/download/
10  projects/rareplants/list.asp?list=esa. Accessed Nov. 25, 2011.
11
12  Coleman, M.A., and CNHP (Colorado Natural Heritage Program), 2007, *Life-History and*
13  *Ecology of the Greenback Cutthroat Trout*, prepared for the Greenback Cutthroat Trout
14  Recovery Program, April 26. Available at http://www.cnhp.colostate.edu/download/documents/
15  2007/GBN_Life_History-Coleman-4-26-07.pdf. Accessed Nov. 29, 2011.
16
17  Fresques, T., 2008, *Programmatic Biological Assessment for BLM's Fluid Minerals Program in*
18  *Western Colorado Re: Water Depletions and Effects on the Four Endangered Big River Fishes:*
19  *Colorado pikeminnow* (Ptychocheilus Lucius), *humpback chub* (Gila cypha), *bonytail chub* (Gila
20  elegans), *and razorback sucker* (Xyrauchen texanus). Available at http://westernenergyalliance.
21  org/wp-content/uploads/uploads/Draft_OG_WD_PBA_5-5-08%20%282%29.pdf. Accessed
22  Nov. 28, 2011.
23
24  Goodwin, S., and W.G. Shriver, 2011, "Effects of Traffic Noise on Occupancy Patterns of Forest
25  Birds," *Conservation Biology* 25(2):406–411.
26
27  Gunnison Sage-Grouse Rangewide Steering Committee, 2005, *Gunnison Sage-Grouse*
28  *Rangewide Conservation Plan,* Colorado Division of Wildlife, Denver, Colo.
29
30  Karp, K.E., and D.R. Metzler, 2006, "Moab, Utah, UMTRA Site: The Last Large Uranium Mill
31  Tailings Pile To Be Cleaned Up in the United States," pp. 671–682 in *Uranium in the*
32  *Environment: Mining Impact and Consequences,* B.J. Merkel and A. Hasche-Berger (editors).
33
34  Leyda, J.D., 2011, *Ecological Effects of Uranium Mining–Colorado, USA*, Leyda Consulting,
35  Inc. Available at http://uraniumwatch.org/doe_uraniumleasingprogram/exhibitA_LCI_
36  UranMine-Ecol-Effcts.110908.pdf. Accessed Nov. 28, 2011.
37
38  Metzler, D.R., et al., 2008, "Ground Water Remediation at the Moab, Utah, USA, Former
39  Uranium-Ore Processing Site," pp. 37–44 in *Uranium Mining and Hydrogeology*, B.J. Merkel
40  and A. Hasche-Berger (editors).
41
42  Mueller, G.A., 2006, *Ecology of Bonytail and Razorback Sucker and the Role of Off-Channel*
43  *Habitats in Their Recovery*, Scientific Investigations Report 2006-5065, U.S. Department of the
44  Interior, U.S. Geological Survey.
45

BLM_0041856

1   NatureServe, 2012, *NatureServe Explorer: An Online Encyclopedia of Life*, Arlington, Va.
2   Available at http://www.natureserve.org/explorer. Accessed April 17, 2012.
3
4   Seglund, A.E., and P.M. Schnurr, 2010, *Colorado Gunnison's and White-Tailed Prairie Dog*
5   *Conservation Strategy*, Colorado Division of Wildlife, Denver, Colo.
6
7   USFWS (U.S. Fish and Wildlife Service), 1978, "Endangered and Threatened Wildlife and
8   Plants; Listing of the Greenback Cutthroat Trout as a Threatened Species," *Federal*
9   *Register* 43:16343–16345.
10
11  USFWS, 1979, "Endangered and Threatened Wildlife and Plants; Determination That
12  *Sclerocactus glaucus* is a Threatened Species," *Federal Register* 44:58868–58870.
13
14  USFWS, 1980, "Determination That the Bonytail Chub (*Gila elegans*) is an Endangered
15  Species," *Federal Register* 45:27710–27713.
16
17  USFWS, 1984, "Endangered and Threatened Wildlife and Plants; Final Rule To Determine
18  *Eriogonum Pelinophilum* To Be an Endangered Species and To Designate Its Critical Habitat,"
19  *Federal Register* 49:28562–28565.
20
21  USFWS, 1988, *Black-Footed Ferret Recovery Plan*, Denver, Colo.
22
23  USFWS, 1990, *Humpback Chub Recovery Plan*, Denver, Colo. Available at http://ecos.fws.gov/
24  docs/recovery_plan/900919c.pdf. Accessed Nov. 25, 2011.
25
26  USFWS, 1991a, "Endangered and Threatened Wildlife and Plants; Uncompahgre Fritillary
27  Butterfly Determined To Be Endangered," *Federal Register* 56:28712–28717.
28
29  USFWS, 1991b, "Endangered and Threatened Wildlife and Plants; the Razorback Sucker
30  (*Xyrauchen texanus*) Determined To Be an Endangered Species," *Federal Register* 56:
31  54957–54967.
32
33  USFWS, 1993, "Endangered and Threatened Wildlife and Plants; Final Rule To List the
34  Mexican Spotted Owl as a Threatened Species," *Federal Register* 58:14248–14271.
35
36  USFWS, 1994a, *Uncompahgre Fritillary Butterfly Recovery Plan*, Denver, Colo. Available at
37  http://ecos.fws.gov/docs/recovery_plan/940317.pdf. Accessed Nov. 30, 2011.
38
39  USFWS, 1994b, "Endangered and Threatened Wildlife and Plants; Determination of Critical
40  Habitat for the Colorado River Endangered Fishes: Razorback Sucker, Colorado Squawfish,
41  Humpback Chub, and Bonytail Chub," *Federal Register* 59:13374–13400.
42
43  USFWS, 1997, "Endangered and Threatened Wildlife and Plants; Final Determination of Critical
44  Habitat for the Southwestern Willow Flycatcher," *Federal Register* 62:39129–39147.
45

BLM_0041857

1   USFWS, 1998, *Greenback Cutthroat Trout Recovery Plan*, Denver, Colo.

3   USFWS, 2000, "Endangered and Threatened Wildlife and Plants; Determination of Threatened
4   Status for the Contiguous U.S. Distinct Population Segment of the Canada Lynx and Related
5   Rule," *Federal Register* 65:16053–16086.

7   USFWS, 2001a, "Endangered and Threatened Wildlife and Plants; Final Designation of Critical
8   Habitat for the Mexican Spotted Owl," *Federal Register* 66:8530–8553.

10  USFWS, 2001b, "Endangered and Threatened Wildlife and Plants; Review of Plant and Animal
11  Species That Are Candidates or Proposed for Listing as Endangered or Threatened, Annual
12  Notice of Findings on Recycled Petitions, and Annual Description of Progress on Listing
13  Actions," *Federal Register* 66:54808–54832.

15  USFWS, 2002a, *Bonytail (*Gila elegans*) Recovery Goals: Amendment and Supplement to the
16  Bonytail Chub Recovery Plan*, Mountain-Prairie Region 6, Denver, Colo.

18  USFWS, 2002b, *Colorado Pikeminnow (*Ptychocheilus lucius*) Recovery Goals: Amendment and
19  Supplement to the Colorado Squawfish Recovery Plan*, Mountain-Prairie Region 6, Denver,
20  Colo.

22  USFWS, 2002c, *Razorback Sucker (*Xyrauchen texanus*) Recovery Goals: Amendment and
23  Supplement to the Razorback Sucker Recovery Plan*, Prairie Region 6, Denver, Colo.

25  USFWS, 2002d, *Southwestern Willow Flycatcher Recovery Plan*, Region 2, Albuquerque, N.M.

27  USFWS, 2003, "Endangered and Threatened Wildlife and Plants; Establishment of Nonessential
28  Experimental Population Status and Reintroduction of Black-Footed Ferrets in South-Central
29  South Dakota," *Federal Register* 68:26498–26510.

31  USFWS, 2004, "Endangered and Threatened Wildlife and Plants; Final Designation of Critical
32  Habitat for the Mexican Spotted Owl," *Federal Register* 69:53182–53298.

34  USFWS, 2005a, "Endangered and Threatened Wildlife and Plants; Designation of Critical
35  Habitat for the Southwestern Willow Flycatcher (*Empidonax traillii extimus*)," *Federal
36  Register* 70:60886–61009.

38  USFWS, 2005b, *Recovery Outline: Contiguous United States Distinct Population Segment of the
39  Canada Lynx*, Helena, Mont. Available at http://ecos.fws.gov/docs/recovery_plan/final%
40  20draft%20Lynx%20Recovery%20Outline%209-05.pdf. Accessed Dec. 2, 2011.

42  USFWS, 2006a, "Endangered and Threatened Wildlife and Plants; Final Listing Determination
43  for the Gunnison Sage-Grouse as Threatened or Endangered," *Federal Register* 71:
44  19954–19982.

BLM_0041858

1  USFWS, 2006b, "Endangered and Threatened Wildlife and Plants; Designation of Critical
2  Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx,"
3  *Federal Register* 71:66008–66061.
4
5  USFWS, 2007, *The Colorado Pikeminnow and the Razorback Sucker,* San Juan River Basin
6  Recovery Implementation Program. Available at http://www.fws.gov/southwest/sjrip/
7  GB_FS.cfm. Accessed Nov. 28, 2011.
8
9  USFWS, 2008a, "Endangered and Threatened Wildlife and Plants; 12-Month Finding on a
10  Petition To List the Gunnison's Prairie Dog as Threatened or Endangered," *Federal Register*
11  73: 6660–6684.
12
13  USFWS, 2008b, "Endangered and Threatened Wildlife and Plants; Review of Native Species
14  That Are Candidates for Listing as Endangered or Threatened; Annual Notice of Findings on
15  Resubmitted Petitions; Annual Description of Progress on Listing Actions," *Federal Register*
16  73: 75176–75244.
17
18  USFWS, 2009a, Eriogonum pelinophilum *(Clay-Loving Wild Buckwheat) 5-Year Review:*
19  *Summary and Evaluation*, Grand Junction, Colo.
20
21  USFWS, 2009b, "Endangered and Threatened Wildlife and Plants; Taxonomic Change of
22  *Sclerocactus Glaucus* to Three Separate Species," *Federal Register* 74:47112–47117.
23
24  USFWS, 2009c, *Uncompahgre Fritillary Butterfly (*Boloria acrocnema*) 5-Year Review:*
25  *Summary and Evaluation*, Grand Junction, Colo.
26
27  USFWS, 2009d, *Greenback Cutthroat Trout (*Oncorhynchus clarki stomias*) 5-Year Review:*
28  *Summary and Evaluation*, Denver, Colo.
29
30  USFWS, 2009e, "Endangered and Threatened Wildlife and Plants; Review of Native Species
31  That Are Candidates for Listing as Endangered or Threatened; Annual Notice of Findings on
32  Resubmitted Petitions; Annual Description of Progress on Listing Actions," *Federal Register* 74:
33  57804–57878.
34
35  USFWS, 2009f, "Endangered and Threatened Wildlife and Plants; Revised Designation of
36  Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada
37  Lynx," *Federal Register* 74:8616–8702.
38
39  USFWS, 2009g, "Endangered and Threatened Wildlife and Plants; 12-Month Finding on a
40  Petition To Change the Final Listing of the Distinct Population Segment of the Canada Lynx To
41  Include New Mexico," *Federal Register* 74:66937–66950.
42
43  USFWS, 2010a, *Recovery Outline for the Colorado Hookless Cactus (*Sclerocactus glaucus*)*,
44  Region 6, Denver, Colo.
45

BLM_0041859

1   USFWS, 2010b, "Endangered and Threatened Wildlife and Plants; Determination for the
2   Gunnison Sage-Grouse as a Threatened or Endangered Species," *Federal Register* 75:
3   59804–59863.
4
5   USFWS, 2010c, "Endangered and Threatened Wildlife and Plants; 12-Month Finding on a
6   Petition To List the North American Wolverine as Endangered or Threatened," *Federal*
7   *Register* 75:78030–78061.
8
9   USFWS, 2011a, *U.S. Fish and Wildlife Service Environmental Conservation Online System,*
10  *Colorado Hookless Cactus.* Available at http://ecos.fws.gov/speciesProfile/profile/
11  speciesProfile.action?spcode=Q3KI. Accessed Nov. 25, 2011.
12
13  USFWS, 2011b, "Endangered and Threatened Wildlife and Plants; Designation of Critical
14  Habitat for *Ipomopsis polyantha* (Pagosa skyrocket), *Penstemon debilis* (Parachute beardtongue),
15  and *Phacelia submutica* (Debeque phacelia)," *Federal Register* 76:45078–45128.
16
17  USFWS, 2011c, "Endangered and Threatened Wildlife and Plants; Determination of Endangered
18  Status for *Ipomopsis polyantha* (Pagosa Skyrocket) and Threatened Status for *Penstemon debilis*
19  (Parachute Beardtongue) and *Phacelia submutica* (Debeque Phacelia)," *Federal Register* 76:
20  45054–45075.
21
22  USFWS, 2011d, *Species Profile: Uncompahgre Fritillary Butterfly (*Boloria acrocnema*).*
23  Available at http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=I01Q.
24  Accessed Nov. 30, 2011.
25
26  USFWS, 2011e, *Federally Listed, Proposed and Candidate Species: Colorado River Fish,*
27  Wyoming Ecological Services. Available at http://www.fws.gov/wyominges/Pages/Species/
28  Species_Listed/CORivFish.html. Accessed Nov. 28, 2011.
29
30  USFWS, 2011f, *Species Profile: Greenback Cutthroat Trout (*Oncorhynchus clarki *ssp. Stomias).*
31  Available at http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=E00F.
32  Accessed Nov. 29, 2011.
33
34  USFWS, 2011g, *Draft Recovery Plan for the Mexican Spotted Owl (*Strix occidentalis lucida*),*
35  *First Revision,* Albuquerque, N.M.
36
37  USFWS, 2011h, *Species Profile: Mexican Spotted Owl (*Strix occidentalis lucida*).* Available at
38  http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=B074. Accessed
39  Nov. 30, 2011.
40
41  USFWS, 2011i, *Species Profile: Southwestern Willow Flycatcher (*Empidonax traillii extimus*).*
42  Available at http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=B094.
43  Accessed Nov. 28, 2011.
44

BLM_0041860

Case No. 1:20-cv-02484-MSK   Document 39   filed 04/27/21   USDC Colorado   pg 431 of 470

1  USFWS, 2011j, *Species Profile: Yellow-Billed Cuckoo (*Coccyzus americanus*)*. Available at
2  http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=B06R. Accessed
3  Nov. 25, 2011.
4
5  USFWS, 2011k, *Species Profile: Canada Lynx (*Lynx canadensis*)*. Available at
6  http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=A073. Accessed
7  Dec. 2, 2011.
8
9  USFWS, 2011l, "Endangered and Threatened Wildlife and Plants; Review of Native Species
10  That Are Candidates for Listing as Endangered or Threatened; Annual Notice of Findings on
11  Resubmitted Petitions; Annual Description of Progress on Listing Actions," *Federal Register*
12  76: 66370–66439.
13
14  USFWS, 2011m, *Species Profile: North American Wolverine (*Gulo gulo luscus*)*. Available at
15  http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=A0FA. Accessed
16  Dec. 1, 2011.
17
18  USFWS, 2012, *Endangered Species: Black-Footed Ferret.* Available at http://www.fws.gov/
19  mountain-prairie/species/mammals/blackfootedferret/. Accessed April 18, 2012.
20
21  Wiggins, D., 2005, *Yellow-Billed Cuckoo (Coccyzus americanus): A Technical Conservation*
22  *Assessment*, U.S. Forest Service, Rocky Mountain Region. Available at http://www.fs.fed.us/
23  r2/projects/scp/assessments/yellowbilledcuckoo.pdf. Accessed Nov. 25, 2011.
24
25

BLM_0041861

*Preliminary Draft PEIS*  
*PEIS Team Use Only*

*PEIS Privileged Information*  
*Do Not Distribute*

*May 2012*

1
2
3
4
5
6
7
8
9
10
11
12
13                    *This page intentionally left blank*
14

BLM_0041862

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  **APPENDIX F:**  
14  
15  **LIST OF PREPARERS**  
16  
17  

BLM_0041863

*Preliminary Draft PEIS*    *PEIS Privileged Information*    *May 2012*
*PEIS Team Use Only*    *Do Not Distribute*

1
2
3
4
5
6
7
8
9
10
11
12
13            *This page intentionally left blank*
14

*F-2*

BLM_0041864

1
2
3
4
5

## APPENDIX F:

## LIST OF PREPARERS

6     Table F-1 lists the U.S. Department of Energy (DOE) management team members for the
7   Uranium Leasing Program (ULP) Programmatic Environmental Impact Statement (PEIS).
8   Table F-2 lists the names, education, and expertise of the ULP PEIS preparers (all are at Argonne
9   National Laboratory). In addition, Ed Cotter of Stoller Corporation provided valuable project
10  insight and information on the ULP for the preparation of this Draft PEIS.

11
12
13  **TABLE F-1  DOE Management Team**

| Name | Office | Title |
|---|---|---|
| *U.S. Department of Energy* | | |
| Laura Kilpatrick | DOE Office of Legacy Management | Document Manager |
| Tracy Ribeiro | DOE Office of Legacy Management | Environmental Compliance Manager |
| David Shafer | DOE Office of Legacy Management | Team Leader, Assessment Management Team |
| Thomas Pauling | DOE Office of Legacy Management | Senior Management |

14
15

BLM_0041865

1   **TABLE F-2  ULP PEIS Preparers**

| Name | Education/Expertise | Contribution |
|---|---|---|
| ***Argonne National Laboratory*** | | |
| Timothy Allison | M.S., Mineral and Energy Resource Economics; M.A., Geography; 26 years of experience in regional analysis and economic impact analysis | Socioeconomics, environmental justice |
| Kevin J. Beckman | B.S., Mathematics and Computer Science; 1 year of experience in Web programming and visual impact analysis | Public web site development and technical support for visual impact analysis |
| Bruce Biwer | Ph.D., Chemistry; 20 years of experience in environmental assessment and transportation risk analysis | Transportation |
| Brian Cantwell | B.S., Forestry, 26 years of experience in cartography and GIS | GIS |
| Young-Soo Chang | Ph.D., Chemical Engineering; 21 years of experience in air quality and noise impact analysis | Climate, air quality, noise |
| Jing-Jy Cheng | Ph.D., Polymer Science and Engineering; 19 years of experience in computer model development and applications for human health and ecological risk assessments | Human health impacts |
| Karl Fischer | B.S.E., Nuclear Engineering, University of Michigan, 1995; M.Eng., Radiological Health Engineering, University of Michigan, 1996; Years of Relevant Experience:  13 | Cumulative impacts |
| Linda Graf | Desktop publishing specialist; 39 years of experience in creating, revising, formatting, and printing documents | Document assembly and production |
| Elizabeth Hocking | J.D.; 18 years of experience in environmental and energy policy analysis | Applicable laws, regulations, and other requirements |

2

BLM_0041866

*Preliminary Draft PEIS*      *PEIS Privileged Information*      *May 2012*
*PEIS Team Use Only*            *Do Not Distribute*

**TABLE F-2  (Cont.)**

| Name | Education/Expertise | Contribution |
|---|---|---|
| Mary Moniger | B.A., English; 30 years of experience in technical editing and writing | Technical editor |
| Ellen Moret | M.P.P., Public Policy; B.A., Environmental Studies; 6 years of experience in environmental assessment | Socioeconomic |
| Michele Nelson | Certificate of Design; 32 years of experience in graphic design and technical illustration | Graphic designer |
| Ben L. O'Connor | Ph.D., Civil Engineering; 4 years of experience in hydrological studies and impact analysis | Water resources |
| Terri Patton | M.S., Geology; 22 years of experience in environmental research and assessment | Geology, land use; cumulative impacts |
| Mary Picel | M.S., Environmental Health Sciences; 23 years of experience in environmental assessment, risk assessment, and waste management | Project manager, document manager, development of alternatives and programmatic topics, human health impacts, waste management, cumulative impacts |
| Robert Sullivan | M.L.A., Landscape Architecture; 21 years of experience in visual impact analysis and simulation; 13 years in web site development | Visual impact analysis |
| Robert A. Van Lonkhuyzen | B.A., Biology; 20 years of experience in ecological research and environmental assessment | Ecological resources analysis (plant communities/habitats) |
| Bruce Verhaaren | Ph.D., Archaeology; 20 years of experience in archaeological analysis; 16 years in environmental assessment and records management | Native American concerns analysis |
| William S. Vinikour | M.S. and B.S., Biology with environmental emphasis; 34 years of experience in ecological research and environmental assessment | Ecological resources analysis (wildlife and aquatic biota) |

BLM_0041867

*Preliminary Draft PEIS*           *PEIS Privileged Information*                    *May 2012*
*PEIS Team Use Only*                    *Do Not Distribute*

**TABLE F-2  (Cont.)**

| Name | Education/Expertise | Contribution |
|------|---------------------|--------------|
| Leroy J. Walston, Jr. | M.S., Biology; 5 years of experience in ecological research and environmental assessment | Ecological resources analysis (special status species) |
| Emily A. Zvolanek | B.A., Environmental Science; 2 years of experience in GIS mapping | GIS mapping |

1

BLM_0041868

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13 **APPENDIX G:**  
14  
15 **CONTRACTOR DISCLOSURE STATEMENT**  
16  
17  

BLM_0041869

1
2
3
4
5
6
7
8
9
10
11
12
13                          *This page intentionally left blank*
14

BLM_0041870

# APPENDIX G:

## CONTRACTOR DISCLOSURE STATEMENT

Argonne National Laboratory is the contractor assisting the U.S. Department of Energy (DOE) in preparing the Uranium Leasing Program (ULP) programmatic environmental impact statement (PEIS). DOE is responsible for reviewing and evaluating the information and determining the appropriateness and adequacy of incorporating any data, analyses, or results in the PEIS. DOE determines the scope and content of the PEIS and supporting documents and will furnish direction to Argonne, as appropriate, in preparing these documents.

The Council on Environmental Quality's regulations (40 CFR 1506.5(c)), which have been adopted by DOE (10 CFR Part 1021), require contractors who will prepare an EIS to execute a disclosure specifying that they have no financial or other interest in the outcome of the project. The term "financial interest or other interest in the outcome of the project" for the purposes of this disclosure is defined on pages 18026–18038 in Volume 46 of the *Federal Register* of March 23, 1981, under "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" at Questions 17a and 17b. It states that financial or other interest in the outcome of the project includes "any financial benefit such as promise of future construction or design work on the project, as well as indirect benefits the consultant is aware of (e.g., if the project would aid proposals sponsored by the firm's other clients)" (46 FR 18026–18038).

In accordance with these regulations, Argonne National Laboratory hereby certifies that it has no financial or other interest in the outcome of the project.

Certified by:

_____
Signature

John R. Krummel
_____
Name

Director, Environmental Science Division
_____
Title

May 1, 2012
_____
Date

BLM_0041871

*Preliminary Draft PEIS*
*PEIS Team Use Only*

*PEIS Privileged Information*
*Do Not Distribute*

*May 2012*

1
2
3
4
5
6
7
8
9
10
11
12
13           *This page intentionally left blank*
14

BLM_0041872





# Final Uranium Leasing Program Programmatic Environmental Impact Statement

Volume 1: Chapters 1 through 4



DOE/EIS-0472
March 2014





U.S. DEPARTMENT OF **ENERGY** | Legacy Management

BLM_0041873

BLM_0041874

1 ## COVER SHEET
2
3
4 ***Lead Agency:*** U.S. Department of Energy (DOE)
5
6 ***Cooperating Agencies:*** The U.S. Department of the Interior (DOI), Bureau of Land Management
7 (BLM); U.S. Environmental Protection Agency (EPA); Colorado Department of Transportation
8 (CDOT); Colorado Division of Reclamation, Mining, and Safety (CDRMS); Colorado Parks and
9 Wildlife (CPW); Mesa County Commission; Montrose County Commission; San Juan County
10 Commission; San Miguel County Board of Commissioners; the Pueblo of Acoma; the Pueblo de
11 Cochiti; the Pueblo de Isleta; the Navajo Nation; and the Southern Ute Indian Tribe
12
13 ***Title:*** Final Uranium Leasing Program Programmatic Environmental Impact Statement
14 (DOE/EIS-0472)
15

*For additional information on this Programmatic*
*Environmental Impact Statement (PEIS), contact:*

*For general information on the DOE National*
*Environmental Policy Act (NEPA) process,*
*contact:*

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021
Telephone: (303) 410-4806
Fax: (720) 377-3829
E-mail: ulpeis@anl.gov
or visit the PEIS web site at http://ulpeis.anl.gov

Carol M. Borgstrom, Director
Office of NEPA Policy and Compliance
U.S. Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585
Telephone: (202) 586-4600, or leave a message
at 1-800-472-2756
E-mail: AskNEPA@hq.doe.gov

16
17 ***Abstract:*** The U.S. Department of Energy has prepared this *Final Uranium Leasing Program*
18 *Programmatic Environmental Impact Statement* (ULP PEIS) pursuant to the National
19 Environmental Policy Act of 1969 (NEPA), the Council on Environmental Quality's (CEQ's)
20 NEPA regulations (40 CFR Parts 1500–1508), and DOE's NEPA implementing procedures
21 (10 CFR Part 1021) to analyze the reasonably foreseeable environmental impacts, including the
22 site-specific impacts, of the range of reasonable alternatives for the management of the ULP.
23 DOE's ULP administers 31 tracts of land covering an aggregate of approximately 25,000 acres
24 (10,000 ha) in Mesa, Montrose, and San Miguel Counties in western Colorado for exploration,
25 mine development and operations, and reclamation of uranium mines. There are currently
26 29 existing leases; two of the lease tracts are not leased. Site-specific information available on
27 the 31 lease tracts (including current lessee information and status, size of each lease tract,
28 previous mining operations that occurred, location of existing permitted mines and associated
29 structures, and other environmental information) has been utilized as the basis for the evaluation
30 contained in this ULP PEIS.
31
32 DOE has evaluated five alternatives that address the range of reasonable alternatives for the
33 management of the ULP. These alternatives are as follows:
34
35 • *Alternative 1:* DOE would terminate all leases, and all operations would be
36 reclaimed by lessees. DOE would continue to manage the withdrawn lands,
37 without leasing, in accordance with applicable requirements.

BLM_0041875

- *Alternative 2:* Same as Alternative 1, except once reclamation was completed by lessees, DOE would relinquish the lands in accordance with 43 CFR Part 2370. If DOI/BLM determines, in accordance with that same Part of the CFR, the lands were suitable to be managed as public domain lands, they would be managed by BLM under its multiple use policies. DOE's uranium leasing program would end.

- *Alternative 3:* DOE would continue the ULP as it existed before July 2007[1] with the 13 then-active leases, for the next 10-year period or for another reasonable period, and DOE would terminate the remaining leases.

- *Alternative 4:* DOE would continue the ULP with the 31 lease tracts for the next 10-year period or for another reasonable period.

- *Alternative 5:* This is the No Action Alternative, under which DOE would continue the ULP with the 31 lease tracts for the remainder of the 10-year period, as the leases were when they were issued in 2008.

**Preferred Alternative:** DOE's preferred alternative is Alternative 4.

**Public Participation:** DOE encourages public participation in the NEPA process. A Notice of Availability (NOA) for the Draft ULP PEIS was published in the *Federal Register* on March 15, 2013 (78 FR 16483), and this began a 60-day public comment period that was to end on May 16, 2013. This comment period was later extended to May 31, 2013 (78 FR 23926), and it was subsequently re-opened on June 3, 2013 (78 FR 33090), with a closing date of July 1, 2013. Hearings were held on the Draft ULP PEIS in Grand Junction, Montrose, Telluride, and Naturita. The public comment period, including the extension and the re-opening, lasted 109 days. All comments received on the Draft ULP PEIS were considered in the preparation of the Final ULP PEIS.

**Changes from the Draft PEIS:** In this Final PEIS, vertical lines in the margin indicate where the Draft PEIS has been revised or supplemented. Deletions are not demarcated.

---

[1] In July 2007, DOE issued a programmatic environmental assessment and Finding of No Significant Impact for the ULP, which a U.S. District Court invalidated on October 18, 2011.

BLM_0041876





# Final Uranium Leasing Program Programmatic Environmental Impact Statement

Volume 1: Chapters 1 through 4

DOE/EIS-0472
March 2014



U.S. DEPARTMENT OF **ENERGY** | Legacy Management

BLM_0041877

BLM_0041878

1
2
3
# CONTENTS
4
5
NOTATION .......................................................................................................... xxxiii
6
CONVERSION TABLE ........................................................................................ xli
7
8
**VOLUME 1:  CHAPTERS 1 THROUGH 4**
9
10   1    INTRODUCTION ......................................................................................... 1-1
11
12       1.1   Background ......................................................................................... 1-1
13       1.2   Current Status of the ULP.................................................................. 1-6
14             1.2.1   DOE ULP Administrative Process............................................ 1-7
15             1.2.2   Lease Requirements .................................................................. 1-13
16       1.3   Site-Specific Information for the ULP Lease Tracts ........................... 1-14
17             1.3.1   ULP Lease Tract 5 .................................................................. 1-14
18             1.3.2   ULP Lease Tract 5A ................................................................. 1-17
19             1.3.3   ULP Lease Tract 6 .................................................................. 1-17
20             1.3.4   ULP Lease Tract 7 .................................................................. 1-19
21             1.3.5   ULP Lease Tract 8 .................................................................. 1-21
22             1.3.6   ULP Lease Tract 8A ................................................................. 1-21
23             1.3.7   ULP Lease Tract 9 .................................................................. 1-23
24             1.3.8   ULP Lease Tract 10 ................................................................. 1-25
25             1.3.9   ULP Lease Tract 11 ................................................................. 1-25
26             1.3.10  ULP Lease Tract 11A ............................................................... 1-27
27             1.3.11  ULP Lease Tract 12 ................................................................. 1-27
28             1.3.12  ULP Lease Tract 13 ................................................................. 1-28
29             1.3.13  ULP Lease Tract 13A ............................................................... 1-30
30             1.3.14  ULP Lease Tract 14 ................................................................. 1-30
31             1.3.15  ULP Lease Tract 15 ................................................................. 1-31
32             1.3.16  ULP Lease Tract 15A ............................................................... 1-31
33             1.3.17  ULP Lease Tract 16 ................................................................. 1-32
34             1.3.18  ULP Lease Tract 16A ............................................................... 1-33
35             1.3.19  ULP Lease Tract 17 ................................................................. 1-33
36             1.3.20  ULP Lease Tract 18 ................................................................. 1-34
37             1.3.21  ULP Lease Tract 19 ................................................................. 1-36
38             1.3.22  ULP Lease Tract 19A ............................................................... 1-36
39             1.3.23  ULP Lease Tract 20 ................................................................. 1-37
40             1.3.24  ULP Lease Tract 21 ................................................................. 1-37
41             1.3.25  ULP Lease Tract 22 ................................................................. 1-38
42             1.3.26  ULP Lease Tract 22A ............................................................... 1-39
43             1.3.27  ULP Lease Tract 23 ................................................................. 1-39
44             1.3.28  ULP Lease Tract 24 ................................................................. 1-40
45             1.3.29  ULP Lease Tract 25 ................................................................. 1-40
46

# CONTENTS (Cont.)

1.3.30  ULP Lease Tract 26 ................................................................. 1-41
1.3.31  ULP Lease Tract 27 ................................................................. 1-42
1.4  Purpose and Need for Agency Action ................................................ 1-43
1.5  Proposed Action ................................................................................ 1-44
1.6  Scope of the ULP PEIS ..................................................................... 1-44
1.7  NEPA Process for the ULP PEIS ...................................................... 1-45
     1.7.1  Public Scoping Process ........................................................... 1-45
            1.7.1.1  Comments Considered Within the ULP PEIS Scope .............. 1-46
            1.7.1.2  Comments Considered Outside the ULP PEIS Scope ............. 1-49
     1.7.2  Public Comment Process ........................................................ 1-49
     1.7.3  Nine Topics of Interest Based on Public Comments
            Received ................................................................................. 1-51
1.8  Other Related, Similar, Connected, or Cumulative Actions .............. 1-61
1.9  Consultation ...................................................................................... 1-62
1.10  Cooperating and Commenting Agencies .......................................... 1-63
1.11  Organization of the ULP PEIS ......................................................... 1-65

2  PROPOSED ACTION AND ALTERNATIVES ........................................ 2-1

2.1  Uranium Mining Methods and Phases ............................................... 2-3
     2.1.1  Exploration ............................................................................. 2-3
     2.1.2  Mine Development and Operations ........................................ 2-4
            2.1.2.1  Surface-Plant Area Construction and Operations ................ 2-5
            2.1.2.2  Mining Method – Underground Mining ................................ 2-12
            2.1.2.3  Mining Method – Surface Open-Pit Mining .......................... 2-13
     2.1.3  Reclamation ........................................................................... 2-13
     2.1.4  Ore Processing ....................................................................... 2-14
            2.1.4.1  Piñon Ridge Mill .................................................................. 2-14
            2.1.4.2  White Mesa Mill ................................................................... 2-16
2.2  Five Alternatives Evaluated .............................................................. 2-17
     2.2.1  Alternative 1 ........................................................................... 2-17
            2.2.1.1  Basis for Impacts Analyses for Alternative 1 ....................... 2-19
     2.2.2  Alternative 2 ........................................................................... 2-20
            2.2.2.1  Basis for Impacts Analyses for Alternative 2 ....................... 2-21
     2.2.3  Alternative 3 ........................................................................... 2-21
            2.2.3.1  Basis for Impacts Analyses for Alternative 3 ....................... 2-24
     2.2.4  Alternative 4 ........................................................................... 2-26
            2.2.4.1  Basis for Impacts Analyses for Alternative 4 ....................... 2-27
     2.2.5  Alternative 5 ........................................................................... 2-30
            2.2.5.1  Basis for Impacts Analyses for Alternative 5 ....................... 2-30
2.3  Alternatives Considered but Not Evaluated in Detail ........................ 2-32
2.4  Summary and Comparison of the Potential Impacts from the Five
     Alternatives ....................................................................................... 2-33

BLM_0041880

# CONTENTS (Cont.)

| | | | | |
|---|---|---|---|---|
| 4 | 2.4.1 | Air Quality | | 2-33 |
| 5 | 2.4.2 | Acoustic Environment | | 2-38 |
| 6 | 2.4.3 | Soil Resources | | 2-38 |
| 7 | 2.4.4 | Water Resources | | 2-39 |
| 8 | 2.4.5 | Human Health | | 2-40 |
| 9 | 2.4.6 | Ecological Resources | | 2-42 |
| 10 | | 2.4.6.1 | Vegetation | 2-43 |
| 11 | | 2.4.6.2 | Wildlife | 2-44 |
| 12 | | 2.4.6.3 | Aquatic Biota | 2-46 |
| 13 | | 2.4.6.4 | Threatened, Endangered, and Sensitive Species | 2-47 |
| 14 | 2.4.7 | Land Use | | 2-48 |
| 15 | 2.4.8 | Socioeconomics | | 2-49 |
| 16 | 2.4.9 | Environmental Justice | | 2-49 |
| 17 | 2.4.10 | Transportation | | 2-50 |
| 18 | 2.4.11 | Cultural Resources | | 2-51 |
| 19 | 2.4.12 | Visual Resources | | 2-53 |
| 20 | 2.4.13 | Waste Management | | 2-54 |
| 21 | 2.4.14 | Cumulative Impacts | | 2-54 |
| 22 | 2.5 | Irreversible and Irretrievable Commitment of Resources | | 2-72 |
| 23 | 2.6 | Preferred Alternative Identified | | 2-72 |

3   AFFECTED ENVIRONMENT ................................................................   3-1

| | | | | |
|---|---|---|---|---|
| 27 | 3.1 | Air Quality | | 3-1 |
| 28 | | 3.1.1 Climate | | 3-1 |
| 29 | | 3.1.1.1 | General Climate | 3-1 |
| 30 | | 3.1.1.2 | Wind | 3-2 |
| 31 | | 3.1.1.3 | Temperature | 3-5 |
| 32 | | 3.1.1.4 | Precipitation | 3-5 |
| 33 | | 3.1.1.5 | Severe Weather | 3-5 |
| 34 | | 3.1.2 Existing Air Emissions | | 3-8 |
| 35 | | 3.1.3 Existing Air Quality | | 3-11 |
| 36 | | 3.1.4 Regulatory Environment | | 3-14 |
| 37 | | 3.1.4.1 | Prevention of Significant Deterioration | 3-14 |
| 38 | | 3.1.4.2 | Visibility Protection | 3-18 |
| 39 | | 3.1.4.3 | General Conformity | 3-18 |
| 40 | | 3.1.4.4 | Air Quality-Related Values | 3-18 |
| 41 | 3.2 | Acoustic Environment | | 3-20 |
| 42 | | 3.2.1 Sound Fundamentals | | 3-20 |
| 43 | | 3.2.2 Background Noise Levels | | 3-21 |
| 44 | | 3.2.3 Noise Regulations | | 3-22 |
| 45 | 3.3 | Geological Setting and Soil Resources | | 3-23 |
| 46 | | 3.3.1 Geological Setting | | 3-23 |

BLM_0041881

**CONTENTS (Cont.)**

| | | | | |
|---|---|---|---|---|
| 3.3.1.1 | Physiography | 3-23 |
| 3.3.1.2 | Structural Geology | 3-24 |
| 3.3.1.3 | Bedrock Geology | 3-27 |
| 3.3.1.4 | Seismicity | 3-34 |
| 3.3.1.5 | Topography and Geology of the Lease Tracts | 3-35 |
| 3.3.1.6 | Paleontological Resources | 3-40 |
| 3.3.2 | Soil Resources | 3-42 |
| 3.3.2.1 | Gateway Lease Tracts | 3-43 |
| 3.3.2.2 | Uravan Lease Tracts | 3-45 |
| 3.3.2.3 | Paradox Lease Tracts | 3-47 |
| 3.3.2.4 | Slick Rock Lease Tracts | 3-51 |
| 3.4 | Water Resources | 3-53 |
| 3.4.1 | Surface Water | 3-53 |
| 3.4.1.1 | Stream and Drainage Systems | 3-53 |
| 3.4.1.2 | Existing Water Quality | 3-59 |
| 3.4.2 | Groundwater | 3-68 |
| 3.4.3 | Water Management | 3-76 |
| 3.5 | Human Health | 3-79 |
| 3.5.1 | Exposure to Radiation | 3-79 |
| 3.5.1.1 | Radiation and Its Effects | 3-79 |
| 3.5.1.2 | Baseline Radiological Dose and Risk | 3-83 |
| 3.5.2 | Exposure to Hazardous Chemicals | 3-88 |
| 3.5.2.1 | Chemical Hazards | 3-88 |
| 3.5.2.2 | Baseline Chemical Risks | 3-89 |
| 3.6 | Ecological Resources | 3-93 |
| 3.6.1 | Vegetation | 3-93 |
| 3.6.1.1 | Wetlands and Floodplains | 3-107 |
| 3.6.2 | Wildlife | 3-114 |
| 3.6.2.1 | Amphibians and Reptiles | 3-115 |
| 3.6.2.2 | Birds | 3-115 |
| 3.6.2.3 | Mammals | 3-130 |
| 3.6.3 | Aquatic Biota | 3-145 |
| 3.6.4 | Threatened, Endangered, and Sensitive Species | 3-153 |
| 3.6.4.1 | Species Listed under the Endangered Species Act | 3-153 |
| 3.6.4.2 | Sensitive and State-Listed Species | 3-175 |
| 3.7 | Land Use | 3-178 |
| 3.7.1 | Specially Designated Areas and Lands with Wilderness Characteristics | 3-179 |
| 3.7.2 | Agriculture | 3-183 |
| 3.7.3 | Rangeland Resources | 3-190 |
| 3.7.3.1 | Livestock Grazing | 3-190 |
| 3.7.3.2 | Wild Horses and Burros | 3-190 |
| 3.7.4 | Mineral Resources and Mining | 3-191 |

BLM_0041882

**CONTENTS (Cont.)**

| | | | |
|---|---|---|---|
| 4 | | 3.7.4.1 | Uranium ..................................................................... 3-191 |
| 5 | | 3.7.4.2 | Coal ............................................................................ 3-195 |
| 6 | | 3.7.4.3 | Oil and Gas ................................................................ 3-195 |
| 7 | | 3.7.4.4 | Other Minerals and Mineral Materials ...................... 3-196 |
| 8 | 3.7.5 | Timber Harvest .......................................................................... 3-196 |
| 9 | 3.7.6 | Recreation .................................................................................. 3-197 |
| 10 | 3.8 | Socioeconomics ......................................................................................... 3-198 |
| 11 | | 3.8.1 | Economic Environment .............................................................. 3-200 |
| 12 | | | 3.8.1.1 | ROI Employment and Unemployment ....................... 3-200 |
| 13 | | | 3.8.1.2 | Employment by Sector ................................................ 3-201 |
| 14 | | | 3.8.1.3 | Personal Income ......................................................... 3-202 |
| 15 | | 3.8.2 | Social Environment .................................................................... 3-205 |
| 16 | | | 3.8.2.1 | Population ................................................................... 3-205 |
| 17 | | | 3.8.2.2 | ROI Housing .............................................................. 3-205 |
| 18 | | | 3.8.2.3 | ROI Community and Social Services .......................... 3-206 |
| 19 | | 3.8.3 | Recreation and Tourism Economy .............................................. 3-211 |
| 20 | 3.9 | Environmental Justice ................................................................................. 3-213 |
| 21 | 3.10 | Transportation ............................................................................................ 3-218 |
| 22 | 3.11 | Cultural Resources ...................................................................................... 3-224 |
| 23 | | 3.11.1 | Cultural History of Southwestern Colorado ............................. 3-224 |
| 24 | | 3.11.2 | Cultural Resource Inventories ................................................... 3-228 |
| 25 | | 3.11.3 | Traditional Cultural Properties ................................................. 3-236 |
| 26 | 3.12 | Visual Resources ........................................................................................ 3-238 |
| 27 | | 3.12.1 | Regional Setting ........................................................................ 3-239 |
| 28 | | 3.12.2 | Lease Tracts ............................................................................... 3-241 |
| 29 | | | 3.12.2.1 | North Group ............................................................. 3-250 |
| 30 | | | 3.12.2.2 | North Central Group and South Central Group ......... 3-252 |
| 31 | | | 3.12.2.3 | South Group ............................................................. 3-254 |
| 32 | | 3.12.3 | Visual Resource Management .................................................... 3-255 |
| 33 | 3.13 | Waste Management ...................................................................................... 3-257 |
| 35 | 4 | ENVIRONMENTAL IMPACTS .......................................................................... 4-1 |
| 37 | 4.1 | Alternative 1 ..................................................................................................... 4-1 |
| 38 | | 4.1.1 | Air Quality ...................................................................................... 4-1 |
| 39 | | 4.1.2 | Acoustic Environment ................................................................... 4-2 |
| 40 | | 4.1.3 | Geology and Soil Resources .......................................................... 4-4 |
| 41 | | | 4.1.3.1 | Potential Soil Impacts Common to All Alternatives ....... 4-4 |
| 42 | | | 4.1.3.2 | Soil Impacts under Alternative 1 .................................. 4-8 |
| 43 | | | 4.1.3.3 | Impacts on Paleontological Resources under Alternative 1 ....... 4-8 |
| 44 | | 4.1.4 | Water Resources ............................................................................ 4-9 |
| 45 | | 4.1.5 | Human Health ............................................................................. 4-10 |
| 46 | | | 4.1.5.1 | Conceptual Site Exposure Model ............................... 4-10 |

BLM_0041883

# CONTENTS (Cont.)

|  |  |  |  |
|---|---|---|---|
| 4 | 4.1.5.2 | Potential Human Health Impacts from Alternative 1 | 4-14 |
| 5 | 4.1.5.3 | Worker Exposure – Reclamation Workers | 4-15 |
| 6 | 4.1.5.4 | General Public Exposure – Residential Scenario | 4-17 |
| 7 | 4.1.5.5 | General Public Exposure – Recreationist Scenario | 4-24 |
| 8 | 4.1.5.6 | General Public Exposure – Individual Receptor Entering | |
| 9 | | an Inactive Underground Mine Portal | 4-26 |
| 10 | 4.1.6 | Ecological Resources | 4-26 |
| 11 | 4.1.6.1 | Vegetation | 4-26 |
| 12 | 4.1.6.2 | Wildlife | 4-30 |
| 13 | 4.1.6.3 | Aquatic Biota | 4-32 |
| 14 | 4.1.6.4 | Threatened, Endangered, and Sensitive Species | 4-32 |
| 15 | 4.1.7 | Land Use | 4-50 |
| 16 | 4.1.8 | Socioeconomics | 4-50 |
| 17 | 4.1.8.1 | Recreation and Tourism | 4-51 |
| 18 | 4.1.9 | Environmental Justice | 4-52 |
| 19 | 4.1.10 | Transportation | 4-53 |
| 20 | 4.1.11 | Cultural Resources | 4-53 |
| 21 | 4.1.12 | Visual Resources | 4-54 |
| 22 | 4.1.12.1 | Vegetation and Landform Alterations | 4-55 |
| 23 | 4.1.12.2 | Removal of Structures and On-Site Materials | 4-56 |
| 24 | 4.1.12.3 | Roads | 4-56 |
| 25 | 4.1.12.4 | Workers, Vehicles, and Equipment | 4-57 |
| 26 | 4.1.12.5 | Lighting | 4-57 |
| 27 | 4.1.12.6 | Impacts on Lands Surrounding the Lease Tracts | 4-57 |
| 28 | 4.1.13 | Waste Management | 4-67 |
| 29 | 4.2 Alternative 2 | | 4-67 |
| 30 | 4.2.1 | Air Quality | 4-68 |
| 31 | 4.2.2 | Acoustic Environment | 4-68 |
| 32 | 4.2.3 | Geology and Soil Resources | 4-68 |
| 33 | 4.2.3.1 | Paleontological Resources | 4-68 |
| 34 | 4.2.4 | Water Resources | 4-68 |
| 35 | 4.2.5 | Human Health | 4-69 |
| 36 | 4.2.6 | Ecological Resources | 4-69 |
| 37 | 4.2.6.1 | Vegetation | 4-69 |
| 38 | 4.2.6.2 | Wildlife | 4-69 |
| 39 | 4.2.6.3 | Aquatic Biota | 4-69 |
| 40 | 4.2.6.4 | Threatened, Endangered, and Sensitive Species | 4-70 |
| 41 | 4.2.7 | Land Use | 4-70 |
| 42 | 4.2.8 | Socioeconomics | 4-70 |
| 43 | 4.2.9 | Environmental Justice | 4-70 |
| 44 | 4.2.10 | Transportation | 4-70 |
| 45 | 4.2.11 | Cultural Resources | 4-71 |
| 46 | 4.2.12 | Visual Resources | 4-71 |

BLM_0041884

<div align="center">

**CONTENTS (Cont.)**

</div>

| | | | |
|---|---|---|---:|
| 4 | | 4.2.13 Waste Management | 4-71 |
| 5 | 4.3 | Alternative 3 | 4-71 |
| 6 | | 4.3.1 Air Quality | 4-72 |
| 7 | | 4.3.1.1 Exploration | 4-72 |
| 8 | | 4.3.1.2 Mine Development and Operations | 4-72 |
| 9 | | 4.3.1.3 Reclamation | 4-75 |
| 10 | | 4.3.2 Acoustic Environment | 4-76 |
| 11 | | 4.3.2.1 Exploration | 4-76 |
| 12 | | 4.3.2.2 Mine Development and Operations | 4-76 |
| 13 | | 4.3.2.3 Reclamation | 4-79 |
| 14 | | 4.3.3 Geology and Soil Resources | 4-80 |
| 15 | | 4.3.3.1 Exploration | 4-80 |
| 16 | | 4.3.3.2 Mine Development and Operations | 4-80 |
| 17 | | 4.3.3.3 Reclamation | 4-81 |
| 18 | | 4.3.3.4 Paleontological Resources | 4-81 |
| 19 | | 4.3.4 Water Resources | 4-82 |
| 20 | | 4.3.4.1 Exploration | 4-82 |
| 21 | | 4.3.4.2 Mine Development and Operations | 4-83 |
| 22 | | 4.3.4.3 Reclamation | 4-88 |
| 23 | | 4.3.5 Human Health | 4-89 |
| 24 | | 4.3.5.1 Worker Exposures – Uranium Miners | 4-89 |
| 25 | | 4.3.5.2 Worker Exposure – Reclamation Workers | 4-91 |
| 26 | | 4.3.5.3 General Public Exposure – Residential Scenario | 4-92 |
| 27 | | 4.3.5.4 General Public Exposures – Recreationist Scenario | 4-101 |
| 28 | | 4.3.5.5 Intentional Destructive Acts | 4-103 |
| 29 | | 4.3.6 Ecological Resources | 4-104 |
| 30 | | 4.3.6.1 Vegetation | 4-104 |
| 31 | | 4.3.6.2 Wildlife | 4-108 |
| 32 | | 4.3.6.3 Aquatic Biota | 4-125 |
| 33 | | 4.3.6.4 Threatened, Endangered, and Sensitive Species | 4-131 |
| 34 | | 4.3.7 Land Use | 4-154 |
| 35 | | 4.3.8 Socioeconomics | 4-154 |
| 36 | | 4.3.8.1 Recreation and Tourism | 4-156 |
| 37 | | 4.3.9 Environmental Justice | 4-159 |
| 38 | | 4.3.9.1 Exploration | 4-159 |
| 39 | | 4.3.9.2 Mine Development and Operations | 4-160 |
| 40 | | 4.3.9.3 Reclamation | 4-161 |
| 41 | | 4.3.10 Transportation | 4-161 |
| 42 | | 4.3.10.1 General Approach and Assumptions | 4-161 |
| 43 | | 4.3.10.2 Routine Transportation Risks | 4-163 |
| 44 | | 4.3.10.3 Transportation Accident Risks | 4-172 |
| 45 | | 4.3.10.4 Accidental Release of Uranium during Transportation | 4-175 |
| 46 | | 4.3.11 Cultural Resources | 4-176 |

BLM_0041885

1          **CONTENTS (Cont.)**
2
3

4                    4.3.11.1  Exploration....................................................................... 4-177
5                    4.3.11.2  Mine Development and Operations ............................... 4-177
6                    4.3.11.3  Reclamation .................................................................. 4-179
7          4.3.12  Visual Resources.............................................................................. 4-179
8                    4.3.12.1  Exploration....................................................................... 4-180
9                    4.3.12.2  Mine Development and Operations ............................... 4-180
10                   4.3.12.3  Reclamation .................................................................. 4-184
11                   4.3.12.4  Impacts on Surrounding Lands ..................................... 4-184
12         4.3.13  Waste Management ........................................................................... 4-192
13   4.4   Alternative 4...................................................................................................... 4-193
14         4.4.1   Air Quality ....................................................................................... 4-193
15                   4.4.1.1  Exploration....................................................................... 4-193
16                   4.4.1.2  Mine Development and Operations ............................... 4-193
17                   4.4.1.3  Reclamation .................................................................... 4-196
18         4.4.2   Acoustic Environment ..................................................................... 4-196
19                   4.4.2.1  Exploration....................................................................... 4-196
20                   4.4.2.2  Mine Development and Operations ............................... 4-197
21                   4.4.2.3  Reclamation .................................................................... 4-199
22         4.4.3   Geology and Soil Resources ........................................................... 4-200
23                   4.4.3.1  Exploration....................................................................... 4-200
24                   4.4.3.2  Mine Development and Operations ............................... 4-200
25                   4.4.3.3  Reclamation .................................................................... 4-200
26                   4.4.3.4  Paleontological Resources ............................................. 4-200
27         4.4.4   Water Resources .............................................................................. 4-201
28                   4.4.4.1  Exploration....................................................................... 4-201
29                   4.4.4.2  Mine Development and Operations ............................... 4-201
30                   4.4.4.3  Reclamation .................................................................... 4-202
31         4.4.5   Human Health ................................................................................... 4-203
32                   4.4.5.1  Worker Exposure – Uranium Miners............................. 4-203
33                   4.4.5.2  Worker Exposure – Reclamation Workers .................... 4-204
34                   4.4.5.3  General Public Exposure – Residential Scenario .......... 4-205
35                   4.4.5.4  General Public Exposure – Recreationist Scenario ....... 4-210
36         4.4.6   Ecological Resources ....................................................................... 4-211
37                   4.4.6.1  Vegetation ....................................................................... 4-211
38                   4.4.6.2  Wildlife ........................................................................... 4-212
39                   4.4.6.3  Aquatic Biota................................................................... 4-213
40                   4.4.6.4  Threatened, Endangered, and Sensitive Species........... 4-213
41         4.4.7   Land Use .......................................................................................... 4-213
42         4.4.8   Socioeconomics ............................................................................... 4-215
43                   4.4.8.1  Recreation and Tourism.................................................. 4-217
44         4.4.9   Environmental Justice ...................................................................... 4-217
45                   4.4.9.1  Exploration....................................................................... 4-217
46                   4.4.9.2  Mine Development and Operations ............................... 4-217

BLM_0041886

1                                           **CONTENTS (Cont.)**
2
3
4                             4.4.9.3    Reclamation ................................................................. 4-217
5                    4.4.10   Transportation ....................................................................... 4-217
6                             4.4.10.1  Routine Transportation Risks ..................................... 4-218
7                             4.4.10.2  Transportation Accident Risks.................................... 4-220
8                    4.4.11   Cultural Resources ................................................................. 4-221
9                    4.4.12   Visual Resources.................................................................... 4-222
10                            4.4.12.1  Exploration, Mine Development and Operations,
11                                      and Reclamation ......................................................... 4-222
12                            4.4.12.2  Impacts on Surrounding Lands.................................... 4-222
13                   4.4.13   Waste Management................................................................. 4-234
14         4.5     Alternative 5............................................................................................. 4-235
15                   4.5.1    Air Quality ............................................................................. 4-235
16                            4.5.1.1   Exploration................................................................... 4-235
17                            4.5.1.2   Mine Development and Operations ............................. 4-235
18                            4.5.1.3   Reclamation ................................................................. 4-237
19                   4.5.2    Acoustic Environment ............................................................ 4-238
20                            4.5.2.1   Exploration................................................................... 4-238
21                            4.5.2.2   Mine Development and Operations ............................. 4-238
22                            4.5.2.3   Reclamation ................................................................. 4-240
23                   4.5.3    Geology and Soil Resources ................................................... 4-241
24                            4.5.3.1   Paleontological Resources ........................................... 4-241
25                   4.5.4    Water Resources ..................................................................... 4-241
26                            4.5.4.1   Exploration................................................................... 4-241
27                            4.5.4.2   Mine Development and Operations ............................. 4-242
28                            4.5.4.3   Reclamation ................................................................. 4-242
29                   4.5.5    Human Health ......................................................................... 4-242
30                            4.5.5.1   Worker Exposure – Uranium Miners............................ 4-243
31                            4.5.5.2   Worker Exposure – Reclamation Workers.................... 4-244
32                            4.5.5.3   General Public Exposure – Residential Scenario .......... 4-245
33                            4.5.5.4   General Public Exposure – Recreationist Scenario ....... 4-250
34                   4.5.6    Ecological Resources .............................................................. 4-251
35                            4.5.6.1   Vegetation.................................................................... 4-251
36                            4.5.6.2   Wildlife ....................................................................... 4-252
37                            4.5.6.3   Aquatic Biota ............................................................... 4-252
38                            4.5.6.4   Threatened, Endangered, and Sensitive Species........... 4-253
39                   4.5.7    Land Use ................................................................................ 4-253
40                   4.5.8    Socioeconomics ..................................................................... 4-253
41                            4.5.8.1   Recreation and Tourism ............................................... 4-255
42                   4.5.9    Environmental Justice ............................................................ 4-255
43                            4.5.9.1   Exploration................................................................... 4-255
44                            4.5.9.2   Mine Development and Operations ............................. 4-255
45                            4.5.9.3   Reclamation ................................................................. 4-255
46                   4.5.10   Transportation ....................................................................... 4-256

BLM_0041887

1
<p style="text-align:center">**CONTENTS (Cont.)**</p>
2
3
4      4.5.10.1 Routine Transportation Risks ....................................................... 4-256
5      4.5.10.2 Transportation Accident Risks....................................................... 4-259
6    4.5.11 Cultural Resources ................................................................................... 4-259
7    4.5.12 Visual Resources ..................................................................................... 4-260
8      4.5.12.1 Exploration, Mine Development and Operations,
9         and Reclamation .......................................................... 4-260
10      4.5.12.2 Impacts on Surrounding Lands ...................................................... 4-260
11    4.5.13 Waste Management.................................................................................. 4-260
12  4.6 Measures To Minimize Potential Impacts from ULP Mining Activities............... 4-261
13  4.7 Cumulative Impacts ............................................................................................... 4-261
14    4.7.1 Reasonably Foreseeable Future Actions................................................... 4-276
15      4.7.1.1 Piñon Ridge Mill.......................................................................... 4-276
16      4.7.1.2 Planned Uranium Exploration ...................................................... 4-278
17      4.7.1.3 Coal Mining .................................................................................. 4-278
18      4.7.1.4 Uranium Mill Remediation........................................................... 4-281
19      4.7.1.5 Reforestation Projects................................................................... 4-284
20      4.7.1.6 Western Area Power Administration ROW Maintenance.......... 4-284
21      4.7.1.7 Construction of Agricultural Water Facilities ............................ 4-285
22      4.7.1.8 Other Future Projects.................................................................... 4-285
23    4.7.2 Present and Ongoing Actions.................................................................... 4-287
24      4.7.2.1 White Mesa Mill ........................................................................... 4-287
25      4.7.2.2 Uranium Mining ........................................................................... 4-289
26      4.7.2.3 Coal and Other Mineral Mining.................................................... 4-303
27      4.7.2.4 Oil and Gas Exploration and Extraction...................................... 4-303
28      4.7.2.5 Long-Term Grazing Permits and Allotments ............................. 4-304
29      4.7.2.6 Power Generation and Transmission ........................................... 4-304
30      4.7.2.7 Potash Exploration........................................................................ 4-306
31      4.7.2.8 Lisbon Natural Gas Processing Plant........................................... 4-308
32      4.7.2.9 Paradox Valley Desalinization Plant ........................................... 4-308
33      4.7.2.10 Cameo Station Power Plant .......................................................... 4-309
34      4.2.7.11 Reconstruction of the Hanging Flume Replica........................... 4-309
35    4.7.3 General Trends.......................................................................................... 4-309
36      4.7.3.1 Population Growth.......................................................................... 4-310
37      4.7.3.2 Energy Demand ............................................................................. 4-310
38      4.7.3.3 Water Use and Availability............................................................ 4-311
39      4.7.3.4 Climate........................................................................................... 4-311
40    4.7.4 Cumulative Impacts from the ULP Alternatives ...................................... 4-312
41
42

BLM_0041888

**CONTENTS (Cont.)**

**VOLUME 2:  CHAPTER 5 THROUGH APPENDIX H**

5    APPLICABLE LAWS AND REQUIREMENTS ............................................................ 5-1

    5.1   Applicable Federal Laws and Regulations ............................................................ 5-1
    5.2   State of Colorado Environmental Laws.................................................................. 5-7
    5.3   County Environmental Ordinances and Plans ....................................................... 5-7
    5.4   Memoranda of Understanding ............................................................................... 5-7

6    CONSULTATION PROCESS FOR THE DOE ULP PEIS.......................................... 6-1

    6.1   Tribal Government-to-Government Consultation.................................................... 6-1
    6.2   Consultation for the ESA....................................................................................... 6-3
    6.3   Consultation for the NHPA.................................................................................... 6-4

7    INDEX .......................................................................................................................... 7-1

8    REFERENCES ............................................................................................................. 8-1

APPENDIX A:  Examples of Existing Leases for the Uranium Leasing Program ................ A-1

APPENDIX B:  Summary of the Public Scoping Process for the ULP PEIS ....................... B-1

APPENDIX C:  Emission Inventories, Costs, and Other Estimates Used as a Basis
                     for the ULP PEIS Impact Analyses.............................................................. C-1

APPENDIX D:  Impact Assessment Methodologies.............................................................. D-1

APPENDIX E:  Correspondence Associated with Endangered Species Act (ESA)
                     Consultation, Biological Opinion, and Biological Assessment ................... E-1

APPENDIX F:  Correspondence Associated with Tribal and National Historic
                    Preservation Act (NHPA) Consultation ....................................................... F-1

APPENDIX G:  List of Preparers ........................................................................................... G-1

APPENDIX H:  Contractor Disclosure Statement.................................................................. H-1

BLM_0041889

**CONTENTS (Cont.)**

**VOLUME 3:  APPENDIX I**

APPENDIX I:    Comment Response Document ..................................................................   I-1

    I.1   Public Comment Process ..........................................................................   I-1
    I.2   Summary of Changes to the Draft PEIS ..................................................   I-2
    I.3   Topics of Interest .....................................................................................   I-4
    I.4   Comments and Responses.........................................................................   I-16
        I.4.1   Organizations That Submitted Comments in Writing via Letter,
             E-mail, or Web Portal or Orally at One of the Public Hearings ...............   I-16
        I.4.2   Individuals Who Submitted Comments in Writing via Letter,
             E-mail, or Web Portal or Orally at One of the Public Hearings ...............   I-16
   Organizations ....................................................................................................   I-23
   Members of the Public.......................................................................................   I-147

**FIGURES**

1.2-1     Locations of the 31 ULP Lease Tracts in Colorado.................................................   1-11

1.3-1     Location of C-JD-5 Mine on Lease Tract 5 ..........................................................   1-16

1.3-2     Location of C-JD-6 Mine on Lease Tract 6 ..........................................................   1-18

1.3-3     Location of C-JD-7 Mine on Lease Tract 7 ..........................................................   1-20

1.3-4     Location of C-JD-8 Mine on Lease Tract 8 ..........................................................   1-22

1.3-5     Location of C-JD-9 Mine on Lease Tract 9 ..........................................................   1-24

1.3-6     Location of C-SR-11 Mine on Lease Tract 11.......................................................   1-26

1.3-7     Location of C-SR-13 Mine on Lease Tract 13.......................................................   1-29

1.3-8     Location of C-SM-18 Mine on Lease Tract 18......................................................   1-35

1.7-1     NEPA Process for the ULP PEIS..........................................................................   1-45

2-1       Thirteen Human Health and Environmental Resource Areas That Are
        Evaluated for Potential Impacts from Exploration, Mine Development and
        Operations, and Reclamation ................................................................................   2-2

2.1-1     Photograph of Mine Plant Surface Configuration at Lease Tract 5.......................   2-6

BLM_0041890

**FIGURES (Cont.)**

2.1-2   Photograph of Mine Plant Surface Configuration at Lease Tract 7 ........................   2-7

2.1-3   Photograph of Mine Plant Surface Configuration at Lease Tract 8 ........................   2-8

2.1-4   Photograph of Former Mine Plant Surface Configuration at Lease Tract 13A ......   2-9

2.1-5   Schematic of a Generic Mine Plant Surface Configuration ...................................   2-10

2.1-6   Locations of White Mesa Mill and Proposed Piñon Ridge Mill ............................   2-15

2.2-1   Locations of Lease Tracts Evaluated under Alternatives 1 and 2 ..........................   2-18

2.2-2   Locations of Lease Tracts Evaluated under Alternative 3 .....................................   2-22

3.1-1   Wind Roses at the Proposed Piñon Ridge Mill, Montrose County, Colorado,
        April 2008–March 2011: (a) Site 1, 33-ft Level; and (b) Site 2, 98-ft Level .........   3-3

3.1-2   Wind Rose at 20-ft Level at Nucla, Montrose County, Colorado, 2006–2010 ......   3-4

3.1-3   Monitored $PM_{10}$ Concentrations at Sites 1 and 2 of the Proposed Piñon
        Ridge Mill, April 2008–March 2010 .........................................................................   3-15

3.1-4   PSD Class I Areas and Colorado Sensitive Class II Areas around the
        ULP Lease Tracts .....................................................................................................   3-17

3.3-1   Physiographic Map of the Colorado Plateau .........................................................   3-23

3.3-2   Extent of the Paradox Basin and the Paradox Fold and Fault Belt in
        Southwestern Colorado and Southeastern Utah ......................................................   3-25

3.3-3   Shaded Relief Map Showing Location of ULP Lease Tracts .................................   3-26

3.3-4   Extent of the Uravan Mineral Belt in Relation to Known
        Uranium-Vanadium Deposits ..................................................................................   3-28

3.3-5   Geologic Map Covering the ULP Lease Tracts ......................................................   3-29

3.3-6   Generalized Stratigraphy of the Paradox Basin .....................................................   3-31

3.3-7   Topography of the Gateway Lease Tracts ...............................................................   3-36

3.3-8   Topography of the Uravan Lease Tracts ..................................................................   3-37

BLM_0041891

**FIGURES (Cont.)**

3.3-9      Topography of the Paradox Lease Tracts ................................................................. 3-39

3.3-10    Topography of the Slick Rock Lease Tracts............................................................ 3-41

3.3-11    Soils within and around the Gateway Lease Tracts ................................................ 3-44

3.3-12    Soils within and around the Uravan Lease Tracts .................................................. 3-46

3.3-13    Soils within and around the Paradox Lease Tracts ................................................. 3-48

3.3-14    Soils within and around the Slick Rock Lease Tracts............................................. 3-52

3.4-1      Average Annual Precipitation in Colorado, 1961–1990......................................... 3-54

3.4-2      Map of Surface Water Features in the Region of the DOE ULP Lease Tracts ...... 3-55

3.4-3      Seasonal Hydrograph and Monthly Discharge Values in the Dolores River
             near Bedrock, Colorado, 1990–2010 ..................................................................... 3-57

3.4-4      Seasonal Hydrograph and Monthly Discharge Values in the San Miguel River
             near Uravan, Colorado, 1990–2010........................................................................ 3-58

3.4-5      Location of Impaired Water Bodies......................................................................... 3-66

3.4-6      Conceptual Diagram of the Hydrogeologic Stratigraphy of the Paradox Basin..... 3-70

3.4-7      Locations of 88 Domestic Wells and One Municipal Well in and
             near the Lease Tracts .............................................................................................. 3-74

3.5-1      Location of the Proposed Piñon Ridge Mill ........................................................... 3-87

3.6-1      Level IV Ecoregions in the Vicinity of DOE ULP Lease Tracts............................ 3-94

3.6-2      Land Cover Types in the Vicinity of DOE ULP Lease Tracts 26 and 27 ............. 3-96

3.6-3      Land Cover Types in the Vicinity of DOE ULP Lease Tracts 18–20,
             24, and 25................................................................................................................ 3-97

3.6-4      Land Cover Types in the Vicinity of DOE ULP Lease Tracts 5–8, 17,
             and 21–23................................................................................................................ 3-98

3.6-5      Land Cover Types in the Vicinity of DOE ULP Lease Tracts 10–16 ................... 3-99

BLM_0041892

# FIGURES (Cont.)

3.6-6      NWI Wetlands Mapped in the Vicinity of Lease Tracts 13 and 14........................3-108

3.6-7      Wild Turkey Activity Areas within the Three-County Study Area
           That Encompasses the Lease Tract Boundaries......................................................3-128

3.6-8      Desert Bighorn Sheep Activity Areas within the Three-County Study Area
           That Encompasses the Lease Tract Boundaries......................................................3-135

3.6-9      Elk Activity Areas within the Three-County Study Area That Encompasses
           the Lease Tract Boundaries...................................................................................3-138

3.6-10     Elk Winter Activity Areas within the Lease Tracts................................................3-139

3.6-11     Mule Deer Activity Areas within the Three-County Study Area That
           Encompasses the Lease Tract Boundaries .............................................................3-141

3.6-12     Mule Deer Winter Activity Areas within the Lease Tracts ....................................3-142

3.6-13     Pronghorn Activity Areas within the Three-County Study Area That
           Encompasses the Lease Tract Boundaries .............................................................3-144

3.6-14     Locations of Designated Critical Habitat for the Colorado River Endangered
           Fishes in the Vicinity of the ULP Lease Tracts ....................................................3-167

3.6-15     Distribution of Proposed Critical Habitat for the Gunnison Sage-Grouse
           in the Vicinity of the ULP Lease Tracts ...............................................................3-169

3.6-16     Recorded Occurrences and Distribution of Potentially Suitable Habitat
           for the Mexican Spotted Owl in the Vicinity of the ULP Lease Tracts.................3-170

3.6-17     Distribution of Potentially Suitable Habitat for the Southwestern Willow
           Flycatcher in the Vicinity of the ULP Lease Tracts ..............................................3-172

3.6-18     Distribution of Potentially Suitable Habitat for the Western Yellow-Billed
           Cuckoo and Canada Lynx in the Vicinity of the ULP Lease Tracts......................3-173

3.6-19     Distribution of Potentially Suitable Habitat for the Gunnison's Prairie Dog
           in the Vicinity of the ULP Lease Tracts ...............................................................3-174

3.7-1      Specially Designated Areas on Public Lands near the ULP Lease Tracts.............3-180

3.7-2      Land with Wilderness Characteristics near the ULP Lease Tracts........................3-184

BLM_0041893

# FIGURES (Cont.)

3.7-3      Wild and Scenic River Segments near the ULP Lease Tracts ...............................3-185

3.7-4      Permitted Oil and Gas Wells and Mines within 25 mi of the ULP Lease Tracts ...3-192

3.8-1      ROI Population from 1960–2010..........................................................................3-200

3.9-1      Minority Populations within the 50-mi Radius surrounding the Proposed
           Lease Tracts ........................................................................................................3-216

3.9-2      Low-Income Populations within the 50-mi Radius surrounding the Proposed
           Lease Tracts ........................................................................................................3-217

3.10-1     Road Network by the Lease Tract and Uranium Mills ...........................................3-219

3.10-2     Local Road Network around the Slick Rock Lease Tracts .....................................3-220

3.10-3     Local Road Network around the Paradox and Uravan Lease Tracts .....................3-221

3.10-4     Local Road Network around the Gateway Lease Tracts .......................................3-222

3.12-1     Locations of the Four Lease Tract Groups: North; North Central;
           South Central; and South .....................................................................................3-240

3.12-2     View from the Western Edge of Lease Tract 26 Facing Southwest ......................3-242

3.12-3     View from Mesa Top near Lease Tract 19 Facing West ........................................3-243

3.12-4     View of Lease Tract 16A........................................................................................3-244

3.12-5     View of the Cotter Mine on Lease Tract 11 ..........................................................3-245

3.12-6     View of the New Verde Mine Reclamation Site on Lease Tract 26.......................3-246

3.12-7     View of Lease Tract 19 Facing West......................................................................3-247

3.12-8     View of Entrance to Underground Mine at Lease Tract 18...................................3-248

3.12-9     Composite Viewshed of Four Lease Tract Groups.................................................3-249

3.12-10    Composite Viewshed with Overlay of Sensitive Visual Resource Areas..............3-251

4.1-1      Conceptual Exposure Model for the Exploration, Mining Development and
           Operations, and Reclamation Phases at the ULP Lease Tracts .............................4-11

BLM_0041894

## FIGURES (Cont.)

4.1-2   Existing Structures in the ULP Lease Tract Surrounding Area .............................. 4-18

4.1-3   Viewshed Analysis for Portions of the North Lease Group under Alternative 1 ... 4-60

4.1-4   Viewshed Analysis for the North Central Lease Group under Alternative 1 ......... 4-61

4.1-5   Viewshed Analysis for the South Central Lease Group under Alternative 1 ......... 4-63

4.1-6   Viewshed Analysis for the South Lease Group under Alternative 1 ...................... 4-66

4.3-1   Viewshed Analysis for the North Central Lease Group under Alternative 3 .........4-186

4.3-2   Viewshed Analysis for the South Central Lease Group under Alternative 3 .........4-188

4.3-3   Viewshed Analysis for the South Lease Group under Alternative 3 .....................4-191

4.4-1   Viewshed Analysis for the North Lease Group under Alternative 4 .....................4-224

4.4-2   Viewshed Analysis for the North Central Lease Group under Alternative 4 .........4-226

4.4-3   Viewshed Analysis for the South Central Lease Group under Alternative 4 .........4-229

4.4-4   Viewshed Analysis for the South Lease Group under Alternative 4 .....................4-233

4.7-1   Region of Influence for Cumulative Effects ...........................................................4-275

4.7-2   Uranium Mining and Oil and Gas Wells within the Region of Influence
        for Cumulative Effects ..........................................................................................4-277

D.5-1   Designated Grouping of the ULP Lease Tracts Used as a Basis for
        Human Health Impacts Evaluation ........................................................................ D-10

## TABLES

1.1-1   Summary of Three Leasing Programs Administered between 1949 and 2008 ......   1-2

1.1-2   Summary of Uranium Ore Production from 1974 to 2008 ....................................   1-3

1.2-1   Summary of the 31 DOE ULP Lease Tracts in 2011.............................................   1-8

1.3-1   Estimated Remaining Ore Reserve at the ULP Lease Tracts ................................  1-15

BLM_0041895

# TABLES (Cont.)

1.7-1    Draft ULP PEIS Public Hearing Locations in Colorado, Dates, and
         Attendance ........................................................................................................ 1-50

2.2-1    Lease Tracts Evaluated under Alternatives 1 and 2................................................. 2-19

2.2-2    Lease Tracts Evaluated under Alternative 3 .......................................................... 2-23

2.2-3    Number of Mines, Ore Production Rate, Disturbed Surface Area, Number of
         Workers, and Water Usage Assumed for the Peak Year of Operations under
         Alternative 3.......................................................................................................... 2-26

2.2-4    Number of Mines, Ore Production Rate, and Disturbed Surface Area
         Assumed for the Peak Year of Operations under Alternative 4.............................. 2-28

2.2-5    Amount of Water To Be Utilized per Mine under Alternative 4 ............................ 2-30

2.2-6    Number of Mines, Ore Production Rate, and Disturbed Surface Area
         Assumed for the Peak Year of Operations under Alternative 5.............................. 2-31

2.2-7    Assumed Amount of Water To Be Utilized per Mine under Alternative 5 ............ 2-32

2.4-1    Meaning of Qualitative Terms Used To Describe Potential Impact Levels ........... 2-34

2.4-2    Summary of Known Cultural Resource Sites by Lease Tract Cluster.................... 2-52

2.4-3    Summary of Potential Impacts on Known Cultural Resource Sites ...................... 2-52

2.4-4    Comparison of the Potential Impacts on Air Quality, the Acoustic
         Environment, and Soil Resources from Alternatives 1 through 5 .......................... 2-57

2.4-5    Comparison of the Potential Impacts on Water Resources, Land Use, and
         Waste Management from Alternatives 1 through 5................................................. 2-60

2.4-6    Comparison of the Potential Impacts on Human Health from
         Alternatives 1 through 5.......................................................................................... 2-62

2.4-7    Comparison of the Potential Impacts on Ecological Resources from
         Alternatives 1 through 5.......................................................................................... 2-65

2.4-8    Comparison of the Potential Impacts on Socioeconomics, Environmental
         Justice, and Transportation from Alternatives 1 through 5.................................... 2-68

BLM_0041896

# TABLES (Cont.)

2.4-9   Comparison of the Potential Impacts on Cultural Resources and Visual
Resources from Alternatives 1 through 5 .................................................................. 2-70

2.5-1   Estimated Amount of Resources Assumed To Be Irreversible and
Irretrievable as a Result of the Implementation of the ULP Alternatives............... 2-72

3.1-1   Temperature and Precipitation Data Summaries at Selected Meteorological
Stations around the ULP Lease Tracts, in Order of Meteorological Station
Starting from North to South .................................................................................. 3-6

3.1-2   Annual Emissions of Criteria Pollutants and Volatile Organic Compounds in
Mesa, Montrose, and San Miguel Counties, Colorado, Encompassing the ULP
Lease Tracts, 2008 ................................................................................................. 3-9

3.1-3   National Ambient Air Quality Standards, Colorado State Ambient Air
Quality Standards, and Background Concentration Levels Representative
of the ULP Lease Tracts in Mesa, Montrose, and San Miguel Counties,
Colorado.................................................................................................................. 3-12

3.1-4   Maximum Allowable PSD Increments for PSD Class I and Class II Areas........... 3-16

3.2-1   Colorado Limits on Maximum Permissible Noise Levels...................................... 3-22

3.3-1   Geologic Units in the Lease Tracts and Their PFYC Ranking............................... 3-42

3.4-1   Range in Reported Peak Discharge Values for Intermittent and Ephemeral
Streams in the Region of the DOE ULP Lease Tracts............................................. 3-59

3.4-2   Impaired Water Bodies on the Colorado 2012 303(d) and M&E Lists or in the
Process of Implementing TMDL within the Upper Dolores, San Miguel, and
Lower Dolores Watersheds..................................................................................... 3-61

3.4.3   COC Concentrations in the Dolores River at SRE and SRW Sites near
Slick Rock Lease Tract 13 ...................................................................................... 3-69

3.4-4   Depths to Groundwater Observed in USGS Monitoring Wells Located within
the Upper Dolores, San Miguel, and Lower Dolores Basins.................................. 3-72

3.4-5   Monitoring Data Collected at Springs Located within the Vicinity of the
DOE ULP Tracts..................................................................................................... 3-73

3.4-6   Domestic and Municipal Wells in the Area 5 mi from the DOE ULP
Lease Tracts ........................................................................................................... 3-75

BLM_0041897

# TABLES (Cont.)

3.4-7   COC Concentrations in Groundwater at SRE and SRW Sites near
         Slick Rock Lease Tract 13 ........................................................................ 3-77

3.4-8   Water Use by Category for Mesa, Montrose, and San Miguel Counties
         in 2005 ...................................................................................................... 3-78

3.5-1   Uranium-Mining-Related Regulations and Guidelines for Workers
         and Members of the Public ...................................................................... 3-84

3.5-2   Comparison of Radiation Exposures from Natural Background Sources near
         ULP Lease Tracts Versus the U.S. National Average ............................ 3-86

3.5-3   Estimated Radiation and Chemical Exposures for Receptors in the DOE
         Lease Tracts Based on Environmental Monitoring Data from Energy Fuels
         Resources Corp. ...................................................................................... 3-90

3.6-1   Land Cover Types within DOE ULP Lease Tracts ............................... 3-100

3.6-2   Descriptions of Land Cover Types ...................................................... 3-104

3.6-3   Noxious Weeds Occurring on or in the Vicinity of ULP Lease Tracts ... 3-106

3.6-4   Wetlands Mapped by the National Wetlands Inventory within ULP Lease
         Tracts ..................................................................................................... 3-109

3.6-5   Descriptions of Wetland Types ............................................................ 3-113

3.6-6   Number of Wildlife Species in the Three-County Study Area ............. 3-115

3.6-7   Amphibian and Reptile Species Expected To Occur within the Lease Tract
         Boundaries ............................................................................................. 3-116

3.6-8   Songbird Species Expected To Occur within the Lease Tract Boundaries ... 3-119

3.6-9   Raptor Species Expected To Occur within the Lease Tract Boundaries ... 3-126

3.6-10  Upland Game Bird Species Expected To Occur within the Lease Tract
         Boundaries ............................................................................................. 3-127

3.6-11  Acreages of Wild Turkey Activity Areas within the Three-County Study
         Area and the Combined Boundary for the Lease Tracts ...................... 3-129

BLM_0041898

# TABLES (Cont.)

3.6-12    Descriptions of Big Game Activity Areas in Colorado ..........................................3-131

3.6-13    Habitat Information for Big Game Species Expected To Occur within the
Lease Tract Boundaries...............................................................................................3-132

3.6-14    Acreages of American Black Bear Activity Areas within the
Three-County Study Area and the Combined Boundary for the
Lease Tracts ................................................................................................................3-133

3.6-15    Acreages of Desert Bighorn Sheep Activity Areas within the
Three-County Study Area and the Combined Boundary for the
Lease Tracts ................................................................................................................3-136

3.6-16    Acreages of Elk Activity Areas within the Three-County Study Area and
the Combined Boundary for the Lease Tracts ............................................................3-140

3.6-17    Acreages of Mule Deer Activity Areas within the Three-County Study Area
and the Combined Boundary for the Lease Tracts.....................................................3-143

3.6-18    Acreages of Pronghorn Activity Areas within the Three-County Study Area
and the Combined Boundary for the Lease Tracts.....................................................3-145

3.6-19    Bat Species Reported from Abandoned Mines within the ULP Lease Tracts........3-146

3.6-20    Small Game, Furbearer, and Nongame Mammal Species Expected To Occur
within the Lease Tract Boundaries ...........................................................................3-147

3.6-21    Threatened, Endangered, and Sensitive Species That May Occur in the
Vicinity of the ULP Lease Tracts .............................................................................3-154

3.6-22    Species Listed, Proposed for Listing, or Candidates for Listing under the
ESA That May Occur in the Vicinity of the ULP Lease Tracts ...............................3-165

3.6-23    Number of Sensitive Species That May Occur on or near ULP Lease
Tracts.........................................................................................................................3-176

3.7-1    Specially Designated Areas on Public Lands within 25 mi of the ULP Lease
Tracts.........................................................................................................................3-181

3.7-2    Lands with Wilderness Characteristics within 25 mi of the ULP Lease Tracts .....3-182

3.7-3    Eligible Wild and Scenic River Segments within 25 mi of the ULP Lease
Tracts.........................................................................................................................3-186

BLM_0041899

# TABLES (Cont.)

3.7-4    Number of Farms and Acreage of Agricultural Lands by County..........................3-189

3.7-5    Active Uranium Mining Permits in Southwestern Colorado .................................3-193 |

3.7-6    Uranium Projects in Southwestern Utah, 2010.......................................................3-194

3.8-1    ROI Employment, 2001–2010 .................................................................................3-201

3.8-2    ROI and State Unemployment Data, 2001–2011 ...................................................3-201

3.8-3    ROI Employment by Sector, 2009..........................................................................3-203

3.8-4    ROI Personal Income, 2000–2009 .........................................................................3-204

3.8-5    ROI Population, 2000–2023 ...................................................................................3-204

3.8-6    ROI Urban Population and Income, 1999–2010.....................................................3-206

3.8-7    ROI Housing Characteristics, 2000 and 2009........................................................3-207

3.8-8    ROI Jurisdictions ...................................................................................................3-208

3.8-9    ROI School District Data, 2010..............................................................................3-208

3.8-10   ROI Physicians, 2010..............................................................................................3-209

3.8-11   ROI Public Safety Employment, 2009....................................................................3-210

3.8-12   ROI and County Crime Rates, 2009 .......................................................................3-210

3.9-1    Minority and Low-Income Populations within the 50-mi Radius
         Surrounding the Proposed Lease Tracts .................................................................3-215

3.10-1   Annual Average Daily Traffic Volumes for Major Roads near the Lease
         Tracts, 2010............................................................................................................3-223

3.11-1   Cultural Resource Survey Coverage of the Lease Tracts .......................................3-230

3.11-2   Correlation of Lease Tract Cluster Designations....................................................3-231

3.11-3   Cultural Resource Survey Coverage, Site Tallies, and Site Density within
         15 mi of Lease Tract Clusters .................................................................................3-231

BLM_0041900