# TABLES (Cont.)

3.11-4    Cultural Resource Survey Coverage, Site Tallies, and Site Density within
Each Lease Tract Cluster ............................................................................... 3-231

3.11-5    Eligible and Potentially Eligible Sites in the Lease Tracts ..................................... 3-233

3.12-1    Sensitive Visual Resource Areas with Potential Views of the North Group .......... 3-252

3.12-2    Sensitive Visual Resource Areas with Potential Views of the North Central
Group ..................................................................................................... 3-253

3.12-3    Sensitive Visual Resource Areas with Potential Visibility of the
South Central Group ..................................................................................... 3-254

3.12-4    Sensitive Visual Resource Areas with Potential Views of the South Group .......... 3-256

4.1-1    Peak-Year Air Emissions from Reclamation under Alternative 1 ......................... 4-3

4.1-2    Potential Impacts from Mining Activities on Soil Resources ................................ 4-5

4.1-3    Potential Human Receptors, Uranium Sources, and Exposure Pathways
to Exploration, Mining Development and Operations, and Reclamation
Phases at the ULP Lease Tracts .............................................................. 4-12

4.1-4    Dimensions of the Waste-Rock Piles per Mine Size Assumed for Human
Health Impact Analysis .............................................................................. 4-16

4.1-5    Estimated Upper-Bound Emission Rates of Particulates, Radon, and
Radionuclides for the Four Assumed Waste-Rock Pile Sizes ................................ 4-20

4.1-6    Potential Maximum Radiation Doses and LCF Risks to a Resident as a Result
of the Emission of Radon from the Four Assumed Waste-Rock Pile Sizes ........... 4-20

4.1-7    Potential Maximum Radiation Doses and LCF Risks to a Resident as a
Result of the Emission of Particulates from the Four Assumed Waste-Rock
Pile Sizes ..................................................................................................... 4-21

4.1-8    Potential Maximum Total Doses and LCF Risks to a Resident as a Result
of the Emission of Radon and Particulates from the Four Assumed Waste-
Rock Pile Sizes ..................................................................................... 4-21

4.1-9    Seed Mixture Developed for Reseeding on the DOE ULP Lease Tracts ............... 4-28

BLM_0041901

# TABLES (Cont.)

4.1-10   Potential Effects of the Uranium Leasing Program under Alternative 1 on Threatened, Endangered, and Sensitive Species ........................................................ 4-33

4.1-11   Socioeconomic Impacts of Uranium Mining Reclamation in the Region of Influence under Alternative 1 ................................................................. 4-51

4.3-1   Peak-Year Air Emissions from Mine Development, Operations, and Reclamation under Alternative 3 ............................................................. 4-73

4.3-2   Radiation Doses and LCF Risks Received by Underground Uranium Miners under Alternative 3 ................................................................. 4-91

4.3-3   Radon Emission Rates per Type of Mine during Mine Operations Assumed for Alternative 3 ................................................................. 4-94

4.3-4   Potential Maximum Radon Levels, Radiation Doses, Radon Concentrations, and LCF Risks to a Resident Associated with the Emission of Radon from Four Uranium Mine Sizes under Alternative 3 ........................................................ 4-96

4.3-5   Collective Doses and LCF Risks to the General Public from Radon Emissions from Uranium Mines during the Peak Year of Operations under Alternative 3 ..... 4-99

4.3-6   Summary of Potential Impacts on Wildlife Associated with Alternative 3 ........... 4-118

4.3-7   Potential Impacts on Aquatic Biota Associated with Alternative 3 ...................... 4-127

4.3-8   Potential Effects of the Uranium Leasing Program under Alternative 3 on Threatened, Endangered, and Sensitive Species ................................................. 4-132

4.3-9   Socioeconomic Impacts of Uranium Mine Development, Operations, and Reclamation in the Region of Influence under Alternative 3 ................................. 4-155

4.3-10   Recreation Sector Activity in the Region of Influence in 2012 ............................ 4-158

4.3-11   Impacts from Reductions in Recreation Sector Employment Resulting from Uranium Mining Development in the Region of Influence, 2012 ................ 4-159

4.3-12   Distances from Lease Tracts to Ore Processing Mills ........................................... 4-164

4.3-13   Peak-Year Collective Population Transportation Impacts under Alternative 3 ...... 4-165

BLM_0041902

# TABLES (Cont.)

4.3-14   Potential Haul Truck Traffic on Local Roads ...........................................................4-166

4.4-15   Potential Number of Truck Shipments to the White Mesa Mill Passing
through Collector Road Intersections with U.S. and State Highways ...................4-167

4.3-16   Potential Number of Truck Shipments to the Piñon Ridge Mill Passing
through Collector Road Intersections with U.S. and State Highways ...................4-169

4.3-17   Single-Shipment Collective Population Impacts from Transporting Ore from
Lease Tracts to Piñon Ridge Mill ...........................................................................4-173

4.3-18   Single-Shipment Collective Population Impacts from Transporting Ore from
Lease Tracts to White Mesa Mill.............................................................................4-174

4.3-19   Hypothetical Single-Shipment Radiological Impacts on Individual Receptors .....4-175

4.3-20   Cultural Resource Sites That Could Be Directly Affected under Alternative 3.....4-178

4.4-1    Peak-Year Air Emissions from Mine Development, Operations, and
Reclamation under Alternative 4 ............................................................................4-194

4.4-2    Radon Emission Rates per Type of Mine during Mine Operations
Assumed for Alternative 4 ......................................................................................4-208

4.4-3    Collective Doses and LCF Risks to the General Public from Radon Emissions
from Uranium Mines during the Peak Year of Operations under Alternative 4.....4-209

4.4-4    Potential Effects of the Uranium Leasing Program under Alternative 4 on
Threatened, Endangered, and Sensitive Species That Would Not Be Affected
under Alternative 3 ..................................................................................................4-214

4.4-5    Socioeconomic Impacts from Uranium Mine Development, Operations, and
Reclamation in the Region of Influence under Alternative 4 .................................4-215

4.4-6    Peak-Year Collective Population Transportation Impacts under Alternative 4......4-219

4.4-7    Cultural Resource Sites That Could Be Directly Affected under Alternative 4 .....4-222

4.5-1    Peak-Year Air Emissions from Mine Development, Operations, and
Reclamation under Alternative 5 ............................................................................4-236

4.5-2    Radon Emission Rates per Type of Mine during Mine Operations Assumed
for Alternative 5......................................................................................................4-246

BLM_0041903

# TABLES (Cont.)

4.5-3    Potential Maximum Radiation Doses, Radon Concentrations, and LCF Risks
         to a Resident Associated with the Emission of Radon from Three Sizes of
         Uranium Mines .......................................................................................4-247

4.5-4    Collective Doses and LCF Risks to the General Public from Radon Emissions
         from Uranium Mines during the Peak Year of Operations under Alternative 5.....4-248

4.5-5    Socioeconomic Impacts of Uranium Mine Development, Operations, and
         Reclamation in the Region of Influence under Alternative 5 .................................4-254

4.5-6    Peak-Year Collective Population Transportation Impacts under Alternative 5......4-257

4.5-7    Cultural Resource Sites Expected To Be Directly Affected under
         Alternative 5...................................................................................................4-260

4.6-1    Measures Identified to Minimize Potential Impacts from Uranium Mining
         at the ULP Lease Tracts....................................................................................4-262

4.7-1    Potential Environmental Impacts of the Proposed Piñon Ridge Mill ....................4-279

4.7-2    Potential Environmental Impacts of the Proposed Book Cliff Mine .....................4-282

4.7-3    Potential Environmental Impacts from Operation of the White Mesa Mill............4-288

4.7-4    Potential Environmental Impacts of the Daneros Mine .........................................4-291

4.7-5    Potential Environmental Impacts of the Whirlwind Mine .....................................4-293

4.7-6    Summary of Exploration Plans for the ULP Lease Tracts....................................4-297

4.7-7    Summary of Reclamation Plans Implemented in 2009 to 2011 for the
         ULP Lease Tracts.............................................................................................4-299

4.7-8    Potential Environmental Impacts of Oil and Gas Exploration
         and Development ..............................................................................................4-305

4.7-9    Potential Environmental Impacts of Livestock Grazing ........................................4-307

4.7-10   General Trends in the Region of Influence for Cumulative Effects .......................4-310

4.7-11   Summary of Major Projects and Activities in the Region of Influence
         for Cumulative Effects ......................................................................................4-314

BLM_0041904

## TABLES (Cont.)

4.7-12   Potential Impacts of Select Projects Considered with the
DOE ULP Alternatives ............................................................................................4-322

5.2-1   Potentially Applicable State Requirements ...........................................................   5-9

5.3-1   Potentially Applicable County Requirements.........................................................  5-11

6.1-1   Indian Tribal Governments Contacted by DOE with Regard
to Their Interest in Being Consulted on the ULP PEIS ...........................................   6-2

6.3-1   NHPA Consultation Efforts ...................................................................................   6-6

B-1   Public Scoping Meeting Locations, Dates, and Attendance ...................................   B-4

B-2   Public Scoping Comments Considered To Be Within the Scope of the
ULP PEIS..............................................................................................................   B-5

B-3   Public Scoping Issues Considered To Be Outside the Scope of the ULP PEIS .....  B-12

C.1-1   Number of Mines Considered per Mine Size and Alternative................................   C-4

C.1-2   Total Disturbed Acreage per Mine Size and Alternative during Exploration ........   C-4

C.1-3   Assumed Workforce per Labor Category and Alternative during Exploration......   C-5

C.1-4   Assumed Total Costs per Alternative during Exploration......................................   C-6

C.1-5   Assumed Equipment and Total Hours Operated per Mine Size and
Alternative during Exploration ...............................................................................   C-7

C.1-6   Assumed Total Material Amounts per Alternative during Exploration..................   C-8

C.1-7   Assumed Annual Air Emissions on an Individual Mine Basis during
Exploration............................................................................................................   C-9

C.1-8   Assumed Total Air Emissions during Exploration ................................................ C-10

C.1-9   Wastes Generated per Alternative during Exploration ..........................................C-10

C.2-1   Estimated Material Amounts and Labor Time per Mine Size during
Development ......................................................................................................... C-11

C.2-2   Estimated Materials and Labor Time per Alternative during Development.......... C-11

BLM_0041905

# TABLES (Cont.)

C.2-3    Number of Workers per Mine Size and Worker Salary per Labor Category ......... C-12

C.2-4    Annual Worker Salaries per Labor Category and Mine Size ................................ C-12

C.2-5    Number and Cost of Capital Equipment Units per Mine Size ............................... C-13

C.2-6    Total Capital Equipment Costs per Alternative ..................................................... C-14

C.2-7    Estimated Total Capital Costs per Mine Size ....................................................... C-15

C.2-8    Estimated Total Capital Costs per Alternative ...................................................... C-16

C.2-9    Assumed Annual Air Emissions on an Individual Mine Basis during
         Development ........................................................................................................ C-17

C.2-10   Estimated Annual Air Emissions per Alternative during Development ................. C-18

C.2-11   Wastes Generated per Alternative during Development ....................................... C-18

C.2-12   Total Worker Peak-Year Annual Wages per Mine Size and Alternative .............. C-19

C.2-13   Peak-Year Annual Water Usage per Mine Size and Alternative
         during Operations ................................................................................................ C-19

C.2-14   Total Peak-Year Annual Cost of Operations per Alternative ................................ C-20

C.2-15   Assumed Annual Air Emissions on an Individual Mine Basis during
         Operations ........................................................................................................... C-20

C.2-16   Estimated Peak-Year Annual Air Emissions per Alternative during Operations ... C-21

C.3-1    Assumed Workforce per Labor Category, Team, JD-7 Mine, and
         Alternative during Reclamation ............................................................................ C-22

C.3-2    Total Disturbed Acreage per Mine Size and Alternative during Reclamation ....... C-22

C.3-3    Assumed Total Costs per Alternative during Reclamation .................................... C-23

C.3-4    Assumed Equipment and Total Hours of Operation per Mine Size and
         Alternative during Reclamation ............................................................................ C-24

C.3-5    Assumed Amounts of Materials per Mine Size and Alternative during
         Reclamation ........................................................................................................ C-25

BLM_0041906

## TABLES (Cont.)

C.3-6   Assumed Annual Air Emissions on an Individual Mine Basis during
        Reclamation ........................................................................................ C-26

C.3-7   Assumed Total Air Emissions during Reclamation ................................ C-27

C.3-8   Wastes Generated per Alternative during Reclamation .......................... C-27

D.5-1   Meteorological Data Used in the COMPLY-R Calculations .................. D-15

D.5-2   Comparison of the Radon Doses Calculated by CAP88-PC and Those
        Calculated by COMPLY-R ................................................................... D-15

D.10-1  Individual Exposure Scenarios ............................................................. D-31

D.10-2  Mine Size for Each Lease Tract as Assumed for the Transportation
        Analysis for Alternatives 3, 4, and 5 .................................................. D-34

E-1     Endangered Species Act Consultation Correspondence ........................   E-3

F-1     Consultation Correspondence ...............................................................   F-3

F-2     Correspondence Regarding the Establishment of a Programmatic
        Agreement for Section 106 Consultation ............................................. F-94

G-1     DOE Management Team ......................................................................   G-3

G-2     ULP PEIS Preparers ...........................................................................   G-4

I.1-1   Draft ULP PEIS Public Hearing Locations in Colorado, Dates, and
        Estimated Attendance ........................................................................   I-2

I.4-1   Organizations That Submitted Comments in Writing via Letter, E-mail,
        or Web Portal or Orally at One of the Public Hearings for ULP ...........  I-17

I.4-2   Individuals Who Submitted Comments in Writing via Letter, E-mail,
        or Web Portal or Orally at One of the Public Hearings for ULP ...........  I-17

BLM_0041907

1
2
3
4
5
6
7
8
9
10
11
12
13                    *This page intentionally left blank*
14
15

BLM_0041908

# NOTATION

The following is a list of acronyms and abbreviations, chemical names, and units of measure used in this document. Some acronyms used only in tables may be defined only in those tables.

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| AADT | annual average daily traffic |
| ACEC | Area of Critical Environmental Concern |
| ACHP | American Council on Historic Preservation |
| AEA | Atomic Energy Act |
| AEC | Atomic Energy Commission |
| APE | area of potential effects |
| AQCR | Air Quality Control Region |
| AQRV | air-quality-related value |
| ATSDR | Agency for Toxic Substances and Disease Registry |
| AUM | animal unit month |
| | |
| BA | biological assessment |
| BLM | Bureau of Land Management |
| BLS | Bureau of Labor Statistics |
| BMP | best management practice |
| BO | biological opinion |
| BOR | Bureau of Reclamation |
| | |
| CAA | Clean Air Act |
| CAAQS | Colorado Ambient Air Quality Standards |
| CASTNET | Clean Air Status and Trends Network |
| CCCD | Colorado Center for Community Development |
| CDA | Colorado Department of Agriculture |
| CDNR | Colorado Department of Natural Resources |
| CDOT | Colorado Department of Transportation |
| CDOW | Colorado Division of Wildlife |
| CDPHE | Colorado Department of Public Health and Environment |
| CDRMS | Colorado Division of Reclamation, Mining, and Safety |
| CDWR | Colorado Division of Water Resources |
| CEDE | committed effective dose equivalent |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CEQ | Council on Environmental Quality |
| CFR | *Code of Federal Regulations* |
| CNHP | Colorado Natural Heritage Program |
| COGCC | Colorado Oil and Gas Conservation Commission |
| CPW | Colorado Parks and Wildlife (formerly CDOW) |

BLM_0041909

| | | |
|---|---|---|
| 1 | CRD | Comment Response Document |
| 2 | CRS | *Colorado Revised Statutes* |
| 3 | CWA | Clean Water Act |
| 4 | CWCB | Colorado Water Conservation Board |
| 5 | | |
| 6 | DCF | dose conversion factor |
| 7 | DEM | Digital Elevation Model |
| 8 | DNL | day-night average sound level |
| 9 | DOE | U.S. Department of Energy |
| 10 | DOE-LM | DOE Office of Legacy Management |
| 11 | DOI | U.S. Department of the Interior |
| 12 | DOT | U.S. Department of Transportation |
| 13 | DPS | distinct population segment (USFWS) |
| 14 | DRI | Desert Research Institute |
| 15 | | |
| 16 | EA | environmental assessment |
| 17 | EDE | effective dose equivalent |
| 18 | EF | enhanced Fujita (scale) |
| 19 | EFR | Energy Fuels Resources |
| 20 | EIA | Energy Information Administration |
| 21 | EIS | environmental impact statement |
| 22 | EMF | electromagnetic field |
| 23 | E.O. | Executive Order |
| 24 | EPA | U.S. Environmental Protection Agency |
| 25 | EPP | environmental protection plan |
| 26 | EPS | Economic and Planning Systems |
| 27 | ERNA | Ecological Research Natural Area |
| 28 | ESA | Endangered Species Act |
| 29 | | |
| 30 | FGR | Federal Guidance Report |
| 31 | FLM | Federal Land Manager |
| 32 | FONSI | Finding of No Significant Impact |
| 33 | FR | *Federal Register* |
| 34 | FTW | full-time worker |
| 35 | | |
| 36 | GAO | Government Accountability Office |
| 37 | GHG | greenhouse gas |
| 38 | GIS | geographic information system |
| 39 | | |
| 40 | HA | herd area |
| 41 | HAP | hazardous air pollutant |
| 42 | HEAST | Health Effect Assessment Summary Tables |
| 43 | HFC | hydrofluorocarbon |
| 44 | HI | hazard index |
| 45 | HMA | herd management area |
| 46 | HMR | hazardous materials regulation (DOT) |

BLM_0041910

| 1 | HQ | hazard quotient |
| 2 | | |
| 3 | I- | Interstate (Highway) |
| 4 | ICRP | International Commission on Radiological Protection |
| 5 | IDA | intentional destructive act |
| 6 | IPaC | Information, Planning, and Conservation System (USFWS) |
| 7 | IRIS | Integrated Risk Information System |
| 8 | ISM | Integrated Safety Management |
| 9 | | |
| 10 | KOP | key observation point |
| 11 | KREX | KREX News Channel |
| 12 | | |
| 13 | $L_{90}$ | sound level exceeded 90% of the time |
| 14 | LCF | latent cancer fatality |
| 15 | $L_{dn}$ | day-night average sound level |
| 16 | $L_{eq}$ | equivalent continuous sound level |
| 17 | Lg | surface wave |
| 18 | LHA | landscape health assessment |
| 19 | LR2000 | Land and Mineral Rehost 2000 System (BLM) |
| 20 | LSA | low specific activity |
| 21 | | |
| 22 | M&E | Monitoring & Evaluation (List) |
| 23 | MLg | surface wave magnitude |
| 24 | MOU | Memorandum of Understanding |
| 25 | MSHA | Mine Safety and Health Administration |
| 26 | | |
| 27 | NAAQS | National Ambient Air Quality Standard(s) |
| 28 | NAICS | North American Industry Classification System |
| 29 | NCA | National Conservation Area |
| 30 | NCDC | National Climatic Data Center |
| 31 | NCRP | National Council on Radiation Protection |
| 32 | NED | National Elevation Data |
| 33 | NEPA | National Environmental Policy Act |
| 34 | NESHAP | National Emission Standards for Hazardous Air Pollutants |
| 35 | NHPA | National Historic Preservation Act |
| 36 | NLCS | National Landscape Conservation System (BLM) |
| 37 | NMFS | National Marine Fisheries Service |
| 38 | NOI | Notice of Intent |
| 39 | NP | National Park |
| 40 | NPDES | National Pollutant Discharge Elimination System |
| 41 | NPS | National Park Service |
| 42 | NRC | U.S. Nuclear Regulatory Commission |
| 43 | NRCS | Natural Resources Conservation Service |
| 44 | NRHP | *National Register of Historic Places* |
| 45 | NWCC | National Wind Coordinating Committee |
| 46 | NWI | National Wetlands Inventory |

BLM_0041911

| | | |
|---|---|---|
| 2 | OAHP | Office of Archaeology and Historic Preservation (Colorado) |
| 3 | OHV | off-highway vehicle |
| 4 | OMP | operations and maintenance plan |
| 5 | ONA | Outstanding Natural Area |
| 6 | ORV | Outstanding Remarkable Value |
| 8 | PA | programmatic agreement |
| 9 | PEA | programmatic environmental assessment |
| 10 | PEIS | programmatic environmental impact statement |
| 11 | PFC | perfluorocarbon |
| 12 | PFYC | Potential Fossil Yield Classification |
| 13 | P.L. | Public Law |
| 14 | PLS | pure live seed |
| 15 | PM | particulate matter |
| 16 | $PM_{2.5}$ | particulate matter with a mean aerodynamic diameter of 2.5 µm or less |
| 17 | $PM_{10}$ | particulate matter with a mean aerodynamic diameter of 10 µm or less |
| 18 | PSD | Prevention of Significant Deterioration |
| 20 | QDEH | Queensland Department of Environment and Heritage |
| 22 | RCRA | Resource Conservation and Recovery Act |
| 23 | RfC | reference dose concentration |
| 24 | RfD | reference dose |
| 25 | RILOR | reclamation in lieu of royalties |
| 26 | RMP | resource management plan |
| 27 | RNA | Research Natural Area |
| 28 | ROD | Record of Decision |
| 29 | ROI | region of influence |
| 30 | ROW | right-of-way |
| 32 | SAAQS | State Ambient Air Quality Standard(s) |
| 33 | SDWA | Safe Drinking Water Act |
| 34 | SH | State Highway |
| 35 | SHPO | State Historic Preservation Office |
| 36 | SIP | State Implementation Plan |
| 37 | SJPLC | San Juan Public Lands Center |
| 38 | SRE | Slick Rock East |
| 39 | SRMA | Special Recreation Management Area |
| 40 | SRW | Slick Rock West |
| 41 | SVRA | sensitive visual resource area |
| 42 | SWCTR | Southwest Colorado Travel Region |
| 43 | SWMP | stormwater management plan |
| 44 | SWReGAP | Southwest Regional Gap Analysis Project |

BLM_0041912

| 1 | TDS | total dissolved solids |
| 2 | TEDE | total effective dose equivalent |
| 3 | THC | total hydrocarbons |
| 4 | TIS | traffic impact study |
| 5 | TMDL | total maximum daily load |
| 6 | TSCA | Toxic Substances Control Act |
| 7 | TSP | total suspended particulates |
| 8 | | |
| 9 | UCC | Union Carbide Corporation |
| 10 | UDEQ | Utah Department of Environmental Quality |
| 11 | UDNR | Utah Department of Natural Resources |
| 12 | UDOGM | Utah Division of Oil, Gas, and Mining |
| 13 | UDOT | Utah Department of Transportation |
| 14 | UDWR | Utah Division of Wildlife Resources |
| 15 | UGS | Utah Geological Survey |
| 16 | ULP | Uranium Leasing Program |
| 17 | UMTRCA | Uranium Milling Tailings Radiation Control Act |
| 18 | UNSCEAR | United Nations Scientific Committee on the Effects of Radiation |
| 19 | US | U.S. Highway |
| 20 | USACE | U.S. Army Corps of Engineers |
| 21 | USC | *United States Code* |
| 22 | USDA | U.S. Department of Agriculture |
| 23 | USFS | U.S. Forest Service |
| 24 | USFWS | U.S. Fish and Wildlife Service |
| 25 | USGRCRP | U.S. Global Research Change Research Program |
| 26 | USGS | U.S. Geological Survey |
| 27 | | |
| 28 | VOC | volatile organic compound |
| 29 | VRI | visual resource inventory |
| 30 | VRM | visual resource management |
| 31 | | |
| 32 | WA | Wilderness Area |
| 33 | WAPA | Western Area Power Administration |
| 34 | WHO | World Health Organization |
| 35 | WL | working level |
| 36 | WLM | working level month |
| 37 | WRCC | Western Regional Climate Center |
| 38 | WSA | Wilderness Study Area |
| 39 | WSR | National Wild and Scenic Rivers |
| 40 | | |
| 41 | | |
| 42 | | |

BLM_0041913

1   **CHEMICALS**
2
3   $CH_4$            methane
4   CO               carbon monoxide
5   $CO_2$            carbon dioxide
6   $CO_2e$           carbon dioxide equivalent
7
8   K-40             potassium-40
9
10  $NO_2$            nitrogen dioxide
11  $N_2O$            nitrous oxide
12  $NO_x$            nitrogen oxides
13
14  $O_3$             ozone
15
16  Pb               lead
17
18  $SF_6$            sulfur hexafluoride
19  $SO_2$            sulfur dioxide
20
21  $U_3O_8$          uranium oxide (triuranium octoxide)
22
23  $V_2O_5$          vanadium oxide (divanadium pentoxide)
24
25
26  **UNITS OF MEASURE**
27
28  ac-ft            acre-foot (feet)
29
30  bbl              barrel(s)
31
32  ºC               degree(s) Celsius
33  Ci               curie(s)
34  cm               centimeter(s)
35  $cm^3$            cubic centimeter(s)
36
37  d                day(s)
38  dB               decibel(s)
39  dBA              a-weighted decibel(s)
40
41  ºF               degree(s) Fahrenheit
42  ft               foot (feet)
43  $ft^3$            cubic foot (feet)
44
45  g                gram(s)
46  gal              gallon(s)
47

BLM_0041914

| 1  | h          | hour(s)              |
| 2  | ha         | hectare(s)           |
| 3  | hp         | horsepower           |
| 4  | Hz         | hertz                |
| 5  |            |                      |
| 6  | in.        | inch(es)             |
| 7  | in.$^3$    | cubic inch(es)       |
| 8  |            |                      |
| 9  | kg         | kilogram(s)          |
| 10 | km         | kilometer(s)         |
| 11 | km$^2$     | square kilometer(s)  |
| 12 |            |                      |
| 13 | L          | liter(s)             |
| 14 | lb         | pound(s)             |
| 15 |            |                      |
| 16 | m          | meter(s)             |
| 17 | m$^2$      | square meter(s)      |
| 18 | m$^3$      | cubic meter(s)       |
| 19 | mg         | milligram(s)         |
| 20 | mGy        | milligray            |
| 21 | mi         | mile(s)              |
| 22 | mi$^2$     | square mile(s)       |
| 23 | min        | minute(s)            |
| 24 | mm         | millimeter(s)        |
| 25 | mo         | month(s)             |
| 26 | mph        | mile(s) per hour     |
| 27 | mrem       | millirem             |
| 28 | MW         | megawatt(s)          |
| 29 |            |                      |
| 30 | pCi        | picocurie(s)         |
| 31 | ppb        | part(s) per billion  |
| 32 | ppm        | part(s) per million  |
| 33 |            |                      |
| 34 | rem        | roentgen equivalent man |
| 35 |            |                      |
| 36 | s          | second(s)            |
| 37 |            |                      |
| 38 | yd         | yard(s)              |
| 39 | yd$^3$     | cubic yard(s)        |
| 40 | yr         | year(s)              |
| 41 |            |                      |
| 42 | μg         | microgram(s)         |
| 43 | μm         | micrometer(s)        |
| 44 | μmho(s)    | micromho(s)          |
| 45 | μS         | microsievert(s)      |

BLM_0041915

1
2
3
4
5
6
7
8
9
10
11
12
13        *This page intentionally left blank*
14

BLM_0041916

1
2
3
4

# CONVERSION TABLE
## ENGLISH/METRIC AND METRIC/ENGLISH EQUIVALENTS

| Multiply | By | To Obtain |
|---|---|---|
| **English/Metric Equivalents** | | |
| acres | 0.004047 | square kilometers (km$^2$) |
| acre-feet (ac-ft) | 1,234 | cubic meters (m$^3$) |
| cubic feet (ft$^3$) | 0.02832 | cubic meters (m$^3$) |
| cubic yards (yd$^3$) | 0.7646 | cubic meters (m$^3$) |
| degrees Fahrenheit (ºF) –32 | 0.5555 | degrees Celsius (ºC) |
| feet (ft) | 0.3048 | meters (m) |
| gallons (gal) | 3.785 | liters (L) |
| gallons (gal) | 0.003785 | cubic meters (m$^3$) |
| inches (in.) | 2.540 | centimeters (cm) |
| miles (mi) | 1.609 | kilometers (km) |
| miles per hour (mph) | 1.609 | kilometers per hour (kph) |
| pounds (lb) | 0.4536 | kilograms (kg) |
| short tons (tons) | 907.2 | kilograms (kg) |
| short tons (tons) | 0.9072 | metric tons (t) |
| square feet (ft$^2$) | 0.09290 | square meters (m$^2$) |
| square yards (yd$^2$) | 0.8361 | square meters (m$^2$) |
| square miles (mi$^2$) | 2.590 | square kilometers (km$^2$) |
| yards (yd) | 0.9144 | meters (m) |
| **Metric/English Equivalents** | | |
| centimeters (cm) | 0.3937 | inches (in.) |
| cubic meters (m$^3$) | 0.00081 | acre-feet (ac-ft) |
| cubic meters (m$^3$) | 35.31 | cubic feet (ft$^3$) |
| cubic meters (m$^3$) | 1.308 | cubic yards (yd$^3$) |
| cubic meters (m$^3$) | 264.2 | gallons (gal) |
| degrees Celsius (ºC) +17.78 | 1.8 | degrees Fahrenheit (ºF) |
| hectares (ha) | 2.471 | acres |
| kilograms (kg) | 2.205 | pounds (lb) |
| kilograms (kg) | 0.001102 | short tons (tons) |
| kilometers (km) | 0.6214 | miles (mi) |
| kilometers per hour (kph) | 0.6214 | miles per hour (mph) |
| liters (L) | 0.2642 | gallons (gal) |
| meters (m) | 3.281 | feet (ft) |
| meters (m) | 1.094 | yards (yd) |
| metric tons (t) | 1.102 | short tons (tons) |
| square kilometers (km$^2$) | 247.1 | acres |
| square kilometers (km$^2$) | 0.3861 | square miles (mi$^2$) |
| square meters (m$^2$) | 10.76 | square feet (ft$^2$) |
| square meters (m$^2$) | 1.196 | square yards (yd$^2$) |

5
6

BLM_0041917

1
2
3
4
5
6
7
8
9
10
11
12
13      *This page intentionally left blank*
14

BLM_0041918

# FINAL URANIUM LEASING PROGRAM
## PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT

# 1 INTRODUCTION

The U.S. Department of Energy (DOE) has prepared the Uranium Leasing Program (ULP) Programmatic Environmental Impact Statement (PEIS) pursuant to the National Environmental Policy Act of 1969 (NEPA) (Title 42, Section 4321 and following sections of the *United States Code* [42 USC 4321 *et seq.*]), the Council on Environmental Quality's (CEQ's) NEPA regulations found in Title 40 of the *Code of Federal Regulations* (40 CFR Parts 1500–1508), and DOE's NEPA implementing procedures (10 CFR Part 1021) in order to analyze the reasonably foreseeable environmental impacts, including the site-specific impacts, of the reasonable range of alternatives identified in the ULP PEIS for the management of the ULP. DOE's ULP administers tracts of land located in Mesa, Montrose, and San Miguel Counties in western Colorado for the exploration, mine development and operations, and extraction of uranium and vanadium ores.

## 1.1 BACKGROUND

Congress authorized DOE's predecessor agency, the U.S. Atomic Energy Commission (AEC), to develop a supply of domestic uranium. In 1948, the Bureau of Land Management (BLM) issued Public Land Order 459, which stated, "Subject to valid existing rights and existing withdrawals, the public lands and the minerals reserved to the United States in the patented lands in the following areas in Colorado are hereby withdrawn from all forms of appropriation under the public-land laws, including the mining laws but not the mineral-leasing laws, and reserved for the use of the United States Atomic Energy Commission." Subsequently, other Public Land Orders increased or decreased the total acreage of the withdrawn lands. In addition, the Federal Government, through the Union Mines Development Corporation, acquired a substantial number of patented and unpatented mining claims, mill[1] and tunnel[2] site claims, and agricultural patents, until the aggregated acreage managed by AEC totaled approximately 25,000 acres (10,000 ha). The areas under consideration are located in western Colorado in Mesa, Montrose, and San Miguel Counties.

Beginning in 1949, the AEC and its successor agencies, the U.S. Energy Research and Development Administration and DOE, administered three separate and distinct leasing

---

[1]  Mill sites are mining claims that may be located in connection with a specific placer or load claim for mining and milling purposes or as an independent/custom mill site. Mill sites are located by metes and bounds or legal subdivision and are up to 5 acres (2 ha) in size.

[2]  A tunnel site is a mining claim that involves a tunnel to develop an underground vein or lode. It may also be used for the discovery of unknown veins or lodes. To stake a tunnel site, two stakes are placed up to 3,000 ft (900 m) apart on the line of the proposed tunnel. Recordation is the same as for a lode claim. A tunnel site can be regarded as more of a right of way than a mining claim.

BLM_0041919

1    programs during the ensuing 60 years, as summarized in Table 1.1-1. To put the production
2    numbers in Table 1.1-1 in perspective, domestic annual uranium production peaked in 1980 at
3    about 44 million lb (20 million kg), of which lease production that year represented about 2.5%
4    of the total. In addition, today's world market produces approximately 100 million lb
5    (45 million kg) of uranium annually and consumes twice that amount. Table 1.1-2 summarizes
6    production rates between 1974 and 1994 and between 1996 and 2008.

8          In preparing for the 1974 leasing period, the AEC evaluated the potential environmental
9    and economic impacts related to the leasing program. This evaluation was documented in
10   *Environmental Statement, Leasing of AEC Controlled Uranium Bearing Lands* (AEC 1972). In
11   1995, DOE again evaluated the potential environmental and economic impacts related to the
12   leasing program and documented its findings in the *Finding of No Significant Impact, Uranium
13   Lease Management Program* (DOE 1995).

15         When the first leasing program ended in 1962, the AEC directed the lessees to close the
16   mines (to prohibit unauthorized entry), but little was done to reclaim the mine sites. These mine
17   sites became DOE's "legacy mine sites," discussed later in this section.

19         In 1974, the AEC initiated reclamation bonding requirements in its new lease agreements
20   that ensured that all mine sites would be adequately reclaimed when lease operations ended.
21   During this period, a new lessee could elect to incorporate an existing mine (from the previous
22   leasing program) into its current operation. By so doing, the new lessee accepted the
23   responsibility and liability associated with the ultimate reclamation of that mine site.

25         In October 1994, DOE initiated a mine-site reconnaissance and reclamation project on
26   the lease tracts. Each lease tract was thoroughly inspected to identify all the abandoned mine
27   sites that resulted from pre-1974 leasing activities. After this identification process, all the
28   mining-related features associated with each site were quantified and assessed for their historic

**TABLE 1.1-1  Summary of Three Leasing Programs Administered
between 1949 and 2008**

| Years of Operation | No. of Leases | Lease Production (millions of lb)[a] | | Royalties Generated (millions of $) |
|---|---|---|---|---|
| | | $U_3O_8$ | $V_2O_5$ | |
| 1949–1962 | 48 | 1.2 | 6.8 | 5.9 |
| 1974–1994[b] | 43 | 6.5 | 33.0 | 53.0 |
| 1996–2008 | 15 | 0.3 | 1.4 | 4.0 |
| Totals | | 8.0 | 41.2 | 62.9 |

[a]   Uranium ore is generated as uranium oxide ($U_3O_8$) and vanadium ore is
      generated as vanadium oxide ($V_2O_5$).

[b]   Mining operations peaked in 1980.

BLM_0041920

1

**TABLE 1.1-2  Summary of Uranium Ore Production from 1974 to 2008**

| Lease Tract | Dates of Operation 1974–1994 | No. and Sizes[a] of Mines in Operation within Lease Tract 1974–1994 | Total Production (tons) 1974–1994 | Dates of Operation 1996–2008 | No. of Mines in Operation within Lease Tract 1996–2008 | Total Production (tons) 1996–2008 |
|---|---|---|---|---|---|---|
| 5 | 5/77–6/90 | 1 (L) | 100,318 | Did not operate | 0 | Did not operate |
| 5A | Did not operate | 0 | 0 | NA[b] | 0 | NA |
| 6 | 5/76–8/80 | 1 (L) | 91,859 | 9/04–2/06 | 1 | 14,773 |
| 7 | 7/79–5/81 | 2 (1 VL, 1 M) | 12,441 | Did not operate | 0 | Did not operate |
| 8 | Did not operate | 0 | 0 | 6/05–2/06 | 1 | 9,236 |
| 8A | Did not operate | 0 | 0 | NA | 0 | NA |
| 9 | 9/78–9/80 | 1 (M) | 34,056 | 5/03–2/06 | 1 | 20,671 |
| 10 | 5/75–8/90 | 4 (1 M, 3 S) | 66,623 | NA | 0 | NA |
| 11 | 9/75–12/80 | 2 (1 M, 1 S) | 46,720 | Did not operate | 0 | Did not operate |
| 11A | Did not operate | 0 | 0 | NA | 0 | NA |
| 12 | 8/77–12/79 | 1 (S) | 7,287 | NA | 0 | NA |
| 13 | 6/75–10/84 | 3 (1 L, 2 S) | 85,863 | Did not operate | 0 | Did not operate |
| 13A | 12/75–10/80 | 1 (M) | 38,158 | Did not operate | 0 | Did not operate |
| 14 | Did not operate | 0 | 0 | NA | 0 | NA |
| 15 | 9/76–4/80 | 3 (S) | 4,646 | Did not operate | 0 | Did not operate |
| 15A | 9/79–1/81 | 2 (S) | 8,842 | NA | 0 | NA |
| 16 | 12/76–6/79 | 4 (S) | 5,709 | NA | 0 | NA |
| 16A | 8/75–11/80 | 3 (S) | 3,503 | NA | 0 | NA |
| 17 | Did not operate | 0 | 0 | NA | 0 | NA |
| 18 | 2/80–9/80 | 1 (M) | 6,654 | 3/05–1/06 | 1 | 20,085 |
| 19 | 7/74–7/90 | 1 (L) | 920,018 | NA | 0 | NA |
| 19A | Did not operate | 0 | 0 | NA | 0 | NA |
| 20 | Did not operate | 0 | 0 | NA | 0 | NA |
| 21 | 10/78–12/80 | 1 (M) | 46,542 | Did not operate | 0 | Did not operate |
| 22 | 3/77–5/82 | 1 (S) | 8,578 | NA | 0 | NA |
| 22A | 10/79–7/82 | 1 (M) | 21,369 | NA | 0 | NA |
| 23 | 5/77–12/81 | 2 (S) | 9,867 | NA | 0 | NA |
| 24 | Did not operate | 0 | 0 | NA | 0 | NA |

BLM_0041921

**TABLE 1.1-2  (Cont.)**

| Lease Tract | Dates of Operation 1974–1994 | No. of Mines in Operation within Lease Tract 1974–1994 | Total Production (tons) 1974–1994 | Dates of Operation 1996–2008 | No. of Mines in Operation within Lease Tract 1996–2008 | Total Production (tons) 1996–2008 |
|---|---|---|---|---|---|---|
| 25 | 8/78–8/80 | 1 (M) | 14,135 | Did not operate | 0 | Did not operate |
| 26 | 12/75–12/80 | 2 (S) | 2,547 | NA | 0 | NA |
| 27 | 8/75–4/83 | 4 (S) | 15,923 | NA | 0 | NA |
| Totals | | 42[c] | 1,551,658 | | 4 | 64,765 |

[a]  The sizes of the mines are noted with the following abbreviations: VL = very large; L = large; M = medium; and S = small.

[b]  NA indicates not applicable, meaning the lease tract was not leased, and thus it was not available for operation or production.

[c]  The total of 42 mines represents 1 very large mine, 4 large mines, 9 medium mines, and 28 small mines.

BLM_0041922

1   importance. In 1995, in the absence of specific guidance pursuant to the reclamation of
2   abandoned uranium mine sites, DOE initiated discussions with BLM officials that culminated in
3   the establishment of a guidance document, *Uranium Closure/Reclamation Guidelines*
4   (BLM 1995) for such sites. DOE's objective in establishing this guidance document was to
5   assure that DOE's lease tracts were reclaimed in a manner that was acceptable to BLM so that
6   the lands could be restored to the public domain and managed by BLM. Subsequently, DOE's
7   "legacy" mine sites were prioritized and systematically reclaimed.
8
9       In July 2007, DOE issued a programmatic environmental assessment (PEA) for the ULP,
10  in which it examined three alternatives for the management of the ULP for the next 10 years
11  (DOE 2007). In that same month, DOE issued a Finding of No Significant Impact (FONSI), in
12  which DOE announced its decision to proceed with the Expanded Program Alternative, and also
13  determined that preparation of an environmental impact statement (EIS) was not required. Under
14  the Expanded Program Alternative, DOE would extend the 13 existing leases for a 10-year
15  period and would also expand the ULP to include the competitive offering of up to 25 additional
16  lease tracts to the domestic uranium industry.
17
18      In the fall of 2007, DOE, in preparation for the execution of new lease agreements for the
19  active lease tracts and the bid-solicitation process for the inactive lease tracts, reviewed the status
20  of its withdrawn lands to determine how to most efficiently and effectively manage those lands.
21  After an extensive review process, DOE decided to realign the existing lease tract boundaries to
22  incorporate those lands that recently reverted to the withdrawals. Concurrent with that action,
23  DOE also decided to systematically assess, and then reclaim, the abandoned uranium mine sites
24  and associated features located on those lands to mitigate the physical safety and environmental
25  hazards associated with the sites. In 2008, following the execution of the new lease agreements,
26  DOE, in accordance with Article XVI (Good Faith Negotiations), negotiated with its lessees to
27  reclaim the abandoned uranium mine sites and associated features on their respective lease tracts
28  in lieu of annual royalty payments due to the Government. These "reclamation in lieu of
29  royalties" (RILOR) negotiations, executed with up to five lessees in any one year, included
30  abandoned uranium mine sites and associated features on 19 lease tracts and took place over a
31  3-year period (2009–2011). Some features at some sites were left intact (barring imminent safety
32  hazards) because they were considered historically significant. At the culmination of these
33  activities, DOE determined that all legacy mine sites located on the lease tracts were completely
34  and successfully reclaimed.
35
36      In 2008, DOE implemented the Expanded Program Alternative and executed new lease
37  agreements with the existing lessees for their 13 respective lease tracts, effective April 30, 2008.
38  In addition, DOE offered the remaining, inactive lease tracts to industry for lease through a
39  competitive solicitation process. That process culminated in the execution of 18 new lease
40  agreements for the inactive lease tracts, effective June 27, 2008. Since that time, two lease tracts
41  were combined into one and another lease was relinquished back to DOE. Accordingly, there are
42  29 lease tracts that are actively held under lease and 2 lease tracts that are currently inactive.
43
44      Between 2009 and 2011, DOE approved seven exploration plans (one each for Lease
45  Tracts 13A, 15A, 17, 21, 24, 25, and 26). These exploration plans primarily involved the drilling
46  of at least one exploratory hole. To date, the approved exploration plans for Lease Tracts 15A

BLM_0041923

1   and 17 have not been implemented. Exploration activities typically resulted in surface
2   disturbance of less than 1 acre (0.4 ha). Disturbed lands were reclaimed by using polyurethane
3   foam to plug holes, and by using surface soils and established seed mixtures. There was also one
4   mine re-entry plan that was approved and implemented for Lease Tract 26. This plan included
5   mine re-entry activities whereby information was collected within an existing mine and the mine
6   was resecured. DOE also approved 20 reclamation plans to reclaim disturbed areas located on
7   Lease Tracts 5, 6, 7, 10, 11, 11A, 12, 13, 16, 16A, 17, 19, 19A, 20, 21, 22, 22A, 23, 26, and 27.
8   All approved reclamation plans have been implemented. Reclamation activities addressed open
9   drill holes and vents, land subsidences, and abandoned mine portals and adits. These exploration
10  and reclamation activities are further discussed and evaluated in the cumulative impacts section
11  (Section 4.7). In addition, for Lease Tract 13, a tamarisk removal activity was performed in lieu
12  of the payment of royalties by the lessee.

## 1.2  CURRENT STATUS OF THE ULP

17          Colorado Environmental Coalition and three other plaintiffs filed a complaint against
18  DOE in the U.S. District Court for the District of Colorado on July 31, 2008, in which the
19  plaintiffs alleged, among other things, that DOE's July 2007 PEA and FONSI violated NEPA by
20  failing to consider adequately the environmental impacts of expansion of the ULP, and violated
21  the Endangered Species Act by jeopardizing endangered species. On October 18, 2011, the Court
22  issued an Order in which it held, among other things, that DOE had violated NEPA by issuing its
23  July 2007 PEA and FONSI instead of preparing an EIS. In that Order, the Court invalidated the
24  July 2007 PEA and FONSI; stayed the 31 leases in existence under the ULP; enjoined DOE from
25  issuing any new leases on lands governed by the ULP; enjoined DOE from approving any
26  activities on lands governed by the ULP; and ordered that after DOE conducts an environmental
27  analysis that complies with NEPA, the ESA, all other governing statutes and regulations, and the
28  Court's Order, DOE could then move the Court to dissolve its injunction (Colorado
29  Environmental Coalition v. DOE, No. 08-cv-1624 [D. Colo. Oct. 18, 2011]).

31          The Court later granted in part DOE's motion for reconsideration of that Order and
32  amended its injunction to allow DOE, other Federal, state, or local governmental agencies,
33  and/or the ULP lessees to conduct only those activities on ULP lands that are absolutely
34  necessary: (1) to conduct DOE's environmental analysis regarding the ULP; (2) to comply with
35  orders from Federal, state, or local government regulatory agencies; (3) to remediate certain
36  dangers to public health, safety, and the environment on ULP lands; or (4) to conduct certain
37  activities to maintain the ULP lease tracts and their existing facilities (Colorado Environmental
38  Coalition v. DOE, No. 08-cv-1624 [D. Colo. Feb. 27, 2012]).

40          Currently, of the 31 ULP lease tracts, 29 have active leases and two do not; Lease
41  Tracts 8A and 14 (Parcels 14-1, 14-2, and 14-3) are currently not leased. Lease Tract 8A is a
42  small tract that is isolated and may be located entirely below (or outside) the uranium-bearing
43  formation, which could indicate a lack of ore. Lease Tract 14 comprises three parcels (14-1,
44  14-2, and 14-3). There was some interest in Parcels 14-1 and 14-2 by potential lessees in the
45  past; however, the third parcel (14-3, which lies east of 14-1) is located almost entirely within the
46  Dolores River corridor and was never leased. Section 1.2.1 describes how DOE administers the

BLM_0041924

ULP; Section 1.2.2 summarizes the requirements in the current leases; and Section 1.2.3 presents site-specific information available on the 31 ULP lease tracts.

On June 21, 2011, DOE published the Notice of Intent (NOI) to prepare the ULP PEIS (see Volume 76, page 36097 of the *Federal Register* [76 FR 36097]). In the NOI, DOE stated that it had determined, in light of the site-specific information that DOE had gathered as a result of the site-specific agency actions proposed and approved pursuant to the July 2007 PEA, that it was appropriate for DOE to prepare a PEIS in order to analyze the reasonably foreseeable environmental impacts, including potential site-specific impacts, of a range of alternatives for the management of the ULP for the remainder of the 10-year period that was covered by the July 2007 PEA. After DOE published the NOI, it notified the ULP lessees that until the PEIS process was completed, DOE would not approve any new exploration and mining plans and would not require any lessees to pay royalties.

## 1.2.1  DOE ULP Administrative Process

DOE's administration of the ULP includes the actions needed to manage the activities conducted at the 31 lease tracts. Table 1.2-1 lists the 31 lease tracts with applicable acreage, current lessee, and the status of each. Figure 1.2-1 shows the locations of the 31 ULP lease tracts. These actions are undertaken to assure that the program's technical and administrative objectives are accomplished. These actions include the following:

- Offer the lease tracts to the domestic uranium industry through a competitive royalty-bid process that culminates in the award of each lease to the highest qualified bidder.

- Inspect and maintain lease tract boundary markers and monuments on the lease tracts. Establish and maintain records of survey control points for said markers and monuments.

- Review lessees' exploration and mining plans, in coordination with BLM and the Colorado Division of Reclamation, Mining, and Safety (CDRMS), to ensure that they are consistent with Federal, state, and local rules and regulations; existing environmental regulations; lease stipulations; and standard industry practices. Approve or deny each plan as warranted.

- Coordinate with other Federal agencies (e.g., BLM, U.S. Fish and Wildlife Service [USFWS], U.S Environmental Protection Agency [EPA]), state agencies (e.g., CDRMS, Colorado Division of Parks and Wildlife [CPW], Colorado Department of Public Health and the Environment [CDPHE]), local and tribal officials, and private entities as appropriate to address concerns that they may have. Routinely review each Memorandum of Understanding (MOU) established with BLM and CDRMS to ensure that the agreements remain up to date and reflect actual work practices.

BLM_0041925

1    **TABLE 1.2-1  Summary of the 31 DOE ULP Lease Tracts in 2011**

| | Lease Tract No. | Acreage | Current Lessee | County | Status[a] |
|---|---|---|---|---|---|
| 1 | 10 | 638 | Golden Eagle Uranium, LLC | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 2 | 11 | 1,303 | Cotter Corporation | San Miguel | One new underground mine permitted and developed; reclamation of previously disturbed areas needed. |
| 3 | 11A | 1,297 | Golden Eagle Uranium, LLC | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 4 | 12 | 641 | Colorado Plateau Partners | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 5 | 13 | 1,077 | Gold Eagle Mining, Inc. | San Miguel | Three existing, permitted underground mines; reclamation of previously disturbed areas is needed. |
| 6 | 13A | 420 | Cotter Corporation | San Miguel | Exploration plan (one hole) approved; drilling and reclamation of the explored area are completed. |
| 7 | 14 (1, 2, 3) | 971 | Not applicable | San Miguel | Lease tract not currently leased. |
| 8 | 15 | 350 | Gold Eagle Mining, Inc. | San Miguel | One existing underground mine; reclamation of previously disturbed areas is needed. |
| 9 | 15A | 172 | Golden Eagle Uranium, LLC | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 10 | 16 | 1,790 | Golden Eagle Uranium, LLC | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 11 | 16A | 585 | Energy Fuels Resources Corp. | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 12 | 5 | 151 | Gold Eagle Mining, Inc. | Montrose | One existing, permitted underground mine; reclamation of previously disturbed areas is needed. |

2

BLM_0041926

**TABLE 1.2-1  (Cont.)**

| | Lease Tract No. | Acreage | Current Lessee | County | Status[a] |
|---|---|---|---|---|---|
| 13 | 5A (1, 2) | 25 | Golden Eagle Uranium, LLC | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 14 | 6 | 530 | Cotter Corporation | Montrose | One existing permitted underground mine; reclamation of previously disturbed areas is needed. |
| 15 | 7[b] | 493 | Cotter Corporation | Montrose | Two existing permitted mines—one underground mine and one large open-pit mine; reclamation of previously disturbed areas is needed. |
| 16 | 8 | 955 | Cotter Corporation | Montrose | One existing permitted underground mine; reclamation of previously disturbed areas is needed. |
| 17 | 8A | 78 | Not applicable | Montrose | Lease tract has not been leased. |
| 18 | 9 | 1,037 | Cotter Corporation | Montrose | One existing permitted underground mine; reclamation of previously disturbed areas is needed. |
| 19 | 17 (1, 2) | 475 | Golden Eagle Uranium, LLC | Montrose and San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 20 | 18 | 1,181 | Cotter Corporation | Montrose | One existing permitted underground mine; reclamation of previously disturbed areas is needed. |
| 21 | 19 | 662 | Energy Fuels Resources Corp. | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 22 | 19A | 1,204 | Energy Fuels Resources Corp. | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 23 | 20 | 627 | Energy Fuels Resources Corp. | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 24 | 21 | 651 | Cotter Corporation | Montrose | Exploration plan (two holes) approved; drilling and reclamation of the explored area are completed; no area needs to be reclaimed under current conditions. |

BLM_0041927

**TABLE 1.2-1  (Cont.)**

| | Lease Tract No. | Acreage | Current Lessee | County | Status[a] |
|---|---|---|---|---|---|
| 25 | 22 | 224 | Golden Eagle Uranium, LLC | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 26 | 22A | 409 | Golden Eagle Uranium, LLC | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 27 | 23 (1, 2, 3) | 596 | Golden Eagle Uranium, LLC | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 28 | 24 | 201 | Energy Fuels Resources Corp. | Montrose | Exploration plan (eight holes) approved; drilling and reclamation of explored area are completed; no area needs to be reclaimed under current conditions. |
| 29 | 25 | 639 | Cotter Corporation | Montrose | Exploration plan (one hole) approved; drilling and reclamation of explored area are completed; no area needs to be reclaimed under current conditions. |
| 30 | 26 | 3,989 | Energy Fuels Resources Corp. | Mesa | Exploration plan (six holes) approved; drilling and reclamation of the explored area are completed; mine re-entry plan is approved, bulkhead partially removed, and assessment completed; portal is resecured; reclamation of previously disturbed areas is needed. |
| 31 | 27 | 1,766 | Energy Fuels Resources Corp. | Mesa | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| Total | | 25,137 | | | |

[a]   On October 18, 2011, a Federal district court stayed the 31 leases, and enjoined DOE from approving any activities on ULP lands. On February 27, 2012, the court amended its injunction to allow DOE, other Federal, state, or local governmental agencies, and the ULP lessees to conduct only those activities on ULP lands that are absolutely necessary, as described in the court's Order. See *Colorado Environmental Coalition v. Office of Legacy Management*, No. 08-cv-01624, 2012 U.S. DIST. LEXIS 24126 (D. Colo. Feb. 27, 2012).

[b]   Least Tracts 7 and 7A were combined (February 2011 time frame) into Lease Tract 7.

1
2
3

BLM_0041928

*Final ULP PEIS*  1: *Introduction*



FIGURE 1.2-1  Locations of the 31 ULP Lease Tracts in Colorado

BLM_0041929

- Establish the amount of reclamation performance bonding appropriate for the amount of environmental disturbance anticipated based on an evaluation of the lessees' proposed activities, including site-specific access routes, exploration drill-hole locations, mine-site support facility locations, and proposed methods of reclamation.

- Monitor lessees' exploration, mine-development, and ore-production activities to ensure compliance with Federal, state, and local environmental regulations and lease stipulations. Identify adverse conditions that need to be addressed and advise the lessees accordingly.

- Review exploration drill-hole logs, drill-hole maps, mine maps, and quarterly reports submitted by the lessees to assess the lessees' progress and verify conditions witnessed during field inspections.

- Review Federal and state mine safety inspection records and reports to identify significant violations or adverse trends and determine whether actions are warranted.

- Monitor and track market prices (spot and long term) for uranium oxide ($U_3O_8$) and vanadium oxide ($V_2O_5$) (uranium ore is generated as uranium oxide and vanadium ore is generated as vanadium oxide) and keep abreast of activities occurring within the world uranium and vanadium industries.

- Develop and maintain procedures to process and maintain records of ores produced from the DOE lease tracts and delivered to a mill or other receiving station for processing. Calculate the resulting royalties due and payable to DOE. Ensure that royalty payments are submitted in accordance with the lease agreements. Maintain records associated with the number of miles traveled by ore trucks on Federal, state, and county roadways. Ensure that lessees' pulp ore samples are analyzed in accordance with lease agreement requirements.

- Maintain a record of and provide for the routine surveillance of concurrent surface activities (e.g., activities associated with oil and gas leases and special use permits) that are authorized by other agencies with surface-management jurisdiction.

- Evaluate sample plants to verify that they or other facilities receiving lease tract ores have adequate procedures for weighing, sampling, and assaying said ores and for reporting the results to DOE.

- Monitor lessees' reclamation activities to ensure that they comply with Federal, state, and local environmental regulations and lease stipulations. Ensure that these activities are consistent with existing exploration and mining plans and standard industry practices. Monitor post-reclamation sites for 3 to

BLM_0041930

5 years to assure that adequate vegetation is successfully re-established at the site.

- Oversee the relinquishment of lease agreements when requested by a lessee or the termination of lease agreements for cause when directed by DOE.

- Determine the eligibility of inactive, reclaimed lease tracts for restoration to the public domain under BLM's management. Prepare a Request to Relinquish Lands and submit it to the BLM Colorado State Officer for processing. Help BLM officials review the Request, and monitor its status until the restoration process is complete.

## 1.2.2  Lease Requirements

Facsimiles of two generic leases currently utilized for the DOE ULP are shown in Appendix A. (The leases could be modified in the future as a result of this ULP PEIS process.) These two generic leases are the same except for how the royalty payment is determined. Before conducting any exploratory or mining activity, the lessee is required to file a "Notice of Intent to Conduct Prospecting Operations" or "Reclamation Permit Application" with the Colorado Mined Land Reclamation Board for the review and approval of the CDRMS. The lessee is then required to submit three copies of a detailed Exploration Plan or Mining Plan to DOE. This plan must include a site-specific environmental analysis and a description of measures to be taken to assure compliance with all Federal, state, and local laws (including all potential impacts that could result in downstream or off-site environmental and/or resource degradation, and air quality or health-related impacts). In addition, the lessee in coordination with DOE must consult with all pertinent Federal, state, and local agencies—including, but not limited to, the BLM, USFWS, U.S. Army Corps of Engineers (USACE), EPA, CPW, State Historic Preservation Office (SHPO), and Indian tribal governments—to determine the presence and/or location of all endangered, threatened, and sensitive plant and wildlife species; known cultural resources; and floodplain and wetland areas. Plans are reviewed by DOE in coordination with BLM and CDRMS, and upon DOE's approval, the actions described in the plan can commence. DOE and other appropriate agencies must be notified in writing if the lessee wishes to change part of the plan, and no change can take place until approval is given. After the plan is approved, but before any ground-disturbing activity can commence, the lessee must file a performance bond (the amount is established by DOE) in coordination with CDRMS. This coordination is reflected in the MOU between DOE and CDRMS (DOE and CDRMS 2012).

Upon termination of the lease, the lessee has 180 days to reclaim and return the land to DOE, unless other arrangements have been agreed to in advance. The lessee is required to remove all equipment, stockpiles, and evidence of mining, unless the improvement is a structural support needed to maintain the mine.

BLM_0041931

## 1.3  SITE-SPECIFIC INFORMATION FOR THE ULP LEASE TRACTS

Information about the 31 lease tracts is presented in Table 1.2-1 (and Figure 1.2-1). Eight of these lease tracts (5, 6, 7, 8, 9, 11, 13, and 18) contain one or more existing mines that operated in the past under DOE's approval and are currently permitted by CDRMS. Please note that three additional lease tracts (13A, 21, and 25) have existing mine sites that have been fully reclaimed in accordance with existing environmental regulations and DOE lease stipulations; however, these mine sites currently remain permitted by CDRMS. Finally, Table 1.3-1 lists the estimated ore reserve that remains at each of the 31 lease tracts.

Site-specific information used as a basis for the ULP PEIS evaluation included mine permit amendment applications for existing mines on Lease Tracts 6, 8, 9,11, 13A, 18, 21, and 25 (Cotter Corp. 2011, 2012a–g). These documents contain site-specific information on climate, soils, and wildlife; wildlife mitigation measures; chemical evaluations; maps; monitoring data; stormwater management plans; environmental protection plans (EPPs); reclamation plans; emergency response plans; and geotechnical stability reports. CDRMS inspection reports were also reviewed for the ULP PEIS evaluation. The inspection reports include information on the conditions and characteristics of the mine sites. For example, inspection reports for several mines located within Lease Tract 13 contain information on observations for contaminants and noxious weeds, the presence and condition of mine facilities and stockpiles, potential erosion and stormwater runoff concerns, and so forth (CDRMS 2012a–c).

Between 2009 and 2011, DOE approved the implementation of various exploration and reclamation activities on several lease tracts. Exploration plans were approved for Lease Tracts 13A, 15A, 17, 21, 24, 25, and 26 and were implemented for all these lease tracts except for 15A and 17 (see Table 4.7-6). Various reclamation plans were submitted for disturbed areas located on Lease Tracts 5, 6, 7, 10, 11, 11A, 12, 13, 16, 16A, 17, 19, 19A, 20, 21, 22, 22A, 23, 26, and 27 (see Table 4.7-7). These plans described reclamation work conducted in lieu of payment of royalties (or RILORs) and included work on mining-related features, such as open drill holes and vents, land subsidence features, and abandoned mine portals and adits.

### 1.3.1  ULP Lease Tract 5

On Lease Tract 5, the C-JD-5 mine is located in Sections 21 and 22, T 46 N, R 17 W, NMPM, in Montrose County, Colorado (see Figure 1.3-1). The original lease was executed effective June 12, 1974. A royalty bid of 12.00%, payable on ores containing 700,000 lb (318,000 kg) of $U_3O_8$, secured the lease.

A mining plan was submitted on June 10, 1976, proposing entry by a shaft 16-ft (4.9-m) in diameter and 320-ft (98-m) deep located in the northwest corner of the property. The lessee

BLM_0041932

1
2

**TABLE 1.3-1  Estimated Remaining
Ore Reserve at the ULP Lease Tracts**

| ULP Lease Tract | Remaining Ore Reserves[a] (lb $U_3O_8$) |
|---|---|
| 5 | 230,000 |
| 5A | 30,000 |
| 6 | 850,000 |
| 7 | 2,800,000 |
| 8 | 330,000 |
| 8A | 30,000 |
| 9 | 630,000 |
| 10[b] | 0 |
| 11 | 740,000 |
| 11A | 300,000 |
| 12 | 160,000 |
| 13 | 330,000 |
| 13A | 220,000 |
| 14 | 85,000 |
| 15 | 84,000 |
| 15A | 250,000 |
| 16 | 44,000 |
| 16A | 18,000 |
| 17 | 75,000 |
| 18 | 1,200,000 |
| 19[b] | 0 |
| 19A | 1,500,000 |
| 20 | 800,000 |
| 21 | 1,000,000 |
| 22 | 140,000 |
| 22A[b] | 0 |
| 23 | 550,000 |
| 24 | 90,000 |
| 25 | 540,000 |
| 26 | 68,000 |
| 27 | 87,000 |

| Total remaining ore reserves | 13,000,000 |
|---|---|

[a]   Amount shown equals the lease "bid quantity" minus the total production to date. Values have been rounded to two significant figures.

[b]   The lease "bid quantity" has been produced from this tract; any additional reserves that may exist have not been quantified.

3

BLM_0041933



1

2    **FIGURE 1.3-1  Location of C-JD-5 Mine on Lease Tract 5**

BLM_0041934

began sinking the shaft shortly after the plan was approved, and the shaft was bottomed in early
April 1977. The ore zone was encountered almost immediately, and the initial shipment of ore
was made on May 26, 1977. As mining continued, a second level was developed that ultimately
yielded the bulk of the mine's production. The mine was extended to the west and south and
connected with the old Paradox D and Mineral Joe No. 4 mines, respectively; during this time,
the mine maintained consistent ore production at approximately 3,000 tons (2,700 metric tons)
per month. The mine was shut down in early 1980 due to a lack of economical ore reserves.

Mining resumed briefly in 1989 (as the mine's economics improved), and production
continued through June 1990. In March 1998, Gold Eagle Mining, Inc. (GEMI), notified DOE of
its intensions to resume operations at the mine. Subsequent to DOE's approval, GEMI upgraded
the mine's entire infrastructure to current standards and code. Unfortunately, GEMI could not
secure a milling agreement, and no ore production occurred. At that time, the mine was placed
on standby status.

A total of 136,000 tons (123,000 metric tons) of ore, containing 466,000 lb (211,000 kg)
of $U_3O_8$ and 1,812,000 lb (822,000 kg) of $V_2O_5$, have been produced and sold from the mine.
Royalties paid for this lease tract (production royalties plus annual royalties) total \$2,154,000.

## 1.3.2  ULP Lease Tract 5A

On Lease Tract 5A, the C-JD-5A mine is located in Section 22, T 46 N, R 17 W, WM, in
Montrose County, Colorado. The original lease was executed effective July 23, 1974. A royalty
bid of 15.82% payable on ores containing 30,000 lb (14,000 kg) of $U_3O_8$ secured the lease.

During September two exploration plans were submitted, one for each tract of the unit,
proposing 86 and 106 holes, respectively. Both plans were approved, and a total of 56 holes were
drilled; 36 holes showed some mineralization. These areas were reclaimed during June 1980.

There have been no mining plans submitted for this lease tract, and consequently, no ore
has been produced. Annual royalties paid for this lease tract total \$24,700.

## 1.3.3  ULP Lease Tract 6

On Lease Tract 6, the C-JD-6 mine is located in Sections 21 and 22, T 46 N, R 17 W,
NMPM, in Montrose County, Colorado (see Figure 1.3-2). The original lease was executed
effective April 18, 1974. A royalty bid of 14.20% payable on ores containing 1,200,000 lb
(544,000 kg) of $U_3O_8$ secured the lease.

A mining plan was submitted in September 1975 proposing access through the Duggan
Adit, which is located on adjacent, privately held, unpatented claims. The plan was approved,
and development work began the following April (1976). The first ore shipment from the mine
was made on May 12, 1976; however, the true production cycle did not begin until August 1977.

BLM_0041935



1

2          **FIGURE 1.3-2  Location of C-JD-6 Mine on Lease Tract 6**

BLM_0041936

1   Mining continued much the same way until May 1980, at which time Cotter Corporation
2   announced a temporary shutdown of operations effective August 8, 1980.
3
4        In May 2004, the lessee, Cotter Corporation, notified DOE of its intentions to resume
5   operations at the mine. Subsequent to DOE's approval and following several weeks of site
6   preparation, Cotter Corporation resumed mining activities on August 2, 2004. Production and/or
7   ore shipments from the mine continued into 2006. In 2008, Cotter Corporation installed a
8   lysimeter downgradient of the mine site to determine whether near-surface soils or rock
9   formations contain moisture that could affect (or be affected by) the mine site. The lysimeter is
10  monitored monthly.
11
12       A total of 107,000 tons (97,000 metric tons) of ore, containing 350,000 lb (159,000 kg) of
13  $U_3O_8$ and 2,248,000 lb (1,020,000 kg) of $V_2O_5$, have been produced and sold from the mine.
14  Royalties paid for this lease tract (production royalties plus annual royalties) total $2,946,000.
15
16
17  **1.3.4  ULP Lease Tract 7**
18
19       On Lease Tract 7, the C-JD-7 mine is located in Sections 16, 20, 21, and 22, T 46 N,
20  R 17 W, NMPM, in Montrose County, Colorado (see Figure 1.3-3). The original lease was
21  executed effective April 18, 1974. A royalty bid of 27.30% payable on ores containing
22  2,800,000 lb (1,270,000 kg) of $U_3O_8$ secured the lease.
23
24       An underground mining plan was submitted in November 1976 proposing entry through
25  a 1,600-ft (490-m) decline in the northern portion of the tract. The plan was approved, and
26  development work was initiated the following May. Following numerous delays, including the
27  encountering of sugar sands, which require continuous support, the incline was finally bottomed
28  in December 1978. Water was then encountered in the drift, and two evaporation ponds were
29  constructed to support dewatering activities. The first ore was shipped in July 1979, and
30  production continued through May 1980, at which time Cotter Corporation announced a
31  temporary shutdown of underground mining operations effective May 22, 1980. In June 1980,
32  the water treatment system was redesigned (another pond was built) to bring the mine-water
33  treatment system into compliance with the existing National Pollutant Discharge Elimination
34  System (NPDES) permit. In June 2005, Cotter Corporation notified DOE of its intentions to
35  resume operations at the mine. Subsequent to DOE's approval, Cotter Corporation began
36  rehabilitating the underground mine workings to support future production activities. This work
37  continued through November 2005.
38
39       During May 1979, Cotter Corporation submitted an open-pit mining plan for the property
40  that would require the removal of 13 million tons (12 million metric tons) of overburden and
41  affect some 650 acres (260 ha). The plan was approved in November, and Cotter Corporation
42  entertained bids on two separate contracts. The first contract was for the removal of the
43  vegetation; that work was initiated in January 1980. The second contract was for Phase 1 of
44  stripping the overburden, which began in April 1980. Phase 1 activities included utilizing the
45  northern portion of Lease Tract 7A (also a Cotter Corporation lease tract) for the spoils pile.
46  Stripping activities continued at a rate of 1,000,000 yd$^3$ (765,000 m$^3$) per month for 13 months,

BLM_0041937



**FIGURE 1.3-3  Location of C-JD-7 Mine on Lease Tract 7**

BLM_0041938

until March 31, 1981, at which time the mine was placed on standby status due to declining market conditions. Mining activities subsequently resumed at the mine, which included in-pit development drilling from 1991 through 1993 and from 1996 through 2004 and other activities through the third quarter of 2011. Once in production, the operation was expected to produce 500 tons (450 metric tons) of ore per day, averaging 0.30% $U_3O_8$.

On February 16, 2011, DOE executed a modification to the lease that incorporated Lease Tract 7A into 7, recognizing that the two lease tracts were inseparable due to the open-pit mining operation.

A total of 12,000 tons (11,000 metric tons) of ore, containing 46,000 lb (21,000 kg) of $U_3O_8$ and 125,000 lb (57,000 kg) of $V_2O_5$, have been produced and sold from the mine. Royalties paid for this lease tract (production royalties plus annual royalties) total $1,442,000.

## 1.3.5  ULP Lease Tract 8

On Lease Tract 8, the C-JD-8 mine is located in Sections 17, 18, 19, and 20, T 46 N, R 17 W, NMPM, in Montrose County, Colorado (see Figure 1.3-4). The original lease was executed effective April 18, 1974. A royalty bid of 36.20% payable on ores containing 375,000 lb (170,000 kg) of $U_3O_8$ secured the lease.

In January 1984, a mining plan was submitted proposing access through the Opera Box Adit, which is located on an adjacent, privately held, patented claim. This plan was approved on November 18, 1985; however, it was never acted upon. A revised mining plan, updated to meet current requirements, was submitted in December 2004 and was approved January 21, 2005. Cotter Corporation enlarged the existing Opera Box portal and the main haulage drift to accommodate larger, more modern equipment. The first ore shipment was made in June 2005, and production and/or ore shipments continued into 2006. In 2008, Cotter Corporation installed a lysimeter downgradient of the mine site to determine whether near-surface soils or rock formations contain moisture that could affect (or be affected by) the mine site. The lysimeter is monitored monthly.

A total of 9,000 tons (8,000 metric tons) of ore, containing 46,000 lb (21,000 kg) of $U_3O_8$ and 178,000 lb (81,000 kg) of $V_2O_5$, have been produced and sold from the mine. Royalties paid for this lease tract (production royalties plus annual royalties) total $1,264,000.

## 1.3.6  ULP Lease Tract 8A

On Lease Tract 8A, the C-JD-8A mine is located in Section 17, T 46 N, R 17 W, NMPM, in Montrose County, Colorado. The original lease was executed effective July 23, 1974. A royalty bid of 26.22% payable on ores containing 30,000 lb (14,000 kg) of $U_3O_8$ secured the lease.

BLM_0041939



1

2          **FIGURE 1.3-4  Location of C-JD-8 Mine on Lease Tract 8**

BLM_0041940

1     In March 2008, DOE initiated a competitive bid process for the inactive tracts. This lease
2 tract was put out to bid; however, there was no interest. Accordingly, this tract remains inactive
3 indefinitely, and consequently, no ore has been produced.
4
5
6 **1.3.7  ULP Lease Tract 9**
7
8     On Lease Tract 9, the C-JD-9 mine is located in Sections 19, 29, and 30, T 46 N, R 17 W,
9 NMPM, in Montrose County, Colorado (see Figure 1.3-5). The original lease was executed
10 effective April 18, 1974. A royalty bid of 24.30% payable on ores containing 850,000 lb
11 (386,000 kg) of $U_3O_8$ secured the lease.
12
13     A mining plan was submitted in February 1977 proposing entry through a 1700-ft
14 (520-m) incline of –17.5% in the south-central portion of the tract. The plan was approved, and
15 development work began in May. Numerous delays were encountered while sinking the decline;
16 however, it was finally bottomed in March 1978, and development drift work continued toward
17 different ore bodies. Water was soon encountered, and two evaporation ponds were constructed
18 to support dewatering activities. Some ore was encountered in August 1978, and the initial ore
19 shipment was made. The ore production rate soon increased, and ore shipments were made on a
20 regular basis until May 1980, at which time Cotter Corporation announced a temporary
21 shutdown of operations effective August 8, 1980.
22
23     On April 28, 1998, Cotter Corporation submitted a plan to construct two new mine-water
24 treatment ponds and decommission the existing pond system on top of Monogram Mesa.
25 Construction of the ponds was completed, but the ponds were never lined or put into service, and
26 the existing pond system was never decommissioned.
27
28     In March 2003, Cotter Corporation advised DOE of its plans to resume mining operations
29 at the site. Following several weeks of site preparation, Cotter Corporation resumed production
30 activities at the mine. The mine continued to produce and/or ship ore into 2006. In 2008, Cotter
31 Corporation installed a lysimeter downgradient of the mine site to determine whether
32 near-surface soils or rock formations contain moisture that could affect (or be affected by) the
33 mine site. In addition, in December 2006, DOE approved the installation of a groundwater
34 monitoring well downgradient of the mine site. The lysimeter and monitoring well are monitored
35 and sampled monthly. In October 2008, Cotter Corporation notified DOE of a rockfall that had
36 occurred at the mine, approximately 100 ft (30 m) down the main haulage drift from the portal.
37 In discussions between DOE and Cotter Corporation, Cotter Corporation concluded that it would
38 assess the situation and options.
39
40     A total of 55,000 tons (50,000 metric tons) of ore, containing 223,000 lb (101,000 kg) of
41 $U_3O_8$ and 1,112,000 lb (504,000 kg) of $V_2O_5$, have been produced and sold from the mine.
42 Royalties paid for this lease tract (production royalties plus annual royalties) total $2,586,000.
43
44

BLM_0041941



1

2        **FIGURE 1.3-5  Location of C-JD-9 Mine on Lease Tract 9**

BLM_0041942

**1.3.8  ULP Lease Tract 10**

On Lease Tract 10, the C-SR-10 mine is located in Sections 28 and 29, T 43 N, R 19 W, WM, San Miguel County, Colorado. The original lease was executed effective June 12, 1974. A royalty bid of 21.76% payable on ores containing 110,000 lb (50,000 kg) of $U_3O_8$ secured the lease.

The first mining plan was submitted in January 1975 proposing entry through the Summit No. 21 incline controlled by Atlas. The plan was approved, and Russell Henderson mined continuously through November 1975. Then Charles W. Martin took over the operation and continued to mine through August 1976. The first ore was shipped from this operation to the Atlas mill in Moab, Utah, on May 1, 1975.

Energy Fuels Nuclear, Inc., submitted a mining plan during February 1979 proposing access through the Sam incline. This plan was approved, and development began in April and continued into June, when some unexpected ore was encountered and 400 tons were stockpiled for later shipment. The initial shipment of ore from this operation to the Energy Fuels mill near Blanding, Utah, was made during the summer of 1979, and production continued through October 1980, at which time the operation became uneconomical and was shut down. Mining resumed in January 1982 and continued throughout the year. Ore was stockpiled on the site until early December, when ore shipments resumed to the Blanding mill. Ore shipments continued through February 1983, at which time the 110,000th pound of $U_3O_8$ was shipped, thereby surpassing the bid quantity and making C-SR-10 the fourth lease tract to produce the bid pounds. In 2000, DOE acknowledged its satisfaction with the reclamation activities. The Colorado Division of Minerals and Geology (now known as the Colorado Division of Reclamation, Mining, and Safety or CDRMS), inspected the site and determined that Energy Fuels Nuclear, Inc., had met its obligations under Permit No. M–1979–027 and released it from further responsibility.

A total of 67,000 tons (61,000 metric tons) of ore, containing 273,000 lb (124,000 kg) of $U_3O_8$ and 2,324,000 lb (1,054,000 kg) of $V_2O_5$ had been produced and sold from the lease tract mines. Royalties paid for this lease tract (production royalties plus annual royalties) total $1,720,000.

**1.3.9  ULP Lease Tract 11**

On Lease Tract 11, the C-SR-11 mine is located in Sections 8, 17, and 18, T 43 N, R 19 W, NMPM, in San Miguel County, Colorado (see Figure 1.3-6). The original lease was executed effective June 12, 1974. A royalty bid of 11.67% payable on ores containing 900,000 lb (408,000 kg) of $U_3O_8$ secured the lease.

A number of different mining plans were submitted and approved for the lease tract, proposing re-entry into existing mines and resumption of mining activities through existing mine workings. However, only two operations have any significant bearing: the Brighton and Ike mines. The Brighton mine, located along the rim of Summit Canyon, was in production from

BLM_0041943



FIGURE 1.3-6  Location of C-SR-11 Mine on Lease Tract 11

Case No. 1:20-cv-02484-MSK   Document 39-1   filed 04/27/21   USDC Colorado   pg 44 of 299

BLM_0041944

1    December 1975 through April 1977. The Ike mine complex, mined through the Dawson incline,
2    was in production from August 1975 through mid-December 1980. This operation included some
3    initial work in the existing Ike No. 2 mine, in addition to development of and production from a
4    nearby incline on the Radium No. 8 claim adjacent to the lease tract along the northeast corner.
5    In December 1980, mining activities on the lease tract were suspended and the mines were
6    placed on standby status. In 1999, Cotter Corporation initiated reclamation activities at the
7    Brighton and Ike mines, as well as on legacy mine sites located on the lease tract. The mine
8    portals and ventilation shafts were permanently sealed and closed; the mine waste-rock dumps
9    were recontoured to blend in with the surrounding natural topography; and the disturbed areas
10   were reseeded. These activities were completed in the fall of 2000.
11
12        In February 2005, Cotter Corporation proposed a new mine for the lease tract located in
13   the south-central portion of the property. Entry was to be gained from a 1,300-ft (400-m) decline,
14   and DOE approved the plan in June 2005. Mine development work began almost immediately
15   and continued through November 2005. At that time, the decline had been advanced
16   approximately 300 ft (90 m).
17
18        A total of 47,000 tons (43,000 metric tons) of ore, containing 162,000 lb (73,000 kg) of
19   $U_3O_8$ and 925,000 lb (420,000 kg) of $V_2O_5$, have been produced and sold from the lease tract
20   mines. Royalties paid for this lease tract (production royalties plus annual royalties) total
21   $1,200,000.
22
23
24   **1.3.10  ULP Lease Tract 11A**
25
26        On Lease Tract 11A, the C-SR-11A mine is located in Section 19, T 43 N, R 19 W and
27   Sections 23, 24, 25 and 26, T 46 N, R 20 W, NMPM, in San Miguel County, Colorado. The
28   original lease was executed effective July 23, 1974. A bid royalty of 36.20% payable on ores
29   containing 300,000 lb (136,000 kg) of $U_3O_8$ secured the lease.
30
31        The initial exploration plan was submitted in October 1977 proposing a total of 68 holes
32   to be drilled. A supplemental plan followed in August 1979 proposing 41 additional holes. Both
33   plans were approved, and at least 87 holes were drilled during the program; only six holes
34   showed any mineralization. Reclamation of drill sites has been completed.
35
36        There have been no mining plans submitted for this lease tract, and consequently, no ore
37   has been produced. Annual royalties paid for this lease tract total $70,600.
38
39
40   **1.3.11  ULP Lease Tract 12**
41
42        On Lease Tract 12, the C-SR-12 mine is located in Section 32, T 43 N, R 18 W, NMPM,
43   in San Miguel County, Colorado. The original lease was executed effective June 12, 1974. A
44   royalty bid of 11.74% payable on ores containing 180,000 lb (82,000 kg) of $U_3O_8$ secured the
45   lease.
46

BLM_0041945

1    A mining plan was submitted in June 1976 proposing entry through an 1,170-ft (360-m)
2  decline at 8% grade, located in the north-central portion of the tract. The plan was approved, and
3  development began in October 1976. The incline was bottomed in ore in early August 1977, and
4  the initial shipment of ore (93 tons [42 metric tons] at 0.18% $U_3O_8$) was made on
5  August 30, 1977. Production continued through November 1979. Operations were ended on
6  December 3, 1979. Reclamation of the SR-12 Mine was undertaken and was satisfactorily
7  completed by May 29, 1986.
8
9    A total of 7,000 tons (6,000 metric tons) of ore, containing 24,000 lb (11,000 kg) of
10  $U_3O_8$ and 233,000 lb (106,000 kg) of $V_2O_5$, have been produced and sold from the lease tract.
11  Royalties paid for this lease tract (production royalties plus annual royalties) total $191,000.
12
13
14  **1.3.12  ULP Lease Tract 13**
15
16    On Lease Tract 13, the C-SR-13 mine is located in Sections 29, 30, 31, 32, and 33,
17  T 44 N, R 18 W, NMPM, in San Miguel County, Colorado (see Figure 1.3-7). The original lease
18  was executed effective May 24, 1974. A royalty bid of 20.60% payable on ores containing
19  700,000 lb (318,000 kg) of $U_3O_8$ secured the lease.
20
21    The initial mining plan submitted in January 1975 proposed entry through the Burro
22  Tunnel Mine. The mine portal and a portion of the main haulage drift are located on the lease
23  tract but provide access to the Burro Mine complex, which is located immediately north of the
24  lease tract on the privately held unpatented Burro claims. The plan was approved, and production
25  began from an area along the northern boundary of the lease tract in an area of the Burro Mine
26  complex where ore was showing in the heading. Production continued from there and extended
27  southward toward the Ellison Mine. The initial shipment of ore was made in June 1975, and
28  production continued through 1981, at which time the mine was placed on standby status. A
29  second mining plan (the new Ellison Mine) was submitted in November 1978 proposing entry
30  through a new decline into the area northeast of the existing Ellison Mine, with which it would
31  connect for ventilation. The plan was approved, and development began in May 1979. The
32  incline was bottomed in August 1980, and development continued through December of that
33  year. Although ore is showing in several headings, the operation was limited to development,
34  and no ore was produced. In March 1981, the mine was expanded to connect with the existing
35  Ellison Mine, establishing a ventilation pathway and a secondary escapeway. Shortly afterward,
36  operations ceased, and this mine was also placed on standby status. Other operations were
37  conducted sporadically during this time and included mines such as Hawkeye and Herbert.
38  However, ore shipments from these operations were small and relatively insignificant when
39  compared with those from the operation at the Burro Mine complex. These smaller mine sites
40  have since been reclaimed. The mine portals were gated to conserve bat habitat, or they were
41  permanently sealed and closed; the mine-waste-rock dumps were recontoured to blend in with
42  the surrounding, natural topography; and the disturbed areas were reseeded.
43
44    A total of 86,000 tons (78,000 metric tons) of ore, containing 323,000 lb (147,000 kg) of
45  $U_3O_8$ and 2,766,000 lb (1,255,000 kg) of $V_2O_5$, have been produced and sold from the lease

BLM_0041946



FIGURE 1.3-7  Location of C-SR-13 Mine on Lease Tract 13

BLM_0041947

tract. Royalties paid for this lease tract (production royalties plus annual royalties) total $4,047,000.

### 1.3.13  ULP Lease Tract 13A

On Lease Tract 13A, the C-SR-13A mine is located in Sections 19 and 30, T 44 N, R 18 W and Sections 24 and 25, T 44 N, R 19 W, NMPM, in San Miguel County, Colorado. The original lease was executed effective July 23, 1974. This tract differs from other DOE lease tracts in that a portion of the tract is patented land with surface rights held by other interests. A royalty bid of 36.20% payable on ores containing 350,000 lb (159,000 kg) of $U_3O_8$ secured the lease.

Early in 1975, Cotter Corporation submitted a tentative evaluation plan in which it proposed to revamp a portion of the Veta Mad Mine. This plan was approved, and Blake Mining Company (mining contractor for Cotter Corporation) began work in May. By November, the main haulage was widened and brought to a constant slope, and mining was ready to begin. The initial mining plan was submitted in April 1976 proposing entry through the Veta Mad Mine. The plan was approved; development work began in May and continued through December, during which time all ore encountered was stockpiled until the initial shipment of ore; the shipment was made to the Cotter Mill at Canon City, Colorado, on December 15, 1976. Production continued until May 1980, when Cotter Corporation announced a temporary shutdown of operations effective August 8, 1980. The mine was reclaimed in 2003, and bat gates were installed in the Georgetto and Veta Mad portals.

In 2008, in accordance with Colorado law, CDRMS reclassified all uranium mines within the state as designated mining operations, requiring the submittal of an environmental protection plan (EPP) and a much more rigorous environmental review. Cotter Corporation has submitted its EPP to CDRMS.

A total of 38,000 tons (34,000 metric tons) of ore, containing 129,000 lb (59,000 kg) of $U_3O_8$ and 744,000 lb (337,000 kg) of $V_2O_5$, had been produced and sold from the lease tract. Royalties paid for this lease tract (production royalties plus annual royalties) totaled $2,010,000.

### 1.3.14  ULP Lease Tract 14

On Lease Tract 14, the C-SR-14 mine is located in Sections 5 and 6, T 43 N, R 18 W, NMPM, in San Miguel County, Colorado. The original lease was executed effective June 12, 1974. That portion of Tract 14 located in Section 4, T 43 N, R 18 W, NMPM (Tract 2), was not leased in 1974 (and has not been leased since) due to its proximity to the Dolores River corridor. A royalty bid of 26.00% payable on ores containing 55,000 lb (25,000 kg) of $U_3O_8$ secured the lease.

The preliminary exploration plan was submitted in October 1977. The plan was approved, and some 140 holes were drilled. Reclamation of drill sites has been completed.

BLM_0041948

1  There has been no mining conducted on this lease tract, and no ore has been produced.
2  Annual royalties paid for this lease tract total $26,000.
3
4
5  **1.3.15  ULP Lease Tract 15**
6
7  On Lease Tract 15, the C-SR-15 mine is located in Sections 23 and 26, T 44 N, R 19 W,
8  NMPM, in San Miguel County, Colorado. The original lease was executed effective
9  June 12, 1974. A royalty bid of 18.60% payable on ores containing 100,000 lb (45,000 kg) of
10  $U_3O_8$ secured the lease.
11
12  A mining plan submitted in October 1975 proposed to screen any remaining ore from the
13  waste dumps around the Cougar mining area. The plan also proposed that existing mines be
14  reopened for examination and evaluation. A second mining plan was submitted in April 1976
15  proposing to mine through existing portals. Both plans were approved; however, it was not until
16  August 1976 that operations started on the Alice claim and the initial shipment of ore was made
17  to the Union Carbide mill at Uravan, Colorado. In September, a second operation located in the
18  Cougar mining area went into production. Both mines operated until May 1977; they produced
19  some 2,450 tons (2,200 metric tons) of ore for shipment to Uravan, including 240 tons
20  (220 metric tons) of material screened from the dumps.
21
22  Activity resumed in August 1979 when two contract miners began mining again on the
23  Alice claim. Production continued through April 1980, involving shipments from first one mine
24  and then another as ore reserves were depleted from the different workings. Efforts to locate
25  further reserves failed, and in April 1980, the mines were shut down. DOE approved reclamation
26  activities which were completed in June 2001.
27
28  A total of 4,600 tons (4,200 metric tons) of ore, containing 16,000 lb (7,000 kg) of $U_3O_8$
29  and 93,000 lb (42,000 kg) of $V_2O_5$, have been produced and sold from the lease tract. Royalties
30  paid to date for this lease tract (production royalties plus annual royalties) total $183,000.
31
32
33  **1.3.16  ULP Lease Tract 15A**
34
35  On Lease Tract 15A, the C-SR-15A mine is located in Sections 17 and 22, T 44 N,
36  R 19 W, NMPM, in San Miguel County, Colorado. The original lease was executed effective
37  July 23, 1974. A royalty bid of 23.00% payable on ores containing 275,000 lb (125,000 kg) of
38  $U_3O_8$ secured the lease.
39
40  During September 1975, Walter Buchanan submitted the initial mining plan proposing
41  entry through an incline just north of Angle Points 13 and 14. The plan was approved, with
42  development work beginning in November and continuing until March 1976. A second mining
43  plan was submitted by Buchanan in December 1976 proposing another incline located near the
44  center of the Mildred F. claim. The plan was approved; however, only a small amount of
45  disturbance occurred before operations ceased for a second time.
46

BLM_0041949

Early in 1979, Union Carbide Corporation (UCC) gave notice of its intent to repair and mine from the 1975 incline, and work began in April. It also submitted a revised plan for the 1976 incline, which abandoned the initial site in lieu of a site located on DOE Lease Tract C-SR-15, which adjoins the property on the east. The revised plan was approved, and development began in June. The abandoned site was reclaimed.

The initial shipment of ore was made in September 1979 when 368 tons was shipped to the UCC mill at Uravan, Colorado. Production from this incline continued through most of 1980, during which time the 1975 incline connected with the old DeLuxe workings and then the two inclines were also connected. Mining at the DeLuxe Mine (1975 incline, 1976/1979 incline, and the Old DeLuxe Mine) was terminated during December 1980 as uranium prices dropped. On September 1, 1993, Umetco Minerals Corporation (successor to UCC) began reclaiming lands disturbed by permitted mining operations on this lease tract. Reclamation consisted of backfilling the DeLuxe shaft by removing the collar and backfilling the opening with available waste-rock materials. The incline on the Mildred F. Claim and the 1975 incline portals were backfilled 25 ft (8 m) with available waste-rock material. The dumps were recontoured and seeded. All reclamation on this tract was completed on October 6, 1993.

A total of 8,800 tons (8,000 metric tons) of ore, containing 28,000 lb (13,000 kg) of $U_3O_8$ and 156,000 lb (71,000 kg) of $V_2O_5$, have been produced and sold from the lease tract. Royalties paid for this lease tract (production royalties plus annual royalties) total $351,000.

## 1.3.17  ULP Lease Tract 16

On Lease Tract 16, the C-SR-16 mine is located in Sections 10, 15 and 16, T 43 N, R 19 W, NMPM, in San Miguel County, Colorado. The original lease was executed effective June 12, 1974. A royalty bid of 23.60% payable on ores containing 70,000 lb (32,000 kg) of $U_3O_8$ secured the lease.

The initial mining plan was submitted by Willis R. Kelly, DBA Skyline Mining Company (mining contractor for the lessee), in October 1976, proposing entry through an incline near the southwest corner of the Ann No. 1 claim. The plan was approved, and development began later that month. Production began in December and continued through the fall of 1977, at which time the mine was shut down for lack of ore.

A second mining plan was submitted in June 1977 proposing entry through an adit along the rim of Summit Canyon on the Nucles claim. This plan was approved, and C.L. Starks (contractor for the lessee) began development work immediately. Production began in August and continued sporadically through May 1979, at which time Anschutz chose to cease operations.

A third plan was submitted in October 1977 proposing entry through an incline near the southwest corner of the Easton B claim. This plan was approved, and Sickles and Farmer (contractors for the lessee) began development work in December. Production started in January 1978 and continued into 1979, when the mine was closed down for lack of ore.

BLM_0041950

A fourth plan was submitted in July 1979 proposing to reopen and mine from the old Michael Bray workings. This plan was approved, and the mine was reopened in August. Production began almost immediately and continued through February 1979, when the miners were moved to the Sheila Mine on DOE Lease Tract C-SR-12.

The fifth plan was also submitted in July 1978; it proposed to reopen and mine from the old Frankie Mine. This plan was approved, and the mine was reopened in August. Production began in September and continued through May 1979, at which time Anschutz chose to cease operations and reclaim the various mining operations. The reclamation was approved, and the bond was returned in May 1985.

A total of 5,700 tons (5,200 metric tons) of ore, containing 26,000 lb (12,000 kg) of $U_3O_8$ and 156,000 lb (71,000 kg) of $V_2O_5$, have been produced and sold from the lease tract. Royalties paid for this lease tract (production royalties plus annual royalties) total $255,000.

**1.3.18  ULP Lease Tract 16A**

On Lease Tract 16A, the C-SR-16A mine is located in Sections 11 and 14, T 43 N, R 19 W, NMPM, in San Miguel County, Colorado. The original lease was executed effective July 23, 1974. A royalty bid of 27.37% payable on ores containing 30,000 lb (14,000 kg) of $U_3O_8$ secured the lease.

The initial mining plan was submitted in April 1975 proposing a small open-pit operation just north of the Keystone claim. The plan was approved, and development began in June. The initial shipment of ore was made to the General Electric ore-buying station near Naturita in August, and production continued for the next few months until the small ore body was mined out.

A second mining plan was submitted by S and Z Associates in October 1976 proposing two operations. The first operation would utilize an entry through an existing pit, and the second operation would gain entry through a new incline located east of the pit. The plan was approved, and development began in early November. Both mines continued in operation through September 1977, when production ceased due to a lack of developed ore reserves, and the mines were shut down. After Dynove Ltd. gained control, activities resumed from July to September 1978 and then again in October and November 1980.

A total of 3,500 tons (3,200 metric tons) of ore, containing 12,000 lb (5,400 kg) of $U_3O_8$ and 103,000 lb (47,000 kg) of $V_2O_5$, have been produced and sold from the lease tract. Royalties paid for this lease tract (production royalties plus annual royalties) total $138,000.

**1.3.19  ULP Lease Tract 17**

On Lease Tract 17, the C-WM-17 mine is located in Section 14, T 45 N, R 18 W, NMPM, in San Miguel and Montrose Counties, Colorado. The original lease was executed

BLM_0041951

1  effective July 23, 1974. A royalty bid of 36.20% payable on ore containing 30,000 lb (14,000 kg)
2  of $U_3O_8$ secured the lease.
3
4  　　　The initial exploration plan was submitted in November 1976 proposing a total of 44 drill
5  holes. Three supplemental plans followed, proposing 102 additional holes. All plans were
6  approved, and each project was essentially completed. Reclamation of drill sites has been
7  completed. In April 2010, DOE received an exploration plan proposing a single exploratory drill
8  hole in the north-central portion of the lease tract. DOE approved the plan, but drilling activities
9  have been suspended until after the ULP PEIS is completed.
10
11  　　　There have been no mining plans submitted for this lease tract, and no ore has been
12  produced. Annual royalties paid for this lease tract total $35,000.
13
14
15  **1.3.20  ULP Lease Tract 18**
16
17  　　　On Lease Tract 18, the C-SM-18 mine is located in Sections 21, 22, 26, 27, and 28,
18  T 48 N, R 17 W, NMPM, Montrose County, Colorado (Figure 1.3-8). The original lease was
19  executed effective April 18, 1974. A royalty bid of 15.60% payable on ores containing
20  1,300,000 lb (590,000 kg) $U_3O_8$ secured the lease.
21
22  　　　A mining plan was submitted in March 1978 proposing entry through a 1,540-ft (470-m)
23  decline in the northwestern portion of the lease. The plan was approved, and development began
24  in late May. After numerous delays, the incline was bottomed in September 1979, and
25  production began in December of that year. The initial shipment of ore was made in
26  February 1980. Production continued until May, when Cotter Corporation announced a
27  temporary shutdown of operations effective May 22, 1980. The mine was placed on standby
28  status and remained so until 1990 when its permit status was revised to be intermittently active.
29  In October 2000, Cotter Corporation submitted a reclamation plan for a portion of its mining
30  operations on Lease Tract 18. The plan was approved by DOE in January 2001, and reclamation
31  activities were completed in February. The mine portal and ventilation shaft were permanently
32  sealed and closed; the dump for mine waste rock was recontoured to blend in with the
33  surrounding, natural topography; and the disturbed areas were reseeded. The maintenance shop
34  building was left intact to support Cotter Corporation's continuing operations on the lease tract.
35
36  　　　In September 2004, Cotter Corporation submitted a new mining plan, proposing entry
37  into the southern portion of the lease tract through the Wright Mine located on an adjacent,
38  privately held, patented claim. DOE approved the plan in October 2004, and site preparation
39  activities began almost immediately. Mining was initiated in the first quarter of 2005, and
40  shipments of lease tract ore began in March. These shipments of lease tract ore from the mine
41  continued into 2006. In 2008, Cotter Corporation installed a lysimeter downgradient of the mine
42  site to determine whether near-surface soils or rock formations contain moisture that could affect
43  (or be affected by) the mine site. The lysimeter is monitored monthly.
44

BLM_0041952



1

2      **FIGURE 1.3-8  Location of C-SM-18 Mine on Lease Tract 18**

BLM_0041953

1   A total of 27,000 tons (24,000 metric tons) of ore, containing 136,000 lb (62,000 kg) of
2   $U_3O_8$ and 1,163,000 lb (528,000 kg) of $V_2O_5$, have been produced and sold from the mine.
3   Royalties paid for this lease tract (production royalties plus annual royalties) total $1,950,000.
4
5
6   **1.3.21  ULP Lease Tract 19**
7
8   On Lease Tract 19, the C-AM-19 mine is located in Sections 13 and 24, T 48 N, R 18 W,
9   NMPM, in Montrose County, Colorado. The original lease was executed effective April 8, 1974.
10  A royalty bid of 27.76% payable on ores containing 2,800,000 lb (1,270,000 kg) of $U_3O_8$
11  secured the lease.
12
13  A mining plan was submitted in December 1974 proposing entry through a 1,200-ft
14  (370-m) decline at 12%, located just within the southern boundary of the lease tract. The plan
15  was approved, and development began in February 1975. The incline was bottomed in
16  August 1976, and an escapeway was driven from the workings on the Fourth of July claim to the
17  bottoming point. The new mine was called the King Solomon Mine. During 1977, the mine
18  development to the north and west connected with the Worcester Mine and Cliff Dweller Mine,
19  which lie adjacent to the unit on the southwest side.
20
21  Development work continued at the mine, as they drifted northward through the middle
22  of the tract and along each side toward known ore bodies. Due to the vast area incorporated
23  within the mine, 10 shafts that were 7 ft (2 m) in diameter were needed to provide adequate
24  ventilation. Production continued uninterrupted through 1981. During 1982, production was
25  reduced somewhat, while development continued on toward the north. Production continued
26  sporadically through July 1990, at which time, mining ceased.
27
28  Following the termination of underground mining activities at the King Solomon Mine,
29  two portals and 15 surface vent features associated with the mine complex were backfilled with
30  waste rock and fully reclaimed during October and November 1997. In 1999, final reclamation
31  and recontouring of waste-rock dumps associated with the King Solomon mine complex were
32  completed. In April 2002, portions of the King Solomon Mine and Cliff Dweller Mine sites were
33  reworked, pocked, and seeded. On August 11, 2005, final reclamation of the lease tract was
34  approved by DOE, and the reclamation bond was returned in full.
35
36  A total of 920,000 tons (835,000 metric tons) of ore, containing 3,610,000 lb
37  (1,640,000 kg) of $U_3O_8$ and 18,000,000 lb (8,200,000 kg) of $V_2O_5$, have been produced and sold
38  from the lease tract. Royalties paid for this lease tract (production royalties plus annual royalties)
39  totaled $30,000,000.
40
41
42  **1.3.22  ULP Lease Tract 19A**
43
44  On Lease Tract 19A, the C-AM-19A mine is located in Sections 18 and 19, T 48 N,
45  R 17 W, NMPM, in Montrose County, Colorado. The original lease was executed effective

BLM_0041954

1  April 18, 1974. A royalty bid of 18.10% payable on ores containing 1,500,000 lb (680,000 kg) of
2  $U_3O_8$ secured the lease.

4      The initial exploration plan was submitted in December 1975 proposing to drill a total of
5  144 holes. Two supplemental plans followed, proposing 90 additional holes. All plans were
6  approved, and some 190 holes were drilled during the period from April 1976 to June 1979.
7  Reclamation of drill sites has been completed.

9      There have been no mining plans submitted for this lease tract, and no ore has been
10  produced. Annual royalties paid for this lease tract total $312,400.

13  **1.3.23  ULP Lease Tract 20**

15      On Lease Tract 20, the C-AM-20 mine is located in Section 20, T 48 N, R 17 W, NMPM,
16  in Montrose County, Colorado. The original lease was executed effective April 18, 1974.
17  A royalty bid of 19.60% payable on ores containing 800,000 lb (363,000 kg) of $U_3O_8$ secured
18  the lease.

20      The initial exploration plan was submitted in August 1976 proposing a total of 157 holes
21  to be drilled. Three supplemental plans followed, proposing 173 additional holes. All plans were
22  approved, and some 177 holes were drilled during the period September 1976 through
23  June 1980. Reclamation of drill sites has been completed.

25      There have been no mining plans submitted for this lease tract, and no ore has been
26  produced. Annual royalties paid for this lease tract total $181,800.

29  **1.3.24  ULP Lease Tract 21**

31      On Lease Tract 21, the C-LP-21 mine is located in Sections 22 and 27, T 47 N, R 17 W,
32  NMPM, in Montrose County, Colorado. The original lease was executed effective
33  April 18, 1974. A royalty bid of 18.40% payable on ores containing 1,200,000 lb (544,000 kg) of
34  $U_3O_8$ secured the lease.

36      A mining plan was submitted in March 1976 proposing entry through an 1,800-ft (550-m)
37  incline at −15.5% located in the southwestern portion of the lease tract. The plan was approved,
38  and Blake Mining Company (mining contractor for Cotter Corporation) began development in
39  late May. The incline was bottomed in December 1977, with development continuing through
40  August 1978. During this time, the mine workings were connected with workings on the
41  Guadalcanal claim adjacent to the southern boundary line of the lease tract. The first ore was
42  encountered in this area. The initial shipment of ore was made to Cotter Corporation's sample
43  plant at Whitewater, Colorado, in October 1978. Production continued until May 1980, when
44  Cotter Corporation announced a temporary shutdown of operations effective August 8, 1980.
45  Blake Mining Company then increased production to ship all available ore.

BLM_0041955

1     In accordance with the terms of the lease, Cotter Corporation agreed to reclaim all
2  pre-existing undesirable conditions resulting from activities conducted during prior leases.
3  Cleanup work on the Virgin Shaft area was completed in December 1980.
4
5     In December 2002, Cotter Corporation submitted a reclamation plan for the C-LP-21
6  mine, which was approved with minor stipulations. Reclamation was completed the following
7  year. On June 21, 2005, Cotter Corporation submitted a mining plan for Lease Tract C-LP-21,
8  proposing to reopen the existing C-LP-21 mine. The plan was approved on August 1, 2005, and
9  DOE established the reclamation performance bond for the operation at $48,000. To date, Cotter
10 Corporation has taken no action on this proposal.
11
12     In 2008, in accordance with Colorado law, CDRMS reclassified all uranium mines within
13 the state as designated mining operations, requiring the submittal of an EPP and a much more
14 rigorous environmental review. Cotter Corporation submitted its EPP to CDRMS, and the
15 document is currently being reviewed.
16
17     A total of 45,000 tons (41,000 metric tons) of ore, containing 176,000 lb (80,000 kg) of
18 $U_3O_8$ and 1,236,000 lb (561,000 kg) of $V_2O_5$, have been produced and sold from the lease tract.
19 Royalties paid for this lease tract (production royalties plus annual royalties) total $2,315,000.
20
21
22 **1.3.25  ULP Lease Tract 22**
23
24     On Lease Tract 22, the C-LP-22 mine is located in Sections 21 and 28, T 47 N, R 17 W,
25 NMPM, in Montrose County, Colorado. The original lease was executed effective June 12, 1974.
26 A royalty bid of 15.301% payable on ores containing 180,000 lb (82,000 kg) of $U_3O_8$ secured
27 the lease.
28
29     A mining plan was submitted in September 1976 proposing entry through a 700-ft
30 (210-m) incline at –7% located in the northwestern portion of the tract. The plan was approved,
31 and development began in December. The incline was bottomed in March 1977, and a drift was
32 advanced into the ore body. The initial ore shipment was made to the Atlas mill near Moab,
33 Utah, on March 10, 1977. Mining continued through 1980, and the mine was connected with the
34 First National Bank workings adjacent to the lease tract on the southwest side. Production
35 continued as mine development progressed eastward toward other small ore bodies, but these
36 were quickly depleted. The lack of ore reserves caused operations to cease on August 14, 1981.
37 The C-LP-22 mine site was reclaimed later that year.
38
39     A total of 8,600 tons (7,800 metric tons) of ore, containing 40,000 lb (18,000 kg) of
40 $U_3O_8$ and 203,000 lb (92,000 kg) of $V_2O_5$, have been produced and sold from the lease tract.
41 Royalties paid for this lease tract (production royalties plus annual royalties) total $298,000.
42
43

BLM_0041956

**1.3.26  ULP Lease Tract 22A**

On Lease Tract 22A, the C-LP-22A mine is located in Sections 16, 17, 20, and 21, T 47 N, R 17 W, NMPM, in Montrose County, Colorado. The original lease was executed effective July 23, 1974. A royalty bid of 19.90% payable on ores containing 50,000 lb (23,000 kg) of $U_3O_8$ secured the lease.

A mining plan was submitted in July 1978 proposing entry through a 1000-ft (300-m) incline, collared in the northeast corner of the lease tract. The plan was approved, and Lark Washburn (mining contractor for Cotter Corporation) began development work in September. The incline was bottomed in January 1979, and development continued. The initial shipment was not made until October 1979 the ore was shipped to Cotter Corporation's sample plant at Whitewater, Colorado. Mining continued through May 1980, at which time Cotter Corporation announced a temporary shutdown of operations effective August 8, 1980.

In April 1981, following the approval of the sublease by DOE, Mendisco Mining Company reopened the mine. Production began almost at once; however, all ore was stockpiled at the mine until arrangements were made to toll the ore through the Energy Fuels mill at Blanding, Utah. The ore was shipped in December 1981, and mining continued through June 1982, when the mining contract was terminated.

Cotter Corporation officials assessed the lease tract operations to determine what actions, if any, were warranted. On the basis of that assessment, they decided to abandon several of the company's lease tract operations. A reclamation plan for the C–LP–22A mine was submitted in preparation for relinquishment of the lease. The plan was approved, and reclamation activities were completed in September 2000.

A total of 21,000 tons (19,000 metric tons) of ore, containing 84,000 lb (38,000 kg) of $U_3O_8$ and 532,000 lb (241,000 kg) of $V_2O_5$, have been produced and sold from the lease tract. Royalties paid for this lease tract (production royalties plus annual royalties) total $768,000.

**1.3.27  ULP Lease Tract 23**

On Lease Tract 23, the C-LP-23 mine is located in Section 36, T 47 N, R 17 W, NMPM, in Montrose County, Colorado. The original lease was executed effective June 12, 1974. A royalty bid of 33.51% payable on ores containing 375,000 lb (170,000 kg) of $U_3O_8$ secured the lease.

A mining plan was submitted in September 1976 proposing entry through a 1,070-ft (330-m) incline of –14% collared in the east-central portion of the lease tract. The plan was approved, and development began in October. The incline was bottomed in February 1977, and production began almost at once. The initial shipment of ore was made to the Atlas mill near Moab, Utah, on May 5, 1977.

BLM_0041957

Production continued through June 1978. Then the miners were moved to another mine controlled by the lessee to do development work. During the next few weeks, a portion of the incline caved in, and it was not until October that the damage was repaired. In December 1978, the mine was shut down altogether for economic reasons. Some contract miners resumed production in early 1980, but after 3 months, it was found to be too costly to continue, and the mine was shut down for the second and final time.

Reclamation of the C-LP-23 mine site was undertaken by DOE as part of the 1994 hazard mitigation activities. The snow shed within the decline was burned, and the decline was subsequently backfilled with available materials. The site was recontoured, covered with available surface soil materials, and reseeded.

A total of 8,100 tons (7,300 metric tons) of ore, containing 24,000 lb (11,000 kg) of $U_3O_8$ and 117,000 lb (53,000 kg) of $V_2O_5$, have been produced and sold from the lease tract. Royalties paid for this lease tract (production royalties plus annual royalties) total $665,000.

**1.3.28  ULP Lease Tract 24**

On Lease Tract 24, the C-CM-24 mine is located in Section 32, T 48 N, R 17 W, NMPM, in Montrose County, Colorado. The original lease was executed effective June 12, 1974. A royalty bid of 11.13% payable on ores containing 90,000 lb (41,000 kg) of $U_3O_8$ secured the lease.

The initial exploration plan was submitted in January 1977. The plan was approved, and a total of 39 holes were drilled. In April 2009, Energy Fuels Resources submitted an exploration plan to DOE proposing eight exploratory drill holes: three in the central portion and five in the southwest corner of the lease tract. DOE approved the plan on August 17, 2009, and the holes were drilled later that month. Down-hole logging results indicated that in two holes, the mineralization was of sufficient grade and thickness for them to be considered ore holes; one hole was mineralized; and the other five holes were blank (contained no mineralization). Reclamation of drill sites has been completed.

In March 1979, a mining plan proposing entry through a vertical shaft some 260 ft (80 m) deep was submitted, but the plan was deemed incomplete, and no action was taken, and consequently, no ore has been produced. No further activity has occurred on the lease tract.

Annual royalties paid for this lease tract total $52,000.

**1.3.29  ULP Lease Tract 25**

On Lease Tract 25, the C-CM-25 mine is located in Sections 5 and 6, T 47 N, R 17 W, NMPM, in Montrose County, Colorado. The original lease was executed effective July 23, 1974. A royalty bid of 25.10% payable on ores containing 600,000 lb (272,000 kg) of $U_3O_8$ secured the lease.

BLM_0041958

A mining plan was submitted in March 1978 proposing entry through an incline located east of the lease tract on the Surprise No. 1 claim controlled by Union Carbide. The incline would connect with the existing workings on Union Carbide's Mill No. 2 and Mill No. 4 claims. These workings are connected to existing workings on the lease tract that resulted from mining under ML-11. The plan was approved, and Robert Taylor, DBA Taminco, Inc. (mining contractor for Cotter Corporation), began sinking the incline in March 1978. The development drift crossed the boundary line of C-CM-25, Lease Tract 2, in July. Some ore was encountered immediately. The initial ore shipment was made to the Cotter Corporation sample plant at Whitewater, Colorado, on July 28, 1978. Cleanup work on the Barkley Mine area was done in October 1977, and work on the Shattuck Denn Mine area was done in June 1980.

Production continued intermittently with development for the next two years, during which time the mine was expanded to connect with the existing LaSalle workings in the east-central portion of Lease Tract 1. In May 1980, Cotter Corporation announced a temporary shutdown of operations effective August 8, 1980. Following this announcement, Robert Taylor (DBA Taminco, Inc.) increased production to ship all available ore before the deadline.

In December 2002, Cotter Corporation submitted a reclamation plan for the C-LP-21 mine, which was approved with minor stipulations. Reclamation was completed the following year.

In 2008, in accordance with Colorado law, CDRMS reclassified all uranium mines within the state as designated mining operations, requiring the submittal of an EPP and a much more rigorous environmental review. Cotter Corporation submitted its EPP to CDRMS, and the document is currently being reviewed.

A total of 14,000 tons (13,000 metric tons) of ore, containing 62,000 lb (28,000 kg) of $U_3O_8$ and 256,000 lb (116,000 kg) of $V_2O_5$, have been produced and sold from the lease tract. Royalties paid for this lease tract (production royalties plus annual royalties) total $863,000.

## 1.3.30  ULP Lease Tract 26

On Lease Tract 26, the C-G-26 mine is located in Sections 5 and 6, T 47 N, R 17 W, NMPM, in Montrose County, Colorado. The original lease was executed effective July 23, 1974. A royalty bid of 25.10% payable on ores containing 600,000 lb (272,000 kg) of $U_3O_8$ secured the lease.

A mining plan was submitted in May 1975 proposing entry through an adit located just up the draw from the New Verde Mine area. The plan was approved, and development began in June. Production began some time thereafter, and the initial shipment of ore was made to the Union Carbide Mill at Uravan, Colorado, on December 1, 1975.

During 1976 a drift was driven from a portion of the old New Verde Mine toward two ore holes drilled during the previous exploration program. The drift crossed the boundary line onto the lease tract in October, but production was delayed by surveying errors. Production from this

BLM_0041959

1   area began in July 1977 and continued through September, when operations ceased because of
2   the lack of ore.
3
4       In September 2004, DOE completed the reclamation of the New Verde Mine site. The
5   metal ore-bins were left intact, and the dump for mine waste rock was excavated back uphill out
6   of the drainage (as much as practicable); recontoured to blend in with the surrounding natural
7   topography; and then covered with surface soil materials and reseeded with a native seed
8   mixture.
9
10      In September 2009, Energy Fuels Resources (EFR) submitted a reentry plan for the New
11  Verde Mine to DOE, proposing entry through the small, northernmost portal. DOE approved the
12  plan on October 9, 2009. On November 10, 2009, EFR personnel removed a small portion of the
13  cinderblock bulkhead securing the portal, collected air-quality measurements for radon, and
14  visually inspected the near-portal workings. In early August 2010, EFR submitted the Phase II
15  reentry plan for the New Verde Mine to DOE for approval. DOE approved the plan on August
16  11, 2010. Later that month, EFR personnel removed a portion of the cinderblock bulkhead,
17  securing the portal, and they visually inspected the applicable mine workings. EFR reported that
18  the workings appeared to be in good condition. The portal was secured immediately after the
19  assessment to preclude unauthorized entry.
20
21      When mining operations ceased on this lease tract, 1,231 tons (1,100 metric tons) of ore,
22  containing 4,220 lb (1,900 kg) of $U_3O_8$ and 18,846 lb (8,600 kg) of $V_2O_5$, had been produced
23  and sold from the lease tract mines. Royalties paid for this lease tract (production royalties plus
24  annual royalties) totaled $12,878.
25
26
27  **1.3.31  ULP Lease Tract 27**
28
29      On Lease Tract 27, the C-G-27 mine is located in Sections 7 and 18, T 50 N, R 17 W, and
30  Sections 12 and 13, T 50 N, R 18 W, NMPM, in Mesa County, Colorado. The original lease was
31  executed effective June 12, 1974. A royalty bid of 10.231% payable on ores containing
32  140,000 lb (64,000 kg) of $U_3O_8$ secured the lease.
33
34      A mining plan was submitted in April 1975 proposing entry through the existing Mesa
35  No. 5 Mine. Mining would be from the area west of the Mesa No. 5 and Ronnie No. 1 Mines,
36  which were connected during previous operations. The plan was approved, and development
37  began in mid-June. Production began in late June, and the initial shipment of ore was made to the
38  General Electric ore buying station near Naturita, Colorado, on August 29, 1975. Production
39  continued intermittently through July 1982.
40
41      A mining plan was submitted in September 1975 proposing to reopen and mine from the
42  G-1 incline. The plan was approved, and the mine was reopened in early 1976. At that time, it
43  was decided that the walls were too badly caved in to be of any use, and the project was
44  terminated.
45

BLM_0041960

1   A mining plan for the area adjacent to the existing G-3 mine was submitted in July 1978.
2   Entry was to be gained by a 700-ft (210-m) incline located northwest of the mine. The plan was
3   approved, and development began in August. Following numerous delays, the incline was
4   bottomed in ore during September 1980. Production began immediately and continued for the
5   remainder of the year. During 1981 and 1982, production was sporadic, with development
6   limited by the close proximity of the existing G-3 mine. In June 1982, the two mines were
7   connected through a small opening; however, there was no production from the old mine because
8   the grade of the ore was lower than expected.

10   A mining plan was submitted in July 1979 proposing to mine across the boundary from
11   the Mineral Channel No. 12 claim located adjacent to the lease tract and controlled by the lessee.
12   The plan was approved, and some production from this mine was noted in September.

14   In accordance with the terms of the lease, the lessee agreed to reclaim all pre-existing
15   undesirable conditions resulting from the activities conducted. The contract included the G-1,
16   6-3, G-4, Ronnie No. 1, Ronnie No. 2, Calamity No. 14, Calamity No. 15, and Neglected Mine
17   areas. Some cleanup work was performed during the summer of 1980.

19   A total of 16,000 tons (15,000 metric tons) of ore, containing 83,000 lb (38,000 kg) of
20   $U_3O_8$ and 351,000 lb (159,000 kg) of $V_2O_5$, have been produced and sold from the lease tract.
21   Royalties paid for this lease tract (production royalties plus annual royalties) total $490,000.

## 1.4  PURPOSE AND NEED FOR AGENCY ACTION

26   The underlying purpose and need for agency action is to support the implementation of
27   the Atomic Energy Act (AEA), which authorized and directed DOE, among other things, to
28   develop a supply of domestic uranium (42 U.S.C. § 2096), and "to issue leases or permits for
29   prospecting for, exploration for, mining of, or removal of deposits of source material in lands
30   belonging to the United States" to the extent that DOE deems it necessary to effectuate the
31   provisions of the AEA (42 U.S.C. § 2097). Congress further recognized the importance of
32   developing a supply of domestic uranium and other source material when it stated in the AEA, in
33   its Congressional findings, that the processing of source material must be regulated "in order to
34   provide for the common defense and security" (42 U.S.C. § 2012(d)). In addition, the Energy
35   Policy Act of 2005 (Public Law [P.L.] 109-58) (EPAct) expressed a continued commitment to
36   "decreasing the dependence of the United States on foreign energy supplies"
37   (42 U.S.C. 16181(a)(3)); and to "[e]nhancing nuclear power's viability as part of the United
38   States energy portfolio" (42 U.S.C. § 16271(a)(1)). The ULP contributes to the development of a
39   supply of domestic uranium consistent with the provisions of the AEA and EPAct. In support of
40   these statutes, DOE needs to determine the future course of the ULP, including whether to
41   continue leasing some or all of the withdrawn lands and other claims (referred to as "DOE-
42   managed lands") for the exploration and production of uranium and vanadium ores.

BLM_0041961

## 1.5  PROPOSED ACTION

DOE's proposed action is to decide whether to continue the ULP and, if it decides to continue the ULP, to determine which alternative to adopt in order to manage the ULP. DOE developed the range of alternatives by carefully considering DOE's underlying need for action and comments received during the public scoping period for the ULP PEIS.

## 1.6  SCOPE OF THE ULP PEIS

This ULP PEIS evaluates five alternatives for managing the ULP, for which there are 31 lease tracts located in Mesa, Montrose, and San Miguel Counties in western Colorado. These alternatives address the range of reasonable options, which involve (1) terminating the leases and conducting reclamation where needed, with DOE continuing to maintain oversight of the lands without uranium leasing; (2) terminating the leases and conducting reclamation where needed, relinquishing the lands for potential management by BLM and public domain lands, and terminating the DOE ULP; and (3) continuing the ULP with associated exploration, mine development and operations, and reclamation at some or all of the 31 lease tracts. At the time that the ULP PEIS was being prepared, 29 of the 31 lease tracts were actively held under lease, and the remaining 2 tracts had not been leased.

Of the 31 lease tracts, 11 are located in San Miguel County, 17 are located in Montrose County, 2 are located in Mesa County, and 1 is located in both San Miguel and Montrose Counties. The lease tracts vary in size from as small as 25 acres (10 ha) to as large as about 4,000 acres (1,600 ha).

The 29 active leases are held by five companies: (1) Golden Eagle Uranium, LLC; (2) Cotter Corporation; (3) Gold Eagle Mining, Inc.; (4) Colorado Plateau Partners; and (5) Energy Fuels Resources Corporation.

The ULP PEIS evaluates the three mining phases associated with the underground and surface open-pit mining methods. These phases are the exploration phase, mine development and operations phase, and reclamation phase. Resource areas evaluated are discussed in Chapter 2. The evaluation discussed in the ULP PEIS incorporates site-specific information available regarding the ULP lease tracts (e.g., current status, previous mining operations that occurred, and other environmental information). In addition, as of now, there have been no new mine plans (i.e., for exploration, mine development and operations, or reclamation) submitted to DOE by the lessees; the location of where new, future, potential mining would take place and other associated details are not currently known. Hence, the evaluation conducted in the ULP PEIS also incorporates assumptions for developing a reasonable scenario that could represent an upper bound level of possible future mining activity for each of the alternatives, as appropriate. These assumptions are discussed in Chapter 2.

BLM_0041962

## 1.7 NEPA PROCESS FOR THE ULP PEIS

During the preparation of the ULP PEIS, opportunities for public participation have been and are being provided (see Figure 1.7-1). After the ULP PEIS is completed and at least 30 days after the EPA issues a notice of availability of the Final ULP PEIS, DOE may issue a Record of Decision (ROD) announcing DOE's selection of an alternative for the continued management of the ULP. Section 2.6 of the ULP PEIS identifies DOE's preferred alternative (Alternative 4, to continue with exploration, mine development and operations, and reclamation on the 31 DOE ULP lease tracts for 10 years or another reasonable time period). After the ROD is issued, as plans (for exploration, mine development and operation, or reclamation) are submitted by the lessees to DOE for approval, further NEPA review for a given action would be conducted. The level of follow-on NEPA review to be done (e.g., categorical exclusion determination, environmental assessment, or environmental impact statement) would depend on the action being proposed by the lessees, as indicated in the plans submitted. For mining plans to be submitted for approval, DOE will require, at a minimum, an environmental assessment (EA) with appropriate public involvement to be prepared to further evaluate potential site impacts. This NEPA review would be conducted to inform DOE's decision on approval of the plans, including the conditions DOE would require to mitigate potential impacts. As discussed in Section 1.2.1 (where requirements of current leases are



**FIGURE 1.7-1  NEPA Process for the ULP PEIS**

summarized), no activity can be undertaken by the lessees until DOE has approved the plans or otherwise acted on the plans. DOE's review would be conducted in consultation with Federal, state, local agencies, and tribal entities for site-specific actions, as appropriate. Public participation on the follow-on NEPA review would occur in a manner consistent with the level of review conducted and with DOE and CEQ regulations. Section 1.7.1 discusses the public scoping process for the ULP PEIS. Section 1.7.2 discusses the public comment process for the ULP PEIS.

### 1.7.1  Public Scoping Process

Consistent with CEQ requirements (40 CFR 1501.7) and DOE NEPA implementation procedures (10 CFR 1021.311), an early and open scoping process was carried out to determine the scope of the PEIS and identify significant issues related to the proposed action. An NOI was issued for public review, and a public scoping process was conducted. Public participation was also solicited for the review of the Draft ULP PEIS during the public comment period. NEPA requires that comments on the Draft PEIS be evaluated and considered during the preparation of the Final PEIS and that a response to comments be provided.

BLM_0041963

The NOI (76 FR 36097) to prepare the ULP PEIS was issued on June 21, 2011, and a supplemental notice (76 FR 43678) was issued on July 21, 2011, to announce the four public scoping meetings and their locations and to announce the extension of the public scoping period to September 9, 2011. Public scoping meetings were held in Montrose, Telluride, and Naturita in Colorado and in Monticello, Utah.

In addition to presenting comments at the scoping meetings, stakeholders were also able to mail comments directly to DOE or submit comments through the project web site (http://ulpeis.anl.gov/). A total of 287 unique "comment documents" were submitted by individuals, organizations, and government agencies to provide comments on the scope of the PEIS. A comment document is a written document, an e-mail submission, or an oral presentation given during a scoping meeting that provides comments on the scope of a PEIS. A single comment document may contain multiple comments on one or more issues. There were 61 comment documents provided at the scoping meetings; 164 were mailed to DOE (counting both e-mails and regular mail), and 62 were submitted electronically through the project web site. Of these comment documents, 8 were received from Federal, state, or local government agencies, with the remainder being from individuals or other organizations. Comment documents were received from 13 states; of the 262 comments for which a state of origin was identified, approximately 88% were from Colorado within the potentially affected areas.

Comments received during the public scoping period focused on whether or not the ULP or uranium mining at the lease tracts should be continued. Representative comments and DOE responses are provided as follows. The first set of comments (Section 1.6.2) consists of those comments determined to be within the PEIS scope, and the second set (Section 1.6.3) consists of those determined to be outside the scope of the ULP PEIS. A detailed discussion on the comments received is presented in Appendix B.

### 1.7.1.1 Comments Considered Within the ULP PEIS Scope

- *The current leases should be terminated and reclamation conducted, after which uranium mining should not be conducted on the lands. The lands could be restored to the public domain under BLM oversight and the DOE ULP terminated.*

Alternatives 1 and 2 evaluated in the ULP PEIS address this comment. Under Alternative 1, all leases on the 31 lease tracts would be terminated, and reclamation would be conducted where needed. The lands would then be maintained per DOE oversight without leasing for uranium mining. Alternative 2 evaluated in the ULP PEIS is similar to Alternative 1, except once reclamation was completed by lessees, DOE's jurisdiction would return to BLM, if approved by the U.S. Department of the Interior (DOI)/BLM (in accordance with 43 CFR § 2372.3). If approved, the land would be managed by BLM under its multiple use policies. DOE's uranium leasing program would end.

BLM_0041964

1 • *DOE should continue with the ULP and continue to make the 31 lease tracts*
2 *available for exploration, mine development and operations, and reclamation,*
3 *as was the case before the preparation of the PEIS was initiated.*
4
5 Alternatives 4 and 5 evaluated in the ULP PEIS address this comment. Under
6 Alternative 4, DOE would continue the ULP with the 31 lease tracts for the
7 next 10-year period or for another reasonable period. Alternative 5 is similar
8 to Alternative 4 except that the lease period is limited to the remainder of the
9 current 10-year lease period, and the leases would continue exactly as they
10 were issued in 2008.
11
12 • *DOE should prohibit any further mining or exploration until reclamation has*
13 *been completed on existing or old leases.*
14
15 As mentioned above, reclamation would be conducted where needed as part of
16 the alternatives evaluated in the ULP PEIS. In addition, all legacy mine sites
17 located on the DOE lease tracts have already been reclaimed.
18
19 • *DOE should stipulate protection of the Dolores and San Miguel River*
20 *watersheds.*
21
22 The preferred alternative includes a requirement for future mines to be at least
23 0.25 mi (0.40 km) from the Dolores River. The San Miguel River is about
24 0.3 mi (0.54 km) from the closest lease tracts. The evaluation for water quality
25 discussed in the ULP PEIS (as summarized in Section 2.4) considers both the
26 Dolores and San Miguel Rivers.
27
28 • *Potential impacts from uranium mining at the DOE ULP lease tracts on air*
29 *quality, water quality, human health, socioeconomics, transportation, views*
30 *from sensitive areas, and cultural resources should be evaluated.*
31
32 Chapter 4 of the ULP PEIS analyzes the potential impacts associated with
33 human health and environmental resource areas listed. Potential impacts on
34 noise, soil resources, land use, ecology, environmental justice, and waste
35 management are also analyzed.
36
37 • *DOE should undertake its duties under Section 7 of the ESA.*
38
39 DOE engaged in consultation with the USFWS pursuant to Section 7 of the
40 ESA. Both a biological assessment (BA) and a biological opinion (BO) have
41 been completed and are presented in Appendix E. Chapter 6 of the ULP PEIS
42 presents a summary of this consultation.
43

BLM_0041965

1    • *DOE should collaborate with other agencies, including the CDRMS, BLM,*
2      *and EPA.*
3
4      DOE is collaborating with various agencies, including CDRMS, BLM, and
5      EPA, on this PEIS process. Section 1.10 presents a list of the cooperating
6      agencies and the commenting agencies.
7
8    • *The review and approval process must include a site-specific NEPA review*
9      *for each proposed mining operation.*
10
11     The ULP PEIS utilizes site-specific data that are available and contains in
12     Section 1.7 a discussion of the NEPA process that would be conducted once
13     site-specific and project-specific mine plans were submitted by the lessees to
14     DOE for review and approval.
15
16   • *Include impacts from the release of radioactive and other toxic materials into*
17     *the atmosphere from mining and milling operations.*
18
19     Chapter 4 of the ULP PEIS addresses the potential impacts from the release of
20     material associated with the ore production. Although potential impacts of
21     milling operations are outside the scope of the proposed action, the
22     transportation of ore generated from the ULP lease tracts to the mills and the
23     cumulative impacts from the mills are evaluated in Chapter 4.
24
25   • *Address the long-term impacts on human health, livestock, and wildlife,*
26     *including food sources, both locally and regionally, due to mining and milling*
27     *activities. The PEIS must consider health effects of mining and milling,*
28     *including cancer incidence, on the human population in towns neighboring*
29     *the mining operation, workers, and local residents.*
30
31     The analyses of impacts on human health and ecological resources (on
32     livestock and wildlife) address the concern about potential impacts from
33     mining operations. The analysis of human health impacts in Chapter 4
34     considers the population within a 50-mi (80-km) radius of the lease tract. This
35     region of influence (ROI) was selected to assess the potential impact on the
36     population as a whole (i.e., for collective dose evaluation). At this distance,
37     the individual doses would have dropped to negligible levels (<0.1–0.2
38     mrem/yr), which supports that the selection of 50 mi (80 km) as the ROI is
39     conservative. The analysis for potential impacts on ecological resources
40     addresses resources in the three counties that encompass the 31 lease tracts.
41     The cumulative impacts evaluated in the ULP PEIS (see Section 4.7) address
42     a 50-mi (80-km) radius of the lease tracts and include the White Mesa and
43     Piñon Ridge Mills.
44
45

BLM_0041966

### 1.7.1.2  Comments Considered Outside the ULP PEIS Scope

- *Because of unstable uranium markets and the uncertainty of future commercial development of nuclear power facilities, uranium should be preserved for the future use by the American people until it becomes critical for national strategic energy purposes.*

  Analyses of future uranium markets, and the future commercial development of nuclear power facilities, are not within the scope of the purpose and need for DOE's action (described in Section 1.4 of the ULP PEIS). See also Section 1.7.3.6.

- *Analyze a No Action Alternative that would allow the leases to lapse with no reclamation conducted.*

  The option of not performing reclamation when leases lapse or are terminated is not consistent with the requirements of the leases, the ULP, and applicable laws and is therefore not considered a reasonable alternative to evaluate in the ULP PEIS.

- *Analyze the economic benefits of fully reclaiming and rehabilitating all Federal and state lands in the Uravan Mineral Belt and compare that to the economic benefit of maintaining the existing uranium leases over the next 5 years.*

  The economic study suggested is not relevant and is considered outside the scope of the ULP PEIS. It does not meet the purpose and need for DOE's action (described in Section 1.4 of the ULP PEIS).

- *Include an alternative that requires old, inactive, and/or abandoned mines to be reclaimed before new leases are granted or any new mines are established.*

  DOE has reclaimed all abandoned mines within its purview. The 29 leases that currently exist have been in place since 2008, and all mining activities are currently on hold until the completion of this PEIS process.

### 1.7.2  Public Comment Process

A Notice of Availability (NOA) for the Draft ULP PEIS was published in the *Federal Register* on March 15, 2013 (78 FR 16483), and this began a 60-day public comment period that was to end on May 16, 2013. This comment period was later extended to May 31, 2013 (78 FR 23926), and it was subsequently re-opened on June 3, 2013 (78 FR 33090), with a closing date of July 1, 2013. The public comment period, including the extension and the re-opening, lasted 109 days. All comments received on the Draft ULP PEIS were considered in the preparation of the ULP PEIS and are presented in Section I.4 of Appendix I.

BLM_0041967

Case No. 1:20-cv-02484-MSK   Document 39-1   filed 04/27/21   USDC Colorado   pg 68 of 299

1    An important part of the NEPA process involves giving the public the opportunity to
2    provide input and comments on a Draft PEIS for consideration in the preparation of a Final
3    PEIS. DOE issued the Draft ULP PEIS for review and comment by other Federal agencies,
4    states, American Indian tribal governments, local governments, and the public. DOE distributed
5    copies to those organizations and government officials known to have an interest in the PEIS and
6    to those organizations and individuals who requested a copy. Copies were also made available on
7    the project web site (http://www.ulpeis.anl.gov/), the DOE NEPA web site
8    (http://energy.gov/nepa/), and in regional DOE public document reading rooms and public
9    libraries. Announcements indicating the availability of the Draft ULP PEIS and the dates and
10   times of the public hearings were published in local newspapers (see Table 1.7-1).
11
12   Each of the public hearings started with an open house that lasted about half an hour,
13   with posters that explained the NEPA process and the alternatives and evaluations presented in
14   the ULP PEIS. Copies of the Summary document and presentation were also made available to
15   the public. Subject matter experts were on hand to answer any questions the public may have had
16   as they viewed the poster display.
17
18   After the open house, DOE gave an overview of the Draft ULP PEIS, and attendees were
19   given an opportunity to provide oral and written comments. Each oral comment presentation,
20   recorded by a court reporter as part of the hearing transcript, was considered as a comment
21   document. Written comments submitted by individuals during the hearings were likewise
22   considered to be comment documents. The transcripts for the four hearings are posted on the
23   project web site.
24
25   DOE received a total of 258 comment documents, which accounted for approximately
26   1,200 individual comments. Of the 258 comment records received, 18 were from organizations
27   or Federal or state agencies and 240 were from private citizens. Written comments were received
28   via letter, email, or through submission of a comment form provided at the public hearings or on
29   the project web site. Oral comments are included in transcripts documenting each of the public
30   hearings held on the Draft ULP PEIS. DOE has identified nine topics of interest based on the
31   comments that were most frequently received and/or the comments that indicated a broad public
32   concern. These topics are summarized in Section 1.7.3. See Appendix I for the complete
33   comment response document.
34
35
36   **TABLE 1.7-1  Draft ULP PEIS Public**
37   **Hearing Locations in Colorado, Dates, and**
38   **Attendance**

| Location | Date | Attendance |
|---|---|---|
| Grand Junction | April 22, 2013 | 52 |
| Montrose | April 23, 2013 | 40 |
| Telluride | April 24, 2013 | 54 |
| Naturita | April 25, 2013 | 22 |

39

BLM_0041968

### 1.7.3  Nine Topics of Interest Based on Public Comments Received

The order in which topics are presented and discussed here does not indicate importance of one topic over another.

#### 1.7.3.1  PEIS analyses need to be more site-specific and more robust in scope. Assumptions used need to be supported with citations.

**Topic Summary:** Commenters said that the analyses performed in the PEIS to estimate the impacts of the program were inadequate. Many commenters asserted that the assumptions made to support the analysis are arbitrary and not supported by citations. Commenters requested that more site-specific data be included and evaluated so that conclusions presented can better support site-specific decisions.

Many commenters were specifically concerned about the adequacy of the evaluations of the impacts on human health, air quality, noise, water quality and water supply, endangered species, socioeconomics, and transportation. Specifically, the concerns expressed were the following: (1) human health impacts from exposure to potentially uranium-contaminated "red-colored" dust some 50 or so mi (about 80 km) away from the ULP lease tracts; (2) climate change impacts; (3) the Colorado River Basin and the impacts of the proposed action on water quantity, water quality, and endangered Colorado River fish species; and (4) impacts on the recreational activities that many people in the area enjoy, and the effects from a boom-and-bust economy that might be created by the proposed action.

**Discussion:** The evaluations conducted for the PEIS were based on site-specific information (see Section 1.3 for a summary of this information). The information is adequate to support the alternatives evaluated and for making fully informed decisions relative to any of the alternatives. Although site-specific information for future mines is not available until the lessees submit specific mine plans, information is available from past mining activities (e.g., cultural resources, threatened and endangered species, waste-rock and ore characteristics, and transportation practices and routes) and is sufficient for supporting the analyses of potential impacts from future mining activities for the five alternatives, including a thorough cumulative effects analysis.

The results of the evaluation (which incorporate site-specific information) are discussed in detail in Chapter 4 and summarized in Sections 2.4.2 to 2.4.13 and Tables 2.4-4 to 2.4-9). The PEIS was revised to add citations where necessary to indicate the sources for information used in the PEIS analyses, including the sources consulted for developing the assumptions that were used.

The human health analysis of the inhalation of dust pathway addressed potential impacts from dust that could originate from the lease tracts. The analysis took into account the emission potential and wind direction. This analysis (discussed in Section 4.3.5.3) indicates that inhalation of dust is not a significant pathway and does not pose a health concern; that is, the potential

BLM_0041969

1   cancer risk to an individual in Telluride would be much lower than $1 \times 10^{-6}$/yr, based on the
2   estimates of risks presented in the PEIS, at a distance of 3.1 mi (5,000 m) from the lease tracts
3   and the much longer distance (greater than 3.1 mi [5,000 m]) from the lease tracts to Telluride.
4
5       Climate change was evaluated in the PEIS (see Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, and
6   4.5.1) in terms of greenhouse gases (GHGs) generated by the ULP proposed action for the five
7   alternatives, respectively. The results indicate that under all alternatives, the maximum potential
8   GHG emissions attributable to the ULP would be small. For perspective, ULP GHG emissions
9   would comprise a very small percentage of both Colorado and U.S. GHGs generated (up to
10  0.03% and 0.0005%, respectively). U.S. GHG emissions account for about one-fifth of global
11  GHG emissions, and GHG emissions from the ULP proposed action would contribute up to
12  about 0.0001% more. The amount of GHGs generated is generally used as a measure of the
13  potential impacts on climate change. ULP operations followed by power generation at nuclear
14  power plants would result in considerably smaller amounts of criteria and toxic air pollutants and
15  GHG emissions than would otherwise be released from fossil power plants. The text in the PEIS
16  has been revised (see the same sections mentioned previously) to explain further how potential
17  impacts from climate change were determined for the PEIS and what the results mean.
18
19      The evaluation of potential transportation impacts presented in this PEIS was done in
20  consultation with the Colorado Department of Transportations as reflected in Chapter 4 (see
21  Section 4.3.10 and Table 4.6-1).
22
23      The potential impacts to water depletion in the Upper Colorado watershed are evaluated
24  in this PEIS; and DOE has consulted with the USFWS with regards to how this water depletion
25  would potentially impact the Colorado four endangered fish species. PEIS text has been revised
26  to be consistent with the BA and BO (see Appendix E and Section 4.3.6.4).
27
28      DOE has initiated programmatic consultation, in compliance with Section 106 of the
29  NHPA, concerning DOE's management of the ULP. Section 106 of the NHPA requires Federal
30  agencies to consider the effect of their undertakings on historic properties and to consult with the
31  appropriate SHPO, American Council on Historic Preservation (ACHP), and other parties that
32  have an interest in the effects of the undertaking on historic properties. For the ULP, per the
33  procedure that has historically been and is currently still being carried out, DOE has addressed
34  consultation through the BLM and the lessees on specific undertakings when ULP
35  activities/plans have been proposed. However, since the NHPA allows for the utilization of a
36  programmatic agreement (PA) to govern large or complex projects, and since PAs can be used
37  when effects on historic properties are expected to be similar and repetitive or regional in scope
38  or when these effects cannot be fully determined prior to approval of an undertaking, DOE has
39  initiated the development of a PA for the ULP. DOE initiated discussion with the BLM and the
40  Colorado SHPO on May 30, 2013. The PA will be revised to address input and review from the
41  consulting parties, and then routed to the responsive parties for concurrence. DOE-LM plans to
42  have the PA in place before issuance of the ULP PEIS ROD.
43
44      See also Section 1.7.3.2 for an additional discussion regarding the potential for creating a
45  boom-and-bust economy from uranium mining in the area.
46

BLM_0041970

**1.7.3.2  Support Alternative 1, which states that DOE would terminate all leases, and all operations would be reclaimed by lessees. DOE would continue to manage the withdrawn lands, without uranium leasing, in accordance with applicable requirements.**

**Topic Summary:** Commenters requested that the ULP be terminated and that lessees be required to reclaim their operations on their respective lease tracts. Commenters cited concerns over natural resources, cultural resources, human health, transportation, and visual impacts of uranium mining in Colorado for Alternatives 3, 4, and 5.

Many commenters noted that uranium mining is hazardous for human health and the environment. They identified concerns about the radioactivity of waste rock piles and the safety of workers and nearby residents. They also noted that mining is harmful to the environment, likely to adversely affect air and water quality, and may disturb cultural resources. A few commenters also noted that mining conflicted with multiple use policies and should not take place on public lands.

They also noted that mining for uranium creates a boom-and-bust economic cycle and that it would be preferable to promote economic growth based on more sustainable resources (e.g., encourage tourism-based economic growth by promoting natural resources and aesthetics). Some other commenters expressed concerns about potential increases in traffic, noise, dust, and the carbon footprint.

Finally, some commenters asserted that additional uranium mining was unnecessary because the United States already has a robust supply of uranium and is able to import inexpensive uranium from countries like Canada and Australia.

**Discussion:** DOE has evaluated the range of reasonable alternatives to meet the purpose and need discussed in Section 1.4. After carefully considering all public comments and the results of the PEIS evaluation, DOE has retained Alternative 4 as the preferred alternative in this PEIS. See the detailed discussion regarding the purpose and need in Section 1.7.3.4 that follows.

The PEIS evaluation for potential impacts from the five alternatives as discussed in Chapter 4 (the impacts are also summarized in Section 2.4) concludes that potential impacts on the resource areas (including natural resources, cultural resources, human health, transportation, and visual impacts) evaluated for the five alternatives  generally would be negligible to moderate and could be further minimized by implementing the compliance and mitigation measures and/or best management practices (BMPs) described in Section 4.6 and Table 4.6-1. All three phases of mining (exploration, mine development and operations, and reclamation) were evaluated for Alternatives 3, 4, and 5, while only reclamation was evaluated for Alternatives 1 and 2, since these two alternatives do not include continued future uranium mining.  See also discussion in Section 1.7.3.1.

BLM_0041971

With regard to concerns about boom-and-bust economic cycles, the large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region, producing a boom-and-bust scenario with rapid growth in the population and economy, followed by equally rapid economic contraction, unemployment, and out-migration. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. Thus, with no demographic impacts likely to occur, given the relatively small scale of development under each of the alternatives, no boom-and-bust scenario would be likely to affect either low-income and minority populations or the general population. In addition there is no evidence to suggest that activities under the proposed ULP would have a negative effect on recreation tourism.

### 1.7.3.3  Support Alternative 4, which is DOE's preferred alternative identified in the ULP PEIS. Under Alternative 4, DOE would continue the ULP with the 31 lease tracts for the next 10-year period or for another reasonable period.

**Topic Summary:** Many commenters voiced support for Alternative 4, under which DOE would continue the ULP with the 31 lease tracts for the next 10-year period or for another reasonable period. DOE identified Alternative 4 as its preferred alternative. Commenters cited their support of uranium mining and the need to secure uranium resources. They also said that the jobs created by the mining industry were beneficial to the region and its inhabitants. They noted their support for the PEIS procedures and noted that the environmental impact analysis was robust. These commenters said that the uranium mining was safe and had a low environmental impact and that the lessees were good stewards of the environment. They mentioned that it would be preferable to mine uranium in the United States, where environmental regulations are stringent and enforced. Finally, they noted that nuclear energy is an important source of domestic energy production.

**Discussion:** DOE has carefully considered all public comments and the results of the ULP PEIS evaluation and has identified Alternative 4 as its preferred alternative in this ULP PEIS. The potential impacts discussed in Chapter 4 are summarized in Sections 2.4.1 to 2.4.13 and in Tables 2.4-4 to 2.4-9. See also the discussion in Section 1.7.3.1. DOE believes that uranium mining activities at the ULP lease tracts can continue to be conducted in a manner protective of the environment and public health, as supported by the ULP PEIS analyses and results obtained. For Alternative 4, mine development and operations could create about 229 direct jobs and 152 indirect jobs, generating about $14.8 million in income. Average unemployment for Mesa, Montrose, and San Miguel Counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1). See also the discussion in Section 1.7.3.4 that follows regarding concerns about the purpose and need discussed in Section 1.4 of the ULP PEIS.

BLM_0041972

### 1.7.3.4   Concern for NEPA-related issues, such as the appropriateness and adequacy of the purpose and need described in the ULP PEIS; the adequacy of the range of alternatives presented and evaluated; and the need for more specific information to assure that appropriate follow-on NEPA reviews will be conducted as specific mine plans are submitted for DOE approval.

**Topic Summary:** Many commenters identified NEPA issues in their submissions. Many commenters said that the purpose and need as identified in the PEIS was inadequate. For example, some commenters noted that DOE had oversimplified the Purpose and Need Statement, and, as such, the alternatives identified in the PEIS were not in compliance with Congressional legislation. Some commenters stated that the purpose and need requires an expansion of the scope of the PEIS. Other commenters noted that the alternatives identified in the PEIS did not support the Purpose and Need Statement or that the Purpose and Need Statement was inappropriate. For example, one commenter noted that the Purpose and Need Statement inappropriately focuses on the need to develop these reserves rather than on an analysis of whether it is the prudent time to develop these reserves. Commenters requested that the Purpose and Need Statement be clarified in the Final ULP PEIS.

Many other commenters mentioned that the alternatives identified in the ULP PEIS were inadequate. For example, some commenters requested that a reclamation alternative, in which the ULP is terminated and all disturbed areas are reclaimed, be added to the ULP PEIS. Other commenters requested that an alternative that would keep the uranium ore in place until demand is evident be included in the ULP PEIS. This alternative would call for current uranium demand and prices, as well as projections of future uranium demand and prices, to be considered in determining the number of lease tracts that are developed. Commenters requested that these alternatives be included in the Final ULP PEIS.

Some commenters said that the ULP PEIS fails to satisfy NEPA because additional follow-on NEPA review will not be required for future actions on the ULP lease tracts due to the categorical exclusions provided under the program. To protect Federal lands, these commenters requested that further NEPA reviews, or, at a minimum, an environmental assessment (EA), be performed for future action on the lease tracts. Commenters said that that site-specific data should be used to document the condition of the sites and the cumulative impacts of the program and that future NEPA reviews consider a detailed analysis of the site-specific conditions and foreseeable activities.

Other commenters voiced concerns about public participation in the ULP PEIS process. Some commenters said that the public was not given sufficient time to comment on the PEIS documents. Many commenters requested that the PEIS be re-done and re-released with these issues addressed.

**Discussion:** DOE does not agree with the comments alleging that the purpose and need for the proposed action requires expansion of the scope of the PEIS. As explained in PEIS Section 1.4, "Purpose and Need for Agency Action," the underlying purpose and need for agency action was

1   established by the U.S. Congress in two provisions of the Atomic Energy Act (AEA):
2   42 U.S.C. § 2096, which authorized and directed DOE, among other things, to develop a supply
3   of domestic uranium; and 42 U.S.C. § 2097, which authorized DOE "to issue leases or permits
4   for prospecting for, exploration for, mining of, or removal of deposits of source material
5   [including uranium ore] in lands belonging to the United States to the extent DOE deems
6   necessary to effectuate the provisions of the AEA."
7
8       The purpose and need for agency action, as described in PEIS Section 1.4, is to support
9   the implementation of those two AEA provisions. Section 1.4 recognizes that in order to support
10  those provisions, "DOE needs to determine the future course of the ULP, including whether to
11  continue leasing some or all of DOE's withdrawn lands and other claims . . . for the exploration
12  and production of uranium and vanadium ores." PEIS Section 1.6, "Scope of the ULP PEIS,"
13  therefore describes the scope of its analysis as the evaluation of the five alternatives for
14  managing the ULP, and the evaluation of "the three mining phases associated with the
15  underground and surface open-pit mining methods," which "are the exploration phase, mine
16  development and operations phase, and reclamation phase." Therefore, the AEA provisions are
17  consistent with the present scope of the ULP PEIS, and do not require that the scope be expanded
18  beyond the ULP to analyze the entire nuclear fuel cycle. Further, no DOE decision to be based
19  on this PEIS would change the nation's use of nuclear fuels, including use of nuclear power
20  reactors and management of associated radioactive materials. These and other aspects of the back
21  end of the nuclear fuel cycle are the subject of numerous other NEPA reviews, including many
22  EISs prepared by the Nuclear Regulatory Commission.
23
24      The DPEIS's Purpose and Need section, in addition to citing the AEA, also cited the
25  Energy Policy Act of 2005, Public Law 109-58 (EPACT), and stated that EPACT "emphasized
26  the reestablishment of nuclear power (Sections 601 through 657)." Comments alleged that the
27  DPEIS thereby expanded the purpose of the proposed action "through a suggestion that the 2005
28  Energy Policy Act calls for more nuclear energy," and that the scope should be expanded to
29  include the nuclear fuel cycle for that reason. It was not DOE's intent to make that suggestion in
30  the DPEIS. The cited EPACT sections 601 through 657 constitute EPACT's Title VI, entitled
31  "Nuclear Matters," which addressed various nuclear matters and amended several sections of the
32  AEA. However, EPACT's Title VI did not "call for more nuclear energy," or amend the two
33  provisions of the AEA that the DPEIS cited in the beginning of its Purpose and Need Section:
34  42 U.S.C. §§ 2096–2097. In order to avoid any confusion regarding the interpretation of the
35  DPEIS's references to EPAct, DOE has amended the Purpose and Need section of this PEIS, in
36  Section 1.4, to explain that Congress expressed, in EPAct, a continued commitment to
37  "decreasing the dependence of the United States on foreign energy supplies"
38  (42 U.S.C. 16181(a)(3)); and to "[e]nhancing nuclear power's viability as part of the
39  United States energy portfolio" (42 U.S.C. §16271 (a)(1). The development of a supply of
40  domestic uranium supports the provisions of the AEA and the EPAct. However, the development
41  of a supply of domestic uranium is separate and distinct from the future utilization of nuclear
42  energy during the entire nuclear fuel cycle. The ULP is related to uranium supply, rather than to
43  future use, which is dependent upon the exact level of future demand for nuclear energy and is
44  therefore uncertain and speculative. The development of a domestic uranium supply, as
45  authorized and directed by Congress in the AEA, enables DOE to support future demand that is
46  uncertain at the present time, whatever its exact level may turn out to be in the future.

BLM_0041974

1  Alternative 1 evaluated in the Draft PEIS does provide a localized, in depth analysis—
2  this alternative involves the termination of the leases with reclamation at any areas requiring
3  such. DOE's land withdrawal relates to the extraction of uranium and vanadium resources from
4  the ULP lease tracts. As such, developing alternative energy is outside the scope of the ULP.
5
6  DOE does not agree with comments that the Purpose and Need Statement must specify
7  the lessees' mitigation requirements; however, the PEIS does contain a robust discussion of
8  mitigation requirements (see Section 4.6).
9
10  Regarding comments about follow-on NEPA reviews, the Draft PEIS stated in
11  Section 1.7: "After the ROD [Record of Decision] is issued, as plans (for exploration, mine
12  development and operation, and reclamation) are submitted by the lessees to DOE for approval,
13  further NEPA review for a given action would be conducted. The level of follow-on NEPA
14  review to be done (e.g., categorical exclusion determination, environmental assessment, or
15  environmental impact statement) would depend on the action being proposed by the lessees, as
16  indicated in the plans submitted. This NEPA review would be conducted to inform DOE's
17  decision on approval of the specific plans, including the conditions DOE would require to
18  mitigate potential impacts." Based on the comments received, Section 1.7 has been revised to
19  state that for all future mining plans submitted for approval, DOE will require, at a minimum, an
20  EA with appropriate public involvement to be prepared to further evaluate potential site-specific
21  impacts. DOE will issue categorical exclusion determinations for classes of actions such as
22  routine maintenance activities that DOE has determined by regulation do not have the potential
23  to result in significant environmental impacts. DOE makes its categorical exclusion
24  determinations publicly available on the internet.
25
26  Although some commenters said the public was not given sufficient time to comment on
27  the Draft PEIS, DOE provided over twice the mandatory duration. The 60-day comment period
28  initially provided exceeded the required 45-day comment period. The comment period was
29  extended twice, so that the final comment period lasted for 109 days.
30
31  After deliberation, DOE determined that re-issuing of the ULP PEIS is not necessary.
32  DOE has adequately evaluated the range of reasonable alternatives, and the information and
33  analysis in the PEIS are adequate for all of the alternatives (see Chapter 4). DOE has reviewed
34  the public comments and, while DOE has made revisions to the document in response to
35  comments, DOE has not made substantial changes to the proposed action and no new significant
36  information has been discovered so as to warrant issuing a revised Draft ULP PEIS.
37
38
39  **1.7.3.5  Reclaim and clean up previously mined sites; conduct reclamation of mined**
40  **locations during long periods of inactivity.**
41
42
43  **Topic Summary:** Many commenters said that previously disturbed mining sites should be
44  reclaimed before any new mining moves forward. Commenters said that cleanup would provide
45  the region with many more jobs and lead to higher economic growth than that realized from

BLM_0041975

1   uranium mining. Some commenters voiced a preference for these types of jobs over jobs from
2   the mining industry.
3
4
5   **Discussion:** Reclamation of all legacy mines under DOE's oversight within the ULP has been
6   completed. There are currently 12 existing mines on eight lease tracts that will ultimately be
7   reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's
8   oversight or authority to reclaim. With regard to the number of jobs that could be generated from
9   the reclamation of the currently 12 existing mines on the ULP lease tracts, the estimates provided
10  in Alternative 1 (which evaluates reclamation of these 12 existing mines) indicate that up to
11  29 direct jobs and 16 indirect jobs could be generated.
12
13          Reclamation is required by Federal and state law and by provisions of the lease.
14  Consistent with state requirements, one lease holder has filed environmental protection plans
15  (EPPs), and another lease holder has submitted reclamation plans. State law requires lease
16  holders to enter Temporary Cessation (TC) if inactive for more than 180 days for an initial
17  period of 5 years. A second 5-year TC may be granted by the state. However, under no
18  circumstances shall the TC period be longer than 10 consecutive years. If TC reaches the 10-year
19  maximum, or a second 5-year period is not granted, an operator is required to either reactivate
20  for a year or fully comply with reclamation and EPP requirements.
21
22
23      **1.7.3.6  Maintain mined uranium ore from the ULP lease tracts as a domestic**
24              **supply.**
25
26
27  **Topic Summary:** Many commenters noted in their submissions that they would prefer that
28  uranium mined in the United States not be exported to foreign governments. Some commenters
29  voiced concerns over national security interests, saying that uranium should not be sold to
30  foreign governments to prevent them from engaging in uranium enrichment activities as part of a
31  program to develop nuclear weapons. Other commenters voiced concerns over energy policy
32  interests, saying that uranium should not be exported to foreign governments because domestic
33  nuclear energy needs take precedence.
34
35          Other commenters requested that the uranium supply be maintained in the ground. These
36  commenters explained that there is no need to generate additional uranium supply because there
37  are already sufficient supplies of uranium stockpiled for domestic use. Few commenters said that
38  there was no market for uranium and others noted that this country already has a robust supply of
39  uranium. Commenters said that uranium ores should be kept in the ground until the time comes
40  when the stockpiled domestic supply needs to be augmented.
41
42
43  **Discussion:** DOE's proposed action in the PEIS does not address uranium ore exports, over
44  which the NRC, not DOE, has authority; and the scope of analysis in the PEIS does not analyze
45  the possibility that uranium ore from the ULP may be subject to export. The possibility that
46  uranium or uranium ore from the ULP may be subject to being exported does not undermine the

BLM_0041976

PEIS's stated purpose and need, and does not require that the PEIS's scope be expanded to analyze the export of uranium or uranium ore. Any export of domestic uranium or uranium ore from any source within the United States, including the ULP lease tracts, is strictly regulated by the NRC under the terms of the AEA and the NRC regulations, which impose requirements that must be satisfied before the NRC will grant a license to export any domestic uranium or uranium ore. See AEA, 42 U.S.C. §§ 2099, 2151–2160d; NRC regulations, 10 C.F.R. §§ 110.19–110.46. For example, 42 U.S.C. § 2099 forbids the NRC from licensing any person to export from the United States any uranium ore, or other source material, if the issuance of such a license "would be inimical to the common defense and security" or the health and safety of the public; 42 U.S.C. § 2155 gives the Executive Branch the authority to veto any export of uranium ore. Many more specific requirements are imposed in the other above-cited provisions of the AEA and the NRC regulations.

In addition, the possibility that uranium ore from the ULP may be subject to export, after a prospective exporter goes through the process of applying for and receiving the necessary permission from the NRC, does not undermine the stated purpose and need for agency action: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of deposits of uranium ore in lands belonging to the United States to the extent DOE deems necessary to effectuate the provisions of the AEA (42 U.S.C. §§ 2096–2097). An active ULP program will be more successful in meeting that need than would an inactive program.

### 1.7.3.7  Use the ULP lease tracts for generating renewable energy instead of uranium ore production.

**Topic Summary:** Some commenters said they would prefer that the land within the ULP lease tracts be used to generate renewable energy. They noted that solar or wind resources were plentiful in the region and that DOE should be doing more to promote renewables over nuclear energy. Commenters noted that renewable energy resources such as solar and wind have less of an impact on the region's environment and the health of area residents.

**Discussion:** The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS; and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

BLM_0041977

1
2
3
4
5
6
7

**1.7.3.8** **Although a long list of mitigation measures is presented in the ULP PEIS, some are inadequate, and additional measures need to be included. The ULP PEIS lacks a discussion on the effectiveness of the measures presented. It is also not clear if some of these measures would be required and how they would be implemented.**

8
9
10
11
12
13
14
15
16
17
18

**Topic Summary:** Commenters pointed out that mitigation measures identified in the ULP PEIS were inadequate or requested that additional mitigation measures be added to the ULP PEIS. Several commenters said that the buffer zone around the Dolores River was inadequate and requested that it be expanded. Commenters noted several other mitigation measures that needed to be strengthened or modified. For example, one commenter noted that to mitigate radionuclides from blowing onto residences, it would be necessary not only to cover the waste rock piles with soil but also to spray the soil with water or some other barrier. Commenters were also concerned about the enforceability of the mitigation measures. They noted that resources would best be protected if lessees were required to undertake the identified mitigation measures.

19
20
21
22
23
24
25
26
27
28

**Discussion:** As indicated in Section 4.6, measures that are identified as compliance and mitigation measures would be implemented because they are required by law (compliance measures) or have been identified to minimize potential impacts (mitigation measures) as included in the leases. The ULP PEIS also indicates that mitigation measures that are currently not in the leases would be included as leases are modified. Implementation of the compliance and mitigation measures would be under the oversight of the corresponding oversight agencies. DOE is responsible for assuring that lease requirements are met and thus would enforce mitigation measures in leases.

29
30
31
32
33
34

**1.7.3.9** **The cumulative impacts analysis does not cover enough area and does not address some projects in the region of cumulative impacts, such as the oil and gas wells present in the area. The conclusions or determinations of negligible to minor potential cumulative impacts need to be re-evaluated.**

35
36
37
38
39
40
41
42
43
44
45

**Topic Summary:** Many commenters said that the cumulative impacts analysis was inadequate. Commenters noted that some information was not included in the cumulative impacts analysis, such as the impacts that could result from climate change and oil and gas activities. Other commenters noted that the cumulative impacts analysis did not address the impacts from the Piñon Ridge Mill. Commenters said the ULP PEIS lacked a detailed cumulative impacts study; excluded an investigation of long-term economic development, transportation corridors, and public health; and failed to consider the combined impacts of all past and present uranium activities in this region. Commenters requested that these analyses be performed for the final issuance of the ULP PEIS.

BLM_0041978

1   **Discussion:** DOE has reviewed the analysis of cumulative impacts in light of these comments to
2   ensure that it is adequately comprehensive to provide a basis for informed, environmentally
3   sound decision making.
4
5        GHG emissions would be small (see discussion in 1.7.3.1).
6
7        Oil and gas projects within the 50-mi (80-km) ROI considered in the PEIS are discussed
8   and evaluated in Section 4.7.2.4. A total of 3,121 wells are located within the ROI studied, as
9   shown in Figure 4.7.2. Table 4.7-8 summarizes potential impacts in the ROI during exploration
10  and future development of oil and gas lease parcels. The cumulative impacts evaluation in
11  Section 4.7.2.2 did analyze all past and present uranium activities within the 50-mi (80-km) ROI.
12  The proposed Piñon Ridge Mill is also evaluated relative to cumulative impacts, since it is within
13  the 50-mi (80-km) ROI addressed in this PEIS. Section 4.7.1.1 describes the Piñon Ridge Mill
14  project and its potential impacts on the environment and human health as discussed in reports
15  prepared by Energy Fuels. This information was then incorporated into Section 4.7.4 to
16  determine the cumulative impacts for this ULP PEIS.
17
18       Studies on long-term economic development, transportation corridors, and public health
19  as suggested by these commenters are not within the scope of this ULP PEIS. However, this ULP
20  PEIS does conservatively analyze the time frame for addressing the life-cycle of the proposed
21  action (i.e., considered the 10-year or longer time that mining activities could occur under the
22  lease terms), and it considers cumulative impacts from all reasonably foreseeable future actions
23  with the 50-mi (80-km) ROI under cumulative impacts.
24
25
26  **1.8  OTHER RELATED, SIMILAR, CONNECTED, OR CUMULATIVE ACTIONS**
27
28       Consistent with NEPA requirements, the identification of related, similar, connected, or
29  cumulative actions to the ULP proposed action was conducted. There are other uranium mining
30  projects planned by other entities for areas near the ULP lease tracts (e.g., Sunday Mines
31  [see Section 4.7.2.2.5]). Although these actions are similar in type of activities conducted and
32  potential impacts on the environment and human health, they are not considered connected to the
33  ULP proposed action, because these other uranium mining projects could or would occur
34  regardless of the ULP proposed action. These projects are, however, included in the cumulative
35  impacts evaluation discussed in Section 4.7 of the ULP PEIS, because they could occur within
36  the ROI for cumulative effects and at the same time frame considered for the ULP proposed
37  action.
38
39       The proposed or ongoing uranium ore milling activities at the proposed Piñon Ridge Mill
40  and at the existing White Mesa Mill could be considered related but not connected to the ULP
41  proposed action. That is, the ore generated from the ULP proposed action could be processed at
42  these nearby mills; however, the White Mesa Mill can continue operating as it currently does and
43  the proposed Piñon Ridge Mill can be constructed and operated regardless of the ULP proposed
44  action. Similar to the uranium mining projects discussed above, the impacts or potential impacts
45  from these two mills are also included in the cumulative impacts evaluation discussed in
46  Section 4.7 of the ULP PEIS.

BLM_0041979

1        In its capacity as a cooperating agency for the ULP PEIS process, CPW provided the
2    following information on an activity that could be related to the ULP proposed action and
3    alternatives evaluated. CPW has been participating in the Dolores River Dialogue (DRD), a
4    coalition of diverse interests whose purpose is to explore management opportunities and build
5    support for and take action to improve the ecological conditions downstream of McPhee
6    Reservoir on the Dolores River. The DRD also seeks to honor water rights, protect agricultural
7    and municipal water supplies, and facilitate the continued enjoyment of rafting and fishing on the
8    Dolores River. A subcommittee of the DRD is the Lower Dolores River Working Group
9    (LDWG), a group that was formed specifically to explore alternatives to the National Wild and
10   Scenic River Act (WSRA) designation. This group identified a "National Conservation Area"
11   (NCA) as its alternative to the current Federal identification of the Dolores River as suitable for
12   WSRA designation. Establishment of an NCA requires Congressional action. Since July of 2010,
13   a legislative subcommittee appointed by the LDWG has been working to define the parameters
14   and goals of the legislation while ensuring the protection of identified Outstandingly Remarkable
15   Values under the WSRA. Part of this effort has contemplated a Federal mineral withdrawal
16   within 0.25 mi (0.4 km) of the Dolores River that could affect the DOE ULP and the ULP PEIS.

## 1.9  CONSULTATION

21       DOE is complying with Executive Order (E.O.) 13175, Section 7 of the ESA, and
22   Section 106 of the National Historic Preservation Act (NHPA) by engaging in consultations with
23   respective tribes, government agencies, and local historical groups. Sections 6.1, 6.2, and 6.3
24   describe the consultation efforts undertaken to date.

26       The government-to-government relationship with Indian tribes was formally recognized
27   by the Federal Government with E.O. 13175 on November 6, 2000, and DOE is coordinating and
28   consulting with Indian tribal governments, Indian tribal communities, and tribal individuals
29   whose interests might be directly and substantially affected by activities on the ULP lands. As
30   part of this consultation, DOE has contacted 25 Indian tribal governments to communicate the
31   opportunities for government-to-government consultations by participating in the planning and
32   resource management decision-making throughout the ULP PEIS process. Five are participating
33   as cooperating agencies, and four are participating as commenting agencies (see Section 1.10).

35       In the NOI (76 FR 36097) to prepare the ULP PEIS, DOE stated that it is preparing to
36   enter into consultation with the USFWS, in compliance with Section 7 of the Endangered
37   Species Act, concerning DOE's management of the ULP. Section 7 requires Federal agencies to
38   consider the effect of their undertakings on species listed under the Act and to consult with the
39   USFWS to ensure that the action or actions that they fund, authorize, or permit are not likely to
40   jeopardize the continued existence of any listed species or result in the destruction or adverse
41   modification of the critical habitat of such species. DOE and the USFWS initiated the informal
42   consultation, and DOE submitted the Final BA to the USFWS on May 14, 2013. The USFWS
43   issued a BO on August 19, 2013. Details are discussed in Section 6.2 of the ULP PEIS.

45       DOE has initiated programmatic consultation, in compliance with Section 106 of the
46   NHPA, concerning DOE's management of the ULP. Section 106 of the NHPA requires Federal

BLM_0041980

agencies to consider the effect of their undertakings on historic properties and to consult with the appropriate SHPO, American Council on Historic Preservation (ACHP), and other parties that have an interest in the effects of the undertaking on historic properties. For the ULP, per the procedure that has historically been and is currently still being carried out, DOE has addressed consultation through the BLM and the lessees on specific undertakings when ULP activities/plans have been proposed. However, since the NHPA allows for the utilization of a programmatic agreement (PA) to govern large or complex projects, and since PAs can be used when effects on historic properties are expected to be similar and repetitive or regional in scope or when these effects cannot be fully determined prior to approval of an undertaking, DOE has initiated the development of a PA for the ULP. Details are discussed in Section 6.3.

## 1.10  COOPERATING AND COMMENTING AGENCIES

DOE invited various Federal, state, and county agencies and tribal nations to participate either as a cooperating agency or commenting agency in the preparation of the ULP PEIS. Since January 2012, monthly, as appropriate, telephone conferences have been held between DOE and the cooperating agencies to develop the ULP PEIS. The following government agencies and tribal groups are participating as cooperating agencies by providing their expertise and required knowledge:

1. *BLM:* Jurisdictional responsibilities in land use planning, designations, or restrictions on and surrounding DOE-withdrawn lands; and an understanding of the potential impacts from increased mining and oil and gas exploration and development. An MOU between the BLM and DOE (BLM and DOE 2010a) is currently in place that identifies the individual and shared roles and responsibilities of DOE and the BLM with respect to the DOE ULP (see Section 5.4 for a summary of this MOU).

2. *EPA:* Expertise in addressing the protection of human health and the environment (e.g., water quality, air quality, and radiation protection).

3. *Colorado Department of Transportation (CDOT):* Knowledge of local and regional transportation systems including primary and secondary highways.

4. *CDRMS:* Expertise in mining and reclamation and the safety requirements attendant to these activities. An MOU between DOE and CDRMS (DOE and CDRMS 2012) is currently in place for the purpose of promoting coordination between DOE and CDRMS to result in efficient and effective oversight of uranium and vanadium mining on the DOE ULP lease tracts (see Section 5.4 for a summary of this MOU).

5. *CPW:* Expertise in addressing the protection of wildlife.

6. *Mesa County Commission:* Expertise in identifying limits to mitigate potential impacts that energy development activities, such as uranium mining, would

BLM_0041981

have on the county's economy, residents, and the environment, including its primary and secondary roadways.

7. *Montrose County Commissioners:* Expertise in socioeconomic, transportation, and water quality issues related to the county.

8. *San Juan County Commission:* Expertise in identifying limits to mitigate potential impacts that energy development activities, such as uranium mining, would have on the county's economy, residents, and the environment, including its primary and secondary roadways.

9. *San Miguel County Board of Commissioners:* Expertise in identifying limits to mitigate potential impacts that energy development activities, such as uranium mining, would have on the county's economy, residents, and the environment, including its primary and secondary roadways and land use and planning.

10. *Navajo Nation:* Knowledge of cultural resources in the area.

11. *Pueblo of Acoma*: Knowledge of cultural resources in the area.

12. *Pueblo de Cochiti*: Knowledge of cultural resources in the area.

13. *Pueblo de Isleta*: Knowledge of cultural resources in the area.

14. *Southern Ute Indian Tribe:* Knowledge of cultural resources in the area.

The following agencies and tribal groups chose to participate as commenting agencies, and they were included in the project distribution list and received the Draft ULP PEIS for review and comment:

1. USFWS,

2. U.S. Nuclear Regulatory Commission (NRC),

3. CDPHE,

4. Utah Department of Transportation (UDOT),

5. Hopi Nation,

6. Ute Indian Tribe,

7. Ute Mountain Ute Tribe, and

8. White Mesa Ute Community.

BLM_0041982

## 1.11  ORGANIZATION OF THE ULP PEIS

The remainder of the ULP PEIS is composed of the following chapters and appendices:

- Chapter 2 describes the alternatives evaluated in the ULP PEIS and compares them with regard to their potential environmental and human health impacts.

- Chapter 3 presents a discussion of the affected environment for each of the resource areas analyzed in the ULP PEIS utilizing site-specific information.

- Chapter 4 provides the results of the evaluation of potential environmental and human health impacts based on site-specific information and assumptions, as appropriate.

- Chapter 5 summarizes applicable requirements relative to the proposed action.

- Chapter 6 summarizes all consultation activities conducted for the proposed action.

- Chapter 7 presents an index for the ULP PEIS.

- Chapter 8 lists references cited in the preparation of the ULP PEIS.

- Appendix A provides examples of leases.

- Appendix B provides a summary of comments received during the public scoping period.

- Appendix C describes the assumptions for the impacts analyses.

- Appendix D describes the methodology used for the impacts analyses.

- Appendix E contains the correspondence between DOE and the USFWS regarding the Endangered Species Act (ESA, Section 7) consultation and (provides the BA and BO for the ULP).

- Appendix F contains the letters of consultation.

- Appendix G provides the list of preparers for the ULP PEIS.

- Appendix H provides the contractor disclosure statement.

- Appendix I presents the comment response document.

BLM_0041983

Case No. 1:20-cv-02484-MSK   Document 39-1   filed 04/27/21   USDC Colorado   pg 84 of 299

1
2
3
4
5
6
7
8
9
10
11
12
13                              *This page intentionally left blank*
14

BLM_0041984

# 2  PROPOSED ACTION AND ALTERNATIVES

Consistent with the purpose and need discussed in Chapter 1, DOE has evaluated five alternatives that address the range of reasonable options for managing the ULP. These options range from terminating all the leases and conducting reclamation where needed, with DOE continuing to maintain oversight of the lands without uranium leasing; terminating the leases and conducting reclamation where needed, restoring the lands to the public domain by the DOI and if approved, placing the lands under BLM's administrative control and terminating the DOE ULP; and continuing the ULP with associated exploration, mine development and operations, and reclamation at some or all of the 31 lease tracts. Table 1.2-1 in Chapter 1 lists the 31 lease tracts and provides information on the current status of each.

DOE developed the range of alternatives by carefully considering DOE's underlying need for action and comments received during the public scoping period for the draft version of the ULP PEIS. The five alternatives are as follows:

1. *Alternative 1:* DOE would terminate all leases, and all operations would be reclaimed by lessees. DOE would continue to manage the withdrawn lands, without uranium leasing, in accordance with applicable requirements.

2. *Alternative 2:* Same as Alternative 1, except once reclamation was completed by lessees, DOE would relinquish the lands in accordance with 43 CFR Part 2370. If DOI/BLM determines, in accordance with that same Part of the CFR, the lands were suitable to be managed as public domain lands, they would be managed by BLM under its multiple use policies. DOE's uranium leasing program would end.

3. *Alternative 3:* DOE would continue the ULP as it existed before July 2007, with the 13 active leases, for the next 10-year period or for another reasonable period, and DOE would terminate the remaining leases.[1]

4. *Alternative 4:* This is the preferred alternative under which DOE would continue the ULP with the 31 lease tracts for the next 10-year period or for another reasonable period.

5. *Alternative 5:* This is the No Action Alternative, under which DOE would continue the ULP with the 31 lease tracts for the remainder of the 10-year period, and the leases would continue exactly as they were issued in 2008.

In the ULP PEIS, DOE has evaluated each alternative for its potential impacts on the following 13 human health and environmental resource areas using available site-specific information (e.g., Cotter Corp. 2011, 2012a–g) in combination with assumptions, as appropriate (see Figure 2-1):

---

[1]  In July 2007, DOE issued a programmatic environmental assessment and finding of no significant impact for the ULP, which a U.S. District Court invalidated on October 18, 2011.

BLM_0041985



1

2  **FIGURE 2-1  Thirteen Human Health and Environmental Resource Areas That Are Evaluated for**
3  **Potential Impacts from Exploration, Mine Development and Operations, and Reclamation**
4
5
6           1.  Air quality,
7           2.  Acoustic environment,
8           3.  Geology and soils,
9           4.  Water resources,
10          5.  Human health,
11          6.  Ecological resources,
12          7.  Land use,
13          8.  Socioeconomics,
14          9.  Environmental justice,
15          10. Transportation,
16          11. Cultural resources,
17          12. Visual resources, and
18          13. Waste management.
19
20          In addition to the above resource areas, DOE has evaluated cumulative impacts
21  (see Section 4.7) that could occur when potential impacts from the proposed action are

BLM_0041986

considered with past, present, and reasonably foreseeable future actions in the region of influence (ROI) for cumulative impacts for the ULP PEIS. The five alternatives are also analyzed for the three phases of uranium mining: exploration; mine development and operations; and reclamation, as applicable to the given alternative. Section 2.1 discusses the three phases of mining, and Section 2.2 describes each alternative and the associated assumptions developed as basis for the evaluation. Section 2.3 provides the discussion on alternatives considered but not evaluated in detail. Section 2.4 summarizes the potential impacts discussed in Chapter 4. Section 2.5 discusses the irreversible and irretrievable commitment of resources that result from the five alternatives; and Section 2.6 discusses the preferred alternative.

## 2.1  URANIUM MINING METHODS AND PHASES

The uranium mining methods that have been used on the DOE ULP lease tracts have included both underground and surface open-pit mining. However, underground mining was used most often in the past and is expected to be the primary method used in the future. The mining activities are conducted in three phases as follows: (1) exploration; (2) mining development and operations; and (3) reclamation. These three phases are described in Sections 2.1.1 through 2.1.3. For the purpose of providing relevant information about where the ore generated from the DOE ULP could be milled or processed, Section 2.1.4 presents descriptions of the two mills that could be available to process the ore generated from the DOE ULP lease tracts: the White Mesa Mill and the proposed Piñon Ridge Mill. The processing of the ore generated at the DOE ULP is outside the scope of the ULP PEIS (see Section 2.3). However, the impacts of ore transportation from the lease tracts to the mills and the potential cumulative impacts of the two mills to the ULP proposed action are evaluated (see Section 4.7).

### 2.1.1  Exploration

The exploration phase is considered a pre-production activity. This phase is typically conducted in a relatively short period of time (i.e., several weeks); however, it can occur annually over the course of several years. It involves planning, obtaining access to the lease tracts, constructing temporary roads as required, and performing exploratory drilling. Exploration holes are drilled to determine the exact location and grade of uranium ore present. A temporary access road is typically prepared to give a drill truck, a pipe truck, and a water truck access to the location identified for exploration; such temporary roads are generally less than 20 ft (6.1 m) in width.

During the exploration phase, surface disturbance would be limited to the minimum area required to obtain a grade and provide for the safe transportation of drilling equipment and personnel. The surface area disturbance would typically include the removal of vegetation and the leveling of high points in the rights-of-way (ROWs). Excavated surface soil material would be stockpiled for use during reclamation. Borrow ditches, crowning, waterbars, culverts, side-slope stabilization measures, and riprap would be used, as necessary, to control erosion.

BLM_0041987

1    Typically, access to a drilling location is established first, and then a site that is about
2    $15 \times 50$ ft ($4.6 \times 15$ m) is leveled to allow a drill rig to operate. Typically four to six exploration
3    holes are drilled by a driller and an assistant. This activity is carried out by the two workers
4    essentially over a short period of time (two days to two weeks). The exploration holes are
5    typically about 6 in. (15 cm) in diameter and can vary in depth from shallow (tens of feet), to
6    moderate (hundreds of feet), to deep (greater than 1,000 feet). During drilling, grab samples are
7    collected from the drill cuttings for every 5 ft (1,5 m) and saved for geologic study. After the
8    exploration holes have been drilled, a probe truck operated by one worker is brought to the site to
9    gamma-log the hole to determine the depth to and width of the ore zone and ore grade. The ore
10   grade is determined by the chemical assay results for the grab samples sent to the laboratory for
11   analysis. After probing is completed, reclamation via plugging of the exploration holes is
12   performed. However, the temporary roads may or may not be reclaimed immediately. This
13   approach allows exploration to be repeated in the same area if necessary, depending on the
14   results of the probe or grab samples. Reclamation of the temporary roads typically involves
15   contouring the surface, followed by revegetation.
16
17   Before this phase can be conducted, an exploration plan must be submitted by the lessees
18   to the DOE for review and approval (see Section 4.7.2.2.7). In addition, a "notice of intent for
19   prospecting" must be submitted to the CDRMS for approval. The exploration plans are to
20   include descriptions of: (1) the specific areas to be explored and the designated proposed access
21   roads (existing or new) to be used, accompanied by maps and aerial photos, as available; (2) the
22   exploration method to be employed; (3) how compliance with NEPA or other applicable
23   environmental requirements is being achieved; and (4) the reclamation to be conducted on the
24   disturbed areas.
25
26   In addition, the lessees would be required to obtain authorization for access to the lease
27   tracts. BLM would administer off-lease access, while DOE would administer on-lease access.
28   The lessees are also responsible for obtaining authorizations from any private, local, and state
29   landowners where oversight is not held by the BLM or DOE.
30
31
32   **2.1.2  Mine Development and Operations**
33
34   As previously mentioned, the most commonly used mining methods for recovering
35   uranium and vanadium ore in the area where the DOE ULP lease tracts are located have been
36   either underground or surface open-pit mining. In situ leaching (ISL) method is not considered to
37   be a viable method because of the location of the ore in "dry" sedimentary strata (see
38   Section 2.4). It is expected that most future mining on the DOE ULP lease tracts would be done
39   by using the underground method because of the location of the anticipated ore resources in the
40   area. Activities common to both underground and surface open-pit mining include accessing the
41   ore deposits, controlling possible pollutants, conducting mine maintenance, hauling ore and
42   waste rock, and transporting ore to the mills for processing.
43
44   When the underground mining method is used, the ore and waste rock from the mine
45   workings are transported through adits (almost horizontal mine entrances) and drifts (mine
46   tunnels) to the aboveground storage and waste-rock pile areas by using rubber-tired (trackless)

BLM_0041988

1    equipment. The ore and mine waste rock can also be transported by similar means to the ore skip
2    and hoisted to the surface through the main production shafts. Some amount of waste-rock
3    material may be placed back or "gobbed" into the mine workings after the ore has been
4    completely mined and in which no groundwater issues have been demonstrated to exist.
5
6          When the surface open-pit mining method is used, overburden consisting of mudstone,
7    shale, and sandstone is removed first to expose the ore deposit. This material is considered mine
8    waste rock and is removed with conventional heavy equipment (such as excavators or shovels,
9    front-end loaders, scrapers, bulldozers, and haul trucks), and transported and stockpiled at an
10   area designated for such material. The waste-rock pile that remains on the surface eventually is
11   graded and vegetated as part of the reclamation activities. The ore is also removed by using
12   similar equipment.
13
14         Before mining, lessees would be required to submit mine plans to DOE for review and
15   approval. Mine plans would include descriptions of the operational activities to be conducted.
16   These operational activities typically involve (1) surface-plant area construction and (2) mine
17   development and operations. These two activities are discussed in more detail in Sections 2.1.2.1
18   and 2.1.2.2. In addition, a "Reclamation Permit Application" (plan of operations) must be
19   submitted to CDRMS for review and approval.
20
21
22   **2.1.2.1  Surface-Plant Area Construction and Operations**
23
24         The following types of infrastructure are typically located at the plant area of a surface
25   mine site (applicable for both underground and open-pit mining methods): buildings; other
26   structures; utilities; a service area; a storage area; mine water discharge and treatment ponds; a
27   mine waste-rock pile; and other waste containment areas. These make up the infrastructure that
28   supports mining operations. This surface area footprint could take up to 25 acres (10 ha),
29   depending on the size of the mine in operation. The surface mine plant configurations would
30   vary depending on the specific project needs and locations of the lease tracts. Figures 2.1-1
31   through 2.1-4 show the surface mine plant configurations that are present or were formerly
32   present at several lease tracts. Figure 2.1-5 is a schematic of a generic mine plant surface
33   configuration.
34
35         Buildings to be constructed could vary, from offices to maintenance shops to storage
36   sheds. They would be constructed and maintained in accordance with Federal, state, and local
37   regulations. Utility needs could include electricity, air, and water. Electricity to operate mining
38   equipment, lighting, and ventilation fans could be supplied by aboveground lines or through
39   generators. Air compressors would be used to supply the air needed for drilling equipment and
40   tools. Water would be hauled to the mine site from a water supplier. Sewage and wastewater
41   would be disposed of through a septic system or a portable facility.
42
43         A service area would also be developed to service vehicles, bulldozers, water trucks, and
44   other heavy equipment used for the mining operations. Fuel storage tanks, water tanks, and
45   55-gal (210-L) oil barrels, if needed for the operations, would be located in this area. As part of
46   maintenance activities, hoses, fuel lines, tank exteriors, and equipment parts stored in the service

BLM_0041989



1
2    FIGURE 2.1-1  Photograph of Mine Plant Surface Configuration at Lease Tract 5

BLM_0041990

1
2



**FIGURE 2.1-2  Photograph of Mine Plant Surface Configuration at Lease Tract 7 (JD-7 Underground Mine)**

BLM_0041991

1
2



FIGURE 2.1-3  Photograph of Mine Plant Surface Configuration at Lease Tract 8

BLM_0041992

1
2



**FIGURE 2.1-4  Photograph of Former Mine Plant Surface Configuration at Lease Tract 13A**

BLM_0041993



1

2 **FIGURE 2.1-5  Schematic of a Generic Mine Plant Surface Configuration**

3

4

5 area would be routinely inspected by the lessee or mine operator. In addition, berms and
6 secondary containment for gasoline, solvent, and oil storage facilities would be installed. If there
7 was a petroleum spill or leak that required notification of Federal and state agencies, the lessee or
8 mine operator would be required to conduct containment and cleanup activities that were
9 consistent with spill prevention and control provisions in the approved mine plan.

10

11       Materials and chemicals needed for mine operations would be stored in compliance with
12 Federal, state, and local regulations. Chemicals would primarily include solvents, oils,
13 degreasers, and other substances used to maintain vehicles. Explosives would also be stored
14 away from areas where volatile substances were located. The approved mine plan would also
15 contain a contingency plan that would outline which types of stored material spills would be
16 reported. Emergency equipment (e.g., first-aid supplies, liquid spill response supplies, and fire

BLM_0041994

1   extinguishers) would also be kept on hand. Emergency equipment, such as mine rescue
2   equipment, would be maintained on site in a centralized location that would allow for quick
3   response times in accordance with Mine Safety and Health Administration (MSHA)
4   requirements.
5
6          Mine water discharge and/or treatment ponds for receiving discharge water from the
7   mines might have to be built. Before construction, the lessees would have to consult with the
8   USFWS to address any concerns that the agency might have. CDRMS requires water treatment
9   ponds to be adequately designed by a certified engineer, lined, provided with a secondary
10  containment, and equipped with a leak monitoring system, as needed. Regulations might require
11  that the ponds be adequately lined, fenced, and netted to ensure that wildlife and livestock and
12  the surrounding environment would not be adversely affected. Water would be pumped into
13  discharge ponds from mine sumps constructed in mine areas where there was an accumulation of
14  water. Mine water would be treated to meet applicable discharge standards, as necessary. Water
15  would then be allowed to flow into a settling pond, where it could be evaporated or discharged to
16  the environment at a discharge location specified per a state water discharge permit and National
17  Pollutant Discharge Elimination System (NPDES) requirements. The state permits are issued and
18  enforced by the CDPHE, Water Quality Control Division. Maintenance of these ponds would
19  include replacing the liners and, when required, reclaiming the ponds after removing the
20  precipitated sediments and liners. Sediment and liners would be disposed of at a state-approved
21  disposal facility. Pond inspection would be conducted by CDPHE as part of its enforcement of
22  the permit. CDRMS also inspects water treatment and stormwater containment structures as part
23  of its permit for maintenance and proper use.
24
25         The surface-plant area would also hold a mine waste-rock pile. Mining operations (both
26  underground and surface open-pit) would involve the removal of rock materials to allow access
27  to the ore deposits of interest. This would result in large amounts of mine wastes. As mentioned
28  previously, some amount of waste rock might be gobbed back into the mine workings after the
29  ore had been completely mined out where no groundwater issues have been demonstrated to
30  exist. Because it is impractical to separate the waste-rock materials, they could contain small
31  quantities of miscellaneous mining-related debris (remnants of mine timbers, drill steels, and
32  other materials used during the ore removal process). Most of the waste-rock pile, however,
33  would be composed of large fractions of coarse rock. The uranium content of the waste-rock pile
34  would be minimal (0% to 0.05% of uranium). State requirements stipulate that any material
35  containing more than 0.05% of uranium be considered radioactive material and be handled
36  accordingly. In this case, the lessees would take the material to the mills for disposition.
37  Colorado State regulations require lessees to construct diversion channels and berms around the
38  waste-rock piles to prevent stormwater runoff from entering or leaving the piles. Rainwater
39  percolating through the coarse rock would not leach significant amounts of uranium. CDRMS
40  regulations require the construction of stormwater diversion ditches as part of the EPP
41  (e.g., Cotter Corp. 2011, 2012a–g). The design for the stormwater diversion ditches has to be
42  approved by an engineer.
43
44         Lastly, mining operations would also generate various types of other waste, including
45  domestic trash (e.g., from lunch rooms, used timbers, old mining equipment, empty 55-gal
46  (208 L) petroleum barrels, and other mining debris). These waste materials would be contained

BLM_0041995

1   temporarily on the surface plant until taken off site to a disposal facility. In addition, the lessee
2   would be required to store and dispose of any hazardous waste that was generated. Similar to the
3   nonhazardous waste, the hazardous waste would also be taken off site for disposal per Federal,
4   state, and local requirements.
5
6
7   ### 2.1.2.2  Mining Method – Underground Mining
8
9       Underground mining would typically be accomplished by a random room-and-pillar
10  method. This method involves leaving random pillars of ore and waste rock in place to provide
11  support while ore material is removed. Two different techniques could be used to mine the ore:
12  (1) the drill, blast, and then muck technique (muck refers to the loading and removal of ore or
13  mine waste rock from the mine); and (2) the continuous-miner technique.
14
15      The first technique could include the use of jackleg drills or similar devices to drill holes
16  2 in. (5 cm) in diameter and 6- to 10-ft (1.8- to 3.0-m) deep in the rock face. The holes would
17  then be filled with explosives that would be detonated. The broken material would be removed
18  with shuttle equipment, such as multi-ton haul trucks or buggies. Split-shooting might also be
19  used in areas with narrow ore seams. With this technique, waste rock would be drilled, blasted,
20  and mucked. The same process would then be used to remove the ore seam. After this, shot-
21  creting, rock-bolting, chain-link fencing, or other methods would be used to support the mined
22  areas.
23
24      The continuous-miner technique would use a machine referred to as a "miner" that
25  removes ore and waste rock without disturbing the surrounding host rock. The miner would
26  deliver the ore and the waste rock directly to haul trucks for removal. The mined-out areas would
27  then be supported in a manner similar to that used for the conventional method just discussed.
28
29      Water would be needed during mining operations. For example, water would be required
30  for underground drilling to suppress airborne dust and to remove cuttings from drill bits. Most
31  underground mines are dry, but some mines, depending on their location, receive seepage from
32  nearby shallow aquifers. This seepage could be one of the sources of water supply for these
33  mines; other sources could include nearby municipal water supplies and other approved sources.
34  If water was not available on site, it would be obtained from the closest available source and
35  hauled to the mines by using water trucks. The amount of water needed would depend on the
36  level of mining activity and the number of workers involved. Applicable Federal, state, and local
37  agency requirements would be met, and permits would be obtained, as appropriate.
38
39      During underground mining operations, the safety of mine workers and protection of the
40  environment would be of primary concern. MHSA regulations would require the lessees to do
41  the following:
42
43      •   Routinely monitor the mine for air quality and noise level. Ventilation shafts
44          to the surface or other ventilation systems would be constructed, as needed, to
45          ensure that the air quality was protective of the workers.
46

BLM_0041996

1      •   Protect the workers from cave-ins by using steel or timber sets and other
2        cribbing materials to brace mine walls, backs (or ceilings), and other surfaces.
3

4      •   Secure mine entrances during periods of temporary shutdown and during
5        periods of daily inactivity. Only authorized individuals would be allowed to
6        enter the mines; the public and wildlife would be discouraged from entry by
7        means of fences, gates, posting, and other barriers.
8
9

10     **2.1.2.3  Mining Method – Surface Open-Pit Mining**
11

12        With the exception of the large surface open-pit mine that exists on Lease Tract 7 (which
13 could resume operations in the future to include a potential increase in the current footprint of the
14 open pit mine area), the surface open-pit mining that could be conducted at the ULP lease tracts
15 would consist of relatively small mining operations and would generally use a trenching method.
16 This method involves the removal of small amounts of waste rock to expose the ore. The ore
17 would then be removed by conventional techniques.
18

19        Larger operations would generally be conducted via a traditional, benched open pit. The
20 depth and size of the ore deposit would dictate the surface dimensions of the pit and benches and
21 the amount and size of equipment used. Underground mines could be used to access ore deposits
22 around the periphery of the main deposit. The maintenance required for the open-pit mine
23 operations would be done primarily to maintain the side walls of the pit, since they are subject to
24 slope failure and erosion from stormwater runoff.
25
26

27 **2.1.3  Reclamation**
28

29        When mining activities were completed and no future intended lease activities remained,
30 the lessee would be required to initiate reclamation activities consistent with the reclamation
31 provisions included in the approved mining plan. The reclamation provisions would be
32 consistent with BLM's reclamation closure guidelines (BLM 1995) and CDRMS regulations.
33 Mine permit and mine permit amendment applications are required to include reclamation plans.
34 The following information is partly abstracted from reclamation plans prepared by Cotter Corp.
35 (2011, 2012a–g).
36

37        Reclamation would include recontouring the land to restore it to its original topography
38 as closely as practicable, replacing surface soil, implementing erosion-control measures, and
39 revegetating disturbed areas with appropriate native and adapted species (a seed mix has been
40 developed for the ULP; see Table 4.1-9 for the list of species included in the seed mix). Surface-
41 plant improvements would be removed in accordance with DOE and other agency requirements.
42 Open shafts, adits, and declines would be closed. Mine waste-rock piles would be graded to a
43 slope (e.g., 3:1 slope or shallower) determined to provide stable soils and where vegetation could
44 grow to desired standards, contoured, covered with surface soil, and seeded in accordance with
45 an approved reclamation plan. Residual ores and other radioactive materials inherent to the site
46 but not taken to the mill for processing would be placed back into the mine workings as part of

BLM_0041997

the portal closure process. Effort would be made to retain all topsoil material removed from the area and stockpiled for use in reclamation. In areas where stockpiled surface soil material was insufficient, surface soil might be borrowed from other areas of the lease tract or from areas preapproved by the BLM. CDRMS would require additional permitting up to and including a possible new permit for any "borrow area" unless it is within the approved CDRMS permit boundaries. DOE would monitor reclamation success each year and would require the lessee to correct problems until the reclamation met state and DOE requirements.

At mine sites, debris and waste (other than waste rock) would be managed according to waste management procedures defined in the mine plans (e.g., waste would be transported to permitted landfills or licensed disposal facilities, as in the case of waste containing low-level radioactivity). Consideration would be given to recycling or returning the materials to the manufacturers, as appropriate. Lessees would be required to comply fully with applicable U.S. Department of Transportation (DOT) requirements (49 CFR Parts 100−180).

Appropriate agencies (e.g., CPW, USFWS, BLM) would be contacted before reclamation activities began to assure that wildlife species that might have taken up residence (e.g., bat or bird species listed as sensitive) would not be adversely affected by permanent shutdown activities. Ecosystem concerns associated with wetland areas would be addressed if a determination was made that wetlands were created as a result of mining operations.

## 2.1.4  Ore Processing

The ore generated from the DOE ULP lease tracts could be taken to two mills for processing—the Proposed Piñon Ridge Mill and the White Mesa Mill (see Figure 2.1-6). The discussion here for the two mills is to provide information about the mills; ore processing is not part of the ULP proposed action. However, as mentioned previously, the impacts of ore transportation from the lease tracts to the mills and the potential cumulative impacts of the two mills (see Section 4.7) to the proposed action are evaluated.

### 2.1.4.1  Piñon Ridge Mill

Energy Fuels Resources Corporation has planned to construct the Piñon Ridge Mill (a conventional uranium mill) in Paradox Valley, between Naturita and Bedrock in Montrose County, Colorado. In early 2011, the Colorado Department of Public Health and Environment (CDPHE) issued a final radioactive materials license to Energy Fuels Resources Corporation (which is an asset of Ontario's Energy Fuels, Inc., located in Lakewood, Colorado), following CDPHE's preparations of a decision analysis and environmental impact analysis (CDPHE 2011d). A group of plaintiffs then challenged that license by filing a lawsuit against CDPHE in Colorado's District Court for the City and County of Denver. On June 13, 2012, the court issued a decision in which it held that the CDPHE had unlawfully issued the license without conducting the necessary administrative procedures. The court set aside CDPHE's action in issuing the license, remanded the case for further proceedings, and ordered CDPHE to convene an additional hearing scheduled for April 2013. On April 25, 2013, CDPHE decided to issue to Energy Fuels

BLM_0041998



**FIGURE 2.1-6  Locations of White Mesa Mill and Proposed Piñon Ridge Mill**

BLM_0041999

1    Resources Corporation a final radioactive materials license that imposed a number of conditions
2    on the construction and operation of the proposed Pinon Ridge Mill (CDPHE 2013). In May
3    2013, a group of plaintiffs filed for judicial review of that CDPHE decision in the District Court
4    for the City and County of Denver.
5
6        The proposed Piñon Ridge Mill would process uranium and vanadium into uranium oxide
7    concentrate (yellowcake) and vanadium oxide concentrate, respectively, by using the solvent
8    extraction process (Energy Fuels Resources 2012a; Edge Environmental, Inc. 2009). The mill is
9    expected to process ore from five to nine mines at any one time, and feeder mines are expected
10   to change over the course of the mill's 40-year lifetime. A surge in uranium exploration, mining,
11   and permitting is anticipated if the mill is constructed, including permitting and development of
12   uranium/vanadium deposits controlled by Energy Fuels Resources (CDNR 25 2012; Energy
13   Fuels Resources 2009; Edge Environmental, Inc. 2009).
14
15       The proposed Piñon Ridge Mill would be constructed on approximately 400 acres
16   (160 ha) of an 880-acre (360-ha) property boundary. Facilities at the mill will consist of mill
17   buildings, including a stockpile pad, mill/leach tank building, boiler building, solvent extraction
18   building, and drying/packaging building; maintenance buildings; waste management facilities
19   such as tailing cells and evaporation ponds; and ancillary facilities, including access roads, an
20   administration building, secondary mill buildings (warehouse, offices, and laboratory), parking
21   facilities, power and heating systems, a fueling station, water pumps, a septic system, and a
22   fence. Construction is anticipated to last 21 months and employ between 125 and 200 workers at
23   its peak. Upon opening, the mill is projected to employ approximately 85 people, working three
24   8-hour shifts, 24 hours per day, 7 days per week, for 350 days per year. Operations are expected
25   to last for 40 years (Piñon Ridge Mill 2012; Edge Environmental, Inc. 2009).
26
27       Host rock will be mined mostly from existing operations (owned and operated by Energy
28   Fuels Resources Corporation) throughout southwestern Colorado and southeastern Utah. Ore
29   would be shipped to Piñon Ridge Mill and received and stored at the ore stockpile pad. From
30   here, the ore will be crushed, mixed with water to create a fine slurry, and then leached with
31   sulfuric acid, resulting in the precipitation of uranium oxide concentrate (yellowcake) and
32   vanadium oxide concentrate, produced at a rate of 500 tons per day. Uranium oxide concentrate
33   would then be shipped to a conversion plant, while the vanadium oxide concentrate would be
34   shipped to a plant that produces ferro-vanadium products (Edge Environmental, Inc. 2009).
35   Energy Fuels is also the lessee for several of the DOE ULP lease tracts.
36
37
38   **2.1.4.2  White Mesa Mill**
39
40       The White Mesa Mill is the only conventional uranium mill operating in the United
41   States. The mill, under the operation of Denison Mines/Energy Fuels Resources Corporation, is
42   located off SH 191, 6 mi (10 km) south of Blanding, Utah. It processes ore from the Colorado
43   Plateau and Arizona Strip as well as from alternate feeds. The mill uses sulfuric acid leaching
44   and solvent extraction to precipitate uranium oxide concentrate (yellowcake) and vanadium
45   oxide concentrate. In addition, the White Mesa Mill is licensed to process 18 different uranium-
46   bearing alternate feed materials, which are processed parallel to conventional uranium ore.

BLM_0042000

Alternate feed materials are uranium-bearing materials other than conventional ores, which are classified as waste products by the generators of the materials (Denison 2012a).

The mill was originally licensed to Energy Fuels, Inc., by the NRC on March 31, 1980, and was renewed in 10-year increments in 1987 and 1997. The State of Utah took over regulatory oversight of the mill in 2004, and the mill license was reissued as a State of Utah Radioactive Materials License on February 16, 2005. In addition, the mill possesses 15 license amendments that allow it to process 18 different alternative feed sources. White Mesa Mill also operates under a groundwater discharge permit and an air quality approval order. Air quality, groundwater, surface water, soil, and vegetation monitoring are conducted at regular intervals, and the results of radiometric scans are reported biannually (Denison 2012a).

Denison Mines took ownership of the mill in December 2006. In February 2007, Denison Mines submitted a formal application and all required documents for license renewal to the Utah Department of Radiation Control, which is currently reviewing public comments received during the public review process. The license remains valid during the license renewal process (UDEQ 2012b; Denison Mines 2012a). In April 2012, Energy Fuels Resources announced the purchase of all Denison Mines' U.S. assets, including the White Mesa Mill. The transaction closed in August 2012, allowing Energy Fuels Resources immediate access to the mill (UDEQ 2012b).

White Mesa Mill is licensed to process an average of 2,000 tons of ore per day and produce 8.0 million lb (3.6 million kg) of uranium oxide per year (Denison 2012a). The mill began processing conventional ore in November 2011, after years of processing only alternate feeds. In 2011, the mill produced approximately 1.0 million lb (0.5 million kg) of uranium oxide and 1.3 million lb (0.6 million kg) of vanadium oxide (Denison 2012b). In full operation, the mill employs approximately 150 people (Denison 2012a).

## 2.2  FIVE ALTERNATIVES EVALUATED

As discussed previously at the beginning of this chapter, DOE evaluated five alternatives for the ULP PEIS; these alternatives are similar to those presented in the NOI (76 FR 36098).

### 2.2.1  Alternative 1

Alternative 1 would involve terminating the existing leases, of which there are currently 29, and conducting reclamation as needed. Two of the 31 lease tracts are not leased. There are currently no ongoing operations on any of the lease tracts, so no ongoing operations would need to be terminated. Reclamation would need to be conducted at 10 of the 31 lease tracts. These 10 lease tracts (5, 6, 7, 8, 9, 11, 13, 15, 18, and 26) shown on Figure 2.2-1 have areas that were disturbed in the past either for exploration or from operations. Table 2.2-1 presents a list of these lease tracts, the lessees, and the approximate acreage that would have to be reclaimed at each lease tract. Existing structures that would have to be removed during reclamation are also listed. Reclamation plans submitted to DOE for review and approval would have to be consistent with

BLM_0042001



FIGURE 2.2-1  **Locations of Lease Tracts Evaluated under Alternatives 1 and 2**

BLM_0042002

1    **TABLE 2.2-1  Lease Tracts Evaluated under Alternatives 1 and 2**

| Lease Tract | Lease Tract Acreage[a] | Approximate Acreage of Mine Site Surface To Be Reclaimed | Structures That Need To Be Removed or Reclaimed | Lease Holder |
|---|---|---|---|---|
| 5 | 151 | 7 | Head frame, hoist house, vent fan, timbered ore bins | Gold Eagle Mining, Inc. |
| 6 | 530 | 8 | Two vent fans | Cotter Corporation |
| 7 | 493 | 210 | Small and large shop buildings, three water treatment ponds, 6,000-gal water tank, vent fan, substation | Cotter Corporation |
| 8 | 955 | 5 | None | Cotter Corporation |
| 9 | 1,037 | 8 | Shop building, four water treatment ponds, three vents, hoist house, pump house, substation | Cotter Corporation |
| 11 | 1,303 | 5[b] | Office trailer, 6,000-gal water tank | Cotter Corporation |
| 13 | 1,077 | 8 | Grated vent | Gold Eagle Mining, Inc. |
| 15 | 350 | 1 | None | Gold Eagle Mining, Inc. |
| 18 | 1,181 | 4 | Shop building, vent fan | Cotter Corporation |
| 26 | 3,989 | 1 | None | Energy Fuels |
| Total | | 257 | | |

a   Indicates total acreage for the lease tract; only disturbed areas need to be reclaimed as listed in the next column.

b   In early November 2005, when construction of the decline was temporarily suspended, Cotter Corporation had disturbed just less than 5 acres (2 ha) and had advanced the decline approximately 300 ft (90 m). The development of the decline created a small mine waste-rock dump at the site, which is how conditions remain to date.

2
3
4   CDRMS requirements. CDRMS requires that reclamation plans take into account existing and
5   planned structures before a permit is issued. The reclamation of these structures is approved prior
6   to the issuance of the permit. Any changes not consistent with the approved plans would require
7   a revision to the CDRMS permit.
8
9        After the leases were terminated and reclamation was completed, DOE would continue to
10  manage the withdrawn lands and not lease these lands for uranium mining purposes. Under
11  Alternative 1, after reclamation was complete, essentially no activity would occur on the lease
12  tracts aside from continued maintenance to assure conditions would remain consistent with
13  Federal, state, and local requirements. Surface rights would continue to be held by the BLM, and
14  current activities approved or permitted by the BLM would continue under BLM oversight.
15
16
17      **2.2.1.1  Basis for Impacts Analyses for Alternative 1**
18
19       The affected environment for resource areas evaluated in the ULP PEIS is discussed in
20  Sections 3.1 through 3.13. Impacts discussed in Chapter 4 are based on assumptions summarized
21  in this section and in Appendix C.

BLM_0042003

1      It is assumed that the 29 leases would be terminated and that reclamation would
2  commence on the lease tracts where it was needed. Currently, there are 14 reclamation permits
3  on developed leases on the ULP issued by CDRMS, and reclamation would be conducted per
4  existing permits, as appropriate. However, since reclamation plans have not been updated
5  recently for any of the lease tracts, assumptions regarding how reclamation would be
6  accomplished have been developed for the purposes of the evaluations presented in the
7  ULP PEIS. Under current lease requirements, it is assumed that reclamation would span a 3-year
8  period, with field work assumed to be completed for all 10 lease tracts within 1 year in order to
9  analyze a "peak year" that could represent the most potential impacts within a given year. An
10 additional time period of about 2 years is incorporated in the assumption to allow an adequate
11 amount of time for the re-seeding to take hold and for the subsequent final approval and release
12 from the state. A workforce of 29 workers would be employed for 1 year to perform the
13 reclamation field work. It is assumed that a team of five workers would be employed for about
14 3 to 4 months to conduct the reclamation needed per lease tract. After completing one lease tract,
15 the teams would then proceed to reclaim the remaining lease tracts. Hence, three teams of
16 five workers each are assumed for the reclamation of the nine lease tracts, excluding Lease
17 Tract 7, where the JD-7 mine is located. It is assumed that an additional 14 workers would be
18 required to complete the reclamation of JD-7 in 1 year. It is also assumed that field work
19 associated with all reclamation would be conducted during the day to mitigate potential noise
20 concerns. This approach is consistent with current lease requirements that reclamation
21 commence and be completed within 180 days of the termination of a given lease.

22
23     Reclamation undertaken for Alternative 1 would require various types of equipment,
24 including front-end loaders, backhoes, dump trucks, bulldozers, flat-bed trailers with a tractor,
25 pick-up trucks, large track hoes, and scrapers (see Appendix C for details).

26
27     Existing waste-rock piles present in some lease tracts would be graded to a slope
28 consistent with the surrounding area (e.g., a 3:1 slope or shallower), covered with surface soil
29 materials (soil or dirt material originally excavated from the lease tract itself), and seeded.

30
31     A seed mix for revegetating the disturbed surface areas, including the graded waste-rock
32 piles, has been developed. The list of species included in the seed mix was developed in
33 consultation with the BLM and has been used within the Slick Rock, Naturita, Uravan, and
34 Gateway, Colorado, areas. Seed selection criteria were based on climate and elevation ranges
35 within these areas. Because surface soil conditions, nutrients, and available moisture can vary
36 within these areas, the successful establishment of six or more of the 12 species is considered
37 adequate. The species making up the seed mix are presented in Table 4.1-9. Revegetation efforts
38 on the disturbed areas would be considered satisfactory when soil erosion resulting from the
39 operation was stabilized and when a vegetative cover representative of the vegetation that was
40 present before the disturbance was reestablished.

41
42
43 **2.2.2  Alternative 2**

44
45     Under this alternative, the same 29 leases addressed in Alternative 1 would be
46 terminated. The primary difference between Alternative 1 and 2 is that under Alternative 2, after

BLM_0042004

1    reclamation was completed by the lessees on the 10 lease tracts listed in Table 2.2-1 and shown
2    on Figure 2.2-1, DOE would relinquish all the withdrawn lands for potential management by
3    BLM in accordance with 43 CFR § 2372.3. DOE's uranium leasing program would end. The
4    land would then be under BLM's administrative control, and DOE would terminate the ULP.
5
6          Under BLM management, private parties could establish new uranium mining claims
7    under the 1872 mining law. The potential impacts from any future potential uranium mining
8    under BLM management would likely be similar to those discussed in the ULP PEIS (e.g., those
9    discussed for Alternatives 3 through 5, depending on the level of mining activity). If BLM
10   determines that the relinquished lands cannot be managed as public domain lands, the General
11   Services Administration (GSA) would evaluate potential management and disposition options.
12
13
14   **2.2.2.1  Basis for Impacts Analyses for Alternative 2**
15
16          The basis for the analysis of impacts for Alternative 2 in the ULP PEIS is the same as that
17   for Alternative 1 (discussed in Section 2.2.1). Activities that could contribute to potential impacts
18   would primarily result from the reclamation activities that would need to be conducted.
19   Therefore, resource needs (e.g., number of workers, equipment) for Alternative 2 are assumed to
20   be the same as those indicated for Alternative 1. Reclamation achieved by DOE's lessees for this
21   alternative is expected to meet the reclamation requirements of DOE, BLM, and CDRMS.
22
23
24   **2.2.3  Alternative 3**
25
26          Under Alternative 3, DOE would continue with exploration, mine development and
27   operations, and reclamation at the 13 lease tracts for which leases existed prior to July 2007. The
28   leases on the remainder of the lease tracts would be terminated. The 13 leases before July 2007
29   were on Lease Tracts 5, 6, 7, 7A, 8, 9, 11, 13, 13A, 15, 18, 21, and 25. Lease Tracts 7 and 7A
30   (separate tracts at that time) were since combined (February 2011) into Lease Tract 7 (held by
31   Cotter Corporation). The lease tracts, which now number 12 (as shown in Figure 2.2-2), either
32   have approved exploration drill holes and/or have existing inactive mines or permits for new
33   underground mines. Of the 12 lease tracts, 9 are leased to Cotter Corporation, and the remaining
34   3 are leased to Gold Eagle Mining, Inc. Table 2.2-2 presents a list of the lease tracts evaluated
35   under Alternative 3. Other relevant information about these lease tracts is also presented.
36
37          This alternative assumes future mine development and operations would occur on the
38   12 lease tracts for the next 10 years or for another reasonable period of time, with subsequent
39   reclamation to be conducted after the operations were considered complete. Leases could be
40   extended after the 10-year period was met. It is expected that all mines to be developed at the
41   12 lease tracts would be underground mines, with the exception of Lease Tract 7, where an
42   open-pit mine currently exists and would likely be operated. This expectation is consistent with
43   the current status of the 12 leases summarized in Table 2.2-2. Notwithstanding the existing,
44   permitted mines located on the lease tracts (that would be expected to resume operations), no
45   new project-specific plans have been submitted to DOE by the lessees. Accordingly, for the
46

BLM_0042005



FIGURE 2.2-2  **Locations of Lease Tracts Evaluated under Alternative 3**

BLM_0042006

1    **TABLE 2.2-2  Lease Tracts Evaluated under Alternative 3**

| Lease Tract | Acreage | Location (County) | Lessee | Current Status |
|---|---|---|---|---|
| 5 | 151 | Montrose | Gold Eagle Mining, Inc. | One existing permitted underground mine |
| 6 | 530 | Montrose | Cotter Corporation | One existing permitted underground mine |
| 7 | 493 | Montrose | Cotter Corporation | Two existing permitted mines: one underground and one very large open pit mine |
| 7A[a] | – | – | – | – |
| 8 | 955 | Montrose | Cotter Corporation | One existing permitted underground mine |
| 9 | 1,037 | Montrose | Cotter Corporation | One existing permitted underground mine |
| 11 | 1,303 | San Miguel | Cotter Corporation | New permit for one underground mine yet to be developed |
| 13 | 1,077 | San Miguel | Gold Eagle Mining, Inc. | Three existing permitted underground mines |
| 13A | 420 | San Miguel | Cotter Corporation | Exploration of one hole approved; drilling and reclamation of the explored area completed |
| 15 | 350 | San Miguel | Gold Eagle Mining, Inc. | One existing permitted underground mine |
| 18 | 1,181 | Montrose | Cotter Corporation | One existing underground mine |
| 21 | 651 | Montrose | Cotter Corporation | Exploration of two holes approved; drilling and reclamation of the explored area completed |
| 25 | 639 | Montrose | Cotter Corporation | Exploration of one hole approved; drilling and reclamation of the explored area completed |

[a]    Lease Tract 7A, which existed in 2007, was combined with Lease Tract 7 in February 2011.

2
3

BLM_0042007

1   purposes of the analyses for the ULP PEIS, additional assumptions have been developed to form
2   the basis of the impacts analyses for Alternative 3, as discussed in Section 2.2.3.1.
3
4
5   **2.2.3.1  Basis for Impacts Analyses for Alternative 3**
6
7        It is assumed that activities associated with the exploration phase would be minor, given
8   that at all 12 lease tracts involved under Alternative 3 contain existing permitted mines or have
9   been the subject of exploration activities. However, assumptions for the exploration phase for
10  Alternative 3 were developed and are summarized in Appendix C (Section C.1). It is assumed
11  that the total disturbed surface area for the exploration of the two small mines, the four medium
12  mines, and the one large mine would be about 0.11 acre (0.04 ha), 0.44 acre (0.17 ha), and
13  0.17 acre (0.06 ha), respectively. The one disturbed area for the very large open-pit mine (the
14  JD-7 mine) is about 210 acres (80 ha). It is further assumed that the total number of workers for
15  the exploration phase for Alternative 3 is eight workers.
16
17       For the purposes of the impact analyses in the ULP PEIS, a "peak year" of activity
18  representing a reasonable upper-bound level of activity was analyzed in order to provide
19  conservative yet reasonable estimates for Alternative 3, addressing impacts that could result from
20  the largest number of mines that could be operated at the same time. The peak year could occur
21  more than once; that is, there could be multiple years with the same number of mines operating
22  at similar ore production rates. It is also reasonable to expect that there would be a smaller
23  number of mines in operation or that ore production could be less in the years other than the peak
24  year(s). Uranium ore from some of the mines could be exhausted before the 10-year lease period,
25  and operations at these mines could end sooner than the 10-year lease period. The potential
26  impacts for years other than the peak year(s) would fall within the range of impacts discussed in
27  Chapter 4.
28
29       For Alternative 3, the potential impacts for the 10-year lease period would be expected to
30  be no more than 10 times those for the peak year, if the assumptions for all 10 years of
31  operations are the same as that for the peak year discussed here.
32
33       For the mine development and operations phase for Alternative 3, it is assumed that a
34  total of eight mines (two small, four medium, one large, and one very large) would be in
35  operation at the same time in the peak year of operations. Although the lessee companies would
36  develop and operate multiple mines at the same time, they would most likely start with one mine
37  at a time per company and move to initiate the second mine after 8 months or so from the start of
38  the first mine, and so on, until all of the mines assumed to operate at the same time would be in
39  operation. This approach would allow the lessees to optimize their resources. The assumptions
40  related to the peak year are considered reasonable given the number of lease tracts involved, the
41  number of mines in operation in previous operational periods at the ULP and given that they
42  reflect reasonable expectations regarding potential mining that could be conducted in the near
43  future.
44
45       Given that Colorado State permits have already been obtained for most of the lease tracts
46  and given that that these permits remain in effect, the peak year of operations for Alternative 3

BLM_0042008

1  could occur as early as year 5 or 6 after the first mine development commenced. The lessees
2  would have to submit a plan to DOE for review and approval prior to the commencement of
3  mining. For existing mines on some of the lease tracts, however, operations could resume sooner
4  and simultaneously; this could result in a peak year that would occur sooner. There could be
5  several peak years, depending on how much ore was available on the lease tracts. It is also
6  expected that some of the mines would be terminated before others, depending on the availability
7  of ore deposits. A 10-year lease period would allow for, on average, about 6 years of operations
8  for each of the mines, and that amount of time might or might not be enough to exhaust the ore
9  that would be available, depending on the lease tracts. However, under Alternative 3, the lease
10 period for a given lease could be extended beyond the 10-year period for another reasonable
11 period, which would then allow additional time for mining operations.
12
13       Other assumptions made to estimate potential impacts from this alternative include the
14 tonnage that would be generated by each mine, the size of the surface area that would be
15 disturbed by each mine, the number of workers needed, and the amount of water needed for each
16 mine. (It is assumed that this water would be trucked into the work site and used as potable
17 water, for showers, and for other activities such as dust control.) For Alternative 3, it is assumed
18 that in addition to the two retention pond systems that currently exist at ULP mine sites (located
19 at medium-size mines at Lease Tracts 7 and 9), an additional two new retention pond systems
20 could be utilized for the new mines. Potential future mining operations at Lease Tracts 8 and 13
21 could encounter water that might need to employ retention pond systems. These ponds are
22 primarily intended to capture surface water and prevent sediment from entering nearby streams
23 and drainages. The pond volumes are between 330,000 gal (about 1 acre-ft) and 470,000 gal
24 (about 1.5 acre-ft) with discharge rates of between 160,000 gal/mo (0.5 acre-ft/mo) and
25 280,000 gal/mo (0.86 acre-ft/mo). These assumptions are generally based on past uranium
26 mining experiences in the area and are summarized in Table 2.2-3 (see Appendix C for details).
27
28       While the existence of ore stockpiles during active mining operations is expected, the
29 duration is not expected to affect human health and the environment. The Colorado State
30 regulations prohibit the stockpiling of ore at the mine sites for more than 180 days.
31
32       For the reclamation phase, a workforce of 29 workers would be employed for a 1-year
33 period to perform the reclamation field work for a peak year (see Appendix C for additional
34 details). It is assumed that a team of five workers would be employed for about 3 to 4 months
35 (adjusting for seasonal considerations) to conduct the reclamation needed per lease tract. Hence,
36 three teams of five workers each are assumed for the reclamation of the nine lease tracts,
37 excluding the JD-7 mine. It is assumed that an additional 14 workers would work on the
38 reclamation of the JD-7 mine for 1 year. The peak year of reclamation has been analyzed to
39 address a reasonable upper-bound scenario to provide a conservative estimate of potential
40 impacts; however, it is expected that reclamation would be conducted for a given lease tract
41 when mining operations were considered complete. Similar to Alternatives 1 and 2, it is assumed
42 that field work associated with reclamation would be conducted during daytime work hours.
43
44       Reclamation undertaken for Alternative 3 would require the same equipment as that
45 discussed for Alternatives 1 and 2. Details on assumptions related to (1) other materials needed

BLM_0042009

1  **TABLE 2.2-3  Number of Mines, Ore Production Rate, Disturbed Surface Area, Number of**
2  **Workers, and Water Usage Assumed for the Peak Year of Operations under Alternative 3**

| Parameter Assumed | Values for Parameter per Mine Size | | | | |
| | Small | Medium | Large | Very Large | Total of All Sizes |
|---|---|---|---|---|---|
| Number of mines | 2 | 4 | 1 | 1[a] | 8 |
| Ore production total (tons/d) | 100 (50 per mine) | 400 (100 per mine) | 200 | 300 | 1000[b] |
| Total disturbed acreage | 20 (10 per mine) | 60 (15 per mine) | 20 | 210[c] | 310[d] |
| Number of workers[e] | 14 (7 per mine) | 44 (11 per mine) | 17 | 51 | 126 |
| Water usage (gal/mo) | 15,200 (7,600 per mine) | 124,000 (31,000 per mine) | 46,000 | 160,000 | 345,000[f] |

[a]  This is the large open-pit mine that currently exists on Lease Tract 7, also known as the JD-7 open-pit mine.

[b]  This amounts to a total of 20,000 tons per month, assuming 20 days per month of operations; and to a total of 2,400,000 tons, assuming 10 years of operations at the peak year level.

[c]  The 210 acres at the JD-7 mine is already disturbed. In addition, about 80 acres have already been disturbed for the topsoil storage area, which is located on private land and not on the lease tract.

[d]  After accounting for the 210 acres already disturbed at the JD-7 mine, there would be 100 acres of additional disturbance under Alternative 3, based on the assumptions made for the purposes of the ULP PEIS.

[e]  It is assumed that the number of workers at each small mine would work for one shift and that the workers at the medium, large, and very large mines would work for two to three shifts.

[f]  For the JD-7 open-pit mine, water usage assumed is for 6 months only (summer) for dust suppression activities. Assuming 10 years of operation at the peak-year level, 120 ac-ft of water would be used. Annual water usage is about 3,200,000 gal (9.8 ac-ft). See Appendix C for details.

3
4
5  for both the mine development and operations phase and the reclamation phase, (2) the cost of
6  equipment and materials needed, and (3) the sanitary and other waste generated are provided in
7  Appendix C. Data on the emissions generated from these phases of mining for Alternative 3 are
8  also provided in Appendix C.
9
10
11  **2.2.4  Alternative 4**
12
13      All 31 lease tracts (see Table 1.2-1 and Figure 1.4-1 in Chapter 1) are assumed to be
14  available for potential exploration and mining of uranium ores under Alternative 4. Leases on the
15  ULP lease tracts would be continued for the next 10 years or for another reasonable period, as
16  appropriate. The current leases include the stipulation for extending the lease period for a given
17  lease, as needed.
18
19      As discussed previously in Section 1.7, Lease Tract 8A and Lease Tract 14 (i.e., Lease
20  Tracts 14-1, 14-2, and 14-3) are currently not leased. Lease Tract 8A is a small tract that is
21  isolated and may be located entirely below or outside the uranium-bearing formation, which
22  could indicate a lack of ore. Lease Tract 14 is composed of three parcels (14-1, 14-2, and 14-3).

BLM_0042010

There was some interest in Lease Tracts 14-1 and 14-2 by potential lessees in the past; however, the third tract (14-3, which lies east of 14-1) is located almost entirely within the Dolores River corridor and was never leased. The leases stipulate that no new mining activity could be conducted within 0.25 mi (0.4 km) of the Dolores River.

As is the case for Alternative 3, no new project-specific plans have been submitted to DOE by the lessees with regard to where and how many mines might be developed and operated in the near future. For the purposes of the analyses for the ULP PEIS, various assumptions have been developed to form the basis of the impact analyses for Alternative 4. These assumptions are discussed in Section 2.2.4.1. Current expectations indicate that most, if not all, of the mines would be underground, with the exception of the JD-7 mine on Lease Tract 7, which is a surface open-pit mine.

### 2.2.4.1  Basis for Impacts Analyses for Alternative 4

It is assumed that under Alternative 4, there would be a total of 19 mines operating at various production rates at the same time during what would be considered the peak year of operations. Similar to Alternative 3, it is further assumed for Alternative 4 that there would be a smaller number of mines in operation in the years other than the peak year, and that this peak year could occur more than once (that is, there could be multiple years with the same number of mines operating at similar ore production rates). It is expected that the potential impacts for years other than the peak year(s) would fall within the range of impacts discussed in the ULP PEIS in Chapter 4. Similar to Alternative 3, the potential impacts for 10 years of operation would be expected to be no more than 10 times those for the peak year, if the assumptions for all 10 years would be the same as that assumed for the peak year discussed here.

Table 2.2-4 presents the assumed number of mines and associated production rates. The size of the mine (small, medium, large, or very large) was assigned based on the assumed ore production rate. The disturbed surface area, which varies somewhat depending on the size of the mine, is also presented in the table.

These assumptions were developed based on a review of historical information and current expectations regarding potential mining that could be conducted in the near future (see Appendix C for detail). For the exploration phase for Alternative 4, it is assumed that a total of 0.33 acre (0.13 ha), 1.1 acre (0.44 ha), and 0.33 acre (0.13 ha) of surface would be disturbed for the 6 small, 10 medium, and 2 large mines assumed, respectively. For the very large mine, 210 acres (92 ha) has already been disturbed at the JD-7 surface open-pit mine. A total of 20 workers would be required to conduct the exploration phase for the number of mines assumed for Alternative 4 (not including the very large open-pit mine at JD-7, for which exploration is assumed to have been completed).

For Alternative 4, an additional important factor taken into account for the assumed ore production rate in the peak year was the milling capacity at the White Mesa Mill and the proposed Piñon Ridge Mill. The maximum capacities were estimated to be 2,000 tons/d for White Mesa Mill and 1,000 tons/d for Piñon Ridge Mill. However, the proposed Piñon Ridge

BLM_0042011

1   **TABLE 2.2-4  Number of Mines, Ore Production Rate, and Disturbed Surface Area Assumed**
2   **for the Peak Year of Operations under Alternative 4**

| Parameter Assumed | Value for Parameter per Size of Mine | | | | |
| --- | --- | --- | --- | --- | --- |
| | Small | Medium | Large | Very Large (JD-7)[a] | Total of All Sizes |
| Number of mines | 6 | 10 | 2 | 1 | 19 |
| Ore production rate (tons/d) | 300 (50 per mine) | 1000 (100 per mine) | 400 (200 per mine) | 300 | 2000[b] |
| Total disturbed surface area (acres) | 60 (10 per mine) | 150 (15 per mine) | 40 (20 per mine) | 210[a] | 460[c] |

[a]  The one very large mine that is assumed is the JD-7 open-pit mine (on Lease Tract 7), which has been
explored and developed but is currently not in operation. The area developed is about 210 acres.

[b]  Total tonnage per day that is assumed to be produced exceeds the assumed milling capacity of
1,500 tons/d, but it is further assumed that the excess tonnage produced could be stockpiled for a few
days, since the mills process ore on 7 days per week, while production typically occurs only on 5 days
per week. Total tonnage of ore generated for 10 years of operation at the peak-year level would be about
4,800,000 tons.

[c]  The total additional area that would be disturbed would be 250 acres, since 210 acres from the JD-7 mine
is already accounted for from previous disturbance. The total area disturbed for Alternative 4 is
460 acres. This acreage should remain the same through the life of Alternative 4.

3
4
5   Mill is expected to process only up to 500 tons/d in its initial operating period once it is built, and
6   it is expected to reach its maximum capacity of 1,000 tons/d only after several years of operation.
7   Appropriate approvals would also have to be obtained before the proposed Piñon Ridge Mill
8   could increase its milling capacity. Also, the proposed Piñon Ridge Mill is expected to process
9   uranium ore from other mines in addition to the ore generated from the DOE ULP lease tracts,
10  and doing so could take up at least 65% of its milling capacity. The White Mesa Mill also
11  processes ores from other sources. Hence, the assumption of 2,000 tons/d of total ore production
12  on the DOE ULP lease tracts in the peak year could be considered reasonably conservative in
13  that it takes into account the optimal milling capacity that could be available if the mills operated
14  for 7 days per week.
15
16          The peak year could occur as early as the seventh year after operations began, for each of
17  the five companies holding the leases. It is assumed that each company would begin mine
18  development and operations at one mine at a time, with the second mine being developed about
19  8 months after the first one, and so on, until the entire number of mines planned to operate at the
20  same time would be in operation. It is also likely that the resources for some of the mines would
21  be exhausted after several years (e.g., the resources for the mines that were placed into operation
22  first could be exhausted after six years, so the potential impacts for the years before and after the
23  peak year[s] would be less). This assumption allows for 2 to 3 years for obtaining permits and
24  plan approvals.

BLM_0042012

1    Other assumptions developed for these alternatives include those associated with the
2  number of workers needed; the number and types of equipment utilized; utilities, water, and
3  other materials (including diesel fuel and explosives) consumed; and overall capital and
4  operational costs (including worker compensation). Waste generated from operations would
5  include a relatively large amount of waste rock, in addition to rubbish from supplies and
6  materials used at the mines and trash generated by the workers (such as lunch room garbage).
7  Details are provided in Appendix C.
8
9    As discussed in Section 2.1, some amount of waste-rock material might be "gobbed"
10  back into the mine workings after ore generation was completed for a particular phase of
11  operations as long as groundwater issues do not exist at the given lease tract. The remaining
12  waste rock would be brought to the surface, stockpiled, covered with a layer of soil materials,
13  and ultimately graded to be consistent with the slope of the area, then seeded to conform to its
14  surroundings. Waste-rock material is considered that material containing a uranium
15  concentration of 0.05% or less. Other waste material or trash would be collected and transported
16  to a waste dump or landfill located in nearby Naturita.
17
18    The number of workers needed for mine development and operations would depend on
19  the size of the mine and could vary from 7 to 51 workers. It is assumed that 7, 11, 17, and
20  51 workers would be needed for each small, medium, large, and very large mine, respectively.
21  These workers would consist mostly of mine workers, with part-time support (as appropriate)
22  provided by administrative, environmental specialist, mechanic, geologist, and engineering staff.
23  Larger mine operations, such as those at a very large open-pit mine, might require a full-time
24  mechanic on staff. Appendix C presents additional information on the number and types of
25  workers assumed for the analysis.
26
27    Equipment needed for mine development and operations would include both underground
28  and surface equipment. The number and types of equipment assumed are listed in Appendix C.
29  The equipment includes diesel skid-steer loaders, diesel trucks or buggies, development drills,
30  production drills, exploration drills, backhoes, highway haul trucks, scrapers, and power
31  generators. The items of equipment needed for mine development and operations at the one very
32  large mine evaluated (the JD-7 surface open-pit mine on Lease Tract 7) are different than those
33  needed for the underground mines assumed under this alternative; primarily surface equipment
34  would be needed at Lease Tract 7.
35
36    Water would also be needed and would be trucked in. The volume of water assumed to
37  be needed for a given size of mine is presented in Table 2.2-5. The annual amount of water
38  needed for the 19 mines assumed for Alternative 4 would be about 6,300,000 gal (19 ac-ft). For
39  the use of retention ponds, similar to the discussion in Section 2.2.3.1 for Alternative 3, as many
40  as four retention pond systems would be used to capture surface water and prevent sediment
41  from entering nearby streams and drainages. Similar pond volumes and discharge rates are
42  discussed in Section 2.2.3.1.
43
44    Reclamation of the mine operations for Alternative 4 would involve 39 workers over the
45  course of a peak year. It is also assumed that there would be a waiting period of about 1 or
46  2 years to account for following up on the revegetation and obtaining the necessary release and

BLM_0042013

1        **TABLE 2.2-5  Amount of Water To Be Utilized per Mine under Alternative 4**

| Parameter Assumed | Value for Parameter per Size of Mine | | | | |
|---|---|---|---|---|---|
| | Small | Medium | Large | Very Large (JD-7)[a] | Total of All Sizes |
| Number of mines | 6 | 10 | 2 | 1 | 19 |
| Amount of water utilized per mine (gal/mo) | 7,600 | 31,000 | 46,000 | 160,000[b] | – |
| Total amount of water utilized (gal/mo) | 45,600 | 310,000 | 92,000 | 160,000 | 610,000[c] |

[a]   The "very large" mine category applies to the JD-7 open-pit mine only.

[b]   The 160,000 gal/mo (0.5 ac-ft) used at the JD-7 mine (since showers are not provided for surface workers) is primarily for dust control and only for six months (summer months).

[c]   This amounts to 610,000 gal/mo (1.9 ac-ft/mo) for the six summer months; water use per month for the non-summer months would be about 448,000 gal/mo or 1.4 ac-ft/mo (water use for JD-7 is not included for the non-summer months). Assuming 10 years of operation at the peak-year level, 186 ac-ft of water would be used. Annual water usage would be about 6,300,000 gal or 19 ac-ft. See Appendix C for details.

approval from DOE, BLM, and CDRMS. The equipment required would be similar to that discussed for Alternatives 1 through 3; details are presented in Appendix C.


**2.2.5  Alternative 5**

The primary difference between Alternatives 4 and 5 is that the leases for Alternative 5 would be for the remainder of the 10-year period and the leases would continue exactly as they were executed in 2008. This is the No Action Alternative and reflects the current status for the management of the ULP. The ULP is administering the 29 leases that existed in 2008. So far, the 10-year period for these leases has been extended for a time period equivalent to the time taken to prepare and complete the ULP PEIS. It is currently projected that the leases would be extended by about 3 years, which means that instead of expiring in 2018, as originally stipulated, the leases would now be expiring in 2021. The lease tracts are listed in Table 1.2-1, and the locations are shown on Figure 1.4-1. The basis for the impacts analyses for Alternative 5 is discussed next in Section 2.2.5.1.


**2.2.5.1  Basis for Impacts Analyses for Alternative 5**

It is assumed that because the lease period for Alternative 5 is shorter than that for Alternative 4, a similar number of mines could be operated in a peak year, but to increase ore production, individual mines would be larger (e.g., there would be more medium mines and no small mines). This would enable the production of as much uranium ore as reasonable within the shorter time frame of Alternative 5. Assuming a starting year of 2014, the peak year could

BLM_0042014

1   reasonably occur after 2 to 3 years from when mine development and operations began (i.e., in
2   2017 or 2018). The end of the lease period could be in 2021, accounting for the 3 years that
3   elapsed from 2008 (when the leases were signed) to 2011 (when the U.S. district court stayed the
4   leases) and the additional 7 years after 2014 (when the ULP PEIS is expected to be completed
5   and DOE will move the district court to dissolve its injunction). Assumptions for the number of
6   mines in the peak year, ore production rate, and surface area disturbed per mine of a given size
7   are summarized in Table 2.2-6.

9       The number of workers assumed for Alternative 5 is similar to that assumed for
10   Alternative 4 for a given mine size. It is also assumed that workers for the medium, large, and
11   very large mines would work for two to three shifts.

13       Water would also be required and would be trucked in. Use of retention ponds would be
14   similar to that assumed for Alternative 4. The volume of water assumed to be needed for a given
15   size mine is presented in Table 2.2-7.

17       Reclamation for Alternative 5 is assumed to involve 39 workers over the course of a peak
18   year, similar to the assumption for Alternative 4. It is also assumed that there would be a waiting
19   period of about 1 to 2 years to account for following up on the revegetation and obtaining the

22   **TABLE 2.2-6  Number of Mines, Ore Production Rate, and Disturbed Surface Area**
23   **Assumed for the Peak Year of Operations under Alternative 5**

| | Value for Parameter per Size of Mine | | | |
| Parameter Assumed | Medium | Large | Very Large (JD-7)[a] | Total of All Sizes |
|---|---|---|---|---|
| Number of mines | 16 | 2 | 1 | 19 |
| Ore production rate (tons/d) | 1,600 (100 per mine) | 400 (200 per mine) | 300 | 2,300[b] |
| Total disturbed surface area (acres) | 240 (15 per mine) | 40 (20 per mine) | 210[a] | 490[c] |

[a]  The one very large mine that is assumed is the JD-7 open-pit mine (on Lease Tract 7), which has been explored and developed but is currently not in operation. The area developed is about 210 acres.

[b]  The total tonnage per day that is assumed to be produced exceeds the assumed milling capacity of 1,500 tons/d, but it is further assumed that the excess tonnage produced could be stockpiled for a few days, since the mills process ore on 7 days per week, while production typically occurs on only 5 days per week. The total weight of ore generated for 10 years of operations at the peak-year level would be about 5,520,000 tons.

[c]  Total additional area that would be disturbed would be 280 acres, since 210 acres from the JD-7 mine is already accounted for from previous disturbance. The total area disturbed for Alternative 5 is 490 acres. This acreage should remain the same through the life of Alternative 5.

BLM_0042015

TABLE 2.2-7  **Assumed Amount of Water To Be Utilized per Mine under Alternative 5**

| Parameter Assumed | Value for Parameter per Size of Mine | | | |
| --- | --- | --- | --- | --- |
| | Medium | Large | Very Large (JD-7)[a] | Total of All Sizes |
| Number of mines | 16 | 2 | 1 | 19 |
| Amount of water utilized per mine (gal/mo) | 31,000 | 46,000 | 160,000[b] | – |
| Total amount of water utilized (gal/mo) | 496,000 | 92,000 | 160,000 | 748,600[c] |

[a]   The very large mine category applies to the JD-7 open-pit mine (on Lease Tract 7) only.

[b]   The 8,000 gal/d used at the JD-7 mine (since showers are not provided for surface workers) is primarily for dust control during the summer (assumed to be for 6 months) .

[c]   This amounts to 748,000 gal/mo (2.3 ac-ft/mo) for the six summer months assumed. The monthly water usage for the non-summer months would be about 588,000 gal/mo (1.8 ac-ft/mo). Assuming 10 years of operation at the peak-year level, 250 ac-ft of water would be used. Annual water usage would be about 8,000,000 gal, or 25 ac-ft. See Appendix C for details.

necessary release and approval from DOE, BLM, and CDRMS. The equipment required would be similar to that discussed for Alternatives 1 through 4.

## 2.3  ALTERNATIVES CONSIDERED BUT NOT EVALUATED IN DETAIL

DOE identified the range of alternatives for detailed analysis based on the purpose and need for agency action described in Section 1.4.

DOE has focused the ULP PEIS on its authority to manage the leasing of land with known uranium resources withdrawn under AEA Public Land Order 459. The extracted ore would later be converted, enriched, and fabricated into nuclear fuel; used in commercial reactors; possibly reprocessed; and ultimately result in the generation of various radioactive wastes requiring specialized disposal. The ULP PEIS does not discuss the impacts of these actions. The quantity of uranium available on the DOE ULP lease tracts (estimated to be 13.5 million lb, or 6.1 million kg) represents approximately only 1.5% of the available domestic uranium reserves (nearly 900 million lb, or 410 million kg). These domestic reserves represent approximately 7% of the world's known uranium reserves. No decisions to be made under the ULP would affect environmental impacts from the use of uranium, including the management of the back end of the nuclear fuel cycle. All components of the nuclear fuel cycle will continue to be addressed by proposal-specific and site-specific environmental analyses by the appropriate governmental entity.

BLM_0042016

1    There is no need to evaluate the ISL method for mining uranium in the ULP PEIS
2  because it is not considered to be a viable option due to the location of the ore in "dry"
3  sedimentary strata. The ISL method is not suitable considering the geology of the DOE ULP area
4  and the manner in which the uranium ore is located on the lease tracts. The uranium ore at the
5  DOE ULP lease tracts is expected to be deposited along roll fronts following stream bends. The
6  ISL method would require that the ore be located within areas where groundwater is present in
7  relative abundance, which is not the case at the DOE ULP lease tracts. In addition, past mining
8  operations on the lease tracts have been primarily underground (and current permits have been
9  primarily for underground mining).
10
11
12  **2.4  SUMMARY AND COMPARISON OF THE POTENTIAL IMPACTS FROM THE**
13      **FIVE ALTERNATIVES**
14
15    The impact analyses discussed in the ULP PEIS use a four-level classification scheme to
16  characterize the impacts from the various mining phases (exploration, mine development and
17  operations, and reclamation) under the five alternatives. Table 2.4-1 provides the intended
18  meaning of the qualitative terms used to describe the levels of potential impact for the various
19  resources evaluated in the ULP PEIS. Sections 2.4.1 through 2.4.14 describe the potential
20  impacts from the five alternatives evaluated for each of the environmental resource areas and
21  human health (see Tables 2.4-4 through 2.4-9, which appear after Section 2.4.14, so as to not
22  interrupt the flow of text). Measures identified to minimize potential impacts summarized in this
23  section are identified in Section 4.6. The measures are categorized as compliance measures,
24  mitigation measures, or best management practices (BMPs). The compliance measures are those
25  that are required by Federal or state regulations. Mitigation measures are ones that are required in
26  the current leases or would be included when the leases are modified. Finally, BMPs are
27  measures considered to be good industry practices that would be considered during
28  implementation.
29
30
31  **2.4.1  Air Quality**
32
33    Potential air quality impacts under the alternatives evaluated are presented in
34  Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, and 4.5.1. Under Alternatives 1 and 2, the potential impacts on
35  ambient air quality from reclamation activities are anticipated to be minor and temporary. The
36  primary source of emissions could be engine exhaust from heavy equipment used during
37  reclamation and from fugitive dust that would result from earth-moving activities and exposed
38  ground and stockpiles. Criteria pollutants evaluated indicate particulate matter (PM) emissions
39  for the peak years would be at about 0.5% and 0.9% of the three-county (Mesa, Montrose, and
40  San Miguel Counties) total emissions for $PM_{2.5}$ and $PM_{10}$, respectively. Among the non-PM
41  emissions (carbon monoxide [CO], nitrogen oxides [$NO_x$], sulfur dioxide [$SO_2$], volatile organic
42  compounds [VOCs], and greenhouse gases [GHGs such as carbon dioxide or $CO_2$]), $NO_x$
43  emissions from diesel combustion of heavy equipment and trucks could be highest at 0.09% of
44  the three-county total emissions. These low emission levels are not anticipated to cause
45  measurable impacts on regional ozone ($O_3$), and potential impacts to climate change would be
46  negligible.

BLM_0042017

1    **TABLE 2.4-1  Meaning of Qualitative Terms Used To Describe Potential Impact Levels**

| Resource/System | Impact Level | | | |
|---|---|---|---|---|
| | Negligible | Minor | Moderate | Major |
| Air quality | No measurable impacts. | Most impacts on affected resource could be avoided with proper mitigation. If impacts occur, the affected resource would recover completely without mitigation once the impacting stressor is eliminated. | Impacts on the affected resource are unavoidable; the viability of the affected resource is not threatened, and would recover completely if proper mitigation is applied or proper remedial action is taken once the impacting stressor is eliminated. | Impacts on the affected resource are unavoidable; the viability of the affected resource may be threatened, and the affected resource would not fully recover even if proper mitigation is applied or remedial action is implemented once the impacting stressor is eliminated. |
| Acoustic environment | Same as for air quality. | Same as for air quality. | Same as for air quality. | Same as for air quality. |
| Soil resources | Same as for air quality. | Same as for air quality. | Same as for air quality. | Same as for air quality. |
| Water resources | Same as for air quality. | Same as for air quality. | Same as for air quality. | Same as for air quality. |
| Human health | Potential impacts are calculated and results compared to appropriate regulatory limits or guidelines. | Potential impacts are calculated and results compared to appropriate regulatory limits or guidelines. | Potential impacts are calculated and results compared to appropriate regulatory limits or guidelines. | Potential impacts are calculated and results compared to appropriate regulatory limits or guidelines. |
| Ecological resources[a] | Same as for air quality. | Same as for air quality. | Same as for air quality. | Same as for air quality. |
| Land use | No measurable impacts. | Adverse impacts on the affected activity, community, or resource could be avoided with proper mitigation. Impacts would not disrupt the normal or routine functions of the affected activity, community, or resource. The | Impacts on the affected activity, community, or resource are unavoidable. Proper mitigation would reduce impacts substantially during the life of the project. A portion of the affected activity, community, or | Impacts on the affected activity, community, or resource are unavoidable. Proper mitigation would reduce impacts substantially during the life of the project. Resources could incur long-term effects or |

2

BLM_0042004

**TABLE 2.4-1  (Cont.)**

| Resource/System | Negligible | Minor | Moderate | Major |
|---|---|---|---|---|
| | | Impact Level | | |
| Land use (Cont.) | | affected activity, community, or resource would return to a condition of no measurable effects once the impacting stressor is eliminated. | resource would have to adjust somewhat to account for disruptions due to impacts of the project. The affected activity, community, or resource would return to a condition of no measurable effects once the impacting stressor is eliminated. | unavoidable disruptions to a degree beyond what is normally acceptable. The affected activity, community, or resource would return to a condition of no measurable effects once the impacting stressor is eliminated. |
| Socioeconomics | Same as for land use. | Same as for land use. | Same as for land use. | Same as for land use. |
| Environmental justice | Same as for land use. | Same as for land use. | Same as for land use. | Same as for land use. |
| Transportation[b] | Radiological impacts are governed by regulations and were found to be negligible. Traffic accident injuries and fatalities are proportional to the distance travelled, with no fatalities expected under any alternative. One potential traffic injury could occur under some alternatives. | Radiological impacts are governed by regulations and were found to be negligible. Traffic accident injuries and fatalities are proportional to the distance travelled, with no fatalities expected under any alternative. One potential traffic injury could occur under some alternatives. | Radiological impacts are governed by regulations and were found to be negligible. Traffic accident injuries and fatalities are proportional to the distance travelled, with no fatalities expected under some alternative. One potential traffic injury could occur under some alternatives. | Radiological impacts are governed by regulations and were found to be negligible. Traffic accident injuries and fatalities are proportional to the distance travelled, with no fatalities expected under any alternative. One potential traffic injury could occur under some alternatives. |
| Cultural resources | Same as for land use. | Same as for land use. | Same as for land use. | Same as for land use. All of the affected resource would be permanently damaged or destroyed. |

BLM_0042019

**TABLE 2.4-1  (Cont.)**

| Resource/System | Negligible | Minor | Moderate | Major |
|---|---|---|---|---|
| | | Impact Level | | |
| Visual resources[c] | *No contrast:* The contrast is technically visible but unlikely to be seen by the casual observer and unlikely to create discernible contrast. | *Weak contrast:* The contrast is unlikely to be seen by the casual observer but is noticeable to those who look closely at the affected area. | *Moderate contrast:* The contrast is likely to be seen by anyone but does not strongly attract and hold visual attention. | *Strong contrast:* The contrast is strong enough to attract and hold visual attention and may dominate the view. |

[a]  Ecological resources include vegetation, wildlife, aquatic biota, and threatened, endangered, and rare species. For most biota, these levels are based on population-level impacts rather than impacts on individuals. For species listed under the ESA, the impact levels consider impacts on individuals, when appropriate, as well as on populations. Impacts on species listed under the ESA are discussed using impact levels consistent with determinations made in ESA Section 7 consultation with the USFWS.

[b]  Radiological transportation impacts are quantified based on the latest scientific knowledge regarding radiation and human health, to aid in understanding the general level of potential risks, but the assignment of cutoff or significance levels is not appropriate. The same is true for potential injuries and fatalities as a result of potential traffic accidents.

[c]  The analysis for visual resources focuses on the potential level of visual contrast (i.e., changes in form, line, color, and texture as compared to the existing or baseline condition) that would occur as a result of mining-related activities on the lease tracts. For this analysis, contrast is characterized as either nonexistent (i.e., no contrast), moderate, weak, or strong—terms that roughly approximate the four-level classification scheme presented in the table.

Under Alternative 3, air quality impacts for the three phases associated with uranium mining (exploration, mine development and operations, and reclamation) were evaluated. For the exploration phase, a relatively short duration of time and little ground disturbance would be involved, and potential impacts on ambient air quality would be minimal and temporary. During the peak year of mine development and operations, it is estimated that total peak-year emission rates would be small compared with the three-county total emissions. PM emissions would be about 1.5% and 0.66% of the three-county total for $PM_{10}$ and $PM_{2.5}$, respectively. $NO_x$ emissions would be the highest of the non-PM emissions, at about 1.0% of the three-county total emissions. Potential impacts on regional ozone would not be of concern. Air emissions from the mine development and operations phase could result in minor impacts on air-quality-related

BLM_0042020

1   values (AQRVs) at nearby Class 1 areas,[2] but implementation of measures (i.e., compliance
2   measures, mitigation measures, and BMPs discussed in Section 4.6) such as fugitive dust
3   mitigation measures could minimize these potential impacts. Potential impacts on climate change
4   would be negligible. During the reclamation phase, $PM_{10}$, $PM_{2.5}$, and $NO_x$ emissions would be
5   at 0.98%, 0.55%, and 0.11% of the three-county total emissions, respectively. Potential impacts
6   on ozone and climate change would likewise be negligible during the reclamation phase.
7
8          Air quality impacts under Alternatives 4 and 5 were evaluated for the exploration, mine
9   development and operations, and reclamation phases in a manner similar to that done for
10  Alternative 3. As was assumed for Alternative 3, a relatively short duration of time for
11  exploration and little ground disturbance would be involved and potential impacts on ambient air
12  quality would be minimal and temporary. $PM_{10}$ and $PM_{2.5}$ emissions from mine development
13  and operations under Alternative 4 are estimated to be about 3.0% and 1.3% of the three-county
14  total emissions, respectively; $NO_x$ emissions would be highest of the non-PM emissions,
15  contributing about 2.0% of the three-county total emissions. As was discussed for Alternative 3
16  above, potential impacts to regional ozone would not be of concern. Likewise, air emissions
17  from the mine development and operations phase could result in minor impacts on AQRVs at
18  nearby Class 1 areas, but implementation of measures (i.e., compliance measures, mitigation
19  measures, and BMPs discussed in Section 4.6) could minimize these potential impacts. Potential
20  impacts on climate change would be negligible. During the reclamation phase, $PM_{10}$, $PM_{2.5}$, and
21  $NO_x$ emissions would be at 1.1%, 0.63%, and 0.17% of the three-county total emissions,
22  respectively. Potential impacts on ozone and climate change would likewise be negligible for the
23  reclamation phase under Alternative 4.
24
25          Potential air quality impacts under Alternative 5 would be slightly greater than under
26  Alternative 4. $PM_{10}$ and $PM_{2.5}$ emissions for mine development and operations are estimated to
27  be about 3.2% and 1.4% of the three-county total emissions, respectively; $NO_x$ emissions would
28  be highest of the non-PM emissions, contributing about 2.3% of the three-county total emissions.
29  As was discussed for Alternatives 3 and 4, potential impacts on regional ozone would not be of
30  concern. Likewise, air emissions from the mine development and operations phase could result
31  in minor impacts on AQRVs at nearby Class 1 areas, but implementation of measures
32  (i.e., compliance measures, mitigation measures, and BMPs discussed in Section 4.6) could
33  minimize these potential impacts. Potential impacts on climate change would be negligible.
34  During the reclamation phase, $PM_{10}$, $PM_{2.5}$, and $NO_x$ emissions would be 1.1%, 0.64%, and
35  0.18% of the three-county total emissions, respectively, and potential impacts on ozone and
36  climate change would be negligible.
37

---

[2]   In the context of the prevention of significant deterioration (PSD) program, all state air quality jurisdictions are
      divided into three classes of air quality protection. Class I areas are special areas of natural wonder and scenic
      beauty, such as national parks (over 6,000 acres), wilderness areas (over 5,000 acres), national memorial parks
      (over 5,000 acres), and international parks that were in existence as of August 1977, where air quality should be
      given special protection. Class I areas are subject to maximum limits on air quality degradation called air quality
      increments (often referred to as PSD increments). The rest of the country (including the ULP lease tracts) is
      designated as Class II areas, for which moderate growth is accommodated and to which less stringent increments
      are applied. If desired by states or Indian tribes, a Class II area may be redesignated to a Class III area, to which
      the least stringent increments are applied, but none has done so.

BLM_0042021

**2.4.2  Acoustic Environment**

Potential noise impacts under the five alternatives are discussed in Sections 4.1.2, 4.2.2, 4.3.2, 4.4.2, and 4.5.2.

Under Alternatives 1 and 2, noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from a reclamation site, which is the Colorado daytime maximum permissible limit in a residential zone. Reclamation conducted near the boundary of Lease Tract 13 could exceed the Colorado limit.

For the exploration phase under Alternatives 3 to 5, potential noise impacts on neighboring residences or communities would be minimal and intermittent due to the short duration of the activities conducted.

During the mine development and operations phase under Alternative 3, noise levels at about 55 dBA and 50 dBA (Colorado nighttime limit) would be limited to distances of 1,650 ft (500 m) from the mine sites and 230 ft (70 m) from the haul routes, respectively. Activities conducted near the boundary of Lease Tract 13 could exceed the Colorado limit established for residential areas.

Under Alternatives 4 and 5, activities conducted near the boundaries of Lease Tracts 13, 13A, 16, and 16A could exceed the Colorado limit of 55 dBA. Noise from haul trucks could exceed the Colorado nighttime limit within 350 ft (107 m) under Alternative 4 and 380 ft (120 m) under Alternative 5 from the haul route.

Potential noise impacts from reclamation activities under Alternatives 3 to 5 would be similar to those discussed above for the mine development and operations phase.

**2.4.3  Soil Resources**

Potential impacts on soil resources under the five alternatives are discussed in Sections 4.1.3, 4.2.3, 4.3.3, 4.4.3, and 4.5.3. Potential impacts on soil resources, both on the lease tracts and on adjacent lands where haul roads and utilities would be used, are anticipated to be minor in the exploration and reclamation phases; mine development and operations would involve more ground disturbance and could result in moderate soil impacts, such as soil compaction, soil horizon mixing, soil erosion and deposition by wind, soil erosion by water and surface runoff, and sedimentation of nearby surface water bodies. Soils could also be contaminated by the accidental release of chemicals (fuels, solvents, oils). These potential impacts would be reduced by the implementation of BMPs and mitigation measures.

Under Alternatives 1 and 2, reclamation would result in ground-disturbing activities, such as the removal of structures and foundations, backfilling of portals, grading of the disturbed surfaces, and spreading of topsoil over waste-rock piles. Direct impacts from these reclamation activities would be smaller than those from mine development and operations because reclamation activities would occur over a shorter duration. The use of existing access roads would reduce impacts like soil compaction and erosion (e.g., fugitive dust generation).

BLM_0042022

Under Alternatives 3 through 5, exploration activities would occur over relatively small areas; in addition, potential impacts would be minor, especially with the implementation of good industry practices and mitigation measures.

Mine development and operations under Alternatives 3 to 5 would involve various degrees of potential ground disturbance because the number of lease tracts and number and sizes of mines that would be developed and operated vary among these alternatives. It is expected that potential impacts would be minor under all three alternatives. Hence, potential impacts from Alternative 3 would be less than those from Alternatives 4 and 5. The number of mines assumed to be developed and operated is the same under Alternatives 4 and 5, with mine sizes under Alternative 5 resulting in slightly greater ground disturbance because mines would mostly be medium to large, with no small mines assumed for Alternative 5. The assumed disturbed areas for Alternatives 3, 4, and 5 are about 310 acres (130 ha), 460 acres (190 ha), and 490 acres (200 ha), respectively.

Potential impacts on soil resources during the reclamation phase under Alternatives 3 to 5 would be similar to those under Alternatives 1 and 2.

## 2.4.4 Water Resources

Potential impacts on water resources under the five alternatives are discussed in Sections 4.1.4, 4.2.4, 4.3.4, 4.4.4, and 4.5.4. Potential impacts on water resources are anticipated to be minor for the exploration and reclamation phases; mine development and operations would involve more ground disturbance and could result in increased soil erosion and surface runoff. Surface water and groundwater could also be potentially contaminated by the accidental release of chemicals (fuels, solvents, oils), mixing of water with varying geochemical characteristics, or cross contamination among aquifers. These potential impacts would be avoided by implementing compliance measures, mitigation measures, and BMPs. The frequently targeted underground source of drinking water in the region (e.g., Navajo Sandstone Aquifer) is not expected to be affected. No public water supply system is present within 5 mi (8 km) from the ULP lease tracts.

Under Alternatives 1 and 2, reclamation activities on Lease Tract 13 would have the greatest potential to affect water resources due to the proximity of the Dolores River and San Miguel River. Soil erosion by water is considered to be minor in general and moderate in some areas. The impacts on groundwater quality by the backfill materials, poor sealing of drill holes and inadequate water reclamation are considered to be minor at Lease Tracts 7, 9, and 13 that have wet underground mines. These potential impacts could be avoided if it is implemented in accordance with reclamation performance standards set forth by the CDWR.

For Alternatives 3 through 5, exploration activities, such as vegetation clearing, drilling, and construction of access roads and drill pads, would occur over small areas. Impacts on water resources associated with runoff generation and erosion would be minor. The exploratory drill holes on Lease Tracts 7, 9, 13, and possibly 8A would have the potential to allow groundwater mixing and leaching because of possible accumulation of small amounts of groundwater found in underground mines. The potential impacts are considered to be minor and could be minimized by implementing compliance measures, mitigation measures, and BMPs.

BLM_0042023

The mine development and operations phase for Alternatives 3 through 5 has the greatest potential (of the three phases) to affect water resources, primarily because of ground disturbance activities, erosion, mine water runoff, the staging of ores and waste rock, alteration of aquifers, mixing of groundwater with varying geochemical characteristics, cross contamination among aquifers, use of chemicals (oil, grease, lubricant), water use, and wastewater generation. Activities near lease tracts closest to the Dolores and San Miguel Rivers would have the greatest potential to affect surface water quality because of erosion. Potential groundwater contamination impacts or dewatering effects would be minor in Lease Tracts 7, 9, and 13 (possibly 8A), where groundwater seepage occurred in underground mines. However, a limited number of existing domestic water wells, associated with Lease Tracts 7, 9, 13, and 8A, would be potentially affected if local groundwater is contaminated or aquifers are dewatered. Based on the assumptions made for Alternatives 3 through 5, potential impacts from Alternative 3 from mine development and operations would be less than those from Alternatives 4 and 5.

The scale of reclamation activities for Alternatives 3 through 5 is expected to increase. Potential impacts from reclamation under Alternatives 3 through 5 would be greater than those under Alternative 1.

## 2.4.5  Human Health

Potential human health impacts under the alternatives evaluated are presented in Sections 4.1.5, 4.2.5, 4.3.5, 4.4.5, and 4.5.5. The potential impact during the exploration phase would be minimal and limited to only a few workers. Exploration would excavate only small amounts of soil, which would be placed back to fill the drill holes in a short period of time (less than a few weeks). For the mine development and operations phase, potential impacts are analyzed for the mine workers, the general public living close to the uranium lease tracts, and the general public living within 50 mi (80 km) around the uranium lease tracts. For the reclamation phase, potential impacts are analyzed for the reclamation workers as well as the general public living close to the uranium lease tracts. After the reclamation phase, potential impacts are analyzed for recreationists who are assumed to unknowingly camp in a uranium mine area and individuals entering an inactive underground mine (e.g., state inspectors [operating under state regulations] who check on the status of uranium mines after their closure). The analyses involve the estimates of potential human health risks associated with both radiation and chemical exposures.

Under Alternatives 1 and 2, potential radiation exposures for reclamation workers were estimated to be about 14.3 mrem, resulting primarily from the external radiation incurred while working on a waste-rock pile; the uranium isotopes and their decay products in the waste rocks were the source of the radiation. The corresponding latent cancer fatality (LCF) risk associated with this exposure is estimated to be $1 \times 10^{-5}$; i.e., the probability of developing a latent fatal cancer is about 1 in 100,000 ($1 \times 10^5$). These estimates of dose and LCF risk were obtained by assuming a base concentration of 70 pCi/g for Ra-226 in waste rocks (Cotter Corp. 2011, 2012a–g). If a higher or lower concentration was assumed (Cotter Corp. 2011, 2012d), the radiation dose and LCF risk would increase or decrease proportionally. The DOE dose limit for protection of the general public is 100 mrem/yr from all exposure pathways. No adverse health effect would

BLM_0042024

result from the chemical toxicity of the uranium and vanadium minerals contained in the waste rocks. The hazard index associated with the potential chemical risk is estimated to be 0.13, which is well below the threshold value of 1.

The potential radiation exposure of the general public living close to the lease tracts would result from airborne emissions of radioactive particulates and radon from the surfaces of waste-rock piles. The level of exposure would depend on the distance and direction between the residence and the radiation sources. It is estimated that during the reclamation phase, the potential dose to a member of the general public would be less than 9 mrem/yr if the person lived 1,600 ft (500 m) or farther from a waste-rock pile, which is less than the dose limit of 10 mrem/yr promulgated by the EPA for airborne emissions of radionuclides. The LCF risk would be less than 1 in 110,000 ($1.1 \times 10^5$) for 1 year of exposure. The hazard index estimated for the chemical exposure is less than 0.03. Again, the above results were obtained assuming a Ra-226 concentration of 70 pCi/g in waste rocks.

With the base concentrations (70 pCi/g of Ra-226) in waste rocks, it is estimated that after the reclamation phase, a recreationist who unknowingly came close to a waste-rock pile would incur a radiation dose of about 0.88 to 30 mrem through external radiation, inhalation, and soil ingestion, assuming he camped on top of the waste-rock pile for 2 weeks. The corresponding LCF risk was estimated to be about $1 \times 10^{-6}$ to $2 \times 10^{-5}$. No potential chemical risk would be incurred because the surface of the waste-rock pile would be covered by soil materials to facilitate the growth of vegetation, rendering potential exposures through the inhalation of particulates and incidental soil ingestion unlikely. Most encounters of recreationists with the uranium lease tracts would be of a much shorter duration; therefore, the resulting radiation dose and LCF risk would be much smaller than those estimated for a two-week camping.

Based on measurement data collected in inactive underground uranium mines, radon levels could range from 3 to 39 working levels (WLs) at different locations within the mine. Therefore, the potential radiation exposure to an individual receptor who illegally enters an inactive underground uranium mine for an extended period of time after its closure could be high. Based on the measurement data, a radon dose rate of 6.9 to 89 mrem/h was estimated, with a corresponding LCF risk ranging from $9 \times 10^{-6}$ to $1 \times 10^{-4}$/h.

Potential human health impacts for individual receptors during and after the reclamation phase under Alternatives 3, 4, and 5 are expected to be similar to those under Alternatives 1 and 2. This is because for individual receptors, their potential radiation and chemical exposures would be dominated by the contamination sources (i.e., waste-rock piles in this case) that are closest to them. If the radiation sources closest to a receptor are the same, the potential health impact on the receptor would depend only on the distances and directions between the sources and the receptor, regardless of the alternative being evaluated. Therefore, the analytical results obtained for the reclamation phase and post-reclamation phase under Alternatives 1 and 2 are applicable for Alternatives 3, 4, and 5. For this same reason, estimates under Alternative 3 for the nearby individual receptor during the mine development and operations phase would be applicable to the same receptors under Alternatives 4 and 5 as well.

BLM_0042025

1    Under Alternative 3, the potential radiation exposures for uranium miners were estimated
2  with historical monitoring data from 1985 to 1989. The average radiation dose for underground
3  uranium miners would be about 433 mrem/yr, the majority of which would result from radon
4  exposures. The corresponding LCF risk was estimated to be $4 \times 10^{-4}$/yr, which translates to a
5  probability of about 1 in 2,500 ($2.5 \times 10^3$) of developing a latent fatal cancer from 1 year of
6  exposure. The potential chemical exposure for the uranium miners was estimated to result in a
7  hazard index of 1.06, which is slightly above the threshold value of 1; therefore, potential
8  adverse health effects may be incurred by uranium miners. Radiation and chemical exposures for
9  individual miners under Alternatives 4 and 5 are expected to be similar to those under
10  Alternative 3.
11
12    In addition to radiation and chemical exposures, potential physical injuries and fatalities
13  were analyzed for the uranium miners. Based on the statistical data on average injury and fatality
14  rates of mining-related activities, two nonfatal injuries and illnesses could occur during the peak
15  year of operations under Alternative 3, and five and six nonfatal injuries could occur under
16  Alternatives 4 and 5, respectively.
17
18    During the mine development and
19  operations phase, potential radiation exposure
20  of members of the general public who live close
21  to the uranium lease tracts would result
22  primarily from the emissions of radon
23  associated with mining. The potential radiation
24  dose incurred by an individual would depend

> The potential radiation exposure of a population
> within an area can be characterized with a
> collective dose, which is equivalent to the sum of
> the individual doses over the population and
> typically assumes the unit of person-rem.

25  on the number and size of the closest uranium mine operation as well as the distance and
26  direction between the residence and each of the uranium mines. Based on the estimates, the
27  maximum radiation dose would be about 5.6 mrem/yr at a distance of 3,300 ft (1,000 m) from a
28  small underground uranium mine; at a distance of 6,600 ft (2,000 m), the dose would decrease to
29  less than 3 mrem/yr. If a medium or a large underground uranium mine was close by, the
30  radiation dose would be two or four times the dose estimated from a small underground uranium
31  mine. Based on the estimates, a nearby resident located downwind from a uranium mine in the
32  most dominant wind direction could receive a radiation dose of more than 10 mrem/yr. The
33  collective dose estimated for the population within 50 mi (80 km) from the uranium lease tracts
34  ranges from 7.5 to 39 person-rem, with a corresponding LCF risk of 0.01 to 0.05 under
35  Alternative 3. Under Alternative 4, the collective dose is estimated to range from 17 to
36  94 person-rem, with a corresponding LCF risk of 0.02 to 0.1. The collective dose estimated
37  under Alternative 5 is 20 to 110 person-rem, with a corresponding LCF risk of 0.03 to 0.1.
38
39
40  **2.4.6  Ecological Resources**
41
42    Potential impacts on ecological resources for the five alternatives are discussed in
43  Sections 4.1.6, 4.2.6, 4.3.6, 4.4.6, and 4.5.6. Potential impacts on vegetation are anticipated to be
44  minor to moderate and range in duration from short term to long term. Mining activities could
45  result in moderate impacts, such as the degradation and loss of habitats. Potential impacts on
46  wildlife (including threatened, endangered, and sensitive species) are anticipated to be negligible

BLM_0042026

1   to moderate and would result from the degradation and loss of habitats (including water
2   depletion), wildlife disturbance, and wildlife injury or mortality. These impacts would be
3   localized; the viability of wildlife populations would not be affected. Potential impacts on
4   aquatic biota (including threatened, endangered, and sensitive species) are anticipated to be
5   negligible to moderate and would result from increases in sedimentation and turbidity or an
6   accidental ore spill into a perennial stream or river. These impacts would be localized; the
7   viability of aquatic biota would not be affected.

### 2.4.6.1 Vegetation

12   Under Alternatives 1 and 2, potential impacts on vegetation would generally be minor
13   and short term. Areas affected by Alternative 1 and 2 activities would generally consist of
14   previously disturbed areas, and reclamation would generally include relatively small surface
15   areas (approximately 1 to 8 acres [0.4 to 3.2 ha] per mine, other than the JD-7 mine).
16   Reclamation would establish plant communities on disturbed areas, including waste rock;
17   however, resulting plant communities might be considerably different from those of adjacent
18   areas. The successful reestablishment of some plant communities, such as sagebrush shrubland
19   or piñon-juniper woodland, would likely require decades.

21   Indirect impacts associated with reclamation activities could include the deposition of
22   fugitive dust, erosion, sedimentation, and the introduction of non-native species, including
23   noxious weeds. However, because of the small areas involved and short duration of reclamation
24   activities, these would generally constitute a short-term impact. The establishment of invasive
25   species, including the potential alteration of fire regimes, could result in long-term impacts,
26   although monitoring and vegetation management programs would likely control invasive
27   species. However, potential impacts from Alternatives 4 and 5 would involve a larger disturbed
28   area (i.e., at 460 ac [190 ha] and 490 ac (200 ha) for Alternatives 4 and 5, respectively, versus
29   310 ac [130 ha] for Alternative 3). In addition, the expected period of disturbance for
30   Alternative 5 would be shorter than that for Alternative 4.

32   Impacts under Alternatives 3 through 5 would be similar and would range from minor to
33   moderate and short term to long term. Impacts from exploration would include disturbance of
34   vegetation and soils, the removal of trees or shrubs, compaction of soils, destruction of plants,
35   burial of vegetation under waste material, or erosion and sedimentation. Exploration activities
36   are expected to affect relatively small areas, and impacts would generally be short term. The
37   localized destruction of biological soil crusts, where present, would be considered a longer-term
38   impact, particularly where soil erosion has occurred. Impacts would include the destruction of
39   habitats during site clearing and excavation, as well as the loss of habitat in additional use areas.
40   Affected areas might include high-quality mature habitats or previously degraded areas.
41   Wetlands present on project sites could be directly or indirectly affected. Indirect impacts from
42   mining would be associated with fugitive dust, invasive species, erosion, sedimentation, and
43   impacts due to changes in surface water or groundwater hydrology or water quality. The
44   deposition of fugitive dust and the establishment of invasive species, including the potential
45   alteration of fire regimes, could result in long-term impacts.

BLM_0042027

### 2.4.6.2  Wildlife

Under Alternatives 1 and 2, reclamation would occur on 10 lease tracts. Altogether, 267 acres (108 ha) would be reclaimed, with most of the acreage (210 acres, or 85 ha) involving the surface open-pit mine on Lease Tract 7. Habitats affected by reclamation would generally consist of previously disturbed areas, although some undisturbed habitats could be affected near the outer margins of the areas being reclaimed. Reclamation activities that could affect wildlife include (1) dismantling of structures, (2) generation of waste materials, (3) recontouring of project areas, (4) revegetation activities, and (5) accidental releases (spills) of potentially hazardous materials. Where mine portals exist, reclamation activities would involve either filling the portals or adding bat gates to the openings. Permanent underground mine closure could destroy potential habitat for bats and other wildlife. The use of bat gates in the mine openings would maintain the mines as potential roost-site habitats. However, the use of underground habitats in uranium-rich areas or reclaimed uranium mines could expose wildlife species to uranium or other radionuclides through inhalation, ingestion, or direct exposure.

During reclamation activities, localized obstructions of wildlife movement could occur. There would also be an increase in noise and visual disturbance associated with reclamation activities. Traffic and equipment operations during reclamation could result in low levels of wildlife mortality. Most wildlife would avoid areas where reclamation activities were taking place. Indirect impacts on wildlife could also occur from dust deposition, erosion, sedimentation, and introduction of non-native plant species.

Reclamation would result in long-term, localized improvement of wildlife habitats within the 10 lease tracts. Reclamation would restore or improve up to 267 acres (108 ha) of habitat for many of the representative wildlife species listed in Section 3.6.2 (except amphibians). Removal of water treatment ponds on Lease Tracts 7 and 9 would eliminate potential drinking water sources and habitats for wildlife (particularly amphibian species). However, removal of water treatment ponds would also eliminate potential sources of contaminant exposure for wildlife. For a species whose range does not include the 210 acres (85 ha) to be reclaimed within Lease Tract 7, the amount of habitat reclaimed would be limited. For example, only a maximum of 27 acres (11 ha) of overall desert bighorn sheep (*Ovis canadensis nelsoni*) habitat would be restored or improved.

Overall, impacts on wildlife would be minor during reclamation activities. Under Alternative 1, negligible impacts on wildlife would occur during DOE's long-term management of the withdrawn lands. Under Alternative 2, impacts on wildlife during BLM's administrative control would depend on the use of the reclaimed areas and could range from negligible (e.g., if no development or other use, other than use as a natural habitat, occurred) to moderate (e.g., if mining occurred once again on the reclaimed areas).

Under Alternative 3, potential impacts on wildlife from exploration would primarily result from short-term disturbance (e.g., due to equipment and vehicle noise and the presence of workers). Some mortality to less mobile wildlife could occur at the exploration sites, and vehicles could hit wildlife. Impacts on wildlife from mine development and operations could occur from habitat disturbance, wildlife disturbance, and wildlife injury or mortality. The

BLM_0042028

310 acres (130 ha) disturbed for the eight mine sites during the peak year of operations is 3.4% of the total acreage of the 12 lease tracts now considered under Alternative 3 (Lease Tracts 7 and 7A have been combined into a single Lease Tract 7) and 1.2% of the total acreage of DOE's lease program. This acreage includes the 210 acres (85 ha) that is a previously disturbed area for the JD-7 open-pit mine site. The remainder of the lease tracts (excluding areas where access roads and utility corridors could be required) would be undisturbed by mining activities under Alternative 3.

Although habitats adjacent to a mine site might remain unaffected, wildlife might tend to make less use of these areas (primarily because of the disturbance that would occur within the project site). Regular or periodic disturbance during mine development and operations could cause adjacent areas to be less attractive to wildlife and result in a reduction of wildlife use in areas exposed to a repeated variety of disturbances such as noise. Habitat reduction could result in a long-term (e.g., decades-long) decrease in wildlife abundance and richness within a mine-site area. Wildlife habitat could be adversely affected if invasive vegetation became established in the construction-disturbed areas and adjacent off-site habitats; this could adversely affect wildlife occurrence and abundance.

Loss of 310 acres (130 ha) of habitats spread throughout the lease tracts would be considered a minor to moderate impact, since an abundance of similar habitats occurs in the region and since many of the wildlife species that could potentially be affected are habitat generalists. Clearing, grading, mining, mine spoils placement, vehicles, and other mine development and operational activities could result in direct injury to or the death of less mobile wildlife species (e.g., reptiles, small mammals) or those that inhabit burrows or mines. Mining activity might increase the exposure of wildlife to uranium and other radioactive decay products and to other chemical elements. The average concentration of radionuclides in the waste-rock piles and, presumably, in the mine would mostly be less than the biota concentration guidelines (i.e., 23.7 pCi/g or less), although in isolated hot spots, concentrations might be several times higher than recommended guidelines.

Under Alternative 3, impacts on wildlife would be largely short term and negligible during site exploration and minor to moderate during mine development and operations. Impacts on wildlife from reclamation activities would be similar to those described for Alternative 1 and 2. In general, it is expected that impacts would be largely localized and would not affect the viability of wildlife populations. Long-term impacts on wildlife following reclamation of the mine sites would be negligible if no development or other use of the sites (other than that of natural resource protection) occurred. Overall, localized impacts on wildlife would not affect the viability of wildlife populations.

Impacts on wildlife from exploration, mine development and operations, and reclamation under Alternatives 4 and 5 would be similar to those under Alternative 3, except that, under peak years of operation for Alternative 4, a total of 460 acres (190 ha) and, under peak years of operation for Alternative 5, 490 (200 ha) of wildlife habitat at 19 mine sites could be disturbed within any of the 31 lease tracts. Under both alternatives, 210 acres (85 ha) for the very large mine (JD-7) have already been disturbed (as were 80 acres [32 ha] for topsoil storage). The differences in impacts under Alternatives 4 and 5 compared with the impacts under Alternative 3

1 would be limited. However, the potential impacts on wildlife under Alternative 4 and 5 would
2 occur at 11 additional mine sites and affect an additional 150 acres (61 ha) for Alternative 4 or
3 180 acres (73 ha) for Alternative 5 of land on any of the 31 lease tracts rather than on any of just
4 the 13 pre-July 2007 then-active lease tracts.
5
6       Although exploration, mine development and operations, and reclamation activities are
7 expected to be incrementally greater under Alternatives 4 and 5 than under Alternative 3,
8 impacts on wildlife are still expected to be negligible during site exploration and minor to
9 moderate during mine development, operations, and reclamation. Overall, localized impacts on
10 wildlife from either Alternative 4 or 5 would range from negligible to moderate and would not
11 affect the viability of wildlife populations. Impacts on wildlife following reclamation of the mine
12 sites would be negligible if no development or other use of the sites (other than that of natural
13 resource protection) occurred.
14
15
16     **2.4.6.3 Aquatic Biota**
17
18       Under Alternatives 1 and 2, reclamation activities could cause sediment deposition in
19 ephemeral and intermittent streams, and, during storm events, the sediments could potentially
20 reach perennial streams. The potential for this is most likely at Lease Tract 13 through which the
21 Dolores River flows. However, a total of only 8 acres (3.2 ha) at three mine sites is being
22 reclaimed in Lease Tract 13, and only 4 acres (1.6 ha) are being reclaimed for one mine site in
23 Lease Tract 18. Thus, the potential for sediments (including those that could contain radioactive
24 or chemical contaminants) to enter either the Dolores River or Atkinson Creek due to
25 reclamation activities is unlikely, particularly with the appropriate use of BMPs to control
26 erosion.
27
28       Reclaimed areas would become less prone to erosion as vegetation becomes established.
29 Following reclamation, the potential for erosion from the reclaimed mine sites would be less than
30 what currently exists for the unreclaimed mine site areas. Overall, impacts on aquatic biota from
31 Alternative 1 would be negligible. Under Alternative 2, impacts on aquatic biota during the
32 BLM's administrative control would depend on the use made of the reclaimed areas and their
33 proximity to aquatic habitats (particularly perennial water bodies) and would be negligible
34 (e.g., if no development or other use, other than use as a natural habitat, occurred) or minor to
35 moderate (e.g., if mining occurred on the reclaimed areas, particularly on the reclaimed areas on
36 Lease Tract 13, through which the Dolores River flows).
37
38       Under Alternative 3, exploration activities would occur in upland areas and not directly
39 within aquatic habitats (including intermittent and ephemeral drainages). Impacts on aquatic
40 biota from mine development and operation could occur from the (1) direct disturbance of
41 aquatic habitats within the footprint of the mine site, (2) sedimentation of nearby aquatic habitats
42 as a consequence of soil erosion from mine areas, and (3) changes in water quantity or water
43 quality as a result of releases of contaminants into nearby aquatic systems. These impacts would
44 primarily occur during the mine development period and throughout the operational life of the
45 mine. Aquatic biota and habitats most likely to be affected are those associated with small
46 intermittent and ephemeral drainages. Impacts on aquatic biota and habitats from the accidental
47 release of contaminants into intermittent or ephemeral drainages would be localized and small,

BLM_0042030

especially if spill response to a release was rapid. The accidental spill of uranium or vanadium ore into an intermittent or ephemeral stream, or more notably a permanent stream or river such as the Dolores River or San Miguel River, could pose a localized short-term impact on the aquatic resources. However, the potential for such an event is extremely low.

Overall, impacts on aquatic biota would be negligible during site exploration and negligible to minor during mine development, operations, and reclamation. Potential impacts from mine development and operations would last at least 10 years prior to reclamation. Potentially moderate impacts would be possible only for mine sites located near perennial water bodies. In general, any impacts on aquatic biota would be localized and not affect the viability of affected resources, especially if mitigation measures were used.

Under Alternatives 4 and 5, impacts on aquatic resources would be similar to those under Alternative 3, except that 19 mines could be in operation on any of the 31 lease tracts. Overall, localized impacts on aquatic biota would be negligible during site exploration and negligible to minor during mine development, operations, and reclamation. Moderate impacts would be expected only if mines were located near perennial water bodies. In general, any impacts on aquatic biota would be localized and would not affect the viability of affected resources.

### 2.4.6.4 Threatened, Endangered, and Sensitive Species

Impacts of ULP activities on threatened, endangered, and sensitive species would be fundamentally similar to those impact on vegetation (Section 2.4.6.1), wildlife (Section 2.4.6.2), and aquatic biota (Section 2.4.6.3). However, because of their low populations, listed species are far more sensitive to impacts than more common and widespread species. Low population size makes these species more vulnerable to the effects of habitat fragmentation, habitat alteration, habitat degradation, human disturbance and harassment, mortality of individuals, and the loss of genetic diversity. Although listed species often reside in unique and potentially avoidable habitats, the loss of even a single individual of a listed species could result in a much greater impact on the population of the affected species than would the loss of an individual of a more common species.

Under Alternatives 1 and 2, reclamation activities would generally cause small, short-term impacts on threatened, endangered, and sensitive species, if present. Although reclamation activities have the potential to create surface disturbances, these disturbances are likely to be short term and are not expected to occur in previously undisturbed areas. The small scale of reclamation activities on previously disturbed areas would generally have a negligible to minor direct impact on sensitive terrestrial species. However, indirect impacts on threatened, endangered, and sensitive species might still be possible (such as those resulting from water withdrawal, erosion, sedimentation, and fugitive dust). Erosion and sedimentation might have a small, short-term impact on sensitive aquatic species. Reclamation activities under Alternatives 1 and 2 are not likely to require large amounts of water from the Upper Colorado River Basin. Therefore, the impact of water withdrawals on aquatic species (particularly the Colorado River endangered fish species) is expected to be minor. Reclamation activities under Alternatives 1 and 2 may affect, but are not likely to adversely affect, the Colorado River endangered fish species or

BLM_0042031

their critical habitat. Impact levels for species listed under the ESA were made consistent with impact determinations made in ESA Section 7 consultation. ULP activities under Alternatives 1 and 2 would have no effect on terrestrial species listed under the ESA. ULP activities under Alternatives 1 and 2 may affect, but not likely to adversely affect, the Colorado River endangered fish species or their critical habitat.

Under Alternative 3, potential impacts on terrestrial threatened, endangered, and sensitive species could range from small to moderate and short term to long term, depending on the location of the mines and amount of surface disturbance. Direct impacts could result from the destruction of habitats during site clearing, excavation, and operations. Indirect impacts could result from water depletions, fugitive dust, erosion, and sedimentation. Most impacts of Alternative 3 ULP activities on terrestrial threatened, endangered, and sensitive species may be minimized or avoided with the implementation measures identified in Table 4.6-1. However, water withdrawals from the Upper Colorado River Basin to support mining activities may result in potentially unavoidable impacts on aquatic biota (particularly the Colorado River endangered fish species). Under Alternative 3, approximately 3,200,000 gal (12,000,000 L) of water would be required to support mining activities during the peak year of operations. This volume of water would equate to approximately 9.7 ac-ft of water during the peak year of operations. For this reason, DOE determined in its May 2013 BA that ULP activities under Alternative 3 may affect, and are likely to adversely affect, the Colorado River endangered fish species and their critical habitat. As discussed in Sections 2.2.3.1 and 4.3.6.4.1, it is estimated that as much as 9.7 ac-ft of water would be needed to support ULP activities during the peak year of operations. It is assumed that the source of this water would be the Upper Colorado River Basin. DOE has completed ESA Section 7 consultation requirements with the USFWS regarding anticipated impacts on the Colorado River endangered fish and other species listed under the ESA. The USFWS then concluded, in its August 2013 BO, that water depletions under Alternative 3 were not likely to jeopardize the continued existence of the Colorado River endangered fish species and not likely to destroy or adversely modify designated critical habitat; that a water depletion fee did not apply (under a 2010 BO that addressed small water depletions); and that further programmatic consultation is not required (see Section 4.3.6.4.1 and Appendix E).

Under Alternatives 4 and 5, potential impacts would be similar to those under Alternative 3. However, there would be more lease tracts available for mining under these alternatives, thereby increasing the area that could be disturbed or developed and the potential for impacts on threatened, endangered, and sensitive species. The total disturbed area for Alternative 5 is slightly greater than that for Alternative 4.

**2.4.7 Land Use**

Potential impacts on land use from the five alternatives are discussed in Sections 4.1.7, 4.2.7, 4.3.7, 4.4.7, and 4.5.7. Potential land use impacts are anticipated to be minor for Alternatives 1 through 5. Withdrawn lands would continue to be closed to mineral entry but would remain open for ROW authorizations and oil and gas leasing. Mining activities would likely preclude some land uses, such as recreation or grazing, but surrounding lands would offer opportunities for these activities.

BLM_0042032

## 2.4.8 Socioeconomics

Potential impacts on socioeconomics from the five alternatives are discussed in Sections 4.1.8, 4.2.8, 4.3.8, 4.4.8, and 4.5.8. The impact analyses for socioeconomics indicate that potential socioeconomic effects would generally be minor and positive, in that a few jobs would be created and the completion of reclamation activities could have a small, positive impact on recreation and tourism. It is also likely that there would be less in-migration of people to work in the mining jobs created from the alternatives, since there would likely be unemployed workers in the local community to fill these newly created jobs.

Under Alternatives 1 and 2, reclamation activities would require 29 direct jobs and generate 16 indirect jobs. Reclamation would produce $1.7 million in income. There would likely be a minor positive impact on recreation and tourism because of the reclamation that would be completed.

Under Alternative 3, the potential impact is expected to be minor. Mine development and operations would create 123 direct jobs, 93 indirect jobs, $4.7 million in direct income, and $4.0 million in indirect income. In-migration could include up to 87 people moving into the ROI. However, as was discussed above, there is an adequate workforce currently available in the ROI that could supply the labor needed, so there could be less in-migration than estimated in the ULP PEIS as a result. Reclamation activities would require 29 direct jobs and generate 17 indirect jobs. Reclamation would produce $1.8 million in income.

Potential impacts under Alternatives 4 and 5 would be almost the same and are expected to be minor. Under Alternative 4, mine development and operations would create 229 direct jobs, 152 indirect jobs, and $14.8 million in income. In-migration could include up to 115 people moving into the ROI. Reclamation activities would require 39 direct jobs and generate 21 indirect jobs. Reclamation would produce $2.4 million in income. Under Alternative 5, mine development and operations would create 253 direct jobs, 152 indirect jobs, and $15.6 million in income. In-migration could include up to 122 people moving into the ROI. Reclamation activities would require 39 direct jobs and generate 25 indirect jobs. Reclamation would produce $2.5 million in income.

## 2.4.9 Environmental Justice

Potential impacts on minority and low-income populations from the five alternatives are discussed in Sections 4.1.9, 4.2.9, 4.3.9, 4.4.9, and 4.5.9. Potential impacts on the general population could result from the uranium mining activities, but for the majority of resources evaluated, impacts would likely be minor. Specific impacts on low-income and minority populations as a result of participation in subsistence or certain cultural and religious activities would be minor. For the majority of resources, any adverse impacts from ULP activities would not disproportionately affect minority or low-income populations.

BLM_0042033

**2.4.10  Transportation**

Potential impacts on transportation from the five alternatives are discussed in Sections 4.1.10, 4.2.10, 4.3.10, 4.4.10, and 4.5.10.

Under Alternatives 1 and 2, no transportation of uranium ore would occur. There would be no radiological transportation impacts. No changes in current traffic trends near the DOE ULP lease tracts are anticipated because no significant supporting traffic or equipment moves would occur, and only about five reclamation workers would be commuting to each site on a regular basis during reclamation activities.

Under Alternative 3, there would be an average of approximately 40 round-trip uranium ore truck shipments per weekday. For the sample case considered, the total annual distance travelled in the peak year by the haul trucks would be about 1.10 million mi (1.77 million km), primarily on State Highways CO 90 and CO 141 and on US 491 and US 191. The estimated attendant traffic accident injuries and fatalities would be about 0.33 and 0.029, respectively. The resultant collective radiological population dose to those individuals living and working near the haul routes was estimated to be approximately 0.14 person-rem, a dose that could potentially result in an LCF risk of $8 \times 10^{-5}$. The potential annual collective dose estimated for the truck drivers is 0.71 person-rem, with an associated risk of 0.0004 LCF. Dependent on which lease tracts have mining operations and which mill was used in each case, the total annual distance in the peak year could range from about 0.47 million to 2.22 million mi (751,000 to 3.58 million km), with impacts roughly proportional to the distance travelled.

Under Alternative 4, there would be an average of approximately 80 round-trip uranium ore truck shipments per weekday. For the sample case considered, the total annual distance travelled in the peak year by the haul trucks would be about 2.22 million mi (3.57 million km), primarily on CO 90 and CO 141 and on US 491 and US 191. The estimated attendant traffic accident injuries and fatalities would be about 0.63 and 0.057, respectively. The resultant collective radiological population dose to those individuals living and working near the haul routes was estimated to be approximately 0.28 person-rem, resulting in an LCF risk of 0.0002 in the population. The potential annual collective dose estimated for the truck drivers is 1.4 person-rem, with an associated LCF risk of 0.0009. Dependent on which lease tracts have mining operations and which mill was used in each case, the total annual distance in the peak year could range from about 1.14 million to 4.26 million mi (1.84 million to 6.86 million km), with impacts roughly proportional to the distance travelled.

Under Alternative 5, there would be an average of approximately 92 round-trip uranium ore truck shipments per weekday. For the sample case considered, the total annual distance travelled in the peak year by the haul trucks would be about 2.72 million mi (4.38 million km), primarily on CO 90 and CO 141 and on US 491 and US 191. The estimated attendant traffic accident injuries and fatalities would be about 0.81 and 0.073, respectively. The resultant collective radiological population dose to those individuals living and working near the haul routes is estimated to be approximately 0.34 person-rem, a dose that could potentially result in an LCF risk of 0.0002 in the population. The potential annual collective dose estimated for the truck

BLM_0042034

drivers was 1.8 person-rem, with an associated LCF risk of 0.001. Depending on which lease tracts have mining operations and which mill was used in each case, the total annual distance in the peak year could range from about 1.45 million to 4.90 million mi (2.34 million to 7.88 million km), with impacts roughly proportional to the distance travelled.

## 2.4.11 Cultural Resources

Cultural resources include archaeological sites, historic buildings and structures (including mining features), and historic landscapes and traditional cultural properties, which include natural features and landscapes that hold cultural significance to specific tribal groups. Cultural resources eligible for listing on the *National Register of Historic Places* (NRHP) are called "historic properties." Federal agencies must take into account the effects of their undertakings on historic properties. All unevaluated historic properties must be treated as if eligible for listing until shown to be ineligible (see Section 3.11). Activities that would physically alter the land surface or that would modify the built environment, such as the alteration or demolition of a building, would have the greatest potential for directly adversely affecting cultural resources. However, an undertaking might have indirect effects as well. Resources in areas surrounding the location of the undertaking itself can be affected by increased human presence. Artifacts on the surface might be subject to displacement or damage by trampling or loss by unauthorized, illegal, and unrecorded collecting. The noise generated by the presence and operation of a facility might compromise the solitude that is an important part of the integrity of a traditional cultural property, or it might represent a visual intrusion into a cultural landscape. Road improvements have the potential to disturb cultural resource sites. Access roads already exist for the permitted mines. Disturbance would occur only if existing roads were widened or altered.

Impacts on a cultural resource are evaluated based on the likely effect each alternative would have on its integrity. Effects resulting from the exploration, mine development and operations, and reclamation phases of uranium mining are analyzed for each of the alternatives when applicable. Table 2.4-2 summarizes known cultural resource sites by lease tract cluster. For the purposes of this analysis, lease tracts have been grouped into four clusters. Since the visual context of a site is an important component of its integrity, the groupings used in Section 3.12 (Visual Resources) are followed here. Site densities were calculated for the surveyed areas of each lease tract. Since it is not known where specific development would take place, it is assumed that any site within a lease tract might be subject to indirect impacts during the exploration, mine development and operations, and reclamation phases. Table 2.4-3 summarizes the number of cultural resource sites likely to be subject to direct and indirect impacts under each alternative. Indirect impacts could occur to all known sites and any newly discovered sites in each lease tract. Direct impacts would occur only when the size or required location of a new facility precluded the avoidance of identified cultural resources or compromised the visual context of a site where visual context is an important part of its integrity.

BLM_0042035

1
2

**TABLE 2.4-2  Summary of Known Cultural Resource Sites by Lease Tract Cluster**

| Lease Tract Cluster | Total Cluster Acreage | Acres Surveyed | Percent Surveyed | No. of Known Sites | Sites per Surveyed Acre |
|---|---|---|---|---|---|
| North | 5,754 | 661 | 11 | 43 | 0.0650 |
| North Central | 6,398 | 694 | 11 | 56 | 0.0807 |
| South Central | 3,744 | 325 | 9 | 19 | 0.0584 |
| South | 10,013 | 977 | 10 | 103 | 0.1053 |
| Total | 25,909 | 2,657 | 10 | 221 | 0.0832 |

3
4
5
6

**TABLE 2.4-3  Summary of Potential Impacts on Known Cultural Resource Sites**

| Alternative | Estimated No. of Sites That Could Be Affected | |
|---|---|---|
| | Indirect Impacts[a] | Direct Impacts |
| 1 | 111 | 0 |
| 2 | 111 | 0 |
| 3 | 128 | 8 |
| 4 | 221 | 21 |
| 5 | 221 | 23 |

[a]  Indirect impacts could occur to all known sites and any newly discovered sites in each lease tract.

7
8
9   Section 106 of the National Historic Preservation Act (NHPA) requires that areas
10  developed as a result of Federal undertakings be surveyed for the presence of cultural resources
11  prior to project implementation. Through these surveys, cultural resources that are eligible for
12  nomination to the NRHP are identified, and plans would be modified to avoid or mitigate
13  negative impacts on cultural resources. Potential impacts on cultural resources are discussed in
14  Section 4.1.11, 4.2.11, 4.3.11, 4.4.11, and 4.5.11.
15
16  Under Alternatives 1 and 2, direct impacts are not expected to occur. However, indirect
17  impacts, such as an increased potential for vandalism related to road or footpath expansion or
18  damage to cultural resources from fugitive dust, could occur on all 111 estimated resources
19  within the 10 lease tracts. Positive impacts could also result, since the termination of uranium

BLM_0042036

1 mining might result in reduced fugitive dust and ground vibration from heavy equipment and
2 traffic.
3
4          Under Alternative 3, indirect impacts on all of the 128 cultural resources located within
5 the 12 lease tracts could occur. Direct impacts are estimated to be possible on 8 of these
6 128 resources. Potential direct impacts would include the disturbance of buried cultural resources
7 or surface deposits as a result of excavation, vibration from equipment, and fugitive dust.
8 Indirect impacts would include visual disturbance to resources; the introduction of noise to
9 traditional cultural areas; potential damage to traditional plant and animal species; and an
10 increased potential for vandalism, erosion, trampling, and unauthorized collecting related to road
11 or footpath expansion.
12
13          Under Alternatives 4 and 5, indirect impacts could occur on the 221 cultural resources
14 located within the 31 lease tracts. Direct impacts could occur on 21 and 23 of these resources,
15 respectively. Types of potential direct and indirect impacts would be the same as those under
16 Alternative 3.
17
18
19 **2.4.12  Visual Resources**
20
21          Visual impacts are expressed as contrasts between an existing landscape and a proposed
22 project or activity in terms of form, line, color, and texture. Visual impacts depend on the type
23 and degree of visual contrasts introduced into an existing landscape. Potential impacts on visual
24 resources are analyzed in 4.1.12, 4.2.12, 4.3.12, 4.4.12, and 4.5.12.
25
26          Under Alternatives 1 and 2, one or more of the 10 lease tracts would be visible from
27 portions of the Sewemup Wilderness Study Area (WSA), Palisade Outstanding Natural Area
28 (ONA) Area of Critical Environmental Concern (ACEC), Palisade WSA, Unaweep/Tabeguache
29 Scenic and Historic Byway, Tabeguache Area, Dolores River Canyon WSA, Dolores River
30 Special Recreation Management Area (SRMA), San Miguel River SRMA, McKenna Peak WSA,
31 San Miguel ACEC, and Trail of the Ancient Byways, which are located within 0 to 25 mi (0 to
32 40 km) of the lease tracts. Visual contrast of visible activities occurring within the lease tracts
33 would range from none to strong, depending on the viewer's location within the special visual
34 resource area (SVRA). Potential visual impacts that could occur under Alternatives 1 and 2
35 would include vegetation clearing, landform alteration, removal of structures and materials,
36 changes to existing roadways, vehicular and worker activity, and light pollution in the form of
37 skyglow, light trespass, or glare.
38
39          Under Alternative 3, 1 or more of the 12 lease tracts would be visible from portions of the
40 Sewemup WSA, Unaweep/Tabeguache Scenic and Historic Byway, Tabeguache Area, Dolores
41 River Canyon WSA, Dolores River SRMA, San Miguel River SRMA, McKenna Peak WSA,
42 San Miguel ACEC, and Trail of the Ancient Byways, which are located within 0 to 25 mi (0 to
43 40 km) of the lease tracts. Visual contrast of visible activities occurring within the lease tracts
44 would range from none to strong, depending on the viewer's location within the SVRA. Potential
45 visual impacts that could occur under Alternative 3 include vegetation clearing, exploratory
46 drilling, road construction, support facility construction, worker and equipment presence, and

BLM_0042037

lighting in the form of skyglow, light trespass, or glare. Visual impacts resulting from activities associated with mine development and operations would vary in frequency and duration, given that mining activity could last 10 years or more.

Under Alternatives 4 and 5, 1 or more of the 31 lease tracts would be visible from portions of the Sewemup, Palisade, Squaw/Papoose Canyon, McKenna Peak, Dolores River Canyon, and Cahone Canyon WSAs; the Palisade ONA and San Miguel ACECs; the Unaweep/Tabeguache Scenic and Historic Byway; the Tabeguache Area; the Dolores River SRMA; the San Miguel River SRMA; the Canyon of the Ancients National Monument; and the Trail of the Ancient Byways, which are located within 0 to 25 mi (0 to 40 km) of the lease tracts. Visual contrast of visible activities occurring within the 31 lease tracts would range from none to strong, depending on the viewer's location within the SVRA. Potential visual impacts under Alternatives 4 and 5 would be the same as those under Alternative 3.

## 2.4.13 Waste Management

In addition to waste rock, other waste materials would also be generated from the exploration, mine development and operations, and reclamation phases of uranium mining. The waste could include solid residue from the treatment of mine water, chemical waste from used oil, antifreeze, and solvents from maintenance activities. Other solid waste materials generated could include concrete from ore pads and foundations, drill steel, mill timbers, and vent bags. Bulk radiological materials would be taken to a mill for uranium recovery, or transported for disposal to a licensed low-level radioactive waste disposal facility. Inert materials, such as the foundation and concrete, would be broken up and buried on the site. Wastes could also be taken to a recycling or a permitted landfill located near Nucla or Naturita, Colorado.

Potential impacts on the waste management or disposal practices just discussed would be minor, since capacity is available at the permitted landfills or licensed facilities. Waste that would remain at the mine site would be placed in a manner that is protective to human health and the environment, in compliance with Federal, state, and local requirements.

## 2.4.14 Cumulative Impacts

Potential impacts from the five alternatives in the ULP PEIS are considered in combination with impacts of past, present, and reasonably foreseeable future actions. For this cumulative impacts analysis, past projects are generally assumed to be reflected in the affected environment discussion. Projects that have been completed, such as the exploration and reclamation activities implemented under the ULP in 2009 and 2011 as discussed in Section 4.7.2.2.7, are generally assumed to be part of the baseline conditions that were analyzed under the five alternatives discussed in Sections 4.1 through 4.5. The summary of ongoing and planned projects or activities in the ROI for cumulative effects is presented in Table 4.7-11. As mentioned previously, the ROI for cumulative effects is conservatively assumed to be a 50-mi (80-km) radius. The ROIs for the various resource areas are listed in Chapter 3, and for most of these resource areas, a 25-mi (40-km) radius was identified as the ROI. The analyses for

BLM_0042038

1  potential environmental justice impacts and potential impacts on the human health of the
2  population generally addressed a 50-mi (80-km) radius, which is why the ROI for cumulative
3  effects was extended to this larger radius (see Appendix D for information on how the radius was
4  identified as the ROI for each resource area).
5
6        The major ongoing projects that are related to uranium mining activities proposed under
7  the five alternatives evaluated in the ULP PEIS include (1) the White Mesa Mill; (2) various
8  permitted uranium mining projects in Montrose, Mesa, and San Miguel Counties, none of which
9  are currently actively producing (of the 33 permitted projects, few of the permits are for mines
10 on the DOE ULP lease tracts); (3) the Daneros Mine; (4) the Energy Queen Mine, which is
11 operational but currently inactive; and (5) the ongoing reclamation of abandoned uranium mines
12 (these mines are not on the DOE ULP lease tracts). There are also several foreseeable projects
13 related to uranium mining, which are currently in the planning phase. These include the Piñon
14 Ridge Mill[3] and Whirlwind Mine near Gateway.
15
16       Several uranium-mining-related projects are also planned and include the planned Piñon
17 Ridge Mill and the Whirlwind Mine near Gateway. Other planned or proposed projects include
18 the Book Cliff Coal Mine near Fruita in Mesa County, a ROW maintenance project for the
19 Western Area Power Administration (WAPA), the reduction of tamarisk and other invasive non-
20 native plant species, and the 2012 restoration of a section of the Hanging Flume located
21 northwest of Nucla.
22
23       The environmental impacts discussion in Chapter 4 indicates that potential impacts on the
24 resource areas evaluated for the five alternatives would be minor and could be further minimized
25 by implementing measures (i.e., compliance measures, mitigation measures, or BMPs described
26 in Section 4.6) determined in project-specific mine plans. Estimates for potential human health
27 impacts indicate that the emission of radon would be the primary source of potential human
28 health radiation exposure. However, requirements for monitoring and ventilating mine operations
29 and for worker safety are expected to mitigate potential impacts on human health.
30
31       Although the various present, ongoing, and planned projects identified in the ROI for
32 cumulative effects could contribute to impacts on the various environmental resource areas
33 evaluated, it is expected that uranium-mining-related projects would be most similar with respect

---

3   Energy Fuels Resources Corporation has planned to construct the Piñon Ridge Mill (a conventional uranium
    mill) in Paradox Valley, between Naturita and Bedrock in Montrose County, Colorado. In early 2011, the
    CDPHE issued a final radioactive materials license to Energy Fuels Resources Corporation (which is an asset of
    Ontario's Energy Fuels, Inc., located in Lakewood, Colorado), following CDPHE's preparations of a decision
    analysis and environmental impact analysis (CDPHE 2011). A group of plaintiffs then challenged that license by
    filing a lawsuit against CDPHE in Colorado's District Court for the City and County of Denver. On June 13,
    2012, the court issued a decision in which it held that the CDPHE had unlawfully issued the license without
    conducting the necessary administrative procedures. The court set aside CDPHE's action in issuing the license,
    remanded the case for further proceedings, and ordered CDPHE to convene an additional hearing scheduled for
    April 2013. On April 25, 2013, CDPHE decided to issue to Energy Fuels Resources Corporation a final
    radioactive materials license that imposed a number of conditions on the construction and operation of the
    proposed Piñon Ridge Mill (CDPHE 2013). In May 2013, a group of plaintiffs filed for judicial review of that
    CDPHE decision in the District Court for the City and County of Denver.

BLM_0042039

1   to the types of potential environmental impacts that could occur, and most of these are located
2   closer to (within 25 mi or 40 km of) the lease tracts. However, information for most of the
3   projects is either not available or qualitative in nature.
4
5           Based on the information in Table 4.7-12 and other information presented in
6   Sections 4.7.1 and 4.7.2, the potential cumulative impacts on the various environmental
7   resources (e.g., air quality, water quality, soils, ecological resources, socioeconomics,
8   transportation) and human health from uranium-mining-related projects and other non-uranium-
9   mining-related projects when added to the ULP alternatives would result in overall impacts that
10  would be negligible to moderate.
11

BLM_0042040

TABLE 2.4-4  Comparison of the Potential Impacts on Air Quality, the Acoustic Environment, and Soil Resources from Alternatives 1 through 5

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Air Quality | Potential impacts on ambient air quality anticipated to be minor and temporary in nature. It is estimated that $PM_{10}$ emissions would be about 0.92% of emission totals for the three counties and $NO_x$ emissions would be about 0.09% of the three-county totals. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Potential impacts from the exploration phase would be minimal and temporary in nature.<br><br>Peak-year emission rate estimates would be small during mine development and operations compared with the emission totals for the three counties. $PM_{10}$ and $PM_{2.5}$ emissions could contribute about 1.5% and 0.66% of the three county total, respectively. $NO_x$ emissions could be highest during operations, contributing about 1% of the three-county total emissions.<br><br>During reclamation, $PM_{10}$ emissions could be highest, at about 0.98% of the three-county total emissions. | Similar to Alternative 3 in that potential impacts from the exploration phase would be minimal and temporary in nature.<br><br>Peak-year emission rates would be small during mine development and operations compared with the emission totals for the three counties. $PM_{10}$ and $PM_{2.5}$ emissions could contribute about 3.0% and 1.3% of the three-county total, respectively. Estimates indicate $NO_x$ emissions would contribute about 2% of the three-county total emissions.<br><br>During reclamation, $PM_{10}$ emission estimates could be highest at about 1.1% of the three-county total emissions. | Peak-year mine development and operations emission rates are estimated to be higher than those under Alternative 4. $PM_{10}$ and $PM_{2.5}$ emissions could contribute about 3.2% and 1.4% of the three-county total, respectively. $NO_x$ emissions would contribute about 2.3% of the three-county total.<br><br>During reclamation, $PM_{10}$ emission estimates could be highest at about 1.1% of the three-county total emissions. |

BLM_0042041

**TABLE 2.4-4  (Cont.)**

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Acoustic Environment | Noise levels would attenuate to about 55 dBA (the Colorado daytime maximum permissible limit) at a distance of 1,650 ft (500 m) from the reclamation sites. Most area residences are located beyond this distance. However, if reclamation activities were conducted near the boundary of Lease Tract 13, noise levels at nearby residences could exceed the Colorado limit. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Noise impacts during the exploration phase on neighboring residences or communities would be minimal and intermittent in nature.<br><br>During mine development and operations, noise levels at about 55 dBA and 50 dBA (Colorado nighttime limit) would be limited to distances of 1,650 ft (500 m) from the mine sites and 230 ft (70 m) from the haul routes, respectively. Most area residences are located beyond these distances. If activities were conducted near the boundary of Lease Tract 13, noise levels at nearby residences could exceed the Colorado limit.<br><br>For reclamation, some unavoidable but localized short-term and minor noise impacts on neighboring residences or communities could occur. | Noise impacts for the three phases would be similar to those from Alternative 3. Activities conducted near Lease Tracts 13, 13A, 16, and 16A could exceed the Colorado daytime limit of 55 dBA. In addition, noise from haul trucks could exceed the Colorado nighttime limit of 50 dBA within 350 ft (107 m) from the haul route, and possibly any residences within this distance could be affected. | Similar to Alternative 4, except Colorado nighttime limit exceedance from haul trucks within 380 ft (120 m) from the haul route. |

BLM_0042042

## TABLE 2.4-4  (Cont.)

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Soil Resources | Ground disturbances from reclamation activities could result in minor impacts due to soil compaction, soil horizon mixing, soil contamination (from oil and fuel releases related to use of trucks and other equipment), and soil erosion. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Ground disturbances from mining-related activities could result in minor impacts due to soil compaction, soil horizon mixing, soil contamination (from oil and fuel releases related to use of trucks and other equipment), and soil erosion. Potential impacts from Alternative 3 would likely be greater than those from Alternative 1 since there would be impacts from mine development and operations, which would also be conducted. | Potential impact could be greater than that from Alternative 3 since more mines would be developed and operated. | Similar to Alternative 4. |

1
2
3
4

BLM_0042043

**TABLE 2.4-5 Comparison of the Potential Impacts on Water Resources, Land Use, and Waste Management from Alternatives 1 through 5**

| Resource/System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Water Resources | Of the 10 lease tracts evaluated for Alternative 1, reclamation activities on Lease Tract 13 have the greatest potential to affect surface water resources due to the proximity to the Dolores River. The potential impacts due to the backfill materials and poor sealing of drill holes would be minor in Lease Tracts 7, 9, and 13 and avoided by implementation of reclamation performance standards set by the CDWR. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Potential impacts (i.e., runoff generation and erosion) associated with exploration would be minor due to the small spatial extent involved. Potential impacts of groundwater mixing and leaching via exploratory drill holes are expected to be minor in a few lease tracts (i.e., Lease Tracts 7, 9, and 13). For mine development and operations, activities on lease tracts closest to the Dolores River and San Miguel River (i.e., Lease Tracts 13 and 18) pose the greatest potential to affect water quality because of erosion. Potential groundwater contamination impacts and dewatering effects would be minor in a few lease tracts (i.e., Lease Tracts 7, 9, and 13). However, a limited number of existing domestic water wells, associated with Lease Tracts 7, 9, and 13, would be potentially affected if local groundwater is contaminated or aquifers are dewatered. Impacts from reclamation activities would be greater than those for Alternative 1. | Similar to the type of potential impacts under Alternative 3, potential impacts associated with exploration (i.e., runoff generation and erosion) would be minor due to the small spatial extent involved. Potential impacts of groundwater mixing and leaching via exploratory drill holes are expected to be minor in a few lease tracts (i.e., Lease Tracts 7, 9, and 13). Also, mine development and operations on the lease tracts closest to the Dolores River and San Miguel River (i.e., Lease Tracts 13 and 18) would have the greatest potential to affect water quality because of erosion. Potential groundwater contamination impacts and dewatering effects would be minor in a few lease tracts (i.e., Lease Tracts 7, 9, 13, and possibly 8A). The number of domestic wells that might be affected is similar to Alternative 3, and they are associated more with Lease Tracts 5, 6, 8, 13, 16, and 18. Impacts from reclamation activities would be greater than those under Alternative 1. | Similar to Alternative 4. |

BLM_0042044

**TABLE 2.4-5  (Cont.)**

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Land Use | Potential impacts due to land use conflicts are expected to be small under Alternative 1; the lands would continue to be closed to mineral entry, and all other activities, like recreation within the lease tracts, would continue. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Potential impacts due to land use conflicts are expected to be minor under Alternative 3; the lands would be closed to mineral entry, and all other activities, like recreation within the lease tracts, would continue. | Potential impacts due to land use conflicts are expected to be small under Alternative 4; the lands would continue to be closed to mineral entry, and all other activities, like recreation within the lease tracts, would continue. | Similar to Alternative 4. |
| Waste Management | Amounts of waste or trash generated would be small and would be taken to a mill for recovery, or taken to a permitted landfill near Nucla or Naturita. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Amounts of waste that would be generated during exploration, mine development and operations, and reclamation would be small and managed in a manner similar to that described for Alternative 1. Any waste-rock piles that would remain at the mine surface would be graded to be consistent with the surrounding area, provided with a top cover of soil or other material from the mine site, and seeded. | Amounts of waste or trash generated during the three phases would be small but more than those generated under Alternative 3. They would be managed in a manner similar to that described for Alternatives 1 and 3. | Similar to Alternative 4. |

BLM_0042045

1

**TABLE 2.4-6  Comparison of the Potential Impacts on Human Health from Alternatives 1 through 5**

| Phase of Activities | Receptor | Assessment Endpoint[a] | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|---|---|
| Mine development and operations | Uranium miner | Individual rad dose (mrem/yr) | NA[b] | NA | 433[c] | Same as Alt. 3 | Same as Alt. 3 |
| | | Individual LCF risk (1/yr) | NA | NA | $4 \times 10^{-4}$ [c] | Same as Alt. 3 | Same as Alt. 3 |
| | | Chemical risk (hazard index or HI) | NA | NA | 1.1[d] | Same as Alt. 3 | Same as Alt. 3 |
| | General public – resident | Individual rad dose (mrem/yr) | NA | NA | 16–1.9[e] (WL: 0.0013 to 0.00016) | Same as Alt. 3 | Same as Alt. 3 |
| | | Individual LCF risk (1/yr) | NA | NA | $2 \times 10^{-5}$ to $3 \times 10^{-6}$ [e] | Same as Alt. 3 | Same as Alt. 3 |
| | | Collective rad dose (person-rem/yr) | NA | NA | 7.5 to 39[f] | 17–94[f] | 20–110[f] |
| | | Collective LCF (1/yr) | NA | NA | 0.01 to 0.05[f] | 0.02–0.1[f] | 0.03–0.1[f] |
| | | Chemical risk (HI) | NA | NA | << 1.0[e] | Same as Alt. 3 | Same as Alt. 3 |
| Reclamation | Reclamation worker | Individual rad dose (mrem/yr) | 14.3 (WL: $<2 \times 10^{-4}$) | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |
| | | Individual LCF risk (1/yr) | $1 \times 10^{-5}$ | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |
| | | Chemical risk (HI) | 0.13 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |
| | General public – resident | Individual rad dose (mrem/yr) | 8.9–0.08[g] (WL: $<5 \times 10^{-4}$) | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |
| | | Individual LCF risk (1/yr) | $9 \times 10^{-6}$ to $8 \times 10^{-8}$ [g] | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |
| | | Chemical risk (HI) | < 0.03 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |

BLM_0042046

**TABLE 2.4-6  (Cont.)**

| Phase of Activities | Receptor | Assessment Endpoint[a] | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|---|---|
| Post-reclamation | General public – recreationist | Individual rad dose (mrem/yr) | 0.88 to 30[h] (WL: <$2 \times 10^{-4}$) | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |
| | | Individual LCF risk (1/yr) | $1 \times 10^{-6}$ to $2 \times 10^{-5}$ | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |
| | | Chemical risk (HI) | < 0.39 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |
| | General public – individual entering an inactive underground mine | Individual rad dose (mrem/h) | 6.9 to 89[i] (WL: 3 to 39) | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |
| | | Individual LCF risk (1/h) | $9 \times 10^{-6}$ to $1 \times 10^{-4}$[i] | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |
| | | Chemical risk (HI) | 0 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 | Same as Alt. 1 |

[a]  Radiation dose and chemical risk (HI) estimates are rounded to two significant figures; LCF risk is rounded to one significant figure. For some radiation doses, the corresponding radon levels in terms of working level (WL) are also listed in parentheses. The estimates listed are based on a Ra-226 concentration of 70 pCi/g in waste-rock piles.

[b]  NA = not applicable; continued uranium mining would not occur under Alternatives 1 and 2.

[c]  The listed values are based on historical data on the average exposures of underground uranium miners.

[d]  The impact associated with exposure to particulates containing uranium and vanadium compounds during this phase was estimated based on the radiation dose associated with inhalation of particulates containing uranium isotopes and their decay products.

[e]  Potential individual radiation dose and LCF risk for the general public – resident scenario would depend on the location of the residence. The dose and risk are functions of the distance and direction from the residence to the radon emission source. The listed range is associated with a residence located in the dominant wind direction that gives the highest exposures at a distance of 1,600 to 16,000 ft (500 to 5,000 m) to the emission source, which is a medium-underground mine. Potential dose and LCF risk associated with a small underground mine would be about half of the listed values; those associated with a large underground mine would be about twice the listed values. Potential dose and LCF risk associated with a very large open-pit mine would be greater than those associated with a small underground mine but less than those associated with a medium-sized underground mine for a distance of 3,300 ft (1,000 m) or greater. Potential hazard index associated with the exposures of residents is expected to be much smaller than that associated with the exposures of uranium miners (i.e., much smaller than the threshold value of 1). Detailed calculation results are provided in Sections 4.1.5, 4.2.5, 4.3.5, 4.4.5, and 4.5.5 for the five alternatives.

**Footnotes continued on next page.**

BLM_0042047

**TABLE 2.4-6  (Cont.)**

f    The collective dose and LCF risk were estimated for the entire population living at a distance of 3.1 to 50 mi (5 to 80 km) from the center of each lease tract group. The collective dose and LCF risk correspond to the peak year of operations. In any other year, the collective dose/LCF risk is expected to be lower than the listed value.

g    Potential individual radiation dose and LCF risk for the general public – resident scenario would depend on the location of the residence. The dose and risk are functions of the distance and direction from the residence to the source of radon and particulate emissions. The listed range is associated with a residence located in the most dominant wind direction at a distance of 1,600 to 16,000 ft (500 to 5,000 m) to the emission source, which is a waste-rock pile at a scale ranging from small to very large. The waste-rock pile is assumed to be generated by the development and operations of an underground mine for 10 years. Detailed calculation results are provided in Sections 4.1.5, 4.2.5, 4.3.5, 4.4.5, and 4.5.5 for the five alternatives.

h    The recreationist dose and LCF risk results were obtained based on the assumption that the emission source (i.e., a waste-rock pile) would be covered by 0–1 ft (0–0.3 m) of soil materials.

i    Potential individual radiation dose and LCF risk for the general public – individual entering an inactive underground mine were calculated on the basis of radon levels that were measured in three abandoned mines in the United Kingdom (Denman et al. 2003).

1
2
3

BLM_0042048

1

**TABLE 2.4-7  Comparison of the Potential Impacts on Ecological Resources from Alternatives 1 through 5**

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Vegetation | It is expected that impacts under Alternative 1 would generally be minor and short term. Areas affected by Alternative 1 activities would generally consist of previously disturbed areas, and reclamation would generally include relatively small surface areas (approximately 1 to 8 acres [0.4 to 3.2 ha] per mine, other than the JD-7 mine). Reclamation would establish plant communities on disturbed areas, including waste rock; however, resulting plant communities might be considerably different from those of adjacent areas. The successful reestablishment of some plant communities, such as sagebrush shrubland or piñon-juniper woodland, would likely require decades.<br><br>Indirect impacts associated with reclamation activities could include the deposition of fugitive dust, erosion, sedimentation, and the introduction of non-native species, including noxious weeds. However, because of the small areas involved and short duration of reclamation activities, these would generally constitute a short-term impact. The establishment of invasive species, including the potential alteration of fire regimes, could result in long-term impacts, although monitoring and vegetation management programs would likely control invasive species. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Impacts under Alternative 3 would range from minor to moderate and short term to long term. Impacts from exploration would result from disturbance of vegetation and soils, the removal of trees or shrubs, compaction of soils, destruction of plants, burial of vegetation under waste material, or erosion and sedimentation. Exploration activities are expected to affect relatively small areas, and impacts would generally be short term. The localized destruction of biological soil crusts, where present, would be considered a longer-term impact, particularly where soil erosion has occurred.<br><br>Ground disturbance from mine development and operations would range from 10 to 20 acres (4 to 8 ha) per mine, except for the 210-acre (85-ha) JD-7 open-pit mine. Impacts would include the destruction of habitats during site clearing and excavation, as well as the loss of habitat in additional use areas. Affected areas might include high-quality mature habitats or previously degraded areas. Wetlands present on project sites could be directly or indirectly affected. Indirect impacts from mining would be associated with fugitive dust, invasive species, erosion, sedimentation, and impacts due to changes in surface water or groundwater hydrology or water quality. The deposition of fugitive dust and the establishment of invasive species, including the potential alteration of fire regimes, could result in long-term impacts. | Impacts would be similar to those for Alternative 3, except a larger area (460 acres, or 190 ha) would be disturbed. | Similar to Alternative 4 with respect to the amount of area disturbed, but disturbance would be for a shorter period of time (i.e., 10 years versus potentially more than 10 years for Alternative 4). |

BLM_0042049

**TABLE 2.4-7  (Cont.)**

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Wildlife | Reclamation activities would cause a short-term, localized disturbance of wildlife in the area of the 13 mine sites on 10 lease tracts. Reclamation of 267 acres (108 ha) would result in long-term, localized improvement of wildlife habitats within the 10 lease tracts. Negligible impacts on wildlife would occur during DOE's long-term management of the withdrawn lands. | Similar to Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | There could be impacts on a total of 310 acres (125 ha) of wildlife habitat at 8 mine sites within 1 or more of the 12 formerly active lease tracts during the peak year of operations. Additional habitats could be affected by any access roads or utility lines required for the mines. Impacts on wildlife could occur from habitat disturbance, wildlife disturbance, and wildlife injury or mortality and habitat loss. Overall, localized impacts on wildlife would range from negligible to moderate during mine development and operations, while wildlife impacts would be long term (last for decades), would be scattered temporarily and, especially, spatially, and would not affect the viability of wildlife populations. | Impacts would be similar to those from Alternative 3, except that a total of 460 acres (190 ha) of wildlife habitat at 19 mine sites could be disturbed within any of the 31 lease tracts during the peak year of operations. Overall, localized impacts on wildlife would range from negligible to moderate and would not affect the viability of wildlife populations. | Impacts on a total of 490 acres (198 ha) of wildlife habitat at 19 mine sites within any of the 31 lease tracts during the peak year of operations. Impacts on wildlife would be similar to, but for a shorter time period than, those for Alternative 4. Overall, localized impacts on wildlife would range from negligible to moderate and would not affect the viability of wildlife populations. |
| Aquatic Biota | Reclamation activities could cause sediment deposition in intermittent and ephemeral streams and possibly the Dolores River. The potential for sediments to enter the perennial streams is negligible to minor due to the limited amount of land undergoing reclamation in any given area. Reclaimed areas would be less prone to erosion as vegetation becomes established. | Similar to Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Impacts on aquatic resources could result from increases in sedimentation and turbidity from soil erosion and runoff during mine development and operations. There would be a very low likelihood of an accidental ore spill into a perennial stream or river. Overall, localized impacts on aquatic biota would range from negligible to moderate and would not affect the viability of any aquatic species. | Impacts on aquatic resources would be similar to those under Alternative 3, except that 19 mines could be in operation on any of the 31 lease tracts during the peak year of operations. Overall, localized impacts on aquatic biota would range from negligible to moderate and would not affect the viability of any aquatic species | Impacts on aquatic resources would be similar to those under Alternative 4, except that the mines would be in operation for a shorter length of time. Overall, localized impacts on aquatic biota would range from negligible to moderate and would not affect the viability of any aquatic species. |

BLM_0042050

**TABLE 2.4-7  (Cont.)**

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Threatened, Endangered, and Sensitive Species | Reclamation activities would generally cause minor, short-term impacts on threatened, endangered, and sensitive species. The small scale of reclamation activities on previously disturbed areas would generally have minor direct impacts on sensitive terrestrial species. Indirect impacts associated with water withdrawal, erosion, and sedimentation might have minor, short-term impacts on sensitive aquatic species (including Colorado River endangered fish species). | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Potential impacts on threatened, endangered, and sensitive species could range from small to moderate and short term to long term, depending on the location of the mines and amount of surface disturbance. Direct impacts could result from the destruction of habitats during site clearing, excavation, and operations. Indirect impacts could result from fugitive dust, erosion, sedimentation, and impacts related to altered surface water and groundwater hydrology.<br><br>Water withdrawals from the Upper Colorado River Basin to support mining activities may result in potentially unavoidable impacts on aquatic biota (particularly the Colorado River endangered fish species). For this reason, DOE determined in its May 2013 BA that ULP activities under Alternative 3 may affect, and are likely to adversely affect, the Colorado River endangered fish species and their critical habitat. The USFWS then concluded, in its August 2013 BO, that water depletions under Alternative 3 were not likely to jeopardize the continued existence of the Colorado River endangered fish species and not likely to destroy or adversely modify designated critical habitat; that a water depletion fee did not apply (under a 2010 BO that addressed small water depletions); and that further programmatic consultation is not required (Appendix E). | Similar to Alternative 3. However, there would be more lease tracts available for mining under this alternative, thereby increasing the area that could be disturbed or developed and the potential for impacts on threatened, endangered, and sensitive species. | Similar to Alternative 4, but the total disturbed surface area is somewhat larger than that under Alternative 4. |

1
2

**TABLE 2.4-8  Comparison of the Potential Impacts on Socioeconomics, Environmental Justice, and Transportation from Alternatives 1 through 5**

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Socioeconomics | Potential impact is expected to be minor. Reclamation activities would require 29 direct jobs and generate 16 indirect jobs. Reclamation would produce $1.7 million in income. There would likely be a small positive impact on recreation and tourism because of the reclamation that would be completed. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Potential impact is expected to be minor. Mine development and operations would create 123 direct jobs, 98 indirect jobs, $4.7 million in direct income, and $4.0 million in indirect income. In-migration could include up to 63 people moving into the ROI. Reclamation activities would require 29 direct jobs and generate 17 indirect jobs. Reclamation would produce $1.8 million in income. | Potential impact is expected to be minor. Mine development and operations would create 229 direct jobs, 152 indirect jobs, and $14.8 million in income. In-migration could include up to 115 people moving into the ROI. Reclamation activities would require 39 direct jobs and generate 21 indirect jobs. Reclamation would produce $2.4 million in income. | Potential impact is expected to be minor. Mine development and operations would create 253 direct jobs, 152 indirect jobs, and $15.6 million in income. In-migration could include up to 122 people moving into the ROI. Reclamation activities would require 39 direct jobs and generate 25 indirect jobs. Reclamation would produce $2.5 million in income. |
| Environmental Justice | Potential impacts on the general population could result from uranium mining activities. For the majority of resources evaluated, impacts would be likely to be minor and would be unlikely to disproportionately affect low-income and minority populations. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Potential impacts are likely to be minor and unlikely to disproportionately affect low-income and minority populations. Specific impacts on low-income and minority populations as a result of participation in subsistence or cultural and religious activities would also be minor and unlikely to be disproportionate. | The types of impacts related to mine development and operations under Alternative 4 would be similar to those described under Alternative 3, but the increase in the disturbed area under Alternative 4 could potentially increase the impacts; however, no disproportionately high and adverse impacts on low-income or minority populations would occur. Impacts on low-income and minority populations associated with the reclamation activities would be the same as those under Alternative 1. | The types of impacts related to exploration under Alternative 5 would be similar to those under Alternative 3. The types of impacts related to mine development and operations under Alternative 5 would be similar to those under Alternative 4. Under Alternative 5, for the majority of resources evaluated, the impacts would likely be minor and would be unlikely to have disproportionate impacts on low income or minority populations. |

BLM_0042052

**TABLE 2.4-8  (Cont.)**

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Transportation | No transportation of uranium ore would occur. There would be no radiological transportation impacts. No changes in current traffic trends near the DOE ULP lease tracts would be anticipated because no significant supporting truck traffic or equipment moves would occur, and only about five reclamation workers would be commuting to each site on a regular basis during reclamation activities. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | There would be an average of approximately 40 round-trip uranium ore truck shipments per weekday under Alternative 3. For the sample case considered, the total annual distance travelled in the peak year by the haul trucks would be about 1.10 million mi (1.77 million km), primarily on CO 90 and CO 141 and on US 491 and US 191. The estimated attendant traffic accident injuries and fatalities would be about 0.33 and 0.029, respectively. The resultant collective radiological population dose to those individuals living and working near the haul routes was estimated to be approximately 0.14 person-rem, a dose that could potentially result in an LCF risk of $8 \times 10^{-5}$. The potential annual collective dose estimated for the truck drivers is 0.71 person-rem, with an associated LCF risk of 0.0004. Dependent on which lease tracts have mining operations and which mill was used in each case, the total annual distance in the peak year could range from about 0.47 million to 2.22 million mi (751,000 to 3.58 million km), with impacts roughly proportional to the distance travelled. | There would be an average of approximately 80 round-trip uranium ore truck shipments per weekday under Alternative 4. For the sample case considered, the total annual distance travelled in the peak year by the haul trucks would be about 2.22 million mi (3.57 million km), primarily on CO 90 and CO 141 and on US 491 and US 191. The estimated attendant traffic accident injuries and fatalities would be about 0.66 and 0.057, respectively. The resultant collective radiological population dose to those individuals living and working near the haul routes was estimated to be approximately 0.28 person-rem, a dose that could potentially result in an LCF risk of 0.0002 in the population. The potential annual collective dose estimated for the truck drivers is 1.4 person-rem, with an associated LCF risk of 0.0009. Dependent on which lease tracts have mining operations and which mill was used in each case, the total annual distance in the peak year could range from about 1.14 million to 4.26 million mi (1.84 million to 6.86 million km), with impacts roughly proportional to the distance travelled. | There would be an average of approximately 92 round-trip uranium ore truck shipments per weekday under Alternative 5. For the sample case considered, the total annual distance travelled in the peak year by the haul trucks would be about 2.72 million mi (4.38 million km), primarily on CO 90 and CO 141 and on US 491 and US 191. The estimated attendant traffic accident injuries and fatalities would be about 0.81 and 0.073, respectively. The resultant collective radiological population dose to those individuals living and working near the haul routes is estimated to be approximately 0.34 person-rem, a dose that could potentially result in an LCF risk of 0.0002 in the population. The potential annual collective dose estimated for the truck drivers is 1.8 person-rem, with an associated LCF risk of 0.001. Depending on which lease tracts have mining operations and which mill was used in each case, the total annual distance in the peak year could range from about 1.45 million to 4.90 million mi (2.34 million to 7.88 million km), with impacts roughly proportional to the distance travelled. |

BLM_0042053

1    **TABLE 2.4-9  Comparison of the Potential Impacts on Cultural Resources and Visual Resources from Alternatives 1 through 5**

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Cultural Resources | Under Alternative 1, indirect impacts could occur on all known cultural resources located within the 10 lease tracts. It is estimated that there are 111 resources within the 10 lease tracts (see Table 4.1-12). Direct impacts are not expected because areas to be reclaimed have already been disturbed, and no new land disturbance is expected. Indirect impacts under Alternative 1 would include the increased potential for vandalism related to road or footpath expansion and for the disturbance of a cultural resource from fugitive dust. Significant cultural properties that could be adversely affected by the proposed action would be identified before any ground-disturbing activities occurred, and plans would be modified to avoid or mitigate impacts on cultural resources. There is potential for buried cultural deposits to be uncovered even if sites were not identified on the surface prior to ground disturbance activities. | Same as Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Under Alternative 3, indirect impacts could occur on all known cultural resource sites located within the 12 lease tracts. It is estimated that there are 128 resources within the 12 lease tracts. Direct impacts could occur on eight of these resources (see Table 4.1-12). Potential direct impacts would include the disturbance of buried cultural resources or surface deposits as a result of excavation, vibration from equipment, and fugitive dust. Indirect impacts would include visual disturbance to resources; the introduction of noise to traditional sacred areas; and an increased potential for vandalism, erosion, trampling, and nonauthorized collecting related to road or footpath expansion.

Significant cultural properties that would be adversely affected by the proposed actions would be identified before any ground-disturbing activities occurred, and plans would be modified to avoid or mitigate impacts on cultural resources. | Under Alternative 4, indirect impacts on all known cultural resources located within the 31 lease tracts could occur. Direct impacts could occur on 21 of these resources (see Table 2.4-3). Types of potential impacts would be the same as those discussed for Alternative 3. Significant cultural properties that would be adversely affected by the proposed action would be identified before ground-disturbing activities occurred, and plans could be modified to avoid or mitigate impacts on cultural resources. | Similar to Alternative 4, except that direct impacts could occur on 23 of the known cultural resources on the 31 lease tracts (see Table 2.4-3). |

BLM_0042054

**TABLE 2.4-9  (Cont.)**

| Resource/ System | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Visual Resources[a] | Potential visual impacts that could occur under Alternative 1 would include vegetation clearing, landform alteration, removal of structures and materials, changes to existing roadways, vehicular and worker activity, and light pollution.<br><br>Under Alternative 1, one or more of the 10 lease tracts would be visible from portions of the Sewemup WSA, Palisade ONA ACEC, Palisade WSA, Unaweep/ Tabeguache Scenic and Historic Byway, Tabeguache Area, Dolores River Canyon WSA, Dolores River SRMA, McKenna Peak WSA, San Miguel ACEC, San Miguel SMRA, and Trail of the Ancient Byways, which are located within 0–25 mi (0–40 km) of the lease tracts. Visual contrast of visible activities occurring within the lease tracts would range from none to strong, depending on the viewer's location with respect to the SVRA. | Similar to Alternative 1. However, under BLM's multiple use policies, there could be additional potential impacts. | Potential visual impacts that could occur under Alternative 3 include vegetation clearing, exploratory drilling, road construction, support facility construction, worker and equipment presence, and lighting in the form of skyglow, light trespass, or glare.<br><br>Under Alternative 3, one or more of the 12 lease tracts would be visible from portions of the Sewemup WSA, Unaweep/Tabeguache Scenic and Historic Byway, Tabeguache Area, Dolores River Canyon WSA, Dolores River SRMA, McKenna Peak WSA, San Miguel ACEC, San Miguel SMRA, and Trail of the Ancient Byways, which are located within 0–25 mi (0–40 km) of the lease tracts. Visual contrast of visible activities occurring within the lease tracts would range from none to strong, depending on the viewer's location with respect to the SVRA. | Potential visual impacts under Alternative 4 would be the same as those under Alternative 3.<br><br>Under Alternative 4, 1 or more of the 31 lease tracts would be visible from portions of the Sewemup, Palisade, Squaw/Papoose Canyon, McKenna Peak, Dolores River Canyon, and Cahone Canyon WSAs; the Palisade ONA, San Miguel SMRA, and San Miguel ACECs; the Unaweep/ Tabeguache Scenic and Historic Byway; the Tabeguache Area; the Dolores River SRMA; Canyon of the Ancients National Monument; and Trail of the Ancient Byways, which are located within 0–25 mi (0–40 km) of the lease tracts. Visual contrast of visible activities occurring within the 31 lease tracts would range from none to strong, depending on the viewer's location with respect to the SVRA. | Similar to Alternative 4. |

---

[a]  ONA = Outstanding Natural Area, SRMA = Special Recreation Management Area, SVRA = special visual resource area, WA = Wilderness Area, WSA = Wilderness Study Area.

1  **2.5  IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES**
2
3          Uranium mining activities associated with the five alternatives evaluated in the
4  ULP PEIS would result in an irreversible and irretrievable commitment of resources. Table 2.5-1
5  summarizes the estimated amounts of the resources assumed to be utilized with the
6  implementation of any of the five alternatives. These resources would be irreversible and
7  irretrievable in that once utilized, the resources are essentially spent and not replaceable.
8
9          The maximum amounts are associated with Alternative 4 based on the assumption of the
10  operational period being 10 years. The period of operations for Alternative 5 is assumed to be
11  five years based on the stipulated lease period for the alternative (i.e., remainder of the 10-year
12  lease period that started in 2008 and no extensions of the leases). For Alternative 4, the preferred
13  alternative, approximately 480,000 tons/yr of uranium ore would be removed from the DOE
14  ULP lease tracts for processing at the mills and ultimately used for various energy purposes. In
15  addition, about 6.3 million gal (19 ac-ft) of water could be utilized during the peak year of mine
16  operations. Other materials that would be expended during operations for Alternative 4 would
17  include about 1.2 million kWh of electricity, about 9,900 tons of steel, and 590,000 gal
18  (2.3 million L) of fuel and lubricants.
19
20
21  **2.6  PREFERRED ALTERNATIVE IDENTIFIED**
22
23          DOE's preferred alternative for the management of the ULP is Alternative 4. DOE would
24  continue to allow, after appropriate NEPA analysis, the exploration, mine development and
25  operations, and reclamation of uranium mines on the 31 lease tracts that are being managed
26
27
28  **TABLE 2.5-1  Estimated Amount of Resources Assumed To Be Irreversible and Irretrievable as a**
29  **Result of the Implementation of the ULP Alternatives**

| Resource | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|
| Uranium ore[a] (tons) | None | None | 2,400,000 | 4,800,000 | 2,760,000 |
| Water (gal)[b] | 160,000 | 160,000 | 32,000,000 | 63,000,000 | 40,000,000 |
| Fuel and lubricants (gal)[b] | 110,000 | 110,000 | 300,000 | 590,000 | 330,000 |
| Steel (tons)[b] | NA[c] | NA | 4,400 | 9,900 | 5,300 |
| Electricity (kWh)[b] | NA | NA | 580,000 | 1,200,000 | 700,00 |

[a]   For Alternatives 3 and 4, assumed 10 years of operations; for Alternative 5, assumed 5 years of operations.

[b]   For Alternatives 1 and 2, resource utilized for the reclamation phase only (which would be completed in 1 year of field work); for Alternatives 3 to 5, estimates include 10 years of operations in addition to the 1 year of exploration and reclamation.

[c]   NA denotes none assumed.

Source: Appendix C of the ULP PEIS

BLM_0042056

1 under the DOE ULP. As stated in previous sections, the difference between Alternative 4 (the
2 preferred alternative) and Alternative 5 (the No Action Alternative for the ULP PEIS) is the lease
3 period associated with these alternatives. Under Alternative 4, the lease period would be for the
4 next 10 years or for another reasonable period; under Alternative 5, the lease period would be for
5 the remainder of the 10-year period stipulated in the leases executed in 2008. Hence, the number
6 of years available for ore generation would be shorter under Alternative 5 and might not give the
7 lessees enough flexibility to time their mining activities to coincide with periods when the
8 economic market for uranium ore was favorable. The shorter period of time associated with
9 Alternative 5 could also mean that the ore in some of the mines might not be exhausted by the
10 time the lease(s) expired, resulting in the premature shutdown of activities, termination, and
11 reclamation.
12
13      The comparison and summary of potential impacts in Section 2.4 indicates that in
14 general, the potential impacts from Alternative 4 would be similar to those from Alternative 5.
15 The exception is that it is assumed that a slightly greater quantity of ore would be generated each
16 year under Alternative 5. This assumption was made to simulate conditions in which the lessees
17 would expedite the ore production by operating medium-sized to large mines (and not any small
18 mines, which are considered under Alternative 4). The slightly higher amount of ore generated
19 under Alternative 5 would result in slightly greater potential impacts than those under
20 Alternative 4.
21
22      Potential impacts from reclamation activities would be similar under all the alternatives,
23 1 through 5. Potential impacts under Alternatives 1 and 2 would result only from reclamation.
24 Potential impacts from mine operations would be slightly less under Alternative 3 than under
25 Alternative 4 because it is assumed that fewer mines (with fewer leases—13 versus 31) would be
26 operated under Alternative 3. The assumptions developed for Alternative 4 are considered more
27 realistic based on historical experience and based on the outlook for future uranium mining in the
28 area.
29

BLM_0042057

1
2
3
4
5
6
7
8
9
10
11
12
13          *This page intentionally left blank*
14

BLM_0042058

# 3  AFFECTED ENVIRONMENT

The ROIs affected by the proposed action presented in the ULP PEIS are described for each resource area evaluated (see Appendix D for additional discussion on the determination of the ROIs). This site-specific information will be used as the basis for evaluating the potential impacts from the alternatives discussed in Chapter 4.

## 3.1  AIR QUALITY

### 3.1.1  Climate

#### 3.1.1.1  General Climate

Wide variations in elevation and topographic features within the area surrounding the ULP lease tracts have an impact on wind patterns, temperatures, and storm tracks in all seasons (NCDC 2011a). The area has a semi-arid, mid-continental climate characterized by abundant sunshine, low humidity, low precipitation, and cold, snowy winters. Strong, outgoing terrestrial radiation provides cool nights. In midwinter, air temperatures are often low, but strong solar radiation and dry air combine to provide generally pleasant conditions.

The local climate is strongly influenced by microclimatic features such as slope, aspect, and elevation. The prevailing wind direction aloft over the region is from the west or the southwest (the westerlies), as it is in most of the United States; however, complex terrains in western Colorado are responsible for deflecting these winds. Accordingly, wind patterns are sometimes dissimilar even over short distances.

The ULP lease tracts are located in southwestern Mesa County and in western Montrose and San Miguel Counties in

---

**Regions of Influence (ROIs)
for the Various Resource Areas Evaluated
in the ULP PEIS**

*Air Quality:* Mostly within 31 mi (50 km) from the source(s) but up to several hundred miles, a minimal but cumulative contribution to air quality-related values (such as visibility and acid deposition)

*Noise:* Within 2–3 mi (3–5 km), from noise source(s) at best

*Paleontological Resources:* Lease tracts and any other areas on adjacent lands that could be affected by mining activities

*Soil Resources:* The lease tracts and any other areas on adjacent lands (e.g., unpaved access roads) that could be affected by mining activities

*Water Resources:* Montrose, Mesa, and San Miguel Counties, primarily on the lease tracts; also the Dolores River, San Miguel River, and their tributaries

*Human Health:* 50-mi (80-km) radius of the lease tracts

*Land Use:* The lease tracts and land within a 25-mi (40-km) radius of each lease tract, with an emphasis on specially designated public land areas

*Ecological Resources:* Montrose, Mesa, and San Miguel Counties, primarily on the lease tracts; the Dolores River, San Miguel River, and Colorado River (for threatened and endangered species evaluation only)

*Socioeconomics:* Montrose, Mesa, and San Miguel Counties

*Environmental Justice:* 50-mi (80-km) radius of the lease tracts

*Transportation:* 25-mi (40-km) radius from the boundary of the lease tracts

*Cultural Resources:* Lease tracts and any other areas on adjacent lands that could be affected by mining activities

*Visual Resources:* 25 mi (40 km) from the lease tracts

*Waste Management:* Surface mine plants on the lease tracts

---

BLM_0042059

1    southwestern Colorado. The elevations of lease tracts range from 5,100 ft (1,500 m) to 8,000 ft
2    (2,439 m) with an average elevation of about 6,401 ft (1,951 m). The area surrounding the ULP
3    lease tracts is characterized by complex topography with valleys, canyons, and plateaus, so the
4    climate varies considerably from place to place.
5
6
7    **3.1.1.2  Wind**
8
9            Wind roses (which graphically display the distribution of wind speed and direction) are
10   presented here based on data available from weather stations in place for the proposed Piñon
11   Ridge Mill, because they are located in the center of the ULP lease tracts scattered over a wide
12   area. These stations are referred to as Site 1 (33-ft [10-m] level) and Site 2 (98-ft [30-m] level).
13   Data for a 3-year period (April 2008–March 2011) are shown in Figure 3.1-1 (Rogers 2011). The
14   proposed Piñon Ridge Mill site is located in the eastern Paradox Valley in western Montrose
15   County, which is roughly at the center of ULP lease tracts. The Paradox Valley is aligned in a
16   northwest–southeast direction. Winds are controlled in large part by the valley and ridge
17   topography. At Site 1 (33-ft [10-m] level), winds blow more frequently from the northwest and
18   southeast, reflecting the channeling of winds parallel to the valley axis. The annual average wind
19   speed is about 6.3 mph (2.8 m/s). Average wind speeds are highest in spring at 7.9 mph (3.5 m/s)
20   and lowest in winter at 4.6 mph (2.1 m/s). Prevailing wind directions are from the southeast
21   (about 14% of the time) and the east–southeast (about 14% of the time). Secondary prevalent
22   wind directions are from the northwest and west-northwest about 18% of the time combined.
23   Thus, about half of the time, upslope and downslope winds along the valley axis prevail.
24   However, effects of prevailing westerlies aloft are relatively minor at the surface. Northwesterly
25   upslope winds blow more frequently during daytime, while southeasterly downslope winds (also
26   called drainage winds) prevail at night.
27
28           Wind rose at Site 2 (98-ft [30-m] level) of the proposed Piñon Ridge Mill site, which is
29   located about 1.3 mi (2.1 km) south–southeast of Site 1 on the same valley floor but closer to the
30   valley wall, is provided in Figure 3.1-1(b). Wind patterns are somewhat different from those at
31   Site 1 (33-ft [10-m]) level. Daytime upslope winds observed are like those at Site 1, while
32   nighttime downslope winds are relatively weak. Typically, downslope winds are shallower than
33   upslope winds, with little or no turbulence because of the stable temperature structure of the air.
34   Throughout the year, westerly or southwesterly winds prevail at Site 2, especially during
35   nighttime hours, suggesting it is more affected by regional winds than by local flows. Average
36   wind speed at Site 2 is about 5.9 mph (2.6 m/s). As it is at Site 1, wind speed at Site 2 is highest
37   in spring and lowest in winter. Prevailing wind direction at Site 2 is from the west–northwest
38   (about 12% of the time) and secondarily is from the west (about 12% of the time). Winds that
39   range from the southeast clockwise to northwest sectors, which is the lower-left half of the valley
40   axis, account for more than three-fourths of the time.
41
42           Typically, wind speeds at higher elevations are faster than those at lower elevations
43   because of surface friction. However, the reverse is observed at the proposed Piñon Ridge Mill.
44   The upslope-downwind speed at Site 2 is lower than that at Site 1, which is located on the central

BLM_0042060

1
2



(a)                                    (b)

3  FIGURE 3.1-1  Wind Roses at the Proposed Piñon Ridge Mill, Montrose County, Colorado, April 2008–March 2011: (a) Site 1, 33-ft
4  (10-m) Level; and (b) Site 2, 98-ft (30-m) Level (Source: Rogers 2011)
5

BLM_0042061

1   valley floor, due to friction with the nearby valley wall at Site 2 and because local flows seem
2   somewhat stronger than regional westerly winds.
3
4          Aside from the weather stations at the proposed Piñon Ridge Mill, there is also a BLM
5   Remote Automated Weather Station at Nucla near the ULP lease tracts. Nucla station is located
6   outside the southeastern edge of Paradox Valley, about 2 mi (3 km) south of Nucla and about
7   11 mi (18 km) east of the proposed Piñon Ridge Mill site. However, wind patterns are quite
8   different from those at Piñon Ridge Mill. As shown in Figure 3.1-2, prevailing wind directions
9   are from the east throughout the year due to predominant nighttime drainage winds from the
10  San Miguel River valley to the east (DRI 2011). During daytime hours, effects of the San Miguel
11  River valley, which runs in a northwest–southeast direction, parallel those of the Paradox Valley,
12  and regional westerly winds are more prominent.
13
14



16  **FIGURE 3.1-2  Wind Rose at 20-ft (6.1-m) Level at Nucla, Montrose**
17  **County, Colorado, 2006–2010 (Source: DRI 2011)**
18

BLM_0042062

### 3.1.1.3  Temperature

Temperatures in the region vary widely with elevation, latitude, season, and time of day. In western Colorado, topography plays a large role in determining the temperature of any specific location (NCDC 2011a). The ULP lease tracts sit at a higher elevation; thus, temperatures there are lower than at lower elevations of comparable latitude. Historical annual average temperatures measured at selected meteorological stations around the ULP lease tracts range from 45.3°F (7.4°C) in Northdale (about 10 mi [16 km] south of the southernmost ULP lease tract at an elevation of 6,680 ft [2,040 m]) to 53.9°F (12.2°C) in Gateway 1 SE (about 6 mi [10 km] northwest of the northernmost ULP lease tract at an elevation of 4,550 ft [1,390 m]), as presented in Table 3.1-1 (WRCC 2011a; DRI 2011). Typically, January is the coldest month, with nighttime lows ranging from 9.0 to 18.0°F (–12.8 to –7.8°C), and July is the warmest month, with daytime highs ranging from 86.5°F to 98.6°F (30.3 to 37.0°C). During the reporting period, the highest temperature of 110°F (43.3°C) was reached in June 1950 at Paradox 1 E and in July 1989 at Uravan, and the lowest of –42°F (–41.1°C) was reached in February 1933 at Northdale. Each year, about 17–76 days had a maximum temperature of ≥90°F (32.2°C), while about 132–205 days had minimum temperatures at or below freezing with subzero temperatures of about 3–18 days.

### 3.1.1.4  Precipitation

In Colorado, precipitation patterns are largely controlled by mountain ranges and elevation (NCDC 2011a). The interior, continental location, ringed by mountains on all sides, results in low precipitation year-round. Air masses crossing the region, which gather moisture over the Pacific Ocean and traverse several hundred miles of mountainous terrain, have precipitated a large percentage of inherent moisture, and thus the Colorado region receives little precipitation. For the reporting period, annual precipitation ranged from about 9.6 in. (24.3 cm) at Nucla to 16.0 in. (40.7 cm) at Paradox 1 W (WRCC 2011a). Precipitation is relatively evenly distributed throughout the year; however, isolated thunderstorms occur during the summer months. In general, precipitation is somewhat higher in fall months (about 30% of the annual total), and lower in winter months (about 22% of the annual total) around the ULP lease tracts. Snowfall varies by location (ranging on average from about 11 in. [28 cm] in Uravan to about 41 in. [104 cm] in Northdale), with the snowiest months being December through February. In general, snowfall tends to increase with increasing elevation, while precipitation has no clear relationship with respect to latitude and elevation in the area.

### 3.1.1.5  Severe Weather

Because mountain ranges surrounding ULP lease tracts block air masses from penetrating into the area, severe weather events, such as tornadoes, are a rarity, but floods, hail, high winds, winter storms, and wildfires do occur frequently (NCDC 2011b).

BLM_0042063

1
2

**TABLE 3.1-1  Temperature and Precipitation Data Summaries at Selected Meteorological Stations around the ULP Lease Tracts, in Order of Meteorological Station Starting from North to South**

| Station[c] | County | Temperature (°F) | | | | | No. of Days with Max. Temp. ≥90°F | No. of Days with Min. Temp. ≤32°F (≤0°F) | Precipitation (in.) | | Period of Record | Elev. (ft) |
| | | Average Monthly Minimum[a] | Average Monthly Maximum[a] | Annual Mean | Extreme Low | Extreme High | | | Total Water Equiv. | Snowfall | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gateway 1 SE | Mesa | 18.0 | 93.2 | 53.9 | –28 | 106 | 61.9 | 132.3 (3.1) | 11.40 | 15.9 | 1947–2010 | 4,550 |
| Paradox 1 W[b] | Montrose | 17.4 | 90.1 | 50.9 | –14 | 106 | 43.8 | 153.6 (3.1) | 16.02 | 27.5 | 1977–1995 | 5,530 |
| Paradox 1 E[b] | Montrose | 12.0 | 92.5 | 49.7 | –21 | 110 | 57.6 | 181.4 (9.9) | 11.73 | 23.4 | 1948–1977 | 5,280 |
| Uravan[c] | Montrose | 15.5 | 95.6 | 53.2 | –23 | 110 | 75.9 | 149.1 (3.8) | 12.61 | 11.1 | 1960–2010 | 5,010 |
| Nucla | Montrose | 12.6 | 98.6 | 52.1 | –10 | 104 | NA[c] | NA | 9.55 | NA | 1998–2011 | 5,860 |
| Northdale | Dolores | 9.0 | 86.5 | 45.3 | –42 | 103 | 17.3 | 205.0 (17.8) | 12.49 | 40.9 | 1930–2002 | 6,680 |

[a]  "Average Monthly Minimum" denotes the monthly average of daily minimum values during the period of record, which normally occurs in January. "Average Monthly Maximum" denotes the monthly average of daily maximum values during the period of record, which normally occurs in July.

[b]  Paradox 1 W and 1 E and Uravan are located at almost the same latitude.

[c]  NA denotes not available.

Sources: DRI (2011); WRCC (2011a)

3

BLM_0042064

1    In the western valleys, localized flood-producing storms are more frequent. Occasionally,
2  remnants of a decayed Pacific hurricane may dump heavy, widespread rains in Colorado
3  (NCDC 2011a). Flash flooding from localized intense thunderstorms is more severe than
4  flooding caused by snowmelt. Since 1994, 88 floods (with 61 flash floods) were reported in
5  Mesa, Montrose, and San Miguel Counties combined (NCDC 2011b). Most floods were reported
6  in towns along the river valleys, including Grand Junction, Gateway, and Mesa in Mesa County;
7  Montrose, Naturita, Nucla, Uravan, and Bedrock in Montrose County; and Telluride and
8  Placerville in eastern San Miguel County. These floods occurred mostly during summer months
9  and caused some property and crop damage.
10
11    In these three counties, a total of 58 hail events were reported since 1962; some of these
12  caused property and crop damage (NCDC 2011b). Hail events occurred mostly from May
13  through September. Hail measuring 1.8 in. (4.4 cm) in diameter was reported in nine incidents.
14
15    Since 1962, 130 high wind events occurred in the three counties. Most were reported in
16  Mesa County (NCDC 2011b). These high wind events occurred more frequently from May
17  through September, with peak occurrence in June. A high wind with a maximum wind speed of
18  122 mph (54.5 m/s), which created blizzard conditions, was reported in January 1999 in Mesa
19  County.
20
21    Winter snows are fairly frequent but are mostly light and quick to melt, except for the
22  land around the southernmost DOE lease tracts near Edgar/The Spud Patch, which have
23  substantial amounts of snow in some years that remain for much of the winter. Heavy snows in
24  the high mountains are much more common. Since 1993, 410 snow and ice events were reported
25  in Mesa County alone (NCDC 2011b). These caused some property damage and several deaths
26  and injuries resulting from avalanches and traffic accidents.
27
28    Since 1999, 24 wildland and forest fires have been reported in the three counties, mostly
29  during summer months, and they caused some property damage (NCDC 2011b). These fires
30  were triggered by lightning in the area. Associated with ongoing global warming, large-wildfire
31  frequency, fire duration, and fire season length have increased substantially in the western
32  United States in recent decades and are projected to increase, especially in the Southwest
33  (USGCRP 2009). This is due primarily to earlier spring snowmelt and higher spring and summer
34  temperatures that reduce the moisture availability and dry out the vegetation that provides the
35  fuel for fires.
36
37    Complex terrain typically disrupts the mesocyclones associated with tornado-producing
38  thunderstorms; thus, tornadoes are less frequent and destructive in this region than they are in
39  tornado alley (in the central United States) or Colorado's eastern plains. Tornado frequencies per
40  area in counties within the ULP lease tracts are less than one-tenth of those in the rest of the
41  state. In the period April 1950 to August 2011, a total of 12 tornadoes (0.2 per year) were
42  reported in the three counties (NCDC 2011b): 9 tornadoes in Mesa County; 3 tornadoes in
43  Montrose County; and no tornados in San Miguel County. However, most tornadoes occurring in

1  the area were relatively weak (eight F0 and four F1 on the Fujita tornado scale[1]), but one caused
2  injury, and some minor property damage was reported. Most of these tornadoes occurred either
3  in northern Mesa County around the I-70 area or in northeastern Montrose County. However, in
4  October 2005, one F1 tornado hit Bedrock, which is located several miles from ULP lease tracts.
5
6
7  **3.1.2  Existing Air Emissions**
8
9        Mesa, Montrose, and San Miguel Counties have many small-scale industrial emission
10 sources and two coal-fired power plants—Cameo station[2] in Palisade, Mesa County, and Nucla
11 station in Nucla, Montrose County. The absolute amount of emissions, except for emissions from
12 the two coal-fired power plants, is relatively low. The population is sparse, and the population
13 centers and many of the industrial facilities are located along the handful of major roads such as
14 I-70, US 50, and US 550. Several state highways exist around the ULP lease tracts, such as
15 CO 90 and CO 141. Onroad mobile and industrial source emissions are concentrated along these
16 routes.
17
18       Data on annual emissions of criteria pollutants and VOCs in Mesa, Montrose, and
19 San Miguel Counties are presented in Table 3.1-2 for 2008 (CDPHE 2011a). Among the three
20 counties, emissions are the highest in Mesa County and the lowest in San Miguel County.
21 Emission data are categorized by type of source: point; area; onroad mobile; nonroad mobile;
22 road dust; construction; biogenic; fires (forest/agricultural fires and structural fires); and so on. In
23 2008, onroad vehicle sources were primary contributors to total carbon monoxide (CO)
24 emissions in three counties (about 38%), followed by forest/agricultural fires (about 21%).
25 Onroad vehicle sources and point sources were primary and secondary contributors to total
26 emissions of nitrogen oxides ($NO_x$) in three counties (about 31% and 22%, respectively). Point
27 sources accounted for most of sulfur dioxide ($SO_2$) emissions in the three counties (over 94%),
28 because of the two coal-fired power plants. Road dust was the primary contributor to $PM_{10}$
29 emissions[3] (about 29%), with construction being a secondary contributor (about 27%). Biogenic
30 sources (i.e., vegetation—including trees, plants, and crops—and soils) that release naturally
31

---

[1]  The Fujita tornado scale is classified with the fastest 0.40-km (0.25-mi) wind speeds: F0 (gale); F1 (moderate);
     and F2 (significant) through F5 (incredible) tornadoes are classified with wind speeds of 40 to 72 mph (19 to
     32 m/s), 73 to 112 mph (33 to 50 m/s), and 113 to 157 mph up to 261 to 318 mph (51 to 70 m/s up to 117 to
     142 m/s). The new Enhanced Fujita (EF) scale based on 3-second wind gusts was implemented on February 1,
     2007. Similar to the original Fujita scale, the ratings are from EF0 to EF5. However, historical tornadoes are still
     categorized with the original Fujita scale, as are those in the NCDC's *Storm Events* database.

[2]  The station has shut down at the end of 2010 and thus is no longer in service (see Section 4.7.2.10).

[3]  Particulate matter, or PM, is dust, smoke, and other solid particles and liquid droplets in the air. The size of the
     particulate is important and is measured in micrometers ($\mu$m), which is 1 millionth of a meter (0.00004 inch).
     $PM_{2.5}$ is PM with an aerodynamic diameter that is less than or equal to 2.5 $\mu$m, and $PM_{10}$ is PM with an
     aerodynamic diameter that is less than or equal to 10 $\mu$m. "Respirable" $PM_{2.5}$ is released into atmosphere
     through combustion-related sources, such as motor vehicles, power plants, and forest fires, and it can penetrate
     deep into the lungs. In contrast, sources of "inhalable" $PM_{10}$ include crushing and grinding operations and
     fugitive dust from vehicles travelling on roads, and this pollutant can enter the respiratory system. These
     particles can cause or aggravate respiratory, heart, and lung diseases.

BLM_0042066

1
2
3

**TABLE 3.1-2  Annual Emissions of Criteria Pollutants and Volatile Organic Compounds in Mesa, Montrose, and San Miguel Counties, Colorado, Encompassing the ULP Lease Tracts, 2008**

| Pollutant[a] | Annual Emissions (tons/yr) | | | |
|---|---|---|---|---|
| | Mesa County | Montrose County | San Miguel County | Three-County Total |
| CO | 40,688 | 19,533 | 5,548 | 65,769 |
| $NO_x$ | 9,048 | 3,665 | 1,093 | 13,806 |
| VOCs | 39,828 | 21,220 | 13,065 | 74,113 |
| $PM_{2.5}$[b] | 2,838 | 2,316 | 370 | 5,524 |
| $PM_{10}$ | 8,050 | 5,823 | 1,504 | 15,377 |
| $SO_2$ | 2,879 | 1,358 | 9 | 4,246 |

[a]  Notation: CO = carbon monoxide; $NO_x$ = nitrogen oxides; $PM_{2.5}$ = particulate matter with an aerodynamic diameter of $\leq 2.5$ μm; $PM_{10}$ = particulate matter with an aerodynamic diameter of $\leq 10$ μm; $SO_2$ = sulfur dioxide; and VOCs = volatile organic compounds.

[b]  $PM_{2.5}$ emissions were not included in the CDPHE's 2008 air pollutant emissions inventory database, so they were estimated by using available $PM_{2.5}/PM_{10}$ ratios (ARB 2011; Countess Environmental 2006).

Source: CDPHE (2011a)

4
5
6   occurring emissions accounted for a significant portion of the VOC emissions (about 83%).
7   Forest/agricultural fires were the primary contributor (about 31%) to total $PM_{2.5}$ emissions of
8   three counties, followed by point sources (about 21%).
9
10      Most of the Paradox Valley is utilized for open ranching, but some agricultural sources
11  exist near Bedrock, Paradox, and Nucla, Montrose County. There are several minor sources
12  throughout the valley, including aggregate processing operations, concrete batch plants, and
13  uranium/vanadium ore mining (Edge Environmental, Inc. 2009). These operations are primarily
14  sources of PM but can also utilize processes and/or equipment that emit $NO_x$, $SO_2$, CO, and
15  some hazardous air pollutants (HAPs). Tri-State Generation and Transmission Association, Inc.,
16  operates a 100-MW coal-fired power plant in Nucla, which receives its coal supply exclusively
17  from a coal strip mine, New Horizon Mine, by tractor-trailer truck (Tri-State 2011). The mine is
18  located about 5 mi (8 km) northwest of the plant. The mining activities and coal transportation
19  are sources of PM, while the power plant is a primary source of $SO_2$, $NO_x$, PM, CO, and some
20  HAPs.
21
22

BLM_0042067

1    In 2010, Colorado produced about 130 million metric tons of *gross*[4] carbon dioxide
2  equivalent ($CO_2e$)[5] emissions (Strait et al. 2007). Gross GHG emissions in Colorado increased
3  by about 50% from 1990 to 2010, an increase more rapid than that in the nation as a whole,
4  which was attributable to Colorado's population growth. In 2010, consumption-based electricity
5  use (37%), followed by transportation (24%), was the primary contributor to gross GHG
6  emissions in Colorado. Electricity use from coal-fired power plants is the single largest
7  contributor to GHG emissions in Colorado (about 31%). Fossil fuel use (in the residential,
8  commercial, and industrial sectors) and fossil fuel industry accounted for about 18% and 9%,
9  respectively, of total state emissions. Non-energy-related emissions from agriculture, industrial
10  processes, and waste management accounted for the rest of the GHG emissions in Colorado.
11  These gross emissions in Colorado equate to about 2% of total GHG emissions of 6,600 million
12  metric tons of $CO_2e$ in the United States during 2009 (EPA 2011a). Colorado's *net* emissions
13  were about 100 million metric tons of $CO_2e$, considering carbon sinks from forestry land use and
14  agricultural soils throughout the state.
15
16    Climate changes are primarily associated with human-induced emissions of heat-trapping
17  gases, so-called GHGs. These emissions come mostly from the burning of fossil fuels (e.g., coal,
18  oil, and natural gas), with considerable contributions from land use changes, such as
19  deforestation or agricultural practices. GHGs include $CO_2$, methane ($CH_4$), nitrous oxide ($N_2O$),
20  and fluorine-containing halogenated substances—hydrofluorocarbons (HFCs), perfluorocarbons
21  (PFCs), and sulfur hexafluoride ($SF_6$). These gases are transparent to solar (short-wave) radiation
22  but opaque to long-wave (infrared) radiation, and are thus capable of preventing long-wave
23  thermal radiant energy emitted at the earth's surface from leaving earth's atmosphere. The net
24  effect over time is a trapping of absorbed radiation and a tendency to warm the planet's surface
25  and the boundary layer of the earth's atmosphere, and this constitutes the "greenhouse effect."
26  Some GHGs ($CO_2$, $CH_4$, and $N_2O$) are both naturally occurring and the product of industrial
27  activities, while fluorine-containing halogenated substances are man-made and are present in the
28  atmosphere exclusively due to human activities. In 2009, $CO_2$ emissions account for about
29  83.0% of total U.S. GHG emissions on the $CO_2e$ equivalent basis, followed by $CH_4$ (about
30  10.3%) and $N_2O$ (about 4.5%), with fluorine-containing halogenated substances accounting for
31  the rest (EPA 2011a).
32
33
34

---

[4]   Excluding GHG emissions removed by agricultural soils and as a result of forestry and land use.

[5]   This is a measure used to compare the emissions from various GHGs on the basis of their global warming
potential, defined as the cumulative radiative forcing effect of a gas over a specified time horizon resulting from
the emission of a unit mass of gas relative to a reference gas, $CO_2$. For example, global warming potentials used
for GHG emission calculations and reporting are 1 for $CO_2$, 21 for methane ($CH_4$), and 310 for nitrous oxide
($N_2O$) over a 100-year time horizon. For other GHGs, including sulfur hexafluoride ($SF_6$), hydrofluorocarbons
(HFCs), and perfluorocarbons (PFCs), global warming potentials are typically much higher. The $CO_2e$ for a gas
is derived by multiplying the mass of the gas by the associated global warming potential.

BLM_0042068

**3.1.3  Existing Air Quality**

Under the Clean Air Act (CAA) which was last amended in 1990, the EPA has set National Ambient Air Quality Standards (NAAQS) for pollutants considered harmful to public health and the environment (EPA 2011b). NAAQS have been established for six criteria pollutants—CO, lead (Pb), nitrogen dioxide ($NO_2$), ozone ($O_3$), PM (both $PM_{2.5}$ and $PM_{10}$), and sulfur dioxide ($SO_2$), as shown in Table 3.1-3. The CAA established two types of NAAQS: primary standards to protect public health including sensitive populations (e.g., asthmatics, children, and the elderly) and secondary standards to protect public welfare, including protection against degraded visibility and damage to animals, crops, vegetation, and buildings. Any individual state can have its own State Ambient Air Quality Standards (SAAQS), but SAAQS must be at least as stringent as the NAAQS. If a state has no standard that corresponds to one of the NAAQS or if the SAAQS are not as stringent as the NAAQS, then the NAAQS apply. Colorado has a more stringent standard than the NAAQS for 3-hour $SO_2$ (CDPHE 2011b), as shown in Table 3.1-3.

An area where a criteria pollutant concentration exceeds NAAQS levels is called a nonattainment area. Previous nonattainment areas where air quality has improved to meet the NAAQS are redesignated as maintenance areas and are subject to an air quality maintenance plan. States must have State Implementation Plans (SIPs) that demonstrate how nonattainment areas will meet the NAAQS and how the NAAQS will be maintained in maintenance areas.

Mesa, Montrose, and San Miguel Counties, which encompass the ULP lease tracts, are located administratively within the Grand Mesa Intrastate Air Quality Control Region (AQCR) (see 40 CFR 81.173), along with other west-central counties in Colorado. Mesa County is within Colorado State AQCR 11, while Montrose and San Miguel Counties are within Colorado State AQCR 10. Currently, Colorado State AQCRs 10 and 11 are designated as being in unclassifiable/attainment for all criteria pollutants (EPA 2011c). However, Telluride in San Miguel County, which is located about 58 mi (93 km) east of the southernmost ULP lease tract, has been designated as a moderate maintenance area for $PM_{10}$ since 2001.

The western counties generally have smaller towns, usually located in fairly broad river valleys. Because of the relatively low population density, low level of industrial activities, and relatively low traffic volume in the area, the quantity of anthropogenic emissions is small, and ambient air quality is thus relatively good.

Except for $PM_{10}$ data at the proposed Piñon Ridge Mill, there are no recent measurement data for criteria air pollutants around the ULP lease tracts. Currently, CO, $O_3$, $PM_{2.5}$, and $PM_{10}$ data are collected around the Grand Junction area in Mesa County (CDPHE 2011c). In addition, $PM_{10}$ data are collected in Telluride in San Miguel County, which is designated as a $PM_{10}$ maintenance area. No monitoring stations are operating in Montrose County.

In addition to the standards, Table 3.1-3 presents background levels for criteria pollutants. The highest background concentration levels that are related to the NAAQS for CO, Pb, $NO_2$, annual $PM_{2.5}$, and $SO_2$ representative of the ULP lease tracts in the statewide

BLM_0042069

1   **TABLE 3.1-3  National Ambient Air Quality Standards (NAAQS), Colorado State Ambient Air**
2   **Quality Standards (SAAQS), and Background Concentration Levels Representative of the ULP**
3   **Lease Tracts in Mesa, Montrose, and San Miguel Counties, Colorado[a]**

| Pollutant | Averaging Time | NAAQS[b] Standard Value | NAAQS[b] Standard Type[c] | Colorado SAAQS | Background Concentration Levels Value[d,e] | Background Concentration Levels Location[f] (Year) |
|---|---|---|---|---|---|---|
| CO | 1-hour | 35 ppm | P | –[g] | 7 ppm (20%) | Grand Junction, Mesa County (2008–2010) |
| | 8-hour | 9 ppm | P | – | 2 ppm (22%) | Grand Junction, Mesa County (2008–2010) |
| Pb | Rolling 3-month | 0.15 µg/m³ | P, S | – | 0.037 µg/m³ (25%) | Denver (2008–2010) |
| NO$_2$ | 1-hour | 100 ppb | P | – | 38 ppb (38%) | Durango, La Plata County (2008–2010) |
| | Annual | 53 ppb | P, S | – | 3 ppb (6%) | Durango, La Plata County (2006–2008) |
| O$_3$ | 8-hour | 0.075 ppm | P, S | – | 0.067 ppm (90%) | Palisade, Mesa County (2008–2010) |
| PM$_{2.5}$ | 24-hour | 35 µg/m³ | P, S | – | 34.3 µg/m³ (98%) | Grand Junction, Mesa County (2008–2010) |
| | Annual | 15 µg/m³ | P, S | – | 9.2 µg/m³ (62%) | Grand Junction, Mesa County (2008–2010) |
| PM$_{10}$ | 24-hour | 150 µg/m³ | P, S | – | 131 µg/m³ (87%) | Grand Junction, Mesa County (2008–2010) |
| | | | | | 89 µg/m³ (59%) | Piñon Ridge Mill, Montrose County (April 2008–March 2010) |
| SO$_2$ | 1-hour | 75 ppb | P | – | 38 ppb (50%) | Denver (2008–2010) |
| | 3-hour | 0.5 ppm | S | 700 µg/m³ (0.267 ppm) | 0.01 ppm (4%) | Denver (2006–2008) |

a   CO = carbon monoxide; NO$_2$ = nitrogen dioxide; O$_3$ = ozone; Pb = lead; PM$_{2.5}$ = particulate matter with an
    aerodynamic diameter of ≤ 2.5 µm; PM$_{10}$ = particulate matter with an aerodynamic diameter of ≤ 10 µm;
    SO$_2$ = sulfur dioxide; ppm = part(s) per million; ppb = part(s) per billion.

**Footnotes continued on next page.**

4

BLM_0042070

**TABLE 3.1-3  (Cont.)**

b   Refer to 40 CFR Part 50 and EPA (2011b) for detailed information on attainment determination and the reference method for monitoring.

c   P = primary standards, which set limits to protect public health, including the health of "sensitive" populations, such asthmatics, children, and the elderly. S = secondary standards, which set limits to protect welfare, including protection against decreased visibility and damage to animals, crops, vegetation, and buildings.

d   Monitored concentrations are second-highest for 1-hour and 8-hour CO and 3-hour $SO_2$; the highest for 24-hour Pb (no rolling 3-month averages available at the time of this writing); 3-year average of 98th percentile of 1-hour $NO_2$ and 24-hour $PM_{2.5}$; highest annual mean over 3 years for annual $NO_2$; 3-year average of annual fourth-highest daily maximum 8-hour average for $O_3$; 3-year average of annual means for annual $PM_{2.5}$; fourth-highest over 3 years for $PM_{10}$ for Grand Junction data but highest over 2 years for Piñon Ridge Mill data; and 3-year average of 99th percentile of 1-hour daily maximum for 1-hour $SO_2$.

e   Values in parentheses are background concentration levels as a percentage of NAAQS or SAAQS (for 3-hour $SO_2$ only).

f   For each pollutant, the location shown is the closest monitoring station from the ULP lease tracts. For Pb and $SO_2$, values for Denver are presented to show that even the highest monitored values in Colorado are still well below the standard and thus not a concern.

g   A hyphen indicates that no standard exists.

Sources: CDPHE (2011b); EPA (2011b,d)

1
2
3   monitoring network were less than or equal to 62% of their respective standards, as shown in
4   Table 3.1-3 (EPA 2011d). However, 8-hour $O_3$ and 24-hour $PM_{2.5}$ and $PM_{10}$ concentrations
5   were approaching or close to the applicable standard (maximum at about 98% for 24-hour
6   $PM_{2.5}$).
7
8          In addition, the Energy Fuels Resources Corp. air monitoring program collected $PM_{10}$
9   data for 24 hours every 6 days at Sites 1 and 2, which are collocated with 10-m (33-ft) and 30-m
10   (98-ft) meteorological towers of the proposed Piñon Ridge Mill, respectively. The 24-hour
11   average $PM_{10}$ data collected at Sites 1 and 2 are presented as a function of time for the period of
12   April 2008 through March 2010 in Figure 3.1-3 (Rogers 2011) and are also presented in
13   Table 3.1-3. The monitored highest 24-hour $PM_{10}$ concentration of 89 $\mu g/m^3$ at the proposed
14   Piñon Ridge Mill was well below the NAAQS of 150 $\mu g/m^3$.
15
16          Climate changes are under way in the United States and globally, and they are projected
17   to continue to grow substantially over next several decades unless intense, concerted measures
18   are taken to reverse this trend (USGCRP 2009). Climate-related changes include rising
19   temperature and sea level, increased frequency and intensity of extreme weathers (e.g., heavy
20   downpours, floods, and droughts), earlier snowmelts and associated frequent wildfires, and
21   reduced snow cover, glaciers, permafrost, and sea ice.
22
23          The Western States have heated up more than the world as a whole (Saunders et al.
24   2008). For the 2003–2007 period, the global climate has averaged 1°F (0.6°C) warmer than the

BLM_0042071

1 20th century average. For the same period, the 11 Western States averaged 1.7°F (0.9°C) and
2 Colorado averaged 1.9°F (1.1°C) warmer than the 20th century average. In the arid/semi-arid
3 West, global warming is already having serious consequences on the region's scarce water
4 supplies, particularly the snow that makes up most of the region's precipitation and, when
5 melted, provides 70% of its water. To date, decreases in snowpack, less snowfall, earlier
6 snowmelt, more winter rain events, increased peak winter flows, and reduced summer flows have
7 been documented.
8
9       As the effects of global climate change continue, it is very likely that, associated with
10 northward migration of storm tracks (USGCRP 2009), desertification will intensify in the
11 Southwestern States; thus, it will be more likely that more dust will be produced as vegetative
12 cover decreases and as soils dry (Morman 2010). It is widely understood that impurities in snow,
13 such as dust or soot, decrease snow albedo and enhance solar radiation absorption and melt rates.
14 Dust may shorten snow cover duration by as much as a month (Painter et al. 2007). Earlier
15 spring snowmelt along with higher spring/summer temperatures have broad implications with
16 regard to water resources in Southwestern States that are already strapped for water, especially
17 during the summer when peak demand is higher, and it leads to an increased the number of forest
18 fires (USGCRP 2009). The problem of disturbed desert dust causing regional climate change and
19 early snowmelt is discussed in numerous recent scientific articles. Neff et al. (2008) documented
20 how the phenomenon of dust causing snowmelt was largely coincidental with increased
21 settlement of the American West. The deposition of this disturbed desert dust on snow leads to
22 early snow melt (Painter et al. 2007). In the Colorado River Basin, these effects are significant.
23 Painter et al. (2010) estimated that the landing of disturbed desert soils traceable to settlement of
24 the American West on mountain snowpack in the Upper Colorado River Basin has resulted in a
25 net loss of approximately 5% of the annual flow of the Colorado River as measured at Lees
26 Ferry, Arizona. It is likely that most dust on snowpack at high mountains around the ULP region
27 is coming from nearby lands where soil-disturbing activity has made them susceptible to wind
28 erosion and from the deserts of the Colorado Plateau along with prevailing westerlies; it is also
29 coming from other Southwestern deserts to some extent. Activities such as exploration and
30 development of energy resources, off-road vehicle use, agriculture, and grazing serve to
31 destabilize soils, making them more susceptible to wind erosion (Belnap et al. 2009).
32
33
34 **3.1.4 Regulatory Environment**
35
36
37       **3.1.4.1 Prevention of Significant Deterioration (PSD)**
38
39       The Prevention of Significant Deterioration (PSD) regulations (see 40 CFR 52.21),
40 which are designed to limit the growth of air pollution in clean areas, apply to a new major
41 source or a modified existing major source within an attainment or unclassified area. PSD
42 regulations limit increases in ambient concentrations above legally established baseline levels for
43 selected criteria pollutants, as shown in Table 3.1-4. Incremental increases in PSD Class I areas,
44 such as National Parks (NPs) or Wilderness Areas (WAs), are strictly limited, while those in

BLM_0042072



FIGURE 3.1-3  Monitored PM$_{10}$ Concentrations at Sites 1 and 2 of the Proposed Piñon Ridge Mill, April 2008–March 2010 (Rogers 2011)

BLM_0042073

1
2
3

**TABLE 3.1-4  Maximum Allowable PSD Increments for PSD Class I and Class II Areas**

| Pollutant | Averaging Time | PSD Increment ($\mu g/m^3$) | |
|---|---|---|---|
| | | Class I | Class II |
| $NO_2$ | Annual | 2.5 | 25 |
| $PM_{2.5}$ | 24-hour | 2 | 9 |
| | Annual | 1 | 4 |
| $PM_{10}$ | 24-hour | 8 | 30 |
| | Annual | 4 | 17 |
| $SO_2$ | 3-hour | 25 | 512 |
| | 24-hour | 5 | 91 |
| | Annual | 2 | 20 |

Source: 40 CFR 52.21; 75 FR 64864

4
5
6  Class II areas (the rest of the country) allow for moderate growth in emission levels. Most of the
7  area surrounding the ULP lease tracts is classified as PSD Class II. Major (large) new and
8  modified stationary sources must meet the requirements for the area in which they are located
9  and the areas they affect.
10
11      As a matter of policy, the EPA recommends that the permitting authority notify the
12  Federal Land Managers (FLMs)[6] when a proposed PSD source would locate within 62 mi
13  (100 km) of a Class I area for a determination of the potential impact on AQRVs, which are
14  discussed in Section 3.1.4.4. There are several Class I areas around the ULP lease tracts, five of
15  which are situated within 62 mi (100 km), as shown in Figure 3.1-4. The permit may still be
16  issued even if the FLM determines that there may be an adverse impact on AQRVs. The nearest
17  Class I area is the Arches NP in Utah (40 CFR 81.430), about 32 mi (51 km) west of the
18  northernmost lease tract. The other four Class I areas within this range include Canyonlands NP
19  in Utah, which is about 34 mi (55 km) west of the southernmost lease tract, and Mesa Verde NP,
20  Black Canyon of the Gunnison WA, and Weminuche WA in Colorado (40 CFR 81.406); these
21  WAs are located about 47 mi (76 km) south–southeast of the southernmost lease tract, 50 mi
22  (81 km) east–northeast of the central lease tract, and 62 mi (100 km) east–southeast of the

---

[6]  FLM is the Secretary of the department with authority over the Federal Class I areas (or the Secretary's designee). For DOI, the Secretary has designated the Assistant Secretary for Fish and Wildlife and Parks as the FLM, whereas the Secretary of Agriculture has delegated the FLM responsibilities to the Regional Forester and, in some cases, the Forest Supervisor.

BLM_0042074

Case No. 1:20-cv-02484-MSK   Document 39-1   filed 04/27/21   USDC Colorado   pg 175 of 299



FIGURE 3.1-4  PSD Class I Areas and Colorado Sensitive Class II Areas around the
ULP Lease Tracts

BLM_0042075

1   southernmost lease tract, respectively. There are two sensitive Class II areas that are regulated by
2   CDPHE as Class I for $SO_2$: Colorado National Monument and Dinosaur National Monument,
3   which are located about 25 mi (40 km) north–northeast and 111 mi (179 km) north of the
4   northernmost ULP lease tracts, respectively. The ULP lease tracts are designated as a PSD
5   Class II area by EPA and the State of Colorado.
6
7
8   ### 3.1.4.2  Visibility Protection
9
10   Visibility was singled out for particular emphasis in the CAA Amendments of 1977.
11   Visibility in a Class I area is protected under two sections of the Act. Section 165 provides for
12   the PSD program (described above) for new sources. Section 169(A), for older sources, describes
13   requirements for both reasonably attributable single sources and regional haze that address
14   multiple sources. FLMs have a particular responsibility to protect visibility in Class I areas. Even
15   sources located outside a Class I area may need to obtain a permit that ensures they have no
16   adverse impact on visibility within the Class I area, and existing sources may need to retrofit
17   controls. The EPA's 1999 Regional Haze Rule set goals of preventing future impairments and
18   remedying existing impairments to visibility in Class I areas. States had to revise their SIPs to
19   establish emission reduction strategies to meet a goal of natural conditions by 2064.
20
21
22   ### 3.1.4.3  General Conformity
23
24   Federal departments and agencies are prohibited from taking actions in nonattainment
25   and maintenance areas unless they first demonstrate that the actions would conform to the SIP as
26   it applies to criteria pollutants. Transportation-related projects are subject to requirements for
27   transportation conformity. General conformity requirements (40 CFR Parts 51 and 93,
28   75 FR 17254, dated April 5, 2010) apply to stationary sources. Conformity addresses only those
29   criteria pollutants for which the area is in nonattainment or maintenance (e.g., VOCs and $NO_x$
30   for $O_3$). If annual source emissions are below specified threshold levels, no conformity
31   determination is required. If the emissions exceed the threshold, a conformity determination must
32   be done to demonstrate how the action will conform to the SIP. The demonstration process
33   involves public notification and response and may require extensive analysis.
34
35
36   ### 3.1.4.4  Air Quality-Related Values
37
38   AQRVs are defined as valued resources that may be adversely affected by a change in air
39   quality from air pollutant emissions, including visibility or a specific scenic, cultural, physical,
40   biological, ecological, or recreational resource identified by the FLM for a particular area.
41   Although the permit applicant should identify the potential impacts of the source on all
42   applicable AQRVs of that area, an FLM may ask an applicant to address any or all of the areas of
43   concern. The primary areas of concern to the FLMs are visibility impairment and effects of
44   pollutant deposition on soils and surface waters (USFS et al. 2010).
45

BLM_0042076

Visibility is a measure of aesthetic value and the ability to enjoy scenic vistas, but it also can be an indicator of general air quality. Visibility degradation is caused by cumulative emissions of air pollutants from a myriad of sources scattered over a wide geographical area, such as combustion-related sources and fugitive sources. The primary cause of visibility degradation is the scattering and absorption of light by fine particles (such as sulfates, nitrates, organic carbon, light-absorbing soot, soil dust, and sea salt) with a secondary contribution provided by gases (such as nitrogen dioxide). In general, visibility conditions in the western United States are substantially better than those in the eastern United States, which has higher pollutant loads and humidity levels. Dust sources vary greatly spatially and temporally but play a more important role in visibility degradation in the arid parts of the western United States. Fugitive dust from wind erosion and anthropogenic activities, including agriculture, construction, grazing, mining, and vehicle traffic on paved and unpaved roads, would be a major concern in the arid desert environment. The typical visual range (defined as the farthest distance at which a large black object can be seen and recognized against the background sky) in most of the West is about 60 to 90 mi (97 to 145 km), while that in most of the eastern United States is about 15 to 30 mi (24 to 48 km) (EPA 2006).

Annual mean reconstructed light extinction coefficients ($b_{ext}$) and deciview (dv)[7] averaged over 2005–2008 are similar for Class I areas around the ULP lease tracts (Hand et al. 2011): $b_{ext}$ of 20.18 Mm$^{-1}$ and 6.66 dv for Canyonlands NP; $b_{ext}$ of 21.34 Mm$^{-1}$ and 7.07 dv for Mesa Verde NP; and $b_{ext}$ of 20.34 Mm$^{-1}$ and 6.66 dv for Weminuche WA. These values correspond to about 120–125 mi (193–201 km) in visual range.

Much progress has been made to control $SO_2$ and $NO_2$ emissions primarily from fossil fuel–fired power plants and onroad/offroad engine exhaust, but dry and wet depositions of sulfur and nitrogen compounds continue to be a problem in the United States. Acid deposition causes acidification of lakes and streams, which has direct impacts on aquatic habitats, and contributes to the damage of trees at high elevation and many sensitive forest soils. In particular, certain sensitive freshwater lakes and streams continue to lose acid-neutralizing capacity (ANC), defined as a measure of the ability for water or soil to neutralize added acids, and sensitive soils continue to be acidified (USFS et al. 2010). In particular, many alpine lakes in the western United States are low in ANC because of thin soils and slowly weathering bedrock. Thus, these alpine lakes are vulnerable to changes in water chemistry caused by acid deposition.

Average total (dry + wet) depositions of sulfur and nitrogen combined at Clean Air Status and Trends Network (CASTNET) stations around the ULP lease tracts are about 2.88 kg/ha/yr for Canyonlands NP; 3.11 kg/ha/yr for Gothic in Gunnison County, Colorado; and 3.82 kg/ha/yr for Mesa Verde NP (EPA 2012b). These deposition fluxes are much lower than those in the

---

[7] The extinction coefficient (*bext*) represents the ability of the atmosphere to scatter and absorb light primarily by particles and, to some extent, by gases, and has unit of inverse length (inverse megameters, Mm$^{-1}$). The *bext* is related to visual range and deciview (a haziness index designed to be linear with respect to human perception of visibility, analogous to the decibel scale in acoustics). A higher *bext* corresponds to a lower visual range and higher deciview values.

BLM_0042077

1  eastern United States. In general, nitrogen depositions are primary contributors to total
2  depositions; in the eastern United States, sulfur depositions are more important.
3
4
5  **3.2  ACOUSTIC ENVIRONMENT**
6
7
8  **3.2.1  Sound Fundamentals**
9
10      Any pressure variation that the human ear can detect is considered "sound," and "noise"
11  is defined as unwanted sound. Sound is described in terms of amplitude (perceived as loudness)
12  and frequency (perceived as pitch). Sound pressure levels are typically measured with a
13  logarithmic decibel (dB) scale.[8] To account for human sensitivity to frequencies of sound
14  (i.e., less sensitive to lower and higher frequencies, and most sensitive to sounds between
15  1,000 and 5,000 Hz),[9] A-weighting (denoted by dBA) (Acoustical Society of America 1983,
16  1985) is widely used. This scale has a good correlation to a human's subjective reaction to
17  sound. Most noise standards, guidelines, and ordinances use the A-weighted scale.
18
19      To account for variations of sound with time, several sound descriptors are used. $L_{90}$ is
20  the sound level exceeded 90% of the time. It is called the residual sound level (or background
21  level), and it is a fairly steady, lower sound level on which discrete single events are
22  superimposed. The equivalent-continuous sound level ($L_{eq}$) is the level that, if it were continuous
23  during a specific time period, would contain the same total energy as the actual time-varying
24  sound. In addition, human responses to noise differ depending on the time of the day. People are
25  more annoyed by noise during nighttime hours when there are lower background noise levels.
26  The day-night average sound level ($L_{dn}$, or DNL) is the average over a 24-hour period, with the
27  addition of 10 dB to sound levels from 10 p.m. to 7 a.m. to account for the greater sensitivity of
28  most people to nighttime noise. The $L_{dn}$ scale is widely used for community noise assessment
29  and has been adopted by several Government agencies (e.g., Federal Aviation Administration,
30  Department of Housing and Urban Development, and Nuclear Regulatory Commission). In
31  general, a 3-dB change over an existing noise level is considered a barely discernible difference,
32  and a 10-dB increase is subjectively perceived as a doubling in loudness and almost always
33  causes an adverse community response (NWCC 2002).
34

---

[8]  Scales for measuring most familiar quantities such as length, distance, and temperature are linear. Logarithmic
scales, such as dB, compress the values of the measurements and are useful for measuring quantities like sound
levels that can vary over a large range. For example, two linear measurements of 10 units and
1,000,000,000 units might correspond to values of 1 and 9, respectively, on a logarithmic scale. Logarithmic
units also add differently than do linear units. For example, if one object is 6 ft long and a second is twice as
long, the second object is 12 ft long. For sounds, however, if one sound level is 50 dB and a second is twice as
loud, the second sound level will be 60 dB, not 100 (50 + 50) dB.

[9]  The frequency is defined as the number of cycles per second, which is denoted by the unit of hertz (Hz). The
normal hearing for a healthy young person ranges in frequency from about 20 to 20,000 Hz. The higher the
frequency of the waveform, the higher the pitch of the sound heard.

BLM_0042078

## 3.2.2 Background Noise Levels

Background noise is defined as the noise from all sources other than the source of interest. The background noise level can vary considerably, depending on the location, season, and time of day. Background noise levels in a busy urban setting can be as high as 80 dBA during the day. In isolated outdoor locations with no wind, vegetation, animals, or running water, background noise may be under 10 dBA. Typical noise levels in rural settings are about 40 dBA during the day and 30 dBA during the night, which correspond to an $L_{dn}$ of 40 dBA; in Wilderness Areas, typical noise levels are on the order of 20 dBA (Harris 1991).

State highways CO 90 and CO 141 run through or near the ULP lease tracts, and many county roads are scattered all over the ULP lease tracts. The nearest railroad runs as close as about 27 mi (43 km) from the northernmost ULP lease tracts. The nearest airport is Hopkins Field Airport in Nucla, about 7 mi (11 km) east of central ULP lease tracts. Other nearby public airports within a 50-mi (80-km) range include Grand Junction Regional Airport and Mack Mesa Airport in Mesa County, Montrose Regional Airport in Montrose County, Telluride Regional Airport in San Miguel County, and Monticello Airport in San Juan County, Utah . In addition, many private airports and heliports are scattered over the counties encompassing the ULP lease tracts. Most of Paradox Valley, which is located in the center of the ULP lease tracts, is utilized for open ranching, but some agricultural activities occur near Bedrock, Paradox, and Nucla in Montrose County. There are several minor noise sources throughout the valley, including aggregate processing operations, concrete batch plants, and uranium and vanadium ore mining (Edge Environmental, Inc. 2009). There is a 100-MW coal-fired power plant in Nucla, which receives coal from a nearby strip mine (New Horizon Mine) by tractor-trailer truck (Tri-State 2011). In addition, agricultural activities occur near Egnar in San Miguel County, south of the southernmost ULP lease tracts. Accordingly, in addition to natural sound sources (e.g., wind, rain, wildlife), noise sources around the ULP lease tracts include road traffic, aircraft flyovers, animal noise, agricultural activities, industrial activities, and nearby community activities and events. Other potential noise sources are recreational all-terrain vehicles being driven across the ULP lease tracts and ventilation shaft noise from underground mines. In summary, the area around the ULP lease tracts is remote, sparsely populated, and undeveloped; the overall character is considered mostly rural or undisturbed wilderness.

No sensitive receptors (e.g., hospitals, schools, or nursing homes) exist within a range of 3 mi (5 km) from the ULP lease tracts. Only 17 residences exist within 1 mi (1.6 km) of the 31 lease tracts; 7 of the 17 residences are adjacent to the 13 lease tracts. To date, no environmental noise survey has been conducted around the ULP lease tracts. It is likely that noise levels along the state highways and near agricultural/industrial activities would be relatively higher (about 50–60 dBA), while levels in areas far removed from manmade noise sources would be similar to wilderness background noise levels (below 30 dBA). On the basis of county population density data, $L_{dn}$ noise level estimates around the ULP lease tracts would be about 38 dBA for Mesa County, 35 dBA for Montrose County, and 30 dBA for San Miguel County (Miller 2002). For comparison, rural and undeveloped areas typically have $L_{dn}$ levels in a range of 33–47 dBA (Eldred 1982).

BLM_0042079

### 3.2.3  Noise Regulations

At the Federal level, the Noise Control Act of 1972 and subsequent amendments (Quiet Communities Act of 1978, 42 USC 4901–4918) delegate the authority to regulate noise to the states and direct Government agencies to comply with local noise regulations. EPA guidelines recommend $L_{dn}$ of 55 dBA as sufficient to protect the public from the effect of broadband environmental noise in typically quiet outdoor and residential areas and farms (EPA 1974). For protection against hearing loss in the general population from nonimpulsive noise, the EPA recommends $L_{eq}$ of 70 dBA or less over a 40-year period.

ULP activities would have to follow applicable Federal, state, or local guidelines and regulations on noise. Colorado has a noise statute with quantitative noise limits by zone and time of day, as shown in Table 3.2-1 (Colorado Revised Statutes, Title 25, "Health," Article 12, "Noise Abatement," Section 103, "Maximum Permissible Noise Levels"). However, Mesa, Montrose, and San Miguel Counties, which encompass the ULP lease tracts, do not have quantitative noise guidelines and regulations applicable to the ULP activities.

**TABLE 3.2-1  Colorado Limits on Maximum Permissible Noise Levels**

|  | Maximum Permissible Noise Levels (dBA)[a] | |
| --- | --- | --- |
| Zone | 7 a.m. to next 7 p.m.[b] | 7 p.m. to next 7 a.m. |
| Residential | 55 | 50 |
| Commercial | 60 | 55 |
| Light industrial | 70 | 65 |
| Industrial | 80 | 75 |

[a]  At a distance of 25 ft or more from the property line. Periodic, impulsive, or shrill noises are considered a public nuisance at a level of 5 dBA less than the levels tabulated. Construction projects shall be subject to the maximum permissible noise levels specified for industrial zones for (1) the period within which construction is to be completed pursuant to any applicable construction permit issued by the proper authority or (2) if no time limitation is imposed, for a reasonable period of time for completion of the project.

[b]  The tabulated noise levels may be exceeded by 10 dBA for a period not to exceed 15 minutes in any 1-hour period.

Source: Colorado Revised Statutes, Title 25, "Health," Article 12, "Noise Abatement," Section 103, "Maximum Permissible Noise Levels"

BLM_0042080

1  ## 3.3 GEOLOGICAL SETTING AND SOIL RESOURCES
2
3
4  ### 3.3.1 Geological Setting
5
6
7  #### 3.3.1.1 Physiography
8
9       The lease tracts are located within the eastern part of the Canyon Lands section of the
10  Colorado Plateau physiographic province in southwestern Colorado (Figure 3.3-1). The plateau
11  is an extensive region generally characterized by nearly horizontal sedimentary formations
12  covering an area of about 130,000 mi$^2$ (340,000 km$^2$) in the four corners region of Utah,
13  Colorado, Arizona, and New Mexico. It is characterized by high elevation (the general plateau
14  surface has an average elevation of about 5,200 ft [1,600 m], with plateaus and peaks nearly as
15  high as 13,000 ft [4,000 m]) and a deeply incised drainage system, forming steep-walled canyons
16
17



19  **FIGURE 3.3-1  Physiographic Map of the Colorado Plateau**
20  **(modified from Foos 1999)**

BLM_0042081

1  that expose geologic formations of late Paleozoic and early Mesozoic age. Most of the Colorado
2  Plateau is drained by the Colorado River and its main tributaries, the Green, San Juan, and Little
3  Colorado Rivers (Hunt 1974; Chronic and Williams 2002; Foos 1999).
4
5      The Canyon Lands section has been broadly uplifted, and structural features that have
6  been superposed on it have strongly affected its topography (Thornbury 1965). In the eastern part
7  of the Canyon Lands section in the area of the ULP lease tracts, topographic features are mainly
8  related to a series of northwest-striking anticlines and synclines. These structures are caused by
9  flowage or solution of masses of salt and gypsum that were deposited during Pennsylvanian time
10  in the Paradox Basin (Thornbury 1965). The section is also known for its incised canyons that
11  have formed in its drainage system. The example in the lease tracts area is the Dolores River and
12  its canyons and incised meanders.
13
14
15  **3.3.1.2  Structural Geology**
16
17      The Colorado Plateau is an uplifted crustal block that is tectonically distinct from the
18  extensional block-faulted regime of the Basin and Range province (to the west and south) and
19  the Rio Grande rift (to the east). The predominant structural features are northwest trending
20  basement uplifts (such as the Uncompahgre Plateau) that form steeply dipping monoclines with
21  associated structural basins. Most of the tectonic deformation on the plateau occurred during the
22  Laramide orogeny from 70 to 40 million years ago. Uplift of the plateau likely began about
23  29 million years ago as a result of compression created by extensional zones flanking the region
24  to the west and east. Heat flow measurements throughout the Colorado Plateau indicate low heat
25  flow in the relatively stable interior and high heat flow along the margins (Wong and
26  Humphrey 1989).
27
28      The lease tracts are located in the eastern part of the Paradox Basin, an elliptically shaped
29  structural basin that covers about 14,000 mi$^2$ (36,000 km$^2$) of the Colorado Plateau in
30  southwestern Colorado and southeastern Utah (Figure 3.3-2). The basin has little surface
31  expression, but is defined as the area on the plateau that is underlain by thick accumulations of
32  evaporites (mainly halite) of the Pennsylvanian age Paradox Formation. The area of northwest-
33  striking anticlines and synclines in the northeast part of the Paradox Basin is known as the
34  Paradox fold and fault belt (Figure 3.3-2). In this belt, the anticlinal structures are known as
35  valleys because their central salt cores have been breached by erosion and the subsequent
36  collapse has formed anticlinal valleys (Thornbury 1965). Strata along the valley sides indicate
37  that diapirism of the salt core occurred as recently as the late Jurassic (about 145 million years
38  ago), especially in the northeastern part of the belt (Hite and Lohman 1973; Chenoweth 1987;
39  Whitfield et al. 1983; Grout and Verbeek 1997; Condon 1997). Synclinal areas between the
40  anticlines have created flat-topped mesas or broad valleys that contrast highly with the fault-
41  bounded anticlinal valleys (Thornbury 1965). The ULP lease tracts are in the eastern part of the
42  Paradox fold and fault belt, in Colorado. Examples of the anticlinal valleys in the lease tracts
43  area are the Paradox and Big Gypsum Valleys; synclinal examples are Dry Creek Basin and
44  Disappointment Valley. Figure 3.3-3 is a shaded relief map showing the locations of the ULP
45  lease tracts.

BLM_0042082



1

2 **FIGURE 3.3-2  Extent of the Paradox Basin and the Paradox Fold and Fault Belt in Southwestern**
3 **Colorado and Southeastern Utah (modified from Grout and Verbeek 1997)**
4
5
6      To the north of the Paradox Basin is the Uncompahgre Uplift (or Plateau), a northwest-
7 trending, Precambrian basement-cored fold that overlies a basinward-oriented overthrust fault
8 (Figure 3.3-2). Vertical offset along this fault is about 3.7 mi (6 km); horizontal offset, which is
9 mainly left lateral, is about 6.2 mi (10 km) (Grout and Verbeek 1997; Condon 1997).
10
11      Relatively young laccolithic intrusions (Oligocene to Miocene age) form several
12 mountain ranges within the basin, including the Abajo and La Sal Mountains in southeastern
13 Utah and the Ute and La Plata Mountains in southwestern Colorado (Figure 3.3-2). These
14 intrusive centers are thought to have been emplaced during a period of crustal extension on the
15 Colorado Plateau (Grout and Verbeek 1997).
16
17

BLM_0042083



**FIGURE 3.3-3  Shaded Relief Map Showing Location of ULP Lease Tracts**

BLM_0042084

Crossing the anticlines and synclines of the Paradox fold and fault belt is the Uravan Mineral Belt, which generally contains the most productive uranium-vanadium deposits (Figure 3.3-4). This north-to-south arcuate band of the mineral belt encompasses all of the ULP lease tracts (Figure 3.3-3). The uranium-vanadium deposits in the mineral belt and the geology of the individual lease tracts are described in Sections 3.3.1.3.2 and 3.3.1.5, respectively.

### 3.3.1.3  Bedrock Geology

The geology of the area covering the ULP lease tracts and vicinity is shown in Figure 3.3-5. Exposed geologic units are predominantly sedimentary rocks of Cretaceous (Mancos Shale, Dakota Sandstone, and Burro Canyon Formation) and Jurassic (Morrison Formation) age.

**3.3.1.3.1  Stratigraphy.** The general stratigraphy of the Paradox Basin is shown in Figure 3.3-6. Selected bedrock formations cropping out in the lease tracts—from the Chinle Formation (Upper Triassic) to the Dakota Sandstone (Lower Cretaceous)—are described here in ascending order (oldest to youngest). Quaternary surficial deposits (alluvium, colluvium, and talus) occur throughout the basin and are found in abundance in river valleys and canyon bottoms.

**Chinle Formation (Upper Triassic).** The Chinle Formation is composed predominantly of siltstone, shale, conglomerate, and sandstone. Sediments of the formation were deposited on the southwestern edge of a nonmarine back-arc basin centered on the four corners region about 250 million years ago (Hazel 2000). Outcrops of the formation occur along the bottom of Summit Canyon and Dolores River Canyon. Its lowest unit, the Moss Back Member, is a fine-grained sandstone with thin layers of mudstone, siltstone, shale, and conglomerate. The unit is about 60 ft (18 m) thick and unconformably overlies the Moenkopi and Cutler Formations (Lower Triassic to Permian). In the Slick Rock area, the Moss Back Member is thought to comprise a system of coalescing channel-fill deposits with a northwestward trend. It is the only unit in the Chinle Formation that is known to be a host rock for uranium deposits (Shawe et al. 1968; Shawe 2011).

**Entrada Sandstone (Middle Jurassic).** The Entrada Sandstone is a fine-grained unit that is moderately well sorted, with thick to very thin crossbedded units and wavy-parallel laminated units. It is normally a reddish-brown color but is bleached to a yellowish brown in areas where it is overlain by the Pony Express Limestone Member of the Wanakah Formation. In the lease tracts, it has a whitish appearance in outcrop that makes it a good marker bed for discerning the approximate base of the Salt Wash Member of the Morrison Formation. Near Uravan, the formation sits unconformably atop the Kayenta Formation (Lower Jurassic) or a thin remnant of the Navajo Sandstone (Lower Jurassic). This unconformity, known as the J-2, is traceable throughout the U.S. western interior. Vanadium-uranium-chromium mineralization has been well

BLM_0042085



1

2    **FIGURE 3.3-4 Extent of the Uravan Mineral Belt in Relation to Known Uranium-Vanadium**
3    **Deposits (modified from Fischer and Hilpert 1952)**
4

BLM_0042086

1



2  **FIGURE 3.3-5  Geologic Map Covering the ULP Lease Tracts (Stoeser et al. 2007; Tweto 1979;**
3  **source of mapped faults and earthquake is USGS 2012)**

BLM_0042087

**Cenozoic (Quaternary, Tertiary)**

Qa    Alluvial deposits

Qe    Eolian deposits

Ql    Landslide deposits

Tmi   Middle Tertiary intrusive rocks (20 – 40 M.Y.); intermediate to felsic composition

**Mesozoic (Cretaceous, Jurassic, Triassic)**

Kmv   Mesaverde Group

Km    Mancos Shale

Kdb   Dakota Sandstone and Burro Canyon Formation

Jm    Morrison Formation

Jmse  Morrison Formation, Summerville Formation, and Entrada Sandstone

JTRgc Glen Canyon Group and Chinle Formation

TRkc  Kayenta Formation, Wingate Sandstone, and Chinle Formation

TRwc  Wingate Sandstone and Chinle Formation

TRc   Chinle Formation

TRPmc Moenkopi Formation (lower Triassic) and Cutler Formation (Permian)

**Paleozoic (Permian, Pennsylvanian)**

Pc    Cutler Formation

Ph    Hermosa Group

**Precambrian**

YXg   Granitic rocks (1,400 - 1,700 M.Y.)

ULP041

1

2    **FIGURE 3.3-5  (Cont.)**

BLM_0042088

| Era | Period | Million Years before Present | Stratigraphic Unit | Unit Thickness (feet) | Physical Characteristics |
|---|---|---|---|---|---|
| **Cenozoic** | Quaternary | 0 — 2.6 — 65.5 | Alluvium | 0–100 | Alluvium sands and gravels, loess, colluvium, windblown sands |
| **Mesozoic** | Upper Cretaceous | | Mesaverde Group | 100–1,000 | Sandstone, siltstone, and shale; major coal beds in lower part |
| | | | Mancos Shale | 1,000–5,000 | Shales interbedded with minor sandstone |
| | | | Dakota Sandstone | 0–200 | Fine-to coarse-grained cross-bedded sandstone; coal present. |
| | Lower Cretaceous | 99.6 — 145.5 | Burro Canyon Fm | 0–250 | Conglomerate, sandstone and shale |
| | Upper Jurassic | | Morrison Formation — Brushy Basin Member | 400–500 | Shales interbedded with minor sandstone |
| | | 161 | Morrison Formation — Salt Wash Member | 300 | Medium-grained sandstone interbedded with red shale |
| | | | Wanakah Fm (Summerville Fm) | 0–120 | Shales interbedded with minor sandstone |
| | Lower and Middle Jurassic | | Entrada Sandstone | 15–170 | Buff to grayish-white cross-bedded sandstones |
| | | | Carmel Formation | 0–40 | Siltstone and mudstone interbedded with fine-grained sandstone |
| | | | Navajo Sandstone | 0–125 | Fine-grained, cross-bedded quartz sandstone |
| | | 201.6 | Kayenta Formation | 0–200 | Sandstone interbedded with siltstone and thin-bedded shale |
| | Upper Triassic | | Wingate Sandstone | 0–400 | Medium-grained, poorly cemented, cross-bedded sandstone |
| | | | Dolores Formation | 150–230 | Pink to red mudstone and fine-grained sandstone. Present in southeast part of basin. |
| | | 235 | Chinle Formation | 0–500 | Shale, siltstones, interbedded with minor fine-grained sandstone |
| | Lower Triassic | 251 | Moenkopi Formation | 0–480 | Mudstone interbedded with minor sandstone |
| **Paleozoic** | Permian | 299 | Cutler Formation | 0–3,500 | Fine-grained sandstone interbedded with minor conglomerate and mudstone |
| | Pennsylvanian | 318 | Hermosa Group | 0–3,900 | Shales, limestones, salt and gypsum; includes the Paradox Formation |
| | Mississippian | 359 | Leadville Limestone | 20–100 | Massive to thinly laminated, gray buff and yellow limestone |
| | Devonian to Cambrian | 542 | Ouray, Elbert, and Ignacio Formations | 0–150 | Limestone, shale, dolomite; Ignacio is a quartzite |

MP011202

**FIGURE 3.3-6  Generalized Stratigraphy of the Paradox Basin (based on Topper et al. 2003, Walker and Geissman 2009, and Molenaar 1987)**

BLM_0042089

1    documented in the upper part of the Entrada Sandstone (e.g., to the southeast of Uravan near
2    Placerville) (Steele 1985).
3
4
5        **Wanakah (also known as the Summerville) Formation (Middle Jurassic).** The
6    Wanakah Formation unconformably overlies the Entrada Sandstone and is of marine and
7    marginal marine origin. It is composed of three members—the upper Marl member, the middle
8    Bilk Creek Sandstone Member, and the lower Pony Express Limestone Member—but is
9    undifferentiated in places. The upper unit (Marl) consists of alternating thin lenticular beds of
10   fine-grained sandstone, siltstone, mudstone, and claystone; the middle unit (Bilk Creek) consists
11   of a moderately well sorted, fine-grained sandstone and an upper unit of well-indurated carnelian
12   sandstone. These units are underlain by a limestone unit (Pony Express) with scattered silt-sized
13   quartz and feldspar grains (Steele 1985).
14
15
16       **Morrison Formation (Upper Jurassic).** The Morrison Formation occurs throughout the
17   U.S. western interior and its greatest known thickness is in the Slick Rock area, where a cored
18   section near Disappointment Valley is more than 1,100 ft (340 m) thick. In the lease tracts area,
19   the formation consists of two members: the lower Salt Wash Member and the upper Brushy
20   Basin Member. Sediments of the Salt Wash Member are composed of interbedded, fluvial
21   sandstones and mudstones deposited in stream channels and floodplains. These sediments were
22   laid down in an area of downwarping that resulted in a fan-shaped apron of thick sediment within
23   the main alluvial plain of deposition. This sediment apron, with its continuous sandstone beds
24   and abundant carbonized plant material, comprises the Salt Wash Member and is the host rock
25   for most of the uranium-vanadium deposits in the Paradox Basin. In the Slick Rock area, the Salt
26   Wash Member is about 300 ft (90 m) thick. The Brushy Basin Member conformably overlies the
27   Salt Wash Member. It consists predominantly of bentonitic mudstones, suggesting deposition in
28   a low-energy lacustrine environment. The sediments of the Brushy Basin Member have a high
29   devitrified volcanic glass content (from ashfalls). Some investigators have suggested that the
30   volcanic glass was originally uranium-rich and that uranium was released during the
31   devitrification process. This would make the Brushy Basin Member a possible source of uranium
32   in the underlying Salt Wash Member ore deposits (Shawe 2011; Breit and Fisher 1988; Mullins
33   and Freeman 1954).
34
35
36       **Burro Canyon Formation (Lower Cretaceous).** The Burro Canyon Formation overlies
37   the Brushy Basin Member of the Morrison Formation. Its type locality is near Slick Rock in San
38   Miguel County. The formation is composed of alternating beds of conglomeratic sandstone and
39   mudstone, with minor chert and limestone. Sandstone units are most abundant in the lower part
40   of the formation, forming ledges and vertical cliffs in outcrop; mudstones predominate in the
41   upper units and tend to form gentle to steep slopes. Together these units are thought to reflect a
42   sequence of high-energy deposition in a fluvial environment during a period of tectonic uplift
43   (lower sandstone) followed by a period of tectonic quiescence and low-energy deposition (upper
44   mudstones). The thickness of the formation is variable across short distances, but in the lease
45

BLM_0042090

1   tracts, it is consistently 130 ft (40 m) or more thick (with a maximum thickness of about 300 ft
2   (90 m) measured in a drill hole in Disappointment Valley) (Craig 1982).
3
4
5   **Dakota Sandstone (Upper Cretaceous).** The Dakota Sandstone unconformably overlies
6   the Burro Canyon Formation and consists mainly of fine- to medium-grained sandstone with a
7   basal unit of conglomerate and a middle unit of carbonaceous shale and mudstone (fossil plants,
8   pyrite, and coal are also present) (Shawe et al. 1968; Simmons 1957). Along with the Burro
9   Canyon Formation, this unit forms the caprock of several mesas in the lease tracts.
10
11
12   **3.3.1.3.2  Uranium Deposits.** The uranium deposits of the Salt Wash Member are known
13   as "sandstone-type" deposits. These are epigenetic concentrations of uranium minerals that occur
14   in fluvial, lacustrine, and deltaic sandstone formations in either continental or marginal marine
15   environments. The dominant host rocks are fine- to medium-grained sandstones of various
16   composition; uranium minerals are typically very fine-grained and occupy the intergranular
17   spaces of the host rock or locally replace fossil wood and bones. Other ore-grade minerals, such
18   as vanadium, copper, and trace metals (molybdenum, selenium, chromium, and radium), are
19   found in association with uranium deposits in the Salt Wash Member (Finch and Davis 1985).
20
21   The Uravan Mineral Belt was defined in the early 1950s to delineate the area of the most
22   concentrated and most productive uranium-vanadium deposits in sandstones of the Salt Wash
23   Member of the Morrison Formation that had been found up to that time (Fischer and
24   Hilpert 1952). Boundaries of the belt are approximate; at that time, some of the deposits were
25   outside of the belt. Since that time, additional deposits have been found by deeper exploratory
26   drilling and other improved exploration methods both within and outside the boundaries of the
27   mineral belt (Figure 3.3-4).
28
29   Most of the mineralized zones in the Salt Wash Member are tabular (lenticular) and
30   concordant with bedding planes; however, some deposits cut across bedding in smooth curves to
31   form rolls or roll fronts, especially near the edge of the ore body. Tabular deposits are thought to
32   have precipitated at chemical interfaces between connate pore waters and infiltrating
33   groundwater solutions; in contrast, roll-front deposits likely precipitated at a redox interface of
34   oxidizing recharge waters enriched with uranium passing through a reducing pyrite-bearing
35   sandstone. Sedimentary features have an important influence on the shape and distribution of
36   deposits in the Salt Wash Member. Most of the Salt Wash deposits are elliptical in plain view
37   and tend to cluster along the margins of major channels. More locally, individual deposits
38   concentrate along features that produce permeability changes, such as shale horizons. Faults also
39   play a role in mineral deposition by providing conduits for mineralizing solutions to access the
40   host rock (Chenoweth 1981; Finch and Davis 1985; Shawe 2011).
41
42
43

BLM_0042091

### 3.3.1.4  Seismicity

Seismicity on the Colorado Plateau is characterized as small to moderate in magnitude with a low to moderate rate of earthquake occurrence. Most seismic activity is concentrated in the Wasatch Plateau-Book Cliffs region (north of Paradox Basin), where numerous small-magnitude earthquakes are generated by coal mining. Earthquakes on the plateau generally occur in the upper crust, ranging in depth from the near-surface to 9 to 12 mi (15 to 20 km) (Wong and Humphrey 1989).

The lease tracts are located in the southeastern region of the Paradox Basin known as the Paradox fold and fault belt in the eastern part of the Paradox Basin (Figure 3.3-2). In this belt, normal faulting is associated with salt anticlines that have collapsed along their crests to form graben-like structural features. An example of such a fault is U.S. Geological Survey (USGS) No. 2286, a high-angle normal fault that trends northwestward along the Paradox Valley graben following the general trend of the valley (Figure 3.3-2). Faults along the edges of the graben are well-defined, and Quaternary movement has been inferred by several investigators. However, no evidence has been found to suggest Holocene age movement has occurred (Widmann 1997; Kirkham and Rogers 1981).

Seismic activity in the Paradox Basin is generally low, and earthquakes are of small magnitude and diffusely distributed (Wong and Humphrey 1989). From January 2000 through August 2012, only 13 earthquakes (of any magnitude) have been recorded within a 62-mi (100-km) radius of Paradox Valley; the most recent earthquake occurred on March 6, 2012 and registered a surface wave magnitude (MLg)[10] of 2.7. The largest earthquake occurred on May 27, 2000. It was located along the Dolores River in the central part of the valley and registered 4.3 MLg (Figure 3.3-5). Since 1980, only 10 of the 28 recorded earthquakes (36%) within a 62-mi (100-km) radius of Paradox Valley had surface wave magnitudes that were equal to or greater than 3.0 (USGS 2012a).

Ake et al. (2005) has noted the occurrence of more than 4,000 human-induced seismic events in Paradox Valley caused by high-pressure subsurface injections of brine by the U.S. Bureau of Reclamation (BOR) at its Paradox Valley Unit, located in Bedrock, Colorado (see Sections 3.9.1.1, 3.4.1.2, and 3.4.3 for information on the Paradox Valley Unit). Most of these events registered magnitudes too small to be felt (less than M 2.5); however, at least 15 have been felt, including the M 4.3 event that occurred in May 2000. The BOR has modified its injection strategy since 1996, and these changes have reduced the frequency of induced seismic events to as low as 60 events per year (most of which are not felt).

---

[10] Surface wave magnitude (MLg) is used for earthquakes with magnitudes of 5 to 8 and is based on the amplitude of the Lg surface wave (USGS 2012b).

BLM_0042092

### 3.3.1.5  Topography and Geology of the Lease Tracts

**3.3.1.5.1  Gateway Lease Tracts.** The Gateway lease tracts are located southeast of the town of Gateway at the northern end of the Uravan Mineral Belt (Figures 3.3-3 and 3.3-4). The two lease tracts, 26 and 27, are located on the tops and side slopes of Calamity and Outlaw Mesas, respectively. Sedimentary rocks cropping out on side slopes below the mesa rims range in age from Triassic to Cretaceous; Cretaceous sandstone and conglomerate cap the mesas (Figure 3.3-5). Uranium-vanadium deposits occur in the Salt Wash Member of the Morrison Formation (Upper Jurassic), and this unit has been mined extensively for nearly 100 years. Surface runoff from the mesas drains to Maverick and Calamity Creeks, tributaries of the Dolores River. Elevations of the Gateway lease tracts range from 5,700 to 7,000 ft (1,700 to 2,100 m) above sea level (Figure 3.3-7).

**3.3.1.5.2  Uravan Lease Tracts.** The six Uravan lease tracts are located immediately north, northwest, and west of the town of Uravan on the tops and side slopes of Atkinson Mesa (Lease Tracts 19, 19A, and 20), Spring Creek Mesa (Lease Tract 18), and Club Mesa (Lease Tracts 24 and 25) (Figure 3.3-8) in the central part of the Uravan Mineral Belt (Figures 3.3-3 and 3.3-4). The lease tracts in this region sit on the northeastern flank of the Paradox Valley anticline, where regional folds have a northwestern trend. There are no known major faults in the region (Joesting and Byerly 1958; Boardman et al. 1957).

Sedimentary rocks exposed in the Club Mesa area dip slightly to the northeast and are of Mesozoic age (Figure 3.3-5). These include the pre-Morrison Formations of Triassic and Jurassic age, the Morrison Formation (Upper Jurassic), and remnants of the Burro Canyon Formation (Lower Cretaceous). In this region, the Morrison Formation is the host rock for all uranium-vanadium deposits. The Salt Wash Member of the formation ranges in thickness from about 200 to 300 ft (60 to 90 m); the overlying Brushy Basin Member is about 400 to 450 ft (120 to 140 m) thick. Most of the uranium-vanadium deposits occur in the Salt Wash Member; small deposits also occur near the base of the Brushy Basin Member (Boardman et al. 1957).

The Dolores River and its main tributary, the San Miguel River, flow in the valley bottoms below the lease tracts. The canyon bottoms consist of unconsolidated fluvial deposits. Bedrock formations exposed along the lower slopes of the canyons are the Wanakah Formation (formerly the Summerville Formation) and the Entrada Sandstone (both Middle Jurassic). Below the Entrada Sandstone are rocks of the Kayenta Formation (Lower Jurassic) and the Wingate and Chinle Formations (Upper Triassic). Elevations of the Uravan lease tracts range from 5,100 to 6,400 ft (1,560 to 1,950 m) above sea level (Figure 3.3-8).

**3.3.1.5.3  Paradox Lease Tracts.** The Paradox lease tracts are located on the high plateaus that flank Paradox Valley in the central part of the Uravan Mineral Belt (Figures 3.3-2 and 3.3-4). Lease Tracts 5, 5A, 6, and 7 and a portion of Lease Tracts 8 are on the steep northeast

BLM_0042093

1

2



FIGURE 3.3-7  Topography of the Gateway Lease Tracts

BLM_0042094



FIGURE 3.3-8  Topography of the Uravan Lease Tracts

1

2

1   aspect of Monogram Mesa along the southwestern flank of the valley. The remainder of Lease
2   Tract 8 and all of Lease Tract 9 sit on the top of Monogram Mesa. The steep northeast aspect of
3   Monogram Mesa is formed by a series of structurally complex, faulted slump blocks composed
4   of the Brushy Basin and Salt Wash Members of the Morrison Formation (Upper Jurassic).
5   Overlying the Morrison Formation and forming the caprock of the mesa are the Burro Canyon
6   Formation (Lower Cretaceous) and the Dakota Sandstone (Upper Cretaceous) (Figure 3.3-5).
7
8         Lease Tracts 21, 22, 22A, and 23 are on a plateau know as Long Park, along the
9   northeastern flank of Paradox Valley. Lease Tracts 17-1 and 17-2 are located farther to the
10  southwest on top of Radium Mountain and Wedding Bell Mountain, respectively. The geology
11  of the Long Park plateau area is similar to that of Monogram Mesa, except that the formations
12  underlying Long Park plateau area (capped by the Brushy Basin Member of the Morrison
13  Formation) dip to the northeast. Elevation of the Paradox Valley floor is 5,500 to 5,600 ft
14  (1,680 to 1,700 m) above sea level, about 1,000 ft (300 m) below the tops of the adjacent mesas
15  to the north and 1,600 ft (490 m) below the top of Monogram Mesa to the south (Figure 3.3-9).
16
17        Lease Tract 17 is located farther to the southwest and consists of two parcels, 17-1 and
18  17-2 (west and east). The west parcel is on top and along the sides of Wedding Bell Mountain.
19  The east parcel is on top and along the sides of Radium Mountain. Both mountains are capped by
20  the Burro Canyon Formation (Lower Cretaceous) and Dakota Sandstone (Upper Cretaceous),
21  and the side slopes of both mountains contain exposures of both members (Brushy Basin and
22  Salt Wash) of the Morrison Formation (Upper Jurassic).
23
24
25        **3.3.1.5.4  Slick Rock Lease Tracts**. The Slick Rock lease tracts are located in the Slick
26  Rock mining district at the southern end of the Uravan Mineral Belt (Figures 3.3-3 and 3.3-4).
27  Major faults in the region have a northwest trend and run parallel to the collapsed Gypsum
28  Valley salt anticline that lies to the northeast. The Disappointment syncline is just to the
29  southwest of the Gypsum Valley anticline (Shawe 1970, 2011).
30
31        Sedimentary rocks cropping out in the region range in age from Permian to Cretaceous
32  and are at least 4,700 ft (1,400 m) thick (Figure 3.3-5). These rocks and the older Paleozoic
33  sedimentary rocks that underlie them together are about 13,000 ft (4,000 m) thick. Uranium and
34  vanadium deposits occur in the Moss Back Member of the Chinle Formation (upper Triassic) and
35  several levels of the Morrison Formation (upper Jurassic); however, most of the important ore
36  production has been from the Salt Wash Member of the Morrison Formation (Shawe et al. 1968;
37  Shawe 2011).
38
39        The 11 lease tracts in the Slick Rock area are located near the Dolores River, which flows
40  northward through the narrow, steep-walled Dolores River Canyon. The canyon bottom and
41  lower slopes consist of unconsolidated fluvial deposits and alluvial/colluvial deposits,
42  respectively. In the northern part of the Canyon, near the town of Slick Rock, the canyon floor is
43  underlain by the Entrada Sandstone. Bedrock formations exposed along the canyon walls and
44  adjoining mesas include, in ascending order, the Salt Wash and Brushy Basin Members of the
45  Morrison Formation (Upper Jurassic), and the Burro Canyon Formation and the Dakota

BLM_0042096

1



2   **FIGURE 3.3-9  Topography of the Paradox Lease Tracts**

BLM_0042097

1   Sandstone (Lower Cretaceous). Lease Tracts 13, 13A, and 14 lie within the Dolores River
2   Canyon or on adjacent ridges. Lease Tracts 15 and 15A are located west of and above the
3   Dolores River on the first topographic bench near Cougar Point. Lease Tracts 11 and 11A are to
4   the southwest of the town of Slick Rock in the western part of Summit Canyon, near the top of
5   Summit Point. Lease Tracts 10, 12, 16, and 16A lie just south of the top of Slick Rock Hill.
6   Elevations of the Slick Rock lease tracts range from 5,400 ft (1,650 m) above sea level along the
7   Dolores River to nearly 8,000 ft (2,400 m) above sea level on the mesa top east and north of
8   Egnar, Colorado (Figure 3.3-10).
9
10

11       **3.3.1.6 Paleontological Resources**
12
13       Significant paleontological resources in the lease tracts are associated with Mesozoic age
14   geologic units (formations), especially those from the Jurassic and Cretaceous Periods (206 to
15   65 million years ago). These units are of marine and nonmarine origin and yield important
16   vertebrate fossils, including fish, frogs, salamanders, turtles, crocodiles, pterosaurs, mammals,
17   birds, and dinosaurs (Armstrong 1982; USFS and BLM 2013). Invertebrate fossils
18   (e.g., ammonites) and plants are also abundant. They generally have a high Potential Fossil Yield
19   Classification (PFYC)[11] ranking that indicates a high fossil yield and a great sensitivity to
20   adverse impacts. Table 3.3-1 lists the geologic units potentially affected in the lease tracts and
21   their PFYC ranking. The Morrison Formation is the main source of uranium in the lease tracts
22   and likely would be the geologic unit most affected by future mining. The table includes deeper
23   (older) geologic units because uranium is also known to occur in the Chinle Formation in the
24   Slick Rock area (see Section 3.3.1.3.1).
25
26       Various statutes, regulations, and policies govern the management of paleontological
27   resources on public lands. Congress recently passed a paleontology law, titled "Paleontological
28   Resources Preservation under the Omnibus Public Lands Act of 2009" (P.L. 111-11, codified at
29   16 USC 470aaa), also known as the PRPA (for Paleontological Resources Preservation Act). The
30   PRPA establishes three main points: (1) paleontological resources collected under a permit are
31   U.S. property and must be available for scientific research and public education and preserved in
32   an approved facility; (2) the nature and location of paleontological resources on public lands
33   must be kept confidential to protect those resources from theft and vandalism; and (3) theft and
34   vandalism of paleontological resources on public lands can result in civil and criminal penalties
35   including fines and/or imprisonment. The law also requires an expansion of public awareness
36   and education regarding the importance of paleontological resources on public lands and the
37   development of management plans for inventory, monitoring, and scientific and educational use
38   of paleontological resources (BLM 2009c).
39

---

[11]  The PFYC system is used by the BLM to classify the potential for significant paleontological resources to occur
      in a geologic unit and to assess possible resource impacts and mitigation needs for Federal actions involving land
      disturbance. The PFYC rankings range from Class 1 (very low) to 5 (very high); units with an unknown potential
      are typically assigned a Class 3 (moderate) rank until further study can be conducted. Geologic units with high
      PFYC rankings (Classes 4 and 5) are highly fossiliferous and are most at risk of human-caused adverse impacts
      or natural degradation (BLM 2007c).

BLM_0042098

1
2

**FIGURE 3.3-10  Topography of the Slick Rock Lease Tracts**

BLM_0042099

1      **TABLE 3.3-1  Geologic Units in the Lease Tracts and Their PFYC Ranking**

| Geologic Unit | PFYC | Known Fossil Resources |
|---|---|---|
| Alluvium (Quaternary) | 2–3 | Mammals (shrub ox) |
| Mancos Shale (Upper Cretaceous) | 2–3 | Invertebrates (ammonites, oysters, brachiopods, clams), sharks, large marine reptiles, fish, dinosaurs, pollen, plants, and trace fossils (e.g., crayfish borrows) |
| Dakota Sandstone (Upper Cretaceous) | 5 | Dinosaur bones and tracks; plants |
| Burro Canyon Formation (Lower Cretaceous) | 3 | Invertebrates and plants |
| Morrison Formation (Upper Jurassic) | 5 | Dinosaurs, lizards, other reptiles, birds, mammals, amphibians, fish, invertebrates, and plants |
| Wanakah Formation (Middle Jurassic) | 4/5 | Dinosaurs, early mammals, seed plants, ferns, marine reptiles, fish, sharks and rays, ammonites, and plankton |
| Entrada Sandstone (Middle Jurassic) | 4/5 | Dinosaurs, early mammals, seed plants, ferns, marine reptiles, fish, sharks and rays, ammonites, and plankton |
| Dolores Formation (Upper Triassic) | 3 | Flowering plants |
| Chinle Formation (Upper Triassic) | 4/5 | Vertebrate (fish) and plants |

Source: USFS and BLM (2013)

2
3
4          Paleontological resources are also managed and protected under the Federal Land Policy
5  and Management Act (FLPMA; P.L. 94-579, codified at 43 USC 1701-1782) and Theft and
6  Destruction of Government Property (18 USC 641), which penalizes the theft or degradation of
7  property of the U.S. Government; see BLM Manual 8270 (*Paleontological Resource
8  Management*) for complete listing of applicable regulations (BLM 1998, 2007c, 2008f).
9
10
11  **3.3.2  Soil Resources**
12
13          Soil formation results from the complex interactions among parent (geologic) material,
14  climate, topographic relief, natural vegetation, and soil organisms over long periods of time. The
15  classification of soils is based on their degree of development into distinct layers or horizons and
16  their dominant physical and chemical properties. In this section, soils in the lease tracts are
17  represented by map units from soil surveys (originally mapped at the 1:24,000 scale) available
18  through the Natural Resources Conservation Service's (NRCS's) online Web survey. Map units
19  consist of soils of different series or of different phases within one series. On the maps that

BLM_0042100

1   follow, the map units are typically of two types: soil complexes (two or more soils intermingled)
2   or soil associations (adjacent soils that commonly occur together and are difficult to delineate).
3   Rocky areas that have shallow or severely eroded soils are classified as rock outcrops (Spears
4   and Kleven 1978; Hawn 2003).
5
6          Most of the soils in the lease tracts are formed in the residuum of weathered sandstone or
7   shale. Soils that formed in weathered sandstone are generally sandy; soils formed in weathered
8   shale are generally clayey. Soils formed in mixed alluvium (derived from both sandstone and
9   shale) in major valleys and bordering uplands tend to be loamy (Spears and Kleven 1978). The
10  potential for wind and water erosion of soils on the relatively flat mesa tops is slight to moderate
11  (but can be higher in localized areas); however, the potential for soil erosion on steep side slopes
12  (where soil is present) is moderate to severe.
13
14         Biological soil crusts are commonly found throughout the Colorado Plateau. They
15  consist of surface crusts formed by soil particles bound together by living organisms and their
16  by-products. Most of the biological soil crusts on the plateau are composed of *Microcoleus*
17  *vaginatus* (a cyanobacteria). Lichens (*Collema* spp.) and mosses (*Tortula* spp.) are also common.
18  Landscapes in which cyanobacteria predominate have a "pinnacle-type" microtopography
19  created by soil heaving in response to winter freezing. Pinnacled crusts may reach heights of
20  4 in. (10 cm). Soil crusts play an important ecological role within an ecosystem (e.g., carbon and
21  nitrogen fixation, solar energy absorption, and seed germination), and their presence can affect
22  water infiltration rates and stabilize soil surfaces against wind and water erosion. Biological soil
23  crusts are highly susceptible to compressional disturbance (from vehicles and trampling by
24  animals or people), especially in sandy soils. Disturbance can affect their composition and may
25  reduce the number and diversity of crust organisms found on the surface. In areas where
26  biological crusts are abundant, these changes may increase the rate of soil loss due to surface
27  runoff or wind erosion (USGS Canyonlands Research Station 2006; Belnap et al. 2001;
28  Rosentreter et al. 2007). Biological soil crusts within the lease tracts have not been surveyed.
29
30
31  **3.3.2.1  Gateway Lease Tracts**
32
33         Soils within the Gateway lease tracts on Calamity and Outlaw Mesas (26 and 27) are
34  predominantly the clay to gravelly loams of the following complexes: Bodot-Sili-rock outcrop
35  (5 to 25% slopes); Gladel-Bond-rock outcrop (3 to 25% slopes); Wrayha-Dollard-Fergus (25 to
36  65% slopes); and Fergus-Zoltay (3 to 12% slopes). Together these complexes make up about
37  55% of the soil coverage at the two lease tracts (Figure 3.3-11). Rock outcrops (50–99% slopes)
38  occur along the mesa rims (Map Unit 904) and cover about 27% of the two lease tracts. Soils on
39  the mesa tops are formed from residuum weathered from clayey shale and sandstone. They are
40  moderately deep to very deep and well-drained with slow to moderate infiltration rates when wet
41  and slow to moderate rates of water transmission. Strewn cobbles, stones, and boulders

BLM_0042101



1
2   **FIGURE 3.3-11  Soils within and around the Gateway Lease Tracts (NRCS 2009)**

BLM_0042102

are common on the surface. Available water-holding capacity[12] is high for soils like the Fergus-Zoltay and Barx-Progresso complexes (Map Units 33 and 64), which have a relatively high organic content (NRCS 2012a).

Water erosion potential for mesa top soils is moderate (Kw factors range from 0.20 to 0.32),[13] with the highest potential occurring for soils of the Gladel-Bond-Rock outcrop complex on the slopes of Maverick Canyon on the west side of Lease Tract 26 (Map Unit 67). The susceptibility to wind erosion is low to moderate (wind erodibility groups [WEGs] 3 to 8),[14] but could be high in areas where vegetation is sparse. Soils on the mesa tops have a moderate to severe rutting hazard. None of the soils are classified as prime or unique farmland (NRCS 2012a).

### 3.3.2.2  Uravan Lease Tracts

Soils within the Uravan lease tracts on Atkinson and Spring Creek Mesas (18, 19, 19A, and 20) are predominantly the loams and fine sandy loams of the Piñon-Bowdish-Rock outcrop (330% slopes) and the Barx-Progresso (3–12% slopes) complexes, which together make up about 74% of the soil coverage at the four lease tracts (Figure 3.3-12). The Rock outcrop-Orthents complex (40–90% slopes) occurs along the south rim of Atkinson Mesa and (Map Unit 88) and the southwest aspect of Spring Creek Mesa; below this complex (i.e., further downslope on terraces of the San Miguel River) is the Bodot, dry-Ustic Torriorthents complex (5–50% slopes) (Map Unit 23). These units together cover about 24% of the four sites. To the south, within the lease tracts on Club Mesa (24 and 25), the cobbly clay loams of the Bodot, dry-

---

[12] Available water-holding capacity is the amount of water that a soil can store that is available for use by plants. In this report it is expressed in relative terms (or classes) of low, medium, and high. The capacity of soil to hold water is affected by various soil characteristics, including texture and the amount of rock fragments and organic matter present. Loams (followed by clays) tend to have higher water-holding capacity than sands; rock fragments in soil decrease its water-holding capacity while organic matter increases it (NRCS 2012h).

[13] K factor is the soil erodibility factor, one of six factors used in the Universal Soil Loss Equation and the Revised Universal Soil Loss Equation to predict average annual rate of soil loss by sheet and rill erosion in tons per acre per year. Values range from 0.02 to 0.69. Other factors being equal, the higher the K value, the more susceptible the soil is to sheet and rill erosion by water. The ratings provided in this section are defined as follows: low, 0.02 to 0.19; moderate, 0.20 to 0.49; and high, 0.50 to 0.69. The values are based on the percentage of silt, sand, and organic matter and on soil structure and saturated hydraulic conductivity and also takes into account the presence of rock fragments. For this reason, it is referred to here as K factor, whole soil (or Kw) (NRCS 2012b).

[14] WEGs are based on soil texture, organic matter content, effervescence of carbonates, content of rock fragments, and mineralogy, and also take into account soil moisture, surface cover, soil surface roughness, wind velocity and direction, and the length of unsheltered distance (USDA 2004). WEG groups range in value from 1 (most susceptible to wind erosion) to 8 (least susceptible to wind erosion). The NRCS provides a wind erodibility index, expressed as an erosion rate in tons per acre per year, for each of the WEGs: WEG 1, 160 to 310 tons/acre/year; WEG 2, 134 tons/acre/year; WEGs 3, 4 and 4L, 86 tons/acre/year; WEG 5, 56 tons/acre/year; WEG 6, 48 tons/acre/year; WEG 7, 38 tons/acre/year; and WEG 8, 0 tons/acre/year. The ratings provided in this section are defined as follows: low, WEGs 7 and 8; moderate, WEGs 3 to 6; and high, WEGs 1 and 2.

BLM_0042103



1
2   FIGURE 3.3-12  Soils within and around the Uravan Lease Tracts (NRCS 2009)

BLM_0042104

Ustic Torriorthents complex (5–50% slopes) predominate, constituting about 68% of the soil coverage at the two lease tracts.

Soils on the Atkinson and Spring Creek Mesas are formed from residuum weathered from interbedded sandstone and shale (Piñon-Bowdish-Rock outcrop complex) and from alluvium derived from sandstone exposed along drainages (Barx-Progresso complex). The soils of the Piñon-Bowdish-Rock outcrop complex are moderately deep and well-drained with very slow infiltration rates (i.e., very high surface runoff) when wet and slow to very slow rates of water transmission. Available water-holding capacity is very low. In contrast, soils of the Barx-Progresso complex have moderate infiltration rates when wet and moderate rates of water transmission; available water-holding capacity of these soils is high (NRCS 2012b).

Water erosion potential for soils on Atkinson and Spring Creek Mesas is moderate (Kw factor for the Barx-Progresso complex is 0.20; the Piñon-Bowdish-Rock outcrop complex is not rated). The susceptibility to wind erosion is also moderate (WEGs 3 and 4L) but could be high in areas where vegetation is sparse. Soils on the mesa tops have a moderate to severe rutting hazard. None of the soils are classified as prime or unique farmland (NRCS 2012b).

Soils on Club Mesa are formed from slope alluvium weathered from shale (Bodot, dry-Ustic Torriorthents complex; Map Unit 23). These soils are moderately deep and well drained with slow infiltration rates (i.e., high surface runoff) when wet and slow rates of water transmission (smectitic properties impede the movement of water). Available water-holding capacity is low. Water erosion potential for soils on the mesa is low (Kw factor is 0.10). The susceptibility to wind erosion is moderate (WEG 5) but could be high in areas where vegetation is sparse. Soils on the mesa top have a moderate rutting hazard. None of the soils are classified as prime or unique farmland (NRCS 2012b).

### 3.3.2.3  Paradox Lease Tracts

**3.3.2.3.1  Long Park Area.** Soils within the Long Park area Lease Tracts 21, 22, and 22A are predominantly the cobbly clay loams of the Bodot, dry-Ustic Torriorthents complex (5–50% slopes), which makes up about 47% of the soil coverage at the three lease tracts (Figure 3.3-13). The Paradox fine sandy loam (Map Unit 73) covers portions of intermittent stream valleys that cut the plateau surface (streams flow to the northeast toward the San Miguel River), especially within Lease Tracts 21 and 22. Soils in lease tracts to the southeast (23-1, 23-2, and 23-3) occupy high-elevation areas cut by intermittent streams. Soils in the high-elevation areas are the loams of the Piñon-Bowdish-rock outcrop complex (3 to 30%); those in the valleys are the cobbly clay loams of the Bodot, dry-Ustic Torriorthents complex (5 to 50% slopes) (NRCS 2012c).

Soils in the high-elevation areas are formed from residuum weathered from interbedded sandstone and shale (Piñon-Bowdish-rock outcrop complex; Map Unit 75). These soils are moderately deep and well-drained with very slow infiltration rates (i.e., very high surface runoff)

BLM_0042105



FIGURE 3.3-13  Soils within and around the Paradox Lease Tracts (NRCS 2009)

BLM_0042106

1    when wet and slow to very slow rates of water transmission. Available water-holding capacity is
2    very low. Water erosion potential for high-elevation soils is not rated. The susceptibility to wind
3    erosion is moderate (WEG 4L) but could be high in areas where vegetation is sparse. High-
4    elevation soils have a moderate to severe rutting hazard (NRCS 2012c).
5
6          Soils in the intermittent stream valleys are formed from slope alluvium weathered from
7    shale (Bodot, dry-Ustic Torriorthents; Map Unit 23). These soils are moderately deep and well-
8    drained with slow infiltration rates (i.e., high surface runoff) when wet and slow rates of water
9    transmission (smectitic properties impede the movement of water). Available water-holding
10   capacity is low. Water erosion potential for stream valley soils is low (Kw factor is 0.10). The
11   susceptibility to wind erosion is moderate (WEG 5) but could be high in areas where vegetation
12   is sparse. These soils have a moderate rutting hazard (NRCS 2012c).
13
14         Of all the soils in the Long Park area, only the Paradox fine sandy loam (Map Unit 73) is
15   classified as prime farmland, if irrigated (NRCS 2012c).
16
17
18         **3.3.2.3.2  Monogram Mesa Area.** Soils within the lease tracts on top of and along the
19   northeast aspect of Monogram Mesa (5, 5A, 6, 7, 8, 8A, and 9) have compositions that vary with
20   elevation (Figure 3.3-13). On the top of the mesa (within Lease Tracts 8 and 9), soils are
21   predominantly loams: the Piñon-Bowdish-Progresso loams, cool (1–12% slopes) and the
22   Monogram loam (1–8% slopes), which together make up about 68% of the soil coverage at the
23   two lease tracts. Lease Tract 8A sits almost exclusively on sandstone outcrops (Map Unit 87)
24   along the mesa side slopes where soil is not well developed. Soils within the remaining lease
25   tracts occur at lower elevations, along the mesa side slopes (Lease Tract 6) where the Gladel-
26   Bond-Rock outcrop complex (1–50% slopes) predominates, covering about 63% of the site, and
27   along the lower terraces above the southeast end of Paradox Valley (5, 5A, and 7) where the
28   Bodot, dry-Ustic Torriorthents complex (5–50% slopes) predominates, covering about 78% of
29   the three lease tracts (NRCS 2012d).
30
31         Soils on the mesa top are formed from residuum weathered from interbedded sandstone
32   and shale and from windblown (eolian) deposits (Monogram loam) over sandstone. They are
33   moderately deep to deep and well-drained with slow to moderate infiltration rates when wet and
34   slow to moderate rates of water transmission. Available water-holding capacity is very low
35   (Piñon-Bowdish-Progresso loams) to high (Monogram loam). Water erosion potential for mesa
36   top soils is moderate (Kw factors range from 0.32 to 0.43), with the highest potential occurring
37   for the Monogram loam on Lease Tract 9 (Map Unit 60). The susceptibility to wind erosion is
38   also moderate (WEGs 4L and 6) but could be high in areas where vegetation is sparse. These
39   soils are not rated for rutting hazard. Only the Monogram loam is classified as prime farmland, if
40   irrigated (NRCS 2012d).
41
42         Soils on the mesa side slopes are formed from residuum and eolian material weathered
43   from sandstone (Gladel-Bond-Rock outcrop complex; Map Unit 45). These soils are very
44   shallow to shallow and well-drained with very slow infiltration rates (i.e., very high surface
45   runoff) when wet and very slow rates of water transmission. Available water-holding capacity is

BLM_0042107

very low. Water erosion potential for soils on the mesa side slopes is moderate (Kw factor is 0.20). The susceptibility to wind erosion is also moderate (WEG 3) but could be high in areas where vegetation is sparse. These soils are not rated for rutting hazard. None of the soils are classified as prime or unique farmland (NRCS 2012d).

Soils on the lower terraces above Paradox valley are formed from slope alluvium weathered from shale (Bodot, dry-Ustic Torriorthents complex; Map Unit 23). These soils are moderately deep and well-drained with slow infiltration rates (i.e., high surface runoff) when wet and slow rates of water transmission (smectitic properties impede the movement of water). Available water-holding capacity is low. Water erosion potential for mesa top soils is low (Kw factor is 0.10). The susceptibility to wind erosion is moderate (WEG 5) but could be high in areas where vegetation is sparse. These soils have a moderate rutting hazard. None of the soils are classified as prime or unique farmland (NRCS 2012d).

**3.3.2.3.3  Wedding Bell and Radium Mountains.** Soils within the lease tracts on top of Wedding Bell and Radium Mountains (17-1 and 17-2) are predominantly the fine sandy loams of the Piñon-Bowdish-Rock outcrop (3 to 30% slopes), which make up about 40% of the soil coverage at the two lease tracts (Figure 3.3-13). The mountain tops are rimmed by rock outcrops, including the Rock outcrop-Orthents complex (Map Units 87 and 88), covering about 29% of the sites. Soils at lower elevations (e.g., toward Bachelor Draw that separates the two landforms) are composed of the cobbly clay loams of the Bodot, dry-Ustic Torriorthents complex (5–50% slopes) (NRCS 2012d).

The soils on the mountain tops are formed from residuum weathered from interbedded sandstone and shale (Piñon-Bowdish-Progresso loams; Map Unit 76). They are moderately deep and well-drained with very slow infiltration rates (i.e., very high surface runoff) when wet and slow to very slow rates of water transmission. Available water-holding capacity is very low. Water erosion potential for mountain top soils is moderate (Kw factor is 0.32). The susceptibility to wind erosion is also moderate (WEG 4L) but could be high in areas where vegetation is sparse. These soils are not rated for rutting hazard. Except for the Monogram loam, which occurs on Lease Tract 17-1, none of the soils are classified as prime or unique farmland (NRCS 2012d).

Soils at lower elevations are formed from slope alluvium weathered from shale (Bodot, dry-Ustic Torriorthents complex; Map Unit 23). These soils are moderately deep and well-drained with slow infiltration rates (i.e., high surface runoff) when wet and slow rates of water transmission (smectitic properties impede the movement of water). Available water-holding capacity is low. Water erosion potential for these soils is low (Kw factor is 0.10). The susceptibility to wind erosion is moderate (WEG 5) but could be high in areas where vegetation is sparse. Soils at lower elevations have a moderate rutting hazard. None of the soils are classified as prime or unique farmland (NRCS 2012d).

BLM_0042108

### 3.3.2.4  Slick Rock Lease Tracts

Soils within the Slick Rock lease tracts can be divided regionally into those that occur on the flanks of Summit Canyon (11, 11A, 16, and 16A), those that occur in Dolores River Canyon (13, 13A, and 14), those that sit on a topographic bench above the Dolores River (15 and 15A), and those that sit on hill slopes to the south of Slick Rock (10 and 12). Soils along Summit Canyon and on the topographic bench above the Dolores River are similar in composition and characteristics to those previously described that form on mesa tops (see Sections 3.3.2.1 and 3.3.2.2; NRCS 2012e, f). They are predominantly Piñon-Bowdish-Progress loams, cool (1–12% slopes) and the sandy loams of the Gladel-Bond-rock outcrop (1–50% slopes) and the Gladel-Bond-rock outcrop, cool (3–25% slopes) complexes; sandstone outcrops (Map Unit 87), where soil is not well developed, are also common along the canyon walls (Figure 3.3-13).

Soils within lease tracts along the Dolores River Canyon (13, 13A, and 14) are predominantly the sandy and stony loams of the Farb-Rock outcrop (1–30% slopes) and Rock outcrop-Orthents (40–90% slopes) complexes, which together make up about 63% of the soil coverage at the three lease tracts (Figure 3.3-14). Soils of the Farb-Rock outcrop complex formed in residuum weathered from sandstone; soils of the Rock outcrop-Orthents complex formed from colluvium and slope alluvium weathered from sandstone and shale. The soils are shallow and well to excessively drained with a very slow infiltration rates (i.e., very high surface runoff) when wet. Available water-holding capacity is very low for most soils within the three lease tracts. Water erosion potential is moderate (Kw factors range from 0.20 to 0.49; the Farb-Rock outcrop complex is not rated), with the highest potential occurring for the Killpack-Deaver loams (Map Unit 52) on the high-elevation slopes along the Dolores River. The susceptibility to wind erosion is low to moderate (WEGs 3 to 8). Soils in the canyon bottom (Fluvaquents; Map Unit 43) are poorly drained and prone to flooding. These soils cover only a small portion of the site (about 3%) and have a moderate water erosion potential (Kw factor 0.37) (NRCS 2012e).

Soils within Lease Tract 10 are predominately the very stony loams of the Borolls-Rock outcrop complex (40 to 90% slopes) and the Beje fine sandy loam (3 to 25% slopes), which together make up about 74% of the soil coverage at the site (Figure 3.3-14). Soils of the Borolls-Rock outcrop complex formed from colluvium and residuum weathered from sandstone and shale; Beje fine sandy loams formed from residuum weathered from sandstone. The soils are shallow and well=drained with very slow infiltration rates (i.e., very high surface runoff) when wet and slow to very slow rates of water transmission; the Borolls-Rock outcrop complex is characterized by a more moderate infiltration rate. Available water-holding capacity is low to very low. Water erosion potential for soils within the lease tract is moderate (Kw factor is 0.24). The susceptibility to wind erosion is also moderate (WEG 6) but could be high in localized areas where vegetation is sparse. None of the soils are classified as prime or unique farmland (NRCS 2012f).

Soils within Lease Tract 12 are predominantly the Nortez loam (1 to 6% slopes), the Nortez-Fivepine loams (1 to 12% slopes), and the Nortez-Acree loams (1 to 12% slopes), which together make up about 87% of the soil coverage at the site (Figure 3.3-14). These soils are formed from mixed alluvium derived from sandstone and shale. They are moderately deep and

BLM_0042109



1
2   FIGURE 3.3-14  Soils within and around the Slick Rock Lease Tracts (NRCS 2009)

BLM_0042110

well-drained with a slow infiltration rate when wet. Available water-holding capacity is low to very low. Water erosion potential for soils within the lease tract is moderate (Kw factor is 0.32). The susceptibility to wind erosion is also moderate (WEG 6) but could be high in areas where vegetation is sparse. None of the soils are classified as prime or unique farmland (NRCS 2012g).

## 3.4 WATER RESOURCES

Water resources in southwestern Colorado are primarily governed by semiarid climate conditions and rugged topography. The DOE ULP tracts are located in the Colorado Plateaus physiographic region, which contains characteristic, high-elevation plateaus and vast canyon regions (USGS 2003). The lease tracts span the Upper Dolores (14030002), San Miguel (14030003), and Lower Dolores (14030004) hydrologic cataloging units (Hydrologic Unit Codes, HUC8), which cover a combined 4,600 mi$^2$ (12,000 km$^2$) in southwestern Colorado and portions of eastern Utah (USGS 2011a). The surficial geology of the region is described in Section 3.3. The climatic conditions of southwestern Colorado can vary over short distances because of the mountainous terrain; they can be generally characterized as having cold winters with snow cover and high summer temperatures (WRCC 2011b). Average annual precipitation patterns are relatively high in the Mountain area, with decreasing precipitation heading west across the study area, as shown in Figure 3.4-1. Monthly precipitation and snowfall amounts have been recorded at Uravan, Colorado (NOAA CO-OP ID 58560; NCDC 2012) since 1960. Average monthly precipitation totals range from 0.5 to 1.5 in. (1.3 to 3.8 cm), and snowfall occurs between October and April, with monthly totals averaging 0.2 to 4.2 in. (0.5 to 10.7 cm), but with maximum monthly snowfalls exceeding 30 in. (76 cm). The average annual precipitation at Uravan was 12.5 in. (31.8 cm), with a range of 7.1 to 21.4 in (18.0 to 54.4 cm) from 1960 to 2012. The potential annual evaporation rate is estimated to be 38 in. (97 cm) by Golder Associates (2009), based on the climate data at the Uravan station. The soil water content is usually deficient, and direct groundwater recharge is thus minimal under the condition of low annual precipitation and the high potential for evaporation in the area.

### 3.4.1 Surface Water

#### 3.4.1.1 Stream and Drainage Systems

The Dolores River and its tributary, the San Miguel River, are the main perennial rivers that flow through the lease tracts, as shown in Figure 3.4-2. The Gunnison River flows into the Colorado River near Grand Junction, Colorado, but it is on the order of 50 mi (80 km) northeast of the lease tracts and separated by a drainage divide. The Dolores River Basin includes three watersheds, Upper Dolores, San Miguel, and Lower Dolores, which are drained by the Dolores and San Miguel Rivers and their tributaries, as well as numerous intermittent and ephemeral streams.

BLM_0042111



Legend (in inches)

| | | | |
|---|---|---|---|
| ■ | Under 10 | ■ | 35 to 40 |
| ■ | 10 to 15 | ■ | 40 to 45 |
| ■ | 15 to 20 | ■ | 45 to 50 |
| ■ | 20 to 25 | ■ | 50 to 55 |
| ■ | 25 to 30 | ■ | Above 55 |
| ■ | 30 to 35 | | |

Period: 1961–1990

This map is a plot of 1961–1990 annual average precipitation contours from NOAA Cooperative stations and (where appropriate) USDA–NRCS SNOTEL stations. Christopher Daly used the PRISM model to generate the gridded estimates from which this map was derived; the modeled grid was approximately 4x4 km latitude/longitude, and was resampled to 2x2 km using a Gaussian filter. Mapping was performed by Jenny Weisburg. Funding was provided by USDA–NRCS National Water and Climate Center.

12/8/97



MP011204

1

2   **FIGURE 3.4-1  Average Annual Precipitation in Colorado, 1961–1990 (WRCC 1997)**

BLM_0042112

1



2   **FIGURE 3.4-2  Map of Surface Water Features in the Region of the DOE ULP Lease Tracts**
3

BLM_0042113

1   The Dolores and San Miguel Rivers originate in the Rico, La Plata, and San Juan
2   Mountains of southwest Colorado, with topographic elevations ranging from 14,200 ft (4,300 m)
3   near the Dolores River headwaters to 4,100 ft (1,250 m) at their combined confluence with the
4   Colorado River near the Colorado–Utah border. The Dolores River flows north and northwest
5   through the Slick Rock lease tract and flows northeast adjacent to the Uravan lease tract near its
6   confluence with the San Miguel River, which flows through the Uravan region. The Dolores
7   River and San Miguel River flow primarily through canyons, with the exception being in low-
8   relief alluvial regions of Paradox Valley that are crossed by the Dolores River. Several
9   ephemeral streams drain the uranium lease tracts and eventually reach the Dolores River and the
10   San Miguel River (Figure 3.4-2).
11
12   The Dolores River reach that flows through the lease tracts is regulated by the McPhee
13   Dam and reservoir located upstream of the lease tracts in Montezuma County, Colorado. The
14   McPhee Dam was constructed in 1984, and its reservoir was filled by 1987 as a part of the
15   Dolores Project for irrigation and water supply (BOR 2009). Downstream of McPhee Dam, flow
16   in the Dolores River is affected by reservoir releases and runoff in the surrounding watershed.
17   Surface runoff below McPhee Dam was estimated to be 2.5 in./yr (64 mm/yr), representing 15%
18   of the precipitation in this region (Weir et al. 1983). Flow in the San Miguel River is largely
19   unregulated except for some water extractions and is primarily controlled by snowmelt in the
20   spring and heavy, short-duration rains in the late summer (Allred and Andrews 2000). Surface
21   runoff in the lower part of the San Miguel River watershed was estimated to range between
22   2.4 and 9.8 in./yr (60 and 250 mm/yr) (Ackerman and Rush 1984).
23
24   Both the Dolores and San Miguel Rivers have large seasonal fluctuations in flow, with
25   high runoff in spring and low flow in winter (Figures 3.4-3 and 3.4-4). Flows are largest during
26   the snowmelt period of April through June each year, with daily averaged discharges ranging
27   between 1,000 and 3,500 ft$^3$/s (28 and 99 m$^3$/s) in the Dolores River near Bedrock (USGS Gage
28   09171100), and between 500 and 2,000 ft$^3$/s (14 and 57 m$^3$/s) in the San Miguel River near
29   Uravan (USGS Gage 09177000). Instantaneous peak discharges can often exceed daily averaged
30   discharge records, and historical peak discharges in the Dolores River near Bedrock, Colorado
31   (USGS Gages 09169500 and 09171100) ranged between 1,300 and 10,000 ft$^3$/s (37 and
32   280 m$^3$/s) before the McPhee Dam was built in the mid-1980s, and between 500 and 5,400 ft$^3$/s
33   (14 and 150 m$^3$/s) after the dam was built (USGS 2011b). Discharge in the Dolores River
34   typically increases as it flows downstream as a result of groundwater discharge
35   (Weir et al. 1983), with the exception being as the river flows through Paradox Valley, where
36   groundwater extraction associated with the Paradox Valley Unit (BOR) reduces river flow
37   (Golder Associates 2009). Discharge in the San Miguel River typically increases as it moves
38   downstream, with localized regions that lose flow to groundwater recharge (Ackerman and
39   Rush 1984). Peak discharges in the San Miguel River near Uravan, Colorado (USGS
40   Gage 09177000) occurred throughout the spring, summer, and fall between 1954 and 2010 and
41   ranged between 1,000 and 9,000 ft$^3$/s (28 and 260 m$^3$/s) (USGS 2011b).
42
43   Intermittent and ephemeral streams, which primarily flow in response to seasonal
44   snowmelt and precipitation events, occur throughout many of the lease tracts. More than
45   150 intermittent and ephemeral stream segments occur within the DOE ULP lease tracts
46

BLM_0042114





1

2  **FIGURE 3.4-3  Seasonal Hydrograph and Monthly Discharge Values in the Dolores River near**
3  **Bedrock, Colorado (USGS Gage 09171100), 1990–2010 (Top shows seasonal hydrographs; bottom**
4  **shows monthly percentile; 50% = tick mark; 25% and 75% = grey box; minimum and maximum**
5  **values = vertical line)**
6

BLM_0042115





1

2  FIGURE 3.4-4  Seasonal Hydrograph and Monthly Discharge Values in the San Miguel River near
3  Uravan, Colorado (USGS Gage 09177000), 1990–2010 (Top shows seasonal hydrographs; bottom
4  shows monthly percentile; 50% = tick mark; 25% and 75% = grey box; minimum and maximum
5  values = vertical line)
6

BLM_0042116

1  (Figure 3.4-2). Total intermittent and ephemeral stream channel lengths within each lease tract
2  are 18 mi (29 km) in Gateway, 11 mi (18 km) in Uravan, 9 mi (14 km) in Paradox, and 20 mi
3  (32 km) in Slick Rock. Peak discharges in these intermittent and ephemeral stream channels have
4  been reported to vary from 2 to 5,660 ft$^3$/s (0.06 to 160 m$^3$/s), as shown in Table 3.4-1.
5  Precipitation and snowmelt runoff conveyed overland, primarily in intermittent and ephemeral
6  streams within the Dolores River basin, was estimated to be as high as 270 million m$^3$/yr
7  (Weir et al. 1983).
8
9
10  **3.4.1.2  Existing Water Quality**
11
12      Section 303(d) of the Clean Water Act (CWA), as amended, requires states to develop
13  lists of water bodies that do not meet water quality standards and to submit updated lists to the
14  EPA every two years, along with the integrated report on water quality conditions that is required
15  in Section 305(b). The latest Colorado 305(b) report and 303(d) list were issued in April 2012 by
16  the CDPHE Water Quality Control Division, covering the
17  2010–2011 two-year period.
18
19      In the current listing cycle (2012), more than 71,048 river miles and more than
20  151,827 lake acres in Colorado were assessed, and their attainment status was determined
21  according to five reporting categories (CDPHE 2012a). Stream segments or reservoirs that are
22  not attaining their classified water uses (Category 5) are defined as impaired and placed in the
23  303(d) list, which requires development of the total maximum daily load (TMDL) to correct
24  impairment. If water bodies are suspected to be impaired but there are not enough data to address
25  the uncertainties, CDPHE places them on the Monitoring and Evaluation (M&E) List to collect
26  more data. The results of CDPHE's assessment in the 2012 reporting cycle represent a current
27  understanding of the existing water quality for Colorado water bodies. All water bodies in the
28
29
30  **TABLE 3.4-1  Range in Reported Peak Discharge Values for Intermittent and**
31  **Ephemeral Streams in the Region of the DOE ULP Lease Tracts**

| Stream | USGS Gage | Peak Discharge (ft$^3$/s) |
|---|---|---|
| Disappointment Creek Tributary near Slick Rock, CO | 9168700 | 36–260 |
| East Paradox Creek Tributary near Bedrock, CO | 9169800 | 26–368 |
| West Paradox Creek near Bedrock, CO | 9171000 | 16–5,200 |
| West Paradox Creek near Paradox, CO | 9170500 | 18–678 |
| Cottonwood Creek near Nucla, CO | 9174500 | 32–321 |
| Dead Horse Creek near Naturita, CO | 9175800 | 10–1,250 |
| Dry Creek near Naturita, CO | 9175900 | 290–5,660 |
| Tabeguache Creek near Nucla, CO | 9176500 | 114–303 |
| Deep Creek near Paradox, CO | 9178000 | 2–22 |
| Salt Creek near Gateway, CO | 9179200 | 25–2,670 |
| Taylor Creek near Gateway, CO | 9177500 | 13–555 |
| West Creek Tributary near Gateway, CO | 9179400 | 19–277 |

32

BLM_0042117

1    2012 303(d) and M&E lists, within the three watersheds (Upper Dolores, San Miguel, and
2    Lower Dolores) that encompass the lease tracts, are presented in Table 3.4-2. The locations of
3    the impaired water bodies are shown in Figure 3.4-5.
4
5         In the Upper Dolores watershed (HUC8: 14030002), impaired water was identified in
6    McPhee Reservoir (located upstream of the lease tracts) because of elevated mercury
7    concentration in fish tissues and in Silver Creek, a tributary to the Dolores River (upstream of
8    McPhee Reservoir), for non-attainment of dissolved cadmium and zinc standards. The McPhee
9    Reservoir has been on the 303(d) list since 1998 and ranked as high priority, requiring
10   development of the TMDL to reduce the mercury concentration (Table 3.4-2). Phase I of TMDL
11   development has been completed by CDPHE. The main suspected sources of mercury in the
12   reservoir include historic mining activities (i.e., hard rock mining), atmospheric deposition from
13   nearby and distant sources, such as coal-based power plants, and naturally occurring background
14   in local geologic formations and soils (CDPHE 2003). An estimated load reduction is 75%
15   assigned to atmospheric deposition load and 50.8 % to loads from the former mining areas. The
16   impaired Silver Creek is currently under implementation of the TMDL established in 2008 and
17   has been removed from the 303(d) list. The high concentrations of cadmium and zinc are
18   primarily the result of mining activity in the watershed between the1880s and the late 1970s
19   (CDPHE 2008a). A range of monthly allowed TMDLs for cadmium and zinc is presented in
20   Table 3.4-2. Along the downstream segment of the Dolores River within the Upper Dolores, the
21   river water is found impaired for their nonattainment of iron standards. A TMDL assessment for
22   the segment is required with a high priority. The sources of elevated iron in the river segment
23   will be analyzed in the TMDL assessment. However, the previous USGS study indicates that
24   iron is not typically enriched in water from the uranium mines in this area (Nash 2002). The
25   Paradox and Uravan lease tract areas near the impaired segment are unlikely to be contributing to
26   impairment. In addition, three stream segments are on the 2012 monitoring and evaluation
27   (M&E) list for their excessive *E. coli* and selenium, requiring collection of more data.
28
29        In the San Miguel watershed (HUC8: 14030003), seven stream segments and one
30   reservoir (located upstream of the lease tracts) were identified as being impaired for their
31   depleted dissolved oxygen, elevated concentrations of cadmium and zinc, or non-attainment of
32   the Colorado multi-metric index for aquatic life (Table 3.4-2). The impairment of Miramonte
33   Reservoir and of Howard Fork and Maverick Draw, tributaries to the San Miguel River (located
34   upstream of Naturita), resulted from excess nutrients, requiring further assessment and TMDL
35   development. The impairment of the other five stream segments was identified as due to
36   exceedance of cadmium and zinc standards. Among them, four segments are located in the San
37   Miguel River headwaters, whose tributaries flow through historical mining areas near Telluride.
38   In the 2012 listing cycle, TMDLs developed for these four stream segments were approved for
39   implementation, and the segments were removed from the 2012 303(d) list. The TMDL
40   assessment indicates that stream impairment is attributed to remnants of mining activities, such
41   as tailings piles, abandoned tunnels, mining equipment, and mills generated from gold, silver,
42   and lead mining from 1875 to 1978. These mining remnants have been exposed to infiltration
43   and runoff, which leaches metals (cadmium and zinc) into surface water (CDPHE 2010). The
44   established TMDLs provide a substantial reduction of loads, as shown in Table 3.4-2. In
45   addition, 12 stream segments were identified as impaired with some uncertainties requiring

**TABLE 3.4-2  Impaired Water Bodies on the Colorado 2012 303(d) and M&E Lists or in the Process of Implementing TMDL within the Upper Dolores, San Miguel, and Lower Dolores Watersheds**

| Water Body ID (WBID) | Segment Description | Portion | Colorado's Monitoring & Evaluation Parameter(s) | Clean Water Act Section 303(d) Impairment | 303(d) Priority | Total Maximum Daily Load (ID)[a] |
|---|---|---|---|---|---|---|
| **Upper Dolores (HUC-8 Basin: 14030002)** | | | | | | |
| COGULD03a | All tributaries to the Dolores River from the bridge at Bradfield Ranch to the Colorado/Utah border | Disappointment Creek | Selenium, *E. coli* | | | |
| COGULD04 | Mainstem of West Paradox Creek from the source to the confluence with the Dolores River; mainstem and all tributaries to Blue Creek from the source to the confluence with the Dolores River | West Paradox Creek | *E. coli*, Iron (Trec) | | | |
| COSJDO04b | McPhee Reservoir and Summit Reservoir | McPhee Reservoir | | Aquatic Life Use (mercury*in fish tissue) | High | |
| COSJDO09_743D | Silver Creek, from Rico's Diversion to Dolores River | | | | | Cadmium 0.0002–0.0013 lb/day: zinc: 0.091–0.377 lb/day (35101) |
| COSJDO11 | All tributaries to Dolores River, from the confluence of the W. Dolores River, to bridge at Bradfield Ranch (Forest Rt. 505, near Montezuma/Dolores County Line | Lost Canyon Creek | *E. coli* | | | |
| COGULD02 | Dolores River from Little Gypsum Valley bridge to Colorado–Utah border | Downstream of Upper Dolores | *E. coli* | Iron (Trec) | High | |

BLM_0042119

**TABLE 3.4-2  (Cont.)**

| Water Body ID (WBID) | Segment Description | Portion | Colorado's Monitoring & Evaluation Parameter(s) | Clean Water Act Section 303(d) Impairment | 303(d) Priority | Total Maximum Daily Load (ID)[a] |
|---|---|---|---|---|---|---|
| *San Miguel (HUC-8 Basin: 14030003)* | | | | | | |
| COGUSM02 | Tributaries to the San Miguel River from the source to Leopard Creek | Bear Creek | Lead | Cadmium, zinc (sc) | High | |
| COGUSM02 | Tributaries to the San Miguel River from the source to Leopard Creek | Cornet Creek | Lead | | | |
| COGUSM02 | Tributaries to the San Miguel River from the source to Leopard Creek | Howard Fork above Swamp Canyon | | pH, dissolved oxygen | High | |
| COGUSM03b | Mainstem of the San Miguel River Marshall Creek to South Fork San Miguel River | All | Lead | | | |
| COGUSM03B_7500 | San Miguel River–Marshall Creek to South Fork San Miguel River | | | | | Cadmium 0.03–0.59 lb/day; zinc 2.6–108.9 lb/day (35252) |
| COGUSM04a | Mainstem of the San Miguel River from the South Fork of the San Miguel to below the CC ditch | From South Fork San Miguel to confluence with Leopard Creek | Lead | | | |
| COGUSM06a | Ingram Creek, source to San Miguel River | All | Manganese. copper | | | |

TABLE 3.4-2  (Cont.)

| Water Body ID (WBID) | Segment Description | Portion | Colorado's Monitoring & Evaluation Parameter(s) | Clean Water Act Section 303(d) Impairment | 303(d) Priority | Total Maximum Daily Load (ID)[a] |
|---|---|---|---|---|---|---|
| *San Miguel (HUC-8 Basin: 14030003) (Cont.)* | | | | | | |
| COGUSM06A_7500 | Ingram Creek, mainstem of Ingram Creek including all tributaries | | | | | Cadmium 0.003 lb/day (38985) |
| COGUSM03A_7500 | San Miguel River –Bridal Veil and Ingram Creek to Marshall | | | | | Zinc 4.1 lb/day (35251) |
| COGUSM06b | Marshall Creek, source to San Miguel River | All | Copper | | | |
| COGUSM06B_7500 | Marshall Creek, mainstem of Marshall Creek including all tributaries, lakes, reservoirs, and wetlands from source to confluence with San Miguel River | | | | | Cadmium 0.003 lb/day; zinc 0.6–13.6 lb/day (38986) |
| COGUSM07a | Mainstem of Howard Fork and tributaries Swamp Gulch the South Fork of the San Miguel | Chapman Creek | Iron (Trec) | | | |
| COGUSM07a | Mainstem of Howard Fork and tributaries from a point immediately below the confluence of Swamp Gulch to its confluence with the South Fork of the San Miguel River | Iron Bog Creek | pH, dissolved oxygen | | | |

**TABLE 3.4-2  (Cont.)**

| Water Body ID (WBID) | Segment Description | Portion | Colorado's Monitoring & Evaluation Parameter(s) | Clean Water Act Section 303(d) Impairment | 303(d) Priority | Total Maximum Daily Load (ID)[a] |
|---|---|---|---|---|---|---|
| *San Miguel (HUC-8 Basin: 14030003) (Cont.)* | | | | | | |
| COGUSM08 | Mainstem of South Fork of San Miguel River from the Howard and Lake Forks to the San Miguel River | All | Manganese (WS) | | | |
| COGUSM10 | Mainstem of Naturita Creek from the Uncompahgre National Forest boundary to its confluence with the San Miguel River, and Gurley Reservoir; Tabeguache Creek from its source to the confluence with San Miguel River | Naturita Creek | Dissolved oxygen, *E. coli* | | | |
| COGUSM11 | West Fork of Naturita Creek, Miramonte Reservoir, the mainstem of Beaver, Horsefly, and Saltado Creeks from the Uncompahgre National Forest boundary to their confluence with the San Miguel River | Miramonte Reservoir | | Dissolved oxygen (temperature) | High | |
| COGUSM12 | All tributaries to the San Miguel River from the confluence of Leopard Creek to the Dolores River | Mesa Creek | Selenium | | | |

BLM_0042122

**TABLE 3.4-2  (Cont.)**

| Water Body ID (WBID) | Segment Description | Portion | Colorado's Monitoring & Evaluation Parameter(s) | Clean Water Act Section 303(d) Impairment | 303(d) Priority | Total Maximum Daily Load (ID)[a] |
|---|---|---|---|---|---|---|
| *San Miguel (HUC-8 Basin: 14030003) (Cont.)* | | | | | | |
| COGUSM12 | All tributaries to the San Miguel River from the confluence of Leopard Creek to the Dolores River | Calamity Draw, Specie Creek | Dissolved oxygen | | | |
| COGUSM12 | All tributaries to the San Miguel River from the confluence of Leopard Creek to the Dolores River | Maverick Draw | | Aquatic life (provisional) | Low | |
| *Lower Dolores (HUC-8 Basin: 14030004)* | | | | | | |
| COGULD02 | Dolores River from Little Gypsum Valley bridge to Colorado–Utah border | All | *E. coli* | Iron (Trec) | High | |
| COGULD05 | Mainstem of West Creek from the source to the confluence with the Dolores River; Roc Creek; La Sal Creek and Mesa Creek from their sources to their confluences with Dolores River | Roc Creek | *E. coli* | Copper, iron (Trec) | High | |

[a]   If the TMDL varies with the monthly mean flow, a range of TMDL for 12 months is presented.

Sources: CDPHE (2008a,b, 2010, 2012a,b)



1

2      **FIGURE 3.4-5  Location of Impaired Water Bodies**

1   further data collection (M&E list). Most of them were added in the 2012 listing cycle. The
2   leading causes of impaired water on the M&E list are elevated concentrations of Pb and other
3   metals in the upper San Miguel River and its tributaries and depleted dissolved oxygen in the
4   lower San Miguel River.
5
6        In the Lower Dolores watershed (HUC: 14030004), the lower Dolores River and Roc
7   Creek, a tributary of the Dolores River, located downstream of the Uravan lease tracts, were
8   identified as impaired for their non-attainment of iron and copper standards. A TMDL
9   assessment for these two segments is required with a high priority. The sources of elevated metal
10  in the river segments will be analyzed in the TMDL assessment.
11
12       Along the Dolores River near the lease tracts, the total dissolved solids (TDS) content is a
13  primary concern because of the high salinity of the groundwater discharge that occurs as it
14  crosses Paradox Valley, which has a geologic structure that naturally causes the saline
15  groundwater (more details on the geology are provided in Section 3.3). The saline concentration
16  in groundwater in this area has been found in excess of 250,000 mg/L (BOR 2013a). The
17  resulting discharge of saline groundwater to the Dolores River propagates through the river, and
18  it historically increases the TDS loading of the Colorado River by 115,000 to 205,000 tons/yr
19  (Watts 2000; Chafin 2003). The Paradox Valley Unit was built by the BOR in order to capture
20  the high TDS groundwater before it could enter the Dolores River (further information on the
21  Paradox Valley Unit is provided in Section 3.4.3 on water management). By 2001, the Paradox
22  Valley Unit had reduced TDS loads to the Dolores River to 10,600 tons/yr (Chafin 2003). The
23  salinity control program funded by the BOR has been continued along the Dolores River near
24  Bedrock through the Colorado 2012 reporting cycle (CDPHE 2012a,b). Because the existing
25  brine disposal well in the unit is nearing the end of its useful life, a new injection well alternative
26  and an evaporation pond alternative are being considered for future brine disposal (BOR 2013b).
27
28       In summary, the existing surface water quality as evaluated by CDPHE (2012a,b)
29  indicates that 10 stream segments and 2 reservoirs are currently impaired in the region of lease
30  tracts that span three watersheds. None of the impaired water is evidently associated with the
31  historical mining activities within the ULP lease tracts. One main segment along the Dolores
32  River near or downstream of the ULP lease tracts is impaired by elevated iron, which is unlikely
33  contributed to the uranium mines in the area. The other impaired waters are located upstream
34  from the lease tracts. In addition, 15 stream segments are suspected to be impaired (M&E list) in
35  the region requiring more data. Most of them are either located upstream of the lease tracts or
36  impaired with nonmetal constituents. Near or downstream of the ULP leased tracts, elevated
37  E. coli is the main concern for the river segment requiring further monitoring and evaluation.
38
39       In addition to the state surface water quality database, local monitoring data are also
40  available at the two former uranium mill tailing processing sites located along the Dolores River
41  at Slick Rock, Colorado. These processing sites, Slick Rock East (SRE) and Slick Rock West
42  (SRW), are located in the floodplain of the Dolores River overlying the shallow alluvial aquifer
43  (see Figure 3.4-5). SRE is located entirely within the bounds of ULP Lease Tract 13 (in the
44  northwest corner of the tract), and SRW is located approximately 1 mile downstream of SRE
45  (approximately 2,000 feet west of ULP Lease Tract 13 and 400 feet southwest of Lease
46  Tract 13A). The sites were remediated by removal of tailings and other residual materials as part

1   of the Uranium Milling Tailings Radiation Control Act (UMTRCA) project. The remediation
2   was completed in 1996, and a monitoring program, for both surface water and groundwater, was
3   subsequently established. The  groundwater cleanup compliance strategy for the sites is natural
4   flushing, combined with institutional controls and compliance monitoring. COCs at SRE and
5   SRW are mainly manganese, molybdenum, nitrate, selenium, and uranium (DOE 2013). Seven
6   surface water monitoring points are located within the Dolores River upstream from, adjacent to,
7   and downstream from the site, respectively, for both sites. The results from the recent annual
8   sampling event in 2012 indicate that COCs in all samples are currently below the EPA drinking
9   water standard or UMTRCA maximum concentration limit (MCL), except for manganese in
10  SRW downstream sample 0694 (0.055 mg/L), which slightly exceeds the standard (0.05 mg/L).
11  For historical sampling events since 1997, one sample from surface water near the SRE site
12  showed a slightly high concentration of uranium (0.055 mg/L) in 2006. Results are summarized
13  in Table 3.4-3 (DOE 2013).

16  **3.4.2  Groundwater**

18          Groundwater is primarily located in bedrock aquifers and small, isolated alluvial aquifers
19  in the region of the uranium lease tracts. The alluvial aquifers within the study region are
20  primarily composed of gravel, silts, and clays of Quaternary age and located in isolated canyon
21  margins of the Dolores River and the San Miguel River (Topper et al. 2003). Mapped alluvial
22  aquifers near the lease tracts are concentrated along a 19-mi (31-km) reach of the Dolores River
23  west of the Gateway lease tracts, a 20-mi (32-km) reach of West Creek north of the Gateway
24  lease tracts, and a 7-mi (11-km) segment of the San Miguel River east of the Paradox lease tract
25  (CDWR 2011). Near the Slick Rock lease tracts, a limited, shallow alluvial aquifer was also
26  reported along the Dolores River bounded by the canyon wall (DOE 2013). The alluvial aquifers
27  of the Dolores River and the San Miguel River are under unconfined conditions, with depths to
28  groundwater ranging from 2 to 90 ft (0.6 to 27 m) below the surface (Topper et al. 2003).
29  Groundwater yields in the alluvial aquifers of the Dolores River and the San Miguel River range
30  between 1 and 200 gal/min (4.5 and 910 L/min) (CDWR 2011).

32          The bedrock aquifers within the region of the uranium lease tracts are a part of the
33  regional Paradox Basin, which consists of upper and lower groundwater systems that are
34  separated by confining layers, including salt beds (Topper et al. 2003). Figure 3.4-6 depicts the
35  hydrogeologic stratigraphy of the Paradox Basin, which shows the lower groundwater system as
36  the Paleozoic carbonate aquifer and the upper groundwater system as the Mesozoic sandstone
37  aquifer. The lower groundwater system consists of fractured limestone units overlain by
38  confining salt beds in the Hermosa Group. Groundwater from the lower system is typically saline
39  (Weir et al. 1983). The upper groundwater system consists of layered sedimentary rock beds
40  overlain by a confining shale layer in certain regions and unconsolidated alluvial material in
41  other parts of the basin. Groundwater in the upper sandstone units is typically unconfined where
42  the units crop out along the eastern edge of the Paradox Basin, whereas confined conditions exist
43  farther into the basin (Topper et al. 2003). Groundwater in the sandstone units is typically low in
44  salinity, and these units vary with respect to the amount of fracturing, which controls their
45  groundwater yields (Weir et al. 1983). Reported groundwater yields in the sandstone units are

BLM_0042126

1  **TABLE 3.4-3  COC Concentrations in the Dolores River at SRE and SRW Sites near**
2  **Slick Rock Lease Tract 13**

| | COCs (mg/L) | | | | |
|---|---|---|---|---|---|
| Standard or Location | Manganese | Molybdenum | Nitrate as NO$_3$ | Selenium | Uranium |
| Drinking water standard[a] | | | | | |
| MCL | | | 10 | 0.05 | 0.030 |
| SMCL | 0.05 | 0.1[b] | | | |
| *2012 Monitoring Data[c]* | | | | | |
| SRE Site | | | | | |
| 0696 (upstream) | –[c] | – | – | – | 0.00057 |
| 0692 (adjacent) | – | – | – | – | 0.0007 |
| 0700 (downstream) | – | – | – | – | 0.00049 |
| SRW Site | | | | | |
| 0693 (upstream) | 0.0037 | 0.0009 | <0.044 | 0.00027 | 0.00055 |
| 0347 (adjacent) | 0.0056 | 0.0009 | <0.044 | 0.00032 | 0.00057 |
| 0349 (adjacent) | 0.024 | 0.0011 | <0.044 | 0.0003 | 0.00062 |
| 0694 (downstream) | **0.055**[d] | 0.0016 | 0.11 | 0.00032 | 0.00083 |
| *Historical Results (Maximum Concentration since 1996)* | | | | | |
| SRE Site | | | | | |
| 0696 (upstream) | 0.01 | 0.004 | 1.55 | 0.0059 | **0.055**[e] |
| 0692 (adjacent) | 0.008 | 0.0041 | 0.99 | 0.0043 | 0.0022 |
| 0700 (downstream) | – | – | – | – | 0.0014 |

[a]  EPA (2013), http://water.epa.gov/drink/contaminants/index.cfm#List. MCL = maximum contaminant level for primary standard; SMCL = maximum contaminant level for secondary standard.

[b]  UMTRCA MCL.

[c]  Data obtained from DOE (2013). Monitoring data are rounded to two significant figures. A dash indicates not analyzed.

[d]  Bold indicates that the concentration at the sampling point is higher than the standard.

[e]  One sample collected in 2006 exceeding the EPA MCL or SMCL.

3
4

BLM_0042127

| Era | Period | Million Years before Present | Stratigraphic Unit | Unit Thickness (feet) | Hydrogeologic Unit | Hydrologic Characteristics |
|---|---|---|---|---|---|---|
| Cenozoic | Quaternary | 0–2.6 | Alluvium | 0–100 | Alluvium | Yields large quantities for domestic, stock, and municipal |
| Mesozoic | Upper Cretaceous | 65.5–99.6 | Mesaverde Group | 100–1,000 | Cretaceous confining beds | Confining unit; none |
| | | | Mancos Shale | 1,000–5,000 | | |
| | | | Dakota Sandstone | 0–200 | | Yields some water, stock and domestic |
| | Lower Cretaceous | 99.6–145.5 | Burro Canyon Fm | 0–250 | Mesozoic sandstone aquifer (Upper Aquifer) | Yields water to springs |
| | Upper Jurassic | 145.5–161 | Morrison Formation: Brushy Basin Member | 400–500 | | None |
| | | | Morrison Formation: Salt Wash Member | 300 | | Yields small quantities, stock and domestic |
| | Lower and Middle Jurassic | 161–201.6 | Wanakah Fm (Summerville Fm) | 0–120 | | None |
| | | | Entrada Sandstone | 15–170 | | Yields water |
| | | | Carmel Formation | 0–40 | | None |
| | | | Navajo Sandstone | 0–125 | | Small to moderate amounts from fractures, stock and domestic |
| | | | Kayenta Formation | 0–200 | | Yields little to no water |
| | Upper Triassic | 201.6–235 | Wingate Sandstone | 0–400 | | Yields water to numerous springs |
| | | | Dolores Formation | 150–230 | Mesozoic-Upper Paleozoic confining beds | Not water bearing |
| | | | Chinle Formation | 0–500 | | Yields small quantities where fractured, stock and domestic |
| | Lower Triassic | 235–251 | Moenkopi Formation | 0–480 | | Yields small quantities stock and domestic |
| Paleozoic | Permian | 251–299 | Cutler Formation | 0–3,500 | | Yields small quantities where fractured, stock and domestic |
| | Pennsylvanian | 299–318 | Hermosa Group | 0–3,900 | Confining salt beds | None |
| | Mississippian | 318–359 | Leadville Limestone | 20–100 | Lower Paleozoic carbonate aquifer (Lower Aquifer) | Transmits saltwater through fractures |
| | Devonian to Cambrian | 359–542 | Ouray, Elbert, and Ignacio Formations | 0–150 | | |

MP011201

**FIGURE 3.4-6 Conceptual Diagram of the Hydrogeologic Stratigraphy of the Paradox Basin (based on Topper et al. 2003 and Walker and Geissman 2009)**

1   typically less than 20 gal/min (91 L/min), except for isolated regions of high fracturing, which
2   have groundwater yields up to 230 gal/min (1,000 L/min) (CDWR 2011).
3
4        Depth to groundwater and groundwater surface elevations are highly dependent on their
5   locations between mesas and valley regions. Depth to groundwater in alluvial aquifers along the
6   rivers ranges from 2 to 90 ft (0.6 to 27 m) below the ground surface, with shallow depths quite
7   commonly found (Topper et al. 2003). Depth to groundwater is greatest beneath mesas; the local
8   groundwater table can be more than 650 ft (200 m) below ground surface in the San Miguel
9   River basin (Ackerman and Rush 1984). However, there are numerous, locally perched aquifers
10  found throughout the Paradox Basin with much shallower groundwater tables (Weir et al. 1983).
11  Table 3.4-4 lists values for the depth to groundwater for USGS monitoring wells within the
12  HUC8 basins of the study region.
13
14       Groundwater flow in the alluvium is typically toward the Dolores River and the
15  San Miguel River. Regionally, groundwater from the upper groundwater system flows to the
16  northwest, discharging to the rivers and providing base flow (Weir et al. 1983; Golder
17  Associates 2009). Disruptions of groundwater flow by folds and faults are common in the upper
18  groundwater system, but the effects of similar geologic structures on flow in the lower
19  groundwater system are not known (Weir et al. 1983). Groundwater recharge in the upper
20  groundwater system is primarily from precipitation infiltration, with interbasin inflow considered
21  to be minor (Weir et al. 1983). Groundwater discharge occurs through evapotranspiration and
22  discharge to springs in the study area, but groundwater is primarily discharged to the base flow
23  of the Dolores River and the San Miguel River (Topper et al. 2003). Springs are typically found
24  at high elevations on the flanks of mesas, with more than 200 springs identified in the Dolores
25  River watershed that have an average discharge of 14 gal/min (53 L/min) (Weir et al. 1983).
26  Additional monitoring data for springs in the vicinity of the DOE ULP tracts collected by the
27  USGS are shown in Table 3.4-5.
28
29       Groundwater quality in the Paradox Basin is variable; the best quality typically is found
30  in the shallower or more productive units, and the TDS content typically increases with depth
31  (Topper et al. 2003). The sandstone units of the upper groundwater system are typically
32  dominated by calcium- or sodium-bicarbonate, with several units containing TDS and sulfate
33  concentrations that exceed secondary drinking water standards (Weir et al. 1983). The limestone
34  unit of the lower groundwater system is brackish (high salinity) and is not suitable to drink
35  without substantial desalinization treatment (Topper et al. 2003). As described previously, the
36  geologic structure of the Paradox Valley generates a highly saline groundwater discharge to the
37  Dolores River, where the brine has a higher salinity than seawater (Chafin 2003).
38
39       Groundwater wells for domestic and municipal water supply were identified for the area
40  within 5 mi (8 km) from the lease tracts based on the Colorado well permit database maintained
41  by the Colorado Division of Water Resources (CDWR). The locations of 88 domestic wells and
42  one municipal well in the area are shown in Figure 3.4-7. The number of wells in the vicinity of
43  each of four lease tracts areas is presented in Table 3.4-6. Among 89 wells, some are owned by
44  mining companies as required water rights for mining activities but are not used for the drinking
45  water supply. Examples of these wells include three "domestic" wells and one "municipal" well
46  located at or near Uravan.

BLM_0042129

*Final ULP PEIS*                                                      *3: Affected Environment*

1
2
3

**TABLE 3.4-4  Depths to Groundwater Observed in USGS Monitoring
Wells Located within the Upper Dolores, San Miguel, and Lower Dolores
Basins (HUC8)**

| USGS Well No. | Elevation[a] (ft) | Well Depth (ft) | No. of Observations | Depth to Groundwater (ft) |
|---|---|---|---|---|
| **Upper Dolores** | | | | |
| 382025108530401 | 5,010 | 91 | 10 | 32.78–39.24 |
| 381932108542801 | 5,130 | 205 | 10 | 107.09–132.03 |
| 380258108544400 | 5,450 | 125 | 7 | 12.88–19.96 |
| 375733108370501 | 6,190 | 65 | 1 | 7.25 |
| 375504108353201 | 6,370 | 115 | 1 | 42.5 |
| 372742108300901 | 6,930 | 240 | 11 | 6–12.99 |
| 372930108244800 | 7,110 | 132 | 11 | 7.25–12.51 |
| 375115108242601 | 7,400 | 80 | 4 | 12.97–41 |
| 382043109110201 | 7,535 | 160 | 1 | 50 |
| 373515108094901 | 8,060 | 63 | 4 | 25–37.27 |
| 374242108020501 | 8,955 | 49 | 5 | 36.68–38.33 |
| | | | | |
| **San Miguel** | | | | |
| 382145108434401 | 5,020 | 516 | 1 | 58 |
| 382229108442101 | 5,032.75 | 550 | 1 | 117 |
| 382131108413901 | 5,115 | 200 | 1 | 106 |
| 381452108321201 | 5,770 | 290 | 1 | 165 |
| 381817108335601 | 5,802 | 202 | 5 | 90.91–97.83 |
| 381212108270301 | 6,230 | 92 | 1 | 17.2 |
| 381029108250801 | 6,470 | 50 | 1 | 32 |
| 381028108243001 | 6,510 | 53 | 10 | 5.47–22.62 |
| 380400108300601 | 6,880 | 448 | 2 | 106–106.35 |
| 380844108163601 | 7,030 | 58 | 8 | 5.48–19.27 |
| 380945108164001 | 7,102 | 250 | 1 | 74.3 |
| 380356108274501 | 7,125 | 80 | 4 | 5.83–22.3 |
| 380646108172001 | 7,220 | 96.1 | 1 | 60.65 |
| 380620108131701 | 7,450 | 123 | 1 | 41.42 |
| 381203108103301 | 7,830 | 80 | 10 | 34–45.15 |
| 380512108083401 | 8,030 | 80 | 1 | 4.45 |
| 375606107482801 | 8,765 | 116 | 1 | 2.67 |
| 375604107483001 | 8,768 | 89.8 | 1 | 4.22 |
| 375534108005801 | 8,960 | 180 | 1 | 41.75 |
| 375602108004401 | 9,230 | 180 | 1 | 73.1 |
| | | | | |
| **Lower Dolores** | | | | |
| 384026108575701 | 4,595 | 140 | 4 | 30–95.45 |
| 384531108470501 | 6,230 | 47 | 4 | 17.07–20 |
| 390421106533400 | 7,984 | 40 | 1 | 18 |

[a]  Surface elevations of the wells below 5,500 ft are typically located in canyons
   and along alluvial areas, and wells located above 5,500 ft are typically located
   on mesas.

Source: USGS (2011b)

BLM_0042130

1  **TABLE 3.4-5  Monitoring Data Collected at Springs Located within the Vicinity of the**
2  **DOE ULP Tracts**

| USGS Site Number | Elevation (ft) | No. of Observations | Temperature (°C) | Conductivity (μS/cm) | Flow (gal/min) |
|---|---|---|---|---|---|
| Upper Dolores (HUC8 Basin) | | | | | |
| 375433108244301 | 9,675 | 1 | 15 | 500 | _a |
| 375435108244401 | 9,635 | 1 | 10 | 140 | – |
| 375802108362601 | 6,320 | 1 | 11.5 | 3600 | 15 |
| 381957109051601 | 6,160 | 3 | 11–15 | 315–332 | 2–5 |
| 382446109022101 | 7,152 | 1 | 8 | 343 | – |
| San Miguel (HUC8 Basin) | | | | | |
| 375710108170901 | 8,230 | 1 | 8.5 | 290 | – |
| 375744108252601 | 8,385 | 1 | 7 | 498 | 10 |
| 375930108274101 | 7,315 | 1 | 7 | 2,380 | |
| 380205108215401 | 7,798 | 2 | 6.5–7.5 | 420–590 | 4 |
| 380324108214001 | 7,490 | 1 | 6.5 | 680 | 2 |
| 380439108185901 | 7,780 | 1 | 17 | 417 | 0.32 |
| 381427108304201 | 5,795 | 1 | 10 | 1,400 | – |
| 381616108212101 | 6,235 | 1 | 8 | 775 | 3 |
| 381821108455001 | 6,615 | 1 | 16 | 700 | – |
| 381950108202001 | 8,425 | 1 | 16 | 220 | – |
| 382154108160801 | 9,485 | 1 | 28 | 180 | – |
| 382432108312801 | 7,400 | 1 | 9 | 490 | – |
| 382503108363101 | 6,470 | 1 | 16 | 600 | – |
| 382714108304101 | 9,265 | 1 | 15 | 600 | – |
| 382817108325801 | 9,385 | 1 | 5 | 440 | – |
| Lower Dolores (HUC8 Basin) | | | | | |
| 382756108522001 | 4,750 | 1 | 12 | 860 | 20 |
| 383326108384801 | 9,180 | 1 | 16 | 522 | – |
| 383521108385301 | 9,300 | 1 | 6 | 372 | – |

a   A dash indicates not available.

3
4
5       The database for the public water supply (PWS) system maintained by the Source Water
6  Assessment and Protection Program at CDPHE indicates that none of PWS wells are located
7  within 5 mi (8 km) of the ULP lease tracts (CDPHE 2012c). In general, the aquifer system in the
8  area has a lower production rate at shallow depths and poorer quality (relatively high TDS,
9  sulfate, etc.) with increasing depths.
10
11      On the basis of the registered water well records in the lease tract area, the main water-
12  bearing formations include (a) alluvium along the Dolores River, San Miguel River, and Paradox
13  Valley; (b) Dakota Sandstone and Burro Canyon Formation near the top of Mesa; (c) Saltwash
14  Sandstone in the Morrison Member and Entrada Sandstone near the floor of the valley or river
15  canyon; and (d) underlying Navajo Sandstone and Wingate Sandstone (Figure 3.4-6). All the
16  lease tracts are located upgradient from the main rivers. Within the lease tract areas, the primary

BLM_0042131



1

2  FIGURE 3.4-7  Locations of **88** Domestic Wells and One Municipal Well in and near the Lease
3  Tracts

BLM_0042132

**TABLE 3.4-6  Domestic and Municipal Wells in the Area 5 mi (8 km) from the DOE ULP Lease Tracts**

| Lease Tract | Number of Wells[a] | Well Depth (ft) | Water Use | Number of Wells within or at the Edge of Lease Tracts[b] | Number of Wells along the Groundwater Flow Pathways[c] |
|---|---|---|---|---|---|
| Gateway | 5 | 40–62 | Domestic | 0 | 0 |
| Uravan | 8 | 15–204 | Domestic | 0 | 1 |
|  | 1 | 229 | Municipal[d] | 0 | 0 |
| Paradox | 22 | 36–600 | Domestic | 1 | 13 |
| Slick Rock | 53 | 24–300 | Domestic | 5 | 1 |

[a]  Any wells that are located within 5 mi (8 km)  from the lease tracts or along the potential pathways of groundwater flow from the lease tracts to the areas of groundwater discharge. Groundwater quality data from these wells are not available.

[b]  Number of wells located within 1,000 ft (300 m) from the lease tracts.

[c]  Number of wells located along the potential pathways from lease tracts to the major rivers.

[d]  The "Municipal" well (as shown in the database) has been owned by a mining company at Uravan for mining activities and not used for a drinking water supply.

Source: CDWR (http://www.dwr.state.co.us/WellPermitSearch/default.aspx)

source of groundwater recharge is from infiltration of precipitation. The low annual precipitation (12.5 in. [31.8 cm]) and high annual evaporation rate (38 in. [97 cm]; Golder Associates 2009) result in an extremely low quantity of groundwater in the water-bearing formations in the lease tract areas. The highest water well yields are 0.05–1.5 gal/min (0.2–5.7 L/min) (Weir et al. 1983). Some alluvial aquifer along the main rivers outside the lease tract areas may have higher yields above 20 gal/min (76 L/min) (CDWR 2011). The underground mines that penetrate through Alluvium, Dakota, or Burro Canyon water-bearing formations into Saltwash Sandstone were often dry or encountered minimal seepage in the lease tract areas. A "moist" zone identified on the basis of 559 exploration drill holes at Paradox Valley lease tracts area is located in an aquitard, Brushy Basin Member, and inferred as formation water (Cotter Corp. 2012a). Brushy Basin Member (shale interbedded with minor fine-grained sandstone) overlies the ore horizon in the upper Saltwash Sandstone and contains bentonite, preventing water movement (Cotter Corp. 2012a). The uppermost aquifer varies across lease tract areas from Entrada Sandstone, to Navajo Sandstone, Wingate Sandstone (which underlies the confining layers), Summerville Formation, Carmel Formation, and Kayenta Formation, respectively (Figure 3.4-6). In the floodplains of the Dolores River, an alluvial aquifer may directly overlie the Entrada aquifer. A local upward vertical hydraulic gradient from Navajo to Entrada and further to alluvial aquifers may occur in the floodplain as identified in the Slick Rock lease tract area along the Dolores River (DOE 2013).

BLM_0042133

1       Information on groundwater quality is limited in lease tract areas. The shallow water-
2  bearing formations (Alluvium, Dakota, and Burro Canyon) are relatively fresh (TDS: 302 to
3  2,570 mg/L). The water quality of the deep water-bearing formations decreases with increasing
4  depth. The TDS of the Saltwash Member varies from 517 to 13,900 mg/L, and that of the
5  underlying Entrada Sandstone varies from 204 to 14,300 mg/L (Weir et al. 1983). Groundwater
6  from the uranium-containing formation (Saltwash Member) may also have elevated levels of
7  radionuclides and sulfate (DOE 2007; Denison 2008). Although Saltwash Member is unsaturated
8  in most of the ULP lease tracts except for Lease Tract 9 (and possibly 7), groundwater quality in
9  the saturated Saltwash is poor (Cotter Corp. 2012b). The results from one monitoring well
10  completed in the Saltwash Member at Lease Tract 9 over a monitoring period of 2007–2011
11  indicate that the average concentration is highly elevated for sulfate (2,139 mg/L), selenium
12  (0.68 mg/L), uranium (0.498 mg/L), and radium (5.9 pCi/L for combined radium 226 and 228).
13
14       Elevated concentrations of constituents associated with uranium mines have been found
15  in groundwater at the two former uranium mill tailing processing sites, SRE and SRW, located
16  along the Dolores River at Slick Rock, Colorado. These processing sites are located in the
17  floodplain of the Dolores River overlying the shallow alluvial aquifer that resulted  in
18  contamination in shallow groundwater. The sites were remediated by removal of tailings and
19  other residual materials as part of the UMTRCA project. The remediation was completed in
20  1996, and a monitoring program for groundwater was subsequently established. The
21  groundwater cleanup compliance strategy for the sites is natural flushing, combined with
22  institutional controls and compliance monitoring. Groundwater contamination includes selenium
23  and uranium at the SRE site and manganese, molybdenum, nitrate, selenium, and uranium at the
24  SRW site. Most of the contaminants remain on site except for manganese, which exceeds the
25  standard at a downgradient off-site location. The monitoring results are shown in Table 3.4-7.
26
27       A few domestic wells (one in Paradox and five in Slick Rock) are within or at the edge of
28  the lease tracts (less than 1,000 ft [310 m] in distance) where groundwater flow might be affected
29  by pumping at these wells. Most of the water wells have shallow to intermediate depths, taking
30  water from alluvial, perched, and/or upper aquifers (sandstone aquifers). Groundwater generally
31  flows directly to the rivers in the alluvial aquifer or flows from the mesa area to springs on the
32  flank of mesas and to the Dolores River and the San Miguel River in upper aquifer. Water wells
33  located along the pathways of groundwater flow from the lease tracts to the areas of groundwater
34  discharge would have relatively high potential to be affected if groundwater within the lease
35  tracts is adversely affected. A total of 15 domestic wells were identified as being located along
36  the potential pathways of groundwater flow, as shown in Table 3.4-6.
37
38
39  **3.4.3  Water Management**
40
41       Water resources and water rights are primarily the responsibility of the CDWR, but
42  several other agencies also address water management issues, including the CDPHE, which
43  oversees stormwater management and water quality issues. Water rights in Colorado are
44  governed by using the Doctrine of Prior Appropriation as the cornerstone; water rights are
45  granted by a water court system and administered by the CDWR (BLM 2001). The DOE ULP
46  lease tracts are located within the boundaries of Divisions 4 and 7 of the CDWR, where both

BLM_0042134

1  **TABLE 3.4-7  COC Concentrations in Groundwater at SRE and SRW Sites near Slick Rock Lease**
2  **Tract 13**

| Standard or Location | COCs (mg/L) | | | | |
|---|---|---|---|---|---|
| | Manganese | Molybdenum | Nitrate as NO$_3$ | Selenium | Uranium |
| Drinking water standard[a] | | | | | |
| MCL | | | 10 | 0.05 | 0.030 |
| SMCL | 0.05 | 0.1[b] | | | |
| *2012 Monitoring Data*[c] | | | | | |
| SRE Site | | | | | |
| 0300 (upgradient) | –[c] | – | – | – | – |
| 0303 (on site) | – | – | – | – | **0.26**[d] |
| 0305 (on site) | – | – | – | 0.014 | **0.69** |
| 0307 (on site) | – | – | – | 0.0029 | **0.59** |
| 0309 (on site) | – | – | – | – | **0.043** |
| 0310 (~600 ft downgradient from site) | – | – | – | – | 0.016 |
| SRW Site | | | | | |
| 0317 (on site) | – | **0.15** | – | 0.0058 | – |
| 0318/0318A (on site) | **0.85** | **1.0** | 34 | 2.2 | 0.026 |
| 0339 (on site) | **1.7** | **1.1** | 44 | 1.8 | **0.030** |
| 0340 (on site) | **5.4** | **1.5** | 320 | 2.4 | **0.045** |
| 0508 (on site) | **2.7** | **1.2** | 200 | 1.1 | **0.080** |
| 0510 (on site) | **3.7** | **0.81** | 210 | 1.1 | **0.083** |
| 0319 (on site) | – | – | – | 0.0013 | – |
| 0320 (on site) | **0.47** | 0.0096 | <0.01 | 0.00033 | 0.010 |
| 0684 (~800 ft downgradient from site) | **0.44** | 0.0058 | <0.01 | 0.00012 | 0.0092 |

a   EPA (2013), http://water.epa.gov/drink/contaminants/index.cfm#List. MCL = maximum contaminant level for primary standard; SMCL = maximum contaminant level for secondary standard.

b   UMTRCA MCL.

c   Monitoring data are rounded to two significant figures. A dash indicates not analyzed.

d   Bold indicates that the concentration at the sampling point is higher than the standard.

3
4
5   surface water and groundwater are considered overappropriated (CDWR 2007). In addition,
6   instream flow water rights (nonconsumptive water rights for ecological benefits, which are
7   administered by the Colorado Water Conservation Board [CWCB]) have been established on
8   segments of the Dolores River and the San Miguel River in the vicinity of the DOE ULP lease
9   tracts (CWCB 2012). Surface waters are the dominant water supply source used in southwestern
10  Colorado, and they are primarily used for irrigation (Table 3.4-8).
11

BLM_0042135

1  **TABLE 3.4-8  Water Use by Category for Mesa, Montrose, and San Miguel Counties**
2  **in 2005**

|  | Daily Water Withdrawals ($10^6$ gal) | | |
| --- | --- | --- | --- |
| Category of Water Use | Mesa County | Montrose County | San Miguel County |
| Irrigation | 866.3 | 679.1 | 27.3 |
| Public supply | 14.6 | 8.9 | 0.8 |
| Domestic | 0.2 | 0.4 | 0.1 |
| Industrial | 0.6 | 1.8 | 0 |
| Livestock | 0.6 | 0.6 | 0.1 |
| Mining | 0.2 | 0.6 | 0 |
| Thermo-electric | 43.9 | 1.7 | 0 |
| Total surface water withdrawals | 925.2 | 691.5 | 28.0 |
| Total groundwater withdrawals | 1.1 | 1.5 | 0.3 |

Source: Ivahnenko and Flynn (2010)

3
4
5       A major water management issue associated with the Dolores River Basin is the Paradox
6   Valley Unit, which was constructed under authorization of the Salinity Control Act (P.L. 93-320)
7   of 1974 to help alleviate the high TDS concentrations that occur in the Dolores River. The
8   Paradox Valley Unit captures highly saline groundwater in the Paradox Valley area before it
9   enters the Dolores River, treats the saline water, and then disposes of the brine by deep well
10  injection (BOR 2013a). The Paradox Valley Unit consists of a series of shallow production wells
11  that intercept saline groundwater and send it to a surface treatment facility, where the brine is
12  removed and re-injected to the lower groundwater system (Paleozoic carbonate aquifer,
13  Figure 3.4-6) that lies 14,000–16,000 ft (4,300–4,800 m) below the land surface (Chafin 2003).
14  The Paradox Valley Unit was built and operated by the BOR, and it removes 110,000 tons of salt
15  per year at a cost of approximately $71/ton (BOR 2013b). The existing deep-injection well,
16  completed in 1988, is nearing the end of its useful life, and action will be needed by BOR to
17  continue long-term salinity control at the Paradox Unit (BOR 2013b). BOR is preparing an EIS
18  to describe the potential alternatives as well as the impacts of the construction and operation of
19  facilities to continue to dispose of brine at Paradox Valley. A new injection well alternative and
20  an evaporation pond alternative, as well as other alternatives, are being considered for future
21  brine disposal (BOR 2013b).
22
23      The BOR also built and operates the McPhee Dam located on the Dolores River, which
24  was built in 1984 as a part of the Dolores Project (BOR 2009). The Dolores Project provides
25  water for irrigation (90,900 ac-ft/yr) and municipal and industrial use (8,700 ac-ft/yr). In
26  addition, the McPhee Dam provides water for recreation and hydroelectric power generation
27  (BOR 2011).
28
29

BLM_0042136

1    **3.5  HUMAN HEALTH**
2
3
4    **3.5.1  Exposure to Radiation**
5
6         Terrestrial radioactive materials in rocks and soils are one of the causes of the natural
7    background radiation that people are exposed to daily. The radionuclides of concern in the area
8    where DOE uranium lease tracts are located are mainly uranium-238 and uranium-235 and their
9    decay products. Among the decay products of uranium isotopes, radium-226 is of primary
10   concern because of the radon gas generated during decay. The radon gas generated underground
11   can diffuse through the pore space in soils and become airborne. The hazard from radon arises
12   from its decay products, which are not gases; when they are inhaled, they deposit on the interior
13   surfaces of the lungs and affect human health.
14
15
16       **3.5.1.1  Radiation and Its Effects**
17
18         Radiation, either man-made or naturally occurring, is released when an unstable atom of
19   an element (an isotope) transforms (decays) into a more stable configuration. The radiation that
20   is released can be in the form of particles (e.g., neutrons, alpha particles, beta particles) or waves
21   of pure energy (e.g., gamma rays and x-rays).
22
23         Radiation can be broadly classified into
24   two categories: ionizing and non-ionizing.
25   Ionizing radiation is generally more energetic
26   than non-ionizing radiation and can knock
27   electrons out of the molecules with which the
28   particles or gamma rays and x-rays interact,
29   creating ion pairs. Non-ionizing radiation, such
30   as that emitted by a laser, is different in that it
31   does not create ions when it interacts with
32   matter but generally dissipates its energy in the
33   form of heat. The radiation associated with
34   uranium ore is ionizing radiation.
35
36         Ionizing radiation is a known human
37   carcinogen, and the relationship between
38   radiation dose and health effects is relatively
39   well characterized for high doses of most types
40   of radiation. Some of these cancers can be fatal,
41   and this is referred to as latent cancer fatality

> **Radiation**
>
> The health effect of concern from exposure to radiation at levels typical of environmental and occupational exposures is the inducement of cancer. Radiation-induced cancers may take years to develop following exposure and are generally indistinguishable from cancers caused by other sources. Current radiation protection standards and practices are based on the premise that any radiation dose, no matter how small, can result in detrimental health effects (cancer) and that the number of effects produced is in direct proportion to the radiation dose. Therefore, doubling the radiation dose is assumed to result in doubling the number of induced cancers. This approach is called the "linear-no-threshold hypothesis" and is generally considered to result in conservative estimates (i.e., overestimates) of the health effects from low doses of radiation.

42   (LCF) because the cancer may take many years to develop and cause death. Lower levels of
43   exposure might constitute a health risk, but it is difficult to establish a direct cause-and-effect
44   relationship because a particular effect in a specific individual can be produced by different
45   processes. The features of cancers resulting from radiation are not distinct from those of cancers
46   produced by other causes. Hence, the risk of cancer from chronic exposures of ionizing radiation

BLM_0042137

1  must be extrapolated from data for increased rates of cancer observed at much higher dose rates.
2  Chronic doses of low-level radiation have not been shown to cause cancer directly, although this
3  assumption has been made in order to be protective.
4
5          The amount of energy deposited in ionizing radiation per unit mass of any material is the
6  absorbed dose and is generally expressed in the unit identified as rad (for radiation-absorbed
7  dose). Certain types of radiation are more effective at producing ionizations than others. For the
8  same amount of absorbed dose, alpha particles will produce significantly more biological harm
9  than beta particles or gamma rays. The dose equivalent approach was developed to normalize the
10 unequal biological effects produced by different types of radiation. The dose equivalent is the
11 product of the absorbed dose (in rad) and a quality factor that accounts for the relative biological
12 effectiveness of the radiation. The dose equivalent is typically expressed in a unit identified as
13 rem (for roentgen equivalent man).
14
15         The dose delivered to internal organs as a result of radionuclides being systemically
16 incorporated into the body may continue long after intake of the radionuclide has ceased. After
17 being taken into the body, some radionuclides are eliminated fairly quickly, while others are
18 incorporated into tissues or ultimately deposited in bones and can be retained for many years.
19 This internal dose process contrasts with the external dose process, which occurs only when a
20 radiation field is present. The committed dose equivalent was developed to account for doses to
21 internal organs from radionuclides taken into the body. The committed dose equivalent is the
22 integrated dose equivalent to specific organs for 50 years following intake.
23
24         The International Commission on Radiological Protection (ICRP) developed the concepts
25 of effective dose equivalent (EDE) and committed effective dose equivalent (CEDE) to account
26 for the differing cancer rates from chronic exposures to radiation by different organs and tissues
27 in the body. The EDE and CEDE are weighted sums of the organ-specific dose equivalents and
28 committed dose equivalents. The weighting factors used in these calculations are based on
29 selected stochastic risk factors and are used to average organ-specific dose equivalents. The total
30 effective dose equivalent (TEDE) is the sum of the EDE for external radiation and the 50-year
31 CEDE for internal radiation. The calculated doses given in the ULP PEIS are the TEDEs, as
32 defined here.
33
34         The most common forms of radiation associated with uranium ore are alpha and beta
35 particles and electromagnetic radiation in the form of gamma rays and x-rays. An alpha particle
36 consists of two protons and two neutrons and is identical to the nucleus of a helium atom. Beta
37 particles can be either positive (positron) or negative (negatron); a negatron is identical to an
38 electron. Gamma rays and x-rays have no electrical charge or mass and can travel long distances
39 in air, body tissues, or other materials.
40
41         Ionizing radiation can impart sufficient localized energy to living cells to cause cell
42 damage. This damage may be repaired by the cell; the cell may die; or the cell may reproduce
43 other altered cells, sometimes leading to the induction of cancer. An individual may be exposed
44 to radiation from outside the body (external exposure) or, if the radioactive material has entered
45 the body through inhalation or ingestion, from inside the body (internal exposure).
46

BLM_0042138

Everyone is exposed to radiation on a daily basis, primarily from naturally occurring cosmic rays, radioactive elements in the soil, and radioactive elements incorporated into the body (such as potassium-40 [K-40]). Man-made sources of radiation include medical x-rays and fallout from previous aboveground nuclear weapons tests and nuclear reactor accidents (such as the accident involving the Chernobyl nuclear reactor in the Soviet Union in 1986). Ionizing radiation causes biological damage only when the energy released during radioactive decay is absorbed by tissue.

Radiation exposures associated with mining uranium ore are expected to be limited to chronic effects. The main health concern associated with chronic exposure to radiation is an increased likelihood of developing cancer, and this impact is assessed in the ULP PEIS. Relatively large doses are required to cause acute effects, and potential mechanisms for such exposures are not expected from activities associated with uranium mining. Acute doses above 25 rad delivered over a short time period can induce a number of deleterious effects, including nausea and vomiting, malaise and fatigue, increased body temperature, blood changes, epilation (hair loss), and temporary sterility; bone marrow changes have not been identified until the acute doses reach 200 rad (Cember 1983). Such exposures are highly unlikely from uranium mining of low-grade ore.

The EPA has developed dose conversion factors (DCFs) for internal and external exposures, and these factors are given in Federal Guidance Report (FGR) 11 (EPA 1988) and FGR 12 (EPA 1993). For internal exposures, the DCF represents the 50-year CEDE per unit intake of radionuclide, and for external exposures, the DCF represents the EDE per unit of time at 1 m (3 ft) above the ground surface per unit of activity concentration of the specified radionuclide. These DCFs given in the two EPA documents are based on the dosimetry models and results given in ICRP 26 (ICRP 1977) and ICRP 30 (ICRP 1979, 1980, 1981). These DCFs were developed on the metabolic and anatomical model of an adult male: the ICRP reference man weighing 70 kg (150 lb).

The ICRP updated its radiation dosimetry models for members of the general public (spanning a range of ages, including adults) in ICRP 72 (ICRP 1996), and the concepts and models included in ICRP 72 are gaining wide acceptance in the scientific community. For the ULP PEIS, the DCFs given in ICRP 72 for adults are used to calculate the doses associated with uranium isotopes and their decay progenies and members of the general public (ICRP 1996). These are the most recent values and provide a reasonable estimate of doses for comparing the various alternatives evaluated in the ULP PEIS.

In addition to estimating the radiation doses (TEDE) for potentially affected individuals, potential collective doses to specific groups of people were also estimated. A collective dose is the sum of the radiation dose each individual in the group received and provides an indication of the potential impact on the group of people as a whole. Other than radiation doses, potential cancer risks associated with radiation exposures were also estimated in this PEIS. For individuals, the estimated cancer risks represent the probabilities of developing a latent fatal cancer due to the radiation each individual received. For a population (i.e., a group of people), the estimated cancer risk represents the amount of latent cancer fatality (LCF) that could occur among the population. The estimated LCF for a population should also be interpreted

BLM_0042139

1  statistically. For example, if the estimated LCF is 0.006 for a population size of 10,000, this
2  means the average number of deaths for each group of 10,000 people, if the same radiation
3  exposure was applied to many groups of 10,000 people, would be 0.006. In most groups, no one
4  would incur an LCF from the radiation. In a very small percentage of groups (about 0.6%),
5  one LCF would occur. In an extremely small percentage of groups, two or possibly more LCFs
6  would occur. An LCF value of 0.006 for a population can also be viewed as a 0.6% chance of
7  one radiation-induced LCF in that population.
8
9       For uranium isotopes and their decay progenies, the LCF risks estimated in the ULP PEIS
10  were obtained by using the EPA slope factors (SFs) from FGR 13 (Eckerman et al. 1999). The
11  SFs are estimated cancer risks per unit intake of radionuclides for internal exposures or per unit
12  time of external exposure associated with a unit radionuclide concentration in a contaminated
13  medium. The SFs for radionuclides were developed by considering the radiation imparted to
14  each critical organ, the age-dependent and organ-specific cancer statistics cause by radiation, and
15  the statistics of life expectancy of the U.S. population. Detailed discussions on the SF
16  methodology can be found in EPA (1994).
17
18       An exception to the assessments of radiation doses and cancer risks using DCFs and SFs,
19  respectively, as described above, is the assessment of potential doses and cancer risks associated
20  with radon exposures. Radon is a noble gas generated by the decay of radium that is present in
21  uranium ores and in the natural environment. The risk to human health from radon exposure
22  (through inhalation) is caused by the decay progenies of radon, which are particles and can
23  deposit on the interior surfaces of lung and, potentially, cause a lung cancer. The exposure
24  concentration of radon is usually expressed in terms of working level (WL), which is a measure
25  of the alpha energy released by the short-lived progenies of radon as they decay. Potential
26  exposure to radon is measured in terms of working level month (WLM). One WLM is equivalent
27  to an exposure of 170 hours to a concentration of one WL. UNSCEAR (2008, 2010)
28  recommends that one WLM be equivalent to an effective dose of 506 mrem for workers and
29  388 mrem for the general public. The different conversions for workers and the general public lie
30  in the different inhalation rates considered for these two groups of receptors. For estimating
31  potential cancer risks, the ICRP (2011) recommends a conversion factor of $5 \times 10^{-4}$ per WLM.
32
33       Another common practice for estimating LCF risks associated with radiation exposures is
34  by converting estimated radiation doses with a dose-to-risk conversion factor. This approach is
35  used in the ULP PEIS for assessing potential LCF risks to different groups of receptors resulting
36  from transportation of uranium ores. The exposures associated with transportation are considered
37  to be mainly from external radiation. The conversion factor relates the radiation dose to the
38  potential number of expected LCFs on the basis of comprehensive studies of groups of people
39  historically exposed to large doses of radiation, such as the Japanese atomic bomb survivors. For
40  the ULP PEIS, a health risk conversion factor of 0.0006 LCF/person-rem was used. This value
41  was identified by the Interagency Steering Committee on Radiation Standards as a reasonable
42  factor to use in the calculation of potential LCFs associated with radiation doses as given in DOE
43  guidance and recommendations (DOE 2003, 2004). This factor means that if a population
44  receives a total collective dose of 10,000 person rem, on average, six additional LCFs will occur
45  among the population.
46

BLM_0042140

The LCF estimates provided in the ULP PEIS are in addition to those from other causes. In 2011, the American Cancer Society estimated 572,000 people would die of cancer in the United States, and about three times that number (1,600,000) would be diagnosed with cancer (ACS 2011). Also, the likelihood of developing an LCF from background radiation is about 0.03, based on an average background radiation dose rate of 620 mrem/yr as given by the National Council on Radiation Protection and Measurements (NCRP 2009), a 70-year lifetime, and an LCF factor of 0.0006/rem. The estimate of 620 mrem/yr for background radiation (given in NCRP 2009) includes about 310 mrem/yr from natural sources and 310 mrem/yr from man-made sources, including medical procedures and consumer products. This value is significantly larger than the previous NCRP estimate of 360 mrem/yr primarily because of the increased use of ionizing radiation in diagnostic and interventional medical procedures (NCRP 2009). In the ULP PEIS, estimates of LCFs are given to one significant figure. Table 3.5-1 lists the uranium-mining-related regulations and guidelines for workers and members of the public.

The radionuclides present in the uranium ore occur naturally in the environment and already contribute to background radiation levels. These radionuclides include isotopes of uranium, thorium, and radium and their radioactive decay products. The radiological impacts given in the ULP PEIS are incremental to those from natural and man-made sources of radiation; that is, the impacts are those that an average individual would incur in addition to the 620 mrem/yr noted above. The radiological impacts from uranium ore mining and transportation are analyzed and reported separately without consideration of the background radiation contribution.

A major source of the dose from natural background radiation is indoor radon gas, largely because of its short-lived decay products. Most of this dose is due to radon-222 (and its progeny products), which is a decay product of radium-226, itself a decay product of uranium-238. The doses from the other two naturally occurring isotopes of radon (radon-219 and radon-220) are much lower than the dose from radon-222. The annual radiation dose from the decay products of radon-222 is estimated to be about 200 mrem/yr (NCRP 2009). This dose is from naturally occurring radon gas in soil, rock, and water that infiltrates into houses; in the houses, the gas's decay products (which are charged particles) can build up and attach to dust particles in the air.

### 3.5.1.2  Baseline Radiological Dose and Risk

The radiation exposure an individual could incur by working or living near the ULP lease tracts could be greater than the national average exposure from background sources, which was estimated to be about 310 mrem per year per person (NCRP 2009). Table 3.5-2 compares these radiation dose estimates with the national average doses.

The information in Table 3.5-2 provides a baseline for gauging human health consequences that could result from the potential increase in human radiation exposures associated with the alternatives evaluated in the ULP PEIS. An additional perspective on background radiation levels in this area can be obtained by studying the environmental monitoring data collected for the proposed Piñon Ridge Mill. The plant would be located in Paradox Valley in western Montrose County, approximately 7 mi (11 km) east of the

BLM_0042141

1  **TABLE 3.5-1  Uranium-Mining-Related Regulations and Guidelines for Workers and Members of**
2  **the Public**

| Regulation/Standard/Guideline | Worker | Member of the Public |
|---|---|---|
| 40 CFR 61.2,2 Subpart B: National Emission Standards for Radon Emissions from Underground Uranium Mines[a] (Clean Air Act) | | Emissions of radon-222 to the ambient air from an underground uranium mine shall not exceed an effective dose equivalent of 10 mrem/yr. |
| 40 CFR 61.92, Subpart H: National Emission Standards for Emissions of Radionuclides Other Than Radon from Department of Energy Facilities (Clean Air Act) | | Emissions of radionuclides to the ambient air from DOE facilities shall not exceed an effective dose equivalent of 10 mrem/yr. |
| 40 CFR 440.32, Subpart C: Uranium, Radium, and Vanadium Ores Subcategory (Clean Water Act, National Pollution Discharge Elimination System) | | Radium-226 (dissolved) mine drainage in pCi/L: 1-day maximum, 10; 30-day average radium-226 (total) mine drainage in pCi/L: 1-day maximum, 30; 30-day average, 10 |
| 30 CFR 57.5039: Maximum Permissible Concentration (Federal Mine Safety and Health Act) | Persons shall not be exposed to air containing concentrations of radon progeny exceeding 1.0 WL[b] in active workings. | |
| 30 CFR 57.5038: Annual Exposure Limits (Federal Mine Safety and Health Act) | 4 WLM in any calendar year | |
| 30 CFR 57.5046: Protection against Radon Gas (Federal Mine Safety and Health Act) | Where radon progeny concentrations exceed 10 WL, respirator protection against radon gas shall be provided in addition to protection against radon progeny. | |
| 30 CFR 57.5047: Gamma Radiation Surveys (Federal Mine Safety and Health Act) | Individual gamma radiation exposure shall not exceed 5 rem/yr. | |
| 29 CFR 1910.1000, Table Z-1: Limits for Air Contaminants (Occupational Health and Safety Act) | Averaged over an 8-h workday: soluble uranium: 0.05 mg U/m$^3$ insoluble uranium: 0.25 mg U/m$^3$ | |
| 10 CFR 835.202: Occupational Dose Limits for General Employees (DOE) | Total effective dose of 5 rem (0.05 Sv). The sum of the equivalent dose to the whole body for external exposures and the committed | |

BLM_0042142

1    **TABLE 3.5-1  (Cont.)**

| Regulation/Standard/Guideline | Worker | Member of the Public |
|---|---|---|
| 10 CFR 835.202(Cont.) | equivalent dose to any organ or tissue other than the skin or the lens of the eye of 50 rem (0.5 Sv). An equivalent dose to the lens of the eye of 15 rem (0.15 Sv). The sum of the equivalent dose to the skin or to any extremity for external exposures and the committed equivalent dose to the skin or to any extremity of 50 rem (0.5 Sv). | |
| 10 CFR 835.208: Limits for Members of the Public Entering a Controlled Area (DOE) | | Total effective dose limit for members of the public exposed to radiation and/or radioactive material during access to a controlled area is 0.1 rem (0.001 Sv) per year. |
| DOE Order 458.1: Radiation Protection of the Public and the Environment, Section 4.b | | Total effective dose exceeding 100 mrem (1 mSv) per year, equivalent dose to the lens of the eye exceeding 1,500 mrem (15 mSv) per year, or equivalent dose to the skin or extremities exceeding 5,000 mrem (50 mSv) per year, from all sources of ionizing radiation and exposure pathways that could contribute significantly to the total dose. |
| National Institute for Occupational Safety and Health recommendation | Averaged for a workday of up to 10 hours: soluble uranium: 0.05 mg $U/m^3$ insoluble uranium: 0.2 mg $U/m^3$  Exposure to soluble uranium should not exceed 0.6 mg $U/m^3$ for more than 15 minutes. | |

[a]   Applies if mined, will mine, or is designed to mine over 100,000 tons of ore during the life of the mine; or has had or will have an annual ore production rate greater than 10,000 tons, unless the mine will not exceed total ore production of 100,000 tons during the life of the mine.

[b]   Working level (WL) is defined as any combination of the short-lived radon progeny in 1 L of air that will result in ultimate emissions of $1.3 \times 10^5$ MeV (million electron volts) of potential alpha energy, and exposure to these radon progeny over a period of time is expressed in terms of working level months (WLMs). Inhalation of air containing a radon daughter concentration of 1 WL for 173 hours results in an exposure of 1 WLM (30 CFR 57.2).

BLM_0042143

1  **TABLE 3.5-2  Comparison of Radiation Exposures from Natural Background**
2  **Sources near ULP Lease Tracts Versus the U.S. National Average**

| Source | Exposure Pathway | U.S. Average Natural Background[a] | Near ULP Lease Tracts |
|---|---|---|---|
| | | Radiation Dose (mrem/yr) | |
| Cosmic and cosmogenic radioactivity[b] | External radiation | 30 | 68[c] |
| Terrestrial radioactivity[d] | External radiation | 20 | 74[c] |
| Internal radioactivity[e] | Food ingestion | 30 | 30[f] |
| Radon and airborne particulates | Inhalation | 230 | 260[g] |
| Rounded total | | 310 | 430 |

[a]  Data for the national averages are from NCRP (2009).

[b]  Radiation exposures are from cosmic rays from outer space filtered by the atmosphere.

[c]  Based on data for Blanding, Utah.

[d]  Radiation exposures are caused by external radiation from radioactive materials in soils, primarily the uranium and thorium decay series.

[e]  The internal dose accounts for radiation caused by radionuclides (mainly K-40) deposited inside human bodies through food ingestion.

[f]  Radiation exposure from internal radioactivity for the ULP lease tracts is expected to be about the same as the national average.

[g]  Based on IUC (2003). The radiation dose is primarily from radon exposure.

3
4
5  unincorporated community of Bedrock and 12 mi (19 km) west of the town of Naturita
6  (Figure 3.5-1). The environmental data collected during 2007–2009 (Edge Environmental, Inc.
7  2009) include samples of on-site and off-site surface soils, surface water, groundwater, radon,
8  airborne radionuclides, and ambient gamma levels.
9
10      To estimate potential radiation exposures from background sources by using the
11  monitoring data, two hypothetical exposure scenarios were developed. The first one considers an
12  individual who lives near the ULP lease tracts and is exposed to radiation for 24 hours a day and
13  350 days a year. This individual was also assumed to pump out groundwater from a well for
14  drinking. Potential dose estimates reveal that this individual could receive a dose of about
15  120 mrem/yr from ambient gamma radiation contributed by terrestrial radioactivity and cosmic
16  and cosmogenic radioactivity, a dose of about 290 mrem/yr from inhalation of radon, a dose of
17  about 0.47 mrem/yr from breathing in airborne radionuclides that are contained in resuspended
18  dust particles, and a dose of about 25 mrem/yr from drinking untreated well water. In total, this
19  hypothetical resident could receive a radiation dose of up to 430 mrem/yr, which is about the
20  same as the total listed in Table 3.5-2. Inhalation of radon is the predominant exposure pathway,
21  followed by the external gamma radiation pathway. The contribution to the dose from the
22  inhalation of dust particles is insignificant compared with that from the inhalation of radon. The
23  dose estimate for drinking contaminated groundwater is conservative (i.e., it is greater than the

BLM_0042144



FIGURE 3.5-1  Location of the Proposed Piñon Ridge Mill (Edge Environmental Inc. 2009)

BLM_0042145

dose that would actually be incurred by an on-site resident), because (1) no treatment was assumed for the groundwater, (2) the water quality and yield of many wells in the area do not meet the requirements for making them a potable water source, and (3) the estimated dose is associated with the monitoring well that would result in the greatest exposure.

The second hypothetical scenario considers a recreationist who camps, bikes, and hunts in the uranium lease tracts. In addition to camping, biking, and hunting, this recreationist was also assumed to raft, float, and fish in the Dolores River. An exposure duration of 14 days per year was assumed for the inland activities. For the surface water activities, an exposure duration of 100 hours per year was assumed. When the same monitoring data collected by Energy Fuels Resources Corp. were used, it was estimated that the recreationist would receive a total dose of about 10.3 mrem/yr from inland activities, with 6.1 mrem/yr coming from ambient gamma radiation, 2.4 mrem/yr from inhalation of radon, 0.03 mrem/yr from inhalation of radionuclides contained in the airborne dust particles, and 1.8 mrem/yr from ingestion of wildlife animals caught from hunting activities. For dose estimates, an ingestion rate of 100 lb (45 kg) of deer meat was assumed. For the activities in Dolores River, a total dose of 3.3 mrem/yr was estimated, 3.1 mrem/yr resulting from ingestion of fish caught from the river and 0.24 mrem/yr resulting from ingestion of the surface water, which was assumed to be used for cooking the fish. An ingestion rate of 2.6 gal (10 L) for water and 2.2 lb (1 kg) for fish was assumed for dose calculation. A much higher dose for ingestion of fish was calculated than for ingestion of water because of the accumulation potential of radionuclides in fish. While aquatic activities could also occur in the San Miguel River, monitoring data for the San Miguel River are not available for this analysis. Because conservative assumptions were made to estimate the exposures associated with the Dolores River, the estimated results with the Dolores River are considered to be also the upper bound of the potential exposures that could be incurred with the San Miguel River. (For comparison with these dose estimates, the DOE radiation dose limit for the general public resulting from DOE activities is 100 mrem/yr for an individual from all sources of ionizing radiation and exposure pathways that could contribute significantly to the total dose [DOE 2011b].)

## 3.5.2  Exposure to Hazardous Chemicals

In addition to resulting in radiation exposures, uranium could also affect human health because of its chemical toxicity. Another chemical of concern is vanadium, which is found to have higher ore concentrations than uranium.

### 3.5.2.1  Chemical Hazards

Human exposure to chemicals in air, water, and soil may occur through ingestion, inhalation, or contact with skin. Methods used to assess hazards associated with chemical exposures may simply involve a comparison of concentrations in air, water, or soil with health-risk-based standards or guidelines available from state and Federal agencies. More detailed assessments estimate the extent of human exposure due to a particular source and compare that exposure with benchmark levels for noncarcinogenic risks ["hazard index" (HI) approach] or

BLM_0042146

1  benchmarks for carcinogenic risks. The
2  chemicals of concern in the ULP PEIS are
3  uranium and vanadium, both of which are
4  noncarcinogens.
5
6      In estimating noncancer risks
7  (i.e., noncancer adverse health outcomes, such
8  as kidney damage or developmental
9  impairment) due to chemical exposures, the
10 first step is to estimate the chemical
11 concentration in air, water, and/or soil, either
12 present from natural sources or attributable to
13 anthropogenic sources. The concentration
14 estimate is combined with an estimate of the
15 human intake level to produce a chemical-
16 specific daily intake estimate. (The intake level
17 is usually from the upper end of the expected
18 range of possible intakes in order to make sure
19 risk estimates account for individuals who have
20 unusually high intakes.) Estimated intakes are
21 compared with chemical-specific reference
22 doses. The reference doses are developed by the
23 EPA for many commonly used chemicals and
24 are based on a broad range of toxicological
25 data. See the text box for further information on
26 risk estimation procedures.
27
28
29      **3.5.2.2 Baseline Chemical Risks**
30
31      Potential chemical risks that could result
32 from potential exposure to uranium and
33 vanadium were assessed by comparing the
34 estimated exposures with threshold values. The
35 threshold values used are reference
36 concentrations (RfCs) for inhalation exposures
37 and reference doses (RfDs) for ingestion
38 exposures. On the basis of the monitoring data
39 obtained by Energy Fuels Resources Corp.
40 (Edge Environmental, Inc. 2009) and by using
41 the same exposure parameters as those used for
42 calculating radiation doses, HIs (sum of HQs
43 for exposures to uranium and vanadium) for the
44 inhalation of particulates and ingestion of
45 water, fish, and wildlife pathways were calculated (Table 3.5-3). The estimates indicate that
46 potential risks from inhaling suspended dust particles containing the uranium and vanadium

---

**Key Concepts in Estimating Risks
from Low-Level Chemical Exposures**

**Reference Dose**

Oral reference doses and inhalation reference
concentrations (RfDs and RfCs, respectively)
have been developed by the EPA for estimating
the noncarcinogenic effects of substances. The
RfD and RfC provide quantitative information
for use in risk assessments for an estimate of a
daily exposure to the human population
(including sensitive subgroups) that is likely to
be without an appreciable risk of deleterious
effects during a lifetime.

**Hazard Quotient (HQ)**

- A comparison of the estimated intake level
  or dose of a chemical with its reference dose.

- Expressed as a ratio of estimated intake
  level to reference dose.

- Examples:
  – The EPA reference level (reference dose)
    for ingestion of soluble compounds of
    uranium is 0.003 mg/kg of body weight per
    day.
  – If a 150-lb (70-kg) person ingested 0.1 mg
    of soluble uranium per day, the daily rate
    would be 0.1 ÷ 70 ≈ 0.001 mg/kg, which
    is below the reference dose and thus
    unlikely to cause adverse health effects.
    This would yield a hazard quotient of
    0.001 ÷ 0.003 = 0.33.

**Hazard Index**

- Sum of the hazard quotients for all
  chemicals to which an individual is exposed.

- Used as a screening tool. A value of less
  than one indicates that the exposed person
  is unlikely to develop adverse human
  health effects. A value of more than one,
  however, does not necessarily mean adverse
  health effects will occur, because different
  chemicals may react differently in the human
  body (i.e., they may have different,
  nonadditive kinds of toxicity).

BLM_0042147

1
2

**TABLE 3.5-3  Estimated Radiation and Chemical Exposures for Receptors in the DOE Lease Tracts Based on Environmental Monitoring Data from Energy Fuels Resources Corp.[a]**

| Receptor | Radiation Source | Exposure Pathways | Dose to Individual (mrem/yr) | Total Hazard Index |
|---|---|---|---|---|
| Recreationist[b] | Ambient gamma radiation (including terrestrial radioactivity and cosmic and cosmogenic radioactivity) | External radiation and air submersion | 6.05[c] | NA[d] |
| | Radon | Inhalation | 2.41[e] | NA |
| | Contaminated airborne dust particles | Inhalation | 0.031[f] | $3.4 \times 10^{-5}$ [g] |
| | Contaminated wildlife animals | Ingestion | 1.78[h] | 0.26[i] |
| | Contaminated surface water | External radiation and ingestion while rafting/boating/fishing in Dolores River | <0.24[j] | 0.002[i] |
| | Contaminated fish | Ingestion | <3.07[k] | 0.03[i] |
| Resident[l] | Ambient gamma radiation (including terrestrial radioactivity and cosmic and cosmogenic radioactivity) | External radiation and air submersion | 121[c] | NA |
| | Radon | Inhalation | 288[e] | NA |
| | Contaminated airborne dust particles | Inhalation | 0.47[f] | $8.6 \times 10^{-4}$ [g] |
| | Contaminated groundwater | Ingestion | <25[m] | <0.66[i] |

Footnotes on next page.

3
4

BLM_0042148

1

**TABLE 3.5-3  (Cont.)**

a   The environmental monitoring data were obtained from Edge Environmental, Inc. (2009).

b   The recreationist scenario considers a receptor spending a total of 14 days per year camping, biking, or hunting in the DOE lease tract and 100 hours per year rafting, floating, or fishing in the Dolores River.

c   The external dose was estimated based on the average monitoring data from five different monitoring stations installed to measure ambient gamma radiation. A conversion factor of 0.9 rem/per roentgen or R was used to convert the measured exposure to radiation dose. A shielding factor of 0.7 was assumed for indoor exposure.

d   Exposure pathway is not applicable.

e   The radon inhalation dose was calculated based on the average measured Rn-222 concentration of 1.4 pCi/L. A soil concentration corresponding to the measured radon concentration was derived with the RESRAD computer code (Yu et al. 2001), which was then used to calculate the potential outdoor and indoor radon exposures. For a resident, the resulting outdoor dose was 20.7 mrem/yr, and the resulting indoor dose was 267 mrem per yr. For a recreationist, the resulting dose was 2.4 mrem/yr, considering outdoor exposure. A dose conversion factor of 388 mrem per working level month (WLM) (UNSCEAR 2010) was used to estimate the radon dose.

f   The radiation dose from inhalation of dust particles was calculated with the monitoring data for airborne radionuclide concentrations and ICRP-60 dose conversion factors (ICRP 1991). An inhalation rate of 8,000 $m^3/yr$ and a dust filtration factor of 0.4 for indoor exposure were assumed. The average radiation dose associated with the concentrations measured for each radionuclide at each monitoring station was calculated first. The individual doses were then added together to obtain the total dose for each monitoring station. The maximum among the five monitoring stations was then reported in this table.

g   The total inhalation HI was the sum of the HQs for exposures to uranium and vanadium. The vanadium air concentration was assumed to be five times the uranium concentration; this ratio was selected on the basis of the mining production rate of vanadium versus that of uranium. The RfCs used in the calculation were 0.0001 $mg/m^3$ for $V_2O_5$ (ATSDR 2012) and 0.0008 $mg/m^3$ for uranium (ATSDR 2012).

h   The radiation dose was estimated by assuming the recreationist hunted down a deer and took it home for consumption. The soil concentration derived for radon exposures (see note e above) and an ingestion rate of 100 lb (45.4 kg) were used in the RESRAD calculation. The RESRAD default radionuclide transfer factors for meat were used as surrogates to obtain the radionuclide concentrations in the tissues of deer.

i   The total ingestion HI was the sum of the HQs for exposures to uranium and vanadium. The reference doses (RfDs) used in the calculation were 0.009 mg/kg-d for $V_2O_5$ from the Integrated Risk Information System (IRIS) (EPA 2012a) and 0.003 mg/kg-d for uranium, also from IRIS.

**Footnotes continued on next page.**

BLM_0042149

1

**TABLE 3.5-3  (Cont.)**

---

j   The radiation dose was estimated by using the maximum measured concentration of each radionuclide in the Dolores River. The radiation dose estimated includes exposure from external radiation, assuming the receptor sits inside a boat in the middle of the river, and from ingestion of surface water (used for cooking), assuming a total ingestion rate of 10 L/yr.

k   The radiation dose was estimated by assuming the recreationist caught fish from the Dolores River and cooked the fish with river water. An ingestion rate of 2.2 lb (1 kg) was assumed in the RESRAD dose calculation. Because of the high accumulation potential of radionuclides in fish tissue, the radiation dose calculated for fish ingestion is much higher than that calculated for water ingestion.

l   The resident scenario assumes a receptor stays in the uranium lease tract for 350 days per year and uses groundwater for drinking.

m   The radiation dose was obtained with the measured groundwater concentrations from different monitoring wells and ICRP-60 dose conversion factors (ICRP 1991). The radiation dose associated with the average concentrations for each monitoring well was calculated, and the maximum value among the monitoring wells was then reported in this table. A water ingestion rate of 700 L/yr was assumed for the dose calculation.

2

BLM_0042150

1    compounds would be very small. The potential exposures would result primarily from ingestion;
2    with an HI of 0.29 for the recreationist scenario and an HI of 0.66 for the resident scenario.
3    Because the hazard index is less than 1 for all pathways combined for both scenarios, potential
4    adverse effects on human health are not expected from exposures to the uranium and vanadium
5    in the background environment.
6
7
8    **3.6 ECOLOGICAL RESOURCES**
9
10
11   **3.6.1 Vegetation**
12
13          An ecoregion is an area in which there is a general similarity in ecosystems. Ecoregions
14   are characterized by the spatial patterns and compositions of biotic and abiotic features. EPA has
15   mapped ecoregions of North America features in a hierarchy of four levels, with Level I being
16   the broadest classification and Level IV being the most local classification. Each level consists of
17   subdivisions of the previous (next-highest) level. The ULP lease tracts are located primarily
18   within the Level III Ecoregion 20 (Colorado Plateaus); however, the northeast portion of lease
19   tract 26 occurs within Ecoregion 21 (Southern Rockies) (Chapman et al. 2006).
20
21          The Colorado Plateaus ecoregion is characterized by a rugged tableland of mesas,
22   plateaus, mountains, and canyons, often with abrupt changes in local relief
23   (Chapman et al. 2006). Habitat types within this ecoregion include Douglas-fir forest,
24   piñon-juniper woodlands, and Gambel oak, as well as sagebrush steppe, desert shrubland, and
25   salt desert scrub. Within the Colorado Plateaus ecoregion, there are three Level IV ecoregions in
26   which ULP lease tracts are located: Monticello-Cortez Uplands and Sagebrush Valleys; Shale
27   Deserts and Sedimentary Basins; and Semiarid Benchlands and Canyonlands. Figure 3.6-1
28   shows Level IV ecoregions in the area encompassing the ULP lease tracts. Each of the tracts is
29   located, at least in part, within the Level IV Ecoregion 20c Semiarid Benchlands and
30   Canyonlands. In this ecoregion, sandy soils support sagebrush steppe with warm season grasses,
31   such as galleta grass (*Pleuraphis jamesii*) and blue grama (*Bouteloua gracilis*), and shrubs,
32   primarily black sagebrush (*Artemisia nova*), winterfat (*Krascheninnikovia lanata*), Mormon tea
33   (*Ephedra viridis*), fourwing saltbush (*Atriplex canescens*), and shadscale (*Atriplex confertifolia*).
34   Stony soils support piñon-juniper woodlands of two-needle piñon pine (*Pinus edulis*) and Utah
35   juniper (*Juniperus osteosperma*). Scattered woodlands of Gambel oak (*Quercus gambelii*) occur
36   at the higher elevations. Woodlands have expanded beyond their original range because of fire
37   suppression and erosion. The average annual precipitation is about 10 to 18 in. (25 to 46 cm) in
38   lower areas and 20 to 25 in. (51 to 64 cm) at the highest elevations.
39
40          Western portions of Lease Tracts 11, 11A, and 12 include the Monticello-Cortez Uplands
41   and Sagebrush Valleys Level IV ecoregion. Within this ecoregion, sagebrush steppe occurs on
42   broad areas of silty soils and is characterized by Wyoming big sagebrush (*Artemisia tridentata*
43   ssp. *wyomingensis*), western wheatgrass (*Pascopyrum smithii*), and Indian ricegrass
44   (*Achnatherum hymenoides*) (Chapman et al. 2006). Scattered piñon-juniper woodlands occur on
45   shallow or stony soils along the rims of benches and minor escarpments. Two-needle piñon pine,
46   bitterbrush (*Purshia tridentata*), and serviceberry (*Amelanchier* sp.) also occur in some areas.

BLM_0042151



1
2   **FIGURE 3.6-1  Level IV Ecoregions in the Vicinity of DOE ULP Lease Tracts (Source:**
3   **Chapman et al. 2006)**

BLM_0042152

1        A small area in the eastern portion of Lease Tract 13 is located within the Shale Deserts
2 and Sedimentary Basins Level IV ecoregion. This arid ecoregion generally supports sparse mat
3 saltbush shrubland and salt desert scrub (Chapman et al. 2006). Characteristic species include
4 mat saltbush (*Atriplex corrugata*), shadscale, Nuttall's saltbush (*Atriplex nuttallii*), blackbrush
5 (*Coleogyne ramosissima*), fourwing saltbush, Wyoming big sagebrush, bud sagebrush
6 (*Picrothamnus desertorum*), galleta grass, and desert trumpet (*Eriogonum inflatum*). The alkaline
7 soils of floodplains support greasewood (*Sarcobatus vermiculatus*), alkali sacaton (*Sporobolus
8 airoides*), seepweed (*Suaeda* sp.), and shadscale. Badland areas support little to no vegetation.
9
10        A small portion in the northeast corner of Lease Tract 26 is located within the
11 Sedimentary Mid-Elevation Forests Level IV ecoregion of the Southern Rockies Level III
12 ecoregion. This ecoregion supports ponderosa pine (*Pinus ponderosa*) forest, aspen (*Populus
13 tremuloides*) forest, and Gambel oak woodland (Chapman et al. 2006). Some areas include
14 mountain mahogany (*Cercocarpus* sp.) and two-needle piñon pine. Shrubs occurring within the
15 habitats of this ecoregion include antelope bitterbrush (*Purshia tridentata*), fringed sage
16 (*Artemisia frigida*), serviceberry, and snowberry (*Symphoricarpos* sp.). Grasses within these
17 habitats include Arizona fescue (*Festuca arizonica*), bluegrass (*Poa* sp.), junegrass (*Koeleria
18 macrantha*), needlegrasses (*Stipa* spp.), mountain muhly (*Muhlenbergia montana*), pine
19 dropseed (*Blepharoneuron tricholepis*), and mountain brome (*Bromus marginatus*).
20
21        Land cover types described and mapped under the Southwest Regional Gap Analysis
22 Project (USGS 2004) were used to evaluate plant communities in and near the lease tracts
23 (Figures 3.6-2 through 3.6-5). Each cover type encompasses a range of similar plant
24 communities or other land cover (e.g., quarries, mines, gravel pits, and oil wells). Land cover
25 types occurring within the lease tracts are listed in Table 3.6-1. Summary descriptions of land
26 cover types are given in Table 3.6-2. The predominant land cover type in most of the tracts is
27 Colorado Plateau Piñon-Juniper Woodland. Large areas of Inter-Mountain Basins Big Sagebrush
28 Shrubland occur in Lease Tracts 9, 12, 19A, 20, and 21; Colorado Plateau Piñon-Juniper
29 Shrubland occurs over large areas of Lease Tracts 13, 13A, 14 (T1), and 18; and large areas of
30 Rocky Mountain Gambel Oak-Mixed Montane Shrubland occur in Lease Tracts 10 and 12.
31 While Cultivated Cropland is identified as occurring in many of the lease tracts, it is unlikely that
32 pasture or cultivated lands are present.
33
34        Lease Tracts 19A, 20, and 21 consist primarily of a composite of Colorado Plateau
35 Piñon-Juniper Woodland and Inter-Mountain Basins Big Sagebrush Shrubland. Lease
36 Tracts 13A, 14, and 18 are primarily composed of Colorado Plateau Piñon-Juniper Woodland
37 and Colorado Plateau Piñon-Juniper Shrubland. Lease Tract 12 is a mosaic of Inter-Mountain
38 Basins Montane Sagebrush Steppe, Inter-Mountain Basins Big Sagebrush Shrubland, and Rocky
39 Mountain Gambel Oak-Mixed Montane Shrubland. Lease Tract 13 is a mosaic of Colorado
40 Plateau Piñon-Juniper Woodland, Colorado Plateau Piñon-Juniper Shrubland, Inter-Mountain
41 Basins Greasewood Flat, Inter-Mountain Basins Shale Badland, and Inter-Mountain Basins
42 Mixed Salt Desert Scrub.
43
44        Noxious weeds and invasive plant species occur in each of the counties containing
45 uranium lease tracts. The Colorado Department of Agriculture (CDA) maintains an official state
46 list of weed species that are designated noxious species (CDA 2011). Table 3.6-3 provides a

BLM_0042153



1
2   FIGURE 3.6-2  Land Cover Types in the Vicinity of DOE ULP Lease Tracts 26 and 27 (USGS 2004)

BLM_0042154



1
2 FIGURE 3.6-3 Land Cover Types in the Vicinity of DOE ULP Lease Tracts 18–20, 24, and 25 (USGS 2004)



1
2   FIGURE 3.6-4  Land Cover Types in the Vicinity of DOE ULP Lease Tracts 5–8, 17, and 21–23 (USGS 2004)

BLM_0042156



1
2  FIGURE 3.6-5  Land Cover Types in the Vicinity of DOE ULP Lease Tracts 10–16 (USGS 2004)

BLM_0042157

1    **TABLE 3.6-1  Land Cover Types within DOE ULP Lease Tracts**

| Land Cover Type[a] | Acreage by Lease Tract Number | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 5 | 5A | 6 | 7 | 8 | 8A | 9 | 10 |
| Colorado Plateau Mixed Bedrock Canyon and Tableland | | | 1 | | 4 | | 25 | 2 |
| Colorado Plateau Mixed Low Sagebrush Shrubland | | | | | 11 | | 5 | |
| Colorado Plateau Piñon–Juniper Shrubland | | | | 21 | | 4 | 1 | |
| Colorado Plateau Piñon–Juniper Woodland | 151 | 23 | 522 | 354 | 876 | 75 | 635 | 417 |
| Cultivated Cropland | | | | | 1 | | | 71 |
| Disturbed/Successional–Recently Chained Piñon–Juniper | | | | | <1 | | | |
| Inter-Mountain Basins Big Sagebrush Shrubland | | 2 | 8 | 1 | 62 | | 369 | 31 |
| Inter-Mountain Basins Greasewood Flat | | | | | | <1 | | |
| Inter-Mountain Basins Mat Saltbush Shrubland | | | | | | | | |
| Inter-Mountain Basins Mixed Salt Desert Scrub | | | 8 | | | | | |
| Inter-Mountain Basins Montane Sagebrush Steppe | | | | | | | | |
| Inter-Mountain Basins Semidesert Grassland | | | | | | | | |
| Inter-Mountain Basins Semidesert Shrub Steppe | | | | | | | | |
| Inter-Mountain Basins Shale Badland | | | | 2 | | | | |
| Introduced Riparian and Wetland Vegetation | | | | | | | | |
| Introduced Upland Vegetation–Annual Grassland | | | | | | | | |
| Introduced Upland Vegetation–Perennial Grassland and Forbland | | | | | | | | |
| Quarries, Mines, Gravel Pits and Oil Wells | | | | 107 | | | | |
| Rocky Mountain Gambel Oak–Mixed Montane Shrubland | | | | | 2 | | 1 | 109 |
| Rocky Mountain Lower Montane–Foothill Shrubland | | | | | | | | 5 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | | | | | | | | |
| Southern Rocky Mountain Dry–Mesic Montane Mixed Conifer Forest and Woodland | | | | | | | | <1 |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | | | | | | | | 2 |
| Southern Rocky Mountain Ponderosa Pine Woodland | | | | | | | | |

2
3

BLM_0042158

1

**TABLE 3.6-1  (Cont.)**

| Land Cover Type | Acreage by Lease Tract Number | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 11 | 11A | 12 | 13 | 13A | 14 | 15 | 15A |
| Colorado Plateau Mixed Bedrock Canyon and Tableland | <1 | | | 29 | 2 | 8 | | |
| Colorado Plateau Mixed Low Sagebrush Shrubland | | | | | <1 | | | 1 |
| Colorado Plateau Piñon-Juniper Shrubland | 4 | | | 340 | 112 | 238 | 53 | |
| Colorado Plateau Piñon-Juniper Woodland | 1,289 | 1,242 | 59 | 200 | 154 | 596 | 279 | 168 |
| Cultivated Cropland | 2 | 4 | 10 | 6 | 1 | | | |
| Disturbed/Successional–Recently Chained Piñon-Juniper | | | | | | | | |
| Inter-Mountain Basins Big Sagebrush Shrubland | 4 | 15 | 156 | 21 | 8 | 14 | | 1 |
| Inter-Mountain Basins Greasewood Flat | <1 | | | 143 | 67 | 14 | | |
| Inter-Mountain Basins Mat Saltbush Shrubland | | | | | 3 | | | |
| Inter-Mountain Basins Mixed Salt Desert Scrub | | | | 136 | 34 | 77 | 18 | 3 |
| Inter-Mountain Basins Montane Sagebrush Steppe | | | 112 | | | | | |
| Inter-Mountain Basins Semidesert Grassland | | | | 26 | 12 | 2 | | |
| Inter-Mountain Basins Semidesert Shrub Steppe | | | | 2 | | | | |
| Inter-Mountain Basins Shale Badland | | | | 163 | 28 | 24 | | |
| Introduced Riparian and Wetland Vegetation | | | | | | | | |
| Introduced Upland Vegetation–Annual Grassland | 2 | 2 | | | | | | |
| Introduced Upland Vegetation–Perennial Grassland and Forbland | | 1 | | | | | | |
| Quarries, Mines, Gravel Pits and Oil Wells | | | | | | | | |
| Rocky Mountain Gambel Oak–Mixed Montane Shrubland | | 29 | 304 | | | | | |
| Rocky Mountain Lower Montane–Foothill Shrubland | | 2 | | | | | | |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | | | | 13 | | | | |
| Southern Rocky Mountain Dry–Mesic Montane Mixed Conifer Forest and Woodland | | | | | | | | |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | | | | | | | | |
| Southern Rocky Mountain Ponderosa Pine Woodland | | | <1 | | | | | |

BLM_0042159

**TABLE 3.6-1  (Cont.)**

| Land Cover Type | 16 | 16A | 17 | 18 | 19 | 19A | 20 | 21 |
|---|---|---|---|---|---|---|---|---|
| | Acreage by Lease Tract Number | | | | | | | |
| Colorado Plateau Mixed Bedrock Canyon and Tableland | | | | 62 | 12 | 14 | 37 | 4 |
| Colorado Plateau Mixed Low Sagebrush Shrubland | | | | | | | | |
| Colorado Plateau Piñon-Juniper Shrubland | | | | 284 | 2 | 16 | 62 | 2 |
| Colorado Plateau Piñon-Juniper Woodland | 1,726 | 563 | 454 | 761 | 534 | 674 | 361 | 449 |
| Cultivated Cropland | 1 | 14 | 2 | | | | | |
| Disturbed/Successional–Recently Chained Piñon-Juniper | | | | | | | | |
| Inter-Mountain Basins Big Sagebrush Shrubland | 56 | 7 | 18 | 46 | 91 | 487 | 162 | 178 |
| Inter-Mountain Basins Greasewood Flat | | | | | 1 | | | 2 |
| Inter-Mountain Basins Mat Saltbush Shrubland | | | | <1 | | 1 | 1 | |
| Inter-Mountain Basins Mixed Salt Desert Scrub | | | | 21 | 24 | <1 | 4 | 4 |
| Inter-Mountain Basins Montane Sagebrush Steppe | | | | | | | | |
| Inter-Mountain Basins Semidesert Grassland | | | | 1 | | | | 6 |
| Inter-Mountain Basins Semidesert Shrub Steppe | | | | 4 | | | 1 | |
| Inter-Mountain Basins Shale Badland | | | | | | 2 | | |
| Introduced Riparian and Wetland Vegetation | | | | <1 | | | | |
| Introduced Upland Vegetation–Annual Grassland | | | | 1 | | | 1 | |
| Introduced Upland Vegetation–Perennial Grassland and Forbland | | | | | | | | |
| Quarries, Mines, Gravel Pits and Oil Wells | | | | | | | | 6 |
| Rocky Mountain Gambel Oak–Mixed Montane Shrubland | | | | | | | | |
| Rocky Mountain Lower Montane–Foothill Shrubland | 1 | | | | | | | |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | | | | | | | | |
| Southern Rocky Mountain Dry–Mesic Montane Mixed Conifer Forest and Woodland | 1 | | | | | | | |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | 4 | 1 | | | | | | |
| Southern Rocky Mountain Ponderosa Pine Woodland | | | | | | | | |

BLM_0042160

**TABLE 3.6-1 (Cont.)**

| Land Cover Type | Acreage by Lease Tract Number | | | | | | |
|---|---|---|---|---|---|---|---|
| | 22 | 22A | 23 | 24 | 25 | 26 | 27 |
| Colorado Plateau Mixed Bedrock Canyon and Tableland | | 21 | 60 | | 5 | 13 | |
| Colorado Plateau Mixed Low Sagebrush Shrubland | | | | | | | |
| Colorado Plateau Piñon-Juniper Shrubland | | | 1 | 5 | 3 | 20 | |
| Colorado Plateau Piñon-Juniper Woodland | 145 | 287 | 442 | 196 | 624 | 3,838 | 1,696 |
| Cultivated Cropland | | | 5 | | | | |
| Disturbed/Successional–Recently Chained Piñon-Juniper | | | | | | | |
| Inter-Mountain Basins Big Sagebrush Shrubland | 74 | 94 | 55 | | 2 | 51 | 65 |
| Inter-Mountain Basins Greasewood Flat | | | | | | 1 | |
| Inter-Mountain Basins Mat Saltbush Shrubland | | | | | | | |
| Inter-Mountain Basins Mixed Salt Desert Scrub | | 2 | 20 | | 4 | | |
| Inter-Mountain Basins Montane Sagebrush Steppe | | | | | | | |
| Inter-Mountain Basins Semidesert Grassland | | 4 | 2 | | | | |
| Inter-Mountain Basins Semidesert Shrub Steppe | | | | | 2 | | |
| Inter-Mountain Basins Shale Badland | | | 5 | | | | |
| Introduced Riparian and Wetland Vegetation | | | | | | | |
| Introduced Upland Vegetation–Annual Grassland | 1 | | 2 | | | | |
| Introduced Upland Vegetation–Perennial Grassland and Forbland | | | | | | | |
| Quarries, Mines, Gravel Pits and Oil Wells | 3 | | 4 | | | | |
| Rocky Mountain Gambel Oak–Mixed Montane Shrubland | | | | | | 4 | |
| Rocky Mountain Lower Montane–Foothill Shrubland | | | | | | | 1 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | | | | | | 22 | <1 |
| Southern Rocky Mountain Dry–Mesic Montane Mixed Conifer Forest and Woodland | | | | | | | |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | | | | | | | |
| Southern Rocky Mountain Ponderosa Pine Woodland | | | | | | | |

[a] Descriptions of land cover types are given in Table 3.6-2. Empty fields in the table indicate this land cover type is not found on a given lease tract.

Source: USGS (2004)

1
2

BLM_0042161

1    **TABLE 3.6-2  Descriptions of Land Cover Types[a]**

**Colorado Plateau Mixed Bedrock Canyon and Tableland:** Includes barren and sparsely vegetated (generally <10% plant cover) steep cliff faces, narrow canyons, and open tablelands. Composed of a very open coniferous tree canopy or scattered trees and shrubs. Herbaceous species are typically sparse.

**Colorado Plateau Mixed Low Sagebrush Shrubland:** Occurs in canyons, draws, hilltops, and dry flats. Consists of open shrubland and steppe habitats. Black sagebrush (*Artemisia nova*) or Bigelow sage (*A. bigelovii*) are the dominant species, with Wyoming big sagebrush (*A. tridentata* ssp. *wyomingensis*) co-dominant in some areas. Semiarid grasses are often present and may exceed 25% cover.

**Colorado Plateau Piñon-Juniper Shrubland:** Occurs on rocky mesatops and dry slopes, often upslope of piñon-juniper woodland. Stunted two-needle piñon (*Pinus edulis*) or Utah juniper (*Juniperus osteosperma*), or both, are the dominant species. Other shrubs may be present. Herbaceous species are sparse to moderately dense.

**Colorado Plateau Piñon-Juniper Woodland:** Occurs on foothills, ridges, and low-elevation mountain slopes. Two-needle piñon (*Pinus edulis*), Utah juniper (*Juniperus osteosperma*), or both, are the dominant species. Understory layers, if present, may be shrub- or grass-dominated.

**Cultivated Cropland:** Areas where pasture/hay or cultivated crops account for more than 20% of total vegetation cover.

**Disturbed/Successional–Recently Chained Piñon-Juniper:** Areas that have recently been chained to remove Piñon-Juniper (*Pinus edulis–Juniperus* sp.).

**Inter-Mountain Basins Big Sagebrush Shrubland:** Dominated by basin big sagebrush (*Artemisia tridentata tridentata*), Wyoming big sagebrush (*Artemisia tridentata wyomingensis*), or both. Other shrubs may be present. Perennial herbaceous plants are present but not abundant.

**Inter-Mountain Basins Greasewood Flat:** Dominated or co-dominated by greasewood (*Sarcobatus vermiculatus*) and generally occurring in areas with saline soils, a shallow water table, and intermittent flooding, although remaining dry for most growing seasons. This community type generally occurs near drainages or around playas. These areas may include, or may be co-dominated by, other shrubs, and may include a graminoid herbaceous layer.

**Inter-Mountain Basins Mat Saltbush Shrubland:** Occurs on gentle slopes and rolling plains. Mat saltbush (*Atriplex corrugata*) or Gardner's saltbush (*Atriplex gardneri*) are typically dominant in these dwarf-shrublands. Other dwarf-shrubs may be dominant or co-dominant. Low shrubs may be present and herbaceous species are usually sparse.

**Inter-Mountain Basins Mixed Salt Desert Scrub:** Generally consists of open shrublands which include at least one species of *Atriplex* along with other shrubs. Perennial grasses dominate a sparse to moderately dense herbaceous layer.

**Inter-Mountain Basins Montane Sagebrush Steppe:** Occurs on flats, ridges, level ridgetops, and mountain slopes. Mountain big sagebrush (*Artemisia tridentata vaseyana*) and related taxa such as big sagebrush (*Artemisia tridentata spiciformis*) are typically the dominant species. Perennial herbaceous species, especially grasses, are usually abundant, although shrublands are also present.

BLM_0042162

**TABLE 3.6-2  (Cont.)**

**Inter-Mountain Basins Semidesert Grassland:** Consists of perennial bunchgrasses as dominants or co-dominants. Scattered shrubs or dwarf shrubs may also be present.

**Inter-Mountain Basins Semidesert Shrub Steppe:** Generally consists of perennial grasses with an open shrub and dwarf shrub layer.

**Inter-Mountain Basins Shale Badland:** Typically occurs on rounded hills and plains. Consists of barren and sparsely vegetated areas (<10% plant cover) with high rate of erosion and deposition. Vegetation consists of sparse dwarf shrubs and herbaceous plants.

**Introduced Riparian and Wetland Vegetation:** Vegetation dominated (typically >60% canopy cover) by introduced species. These are spontaneous, self-perpetuating, and not (immediately) the result of planting, cultivation, or human maintenance. Land occupied by introduced vegetation is generally permanently altered (converted) unless restoration efforts are undertaken. Specifically, land cover is significantly altered/disturbed by introduced riparian and wetland vegetation.

**Introduced Upland Vegetation–Annual Grassland:** Dominated by non-native annual grass species.

**Introduced Upland Vegetation–Perennial Grassland and Forbland:** Dominated by non-native perennial grass and forb species.

**Quarries, Mines, Gravel Pits and Oil Wells:** Includes open-pit mines and quarries.

**Rocky Mountain Gambel Oak–Mixed Montane Shrubland:** Occurs on dry foothills and lower mountain slopes. Gambel oak (*Quercus gambelii*) may be the only dominant species or share dominance with other shrubs.

**Rocky Mountain Lower Montane–Foothill Shrubland:** Occurs on dry foothills, canyon slopes, and lower mountains. These areas are typically dominated by a variety of shrubs. Scattered trees or patches of grassland or steppe may occur.

**Rocky Mountain Lower Montane Riparian Woodland and Shrubland:** Occurs on stream banks, islands, and bars, in areas of annual or episodic flooding, and often occurs as a mosaic of tree-dominated communities with diverse shrubs.

**Southern Rocky Mountain Dry–Mesic Montane Mixed Conifer Forest and Woodland:** Occurs on all aspects of mountain slopes, ridges, canyon slopes, and plateaus. Consists of a mix of trees, as well as shrubs and grasses on dry to mesic soils.

**Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland:** Occurs in cool, moist areas of ravine slopes, stream terraces, and north- or east-facing slopes. A dense layer of diverse deciduous shrubs is often present. A high diversity of herbaceous species, including grasses, sedges, and forbs are present.

**Southern Rocky Mountain Ponderosa Pine Woodland:** Occurs on dry slopes. Ponderosa pine (*Pinus ponderosa*) is the dominant species. Other tree species may be present. The understory is usually shrubby and grasses may be present.

[a]   Land cover descriptions are from USGS (2005)

1
2

BLM_0042163

1　　**TABLE 3.6-3  Noxious Weeds Occurring on or in the Vicinity[a] of ULP Lease Tracts**

| Common Name | Scientific Name | List[b] | Tract[c] |
|---|---|---|---|
| Bull thistle | *Cirsium vulgare* | B | |
| Canada thistle | *Cirsium arvense* | B | 9, 13 |
| Cypress spurge | *Euphorbia cyparissias* | A | |
| Dalmatian toadflax | *Linaria dalmatica* | B | |
| Dame's rocket | *Hesperis mattronalis* | B | |
| Diffuse knapweed | *Centaurea diffusa* | B | |
| Downy brome/cheatgrass | *Bromus tectorum* | C | 5, 7, 10, 11, 12, 13, 16, 18, 19, 21, 22, 23, 25, 26, 27 |
| Dyer's woad | *Isatis tinctoria* | A | |
| Field bindweed | *Convolvulus arvensis* | C | 19, 21, 27 |
| Halogeton | *Halogeton glomeratus* | C | 13, 13A, 15, 15A, 17, 18, 19, 19A, 23, 25 |
| Hoary cress | *Cardaria draba* | B | |
| Houndstongue | *Cynoglossum officinale* | B | |
| Jointed goatgrass | *Aegilops cylindrica* | B | 18 |
| Leafy spurge | *Euphorbia esula* | B | |
| Musk thistle | *Carduus nutans* | B | 7, 8, 9, 11, 19, 23 |
| Oxeye daisy | *Chrysanthemum leucanthemum* | B | |
| Perennial pepperweed | *Lepidium latifolium* | B | |
| Purple loosestrife | *Lythrum salicaria* | A | |
| Redstem filaree | *Erodium cicutarium* | C | 10, 11, 16, 18, 19, 21, 22, 25, 26, 27 |
| Russian knapweed | *Acroptilon repens* | B | 5, 6, 7, 8, 9, 10, 11, 11A, 13, 13A, 14, 15, 15A, 16, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25 |
| Russian-olive | *Elaeagnus angustifolia* | B | |
| Salt cedar | *Tamarix ramosissima* | B | 9, 13, 13A, 14, 15A, 17, 18, 19, 19A, 20, 22, 22A |
| Scentless chamomile | *Matricaria perforata* | B | |
| Scotch thistle | *Onopordium acanthium* | B | |
| Spotted knapweed | *Centaurea maculosa* | B | |
| Sulphur cinquefoil | *Potentilla recta* | B | |
| Yellow toadflax | *Linaria vulgaris* | B | |

[a]　Mapped within approximately 20 mi (32 km) of lease tracts (CDA 2010).

[b]　The CDA classifies noxious weeds into one of three lists (CDA 2011): "List A species in Colorado that are designated by the Commissioner for eradication." "List B weed species are species for which the Commissioner, in consultation with the state noxious weed advisory committee, local governments, and other interested parties, develops and implements state noxious weed management plans designed to stop the continued spread of these species." "List C weed species are species for which the Commissioner, in consultation with the state noxious weed advisory committee, local governments, and other interested parties, will develop and implement state noxious weed management plans designed to support the efforts of local governing bodies to facilitate more effective integrated weed management on private and public lands. The goal of such plans will not be to stop the continued spread of these species but to provide additional education, research, and biological control resources to jurisdictions that choose to require management of List C species."

2　[c]　Tract where species has been recorded within tract boundaries (S.M. Stoller Corporation 2012).

BLM_0042164

1  summary of the noxious weed species regulated in Colorado that are known to occur in the
2  vicinity (within approximately 20 mi [32 km]) of the lease tracts (CDA 2010) or have been
3  identified within the boundaries of the lease tracts (S.M. Stoller Corp. 2012).
4
5
6  ### 3.6.1.1  Wetlands and Floodplains
7
8         Rocky Mountain Lower Montane Riparian Woodland and Shrubland occurs along
9  segments of Calamity Creek in Lease Tracts 26 and 27 and along the Dolores River in Lease
10 Tract 13 and the withdrawn area of the northwest section of Lease Tract 13A. A small area of
11 Introduced Riparian and Wetland Vegetation occurs in the northwest corner of Lease Tract 18
12 along Atkinson Creek.
13
14        Wetland areas are typically inundated or have saturated soils for at least a portion of the
15 growing season (Cowardin et al. 1979). Wetlands generally support plant communities that are
16 adapted to saturated soil conditions; however, as described in Cowardin et al. (1979),
17 streambeds, mudflats, gravel beaches, and rocky shores are wetland areas that may not be
18 vegetated. Although surface flows provide the water source for some wetlands, such as many
19 riverine marshes, other wetlands, such as springs and seeps, are supported by groundwater
20 discharge. Wetlands are often associated with perennial water sources, such as springs, perennial
21 segments of streams, or lakes and ponds. However, some wetlands, such as vernal pools, have
22 seasonal or intermittent sources of water. Wetlands in the area of the lease tracts have been
23 mapped by the National Wetlands Inventory (NWI) (USFWS 2012). Digital data are not
24 available for this area of Colorado; however, wetlands are mapped and identified by type.
25 Figure 3.6-6 shows an example of NWI mapping in the vicinity of Lease Tracts 13 and 14.
26 Because of the lack of digital data, wetland acreages are not available. Because wetlands may
27 change over time (e.g., boundaries may shift due to new impoundments or wetlands may be
28 eliminated by development), wetlands on the lease tracts may not always correspond to NWI
29 data. Some wetlands occurring in these areas may not be mapped because of the inherent
30 limitations of high-altitude image interpretation. Riverine wetlands occur in many canyon areas
31 within the tracts, including along the Dolores River and named creeks. Small palustrine wetlands
32 occur in several tracts, typically as a result of a dike or impoundment, and may represent
33 livestock watering ponds. Table 3.6-4 lists the NWI mapped wetlands for each tract; Table 3.6-5
34 gives the description of each wetland type. The lease tracts may include jurisdictional wetlands
35 (those that are under the jurisdiction of Section 404 of the Clean Water Act).
36
37        As described in 10 CFR Part 1022, DOE shall determine whether a proposed action
38 would occur within a base or critical floodplain. A base floodplain is the 100-year floodplain
39 (i.e., a floodplain with a 1.0% chance of flooding in any given year). A critical action floodplain
40 is a floodplain (500-year floodplain at a minimum) in which an action could occur for which
41 even a slight chance of flooding would be too great, and it would not apply to the ULP. Portions
42 of Lease Tracts 13, 13A, and 14 are located within the 100-year floodplain of the Dolores River
43 (DOE 2007). Other perennial streams occurring within the lease tracts are Calamity Creek (Lease
44 Tracts 26 and 27) and Atkinson Creek (Lease Tract 18). The floodplains along these streams are
45 unmapped, although the entire area in which Lease Tracts 26 and 27 occur is mapped as a
46 moderate flood hazard area (outside the 100-year flood but not the 500-year flood).

BLM_0042165



FIGURE 3.6-6  NWI Wetlands Mapped in the Vicinity of Lease Tracts 13 and 14 (USFWS 2012)

BLM_0042166

**TABLE 3.6-4  Wetlands Mapped by the National Wetlands Inventory within ULP Lease Tracts**

| Wetland Type[a] | 5 | 5A | 6 | 7 | 8 | 8A | 9 | 10 |
|---|---|---|---|---|---|---|---|---|
| | | | | Lease Tract Number | | | | |
| Palustrine, Aquatic Bed, Semipermanently Flooded, Diked/Impounded | | | | | | | | X |
| Palustrine, Emergent, Seasonally Flooded, Diked/Impounded | | | | | | | | |
| Palustrine, Emergent, Semipermanently Flooded, Diked/Impounded | | | | | | | | |
| Palustrine, Emergent, Temporary Flooded | | | | | | | X | |
| Palustrine, Emergent, Temporarily Flooded, Diked/Impounded | | | X | | | | | |
| Palustrine, Scrub-Shrub, Temporary Flooded | | | | | | | | |
| Palustrine, Unconsolidated Bottom, Semipermanently Flooded, Excavated | | | | X | | | X | |
| Palustrine, Unconsolidated Shore, Semipermanently Flooded, Excavated | X | | | | X | | | |
| Palustrine, Unconsolidated Shore, Temporary Flooded, Diked/Impounded | | | | | X | | | |
| Palustrine, Unconsolidated Shore, Seasonally Flooded, Excavated | | | | | | | | |
| Riverine, Intermittent, Streambed, Intermittently Flooded | | | | | | | | |
| Riverine, Intermittent, Streambed, Seasonally Flooded | | | | | | | | |
| Riverine, Intermittent, Streambed, Temporary Flooded | | | | | | | X | X Bishop Canyon |
| Riverine, Upper Perennial, Unconsolidated Bottom, Semipermanently Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Permanently Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Seasonally Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Temporary Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Shore, Seasonally Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Shore, Temporary Flooded | | | | | | | | |

BLM_0042167

**TABLE 3.6-4  (Cont.)**

| Wetland Type[a] | Lease Tract Number | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 11 | 11A | 12 | 13 | 13A | 14 | 15 | 15A |
| Palustrine, Aquatic Bed, Semipermanently Flooded, Diked/Impounded | | | X | | | $X^{2,b}$ | | |
| Palustrine, Emergent, Seasonally Flooded, Diked/Impounded | | | | | | X | | |
| Palustrine, Emergent, Semipermanently Flooded, Diked/Impounded | | | | | | | | |
| Palustrine, Emergent, Temporary Flooded | | | | | | | | |
| Palustrine, Emergent, Temporary Flooded, Diked/Impounded | | | | | | | | |
| Palustrine, Scrub-Shrub, Temporary Flooded | | | | $X^7$ Dolores River | $X^4$ Dolores River | | | |
| Palustrine, Unconsolidated Bottom, Semipermanently Flooded, Excavated | | | | | | | | |
| Palustrine, Unconsolidated Shore, Semipermanently Flooded, Diked/Impounded | X | | | | | | | |
| Palustrine, Unconsolidated Shore, Temporary Flooded, Diked/Impounded | | | | $X^2$ | | | | |
| Palustrine, Unconsolidated Shore, Seasonally Flooded, Excavated | | | | | | | | |
| Riverine, Intermittent, Streambed, Intermittently Flooded | X Summit Canyon | X Summit Canyon | | | | | | |
| Riverine, Intermittent, Streambed, Seasonally Flooded | | | | | | | | |
| Riverine, Intermittent, Streambed, Temporary Flooded | X Summit Canyon | X Summit Canyon | | $X^2$ Burro Canyon Bush Canyon | | $X^2$ Morrison Canyon Bush Canyon | X | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Semipermanently Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Permanently Flooded | | | | $X^3$ Dolores River | $X^2$ | X Dolores River | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Seasonally Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Temporary Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Shore, Seasonally Flooded | | | | $X^5$ Dolores River | $X^3$ Dolores River | | | |
| Riverine, Upper Perennial, Unconsolidated Shore, Temporary Flooded | | | | $X^4$ Dolores River | | | | |

TABLE 3.6-4  (Cont.)

| Wetland Type[a] | Lease Tract Number | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 16 | 16A | 17 | 18 | 19 | 19A | 20 | 21 |
| Palustrine, Aquatic Bed, Semipermanently Flooded Diked/Impounded | | | | X | X | X² | | |
| Palustrine, Emergent, Seasonally Flooded Diked/Impounded | | | | | | | | |
| Palustrine, Emergent Semipermanently Flooded, Diked/Impounded | X | | | | | | | |
| Palustrine, Emergent, Temporary Flooded | | | | | | | | |
| Palustrine, Emergent, Temporary Flooded, Diked/Impounded | | | | X² | | X | | X |
| Palustrine, Scrub-Shrub, Temporary Flooded | | | | | | | | |
| Palustrine, Unconsolidated Bottom, Semipermanently Flooded, Excavated | | | | | | | | |
| Palustrine, Unconsolidated Shore, Seasonally Flooded, Diked/Impounded | | | | X² | | X | | |
| Palustrine, Unconsolidated Shore, Temporary Flooded, Diked/Impounded | | | | X | | | X | |
| Palustrine, Unconsolidated Shore, Seasonally Flooded, Excavated | | | | | | | | X |
| Riverine, Intermittent, Streambed, Intermittently Flooded | | | | | | | | |
| Riverine, Intermittent, Streambed, Seasonally Flooded | | | | X Atkinson Creek | | | | |
| Riverine, Intermittent, Streambed, Temporary Flooded | X | X | | | | | | X |
| Riverine, Upper Perennial, Unconsolidated Bottom, Semipermanently Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Permanently Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Seasonally Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Temporary Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Shore, Seasonally Flooded | | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Shore, Temporary Flooded | | | | | | | | |

BLM_0042169

**TABLE 3.6-4  (Cont.)**

| Wetland Type[a] | Lease Tract Number | | | | | | |
|---|---|---|---|---|---|---|---|
| | 22 | 22A | 23 | 24 | 25 | 26 | 27 |
| Palustrine, Aquatic Bed, Semipermanently Flooded, Diked/ Impounded | X | X | X | X | X | X[2] | X[2] |
| Palustrine, Emergent, Seasonally Flooded, Diked/Impounded | | X | | | | | X |
| Palustrine, Emergent, Semipermanently Flooded, Diked/Impounded | | | | | | | |
| Palustrine, Emergent, Temporary Flooded | | | | | | | |
| Palustrine, Emergent, Temporary Flooded, Diked/Impounded | | | | X | | | X |
| Palustrine, Scrub-Shrub, Temporary Flooded | | | | | | | |
| Palustrine, Unconsolidated Bottom, Semipermanently Flooded, Excavated | | | | | | | |
| Palustrine, Unconsolidated Shore, Seasonally Flooded, Diked/Impounded | | | X | | | | X |
| Palustrine, Unconsolidated Shore, Temporary Flooded, Diked/Impounded | | | X | | X | X | |
| Palustrine, Unconsolidated Shore, Seasonally Flooded, Excavated | | | | | | | |
| Riverine, Intermittent, Streambed, Intermittently Flooded | | | | | | | |
| Riverine, Intermittent, Streambed, Seasonally Flooded | | | | | | | |
| Riverine, Intermittent, Streambed, Temporary Flooded | | | | | | X[2] Maverick Canyon Calamity Creek | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Semipermanently Flooded | | | | | | X Calamity Creek | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Permanently Flooded | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Seasonally Flooded | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Bottom, Temporary Flooded | | | | | | | |
| Riverine, Upper Perennial Unconsolidated Shore, Seasonally Flooded | | | | | | | |
| Riverine, Upper Perennial, Unconsolidated Shore, Temporary Flooded | | | | | | | |

[a]   See Table 3.6-4 for descriptions of wetland types.

[b]   Superscripts refer to the number of occurrences of that wetland type in the indicated lease tract.

BLM_0042170

1   **TABLE 3.6-5  Descriptions of Wetland Types**

**Aquatic Bed (AB)**: Includes wetlands and deepwater habitats dominated by plants that grow principally on or below the surface of the water for most of the growing season in most years.

**Diked/Impounded (D/I)**: Created or modified by a human-made barrier or dam that obstructs the inflow or outflow of water. The descriptors "diked" and "impounded" have been combined into a single modifier, since the observed effect on wetlands from either a dike or an impoundment is similar. They have been combined here because of image interpretation limitations.

**Emergent (E)**: Characterized by erect, rooted, herbaceous hydrophytes, excluding mosses and lichens. This vegetation is present for most of the growing season in most years. These wetlands are usually dominated by perennial plants.

**Excavated (Ex)**: Lies within a basin or channel that has been dug, gouged, blasted. or suctioned through artificial means by man.

**Intermittent (I)**: Includes channels that contain flowing water only part of the year but may contain isolated pools when the flow stops.

**Intermittently Flooded (IF)**: Limited to describing habitats in the arid western portions of the United States. Substrate is usually exposed, but surface water is present for variable periods without detectable seasonal periodicity. These habitats are very climate-dependent. Weeks or months or even years may intervene between periods of inundation. Flooding or inundation may come from spring snowmelt or sporadic summer thunderstorms. The dominant plant communities under this regime may change as soil moisture conditions change. Some areas exhibiting this regime do not fall within the Cowardin et al. (1979) definition of wetland, because they do not have hydric soils or support hydrophytes. This water regime has been used extensively in vegetated and nonvegetated situations, including identifying some shallow depressions (playa lakes), intermittent streams, and dry washes in the arid west.

**Palustrine (P)**: Includes all nontidal wetlands dominated by trees, shrubs, emergents, mosses, or lichens. Wetlands lacking such vegetation are also included if they exhibit all of the following characteristics: (1) are less than 20 acres (8 ha); (2) do not have an active wave-formed or bedrock shoreline feature; (3) have, at low water, a depth of less than 6.6 ft (2 m) in the deepest part of the basin; and (4) have salinity due to ocean-derived salts that is less than 0.5 part per trillion.

**Permanently Flooded (PF)**: Covered by water throughout the year in all years.

**Riverine (R)**: Includes all wetlands and deepwater habitats contained in natural or artificial channels periodically or continuously containing flowing water, or that form a connecting link between the two bodies of standing water. Upland islands or palustrine wetlands may occur in the channel, but they are not part of the riverine system.

**Seasonally Flooded (SF)**: Surface water is present for extended periods, especially early in the growing season, but is absent by the end of the growing season in most years. The water table after flooding ceases is variable, extending from saturated at the surface to a water table well below the ground surface.

**Semipermanently Flooded (SPF)**: Surface water persists throughout the growing season in most years. When surface water is absent, the water table is usually at or very near the land's surface.

**Streambed (S)**: Includes all wetlands contained within the Intermittent Subsystem of the Riverine System.

BLM_0042171

**TABLE 3.6-5  (Cont.)**

---

**Scrub-Shrub (SS):** Includes areas dominated by woody vegetation less than 6 m (20 ft) tall; the species include true shrubs, young trees (saplings), and trees or shrubs that are small or stunted because of environmental conditions.

**Temporary Flooded (TF):** Surface water is present for brief periods during growing season, but the water table usually lies well below the soil surface for most of the growing season. Plants that grow both in uplands and wetlands may be characteristic of this water regime.

**Unconsolidated Bottom (UB):** Includes all wetlands and deepwater habitats with a cover of at least 25% consisting of particles smaller than stones (less than 6–7 cm or 2.4–2.8 in.) and a vegetative cover of less than 30%.

**Upper Perennial (UP):** This subsystem is characterized by a high gradient and a fast water velocity. Some water flows throughout the year. This substrate consists of rock, cobbles, or gravel, with occasional patches of sand. There is very little floodplain development.

**Unconsolidated Shore (US):** Includes all wetland habitats having two characteristics: (1) unconsolidated substrates with less than 75% areal cover of stones, boulders, or bedrock; and (2) less than 30% areal cover of vegetation. Landforms such as beaches, bars, and flats are included in this class.

---

## 3.6.2  Wildlife

As discussed in Section 3.6.1, the various ecoregions within the three-county study area within which the lease tracts are located include a diversity of land cover, plant communities, and plant species, which, in turn, provide a wide range of habitats supporting diverse assemblages of terrestrial wildlife species (Table 3.6-6). Many of these species may be expected to inhabit areas within or near the lease tracts, depending upon the plant communities and habitats present.

The BLM and other Federal agencies that administer public lands have active wildlife management programs. These programs are aimed largely at habitat protection and improvement. The general objectives of wildlife management are to (1) maintain, improve, or enhance wildlife species diversity while ensuring healthy ecosystems; (2) restore disturbed or altered habitat with the objective of obtaining desired native plant communities while providing for wildlife needs and soil stability; and (3) protect and maintain wildlife and associated wildlife habitat by addressing and mitigating impacts from authorized and unauthorized uses of BLM-administered lands. Federal agencies such as the BLM are primarily responsible for managing habitats, while state agencies (e.g., Colorado Parks and Wildlife,[15] a division of the Colorado Department of Natural Resources [CDNR]) are responsible for managing the big game, small game, and nongame wildlife species in cooperation with the BLM. The USFWS has responsibility for oversight of migratory bird species and most Federal threatened, endangered,

---

[15] Colorado Parks and Wildlife was created July 1, 2011, from the merger of Colorado State Parks and the Colorado Division of Wildlife (CDOW). Some of the references listed in Chapter 8 of the ULP PEIS that were prepared by CDOW still mention that within the citation.

BLM_0042172

TABLE 3.6-6  Number of Wildlife Species in the
Three-County Study Area[a]

| County | Amphibians | Reptiles | Birds | Mammals |
|--------|-----------|----------|-------|---------|
| Mesa | 10 | 20 | 343 | 83 |
| Montrose | 10 | 20 | 260 | 82 |
| San Miguel | 9 | 19 | 224 | 81 |

[a]  Excludes native species that have been extirpated and not
subsequently reintroduced into the wild, and feral
domestic species.

Sources: CPW (2011a); Colorado Field Ornithologists
(2010a,b,c)

proposed, or candidate species. Management of threatened and endangered species is discussed
in Section 3.6.4.

### 3.6.2.1  Amphibians and Reptiles

The three-county study area supports a number of amphibian and reptile species
(Table 3.6-6). However, amphibian species are not expected to be found throughout most of the
lease tracts because of the limited abundance of water bodies and wetlands capable of supporting
breeding populations of amphibians. A number of lizard and snake species may inhabit the lease
tracts. Turtles do not inhabit areas within the three-county study area (CPW 2011a). Table 3.6-7
lists a number of the amphibian and reptile species expected to inhabit areas within the lease tract
boundaries. Threatened, endangered, and other special status amphibian and reptile species
(e.g., BLM sensitive species) are addressed in Section 3.6.4.

### 3.6.2.2  Birds

Several hundred species of birds occur in the three-county study area (Table 3.6-6). The
following discussion focuses on major groups of birds that occur within the three-county study
area. These include birds that have key habitats within the study area, are important to humans
(e.g., waterfowl and upland game species), and/or are representative of other species that share
important habitats. Threatened, endangered, and other special status bird species are addressed in
Section 3.6.4.

**3.6.2.2.1  Waterfowl, Wading Birds, and Shorebirds.** Waterfowl (ducks, geese, and
swans), wading birds (herons and cranes), and shorebirds (plovers, sandpipers, and similar
birds) are among the more abundant groups of birds in the three-county study area. Many of
these species migrate extensive distances from breeding areas in Alaska and Canada to wintering

BLM_0042173

1  **TABLE 3.6-7  Amphibian and Reptile Species Expected To Occur within the Lease Tract**
2  **Boundaries**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| ***Amphibians*** | | |
| New Mexico spadefoot (*Spea multiplicata*) | 3,000–6,500 | Desert grassland, shortgrass prairie, sagebrush, mixed grassland, piñon-juniper, pine-oak woodlands, and open pine forests. Breeding habitat includes ephemeral artificial impoundments (e.g., stock tanks and pools that form along roads or railroad grades), ephemeral pools and playas, and isolated pools in temporary streams. |
| Red-spotted toad (*Bufo punctatus*) | 3,000–7,000 | Usually associated with rocky canyons, occasionally along streams and in canyon bottoms without large rocks. |
| Tiger salamander (*Ambystoma tigrinum*) | 3,000–12,000 | Any habitat that has a body of water nearby for breeding (e.g., ponds, lakes, and impoundments ranging from a few meters in diameter to several hectares in area). Virtually any water source may be used for breeding. |
| ***Reptiles*** | | |
| Collared lizard (*Crotaphytus collaris*) | 3,000–8,000 | Rocky canyons, slopes, and gullies; rocky ledges above cliffs; bedrock exposures; and areas with scattered large rocks and sparse vegetation. |
| Fence lizard (*Sceloporus undulatus*) | 3,000–9,500 | Rocky habitats including cliffs, talus, old lava flows and cones, canyons, hogbacks, and outcroppings. Adjacent vegetation includes piñon-juniper woodland, mountain shrubland, semidesert shrubland, and various grasses and forbs. May occur in riparian habitats, but not known to make significant use of aquatic habitat. |
| Gopher snake (*Pituophis catenifer*) | 3,000–8,500 | Multitude of habitats including plains grasslands, sandhills, riparian areas, marshes, pond and lake edges, rocky canyons, semidesert and mountain shrublands, piñon-juniper woodlands, ponderosa pine, and rural and suburban areas. |
| Night snake (*Hypsiglena torquata*) | 3,000–8,000 | Rocky slopes and canyons sparsely vegetated with piñon-juniper woodland and/or various shrubs and grasses. |
| Plateau striped whiptail (*Cnemidophorus velox*) | 4,500–7,500 | Mainly piñon-juniper woodland, but also a wide variety of other grassland, shrubland, and forest habitats. |
| Sagebrush lizard (*Sceloporus graciosus*) | 4,500–8,500 | Various habitats including piñon-juniper woodlands, semidesert shrublands, and shale hills with sparse grasses and low shrubs. |
| Short-horned lizard (*Phrynosoma hernandesi*) | 3,000–11,000 | Various habitats including short-grass prairie, sagebrush, semidesert shrubland, shale barrens, and piñon-juniper woodland. |

BLM_0042174

1    **TABLE 3.6-7  (Cont.)**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| **Reptiles (Cont.)** | | |
| Side-blotched lizard (*Uta stansburiana*) | 4,500–6,000 | Washes, arroyos, boulder-strewn ravines, rocky canyon slopes, bedrock exposures, rimrock outcroppings, rocky cliff bases, and shrubby areas in canyon bottoms where soils are soft and deep. Usually found where there is an abundance of bare ground. |
| Striped whipsnake (*Masticophis taeniatus*) | 4,500–8,500 | Semidesert shrublands, piñon-juniper woodlands and shrublands on mesa tops and rocky slopes, and intermittent stream courses and arroyos in the bottoms of canyons. |
| Tree lizard (*Urosaurus ornatus*) | 4,500–8,000 | Cliffs, canyon walls, steep bedrock exposures, talus slopes with large boulders, and other areas strewn with huge rocks. Vegetation present includes piñon pine, juniper, and various shrubs. |
| Western rattlesnake (*Crotalus viridis*) | 3,000–9,500 | Various habitats including plains grasslands, sandhills, semidesert shrubland, mountain shrubland, riparian zones, and piñon-juniper woodland. |
| Western whiptail (*Cnemidophorus tigris*) | 4,500–6,000 | Canyon bottoms to adjacent low mesa tops, preferring open spaced stands of shrubs such as greasewood, sagebrush, or piñon-pine and juniper of friable soils. |

Source: CPW (2011a); USGS (2007)

grounds in Mexico and southward (Lincoln et al. 1998). Most are ground-level nesters, and many forage in flocks (sometimes relatively large) on the ground or water. Within the study area, migration routes for these birds are often associated with riparian corridors and wetland or lake stopover areas.

Common to abundant waterfowl and shorebird species reported from the three-county study area include Canada goose (*Branta canadensis*), green-winged teal (*Anas crecca*), mallard (*Anas platyrhynchos*), northern shoveler (*Anas clypeata*), gadwall (*Anas strepera*), ring-necked duck (*Aythya collaris*), great blue heron (*Ardea herodias*), killdeer (*Charadrius vociferous*), spotted sandpiper (*Actitis macularius*), and snow goose (*Chen caerulescens*) (CPW 2011a). Major waterfowl species harvested in the three counties include mallard and Canada goose. Other species commonly harvested include gadwall, American widgeon (*Anas americana*), teal (*Anas* spp.), northern pintail (*Anus acuta*), and northern shoveler (USFWS 2003). In Colorado, no hunting season for the sandhill crane (*Grus canadensis*) occurs west of the Continental Divide (CPW 2011b).

Habitat for most waterfowl, wading birds, and shorebirds in the three-county study area occurs within the larger permanent water bodies, such as the Dolores and San Miguel Rivers.

BLM_0042175

Waterfowl, wading birds, and shorebirds are limited within the lease tract boundaries because of a lack of their suitable habitats within the lease tracts.

**3.6.2.2.2  Songbirds.** Songbirds (also referred to as perching birds) of the order Passeriformes represent the most diverse category of birds, with the warblers and sparrows representing the two most diverse groups of passerines. The passerines exhibit a wide range of seasonal movements, with some species remaining as year-round residents in some areas and being migratory in others, and with still other species migrating hundreds of miles or more (Lincoln et al. 1998). Nesting occurs in vegetation from near ground level to the upper canopy of trees. Some songbirds, such as the thrushes and chickadees, are relatively solitary throughout the year, while others, such as swallows and blackbirds, may occur in small to large flocks at various times of the year. Foraging may occur in flight (e.g., swallows and swifts) or on vegetation or the ground (e.g., warblers, finches, and thrushes). Table 3.6-8 lists a number of the songbird species that are expected to inhabit areas within the lease tract boundaries and that are considered by CPW (2011a) to be fairly common to abundant within the three-county study area.

**3.6.2.2.3  Birds of Prey.** The birds of prey include the raptors (hawks, falcons, eagles, kites, and osprey), owls, and vultures. These species represent the top avian predators in many ecosystems. The raptors and owls vary considerably among species with regard to their seasonal occurrence. Some species are nonmigratory (year-round residents), some species are migratory in the northern portions of their ranges but not in the southern portions of their ranges, and still other species migrate throughout their ranges.

Raptors forage on a variety of prey, including small mammals, reptiles, other birds, fish, invertebrates, and, at times, carrion. They typically perch on trees, utility support structures, highway signs, and other high structures that provide a broad view of the surrounding topography, and they may soar for extended periods at relatively high altitudes. The raptors forage from either a perch or on the wing (depending on the species), and all forage during the day. The owls also perch on elevated structures and forage on a variety of prey, including mammals, birds, and insects. Forest-dwelling species typically forage by diving on a prey item from a perch, while open-country species hunt on the wing while flying low over the ground. While generally nocturnal, some owl species are also active during the day. The vultures, of which only the turkey vulture (*Cathartes aura*) occurs in the three-county study area, are large, soaring scavengers that feed on carrion.

Table 3.6-9 lists a number of the raptor species expected to occur within the lease tract boundaries. Threatened, endangered, and other special status raptor species are discussed in Section 3.6.4.

**3.6.2.2.4  Upland Game Birds.** Upland game birds that are native to the three-county study area include dusky grouse (*Dendragapus obscurus*), Gambel's quail (*Callipepla gambelii*), mourning dove (*Zenaida macroura*), white-winged dove (*Z. asiatica*), and wild turkey (*Meleagris gallopavo*). Introduced species include ring-necked pheasant (*Phasianus colchicus*)

BLM_0042176

1    **TABLE 3.6-8  Songbird Species Expected To Occur within the Lease Tract Boundaries**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| American crow (*Corvus brachyrhynchos*) | 3,000–10,000 | Mostly riparian, agricultural, and urban areas, but also coniferous forests, shrublands, and cholla grasslands. |
| American robin (*Turdus migratorius*) | 3,000–11,500 | Summer: urban areas around farmhouses and windbreaks; riparian areas; coniferous and aspen forests; and krummholz. During migration: woods and bare or sparsely vegetated fields. Winter: urban, riparian, and agricultural areas; piñon-juniper woodlands; and ponderosa pine forests. |
| Ash-throated flycatcher (*Myiarchus cinerascens*) | 3,000– 9,000 | Piñon-juniper woodlands and open riparian forests. |
| Berwick's wren (*Thryomanes bewickii*) | 3,000–7,000 | Dry canyon and piñon-juniper woodlands and semidesert shrublands. Often inhabits tamarisk in summer, and mostly inhabits tamarisk in winter. |
| Black-billed magpie (*Pica pica*) | 3,000–13,000 | Most common in riparian forests, agricultural, and urban areas, but also regularly inhabits shrublands, piñon-juniper woodlands, and cholla grasslands. |
| Black-chinned hummingbird (*Archilochus alexandri*) | 3,000–7,000 | Piñon-juniper woodlands, lowland and foothill riparian forests, Gambel oak shrublands, and urban areas. |
| Black-headed grosbeak (*Pheucticus melanocephalus*) | 3,000–11,500 | Breeds primarily in ponderosa pine, aspen, and foothill riparian forests, piñon-juniper woodlands, and Gambel oak shrublands. Needs to be near water. |
| Black-throated gray warbler (*Dendroica nigrescens*) | 3,000–7,500 | Breeds in piñon-juniper woodlands, especially in taller and denser woodlands. Occasionally inhabits other coniferous forest types adjacent to piñon-juniper. During migration it primarily inhabits piñon-juniper woodlands, but occasionally shrublands and lowland riparian forests. |
| Blue-gray gnatcatcher (*Polioptila caerulea*) | 5,000–7,000 | Breeds in piñon-juniper woodlands, Gambel oak, mountain mahogany and riparian shrublands. During migration, it inhabits wooded or brushy areas. In winter it inhabits shrublands on dry, sunny slopes or along open streams. |
| Brewer's blackbird (*Euphagus cyanocephalus*) | 3,000–12,000 | Meadows, grasslands, and riparian, agricultural, and urban areas; occasionally sagebrush or other shrublands. During winter, it most often inhabits areas near open water (streams and irrigation canals) and farmyards with livestock. |

2

BLM_0042177

**TABLE 3.6-8  (Cont.)**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| Brown-headed cowbird (*Molothrus aster*) | 3,000–12,000 | Breeds mostly in open areas such as grasslands, shrublands, agricultural areas, mountain meadows, and adjacent open forests. During winter, it mostly frequents feedlots or farmyards. |
| Bushtit (*Psaltriparus minimus*) | 5,000–8,500 | Primarily piñon-juniper woodlands and in upland and riparian shrublands, also rabbitbrush in fall. |
| Canyon wren (*Catherpes mexicanus*) | 5,000–8,500 | Cliffs and on rocky slopes, river canyons, river bluffs, cliffs, and rock slides. Frequents canyons with streams at the bottom. |
| Chipping sparrow (*Spizella passerine*) | 3,000–11,000 | Breeds in ponderosa pine forests, riparian and piñon-juniper woodlands, and shrublands. Occasionally inhabits Douglas-fir, lodgepole pine, aspen, or spruce-fir forests, especially adjacent to meadows. During migration, it inhabits weedy fields, agricultural areas, grasslands, and urban areas. |
| Clark's nutcracker (*Nucifraga columbiana*) | 5,500–12,000 | Breeds in spruce-fir, Douglas-fir, and limber pine forests; also occurs inhabits aspen forests at all seasons. It wanders to alpine tundra in spring, summer, and fall, and to Gambel oak and mountain mahogany shrublands, riparian, and agricultural areas in fall and early winter. In years of large cone production, large numbers may inhabit ponderosa pine forests and piñon-juniper woodlands. |
| Cliff swallow (*Petrochelidon pyrrhonota*) | 3,000–10,000 | Breeds on cliffs and human-made structures such as buildings, bridges, culverts, and dams (mostly in or near open habitats). During migration, it frequents areas around lakes, marshes, and open agricultural areas. |
| Common nighthawk (*Chordeiles minor*) | 3,000–10,000 | Inhabits grasslands, sagebrush and semidesert shrublands, open riparian and ponderosa pine forests, piñon-juniper woodlands, agricultural areas, and urban areas. Also forages in other habitats. |
| Common raven (*Corvus corax*) | 5,000–14,000 | Breeds on cliffs, and wanders (mostly outside of the breeding season) to adjacent lowlands, mostly in grasslands and shrublands but also in riparian and agricultural areas. Also nests in tall trees and on power poles. |
| Dark-eyed junco (*Junco hyemalis*) | 3,000–10,000 | Variety of wooded habitats that have openings with dense herbaceous ground cover. Winters in coniferous and riparian forests and thickets, shrublands, and wooded urban areas. |

BLM_0042178

## TABLE 3.6-8  (Cont.)

| Species | Elevation (ft) | Habitat |
|---|---|---|
| Dusky flycatcher (*Empidonax oberholseri*) | 5,500–11,000 | Breeds in fairly open or brushy habitats, such as ponderosa pine forest, hillside shrublands (Gambel oak, mountain mahogany, serviceberry), shrubby openings in piñon-juniper woodlands, montane and foothill riparian forests, small willow thickets, and aspen forests. During migration, it inhabits all wooded or brushy habitats. |
| Green-tailed towhee (*Pipilo chlorurus*) | 3,000–11,500 | Breeds most commonly in dry, hillside shrublands (Gambel oak, mountain mahogany, serviceberry, sagebrush), and also in riparian shrublands and piñon-juniper woodlands. Migrates in wooded or brushy riparian and urban areas and shrublands. |
| Hermit thrush (*Catharus guttatus*) | 3,000–11,500 | Summer habitat primarily includes spruce-fir forests, but also all other coniferous forest types. In some areas, it is most common in lodgepole pine forests and may be fairly common in dense upper elevation piñon-juniper woodlands. Locally inhabits Gambel oak shrublands, especially those with scattered conifers. During migration, it inhabits wooded habitats. |
| Horned lark (*Eremophila alpestris*) | 3,000–9,000 | Breeds in grasslands, sagebrush and semidesert shrublands, and alpine tundra. During migration and in winter, it inhabits the same habitats (except tundra), and also in agricultural areas. It is especially common in stubble and fallow fields and also occurs around feedlots and farmyards in winter. Almost always occurs where plant density is low and there is exposed soil. Can be found in association with prairie dog colonies. |
| House finch (*Carpodacus mexicanus*) | 3,000–10,000 | Most common in urban areas and lower piñon-juniper woodlands, but also in agricultural areas, riparian forests, shrublands (sagebrush and rabbitbrush), and cholla grasslands. |
| Juniper titmouse (*Baeolophus griseus*) | 2,250–8,000 | Dry habitats of open woodlands. Most common where large mature junipers are present, especially piñon-juniper woodlands. Also forages in shrub and riparian habitats. |
| Lark sparrow (*Chondestes grammacus*) | 3,000–9,000 | Inhabits grasslands, shrublands, open riparian areas, and agricultural areas. Sometimes inhabits open piñon-juniper woodlands. Can be found in association with prairie dog colonies. |

BLM_0042179

## TABLE 3.6-8  (Cont.)

| Species | Elevation (ft) | Habitat |
|---|---|---|
| Lazuli bunting (*Passerina amoena*) | 3,000–9,500 | Breeds most commonly in Gambel oak shrublands, but also in other hillside shrublands (mountain mahogany, serviceberry, etc.), lowland and foothill riparian forests and shrublands, brushy meadows, sage shrublands, and piñon-juniper woodlands. In all habitats, it requires low shrubs. During migration, it inhabits wooded or brushy areas. |
| Mountain bluebird (*Sialia currucoides*) | 3,000–13,500 | In summer, it inhabits mountain grasslands and sage shrublands adjacent to open coniferous forests (especially ponderosa pine and piñon-juniper) and aspen forests. Alpine tundra adjacent to krummholz, and Gambel oak and mountain mahogany shrublands also provide excellent habitat. During migration, it inhabits grasslands, open shrublands, and agricultural areas. In winter, it commonly inhabits piñon-juniper woodlands, but also inhabits shrublands and agricultural areas. |
| Mountain chickadee (*Poecile gambeli*) | 5,500–11,500 | Inhabits coniferous and aspen forests. Also occurs in piñon-juniper woodlands. In winter, wandering birds also occur in shrublands, urban areas, and lowland riparian forests. |
| Northern flicker (*Colaptes auratus*) | 3,000–11,500 | Grassland, shrubland, forestland, riparian/wetland, and urban/cropland habitats. |
| Orange-crowned warbler (*Vermivora celata*) | 3,000–9,000 | During migration, it inhabits riparian and urban areas, but also most other forest and shrubland habitats. In summer, it frequents Gambel oak shrublands, foothill riparian and aspen forests, piñon-juniper woodlands, and montane riparian willow shrublands. |
| Pine siskin (*Carduelis pinus*) | 3,000–11,500 | Breeds primarily in coniferous forests (especially spruce-fir) and rarely in riparian areas, aspen forests, and shrublands. Also inhabits ponderosa, lodgepole, and piñon pine. In winter and during migration, it frequents coniferous forests, riparian areas, shrublands, agricultural, and urban areas. |
| Piñon jay (*Gymnorhinus cyanocephalus*) | 5,000–7,000 | Inhabits piñon-juniper woodlands. Wandering birds inhabit isolated aspen stands, and alpine tundra. |
| Plumbeous vireo (*Vireo plumbeus*) | 3,000–8,000 | Inhabits ponderosa pine forests and piñon-juniper woodlands, especially denser woodlands at the upper elevational range of piñon-juniper and aspen forests, foothill riparian forests, and Gambel oak shrublands with scattered tall trees. Occasionally breeds in lowland riparian forests adjacent to foothills. |

BLM_0042180

**TABLE 3.6-8  (Cont.)**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| Pygmy nuthatch (*Sitta pygmaea*) | 5,500–10,000 | Inhabits ponderosa pine forests, but may also nest in lodgepole pines and aspens. Wanders rarely to Douglas-fir and piñon-juniper woodlands, and even more rarely to spruce-fir forests and lowland riparian forests. |
| Rock wren (*Salpinctes obsoletus*) | 3,000–12,000 | Habitat includes open, rocky slopes and around cliffs. During migration, it inhabits grasslands, brushy slopes, riparian areas, and urban areas. |
| Ruby-crowned kinglet (*Regulus calendula*) | 3,000–11,500 | Breeds in coniferous forests, primarily in spruce-fir, and is common in lodgepole pine forests in some areas. During migration, it frequents all wooded habitats. In winter, it inhabits piñon-juniper woodlands, ponderosa pine forests, planted conifers, urban areas, and lowland riparian forests. |
| Sage sparrow (*Amphispiza belli*) | 3,000–7,000 | Breeds in big sagebrush or mixed big sagebrush and greasewood habitats. During migration, it inhabits grasslands and shrublands. |
| Sage thrasher (*Oreoscoptes montanus*) | 3,000–14,000 | Breeds in sagebrush shrublands and occasionally in other shrublands or cholla grasslands. During migration and in winter, it inhabits open agricultural areas, pastures, grasslands, shrublands, open riparian areas, and piñon-juniper woodlands. |
| Say's phoebe (*Sayornis saya*) | 3,000–9,500 | Breeds in most open habitats such as grasslands and shrublands, often near buildings (especially if abandoned) and bridges. It generally does not breed in agricultural areas except those adjacent to uncultivated areas. During migration, it inhabits all open habitats, including cultivated and riparian areas. In winter, it is usually found around the open water of streams and sewage ponds. Can be found associated with prairie dog colonies. |
| Spotted towhee (*Pipilo maculatus*) | 3,000–8,000 | Prefers scrub oak, shrubby piñon-pine woodlands, and riparian thickets. |
| Vesper sparrow (*Pooecetes gramineus*) | 3,000–13,000 | Breeds in grasslands, open shrublands mixed with grasslands, and open piñon-juniper woodlands. During migration, it inhabits open riparian and agricultural areas. |

BLM_0042181

TABLE 3.6-8  (Cont.)

| Species | Elevation (ft) | Habitat |
|---------|----------------|---------|
| Virginia's warbler (*Vermivora virginiae*) | 3,000–10,000 | Breeds in dry, dense hillside shrublands, especially Gambel oak. Habitat includes mountain mahogany and riparian thickets, ponderosa pine forests, and piñon-juniper woodlands, especially with shrubby understories. Occasionally inhabits aspen or Douglas-fir forests, especially those with an understory of shrubs. During migration, it frequents riparian and urban areas and shrublands. |
| Western bluebird (*Sialia mexicana*) | 3,000–8,000 | Breeds primarily in ponderosa pine forests (or mixed ponderosa pine/aspen) and less often in piñon-juniper woodlands and Gambel oak shrublands. During migration, it inhabits most open forest types and adjacent open areas. In winter, it frequents piñon-juniper woodlands, but also inhabits riparian areas and shrublands, generally where fruits are abundant. |
| Western kingbird (*Tyrannus verticalis*) | 3,000–10,000 | Breeds mostly in open riparian and agricultural areas, but also in piñon-juniper woodlands adjacent to fields and in urban areas. Inhabits grasslands or desert shrublands, mostly in the vicinity of streams, isolated trees, shelterbelts, and houses. Often associated with prairie dog colonies in areas of juniper and cholla or sagebrush. |
| Western meadowlark (*Sturnella neglecta*) | 3,000–12,000 | Most common in agricultural areas, especially in winter when it often frequents areas around farmyards. Also inhabits grasslands, croplands, weedy fields, and, less commonly, semidesert and sagebrush shrublands. |
| Western scrub-jay (*Aphelocoma californica*) | 5,000–7,000 | Scrub-oak and piñon-juniper woodlands, ponderosa pine forests, wooded creek bottoms, and brushy ravines. |
| Western tanager (*Piranga ludoviciana*) | 3,000–10,500 | Breeds most commonly in ponderosa pine and Douglas-fir forests. It also regularly inhabits Gambel oak shrublands, especially those with trees, and piñon-juniper woodlands and aspen forests. During migration, it inhabits lowland riparian forests and wooded urban areas. |
| Western wood-pewee (*Contopus sordidulus*) | 3,000–10,000 | Commonly breeds in aspen forests. Also inhabits ponderosa pine and foothill riparian forests. It is generally less common in lodgepole pine, Douglas-fir, lowland riparian forests, and piñon-juniper woodlands. During migration, it frequents wooded riparian and urban areas. |
| White-breasted nuthatch (*Sitta carolinensis*) | 3,000–11,500 | Most common in ponderosa pine forests and piñon-juniper woodlands. It also regularly inhabits foothill and lowland riparian forests, and can be found in urban areas, especially in fall and winter. |

BLM_0042182

**TABLE 3.6-8  (Cont.)**

| Species | Elevation (ft) | Habitat |
|---------|----------------|---------|
| White-throated swift (*Aeronautes saxatalis*) | 5,500–10,000 | Nests in crevices in cliffs, canyon walls, pinnacles, and large rocks, and in human-made structures that provide crevice-like openings. |
| Yellow-rumped warbler (*Dendroica coronate*) | 3,000–11,000 | Nests in forests and open woodlands. During migration and winter, it inhabits open forests, woodlands, savannas, roadsides, pastures, and scrublands. |

Sources: CPW (2011a); USGS (2007)

and chukar (*Alectoris chukar*). All the upland game bird species are year-round residents. The Gunnison sage-grouse (*Centrocercus minimus*), no longer considered an upland game bird in Colorado, is addressed in Section 3.6.4.

Table 3.6-10 lists the upland game bird species expected to inhabit areas within the lease tract boundaries.

Figure 3.6-7 shows the activity areas for the wild turkey in the three-county study area (CPW 2011a). Only lease tracts 26 and 27 occur within the overall range and winter range of the wild turkey. Winter habitat includes dense mature conifer stands that provide thermal protection and roost sites (Sargent and Carter 1999). Trees that produce pine nuts, juniper berries, or acorns are also important for food sources in winter (UCDC 2012). Table 3.6-11 provides the acreage of the wild turkey activity areas within the three-county study area and within the combined boundary for the lease tracts.

**3.6.2.2.5  Regulatory Framework for Protection of Birds**. The Federal regulatory framework for protecting birds includes the ESA, Migratory Bird Treaty Act, Bald and Golden Eagle Protection Act, and E.O. 13186, "Responsibilities of Federal Agencies to Protect Migratory Birds." The ESA is discussed in Section 6.6.4, and the other regulations are discussed briefly here:

- The Migratory Bird Treaty Act implements a variety of treaties and conventions in the United States, Canada, Mexico, Japan, and Russia. This Act provides that it is unlawful to pursue, hunt, take, capture or kill, possess, offer to sell, barter, purchase, deliver or cause to be shipped, exported, imported, transported, carried or received any migratory bird, part, nest, egg, or product, manufactured or not, unless permitted by regulations, except as authorized under a valid permit. Most of the bird species reported from the three-county study area Region are classified as migratory under this Act.

BLM_0042183

1    **TABLE 3.6-9  Raptor Species Expected To Occur within the Lease Tract Boundaries**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| American kestrel (*Falco sparverius*) | 3,000–10,000 | Inhabits virtually all terrestrial habitats, especially during migration. Most often inhabits agricultural areas, grasslands, riparian forest edges, and urban areas. |
| Cooper's hawk (*Accipiter cooperi*) | 3,000–10,000 | Mostly breeds in ponderosa pine, Douglas-fir, lodgepole pine, and aspen forests. Some may also inhabit riparian and spruce-fir forests and piñon-juniper woodlands. Migrants and winter residents inhabit the same habitats plus lowland riparian forests and urban areas. Migrants also inhabit open areas such as shrublands, grasslands, and agricultural areas. |
| Golden eagle (*Aquila chrysaetos*) | 3,000–14,000 | Inhabits grasslands, shrublands, piñon-juniper woodlands, and ponderosa pine forests. Occasionally inhabits. Nests are located on cliffs and sometimes in trees in rugged areas. Breeding birds range widely over surrounding habitats. |
| Long-eared owl (*Asio otus*) | 3,000–9,000 | In lowlands, it primarily inhabits riparian forests and windbreaks, but also urban areas and tamarisk thickets. In mountains, it primarily inhabits dense Douglas-fir forests. It primarily inhabits areas where there are dense, tall shrubs and/or trees. Also recorded from foothill shrublands, piñon-juniper woodlands, aspen forests, and spruce-fir forests. |
| Northern harrier (*Circus cyaneus*) | 3,000–9,500 | Inhabits grasslands, shrublands, agricultural areas, and marshes; also observed on alpine tundra in the fall. Breeds mainly in wet habitats. |
| Northern pygmy-owl (*Glaucidium gnoma*) | 5,000–10,000 | Inhabits coniferous forests, piñon-juniper woodlands, aspen forests, and foothills and montane riparian forests. Prefers canyons with running water and ecotonal areas. |
| Northern saw-whet owl (*Aegolius acadicus*) | 5,500–10,000 | Prefers dense forests or woodlands associated with water. Mostly inhabits ponderosa pine, Douglas-fir forests, lodgepole pine, spruce-fir and montane riparian forests, and piñon-juniper woodlands. |
| Prairie falcon (*Falco mexicanus*) | 3,000–14,000 | Breeding birds nest on cliffs or bluffs in open areas, and range widely over surrounding grasslands, shrublands, and alpine tundra. Migrants and winter residents mostly inhabits grasslands, shrublands, and agricultural areas. |
| Red-tailed hawk (*Buteo jamaicensis*) | 3,000–13,500 | Inhabits open areas with scattered, elevated perch sites in a wide range of altitudes and habitats such as scrub desert, plains and montane grasslands, agricultural fields, pastures, urban parklands, and broken coniferous and deciduous woodlands. |

BLM_0042184

**TABLE 3.6-9  (Cont.)**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| Sharp-shinned hawk (*Accipiter striatus*) | 3,000–11,500 | Breeds in ponderosa pine, Douglas-fir, aspen, lodgepole pine, and spruce-fir forests; some may also inhabit riparian forests or piñon-juniper woodlands. Migrants and winter residents inhabit most types of forests and in urban areas and are often observed over open areas, such as shrublands, grasslands, and agricultural areas. |
| Swainson's hawk (*Buteo swainsoni*) | 3,000–10,000 | Inhabits grasslands, agricultural areas, shrublands, and riparian forests. Nests in trees in or near open areas. Migrants are often observed in treeless areas. |
| Turkey vulture (*Cathartes aura*) | 3,000–9,000 | Migrants and foraging birds inhabit most open habitats such as grasslands, shrublands, and agricultural areas. Nests on cliffs. Nests are located on the ground under vegetation; fallen, hollow logs; broken tree stumps; or in caves. |
| Western screech-owl (*Otus kennicottii*) | 3,000–9,000 | Inhabits mature lowland and foothill riparian forests with shrubby undergrowth and rural woodlots; also inhabits aspen and coniferous forests and from piñon-juniper woodlands. |

Sources: CPW (2011a); USGS (2007)

1
2
3

**TABLE 3.6-10  Upland Game Bird Species Expected To Occur within the Lease Tract Boundaries**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| Chukar (*Alectoris chukar*) | 4,500–6,000 | Inhabits desert areas with rocky canyons, steep hillsides, scattered bushes, and blankets of cheatgrass. |
| Gambel's quail (*Callipepla gambelii*) | 4,500–7,000 | Inhabits semidesert sagebrush and rabbitbrush shrublands, and adjacent agricultural areas. Requires tall shrubs such as greasewood and tamarisk. |
| Mourning dove (*Zenaida macroura*) | 3,000–11,500 | Inhabits grasslands, shrublands, croplands, lowland and foothill riparian forests, ponderosa pine forests, and urban areas. Rarely inhabits aspen forests, coniferous woodlands, forests other than ponderosa pine, and alpine tundra. In winter it mostly inhabits lowland riparian forests adjacent to cropland. |
| Wild turkey (*Meleagris gallopavo*) | 3,000–8,000 | Primarily inhabits ponderosa pine forests with an understory of Gambel oak. Tall pines used during all seasons for roosting. Also inhabits foothill shrublands (mountain mahogany), piñon-juniper woodlands, foothill riparian forests, and agricultural areas. |

Source: CPW (2011a)

BLM_0042185



FIGURE 3.6-7  **Wild Turkey Activity Areas within the Three-County Study Area That Encompasses the Lease Tract Boundaries (CPW 2011a)**

BLM_0042186

1
2
3

**TABLE 3.6-11  Acreages of Wild Turkey Activity Areas within the Three-County Study Area and the Combined Boundary for the Lease Tracts**

| Activity Area | Acreage | | |
|---|---|---|---|
| | Three-County Study Area | Lease Tract Boundaries | Lease Tracts |
| Overall range | 2,202,563 | 5,000 | 26, 27 |
| Production area | 125,555 | 0 | None |
| Roost sites | 11,020 | 0 | None |
| Winter range | 928,954 | 5,000 | 26, 27 |
| Winter concentration area | 62,694 | 0 | None |

Source: CPW (2011a)

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

- The Bald and Golden Eagle Protection Act provides for the protection of bald and golden eagles by prohibiting the take, possession, sale, purchase or barter, offer to sell, transport, export, or import of any bald or golden eagle, alive or dead, including any part, nest, or egg, unless allowed by permit. The Act defines "take" as "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb;" and "disturb" means "to agitate or bother an eagle to a degree that causes, or is likely to cause, injury; decrease in its productivity, by substantially interfering with normal breeding, feeding or sheltering behavior; or nest abandonment by substantially interfering with normal breeding, feeding, or sheltering behavior." In addition to immediate impacts, this definition also covers impacts that result from human-induced alterations initiated around a previously used nest site during a time when eagles are not present, if, upon the eagle's return, such alterations agitate or bother an eagle to a degree that interferes with or interrupts normal breeding, feeding, or sheltering habits, and causes injury, death or nest abandonment.

22
23
24
25
26
27
28

- Under E.O. 13186, each Federal agency that is taking an action that has or is likely to have negative impacts on migratory bird populations must work with the USFWS to develop an agreement to conserve those birds. The protocols developed by this consultation are intended to guide future agency regulatory actions and policy decisions.

BLM_0042187

1    **3.6.2.3  Mammals**
2
3        More than 80 mammal species occur in the three-county study area (Table 3.6-6). The
4    following discussion emphasizes big game and other mammal species that (1) have key habitats
5    within or near the lease tracts, (2) are important to humans (e.g., big and small game and
6    furbearer species), and/or (3) are representative of other species that share important habitats.
7    Threatened, endangered, and other special status mammal species are addressed in Section 3.6.4.
8
9
10        **3.6.2.3.1  Big Game.** The big game species within the three-county study area include
11   American black bear (*Ursus americanus*), cougar (*Puma concolor*), desert bighorn sheep (*Ovis*
12   *canadensis nelsoni*), elk (*Cervis canadensis*), moose (*Alces americanus*) mule deer (*Odocoileus*
13   *hemionus*), and pronghorn (*Antilocapra americana*). Because the moose is located only in the far
14   eastern and northern most portions of the three-county study area, it is geographically separated
15   from the lease tracts; therefore, the species will not be addressed further in the ULP PEIS. A
16   number of the big game species migrate when seasonal changes reduce food availability, when
17   movement within an area becomes difficult (e.g., due to snow pack), or when local conditions
18   are not suitable for calving or fawning. Established migration corridors provide important
19   transition habitats between seasonal ranges and provide food sources for the animals during
20   migration (Feeney et al. 2004). Maintaining genetic interchange through landscape linkages
21   among subpopulations is also essential for the long-term survival of species. Maintaining
22   migration corridors and landscape linkages, especially when seasonal ranges or subpopulations
23   are far removed from each other, can be difficult because of the various land ownership mixes
24   that often need to be traversed (Sawyer et al. 2005). Although migration corridors for the desert
25   bighorn sheep, elk, and mule deer are present within the three-county study area, the lease tracts
26   do not occur within those corridors.
27
28        Table 3.6-12 provides a description of the various activity areas that have been mapped
29   for the big game species in Colorado. Table 3.6-13 provides habitat information for the big game
30   species expected to occur within the lease tract boundaries.
31
32        The following presents a generalized overview of the big game species that inhabit the
33   lease tracts.
34
35
36        **American Black Bear.** The American black bear occurs mostly within forested or
37   brushy mountain environments and woody riparian corridors (UDWR 2008). It is considered
38   secure in Colorado (common, widespread, and abundant) (NatureServe 2011). The omnivorous
39   American black bear will feed on forbs and grasses, fruits and acorns, insects, small vertebrates,
40   and carrion depending on their seasonal availability (CPW 2011a). Breeding occurs in June or
41   July, with young born in January or February (UDWR 2008). American black bears are generally
42   nocturnal and have a period of winter dormancy (UDWR 2008). They are locally threatened by
43   habitat loss and disturbance by humans (NatureServe 2011). The home range size of American
44   black bears varies, depending on the area and the bear's gender, and has been reported to be from
45   about 1,250 to nearly 32,200 acres (500 to 13,000 ha) (NatureServe 2011).
46

BLM_0042188

1    **TABLE 3.6-12 Descriptions of Big Game Activity Areas in Colorado**

| Activity Area | Activity Area Description |
|---|---|
| Concentration area | That part of the overall range where densities are at least 200% greater than they are in the surrounding area during a season other than winter. |
| Fall concentration area | That part of the overall range occupied from August 15 until September 30 for the purpose of ingesting large quantities of mast and berries to establish fat reserves for the winter hibernation period. Applies to the American black bear. |
| Migration corridor | Specific mappable site through which large numbers of animals migrate and the loss of which would change migration routes. |
| Overall range | Area that encompasses all known seasonal activity areas for a population. |
| Production area | That part of the overall range occupied by females from May 15 to June 15 for calving. Applies to ungulates. |
| Resident population area | Area used year-round by a population (i.e., an individual could be found in any part of the area at any time of the year). |
| Severe winter range | That part of the winter range where 90% of the individuals are located when the annual snowpack is at its maximum and/or temperatures are at a minimum during the 2 worst winters out of 10. Applies to ungulates. |
| Summer concentration area | That portion of the overall range where individuals congregate from mid-June through mid-August. |
| Summer range | That portion of the overall range where 90% of the individuals are located between spring green-up and the first heavy snowfall. |
| Water source | Water sources known to be utilized (by bighorn sheep) in dry, water scarce areas. Up to a 1-mi radius described around a point source, and up to a 1-mi band along a river or stream. |
| Winter concentration area | That part of the winter range where densities are at least 200% greater than in the surrounding winter range during an average of 5 winters out of 10. |
| Winter range | That part of the overall range where 90% of the individuals are located during an average of 5 winters out of 10 from the first heavy snowfall to spring green-up. |

Source: CPW (2011a)

2
3

BLM_0042189

1    **TABLE 3.6-13  Habitat Information for Big Game Species Expected To Occur within the Lease**
2    **Tract Boundaries**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| American black bear (*Ursus americanus*) | 4,500–11,500 | Montane shrublands and forests, and subalpine forests at moderate elevations. Dens in mixed conifer forests, piñon-juniper woodlands, spruce-fir forests, ponderosa pine forests, and oak shrublands. |
| Cougar (*Puma concolor*) | 3,000–12,500 | Most common in rough, broken foothills and canyon country, often in association with montane forests, shrublands, and piñon-juniper woodlands. |
| Desert bighorn sheep (*Ovis canadensis nelsoni*) | 2,500–5,500 (winter) 6,000–10,000 (summer) Mainly 4,500–9,000 in project area | Vertical cliffs and sandstone rims to rolling flat desert valley bottoms dissected by gulches. Piñon-juniper and desert shrubs in canyons and mesas, aspen and ponderosa pine in upper drainages, and grasslands intermixed with oak brush, sagebrush, and juniper woodlands at intermediate elevations. |
| Elk (*Cervis canadensis*) | 6,000–13,000 | Semi-open forests or forest edges adjacent to parks, meadows, and alpine tundra. |
| Mule deer (*Odocoileus hemionus*) | 3,000–13,000 | All ecosystems from grasslands to alpine tundra. Highest densities in shrublands on rough, broken terrain, which provide abundant browse and cover. |
| Pronghorn (*Antilocapra americana*) | 3,000–9,500 | Grasslands and semidesert shrublands on rolling topography that affords good visibility. Most abundant in shortgrass or midgrass prairies, and least common in xeric habitats. |

Sources: BLM and CDOW (1989); CPW (2011a); Streubel (2000); USGS (2007)

3
4
5        All the lease tracts occur within the overall range for the American black bear.
6    Table 3.6-14 provides the acreage of the American black bear activity areas within the three-
7    county study area and within the combined boundary for the lease tracts.
8
9
10       **Cougar.** Cougars (also known as mountain lions or puma) inhabit most ecosystems in the
11   three-county study area but are most common in the rough, broken terrain of foothills and
12   canyons, often in association with montane forests, shrublands, and piñon-juniper woodlands
13   (CPW 2011a). They mostly occur in remote and inaccessible areas (NatureServe 2011). They are
14   considered apparently secure in Colorado (uncommon but not rare, some cause for long-term
15   concern due to declines or other factors) (NatureServe 2011). Their annual home range can be
16   more than 560 mi$^2$ (1,450 km$^2$), while densities are usually not more than 10 adults per 100 mi$^2$

BLM_0042190

1
2
3

**TABLE 3.6-14  Acreages of American Black Bear Activity Areas within the Three-County Study Area and the Combined Boundary for the Lease Tracts**

|                          | Acreages | | |
|--------------------------|----------------------------|---------------------------|-------------|
| Activity Area            | Three-County Study Area    | Lease Tract Boundaries    | Lease Tracts |
| Overall range            | 4,377,502                  | 25,909                    | All         |
| Summer concentration area| 645,821                    | 0                         | None        |
| Fall concentration area  | 759,012                    | 0                         | None        |

Source: CPW (2011a)

4
5
6 (259 km²) (NatureServe 2011). The cougar is generally found where its prey species (especially
7 mule deer) are located. In addition to preying on deer, cougars prey upon most other mammals
8 (which sometimes include domestic livestock) and some insects, birds, fishes, and berries
9 (CPW 2011a). They are active year-round. Their peak periods of activity are within 2 hours of
10 sunset and sunrise, although their activity peaks after sunset when they are near humans
11 (NatureServe 2011; UDWR 2008). In some states, they are hunted on a limited and closely
12 monitored basis (NatureServe 2011).
13
14        The overall range of the cougar covers the three-county study area, including all the lease
15 tracts, and 122,000 acres (302,000 ha) of cougar peripheral range habitat occurs within Mesa
16 County. Peripheral range is the part of the overall range where habitat is limited and populations
17 are isolated. Population density may also be lower there than in the central part of the cougar's
18 range (CPW 2011a). None of the tract leases in Mesa County is located near cougar peripheral
19 range habitat.
20
21
22        **Desert Bighorn Sheep.** The bighorn sheep is considered apparently secure in Colorado
23 (uncommon, but not rare, some cause for long-term concern due to declines or other factors)
24 (NatureServe 2011).[16] The bighorn sheep is considered to be a year-long resident; it does not
25 make seasonal migrations like elk and mule deer. Winter snow pack can limit the distribution
26 and survival of bighorn sheep; therefore, during winter many of the larger herds in Colorado are
27 associated with areas that receive warm, down slope, winter winds or low to mid-elevation cold
28 desert habitats (George et al. 2009). Ewes move to reliable water courses or water sources during
29 the lambing season, with lambing occurring on steep talus slopes within 1 mi to 2 mi (1.6 km to
30 3.2 km) of water. Bighorn sheep prefer open vegetation, such as low shrub, grassland, and other

---

[16] Within Colorado, there are two subspecies of bighorn sheep: the Rocky Mountain bighorn sheep (*Ovis canadensis canadensis*) and the desert bighorn sheep (*O. c. nelsoni*). The desert bighorn sheep, a BLM sensitive species (see Section 3.6.4), is the subspecies that inhabits areas within or near the lease tract boundaries.

BLM_0042191

1   treeless areas with steep talus and rubble slopes. Unsuitable habitats include open water,
2   wetlands, dense forests, and other areas without grass understory (NatureServe 2011). Their
3   annual home ranges can be up to 23 mi$^2$ (37 km$^2$) for males and 12 mi$^2$ to 17 mi$^2$ (19 to 27 km$^2$)
4   for females (NatureServe 2011).
5
6        The diet of the bighorn sheep consists of shrubs, forbs, and grasses. In the early 1900s,
7   bighorn sheep experienced significant declines due to disease, habitat degradation, and hunting.
8   Threats to bighorn sheep include habitat changes resulting from fire suppression, interactions
9   with feral and domestic animals, and human encroachment (NatureServe 2011). Bighorn sheep
10  are very vulnerable to viral and bacterial diseases carried by livestock, particularly domestic
11  sheep. Therefore, the BLM has adopted specific guidelines regarding domestic sheep grazing in
12  or near bighorn sheep habitat. In appropriate locations, reintroduction efforts, coupled with water
13  and vegetation improvements, have been conducted to restore bighorn sheep populations.
14
15       Thirty-six desert bighorn sheep were first introduced to Colorado from 1979 through
16  1981from translocations of individuals from Nevada and Arizona (BLM and CDOW 1989). The
17  desert bighorn sheep occurs in the extreme western portion of the state within portions of Mesa,
18  Montrose, San Miguel, and Dolores Counties. There are only four herds of desert bighorn sheep
19  totaling about 325 individuals (in 2007). These herds occur in Game Management Units S56,
20  S62, S63, and S64 (George et al. 2009). The population of desert bighorn sheep in Colorado falls
21  short of the population objective of 1,200 individuals set by BLM and CDOW (1989).
22  Respiratory disease, habitat quantity and quality, and cougar predation account for the failure to
23  reach the population objective (George et al. 2009).
24
25       Figure 3.6-8 shows the activity areas for the desert bighorn sheep in the three-county
26  study area (CPW 2011a). Within the study area, the desert bighorn sheep primarily inhabits areas
27  along the Dolores, Gunnison, and lower Uncompahgre Rivers. Several of the lease tracts within
28  the Uravan, Paradox, and Slick Rock Lease Tracts occur within the overall, winter, and summer
29  ranges of the desert bighorn sheep; primarily of the 100 individuals of desert bighorn sheep in
30  the two herds of Game Management Units S63 and S64 (George et al. 2009). Based on limited
31  data collected for desert bighorn sheep with GPS collars, individuals have been recorded within
32  lease tracts 9, 13A, 14, and 15 (CPW 2012b). Table 3.6-15 provides the acreage of the desert
33  bighorn sheep activity areas within the three-county study area and within the combined
34  boundary for the lease tracts.
35
36       Although there are no mapped migration corridors in the area of the lease tracts, data
37  provided for desert bighorn sheep occurrence (CPW 2012b) demonstrate that Lease Tracts 13,
38  13A, and 14 provide a critical linkage point between the upper Dolores and middle Dolores
39  desert bighorn sheep populations. Lease Tracts 15 and 15A are also important to the desert
40  bighorn sheep, and Lease Tract 17 occurs in an area that seems to funnel desert bighorn sheep
41  movements in the area. GPS collars on individual desert bighorn sheep in the Dolores River area
42  have demonstrated that the area around Slick Rock is a significant movement corridor between
43  the two desert bighorn sheep populations and may be where many of the sheep lamb and winter
44  (CPW 2012b).
45
46

BLM_0042192

*Final ULP PEIS*                                                                 *3: Affected Environment*



**FIGURE 3.6-8  Desert Bighorn Sheep Activity Areas within the Three-County Study Area That Encompasses the Lease Tract Boundaries (CPW 2011a)**

BLM_0042193

1   **TABLE 3.6-15  Acreages of Desert Bighorn Sheep Activity Areas within the Three-County**
2   **Study Area and the Combined Boundary for the Lease Tracts**

| | Acreage | | |
|---|---|---|---|
| Activity Area | Three-County Study Area | Lease Tract Boundaries | Lease Tracts |
| Overall range | 380,836 | 4,263 | 8, 9, 10, 11, 11A, 13, 13A, 14, 15, 16, 17, 19 |
| Migration corridor | 4,087 | 0 | None |
| Production area | 26,819 | 709 | 13, 13A, 14 |
| Winter range | 371,100 | 3,695 | 8, 9, 10, 11, 11A, 13, 13A, 16, 17, 19, 19A, 20 |
| Winter concentration area | 28,008 | 2,621 | 10, 11, 11A, 13, 13A, 16, 19A, 20 |
| Severe winter range | 0 | 0 | None |
| Summer range | 373,472 | 3,276 | 8, 9, 10, 11, 11A, 13, 13A, 14, 15, 16, 17, 19, 19A, 20 |
| Summer concentration area | 14,819 | 0 | None |
| Water source | 148,697 | 2,420 | 13, 13A14, 15, 19, 19A, 20 |

Source: CPW (2011a)

3
4
5      **Elk.** The elk is considered secure in Colorado (common, widespread, and abundant)
6   (NatureServe 2011). Elk generally migrate between their summer and winter ranges, although
7   some herds remain within the same area year-round (UDWR 2005). Their summer range occurs
8   at higher elevations. Aspen and conifer woodlands provide security and thermal cover, while
9   upland meadows, sagebrush/mixed grass, and mountain shrub habitats are used for forage. Their
10  winter range occurs at mid to lower elevations, where they forage in sagebrush/mixed grass, big
11  sagebrush/rabbitbrush, and mountain shrub habitats. They are highly mobile within both their
12  summer and winter ranges as they search for the best forage conditions. In winter,
13  they congregate into large herds of 50 to more than 200 individuals. The crucial winter range
14  is considered to be the part of the local elk range where about 90% of the local population is
15  located during an average of 5 winters out of 10 from the first heavy snowfall to spring. Elk
16  calving generally occurs in aspen-sagebrush parkland vegetation and habitat zones during late
17  spring and early summer. Calving areas are located mostly where cover, forage, and water are
18  nearby. Migratory herds may move up to 60 mi (97 km) annually, while nonmigratory herds
19  have a home range of 0.7 mi$^2$ to 2.0 mi$^2$ (1.8 km$^2$ to 5.3 km$^2$) (NatureServe 2011). Elk are
20  susceptible to chronic wasting disease.
21
22

BLM_0042194

1        Figure 3.6-9 shows the activity areas for the elk in the three-county study area, and
2  Figure 3.6-10 shows the various winter activity areas for the elk within the lease tracts
3  (CPW 2011a). All the lease tracts occur within the overall range of the elk, and more than 70%
4  of the lease tracts occur within the winter range and severe winter range habitats. Table 3.6-16
5  provides the acreage of the elk activity areas within the three-county study area and within the
6  combined boundary for the lease tracts.
7
8
9       **Mule Deer**. Mule deer occur within most ecosystems in the three-county study area but
10  attain their highest densities in shrublands characterized by rough, broken terrain with abundant
11  browse and cover. The deer are considered secure in Colorado (common, widespread, and
12  abundant) (NatureServe 2011). The size of their home range can vary from 74 to 590 acres
13  (180 to 1,500 ha) or more, depending on the availability of food, water, and cover
14  (NatureServe 2011). Some populations of mule deer are resident (particularly those that inhabit
15  plains), but those in mountainous areas generally migrate between their summer and winter
16  ranges (NatureServe 2011). In arid regions, they may migrate in response to rainfall patterns
17  (NatureServe 2011). In mountainous regions, they may migrate more than 62 mi (100 km)
18  between high summer and lower winter ranges (NatureServe 2011). Their summer range is at
19  higher elevations that contain aspen and conifers and mountain browse vegetation. Fawning
20  occurs during the spring while the mule deer are migrating to their summer range. This normally
21  occurs in aspen-mountain browse intermixed vegetation.
22
23       Mule deer have a high fidelity to specific winter ranges, where they congregate within a
24  small area at a high density. Their winter range is at lower elevations within sagebrush
25  and piñon-juniper vegetation. Winter forage is primarily sagebrush, but Colorado birchleaf
26  mountain-mahogany (*Cercocarpus montanus*), fourwing saltbush (*Atriplex canescens*), and
27  antelope bitterbrush (*Purshia tridentata*) are also important. Piñon-juniper provides emergency
28  forage during severe winters. Overall, mule deer habitat is characterized by areas of thick brush
29  or trees (used for cover) interspersed with small openings (for forage and feeding areas); mule
30  deer do best in habitats that are in the early stage of succession (UDWR 2003). Prolonged
31  drought and other factors can limit mule deer populations. Several years of drought can limit
32  forage production, which can substantially adversely affect the animals' condition and fawn
33  production and survival. Severe drought conditions were responsible for declines in the
34  population of mule deer in the 1980s and early 1990s. In arid regions, they are seldom found
35  more than 1.0 to 1.5 mi (1.6 to 2.4 km) from water. Mule deer are also susceptible to chronic
36  wasting disease. When the disease is present, up to 3% of a herd's population can be affected.
37  Some deer herds in Colorado have experienced significant outbreaks of chronic wasting disease.
38
39       Figure 3.6-11 shows the activity areas for the mule deer in the three-county study area,
40  and Figure 3.6-12 shows the various winter activity areas for the mule deer within the lease tracts
41  (CPW 2011a). All the lease tracts occur within the overall range of the mule deer, and more than
42  70% of the lease tracts occur within mule deer winter range and severe winter range habitats.
43  Table 3.6-17 provides the acreage of the mule deer activity areas within the three-county study
44  area and within the combined boundary for the lease tracts.
45
46

BLM_0042195



1

2  **FIGURE 3.6-9  Elk Activity Areas within the Three-County Study Area That Encompasses the**
3  **Lease Tract Boundaries (CPW 2011a)**

BLM_0042196



FIGURE 3.6-10  Elk Winter Activity Areas within the Lease Tracts (CPW 2011a)

BLM_0042197

1    **TABLE 3.6-16  Acreages of Elk Activity Areas within the Three-County Study Area and the**
2    **Combined Boundary for the Lease Tracts**

|  | Acreage | | |
| Activity Area | Three-County Study Area | Lease Tract Boundaries | Lease Tracts |
| --- | --- | --- | --- |
| Overall range | 3,859,070 | 25,909 | All |
| Migration corridor | 99,611 | 0 | None |
| Production area | 287,244 | 0 | None |
| Winter range | 2,515,281 | 16,371 | 5, 5A, 6, 7, 8, 8A, 9, 13, 13A, 14, 15, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25, 26, 27 |
| Winter concentration area | 533,978 | 1,994 | 7, 8A, 19A, 20, 26, 27 |
| Severe winter range | 1,155,714 | 16,846 | 5, 5A, 6, 7, 8, 8A, 9, 13, 13A, 14, 15, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25, 26, 27 |
| Summer range | 1,531,501 | 1,060 | 12, 19A, 20, 26, 27 |
| Summer concentration area | 432,072 | 0 | None |
| Resident population area | 133,097 | 758 | 10, 11, 11A, 19A, 20 |

Source: CPW (2011a)

3
4
5    **Pronghorn.** Pronghorns inhabit nonforested areas such as desert, grassland, and
6    sagebrush habitats. They are considered apparently secure in Colorado (uncommon but not rare,
7    some cause for long-term concern due to declines or other factors) (NatureServe 2011). Herd
8    size can commonly exceed 100 individuals, especially during winter. Pronghorns consume a
9    variety of forbs, shrubs, and grasses, with shrubs being most important in winter. Some
10   pronghorns are year-long residents and do not have seasonal ranges. Fawning occurs throughout
11   the species range. However, some seasonal movement within their range occurs in response to
12   factors such as extreme winter conditions and water or forage availability. Other pronghorns are
13   migratory. Most herds range within an area 5 mi (8 km) or more in diameter, although the
14   separation between summer and winter ranges has been reported to be as much as 99 mi
15   (159 km) or more (NatureServe 2011). Pronghorn populations have been adversely affected in
16   some areas by historic range degradation and habitat loss and by periodic drought conditions.
17
18       Figure 3.6-13 shows the activity areas for the pronghorn in the three-county study area
19   (CPW 2011a). Only lease tract 13 occurs within pronghorn activity areas. Table 3.6-18 provides

BLM_0042198



FIGURE 3.6-11  Mule Deer Activity Areas within the Three-County Study Area That
Encompasses the Lease Tract Boundaries (CPW 2011a)

BLM_0042199