Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 1 of 375



1

2    **FIGURE 3.6-12  Mule Deer Winter Activity Areas within the Lease Tracts (CPW 2011a)**
3

BLM_0042200

1   **TABLE 3.6-17  Acreages of Mule Deer Activity Areas within the Three-County Study Area**
2   **and the Combined Boundary for the Lease Tracts**

|  | Acreage | | |
|---|---|---|---|
| Activity Area | Three-County Study Area | Lease Tract Boundaries | Lease Tracts |
| Overall range | 4,389,942 | 25,909 | All |
| Migration corridor | 57,159 | 0 | None |
| Winter range | 2,583,851 | 25,909 | All |
| Winter concentration area | 690,210 | 5,817 | 5A, 12, 13, 14, 18, 19, 19A, 20, 26, 27 |
| Severe winter range | 1,186,029 | 14,524 | 5A, 7, 8A, 12, 13, 13A, 14, 15, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25, 26, 27 |
| Summer range | 2,267,402 | <1 | 27 |
| Concentration area | 155,470 | 0 | None |
| Resident population area | 487,478 | 656 | 10, 12 |

Source: CPW (2011a)

5 the acreage of the pronghorn activity areas within the three-county study area and within the
6 combined boundary for the lease tracts.

9      **3.6.2.3.2  Other Mammals.** Other mammals that occur in the three-county study area
10 include small game, furbearers, and nongame species. Small game species that occur within the
11 three-county study area include black-tailed jackrabbit (*Lepus californicus*), white-tailed
12 jackrabbit (*Lepus townsendii*), desert cottontail (*Sylvilagus audubonii*), mountain cottontail
13 (*S. nuttallii*), squirrels (*Sciurus* spp.), snowshoe hare (*L. americanus*), and yellow-bellied marmot
14 (*Marmota flaviventris*). Furbearers include American badger (*Taxidea taxus*), American marten
15 (*Martes americana*), American beaver (*Castor canadensis*), bobcat (*Lynx rufus*), common
16 muskrat (*Ondatra zibethicus*), coyote (*Canis latrans*), red fox (*Vulpes vulpes*), gray fox
17 (*Urocyon cinereoargenteus*), raccoon (*Procyon lotor*), striped skunk (*Mephitis mephitis*), and
18 long-tailed weasel (*Mustela frenata*). Nongame species include bats, shrews, mice, voles,
19 chipmunks, and many other rodent species. Bats are of particular concern because their
20 populations have declined in many parts of North America and because a number of bat species
21 roost or hibernate in mines.

23      Nineteen species of bats occur in Colorado (Colorado Bat Working Group 2010a).
24 Mining is one of the issue categories that affect bat populations in Colorado (Ellison et al. 2003).

BLM_0042201



FIGURE 3.6-13  Pronghorn Activity Areas within the Three-County Study Area That
Encompasses the Lease Tract Boundaries (CPW 2011a)

BLM_0042202

1
2
3

**TABLE 3.6-18  Acreages of Pronghorn Activity Areas within the Three-County Study Area and the Combined Boundary for the Lease Tracts**

| Activity Area | Acreage | | |
| --- | --- | --- | --- |
| | Three-County Study Area | Lease Tract Boundaries | Lease Tract |
| Overall range | 290,431 | 30 | 13 |
| Winter range | 257,064 | 30 | 13 |
| Winter concentration area | 30,152 | 0 | None |
| Severe winter range | 15,469 | 0 | None |
| Concentration area | 3,551 | 0 | None |
| Resident population area | 93,020 | 30 | 13 |

Source: CPW (2011a)

4
5
6
7
8
9
10
11
12
13
14
15
16

As recreational caving and deforestation diminishes natural bat habitat, abandoned mines have increased in importance as roosting habitat. About 30% of the 23,000 abandoned mines in Colorado show signs of providing bat roosting habitat (Ellison et al. 2003). Abandoned mines surveyed in Lease Tracts 13, 13A, 14, 15, 16, 23, 26, and 27 have been observed to provide summer and/or winter roosting habitat for twelve bat species (Woodward 2012a,b; Table 3.6-19). The spotted bat (*Euderma maculatum*), fringed myotis (*Myotis thysanodes*), long-eared myotis (*M. evotis*), long-legged myotis (*M. volans*), western small-footed myotis (*M. ciliolabrum*), California myotis (*M. californicus*), and Yuma myotis (*M. yumanensis*) have been observed in abandoned uranium mines in Colorado (DOE 1995). Some of the DOE-reclaimed mine sites have bat gate closures to protect these bat habitats.

17
18
19
20
21

Table 3.6-20 provides habitat information for the small game, furbearer, and nongame mammal species expected to occur within the lease tract boundaries. Information on threatened, endangered, and other special status mammal species is provided in Section 3.6.4.

22
23

**3.6.3  Aquatic Biota**

24
25
26
27
28

The three-county study area contains a variety of freshwater aquatic habitats, which, in turn, support a wide diversity of aquatic biota. Aquatic habitats range in size and permanency from ephemeral ponds and streams to the Dolores and San Miguel Rivers. Sport fish in the three-county study area include trout (family Salmonidae), catfish (family Ictaluridae), sunfish and black basses (family Centrarchidae), suckers (family Catostomidae), perch and walleye (family

BLM_0042203

Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 5 of 375

1
2

**TABLE 3.6-19  Bat Species Reported from Abandoned Mines within the ULP Lease Tracts**

| Species | Lease Tract |
|---|---|
| Big brown bat (*Eptesicus fuscus*) | 13A, 15, 16, 23, 26, 27 |
| Big free-tailed bat (*Nyctinomops macrotis*) | 13 |
| California myotis (*Myotis californicus*) | 13A, 14, 15, 16, 23, 26, 27 |
| Fringed myotis (*Myotis thysanodes*) | 14, 23, 26, 27 |
| Little brown bat (*Myotis lucifugus*) | 13 |
| Long-eared myotis (*Myotis evotis*) | 14, 26, 27 |
| Long-legged myotis (*Myotis volans*) | 13A, 14, 15, 23, 26, 27 |
| Spotted bat (*Euderma maculatum*) | 27 |
| Townsend's big-eared bat (*Corynorhinus townsendii*) | 13, 13A, 14, 15, 16, 23, 26, 27 |
| Western pipistrelle (*Pipistrellus hesperus*) | 13 |
| Western small-footed myotis (*Myotis ciliolabrum*) | 13A, 14, 15, 16, 23, 26, 27 |

Source: Woodward (2012a)

3
4
5 Percidae), and pike (family Esocidae). In addition to fish, aquatic habitats also support a large
6 variety of aquatic invertebrates, including crustaceans and insects.
7
8 Valdez et al. (1992) identified 11 orders of macroinvertebrates in the Dolores and
9 San Miguel Rivers. Diptera (true flies), Ephemeroptera (mayflies), and Trichoptera (Caddisflies)
10 made up more than 85% of the macroinvertebrates in the Dolores River and more than 70% of
11 the macroinvertebrates in the San Miguel River. The crayfish *Orconectes virilis* was abundant in
12 the Dolores River. Valdez et al. (1992) reported that macroinvertebrate diversity was very low in
13 the Dolores and San Miguel Rivers in the 1970s and 1980s. Biotic Condition Index values for the
14 Dolores and San Miguel Rivers for 1991 rated the rivers as excellent and fair to poor,
15 respectively (Valdez et al. 1992).
16
17 Historically, only 12 species of fish were native to the Upper Colorado River Basin,
18 including 5 minnow species, 4 sucker species, 2 salmonids, and the mottled sculpin (*Cottus
19 bairdii*, family Cottidae). Four of these native species (humpback chub [*Gila cypha*], bonytail
20 [*Gila elegans*], Colorado pikeminnow [*Ptychocheilus lucius*], and razorback sucker [*Xyrauchen
21 texanus*]) are now Federally listed as endangered, and critical habitat for these species has been
22 designated within the Upper Colorado River Basin (see Section 3.6.4). The roundtail chub (*Gila
23 robusta*), bluehead sucker (*Catostomus discobolus*), and flannelmouth sucker (*Catostomus
24 latipinnis*) (which occur in both the Dolores and San Miguel Rivers) are BLM-sensitive species,
25 and the roundtail chub is also a Colorado species of special concern. See Section 3.6.4 for
26 additional information on these species. In addition to native fish species, more than
27 25 non-native fish species are now present in the basin, often as a result of intentional
28 introductions (e.g., for establishment of sport fisheries) (Muth et al. 2000; McAda 2003). Most of
29 the trout species found within the Upper Colorado River Basin are introduced non-natives
30 (e.g., rainbow trout [*Oncorhynchus mykiss*], brown trout [*Salmo trutta*], and some strains of
31 cutthroat trout [*Oncorhynchus clarkii*]). However, the mountain whitefish (*Prosopium*

BLM_0042204

1  **TABLE 3.6-20  Small Game, Furbearer, and Nongame Mammal Species Expected To Occur within**
2  **the Lease Tract Boundaries**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| ***Small Game and Furbearers*** | | |
| American badger (*Taxidea taxus*) | 4,500–14,500 | Grasslands, meadows in subalpine and montane forests, alpine tundra, and semidesert shrublands. |
| Black-tailed jackrabbit (*Lepus californicus*) | 3,000–7,000 | Grasslands and semidesert shrublands. |
| Bobcat (*Lynx rufus*) | 3,000–14,500 | Most common in the rocky, broken terrain of foothills and canyonlands. Preferred habitats are piñon-juniper woodlands and montane forests, although it inhabits all terrestrial ecosystems. |
| Coyote (*Canis latrans*) | 3,000–14,500 | All terrestrial habitats, but least abundant in dense coniferous forests. |
| Desert cottontail (*Sylvilagus audubonii*) | 3,000–7,000 | Variety of habitats, including montane shrublands, riparian lands, semidesert shrublands, piñon-juniper woodlands, and various woodland-edge habitats. It will inhabit areas with minimal vegetation provided that adequate cover is present in the form of burrows, scattered trees and shrubs, or crevices and spaces under rocks. |
| Gray fox (*Urocyon cinereoargenteus*) | 5,500–13,000 | Usually rough, broken terrain in semidesert shrublands, montane shrublands, piñon-juniper and riparian woodlands, orchards, and weedy margins of croplands. |
| Long-tailed weasel (*Mustela frenata*) | 3,000–14,500 | All habitat types. Distribution is probably more dependent on availability of prey species than on vegetation or topography. |
| Mountain cottontail (*Sylvilagus nuttallii*) | 6,000–11,500 | Montane shrublands and semidesert shrublands and the edges of piñon-juniper woodlands and montane and subalpine forests. Also inhabits open parklands with sufficient shrub, rock, or tree cover. |
| Red fox (*Vulpes vulpes*) | 3,000–14,500 | Most common in open woodlands, pasturelands, and riparian and agricultural lands. Prefers areas with a mixture of these vegetation types. Also inhabits the margins of urbanized areas and is common in open spaces and other undeveloped areas adjacent to cities. In the mountains, it inhabits montane and subalpine meadows as well as in alpine and forest edges, usually near water. |

3

BLM_0042205

**TABLE 3.6-20  (Cont.)**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| **Small Game and Furbearers (Cont.)** | | |
| Ringtail (*Bassariscus astutus*) | 3,000–9,500 | Arid and semiarid habitats. Typically associated with rocky canyon country and foothills areas of piñon-juniper woodlands, montane shrublands, and mixed conifer-oakbrush. |
| Striped skunk (*Mephitis mephitis*) | 3,000–10,000 | Wide range of grassland, shrubland, forestland, wetland, and riparian habitats. |
| Western spotted skunk (*Spilogale gracilis*) | 4,000–8,000 | Common in shrub habitats in broken country. Also inhabits montane forest and shrublands, semidesert shrublands, and piñon-juniper woodlands. Frequents rocky habitats. |
| White-tailed jackrabbit (*Lepus townsendii*) | 4,000–14,500 | Mostly semidesert shrublands, but also many grassland, shrubland, and forestland habitats. |
| **Nongame (Small) Mammals** | | |
| Big brown bat (*Eptesicus fuscus*) | 3,000–10,000 | Variety of shrublands, forestlands, wetlands, and riparian areas. Roosts in dwellings and other structures, hollow trees, rock crevices, caves, under bridges, and in practically any other location that offers concealment and cover from the elements. |
| Botta's pocket gopher (*Thomomys bottae*) | 4,000–8,500 | Various vegetation types, including agricultural land, grasslands, roadsides, open parklands, piñon-juniper woodlands, open montane forest, montane shrublands, and semidesert shrublands. |
| Brazilian free-tailed bat (*Tadarida brasiliensis*) | 3,000–9,500 | Piñon-juniper woodlands, arid grasslands, and semidesert shrublands. Typically roosts in caves, mines, rock fissures, or buildings. |
| Brush mouse (*Peromyscus boylii*) | 4,000–8,500 | Montane shrublands, piñon-juniper woodlands, riparian cottonwood stands, willow thickets, and brushy salt-cedar (tamarisk) bottoms. Usually inhabits areas of rough, broken terrain with boulders and heavy brush. |
| Bushy-tailed woodrat (*Neotoma cinerea*) | 4,500–14,000 | Montane and subalpine forests, ponderosa pine forests, aspen communities, and alpine talus. Common around old mining camps and diggings at higher elevations. Also inhabits lower-elevation canyon country in semidesert shrublands, and in piñon-juniper woodlands, typically in rimrock, rock outcrops, and similar geologic features. |

BLM_0042206

**TABLE 3.6-20  (Cont.)**

| Species | Elevation (ft) | Habitat |
| --- | --- | --- |
| ***Nongame (Small) Mammals (Cont.)*** | | |
| California myotis (*Myotis californicus*) | 4,500–7,500 | Most common in semidesert shrublands and piñon-juniper woodlands. Night roosts include abandoned structures, mines, caves, and cracks and crevices in cliff faces. Day roosts are similar but also include hollow trees and spaces under bark. |
| Canyon mouse (*Peromyscus crinitus*) | 4,500–8,000 | Inhabits talus and outwash rubble, or eroded, exposed sandstone. Habitat includes piñon-juniper woodlands and montane and semidesert shrublands. |
| Common porcupine (*Erethizon dorsatum*) | 3,000–14,500 | Associated with conifers in montane and subalpine forests and piñon-juniper woodlands. Also occupies cottonwood-willow forests in river bottoms, aspen groves, and semidesert shrublands. |
| Deer mouse (*Peromyscus maniculatus*) | 3,000–14,000 | Most native terrestrial habitats with cover except well-developed wetlands. Cover types include burrows of other animals, cracks and crevices in rocks, surface debris and litter, and human structures. |
| Golden-mantled ground squirrel (*Spermophilus lateralis*) | 5,200–12,500 | Open woodlands, shrublands, mountain meadows, and forest-edge habitat. |
| Hoary bat (*Lasiurus cinereus*) | 3,000–10,000 | Variety of riparian/wetland, shrubland, and forestland habitats. |
| Hopi chipmunk (*Tamias rufus*) | 4,500–8,000 | Canyon and slickrock piñon-juniper country. Highest densities found in areas with an abundance of broken rock or rubble at the base of cliff faces or in rock formations with deep fissures and crevices suitable for den sites. |
| Least chipmunk (*Tamias minimus*) | 5,500–12,000 | Low-elevation semidesert shrublands, montane shrublands and woodlands, forest edges, and alpine tundra. |
| Little brown myotis (*Myotis lucifugus*) | 5,000–11,000 | Roosts are under bark and rocks, in wood piles, buildings, and other structures, and less frequently in caves and mines. |
| Long-eared myotis (*Myotis evotis*) | 4,000–9,000 | Most common in ponderosa pine woodlands, also found in piñon-juniper woodlands and subalpine forests. Day roosts found in tree cavities, under loose bark, and in buildings. These sites, as well as caves and mines, are used for night roosts. |

BLM_0042207

**TABLE 3.6-20  (Cont.)**

| Species | Elevation (ft) | Habitat |
| --- | --- | --- |
| **Nongame (Small) Mammals (Cont.)** | | |
| Long-legged myotis (*Myotis volans*) | 4,000–12,500 | Relatively common in ponderosa pine forests and piñon-juniper woodlands. Roosts in a variety of sites including trees, buildings, crevices in rock faces, and even fissures in the ground in severely eroded areas. |
| Mexican woodrat (*Neotoma mexicana*) | 4,000–8,500 | Rocky slopes and cliffs in montane shrublands, piñon-juniper woodlands, and montane forests. Usually dens and nests beneath ledges or in fissures of cliffs. Also uses abandoned or seasonally occupied buildings or mine tunnels. |
| Northern grasshopper mouse (*Onychomys leucogaster*) | 4,500–8,000 | Semiarid grasslands, sand hills, and open semidesert shrublands. Highest densities found on overgrazed rangelands, which typically have high populations of insects and numerous blowouts (patches of windblown soil) that are loose enough for burrowing and for dust bathing. |
| Northern pocket gopher (*Thomomys talpoides*) | 5,000–14,500 | Variety of habitats including agricultural and pasture lands, semidesert shrublands, and grasslands at lower elevations and upward into alpine tundra. |
| Ord's kangaroo rat (*Dipodomys ordii*) | 3,000–8,000 | Variety of habitats from semidesert shrublands and piñon-juniper woodlands to shortgrass or mixed prairie and silvery wormwood. Also dry, grazed, riparian areas if vegetation is sparse. Most common on sandy soils that allow for easy digging and construction of burrow systems. |
| Pallid bat (*Antrozous pallidus*) | 3,000–7,000 | Semidesert and montane shrublands, piñon-juniper woodlands, and riparian woodland in the foothills and canyon country. Day roosts are crevices and fissures in cliff faces, sallow caves and grottos, and buildings. |
| Piñon mouse (*Peromyscus truei*) | 4,500–8,000 | Piñon-juniper woodlands and occasionally sagebrush stands and rocky canyon country. |
| Rock squirrel (*Spermophilus variegatus*) | 3,000–8,300 | Mostly in piñon-juniper woodlands and montane shrublands in rocky hillsides, rimrock, and canyons. It requires boulders, talus, or dense tangles of vegetation under which it burrows. |

BLM_0042208

**TABLE 3.6-20  (Cont.)**

| Species | Elevation (ft) | Habitat |
|---|---|---|
| ***Nongame (Small) Mammals (Cont.)*** | | |
| Silver–haired bat (*Lasionycteris noctivagans*) | 4,500–9,500 | Prefers forest edges. Forages over open areas or over streams and ponds. Generally uses tree cavities or crevices under loose bark for summer roosts but also uses buildings, caves, and woodpiles during migration or hibernation. |
| Western pipistrelle (*Pipistrellus hesperus*) | 3,000–6,000 | Canyon and desert country. Roosts under loose rocks, in crevices or caves, and occasionally in buildings. Also uses the burrows of animals in open desert scrub communities. |
| Western small–footed myotis (*Myotis ciliolabrum*) | 4,000–8,500 | In summer, it roosts in rock crevices, caves, dwellings, burrows, among rocks, under bark, and beneath rocks scattered on the ground. Generally found in the broken terrain of canyons and foothills, commonly in places with a cover of trees or shrubs. |
| White–tailed antelope squirrel (*Ammospermophilus leucurus*) | 4,500–7,000 | Semidesert shrublands, piñon–juniper woodlands, montane shrublands, and occasionally lowland riparian areas. Occupies burrows dug by other species such as kangaroo rats or small ground squirrels, but can also dig its own burrow under bushes, clumps of grasses, or at the base of trees, often in sandy soils near rock outcrops. |
| White–throated woodrat (*Neotoma albigula*) | 3,000–7,000 | Shrublands and piñon–juniper and juniper woodlands. |
| Yuma myotis (*Myotis yumanensis*) | 3,000–6,000 | Associated with riparian lands, although some of these areas may be relatively dry and shrubby. Day roosts are rock crevices, buildings, caves, and mines. Night roosts include buildings, under ledges, or similar shelters. |

Sources: CPW (2011a); USGS (2007)

1
2
3 *williamsoni*) and Colorado River cutthroat trout (*Oncorhynchus clarkii pleuriticus*) are native to
4 the basin. Although the Colorado River cutthroat trout was once common within the upper Green
5 River and upper Colorado River watersheds, it now occurs only in isolated subdrainages in
6 Colorado, Utah, and Wyoming and is a species of concern in those states (Hirsch et al. 2006,
7 see Section 3.6.4).
8
9      In 1990 and 1991, Valdez et al. (1992) collected 19 species of fish in the 180-mi
10 (290-km) reach of the Dolores River between its confluence with the Colorado River and
11 Bradfield Bridge (about 14 mi [22 km] downstream of McPhee Reservoir). Native fish collected
12 included the Colorado pikeminnow, roundtail chub, flannelmouth sucker, bluehead sucker,

BLM_0042209

1   speckled dace (*Rhinichthys osculus*), and mottled sculpin. The red shiner (*Cyprinella lutrensis*),
2   sand shiner (*Notropis stramineus*), fathead minnow (*Pimephales promelas*), common carp
3   (*Cyprinus carpio*), and channel catfish (*Ictalurus punctatus*) were the most abundant non-native
4   species. The other non-native species collected included the white sucker (*Catostomus*
5   *commersonii*), bluegill (*Lepomis macrochirus*), green sunfish (*Lepomis cyanellus*), largemouth
6   bass (*Micropterus salmoides*), plains killifish *Fundulus zebrinus*), black bullhead (*Ameiurus*
7   *melas*), channel catfish, brown trout, and rainbow trout (Valdez et al. 1992). Native species made
8   up only 19% of the numbers of fish collected; however, this percentage is relatively higher here
9   than it is in other upper Colorado River basins, indicating that predation and competition by non-
10  native species was not a limiting factor for native fish species in the river system. Fish
11  composition was similar to that found in a survey conducted in 1981, indicating that the fish
12  community was somewhat stable over that 10-year period (Valdez et al. 1992).
13
14         Four Colorado pikeminnows were collected within 1.2 mi (2 km) of the confluence with
15  the Colorado River. The species was reported in the lower 60 mi (100 km) of the Dolores River
16  in the 1950s and 1960s. Although no Colorado pikeminnows were collected in the Dolores River
17  in 1971 and 1981, there were unconfirmed reports of seven individuals collected in the lower
18  6 mi (10 km) of the San Miguel River in 1973 (Valdez et al. 1992). See Section 3.6.4 for
19  additional information on the Colorado pikeminnow and other special status fish species.
20
21         Altered base flow releases from McPhee Dam (constructed in 1984 and located 200 mi
22  [320 km] upstream of the Dolores River confluence with the Colorado River) accounted for
23  reduced native fish habitat in the lower 170 mi (270 km) of the river, which resulted from
24  decreased fish holding areas, dewatered nursery backwaters, impeded movement, and enhanced
25  sedimentation (Valdez et al. 1992).
26
27         The Colorado Department of Wildlife (now Colorado Parks and Wildlife) collected fish
28  from the Dolores River in Big Gypsum Valley near the Montrose/San Miguel County border
29  (Anderson and Stewart 2003). This site is less than 1.5 mi (2.4 km) west of Lease Tract 17. A
30  total of 13 fish species were collected in 2000, 2001, 2004, and 2005. These included four native
31  species—flannelmouth sucker, bluehead sucker, roundtail chub, and speckled dace—and
32  nine nonnative species—channel catfish, black bullhead, common carp, green sunfish,
33  pumpkinseed (*Lepomis gibbosus*), red shiner, sand shiner, fathead minnow, and brown trout
34  (Anderson and Stewart 2003). Increasing drought and sedimentation problems over the course of
35  the study resulted in an increased number of black bullheads and a decreased number of
36  flannelmouth suckers. Low-velocity pools that dominated the study area were favorable to
37  bullhead and not favorable to native species. The absence of quality riffle habitats accounted for
38  low numbers of bluehead suckers observed in the later years of the study (Anderson and
39  Stewart 2003). Degraded or more silted riffle habitats observed after 2002 may have decreased
40  invertebrate production and, as a result, caused the decreases observed for roundtail chub and
41  channel catfish. The roundtail chub, flannelmouth sucker, and bluehead sucker appear to mature
42  at a younger age and smaller size in the Dolores River than is typical in other larger rivers
43  (Anderson and Stewart 2003). Several of the species may also occur in the tributary streams to
44  the Dolores and San Miguel Rivers where flows are sufficient to provide habitat.
45
46

BLM_0042210

### 3.6.4  Threatened, Endangered, and Sensitive Species

A total of 52 species of plants and animals that are listed as threatened, endangered, or sensitive by state and Federal agencies may occur on or in the vicinity of the ULP lease tracts (Table 3.6-21). The known or potential distribution and habitat requirements for these species were determined from the USFWS Information, Planning, and Conservation System (IPaC) (USFWS 2011a), USFWS Critical Habitat Portal (USFWS 2011b), NatureServe Explorer (NatureServe 2011), Colorado Natural Heritage Program (CNHP) Rare Plant Guide List (CNHP 2011a), CNHP Element Occurrence Records (CNHP 2011b), CPW (2011a), and the Southwest Regional Gap Analysis Project (SWReGAP) (USGS 2007). The following types of species are considered in this assessment:

- Species that are listed as threatened or endangered under the ESA, or that are proposed or candidates for listing under the ESA;

- Species that are listed by the BLM as sensitive;

- Species that are listed by the U.S. Forest Service (USFS) as sensitive;

- Species that are listed as threatened or endangered by the State of Colorado.

#### 3.6.4.1  Species Listed under the Endangered Species Act

Of the 10 ESA-listed, proposed, and candidate species that may occur in the vicinity of the ULP lease tracts, 7 are ESA-listed as threatened or endangered and 3 are candidates for listing (Table 3.6-21). The following definitions are applicable to the species listing categories under the ESA:

- *Endangered:* Any species that is in danger of extinction throughout all or a significant portion of its range.

- *Threatened:* Any species that is likely to become endangered within the foreseeable future throughout all or a significant part of its range.

- *Proposed for listing:* Species that has been formally proposed for listing by the USFWS by a notice in the *Federal Register*.[17]

---

[17] Within 1 year of a proposal for listing, the USFWS or National Marine Fisheries Service (NMFS) must take one of three possible courses of action: (1) finalize the listing rule (as proposed or revised); (2) withdraw the proposal if the biological information on hand does not support the listing; or (3) extend the proposal for up to an additional 6 months because, at the end of 1 year, there is substantial disagreement within the scientific community concerning the biological appropriateness of the listing. After the extension, the USFWS or NMFS must make a decision on whether to list the species on the basis of the best scientific information available.

BLM_0042211

1

**TABLE 3.6-21  Threatened, Endangered, and Sensitive Species That May Occur in the Vicinity of the ULP Lease Tracts**

| Common Name | Scientific Name | Status[a] | Habitat and Occurrence in the ULP Project Area[c] |
|---|---|---|---|
| ***Plants*** | | | |
| Canyonlands biscuitroot | *Aletes latilobus* | BLM-S | In Colorado, known only from Mesa County. Inhabits piñon-juniper and desert shrub communities on sandy soils derived from the Entrada Formation. Elevation range is 5,000–7,000 ft. Not known to occur in any lease tracts, but suitable habitat could occur on or near lease tracts in Mesa County. |
| Dolores River skeletonplant | *Lygodesmia doloresensis* | BLM-S | Juniper-desert shrub or juniper-grassland communities on alluvial soils derived from sandstone outcrops associated with the undivided lower portion of the Cutler Group. Elevation range is 4,400–4,700 ft. Known occurrences of habitat for this species on Lease Tract 13; quad-level occurrences for this species also intersect Lease Tract 26. Suitable habitat could occur on or near lease tracts in Mesa, Montrose, and San Miguel Counties. |
| Eastwood's monkeyflower | *Mimulus eastwoodiae* | BLM-S | Shallow caves and seeps on steep canyon walls. Elevation range is 4,700–5,800 ft. Known to occur in western Mesa, Montrose, and San Miguel Counties. Quad-level occurrences intersect Lease Tracts 11, 13, 13A, 14(1), 14(2), 15, 15A, 16, 16A, 18, 19, 19A, 20, 24, and 26. Suitable habitat could occur on or near lease tracts in Mesa, Montrose, and San Miguel Counties. |
| Fisher milkvetch | *Astragalus piscator* | BLM-S | In Colorado, known only from Mesa County on sandy, sometimes gypsiferous, soils of valley benches and gullied foothills. Elevation range is 4,300–5,600 ft. Quad-level occurrences intersect Lease Tract 26 in Mesa County. Suitable habitat could occur on or near lease tracts in Mesa County. |
| Grand Junction milkvetch | *Astragalus linifolius* | BLM-S | Grows on the Chinle and Morrison Formations, with piñon-juniper and sagebrush. Elevation range is 4,800–6,200 ft. Known to occur in Mesa and Montrose Counties. Quad-level occurrences intersect Lease Tracts 19, 19A, 20, 21, 22, 23(1), 23(2) 23(3), 24, 26, and 27. Suitable habitat could occur on or near lease tracts in Mesa and Montrose Counties. |
| Grand Junction suncup | *Camissonia eastwoodiae* | BLM-S | Occurs in adobe hills in the lower valleys of western Colorado. Inhabits saltbush, shadscale, blackbrush, and juniper communities at 3,900–5,900 ft. Not known to occur in any lease tracts, but suitable habitat could occur on or near lease tracts in Mesa County. |

2

**TABLE 3.6-21  (Cont.)**

| Common Name | Scientific Name | Status[a] | Habitat and Occurrence in the ULP Project Area[c] |
|---|---|---|---|
| *Plants (Cont.)* | | | |
| Gypsum Valley cateye | *Cryptantha gypsophila* | BLM-S | Endemic to western Colorado. Inhabits gypsum outcrops. Quad-level occurrences intersect Lease Tracts 12, 13, 14(1), and 26. Suitable habitat could occur on or near lease tracts in Mesa, Montrose, and San Miguel Counties. |
| Helleborine | *Epipactis gigantea* | BLM-S; FS-S | Inhabits seeps on sandstone cliffs and hillsides; also occurs along springs. Elevation range is 4,800–8,000 ft. Quad-level occurrences intersect Lease Tracts 18, 19, 19A, 20, and 24. Suitable habitat could occur on or near lease tracts in Mesa, Montrose, and San Miguel Counties. |
| Horseshoe milkvetch | *Astragalus equisolensis* | BLM-S | In Colorado, known only from Mesa County. Occurs in shrubland communities. Quad-level occurrences intersect Lease Tract 26. Suitable habitat could occur on or near lease tracts in Mesa County. |
| Kachina daisy | *Erigeron kachinensis* | BLM-S | Endemic to the Colorado Plateau in western Colorado and eastern Utah. Inhabits saline soils in alcoves and seeps in canyon walls. Elevation range is 4,800–5,600 ft. Quad-level occurrences intersect Lease Tracts 18, 19, 19A, 20, and 24. Suitable habitat could occur on or near lease tracts in Montrose County. |
| Naturita milkvetch | *Astragalus naturitensis* | BLM-S | Inhabits sandstone mesas, ledges, crevices, and slopes in piñon-juniper woodlands. Elevation range is 5,000–7,000 ft. Known occurrences and habitat for this species are on Lease Tract 13, near Paradox Valley, and near Uravan. Quad-level occurrences also intersect Lease Tracts 6, 7, 8, 8A, 9, 12, 13, 13A, 14(1), 14(2), 15, 15A, 17(1), 17(2), 18, 19, 19A, 20, and 24. Suitable habitat could occur on or near lease tracts in Mesa, Montrose, and San Miguel Counties. |
| Osterhout's cryptantha | *Cryptantha osterhoutii* | BLM-S | Known from Mesa County, Colorado, as well as eastern Utah. Inhabits dry, barren sites, on sandstone substrates. Elevation range is 4,500–6,100 ft. Not known to occur in any lease tracts, but suitable habitat could occur on or near lease tracts in Mesa County. |

BLM_0042213

**TABLE 3.6-21  (Cont.)**

| Common Name | Scientific Name | Status[a] | Habitat and Occurrence in the ULP Project Area[c] |
|---|---|---|---|
| *Plants (Cont.)* | | | |
| Paradox breadroot | *Pediomelum aromaticum* | BLM-S | Known from adobe hills in Mesa and Montrose Counties, Colorado. Not known to occur in any lease tracts, but suitable habitat could occur on or near lease tracts in Mesa, Montrose, and San Miguel Counties. |
| Paradox lupine | *Lupinus crassus* | BLM-S | Endemic to western Montrose County, Colorado. Inhabits piñon-juniper woodlands or clay barrens along draws and washes with sparse vegetation. Elevation range is 5,000–8,000 ft. Occurs near Paradox Valley lease tracts and near Uravan. Quad-level occurrences also intersect Lease Tracts 18, 21, 22, 22A, 23(1), 23(2), 23(3), 24, and 25. Suitable habitat could occur on or near lease tracts in Montrose County. |
| San Rafael milkvetch | *Astragalus rafaelensis* | BLM-S | Inhabits hillsides, washes, and talus under cliffs on clay, silty, or sandy substrates. Elevation range is 4,400–6,500 ft. Known to occur near Uravan lease tracts. Quad-level occurrences intersect Lease Tracts 5, 5A, 6, 7, 8, 8A, 9, 18, 19, 19A, 20, 22, 22A, 24, 26, and 27. Suitable habitat could occur on or near lease tracts in Mesa and Montrose Counties. |
| Sandstone milkvetch | *Astragalus sesquiflorus* | BLM-S | Occurs on sandstone rock ledges, fissures of domed siltrock, talus, and sometimes in sandy washes. Elevation range is 5,000–5,500 ft. Quad-level occurrences intersect Lease Tracts 5, 5A, 6, 7, 8, 8A, 9, 18, 19, 19A, 20, 22, 22A, and 24. Suitable habitat could occur on or near lease tracts in Montrose County. |
| Wetherill's milkvetch | *Astragalus wetherillii* | FS-S | Occurs on steep slopes, canyon benches, and talus under cliffs. Elevation range is 5,250–7,400 ft. Quad-level occurrences intersect Lease Tracts 5, 5A, 6, and 7. Suitable habitat could occur on or near lease tracts in Mesa, Montrose, and San Miguel Counties. |

1
2

**TABLE 3.6-21  (Cont.)**

| Common Name | Scientific Name | Status[a] | Habitat and Occurrence in the ULP Project Area[c] |
|---|---|---|---|
| *Invertebrates* | | | |
| Great Basin silverspot butterfly | *Speyeria nokomis nokomis* | BLM-S | Inhabits streamside meadows, open seepage areas, and other riparian areas with an abundance of violets. Not known to occur in any lease tracts, but suitable habitat could occur on or near lease tracts in Mesa, Montrose, and San Miguel Counties. |
| *Fish* | | | |
| Bluehead sucker | *Catostomus discobolus* | BLM-S; FS-S | Found in a variety of aquatic habitats from headwater streams to large rivers. The bluehead sucker requires water moving at a moderate to fast velocity, preferably over rock substrates. This species does not occur on any of the lease tracts; however, it could occur in the Dolores and San Miguel Rivers, which are downstream of lease tracts in Mesa, Montrose, and San Miguel Counties; the Dolores River flows through portions of Lease Tracts 13A, 13, and 14. It is most common in the Dolores River downstream of the confluence with the San Miguel River. |
| Bonytail chub | *Gila elegans* | ESA-E; CO-E | Found historically throughout the Colorado River drainage; currently known only from the Green River in Utah and Lakes Havasu and Mohave. Inhabits large river systems in eddies and pools. The bonytail chub does not occur on any of the lease tracts; however, it could inhabit the Colorado River downstream from the confluence of the Dolores River, which flows through Lease Tracts 13A, 13, and 14 approximately 70 mi upstream. |
| Colorado pikeminnow | *Ptychocheilus lucius* | ESA-E; CO-T | Restricted to large rivers of the Colorado River basin. The Colorado pikeminnow does not occur on any of the lease tracts; however, it could inhabit the Colorado River downstream from the confluence of the Dolores River, which flows through Lease Tracts 13A, 13, and 14 approximately 70 mi upstream. |
| Flannelmouth sucker | *Catostomus latipinnis* | BLM-S; FS-S | Inhabits moderate to large rivers, is seldom in small creeks, and is absent from impoundments. Prefers pools and deep runs. Spawns in riffles, usually over a substrate of coarse gravel. In Colorado, the flannelmouth is found only in large rivers on the western slope. This species does not occur on any of the lease tracts; however, it could occur in the Dolores and San Miguel Rivers, which are downstream of lease tracts in Mesa, Montrose, and San Miguel Counties; the Dolores River flows through portions of Lease Tracts 13A, 13, and 14. |

**TABLE 3.6-21  (Cont.)**

| Common Name | Scientific Name | Status[a] | Habitat and Occurrence in the ULP Project Area[c] |
|---|---|---|---|
| **Fish (Cont.)** | | | |
| Humpback chub | *Gila cypha* | ESA-E; CO-T | Historically ranged throughout the Colorado River system. Current distribution in Colorado is limited to the Yampa, Gunnison, Green, and Colorado Rivers in the western portion of the state. Inhabits slow eddies and pools over rock, sand, or gravel substrates. The humpback chub does not occur on any of the lease tracts; however, it could inhabit the Colorado River downstream from the confluence of the Dolores River, which flows through Lease Tracts 13A, 13, and 14 approximately 70 mi upstream. |
| Razorback sucker | *Xyrauchen texanus* | ESA-E; CO-E | Historically ranged throughout the Colorado River system. Current distribution in Colorado is limited to the lower mainstem Colorado, Gunnison, lower Yampa, and Green Rivers. The razorback sucker does not occur on any of the lease tracts; however, it could inhabit the Colorado River downstream from the confluence of the Dolores River, which flows through Lease Tracts 13A, 13, and 14 approximately 70 mi upstream. |
| Roundtail chub | *Gila robusta* | BLM-S; FS-S | Found in the Colorado River mainstem and larger tributaries. Prefers slow-moving waters adjacent to areas of faster water. The roundtail chub does not occur on any of the lease tracts; however, it could inhabit downstream areas, including the Dolores River, which flows through Lease Tracts 13A, 13, and 14. It is the most abundant native fish species in the downstream reaches of the Dolores River. |
| **Amphibians** | | | |
| Boreal toad | *Bufo boreas* | CO-E | Generally associated with montane riparian habitats at elevations from 8,500–11,500 ft. Habitats include marshes, meadows, streams, beaver ponds, and lakes. Not known to occur on or near any of the lease tracts and suitable habitat is not likely to occur on the lease tracts. However, according to the SWReGAP habitat model, potentially suitable habitat may occur in the vicinity of the Calamity Mesa, Outlaw Mesa, and Uravan lease tracts (19, 26, and 27). |
| Canyon treefrog | *Hyla arenicolor* | BLM-S | Occurs along intermittent streams in deep, rocky, canyons. Elevation typically ranges from 4,500–6,300 ft. Quad-level occurrences for this species intersect Lease Tracts 6, 7, 8, 8A, 9, 11, 13, 13A, 14(1), 14(2), 15, 15A, 16, 16A, and 26. Suitable habitat could occur on or near lease tracts in Mesa, Montrose, and San Miguel Counties. |

**TABLE 3.6-21 (Cont.)**

| Common Name | Scientific Name | Status[a] | Habitat and Occurrence in the ULP Project Area[c] |
|---|---|---|---|
| ***Amphibians (Cont.)*** | | | |
| Great Basin spadefoot | *Spea intermontana* | BLM-S | Inhabits piñon-juniper woodlands, sagebrush communities, and semidesert shrublands at elevations generally below 7,000 ft. Not known to occur in any lease tracts. However, according to the SWReGAP habitat model, potentially suitable habitat could occur within 1 mile to the west of Lease Tracts 11 and 11A. |
| Northern leopard frog | *Rana pipiens* | BLM-S; FS-S | Inhabits wet meadows, marshes, ponds, lakes, and reservoirs, as well as streams and irrigation ditches. Elevation range is 3,000–11,000 ft. Not known to occur in any lease tracts, and suitable habitat does not occur on the lease tracts. However, according to the SWReGAP habitat model, potentially suitable habitat could occur in the vicinity of Uravan lease tracts (18, 19, 19A, 24, and 25) and lease tracts in the Slick Rock area (13, 13A, 14, 15, and 15A). |
| ***Reptiles*** | | | |
| Longnose leopard lizard | *Gambelina wislizenii* | BLM-S | Inhabits flat or gently sloping shrublands in sparse vegetation. Quad-level occurrences intersect Lease Tract 26. According to the SWReGAP habitat model, potentially suitable habitat could occur on or near Calamity Mesa, Outlaw Mesa, and Uravan lease tracts (18, 19, 19A, 20, 24, 26, and 27). |
| Midget-faded rattlesnake | *Crotalus oreganus concolor* | BLM-S | Quad-level occurrences for this species intersect Lease Tracts 26 and 27. According to the SWReGAP habitat model, potentially suitable habitat for this species occurs on or near all lease tracts. |
| ***Birds*** | | | |
| Bald eagle | *Haliaeetus leucocephalus* | BLM-S; FS-S | Preferred habitat includes reservoirs and large rivers. In winter, bald eagles may occur locally in semidesert and grassland habitats, especially near prairie dog towns. May forage in arid shrubland environments. Bald eagles winter in riparian habitat along the Dolores River and in Dry Creek Basin. A winter nocturnal roost area is located in the Slick Rock area. Eagles probably forage for carrion in deer and elk winter concentration areas such as Atkinson Mesa (Lease Tracts 18, 19, 19A and 20), The Slick Rock area (Lease Tracts 13, 13A, and 14), Paradox Valley (Lease Tracts 21, 22A, and 23A), Monogram Mesa (Lease Tracts 5, 6, 7, 7A, 8, and 9), and Calamity Mesa (Lease Tracts 26, 26A, 27, and 27A). |

**TABLE 3.6-21 (Cont.)**

| Common Name | Scientific Name | Status[a] | Habitat and Occurrence in the ULP Project Area[c] |
|---|---|---|---|
| *Birds (Cont.)* | | | |
| Brewer's sparrow | *Spizella breweri* | BLM-S | A summer resident on mesas and foothills of western Colorado; occurs primarily in sagebrush shrublands but also occurs in mountain mahogany communities. Not known to occur in any lease tracts; however, according to the SWReGAP habitat model, potentially suitable summer breeding habitat could occur on or near all lease tracts. |
| Burrowing owl | *Athene cunicularia* | BLM-S; CO-T | A year-round resident in western Colorado in grasslands near prairie dog towns. This species may occur in association with prairie dog towns on or near the Gateway lease tracts (26 and 27). According to the SWReGAP habitat model, potentially suitable summer breeding habitat could occur on or near all lease tracts. |
| Ferruginous hawk | *Buteo regalis* | BLM-S; FS-S | A winter resident in western Colorado in grasslands and semidesert shrublands. Occasionally found in piñon-juniper woodlands. Winter residents concentrate around prairie dog towns. This species may use portions of the lease tracts during winter migration. According to the SWReGAP habitat model, potentially suitable winter habitat could occur on or near all lease tracts. |
| Gunnison sage-grouse | *Centrocercus minimus* | ESA-P; BLM-S; FS-S | Inhabits sagebrush shrublands, but will sometimes occur in meadows, grasslands, and thickets adjacent to sagebrush communities. A portion of the proposed occupied critical habitat for this species is within 1 mi (1.6 km) south of Lease Tracts 6, 8, and 9. Potential proposed critical habitat intersects several lease tracts in the Slick Rock area (Lease Tracts 10, 11, 11A, 12, 15A, 16, and 16A). |
| Mexican spotted owl | *Strix occidentalis lucida* | ESA-T; CO-T | Inhabits large steep canyons with dense old-growth mixed coniferous forest. Quad-level occurrences for this species intersect Lease Tract 12. However, suitable habitat for this species does not occur on any of the lease tracts. According to the SWReGAP habitat model for the spotted owl (*S. occidentalis*), potentially suitable migratory habitat may occur on all lease tracts. |
| Northern goshawk | *Accipiter gentilis* | BLM-S; FS-S | A rare migrant and winter resident in western Colorado, the northern goshawk inhabits various forest types including coniferous, piñon-juniper, and riparian habitats. May also forage in shrubland areas. According to the SWReGAP habitat suitability model, potentially suitable year-round habitat may occur on or near all lease tracts. Although the lease tracts may provide foraging habitat, it is unlikely that the lease tracts provide any nesting habitat for this species. |

**TABLE 3.6-21  (Cont.)**

| Common Name | Scientific Name | Status[a] | Habitat and Occurrence in the ULP Project Area[c] |
|---|---|---|---|
| **Birds (Cont.)** | | | |
| Peregrine falcon | *Falco peregrinus* | BLM-S; FS-S | A summer breeding resident in western Colorado, this species occurs near cliffs and bluffs that overlook grasslands and shrublands. Breeding birds nest on cliff faces. Quad-level occurrences for this species intersect Lease Tracts 12, 22, 22A, 24, 25, and 26. Nesting is known to occur close to Paradox Valley lease tracts. According to the SWReGAP habitat model, potentially suitable summer breeding habitat could occur on or near all lease tracts. |
| Sage sparrow | *Amphispiza belli* | FS-S | Local and irregular summer resident on mesas of western Colorado. Breeds in sagebrush shrublands. Quad-level occurrences for this species intersect Lease Tracts 5, 5A, 6, 7, 8, 8A, 9, 18, 19, 19A, 20, 22, 22A, 24, and 25. According to the SWReGAP habitat model, potentially suitable summer breeding habitat could occur on or near all lease tracts. |
| Southwestern willow flycatcher | *Empidonax traillii extimus* | ESA-E; CO-E | An uncommon summer resident in western Colorado. Breeds in montane riparian thickets dominated by willow. Not known to occur in any of the lease tracts; however, potentially suitable breeding habitat could occur along the Dolores and San Miguel Rivers, which are downstream from lease tracts in Mesa, Montrose, and San Miguel Counties; the Dolores River also flows through portions of Lease Tracts 13A, 13, and 14. |
| Western yellow-billed cuckoo | *Coccyzus americanus occidentalis* | ESA-C; BLM-S; FS-S | An uncommon summer breeding resident in western Colorado. Inhabits riparian woodlands, particularly those consisting of cottonwood and willow. Not known to occur on any of the lease tracts. According to the SWReGAP habitat model, potentially suitable breeding habitat may occur along the Dolores River in southern Mesa County and northern Montrose County, downstream from the Calamity Mesa, Outlaw Mesa, and Uravan lease tracts (18, 19, 19A, 20, 24, 25, 26, and 27). Potentially suitable habitat may occur on or near other lease tracts along the Dolores and San Miguel Rivers. |
| White-faced ibis | *Plegadis chihi* | BLM-S; FS-S | A rare fall migrant in western Colorado, this species inhabits wet meadows, marshlands, and reservoir shorelines. This species is not known to occur on any of the lease tracts. According to the SWReGAP habitat model, however, potentially suitable migratory habitat could occur on or near some Slick Rock area lease tracts (13, 13A, 14, 15, and 15A). |

1

BLM_0042219

**TABLE 3.6-21  (Cont.)**

| Common Name | Scientific Name | Status[a] | Habitat and Occurrence in the ULP Project Area[c] |
|---|---|---|---|
| **Mammals** | | | |
| Big free-tailed bat | *Nyctinomops macrotis* | BLM-S; FS-S | Forages primarily on moths in a variety of habitats, including montane forests and shrublands. Roosts in crevices on cliff faces or in buildings. Known to occur at Lease Tracts 8 and 13. According to the SWReGAP habitat model, potentially suitable year-round habitat intersects all lease tracts. |
| Black-footed ferret | *Mustela nigripes* | ESA-E; ESA-XN; CO-E | Believed to be extirpated from the state of Colorado since the 1950s. Experimental populations were reintroduced to the northwestern portion of Colorado beginning in 2001. Historically, it inhabited prairies and semiarid shrublands, where it preyed on prairie dogs. According to the SWReGAP habitat model, potentially suitable habitat does not occur near any lease tracts; however, this species could occur on or near some lease tracts that support prairie dog towns. |
| Fringed myotis | *Myotis thysanodes* | BLM-S | A snag-dependent bat species that occurs in a wide variety of forest types including ponderosa pine, oak, and piñon-juniper. Also forages in grasslands and shrublands. Roosts in snags and rock crevices. Known to occur at Lease Tracts 14, 23, 26, and 27. According to the SWReGAP habitat model, potentially suitable year-round habitat intersects all lease tracts. |
| Gunnison's prairie dog | *Cynomys gunnisoni* | ESA-C; BLM-S; FS-S | In Colorado, this species is restricted to the southwestern and south-central portion of the state. Inhabits grasslands and semiarid shrublands. According to CPW, this species is known to occur in at least one lease tract and suitable habitat may occur in several other lease tracts in Montrose and San Miguel Counties. The overall range for this species intersects several Paradox and Uravan lease tracts. |
| Desert bighorn sheep | *Ovis canadensis nelsoni* | BLM-S; FS-S | Inhabits visually open, steep, rocky terrain in mountainous habitats of the southwestern United States. Rarely uses valleys and lowlands, except as travel corridors between mountain ranges. Known to occur in Lease Tracts 9, 13, 13A, 14, and 15. According to the SWReGAP habitat suitability model, however, potentially suitable habitat for this species could occur on or near all lease tracts. Winter concentration areas occur on or near lease tracts in the Slick Rock area (10, 11, 11A, 12, 13, 13A, 14, 15, 15A, 16, and 16A). |

BLM_0042220

**TABLE 3.6-21 (Cont.)**

| Common Name | Scientific Name | Status[a] | Habitat and Occurrence in the ULP Project Area[c] |
|---|---|---|---|
| **Mammals (Cont.)** | | | |
| Northern river otter | *Lutra canadensis* | CO-T | Occupies riparian and riverine habitats where permanent water is available. Feeds primarily on fish and crustaceans. Known to occur in the Dolores River, which flows through portions of Lease Tracts 13A, 13, and 14. |
| Spotted bat | *Euderma maculatum* | BLM-S; FS-S | Occurs near forests and shrubland habitats. Uses caves and rock crevices for day roosting and winter hibernation. Known to occur at Lease Tract 27. According to the SWReGAP habitat model, potentially suitable year-round habitat could occur on or near all lease tracts. |
| Townsend's big-eared bat | *Corynorhinus townsendii pallescens* | BLM-S; FS-S | Inhabits semiarid shrublands, piñon-juniper woodlands, and montane forests below elevations of 10,000 ft. Roosts in caves, mines, rock crevices, under bridges, or within buildings. Quad-level occurrences for this species intersect Lease Tracts 10, 11, 12, 16, 16A, 19, 19A, 20, 24, 26, and 27. Known to occur at Lease Tracts 8, 12, 13, 13A, 14, 15, 16, 23, 26, and 27. According to the SWReGAP habitat model, potentially suitable year-round habitat for this species could occur on or near all lease tracts. |
| White-tailed prairie dog | *Cynomys leucurus* | BLM-S; FS-S | In Colorado, this species is known from the northwestern and west-central portion of the state. Inhabits open shrublands, semidesert grasslands, and mountain valleys. Not known to occur near any of the lease tracts. According to the SWReGAP habitat model, however, potentially suitable year-round habitat could occur on or near the Gateway and Uravan lease tracts (18, 19, 19A, 24, 25, 26, and 27). |

[a]  BLM-S = listed as sensitive by the BLM; CO-E = listed as endangered by the state of Colorado; CO-T = listed as threatened by the state of Colorado; ESA-C = candidate for listing under the ESA; ESA-E = listed as endangered under the ESA; ESA-T = listed as threatened under the ESA; ESA-XN = experimental, nonessential population under the ESA; FS-S = listed as sensitive by the USFS.

[b]  The potential to occur on or near ULP lease tracts is based on the known or potential distribution and availability of suitable habitat in the vicinity of the ULP lease tracts. Sources that were considered included USFWS (2011a,b), CNHP (2011a,b), CPW (2011a), CPW (2012a), and USGS (2007). If potential for occurrence exists, a site-specific survey will be conducted prior to any ground-disturbing activity.

[c]  The availability of potentially suitable habitat was determined by using SWReGAP habitat suitability models (USGS 2007). Quad-level occurrences were obtained from CNHP (2011b). Habitat and natural history information was obtained from NatureServe (2011), CNHP (2011a), and CPW (2011a).

1 • *Candidate:* Species for which the USFWS has sufficient information on its
2 biological status and threats that it could propose the species as threatened or
3 endangered under the ESA, but for which development of a proposed listing
4 regulation is precluded by other higher priority listing actions.
5
6 • *Critical habitat:* Critical habitat for a listed species consists of
7
8 – Specific areas within the geographical area occupied by the species at the
9 time it is listed in accordance with the provisions of Section 4 of the ESA,
10 on which are found those physical or biological features (constituent
11 elements) (a) that are essential to the conservation of the species and
12 (b) that may require special management considerations or protection; and
13 – Specific areas outside the geographical area occupied by the species at the
14 time it is listed in accordance with the provisions of Section 4 of the ESA,
15 upon a determination by the Secretary of the Interior that such areas are
16 essential for the conservation of the species.
17
18 Designated critical habitats are described in 50 CFR Parts 17 and 226.
19
20 These 10 ESA-listed, proposed, and candidate species are listed in Table 3.6-22 and are
21 further discussed below. For these species, programmatic consultation with the USFWS was
22 required to comply with Section 7 of the ESA. The final consultation documents (Biological
23 Assessment [BA] and Biological Opinion [BO]) are provided in Appendix E. Additional
24 information on the status, ecology, and natural history of these species is also provided in the BA
25 in Appendix E. Additional lease-specific consultation with the USFWS may be required prior to
26 the approval of project development and subsequent ground-disturbing activities.
27
28 There are no plants or invertebrates listed under the ESA that could occur in the vicinity
29 of the ULP lease tracts. The Federally threatened Colorado hookless cactus (*Sclerocactus
30 glaucus*) may occur in Mesa and Montrose Counties; however, this species and its habitat do not
31 occur near any of the ULP lease tracts (Holsinger 2012). The uncompahgre fritillary butterfly
32 (*Boloria acrocnema*) is a Federally endangered butterfly that is known to occur in alpine (above
33 12,000 ft [3,658 m]) habitats in San Miguel County. However, none of these habitats occur in the
34 vicinity of any of the ULP lease tracts.
35
36
37 **3.6.4.1.1 Fish.** There are four ESA-listed species of fish that may have suitable habitat
38 occurring on or near the ULP lease tracts: the bonytail chub; Colorado pikeminnow; humpback
39 chub; and razorback sucker. Collectively, these fish species are referred to as the Colorado River
40 endangered fishes. Each of these fish species historically inhabited tributaries of the Colorado
41 River system, including portions of the Dolores and San Miguel Rivers in the ULP project
42 counties. Current populations of the Colorado River endangered fishes no longer inhabit these
43 rivers in the vicinity of the lease tracts. The last recorded observation of any of these species in
44 the Dolores River was in 1991 when four Colorado pikeminnow were captured in the lower
45 portion of the river (Valdez et al. 1992). Suitable habitat and populations may occur in the
46 Colorado River downstream from the Dolores River, which is downgradient from several lease

BLM_0042222

1
2

**TABLE 3.6-22  Species Listed, Proposed for Listing, or Candidates for Listing under the ESA That May Occur in the Vicinity of the ULP Lease Tracts**

| Common Name | Scientific Name | ESA Status | Potential ULP County Occurrence | Designated Critical Habitat (Y/N) | ULP Counties in Which Critical Habitat Occurs | Recovery Plan (Y/N) |
|---|---|---|---|---|---|---|
| *Fish* | | | | | | |
| Bonytail chub | *Gila elegans* | Endangered | Mesa, Montrose, San Miguel | Y | Mesa | Y |
| Colorado pikeminnow | *Ptychocheilus lucius* | Endangered | Mesa, Montrose, San Miguel | Y | Mesa | Y |
| Humpback chub | *Gila cypha* | Endangered | Mesa, Montrose, San Miguel | Y | Mesa | Y |
| Razorback sucker | *Xyrauchen texanus* | Endangered | Mesa, Montrose, San Miguel | Y | Mesa | Y |
| *Birds* | | | | | | |
| Gunnison sage-grouse | *Centrocercus minimus* | Proposed Endangered | Mesa, Montrose, San Miguel | N[a] | NA | N |
| Mexican spotted owl | *Strix occidentalis lucida* | Threatened | Montrose, San Miguel | Y | NA | Y |
| Southwestern willow flycatcher | *Empidonax traillii extimus* | Endangered | Mesa, Montrose, San Miguel | Y | NA | Y |
| Western yellow-billed cuckoo | *Coccyzus americanus occidentalis* | Candidate | Mesa, Montrose, San Miguel | N | NA | N |
| *Mammals[b]* | | | | | | |
| Black-footed ferret | *Mustela nigripes* | Endangered | Mesa, Montrose, San Miguel | N | NA | Y |
| Gunnison's prairie dog | *Cynomys gunnisoni* | Candidate | Montrose, San Miguel | N | NA | N |

[a]  Critical habitat for the Gunnison sage-grouse has been proposed (USFWS 2013a,b).

[b]  The Canada lynx is a Federally threatened species, and the North American wolverine is a candidate for listing under the ESA. Both of these species have the potential to occur in the project counties. However, suitable habitat for these species is not likely to occur in the vicinity of the ULP lease tracts.

Source: USFWS (2011a)

BLM_0042223

1    tracts and flows through Lease Tracts 13, 13A, and 14 (Table 3.6-21). The confluence of the
2    Colorado River and the Dolores River is in northeastern Utah, approximately 35 river miles
3    (56 km) downstream from the nearest ULP lease tract (26). The confluence between the
4    Colorado River and the Dolores River is approximately 56 river miles (90 km) downstream from
5    the confluence of the Dolores and San Miguel Rivers (Figure 3.6-14). Designated critical habitat
6    for the Colorado River endangered fishes also occurs in the Colorado River in Mesa County,
7    downstream from the Dolores River (Table 3.6-22). The location of the ULP lease tracts relative
8    to designated critical habitat for the Colorado River endangered fishes is shown in Figure 3.6-14.
9
10       The bonytail chub was listed as an endangered species under the ESA on April 23, 1980.
11   Critical habitat for this species was designated within 310 mi (500 km) of the Colorado River
12   basin on March 21, 1994. Designated critical habitat spans five states and includes portions of
13   the Colorado, Green, and Yampa Rivers in the Upper Basin of the Colorado River. Currently,
14   there are no self-sustaining populations of bonytail chub in the wild; only a small number of
15   adults exist in the wild in the Green River and upper Colorado River. Hatchery-reared adults
16   have been released into these rivers, but results indicate a low survival rate and no reproduction
17   or recruitment (USFWS 2002a).
18
19       The Colorado pikeminnow was listed as an endangered species under the ESA on
20   March 11, 1967. Critical habitat for this species was designated within 1,100 mi (1,850 km) of
21   the Colorado River basin on March 21, 1994. Designated critical habitat spans three states and
22   includes portions of the Colorado, Green, Yampa, White, and San Juan Rivers in the Upper
23   Basin of the Colorado River. Currently, three wild reproducing populations of Colorado
24   pikeminnow occur in the Green River, San Juan River, and upper Colorado River subbasins
25   (USFWS 2002b).
26
27       The humpback chub was listed as an endangered species under the ESA on
28   March 11, 1967. Critical habitat for this species was designated within 380 mi (610 km) of the
29   Colorado River basin on September 19, 1990. Designated critical habitat spans three states and
30   includes portions of the Colorado, Green, and Yampa Rivers in the Upper Basin of the Colorado
31   River. The humpback chub is presently restricted to remote white water canyons. It is known to
32   occur in the upper Colorado River (USFWS 1990).
33
34       The razorback sucker was listed as an endangered species under the ESA on October 23,
35   1991. Critical habitat for this species was designated within 1,700 mi (2,800 km) of the Colorado
36   River basin on March 21, 1994. The critical habitat spans six states and includes portions of the
37   Colorado, Duchesne, Green, Gunnison, San Juan, White, and Yampa Rivers in the Upper Basin
38   of the Colorado River. Currently, the razorback sucker inhabits only about 25% of its historic
39   range in the upper Colorado River basin (USFWS 2002c). In the upper basin of the Colorado
40   River, the species is found in small numbers in the Green River, upper Colorado River, and
41   San Juan River.
42
43
44       **3.6.4.1.2 Birds.** There are four ESA-listed or candidate species of birds that could occur
45   on the ULP lease tracts or may have suitable habitat occurring on or near the ULP lease tracts:

BLM_0042224

Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 26 of 375



1

2   **FIGURE 3.6-14  Locations of Designated Critical Habitat for the Colorado River Endangered**
3   **Fishes in the Vicinity of the ULP Lease Tracts (USFWS 2011b)**

BLM_0042225

<br>

1    the Gunnison sage-grouse; Mexican spotted owl; southwestern willow flycatcher; and western
2    yellow-billed cuckoo (Table 3.6-22). These species are discussed individually here.
3
4         The Gunnison sage-grouse is a species proposed for listing as endangered under the ESA
5    (USFWS 2013a). This species occurs in sagebrush-dominated habitats in southwestern Colorado,
6    northwestern New Mexico, northeastern Arizona, and southeastern Utah. This species is known
7    to occur in Mesa, Montrose, and San Miguel Counties. Critical habitat for this species has been
8    proposed in portions of western Colorado and eastern Utah (USFWS 2013b; Figure 3.6-15). The
9    proposed critical habitat has been categorized as occupied, potential, or vacant/unknown critical
10   habitat[18]. Although the species is not known to occur on any of the ULP lease tracts, a portion of
11   the potential proposed critical habitat intersects several lease tracts in the Slick Rock area (Lease
12   Tracts 10, 11, 11A, 12, 15A, 16, and 16A). No occupied or vacant/unknown proposed critical
13   habitat intersects any of the ULP lease tracts. Occupied proposed critical habitat occurs within
14   1 mi (1.6 km) south of lease tracts in the Paradox area (Lease Tracts 6, 8, and 9) (Table 3.6-21;
15   Figure 3.6-15).
16
17        The Mexican spotted owl was listed as a threatened species under the ESA on March 16,
18   1993. Critical habitat for this species was designated by the USFWS on June 6, 1995 (revised on
19   February 1, 2001, and August 31, 2004). However, critical habitat for this species does not occur
20   in the vicinity of any of the lease tracts. The Mexican spotted owl is known to occur in Montrose
21   and San Miguel Counties, where it is considered to be a rare transient. However, recent surveys
22   by the BLM and USFWS in these counties have not detected this species. The Mexican spotted
23   owl inhabits steep canyons with dense old-growth coniferous forests. It is not known to occur on
24   any of the lease tracts, but, according to the CNHP (2011b), quad-level occurrences for this
25   species intersect Lease Tract 12 in southern San Miguel County. Suitable old growth forests and
26   canyonlands do not occur on any of the lease tracts. According to the SWReGAP habitat
27   suitability model, potentially suitable nonbreeding migratory habitat intersects and occurs in the
28   vicinity of all lease tracts (Table 3.6-21; Figure 3.6-16).
29
30        The southwestern willow flycatcher was listed as an endangered species under the ESA
31   on March 29, 1995. Critical habitat for this species was designated by the USFWS on July 22,
32   1997 (revised on October 19, 2005). However, critical habitat for this species does not occur in
33   the vicinity of any of the lease tracts. The southwestern willow flycatcher is known to occur in
34   San Miguel County, where it is an uncommon summer breeding resident. It nests in thickets,
35   scrubby and brushy areas, open second growth, and riparian woodlands. This species is not
36   known to occur in the vicinity of any of the lease tracts; however, according to the SWReGAP
37   habitat suitability model for the species, potentially suitable summer nesting habitat may occur
38   along the Dolores and San Miguel Rivers as well as their tributaries in Mesa, Montrose, and
39   San Miguel Counties. These potentially suitable habitat areas occur downslope from and in the
40

---

[18] From USFWS 2013b, occupied proposed critical habitat refers to the geographic area occupied by the species at
the time of the proposed listing. Potential proposed critical habitat is defined as "unoccupied habitats that could
be suitable for occupation of sage grouse if practical restoration were applied." The vacant/unknown potential
critical habitat category is defined as "suitable habitat for sage grouse that is separated (not contiguous) from
occupied habitats that either (1) has not been adequately inventoried, or (2) has not had documentation of grouse
presence in the past 10 years."

BLM_0042226



1

2  **FIGURE 3.6-15  Distribution of Proposed Critical Habitat for the Gunnison Sage-Grouse in the**
3  **Vicinity of the ULP Lease Tracts (USFWS 2013b)**

BLM_0042227



FIGURE 3.6-16  Recorded Occurrences and Distribution of Potentially Suitable Habitat for the
Mexican Spotted Owl in the Vicinity of the ULP Lease Tracts (CNHP 2011b; USGS 2007)

BLM_0042228

1 vicinity of all lease tracts; they also intersect lease tracts in the Slick Rock area (13, 13A, and 14)
2 along the Dolores River (Table 3.6-21; Figure 3.6-17).
3
4          The western yellow-billed cuckoo is considered by the USFWS as a "distinct population
5 segment" (DPS) (subspecies *occidentalis*) of the yellow-billed cuckoo. This species became a
6 candidate for listing under the ESA on October 30, 2001. It inhabits deciduous riparian
7 woodlands, particularly cottonwood and willow. The western yellow-billed cuckoo is known to
8 occur in Mesa and Montrose Counties, where it is an uncommon summer breeding resident. This
9 species is not known to occur in the vicinity of any of the lease tracts; however, according to the
10 SWReGAP habitat suitability model for the species, potentially suitable summer nesting habitat
11 may occur along the Dolores River in southern Mesa and northern Montrose Counties. These
12 potentially suitable habitat areas do not intersect any of the lease tracts, but they do occur
13 downslope from and in the vicinity of Calamity Mesa, Outlaw Mesa, and Uravan lease tracts
14 (Table 3.6-21; Figure 3.6-18).
15
16
17          **3.6.4.1.3  Mammals.** There are two ESA-listed or candidate species of mammals that
18 could occur on the ULP lease tracts or may have suitable habitat occurring on or near the ULP
19 lease tracts: the black-footed ferret and the Gunnison's prairie dog (Table 3.6-21). Suitable
20 habitat for the Canada lynx may occur in the three project counties. However, given the strict
21 habitat requirements for this species (high-elevation coniferous forests), suitable habitat for this
22 species is not expected to occur near any of the ULP lease tracts (Figure 3.6-18).
23
24          The black-footed ferret was listed as an endangered species under the ESA on March 11,
25 1967. It is the only ferret species native to North America. Black-footed ferrets historically
26 occurred in western Colorado, but it is believed it has been extirpated from the state since the
27 1950s. Experimental, nonessential populations have been established in the northwestern portion
28 of Colorado as well as elsewhere throughout its historic range. This species inhabits prairies and
29 semiarid shrublands where it preys upon prairie dogs. Black-footed ferrets are not known to
30 occur in the vicinity of any of the lease tracts, and the SWReGAP model for the species indicates
31 that no suitable habitat for the species occurs in the vicinity of the lease tracts. However, the
32 species may occur on or near some of the lease tracts that support prairie dog towns
33 (Table 3.6-21). The lease tracts have not been surveyed for prairie dog towns that might meet
34 criteria for ferret habitat. Critical habitat for this species has not been designated.
35
36          The Gunnison's prairie dog became a candidate for listing under the ESA on February 5,
37 2008. It inhabits mountain valleys, plateaus, and open brush habitats at elevations between
38 6,000 and 12,000 ft (1,800 and 3,700 m). This species is known to occur in Montrose and Mesa
39 Counties as a year-round resident and to occur in at least one ULP lease tract. According to
40 information provided by CPW, the overall range for the Gunnison's prairie dog intersects several
41 Paradox and Uravan lease tracts (Table 3.6-21; Figure 3.6-19).
42
43

BLM_0042229



1

2  FIGURE 3.6-17  Distribution of Potentially Suitable Habitat for the Southwestern Willow
3  Flycatcher in the Vicinity of the ULP Lease Tracts (USGS 2007)

BLM_0042230



1

2   **FIGURE 3.6-18  Distribution of Potentially Suitable Habitat for the Western Yellow-Billed Cuckoo**
3   **and Canada Lynx in the Vicinity of the ULP Lease Tracts (USGS 2007)**

BLM_0042231



1

FIGURE 3.6-19  Distribution of Potentially Suitable Habitat for the Gunnison's Prairie Dog in
the Vicinity of the ULP Lease Tracts (USGS 2007)

BLM_0042232

### 3.6.4.2  Sensitive and State-Listed Species

In addition to species listed under the ESA, several sensitive species may occur in the vicinity of the ULP lease tracts. For this assessment, these species include those that are designated as sensitive by the BLM and USFS, as well as those listed as threatened or endangered by the State of Colorado.

The BLM has established a policy, as specified in BLM Manual 6840, *Special Status Species Management* (BLM 2008a), that is designed "to provide policy and guidance for the conservation of BLM special status species and the ecosystems upon which they depend on BLM-administered lands." BLM special status species are identified in that manual as "(1) species listed or proposed for listing under the ESA, and (2) species requiring special management consideration to promote their conservation and reduce the likelihood and need for future listing under the ESA, which are designated as Bureau sensitive by the State Director(s). All Federal candidate species, proposed species, and delisted species in the 5 years following delisting will be conserved as Bureau sensitive species." In addition, each BLM state director maintains a list of sensitive species, and impacts on these species would have to be considered in project-specific assessments developed before any activity that would affect them or their critical habitat could be approved.

The USFS has identified species considered sensitive under USFS Manual 2670 (USFS 2005). Many of these species are also listed as sensitive by the BLM.

The State of Colorado has also identified species that are threatened or endangered with extinction from the state under the Colorado Revised Statute 33-2-101. Many state-listed species are also listed as BLM sensitive species or USFS sensitive species, and some are also listed under the ESA. In cooperation with the USFWS, states are required to monitor, for no less than 5 years, the status of all species that have recovered to a point at which they are no longer listed as threatened or endangered (e.g., bald eagle).

By definition, all the species listed in Table 3.6-21 are considered to be sensitive species, including the 10 species listed or candidates for listing under the ESA (Section 3.6.4.1). Of the sensitive species that may occur on or near the ULP lease tracts, 41 are designated as sensitive by the BLM, 20 are designated as sensitive by the USFS, and 10 are listed as threatened or endangered by the State of Colorado. A summary of sensitive species by taxonomic group is provided in Table 3.6-23. Many of these species are protected under one or more regulatory statute (e.g., Bald and Golden Eagle Protection Act, Migratory Bird Treaty Act), and some are listed under the ESA. A discussion of these species by listing status is provided below.

**3.6.4.2.1  BLM Sensitive Species.** A total of 41 species are designated as sensitive by the Colorado BLM state office that have the potential to occur on or in the vicinity of the ULP lease tracts. The ecology, habitat requirements, and potential distribution of each of these species in the vicinity of the ULP lease tracts are provided in Table 3.6-21. Of these BLM-designated sensitive species, there are 16 plants, 1 invertebrate, 3 fish, 3 amphibians, 2 reptiles, 9 birds, and

BLM_0042233

**TABLE 3.6-23  Number of Sensitive Species That May Occur on or near ULP Lease Tracts**

| Taxonomic Group | Number of Sensitive Species[a] |
|---|---|
| Plants | 17 |
| Insects | 1 |
| Fish | 7 |
| Amphibians | 4 |
| Reptiles | 2 |
| Birds | 12 |
| Mammals | 8 |

[a] Sensitive species are those that have been designated as sensitive by the BLM or USFS, as well as those species listed as threatened or endangered by the State of Colorado under *Colorado Revised Statutes* 33-2-101. Note: Sensitive species may also be listed under the ESA.

7 mammals. Some of the BLM-designated sensitive species are previously listed or considered for listing under the ESA.

Most of the BLM-designated sensitive plant species have the potential to inhabit desert shrublands or piñon-juniper forests in one or more of the ULP counties (Mesa, Montrose, or San Miguel). Shrublands and piñon-juniper forests either dominate or have the potential to occur on every ULP lease tract. These BLM-designated sensitive plant species also occur at elevation ranges that generally coincide with the elevation ranges for one or more of the ULP lease tracts.

The single BLM-designated sensitive invertebrate species –the Great Basin silverspot butterfly (*Speyeria nokomis nokomis*)—inhabits streamside meadows and other riparian areas in western Colorado. It is not known to occur in the vicinity of the ULP lease tracts, but suitable habitat could occur on each of the lease tracts in each of the ULP counties.

The three BLM-designated sensitive fish species (bluehead sucker, flannelmouth sucker, and roundtail chub) could occur in the project area in the Dolores and San Miguel Rivers. The Dolores River intersects Lease Tracts 13A, 13, and 14. Suitable habitat may also occur downgradient and in the vicinity of several other lease tracts. All three species are experiencing variable or declining population trends in the Dolores River. Two of these species (bluehead sucker and roundtail chub) may be extirpated from upstream reaches near McPhee Reservoir (Bestgen et al. 2011).

BLM_0042234

Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 36 of 375

1   The three BLM-designated sensitive amphibian species are generally associated with
2   montane riparian areas that occur in one or more of the project counties. These species also occur
3   at elevation ranges that generally coincide with the elevation ranges for one or more of the ULP
4   lease tracts. According to the SWReGAP habitat suitability models, suitable habitat for these
5   species could occur on or in the vicinity of several lease tracts.
6
7   The two BLM-designated sensitive reptile species are generally associated with montane
8   shrublands and slopes. Quad-level occurrences for both of these species intersect at least one
9   ULP lease tract. According to the SWReGAP habitat suitability models, suitable habitat for these
10  species could occur on or in the vicinity of several lease tracts.
11
12  Several BLM-designated sensitive bird species could occur in the ULP project area.
13  These species occur as summer breeding residents, winter residents (including transients and
14  migrants), or year-round residents. According to records provided by the CNHP and SWReGAP
15  habitat suitability models, these species are either known to occur or may have suitable habitat in
16  one or more of the ULP lease tracts. The summer breeding residents include species such as
17  Brewer's sparrow (*Spizella breweri*) and peregrine falcon (*Falco peregrinus*). Nesting habitat for
18  these species may occur on or in the vicinity of several lease tracts (Table 3.6-21). Winter
19  residents include species such as the bald eagle (*Haliaeetus leucocephalus*), ferruginous hawk
20  (*Buteo regalis*), and northern goshawk (*Accipiter gentilis*). Some of these species are known to
21  occur in the vicinity of several lease tracts. According to the SWReGAP habitat suitability
22  models, potentially suitable winter foraging habitat for these species may occur on or in the
23  vicinity of several lease tracts. Year-round permanent residents in the ULP project area include
24  species such as the burrowing owl (*Athene cunicularia*). This species inhabits grasslands and
25  shrublands, preying upon prairie dogs and inhabiting their burrows. Occurrences and potentially
26  suitable habitat for this species are known from the vicinity of several lease tracts.
27
28  Most of the BLM-designated sensitive mammal species are bat species. There are
29  four bat species that are BLM-designated sensitive that could occur on or in the vicinity of the
30  ULP lease tracts. Some of these bat species have been documented to occur in the vicinity of the
31  ULP lease tracts (e.g., fringed myotis [*Myotis thysanodes*]). Bat species in the project area may
32  forage in riparian areas, shrublands, and piñon-juniper woodlands. One or more of these habitat
33  types could occur on each of the ULP lease tracts. Bats in the region roost in rock crevices,
34  caves, mines, and trees. These potential roost sites also occur on or in the vicinity of each of the
35  ULP lease tracts. According to records provided by Colorado Parks and Wildlife, various species
36  of bats (including sensitive species) have been documented to roost in the mines on Lease
37  Tracts 8, 12, 13, 13A, 14, 15, 16, 23, 26, and 27 (CPW 2012a). For all these bat species,
38  SWReGAP habitat suitability models indicate the presence of potentially suitable habitat in the
39  vicinity of one or more lease tracts (Table 3.6-21).
40
41  Other BLM-designated sensitive mammal species that could occur in the project area
42  include desert bighorn sheep (*Ovis canadensis nelsoni*) and white-tailed prairie dog (*Cynomys
43  leucurus*). According to SWReGAP habitat suitability models, potentially suitable habitat for
44  each of these species may occur on or in the vicinity of several lease tracts. According to
45  information provided by CPW (2012b), desert bighorn sheep are known to occur in 5 lease tracts

BLM_0042235

1  (Lease Tracts 9, 13, 13A, 14, and 15); they may also occur in winter concentration areas near
2  11 lease tracts (Lease Tracts 10, 11, 11A, 12, 13, 13A, 14, 15, 15A, 16, and 16A).
3
4
5     **3.6.4.2.2  USFS Service Sensitive Species.** A total of 20 species designated as sensitive
6  by the USFS that have the potential to occur on or in the vicinity of the ULP lease tracts. The
7  ecology, habitat requirements, and potential distribution of each of these species in the vicinity of
8  the ULP lease tracts are provided in Table 3.6-21. Of these sensitive species, there are two
9  plants, three fish, one amphibian, eight birds, and six mammals. Most of the USFS sensitive
10  species are previously listed or considered for listing under the ESA or are BLM-designated
11  sensitive species. The only UFSF-designated sensitive species that are not previously discussed
12  include Wetherill's milkvetch (*Astragalus wetherillii*) and sage sparrow (*Amphisppiza belli*). The
13  Wetherill's milkvetch inhabits slopes and cliffs and is known to occur in the vicinity of lease
14  tracts 5, 5A, 6, and 7. The sage sparrow is a summer breeding resident that nests in sagebrush
15  shrublands. Potentially suitable habitat for this species could occur on or near all lease tracts.
16
17
18     **3.6.4.2.3  State-Listed Species.** A total of 10 species listed as threatened or endangered
19  by the State of Colorado have the potential to occur on or in the vicinity of the ULP lease tracts.
20  The ecology, habitat requirements, and potential distribution of each of these species in the
21  vicinity of the ULP lease tracts are provided in Table 3.6-21. Of these species, there are four fish,
22  one amphibian, three birds, and two mammals. Most of these species are previously listed or
23  considered for listing under the ESA, or are BLM- or USFS-designated sensitive species. The
24  only state-listed species not previously discussed are the boreal toad (*Bufo boreas*) and northern
25  river otter (*Lutra canadensis*). The boreal toad typically inhabits montane riparian and aquatic
26  habitats at elevations between 8,500 and 11,500 ft (2,570 and 3,500 m). Although suitable
27  habitat for this species is not likely to occur on any of the lease tracts, potentially suitable habitat
28  may occur in the vicinity of lease tracts 19, 26, and 27. The northern river otter inhabits riverine
29  systems where permanent water is present. It is known to occur in the Dolores River, which
30  flows through Lease Tracts 13, 13A, and 14.
31
32
33  **3.7  LAND USE**
34
35     The ULP lease tracts are located on public land administered by the BLM. The BLM
36  manages its lands within a framework of numerous laws, the most comprehensive of which is the
37  FLPMA. The FLPMA established the "multiple use" management framework for public lands so
38  that "public lands and their various resource values … are utilized in the combination that will
39  best meet the present and future needs of the American people" (from Section 103(a) of
40  FLPMA). The FLPMA ensures that no predominant or single use overrides the multiple-use
41  concept of any of the lands managed by the BLM. BLM-administered lands (and resources) are
42  used for domestic livestock grazing; fish and wildlife development and utilization; mineral
43  exploration, development and production; ROWs; outdoor recreation; and timber production.
44
45     Beginning in 1948, lands within the Uravan Mineral Belt in southwestern Colorado
46  (including the subject 31 lease tracts) were withdrawn from mineral entry under Public Land

BLM_0042236

1 Order 459 (and others) to reserve them for the exploration and development of uranium and
2 vanadium resources. These lands are currently managed under the ULP. Under the ULP, DOE
3 maintains jurisdiction and authority over all mining-related activities on the lease tracts
4 (exploration, development, mining, and transportation); the BLM maintains jurisdiction over all
5 other surface uses. During the term of the land withdrawal, the lands cannot be appropriated,
6 sold, or exchanged, and new mining claims cannot be filed. However, the lands remain open to
7 mineral leasing (e.g., oil and gas) and the mineral material laws. They also remain open to ROW
8 authorizations (for pipelines, transmission lines, and roads).
9
10
11 **3.7.1 Specially Designated Areas and Lands with Wilderness Characteristics**
12
13 Most of the lands surrounding the lease tracts are administered by the BLM
14 (Figure 3.7-1). Some of these lands are components of the BLM's National Landscape
15 Conservation System (NLCS), which includes more than 886 Federally recognized areas and
16 about 27 million acres (11 million ha) of specially designated areas, mainly in the western
17 United States. The purpose of the NLCS is to "conserve, protect, and restore nationally
18 significant landscapes with outstanding cultural, ecological, and scientific values for the benefit
19 of current and future generations" (BLM 2011g). Specially designated areas are those areas
20 designated by an E.O., by an Act of Congress, or by the BLM through its land use planning
21 process, as being deemed to possess unique or important resource values. Examples include
22 ACECs, SRMAs, and WSAs. Table 3.7-1 lists the types of specially designated areas and their
23 acreages (or mileage) within 25 mi (40 km) of the lease tracts; lands managed by the USFS are
24 also listed.
25
26 The BLM also has inventories of Lands with Wilderness Characteristics (LWCs) within
27 25 mi (40 km) of the ULP lease tracts. These lands are defined by BLM as (1) being of sufficient
28 size (generally more than 5,000 acres [2,000 ha] of roadless, contiguous BLM lands, excluding
29 State or private lands), (2) being natural, (3) having outstanding opportunities for solitude or
30 primitive and unconfined recreation, and (4) having supplemental values, such as ecological,
31 geological, or other features of scientific, educational, scenic, or historical value (BLM 2012d,e).
32 Table 3.7-2 lists and describes the LWCs near the ULP lease tracts; Figure 3.7-2 shows their
33 locations.
34
35 Several river segments within the region have been determined by BLM to be eligible for
36 inclusion in the National Wild and Scenic Rivers (WSR) System (Figure 3.7-3). WSR
37 designation preserves and protects the free-flowing condition, water quality, and outstanding
38 remarkable values (ORVs) of selected rivers or river segments and provides legal protections
39 from development. Table 3.7-3 lists the river segments eligible for WSR designation within
40 25 mi (40 km) of the lease tracts based on BLM's WSR eligibility reports for the Uncompahgre,
41 Grand Junction, and Tres Rios Field Office or Planning Area (BLM 2010e, 2009d; USFS and
42 BLM 2013). These include several segments and tributaries of the San Miguel and Dolores
43 Rivers.
44

BLM_0042237



1

2    **FIGURE 3.7-1  Specially Designated Areas on Public Lands near the ULP Lease Tracts**

BLM_0042238

1     **TABLE 3.7-1  Specially Designated Areas on Public Lands within 25 mi (40 km) of the ULP Lease**
2     **Tracts**

| Name | Acreage | Name | Acreage |
|---|---|---|---|
| *Areas of Critical Environmental Concern* | | *U.S. Forest Service Lands* | |
| 12-Ec | 1,441 | Grand Mesa, Uncompahgre, and | 411,767 |
| Alkali Ridge | 1,713 | Gunnison National Forests | |
| Gunnison Gravels RNA[a] | 40 | Manti-Lasal National Forest | 176,752 |
| Rough Canyon RNA | 79 | San Juan National Forest | 121,532 |
| San Miguel | 2,959 | | |
| The Palisade ONA[a] | 23,648 | *Wilderness Study Areas* | |
| Unaweep Seep RNA | 78 | Cahone Canyon | 9,153 |
| | | Dolores River Canyon | 29,166 |
| *BLM Wilderness Areas* | | Dominguez | 39,903 |
| Dominguez Canyons Wilderness Area | 37,530 | McKenna Peak | 19,337 |
| Tabeguache Wilderness | 8,1860 | Sewemup | 19,637 |
| | | Squaw/Papoose Canyon | 2,460 |
| *Colorado State Park* | | The Palisade | 26,656 |
| Lone Mesa State Park | 1,689 | Westwater Canyon | 1,398 |

| Name | Mileage |
|---|---|

| Name | Acreage | Name | Mileage |
|---|---|---|---|
| *National Monument* | | *National Historic Trails* | |
| Canyons of the Ancients | 15,944 | High Potential Old Spanish Trail | 17 |
| | | Old Spanish Trail | 173 |
| *National Park Service Land* | | | |
| Colorado National Monument | 14 | *Scenic Byways* | |
| | | Dinosaur Diamond Prehistoric | 0.3 |
| *National Register of Historic Places Sites* | | Highway (Colorado) | |
| Coates Creek Schoolhouse | 1 | Dinosaur Diamond Prehistory | 0.3 |
| Dolores River Bridge | 1 | Highway (Utah) | |
| Frederick Isaac and Mary M. Jones | 1 | Indian Creek Corridor Scenic Byway | 11 |
| House | | Trail of the Ancients (Colorado) | 11 |
| Hanging Flume | 4 | Trail of the Ancients (Utah) | |
| Hyland Hotel | 1 | Unaweep/Tabeguache Scenic | 108 |
| Pinhook Battleground | 8 | and Historic Byway | |
| | | Upper Colorado River Scenic | 0.3 |
| *Special Recreation Management Areas* | | Byway (U-128)[b] | |
| Bangs Canyon | 23,579 | | |
| Cameo Cliffs | 9,941 | | |
| Canyon Rims | 274 | | |
| Colorado Riverway | 30,056 | | |
| San Miguel River | TBP | | |
| Dolores River | 65,270 | | |
| Dolores River Canyon | 31,670 | | |
| Indian Creek | 566 | | |
| Two Rivers | 3,788 | | |

[a]  RNA = Research Natural Area; ONA = Outstanding Natural Area.

[b]  U = Utah.

3

BLM_0042239

1    **TABLE 3.7-2  Lands with Wilderness Characteristics within 25 mi (40 km) of the ULP Lease**
2    **Tracts**

| Name | Planning Area | Acreage | Description |
|------|---------------|---------|-------------|
| Dolores River Canyon WSA Addition | Uncompahgre | 3,750 | Adjacent to the Dolores River Canyon WSA, with no recreation facilities. The unit does not possess outstanding opportunities for solitude; no supplemental values noted. |
| Roc Creek | Uncompahgre | 7,650 | Near but not contiguous with Sewemup Mesa WSA. Accessible only by foot or on horse; no recreational facilities. |
| Shavano Creek | Uncompahgre | 6,090 | Immediately north of the Tabeguache Area (separated by Montrose County Road V24 and therefore not adjacent). |
| CO-030-290-h | Tres Rios | 3,115 | Centered around the Coyote Wash drainage, west of the Dolores River WSA and east of the Utah/Colorado state line. Supplemental value noted for Mexican spotted owl habitat (endangered species). |
| CO-030-301-a | Tres Rios | 10,150 | Bounded on the west by private lands and spur roads near the canyon rim, Snaggletooth Road along the Dolores River on the east, and a county road on the south. Largely undeveloped, isolated canyon country. Supplemental value noted for very scenic river corridor. |
| CO-030-301-b | Tres Rios | 19,510 | Bounded on the north by Snaggletooth Road, on the west by Snaggletooth Road along the Dolores River, and on the east by roads and road spurs near the canyon rim. Largely undeveloped, isolated canyon country. Supplemental value noted for very scenic river corridor. |
| CO-030-286-b | Tres Rios | 2,635 | Bounded by wilderness inventory roads and the McKenna Peak WSA to the south and east. Supplemental value noted for wild horse herd. |
| CO-030-286-d | Tres Rios | 2,390 | Adjacent to McKenna Peak WSA. Supplemental value noted for Spring Creek wild horse herd. |
| CO-030-286-f | Tres Rios | 1,578 | Adjacent to McKenna Peak WSA. No supplemental values noted. |
| Bang's Canyon (1) | Grand Junction | 20,434 | Located in Mesa County about 6 mi (10 km) south of Grand Junction. Supplemental value noted for critically sensitive cultural resources and ecology. |

BLM_0042240

**TABLE 3.7-2 (Cont.)**

| Name | Planning Area | Acreage | Description |
|------|---------------|---------|-------------|
| Lumsden Canyon (18) | Grand Junction | 10,072 | Located in southern Mesa County, just west of the town of Gateway and Highway 141; encompasses a system of canyons which rise above the Dolores River. Unit offers geologic, scenic, and ecological supplemental values. |
| Maverick Canyon (20) | Grand Junction | 20,401 | Located in Mesa County, about 25 mi (40 km) southwest of Grand Junction. Bounded on the north by private lands and on the west by private lands and the Dolores River; east side of the unit follows the rims of various canyons. Supplemental value noted for the Juanita Arch, a natural bridge and the only one of its kind in Colorado. |
| Unaweep (30) | Grand Junction | 7,154 | Located in Mesa County, about 25 mi (40 km) southwest of Grand Junction and just northeast of Gateway. No supplemental values noted. |
| West Creek (31) | Grand Junction | 111 | Adjacent to existing Palisade WSA and the Palisade Outstanding Natural Area about 35 mi (56 km) southwest of Grand Junction. Supplemental value noted for unique hydrologic features and a rare species of butterfly. |

Sources: BLM (2011o, 2012f,g)

## 3.7.2 Agriculture

According to the 2007 agriculture census (USDA 2009a), about 845,000 acres (3,400 ha) in Colorado counties within 25 mi (40 km) of the ULP lease tracts (Mesa, Montrose, and San Miguel) are classified as farmland[19] (Table 3.7-4). Most farmland in these counties (about 58%) is permanent pasture and rangeland, with the remainder classified as cropland (29%), woodland (8.3%), and land in farmsteads, buildings, and livestock facilities (4.6%). About 67% of cropland in these counties is irrigated. While there are far fewer farms in San Miguel County than in Mesa and Montrose Counties, the average farm size in San Miguel County is four to five times larger.

About 1.6 million acres (0.65 million ha) in Utah counties within 25 mi (40 km) of the ULP lease tracts (Grand and San Juan) are classified as farmland, with most of the farmland (about 97%) occurring in San Juan County (Table 3.7-4). Most of the farmland in these counties (about 87%) is permanent pasture and rangeland, with the remainder classified as cropland

---

[19] A farm is defined by the U.S. Department of Agriculture (USDA 2009a) as any place from which agricultural products worth $1,000 or more were produced or sold during the census year.

BLM_0042241



**FIGURE 3.7-2  Land with Wilderness Characteristics near the ULP Lease Tracts**

BLM_0042242



1

2   **FIGURE 3.7-3  Wild and Scenic River Segments near the ULP Lease Tracts**

BLM_0042243

1  **TABLE 3.7-3  Eligible Wild and Scenic River Segments within 25 mi (40 km) of the ULP Lease**
2  **Tracts[a]**

| River Segment (Classification) | Ownership | | ORVs[b] |
| | River Segment (mi) | Within 0.5-mi-wide Corridor (acres) | |
| --- | --- | --- | --- |
| ***Grand Junction Planning Area*** | | | |
| *Dolores River Watershed* | | | |
| Dolores River (Recreational) | 32.01 (total), 18.62 (BLM) | NA[b] | Scenic, recreational, geological, paleontological, and fish. |
| North Fork Mesa Creek (Scenic) | 2.05 (BLM) | NA | Vegetation |
| Blue Creek (Scenic) | 11.36 (total), 10.08 (BLM) | NA | Scenic, fish, and cultural |
| *Dominguez Canyons* | | | |
| Big Dominguez Creek, Segment 1 (Wild) | 15.86 (BLM) | NA | Scenic, recreational, wildlife, geological, and cultural |
| Big Dominguez Creek – Segment 2 (Scenic) | 0.78 (BLM) | NA | Scenic, geological, wildlife, and cultural |
| Little Dominguez Creek, Segment 1 (Wild) | 13.14 (BLM) | NA | Scenic, geological, wildlife, and cultural |
| Little Dominguez Creek, Segment 2 (Scenic) | 2.45 (BLM) | NA | Scenic, geological, wildlife, and cultural |
| *Little Dolores River* | | | |
| Little Dolores River (Scenic) | 20.03 (total), 1.1 (BLM) | NA | Cultural and scientific |
| *Unaweep Canyon* | | | |
| East Creek (Recreational) | 20.26 (total), 8.96 (BLM) | NA | Geological |
| West Creek (Recreational) | 23.56 (total), 4.93 (BLM) | NA | Scenic, geological, wildlife, and vegetation |
| North Fork West Creek (Wild) | 8.46 (total), 3.31 (BLM) | NA | Scenic |

BLM_0042244

1 **TABLE 3.7-3  (Cont.)**

| River Segment (Classification) | Ownership | | ORVs[b] |
|---|---|---|---|
| | River Segment (mi) | Within 0.5 mi-wide Corridor (acres) | |
| *Unaweep Canyon (Cont.)* | | | |
| Ute Creek (Scenic) | 4.22 (total), 4.19 (BLM) | NA | Vegetation |
| ***Uncompahgre Planning Area*** | | | |
| *San Miguel Hydrologic Unit* | | | |
| Dry Creek (Wild) | 10.42 (BLM), 0.07 (State) | 2,760.4 (BLM), 80.7 (State), 2.8 (Private) | Scenic and geologic |
| Naturita Creek (Scenic) | 9.9 (BLM), 14.98 (Private) | 3,238.5 (BLM), 2.3 (USFS), 3,176.6 (Private) | Fish |
| San Miguel, River Segment 1 (Recreational) | 17.34 (BLM), 0.08 (USFS), 9.81 (Private) | 6,679.2 (BLM), 136.0 (USFS), 1628.8 (Private) | Scenic, recreational, wildlife, historic, vegetation, and paleontological |
| San Miguel, River Segment 2 (Wild) | 3.64 (BLM), 0.37 (USFS) | 1,112.0 (BLM), 122.7 (USFS), 21.3 (Private) | Scenic, recreational, wildlife, and vegetation |
| San Miguel, River Segment 3 (Scenic) | 5.30 (BLM), 2.01 (Private) | 1,880.7 (BLM), 407.6 (Private) | Recreational, fish, wildlife, and vegetation |
| San Miguel, River Segment 5 (Recreational) | 2.59 (BLM), 11.41 (Private) | 2,738.1 (BLM), 1,610.4 (Private) | Recreational, fish, historic, and vegetation |
| San Miguel, River Segment 6 (Recreational) | 2.25 (BLM), 0.98 (Private) | 808.7 (BLM), 180.7 (Private) | Recreational, fish, historic, and vegetation |
| Tabeguache Creek, Segment 1 (Wild) | 3.61 (BLM) | 1,077.0 (BLM), 6.3 (Private) | Vegetation |
| Tabeguache Creek, Segment 2 (Recreational) | 7.89 (BLM), 3.68 (Private) | 2,487.3 (BLM), 515.4 (Private) | Cultural and vegetation |

2
3

BLM_0042245

1   TABLE 3.7-3  (Cont.)

| River Segment (Classification) | Ownership | | ORVs[b] |
| | River Segment (mi) | Within 0.5 mi-wide Corridor (acres) | |
|---|---|---|---|
| *Lower Dolores Hydrological Unit* | | | |
| Lower Dolores River (Scenic) | 6.93 (BLM), 3.60 (Private) | 2,197.5 (BLM), 922.7 (Private) | Scenic, recreational, geologic, fish, and wildlife |
| North Fork Mesa Creek (Scenic) | 5.81 (BLM), 2.72 (Private) | 2,042.4 (BLM), 424.5 (Private) | Vegetation |
| *Upper Dolores Hydrological Unit* | | | |
| Dolores River, Segment 2 (Recreational) | 5.42 (BLM), 6.08 (Private) | 1,820.7 (BLM), 1,423.8 (Private) | Scenic, recreational, geologic, fish, wildlife, and vegetation |
| Ice Lake Creek, Segment 2 (Scenic) | 0.31 (BLM), 0.27 (Private) | 104.8 (BLM), 75.8 (Private) | Scenic |
| La Sal Creek, Segment 1 (Scenic) | 0.62 (BLM), 4.20 (Private) | 718.1 (BLM), 630.8 (Private) | Fish, vegetation |
| La Sal Creek, Segment 3 (Wild) | 3.37 (BLM) | 907.7 (BLM) | Scenic, recreational, fish, cultural, and vegetation |
| Lion Creek, Segment 2 (Scenic) | 1.26 (BLM), 0.31 (Private) | 401.5 (BLM), 84.7 (Private) | Vegetation |
| Spring Creek (Recreational) | 1.49 (BLM), 1.16 (Private) | 633.0 (BLM), 201.4 (Private) | Vegetation |
| ***Tres Rios–San Juan Planning Area*** | | | |
| Dolores River – McPhee to Bedrock | 109.02 | NA | Wildlife, scenic, recreational |
| Summit Canyon | 12.15 | NA | Scenic |
| Coyote Wash | 7.60 | NA | Wildlife |

[a]   River segments in the Tres Rios Planning Area are designated "suitable" for wild and scenic rivers status.

[b]   ORVs are river-related values that are unique, rare, or exemplary; these include scenic, recreational, geologic, fish, wildlife, cultural, historical, vegetation, or other similar values (such as paleontological and scientific).

Sources: BLM (2009d, 2010e); USFS and BLM (2013)

BLM_0042246

1          **TABLE 3.7-4  Number of Farms and Acreage of Agricultural Lands by County**

| Agriculture Lands | Acreage of Agricultural Lands by County | | | | |
|---|---|---|---|---|---|
| | Mesa | Montrose | San Miguel | Grand | San Juan |
| Number of farms | 1,767 | 1,045 | 123 | 90 | 758 |
| Average farm size | 211 | 307 | 1,227 | 561 | 2,041 |
| Total land in farms | 372,511 | 321,056 | 150,947 | 52,729[a] | 1,546,914 |
| Total cropland | 131,178 | 93,262 | 17,807 | 7,956 | 143,231 |
| Harvested | 47,438 | 60,094 | 6,769 | 3,623 | 48,168 |
| Pasture/grazing | 68,769 | 27,740 | 5,104 | NA[b] | 14,999 |
| Other (fallow, etc.) | 14,971 | 5,428 | 5,934 | NA | 80,064 |
| Total woodland | 30,223 | 25,698 | 15,013 | 623 | 34,606 |
| Pastured | 25,106 | 21,237 | 13,470 | NA | 20,196 |
| Not pastured | 5,117 | 4,461 | 1,543 | NA | 14,410 |
| Permanent pasture and rangeland | 197,682 | 179,935 | 115,143 | 37,109[a] | 1,360,534 |
| Land in farmsteads, buildings, livestock facilities, ponds, roads, wasteland, etc. | 13,428 | 22,161 | 2,984 | 3,012 | 8,543 |
| Pastureland, all types | 291,557 | 228,912 | 133,717 | 40,355[a] | 1,414,748 |
| Irrigated land | 64,272 | 85,656 | 12,694 | 4,712 | 5,177 |

[a]   Data for Grand County are from the 2002 census (2007 data were withheld to avoid disclosing data for individual farms).

[b]   NA = not available (2007 data were withheld to avoid disclosing data on individual farms).

2
3
4     (9.5%), woodland (2.2%), and land in farmsteads, buildings, and livestock facilities (<1%). Only
5     a small portion of cropland (6.5%) in Grand and San Juan Counties is irrigated.
6
7               There are 329,000 acres (1,300 ha) of farmland estimated to be within 25 mi (40 km) of
8     the ULP lease tracts; most of this land occurs to the southwest of the lease tracts in San Juan
9     County (Utah) and Dolores County (Colorado). There are no agricultural activities associated
10    with any of the ULP lease tracts. A few soil types within the ULP lease tracts have been
11    classified by the NRCS as prime or unique farmland, if irrigated (see Section 3.3.2).
12
13

BLM_0042247

### 3.7.3  Rangeland Resources

#### 3.7.3.1  Livestock Grazing

Domestic livestock grazing is a major and widespread use of public lands managed by the BLM. Grazing on public land is authorized either through a grazing permit or lease issued by the BLM to local ranchers. The BLM administers its grazing program in accordance with the Taylor Grazing Act of 1934; regulations governing grazing are contained in 43 CFR Part 4100. As of October 2010, the BLM had issued 1,510 grazing permits and leases in Colorado (BLM 2011h).

The lease tracts provide some forage for livestock grazing but do not support concentrated grazing. The BLM has determined that in the lease tracts, 30 to 50 acres (12 to 20 ha) of forage constitute one animal unit month (AUM). Nearly all the lease tracts are within areas designated by the BLM as livestock management areas for cattle or sheep (Hurshman 1994; USFS and BLM 2013).

#### 3.7.3.2  Wild Horses and Burros

The Wild Free-Roaming Horse and Burro Act of 1971 (16 USC 1331 *et seq.*) (the Act) gave the BLM and other Federal land management agencies the responsibility for protecting, managing, and controlling wild horses and burros. The general objectives for managing wild horses and burros are to (1) protect, maintain, and control viable, healthy herds with diverse age structures while retaining their free-roaming nature; (2) provide adequate habitat through the principles of multiple use and environmental protection; (3) maintain a thriving natural ecological balance with other resources; (4) provide opportunities for the public to view wild horses and burros; and (5) protect wild horses and burros from unauthorized capture, branding, harassment, or death.

Wild horses and burros are managed within herd management areas (HMAs), with the goal being to maintain both the natural ecological balance of public lands and the ability to support multiple herds (BLM 2011i). An HMA is usually some portion of a herd area (HA), which is an area that was wild horse or burro habitat at the time of the passage of the Act but has not been designated for long-term management of wild horses or burros. The exterior boundaries of both HAs and HMAs can include private or state lands, but the BLM has management authority over only the public lands. Herd population management is important for balancing herd numbers with forage resources and with other uses of the public and adjacent private lands.

There are four HAs in Western Colorado. These occur in Rio Blanco, Mesa, Montrose, and San Miguel Counties. There are also four HMAs, but only three coincide with the HAs: Piceance-East Douglas Creek (Rio Blanco County); Little Book Cliffs (Mesa County); and Spring Creek Basin (San Miguel County). Another HMA, Sand Wash Basin, is located in Moffat County. The HMA nearest to the lease tracts is in Spring Creek Basin, about 20 mi (32 km) to the east of the Slick Rock lease tract (on the east side of Disappointment Valley). There is an HA

BLM_0042248

that straddles the Montrose-San Miguel County line in the canyons south of Paradox Valley near the southern part of the Paradox lease tract.

### 3.7.4  Mineral Resources and Mining

Mineral resources in southwestern Colorado and southeastern Utah include uranium, vanadium, oil, natural gas, coal, and other metallic and nonmetallic minerals and mineral materials (Figure 3.7-4). These resources are discussed in the following subsections.

#### 3.7.4.1  Uranium

As of June 13, 2011, there were 32 actively permitted uranium mining projects in southwestern Colorado, none of which were producing ore (CDNR 2011). The mines and their status are shown in Table 3.7-5; 15 of the permitted projects in Colorado are in the lease tracts (in Mesa, Montrose, and San Miguel Counties). The most recent ore production occurred at three mines operated by Denison Mines (USA) Corporation in San Miguel County, which operated from 2007 to 2009. Uranium prospecting activities have declined in recent years,[20] but the CDNR expects an increase in these activities once the Piñon Ridge Mill in Paradox Valley is constructed.

There were 23 uranium projects in Utah in 2010, a few of which were producing ore (UGS 2011). The mines and their status are shown in Table 3.7-6; most of the projects in Utah are in the lease tracts area (in Grand and San Juan Counties). Two mines operated by Denison Mines (USA) Corp. (Pandora and Beaver Mines) in San Juan County produced 371,700 lb (168,600 kg) of $U_3O_8$ and 2,080,000 lb (943,500 kg) of $V_2O_5$ in 2010. White Canyon's Daneros Mine (also in San Juan County) also produced uranium ore in 2010 (UGS 2011).

According to the BLM's Land and Mineral Rehost 2000 System (LR2000), accessed on September 10 and 11, 2012, there are several authorized notices of intent and one plan of operation on file with the BLM for uranium- and vanadium-related mining activities within or immediately adjacent to the lease tracts; these include:

- *Gateway lease tract*. One notice of intent (COC 071901) filed by Rimrock Exploration and Development, Inc. for uranium mining on a claim in the vicinity of Lease Tract 27, in section 13 of T50N, R18W; operations authorized in 2008.

- *Uravan lease tract*. One notice of intent (COC 071888) filed by Energy Fuels Resources Corp. for uranium and other minerals mining on claims that are adjacent to Lease Tract 25 in sections 5 and 6 of T47N, R17W; operations authorized in 2009.

---

[20] As measured by the number of uranium prospecting notices of intent filed with the state (CDNR 2011).

BLM_0042249



**FIGURE 3.7-4  Permitted Oil and Gas Wells and Mines within 25 mi (40 km) of the ULP Lease Tracts**

BLM_0042250

1 **TABLE 3.7-5 Active Uranium Mining Permits in Southwestern Colorado**

| Site Name | Permittee | County | Permit/Site Status[a] |
|---|---|---|---|
| C-JD-5[b] | Gold Eagle Mining, Inc. | Montrose | INT/Maintenance |
| Mineral Joe Claims | Cotter Corporation | Montrose | INT/Tied to JD-6 Mine |
| Sunday Mine | Denison Mines (USA) Corp. | San Miguel | INT/Maintenance |
| Deremo-Snyder | Umetco Minerals Corporation | San Miguel | INT/Reclaimed |
| Monogram-Jo Dandy | Nuvemco, LLC | Montrose | INT/Maintenance |
| Burros Mine[b] | Gold Eagle Mining, Inc. | San Miguel | INT/Maintenance |
| C-LP-21 Mine[b] | Cotter Corporation | Montrose | INT-TC/Reclaimed |
| JD-9 Mine[b] | Cotter Corporation | Montrose | INT-TC/Maintenance |
| CM-25 Mine[b] | Cotter Corporation | Montrose | INT/Reclaimed |
| C-JD-7[b] | Cotter Corporation | Montrose | INT-TC/Maintenance |
| JD-6 Mine[b] | Cotter Corporation | Montrose | INT-TC/Maintenance |
| SR-13A Mine[b] | Cotter Corporation | San Miguel | INT-TC/Reclaimed |
| Carnation Mine | Denison Mines (USA) Corp. | San Miguel | INT-TC/Maintenance |
| Sego Mine | Sutherland Drilling | San Miguel | INT/Maintenance |
| Ike No. 1 Mine[b] | Cotter Corporation | San Miguel | INT/Maintenance |
| Tramp Mine | Bluerock Energy Corp. | Montrose | INT/Maintenance |
| St. Jude Mine | Denison Mines (USA) Corp. | San Miguel | INT-TC/Maintenance |
| SM-18 Mine[b] | Cotter Corporation | Montrose | INT/Maintenance |
| Monogram Mines | Nuvemco, LLC | Montrose | INT/Maintenance |
| Hawkeye Mine[b] | Gold Eagle Mining, Inc. | San Miguel | INT/Maintenance |
| Ellison Mine[b] | Gold Eagle Mining, Inc. | San Miguel | INT/Maintenance |
| JD-7 Pit[b] | Cotter Corporation | Montrose | INT-TC/Maintenance |
| Wright Group[b] | Cotter Corporation | Montrose | INT/Maintenance |
| Topaz Mine | Denison Mines (USA) Corp. | San Miguel | INT-TC/Maintenance |
| West Sunday Mine | Denison Mines (USA) Corp. | San Miguel | INT-TC/Maintenance |
| C-JD-8[b] | Cotter Corporation | Montrose | INT-TC/Maintenance |
| Centennial | B-Mining Company | San Miguel | INT/Maintenance |
| Van 4 Shaft | Denison Mines (USA) Corp. | Montrose | AC/Maintenance |
| J Birds | Rimrock Exploration and Development, Inc. | Montrose | INT/Maintenance |
| Whirlwind Mine | Energy Fuels Resources Corp. | Mesa | INT/Maintenance |
| Last Chance #3 and #4 | Nuvemco, LLC | Montrose | AW |
| October Ore Pile Reclamation | Nuvemco, LLC | Mesa | AC/Maintenance |

[a] The status listed is as of March 2014. AC = active; AW = awaiting warranty; TC = temporary cessation; and INT = intermittent. Maintenance includes general upkeep as required for operations with intermittent (INT) status or temporary cessation (TC) status, but it does not include development or production activities.

[b] Mines that are on the DOE ULP lease tracts.

Source: CDNR (2011)

2
3

BLM_0042251

1      **TABLE 3.7-6  Uranium Projects in Southeastern Utah, 2010[a]**

| Site Name | Permittee | County | Site Status |
|---|---|---|---|
| Whirlwind | Energy Fuels Resources Corp. | Grand | Permitted resource |
| Thompson Project | Energy Fuels Resources (USA) Inc. | Grand | Acquired 6,672 acres; exploration project |
| Dunn Mine | Energy Fuels Resources (USA) Inc. | San Juan | Resource quantified |
| Rim-Columbus | Energy Fuels Resources (USA) Inc. | San Juan | Permitted resource |
| Marcy-Look | Energy Fuels Resources (USA) Inc. | San Juan | Acquired 907 acres; exploration project |
| Blue Jay | Energy Fuels Resources (USA) Inc. | San Juan | Acquired 289 acres; exploration project |
| Energy Queen (Hecla Shaft) | Energy Fuels Resources Corp. | San Juan | Permitted resource |
| North La Sal | Vane Minerals PLC | San Juan | Acquired 80 acres |
| North Alice Extension | Vane Minerals PLC | San Juan | Resource quantified |
| Pandora/Snowball/Beaver | Energy Fuels Resources (USA) Inc. | San Juan | Standby mode |
| DAR-RAD | West Lisbon LLC | San Juan | 1,000 acres of property |
| Lisbon Mine | Mesa Uranium Corp. | San Juan | 22 holes completed |
| Velvet | Uranium One, Inc. | San Juan | Resource quantified |
| Calliham (J.H. Ranch) | Energy Fuels Resources Corp. | San Juan | Resource quantified |
| Crain | Energy Fuels Resources Corp. | San Juan | Resource quantified |
| Daneros (Lark Royal) | Energy Fuels Resources (USA) Inc. | San Juan | Standby mode |
| Geitus | Energy Fuels Resources (USA) Inc. | San Juan | Resource quantified |
| Happy Jack | Vane Minerals PLC | San Juan | 22 holes completed |
| LaSal II | Laramide Resources, Ltd. | San Juan | Permitted resource |

[a]   Table lists only projects occurring in San Juan and Grand Counties because these are the only
       Utah counties within 25 mi (40 km) of the DOE ULP lease tracts in which uranium projects are
       located.

Source: UGS (2011); White (2014)

2
3

4      • *Paradox Valley lease tract.* One plan of operation (COC 062522) filed by
5        Energy Fuels Resources Corp. for uranium mining on claims immediately
6        adjacent to Lease Tract 9 in section 29 of T46N, R17W; operations authorized
7        in 1998. Two notices of intent (COC 070985 and 072947) filed by Energy
8        Fuels Resources Corp. for uranium and other mining in the same section;
9        operations authorized in 2007 and 2008, respectively.
10

11     • *Slick Rock least tract.* One plan of operation (COC 052755) filed by Umetco
12       Minerals Corp. for vanadium mining on claims that are adjacent to Lease
13       Tract 13 in sections 29 and 30 of T44N, R18W; operations authorized in
14       1993.

BLM_0042252

Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 54 of 375

### 3.7.4.2  Coal

Coal-bearing areas in the Colorado Plateau region are extensive, and many of these areas (about 50%) occur beneath lands administered by various Federal agencies (BLM, National Park Service [NPS], and USFS). About 23% of the areas are beneath Native American tribal lands; another 26% are administered by state agencies or are privately owned (USGS 2001). In 2011, Colorado counties within 25 mi (40 km) of the ULP lease tracts produced about 2.6 million tons of coal from both surface and underground mines, with most of the production coming from Delta County (CDRMS 2011).[21] During that same year, there was no coal production in the two Utah counties (Grand and San Juan) within 25 mi (40 km) of the lease tracts (most coal production in Utah is to the west, in Carbon and Emery Counties) (UGS 2012).

According to the LR2000, accessed on September 10 and 11, 2012, there are no coal leases within any of the 31 ULP lease tracts (BLM 2012b). The New Horizon Mine (operated by Western Fuels Association, Inc.), located near Nucla in Montrose County about 10 mi (16 km) to the east of Paradox Valley, is the only active coal mine near the lease tracts. The surface mine is located in the Nucla-Naturita coal field that produces coal from minable coal beds in the Dakota Sandstone.[22] The mine is the exclusive supplier of coal to Nucla Station power plant, a 100-MW power plant located about 3 mi (4.8 km) southeast of Nucla. The New Horizon Mine produced 360,000 tons of coal in 2011, a 23% increase over production in 2010 (CDRMS 2012d, e). Coal production at the New Horizon Mine is expected to continue for the life of the power plant (Montrose County 2010).

### 3.7.4.3  Oil and Gas

Oil production and natural gas production in the region are concentrated in the Paradox Basin, especially along the Colorado–Utah border (Figure 3.7-4). In 2011, Colorado counties within 25 mi (40 km) of the ULP lease tracts produced 255,000 barrels (bbl) of oil and 314,000,000 million cubic feet of natural gas (including coalbed methane), with most of the production coming from Montezuma County (COGCC 2012a). During that same year, 3,580,000 bbl of oil and 11,300,000 million cubic feet of natural gas were produced in the two Utah counties (Grand and San Juan) within 25 mi (40 km) of the lease tracts (an 11% and 21% decline in production from the previous year, respectively) (UDOGM 2012).

---

[21]  Coal production was estimated by adding the production numbers reported in CDRMS (2011) for counties falling within 25 mi (40 km) of the ULP lease tracts. Coal production estimates are from Delta and Montrose Counties only; several counties within this range did not produce coal in 2011; these include Mesa, San Miguel, Dolores, and Montezuma Counties.

[22]  The mine produces coal from three coal beds in the Dakota Sandstone with thicknesses of about 3 to 5 ft (0.9 to 1.5 m). Although the coal-bearing formation extends into surrounding counties (Dolores, Mesa, Montezuma, Ouray, and San Miguel), it is not considered important for exploitation, because the coal beds are generally thin and discontinuous (Kirschbaum and Biewick 2012).

BLM_0042253

1   There are authorized oil and gas leases within most of the lease tracts.[23] According to the
2   LR2000, accessed September 10 and 11, 2012, most of the oil and gas leases are located along
3   the Dolores River Canyon in the Slick Rock lease tracts (San Miguel County); there are also
4   several leases in the Uravan and Paradox lease tracts, but none in the Gateway lease tract
5   (BLM 2012c). None of the oil and gas leases in the lease tracts have produced oil or gas
6   (COGCC 2012b). There is one pending notice for geophysical exploration activities in the
7   Paradox lease tract, associated with oil and gas leases that overlap Lease Tracts 17-1 and 17-2 in
8   sections 14 and 15 of T45 N, R18W (on Radium Mountain and Wedding Bell Mountain,
9   respectively) (BLM 2012b).

### 3.7.4.4  Other Minerals and Mineral Materials

14   In addition to uranium and vanadium, metallic minerals mined in the Colorado counties
15   within 25 mi (40 km) of the ULP lease tracts include gold, silver, platinum (San Miguel County
16   only), lead, zinc, copper, cadmium, and rare earths (Montrose County only). Non-metallic
17   minerals include gypsum and potash (CDRMS 2012e). According to the LR2000, accessed
18   September 10 and 11, 2012, there are four pending potash permits within some of the Slick Rock
19   lease tracts: one pending permit (COC 073566) is located in section 27 of T44N, R19W, which
20   slightly overlaps Lease Tract 15A; two pending permits (COC 073567 and COC 073568) cover
21   most of sections 10, 11, and 14 through 16 of T43N, R19W, in Lease Tracts 16 and 16A; and
22   one pending permit (COC 073572) is located in section 32 of 43N, R18W, in Lease Tract 12
23   (BLM 2012b).

25   Mineral materials of commercial value mined in the region include sand and gravel,
26   crushed stone, dimension stone, granite, limestone, sandstone (silica, stone, and quartz), shale,
27   clay, and aggregate (CDRMS 2012e). There is only one authorized mineral material site (for
28   common clay) within all the ULP lease tracts. The site is located on 9 acres (3.6 ha) in Lease
29   Tract 25, in the northeast quadrant of section 5 in T47N, R17W (COC 069589; Umetco Minerals
30   Corp., permittee). No other mineral material contracts or free use permits occur within the lease
31   tracts (BLM 2012b).

### 3.7.5  Timber Harvest

36   In 2002 (the latest year for which county-level data are available), the timber harvest in
37   Colorado counties within 25 mi (40 km) of the ULP lease tracts (Mesa, Montrose, and
38   San Miguel) was an estimated 13 million board feet, accounting for about 16% of Colorado's
39   timber production during that year. The leading species harvested in Colorado, in decreasing
40   order, were ponderosa pine (31%), spruce (Engelmann and blue spruce; 25%), lodgepole pine

---

[23] The ULP lease tracts are located on BLM lands that are withdrawn from mineral entry. The lands remain open to mineral leasing and the mineral material laws.

BLM_0042254

Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 56 of 375

1   (17%), aspen and cottonwood (14%), and douglas fir (10%). Most of these species were
2   harvested for sawlogs. The timber harvest on public lands in Colorado has been in decline since
3   1982 (with an increasing share being provided by private and tribal land owners)
4   (Morgan et al. 2006).
5
6         The timber harvest in Utah counties within 25 mi (40 km) of the ULP lease tracts (Grand
7   and San Juan) was estimated to be about 1.5 million board feet, accounting for only about 3.6%
8   of Utah's timber production in 2002. The leading species harvested in Utah, in decreasing order,
9   were spruce (44%), lodgepole pine (23%), ponderosa pine (13%), aspen and cottonwood (10%),
10  and douglas fir (8%). Most of these species were harvested for sawlogs and house logs. Although
11  National Forests still provide the majority of the state's harvest in Utah, timber harvest on public
12  lands in the state has been in decline since 1992 (with an increasing share being provided by
13  private and tribal land owners) (Morgan et al. 2006).
14
15        There are an estimated 3,900 acres (16 km$^2$) of harvested forest land within 25 mi
16  (40 km) of the ULP lease tracts; most of this land is concentrated along the southwestern edge of
17  the Uncompahgre Plateau and Piñon Mesa to the northeast and the La Sal Mountains to the west
18  (in Utah). Although there is no commercial timber harvesting within the ULP lease tracts, the
19  lease tracts and adjacent public lands provide piñon pine and juniper trees for small-scale
20  harvesting to use as firewood, fence posts, and Christmas trees. In addition, commercial
21  timbering was conducted in 2009 on Pine Mountain, north of Lease Tract 26.
22
23
24  **3.7.6 Recreation**
25
26        BLM-designated SRMAs are areas where the principal land management priority is
27  recreation. There are several SRMAs within 25 mi (40 km) of the ULP lease tracts
28  (Figure 3.7-1). These include Bangs Canyon and Dolores River in Colorado, and Cameo Cliffs,
29  Canyon Rims, Colorado Riverway, San Miguel River, Dolores River, Dolores River Canyons,
30  Indian Creek, and Two Rivers in Utah (Table 3.7-1). The SRMA nearest to the lease tracts is a
31  100-river mile (160-km) segment of the Dolores River that flows northward from the McPhee
32  Reservoir in Montezuma County to Bedrock in Paradox Valley. The SRMA cuts through the
33  Slick Rock lease tracts area and is a popular rafting destination from late April to early June,
34  except during very dry years (BLM 2010d). Many segments and tributaries of the Dolores and
35  San Miguel Rivers (and others) in the region are designated as WSRs on the basis of numerous
36  ORVs that include recreational value (Figure 3.7-2; Table 3.7-2).
37
38        The Gateway area and surrounding Unaweep Canyon have undergone development in
39  recent years to promote recreational activities in the area. Tourism and activities related to the
40  Gateway Canyons Resort (e.g., river rafting) are expected to increase, especially in the summer
41  months.
42
43        The Paradox Valley area along Long Park Road (County Road EE22) is a popular
44  location for rock climbing. The Paradox Trail is a 100-mi (160-km), two-track path along the
45  Dolores River that links to the Tabeguache Trail on the Uncompahgre Plateau (to the east) with
46  the Kokopelli Trail in the La Sal Mountains of Utah (to the west). Together, these trails form a

BLM_0042255

Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 57 of 375

"Grand Loop" of 360 mi (580 km) of back country mountain bike trails. The trail is accessible by mountain bike from May through November; only parts of the trail are accessible by two-wheel drive vehicles (BLM 2011k).

There are developed recreation sites along the San Miguel River and Dolores River SRMAs, including campsites, boat ramps, picnic areas, parking areas, restrooms, and boat ramps. Recreational activities in these areas include off-highway vehicle (OHV) riding (such as four-wheel drive, motorcycle, ATV, and the like), hiking, camping, hunting, mountain biking, horseback riding, recreational mining, fishing, rafting, and kayaking (BLM 2011k).

The Unaweep Tabeguache Byway (Highways 141 and 145) offers opportunity for scenic and historic touring in the region. The byway runs from Whitewater through Gateway, Naturita, Norwood, and Placerville (Figure 3.7-1). Sites along the byway include the Grand Valley Overlook, the Driggs Mansion, Gateway Community Park, the Hanging Flume Overlook, and the San Miguel River Nature Conservancy Preserve (CDOT 2012).

## 3.8  SOCIOECONOMICS (INCLUDING TOURISM AND RECREATION)

The use of Federal lands for uranium mining affects local communities in the project area by changing demographic characteristics and local economies and altering social structures. The ROI referred to here includes the area that could be affected by uranium mining on the 31 DOE ULP lease tracts and where workers are expected to reside and spend their wages. For this analysis, the ROI includes the counties where the 31 DOE ULP lease tracts are located: Mesa County; Montrose County; and San Miguel County in western Colorado. These lease tracts are located in the westernmost portions of all three counties. For the ROI, three economic indicators are described: employment; unemployment; and personal income. Measures of social activity considered include population, housing, public service employment, and levels of service for education (schools), healthcare, and public safety.

For the most part, the communities within the ROI are rural in nature; the exception is the larger town of Grand Junction. The town nearest the DOE ULP lease tracts in Mesa County is Gateway, an unincorporated town of approximately 650 people that lies 6 mi (9.7 km) to the northwest of the lease tracts. The closest incorporated areas in Mesa County are at least 30 mi (48 km) to the northeast of the potential lease tracts. In Montrose County, the unincorporated towns of Bedrock and Paradox are located 7 mi (11 km) and 9 mi (14 km) to the west of the lease tracts, respectively. The larger towns closest to the lease tracts are Nucla and Naturita, at a distance of 7 to 8 mi (11 to 13 km). The population in San Miguel is concentrated almost entirely in the eastern portion of the county; the lease tracts are located about 43 mi (69 km) west of the populated areas, near the border with Utah.

Two recent studies have estimated the economic impacts of uranium mining in western Colorado. Economic and Planning Systems (EPS) used data from a mining operations plan and the associated socioeconomic impact analysis prepared for an application from Energy Fuels Resource Corp. to describe the impacts of a uranium mining project in Montrose County (EPS 2010). Beginning in 2012, up to 500 tons of ore per day (175,000 tons annually) would be

BLM_0042256

1   produced by 2020, involving between 5 and 9 mines and the operation of a new mill at Piñon
2   Ridge. If half of the uranium mining, milling, and transportation activity occurred in Montrose
3   County, Energy Fuels Resource Corp. estimated that approximately 200 direct jobs, paying an
4   average of $60,000 per job, and about 500 total jobs (direct plus indirect plus "induced" jobs [the
5   indirect jobs estimated using an IMPLAN model]) would be produced in the county beginning in
6   2020. If all mining, milling, and transportation activities were located in Montrose County,
7   315 direct and up to 650 total jobs would be created.
8
9       Power Consulting (2010) suggested that the number of direct jobs created at a new
10  uranium mill would be significantly smaller than those estimated in the EPS report, numbering
11  only about 70, and that the total number of jobs (direct plus indirect plus induced) would be 120,
12  as it can only be assumed that a small percentage of mine and mill workers would reside in
13  Montrose County, with few of the projected mill jobs being filled by unemployed workers living
14  in the county. Power Consulting also suggested that many of the industries supplying the
15  uranium resource developments would be located outside the county, and that a small proportion
16  of the uranium supplying the Piñon Ridge Mill would be mined in the county, resulting in
17  reduced positive economic impacts in the county. Power Consulting also suggested that the
18  generation of radioactive waste might discourage the location of new economic activity in the
19  county, particularly income from tourism and retirees, and that economic activity at a level
20  comparable with the development of new mines and milling could be created through uranium
21  mine reclamation activities. Finally, it also suggested that volatility in uranium markets (and the
22  impact this would have on uranium employment in Montrose County) might produce a "boom-
23  and-bust" scenario, creating instability in local labor markets, causing social disruption, and
24  undermining the ability of local governments to plan with regard to providing public and
25  educational services.
26
27      Western Colorado has experienced past boom and bust periods from uranium mining
28  activities. The uranium industry's first boom occurred in the 1950s and crashed after 1970 when
29  the Federal Government phased out financial subsidies. Another boom driven by the expansion
30  of nuclear power in the mid-1970s led to the height of the uranium boom. By the early 1980s, the
31  United States stopped building new nuclear power plants, the price of uranium dropped
32  dramatically, and the uranium boom ended. The boom and bust effects from uranium mining had
33  varying impacts on individual communities. Much of western Colorado began to diversify its
34  economy in the 1980s, focusing on recreation and tourism opportunities.
35
36      Taken in its entirety, the population growth rate in the ROI between 1960 and 2010 was
37  generally greater than the average U.S. population growth rate over the same period. The period
38  between 1960 and 1970 was the only 10-year period in which the ROI counties had a lower
39  growth rate than the U.S. average, and the only period in which the population of one of the
40  counties (San Miguel County) fell from the previous decade. Figure 3.8-1 presents the
41  population trend in the ROI over the 50-year period between 1960 and 2010. Although the
42  overall population of the ROI was not greatly affected by uranium mining, the west end of
43  Montrose County lost almost 60% of its population between 1960 and 1990. The town of
44  Uravan, for example, had 600 residents in 1950 and was shut down entirely by 1986. The
45  population of the west end of San Miguel County increased from fewer than 200 residents to

BLM_0042257



1

2   **FIGURE 3.8-1 ROI Population from 1960–2010 (Sources: CensusViewer 2013a,**
3   **b, c; U.S. Bureau of the Census 1995)**
4
5
6   more than 1,000 and then collapsed to about 100 residents between 1930 and 1990 (Power
7   Consulting 2010).
8
9
10  **3.8.1  Economic Environment**
11
12
13      **3.8.1.1  ROI Employment and Unemployment**
14
15          The ROI, like Colorado and the rest of the United States, has experienced an increase in
16  unemployment in recent years. It experienced a sharp rise in unemployment between 2000 and
17  2010. However, as shown in Table 3.8-1, the overall growth in employment in the ROI (1.9%)
18  was higher than the growth in the state of Colorado as a whole (0.7%). Within the ROI, the
19  average growth rate in employment was higher in Mesa County (2.2 %) than in either Montrose
20  (1.4%) or San Miguel County (0.0%) in the years 2001–2010.
21
22          Although the ROI experienced a greater increase in employment during 2001–2010 than
23  did the state as a whole, the unemployment rate was relatively high in the ROI when compared to
24  that of the state of Colorado during the same period (Table 3.8-2). All the counties in the ROI
25  experienced higher rates of unemployment in 2010 and 2011, and during that period, the average
26  unemployment rate was higher in the ROI (10.5% and 9.6%, respectively) than in Colorado as a
27  whole (8.9% and 8.8%). Each county in the ROI experienced a slight decline in the
28  unemployment rate between 2010 and 2011. Unemployment rates in Montrose County were the
29  highest in the ROI in both 2010 and 2011 (11.1% and 11.0%, respectively), while San Miguel
30  County had the lowest unemployment rates in 2010 and 2011 (7.7% and 7.6%, respectively). The

BLM_0042258

1          **TABLE 3.8-1  ROI Employment, 2001–2010**

| Location | 2001 | 2010 | Average Annual Growth Rate, 2001–2010 (%) |
|---|---|---|---|
| Mesa County | 58,066 | 78,853 | 2.2 |
| Montrose County | 16,203 | 18,338 | 1.4 |
| San Miguel County | 4,742 | 4,724 | -0.4 |
| ROI | 79,011 | 93,585 | 1.9 |
| Colorado | 2,303494 | 2,447,712 | 0.7 |

Sources: U.S. Department of Labor (2010a,b)

2
3
4          **TABLE 3.8-2  ROI and State Unemployment Data,**
5          **2001–2011**

| Location | Average 2001–2010 | 2010 Average | 2011 Average |
|---|---|---|---|
| Mesa County | 5.6 | 10.6 | 10.3 |
| Montrose County | 5.9 | 11.1 | 11.0 |
| San Miguel County | 4.8 | 7.7 | 7.6 |
| ROI | 5.6 | 10.5 | 9.6 |
| Colorado | 6 | 8.9 | 8.8 |

[a]   Rates for 2011 are the average for January through
      September.

Sources: U.S. Department of Labor (2011, 2010a)

6
7
8    unemployment rate for in San Miguel County was also lower than the state average in both 2010
9    and 2011. Telluride, Colorado, is located in San Miguel County, and the numerous seasonal jobs
10   provided by the ski resort are likely responsible for the lower rates of unemployment. Because
11   Telluride represents 30% of the entire population of San Miguel County, it contributes toward
12   the lower overall unemployment for the county.
13
14
15       **3.8.1.2  Employment by Sector**
16
17       The services industry represents almost 50% of all employment in the ROI because of the
18   high level of recreation and tourism in the area (see Section 3.8.3). Wholesale and retail trade

BLM_0042259

1   provides the second-highest number of jobs, accounting for 19.7% (Table 3.8-3). Construction
2   jobs make up 8.9% of employment in the ROI. San Miguel County has the highest percentage of
3   people working in the services industry (64.5%), while Montrose has the least, at 41.6%. The
4   Telluride ski area, a popular destination in San Miguel County, brings many service-related jobs
5   to the area. San Miguel County also has a higher percentage of construction-related employment
6   (13%) than either Mesa County (9.8%) or Montrose County (8.3%). Wholesale and retail trade
7   made up the largest percentage of employment in Montrose County (21.4%). Mesa County
8   employed 20.2% of its workforce in wholesale and retail trade, while that category represented
9   only 9.8% of employment in San Miguel County. Montrose County employed a larger
10  percentage of its workforce in agriculture (6.8%) than either Mesa County (3.6%) or San Miguel
11  County (1.3%), which would be expected given that more than 700,000 acres (280,000 ha) in
12  Montrose County is farmland, and the county has been referred to as the agricultural hub of
13  Colorado's Western Slope (USDA 2007b).
14
15
16  **3.8.1.3  Personal Income**
17
18          In general, in 2010 per-capita income was less in the ROI ($34,898) than in the state of
19  Colorado as a whole ($42,582) (Table 3.8-4), and significantly less than the U.S. average
20  ($52,269). In San Miguel County, however, per-capita income in 2010 was $48,611, exceeding
21  the state average. The towns of Sawpit and Telluride, both located in San Miguel County, had
22  the highest median household incomes in the ROI in 2005–2009, which explains the high per-
23  capita income in San Miguel County. The growth rate in Mesa County was higher in 2010 for
24  both total income and per capita income (3.5% and 0.9%, respectively), while growth rates in
25  Montrose County (3.0% and 0.6%) and San Miguel County (2.2% and 0.6%) were slower during
26  that period. The state of Colorado's annual growth rate fell between 2000 and 2009.
27
28          At $91,222, Sawpit had the highest median household income in the ROI in 2005–2009,
29  although, with a population of 23 residents, it is also the smallest town in the ROI. In addition to
30  Sawpit, the towns of De Beque, Fruitvale, Fruita, Redlands, Ophir, and Telluride also had
31  average median household incomes higher than the U.S. average of $52,269 during the same
32  period. The town of Naturita had the lowest median household income in the ROI, at $29,452,
33  and it experienced a decline in relative household income from the year 1999. Olathe had the
34  second-lowest median household income ($32,035) and also experienced a moderate decrease in
35  individual earnings from the year 1999. All other towns in the ROI had a median household
36  income of $35,000 or higher in 2005–2009.
37
38          The towns of Sawpit and De Beque experienced the largest growth in median household
39  income between 1999 and 2005–2009, although the populations of both towns were quite small
40  (Table 3.8-5). Exactly half (9 out of 18) of the towns in the ROI experienced a decrease in
41  median household income during that period. The largest town in the ROI, Grand Junction,
42  experienced an average annual growth rate in median household income of 0.69%, and the larger
43  towns of Clifton, Fruita, and Montrose experienced growth rates of –0.25%, 2.80%, and 0.30%,
44  respectively. Fruita, which had the fastest population growth rate between 2000 and 2010, also
45  had one of the highest growth rates in median household income in the ROI.
46

BLM_0042260

1

**TABLE 3.8-3  ROI Employment by Sector, 2009[a]**

| Sector | Mesa County, Colorado | | Montrose County, Colorado | | San Miguel County, Colorado | | ROI | |
|---|---|---|---|---|---|---|---|---|
| | Employment | % of Total | Employment | % of Total | Employment | % of Total | Employment | % of Total |
| Agriculture[a] | 1,970 | 3.6 | 836 | 6.8 | 64 | 1.3 | 2,870 | 4.0 |
| Mining[b] | 1,619 | 2.9 | 114 | 0.9 | 60 | 1.2 | 1,793 | 2.5 |
| Construction | 4,592 | 8.3 | 1,203 | 9.8 | 637 | 13.0 | 6,432 | 8.9 |
| Manufacturing | 2,593 | 4.7 | 1,053 | 8.6 | 136 | 2.8 | 3,782 | 5.2 |
| Transportation and public utilities | 3,022 | 5.5 | 740 | 6.0 | 50 | 1.0 | 3,812 | 5.3 |
| Wholesale and retail trade | 11,151 | 20.2 | 2,628 | 21.4 | 470 | 9.6 | 14,249 | 19.7 |
| Finance, insurance, and real estate | 3,434 | 6.2 | 587 | 4.8 | 285 | 5.8 | 4,306 | 6.0 |
| Services | 26,739 | 48.5 | 5,098 | 41.6 | 3,159 | 64.5 | 34,996 | 48.4 |
| Other | 10 | 0.0 | 10 | 0.1 | 38 | 0.8 | 58 | 0.1 |
| Total | 55,130 | | 12,269 | | 4,899 | | 72,298 | |

[a]  Agricultural employment includes 2007 data for hired farm workers.

[b]  Mining employment includes mining, quarrying, and oil and gas extraction; nonmetallic mineral mining and quarrying; sand, gravel, clay, and ceramic and refractory minerals mining and quarrying; construction sand and gravel mining; coal and metal mining; and support activities for mining.

Sources: U.S. Bureau of the Census (2011a); USDA (2007a)

1          **TABLE 3.8-4  ROI Personal Income, 2000–2009**

| Location | 2000 | 2009 | Average Annual Growth Rate, 2000–2009 (%) |
|---|---|---|---|
| **Mesa County, Colorado** | | | |
| Total income ($ billion 2010) | 3.8 | 5.2 | 3.5 |
| Per-capita income ($) | 32,716 | 35,362 | 0.9 |
| **Montrose County, Colorado** | | | |
| Total income ($ billion 2010) | 1.0 | 1.3 | 3.0 |
| Per-capita income ($) | 29,170 | 30,760 | 0.6 |
| **San Miguel County, Colorado** | | | |
| Total income ($ billion 2010) | 0.3 | 0.4 | 2.2 |
| Per-capita income ($) | 45,874 | 48,611 | 0.6 |
| **ROI** | | | |
| Total income ($ billion 2010) | 5.1 | 6.8 | 3.3 |
| Per-capita income ($) | 32,512 | 34,898 | 0.8 |
| **Colorado** | | | |
| Total income ($ billion 2010) | 186.2 | 214.0 | 1.6 |
| Per-capita income ($) | 43,293 | 42,582 | –0.2 |

Sources: U.S. Department of Commerce (2011)

2
3
4          **TABLE 3.8-5  ROI Population, 2000–2023**

| Location | 2000 | 2010 | Average Annual Growth Rate, 2000–2010 (%) | 2021 | 2023 |
|---|---|---|---|---|---|
| Mesa County | 116,255 | 146,723 | 2.4 | 174,681 | 180,835 |
| Montrose County | 33,432 | 41,276 | 2.1 | 56,245 | 59,228 |
| San Miguel County | 6,594 | 7,359 | 1.1 | 10,695 | 11,349 |
| ROI | 156,281 | 195,358 | 2.3 | 241,621 | 251,412 |
| Colorado | 4,301,261 | 5,160,189 | 1.8 | 6,281,388 | 6,491,972 |

Sources: U.S. Bureau of the Census (2011c); Colorado State Demography Office (2011)

5
6

BLM_0042262

Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 64 of 375

**3.8.2  Social Environment**

**3.8.2.1  Population**

Population in the ROI experienced an average annual growth rate of 2.3% from 2000 to 2010, which was higher than the growth rate in the state of Colorado over the same time period (Table 3.8-5). The average annual growth rate indicates that each year the population in the ROI grew an average of 2.3% each year, over the course of ten years. San Miguel County had the smallest population in the ROI, with a 2010 population of 7,359, while Mesa County had the largest population, at 146,723. Mesa County also had the highest rate of population growth between 2000 and 2010 (2.4%), while San Miguel County had the smallest (1.1%). All counties are projected to increase in population size over the next 20 years. By 2023, the ROI population is projected to be more than 250,000, a 29% increase from the 2010 census.

Population growth rates between 2000 and 2010 were highest for some of the ROI's largest cities, including Fruita (6.9%), Grand Junction (3.4%), and Montrose (4.5%) (Table 3.8-6). Fruita experienced the highest rate of population growth (6.9%), almost doubling its population in the 10 years between 2000 and 2010. The town of Sawpit was the only town to experience a negative growth rate (–0.8%), although because of its small population size, the impact on the ROI was negligible. Six towns experienced a growth rate of less than 1% (Orchard Mesa, Redlands, Naturita, Nucla, Norwood, and Telluride), and six towns experienced a growth rate between 1% and 2% (Clifton, Collbran, Fruitvale, Palisade, Olathe, and Ophir). Four towns grew at a rate that was more than 2% (Fruita, Grand Junction, Montrose and Mountain Valley). Of these, only the town of Mountain Village had a population of fewer than 6,000 people. The populations of two of the three largest cities in the ROI (Grand Junction and Montrose) increased fairly rapidly at a rate of more than 3.4%. The second-largest city, Clifton, had a population growth rate of 1.4%. Overall, relatively high growth rates in the larger towns contributed to the moderate population growth in the ROI as a whole.

**3.8.2.2  ROI Housing**

On average, vacant housing in the ROI increased from 8.8% in 2000 to 10.0% in 2009 (Table 3.8-7). The ROI had a total of 8,117 total vacant units. As would be expected, Mesa County contained the most housing units, with a total of 58,329 units. Mesa County and Montrose County have similar rates of housing vacancy; in 2009, Mesa County had 6% of its available housing vacant, and Montrose County had a vacancy rate of 8.9%. San Miguel County, however, had the highest vacancy rate by far, at 50%. Many residential units in San Miguel County are used as vacation accommodations or second homes rather than for primary housing. Available units are generally priced too high, and it is estimated that 44% of the households in San Miguel County are living in houses that are not affordable (RRC Associates and Rees Consulting 2011). On the other hand, vacancy rates for rental units are very low; in Telluride, where seasonal housing is in demand, the vacancy rate is only 1.1%. This suggests that most of the vacancy stems from high sale prices, because even though there is a demand for affordable housing, the vacancy rate remains high (RRC Associates and Rees Consulting 2011).

BLM_0042263

1    **TABLE 3.8-6  ROI Urban Population and Income, 1999–2010**

| City in Colorado | Population | | | Median Household Income ($ 2010) | | |
|---|---|---|---|---|---|---|
| | 2000 | 2010 | Average Annual Growth Rate, 2000–2010 (%) | 1999 | 2005–2009 | Average Annual Growth Rate, 2005–2009 (%)[a] |
| Clifton | 17,345 | 19,899 | 1.4 | 44,174 | 43,073 | –0.25 |
| Collbran[b] | 389 | 439 | 1.2 | 42,538 | 43,985 | 0.34 |
| De Beque[b] | 474 | 543 | 1.4 | 38,784 | 59,431 | 4.36 |
| Fruitvale | 6,936 | 7,675 | 1.0 | 58,163 | 56,732 | –0.25 |
| Fruita | 6,478 | 12,646 | 6.9 | 43,099 | 56,815 | 2.80 |
| Grand Junction | 41,986 | 58,566 | 3.4 | 43,391 | 46,460 | 0.69 |
| Orchard Mesa | 6,456 | 6,836 | 0.6 | 53,513 | 51,465 | –0.39 |
| Palisade[b] | 2,585 | 2,931 | 1.3 | 36,306 | 44,600 | 2.08 |
| Redlands | 8,043 | 8,685 | 0.8 | 70,067 | 67,490 | –0.37 |
| Montrose | 12,344 | 19,132 | 4.5 | 44,174 | 45,497 | 0.30 |
| Naturita[b] | 637 | 669 | 0.5 | 29,777 | 29,452 | –0.11 |
| Nucla[b] | 736 | 744 | 0.1 | 37,258 | 49,761 | 2.94 |
| Olathe[b] | 1,601 | 1,764 | 1.0 | 34,405 | 32,035 | –0.71 |
| Mountain Village[b] | 991 | 1,389 | 3.4 | 40,134 | 35,447 | –1.23 |
| Norwood[b] | 438 | 460 | 0.5 | 51,536 | 38,702 | –2.82 |
| Ophir[b] | 113 | 128 | 1.3 | 75,805 | 52,345 | –3.64 |
| Sawpit[b] | 25 | 23 | –0.8 | 34,358 | 91,222 | 10.26 |
| Telluride[b] | 2,254 | 2,400 | 0.6 | 67,980 | 68,970 | 0.14 |

[a]   Data are averages for the period 2005 to 2009.

[b]   Data are for 2009 population estimates.

Sources: U.S. Bureau of the Census (2011b,c,d,e)

### 3.8.2.3  ROI Community and Social Services

The following sections discuss community and social services, including levels of service, in the ROI. The jurisdictions included in the ROI are listed in Table 3.8-8.

**3.8.2.3.1  Education.** There were a total of 68 schools located within the ROI in 2010. As shown in Table 3.8-9, there was an average student/teacher ratio of 16.7, which was comparable to the state average of 16.9, but somewhat higher than the nationwide average of 15.4. Mesa County had the highest student-teacher ratio at 17 students per teacher, while San Miguel County had the lowest at 11.3. The levels of service (the number of employees per 1,000 population) ranged from 9.12 in Mesa County to 11.67 in San Miguel County. The overall level of service for the ROI was 9.39. The City of Grand Junction contained the largest number of schools in the ROI by far; Mesa County School District 51 has 44 public schools (elementary, middle, high,

BLM_0042264

1
2

**TABLE 3.8-7  ROI Housing Characteristics, 2000 and 2009**

| | No. of Units | |
|---|---|---|
| Status of Housing | 2000 | 2009[a] |
| **Mesa County** | | |
| Owner-occupied | 33,313 | 39,539 |
| Rental | 12,510 | 15,272 |
| Vacant units | 2,604 | 3,518 |
| Percentage vacancy | 5.4 | 6.0 |
| Seasonal and recreational use | 508 | NA[b] |
| Total units | 48,427 | 58,329 |
| **Montrose County** | | |
| Owner-occupied | 9,773 | 11,875 |
| Rental | 3,270 | 3,765 |
| Vacant units | 1,159 | 1,521 |
| Percentage vacancy | 8.2 | 8.9 |
| Seasonal and recreational use | 194 | NA |
| Total units | 14,202 | 17,161 |
| **San Miguel County** | | |
| Owner-occupied | 1,556 | 1,894 |
| Rental | 1,459 | 1,159 |
| Vacant units | 2,182 | 3,078 |
| Percentage vacancy | 42 | 50.2 |
| Seasonal and recreational use | 1,741 | NA |
| Total units | 5,197 | 6,131 |
| **ROI total** | | |
| Owner-occupied | 44,642 | 53,308 |
| Rental | 17,239 | 20,196 |
| Vacant units | 5,945 | 8,117 |
| Percentage vacancy | 8.8 | 9.9 |
| Seasonal and recreational use | 2,443 | NA |
| Total units | 67,826 | 81,621 |

[a]   2009 data for number of owner-occupied, rental, and vacant units for Colorado counties are not available; data are based on 2009 total housing units and 2000 data on housing tenure.

[b]   NA = data not available.

Source: U.S. Bureau of the Census (2011f)

3
4

BLM_0042265

1       **TABLE 3.8-8  ROI Jurisdictions**

| Type of Jurisdiction | Governments |
|---|---|
| Counties | Mesa, Montrose, San Miguel |
| Cities | Clifton, Collbran, De Beque, Fruitvale, Fruita, Grand Junction, Orchard Mesa, Palisade, Redlands, Montrose, Naturita, Nucla, Olathe, Mountain Village, Norwood, Ophir, Sawpit, Telluride |
| School districts | De Beque, Joint District No. 49, Grand Valley Boces, Mesa 51 Grand Junction, Mesa County Valley School District No. 51, Plateau Valley, School District No. 50 In The County Of Mesa, Montrose County School District Re-1j, Montrose Re-1j, West End School District No. Re-2, Norwood School District No. R-2j, Telluride School District No. R-1 |
| Tribal | Jicarilla Apache Nation, New Mexico |

Sources: NCES (2011); U.S. Bureau of the Census (2011d); DOI (2011)

2
3
4       **TABLE 3.8-9  ROI School District Data, 2010[a]**

| Location | Number of Students | Number of Teachers | Student-Teacher Ratio | Level of Service |
|---|---|---|---|---|
| Mesa County | 22,699 | 1,338 | 17 | 9.12 |
| Montrose County | 6,867 | 410 | 16.8 | 9.93 |
| San Miguel County | 973 | 86 | 11.3 | 11.67 |
| ROI | 30,539 | 1,834 | 16.7 | 9.39 |

[a]   Number of teachers per 1,000 population.

Source: NCES (2011)

5
6
7   and alternative) within the greater metropolitan area, serving over 22,000 students. Mountain
8   Village, Ophir, and Sawpit are towns in the ROI that do not contain any schools; students from
9   there attend schools in Telluride. Although the student-teacher ratio for each county is
10  comparable to the state average, it varies among towns. For instance, Grand Junction has the
11  highest ratio, but smaller towns, such as Collbran, Telluride, De Beque, and Norwood, have an
12  average of 11.46 students per teacher (NCES 2011).
13
14          Colorado Mesa University in Grand Junction is a public university that offers associate's,
15  bachelor's, and master's degrees; it is the only college or university in the ROI. Until April 2011,
16  the school was known as Mesa State College. The school has an enrollment of 9,000 students.
17  Western Colorado Community College, a division of Colorado Mesa University, offers degree

BLM_0042266

1   programs focused on technical training, including construction technology, machining
2   technology, transportation technology, and welding services, among other technical and
3   nontechnical degree programs.
4
5
6       **3.8.2.3.2  Health Care.** The number of physicians and the level of service are two
7   measures for determining access to adequate healthcare. In 2010, most of the physicians in the
8   ROI were located in Mesa County (552) (Table 3.8-10). The level of service was the lowest in
9   San Miguel County, which also had the fewest number of physicians (19). The level of service
10  was highest in Mesa County (3.76), and it was 3.51 for the entire ROI. Mesa County has three
11  hospitals, all in Grand Junction: Community Hospital (78 beds); St. Mary's Hospital (350 beds,
12  and the largest medical center between Denver and Salt Lake City); and the Grand Junction
13  Veterans Administration Medical Center (53 beds). Montrose County has one hospital, Montrose
14  Memorial Hospital; it has 75 beds and is located in the city of Montrose. There are also clinics in
15  Olathe and Naturita. The Telluride Medical Center, with 7 beds, is the only hospital in
16  San Miguel County.
17
18
19      **3.8.2.3.3  Public Safety.** As shown in Table 3.8-11, in 2009, most of the firefighters in
20  the ROI were located in Mesa County. The level of service was the lowest in San Miguel County
21  (0.40), which also had the fewest number of professional firefighters. The level of service was
22  highest in Mesa County (0.60), and it was 0.57 for the entire ROI.
23
24      Most of the police officers in the ROI were also located in Mesa County (122). The level
25  of service was highest in San Miguel County (4.37), which also had the fewest number of police
26  officers (33). The level of service was lowest in Mesa County (0.84), and it was 1.08 for the
27  entire ROI. The highest crime rates for both violent crimes and property crimes were also in the
28  most populated county, Mesa County, which also had the lowest level of service with regard to
29  police officers (Table 3.8-12). The incidences of crime in Montrose and San Miguel Counties
30  were comparable to one another, although more property crime occurred in San Miguel County.
31
32
33                      **TABLE 3.8-10  ROI Physicians, 2010[a]**

| Location | No. of Physicians | Level of Service |
|---|---|---|
| Mesa County | 552 | 3.76 |
| Montrose County | 115 | 2.79 |
| San Miguel County | 19 | 2.58 |
| ROI | 686 | 3.51 |

[a]   Number of physicians per 1,000 population.

Source: AMA (2010)

34

BLM_0042267

1          **TABLE 3.8-11  ROI Public Safety Employment, 2009**

| Location | No. of Police Officers | Level of Service[a] | No. of Firefighters[b] | Level of Service |
|----------|------------------------|---------------------|------------------------|------------------|
| Mesa County | 122 | 0.84 | 88 | 0.60 |
| Montrose County | 56 | 1.35 | 21 | 0.51 |
| San Miguel County | 33 | 4.37 | 3 | 0.40 |
| ROI | 211 | 1.08 | 112 | 0.57 |

[a]   Number per 1,000 population.

[b]   Number does not include volunteers.

Sources: DOJ (2009b); Fire Departments Network (2011)

2
3
4          **TABLE 3.8-12  ROI and County Crime Rates, 2009[a]**

| Location | Violent Crime[b] | | Property Crime[c] | | All Crime | |
|----------|------------------|------|-------------------|------|-----------|------|
|          | No. of Offenses | Rate | No. of Offenses | Rate | No. of Offenses | Rate |
| Mesa County | 185 | 1.3 | 1,467 | 10.0 | 1,652 | 11.3 |
| Montrose County | 36 | 0.9 | 136 | 3.3 | 172 | 4.2 |
| San Miguel County | 3 | 0.4 | 36 | 4.9 | 39 | 5.3 |
| ROI | 224 | 1.15 | 1,639 | 8.39 | 1,863 | 9.54 |
| Colorado | 21,179 | 0.45 | 177,629 | 3.77 | 198,808 | 4.2 |

[a]   Rates are the number of crimes per 1,000 population.

[b]   Violent crime includes murder and non-negligent manslaughter, forcible rape, robbery, and aggravated assault.

[c]   Property crime includes burglary, larceny, theft, motor vehicle theft, and arson.

Source: DOJ (2009a)

5
6
7

BLM_0042268

1   The rates of crime for the ROI were higher than those in the state of Colorado for both property
2   crimes and violent crimes.
3
4
5   **3.8.3  Recreation and Tourism Economy**
6
7           Western Colorado is a major tourist destination. Visitors travel to western Colorado
8   year-round for outdoor sports, including hiking, biking, whitewater rafting, horseback riding,
9   skiing, OHV trail-riding, hunting, fishing, and snowshoeing. Most of the land in the ROI is
10  managed by the USFS and BLM. The BLM manages more than 8.4 million acres (3.4 ha) in
11  Colorado and provides recreation opportunities for more than 5 million visitors annually. Much
12  of the public land in the ROI is accessible for public recreational use. Among the many
13  recreation areas that the BLM manages are numerous SRMAs and NLCS units (BLM undated).
14  SRMAs are areas where recreation is the principal management focus and where the objective is
15  to provide specific "structured" recreational opportunities (BLM 2011k). These can include
16  campgrounds, trails, and boat ramps for river access. The Dolores Canyon SRMA in Montrose
17  County is in close proximity to the lease tracts. The distance from the SRMA to the lease tracts
18  ranges from 0.48 mi (0.77 km) (Lease Tract 17) to 8.4 mi (14 km) (Lease Tract 19). In
19  San Miguel County, three of the leases are located within the SRMA. The Dolores Canyon
20  SRMA is a popular location for whitewater rafting and river sports, and its visitors are attracted
21  to the Dolores River's remote character. Developed recreation sites are located along the San
22  Miguel River SRMA and in the Dolores River SRMA. There are several developed campsites
23  along the San Miguel River corridor that have boat ramps and other amenities such as toilets,
24  picnic areas, and parking areas (BLM 2012a). In addition, the Unaweep-Tabeguache Scenic and
25  Historic Byway is 133 mi (214 km) along CO 141 and 145 and passes through the towns of
26  Nucla, Naturita, Uravan, Redvale, and Norwood. The scenic byway follows the Dolores and
27  San Miguel Rivers and offers recreational opportunities on backroads and trails on BLM and
28  USFS land, as well as whitewater rafting and kayaking (CCCD 1995). There are a variety of
29  unimproved roads on and around the lease tracts, many of which were constructed by the mining
30  and ranching industries and are currently maintained by county agencies or the BLM (see
31  Section 3.10 for additional information on transportation and roads).
32
33          As discussed in Section 3.8.2.1.2, employment in the ROI is concentrated in the service
34  industry, and much of that results from the recreation provided by the publicly managed areas
35  discussed above. The tourism industry is difficult to quantify; it covers multiple job sectors and
36  has direct and indirect impacts on the local economy resulting from increased sales from visitor
37  spending, changes to local employment and income, and induced effects reflected in local goods
38  and services purchased by residents who experience changes in income from new economic
39  activity.
40
41          In September 2001, the Southwest Colorado Travel Region (SWCTR) and the USFS
42  sought to understand the relationship between tourism and employment in the region, including
43  the regional dependency on tourism, the types of jobs that tourism supports, ways to encourage
44  growth in employment, ways to develop complementary economic industries (e.g., real estate
45  and construction), and the connections between the tourism industry and local government
46  services and revenues. The SWCTR comprises 12 counties, including Montrose and San Miguel

BLM_0042269

1    Counties. The study aimed to identify the types of tourism that drive the local economy. A
2    distinction was made between activities that took place on public lands and those that occurred
3    on private lands. This distinction helped to clarify the difference between the impacts from
4    public parks and outdoor recreation and the impacts from private resort recreation (Information
5    Services 2001).

6

7           In 2000, the tourism industry accounted for 14% of the jobs and 9% of the income
8    generated in Montrose County. In San Miguel County, the percentages of tourism-related jobs
9    and income were 59% and 53%, respectively. Total wages from tourism employment totaled
10    $27 million in Montrose County and more than $80 million in San Miguel County. Employment
11    in the tourism industry related to public lands represented 7% of all employment in Montrose
12    County, 38% in San Miguel County, and 14% in the SWCTR region. Activities on public lands
13    include skiing and touring, visits to parks and monuments, and outdoor recreation. Outdoor
14    recreation includes hiking, biking, fishing, hunting, rafting, and snowmobiling on public land. In
15    Montrose County, outdoor activities were responsible for the most tourism-related employment
16    in 2000, mostly in the summer and fall months. In San Miguel County, the real estate and
17    construction sector was very strong, although the ski resort in Telluride provided the largest
18    number of jobs in the tourism sector. From 1997 to 1999, tourism employment in San Miguel
19    County grew 14% (Information Services 2001). In 2010, 63% of employment in San Miguel
20    County came from the tourism industry, an increase of 4% since 2000 (Colorado Department of
21    Local Affairs 2011).

22

23           Public land use and activity estimates are difficult to quantify accurately and depend on a
24    combination of computerized trail counter data, field observations, and the professional
25    judgment of the recreation staff (BLM 2012i). The general trend across the Grand Junction Field
26    Office has been a 7–10 percent increase in visitation each year. Black Canyon of the Gunnison
27    National Park is located in the eastern portion of Montrose County, 52 mi (84 km) east of the
28    nearest lease tract. In 2010, 176,344 people visited the national park, which was fewer than the
29    number of visitors in 2000 (191,500) and 2007 (219,600) (www.nationalparked.net 2011). A
30    2010 visitor survey conducted at Black Canyon National Park indicated that out-of-state visitors
31    accounted for more than 65% of those surveyed, which suggests that park visitors probably also
32    spent money outside the park in other sectors, such as for hotel and other accommodations and in
33    eating and drinking establishments.

34

35           The Colorado National Monument is located 25 mi (40 km) north of the nearest lease
36    tracts in Mesa County. Other recreation areas in Mesa County include Bangs Canyon SRMA,
37    Grand Mesa Slopes SRMA, and the James M. Robb Colorado River State Park. Visitation to
38    Colorado National Monument increased over the past few years, achieving a record-high number
39    of annual visitors of 714,000 in 2007, a 9% increase from the previous year (National Park
40    Service 2008). Hiking use increased 34% in October 2007 compared to that in October 2006, and
41    the park experienced increases in other types of recreation, including biking and rock climbing.
42    An economic analysis of state parks in Colorado estimated that the average vehicle visiting
43    Colorado River State Park spent $312 within 50 mi (80 km) of the park. Total expenditures for
44    all visitors to the park totaled almost $23 million (Corona Research, Inc. 2009).

45

46

BLM_0042270

## 3.9  ENVIRONMENTAL JUSTICE

On February 11, 1994, the President signed E.O. 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," which formally requires Federal agencies to incorporate environmental justice as part of their missions (59 FR 7629, Feb. 11, 1994). Specifically, it directs them to address, as appropriate, any disproportionately high and adverse human health or environmental effects of their actions, programs, or policies on minority and low-income populations.

The analysis of how mining projects affect environmental justice concerns follows guidelines described in the CEQ's *Environmental Justice Guidance under the National Environmental Policy Act* (CEQ 1997). The analysis method has three parts. First, a description of the geographic distribution of low-income and minority populations in the affected area is undertaken. Then an assessment is conducted to determine whether exploration, mine development and operations, and reclamation would produce human health or environmental impacts that are high and adverse. Finally, if impacts are high and adverse, a determination is made as to whether these impacts disproportionately affect minority and low-income populations.

Exploration, mine development and operations, and reclamation in the proposed lease tracts could affect environmental justice if any adverse human health and environmental impacts resulting from any phase would be significantly high and if these impacts would disproportionately affect minority and low-income populations. If the analysis determined that human health and environmental impacts would not be significant, there could be no disproportionately high and adverse impacts on minority and low-income populations. In the event a potential for human health or environmental impacts is significant, disproportionality would be determined by comparing the proximity of any high and adverse impacts with the location of low-income and minority populations. For example, the analysis would consider whether potentially significant human health risks would appreciably exceed the risk to the general population.

The analysis of environmental justice issues associated with the development of uranium facilities considered impacts within the proposed lease tracts and an associated 50-mi (80-km) radius around the boundary of the proposed lease tracts. A description of the geographic distribution of minority and low-income groups in the affected area was based on Census Bureau demographic data (U.S. Bureau of the Census 2011g,h). The following definitions were used to define minority and low-income population groups:

- *Minority.* Persons are included in the minority category if they identify themselves as belonging to any of the following racial groups: (1) Hispanic; (2) Black (not of Hispanic origin) or African American; (3) American Indian or Alaska Native; (4) Asian; or (5) Native Hawaiian or Other Pacific Islander.

  Beginning with the 2010 census, where appropriate, the census form allows individuals to designate multiple population group categories to reflect their ethnic or racial origin. In addition, persons who classify themselves as being

of multiple racial origins may choose up to six racial groups as the basis of their racial origins. The term minority includes all persons, including those classifying themselves in multiple racial categories, except those who classify themselves as not being of Hispanic origin and as being White or "Other Race" (U.S. Bureau of the Census 2011g).

The CEQ guidance proposed that minority populations should be identified where either (1) the minority population of the affected area exceeds 50% or (2) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis.

The ULP PEIS applies both criteria in using the Census Bureau data for census block groups, wherein consideration is given to the minority population that is both greater than 50% and 20 percentage points higher than in the state (the reference geographic unit).

- *Low-income.* Individuals who fall below the poverty line. The poverty line takes into account the family size and the ages of individuals in the family. For example, in 2009, the poverty line for a family of five with three children younger than 18 was $26,023. For any given family below the poverty line, all family members are considered as being below the poverty line for the purposes of analysis (U.S. Bureau of the Census 2011h).

The data in Table 3.9-1 show the minority and low-income composition of the total population located in the proposed lease tracts based on Census Bureau data and CEQ guidelines. Individuals identifying themselves as Hispanic or Latino are included in the table as a separate entry. However, because Hispanics can be of any race, this number also includes individuals who also identify themselves as being part of one or more of the population groups listed in the table.

Within the 50-mi (80-km) radius around the boundary of the proposed lease tracts in Colorado, 18.3% of the population is classified as minority, while 11.9% is classified as low-income. Because the number of minority individuals does not exceed 50% of the total population in the 50-mi (80-km) area and because the number of minority individuals does not exceed the state average by 20 percentage points or more, there is no minority population in the Colorado portion of the proposed lease tracts based on Census Bureau data and CEQ guidelines. The number of low-income individuals does not exceed the state average by 20 percentage points or more and does not exceed 50% of the total population in the area; therefore, there are no low-income populations in the Colorado portion of the proposed lease tracts.

Within the 50-mi (80-km) radius in Utah, 25.9% of the population is classified as minority, while 16.1% is classified as low-income. Because the number of minority individuals does not exceed the state average by 20 percentage points or more and because the number of minority individuals does not exceed 50% of the total population in the area, there is no minority population in the Utah portion of the 50-mi (80-km) area based on Census Bureau data and CEQ

BLM_0042272

1
2

**TABLE 3.9-1  Minority and Low-Income Populations within the 50-mi (80-km) Radius Surrounding the Proposed Lease Tracts**

| Type of Population | Colorado | Utah |
|---|---|---|
| Total population | 245,460 | 22,727 |
| White, non-Hispanic | 200,585 | 16,837 |
| Hispanic or Latino | 34,682 | 1,575 |
| Non-Hispanic or Latino minorities | 210,778 | 21,152 |
|    One race | 207,210 | 20,826 |
|    Black or African American | 1,056 | 49 |
|    American Indian or Alaskan Native | 3,544 | 3,789 |
|    Asian | 1,578 | 129 |
|    Native Hawaiian or other Pacific Islander | 202 | 11 |
|    Some other race | 245 | 11 |
|    Two or more races | 3,568 | 326 |
| Total minority | 44,875 | 5,890 |
| Low-income | 11,184 | 1,164 |
| Percentage minority | 18.3 | 25.9 |
| State percentage minority | 30.0 | 19.6 |
| Percentage low-income | 11.9 | 16.1 |
| State percentage low-income | 12.2 | 10.8 |

Sources: U.S. Bureau of the Census (2011g,h)

3
4
5    guidelines. The number of low-income individuals does not exceed the state average by
6    20 percentage points or more and does not exceed 50% of the total population in the area;
7    therefore, there are no low-income populations in the Utah portion of the proposed lease tracts.
8
9          Figures 3.9-1 and 3.9-2 show the locations of the minority and low-income population
10   groups within the 50-mi (80-km) radius around the boundary of the proposed lease tracts.
11
12          In the Colorado portion of the 50-mi (80-km) radius, there are single block groups in the
13   cities of Grand Junction, Montrose, and Olathe that are more than 50% minority. One block
14   group in southwestern Montezuma County is also more than 50% minority; it is the location of
15   the Ute Mountain Indian Reservation. In the Utah portion of the 50-mi (80-km) radius, San Juan
16   County has two block groups (one located in the southeastern part of the county, and the other in
17   the central and southwestern part of the county) that are more than 50% minority. There are no
18   block groups in the Utah portion of the 50-mi (80-km) radius that have minority populations that
19   are 20 percentage points higher than the state average but less than 50% minority.
20

BLM_0042273



FIGURE 3.9-1  **Minority Populations within the 50-mi (80-km) Radius surrounding the Proposed Lease Tracts**

BLM_0042274



FIGURE 3.9-2  Low-Income Populations within the 50-mi (80-km) Radius surrounding the
Proposed Lease Tracts

BLM_0042275

1     In the Colorado portion of the 50-mi (80-km) radius, the number of low-income
2 individuals is more than 20 percentage points higher than the state average in four block groups
3 in the city of Grand Junction, in two block groups in Montrose, and in one block group in Delta.
4 There is also a single block group in southwestern Montezuma County, in the Ute Mountain
5 Indian Reservation. In the Utah portion of the 50-mi (80-km) radius, there are block groups in
6 the southeastern part of San Juan County, and in the city of Blanding, that have low-income
7 population shares that are more than 20 percentage points higher than the state average. There
8 are no block groups in either portion of the 50-mi (80-km) radius where the population is more
9 than 50% low income.
10
11
12 **3.10  TRANSPORTATION**
13
14     The road network in western Colorado in the area of the lease tracts and the proposed
15 Piñon Ridge Mill consists of two primary roads, State Highways CO 90 and CO 141, as shown
16 in Figure 3.10-1. A number of county roads provide access to the lease tracts from these
17 highways, as shown in Figures 3.10-2 to 3.10-4. A variety of unimproved roads on public lands
18 exist on and around the lease tracts. Many of these roads were constructed by the mining and
19 ranching industries before the BLM developed regulations for authorizing road construction and
20 use. However, many of these roads are currently maintained by county agencies or the BLM.
21
22     Travel on BLM land is currently limited to existing routes. However, as per BLM's
23 planning handbook guidance, the "Limited to Existing Routes" designation will be changed to
24 "Limited to Designated Routes" no later than 5 years after the signing of the Resource
25 Management Plan revision ROD. The use of motorized or mechanized modes of travel
26 (including snowmobiles) during the execution of BLM-issued authorizations or permits would be
27 subject to the terms and conditions or stipulations of each individual authorization on a case-by-
28 case basis. Additional environmental documentation and analysis could be required for some
29 authorizations (BLM2008-64 EA and Land Use Plan Amendment).
30
31     Although most of the area roads pass through uninhabited public lands, 15 residences
32 among the 31 lease tracts could be affected by ore shipments travelling on these haul roads en
33 route to the state highways and subsequently to the ore-processing mills. Routes that pass 13 of
34 the 15 residences have been used in the last 10 years to haul uranium ore, and all the routes have
35 been used to haul ore in the last 30 years.
36
37     The White Mesa Mill in Utah south of Blanding is served by US 191. Access to the mill
38 from the lease tracts would be via CO 141 south to US 491 at Dove Creek, then west to US 191.
39 An alternate route from the general lease tract would be to take CO 90 west into Utah where it
40 becomes UT 46, which continues westward to US 191. The annual average traffic volume on
41 major roads near the lease tracts each day is listed in Table 3.10-1.
42
43

BLM_0042276



FIGURE 3.10-1  Road Network by the Lease Tracts and Uranium Mills

BLM_0042277

Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 79 of 375



FIGURE 3.10-2  Local Road Network around the Slick Rock Lease Tracts

BLM_0042278

Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 80 of 375



FIGURE 3.10-3  Local Road Network around the Paradox and Uravan Lease Tracts

BLM_0042279

Case No. 1:20-cv-02484-MSK   Document 39-2   filed 04/27/21   USDC Colorado   pg 81 of 375



1

2        **FIGURE 3.10-4  Local Road Network around the Gateway Lease Tracts**

BLM_0042280

1   **TABLE 3.10-1  Annual Average Daily Traffic (AADT) Volumes for Major Roads near the Lease**
2   **Tracts, 2010**

|  | Mileage Marker | | | AADT | |
|---|---|---|---|---|---|
| Road | Start | End | Location[a] | All | Trucks |
| *Colorado*[b] | | | | | |
| CO 90 | 0 | 9.5 | UT/CO state line east toward Paradox | 230 | 30 |
|  | 9.5 | 14.8 | Near Bedrock | 330 | 40 |
|  | 14.8 | 33.9 | Near western junction with CO 141 | 430 | 40 |
|  | 81.7 | 84.9 | East of Shavano Valley Road intersection, western outskirts of Montrose | 190 | 10 |
| CO 141 | 0 | 9.4 | North of intersection with US 491 | 590 | 20 |
|  | 9.4 | 11.3 | North of Monticello Rd./CR H1 intersection in Egnar | 350 | 50 |
|  | 11.3 | 44.1 | North of Egnar, southeast of K8 Rd. | 250 | 40 |
|  | 44.1 | 55.5 | Southeast of junction with CO 145 | 470 | 70 |
|  | 55.5 | 60.2 | Northwest of junction with CO 145 | 1,300 | 130 |
|  | 60.5 | 60.7 | Main St. in Naturita, west of CO 97 (Nucla Rd.) | 2,100 | 110 |
|  | 60.8 | 62.4 | East of junction with CO 90 | 600 | 70 |
|  | 62.4 | 64.4 | West of junction with CO 90 | 270 | 30 |
|  | 64.4 | 110.5 | Southwest of John Brown Rd. (4 4/10 Rd.) in Gateway | 280 | 30 |
|  | 110.5 | 153.8 | Northeast of junction with CR Sx 9/10 Rd. in Gateway | 660 | 80 |
|  | 153.8 | 154.1 | Southwest of junction with CO 50 in Whitewater | 1,100 | 90 |
| US 491 | 68.7 | 69.6 | At UT/CO state line | 2,100 | 460 |
|  | 63.3 | 67.9 | Northwest of CO 141 | 2,300 | 440 |
|  | 61.5 | 63.3 | Southeast of CO 141 | 3,100 | 550 |
| *Utah*[c] | | | | | |
| US 191 | 36.4 | 47.3 | Junction with CO 262 | 2,525 | 270 |
|  | 47.3 | 50.4 | Junction with CO 95, south of Blanding | 2,820 | 340 |
|  | 50.4 | 51.7 | Blanding, 800 south | 5,025 | 655 |
|  | 51.7 | 65.2 | Blanding, 200 north | 2,970 | 385 |
|  | 65.2 | 71.5 | Verdure | 2,490 | 350 |
|  | 71.5 | 71.9 | Monticello, 400 south | 2,670 | 615 |
|  | 71.9 | 72.4 | Monticello, junction with US 491 | 5,965 | 1,610 |
|  | 72.4 | 86.1 | Monticello, 600 north | 3,575 | 1,145 |
| US 491 | 0.0 | 0.4 | Monticello, junction with US 191 | 4,620 | 970 |
|  | 0.4 | 2.0 | Monticello, 500 east | 2,430 | 630 |
|  | 2.0 | 17.0 | Monticello Port of Entry at Milepost 2 to UT/CO state line | 2,270 | 770 |

[a]   CR = County Road

[b]   Source: CDOT (2011)

[c]   Source: UDOT (2011)

3
4

BLM_0042281

## 3.11  CULTURAL RESOURCES

Cultural resources are resources important to maintaining the heritage of the people of the United States. They provide a physical connection to the past and contemporary traditional culture. They include archaeological sites; historic buildings and structures or groups of structures; landscapes; culturally important natural features; and traditional cultural properties important to specific social or cultural groups, such as Native American Indian tribes. Cultural resources that meet the eligibility criteria for listing on the *National Register of Historic Places* (NRHP) (see text box) are termed "historic properties" under the National Historic Preservation Act of 1966, as amended (NHPA). The NHPA requires Federal agencies to take into account the potential effects of their undertakings, such as the leasing of uranium mining tracts, on designated and potential historic properties ranging in date from prehistoric times to the development of the Uravan Mineral Belt.

### 3.11.1  Cultural History of Southwestern Colorado

Human presence in western Colorado appears to have begun during the Paleoindian era, although archaeological remains from that era are rarely encountered in the region. Four Paleoindian traditions have been distinguished based on projectile point styles. The earliest remains in western Colorado are part of the Clovis tradition, beginning about 13,400 years ago, sometimes found in association with mammoth or other Pleistocene megafauna. To date, no Clovis artifacts have been found in association with megafauna in the study area, but the distribution of Pleistocene megafauna finds and Clovis points elsewhere suggests that major canyons, well suited to megafauna at the end of the Pleistocene, were a likely focus of Clovis hunters (Reed 2006).

---

**NRHP Significance Criteria**

"The quality of significance in American history, architecture, archaeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association" and meet one or more of the following criteria for evaluation.

*Criterion A: Associative Value – Event:* "Properties can be eligible for the *National Register* if they are associated with events that have made a significant contribution to the broad patterns of our history."

*Criterion B: Associative Value – Person:* "Properties can be eligible for the *National Register* if they are associated with the lives of persons significant in our past."

*Criterion C: Design or Construction Value:* "Properties can be eligible for the *National Register* if they embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction."

*Criterion D: Information Value:* "Properties can be eligible for the *National Register* if they have yielded, or may be likely to yield information important to prehistory or history."

Also applicable is this special criteria consideration:

*Criteria Consideration G: Properties That Have Achieved Significance within the Last Fifty Years.* "A property achieving significance within the last fifty years is eligible if it is of exceptional significance."

(36 CFR 60.4)

---

BLM_0042282

The Clovis tradition appears to have been followed by the Folsom tradition (12,800–11,500 years ago). Likewise focused on big game, Folsom hunters, using finely crafted, fluted lanceolate projectile points, appear to have preferred now-extinct species of bison. Folsom points are relatively rare in the study area, either because Folsom sites have been eroded or because the region was utilized less intensely at this time than in later periods. In the rugged and mountainous environs of southwestern Colorado, the Folsom tradition is followed by the Foothill-Mountain complex (11,500–7,500 years ago). Characterized by unfluted lanceolate points, the Foothill-Mountain complex reflects a broader subsistence base that included smaller game, such as deer, bighorn sheep, and pronghorn, and showed more regional variability than earlier Paleoindian cultures (Reed 2006).

The trend toward a broader subsistence base dependent on an increasingly wide array of smaller game and increased evidence of dependence on plant resources continued in the Archaic era. Milling stones, used in plant processing, increased in frequency, and projectile points, thought to be dart or lance points, were smaller and more variable, including corner- and side-notched varieties as well as certain varieties of stemmed points. Reed and Metcalf (1999) divided the Archaic era in west-central Colorado into four periods: Pioneer (7400–5400 B.C.); Settled (5400–3100 B.C.); Transitional (3100–1200 B.C.); and Terminal (1200–250 B.C.). These periods represent an increasing population and an increasing intensity of subsistence use. Archaic people appear to have followed a seasonal round, taking advantage of resources maturing at different times at different elevations. Winters appear to have been spent in the piñon-juniper woodlands of middle elevations in the winter range of deer and elk. Lower elevations may have been exploited in the spring, and higher elevations exploited in the summer and fall (Reed 2006).

The Archaic tradition was succeeded by the Formative stage (250 B.C.–A.D. 1300), which was marked by the introduction of maize horticulture, the introduction of the bow and arrow, the construction of more permanent dwellings, and the fabrication of ceramics. In southwestern Colorado, the integration of maize horticulture into subsistence strategies appears to have been incomplete. The growing season in the higher elevations of the project area was too short to support maize horticulture.

Sites representing the following four contemporaneous traditions associated with the Formative stage in western Colorado lie within or adjacent to the lease tracts (Reed 2006; Sullivan 2011).

1. The Anasazi or Ancestral Puebloan tradition—characterized by distinctive ceramics, highly patterned residential site layouts, pit structures, kivas, water control structures, and complex intraregional relations—is represented in areas near the southernmost Slick Rock lease tracts. It is likely that Ancestral Puebloan procurement forays from their northernmost settlements included the lease tracts. Social and environmental factors appear to have resulted in the abandonment of southwestern Colorado by Ancestral Puebloan peoples around 1275. Modern Puebloan groups regard the Ancestral Puebloan and Fremont as their ancestors.

BLM_0042283

2.   The Fremont tradition, centered in Utah, may be minimally represented in the Paradox Valley of western Montrose County and in areas near the Gateway lease tracts. This tradition is represented by distinct coiled pottery, one-rod-and-bundle basketry, moccasins made from deer or mountain sheep hides, and artistic renditions of trapezoidal anthropomorphic figures. The Fremont appear to have abandoned the area about the same time as the Ancestral Puebloans for reasons that are not fully understood.

3.   In western Montrose and San Miguel Counties, near the Paradox Valley and Uravan lease tracts, a third tradition, designated by Reed (2006) as the Gateway tradition, which reflected both Ancestral Puebloan and Fremont influence, has been recognized. It is characterized by limited reliance on maize horticulture; the manufacture of small arrow points; a lack of ceramic production; short-term use of noncontiguous, circular, masonry habitation structures, granaries, and storage cists constructed in rock shelters; and rock art that reflects both Ancestral Puebloan and Fremont influence. The Gateway tradition appears to be coterminous with maize horticulture. Gateway sites are clustered in western Montrose and San Miguel Counties near the central portion of the project area.

4.   At this time, sites without masonry or evidence of horticulture are more common in west-central Colorado. These sites, often associated with the fourth, or Aspen, tradition, reflect a hunting and gathering lifestyle and are characterized by basin houses, tipi rings, and game drive systems. These sites may reflect a more intensive occupation exploiting areas with too short a growing season for maize, or they may be procurement sites for the Gateway population (Reed 2006).

While there is some debate as to when they first arrived in western Colorado (Fritz 2006), the Utes were the primary inhabitants of the project area between the end of the Formative era and their ultimate removal to present-day reservations in the late nineteenth century. The Utes were one of the Numic-speaking peoples centered in the Great Basin and the Colorado Plateau. Linguistic and archaeological evidence suggests that the Utes migrated from southwestern Nevada and southeastern California around A.D. 1100 (Ott et al. 2010). They were highly mobile hunters and gatherers, whose habitation structures were wickiups—brush structures with neither excavated floors nor post holes. They manufactured small amounts of brownware pottery, locally termed Uncompahgre brownware, and desert side-notched projectile points.

The period between 1100 and the beginning of an equestrian lifestyle in about 1650 is termed the Canalla phase. In this phase, the Utes followed a pedestrian hunting and gathering lifestyle following a seasonal round. During the following Antero phase (1650–1881), the acquisition of horses allowed the Utes to range farther onto the plains to hunt bison and to raid in the south and west, supplying slaves to Spanish immigrants. The Utes begin to take on aspects of Plains culture during this period, and Euro-American artifacts become increasingly more common at Ute sites.

BLM_0042284

1    The Spanish explorer Juan de Rivera led an expedition through the heart of the area in
2    1765 in search of mineral wealth. Later, in 1776, the Escalante-Dominguez party passed though
3    western Colorado seeking a route from Santa Fe to California, which eventually led to the
4    establishment of the northern branch of the Old Spanish Trail. The trail was followed by Spanish
5    traders and by fur trappers and explorers. Euro-Americans began to explore the area's natural
6    resources in the 1820s, when fur trappers such as James Pattie and Antoine Roubideau travelled
7    through the area. The fur trade began to wane in the 1830s due to over-trapping and falling
8    prices. During the next two decades, the Euro-American presence was limited primarily to
9    U.S.-Government-sponsored exploratory expeditions.
10
11    The situation changed in 1859 with the discovery of gold on Cherry Creek near present-
12    day Denver. The resulting influx of Euro-Americans into Ute territory led to conflict. In
13    response, the treaty of 1868 established much of western Colorado as a reservation for the Utes,
14    but subsequent discoveries of ore bodies in the San Juan mountains led to further conflict, and
15    the Utes relinquished the San Juans in the Brunot Treaty of 1873, whereby the Moache, Capote,
16    and Weeminuche Ute bands were restricted to the Southern Ute Reservation along the
17    New Mexico border. Hostilities increased, which led to the Meeker Incident in 1879 and the
18    removal of the White River and Uncompahgre Utes to reservations in northeastern Utah and
19    southern Colorado (Reed 2006).
20
21    With the removal of the Utes, a limited amount of Euro-American farming and ranching
22    increased along the canyon bottoms of the area, but it was the discovery of a parrot-yellow
23    mineralization in a sandstone bed at the confluence of the Dolores River and Roc Creek about
24    1880 that led to the world's first discoveries of radioactive metals, in the form of carnotite ore,
25    and to the development of the Uravan Mineral Belt. Historically, the prosperity of the towns of
26    Bedrock, Nucla, and Naturita can be attributed to the construction of uranium- and vanadium-ore
27    processing plants. As is a common occurrence with mining and mineral extraction, the Uravan
28    Mineral Belt experienced a repeated boom-and-bust cycle tied to the supply of and demand for
29    radioactive metals and vanadium. Six periods of historical significance have been identified for
30    the Uravan Belt (Twitty 2008). The remains of the prospects, mines, roads, mining camps, drill
31    pads, and other modifications of the landscape remain in the Uravan Mineral Belt. Those that
32    retain their integrity and association with significant periods may be eligible for listing on the
33    NRHP.
34
35    In the late nineteenth century, about the time that the Curies working in France were
36    identifying radioactivity, it was discovered that carnotite ore, unique to the Uravan Mineral Belt,
37    contained the radioactive metals of radium and uranium. The period from 1898 through 1905
38    was a time of interest in radium in Europe. A growing demand for radium, first in the scientific
39    community and then in the medical industry, stimulated a minor wave of prospecting along the
40    San Miguel and Dolores Rivers. Ore bodies were identified, and the first successful uranium
41    extraction mills were built. However, the remoteness of the belt from Europe led Europeans to
42    rely on pitchblende ores from eastern Germany as a more economical source of uranium and
43    radium (Twitty 2008). Production in Montrose and San Miguel Counties collapsed in 1905.
44
45    In the following year, 1906, the construction of the first successful vanadium
46    concentration mill at Newmire (later Vanadium) sparked a revival of mining. Vanadium was in

demand as a hardening alloy used in steel production and was especially important for weapons production in Europe during World War I. San Miguel County proved to have rich deposits of roscoelite ore from which vanadium could be extracted. Radium was also in demand, especially after German sources were no longer available in the West. There was a mining boom and associated population growth. However, demand for both radium and vanadium collapsed in the early 1920s when sources were discovered in the Belgian Congo.

Mining in the Uravan Mineral Belt was much reduced until the middle of the Great Depression, when industry had revived enough to create a demand for vanadium. Development of vanadium milling continued, and large-scale companies came to dominate the industry, although smaller operations cumulatively provided a significant amount of ore. The process of vanadium revival accelerated between 1941 and 1945. During World War II, vanadium was in demand. The Government aggressively pursued vanadium production as a key component of weaponry and armor. In addition, under the guise of vanadium production, the Government sought uranium for use in the development of atomic weapons. The area contributed 15% of the uranium used in the Manhattan Project, mostly obtained by processing vanadium mill tailings.

By 1944, however, the U.S. Government's uranium production goals had been met, and in 1945, the bottom fell out of the uranium market. Some of the slack was taken up by the revival of industrial demand for vanadium. In 1947, the Federal Government formulated a strategy to stimulate the discovery, production, and milling of uranium from domestic sources. This became increasingly important during the Cold War. The industry was completely dependent on the Government, which strictly regulated uranium production. In the early 1960s, the U.S. Department of Defense's needs were almost fulfilled, and the AEC began to reduce its financial support of the uranium mining industry. The industry declined but then experienced a brief revival in the mid- to late 1970s, when vanadium was once more in demand for industry and uranium was needed for nuclear power production. Uranium prices collapsed once again in 1980, most of the mines closed, and the region lost much of its economic foundation (Twitty 2008).

## 3.11.2  Cultural Resource Inventories

The cultural resource site information discussed in this section was obtained from the Office of Archaeology and Historic Preservation in the state of Colorado in December 2011, from the State Historic Preservation Office of the Utah State Historical Society in March 2012, and from survey reports.

Cultural resource inventories can include both field surveys and documentary research studying the results of past field work in the area of interest. Archaeological surveys in the area were initiated by George and Edna Woodbury in 1931, but, by far, the majority of cultural resource surveys have been conducted in response to the requirements of Section 106 of the NHPA. Over time, the rigor and scope of these surveys have increased, so that, in general, Federal land-managing agencies (such as the BLM, which manages the surface resources of the lease tracts) regard the surveys conducted after about 1985 as adequate. Section 106 surveys

BLM_0042286

1 provide the data that Federal agencies use, in consultation with the SHPO and affected tribes, to
2 evaluate whether the identified sites meet the eligibility criteria for listing on the NRHP.
3
4        A cultural resource survey based on documentary evidence in past surveys and
5 investigations is termed a Class I inventory by the BLM. In 2006, Alan Reed conducted a Class I
6 cultural resource inventory of the lease tracts for DOE. He identified 126 mostly small-scale
7 surveys conducted on the lease tracts. Since 2006, 13 additional surveys have been conducted.
8 Table 3.11-1 shows the acreage of land that had been surveyed as of 2011. It shows that
9 2,800 acres (1,100 ha), or about 11%, of the 26,000 acres (10,500 ha) that lie within the lease
10 tracts have been subjected to cultural resource surveys. This is a somewhat lower percentage
11 than the survey coverage of lands in the surrounding 15 mi (24 km). Approximately
12 314,000 acres (127,000 ha), or about 18%, of the surrounding 1,700,000 acres (680,000 ha) have
13 been surveyed according to geographical information system (GIS) layers provided by the
14 Colorado and Utah SHPOs (Sullivan 2011; Miller 2012).
15
16        Archaeological site data on surveyed lands within 15 mi (24 km) surrounding the lease
17 tracts are also available from the SHPOs. The tracts cluster into four groups, as described in
18 Section 3.12. These four clusters vary somewhat from the named groups used in Section 3.3.
19 Since setting and viewshed are important components of the integrity of historic properties, this
20 section uses the groupings used in Section 3.12, Visual Resources; see Table 3.11-2.
21
22        The extent of archaeological survey coverage and the numbers of sites contained in the
23 15-mi (24-km) zones circumscribed around these four groups are listed in Table 3.11-3.
24 Calculated site densities are also listed. Site density ranges from 24 to 35 sites per square mile,
25 with density increasing from north to south. This increase may reflect a generally greater
26 accumulation of prehistoric sites (especially those dating to the latter parts of prehistory) along a
27 transect from higher to lower elevation and south toward the Ancestral Puebloan cultural
28 heartland. These site data from the 15-mi (24-km) radius hinterlands also provide a basis for
29 comparison with data from within the lease tracts proper, as summarized in Table 3.11-4.
30
31        Individual inventories in the northern cluster of lease tracts near Gateway reported site
32 densities ranging between 13 and 69 sites per square mile (Reed 2006). This range brackets the
33 average frequency of 24 sites per square mile derived from the surrounding 15-mi (24-km) zone.
34 It also brackets the average of 43 sites per square mile determined from Colorado SHPO data for
35 all the northern lease tracts (Sullivan 2011). The anomalously high site frequency figure of
36 69 sites per square mile is probably a result of sampling error.
37
38        One cultural resource inventory in the North Central tracts around Uravan reported a
39 density of 11 sites per square mile (Reed 2006). This figure is less than half the density number
40 derived from the survey in the surrounding 15-mi (24-km) zone. It is also much lower than the
41 average site density within the tracts of 52 sites per square mile derived from SHPO data. The
42 anomalously low number may be attributed to sampling error; however, only 12% of the North
43 Central tracts have been surveyed (Sullivan 2011). Averages based on such small sample sizes
44 may be misleading, especially where large numbers of mining-related sites may be clustered in
45 relatively small areas.
46

BLM_0042287

1
2

**TABLE 3.11-1  Cultural Resource Survey Coverage of the Lease Tracts**

| Lease Tract | Total Acreage of Lease Tract | No. of Acres Surveyed | Percentage of Total Surveyed |
|---|---|---|---|
| 5 | 151 | 4 | 2.6 |
| 5A | 25 | –[a] | 0.0 |
| 6 | 530 | 20 | 3.8 |
| 7 | 493 | 259 | 52.5 |
| 8 | 955 | 34 | 3.6 |
| 8A | 79 | 3 | 3.3 |
| 9 | 1,037 | 12 | 1.2 |
| 10 | 638 | 56 | 8.8 |
| 11 | 1,503 | 103 | 6.8 |
| 11A | 1,293 | 51 | 3.9 |
| 12 | 641 | 513 | 80.0 |
| 13 | 1,077 | 128 | 11.9 |
| 13A | 517 | 111 | 21.4 |
| 14 | 972 | 7 | 0.7 |
| 15 | 350 | 11 | 3.3 |
| 15A | 173 | 8 | 4.6 |
| 16 | 2,039 | 8 | 0.4 |
| 16A | 811 | 9 | 1.1 |
| 17 | 475 | 5 | 1.1 |
| 18 | 1,181 | 313 | 26.5 |
| 19 | 664 | 2 | 0.2 |
| 19A | 1,205 | 213 | 17.7 |
| 20 | 629 | – | 0.0 |
| 21 | 651 | 48 | 7.3 |
| 22 | 224 | 66 | 29.3 |
| 22A | 408 | 35 | 8.7 |
| 23 | 596 | 40 | 6.8 |
| 24 | 201 | 1 | 0.4 |
| 25 | 639 | 32 | 5.0 |
| 26 | 3,991 | 523 | 13.1 |
| 27 | 1,763 | 151 | 8.6 |
| Total | 25,911 | 2,766 | 10.6 |

[a]   A dash indicates not surveyed.

3
4

BLM_0042288

1
2

**TABLE 3.11-2  Correlation of Lease Tract Cluster Designations**

| Geographic Clusters | Named Grouping |
|---|---|
| North Cluster | Gateway |
| North Central Cluster | Uravan + Lease Tracts 21-23 |
| South Central Cluster | Paradox south of Paradox Valley |
| South Cluster | Slick Rock |

3
4
5
6

**TABLE 3.11-3  Cultural Resource Survey Coverage, Site Tallies, and Site Density within 15 mi (24 km) of Lease Tract Clusters**

| Lease Tract Cluster | Surveyed Acreage within a 15-mi Zone | Site Tally | No. of Sites per Acre | No. of Sites per Square Mile |
|---|---|---|---|---|
| North | 40,830 | 1,498 | 0.0367 | 23.5 |
| North Central | 99,950 | 4,223 | 0.0423 | 27.0 |
| South Central | 96,451 | 5,029 | 0.0521 | 33.4 |
| South | 77,065 | 4,167 | 0.0541 | 34.6 |
| Total | 314,296 | 14,917 | 0.0475 | 30.4 |

7
8
9
10

**TABLE 3.11-4  Cultural Resource Survey Coverage, Site Tallies, and Site Density within Each Lease Tract Cluster**

| Lease Tract Cluster | Surveyed Acreage within Cluster | Site Tally | No. of Sites per Acre | No. of Sites per Square Mile |
|---|---|---|---|---|
| North | 662 | 43 | 0.0650 | 41.6 |
| North Central | 694 | 56 | 0.0807 | 51.6 |
| South Central | 326 | 19 | 0.0584 | 37.3 |
| South | 978 | 103 | 0.1053 | 67.4 |
| Total | 2,659 | 221 | 0.0831 | 53.2 |

11
12

BLM_0042289

1   South of Paradox Valley, in the South Central lease tracts, individual surveys reported
2   site densities ranging from 21 to 54 sites per square mile (Reed 2006). This range evenly
3   brackets the average of 33 sites per square mile determined for the surrounding 15-mi (24-km)
4   zone. It also brackets the average site density of 37 sites per square mile derived from all
5   previous surveys in the south central lease tracts. Even though only 11% of the South Central
6   lease tracts have received archaeological survey coverage, site density figures generated for this
7   area seem reliable.
8
9   In the South tracts near Slick Rock, individual surveys determined site density figures
10  ranging from 14 to 31 sites per square mile (Reed 2006). Data from the surrounding 15-mi
11  (24-km) zone produced an average of 35 sites per square mile. Colorado SHPO data indicated
12  that surveyed land within the South Cluster lease tracts contained an average of 67 sites per
13  square mile (Sullivan 2011). There are clear discrepancies among these results. It seems likely
14  that the discrepancies are the result of incomplete survey coverage in the South Cluster lease
15  tracts, where only 10% of the area has been surveyed.
16
17  All the lease tracts are near or overlap areas of known prehistoric occupation as well as
18  areas of early Euro-American settlement, mining, and ranching (Reed 2006). Many of the lease
19  tracts contain structures and artifacts associated with the early uranium mining boom in the
20  United States; some of these features are considered historic and eligible for inclusion in the
21  NRHP. The extent that each lease tract has been inventoried ranges from 0% to 80%. Forty-two
22  individual cultural sites on the lease tracts were eligible for, or potentially eligible for, inclusion
23  in the NRHP. These include sites that have been officially determined to be NRHP-eligible by
24  Federal or state agencies, sites that have been recommended as eligible by site recorders but not
25  formally evaluated by the agencies, and sites that are classified by either the agencies or the
26  recorders as "needs data." These last sites require additional investigation to determine whether
27  they are eligible for listing on the NRHP. They must be managed as if they were eligible until it
28  is formerly determined otherwise.
29
30  Table 3.11-5 lists the number of eligible historic and prehistoric sites known from each
31  tract. Of the 42 cultural sites identified within the tracts, 24 are prehistoric, 14 are historic, and 4
32  have both historic and prehistoric components. Most of the prehistoric sites are classified as
33  either lithic scatters or as camp sites. In addition, one site is a rock art panel, and two are
34  classified as rock shelters. Historic sites are predominantly mines but also include a highway, a
35  cabin, and a mining camp (Reed 2006; Sullivan 2011).
36
37  One site associated with carnotite mining, Calamity Camp, is now listed on the NRHP
38  but has been excluded from Lease Tract 26. It includes approximately 23 stone and wood
39  structures, many of them constructed prior to 1922. At first, from the early 1900s through the
40  early 1920s, radium was the resource sought. Later, the ore was processed for vanadium and
41  uranium. This camp and others on Outlaw and Calamity Mesas, notably Foster Camp, Climax
42  Camp, and Arrowhead Camp, served as community centers for miners and their families during
43  the vanadium and uranium booms in southwest Colorado. To protect the structures and features
44  associated with this camp, BLM and DOE agreed to a "No Surface Occupancy" area that
45  includes and surrounds the camp. No cleanup or remediation work has or will take place within

BLM_0042290

1
2

**TABLE 3.11-5  Eligible and Potentially Eligible Sites in the Lease Tracts**

| Lease Tract No. | No. of Eligible Sites[a] | Prehistoric | Historic[a] | Multicomponent |
|---|---|---|---|---|
| 5 | 1 | 0 | 1 | 0 |
| 5A | 0 | 0 | 0 | 0 |
| 6 | 0 | 0 | 0 | 0 |
| 7 | 0 | 0 | 0 | 0 |
| 8 | 2 | 1 | 0 | 1 |
| 8A | 0 | 0 | 0 | 0 |
| 9 | 2 | 2 | 0 | 0 |
| 10 | 1 | 1 | 0 | 0 |
| 11 | 1 | 0 | 0 | 1 |
| 11A | 1 | 1 | 0 | 0 |
| 12 | 2 | 2 | 0 | 0 |
| 13 | 4 | 1 | 2 | 1 |
| 13A | 3 | 3 | 0 | 0 |
| 14 | 1 | 1 | 0 | 0 |
| 15 | 2 | 1 | 1 | 0 |
| 15A | 0 | 0 | 0 | 0 |
| 16 | 0 | 0 | 0 | 0 |
| 16A | 1 | 0 | 1 | 0 |
| 17 | 0 | 0 | 0 | 0 |
| 18 | 0 | 0 | 0 | 0 |
| 19 | 0 | 0 | 0 | 0 |
| 19A | 6 | 6 | 0 | 0 |
| 20 | 0 | 0 | 0 | 0 |
| 21 | 3 | 1 | 2 | 0 |
| 22 | 2 | 0 | 2 | 0 |
| 22A | 3 | 1 | 2 | 0 |
| 23 | 2 | 0 | 1 | 1 |
| 24 | 0 | 0 | 0 | 0 |
| 25 | 0 | 0 | 0 | 0 |
| 26 | 4 | 2 | 2 | 0 |
| 27 | 2 | 1 | 1 | 0 |

[a]  One site, 5SM3670, straddles the boundary between two sites and appears twice in this table.

Source: Information obtained from the Office of Archaeology and Historic Preservation in the state of Colorado in December 2011.

3
4
5

BLM_0042291

1  this area, and no remediation or disturbance is allowed within a 98-ft (30-m) buffer zone
2  surrounding the camp boundary.
3
4          Cultural site densities within DOE's lease tracts vary greatly. Cultural resource
5  inventories on some of the South Cluster or Slick Rock lease tracts have indicated densities of
6  14, 31, 22, and 24 sites per square mile (Lease Tracts 10, 11, 13A, and 15, respectively)
7  (Reed 2006). A total of 17 sites in the South Cluster lease tracts are eligible or potentially
8  eligible for listing in the NRHP. An open lithic site in Lease Tract 10 is potentially eligible for
9  inclusion in the NRHP. A prehistoric rock art site with a historic inscription is the only
10 potentially eligible site in Lease Tract 11, and an Ancestral Puebloan site is the only potentially
11 eligible site in Lease Tract 11A. An Archaic Period site with an Ancestral Puebloan component
12 is an eligible site in Lease Tract 12, along with a potentially eligible Archaic site. Four sites in
13 Lease Tract 13 are eligible or potentially eligible: (1) portions of a historic highway also known
14 as CO 141; (2) an open lithic site; (3) a historic mining camp; and (4) a multicomponent site with
15 a sheltered lithic component and historic trail. Three prehistoric sites in Lease Tract 13A are
16 potentially eligible: (1) a possible Archaic open lithic site; (2) an open camp site with a historic
17 prospect pit; and (3) an open camp site with a hearth feature and lithic remains. Lease Tract 14
18 has one potentially eligible site. It is an open lithic site of unknown cultural affiliation. Two sites
19 in Lease Tract 15 are potentially eligible: (1) a possible Paleoindian open lithic site and (2) the
20 Rimrock Cabins, a historic habitation site. Lease Tracts 16 and 16A are immediately adjacent to
21 the aforementioned eligible historic highway (Sullivan 2011). A survey of historic mine features
22 was conducted by Alpine Archaeological Consultants, Inc. (Moore-McMillian and Omvig 2009)
23 in the South Cluster tracts; however, none of the mines documented were determined eligible for
24 inclusion in the NRHP.
25
26          Cultural resource inventories on some of the lease tracts south of Paradox Valley reported
27 densities of 54 and 53 sites per square mile (Lease Tracts 5 and 9, respectively) (Reed 2006).
28 Two well-known cultural sites are located about 2 mi (3.2 km) southwest of Lease Tract 9: the
29 Bull Canyon rock shelter, a prehistoric site; and Indian Henry's Cabin, a noneligible, late-
30 nineteenth century site containing a well-preserved log cabin, corral, and grave site. A historic
31 mine, the Joe Dandy #5 site, is the only eligible site located on Lease Tract 5. An open camp site
32 with a historic rock ring is an eligible site on Lease Tract 8, where there is also a potentially
33 eligible open lithic site. The two sites located on Lease Tract 9 are open camp sites that are
34 potentially eligible for inclusion in the NRHP. The Radium Hill No. 10 Mine is an eligible
35 historic site on Lease Tract 17 (Sullivan 2011).
36
37          North of Paradox Valley and near Uravan, inventories of 22, 32, and 21 sites per square
38 mile were reported from Lease Tracts 21, 22, and 22A respectively (Reed 2006). Cultural
39 resource inventories on Lease Tract 18 indicate a density of 11 sites per square mile
40 (Sullivan 2011). Lease Tracts 19, 19A, 20, 24, and 25 are expected to have similar or higher site
41 densities (Reed 2006). Six sites on Lease Tract 19A are eligible or potentially eligible for
42 inclusion in the NRHP: four possible Archaic open camps; an open camp of unknown cultural
43 affiliation; and a rock shelter with an isolated historic find.
44
45          Lease Tract 21 has two eligible historic mine sites and a prehistoric open camp
46 (Sullivan 2011). One historic mine site is the Vanadium King No. 5 Mine; extant features of the

BLM_0042292

1    mine consist of an inclined shaft, an explosives magazine, a hoist house, a track-and-rail system
2    for ore car transportation, and an ore bin. The most intensive activity at the mine likely took
3    place during the Atomic era (1946–1963), although the mine operated until 1992. The mine has
4    retained enough integrity to illustrate uranium mining during the Atomic era and is therefore
5    eligible for NRHP inclusion (Moore and Horn 2010). Long Park Nos. 1 and 16 Mines make up
6    the other historic mine site. The principal remains of this site consist of a mine shaft, a waste-
7    rock dump, head frame, hoist foundation, hoist house, ore bin, ore chute, blower foundation,
8    storehouse ruin, and refuse dump. The No. 1 mine claim was initially located in 1912, and the
9    No. 16 mine claim was located in 1939, and both claims were active until 1992 (Moore and
10   Horn 2010). The site is considered eligible under Criterion A because of its association with the
11   Cold War and under Criterion C because it is an outstanding example of a formally engineered,
12   productive shaft mine (Twitty 2008).
13
14          Two sites in Lease Tract 22 are eligible for NRHP inclusion: the Cripple Creek/Donald C
15   Mine, Shaft No. 1 and Shaft No. 2. The extant features of Shaft No. 1 consist of an inclined
16   shaft, two waste-rock dumps, a hoist house foundation, a hoist house platform, a compressor
17   house platform, two rail line remnants, a trestle remnant, a trestle, an ore bin, an ore loading area,
18   a parking area, and a ventilation stack (Moore and Horn 2010). The remains of Shaft No. 2
19   consist of an inclined shaft, waste-rock dump, hoist foundation, rail line remnant, trestle ruin,
20   parking area, trestle segment, and ventilation stack (Moore and Horn 2010). Both mines are
21   eligible under Criterion A because of their association with the uranium boom in the 1950s as
22   part of the Cold War and under Criterion C because they are excellent examples of inclined shaft
23   mines for surface uranium drilling (Moore and Horn 2010).
24
25          Three sites in Lease Tract 22A are eligible or potentially eligible for the NRHP: Hidden
26   Basin Mine; the Republican Camp historic mining site; and an open camp site. Hidden Basin
27   Mine was initially located in 1944, and the extant remains at the site consist of an inclined shaft,
28   waste-rock dump, hoist house remnant, incline frame, rail line remnant, trestle remnant, ore bin,
29   loading area, utility pole, generator foundation, and low-grade ore piles (Moore and Horn 2010).
30   One site, an open camp and historic sweat lodge on Lease Tract 23(3), is potentially eligible for
31   the NRHP.
32
33          Cultural resource inventories of the Gateway or North Cluster lease tracts indicate a
34   density of 24 sites per square mile (Sullivan 2011) (Table 3.11-3). Numerous sites associated
35   with historical uranium mining are present. Lease Tract 26 contains four sites that are listed,
36   eligible, or potentially eligible for NRHP inclusion. A late Archaic open camp site has been
37   declared eligible for NRHP inclusion, as has another open camp site. An historic site has been
38   declared eligible for the NRHP; it is known as the New Verde Mine and dates to the 1940s. The
39   Radium No. 5 Mine is the fourth eligible site located on Lease Tract 26. The mine was first
40   located in 1939 and is eligible under Criterion C because of the presence and integrity of the
41   windlass artifact at the mine site (Horn and Moore-McMillian 2009). A historic mining complex
42   is an eligible site located on Lease Tract 27, and a possibly Archaic open camp is potentially
43   eligible on this lease tract.
44
45          Taken as a whole, the site distribution pattern found in the lease tracts suggests that
46   prehistoric sites are most likely to be found (1) on level to gently sloping land forms, often on

BLM_0042293

1  ridge crests or along mesa rims, within the juniper-piñon woodlands, and (2) along benches
2  overlooking rivers and streams. Ranching sites are most likely located along river bottom lands.
3  The distribution of mining sites is dictated by the presence of ore bodies. During the late
4  nineteenth and early-twentieth centuries, these ore bodies were primarily located visually and
5  tested by prospects, often along rims. Mining camps were located near the mines. Later, with the
6  advent of coring, deeply buried ore bodies were discovered well away from the rims, and
7  improvements in the road system allowed miners and their families to reside in the valley towns.
8  In an area where water is scarce, there is little doubt that the development of the mineral belt
9  resulted in historic mines, and settlements have already destroyed much of the prehistoric record
10  in the area. Networks of roads connecting mines, prospects, and drill pads, along with the
11  leveling done for mine facilities, waste rock disposal, and ore storage, are likely to have taken
12  their toll on prehistoric remains as well.

### 3.11.3  Traditional Cultural Properties

Traditional cultural properties are properties that are associated with the cultural practices
or beliefs of a community and are significant to the community's history or may be important in
maintaining the community's cultural identity. They can include archaeological sites; burial
sites; rock art; culturally important resources such as plants important for medicine or in rituals;
natural features such as mountain peaks, springs, caves, and distinctive rock formations; and
sacred landscapes. In many cases, they cannot be identified without input from the community
that considers them sacred or otherwise culturally important.

Traditional properties may not be readily identifiable during a Class I inventory or a
Class III field inventory (required prior to any new surface disturbing activity) alone. A Class III
field inventory is an intensive survey of an entire target area, aimed at locating and recording all
cultural resources (archaeological sites, historic structures, historic and cultural landscapes, and
traditional cultural properties) that have surface indications, and it is performed by walking
close-interval, parallel transects until the area has been thoroughly examined. The NHPA
requires that these properties or places be considered by Federal agencies in the same manner as
are other eligible cultural resources through the Section 106 consultation process.

In order to help identify traditional cultural properties in the study area that could be
affected by the proposed alternatives, DOE contracted with a cultural anthropologist in 2006
(Fritz 2006). He identified three Native American tribes with potential historical and cultural ties
to the lease tract, the Navajo, the Hopi, and the Utes. These tribes retain cultural ties to their
traditional homelands that can lie well beyond the boundaries of their current reservations. They
include sacred landscapes, often the settings for traditions regarding tribal emergence. They may
believe they have a divinely mandated stewardship over these sacred lands. The tribes and their
interests are described briefly here.

- *Navajo.* The Navajo take the view that they have always lived "among the
  four sacred mountains," having emerged from the four underworlds into this
  world at Mount Blanca (Two Bears 2012). However, according to linguistic
  and archeological evidence, today's Navajo, along with the Apache, coalesced

BLM_0042294

1   out of Athabaskan-speaking groups that probably entered the Southwest from
2   the north only relatively recently. One possible migration route is an
3   intermountain one through western Colorado and eastern Utah that would
4   include the lease tracts. Although evidence is scarce, it is likely that at least
5   some Athabaskan groups entered the study area prior to the fifteenth century.
6   It is possible that early Navajo sites may be found in the area. By the
7   sixteenth and seventeenth centuries, traditional Navajo lands included the
8   canyon tributaries of the San Juan River, Los Pinos River, and Animas River.
9   Some Navajo people were in alliance with the Ute and Paiute peoples in Moab
10  and the Lisbon Valley area close to the lease tract by the
11  mid-nineteenth century (Fritz 2006). In the twentieth century, some Navajos
12  became skilled miners and worked underground in the Uravan Mineral Belt
13  mines. Traditional Navajo hogans and sweat lodges have been documented in
14  the area (Twitty 2008).

15

16  •   *Hopi.* The Hopi are a Puebloan people whose traditional villages currently lie
17      on three mesas in northern Arizona. However, their current reservation
18      encompasses only a fraction of their traditional sacred and ancestral
19      homeland, or *Tutsqua*. Hopi clans have traditional migration narratives that
20      link them to places north and east of their current home. They are linked to an
21      extensive network of ancestral sites, often marked by clan rock art, that
22      include burial sites, shrines, medicinal gathering places, ancient farming
23      lands, and the habitat for the animals after which the clans are named. They
24      see themselves as descending from the Ancestral Puebloan cultures of the
25      Southwest, including those known to archaeologists as the Fremont and
26      Ancestral Puebloan cultures. The Hopi feel bound to *Tutsqua* by a long
27      history and a powerful spiritual covenant that includes a divine mandate to act
28      as stewards of the land. The lease tracts fall within the northern extent of
29      *Tutsqua* (Fritz 2006).

30

31  •   *Ute.* As already discussed, the Ute Indians are the Native Americans who
32      most recently dominated western Colorado. The lease tracts lie within the
33      heart of the Ute homeland. Traditionally, Ute populations have been identified
34      living along the Dolores River, along the San Miguel River, in Paradox
35      Valley, and on the Uncompahgre Plateau. Traditional Ute creation and
36      migration narratives and ceremonies, such as the Bear Dance, derive from the
37      natural world. Traditionally, the Utes see the landscape as infused with
38      sacredness and as a source of spiritual power. Utes were traditionally hunters
39      and gatherers following a seasonal round. Ute ceremonial and subsistence
40      patterns incorporate an extensive array of plants, and more than 100 species
41      have been recorded. These indications suggest a high potential for traditional
42      gathering areas within the lease tracts. In spite of their forced removal from
43      their traditional homeland, the Utes have retained a strong bond to these
44      locations (Fritz 2006).

45

BLM_0042295

1      A recent BLM project brought Utes from Utah and Colorado to areas that
2      included the northern half of the lease tracts to explore their ties to their
3      traditional homeland. They expressed deeply held values on living landscapes
4      and landforms that once were home to their ancestors or figured in their
5      cultural traditions. They were interested in the preservation of Ute trails and
6      wickiup sites. They expressed the importance of preserving access to locations
7      of traditional importance as well as to traditional plant resources. Ute
8      archaeological sites often include wooden surface features, such as wickiups,
9      tree platforms, ramadas, hunting blinds, brush fences, and corrals that, in the
10     past, have not always been recognized as having Ute affiliation
11     (Ott et al. 2010).
12

13 In 2006, communication was attempted with Native American tribal members who might
14 have knowledge of such traditional cultural properties being important to the tribes in the lease
15 tracts. During the preparation of the earlier environmental assessment, DOE formally initiated
16 the NHPA consultation process by notifying potentially interested Native American tribes that
17 resided in or had cultural ties to the project area to inform them of DOE's proposed alternatives
18 and to solicit their concerns or comments. A total of 11 representatives from five Native
19 American tribes—the Ute Mountain Ute Tribe (including the White Mesa Ute Tribe), Southern
20 Ute Tribe, Uintah-Ouray Ute Tribe, Navajo Nation, and Hopi Tribe—were contacted by mail,
21 telephone, and e-mail. All representatives were contacted again in July 2006 and given a copy of
22 the Class I inventory. Follow-up phone calls and e-mails continued through November 2006.
23 Responses were received from four tribes: the Ute Indian tribe of the Uintah and Ouray
24 Reservation; the Ute Mountain Utes; the Hopi; and the Navajo Nation. Both the Utes and the
25 Navajo both requested additional information. The Hopi responded that the area was not a high
26 priority, while the Ute Mountain Utes indicated that the area involved was too small (Fritz 2006).
27 To date, no tribe has made a determination regarding traditional cultural properties on the lease
28 tracts, primarily because future, site-specific development activities and the cultural sites they
29 might affect have not yet been determined. Section 6.1 presents a discussion of government-to-
30 government consultations being conducted for the ULP PEIS.
31
32

33 **3.12 VISUAL RESOURCES**
34

35      For this discussion, the lease tracts were divided into four groups:
36

37     1. North Group: Lease Tracts 27 and 26;
38

39     2. North Central Group: Lease Tracts 25, 24, 23T-3, 23T-2, 23T-1, 22, 22A, 21,
40         20, 19, 19A, and 18;
41

42     3. South Central Group: Lease Tracts 17T-2, 17T-1, 9, 8, 8A, 7, 6, 5, 5AT-3, and
43         5AT-2; and
44

45     4. South Group: Lease Tracts 16, 16A, 15, 15A, 14T-3, 14T-2, 14T-1, 13, 13A,
46         12, 11, 11A, and 10.

BLM_0042296

1   The North Group is located within Mesa County, east of the Dolores River. The North Central
2   Group and South Central Group are located within Montrose County; however, portions of Lease
3   Tract 17 straddle the borders of Montrose and San Miguel Counties. The South Group is located
4   entirely within San Miguel County adjacent to the Utah–Colorado border (Figure 3.12-1). These
5   groups, as well as portions of these groups, are analyzed for impacts resulting from activities
6   associated with Alternatives 1 through 5.
7
8          The grouping of lease tracts for the visual impact analysis differs from the named
9   groupings used in other portions of the ULP PEIS; the requirements of the visual impact analysis
10  dictate that lease tracts in close physical proximity be analyzed as a group, because they will
11  have views of approximately the same landscape. Lease tracts 21–23 north of Paradox Valley
12  have viewsheds (i.e., visible areas of the surrounding landscape) that are similar to those in the
13  Uravan Lease Tracts, but have very limited visibility of lands within Paradox Valley and south of
14  the valley. Lease tracts 6–9 of the Paradox Valley lease group have extensive views of Paradox
15  Valley and lands south of Paradox Valley. Combining the viewsheds of the lease tracts south of
16  Paradox Valley with those north of Paradox Valley would have generated misleading results that
17  would have implied that the more northern lease tracts would have views of activities south of
18  Paradox Valley. This problem was avoided by grouping the lease tracts of the Paradox Valley
19  lease group north of Paradox Valley with the Uravan lease tracts.
20
21
22  **3.12.1  Regional Setting**
23
24          This region within Colorado historically has been utilized for mining activities, including
25  the exploration and development of coal, oil, and gas; sand and gravel; and radium, uranium, and
26  vanadium.
27
28          Natural vegetation on and near the lease tracts varies from grasses and shrubs to
29  woodlands of piñon-juniper and Gambel oak. The land forms are characterized by a range of
30  features, including high mountain peaks, rolling plains, basins, valleys, and rock outcrops
31  (Chapman et al. 2006), creating a highly variable landscape with numerous colors, textures,
32  forms, and lines. The three counties are characterized by diverse landscapes consisting of
33  valleys, mesas, and plateaus. Within Mesa County, approximately 76% of the land is publicly
34  owned and controlled.
35
36          Montrose County is bisected by the Uncompahgre Plateau. In this county, the area west
37  of the plateau is known traditionally as the West End Planning Area; it contains the towns of
38  Nucla and Naturita, as well as several unincorporated communities. In this area, mining has been
39  a longstanding industry, and similar to land in Mesa County, much of the land in this area is
40  publicly administered. The West End has numerous natural resources, including the Dolores
41  River, which cuts across Paradox Valley (Montrose County 2010a), and the San Miguel River.
42  Portions of this county are also designated for their unique and/or specific environmental,
43  historic, and recreational qualities (e.g., Tabeguache Wilderness, the Unaweep Tabeguache
44  Byway, the Dolores River Canyon SRMA, the Dolores River Canyon Wilderness Study Area,
45  and the Hanging Flume).
46

BLM_0042297



**FIGURE 3.12-1  Locations of the Four Lease Tract Groups: North; North Central; South Central; and South**

BLM_0042298

Portions of the lease tracts within San Miguel County are located in the county's West End, as it also is known locally. In San Miguel County, this area includes locations within the Dry Creek Basin, Disappointment Valley, Slick Rock, and Egnar. This area is noted for its wildlife, historical and archaeological sites, natural resources, and landmarks. One of the main goals of the county comprehensive land management plan is to develop the county's natural resources in a way that would maintain the high overall quality of life enjoyed by its citizens. As part of this goal, the county intends to preserve the natural beauty of the San Miguel West End (San Miguel County 2008). Similar to both areas in Mesa and Montrose Counties, areas designated for their unique and/or environmental/recreational qualities also are located within the western portion of the county.

### 3.12.2  Lease Tracts

Many of the lease tracts are located along the tops and side slopes of broad mesa tops and benches, as well as within Dolores Canyon and Paradox Valley. During the October 2011 site visit, ephemeral streams also were noted, including some located within Paradox Valley. In some locations, such water sources have created deep incisions into the valley floors. The Dolores and San Miguel Rivers are major features in this area as well and are visible from elevated locations and within the canyons themselves.

Numerous unpaved, dirt and gravel roads cross the areas containing the lease tracts. Many of these roads lead to the individual tracts, providing an interconnected system of state and local roadways. In addition to the roads, other evidence of past mining activities in the region is present, including structures such as ore bins, head frames, gates, and water tanks. Similar types of structures likely would be utilized if mining activities were to continue. Views of the lease tracts and surrounding areas, including existing cultural modifications, are shown in Figures 3.12-2 through 3.12-8.

As observed during an October 2011 site visit, vegetation colors included yellows, greens, and browns, with variable textures and heights sufficient to add some visual interest. Varying levels of intermediate and full growth were indicated within the lease tracts as well. Depending on the season, some or all of the vegetation may be snow-covered or subject to color changes, which could affect the visual qualities of the area. In addition, ongoing reclamation efforts also could alter the existing vegetation.

A GIS viewshed analysis was conducted for each of the four groups of lease tracts. Viewshed calculations were performed by using National Elevation Data (NED) 10-meter Digital Elevation Model (DEM). The analyses included lands within 25 mi (40 km) of the lease tract borders. The ROI for visual resource analysis was set at 25 mi (40 km) because it is the approximate limit at which non-negligible visual contrasts from the structures and landforming activities in the proposed action could reasonably be expected to be visible in this region, assuming favorable viewing conditions and strong contrast between an object and its background. The analyses were conducted by assuming a target height of 30 ft (9 m) and a viewer height of 5 ft (1.5 m) (see Figure 3.12-9). The target height is the approximate maximum

BLM_0042299



1
2   **FIGURE 3.12-2  View from the Western Edge of Lease Tract 26 Facing Southwest (The La Sal Mountains are in the background.)**
3
4

BLM_0042300

1
2
3



**FIGURE 3.12-3  View from Mesa Top near Lease Tract 19 Facing West (showing the Dolores River in the middle ground area)**

BLM_0042301



1
2    FIGURE 3.12-4  View of Lease Tract 16A (showing the rubble pile from the previous open-pit mining activities)

BLM_0042302



1
2 FIGURE 3.12-5  View of the Cotter Mine on Lease Tract 11 (Remnants of previous activities are indicated by the presence of
3 the water tank.)

BLM_0042303

1
2
3



**FIGURE 3.12-6  View of the New Verde Mine Reclamation Site on Lease Tract 26 (Remnants of mining structures and an ore bin are present.)**

BLM_0042304



1
2 FIGURE 3.12-7  View of Lease Tract 19 Facing West (A headframe structure is located above the closed shaft of the Golden Cycle
3 underground mine.)
4

BLM_0042305



1

**FIGURE 3.12-8  View of Entrance to Underground Mine at Lease Tract 18 (The Cotter Mine entrance has a locked gate to prevent unauthorized entrance and is covered with fabric to control ventilation.)**

height of structures or other modifications to the landscape anticipated to cause visual contrasts associated with the proposed action or alternatives. The viewshed analyses did not take into account the height or screening potential of surrounding foliage or trees. The viewshed analysis did account for earth curvature and atmospheric refraction.

In addition to the overall viewshed, SVRAs were considered in each of these analyses. These areas included the following:

- National Parks, National Monuments, National Recreation Areas, National Preserves, National Wildlife Refuges, National Reserves, National Conservation Areas, and National Historic Sites;

- Congressionally authorized Wilderness Areas;

- Wilderness Study Areas;

BLM_0042306



**FIGURE 3.12-9  Composite Viewshed of Four Lease Tract Groups**

BLM_0042307

- National Wild and Scenic Rivers and Congressionally authorized Wild and Scenic Study Rivers;

- National Scenic Trails and National Historic Trails;

- National Historic Landmarks and National Natural Landmarks;

- All-American Roads, National Scenic Byways, State Scenic Highways, and BLM- and USFS-designated Scenic Highways and Byways;

- BLM-designated Special Recreation Management Areas; and

- Areas of Critical Environmental Concern.

Figure 3.12-10 shows the composite viewshed with SVRAs overlaid. No Nationally Wild and Scenic Rivers or Congressionally authorized Wild and Scenic Study Rivers were found to occur in the study area.

### 3.12.2.1 North Group

The north group of lease tracts is located within the Uncompahgre Plateau, east of Maverick Canyon, on the Calamity and Outlaw Mesas. Elevation within this grouping varies between 5,700 and 7,000 ft (1,700 and 2,100 m). Calamity Creek, Indian Creek, and Cow Creek run through the lease tracts in this grouping. The town of Gateway is located approximately 5.5 mi (8.8 km) northwest of the lease tracts. Off-site views from the northern lease tracts include the Uncompahgre Plateau to the northeast–east, the Dolores River to the west, and the La Sal Mountains to the south–southwest (see Figure 3.12-9). Views to the south also include a mountainous area consisting of mesa tops and canyons cut by tributaries of the Dolores River.

A preliminary viewshed analysis was conducted to identify which lands surrounding the North Group would potentially have views of the activities and infrastructure within the lease tracts. The methodology for this reverse viewshed analysis is provided in Appendix D; this analysis considered Federal, state, and BLM-designated sensitive visual resources. Table 3.12-1 provides a list of SVRAs that would have potential views of the North Group. As shown, the lease tracts within the North Group would be visible from nearly 38% (7,500 acres [3,000 ha]) of the Sewemup WSA, while the North Group would be visible from less than 1% (2 acres [0.8 ha]) of the Tabeguache Wilderness. Figure 3.12-10 illustrates the location of these areas.

Calamity Mine, an NRHP site, is a 38-acre (15-ha) historical mining complex located on Lease Tract 26. A 98-ft (30-m) buffer has been instituted around the site; however, activities within portions of Lease Tract 26 would likely be visible from the camp within the BLM foreground distance of 0 to 3–5 mi (5–8 km), assuming that vegetation did not screen these areas from view of the camp. Distant views (13–25 mi [21–40 km]) of activities within some of the lease tracts in the North Central group would also be possible, assuming that vegetation did not screen these areas from view of the camp.

BLM_0042308



1

2   **FIGURE 3.12-10  Composite Viewshed with Overlay of Sensitive Visual Resource Areas**

BLM_0042309

1    **TABLE 3.12-1  Sensitive Visual Resource Areas with Potential Views of the**
2    **North Group**

|  | | Acreage Visible | | |
| SVRA | Total Acreage | Within 5 mi | Within 15 mi | Within 25 mi |
|---|---|---|---|---|
| The Palisade ONA ACEC[a] | 23,645 | 0 | 555 | 555 |
| Unaweep/Tabeguache Scenic and Historic Byway | 41,348 | 4 | 67 | 67 |
| Dolores River SRMA | 65,278 | 0 | 0 | 124 |
| Dolores River Canyon WSA | 29,169 | 0 | 0 | 122 |
| Sewemup WSA | 19,627 | 639 | 7,519 | 7,519 |
| The Palisade WSA | 26,654 | 0 | 387 | 387 |

[a]    The Palisade (ONA) ACEC was designated in part for its high scenic values;
      therefore, it is being considered in this analysis.

3
4
5    **3.12.2.2  North Central Group and South Central Group**
6
7        The center two groupings of lease tracts are bisected by Paradox Valley. The elevation
8    within these groups varies between 5,000 and 7,200 ft (1,500 and 2,200 m). Portions of these two
9    groupings are located along the Atkinson Mesa, Club Mesa, and Monogram Mesa. Atkinson
10   Creek, a tributary of the Dolores River, crosses through Lease Tract 18.
11
12       Highway 141 also runs within the grouping, passing between Lease Tracts 24 and 19,
13   19A, 20, and 18; this roadway follows the Dolores River and San Miguel River. Hanging Flume,
14   a site on the NRHP, is located west of Lease Tract 19 along this highway. Highway 141 in this
15   area is also known as the Unaweep/Tabeguache Scenic and Historic Byway.
16
17       Views from the North Central Group include mountainous areas consisting of mesa tops
18   and canyons in all directions, as well as the Paradox Valley, which is located south of the lease
19   tracts. The Manti La Sal National Forest is also visible from these lease tracts, especially those
20   lease tracts located closest to the Colorado–Utah border. The historic town of Uravan, which is
21   no longer populated, is located within the grouping, between Lease Tracts 18 and 25. The lease
22   tracts likely would not be visible from the valley due to the surrounding topography.
23
24       A viewshed analysis was conducted to illustrate areas within the SVRAs that would have
25   views of the lease tracts in the North Central Group. Table 3.12-2 provides a list of these
26   locations. The North Central Group would be visible from 4,800 acres (1,900 ha), or 58.6%, of
27   the Tabeguache Wilderness. In addition, four SVRAs would have views not only of the North

BLM_0042310

1    **TABLE 3.12-2  Sensitive Visual Resource Areas with Potential Views of the North**
2    **Central Group**

|  |  | Acreage Visible | | |
| --- | --- | --- | --- | --- |
| SVRA | Total Acreage | Within 5 mi | Within 15 mi | Within 25 mi |
| San Miguel ACEC[a] | 24,204 | 0 | 0 | 51 |
| Unaweep/Tabeguache Scenic and Historic Byway | 41,348 | 4,067 | 6,097 | 8,820 |
| Dolores River SRMA | 65,278 | 0 | 879 | 879 |
| San Miguel River SRMA | 39,373 | 0 | 0 | 285 |
| Tabeguache Wilderness | 8,187 | 0 | 4,802 | 4,802 |
| Dolores River Canyon WSA | 29,169 | 0 | 860 | 860 |
| Sewemup WSA | 19,627 | 309 | 6,947 | 6,947 |

[a]   The San Miguel ACEC was designated in part for its high scenic values; therefore, it is being considered in this analysis.

3
4
5    Central Group but also of the lease tracts within the North Group; they are the Dolores River
6    SRMA, the Tabeguache Area, the Dolores River Canyon WSA, and the Sewemup WSA.
7
8           Areas within the South Central Group have views down to the Paradox Valley, the
9    Dolores River SRMA, and the Mt. Pearle Ecological Research Natural Area (ERNA). Portions
10   of the North Central Group are also within view of elevated locations in the South Central
11   Group, and there is intervisibility between the individual lease tracts within the South Central
12   Group.
13
14          A preliminary viewshed analysis was conducted to identify which lands surrounding the
15   South Central Group would have views of the lease tracts. Table 3.12-3 provides a list of SVRAs
16   that have potential views of the lease tracts in the South Central Group. As shown, all the areas
17   listed have views of both the South Central Group and the North Central Group. One additional
18   area, the McKenna Peak WSA, has potential views of the South Central Group. The South
19   Central Group is visible from approximately 720 acres (290 ha), or 3.5%, of this WSA.
20
21          The SVRAs within the 25-mi (40-km) viewshed of the North Central and South Central
22   Groups are depicted in Figure 3.12-10.
23
24

BLM_0042311

1  **TABLE 3.12-3  Sensitive Visual Resource Areas with Potential Visibility of the South**
2  **Central Group**

| SRVA | Total Acreage | Acreage Visible | | |
|------|--------------|-----------------|---|---|
| | | Within 5 mi | Within 15 mi | Within 25 mi |
| San Miguel ACEC[a] | 24,204 | 0 | 0 | 21 |
| Unaweep/Tabeguache Scenic and Historic Byway | 41,348 | 0 | 1,053 | 3,789 |
| Dolores River SRMA | 65,278 | 3,239 | 8,394 | 8,937 |
| San Miguel River SRMA | 39,373 | 0 | 0 | 285 |
| Tabeguache Wilderness | 8,187 | 0 | 3,660 | 3,744 |
| Dolores River Canyon WSA | 29,169 | 3,196 | 6,485 | 6,485 |
| McKenna Peak WSA | 19,927 | 0 | 0 | 715 |
| Sewemup WSA | 19,627 | 0 | 0 | 1,580 |

[a]  The San Miguel ACEC was designated in part for its high scenic values; therefore, it is being considered in this analysis.

3
4
5  **3.12.2.3  South Group**
6
7      The South Group of lease tracts lies to the west–southwest of Disappointment Valley, Big
8  Gypsum Valley, and Dry Creek Basin near Slick Rock. Elevation within this part of the region
9  varies between approximately 5,400 and 8,000 ft (1,650 and 2,400 m). The Dolores River
10  crosses various lease tracts within this grouping. Portions of the Dolores River SRMA are within
11  these lease tracts as well. Highway 141 also crosses through the South Group within Lease
12  Tract 13 and along the borders of Lease Tracts 16 and 16A.
13
14      Off-site views from the southern lease tracts include the Dolores River and the Dolores
15  River SRMA. Views to the north also include the South Central lease tracts; to the northwest,
16  Mt. Peale ERNA is also visible from this group. Views to the east include the San Miguel
17  ACEC, the San Miguel River SRMA, the Tabeguache Wilderness, and the Unaweep/Tabeguache
18  Scenic and Historic Byway. In addition, views to the south include the Canyon of the Ancients
19  National Monument; views to the southeast include McKenna Peak WSA and areas within the
20  San Juan National Forest. There is intervisibility among the individual lease tracts within the
21  group as well.
22
23      Similar to the analyses for other three groups, a preliminary viewshed analysis was
24  conducted to determine which lands would have potential views of the lease tracts within the

BLM_0042312

1   South Group. Table 3.12-4 provides a list of these SVRAs. The South Group is visible from
2   seven of the SVRAs. Of these seven SVRAs, three also have potential views of locations in
3   another lease tract group—the Dolores River SRMA, the Dolores River Canyon WSA, and the
4   McKenna Peak WSA. Figure 3.12-10 shows the location of these areas within the South Group
5   lease tracts.

### 3.12.3  Visual Resource Management

10   The lease tracts are located within three BLM field offices: the Tres Rios; Grand
11   Junction; and Uncompahgre Field Offices. In 2009, the Uncompahgre and Grand Junction Field
12   Offices conducted visual resource inventories (VRIs). These inventories included an evaluation
13   of lands contained within some of the lease tracts in the North, North Central, and South Central
14   Groups (Otak, Inc. 2009).[24]

16   A BLM VRI evaluates BLM-administered lands in terms of their scenic quality,
17   sensitivity level (in terms of public concern for preservation of scenic values in the evaluated
18   lands), and distance from travel routes or key observation points (KOPs). On the basis of these
19   three factors, BLM-administered lands are placed into one of four VRI classes, which represent
20   the relative value of the visual resources. Class I and II are the most valued; Class III represents a
21   moderate value; and Class IV represents the least value. Class I is reserved for specially
22   designated areas, such as national wildernesses and other Congressionally and administratively
23   designated areas for which decisions have been made to preserve a natural landscape. Class II is
24   the highest rating for lands without special designation. More information about the VRI
25   methodology is available in *Visual Resource Inventory, BLM Manual Handbook 8410-1*
26   (BLM 1986a).

28   Within the Grand Junction Field Office, Lease Tracts 26 and 27 (i.e., the North Group)
29   contain lands assigned a value of VRI Class IV (Scenic Quality Rating Unit 53 – Maverick
30   Mesa), indicating low relative visual values.

32   Within the Uncompahgre Field Office, Lease Tracts 5, 5A, 6, 7,8, 9, 21, 22, 22A, 23, 24,
33   and 25 (i.e., portions of the North Central and South Central Groups) contain lands assigned a
34   value of VRI Class III, indicating moderate relative visual values. These lease tracts are located
35   in areas defined by their exposed rock faces and mixtures of sage, piñon-juniper, and ponderosa
36   vegetation, as well as by their steep elevation grade from the Paradox Valley and existing mining
37   activities (Otak, Inc. 2009).

39   Lease Tract 7 (i.e., a lease tract within the South Central Group) primarily contains areas
40   that are assigned to VRI Class III; however, a small portion in the northwest corner is located
41   within an area assigned a value of VRI Class II. The areas contained by this lease tract are
42   defined by an enclosed valley that is surrounded by prominent cliff faces, as well as the presence
43   of the Dolores River and West Paradox Creek.

---

24   Data were not available for the Tres Rios Field Office as of April 2012.

BLM_0042313

1
2

**TABLE 3.12-4  Sensitive Visual Resource Areas with Potential Views of the South Group**

| | | Acreage Visible | | |
|---|---|---|---|---|
| SRVA | Total Acreage | Within 5 mi | Within 15 mi[a] | Within 25 mi[a] |
| Canyons of the Ancients National Monument | 181,629 | 0 | 0 | 1,111 |
| Dolores River SRMA | 65,278 | 7,098 | 8,283 | 8,391 |
| Cahone Canyon WSA | 9,154 | 0 | 0 | 794 |
| Dolores River Canyon WSA | 29,169 | 0 | 1,100 | 1,205 |
| McKenna Peak WSA | 19,927 | 0 | 246 | 5,421 |
| Squaw/Papoose Canyon WSA | 5,017 | 0 | 0 | 46 |
| Trail of the Ancients | 46,181 | 0 | 0 | 1,748 |

3
4
5    Lease Tracts 18, 19, 19A, and 20 (i.e., portions of the North Central Group) primarily
6 include lands that are assigned a value of VRI Class III, although portions of the lease tracts
7 contain areas indicated as VRI Class II. These lease tracts include areas defined by open, rolling
8 landscapes with low hills and gentle drainages, as well as lands characterized by dominant
9 vegetation and a long canyon. The VRI for the areas contained by these lease tracts suggests that
10 former uranium mines and milling are present where reclamation has "significantly reduced
11 visual evidence of human impact" (Otak, Inc. 2009).
12
13    A viewshed analysis was conducted for each of the four groups of lease tracts. The
14 viewshed analyses included lands within 25 mi (40 km) of the lease tract borders.
15
16    Once VRI classes are established, the information obtained can be used, along with
17 considerations for other land uses, to determine the visual resource management (VRM)
18 objectives for the field office. The VRM system provides guidance for future decisions that
19 allow for protection of visual resources (BLM 2010b). The VRM classes are prescribed within
20 the resource management plans (RMPs) for the individual field offices and district offices.
21
22    The Grand Junction RMP includes the North Group lease tracts. The Grand Junction
23 RMP is currently being updated, and the new RMP is anticipated for the spring of 2014
24 (BLM 2011d).
25
26    A majority of the lease tracts within the North Central and South Central Groups are
27 located within lands managed by the Uncompahgre Field Office, while portions of Lease
28 Tracts 9 and 17 are within lands managed by the Tres Rios Field Office. The South Group lease
29 tracts also are located on lands managed by the Tres Rios Field Office.

BLM_0042314

The Uncompahgre and Tres Rios Field Offices are participating in ongoing revisions of their 1988 and 1985 land use plans, respectively (BLM 1985, 1988).

For the Uncompahgre Field Office, the RMP update process began in the winter of 2009–2010. The final RMP is anticipated for completion in late summer of 2014 (BLM 2010a). According to the RMP Planning Fact Sheet on VRM for this field office, VRM classes that were prescribed in the 1985 and 1989 RMPs "are now insufficient to be used as a management tool because of data inconsistencies and the outdated nature of the class designations" (BLM 2010b). As part of the RMP revision process, all land within the planning area was reevaluated and assigned to a VRI class (BLM 2010b).

The Tres Rios Field Office is involved in the revision of its RMP as part of the San Juan Public Lands RMP revision; that RMP covers the field offices of Dolores (now Tres Rios), Columbine, and Pagosa (BLM 2007b). The Draft EIS for that RMP was prepared in 2007, with a supplement prepared in August 2011. The VRM classes have not yet been established; four alternatives for these classes are presented in the Draft EIS (BLM 2007a).

More information about the BLM VRM program is available in *Visual Resource Management, BLM Manual Handbook 8400* (BLM 1984).

## 3.13  WASTE MANAGEMENT

Waste rock is generated as the ore is segregated from the host and/or cover rock during underground or surface open-pit mining. Mines in the area where the DOE ULP lease tracts are located are expected to generate 2 to 3.5 tons of waste rock per ton of ore (Energy Fuels Resources Corp. and Greg Lewicki and Associates 2008). Once the waste rock has been generated, it can be placed or piled up in a designated area on the mine site that is commonly referred to as the waste-rock area. The optimal locations for waste-rock areas are outside drainages and flat areas where water runoff can be controlled. This approach also facilitates subsequent reclamation activities. Typically, some percentage of the waste rock generated can be placed back into mine openings during reclamation activities. However, a large percentage does remain on the surface, and it is eventually graded to slope that is consistent with the surrounding area, covered with surface soil materials and seeded.

In addition to the waste rock, other waste material is generated while mining activities are conducted; such wastes include the following:

1.  Waste (primarily solids) from the treatment of water containing uranium and other metals in concentrations exceeding those specified in the surface water discharge standards. The treated water is then discharged in a manner consistent with discharge permits, and the solid residue is accumulated, dried out, and packaged for off-site disposal (e.g., to a mill or licensed low-level radioactive waste facility).

BLM_0042315

2.  Used oil, antifreeze, and solvents from maintenance activities. These wastes are given secondary containment while they are stored on site in accordance with Federal and state regulations. Then they are transported to a permitted facility for recycling or for disposal.

3.  Other solid waste materials generated (including concrete from ore pads and foundations, drill steel, mine timbers, and vent bags). Materials exceeding standards are either placed back into mine workings or taken to a mill for uranium recovery. Inert materials, such as the foundation and concrete, are broken up and buried on the site. These wastes can also be taken to a recycling or a permitted landfill (e.g., landfills located near Nucla or Naturita, Colorado). Soils containing contaminants inherent in the ore are managed as radioactive material. Pollutants, contaminants, wastes, or contaminated media that are not inherent to site geology are be removed from the site and managed as waste under state or Federal regulations.

With regard to sanitary waste, small mines are typically equipped with portable facilities, and these are removed from the site and disposed of. Leach fields with septic tanks are typically found in larger mine operations so that gray water or sanitary wastewater can be released to a subsurface drain field. The solids from the septic tanks are pumped out or removed for off-site disposal (e.g., at a landfill).

BLM_0042316

# 4 ENVIRONMENTAL IMPACTS

DOE is evaluating potential impacts from the five alternatives discussed in Chapter 2 for the management of the ULP. The affected environments in the ROI for each of the 13 resource areas are discussed in Chapter 3. Other site-specific information and assumptions or bases for the impact evaluation for each of the five alternatives are discussed in Chapter 2 (Sections 2.2.1.1, 2.2.2.1, 2.2.3.1, 2.2.4.1, and 2.2.5.1), with additional details presented in Appendix C. The methodology used to evaluate the potential impacts is summarized in Appendix D for each of the resource areas evaluated. Additional discussion on the determination of the ROIs can also be found in Appendix D. To minimize redundancy in the text presented, information that applies to all five alternatives is presented in the text for the first alternative where it is applicable and not repeated in subsequent sections for the remaining alternatives.

## 4.1 ALTERNATIVE 1

Under Alternative 1, existing disturbed areas at 10 lease tracts (5, 6, 7, 8, 9, 11, 13, 15, 18, and 26) totaling about 257 acres (100 ha) would be reclaimed. It is assumed that the reclamation would be completed within 1 year of field work, followed by an observation period of about 2 years to gauge revegetation performance and obtain state approval.

> Alternative 1: DOE would terminate all leases, and all operations would be reclaimed by lessees. DOE would continue to manage the withdrawn lands, without uranium leasing, in accordance with applicable requirements.

Reclamation activities would involve (1) removing most, if not all, of the surface-plant area improvements (e.g., equipment, buildings, utilities); (2) removing from the site all wastes, contaminated media, and contaminated structures that were not inherent to the site geology and managing them as waste under state or Federal regulations; (3) placing in the mine any residual ores and other radioactive materials inherent to the site; (4) closing open shafts, adits, and inclines; (5) implementing erosion-control measures; (6) grading the waste-rock pile to be consistent with surrounding slopes; (7) replacing surface soils; and (8) revegetating.

### 4.1.1 Air Quality

Under Alternative 1, during reclamation, primary emission sources would include engine exhaust from heavy equipment and trucks, fugitive dust from earth-moving activities, and exposed ground or stockpiles being eroded by the wind. Engine exhaust emissions from heavy equipment and trucks would include criteria pollutants such as carbon monoxide (CO), nitrogen oxides ($NO_x$), particulate matter ($PM_{2.5}$ and $PM_{10}$), and sulfur dioxide ($SO_2$); VOCs; and greenhouse gases (GHGs) (e.g., the primary GHG, carbon dioxide [$CO_2$]). Soil disturbances and wind erosion would generate mostly PM emissions. Typically, the amount of fugitive dust emissions is larger than the amount of engine exhaust emissions during the reclamation phase.

BLM_0042317

1    Emissions during the reclamation year were estimated as shown in Table 4.1-1
2  (see Appendix C for details). $PM_{10}$ emission estimates of about 142 tons/yr are highest,
3  accounting for about 0.92% of emission totals for the three counties (Mesa, Montrose, and
4  San Miguel) encompassing the DOE ULP lease tracts. Most of these $PM_{10}$ emissions, which
5  account for about 2.4% of total emissions in Montrose County, would come from a very large
6  open-pit mine (JD-7). A potential for 24-hour $PM_{10}$ NAAQS exceedances at the lease tract
7  boundary is anticipated when heavy activities would occur near the boundary. Among non-PM
8  emissions, $NO_x$ emissions from diesel combustion of heavy equipment and trucks are highest, up
9  to 0.09% of three-county total emissions. Measures (i.e., compliance measures, mitigation
10 measures, and BMPs) provided in Table 4.6-1 (Section 4.6), would be implemented to ensure
11 compliance with environmental requirements. Thus, it is anticipated that potential impacts on
12 ambient air quality associated with reclamation activities under Alternative 1 would be minor
13 and temporary in nature. These low-level emissions are not anticipated to cause measureable
14 impacts on regional ozone ($O_3$) or AQRVs, such as visibility or acid deposition, at nearby Class I
15 areas, as discussed in detail in Section 4.3.1. In addition, $CO_2$ emissions during reclamation are
16 estimated to be about 0.001% of Colorado GHG emissions in 2010 at 140 million tons
17 (130 million metric tons) of $CO_2$ equivalent ($CO_2e$) and 0.00002% of U.S. GHG emissions in
18 2009 at 7,300 million tons (6,600 million metric tons of $CO_2e$) (EPA 2011a; Strait et al. 2007).
19 Thus, under Alternative 1, potential impacts from reclamation activities on climate change would
20 be negligible.
21
22    Reclamation activities will include grading, contouring, topsoil replacement, and seeding
23 and mulching, in such a manner that the approximate original topographic contours are
24 reestablished. The reclaimed areas will be monitored on a regular basis to ensure the integrity is
25 maintained. Accordingly, long-term effects on ambient air quality after the reclamation are
26 anticipated to be negligible.
27
28
29 **4.1.2  Acoustic Environment**
30
31    Reclamation activities would be similar to conventional construction activities in terms of
32 procedures and equipment; however, activities would generally proceed in reverse order and
33 would also proceed more quickly; thus, the associated impacts would last for a shorter time and
34 on a more limited scale. Potential noise impacts on nearby residences or communities would be
35 correspondingly less than those from operational activities. During reclamation, heavy
36 construction equipment that would be used would include a backhoe, bulldozers, a grader,
37 loaders, a track hoe, trucks, and a scraper.
38
39    Heavy equipment used during reclamation is similar to that used during mine
40 development and operations, so it is conservatively assumed that noise levels during reclamation
41 would be the same as they were during the mine development and operations phase. A composite
42 noise level of 95 dBA at a distance of 50 ft (15 m) is assumed, as discussed in detail in
43 Section 4.3.2. When only geometric spreading and ground effects among several sound
44 attenuation mechanisms are considered (Hanson et al. 2006), noise levels would attenuate to
45 about 55 dBA at a distance of 1,650 ft (500 m) from the reclamation site, which is the Colorado

BLM_0042318

1
2

**TABLE 4.1-1  Peak-Year Air Emissions from Reclamation under Alternative 1[a]**

| Pollutant[b] | Annual Emissions (tons/yr) | | |
|---|---|---|---|
| | Three-County Total[c] | Reclamation | |
| CO | 65,769 | 5.8 | (0.01%)[d] |
| $NO_x$ | 13,806 | 12.1 | (0.09%) |
| VOCs | 74,113 | 1.2 | (0.002%) |
| $PM_{2.5}$ | 5,524 | 29.1 | (0.53%) |
| $PM_{10}$ | 15,377 | 142.1 | (0.92%) |
| $SO_2$ | 4,246 | 1.6 | (0.04%) |
| $CO_2$ | $142.5 \times 10^6$ [e] | 1,100 | (0.001%) |
| | $7,311.8 \times 10^6$ [f] | | (0.00002%) |

[a]  Under Alternative 1, it is assumed that 10 lease tracts (5–9,11,13,15,18, and 26) with a total area of 257 acres (100 ha) would be reclaimed within a year.

[b]  Notation: CO = carbon monoxide; $CO_2$ = carbon dioxide; $NO_x$ = nitrogen oxides; $PM_{2.5}$ = particulate matter with a mean aerodynamic diameter of ≤2.5 µm; $PM_{10}$ = particulate matter with a mean aerodynamic diameter of ≤10 µm; $SO_2$ = sulfur dioxide; and VOCs = volatile organic compounds.

[c]  Total emissions in 2008 for all three counties encompassing the DOE ULP lease tracts (Mesa, Montrose, and San Miguel Counties), except for $CO_2$ (see footnotes e and f). See Table 3.1-2.

[d]  Numbers in parentheses are percentages of three-county total emissions except for $CO_2$, which are percentages of total Colorado emissions (top line) and total U.S. emissions (bottom line).

[e]  Annual emissions in 2010 for Colorado on a $CO_2$-equivalent basis.

[f]  Annual emissions in 2009 for the United States on a $CO_2$-equivalent basis.

Source: CDPHE (2011a); EPA (2011a); Strait et al. (2007)

3

BLM_0042319

1  daytime maximum permissible limit of 55 dBA in a residential zone.[1] If a 10-hour daytime work
2  schedule is considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974)
3  would occur about 1,200 ft (360 m) from the site. In addition, other attenuation mechanisms,
4  such as air absorption, screening effects (e.g., natural barriers by terrain features), and skyward
5  reflection due to temperature lapse conditions typical of daytime hours would reduce noise levels
6  further. Most residences are located beyond these distances; however, if reclamation activities
7  occurred near the boundary of Lease Tract 13, noise levels at nearby residences could exceed the
8  Colorado limit.
9
10       It is assumed that most reclamation activities would occur during the day, when noise is
11  better tolerated, because the masking effects from background noise are better at that time than at
12  night. In addition, reclamation activities at the lease tracts would be temporary in nature
13  (typically a few weeks to months depending on the size of the area to be reclaimed).
14  Accordingly, reclamation within the lease tracts would cause some unavoidable but localized
15  short-term and minor noise impacts on neighboring residences or communities. The same
16  measures (i.e., compliance measures, mitigation measures, and BMPs) adopted during the mine
17  development and operations phase, identified in Table 4.6-1 (Section 4.6), could also be
18  implemented during reclamation under Alternative 1.
19
20
21  **4.1.3  Geology and Soil Resources**
22
23       Section 4.1.3.1 provides an overview of various potential impacts on soil resources due to
24  ground disturbance from mining activities at the DOE ULP lease tracts. Section 4.1.3.2 discusses
25  the potential impacts on soil resources under Alternative 1. Section 4.1.3.1.7 provides an
26  overview of various potential impacts on paleontological resources due to ground disturbance
27  from mining activities at the ULP lease tracts. Section 4.1.3.3 discusses the potential impacts on
28  paleontological resources under Alternative 1.
29
30
31       **4.1.3.1  Potential Soil Impacts Common to All Alternatives**
32
33       Table 4.1-2 provides a summary of the types of potential soil impacts common to all
34  alternatives (in varying degrees) and the mining activities that could cause them. These impacts
35  include soil compaction, soil horizon mixing, loss of soil organic matter, soil erosion and
36  deposition by wind, soil erosion by water and surface runoff, and sedimentation, as described
37  below. The implementation of mitigation measures and BMPs to preserve the health and
38  functioning of soils within the lease tracts would reduce the likelihood of soil impacts becoming
39  impacting factors on other resources, such as vegetation, air, water, and wildlife, and it would
40  also contribute to the success of future reclamation efforts. Such measures (i.e., compliance and
41  mitigation measures) and BMPs are detailed in Table 4.6-1 (Section 4.6).

---

[1]  DOE ULP activities might be subject to the much higher levels that pertain to light industrial or industrial zones,
     as in Colorado Revised Statutes, Title 25, "Health," Article 12, "Noise Abatement," Section 103, "Maximum
     Permissible Noise Levels."

BLM_0042320

1    **TABLE 4.1-2  Potential Impacts from Mining Activities on Soil Resources**

| Soil Impact | Impacting Mining Activities | Resources Potentially Affected by Soil Impact |
|---|---|---|
| Soil compaction | • Clearing vegetation<br>• Grading soil surface<br>• Excavating and backfilling<br>• Constructing infrastructure (roads and pads, buildings, storage areas, and utilities)<br>• Stockpiling of soil, waste rock and ore<br>• Operating heavy trucks and equipment on unpaved roads and surfaces<br>• Increased foot traffic | • Vegetation (diminished productivity)<br>• Water resources (changes in natural flow systems due to increased surface runoff; degradation of surface water quality)<br>• Microbial community (sterilization) |
| Soil horizon mixing | • Clearing vegetation<br>• Grading soil surface<br>• Excavating and backfilling<br>• Stockpiling waste rock and ore | • Vegetation (diminished productivity; growth of invasive species)<br>• Cultural (disturbance of and/or damage to buried artifacts) |
| Soil contamination | • Releasing fluids related to truck and mechanical equipment use<br>• Applying chemical stabilizers for dust suppression | • Vegetation (diminished productivity)<br>• Wildlife (mortality, injury)<br>• Water resources (degradation of surface water quality) |
| Soil erosion and deposition by wind | • Clearing vegetation<br>• Excavating and backfilling<br>• Stockpiling excavated topsoils<br>• Operating heavy trucks and equipment on unpaved roads and surfaces | • Vegetation (diminished productivity)<br>• Wildlife (habitat degradation)<br>• Air quality (fugitive dust)<br>• Water resources (degradation of surface water quality)<br>• Cultural (exposure of artifacts from soil erosion) |
| Soil erosion by water and surface runoff | • Clearing vegetation<br>• Excavating and backfilling<br>• Stockpiling excavated topsoils<br>• Constructing road beds<br>• Crossing drainages or wetlands<br>• Operating heavy trucks and equipment on unpaved roads and surfaces | • Vegetation (diminished productivity)<br>• Wildlife (habitat degradation)<br>• Water resources (changes in natural flow systems and surface water quality)<br>• Cultural (exposure of artifacts from soil erosion) |
| Sedimentation (indirect impact) | • Clearing vegetation<br>• Excavating and backfilling<br>• Stockpiling excavated topsoils<br>• Constructing road beds<br>• Crossing drainages or wetlands<br>• Operating heavy trucks and equipment traffic on unpaved roads and surfaces | • Vegetation (diminished productivity)<br>• Wildlife (habitat degradation)<br>• Water resources (changes in natural flow systems and surface water quality)<br>• Commercial and recreational fisheries (degradation) |

2

BLM_0042321

**4.1.3.1.1  Soil Compaction.** Soil compaction is a form of soil damage that occurs when soil particles are compressed, increasing their density by reducing the pore spaces between them (USDA 2004). It is both (1) an intentional engineering practice that uses mechanical methods to increase the load-bearing capacity of soils underlying roads and site structures, and (2) an unintentional consequence of activities occurring in all phases of mining. Unintentional soil compaction is usually caused by vehicular (wheel) traffic on unpaved surfaces, but can also result from animal and human foot traffic. Soils are more susceptible to compaction when they are moist or wet. Other soil factors, such as low organic content and poor aggregate stability, also increase the likelihood that compaction will occur. Soil compaction can directly affect vegetation by inhibiting plant growth, because reduced pore spaces restrict the movement of nutrients and plant roots through the soil. Reduced pore spaces can also alter the natural flow of hydrological systems by causing excessive surface runoff, which, in turn, might increase soil erosion and degrade the quality of nearby surface water. Because soil compaction is difficult to correct once it occurs (USDA 2004), the best mitigation is prevention to the extent possible.

**4.1.3.1.2  Soil Horizon Mixing.** Soil horizon mixing is another form of soil damage that occurs as a result of activities like excavation and backfilling that displace topsoil and disturb the existing soil profile. When topsoil is removed, stabilizing matrices, such as biological crusts, are destroyed, increasing the susceptibility of soils to erosion by both wind and water. Burying topsoil is also damaging. Such disturbances directly affect vegetation by disrupting indigenous plant communities and creating an opportunity for the growth of invasive plant species and noxious weeds. Mixing ore and waste rock into the topsoil can also adversely affect indigenous plant communities by changing the soil composition.

**4.1.3.1.3  Soil Contamination.** Soil contamination within the lease tracts could result from the use of trucks and mechanical equipment (fuels, oils, and the like) during all phases of mining. Fuel tanks and generators stored on site could result in accidental spills, leaks, and fires; however, secondary containment practices would reduce the potential for releases to soil. Maintenance-related activities could also contaminate soils in mining areas. These activities include the applications of herbicides (for weed control) and chemical stabilizers such as magnesium chloride (for dust control) to the soil surface. Releases to soil would likely be localized, but they could be problematic to other resources, including vegetation (through uptake), wildlife (through inhalation and ingestion), and water quality (to surface water, through deposition, and to groundwater, through leaching and infiltration).

**4.1.3.1.4  Soil Erosion and Deposition by Wind.** Exposed soils are susceptible to wind erosion. Wind erosion is a natural process in which the shear force of wind is the dominant eroding agent, resulting in significant soil loss across much of the exposed area. Mining-related activities such as vegetation clearing, excavating, stockpiling soils, and truck and equipment traffic (especially on unpaved roads and surfaces) can significantly increase the susceptibility of soils to wind erosion. In its soil surveys, the NRCS rates the susceptibility of soils to wind erosion by assigning them to wind erodibility groups based on soil texture, organic matter content, effervescence of carbonates, rock fragment content, and mineralogy (NRCS 2010). The

BLM_0042322

rating also takes into account factors such as soil moisture, surface cover, soil surface roughness, wind direction and speed, and length of uncovered distance (USDA 2004). Because wind dispersion and the deposition of eroded soils can be geographically widespread, this process is an important impacting factor for air quality, water quality, vegetation, and all wildlife. State and local governments might also have specific air permitting requirements for the control of fugitive dust and windborne particulates. Wind erosion and wind erodibility group designations for soils in the lease tracts are identified in Section 3.3.2.

**4.1.3.1.5  Soil Erosion by Water and Surface Runoff.** Exposed soils are also susceptible to erosion by water. Water erosion is a natural process in which water (in the form of raindrops, ephemeral washes, sheets, and rills) is the dominant eroding agent. The degree of erosion by water is generally determined by the amount and intensity of rainfall, but it is also affected by the cohesiveness of the soil (which increases with organic content), its capacity for infiltration, vegetation cover, and slope gradient and length (USDA 2004). The ULP lease tracts are located in a semi-arid environment where rainfall is rare; however, occasional heavy rains can cause sudden runoff. Activities such as vegetation clearing, excavating, and stockpiling soils significantly increase the susceptibility of soils to runoff and erosion, especially during heavy rainfall. Surface runoff caused by soil compaction also increases the likelihood of erosion. Soil erosion by surface runoff is an important impacting factor for the natural flow of hydrological systems, surface water quality (due to increased sediment loads), vegetation (diminished productivity), and all wildlife (habitat degradation). State and local governments might also have specific requirements about how surface runoff should be controlled. Surface runoff potential and water erosion potential for the soils in the lease tracts are described in Section 3.3.2.

**4.1.3.1.6  Sedimentation.** Soil loss during construction by wind or water erosion is a major source of sediment that ultimately makes its way to surface water bodies such as stock ponds, reservoirs, rivers, streams, and wetlands. Sedimentation occurs when sediment settles out of water; this process can clog drainages and block navigation channels, increasing the need for dredging. By raising streambeds and filling in streamside wetlands, sedimentation increases the probability and severity of floods. Sediment that remains suspended in surface water can degrade water quality, damaging aquatic wildlife habitat and commercial and recreational fisheries. Sediment in water also increases the cost of water treatment for municipal and industrial users (USDA 2004).

**4.1.3.1.7  Potential Impacts on Paleontological Resources Common to All Alternatives.** Significant paleontological resources, if present, could be affected by mining on the ULP lease tracts as a result of ground-disturbing activities associated with mine site improvements, such as the construction of buildings (offices and maintenance), utilities, parking areas, roads, service areas (for vehicles and heavy equipment), storage areas (for fuel, chemicals, materials, solvents, oils, and degreasers), discharge/treatment ponds (for mine water discharge), and diversion channels and berms; the use of trucks, heavy earth-moving equipment, and mining equipment; and the construction of various stockpile and loading areas (for waste rock, ore, and topsoil). Off-lease land disturbances would occur on adjacent BLM land and would mainly

BLM_0042323

1   involve obtaining or improving ROWs for haul roads and utilities and would be subject to
2   BLM's NEPA process.
3
4        Potential direct adverse impacts on paleontological resources common to all alternatives
5   (in varying degrees) could include the damage or destruction of near-surface fossils and loss of
6   valuable scientific information from disturbing their stratigraphic context as a result of mining-
7   related ground-disturbing activities or soil erosion within or near the lease tracts. Indirect impacts
8   include looting or vandalism as a result of increased accessibility. The application of mitigation
9   measures developed in consultation with BLM Field Offices (and detailed in the lessee's
10  paleontological resources management plan) would reduce or eliminate the potential for such
11  impacts.
12
13
14  **4.1.3.2  Soil Impacts under Alternative 1**
15
16       Reclamation activities at the 10 lease tracts under Alternative 1 could result in minor
17  impacts on soil resources because they would involve ground disturbances that could increase
18  the potential for soil compaction, soil horizon mixing, soil contamination, soil erosion and
19  deposition by wind, soil erosion by water and surface runoff, and sedimentation of nearby
20  surface water bodies. Ground-disturbing activities would involve removing most, if not all,
21  equipment, buildings, structures, and portal foundations; backfilling portals; regrading waste-
22  rock piles; spreading topsoil over the waste-rock pile storage area and other disturbed areas
23  (using salvaged topsoil from the mining site, if available); and seeding. Direct adverse impacts
24  would be smaller during reclamation than other mining phases (e.g., mine development and
25  operations), because they would occur over a shorter duration (1 year of field activity) and
26  because the use of existing access roads would reduce impacts such as compaction and erosion
27  (e.g., fugitive dust generation). However, given the longer time frame (1 to 2 years following the
28  field activities) needed to re-establish vegetation, soils would likely remain susceptible to erosion
29  throughout the 2- to 3-year reclamation phase and beyond, especially if subjected to high winds
30  or intense rainfall. Soil contamination is less likely during this phase but could result from fuel
31  and oil releases related to the use of trucks and mechanical equipment and the removal of fuel
32  tanks. An estimated 257 acres (100 ha) across 10 lease tracts would be disturbed temporarily
33  during the reclamation phase under Alternative 1. Implementing measures (i.e., compliance
34  measures and mitigation measures, and BMPs) such as those listed in Table 4.6-1 and in DOE
35  (2011a) would reduce the potential for adverse impacts associated with these activities.
36
37
38  **4.1.3.3  Impacts on Paleontological Resources under Alternative 1**
39
40       Reclamation activities at the 10 lease tracts under Alternative 1 could result in adverse
41  impacts on paleontological resources, if present, because they would involve ground
42  disturbances that could expose fossils, making them vulnerable to damage or destruction and
43  looting/vandalism. Field surveys, conducted by a qualified paleontologist early in the
44  reclamation process, would identify areas of moderate to high fossil-yield potential or known
45  significant localities so that these areas could be avoided. In addition, mine operators would
46  notify the BLM of any fossil discoveries so appropriate measures could be taken to protect

BLM_0042324

1  discoveries from adverse impacts (see also Table 4.6-1). For this reason, it is anticipated that
2  impacts on paleontological resources would be minor.
3
4
5  **4.1.4  Water Resources**
6
7  Land disturbance activities associated with reclamation have the potential to affect water
8  resources by eroding soil and by altering the topography and soil conditions that affect
9  hydrologic processes. The short duration of reclamation (2 to 3 years) in comparison to mining
10  operations (on the order of 10 years or more) would reduce direct impacts on water resources;
11  however, given the potentially 2 to 3 years needed to re-establish vegetation and soil conditions
12  after reclamation, indirect impacts of reclamation could be significant.
13
14  Surface runoff, infiltration, and groundwater flow are the key hydrologic processes that
15  affect water quality in the vicinity of a mine site, by controlling the runoff of sediments and
16  contaminants to nearby rivers and by controlling the transport and geochemical conditions in
17  local and regional groundwater aquifers. Reclamation activities involving unconsolidated
18  materials (e.g., waste-rock piles) in upland areas near canyon walls or mesa cliffs could increase
19  the potential for erosion from flash flooding. Backfilling of mine portals could affect
20  groundwater quality through leaching processes and by connecting aquifers if seepage areas were
21  not properly sealed.
22
23  Many direct and indirect impacts on water resources from reclamation activities could be
24  minimized through the implementation of compliance measures, mitigation measures, and
25  BMPs, such as those identified in Table 4.6-1 (Section 4.6). Many of these are based on the
26  guidelines proposed by the Colorado Division of Minerals and Geology (CDMG 2002) and by
27  DOE's standard reclamation procedures outlined in DOE (2011a). Reclamation of a mine site
28  does not result in hydrologic conditions that are similar to predisturbance conditions. It is likely
29  that surface runoff will be greater and groundwater recharge will be less because of soil
30  compaction, and it will alter groundwater flow paths and lower groundwater surface elevations in
31  shallow aquifers (National Research Council 2012). In addition, there is evidence from reclaimed
32  coal mine sites in the eastern United States that reclamation alters the ecosystem structure
33  (compared to predisturbance conditions), which can affect surface runoff and nutrient cycling
34  within a watershed, thus affecting both surface water and groundwater quality
35  (Simmons et al. 2008).
36
37  Of the 10 lease tracts that would be reclaimed, Lease Tract 13 has the greatest potential to
38  affect water resources because of its proximity to the Dolores River. Lease Tract 13 in the Slick
39  Rock region encompasses a 3-mi (5-km) reach of the Dolores River where the canyon slopes are
40  between 20% and 90%. The erosion of soil by water could potentially cause an increased loading
41  of sediments to reach the Dolores River. Its impact is considered moderate but temporary in this
42  region, with the highest erosion potential occurring along the canyon slopes of the Dolores River.
43  Implementing erosion management (such as restricted activities and routine inspections for
44  erosion control) along the side slopes (Table 4.6-1) could mitigate the impact of soil erosion
45  on water quality near the Dolores River.
46

BLM_0042325

1    The potential impacts of decreasing the water quantity by reduced groundwater recharge
2  on the domestic water supply are localized and considered temporary and minor. As discussed in
3  Section 3.4.2, two domestic wells are located within Lease Tract 13 and four are located near the
4  edge of Lease Tracts 8 and 13 (less than 1000 ft [330 m] from the edge of the lease tracts). It is
5  not anticipated that the reclamation activities themselves would have any impacts on these water
6  users.
7
8    The potential for impacts on groundwater quality might result from the backfill materials,
9  poor sealing of drill holes, and inadequate water reclamation. As discussed in Section 3.4, most
10  underground mines in lease tracts are dry, and impacts on groundwater are minimal except at
11  Lease Tracts 7, 9, and 13 with a very low rate of groundwater seepage. During reclamation, the
12  appropriate backfilling of mine portal and vent holes and complete sealing of drill holes that
13  intercept multiple aquifers, in accordance with state regulations and standards set by the CDWR,
14  could prevent leaching via backfills and minimize the future potential of cross-contamination
15  between aquifers. The quality of groundwater will be evaluated to ensure that water quality is not
16  affected by uranium prospecting based on standards set by the Colorado Water Quality Control
17  Commission. The appropriate actions would otherwise be taken to comply with reclamation
18  performance standards set forth by the CDWR.
19
20
21  **4.1.5  Human Health**
22
23    Section 4.1.5.1 provides a discussion of the conceptual site exposure model and the
24  potential pathways of exposure at the ULP lease tracts and the surrounding area resulting from
25  the exploration, mine development and operations, and reclamation phases associated with the
26  five alternatives discussed in the ULP PEIS. This discussion is intended to provide the basis for
27  the human health evaluation discussed subsequently for each of the five alternatives in
28  Chapter 4. Section 4.1.5.2 discusses the potential impacts on human health under Alternative 1.
29
30
31    **4.1.5.1  Conceptual Site Exposure Model**
32
33    Potential human health risks associated with uranium mining were analyzed based on the
34  conceptual site exposure model shown in Figure 4.1-1 and the source-receptor-exposure pathway
35  relationships presented in Table 4.1-3. Mining of uranium ores, which originally are located
36  underground, would bring the ore materials and surrounding waste rocks to the ground surface,
37  thereby providing additional sources for potential human exposure. The sources of potential
38  exposure above ground would include the uranium ore piles, waste-rock piles, potentially
39  contaminated ground surface, and the wastewater treatment ponds. Waste-rock piles would
40  contain uranium isotopes and their decay products because of the possible intermixing of
41  uranium ores with surrounding rocks during mining and the inclusion of the abandoned ore
42  materials that did not meet the cut-off uranium content requirement to be included in the uranium
43  ore piles.
44

BLM_0042326



**FIGURE 4.1-1  Conceptual Exposure Model for the Exploration, Mining Development and Operations, and Reclamation Phases at the ULP Lease Tracts**

BLM_0042327

1   **TABLE 4.1-3  Potential Human Receptors, Uranium Sources, and Exposure Pathways to**
2   **Exploration, Mining Development and Operations, and Reclamation Phases at the ULP Lease**
3   **Tracts[a]**

| Receptor | Radiation Source | Exposure Pathway | | | | | |
|---|---|---|---|---|---|---|---|
| | | Direct Radiation | Inhalation | Plant/ Meat/Milk Ingestion | Ground-shine | Soil Ingestion | Surface Water/ Groundwater Use |
| **Exploration phase** | | | | | | | |
| Worker | Contaminated ground surface | A | A | _[b] | n | A | – |
| Off-site resident | Contaminated ground surface | – | n | n | n | n | – |
| **Development/ operations phase** | | | | | | | |
| Worker[c] | Uranium ores | A | A | – | a | a | – |
| | Contaminated ground surface | a | a | – | a | a | – |
| | Waste-rock piles | a | a | – | a | a | – |
| | Uranium ore piles | a | a | – | a | a | – |
| | Wastewater treatment pond | a | a | – | | | |
| Off-site resident | Uranium ores | – | A | n | n | n | – |
| | Contaminated ground surface | – | n | n | n | n | – |
| | Waste-rock piles | – | n | n | n | n | – |
| | Uranium ore piles | – | n | n | n | n | – |
| | Wastewater treatment pond | – | n | – | | | |
| **Reclamation phase** | | | | | | | |
| Worker (waste rocks) | Contaminated ground surface | n | n | – | n | n | – |
| | Waste-rock piles | A | a | – | n | a | – |
| Worker (mine workings)[d] | Contaminated ground surface | N | n | – | n | n | – |
| | Waste-rock piles | n | n | – | n | n | – |
| Off-site resident | Contaminated ground surface | – | n | n | n | n | – |
| | Waste-rock piles | – | A | n | n | n | – |
| Post reclamation phase | | | | | | | |
| Off-site resident | Contaminated ground surface | – | n | a | n | n | – |
| | Waste-rock piles | – | A | a | n | a | – |
| Recreationist (camper/hunter) | Contaminated ground surface | n | n | a | n | n | – |
| | Waste-rock piles | A | a | n | n | a | – |
| Mine inspector[e] | Uranium ores | N | A | – | – | n | – |
| | Contaminated ground surface | n | n | – | n | n | – |
| | Waste-rock piles | n | n | – | – | n | – |

[a]   Exposure pathways marked with an "A,, "a," "N," or "n" are considered completed pathways. Those marked with an uppercase "A" or "N" are major pathways, while those marked with a lowercase "a" or "n" are minor pathways. Exposure pathways that were quantified for potential exposures in the ULP PEIS are marked with an "A" or "a." The exposure pathways marked with an "N" or "n" were not quantified.

**Footnotes continued on next page.**

BLM_0042328

**TABLE 4.1-3  (Cont.)**

b   A dash means item is not considered to be a completed exposure pathway.

c   Potential exposures of uranium miners were analyzed with historical measurement data that included contributions from all
major and minor pathways.

d   The potential exposures incurred by workers working on reclaiming the aboveground mine workings are expected to be less
than those incurred by workers working on waste-rock piles. Therefore, further analysis of potential exposures associated
with reclaiming the mine workings was not conducted.

e   Mine inspectors are expected to incur high radiation exposures from the direct radiation and radon inhalation pathways,
with the radon dose being much larger than the direct radiation dose. Therefore, only the radon dose was analyzed and
discussed in the ULP PEIS.

f   Potential groundwater and surface water contamination from ULP mining activities was not considered to be a completed
pathway because the transport of contaminants of concern to potential exposure points would be incomplete or would result
in negligible exposures.

Ground surface on the mining site could potentially become contaminated from spills
during ore handling and through runoff from uranium ore piles or waste-rock piles during rain
events. Human activities and vehicular traffic could expand the surface contamination to a larger
area. However, minimization of ground surface contamination can be achieved by implementing
measures (i.e., compliance measures, mitigation measures, and BMPs), such as immediate
cleanup after a spill, and by directing and collecting runoff from uranium ore piles through the
use of diversion channels.

The wastewater treatment pond would be constructed to accept excess water pumped out
from uranium mines during mining operations or water collected from uranium ore pads.
Depending on the level of uranium concentration, the water in the wastewater treatment pond
may need treatment before being discharged. The uranium ore piles and the wastewater in the
treatment pond would be removed after the uranium mining operations ceased. Therefore, only
waste-rock piles and residual ground surface contamination would remain after a reclamation.

Figure 4.1-1 shows the environmental transport and subsequent exposure pathways for
the potential human receptors. Potential contamination of surface water and groundwater from
the ULP lease tracts are not quantified here because the radioactive/chemical constituents of
concern are not expected to reach a surface water body or an underlying groundwater aquifer
near the mining site. The ULP lease tracts are very dry (i.e., with an annual average precipitation
rate of about 1 ft/yr [0.3 m/yr]), and most of the precipitation is lost through runoff and
evapotranspiration, so there is little water that would infiltrate the aboveground waste-rock pile
or surface ground sources to leach out to groundwater. Furthermore, the depth to the
groundwater aquifer would make it unlikely that any leached constituents would reach the
groundwater table. Because of the poor quality of the on-site groundwater, groundwater use as a
potential exposure pathway was not quantified. During mining operations, small amounts of
water could be used; however, excess water that accumulates in the mine cavities would be
pumped out, so that the potential for leaching of the radioactive/chemical constituents in uranium
ores is minimized. In fact, because of the mining operations, the amount of uranium ores
available for leaching would be greatly reduced from the initial amount before mining.

BLM_0042329

1    Most surface waters in the area of the ULP lease tracts are ephemeral and would appear
2  only after a heavy rain event and then evaporate shortly thereafter. For ULP lease tracts near the
3  Dolores River, a distance of 1,300 ft (0.25 mi) from the river would be required for new ULP
4  mining activities. Therefore, surface runoff from aboveground sources to a surface water body is
5  not considered a plausible pathway. Off-site surface water could be contaminated as a result of
6  deposition of airborne particulates released from on-site uranium sources; however, the dilution
7  in the surface water body would be so large that the potential exposure through the use of off-site
8  surface water is considered to be negligible compared with the exposures through the inhalation
9  pathway for off-site receptors.
10
11    Table 4.1-3 lists the receptors that could be exposed to the radioactive and chemical
12  constituents of concern for the ULP activities. The radiation sources, potential exposure
13  pathways, and exposure pathways that are quantified in the ULP PEIS are also indicated in the
14  table. Among the various potential pathways, only a few are considered to be major contributors
15  to the potential exposures. These major contributor pathways and the associated exposures are
16  quantified in the ULP PEIS. Detailed discussions on the methodology used for the analyses are
17  presented in Appendix D. The analyses were conducted with the use of three computer codes:
18  RESRAD (Yu et al. 2001); CAP88-PC (Trinity Engineering Associates, Inc. 2007); and
19  COMPLY-R (EPA 1989b). Detailed information on the input parameters used and the output
20  results generated with these models is available in Argonne National Laboratory (Argonne)
21  2012.
22
23
24    **4.1.5.2  Potential Human Health Impacts from Alternative 1**
25
26    Under Alternative 1, potential human health impacts could result from implementation of
27  reclamation activities including from the waste-rock piles that would be graded, provided with a
28  top layer of soil material, and revegetated but would remain on site after reclamation.
29
30    Although the uranium and uranium decay products in the waste-rock piles would be at
31  much lower concentrations than those in the uranium ores, they could still be higher than the
32  concentrations in the undisturbed surface soils (i.e., higher than background levels), because
33  some uranium ores could be intermixed with the waste rocks. Available measurement data for
34  waste-rock samples indicated varied Ra-226 concentrations. Sampling data taken from the
35  Whirlwind Mine indicated a range from 2.8 to 4.2 pCi/g (BLM 2008b), while those taken from
36  the JD-6 and JD-8 lease tracts indicated a range from 30 to 70 pCi/g (corresponding to the
37  measured total uranium concentration of 91 to 212 mg/kg, assuming the same activity ratio of
38  1:1:0.046 for U-234:U-238:U-235 as in natural uranium) (Whetstone Association 2011, 2012).
39  The Ra-226 concentrations from sampling data from the JD-6 and JD-8 lease tracts were used in
40  the analyses.  However, because waste rock is typically considered to possibly contain less than
41  0.05% of uranium, there could be spots on the waste-rock piles that could contain concentrations
42  closer to 0.05% (or higher). Therefore, in some hot spots within the waste-rock piles, the
43  concentration of Ra-226 could be as high as 168 pCi/g (under the secular equilibrium
44  assumption). For the human health risk assessment presented in this section, an average Ra-226
45  concentration of 70 pCi/g was used as the base value for obtaining estimates of radiation
46  exposure associated with waste-rock piles. In addition to the base estimates, the potential ranges

BLM_0042330

1    of exposures are also estimated by considering the potential for higher concentrations for the
2    waste-rock piles.  Assuming there is secular equilibrium between U-238 and its decay products,
3    the base activity concentrations for U-238, U-234, Th-230, and Pb-210 would be the same as the
4    Ra-226 concentration. A base concentration of  3.22 pCi/g was assumed for U-235, based on the
5    natural radioactivity ratio of 1:1:0.046 among the uranium isotopes U-234, U-238, and U-235.
6    The base concentrations for the U-235 decay products, Pa-231 and Ac-227, would be 3.22 pCi/g
7    as well, if the secular equilibrium assumption is applied.
8
9            The dimension of the waste-rock pile accumulated over the lifetime of a uranium mine
10   would depend on the cumulative amount of production of uranium ores. Based on available
11   information, the mines in this area have typically averaged 2 to 3.5 tons of waste per ton of ore
12   produced (BLM 2008b). For analysis in the ULP PEIS, the dimensions of four sizes of waste-
13   rock piles were developed to correspond to the four mine sizes assumed for evaluation in the
14   ULP PEIS. Other assumptions used to develop the dimensions of the waste-rock piles include the
15   following:
16
17        1.  The ratio of waste rock to uranium ore produced is 3 to 1.
18
19        2.  The waste-rock pile occupies 40% of the total surface plant area, or 10% of
20            the disturbed area for the very large open-pit mine.
21
22        3.  The waste-rock pile is the accumulation resulting from mine development and
23            mining operations for 10 years.
24
25        4.  The average bulk density of the waste-rock pile is 2.8 g/cm$^3$ (EPA 2008).
26
27        5.  For underground mining, 10% of the waste rock is placed back or "gobbed"
28            into the mine cavities, and 90% is piled up on the ground surface.
29
30        6.  For open-pit mining, 30% of the waste rock produced is used for backfilling,
31            leaving 70% on the ground surface.
32
33           Table 4.1-4 lists the dimensions developed for the four waste-rock piles associated with
34   the four mine sizes assumed. For evaluation purposes, it is assumed that all the waste rock is
35   placed as one pile. This approach concentrates all the radionuclide inventory in the radiation
36   source assumed for dose modeling; therefore, it will most likely result in overestimating the
37   potential radiation exposures, especially when the exposures are dominated by direct external
38   radiation.
39
40
41           **4.1.5.3  Worker Exposure – Reclamation Workers**
42
43           During the reclamation period, a worker could incur radiation exposures from working on
44   or near a waste-rock pile. For the calculations here, it is assumed that the worker would work
45   8 hours a day on top of a waste-rock pile for 20 days. Potential radiation exposures could result

BLM_0042331

1
2

**TABLE 4.1-4  Dimensions of the Waste-Rock Piles per
Mine Size Assumed for Human Health Impact Analysis**

| Dimensions | Small[a] | Medium[a] | Large[a] | Very Large[b] |
|---|---|---|---|---|
| Base area (m$^2$) | 16,180 | 24,280 | 32,370 | 80,920 |
| Base area (acres) | 4 | 6 | 8 | 20 |
| Height (m) | 6.4 | 8.6 | 12.9 | 6.0 |
| Height (ft) | 21 | 28 | 42 | 20 |

[a]   Underground mines.

[b]   Surface open-pit mine.

3
4
5   from the following pathways: (1) direct external radiation; (2) inhalation of particulates and
6   radon; and (3) incidental ingestion of dust particles.
7
8       Based on RESRAD Version 6.7 (Yu et al. 2001) calculation results, the total radiation
9   dose incurred by a reclamation worker from working on top of a waste-rock pile would be about
10  14.3 mrem or slightly lower from any of the four waste-rock pile sizes. This dose estimate
11  corresponds to the base concentration of 70 pCi/g assumed for Ra-226. If the 168 pCi/g (in cases
12  where hots spots could be present at a waste-rock pile) was used, the radiation dose estimated
13  would be as high as 34.2 mrem. For comparison, the dose limit set in DOE Order 458.1 for
14  protection of the general public from all exposure pathways is 100 mrem/yr. The radiation
15  exposure would primarily be from the external radiation pathway, which would contribute about
16  94–96% of the total dose, followed by the incidental soil ingestion pathway, which would
17  account for about 3% of the total dose. The remaining dose would be contributed by the
18  exposures resulting from inhalation of particulate and radon pathways. The potential LCF risk
19  associated with this radiation exposure is estimated to range from $1 \times 10^{-5}$ to $3 \times 10^{-5}$; i.e., the
20  probability that the receptor would develop a fatal cancer would be about 1 in 100,000 to 1 in
21  33,000. If the reclamation worker would work for more than 20 days to reclaim multiple waste-
22  rock piles, the radiation dose and LCF risk he would incur would increase proportionally with
23  the number of days of exposure.
24
25       In addition to the radiation emitted by the uranium isotopes and their decay products, the
26  chemical toxicity of the uranium and vanadium minerals in the waste rocks could also affect the
27  health of a reclamation worker. The potential chemical exposures could result from (1) inhalation
28  of particulates suspended in the air that came from the waste-rock pile and (2) incidental
29  ingestion of the particulates. On the basis of past uranium and vanadium production rates from
30  the DOE lease tracts, the ratio of vanadium to uranium in the waste rock is assumed to be six to
31  one or 6:1. The same exposure parameters as those used for estimating the radiation dose were
32  used to evaluate the potential chemical hazard for the reclamation worker. The potential
33  chemical risk from each exposure pathway is expressed in terms of hazard quotient, which is the
34  ratio of the average daily intake rate from an exposure pathway to the threshold value for that
35  pathway. The hazard quotients from each pathway are then added to get the hazard index for
36  each chemical. Based on the evaluation results, the total hazard index ranges from about 0.13 to

BLM_0042332

0.31 (for 70 pCi/g to 168 pCi/g U-238). Vanadium contributes 95% and uranium contributes 5% of the estimated hazard index. Because the hazard index is below 1, the reclamation worker is not expected to experience adverse health effects resulting from exposure to vanadium and to the chemical effects of uranium.

The above analyses consider potential exposures from working on a waste-rock pile, which is the largest aboveground radiation source in a lease tract during the reclamation phase. Therefore, the potential radiation dose associated with reclaiming other above ground mine working areas is expected to be less than those presented in this section.

In addition to conducting reclamation activities above the ground, a reclamation worker may be required to work underground to reclaim workings in the mine cavities; however, the time spent underground is expected to be much shorter than the time spent above the ground. The radiation exposure rate at underground workings would be higher than that on top of a waste-rock pile, due to the high level of radon in the mine cavities. The exposure rate that would be incurred by reclamation workers is expected to be similar to that incurred by uranium miners during mining operations (discussed in Section 4.3.5.1). On the basis of an average radiation dose of 433 mrem/yr for uranium miners (from monitoring data, see Section 4.3.5.1) and the assumption that the monitored miners worked 2,000 hours per year, a radiation dose rate of 0.29 mrem/h can be calculated. Therefore, a reclamation worker would need to spend 66–158 hours in underground mine workings to receive the same dose (14.3–34.2 mrem) as he would receive from working on top of a waste-rock pile for 160 hours (i.e., 20 workdays).

### 4.1.5.4  General Public Exposure – Residential Scenario

Residents who live close to uranium mines during or after the reclamation phase could be exposed to radiation as a result of radioactive particulates and radon gas being blown off from aboveground radiation sources located within ULP lease tracts, among which waste-rock piles are significantly larger sources than the others. Therefore, in the assessment of potential human health impacts, radiation exposures associated with the waste-rock piles are considered. Potential radiation exposure would depend on the direction and distance between the residence and the waste-rock piles and the emission rates of particulates and radon. Figure 4.1-2 shows the existing structures surrounding the uranium lease tracts as identified by Cotter (Cotter 2012) through the use of Google Earth satellite images. A total of 32 structures were identified.

The emission rate for Rn-222 as an input to CAP88-PC (Trinity Engineering Associates, Inc. 2007) was obtained from the RESRAD (Yu et al. 2001) analysis for the exposure of reclamation workers (see previous section). The RESRAD analysis generated the radon flux (~60–144 pCi/m$^2$/s, corresponding to a Ra-226 concentration of 70 -168 pCi/g) from the surfaces of the four assumed waste-rock piles. A radon emanation coefficient of 0.15 rather than the RESRAD default value of 0.25 was used in the calculation, based on measurement data taken from rock samples (Ferry et al. 2002; Sakoda et al. 2010). The emission rates for particulates were estimated following the guidance from Regulatory Guide 3.59 (NRC 1987) concerning emission of dust particles from exposed uranium mill tailings sands due to wind erosion.  The frequencies of different wind speed groups that are required in the particulate emission

BLM_0042333



1

2    **FIGURE 4.1-2  Existing Structures in the ULP Lease Tract Surrounding Area**

1  calculation were calculated on the basis of meteorological data from the lease tracts (Rogers
2  2011). Table 4.1-5 lists the annual emission rates calculated for radon and radioactive
3  particulates containing uranium isotopes and their decay products for the four assumed waste-
4  rock pile sizes ranging from small to very large. The emission rates listed in the table correspond
5  to a base  concentration of 70 pCi/g for Ra-226 in waste rocks, as discussed in the previous
6  section. If the value of 168 pCi/g is assumed, the estimated emission rates would increase by a
7  factor of less than 3. The emission rates listed in Table 4.1-5 are expected to be greater than the
8  actual values because wind erosion rates from waste rocks would be lower than those from
9  uranium mill tailings sands; furthermore, no cover material on top of the waste rocks was
10 considered. As a conservative approach, the entire surface of the waste-rock piles was assumed
11 to be exposed for wind erosion.
12
13      Tables 4.1-6 through 4.1-8 list the estimated maximum radiation doses and corresponding
14 LCF risks associated with the emissions of radon, particulates, and both radon and particulates,
15 respectively, from the four assumed sizes of waste-rock piles that have an upper-end Ra-226
16 concentration of 70 pCi/g. The exposures are incurred mainly through the inhalation pathway,
17 which accounts for more than 95% of the dose, and through the groundshine, incidental soil
18 ingestion, and ingestion of plant foods, meat, and milk pathways, resulting from deposition of
19 airborne particulates to ground surfaces. The radiation exposures associated with the emissions
20 from a waste-rock pile would decrease with increasing distance because of greater dilution in the
21 air concentrations of radon and radionuclides. The maximum exposure at a fixed distance from
22 the center of a waste-rock pile would occur in the sector that coincides with one of the dominant
23 wind directions for the DOE ULP lease tracts. In any of the other sectors, the potential exposure
24 would be less than the maximum values. Because the emission rates of particulates and radon
25 from a very large waste-rock pile are significantly higher than those from a small, medium, or
26 large waste-rock pile, the corresponding dose and LCF risk are also significantly higher. This is
27 because the surface area of a very large waste-rock pile is much larger than the surface area of a
28 small, medium, or large waste-rock pile (see Table 4.1-4). At a distance of 1,600 ft (500 m), the
29 dose/LCF risk associated with emissions from a small or a medium waste-rock pile are greater
30 than the dose/LCF risk associated with a large waste rock pile; beyond 1,600 ft (500 m), the
31 dose/LCF risk associated with a large waste-rock pile are greater than the dose/LCF risk
32 associated with a small or a medium waste-rock pile. This shows the influence of release height
33 on the downwind air concentrations. Emissions from a source of higher altitude would be
34 dispersed over a larger area than emissions from a source of lower altitude, resulting in smaller
35 air concentrations at short distances from the release point.
36
37      The results in Tables 4.1-6 and 4.1-7 indicate that the maximum radiation doses
38 associated with radon emissions would be two times or more the doses associated with
39 particulate emissions; the ratio would also increase as the distance increased. This increase in the
40 ratio would occur because some airborne particulates would deposit to the ground surface during
41 their transit to downwind locations, whereas radon gas would not be deposited (although its
42 decay progenies, which are not gas, could attach to particulates and plate out from the air).
43 Furthermore, the short-lived progeny of Rn-222 that are responsible for the radon dose would be
44 generated along the transit to downwind locations. As a result, the radiation dose associated with
45 a particulate emission would decrease faster with increasing distance than would the radiation
46 dose associated with a radon emission. In terms of potential maximum LCF risks, the exposure

BLM_0042335

1  **TABLE 4.1-5  Estimated Upper-Bound Emission Rates of Particulates, Radon, and**
2  **Radionuclides for the Four Assumed Waste-Rock Pile Sizes**

| Parameters | Small[a] | Medium[a] | Large[a] | Very Large[b] |
|---|---|---|---|---|
| Base area (m$^2$) | 1.62E+04 | 2.43E+04 | 3.24E+04 | 8.09E+04 |
| Dust emission (g/yr)[c] | 2.75E+06 | 4.12E+06 | 5.49E+06 | 1.37E+07 |
| Emission rate of radionuclide (Ci/yr) | | | | |
| U-238 | 1.92E-04 | 2.88E-04 | 3.85E-04 | 9.61E-04 |
| U-234 | 1.92E-04 | 2.88E-04 | 3.85E-04 | 9.61E-04 |
| Th-230 | 1.92E-04 | 2.88E-04 | 3.85E-04 | 9.61E-04 |
| Ra-226 | 1.92E-04 | 2.88E-04 | 3.85E-04 | 9.61E-04 |
| Pb-210 | 1.92E-04 | 2.88E-04 | 3.85E-04 | 9.61E-04 |
| U-235 | 8.84E-06 | 1.33E-05 | 1.77E-05 | 4.42E-05 |
| Pa-231 | 8.84E-06 | 1.33E-05 | 1.77E-05 | 4.42E-05 |
| Ac-227 | 8.84E-06 | 1.33E-05 | 1.77E-05 | 4.42E-05 |
| Emission rate of Rn-222 (Ci/yr)[d] | 3.07E+01 | 4.61E+01 | 6.14E+01 | 1.54E+02 |

[a]  Small, medium, and large represent the size of the hypothetical underground uranium mine with which the waste-rock pile is associated.

[b]  Very large denotes the waste-rock pile that is associated with the surface open-pit uranium mine in Lease Tract 7.

[c]  The dust emission rates were calculated with the Regulatory Guide 3.52 annual dust loss equation concerning wind erosion of exposed uranium tailings sands (NRC 1987).

[d]  The emission rates of Rn-222 (corresponding to a Ra-226 concentration of 70 pCi/g) were calculated with the radon flux from the RESRAD code (Yu et al. 2001).

3
4
5  **TABLE 4.1-6  Potential Maximum Radiation Doses and LCF Risks[a] to a Resident as**
6  **a Result of the Emission of Radon from the Four Assumed Waste-Rock Pile Sizes**

| Distance (m) | Dose (mrem/yr) Associated with the Four Waste-Rock Pile Sizes | | | | LCF Risk (1/yr) Associated with the Four Waste-Rock Pile Sizes | | | |
|---|---|---|---|---|---|---|---|---|
| | Small | Medium | Large | Very Large | Small | Medium | Large | Very Large |
| 500 | 1.24 | 1.39 | 0.88 | 5.82 | 2E-06 | 2E-06 | 1E-06 | 9E-06 |
| 1,000 | 0.47 | 0.65 | 0.68 | 2.39 | 6E-07 | 8E-07 | 9E-07 | 3E-06 |
| 1,500 | 0.27 | 0.38 | 0.44 | 1.36 | 3E-07 | 5E-07 | 6E-07 | 2E-06 |
| 2,000 | 0.18 | 0.26 | 0.32 | 0.92 | 2E-07 | 3E-07 | 4E-07 | 1E-06 |
| 2,500 | 0.13 | 0.19 | 0.24 | 0.68 | 2E-07 | 3E-07 | 3E-07 | 9E-07 |
| 3,000 | 0.10 | 0.15 | 0.19 | 0.53 | 1E-07 | 2E-07 | 2E-07 | 6E-07 |
| 4,000 | 0.08 | 0.11 | 0.14 | 0.38 | 1E-07 | 1E-07 | 2E-07 | 6E-07 |
| 5,000 | 0.06 | 0.09 | 0.11 | 0.30 | 8E-08 | 1E-07 | 1E-07 | 3E-07 |

[a]  Listed values correspond to a Ra-226 concentration of 70 pCi/g in waste rocks.

7
8

BLM_0042336

*Final ULP PEIS*                                                      *4: Environmental Impacts*

1  **TABLE 4.1-7  Potential Maximum Radiation Doses and LCF Risks[a] to a Resident as a**
2  **Result of the Emission of Particulates from the Four Assumed Waste-Rock Pile Sizes**

| Distance (m) | Dose (mrem/yr) Associated with the Four Waste-Rock Pile Sizes | | | | LCF Risk (1/yr) Associated with the Four Waste-Rock Pile Sizes | | | |
|---|---|---|---|---|---|---|---|---|
| | Small | Medium | Large | Very Large | Small | Medium | Large | Very Large |
| 500 | 0.65 | 0.74 | 0.48 | 2.95 | 2E-07 | 2E-07 | 1E-07 | 9E-07 |
| 1,000 | 0.22 | 0.31 | 0.33 | 1.09 | 5E-08 | 8E-08 | 8E-08 | 3E-07 |
| 1,500 | 0.11 | 0.16 | 0.20 | 0.56 | 3E-08 | 4E-08 | 5E-08 | 1E-07 |
| 2,000 | 0.07 | 0.10 | 0.13 | 0.35 | 2E-08 | 3E-08 | 3E-08 | 9E-08 |
| 2,500 | 0.05 | 0.07 | 0.09 | 0.23 | 1E-08 | 2E-08 | 2E-08 | 6E-08 |
| 3,000 | 0.03 | 0.05 | 0.07 | 0.17 | 9E-09 | 1E-08 | 2E-08 | 3E-08 |
| 4,000 | 0.02 | 0.03 | 0.04 | 0.11 | 5E-09 | 8E-09 | 1E-08 | 3E-08 |
| 5,000 | 0.02 | 0.02 | 0.03 | 0.08 | 4E-09 | 6E-09 | 8E-09 | 2E-08 |

   [a]  Listed values correspond to a Ra-226 concentration of 70 pCi/g in waste rocks.

3
4
5  **TABLE 4.1-8  Potential Maximum Total Doses and LCF Risks[a] to a Resident as a**
6  **Result of the Emission of Radon and Particulates from the Four Assumed Waste-Rock**
7  **Pile Sizes**

| Distance (m) | Dose (mrem/yr) Associated with the Four Waste-Rock Pile Sizes | | | | LCF Risk (1/yr) Associated with the Four Waste-Rock Pile Sizes | | | |
|---|---|---|---|---|---|---|---|---|
| | Small | Medium | Large | Very Large | Small | Medium | Large | Very Large |
| 500 | 1.89 | 2.13 | 1.36 | 8.86 | 2E-06 | 2E-06 | 1E-06 | 9E-06 |
| 1,000 | 0.69 | 0.96 | 1.01 | 3.49 | 7E-07 | 9E-07 | 1E-06 | 3E-06 |
| 1,500 | 0.38 | 0.55 | 0.64 | 1.92 | 4E-07 | 5E-07 | 6E-07 | 2E-06 |
| 2,000 | 0.25 | 0.36 | 0.44 | 1.24 | 3E-07 | 4E-07 | 4E-07 | 1E-06 |
| 2,500 | 0.18 | 0.27 | 0.33 | 0.92 | 2E-07 | 3E-07 | 3E-07 | 9E-07 |
| 3,000 | 0.14 | 0.20 | 0.26 | 0.68 | 1E-07 | 2E-07 | 3E-07 | 6E-07 |
| 4,000 | 0.10 | 0.15 | 0.19 | 0.50 | 1E-07 | 2E-07 | 2E-07 | 6E-07 |
| 5,000 | 0.08 | 0.11 | 0.15 | 0.38 | 8E-08 | 1E-07 | 2E-07 | 3E-07 |

   [a]  Listed values correspond to a Ra-226 concentration of 70 pCi/p in waste rocks.

8
9
10  to radon would result in a risk 10 times higher or more than the exposure to radioactive
11  particulates. Based on the CAP88-PC calculation results, the radon level at any downwind
12  location 1,600 ft (500 m) or greater from the center of a small, medium, or large waste-rock pile
13  would be less than $1.2 \times 10^{-4}$ working level (WL). At a downwind location of 1,600 ft (500 m)
14  or greater, the radon level from a very large waste-rock pile would be higher than that from a
15  small, medium, or large waste-rock pile. According to the estimated results, at a distance of
16  1,600 ft (500 m) or beyond, the radon level would be less than $4.9 \times 10^{-4}$ WL.
17
18

BLM_0042337

1    The total maximum doses listed in Table 4.1-8 provide some insight on the potential
2  exposures of nearby residents. For example, if a resident lived a distance of 3,300 ft (1,000 m)
3  from a small, medium, or large waste-rock pile, then the radiation dose he could receive would
4  be less than 1.01 mrem/yr (LCF risk of $1 \times 10^{-6}$/yr; i.e., 1 in 1,000,000), and if the distance
5  increased to 6,600 ft (2,000 m), then the exposure would be less than 0.44 mrem/yr (LCF risk of
6  $4 \times 10^{-7}$/yr; i.e., 1 in 2,500,000). If a resident lived close to a very large waste-rock pile, then the
7  radiation dose he could receive would decrease from 3.49 mrem/yr (LCF risk of $3 \times 10^{-6}$/yr;
8  i.e., 1 in 330,000) at a distance of 3,300 ft (1,000 m) to 1.24 mrem/yr (LCF risk of $1 \times 10^{-6}$/yr;
9  i.e., 1 in 1,000,000) at a distance of 6,600 ft (2,000 m). It should be noted that the maximum
10  doses listed in Table 4.1-8 are estimated based on the assumed dimensions for waste-rock piles
11  presented in Table 4.1-4. If the dimensions of a waste-rock pile were smaller than the assumed
12  dimensions, the potential dose (LCF risk) to this resident would be less than the estimated
13  values. On the other hand, if there were two waste-rock piles nearby, then the potential dose
14  (LCF risk) that this resident would incur would be the sum of the doses (LCF risk) contributed
15  by each waste-rock pile. For comparison, the general public living close to the lease tracts would
16  receive a radiation dose of approximately 430 mrem/yr (LCF risk of $3 \times 10^{-4}$) from natural
17  background radiation.
18
19    The presence of waste-rock piles in ULP lease tracts was assumed for the purposes of
20  estimating potential human health impacts during or after the reclamation phase. Currently, the
21  waste rock pile in Lease Tract 7 where an open-pit mine was located has been removed from
22  above the ore horizon; therefore, there would not be a very large waste-rock pile under
23  Alternative 1. The potential human health impact on residents living close to Lease Tract 7 is
24  expected to be much lower than those presented in Table 4.1-6 for a very large waste-rock pile.
25  On the basis of this reality and the maximum doses listed in Table 4.1-8, the potential dose
26  incurred by any resident living close to the ULP lease tracts (at a distance of 1,600 ft [500 m] or
27  greater) is expected to be much smaller (< 2.13 mrem/yr) than the National Emission Standards
28  for Hazardous Air Pollutants (NESHAP) dose limit of 10 mrem/yr for airborne emissions
29  (40 CFR Part 61). The potential LCF risk would be less than $2 \times 10^{-6}$/yr, which means the
30  probability of developing a fatal cancer from living close to the ULP lease tracts for 1 year
31  during or after reclamation is 1 in 500,000. If a resident lived in the same location for 30 years,
32  then the cumulative LCF risk would be less than $6 \times 10^{-5}$.
33
34    During reclamation, it would be required that waste-rock piles be covered by a layer of
35  soil material to facilitate vegetation growth (see measures [i.e., compliance measures, mitigation
36  measures, and BMPs] identified in Table 4.6-1 in Section 4.6). If the thickness of this soil
37  material is sufficient (the sufficient thickness would depend on the concentration of the
38  radionuclide in the waste rocks), emissions of radioactive particulates would most likely be
39  eliminated, and direct external radiation would be greatly reduced, if not eliminated completely.
40  Emissions of radon from waste-rock piles could continue, although the emission rate would be
41  also reduced. In fact, because the uranium isotopes and their decay products have long decay
42  half-lives, the potential of radon emissions from waste-rock piles could persist for millions of
43  years after reclamation was completed.
44
45

BLM_0042338

1    In addition to radiation exposure, the residents living close to the ULP lease tracts could
2  incur chemical exposures due to the chemical toxicity of uranium and vanadium minerals
3  contained in the waste rocks. Potential chemical exposures would be associated with the
4  emissions of particulates and primarily through the inhalation pathway. The same exposure
5  parameters as those used for radiation dose modeling were used to evaluate the potential
6  chemical risks to nearby residents. Based on the estimates, the total HI would be less than
7  0.006 at a distance of 1,600 ft (500 m) from a large waste-rock pile (less than 0.03 at a distance
8  of 1,600 ft [500 m] from a very large waste-rock pile, if it was not removed). Because the HI is
9  much smaller than 1, potential adverse health effects are not expected for the residents.

10

11    The estimates of human health risks presented above were obtained by assuming the
12  Ra-226 concentration in waste rocks was at the base concentration of 70 pCi/g. If the 168 pCi/g
13  concentration of radionuclides were used in the analyses, the potential risks estimated for a
14  resident living close to a ULP lease tract would increase by a factor of less than 3. Therefore,
15  without the presence of a very large waste-rock pile, even if the Ra-226 concentration was
16  increased to the higher 168 pCi/g value, the maximum radiation dose a nearby resident could
17  receive would increase to 5.1 mrem/yr at a distance of 1,600 ft or 500 m (LCF risk of $5 \times 10^{-6}$/yr,
18  i.e., 1 in 200,000 per year), and the maximum hazard index would increase to 0.01.

19

20    The above discussions consider the exposures of nearby residents to the airborne
21  emissions of radon and particulates from waste-rock piles. A less likely exposure scenario after
22  the reclamation phase is for a nearby resident to raise livestock in the lease tract and consume the
23  meat and milk produced. The RESRAD compute code (Yu et al. 2001), which models the
24  ingrowth and decay of radionuclides, including radon, in contaminated porous media and the
25  uptake of radionuclides by plant roots extending to the contaminated media, was used to analyze
26  this scenario. To get a perspective on the potential dose, it was assumed that there were no soil
27  covers and that grass would thrive on waste rocks for meat and milk cows to graze on. If it was
28  further assumed that a nearby resident obtained 100% of the meat and milk he would consume
29  from his livestock (139 lb/yr [63 kg/yr] for meat and 24 gal/yr [92 L/yr] for milk), then the
30  potential radiation dose he would receive was estimated to be about 81 mrem/yr (48 mrem/yr
31  from meat consumption, and 33 mrem/yr from milk consumption), with a corresponding LCF
32  risk of $4 \times 10^{-5}$/yr (i.e., 1 in 25,000) for developing a fatal cancer. If the consumption would be
33  less, the potential radiation dose would decrease proportionally. This estimate was obtained by
34  using the upper-end concentrations assumed for uranium and its decay progenies (70 pCi/g for
35  Ra-226). In reality, it would be quite unlikely that grass would thrive by growing into waste
36  rocks. If waste rocks would be covered by a layer of surface soil materials to facilitate vegetation
37  growth, the potential radiation dose associated with the meat and milk ingestion would be less,
38  because the extent of roots to the contaminated zone would decrease. A more realistic
39  consideration for radiation exposure through the meat and milk ingestion pathway would be for
40  the cows to graze in an open area with residual surface contamination. Assuming a thickness of
41  0.4 in. (1 cm) in the RESRAD analysis, the potential radiation dose the resident would receive
42  was estimated to be less than 5.5 mrem/yr, if the upper-end concentrations for waste rocks were
43  assumed. The corresponding LCF risk would be less than $3 \times 10^{-6}$/yr; i.e., the probability of
44  developing a latent fatal cancer would be less than 1 in 330,000 per year. In reality, the residual
45  contamination would not be everywhere, and the average concentration would be lower;

BLM_0042339

1    therefore, a radiation dose of 5.5 mrem/yr (LCF risk of $3 \times 10^{-6}$/yr) is considered to be an
2    overestimate for the resident.
3
4
5    **4.1.5.5  General Public Exposure – Recreationist Scenario**
6
7        In addition to the residents who might live near the ULP lease tracts and could thus be
8    affected by the emissions from the waste-rock piles left after reclamation was completed, a
9    recreationist who would unknowingly enter the lease tract could also be exposed to radiation. To
10   model this potential radiation exposure, the recreationist is assumed to camp on top of a waste-
11   rock pile for 2 weeks. A waste-rock pile is considered because it is the largest radiation source
12   after reclamation. In addition to camping, the recreationist is assumed to collect and eat wild
13   berries grown in the ULP lease tract and hunt wildlife animals for consumption. This
14   recreationist could receive radiation exposure through the direct external radiation and radon
15   inhalation pathways. Because the wild berries could grow in soil with residual contamination,
16   and the meat of the wildlife animals could be contaminated due to consumption of contaminated
17   plants by the animals, the recreationist could also incur radiation exposure through the food
18   ingestion pathway. The inhalation of radioactive particulates and incidental soil ingestion
19   pathways may be also viable depending on the thickness of soil materials placed on top of the
20   waste-rock pile during reclamation. For radiation dose analysis, it is assumed that the thickness
21   of soil materials on top of waste-rock piles would range from 0 to 1 ft (0 to 0.3 m) (see also
22   Table 4.6-1 in Section 4.6).
23
24       The potential radiation doses that the recreationist could receive during the 2 weeks of
25   camping were obtained with the RESRAD code (Yu et al. 2001). According to the calculation
26   results, the direct external radiation dose could range from 0.75 mrem for a cover thickness of
27   1 ft (0.3 m) to 28.5 mrem with no cover. The radiation dose associated with inhalation of
28   contaminated dust particles could range from 0 mrem with a cover thickness of at least 6 in.
29   (0.15 m) to 0.26 mrem with no cover. The radiation dose associated with radon inhalation would
30   range from 0.13 mrem with a cover thickness of 1 ft (0.3 m) to 0.17 mrem with no cover. The
31   radiation dose that could be incurred through soil ingestion would be about 0.93 mrem if there
32   was no cover. This ingestion dose could be reduced to zero with a cover thickness of just a few
33   inches. In total, the radiation dose that could be incurred through the above four exposure
34   pathways would range from 0.88 mrem with a cover thickness of 1 ft (0.3 m) to 30 mrem with no
35   cover. The corresponding LCF risk would range from $1 \times 10^{-6}$ to $2 \times 10^{-5}$; i.e., the probability
36   of developing a latent fatal cancer would be about 1 in 1,000,000 to 1 in 50,000.
37
38       The above dose results were calculated with the base radionuclide concentrations in
39   waste rocks (70 pCi/g for Ra-226). If the concentration of 168 pCi/g for Ra-226 was used for the
40   calculations, the potential dose (LCF risk) would increase by a factor of less than 3,  i.e., the
41   radiation dose would range from 2.13 to 71.7 mrem (LCF risk of $3 \times 10^{-6}$ to $6 \times 10^{-5}$/yr; i.e.,
42   1 in 330,000 to 1 in 16,000) as the thickness of the cover materials on the waste-rock pile was
43   decreased from 1 ft (0.3 m) to 0. For comparison, in DOE Order 458.1, the dose limit set to
44   protect the general public from radiation exposure is 100 mrem/yr; the acceptable LCF risk
45   usually ranges from $1 \times 10^{-6}$/yr to $1 \times 10^{-4}$/yr (DOE 2011e).
46

BLM_0042340

As discussed in the previous section (Section 4.1.5.2), it is quite difficult for plants to thrive on top of waste-rock piles unless they are covered by a layer of soil materials; also, if the plant roots are limited to the cover layer, then there would be essentially no uptake of radionuclides by roots, and the plants would not be contaminated. (The radon gas generated by Ra-226 in waste rocks could diffuse through the cover layer and leave behind its decay products; however, the amount of radioactivity in the cover layer would be negligible compared to that in waste rocks. Therefore, the amount of root uptake would be negligible, if the roots would not extend to waste rocks.) Therefore, the analyses of potential doses associated with eating wild berries and wildlife animals were made based on residual soil contamination that was assumed to have a thickness of 0.4 in. (1 cm) and the upper-end concentrations of waste rocks (i.e., 70 pCi/g for Ra-226). Furthermore, ingestion rates of 1 lb (0.45 kg) of wild berries and 100 lb (45.4 kg) of deer meat were assumed. The potential radiation exposure would depend on the depth of plant roots. When the RESRAD default value of 0.9 m was used, a radiation dose of 1.08 mrem was estimated (0.04 mrem from eating wild berries and 1.04 mrem from eating deer meat). If a depth of 1 ft (0.3 m) is assumed, the potential dose would increase to 1.66 mrem (0.12 mrem from eating wild berries and 1.54 mrem from eating deer meat). In either case, the potential dose would be less than 2 mrem. The corresponding LCF risk was estimated to be less $8 \times 10^{-7}$ (i.e., 1 in 1,250,000).

No chemical risks would result from camping on a waste-rock pile if the waste-rock pile was covered by soil materials. In the worst situation (no soil cover), a hazard index of 0.039 was calculated considering both the inhalation of particulate and soil ingestion pathways. Potential chemical risk associated with ingesting contaminated wild berries would be negligible, with a hazard index of less than 0.003. However, because vanadium could accumulate in the tissues of animals if the animals ingested contaminated plants, potential chemical risks associated with the ingestion of deer meat pathway would be greater than those associated with the ingestion of wild berries pathway. Assuming an ingestion rate of 100 lb (45 kg) for deer meat, a hazard index of 0.39 was calculated. Overall, the sum of hazard indexes across all the exposure pathways is about 0.4, which is far below the threshold value of 1; therefore, the recreationist is not expected to experience any adverse health effect from these exposures.

In the above analyses, a recreationist was assumed to spend 14 days camping on top of a waste-rock pile in a ULP lease tract after the reclamation was completed. In reality, most of the encounter between a recreationist and a ULP lease tract would be much shorter; therefore, the potential radiation dose a recreationist would receive from the encounter would be much lower than the doses reported above. To get a perspective, the potential dose can be estimated by scaling the reported total dose with the duration of exposure. For example, the radiation dose associated with spending 1 hour on top of a waste-rock pile in a ULP lease tract after reclamation would be less than 0.09 mrem/h (LCF risk of $7 \times 10^{-8}$; i.e., 1 in 14,000,000), assuming Ra-226 concentration in the waste-rock pile is 70 pCi/g.

BLM_0042341

### 4.1.5.6  General Public Exposure – Individual Receptor Entering an Inactive Underground Mine Portal

During underground uranium mining operations, radon monitoring is required to ensure the safety of mine workers. Specifically, the radon concentration at the worker's breathing zone should be determined at least every 2 weeks and maintained at a level of less than 0.3 WL (30 CFR Part 57). To comply with this requirement, ventilation systems have to be operated efficiently. Without the ventilation systems, potential radon concentrations can accumulate to an unacceptable (high) level. Radon concentrations in bulk-headed areas (where mining is no longer active) have been reported to be from 30,000 to 300,000 pCi/L (EPA 1985). If an equilibrium factor of 0.2 is assumed for radon progenies, this would be equivalent to 60 to 600 WL (compared to the limit of 0.3 WL allowed for worker exposures).

The following information provides an additional perspective on potential radon exposures associated with entering an inactive underground mine after its closure. Denman et al. (2003) measured the radon levels in abandoned mines in the United Kingdom and reported the levels to range from 3 to 39 WL in three different mines at different locations within the mines. Using these measurement data, the corresponding radon dose rate was estimated to range from 6.85 to 89 mrem/h. The corresponding LCF risk would range from $9 \times 10^{-6}$ to $1 \times 10^{-4}$ (i.e., 1 in 110,000 to 1 in 10,000) per hour.

Based on the above two sources of data for radon, potential exposure to an individual who inadvertently enters an inactive underground mine could be high. It should be noted that most mines would be permanently closed after reclamation, so entry to a closed mine would be highly unlikely unless it was by an individual committing an illegal act of vandalism. However, entry to underground mines could be done by Federal or state employees and their contractors, and such entries would be conducted in compliance with appropriate requirements.

## 4.1.6  Ecological Resources

### 4.1.6.1  Vegetation

Under Alternative 1, lessees would complete reclamation on their respective leases. Exploration and mine development and operations would not occur on any of the lease tracts. Reclamation would occur on Lease Tracts 5, 6, 7, 8, 9, 11, 13, 15, 18, and 26. It is assumed that reclamation field activities would occur over a 1-year period and would include grading to create landforms conforming with the surrounding area, the application of surface soil materials, and seeding. The area of direct effects is considered to be the area that would be physically modified during reclamation (i.e., where ground-disturbing activities would occur).

Upland areas affected by grading would generally consist of previously disturbed areas, although higher-quality undisturbed plant communities near the margins of work areas could potentially be affected. Disturbed areas generally support commonly occurring non-native species, which in some areas include noxious weeds (see Table 3.6-4), or weedy native early

BLM_0042342

1  successional species. Grading would be followed by the placement of a cover of surface soil
2  materials designed to ensure an adequate thickness for protection of human health (see
3  Section 4.1.5).
4
5         The disturbed surface area would be seeded following final surface preparation. BMPs
6  that would improve the potential for successful vegetation establishment that have been proposed
7  for use at several at mine sites (JD-6, JD-8, JD-9, CM-25, LP-21, SM-18, SR-11, SR-13A)
8  include these: pocking south-facing slopes following placement of soil but before seeding, to
9  enhance moisture retention; seeding immediately following topsoil placement before crust
10 formation, preferably in the spring or fall; covering seeds by using a drag bar, chain link, or
11 packer wheels (except pocked surfaces). The seed mix developed by DOE, in consultation with
12 BLM, for use in reclamation of all lease tracts is given in Table 4.1-9. Weed-free seed mixes
13 from local sources, where available, would be used. Higher short-term and long-term
14 establishment and survival rates would likely result from the use of seeds of local native
15 genotypes, adapted to local environmental conditions. Seeding may potentially introduce
16 nonadapted genetic strains into local native populations of the species planted and could
17 potentially lower the fitness of these populations (BLM 2008d). While effects would extend
18 beyond the reclamation period, they would not threaten the local population of any affected
19 species and would be considered minor. Following the second growing season, the establishment
20 of desirable vegetation would be evaluated. The desired plant community at each mine site
21 would depend on site-specific conditions and would be determined on a case-by-case basis. Most
22 of the lease tracts are located in areas of piñon-juniper woodland and sagebrush shrubland (see
23 Section 3.6.1). The reclaimed areas would be monitored until vegetation establishment was
24 determined to be successful. The final determination of successful vegetation establishment
25 would be made by DOE with input from BLM and the CDRMS. Satisfactory reclamation would
26 require the successful establishment of at least six of the species shown in Table 4.1-9, the
27 stabilization of soil erosion resulting from the project, plant cover at least equal to what existed
28 prior to disturbance, and species composition at least as desirable as what existed prior to
29 disturbance. Follow-up activities might be required to correct deficiencies in community
30 composition or cover. While reclamation would be expected to establish native plant
31 communities over the long term, it might result in the establishment of plant communities that
32 would be considerably different from those of adjacent areas (Newman and Redente 2001).
33 Colonization of reclaimed areas by species from nearby plant communities might be slow
34 (Paschke et al. 2005; Newman and Redente 2001; Sydnor and Redente 2000). The successful
35 reestablishment of some plant communities, such as sagebrush shrubland or piñon-juniper
36 woodland, would likely require decades.
37
38         Reclamation activities could result in indirect impacts on habitats in adjacent areas.
39 Indirect impacts associated with reclamation activities could include the deposition of fugitive
40 dust, erosion, sedimentation, and the introduction of non-native species, including noxious
41 weeds. Measures, such as applying dust suppressants, creating gentle slopes, controlling runoff
42 and sediment, and eradicating invasive species, which are listed in Table 4.6-1, would mitigate
43 these potential impacts. The area of indirect effects includes the lease tracts and the area within
44 5 mi [8 km] of the lease tracts, where ground-disturbing activities would not occur but that could
45 be indirectly affected by activities in the area of direct effects. The potential degree of indirect
46 effects would decrease with increasing distance from the lease tracts. This area of indirect effects

BLM_0042343

1      **TABLE 4.1-9  Seed Mixture Developed for Reseeding on the DOE ULP Lease Tracts**

| Species | | Broadcast Application Rate (lb PLS/acre)[a] |
|---|---|---|
| Scientific Name | Common Name | |
| *Achnatherum hymenoides* | Paloma Indian ricegrass | 4.0 |
| *Atriplex canescens* | Rincon fourwing saltbush | 3.0 |
| *Bouteloua gracilis* | Hachita blue grama | 2.0 |
| *Elymus trachycaulus* ssp. *trachycaulus* | Slender wheatgrass | 2.0 |
| *Hesperostipa comata* | Needleandthread grass | 1.0 |
| *Krascheninnikovia lanata* | Winterfat | 1.0 |
| *Linum lewisii* | Maple Grove Lewis flax | 1.0 |
| *Nassella viridula* | Lodorm green needlegrass | 2.0 |
| *Pascopyrum smithii* | Arriba western wheatgrass | 4.0 |
| *Penstemon cyanocaulis*[b] | Bluestem beardtongue | 0.5 |
| *Pleuraphis jamesii* (florets) | Galleta grass | 2.0 |
| *Sphaeralcea coccinea* or *Sphaeralcea parvifolia* | Scarlet or parvifolia globemallow | 0.3 |

[a]   PLS = pure live seed.

[b]   Rocky Mountain penstemon (Bandera) should be used if *Penstemon cyanocaulis* is not available.

4      was identified on the basis of professional judgment and was considered sufficiently large to
5      bound the area that would potentially be subject to indirect effects.

7             Because most impacts could be avoided and plant communities would be expected to
8      fully recover from remaining impacts, the impacts of reclamation activities would be minor.

10            Deposition of fugitive dust generated during grading and the use of access roads could
11     reduce photosynthesis and productivity in plant communities near project areas. Prolonged
12     exposure to fugitive dust could alter a plant community's composition, reducing the occurrence
13     of species less tolerant of disturbance and resulting in habitat degradation. However, because of
14     the short duration of reclamation activities, the deposition of fugitive dust would constitute a
15     short-term minor impact.

17            Soils disturbed by equipment or used for waste-rock reclamation could be subject to
18     erosion. Soil erosion might also occur in areas where biological soil crusts had been disturbed by
19     equipment or foot traffic. Soil compaction from the operation of heavy equipment could reduce
20     the infiltration of precipitation or snowmelt and result in increased runoff and subsequent
21     erosion. Erosion could result in the localized loss of plant communities in areas where surface
22     soil materials were lost, and it could include areas outside the mine site. Effects might include
23     mortality or reduced growth of plants, changes in species composition, or reduced biodiversity.
24     Species more tolerant of disturbance, including invasive species, might become dominant in
25     affected plant communities. Reclamation of mine sites would generally include a working area of
26     approximately 1 to 8 acres (0.4 to 3.2 ha) per mine. However, the reclamation of the open-pit
27     mine on JD-7 would involve approximately 210 acres (85 ha). A greater working area would be

BLM_0042344

expected to increase the potential for erosion and sedimentation impacts. However, measures such as directing runoff to settling or rapid infiltration basins and quickly stabilizing slopes, which are listed in Table 4.6-1, would mitigate these potential impacts.

As noted above, areas on the lease tracts that have been previously disturbed by mining activities generally support commonly occurring non-native species, which in some areas include noxious weeds or weedy native early successional species. Eight species of noxious weeds are known to occur on the lease tracts included in Alternative 1 (Table 3.6-5), while many others occur in the area. Soils disturbed by reclamation activities might provide an additional opportunity for the introduction and spread of invasive species or noxious weeds. Seeds of these species could be inadvertently brought to a project site from infested areas by vehicles or equipment used at the site. Invasive species or noxious weeds might also colonize disturbed soils from established populations in nearby areas. DOE and the state of Colorado require lessees to control noxious weed infestations. The establishment of invasive species or noxious weeds might slow or prevent the establishment of desired plant communities, but would be minimized by on-going weed control measures. Invasive species or noxious weeds might also alter fire regimes, including increasing the frequency and intensity of wildfires, particularly as a result of the establishment of annual grasses such as cheatgrass. Habitats that were not adapted to frequent or intense fires could experience long-term effects, requiring decades to recover, or replacement by non-native species. As just noted, reclaimed areas would be monitored until vegetation establishment was successful, and invasive species would be eradicated immediately. Therefore, the spread of these species would be minimized. In addition, any noxious weeds or invasive species currently present on areas to reclaimed would be replaced by native plant communities, reducing seed sources for those species.

### 4.1.6.1.1 Wetlands and Floodplains

Grading operations would include the filling or removal of containment ponds, sedimentation ponds, or other retention basins that can occur on mine sites. Some of these areas might include wetland habitats, requiring compliance with E.O. 11990, *Protection of Wetlands*, and the DOE implementation in 10 CFR Part 1022, as well as with Section 404 of the CWA for jurisdictional wetlands. Compliance may include mitigation requirements.

Erosion might result in sedimentation in downgradient wetland habitats and increased sediment deposition in ephemeral or intermittent drainages or riparian habitats of receiving streams such as the Calamity Creek drainage in Lease Tract 26, the Dolores River drainage in Lease Tract 13, or the Atkinson Creek drainage in Lease Tract 18. Effects might include mortality or reduced growth of plants, changes in species composition, or reduced biodiversity. Species more tolerant of disturbance, including invasive species, might become dominant in affected plant communities.

BLM_0042345

### 4.1.6.2  Wildlife

Under Alternative 1, reclamation would occur on 10 lease tracts. Altogether, 267 acres (108 ha) would be reclaimed, with most of it (210 acres or 85 ha) involving the surface open-pit mine on Lease Tract 7. As discussed in Section 4.1.6.1, areas affected by reclamation would generally consist of previously disturbed areas, although some undisturbed habitats could be affected near the outer margins of the areas being reclaimed. As mentioned in mine permit amendment applications, mines will be reclaimed for range and wildlife habitat to meet DOE's directive to return land as closely as possible to pre-mine land use (Cotter Corp. 2011, 2012a–g). Post-mine conditions should improve forage and habitat for both wildlife and grazing stock.

Reclamation activities could affect wildlife by altering existing habitat characteristics and the species supported by those habitats. These activities would vary among locations, depending on the extent of infrastructure (if any) that would need to be removed, projected future land use, and the amount of site restoration (e.g., amount of recontouring) required. Reclamation activities that could affect wildlife include (1) dismantling of structures, (2) generation of waste materials, (3) recontouring of project areas, (4) revegetation activities, and (5) accidental releases (spills) of potentially hazardous materials. Where mine portals exist, reclamation activities would involve either filling the portals or adding bat gates to the openings. Mine closure would be achieved with boulders and rocks and/or by backfilling the portals with available mine-waste rock and other surface soil materials, covering those materials with surface soil materials, and reseeding.

During reclamation activities, localized obstructions of wildlife movement could occur. There would also be an increase in noise and visual disturbance associated with removal of project facilities and site restoration. Traffic and equipment operations during reclamation could result in low levels of wildlife mortality. Most wildlife would avoid areas where reclamation activities were taking place. Avoidance would be a short-term impact.

Other potential environmental concerns resulting from reclamation would include the disposal of solid wastes and hazardous materials and the remediation of any contaminated soils and water treatment pond sediments. Some fuel and chemical spills could also occur, but they would be generally confined to access roads and project site areas. The probability of wildlife exposure to such spills would be small and limited to a few individuals. After reclamation activities were complete, there would be no fuel or chemical spills associated with the reclaimed mine areas.

Permanent underground mine closure could destroy potential habitat for bats and other wildlife. To mitigate this impact, mines to be closed should be surveyed for the presence of bats, if feasible (Brown et al. 2000) (see Table 4.6-1 in Section 4.6). The use of bat gates in the mine openings would maintain the mines utilized by bats as potential roost-site habitats. However, the use of underground habitats in uranium-rich areas or reclaimed uranium mines could expose wildlife species to uranium or other radionuclides through inhalation, ingestion, or direct exposure (BLM 2011n). The potential exists for radium-226 concentrations to exceed DOE's biota concentration guideline of 50.6 pCi/g (i.e., the assumed concentration could be 168 pCi/g or more in hot spots); although the overall radium-226 concentration is expected to be below the guideline (i.e., 23.7 pCi/g or less, which would be similar to the waste-rock pile). Exposure to

BLM_0042346

1    continuous low doses of radiation has been shown to adversely affect bats (e.g., cause genetic
2    damage) (Meehan 2001). Thus, unless the mine sites slated for reclamation have exceptional
3    qualities as hibernacula or roost sites, consideration should be given to evicting bats
4    (e.g., determining when fewest bats would be present in the mine and then adding exclusion
5    barriers to allow bats to exit, but not reenter the mine) and permanently sealing the mines in
6    order to remove the threat of their exposure to radionuclides. The Colorado Bat Working Group
7    (2005) discussed the pros and cons of gating uranium mines. Evidence of adverse radiation
8    impacts on bats was inconclusive. The risks of exposure to radionuclides may be outweighed by
9    the use of caves as alternatives to diminishing natural habitats. In particular, the majority of
10   Colorado's Townsend's big-eared bats (*Corynorhinus townsendii*) maternity roosts are in
11   uranium mines, and displacing them could impact the population (Colorado Bat Working
12   Group 2005). The closure of abandoned mines is considered a substantial imminent threat to the
13   Townsend's big-eared bat; a substantial non-imminent threat to the fringed myotis (*Myotis*
14   *thysanodes*); and a widespread, low-severity threat, slightly threatened, or unthreatened for other
15   bats species in Colorado (Colorado Bat Working Group 2010b). Decisions on whether to use bat
16   gates or permanently close underground mines should be made among DOE, BLM, CPW, and
17   other interested stakeholders such as the Colorado Bat Working Group.

19        Indirect impacts on wildlife could occur from dust deposition, erosion, sedimentation,
20   and introduction of non-native plant species. Non-native plant species can increase the frequency
21   and intensity of wildfires (Section 4.1.6.1). Measures (i.e., compliance measures, mitigation
22   measures, and BMPs; see Table 4.6-1 in Section 4.6.4) would minimize these impacts. The seed
23   mixture approved for reseeding mine sites during reclamation (Section 4.1.6.1) would reduce the
24   potential for invasive plant species to become established.

26        Overall, impacts on wildlife would be minor during reclamation activities. The potential
27   to minimize or avoid impacts on migration, breeding, and other seasonal wildlife activities could
28   be accomplished by timing reclamation work so as not to occur during these periods.
29   Reclamation would restore habitat and establish ecological conditions suitable for wildlife
30   species. However, except for species whose range includes the 210 acres (85 ha) to be reclaimed
31   within Lease Tract 7, the amount of habitat reclaimed would be limited. For example, only a
32   maximum of 27 acres (11 ha) of overall desert bighorn sheep (*Ovis canadensis nelsoni*) habitat
33   would be restored or improved. Reclamation would restore or improve up to 267 acres (108 ha)
34   of habitat for many of the representative wildlife species listed in Section 3.6.2 (except
35   amphibians). Removal of water treatment ponds on Lease Tracts 7 and 9 would eliminate
36   potential drinking water sources and habitats for wildlife (particularly amphibian species).
37   However, water treatment pond removal would also eliminate potential sources of contaminant
38   exposure for wildlife. There is no evidence that these ponds are extensively used by water fowl
39   or other migratory birds. The removal of these ponds would not result in a valuable resource loss
40   for birds or other wildlife.

42        The effectiveness of any reclamation activities would depend on the specific actions
43   taken; the best results, however, would occur where original site topography, hydrology, surface
44   soil materials, and vegetation patterns were reestablished. This could most likely be attained at
45   underground mine sites. However, this might not be possible under all situations. Following

BLM_0042347

1  reclamation, negligible impacts on wildlife would occur during DOE's long-term management of
2  the withdrawn lands.
3
4
5  **4.1.6.3 Aquatic Biota**
6
7          During reclamation, erosion could result in sediment deposition in intermittent and
8  ephemeral drainages, and, during storm events, the sediments could potentially reach perennial
9  streams and rivers. The potential for this is most likely at Lease Tract 13, through which the
10 Dolores River flows. A total of only 8 acres (3.2 ha) at three mine sites is being reclaimed in
11 Lease Tract 13. Thus, the potential for sediments (including those that could contain radioactive
12 or chemical contaminants) to enter either the Dolores River due to reclamation activities is
13 unlikely, particularly with the appropriate use of mitigative and compliance measures and BMPs
14 to control erosion (see Table 4.6-1 in Section 4.6).
15
16         Areas being reclaimed would become less prone to erosion over time because site
17 grading would be completed and vegetative cover would be established in accordance with the
18 mitigative and compliance measures and BMPs identified in Table 4.6-1. Assuming that
19 reclamation activities were successful, restored areas should eventually become similar to natural
20 areas in terms of erosion potential. Following reclamation, the potential for erosion from the
21 reclaimed mine sites would be less than what currently exists for the unreclaimed mine site areas.
22
23         Overall, impacts on aquatic biota from Alternative 1 would be negligible.
24
25
26 **4.1.6.4 Threatened, Endangered, and Sensitive Species**
27
28         Impacts on threatened, endangered, and sensitive species from uranium mining activities
29 are fundamentally similar to, or the same as, those described for impacts on more common and
30 widespread plant communities and habitats, wildlife, and aquatic resources (see Sections 4.1.6.1,
31 4.1.6.2, and 4.1.6.3). However, because of their low populations, listed species are far more
32 sensitive to impacts than more common and widespread species. Low population size makes
33 these species more vulnerable to the effects of habitat fragmentation, habitat alteration, habitat
34 degradation, human disturbance and harassment, mortality of individuals, and the loss of genetic
35 diversity. Although listed species often reside in unique and potentially avoidable habitats, the
36 loss of even a single individual of a listed species could result in a much greater impact on the
37 population of the affected species than would the loss of an individual of a more common
38 species.
39
40         Under Alternative 1, potential impacts could result from reclamation activities at Lease
41 Tracts 5, 6, 7, 8, 9, 11, 13, 15, 18, and 26. Table 4.1-10 presents the potential for impacts on
42 threatened, endangered, and sensitive species under Alternative 1. Of the 52 species listed in
43 Table 4.1-10, 45 might be affected by program activities under Alternative 1. Among these
44 species that might be affected are 17 plants, 7 fish, 2 amphibians, 1 reptile, 9 birds, and
45 7 mammals.
46

BLM_0042348

**TABLE 4.1-10  Potential Effects of the Uranium Leasing Program under Alternative 1 on Threatened, Endangered, and Sensitive Species**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Plants*[d] | | | | |
| Canyonlands biscuitroot | *Aletes latilobus* | BLM-S | 26, 27 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tract 26 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Dolores River skeletonplant | *Lygodesmia doloresensis* | BLM-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Eastwood's monkeyflower | *Mimulus eastwoodiae* | BLM-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Fisher milkvetch | *Astragalus piscator* | BLM-S | 26, 27 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tract 26 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |

BLM_0042349

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Plants (Cont.)** | | | | |
| Grand Junction milkvetch | *Astragalus linifolius* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25, 26, 27 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tracts 5, 6, 7, 8, 9, 18, and 26 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Grand Junction suncup | *Camissonia eastwoodiae* | BLM-S | 26, 27 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tract 26 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Gypsum Valley cateye | *Cryptantha gypsophila* | BLM-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Helleborine | *Epipactis gigantean* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Horseshoe milkvetch | *Astragalus equisolensis* | BLM-S | 26, 27 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tract 26 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect impacts such as runoff, sedimentation, and the dispersion of fugitive dust. |

BLM_0042350

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Plants (Cont.)** | | | | |
| Kachina daisy | *Erigeron kachinensis* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tracts 5, 6, 7, 8, 9, and 18 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Naturita milkvetch | *Astragalus naturitensis* | BLM-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Osterhout's cryptantha | *Cryptantha osterhoutii* | BLM-S | 26, 27 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tract 26 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Paradox breadroot | *Pediomelum aromaticum* | BLM-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as runoff, sedimentation, and the dispersion of fugitive dust. |
| Paradox lupine | *Lupinus crassus* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tracts 5, 6, 7, 8, 9, and 18 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as those resulting from runoff, sedimentation, and the dispersion of fugitive dust. |

BLM_0042351

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| ***Plants (Cont.)*** | | | | |
| San Rafael milkvetch | *Astragalus rafaelensis* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25, 26, 27 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tracts 5, 6, 7, 8, 9, 18, and 26 could affect this species. Impacts could occur through direct effects such as those resulting from mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as those resulting from runoff, sedimentation, and the dispersion of fugitive dust. |
| Sandstone milkvetch | *Astragalus sesquiflorus* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tracts 5, 6, 7, 8, 9, and 18 could affect this species. Impacts could occur through direct effects such as those resulting from mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as those resulting from runoff, sedimentation, and the dispersion of fugitive dust. |
| Wetherill's milkvetch | *Astragalus wetherillii* | FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality and habitat disturbance resulting from reclamation activities, as well as indirect effects such as those resulting from runoff, sedimentation, and the dispersion of fugitive dust. |
| ***Invertebrates*[e]** | | | | |
| Great Basin silverspot butterfly | *Speyeria nokomis nokomis* | BLM-S | All | No impact. Direct or indirect impacts on the species or its habitat (riparian areas) from reclamation activities are unlikely to occur. |
| ***Fish*** | | | | |
| Bluehead sucker | *Catostomus discobolus* | BLM-S; FS-S | All | Potential for negative impact. Reclamation activities could cause short-term soil erosion and sediment in ephemeral drainages, streams, and rivers. Greatest potential for impact occurs at Lease Tracts 13 and 13A. |

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Fish (Cont.)* | | | | |
| Bonytail | *Gila elegans* | ESA-E; CO-E | All | Potential for negative impact. Reclamation activities could cause short-term soil erosion and sediment in ephemeral drainages, streams, and rivers. Greatest potential for impact occurs at Lease Tracts 13 and 13A. With the implementation of minimization and mitigation measures, ULP activities under Alternative 1 may affect, but are not likely to adversely affect, the bonytail or its critical habitat. |
| Colorado pikeminnow | *Ptychocheilus lucius* | ESA-E; CO-T | All | Potential for negative impact. Reclamation activities could cause short-term soil erosion and sediment in ephemeral drainages, streams, and rivers. Greatest potential for impact occurs at Lease Tracts 13 and 13A. With the implementation of minimization and mitigation measures, ULP activities under Alternative 1 may affect, but are not likely to adversely affect, the Colorado pikeminnow or its critical habitat.. |
| Flannelmouth sucker | *Catostomus latipinnis* | BLM-S; FS-S | All | Potential for negative impact. Reclamation activities could cause short-term soil erosion and sediment in ephemeral drainages, streams, and rivers. Greatest potential for impact occurs at Lease Tracts 13 and 13A. |
| Humpback chub | *Gila cypha* | ESA-E; CO-T | All | Potential for negative impact. Reclamation activities could cause short-term soil erosion and sediment in ephemeral drainages, streams, and rivers. Greatest potential for impact occurs at Lease Tracts 13 and 13A. With the implementation of minimization and mitigation measures, ULP activities under Alternative 1 may affect, but are not likely to adversely affect, the humpback chub or its critical habitat.. |

BLM_0042353

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| ***Fish (Cont.)*** | | | | |
| Razorback sucker | *Xyrauchen texanus* | ESA-E; CO-E | All | Potential for negative impact. Reclamation activities could cause short-term soil erosion and sediment in ephemeral drainages, streams, and rivers. Greatest potential for impact occurs at Lease Tracts 13 and 13A. With the implementation of minimization and mitigation measures, ULP activities under Alternative 1 may affect, but are not likely to adversely affect, the razorback sucker or its critical habitat.. |
| Roundtail chub | *Gila robusta* | BLM-S; FS-S | All | Potential for negative impact. Reclamation activities could cause short-term soil erosion and sediment in ephemeral drainages, streams, and rivers. Greatest potential for impact occurs at Lease Tracts 13 and 13A. |
| ***Amphibians*** | | | | |
| Boreal toad | *Bufo boreas* | CO-E | 18, 19, 19A, 26, 27 | No impact. Direct or indirect impacts on the species or its habitat (riparian areas) from reclamation activities are unlikely to occur. |
| Canyon treefrog | *Hyla arenicolor* | BLM-S | All | Potential for negative impact—indirect effects only. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Direct impacts on the species or its habitat (canyonlands and riparian areas) are unlikely to occur. However, indirect effects from runoff, sedimentation, or fugitive dust deposition might be possible. |
| Great Basin spadefoot | *Spea intermontana* | BLM-S | 11, 11A | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tract 11 could affect this species. Impacts could occur through direct effects such as those resulting from mortality and habitat disturbance, as well as indirect effects such as those resulting from runoff, sedimentation, and the dispersion of fugitive dust. |
| Northern leopard frog | *Rana pipiens* | BLM-S; FS-S | 13, 13A, 14, 15, 18, 19, 19A, 24, 25 | No impact. Direct or indirect impacts on the species or its habitat (riparian areas) from reclamation activities are unlikely to occur. |

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Reptiles** | | | | |
| Longnose leopard lizard | *Gambelina wislizenii* | BLM-S | 18, 19, 19A, 20, 24, 26, 27 | No impact. Direct or indirect impacts on the species or its habitat (riparian areas) from reclamation activities are unlikely to occur. |
| Midget-faded rattlesnake | *Crotalus oreganus concolor* | BLM-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality and habitat disturbance, as well as indirect effects such as those resulting from runoff, sedimentation, and the dispersion of fugitive dust. |
| **Birds** | | | | |
| Bald eagle | *Haliaeetus leucocephalus* | BLM-S; FS-S | 5, 5A, 6, 7, 8, 8A, 9, 13, 13A, 14, 18, 19, 19A, 20, 21, 22, 22A, 23, 26, 27 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tracts 5, 6, 7, 8, 9, 13, 13A, 18, and 26 could affect this species. Direct effects include disturbance of foraging habitat within the lease tracts. Wintering habitat along the Dolores River and Dry Creek Basin is not expected to be directly affected. However, indirect effects on these wintering habitats from noise, runoff, sedimentation, or fugitive dust deposition might be possible. |
| Brewer's sparrow | *Spizella breweri* | BLM-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of sagebrush habitats, as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust. |

BLM_0042355

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Birds (Cont.)** | | | | |
| Burrowing owl | *Athene cunicularia* | BLM-S; CO-T | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitats (sagebrush, shrublands, and grasslands), as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust. |
| Ferruginous hawk | *Buteo regalis* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitats (sagebrush, shrublands, and grasslands), as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust. |
| Gunnison sage-grouse | *Centrocercus minimus* | ESA-P; BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitats (sagebrush, shrublands, and grasslands), as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust. With the implementation of minimization and mitigation measures, ULP activities under Alternative 1 may affect, but are not likely to adversely affect, the Gunnison sage-grouse. |

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| ***Birds (Cont.)*** | | | | |
| Mexican spotted owl | *Strix occidentalis lucida* | ESA-T; CO-T | All | Potential for negative impact—indirect effects only. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Direct impacts on the species or its habitat (canyonlands and coniferous forests) are unlikely to occur. However, indirect effects on suitable habitat from noise, runoff, sedimentation, or fugitive dust deposition might be possible. With the implementation of minimization and mitigation measures, ULP activities under Alternative 1 will have no effect on the Mexican spotted owl or its critical habitat. |
| Northern goshawk | *Accipiter gentilis* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from disturbance of foraging habitats (sagebrush, shrublands, and grasslands), as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust. |
| Peregrine falcon | *Falco peregrinus* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of foraging or nesting habitats, as well as indirect effects such as those resulting from noise runoff, sedimentation, and the dispersion of fugitive dust. Nests near Paradox Valley lease tracts might be indirectly affected by reclamation activities. |
| Sage sparrow | *Amphispiza belli* | FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of sagebrush habitats, as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust. |

BLM_0042357

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| ***Birds (Cont.)*** | | | | |
| Southwestern willow flycatcher | *Empidonax traillii extimus* | ESA-E; CO-E | All | No impact. Direct or indirect impacts on the species or its habitat (riparian thickets and woodlands) from reclamation activities are unlikely to occur. With the implementation of minimization and mitigation measures, ULP activities under Alternative 1 will have no effect on the southwestern willow flycatcher or its critical habitat. |
| Western yellow-billed cuckoo | *Coccyzus americanus occidentalis* | ESA-C; BLM-S; FS-S | All | No impact. Direct or indirect impacts on the species or its habitat (riparian woodlands) from reclamation activities are unlikely to occur. With the implementation of minimization and mitigation measures, ULP activities under Alternative 1 will have no effect on the western yellow-billed cuckoo. |
| White-faced ibis | *Plegadis chihi* | BLM-S; FS-S | 13, 13A, 14, 15, and 15A. | No impact. Direct or indirect impacts on the species or its habitat (wetlands and water bodies) from reclamation activities are unlikely to occur. |
| ***Mammals[f]*** | | | | |
| Big free-tailed bat | *Nyctinomops macrotis* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust to roosting or foraging habitats. |
| Black-footed ferret | *Mustela nigripes* | ESA-E; ESA-XN; CO-E | All | No impact. This species is considered extirpated from the ULP project counties. Prairie dog colonies in the vicinity of the ULP lease tracts are not at suitable densities for supporting ferret populations. ULP activities under Alternative 1 will have no effect on the black-footed ferret. |

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Mammals (Cont.)** | | | | |
| Fringed myotis | *Myotis thysanodes* | BLM-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust to roosting or foraging habitats. |
| Gunnison's prairie dog | *Cynomys gunnisoni* | ESA-C; BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitat, as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust to suitable habitats. With the implementation of minimization and mitigation measures, ULP activities under Alternative 1 may affect, but are not likely to adversely affect, the Gunnison's prairie dog. |
| Nelson's bighorn sheep | *Ovis canadensis nelsoni* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from disturbance of habitat, as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust to suitable habitat. |
| Northern river otter | *Lutra canadensis* | CO-T | All | No impact. Direct or indirect impacts on the species or its habitat (river systems) from reclamation activities are unlikely to occur. |

**TABLE 4.1-10  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Mammals (Cont.)** | | | | |
| Spotted bat | *Euderma maculatum* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust to roosting or foraging habitats. |
| Townsend's big-eared bat | *Corynorhinus townsendii pallescens* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Reclamation activities on all lease tracts under Alternative 1 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust to roosting or foraging habitats. |
| White-tailed prairie dog | *Cynomys leucurus* | BLM-S; FS-S | 18, 19, 19A, 24, 25, 26, and 27 | Potential for negative impact—direct and indirect effects. Reclamation activities on Lease Tracts 18 and 26 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitat, as well as indirect effects such as those resulting from noise, runoff, sedimentation, and the dispersion of fugitive dust to suitable habitats. |

[a]  BLM-S = BLM-designated sensitive species; ESA-C = candidate for listing under the ESA; ESA-E = listed as endangered under the ESA; ESA-P = proposed for listing under the ESA; ESA-T = listed as threatened under the ESA; ESA-XN = experimental, nonessential population as defined by Section 10 of the ESA; FS-S = USFS-designated sensitive species.

[b]  Refer to Table 3.6.4-1 (Section 3.6.4) for a description of species' habitat requirements and potential to occur on or near lease tracts. Recorded occurrences were obtained as U.S. Geological Survey (USGS) quad-level or township range-level element occurrence records from state natural heritage program offices (CNHP 2011b). If available for terrestrial vertebrates, SWReGAP animal habitat suitability models (USGS 2007) were used to determine the presence of potentially suitable habitat in the vicinity of the lease tracts.

**Footnotes continued on next page.**

**TABLE 4.1-10  (Cont.)**

[c]   Potential impacts are based upon the presence of potentially suitable habitat or recorded occurrences in the vicinity of the Alternative 1 lease tracts. Impacts on species might occur as either direct or indirect effects. Direct effects are considered to be physical impacts resulting from ground-disturbing activities; these include impacts such as direct mortality and habitat disturbance. The impact zone for direct effects does not extend beyond the lease tract boundaries. Indirect effects result from factors including, but not limited to, noise, runoff, dust, accidental spills, and potential radiation exposure. The impact zone for indirect effects might extend beyond the lease tract boundaries, but the potential degree of indirect effects would decrease with increasing distance from the lease tracts. Impacts on species listed under the ESA are discussed using impact levels consistent with determinations made in the ESA Section 7 consultation with the USFWS.

[d]   One plant species, the Colorado hookless cactus (ESA-T), might occur in one or more project county. However, suitable habitat for this species does not occur in the vicinity of any of the ULP lease tracts; ULP activities are not likely to affect this species or its habitat.

[e]   One invertebrate species, the Uncompahgre fritillary butterfly (ESA-E), might occur in one or more project county. However, suitable habitat for this species does not occur in the vicinity of any of the ULP lease tracts; ULP activities are not likely to affect this species or its habitat.

[f]   Two mammal species, the Canada lynx (ESA-T) and North American wolverine (ESA-C), might occur in one or more project counties. However, suitable habitat for these species does not occur in the vicinity of any of the ULP lease tracts; ULP activities are not likely to affect these species or their habitats.

BLM_0042361

1    **4.1.6.4.1  Impacts on Species Listed under the Endangered Species Act.** Ten of the
2    species listed in Table 4.1-10 are listed as threatened or endangered under the ESA or are
3    proposed or candidates for listing under the ESA: four fish—the bonytail chub, Colorado
4    pikeminnow, humpback chub, and razorback sucker; four birds—the Gunnison sage-grouse,
5    Mexican spotted owl, southwestern willow flycatcher, and western yellow-billed cuckoo; and
6    two mammals—the black-footed ferret and Gunnison's prairie dog. Impacts of the preferred
7    alternative (Alternative 4) on ESA-listed species were also evaluated through programmatic
8    consultation with the U.S. Fish and Wildlife Service (USFWS) as required under Section 7(c)(1)
9    of the ESA. Impacts on these species are discussed using the impact determinations consistent
10   with terminology used in the ESA Section 7 consultation with the USFWS. The BA and BO
11   prepared as part of the ESA Section 7 consultation are presented in Appendix E. Although the
12   BA and BO discuss impacts related to the preferred alternative (Alternative 4), the programmatic
13   consultation considered reclamation activities under Alternative 4, which could inform impact
14   determinations under Alternative 1. As discussed in Section 3.6.4.1, there are no plants or
15   invertebrates listed under the ESA that could occur in the vicinity of the ULP lease tracts.
16   Impacts on these ESA-listed species are discussed below.
17
18
19       **Colorado River Endangered Fishes.** There are four listed species of fish that might be
20   affected by ULP activities under Alternative 1: the bonytail chub; Colorado pikeminnow;
21   humpback chub; and razorback sucker. Each of these fish species historically inhabited
22   tributaries of the Colorado River system, including portions of the Dolores and San Miguel
23   Rivers in the ULP project counties. Current populations of the Colorado River endangered fishes
24   no longer inhabit these rivers in the vicinity of the lease tracts. However, suitable habitat and
25   populations occur in the Colorado River downstream from the Dolores River, which is in the
26   vicinity of and downgradient from several lease tracts and flows through Lease Tracts 13 and
27   13A. Designated critical habitat for the Colorado River endangered fishes also occurs in the
28   Colorado River, downstream from the Dolores River. Direct impacts on these species or their
29   habitat are unlikely to occur. However, indirect impacts on the Dolores or San Miguel Rivers
30   from erosion, runoff, and sedimentation might be possible, which might affect the species and
31   their habitat (including designated critical habitat) in the Colorado River (Table 4.1-10).
32
33       Water consumption from the Dolores River and Upper Colorado River Basin has the
34   potential to affect downstream aquatic habitat for the Colorado River endangered fish. However,
35   water consumption to support ULP reclamation activities under Alternative 1 will be low and is
36   not likely to affect aquatic habitats. As discussed in Section 4.1.6.3, the potential for reclamation
37   activities under Alternative 1 to affect biota such as the Colorado River endangered fishes is
38   considered to be small. Any disturbance to surface features that would result in erosion and
39   sedimentation would be short term; areas being reclaimed would become less prone to erosion
40   over time because of the completion of site grading and establishment of vegetated cover.
41   Actions to reduce impacts on the Colorado River endangered fishes are discussed in Table 4.6-1
42   and through formal programmatic ESA Section 7 consultation with the USFWS (Appendix E).
43   Consultation with the CPW should also occur to determine any state mitigation requirements.
44   Given the implementation of these minimization and mitigation measures, ULP activities under
45   Alternative 1 may affect, but are not likely to adversely affect, the Colorado River endangered
46   fishes or their critical habitats.

BLM_0042362

1    **Gunnison Sage-Grouse.** The Gunnison sage-grouse is a species proposed for listing
2    as endangered under the ESA. It was proposed for listing as an endangered species on
3    January 11, 2013 (USFWS 2013a). Critical habitat for the species was also proposed at that time
4    (USFWS 2013b). This species occurs in sagebrush-dominated habitats in western and
5    southwestern Colorado. Although the species is not known to occur on any of the ULP lease
6    tracts, a portion of the potential proposed critical habitat intersects several lease tracts in the
7    Slick Rock area (Lease Tracts 10, 11, 11A, 12, 15A, 16, and 16A). No occupied or
8    vacant/unknown proposed critical habitat intersects any of the ULP lease tracts. Occupied
9    proposed critical habitat occurs within 1 mi (1.6 km) south of lease tracts in the Paradox area
10   (Lease Tracts 6, 8, and 9) (Figure 3.6-15). Reclamation activities in the above-mentioned lease
11   tracts under Alternative 1 could affect this species through direct effects associated with habitat
12   disturbance, as well as indirect effects resulting from noise, runoff, sedimentation, and the
13   dispersion of fugitive dust (Table 4.2-1).
14
15    Surveys would be needed to determine the presence of the Gunnison sage-grouse and its
16   habitat (e.g., sagebrush) on the ULP lease tracts and develop the appropriate avoidance,
17   minimization, and mitigation measures, if necessary. Program activities would also comply with
18   guidelines set forth in the BLM's *Greater Sage-Grouse Interim Management Policies and*
19   *Procedures* (BLM 2011e) and *BLM National Greater Sage-Grouse Land Use Planning Strategy*
20   (BLM 2011f). Measures to reduce impacts on this species (including survey protocol
21   development, avoidance measures, minimization measures, and, potentially, translocation actions
22   and compensatory mitigation if necessary) should be determined following coordination with the
23   USFWS and the CPW. Programmatic minimization and mitigation measures are discussed in
24   Table 4.6-1 and through formal programmatic ESA Section 7 consultation with the USFWS
25   (Appendix E). Given the implementation of these minimization and mitigation measures, ULP
26   activities under Alternative 1 may affect, but are not likely to adversely affect, the Gunnison
27   sage-grouse.
28
29
30    **Mexican Spotted Owl.** The Mexican spotted owl is listed as threatened under the ESA.
31   This species is considered to be a rare migrant in Montrose and San Miguel Counties, Colorado.
32   It inhabits steep canyons with dense old-growth coniferous forests. This habitat does not occur
33   on the ULP lease tracts, but suitable habitat might occur in the vicinity of the ULP lease tracts.
34   Reclamation activities in all lease tracts under Alternative 1 would not be likely to directly affect
35   this species. However, indirect impacts on suitable habitat resulting from noise, runoff,
36   sedimentation, or fugitive dust deposition might be possible (Table 4.1-10). The implementation
37   of best reclamation practices should be sufficient to reduce or minimize indirect impacts on this
38   species. Designated critical habitat for this species does not occur in the vicinity of the ULP lease
39   tracts and is not expected to be affected by program activities. Programmatic minimization and
40   mitigation measures are discussed in Table 4.6-1 and through formal programmatic ESA
41   Section 7 consultation with the USFWS (Appendix E). Given the implementation of these
42   minimization and mitigation measures, ULP activities under Alternative 1 will have no effect on
43   the Mexican spotted owl or its critical habitat.
44
45

BLM_0042363

**Southwestern Willow Flycatcher.** The southwestern willow flycatcher is listed as endangered under the ESA. This species is considered to be an uncommon breeding resident in San Miguel County, Colorado. It inhabits riparian thickets and riparian woodlands. This species is not known to occur on any of the ULP lease tracts. However, according to the SWReGAP habitat suitability model for this species, potentially suitable summer nesting habitat might occur along the Dolores and San Miguel Rivers as well as their tributaries in Mesa, Montrose, and San Miguel Counties. These potentially suitable habitat areas occur in Lease Tracts 13 and 13A, which are being evaluated under Alternative 1. Program activities under Alternative 1 would not be expected to directly affect the southwestern willow flycatcher because direct impacts on this species and its habitat (riparian habitats) would probably be avoided. However, program activities in all lease tracts under Alternative 1 have the potential to indirectly affect the southwestern willow flycatcher through impacts resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure (Table 4.1-10). Critical habitat for the southwestern willow flycatcher does not occur in the vicinity of the lease tracts and is not likely to be affected.

The implementation of stormwater controls, mine water treatment systems, and other discharge mitigation methods would reduce impacts of ULP activities on this species under Alternative 1. Programmatic minimization and mitigation measures are discussed in Table 4.6-1 and through formal programmatic ESA Section 7 consultation with the USFWS (Appendix E). Given the implementation of these minimization and mitigation measures, ULP activities under Alternative 1 will have no effect on the southwestern willow flycatcher or its critical habitat.

**Western Yellow-Billed Cuckoo.** The western yellow-billed cuckoo is a candidate species for listing under the ESA. It inhabits deciduous riparian woodlands, particularly cottonwood and willow. The western yellow-billed cuckoo is known to occur in Mesa and Montrose Counties as an uncommon summer breeding resident. This species is not known to occur in the vicinity of any of the lease tracts; however, according to the SWReGAP habitat suitability model for the species, potentially suitable summer nesting habitat might occur along the Dolores River in southern Mesa and northern Montrose Counties. These potentially suitable habitat areas do not intersect any of the lease tracts, but they are downslope from Calamity Mesa, Outlaw Mesa, and Uravan lease tracts in Sinbad Valley. Program activities under Alternative 1 are not expected to directly affect the western yellow-billed cuckoo because direct impacts on this species and its habitat (riparian habitats) would probably be avoided. However, program activities in all lease tracts under Alternative 1 have the potential to indirectly affect the southwestern willow flycatcher through impacts resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure (Table 4.1-10).

The implementation of stormwater controls, mine water treatment systems, and other discharge mitigation methods would reduce impacts of ULP activities on the western yellow-billed cuckoo. Programmatic minimization and mitigation measures are discussed in Table 4.6-1 and through formal programmatic ESA Section 7 consultation with the USFWS (Appendix E). Given the implementation of these minimization and mitigation measures, ULP activities under Alternative 1 will have no effect on the western yellow-billed cuckoo.

BLM_0042364

1    **Black-Footed Ferret.** The black-footed ferret is listed as endangered under the ESA.
2    There are several introduced populations that are listed as experimental and nonessential;
3    however, these populations do not occur in the vicinity of the ULP lease tracts. This species
4    inhabits prairies and shrublands in association with prairie dogs. According to the SWReGAP
5    model, suitable habitat for this species does not occur on or in the vicinity of the ULP lease
6    tracts. The black-footed ferret is presumably extirpated from west central Colorado in the region
7    of the ULP lease tracts even though block clearance surveys for this species have not been
8    conducted in western Colorado (USFWS 2009a). Prairie dog densities in the region surrounding
9    the ULP lease tracts are not at sufficient densities for supporting the black-footed ferret.
10   Programmatic minimization and mitigation measures are discussed in Table 4.6-1 and through
11   formal programmatic ESA Section 7 consultation with the USFWS (Appendix E). Given the
12   implementation of these minimization and mitigation measures, ULP activities associated with
13   Alternative 1 will have no effect on the black-footed ferret.
14
15
16   **Gunnison's Prairie Dog.** The Gunnison's prairie dog is a candidate species for listing
17   under the ESA. This species is known to occur in the ULP counties in shrubland habitats at
18   elevations between 6,000 and 12,000 ft (1,800 and 3,700 m). According to CPW, this species is
19   known to occur in at least one lease tract, and suitable habitat may occur in several other lease
20   tracts in Montrose and San Miguel Counties. The overall range for this species intersects several
21   Paradox and Uravan lease tracts. Furthermore, information provided by CNHP (2011b) indicated
22   recorded quad-level occurrences of this species near Wild Steer Mesa, which is near the lease
23   tracts in Paradox Valley and Dry Creek Basin. Reclamation activities in all lease tracts under
24   Alternative 1 could affect this species through direct effects associated with habitat disturbance,
25   as well as indirect effects resulting from noise, runoff, sedimentation, and the dispersion of
26   fugitive dust (Table 4.1-10). Programmatic minimization and mitigation measures are discussed
27   in Table 4.6-1 and through formal programmatic ESA Section 7 consultation with the USFWS
28   (Appendix E). Predisturbance surveys would be needed to determine the presence of this species
29   and its habitat on the ULP lease tracts and develop the appropriate project-specific avoidance,
30   minimization, and mitigation measures, if necessary. With the implementation of minimization
31   and mitigation measures (Table 4.6-1), ULP activities under Alternative 1 may affect, but are not
32   likely to adversely affect, the Gunnison's prairie dog.
33
34
35   **4.1.6.4.2  Impacts on Sensitive and State-Listed Species.** In addition to species listed
36   under the ESA, there are several other sensitive species that could be affected by ULP activities
37   under Alternative 1. These species include species designated as sensitive by the BLM and
38   USFS, as well as those listed as threatened or endangered by the State of Colorado.
39
40   Of the species listed in Table 4.1-10, there are 41 species that are designated as sensitive
41   by the BLM. Of these BLM-designated sensitive species, there are 16 plants, 1 invertebrate,
42   2 fish, 3 amphibians, 2 reptiles, 9 birds, and 7 mammals. Several of these BLM-designated
43   sensitive species are candidates for listing under the ESA. Impacts to BLM-designated sensitive
44   species are presented in Table 4.1-10.
45

BLM_0042365

Of the species listed in Table 4.1-10, there are 20 species that are designated as sensitive by the USFS. Of these USFS-designated sensitive species, there are 2 plants, 3 fish, 1 amphibian, 8 birds, and 6 mammals. Several of these USFS-designated sensitive species are candidates for listing under the ESA or are also designated as BLM-sensitive. Impacts to USFS-designated sensitive species are presented in Table 4.1-10.

Of the species listed in Table 4.1-10, there are 10 species that are listed as threatened or endangered by the State of Colorado. Of these state-listed species, there are 4 fish, 1 amphibian, 3 birds, and 2 mammals. Several of these state-listed species are listed under ESA (or proposed or candidates for listing under the ESA) or are also designated by the BLM or USFS as sensitive. Impacts on state-listed species are presented in Table 4.1-10.

### 4.1.7  Land Use

Under Alternative 1, the existing 29 leases would be terminated, and DOE would continue to manage the withdrawn lands, without leasing. The lands would continue to be closed to mineral entry; however, all other activities (e.g., recreation) within the lease tracts would continue. As a result, impacts due to land use conflicts are expected to be minor.

### 4.1.8  Socioeconomics

The socioeconomic impacts of uranium mining reclamation were assessed for an ROI that comprises three counties in Colorado (Mesa, Montrose, and San Miguel Counties). The ROI corresponds to the area in which workers at the site would reside and spend their wages and salaries.

The economic impacts of uranium mining reclamation activities were measured in terms of employment and income. Direct impacts would include wages and salaries as well as the purchase of goods and services required for uranium mining reclamation. Indirect and induced impacts would include project wages and salaries as well as the purchase of goods and services required for reclamation that would subsequently circulate through the economy, creating additional employment and income. Sales of goods and services by retailers in the ROI, together with the purchase of equipment and materials required for reclamation, would provide new sources of indirect employment and income to ROI residents.

The potential socioeconomic impacts from reclamation activities are expected to be minor. Reclamation would require 29 direct jobs during the reclamation year for field work and revegetation. It is assumed that the jobs required for reclamation would include laborers, supervisors, equipment operators, truck drivers, and electricians. The entire reclamation period would likely span 2 to 3 years, although only 1 year of reclamation activities would require a workforce. Reclamation would generate 16 indirect jobs (see Table 4.1-11). In total, reclamation activities would constitute 0.1% of total ROI employment and would increase the annual average employment growth rate by less than 0.1% in the ROI. Reclamation under Alternative 1 would also produce $1.7 million in income.

BLM_0042366

1
2
3

**TABLE 4.1-11  Socioeconomic Impacts of Uranium Mining Reclamation in the Region of Influence under Alternative 1**

| Parameter | Reclamation |
|---|---|
| Employment (no.) | |
| Direct | 29 |
| Indirect | 16 |
| Total | 45 |
| Income[a] | |
| Total | 1.7 |
| In-migrants (no.)[b] | 0 |
| Vacant housing[c] (no.) | 0 |
| Local community service employment[d] | |
| Teachers (no.) | 0 |
| Physicians (no.) | 0 |
| Public safety (no.) | 0 |

[a]  Unless indicated otherwise, values are reported in $ million 2009.

[b]  Reclamation would not result in in-migrants.

[c]  Reclamation would not affect vacant rental housing or vacant owner-occupied housing.

[d]  Reclamation would not require additional local community employment.

4
5
6
7
8
9
10
11
12
13
14

   As discussed in Section 3.8, the average unemployment rate in the ROI was 9.6% in 2010; approximately 10,600 people were unemployed. Based on the number of people that could be available from the unemployed workforce and the ROI's distribution of employment by sector, there could be approximately 2,100 people available for reclamation activities in the ROI. On the basis of the available labor supply in the ROI as a whole, the current workforce could meet the demand for labor necessary for reclamation of the existing leases; therefore, in-migration of workers or families may not be required.

15
16

**4.1.8.1  Recreation and Tourism**

17
18
19
20
21
22

   As described in Section 3.8.3, the three counties that make up the ROI (Mesa, Montrose, and San Miguel) contain large acreages of public land, both state and Federally managed. These public lands include designated wilderness, National Conservation Areas (NCAs), the Colorado National Monument, SRMAs including the Dolores River SRMA, Black Canyon of the Gunnison National Park, State Parks, WSAs, and other areas used for recreation. Recreation and tourism together are an economic driver in the area, with significant indirect impacts on the local

BLM_0042367

economy. The diverse types of recreation that occur in the area include hunting, fishing, hiking, camping, horseback riding, mountain bike riding, OHV use, rafting, and cross-country and downhill skiing (BLM 2009e). According to the BLM, nearly all public land visitors use vehicles for recreation. For some visitors, their vehicle is just the mode of transportation used to access their recreational activity. For others, vehicle use itself is the activity. For example, the Unaweep/Tabeguache Scenic and Historic Byway passes through many towns in the ROI, including Nucla, Naturita, Redvale, Norwood, Sawpit, and Telluride.

If recreation and outdoor areas are the drivers of an area's tourism industry, then the condition of the environment is vital to the success of the industry. It is difficult to estimate the impact of any activity on recreation because it is not always clear how it could affect recreational visitation and nonmarket values (i.e., the value of recreational resources for potential or future visits).

Impacts on recreation in the area that would result from reclamation activities are likely to be minor. There might be a negative perception of uranium mining and its potential impacts on air quality, wildlife habitat, water quality, scenic viewsheds, and local roads from increased truck traffic. Therefore, the cessation of all uranium mining activities and initiation of reclamation on existing leases could have a positive effect on the local recreation economy if more people visited the area after reclamation. Increased mining activity in the area could put a strain on local governments from increased road use and traffic safety issues; the absence of mining activities would eliminate this pressure on local governments. Because reclamation would require such a small workforce, it is unlikely that traffic would affect recreational activities in the area. Reclamation does not require tall structures; therefore, the visual impacts would be limited. Unlike uranium mining development, which would continue 10 years past each mine's development phase, reclamation ground-disturbing activities would last only 1 year, and the expectation is that full reclamation would be completed within 2 to 3 years. The shortened time line, small workforce, and absence of uranium mining would likely result in a minor positive impact on recreation and tourism in the ROI.

## 4.1.9 Environmental Justice

Although there are unique radiological exposure pathways (such as subsistence fish, vegetation, wildlife consumption, or well water use) that could potentially produce adverse health and environmental impacts on low-income and minority populations, no radiological impacts are expected during the reclamation of uranium mining facilities. Reclamation would produce only minor radiological risks to workers or radiological or adverse health impacts to the general public (see Section 4.1.5) and thus would not disproportionately affect low-income and minority populations. Air emissions from fugitive dust and from the operation of equipment are expected to be minor (see Section 4.1.1), and chemical exposure during reclamation would be limited to airborne toxic air pollutants, would be at less than standard levels, and would not result in any adverse health impacts. No disproportionate impacts on low-income and minority populations would therefore be expected.

BLM_0042368

Because water would be trucked in from outside the local area during reclamation, there would be no diversion of water from domestic, cultural, religious, or agricultural uses that might disproportionately affect low-income and minority populations. Potential impacts of mining operations on surface water through runoff could occur in some lease tracts, and it has the potential to affect local rivers and aquifers (see Section 4.1.3.1). Short-term soil erosion impacts could occur during reclamation (see Section 4.1.3), with longer-term erosion impacts associated with runoff before revegetation would occur. Longer-term surface water runoff and soil erosion impacts could affect wildlife, water quality, and, if there was sedimentation, recreational fishing, and they could increase the potential for flooding. Both short-term and long-term surface water runoff and soil erosion impacts could affect subsistence activities, which could produce disproportionate impacts on low-income and minority populations.

Reclamation would introduce contrasts in form, line, color, and texture, as well as an increasing degree of human activity into landscapes where activity levels are generally low (see Section 4.1.12). However, dust mitigation would reduce the visual impact of reclamation, while revegetation programs would reduce the longer-term visual impact of mining sites on local communities and religious and cultural sites and, consequently, any disproportionate impacts on low-income and minority populations. Adverse impacts of uranium mining on property values would likely be minor, and the proximity to reclamation employment, higher tax revenues, and improved local public service provisions in local communities where there are low-income and minority populations would likely have positive impacts on these populations.

Although potential impacts on the general population could result from the reclamation of uranium mining facilities, for the majority of resources evaluated, impacts would likely be minor, and they would be unlikely to disproportionately affect low-income and minority populations. Specific disproportionate impacts on low-income and minority populations as a result of participation in subsistence or certain cultural and religious activities would also be minor.

## 4.1.10  Transportation

No transport of uranium ore would occur under Alternative 1. There would be no radiological transportation impacts. No changes in current traffic trends near the uranium lease tracts are anticipated because no significant supporting truck traffic or equipment moves would occur, and only about five reclamation workers would be commuting to each site on a regular basis during reclamation activities.

## 4.1.11  Cultural Resources

Under Alternative 1, reclamation activities would be conducted within Lease Tracts 5, 6, 7, 8, 9, 11, 13, 15, 18, and 26 where there are existing and permitted mines. A total of 111 cultural resource sites have been inventoried in these lease tracts. Adverse impacts are expected to be limited. No undeveloped land surfaces are expected to be directly affected. Any borrow material needed to cap old mines would come from existing stockpile locations. Direct

BLM_0042369

impacts on cultural resources are not expected under this alternative. Indirect adverse impacts from vandalism could still occur in the lease tracts where reclamation is proposed, depending on the number and activities of workers engaged in reclamation.

Mining features themselves can be historically significant. Mining has had a significant influence on the development of the economic base of the Uravan Mineral Belt. Mining features and artifacts are at risk in reclamation activities. The BLM is responsible for surface management of the lease tracts. DOE procedures require ULP personnel to oversee the lessees' reclamation activities and, prior to reclamation, to consult with the BLM and adhere to Section 106 of the National Historic Preservation Act and consult with the Colorado SHPO to determine whether historic (eligible for inclusion on the NRHP) mine structures or features (trash piles, collapsed buildings, old mining equipment) are present on the site, and, if so, how they are to be managed (DOE 2011a).

All but one of the currently permitted mines are underground, and surface disturbance is restricted to portal and shaft openings and associated facilities. This area would already have been disturbed. Direct disturbance would occur if the already-stockpiled surface soil was not sufficient to complete surface reclamation.

The presence of reclamation work crews could put cultural resources at risk. The added presence of work crews would increase the risk of cultural resources being trampled, illegally collected, and/or vandalized. This risk could be reduced by the training of work crews and through the on-site oversight of reclamation activities by DOE and BLM personnel.

There is also the potential for positive consequences on cultural resources to occur under this alternative. Reclamation would take only about a year, whereas mine development and production could take 10 or more years. The termination of uranium mining would likely result in less heavy equipment, which would result in ground vibration, which can also have negative impacts on structural remains. It would also likely reduce regular human presence in the area the attendant potential adverse effects.

## 4.1.12  Visual Resources

As indicated in Section 3.12, the BLM's VRM procedures provide a means of systematically describing visual impacts, as well as a method for evaluating potential impacts on the scenic qualities of affected landscapes (BLM 1984). In essence, the BLM is responsible for ensuring that the scenic values of BLM-administered public lands are considered before allowing uses that might have negative visual impacts, such as uranium mining operations.

The BLM's VRM system defines a visual impact as the contrast that observers perceive between an existing landscape and a proposed project or activity. The BLM's contrast rating system (BLM 1986b) specifies a systematic approach for determining the nature and extent of visual contrasts that might result from a proposed activity and for determining whether those levels of contrast are consistent with the VRM class designation for the area. Contrasts between an existing landscape and a proposed project or activity are expressed in terms of form, line,

BLM_0042370

1   color, and texture.[2] These basic design elements are routinely used by landscape designers to
2   describe and evaluate landscape aesthetics; these elements have been incorporated into the
3   BLM's VRM system to lend objectivity, integrity, and consistency to the process of assessing
4   visual impacts of proposed projects and activities on BLM-administered lands.
5
6         Visual impacts can depend on the type and degree of visual contrasts introduced into an
7   existing landscape. Where modifications repeat the general form, line, color, and texture of the
8   existing landscape, the degree of visual contrast is generally lower and the perceived impacts are
9   lower. Where modifications introduce pronounced changes in form, line, color, and texture, the
10  degree of contrast is often greater, and perceived impacts are greater too.
11
12        Visual changes associated with Alternative 1 are associated with the reclamation
13  activities that would be conducted at Lease Tracts 5, 6, 7, 8, 9, 11, 13, 15, 18, and 26.
14
15        Impacts resulting from reclamation can be produced through a range of direct and
16  indirect actions or activities occurring on the lands contained within the lease areas. These types
17  of impacts include the following:
18
19        •   Vegetation and landform alterations,
20
21        •   Removal of structures and materials,
22
23        •   Changes to existing roadways, and
24
25        •   Vehicular and worker activity.
26
27        Each of these impacts is discussed in further detail in Sections 4.1.12.1 through 4.1.12.5.
28  These sections largely refer to impacts that are associated with the actual mining sites within the
29  individual lease tracts. For this reason, an additional analysis was conducted to determine the
30  impacts on lands surrounding the lease tracts. This discussion is provided in Section 4.1.12.6.
31  Potential mitigation and compliance measures and BMPs to minimize lighting to off-site areas
32  and to minimize contrast with surrounding areas are summarized in Table 4.6-1 (Section 4.6).
33
34
35  **4.1.12.1  Vegetation and Landform Alterations**
36
37        The reclamation of mining sites might require minimal clearing of vegetation, large
38  rocks, and other objects in order to accommodate large equipment. The nature and extent of
39  clearing are affected by the requirements of the individual mines, the types of vegetation, and the
40  need for other objects to be cleared. The removal of vegetation would result in contrasts in color
41  and texture because the varied colors and textures of vegetation would be replaced by the more
42  uniform color and texture of bare soil. Depending on the type of vegetation cleared and the
43  nature of the cleared surface, vegetation removal could also introduce additional contrasts in

---

[2]  See BLM (1986b) for definitions of form, line, color, and texture, and see BLM (1986a) for the applicability of
     these terms to the contrast rating.

BLM_0042371

form and line. Vegetation removal may also cause contrasts in texture during the short term (1 to 3 years). This might occur in areas where stockpiled soil was not sufficient to provide material for reclamation activities (DOE 1995). Over the long term (2 to 5 years), contrasts in line, color, and texture would begin to decrease as vegetation became established in reclaimed areas.

Recontouring of the land surface; potential grading, scarifying, seeding, and planting; and, at times, stabilizing disturbed surfaces would also be conducted (DOE 1995). The contours of reclaimed areas might not replicate pre-mining conditions. In the conditions generally found in the lease tracts, newly disturbed soils resulting from these activities might create visual contrasts that could persist for many seasons before revegetation would begin to disguise past activity.

In addition, invasive species also might colonize reclaimed areas; this occurrence likely would produce contrasts of color and texture over the short term, until infestations were controlled. Lessees are required to control invasive species and repeat reclamation if it is not successful after 3 years; however, if a lack of proper management led to the growth of invasive species in the reseeded areas, noticeable color and texture contrasts might remain indefinitely. The unsuccessful reclamation of cleared areas also could result in soil erosion, ruts, gullies, or blowouts, which could cause negative visual impacts until the erosional features were mitigated and adequate vegetation was established. Proper weed management would minimize these effects.

### 4.1.12.2  Removal of Structures and On-Site Materials

During many reclamation activities, structures associated with mining activities would probably be removed; pond liners would be removed from discharge and treatment ponds; debris and waste would be managed and transported off site; and adits and mine shaft openings would be closed. In some cases, mine waste-rock piles, residual ores, and other radioactive materials would be placed in the mine (DOE 1995).

These activities might result in some physical ground disturbance, which could produce contrasts of form, line, color, and texture. These impacts would be short term (1 to 3 years) and would decrease as vegetation became established.

Permanent structures might be needed to block off areas where mine shafts were opened. In the case of underground mines, this effort might include the addition of bat gates or other means of closure for open shafts. These types of structures might be visible from outside the lease tracts after reclamation activities were completed.

### 4.1.12.3  Roads

In general, no new roads would be needed for the reclamation of the mining areas. However, if additional upgrades to roads were needed, their development might introduce minor

BLM_0042372

visual contrasts to the landscape, depending on the routes selected relative to surface contours and on the widths, lengths, and surface treatments of the roads.

Likewise, the closure of previously used access roads would have some associated residual impacts (e.g., vegetation disturbance, traffic patterns, and ground disturbance) that could be evident for some years afterward, with a gradual diminishing of impacts over time.

### 4.1.12.4  Workers, Vehicles, and Equipment

The various reclamation activities needed to restore the mine sites to their predevelopment conditions would require work crews, vehicles, and equipment. Each of these components might produce visual impacts. For instance, traffic involving small vehicles to allow worker access and traffic involving large equipment used for reclamation activities would occur.

The movement of workers and heavy machinery would produce visible activity and dust in dry soils. The suspension and visibility of dust would be influenced by the frequency and density of traffic, vehicle speeds and weights, road surface materials, and weather conditions. Visual impacts from truck-created dust typically would be localized to the unpaved roads (BLM 2011g). Temporary parking for vehicles would be needed at or near work locations. If there was unplanned and unmonitored parking, it could expand these areas, producing visual contrast from suspended dust and loss of vegetation. Some of the reclamation equipment could also produce emissions while it operated and thereby create visible exhaust.

Reclamation activities could also proceed in phases, with several crews moving through a given area in succession, giving rise to brief periods of intense activity (and associated visual impacts) followed by periods of inactivity.

### 4.1.12.5  Lighting

During reclamation, lighting might be needed around temporary buildings, parking areas, and work areas. Security and other lighting around and on support structures (e.g., temporary trailers) could contribute to light pollution. Section 4.3.12.2 provides an additional discussion on the potential visual impacts that might be created by the use of exterior lighting on mine sites.

### 4.1.12.6  Impacts on Lands Surrounding the Lease Tracts

Lands outside the lease areas might be subject to visual impacts related to the reclamation activities conducted at the mining sites. The affected areas and the extent of impacts would depend mostly on topography, vegetation, the types of activities conducted, length of exposure, and viewer distance.

Preliminary viewshed analyses were conducted to identify which lands surrounding the four lease groups, as identified in Section 3.12, are visible from within the various lease tracts.

BLM_0042373

An additional viewshed analysis was conducted for a subset of these groups that would include all of the lease tracts in which reclamation activities would be conducted under Alternative 1. This analysis was based upon a reverse viewshed analysis, (for which the methodology is provided in Appendix D); it considered Federal, state, and BLM-designated sensitive visual resources. The intent of the analysis was to determine the potential levels of contrasts (i.e., changes in form, line, color, and texture from the existing condition to that under Alternative 1) that would be present from within a surrounding land.

Under Alternative 1, reclamation activities would take place at 10 lease tracts. This analysis provides an overview of the potential visual impacts to those SVRAs surrounding the lease tracts. Due to the number of leases and the potential for increased activity, lands outside the lease tracts that have views of the lease tracts would be subject to visual impacts. For this analysis and subsequent analyses under other alternatives, SVRAs are defined as surrounding lands with a Federal, state, or BLM designation that have scenic and visual values and are thereby visually sensitive. SVRAs that surround the lease tracts and have open lines of sight to the mining facilities could be subject to impacts from the visual contrasts that would result, particularly if the distances to the facilities were short or the viewpoints in the SVRAs were elevated with respect to the individual lease tracts. In general, since the public is not allowed access to the mine sites, and since the sizes of the disturbed lease tracts that need to be reclaimed are relatively small, the viewing duration would be short, especially if the viewer was traveling along local roads near the lease tracts.

In some locations, views could include multiple mining sites that varied in size, layout, and type of activity being conducted (e.g., underground or open-pit mining). The variety of project sizes, layouts, and associated visual impacts could exceed the visual absorption capability of the landscape, resulting in "visual clutter" that would detract from the experience or enjoyment of scenic or visual qualities for visitors to the SVRAs.

For the purposes of this analysis, the lease tracts were analyzed in four groups: North; North Central; South Central; and South Groups (as described in Section 3.12). Ten lease tracts were evaluated under this alternative: Lease Tracts 5; 6; 7; 8; 9; 11; 13; 15; 16; and 18. This analysis accounts only for these tracts within each group.

**4.1.12.6.1  North Group**. Under Alternative 1, the following SVRAs potentially would have views of activities in the North Group (i.e., Lease Tract 26):[3]

• Sewemup WSA;

• The Palisade ONA (an ACEC); and

• The Palisade WSA.

---

[3]   For the four groups of lease tracts, the SVRAs are presented in descending order, based on the percentage of the total acreage or mileage visible.

BLM_0042374

Figure 4.1-3 shows the results of the viewshed analysis for the lease tract within the North Group. The colored segments indicate areas in the SVRAs with clear lines of sight to one or more areas within the lease tract and from which reclamation activities conducted within the lease group could be visible, assuming the absence of screening vegetation or structures and the presence of adequate lighting and other favorable atmospheric conditions.

The North Group lease tract would potentially be visible from approximately 3.2% (620 acres or 250 ha) of the Sewemup WSA; these viewing areas are located within 5 mi (8 km) of this portion of the North Group. The lease tracts also would be visible from approximately 34% (6,600 acres or 2,700 ha) of the WSA that is within 15 mi (24 km) or less of the North Group lands. Views of the North Group from the WSA are generally partially or fully screened by the intervening mountains. Visibility of this portion of the North Group is most likely from the locations within the WSA that are higher in elevation than the lease tract. Views of the reclamation activities would likely be limited and could include existing structures and possibly equipment used for the reclamation activities. Reclamation activities under Alternative 1 would be expected to cause minimal (barely discernible) to weak (not likely to be noticed by a casual viewer) visual contrast for views from the Sewemup WSA.

Portions of the North Group would be visible from the Palisade ONA ACEC in areas of the ACEC between 5 and 15 mi (8 and 24 km) from the North Group. The North Group would be visible from approximately 390 acres (160 ha) (1.6%) of the total ACEC. Views of the lease tract within the North Group from the ACEC are generally partially or fully screened by the intervening mountains. Only views from the northernmost portions of the ACEC would include this lease tract. Views of the reclamation activities and site would likely be limited and could include existing structures and possibly equipment used for the reclamation activities. As such, reclamation activities under this alternative would be expected to cause minimal to zero contrast levels for views from this ACEC.

Approximately 290 acres (120 ha) (1.1%) of the Palisade WSA would potentially have views of the lease tract, in portions of the WSA that are between 5 and 15 mi (8 and 24 km) from the North Group. The Palisade WSA is contained almost entirely within the Palisade ONA ACEC. As a result, levels of contrast in this area would be similar to those described for the ACEC.

**4.1.12.6.2  North Central Group.** Figure 4.1-4 shows the results of the viewshed analysis for Lease Tract 18 within the North Central Group. The following SVRAs could have views of this lease tract:

- Tabeguache Area;

- Sewemup WSA; and

- Unaweep/Tabeguache Scenic and Historic Byway.

BLM_0042375



**FIGURE 4.1-3  Viewshed Analysis for Portions of the North Lease Group under Alternative 1**

BLM_0042376



FIGURE 4.1-4  Viewshed Analysis for the North Central Lease Group under Alternative 1

BLM_0042377

The North Central Group activities could be visible from portions of the Tabeguache Area located between 0 and 25 mi (0 and 40 km) from the lease tract. Views of Lease Tract 18 are partially or fully screened by the intervening mountains and vegetation. This lease tract would be visible from approximately 20% (1,600 acres or 670 ha) of the Tabeguache Area. Views of the lease tract would be possible from elevated viewpoints within the Tabeguache Area. Views of the reclamation activities and site might be limited and include existing structures and possibly equipment used for the reclamation activities. Reclamation activities under Alternative 1 would be expected to cause minimal to weak levels of contrast for views from within this area.

The North Central Group activities could be visible from approximately 19% (3,700 acres or 1,500 ha) of the Sewemup WSA. It would be visible from portions of the WSA that are located between 5 and 15 mi (8 and 24 km) of the North Central Group. Views of this lease tract from the WSA are generally partially or fully screened by the intervening mountains. Visibility of this portion of the North Central Group is likely from the locations within the WSA that are higher in elevation than the lease tract. Views of the reclamation activities and site might be limited and include existing structures and possibly equipment used for the reclamation activities. Reclamation activities under this alternative would be expected to cause minimal to weak levels of contrast for views from this WSA.

The viewshed analysis indicates that activities within the North Central Group lease tracts could be visible from approximately 23 mi (37 km) of the Unaweep/Tabeguache Scenic and Historic Byway, 6 mi (10 km) of which is within 1 mi (1.6 km) of Lease Tract 18. However, because of minor mapping inaccuracies that place portions of the roadway outside the narrow canyon it occupies, thereby locating them at higher elevations than they actually are, and because of vegetative screening, the actual mileage of the byway with views of the lease tracts is likely smaller. Actual visibility would be determined as part of a site- and project-specific environmental assessment. Views of the reclamation activities and existing infrastructure might be visible to visitors driving along the byway. Activities conducted under this alternative would be expected to cause minimal to no contrast levels for views from the byway, because of the small size of the individual lease tract and the location of the byway within the San Miguel River Canyon below the lease tract.

**4.1.12.6.3  South Central Group.** Figure 4.1-5 shows the results of the viewshed analysis for lease tracts within the South Central Group in which reclamation activities would take place; these are Lease Tracts 5, 6, 7, 8, and 9. The following SVRAs might have views of the South Central Group:

- Tabeguache Area;

- Unaweep/Tabeguache Scenic and Historic Byway;

- Dolores River Canyon WSA;

- Sewemup WSA;

BLM_0042378



FIGURE 4.1-5  **Viewshed Analysis for the South Central Lease Group under Alternative 1**

BLM_0042379

1      •   Dolores River SRMA;

3      •   McKenna Peak WSA;

5      •   San Miguel ACEC; and

7      •   San Miguel River SRMA.

9      The South Central Group lease tracts would potentially be visible from approximately
10 47% (3,800 acres or 1,600 ha) of the Tabeguache Area; areas in Tabeguache Area with potential
11 visibility of the lease tracts are located between 5 and 25 mi (8 and 24 km) of the South Central
12 Group. Views of the lease tracts within the South Central Group are partially or fully screened by
13 the intervening topography and vegetation. Views of the reclamation activities might be limited
14 and likely would include any existing infrastructure, if present within the mine sites. The
15 reclamation activities under this alternative would be expected to cause minimal to weak levels
16 of contrast for views from the Tabeguache Area.

18      The viewshed analysis indicates that drivers on the Unaweep/Tabeguache Scenic and
19 Historic Byway would potentially have views of the South Central Group in locations within the
20 background and "seldom seen" distances, along approximately 16 miles (25 km) of the Byway.
21 However, because of minor mapping inaccuracies that place portions of the roadway outside the
22 narrow canyon it occupies, thereby locating them at higher elevations than they actually are, and
23 because of vegetative screening, the actual mileage of the byway with views of the lease tracts is
24 likely much smaller. Actual visibility would be determined as part of a site- and project-specific
25 environmental assessment. Views of the reclamation activities likely would be limited and could
26 include any existing infrastructure, if present within the mine sites.

28      Activities conducted under this alternative would be expected to cause minimal to zero
29 contrast levels for views from the byway.

31      The South Central Group lease tracts would potentially be visible from approximately
32 3.6% (1,000 acres or 420 ha) of the Dolores River Canyon WSA; these viewing locations are
33 within 0 to 25 mi (0 to 40 km) from the South Central Group. If present, existing infrastructure
34 might be visible from within the WSA. Views of the lease tracts are more likely to occur from
35 elevated locations than from within the canyon. Reclamation activities under this alternative
36 would be expected to cause minimal to weak contrast levels for views from the WSA.

38      The South Central Group would potentially be visible from approximately 2.1%
39 (410 acres or 170 km) of the Sewemup WSA. Views of the South Central Group from the WSA
40 are generally partially or fully screened by the intervening mountains. Visibility of this group of
41 lease tracts is likely from the locations along the western edge of the Sewemup Mesa within the
42 WSA that are higher in elevation than the lease tracts. Views of the reclamation activities likely
43 would be limited and would include any existing infrastructure present within the mine sites.
44 Activities conducted under this alternative would be expected to cause minimal to zero levels of
45 contrast at all for views from within this area.

BLM_0042380

1    In addition, the South Central Group lease tracts would potentially be visible from
2    approximately 2.0% (1,300 acres or 530 ha) of the Dolores River Canyon SRMA. The group
3    would be visible from approximately 0.7% (489 acres or 200 ha) of the SRMA in viewing
4    locations within 0 to 5 mi (0 to 8 km) from the lease tracts. Views of the reclamation activities
5    from the SRMA might be limited and likely would include existing infrastructure, if present.
6    Views of the lease tracts are more likely to occur from elevated locations than from within the
7    canyon. Similar to the Dolores River Canyon WSA, reclamation activities under this alternative
8    would be expected to cause minimal to weak levels of contrast for views from this SRMA.
9
10    The South Central Group lease tracts would be potentially visible from approximately
11    1.1% (220 acres or 88 ha) of the McKenna Peak WSA. These viewing locations are between
12    15 and 25 mi (24 and 40 km) from the South Central Group; these areas are primarily located
13    within San Miguel County. Views of the reclamation activities might be limited and likely would
14    include any existing infrastructure, if present within the mine sites. Reclamation activities under
15    this alternative would be expected to cause minimal to zero levels of contrast for views from this
16    SVRA.
17
18    The South Central Group lease tracts would be potentially visible from less than 1%
19    (3 acres or 1.2 ha) of the San Miguel ACEC. Under this alternative, activities would be expected
20    to cause minimal to zero levels of contrast for views from this SVRA due to the limited amount
21    of acreage that would have views of the lease tracts.
22
23    The South Central Group lease tracts would be potentially visible from less than 1%
24    (105 acres or 43 ha) of the San Miguel River SRMA, at distances of 18–22 mi (29–35 km) from
25    the SRMA. There could potentially be views of the lease tracts from elevated viewpoints within
26    the SRMA outside the river canyon. Activities conducted within the South Central Group lease
27    tracts would be expected to cause minimal to no contrasts at all as seen from the SRMA,
28    primarily due to the relatively long distance between the SRMA and the lease tracts, and the very
29    limited amount of acreage within the SRMA that would potentially have views of the lease
30    tracts.
31
32
33    **4.1.12.6.4  South Group.** Figure 4.1-6 shows the results of the viewshed analysis for
34    lease tracts within the South Group in which reclamation activities would occur; these include
35    Lease Tracts 11, 13, and 15. Views from the following SVRAs could potentially include the
36    South Group:
37
38    •    McKenna Peak WSA;
39
40    •    Dolores River SRMA; and
41
42    •    Trail of the Ancients Byway.
43
44    The three lease tracts within the South Group would potentially be visible from
45    approximately 16% (3,300 acres or 1,300 ha) of the McKenna Peak WSA, at distances up to
46    15 mi (24 km) from the lease tracts. Views of the reclamation activities might be limited and

BLM_0042381



2    **FIGURE 4.1-6  Viewshed Analysis for the South Lease Group under Alternative 1**

BLM_0042382

1  likely would include any existing infrastructure, if present within the mine sites. Under
2  Alternative 1, reclamation activities would be expected to cause minimal to weak levels of
3  contrast for views from this SVRA.
4
5         Within 5 mi (8 km) of the lease tracts within the South Group, the lease tracts could
6  potentially be visible from approximately 8.7% (5,700 acres or 2,300 ha) of the Dolores River
7  Canyon SRMA; in fact, portions of the SRMA are located within the actual lease tracts,
8  including Lease Tract 13. Between 0 and 25 mi (0 and 40 km), portions of the South Group lease
9  tracts could be visible from approximately 9.0% (5,900 acres or 2,400 ha) of the SRMA. Views
10 of the reclamation activities might be limited and likely would include any existing
11 infrastructure, if present within the mine sites. For this alternative, mining-related activities
12 would be expected to cause weak to strong contrast levels (i.e., not likely to be noticed by casual
13 observers, attracting and holding their visual attention and potentially dominating the view) for
14 views from this SRMA; stronger contrast levels would be expected for views from portions of
15 the SRMA that are located within the South Group; lower contrast levels would be expected for
16 views from areas farther from the lease tracts.
17
18        The South Group lease tracts could potentially be visible from approximately 7.4 mi
19 (3 km) of the Trail of the Ancients Byway in Utah. This portion of the byway is located within
20 the "seldom seen" distance zone (i.e., between 15 and 25 mi or 24 and 40 km) and is primarily
21 west of the lease tracts. Views of the lease tracts would be limited, and they would be of brief
22 duration for byway drivers. The byway generally follows US 191. Reclamation under
23 Alternative 1 would be expected to cause minimal to zero levels of contrast for views from along
24 the byway.
25
26
27 **4.1.13  Waste Management**
28
29        Potential impacts on waste management practices (described in Section 3.13) from waste
30 generated during reclamation activities under Alternative 1 are expected to be small. Waste that
31 could remain on the mine sites would be managed accordingly, and disposal capacity at the
32 permitted landfills or licensed facilities would be adequate to accommodate the waste that would
33 need to be transported off site for disposal.
34
35
36 **4.2  ALTERNATIVE 2**
37
38        As would occur under Alternative 1, a
39 total of about 257 acres (100 ha) would be
40 reclaimed at 10 lease tracts (5, 6, 7, 8, 9, 11, 13,
41 15, 18, and 26). Also similar to what would
42 happen under Alternative 1, the only mining
43 activity to be implemented as part of this
44 alternative would be reclamation.
45
46

Alternative 2: Same as Alternative 1, except once reclamation was completed by lessees, DOE would relinquish the lands in accordance with 43 CFR Part 2370. If DOI/BLM determines, in accordance with that same Part of the CFR, the lands were suitable to be managed as public domain lands, they would be managed by BLM under its multiple use policies. DOE's uranium leasing program would end.

BLM_0042383

## 4.2.1  Air Quality

The types of impacts and resulting emissions would be the same as those described for Alternative 1 (Section 4.1.1). Thus, potential impacts on ambient air quality associated with reclamation activities under Alternative 2 would be minor and temporary in nature. In addition, these activities are not anticipated to cause any measurable impacts on regional ozone or AQRVs at nearby Class I areas. Potential impacts from these activities on climate change would be negligible.

As discussed in Section 4.1.1, long-term impacts on ambient air quality after the reclamation are anticipated to be negligible.

## 4.2.2  Acoustic Environment

The type of impacts and resulting noise levels would be the same as those described for Alternative 1 (Section 4.1.2). Most residences are located beyond the distances where the Colorado noise limit is reached, but, if reclamation activities occurred near the boundary of Lease Tract 13, noise levels at nearby residences could exceed the Colorado limit.

It is assumed that most reclamation activities would occur during the day, when noise is better tolerated because of the masking effects of background noise that occurs during daytime. In addition, reclamation activities for ULP lease tracts would be temporary in nature (typically a few weeks to months, depending on the size of disturbed area to be reclaimed). Accordingly, reclamation within the DOE ULP lease tracts would cause some unavoidable but localized short-term noise impacts on neighboring residences or communities. Mitigation measures would be implemented to minimize these potential impacts.

## 4.2.3  Geology and Soil Resources

Soil impacts from ground-disturbing activities at the 10 lease tracts requiring reclamation would be the same as those described for Alternative 1 (Section 4.1.3.1).

### 4.2.3.1  Paleontological Resources

Impacts on paleontological resources from ground-disturbing activities at the 10 lease tracts requiring reclamation would be the same as those described for Alternative 1 (Section 4.1.3.3).

## 4.2.4  Water Resources

Under Alternative 2, impacts on water resources associated with the reclamation activities would be the same as those described for Alternative 1 (Section 4.1.4). The potential

BLM_0042384

impact of soil erosion by water is moderate but temporary in lease tracts along the Dolores River. It is not anticipated that the reclamation activities would injure any existing water rights in the region. Potential impacts on groundwater quality are minor and could be avoided if water reclamation is performed in accordance with reclamation performance measures set by the CDWR. Subsequent impacts on water quality during BLM's administrative control would depend on the use of the reclaimed areas and could range from negligible (e.g., if no development or other use, other than as a natural land, occurred) to minor (e.g., if mining occurred once again on the reclaimed areas).

### 4.2.5 Human Health

Potential human health impacts to individual receptors under Alternative 2 would be the same as those under Alternative 1 (see Section 4.1.5) because people would conduct the same types of activities and work the same amount of hours regardless of the alternative under consideration. The dimensions of and radioactivity levels in the major radiation sources to which these receptors would be exposed would also be the same.

### 4.2.6 Ecological Resources

#### 4.2.6.1 Vegetation

Impacts on vegetation under this alternative would be similar to those described for Alternative 1.

#### 4.2.6.2 Wildlife

There would be no difference in reclamation activities under Alternative 2 than those under Alternative 1 (Section 4.1.6.2). Therefore, the potential impacts on wildlife from reclamation activities would be minor. Subsequent impacts on wildlife during BLM's administrative control would depend on the use of the reclaimed areas and could range from negligible (e.g., if no development or other use, other than use as a natural habitat, occurred) to moderate (e.g., if mining occurred once again on the reclaimed areas).

#### 4.2.6.3 Aquatic Biota

There would be no difference in reclamation impacts under Alternative 2 than those under Alternative 1 (Section 4.1.6.2). Therefore, the potential impacts on aquatic biota from reclamation activities would be negligible. Subsequent impacts on aquatic biota during BLM's administrative control would depend on the use made of the reclaimed areas and their proximity to aquatic habitats (particularly perennial water bodies) and could range from negligible (e.g., if no development or other use, other than use as a natural habitat, occurred) or minor to moderate

BLM_0042385

1  (e.g., if mining occurred on the reclaimed areas, particularly on the reclaimed areas on Lease
2  Tracts 13 or 18, through which the Dolores River and Atkinson Creek, respectively, flow).
3
4
5  **4.2.6.4  Threatened, Endangered, and Sensitive Species**
6
7      There would be no difference between Alternative 1 and 2 impacts on threatened,
8  endangered, and sensitive species (Section 4.1.6.4). The potential for impacts on threatened,
9  endangered, and sensitive species from Alternative 2 would be identical to those from
10  Alternative 1 (Table 4.1-10).
11
12
13  **4.2.7  Land Use**
14
15      Under Alternative 2, all the ULP lease tracts would be terminated, and DOE would
16  restore the lands to the public domain under BLM's administrative control once reclamation
17  activities were completed. The lands would no longer be closed to mineral entry, and all other
18  activities within the lease tracts would continue. As a result, impacts due to land use conflicts are
19  expected to be minor. Impacts related to future activities, such as ROW authorizations, mining
20  (including uranium mining), or drilling oil and gas wells, would be evaluated under a separate
21  NEPA review.
22
23
24  **4.2.8  Socioeconomics**
25
26      Potential impacts on socioeconomics (including recreation and tourism) for Alternative 2
27  would be the same as those described for Alternative 1 in Section 4.1.8.
28
29
30  **4.2.9  Environmental Justice**
31
32      Each of the health and environmental impacts that would occur under Alternative 1
33  would not change by adding mining land to the public domain after reclamation. Potential
34  impacts occurring at each mine site during mining operations and reclamation would be minor,
35  with the majority of potential impacts occurring off site. Once reclamation has been completed,
36  there would be no additional impacts to the general public on reclaimed mining land, meaning
37  that impacts on environmental justice associated with reclamation activities under Alternative 2
38  would be the same as those under Alternative 1, as described in Section 4.1.9.
39
40
41  **4.2.10  Transportation**
42
43      No transport of uranium ore would occur under Alternative 2. There would be no
44  radiological transportation impacts. No changes in current traffic trends near the uranium lease
45  tracts are anticipated because no significant supporting truck traffic or equipment moves would

BLM_0042386

1   occur, and only about five reclamation workers would be commuting to each site on a regular
2   basis during reclamation activities.
3
4
5   **4.2.11  Cultural Resources**
6
7       Impacts on cultural resources would be similar to those described for Alternative 1 in
8   Section 4.1.11. Under Alternative 2, the reclamation activities would take place as they would
9   under Alternative 1; however, after reclamation, all lands would be returned to the public domain
10  and managed by the BLM rather than DOE. DOE's ULP would end, but uranium mining could
11  continue under BLM regulations and procedures. Under the current ULP, the BLM functions as
12  land manager, with responsibility for the surface estate, including cultural resources. Cultural
13  resources would continue to be managed in accordance with Section 106 of the NHPA. As they
14  would be under Alternative 1, impacts from ULP activity under Alternative 2 would be
15  associated primarily with reclamation activities, and adverse impacts are expected to be limited.
16  Adverse impacts would be possible at the 10 lease tracts where reclamation would need to be
17  conducted; the impacts would depend on the amount of land that was disturbed, the number of
18  historically significant mining features that were demolished, and the number of workers
19  engaged in the reclamation activities. The potential impacts from any future potential uranium
20  mining under BLM management would likely be similar to those discussed for Alternatives 3
21  through 5 in the ULP PEIS.
22
23
24  **4.2.12  Visual Resources**
25
26      Because the primary difference between Alternative 1 and 2 is in the administrative
27  control of the lease tracts, the resulting visual impacts would be similar to those presented in
28  Section 4.1.12.
29
30
31  **4.2.13  Waste Management**
32
33      The potential impact on the ability to manage the waste generated from reclamation
34  activities under Alternative 2 would be the same as that described for Alternative 1 in
35  Section 4.1.13.
36
37
38  **4.3  ALTERNATIVE 3**
39
40      Under Alternative 3, eight mines
41  (two small, four medium, one large, and one very
42  large) with a total surface area of 310 acres
43  (130 ha) are assumed to be in operation during
44  the peak year. The three phases involved in
45  uranium mining (exploration, mine development
46  and operations, and reclamation) are evaluated

> Alternative 3: DOE would continue the ULP as it
> existed before July 2007, with the 13 active
> leases, for the next 10-year period or for another
> reasonable period, and DOE would terminate the
> remaining leases.

BLM_0042387

1   for this alternative. The exploration phase is assumed to require a relatively short duration of
2   time, from 2 weeks to a month for each mine; however, it can occur annually over the course of
3   several years. Mine development and operations would be conducted for about 10 years.
4   Reclamation would be conducted within a time frame of 2 to 3 years after operations ceased.
5
6
7   **4.3.1  Air Quality**
8
9
10      **4.3.1.1  Exploration**
11
12          The degree of potential impacts on ambient air quality would vary depending on a
13   number of factors, such as existing road conditions, topography, soil properties, vegetation
14   cover, and meteorological conditions (e.g., wind speed, precipitation). Exploration activities
15   would involve little ground disturbance. The exploration phase is assumed to require a relatively
16   short duration, and a small fleet of heavy equipment along with a small crew would be used. In
17   addition, measures (i.e., compliance measures, mitigation measures, and BMPs) would be
18   implemented to ensure compliance with environmental requirements and to mitigate potential
19   impacts, if any (see Table 4.6-1, Section 4.6).
20
21          During this phase, exploration activities would occur on all 12 lease tracts, with multiple
22   drill holes on each lease tract. For the analysis, air emissions from engine exhaust and soil
23   disturbances are estimated, assuming that two, four, and six borehole drillings up to a depth of
24   600 ft (180 m) would occur at two small mines, four medium mines, and one large mine,
25   respectively, on any peak year. Emission sources would include drilling rigs, front-end
26   loaders/bulldozers/skid-steer loaders, and support vehicles (water truck, flatbed truck for extra
27   drill pipe, pickups, and probe truck). Types of air pollutants being emitted are discussed in
28   Section 4.3.1.2, and estimated emissions are presented in Table 4.3-1. Among criteria pollutants
29   and VOCs, $NO_x$ emissions would be the highest, which account for about 0.06% of three-county
30   total emissions. Annual total $CO_2$ emissions account for about 0.001% of Colorado GHG
31   emissions in 2010 at 140 million tons (130 million metric tons) of $CO_2e$ and account for
32   0.00001% of U.S. GHG emissions in 2009 at 7,300 million tons (6,600 million metric tons) of
33   $CO_2e$ (EPA 2011a; Strait et al. 2007).
34
35          Air emissions during the exploration phase would be negligible, and thus potential
36   impacts on ambient air quality would be negligible and temporary. These activities are not
37   anticipated to cause measureable impacts on regional ozone or AQRVs. Potential impacts from
38   these activities on climate change would be negligible.
39
40
41      **4.3.1.2  Mine Development and Operations**
42
43          During mine development and operations, primary emission sources would include
44   engine exhaust from heavy equipment and trucks, fugitive dust from earth-moving activities,
45   erosion of exposed ground or stockpiles caused by wind, and explosives use (e.g., ammonium
46   nitrate–fuel oil). Engine exhaust emissions from heavy equipment and trucks would include

BLM_0042388

**TABLE 4.3-1  Peak-Year Air Emissions from Mine Development, Operations, and Reclamation under Alternative 3[a]**

| Pollutant[b] | Three-County Total[c] | Exploration | | Mine Development | | Mine Operations | | Reclamation | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Annual Emissions (tons/yr) | | | | | |
| CO | 65,769 | 3.3 | (0.01%)[d] | 74.0 | (0.11%) | 64.2 | (0.10%) | 7.2 | (0.01%) |
| $NO_x$ | 13,806 | 8.0 | (0.06%) | 26.0 | (0.19%) | 138 | (1.0%) | 14.9 | (0.11%) |
| VOCs | 74,113 | 1.0 | (0.001%) | 0.8 | (0.001%) | 13.4 | (0.02%) | 1.5 | (0.002%) |
| $PM_{2.5}$ | 5,524 | 0.7 | (0.01%) | 36.4 | (0.66%) | 11.8 | (0.21%) | 30.6 | (0.55%) |
| $PM_{10}$ | 15,377 | 1.1 | (0.01%) | 225 | (1.5%) | 22.5 | (0.15%) | 150.3 | (0.98%) |
| $SO_2$ | 4,246 | 0.9 | (0.02%) | 3.1 | (0.07%) | 17.7 | (0.42%) | 2.0 | (0.05%) |
| $CO_2$ | $142.5 \times 10^{6}$ [e] | 890 | (0.001%) | 750 | (0.001%) | 13,000 | (0.009%) | 1,400 | (0.001%) |
| | $7,311.8 \times 10^{6}$ [f] | | (0.00001%) | | (0.00001%) | | (0.00018%) | | (0.00002%) |

[a]  Under Alternative 3, it is assumed that 8 mines (2 small, 4 medium, 1 large, and 1 very large) would be in operation, and a total surface (disturbed area of about 310 acres [130 ha]) would be reclaimed in any peak year.

[b]  Notation: CO = carbon monoxide; $CO_2$ = carbon dioxide; $NO_x$ = nitrogen oxides; $PM_{2.5}$ = particulate matter with a mean aerodynamic diameter of ≤2.5 μm; $PM_{10}$ = particulate matter with a mean aerodynamic diameter of ≤10 μm; $SO_2$ = sulfur dioxide; and VOCs = volatile organic compounds.

[c]  Total emissions in 2008 for all three counties encompassing the DOE ULP lease tracts (Mesa, Montrose, and San Miguel Counties), except for $CO_2$. See Table 3.1-2.

[d]  Numbers in parentheses are percentages of three-county total emissions except for $CO_2$, for which the numbers are percentages of Colorado total emissions and percentages of U.S. total emissions.

[e]  Annual emissions in 2010 for Colorado on a $CO_2$-equivalent basis.

[f]  Annual emissions in 2009 for the United States on a $CO_2$-equivalent basis.

Source: CDPHE (2011a); EPA (2011a); Strait et al. (2007).

BLM_0042389

1   criteria pollutants (such as CO, $NO_x$, $PM_{2.5}$, $PM_{10}$, and $SO_2$), VOCs, and GHGs (e.g., the
2   primary GHG $CO_2$), while soil disturbances and wind erosion would generate mostly PM
3   emissions. Explosive use would also generate all criteria pollutants, VOCs, and $CO_2$, but most
4   explosives produce more CO than any other combustion-related pollutants, and large quantities
5   of PM are generated in the shattering of the rock and earth by explosives. Typically, the amount
6   of fugitive dust emissions (e.g., $PM_{10}$) would be larger during mine development, while the
7   amount of exhaust emissions (e.g., $NO_x$) would be larger during operations. Mitigation measures
8   and BMPs to address both types of emissions are identified in Table 4.6-1 (Section 4.6).
9
10      Air emissions of criteria pollutants, VOCs, and $CO_2$ from the mine development and
11   operations phase are estimated for the peak year and presented in Table 4.3-1 and compared with
12   emission totals for three counties combined (Mesa, Montrose, and San Miguel), which
13   encompass the DOE ULP lease tracts. Detailed information on emission factors for each activity
14   and on a mine-group basis (such as small, medium, large, and very large mines), underlying
15   assumptions, emission control efficiencies, and emission inventories is presented in Appendix C.
16   As shown in the table, total peak-year emission rates are estimated to be rather small compared
17   with emission totals for all three counties. During mine development, the amount of non-PM
18   emissions would be relatively small (up to 0.19%), and $PM_{10}$ and $PM_{2.5}$ emissions would
19   amount to about 1.5% and 0.66%, respectively, of the three-county combined emissions. $PM_{10}$
20   emissions would result equally from site preparation (44%) and explosive use (43%), followed
21   by wind erosion (13%), but exhaust emissions contribute only a little to total $PM_{10}$ emissions.
22   During mine operations, $NO_x$ emissions of 138 tons/yr would be highest, amounting to about
23   1.0% of three-county total emissions. Most $NO_x$ emissions would be from diesel-fueled heavy
24   equipment, such as heavy trucks, bulldozers, scrapers, or power generators. Potential impacts
25   would be minimized by implementing good industry practices and fugitive dust mitigation
26   measures such as watering unpaved roads, disturbed surfaces, and temporary stockpiles (see
27   Section 4.6). Therefore, potential impacts on ambient air quality would be minor and temporary.
28
29      The three counties encompassing the DOE ULP lease tracts are currently in attainment
30   for ozone (EPA 2011b), and ozone levels in the area approached the standard (about 90%)
31   (see Table 3.1-3). Recently, wintertime ozone[4] exceedances have frequently been reported at
32   higher-elevation stations in northwestern Colorado, northeastern Utah, and southwestern
33   Wyoming. However, ozone precursor emissions from mine development or operations would be
34   relatively small, less than 1.0% and 0.02% of three-county combined $NO_x$ and VOC emissions,
35   respectively, and would be much lower than those for the regional airshed in which emitted
36   precursors are transported and transformed into $O_3$. In addition, the wintertime high-ozone areas
37   are located more than 100 mi (160 km) from the DOE ULP lease tracts and are not located
38   downwind of the prevailing westerlies in the region. Accordingly, the potential impacts of $O_3$

---

[4]   High-ozone incidents during wintertime result from several factors: high solar radiation due to high elevation
enhanced by high albedo (defined as solar reflectivity of the earth's surface) caused by snow cover; shallow
mixing height below temperature inversion; no or few clouds; stagnant or light winds; and abundant ozone
precursors (such as $NO_x$ and VOC) from existing oil and gas development activities (Kotamarthi and
Holdridge 2007; Morris et al. 2009). In particular, snow cover plays an important role in UV reflection and
insulation from the ground, which reduces the surface heating that promotes the breakup of temperature
inversions.

BLM_0042390

1    precursor emissions from the mine development and operations phase on regional ozone would
2    not be of concern.
3
4        As discussed in Section 3.1, there are several Class I areas around the DOE ULP lease
5    tracts where AQRVs, such as visibility and acid deposition, might be a concern. Primary
6    pollutants affecting AQRVs include $NO_x$, $SO_2$, and PM. $NO_x$ and $SO_2$ emissions from mine
7    development and operations in any peak year would be relatively small (up to 1.0% of three-
8    county combined emissions), while $PM_{10}$ emissions would be about 1.5% of three-county
9    combined emissions. Air emissions from mine development and operations could result in minor
10    impacts on AQRVs at nearby Class I areas, but the implementation of good industry practices
11    and fugitive dust mitigation measures could minimize these impacts.
12
13        Annual total $CO_2$ emissions from mine development and operations were estimated as
14    shown in Table 4.3-1. $CO_2$ emissions would be much higher during operations than during
15    development. During operations, annual total $CO_2$ emissions would be about 13,000 tons
16    (12,000 metric tons). These accounted for about 0.009% of Colorado GHG emissions in 2010
17    (at 140 million tons [130 million metric tons] of $CO_2$e) and for 0.00018% of U.S. GHG
18    emissions in 2009 (at 7,300 million tons [6,600 million metric tons] of $CO_2$e) (EPA 2011a;
19    Strait et al. 2007). Thus, potential impacts from mine development and operations on global
20    climate change would be negligible.
21
22
23    **4.3.1.3  Reclamation**
24
25        The type of impacts from reclamation under Alternative 3 are similar to those described
26    under Alternative 1 (Section 4.1.1). It is also assumed that reclamation activities under
27    Alternative 3 would occur on about 310 acres (130 ha) of surface area at the peak year of
28    reclamation.
29
30        Peak-year emissions during the reclamation phase under Alternative 3 are presented in
31    Table 4.3-1. $PM_{10}$ emissions would be highest, accounting for about 0.98% of three-county
32    combined emissions. Among non-PM missions, $NO_x$ emissions from diesel combustion of heavy
33    equipment and trucks would be highest, up to 0.11% of three-county total emissions. Good
34    industry practices and mitigation measures would be implemented to ensure compliance with
35    environmental requirements. Thus, potential impacts on ambient air quality associated with
36    reclamation activities under Alternative 3 are anticipated to be minor and temporary in nature.
37    These low-level emissions are not anticipated to cause any measureable impacts on regional
38    ozone or AQRVs, such as visibility or acid deposition, at nearby Class I areas. In addition, $CO_2$
39    emissions during the reclamation phase were about 0.001% of Colorado GHG emissions in 2010
40    and about 0.00002% of U.S. GHG emissions in 2009, respectively (EPA 2011a;
41    Strait et al. 2007). Thus, under Alternative 3, potential impacts from reclamation activities on
42    global climate change would be negligible.
43
44

BLM_0042391

## 4.3.2  Acoustic Environment

The noise levels generated by heavy construction equipment would vary significantly depending on various factors, such as the type, model, size, and condition of equipment; operation schedule; and condition of the area where work was being done. Not only are there daily variations in activities, but major construction projects are accomplished in several different phases. Each phase has a specific equipment mix, depending on the work to be accomplished during that phase. Any potential impact analysis should be based on typical activities in each phase.

### 4.3.2.1  Exploration

For the exploration phase, if existing roads did not provide site access, noise sources would include a grader or bulldozer for construction of an access road. Other noise sources would include vehicular traffic for commuting or delivery to and from the site and, where siting could not avoid brush, chainsaws and chippers for brush clearing.

Most noise-generating activities would occur intermittently during the exploration phase. It is anticipated that all of these activities would be conducted by using only a small crew and a small fleet of heavy equipment and would occur during daytime hours, when noise is tolerated better than it is at night because of the masking effect of daytime background noise. Accordingly, it is anticipated that potential noise impacts during the exploration phase on neighboring residences or communities, if any, would be minor and intermittent.

### 4.3.2.2  Mine Development and Operations

During this phase, heavy construction and mining equipment would be used. Underground equipment would include loaders, haul or support trucks, and drills, while aboveground equipment would include bulldozers, graders, loaders, haul or support trucks, scrapers, and power generators. During surface-plant area improvements, most activities would occur aboveground. However, most mine development and operational activities would occur above the ground for surface open-pit mines and under the ground for underground mines. Ventilation shafts would also contribute noise during mine development and the operation of underground mines.

Primary sources of noise during this phase would include operation of machinery, on-road and off-road vehicle traffic, and, if necessary, blasting. Aboveground equipment includes backhoes, dozers, graders, power generators, and scrapers, while underground equipment includes rock drills; various types of loaders and trucks would be used both above and under the ground. The average noise levels from most of these pieces of heavy equipment range from 80 to 90 dBA, except for a rock drill at a distance of 50 ft (15 m), which is 98 dBA (Hanson et al. 2006). In general, the dominant noise source from most construction equipment is a diesel engine without sufficient muffling that is continuously mining around a fixed location or with limited movement. Except for rock drills, noise levels for typical construction equipment

BLM_0042392

1  that would likely be used at the DOE ULP lease tracts range from about 80 to 90 dBA at a
2  distance of 50 ft (15 m) from an equipment.
3
4       To estimate noise levels associated with these activities, a composite noise level of
5  95 dBA at a distance of 50 ft (15 m) from the construction site is conservatively assumed, if
6  impact equipment such as rock drills is not being used. Typically, this level could be reached
7  when several pieces of noisy heavy equipment operated simultaneously in close proximity to
8  each other at peak load.
9
10      When only geometric spreading and ground effects are considered (Hanson et al. 2006),
11  noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from the lease
12  tracts, which is the Colorado daytime maximum permissible limit of 55 dBA in a residential
13  zone. If a 10-hour daytime work schedule is considered, the EPA guideline level of 55 dBA $L_{dn}$
14  for residential areas (EPA 1974) would occur about 1,200 ft (360 m) from the construction site.
15  In addition, other attenuation mechanisms, such as air absorption, screening effects (e.g., natural
16  barriers by terrain features), and skyward reflection due to temperature lapse conditions typical
17  of daytime hours, would reduce noise levels further. Thus, noise attenuation to Colorado or EPA
18  limits would occur at distances somewhat shorter than the aforementioned distances. In many
19  cases, these limits would not reach any nearby residences or communities. However, when
20  construction occurred near the lease tract boundary, noise levels at residences around Lease
21  Tract 13 would exceed the Colorado limit.
22
23      It is assumed that most operational activities would occur during the day, when noise is
24  better tolerated because of the masking effects of background noise during daytime. In addition,
25  mine development activities are temporary (typically lasting only a few months), and they would
26  have some unavoidable but localized short-term noise impacts on neighboring residences or
27  communities, particularly if activities occurred near the residences or communities adjacent to
28  the lease tract boundary.
29
30      During mine operations, ventilation fans would run continuously at mine sites, for which
31  noise calculations were made separately. The number of fans used for a mine depends on how
32  extensive the mine activities are but typically would be one or two fans for small mines, two or
33  three fans for medium mines, and three or four fans for large mines at an interval of every
34  366–457 m (1,200–1,500 ft) (Williams 2013). The composite noise level for a ventilation fan,
35  such as that used at JD-9 mine, is about 86 dBA at a distance of 3 m (10 ft) (Spendrup 2013),
36  corresponding to about 70 dBA at a reference distance of 15 m (50 ft), which is far lower than
37  noise levels for typical heavy equipment. For a single fan, noise levels would attenuate to 55 and
38  50 dBA at distances of about 60 m (200 ft) and 90 m (300 ft) from the fan, respectively, which are
39  the Colorado daytime and nighttime maximum permissible limits of 55 and 50 dBA in a residential
40  zone. The EPA guideline level of 55 dBA $L_{dn}$ for residential areas would occur at about 110 m
41  (360 ft). For four identical fans that are located equidistant from a receptor, these distances
42  would be extended to about 100 m (330 ft), 160 m (530 ft), and 190 m (620 ft), respectively.
43  During daytime hours, beyond some distances, a noise of interest can be overshadowed by
44  relatively high background levels along with skyward refraction caused by temperature lapses
45  (i.e., temperature decreases with increasing height, so sound tends to bend towards the sky).
46  However, on a calm, clear night typical of ULP lease tract settings, the air temperature would

BLM_0042393

1    likely increase with increasing height (temperature inversion) because of strong radiative
2    cooling. Such a temperature profile tends to focus noise downward toward the ground. Thus,
3    there would be no shadow zone[5] within 1 or 2 mi (2 or 3 km) of the source in the presence of a
4    strong temperature inversion (Beranek 1988). In particular, such conditions add to the effect of
5    noise being more discernible during nighttime hours, when the background levels are the lowest.
6    Considering these facts, potential impact distances would be extended further, to several hundred
7    meters. Accordingly, noise control measures (e.g., the installation of front and rear silencers,
8    which can reduce  noise levels from 5 to 10 dBA [Spendrup 2013]) would be warranted if any
9    residences were located within these distances from ventilation fans. Also, the outlet could have
10   a 45 degree or 90 degree elbow pointed away from the sensitive receptors (Williams 2013).
11

12        During mine operations, over-the-road heavy haul trucks would transport uranium ores
13   from ULP lease tracts to either the proposed Piñon Ridge Mill or White Mesa Mill in Utah.
14   These shipments could produce noise along the haul routes. Under Alternative 3, about
15   1,000 tons per day of uranium ores would be produced. Assuming 25 tons of uranium ore per
16   truck and round-trip travel, the traffic volume would be 80 truck trips per day (40 round trips per
17   day) and 10 truck trips per hour (for 8-hour operation). A peak pass-by noise level of 84 dBA
18   from a heavy truck operating at 55 mi/h or mph (88 km/h) was estimated based on
19   Menge et al. (1998). At a distance of 120 ft (37 m) and 230 ft (70 m) from the route, noise levels
20   would attenuate to 55 and 50 dBA, respectively, which are Colorado daytime and nighttime
21   maximum permissible limits in a residential zone. Noise levels above the EPA guideline level of
22   55 dBA $L_{dn}$ for residential areas would be reached up to the distance of 60 ft (18 m) from the
23   route. Accordingly, Colorado limits or EPA guideline levels would be exceeded within 230 ft
24   (70 m) of the haul route, and any residences within this distance might be affected.
25

26        Depending on local geological conditions, explosive blasting during mine development
27   and operations might be needed. Blasting would generate a stress wave in the surrounding rock,
28   causing ground and structures on the ground surface to vibrate. The blasting also would create a
29   compressional wave in the air (air blast overpressure), the audible portion of which would be
30   manifested as noise. Potential impacts of ground vibration include damage to structures, such as
31   broken windows. Potential impacts of blast noise include effects on humans and animals.
32   Estimates of the potential increases in ambient noise levels, ground vibration, and air blast
33   overpressure and evaluations of any environmental impacts associated with such increases would
34   be required at the site-specific project phase if potential impacts at the nearby residences or
35   structure are anticipated.
36

37        Blasting techniques are designed and controlled by blasting and vibration control
38   specialists to prevent damage to structures or equipment. These controls attenuate blasting noise
39   as well. Under Alternative 3, there are several residences within 0.5 mi (0.8 km) of the
40   boundaries of some of the lease tracts. However, given the impulsive nature of blasting noise, it
41   is critical that blasting activities be avoided at night and on weekends and that affected
42   neighborhoods be notified in advance of scheduled blasts.
43

---

[5]   A shadow zone is defined as the region where direct sound does not penetrate because of upward refraction.

BLM_0042394

There are several specially designated areas (e.g., Dolores River SRMA, Dolores River Canyon WSA) and other nearby wildlife habitats around the DOE ULP lease tracts and haul routes where noise might be a concern. Negative impacts on wildlife begin at 55–60 dBA, a level that corresponds to the onset of adverse physiological impacts (Barber et al. 2010). As discussed above, these levels would be limited up to distances of up to 1,650 ft (500 m) from the mine sites and 120 ft (37 m) from the haul routes. However, there is the potential for other effects to occur at lower noise levels (Barber et al. 2011). To account for these impacts and the potential for impacts at lower noise levels, impacts on terrestrial wildlife from construction noise and mitigation measures would have to be considered on a project-specific basis. These studies would need to consider site-specific background levels and the hearing sensitivity for site-specific terrestrial wildlife of concern.

In summary, the potential for noise impacts from mine development on humans and wildlife is anticipated near the mine sites and along the haul routes, but impacts would be minor and limited to proximate areas unless the activities occurred near a lease tract boundary adjacent to nearby residences or communities or areas specially designated to be of concern with regard to wildlife, if any. Implementation of mitigation measures and BMPs identified in Table 4.6-1 (Section 4.6) and adherence to coherent noise management plans could minimize these impacts.

### 4.3.2.3  Reclamation

It is assumed that reclamation activities under Alternative 3 would occur over about 300 acres (120 ha) at any peak year. As discussed in Section 4.1.2, noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from the reclamation site, which is the Colorado daytime maximum permissible limit of 55 dBA in a residential zone. If a 10-hour daytime work schedule is considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) would occur about 1,200 ft (360 m) from the construction site. Most residences are located beyond these distances, but if reclamation activities occurred near the boundary of Lease Tract 13, noise levels at the nearby residences could exceed the Colorado limit.

It is assumed that most reclamation activities would occur during the day, when noise is better tolerated than at night, because of the masking effects of background noise in the daytime. In addition, reclamation activities at ULP lease tracts are temporary in nature (typically a few weeks to months, depending on the area size to be reclaimed). Accordingly, reclamation within the DOE ULP lease tracts would cause some unavoidable but localized short-term and minor noise impacts on neighboring residences or communities. The same mitigation measures and BMPs as those adopted during the construction phase would also be implemented during the reclamation phase (see Table 4.6-1 in Section 4.6).

BLM_0042395

1   **4.3.3  Geology and Soil Resources**
2
3       Potential impacts under Alternative 3 on soil resources during exploration, mine
4   development and operations, and reclamation are evaluated and discussed in Sections 4.3.3.1 to
5   4.3.3.3 below.
6
7
8       **4.3.3.1  Exploration**
9
10      Exploration activities would involve some ground-disturbing activities, such as
11  vegetation clearing, grading, trenching (and sampling), drilling, and building access roads and
12  drill pads. Direct adverse impacts from these activities relate mainly to the increased potential for
13  soil compaction, soil horizon mixing, soil erosion and deposition by wind, soil erosion by water
14  and surface runoff, and sedimentation of nearby surface water bodies. The degree of impact
15  would vary among the lease tracts, depending on the activities needed to explore each mine site
16  and on site-specific factors, such as soil properties, slope, vegetation cover, weather conditions
17  (e.g., precipitation rate and intensity, prevailing wind direction and speed), and distance to
18  surface water bodies. However, because exploration activities would occur over relatively small
19  areas and involve little or no ground disturbance, potential impacts associated with this phase are
20  expected to be minor. Implementing mitigation measures and BMPs (Table 4.6-1 in Section 4.6)
21  would further reduce the level of adverse impacts associated with these activities.
22
23
24      **4.3.3.2  Mine Development and Operations**
25
26      Mine development activities could potentially result in minor to moderate impacts on soil
27  resources because they would involve ground disturbances that could increase the potential for
28  soil compaction, soil horizon mixing, soil erosion and deposition by wind, soil erosion by water
29  and surface runoff, and sedimentation of nearby surface water bodies on both lease tracts and
30  off-lease land. Ground-disturbing activities would be associated mainly with mine site
31  improvements, such as the construction of buildings (offices and maintenance), utilities, parking
32  areas, roads, service areas (for vehicles and heavy equipment), storage areas (for fuel, chemicals,
33  materials, solvents, oils, and degreasers), discharge/treatment ponds (for mine water discharge),
34  and diversion channels and berms; the use of trucks, heavy earth-moving equipment, and mining
35  equipment; and the construction of various stockpile and loading areas (for waste rock, ore, and
36  topsoil). Off-lease land disturbances would occur on adjacent BLM land and would mainly
37  involve obtaining or improving ROWs for haul roads and utilities and would be subject to
38  BLM's NEPA process. Potential fuel or chemical contamination could result from the use of
39  trucks and mechanical equipment or fuel storage and handling and from the application of
40  chemical stabilizers to control fugitive dust emissions.
41
42      Ground-disturbing activities during the operational period would be associated with the
43  stripping of topsoil from areas to be disturbed, the stockpiling of topsoil, and the hauling and
44  storing of ore and waste rock and maintenance of storage areas (for ore and waste rock). These
45  activities could result in minor impacts on soil resources when compared to the level of impacts
46  resulting from mine development.

BLM_0042396

Under Alternative 3, ground disturbance during the peak production year would occur on an estimated 300 acres (120 ha) across 12 lease tracts, mainly during mine development. Impacts associated with this phase are expected to be minor to moderate. The degree of impact would vary among the lease tracts, depending on the activities needed to prepare and develop each mine site (because some sites are more developed than others) and depending on site-specific factors, such as soil properties, slope, vegetation, weather, and distance to surface water. Implementing mitigation measures and BMPs listed in Table 4.6-1 (Section 4.6) would reduce the potential for adverse impacts associated with these activities.

### 4.3.3.3  Reclamation

The types of impacts related to reclamation under Alternative 3 would be similar to those described for Alternative 1 (Section 4.1.3.2); however, ground disturbance would occur over a larger area—an estimated 300 acres (120 ha) across 12 lease tracts—than that for Alternative 1.

### 4.3.3.4  Paleontological Resources

**4.3.3.4.1  Exploration.** Exploration activities would involve some ground-disturbing activities, such as vegetation clearing, grading, trenching (and sampling), drilling, and building access roads and drill pads. These activities could result in adverse impacts on paleontological resources, if present, because they would involve ground disturbances that could expose fossils, making them vulnerable to damage or destruction and looting/vandalism. Field surveys, conducted by a qualified paleontologist early in the reclamation process, would identify areas of moderate to high fossil-yield potential or known significant localities so that these areas could be avoided. In addition, mine operators would notify the BLM of any fossil discoveries so appropriate measures could be taken to protect discoveries from adverse impacts (see also Table 4.6-1). For this reason, it is anticipated that impacts on paleontological resources would be minor.

**4.3.3.4.2  Mine Development and Operations.** Mine development activities could potentially result in adverse impacts on paleontological resources, if present, because they would involve ground disturbances that could expose fossils, making them vulnerable to damage or destruction and looting/vandalism. Ground-disturbing activities would be associated mainly with mine site improvements, such as the construction of buildings (offices and maintenance), utilities, parking areas, roads, service areas (for vehicles and heavy equipment), storage areas (for fuel, chemicals, materials, solvents, oils, and degreasers), discharge/treatment ponds (for mine water discharge), and diversion channels and berms; the use of trucks, heavy earth-moving equipment, and mining equipment; and the construction of various stockpile and loading areas (for waste rock, ore, and topsoil). Off-lease land disturbances would occur on adjacent BLM land and would mainly involve obtaining or improving ROWs for haul roads and utilities and would be subject to BLM's NEPA process.

BLM_0042397

Ground-disturbing activities during the operational period would be associated with the stripping of topsoil from areas to be disturbed, the stockpiling of topsoil, and the hauling and storing of ore and waste rock and maintenance of storage areas (for ore and waste rock). These activities could result in minor impacts on paleontological resources, if present.

Field surveys, conducted by a qualified paleontologist early in the exploration phase, would identify areas of moderate to high fossil-yield potential or known significant localities so that these areas could be avoided. In addition, mine operators would notify the BLM of any fossil discoveries so appropriate measures could be taken to protect discoveries from adverse impacts (see also Table 4.6-1). For this reason, it is anticipated that impacts on paleontological resources would be minor.

**4.3.3.4.3  Reclamation.** The types of impacts related to reclamation under Alternative 3 would be similar to those described for Alternative 1 (Section 4.1.3.3); however, ground disturbance would occur over a larger area (an estimated 300 acres [120 ha] across 12 lease tracts) than the area under Alternative 1.

**4.3.4  Water Resources**

Potential impacts on water resources are considered for the three phases of mining (exploration, mine development and operations, and reclamation) in Sections 4.3.4.1 through 4.3.4.3.

**4.3.4.1  Exploration**

Exploration activities would involve some land disturbance activities, such as vegetation clearing, grading, drilling, and building of access roads and drill pads, but these activities would occur over relatively small areas. Impacts on water resources associated with runoff generation and erosion would be minor, considering the small spatial extent over which exploration activities would occur.

The drilling of exploration boreholes and wells has the potential to alter the geochemical properties of an aquifer and to provide a connection between disconnected aquifers. Drilling and trenching techniques could introduce drilling muds and oxygen into aquifers, which could alter water chemistry and result in changes in pH and solubility conditions relevant to many metal ions, including uranium (Curtis et al. 2006; National Research Council 2012). The exploratory boreholes or wells could also provide a conduit connection between aquifers that could allow the mixing of water of potentially poorer quality (e.g., higher TDS concentrations) from one aquifer to another (National Research Council 2012).

As discussed in Section 3.4, the main water-bearing formations, in ascending order by depth, are Alluvium, Dakota Sandstone, Burro Canyon, Saltwash Member, Entrada Sandstone, Navajo Sandstone, and Wingate Sandstone. In lease tract areas, the shallow (or perched)

BLM_0042398

1   aquifers, such as Alluvium, Dakota Sandstone, and Burro Canyon, have a limited amount of
2   water but are relatively fresh, while the relatively deep aquifers (Saltwash Member and Entrada
3   Sandstone) contain elevated TDS and sulfate (Section 3.4.2), exceeding the EPA secondary
4   drinking water standard (Weir 1983; CGS 2003). The scarcity of groundwater in shallow
5   aquifers results from extremely low groundwater recharge because of low precipitation (12.5 in.
6   or 31.8 cm) and from the high potential for evaporation (38 in. or 97 cm) in the area.
7   Groundwater in the shallow aquifer is used only locally for domestic or stock supply. The upper
8   portion of the Navajo Sandstone aquifer has low TDS and is often a targeted underground source
9   of drinking water (CGS 2003). In the Uravan area, several domestic and industrial wells were
10  completed in the Wingate aquifer (Cotter Corp. 2012c, CM-25). Within 5 mi (8 km) of lease
11  tracts, however, no public water supply (PWS) wells are present.
12
13       The exploratory drill holes are expected to go through alluvial aquifers along the rivers
14  and Paradox Valley or Dakota Sandstone and Burro Canyon aquifers (or perched aquifers) at
15  mesas to reach Saltwash Member, the uranium-containing unit. Historically, most of
16  underground mines are dry in the ULP lease tracts. The potential for groundwater mixing and
17  leaching via exploratory drill holes is minimal. In Paradox and Slick Rock, some groundwater
18  accumulation at a low rate has been found in underground mines in Lease Tracts 7 and 9 near
19  Paradox Valley and in Lease Tract 13 along the Dolores River (Slick Rock) (DOE 2007). During
20  exploration at these lease tracts, impacts associated with the drilling of exploratory boreholes and
21  wells can be minimized by using BMPs and standards set forth by the CDWR (2005) (see also
22  Table 4.6-1 in Section 4.6), such as grouting open boreholes to reduce the volume of
23  groundwater that enters, using underground sumps to contain seeped groundwater, or removing
24  groundwater to the surface treatment facility. In addition, a substantial number of historical
25  exploration studies have been performed in the Uravan Mineral Belt region (Nash 2002), limiting
26  the amount of exploratory boreholes and wells needed for future mining activities. These
27  historical exploration studies have also indicated the existence of groundwater throughout the
28  region is quite minimal and very localized.
29
30       The Navajo Sandstone aquifer, a frequently targeted underground source of drinking
31  water in the region, is located more than 100 ft (30 m) below the uranium-containing unit of the
32  Saltwash Member and is confined by overlying confining units of the Carmel Formation and
33  Wanakah Formation (Summerville Formation) (Figure 3.4-5). The exploratory activities would
34  have no impact on the groundwater quality of the Navajo Sandstone aquifer or the underlying
35  Wingate aquifer.
36
37
38  **4.3.4.2  Mine Development and Operations**
39
40       Of the three phases evaluated, the mine development and operations phase has the
41  greatest potential to affect water resources, primarily as a result of land disturbance activities,
42  erosion, mine water runoff, the staging of ores and waste rock, the alteration of shallow aquifers,
43  the mixing of groundwater with varying chemical characteristics, the use of chemicals,
44  consumptive water use, and wastewater generation. These activities take place over different
45  durations of time and at different times during the mine development and operations phase,
46  which occurs over a period of about 10 years. It is assumed that during the peak year, a total of

BLM_0042399

eight mines (two small, four medium, one large, and one very large) would be in operation across the DOE ULP lease tracts. Assumptions used in the assessment of mine operations are presented in Section 2.2.3.1.


**4.3.4.2.1 Elements Potentially Affecting Water Resources.** Land disturbance activities associated with mine development and operations include vegetation clearing, grading for surface structures, access road construction or improvements, drainage contouring, detention basin construction, and mine excavation. Assumed total land disturbance during the peak year would be 300 acres (120 ha). These activities would increase erosion and runoff by exposing unconsolidated materials and by compacting soils. Removal of the overburden for surface mines or mine excavation for underground mines would generate unconsolidated materials that would need to be stored at the mine site. The accumulation of unconsolidated material, along with vegetation clearing, would increase the potential for erosion, primarily by flash flooding events (Nash 2002; BLM 2008b). Runoff from mine sites has the potential to increase sediment and pollutant loadings to nearby surface waters; pollutants result from sediment-associated compounds, chemical dust control compounds (e.g., magnesium chloride), fuels and other chemicals used in mining, and mineral leachates (National Research Council 2011). In the Uravan Mineral Belt region, runoff from historical mining areas has been shown to have elevated concentrations of arsenic, molybdenum, and selenium, but the amount of runoff was small, resulting in only localized contamination of water quality (Nash 2002).

Stormwater infrastructure consisting of berms, drainage swales, and detention basins would need to accommodate the permitting requirements for stormwater discharge according to state and Federal regulations administered by the CDPHE. In general, the mine site would be developed to divert upgradient stormwater away from the mine and to collect stormwater generated on site and in detention basins for settling and potential chemical treatment prior to release (DOE 1995; BLM 2008b,c). In addition, stormwater BMPs would be followed to minimize impacts related to stormwater (EPA 2012a) (see also Table 4.6-1 in Section 4.6). While stormwater regulations are typically adequate to accommodate large flooding events, western Colorado has the potential for infrequent and localized flash flooding that could overwhelm even properly designed stormwater infrastructure (Nash 2002).

Surface and underground mines have the potential to disrupt shallow aquifers by exposing or creating an open cavity within aquifers, which could lower groundwater surface elevations, alter groundwater flow paths, and degrade water quality. Groundwater typically accumulates in underground mines via percolation of shallow groundwater; it could be used to support mine operations, such as drilling and dust control (DOE 1995). The open cavity of a surface or underground mine increases groundwater discharge, which could lower groundwater surface elevations and alter groundwater flow paths. The dewatering effect created by the mine cavity has the potential to disrupt nearby features dependent on groundwater, such as vegetation, springs, and other groundwater users (National Research Council 2011). On the basis of information on historical mining in the area, most of underground mines are relatively dry.

Some underground mines in Paradox and Slick Rock, such as those in Lease Tracts 7, 9, and 13, encountered groundwater in underground working areas via intercepting perched and/or

BLM_0042400

1  shallow alluvial aquifers (DOE 2007). The amount of water encountered was contained during
2  normal operations. Groundwater seepage to the underground mines was also reported at
3  0.3 gal/min (1.1 L/min) for the Sunday Mines in the area (Denison 2008). The Sunday Mines are
4  located near and downgradient from the perennial river, receiving groundwater recharge from the
5  river in addition to infiltration from precipitation. A similar effect might be expected in the
6  portion that is along the Dolores River at Lease Tract 13. For Lease Tracts 7 and 9, the perched
7  water is anticipated to enter mine workings from the Dakota/Burro Canyon Formations via
8  intercepting vents and from the ore-containing rock, Saltwash Member. Unlike at the other lease
9  tract areas, the saturation was found in the upper sandstone unit of the Saltwash Member and
10  probably resulted from local recharge over the relatively large exposure area of the unit along the
11  surrounding canyons at Lease Tract 9 (Cotter Corp. 2012b). The estimated seepage rate from the
12  Dakota/Burro Canyon Formation is 1 to 2 gal/min (4 to 8 L/min) and the total dewatering rate
13  from underground workings is likely 8 gal/min (30 L/min) at Lease Tract 9 and 6 gal/min
14  (23 L/min) at Lease Tract 7 (Cotter Corp. 2012b). Because of the low rate of groundwater
15  seeping from the perched or alluvial aquifer above the ore horizon, equivalent to the normal
16  pumping rate for one household, the extent of dewatering for portable water would be limited,
17  and its effects would be localized. As discussed in Section 3.4.2, there are only five domestic
18  wells within or near the edge of ULP lease tracts that have wet mines. The impact on other
19  groundwater users and springs is considered to be moderate for Lease Tracts 7 and 9 and minor
20  for all other lease tracts.
21
22      In addition to decreasing groundwater quantity, surface and subsurface mines can
23  degrade water quality by creating conduits between aquifers with varying chemical
24  characteristics. For example, introducing oxygen to reduced environments would affect the
25  solubility of metals (National Research Council 2011). Uranium is typically insoluble under the
26  chemically reduced conditions, but it can be mobilized through oxidation to a more soluble form.
27  The exposure of groundwater in uranium-containing aquifer to oxidizing conditions with
28  relatively fresh alluvial groundwater or rain infiltration in the mines may increase uranium
29  concentration in groundwater. However, the uranium adsorption study also indicates that the
30  uranium mobility is highly sensitive to the alkalinity in groundwater (Curtis et al. 2006). The
31  mixing of groundwater from uranium-containing aquifer with water from shallow alluvial
32  aquifer or rain infiltration may decrease alkalinity of the source water. Experiments focused on
33  the leaching of metals from uranium-containing sandstones from Lease Tracts 9 and 21 as well
34  as other areas of the Uravan Mineral Belt region suggest that leachates have a neutral pH (thus
35  indicating potential acid mine drainage is not a primary concern); low metal concentrations; and
36  elevated concentrations of arsenic, molybdenum, selenium, and vanadium (Cotter Corp. 2012b;
37  Nash 2002).
38
39      The elevated uranium concentration in groundwater (two to three orders of magnitude
40  higher than the source groundwater in the Saltwash Member) at the historical mine tailing site in
41  the area was mainly caused by tails leached by carbonate and acids (Curtis et al. 2006). The
42  adsorption of uranium (VI) can be decreased by five orders of magnitude from pH 9 to pH 6 and
43  is even more sensitive to increases in alkalinity. As discussed in Section 3.4.2, elevated
44  concentrations of manganese, molybdenum, nitrate, selenium, and uranium were found in
45  groundwater in the shallow alluvial aquifer beneath the two former tailing sites along the Dolores
46  River near Lease Tract 13. However, under the proposed mine development and operations, no

BLM_0042401

1  carbonate, acid leaches, or any ore processing or residuals from it will be involved or kept at the
2  mine sites. The observed historical impacts at the mine tailing sites in the area would not be
3  expected.
4
5       Chemicals used at mining sites are primarily fuels, solvents, oils, and degreasers used for
6  trucks and earth-moving machinery, which can contaminate surface water and groundwater by
7  accidental spills. Impacts associated with the accidental release of chemicals would be
8  minimized through permitting processes with appropriate state and Federal agencies and through
9  BMPs.
10
11      Water use during mine development and operations is for dust suppression, mining
12  machines in operation, and a potable water supply for workers. Under Alternative 3, it is
13  assumed that a total of 3,200,000 gal/yr (9.8 ac-ft/yr) would be used by all eight mines operating
14  during the peak year. Since local surface water and groundwater sources are scarce and often of
15  relatively poor quality with high TDS, it is assumed that the water supply would be trucked to
16  the site from another region. The estimate of water use is considered as the conservative scenario
17  that all underground mines are dry and no water is encountered from groundwater seepage,
18  which is commonly collected for mining operation. The possible sources of water use for ULP
19  activities would be the existing water right owners in the mining industry and municipal water in
20  the Dolores River Basin across three counties: Mesa, Montrose, and San Miguel. The amount of
21  water use is about 1.45% of the current water use for mining and 0.05% of the current public
22  water supply within the three counties. The impacts of water use on the local water supplies
23  would be minor. Consumptive water use is a fraction of the estimated water use. This part of
24  water use will be returned to the hydrologic system in the region (potable water, etc.). The
25  detailed water allocation for each mining project would be identified when the specific mining
26  plan is developed. Subsequently, the water development plan for the water supply would address
27  options of either applying for a state water right permit or purchasing from another region.
28
29      The wastewater generated during mine development and operations could be classified as
30  sanitary and industrial wastewater. Sanitary wastewater would be collected in portable fixtures,
31  treated off site or in underground septic systems, and released to a subsurface drain field. If a
32  septic system is planned, the septic permit for the sewage system will be obtained, and waste
33  management will be implemented to minimize the contribution to the water currently impaired
34  by E. coli along the Dolores River near and downgradient of the lease tract area, as discussed in
35  Section 3.4. Industrial wastewater would primarily consist of unused (i.e., not reused for drilling
36  or dust control) groundwater seepage water in the mine and stormwater that was collected
37  on site. These industrial wastewaters would be diverted or pumped into sedimentation basins as
38  mentioned previously for stormwater management. For most of the lease tracts, industrial
39  wastewater from dewatering for mine workings is minimal except for Lease Tracts 7 and 9,
40  which would produce wastewater pumped from mine workings up to 8 gal/min (30 L/min) and
41  be required to be treated to reduce elevated TDS, radium, and uranium prior to discharge from
42  the treatment facility. Impacts associated with sanitary and industrial wastewater would be
43  minimized through permitting with appropriate state and Federal agencies.
44
45

BLM_0042402

1      **4.3.4.2.2  Potential Impacts and Mitigation Measures.** The potential for impacts on
2    surface water and groundwater in the vicinity of the DOE ULP lease tracts during mine
3    development and operations that would result from erosion, runoff, dewatering, consumptive
4    water use, and the impacts associated with groundwater-contamination-related causes, chemical
5    spills, and wastewater could be minimized through permitting and BMP implementation.
6
7      Of the lease tracts considered in Alternative 3, the ones closest to the Dolores River and
8    San Miguel River have the greatest potential for affecting water quality because of their
9    proximity to perennial water bodies. The lease tracts located in the Slick Rock and Uravan lease
10   tracts are the closest to the Dolores River and San Miguel River, respectively. As discussed in
11   Section 4.2.4, Lease Tract 13 encompasses a 3-mi (5-km) reach of the Dolores River and is
12   where erosion poses the greatest threat to water quality. An increase in erosion and runoff may
13   increase the potential of sediment and pollutant loadings to nearby rivers. Possible pollutants
14   may include sediment-associated compounds, chemical dust control compounds, fuels and other
15   chemicals used in mining, and mineral leachates. As recently evaluated by the CDPHE
16   (2012a,b), the existing impaired surface water that exceeds Colorado standards is mainly located
17   upstream and not associated with the DOE ULP lease tracts (Section 3.4.1.2). During future mine
18   development and operations, impacts of erosion by runoff are considered to be moderate in some
19   areas near Lease Tracts 13 and 18. However, the potential of sediment and pollutant loadings
20   could be minimized by implementing a stormwater control system, a diversion ditch, a
21   sedimentation pond, and an appropriate monitoring system, as well as by restricting mine activity
22   within 0.25 mi (0.40 km) of the Dolores River and San Miguel River (Table 4.6-1). The
23   site-specific requirements for the protection system would be evaluated and incorporated in the
24   future drainage design plan for each lease tract.
25
26     Potential impacts of dewatering on portable groundwater are minimal, localized, and
27   temporary within the period of operations, since the groundwater seepage rate is anticipated to be
28   low, approximate to typical water use for one household. The area of impacts is limited to Lease
29   Tracts 7, 9, and 13. Five domestic wells are identified at or near Lease Tract 13. Using BMPs
30   and mitigation measures in Table 4.6-1—such as (1) grouting exploratory boreholes to reduce
31   the volume of groundwater entered from the alluvial, perched, and shallow aquifers and
32   (2) placing drill holes at locations distant to the existing water rights—would further minimize
33   the impacts.
34
35     The potential for groundwater contamination is likely to be limited to wet mines in Lease
36   Tracts 7 and 9 in Paradox and Lease Tract 13 in Slick Rock. At Lease Tract 9, saturation of the
37   upper sandstone unit in the Saltwash Member resulted in the elevated TDS, sulfate, radium,
38   selenium, and uranium in groundwater from the unit and in water collected at the sump from
39   dewatering (Cotter Corp. 2012b). Appropriate dewatering, groundwater monitoring, and surface
40   treatment could minimize its impact.
41
42     There are 5 domestic wells within or near the edge of Lease Tract 13, and 14 domestic
43   wells are located along the potential groundwater flow pathways from Lease Tracts 7, 9, and 18
44   to the groundwater discharge area. In addition, activities on the Paradox lease tract pose possibly
45   the greatest risk of contaminating locally perched aquifers by the underlying poorer-quality

BLM_0042403

aquifer in the area. The impacts of groundwater contamination could be minimized by the following actions (Table 4.6-1):

- Control groundwater seepage entering underground mines by plugging open exploratory drill holes and the area around vent shafts during operations to the extent possible, containing water in underground sumps, and removing water from groundwater seepage, if necessary, to the surface mine water treatment pond;

- Pump groundwater to the surface mine water treatment facility with a permit, if groundwater flow cannot be controlled by underground containment, and manage discharge in accordance with Federal and state regulations;

- Divert surface water overland flow and shallow groundwater via a diversion ditch to reduce water directly from precipitation and infiltration into underground mines;

- Install lysimeters to monitor infiltration to the subsurface as an early warning system; and

- Provide off-site (downgradient) groundwater monitoring consistent with Colorado requirements for groundwater protection permits.

Impacts of chemical spills and wastewater would also be minimized through mitigation measures, permitting, BMPs, and Federal and state regulations (Table 4.6-1). The site-specific requirements and plans for drainage design, stormwater management, and spill prevention and control would be expected to be evaluated and incorporated in the future project-specific action.


### 4.3.4.3 Reclamation

Under Alternative 3, the scale of reclamation activities would be greater than the scale under Alternative 1, even though the types of impacts would be the same as those described for Alternative 1 (Section 4.1.4). The assumed level of active prospecting during the previous operations phase would require more underground working areas to be backfilled and more boreholes to be plugged in this phase than under Alternative 1. The potential would be higher than the potential under Alternative 1 for impacts on groundwater quality that would result from leaching via backfills and poor sealing of drill holes. However, the actual impact could be minimized by the appropriate backfilling of mine portal and vent holes, complete sealing of drill holes that intercept multiple aquifers, and adequate water reclamation in accordance with reclamation performance measures required by CDRMS. It is not anticipated that the reclamation activities would injure any existing water rights in the region.

Land disturbance is expected to be similar to that under Alternative 1. The potential impact on soil erosion from water would be moderate but temporary in lease tracts along the Dolores River.

BLM_0042404

## 4.3.5  Human Health

The analysis of human health impacts focuses on the consequences from uranium mine development and operations and the reclamation of the lease tracts. Since the drilling conducted during exploration would disturb only small areas (a borehole has a diameter of a few inches) and the drill holes would be backfilled in a short period of time (less than a few weeks), it is expected that human health impacts would be minimal and limited to only a few workers. To provide a perspective of the potential radiation dose, a RESRAD analysis was conducted assuming a pile of excavated soils as the radiation source. The drilling of a borehole (8 in. [20 cm] in diameter and 600 ft [180 m] in depth) was assumed to bring up about 210 ft$^3$ (6 m$^3$) of soil, which was spread on ground surface covering an area of about 100 ft$^2$ ($3 \times 3$ m). The soils were assumed to have the same radionuclide concentrations as waste rocks (i.e., the upper-end concentrations as discussed in Section 4.1.5). To obtain a conservative estimate of radiation dose, an exploration worker was assumed to stand on top of the excavated soils. The potential radiation exposure would result almost entirely from direct radiation, which was estimated to be about 0.3 mrem for each working day (i.e., 8 hours). Because most of the time, an exploration worker would stand at some distance away from the excavated soils pile, the radiation dose he would actually receive would be much lower than 0.3 mrem per day. Therefore, it can be reasonably expected that the total dose an exploration worker would receive from mine exploration would be less than 5 mrem.

### 4.3.5.1  Worker Exposures – Uranium Miners

As is the case with many other occupations, physical injuries or fatalities could result from uranium mining. According to the data published by U.S. Department of Labor, Bureau of Labor Statistics, in 2010, the fatal occupational injury rate for the mining industry was 19.8 per 100,000 full-time workers (BLS 2011a), and the nonfatal occupational injury and illness rate was 2.3 per 100 full-time workers (BLS 2011b). Assuming the injury and fatality rates for uranium mining are similar to those for other types of mining, during the year of peak operations, there could be two nonfatal injuries and illnesses among the 98 workers assumed for this alternative (see Section 2.2.3.1). However, no mining-related fatality is predicted among the workers. The above estimates of injury and fatality were made on the basis of statistical data and should be interpreted from a statistical perspective as well. The actual injury and fatality rates among individual mines could be different. Proper worker training and extensive experience in uranium mining would reduce mining accidents, thereby reducing the potential of injury and fatality.

Past records and studies on the health of uranium mine workers show that in addition to the physical hazards that are associated with the mining activities, inhalation exposure to radon gas could also cause long-term health risks to uranium miners. Mining for uranium ores would accelerate the release of radon, which can cause lung cancers. In addition to inhalation of radon, uranium miners are also exposed to external radiation when they work close to the mineralized ores that contain the uranium isotopes and their decay products.

BLM_0042405

The MSHA requires that underground uranium mines be monitored for radon levels in air to ensure the safety of mine workers. In 30 CFR Part 57, specific requirements for radon monitoring are included, as follows:

> "Where uranium is mined—radon daughter concentrations representative of worker's breathing zone shall be determined at least every two weeks at random times in all active working areas such as stopes, drift headings, travelways, haulageways, shops, stations, lunch rooms, magazines, and any other place or location where persons work, travel, or congregate. However, if concentrations of radon daughters are found in excess of 0.3 WL in an active working area, radon daughter concentrations thereafter shall be determined weekly in that working area until such time as the weekly determinations in that area have been 0.3 WL or less for 5 consecutive weeks."

Mining regulations also require operators to keep records of worker exposures to the decay products of radon gas. Federal regulations governing underground mining also require that workers not be exposed routinely to levels exceeding 1 WL in active work areas.

> An exposure concentration of radon is usually expressed in terms of a working level or WL, which is a measure of the release of alpha energy by the short-lived progenies of radon. The exposures are measured in working level months (WLMs). One WLM is equivalent to an exposure of 170 hours to a concentration of 1 WL. An individual worker's exposure must not exceed 4 WLM in any calendar year (30 CFR Part 57).

According to the United Nations Scientific Committee on the Effects of Atomic Radiation (UNSCEAR 2010), among workers involved in nuclear power production, those involved in uranium mining receive the highest collective doses; a significant part of that exposure is from radon inhalation. Over the period of 1985 to 1989, the average radiation exposure for monitored uranium mine workers in the United States was 350 mrem/yr; the average radiation exposure for measurably exposed workers was 433 mrem/yr (UNSCEAR 2010). These average exposures exclude the radiation dose associated with natural background radiation, which was estimated to be about 430 mrem/yr in this area. In general, underground miners receive a higher radiation exposure than open-pit miners, because underground cavities accumulate higher radon concentrations and airborne uranium ore dust concentrations than does aboveground, open space. According to UNSCEAR (1993), external exposure accounts for 28% of the total dose for underground miners and for 60% of the total dose for open-pit miners; the inhalation of radon accounts for 69% and 34% of the total dose for underground miners and open-pit miners, respectively; and the inhalation of uranium ore dust accounts for 3% and 6% of the total dose for underground miners and open-pit miners, respectively. Based on the assumption that the average dose for underground miners is 433 mrem/yr and based on the distributions of the total dose among different pathways, an LCF risk of $4 \times 10^{-4}$/yr is calculated for an average miner (see Table 4.3-2). This translates to a probability of about 1 in 2,500 of developing a latent fatal cancer through 1 year of radiation exposure. For a worker who would conduct underground uranium mining for 10 years, the total cumulative dose he would receive would be 4,330 mrem, which would translate to a lifetime LCF risk of $4 \times 10^{-3}$; i.e., the probability of developing a fatal cancer would be about 1 in 250.

BLM_0042406

**TABLE 4.3-2  Radiation Doses and LCF Risks Received by Underground Uranium Miners under Alternative 3**

| Radiation Dose | Fraction of Total | Dose (mrem/yr) |
|---|---|---|
| External radiation | 0.28 | 121 |
| Inhalation of radon | 0.69 | 299 |
| Inhalation of particulates | 0.03 | 13 |
| Total | 1 | 433 |

| LCF Risk[a] | Fraction of Total | Risk (1/yr) |
|---|---|---|
| External radiation | 0.19 | 7E–05 |
| Inhalation of radon | 0.79 | 3E–04 |
| Inhalation of particulates | 0.02 | 8E–06 |
| Total | 1 | 4E–04 |

[a]  The LCF risks were calculated with a conversion factor of $5 \times 10^{-4}$/WLM for the inhalation of radon exposure (ICRP 2011), and a conversion factor of $6 \times 10^{-4}$/rem for the external radiation and inhalation of particulates exposure pathways.

Uranium miners could also incur chemical exposures due to the chemical toxicity of uranium and vanadium, which are present in the uranium ores. Because measured air concentrations in uranium mines are not available, potential chemical risks can only be inferred from the measured radiation exposures. Assuming the radiation dose of 13 mrem/yr as listed in Table 4.3-2 from inhalation of particulate was incurred over an exposure duration of 2,000 hours, then with an inhalation rate of 42 ft$^3$/h (1.2 m$^3$/h) and under the secular equilibrium assumption between uranium isotopes and their decay progenies, the air concentration of uranium (attached to particulates) was estimated to be $1.6 \times 10^{-12}$ lb/ft$^3$ ($2.6 \times 10^{-8}$ g/m$^3$). If the ratio of air concentration between vanadium and uranium is the same as the ratio of their concentrations in uranium ores, then the air concentration of vanadium would be five times the air concentration of uranium. If vanadium is present as divanadium pentoxide ($V_2O_5$), then the air concentration of $V_2O_5$ in uranium mines during the operation and developmental phase would be about $2.9 \times 10^{-11}$ lb/ft$^3$ ($4.7 \times 10^{-7}$ g/m$^3$). The potential hazard index calculated with these estimated air concentrations is slightly over 1 (1.06), which is contributed mostly by exposure to $V_2O_5$. This hazard index indicated that potential adverse health effect might result from working in underground uranium mines.

**4.3.5.2  Worker Exposure – Reclamation Workers**

During the reclamation phase, the largest sources of radiation exposure would be the aboveground waste-rock piles accumulated over the operational period. The potential radiation dose that could be incurred by reclamation workers would depend on the size of the waste-rock pile and its uranium content. Because future mining plans are currently not known, the potential

BLM_0042407

1  radiation exposure of a reclamation worker was estimated on the basis of four varying sizes of
2  waste-rock piles. Detailed discussions on the development of the four hypothetical waste-rock
3  piles are provided in Section 4.1.5 for Alternative 1.
4
5          Radiation exposure of an individual worker resulting from performing reclamation
6  activities is expected to be about the same as that analyzed in Section 4.1.5 for Alternative 1.
7  Based on the RESRAD (Yu et al. 2001) analysis, the total radiation dose incurred by a
8  reclamation worker would be about 14.3 mrem or slightly lower. The total dose is estimated on
9  the basis of the assumption that the worker would work 8 hours per day for 20 days on top of a
10  waste-rock pile. The radiation exposure is dominated by the external radiation pathway, which
11  contributes about 94–96% of the total dose, followed by the incidental soil ingestion pathway,
12  which accounts for about 3% of the total dose. The remaining dose is contributed by exposures
13  from inhalation of radioactive particulate and radon gas. The potential LCF risk associated with
14  this radiation exposure is estimated to be $1 \times 10^{-5}$; i.e., the probability of developing a latent
15  fatal cancer is 1 in 100,000. The above estimates were obtained by assuming the base
16  radionuclide concentrations in waste rocks (with a Ra-226 concentration of 70 pCi/g). If the
17  higher Ra-226 concentration of 168 pCi/g was used, the potential dose or LCF risk would
18  increase by a factor of less than 3; i.e., the radiation dose could be as high as 34.2 mrem (LCF
19  risk of $3 \times 10^{-5}$, i.e. 1 in 330,00). See Section 4.1.5 for discussion on waste-rock radionuclide
20  concentrations.
21
22          In addition to working above the ground, a reclamation worker may be required to work
23  underground to reclaim workings in the mine cavities; however, the time spent underground is
24  expected to be much shorter than the time spent above the ground. Based on past monitoring data
25  for uranium miners (433 mrem/yr in average, see Section 4.3.5.1), it is estimated that a
26  reclamation worker would need to spend 66–158 hours at underground workings to receive the
27  same dose (14.3–34.2 mrem) as he would receive from working on top of a waste-rock pile for
28  160 hours (i.e., 20 workdays).
29
30          In addition to the radiation that is emitted by the uranium isotopes and their decay
31  products in the waste rocks, the chemical toxicity of the uranium and vanadium minerals in the
32  waste rocks could also affect the health of a reclamation worker. The potential chemical risk that
33  a reclamation worker would incur under Alternative 3 is expected to be about the same as that
34  under Alternative 1. Based on the evaluation results for Alternative 1 (Section 4.1.5.1), the total
35  hazard index associated with the chemical exposures would be about 0.13, with 95% contributed
36  by vanadium exposure and 5% contributed by uranium exposure, if the base concentrations in
37  waste rocks were assumed. If higher radionuclide concentrations (168 pCi/g for Ra-226) were
38  used, then the total hazard index would increase to about 0.31. Because the hazard index would
39  be well below the threshold value of 1, potential adverse health effects are not expected for the
40  reclamation worker.
41
42
43  **4.3.5.3  General Public Exposure – Residential Scenario**
44
45          A member of the general public who lived near the ULP lease tracts could be exposed to
46  radiation as a result of the release of radon gas and radioactive particulates that contain uranium

1    isotopes and their decay products from mining-related activities. Because the exact locations and
2    sizes of the mines that would be developed under Alternative 3 are not known at this time, the
3    potential radiation exposure was estimated as a function of distance from the release point of
4    radionuclides, which can be used to estimate the potential exposure of an individual living close
5    to the ULP lease tracts once the location and size of the mine are known. The maximum doses
6    were estimated for four sizes of uranium mines based on the assumptions described in Chapter 2
7    for Alternative 3.
8
9         Except for potential exposures resulting from airborne release of radon gas and
10   radioactive particulates, a less likely exposure pathway for nearby residents after the reclamation
11   phase would be for these residents to let livestock graze in the ULP lease tracts and then
12   consume the meat or milk produced by the livestock. The potential exposures are also analyzed
13   and summarized in the following sections.
14
15
16   **4.3.5.3.1  Exposure during Uranium Mine Development and Operations.**
17
18
19        **Exposure to an Individual Receptor.** During the operational phase of underground
20   mining, the major source of radon (Rn-222) emissions to the ambient air is through the exhaust
21   vents of the ventilation systems. Rn-222 emissions from these vents are highly variable and
22   depend on many interrelated factors, including the ventilation rate, ore grade, production rate,
23   age of the mine, size of active working areas, mining practices, and several other variables. In
24   addition to the exhaust vents, Rn-222 is emitted to air from several aboveground sources. These
25   sources are the ore, sub-ore, and waste-rock storage piles, as well as the loading and dumping
26   of these materials. Pacific Northwest National Laboratory has estimated that the Rn-222
27   emissions from these aboveground sources are about 2–3% of the emissions from the vents
28   (Jackson et al. 1980).
29
30        According to the EPA's NESHAP background document (EPA 1989a), the aboveground
31   sources also emit radionuclides to air as particulates. The particulate emissions result from ore
32   dumping and loading operations, wind erosion of storage piles, and vehicular traffic. An
33   assessment of the risks from the particulate emissions showed that they were much smaller
34   (a factor of 100 times less) than the risks from Rn-222 emissions. On the basis of this
35   information and the finding from Pacific Northwest National Laboratory, emissions of Rn-222
36   from mine workings would be the primary sources of radiation exposures for the general public.
37   They are therefore the focus of the human health impact analysis discussed in this section.
38
39        Table 4.3-3 presents the radon emission rates assumed for human health impact analysis
40   during mine development and operations. The uranium ore production rates for the four mine
41   sizes are discussed in Section 2. The emission rates of Rn-222 were calculated with the equation
42   developed by the EPA (EPA 1985) in a study on the Rn-222 emissions from underground
43   uranium mines, in which the emission rates were found to be proportional to the cumulative
44   production of uranium ores. The linear correlations were developed by using radon emission data
45   from more than 25 years ago and have not been re-examined by using newer data. The
46   examination also does not consider the reduction in emissions achieved by using emission

BLM_0042409

1  **TABLE 4.3-3  Radon Emission Rates per Type of Mine during Mine Operations Assumed for**
2  **Alternative 3**

| Parameters | Small[a] | Medium[a] | Large[a] | Very Large[b] | Total |
|---|---|---|---|---|---|
| Uranium ore production per mine (tons/d) | 50 | 100 | 200 | 300 | |
| Cumulative uranium ore production per mine (tons) | 1.20E+05 | 2.40E+05 | 4.80E+05 | 7.20E+05 | |
| Rn-222 emission rate per mine (Ci/yr)[c] | 5.28E+02 | 1.06E+03 | 2.11E+03 | 6.00E+02 | |
| Alternative 3 in peak year of operations | | | | | |
| No. of active mines | 2 | 4 | 1 | 1 | 8 |
| Total Rn-222 emission rate (Ci/yr) | 1.06E+03 | 4.22E+03 | 2.11E+03 | 6.00E+02 | 7.99E+03 |

[a]  Underground mine.

[b]  Open-pit mine.

[c]  The emission rates of radon from underground mines were estimated with the correlation developed by the EPA in 1985: Rn-222 emission (Ci/yr) = 0.0044 × cumulative uranium ore production (tons) (EPA 1985). A cumulative period of 10 years was assumed for this calculation. The emission rate from the very large open-pit mine was determined based on the data compiled by the EPA for open-pit uranium mines (EPA 1989a).

3
4
5  control measures. Therefore, it is judged that the estimates obtained with the EPA equation
6  would overestimate the actual emission rates. For the human health impact analysis, an
7  operational period of 10 years was assumed in order to develop the radon emission rates. Since
8  some uranium mines might not be developed immediately after the ULP PEIS is finalized and
9  issued (i.e., 2013), and since some might be completed in fewer than 10 years, the estimates of
10  radon emission rates based on a 10-year operational period could be higher than the actual
11  emission rates (and the radiation doses) from the underground mine that would be developed.
12  The Rn-222 emission rate for a very large mine (i.e., the existing open-pit mine in Lease Tract 7)
13  was estimated on the basis of the data compiled by the EPA in 1989 (Table 12-7 in EPA 1989a)
14  for surface mines. The estimated value is also expected to be greater than the actual emission rate
15  and would similarly provide more conservative dose results.
16
17      CAP88-PC (Trinity Engineering Associates, Inc. 2007) was employed to obtain the radon
18  levels for the estimates of maximum radiation doses and corresponding LCF risks associated
19  with the emissions of radon from four hypothetical uranium mines. For comparison purposes,
20  COMPLY-R (EPA 1989b) was also used to estimate the maximum radiation doses associated
21  with the emissions of radon from the four hypothetical mines. COMPLY-R is pre-approved by
22  EPA for use to analyze radon exposures and to demonstrate compliance with the NESHAP dose
23  limit of 10 mrem/yr for the general public (40 CFR Part 61). However, because it handles only
24  stack emissions of radon, which can be reasonably assumed as point sources, and does not
25  calculate radiation doses associated with radon emissions from area sources, emissions of
26  radionuclides attaching to particulates, or collective exposures for a population, to keep
27  consistency in air emission modeling, CAP88-PC was selected as the primary code for

BLM_0042410

1   evaluating human health impacts in the ULP
2   PEIS. Table 4.3-4 lists the estimated results.
3   The radiation exposures would decrease with
4   increasing distance because of greater dilution
5   in the radon concentrations, which are
6   expressed in terms of WL and are also listed in
7   Table 4.3-4. The maximum exposure at a fixed
8   distance from the center of each mine, which
9   was assumed to be the emission point for an
10  underground mine, would always occur in the
11  sector that coincides with a dominant wind
12  direction. In any other sector, the potential
13  exposure would be less than the maximum
14  values.
15
16         The maximum dose estimates are listed
17  in Table 4.3-4. Based on this table, if the
18  resident lived a distance of 3,300 ft (1,000 m)
19  from the emission point of a small underground
20  mine, then the maximum radiation dose he
21  could incur would be about 5.63 mrem/yr based
22  on CAP88-PC results, which is 56% of the
23  NESHAP dose limit (40 CFR Part 61) for
24  airborne emissions of radionuclides. If the
25  distance was increased to 6,600 ft (2,000 m),
26  then the maximum exposure would be less than

> **Comparison of CAP88-PC and COMPLY-R**
>
> CAP88-PC was used for the calculations
> performed for the ULP PEIS to maintain
> consistency in the methodology for evaluating the
> potential radiation exposures to the general
> public, both individually and collectively. The
> COMPLY-R computer code is pre-approved by
> EPA for use to demonstrate compliance with the
> dose requirement in 40 CFR 61 Part B. However,
> it evaluates only radon emissions and does not
> calculate collective population exposure.
> However, a calculation for potential individual
> exposure associated with the release of radon
> during the operation of a small underground mine
> was made by using both CAP88-PC and
> COMPLY-R in order to provide a comparison.
> The radon doses calculated by CAP88-PC were
> smaller than those calculated by COMPLY-R for
> shorter distances (from the emission point; in this
> case, the potential mine site), but the difference in
> calculated doses became smaller as distance from
> the emission point increased. This difference was
> partly due to different conversion factors used to
> convert radon levels to effective doses in the
> calculations. The conversion factor used in the
> CAP88-PC calculation is 388 mrem/WLM, while
> COMPLY-R uses a conversion factor of
> 920 mrem/WLM. Details of this comparison are
> discussed in Appendix D, Section D.5.6.

27  3 mrem/yr. The radiation doses calculated by
28  COMPLY-R are higher; at a distance of 3,300 ft (1,000 m) from a small underground mine, the
29  maximum dose was calculated to be 12 mrem/yr; increasing the distance to 6,600 ft (2,000 m),
30  the maximum dose was reduced to 4.3 mrem/yr. In general, the radon doses calculated by
31  CAP88-PC were smaller than those calculated by COMPLY-R for shorter distances (from the
32  emission point), but the difference became smaller as the distance from the emission point
33  increased. This difference in estimated radon doses was partly due to different conversion factors
34  used to convert radon levels to effective doses in the calculations. The conversion factor used in
35  the CAP88-PC calculation is 388 mrem/WLM (UNSCEAR 2008), while COMPLY-R uses a
36  conversion factor of 920 mrem/WLM. The maximum doses associated with a medium or a large
37  mine would be two or four times, respectively, the maximum doses associated with a small mine,
38  because according to the EPA radon emission model (EPA 1985), the amount of radon released
39  from a medium or large mine would be two or four times, respectively, the amount of radon
40  released from a small mine. Therefore, at a distance of 3,300 ft (1,000 m) from a medium or
41  large mine, the maximum dose (11.26 mrem/yr or 22.52 mrem/yr from CAP88-PC calculations;
42  24 mrem/yr or 48 mrem/yr from COMPLY-R calculations) would exceed the NESHAP dose
43  limit of 10 mrem/yr. Currently, compliance with the NESHAP dose limit of 10 mrem/yr for
44  radon emissions from underground mines is required for owners or operators of active uranium
45  mines that meet either of two conditions: (1) it has mined (or will, or is designed to mine)
46  100,000 tons of ore during the life of the mine, or (2) it has produced (or will produce) more than

BLM_0042411

1    **TABLE 4.3-4  Potential Maximum Radon Levels, Radiation Doses, Radon Concentrations, and**
2    **LCF Risks to a Resident Associated with the Emission of Radon from Four Uranium Mine Sizes**
3    **under Alternative 3**

| Distance (m) | Radiation Dose (mrem/yr) and Radon Level (WL) per Mine Size[a] | | | | LCF Risk (1/yr) per Mine Size[b] | | | |
|---|---|---|---|---|---|---|---|---|
| | Small | Medium | Large | Very Large | Small | Medium | Large | Very Large |
| 500 | 7.83/35.70 (0.00065) | 15.66/71.40 (0.0013) | 31.32/142.80 (0.0026) | 27.40 (0.0023) | 1E-05 | 2E-05 | 4E-05 | 4E-05 |
| 1,000 | 5.63/12.00 (0.00047) | 11.26/24.00 (0.00094) | 22.52/48.00 (0.0019) | 9.05 (0.00076) | 7E-06 | 1E-05 | 3E-05 | 1E-05 |
| 1,500 | 3.72/6.50 (0.00031) | 7.44/13.00 (0.00062) | 14.88/26.00 (0.0012) | 5.53 (0.00046) | 5E-06 | 1E-05 | 2E-05 | 7E-06 |
| 2,000 | 2.67/4.30 (0.00022) | 5.34/8.60 (0.00044) | 10.68/17.20 (0.00089) | 3.72 (0.00031) | 3E-06 | 7E-06 | 1E-05 | 5E-06 |
| 2,500 | 2.04/2.90 (0.00017) | 4.08/5.80 (0.00034) | 8.16/11.60 (0.00068) | 2.7 (0.00023) | 3E-06 | 5E-06 | 1E-05 | 3E-06 |
| 3,000 | 1.63/2.50 (0.00014) | 3.26/5.00 (0.00027) | 6.52/10.00 (0.00054) | 2.09 (0.00017) | 2E-06 | 4E-06 | 8E-06 | 3E-06 |
| 4,000 | 1.22/1.70 (0.00010) | 2.44/3.40 (0.00020) | 4.88/6.80 (0.00040) | 1.53 (0.00013) | 2E-06 | 3E-06 | 6E-06 | 2E-06 |
| 5,000 | 0.97/1.30 (0.00008) | 1.94/2.60 (0.00016) | 3.88/5.20 (0.00032) | 1.2 (0.00010) | 1E-06 | 3E-06 | 5E-06 | 2E-06 |

[a]   Radiation dose is on top line, and radon concentration (as working level) is in parentheses below. Two dose results are listed; the first one was obtained with CAP88-PC, and the second one was obtained with COMPLY-R.

[b]   Cancer risks were estimated on the basis of the CAP88-PC results. COMPLY-R does not provide estimates of cancer risks.

4
5
6    10,000 tons of ore during a 12-month period, unless the owner or operator can prove that total
7    lifetime ore production will be 100,000 tons or less (40 CFR 61 Subpart B). The "small" mine
8    assumed for the ULP PEIS would generate 12,000 tons of ore during a 12-month period during
9    the peak year. The NESHAP dose limit of 10 mrem/yr for radon emissions from underground
10   mines would apply.
11
12          It should be noted that the maximum doses listed in Table 4.3-4 are for a resident living
13   in a dominant wind direction and were obtained by using the radon emission rates corresponding
14   to an operational period of 10 years. The radiation doses at nondominant wind locations would
15   be less. Likewise, the emission rates for uranium mines developed and operated for fewer than
16   10 years would be less. If there were one or more uranium mines close to a given residence and
17   they were being operated at the same time, the potential dose that the resident could receive
18   would be the sum of the doses contributed by each mine.
19

BLM_0042412

Based on the maximum doses presented in Table 4.3-4, it is possible that a resident could receive a radon dose of more than 10 mrem/yr, if he lives less than 1.6 mi (2.5 km) from a uranium mine and the residence happened to be located in a dominant wind direction from the emission point. However, the estimates in Table 4.3-4 were obtained by using conservative assumptions; the actual radon dose could be much smaller based on actual radon emission data, since monitoring would be implemented to ensure radiation levels were consistent with requirements. In case the radon dose estimated with actual emission data shows a potential for exceeding the 10-mrem/yr dose limit, mitigation measures (see discussions that follow) would be required to reduce the radon emissions; increased reporting of monitoring status and results would also be required.

The maximum LCF risk for a resident living close to a small underground uranium mine was estimated to range from $1 \times 10^{-6}$/yr at a distance of 3.1 mi (5,000 m) to $1 \times 10^{-5}$/yr at a distance of 0.3 mi (500 m). That is, the probability of developing a latent fatal cancer ranges from 1 in 1,000,000 at a distance of 3.1 mi (5,000 m) to 1 in 100,000 at a distance of 0.3 mi (500 m) from each year of exposure. The probability would increase by a factor of two or four if the resident lived close to a medium-sized or a large underground mine, respectively.

Potential chemical exposures resulting from emissions of particulates containing uranium and vanadium during development and operation of uranium mines are not expected to cause adverse health effects to the general public living near the ULP lease tracts. According to the analysis of potential chemical exposures to underground uranium miners, which is detailed in Section 4.3.5.1, the hazard index (1.06) associated with the exposures was estimated to be just slightly over the threshold value of 1. Because after being released through the emission stacks, the air concentrations of uranium and vanadium would be greatly diluted, potential chemical exposures experienced by a nearby resident would be much lower than those experienced by a worker; therefore, the hazard index associated with the exposures of a nearby resident would be much lower than 1.

Because potential radon exposures of the general public living near the ULP lease tracts could exceed the NESHAP dose limit of 10 mrem/yr, compliance measures, mitigation measures, and BMPs are identified in Section 4.6, Table 4.6-1, to achieve the following two objectives: (1) obtain actual radon emission rates to refine the dose estimates associated with radon exposures and (2) reduce the impact on the general public, if the refined estimates would exceed the 10-mrem/yr dose limit. Specific measures that would be mandatory include the following:

- Measures for obtaining actual radon emission rates:
  - Monitor the radon discharge concentration continuously whenever the mine ventilation system is operational;
  - Measure each mine vent exhaust flow rate; and
  - Calculate and record a weekly radon-222 emission rate for the mine.

- Measures for reducing impact to the general public:
  - Increase the ventilation flow rate;
  - Reroute ventilation flow;

BLM_0042413

1         – Reroute ventilation to a new vent;
2         – Modify the vent stack;
3         – Decrease vent stack diameter;
4         – Increase vent stack release height; and
5         – Construct additional bulkheads.

8 **Exposure to a Collective Population.** In addition to the residents who lived near the
9 DOE ULP lease tracts, members of the general public who lived further away from the lease
10 tracts could also be exposed to radiation associated with the radon emissions from mining
11 activities, although their exposures would be much lower than those of the nearby residents.
12 Because of air dispersion, in general, the radon level would decrease as the distance from the
13 emission point increases. The potential radiation exposure of a population within an area can be
14 characterized with a collective dose, which is equivalent to the sum of the individual doses over
15 the population and typically assumes the unit of person-rem. The collective dose of the general
16 public who live within 50 mi (80 km) around the active uranium mines were estimated in the
17 ULP PEIS by using CAP88-PC (Trinity Engineering Associates, Inc. 2007). A distance of 50 mi
18 (80 km) was selected because it is the largest distance accepted by CAP88-PC.

20 Collective exposures of the general public were estimated for the peak year of operations
21 by using the assumptions described in Chapter 2. To estimate the range of collective exposure,
22 radon emissions from all the underground mines were combined and assumed to be released
23 from a single exhaust vent. This single vent was selected to be at the center of each lease tract
24 group. The lease tracts were divided into four groups for analysis (see the methodology
25 discussed in Section D.5.1).

27 In addition to the emissions from underground mining, the collective exposure to the
28 emissions from surface mining was also calculated. Because the only open-pit mine considered
29 in the ULP PEIS is located in Lease Tract 7, when calculating the collective exposure, it was
30 assumed that the emission came from the center of lease tract group 3. The sum of the collective
31 doses from underground mining and open-pit mining were used to approximate the total
32 collective dose during the year of peak operations.

34 The collective exposures were estimated by using the population distribution data
35 developed around the center of each lease tract group. The distribution data account for the
36 population living 3.1 to 50 mi (5 to 80 km) from the center. The distribution within the first
37 3.1 mi (5 km) was not utilized for two reasons: (1) the population within 3.1 mi (5 km) could not
38 be determined and distributed as accurately as the population beyond 3.1 mi (5 km); and (2) the
39 population within 3.1 mi (5 km) of the ULP lease tracts is very small compared with the total
40 population within 50 mi (80 km). This approach is expected to provide a reasonable estimate of
41 the potential range of collective exposures.

43 Table 4.3-5 presents the collective doses estimated for the peak year of operations under
44 Alternative 3. According to the estimates, the collective dose associated with underground
45 mining ranges from 6.6 to 38 person-rem. The collective dose associated with the one very large
46 open-pit mine is about 0.88 person-rem. Combined, the underground and open-pit mines would

BLM_0042414

1  **TABLE 4.3-5  Collective Doses and LCF Risks to the General Public**
2  **from Radon Emissions from Uranium Mines during the Peak Year of**
3  **Operations under Alternative 3**

| Type of Mining and Location | Collective Dose (person–rem/yr) | Collective LCF (1/yr)[a] |
|---|---|---|
| From underground mines[b] | | |
| Based on the center of Group 1[c] | 3.84E+01 | 5E-02 |
| Based on the center of Group 2[d] | 2.05E+01 | 3E-02 |
| Based on the center of Group 3[e] | 1.04E+01 | 1E-02 |
| Based on the center of Group 4[f] | 6.59E+00 | 8E-03 |
| From open–pit mines[g] | | |
| Based on the center of Group 3[e] | 8.81E-01 | 1E-03 |
| Total | | |
| Minimum | 7.47E+00 | 1E-02 |
| Maximum | 3.93E+01 | 5E-02 |

[a]  Denotes the number of latent lung cancers that could result from radiation exposure.

[b]  The total radon emission rate from underground mining during the peak year of operations is 7,390 Ci/yr.

[c]  If the emission is from the center of lease tract Group 1, the total population between 3 and 50 mi (5 and 80 km) is 178,473.

[d]  If the emission is from the center of lease tract Group 2, the total population between 3 and 50 mi (5 and 80 km) is 86,657.

[e]  If the emission is from the center of lease tract Group 3, the total population between 3 and 50 mi (5 and 80 km) is 27,062.

[f]  If the emission is from the center of lease tract Group 4, the total population between 3 and 50 mi (5 and 80 km) is 33,166.

[g]  The total radon emission rate from open–pit mines during the peak year of operations is 600 Ci/yr.

4
5
6  result in a total collective dose ranging from 7.5 to 39 person-rem during the year of peak
7  operations. This collective exposure would result in a collective LCF of 0.01 to 0.052. Therefore,
8  no LCF among the population would be expected to result from the collective exposure to the
9  radon emitted from the eight uranium mines that would be operated simultaneously during the
10  peak year of operations under Alternative 3. The total populations involved in these estimates
11  range from 27,062 to 178,473, depending on the location assumed for the emission point. If the
12  collective dose is evenly distributed among the population, the corresponding average individual
13  dose would be less than 0.4 mrem (LCF risk of $3 \times 10^{-7}$; i.e., 1 in 3,300,000) during the peak
14  year of operations. In reality, because the active lease tracts (the lease tracts with mining
15  operations) could be spread out among the four lease tract groups rather than concentrating in
16  one single group (as was assumed for the calculations), the population size within 3 to 50 mi
17  (5 to 80 km) of the lease tracts should be greater than the 178,473 used in the calculations.

BLM_0042415

1  Therefore, the actual average individual dose should be just a fraction of the calculated average
2  value.
3
4
5      **4.3.5.3.2  Accidental Release of Uranium during Operations.** No mining accident
6  would be expected to expose the public or ecological systems to greater amounts of the ore than
7  the amount that occurs during operations, as discussed in this section and Section 4.3.6.
8  Accidents involving the low-grade uranium ore at a lease tract mine are not expected to result in
9  release of radioactive material that would pose a health risk to the public greater than the risks
10 assessed for routine operations. Mine operations already involve the movement of large volumes
11 of ore that are open to the environment during the actual mining of the ore (for the open-pit
12 mine), stockpiling, and loading of the haul trucks. In addition, the stony, aggregate nature of the
13 ore precludes any widespread dispersion by air or water. Some dust and fines are present, but
14 their suspension in air is minimized because they are sprayed with water or a similar suppression
15 agent to limit worker exposures and off-site dispersion. Any work at the mines would be isolated
16 from surface water, thus reducing the potential of surface water contamination to a minimum.
17
18
19     **4.3.5.3.3  Exposure during and after Reclamation.** Residents who live close to a
20 uranium mine during or after the reclamation phase could be exposed to radiation as a result of
21 emissions of radioactive particulates and radon gas from the waste-rock piles left aboveground.
22 The potential radiation dose would depend on the direction and distance between the residence
23 and the waste-rock piles and the emission rates of particulates and radon. The potential range of
24 the radiation dose that a resident would incur under Alternative 3 is expected to be similar to the
25 range of the radiation dose incurred under Alternatives 1 and 2, because the exposures would be
26 dominated by the emissions from the waste-rock pile(s) that is (are) closest to this resident.
27
28     Based on the estimates presented in Section 4.1.5.4, if a resident lived at a distance of
29 3,300 ft (1,000 m) from a waste-rock pile, the radiation dose he could receive would be less than
30 3.5 mrem/yr; if the distance was increased to 6,600 ft (2,000 m), the exposure would be less than
31 1.3 mrem/yr. If there were two waste-rock piles nearby, the potential dose this resident could
32 incur would be the sum of the doses contributed by each waste-rock pile. Based on the listed
33 maximum doses in Table 4.1-8, the potential dose incurred by any resident living at a distance of
34 more than 1,600 ft (500 m) from the center of a waste-rock pile is expected to be smaller than the
35 NESHAP dose limit of 10 mrem/yr for airborne emissions (40 CFR Part 61). The potential LCF
36 risk would be less than $9 \times 10^{-6}$/yr, which means the probability of developing a latent fatal
37 cancer from living close to the ULP lease tracts for 1 year during or after the reclamation would
38 be 1 in 110,000. If a resident lived in the same location for 30 years, then the cumulative LCF
39 risk would be less than $3 \times 10^{-4}$. The above estimates were obtained with the base
40 concentrations assumed for waste rocks (70 pCi/g for Ra-226); should the higher 168 pCi/g
41 concentrations be used, the potential radiation doses and LCF risks would increase by a factor of
42 less than 3; therefore, the potential LCF risk would be less than $7 \times 10^{-6}$/yr at a distance of
43 3,300 ft (1,000 m), and for 30 years, the total LCF risk would be less than $2 \times 10^{-4}$.
44
45     In reality, waste-rock are expected to be covered by a layer of soil materials during
46 reclamation to facilitate vegetation growth. Because of this cover, emissions of radioactive

BLM_0042416

1   particulates would be greatly reduced, if not eliminated completely. Emissions of radon
2   from waste-rock piles could continue, although the emission rates would be reduced. In fact,
3   because uranium isotopes and their decay products have long decay half-lives, the potential of
4   radon emissions from waste-rock piles could persist for millions of years after the reclamation
5   was completed.
6
7          In addition to radiation exposure, the residents living close to the ULP lease tracts could
8   incur chemical exposures due to the chemical toxicity of uranium and vanadium minerals
9   contained in the waste rocks. Potential chemical exposures would be associated with emissions
10  of particulates and with the inhalation and incidental dust ingestion pathways. The same
11  exposure parameters as those used for radiation dose modeling were used to evaluate potential
12  chemical risks to nearby residents. According to the evaluation results, the total hazard index
13  would be well below the threshold value of 1, with inhalation being the dominant pathway.
14  Therefore, nearby residents are not expected to experience any adverse health effects associated
15  with the potential exposures.
16
17         The above discussions consider the exposures of nearby residents to the airborne
18  emissions of radon and particulates from waste-rock piles. A less likely exposure scenario after
19  the reclamation phase is for a nearby resident to raise livestock in the lease tract and consume the
20  meat and milk produced. According to the RESRAD calculation results, the potential dose would
21  be less than 5.5 mrem/yr, which is a small fraction of the DOE dose limit of 100 mrem/yr for the
22  general public from all applicable exposure pathways (DOE Order 458.1). The corresponding
23  LCF risk would be $3 \times 10^{-6}$/yr; i.e., the probability of developing a latent fatal cancer would be
24  less than 1 in 330,000 per year. Section 4.1.5.2. provides detailed discussions on this analysis.
25
26
27  **4.3.5.4  General Public Exposures – Recreationist Scenario**
28
29         In addition to the residents who live near the ULP lease tracts and could therefore be
30  exposed to the emissions from the lease tracts, a recreationist who unknowingly entered the lease
31  tracts could also potentially be exposed to radiation. He could enter the lease tracts prior to
32  reclamation (when active mining is going on), during reclamation, or after reclamation. During
33  the first two phases, the presence of mining/reclamation equipment, mining infrastructure, and
34  workers would deter a recreationist from entering a lease tract. Even if he did enter, the duration
35  of time spent there would be much shorter than the duration after reclamation. Therefore, the
36  potential impact on a recreationist after reclamation is the focus of the ULP PEIS.
37
38         The potential radiation exposure that a recreationist might incur from entering a lease
39  tract would be higher during active mining than during active reclamation. The radiation
40  exposure during active mining would be bounded by the exposure of an open-pit uranium miner.
41  Past monitoring data for uranium miners indicated that on average, a uranium miner would
42  receive a radiation dose of about 433 mrem/yr; open-pit miners received less exposure than
43  underground miners. If this average value is conservatively used as the radiation dose to an open-
44  pit miner, and if the number of hours he worked is assumed to be 2,000 per year, an average dose
45  rate of 0.22 mrem/h can be calculated. This dose rate would include 0.13 mrem/h from external
46  radiation, 0.07 mrem/h from radon inhalation, and 0.013 mrem/h from inhalation of particulates

BLM_0042417

1   (the contributions to the total dose from individual pathways are 60%, 34%, and 6%,
2   respectively) (see discussions in Section 4.3.5.1). This dose rate is 2.5 times the dose rate
3   (0.089 mrem/h, equivalent to 30 mrem for 2 weeks) estimated considering the recreationist
4   entering the lease tract after reclamation (spending time on top of a waste-rock pile, discussed in
5   the following paragraphs). The higher dose rate during active mining is primarily due to the
6   presence of uranium ores (in a pile or in the open pit). If the lease tract has an active underground
7   mine rather than an active open-pit mine, the dose rate would not be higher, because there would
8   not be any exposed uranium ores in the ground.
9
10      Although the ventilation stacks of the underground mine would release large amounts of
11   radon, the radon concentration would be greatly diluted upon exiting the stack because of mixing
12   with surrounding air. Based on the CAP88-PC modeling results, the maximum radon
13   concentration from stack emissions from a small underground mine is about 0.005 WL (at a
14   distance of about 50 m from the release point); the corresponding radon dose is 0.012 mrem/h.
15   For a large underground mine, the maximum radon level would be about 0.02 WL, with a
16   corresponding dose rate of 0.048 mrem/h. These two radon dose rates estimated for an
17   underground mine are less than that estimated for an open-pit mine, as discussed above
18   (0.07 mrem/h).
19
20      To model the potential radiation exposure incurred after reclamation, it is assumed the
21   recreationist would camp on top of a waste-rock pile for 2 weeks during each trip, eat wild
22   berries collected in the areas, and hunt wildlife animals for consumption. This recreationist could
23   receive radiation exposure through the direct external radiation, inhalation of radon, inhalation of
24   particulates, and incidental soil ingestion pathways while camping on waste rocks. The potential
25   exposures would vary with the thickness of soil cover placed on top of waste rocks during
26   reclamation. In the analysis, the thickness was assumed to range from 0 to 1 ft (0.3 m).
27
28      The potential dose that could be incurred by a recreationist under Alternative 3 would be
29   similar to that under Alternatives 1 and 2. According to the RESRAD (Yu et al. 2001)
30   calculation results, the radiation dose incurred by the recreationist from camping on waste rocks
31   for 2 weeks would range from 0.88 mrem with a cover thickness of 1 ft (0.3 m) to 30 mrem with
32   no cover. The corresponding LCF risk would range from $1 \times 10^{-6}$ to $2 \times 10^{-5}$; i.e., the
33   probability of developing a latent fatal cancer would be about 1 in 1,000,000 to 1 in 50,000. The
34   majority of the radiation dose would result from direct external radiation. These dose estimates
35   were made by using the base concentration  (70 pCi/g for Ra-226) assumed for waste rocks. If
36   the concentrations were increased to the higher 168 pCi/g concentrations, potential dose and LCF
37   risks would be increased by a factor of less than 3.
38
39      The potential radiation dose associated with eating wild berries and wildlife animals was
40   calculated with assumed ingestion rates of 1 lb (0.45 kg) and 100 lb (45.4 kg), respectively. The
41   potential dose was estimated to range from1.08 mrem to 1.66 mrem, depending on the depth of
42   plant roots assumed for the estimate. The corresponding LCF risk was estimated to be less than
43   $8 \times 10^{-7}$; i.e., the probability of developing an LCF would be less than 1 in 1,250,000.
44
45      No chemical risks would result from camping on a waste-rock pile if the pile was covered
46   by a few inches of soil materials. In the worst situation in which there was no soil cover, a hazard

BLM_0042418

index of 0.039 was calculated. The potential chemical risk associated with ingesting contaminated wild berries would be small, with a hazard index of less than 0.003. The hazard index associated with eating wildlife animals would be more than 100 times greater than that associated with eating wild berries, because of the potential accumulation of vanadium in animal tissues. The hazard index calculated was 0.39. However, because the sum of all these hazard indexes was much less than 1, the recreationist is not expected to experience any adverse health effect from these two ingestion pathways.

Most of the encounters between recreationists and ULP lease tracts are expected to be much shorter than 2 weeks. When the total dose associated with exposures to waste rocks from camping is used, a dose rate of less than 0.09 mrem/h (LCF risk of $7 \times 10^{-8}$, i.e., 1 in 14,000,000) was estimated.

A detailed analysis of the potential exposure to an individual receptor under post-reclamation conditions at the mine sites is discussed in Section 4.1.5.3. Mitigation measures to reduce the potential for exposure at sites following reclamation are listed in Table 4.6-1 (Section 4.6).

### 4.3.5.5  Intentional Destructive Acts

The impacts of intentional destructive acts (IDAs) are addressed here to provide perspective on the risks that the uranium ore could pose should such an act occur. The consequences of an IDA involving hazardous material depend on the material's packaging, chemical composition, radioactive and physical properties, accessibility, quantity, and ease of dispersion, and on the surrounding environment, including the number of people who are close to the event. An IDA could occur during mining, temporary storage of the mined ore, loading of the haul trucks, and transportation activities for Alternatives 3, 4, and 5.

The low-grade nature of the uranium ore considered in the ULP PEIS (0.2% as $U_3O_8$) poses little risk, in general, to human health and the environment, even under accident conditions, as discussed in Sections 4.3.5.3.2, 4.3.6.3, and 4.3.10.4. There are already large quantities of the ore exposed to the environment during mining (for the open-pit mine), stockpiling, and loading of the haul trucks. In addition, the stony, aggregate nature of the ore precludes any widespread dispersion by air or water during mining operations or following a potential accident. In the case of transportation, the uranium ore being transported is treated by DOT regulations as a low-specific-activity material and requires minimal packaging (i.e., a tarp is required to cover the top of the haul truck to minimize the dispersion of any loose material). Because of the low-grade nature of the uranium ore, an ore spill of the entire shipment (25 tons) would not constitute a reportable quantity for uranium as defined in 49 CFR 172.101. Thus, an IDA would not be expected to result in chemical or radiological impacts any greater than those present during mining operations and transport to a mill.

In addition, the remote locations of the lease tracts and the transportation routes also would reduce the likelihood of the already minimal impacts from a potential IDA event. An IDA at a location farther from potential victims would affect fewer individuals and would likely be a

BLM_0042419

1  less attractive option for terrorists. Terrorists might also find it harder to blend into the local
2  population in the sparsely populated areas surrounding the lease tracts (i.e., they might be more
3  easily detected while they were planning, preparing, and executing a potential IDA).
4
5
6  **4.3.6  Ecological Resources**
7
8
9      **4.3.6.1  Vegetation**
10
11      Previous disturbance from exploration or mine development occurred in each of these
12  lease tracts; however, new exploration could occur in either disturbed or undisturbed areas of
13  these lease tracts. Exploration activities generally include drilling one or more bore holes for
14  geologic sampling followed by reclamation of the explored area. Impacts from exploration
15  would occur from the disturbance of vegetation and soils that could result from equipment
16  operation. In some areas, the removal of trees or shrubs might be necessary to provide access to
17  sampling locations. Impacts would include compaction of soils, disturbances to plants, and burial
18  of vegetation under waste material. Erosion and sedimentation could occur where soil
19  compaction or loss of biological soil crusts increased surface runoff, loosened soils were not
20  stabilized, or vegetation was removed. Impacts on ephemeral or intermittent drainages crossed
21  by heavy equipment could result in sediment deposition in downstream areas. Measures, such as
22  minimizing the extent of ground-disturbing activities, using existing roads, and avoiding steep
23  slopes and natural drainages, which are listed in Table 4.6-1, would mitigate potential impacts.
24  Exploration activities are expected to affect relatively small areas at each sampling location, and
25  impacts on vegetation would generally be short term, with recovery generally occurring within
26  5 years. The localized destruction of biological soil crusts, where present, would be considered a
27  longer-term impact, particularly where soil erosion had occurred. In either case, because of the
28  small areas involved relative to the extent of the affected plant communities and because most
29  impacts could be avoided and plant communities would be expected to fully recover from
30  remaining impacts, the impacts of exploration activities would be considered minor.
31
32      Under Alternative 3, it is assumed mine development and operations would occur in the
33  12 lease tracts and ground disturbance would range from 10 acres (4.0 ha) for small mines to
34  20 acres (8.1 ha) for a large mine, with the total being 100 acres (40 ha). In addition, the
35  210-acre (85-ha) open-pit mine at JD-7 would resume operations, resulting in a total of 310 acres
36  (130 ha) of disturbance under Alternative 3. Disturbance would be expected to extend over a
37  period of more than 10 years, prior to the initiation of reclamation activities. Direct impacts
38  associated with the development of mines would include the destruction of habitats during site
39  clearing and excavation as well as the loss of habitats at the locations of the waste-rock disposal
40  area (about one-third of the total area disturbed), soil storage areas, project facilities, and access
41  roads. Stored waste rock could contain up to 0.05% uranium. Based on the assumed
42  concentration of uranium (23.7 pCi/g) as well as other radionuclides that might be present in the
43  waste rock, the potential radiation exposure to plants would be below screening levels for
44  ecological risk (see Section 4.1.5.1). Storage areas for woody vegetation removed from project
45  areas during land clearing would affect additional areas. The area of direct effects is the area that
46  could be physically modified during mine development (i.e., where ground-disturbing activities

BLM_0042420

1    could occur) and includes the area of the 12 lease tracts. Although the loss of habitat would be
2    unavoidable, the plant communities that would be affected are generally common in the area.
3    Measures listed in Table 4.6-1, for example, would mitigate potential impacts, and impacts on
4    sensitive habitats would be minimized. Therefore, the impacts would be moderate.
5
6           The lease tracts included in Alternative 3 support a variety of vegetation types; however,
7    the predominant types are piñon-juniper woodland and shrubland and big sagebrush shrubland.
8    Some of the areas affected might include high-quality, mature habitats (i.e., habitats with few
9    weedy species and a high diversity of native species less tolerant of disturbance), which would
10   result in greater impact levels than the levels in previously degraded areas. Indirect impacts of
11   mining would be associated with fugitive dust, invasive species, erosion, sedimentation, and
12   impacts due to changes in surface water or groundwater hydrology or water quality. The area of
13   indirect effects includes the lease tracts and the area within 5 mi [8 km] of the lease tracts, where
14   ground-disturbing activities would not occur but that could be indirectly affected by activities in
15   the area of direct effects. The potential degree of indirect effects would decrease with increasing
16   distance from the lease tracts. This area of indirect effect was identified on the basis of
17   professional judgment and was considered sufficiently large to bound the area that would
18   potentially be subject to indirect effects.
19
20          Fugitive dust would be generated during site clearing, excavation, processing, and use of
21   access roads. Deposition of fugitive dust could reduce photosynthesis and productivity in plant
22   communities near project areas. Prolonged exposure to fugitive dust could alter a plant
23   community's composition, reducing the occurrence of species less tolerant of disturbance,
24   resulting in habitat degradation. Open-pit mines would generate more fugitive dust than would
25   underground mines, since most of the project area would consist of exposed soils, rock materials,
26   and operating mining equipment. Because fugitive dust would be produced throughout the life of
27   the project (more than 10 years), the deposition of fugitive dust would constitute a long-term
28   impact. Measures, such as the application of dust suppressants on roads, which are listed in
29   Table 4.6-1, would reduce the generation of fugitive dust. Plant communities would be expected
30   to fully recover from impacts of fugitive dust from underground mines, and impacts would be
31   minor. Impacts from open-pit mines, such as JD-7, would be moderate, however, since
32   unavoidable impacts (for example, from wind erosion) could occur but would not threaten the
33   persistence of affected plant communities.
34
35          Disturbed soils could provide an opportunity for the introduction and spread of invasive
36   species or noxious weeds. Seeds of these species could be inadvertently brought to a project site
37   from infested areas by vehicles or equipment used at the site. Invasive species or noxious weeds
38   might also colonize disturbed soils from established populations in nearby areas. Vehicle traffic
39   to and from mine sites might contribute to the spread of seeds of these species, expanding
40   populations along roadways. Invasive species or noxious weeds might alter fire regimes,
41   including increasing the frequency and intensity of wildfires, particularly as a result of the
42   establishment of annual grasses such as cheatgrass. Habitats that are not adapted to frequent or
43   intense fires could experience long-term effects, requiring decades to recover or being replaced
44   by non-native species. Monitoring the lease area regularly throughout all mining phases,
45   including intermittent mining phases, and controlling noxious weeds constitute a mitigation
46   measure used at some mine sites (JD-6, JD-8) to protect native plant communities.

BLM_0042421

1
2        Soils disturbed by land clearing or excavation might be subject to erosion. Soil erosion
3  might also occur in areas where biological soil crusts have been disturbed by equipment or foot
4  traffic (Belnap and Herrick 2006). The destruction of biological soil crusts could also alter
5  nutrient cycling and availability, reduce water infiltration, reduce germination of native species,
6  and increase the occurrence of non-native species, affecting plant community characteristics
7  (Fleischner 1994; Belnap et al. 2001; Gelbard and Belnap 2003; Rosentreter et al. 2007). Soil
8  compaction from the operation of heavy equipment could reduce the infiltration of precipitation
9  or snowmelt and result in increased runoff and subsequent erosion. Erosion could result in the
10 localized loss of plant communities in areas where surface soil materials were lost; this might
11 include areas outside the mine site. Effects might include mortality or reduced growth of plants,
12 changes in species composition, or reduced biodiversity. Species more tolerant of disturbance,
13 including invasive species, might become dominant in affected plant communities.
14
15       Reclamation activities under Alternative 3 would be similar to those described for
16 Alternative 1. Upland areas affected by grading would generally consist of previously disturbed
17 areas. Most of the reclamation would be associated with covering the waste-rock pile. Indirect
18 impacts associated with reclamation activities could include the deposition of fugitive dust,
19 erosion, sedimentation, the introduction of non-native species including noxious weeds, and the
20 introduction of new genetic strains of native species.
21
22       Measures, such as invasive species monitoring and eradication, avoiding natural
23 drainages, controlling runoff and sediment, and placing barriers around drainages and wetlands
24 (which are listed in Table 4.6-1) could mitigate potential indirect impacts associated with the
25 three mining phases considered under Alternative 3. Stormwater management plans and drainage
26 design plans developed for mining operations (e.g., JD-6, JD-8, CM-25, LP-21, SM-18, SR-11,
27 SR-13A) generally include BMPs for stormwater control to minimize soil erosion and
28 sedimentation, such as diversion ditches to direct off-site run-on from the mining areas, berms,
29 stormwater retention/sedimentation ponds, and other sediment and erosion prevention measures.
30 Impacts on plant communities from invasive species, erosion, sedimentation, and hydrologic
31 changes would be moderate since, although many impacts could be minimized, unavoidable
32 impacts (for example, unavoidable changes in drainage patterns or undetected invasive species)
33 could occur but would not threaten the persistence of affected plant communities. As described
34 in Section 4.1.6.1, impacts from reclamation activities would be expected to be minor.
35
36
37       **4.3.6.1.1 Wetlands and Floodplains.** Direct impacts would primarily affect upland plant
38 communities; however, wetlands present on project sites could also be affected. Federal agencies
39 are required by E.O. 11990, "Protection of Wetlands," to minimize the destruction, loss, or
40 degradation of wetlands and to preserve and enhance the natural and beneficial values of
41 wetlands. Impacts on jurisdictional wetlands (those under the regulatory jurisdiction of the
42 CWA, Section 404, and the USACE) would require permitting. Wetlands occur on each of the
43 lease tracts included in Alternative 3, as well as in immediate downstream areas. Streams located
44 within lease tracts, such as the Dolores River (Lease Tracts 13 and 13A) or Atkinson Creek
45 (Lease Tract 18), would not likely be directly affected because mines would be required to be
46 located at a distance from these streams (e.g., 1,300 ft [0.25 mi] from the Dolores River). Indirect

BLM_0042422

impacts on these streams, however, could occur. Indirect impacts of mining would be associated with fugitive dust, invasive species, erosion, sedimentation, and impacts due to changes in surface water or groundwater hydrology or water quality.

Soil compaction from the operation of heavy equipment could reduce the infiltration of precipitation or snowmelt and result in increased runoff and subsequent erosion. Erosion could result in the localized loss of plant communities in areas where topsoil was lost and might include areas outside the mine site. Erosion might result in sedimentation in downgradient wetland habitats and increased sediment deposition in ephemeral drainages or riparian habitats of receiving streams. Effects might include mortality or reduced growth of plants, changes in species composition, or reduced biodiversity. Species more tolerant of disturbance, including invasive species, might become dominant in affected plant communities. As noted in Section 4.3.6.1 above, BMPs for stormwater control are designed to minimize erosion and sedimentation.

Changes in surface drainage patterns, such as the elimination of ephemeral drainages or other changes in runoff patterns, could alter hydrologic characteristics of downstream wetland or riparian habitats and could result in changes in plant community composition or distribution. For example, the drainages associated with Atkinson Creek in Lease Tract 18 and the Dolores River in Lease Tracts 13 and 13A, are upstream of wetlands located in those streams. Increases in the volumes or velocities of flows could result in the erosion of substrates or vegetation in downstream habitats, while decreased flows could result in desiccation of habitats. Underground mines would be less likely to result in large changes to surface water flow patterns and associated impacts on plant communities than would open-pit mines, which cause extensive modifications to landscape surfaces. Waste-rock storage for underground mines, however, could disrupt surface drainage patterns over a large area. Leachate from waste-rock storage areas could result in impacts on the quality of surface water or groundwater and affect downgradient habitats. Groundwater pumped from mines could affect habitats receiving surface water flows as a result of reduced water quality or increased flow velocities or volumes.

Mining operations could affect groundwater flows if excavations intercepted groundwater resources. Reductions in groundwater flows could affect downgradient habitats that depend on groundwater discharges (such as springs, seeps, or within streams with flows supplemented or maintained by groundwater). Plant communities could be degraded as a result of reductions in water availability. For example, Lease Tracts 13, 13A, and 14 likely include shallow alluvial aquifers of the Dolores River that may be intercepted by a mine excavation. Measures, such as plugging open drill portals and areas around vent shafts (which are listed in Table 4.6-1), could mitigate potential impacts. See Section 4.3.4 for a thorough discussion of potential impacts on groundwater flow. Impacts on groundwater flows would be small and would result in minor impacts on downgradient habitats, which would be expected to fully recover.

### 4.3.6.2  Wildlife

Potential impacts on wildlife from exploration would primarily result from disturbance (e.g., due to equipment and vehicle noise and the presence of workers). Impacts would generally

BLM_0042423

1   be temporary and at a smaller scale than those that occur during other phases (i.e., mine
2   development and operations and reclamation). Some mortality to less mobile wildlife could
3   occur at the exploration sites, and vehicles could hit wildlife.
4
5          The following discussion provides an overview of the potential impacts on wildlife that
6   could result from the development and operation of mines. On-site activities could include the
7   (1) placement, construction, and operation of surface components and (2) mine development and
8   operations. Off-site activities could include the construction and use of access roads and utilities,
9   as necessary. The overall impact of mine development and operational activities on wildlife
10  populations at a lease tract site would depend on the types and amounts of wildlife habitat
11  affected by a given stressor, the length of time that the effects persist, and the species of wildlife
12  that inhabit or utilize the mine site and surrounding areas. Impacts on wildlife could occur from
13  habitat disturbance, wildlife disturbance, and wildlife injury or mortality.
14
15         As described in mine permit amendment applications, the lessee will consult with the
16  BLM, USFWS, and/or CPW prior to surface-disturbing activities to determine if the agencies
17  have concerns regarding wildlife in the area to be disturbed (Cotter Corp. 2011, 2012a–g). If
18  required, the lessee shall conduct surveys or provide other documentation regarding the
19  presence of the wildlife species of concern. The lessee shall conduct all operations so as to
20  protect all natural resources and the environment, including aquatic habitats and fish and
21  wildlife resources, as required by applicable statutes and regulations. The lessee shall control
22  all mine wastes, contaminants, pollutants, and sediments associated with stormwater runoff in
23  accordance with existing regulations, and the lessee shall comply with all environmental
24  regulations regarding discharge into or degradation of water resources.
25
26
27         **4.3.6.2.1 Habitat Disturbance.** Mine development and operations would affect wildlife
28  through habitat reduction, alteration, and fragmentation. Habitats within the construction
29  footprint of the projects, utility ROWs, access roads, and other infrastructure would be destroyed
30  or disturbed. Direct impacts resulting from mine development could include destruction of
31  habitats from site clearing and excavation, storage of waste-rock and surface soil materials,
32  placement of project facilities, development of access roads, and, as necessary, clearing for
33  utility lines. The 310 acres (130 ha) disturbed for the eight mine sites during the peak year of
34  operations is 3.4% of the total acreage of the 12 lease tracts now considered under Alternative 3
35  (Lease Tracts 7 and 7A have been combined into a single Lease Tract 7) and 1.2% of the total
36  acreage of DOE's lease program. This acreage includes the 210 acres (85 ha) of this total that is
37  a previously disturbed area for the JD-7 open-pit mine site. The remainder of the lease tracts
38  (excluding areas where access roads and utility corridors could be required) would be
39  undisturbed by mining activities under Alternative 3.
40
41

BLM_0042424

1    Habitat reduction could result in a long-term (e.g., decades-long) decrease in wildlife
2  abundance and richness within a mine-site area. Species affected by habitat reduction might be
3  able to shift their habitat use. However, the habitat into which displaced individuals moved might
4  not be able to sustain an increased level of use. Many of the individuals that would make use of
5  areas adjacent to a development could be subjected to increased physiological stress as a result of
6  complications from overcrowding (e.g., increased competition for space and food, increased
7  vulnerability to predators, and increased potential for the propagation of diseases and parasites)
8  (Edge Environmental, Inc. 2009). Areas used by wildlife before development can be considered
9  preferred habitat. Thus, observed shifts in areas used because of development would be toward
10  less preferred and presumably less suitable habitats (Sawyer et al. 2006).
11
12    Overcrowding of species such as mule deer (*Odocoileus hemionus*) in winter ranges
13  could cause density-dependent effects, such as increased fawn mortality (Sawyer et al. 2006). All
14  of the Alternative 3 lease tracts and all but Lease Tract 11 are within the winter range for mule
15  deer and elk (*Cervis canadensis*), respectively. Lease Tracts 8, 9, 11, 13, and 13A are within the
16  winter range for the desert bighorn sheep. Hobbs (1989) determined that the mortality of mule
17  deer does during a severe winter period could double if they were disturbed twice a day and
18  forced to move a minimum of 1,500 ft (460 m) per disturbance. Most mine development would
19  probably occur during warmer seasons, which would minimize disturbance to big game during
20  winter. Mine development would likely not occur during severe winter conditions when impacts
21  on big game would be of most concern (WEST, Inc. 2007). Among the Alternative 3 lease tracts,
22  Lease Tracts 7, 13, 13A, 15, 18, 21, and 25 contain severe winter range for mule deer, while all
23  of the lease tracts except Lease Tract 11 contain severe winter range for elk. While none of the
24  lease tracts occur within severe winter range for the desert bighorn sheep, Lease Tracts 11, 13,
25  and 13A occur within a winter concentration area. Expanded uranium mining within the Dolores
26  River corridor could have adverse impacts on continued unrestricted movement of desert bighorn
27  sheep between the upper Dolores and middle Dolores populations. Exclusion of new mining and
28  other surface-disturbing activities within 0.25 mi (0.4 km) of the river would minimize impacts
29  on the desert bighorn sheep movement corridor.
30
31    Although habitats adjacent to a mine site might remain unaffected, wildlife might tend to
32  make less use of these areas (primarily because of the disturbance that would occur within the
33  project site). This impact is an indirect habitat loss and could affect a greater area than would
34  direct habitat loss (Sawyer et al. 2006). A utility line might also lead to a loss of usable feeding
35  areas for those species that avoid the close proximity of these facilities due to their use by
36  predators (BirdLife International 2003). For example, common ravens (*Corvus corax*) and some
37  birds of prey might become more common along utility lines because of the presence of perch
38  and nest sites (Knight and Kawashima 1993). Use of anti-perching devices could minimize such
39  impacts (see Section 4.6, Table 4.6-1). Access roads can affect wildlife by increasing mortality,
40  modifying behavior, altering habitat, and helping to spread nonindigenous plants (Ingelfinger
41  and Anderson 2004). Even along roads driven on by fewer than 12 vehicles per day, Ingelfinger
42  and Anderson (2004) observed the density of sagebrush obligate bird species to be reduced
43  within a 330-ft (100-m) access road zone. The relative abundance of the horned lark (*Eremophila*
44  *alpestris*), a grassland species, increased in the access road zone due to an increase in forage
45  (windblown seeds) that collected along the road (Ingelfinger and Anderson 2004).
46

BLM_0042425

1    Mine development and operational activities could also result in increased erosion and
2  runoff from freshly cleared and graded sites. The potential for erosion and the resulting sediment
3  loading of nearby aquatic or wetland habitats would be proportional to the amount of surface
4  disturbance, the condition of disturbed lands at any given time, and the proximity to the aquatic
5  or wetland habitats. The potential for water quality impacts during construction would be short
6  term, lasting until disturbed surface soil materials were stabilized (e.g., from the use of BMPs to
7  control erosion or the reestablishment of ground cover; see Table 4.6-1, Section 4.6). Although
8  the potential for runoff would be temporary, erosion could result in impacts on local amphibian
9  populations, particularly if an entire recruitment class was eliminated (e.g., complete recruitment
10  failure could occur in a given year because of the siltation of eggs or mortality of aquatic larvae).
11  The impacts of sedimentation on amphibians could be heightened if the sediments contained
12  toxic materials (Maxell 2000). The red-spotted toad (*Bufo punctatus*) is the amphibian species
13  most likely to be affected.
14
15    Habitat disturbance could also facilitate the spread and introduction of invasive plant
16  species by altering existing habitat conditions, stressing or removing native plant species, and
17  allowing easier movement by wildlife or human vectors (Trombulak and Frissell 2000). Wildlife
18  habitat could be adversely affected if invasive vegetation became established in the construction-
19  disturbed areas and adjacent off-site habitats. This could adversely affect wildlife occurrence and
20  abundance.
21
22    Increased human activity could increase the potential for fires. In general, short-term and
23  long-term effects of fire on wildlife are related to impacts on vegetation, which, in turn, affect
24  habitat quality and quantity, including the availability of forage and shelter. Long-term changes
25  in vegetation from a fire (such as loss of sagebrush or the invasion or increase of non-native
26  annual grasses) might affect food availability and the quality and quantity of available wildlife
27  habitats; the changes could also increase the risk from predation for some species (Groves and
28  Steenhof 1988; Sharpe and Van Horne 1998; Lyon et al. 2000b; Knick and Dyer 1997;
29  Schooley et al. 1996).
30
31    Raptor populations generally are unaffected by, or respond favorably to, burned habitats
32  (Lyon et al. 2000b). In the short term, fires could benefit raptors by reducing cover and exposing
33  prey; raptors might also benefit if prey species increased in response to post-fire increases in
34  forage (Lyon et al. 2000b). Direct mortality of raptors from fire is rare (Lehman and
35  Allendorf 1989). Most adult birds can escape fires, while fires during the nesting season (prior to
36  fledging) might kill young birds, especially those from ground-nesting species. Fires in wooded
37  areas, such as piñon-juniper woodlands, could decrease the populations of raptors that nest in
38  these habitats.
39
40    The very large mine site contains mostly barren ground and partially grassed habitats; the
41  other mine sites could be located in areas dominated by piñon-juniper woodlands and sagebrush
42  habitats. Loss of 310 acres (130 ha) of these habitats spread throughout the lease tracts would be
43  considered a minor to moderate impact, since an abundance of such habitats occurs in the region
44  and since many of the wildlife species that could potentially be affected are habitat generalists
45  that could inhabit other areas in the region. Impacts to sagebrush obligates or species that prefer
46  sagebrush habitats, such as the sage sparrow (*Amphispiza belli*) and sage thrasher (*Oreoscoptes*

BLM_0042426

1   *montanus*), would also be expected to be minor to moderate, since only small areas would be
2   disturbed for individual mines sites and since sagebrush habitats make up less than 10% of the
3   habitat types within the lease tracts (Section 3.6.1).
4
5
6       **4.3.6.2.2  Wildlife Disturbance.** During mine development and operations, wildlife
7   disturbance could be of greater concern than habitat loss (Arnett et al. 2007). The response of
8   wildlife to disturbances caused by noise and human presence would be species-specific.
9   Responses for a given species could be affected by the physiological or reproductive conditions
10  of individuals; their distance from the disturbance; and the type, intensity, and duration of the
11  disturbance. Wildlife could respond to a disturbance in various ways, including attraction,
12  habituation, or avoidance (Knight and Cole 1991). All three behaviors can be considered adverse
13  impacts. Wildlife might cease foraging, mating, or nesting near areas where the disturbance
14  occurred. There could even be a temporary interference to migration routes due to increased
15  human activity. For example, disturbance near active sage grouse leks could lead to lek
16  abandonment, displacement, and reduced reproduction. In contrast, wildlife such as bears, foxes,
17  and squirrels can habituate to disturbances and might be attracted to human activities, primarily
18  when a food source was accidentally or deliberately made available.
19
20      Regular or periodic disturbance during mine development and operations could cause
21  adjacent areas to be less attractive to wildlife and result in a reduction of wildlife use in areas
22  exposed to a repeated variety of disturbances such as noise. Principal sources of noise would
23  include vehicle traffic, the operation of heavy equipment, blasting, and ventilation fans. The
24  average noise levels from most heavy equipment range from 74 to 90 dBA at 50 ft (15 m), while
25  the noise level from a ventilation fan would be about 70 dBA at 50 ft (15 m) (Section 4.3.2.2).
26  Noise levels would drop to 40 dBA at a distance of 1 mi (1.6 km). Negative impacts on wildlife
27  begin at 55 to 60 dB, a level that corresponds to the onset of adverse physiological impacts
28  (Barber et al. 2010). As discussed in Section 4.3.2.2, these levels would be limited up to
29  distances of 1,650 ft (500 m) from the mine sites and 120 ft (37 m) from the haul routes.
30  However, there is the potential for behavioral effects to occur at lower noise levels
31  (Barber et al. 2011). Sound levels above 90 dB are likely to adversely affect wildlife
32  (Manci et al. 1988). The potential effects of noise on wildlife include acute or chronic
33  physiological damage to the auditory system, increased energy expenditures, physical injury
34  incurred during panicked responses, interference with normal activities (e.g., feeding), breeding
35  activities (e.g., lekking behavior), and impaired communication (AMEC Americas Limited 2005;
36  Habib et al. 2007; Larkin 1996; Manci et al. 1988; Pater et al. 2009; Salt and Hullar 2010;
37  USFWS 2011c). The response of wildlife to noise would vary by species; physiological or
38  reproductive condition; distance; and the type, intensity, and duration of disturbance
39  (BLM 2002). Unpredictable, erratic, or sudden sounds (e.g., blast noise) may cause site
40  abandonment or decreases in population numbers because the sounds are perceived as threats
41  (Francis and Barber 2013). Regular or periodic noise could cause adjacent areas to be less
42  attractive to wildlife and result in a long-term reduction in use by wildlife in those areas.
43  However, wildlife can habituate to noise (Krausman et al. 2004). Also, the cause of the observed
44  reaction in wildlife could be the visual element of the event rather than the auditory component,
45  or it could be both components (AMEC Americas Limited 2005).
46

BLM_0042427

1    Vehicle noise might affect the ability of amphibians to hear calls and locate breeding
2    aggregations (Maxell 2000). However, plasticity in vocalizations could allow maintenance of
3    acoustic communications in the presence of traffic noise (Cunnington and Fahrig 2010).
4
5    Much of the research on wildlife-related noise effects has focused on birds. This research
6    has shown that noise might affect territory selection, territorial defense, dispersal, foraging
7    success, fledging success, and song learning (e.g., Reijnen and Foppen 1994; Foppen and
8    Reijnen 1994; Larkin 1996). Responses of birds to disturbance often involve activities that are
9    energetically costly (e.g., flying) or affect their behavior in a way that might reduce food intake
10   (e.g., shift away from a preferred feeding site) (Hockin et al. 1992). A variety of adverse effects
11   of noise on raptors have been demonstrated, but for some species, the effects were temporary,
12   and the raptors became habituated to the noise (Brown et al. 1999; Delaney et al. 1999). Noise
13   can reduce bird nesting success and alter species interactions, resulting in different avian
14   communities (Francis et al. 2009). On the basis of a review of the literature by Hockin et al.
15   (1992), the effects of disturbance on bird breeding and breeding success include reduced nest
16   attendance, nest failures, reduced nest building, increased predation on eggs and nestlings, nest
17   abandonment, inhibition of laying, increased absence from the nest, reduced feeding and
18   brooding, exposure of eggs and nestlings to heat or cold, retarded chick development, and
19   lengthening of the incubation period. The most adverse impacts associated with noise could
20   occur if critical life-cycle activities were disrupted (e.g., mating and nesting). For instance,
21   disturbance of birds during the nesting season can result in nest or brood abandonment. The eggs
22   and young of displaced birds would be more susceptible to cold or predators.
23
24   During winter, the average mean flush distance for several raptor species was 390 ft
25   (120 m) from people walking and 250 ft (75 m) from vehicles (Holmes et al. 1993). Disturbance
26   from light traffic (e.g., 1 to 12 vehicles per day) during the breeding season might reduce nest-
27   initiation rates and increase distances moved from sage grouse leks during nest site selection
28   (Lyon and Anderson 2003). The density of sagebrush obligate passerines was reduced 39– 60%
29   within a 330-ft (100-m) buffer around dirt roads with traffic volumes ranging from 10 to
30   700 vehicles/day. However, traffic volumes alone might not explain the observed effect. The
31   birds might also have been responding to edge effects, habitat fragmentation, and increases in
32   other passerine species along the road corridors. Thus, declines might persist even after traffic
33   subsides, lasting until the road areas are reclaimed and fully vegetated (Ingelfinger and
34   Anderson 2004).
35
36   Various adverse effects of noise on raptors occur, but for some species, the effects are
37   temporary as the raptors habituate to the noise (Brown et al. 1999; Delaney et al. 1999). As
38   reviewed by Hockin et al. (1992), the effects of noise disturbance on bird breeding and breeding
39   success include reduced nest attendance, nest failures, reduced nest building, increased predation
40   on eggs and nestlings, nest abandonment, inhibition of laying, increased absences from the nest,
41   reduced feeding and brooding, exposure of eggs and nestlings to heat or cold, retarded chick
42   development, lengthened incubation period, increased physiological stress, increased energy
43   expenditures, habitat avoidance, decreased population or nesting densities, altered species
44   composition, and disruption and disorientation of movements. The most severe impacts
45   associated with noise could occur if critical life-cycle activities were disrupted (e.g., mating and

BLM_0042428

1   nesting). For instance, disturbance of birds during the nesting season could result in nest or brood
2   abandonment.
3
4           Mule deer and elk have been reported to respond at a distance of 3,300 ft (1,000 m) or
5   more from roads on which more than one vehicle is driven per day (Gaines et al. 2003).
6   However, big game species such as mule deer can habituate to and ignore motorized traffic,
7   provided they are not pursued (Yarmoloy et al. 1988). Harassment, an extreme type of
8   disturbance caused by intentional actions to chase or frighten wildlife, generally increases the
9   magnitude and duration of displacement. As a result, there is a greater potential for physical
10  injury from fleeing and higher metabolic rates due to stress. Bears can habituate to human
11  activities, particularly moving vehicles, making them more vulnerable to legal and illegal harvest
12  (McLellan and Shackleton 1988).
13
14          Noise from traffic and other sources can interfere with bat echolocation (Jones 2008),
15  while blasting during mine construction and operations can disrupt roosting bats
16  (Brown et al. 2000).
17
18          Lighting could also disturb wildlife in the mine area. Lights directly attract migratory
19  birds (particularly in inclement weather and during other low-visibility conditions), and they
20  could indirectly attract birds and bats by attracting flying insects.
21
22
23          **4.3.6.2.3  Wildlife Injury or Mortality.** Clearing, grading, mining, mine spoils
24  placement, vehicles, and other mine development and operational activities could result in direct
25  injury to or the death of less mobile wildlife species (e.g., reptiles, small mammals) or those that
26  inhabit burrows or mines. If clearing or other ground-disturbing activities occurred during the
27  spring and summer, bird nests and eggs or nestlings could be destroyed, which could be a
28  violation of the Migratory Bird Treaty Act. Although more mobile wildlife species, such as big
29  game and adult birds, can avoid mine development and operational activities by moving to
30  adjacent areas, it is conservatively assumed that adjacent habitats would be at carrying capacity
31  for the species that live there and could not support additional individuals from the mine areas
32  for an extended period of time. As previously mentioned, competition for resources in adjacent
33  habitats might preclude the incorporation of the displaced individuals into the resident
34  populations.
35
36          Direct mortality from vehicle collisions could occur along access and haul roads,
37  especially in wildlife concentration areas or migration corridors. When roads cut across
38  migration corridors, the effects can be dangerous for both animals and humans. No mapped
39  migration corridors for big game species occur on any of the lease tracts (Section 3.6.2.3).
40  Amphibians, being somewhat small and inconspicuous, are vulnerable to road mortality when
41  they migrate between wetland and upland habitats; reptiles are vulnerable on roads they use for
42  thermal cooling and heating. Sage grouse are susceptible to road mortality in spring because they
43  often fly to and from leks near ground level. They are also susceptible to vehicular collisions
44  along dirt roads because they sometimes use them to take dust baths. In general, the species most
45  vulnerable to vehicle collisions are day-active, slow-moving species (Hels and Buchwald 2001).
46  However, road kills rarely cause population-level impacts. The avoidance of habitats near roads,

BLM_0042429

1   especially due to traffic noise, tends to have a greater ecological impact than does mortality from
2   vehicular collisions (Forman and Alexander 1998). Ore haul trucks generally travel at slow
3   speeds on unpaved, narrow, winding county or other dirt roads (i.e., Colorado speed limit on
4   winding, narrow mountain highways and blind curves is 20 mph or 32 km per hour
5   [Salek 2011]), which would minimize their potential to collide with big game.
6
7        Little information is available about the effects of fugitive dust on wildlife; however, if
8   the exposure was of sufficient magnitude and duration, the effects could be similar to those on
9   humans (e.g., breathing and respiratory symptoms, including dust pneumonia). A more probable
10  effect would be the dusting of plants, which could make forage less palatable. The highest rates
11  of dust deposition would generally occur within the area where wildlife would be disturbed by
12  human activities). Dusting impacts could be potentially more pervasive along unpaved access
13  roads. Use of calcium or magnesium chloride to control road dust could desiccate amphibians
14  crossing roads, while the use of oils could contaminate aquatic habitats (Maxell 2000). With use
15  of appropriate BMPs to control dust (see Section 4.6), fugitive dust is not expected to result in
16  any population-level effects to wildlife. Potential effects of radionuclides, which could be
17  associated with dust at mine sites, are discussed later in this section.
18
19        As previously mentioned, increased human activity could increase the potential for fires.
20  While individuals caught in a fire could incur increased mortality, depending on how quickly the
21  fire spread, most wildlife would likely escape by either outrunning the fire or seeking
22  underground or aboveground refugia within the fire (Ford et al. 1999; Lyon et al. 2000a).
23  However, some mortality of burrowing mammals from asphyxiation has been reported (Erwin
24  and Stasiak 1979).
25
26        Overhead electrical lines, rather than generators, might be used at mine sites located near
27  existing electrical lines. Some birds, especially raptors, are susceptible to electrocution on power
28  lines. However, the potential for electrocution should be negligible since modern power lines
29  designs minimize such risks (e.g., adequate spacing between conductors and use of appropriate
30  insulation). The potential for bird collisions with utility lines depends on variables such as
31  habitat, the relationship of the line to migratory flyways and feeding flight patterns, the
32  migratory and resident bird species present, and the structural characteristics of the lines. Birds
33  that migrate at night, fly in flocks, and/or are large and heavy with limited maneuverability are
34  particularly at risk (BirdLife International 2003). Waterfowl, wading birds, shorebirds, and
35  passerines are most vulnerable to colliding with transmission lines near wetlands, while raptors
36  and passerines are most susceptible in habitats away from wetlands (Faanes 1987). Sage grouse
37  and other upland game birds are potentially vulnerable to colliding with utility lines, in part
38  because they lack good visual acuity (Bevanger 1995). Of highest concern with regard to bird
39  collisions are locations where utility lines span flight paths, such as river valleys, wetland areas,
40  lakes, areas between waterfowl feeding and roosting areas, and narrow corridors (e.g., passes that
41  connect two valleys). Young inexperienced birds, as well as migrants in unfamiliar terrain,
42  appear to be more vulnerable to wire strikes than are resident breeders. Also, many species
43  appear to be most highly susceptible to collisions when alarmed, pursued, searching for food
44  while flying, engaged in courtship, taking off, and landing, and during the night and inclement
45  weather (BirdLife International 2003).
46

BLM_0042430

Although they are not immune to collisions, raptors have several attributes that decrease their susceptibility to collisions with utility lines: (1) they have keen eyesight; (2) they soar or fly by using relatively slow, flapping motions; (3) they can generally maneuver while in flight; (4) they learn to use utility poles and structures as hunting perches or nests and become conditioned to the presence of lines; and (5) they do not fly in groups (like waterfowl), so their position and altitude are not determined by other birds. Therefore, raptors are not as likely to collide with utility lines except when they are distracted (e.g., while pursuing prey) or when other environmental factors (e.g., adverse weather conditions such as heavy fog or snowfall) increase their susceptibility (Olendorff and Lehman 1986).

Electrocution of raptors or other birds would not be expected if the spacing between the conductors or between a conductor and a ground wire or other grounding structure exceeds the wingspan of bald eagles (*Haliaeetus leucocephalus*) and golden eagles (*Aquila chrysaetos*), the largest birds that occur in southwestern Colorado and that perch on electrical line support structures. Although it is a rare event, electrocution can occur during current arcing when flocks of small birds cross an electrical line or when several roosting birds take off simultaneously. This is most likely to occur in humid weather conditions (Bevanger 1995; BirdLife International 2003). Arcing can also occur from the waste streams of large birds roosting on the crossarms above insulators (BirdLife International 2003). The electrocution of other wildlife from contact with electrical lines is even less common; it occurs more often on smaller distribution lines and at substations. Nonavian wildlife species such as snakes, squirrels, and raccoons can also be electrocuted on smaller distribution lines and at substations. Even electrocutions of cougars (*Puma ancelar*) have been reported (Thompson and Jenks 2007). Because electrocution is a relatively rare event, population-level effects are not expected.

The potential effects of electromagnetic field (EMF) exposure on animal behavior, physiology, endocrine systems, reproduction, and immune functions have been found to be negative, very minor, or inconclusive (WHO 2007). Generally, these results are for exposures much higher and longer than would be encountered by wildlife under actual field conditions. Also, there is no evidence that EMF exposure alone causes cancer in animals, and the evidence that EMF exposure in combination with known carcinogens can enhance cancer development is inadequate (WHO 2007).

Utility lines could provide perch sites for raptors and corvids (e.g., ravens, crows, and magpies), thereby increasing predatory levels on other wildlife (e.g., small mammals, gallinaceous birds). Utility support structures could also protect some bird species from mammalian predators, range fires, and heat (Steenhof et al. 1993).

A potential source of injury or mortality to wildlife would include exposure to contaminants such as herbicides, fuel, or other chemicals (e.g., lubricating oils). Potential exposure to chemical materials would most likely occur from a spill. A spill could result in direct contamination of individual animals, contamination of habitats, and contamination of food resources. Potential impacts on wildlife from exposure to fuel spills or accidental releases of other chemicals would vary according to the chemical spilled, volume of the spill, location of the spill, and the exposed species. A spill could have a population-level adverse impact if the spill was very large or if it contaminated a crucial habitat area where a large number of individual

BLM_0042431

animals were concentrated. The potential for either event is very unlikely. In addition, wildlife near the mine sites would be limited, since there would be disturbances there related to mine development and operations, which would thus greatly reduce the potential for wildlife to be present and get exposed to contaminants. Furthermore, a spill prevention and response plan would be required, work crews would be trained in spill response, and materials required for spill cleanup would be kept on hand. Prompt spill response should minimize potential impacts on wildlife. As mentioned in mine permit amendment applications, if a fuel tank is used at a mine site, it would be located within a lined containment area adequate to contain 120% of the tank volume (Cotter Corp. 2011, 2012a–g).

Mining activity might increase the exposure of wildlife to uranium and other radioactive decay products and to other chemical elements. Negative impacts on terrestrial invertebrates, birds, and mammals from uranium radionuclides occur from 0.2 to 40 mGy/h, 0.14 to 40.0 mGy/h, and 0.004 to 40.0 mGy/h, respectively (Hinck et al. 2010). The potential magnitude of impacts would be influenced by life history strategy, habitat requirements, and the mass of the organism (Hinck et al. 2010). Some birds might be at greater risk to radiation exposure than other wildlife due to their foraging and ingestion of grit, which increases the radiation dose (Driver 1994). Species that spend considerable amounts of time underground in caves, mines, or burrows could potentially inhale, ingest, or be directly exposed to uranium and other radionuclides while digging, eating, preening, and/or hibernating. Herbivores could also be exposed by ingesting radionuclides that aerially deposited on vegetation or concentrated in surface waters at or near mine sites (BLM 2011b). As discussed in Section 4.1.6.2, the average concentration of radionuclides in the waste-rock piles and, presumably, in the mine would be less than the biota concentration guidelines; although in isolated hot spots, concentrations may be several times higher than recommended guidelines.

Water treatment ponds may be used at some of the mine sites. These bodies of water could attract a number of wildlife species, including waterfowl and shorebirds at mines located near the San Miguel or Dolores Rivers. While providing a potential source of water and prey (e.g., aquatic invertebrates), the treatment ponds may have elevated levels of contaminants, such as total dissolved solids and selenium, that could result in adverse impacts on wildlife. Also, the ponds could potentially provide habitat for mosquitoes that are vectors of West Nile virus, which is a significant stressor on sage grouse and other at-risk bird species (Naugle et al. 2004).

As stated in the mine permit amendment applications (Cotter Corp. 2011, 2012a–g), uranium ore and waste rock are not designated as chemicals, nor do they generate designated chemicals. They are regarded under the Hard Rock Rule 1.1(I) as potentially acid- and toxic-producing materials. Common minerals for uranium ores (carnotite, tyuyamunite, and uraninite [pitchblende]) lack sulfides. Thus, there are no acid-forming properties of uranium minerals like those of metal minerals. Any acid pyrite produced by pyrite deposition would be quickly neutralized by alkalinity released from carbonate minerals in associated waste rock.

During uranium mining operations, excavated subsurface materials are exposed to oxidative conditions that can elevate the potential levels of bioavailable selenium that could enter the food chain (Sharmasarkar and Vance 2002). Selenium is a nutritionally required trace element, but it can become toxic at concentrations only twice those required (Lemly 1997). Diet

BLM_0042432

1    is the primary pathway of selenium exposure (Chapman et al. 2009). Skorupa and Ohlendorf
2    (1991) reported that water with a selenium concentration of >20 µg/L is hazardous to aquatic
3    birds. Chronic exposure to selenium can suppress the immune system in birds (Fairbrother et al.
4    1994), which can make them more susceptible to disease and predation. Selenium exposure can
5    also cause embryonic deformities and mortality (Chapman et al. 2009; See et al. 1992; Skorupa
6    and Ohlendorf 1991). Overall, a waterborne selenium concentration ≥2 µg/L is detrimental to the
7    survival of wildlife due to the high potential for food chain bioaccumulation, dietary toxicity, and
8    reproductive effects (Lemly 1997). A concentration of 3 to 20 µg/L can be considered
9    peripherally hazardous to aquatic birds, and concentrations of >20 µg/L can be considered
10   widely hazardous (Skorupa and Ohlendorf 1991).

12        Salinity concentrations may increase at retention and sedimentation ponds as water
13   evaporates and ultimately result in the accumulation of evaporates/precipitates.
14   Windingstad et al. (1987) reported salt toxicosis in waterfowl inhabiting a lake with sodium
15   concentrations of >17,000 mg/L, while Gordus et al. (2002) and Wobeser and Howard (1987)
16   reported bird mortalities at hypersaline lakes with conductivities of >70,000 µmhos/cm. Salt
17   toxicosis is associated with high sodium concentrations in the brain. Birds can suffer from
18   general dehydration, hemorrhages, salt encrustation of feathers, ocular lens opacity and
19   cataract formation, acute muscle degeneration, and eventual mortality (Gordus et al. 2002;
20   Meteyer et al. 1997).

22        Fencing and netting of the ponds that contain high concentrations of contaminants such
23   as selenium or salts are the best management practice for providing barriers that prevent
24   exposure of birds and other wildlife and for avoiding take under the Migratory Bird Treaty Act
25   (see the USFWS BO in Appendix E). It is mentioned in mine permit amendment applications
26   that a fence around the ponds would minimize wildlife access, and that the ponds are treated and
27   would not pose a threat to wildlife (Cotter et al. 2011, 2012a–g). The need to net the ponds could
28   be decided through a consultation among the USFWS, CPW, and the lessee prior to mine
29   operations.

32        **4.3.6.2.4  Summary of Common Impacts on Wildlife.** Overall, impacts from site
33   characterization, construction, operations, and reclamation of mines under Alternative 3
34   (including access roads and transmission lines) on wildlife populations would depend on the
35   following:

37   • The type and amount of wildlife habitat that would be disturbed;

39   • The nature of the disturbance;

41   • The wildlife that occupied the mine site and surrounding areas; and

43   • The timing of construction activities relative to the crucial life stages of
44      wildlife (e.g., breeding season).

46        Table 4.3-6 summarizes the potential impacts on wildlife species resulting from
47   Alternative 3. Impacts on wildlife from reclamation activities would be similar to those described

BLM_0042433

1

**TABLE 4.3-6  Summary of Potential Impacts on Wildlife Associated with Alternative 3**

| Impacting Factor | Project Phase | Consequence | Expected Relative Impact[a] for Different Wildlife[b] | | | | Ability to Mitigate Impacts[c] |
|---|---|---|---|---|---|---|---|
| | | | Negligible | Minor | Moderate | Large | |
| ***Individual Impacting Factor[d]*** | | | | | | | |
| Alteration of topography and drainage patterns | Construction, operations | Changes in surface temperature, soil moisture, and hydrologic regimes, and distribution and extent of aquatic, wetland, and riparian habitats; erosion; changes in groundwater recharge; spread of invasive species. | None | Amphibians, reptiles, birds, mammals | None | None | Can be mitigated by avoiding development of drainages and using appropriate stormwater management strategies. |
| Human presence and activity | Site characterization, construction, operations, reclamation | Behavioral disturbance, harassment, nest abandonment, avoidance of areas, territory adjustments, reduction in carrying capacity. | None | Amphibians, reptiles, small mammals | Birds, large mammals | None | Can be mitigated during site characterization and construction by timing activities to avoid sensitive periods. Difficult to mitigate impacts during operations. |
| Blockage of dispersal and movement | Construction, operations | Genetic isolation, loss of access to important habitats, reduction in diversity, reduction in carrying capacity. | None | Amphibians, reptiles, small mammals | Large mammals | None | Can be mitigated by restricting project size, avoiding important movement corridors. |
| Erosion | Construction, operations, reclamation | Habitat degradation; loss of plants; sedimentation of adjacent areas especially aquatic, wetland, systems, loss of productivity; reduction in carrying capacity; spread of invasive species. | None | Amphibians, reptiles, birds, mammals | None | None | Easily mitigated with standard erosion control practices. |

2

BLM_0042434

**TABLE 4.3-6  (Cont.)**

| Impacting Factor | Project Phase | Consequence | Expected Relative Impact[a] for Different Wildlife[b] | | | | Ability to Mitigate Impacts[c] |
|---|---|---|---|---|---|---|---|
| | | | Negligible | Minor | Moderate | Large | |
| ***Individual Impacting Factor[d] (Cont.)*** | | | | | | | |
| Equipment noise | Site characterization, construction, operations, reclamation | Behavioral disturbance, harassment, nest abandonment, avoidance of areas, territory adjustments, reduction in carrying capacity. | None | Amphibians, reptiles, small mammals | Birds, large mammals | None | Can be mitigated using mufflers and other sound-dampening devices. |
| Fugitive dust | Site characterization, construction, operations, reclamation | Decrease in photosynthesis, reduction in productivity, increase turbidity and sedimentation in aquatic habitat, spread of invasive species. | None | Amphibians, reptiles, birds, mammals | None | None | Can be mitigated by retaining vegetative cover, soil covers, or soil stabilizing agents. |
| Groundwater withdrawal | Construction, operations | Change in hydrologic regime, reduction in surface water, reduction in soil moisture, reduction in productivity. | None | Amphibians, reptiles, birds, mammals | None | None | Can be mitigated by reducing water consumption requirements or altering water source. |
| Habitat fragmentation | Construction, operations | Genetic isolation, loss of access to important habitats, reduction in diversity, reduction in carrying capacity, spread of invasive species. | None | Amphibians, reptiles, birds, small mammals | Large mammals | None | Minimize disruption of intact communities.. |
| Habitat establishment | Reclamation | Establishment of habitat for wildlife in mines, particularly roost sites for bats | Amphibians, birds, large mammals | Reptiles, most small mammals | Bats | None | Use of bat gates rather than backfilling mines. |

**TABLE 4.3-6  (Cont.)**

| Impacting Factor | Project Phase | Consequence | Expected Relative Impact[a] for Different Wildlife[b] | | | | Ability to Mitigate Impacts[c] |
|---|---|---|---|---|---|---|---|
| | | | Negligible | Minor | Moderate | Large | |
| ***Individual Impacting Factor[d] (Cont.)*** | | | | | | | |
| Increased human access | Construction, operations | Harassment, collection, increased predation risk, increased collision mortality risk. | None | Amphibians, reptiles, birds, mammals | None | None | Can be mitigated by reducing the number of mines, transmission lines and access roads in important habitats. |
| Contaminant exposure | Site characterization, construction, operations, reclamation | Death of directly affected individuals, uptake of toxic materials, reproductive impairment, reduction in carrying capacity. | None | Amphibians, reptiles, birds, mammals | None | None | Can be mitigated using project mitigation measures (e.g., spill prevention and response planning, fencing and netting of water treatment ponds) |
| Project infrastructure | Operations | Increased predation rates from predators using structures, collision mortality. | Large mammals | Amphibians, reptiles, birds, and small mammals | None | None | Can be mitigated using appropriate markers on lines and guy wires, or elimination of guy wires, design transmission lines to discourage use by ravens and raptors. |
| Restoration of topography and drainage patterns | Reclamation | Beneficial changes in temperature, soil moisture, and hydrologic regimes. | None | Amphibians, reptiles, birds, mammals | None | None | Mostly beneficial; adverse impacts can be mitigated by using standard erosion and runoff control measures. |
| Restoration of surface soil materials | Reclamation | Beneficial changes in soil moisture, increased productivity and carrying capacity. | None | Amphibians, reptiles, birds, mammals | None | None | Mostly beneficial; adverse impacts can be mitigated using standard erosion and runoff control measures. |

BLM_0042436

**TABLE 4.3-6  (Cont.)**

| Impacting Factor | Project Phase | Consequence | Expected Relative Impact[a] for Different Wildlife[b] | | | | Ability to Mitigate Impacts[c] |
|---|---|---|---|---|---|---|---|
| | | | Negligible | Minor | Moderate | Large | |
| **_Individual Impacting Factor[d] (Cont.)_** | | | | | | | |
| Restoration of native vegetation | Reclamation | Beneficial changes in soil moisture, increased productivity and carrying capacity, increased diversity. | None | Amphibians, reptiles, birds, mammals | None | None | Mostly beneficial; adverse impacts can be mitigated by ensuring species mix includes a diverse weed-free mix of native species. |
| Site lighting | Construction, operations | Behavioral disturbance, harassment, nest abandonment, avoidance of areas, territory adjustments, reduction in carrying capacity, collision with structures. | None | Amphibians, reptiles, birds, mammals | None | None | Easily mitigated by ensuring lighting is minimized to that needed for safe construction and operations and does not project past mine site boundaries. |
| Surface soil material compaction | Site characterization, construction, operations, reclamation | Reduction in productivity, reduction in diversity, reduction in carrying capacity, increased runoff and erosion, spread of invasive species. | None | Amphibians, reptiles, birds, mammals | None | None | Can be mitigated by minimizing off-road travel and mine site development (e.g., area of waste rock storage). |
| Surface soil material removal | Construction, operations | Reduction in productivity, reduction in diversity, reduction in carrying capacity, direct mortality of individuals, increased sedimentation in aquatic habitat, spread of invasive species. | None | Amphibians, reptiles, birds, mammals | None | None | Readily mitigated by stockpiling surface soil materials to maintain seed viability, vegetating to reduce erosion, and replacing at appropriate depths when other site activities are complete. |

**TABLE 4.3-6  (Cont.)**

| Impacting Factor | Project Phase | Consequence | Expected Relative Impact[a] for Different Wildlife[b] | | | | Ability to Mitigate Impacts[c] |
|---|---|---|---|---|---|---|---|
| | | | Negligible | Minor | Moderate | Large | |
| ***Individual Impacting Factor[d] (Cont.)*** | | | | | | | |
| Vegetation clearing | Construction, operations | Elimination of habitat, habitat fragmentation, direct mortality of individuals, loss of prey base, changes in temperature and moisture regimes, erosion, increased fugitive dust emissions, reduction in productivity, reduction in diversity, reduction in carrying capacity, spread of invasive species. | None | None | Amphibians, reptiles, birds, mammals | None | Difficult to mitigate; most mine site areas are likely to require clearing. |
| Vegetation maintenance | Operations | Reduction in vegetation cover or vegetation maintained in early successional-stage or low-stature, habitat fragmentation, direct mortality of individuals, reduction in diversity, reduction in carrying capacity, spread of invasive species. | None | Amphibians, reptiles, birds, mammals | None | None | Can be mitigated by managing for low-maintenance vegetation (e.g., native shrubs, grasses, and forbs), invasive species control, minimizing the use of herbicides near sensitive habitats (e.g., aquatic and wetland habitats), and only using approved herbicides consistent with safe-application guidelines. |
| Vehicle and equipment emissions | Construction, operations, reclamation | Reduced productivity. | None | Amphibians, reptiles, birds, mammals | None | None | Readily mitigated by maintaining equipment in proper operating condition. |

**TABLE 4.3-6  (Cont.)**

| Impacting Factor | Project Phase | Consequence | Expected Relative Impact[a] for Different Wildlife[b] | | | | Ability to Mitigate Impacts[c] |
|---|---|---|---|---|---|---|---|
| | | | Negligible | Minor | Moderate | Large | |
| ***Individual Impacting Factor[d] (Cont.)*** | | | | | | | |
| Vehicle and foot traffic | Site characterization, construction, operations, reclamation | Direct mortality of individuals through collision or crushing, surface soil materials compaction, increased fugitive dust emissions. | None | Amphibians, reptiles, birds, mammals | None | None | Can be mitigated using worker education programs, signage, and traffic speed restrictions. |
| ***All Impacting Factors Combined*** | | | | | | | |
| | Site characterization | | None | Amphibians, reptiles, birds, mammals | None | None | Relatively easy. |
| | Construction | | None | None | Amphibians, reptiles, birds, mammals | None | Relatively difficult; residual impact mostly dependent on the size of mine areas developed. |
| | Operations | | None | None | Amphibians, reptiles, birds, mammals | None | Relatively difficult; residual impact mostly dependent on the size of mine areas developed. |
| | Reclamation | | None | None | Amphibians, reptiles, birds, mammals (short-term adverse impacts, long-term benefits) | None | Relatively easy to mitigate adverse impacts of reclamation. May be difficult to achieve restoration objectives. |

**TABLE 4.3-6  (Cont.)**

| Impacting Factor | Project Phase | Consequence | Expected Relative Impact[a] for Different Wildlife[b] | | | | Ability to Mitigate Impacts[c] |
|---|---|---|---|---|---|---|---|
| | | | Negligible | Minor | Moderate | Large | |
| *All Impacting Factors Combined (Cont.)* | | | | | | | |
| | Overall project | | None | None | Amphibians, reptiles, birds, mammals | None | Relatively difficult; residual impact mostly dependent on the size of areas developed and the success of restoration activities. |

[a] Relative impact magnitude categories were based on professional judgment utilizing CEQ regulations for implementing NEPA (40 CFR 1508.27) by defining significance of impacts based on context and intensity. Impact magnitude definitions are as follows: (1) *negligible*—no impact would occur; (2) *minor*—effects are so minor that they will neither destabilize nor noticeably alter any important attribute of the resource (e.g., ≤1% of the population or its habitat would be lost in the region); (3) *moderate*—effects are sufficient to alter noticeably but not to destabilize important attributes of the resource (e.g., >1 but ≤10% of the population or its habitat would be lost in the region); and (4) *large*—effects are clearly noticeable and are sufficient to destabilize important attributes of the resource (e.g., >10% of a population or its habitat would be lost in the region). Actual impact magnitudes on wildlife species would depend on the location of projects, project-specific design, application of mitigation measures (including avoidance, minimization, and compensation), and the status of wildlife species and their habitats in project areas. Impact magnitudes provided are conservative (i.e., they could be less than stated).

[b] Wildlife species are placed into groups based on taxonomy (amphibians, reptiles, birds, and mammals). Other categories such as ecological system (aquatic, wetland, riparian, and terrestrial) or size (e.g., small and large mammals) are used when the category is relevant to impact magnitude.

[c] Actual ability to mitigate impacts will depend on site-specific conditions and the species present in the project area. Measures identified to minimize potential impacts are presented in Table 4.6-1 (Section 4.6).

[d] Impacting factors are presented in alphabetical order.

1   for Alternative 1 (Section 4.1.6.2). Reclamation activities would occur in areas previously
2   disturbed by mine development and operations. Mitigation measures, compliance measures, and
3   BMPs would minimize impacts on wildlife consistent with applicable laws and regulations (see
4   Table 4.6-1 in Section 4.6). Wildlife would benefit from habitat development following
5   reclamation activities.
6
7         Under Alternative 3, impacts on wildlife would be largely short term and negligible
8   during site exploration, and minor to moderate during mine development and operations. While
9   wildlife impacts would be long term (last for decades), they would be scattered temporally and,
10  especially, spatially. In general, it is expected that impacts would be largely localized and would
11  not affect the viability of wildlife populations, especially if mitigation measures were used
12  (see Section 4.6).
13
14
15      **4.3.6.3  Aquatic Biota**
16
17
18      **4.3.6.3.1  Impacts**. Impacts on aquatic biota from uranium mining could occur from the
19  (1) direct disturbance of aquatic habitats within the footprint of the mine site, (2) sedimentation
20  of nearby aquatic habitats as a consequence of soil erosion from mine areas, and (3) changes in
21  water quantity or water quality as a result of releases of contaminants into nearby aquatic
22  systems. These impacts would primarily occur during the mine development period and
23  throughout the operational life of the mine.
24
25        Exploration activities would occur in upland areas and not directly within aquatic habitats
26  (including intermittent and ephemeral drainages). Because of the limited number of perennial
27  streams in the area and the short duration of exploration activities, the crossing of any individual
28  stream is expected to be infrequent. In some cases, individual streams might be crossed only a
29  single time. As a result, any potential impacts from stream crossings would be short term and
30  localized to individual crossing locations.
31
32        Because of the limited area in which exploration activities would take place, the small
33  amount of soil disturbance that might occur during exploration, and the short duration during
34  which exploration at a particular area would occur, most impacts would be very localized and
35  short term. Potentially affected habitats would likely be smaller, low-order and headwater
36  intermittent and ephemeral streams. Aquatic biota and habitats in larger surface water bodies,
37  such as the main channels of the San Miguel and Dolores Rivers, are not expected to be affected
38  by site exploration activities.
39
40        Ground disturbance during mine development and operations might increase soil erosion
41  and runoff that could lead to increases in sedimentation and turbidity in downgradient surface
42  water habitats. Increased turbidity might affect foraging and predator avoidance, reduce the
43  oxygen content of the water, interfere with photosynthesis of algae, and interfere with gill
44  function in some invertebrates and fish. Increased sedimentation might foul the eggs and smother
45  the larvae of invertebrates and fish and alter sediment characteristics. Changes in surface
46  drainage patterns could eliminate ephemeral drainages or cause other changes in runoff patterns.

BLM_0042441

1   Any changes in discharges to springs, seeps, or streams due to groundwater withdrawals could,
2   as a result, affect aquatic habitats.
3
4          Aquatic biota and habitats most likely to be affected during mine development and
5   operations are those associated with small intermittent and ephemeral drainages. Such habitats
6   might be crossed with some regularity by vehicles. In addition, impacts from soil erosion and
7   accidental releases of regulated or hazardous materials might be expected in drainages that most
8   often exhibit no or low volumes and flows. Impacts on aquatic biota and habitats from the
9   accidental release of contaminants into intermittent or ephemeral drainages would be localized
10  and small, especially if spill response to a release was rapid.
11
12         The accidental spill of uranium or vanadium ore into an intermittent or ephemeral stream,
13  or more notably a permanent stream or river such as the Dolores or San Miguel River, could pose
14  a localized short-term impact on the aquatic resources. However, the potential for such an event
15  is extremely low. For example, SENES (2009) determined that the frequency of a rollover and/or
16  crash of an ore truck at a water crossing en route to the proposed Piñon Ridge Mill would be
17  $8.4 \times 10^{-5}$/yr (less than 1 in 10,000). In addition to uranium and vanadium, the ore contains other
18  potentially toxic elements, such as aluminum, arsenic, barium, copper, iron, lead, manganese,
19  selenium, on zinc. Most ore solids would settle in the water body within a short distance from a
20  spill site (Edge Environmental, Inc. 2009). It is expected that expedient and comprehensive
21  cleanup actions would be required under DOT regulations and that an emergency response plan
22  would be in place for responding to accidents and cargo spills (Edge Environmental, Inc. 2009).
23  Overall, the potential for impacts on aquatic biota from an accidental spill would be localized
24  and negligible to minor (i.e., environmental effects are not detectable or so small that they will
25  neither destabilize nor noticeably alter any aquatic species populations or their habitats).
26
27
28         **4.3.6.3.2  Summary of Common Impacts on Aquatic Biota and Habitats.** Overall,
29  impacts from site characterization, construction, operations, and reclamation under Alternative 3
30  on aquatic habitats and aquatic biota would depend on the following:
31
32      •   The type and amount of aquatic habitat that would be disturbed;
33
34      •   The nature of the disturbance; and
35
36      •   The types, numbers, and uniqueness of the aquatic biota that occupy the
37          surrounding areas.
38
39         Potential impacts on aquatic resources (without mitigation) from the various impacting
40  factors associated with Alternative 3 are summarized in Table 4.3-7. Potential impacts on
41  threatened, endangered, and sensitive aquatic species are presented in Section 4.3.6.4, and
42  potential impacts on other types of organisms that could occur in aquatic habitats
43  (e.g., amphibians and waterfowl) are presented in Section 4.3.6.2.
44
45         Impacts on aquatic biota and habitats during reclamation should be similar in nature to,
46  and not greater in magnitude than, impacts that might have occurred from mine development and

BLM_0042442

1

**TABLE 4.3-7  Potential Impacts on Aquatic Biota Associated with Alternative 3**

| Impacting Factor | Project Phase | Consequence | Expected Impact[a] | Ability to Mitigate Impacts[b] |
|---|---|---|---|---|
| ***Individual Impacting Factor[c]*** | | | | |
| Alteration of topography and drainage patterns | Construction, operations | Changes in water temperature; change in distribution and structure of aquatic, wetland, and riparian habitat and communities; erosion; changes in groundwater recharge. | Negligible to minor | Can be mitigated by avoiding development of drainages and using appropriate stormwater management strategies. |
| Human presence and activity | Site characterization, construction, operations, reclamation | Ground disturbance from vehicles and foot traffic; behavioral avoidance of areas; habitat degradation; non-native species introductions. | Negligible to minor | Can be mitigated during site characterization and construction by timing activities to avoid sensitive periods and locations. Difficult to mitigate impacts during operations. Decontaminating equipment would reduce the risk of non-native species introductions. |
| Blockage of dispersal and movement | Construction, operations | Genetic isolation; loss of access to important habitats; change in community structure; reduction in carrying capacity. | Negligible | Can be mitigated by restricting project size, avoiding aquatic habitat disturbance. |
| Erosion | Construction operations, reclamation | Sedimentation of adjacent aquatic systems; loss of productivity; change in communities; physiological stress. | Negligible to minor | Easily mitigated with standard erosion control practices. |
| Fugitive dust | Site characterization, construction, operations, reclamation | Increase in turbidity and sedimentation in aquatic habitat; decrease in photosynthesis; change in community structure; physiological stress. | Negligible to minor | Can be mitigated by retaining vegetative cover, surface soil material covers, or soil stabilizing agents. |
| Groundwater withdrawal | Construction, operations | Change in hydrologic regime; reduction in productivity and aquatic habitat at the surface. | minor to moderate[d] | Difficult to mitigate; water consumption is expected for all mining operations. It assumed that all water will come from the Upper Colorado River Basin. |

2

BLM_0042443

**TABLE 4.3-7  (Cont.)**

| Impacting Factor | Project Phase | Consequence | Expected Impact[a] | Ability to Mitigate Impacts[b] |
|---|---|---|---|---|
| ***Individual Impacting Factor[c] (Cont.)*** | | | | |
| Habitat fragmentation | Construction, operations | Genetic isolation; loss of access to important habitats; reduction in carrying capacity; change in community structure. | Negligible to minor | Can be mitigated by restricting project size, avoiding aquatic habitat disturbance. |
| Increased human access | Construction, operations | Habitat degradation; fishing pressure. | Negligible to minor | Can be mitigated by reducing the number of new transmission lines and access roads that cross aquatic habitats. |
| Contaminant spills | Site characterization, construction, operations, reclamation | Mortality; physiological stress; reproductive impairment; reduction in carrying capacity. | Minor | Can be mitigated using project mitigation measures (e.g., spill prevention and response planning). |
| Restoration of topography and drainage patterns | Reclamation | Impacts initially adverse; some degree of restoration to pre-construction conditions. | Negligible to minor | Mostly beneficial; adverse impacts can be mitigated using standard erosion and runoff control measures. |
| Restoration of surface soil materials and native vegetation | Reclamation | Reduced erosion and fugitive dust; increased productivity. | Negligible to minor | Mostly beneficial; adverse impacts can be mitigated using standard erosion and runoff control measures. |
| Surface soil material removal | Construction, operations | Increased sedimentation in aquatic habitat; change in community structure; physiological stress. | Negligible to minor | Readily mitigated by stockpiling surface soil materials to maintain seed viability, vegetating to reduce erosion, and replacing at appropriate depths when other site activities are complete. |

BLM_0042444

**TABLE 4.3-7  (Cont.)**

| Impacting Factor | Project Phase | Consequence | Expected Impact[a] | Ability to Mitigate Impacts[b] |
|---|---|---|---|---|
| ***Individual Impacting Factor[c] (Cont.)*** | | | | |
| Vegetation clearing and maintenance | Construction, operations | Change in water temperature; increased sedimentation from erosion and fugitive dust; changes in productivity and diversity; reduction in carrying capacity; herbicide inputs; acute and chronic toxicological impacts. | Negligible to minor | Difficult to mitigate; most project areas are likely to require clearing. Can be mitigated by managing for low-maintenance vegetation (e.g., native shrubs, grasses, and forbs), invasive species control, minimizing the use of herbicides near sensitive habitats (e.g., aquatic and wetland habitats), and using only approved herbicides consistent with safe application guidelines. Restoration of a vegetative cover consistent with the intended land use would reduce some impacts. |
| Vehicle traffic | Site characterization, construction, operations, reclamation | Direct mortality of individuals through crushing; increased fugitive dust emissions. | Negligible to minor | Can be mitigated using worker education programs, signage, and traffic restrictions. |
| ***All Impacting Factors Combined*** | | | | |
| | Site characterization | | Negligible | Relatively easy. |
| | Construction | | Negligible to minor | Relatively difficult; residual impact mostly dependent on the size of area developed. |
| | Operations | | Negligible to minor | Relatively difficult; residual impact mostly dependent on the size of area developed. |
| | Reclamation | | Negligible to minor | Relatively easy to mitigate adverse impacts of reclamation. May be difficult to achieve restoration objectives. |
| | Overall project | | Negligible to minor | Relatively difficult; residual impact mostly dependent on the size of area developed and the success of restoration activities. |

Footnotes on next page.

BLM_0042445

**TABLE 4.3-7  (Cont.)**

a  Relative impact magnitude categories were based on professional judgment utilizing CEQ regulations for implementing NEPA (40 CFR 1508.27) by defining significance of impacts based on context and intensity. Impact magnitude categories and definitions are as follows: (1) *negligible*—no impact would occur; (2) *minor*—effects are so small that they will neither destabilize nor noticeably alter any important attribute of the resource. (e.g., <1% of the population or its habitat would be lost in the region); (3) *moderate*—effects are sufficient to alter noticeably but not to destabilize important attributes of the resource (e.g., >1 but <10% of the population or its habitat would be lost in the region); and (4) *large*—effects are clearly noticeable and are sufficient to destabilize important attributes of the resource (e.g., >10% of a population or its habitat would be lost in the region). Assigned impact magnitudes assume no mitigation. Actual magnitudes of impacts on aquatic habitat and biota would depend on the location of projects, project-specific design, application of mitigation measures (including avoidance, minimization, and compensation), and the ecological condition of aquatic habitat and biota in project areas.

b  Actual ability to mitigate impacts will depend on site-specific conditions and the species present in the project area.

c  Impacting factors are presented in alphabetical order.

d  Impacts are expected to be minor for most aquatic biota. Moderate impacts are most likely to occur for threatened, endangered, and sensitive species (including Colorado River endangered fish).

BLM_0042446

1    operations. In general, impacts on aquatic biota from reclamation activities would be similar to
2    those described for Alternative 1 (Section 4.1.6.2). Measures (i.e., compliance measures,
3    mitigation measures, and BMPs) would be implemented to minimize potential impacts on aquatic
4    resources, consistent with applicable laws and regulations (see Table 4.6-1 in Section 4.6).
5
6           Overall, impacts on aquatic biota are expected to be negligible during site exploration and
7    negligible to minor during mine development operations and reclamation. Potential impacts from
8    mine development and operations would last at least 10 years prior to reclamation. Potentially
9    moderate impacts would be possible only for mine sites located near perennial water bodies. In
10   general, any impacts on aquatic biota would be localized and not affect the viability of affected
11   resources, especially if mitigation measures were used (e.g. those aimed at protecting soils from
12   erosion and those aimed at protecting surface water bodies from contamination and
13   sedimentation; see Table 4.6-1).
14
15
16           **4.3.6.4  Threatened, Endangered, and Sensitive Species**
17
18           Impacts on threatened, endangered, and sensitive species from uranium mining activities
19   would fundamentally be similar to, or the same as, impacts on more common and widespread
20   plant communities and habitats, wildlife, and aquatic resources (see Sections 4.3.6.1, 4.3.6.2, and
21   4.3.6.3). However, listed species, because of their low populations, would be far more sensitive
22   to impacts than more common and widespread species. Their small population makes these
23   species more vulnerable to the effects of habitat fragmentation, habitat alteration, habitat
24   degradation, human disturbance and harassment, mortality of individuals, and the loss of genetic
25   diversity. Although listed species often reside in unique and potentially avoidable habitats, the
26   loss of even a single individual from such a species could have a much greater impact on the
27   species population than would the loss of an individual from a more common species.
28
29           Table 4.3-8 presents the potential for impacts to on threatened, endangered, and sensitive
30   species under Alternative 3. Of the 46 species listed, there are 12 plants, 1 insect, 7 fish,
31   4 amphibians, 2 reptiles, 12 birds, and 8 mammals. A discussion of impacts on these species by
32   listing status is provided in the text that follows.
33
34
35           **4.3.6.4.1  Impacts on Species Listed under the Endangered Species Act.** Of the
36   species listed in Table 4.3-8, there are 10 that are listed as threatened or endangered under the
37   ESA or are proposed or candidates for listing under the ESA. Four are fish—the bonytail chub,
38   Colorado pikeminnow, humpback chub, and razorback sucker (these four fish species are
39   collectively referred to as the Colorado River endangered fishes); four are birds—the Gunnison
40   sage-grouse, Mexican spotted owl, southwestern willow flycatcher, and western yellow-billed
41   cuckoo; and two are mammals—the black-footed ferret and Gunnison's prairie dog. These
42   species are discussed below. As discussed in Section 3.6.4.1, there are no plants or invertebrates
43   listed under the ESA that could occur in the vicinity of the ULP lease tracts.
44
45

BLM_0042447

1

**TABLE 4.3-8  Potential Effects of the Uranium Leasing Program under Alternative 3 on Threatened, Endangered, and Sensitive Species**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Plants* | | | | |
| Dolores River skeletonplant | *Lygodesmia doloresensis* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Eastwood's monkeyflower | *Mimulus eastwoodiae* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Grand Junction milkvetch | *Astragalus linifolius* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25, 26, 27 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |

2
3

BLM_0042448

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Plants (Cont.)** | | | | |
| Gypsum Valley cateye | *Cryptantha gypsophila* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Helleborine | *Epipactis gigantea* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Kachina daisy | *Erigeron kachinensis* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Naturita milkvetch | *Astragalus naturitensis* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |

BLM_0042449

TABLE 4.3-8  (Cont.)

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Plants (Cont.)* | | | | |
| Paradox breadroot | *Pediomelum aromaticum* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Paradox lupine | *Lupinus crassus* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| San Rafael milkvetch | *Astragalus rafaelensis* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25, 26, 27 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Sandstone milkvetch | *Astragalus sesquiflorus* | BLM-S | 5, 5A, 6, 7, 8, 8A, 9, 17, 18, 19, 19A, 20, 21, 22, 22A, 23, 24, 25 | Potential for negative impact—direct and indirect effects. Program activities in Lease Tracts 5, 6, 7, 8, 9, 18, 21, and 25 could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Plants (Cont.)* | | | | |
| Wetherill's milkvetch | *Astragalus wetherillii* | FS-S | All | Potential for negative impact—direct and indirect effects. Program activities in all Alternative 3 lease tracts could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| *Invertebrates* | | | | |
| Great Basin silverspot butterfly | *Speyeria nokomis nokomis* | BLM-S | All | Potential for negative impact—indirect effects only. Program activities in all Alternative 3 lease tracts could affect this species. Neither this species nor its habitat is not expected to occur on any of the lease tracts. Direct impacts on the species or its habitat (riparian areas) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. |
| *Fish* | | | | |
| Bluehead sucker | *Catostomus discobolus* | BLM-S; FS-S | All | Potential for negative impact—indirect effects only. Program activities in all Alternative 3 lease tracts could affect this species. It is known to occur in the Dolores River. Suitable habitat for this species might occur in the Dolores and San Miguel Rivers, which are downgradient from all lease tracts and intersect Lease Tracts 13 and 13A. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on suitable habitat from water withdrawals, runoff, sedimentation, or fugitive dust deposition might be possible. |

BLM_0042451

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **_Fish (Cont.)_** | | | | |
| Bonytail | _Gila elegans_ | ESA-E; CO-E | All | Potential for negative impact—indirect effects only. Program activities in all Alternative 3 lease tracts could affect this species. Suitable habitat for this species does not occur in any of the lease tracts. However, both suitable habitat and designated critical habitat for this species occur within the Colorado River, which is downstream from the Dolores River. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the Dolores River from water withdrawals, runoff, sedimentation, or release of radioactive material fugitive dust deposition might be possible, which might affect the species and its habitat (including designated critical habitat) in the Colorado River. For this reason, DOE determined in its May 2013 BA that ULP activities under Alternative 3 may affect, and are likely to adversely affect, the bonytail and its critical habitat. The USFWS then concluded, in its August 2013 BO, that water depletions under Alternative 3 were not likely to jeopardize the continued existence of the Colorado River endangered fish species and not likely to destroy or adversely modify designated critical habitat; that a water depletion fee did not apply (under a 2010 BO that addressed small water depletions); and that further programmatic consultation is not required (Appendix E of the ULP PEIS). |

BLM_0042452

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Fish (Cont.)* | | | | |
| Colorado pikeminnow | *Ptychocheilus lucius* | ESA-E; CO-T | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. Suitable habitat for this species does not occur in any of the lease tracts. However, both suitable habitat and designated critical habitat for this species occur within the Colorado River, which is downstream from the Dolores River. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the Dolores River from water withdrawals, runoff, sedimentation, or release of radioactive material might be possible, which might affect the species and its habitat (including designated critical habitat) in the Colorado River. For this reason, DOE determined in its May 2013 BA that ULP activities under Alternative 3 may affect, and are likely to adversely affect, the Colorado pikeminnow and its critical habitat. The USFWS then concluded, in its August 2013 BO, that water depletions under Alternative 3 were not likely to jeopardize the continued existence of the Colorado River endangered fish species and not likely to destroy or adversely modify designated critical habitat; that a water depletion fee did not apply (under a 2010 BO that addressed small water depletions); and that further programmatic consultation is not required (Appendix E of the ULP PEIS). |

BLM_0042453

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Fish (Cont.)* | | | | |
| Flannelmouth sucker | *Catostomus latipinnis* | BLM-S; FS-S | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. It is known to occur in the Dolores River. Suitable habitat for this species might occur in the Dolores and San Miguel Rivers, which are downgradient from all lease tracts and intersect Lease Tracts 13 and 13A. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. |
| Humpback chub | *Gila cypha* | ESA-E; CO-T | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. Suitable habitat for this species does not occur in any of the lease tracts. However, both suitable habitat and designated critical habitat for this species occur within the Colorado River, which is downstream from the Dolores River. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the Dolores River from water withdrawals, runoff, sedimentation, or release of radioactive material might be possible, which might affect the species and its habitat (including designated critical habitat) in the Colorado River. For this reason, DOE determined in its May 2013 BA that ULP activities under Alternative 3 may affect, and are likely to adversely affect, the humpback chub and its critical habitat. The USFWS then concluded, in its August 2013 BO, that water depletions under Alternative 3 were not likely to jeopardize the continued existence of the Colorado River endangered fish species and not likely to destroy or adversely modify designated critical habitat; that a water depletion fee did not apply (under a 2010 BO that addressed small water depletions); and that further programmatic consultation is not required (Appendix E of the ULP PEIS). |

BLM_0042454

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Fish (Cont.)* | | | | |
| Razorback sucker | *Xyrauchen texanus* | ESA-E; CO-E | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. Suitable habitat for this species does not occur on any of the lease tracts. However, both suitable habitat and designated critical habitat for this species occur within the Colorado River, which is downstream from the Dolores River. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the Dolores River from water withdrawals, runoff, sedimentation, or release of radioactive material might be possible, which might affect the species and its habitat (including designated critical habitat) in the Colorado River. For this reason, DOE determined in its May 2013 BA that ULP activities under Alternative 3 may affect, and are likely to adversely affect, the razorback sucker and its critical habitat. The USFWS then concluded, in its August 2013 BO, that water depletions under Alternative 3 were not likely to jeopardize the continued existence of the Colorado River endangered fish species and not likely to destroy or adversely modify designated critical habitat; that a water depletion fee did not apply (under a 2010 BO that addressed small water depletions); and that further programmatic consultation is not required (Appendix E of the ULP PEIS). |
| Roundtail chub | *Gila robusta* | BLM-S; FS-S | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. It is known to occur in the Dolores River. Suitable habitat for this species might occur in the Dolores and San Miguel Rivers, which are downgradient from all lease tracts and intersect Lease Tracts 13 and 13A. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. |

BLM_0042455

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Amphibians** | | | | |
| Boreal toad | *Bufo boreas* | CO-E | 18, 19, 19A, 26, 27 | Potential for negative impact—indirect effects only. Program activities on Lease Tract 18 could affect this species. Suitable habitat for this species is not expected to occur on this lease tract. Direct impacts on the species or its habitat (riparian areas) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. |
| Canyon treefrog | *Hyla arenicolor* | BLM-S | All | Potential for negative impact—indirect effects only. Program activities on all lease tracts under Alternative 3 could affect this species. Direct impacts on the species or its habitat (canyonlands and riparian areas) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. |
| Great Basin spadefoot | *Spea intermontana* | BLM-S | 11, 11A | Potential for negative impact—direct and indirect effects. Program activities in Lease Tract 11 could affect this species. Impacts could occur through direct effects such as those resulting from mortality and habitat disturbance, as well as indirect impacts such as those resulting from water withdrawals, runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Northern leopard frog | *Rana pipiens* | BLM-S; FS-S | 13, 13A, 14, 15, 18, 19, 19A, 24, 25 | Potential for negative impact—indirect effects only. Program activities on Lease Tracts 13, 13A, 15, 18, and 25 could affect this species. Direct impacts on the species or its habitat (riparian areas and water bodies) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. |

BLM_0042456

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Reptiles** | | | | |
| Longnose leopard lizard | *Gambelina wislizenii* | BLM-S | 18, 19, 19A, 20, 24, 26, 27 | Potential for negative impact—indirect effects only. Program activities on Lease Tract 18 could affect this species. Direct impacts on the species or its habitat (riparian areas) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. |
| Midget-faded rattlesnake | *Crotalus oreganus concolor* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality and habitat disturbance, as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| **Birds** | | | | |
| Bald eagle | *Haliaeetus leucocephalus* | BLM-S; FS-S; CO-T | 5, 5A, 6, 7, 7, 8, 8A, 9, 13, 13A, 14, 18, 19, 19A, 20, 21, 22, 22A, 23, 26, 27 | Potential for negative impact—direct and indirect effects. Program activities on Lease Tracts 5, 6, 7, 8, 9, 13, 13A, 18, and 21 could affect this species. Direct effects would include disturbance of foraging habitat and the winter concentration areas within the lease tracts. Winter concentration areas along the Dolores River might be directly affected by program activities on Lease Tracts 13 and 13A. Indirect impacts on these winter concentration areas from noise, water withdrawal, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. |
| Brewer's sparrow | *Spizella breweri* | BLM S | All | Potential for negative impact  direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of sagebrush habitats, as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Birds (Cont.)* | | | | |
| Burrowing owl | *Athene cunicularia* | BLM-S; CO-T | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitats (sagebrush, shrublands, and grasslands), as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Ferruginous hawk | *Buteo regalis* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitats (sagebrush, shrublands, and grasslands), as well as indirect impacts such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Gunnison sage-grouse | *Centrocercus minimus* | ESA-P; BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitats (sagebrush, shrublands, and grasslands), as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. ULP activities under Alternative 3 may affect, but are not likely to adversely affect, the Gunnison sage-grouse. |

BLM_0042458

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| ***Birds (Cont.)*** | | | | |
| Mexican spotted owl | *Strix occidentalis lucida* | ESA-T; CO-T | All | Potential for negative impact—indirect effects only. Program activities on all lease tracts under Alternative 3 could affect this species. Direct impacts on the species or its habitat (canyonlands and coniferous forests) are unlikely to occur. Indirect impacts on the species or its habitat from water withdrawals, noise, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. However, with the implementation of minimization and mitigation measures, ULP activities under Alternative 3 will have no effect on the Mexican spotted owl. |
| Northern goshawk | *Accipiter gentilis* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from disturbance of foraging habitats (sagebrush, shrublands, and grasslands), as well as indirect impacts such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Peregrine falcon | *Falco peregrinus* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of foraging or nesting habitats, as well as indirect impacts such as those resulting from noise runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. Nests near Paradox Valley lease tracts might be indirectly affected by program activities in Lease Tracts 5, 6, 7, 8, and 9. |

BLM_0042459

TABLE 4.3-8  (Cont.)

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Birds (Cont.)* | | | | |
| Sage sparrow | *Amphispiza belli* | FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of sagebrush habitats, as well as indirect impacts such as those resulting from runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Southwestern willow flycatcher | *Empidonax traillii extimus* | ESA-E; CO-E | All | Potential for negative impact—indirect effects only. Program activities on all lease tracts under Alternative 3 could affect this species. Direct impacts on the species or its habitat (riparian woodlands) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, noise, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. ULP activities under Alternative 3 may affect, but are not likely to adversely affect, the southwestern willow flycatcher. |
| Western yellow-billed cuckoo | *Coccyzus americanus occidentalis* | ESA-C; BLM-S; FS-S | All | Potential for negative impact—indirect effects only. Program activities on all lease tracts under Alternative 3 could affect this species. Direct impacts on the species or its habitat (riparian woodlands) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, noise, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. ULP activities under Alternative 3 may affect, but are not likely to adversely affect, the western yellow-billed cuckoo. |
| White-faced ibis | *Plegadis chihi* | BLM-S; FS-S | 13, 13A, 14, 15, and 15A. | Potential for negative impact—indirect effects only. Program activities on Lease Tracts 13, 13A, and 15 under Alternative 3 could affect this species. Direct impacts on the species or its habitat (wetlands and water bodies) are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, noise, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. |

BLM_0042460

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| ***Mammals*** | | | | |
| Big free-tailed bat | *Nyctinomops macrotis* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect impacts on roosting or foraging habitats such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Black-footed ferret | *Mustela nigripes* | ESA-E; ESA-XN; CO-E | All | No impact. This species is considered extirpated from the ULP project counties. Prairie dog colonies in the vicinity of the ULP lease tracts are not at suitable densities for supporting ferret populations. ULP activities under Alternative 3 will have no effect on the black-footed ferret. |
| Fringed myotis | *Myotis thysanodes* | BLM-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect impacts on roosting or foraging habitats such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Gunnison's prairie dog | *Cynomys gunnisoni* | ESA-C; BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitat, as well as indirect impacts such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. ULP activities under Alternative 3 may affect, but are not likely to adversely affect, the Gunnison's prairie dog. |

BLM_0042461

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| **Mammals (Cont.)** | | | | |
| Nelson's bighorn sheep | *Ovis canadensis nelsoni* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from disturbance of habitat, as well as indirect impacts such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Northern river otter | *Lutra canadensis* | CO-T | All | Potential for negative impact—indirect effects only. Program activities on all Alternative 3 lease tracts could affect this species. It is known to occur in the Dolores River, which is downgradient from all lease tracts and intersects Lease Tracts 13, 13A, and 14. Direct impacts on the species or its habitat are unlikely to occur. However, indirect impacts on the species or its habitat from water withdrawals, runoff, sedimentation, fugitive dust deposition, or those related to contaminant exposure might be possible. |
| Spotted bat | *Euderma maculatum* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities on all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect impacts on roosting or foraging habitats such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |
| Townsend's big-eared bat | *Corynorhinus townsendii pallescens* | BLM-S; FS-S | All | Potential for negative impact—direct and indirect effects. Program activities in all lease tracts under Alternative 3 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of roosting or foraging habitat, as well as indirect impacts on roosting or foraging habitats such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |

**TABLE 4.3-8  (Cont.)**

| Common Name | Scientific Name | Status[a] | Potential to Occur on or near the Following Lease Tracts[b] | Potential for Effect[c] |
|---|---|---|---|---|
| *Mammals (Cont.)* | | | | |
| White-tailed prairie dog | *Cynomys leucurus* | BLM-S; FS-S | 18, 19, 19A, 24, 25, 26, and 27 | Potential for negative impact—direct and indirect effects. Program activities on Lease Tracts 18 and 25 could affect this species. Impacts could occur through direct effects such as those resulting from mortality or disturbance of habitat, as well as indirect impacts such as those resulting from noise, runoff, sedimentation, dispersion of fugitive dust, and effects related to contaminant exposure. |

[a]  BLM-S = BLM-designated sensitive species; ESA-C = candidate for listing under the ESA; ESA-E = listed as endangered under the ESA; ESA-P = proposed for listing under the ESA; ESA-T = listed as threatened under the ESA; ESA-XN = experimental, nonessential population as defined by Section 10 of the ESA; FS-S = USFS-designated sensitive species.

[b]  Refer to Table 3.6-20 (Section 3.6.4) for a description of species' habitat requirements and potential to occur on or near lease tracts. Recorded occurrences were obtained as USGS quad-level or township range-level element occurrence records from state natural heritage program offices (CNHP 2011b). If available for terrestrial vertebrates, SWReGAP animal habitat suitability models (USGS 2007) were used to determine the presence of potentially suitable habitat in the vicinity of the lease tracts.

[c]  Potential impacts are based on the presence of potentially suitable habitat or recorded occurrences in the vicinity of the Alternative 1 lease tracts. Impacts on species might occur as either direct or indirect effects. Direct effects are considered to be physical impacts resulting from ground-disturbing activities; these include impacts such as direct mortality and habitat disturbance. The impact zone for direct effects does not extend beyond the lease tract boundaries. Indirect effects result from factors including, but not limited to, noise, runoff, dust, accidental spills, and contaminant exposure. The impact zone for indirect effects might extend beyond the lease tract boundaries, but the potential degree of indirect effects would decrease with increasing distance from the lease tracts. Impacts on species listed under the ESA are discussed by using impact levels consistent with determinations made in the ESA Section 7 consultation with the USFWS.

[d]  Two mammal species—the Canada lynx (ESA-T) and North American wolverine (ESA-C)—might occur in the project counties. However, suitable habitat for these species does not occur in the vicinity of the ULP lease tracts and is not likely to be affected by ULP activities.

BLM_0042463

1    The BA and BO prepared as part of the ESA Section 7 consultation is presented in
2  Appendix E. Although the BA and BO discuss impacts related to the preferred alternative
3  (Alternative 4), the programmatic consultation provided appropriate information for impact
4  determinations under Alternative 3. Additional lease-specific minimization and mitigation
5  measures (if appropriate) would be identified in the EPPs prepared for individual leases. In
6  addition, lease-specific consultation with the CPW may also be needed to determine any state
7  mitigation requirements for listed species. Additional ESA Section 7 consultation may be
8  necessary should new species be listed under the ESA or if new information become available
9  that may alter anticipated impacts on listed species becomes available. See the discussion of the
10  ESA Section 7 consultation in Sections 1.8 and 6.2.

13    **Colorado River Endangered Fishes.** Four listed species of fish might be affected by
14  ULP activities under Alternative 3: the bonytail chub; Colorado pikeminnow; humpback chub;
15  and razorback sucker. Each of these fish species historically inhabited tributaries of the Colorado
16  River system, including portions of the Dolores and San Miguel Rivers in the ULP project
17  counties. Current populations of the Colorado River endangered fishes no longer inhabit these
18  rivers in the vicinity of the lease tracts. However, suitable habitat and populations occur in the
19  Colorado River downstream from the Dolores River, which is downgradient from several lease
20  tracts and flows through Lease Tracts 13, 13A, and 14. Designated critical habitat for the
21  Colorado River endangered fishes also occurs in the Colorado River, downstream from the
22  Dolores River.

24    Under Alternative 3, direct impacts on the Colorado River endangered fish or their
25  habitats are unlikely to occur. However, indirect impacts on the Dolores and San Miguel Rivers
26  may occur from water withdrawals, contaminants, runoff, sedimentation, physical stream
27  alteration, or the spread of introduced species, which might affect the species and their habitats
28  (including designated critical habitat in the Colorado River) (Table 4.3-8). Water consumption
29  from the Dolores River Basin has the potential to affect downstream aquatic habitat for the
30  endangered fish in the Colorado River. Since local surface water and groundwater sources are
31  scarce and often of poor quality, it is assumed that most of the water supply would be brought to
32  the site from sources outside the lease tracts. However, it is expected that water would come
33  from the same hydrologic basin as that for the ULP lease tracts (Dolores River Basin) and that
34  the consumed water would also be discharged within the same hydrologic basin. Although local
35  water sources (surface water or groundwater) are not abundantly available in most ULP lease
36  tracts, the source of water used by the lessees to support ULP activities would be purchased from
37  sources from the local area. The surface water and groundwater sources in the Dolores River
38  Basin where the ULP lease tracts occur are considered over-appropriated by the Colorado
39  Division of Water Resources (CDWR 2007). Therefore, water used to support ULP activities
40  would come from purchased sources. For example, as discussed in the EPP for the JD-8 Mine
41  (Cotter Corp. 2011), water to be used for development and mining would be purchased from the
42  Nucla Municipal System, and no adjudicated water rights would be impacted by the project.

44    Uranium mining and milling activities can release contaminants into surrounding surface
45  and groundwater sources. The primary contaminants include radionuclides (e.g., radium,
46  thorium, uranium, radon), heavy metals (e.g., iron, lead, copper, zinc, cadmium, nickel, cobalt),

BLM_0042464

1    trace metals (e.g., arsenic, selenium), and other potentially toxic substances (e.g., ammonia,
2    nitrates, sulphates) (Mkandawire and Dudel 2005; Karp and Metzler 2006; Kelly and Janz 2009;
3    Pollmann et al. 2006; Muscatello and Janz 2009). The toxicity of uranium mine tailings has been
4    shown to be devastating to aquatic life in the Colorado River system (USFWS 1990). Several
5    contaminants, particularly radionuclides and metals, can bioaccumulate in aquatic biota and
6    result in population-level impacts on fish species. Exposure to elevated doses of radiation from
7    radionuclides may affect fish species by affecting fish reproductive organs and decreasing
8    reproductive success (Real et al. 2004). Exposure to elevated concentrations of metals could
9    affect fish by inhibiting growth, tissue damage, reproductive impairment, oxidative stress, and
10   histopathological lesions (Kelly and Janz 2009; Muscatello and Janz 2009). The effects of
11   ammonium include reduced growth rate, reduced gamete production, body deformities and
12   malformations, and degenerative gill and kidney appearance and function. Mining activities may
13   also affect habitat quality for the Colorado River endangered fish by increasing the amount of
14   sediment in the river (Leyda 2011).
15
16          Other threats to the Colorado River endangered fish that might be associated with ULP
17   activities include physical stream alteration and the spread of introduced species. Access roads
18   and other structures to support ULP activities may be created to cross stream channels, which
19   could physically alter aquatic environments and reduce the suitability of these habitats for fish
20   populations. Increased human presence near the Dolores and San Miguel Rivers could facilitate
21   the introduction and spread of non-native invasive species, which could negatively affect the
22   endangered fish species through competition and predation.
23
24          Measures to avoid or minimize indirect impacts on the Colorado River endangered fish
25   focus on avoiding any additive groundwater withdrawals from the Dolores River Basin,
26   minimizing the potential for contaminants to enter aquatic habitats, and maintaining pre-existing
27   habitat features and biological communities. These measures are listed in Table 4.6-1 and
28   through formal programmatic ESA Section 7 consultation with the USFWS (Appendix E).
29   Although multiple measures from several categories in Table 4.6-1 that could minimize impacts
30   exist, measures from the following categories would be primarily responsible for reducing or
31   eliminating impacts on the Colorado River endangered fish species:
32
33        •  M-4:  Measures designed to protect soils from erosion, protect local surface
34            water bodies from contamination and sedimentation, and protect local aquifers
35            from contamination; and
36
37        •  M-7:  Measures designed to protect wildlife and wildlife habitats (and grazing
38            animals, if present) from ground disturbance and general site activities.
39
40          The ULP would also implement stormwater controls, mine water treatment systems, and
41   other discharge mitigation methods to reduce impacts on the Colorado River endangered fishes.
42   Indirect impacts related to water contamination, physical stream modification, and introduced
43   species are expected to be minimized with the measures identified in Table 4.6-1 to levels that
44   would not adversely affect the species or their habitats. Impacts related to water withdrawal and
45   consumption from the Dolores River Basin are possible (i.e., there are no measures to completely
46   eliminate or offset water withdrawals from the basin). For this reason, DOE determined in its

BLM_0042465

1   May 2013 BA that the proposed ULP may affect, and is likely to adversely affect, both the
2   Colorado River endangered fish and their critical habitat. Then, the USFWS, in its August 2013
3   BO, concluded that water depletions under the preferred alternative (Alternative 4) were not
4   likely to jeopardize the continued existence of the Colorado River endangered fish species and
5   not likely to destroy or adversely modify designated critical habitat; that a water depletion fee
6   did not apply (under a 2010 BO that addressed small water depletions); and that further
7   programmatic consultation is not required (Appendix E). Because fewer mines would be
8   operated under Alternative 3 than under Alternative 4, there would be no additional potential for
9   impacts beyond those considered through ESA Section 7 consultation with the USFWS.
10
11
12          **Gunnison Sage-Grouse.** The Gunnison sage-grouse is a species proposed for listing as
13   endangered under the ESA (USFWS 2013a). Critical habitat for this species is also proposed
14   (USFWS 2013b). This species occurs in sagebrush-dominated habitats in western and
15   southwestern Colorado. Although the species is not known to occur on any of the ULP lease
16   tracts, a portion of the potential proposed critical habitat intersects several lease tracts in the
17   Slick Rock area (Lease Tracts 10, 11, 11A, 12, 15A, 16, and 16A). No occupied or
18   vacant/unknown proposed critical habitat intersects any of the ULP lease tracts. Occupied
19   proposed critical habitat occurs within 1 mi (1.6 km) south of lease tracts in the Paradox area
20   (Lease Tracts 6, 8, and 9) (Figure 3.6-15). Program activities in the above-mentioned lease tracts
21   under Alternative 3 could affect this species through direct effects associated with habitat
22   disturbance, as well as through indirect effects resulting from noise, runoff, sedimentation,
23   dispersion of fugitive dust, and effects related to contaminant exposure (Table 4.3-8).
24
25          Predisturbance surveys would be needed to determine the presence of the Gunnison sage-
26   grouse and its habitat (e.g., sagebrush) on the ULP lease tracts. Program activities would also
27   comply with guidelines set forth in the BLM's *Greater Sage-Grouse Interim Management*
28   *Policies and Procedures* (BLM 2011e) and *BLM National Greater Sage-Grouse Land Use*
29   *Planning Strategy* (BLM 2011c). Measures to reduce impacts on this species, including
30   development of a survey protocol, avoidance measures, minimization measures, and, potentially,
31   translocation actions, and compensatory mitigation (if necessary), should be determined
32   following coordination with the USFWS and the CPW. Programmatic minimization and
33   mitigation measures are discussed in Table 4.6-1 and through formal programmatic ESA
34   Section 7 consultation with the USFWS (Appendix E). Given the implementation of these
35   measures, ULP activities under Alternative 3 may affect, but are not likely to adversely affect the
36   Gunnison sage-grouse. As a species proposed for listing under the ESA, this species is not
37   required in ESA Section 7 consultation. Should the proposal to list the species become final, all
38   aspects of the ESA (including Section 7 consultation) would apply (USFWS Biological Opinion;
39   Appendix E).
40
41
42          **Mexican Spotted Owl.** The Mexican spotted owl is listed as threatened under the ESA.
43   This species is considered to be a rare migrant in Montrose and San Miguel Counties, Colorado.
44   It inhabits steep canyons with dense old-growth coniferous forests. This habitat does not occur
45   on the ULP lease tracts, but suitable habitat might occur in the vicinity of the ULP lease tracts.
46   Program activities in all lease tracts under Alternative 3 would not be likely to directly affect this

BLM_0042466

1   species. However, indirect impacts on suitable habitat resulting from noise, runoff,
2   sedimentation, or fugitive dust deposition might be possible (Table 4.3-8). Programmatic
3   minimization and mitigation measures are discussed in Table 4.6-1 and through formal
4   programmatic ESA Section 7 consultation with the USFWS (Appendix E). The implementation
5   of best reclamation practices should be sufficient to reduce or minimize indirect impacts on this
6   species. Designated critical habitat for this species does not occur in the vicinity of the ULP lease
7   tracts and is not expected to be affected by program activities. Given the implementation of
8   appropriate measures to minimize noise and other indirect impacts, ULP activities under
9   Alternative 3 may affect, but are not likely to adversely affect, the Mexican spotted owl. The
10  USFWS has concurred with this determination under the preferred alternative (Alternative 4) in
11  its programmatic BO (Appendix E). Because fewer mines would be operated under Alternative 3
12  than under Alternative 4, there would be no additional potential for impacts beyond those
13  considered through ESA Section 7 consultation with the USFWS.
14
15
16      **Southwestern Willow Flycatcher.** The southwestern willow flycatcher is listed as
17  endangered under the ESA. This species is considered to be an uncommon breeding resident in
18  San Miguel County, Colorado. It inhabits riparian thickets and riparian woodlands. This species
19  is not known to occur on any of the ULP lease tracts. However, according to the SWReGAP
20  habitat suitability model for this species, potentially suitable summer nesting habitat might occur
21  along the Dolores and San Miguel Rivers as well as their tributaries in Mesa, Montrose, and San
22  Miguel Counties. These potentially suitable habitat areas occur in Lease Tracts 13 and 13A,
23  which are being evaluated under Alternative 3. Program activities under Alternative 3 would not
24  be expected to directly affect the southwestern willow flycatcher because direct impacts on this
25  species and its habitat (riparian habitats) would probably be avoided. However, program
26  activities in all lease tracts under Alternative 3 might indirectly affect the southwestern willow
27  flycatcher through impacts resulting from water withdrawals, runoff, sedimentation, dispersion
28  of fugitive dust, and effects related to contaminant exposure (Table 4.3-8). Critical habitat for the
29  southwestern willow flycatcher does not occur in the vicinity of the lease tracts and is not likely
30  to be affected.
31
32      Measures to avoid or minimize groundwater withdrawals to serve ULP activities, along
33  with the implementation of stormwater controls, mine water treatment systems, and other
34  discharge mitigation methods, would reduce impacts of ULP activities on this species.
35  Development of actions to reduce indirect impacts on the southwestern willow flycatcher,
36  including necessary avoidance and minimization measures, would require formal consultation
37  with the USFWS under Section 7 of the ESA. Consultation with the CPW should also occur to
38  determine any state mitigation requirements. Given the implementation of appropriate
39  minimization and mitigation measures, ULP activities under Alternative 3 may affect, but are not
40  likely to adversely affect, the southwestern willow flycatcher. The USFWS has concurred with
41  this determination under the preferred alternative (Alternative 4) in its programmatic BO
42  (Appendix E). Because fewer mines would be operated under Alternative 3 than under
43  Alternative 4, there would be no additional potential for impacts beyond those considered
44  through ESA Section 7 consultation with the USFWS.
45
46

BLM_0042467

1     **Western Yellow-Billed Cuckoo.** The western yellow-billed cuckoo is a candidate
2 species for listing under the ESA. It inhabits deciduous riparian woodlands, particularly
3 cottonwood and willow. The western yellow-billed cuckoo is known to occur in Mesa and
4 Montrose Counties as an uncommon summer breeding resident. This species is not known to
5 occur in the vicinity of any of the lease tracts; however, according to the SWReGAP habitat
6 suitability model for the species, potentially suitable summer nesting habitat might occur along
7 the Dolores River in southern Mesa and northern Montrose Counties. These potentially suitable
8 habitat areas do not intersect any of the lease tracts, but they are downslope from Calamity Mesa,
9 Outlaw Mesa, and Uravan lease tracts in Sinbad Valley. Program activities under Alternative 3
10 are not expected to directly affect the western yellow-billed cuckoo because direct impacts on
11 this species and its habitat (riparian habitats) would probably be avoided. However, program
12 activities at all lease tracts under Alternative 3 might indirectly affect the western yellow-billed
13 cuckoo through impacts resulting from water withdrawals, runoff, sedimentation, dispersion of
14 fugitive dust, and effects related to contaminant exposure (Table 4.3-8).
15
16     Measures to avoid or minimize groundwater withdrawals to serve ULP activities, along
17 with the implementation of stormwater controls, mine water treatment systems, and other
18 discharge mitigation methods, would reduce impacts of ULP activities on the western yellow-
19 billed cuckoo. Development of actions to reduce indirect impacts on this species, including
20 necessary avoidance and minimization measures, should be determined following coordination
21 with the USFWS and the CPW. Given the implementation of appropriate minimization and
22 mitigation measures, ULP activities under Alternative 3 may affect, but are not likely to
23 adversely affect, the western yellow-billed cuckoo. As a candidate species for listing under the
24 ESA, this species is not required in ESA Section 7 consultation. Should the proposal to list the
25 species become final, all aspects of the ESA (including Section 7 consultation) would apply
26 (USFWS Biological Opinion; Appendix E).
27
28
29     **Black-Footed Ferret.** The black-footed ferret is listed as endangered under the ESA.
30 There are several introduced populations that are listed as experimental and nonessential;
31 however, these populations do not occur in the vicinity of the ULP lease tracts. This species
32 inhabits prairies and shrublands in association with prairie dogs. According to the SWReGAP
33 model, suitable habitat for this species does not occur on or in the vicinity of the ULP lease
34 tracts. The black-footed ferret is presumably extirpated from west central Colorado in the region
35 of the ULP lease tracts, even though block clearance surveys for this species have not been
36 conducted in western Colorado (USFWS 2009b). Prairie dog densities in the region surrounding
37 the ULP lease tracts are not at sufficient densities for supporting the black-footed ferret.
38 Activities associated with Alternative 3 will have no effect on the black-footed ferret. The
39 USFWS has concurred with this determination under the preferred alternative (Alternative 4) in
40 its programmatic BO (Appendix E). Because fewer mines would be operated under Alternative 3
41 than under Alternative 4, there would be no additional potential for impacts beyond those
42 considered through ESA Section 7 consultation with the USFWS.
43
44
45     **Gunnison's Prairie Dog.** The Gunnison's prairie dog is a candidate species for listing
46 under the ESA. This species is known to inhabit ULP counties in shrubland habitats at elevations

BLM_0042468

1   between 6,000 and 12,000 ft (1,800 and 3,700 m). According to CPW, this species is known to
2   occur in at least one lease tract, and suitable habitat may occur in several other lease tracts in
3   Montrose and San Miguel Counties. The overall range for this species intersects several Paradox
4   and Uravan lease tracts. Furthermore, information provided by the CNHP (2011b) indicated
5   recorded quad-level occurrences of this species near Wild Steer Mesa, which is near the lease
6   tracts in Paradox Valley and Dry Creek Basin. Program activities in all lease tracts under
7   Alternative 3 could affect this species through direct effects associated with habitat disturbance,
8   as well as through indirect effects resulting from noise, runoff, sedimentation, dispersion of
9   fugitive dust, and effects related to contaminant exposure (Table 4.3-8).
10
11      Predisturbance surveys would be needed to determine the presence of this species and its
12   habitat on the ULP lease tracts. Measures to reduce impacts on this species, including the
13   development of a survey protocol, avoidance measures, minimization measures, and, potentially,
14   translocation actions, and compensatory mitigation (if necessary), should be determined
15   following coordination with the USFWS and the CPW. With the implementation of
16   minimization and mitigation measures, ULP activities under Alternative 3 may affect, but are not
17   likely to adversely affect the Gunnison's prairie dog. As a candidate species for listing under the
18   ESA, this species is not required in ESA Section 7 consultation. Should the proposal to list the
19   species become final, all aspects of the ESA (including Section 7 consultation) would apply
20   (USFWS BO; Appendix E).
21
22
23      **4.3.6.4.2  Impacts on Sensitive and State-Listed Species.** In addition to species listed
24   under the ESA, there are several other sensitive species that could be affected by ULP activities
25   under Alternative 3. These species include species designated as sensitive by the BLM and
26   USFS, as well as those listed as threatened or endangered by the State of Colorado.
27
28      Of the species listed in Table 4.3-8, there are 36 designated as sensitive by the BLM that
29   could be affected by ULP activities under Alternative 3. Of these BLM-designated sensitive
30   species, there are 11 plants, 1 invertebrate, 3 fish, 3 amphibians, 2 reptiles, 9 birds, and
31   7 mammals. Several of these BLM-designated sensitive species are candidates for listing under
32   the ESA. Impacts on BLM-designated sensitive species are presented in Table 4.3-8.
33
34      Of the species listed in Table 4.3-8, there are 20 designated as sensitive by the USFS that
35   could be affected by ULP activities under Alternative 3. Of these USFS-designated sensitive
36   species, there are 2 plants, 3 fish, 1 amphibian, 8 birds, and 6 mammals. Several of these
37   USFS-designated sensitive species are candidates for listing under the ESA or are also
38   designated as BLM sensitive species. Impacts on USFS-designated sensitive species are
39   presented in Table 4.3-8.
40
41      Of the species listed in Table 4.3-8, there are 10 that are listed as threatened or
42   endangered by the State of Colorado that could be affected by ULP activities under
43   Alternative 3. Of these state-listed species, there are 4 fish, 1 amphibian, 3 birds, and
44   2 mammals. Several of these state-listed species are listed under ESA or are also designated by
45   the BLM or USFS as sensitive. Impacts on state-listed species are presented in Table 4.3-8.
46

BLM_0042469

### 4.3.7  Land Use

Under Alternative 3, DOE would continue the ULP as it existed before July 2007—with the 13 then-active leases (now 12 leases)—for the next 10-year period or for another reasonable period. The lands would continue to be closed to mineral entry; however, all other activities within the lease tracts would continue. Mining activities within the lease tracts would likely discourage some land uses, such as recreation or grazing, but because many of the surrounding lands offer opportunities for these activities, impacts due to land use conflicts are considered to be minor. See Section 4.3.8.1 for further discussion of potential impacts on recreation and tourism.

### 4.3.8  Socioeconomics

The assessment of the socioeconomic impacts of mine exploration, development and operations, and reclamation under Alternative 3 is based on assumptions discussed in Chapter 2 (see Section 2.2.3.1). It is assumed that a total of 8 mines would be in operation in the peak year (2 small, 4 medium, 1 large, and 1 very large mine), producing approximately 1,000 tons of uranium ore per day. Exploration activities would create direct employment of 8 people during the peak year and would create an additional 9 indirect jobs (see Table 4.3-9). Development and operational activities would create direct employment of 123 people during the peak year and would create additional 98 indirect jobs. Mining development and operations activities would constitute 0.3% of total ROI employment. Uranium mining would also produce $4.7 million in direct income and $4.0 million in indirect income. The operational period is assumed to be 10 years or a reasonable longer period of time.

As discussed in Section 3.8, the average unemployment rate in the ROI was 9.6% in 2010; approximately 10,600 people were unemployed. Based on the number of people that could be available from the unemployed workforce and the ROI's distribution of employment by sector, there could be about 2,100 people available for uranium exploration, mining, and reclamation in the ROI. Because of the small number of jobs required for exploration, the current workforce in the ROI could meet the demand for labor; thus, there would be no in-migration of workers. Based on the available labor supply in the ROI as a whole, some of the current workforce could meet the demand for labor needed for mine development and operations. However, some in-migration would occur as a result of uranium mining activities; under this alternative, 63 people would move into the ROI. In-migration of workers would represent an increase in the ROI forecasted population growth rate of 0.04%. The additional workers would increase the annual average employment growth rate by less than 1% in the ROI. The in-migrants would have only a marginal effect on local housing and population and would require less than 1% of vacant owner-occupied housing during mining development and operations. One additional physician, one additional firefighter, and one additional police officer would be required to maintain current levels of service within the ROI as a result of the increased population from in-migrants. No additional teachers would be required to maintain the current student-to-teacher ratio in the ROI.

BLM_0042470

1    **TABLE 4.3-9  Socioeconomic Impacts of Uranium Mine Development,**
2    **Operations, and Reclamation in the Region of Influence under Alternative 3**

| Parameter | Exploration | Development and Operations | Reclamation |
|---|---|---|---|
| Employment (no.) | | | |
| Direct | 8 | 123 | 29 |
| Indirect | 9 | 98 | 17 |
| Total | 17 | 221 | 46 |
| Income[a] | | | |
| Total | 0.7 | 8.8 | 1.8 |
| In-migrants (no.) | 0 | 63 | 0 |
| Vacant housing (no.) | 0 | 37 | 0 |
| Local community service employment | | | |
| Teachers (no.) | 0 | 0 | 0 |
| Physicians (no.) | 0 | 1 | 0 |
| Public safety (no.) | 0 | 2 | 0 |

[a]   Unless indicated otherwise, values are reported in $ million 2009.

3
4
5        Impacts on the ROI would be minor because employment would likely be distributed
6    across all three counties, and the impact would be absorbed across multiple governments and
7    many municipalities. The employment pool would come from a larger population group than if
8    all employment originated from any one county. Mining workers could choose to live in larger
9    population centers within the ROI, such as Grand Junction, Montrose, or Clifton, and commute
10   to mining locations. A report prepared for Sheep Mountain Alliance acknowledged that workers
11   "may choose to live at some distance from the mill and mines to protect the investments they put
12   into their homes. Some businesses serving the mill and mines and their workers may choose to
13   do the same" (Power Consulting 2010). This suggests that the communities in close proximity to
14   the proposed leases might not benefit as greatly from the positive direct and indirect economic
15   impacts from uranium mining, but they could also avoid the conditions under which previous
16   boom and bust periods occurred. Also, the report recognized that despite the decline in uranium
17   and other mining activities following 1980 in the west ends of Montrose, Mesa, and San Miguel
18   Counties, these counties as a whole experienced significant economic expansion after the
19   collapse of the uranium industry in the mid-1980s due to a "growth of a visitor economy
20   including tourists, recreationists, and second homeowners" (Power Consulting 2010). However,
21   individual municipalities in smaller rural communities might experience a temporary increase in
22   population if workers chose to move to communities closer to mining projects rather than
23   commuting from elsewhere in the ROI. Although there might not be a large number of
24   in-migrating workers from outside the three-county ROI and thus little impact on the ROI as a
25   whole, the impact on individual communities could vary.
26

BLM_0042471

Reclamation of the 12 lease tracts would occur after operations ceased and the leases were terminated. The reclamation period would likely span 2 to 3 years, although only 1 year of reclamation activities would require a workforce. Reclamation would require a direct workforce of 29 people and would create 17 indirect jobs. During reclamation, the required workforce would generate $1.8 million in income. Because of the small number of jobs required for reclamation, the current workforce in the ROI could meet the demand for labor; thus, there would be no further in-migration of workers.

### 4.3.8.1  Recreation and Tourism

Under Alternative 3, impacts on recreational opportunities in the area could occur if there was a negative perception of the area due to uranium mining and its potential impacts on air quality, wildlife habitat, water quality, scenic viewsheds, and local roads from increased truck traffic. In addition to economic impacts, there could be social impacts on local communities. Mining activities within the lease tracts would likely discourage land uses for recreation in the specific areas being explored or mined, but much of the lease tract areas would be available for recreation and many of the surrounding lands offer opportunities for these activities. Additional impacts on recreation could occur depending on environmental impacts in other resource areas. DOE ULP lease tracts that are in close proximity to recreation areas and are visible to recreationalists could result in reduced visitation to those areas. The following specially designated areas are within 10 mi (17 km) of the lease tracts and could be in viewing distance from uranium mining activities (visual resources are discussed in Section 4.4.12):

- The Unaweep/Tabeguache Scenic and Historic Byway is located between 2 and 6 mi (3 and 10 km) from lease tracts in Montrose County. Uranium mining activities would be expected to cause minimal to strong contrast levels for views from the byway. Depending on the infrastructure placed within the lease tracts, views of the mine activities and sites would be visible to visitors driving or biking along the byway, primarily in the area within Montrose County.

- The Dolores River Canyon WSA is located between 1 and 6 mi (2 and 10 km) from lease tracts in Montrose County. Uranium mining-related activities in the lease tracts would be expected to cause minimal to weak contrasts for viewpoints in the WSA.

- The Dolores River SRMA is located between 0.25 and 4 mi (0.40 and 6 km) from lease tracts in San Miguel County. Uranium mining-related activities in the lease tracts would be expected to cause minimal to strong contrast levels for views in this SRMA. Portions of the SRMA are contained within the actual lease tracts, including Lease Tracts 13, 13A, and 14.

- The Sewemup WSA is located 4 mi (6 km) from the lease tracts in Montrose County. Uranium mining-related activities in the lease tracts would be expected to cause minimal to weak contrast levels for views from this WSA.

BLM_0042472

1 • There would be minimal to no contrast for all other designated areas,
2    including Palisade WSA, which is located 6 mi (10 km) from Mesa County.
3

4    Impacts on surface water quality of the Dolores River from mining activities could affect
5 opportunities for fishing and water sports in the ROI. Increased truck traffic on state highways
6 and backcountry roads could lead to potential conflicts with other road users, including
7 recreational cyclists. Noise impacts from mine development would occur to humans and wildlife
8 near the mine sites and along the haul routes, but the impacts would be minor unless these
9 activities occurred near lease tract boundaries adjacent to nearby residences or areas specially
10 designated for wildlife concerns. Section 4.3.5.4 analyzed potential impacts on recreationalists,
11 assuming that a person would camp on top of a waste-rock pile for 2 weeks during each trip, eat
12 wild berries collected in the areas, and hunt wildlife animals for consumption. The total dose
13 associated with exposures would be less than 0.03 mrem/h, although most of the encounters
14 between recreationists and ULP lease tracts are expected to be much shorter than 2 weeks.
15 Wildlife impacts would be localized and would not affect the viability of wildlife populations
16 and therefore should not affect wildlife viewing. Some people visit recreation areas, including
17 specially designated areas, for solitude and to visit undisturbed land. Uranium mining
18 development in the nearby area could negatively impact their perception of the environment
19 surrounding the lease tracts.
20

21    Three of the lease tracts included in this alternative are located within the Dolores
22 Canyon SRMA. In recent years, recreation and tourism have become significant components of
23 the local economy in the ROI. According to a report published by the Sonoran Institute (2009),
24 the most significant changes in the economy in the West over the past 40 years have been a rapid
25 growth in the services economy, the rise in nonlabor sources of income (such as investments,
26 Social Security, and Medicare), and the diminished level of jobs and income in the extractive
27 industries (e.g., mining). Increased mining activity in the area could put a strain on local
28 governments from increased road use, traffic safety issues, and potential impacts on public
29 health. Haulage and worker traffic will have an impact on recreationists on state highways
30 without shoulders and roads with bad pavement conditions. Road improvements would be
31 needed for mixed-use roads, and scenic byway status could be dropped, depending on the degree
32 of impact.
33

34    Tourism is an important component of local economies because it brings in significant
35 income from outside the area. However, economic impacts from the tourism and recreation
36 sector are difficult to quantify because it is served by a wide-ranging array of industries,
37 including restaurants, hotels, retail shops, second homes, and vacation homes. However,
38 Table 4.3-10 tabulates estimates made for the purpose of providing some perspective on the
39 potential impact. If recreation and outdoor areas are the drivers of an area's tourism industry,
40 then the condition of the environment is vital to the success of the industry. It is difficult to
41 estimate the impact of uranium mining on recreation because it is not clear how mining
42 development and operations could affect recreational visitation and nonmarket values (i.e., the
43 value of recreational resources for potential or future visits). While it is clear that some land in
44 the ROI would no longer be accessible for recreation, the majority of popular recreational
45 locations would still be available for recreation purposes. Although the impacts of uranium
46 mining on visual impacts is generally minimal, since very few structures are taller than 30 ft

BLM_0042473

1
2

**TABLE 4.3-10  Recreation Sector Activity in the Region of Influence in 2012**

| Type of Activity | Employment | Income ($ million) |
|---|---|---|
| Amusement and recreation services | 753 | 15.6 |
| Automotive rental | 192 | 3.4 |
| Eating and drinking places | 7,565 | 132.2 |
| Hotels and lodging places | 997 | 21.9 |
| Museums and historic sites | 35 | 0.86 |
| Recreational vehicle parks and campsites | 121 | 3.4 |
| Scenic tours | 531 | 26.4 |
| Sporting goods retailers | 942 | 19.0 |
| Total ROI | 11,136 | 222.76 |

Source: MIG (2012)

3
4
5   (9.1 m), it is possible that mining activities in the ROI would be visible from recreational
6   locations and would thus reduce visitation and possibly affect the economy of the ROI.
7
8          The Uncompahgre BLM Field Office, which includes Montrose County and parts of San
9   Miguel and Mesa County, currently issues approximately 50 commercial permits for activities
10  such as guided fishing, whitewater rafting, vehicle shuttles, big and small game hunting,
11  mountain lion hunting, horseback trail rides, jeep and motorcycle tours, camping, archery
12  tournaments, and mountain bike rides. Developed recreational sites occur mainly along the San
13  Miguel River SRMA and in the Dolores River SRMA (BLM 2011k). The number of visitors
14  using state and Federal lands for recreational activities is not available from the various
15  administering agencies; consequently, the value of recreational resources in these areas based on
16  the number of recorded visitors is probably underestimated. Because the impact of uranium
17  mining on tourism is not known, this section presents simple scenarios to indicate the magnitude
18  of the economic impact of uranium mining on recreation and tourism; it indicates the impact of a
19  0.05%, 0.1%, and 0.5% reduction in ROI recreational employment. Impacts include the direct
20  loss of recreation employment in the recreation sectors in each ROI, and the indirect effects,
21  which represent the impact on the remainder of the economy in each ROI as a result of a
22  declining recreation employee wage and salary spending and as a result of expenditures by the
23  recreation sector on materials, equipment, and services. Impacts were estimated by using
24  IMPLAN data for each ROI.
25
26          In the ROI, if the impacts of uranium mining caused a 0.05% reduction in recreational
27  employment, there would be a loss of 7 jobs and an income loss of $0.2 million. If there was a
28  0.1% reduction in recreational employment, there would be a loss of 15 jobs and a corresponding
29  income loss of $0.3 million. If recreational employment declined by 0.5%, 73 jobs would be lost,
30  and there would be a reduction in income of $1.7 million (see Table 4.3-11). Alternately, it is
31  also possible that recreational use could increase if roads close to the ULP lease tracts are
32  improved and if recreationists had easier access to the area.

BLM_0042474

1   **TABLE 4.3-11  Impacts from Reductions in Recreation Sector Employment Resulting from**
2   **Uranium Mining Development in the Region of Influence, 2012[a]**

| Area Affected | 0.05% Employment Reduction | | 0.1% Employment Reduction | | 0.5% Employment Reduction | |
|---|---|---|---|---|---|---|
| | No. of Jobs Lost | Loss in Income ($ million 2011) | No. of Jobs Lost | Loss in Income ($ million 2011) | No. of Jobs Lost | Loss in Income ($ million 2011) |
| ROI[b] | 7 | 0.2 | 15 | 0.3 | 73 | 1.7 |

[a]   The recreation sector includes amusement and recreation services, automotive rental, eating and drinking establishments, hotels and lodging facilities, museums and historic sites, recreational vehicle parks and camp sites, scenic tours, and sporting goods retailers.

[b]   The Colorado ROI includes Mesa, Montrose and San Miguel Counties.

3
4
5   **4.3.9  Environmental Justice**
6
7         In the following sections, potential impacts on environmental justice are assessed for the
8   three phases of mining: exploration; development and operation; and reclamation.
9
10
11        **4.3.9.1  Exploration**
12
13        Mine exploration activities would involve some land disturbance activities, such as
14  vegetation clearing, grading, drilling, and building of access roads and drill pads, occurring over
15  relatively small areas. Impacts on minority or low-income populations would be minor and
16  would not be disproportionate, considering the small spatial extent in which exploration
17  activities would occur.
18
19        Air emissions from fugitive dust and the operation of construction equipment and mine
20  facility equipment are expected to be minor (see Section 4.3), and chemical exposure during
21  exploration would be limited to airborne toxic air pollutants, which would be at less than
22  standard levels and would not result in any adverse health impacts. No disproportionate impacts
23  would therefore occur on low-income or minority populations.
24
25        Diversion of water from domestic, cultural, religious, or agricultural uses that might
26  disproportionately affect low-income and minority populations is not expected based on water
27  usage for exploration. Potential impacts of exploration on surface water through runoff could
28  occur in some lease tracts, and it has the potential to affect local rivers and aquifers
29  (see Section 4.1.3.1). Short-term soil erosion impacts could occur during exploration
30  (see Section 4.1.3), with longer-term erosion impacts associated with runoff before revegetation
31  would occur. Longer-term surface water runoff and soil erosion impacts could affect wildlife and
32  water quality and, if there was sedimentation, recreational fishing, and they could increase the

BLM_0042475

potential for flooding. Both short-term and long-term surface water runoff and soil erosion impacts could affect subsistence activities, which could have disproportionate impacts on low-income and minority populations.

Exploration would introduce contrasts in form, line, color, and texture, as well as an increasing degree of human activity, into landscapes where activity levels are generally low (see Section 4.1.12). However, dust mitigation would reduce the visual impact of exploration, while revegetation programs would reduce the longer-term visual impacts from mine exploration in local communities and religious and cultural sites and, consequently, reduce any disproportionate impacts on low-income and minority populations. Adverse impacts of exploration on property values would likely be minor, given the existence of mining in the area, the potential small scale of the proposed mining activities, and the opportunity for lucrative uranium exploration employment in local communities where there are low-income and minority populations.

### 4.3.9.2  Mine Development and Operations

Although there are unique radiological exposure pathways (such as subsistence fish, vegetation, or wildlife consumption or well water use) that could potentially produce adverse health and environmental impacts on low-income and minority populations, no radiological impacts are expected during mine development and operations. Mining facilities would not produce any significant radiological risks to underground or surface mine workers or any radiological or adverse health impacts on the general public during operations (see Section 4.3.5) and therefore would not disproportionately affect low-income and minority populations. Air emissions from fugitive dust and the operation of construction equipment and mine facility equipment are expected to be minor (see Section 4.1.1). Chemical exposure during mine development and operations would be limited to airborne toxic air pollutants, which would be at less than standard levels and would not result in any adverse health impacts. No disproportionate impacts on low-income or minority populations would therefore be expected.

Diversion of water from domestic, cultural, religious, or agricultural uses that might disproportionately affect low-income and minority populations is not expected based on water usage for operations. Potential impacts from mining operations on surface water through runoff contamination could occur in some lease tracts, and they have the potential to affect local rivers and aquifers (see Section 4.3.3.1). Short-term soil erosion impacts could occur during mine development (see Section 4.3.3). Longer-term erosion impacts associated with runoff before revegetation occurred could affect wildlife and water quality and, with potential sedimentation, recreational fishing. Erosion impacts could also increase the potential for flooding, which could affect subsistence activities, which could have disproportionate impacts on low-income and minority populations.

Mining facilities would introduce contrasts in form, line, color, and texture, as well as an increasing degree of human activity, into landscapes where activity levels are generally (see Section 4.3.12). However, dust mitigation would reduce the visual impact of mine development activity. Attempts could be made to choose construction materials that would minimize scenic contrast, and revegetation programs could reduce the longer-term visual impacts from mining

BLM_0042476

sites in local communities and religious and cultural sites and, consequently, reduce any disproportionate impacts on low-income and minority populations. Adverse impacts of uranium mining on property values would likely be minor, given the existence of mining in the area, the potential small scale and phased schedule of proposed mining activities, the opportunity for lucrative uranium mining employment, and the higher tax revenues and improved local public service provisions in local communities where there are low-income and minority populations.

### 4.3.9.3  Reclamation

Under Alternative 3, impacts on environmental justice associated with reclamation activities would be the same as those described for Alternative 1 (Section 4.1.9).

Although potential impacts on the general population could result from exploration, mine development and operations, and reclamation of uranium mining facilities under Alternative 3, for the majority of resources evaluated, impacts are likely to be minor and are unlikely to disproportionately affect low-income and minority populations. Specific disproportionate impacts on low-income and minority populations as a result of participation in subsistence or certain cultural and religious activities would also be minor.

### 4.3.10  Transportation

The transportation risk analysis estimated both radiological and nonradiological impacts associated with the shipment of uranium ore from its point of origin (at one of eight mines) to a uranium mill. Each mine is assumed to be operating on one of the 12 lease tracts considered under Alternative 3. Further details on the risk methodology and input data are provided in Section D.10 of Appendix D. Mitigation measures and BMPs for the safe transportation of uranium ore are provided in Table 4.6-1 (Section 4.6).

### 4.3.10.1  General Approach and Assumptions

The ULP PEIS transportation assessment evaluated the annual impacts expected during the peak year of operations when the largest potential number of mines could be operating on the 12 lease tracts considered. The shipment of uranium ore is not assumed over the life of the program because of the uncertainty associated with future uranium demand and mine development.

A sample set of 8 of the 12 lease tracts was evaluated in the transportation analysis to represent operations during the peak year of production. To select lease tracts for the transportation analysis, lease tract locations, lessees, and prior mining operations, if any, were considered. In addition, mill distance and capacity were considered when determining which mill would receive a particular mine's ore shipments. The nearest mill was not always the destination for a given shipment. At the time of actual shipment, various factors, such as existing road conditions due to traffic, weather, and road maintenance and repairs as well as mill capacity and

BLM_0042477

1    costs, would be among the criteria used to determine which mill would receive a given ore
2    shipment. The intent of the transportation analysis is to provide a reasonable estimate of impacts
3    that could occur. Impacts were also estimated on the basis of the assumption that all shipments
4    would go to a single mill to provide an upper range on what might be expected. Single shipment
5    risks for uranium ore were also determined so that an estimate for any future shipping campaign
6    could be evaluated.
7
8          The transportation risk assessment considered human health risks from routine (normal,
9    incident-free) transport of radiological materials and from accidents. The risks associated with
10   the nature of the cargo itself ("cargo-related" impacts) were considered for routine transport.
11   Risks related to the transportation vehicle regardless of type of cargo ("vehicle related" impacts)
12   were considered for routine transport and potential accidents. Radiological-cargo-related
13   accident risks are expected to be negligible and were not assessed as part of this analysis, as
14   discussed in Appendix D, Section D.10.1. Transportation of hazardous chemicals was not part of
15   this analysis because no hazardous chemicals have been identified as being part of uranium
16   mining operations.
17
18
19         **4.3.10.1.1  Routine Transportation Risks.** The nonradiological routine impacts
20   associated with uranium ore transportation would be vehicle-related as a result of the increase in
21   truck traffic on affected routes. A comparison with existing traffic densities was made, and the
22   potential for traffic delays was considered.
23
24         The radiological risk associated with routine transportation would be cargo-related and
25   result from the potential exposure of people to low levels of external radiation near a loaded
26   shipment. No direct physical exposure to radioactive material would occur during routine
27   transport because the uranium ore would be covered by a tarp during transport. No significant
28   unintended releases would occur.
29
30         Collective population radiological risks were estimated for persons living or working in
31   the vicinity of a shipment route (off-link population) and persons in all vehicles sharing the
32   transportation route (on-link population). Collective doses were also calculated for the truck
33   drivers involved in the actual shipment of uranium ore. Workers involved in loading or
34   unloading were not considered in the transportation analysis. The doses calculated for the first
35   two population groups were added together to yield the collective dose to the public; the dose
36   calculated for the truck drivers represents the collective dose to workers.
37
38         In addition to assessing the routine collective population risk, the radiological risks to
39   individuals were estimated for a number of hypothetical exposure scenarios. Receptors included
40   members of the public exposed standing along the roadside, at a nearby residence, or during
41   traffic delays.
42
43
44         **4.3.10.1.2  Transportation Accident Risks.** The vehicle-related accident risk refers to
45   the potential for transportation accidents that could result directly in injuries and fatalities not
46   related to the nature of the cargo in the shipment. This risk represents injuries and fatalities from

BLM_0042478

1   physical trauma. Route-specific or countywide rates for transportation injuries and fatalities were
2   used in the assessment, as discussed in Appendix D, Section D.10.4.1.3. Vehicle-related accident
3   risks were calculated by multiplying the total distance traveled by the rates for transportation
4   injuries and fatalities. In all cases, the vehicle-related accident risks were calculated on the basis
5   of distances for round-trip shipment, since the presence or absence of cargo would not be a factor
6   in accident frequency.
7
8
9       **4.3.10.1.3  Transportation Routes**. Ore shipments would travel primarily on CO 90 and
10  CO 141, depending on the lease tract, if the Piñon Ridge Mill was used to process the ore.
11  Shipments to the White Mesa Mill would use these roads and also US 491 in Colorado and Utah
12  and US 191 in Utah. Travel on county or BLM roads would also be necessary for those mines
13  without direct access to the state roads. Table 4.3-12 lists the distances to each mill from all lease
14  tracts that could support mining operations under Alternatives 3 through 5.
15
16
17      **4.3.10.2  Routine Transportation Risks**
18
19
20      **4.3.10.2.1  Nonradiological Impacts.** The estimated number of shipments from the
21  operating uranium mines to the mills during the peak year of uranium mining under Alternative 3
22  would be 40 per day, assuming a combined mill processing capability of 1,000 tons per day as
23  discussed in Section 2.2.3.1 and a truck load of 25 tons. Including round-trip travel, 80 trucks per
24  day would be expected to travel the affected routes. As listed in Table 3.10-1, the lowest annual
25  average daily traffic (AADT) along any of the routes would be about 250 vehicles per day near
26  Egnar on CO 141. If all 80 trucks per day passed through Egnar, in the extreme case of all
27  shipments going to the White Mesa Mill, this scenario would represent a 32% increase in traffic
28  in this area but an increase of less than 2% at the most heavily traveled location in Monticello,
29  Utah—again, if all shipments went to the White Mesa Mill. No additional traffic congestion
30  would be expected in any area, and only about two to three additional trucks per hour going in
31  each direction would be expected in that extreme case, assuming a 16-hour workday for
32  transport.
33
34      For the example case with operations at 8 mines (1 very large, 1 large, 4 medium, and
35  2 small, as discussed in Section 2..2.3.1), the total distance traveled by haul trucks during the
36  peak year would be approximately 1.10 million mi (1.77 million km), assuming round-trip travel
37  between the lease tracts and the mills as shown in Table 4.3-13. Using peak-year assumptions of
38  40 shipments a day and 20 days a month, 9,600 round-trips would be expected. According to the
39  CDOT and UDOT, the estimated total truck distance travelled of 1.10 million mi (1.77 million
40  km) would be about 9% of the total heavy truck miles travelled (12.6 million mi, or 20.3 million
41  km) along the affected highways in 2010 (CDOT 2011; UDOT 2011).In general, actual annual
42  impacts over the course of the ULP could be lower or higher than these impacts, because the
43  shipment numbers are for the estimated peak year and because, for a given lease tract, the ore
44  could be transported to a different mill than that used in the ULP PEIS analysis or because lease
45  tracts other than those used in the sample case would be developed.
46

BLM_0042479

1
2

**TABLE 4.3-12  Distances from Lease Tracts to Ore Processing Mills**

| Lease Tract | Distance (km) | | Alternative[a] |
|---|---|---|---|
| | Piñon Ridge | White Mesa | |
| 5 | 6.6 | 195.7 | 3, 4, 5 |
| 5A | 7.0 | 196.1 | 4, 5 |
| 6 | 8.1 | 197.2 | 3, 4, 5 |
| 7 | 7.0 | 196.1 | 3, 4, 5 |
| 8 | 9.4 | 198.5 | 3, 4, 5 |
| 8A | 9.4 | 198.5 | 4, 5 |
| 9 | 27.4 | 209.3 | 3, 4, 5 |
| 10 | 99.8 | 107.1 | 4, 5 |
| 11 | 105.5 | 99.7 | 3, 4, 5 |
| 11A | 108.6 | 102.8 | 4, 5 |
| 12 | 107.0 | 103.2 | 4, 5 |
| 13 | 86.0 | 114.8 | 3, 4, 5 |
| 13A | 87.9 | 116.8 | 3, 4, 5 |
| 14 | 87.9 | 116.1 | 4, 5 |
| 15 | 91.7 | 120.5 | 3, 4, 5 |
| 15A | 93.9 | 122.8 | 4, 5 |
| 16 | 96.0 | 105.5 | 4, 5 |
| 16A | 95.2 | 104.9 | 4, 5 |
| 17 | 30.2 | 172.8 | 4, 5 |
| 18 | 43.2 | 204.9 | 3, 4, 5 |
| 19 | 50.5 | 212.3 | 4, 5 |
| 19A | 47.8 | 209.6 | 4, 5 |
| 20 | 47.8 | 209.6 | 4, 5 |
| 21 | 21.6 | 199.7 | 3, 4, 5 |
| 22 | 24.3 | 202.3 | 4, 5 |
| 2A | 26.0 | 204.1 | 4, 5 |
| 23 | 18.4 | 196.4 | 4, 5 |
| 24 | 44.0 | 205.8 | 4, 5 |
| 25 | 42.8 | 204.5 | 3, 4, 5 |
| 26 | 104.5 | 266.2 | 4, 5 |
| 27 | 85.6 | 247.3 | 4, 5 |

[a]  ULP PEIS alternatives that would mine and produce ore to ship to a mill.

3
4
5

BLM_0042480

1    **TABLE 4.3-13  Peak-Year Collective Population Transportation Impacts under Alternative 3**

| Scenario | Total Distance (km) | Radiological Impacts | | | | Accidents per Round Trip | |
|---|---|---|---|---|---|---|---|
| | | Public Dose (person-rem) | Risk (LCF) | Worker Dose (person-rem) | Risk (LCF) | Injuries | Fatalities |
| Sample case | 1,766,000 | 0.14 | 8E-05 | 0.71 | 0.0004 | 0.33 | 0.029 |
| All to Piñon Ridge Mill | 751,000 | 0.058 | 3E-05 | 0.30 | 0.0002 | 0.14 | 0.012 |
| All to White Mesa Mill | 3,581,000 | 0.28 | 0.0002 | 1.5 | 0.0009 | 0.66 | 0.060 |

2
3
4         To help put the sample case results in perspective, Table 4.3-13 also lists the total
5    distances that ore would be shipped if all the ore was shipped to one mill or the other. Because of
6    the relative locations of all the lease tracts with respect to the mills, shipping all of the ore to
7    White Mesa Mill (2.22 million mi or 3.58 million km) would represent close to the upper bound
8    for the total distance for all shipments. Shipment of all of the ore to the Piñon Ridge Mill
9    (0.47 million mi or 0.75 million km) would represent close to the lower bound for total distance.
10
11        Most of the distance travelled by the haul trucks would occur on state or U.S. highways.
12   To access these roads, the haul trucks might travel distances of up to several miles on county and
13   local roads, depending on the location of the lease tract and the location of the mine within the
14   lease tract. Several residences are located near lease tracts along such roads. In those cases, the
15   number of passing haul trucks could range from about 4 (small mine) to 16 per day (large mine),
16   depending on the size of the nearby mine, as shown in Table 4.3-14. No residences are located
17   along the short distance between the very large mine (JD-7) and the highway. If hauling were to
18   occur 16 hours per day, then up to one haul truck per hour could pass by on the way to or from
19   the main highway in the case of a very large mine. In addition, some of these residences might
20   encounter local truck traffic for the first time should ore production occur on neighboring lease
21   tracts.
22
23        Access to the lease tracts from the Colorado state highways is provided by local roads, as
24   discussed in Section 3.10. Improvements to the intersections between the local roads and the
25   state highways (e.g., pave local road surface a prescribed distance back, add turn lanes, improve
26   sight distance) might be necessary, as governed by the State of Colorado State Highway Access
27   Code (pursuant to *Colorado Revised Statutes* [CRS] 43-2-147(4)]), depending on the increased
28   level of traffic from uranium ore production. At this time, it is possible to provide only a general
29   estimate of the potential number of ore shipments and amounts of other related traffic that could
30   be generated and pass through these intersections, regardless of the alternative considered, given
31   the uncertainty regarding which lease tracts would eventually host a mine site, the actual ore
32   production rate associated with each mine, the number of mines operating simultaneously, and
33   the relative locations of the mines and the mills (i.e., whether or not the mines share the use of a
34   common access road).
35

BLM_0042481

1    **TABLE 4.3-14  Potential Haul Truck Traffic**
2    **on Local Roads**

| Size of Mine | Ore Production Rate (tons/d) | No. of Trucks/d[a] |
|---|---|---|
| Small | 50 | 4 |
| Medium | 100 | 8 |
| Large | 200 | 16 |
| Very large | 300 | 24 |

[a]   Assumes 25 tons of uranium ore per truck
     and round-trip travel.

3
4
5         The transportation analysis conducted for Alternatives 3 through 5 used an assumed mine
6    size, which determines the number of ore shipments, for each lease tract considered, as discussed
7    in Section D.10.4.5. While it is highly unlikely that all lease tracts considered in the ULP PEIS
8    would have mines at the sizes assumed in Table D.10-2 operating simultaneously, it is possible
9    that in isolated cases, two or more lease tracts sharing an access road to a state highway could
10   have mines operating at the same time under Alternative 3, 4, or 5.
11
12        Tables 4.3-15 and 4.3-16 present the number of shipments passing through the
13   intersection of each local access road from a lease tract onto a state or U.S. highway, assuming
14   that all shipments would go to either the White Mesa Mill or the Piñon Ridge Mill, respectively.
15   As shown, the number of shipments ranges from 0 to 36 per day, depending on the destination
16   mill and the specific intersection. Note that the value of 36 shipments corresponds to the
17   intersection of DD19 Road with CO 90, with DD19 Road serving the very large mine on JD-7 in
18   addition to six other lease tracts. In each case, the number of haul trucks passing through would
19   be doubled, to account for the return of the empty truck. The number of shipments shown in
20   Tables 4.3-15 and 4.3-16 for each intersection is not necessarily an upper bound, because larger
21   mines than those assumed (or more than one mine) could potentially be sited at each location.
22   However, based on prior mining experience in this region of Colorado, the number of shipments
23   is expected to be at the higher end of the potential range and to provide an indication of the
24   potential impacts on traffic from future mining operations.
25
26        In addition to increased traffic flows on the state highways, the associated traffic impacts
27   include the number of vehicle turns (and their direction) from the state highways onto the roads
28   used to access the lease tracts as well as the number of turns in the opposite direction. While the
29   increased traffic flows related to potential mining on the lease tracts are not expected to have any
30   significant effects on traffic congestion, some potential mitigation measures may be necessary.
31   As previously discussed, access to Colorado's state highways is governed by the State of
32   Colorado Access Code. The code contains provisions aimed at maintaining roadway safety that
33   pertain to the intersections between the state highways and other roads that access the highway.
34   Note that mine lessees intending to commence mine operations are expected to discuss their
35   plans with CDOT beforehand. A sample case is provided in the text box as an example to
36

BLM_0042482

1   **TABLE 4.3-15  Potential Number of Truck Shipments to the White Mesa Mill Passing through**
2   **Collector Road Intersections with U.S. and State Highways**

| Lease Tract | No. of Shipments per Day | DD19 Rd (CO 90) | EE21 Rd (CO 90) | 7N Rd (CO 141) | UCOLO Rd (US 491) | S8 Rd (CO 141) | K8 Rd (CO 141) | Unk Rd 1 (CO 141) | Unk Rd 3 (CO 141) |
|---|---|---|---|---|---|---|---|---|---|
| C-JD-5 | 8 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-5A | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-6 | 8 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-7 | 12 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-8 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-8A | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-9 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-10 | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 |
| C-SR-11 | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| C-SR-11A | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| C-SR-12 | 2 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| C-SR-13 | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| C-SR-13A | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| C-SR-14 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 |
| C-SR-15 | 2 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| C-SR-15A | 2 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| C-SR-16 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-16A | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| C-WM-17 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SM-18 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-AM-19 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-AM-19A | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-AM-20 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-LP-21 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-LP-22 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-LP22A | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-LP-23 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-CM-24 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-CM-25 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-G-26 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-G-27 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | |
| Total shipments | 116 | 36 | 4 | 4 | 8 | 12 | 2 | 4 | 2 |
| Round-trip trucks | 232 | 72 | 8 | 8 | 16 | 24 | 4 | 8 | 4 |

3
4

BLM_0042483

1      **TABLE 4.3-15  (Cont.)**

| Lease Tract | No. of Shipments per Day | Unk Rd 4 (CO 141) | 25R Rd (CO 141 | U18 (CO 141) | S17 (CO 141) | EE22 Rd (CO 90)) | EE22 Rd (CO 141) | P12 Rd (CO 141) |
|---|---|---|---|---|---|---|---|---|
| C-JD-5 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-5A | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-6 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-7 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-8 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-8A | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-9 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-10 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-11 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-11A | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-12 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-13A | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-14 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-15 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-15A | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-16 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-16A | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-WM-17 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| C-SM-18 | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| C-AM-19 | 8 | 0 | 0 | 0 | 8 | 0 | 0 | 0 |
| C-AM-19A | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| C-AM-20 | 2 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| C-LP-21 | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| C-LP-22 | 2 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| C-LP22A | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| C-LP-23 | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| C-CM-24 | 2 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| C-CM-25 | 2 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| C-G-26 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| C-G-27 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Total shipments | 116 | 2 | 2 | 4 | 14 | 14 | 4 | 4 |
| Round-trip trucks | 232 | 4 | 4 | 8 | 28 | 28 | 8 | 8 |

2
3

BLM_0042484

1   **TABLE 4.3-16  Potential Number of Truck Shipments to the Piñon Ridge Mill Passing**
2   **through Collector Road Intersections with U.S. and State Highways**

| Lease Tract | No. of Shipments per Day | DD19 Rd (CO 90) | EE21 Rd (CO 90) | 7N Rd (CO 141) | S8 Rd (CO 141) | K8 Rd (CO 141) | Unk Rd 1 (CO 141) | Unk Rd 3 (CO 141) |
|---|---|---|---|---|---|---|---|---|
| C-JD-5 | 8 | 8 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-5A | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-6 | 8 | 8 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-7 | 12 | 12 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-8 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-8A | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-9 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 |
| C-SR-10 | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| C-SR-11 | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| C-SR-11A | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| C-SR-12 | 2 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| C-SR-13 | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| C-SR-13A | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| C-SR-14 | 4 | 0 | 0 | 0 | 0 | 0 | 4 | 0 |
| C-SR-15 | 2 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| C-SR-15A | 2 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| C-SR-16 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-16A | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| C-WM-17 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| C-SM-18 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-AM-19 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-AM-19A | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-AM-20 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-LP-21 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-LP-22 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-LP22A | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-LP-23 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-CM-24 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-CM-25 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-G-26 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-G-27 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| Total shipments | 116 | 36 | 6 | 4 | 20 | 2 | 4 | 2 |
| Round-trip trucks | 232 | 72 | 12 | 8 | 40 | 4 | 8 | 4 |

3
4

BLM_0042485

1        **TABLE 4.3-16  (Cont.)**

| Lease Tract | No. of Shipments per Day | Unk Rd 4 (CO 141) | U18 (CO 141) | S17 (CO 141) | EE22 Rd (CO 90) | EE22 Rd (CO 141) | P12 Rd (CO 141) |
|---|---|---|---|---|---|---|---|
| C-JD-5 | 8 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-5A | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-6 | 8 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-7 | 12 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-8 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-8A | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-JD-9 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-10 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-11 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-11A | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-12 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-13A | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-14 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-15 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-15A | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SR-16 | 2 | 2 | 0 | 0 | 0 | 0 | 0 |
| C-SR-16A | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-WM-17 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| C-SM-18 | 4 | 0 | 4 | 0 | 0 | 0 | 0 |
| C-AM-19 | 8 | 0 | 0 | 8 | 0 | 0 | 0 |
| C-AM-19A | 4 | 0 | 0 | 4 | 0 | 0 | 0 |
| C-AM-20 | 2 | 0 | 0 | 2 | 0 | 0 | 0 |
| C-LP-21 | 4 | 0 | 0 | 0 | 4 | 0 | 0 |
| C-LP-22 | 2 | 0 | 0 | 0 | 2 | 0 | 0 |
| C-LP22A | 4 | 0 | 0 | 0 | 4 | 0 | 0 |
| C-LP-23 | 4 | 0 | 0 | 0 | 4 | 0 | 0 |
| C-CM-24 | 2 | 0 | 0 | 0 | 0 | 2 | 0 |
| C-CM-25 | 2 | 0 | 0 | 0 | 0 | 2 | 0 |
| C-G-26 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| C-G-27 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Total shipments | 116 | 2 | 4 | 14 | 14 | 4 | 4 |
| Round-trip trucks | 232 | 4 | 8 | 28 | 28 | 8 | 8 |

2
3
4

BLM_0042486

---

**Auxiliary Turn Lane Requirements for State Highways CO 90 and CO 141**
Left turn lane:    Left ingress turning volume greater than 10 vehicles per hour
Right turn lane:   Right ingress turning volume greater than 25 vehicles per hour

**Definitions**
Passenger car equivalent (PCE): Used to account for vehicles larger than passenger cars/trucks in the access code criteria. A combination truck (e.g., a uranium ore haul truck) 40 ft or longer is considered as 3 PCEs.

**Example Assumptions**
Two medium mines on the same access road
Number of ore trucks per day (round-trip):  16 (48 PCEs)
Number of workers:            20
All workers arrive and leave over a 1-hour span in the morning and evening in their own cars.

Turn direction from mill onto access road from highway:  Left

Turn direction from home onto access road for worker commutes:  40% left, 60% right

Existing traffic:  Left turns off highway    12 per day
Right turns off highway    4 per day

**Determination**
Peak incoming traffic volume would be in the morning when workers arrive and could include a couple of incoming empty haul trucks from the mill. The number of vehicles turning left off the highway during the 1-hour arrival of all workers would include 8 worker vehicles (40% of 20), the haul trucks (6 PCEs), and possibly some of the existing traffic (1 PCE), for total of 15 PCEs; thus, a left-turn lane off the highway to the access road would likely be required. For right-turn access, only 12 worker vehicles and possibly 1 vehicle from existing traffic would amount to a total of only 13 PCEs, below the requirement for a right-turn lane.

---

1
2   illustrate the process used by CDOT to ensure compliance with the code when determining one
3   facet of intersection safety—the need for a left or right turn lane off the state highway.
4
5
6       **4.3.10.2.2  Radiological Impacts.** Radiological impacts during routine conditions would
7   be a result of human exposure to the low levels of radiation near the shipment. The regulatory
8   limit established in 49 CFR 173.441 (Radiation Level Limitations) and 10 CFR 71.47 (External
9   Radiation Standards for All Packages) to protect the public is 10 mrem/h at 6 ft (2 m) from the
10  outer lateral sides of the transport vehicle. As discussed in Appendix D, Section D.10.4.2, the
11  average external dose rate for uranium ore shipments is approximately 0.1 mrem/h at 6.6 ft
12  (2 m), two orders of magnitude lower than the regulatory maximum.
13
14
15      **Collective Population Risk.** The collective population risk is a measure of the total risk
16  posed to society as a whole by the actions being considered. For a collective population risk
17  assessment, the persons exposed are considered as a group; no individual receptors are specified.
18  The annual collective population dose to persons sharing the shipment route and to persons
19  living and working along the route was estimated to be approximately 0.14 person-rem for the
20  peak year, assuming about 9,600 shipments for the year for the sample case, as shown in

---

BLM_0042487

1   Table 4.3-13. The total collective population dose of 0.14 person-rem could result in an LCF risk
2   of approximately $8 \times 10^{-5}$. Therefore, no latent fatal cancers are expected. These impacts are
3   roughly double the impacts that would occur if all ore shipments went to the Piñon Ridge Mill
4   and roughly half the impacts that would occur if all ore shipments went to the White Mesa Mill,
5   as shown in Table 4.3-13.
6
7          Collectively for the sample case, the truck drivers (transportation crew) would receive a
8   dose of about 0.71 person-rem (0.0004 LCF) during the peak year of operations from all
9   shipments. Again, no latent fatal cancers would be expected. For perspective, the collective dose
10  of 0.71 rem (710 mrem) over 9,600 shipments is slightly more than what a single individual
11  would receive in 1 year from natural background radiation (about 310 mrem) and human-made
12  sources of radiation (about 310 mrem/yr).
13
14         For scenarios other than those presented in the ULP PEIS, single shipment risks are
15  provided for transporting ore from any of the lease tracts considered in any alternative to the
16  Piñon Ridge Mill (Table 4.3-17) and the White Mesa Mill (Table 4.3-18). In conjunction with
17  Table 4.3-10, all collective population impacts related to any combination and number of ore
18  shipments between lease tracts and uranium mills can be estimated.
19
20
21         **Highest-Exposed Individuals during Routine Conditions.** In addition to assessing the
22  routine collective population risk, the risks to individuals for a number of hypothetical exposure
23  scenarios were estimated, as described further in Appendix D, Section D.10.2.2. The scenarios
24  were not meant to be exhaustive but were selected to provide a range of potential exposure
25  situations. The estimated doses and associated likelihoods of LCFs are provided in Table 4.3-19.
26
27         The highest potential routine radiological exposure to an individual—with an LCF risk of
28  $5 \times 10^{-8}$—would be to someone caught in traffic next to a haul truck for up to 30 minutes at a
29  distance of 3.9 ft (1.2 m). There is also the possibility for multiple exposures in some cases. For
30  example, if an individual lived or worked near a uranium mill, the person could receive a
31  combined dose of as much as approximately 0.013 mrem if present for all ore shipments over the
32  course of the peak year (if all of the ore went to a single mill). This dose is extremely low, about
33  24,000 times lower than the amount an individual receives in a single year from natural
34  background radiation (about 310 mrem/yr).
35
36
37         **4.3.10.3  Transportation Accident Risks**
38
39         The total distance traveled by haul trucks during the peak year would be approximately
40  1.10 million mi (1.77 million km), including round-trip travel between the lease tracts and the
41  mills, as discussed in Section 4.5.10.2.1 for the sample case. As shown in Table 4.3-13, potential
42  transportation accident impacts for the peak year would not include any expected injuries or
43  fatalities from traffic accidents (risk of <0.5). For perspective, from 2006 through 2010 over the
44  entire area of the affected counties (San Juan County in Utah and Dolores, Mesa, Montrose, and
45  San Miguel Counties in Colorado), a total of 21 heavy-truck-related traffic fatalities occurred
46  (DOT 2010 a–e), representing an average of 4.2 fatalities per year.

BLM_0042488

1
2

**TABLE 4.3-17  Single-Shipment Collective Population Impacts from Transporting Ore from Lease Tracts to Piñon Ridge Mill[a]**

| Lease Tract | Radiological Impacts | | | | Accidents per Round Trip | |
| | Public Dose (person-rem) | Risk (LCF) | Worker Dose (person-rem) | Risk (LCF) | Injuries | Fatalities |
|---|---|---|---|---|---|---|
| 5 | 1.0E-06 | 6E-10 | 5.4E-06 | 3E-09 | 2.45E-06 | 2.20E-07 |
| 5A | 1.1E-06 | 6E-10 | 5.6E-06 | 3E-09 | 2.57E-06 | 2.32E-07 |
| 6 | 1.3E-06 | 8E-10 | 6.5E-06 | 4E-09 | 2.99E-06 | 2.70E-07 |
| 7 | 1.1E-06 | 6E-10 | 5.7E-06 | 3E-09 | 2.58E-06 | 2.33E-07 |
| 8 | 1.5E-06 | 9E-10 | 7.6E-06 | 5E-09 | 3.49E-06 | 3.14E-07 |
| 8A | 1.5E-06 | 9E-10 | 7.6E-06 | 5E-09 | 3.49E-06 | 3.14E-07 |
| 9 | 4.2E-06 | 3E-09 | 2.2E-05 | 1E-08 | 1.01E-05 | 9.10E-07 |
| 10 | 1.5E-05 | 9E-09 | 8.1E-05 | 5E-08 | 3.68E-05 | 3.32E-06 |
| 11 | 1.6E-05 | 1E-08 | 8.5E-05 | 5E-08 | 3.89E-05 | 3.51E-06 |
| 11A | 1.7E-05 | 1E-08 | 8.8E-05 | 5E-08 | 4.01E-05 | 3.61E-06 |
| 12 | 1.7E-05 | 1E-08 | 8.6E-05 | 5E-08 | 3.95E-05 | 3.56E-06 |
| 13 | 1.3E-05 | 8E-09 | 6.9E-05 | 4E-08 | 3.17E-05 | 2.86E-06 |
| 13A | 1.4E-05 | 8E-09 | 7.1E-05 | 4E-08 | 3.25E-05 | 2.92E-06 |
| 14 | 1.4E-05 | 8E-09 | 7.1E-05 | 4E-08 | 3.24E-05 | 2.92E-06 |
| 15 | 1.4E-05 | 8E-09 | 7.4E-05 | 4E-08 | 3.38E-05 | 3.05E-06 |
| 15A | 1.5E-05 | 9E-09 | 7.6E-05 | 5E-08 | 3.47E-05 | 3.12E-06 |
| 16 | 1.5E-05 | 9E-09 | 7.8E-05 | 5E-08 | 3.54E-05 | 3.19E-06 |
| 16A | 1.5E-05 | 9E-09 | 7.7E-05 | 5E-08 | 3.51E-05 | 3.16E-06 |
| 17 | 4.7E-06 | 3E-09 | 2.4E-05 | 1E-08 | 1.11E-05 | 1.00E-06 |
| 18 | 6.7E-06 | 4E-09 | 3.5E-05 | 2E-08 | 1.59E-05 | 1.44E-06 |
| 19 | 7.8E-06 | 5E-09 | 4.1E-05 | 2E-08 | 1.86E-05 | 1.68E-06 |
| 19A | 7.4E-06 | 4E-09 | 3.9E-05 | 2E-08 | 1.76E-05 | 1.59E-06 |
| 20 | 7.4E-06 | 4E-09 | 3.9E-05 | 2E-08 | 1.76E-05 | 1.59E-06 |
| 21 | 3.3E-06 | 2E-09 | 1.7E-05 | 1E-08 | 7.98E-06 | 7.19E-07 |
| 22 | 3.7E-06 | 2E-09 | 2.0E-05 | 1E-08 | 8.96E-06 | 8.07E-07 |
| 22A | 4.0E-06 | 2E-09 | 2.1E-05 | 1E-08 | 9.62E-06 | 8.66E-07 |
| 23 | 2.8E-06 | 2E-09 | 1.5E-05 | 9E-09 | 6.78E-06 | 6.10E-07 |
| 24 | 6.8E-06 | 4E-09 | 3.6E-05 | 2E-08 | 1.63E-05 | 1.46E-06 |
| 25 | 6.6E-06 | 4E-09 | 3.5E-05 | 2E-08 | 1.58E-05 | 1.42E-06 |
| 26 | 1.6E-05 | 1E-08 | 8.4E-05 | 5E-08 | 3.86E-05 | 3.47E-06 |
| 27 | 1.3E-05 | 8E-09 | 6.9E-05 | 4E-08 | 3.16E-05 | 2.84E-06 |

a    See Appendix D, Section D.10.4, for assumptions.

3
4
5

BLM_0042489

1
2

**TABLE 4.3-18  Single-Shipment Collective Population Impacts from Transporting Ore from Lease Tracts to White Mesa Mill[a]**

| Lease Tract | Radiological Impacts | | | | Accidents per Round Trip | |
|---|---|---|---|---|---|---|
| | Public Dose (person-rem) | Risk (LCF) | Worker Dose (person-rem) | Risk (LCF) | Injuries | Fatalities |
| 5 | 3.0E-05 | 2E-08 | 1.6E-04 | 9E-08 | 7.22E-05 | 6.51E-06 |
| 5A | 3.0E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.24E-05 | 6.52E-06 |
| 6 | 3.0E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.28E-05 | 6.56E-06 |
| 7 | 3.0E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.24E-05 | 6.52E-06 |
| 8 | 3.1E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.33E-05 | 6.60E-06 |
| 8A | 3.1E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.33E-05 | 6.60E-06 |
| 9 | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.72E-05 | 6.96E-06 |
| 10 | 1.7E-05 | 1E-08 | 8.6E-05 | 5E-08 | 3.95E-05 | 3.56E-06 |
| 11 | 1.5E-05 | 9E-09 | 8.0E-05 | 5E-08 | 3.68E-05 | 3.31E-06 |
| 11A | 1.6E-05 | 1E-08 | 8.3E-05 | 5E-08 | 3.80E-05 | 3.42E-06 |
| 12 | 1.6E-05 | 1E-08 | 8.3E-05 | 5E-08 | 3.81E-05 | 3.43E-06 |
| 13 | 1.8E-05 | 1E-08 | 9.3E-05 | 6E-08 | 4.24E-05 | 3.82E-06 |
| 13A | 1.8E-05 | 1E-08 | 9.4E-05 | 6E-08 | 4.31E-05 | 3.88E-06 |
| 14 | 1.8E-05 | 1E-08 | 9.4E-05 | 6E-08 | 4.28E-05 | 3.86E-06 |
| 15 | 1.9E-05 | 1E-08 | 9.7E-05 | 6E-08 | 4.45E-05 | 4.01E-06 |
| 15A | 1.9E-05 | 1E-08 | 9.9E-05 | 6E-08 | 4.53E-05 | 4.08E-06 |
| 16 | 1.6E-05 | 1E-08 | 8.5E-05 | 5E-08 | 3.89E-05 | 3.51E-06 |
| 16A | 1.6E-05 | 1E-08 | 8.5E-05 | 5E-08 | 3.87E-05 | 3.49E-06 |
| 17 | 2.7E-05 | 2E-08 | 1.4E-04 | 8E-08 | 6.38E-05 | 5.75E-06 |
| 18 | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.56E-05 | 6.81E-06 |
| 19 | 3.3E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.84E-05 | 7.06E-06 |
| 19A | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.74E-05 | 6.97E-06 |
| 20 | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.74E-05 | 6.97E-06 |
| 21 | 3.1E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.37E-05 | 6.64E-06 |
| 22 | 3.1E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.47E-05 | 6.73E-06 |
| 22A | 3.2E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.53E-05 | 6.79E-06 |
| 23 | 3.0E-05 | 2E-08 | 1.6E-04 | 1E-07 | 7.25E-05 | 6.53E-06 |
| 24 | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.60E-05 | 6.84E-06 |
| 25 | 3.2E-05 | 2E-08 | 1.7E-04 | 1E-07 | 7.55E-05 | 6.80E-06 |
| 26 | 4.1E-05 | 2E-08 | 2.1E-04 | 1E-07 | 9.82E-05 | 8.85E-06 |
| 27 | 3.8E-05 | 2E-08 | 2.0E-04 | 1E-07 | 9.13E-05 | 8.22E-06 |

a    See Appendix D, Section D.10.4, for assumptions.

3
4
5

BLM_0042490

**TABLE 4.3-19  Hypothetical Single-Shipment Radiological Impacts on Individual Receptors**

| Receptor | Dose (mrem) | LCF Risk |
|---|---|---|
| Person at roadside | $1.8 \times 10^{-5}$ | $1 \times 10^{-11}$ |
| Person in traffic jam | 0.089 | $5 \times 10^{-8}$ |
| Resident near route | $1.4 \times 10^{-6}$ | $8 \times 10^{-13}$ |

### 4.3.10.4  Accidental Release of Uranium during Transportation

It is expected that the uranium mine operators and their transportation carriers would maintain an emergency response plan for haul truck accidents. Accidental spills of uranium ore would be cleaned up in the shortest possible time by qualified personnel. Uranium ore being transported is treated by U.S. Department of Transportation regulations as a low-specific-activity material. However, because of the low-grade nature of the uranium ore considered in the ULP PEIS (0.2% as $U_3O_8$), an ore spill of the entire shipment (25 tons) would not constitute a reportable quantity for uranium as defined in 49 CFR 172.101.

Impacts on the public and the environment from an accident involving a haul truck carrying uranium ore are expected to be minimal and short-term, as related to the reduced use of the affected highway segment during cleanup. If a transportation accident occurred and some or all of the uranium ore spilled on the ground, the ore would be completely recovered, loaded onto a truck, and transported to the mill. Because it is low-grade uranium ore and because the ore is of a stony, aggregate composition that would limit any widespread dispersion, there would be no significant impacts on human health or natural resources. The short-term dose to an individual involved in an accidental spill or the cleanup would be minimal (i.e., a small fraction of that received by a uranium miner, as discussed in Section 4.3.5.1). A miner is estimated to receive an *annual* dose of 430 mrem, primarily from radon inhalation because of the confined nature of the mine. Such confinement would be absent from an accident spill location, and a worker involved in cleanup might therefore be expected to receive a dose on the order of 1 mrem or less. Only local disturbance of soil and vegetation might occur as a consequence of spill cleanup.

If a haul truck accident involved spilling ore into a surface water body, adverse radiological impacts on biota would not be expected. First, the nature of the ore—relatively large, insoluble chunks of material—would make it more amenable to cleanup from the water body. Second, the low concentrations of hazardous constituents in the ore and their relatively low levels of solubility in water would minimize the likelihood of them approaching toxic concentration levels. Third, prompt cleanup of the spill would reduce the time it would take for contaminants to leach into the water. Any finer ore particles would be dispersed by water flow in streams or rivers. In the case of fine particles, more extensive cleanup might be necessary if a sensitive, shallow water body like a pond was involved. The primary impact on water quality from a spill would be a short-term increase in turbidity and total suspended solids (TSP).

BLM_0042491

### 4.3.11  Cultural Resources

Under Alternative 3, the full range of uranium mining activities (exploration, development, operations, and reclamation) could occur on 12 lease tracts. As shown in Table 2.4-2, only 10% of the area within the lease tracts has been surveyed for cultural resources; however, it is likely that cultural resources exist in the unsurveyed areas. In each of these phases, cultural resources could be disturbed as a result of activities in which the ground surface was disturbed, historic structures were damaged or destroyed, or pedestrian and vehicle traffic increased on the lease tracts and their access roads. These activities could also have adverse effects on traditional cultural properties, such as plant and animal species traditionally collected by Native Americans for food, medicine, and ritual purposes, and on sacred or culturally significant places and landforms.

DOE ULP procedures require lessees to prepare and submit exploration and mining plans before initiating any surface-disturbing activities or building surface facilities on the lease tracts. These plans must undergo a technical review and a review for compliance with lease provisions. As part of the technical and compliance review process, ULP staff members conduct a field review to identify areas where cultural resources and any additional investigations are required. Per the procedure that has historically been carried out, DOE has addressed consultation through the BLM and the lessees on specific undertakings. If historic properties are identified, BLM, as the surface-managing agency for the lease tracts, would take the lead in notifying the SHPO, Federally recognized tribes, and other concerned parties as required by Section 106 of the NHPA (DOE 2011a). A qualified archaeologist or other cultural resource specialist would evaluate the properties for their eligibility for listing on the NRHP. Upon the recommendation of the cultural resource specialist, a final eligibility determination would be made by BLM in consultation with DOE, the SHPO, tribes, and other concerned parties. If historic properties were discovered to be within the area of potential effects or areas that potentially could be affected by the undertaking proposed in the exploration and mining plans, BLM and DOE would assess the potential for adverse effects. A finding of potential adverse effects would require additional consultation for methods to resolve the effects (DOE 2011a). Per Section 6.3, the final Programmatic Agreement will formalize the process that DOE will use to coordinate these efforts in the future. Potential adverse effects are often resolved by avoiding and/or protecting the threatened cultural resource. It is not always possible to avoid adverse effects. In these cases, data recovery through controlled excavation of an archaeological site, or appropriate recording of historic structures, mitigates but does not eliminate the adverse effects by providing a record of the property. In some cases, it might not be possible to mitigate all adverse effects. For example, Native Americans are likely to oppose the excavation of prehistoric sites, especially if humans are likely to be buried there. Mitigation measures and BMPs to minimize impacts on cultural resources are identified in Table 4.6-1 (Section 4.6).

Even if well-executed cultural resources surveys precede mining activities, since buried cultural remains do not always leave surface indicators, it is possible that unanticipated cultural resources might be encountered during exploration and operations. DOE-LM procedures require that if an in-process project encounters and will affect a previously unidentified cultural resource

BLM_0042492

or will affect a known historic property in an unanticipated manner, that activity must immediately cease in the area of the discovery. The resource must be protected, and DOE must be notified of the discovery. Surface-disturbing activity in the area of the discovery can continue only after DOE has made a decision regarding the disposition of the resource (DOE 2011a).

### 4.3.11.1 Exploration

The exploration phase is generally limited in time and scope and usually involves minimal surface disturbance. Potential surface disturbance could result from drilling test holes and small pits used to catch cuttings and grading any necessary access roads. Any new roads that would increase access to remote areas would provide easier access to unauthorized artifact collectors. ULP procedures require lessees to prepare and submit exploration plans for review before any surface disturbance takes place. Plans undergo technical review for compliance with lease provisions. As part of the technical and compliance review process, ULP staff members conduct a field review to identify areas where cultural resources inventories and any additional investigations are required. For all proposed new surface disturbances, the lessee is required to perform a cultural resources inventory. The inventory must be conducted to meet the BLM's Class III inventory standards and be provided to both the DOE and the BLM, which is responsible for surface management of the lease tracts (DOE 2011a). Already approved exploration plans for Lease Tracts 13A, 21, and 25 include drilling from one to two test holes.

Because of the very small scale of ground-disturbing activities during the exploration phase and the procedures in place that require pre-exploration cultural resource surveys of the areas to be impacted and mitigation plans for any unavoidable adverse effects, direct impacts on cultural resources in the exploration phase would be limited. Drilling locations are normally about $15 \times 50$ ft ($4.6 \times 15$ m); a typical cutting pit would be $10 \times 10 \times 3$ ft ($3 \times 3 \times 1$ m); and roads are generally less than 20 ft (6 m) in width. Typically, exploration teams use existing access roads when available and drive over land to off-road sites when possible to limit the amount of road cutting necessary. If cultural resources are encountered in the surveys mandated before drilling can occur, the drill site can usually be relocated to avoid the resource. Lessees must consider and plan for reclamation in their exploration and mining plans, and this process encourages them to minimize surface disturbance.

### 4.3.11.2 Mine Development and Operations

Potential adverse effects on cultural resources from mine development and operations would be similar to those possible during the exploration phase, but on a larger scale. With the exception of a large open-pit mine on Lease Tract 7, which already exists, all of the mining proposed for the lease tracts is expected to be underground. Surface disturbance would include (1) entry portals, inclines, shafts, and adits; (2) associated surface structures, including water and fuel tanks, headframes, hoists, and winches; (3) ventilation equipment and dewatering ponds where necessary; (4) equipment marshaling yards; (5) parking areas; and (6) large cleared areas for storing waste rock and surface soil as well as ore. The area taken up by facilities associated with mine development and operations would vary with the size of the mine. On the ULP lease

BLM_0042493

1   tracts, it is assumed that a small mine would take up to 10 acres (4.0 ha) and a medium-sized one
2   would take up to 15 acres (6.1 ha). A mine with surface facilities that occupied up to 20 acres
3   (8.1 ha) would be considered large. The open-pit mine in Lease Tract 7 takes up 210 already-
4   disturbed acres (85 ha). The operation of most mines requires large equipment but relatively
5   small crews of five to eight people. Mine operations are assumed for a period of 10 years. Of the
6   lease tracts that would continue under Alternative 3 (5, 6, 7, 8, 9, 11, 13, 13A, 18, 21, and 25),
7   eight have existing permitted mines. There are 11 existing permitted mines in these eight tracts.
8   New surface disturbance would be limited to new mine-related facilities and stockpiling areas.
9   At three lease tracts (13A, 21, and 25), exploratory drilling has been completed and land has
10  been reclaimed. The specific locations of new mines to be developed and operated will not be
11  known until plans are submitted by the lessees to DOE for approval. However, there is likely to
12  be more surface disturbance on these lease tracts as mines are developed and operated. BLM and
13  DOE require that the areas to be developed be surveyed for cultural resources before the ground
14  surface is disturbed. Table 4.3-20 shows the projected number of cultural resources that could be
15  directly affected under the mine development scenario for Alternative 3.
16
17
18      **4.3.11.2.1  Roads.** As discussed in Section 3.11.1, the Uravan Mineral Belt has been
19  actively mined for more than 100 years. Mining activity has resulted in the construction of a
20  network of mostly dirt roads providing access to the mines, haul routes, maintenance roads, and
21  roads supporting associated structures. The 11 lease tracts with existing permitted mines are
22  already served by access roads. Road construction at these sites would primarily be confined to
23  upgrading existing roads. If new roads either within the lease tracts or providing access to the
24  lease tracts were constructed, cultural resource surveys would first have to be conducted by
25  following BLM regulations and guidelines. Four lease tracts (13A, 15, 21, and 25) have been
26  subjected to exploratory drilling and past mining. There are access roads serving each of these
27  four lease tracts, along with a network of exploration roads. It is likely that these lease tracts
28  could be developed by using mostly existing roads. These might have to be upgraded, and new
29  roads might have to be graded. New roads or road improvements in areas that have not been
30  surveyed would require cultural resource surveys before ground-disturbing activities could
31  begin.
32
33
34      **TABLE 4.3-20  Cultural Resource Sites That Could Be Directly**
35      **Affected under Alternative 3**

| Mine Size Category under Alternative 3 | No. of Mines in Each Category | Expected No. of Sites per Category | Total No. of Sites Affected |
|---|---|---|---|
| Small | 2 | 0.8 | 2 |
| Medium | 4 | 1.2 | 5 |
| Large | 1 | 1.7 | 2 |
| Total | | | 8 |

36
37

BLM_0042494

Most roads serving the lease tracts are gravel, county roads; most secondary roads serving the lease tracts are dirt. Increased traffic during the mine development and operational phases could lead to secondary impacts on cultural resources. Depending on the weather and the proximity of significant cultural resources, they could be affected by traffic vibration and/or fugitive dust. Fugitive dust can have deleterious effects on rock art panels. Vibration can affect built structures. Traffic noise could have a negative effect on areas used for prayer or areas sacred to traditional cultures where solitude is an essential component. Road improvements might render lease tracts more accessible to hunters and other recreational users. An increased human presence renders cultural resources subject to potential trampling; erosion; vandalism; and illegal, unpermitted collecting.

**4.3.11.2.2  Support Facility Construction and Operations.** As discussed above, mines already exist in 11 of the lease tracts that would continue under Alternative 3, whereas only exploration and past mining has occurred in the remaining three lease tracts. While it is possible that new facilities would need to be constructed on the lease tracts with existing mines, it is likely that more construction and ground-disturbing activities would occur where development has only reached the exploration stage. On the other hand, existing mines would be more likely to include historic structures or features than would new mining sites. However, since many mines operate for only a few years, it is also possible that existing mines might not include any historic structures. The construction and operations of support facilities could adversely affect buried archaeological sites and historically important features of existing mines and could be visually and acoustically intrusive to traditional cultural properties. As discussed in Section 3.4.11, the pre-construction and excavation reviews required and the cultural resource surveys required prior to construction or ground-disturbing activities should identify significant cultural properties that would be adversely affected by the proposed actions. Plans would then be modified to avoid or mitigate impacts on cultural resources.

Mine construction and operations would also introduce vehicles, equipment, and workers to the mining areas. Impacts from these sources would be similar to those discussed in the section on roads but would be of longer duration. They would include the introduction of vibration, noise, and fugitive dust. These would be confined to areas directly adjacent to mine openings themselves. The introduction of a long-term workforce would increase the possibility of disturbance of cultural resources by human agency.

### 4.3.11.3  Reclamation

Impacts from the reclamation phase would be the same as those discussed in Section 4.1.11.

### 4.3.12  Visual Resources

Under Alternative 3, exploration, mine development and operations, and reclamation would occur on the 12 lease tracts.

BLM_0042495

### 4.3.12.1  Exploration

Potential visual impacts that could result from this phase include contrasts in form, line, color, and texture resulting from the following activities: (1) vegetation clearing; (2) exploratory drilling; (3) road construction (if needed); and (4) the presence of workers, personal and commercial vehicles, and construction equipment, along with their associated occasional, short-duration road traffic, parking, and dust.

A minimal amount of vegetation clearance might be needed to establish a drilling location, and some roads might need to be constructed or upgraded, resulting in the clearance of some vegetation. The clearing of the vegetation might expose bare soil, creating a change in the color of the ground surface. This impact would be limited, since a typical drilling location is approximately 15 × 50 ft (4.6 × 15 m), and exploratory roadways are generally less than 20 ft (6.1 m) in width. Topsoil from the clearing for both of these features typically would be stockpiled on site for future reclamation, and vegetation clearance would be minimized to the extent possible (DOE 1995).

Exploratory drill rigs are typically 35 ft (11 m) in height. These rigs are used to drill exploratory holes. In some scenarios, small drill rigs that are track- or truck-mounted might be used (DOE 1995). These drill rigs might be visible from within the lease tracts as well as from surrounding lands (Section 4.3.12.4).

If road upgrading or new road construction was necessary, visual contrasts might be introduced due to changes in form, line, color, and texture. The occurrence of visual impacts would depend on the routes selected relative to surface contours and the widths, lengths, and surface treatments of the existing road network. In addition, if improper road maintenance occurred, it could lead to the growth of invasive species or erosion, both of which could introduce visible contrasts in line, color, and texture, primarily with regard to foreground and near-middle-ground views.

Workers, vehicles, and other equipment could be visible in surrounding areas. Depending on site and weather conditions, worker activities (especially those involving vehicles) could result in visible dust. If proper site sanitation practices were not followed, litter could be visible.

Visual impacts associated with exploration are generally minor and of short duration due to the quick time frame in which these activities are conducted. Impacts due to road construction, erosion, or other landform alterations or vegetation clearing in arid environments, however, might be visible for extended periods.

### 4.3.12.2  Mine Development and Operations

Under Alternative 3, mine development and operations could require up to 10 acres (4 ha) of land for small mines, up to 15 acres (6 ha) for medium-sized mines, and up to 20 acres (8 ha) for large mines. Under this alternative, the largest mine site would be located on Lease Tract 7, at which 210 acres (85 ha) are already disturbed from previous activity. An additional

BLM_0042496

100 acres (40 ha) of disturbance could occur at this location. Potential visual impacts that could result from mine development and operations would include contrasts in form, line, color, and texture resulting from the following activities: (1) vegetation and ground clearing; (2) road building and upgrading; (3) support facility construction; (4) vehicle, equipment, and worker presence and activity, along with their associated vegetation and ground disturbance, dust, and emissions; and (5) lighting.

Visual impacts resulting from activities associated with mine development and operations would vary in frequency and duration, since this phase can last for 10 years or more.

**4.3.12.2.1  Vegetation/Ground Clearing.** Mine development for underground and open-pit mines would require clearing of vegetation, large rocks, and other objects that have the potential to interfere with mining activities. The nature and extent of clearing would be affected by the requirements of the project, the types of vegetation, and the characteristics of other objects to be cleared. Vegetation clearing and topographic grading might be required for the construction of access roads, maintenance roads, and roads to support associated structures. The removal of vegetation would result in contrasts in color and texture, because the varied colors and textures of vegetation would be replaced by the more uniform color and texture of bare soil. This activity also could introduce contrasts in form and line, depending on the type of vegetation cleared and nature of the cleared surface. The cleared areas likely would be maintained during operation. At this time, vegetation and ground clearance would be anticipated to result in minimal changes as compared to those activities required for the initial site development.

**4.3.12.2.2  Road Building/Upgrading.** While not anticipated, some minor construction of new temporary and permanent access roads and/or upgrading of existing roads to support mining activities might be required during mine development. These activities also might occur on off-lease lands (DOE 1995).

Road development might introduce strong visual contrasts to the landscape, depending on the routes selected relative to surface contours and on the widths, lengths, and surface treatments of the roads. Upgrades to roadways generally would consist of widening access roads, if necessary, to accommodate construction equipment. This might consist of additional vegetation or ground clearance, depending on the location and intended use of the roadway.

During mine operations, the roadways would need to be maintained in order to accommodate the transportation of the mined material. These activities might consist of minimal grading or removal of overgrowth. The roads would need to be maintained for the life of the facilities, if required for either the open-pit or underground mining methods.

**4.3.12.2.3  Support Facility Construction and Operations.** In addition to the use of roadways, mine development would include the construction and placement of surface plant area improvements (i.e., support facility construction).

BLM_0042497

At some of the mining locations, the structures would not be permanent, and in some cases, they would be positioned on previously disturbed land (Energy Fuels Resources Corp. and Greg Lewicki and Associates 2008). The presence of these structures could potentially create visual impacts as a result of contrasts in form, line, color, and texture, especially if no infrastructure was in place prior to the start of activities. The impacts from placing temporary structures during mine development would be limited due to the short duration of mine development when compared to the time associated with more permanent structures needed for the operational life of the mine.

**4.3.12.2.4  Vehicles, Equipment, and Workers.** The development of mine sites would require work crews, vehicles, and equipment that could potentially cause visual contrasts in form, line, color, and texture. For instance, traffic associated with workers and large equipment (e.g., trucks, graders, excavators, and cranes) would be expected for constructing roads and buildings. The traffic would produce visible activity and could cause visible dust plumes in dry soils. In addition, temporary parking for vehicles would be needed at or near work locations during construction.

Ground disturbance would produce contrasts of color, form, texture, and line. Any excavating that might be required for building foundations, grading and surfacing roads, clearing and leveling mining areas, and stockpiling soil and ore would damage or remove vegetation, expose bare soil, and suspend dust. Soil scars, exposed slope faces, eroded areas, and areas of compacted soil could result from excavation, leveling, and equipment and vehicle movement. Invasive species might colonize disturbed areas, stockpiles, and compacted areas. These species might be introduced naturally; or in seeds, plants, or soils introduced for intermediate restoration; or by vehicles. In some situations, the presence of invasive species might introduce contrasts with naturally occurring vegetation, primarily in color and texture.

If proper site sanitation practices were not followed, litter and debris could be visible within and around work sites. Site monitoring and restoration activities could reduce many of these impacts. Other activities during this phase could include bracing and cutting existing fences and constructing new fences to limit or prevent access; providing temporary walks, passageways, fences, or other structures to prevent interference with traffic; and providing lighting in areas where work might be conducted at night.

Once surface structures were operating, the nature and extent of visual impacts associated with them would depend in part on the type of mine (i.e., open-pit or underground), the size of the structures, the nature of required clearing and grading, and the types and amounts of materials to be stored for mining activities.

For instance, open-pit mining generally requires larger surface areas for storage of overburden and waste rock than do underground methods (IAEA 2000). Stockpiles could be visible for the duration of operations. Open-pit mining generally utilizes backhoes, front-end loaders, scrapers, bulldozers, and trucks to move mine-rock waste around the site. In addition, for underground mining, vertical and inclined shafts are equipped with hoists and headframes that protrude above the ground surface. Large surface fans also might be used to assist with

BLM_0042498

1   underground ventilation (National Research Council 2012). If no natural sources of water were
2   available, water may be brought on site by water trucks. These trucks might be visible
3   (DOE 1995). Stockpiles also could be visible for the duration of operations at these types of
4   mines. Underground mines utilize rubber-tired, trackless mobile equipment to transport waste
5   rock (DOE 1995).
6
7        The operation of open-pit and underground mines also might create dust, which could be
8   composed of fine particles generated from the mechanical disturbance of rock and soil,
9   bulldozing, blasting, and vehicles traveling on dirt roads. Particles might also be mobilized by
10  wind blowing over ore stockpiles (National Research Council 2012). The suspension and
11  visibility of dust would be influenced by vehicle speeds, road surface materials, and weather
12  conditions (DOE 1995).
13
14
15        **4.3.12.2.5 Lighting.** It is not anticipated that mine construction would occur at night.
16  However, some outdoor lighting might be necessary for security and safety around the lease
17  tracts. Lighting might be needed around temporary facilities (e.g., construction trailers), parking,
18  and work areas.
19
20        During mine operations, exterior lighting might be needed around structures, parking
21  locations, and work areas. Exterior lighting could contribute to light pollution. This type of
22  pollution is caused by outdoor lights that are positioned to face upward or sideways. Any light
23  that escapes upward, unless blocked by an object, will scatter throughout the atmosphere and
24  brighten the night sky. Air pollution particles also might increase the scattering of light at night,
25  just as they affect visibility during the daytime (BLM and DOE 2010b). Light pollution impacts
26  associated with the reclamation of mining sites might include skyglow, light trespass, and glare.
27  Security and other lighting around and on support structures could also contribute to light
28  pollution.
29
30        "Skyglow" is a brightening of the night sky caused by both natural and human-related
31  factors. It decreases a person's ability to see dark night skies and stars, which is an important
32  recreational activity in many parts of the United States, including at BLM and non-BLM lands
33  within the areas that include and surround the lease tracts. These types of effects can be visible
34  for long distances. Outdoor artificial lighting can contribute to this effect by directing light
35  directly upward into the night sky and also through the reflection of light from the ground and
36  other illuminated surfaces.
37
38        "Light trespass" is the casting of light into areas where it is unneeded or unwanted.
39  Poorly placed and aimed lighting can cause light to spill into areas outside the location needing
40  illumination. Although few residences are located within the vicinity of the lease tracts, the light
41  spillage might be noticeable to the traveling public, albeit for a brief duration (a few seconds or
42  minutes depending on circumstances), due to the size of the lease tracts.
43
44        "Glare" is the visual sensation caused by excessive and uncontrolled brightness, and, in
45  the context of outdoor lighting, it is generally associated with direct views of a strong light
46  source. Poorly placed and aimed lighting can cause glare, as can the use of excessively bright

BLM_0042499

lighting. In general, any degree of lighting would produce some off-site light pollution, which might be particularly noticeable in dark nighttime sky conditions typical of the settings within the lease tracts. Glare also can be produced from unintentional sources, such as vehicle windshields or metal pieces on structures (BLM and DOE 2010b).

### 4.3.12.3  Reclamation

See Section 4.1.12 for a discussion of the visual impacts associated with reclamation activities.

### 4.3.12.4  Impacts on Surrounding Lands

The following analysis provides an overview of the potential visual impacts on those SVRAs surrounding the mining locations under Alternative 3. Because of the number of leases and the potential for increased mining activity, lands outside the lease tracts that have views of the lease tracts would be subject to visual impacts. The affected areas and extent of impacts would depend on a number of visibility factors, viewer duration, and viewer distance.

Preliminary viewshed analyses were conducted to identify which lands surrounding the four lease groups identified in Section 3.12 might have views of some portions of the various lease tracts. An additional viewshed analysis was conducted for a subset of these groups that would include all of the lease tracts in which reclamation activities would be conducted under Alternative 3 (see Section 4.3.12.1).

The impact analysis is based on a reverse viewshed analysis for which the methodology is provided in Appendix D. This analysis considers Federal, state, and BLM-designated sensitive visual resources. The intent of the analysis is to determine the potential levels of contrasts (i.e., changes in form, line, color, and texture from the existing condition to that under Alternative 3) that would occur as a result of activities on the lease tracts.

Under Alternative 3, 12 lease tracts would be in operation: Lease Tracts 5; 6; 7; 8; 9; 11; 13; 13A; 15; 18; 21; and 25. The following analysis provides an overview of the potential visual contrasts expected for those SVRAs surrounding the mining locations. Under this alternative, the lease tracts were analyzed in only three of the four groups: the North Central Group; the South Central Group; and the South Group.

Potential mitigation measures and BMPs to minimize lighting to off-site areas and to minimize contrast with surrounding areas are summarized in Table 4.6-1 (Section 4.6).

BLM_0042500

1      **4.3.12.4.1  North Central Group.** Figure 4.3-1 shows the results of the viewshed
2  analysis for lease tracts within the North Central Group, including Lease Tracts 18, 21, and 25.
3  The following SVRAs might have views of the lease tracts:[6]

5      •   Tabeguache Area;

7      •   Sewemup WSA;

9      •   Unaweep/Tabeguache Scenic and Historic Byway;

11     •   Dolores River Canyon WSA;

13     •   Dolores River SRMA;

15     •   San Miguel ACEC; and

17     •   San Miguel River SRMA.

19      Figure 4.3-1 shows the results of the viewshed analysis for the lease tracts within the
20  North Central Group. The colored segments indicate areas in the SVRAs with clear lines of sight
21  to one or more areas within the lease tracts and from which activities conducted within the lease
22  groups would be expected to be visible, assuming the absence of screening vegetation or
23  structures and assuming there would be adequate lighting and other atmospheric conditions
24  would be suitable.

26      The lease tracts within the North Central Group would potentially be visible from
27  portions of the Tabeguache Area between 5 and 15 mi (8 and 24 km) from the lease tracts. Views
28  of the North Central Group from the area are partially or fully screened by the intervening
29  mountains and vegetation. The lease tracts would potentially be visible from approximately 49%
30  (4,000 acres or 1,600 ha) of the area. Views of the lease tracts would be possible from elevated
31  viewpoints within the area. Depending on the infrastructure placed within the North Central
32  Group, views of the mine activities and sites might be limited and include the tops of
33  headframes, drill rigs, or other structures, if located on the individual lease tracts. Mine
34  development and operations under Alternative 3 would be expected to cause minimal to weak
35  visual contrast for views from the Tabeguache Area.

37      From distances between 5 and 15 mi (8 and 24 km) from the lease tracts, views from
38  approximately 32% (6,300 acres or 2,600 ha) of the Sewemup WSA would potentially include
39  the North Central Group. Similar to views from the Tabeguache Area, views of the North Central
40  Group from the WSA are generally partially or fully screened by the intervening mountains.
41  Visibility of the North Central Group is likely from the locations within the WSA that are higher
42  in elevation than the lease tracts. Depending on the infrastructure placed within the lease tracts,
43  views of the mine activities and sites might be limited and include the tops of headframes, drill

---

[6]  For the three groups of lease tracts, the SVRAs are presented in descending order, based on the percentage of the
    total acreage or mileage that would have a potential view of the lease tracts.

BLM_0042501



FIGURE 4.3-1  Viewshed Analysis for the North Central Lease Group under Alternative 3

BLM_0042502

rigs, or other structures. Activities associated with this alternative would be expected to create minimal to weak levels of contrast for views from the WSA.

The Unaweep/Tabeguache Scenic and Historic Byway passes between Lease Tracts 18 and 25. The viewshed analysis indicates that lease tracts within the North Central Group would potentially be visible from approximately 43 mi (69 km) of the byway; however, because of minor mapping inaccuracies that place portions of the roadway outside the narrow canyon it occupies and thereby locate them at higher elevations than they actually are, and because of vegetative screening, the actual number of miles of the byway that has views of the lease tracts is probably much smaller. Actual visibility would be determined as part of a site- and project-specific environmental assessment.

Depending on the infrastructure placed within the lease tracts, the mine activities and sites could be visible to visitors driving along the byway, primarily in the area within Montrose County. Where views were unobstructed, views that were level or looking down onto the lease tracts would likely involve stronger visual contrasts than those that were lower in elevation. Views would include headframes, drill rigs, or other structures, if needed for the mining activities. As such, mine development and operations would be expected to cause minimal to strong visual contrast for views from the byway; however, views from the byway would be of relatively short duration, largely due to the small size of the individual lease tracts within the North Central Group.

The North Central Group lease tracts would be potentially visible from less than 1% (113 acres or 46 ha) of the San Miguel River SRMA, at distances of 18–24 mi (30–39 km) from the SRMA. There could potentially be views of the lease tracts from elevated viewpoints within the SRMA outside the river canyon. Activities conducted within the North Central Group lease tracts would be expected to cause minimal contrasts to no contrasts at all as seen from the SRMA, primarily due to the relatively long distance between the SRMA and the lease tracts and to the very limited amount of acreage within the SRMA that would potentially have views of the lease tracts.

The North Central Group lease tracts would be potentially visible from less than 1% of the Dolores River Canyon WSA (4 acres or 1.6 ha), the Dolores River SRMA (4 acres or 1.6 ha), and the San Miguel ACEC (5 acres or 2.0 ha). Mining-related activities conducted under this alternative would be expected to create minimal levels of contrast to no contrasts at all for views from these SVRAs.

**4.3.12.4.2  South Central Group.** Figure 4.3-2 shows the results of the viewshed analysis for portions of the South Central Group, including Lease Tracts 5, 6, 7, 8, and 9. The following SVRAs might have views of the South Central Group:

- Tabeguache Area;

- Unaweep/Tabeguache Scenic and Historic Byway;

BLM_0042503



FIGURE 4.3-2  Viewshed Analysis for the South Central Lease Group under Alternative 3

BLM_0042504

1     •   Dolores River Canyon WSA;
2
3     •   Sewemup WSA;
4
5     •   Dolores River SRMA;
6
7     •   McKenna Peak WSA;
8   .
9     •   San Miguel ACEC; and
10
11     •   San Miguel River SRMA.
12
13        The South Central Group lease tracts would potentially be visible from approximately
14 47% (3,800 acres or 1,600 ha) of the Tabeguache Area. Most of this area is located between
15 5 and 15 mi (8 and 24 km) from this group of lease tracts within Montrose County. Views of the
16 South Central Group are partially or fully screened by the intervening topography and
17 vegetation. Views of the mine activities and sites within the lease tracts contained within this
18 group likely would be limited and would include the tops of headframes, drill rigs, or other
19 structures, if located within the mine sites. Similar to those impacts experienced from views of
20 the North Central Group, mine development and operations under Alternative 3 would be
21 expected to cause minimal to weak visual contrast for views from the Tabeguache Area.
22
23        The viewshed analysis indicates that the South Central Group lease tracts could
24 potentially be visible from approximately 19 mi (30 km) of the Unaweep/Tabeguache Scenic and
25 Historic Byway located east–southeast of the lease tracts, and within the background and
26 "seldom seen" distances (i.e., beyond 5 mi or 8 km); however, because of minor mapping
27 inaccuracies that place portions of the roadway outside the narrow canyon it occupies and
28 thereby locate them at higher elevations than they actually are, and because of vegetative
29 screening, the actual mileage of the byway with views of the lease tracts is probably much
30 smaller. Actual visibility would be determined as part of a site- and project-specific
31 environmental assessment. Depending on the infrastructure used at each mine site, views of
32 headframes, drill rigs, or other structures might occur. Activities under Alternative 3 would be
33 expected to cause minimal levels of contrast to no contrasts at all for views from the byway.
34
35        The lease tracts within the South Central Group could potentially be visible from
36 approximately 1.7% (500 acres or 800 ha) of the Dolores River Canyon WSA, in areas between
37 0 and 5 mi (0 and 8 km) from the lease tracts. Between 0 and 25 mi (0 and 40 km), views from
38 approximately 3.6% (1,000 acres or 420 ha) would potentially include the lease tracts. If present,
39 headframes, drill rigs, or other structures might be visible from within the WSA. Views of the
40 lease tracts are more likely to occur from elevated locations than from within the canyon. Mine
41 development and operations under Alternative 3 would be expected to cause minimal to weak
42 visual contrast for views from the WSA.
43
44        The South Central Group lease tracts would be potentially visible from less than 1%
45 (105 acres or 43 ha) of the San Miguel River SRMA, at distances of 18–22 mi (30–35 km) from
46 the SRMA. There could potentially be views of the lease tracts from elevated viewpoints within

BLM_0042505

the SRMA outside the river canyon. Activities conducted within the South Central Group lease tracts would be expected to cause minimal contrasts to no contrasts at all as seen from the SRMA, primarily due to the relatively long distance between the SRMA and the lease tracts and to the very limited amount of acreage within the SRMA that would potentially have views of the lease tracts.

The South Central Group would potentially be visible from approximately 2.1% (410 acres or 170 ha) of the Sewemup WSA, within 15 and 25 mi (24 and 40 km) of the lease tracts. Views of the South Central Group from the WSA are generally partially or fully screened by the intervening mountains. Visibility of this group of lease tracts is likely from the locations along the western edge of the Sewemup Mesa within the WSA that are higher in elevation than the lease tracts. Depending on the infrastructure present on each lease tract, views of the mine activities and sites likely would be limited and could include the tops of headframes, drill rigs, or other structures. Under this alternative, mine development and operations would be expected to create minimal levels of contrast to no contrasts at all for views from this WSA.

The South Central Group lease tracts would potentially be visible from approximately 2.0% (1,300 acres or 530 ha) of the Dolores River SRMA. Views of the mine activities and sites within the lease tracts contained within this group might be limited and likely would include the tops of headframes, drill rigs, or other structures, if located within the mine sites. Views of the lease tracts are more likely to occur from elevated locations than from within the canyon. Similar to the Dolores River Canyon WSA, mine development and operations would be expected to cause minimal to weak levels of contrast for views from this area.

The South Central Group lease tracts would potentially be visible from approximately 1.1% (220 acres or 88 ha) of the McKenna Peak WSA; areas with potential views of the lease tracts are in the northern portion of the WSA that is in San Miguel County. The South Central Group lease tracts would potentially be visible from portions of the WSA that are located between 15 and 25 mi (24 and 40 km) from the lease tracts. Views of the mine activities and sites within the lease tracts contained within this group would likely be limited and could include the tops of headframes, drill rigs, or other structures, if present. Mine development and operations under Alternative 3 would be expected to cause minimal levels of contrast to no contrasts at all for views from this SVRA.

The South Central Group lease tracts would potentially be visible from less than 1% (3 acres or 1.2 ha) of the San Miguel ACEC. Views of the mine activities and sites within the lease tracts contained within this group would likely be limited. Mine development and operations under Alternative 3 would be expected to cause minimal levels of contrast to no contrasts at all for views from this SVRA.

**4.3.12.4.3  South Group.** Figure 4.3-3 shows the results of the viewshed analysis of Lease Tracts 11, 13, 13A, and 15 within the South Group. The following SVRAs might have views of the South Group lease tracts:

BLM_0042506



FIGURE 4.3-3  Viewshed Analysis for the South Lease Group under Alternative 3

BLM_0042507

- McKenna Peak WSA;

- Dolores River SRMA; and

- Trail of the Ancients Byway.

The South Group lease tracts would potentially be visible from approximately 17% (3,400 acres or 1,400 ha) of the McKenna Peak WSA. Areas within the WSA with visibility of the South Group are located between 15 and 25 mi (24 and 40 km) from this group of lease tracts within the western portion of the WSA. Views of the mine activities and sites within the lease tracts contained within this group might be limited and likely would include the tops of headframes, drill rigs, or other structures, if present. Mine development and operations would be expected to cause weak contrast to minimal contrast for views from this SVRA.

Within 5 mi (8 km) of the South Group, the lease tracts would potentially be visible from approximately 9.4% (6,100 acres or 2,500 ha) of the Dolores River Canyon SRMA; portions of the SRMA are within the actual lease tracts (specifically Lease Tracts 13, 13A, and 15). Between 0 and 25 mi (0 and 40 km), views from approximately 9.7% (6,300 acres or 2,600 ha) of the SRMA would potentially include the lease tracts. Depending on the infrastructure placed within the South Group, views of the mine activities and sites would include headframes, drill rigs, or other structures, as well as the actual mining activities. Mine development and operations under Alternative 3 would be expected to cause weak to strong levels of contrast for views from this SRMA. Stronger appearances of contrasts would occur for views from the SRMA, which are located within the South Group, and the contrasts would lessen as the distance from the lease tracts increased.

The South Group lease tracts would be visible from approximately 7.4 mi (12 km) of the Trail of the Ancients Scenic Byway. The byway is located within the "seldom seen" distance zone (i.e., between 15 and 25 mi or 24 and 40 km). The South Group lease tracts would primarily be visible from portions of the byway that are located to the west of the lease tracts in Utah.

Views of the lease tracts would be limited, and the would be of brief duration to byway drivers. The trail's footprint primarily follows US 191. Mine development and operations would be expected to cause minimal levels of contrast to no contrasts at all for views from along the trail.

## 4.3.13 Waste Management

Potential impacts on waste management practices (described in Section 3.13) from waste generated during exploration, mine development and operations, and reclamation are expected to be minor. As discussed for Alternative 1, waste that was allowed to remain on the mine sites would be managed accordingly, and disposal capacity at the permitted landfills or licensed facilities would be adequate to accommodate the waste that would need to be transported off site for disposal. Because exploration and mine development and operations would be conducted in addition to reclamation under Alternative 3, the waste generated would be more than that

BLM_0042508

generated under Alternatives 1 and 2. Appendix C presents estimates of waste that could be generated (in addition to the waste-rock piles) for the three phases of mining evaluated under Alternative 3.

## 4.4  ALTERNATIVE 4

Under Alternative 4, it is assumed that a total of 19 mines (6 small, 10 medium, 2 large, and 1 very large) with a total disturbed surface area of 460 acres (190 ha) would be in operation in the peak year; however, all of the lease tracts could be developed under this Alternative 4. As they were for Alternative 3, the three phases (exploration, mine development and operations, and reclamation) are evaluated here for Alternative 4.

> Alternative 4: This is the preferred alternative, under which DOE would continue the ULP with the 31 lease tracts for the next 10-year period or for another reasonable period.

### 4.4.1  Air Quality

#### 4.4.1.1  Exploration

Types of potential impacts and emission sources are discussed in Section 4.3.1.1. Under Alternative 4, two, four, and six borehole drillings up to the depth of 600 ft (180 m) would occur at 6 small, 10 medium, and 2 large mines, respectively, in any peak year. As shown in Table 4.4-1, estimated air emissions under Alternative 4 are about two to three times higher than those under Alternative 3 but still negligible compared to three-county total emissions for criteria pollutants and VOCs and Colorado or U.S. GHG emissions.

As a consequence, the types of impacts related to exploration under Alternative 4 are similar to those described for Alternative 3 (Section 4.3.1.1). Exploration activities would occur over relatively small areas, involve little ground disturbance, and require only a small crew and a small fleet of heavy equipment. Thus, potential impacts from this phase on ambient air quality and regional ozone or AQRVs are anticipated to be negligible and temporary. Potential impacts from these activities on climate change would be negligible.

#### 4.4.1.2  Mine Development and Operations

The types of impacts related to mine development and operations under Alternative 4 are similar to those described for Alternative 3 (Section 4.3.1.2).

Air emissions of criteria pollutants, VOCs, and $CO_2$ from mine development and operations estimated for the peak year are presented in Table 4.4-1 and compared with emission totals for the three counties (Mesa, Montrose, and San Miguel) that encompass the DOE ULP

BLM_0042509

**TABLE 4.4-1 Peak-Year Air Emissions from Mine Development, Operations, and Reclamation under Alternative 4[a]**

| Pollutant[b] | Three-County Total[c] | Exploration | | Mine Development | | Mine Operations | | Reclamation | |
|---|---|---|---|---|---|---|---|---|---|
| | | Annual Emissions (tons/yr) | | | | | | | |
| CO | 65,769 | 8.0 | (0.01%)[d] | 165 | (0.25%) | 128 | (0.20%) | 11.1 | (0.02%) |
| $NO_x$ | 13,806 | 19.6 | (0.14%) | 57.4 | (0.42%) | 275 | (2.0%) | 23.1 | (0.17%) |
| VOCs | 74,113 | 2.4 | (0.003%) | 1.7 | (0.002%) | 26.9 | (0.04%) | 2.3 | (0.003%) |
| $PM_{2.5}$ | 5,524 | 1.9 | (0.03%) | 73.4 | (1.3%) | 23.5 | (0.43%) | 34.8 | (0.63%) |
| $PM_{10}$ | 15,377 | 3.6 | (0.02%) | 459 | (3.0%) | 45.1 | (0.29%) | 171.9 | (1.12%) |
| $SO_2$ | 4,246 | 2.2 | (0.05%) | 6.9 | (0.16%) | 35.4 | (0.83%) | 3.0 | (0.07%) |
| $CO_2$ | $142.5\times10^6$ [e] | 2,200 | (0.002%) | 1,600 | (0.001%) | 25,000 | (0.018%) | 2,200 | (0.002%) |
| | $7{,}311.82\times10^6$ [f] | | (0.00003%) | | (0.00002%) | | (0.00034%) | | (0.00003%) |

[a] Under Alternative 4, it is assumed that 19 mines (6 small, 10 medium, 2 large, and 1 very large) with a total disturbed surface area of 460 acres (190 ha) would be in operation or reclaimed in any peak year.

[b] Notation: CO = carbon monoxide; $CO_2$ = carbon dioxide; $NO_x$ = nitrogen oxides; $PM_{2.5}$ = particulate matter with a mean aerodynamic diameter of ≤2.5 µm; $PM_{10}$ = particulate matter with a mean aerodynamic diameter of ≤10 µm; $SO_2$ = sulfur dioxide; and VOCs = volatile organic compounds.

[c] Total emissions in 2008 for all three counties encompassing the DOE ULP lease tracts (Mesa, Montrose, and San Miguel Counties), except for $CO_2$. See Table 3.1-2.

[d] Numbers in parentheses are percentages of three-county total emissions, except for $CO_2$, which are percentages of Colorado total emissions (top line) and U.S. total emissions (bottom line).

[e] Annual emissions in 2010 for Colorado on a $CO_2$-equivalent basis.

[f] Annual emissions in 2009 for the United States on a $CO_2$-equivalent basis.

Sources: CDPHE (2011a); EPA (2011a); Strait et al. (2007)

1    lease tracts combined. Detailed information on emission factors, assumptions, and emission
2    inventories is available in Appendix C. As shown in the table, total peak-year emission rates are
3    estimated to be rather small when compared with emission totals for all three counties. Typically,
4    PM emissions are highest during mine development, while $NO_x$ emissions are highest during
5    operations. During mine development, non-PM emissions would be relatively small (up to
6    0.42%), but $PM_{10}$ and $PM_{2.5}$ emissions of 459 and 73 tons/yr would amount to about 3.0% and
7    1.3%, respectively, of the three-county total emissions. $PM_{10}$ emissions result would from
8    explosive use (47%) and site preparation (43%), followed by wind erosion (9%), but exhaust
9    emissions would contribute only a little to total $PM_{10}$ emissions. Site preparation, explosives use,
10   and wind erosion account for 57%, 33%, and 9%, respectively, of total $PM_{2.5}$ emissions. During
11   operations, $NO_x$ emissions of 275 tons/yr would be highest, amounting to about 2.0% of three-
12   county total emissions. $NO_x$ emissions would come mostly from diesel-fueled heavy equipment
13   (e.g., bulldozers or power generators) and trucks. Mesa, Montrose, and San Miguel Counties
14   encompass 2, 17, and 11 lease tracts, respectively, with one lease tract straddling Montrose and
15   San Miguel Counties. It can be presumed that these emissions would spread over wide areas in
16   three counties (over 50 mi [80 km]). Although site-specific knowledge of some mines and
17   operations are known, future locations are not known at this time where these mines would be
18   developed; thus, the spatial extents of emissions on the various lease tracts as well as which
19   counties are involved are unknown. However, $NO_x$ emission factors of about 44 and 85 tons/yr
20   for the large and very large mine groups, respectively, are relatively high (in Appendix C). In
21   particular, $NO_x$ emissions from a very large open-pit mine (JD-7) would account for about 2.3%
22   of total emissions in Montrose County. There is a potential for near-field exceedances of the
23   1-hour nitrogen dioxide ($NO_2$) NAAQS at the lease tract boundary. Thus, detailed air quality
24   impact analysis would be warranted during the air permit application process. These impacts
25   would be minimized by implementation of good industry practices and fugitive dust mitigation
26   measures (such as watering unpaved roads, disturbed surfaces, and temporary stockpiles), as
27   detailed in Table 4.6-1 (Section 4.6). Therefore, potential impacts on ambient air quality would
28   be minor and temporary.
29
30         The three counties encompassing DOE ULP lease tracts are currently in attainment for
31   ozone (EPA 2011b), but ozone levels in the area approached the standard (about 90%)
32   (see Table 3.1-3). Recently, wintertime ozone exceedances were often reported at higher
33   elevations in northwestern Colorado, northeastern Utah, and southwestern Wyoming. However,
34   ozone precursor emissions from mine development and operations would be relatively small
35   (less than 2.0% and 0.04% of three-county total $NO_x$ and VOC emissions, respectively) and
36   would be much lower than those for the regional airshed in which emitted precursors are
37   transported and transformed into ozone. In addition, the wintertime high-ozone areas are located
38   more than 100 mi (160 km) from the DOE ULP lease tracts and not located downwind of the
39   prevailing westerlies in the region. Accordingly, the potential impacts of ozone precursor
40   releases from mine development and operations on regional ozone should not be of concern.
41
42         As discussed in Section 3.1.4, there are several Class I areas around the DOE ULP lease
43   tracts where AQRVs, such as visibility and acid deposition, might be a concern. Primary
44   pollutants affecting AQRVs include $NO_x$, $SO_2$, and PM. $NO_x$ and $SO_2$ emissions from mine
45   development activities would be relatively small (up to 2.0%) of three-county total emissions,
46   while $PM_{10}$ emissions would be about 3.0% of three-county total emissions. Air emissions from

BLM_0042511

1  mine development and operations could result in minor impacts on AQRVs at nearby Class I
2  areas. Implementation of good industry practices and fugitive dust mitigation measures could
3  minimize these impacts.
4
5      Annual total $CO_2$ emissions from mine development and operations are estimated as
6  shown in Table 4.4-1. $CO_2$ emissions during operations would be much higher than those during
7  mine development. During operations, annual total $CO_2$ emissions would be about 25,000 tons
8  (23,000 metric tons), accounting for about 0.018% of Colorado GHG emissions in 2010 at
9  140 million tons (130 million metric tons) of $CO_2e$ and 0.00034% of U.S. GHG emissions in
10  2009 at 7,300 million tons (6,600 million metric tons) of $CO_2e$ (EPA 2011a; Strait et al. 2007).
11  Thus, potential impacts from the mine development and operations phase on global climate
12  change would be negligible.
13
14
15      **4.4.1.3  Reclamation**
16
17      The type of impacts would be similar to those described for Alternative 1 (Section 4.1.1).
18  It is also assumed that reclamation activities under Alternative 4 would occur over about
19  460 acres (190 ha) in the peak year of reclamation.
20
21      Peak-year emissions during the reclamation phase under Alternative 4 are shown in
22  Table 4.4-1. $PM_{10}$ emissions would be highest, accounting for about 1.1% of three-county
23  combined emissions. Among non-PM missions, $NO_x$ emissions from diesel combustion of heavy
24  equipment and trucks would be highest: up to 0.17% of three-county total emissions. Good
25  industry practices and mitigation measures would be implemented to ensure compliance with
26  environmental requirements. Thus, potential impacts on ambient air quality associated with
27  reclamation activities under Alternative 4 are anticipated to be minor and temporary. These low-
28  level emissions are not anticipated to cause any measureable impacts on regional ozone or
29  AQRVs, such as visibility or acid deposition, at nearby Class I areas. In addition, $CO_2$ emissions
30  during the reclamation phase are about 0.002% and 0.00003% of Colorado GHG emissions in
31  2010 and U.S. GHG emissions in 2009, respectively (EPA 2011a; Strait et al. 2007). Thus, under
32  Alternative 4, potential impacts from reclamation activities on global climate change would be
33  negligible.
34
35
36  **4.4.2  Acoustic Environment**
37
38      Potential noise-related impacts under Alternative 4 are discussed here.
39
40
41      **4.4.2.1  Exploration**
42
43      The types of impacts related to exploration under Alternative 4 would be similar to those
44  under Alternative 3 (Section 4.3.2.1). Exploration activities occur over relatively small areas,
45  involve little ground disturbance, and require only a small crew and a small fleet of heavy

BLM_0042512

1    equipment. Accordingly, it is anticipated that potential noise impacts from the exploration phase
2    on neighboring residences or communities, if any, would be minor and intermittent.
3
4
5    **4.4.2.2  Mine Development and Operations**
6
7         The types of impacts related to mine development and operations under Alternative 4 are
8    similar to those under Alternative 3 (Section 4.3.2.2).
9
10        As described in Section 4.3.2.2, noise levels would attenuate to about 55 dBA at a
11   distance of 1,650 ft (500 m) from the construction site, which is the Colorado daytime maximum
12   permissible limit of 55 dBA in a residential zone. If a 10-hour daytime work schedule is
13   considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) would occur
14   about 1,200 ft (360 m) from the construction site. In addition, other attenuation mechanisms,
15   such as air absorption, screening effects (e.g., natural barriers caused by terrain features), and
16   skyward reflection due to temperature lapse conditions typical of daytime hours, would reduce
17   noise levels further. Thus noise attenuation to Colorado limits (as in Colorado revised statutes
18   Title 25, Article 12, Section 103) or EPA limits (EPA 1974) would occur at distances somewhat
19   shorter than the aforementioned distances. In many cases, these limits would not reach any
20   nearby residences or communities. However, when construction would occur near a lease tract
21   boundary, noise levels at four residences around Lease Tracts 13, 13A, 16, and 16A could
22   exceed the Colorado limit. The nearest residence is a cow camp, which abuts Lease Tract 13. A
23   residence is located about 520 ft (160 m) and 1,600 ft (480 m), respectively, from Least Tracts
24   13 and 13A, and a residence is located about 1,000 ft (310 m) from Lease Tract 13. A store is
25   located about 1,050 ft (320 m) and 1,600 ft (480 m), respectively, from Lease Tracts 16 and 16A.
26
27        It is assumed that most mine development and operations would occur during the day,
28   when noise is better tolerated because the masking effects of background noise occur more
29   during daytime than at night. In addition, construction activities for DOE ULP lease tracts would
30   be temporary (typically lasting a few months). Construction within the DOE ULP lease tracts
31   would cause some unavoidable but localized short-term noise impacts on neighboring residences
32   or communities, particularly when mining activities occurred near residences or communities
33   adjacent to the lease tract boundary.
34
35        During mine operations, ventilation fans would run continuously at mine sites, for which
36   noise calculations were made separately. The number of fans used for a mine depends on how
37   extensive the mine activities are but typically would be one or two fans for small mines, two or
38   three fans for medium mines, and three or four fans for large mines at an interval of every
39   366–457 m (1,200–1,500 ft) (Williams 2013). The composite noise level for a ventilation fan,
40   such as that used at JD-9 mine, is about 86 dBA at a distance of 3 m (10 ft) (Spendrup 2013),
41   corresponding to about 70 dBA at a reference distance of 15 m (50 ft), which is far lower than
42   noise levels for typical heavy equipment. For a single fan, noise levels would attenuate to 55 and
43   50 dBA at distances of about 60 m (200 ft) and 90 m (300 ft) from the fan, respectively, which are
44   the Colorado daytime and nighttime maximum permissible limits of 55 and 50 dBA in a residential
45   zone. The EPA guideline level of 55 dBA $L_{dn}$ for residential areas would occur at about 110 m
46   (360 ft). For four identical fans that are located equidistant from a receptor, these distances

BLM_0042513

would be extended to about 100 m (330 ft), 160 m (530 ft), and 190 m (620 ft), respectively.
During daytime hours, beyond some distances, a noise of interest can be overshadowed by
relatively high background levels along with skyward refraction caused by temperature lapses
(i.e., temperature decreases with increasing height, so sound tends to bend towards the sky).
However, on a calm, clear night typical of ULP lease tract settings, the air temperature would
likely increase with increasing height (temperature inversion) because of strong radiative
cooling. Such a temperature profile tends to focus noise downward toward the ground. Thus,
there would be no shadow zone[7] within 1 or 2 mi (2 or 3 km) of the source in the presence of a
strong temperature inversion (Beranek 1988). In particular, such conditions add to the effect of
noise being more discernible during nighttime hours, when the background levels are the lowest.
Considering these facts, potential impact distances would be extended further, to several hundred
meters. Accordingly, noise control measures (e.g., the installation of front and rear silencers,
which can reduce  noise levels from 5 to 10 dBA [Spendrup 2013]) would be warranted if any
residences were located within these distances from ventilation fans. Also, the outlet could have
a 45 degree or 90 degree elbow pointed away from the sensitive receptors (Williams 2013).

During operations, over-the-road heavy haul trucks would transport uranium ores from
DOE ULP lease tracts to either the proposed Piñon Ridge Mill or White Mesa Mill in Utah.
These shipments could produce noise along the haul routes. Under Alternative 4, about
2,000 tons per day of uranium ores would be produced. Assuming 25 tons of uranium ore per
truck and round-trip travel, the traffic volume would be 160 truck trips per day (80 round trips
per day) and 20 trucks per hour (for 8-hour operation). At distances of 180 ft (55 m) and 350 ft
(110 m) from the route, noise levels would attenuate to 55 and 50 dBA, respectively, which are
the Colorado daytime and nighttime maximum permissible limits in a residential zone. Noise
levels above the EPA guideline levels of 55 dBA $L_{dn}$ for residential areas could reach up to a
distance of 94 ft (29 m) from the route. Accordingly, Colorado limits or EPA guideline levels
could be exceeded within 350 ft (110 m) from the haul route, and any residences within this
distance might be affected; however, mitigation measures described in Section 4.6 are expected
to bring these activities into compliance with applicable limits.

Depending on local geological conditions, explosive blasting during mine development
and operations might be needed. Blasting would generate a stress wave in the surrounding rock,
causing vibration of the ground and structures on the ground surface. The blasting also would
create a compressional wave in the air (air blast overpressure), the audible portion of which
would be manifested as noise. Potential impacts of ground vibration would include damage to
structures, such as window breakage. Potential impacts of blast noise would include effects on
humans and animals. The estimation of potential increases in ambient noise levels, ground
vibration, and air blast overpressure and evaluation of possible environmental impacts associated
with such increases would be required at the project-specific phase if potential impacts at nearby
residences or structures were anticipated.

Blasting techniques would be designed and controlled by blasting and vibration control
specialists to prevent damage to structures or equipment. These controls would attenuate blasting

---

[7] A shadow zone is defined as the region where direct sound does not penetrate because of upward refraction.

BLM_0042514

1  noise as well. For the 31 lease tracts evaluated under Alternative 4, there are several residences
2  within 1.0 mi (1.6 km) from the boundaries of the lease tracts to be developed. The further
3  distances of other off-site residences make additional mitigation unnecessary. However, given
4  the impulsive nature of blasting noise, it is critical that blasting activities be avoided at night and
5  on weekends and that affected neighborhoods be notified in advance of scheduled blasts.
6
7         There are several specially designated areas (e.g., Dolores River SRMA, Dolores River
8  Canyon WSA) and other nearby wildlife habitats around the DOE ULP lease tracts and haul
9  routes where noise might be a concern. Negative impacts on wildlife begin at 55–60 dBA, which
10  corresponds to the onset of adverse physiological impacts (Barber et al. 2010). As discussed
11  above, these levels would be limited up to distances of 1,650 ft (500 m) from the mine sites and
12  180 ft (55 m) from the haul routes. However, there is the potential for other effects to occur at
13  lower noise levels (Barber et al. 2011). When these impacts and the potential for impacts at
14  lower noise levels are taken into account, impacts on terrestrial wildlife from construction noise
15  and mitigation measures would have to be considered on a project-specific basis. Such a
16  consideration should incorporate site-specific background levels and hearing sensitivity for site-
17  specific terrestrial wildlife of concern.
18
19         In summary, potential noise impacts from mine development on humans and wildlife
20  would be anticipated near the mine sites and along the haul routes, but the impacts would be
21  minor and limited to proximate areas unless these activities occurred near lease tract boundaries
22  adjacent to nearby residences or communities or areas specially designated for wildlife concerns,
23  if any. Implementation of measures (i.e., compliance measures, mitigation measures, and BMPs)
24  and coherent noise management plans could minimize these impacts (see Table 4.6-1 in
25  Section 4.6).
26
27
28      **4.4.2.3  Reclamation**
29
30         The type of impacts would be similar to those described for Alternative 1 (Section 4.2.2).
31  It is also assumed that reclamation activities under Alternative 4 would occur over about
32  460 acres (190 ha) during the peak year of reclamation.
33
34         As detailed in Section 4.1.2, noise levels would attenuate to about 55 dBA at a distance
35  of 1,650 ft (500 m) from the reclamation site, which is the Colorado daytime maximum
36  permissible limit of 55 dBA in a residential zone. If a 10-hour daytime work schedule is
37  considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) would occur
38  about 1,200 ft (360 m) from the construction site. Most residences are located beyond these
39  distances but, if reclamation activities occurred near the boundary of Lease Tracts 13, 13A, 16,
40  or 16A, noise levels at four residences could exceed the Colorado limit.
41
42         It is assumed that most reclamation activities would occur during the day, when noise is
43  better tolerated, because of the masking effects of background noise that occurs more during
44  daytime than at night. In addition, reclamation activities at DOE ULP lease tracts would be
45  temporary (typically lasting a few weeks to months, depending on the size of the area to be
46  reclaimed). Accordingly, reclamation within the DOE ULP lease tracts would cause some

BLM_0042515

unavoidable but localized short-term and minor noise impacts on neighboring residences or communities. The same mitigation measures adopted during the mine development and operations phase could also be implemented during the reclamation phase.

### 4.4.3  Geology and Soil Resources

#### 4.4.3.1  Exploration

The types of impacts related to exploration under Alternative 4 would be similar to those under Alternative 3 (Section 4.3.3.1). Because exploration activities would occur over relatively small areas and involve little or no ground disturbance, impacts associated with this phase are expected to be minor.

#### 4.4.3.2  Mine Development and Operations

The types of impacts related to mine development and operations under Alternative 4 are similar to those under Alternative 3 (Section 4.3.3.2). Under Alternative 4, ground disturbance during the peak production year would occur on an assumed 460 acres (190 ha), mainly during mine development. Impacts associated with this phase are expected to be minor to moderate. The degree of impact would vary among the lease tracts, depending on the activities needed to prepare and develop each mine site (because some sites are more developed than others) and depending on site-specific factors, such as soil properties, slope, vegetation, weather, and distance to surface water. Implementing the mitigation measures and BMPs listed in Table 4.6-1 (Section 4.6) would reduce the potential for adverse impacts associated with these activities.

#### 4.4.3.3  Reclamation

The types of impacts related to reclamation under Alternative 4 would be similar to those under Alternatives 1, 2, and 3 (Sections 4.1.3.2, 4.2.3, and 4.3.3.3, respectively). However, ground disturbance would occur over a larger area (assumed to be 460 acres, or 190 ha) than that assumed for Alternatives 1, 2, and 3.

#### 4.4.3.4  Paleontological Resources

**4.4.3.4.1  Exploration.** The types of impacts related to exploration under Alternative 4 would be similar to those under Alternative 3 (Section 4.3.3.4.1). Because exploration activities would occur over relatively small areas and involve little or no ground disturbance, impacts associated with this phase are expected to be minor.

BLM_0042516

**4.4.3.4.2  Mine Development and Operations.** The types of impacts related to mine development and operations under Alternative 4 are similar to those under Alternative 3 (Section 4.3.3.4.2). However, under Alternative 4, ground disturbance during the peak production year would occur on an assumed 460 acres (190 ha), a larger area than that assumed for Alternative 3, mainly during mine development.

**4.4.3.4.3  Reclamation.** The types of impacts related to reclamation under Alternative 4 would be similar to those under Alternatives 1, 2, and 3 (Sections 4.1.3.3, 4.2.3.1, and 4.3.3.4.3, respectively). However, ground disturbance would occur over a larger area (assumed to be 460 acres, or 190 ha) than that assumed for Alternatives 1, 2, and 3.

## 4.4.4  Water Resources

### 4.4.4.1  Exploration

Exploration activities are expected to increase significantly under an assumption that the number of mines and production rate would be double (Table 2.2-4) what they are under Alternative 3. While the types of impacts related to exploration under Alternative 4 would be similar to those under Alternative 3 (Section 4.3.4.1), an increase in exploration activities would have the potential to increase those impacts.

The number of exploratory drill holes is anticipated to increase in order to develop the up to 19 mines assumed. There would be the potential in this phase to increase impacts of groundwater leaching, mixing water with varying geochemical characteristics, and cross-contamination via an increased number of drill boreholes and wells. However, groundwater seepage from shallow aquifers (alluvial and perched sandstone aquifers) is still a key factor governing impacts. The number of wet mines would be similar to those under Alternative 3 and possibly limited to lease tracts in Paradox and Lease Tract 13 along the Dolores River in Slick Rock.

The increased exploration activities would occur over relatively small areas and involve only a small amount of ground disturbance. Impacts associated with runoff generation and erosion in this phase are expected to be minor.

### 4.4.4.2  Mine Development and Operations

Under Alternative 4, there would be a total of 19 mines operating across the 31 DOE ULP lease tracts, involving a total land disturbance of 460 acres (190 ha) and an annual water use of 6,300,000 gal (19 ac-ft) (Section 2.2.4.1). The types of impacts related to mine development and operations under Alternative 4 would be similar to those described for Alternative 3 (Section 4.3.4.2).

BLM_0042517

The increase in area of surface disturbed under Alternative 4 has the potential to increase impacts associated with erosion; however, the proximity of the lease tract to the Dolores River and the San Miguel River would still be the primary factor governing impacts. The additional 18 lease tracts included under Alternative 4 are not located along the reaches of perennial rivers. The overall magnitude of impacts would be expected to be similar to the magnitude under Alternative 3.

The increase in mining operations may also have the potential to increase dewatering effects and groundwater contamination.

The underground working areas are expected to increase significantly in order to achieve the assumed production of up to 3,000 tons/d (2,700 metric tons/d). However, groundwater seepage from alluvial, perched, and uranium-containing aquifers is the primary driver that could cause dewatering, groundwater leaching, and cross-contamination. The underground mines in the 18 additional lease tracts under Alternative 4 are anticipated to be relatively dry except for Lease Tract 8A, which has not been leased before and is close to Lease Tract 7, which has wet mines near Paradox Valley. Two domestic wells were identified as being associated with some of the 18 additional lease tracts. One is located within 1,000 ft (300 m) from Lease Tract 8A, and the other is located on a potential migration pathway from Lease Tract 16 to the Dolores River. The nature and magnitude of impacts would be expected to be similar to those under Alternative 3. Those impacts could be minimized through mitigation measures, permitting, and BMPs, as discussed in Section 4.3.4.2 and listed in Table 4.6-1. The site-specific requirements and plans for drainage design, stormwater management, and spill prevention and control would be expected to be evaluated and incorporated in the future project-specific action.

The estimated annual water use under Alternative 4 would be two times higher than that under Alternative 3. However, the potential impacts are still minor compared to regional water use in three counties for mining (2.9%) and for the public water supply (0.1%). The consumptive water use is a fraction of the estimated water use. This part of water use will be returned to the hydrologic system in the region (potable water, etc.). The further specific evaluation would be included in future project-specific NEPA documents.

### 4.4.4.3 Reclamation

The potential impacts on water resources associated with the reclamation activities under Alternatives 1–3 are described in Sections 4.1.4., 4.2.4, and 4.3.4. Under Alternative 4, the type of impacts would be the same as those under Alternatives 1–3. However, the area of land disturbance would be 1.5 times higher and the size of underground mines would be about 2 times higher than those under Alternative 3. The increased scale of reclamation might have the potential to increase impacts associated with reclamation activities.

The increase in the area of surface land disturbance in this phase could increase impacts associated with erosion; however, the proximity of the lease tract to the Dolores River and the San Miguel River would still be the primary factor governing the impact. The additional 18 lease

BLM_0042518

tracts included under Alternative 4 are not located along the reaches of perennial rivers. The overall magnitude of impacts would be expected to be similar to those under Alternative 3.

The increased level of active prospecting across up to 31 lease tracts during the previous operations phase would require more underground working areas to be backfilled and more boreholes to be plugged in this phase than under Alternative 3. The potential could be higher than it is under Alternative 3 for impacts on groundwater quality that would result from leaching via backfills and poor sealing of drill holes. However, groundwater seepage from shallow aquifers is the primary driver that could cause groundwater leaching and cross-contamination via drill holes and open mine portals and vent holes. Under Alternative 4, the underground mines in the 18 additional lease tracts are expected to be relatively dry except for Lease Tract 8A, as just discussed. Potential impacts on groundwater quality would be minor and could be avoided if the reclamation is performed by appropriate backfilling of mine portal and vent holes, complete sealing of drill holes that intercept multiple aquifers, and adequate water reclamation in accordance with reclamation performance measures by CDRMS.

## 4.4.5 Human Health

Exploration for uranium ores would involve drilling small holes (a few inches in diameter) in the ground and bringing up small amounts of mineralized cuttings, most of which would be placed back to fill the holes. Because potential human health impacts during mine exploration are expected to be minimal and limited to only a few workers, the analysis of human health impacts in this section focuses on the consequences caused by development and operations of the uranium mines and the reclamation of lease tracts. Nevertheless, to provide a perspective of the potential dose associated with mine exploration, an analysis with the RESRAD code was conducted (see Section 4.3.5 for more descriptions). The analysis assumed that the mineralized cuttings brought up from drilling would be spread over an area of about 100 ft$^2$ (3 m $\times$ 3 m), and an exploration worker would stand on the cuttings and be exposed to radiation. According to the analysis, the radiation dose rate would be much lower than 0.3 mrem per day. Therefore, it is considered reasonable to expect that the total dose that an exploration worker would receive from mine exploration would be less than 5 mrem.

### 4.4.5.1 Worker Exposure – Uranium Miners

Like many other occupations, uranium mining can result in physical injuries or fatalities. Based on data published by the U.S. Department of Labor, Bureau of Labor Statistics, in 2010, the fatal occupational injury rate for the mining industry was 19.8 per 100,000 full-time workers (FTWs) (BLS 2011a), and the nonfatal occupational injury and illness rate was 2.3 per 100 FTWs (BLS 2011b). Assuming the injury and fatality rates for uranium mining are similar to those for other types of mining, during the year of peak operations, there could be five nonfatal injuries and illnesses among the 218 workers assumed for Alternative 4. However, no mining-related fatality is predicted among the workers. The above estimated numbers of injury and fatality were made on the basis of statistical data and should be interpreted from a statistical perspective as well. The actual injury and fatality rates among individual mines could be

BLM_0042519

1  different. Proper worker training and extensive experience in uranium mining would reduce
2  mining accidents, thereby reducing the potential of injury and fatality.
3
4       In addition to being exposed to physical hazards, uranium miners could receive radiation
5  exposure from mining activities. The radiation exposure to individual miners under Alternative 4
6  would be similar to that under Alternative 3. Monitoring data over the period 1985 to 1989
7  indicated that the average radiation exposure for uranium mine workers in the United States
8  ranged from 350 to 433 mrem/yr (UNSCEAR 2010), excluding the background radiation dose,
9  which is estimated to be about 430 mrem/yr in the ULP lease tracts. In general, underground
10 miners receive higher radiation exposure than open-pit miners, because underground cavities
11 accumulate higher radon concentrations and airborne uranium ore dust concentrations than does
12 aboveground open space. According to UNSCEAR (1993), external exposure accounts for 28%
13 of the total dose for underground miners and 60% for open-pit miners; the inhalation of radon
14 accounts for 69% and 34% of the total dose for underground miners and open-pit miners,
15 respectively; and inhalation of uranium ore dust accounts for 3% and 6% of the total dose for
16 underground miners and open-pit miners, respectively. Based on the assumption that the average
17 dose for underground miners is 433 mrem/yr and based on the distribution of the total dose
18 among different pathways, an LCF risk of $4 \times 0^{-4}$/yr is calculated for an average miner
19 (see Table 4.3-2). This translates to a probability of about 1 in 2,500 of developing a latent fatal
20 cancer from 1 year of radiation exposure. If a worker would work for 10 years as a uranium
21 miner, the total cumulative dose he would receive would be 4,330 mrem, with a corresponding
22 cumulative LCF risk of $4 \times 10^{-3}$; i.e., the probability of developing a fatal cancer would be about
23 1 in 250.
24
25      An attempt was also made to infer potential chemical exposures associated with
26 underground uranium mining. This inference was detailed in Section 4.3.5.1. Potential air
27 concentrations of uranium and vanadium, assumed in the form of $V_2O_5$, were estimated using
28 the radiation dose associated with the inhalation of particulate pathway that an average miner
29 would receive. The estimated chemical concentrations were then used to estimate the potential
30 hazard index associated with uranium and vanadium exposures. A hazard index of 1.06 was
31 estimated, contributed primarily by vanadium exposure. Because the hazard index slightly
32 exceeds the threshold value of 1, it is concluded that potential adverse health effect might result
33 from working in underground uranium mines.
34
35
36 **4.4.5.2  Worker Exposure – Reclamation Workers**
37
38      During the reclamation phase, the largest source of radiation exposure would be the
39 aboveground waste-rock piles accumulated over the operational period. The potential radiation
40 dose incurred by reclamation workers would depend on the size of the waste-rock pile and its
41 uranium content. The potential radiation exposure of a reclamation worker was estimated on the
42 basis of four assumed waste-rock pile dimensions corresponding to the four mine sizes assumed.
43 Detailed discussions on the development of the four waste-rock piles evaluated are provided in
44 Section 4.1.5.
45

BLM_0042520

1      The radiation exposure of an individual worker that would result from performing
2  reclamation activities is expected to be about the same as that analyzed in Section 4.1.5 for
3  Alternative 1. Based on the RESRAD (Yu et al. 2001) analysis, the total radiation dose incurred
4  by a reclamation worker would range from 14.3 to 34.2 mrem, depending on the radionuclide
5  concentrations assumed for waste rocks. The lower end of the estimate corresponds to the
6  maximum concentration reported for waste rock samples taken from the JD-6 and JD-8 lease
7  tracts (Whetstone Association 2011, 2012), which was reported to have a concentration for
8  Ra-226 of 70 pCi/g. Section 4.1.5 provides more discussions on the determination of
9  radionuclide concentrations in waste-rock piles. The total dose is estimated on the basis of the
10 assumption that the worker would work 8 hours per day for 20 days on top of a waste-rock pile.
11 The radiation exposure would be dominated by the external radiation pathway, which would
12 contribute about 94–96% of the total dose, followed by the incidental soil ingestion pathway,
13 which accounts for about 3% of the total dose. The remaining dose would be contributed by
14 exposures from inhalation of radioactive particulates and radon gas. The potential LCF risk
15 associated with this radiation exposure is estimated to $1 \times 10^{-5}$; i.e., the probability of
16 developing a latent fatal cancer ranges from about 1 in 100,000 based on the 70 pCi/g
17 concentration. The estimates for the 168 pCi/g concentration would be less than 3 times as much.
18
19     Reclamation workers may be required to work underground to reclaim mine workings;
20 however, the time spent underground is expected to be much shorter than the time spent above
21 the ground. Based on past monitoring data for uranium miners (433 mrem/yr on average, see
22 Section 4.3.5.1), it is estimated that a reclamation worker would need to spend 66–158 hours at
23 underground workings to receive the same dose (6.1–14.3 mrem) as he would from working on
24 top of a waste-rock pile for 160 hours (i.e., 20 workdays).
25
26     In addition to the radiation that would be emitted by the uranium isotopes and their decay
27 products in the waste rocks, the chemical toxicity of the uranium and vanadium minerals in the
28 waste rocks could also affect the health of a reclamation worker. The potential chemical risk that
29 a reclamation worker could incur under Alternative 4 is expected to be about the same as that
30 under Alternative 1 (Section 4.1.5.1). The chemical exposure would be well below the threshold
31 values, the reclamation worker is not expected to experience adverse health effects.
32
33
34 **4.4.5.3  General Public Exposure – Residential Scenario**
35
36     The maximum potential radiation exposure for a member of the general public was
37 estimated as a function of distance from the release point of radionuclides, which can be used to
38 estimate the potential exposure of an individual living close to the ULP lease tracts, given the
39 location and size of the uranium mine being operated. The maximum doses were estimated for
40 the four mine sizes assumed.
41
42

BLM_0042521

1    **4.4.5.3.1  Uranium Mine Development and Operations.**
2
3
4         **Exposure to an Individual Receptor.** Based on the discussions in Section 4.3.5.3.1 (for
5    Alternative 3), the primary source of potential human health impacts on the residents who lived
6    near the ULP lease tracts during the operational phase would be the radon gas emitted from
7    mining activities. The analysis of potential radiation exposures to the residents focused on the
8    consequences associated with the release of radon.
9
10        For human health impact analysis, the radon emission rates for the three sizes of
11   underground uranium mines assumed were developed by using the equation developed by the
12   EPA (EPA 1985) that correlates the radon emission rate with cumulative uranium ore
13   production. An operational period of 10 years was assumed when developing the radon emission
14   rates. The radon emission rates based on a 10-year operational period were considered to be the
15   upper-bound estimates for underground mines. The radon emission rate for a very large mine
16   (i.e., the existing open-pit mine on Lease Tract 7) was estimated on the basis of the data
17   compiled by the EPA (Table 12-7 in EPA 1989a) for surface mines. The estimated value is also
18   expected to be greater than the actual emission rate. The emission rates developed for the four
19   sizes of uranium mines assumed under Alternative 4 would have the same values as those
20   developed under Alternative 3. Therefore, the potential maximum doses would be the same as
21   those listed in Table 4.3-4.
22
23        Based on the results in Table 4.3-4, the radiation exposures would decrease with
24   increasing distance because of greater dilution in the radon concentrations. The maximum
25   exposure at a fixed distance from the emission point of an underground mine or from the center
26   of the open-pit mine would always occur in a specific sector that coincides with at dominant
27   wind direction. In any other sector, the potential exposure would be less than the maximum
28   values.
29
30        As presented in Table 4.3-4 with the CAP88-PC results, if the resident lived at a distance
31   of 3,300 ft (1,000 m) from the emission point of a uranium mine, the potential maximum
32   radiation dose he could incur would range from 5.6 to 22.5 mrem/yr, depending on the scale of
33   the uranium mine. If the distance increased to 6,600 ft (2,000 m), then the maximum exposure
34   would be reduced to range from 2.7 to 10.7 mrem/yr. Beyond a distance of 8,200 ft (2,500 m),
35   the maximum exposures would be less than 10 mrem/yr, which is the NESHAP dose limit
36   (40 CFR Part 61) for airborne emissions of radionuclides. It should be noted that the maximum
37   doses listed in Table 4.3-4 are for a resident living in a dominant wind direction and that they
38   were obtained by using radon emission rates corresponding to an operational period of 10 years.
39   The emission rates for uranium mines that have been developed and operated for fewer than
40   10 years would be less. However, if two or more uranium mines located close to a given
41   residence were being operated at the same time, the potential dose to the resident would be the
42   sum of the doses contributed by each mine.
43
44        The maximum LCF risk for a resident living close to a uranium mine was estimated to
45   range from $1 \times 10^{-6}$/yr to $5 \times 10^{-6}$/yr at a distance of 16,000 ft (5,000 m) and to range from
46   $7 \times 10^{-6}$/yr to $3 \times 10^{-5}$/yr at a distance of 3,300 ft (1,000 m). That is, the probability of

BLM_0042522

developing a latent fatal cancer ranges from 1 in 1,000,000 to 1 in 200,000 at a distance of 16,000 ft (5,000 m), and it ranges from 1 in 140,000 to 1 in 33,000 at a distance of 3,300 ft (1,000 m), for each year of exposure.

Due to the large dilution in air concentrations after the uranium- and vanadium-contained dust particles were released from the emission stacks, potential chemical exposures of nearby residents are expected to be much lower than those of underground uranium miners. The hazard index estimated for an underground miner is 1.06 (from Section 4.3.5.1); therefore, for a nearby resident, the hazard index should be much lower than 1. On the basis of this inference, a nearby resident is not expected to experience any adverse health effect from the chemical exposures.

Because potential radon exposures of the general public living near the ULP lease tracts could exceed the NESHAP dose limit of 10 mrem/yr, mitigation measures would be required for (1) obtaining actual radon emission rates to refine the dose estimates associated with radon exposures and (2) reducing the impact to the general public, if the refined estimates would exceed the 10-mrem/yr dose limit. See Section 4.3.5.3.1 for the suggested mitigation measures.

**Exposure to a Collective Population.** Collective exposures of the general public living within 50 mi (80 km) of the ULP lease tracts were evaluated by using the same method described in Section 4.3.5.3.1. The range of the potential collective dose in the peak year of operations can be estimated by summing all the radon emissions from active uranium mines and placing the total emission at the center of each lease tract group.

Table 4.4-2 lists the estimated Rn-222 emission rates during the peak year of operations under Alternative 4. It was assumed that the active mines would have been developed and operated for 10 years at the peak year of operations. The total Rn-222 emission rate from underground mining was estimated to be about 18,000 Ci/yr, and the estimated Rn-222 emission rate from the very large open-pit mine was 600 Ci/yr.

Table 4.4-3 presents the collective doses to the general public living within 3.1 to 50 mi (5 to 80 km) of the assumed emission points during the peak year of operations under Alternative 4 obtained by using the CAP88-PC code. The estimated collective dose associated with underground mining ranges from 16 to 93.3 person-rem. The estimated collective dose associated with open-pit mining is about 0.88 person-rem. Combined, the underground and open-pit mining would result in a total collective dose ranging from 16.9 to 94.1 person-rem during the peak year of operations. This collective exposure would cause a collective LCF risk of 0.022 to 0.12. Therefore, no cancer fatality is expected among the population resulting from exposure to the radon gas emitted from 19 uranium mines that would be operated simultaneously during the peak year of operations under Alternative 4. The total populations involved in these estimates would range from 27,062 to 178,473. If the collective dose was evenly distributed among the affected population, the average individual dose would range from 0.51 to 0.97 mrem (LCF risk of $7 \times 10^{-7}$ to $1 \times 10^{-6}$; i.e., 1 in 1,400,000 to 1 in 1,000,000) during the peak year of operations. In reality, because the active lease tracts (the lease tracts with mining operations) would be scattered among the four lease tract groups rather than being concentrated in one single group (as they were assumed to be in the calculations), the size of the population within 3.1 to 50 mi (5 to

BLM_0042523

1  **TABLE 4.4-2  Radon Emission Rates per Type of Mine during Mine Operations Assumed for**
2  **Alternative 4**

| Parameters | Small[a] | Medium[a] | Large[a] | Very Large[b] | Total |
|---|---|---|---|---|---|
| Uranium ore production per mine (tons/d) | 50 | 100 | 200 | 300 | |
| Cumulative uranium ore production per mine (tons) | 1.20E+05 | 2.40E+05 | 4.80E+05 | 7.20E+05 | |
| Rn-222 emission rate per mine (Ci/yr)[c] | 5.28E+02 | 1.06E+03 | 2.11E+03 | 6.00E+02 | |
| Alternative 4 (peak year of operations) | | | | | |
| No. of active mines | 6 | 10 | 2 | 1 | 19 |
| Total Rn-222 emission rate (Ci/yr) | 3.17E+03 | 1.06E+04 | 4.22E+03 | 6.00E+02 | 1.86E+04 |

[a]  Underground mine.

[b]  Open-pit mine.

[c]  The emission rates of radon from underground mines were estimated by using the correlation developed
    by the EPA in 1985: Rn-222 emission (Ci/yr) = 0.0044 × cumulative uranium ore production (tons)
    (EPA 1985). A cumulative period of 10 years was assumed for this calculation. The emission rate from
    the very large open-pit mine was determined based on data compiled by the EPA for surface uranium
    mines (EPA 1989a).

3
4
5  80 km) of the lease tracts should be larger than 178,473. Therefore, the actual average individual
6  dose should be just a fraction of the calculated values.
7
8
9      **4.4.5.3.2  Reclamation.** Residents living close to a uranium mine could be exposed to
10  radiation as a result of emissions of radioactive particulates and radon gas from the waste-rock
11  piles left aboveground. The potential radiation dose would depend on the direction and distance
12  between the residence and the waste-rock piles and the emission rates of the particulates and
13  radon. The potential range of radiation dose a resident would incur under Alternative 4 is
14  expected to be similar to that estimated for Alternatives 1 and 2, because the exposures would be
15  dominated by the emissions from the waste-rock pile(s) that were closest to this resident.
16
17      Based on the calculation results presented in Section 4.1.5.2, if a resident lived 3,300 ft
18  (1,000 m) from a waste-rock pile, the radiation dose he could receive would be less than
19  3.5 mrem/yr; if the distance was increased to 6,600 ft (2,000 m), then his exposure would drop to
20  less than 1.3 mrem/yr. If there were two waste-rock piles nearby, the potential dose that this
21  resident would incur would be the sum of the doses contributed by each waste-rock pile. Based
22  on the listed maximum doses in Table 4.1-8, the potential dose incurred by any resident living at
23  a distance of more than 1,600 ft (500 m) from the center of a waste-rock pile is expected to be
24  smaller than the NESHAP dose limit of 10 mrem/yr for airborne emissions (40 CFR Part 61).
25  The potential LCF risk would be less than $9 \times 10^{-6}$/yr, which means the probability of
26  developing a latent fatal cancer from living close to the ULP lease tracts for 1 year during or

BLM_0042524

1
2
3

**TABLE 4.4-3  Collective Doses and LCF Risks to the General Public from Radon Emissions from Uranium Mines during the Peak Year of Operations under Alternative 4**

| Radon Source | Collective Dose (person-rem/yr) | Collective LCF (1/yr)[a] |
|---|---|---|
| From underground mining[b] | | |
| Based on the center of Group 1[c] | 9.33E+01 | 1E-01 |
| Based on the center of Group 2[d] | 4.98E+01 | 6E-02 |
| Based on the center of Group 3[e] | 2.53E+01 | 3E-02 |
| Based on the center of Group 4[f] | 1.60E+01 | 2E-02 |
| | | |
| From open-pit mining[g] | | |
| Based on the center of Group 3[e] | 8.80E-01 | 1E-03 |
| | | |
| Total | | |
| Minimum | 1.69E+01 | 2E-02 |
| Maximum | 9.41E+01 | 1E-01 |

[a]  Denotes the number of latent lung cancers that could result from radiation exposure.

[b]  The total radon emission rate from underground mining during the peak year of operations is 17,990 Ci/yr.

[c]  If the emission is from the center of lease tract Group 1, the total population between 3 and 50 mi (5 and 80 km) is 178,473.

[d]  If the emission is from the center of lease tract Group 2, the total population between 3and 50 mi (5 and 80 km) is 86,657.

[e]  If the emission is from the center of lease tract Group 3, the total population between 3 and 50 mi (5 and 80 km) is 27,062.

[f]  If the emission is from the center of lease tract Group 4, the total population between 3 and 50 mi (5 and 80 km) is 33,166.

[g]  The total radon emission rate from open-pit mining during the peak year of operations is 600 Ci/yr.

4
5
6   after reclamation would be 1 in 110,000. If a resident lived in the same location for 30 years, the
7   cumulative LCF risk would be less than $3 \times 10^{-4}$ (i.e., 1 in 3,300). The above estimates were
8   obtained by using the base concentration of 70 pCi/g for Ra-226. Should the higher 168 pCi/g
9   concentration be used, the potential radiation doses and LCF risks would increase by a factor of
10   less than 3.
11
12          The waste-rock piles would be covered by a layer of soil or top cover materials during
13   reclamation to facilitate vegetation growth. Because of this cover, emissions of radioactive
14   particulates would be greatly reduced, if not eliminated completely. Emissions of radon from
15   waste-rock piles could continue, although the emission rates would be reduced. However,
16   because the uranium isotopes and their decay products have long decay half-lives, the potential

BLM_0042525

1  of radon emissions from waste-rock piles could persist for millions of years after reclamation
2  was completed.
3
4      In addition to radiation exposure, the residents living close to the ULP lease tracts could
5  incur chemical exposures due to the chemical toxicity of uranium and vanadium minerals
6  contained in the waste rocks. Potential chemical exposures would be associated with the
7  emissions of particulates and come through the inhalation and incidental dust ingestion
8  pathways. By using the same exposure parameters as those used for radiation dose modeling,
9  potential chemical risks to the nearby residents were evaluated. The total hazard index would be
10 well below the threshold value of one, with inhalation being the dominant pathway. Therefore,
11 nearby residents are not expected to experience any adverse health effects with the potential
12 exposures.
13
14     A less likely exposure scenario after the reclamation phase is for a nearby resident to
15 raise livestock in the lease tract and consume the meat and milk produced. According to the
16 RESRAD calculation results, the potential dose would be less than 5.5 mrem/yr, which is a small
17 fraction of the DOE dose limit of 100 mrem/yr for the general public from all applicable
18 exposure pathways (DOE Order 458.1). The corresponding LCF risk would be $3 \times 10^{-6}$/yr;
19 i.e., the probability of developing a latent fatal cancer would be less than 1 in 330,000 per year.
20 Section 4.1.5.2 provides detailed discussions on this analysis.
21
22
23     **4.4.5.4  General Public Exposure – Recreationist Scenario**
24
25     A recreationist who unknowingly entered the lease tracts could also be exposed to
26 radiation. To model this potential radiation exposure, it is assumed that the recreationist would
27 camp on top of a waste-rock pile for 2 weeks, eat wild berries collected in the areas, and hunt
28 wildlife animals for consumption. This recreationist could receive radiation exposure through the
29 direct external radiation, inhalation of radon, inhalation of particulates, and incidental soil
30 ingestion pathways while camping on waste rocks. The potential exposures would vary with the
31 thickness of soil cover placed on top of waste rocks during reclamation. In the analysis, the
32 thickness was assumed to range from 0 to 1 ft (0 to 0.3 m).
33
34     The potential dose that could be incurred by a recreationist under Alternative 4 would be
35 similar to that under Alternatives 1 and 2. The estimated radiation dose incurred by the
36 recreationist from camping on waste rocks for 2 weeks would range from 0.88 mrem with a
37 cover thickness of 1 ft (0.3 m) to 30 mrem with no cover. The corresponding LCF risk would
38 range from $1 \times 10^{-6}$ to $2 \times 10^{-5}$; i.e., the probability of developing a latent fatal cancer would be
39 about 1 in 1,000,000 to 1 in 50,000. The majority of the radiation dose would result from direct
40 external radiation. These dose estimates were made by using the base concentrations (70 pCi/g
41 for Ra-226) assumed for waste rocks. If the concentrations were increased to 168 pCi/g, the
42 potential doses and LCF risks would increase by a factor of less than 3.
43
44     The potential radiation dose associated with eating wild berries and wildlife animals was
45 calculated by using assumed ingestion rates of 1 lb (0.45 kg) and 100 lb (45.4 kg), respectively.
46 The potential dose was estimated to range from 1.08 to 1.66 mrem, depending on the depth of

BLM_0042526

1   plant roots assumed for the estimate. The corresponding LCF risk was estimated to be less than
2   $8 \times 10^{-7}$; i.e., the probability of developing a latent cancer fatality would be less than 1 in
3   1,250,000.
4
5          No chemical risks would result from camping on a waste-rock pile if the waste rock pile
6   was covered by a few inches of soil materials. In the worst situation in which there would be no
7   soil cover, a hazard index of 0.039 was calculated. The potential chemical risk associated with
8   ingesting contaminated wild berries would be small, with a hazard index of less than 0.003. The
9   hazard index associated with eating wildlife animals would be more than 100 times greater than
10  that associated with eating wild berries, because of the potential accumulation of vanadium in
11  animal tissues. The hazard index calculated was 0.39. However, because the sum of all these
12  hazard indexes was much less than 1, the recreationist is not expected to experience any adverse
13  health effect from these two ingestion pathways.
14
15         Most of the encounters between recreationists and ULP lease tracts are expected to be
16  much shorter than 2 weeks. When the total dose associated with exposures to waste rocks from
17  camping was used, a dose rate of less than 0.09 mrem/h (LCF risk of $7 \times 10^{-8}$; i.e., 1 in
18  14,000,000) was estimated.
19
20         A discussion of a detailed analysis of the potential exposure to an individual receptor
21  under post-reclamation conditions at the mine sites is provided in Section 4.1.5.3.
22
23
24  **4.4.6 Ecological Resources**
25
26
27     **4.4.6.1 Vegetation**
28
29         Exploration and development activities could occur on each of the 31 lease tracts
30  included under Alternative 4. Previous disturbance from exploration or mine development has
31  occurred in each of these lease tracts except Lease Tract 8A. However, new exploration and
32  development could occur in either disturbed or undisturbed areas of the lease tracts. Exploration
33  and development on Lease Tract 8A would occur in undisturbed habitats.
34
35         The types of impacts from exploration, development and operations, and reclamation
36  under Alternative 4 would be similar to those under Alternative 3, except that during the peak
37  year of operations a greater area would be disturbed. Up to 19 mines could be in operation
38  (6 small, 10 medium, 2 large, and 1 very large); in addition, the mines could be located on any of
39  the 31 lease tracts rather than on just 12 of them. Ground disturbance would range from 10 acres
40  (4.0 ha) for small mines, to 15 acres (6.1 ha) for medium mines, to 20 acres (8.1 ha) for large
41  mines, with the total being 250 acres (100 ha). In addition, the 210-acre (85-ha) open-pit mine
42  (Lease Tract 7) would resume operations, resulting in a total of 460 acres (190 ha) of disturbance
43  under Alternative 4. Direct impacts associated with the development of mines would include the
44  destruction of habitats during site clearing and excavation as well as the loss of habitats at the
45  waste-rock disposal area, various storage areas, project facilities, and access roads. The lease
46  tracts included in Alternative 4 support a wide variety of vegetation types. The predominant

BLM_0042527

types are piñon-juniper woodland and shrubland and big sagebrush shrubland. Some of the areas affected might include high-quality mature habitats, resulting in greater impact levels than those that would occur in previously degraded areas. Indirect impacts of mining would be associated with fugitive dust, invasive species, erosion, sedimentation, and impacts due to changes in surface water or groundwater hydrology or water quality.

**4.4.6.1.1 Wetlands and Floodplains.** Wetlands occur in most of the lease tracts and might be directly or indirectly affected. Indirect impacts of mining would be associated with fugitive dust, invasive species, erosion, sedimentation, and impacts due to changes in surface water or groundwater hydrology or water quality.

### 4.4.6.2  Wildlife

Impacts on wildlife from exploration, mine development and operations, and reclamation under Alternative 4 would be similar to those under Alternative 3 (Section 4.3.6.2) except that (1) during the peak years of operation, up to 19 mines could be in operation at the same time, and (2) the mines could be located on any of the 31 lease tracts. The 19 mines would include 6 small mines (10 acres or 4.0 ha disturbed per mine), 10 medium mines (15 acres or 6.1 ha disturbed per mine), 2 large mines (20 acres or 8.1 ha disturbed per mine), and 1 very large mine (210 acres or 85 ha disturbed), for a total of 460 acres (190 ha). The 210 acres (85 ha) for the very large mine (JD-7) have already been disturbed (as were 80 acres [32 ha] for topsoil storage). Therefore, areas of existing and new disturbances could occur at the other mine locations, and they would involve a total of 250 acres (100 ha) of land containing various amounts of upland vegetation. Including the existing area disturbed for JD-7, this area of disturbance represents 1.8% of the total acreage of DOE's lease program. The remainder of the lease tracts (excluding areas where access roads and utility corridors could be required) would be undisturbed by mining activities under Alternative 4.

The differences in impacts under Alternative 4 compared with the impacts under Alternative 3 would be limited (Section 4.3.6.2). However, the potential impacts on wildlife would occur at additional mine sites and affect an additional 150 acres (61 ha) of land on any of the 31 lease tracts rather than on any of just the 13 pre-July 2007 then-active lease tracts. Although exploration, mine development and operations, and reclamation activities are expected to be incrementally greater under Alternative 4 than under Alternative 3, impacts on wildlife are still expected to be negligible during site exploration and minor to moderate during mine development, operations, and reclamation. While impacts on wildlife could be long term (e.g., last for decades), they would be scattered temporally and, especially, spatially. In general, impacts would be localized and would not affect the viability of wildlife populations, especially if mitigation measures are implemented (see Section 4.6).

Impacts on wildlife following reclamation of the mine sites would be negligible if no development or other use of the sites (other than that of natural resource protection) occurred.

BLM_0042528

### 4.4.6.3  Aquatic Biota

Impacts on aquatic biota from mine exploration, development, operations, and reclamation under Alternative 4 would be similar to those under Alternative 3 (Section 4.3.6.3) except that (1) during the peak year of operations, up to 19 mines could be in operation, and (2) the mines could be located on any of the 31 lease tracts. Overall, impacts on aquatic biota are expected to be negligible during site exploration and negligible to minor during mine development, operations, and reclamation. Moderate impacts would only be expected if mines were located near perennial water bodies. In general, any impacts on aquatic biota would be localized and would not affect the viability of affected resources, especially if mitigation measures are implemented (see Section 4.6).

### 4.4.6.4  Threatened, Endangered, and Sensitive Species

Under Alternative 4, impacts on threatened, endangered, or sensitive species could result from exploration, mine development and operational, and reclamation activities. The threatened, endangered, and sensitive species evaluated under Alternative 3 (Section 4.3.6.4) would still be considered under Alternative 4. The only difference is that the potential for impacts on these species might be greater because more lease tracts could be developed, representing a greater potential for direct and indirect effects on these species.

All species evaluated under Alternative 3 have the potential to be affected by program activities under Alternative 4. Potential impacts on these species, as well as potentially applicable avoidance, minimization, and mitigation measures, are identified in Section 4.3.6.4 (see Table 4.3-8). In addition to these species, Table 4.4-4 shows there is the potential for impacts on other sensitive species that might be affected by ULP activities on the expanded number of lease tracts under Alternative 4. In total, 52 threatened, endangered, or sensitive species might be affected by ULP activities under Alternative 4. (This includes all species listed back in Table 4.3-8 and listed here in Table 4.4-4.) Of these 52, 5 sensitive species that might be affected by ULP activities under Alternative 4 would not be affected under Alternative 3 (Table 4.3-8). These 5 species are all BLM-designated sensitive plant species. Impacts on these additional species are described in Table 4.4-4. DOE consulted with the USFWS on potential impacts on federally listed species under this alternative as part of its obligations under Section 7 of the ESA. The BA and BO prepared for this consultation is provided in Appendix E.

### 4.4.7  Land Use

Under Alternative 4, DOE would continue the ULP with the 31 lease tracts for the next 10-year period or for another reasonable period. A total of 19 mines are assumed to be in operation during the peak year of ore production. The lands would continue to be closed to mineral entry; however, all other activities within the lease tracts would continue. Mining activities within the lease tracts would likely preclude some land uses such as recreation or grazing, but because many of the surrounding lands offer opportunities for these activities,

BLM_0042529

1    **TABLE 4.4-4  Potential Effects of the Uranium Leasing Program under Alternative 4 on**
2    **Threatened, Endangered, and Sensitive Species That Would Not Be Affected under Alternative 3[a]**

| Common Name | Scientific Name | Status[b] | Potential to Occur on or near the Following Lease Tracts[c] | Potential for Effect[d] |
|---|---|---|---|---|
| ***Plants*** | | | | |
| Canyonlands biscuitroot | *Aletes latilobus* | BLM-S | 26, 27 | Potential for negative impact—direct and indirect effects. ULP activities could affect this species. Impacts could occur through direct effects such as mortality and habitat disturbance resulting from exploration, development, and reclamation activities, as well as indirect impacts such as runoff, sedimentation, dispersion of fugitive dust, and effects related to radiation exposure. |
| Fisher milkvetch | *Astragalus piscator* | BLM-S | 26, 27 | Same as above. |
| Grand Junction suncup | *Camissonia eastwoodiae* | BLM-S | 26, 27 | Same as above. |
| Horseshoe milkvetch | *Astragalus equisolensis* | BLM-S | 26, 27 | Same as above. |
| Osterhout's cryptantha | *Cryptantha osterhoutii* | BLM-S | 26, 27 | Same as above. |

[a]   Threatened, endangered, and sensitive species that might be affected under Alternative 4 include all species that might be affected under Alternative 3, as well as all species presented in this table. See Section 4.3.6.4 and Table 4.3-6 for a discussion and presentation of potential impacts on threatened, endangered, and sensitive species under Alternative 3.

[b]   BLM-S = BLM-designated sensitive species.

[c]   Refer to Table 3.6-20 (Section 3.6.4) for a description of species' habitat requirements and potential to occur on or near lease tracts.

[d]   Potential impacts are based upon the presence of potentially suitable habitat or recorded occurrences in the vicinity of the Alternative 1 lease tracts. Impacts on species might occur as either direct or indirect effects. Direct effects are considered to be physical impacts resulting from ground-disturbing activities; these include impacts such as direct mortality and habitat disturbance. The impact zone for direct effects does not extend beyond the lease tract boundaries. Indirect effects result from factors including, but not limited to, noise, runoff, dust, accidental spills, and radiation exposure. The impact zone for indirect effects might extend beyond the lease tract boundaries, but the potential degree of indirect effects would decrease with increasing distance from the lease tracts.

3
4
5

BLM_0042530

1    impacts due to land use conflicts are considered to be minor (but greater than those under
2    Alternative 3 because they involve more lands). See Section 4.4.8.1 for further discussion of
3    potential impacts on recreation and tourism.
4
5
6    **4.4.8  Socioeconomics**
7
8        Exploration activities would create 20 jobs during the peak year and would create
9    16 additional indirect jobs (see Table 4.4-5). Because of the small number of jobs required for
10    exploration, the current workforce in the ROI could meet the demand for labor; thus, there would
11    be no in-migration of workers. Mining development and operational activities would create
12    direct employment of 229 people during the peak year and would create 152 additional indirect
13    jobs. Development and operational activities would constitute 0.6% of total ROI employment.
14    Uranium mining would also produce $14.8 million in income. Mine operation is assumed to be
15    10 years.
16
17        As discussed in Section 3.8, the average unemployment rate in the ROI was 9.6% in
18    2010; approximately 10,600 people were unemployed. Based on the number of people that could
19    be available from the unemployed workforce and the ROI's distribution of employment by
20    sector, there could be approximately 2,100 people available for uranium mining and reclamation
21    in the ROI. Based on the available labor supply in the ROI as a whole, some of the current
22
23
24       **TABLE 4.4-5  Socioeconomic Impacts from Uranium Mine Development,**
25       **Operations, and Reclamation in the Region of Influence under Alternative 4**

| Parameter | Exploration | Development and Operations | Reclamation |
|---|---|---|---|
| Employment (no.) | | | |
|    Direct | 20 | 229 | 39 |
|    Indirect | 16 | 152 | 21 |
|    Total | 36 | 381 | 60 |
| Income[a] | | | |
|    Total | 1.7 | 14.8 | 2.4 |
| In-migrants (no.) | 0 | 115 | 0 |
| Vacant housing (no.) | 0 | 69 | 0 |
| Local community service employment | | | |
|    Teachers (no.) | 0 | 0 | 0 |
|    Physicians (no.) | 0 | 1 | 0 |
|    Public safety (no.) | 0 | 2 | 0 |

[a]   Unless indicated otherwise, values are reported in $ million 2009.

BLM_0042531

1  workforce could meet the demand for labor necessary for mine development and operations and
2  reclamation of the 19 assumed mines.
3
4         However, some in-migration would occur as a result of uranium mining activities; under
5  Alternative 4, 115 people would move into the ROI. In-migration of workers would represent an
6  0.08% increase in the ROI forecasted population growth rate. The additional workers would
7  increase the annual average employment growth rate by less than 1% in the ROI. The
8  in-migrants would have only a marginal effect on local housing and population and would
9  require less than 1% of vacant owner-occupied housing during mine development and
10 operations. One additional physician, one additional firefighter, and one additional police officer
11 would be required to maintain current levels of service within the ROI as a result of the increased
12 population from in-migrants. No additional teachers would be required to maintain the current
13 student-to-teacher ratio in the ROI.
14
15        Impacts in the ROI would be small because (a) employment would likely be distributed
16 across all three counties, (b) the impacts would be absorbed across multiple governments and
17 many municipalities, and the (c) employment pool would come from a larger population group
18 than if all employment originated from any one county. Mining workers could live in larger
19 population centers in the ROI and close vicinity, such as Grand Junction, Montrose, or Telluride,
20 and commute to mining locations. A report prepared for Sheep Mountain Alliance
21 acknowledged that workers "may choose to live at some distance from the mill and mines to
22 protect the investments they put into their homes. Some businesses serving the mill and mines
23 and their workers may choose to do the same" (Power Consulting 2010). This suggests that the
24 communities in close proximity to the proposed leases might not benefit as greatly from the
25 positive direct and indirect economic impacts from uranium mining, but they could also avoid
26 the conditions under which previous boom-and-bust periods occurred. Also, the report
27 recognized that despite the decline in uranium and other mining activities following 1980 in the
28 west ends of Montrose, Mesa, and San Miguel Counties, these counties as a whole experienced
29 significant economic expansion after the collapse of the uranium industry in the mid-1980s due
30 to a "growth of a visitor economy including tourists, recreationists, and second homeowners"
31 (Power Consulting 2010). However, individual municipalities in smaller rural communities
32 might experience a temporary increase in population from workers if they chose to move to
33 communities closer to mining projects rather than commuting longer distances. Although there
34 might not be a large number of in-migrating workers from outside the three-county ROI and thus
35 minor impact on the ROI as a whole, the impact on individual communities could vary.
36
37        Potential impacts during reclamation would be minor. The reclamation period would
38 likely span 2 to 3 years, although only 1 year of reclamation activities would require a
39 workforce. Reclamation would require 39 direct jobs and 21 indirect jobs during the peak year
40 for field work and revegetation (see Table 4.4-5). Reclamation would use the existing workforce
41 in the ROI, so there would be no further in-migration of workers.
42
43

BLM_0042532

### 4.4.8.1  Recreation and Tourism

Potential impacts on recreation and tourism under Alternative 4 would be the same as those under Alternative 3 (see Section 4.3.8.1).

## 4.4.9  Environmental Justice

### 4.4.9.1  Exploration

The types of impacts related to exploration under Alternative 4 are similar to those under Alternative 3 (Section 4.3.9.1). Because exploration activities would occur over relatively small areas and involve little or no ground disturbance, impacts associated with this phase are expected to be minor.

### 4.4.9.2  Mine Development and Operations

Under Alternative 4, there would be a total of 19 mines operating across the 31 DOE ULP lease tracts. The types of impacts related to mine development and operations under Alternative 4 would be similar to those described under Alternative 3 (Section 4.3.9.2), but the increase in the disturbed area under Alternative 4 could potentially increase the impacts.

### 4.4.9.3  Reclamation

Under Alternative 4, impacts on environmental justice associated with the reclamation activities would be the same as those under Alternative 1 (Section 4.1.9).

Although impacts on the general population could be incurred as a result of exploration, mine development and operations, and reclamation of uranium mining facilities under Alternative 4, for the majority of resources evaluated, impacts are likely to be minor. Specific impacts on low-income and minority populations as a result of participation in subsistence or certain cultural and religious activities would also be minor and would not disproportionately affect minority populations.

## 4.4.10  Transportation

The transportation risk analysis estimated both radiological and nonradiological impacts associated with the shipment of uranium ore from its points of origin at one of the 31 lease tracts to a uranium mill. Further details on the risk methodology and input data are provided in Section 4.3.10.1 and Section D.10 of Appendix D.

BLM_0042533

1    The Alternative 4 transportation assessment evaluates the annual impacts expected during
2    the peak year of operations when 19 of the 31 lease tracts could have operating mines. The
3    shipment of uranium ore over the life of the program is not discussed because of the uncertainty
4    associated with future uranium demand and mine development.
5
6    A sample set of 19 of the 31 lease tracts were evaluated in the transportation analysis to
7    represent operations during the peak year of production. As was done for Alternative 3, lease
8    tract selection for the transportation analysis considered the lease tract locations, lessees, and
9    prior mining operations, if any. In addition to a mill's distance, its capacity was also considered
10   when determining which mill would receive a particular mine's ore shipments. Thus, the nearest
11   mill was not always the destination for a given shipment. At the time of actual shipment, various
12   factors, such as existing road conditions due to traffic, weather, and road maintenance or repair,
13   as well as mill capacity and costs, would be among the criteria used to determine which mill
14   should receive a given ore shipment. The intent of the transportation analysis is to provide a
15   reasonable estimate of impacts that could occur. Impacts were also estimated on the basis of the
16   assumption that all shipments would go to a single mill in order to provide an upper range on
17   what might be expected. Single shipment risks for uranium ore shipments are also provided so
18   that an estimate for any future shipping campaign can be evaluated.
19
20   The transportation risk assessment considered human health risks from routine (normal,
21   incident-free) transport of radiological materials and from accidents. The risks associated with
22   the nature of the cargo itself ("cargo-related" impacts) were considered for routine transport.
23   Risks related to the transportation vehicle, regardless of type of cargo ("vehicle related"
24   impacts), were considered for routine transport and potential accidents. Radiological-cargo-
25   related accident risks are expected to be negligible and were not assessed as part of this analysis,
26   as discussed in Appendix E, Section E.10.1. Transportation of hazardous chemicals was not part
27   of this analysis because no hazardous chemicals have been identified as being part of uranium
28   mining operations.
29
30
31   **4.4.10.1  Routine Transportation Risks**
32
33
34   **4.4.10.1.1  Nonradiological Impacts.** The estimated number of shipments from the
35   operating uranium mines to the mills during the peak year of uranium mining under Alternative 4
36   would be 80 per day, assuming an ore production rate of 2,000 tons per day, as discussed in
37   Section 2.2.4.1, and a truck load of 25 tons. Including round-trip travel, 160 trucks per day would
38   be expected to travel the affected routes. As listed in Table 3.10-1, the lowest AADT along the
39   route would be about 250 vehicles per day near Egnar on CO 141. If all 160 trucks per day
40   passed through Egnar, in the extreme case of all shipments going to the White Mesa Mill, there
41   would be a 64% increase in traffic in this area, but only a 3% increase at the most heavily
42   traveled location in Monticello, Utah. No additional traffic congestion would be expected in any
43   area, and only about five additional trucks per hour would be expected in each direction,
44   assuming a 16-hour workday for transport.
45

BLM_0042534

1    For the example case with operations at 19 mines (1 very large, 2 large, 10 medium, and
2  6 small, as discussed in Section 2.2.4.1), the total distance travelled by haul trucks during the
3  peak year would be approximately 2.22 million mi (3.57 million km), assuming round-trip travel
4  between the lease tracts and the mills as shown in Table 4.4-6. Using peak year assumptions of
5  80 shipments a day and 20 days a month, 19,200 round trips would be expected. The estimated
6  total truck distance traveled of approximately 2.22 million mi or 3.57 million km would be about
7  18% of the total heavy-truck miles travelled (12.6 million mi or 20.3 million km) along the
8  affected highways in 2010 (CDOT 2011; UDOT 2011). In general, actual annual impacts over
9  the course of the ULP could be lower or higher than these impacts, because the shipment
10  numbers are for the estimated peak year; because for a given lease tract, the ore could be
11  transported to a different mill than that used in the ULP PEIS analysis; or because lease tracts
12  other than those used in the sample case could be developed.

14    To put the sample case results in perspective, Table 4.4-6 also lists the total distances that
15  ore would be shipped if all of the ore was shipped to one mill or the other. Because of the
16  relative locations of all of the lease tracts with respect to the mills, shipping all of the ore to the
17  White Mesa Mill (4.26 million mi or 6.86 million km) would represent close to the upper bound
18  for the total distance for all shipments. Conversely, shipment of all of the ore to the Piñon Ridge
19  Mill (1.14 million mi or 1.84 million km) would represent close to the lower bound for total
20  distance.

22    As previously discussed in Section 4.3.10.2.1, most of the distance traveled by the haul
23  trucks would occur on state or U.S. highways. To access these roads, the haul trucks might have
24  to travel distances of up to several miles on county and local roads, depending on the location of
25  the lease tract and the location of the mine within the lease tract. Several residences are located
26  near lease tracts along such roads. In those cases, the number of passing haul trucks could range
27  from about 4 (small mine) to 16 (large mine) trucks per day, depending on the size of the nearby
28  mine, as shown in Table 4.3-14. No residences are located along the short distance between the
29  very large mine (JD-7) and the highway.

32    **4.4.10.1.2  Radiological Impacts.** Radiological impacts during routine conditions would
33  be a result of human exposure to the low levels of radiation near the shipment. The regulatory

36  **TABLE 4.4-6  Peak-Year Collective Population Transportation Impacts under Alternative 4**

| Scenario | Total Distance (km) | Radiological Impacts | | | | Accidents per Round Trip | |
|---|---|---|---|---|---|---|---|
| | | Public Dose (person–rem) | Risk (LCF) | Worker Dose (person–rem) | Risk (LCF) | Injuries | Fatalities |
| Sample case | 3,565,000 | 0.28 | 0.0002 | 1.4 | 0.0009 | 0.66 | 0.059 |
| All to Piñon Ridge Mill | 1,835,000 | 0.14 | 9E-05 | 0.74 | 0.0004 | 0.34 | 0.031 |
| All to White Mesa Mill | 6,861,000 | 0.53 | 0.0003 | 2.8 | 0.002 | 1.3 | 0.11 |

BLM_0042535

1   limit established in 49 CFR 173.441 (Radiation Level Limitations) and 10 CFR 71.47 (External
2   Radiation Standards for All Packages) to protect the public is 10 mrem/h at 6 ft (2 m) from the
3   outer lateral sides of the transport vehicle. As discussed in Appendix D, Section D.10.4.2, the
4   average external dose rate for uranium ore shipments is approximately 0.1 mrem/h at 6.6 ft
5   (2 m), two orders of magnitude lower than the Federal regulatory maximum.
6
7
8       **Collective Population Risk.** The collective population risk is a measure of the total risk
9   posed to society as a whole by the actions being considered. For a collective population risk
10  assessment, the persons exposed are considered as a group; no individual receptors are specified.
11  The annual collective population dose to persons sharing the shipment route and to persons
12  living and working along the route was estimated to be approximately 0.28 person-rem for the
13  peak year, assuming about 19,200 shipments for the sample case, as shown in Table 4.4-6. The
14  total collective population dose of 0.28 person-rem could result in approximately 0.0002 LCF.
15  Therefore, no LCFs are expected. These impacts are intermediate between the impacts estimated
16  if all ore shipments went to the Piñon Ridge Mill and the impacts estimated if all went to the
17  White Mesa Mill, as shown in Table 4.4-6.
18
19      Collectively for the sample case, the truck drivers (transportation crew) would receive a
20  dose of about 1.4 person-rem (0.0009 LCF) during the peak year of operations from all
21  shipments. Again, no LCFs would be expected. For perspective, the collective dose of 1.4 rem
22  (1,400 mrem) over 19,200 shipments is slightly more than double the dose that a single
23  individual would receive in 1 year from natural background radiation and human-made sources
24  of radiation (about 620 mrem/yr).
25
26      For scenarios other than those presented in the ULP PEIS, single shipment risks are
27  provided for transporting ore from any of the lease tracts considered under any alternative to the
28  Piñon Ridge Mill (Table 4.3-15) and to the White Mesa Mill (Table 4.3-16). In conjunction with
29  Table 4.3-12, all collective population impacts related to any combination and number of ore
30  shipments between lease tracts and uranium mills could be estimated.
31
32
33      **Highest-Exposed Individuals during Routine Conditions.** In addition to assessing the
34  routine collective population risk, the risks to individuals under a number of hypothetical
35  exposure scenarios were estimated, as described further in Appendix D, Section D.10.2.2. The
36  scenarios were not meant to be exhaustive but were selected to provide a range of potential
37  exposure situations. The estimated doses and associated likelihood of LCFs are discussed in
38  Section 4.3.10.2.2.
39
40
41      **4.4.10.2  Transportation Accident Risks**
42
43      The total distance traveled by haul trucks during the peak year would be approximately
44  2.22 million mi (3.57 million km), including round-trip travel between the lease tracts and the
45  mills, as discussed in Section 4.4.10.1.1 for the sample case. As shown in Table 4.4-6, potential
46  transportation accident impacts for the peak year would not include any expected fatalities and

BLM_0042536

would include possibly one injury from traffic accidents. For perspective, over the entire area of the affected counties (San Juan County in Utah and Dolores, Mesa, Montrose, and San Miguel Counties in Colorado), from 2006 through 2010, a total of 21 heavy-truck-related traffic fatalities occurred (DOT 2010a–e), representing an average of 4.2 fatalities per year.

### 4.4.11 Cultural Resources

Under Alternative 4, the DOE ULP would continue at all 31 lease tracts for the next 10-year period or for another reasonable period. All phases of uranium mining activities (exploration, development and operations, and reclamation) would be expected to occur. Impacts would be similar to those discussed in previous cultural resources sections, except they would occur on a larger scale, since they could occur on all lease tracts.

Impacts from exploration would be expected to be the same as those described in Section 4.3.11.1. They would accrue mostly from exploration test borings and would be minimal within any lease tract. Drill pads are generally small (15 × 50 ft or 4.6 × 75 m), and boring can usually be accomplished with minimal surface disruption. Drilling sites and the proposed locations for any new road construction would have to undergo cultural surveys before any dirt could be moved, and cultural resources would generally be avoided. Secondary impacts from increased access, traffic, and human presence would be similar, but on a larger scale, since three times as many lease tracts would be in play. As listed in Table 2.4-3, 221 known cultural resource sites could be exposed to secondary impacts under Alternative 4.

Impacts from mine development and operations would be similar in nature to those described in Section 4.3.11.2, but once again, on a larger scale. They would include disturbance of archaeological sites, damage or demolition of historic structures, damage or destruction of plant or animal resources that are important to Native Americans, and damage to or disruption of sites that are sacred or culturally important to traditional cultures. The agents of disturbance would likely include earth-moving activities, the demolition or significant alteration of existing structures for mine development, increased human presence, increased access, increased noise, and increased traffic. Based on the average site frequency across all lease tracts and the proposed numbers and sizes of new mines, an estimate of direct impacts was generated and is shown in Table 4.4-7. An estimated 21 cultural resource sites would be likely to be affected by the development of mining activities under Alternative 4.

Impacts from reclamation activities would be the same as those discussed in Section 4.1.11. They include adverse impacts on historically important mining structures and features, ground-disturbing activities if borrowing from undisturbed areas or road construction and improvement occurred, and temporary increases in traffic and human presence. Potential positive impacts from reclamation could include the restoration of habitat for plant and animal resources that are important to Native Americans, the restoration of solitude, and the elimination of some visual intrusions in places that are important to traditional cultures.

BLM_0042537

1
2

**TABLE 4.4-7  Cultural Resource Sites That Could Be Directly Affected under Alternative 4**

| Mine Size Categories under Alternative 4 | No. of Mines in Category | Expected No. of Sites per Category | Total No. of Sites Expected |
|---|---|---|---|
| Small | 6 | 0.8 | 5 |
| Medium | 10 | 1.2 | 12 |
| Large | 2 | 1.7 | 3 |
| Total | | | 21 |

3
4

### 4.4.12  Visual Resources

5
6

7    Under this alternative, exploration, mine development and operations, and reclamation
8    activities would occur on all of the lease tracts considered in the ULP PEIS. Mitigation measures
9    and BMPs for reducing impacts related to off-site lighting and contrast with surrounding areas
10   are summarized in Table 4.6-1 (Section 4.6).

11
12

#### 4.4.12.1  Exploration, Mine Development and Operations, and Reclamation

13
14

15   Visual impacts generally would be the same under this alternative as those under
16   Alternatives 1 and 3 (see Sections 4.1.12 and 4.3.12). The primary difference would be that
17   activities would occur on all lease tracts. Impacts could result from a range of direct and indirect
18   actions or activities occurring on the lands contained within the lease areas. These types of
19   impacts include the following: (1) vegetation and landform alterations; (2) removal and addition
20   of structures and materials; (3) changes to existing roadways; (4) vehicular and worker activity;
21   and (5) light pollution.

22
23   Visual impacts associated with exploration and mine development and operations were
24   discussed further in Sections 4.3.12.1 and 4.3.12.2. Impacts associated with reclamation
25   activities were discussed further in Sections 4.1.12.1 through 4.1.12.5.

26
27

#### 4.4.12.2  Impacts on Surrounding Lands

28
29

30   Under Alternative 4, DOE would continue the ULP at all 31 of the lease tracts for the
31   next 10-year period or for another reasonable period. The following analysis provides an
32   overview of the potential visual impacts on the SVRAs surrounding the mining locations.
33   Because of the number of leases and the potential for increased mining activity, lands outside the
34   lease tracts that have views of the lease tracts would be subject to visual impacts. The affected
35   areas and extent of impacts would depend on a number of visibility factors, view duration, and
36   view distance.

BLM_0042538

Preliminary viewshed analyses were conducted to identify which lands surrounding the lease tracts could have views of the mining activities in at least some portion of the four groups. This analysis was based on a reverse viewshed analysis. Appendix E provides an overview of the methodology used to determine which locations are visible within a 25-mi (40 km) distance surrounding the lease tracts. For the purposes of this analysis, the lease tracts were analyzed in four groups, as described in Section 4.12: the North; North Central; South Central; and South Groups. The intent of the analysis was to determine the potential levels of contrasts (i.e., changes in form, line, color, and texture from the existing conditions to those under Alternative 4) that would be present.

**4.4.12.2.1 North Group.** Views from the following SVRAs would potentially include the lease tracts from the North Group:[8]

- Sewemup WSA;

- The Palisade ONA (an ACEC);

- The Palisade WSA;

- Unaweep/Tabeguache Scenic and Historic Byway;

- Tabeguache Area;

- Dolores River SRMA; and

- Dolores River Canyon WSA.

Figure 4.4-1 shows the results of the viewshed analysis for lease tracts within the North Group. The colored segments indicate areas in the SVRAs with clear lines of sight to one or more areas within the lease tracts and from which mining activities within the lease tracts would be expected to be visible, assuming the absence of screening vegetation or structures, and assuming there would be adequate lighting and other atmospheric conditions.

Within 5 mi (8 km) of the North Group, views from approximately 3% (640 acres or 260 ha) of the Sewemup WSA would potentially include the lease tracts. This WSA is located to the southwest of the North Group. As the distance from the lease tracts increases, views from approximately 38% (7,500 acres or 3,000 ha) of the WSA would potentially include the lease tracts. Views of the North Group from the WSA are generally partially or fully screened by the intervening mountains. The visible areas generally are located to the west of the Dolores River. Visibility of the North Group is most likely from the locations within the WSA that are higher in elevation than the lease tracts. Depending on the infrastructure placed within the two lease tracts,

---

[8]   For the four groups of lease tracts, the SVRAs are presented in descending order, based on the percentage of the total acreage or mileage that would have potential views of the lease tracts.

BLM_0042539



1

2    **FIGURE 4.4-1  Viewshed Analysis for the North Lease Group under Alternative 4**

3

views of the mine activities and sites might be limited and include the tops of headframes, drill rigs, or other structures, if present. Activities conducted under Alternative 4 would be expected to cause minimal to weak contrast levels for views from this WSA.

Portions of the Palisade ONA ACEC that would potentially have visibility of the North Group lease tracts are located between 5 and 25 mi (8 and 40 km) of the lease tracts. The ACEC is located to the north of these two lease tracts. Within this distance, views from approximately 560 acres (220 ha), or 2.3% of the total ACEC, could potentially include the lease tracts. Views of the North Group from the ACEC are generally partially or fully screened by the intervening mountains. Only views from the northernmost portions of the ACEC would potentially include the lease tracts, such as from portions of the ACEC located along the Piñon Mesa. Depending on the infrastructure placed within the two lease tracts, views of the mine activities and sites might be limited and include the tops of headframes, drill rigs, or other structures, if present. As such, activities conducted under Alternative 4 would be expected to cause minimal contrast levels to no contrasts at all for views from this area.

Between 5 and 15 mi (8 and 24 km) from the North Group, the lease tracts would potentially be visible from approximately 1.5% (390 acres or 60 ha) of the Palisade WSA. The Palisade WSA is contained almost entirely within the Palisade ONA ACEC. As a result, contrast levels for this area would be similar to those described for the ACEC.

The lease tracts would potentially be visible from less than 1% of the Unaweep/ Tabeguache Scenic and Historic Byway, the Tabeguache Area, the Dolores River SRMA, and the Dolores River WSA. Under Alternative 4, mining-related activities in the lease tracts would be expected to cause minimal contrast levels to no contrasts at all for views from these SVRAs.

Views from portions of the North and South Central Groups also would potentially include lease tracts within the North Group. These locations are within 5 and 25 mi (8 and 40 km) of the group.

**4.4.12.2.2  North Central Group.** Figure 4.4-2 shows the results of the viewshed analysis for lease tracts within the North Central Group. Views from the following SVRAs would potentially include the North Central Group:

- Tabeguache Area;

- Sewemup WSA;

- Unaweep/Tabeguache Scenic and Historic Byway;

- Dolores River Canyon WSA;

- Dolores River SRMA;

BLM_0042541



FIGURE 4.4-2  Viewshed Analysis for the North Central Lease Group under Alternative 4

BLM_0042542

1 • San Miguel ACEC; and

3 • San Miguel River SRMA.

5 The North Central Group lease tracts would be visible from portions of the Tabeguache
6 Area. The entire area is located between 5 and 15 mi (8 and 40 km) of this group of lease tracts
7 within Montrose County. Views of the North Central Group from the area are partially or fully
8 screened by the intervening mountains and vegetation. The lease tracts would be visible from
9 approximately 59% (4,800 acres or 1,700 ha) of the area. Views of the lease tracts would be
10 possible from elevated viewpoints within the area. Depending on the infrastructure placed within
11 the North Central Group, views of the mine activities and sites might be limited and include the
12 tops of headframes, drill rigs, or other structures, if located on the individual lease tracts.
13 Activities conducted under this alternative would be expected to cause minimal to weak contrast
14 levels for views from this area.

16 The North Central Group lease tracts would be visible from approximately 1.6%
17 (310 acres or 130 ha) of the Sewemup WSA. As the distance from the lease tracts increases,
18 views from approximately 35% (6,900 acres or 2,800 ha) of the WSA would potentially include
19 the lease tracts. Similar to views from the Tabeguache Area, views of the North Central Group
20 from the WSA are generally partially or fully screened by the intervening mountains. Visibility
21 of the North Central Group is likely from the locations within the WSA that are higher in
22 elevation than the lease tracts. Depending on the infrastructure placed within the lease tracts,
23 views of the mine activities and sites might be limited and include the tops of headframes, drill
24 rigs, or other structures. Activities conducted under this alternative would be expected to cause
25 minimal to weak contrast levels for views from this WSA.

27 Drivers along the Unaweep/Tabeguache Scenic and Historic Byway would have views
28 of the North Central Group from locations within the BLM foreground distance of 3 to 5 mi
29 (5 to 8 km). Within this distance, views from approximately 22 mi (35 km) of the byway would
30 potentially include the lease tracts. Between 0 and 15 mi (0 and 24 km), views from
31 approximately 36 mi (58 km) would potentially include the lease tracts, and between 0 and 25 mi
32 (0 and 40 km), views from approximately 43 mi (69 mi) would potentially include the lease
33 tracts. The byway passes between Lease Tracts 18, 19, 19A, 20, 24, and 25. Depending on the
34 infrastructure placed within the lease tracts, views of the mine activities and sites would be
35 visible to visitors driving along the byway, primarily in the area within Montrose County. Views
36 that are level or looking down onto the lease tracts would involve stronger contrasts than views
37 that are lower in elevation. Views would include headframes, drill rigs, or other structures, if
38 needed for the mining activities. As such, activities conducted under this alternative would be
39 expected to cause minimal to strong contrast levels for views from the byway. However, views
40 from the byway would be relatively short in duration, largely due to the small size of the
41 individual lease tracts within the North Central Group.

43 Between 5 and 25 mi (8 and 40 km) from the North Central Group, the North Central
44 Group lease tracts would be visible from approximately 2.9% (860 acres or 350 km) of the
45 Dolores River Canyon WSA. Views of the North Central Group from the WSA are generally
46 partially or fully screened. Scattered portions of the WSA are visible largely as a result of the

BLM_0042543

1    intervening mesa tops and Paradox Valley. Views of the mine activities and sites within the lease
2    tracts contained within this group might be limited and include the tops of headframes, drill rigs,
3    or other structures, if present. Under Alternative 4, activities would be expected to cause minimal
4    to weak contrast levels for views from the Dolores River Canyon WSA.
5
6        The North Central Group lease tracts would be visible from approximately 1.3%
7    (880 acres or 360 ha) of the Dolores River SRMA. Portions of the SRMA with views of the lease
8    tracts are located to the west of Paradox Valley and to the northwest of Lease Tracts 8, 8A,
9    and 9. These locations are near Bedrock, Colorado. Similar to other SVRAs located within 25 mi
10   (40 km) of the North Central Group, views from elevated locations would likely include the tops
11   of headframes, drill rigs, and other structures, if present. Activities conducted under this
12   alternative would be expected to cause minimal to weak contrast levels for views from this
13   SRMA.
14
15       The North Central Group lease tracts would be visible from less than 1% (51 acres or
16   21 ha) of the San Miguel ACEC. Portions of the ACEC with views of the lease tracts are located
17   between 15 and 25 mi (24 and 40 km) of the North Central Group north of Norwood, Colorado,
18   and Route 145. Views of the lease tracts from the San Miguel ACEC would likely be limited.
19   Activities conducted under this alternative would be expected to cause minimal contrast levels to
20   no contrasts at all for views from this ACEC.
21
22       The North Central Group lease tracts would be potentially visible from less than 1%
23   (280 acres or 120 ha) of the San Miguel River SRMA. Locations within the SRMA with
24   potential views of the lease tracts are between 15–25 mi (24–40 km) southeast of the North
25   Central Group. There could potentially be views of the lease tracts from elevated viewpoints
26   within the SRMA outside the river canyon. Activities conducted within the North Central Group
27   lease tracts would be expected to cause minimal to no contrasts at all as seen from the SRMA,
28   primarily due to the relatively long distance between the SRMA and the lease tracts and to the
29   very limited amount of acreage within the SRMA that would potentially have views of the lease
30   tracts.
31
32       Views from portions of the North and South Central Groups also would potentially
33   include the North Central Group. These viewing locations are within 5 and 25 mi (8 and 40 km)
34   of the North Central Group.
35
36
37       **4.4.12.2.3  South Central Group.** Figure 4.4-3 shows the results of the viewshed
38   analysis for lease tracts within the South Central Group. The following SVRAs might have views
39   of the South Central Group:
40
41       •   Tabeguache Area;
42
43       •   Dolores River Canyon WSA;
44
45       •   Dolores River SRMA;
46

BLM_0042544



FIGURE 4.4-3  **Viewshed Analysis for the South Central Lease Group under Alternative 4**

BLM_0042545

1        • Unaweep/Tabeguache Scenic and Historic Byway;

3        • Sewemup WSA;

5        • McKenna Peak WSA;

7        • San Miguel ACEC; and

9        • San Miguel River SRMA.

11 Of these SVRAs, only the Dolores River SRMA and the Dolores River Canyon WSA
12 include lands within 5 mi (8 km) of the South Central Group with potential views of the lease
13 tracts.

15 The South Central Group lease tracts are potentially visible from approximately 46%
16 (3,700 acres or 1,500 ha) of the Tabeguache Area. Most of this area is located between 5 and
17 15 mi (8 and 24 km) of this group of lease tracts within Montrose County. Views of the South
18 Central Group are partially or fully screened by the intervening topography and vegetation.
19 Views of the mine activities and sites within the lease tracts contained within this group might be
20 limited and likely would include the tops of headframes, drill rigs, or other structures, if located
21 within the mine sites. Similar to those impacts experienced from views to the North Central
22 Group, activities conducted under this alternative would be expected to cause minimal to weak
23 contrast levels for views from this area.

25 Between 0 and 15 mi (24 km) from the lease tracts, the South Central Group lease tracts
26 could potentially be visible from approximately 22% (6,500 acres or 2,600 ha) of the Dolores
27 River Canyon WSA. These viewing locations are south of Bedrock, Colorado. If present,
28 headframes, drill rigs, or other structures might be visible from within the WSA. Views of the
29 lease tracts are more likely to occur from elevated locations than from within the canyon.
30 Activities conducted under this alternative would be expected to cause minimal to weak contrast
31 levels for views from this WSA.

33 The South Central Group lease tracts are potentially visible from approximately 14%
34 (8,900 acres or 3,600 ha) of the Dolores River Canyon SRMA. These viewing locations are in
35 those portions of the SRMA within Montrose County, south of the Bedrock, Colorado. Views of
36 the mine activities and sites within the lease tracts contained within this group might be limited
37 and likely would include the tops of headframes, drill rigs, or other structures, if located within
38 the mine sites. Views of the lease tracts are more likely to occur from elevated locations than
39 from within the canyon. Similar to the Dolores River Canyon WSA, activities conducted under
40 Alternative 4 would be expected to cause minimal to weak contrast levels for views from this
41 SRMA.

43 The viewshed analysis indicates that drivers along the Unaweep/Tabeguache Scenic and
44 Historic Byway would potentially have views of the South Central Group in locations within the
45 background and "seldom seen" distances, along approximately 19 mi (30 km) of the byway.
46 However, because of minor mapping inaccuracies that place portions of the roadway outside the

BLM_0042546

1   narrow canyon it occupies and thereby locate them at higher elevations than they actually are,
2   and because of vegetative screening, the actual mileage of the byway with views of the lease
3   tracts is likely much smaller. Actual visibility would be determined as part of a site- and project-
4   specific environmental assessment. Views from the byway near the towns of Redvale and
5   Naturita also could include the lease tracts within the South Central Group. Depending on the
6   infrastructure used at each mine site, views of headframes, drill rigs, or other structures might
7   occur. Minimal contrast levels to no contrasts at all would be expected to occur for users of the
8   byway.
9
10      The South Central Group lease tracts are potentially visible from approximately 8.0%
11   (1,580 acres or 640 ha) of the Sewemup WSA. These viewing locations are within 15 and 25 mi
12   (24 and 40 km) of the South Central Group. Views of the South Central Group from the WSA
13   are generally partially or fully screened by the intervening mountains. This group of lease tracts
14   is likely to be visible from the western edge of Sewemup Mesa within the WSA areas that are
15   higher in elevation than the lease tracts. Depending on the infrastructure present on each lease
16   tract, views of the mine activities and sites might be limited, and they could include the tops of
17   headframes, drill rigs, or other structures. Activities conducted under this alternative would be
18   expected to cause minimal contrast levels to no contrasts for all for views from this area.
19
20      The South Central Group lease tracts are potentially visible from approximately 3.6%
21   (720 acres or 290 ha) of the McKenna Peak WSA. These locations within the WSA are between
22   15 and 25 mi (24 and 40 km) from the South Central Group. These viewing areas primarily are
23   located within San Miguel County, with only a small portion being within Dolores County.
24   Views of the mine activities and sites within the lease tracts contained within this group might be
25   limited, and they would be likely to include the tops of headframes, drill rigs, or other structures,
26   if present. Activities conducted under this alternative would be expected to cause minimal
27   contrast levels to no contrasts at all for views from this SVRA.
28
29      The South Central Group lease tracts are potentially visible from less than 1% (21 acres
30   or 8.5 ha) of the San Miguel ACEC. These viewing locations are within Montrose County, north
31   of Norwood, Colorado, along an elevated mountain ridge in the north part of the ACEC. Views
32   of the lease tracts form the ACEC are likely to be limited. Activities conducted under
33   Alternative 4 would be expected to cause minimal (barely discernible) contrast levels to no
34   contrasts at all for views from this SVRA.
35
36      The South Central Group lease tracts would be potentially visible from less than 1%
37   (280 acres or 120 ha) of the San Miguel River SRMA, at distances from 18–24 mi (29–39 km)
38   from the SRMA. There could potentially be views of the lease tracts from elevated viewpoints
39   within the SRMA outside the river canyon. Activities conducted within the South Central Group
40   lease tracts would be expected to cause minimal to no contrasts at all as seen from the SRMA,
41   primarily due to the relatively long distance between the SRMA and the lease tracts and to the
42   very limited amount of acreage within the SRMA that would potentially have views of the lease
43   tracts.
44

BLM_0042547

Portions of the North Central and South Groups also would potentially include the lease tracts within the South Central Group. These viewing locations are within 5 and 15 mi (8 and 24 km) of the group.

**4.4.12.2.4  South Group.** Figure 4.4-4 shows the results of the viewshed analysis for lease tracts within the South Group. The following SVRAs might have views of the South Group:

- McKenna Peak WSA;

- Dolores River SRMA;

- Cahone Canyon WSA;

- Dolores River Canyon WSA;

- Trail of the Ancients Byway;

- Squaw/Papoose Canyon WSA; and

- Canyons of the Ancients National Monument.

Of these SVRAs, only the Dolores River Canyon WSA includes lands within 5 mi (8 km) of the South Group with potential views of the lease tracts.

The South Group lease tracts are potentially visible from approximately 27% (5,400 acres or 2,200 ha) of the McKenna Peak WSA. Portions of the WSA with potential views of the lease tracts are between 15 and 25 mi (24 and 40 km) of the lease tracts. Views of the mine activities and sites within the lease tracts contained within this group might be limited and likely would include the tops of headframes, drill rigs, or other structures, if present. Activities conducted under this alternative would be expected to cause minimal to weak contrast levels for views from this SVRA.

From within 5 mi (8 km) of the South Group, the lease tracts are potentially visible from approximately 13% (8,400 acres or 3,400 ha) of the Dolores River Canyon SRMA. In fact, portions of the SRMA are contained within the actual lease tracts, including Lease Tracts 13, 13A, and 14. Depending on the infrastructure placed within the South Group, views of the mine activities and sites would include headframes, drill rigs, or other structures, as well as actual mining activities. Activities under this alternative would be expected to create weak to strong contrast levels for views from this SRMA. The stronger contrast levels would occur for views from those areas of the SRMA that were located within the contrast South Group, and the levels would lessen as the distance from the lease tracts increased.

BLM_0042548



1

2  **FIGURE 4.4-4  Viewshed Analysis for the South Lease Group under Alternative 4**

3

BLM_0042549

1     Within the "seldom seen" distance zone (i.e., between 15 and 25 mi or 24 and 40 km), a
2   small portion of the South Group lease tracts are potentially visible from approximately
3   790 acres or 320 ha (8.7%) of the Cahone Canyon WSA. Views of the lease tracts from the WSA
4   are likely to be very limited. Depending on the infrastructure placed within the lease tracts, views
5   might include headframes, drill rigs, or other structures. Activities conducted under this
6   alternative would be expected to cause minimal contrasts levels to no contrasts at all for views
7   from the WSA.
8
9     Between 5 and 25 mi (8 and 40 km) from the South Group, the lease tracts are potentially
10   visible from approximately 4.1% of the Dolores River Canyon WSA. Views of the South Group
11   from the WSA are generally partially or fully screened; they are located primarily within
12   elevated portions of the WSA, near the Slick Rock Canyon. Views of the mine activities and
13   sites might be limited and include only the tops of headframes, drill rigs, or other structures, if
14   present. Activities conducted under this alternative would be expected to cause minimal contrast
15   levels to no contrasts at all for views from the Dolores River Canyon WSA.
16
17     Views from approximately 9.5 mi (15 km) of the Trail of the Ancients would potentially
18   include the South Group. This trail is located within the "seldom seen" distance zone
19   (i.e., between 15 and 25 mi or 24 and 40 km). Viewing locations from the trail that would
20   include views of the lease tracts are mainly to the west of the South Group in Utah. The trail's
21   footprint primarily follows US 191. Views of the lease tracts would be limited, and the views
22   would be of brief duration to byway drivers. Activities conducted under Alternative 4 would be
23   expected to cause minimal contrast levels to no contrasts at all for views from along the trail.
24
25     A small portion of the South Group lease tracts is potentially visible from less than 1% of
26   the Squaw/Papoose Canyon WSA and the Canyons of the Ancients National Monument.
27   Portions of these SVRAs with potential views of the lease tracts are between 15 and 25 mi
28   (24 and 40 km) from the South Group. Views of the lease tracts from the WSA are likely to be
29   very limited. Activities conducted under this alternative would be expected to cause minimal
30   contrast levels to no contrasts at all for views from these SVRAs.
31
32     Portions of the South Central Group also would potentially include views of the lease
33   tracts within the South Group, including Lease Tracts 8, 9, and 17. Viewing locations with this
34   potential are within 5 and 15 mi (8 and 24 km) from the group.
35
36
37   **4.4.13  Waste Management**
38
39     Potential impacts on waste management practices under Alternative 4 would be small and
40   similar to those under Alternatives 1, 2, and 3. The quantity of waste to be managed under
41   Alternative 4 would be slightly larger than the quantity under Alternative 3 for the peak year of
42   mine development and operations.
43
44

BLM_0042550

## 4.5  ALTERNATIVE 5

Under Alternative 5, it is assumed that a total of 19 mines (16 medium, 2 large, and 1 very large) with a total area of 490 acres (200 ha) would be in operation in the peak year. The same three phases of mining evaluated for Alternatives 3 and 4 were also evaluated for Alternative 5.

> Alternative 5: This is the No Action Alternative, under which DOE would continue the ULP with the 31 lease tracts for the remainder of the 10-year period, and the leases would continue exactly as they were issued in 2008.

### 4.5.1  Air Quality

#### 4.5.1.1  Exploration

Types of potential impacts and emission sources are discussed in Section 4.3.1.1. Under Alternative 5, four and six borehole drillings up to a depth of 600 ft (180 m) would occur at 16 medium and 2 large mines, respectively, in any peak year. As shown in Table 4.5-1, estimated air emissions under Alternative 5 are about three to four times higher than those under Alternative 3, but they are still negligible when compared to three-county total emissions for criteria pollutants and VOCs and Colorado or U.S. GHG emissions.

In consequence, similar to Alternatives 3 and 4 discussed previously, exploration activities occur over relatively small areas and involve little ground disturbance, a small crew, and a small fleet of heavy equipment. Thus, it is anticipated that potential impacts from this phase on ambient air quality and regional ozone or AQRVs would be negligible and temporary. Potential impacts from these activities on climate change would be negligible.

#### 4.5.1.2  Mine Development and Operations

Air emissions of criteria pollutants, VOCs, and $CO_2$ from mine development and operations estimated for the peak year are presented in Table 4.5-1 and compared to emission totals for a combination of the three counties (Mesa, Montrose, and San Miguel) that encompass the DOE ULP lease tracts. As shown in the table, total peak-year emission rates are estimated to be rather small compared to emission totals for all three counties. Typically, PM emissions are highest during mine development, while $NO_x$ emissions are highest during operations. During mine development, non-PM emissions would be relatively small (up to 0.45%), and $PM_{10}$ and $PM_{2.5}$ emissions would be about 3.2% and 1.4%, respectively, of the three-county total emissions. $PM_{10}$ emissions would result from explosives use (47%) and site preparation (43%), followed by wind erosion (9%). Exhaust emissions would contribute only a little to total $PM_{10}$ emissions. During operations, $NO_x$ emissions of 313 tons/yr are highest, amounting to about 2.3% of three-county total emissions. $NO_x$ emissions would mostly come from diesel-fueled heavy equipment (e.g., bulldozers or power generators) and trucks. These impacts would be minimized by implementing good industry practices and fugitive dust mitigation measures (such

BLM_0042551

**TABLE 4.5-1  Peak-Year Air Emissions from Mine Development, Operations, and Reclamation under Alternative 5[a]**

| Pollutant[b] | Three-County Total[c] | Exploration | | Mine Development | | Mine Operations | | Reclamation | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Annual Emissions (tons/yr) | | | | | |
| CO | 65,769 | 9.5 | (0.01%)[d] | 176 | (0.27%) | 145 | (0.22%) | 12.0 | (0.02%) |
| $NO_x$ | 13,806 | 23.3 | (0.17%) | 61.8 | (0.45%) | 313 | (2.3%) | 24.8 | (0.18%) |
| VOCs | 74,113 | 2.8 | (0.004%) | 1.9 | (0.003%) | 30.4 | (0.04%) | 2.5 | (0.003%) |
| $PM_{2.5}$ | 5,524 | 2.3 | (0.04%) | 78.3 | (1.4%) | 26.7 | (0.48%) | 35.3 | (0.64%) |
| $PM_{10}$ | 15,377 | 4.5 | (0.03%) | 489 | (3.2%) | 51.4 | (0.33%) | 174.7 | (1.14%) |
| $SO_2$ | 4,246 | 2.6 | (0.06%) | 7.5 | (0.18%) | 40.1 | (0.95%) | 3.3 | (0.08%) |
| $CO_2$ | $142.5\times10^{6}$ [e] | 2,600 | (0.002%) | 1,800 | (0.001%) | 29,000 | (0.020%) | 2,400 | (0.002%) |
| | $7,311.8\times10^{6}$ [f] | | (0.00004%) | | (0.00002%) | | (0.00040%) | | (0.00003%) |

[a]  Under Alternative 5, it is assumed that 19 mines (16 medium, 2 large, and 1 very large) with a total area of 490 acres (200 ha) would be in operation or reclaimed in any peak year.

[b]  Notation: CO = carbon monoxide; $CO_2$ = carbon dioxide; $NO_x$ = nitrogen oxides; $PM_{2.5}$ = particulate matter with a mean aerodynamic diameter of ≤2.5 μm; $PM_{10}$ = particulate matter with a mean aerodynamic diameter of ≤10 μm; $SO_2$ = sulfur dioxide; VOCs = volatile organic compounds.

[c]  Total emissions in 2008 for all three counties encompassing the DOE ULP lease tracts (Mesa, Montrose, and San Miguel Counties), except for $CO_2$ emissions. See Table 3.1–2.

[d]  Numbers in parentheses are percentages of three-county total emissions, except for $CO_2$, which are percentages of Colorado total emissions (top line) and U.S. total emissions (bottom line).

[e]  Annual emissions in 2010 for Colorado on a $CO_2$-equivalent basis.

[f]  Annual emissions in 2009 for the United States on a $CO_2$-equivalent basis.

Sources: CDPHE (2011a); EPA (2011a); Strait et al. (2007)

BLM_0042552

1   as watering unpaved roads, disturbed surfaces, and temporary stockpiles). Therefore, potential
2   impacts on ambient air quality would be minor and temporary.
3
4        The three counties encompassing the lease tracts are currently in attainment for ozone
5   (EPA 2011b), but ozone levels in the area approached the standard (about 90%)
6   (see Table 3.1-3). Recently, wintertime ozone exceedances have been frequently reported at
7   higher elevations in northwestern Colorado, northeastern Utah, and southwestern Wyoming.
8   However, ozone precursor emissions from mine development and operations would be relatively
9   small—less than 2.3% and 0.04%, respectively, of three-county total $NO_x$ and VOC emissions,
10  and they would be much lower than those for the regional airshed in which emitted precursors
11  are transported and transformed into ozone. In addition, the wintertime high-ozone areas are
12  located more than 100 mi (160 km) from the lease tracts and are not located downwind of the
13  prevailing westerlies in the region. Accordingly, potential impacts of $O_3$ precursor releases from
14  mine development and operations on regional ozone would not be of concern.
15
16       As discussed in Section 4.1.4, there are several Class I areas around the lease tracts where
17  AQRVs, such as visibility and acid deposition, might be a concern. Primary pollutants affecting
18  AQRVs include $NO_x$, $SO_2$, and PM. $NO_x$ and $SO_2$ emissions from mine development and
19  operations would be relatively small, accounting for up to 2.3% of three-county total emissions,
20  while $PM_{10}$ emissions would be about 3.2% of three-county total emissions. Air emissions from
21  mine development and operations could result in minor impacts on AQRVs at nearby Class I
22  areas. The implementation of good industry practices and fugitive dust mitigation measures
23  could minimize these impacts.
24
25       Annual total $CO_2$ emissions from mine development and operations were estimated as
26  shown in Table 4.5-1. CO emissions during operations would be much higher than those during
27  mine development. During operations, annual total $CO_2$ emissions would be about 29,000 tons
28  (26,000 metric tons). They accounted for about 0.020% of Colorado GHG emissions in 2010 at
29  140 million tons (130 million metric tons) of $CO_2e$ and for about 0.00040% of U.S. GHG
30  emissions in 2009 at 7,300 million tons (6,600 million metric tons) of $CO_2e$ (EPA 2011a;
31  Strait et al. 2007). Thus, potential impacts from mine development and operations on global
32  climate change would be negligible.
33
34
35  **4.5.1.3  Reclamation**
36
37       Peak-year emissions during the reclamation phase under Alternative 5 are included in
38  Table 4.5-1. $PM_{10}$ emissions are highest, accounting for about 1.1% of three-county combined
39  emissions. Among non-PM emissions, $NO_x$ emissions from diesel combustion of heavy
40  equipment and trucks are highest, up to 0.18% of three-county total emissions. Good industry
41  practices and mitigation measures would be implemented to ensure compliance with
42  environmental requirements. Thus, potential impacts on ambient air quality associated with
43  reclamation activities under Alternative 5 are anticipated to be minor and temporary in nature.
44  These low-level emissions are not anticipated to cause any measurable impacts on regional
45  ozone or AQRVs, such as visibility or acid deposition, at nearby Class I areas. In addition, $CO_2$
46  emissions during the reclamation phase were about 0.002% of Colorado GHG emissions in 2010

BLM_0042553

and 0.00003% of U.S. GHG emissions in 2009 (EPA 2011a; Strait et al. 2007). Thus, under Alternative 5, potential impacts from reclamation activities on global climate change would be negligible.

## 4.5.2  Acoustic Environment

### 4.5.2.1  Exploration

Details on activities during the exploration phase are presented in Section 4.3.1.1. The types of impacts related to exploration under Alternative 5 would be similar to those under Alternative 3 (Section 4.3.1.1). Exploration activities would occur over relatively small areas and involve little ground disturbance, a small crew, and a small fleet of heavy equipment. Accordingly, it is anticipated that noise impacts from the exploration phase on neighboring residences or communities, if any, would be minor and intermittent.

### 4.5.2.2  Mine Development and Operations

As described in Section 4.3.2.2, noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from the mine development site, which is the Colorado daytime maximum permissible limit of 55 dBA in a residential zone. If a 10-hour daytime work schedule is considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) would occur about 1,200 ft (360 m) from the mine development site. In addition, other attenuation mechanisms, such as air absorption, screening effects (e.g., natural barriers caused by terrain features), and skyward reflection due to temperature lapse conditions typical of daytime hours, would reduce noise levels further. Thus, noise attenuation to Colorado or EPA limits would occur at distances somewhat shorter than the aforementioned distances. In many cases, these limits would not reach any nearby residences or communities. However, if mine development occurred near the lease tract boundary, noise levels at residences around Lease Tracts 13, 13A, 16, and 16A would exceed the Colorado limit.

It is assumed that most mine development and operational activities would occur during the day, when noise is better tolerated because of the masking effects of background noise, which occurs more during daytime than at night. In addition, mine development activities for lease tracts are temporary in nature (typically a few months). Mine development within the lease tracts would cause some unavoidable but localized short-term noise impacts on neighboring residences or communities, particularly when mine development occurred near the residences or communities adjacent to the lease tract boundary.

During mine operations, ventilation fans would run continuously at mine sites, for which noise calculations were made separately. The number of fans used for a mine depends on how extensive the mine activities are but typically would be one or two fans for small mines, two or three fans for medium mines, and three or four fans for large mines at an interval of every 366–457 m (1,200–1,500 ft) (Williams 2013). The composite noise level for a ventilation fan,

BLM_0042554

1   such as that used at JD-9 mine, is about 86 dBA at a distance of 3 m (10 ft) (Spendrup 2013),
2   corresponding to about 70 dBA at a reference distance of 15 m (50 ft), which is far lower than
3   noise levels for typical heavy equipment. For a single fan, noise levels would attenuate to 55 and
4   50 dBA at distances of about 60 m (200 ft) and 90 m (300 ft) from the fan, respectively, which are
5   the Colorado daytime and nighttime maximum permissible limits of 55 and 50 dBA in a residential
6   zone. The EPA guideline level of 55 dBA $L_{dn}$ for residential areas would occur at about 110 m
7   (360 ft). For four identical fans that are located equidistant from a receptor, these distances
8   would be extended to about 100 m (330 ft), 160 m (530 ft), and 190 m (620 ft), respectively.
9   During daytime hours, beyond some distances, a noise of interest can be overshadowed by
10  relatively high background levels along with skyward refraction caused by temperature lapses
11  (i.e., temperature decreases with increasing height, so sound tends to bend towards the sky).
12  However, on a calm, clear night typical of ULP lease tract settings, the air temperature would
13  likely increase with increasing height (temperature inversion) because of strong radiative
14  cooling. Such a temperature profile tends to focus noise downward toward the ground. Thus,
15  there would be no shadow zone[9] within 1 or 2 mi (2 or 3 km) of the source in the presence of a
16  strong temperature inversion (Beranek 1988). In particular, such conditions add to the effect of
17  noise being more discernible during nighttime hours, when the background levels are the lowest.
18  Considering these facts, potential impact distances would be extended further, to several hundred
19  meters. Accordingly, noise control measures (e.g., the installation of front and rear silencers,
20  which can reduce  noise levels from 5 to 10 dBA [Spendrup 2013]) would be warranted if any
21  residences were located within these distances from ventilation fans. Also, the outlet could have
22  a 45 degree or 90 degree elbow pointed away from the sensitive receptors (Williams 2013).
23
24        During operations, over-the-road heavy haul trucks would transport uranium ores from
25  lease tracts to either the proposed Piñon Ridge Mill or White Mesa Mill in Utah. These
26  shipments could generate noise along the haul routes. Under Alternative 5, about 2,300 tons per
27  day of uranium ore would be generated. Based on the assumptions that there would be 25 tons of
28  uranium ore per truck and round-trip travel, the traffic volume would be 184 truck trips per day
29  (92 round trips per day) and 23 trucks per hour (for 8-hour operation). At distances of 200 ft
30  (61 m) and 380 ft (120 m) from the route, noise levels would attenuate to 55 and 50 dBA,
31  respectively, which are Colorado daytime and nighttime maximum permissible limits in a
32  residential zone. Noise levels above the EPA guideline level of 55 dBA $L_{dn}$ for residential areas
33  would be reached at a distance of up to 100 ft (31 m) from the route. Accordingly, Colorado
34  limits or EPA guideline levels would be exceeded within 380 ft (120 m) from the haul route, and
35  any residences within this distance might be affected.
36
37        Depending on local geological conditions, explosive blasting during mine development
38  and operations might be required. Blasting would generate a stress wave in the surrounding rock,
39  causing the ground and the structures on the ground surface to vibrate. The blasting would also
40  create a compressional wave in the air (air blast overpressure), the audible portion of which
41  would be manifested as noise. Potential impacts of ground vibration would include damage to
42  structures, such as broken windows. Potential impacts of blast noise would include effects on
43  humans and animals. The estimation of potential increases in ambient noise levels, ground
44  vibration, and air blast overpressure, as well as the evaluation of any environmental impacts

---

[9]   A shadow zone is defined as the region where direct sound does not penetrate because of upward refraction.

BLM_0042555

associated with such increases, would be required at the site-specific project phase, if potential impacts were anticipated at nearby residences or structures.

Blasting techniques are designed and controlled by blasting and vibration control specialists to prevent damage to structures or equipment. The controls attenuate blasting noise as well. Under Alternative 5, several residences are within 1.0 mi (1.6 km) of the boundaries of the lease tracts to be developed. Residences at further distances would not require additional mitigation. However, given the impulsive nature of blasting noise, it is critical that blasting activities be avoided at night and on weekends and that affected neighborhoods be notified in advance of scheduled blasts.

There are several specially designated areas (e.g., Dolores River SRMA and Dolores River Canyon SRA) and other nearby wildlife habitats around the DOE ULP lease tracts and haul routes where noise might be a concern. Negative impacts on wildlife (specifically, onset of adverse physiological impacts) begin between 55 and 60 dBA (Barber et al. 2010). As discussed above, these levels would be limited up to distances of 1,650 ft (500 m) from the mine sites and 200 ft (61 m) from the haul routes. However, there is the potential for other effects to occur at lower noise levels (Barber et al. 2011). To adequately account for these impacts and the potential for impacts at lower noise levels, impacts on terrestrial wildlife from mine development noise and mitigation measures would have to be determined on a site-specific basis, including the consideration of site-specific background levels and the hearing sensitivities of site-specific terrestrial wildlife of concern.

In summary, potential noise impacts from mine development on humans and wildlife would be anticipated near the mine sites and along the haul routes, but their impacts would be minor and limited to proximate areas unless these activities occurred near the lease tract boundaries adjacent to nearby residences or communities or areas specially designated for wildlife concerns, if any. Implementation of good industry practices and coherent noise management plans could minimize these impacts.

### 4.5.2.3  Reclamation

As detailed in Section 4.1.2, noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from the reclamation site, which is the Colorado daytime maximum permissible limit of 55 dBA in a residential zone. If a 10-hour daytime work schedule is considered, the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) would occur about 1,200 ft (360 m) from the mine development site. Most residences are located beyond these distances, but if reclamation activities occurred near the boundaries of Lease Tracts 13, 13A, 16, or 16A, noise levels at nearby residences could exceed the Colorado limit.

It is assumed that most reclamation activities would occur during the day, when noise is better tolerated because of the masking effects of background noise, which is more prominent in daytime than at night. In addition, reclamation activities at lease tracts would be temporary (typically lasting a few weeks to months, depending on the size of the area to be reclaimed). Accordingly, reclamation within the lease tracts would cause some unavoidable but localized

BLM_0042556

1  short-term and minor noise impacts on neighboring residences or communities. The same
2  mitigation measures adopted during the mine development phase could also be implemented
3  during the reclamation phase (see Table 4.6-1 in Section 4.6).
4
5
6  **4.5.3  Geology and Soil Resources**
7
8       Soil impacts under Alternative 5 for the exploration, mine development and operations,
9  and reclamation phases would be the same as those described under Alternative 4 because DOE
10 would continue the ULP with the 31 lease tracts for the remainder of the 10-year period. The
11 number of mines assumed to be operating at the peak year of ore production would be the same
12 as the number under Alternative 4, except that a slightly larger surface area would be used for
13 mine development.
14
15
16      **4.5.3.1  Paleontological Resources**
17
18       Impacts on paleontological resources (if present) under Alternative 5 for the exploration,
19 mine development and operations, and reclamation phases would be the same as those described
20 under Alternative 4 because DOE would continue the ULP with the 31 lease tracts for the
21 remainder of the 10-year period. The number of mines assumed to be operating at the peak year
22 of ore production would be the same as the number under Alternative 4, except that a slightly
23 larger surface area would be used for mine development.
24
25
26 **4.5.4  Water Resources**
27
28
29      **4.5.4.1  Exploration**
30
31       The types of impacts related to exploration under Alternative 5 would be similar to those
32 under Alternative 3 (Section 4.3.4.1). Because exploration activities would occur over relatively
33 small areas and involve a little disturbance, impacts associated with runoff generation and
34 erosion in this phase are expected to be minor.
35
36       The exploratory drill holes are expected to run through alluvial aquifers along the
37 rivers and Paradox Valley or Dakota Sandstone and Burro Canyon aquifers (or perched
38 aquifers) at mesas to reach Saltwash Member, the uranium-containing unit. Historically, most
39 of the underground mines in the ULP lease tracts are dry. The potential for groundwater
40 mixing and leaching via exploratory drill holes is minimal. In Paradox and Slick Rock, some
41 groundwater accumulation at a low rate has been found in underground mines in Lease
42 Tracts 7 and 9 near Paradox Valley and Lease Tract 13 along the Dolores River (Slick Rock)
43 (DOE 2007). Lease Tract 8A has not been leased before and is close to Lease Tract 7, which
44 has wet mines near Paradox Valley. During exploration at these lease tracts, impacts
45 associated with the drilling of exploratory boreholes and wells would be considered minor and

BLM_0042557

1   minimized if BMPs, mitigation measures, and standards set forth by the CDWR (2005) (see
2   also Table 4.6-1 in Section 4.6) are implemented.
3
4
5   **4.5.4.2  Mine Development and Operations**
6
7       Under Alternative 5, there would be a total of 19 mines operating across the 31 DOE
8   ULP lease tracts, with a total land disturbance of 490 acres (200 ha) and an annual water use of
9   8,000,000 gal (25 ac-ft) (Section 2.2.5.1). The types of impacts related to mine development and
10  operations under Alternative 5 would be similar to those under Alternative 3 (Section 4.3.4.2).
11
12      The increase in disturbed area under Alternative 5 might increase the impacts associated
13  with erosion; however, the proximity of the lease tract to the Dolores River and the San Miguel
14  River would be still be the primary factor governing impacts. The additional lease tracts added
15  under Alternative 5 are not located along the reaches of perennial rivers. The overall
16  magnitude of impacts would be expected to be similar to that under Alternative 3.
17
18      The increase in mining operations could also increase dewatering effects and
19  groundwater contamination. The potential increase in underground working areas could also
20  increase the potential for backfills and poor sealing of drill holes. However, groundwater
21  seepage from shallow aquifers is the primary driver that could cause groundwater leaching and
22  cross-contamination via drill holes and open mine portal and vent holes. Under Alternative 5, the
23  underground mines in the 18 additional lease tracts are expected to be relatively dry, except at
24  Lease Tract 8A as discussed above. Potential impacts on groundwater quality would be minor
25  and could be avoided if the reclamation is performed by the appropriate backfilling of mine
26  portal and vent holes, complete sealing of drill holes that intercept multiple aquifers, and
27  adequate water reclamation in accordance with reclamation performance measures by CDRMS.
28  (However, the number of domestic wells that might be affected is similar to that under
29  Alternative 3, and it only increases by one well associated with Lease Tract 16. The increase in
30  consumptive water use would be negligible because it is assumed that the water would be
31  trucked in from off site.)
32
33
34  **4.5.4.3  Reclamation**
35
36      Under Alternative 5, impacts on water resources associated with reclamation activities
37  would be the same as those under Alternative 1 (Section 4.1.4).
38
39
40  **4.5.5  Human Health**
41
42      Similar to Alternatives 3 and 4, for Alternative 5, because the exploration drilling would
43  disturb only small areas and the drill holes would be backfilled in a short period of time (less
44  than a few weeks), potential human health impacts are expected to be minimal and limited to
45  only a few workers. Therefore, the analysis of human health impacts under Alternative 5 focuses
46  on the consequences caused by the development and operations of uranium mines and the

BLM_0042558

1   reclamation of lease tracts. Nevertheless, the potential exposure associated with exploration
2   drilling was estimated and is discussed in Section 4.3.5. According to that estimate, the total dose
3   that an exploration worker would receive would be less than 5 mrem (LCF risk of about $4 \times 10^{-6}$
4   or 1 in 250,000).
5
6
7       **4.5.5.1  Worker Exposure – Uranium Miners**
8
9           On the basis of the data published by the U.S. Department of Labor, Bureau of Labor
10  Statistics, in 2010, the fatal occupational injury rate for the mining industry was 19.8 per
11  100,000 full-time workers (BLS 2011a), and the nonfatal occupational injury and illness rate was
12  2.3 per 100 full-time workers (BLS 2011b). Based on the assumption that the injury and fatality
13  rates for uranium mining are similar to those for other types of mining, during the peak year of
14  operations, there could be six nonfatal injuries and illnesses among the 242 workers assumed for
15  mining development under Alternative 5. However, no mining-related fatality is predicted
16  among the workers. The above estimates of injury and fatality were made on the basis of
17  statistical data and should be interpreted from a statistical perspective as well. The actual injury
18  and fatality rates among individual mines could be different. Proper worker training and
19  extensive experience in uranium mining would reduce mining accidents, thereby reducing the
20  potential of injury and fatality.
21
22          In addition to being exposed to physical hazards, uranium miners could be exposed to
23  radiation from mining activities. The radiation exposure of individual miners under Alternative 5
24  would be similar to those under Alternative 3. On the basis of monitoring data for the period
25  1985 to 1989, the average radiation exposure for uranium mine workers in the United States
26  ranged from 350 to 433 mrem/yr (UNSCEAR 2010), excluding the background radiation dose,
27  which is estimated to be about 430 mrem/yr in the ULP lease tract. In general, underground
28  miners are exposed to higher radiation levels than are open-pit miners, because underground
29  cavities accumulate higher radon concentrations and airborne uranium ore dust concentrations
30  than do aboveground open spaces. According to UNSCEAR (1993), external exposure accounts
31  for 28% of the total dose to underground miners and for 60% of the total dose to open-pit miners;
32  inhalation of radon accounts for 69% of the total dose to underground miners and for 34% of the
33  total dose to open-pit miners; and inhalation of uranium ore dust accounts for 3% of the total
34  dose for underground miners and for 6% of the total dose to open-pit miners. Based on
35  assumptions that the average dose for underground miners is 433 mrem/yr and that the total dose
36  is distributed among different pathways, an LCF of $4 \times 10^{-4}$/yr was calculated for an average
37  miner (see Table 4.3-2). This translates to a probability of about 1 in 2,500 for a worker to
38  develop a latent fatal cancer through 1 year of radiation exposure. If a miner worked for 10 years
39  in uranium mines, the total cumulative dose received would be 4,330 mrem, with a
40  corresponding cumulative LCF risk of $4 \times 10^{-3}$; i.e., the probability of developing a fatal cancer
41  would be about 1 in 250.
42
43          An inference was made in order to estimate potential chemical exposures associated with
44  underground uranium mining. This inference was detailed in Section 4.3.5.1. Potential air
45  concentrations of uranium and vanadium, assumed in the form of $V_2O_5$, were estimated by using
46  the radiation dose associated with the inhalation of particulates pathway that an average miner

BLM_0042559

would receive. The estimated chemical concentrations were then used to estimate the potential hazard index associated with uranium and vanadium exposures. A hazard index of 1.06 was estimated, primarily due to vanadium exposure. Because the hazard index slightly exceeds the threshold value of 1, potential adverse health effects might result from working in underground uranium mines.

### 4.5.5.2  Worker Exposure – Reclamation Workers

After mining operations were completed, the disturbed land would be reclaimed. During the reclamation phase, the largest sources for radiation exposure would be the aboveground waste-rock piles accumulated over the operational period. The potential radiation dose incurred by reclamation workers would depend on the size of the waste-rock pile and its uranium content. As it was under Alternatives 3 and 4, the potential radiation exposure of a reclamation worker was estimated on the basis of three waste-rock pile dimensions corresponding to the three mine sizes (medium, large, and very large) assumed. A detailed discussion on the development of the three waste-rock piles evaluated is provided in Section 4.1.5.

The radiation exposure of an individual worker that would result from performing reclamation activities is expected to be about the same as that analyzed in Section 4.1.5 for Alternative 1. Based on the RESRAD analysis, the total radiation dose incurred by a reclamation worker would range from 14.3 to 34.2 mrem, depending on whether the radionuclide concentration assumed for waste rocks is 70 pCi/g or 168 pCi/g. The radiation exposure would be about the same regardless of the size of waste-rock pile, because external radiation dose (which is the dominant pathway contributing to the total dose) would not vary much among the three sizes of waste-rock pile considered. The total dose was estimated based on the assumption that the worker would work 8 hours per day for 20 days on top of a waste-rock pile. The radiation exposure would be dominated by the external radiation pathway, which would contribute about 94–96% to the total dose, followed by the incidental soil ingestion pathway, which would account for about 3% of the total dose. The remaining dose would be from the inhalation of radioactive particulates and radon gas. The potential LCF risk associated with this radiation exposure is estimated to range from $1 \times 10^{-5}$ to $3 \times 10^{-5}$; i.e., the probability of developing a latent fatal cancer ranges from about 1 in 100,000 to 1 in 33,000.

Reclamation workers may be required to work underground to reclaim mine workings; however, the time spent underground is expected to be much shorter than the time spent above the ground. Based on past monitoring data for uranium miners (433 mrem/yr on average, see Section 4.3.5.1), it is estimated that a reclamation worker would need to spend 66–158 hours at underground workings to receive the same dose (14.3 to 34.2 mrem) as he would from working on top of a waste-rock pile for 160 hours (i.e., 20 workdays).

Similar to Alternatives 1, 3, and 4, the total hazard index associated with potential chemical exposure is estimated to be well below the threshold value of 1 (See Section 4.1.5.1 for detailed discussions); therefore, it is expected that the reclamation worker would not experience adverse health effects resulting from the exposures.

BLM_0042560

### 4.5.5.3  General Public Exposure – Residential Scenario

Members of the general public who live in or around the ULP lease tracts could be exposed to radiation as a result of the release of radon gas and radioactive particulates that contain uranium isotopes and their decay products from mining-related activities. The potential maximum radiation exposure was estimated as a function of distance from the release point of radionuclides. It could be used to estimate the potential exposure of an individual living close to the ULP lease tracts once the locations and scales of uranium mines are known. The maximum doses were estimated for three uranium mine sizes.

#### 4.5.5.3.1  Uranium Mine Development and Operations.

**Exposure to an Individual Receptor.** Based on the discussion provided in Section 4.3.5.3.1 under Alternative 3, the primary source of human health impacts on the residents living close to the ULP lease tracts during the operational phase would be the radon gas emitted from mining activities. Therefore, the analysis of potential radiation exposures to the residents focused on the consequences associated with the release of radon.

For the human health impacts analysis, the radon emission rates for underground uranium mines were developed based the equation developed by the EPA (EPA 1985), which correlates the radon emission rate with cumulative uranium ore production. An operational period of 10 years was assumed when developing the radon emission rates. The radon emission rates calculated based on this assumption are considered to be the upper bound for underground mines under Alternative 5. The radon emission rate for a very large mine (i.e., the existing open-pit mine on Lease Tract 7) was estimated on the basis of the data compiled in EPA (1989a, Table 12-7) for surface mines. The estimated value is expected to be greater than the actual emission rate. The emission rates developed for the three hypothetical mines under Alternative 5 are listed in Table 4.5-2. The total Rn-222 emission rate from underground mining was estimated to be about 21,120 Ci/yr, and the estimated Rn-222 emission rate from the very large open-pit mine was 600 Ci/yr.

Table 4.5-3 lists the maximum radiation doses calculated with CAP88-PC at different exposure distances for the three assumed uranium mine sizes. Based on the calculation results, the radiation exposures would decrease with increasing distance because of greater dilution in the radon concentrations. The maximum exposure at a fixed distance from the emission point of an underground mine or from the center of the open-pit mine would always occur in the sector that coincides with a dominant wind direction. In any other sector, the potential exposure would be less than the maximum values.

Based on Table 4.5-3, if the resident lived at a distance of 3,300 ft (1,000 m) from the emission point of an underground mine, then the maximum radiation dose he could incur would range from 9.1 to 22.5 mrem/yr. If the distance increased to 8,000 ft (2,500 m), then the maximum exposure would be reduced and range from 2.7 to 8.2 mrem/yr, below the NESHAP dose limit (40 CFR Part 61) of 10 mrem/yr for airborne emissions of radionuclides. Note that the

BLM_0042561

**TABLE 4.5-2  Radon Emission Rates per Type of Mine during Mine Operations Assumed for Alternative 5**

| Parameters | Medium[a] | Large[a] | Very Large[b] | Total |
|---|---|---|---|---|
| Uranium ore production per mine (tons/d) | 100 | 200 | 300 | |
| Cumulative uranium ore production per mine (tons) | 2.40E+05 | 4.80E+05 | 7.20E+05 | |
| Rn-222 emission rate per mine (Ci/yr)[c] | 1.06E+03 | 2.11E+03 | 6.00E+02 | |
| Alternative 5 in peak year of operations | | | | |
| No. of active mines | 16 | 2 | 1 | 19 |
| Total Rn-222 emission rate (Ci/yr) | 1.69E+04 | 4.22E+03 | 6.00E+02 | 2.17E+04 |

[a]   Underground mine.

[b]   Open-pit mine.

[c]   The emission rates of radon from underground mines were estimated by using the correlation developed as indicated by the EPA in 1985 (EPA 1985): Rn-222 emissions (Ci/yr) = 0.0044 × cumulative uranium ore production (tons). A cumulative period of 10 years was assumed for this calculation. The emission rate from the very large open-pit mine was determined based on data from surface uranium mines compiled by the EPA in 1989 (EPA 1989a).

maximum doses listed in Table 4.5-3 are estimated for a resident living in a dominant wind direction and were obtained by using the radon emission rates corresponding to an operational period of 10 years. The emission rates for uranium mines that have been developed and operated for less than 10 years would be less; therefore, the potential radon exposures associated with mining would be smaller than those listed in the table. On the other hand, if there was more than one uranium mine located close to the resident and if the mines were being operated at the same time, the potential dose to the resident would be the sum of the doses contributed by each mine.

The maximum LCF for a resident living close to a medium-sized underground uranium mine was estimated to range from $3 \times 10^{-6}$/yr to $5 \times 10^{-6}$/yr at a distance of 16,400 ft (5,000 m), and from $1 \times 10^{-5}$/yr to $3 \times 10^{-5}$/yr at a distance of 3,300 ft (1,000 m). That is, the probability of developing a latent fatal cancer would range from about 1 in 330,000 to 1 in 200,000 at a distance of 16,400 ft (5,000 m) to about 1 in 100,000 to 1 in 33,000 at a distance of 3,300 ft (1,000 m) in each year of exposure.

Because potential radon exposures of the general public living near the ULP lease tracts could exceed the NESHAP dose limit of 10 mrem/yr, mitigation measures would be required to (1) obtain actual radon emission rates to refine the dose estimates associated with radon exposures and (2) reduce the impact on the general public, if the refined estimates would exceed the 10-mrem/yr dose limit. See Section 4.3.5.3.1 for the suggested mitigation measures.

BLM_0042562

1    **TABLE 4.5-3  Potential Maximum Radiation Doses, Radon Concentrations, and LCF**
2    **Risks to a Resident Associated with the Emission of Radon from Three Sizes of**
3    **Uranium Mines**

|              | Radiation Dose (mrem/yr) and Radon Level (WL) per Mine Size[a] | | | LCF Risk (1/yr) per Mine Size | | |
| --- | --- | --- | --- | --- | --- | --- |
| Distance (m) | Medium | Large | Very Large | Medium | Large | Very Large |
| 500   | 15.66 (0.0013)  | 31.32 (0.0026)  | 27.4 (0.0023)  | 2E-05 | 4E-05 | 4E-05 |
| 1,000 | 11.26 (0.00094) | 22.52 (0.0019)  | 9.05 (0.00076) | 1E-05 | 3E-05 | 1E-05 |
| 1,500 | 7.44 (0.00062)  | 14.88 (0.0012)  | 5.53 (0.00046) | 1E-05 | 2E-05 | 7E-06 |
| 2,000 | 5.34 (0.00044)  | 10.68 (0.00089) | 3.72 (0.00031) | 7E-06 | 1E-05 | 5E-06 |
| 2,500 | 4.08 (0.00034)  | 8.16 (0.00068)  | 2.7 (0.00023)  | 5E-06 | 1E-05 | 3E-06 |
| 3,000 | 3.26 (0.00027)  | 6.52 (0.00054)  | 2.09 (0.00017) | 4E-06 | 8E-06 | 3E-06 |
| 4,000 | 2.44 (0.00020)  | 4.88 (0.00040)  | 1.53 (0.00013) | 3E-06 | 6E-06 | 2E-06 |
| 5,000 | 1.94 (0.00016)  | 3.88 (0.00032)  | 1.2 (0.00010)  | 3E-06 | 5E-06 | 2E-06 |

[a]  Radiation doses appear on the top line, and radon concentrations in terms of working level (WL) are in parentheses on the line below.

4
5
6       **Collective Population Exposure.** Collective exposures of the general public living
7    within 50 mi (80 km) of the ULP lease tracts were evaluated by using the same method as that
8    described in Section 4.3.5.3.1. The range of potential collective dose at the peak year of
9    operations can be obtained by summing all the radon emissions from active uranium mines and
10   placing the total emissions at the center of each lease tract group.
11
12      Table 4.5-4 presents the collective doses obtained by using the CAP88-PC model (Trinity
13   Engineering Associates, Inc. 2007) for the general public living within 3 to 50 mi (5 to 80 km) of
14   the assumed emission points during the peak year of operations under Alternative 5. According
15   to the estimated results, the collective dose associated with underground mining ranges from
16   18.8 to 110 person-rem. The collective dose associated with open-pit mining is about
17   0.88 person-rem. Together, underground and open-pit mining would result in a total collective
18   dose ranging from 20 to 110 person-rem during the peak year of operations. This collective
19   exposure would cause a collective cancer risk of 0.03 to 0.1. Therefore, it is expected that no
20   cancer fatality among the population would result from exposure to the radon gas emitted from
21   the 19 uranium mines that would be operated simultaneously during the peak year of operations
22   under Alternative 5. The total populations involved in these estimates would range from
23   27,062 to 178,473 people. If the collective dose was evenly distributed among the affected
24   population, the average individual dose would range from 0.59 to 1.1 mrem (LCF risk of

BLM_0042563

1
2
3

**TABLE 4.5-4  Collective Doses and LCF Risks to the General Public from Radon Emissions from Uranium Mines during the Peak Year of Operations under Alternative 5**

| Radon Source | Collective Dose (person-rem/yr) | Collective LCF Risk (1/yr)[a] |
|---|---|---|
| From underground mining[b] | | |
| Based on the center of Group 1[c] | 1.10E+02 | 1E-1 |
| Based on the center of Group 2[d] | 5.86E+01 | 8E-2 |
| Based on the center of Group 3[e] | 2.98E+01 | 4E-2 |
| Based on the center of Group 4[f] | 1.88E+01 | 2E-2 |
| | | |
| From open-pit mining[g] | | |
| Based on the center of Group 3[e] | 8.80E-01 | 1E-3 |
| | | |
| Total | | |
| Minimum | 1.97E+01 | 3E-2 |
| Maximum | 1.11E+02 | 1E-1 |

[a]  Denotes the number of latent lung cancers that could result from radiation exposure.

[b]  The total radon emission rate from underground mining during the peak year of operations would be 21,120 Ci/yr.

[c]  If the emission was from the center of lease tract Group 1, the total population residing 3 to 50 mi (5 to 80 km) away would be 178,473.

[d]  If the emission was from the center of lease tract Group 2, the total population residing 3 to 50 mi (5 to 80 km) away would be 86,657.

[e]  If the emission was from the center of lease tract Group 3, the total population residing 3 to 50 mi (5 to 80 km) away would be 27,062.

[f]  If the emission was from the center of lease tract Group 4, the total population residing 3 to 50 mi (5 to 80 km) away would be 33,166.

[g]  The total radon emission rate from open-pit mining during the peak year of operations would be 600 Ci/yr.

4
5
6
7
8
9
10
11
12
13

$8 \times 10^{-7}$ to $1 \times 10^{-7}$; i.e., 1 in 1,250,000 to 1 in 1,000,000) during the peak year of operations. In reality, because the active lease tracts (the lease tracts with mining operations) would be scattered among the four lease tract groups rather than being concentrated in one single group as assumed in the calculations, the size of the population within 3 to 50 mi (5 to 80 km) of the lease tracts should be larger than 178,473 people. Therefore, the actual average individual dose should be just a fraction of the calculated values.

14
15
16

**4.5.5.3.2  Reclamation.** Residents who lived close to a uranium mine during or after the reclamation phase could be exposed to radiation as a result of emissions of radioactive particulates and radon gas from the waste-rock piles left aboveground. The potential radiation

BLM_0042564

1    dose would depend on the direction and distance between the residence and the waste-rock piles
2    and the emission rates of particulates and radon. The potential range for the radiation dose to
3    resident under Alternative 5 is expected to be similar to the range under Alternatives 1 and 2,
4    because the exposures would be dominated by the emissions from the waste-rock pile(s) that was
5    (were) closest to this resident.
6
7         According to the calculation results presented in Section 4.1.5.2, if a resident lived
8    3,300 ft (1,000 m) from a waste-rock pile, then the radiation dose he could receive would be less
9    than 3.5 mrem/yr. If the distance increased to 6,600 ft (2,000 m), then his exposure would drop
10   to less than 1.3 mrem/yr. If there were two waste-rock piles nearby, then the potential dose that
11   this resident would receive would be the sum of the doses contributed by each waste-rock pile.
12   Based on the listed maximum doses in Table 4.1-8, the potential dose received by any resident
13   living at a distance of more than 1,600 ft (500 m) from the center of a waste-rock pile is expected
14   to be smaller than the NESHAP dose limit of 10 mrem/yr for airborne emissions (40 CFR
15   Part 61). The potential LCF risk would be less than $9 \times 10^{-6}$/yr, which means the probability of
16   developing a latent fatal cancer from living close to the ULP lease tracts for 1 year during or
17   after reclamation would be 1 in 110,000. If a resident lived in the same location for 30 years, the
18   cumulative LCF risk would be less than $3 \times 10^{-4}$; i.e., the probability of developing a fatal
19   cancer is less than 1 in 3,300. The above estimates were obtained on the basis of the base
20   concentrations assumed for waste rocks (70 pCi/g for Ra-226). Should the higher concentration
21   of 168 pCi/g of Ra-226 be used, the potential radiation doses and LCF risks would increase by a
22   factor of less than 3.
23
24        In reality, it is expected that waste-rock piles would be covered by a layer of soil
25   materials during reclamation to facilitate vegetation growth. Because of this cover, emissions of
26   radioactive particulates would be greatly reduced, if not eliminated completely. Emissions of
27   radon from waste-rock piles could continue, although the emission rates would be reduced. In
28   fact, because uranium isotopes and their decay products have long decay half-lives, the potential
29   for radon to be emitted from waste-rock piles could persist for millions of years after the
30   reclamation concluded.
31
32        In addition to radiation exposure, the residents living close to the ULP lease tracts could
33   receive chemical exposures due to the chemical toxicity of the uranium and vanadium minerals
34   contained in the waste rocks. Potential chemical exposures would be associated with the
35   emissions of particulates and result from inhalation and incidental dust ingestion. By using the
36   same exposure parameters as those used for radiation dose modeling, potential chemical risks for
37   the nearby residents were evaluated. According to the evaluation results, the total hazard index
38   would be well below the threshold value of 1, with inhalation being the dominant pathway.
39   Therefore, it is expected that nearby residents would not experience any adverse effects from the
40   potential exposures.
41
42        A less likely exposure scenario after the reclamation phase would be for a nearby resident
43   to raise livestock in the lease tract and consume the meat and milk produced. According to the
44   RESRAD calculation results, the potential dose would be less than 5.5 mrem/yr, which is a small
45   fraction of the DOE dose limit of 100 mrem/yr for the general public from all applicable

BLM_0042565

1   exposure pathways (DOE Order 458.1). Section 4.1.5.2 provides detailed discussions on this
2   analysis.
3
4
5   **4.5.5.4  General Public Exposure – Recreationist Scenario**
6
7        In addition to the residents who live near the ULP lease tracts and could thus be affected
8   by the emissions from the waste-rock piles left after reclamation concluded, a recreationist who
9   unknowingly entered the lease tracts could also be exposed to radiation. To model the potential
10  radiation exposure, it was assumed that the recreationist would camp on top of a waste-rock pile
11  for 2 weeks, eat wild berries collected in the area, and hunt wildlife animals for consumption.
12  This recreationist could receive radiation exposure through direct external radiation, inhalation of
13  radon, inhalation of particulates, and incidental soil ingestion pathways while camping on waste
14  rocks. The potential exposures would vary with the thickness of soil cover placed on top of waste
15  rocks during reclamation. In the analysis, the thickness was assumed to range from 0 to 1 ft (0 to
16  0.3 m).
17
18       The potential dose that could be incurred by a recreationist under Alternative 5 would be
19  similar to that under Alternatives 1 and 2. According to the RESRAD calculation results, the
20  radiation dose incurred by the recreationist from camping on waste rocks during a 2-week trip
21  would range from 0.88 mrem if the cover thickness was 1 ft (0.3 m) to 30 mrem if there was no
22  cover. The corresponding LCF risk would range from $1 \times 10^{-6}$ to $2 \times 10^{-5}$; i.e., the probability
23  of developing a latent fatal cancer would be about 1 in 1,000,000 to 1 in 50,000. The majority of
24  the radiation dose would result from direct external radiation. These dose estimates were derived
25  based on a concentration of  70 pCi/g for Ra-226 assumed for waste rocks. If the assumed
26  concentration was to increase to 168 pCi/g, potential dose and LCF risks would increase by a
27  factor of less than 3.
28
29       The potential radiation dose associated with eating wild berries and wildlife animals was
30  calculated by assuming ingestion rates of 1 lb (0.45 kg) and 100 lb (45.4 kg), respectively. The
31  potential dose was estimated to range from 1.08 to 1.66 mrem, depending on the depth of plant
32  roots assumed for the estimate. The corresponding LCF risk was estimated to be less than
33  $8 \times 10^{-7}$; i.e., the probability of developing a latent fatal cancer would be less than 1 in
34  1,250,000.
35
36       No chemical risks would result from camping on a waste-rock pile if the waste rock pile
37  was covered by a few inches of soil materials. In the worst situation in which there is no soil
38  cover, a hazard index of 0.039 was calculated. The potential chemical risk associated with
39  ingesting contaminated wild berries would be small, with a hazard index of less than 0.003. The
40  hazard index associated with eating wildlife animals would be more than 100 times greater than
41  that associated with eating wild berries, because of the potential accumulation of vanadium in
42  animal tissues. The hazard index calculated was 0.39. However, because the sum of all these
43  hazard indexes is much less than 1, it is expected that the recreationist would not experience any
44  adverse health effects from these two ingestion pathways.
45

BLM_0042566

Most of the encounters between recreationists and ULP lease tracts are expected to be much shorter than 2 weeks. When the total dose associated with exposures to waste rocks from camping was used, a dose rate of less than 0.09 mrem/h (LCF risk of $7 \times 10^{-8}$; i.e., 1 in 14,000,000) was estimated.

A discussion of a detailed analysis of the potential exposure of an individual receptor to post-reclamation conditions at the mine site is provided in Section 4.1.5.3.

## 4.5.6  Ecological Resources

### 4.5.6.1  Vegetation

Exploration and development activities could occur on each of the 31 lease tracts included under Alternative 5. Previous disturbance from exploration or mine development has occurred on each of these lease tracts except Lease Tract 8A; however, new exploration and development could occur in either disturbed or undisturbed areas of lease tracts. Exploration and development on Lease Tract 8A would occur in undisturbed habitats.

Mine development and operations might include small surface mines. Most new mines are expected to be underground mines. During the peak year, it is assumed that 19 mines would be in operation simultaneously, as is the case under Alternative 4. However, development and operations would continue for a shorter duration under Alternative 5: for only 10 years. Ground disturbance would range from 15 acres (6.1 ha) for each of 16 medium-sized mines to 20 acres (8.1 ha) for each of 2 large mines, with a total of 280 acres (110 ha). In addition, the 210-acre (85 ha) open-pit mine (Lease Tract 7) would resume operations, resulting in a total of 490 acres (200 ha) of disturbance under Alternative 5.

The types of impacts from exploration, mine development and operations, and reclamation under Alternative 5 would be similar to those under Alternatives 3 and 4; however, a larger total area would be affected. Direct impacts associated with the development of mines would include the destruction of habitats during site clearing and excavation, as well as the loss of habitats at the locations of the waste-rock disposal area, various storage areas, project facilities, and access roads. The lease tracts included under Alternative 5 support a wide variety of vegetation types; the predominant types are piñon-juniper woodland and shrubland and big sagebrush shrubland. Some of the areas affected might include high-quality, mature habitats, resulting in greater levels of impact than those in previously degraded areas. Indirect impacts from mining would be similar to those described for Alternative 3 and would be associated with fugitive dust, invasive species, erosion, sedimentation, and impacts due to changes in surface water or groundwater hydrology or in water quality.

**4.5.6.1.1  Wetlands and Floodplains.** Wetlands occur in most of the lease tracts, and they might be directly or indirectly affected. Indirect impacts from mining would be similar to those described for Alternative 3 and would be associated with fugitive dust, invasive species,

BLM_0042567

1    erosion, sedimentation, and impacts due to changes in surface water or groundwater hydrology
2    or in water quality.
3
4
5    **4.5.6.2  Wildlife**
6
7         Under Alternative 5, impacts on wildlife could result from exploration, mine
8    development and operations, and reclamation on any of the lease tracts for a 10-year period. It is
9    assumed that 19 mines would be developed and in operation at the same time in the peak years.
10   The 19 mines would include 16 medium-sized mines (15 acres or 6.1 ha disturbed per mine),
11   2 large mines (20 acres or 8.1 ha disturbed per mine), and 1 very large mine (210 acres or 85 ha
12   disturbed). The 210 acres (85 ha) for the very large mine (JD-7) were disturbed previously, as
13   were 80 acres (32 ha) for topsoil storage. Therefore, areas of existing and new disturbances could
14   occur at the other mine locations (unless mine development occurred at any of the mine locations
15   that would have otherwise been reclaimed under either Alternative 1 or 2), and would disturb
16   280 acres (110 ha) of land containing various amounts of upland vegetation. Including the
17   existing area disturbed for JD-7, this area of disturbance represents 1.9% of the total acreage in
18   DOE's ULP. The remainder of the lease tracts (excluding areas where access roads and utility
19   corridors could be required) would be undisturbed by mining activities under Alternative 5.
20
21        There would be few differences in impacts under Alternative 5 and Alternative 3
22   (Section 4.3.6.2). However, under Alternative 5, the potential impacts on wildlife would occur
23   on additional mine sites and affect an additional 180 acres (73 ha) of land on any of the 31 lease
24   tracts rather than just on any of the 13 pre-July 2007, then-active lease tracts. Although
25   exploration, mine development and operations, and reclamation are expected to be incrementally
26   greater under Alternative 5 than under Alternative 3, impacts on wildlife are still expected to be
27   negligible for site exploration and minor to moderate for mine development, operations, and
28   reclamation. While wildlife impacts would be long term (e.g., lasting for decades), they would be
29   scattered temporally and, especially, spatially. In general, impacts would be localized, and they
30   would not affect the viability of wildlife populations, especially if mitigation measures are
31   implemented (see Section 4.6).
32
33        Impacts on wildlife following the reclamation of the mine sites would be negligible if no
34   development or other use of the sites (other than that of natural resource protection) occurred.
35
36
37   **4.5.6.3  Aquatic Biota**
38
39        Impacts on aquatic biota from exploration, development and operations, and reclamation
40   under Alternative 5 would be similar to those under Alternative 3 (Section 4.3.6.3) except that
41   (1) during the peak years of operations, up to 19 mines could be in operation, and (2) the mines
42   could be located on any of the 31 lease tracts. Overall, impacts on aquatic biota are expected to
43   be negligible during site exploration and small to moderate (see Section D.6.2.2, Appendix D for
44   impact category definitions) during mine development and operations and reclamation. Moderate
45   impacts would be expected only if the mines were located near perennial water bodies. In

BLM_0042568

general, any impacts on aquatic biota would be localized and not affect the viability of affected resources, especially if mitigation measures are implemented (see Table 4.6-1 in Section 4.6).

### 4.5.6.4  Threatened, Endangered, and Sensitive Species

Under Alternative 5, there would be no fundamental differences in the impacts on threatened, endangered, and sensitive species than the impacts under Alternative 4 (Section 4.4.6.4). The potential for impacts on threatened, endangered, and sensitive species under Alternative 5 would be similar to the potential for impacts under Alternative 4 (Section 4.4.6.4).

## 4.5.7  Land Use

Under Alternative 5, DOE would continue the ULP with the 31 lease tracts for the remainder of the 10-year period (as they were when issued in 2008). It is assumed that a total of 19 mines would be in operation during the peak year of ore production. As a result, impacts under Alternative 5 would be the same as those under Alternative 4.

## 4.5.8  Socioeconomics

It is assumed that a total of 19 mines would be in operation at the same time in the peak year (16 medium, 2 large, and 1 very large), producing approximately 2,300 tons of uranium ore per day. Exploration activities would create direct employment for 24 people and would generate an additional 28 indirect jobs. Development and operational activities would create direct employment for 253 people during the peak year and would generate an additional 152 indirect jobs (Table 4.5-5). Development activities would constitute 0.6% of total ROI employment. Uranium mining would also produce $15.6 million in income.

Because of the small number of jobs required for exploration, the current workforce in the ROI could meet the demand for labor; thus, there would be no in-migration of workers. It is assumed that some in-migration would occur as a result of uranium mining activities; under Alternative 5, 122 people would move into the ROI. In-migration of workers would represent an increase of 0.09% in the ROI forecasted population growth rate. The additional workers would increase the annual average employment growth rate by less than 1% in the ROI. The in-migrants would have only a marginal effect on local housing and population and would require approximately 1% of vacant owner-occupied housing during mining development and operations. One additional physician, one additional firefighter, and one additional police officer would be required to maintain current levels of service within the ROI as a result of the increased population. No additional teachers would be required to maintain the current student-to-teacher ratio in the ROI.

BLM_0042569

1    **TABLE 4.5-5  Socioeconomic Impacts of Uranium Mine Development,**
2    **Operations, and Reclamation in the Region of Influence under Alternative 5**

| Parameter | Exploration | Development and Operations | Reclamation |
|---|---|---|---|
| **Employment (no.)** | | | |
| Direct | 24 | 253 | 39 |
| Indirect | 28 | 152 | 25 |
| Total | 52 | 405 | 64 |
| **Income**[a] | | | |
| Total | 2.0 | 15.6 | 2.5 |
| **In-migrants (no.)** | 0 | 122 | 0 |
| **Vacant housing (no.)** | 0 | 74 | 0 |
| **Local community service employment** | | | |
| Teachers (no.) | 0 | 0 | 0 |
| Physicians (no.) | 0 | 1 | 0 |
| Public safety (no.) | 0 | 2 | 0 |

   [a]   Values are reported in $ million 2009.

3
4
5         Impacts in the ROI would be minor because (1) employment would be distributed across
6    three counties, (2) the impact would be absorbed across multiple governments and many
7    municipalities, and (3) the employment pool would come from a larger population group than if
8    all employment originated from any one county. Mining workers could live in larger population
9    centers in the ROI and close vicinity, such as Grand Junction, Montrose, or Telluride, and
10   commute to mining locations. A report prepared for  Sheep Mountain Alliance acknowledged
11   that workers  "may choose to live at some distance from the mill and mines to protect the
12   investments they put into their homes. Some businesses serving the mill and mines and their
13   workers may choose to do the same" (Power Consulting 2010). This suggests that the
14   communities in close proximity to the proposed leases might not benefit as greatly from the
15   positive direct and indirect economic impacts from uranium mining, but they could also avoid
16   the conditions under which previous boom-and-bust periods occurred. Also, the report
17   recognized that despite the decline in uranium and other mining activities following 1980 in the
18   west ends of Montrose, Mesa, and San Miguel Counties, these counties as a whole experienced
19   significant economic expansion after the collapse of the uranium industry in the mid-1980s due
20   to a "growth of a visitor economy including tourists, recreationists, and second homeowners"
21   (Power Consulting 2010). However, individual municipalities in smaller rural communities
22   might experience a temporary increase in population from workers if they moved to communities
23   closer to mining projects rather than commuting from longer distances elsewhere in the ROI.
24   There would be a small number of in-migrating workers from outside the three-county ROI and

BLM_0042570

thus minor impact on the ROI as a whole; however, the impact on individual communities could vary.

Potential impacts during reclamation would be minor. Reclamation would occur after operations ceased. The reclamation period would likely span 2 to 3 years, although only 1 year would require a workforce. Reclamation would require 39 direct jobs during the peak year for field work and revegetation and create 25 indirect jobs (see Table 4.5-5). During reclamation, the required workforce would generate $2.5 million in income. Because of the small number of jobs required for reclamation, the current workforce in the ROI could meet the demand for labor; therefore, there would be no further in-migration of workers or families and no social impacts.

### 4.5.8.1  Recreation and Tourism

Potential impacts on recreation and tourism would be similar to those under Alternative 3 as discussed in Section 4.3.8.1.

## 4.5.9  Environmental Justice

### 4.5.9.1  Exploration

The types of impacts related to exploration under Alternative 5 would be similar to those under Alternative 3 (Section 4.3.9.1). Because exploration activities would occur over relatively small areas and involve little or no ground disturbance, impacts associated with this phase are expected to be minor.

### 4.5.9.2  Mine Development and Operations

Under Alternative 5, there would be a total of 19 mines operating across the 31 DOE ULP lease tracts during the peak year. The types of impacts related to mine development and operations under Alternative 5 would be similar to those under Alternative 4 (Section 4.4.9.2).

### 4.5.9.3  Reclamation

Although potential impacts on the general population could result from exploration, mine development and operations, and reclamation under Alternative 5, for the majority of resources evaluated, the impacts would likely be minor. Specific impacts on low-income and minority populations as a result of participation in subsistence or certain cultural and religious activities would also be minor and unlikely to disproportionately affect low-income and minority populations.

BLM_0042571

**4.5.10  Transportation**

The transportation risk analysis estimated both radiological and nonradiological impacts associated with shipments of uranium ore from their points of origin at one of the 31 lease tracts to a uranium mill. Further details on the risk methodology and input data are provided in Section 4.3.10.1 and Section D.10 of Appendix D.

The Alternative 5 transportation assessment evaluates the annual impacts expected during the peak year of operations when 19 of the 31 lease tracts could have operating mines. Shipment of uranium ore is not presented over the life of the program because of the uncertainty associated with future uranium demand and mine development.

As was done for Alternative 4, a sample set of 19 of the 31 lease tracts was evaluated in the transportation analysis to represent operations during the peak year of production. As was also done for Alternatives 3 and 4, the selection of lease tracts for the transportation analysis considered the lease tract's location, lessee, and prior mining operations, if any. In addition to distance, its capacity was also considered when determining which mill would receive a particular mine's ore shipments. Thus, the nearest mill was not always a given shipment's destination. Later, at the time of actual shipment, various factors, such as existing road conditions due to traffic, weather, and road maintenance and repairs as well as mill capacity and costs, should be among the criteria used to determine the mill for a given ore shipment. This transportation analysis is intended to provide a reasonable estimate of impacts that could occur. Impacts were also estimated on the basis of the assumption that all shipments would go to a single mill in order to provide an upper range on what might be expected. Single shipment risks for uranium ore shipments are also provided so that an estimate for any future shipping campaign could be evaluated.

The transportation risk assessment considered human health risks from routine (normal, incident-free) transport of radiological materials and from accidents. The risks associated with the nature of the cargo itself ("cargo-related" impacts) were considered for routine transport. Risks related to the transportation vehicle, regardless of type of cargo ("vehicle related" impacts), were considered for routine transport and potential accidents. Radiological-cargo-related accident risks are expected to be negligible and were not quantified as part of this analysis, as discussed in Appendix D, Section D.10.1. Transportation of hazardous chemicals was not part of this analysis because no hazardous chemicals have been identified as being part of uranium mining operations.

**4.5.10.1  Routine Transportation Risks**

**4.5.10.1.1  Nonradiological Impacts.** The estimated number of shipments from the operating uranium mines to the mills during the peak year of uranium mining under Alternative 5 would be 92 per day, assuming an ore production rate of 2,300 tons per day and a truck load of 25 tons. Including round-trip travel, 184 trucks per day would be expected to travel the affected routes. As listed in Table 3.10-1, the lowest AADT along the route would be about 250 vehicles

BLM_0042572

1  per day near Egnar on CO 141. If all 184 trucks per day passed through Egnar, in the extreme
2  case of all shipments going to the White Mesa Mill, there would be a 74% increase in traffic in
3  this area but only a 3% increase in the most heavily travelled location of Monticello, Utah—
4  again, if all shipments went to White Mesa Mill. No additional traffic congestion would be
5  expected in any area, since there would be only about five or six additional trucks per hour in
6  each direction, assuming a 16-hour workday for transport.
7
8  For the example case with operations at 19 mines (1 very large, 2 large, and 16 medium-
9  sized), the total distance travelled by haul trucks during the peak year would be approximately
10 2.72 million mi (4.38 million km), assuming round-trip travel between the lease tracts and the
11 mills as shown in Table 4.5-6. Based on peak-year assumptions of 92 shipments per day, 20 days
12 per month, 22,080 round-trips would be expected. The estimated total truck distance travelled of
13 approximately 2.72 million mi (4.38 million km) would be about 22% of the total heavy truck
14 miles travelled (12.6 million mi or 20.3 million km) along the affected highways in 2010
15 (CDOT 2011; UDOT 2011). In general, actual annual impacts over the course of the ULP could
16 be lower or higher than these estimated impacts because the shipment numbers given are for the
17 estimated peak year, which would have the largest number of annual shipments; because the ore
18 could be transported to a different mill than the one assumed for the ULP PEIS analysis for a
19 given lease tract, leading to a shorter or larger travel distance; and because lease tracts other than
20 those used in the sample case could be developed, leading to shorter or larger travel distances.
21
22 To help put the sample case results in perspective, Table 4.5-6 also lists the total
23 distances that ore would be shipped if all of the ore was shipped to one mill or the other. Because
24 of the relative locations of all of the lease tracts with respect to the mills, shipping all of the ore
25 to the White Mesa Mill (4.90 million mi or 7.88 million km) would represent close to the upper
26 bound for the total distance for all shipments. Conversely, shipment of all of the ore to the Piñon
27 Ridge Mill (1.45 million mi or 2.34 million km) would represent close to the lower bound for
28 total distance.
29
30 As previously discussed in Section 4.3.10.2.1, most of the distance travelled by the haul
31 trucks would occur on State or U.S. Highways. To access these roads, the haul trucks might
32 travel distances of up to several miles on county and local roads, depending on the location of the
33 lease tract and the location of the mine within the lease tract. Several residences are located near
34
35
36 **TABLE 4.5-6  Peak-Year Collective Population Transportation Impacts under Alternative 5**

| Scenario | Total Distance (km) | Radiological Impacts | | | | Accidents Roundtrip | |
|---|---|---|---|---|---|---|---|
| | | Public Dose (person–rem) | Risk (LCF) | Worker Dose (person–rem) | Risk (LCF) | Injuries | Fatalities |
| Sample case | 4,380,000 | 0.34 | 0.0002 | 1.8 | 0.001 | 0.81 | 0.073 |
| All to Piñon Ridge Mill | 2,336,000 | 0.18 | 0.0001 | 0.94 | 0.0006 | 0.43 | 0.039 |
| All to White Mesa Mill | 7,881,000 | 0.61 | 0.0004 | 3.2 | 0.002 | 1.5 | 0.13 |

37

BLM_0042573

1  lease tracts along such roads. In those cases, the number of passing haul trucks could range from
2  about 4 (small mine) to 16 (large mine) trucks per day, depending on the size of the nearby mine,
3  as shown in Table 4.3-12. No residences are located along the short distance between the very
4  large mine (JD-7) and the highway.
5
6
7      **4.5.10.1.2  Radiological Impacts.** Radiological impacts during routine conditions would
8  be a result of human exposure to the low levels of radiation near the shipment. The regulatory
9  limit established in 49 CFR 173.441 (Radiation Level Limitations) and 10 CFR 71.47 (External
10  Radiation Standards for All Packages) to protect the public is 10 mrem/h at 6 ft (2 m) from the
11  outer lateral sides of the transport vehicle. As discussed in Appendix D, Section D.10.4.2, the
12  average external dose rate for uranium ore shipments is approximately 0.1 mrem/h at 6.6 ft
13  (2 m), which is two orders of magnitude lower than the regulatory maximum.
14
15
16      **Collective Population Risk.** The collective population risk is a measure of the total risk
17  posed to society as a whole by the actions being considered. For a collective population risk
18  assessment, the persons exposed are considered as a group; no individual receptors are specified.
19  The annual collective population dose to persons sharing the shipment route and to persons
20  living and working along the route was estimated to be approximately 0.34 person-rem for the
21  peak year, assuming about 22,080 shipments for the sample case, as shown in Table 4.5-6. The
22  total collective population dose of 0.34 person-rem could result in an LCF risk of approximately
23  0.0002. Therefore, no latent fatal cancers are expected. These impacts are intermediate between
24  the impacts estimated if all ore shipments went to the Piñon Ridge Mill or to the White Mesa
25  Mill, as shown in Table 4.5-6.
26
27      Collectively for the sample case, the truck drivers (transportation crew) would receive a
28  dose of about 1.8 person-rem (0.001 LCF) during the peak year of operations from all shipments.
29  Again, no latent fatal cancers are be expected. For perspective, the collective dose of 1.8 rem
30  (1,800 mrem) over 22,080 shipments is less than three times the amount that a single individual
31  would receive in 1 year from natural background radiation and human-made sources of radiation
32  (about 620 mrem/yr).
33
34      For scenarios other than those presented in the ULP PEIS, single shipment risks were
35  provided for transporting ore from any of the lease tracts considered under any alternative to the
36  Piñon Ridge Mill (Table 4.3-13) and the White Mesa Mill (Table 4.3-14). In conjunction with
37  Table 4.5-6, all collective population impacts related to any combination and number of ore
38  shipments between lease tracts and uranium mills can be estimated.
39
40
41      **Highest-Exposed Individuals during Routine Conditions.** In addition to assessing the
42  routine collective population risk, the risks to individuals for a number of hypothetical exposure
43  scenarios were estimated, as described further in Section E.10.2.2 of Appendix E. The scenarios
44  were not meant to be exhaustive but were selected to provide a range of potential exposure
45  situations. The estimated doses and associated likelihood of LCF estimates were discussed in
46  Section 4.3.10.2.2.

BLM_0042574