#### 4.5.10.2 Transportation Accident Risks

The total distance travelled by haul trucks during the peak year would be approximately 2.72 million mi (4.38 million km), including round-trip travel between the lease tracts and the mills, as discussed in Section 4.5.10.1.1 for the sample case. As shown in Table 4.5-6, potential transportation accident impacts in the peak year would include zero expected fatalities and potentially one injury from traffic accidents. For perspective, over the entire affected counties from 2006 through 2010 (San Juan County in Utah and Dolores, Mesa, Montrose, and San Miguel Counties in Colorado), a total of 21 heavy-truck-related traffic fatalities occurred (DOT 2010a–e), representing an average of 4.2 fatalities per year.

### 4.5.11 Cultural Resources

Under Alternative 5, impacts would be similar to those discussed in Section 4.4.11, except they would be of shorter duration.

Impacts from exploration would be expected to be the same as those described in Section 4.3.11.1. They would accrue mostly from exploration test borings and would be minimal within any lease tract. Drill pads are generally small (15 × 50 ft or 4.6 × 15 m) and boring can usually be accomplished with minimal surface disruption. Drilling sites and the proposed locations for any new road construction would have to undergo cultural surveys before any dirt could be moved, and cultural resources could generally be avoided. Secondary impacts from increased access, traffic, and human presence would be similar but on a larger scale, since three times as many lease tracts would be in play. As listed in Table 2.4-2, 221 known cultural resource sites could be exposed to secondary impacts under this alternative.

Impacts from mine development and operations would be similar in nature to those described in Section 4.3.11.2, but on a larger scale. They would include disturbance of archaeological sites, damage to or demolition of historic structures, damage to or destruction of plant or animal resources that are important to Native Americans, and damage to or disruption of sites that are considered sacred or culturally important to traditional cultures. The agents of disturbance would likely include earth-moving activities, the demolition or significant alteration of existing structures for mine development, increased human presence, increased access, increased noise, and increased traffic. Based on the average site frequency across all lease tracts and the proposed numbers and sizes of new mines, an estimate of direct impacts was generated. This estimate is provided in Table 4.5-7. An estimated total of 23 cultural resource sites would likely be affected by the development of mining activities under Alternative 5. Impacts from reclamation activities would be the same as those discussed Section 4.1.11. They would include adverse impacts on historically important mining structures and features, ground-disturbing activities if borrowing from undisturbed areas or road construction and improvement occurred, and temporary increases in traffic and human presence. Potential positive impacts from reclamation could include the restoration of habitats used by plant and animal resources that are important to Native Americans, the restoration of solitude, and the elimination of some visual intrusions in places that are important to traditional cultures.

**TABLE 4.5-7 Cultural Resource Sites Expected To Be Directly Affected under Alternative 5**

| Size Categories under Alternative 5 | No. of Mines in Each Size Category | Expected No. of Sites by Size Category | Total No. of Sites Expected |
|---|---|---|---|
| Small | 0 | 0.8 | 0 |
| Medium | 16 | 1.2 | 20 |
| Large | 2 | 1.7 | 3 |
| Total | | | 23 |

## 4.5.12 Visual Resources

As indicated in Section 3.5, Alternative 5 would continue the ULP with the 31 lease tracts for the remainder of the 10-year period as the leases were when they were issued in 2008. Under this alternative, all lease tracts would be evaluated with respect to the exploration, mine development and operations, and reclamation phases.

### 4.5.12.1 Exploration, Mine Development and Operations, and Reclamation

Visual impacts would generally be the same under this alternative as the impacts described in Sections 4.1.12 and 4.3.12. As stated for Alternative 4, the primary difference from Alternative 1 would be that activities would occur on all lease tracts.

Visual impacts associated with exploration and mine development and operations are discussed further in Sections 4.3.12.1 and 4.3.12.2. Impacts associated with reclamation activities are discussed further in Sections 4.1.12.1 through 4.1.12.5.

### 4.5.12.2 Impacts on Surrounding Lands

Under Alternative 5, DOE would continue the ULP with the 31 lease tracts for the remainder of the 10-year period as the leases were when they were issued in 2008. Because of the similarities between Alternatives 4 and 5, impacts on surrounding SVRAs under Alternative 5 would be the same as those under Alternative 4. See Section 4.4.12.2 for the analysis of these resources.

## 4.5.13 Waste Management

Potential impacts on waste management practices under Alternative 5 would be the same as those under Alternative 4.

## 4.6 MEASURES TO MINIMIZE POTENTIAL IMPACTS FROM ULP MINING ACTIVITIES

The potential impacts discussed in Sections 4.1 to 4.5 are expected to be minimized or reduced by implementation of the measures listed in Table 4.6-1. These measures would be implemented by the lessees and apply to the three phases of the proposed action (exploration, mine development and operations, and reclamation), as applicable. The measures have been grouped by the 11 objectives included in Table 4.6-1 and further categorized into the following three categories: (1) compliance measures—measures that are required by applicable regulations; (2) mitigation measures—measures that are identified by DOE as being required and that are identified in the current leases or could be included in the next lease modifications (and may or may not be required to fulfill regulatory requirements); and (3) BMPs—best industry practices and activities that should be considered during implementation, as practicable.

Reclamation activities would be conducted to assure that post-reclamation mine conditions are protective of the environment and human health. Mitigation measures such as those listed in Table 4.6-1 would be implemented so that potential exposure to a reasonable end-state scenario (i.e., a recreational visitor scenario at the mine site footprint and within the lease tracts and a resident scenario for outside the lease tracts) would be at acceptable risk levels (e.g., meet applicable dose requirements or the EPA's acceptable risk range) for the appropriate end-state land use.

Specifics associated with the measures (compliance or mitigation measures or BMPs) that involve monitoring, sample collection, and the installation of protective elements (e.g., depth of soil cover on waste-rock piles, the necessity for and/or type of liners for water evaporation ponds, other elements) during operations and reclamation would be identified in the mine plans submitted to DOE for review and approval.

## 4.7 CUMULATIVE IMPACTS

Potential impacts of the five alternatives in combination with the impacts of past, present, and reasonably foreseeable future actions in the region are considered in this section.

Consistent with 40 CFR 1508.7, in the ULP PEIS, a "cumulative impact" is an impact on the environment that results from the incremental impact of an action when added to other past, present, and reasonably foreseeable future actions, regardless of the agency (Federal or non-Federal) or person that undertakes such actions. A cumulative impacts assessment accounts for both geographic (spatial) and time (temporal) considerations of past, present, and reasonably foreseeable actions. Geographic boundaries can vary by resource area—depending on the amount of time an impact remains in the environment, the extent to which such an impact can migrate, and the magnitude of that impact. Although the geographic extent of cumulative impacts may be less for some resource areas, the boundary for this analysis is conservatively defined as 50 mi (80 km) for all resource areas (see Figure 4.7-1). The primary factor considered for the purpose of the cumulative impacts analysis for the ULP PEIS is whether the other actions would have some influence on the resources in the same time and space as those affected by the

**TABLE 4.6-1 Measures Identified to Minimize Potential Impacts from Uranium Mining at the ULP Lease Tracts**

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| **M-1** | **Reduce dust emissions; reduce air emissions** | | | |
| | • Apply water or chemical suppressants on unpaved haul roads, disturbed surfaces, and temporary stockpiles. | X | | |
| | • Limit soil-disturbing activities and travel on unpaved roads. | | X[d] | |
| | • Design and construct new access roads to meet appropriate standards; roads should be no larger than necessary to accommodate their intended function. | | X[d] | |
| | • Cover unpaved access roads, frequently used on-site roads, and parking lots with aggregate. | X | | |
| | • Assure all heavy equipment meets emission standards as required. | X | | |
| | • Limit idle time of vehicles and motorized equipment. | | | X |
| | • Fuel all diesel engines used with ultra-low sulfur diesel (sulfur content of $\leq$15 parts per million [ppm]). | | | X[e] |
| | • Avoid construction traffic and reduce speeds on unpaved surfaces. | X | | |
| | • Ensure that all vehicles transporting loose materials are covered (e.g., with tarpaulins), both when travelling with a load of ore and when returning empty; loads should be sufficiently wet and kept below the freeboard. | X | | |
| **M-2** | **Identify and protect paleontological resources** | | | |
| | • Consult with affected BLM Field Offices to determine whether areas of moderate to high fossil-yield potential (i.e., PFYC 3, 4, or 5) or known significant localities occur within proposed areas of disturbance and if surveys, sampling, or the development of paleontological resources management plan would be needed. | | X | |
| | • Immediately notify the BLM authorized officer of any paleontological resources discovered as a result of mining activities so that appropriate measures to mitigate adverse effects to significant paleontological resources can be determined and implemented. Operations may continue if activities can avoid further impacts on the fossil discovery or can be continued elsewhere. | | X | |

**TABLE 4.6-1 (Cont.)**

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| **M-3** | **Reduce noise-related impacts** | | | |
| | • Maintain noise level below Colorado maximum permissible limit of 55 dBA during the day (7 a.m.–7 p.m.) and of 50 dBA at night (7 p.m.–7 a.m.), and below EPA guideline level of 55 dBA $L_{dn}$ at receptor location. | X | | |
| | • Maintain equipment in good working order in accordance with manufacturer's specifications. | | | X |
| | • Limit noisy activities to the least noise-sensitive times of the day (daytime between 7 a.m. and 7 p.m.) and weekdays and limit idle time for vehicles and motorized equipment. | | | X |
| | • Notify area residents of high-noise and/or high-vibration-generating activities (e.g., aboveground and belowground blasting) in advance. | | | X |
| | • Employ noise-reduction devices (e.g., mufflers) as appropriate. | | | X |
| | • Provide a noise complaint process for surrounding communities. | | | X |
| | • Site noise sources to take advantage of topography and distance; construct engineered sound barriers and/or berms as necessary. | | | X |
| | • Limit operational noise to 49 dBA or less within 2 mi (3 km) from an occupied/active Gunnison sage-grouse lek. | | | X |
| **M-4** | **Protect soils from erosion; protect local surface water bodies from contamination and sedimentation; protect local aquifers from contamination** | | | |
| | • Identify local factors that cause slope instability (e.g., slope angles, precipitation) and avoid areas with unstable slopes. | | | X |
| | • Avoid creating excessive slopes during excavation; use special construction techniques, where applicable, in areas of steep slopes, erodible soil, and stream channel crossings. | | X[f] | |
| | • Apply all dust palliatives in accordance with appropriate laws and regulations; ensure that dust suppression chemicals are not sprayed on (released to) soils or streams. | | X[g] | |
| | • Control and direct runoff from slope tops to settling or rapid infiltration basins until disturbed slopes are stabilized; stabilize slopes as quickly as possible. | X[h] | | |
| | • Assure operators comply with CDRMS requirements regarding groundwater and groundwater contamination. | X | | |
| | • Obtain borrow materials from authorized or permitted sites. | | X[i] | |
| | • Retain sediment-laden waters from disturbed areas with the lease tract through the use of barriers and sedimentation devices (e.g., berms, straw bales, sandbags, jute netting, or silt fences) as necessary. | X[h] | | |
| | • Place barriers and sedimentation devices around drainages and wetlands. | | X[g] | |

**TABLE 4.6-1 (Cont.)**

| Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|
| • Require developers using on-site groundwater supplies to conduct a hydrologic study consistent with that required by the state's environmental protection plan. | X | | |
| • Conduct routine inspections to assess effectiveness and maintenance requirements for erosion and sediment control systems. | | | X |
| • Maintain, repair, or replace barriers and sedimentation devices as necessary to ensure optimum control. | X[h] | | |
| • Inspect and clean tires of all vehicles to ensure they are free of dirt before they enter paved public roadways to the extent practicable. | | | X |
| • Locate a diversion ditch upstream of the mine site to intercept surface water flow or shallow groundwater and channel it around the site; tailor the location and length of the ditch to site-specific conditions, taking into account the location of mine waste piles, the site topography, and surface flow patterns. | X[h] | | |
| • Place drill holes at a distance from existing water rights to the extent possible. | | | X |
| • Plug open drill holes and areas around vent shafts to reduce the volume of groundwater entering an underground mine during operations to the extent possible; use underground sumps to contain water flow, as needed; pump water from groundwater seepage to control water flow, if necessary, into surface mine-water treatment pond. | | X[j] | |
| • Divert water pumped from mines (or drill sites) to a lined sedimentation pond for treatment. Locate settling pond(s) in topographically low areas (but not any that are along drainages or near naturally flowing water). The purpose of treatment is to promote the precipitation of heavy metals through oxidation processes like aeration. (Employ this option at sites at which the mine drainage is high in total suspended solids). | X[h] | | |
| • As sedimentation ponds are cleaned, test sediments and precipitates for proper disposal. | X[h] | | |
| • Locate mine ore storage and waste-rock or tailings piles on topographically high ground so they do not come into direct contact with flowing or ponded water; grade the ore storage area and construct an earthen berm around it. Divert any runoff from the area to a sedimentation pond for testing and treatment. | | X | |
| • Contain any runoff from mine waste-rock piles (e.g., divert it to a sedimentation pond) and treat it, as needed. | X[h] | | |
| • Provide off-site (downgradient) groundwater monitoring consistent with Colorado requirements for groundwater protection permits. New mining activities should consider cumulative impacts in combination with other projects also occurring in the vicinity with implementation of necessary measures for the protection of human health and the environment. | X[i] | | |
| • Site and design mine entrances and activities so that they avoid direct and indirect impacts on important, sensitive, or unique habitats, including, but not limited to, wetlands (both jurisdictional and nonjurisdictional), springs, seeps, streams (ephemeral, intermittent, and perennial), 100-year floodplains, ponds and other aquatic habitats, riparian habitats, remnant vegetation associations, rare or unique biological communities, crucial wildlife habitats, and habitats supporting sensitive species populations. | | X[k] | |

**TABLE 4.6-1 (Cont.)**

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| | • Restrict activities at previously mined sites so they do not further encroach toward perennial streams (e.g., the Dolores River); new mining activities should not be allowed within 0.25 mi (0.40 km) of perennial streams and should consider cumulative impacts in combination with other projects also occurring in the vicinity with implementation of necessary measures for the protection of human health and the environment; avoid the placement of facilities or roads in drainages; and make necessary accommodations for the disruption of runoff. | | X[l] | |
| | • Identify surface water runoff patterns at the mine site and develop mitigation that prevents soil deposition and erosion throughout and downhill from the site; potential adverse impacts could be minimized by incorporating erosion-control techniques such as water bars, weed-free hay bales and silt fences, vegetation, erosion-control fabric, temporary detention basins, and land contours in the construction design. | X[h] | | |
| | • Assure that herbicides used meet the specifications and standards of BLM and county weed control staff. | X[m] | | |
| | • Seed soil stockpiles to minimize erosion and growth of weeds. | | | X |
| | • Apply methods such as chisel plowing[n] or subsoiling[o] (tilling), as necessary, to abandoned roads and areas no longer needed to alleviate soil compaction. | | | X |
| | • Limit herbicide use to nonpersistent, immobile substances. Do not use herbicides near or in U.S. waters, including ponds, lakes, streams (intermittent or perennial), and wetlands, unless the herbicide is labeled for such uses. If herbicides are used in or near U.S. waters, the applicator shall ensure that the applications meet the requirements of the EPA's "Pesticide General Permit for Discharges from the Application of Pesticides." Determine setback distances in coordination with Federal and state resource management agencies. Before beginning any herbicide treatments, ensure that a qualified biologist has conducted surveys of bird nests and of sensitive species to identify the special measures or BMPs that are necessary to avoid and minimize impacts on migratory birds and sensitive species. The herbicides to be used would be approved by BLM through submission of "Pesticide Use Proposal" forms. The state-, county-, and BLM-listed plant species scheduled for eradication that are found in the project area would be eradicated and reported to BLM through submission of "Pesticide Application Records." | X[m] | | |
| **M-5** | **Minimize the extent of ground disturbance and the duration of ground-disturbing activities** | | | |
| | • Reduce the surface footprint of disturbed areas (buildings, service areas, storage areas, stockpile areas, and loading areas) within the lease tracts to the extent possible. | | | X |
| | • Minimize the duration of ground-disturbing activities, especially during periods of heavy rainfall. | | | X |
| | • Expand disturbed areas (e.g., waste-rock pile storage areas) incrementally to the extent practicable. | | | X |

**TABLE 4.6-1 (Cont.)**

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| | • Use existing roads and disturbed areas (and transportation ROWs) to the extent possible (before constructing new roads or disturbing new areas). | | X | |
| | • If ground-disturbing activities require an extended schedule, employ measures to limit exposure to wind and water during the activity. | | | X |
| | • Avoid clearing and disturbing sensitive areas (e.g., steep slopes and natural drainages) and minimize the potential for erosion. | | X | |
| | • Limit access to disturbed areas and staging areas to authorized vehicles traveling only on designated (dust-stabilized) roads. | | | X |
| | • Minimize disturbance to vegetation, soils, drainage channels, and stream banks. | | X[p] | |
| **M-6** | **Restore original grade and reclaim soil and vegetation** | | | |
| | • Salvage topsoil and vegetation prior to site disturbance and place in stockpiles (to be used in final reclamation). | | | X |
| | • Use DOE-developed seed mixture (see Table 4.1-9). | X[m] | | |
| | • Reestablish the original grade and drainage pattern of all disturbed areas before final reclamation to the extent practicable. | | X[p] | |
| | • Test for agronomic nutrient profile to determine whether amendments are needed to establish vegetation before final reclamation. | | | X |
| | • Place topsoil over the top of disturbed areas and seed (e.g., by broadcast or drill seeder). | | X | |
| | • Monitor seeded areas for some period following seeding to ensure vegetation is reestablished. | X[h] | | |
| | • Grade mine waste-rock or tailings piles to create a gently sloping (more stable) surface. | | X[f] | |
| | • Recontour soil borrow areas and cut and fill slopes, berms, waterbars, and other disturbed areas to approximate naturally occurring slopes. | | X[f] | |
| **M-7** | **Protect wildlife and wildlife habitats (and grazing animals, if present) from ground disturbance and general site activities** | | | |
| | • Use wattles or other appropriate materials to reduce potential for sediment transport off the site. | | | X |
| | • Avoid unnecessary disturbance or feeding of wildlife. The collection, harassment, or disturbance of wildlife and their habitats should be reduced through employee and contractor education about applicable state and Federal laws. | | | X |

**TABLE 4.6-1 (Cont.)**

| Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|
| • Minimize the number of areas where wildlife could hide or be trapped (e.g., open sheds, pits, uncovered basins, and laydown areas). For example, cap uncovered pipes at the end of each workday to prevent animals from entering the pipes. If a sensitive species is discovered inside a component, do not move that component, or, if it must be moved, move it only to remove the animal from the path of activity, until the animal has escaped. | | | X |
| • Establish buffer zones around sensitive habitats and either exclude project facilities and activities from those areas or modify them within those areas, to the extent practicable. | | | X |
| • If any Federally listed threatened and endangered species are found during any phase of the project, consult with the USFWS as required by Section 7 of the ESA and determine an appropriate course of action to avoid or mitigate impacts. | X | | |
| • Schedule activities to avoid critical winter ranges for big game (mule deer and elk) when they are heavily used (December 1 through April 15), or utilize compensatory mitigation (e.g., habitat enhancement or replacement) to offset long-term displacement of big game from critical winter ranges. Compensatory mitigation projects may be developed in coordination with CPW. | | X | |
| • Conduct pre-disturbance surveys for threatened, endangered, and sensitive species within all areas that would be disturbed by mining activities. These surveys would be used to determine the presence of sensitive species on the lease tracts and develop the appropriate measures to avoid, minimize, or mitigate impacts on these species. If sensitive species are located in the area that might be developed, coordination with the USFWS and CPW would be necessary to determine the appropriate species-specific measures. | | X | |
| • Minimize increases in the number of nuisance animals and pests in the project area, particularly any individuals or species that could affect human health and safety or that could adversely affect native plants and animals to the extent practicable. | | | X |
| • Monitor to the extent practicable the potential for an increase in the predation of sensitive species (particularly Gunnison sage-grouse) from ravens and other species that are attracted to developed areas and that use tall structures opportunistically to spot vulnerable prey. | | | X |
| • Locate soil borings, mine entrances, and travel routes to avoid important, sensitive, or unique habitats, including, but not limited to, wetlands, springs, seeps, ephemeral streams, intermittent streams, ponds and other aquatic habitats, riparian habitat, remnant vegetation associations, rare natural communities, and habitats supporting sensitive species populations as identified in applicable land use plans or best available information and science. | | X[g] | |
| • Conduct pre-construction raptor nest surveys to ensure compliance with the Migratory Bird Treaty Act; follow the recommended buffer zones and seasonal restrictions for Colorado's raptors (CPW 2008). | X[q] | | |

**TABLE 4.6-1 (Cont.)**

| Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|
| • Schedule activities to avoid, minimize, or mitigate impacts on wildlife. For example, avoid crucial winter ranges, especially during the periods when they are used. If there are plans to conduct activities during bird breeding seasons, a nesting bird survey should be conducted first. If active nests are detected, the nest area should be flagged, and no activity should take place near the nest (at a distance determined in coordination with the USFWS) until nesting is completed (i.e., until nestlings have fledged or the nest has failed) or until appropriate agencies agree that construction can proceed with the incorporation of agreed-upon monitoring measures. Coordinate the timing of activities with BLM, USFWS, and CPW. Prior to authorization of ground disturbing activities a habitat suitability analysis would be done and for habitats found suitable, a protocol survey would be done. If nesting birds are found, seasonal and year-round buffers would be established with USFWS coordination. | | X | |
| • Avoid and minimize impacts to bats during mine renewal activities (as well as during mine closure and reclamation) as follows:<br>– Reentry of existing mines that contain winter roosting bats should be avoided during the winter season (October 1 through April 15). For existing mines expected to be reused, exclusion devices could be used to prevent bats from using the mines during winter. This would involve screening out bats by placing chicken wire with ≤1-in. (2.5-cm) mesh across the bat gate or open-access point at mine complexes that are ungated. Exclusions should be installed by September 1, if possible, but no later than September 30.<br>– Existing mines utilized as summer roosting sites (other than maternity roost sites) can be handled similarly. The summer season is considered April 15 through September 1.<br>– Any mine to be reworked that is used as a maternity roost should undergo an exclusion effort by April 15 and should be maintained from at least April 15 through June 15. Also, the portal(s) should be covered during night to prevent the potential reuse as maternity sites. In the event that a maternity roost will be permanently impacted, consideration should be given to preserving nearby mine features, if possible, to serve as mitigation and as a possible alternate habitat for bats. This is also recommended to mitigate impacts for a large winter roost site that will be permanently impacted. The creation of artificial bat habitat could also serve as an important alternative to mitigate impacts on maternity roosts or large winter roost sites.<br>– For mine sites used year round, mining renewal activities should be spring (April through May) or fall (September through October).<br>– The development and enactment of bat mitigation should be coordinated with the Colorado Bat Working Group and CPW. | | X | |

TABLE 4.6-1 (Cont.)

| Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|
| • Avoid vegetation clearing, grading, and other construction activities during the bird breeding season; if activities are planned during the breeding season, a survey of nesting birds should be conducted first. If active nests are detected, the nest area should be flagged, and no activity should take place near the nest (at a distance determined in coordination with the USFWS) until nesting is completed (i.e., until nestlings have fledged or the nest has failed) or until appropriate agencies agree that construction can proceed with the incorporation of agreed-upon monitoring measures. Coordinate the timing of initial development activities with the BLM, USFWS, and CPW. | X[q] | | |
| • Relocate wildlife found in harm's way away from the area of the activity when safe to do so. | | | X |
| • Design stream crossings to provide in-stream conditions that would allow for and maintain uninterrupted movement of water and safe passage of fish; minimize removal of any deadfall and overhanging vegetation that provides shelter and shading to aquatic organisms. | | | X |
| • Exclude new mining and other surface-disturbing activities within 0.25 mi (0.4 km) of the Dolores River to avoid impacts on a desert bighorn sheep movement corridor (and other wildlife). | | X[l] | |
| • Limit vegetation maintenance for transmission lines located near aquatic habitats or riparian areas (e.g., use minimum buffers identified in the applicable land use plan or best available science and information) and perform maintenance mechanically rather than with herbicides. Cutting in wetlands or stream and wetland buffers should be done by hand. Tree cutting in stream buffers should only target trees able to grow into a transmission line conductor clearance zone within 3 to 4 years. Cutting in such areas for construction or vegetation management should be minimized, and the disturbance of soil and remaining vegetation should be minimized. | | | X |
| • The leaseholder should consult with the USFWS to address concerns regarding mine-water treatment ponds. Water pumped from mines should be diverted to a lined sedimentation pond for treatment. Settling ponds should be located in topographically low areas but not in any areas that are along drainages or near naturally flowing water. The treatment ponds should be constructed in accordance with applicable regulations. As applicable, the ponds should be fenced and netted to prevent use by wildlife (or livestock), including birds and bats. The lower 18 in. (46 cm) of the fencing should be a solid barrier that would exclude entrance by amphibians and other small animals. | | X[q] | |
| • Before mine entrances are closed during reclamation, conduct a summer and winter bat survey, if required, to determine the number and species of bats that could potentially occupy a site. Depending on the results of the surveys, undertake actions that could include the installation of bat gates. If bat surveys indicate no presence of bats, promptly close off all mine openings when finished with mining activities before bats have an opportunity to establish roosts or hibernacula. | | X[q] | |

**TABLE 4.6-1 (Cont.)**

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| | • Use herbicides that have a low toxicity to wildlife and untargeted native plant species, as determined in consultation with the USFWS. Do not use herbicides near or in U.S. waters, including ponds, lakes, streams (intermittent or perennial), and wetlands, unless the herbicide is labeled for such uses. If herbicides are used in or near U.S. waters, the applicator shall ensure that the applications meet the requirements of the EPA's "Pesticide General Permit for Discharges from the Application of Pesticides." Determine setback distances in coordination with Federal and state resource management agencies. Before beginning any herbicide treatments, ensure that a qualified biologist has conducted surveys of bird nests and of sensitive species to identify the special measures or BMPs that are necessary to avoid and minimize impacts on migratory birds and sensitive species. The herbicides to be used would be approved by BLM through submission of "Pesticide Use Proposal" forms. The state-, county-, and BLM-listed plant species scheduled for eradication that are found in the project area would be eradicated and reported to BLM through submission of "Pesticide Application Records." | X[m] | | |
| | • If a transmission line is required, it should be designed and constructed in conformance with *Avian Protection Plan Guidelines* (APLIC and USFWS 2005), in conjunction with *Suggested Practices for Avian Protection on Power Lines* (APLIC 2006), to reduce the operational and avian risks that result from avian interactions with electric utility facilities. For example, transmission line support structures and other facility structures shall be designed to discourage their use by raptors for perching or nesting (e.g., by use of anti-perching devices). This would also minimize potential increased presence of ravens and raptors that may prey upon Gunnison sage-grouse. Shield wires should be marked with devices that have been scientifically tested and found to significantly reduce the potential for bird collisions. | | X[q] | |
| **M-8** | **Minimize the establishment and spread of invasive (vegetative) species** | | | |
| | • Monitor the area regularly and eradicate invasive species immediately. | X[m] | | |
| | • Use DOE-developed seed mixture (see Table 4.1-9) and weed-free mulch. | X[m] | | |
| | • Clean vehicles to avoid introducing invasive weeds. | | | X |
| **M-9** | **Identify and protect cultural and historic resources** | | | |
| | • Assure that all activities comply with Section 106 of the NHPA. | X | | |
| | • Assure that all individuals performing cultural resources management tasks and services meet the Secretary of the Interior Standards for Archaeology and Historic Preservation. | X | | |

**TABLE 4.6-1 (Cont.)**

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| | • Identify through searches of records, field surveys, and consultation with tribes, as necessary, all cultural resources in the area of potential effects and evaluate them for eligibility for inclusion on the NRHP. | X | | |
| **M-10[r]** | **Minimize lighting to off-site areas; minimize contrast with surrounding areas** | | | |
| | • Design lighting to provide the minimum illumination needed to achieve safety and security objectives. Minimize or eliminate lighting of off-site areas or the sky. All unnecessary lighting should be turned off at night to limit attracting migratory birds, bats, or other wildlife. | | | X |
| | • Minimize the number of structures required. | | | X |
| | • Construct low-profile structures whenever possible to reduce the structures' visibility. | | | X |
| | • Repeat and/or blend materials and surface treatments (e.g., paint buildings) to correspond with the existing form, line, color, and texture of the landscape. | | | X |
| | • Select appropriately colored materials for structures, or apply appropriate stains as coatings, so they blend with the backdrop of the lease tract. | | | X |
| | • Use materials, coatings, or paints having little or no reflectivity whenever possible. | | | X |
| | • Avoid installing gravel and pavement wherever possible to reduce contrasts in color and texture with the existing landscape to the extent practicable. | | | X |
| | • Avoid downslope wasting of excess fill material. | | | X |
| | • Control litter and noxious weeds by removing them regularly during mine development and operations. | | | X |
| | • When accurate color rendition is not required (e.g., roadway, basic security), lighting should be amber in color, using either low-pressure sodium lamps or yellow LED lighting, or an equivalent. | | X | |
| | • Undertake interim restoration during the operating life of the mine, as soon as possible after disturbances have occurred. | | X[p] | |
| | • Ensure that lighting for structures on the mining sites does not exceed the minimum number of lights and brightness required for safety and security and does not cause excessive reflected glare. | | X | |
| | • Use full cut-off luminaires recommended or approved by the International Dark Sky Association to minimize uplighting; direct lights downward or toward the area to be illuminated. | | | X |
| | • Ensure that light fixtures do not spill light beyond the lease tract boundaries to the extent practicable. | | | X |

**TABLE 4.6-1 (Cont.)**

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| **M-11** | **Protect human health from radiological exposures** | | | |
| | • Monitor radon emissions and related operational conditions to obtain data for the estimation of more precise radon doses with respect to the potential exposures of nearby residents, including (1) monitoring the radon discharge concentration continuously whenever the mine ventilation system is operational, (2) measuring each mine vent exhaust flow rate, and (3) calculating and recording a weekly radon-222 emission rate for the mine. Model the dose to the nearest member of the public by using COMPLY-R, as required by 40 CFR Part 61, Subpart B. | X | | |
| | • In cases where radon doses to nearby residents exceed the NESHAP (40 CFR Part 61 Subpart B) dose limit of 10 mrem/yr, implement one or more of the following measures to reduce the potential radon exposures: (1) increase the ventilation flow rate, (2) reroute ventilation flow, (3) reroute ventilation to a new vent, (4) modify the vent stack, (5) decrease the vent stack diameter, (6) increase the vent stack release height, or (7) construct additional bulkheads. | X | | |
| | • Promptly and properly close off all mine openings and install warning signs of potentially high levels of radiation exposures when finishing the mining activities to prevent any inadvertent intrusion to the mine or getting too close to the mine openings. | | X | |
| | • Assure an adequate thickness for the surface soil material covering waste-rock piles before seeding. The thickness should be adequate to prevent the underlying waste rocks from exposure to the ground surface over time. Through modeling and/or monitoring, evaluate measured uranium and decay product concentrations in waste rocks to determine whether the thickness is sufficient to mitigate potential radiation exposures. | | X | |
| | • Develop an emergency rescue plan and ensure a trained rescue team can be dispatched immediately when needed. | | X | |
| **M-12** | **Assure safe and proper transportation** | | | |
| | • Maintain the haul trucks for exclusive use only. Avoid using trucks for cartage of material other than uranium ore unless they have been properly cleaned for unrestricted use. | X | | |
| | • Use a gravel track pad or similar method to minimize tracking of mud and dirt from any mine site onto the local public and county roads that provide site access. | | | X |
| | • Assure that uranium ore shipments proceed directly to the mill from the mine location. Identify locations for potential "safe havens" for temporary wayside parking or storage in the event there are unforeseen delays or scheduling issues associated with the mill. | | X[s] | |

**TABLE 4.6-1 (Cont.)**

| Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|
| • Assure that mine and mill operators are aware of the routes used for shipments of uranium ore. | | X[s] | |
| • The State of Colorado Highway Access Code recognizes the right of reasonable access, by development, to the state highway system, providing the development mitigates traffic impacts on the highway at the point of access to the state highway. This would also apply to the traffic generation/impacts from the lease tracts considered in the ULP PEIS. As a measure to minimize potential traffic impacts due to the ULP proposed action, the following steps would be taken by each lease operator prior to opening a mining operation on a lease tract: | | | |
| 1. The lessee should contact CDOT to meet for an access pre-application meeting to determine the size and scope of traffic impacts to be considered before submitting an access application. | | | X |
| 2. The lessee shall submit a complete Access Permit Application to CDOT (Region 5 Access Permit Office) for its review. This application should include a traffic impact study (TIS) that identifies the directional distribution and daily and peak-hour volumes of traffic generated to identify if intersection improvements are warranted. Depending upon the size and impacts of a facility, the requirements for a TIS maybe waived for smaller operations, depending upon the outcome of the pre-application meeting. Typically the lessee would receive a response from CDOT within 20 days if additional documentation was needed before the permit would be completed. If CDOT accepted the application with no revisions, a permit would be issued or denied within 45 days of receipt of the application. If revisions were necessary, the application review period (20-day review) would restart upon receipt of the revised information by CDOT. | X | | |
| 3. The mine development constructs intersection improvements per the requirements of the access permit issued prior to commencement of the activity. | X | | |

[a] Compliance measures are those measures needed to fulfill regulatory requirements. Note that Appendix C of the lease agreement requires lessees to comply with all applicable statutes and regulations. Generic leases for the ULP are presented in Appendix A of the ULP PEIS.

[b] Mitigation measures identified in the table include measures that are required by DOE as identified in current leases or that could be added to the leases when modified. DOE may also identify additional mitigation measures.

[c] BMPs are those practices and activities generally implemented within the industry to conserve resources. These BMPs are not necessarily required by DOE but may be implemented to further reduce impacts.

[d] See Appendix C, Section I of the lease agreement.

**Footnotes continued on next page.**

**TABLE 4.6-1 (Cont.)**

---

[e] Except for older diesel equipment meeting emissions requirements that need higher sulfur content for proper functioning.

[f] See Appendix C, Section L of the lease agreement.

[g] See Appendix C, Section J of the lease agreement.

[h] The CDRMS requires lessees to obtain permits for their mining operations and to submit and follow an EPP. Runoff and run-on are specifically addressed on a site-by-site basis, as are issues concerning hydrology and reestablishment of vegetation.

[i] Article XIII MINING PLAN of the lease agreement addresses the process for reclamation; the ULP will work with the BLM to identify and clear local sources of borrow material.

[j] See Appendix C, Section M of the lease agreement; also required to be submitted under Article XII EXPLORATION PLAN of the lease agreement.

[k] See Appendix C, Sections G and H of the lease agreement, which address the location of mining infrastructure.

[l] See Appendix C, Section T of the lease agreement (for applicable lease tracts).

[m] Requirement of the surface management agency, BLM.

[n] Chisel plowing is a method used to alleviate shallow soil compaction by inserting a narrow tool in soil to depths of at least 14 in. (35 cm).

[o] Subsoiling is a method used to alleviate shallow soil compaction by tillage of soil to depths of at least 14 in. (35 cm).

[p] See Appendix C, Section H of the lease agreement.

[q] Measure per CPW.

[r] Primary source of information is USDA and DOI (2007).

[s] See Appendix C, Section P of the lease agreement.



FIGURE 4.7-1 Region of Influence for Cumulative Effects

implementation of any of the five alternatives, including the preferred alternative (i.e., continue the ULP with the 31 lease tracts for the next 10-year lease period or for another reasonable period of time).

The primary uses of land within the immediate vicinity (10 mi [16 km]) of the ULP lease tracts are grazing, wildlife habitat, and uranium/vanadium exploration and development. Most of this land is managed and owned by the BLM and USFS. Most of the land within 50 mi (80 km) of the ULP lease tracts is owned by either the Federal Government or the States of Colorado or Utah. At the time of the preparation of the ULP PEIS, no large actions were being planned on BLM land.

In the analysis that follows, impacts of the five alternatives are considered in combination with the impacts of past, present, and reasonably foreseeable future actions. This section begins with a description of reasonably foreseeable future actions in the ROI for cumulative effects (see Figures 4.7-1 and 4.7-2), including those that are ongoing, under construction, or planned/proposed for future implementation. In general, past and present actions are accounted for in the affected environment section (Section 3).

## 4.7.1 Reasonably Foreseeable Future Actions

Reasonably foreseeable future actions within the ROI for cumulative effects are discussed in the following sections. These actions were identified primarily from a review of the Schedule of Proposed Action for the San Juan National Forest and other relevant documents and data sources (Edge Environmental, Inc. 2009; USDA 2011b, 2012a). The actions listed are planned, under construction, or ongoing.

### 4.7.1.1 Piñon Ridge Mill

Energy Fuels Resources Corporation has planned to construct the Piñon Ridge Mill (in Paradox Valley, between Naturita and Bedrock in Montrose County, Colorado) (Energy Fuels 2012d). CDPHE issued a final radioactive materials license to Energy Fuels Resources Corporation (located in Lakewood, Colorado; an asset of Ontario's Energy Fuels, Inc.) in early 2011, following the performance of an environmental impact assessment (CDPHE 2011d). The license application included an environmental report, which outlined the proposed action alternatives, affected environment, environmental impacts, and cumulative impacts (Edge Environmental, Inc. 2009). On June 13, 2012, a Colorado court set aside CDPHE's action in issuing the license, remanded the case for further proceedings, and ordered CDPHE to convene an additional hearing scheduled for April 2013. On April 25, 2013, CDPHE decided to issue to Energy Fuels Resources Corporation a final radioactive materials license that imposed a number of conditions on the construction and operation of the proposed Pinon Ridge Mill (CDPHE 2013). In May 2013, a group of plaintiffs filed for judicial review of that CDPHE decision in the District Court for the City and County of Denver.



**FIGURE 4.7-2 Uranium Mining and Oil and Gas Wells within the Region of Influence for Cumulative Effects**

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 20 of 426

The proposed Piñon Ridge Mill, as the first new conventional uranium mill constructed in 30 years, would process uranium and vanadium into uranium oxide concentrate (yellowcake) and vanadium oxide concentrate, respectively, by using the solvent extraction process (Edge Environmental, Inc. 2009; Energy Fuels 2012a). The mill is expected to process ore from five to nine mines at any one time, and feeder mines are expected to change over the course of the mill's 40-year lifetime. A surge in uranium exploration, mining, and permitting is anticipated if the mill is constructed, including permitting and development of uranium/vanadium deposits controlled by Energy Fuels (CDNR 2012; Edge Environmental, Inc. 2009; Energy Fuels 2009).

The proposed Piñon Ridge Mill would be constructed on approximately 400 acres (160 ha) within an 880-acre (360-ha) property; the licensed (restricted) portion of the site would occupy approximately 300 acres (120 ha). Facilities would consist of a stockpile pad, process buildings, administration and maintenance buildings, waste management facilities (such as tailing cells and evaporation ponds), and ancillary facilities. Construction is expected to last for 21 months and employ 125 to 200 workers (at the peak of construction). During operations, the mill is projected to employ approximately 85 people around the clock. Operations are expected to last for 40 years (Edge Environmental, Inc. 2009; Energy Fuels 2012a).

Ore would be mined mostly from existing operations (owned and operated by Energy Fuels) throughout southwestern Colorado and southeastern Utah. Ore would be shipped to Piñon Ridge Mill, stored at the ore stockpile pad, crushed and mixed with water to create a fine slurry, and leached with sulfuric acid, resulting in the precipitation of uranium oxide and vanadium oxide concentrates (500 tons per day). Uranium oxide concentrate would be shipped to a conversion plant, while vanadium oxide concentrate would be shipped to a plant that produces ferro-vanadium products (Edge Environmental, Inc. 2009).

Table 4.7-1 summarizes the potential environmental impacts from the proposed Piñon Ridge Mill.

#### 4.7.1.2 Planned Uranium Exploration

Exploration for uranium typically involves the drilling of exploration holes with diameters ranging from 3 to 6 in. (7.6 to 15 cm), and it is typically accompanied by the construction of mud pits (to collect drill cuttings and manage drilling fluids). Monitoring wells might also be required to monitor groundwater quality and depth. Surface disturbance is typically limited. As noted in Section 4.7.2.2, uranium exploration activities are generally short term (BLM 2009b) and are not expected to have significant impacts on the environment or human health.

#### 4.7.1.3 Coal Mining

The Book Cliff Mine (formerly the Red Cliff Mine) is a proposed underground coal mine located 11 mi (18 km) north of Mack and Loma, Colorado. Proposed by CAM-Colorado, LLC (a subsidiary of Rhino Energy, LLC), the mine would extract low-sulfur coal from existing

BLM_0042594

**TABLE 4.7-1 Potential Environmental Impacts of the Proposed Piñon Ridge Mill**

| Resource Area | Anticipated Impacts |
|---|---|
| Air quality | Potential nonfugitive emissions would not exceed thresholds for a major source permit or PSD thresholds. Modeling indicates that $PM_{10}$ emissions would not cause the exceedance of NAAQS or Colorado Ambient Air Quality Standards (CAAQS). No significant dust or fume emissions would be expected from routine transportation of uranium ore or hazardous materials. |
| Noise | The estimated maximum noise level at the property boundary would be below the most restrictive maximum permissible noise level established by county regulation. |
| Geology and soils | Approximately 415 acres (170 ha) would be disturbed by site development activities. Construction impacts could include erosion of surface water control and settling. Surface disturbances would be stabilized by vegetation during operation. |
| Surface water | Design of the mill, ore pad, tailings cells, and evaporation ponds would result in no off-site stormwater discharge. Stormwater runoff from outside the zero-discharge footprint would be controlled by using BMPs. Operational impacts could include the spread of contamination through facility flooding, erosion of stormwater channels, and reduction of surface water flow to the Dolores River. |
| Groundwater | Primary impacts during operations could be the potential depletion of the bedrock aquifer by supply wells, which could potentially affect other groundwater users (impacts are not quantifiable until site withdrawals begin). The capture of stormwater runoff would limit infiltration or runoff to the Dolores River. Leaks and spills could affect water quality, but containment features and the absence of groundwater below parts of the facility would limit the impact. |
| Public health – radiological | Radiological exposures would occur from transportation, on-site storage, and mineral processing operations, as well as via airborne, waterborne, and de minimis pathways. The estimated dose to the maximum exposed theoretical receptor at the site boundary would be 8.2 mrem/yr (including radon), which falls within the applicable regulatory limits of 25 mrem/yr (EPA) and 100 mrem/yr (CDNR). The estimated dose to the maximum exposed actual off-site receptor (nearest downwind resident) would be 0.5 mrem/yr. Natural background dose in the area is 400 mrem/yr. Occupational doses would be expected to be less than 500 mrem/yr. |
| Public health – nonradiological | Chemical and particulate exposures would occur from transportation, on-site storage, and mineral processing operations. Impacts on air quality in the area of the facility would be less than levels deemed protective of human health. Occupational exposures to elevated levels of nonradiological contaminants of concern would be unlikely; no significant health impacts from routine operations would be expected. |
| Ecological resources | No Federally threatened, endangered, or candidate species were observed during wildlife surveys, and no state species of concern were observed. Four habitats of importance to area wildlife were identified on the project site; Energy Fuels has proposed offsets to the potential impacts. Indirect impacts could occur from degradation of habitat by the facility and increased traffic. Contents of evaporation ponds and tailing cells could be toxic to invading threatened and endangered species, and the project could hinder reestablishment of Gunnison sage-grouse. No jurisdictional wetlands are located at the site, and no aquatic species or habitats occur at the site. Indirect impacts on vegetation could occur if the project displaced native herbivores or if invasive, non-native species became established in disturbed areas. Soil disturbance, vehicle traffic, and other project activities could promote the spread of invasive plants. Increased traffic and erection of fences would increase the potential for collisions with and mortality of terrestrial wildlife and some threatened and endangered species. Radiation dose rates to plants and animals in the vicinity of the facility would be below recommended limits, and exposures from inhalation would be minimal. Nonradiological impacts on biota would be minimized. |

**TABLE 4.7-1 (Cont.)**

| Resource Area | Anticipated Impacts |
| --- | --- |
| Socioeconomics | The project would employ 25 to 45 and 125 to 200 workers during the construction of ancillary facilities and construction of the mill, respectively; the mill would employ 85 workers during 24/7 operation. As many as 538 direct and 664 indirect jobs could be created by stimulating regional mining and transportation activities, mainly near the locations of mines expected to provide ore for the mill. Approximately 80% of mill employees would be expected to be local residents, but the creation of direct and indirect jobs would result in growth of the Nucla/Naturita area and increase the demand for housing in mill- and mine-area communities. Some infrastructure and services might be inadequate for a period, especially during construction. Increases in local employment and housing demand would result in greater tax revenues. A future economic downturn would be possible due to the variable nature of the resource extraction economy. The influx of construction workers would introduce a transient population. Induced effects of the increase in local employment might encourage the development of new businesses; employment decreases could have negative impacts on the community. |
| Recreation and tourism | Increased availability of local services might lead to the expansion of recreation and tourism in the area. An association of negative impacts from mining and milling on recreation and tourism has not been demonstrated. |
| Land use | The project site would be unavailable for recreational or range/grazing use during construction and the 40-year operational period. No changes in land use would be expected for existing uranium mines in the region, but operations might result in resumed production of some regional uranium mines that are on standby. |
| Visual and scenic resources | Construction would not significantly affect the viewshed from Davis Mesa or State Highway 90 (CO 90), and impacts would be temporary. Facility features would be noticeable to travellers on CO 90 but would not dominate the view of the casual observer; existing open-pit mine overburden piles, waste-rock dumps, mine buildings, and access roads currently draw attention from CO 90. Visual impacts would be most prominent later in the 40-year facility lifetime, when evaporation ponds would be completed to full capacity. |
| Transportation | Worker and heavy-truck traffic associated with facility construction and operations could affect area landowners and recreationists; average daily traffic on CO 90 and CO 141 would increase by 40% and 30%, respectively, during the peak quarter of construction. Ore deliveries, product shipments, and commuting workers would continue to contribute to an increase in traffic over baseline levels, but the impact would be much smaller than it is during construction. The CDOT does not consider the increased level of traffic to be large. The condition of certain unimproved roads could worsen from use by increased mill traffic. No significant radiological or nonradiological health impacts would be expected from routine transportation. |
| Cultural and paleontological resources | The project would not be expected to affect any historic properties, and it is expected that artifact surveys would continue as the facility was developed. There would be little potential for disturbance of known cultural sites or unanticipated discoveries during operations. No impacts on paleontological resources were identified. |
| Wastewater | Process water would be allowed to evaporate while salts precipitated to the bottom of the lined ponds. A large portion of tailings water would be recovered for reuse in the mill, and all gray water (from showers and sinks) would be recycled as process water. Makeup water would represent about 40% of total process flows. |

**TABLE 4.7-1 (Cont.)**

| Resource Area | Anticipated Impacts |
|---|---|
| Accidents | Transportation accidents involving uranium ore would not be likely to have an adverse impact on biota because of the relatively low toxicity and concentration of hazardous constituents in uranium ore. The primary impact on affected surface water bodies would be a short-term increase in turbidity and suspended solids. |

Source: CDPHE (2011d)

Federal coal leases, potential new leases, and private land within the Cameo Seam. At full production, the mine would be expected to produce 6 to 8 million tons per year; however, production would depend on market demand. The mine would be expected to operate continuously and employ 200 to 250 full-time employees. Within its first 5 years, the mine would be expected to produce up to 3 million tons per year. The life expectancy of the mine is 30 years (BLM 2009a).

The BLM has prepared a Draft EIS for the Book Cliff Mine (Red Cliff Mine 2012; BLM 2009a). Table 4.7-2 summarizes the potential impacts from the proposed Book Cliff Mine. If approved, the project would consist of portal conveyor transfer buildings, fuel oil storage/fueling stations, electrical transformers, a bathhouse/office building, outdoor material storage areas, an equipment shop, a warehouse, a wash bay, covered storage, a sewage treatment plant, a water tank and water treatment buildings, a mine vent fan, noncoal waste storage, rock dust storage, a unit train load-out area, a pump house, a maintenance road, a water pipeline and diversion line, coal storage piles, a coal preparation plant, and mine access roads and entry points. In addition, a 14-mi (22-km) dedicated transmission line and a 2-mi (3-km) railroad connection spur would also be constructed. It is anticipated that construction of the mine would last for 2 years, cost $160 million, and encompass 23,000 acres (9,300 ha) of land (BLM 2009a). Several other coal mines in the ROI for cumulative effects are closed or no longer producing. See Section 4.7.2.3 for more information on current coal-mining activities.

### 4.7.1.4 Uranium Mill Remediation

Multiple abandoned/decommissioned uranium mills are located within the ROI for cumulative effects. These sites were radiologically and/or chemically contaminated by milling, processing, research, and/or weapons manufacturing operations.

Title I of UMTRCA designated 22 inactive uranium ore-processing sites for remediation. Remediation of these sites resulted in the creation of 19 disposal cells that contain encapsulated uranium mill tailings and associated contaminated material. For these sites, DOE became a licensee to the NRC. Inspection, reporting, and record-keeping requirements are defined in 10 CFR Part 40.27, “General License for Custody and Long-Term Care of Residual Radioactive Material Disposal Sites.” All but one of the Title I disposal sites are under the general license. Four of these sites are within the ROI of the ULP lease tracts: the Naturita, Colorado, processing

**TABLE 4.7-2 Potential Environmental Impacts of the Proposed Book Cliff Mine**

| Resource Area | Anticipated Impacts |
|---|---|
| Air quality | Construction and operations could increase the amount of fugitive dust and nitrogen emissions, as well as GHG and $CO_2$ emissions. |
| Noise | During construction, an increase in loud noise from large vehicles and equipment and rock-blasting would be expected. Rock-blasting would be expected to last approximately 6 months and would be heard within a 1,250-ft (380-m) radius. During operations, noise would not be expected to reach residential areas; however, the new railroad spur would increase train noise, and residents in Mack would hear the train passing and its horn blowing at least eight times a day. |
| Geology and soils | Construction and operations could aggravate landslides and cause caving or sinkholes, lowering of the surface, and accelerated erosion. A reduction in the ability to recover oil and gas deposits might also occur. Construction and operations would make it difficult to revegetate the surface because of high soil salinity. Runoff from stock and waste piles could increase the corrosive properties of the soil. Mining would likely result in mixed soil horizons. |
| Water resources | Sediment erosion could disturb or reroute surface water flow or drainage and result in the discharge of untreated stormwater into streams. Groundwater could be affected by the seepage of water that contained salts and metals leached from waste rock. Impacts would be considered minimal if proper water treatment and storage practices were implemented. |
| Occupational health | Workers would have an increased risk of the following: inhalation of toxic dust; on-site traffic accidents; occupational accidents resulting from improper use of industrial equipment; exposure to prolonged noise and extreme temperature fluctuations (resulting in body stress); exposure to chemical leaks; falling rocks; roof falls; exposure to poor underground and aboveground air quality; injuries from rock-blasting; and diseases from inhaling bird and bat excrement. |
| Ecological resources | A total of 240 acres (96 ha) for the mine facility and 210 acres (86 ha) for underlying railroad would be cleared of vegetation. The mine would potentially affect 0.1 acre (0.04 ha) of jurisdictional wetland. Construction and operations would reduce habitat for a number of plant and animal species. Increased traffic might result in increased wildlife collisions and mortality. Increased sediment flow could affect spawning native fish species, such as the round-tailed chub and flannel-mouth sucker. Loss of individuals of several threatened and endangered species could occur; not all species were noted in the project area. If proper wildlife management practices are implemented, this impact would be minimal. |
| Grazing | Approximately 460 acres (190 ha) of livestock forage would be lost for the duration of the project. Additional grazing land could be lost, because shrubbery has an increased potential to catch fire from sparks caused by railroad transport. |
| Socioeconomics | Construction and operations would create new jobs, likely resulting in an increase in the size of the local population and a need for additional housing and community services. New businesses might start, and established businesses might expand, resulting in increased employment opportunities. Property values might decrease due to their proximity to the mine and/or ancillary facilities, but they might also increase depending on new development. The influx of business and people has the potential to reduce the "rural" way of life. Industrialization could increase due to the expansion of the railroad. Operations would increase local, state, and Federal revenues. |
| Land use | Agricultural land, grazing activities, recreational use, and wildlife habitat would be restricted or unavailable for the duration of the project (approximately 30 years). |

**TABLE 4.7-2 (Cont.)**

| Resource Area | Anticipated Impacts |
|---|---|
| Recreation | Construction of the water pipeline, transmission line, and railroad would temporarily limit access to recreational trails located within the North Fruita Desert SRMA and result in visual disturbance from unsightly construction equipment and project areas. Long-term impacts include restricted access to or the rerouting of recreational trails, the elimination of the mine area for recreational use, and visual disruption from transmission line, railroad, and water pipeline ROWs. |
| Visual and scenic resources | Surface disturbance as a result of unsightly construction areas and staging areas would be likely to occur and would be considered temporary. Night lighting during construction and operations would result in night sky disturbance. Construction and operations would result in the alteration of the landscape from mining facilities, the railroad spur, access roads, and the transmission line. |
| Transportation | During construction, traffic along Utah State Highway 139 and at projected railroad crossings might be temporarily obstructed or rerouted for up to 4 weeks. During operations, occasional delays would be anticipated at railroad crossings and near mine entrances or access roads. |
| Cultural resources and paleontology | There would be no direct impacts on cultural resources or traditional cultural properties within the mine footprint. Indirect impacts might occur as a result of the reconfiguration of OHV and recreational trails. Construction and operations would pose a high risk of uncovering or destroying paleontological resources. |
| Hazardous materials | Hazardous materials might result if toxic materials were uncovered or inadvertently produced during the mining process. |
| Utilities | Temporary power outages could occur during construction or maintenance of the transmission line. |

Source: BLM (2009a)

and disposal sites; the Slick Rock, Colorado, processing and disposal sites; the Grand Junction, Colorado, processing and disposal sites; and the Moab mill tailings site in Utah. A portion of the cell at the Grand Junction, Colorado, disposal site will be left open to receive additional contaminated materials; it is managed by DOE. The Moab mill tailings site is not yet under the DOE general license.

Uranium processing sites addressed by Title II of the UMTRCA were active when the act was passed. These sites were commercially owned and regulated under an NRC license. In later years, licensing and regulation of some of these sites transferred to the states, such as Colorado and Utah. After remediation is deemed complete, the Title II UMTRCA sites are transferred to DOE. DOE then administers Title II sites under the provisions of a general NRC license granted under 10 CFR Part 40.28, "General License for Custody and Long-Term Care of Uranium or Thorium Byproduct Materials Disposal Sites." Two of these sites are within the ROI of the ULP lease tracts: the Durita, Colorado, processing and disposal sites; and the Lisbon Valley, Utah, processing and disposal sites. These sites have not yet transferred to the DOE Office of Legacy Management (LM).

Three former mill sites are listed in the EPA Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)/Resource Conservation and Recovery Act (RCRA)

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 26 of 426

site database: Fry Canyon Mill, Utah; the Uravan Uranium Project (Union Carbide) in Uravan, Colorado; and the Monticello, Utah, disposal and processing sites. The BLM has determined that site remediation is necessary at the Fry Canyon Mill (near the Daneros Mine, outside the region of cumulative effects), but a time frame for CERCLA work is unknown. The Uravan Uranium Project site has undergone remediation. Transfer of the site to DOE is currently under discussion between the current owner and multiple county, state, and Federal agencies. Remediation at the Monticello sites was conducted by DOE. Ongoing activities include operation and maintenance of remedial action systems, routine inspection and maintenance, records-related activities, and stakeholder support.

#### 4.7.1.5 Reforestation Projects

In August 2009, the Narraguinnep and Bradfield wildfires destroyed nearly 7,500 acres (3,000 ha) of the San Juan National Forest, Mancos/Dolores District (CSFS 2009). The San Juan National Forest, Mancos/Dolores District, has proposed to reforest portions of the areas affected by the fire with ponderosa pine seedlings. Project implementation reportedly began in April 2012 (USDA 2011b).

In 2002, the Nizhoni Fire destroyed a ponderosa pine forest in San Juan County, north of Blanding. In 2010, the U.S. Department of Agriculture's (USDA's) Moab/Monticello Ranger District proposed to restore ponderosa pine over approximately 2,000 acres (810 ha). The prescribed burns can be used to create open areas and reduce vegetative fuels before manual planting. The project was approved in August 2011; its current status is unknown.

#### 4.7.1.6 Western Area Power Administration (WAPA) ROW Maintenance

In 2010, WAPA began developing a plan to proactively maintain 280 mi (450 km) of ROW and access to electrical structures and equipment located within the National Forest systems in Colorado, Utah, and Nebraska. Unmaintained ROWs pose dangers to the electrical line, surrounding environment, and people living in the area. Vegetation buildup in a ROW can prevent access to the line for repair or maintenance and makes the line more susceptible to damage from wildfires (WAPA 2012a,b).

The proposed plan outlines a phased approach to implement changes to the current program. The short-term phase proposes clearing ROWs of all tall tree species. The mid-term phase intends to manage threats from vegetation, such as the buildup of timber and brush, to structures and conductors. In the long term, WAPA plans to maintain ROWs to ensure the safety and reliability of electrical service. The plan will include a modified vegetation management program intended to comply with best practices and Federal regulations while allowing access to the electrical facilities for regular maintenance (WAPA 2012a,b).

BLM_0042600

#### 4.7.1.7  Construction of Agricultural Water Facilities (Ditch Bill Easements)

The Colorado Ditch Bill Act of 1986 (Public Law 99-545) authorizes the Secretary of Agriculture to issue permanent easements for water conveyance systems used for agricultural irrigation or livestock watering. Granting easements is not a USDA discretionary decision. An applicant meeting the criteria specified in the act is entitled to an easement, and the decision to grant it does not constitute a Federal action subject to NEPA review. However, conditions of the easement (including operations and maintenance) might require NEPA review (USDA 2012b). Similarly, the Moab and Monticello Ditch Bills authorize easements in Utah.

A number of Ditch Bill easement applications occurring within the Grand Mesa, Uncompahgre, San Juan, and Manti-La Sal National Forest administrative areas are currently in the scoping process or on hold (USDA 2012a,c,d). While the granting of the easement is nondiscretionary, a NEPA analysis is often done on a group of easement applications to document any environmental concerns; determine whether there is a need to establish discretionary terms and conditions in an operations and maintenance plan (OMP); and protect threatened, endangered, and sensitive species. The type and magnitude of impacts from Ditch Bill easements depend on the location and nature of the projects. In many cases, a site visit and site-specific impact analysis would be necessary. Impacts representative of those that could occur as a result of implementing terms and conditions on a Ditch Bill easement include beneficial actions to improve resource conditions and habitat in easement areas (e.g., the stabilization of ground to prevent erosion and reduce sedimentation in downstream habitats, the control of noxious weeds, and the protection of cultural resources). Establishment of an OMP would not result in incremental adverse impacts (USDA 2009b).

#### 4.7.1.8  Other Future Projects

Other proposed or planned activities with the potential to contribute to cumulative impacts relate to utility corridors and ROW maintenance, water use and management, grazing and grazing management, wildlife management, and other land and resource management activities. For some of these activities, an environmental assessment may not yet have been completed, so the environmental impacts have not been quantified.

- Closure and reclamation of the abandoned Vision uranium mine (USDA 2012d);

- Closure and reclamation of abandoned coal and uranium mines;

- Continued aerial application of fire retardant on National Forest Service lands (USDA 2011b,d);

- Management of gypsy moths, spruce beetles, and other insects (USDA 2008, 2012a,c);

BLM_0042601

- Changes in reservoir operation to help meet flow recommendations for the Gunnison and Colorado Rivers (Montrose County) (DOI 2012);
- Management of existing and proposed utility corridors, gathering pipelines, and ROWs;
- Wild horse management, wildlife habitat improvement, and wildlife conservation (various counties);
- Vegetation and forest (fuels) management (USDA 2011b, 2012c) (likely to continue on BLM lands);
- Timber sales and fuels management (ongoing and planned projects in various counties) (USDA 2011b; BLM 2012c; USFS and BLM 2013);
- Dolores River restoration treatments (BLM 2012a);
- Exploratory geophysical seismic surveys, including drilling and detonation of explosives underground;
- Final San Juan National Forest and Proposed Tres Rios Field Office Land and Resource Management Plan (USFS and BLM 2013);
- San Juan National Forest Oil and Gas Leasing Availability (Record of Decision published in September 2013)—the environmental analysis for this decision is captured in USFS and BLM (2013);
- BLM Uncompahgre Resource Management Plan Revision (initiated in February 2010);
- Master Leasing Plan and Amendments to the BLM Moab and Monticello Resource Management Plans (initiated in March 2012; necessary in order to consider new leasing of oil/gas and potash projects on public lands);
- Boggy-Glade Travel Management Plan (public comment period in progress; implements a new travel management rule and designates routes for motorized travel in Boggy Draw and the Glade in Dolores and Montezuma Counties);
- Ridgway Comprehensive Travel Management Plan;
- Resource Management Plan Amendment for Mancos-Cortez Travel Management Plan; and
- The BLM Grand Junction Field Office is in the process of revising its Resource Management Plan to guide management of about 1 million acres

BLM_0042602

[400,000 ha] of public land it administers. The Final Resource Management Plan and ROD are expected in 2014.

## 4.7.2 Present and Ongoing (Past) Actions

The following sections describe present and ongoing actions within the ROI for cumulative effects. Some of the actions described are past actions that are either ongoing or have the potential to become active in the foreseeable future.

### 4.7.2.1 White Mesa Mill

The White Mesa Mill, located 6 mi (10 km) south of Blanding, Utah, is the only conventional uranium mill currently operating in the United States. The mill precipitates uranium oxide concentrate (yellowcake) and vanadium oxide concentrate from the processed ore. It is licensed to process 2,000 tons of ore per day and produce 8 million lb (3.6 million kg) of uranium oxide per year. The mill is also licensed to process and reclaim uranium from alternative feed materials, including uranium-bearing waste materials derived from uranium conversion, metal processing facilities, and U.S. Government cleanup projects. The mill began processing conventional ore in 2011, after years of processing only alternative feeds (Denison 2012a). In 2011, the mill produced approximately 1.0 million lb (0.45 million kg) of uranium oxide and 1.3 million lb (0.6 million kg) of vanadium oxide (Denison 2012b; EIA 2010). Cotter Corporation has begun to ship unprocessed, stockpiled ore from its Canon City Mill to the White Mesa Mill, where it will be processed. Cotter Corporation has estimated that the shipping of this ore will continue until approximately March 31, 2013. This ore had been originally shipped, in 2005 and 2006, from ULP lease tracts (Williams 2012).

The mill was originally licensed by the NRC to Energy Fuels Nuclear, Inc., in 1980; the license was renewed in 10-year increments in 1987 and 1997. The State of Utah assumed regulatory oversight in 2004, and the license was reissued in 2005. Denison Mines assumed ownership of the mill in 2006 and submitted an application in 2007 for renewal of the state license (UDEQ 2012a; Denison 2012a). Denison possesses 15 license amendments allowing the mill to process 18 different alternative feeds (Denison 2012b). At full capacity, the mill employs about 150 people (Denison 2012a). In April 2012, Energy Fuels Resources Corporation and Denison Mines announced that all of Denison's mining assets in the United States (including the White Mesa Mill) will be acquired by Energy Fuels Resources Corporation (UDEQ 2012b).

Three other uranium mills exist in the United States; all were on standby at the end of 2010 (EIA 2012).

Table 4.7-3 summarizes the potential environmental impacts from operation of the White Mesa Mill.

**TABLE 4.7-3 Potential Environmental Impacts from Operation of the White Mesa Mill**

| Resource Area | Anticipated Impacts |
|---|---|
| Air quality | Discharge of air pollutants during operations would be minor, and the effects would be negligible. The concentration of particulates, $SO_2$, and $NO_x$ at the site boundary would be below air quality standards. |
| Noise | No information was available. |
| Geology and soils | Soils in the project vicinity are normally subject to erosion due to their lack of consolidation and poor vegetative cover. Construction and operations of the mill would accelerate wind and water erosion. Total off-site sediment transfer would be reduced as a result of the project. |
| Surface water | There would be a minimal impact on surface water resources; there would be no discharge of mill effluents or sanitary wastes on surface waters. |
| Groundwater | Approximately 480 ac-ft (160 million gal) per year of groundwater would be drawn from the Navajo aquifer, with no expected effect on the aquifer or other users; the permit allows up to 810 ac-ft (260 million gal) per year. The possibility of groundwater degradation is expected to be remote due to the elimination of seepage (by multicomponent lining of tailings cells) and the high net evaporation rate in the area. |
| Public health – radiological | Background radiation levels in the area of the mill would increase as a result of continuous but small releases of radioactive material (including uranium, radium, and radon) during operations. The calculated dose at the nearest potential residence in the direction of prevailing winds (4.0 mi or 6.4 km in 1979) from inhalation, external exposure, and consumption of contaminated food products would be 5.8 mrem/yr. The calculated collective dose to the population within 50 mi (80 km) would be 3.4 person-rem/yr (compared to 7,500 person-rem/yr from natural background). Calculated individual public doses are a small fraction of NRC limits in unrestricted areas. The combined occupational exposure for most workers would be expected to be less than 25% of applicable Federal limits. |
| Ecological resources | Construction and operations of the mill would result in a loss of habitat for terrestrial biota (vegetation, foraging for wildlife), but it is expected that the loss would be small and should not significantly reduce the amount of habitat for regional species because of the availability of similar rangeland throughout the region. Impacts from suspended PM would be expected to be negligible. Construction noise and increased human activity might cause wildlife to migrate away from the project vicinity. The fence around the tailings impoundment would exclude large animals, and the acidity/salinity of the water would make it unattractive to waterfowl. No impacts on endangered plant or animal species would be expected. |
| Socioeconomics | Construction and operations would be expected to employ up to 250 (peak) and 85 workers, respectively. A total population increase of 1,500 to 2,000 would be anticipated (due to milling and associated mining operations, including direct and non-basic-sector jobs), along with increased commercial and residential development in neighboring communities. New housing units would be in demand. |
| Land use | A total of 480 acres (200 ha) would be altered for the mill, tailings area, and roads. The 330-acre (140-ha) tailings area might be unavailable for further productive use when the mill area is reclaimed after operations cease, but the land might be returned to former grazing use after radiation levels are reduced to acceptable levels. Land use in surrounding areas might be affected; for example, land might be used for increased residential and commercial development to serve the mill-related population growth or mineral extraction in the vicinity. |
| Visual and scenic resources | Stack emissions would be visible to the public travelling on US 163, but they would not be expected to be visible from major recreational areas in the vicinity. |

**TABLE 4.7-3  (Cont.)**

| Resource Area | Anticipated Impacts |
|---|---|
| Transportation | Traffic volume on area highways would increase substantially (due to mill employees, new mine employees, new workers in the non-basic sector, and heavy-truck traffic), increasing traffic congestion. Approximately 250 and 125 workers per day would commute to and from the facility during the peak construction period and peak operational period, respectively. |
| Cultural and paleontological resources | Six historical sites were identified by the survey; of the five eligible for inclusion in the NRHP, one would be adversely affected by the mill and would require mitigation. No impacts on paleontological resources were identified. |
| Waste and wastewater | A total of 2,000 tons per day of waste material (tailings) would be produced for on-site deposition. Process water (310 gal or 1,200 L per minute) would be discharged to the tailings impoundment. There would be no discharge of liquid or solid effluents from the mill/tailings site. |
| Accidents | Accidents related to mill activities might include trivial incidents (not resulting in radiological release), small and large radiological releases (in comparison to annual releases from normal operation), nonradiological accidents, and transportation accidents. No health impacts on the off-site public would be expected as a result of postulated radiological or nonradiological accidents and most mill-related transportation accidents. |

Source: NRC (1979)

### 4.7.2.2  Uranium Mining

The Uravan Mineral Belt is the oldest uranium mining area in the United States. Although there was no uranium ore production in Colorado from 2009 through 2011 and uranium prospecting activities in general are down, there have been some mining- and reclamation-related activities in the region (e.g., development of environmental protection plans). There are currently 31 actively permitted uranium mines in southwestern Colorado (CDRMS 2012f). The following sections present information on the status of mining projects within the ROI for cumulative effects.

**4.7.2.2.1  Daneros Mine.** The Daneros project, a conventional underground mine initially proposed by Utah Energy Corporation in 2008, is located in Bullseye Canyon in San Juan County, Utah. The BLM issued final approval for the mine permit in May 2009 for 7 years of mine operation. Expected to produce 500,000 lb (23,000 kg) of uranium oxide per year for processing at the White Mesa Mill, the Daneros Mine is the state's first new uranium mine in 30 years. The mine is expected to employ 8 to 11 employees, working two shifts (BLM 2009b). The mine was acquired by Denison Mines through its acquisition of White Canyon Uranium Ltd. in 2011 and was later acquired by Energy Fuels Resources Inc. through its acquisition of Denison's U.S. assets in 2012.

Anticipated adverse environmental impacts associated with the mine project include altered visual resources, dust generation from mining and transportation, particulate and criteria pollutant emissions from fossil fuel combustion, radioactive dust and gas emissions, soil

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 32 of 426

disturbance and vegetation clearing, displacement of desert bighorn sheep and the degradation of their habitat, health impacts on mine workers and the general public related to radiation exposure and transportation, and decreases in recreation and tourism-related recreation. None of these impacts are considered significant. No significant cultural resources were identified in the area of potential effects, and no historic properties would be affected. The project would require 5,000 gal (19,000 L) per day of well water for mining and dust suppression and would not be expected to affect existing water rights in Bullseye Canyon. Additional traffic from mining operations would not have a noticeable impact on local roads (BLM 2009b). Table 4.7-4 summarizes the potential environmental impacts from the Daneros Mine.

The Daneros Mine was placed on standby status in October 2012 (Energy Fuels 2013a). In March 2013, Energy Fuels Resources Inc. submitted an NOI to revise operations at the Daneros Mine. Plans include the maximum possible expansion of the project over the life of the mine (Filas 2013).

**4.7.2.2.2 La Sal Mines Complex.** Denison's La Sal Mines complex is a collection of four separate, existing underground uranium mines (Pandora, La Sal, Snowball, and Beaver Shaft) in the vicinity of La Sal, Utah (San Juan County). The complex began operations in the 1970s and is part of a series of underground mines previously operated by Atlas Minerals and Umetco Minerals Corporation. Surface facilities are located on both private and public lands administered or managed by the BLM, USDA (USFS), and State of Utah (CDM 2010). In 2012, the complex was one of two actively producing mines in the state (Edge Environmental, Inc. 2009; UDNR 2012). Ore produced at the complex was shipped to Denison's White Mesa Mill for processing. Denison submitted a request in 2010 to amend its plan of operations to include expansion of the Pandora Mine, further exploration activities within the complex, and the drilling of vent holes on private and public land; these activities were expected to take place in three phases between 2011 and 2030. The La Sal Mines complex was acquired by Energy Fuels Resources Inc. in 2012 through its acquisition of Denison's U.S. assets.

The La Sal Mines Complex is currently on standby status (Energy Fuels 2013b).

**4.7.2.2.3 Whirlwind Mine.** Energy Fuels Resources Corporation's Whirlwind Mine is located 5 mi (8 km) southwest of Gateway in Mesa County, in the Gateway Mining District and spanning the Colorado/Utah border. The mine is composed of two formerly closed uranium-vanadium mines, the Urantah Decline and Packrat Mines. The mining claim block encompasses 4,900 acres (2,000 ha), but the mine is underground and is permitted for 24 acres (10 ha) of surface disturbance. Surface facilities include two portal areas containing waste-rock stockpiles, topsoil stockpiles, a water treatment plant, fuel and oil storage areas, support buildings, monitoring areas, ventilation shafts, and power drops (BLM 2008b).

BLM completed an environmental assessment for the proposed Whirlwind Mine project in 2008; upon finding no significant impact on the surrounding area, the BLM authorized restoration of the mine and the resumption of ore production. Energy Fuels completed

BLM_0042606

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 33 of 426

**TABLE 4.7-4 Potential Environmental Impacts of the Daneros Mine**

| Resource Area | Anticipated Impacts |
|---|---|
| Air quality | Impacts from mine development could include dust generation, diesel exhaust, the release of GHGs, and the release of radioactive dust and gases from truck travel on unimproved roads. Radon emissions from mine shafts could result in minor air quality impacts, but the low amount of radon would not pose a health risk. With mitigation, operations would not result in the exceedance of NAAQS; air quality impacts would be minor and would not violate state or Federal standards. |
| Noise | No noise impacts were identified. |
| Geology and soils | No geology or soil impacts were identified. |
| Water resources | Operations would not affect surface water quality. Operations would require 5,000 gal (19,000 L) per day for mining and dust suppression, eventually drawn from a well in the Cutler White Rim aquifer. No drawdown is expected, and existing water rights would not be affected. |
| Human health | Public health impacts from radiation exposure and transportation are expected to be minimal. Radon emissions would quickly disperse, resulting in impacts on the general public much lower than the dose limit of 10 mrem/yr set in 40 CFR Part 61 for airborne emissions. A post-operation exposure rate of less than 1 mrem/yr is estimated for a recreationist camping on top of the reclaimed waste-rock pile with a soil cover material of 6 in. (15 cm) or more for 14 days. |
| Socioeconomics and environmental justice | No socioeconomic or environmental justice impacts were identified. |
| Ecological resources | Increased human activity, traffic, and noise and the removal of habitat might displace the desert bighorn sheep (or disrupt their normal movement patterns) during the life of the project. |
| Land use | Access to the mine site would be restricted during the life of mine operations for public safety purposes. After operations, the public would have access to the reclaimed waste-rock pile. |
| Recreation | No recreational impacts were identified. |
| Visual and scenic resources | No visual and scenic impacts were identified. |
| Transportation | The increased truck traffic from operations (16 round trips per day) would not have a noticeable impact on the level of service for local roads and would not measurably affect traffic flow/patterns. The risk of accidents is expected to be minimal. |
| Cultural resources, Native American concerns, and paleontology | No impacts on cultural or paleontological resources were identified. |
| Hazardous materials | No hazardous materials impacts were identified. |

Source: BLM (2009b)

BLM_0042607

construction of the mine in 2009 but announced late that year that the mine would be put into maintenance status (BLM 2008b; Energy Fuels 2012c; CDNR 2011).

The Whirlwind Mine is one of two mines expected to provide ore to the proposed Piñon Ridge Mill (Edge Environmental, Inc. 2009; CDPHE 2011d). Ore could also be transported to the White Mesa Mill for processing. If reopened and operating at full capacity, the mine would employ 24 workers covering three 8-hour shifts, 5 days per week. Using the room and pillar mining technique, initial ore production is expected to reach 100 tons per day, increasing to 200 tons per day as market demand increases. Life expectancy of the mine is 10 years (BLM 2008b; Energy Fuels 2012c).

Table 4.7-5 summarizes the potential environmental impacts from the Whirlwind Mine.

**4.7.2.2.4 Energy Queen Mine.** The Energy Queen Mine (formerly known as the Hecla Shaft) is located in the La Sal Mineral Belt, approximately 3 mi (4.8 km) west of La Sal, Utah. The mine was originally owned as a joint venture of Hecla Mining Company and Union Carbide (Umetco Minerals Corporation), operating from 1979 to 1983, when it was closed due to a decline in uranium prices. Ownership of the mine was transferred to Energy Fuels Resources Corporation in 2006; land and mineral rights are privately owned. In 2007, Energy Fuels Resources Corporation began acquiring adjacent and nearby land for exploratory drilling and potential expansion (Peters 2011).

In 2009, Energy Queen Mine was fully permitted by the Utah Division of Oil, Gas, and Mining and San Juan County. The mine shaft is currently flooded, and plans are being evaluated to dewater it. In addition, mining facilities, surface facilities, and equipment are currently being evaluated. The existing water treatment plant and settling ponds will need to be replaced prior to reopening the mine. Energy Fuels estimates a 12-month turnaround for mine rehabilitation, from dewatering to full production. The mine is expected to produce approximately 200 tons or more of uranium/vanadium ore per day (Peters 2011; Energy Fuels 2012b).

Energy Queen Mine is one of the mines expected to provide ore to the proposed Piñon Ridge Mill (CDPHE 2011d). Although the environmental impacts of each uranium mining project would vary, descriptions of the potential environmental impacts of a uranium mine can be found in Sections 4.7.2.2.1 and 4.7.2.2.3.

**4.7.2.2.5 Sunday Mines.** The Sunday Mines are underground uranium and vanadium mines located in Big Gypsum Valley, southwest of the town of Naturita, in San Miguel County, Colorado. The Sunday Mines consist of five operating mines: the Topaz; Sunday; West Sunday; Carnation; and St. Jude Mines. Denison Mines (USA) Corp. currently holds claim rights and permitting responsibility for the Sunday Mines. The mines were permitted with the CDRMS in 1978, as required, but historical evidence shows they may have existed as early as the 1950s. Operations at the Sunday Mines include underground mining operations, waste-rock placement, temporary ore storage, transportation of ore to the White Mesa Mill, water supply and use, chemical storage, dust control, and light equipment maintenance.

BLM_0042608

**TABLE 4.7-5 Potential Environmental Impacts of the Whirlwind Mine**

| Resource Area | Anticipated Impacts |
|---|---|
| Air quality | Construction and operations could increase the amount of fugitive dust in the area; however, air quality is not expected to exceed ambient air quality standards. The potential for radon exposure in enclosed spaces exists but is considered minimal. |
| Noise | An increase in noise is expected from mining operations, including the use of ventilation fans and generators, large construction and mining equipment, and rock blasting. A slight increase in traffic-related noise is expected three times a day. Noise is not expected to exceed 50 dB outside the established noise boundary. |
| Geology and soils | The mine would deplete the uranium ore deposit and increase waste rock. Approximately 24 acres (10 ha) of topsoil would be disturbed and saved for reclamation. The potential exists for topsoil to mix with waste rock, ore, or soil containing other minerals, which could affect reclamation efforts at the end of the project. |
| Water resources | Groundwater could be affected by the seepage of water from waste rock. Construction of mines and shafts/vents/drill holes might affect aquifers, increase mineral contamination, and mix water sources between aquifers. Sediment erosion could disturb or reroute surface water flow or drainage and result in the discharge of untreated stormwater into streams. Fuel, chemical, or ore spills could affect both surface water and groundwater. Impacts will be minimal to negligible if proper water treatment, transport, and storage practices are implemented. |
| Human health | With proper implementation of EPA guidelines and MSHA regulations, potential impacts on the health of the general public are expected to be lower than the 10 mrem/yr dose limit set in 40 CFR Part 61 Subpart B for airborne emissions. |
| Socioeconomics and environmental justice | Operations would create 10 to 24 full-time, year-round jobs, with most positions expected to be filled by local hires. No significant impacts on housing/infrastructure or community services are expected. Operations would result in increased local, state, and Federal revenues. An increase in indirect income for local businesses is likely. Property taxes could increase depending on development that occurs as a result of mine operations. No environmental justice impacts were identified. |
| Ecological resources | Approximately 24 acres (10 ha) of plant (mostly piñon) and animal habitat will be disturbed, resulting in a minimal reduction in habitat and food supply. Soil disturbance, foot traffic, and mining equipment could spread invasive plants and noxious weeds; the impact would be minimal if a proper vegetation management plan is implemented. Fuel, chemical, or ore spills could affect floodplain areas. Increased vehicle traffic might result in wildlife collisions and mortality. Big game animals may need to exert more energy during winter months to avoid vehicle traffic, construction equipment, and mine operations, which could be detrimental to their survival. Ore or chemical spillage, water depletion, unexpected water releases, and increased sediment flow could affect water flow or contaminate streams and harm aquatic species. Potential impacts on the habitat and food resources of threatened, endangered, and sensitive species could occur, although only four sensitive species were noted in the area. Habitats of these species could be directly affected by operations, fugitive dust, increased traffic, and dust abatement methods. Wild turkeys, chuckers, black-throated gray warblers, Virginia's warblers, and peregrine falcons were noted in the area, but minimal impacts are anticipated. Impacts would be minimal to negligible if proper management practices are implemented. No impacts were identified for wilderness areas, wild and scenic rivers, and farmlands. |

**TABLE 4.7-5 (Cont.)**

| Resource Area | Anticipated Impacts |
|---|---|
| Grazing | There would be no significant impact on the two AUMs located within the two grazing allotments within the project area. |
| Land use | Night lights and noise may disturb the landowner to the northwest. |
| Recreation | An increase in the number of ore-hauling trucks might delay the arrival of recreationists at hiking and biking trailheads. Accidents between ore-hauling trucks and bicyclists and motorcyclists could occur. |
| Visual and scenic resources | The mine can be seen from points of interest, such as the Palisade WSA and the La Sal Mountains and foothills; however, the mine does not dominate the view of the casual viewer. |
| Transportation | Increased traffic is expected on local roads. Increases of 14 light-duty vehicle round trips and 9 heavy-duty vehicle round trips are expected per day. |
| Cultural resources, Native American concerns, and paleontology | No impacts on cultural resources or traditional cultural properties were identified. However, the potential to discover or damage buried deposits that are not readily identifiable does exist. There is also some potential for discovering or damaging vertebrate fossils within the Morrison Formation located within the mine. |
| Hazardous materials | As a result of a chemical, fuel, or oil spill, impacts could occur on a variety of resources. |

Source: BLM (2008b)

BLM released an EA for the Sunday Mines in 2008; BLM is further analyzing this action in an EA. The assessment proposed expanding the Topaz Mine and adding vent holes and exploratory drilling at the Sunday Mines. Denison estimated that a maximum of 72,000 tons of ore would be produced annually from the Topaz Mine. Denison was unable to estimate the locations of the vent holes, but it did estimate that there would be no more than 60 exploration holes unreclaimed at any time, resulting in a maximum surface disturbance of 10 acres (4.0 ha) (BLM 2008c). The Sunday Mines were acquired by Energy Fuels Resources Corporation in 2012 through its acquisition of Denison's U.S. assets.

Although environmental impacts would vary for each uranium mining project, descriptions of the potential environmental impacts of a uranium mine can be found in Sections 4.7.2.2.1 and 4.7.2.2.3.

**4.7.2.2.6 Other Uranium Mining and Uranium Exploration.** The Uravan Mineral Belt in western Colorado includes an estimated 1,200 historic mines, with production dating back to 1898 (1948 for uranium). Total uranium ore production in Colorado was estimated to be more than 255,000 lb (116,000 kg) in 2005, all originating from Cotter Corporation mines in the Uravan Mineral Belt near Nucla and Naturita. The Cotter Corporation JD-7 open-pit mine is adjacent to the Piñon Ridge Mill site. The Cotter Corporation mines ceased production in November 2005, partly due to high energy costs and the high cost of transporting ore to Cañon

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 37 of 426

City for milling (the JD-7 open-pit mine had not started production). As of December 2011, Cotter Corporation was not seeking to renew its radioactive materials license for the Cañon City mill and had initiated closure of the facility (CDNR 2012).

Denison's Sunday Mines began producing uranium in San Miguel County in 2007; ore from these mines was shipped to the White Mesa Mill in Blanding. Production at these mines ceased in 2009 due to declining uranium prices, but the BLM's Tres Rios Field Office is currently preparing an environmental assessment for reopening the complex. Limited uranium production began at Bluerock Energy's J-Bird Mine in Montrose County in 2008, but production ceased when the mine was transferred to Rimrock Exploration and Development. The mine remains in maintenance status, and no production is anticipated in the immediate future (CDNR 2011). Bluerock sought approval of a plan of operation for Cone Mountain Mine (south of Gateway) but the company ceased development activity later in the same year (Argus 2008a,b). The Prince Albert (Rimrock), Last Chance (Nuvemco), and Return (Beck) Mines may have had limited production for test purposes within the last 4 years.

There are 31 actively permitted uranium mine projects in southwestern Colorado, and one new permit is under review. No uranium production was reported from 2009 to 2011, and none of the actively permitted mine projects is producing as of October 2012; 24 are in maintenance status, seven are being (or have been) reclaimed, and two are involved in development activities. In September 2011, all uranium operators were notified of the requirement to submit an environmental protection plan, file for an exemption, or commence final site reclamation by October 2012 (CDNR 2012).

There are 12 permitted uranium mines in Utah; only 2 of the 12 (Daneros and La Sal) are actively producing (UDNR 2012). Several former underground uranium mines are located in the Red Canyon watershed (near the operating Daneros Mine) and other areas of the state that are outside the ROI for cumulative effects. Small, remote mining operations that have not been reclaimed are not considered to be a significant human health hazard; the impacts on wildlife are minor; and low precipitation levels make it unlikely that hazardous concentrations of radioactive minerals and other compounds would significantly affect local watershed characteristics (BLM 2009b).

Although environmental impacts would vary for each uranium mining project, descriptions of the potential environmental impacts of a uranium mine can be found in Sections 4.7.2.2.1 and 4.7.2.2.3.

Pre-mining exploration and mine sampling work is ongoing on BLM permits and claims. Uranium exploration (i.e., drilling) activities are generally short term and are not expected to have direct or cumulative significant environmental or public health effects, provided there are no extraordinary circumstances nearby (e.g., the presence of Federally listed threatened and endangered species in the vicinity of the project area; the presence of floodplains or wetlands in the project area that would be affected; the presence of WA, WSA, or National Recreation Areas near the project area; or the presence of Native American religious or cultural sites, archaeological sites, or historic properties within the project area) (USDA 2011a). Uranium

BLM_0042611

exploration activities typically involve few workers, low traffic volumes, and no emissions (Edge Environmental, Inc. 2009).

**4.7.2.2.7 Exploration and Reclamation Activities on the ULP Lease Tracts between 2009 and 2011.** Between 2009 and 2011, DOE approved the implementation of various exploration and reclamation activities on several lease tracts. Exploration plans were approved for Lease Tracts 13A, 15A, 17, 21, 24, 25, and 26 and were implemented for all these lease tracts except for 15A and 17 (see Table 4.7-6). Most exploration plans called for the drilling of one exploratory hole. However, one plan called for the drilling of two holes (on Lease Tract 21), one plan called for six holes (on Lease Tract 26), and one plan called for eight holes (on Lease Tract 24). The equipment used for exploration activities was typically a truck-mounted rotary drill, a bulldozer, a probe truck and support truck, and a small track-hoe. During exploration activities, groundwater was not encountered; however, most plans included a rigid-frame water and pipe truck to be on site for use if needed. The drill sites were accessed by overland travel along designated routes on existing roads. Improvements to existing roads were made to the extent necessary to allow proper access for the required equipment. In one case (for the exploratory activities on Lease Tract 26), a new road was required. The new road was 30 × 100 ft (9.1 × 30 m) and led from an existing road to the drill site. The estimated surface disturbance area for these activities was less than 1 acre (0.4 ha) in all cases. After exploration activities were completed, the areas were reclaimed in accordance with CDRMS regulations. Drill cuttings were returned to the borehole first to a depth of 5 or 7 ft (1.5 or 2.1 m). Polyurethane foam or concrete was used to fill the next 3 or 5 ft (0.9 or 1.5 m), and the remaining 2 ft (0.6 m) was filled with native soil. The site was graded to blend with the surrounding natural topography and reseeded with an approved mixture of native plant species.

A mine re-entry plan was also implemented for Lease Tract 26. The existing mine was accessed by foot, and the bulkhead of the mine was broken up by using hand tools. The area inside the mine was carefully tested for hazardous air constituents before workers entered the mine. After completion of the mine inspection, the mine was re-secured. The bulkhead was replaced with similar materials and secured with a metal gate with a lock that was installed.

Various reclamation plans were submitted for disturbed areas located on Lease Tracts 5, 6, 7, 10, 11, 11A, 12, 13, 16, 16A, 17, 19, 19A, 20, 21, 22, 22A, 23, 26, and 27 (see Table 4.7-7). Plans for reclamation included mining-related features, such as open drill holes and vents, land subsidence features, and abandoned mine portals and adits. Reclamation plans for subsidence features typically included digging out the subsidence, refilling it with available surface soil materials, recontouring it, and reseeding it with an approved seed mixture. Other lease tracts had features, such as surface pits and trenches, that would be reclaimed in the same manner as would the subsidence features.

Plans to reclaim open drill holes and vents involved filling the hole with a polyurethane plug, covering it with surface soil materials, and reseeding it with an approved seed mixture. Abandoned mine portal openings and adits would be reclaimed by closing the portal with large rocks and then backfilling it with available materials from the mine waste-rock dump. The remaining mine waste rock would then be recontoured to blend with the natural topography. The

**TABLE 4.7-6 Summary of Exploration Plans for the ULP Lease Tracts**

| Lease Tract | Proposal | Trucks and Equipment | Site Access | Workers | Water Estimate | Surface Disturbance | Reference |
|---|---|---|---|---|---|---|---|
| 26 | Drill six holes | A truck-mounted rotary drill rig, probe truck, pickup trucks, small track-hoe, and/or skid-steer loader | Access to five of the drill holes was by existing roads, and access to one hole required about 100 × 30 ft (30 × 9.1 m) of new road construction | No information available | There is no mention of water use estimates in documents. There is no surface water near the sites, and no groundwater was in the formations to be penetrated. | More than 0.3 acre (0.1 ha) | DOE 2009a |
| 26 | Access the New Verde mine through the bulkhead, evaluate mine, close mine | Workers would use hand tools (hammers, mallets) to break out the bulkhead and enter the mine. Respirators would be used, if necessary. | Access to the portal site was by overland travel on existing roads: a former mine access road and on public roads | About four workers were needed. A health and safety person was a crew member to monitor conditions in the mine before workers entered. | | No surface-disturbing activities will be conducted. | DOE 2010c |
| 25 | Drill one hole | Truck-mounted rotary drill rig, rigid-frame water and/or rod truck, pickup trucks | Drill site was accessed via existing dirt road. The drill holes required overland travel of 100 ft (30 m) between the county road and drill hole site. | No information available | No water was encountered during drilling. The nearest perennial stream was the San Miguel River, located about 1.5 mi (2.4 km) to the northeast. | Approximately 10 × 10 ft (3 × 3 m) or 0.002 acre (0.0008 ha) | DOE 2009i |
| 24 | Drill eight holes | Truck-mounted rotary or hammer drill rig, probe truck, pickup trucks, small track-hoe, and/or skidsteer loader | Drill sites were accessed via existing soil and rock surface. No surfacing actions were required, but one small tree was removed for access purposes. | An estimated three to four workers and oversight personnel were required for this project. | Groundwater was not encountered during any of the drilling. There was no surface water within 1mi (1.6 km) of any of the drill hole locations. | Approximately 0.5 acre (0.2 ha) | DOE 2009h |
| 21 | Drill two holes | Small, truck-mounted rotary drill rig; rigid-frame water and/or rod truck (single or dual rear axles) if needed; support vehicle for drilling crew (3/4 ton, 4×4 pickup truck or equivalent) | No new roads were constructed; all drill sites were accessed by overland travel along designated routes. Existing roads were improved only to the extent necessary to allow proper access to the required equipment. | No information available | The proposed drilling is expected to be dry. There are no bodies of water on or near the area of exploration activity. The nearest perennial stream is the San Miguel River, located 3.5 mi (5.6 km) to the northeast. | Estimated to be 0.002 acre (0.0008 ha) per drill hole | DOE 2009b |

**TABLE 4.7-6 (Cont.)**

| Lease Tract | Proposal | Trucks and Equipment | Site Access | Workers | Water Estimate | Surface Disturbance | Reference |
|---|---|---|---|---|---|---|---|
| 13A | Drill one hole | Small, truck-mounted rotary drill rig; rigid-frame water and/or rod truck; pickup truck support vehicle; water truck if needed | No new roads were constructed; all drill sites were accessed by about 75 ft (23 m) of overland travel along designated routes. Existing roads were improved only to the extent necessary to allow proper access to the required equipment. | No information available | No groundwater was encountered during drilling. It was not anticipated that water would be required during the drilling or plugging process. The nearest perennial stream is the Dolores River, located 1 mi (1.6 km) to the southwest. | More than 0.5 acre (0.2 ha) | DOE 2009c |
| 17 | Drill one hole (presently suspended) | Bull dozer (small CAT-4 equivalent) or small tire-mounted backhoe and loader; truck-mounted rotary drill rig; probe truck (3/4 or 1 ton) and support truck (1/2 or 3/4 ton); rigid-frame water and pipe truck (single or dual rear axles) if needed | Drill site will be accessed by existing roads. Minor road improvements may be needed in a few rough spots. | No information available | There are no water bodies on or near the exploration site. No groundwater is expected to be encountered during drilling. Historical data indicate that the hole will be dry. The nearest perennial stream is the Dolores River, located about 2 mi (3 km) to the west. | Less than 1 acre (0.4 ha) | DOE 2010b |
| 15A | Drill one hole (presently suspended) | Bulldozer (small CAT-4 equivalent) or small tire-mounted backhoe and loader; truck-mounted rotary drill rig; probe truck (3/4 or 1 ton) and support truck (1/2 or 3/4 ton); rigid-frame water and pipe truck (single or dual rear axles) if needed | Drill site will be accessed by existing dirt roads. | No information available. | There are no water bodies on or near the exploration site. No groundwater is expected to be encountered during drilling. Historical data indicate that the hole will be dry. The nearest perennial stream is the Dolores River, located 1 mi (1.6 km) to the east. | Less than 1 acre (0.4 ha) | DOE 2010a |

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 41 of 426

**TABLE 4.7-7 Summary of Reclamation Plans Implemented in 2009 to 2011 for the ULP Lease Tracts**

| Lease Tract No. | Description of Reclamation Work | Reference |
|---|---|---|
| 5 | Open drill holes located throughout the lease tract were permanently closed with polyurethane foam plugs, covered with surface soil materials, and reseeded. | DOE 2009e |
| 6 | Numerous open drill holes located throughout the lease tract were closed with a polyurethane foam plug, covered with surface soil materials, and reseeded. | DOE 2010d |
| 7 | The adit was backfilled with on-site materials (large rocks and mine waste rock), finished to the desired grade with common borrow surface materials, and reseeded. | DOE 2010e |
| | The vents associated with the mine were closed with a polyurethane foam plug, covered with surface soil materials, and reseeded. | |
| 10 | Six adits were permanently closed and backfilled with mine waste-rock materials and gated to conserve potential bat habitat. Mine waste-rock dumps were recontoured to blend in with the natural topography. The area was covered with surface soil materials and reseeded. | DOE 2009g |
| | The portal was permanently closed and backfilled with mine waste-rock materials. Mine waste-rock dumps were recontoured to blend in with the natural topography. The area was covered with surface soil materials and reseeded. | |
| | Subsidence was backfilled with surface soil materials and reseeded. | |
| | Subsidence was backfilled with surface soil materials and reseeded. | |
| | The shaft that had subsided to a depth of 35–40 ft (11–12 m) was backfilled with available mine waste-rock materials to within 5 ft (1.5 m) of the ground surface. A polyurethane plug was placed on top, and the remaining portion of the shaft was backfilled to the surface, mounded slightly with available surface soil materials, and reseeded. | |
| | The vent that had subsided to a depth of 40–50 ft (12–15 m) was backfilled with available materials to within 5 ft (1.5 m) of the ground surface. A polyurethane plug was placed on top, and the remaining portion of the shaft was backfilled to the surface, mounded slightly with available surface soil materials, and reseeded. | |
| | Several small subsidences were backfilled to the ground surface, mounded slightly with available materials, and reseeded. | |
| 11 | A subsidence had to be dug out to allow placement of large rocks in the opening and then be pushed back. The opening was backfilled with additional mine waste-rock material, covered with common borrow surface materials, and reseeded. | DOE 2010d |
| | Material from the waste-rock dump had washed out into the roadway and was cleaned up and regraded to allow access beyond the site. | |
| | Numerous pits and trenches were reclaimed. Side walls of the pits and trenches were broken down, and mine waste-rock piles were dozed. Surface soil materials were used as a cover, and the site was graded to fit in with the natural landscape. | |

BLM_0042615

**TABLE 4.7-7  (Cont.)**

| Lease Tract No. | Description of Reclamation Work | Reference |
|---|---|---|
| | Several large surface pits and trenches (and associated adits) were backfilled with available spoils material, recontoured to blend in with the natural topography, covered with other available surface soil materials, pocked, and reseeded. | |
| | Two large rim adits were closed with rocks, backfilled with available mine waste-rock and other surface soil materials, pocked, and reseeded. | |
| | A small subsidence that leads into a previously reclaimed mine was permanently closed with a polyurethane foam plug, covered with surface soil materials, and reseeded. | |
| 11A | The portal was permanently closed and backfilled with mine waste-rock materials. The ore chute was dismantled and buried on site. Mine waste-rock dumps were recontoured to blend in with the natural topography. The area was covered with surface soil materials and reseeded. | DOE 2009g |
| 12 | At the abandoned mine sites, the portals were permanently closed with rocks and backfilled with mine waste-rock materials. Mine waste-rock dumps were recontoured to blend in with the natural topography. The area was covered with surface soil materials and reseeded. | DOE 2009d |
| | The subsidence was dug out and refilled with available surface soil materials and reseeded. | |
| | An open drill hole was permanently closed with polyurethane foam plugs, covered with surface soil materials, and reseeded. | |
| 13 | Two subsidence features were backfilled with available surface soil materials, pocked, and reseeded with an approved seed mixture. | DOE 2009e |
| 16 | The subsidence features were backfilled with available surface soil materials and reseeded. | DOE 2009g |
| | Several small surface pits and trenches were backfilled with available mine waste-rock and other surface soil and then reseeded. | |
| | The subsidence was backfilled with available mine waste-rock and other surface soil materials and then reseeded. | |
| 16A | The subsidence was dug out, refilled with available surface soil materials, and reseeded. | DOE 2009f |
| | The small subsidence was dug out, refilled with available surface soil materials, and reseeded. | |
| | A series of surface pits and trenches were backfilled with available mine waste-rock materials, covered with other available surface soil materials, pocked, and reseeded. | |
| 17 | A portal subsidence was dug out and closed with on-site materials. The vent was closed. The hoist shack was demolished, burned, and buried on the site. | DOE 2010e |
| 19 | Several subsidence features were backfilled with available surface soil materials and reseeded. | DOE 2011d |
| 19A | A mine adit was sealed with a polyurethane foam bulkhead applied to the wooden door structure after the door was cleared of debris and closed. | DOE 2010f |
| | A subsided vent was be backfilled with available surface soil materials, mounded, and reseeded. | |

BLM_0042616

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 43 of 426

**TABLE 4.7-7 (Cont.)**

| Lease Tract No. | Description of Reclamation Work | Reference |
|---|---|---|
| 19A (Cont.) | A 24-in. (61-cm) open vent with metal casing was secured by welding grating to the casing. | |
| 20 | A 20-in. (51-cm) open vent with metal casing was secured by welding grating to the top of the casing. | DOE 2011c |
| | A 24-in. (61-cm) open vent with metal casing was secured by welding grating to the casing. A second 24-in. (61-cm) open vent was similarly reclaimed. | |
| 21 | The abandoned mine site was reclaimed. The wooden ore-storage bin was stabilized in place, and the remaining wooden/timber structures were left undisturbed. All trash and debris were placed in the decline trench before it was closed. The decline portal was closed with rocks and backfilled with available surface soil materials. The mine waste-rock dump was left undisturbed. The three vents associated with the mine were closed with polyurethane foam plugs, covered with surface soil materials, and reseeded. An open drill hole was similarly closed. | DOE 2010d |
| | The shaft had subsided again and was backfilled with mine waste-rock materials to a level equal with the top of the existing timber sets. The shaft was closed with a concrete plug, and the remainder was backfilled with additional mine waste-rock materials, covered with available surface soil materials, and seeded. All trash and debris associated with the site were buried before the shaft was backfilled. The shaft's headframe and hoist house were left in their original condition. | |
| 22 | The south side of the main dump was dressed up to near its original configuration and reseeded. Other features on the site are historical and were not disturbed. | DOE 2009g |
| | The smaller abandoned mine site was reclaimed. The decline portal was closed with large rocks, backfilled with mine waste-rock materials, and reseeded. The top of the smaller dump was raked by hand and reseeded. Other features on the site are historical and were not disturbed. | |
| | All debris at the large, abandoned mine site was left undisturbed. The decline portal was closed and backfilled with mine waste-rock materials. Mine waste-rock dumps were left undisturbed. The disturbed areas were covered with surface soil materials and reseeded. | |
| | The mine vents were closed with polyurethane foam plugs, covered with surface soil materials, and reseeded. | |
| 22A | Debris at the large, abandoned mine site was gathered, placed in the decline trench, and burned. The decline portal was closed with large rocks, backfilled with mine waste-rock materials, covered with surface soil materials, and reseeded. Other features on the site were historical and not disturbed. Two remaining vents were closed, covered, and seeded. | DOE 2009g |
| | The seven vents were closed with polyurethane foam plugs, covered with surface soil materials, and reseeded. | |
| | The open drill hole was closed with polyurethane foam plugs, covered with surface soil materials, and reseeded. | |
| | The subsidence was dug out and backfilled with available surface soil materials and reseeded. | |

BLM_0042617

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 44 of 426

**TABLE 4.7-7 (Cont.)**

| Lease Tract No. | Description of Reclamation Work | Reference |
|---|---|---|
| 23 | The subsidence was dug out, filled with available surface soil materials, and reseeded. | DOE 2009d |
| | Two open vents were reclaimed. Metal casings were terminated below grade. Then the vents were closed with polyurethane foam plugs, covered with surface soil materials, and reseeded. | |
| 26 | The portal of the abandoned mine site was closed with large rocks and then backfilled with available mine waste-rock materials. The mine waste-rock dump was recontoured to blend with the natural topography. The area was then covered with other surface soil materials, pocked, and reseeded. | DOE 2010f |
| | The portal at the abandoned mine site was closed with rocks and backfilled with available mine waste-rock and other available surface soil materials. The posts and cribbing were left intact. The vertical shaft was backfilled with polyurethane foam to within 3 ft (0.9 m) of the surface, and surface soil was added. Mine waste-rock materials were recontoured. The area was reseeded. The historic windlass was preserved. | |
| | The subsidence was dug out and then refilled with available surface soil materials and reseeded. The drainage was rerouted to the east of the subsidence area. | |
| | The vent casing from a small cased vent was removed or terminated below grade, and the subsidence was backfilled with available surface soil materials and reseeded. | |
| | A subsided shaft was backfilled with available surface soil materials and reseeded. | |
| | An 18-in. (46-cm) cased vent was removed and terminated about 1ft (0.3 m) below grade. The vent was closed with a polyurethane foam plug, backfilled with available surface soil materials, and reseeded. | |
| | A subsided shaft was backfilled with available surface soil materials and reseeded. | |
| | A 14-in. (36-cm) cased vent was already closed. A bucket of soil from an adjacent pile was placed in the subsidence, and the area was reseeded. | |
| | A subsided shaft (water drop) was reclaimed. The water pipe was terminated about 1 ft (0.3 m) below grade, and the subsidence was backfilled with available surface soil materials and reseeded. | |
| | A subsided shaft was backfilled with available surface soil materials and reseeded. | |
| 27 | The subsidence was dug out, refilled with available surface soil materials, and reseeded. | DOE 2010f |

BLM_0042618

area would then be covered with other surface soil materials, pocked if needed, and reseeded with an approved seed mixture.

Some reclamation plans included other activities. For example, on Lease Tract 11, debris needed to be cleared from a road, where it had settled after running off from a mine site. In addition, the reclamation activities on Lease Tracts 17 and 22A involved collecting and burning/burying mine timbers and other wooden debris. The debris would then be placed in the decline trench before its closure. A small number of lease tracts had special resources that took some effort to protect. For example, there were historic features located on Lease Tracts 21, 22, and 22A. Special plans were made to protect these resources while reclamation activities were implemented.

#### 4.7.2.3 Coal and Other Mineral Mining

The 20-acre (8-ha) New Horizon Mine near Nucla is a surface coal mine owned and managed by Western Fuels Association, a not-for-profit, national fuel supply cooperative. The mine is the exclusive coal supplier to the Nucla Station coal-fired power plant (5 mi [8 km] southeast), producing approximately 350,000 to 400,000 tons of coal per year (Tri-State 2012a). The coal mined from the Dakota sandstone is higher in ash and sulfur content than are the types of coal mined in other parts of Colorado. The mine employed 23 miners in 2007 (CDNR 2008).

As of 2010, there were no actively producing Utah coal mines within the ROI for cumulative effects (UDNR 2011).

Although environmental impacts would vary for each coal mining project, descriptions of the potential environmental impacts of a coal mine can be found in Section 4.7.1.3.

Other permitted activities in the ROI for cumulative effects include the mining of sand/gravel, borrow material, sandstone, gold, and quartz/granite (over 4,650 acres or 1,880 ha), as well as the mining and exploration of copper and the mining of limestone quarries (BLM 2011b). The Lisbon Valley Copper Mine resumed operations after receiving BLM approval on its revised plan of operations in 2011.

#### 4.7.2.4 Oil and Gas Exploration and Extraction

BLM routinely offers land parcels for competitive oil and gas leasing to allow exploration and development of oil and gas resources for public sale. Continued leasing is necessary so that oil and gas companies can seek new areas for oil and gas production or develop previously inaccessible or uneconomical reserves. In 2010 and 2011, oil and gas leases were issued within the ROI for cumulative effects (by BLM Field Offices), covering a total of approximately 2,100 acres (830 ha) of land surface. Approximately 3,000 wells are located within the ROI for cumulative effects (as shown in Figure 4.7-2), including wells that are actively producing, shut-in but capable of production, plugged, and abandoned; this total does

not include capped wells. The majority of these oil and gas wells were drilled in the 1970s and 1980s (BLM 2010c).

The type and magnitude of impacts from exploration and future development will depend on the location and nature of the proposed exploration and development. As such, specific impacts on some resource areas cannot be predicted at the leasing stage (BLM 2011l). In many cases, a site visit and site-specific impact analysis would be necessary. Although environmental impacts would vary for each oil and gas exploration project, Table 4.7-8 summarizes potential impacts that could occur within the ROI for cumulative effects during exploration and future development of lease parcels.

Oil and gas exploration activities depend on market conditions. As of January 2012, BLM had developed a proposal to revise the 1993 revision of the oil and gas leasing EIS decision to change conditions, revise leasing stipulations, and identify land availability (USDA 2012c).

Gothic shale gas, a potential new gas development play underlying portions of the region of cumulative effects (including San Miguel and Dolores Counties), has also been recently analyzed as a foreseeable scenario for oil and gas development within the Paradox Basin (SJPLC 2011).

#### 4.7.2.5 Long-Term Grazing Permits and Allotments

Livestock producers are required to hold a permit or lease to graze livestock on public land. BLM Field Offices administer grazing permits and allotments throughout the ROI for cumulative effects (Grand Junction, Uncompahgre, Tres Rios, Moab, and Monticello). Grazing areas in Colorado are generally in rough mountainous terrain, with steep side slopes and insufficient livestock water or forage, which results in large areas of grazing allotments that are infrequently or not grazed. This generally lessens adverse impacts on wildlife, soils, and cultural resources. Most allotments have been grazed continuously since implementation of the Taylor Grazing Act (1934), if not even before then (1890) (BLM 2011j).

BLM performs an environmental assessment to analyze the impacts of renewing 10-year grazing permits within a given landscape health assessment (LHA) area; only actions necessary to graze livestock are considered (BLM 2011j). Although environmental impacts would vary for each grazing permit, Table 4.7-9 summarizes the potential impacts that could occur within the ROI for cumulative effects during present and future grazing activities.

#### 4.7.2.6 Power Generation and Transmission

Owned by Tri-State Generation & Transmission, Nucla Station is a 100-MW coal-fired power plant located just outside Nucla, Colorado. It is the world's first utility-scale power plant to employ atmospheric circulated fluidized-bed combustion. The plant started operating in 1959 as a conventional electric generating station and currently employs 50 people. Between 1985 and

BLM_0042620

**TABLE 4.7-8 Potential Environmental Impacts of Oil and Gas Exploration and Development**

| Resource Area | Anticipated Impacts[a] |
|---|---|
| Air quality | Exploration and development of lease parcels could adversely impact local air quality through emissions of PM, criteria air pollutants, and GHGs as a result of soil and surface disturbance, transportation, engine exhaust, and windblown dust and emissions of VOCs from gas flaring and venting. Generally it is not possible to quantify emissions, but they are unlikely to result in the exceedance of NAAQS or CAAQS guidelines. Generally, it is not possible to quantify the net impact on the climate from global or local GHG production. |
| Geology and soils | Direct impacts from construction and lease tract ok development include the removal of vegetation; disturbance, exposure, compaction, and destabilization of soils; an increased susceptibility to erosion; and the mixing of soil horizons, loss of soil productivity, and possible contamination of soils with chemicals or petroleum constituents. The magnitude of disturbance depends on the size of the well pads, the type of drilling, and the terrain and slope. Indirect impacts could include increased runoff, erosion, and sedimentation. |
| Surface water | Clearing and grading would alter overland flow and recharge patterns. Compaction of soil and reduced infiltration could lead to increased runoff and an increase in the frequency and extent of downstream flooding. |
| Groundwater | Impacts could occur as a result of the failure of well integrity, surface spills, or the loss of process fluids into groundwater. Changes in groundwater quality (including cross-contamination of aquifers) could affect downstream users. Development would require the use of existing or new water disposal facilities. |
| Human health | Substances emitted and used during exploration and development may pose a risk to human health and the environment. |
| Ecological resources | Direct construction impacts could include the removal and loss of vegetation on well pads, pipelines, and roads. Indirect impacts could include the creation of an environment in which invasive species and other noxious weeds could become established, the loss of the wildlife habitat base and rangeland productivity, and changes in visual aesthetics. Cumulative water depletions from the Colorado River Basin could jeopardize some threatened, endangered, and sensitive species. If such species or their habitats occurred within or near a lease tract, further analysis of impacts would be required. Continued development activity would contribute to habitat fragmentation and degradation, noise-related changes in wildlife behavior, displacement of resources into less suitable habitat, disruption of nesting and breeding, and increased vehicle-related wildlife collisions and mortality. If farmlands (prime or unique), ACECs, WAs, WSAs, Wild and Scenic Rivers, wetlands and riparian zones, and floodplains are within or near a lease tract, further analysis of impacts would be required. |
| Socioeconomics and environmental justice | Impacts are related to temporary or permanent employment, the rental or purchase of equipment, royalties paid to Federal and state governments, and other expenditures related to development . Indirect employment opportunities (related to exploration and service support industries) could be created in the region. Environmental justice impacts would not be likely due to the remoteness of exploration activities and the dispersal of minority and low-income populations throughout affected counties. |
| Transportation | Local roads would be affected by increased traffic from exploration and production vehicles, equipment, deliveries, and workers. |
| Land use | Development could conflict with other permitted uses, reduce the availability of land for recreation or range and grazing use, or affect existing ROWs. Development near a fence or corral could compromise the land's usefulness. |

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 48 of 426

**TABLE 4.7-8 (Cont.)**

| Resource Area | Anticipated Impacts[a] |
|---|---|
| Recreation | Areas used for grazing or hunting could experience an increase in activity and noise disturbance. |
| Cultural resources and paleontology | Surveys/lease tract development (including well pads, access roads, pipelines, and other infrastructure) have the potential to identify/disturb previously unrecorded cultural resource sites, traditional cultural properties, and paleontological resources. |
| Visual and scenic resources | Construction and infrastructure could affect the character of the landscape and detract from the undisturbed visual setting. |
| Solid and hazardous wastes | Substances used and emitted in exploration, development, and production may pose a risk to human health and the environment. |

[a] This table is intended to provide a summary of exploration and development activities and to broadly address potential impacts. It is not intended to strictly describe the lease offerings from which they are adapted, nor can all potential impacts be quantified without site-specific analysis.

Sources: BLM (2011 l,m)

1987, the plant was refitted to employ atmospheric circulating fluidized-bed combustion technology, which removes pollutants inside the coal boiler, resulting in more efficient fuel combustion and reduced emissions. The plant covers 60 acres (24 ha) and draws water from the San Miguel River. The plant receives about sixty 25-ton loads of coal per day from its sole source, the New Horizon Mine (located 5 mi [8 km] northwest of the plant (Tri-State 2012a).

Tri-State Generation & Transmission is also in the process of upgrading its 50-year-old, 69-kV transmission line that supplies secondary power from Nucla Station to the Telluride area. BLM published a Final EIS in 2001 (66 FR 226, November 23), but this document was not located. Construction on the 51-mi (82 km), 115-kV upgrade began in June 2010; the final phase of construction was scheduled to begin in May 2012, with completion of the project expected in the fall of 2012 (Tri-State 2012b). The new line will run in the approximate original alignment of the dismantled line—from the Nucla Substation west of Naturita to the Sunshine Substation southwest of Telluride. Ten miles (16 km) of the new line will be constructed underground in response to landowner concerns. Construction of the new line includes modifying the Nucla and Sunshine Substations, replacing the Wilson Mesa Substation, and expanding the Norwood Substation. The San Manuel Power Association will remove the Oak Hill and Specie Mesa Substations that supported the 69-kV line and reclaim the land (Tri-State 2012b,c).

#### 4.7.2.7 Potash Exploration

The BLM Tres Rios Field Office, formerly the Dolores Public Lands Office, has received 21 permit applications from RM Potash for potash exploration, affecting 40,000 acres (16,000 ha) of land in the vicinity of Egnar, Colorado (BLM 2011a). BLM has prepared an EA to evaluate exploration drilling on some of these land applications. BLM analyzed the potential

BLM_0042622

**TABLE 4.7-9 Potential Environmental Impacts of Livestock Grazing**

| Resource Area | Anticipated Impacts[a] |
|---|---|
| Air quality | Gaseous emissions and fugitive dust may be produced where livestock gather, but concentrations are expected to rapidly dissipate. Emissions from grazing are not expected to exceed air quality standards. |
| Geology and soils | Grazing can rednce vegetative cover and biological soil crust (two factors that help maintain soil health and moisture content). Overgrazing removes organic matter that provides nutrients for continued plant growth. Soil crust disturbance reduces nutrient cycling, water infiltration, and moisture retention. Reduction of native perennial vegetation can lead to the domination of weeds. |
| Water resources | A major concern related to surface-water quality is accelerated sediment yield from upland soil and stream channel erosion. No impacts on groundwater or water rights were identified. |
| Ecological resources | If farmlands (prime or unique), ACECs, Was, WSAs, Wild and Scenic Rivers, wetlands and riparian zones, and floodplains are within or near a grazing allotment, further impact analysis would be required. The reauthorization of grazing permits might or might not include changes to historical levels of grazing use, and it would not impair wilderness characteristics or classifications of stream segments eligible for listing as wild, scenic, or recreational. The lack of irrigation and the arid climate in the ROI for cumulative effects generally prevents soils from being used for private agricultural production; therefore, the renewal of grazing permits would not harm the potential for future classification as "prime" or "unique" farmlands. Grazing might have long-term positive impacts on vegetation and controlling weed infestations. If threatened, endangered, or sensitive species or their habitats occurred within or near a grazing allotment, further impact analysis would be required. Grazing might impact migratory birds through disturbance of birds and nests, causing destruction, disruption, or abandonment of the nest and influencing reproductive success; effects would be greater for species that nest in vegetation types that are prone to grazing. Grazing is expected to have a minimal effect on terrestrial and aquatic wildlife. If riparian areas or known wetlands occurred within or near a grazing allotment, further impact analysis would be required. |
| Socioeconomics and environmental justice | No environmental justice impacts are anticipated. |
| Transportation | Grazing permits do not allow for restriction of access to or travel through public lands where legal access currently exists. The renewal of grazing permits would have no impact on transportation. |
| Land use | The environmental impact of improved rangeland management by BLM and grazing permittees is expected to be positive. |
| Recreation | Grazing permits do not allow for restriction of access to or travel through public lands where legal access currently exists. The renewal of grazing permits would have no impact on recreational use. |
| Cultural resources and paleontology | Direct impacts could include trampling, chiseling, and churning of soils and cultural features and items of Native American religious concern; artifact breakage; and impacts from standing, leaning, and rubbing against aboveground features. Indirect impacts could include erosion and potential for unlawful collection or vandalism. Continued grazing in areas where cultural sites are present might contribute to substantial ground disturbance and have irreversible adverse effects on historic properties. The potential for damage to undisturbed paleontological resources is expected to be low, because in situ fossils are seldom encountered in alluvial areas. |
| Visual and scenic resources | The renewal of grazing permits is not expected to result in visual or scenic impacts. |

**TABLE 4.7-9 (Cont.)**

| Resource Area | Anticipated Impacts[a] |
|---|---|
| Solid and hazardous wastes | Solid or hazardous wastes could be introduced as a result of the maintenance associated with range improvements (e.g., fuels and lubricants could spill from heavy equipment). The improper disposal of solid waste and improper use of hazardous substances (e.g., herbicides and pesticides) could contaminate public land. |

[a] This table is intended to summarize permitted grazing activities and broadly address potential impacts. It is not intended to strictly describe the permit actions from which they are adapted, nor can all potential impacts be quantified without site-specific analysis.

Source: BLM (2011j)

effects of approving up to six potassium prospecting permit applications and implementing the associated exploration plan(s) that RM Potash submitted for the proposed exploration project. Core drilling is proposed on the six permit application sites to confirm the presence of potash and determine its thickness and grade. The EA was completed in October 2012 (BLM 2012h). The BLM Tres Rios Office approved five of six Potash Prospecting Permits in the summer of 2013 and deferred a sixth. As of November 2013, no drilling has taken place.

Potash exploration is also performed on lands administered by the State of Utah (BLM 2011b). Three companies produced approximately 374,000 short tons of potash in Utah in 2010; only one (Intrepid Potash-Moab) produced potash within the ROI for cumulative effects (UDNR 2011).

#### 4.7.2.8 Lisbon Natural Gas Processing Plant

The Lisbon Gas Plant is located approximately 35 mi (56 km) south of Moab in San Juan County. Operated by Patara Midstream, LLC, it is a major source of GHG and VOC emissions in the ROI for cumulative effects. The plant was originally permitted by the Utah Department of Environmental Quality in 2002 (UDEQ 2011).

#### 4.7.2.9 Paradox Valley Desalinization Plant

The Paradox Valley Unit desalinization plant is located adjacent to the Dolores River, approximately 2 mi (11 km) east of Bedrock. Operated by the BOR, the plant prevents natural salt loads in groundwater from entering the Dolores River by intercepting and disposing of brine via deep-well injection. Major facilities include a brine production well field, brine surface treatment facility, and deep injection well (CDPHE 2011d). The existing deep-injection well, completed in 1988, is nearing the end of its useful life, and action will be needed by BOR to continue long-term salinity control at the Paradox Unit (BOR 2013b). BOR is preparing an EIS to describe the potential alternatives as well as the impacts of the construction and operation of facilities to continue to dispose of brine at Paradox Valley. A new injection well alternative and

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 51 of 426

an evaporation pond alternative as well as other alternatives are being considered for future brine disposal (BOR 2013b).

#### 4.7.2.10 Cameo Station Power Plant

In 2007, Xcel Energy announced it plans to shut down the 1,100-acre (450-ha) Cameo Station Power Plant (near Palisade, Colorado) by the end of 2010. The plant, fueled primarily by coal from nearby McClane Canyon Mine in Garfield County, operated for 53 years as a coal-fired electrical generation facility until it was determined to be inefficient (KKCO 2007).

Prior to closing, Xcel Energy partnered with Abengoa Solar to develop a $4.5 million, first-of-its kind experiment in hybrid coal-solar facilities. In 2009, Cameo Station was expanded to include 6 acres (2.4 ha) of parabolic trough solar panels. It began operating as a hybrid facility in 2010. The panels replaced the thermal energy formerly provided by coal combustion. Xcel/Abengoa anticipated that the use of solar panels would reduce the amount of coal used at the facility by 2–3%, thereby reducing carbon emissions. The year-long experiment had favorable results, but the solar panels did not generate the projected thermal energy, and the project was not as cost effective as anticipated. The facility was closed in 2010, and dismantling began in September 2011 (Xcel 2010; GJSentinel 2011; KREX 2011).

#### 4.7.2.11 Reconstruction of the Hanging Flume Replica

Under the Hanging Flume interpretive program, the Western Colorado Interpretive Association proposes to build a modern replica of a collapsed section of the original Hanging Flume northwest of Nucla. The Hanging Flume site is listed in the NRHP. The BLM completed an environmental assessment in 2009, prior to approval of the first phase of the project (construction of an overlook to replace a graveled parking area above the Dolores Canyon rim). Reconstruction of the flume is complete, having been approved by the BLM in 2011. No new disturbance of cultural resources occurred, and no traditional cultural properties are known to exist with regard to the area. The project had no adverse effects on threatened or endangered species or their habitats. The small scale of the project limited environmental impacts (BLM 2011c). The time frame for the project initiation and completion is not known.

### 4.7.3 General Trends

Table 4.7-10 lists general trends in the ROI for cumulative effects with the potential to contribute to cumulative impacts (although impacts here are not quantifiable); trends are discussed in the following sections. The discussion takes into account available information on populations and water use for the eight Colorado counties (Delta, Dolores, Mesa, Montezuma, Montrose, Ouray, San Juan, and San Miguel) and three Utah counties (Grand, San Juan, and Wayne) that lie within 50 mi (80 km) of the ULP lease tracts.

BLM_0042625

**TABLE 4.7-10 General Trends in the Region of Influence for Cumulative Effects**

| General Trend | Potential Impacting Factors |
|---|---|
| Population growth | Urbanization<br>Increased use of roads; increased traffic<br>Increased use of resources (e.g., energy and water)<br>Increased emissions of air pollutants<br>Land use modification<br>Employment<br>Education and training<br>Tax revenue |
| Energy demand | Increase use of energy resources<br>Energy development (including alternative energy sources)<br>Energy transmission and distribution |
| Water use and availability | Drought conditions and water loss<br>Conservation practices<br>Changes in water distribution and availability |
| Climate | Water cycle changes<br>Increased wildland fires<br>Changes in habitat<br>Changes in farming production and costs |

#### 4.7.3.1 Population Growth

Between 2000 and 2010, population increased in both Colorado (by 17%) and Utah (by 24%) (Mackun and Wilson 2011). Three Colorado counties within the ROI for cumulative effects ranked in the top 20 most populous counties in the state and had significant increases in population between 2000 and 2010: Mesa County (ranked 11th in 2010), with an increase of 26%; Montrose County (ranked 17th in 2010), with an increase of 24%; and Delta County (ranked 18th in 2010), with an increase of 11% (U.S. Bureau of the Census 2011i). The only Utah county within the ROI for cumulative effects ranking in the top 20 most populous counties in the state was San Juan County. Between 2000 and 2010, population growth in San Juan County was 2.3% (U.S. Bureau of the Census 2011j). The U.S. Census Bureau projects population growth of 19% (for Colorado) and 32% (for Utah) over the next 20 years (from 2010 to 2030) (U.S. Bureau of the Census 2011b).

#### 4.7.3.2 Energy Demand

The growth in energy demand is related to population growth through increases in housing, commercial floor space, transportation, and goods and services. Given that population growth is expected in several counties within the ROI for cumulative effects (Mesa, Montrose,

and Delta Counties in Colorado and San Juan County in Utah), an increase in energy demand in these counties is also expected. However, the EIA projects a decline in per capita energy use to 2035, mainly because of improvements in equipment and vehicle efficiency and changes in the industrial sector from energy-intensive manufacturing to services. In general, primary energy use in the United States between 2010 and 2035 is expect to grow by about 0.3% each year, with the fastest growth projected for the commercial and industrial sectors (at 0.7% each year). Transportation and residential are each expected to grow by about 0.2% each year (EIA 2012).

#### 4.7.3.3 Water Use and Availability

In 2005 (the latest year for which annual statistics are available), freshwater and saline water withdrawals in the Colorado and Utah counties within the ROI for cumulative effects were estimated to be 2,600 million gal per day: 2,500 million gal (7,718 ac-ft) per day from the eight Colorado counties, with 99.5% of the withdrawals coming from surface water sources, and 120 million gal (370 ac-ft) per day from the three Utah counties, with 72% of the total withdrawals coming from surface water sources. The highest water usage in 2005 occurred in Mesa and Montrose Counties (Colorado) at 930 and 710 million gal (2,842 and 2,167 ac-ft) per day, respectively (Kenny et al. 2009).

The U.S. Geological Survey tracks eight categories of water use in the United States: public supply; domestic; irrigation; livestock; aquaculture; industrial; mining; and thermoelectric power. In 2005, the greatest water consumption in Colorado and Utah counties within the region of cumulative effects was in the category of irrigation, which accounted for about 94% of water use (with as much as 870 million gal [2,700 ac-ft] per day in Mesa County in Colorado, and 48 million gal [150 ac-ft] per day from Wayne County in Utah). Mining accounted for only a small part of water consumption in both states and was highest in San Juan County (Utah), which used about 4.6 million gal (14 ac-ft) of mostly saline water per day. Consumption of water via the public supply was generally proportional to the county population and was highest in Mesa and Montrose Counties (Colorado). The highest per capita usage in 2005 occurred in Montrose (240 gal [900 L] per day) and Delta (200 gal [750 L] per day) counties in Colorado (Kenny et al. 2009).

Water consumption in the eight Colorado and three Utah counties within the ROI for cumulative effects decreased between 2000 and 2005 (due mainly to a decrease in irrigation): down 17.6% in Colorado counties and down 7.7% in Utah counties (based on data from Hutson et al. 2004 and Kenney et al. 2009). This decreasing trend will likely continue into the foreseeable future as drought conditions in the Upper Colorado River Basin decrease runoff for most rivers and reduce water supplies (BOR 2012).

#### 4.7.3.4 Climate

According to a recent report prepared for the CWCB (Hoerling et al. 2008), temperatures in Colorado have increased by about 2°F (1.1°C) between 1977 and 2006. Climate models project continued increasing temperatures in Colorado—as much as 2.5°F (1.4°C) by 2025 and

4.0°F (2.2°C) by 2050 (relative to the 1950 to 1999 baseline temperature). In 2050, seasonal increases in temperature could rise as much as 5.0°F (2.8°C) in summer and 3.0°F (1.7°C) in winter. These changes in temperature would have the effect of shifting the climate typical of the Eastern Plains of Colorado westward and upslope, bringing temperature regimes that currently occur near the Colorado-Kansas border into the Front Range.

Because of the high variability in precipitation across the state, current climate models have not been able to identify consistent long-term trends in annual precipitation. However, projections do indicate a seasonal shift in precipitation, with a significant increase in the proportion of precipitation falling as rain rather than snow. A precipitous decline in snowpack at lower elevations (below 8,200 [2,500 m]) is expected by 2050.

In the past 30 years, the onset of streamflows from melting snow (called the "spring pulse") has shifted earlier in the season by two weeks. This trend is expected to continue as spring temperatures warm. Projections also suggest a decline in runoff for most of the river basins in Colorado by 2050. Hydrologic studies of the Upper Colorado River Basin (which includes the ROI for cumulative effects) estimate average decreases in runoff of 6 to 20% by 2050 (as compared to the twentieth century average). These changes in the water cycle, combined with increasing temperatures and related changes in groundwater recharge rates and soil moisture and evaporation rates, will increase the potential for severe drought and reduce the total water supply, while creating greater demand pressures on water resources (Hoerling et al. 2008).

In general, the physical effects of climate change in the western United States include warmer springs (with earlier snowmelt), melting glaciers, longer summer drought, and increased wildland fire activity (Westerling et al. 2006). All these factors contribute to detrimental changes to ecosystems (e.g., increase in insect and disease infestations, shifts in species distribution, and changing in the timing of natural events). Adverse impacts on human health, agriculture (crops and livestock), vegetation (including biological soil crusts), infrastructure, water supplies, energy demand (due to increased intensity of extreme weather and reduced water for hydropower), fishing, ranching, and other resource-use activities are also predicted (GAO 2007; NSTC 2008; Backlund et al. 2008; Schwinning et al. 2008).

The State of Colorado has plans to reduce its GHG emissions by 80% over the next 40 years (Ritter 2007). Initiatives to accomplish this goal will focus on modifying farm practices (e.g., less frequent tilling, improving storage and management of livestock manure, and capturing livestock-produced methane), improving standards in the transportation sector, providing reliable and sustainable energy supplies (e.g., small-scale hydropower, solar, wind, and geothermal energy), and joining the Climate Registry of North American GHG emissions, among others.

### 4.7.4 Cumulative Impacts from the ULP Alternatives

Potential impacts from the five alternatives in the ULP PEIS are considered in combination with impacts of past, present, and reasonably foreseeable future actions. For this

cumulative impacts analysis, past projects are reflected in the affected environment discussion. Projects that have been completed, such as the exploration and reclamation activities implemented under the ULP in 2009 and 2011 as discussed in Section 4.7.2.2.7, are generally assumed to be part of the baseline conditions that were analyzed under the five alternatives discussed in Sections 4.1 through 4.5. The summary of ongoing and planned projects or activities in the ROI for cumulative effects is presented in Table 4.7-11. As mentioned previously, the ROI for cumulative effects is conservatively assumed to be a 50-mi (80-km) radius. The ROIs for the various resource areas are listed in Chapter 3, and for most of these resource areas, a 25-mi (40-km) radius was identified as the ROI. The analyses for environmental justice and human health addressed a 50-mi (80-km) radius, which is why the ROI for cumulative effects was extended to this larger radius.

The major ongoing projects listed in Table 4.7-11 that are related to uranium mining activities proposed under the five alternatives evaluated in the ULP PEIS include (1) the White Mesa Mill; (2) various permitted uranium mining projects in Montrose, Mesa, and San Miguel Counties, none of which are currently actively producing (of the 33 noted on Table 4.7-10, a few of the permits are for mines on the DOE ULP lease tracts); (3) the Daneros Mine; (4) the Energy Queen Mine, which is operational but currently inactive; and (5) the ongoing reclamation of abandoned uranium mines (these mines are not on the DOE ULP lease tracts). There are also several foreseeable projects related to uranium mining, which are currently in the planning phase (also listed in Table 4.7-11). These include the Piñon Ridge Mill and the Whirlwind Mine near Gateway.

Projects listed in Table 4.7-11 that are not related to uranium mining include the operating Nucla Station Power Plant; the Lisbon Natural Gas Processing Plant; the New Horizon Coal Mine; other mineral mining projects (for sand, gravel, gold, quartz, and granite); oil and gas exploration, transmission line, and transportation ROW projects; grazing and wildlife and vegetation management projects; and National Monument improvement projects.

The environmental impacts discussion in Chapter 4 (the impacts are also summarized in Section 2.4) concludes that potential impacts on the resource areas evaluated for the five alternatives generally would be minor and could be further minimized by implementing the compliance and mitigation measures and/or BMPs as required by project-specific mine plans. Estimates for potential human health impacts indicate that the emission of radon would be the primary source of potential human health radiation exposure. However, requirements for monitoring and ventilating mine operations and for worker safety are expected to mitigate potential impacts on human health. The potential radon dose estimates presented in the ULP PEIS were obtained by using a conservative value for the radon emission rate, which is a sensitive input parameter, and by using conservative assumptions with regard to the number of mines that would operate at the same time and the number of years of operation. The actual radon dose would be much lower if measured radon data and the actual number of years of operation were used to obtain the radon exposure estimates.

Although the various present, ongoing, and planned projects identified in the ROI for cumulative effects could contribute to impacts on the various environmental resource areas evaluated, it is expected that uranium-mining-related projects would be most similar with respect

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 56 of 426

**TABLE 4.7-11 Summary of Major Projects and Activities in the Region of Influence for Cumulative Effects**

| Project | Summary | Location | Status |
|---|---|---|---|
| ***Planned/Future*** | | | |
| Piñon Ridge Mill | Energy Fuels plans to begin construction depending upon the outcome of litigation | Paradox Valley, 7 mi W of Naturita (Montrose Co.) | Planned |
| Book Cliff Coal Mine | Surface mine; proposed by CAM-Colorado | N of Fruita (Mesa Co.) | Proposed |
| Whirlwind Mine | Underground mine; permitted in 2008 but went on standby status a few months later; may operate again if economically viable | Vicinity of Gateway | Planned |
| Uranium/vanadium exploration | Exploratory drilling and accompanying activities | Various | Planned and ongoing |
| Potash exploration | Exploratory drilling for potash | Various | Under NEPA review |
| WAPA ROW maintenance | Vegetation management to protect transmission lines | Montrose Co. Delta Co. San Juan Co. Grand Co. | Under NEPA review |
| Utility corridors | Existing and proposed utility corridors and gathering pipelines through San Juan Public Lands | Dolores Co. Montezuma Co. | Under NEPA review |
| Seismic surveys | Exploratory geophysical seismic survey, including drilling and detonation of explosives underground | Dolores Co. | Under NEPA review |
| Aerial application of fire retardant on NFS lands | Continued aerial application of fire retardant on NFS lands | Various | Under NEPA review |
| Aspinall Unit operations | Reservoir operation changes to help meet flow recommendations for Gunnison and Colorado Rivers | Montrose Co. | Under NEPA review |
| Dolores River restoration treatments | Reduction of tamarisk and other invasive nonnative plant species | Various | Planned |
| Ditch Bill easements | Authorization of agricultural water conveyance facilities | Various | Under NEPA review |
| ***Present/Past (Ongoing or Potentially Ongoing)*** | | | |
| White Mesa Mill | The only conventional uranium mill currently operating in the country | 6 mi S of Blanding | Operational |

BLM_0042630

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 57 of 426

**TABLE 4.7-11 (Cont.)**

| Project | Summary | Location | Status |
|---|---|---|---|
| Uranium mines in Colorado | 33 actively permitted mining projects (none actively producing in Colorado) | Montrose Co.<br>San Miguel Co.<br>Mesa Co. | Various |
| Uranium mines in Utah | Daneros, Energy Queen | San Juan Co. | Operational, inactive |
| Abandoned mine closures | Closure and reclamation of the abandoned uranium and coal mines | Various | Ongoing, planned |
| Nucla Station Power Plant | 100-MW coal-fired power plant owned by Tri-State Generation & Transmission Assoc. | Nucla | Operational |
| Lisbon natural gas processing plant | Processes natural gas and crude oil from the Lisbon Oil Field | 35 mi S of Moab | Operational |
| New Horizon Coal Mine | Surface mine managed by Western Fuels Assoc., exclusive coal supplier to nearby Nucla Station | Nucla | Operational |
| Nucla-Sunshine transmission line ROW amendment | Transmission line upgrade; construction began in 2010; completion is expected in 2012 | Between Nucla and Telluride | Under construction |
| Other mineral mining | Permitted sand/gravel, borrow material, sandstone, gold, and quartz/granite mining | Various | Operational |
| Oil and gas exploration, extraction, and transmission | Activity depends on market conditions | Various | Various |
| Grazing and grazing management | Renewal of grazing permits, analysis of range management | Various | Ongoing |
| Wildlife | Trapping and removal of wild horses, habitat improvement, vegetation management, wildfire fuel reduction | San Miguel Co.<br>Dolores Co. | Ongoing |
| Narraguinnep and Bradfield reforestation | Vegetation management | Dolores Co. | Approved |
| Timber sales/fuel management projects | Three ongoing and two planned projects | Dolores Co.<br>Montezuma Co. | Present and planned |
| Transportation ROWs | ROWs to access private property | Montezuma Co. | Various |

BLM_0042631

to the types of potential environmental impacts that could occur, and most of these are located closer to (within 25 mi or 40 km) the lease tracts. Available information regarding potential impacts from these various projects is summarized in Sections 4.7.1 and 4.7.2; however, information for most of the projects is either not available or qualitative in nature.

Potential impacts from the five alternatives would generally be negligible to moderate. The potential (incremental) impacts from the five alternatives are tabulated in Table 4.7-12, along with impacts from several of the major uranium-mining-related projects discussed in Sections 4.7.1 and 4.7.2. Potential impacts from other large projects (e.g., oil and gas exploration, coal mines) can be gleaned from Tables 4.7-1 through 4.7-8.

For specific resources, the cumulative impacts as well as the incremental contributions to these impacts from implementation of the ULP under any of the five alternatives are summarized below:

- *Air quality.* Because of the relatively low population density, low level of industrial activities, and relatively low traffic volume in the ULP region, the quantity of anthropogenic emissions is small and the ambient air quality is relatively good. Particulate emissions associated with ongoing actions in the region, such as White Mesa Mill and uranium mining, and planned actions, such as Piñon Ridge Mill, are not expected to exceed ambient air quality standards. Cumulative impacts on air quality in the ULP region are therefore considered to be minor. Under Alternatives 1 and 2, $PM_{10}$ and $NO_x$ emissions during reclamation are estimated to be less than 1% and 0.1% of the emission totals, respectively, for the Colorado counties (Mesa, Montrose, and San Miguel) encompassing the ULP lease tracts. Under Alternatives 3 through 5, $PM_{10}$ and $NO_x$ emissions are estimated to be highest during the development and operations phase, ranging from 1.5 to 3.2% ($PM_{10}$) and 1.0 to 2.3% ($NO_x$) of emission totals. The contribution of any alternative to cumulative impacts in the region is expected to be negligible to minor. None of the ULP alternatives would cause measurable impacts on regional ozone or AQRVs at nearby Class 1 areas.

- *Acoustic environment.* There are no sensitive receptors (such as hospitals or schools) within 3 mi (5 km) of the ULP lease tracts, and only 17 residences lie within 1 mi (1.6 km) of the lease tracts (7 of which are adjacent to a lease tract). Although there are no noise surveys of the immediate vicinity, it is likely that the highest human-caused noise levels (in the range of 50 to 60 dBA) in the ULP region are intermittent and associated with state highways and agricultural/industrial activities. Planned and ongoing actions, such as the Piñon Ridge Mill and uranium mining, are not expected to exceed the maximum permissible noise levels. Noise-related cumulative impacts are therefore considered minor. Noise levels associated with reclamation activities under Alternatives 1 and 2 would be about 55 dBA at a distance of about 1,650 ft (500 m) from the reclamation site; this is the Colorado daytime maximum permissible limit in a residential zone. Under all alternatives, noise-

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 59 of 426

related impacts are expected to be local and intermittent and, therefore, minor. Noise levels could exceed the Colorado limit at Lease Tract 13 under Alternatives 1 through 3 and at Lease Tracts 13, 13A, 16, and 16A under Alternatives 4 and 5, if any activities occurred near the boundary. The contribution of any of the five ULP alternatives to cumulative noise-related impacts in the region is expected to be minor.

- *Paleontological resources.* Significant paleontological resources within the ULP lease tracts (the ROI for cumulative effects) are associated with stratigraphic units of Jurassic and Cretaceous age. The PFYC ranking of the Jurassic-age Morrison Formation, the main source of uranium in the lease tracts and the geologic unit most likely to be affected by future mining, is 5 (very high), indicating that it is highly fossiliferous and most at risk for human-caused adverse impacts or natural degradation. Other uranium mines in the region have acknowledged the potential for discovering or damaging vertebrate fossils within in the Morrison Formation. Because there are compliance-driven measures governing the management of paleontological resources on Federal lands, the cumulative impacts on these resources are considered to be minor. Lessees would follow requirements set forth in project-specific paleontological management plans prepared in consultation with the BLM. Therefore, the contribution of any of the five ULP alternatives to cumulative impacts on paleontological resources is expected to be minor.

- *Soil resources.* Cumulative impacts on soil resources within and adjacent to the ULP lease tracts (the ROI for cumulative effects) would result mainly from ground-disturbing activities associated with mining activities under any of the five alternatives. These impacts are expected to be minor to moderate, but they would be short in duration and generally controlled through mitigation measures and BMPs.

- *Water resources.* Water resources in the ROI for cumulative effects include surface water in the Upper Dolores, San Miguel, and Lower Dolores watersheds; groundwater in the bedrock aquifers within Paradox Basin; and alluvial aquifers within the various canyons along the Dolores and San Miguel Rivers. Cumulative impacts on stream flow in the Dolores River are considered moderate due mainly to the effects of regulated flow by the McPhee Dam located upstream of the ULP lease tracts. Changes in the water cycle due to seasonal shifts in precipitation (and a decline in snowpack) are projected to cause up to a 20% decrease in runoff in the Upper Colorado River Basin (of which the Dolores and San Miguel Rivers are a part) in the foreseeable future; the decrease in runoff will also affect recharge rates in aquifers throughout the region. Water consumption, especially in terms of irrigation from surface water sources, is already on the decline because of regional drought conditions, and this trend is likely to continue into the foreseeable future. In terms of water quality, the cumulative impacts on groundwater and surface water in the Paradox Basin are considered to be

BLM_0042633

moderate, due mainly to the naturally high saline groundwater that discharges to the Dolores River in Paradox Valley. Activities associated with ongoing actions in the region, such as the White Mesa Mill and uranium mining, and planned actions such as the Piñon Ridge Mill, could reduce runoff to the Dolores River; however, water quality impacts are not expected. Under all five alternatives, minor impacts on water quality could occur as a result of land disturbance and underground mining activities associated with mine development, operations, and reclamation; these impacts would be minimized by the implementation of compliance and mitigation measures and/or BMPs (Table 4.6-1). Cumulative impacts from ULP mining operations, in combination with other projects (such as that for Slick Rock mill sites monitoring near Lease Tract 13), would be re-evaluated as part of follow-on NEPA review for mining plans submitted. Mitigation measures would be implemented, as needed, for the protection of human health and the environment. Minor (local and temporary) impacts on stream flow are also expected. Minor (local and temporary) impacts on stream flow are also expected.

- *Human health.* Exposures from background radiation sources within a 50-mi (80-km) radius of the ULP lease tracts were estimated on the basis of two hypothetical scenarios: (1) considering an individual who lives near (i.e., 1,600 to 16,000 ft [500 to 5,000 m]) the lease tracts and (2) considering an individual pumping out groundwater from a well for drinking. Potential dose estimates show that an individual could receive a dose of about 120 mrem/yr from ambient gamma radiation, 290 mrem/yr from inhalation of radon, 0.47 mrem/yr from breathing airborne radionuclides in resuspended dust particles, and 25 mrem/yr from drinking untreated well water. Dose estimates associated with White Mesa and Piñon Ridge Mills (to the nearest receptor at the site boundary) range from 5.8 to 8.2 mrem/yr. The contribution of any of the five ULP alternatives to cumulative impacts due to radiation exposure in the region is expected to be negligible, ranging only from 1 to 10 mrem/yr for a resident living more than 1.5 mi (2,500 m) from the lease tract. The potential dose could be higher if the distance is less than 1.5 mi (2,500 m), but the dose would still be less than 31 mrem/yr.

- *Ecological resources (vegetation).* The ROI for cumulative effects (Montrose, Mesa, and San Miguel Counties) supports a wide variety of vegetation types, primarily woodlands and shrublands. Incremental impacts on vegetation result mainly from ground disturbance (which can destroy vegetation and introduce non-native species); indirect impacts include deposition of fugitive dust, soil erosion, sedimentation, and changes in water quantity or quality. Impacts are expected to be minor to moderate; establishment of native plant communities during reclamation would reduce impacts over the long term.

- *Ecological resources (wildlife).* Incremental impacts on wildlife in the region of cumulative effects (Montrose, Mesa, and San Miguel Counties) result mainly from habitat disturbance. Such impacts could be minor to moderate in

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 61 of 426

the short term but would be localized and would not affect the viability of wildlife populations.

- *Ecological resources (aquatic biota).* Impacts on aquatic resources could result from increases in sedimentation and turbidity from soil erosion and runoff during mine development and operations. There would be a very low likelihood of an accidental ore spill into a perennial stream or river. Overall, localized impacts on aquatic biota would range from negligible to moderate and would not affect the viability of any aquatic species.

- *Ecological resources (threatened, endangered, and sensitive species).* Potential impacts on threatened, endangered, and sensitive species could range from small to moderate and short term to long term, depending on the location of the mines and amount of surface disturbance. Direct impacts could result from the destruction of habitats during site clearing, excavation, and operations. Indirect impacts could result from fugitive dust, erosion, sedimentation, and impacts related to altered surface water and groundwater hydrology. The USFWS concluded that implementation of the best management practices related to aquatic habitats and water quality will reduce water quality impacts to the extent that they are insignificant.

  Water withdrawals from the Upper Colorado River Basin to support mining activities may result in potentially unavoidable impacts on aquatic biota (particularly the Colorado River endangered fish species). For this reason, DOE determined in its May 2013 BA that ULP activities under Alternative 3 may affect, and are likely to adversely affect, the Colorado River endangered fish species and their critical habitat. The USFWS then concluded, in its August 2013 BO, that water depletions under Alternative 3 were not likely to jeopardize the continued existence of the Colorado River endangered fish species and not likely to destroy or adversely modify designated critical habitat; that a water depletion fee did not apply (under a 2010 BO that addressed small water depletions); and that further programmatic consultation is not required (Appendix E of the ULP PEIS).

- *Land use.* Most of the lands surrounding the ULP lease tracts are managed by the BLM under its "multiple use" management framework. These lands are currently managed for uses that include conservation, recreation, agriculture (including grazing), rangeland, and minerals (via mining, leasing, and free use). Because these lands are managed under the authority of the BLM and USFS, the cumulative impacts within the 25-mi (40-km) radius (the ROI for cumulative effects) are considered to be minor. Lands within the Uravan Mineral Belt, including those on which the ULP lease tracts are located, were withdrawn from mineral entry in 1948 in order to reserve them for the exploration and development of uranium and vanadium resources. Under Alternatives 1 and 2, all mining activities on these lands would cease, and other activities within the lease tracts would continue. The contributions of the

BLM_0042635

ULP to cumulative impacts in the region would be minor since there would be no conflict between mining and other uses. Under Alternatives 3 through 5, mining activities within the lease tracts may preclude certain other uses (such as recreation and grazing), but their contributions to cumulative impacts would also be considered minor since the surrounding lands offer ample opportunity for these other uses.

- *Socioeconomics.* Cumulative socioeconomic impacts result from changes in employment opportunities and income, expenditures for goods and services, and tax revenues associated with various types of commercial, industrial, and recreational activities that are taking place within the ROI for cumulative effects (Montrose, Mesa, and San Miguel Counties). These impacts are generally considered beneficial to local communities, counties, and states. Unemployment in the three-county region is currently 9.6% (2011). Under Alternatives 1 and 2, socioeconomic impacts are expected to be minor, increasing the total employment by about 0.1% in the region. Under Alternatives 3 through 5, impacts would also be minor, increasing the total employment by less than 1% in the region.

- *Environmental justice.* Cumulative environmental justice impacts would encompass any (and all) impacts that could be disproportionately high and adverse on minority or low-income populations; however, there are no minority or low-income populations, as defined by CEQ guidelines, within the ROI for cumulative effects. As a result, there would be no anticipated cumulative impacts on these populations, and no contribution to these impacts from any of the five ULP alternatives.

- *Transportation.* Most roads in the ROI for cumulative effects pass through uninhabited public lands; however, routes used to haul uranium ore over the past 10 to 30 years pass 13 of 15 residences along the ULP lease tracts. Traffic volume along these routes is expected to increase with the continued operation of White Mesa Mill, the construction of Piñon Ridge Mill, and future uranium mining in the region. Under Alternatives 1 and 2, there would be no transport of uranium ore and therefore no change in current traffic trends. Ore shipments under Alternatives 3 through 5 would increase truck traffic along affected routes and would contribute to cumulative impacts, such as human exposure to low levels of radiation, increased traffic, and potential accidents. It is estimated that the number of shipments from mines to mills could be as high as 92 per day under Alternative 5. The average external dose rate is about 0.1 mrem/h at 6.6 ft (2 m), two orders of magnitude lower than the regulatory maximum. Estimated potential impacts include no LCFs to the collective population, no traffic fatalities, and possibly one traffic injury under Alternatives 4 and 5.

- *Cultural resources.* Incremental impacts from the five ULP alternatives could result from vandalism, theft, and damage or destruction of cultural artifacts

BLM_0042636

within the lease tracts or in adjacent areas affected by mining activities. Adverse impacts on traditional cultural properties are also counted among the direct impacts on cultural resources. Direct impacts on these resources are not expected under Alternatives 1 and 2; however, vandalism and theft are possible impacts because of greater site accessibility. Ground disturbance under Alternatives 3 through 5 could damage or destroy artifacts and traditional cultural properties, and artifacts could be lost through vandalism or theft as a result of improved site access. Such impacts would be minimized or avoided, since all activities would comply with Section 106 of the NHPA.

- *Visual resources.* Incremental impacts from the five ULP alternatives relate mainly to alterations to vegetation and landforms, removal of structures and materials, changes to roadways, and changes in vehicular and work activities. Although impacts associated with exploration are generally expected to be minor, potential long-term impacts could result from mine development and operations, as would occur under Alternatives 3 through 5, because activities during these phases could increase contrasts in form, line, color, and texture. The magnitude of these impacts would need to be determined at the project level.

- *Waste management.* Incremental impacts on waste management within the lease tracts (the ROI for cumulative effects for waste management) are associated with the generation of waste from the various mining phases. These impacts are expected to minor under all five of the ULP alternatives.

Based on the information in Table 4.7-12 and other information presented in Sections 4.7.1 and 4.7.2, the potential cumulative impacts on the various environmental resources (e.g., air quality, water quality, soils, ecological resources, socioeconomics, transportation) and human health from various projects and activities within the 50-mi (80-km) ROI, when added to activities related to the ULP, would vary by resource but would generally range from negligible to moderate (see Table 2.4-1). The overall contribution of the ULP to these impacts is considered to be minor.[10]

[10] Because of the qualitative nature of information presented for most projects or activities in the ROI for cumulative effects, it is not possible to determine an overall cumulative impact in a quantitative sense. Even for projects where quantitative results are calculated or estimated, (e.g., for air emissions, human health doses, transportation, and socioeconomics in Table 4.7-12), the methodology and associated assumptions used for the calculations vary, making definitive comparisons among projects difficult. For the ULP PEIS, the potential incremental impacts of the five alternatives are based on conservative assumptions and mostly do not take credit for measures (compliance measures, mitigation measures, and BMPs) that would minimize the potential impacts. Hence, it is expected that the potential incremental impacts of the ULP would be less than those summarized in Table 4.7-12, since such measures would be implemented as required by project-specific mine plans and permits. For this reason, the overall incremental impact of the ULP alternatives is expected to be negligible.

**TABLE 4.7-12 Potential Impacts of Select Projects Considered with the DOE ULP Alternatives**

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Air quality | During reclamation, $PM_{10}$ emissions are estimated to be about 140 tons/yr or about 0.92% of emission totals for the three counties (Mesa, Montrose, and San Miguel) encompassing the DOE ULP lease tracts. $NO_x$ emissions are estimated at up to 0.09% of three-county total emissions. Thus, potential impacts on ambient air quality associated with reclamation activities would be minor and temporary in nature. In addition, these activities are not anticipated to cause any measurable impacts on regional ozone or AQRVs at nearby Class I areas. Potential impacts from these activities on climate change would be negligible. | The types of impacts and resulting emissions would be almost the same as those described for Alternative 1. | Air emissions during the exploration phase would be negligible, and thus potential impacts on ambient air quality, regional ozone, AQRVs, and global climate change would be negligible as well. During mine development, $PM_{10}$ emissions would amount to about 1.5% of the three-county combined emissions. During mine operations, $NO_x$ emissions of 140 tons/yr would be about 1.0% of three-county total emissions. Potential impacts from mine development and operations on ambient air quality, regional ozone, and AQRVs at nearby Class I areas would be minor and those on global climate change would be negligible. The types of impacts associated with mine reclamation would be similar to those discussed under Alternative 1. | Similar to Alternative 3, potential impacts from exploration on ambient air quality, regional ozone, AQRVs, and global climate change would be negligible. Potential impacts are anticipated to be small, with $PM_{10}$ and $NO_x$ emissions estimated to be no higher than about 3% and 2% of the three-county (Mesa, Montrose, and San Miguel) total, respectively. Potential impacts from mine development and operations on ambient air quality, regional ozone, and AQRVs at nearby Class I areas would be minor and those on global climate change would be negligible. The types of impacts associated with mine reclamation would be similar to those discussed under Alternative 1. | Similar to Alternatives 3 and 4, potential impacts from exploration on ambient air quality, regional ozone, AQRVs, and global climate change would be negligible. During development and operations, $PM_{10}$ emissions would be about 3.2% and of the three-county total emissions. $NO_x$ emissions of 313 tons/yr amount to about 2.3% of three-county total emissions. Potential impacts from mine development and operations on ambient air quality, regional ozone, and AQRVs at nearby Class I areas would be minor and those on global climate change would be negligible. The types of impacts associated with mine reclamation would be similar to those discussed under Alternative 1. | Particulate emissions at the site boundary would be below air quality standards. | $PM_{10}$ emissions would not exceed regulatory limits. No significant dust or fume emissions are expected from transportation of uranium ore or hazardous materials. | An increase in fugitive dust would result but would not be expected to exceed ambient air quality standards. |

**TABLE 4.7-12 (Cont.)**

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Acoustic environment | During reclamation, noise levels would attenuate to about 55 dBA at a distance of 1,650 ft (500 m) from the reclamation site, which is the Colorado daytime maximum permissible limit of 55 dBA in a residential zone. Most residences are located beyond the distances where the Colorado noise limit is reached, but, if reclamation activities occurred near the boundary of Lease Tract 13, noise levels at nearby residences could exceed the Colorado limit. | The type of impacts and resulting noise levels would be almost the same as those described for Alternative 1. | Potential noise impacts during the exploration phase would be minor and intermittent. During the mine development and operations phase, potential for noise impacts is anticipated near the mine sites and along the haul routes, but impacts would be minor and limited to proximate areas. The types of impacts associated with mine reclamation would be similar to those discussed under Alternative 1. | The types of impacts related to exploration, mine development, and operations under Alternative 4 are similar to those under Alternative 3. The types of impacts related to reclamation under Alternative 4 are similar to those under Alternative 1. However, if mine development or reclamation activities would occur near the lease tract boundary, noise levels at residences around Lease Tracts 13, 13A, 16, and 16A could exceed the Colorado limit. | The types of impacts related to exploration, mine development, and operations, and reclamation under Alternative 5 would be similar to those under Alternative 4. | No information was available. | Estimated maximum noise level at the property boundary would be below the most restrictive maximum permissible noise level established by county regulation. | An increase in noise is expected from mining operations and associated traffic. Noise is not expected to exceed 50 dB outside of the established noise boundary. |

TABLE 4.7-12 (Cont.)

| Resource Area | ULP Alternatives: Alternative 1 | ULP Alternatives: Alternative 2 | ULP Alternatives: Alternative 3 | ULP Alternatives: Alternative 4 (Preferred Alternative) | ULP Alternatives: Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Soil resources | Activities during the reclamation phase could result in minor impacts on soil resources because they would involve ground disturbances that would increase the potential for soil compaction, soil horizon mixing, soil contamination, soil erosion and deposition by wind, soil erosion by water and surface runoff, and sedimentation of nearby surface water bodies. | Soil impacts from ground-disturbing activities at the 10 lease tracts requiring reclamation would be the same as those described for Alternative 1. | Because exploration activities would occur over relatively small areas and involve little or no ground disturbance, potential impacts associated with this phase are expected to be small. Under Alternative 3, ground disturbance during the peak production year would occur on an estimated 300 acres (120 ha) across 12 lease tracts, mainly during mine development. Impacts associated with this phase are expected to be minor to moderate. The types of impacts related to reclamation under Alternative 3 would be similar to those described for Alternative 1; however, ground disturbance would occur over a larger area. | The types of impacts from exploration under Alternative 4 would be minimal similar to those under Alternative 3. The types of impacts related to mine development and operations under Alternative 4 are similar to those under Alternative 3. Under Alternative 4, ground disturbance during the peak production year would occur on an assumed 460 acres (190 ha). Impacts associated with this phase are expected to be minor to moderate. The types of impacts related to reclamation under Alternative 4 would be similar to those under Alternatives 1, 2, and 3. However, ground disturbance would occur over a larger area. | Soil impacts under Alternative 5 for the exploration, mine development and operations, and reclamation phases would be the same as those described under Alternative 4 because DOE would continue the ULP with the 31 lease tracts for the remainder of the 10-year period. The number of mines assumed to be operating at the peak year of ore production would be the same as the number under Alternative 4, except that a slightly larger surface area would be used for mine development. | Soils in the project vicinity are normally subject to erosion due to lack of consolidation and poor vegetative cover. Mill construction and operations would accelerate wind and water erosion. Total off-site sediment transfer would be reduced as a result of the project. | About 420 acres (170 ha) would be disturbed by site development activities. Construction impacts could include erosion of surface water control and settling. Surface disturbances would be stabilized by vegetation during operations. | The mine will deplete the uranium ore deposit and increase waste rock. About 24 acres (10 ha) of topsoil will be disturbed and saved for reclamation. The potential exists for topsoil to mix with waste rock, ore, or soil containing other minerals, which could affect reclamation efforts at the end of the project. |
| Water resources | Land disturbance activities associated with reclamation have the potential to affect water resources by eroding soil and by altering the | Under Alternative 2, impacts on water resources associated with the reclamation | Exploration activities would involve some land disturbance activities, such as vegetation clearing, grading, drilling, and building of | The types of impacts related to exploration under Alternative 4 would be similar to those under Alternative 3. The types of impacts related | The types of impacts related to exploration under Alternative 5 would be similar to those under Alternative 3. The types of impacts related | There would be a minimal impact on surface water resources. There is no discharge of mill effluents or | Impacts could include erosion of stormwater channels and reduction of surface water | Impacts on groundwater and surface water are considered minimal to |

**TABLE 4.7-12 (Cont.)**

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Water resources (Cont.) | topography and soil conditions that affect hydrologic processes. Potential groundwater quality impacts resulting from the backfill materials and poor sealing of drill holes in wet mines would be minor. The short duration of reclamation (2 to 3 years) in comparison to mining operations (on the order of 10 years or more) would reduce direct impacts on water resources; however, given the potentially long time needed to reestablish vegetation and soil conditions after reclamation, indirect impacts of reclamation could be significant. | activities would be the same as those described for Alternative 1 | access roads and drill pads, but these activities would occur over relatively small areas. The exploratory drill holes for wet underground mines would have the potential to allow groundwater leaching, but the impact is considered minor due to the limited amount of groundwater in the area. Of the three phases evaluated, the mine development and operations phase has the greatest potential to affect water resources, primarily as a result of land disturbance activities, erosion, mine water runoff, the staging of ores and waste rock, the alteration of shallow aquifers, the mixing of groundwater with varying geochemical characteristics, the use of chemicals, water use, and wastewater generation. The types of impacts associated with mine reclamation would be similar to those discussed under Alternative 1. | to mine development and operations under Alternative 4 would be similar to those described for Alternative 3. The increase in the area of surface disturbed and size of underground mines under Alternative 4 has the potential to increase impacts associated with erosion and groundwater contamination; however, the proximity of the lease tract to the Dolores River and the San Miguel River and amount of groundwater seepage would still be the primary factors governing impacts. Under Alternative 4, impacts associated with the reclamation activities would be the same as those under Alternative 1, but the scale of reclamation is greater. | to mine development and operations under Alternative 5 would be similar to those under Alternative 3. The increase in disturbed area and size of underground mines under Alternative 5 might increase the impacts associated with erosion and groundwater contamination; however, the proximity of the lease tract to the Dolores River and the San Miguel River and amount of groundwater seepage would be still be the primary factors governing impacts. Under Alternative 5, impacts on water resources associated with reclamation activities would be the same as those under Alternative 1, but the scale of reclamation is greater. | sanitary wastes to surface waters. | flow to the Dolores River. | negligible if proper water treatment, transport, and storage practices are implemented. |

**TABLE 4.7-12 (Cont.)**

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Human health | Potential human health impacts could result from implementation of reclamation activities and from the aboveground waste-rock piles that would be regraded, provided with a top layer of soil materials, and revegetated but remain on site after reclamation. Under this alternative, minor impacts could occur from radiation exposures. A reclamation worker could receive a dose up to 14.3 mrem/yr (with implementation of engineering controls when closing mine openings), a resident could receive a dose up to 8.9 mrem/yr, and a recreationist could receive one up to 30 mrem/yr. | Potential human health impacts under Alternative 2 would be the same as those under Alternative 1. | Under Alternative 3, it can be reasonably expected that the total dose that a worker would receive from mine exploration would be less than 5 mrem. During the year of peak operations, there could be two nonfatal injuries and illnesses among the 98 workers assumed for this alternative. Under this alternative, a mine worker could experience adverse health effect from exposure to vanadium, and the probability for him to develop a fatal cancer from long-term (10 years) exposure to radiation would be about 1 in 250. For the general public, it is possible that a resident could receive a radon dose of more than 10 mrem/yr during the development and operations of uranium mines, if this resident lived less than 1.6 mi (2.5 km) from a uranium mine. For the population living 3 to 50 mi (5 to 80 km) from the uranium lease tract area, the average radiation exposure would be | Potential human health impacts for individual receptors under Alternative 4 would be the same as those under Alternative 3. For the population living 3 to 50 mi (5 to 80 km) from the uranium lease tract area, the average radiation exposure during mine development and operations would be negligible, less than 1 mrem/yr. | Potential human health impacts for individual receptors under Alternative 5 would be the same as those under Alternative 3. For the population living 3 to 50 mi (5 to 80 km) from the uranium lease tract area, the average radiation exposure during mine development and operations would be negligible, less than 1.1 mrem/yr. | The dose to nearest potential residence was calculated to be 5.8 mrem/yr. | The estimated dose to a receptor at the site boundary is about 8.2 mrem/yr (including radon). The estimated dose to the nearest downwind off-site receptor is 0.5 mrem/yr. | No impacts on human health are predicted if EPA guidelines and MHSA regulations are properly implemented. |

TABLE 4.7-12 (Cont.)

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Human health (Cont.) | | | negligible, less than 0.4 mrem/yr. The types of impacts associated with mine reclamation would be similar to those discussed under Alternative 1. | | | | | |
| Ecological resources | Reclamation would be expected to establish native plant communities over the long term. Impacts could include habitat loss, fugitive dust, erosion, sedimentation, and the hydrologic changes, non-native species. Reclamation activities could affect wildlife by altering existing habitat characteristics and the species supported by those habitats, but overall, impacts on wildlife would be minor. Overall, impacts on aquatic biota from Alternative 1 would be negligible. Impacts on threatened, endangered, and sensitive species would be similar to, or the same as, impacts on other plant communities, habitats, wildlife, and aquatic biota. | Potential impacts on vegetation, wildlife, aquatic biota, and special status species under Alternative 2 would be the same as those under Alternative 1. | Exploration activities are expected to affect relatively small areas, and impacts on vegetation, wildlife, and aquatic biota would generally be minimal and short term. Impacts would be minor to moderate during mine development, operations, and reclamation. Impacts could include habitat loss, fugitive dust, erosion, sedimentation, hydrologic changes, and non-native species. Although wildlife impacts would be long term, they would be scattered temporally and, especially, spatially. Potential impacts on threatened, endangered, and sensitive species could range from small to moderate and short term to long term, depending on the location of the mines and amount of surface | Potential impacts on vegetation would be minor to moderate. Potential localized impacts on wildlife and aquatic biota would be negligible to moderate and would not affect the viability of their populations. Potential impacts on threatened, endangered, and sensitive species will be similar to those under Alternative 3. The types of impacts under Alternative 4 would be similar to those under Alternative 3, except that during the peak year of operations, up to 19 mines could be in operation (6 small, 10 medium, 2 large, and 1 very large); in addition, the mines could be located on any of the 31 lease tracts rather than on just 12 of them. | The types of impacts from exploration, mine development and operations, and reclamation under Alternative 5 would be similar to those under Alternative 3; however, a larger total area would be affected. Although exploration, mine development and operations, and reclamation are expected to be incrementally greater under Alternative 5 than under Alternative 3, impacts on wildlife and terrestrial threatened, endangered, and sensitive species are still expected to be negligible to minor for site exploration and minor to moderate for mine development, operations, and reclamation. Overall, impacts on aquatic biota are expected to be negligible during site | Loss of habitat for terrestrial biota (including vegetation, wildlife, and threatened, endangered, and sensitive species) is expected to be minor. Increased human activity might cause wildlife displacement away from the mill site. Impacts on aquatic biota (including sensitive species) are expected to be negligible to minor. | The disturbance of about 420 acres (170 ha) would be a moderate impact on vegetation and a minor to moderate impact on wildlife and sensitive species. Potential impacts on ecological resources from operations would be similar to those for the White Mesa Mill. Contents of evaporation ponds and tailing cells could be toxic to wildlife, including special status species. BMPs | About 24 acres (10 ha) of habitat for terrestrial biota (including vegetation, wildlife, and sensitive species) would be disturbed and is considered a minor reduction of habitat. Impacts on terrestrial biota and sensitive species are expected to be minor to negligible if proper management practices are implemented. Impacts on aquatic biota (including sensitive species) are expected to be |

**TABLE 4.7-12 (Cont.)**

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Ecological resources (Cont.) | | | disturbance. Direct impacts could result from the destruction of habitats during site clearing, excavation, and operations. Indirect impacts could result from fugitive dust, erosion, sedimentation, and impacts related to altered surface water and groundwater hydrology. The USFWS concluded that implementation of the best management practices related to aquatic habitats and water quality will reduce water quality impacts to the extent that they are insignificant.<br><br>Water withdrawals from the Upper Colorado River Basin to support mining activities may result in potentially unavoidable impacts on aquatic biota (particularly the Colorado River endangered fish species). For this reason, DOE determined in its May 2013 BA that ULP activities under Alternative 3 may affect, and are likely to adversely affect, the | | exploration and minor to major during mine development and operations and reclamation. Potential impacts on threatened, endangered, and sensitive species could range from small to moderate and short term to long term, depending on the location of the mines and amount of surface disturbance. Direct impacts could result from the destruction of habitats during site clearing, excavation, and operations. Indirect impacts could result from fugitive dust, erosion, sedimentation, and impacts related to altered surface water and groundwater hydrology. The USFWS concluded that implementation of the best management practices related to aquatic habitats and water quality will reduce water quality impacts to the extent that they are insignificant.<br><br>Water withdrawals from the Upper Colorado River Basin to support | | would be utilized to exclude wildlife use of these areas. Impacts on aquatic biota (including sensitive species) are expected to be negligible to minor. | negligible to minor. |

TABLE 4.7-12 (Cont.)

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Ecological resources (Cont.) | | | Colorado River endangered fish species and their critical habitat. The USFWS then concluded, in its August 2013 BO, that water depletions under Alternative 3 were not likely to jeopardize the continued existence of the Colorado River endangered fish species and not likely to destroy or adversely modify designated critical habitat; that a water depletion fee did not apply (under a 2010 BO that addressed small water depletions); and that further programmatic consultation is not required (Appendix E of the ULP PEIS). Reclamation activities under Alternative 3 would be similar to those described for Alternative 1. | | mining activities may result in potentially unavoidable impacts on aquatic biota (particularly the Colorado River endangered fish species). For this reason, DOE determined in its May 2013 BA that ULP activities under Alternative 3 may affect, and are likely to adversely affect, the Colorado River endangered fish species and their critical habitat. The USFWS then concluded, in its August 2013 BO, that water depletions under Alternative 3 were not likely to jeopardize the continued existence of the Colorado River endangered fish species and not likely to destroy or adversely modify designated critical habitat; that a water depletion fee did not apply (under a 2010 BO that addressed small water depletions); and that further | | | |

**TABLE 4.7-12 (Cont.)**

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Ecological resources (Cont.) | | | | | programmatic consultation is not required (Appendix E of the ULP PEIS). | | | |
| Land use | Under Alternative 1, mining activities would cease, but all other activities within the lease tracts would continue. As a result, impacts due to land use conflicts are expected to be minor. | Under Alternative 2, all the ULP lease tracts would be terminated, and DOE would restore the lands to the public domain under BLM's administrative control once reclamation activities were completed. As a result, impacts due to land use conflicts are expected to be minor. | Mining activities within the lease tracts would likely preclude some land uses, such as recreation or grazing. However, because many of the surrounding lands offer opportunities for these activities, impacts due to land use conflicts are considered to be minor. | Impacts would be similar to those under Alternative 3 but greater because they involve more lands. | Impacts under Alternative 5 would be the same as those under Alternative 4. | A total of 480 acres (200 ha) for the mill, tailings area, and roads would be altered. The 330-acre (140-ha) tailings area might be unavailable for further productive use when the mill area is reclaimed after operations cease, but the land might be returned to former grazing use after radiation levels are reduced to acceptable levels. Land use in surrounding areas might be affected, such as for | The project site would be unavailable for recreational or range and grazing use during construction and the 40-year operational period. No changes in land use would be expected for existing uranium mines in the region, but operations might result in resumed production of some regional uranium mines | Night lights and noise may disturb the landowner to the northwest. |

**TABLE 4.7-12 (Cont.)**

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Land use (Cont.) | | | | | | increased residential and commercial development to serve mill-related population growth and mineral extraction in the vicinity. | that are on standby. | |
| Socio-economics | Reclamation would require 29 direct jobs during the year for field work and revegetation and would generate 16 indirect jobs. | Potential impacts on socioeconomics (including recreation and tourism) for Alternative 2 would be the same as those described for Alternative 1. | Exploration activities would directly employ 8 people during the peak year and would create an additional 9 indirect jobs under Alternative 3. Development and operational activities would directly employ 123 people during the peak year and would create an additional 98 indirect jobs. Reclamation would require a direct workforce of 29 people and would create 17 indirect jobs. | Exploration activities would directly employ 20 people during the peak year and would create an additional 16 indirect jobs under Alternative 4. Mining development and operational activities would create direct employment of 229 people during the peak year and would create 152 additional indirect jobs. Reclamation would require 39 direct jobs and 21 indirect jobs. | Exploration activities would directly employ 24 people during the peak year and would create an additional 28 indirect jobs under Alternative 5. Development and operational activities would create direct employment for 253 people during the peak year and would generate an additional 152 indirect jobs. Reclamation would require 39 direct jobs and create 25 indirect jobs. | About 8 jobs would be created to support operations of the mill. | As many as 538 direct and 664 indirect jobs could be created. Increased availability of local services could lead to expansion of recreation and tourism in the area. An association of negative impacts from mining and milling on recreation and tourism has not been demonstrated. | Potential impacts could be 10 to 24 full-time, year-round jobs, with most positions expected to be filled by local hires. |

**TABLE 4.7-12 (Cont.)**

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Environ-mental justice | Although potential impacts on the general population could result from the reclamation of uranium mining facilities, for the majority of resources evaluated, impacts would likely be minor. For the majority of resources, it is unlikely that there would be any disproportionate impacts to low income or minority populations. | Impacts on environmental justice associated with reclamation activities under Alternative 2 would be the same as those under Alternative 1. | Although potential impacts on the general population could result from exploration, mine development and operations, and reclamation under Alternative 3, for the majority of resources evaluated, impacts would likely be minor. Specific impacts on low-income and minority populations as a result of participation in subsistence or cultural and religious activities would also be minor and unlikely to be disproportionate. | The types of impacts related to mine development and operations under Alternative 4 would be similar to those described under Alternative 3, but the increase in the disturbed area under Alternative 4 could potentially increase the impacts. Impacts on environmental justice associated with the reclamation activities would be the same as those under Alternative 1. | The types of impacts related to exploration under Alternative 5 would be similar to those under Alternative 3. Under Alternative 5, there would be a total of 19 mines operating across the 31 DOE ULP lease tracts. The types of impacts related to mine development and operations under Alternative 5 would be similar to those under Alternative 4. Although potential impacts on the general population could result from exploration, mine development and operations, and reclamation under Alternative 5, for the majority of resources evaluated, the impacts would likely be minor and unlikely to have disproportionate impacts on low income or minority populations. | No information was available. | No information was available. | No environmental justice impacts were identified. |

TABLE 4.7-12 (Cont.)

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Transportation | No transport of uranium ore would occur under Alternative 1. There would be no radiological transportation impacts. No changes in current traffic trends near the ULP lease tracts are anticipated. | No transport of uranium ore would occur under Alternative 2. There would be no radiological transportation impacts. | The estimated number of shipments from the operating uranium mines to the mills during the peak year of uranium mining under Alternative 3 would be 40 per day; 80 trucks per day would be expected to travel the affected routes. The nonradiological routine impacts associated with uranium ore transportation would be vehicle-related as a result of the increase in truck traffic on affected routes. Radiological impacts during routine conditions would be a result of human exposure to the low levels of radiation near the shipment. The annual collective population dose to persons sharing the shipment route and to persons living and working along the route was estimated to be approximately 0.14 person-rem ($8 \times 10^{-5}$ LCF) for the peak year, and the truck drivers (transportation crew) would receive a dose of about | The estimated number of shipments from the operating uranium mines to the mills during the peak year of uranium mining under Alternative 4 would be 80 per day; 160 trucks per day would be expected to travel the affected routes. If all 160 trucks per day passed through Egnar, in the extreme case of all shipments going to the White Mesa Mill, there would be an increase of 64% in traffic in this area, but only a 3% increase at the most heavily travelled location in Monticello, Utah. The annual collective population dose to persons sharing the shipment route and to persons living and working along the route was estimated to be approximately 0.28 person-rem (0.0002 LCF) for the peak year. The truck drivers (transportation crew) would receive a dose of about 1.4 person-rem | The estimated number of shipments from the operating uranium mines to the mills during the peak year of uranium mining under Alternative 5 would be 92 per day; 184 trucks per day would be expected to travel the affected routes. If all 184 trucks per day passed through Egnar, in the extreme case of all shipments going to the White Mesa Mill, there would be an increase of 74% in traffic in this area, but only a 3% increase at the most heavily travelled location in Monticello, Utah. The average external dose rate for uranium ore shipments is about 0.1 mrem/h at 6.6 ft (2 m), which is two orders of magnitude lower than the regulatory maximum. Collectively for the sample case, the truck drivers (transportation crew) would receive a dose of about 1.8 person-rem (0.001 LCF) during the peak year of operations | The traffic volume on area highways would increase substantially, increasing traffic congestion. | Average daily traffic on CO 90 and CO 141 would increase by 40%. CDOT does not consider the increase in traffic to be large. The condition of certain unimproved roads could worsen as a result of their use by an increased amount of mill traffic. | Increased traffic is expected on local roads. Increases of 14 light-duty vehicle round-trips and 9 heavy-duty vehicle round-trips per day are expected. |

**TABLE 4.7-12 (Cont.)**

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Transportation (Cont.) | | | 0.71 person-rem (0.0004 LCF) during the peak year of operations. Potential transportation accident impacts for the peak year would not include any expected injuries or fatalities from traffic accidents. Impacts on the public and the environment from an accident involving a haul truck carrying uranium ore are expected to be minimal and short term. | (0.0009 LCF) during the peak year of operations from all shipments. Potential transportation accident impacts for the peak year would not include any expected fatalities and would include possibly one injury from traffic accidents. | from all shipments. The annual collective population dose to persons sharing the shipment route and to persons living and working along the route was estimated to be approximately 0.34 person-rem (0.0002 LCF) for the peak year. Potential transportation accident impacts in the peak year would include zero expected fatalities and potentially one injury from traffic accidents. | | | |

TABLE 4.7-12 (Cont.)

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Cultural resources | Direct impacts on cultural resources are not expected under this alternative. Indirect adverse impacts from vandalism could still occur in the lease tracts where reclamation is proposed, depending on the number and activities of workers engaged in reclamation. | Impacts on cultural resources would be the same as those discussed for Alternative 1. | In each of the exploration, development and operations, and reclamation phases, cultural resources could be disturbed as a result of activities in which the ground surface was disturbed, historic structures were damaged or destroyed, or pedestrian and vehicle traffic increased on the lease tracts and their access roads. These activities could also have adverse effects on traditional cultural properties, such as plant and animal species traditionally collected by Native Americans and on sacred or culturally significant places and landforms. | Under Alternative 4, impacts would be similar to those discussed under Alternatives 1, 2, and 3, except they would occur on a larger scale, since they could occur on all lease tracts. | Under Alternative 5, impacts would be similar to those discussed for Alternative 4, except they would be of shorter duration. Impacts from mine development and operations would be similar in nature to those described for Alternative 3, but on a larger scale. An estimated total of 23 cultural resource sites would likely be affected by the development of mining activities under Alternative 5. Impacts from reclamation activities would be the same as those discussed for Alternative 1. | Six historical sites were identified by a survey; of the five eligible for inclusion in the NRHP, one would be adversely affected by the mill and would require mitigation. No impacts on paleontological resources were identified. | Project would not be expected to affect any historic properties, and artifact surveys would be expected to continue as the facility is developed. There would be little potential for disturbance of known cultural sites or unanticipated discoveries during operations. No paleontological resource impacts were identified. | No impacts on cultural resources were identified, nor were any traditional cultural properties. However, there is a potential for discovering or damaging buried deposits that are not readily identifiable. There is also some potential for discovering or damaging vertebrate fossils within the Morrison Formation located within the mine. |

TABLE 4.7-12 (Cont.)

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Visual resources | Impacts resulting from reclamation can be produced through a range of direct and indirect actions or activities occurring on the lands contained within the lease tracts. These types of impacts include the following: vegetation and landform alterations; removal of structures and materials; changes to existing roadways; and changes in vehicular and worker activities. | Because the primary difference between Alternative 1 and Alternative 2 is in the administrative control of the lease tracts, the resulting visual impacts would be similar. | Visual impacts associated with exploration are generally minor and of short duration due to the quick time frame in which these activities are conducted. Impacts due to road construction, erosion, or other landform alterations or vegetation clearing in arid environments, however, might be visible for extended periods. Potential visual impacts that could result from mine development and operations would include contrasts in form, line, color, and texture. The types of impacts associated with mine reclamation would be similar to those discussed for Alternative 1. | Visual impacts generally would be the same under this alternative as those under Alternatives 1 and 3, except they would be on a larger scale. | Visual impacts would generally be the same for this alternative as those described for Alternatives 1 and 3. As stated for Alternative 4, the primary difference from Alternative 1 would be that activities would occur on all of the lease tracts. | Stack emissions would be visible to the public travelling on US 163, but the stack emissions would not be expected to be visible from major recreational areas in the vicinity. | Construction would not significantly affect the viewshed from Davis, Mesa, or CO 90, and impacts would be temporary. Facility features would be noticeable to travellers on CO 90 but would not dominate the view of the casual observer; existing open-pit mine overburden piles, waste-rock dumps, mine buildings, and access roads currently draw attention from CO 90. Visual impacts would be most prominent later in the 40-yr facility lifetime, when evaporation ponds would be completed to full capacity. | The mine can be seen from points of interest such as Palisade WSA and the La Sal Mountains and foothills; however, the mine does not dominate the view of the casual viewer. |

**TABLE 4.7-12 (Cont.)**

| Resource Area | ULP Alternatives: Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 (Preferred Alternative) | Alternative 5 | White Mesa Mill (Present) | Piñon Ridge Mill (Planned) | Uranium Mines (Present)[a] |
|---|---|---|---|---|---|---|---|---|
| Waste management | The potential impacts on waste management practices that would result from waste generated during reclamation activities under Alternative 1 would be expected to be minor. | The potential impacts on the ability to manage the waste generated from reclamation activities under Alternative 2 would be the same as those described for Alternative 1. | The potential impacts on waste management practices that would result from waste generated during exploration, mine development and operations, and reclamation would be expected to be minor. Because exploration and mine development and operations would be conducted in addition to reclamation under Alternative 3, the waste generated would be more than that generated under Alternatives 1 and 2. | Potential impacts on waste management practices under Alternative 4 would be small and similar to those under Alternatives 1, 2, and 3. The quantity of waste to be managed under Alternative 4 would be slightly larger than the quantity under Alternative 3 for the peak year of mine development and operations. | Potential impacts on waste management practices under Alternative 5 would be the same as those under Alternative 4. | A total of 2,000 tons per day of waste material (tailings) would be produced, for on-site deposition. Process water (310 gal or 1,200 L per minute) would be discharged to the tailings impoundment. There would be no discharge of liquid or solid effluents from the mill and tailings site. | No information was available. | No information was available. |

[a] Taken from impacts discussed for the Whirlwind Mine.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 80 of 426

*This page intentionally left blank*

BLM_0042654





# Final Uranium Leasing Program Programmatic Environmental Impact Statement

Volume 2: Chapter 5 through Appendix H

DOE/EIS-0472
March 2014

U.S. DEPARTMENT OF
ENERGY
Legacy
Management

BLM_0042656



# Final Uranium Leasing Program Programmatic Environmental Impact Statement

## Volume 2: Chapter 5 through Appendix H

DOE/EIS-0472
March 2014

U.S. DEPARTMENT OF
ENERGY
Legacy
Management

BLM_0042658

# CONTENTS

NOTATION ........ xxxiii

CONVERSION TABLE ........ xli

**VOLUME 1: CHAPTERS 1 THROUGH 4**

1 INTRODUCTION ........ 1-1

1.1 Background ........ 1-1
1.2 Current Status of the ULP ........ 1-6
1.2.1 DOE ULP Administrative Process ........ 1-7
1.2.2 Lease Requirements ........ 1-13
1.3 Site-Specific Information for the ULP Lease Tracts ........ 1-14
1.3.1 ULP Lease Tract 5 ........ 1-14
1.3.2 ULP Lease Tract 5A ........ 1-17
1.3.3 ULP Lease Tract 6 ........ 1-17
1.3.4 ULP Lease Tract 7 ........ 1-19
1.3.5 ULP Lease Tract 8 ........ 1-21
1.3.6 ULP Lease Tract 8A ........ 1-21
1.3.7 ULP Lease Tract 9 ........ 1-23
1.3.8 ULP Lease Tract 10 ........ 1-25
1.3.9 ULP Lease Tract 11 ........ 1-25
1.3.10 ULP Lease Tract 11A ........ 1-27
1.3.11 ULP Lease Tract 12 ........ 1-27
1.3.12 ULP Lease Tract 13 ........ 1-28
1.3.13 ULP Lease Tract 13A ........ 1-30
1.3.14 ULP Lease Tract 14 ........ 1-30
1.3.15 ULP Lease Tract 15 ........ 1-31
1.3.16 ULP Lease Tract 15A ........ 1-31
1.3.17 ULP Lease Tract 16 ........ 1-32
1.3.18 ULP Lease Tract 16A ........ 1-33
1.3.19 ULP Lease Tract 17 ........ 1-33
1.3.20 ULP Lease Tract 18 ........ 1-34
1.3.21 ULP Lease Tract 19 ........ 1-36
1.3.22 ULP Lease Tract 19A ........ 1-36
1.3.23 ULP Lease Tract 20 ........ 1-37
1.3.24 ULP Lease Tract 21 ........ 1-37
1.3.25 ULP Lease Tract 22 ........ 1-38
1.3.26 ULP Lease Tract 22A ........ 1-39
1.3.27 ULP Lease Tract 23 ........ 1-39
1.3.28 ULP Lease Tract 24 ........ 1-40
1.3.29 ULP Lease Tract 25 ........ 1-40

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 86 of 426

**CONTENTS (Cont.)**

1.3.30 ULP Lease Tract 26 ........ 1-41
1.3.31 ULP Lease Tract 27 ........ 1-42
1.4 Purpose and Need for Agency Action ........ 1-43
1.5 Proposed Action ........ 1-44
1.6 Scope of the ULP PEIS ........ 1-44
1.7 NEPA Process for the ULP PEIS ........ 1-45
1.7.1 Public Scoping Process ........ 1-45
1.7.1.1 Comments Considered Within the ULP PEIS Scope ........ 1-46
1.7.1.2 Comments Considered Outside the ULP PEIS Scope ........ 1-49
1.7.2 Public Comment Process ........ 1-49
1.7.3 Nine Topics of Interest Based on Public Comments Received ........ 1-51
1.8 Other Related, Similar, Connected, or Cumulative Actions ........ 1-61
1.9 Consultation ........ 1-62
1.10 Cooperating and Commenting Agencies ........ 1-63
1.11 Organization of the ULP PEIS ........ 1-65

2 PROPOSED ACTION AND ALTERNATIVES ........ 2-1

2.1 Uranium Mining Methods and Phases ........ 2-3
2.1.1 Exploration ........ 2-3
2.1.2 Mine Development and Operations ........ 2-4
2.1.2.1 Surface-Plant Area Construction and Operations ........ 2-5
2.1.2.2 Mining Method – Underground Mining ........ 2-12
2.1.2.3 Mining Method – Surface Open-Pit Mining ........ 2-13
2.1.3 Reclamation ........ 2-13
2.1.4 Ore Processing ........ 2-14
2.1.4.1 Piñon Ridge Mill ........ 2-14
2.1.4.2 White Mesa Mill ........ 2-16
2.2 Five Alternatives Evaluated ........ 2-17
2.2.1 Alternative 1 ........ 2-17
2.2.1.1 Basis for Impacts Analyses for Alternative 1 ........ 2-19
2.2.2 Alternative 2 ........ 2-20
2.2.2.1 Basis for Impacts Analyses for Alternative 2 ........ 2-21
2.2.3 Alternative 3 ........ 2-21
2.2.3.1 Basis for Impacts Analyses for Alternative 3 ........ 2-24
2.2.4 Alternative 4 ........ 2-26
2.2.4.1 Basis for Impacts Analyses for Alternative 4 ........ 2-27
2.2.5 Alternative 5 ........ 2-30
2.2.5.1 Basis for Impacts Analyses for Alternative 5 ........ 2-30
2.3 Alternatives Considered but Not Evaluated in Detail ........ 2-32
2.4 Summary and Comparison of the Potential Impacts from the Five Alternatives ........ 2-33

BLM_0042660

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 87 of 426

**CONTENTS (Cont.)**

2.4.1 Air Quality .......... 2-33
2.4.2 Acoustic Environment .......... 2-38
2.4.3 Soil Resources .......... 2-38
2.4.4 Water Resources .......... 2-39
2.4.5 Human Health .......... 2-40
2.4.6 Ecological Resources .......... 2-42
2.4.6.1 Vegetation .......... 2-43
2.4.6.2 Wildlife .......... 2-44
2.4.6.3 Aquatic Biota .......... 2-46
2.4.6.4 Threatened, Endangered, and Sensitive Species .......... 2-47
2.4.7 Land Use .......... 2-48
2.4.8 Socioeconomics .......... 2-49
2.4.9 Environmental Justice .......... 2-49
2.4.10 Transportation .......... 2-50
2.4.11 Cultural Resources .......... 2-51
2.4.12 Visual Resources .......... 2-53
2.4.13 Waste Management .......... 2-54
2.4.14 Cumulative Impacts .......... 2-54
2.5 Irreversible and Irretrievable Commitment of Resources .......... 2-72
2.6 Preferred Alternative Identified .......... 2-72

3 AFFECTED ENVIRONMENT .......... 3-1

3.1 Air Quality .......... 3-1
3.1.1 Climate .......... 3-1
3.1.1.1 General Climate .......... 3-1
3.1.1.2 Wind .......... 3-2
3.1.1.3 Temperature .......... 3-5
3.1.1.4 Precipitation .......... 3-5
3.1.1.5 Severe Weather .......... 3-5
3.1.2 Existing Air Emissions .......... 3-8
3.1.3 Existing Air Quality .......... 3-11
3.1.4 Regulatory Environment .......... 3-14
3.1.4.1 Prevention of Significant Deterioration .......... 3-14
3.1.4.2 Visibility Protection .......... 3-18
3.1.4.3 General Conformity .......... 3-18
3.1.4.4 Air Quality-Related Values .......... 3-18
3.2 Acoustic Environment .......... 3-20
3.2.1 Sound Fundamentals .......... 3-20
3.2.2 Background Noise Levels .......... 3-21
3.2.3 Noise Regulations .......... 3-22
3.3 Geological Setting and Soil Resources .......... 3-23
3.3.1 Geological Setting .......... 3-23

BLM_0042661

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 88 of 426

**CONTENTS (Cont.)**

3.3.1.1 Physiography ............ 3-23
3.3.1.2 Structural Geology ............ 3-24
3.3.1.3 Bedrock Geology ............ 3-27
3.3.1.4 Seismicity ............ 3-34
3.3.1.5 Topography and Geology of the Lease Tracts ............ 3-35
3.3.1.6 Paleontological Resources ............ 3-40
3.3.2 Soil Resources ............ 3-42
3.3.2.1 Gateway Lease Tracts ............ 3-43
3.3.2.2 Uravan Lease Tracts ............ 3-45
3.3.2.3 Paradox Lease Tracts ............ 3-47
3.3.2.4 Slick Rock Lease Tracts ............ 3-51
3.4 Water Resources ............ 3-53
3.4.1 Surface Water ............ 3-53
3.4.1.1 Stream and Drainage Systems ............ 3-53
3.4.1.2 Existing Water Quality ............ 3-59
3.4.2 Groundwater ............ 3-68
3.4.3 Water Management ............ 3-76
3.5 Human Health ............ 3-79
3.5.1 Exposure to Radiation ............ 3-79
3.5.1.1 Radiation and Its Effects ............ 3-79
3.5.1.2 Baseline Radiological Dose and Risk ............ 3-83
3.5.2 Exposure to Hazardous Chemicals ............ 3-88
3.5.2.1 Chemical Hazards ............ 3-88
3.5.2.2 Baseline Chemical Risks ............ 3-89
3.6 Ecological Resources ............ 3-93
3.6.1 Vegetation ............ 3-93
3.6.1.1 Wetlands and Floodplains ............ 3-107
3.6.2 Wildlife ............ 3-114
3.6.2.1 Amphibians and Reptiles ............ 3-115
3.6.2.2 Birds ............ 3-115
3.6.2.3 Mammals ............ 3-130
3.6.3 Aquatic Biota ............ 3-145
3.6.4 Threatened, Endangered, and Sensitive Species ............ 3-153
3.6.4.1 Species Listed under the Endangered Species Act ............ 3-153
3.6.4.2 Sensitive and State-Listed Species ............ 3-175
3.7 Land Use ............ 3-178
3.7.1 Specially Designated Areas and Lands with Wilderness Characteristics ............ 3-179
3.7.2 Agriculture ............ 3-183
3.7.3 Rangeland Resources ............ 3-190
3.7.3.1 Livestock Grazing ............ 3-190
3.7.3.2 Wild Horses and Burros ............ 3-190
3.7.4 Mineral Resources and Mining ............ 3-191

BLM_0042662

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 89 of 426

**CONTENTS (Cont.)**

3.7.4.1 Uranium ... 3-191
3.7.4.2 Coal ... 3-195
3.7.4.3 Oil and Gas ... 3-195
3.7.4.4 Other Minerals and Mineral Materials ... 3-196
3.7.5 Timber Harvest ... 3-196
3.7.6 Recreation ... 3-197
3.8 Socioeconomics ... 3-198
3.8.1 Economic Environment ... 3-200
3.8.1.1 ROI Employment and Unemployment ... 3-200
3.8.1.2 Employment by Sector ... 3-201
3.8.1.3 Personal Income ... 3-202
3.8.2 Social Environment ... 3-205
3.8.2.1 Population ... 3-205
3.8.2.2 ROI Housing ... 3-205
3.8.2.3 ROI Community and Social Services ... 3-206
3.8.3 Recreation and Tourism Economy ... 3-211
3.9 Environmental Justice ... 3-213
3.10 Transportation ... 3-218
3.11 Cultural Resources ... 3-224
3.11.1 Cultural History of Southwestern Colorado ... 3-224
3.11.2 Cultural Resource Inventories ... 3-228
3.11.3 Traditional Cultural Properties ... 3-236
3.12 Visual Resources ... 3-238
3.12.1 Regional Setting ... 3-239
3.12.2 Lease Tracts ... 3-241
3.12.2.1 North Group ... 3-250
3.12.2.2 North Central Group and South Central Group ... 3-252
3.12.2.3 South Group ... 3-254
3.12.3 Visual Resource Management ... 3-255
3.13 Waste Management ... 3-257

4 ENVIRONMENTAL IMPACTS ... 4-1

4.1 Alternative 1 ... 4-1
4.1.1 Air Quality ... 4-1
4.1.2 Acoustic Environment ... 4-2
4.1.3 Geology and Soil Resources ... 4-4
4.1.3.1 Potential Soil Impacts Common to All Alternatives ... 4-4
4.1.3.2 Soil Impacts under Alternative 1 ... 4-8
4.1.3.3 Impacts on Paleontological Resources under Alternative 1 ... 4-8
4.1.4 Water Resources ... 4-9
4.1.5 Human Health ... 4-10
4.1.5.1 Conceptual Site Exposure Model ... 4-10

BLM_0042663

**CONTENTS (Cont.)**

4.1.5.2 Potential Human Health Impacts from Alternative 1 ................. 4-14
4.1.5.3 Worker Exposure – Reclamation Workers ................. 4-15
4.1.5.4 General Public Exposure – Residential Scenario ................. 4-17
4.1.5.5 General Public Exposure – Recreationist Scenario ................. 4-24
4.1.5.6 General Public Exposure – Individual Receptor Entering an Inactive Underground Mine Portal ................. 4-26
4.1.6 Ecological Resources ................. 4-26
4.1.6.1 Vegetation ................. 4-26
4.1.6.2 Wildlife ................. 4-30
4.1.6.3 Aquatic Biota ................. 4-32
4.1.6.4 Threatened, Endangered, and Sensitive Species ................. 4-32
4.1.7 Land Use ................. 4-50
4.1.8 Socioeconomics ................. 4-50
4.1.8.1 Recreation and Tourism ................. 4-51
4.1.9 Environmental Justice ................. 4-52
4.1.10 Transportation ................. 4-53
4.1.11 Cultural Resources ................. 4-53
4.1.12 Visual Resources ................. 4-54
4.1.12.1 Vegetation and Landform Alterations ................. 4-55
4.1.12.2 Removal of Structures and On-Site Materials ................. 4-56
4.1.12.3 Roads ................. 4-56
4.1.12.4 Workers, Vehicles, and Equipment ................. 4-57
4.1.12.5 Lighting ................. 4-57
4.1.12.6 Impacts on Lands Surrounding the Lease Tracts ................. 4-57
4.1.13 Waste Management ................. 4-67
4.2 Alternative 2 ................. 4-67
4.2.1 Air Quality ................. 4-68
4.2.2 Acoustic Environment ................. 4-68
4.2.3 Geology and Soil Resources ................. 4-68
4.2.3.1 Paleontological Resources ................. 4-68
4.2.4 Water Resources ................. 4-68
4.2.5 Human Health ................. 4-69
4.2.6 Ecological Resources ................. 4-69
4.2.6.1 Vegetation ................. 4-69
4.2.6.2 Wildlife ................. 4-69
4.2.6.3 Aquatic Biota ................. 4-69
4.2.6.4 Threatened, Endangered, and Sensitive Species ................. 4-70
4.2.7 Land Use ................. 4-70
4.2.8 Socioeconomics ................. 4-70
4.2.9 Environmental Justice ................. 4-70
4.2.10 Transportation ................. 4-70
4.2.11 Cultural Resources ................. 4-71
4.2.12 Visual Resources ................. 4-71

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 91 of 426

**CONTENTS (Cont.)**

4.2.13 Waste Management ........ 4-71
4.3 Alternative 3 ........ 4-71
4.3.1 Air Quality ........ 4-72
4.3.1.1 Exploration ........ 4-72
4.3.1.2 Mine Development and Operations ........ 4-72
4.3.1.3 Reclamation ........ 4-75
4.3.2 Acoustic Environment ........ 4-76
4.3.2.1 Exploration ........ 4-76
4.3.2.2 Mine Development and Operations ........ 4-76
4.3.2.3 Reclamation ........ 4-79
4.3.3 Geology and Soil Resources ........ 4-80
4.3.3.1 Exploration ........ 4-80
4.3.3.2 Mine Development and Operations ........ 4-80
4.3.3.3 Reclamation ........ 4-81
4.3.3.4 Paleontological Resources ........ 4-81
4.3.4 Water Resources ........ 4-82
4.3.4.1 Exploration ........ 4-82
4.3.4.2 Mine Development and Operations ........ 4-83
4.3.4.3 Reclamation ........ 4-88
4.3.5 Human Health ........ 4-89
4.3.5.1 Worker Exposures – Uranium Miners ........ 4-89
4.3.5.2 Worker Exposure – Reclamation Workers ........ 4-91
4.3.5.3 General Public Exposure – Residential Scenario ........ 4-92
4.3.5.4 General Public Exposures – Recreationist Scenario ........ 4-101
4.3.5.5 Intentional Destructive Acts ........ 4-103
4.3.6 Ecological Resources ........ 4-104
4.3.6.1 Vegetation ........ 4-104
4.3.6.2 Wildlife ........ 4-108
4.3.6.3 Aquatic Biota ........ 4-125
4.3.6.4 Threatened, Endangered, and Sensitive Species ........ 4-131
4.3.7 Land Use ........ 4-154
4.3.8 Socioeconomics ........ 4-154
4.3.8.1 Recreation and Tourism ........ 4-156
4.3.9 Environmental Justice ........ 4-159
4.3.9.1 Exploration ........ 4-159
4.3.9.2 Mine Development and Operations ........ 4-160
4.3.9.3 Reclamation ........ 4-161
4.3.10 Transportation ........ 4-161
4.3.10.1 General Approach and Assumptions ........ 4-161
4.3.10.2 Routine Transportation Risks ........ 4-163
4.3.10.3 Transportation Accident Risks ........ 4-172
4.3.10.4 Accidental Release of Uranium during Transportation ........ 4-175
4.3.11 Cultural Resources ........ 4-176

BLM_0042665

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 92 of 426

**CONTENTS (Cont.)**

4.3.11.1 Exploration ... 4-177
4.3.11.2 Mine Development and Operations ... 4-177
4.3.11.3 Reclamation ... 4-179
4.3.12 Visual Resources ... 4-179
4.3.12.1 Exploration ... 4-180
4.3.12.2 Mine Development and Operations ... 4-180
4.3.12.3 Reclamation ... 4-184
4.3.12.4 Impacts on Surrounding Lands ... 4-184
4.3.13 Waste Management ... 4-192
4.4 Alternative 4 ... 4-193
4.4.1 Air Quality ... 4-193
4.4.1.1 Exploration ... 4-193
4.4.1.2 Mine Development and Operations ... 4-193
4.4.1.3 Reclamation ... 4-196
4.4.2 Acoustic Environment ... 4-196
4.4.2.1 Exploration ... 4-196
4.4.2.2 Mine Development and Operations ... 4-197
4.4.2.3 Reclamation ... 4-199
4.4.3 Geology and Soil Resources ... 4-200
4.4.3.1 Exploration ... 4-200
4.4.3.2 Mine Development and Operations ... 4-200
4.4.3.3 Reclamation ... 4-200
4.4.3.4 Paleontological Resources ... 4-200
4.4.4 Water Resources ... 4-201
4.4.4.1 Exploration ... 4-201
4.4.4.2 Mine Development and Operations ... 4-201
4.4.4.3 Reclamation ... 4-202
4.4.5 Human Health ... 4-203
4.4.5.1 Worker Exposure – Uranium Miners ... 4-203
4.4.5.2 Worker Exposure – Reclamation Workers ... 4-204
4.4.5.3 General Public Exposure – Residential Scenario ... 4-205
4.4.5.4 General Public Exposure – Recreationist Scenario ... 4-210
4.4.6 Ecological Resources ... 4-211
4.4.6.1 Vegetation ... 4-211
4.4.6.2 Wildlife ... 4-212
4.4.6.3 Aquatic Biota ... 4-213
4.4.6.4 Threatened, Endangered, and Sensitive Species ... 4-213
4.4.7 Land Use ... 4-213
4.4.8 Socioeconomics ... 4-215
4.4.8.1 Recreation and Tourism ... 4-217
4.4.9 Environmental Justice ... 4-217
4.4.9.1 Exploration ... 4-217
4.4.9.2 Mine Development and Operations ... 4-217

BLM_0042666

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 93 of 426

**CONTENTS (Cont.)**

4.4.9.3 Reclamation ........ 4-217
4.4.10 Transportation ........ 4-217
4.4.10.1 Routine Transportation Risks ........ 4-218
4.4.10.2 Transportation Accident Risks ........ 4-220
4.4.11 Cultural Resources ........ 4-221
4.4.12 Visual Resources ........ 4-222
4.4.12.1 Exploration, Mine Development and Operations, and Reclamation ........ 4-222
4.4.12.2 Impacts on Surrounding Lands ........ 4-222
4.4.13 Waste Management ........ 4-234
4.5 Alternative 5 ........ 4-235
4.5.1 Air Quality ........ 4-235
4.5.1.1 Exploration ........ 4-235
4.5.1.2 Mine Development and Operations ........ 4-235
4.5.1.3 Reclamation ........ 4-237
4.5.2 Acoustic Environment ........ 4-238
4.5.2.1 Exploration ........ 4-238
4.5.2.2 Mine Development and Operations ........ 4-238
4.5.2.3 Reclamation ........ 4-240
4.5.3 Geology and Soil Resources ........ 4-241
4.5.3.1 Paleontological Resources ........ 4-241
4.5.4 Water Resources ........ 4-241
4.5.4.1 Exploration ........ 4-241
4.5.4.2 Mine Development and Operations ........ 4-242
4.5.4.3 Reclamation ........ 4-242
4.5.5 Human Health ........ 4-242
4.5.5.1 Worker Exposure – Uranium Miners ........ 4-243
4.5.5.2 Worker Exposure – Reclamation Workers ........ 4-244
4.5.5.3 General Public Exposure – Residential Scenario ........ 4-245
4.5.5.4 General Public Exposure – Recreationist Scenario ........ 4-250
4.5.6 Ecological Resources ........ 4-251
4.5.6.1 Vegetation ........ 4-251
4.5.6.2 Wildlife ........ 4-252
4.5.6.3 Aquatic Biota ........ 4-252
4.5.6.4 Threatened, Endangered, and Sensitive Species ........ 4-253
4.5.7 Land Use ........ 4-253
4.5.8 Socioeconomics ........ 4-253
4.5.8.1 Recreation and Tourism ........ 4-255
4.5.9 Environmental Justice ........ 4-255
4.5.9.1 Exploration ........ 4-255
4.5.9.2 Mine Development and Operations ........ 4-255
4.5.9.3 Reclamation ........ 4-255
4.5.10 Transportation ........ 4-256

BLM_0042667

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 94 of 426

**CONTENTS (Cont.)**

4.5.10.1 Routine Transportation Risks ........ 4-256
4.5.10.2 Transportation Accident Risks ........ 4-259
4.5.11 Cultural Resources ........ 4-259
4.5.12 Visual Resources ........ 4-260
4.5.12.1 Exploration, Mine Development and Operations, and Reclamation ........ 4-260
4.5.12.2 Impacts on Surrounding Lands ........ 4-260
4.5.13 Waste Management ........ 4-260
4.6 Measures To Minimize Potential Impacts from ULP Mining Activities ........ 4-261
4.7 Cumulative Impacts ........ 4-261
4.7.1 Reasonably Foreseeable Future Actions ........ 4-276
4.7.1.1 Piñon Ridge Mill ........ 4-276
4.7.1.2 Planned Uranium Exploration ........ 4-278
4.7.1.3 Coal Mining ........ 4-278
4.7.1.4 Uranium Mill Remediation ........ 4-281
4.7.1.5 Reforestation Projects ........ 4-284
4.7.1.6 Western Area Power Administration ROW Maintenance ........ 4-284
4.7.1.7 Construction of Agricultural Water Facilities ........ 4-285
4.7.1.8 Other Future Projects ........ 4-285
4.7.2 Present and Ongoing Actions ........ 4-287
4.7.2.1 White Mesa Mill ........ 4-287
4.7.2.2 Uranium Mining ........ 4-289
4.7.2.3 Coal and Other Mineral Mining ........ 4-303
4.7.2.4 Oil and Gas Exploration and Extraction ........ 4-303
4.7.2.5 Long-Term Grazing Permits and Allotments ........ 4-304
4.7.2.6 Power Generation and Transmission ........ 4-304
4.7.2.7 Potash Exploration ........ 4-306
4.7.2.8 Lisbon Natural Gas Processing Plant ........ 4-308
4.7.2.9 Paradox Valley Desalinization Plant ........ 4-308
4.7.2.10 Cameo Station Power Plant ........ 4-309
4.2.7.11 Reconstruction of the Hanging Flume Replica ........ 4-309
4.7.3 General Trends ........ 4-309
4.7.3.1 Population Growth ........ 4-310
4.7.3.2 Energy Demand ........ 4-310
4.7.3.3 Water Use and Availability ........ 4-311
4.7.3.4 Climate ........ 4-311
4.7.4 Cumulative Impacts from the ULP Alternatives ........ 4-312

BLM_0042668

**CONTENTS (Cont.)**

**VOLUME 2: CHAPTER 5 THROUGH APPENDIX H**

5 APPLICABLE LAWS AND REQUIREMENTS ........ 5-1

5.1 Applicable Federal Laws and Regulations ........ 5-1
5.2 State of Colorado Environmental Laws ........ 5-7
5.3 County Environmental Ordinances and Plans ........ 5-7
5.4 Memoranda of Understanding ........ 5-7

6 CONSULTATION PROCESS FOR THE DOE ULP PEIS ........ 6-1

6.1 Tribal Government-to-Government Consultation ........ 6-1
6.2 Consultation for the ESA ........ 6-3
6.3 Consultation for the NHPA ........ 6-4

7 INDEX ........ 7-1

8 REFERENCES ........ 8-1

APPENDIX A: Examples of Existing Leases for the Uranium Leasing Program ........ A-1

APPENDIX B: Summary of the Public Scoping Process for the ULP PEIS ........ B-1

APPENDIX C: Emission Inventories, Costs, and Other Estimates Used as a Basis for the ULP PEIS Impact Analyses ........ C-1

APPENDIX D: Impact Assessment Methodologies ........ D-1

APPENDIX E: Correspondence Associated with Endangered Species Act (ESA) Consultation, Biological Opinion, and Biological Assessment ........ E-1

APPENDIX F: Correspondence Associated with Tribal and National Historic Preservation Act (NHPA) Consultation ........ F-1

APPENDIX G: List of Preparers ........ G-1

APPENDIX H: Contractor Disclosure Statement ........ H-1

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 96 of 426

## CONTENTS (Cont.)

### VOLUME 3: APPENDIX I

APPENDIX I: Comment Response Document ..... I-1

I.1 Public Comment Process ..... I-1
I.2 Summary of Changes to the Draft PEIS ..... I-2
I.3 Topics of Interest ..... I-4
I.4 Comments and Responses ..... I-16
I.4.1 Organizations That Submitted Comments in Writing via Letter, E-mail, or Web Portal or Orally at One of the Public Hearings ..... I-16
I.4.2 Individuals Who Submitted Comments in Writing via Letter, E-mail, or Web Portal or Orally at One of the Public Hearings ..... I-16
Organizations ..... I-23
Members of the Public ..... I-147

## FIGURES

1.2-1 Locations of the 31 ULP Lease Tracts in Colorado ..... 1-11

1.3-1 Location of C-JD-5 Mine on Lease Tract 5 ..... 1-16

1.3-2 Location of C-JD-6 Mine on Lease Tract 6 ..... 1-18

1.3-3 Location of C-JD-7 Mine on Lease Tract 7 ..... 1-20

1.3-4 Location of C-JD-8 Mine on Lease Tract 8 ..... 1-22

1.3-5 Location of C-JD-9 Mine on Lease Tract 9 ..... 1-24

1.3-6 Location of C-SR-11 Mine on Lease Tract 11 ..... 1-26

1.3-7 Location of C-SR-13 Mine on Lease Tract 13 ..... 1-29

1.3-8 Location of C-SM-18 Mine on Lease Tract 18 ..... 1-35

1.7-1 NEPA Process for the ULP PEIS ..... 1-45

2-1 Thirteen Human Health and Environmental Resource Areas That Are Evaluated for Potential Impacts from Exploration, Mine Development and Operations, and Reclamation ..... 2-2

2.1-1 Photograph of Mine Plant Surface Configuration at Lease Tract 5 ..... 2-6

BLM_0042670

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 97 of 426

**FIGURES (Cont.)**

2.1-2 Photograph of Mine Plant Surface Configuration at Lease Tract 7 ........ 2-7

2.1-3 Photograph of Mine Plant Surface Configuration at Lease Tract 8 ........ 2-8

2.1-4 Photograph of Former Mine Plant Surface Configuration at Lease Tract 13A ...... 2-9

2.1-5 Schematic of a Generic Mine Plant Surface Configuration ........ 2-10

2.1-6 Locations of White Mesa Mill and Proposed Piñon Ridge Mill ........ 2-15

2.2-1 Locations of Lease Tracts Evaluated under Alternatives 1 and 2 ........ 2-18

2.2-2 Locations of Lease Tracts Evaluated under Alternative 3 ........ 2-22

3.1-1 Wind Roses at the Proposed Piñon Ridge Mill, Montrose County, Colorado, April 2008–March 2011: (a) Site 1, 33-ft Level; and (b) Site 2, 98-ft Level ......... 3-3

3.1-2 Wind Rose at 20-ft Level at Nucla, Montrose County, Colorado, 2006–2010 ...... 3-4

3.1-3 Monitored $PM_{10}$ Concentrations at Sites 1 and 2 of the Proposed Piñon Ridge Mill, April 2008–March 2010 ........ 3-15

3.1-4 PSD Class I Areas and Colorado Sensitive Class II Areas around the ULP Lease Tracts ........ 3-17

3.3-1 Physiographic Map of the Colorado Plateau ........ 3-23

3.3-2 Extent of the Paradox Basin and the Paradox Fold and Fault Belt in Southwestern Colorado and Southeastern Utah ........ 3-25

3.3-3 Shaded Relief Map Showing Location of ULP Lease Tracts ........ 3-26

3.3-4 Extent of the Uravan Mineral Belt in Relation to Known Uranium-Vanadium Deposits ........ 3-28

3.3-5 Geologic Map Covering the ULP Lease Tracts ........ 3-29

3.3-6 Generalized Stratigraphy of the Paradox Basin ........ 3-31

3.3-7 Topography of the Gateway Lease Tracts ........ 3-36

3.3-8 Topography of the Uravan Lease Tracts ........ 3-37

BLM_0042671

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 98 of 426

**FIGURES (Cont.)**

3.3-9 Topography of the Paradox Lease Tracts ........ 3-39

3.3-10 Topography of the Slick Rock Lease Tracts ........ 3-41

3.3-11 Soils within and around the Gateway Lease Tracts ........ 3-44

3.3-12 Soils within and around the Uravan Lease Tracts ........ 3-46

3.3-13 Soils within and around the Paradox Lease Tracts ........ 3-48

3.3-14 Soils within and around the Slick Rock Lease Tracts ........ 3-52

3.4-1 Average Annual Precipitation in Colorado, 1961–1990 ........ 3-54

3.4-2 Map of Surface Water Features in the Region of the DOE ULP Lease Tracts ........ 3-55

3.4-3 Seasonal Hydrograph and Monthly Discharge Values in the Dolores River near Bedrock, Colorado, 1990–2010 ........ 3-57

3.4-4 Seasonal Hydrograph and Monthly Discharge Values in the San Miguel River near Uravan, Colorado, 1990–2010 ........ 3-58

3.4-5 Location of Impaired Water Bodies ........ 3-66

3.4-6 Conceptual Diagram of the Hydrogeologic Stratigraphy of the Paradox Basin ........ 3-70

3.4-7 Locations of 88 Domestic Wells and One Municipal Well in and near the Lease Tracts ........ 3-74

3.5-1 Location of the Proposed Piñon Ridge Mill ........ 3-87

3.6-1 Level IV Ecoregions in the Vicinity of DOE ULP Lease Tracts ........ 3-94

3.6-2 Land Cover Types in the Vicinity of DOE ULP Lease Tracts 26 and 27 ........ 3-96

3.6-3 Land Cover Types in the Vicinity of DOE ULP Lease Tracts 18–20, 24, and 25 ........ 3-97

3.6-4 Land Cover Types in the Vicinity of DOE ULP Lease Tracts 5–8, 17, and 21–23 ........ 3-98

3.6-5 Land Cover Types in the Vicinity of DOE ULP Lease Tracts 10–16 ........ 3-99

BLM_0042672

**FIGURES (Cont.)**

3.6-6 NWI Wetlands Mapped in the Vicinity of Lease Tracts 13 and 14 ........................ 3-108

3.6-7 Wild Turkey Activity Areas within the Three-County Study Area That Encompasses the Lease Tract Boundaries ........................ 3-128

3.6-8 Desert Bighorn Sheep Activity Areas within the Three-County Study Area That Encompasses the Lease Tract Boundaries ........................ 3-135

3.6-9 Elk Activity Areas within the Three-County Study Area That Encompasses the Lease Tract Boundaries ........................ 3-138

3.6-10 Elk Winter Activity Areas within the Lease Tracts ........................ 3-139

3.6-11 Mule Deer Activity Areas within the Three-County Study Area That Encompasses the Lease Tract Boundaries ........................ 3-141

3.6-12 Mule Deer Winter Activity Areas within the Lease Tracts ........................ 3-142

3.6-13 Pronghorn Activity Areas within the Three-County Study Area That Encompasses the Lease Tract Boundaries ........................ 3-144

3.6-14 Locations of Designated Critical Habitat for the Colorado River Endangered Fishes in the Vicinity of the ULP Lease Tracts ........................ 3-167

3.6-15 Distribution of Proposed Critical Habitat for the Gunnison Sage-Grouse in the Vicinity of the ULP Lease Tracts ........................ 3-169

3.6-16 Recorded Occurrences and Distribution of Potentially Suitable Habitat for the Mexican Spotted Owl in the Vicinity of the ULP Lease Tracts ........................ 3-170

3.6-17 Distribution of Potentially Suitable Habitat for the Southwestern Willow Flycatcher in the Vicinity of the ULP Lease Tracts ........................ 3-172

3.6-18 Distribution of Potentially Suitable Habitat for the Western Yellow-Billed Cuckoo and Canada Lynx in the Vicinity of the ULP Lease Tracts ........................ 3-173

3.6-19 Distribution of Potentially Suitable Habitat for the Gunnison's Prairie Dog in the Vicinity of the ULP Lease Tracts ........................ 3-174

3.7-1 Specially Designated Areas on Public Lands near the ULP Lease Tracts ........................ 3-180

3.7-2 Land with Wilderness Characteristics near the ULP Lease Tracts ........................ 3-184

## FIGURES (Cont.)

3.7-3 Wild and Scenic River Segments near the ULP Lease Tracts ....3-185

3.7-4 Permitted Oil and Gas Wells and Mines within 25 mi of the ULP Lease Tracts ...3-192

3.8-1 ROI Population from 1960–2010....3-200

3.9-1 Minority Populations within the 50-mi Radius surrounding the Proposed Lease Tracts ....3-216

3.9-2 Low-Income Populations within the 50-mi Radius surrounding the Proposed Lease Tracts ....3-217

3.10-1 Road Network by the Lease Tract and Uranium Mills ....3-219

3.10-2 Local Road Network around the Slick Rock Lease Tracts ....3-220

3.10-3 Local Road Network around the Paradox and Uravan Lease Tracts ....3-221

3.10-4 Local Road Network around the Gateway Lease Tracts ....3-222

3.12-1 Locations of the Four Lease Tract Groups: North; North Central; South Central; and South ....3-240

3.12-2 View from the Western Edge of Lease Tract 26 Facing Southwest ....3-242

3.12-3 View from Mesa Top near Lease Tract 19 Facing West ....3-243

3.12-4 View of Lease Tract 16A....3-244

3.12-5 View of the Cotter Mine on Lease Tract 11 ....3-245

3.12-6 View of the New Verde Mine Reclamation Site on Lease Tract 26....3-246

3.12-7 View of Lease Tract 19 Facing West....3-247

3.12-8 View of Entrance to Underground Mine at Lease Tract 18....3-248

3.12-9 Composite Viewshed of Four Lease Tract Groups....3-249

3.12-10 Composite Viewshed with Overlay of Sensitive Visual Resource Areas....3-251

4.1-1 Conceptual Exposure Model for the Exploration, Mining Development and Operations, and Reclamation Phases at the ULP Lease Tracts .... 4-11

BLM_0042674

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 101 of 426

**FIGURES (Cont.)**

4.1-2 Existing Structures in the ULP Lease Tract Surrounding Area .... 4-18

4.1-3 Viewshed Analysis for Portions of the North Lease Group under Alternative 1 .... 4-60

4.1-4 Viewshed Analysis for the North Central Lease Group under Alternative 1 .... 4-61

4.1-5 Viewshed Analysis for the South Central Lease Group under Alternative 1 .... 4-63

4.1-6 Viewshed Analysis for the South Lease Group under Alternative 1 .... 4-66

4.3-1 Viewshed Analysis for the North Central Lease Group under Alternative 3 .... 4-186

4.3-2 Viewshed Analysis for the South Central Lease Group under Alternative 3 .... 4-188

4.3-3 Viewshed Analysis for the South Lease Group under Alternative 3 .... 4-191

4.4-1 Viewshed Analysis for the North Lease Group under Alternative 4 .... 4-224

4.4-2 Viewshed Analysis for the North Central Lease Group under Alternative 4 .... 4-226

4.4-3 Viewshed Analysis for the South Central Lease Group under Alternative 4 .... 4-229

4.4-4 Viewshed Analysis for the South Lease Group under Alternative 4 .... 4-233

4.7-1 Region of Influence for Cumulative Effects .... 4-275

4.7-2 Uranium Mining and Oil and Gas Wells within the Region of Influence for Cumulative Effects .... 4-277

D.5-1 Designated Grouping of the ULP Lease Tracts Used as a Basis for Human Health Impacts Evaluation .... D-10

**TABLES**

1.1-1 Summary of Three Leasing Programs Administered between 1949 and 2008 .... 1-2

1.1-2 Summary of Uranium Ore Production from 1974 to 2008 .... 1-3

1.2-1 Summary of the 31 DOE ULP Lease Tracts in 2011 .... 1-8

1.3-1 Estimated Remaining Ore Reserve at the ULP Lease Tracts .... 1-15

BLM_0042675

**TABLES (Cont.)**

1.7-1 Draft ULP PEIS Public Hearing Locations in Colorado, Dates, and Attendance ........ 1-50

2.2-1 Lease Tracts Evaluated under Alternatives 1 and 2 ........ 2-19

2.2-2 Lease Tracts Evaluated under Alternative 3 ........ 2-23

2.2-3 Number of Mines, Ore Production Rate, Disturbed Surface Area, Number of Workers, and Water Usage Assumed for the Peak Year of Operations under Alternative 3 ........ 2-26

2.2-4 Number of Mines, Ore Production Rate, and Disturbed Surface Area Assumed for the Peak Year of Operations under Alternative 4 ........ 2-28

2.2-5 Amount of Water To Be Utilized per Mine under Alternative 4 ........ 2-30

2.2-6 Number of Mines, Ore Production Rate, and Disturbed Surface Area Assumed for the Peak Year of Operations under Alternative 5 ........ 2-31

2.2-7 Assumed Amount of Water To Be Utilized per Mine under Alternative 5 ........ 2-32

2.4-1 Meaning of Qualitative Terms Used To Describe Potential Impact Levels ........ 2-34

2.4-2 Summary of Known Cultural Resource Sites by Lease Tract Cluster ........ 2-52

2.4-3 Summary of Potential Impacts on Known Cultural Resource Sites ........ 2-52

2.4-4 Comparison of the Potential Impacts on Air Quality, the Acoustic Environment, and Soil Resources from Alternatives 1 through 5 ........ 2-57

2.4-5 Comparison of the Potential Impacts on Water Resources, Land Use, and Waste Management from Alternatives 1 through 5 ........ 2-60

2.4-6 Comparison of the Potential Impacts on Human Health from Alternatives 1 through 5 ........ 2-62

2.4-7 Comparison of the Potential Impacts on Ecological Resources from Alternatives 1 through 5 ........ 2-65

2.4-8 Comparison of the Potential Impacts on Socioeconomics, Environmental Justice, and Transportation from Alternatives 1 through 5 ........ 2-68

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 103 of 426

**TABLES (Cont.)**

2.4-9 Comparison of the Potential Impacts on Cultural Resources and Visual Resources from Alternatives 1 through 5 .......... 2-70

2.5-1 Estimated Amount of Resources Assumed To Be Irreversible and Irretrievable as a Result of the Implementation of the ULP Alternatives.......... 2-72

3.1-1 Temperature and Precipitation Data Summaries at Selected Meteorological Stations around the ULP Lease Tracts, in Order of Meteorological Station Starting from North to South .......... 3-6

3.1-2 Annual Emissions of Criteria Pollutants and Volatile Organic Compounds in Mesa, Montrose, and San Miguel Counties, Colorado, Encompassing the ULP Lease Tracts, 2008 .......... 3-9

3.1-3 National Ambient Air Quality Standards, Colorado State Ambient Air Quality Standards, and Background Concentration Levels Representative of the ULP Lease Tracts in Mesa, Montrose, and San Miguel Counties, Colorado.......... 3-12

3.1-4 Maximum Allowable PSD Increments for PSD Class I and Class II Areas.......... 3-16

3.2-1 Colorado Limits on Maximum Permissible Noise Levels.......... 3-22

3.3-1 Geologic Units in the Lease Tracts and Their PFYC Ranking.......... 3-42

3.4-1 Range in Reported Peak Discharge Values for Intermittent and Ephemeral Streams in the Region of the DOE ULP Lease Tracts.......... 3-59

3.4-2 Impaired Water Bodies on the Colorado 2012 303(d) and M&E Lists or in the Process of Implementing TMDL within the Upper Dolores, San Miguel, and Lower Dolores Watersheds.......... 3-61

3.4.3 COC Concentrations in the Dolores River at SRE and SRW Sites near Slick Rock Lease Tract 13 .......... 3-69

3.4-4 Depths to Groundwater Observed in USGS Monitoring Wells Located within the Upper Dolores, San Miguel, and Lower Dolores Basins.......... 3-72

3.4-5 Monitoring Data Collected at Springs Located within the Vicinity of the DOE ULP Tracts.......... 3-73

3.4-6 Domestic and Municipal Wells in the Area 5 mi from the DOE ULP Lease Tracts .......... 3-75

BLM_0042677

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 104 of 426

**TABLES (Cont.)**

3.4-7 COC Concentrations in Groundwater at SRE and SRW Sites near Slick Rock Lease Tract 13 .......... 3-77

3.4-8 Water Use by Category for Mesa, Montrose, and San Miguel Counties in 2005 .......... 3-78

3.5-1 Uranium-Mining-Related Regulations and Guidelines for Workers and Members of the Public .......... 3-84

3.5-2 Comparison of Radiation Exposures from Natural Background Sources near ULP Lease Tracts Versus the U.S. National Average .......... 3-86

3.5-3 Estimated Radiation and Chemical Exposures for Receptors in the DOE Lease Tracts Based on Environmental Monitoring Data from Energy Fuels Resources Corp. .......... 3-90

3.6-1 Land Cover Types within DOE ULP Lease Tracts .......... 3-100

3.6-2 Descriptions of Land Cover Types .......... 3-104

3.6-3 Noxious Weeds Occurring on or in the Vicinity of ULP Lease Tracts .......... 3-106

3.6-4 Wetlands Mapped by the National Wetlands Inventory within ULP Lease Tracts .......... 3-109

3.6-5 Descriptions of Wetland Types .......... 3-113

3.6-6 Number of Wildlife Species in the Three-County Study Area .......... 3-115

3.6-7 Amphibian and Reptile Species Expected To Occur within the Lease Tract Boundaries .......... 3-116

3.6-8 Songbird Species Expected To Occur within the Lease Tract Boundaries .......... 3-119

3.6-9 Raptor Species Expected To Occur within the Lease Tract Boundaries .......... 3-126

3.6-10 Upland Game Bird Species Expected To Occur within the Lease Tract Boundaries .......... 3-127

3.6-11 Acreages of Wild Turkey Activity Areas within the Three-County Study Area and the Combined Boundary for the Lease Tracts .......... 3-129

BLM_0042678

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 105 of 426

**TABLES (Cont.)**

3.6-12 Descriptions of Big Game Activity Areas in Colorado ....................................... 3-131

3.6-13 Habitat Information for Big Game Species Expected To Occur within the Lease Tract Boundaries ....................................... 3-132

3.6-14 Acreages of American Black Bear Activity Areas within the Three-County Study Area and the Combined Boundary for the Lease Tracts ....................................... 3-133

3.6-15 Acreages of Desert Bighorn Sheep Activity Areas within the Three-County Study Area and the Combined Boundary for the Lease Tracts ....................................... 3-136

3.6-16 Acreages of Elk Activity Areas within the Three-County Study Area and the Combined Boundary for the Lease Tracts ....................................... 3-140

3.6-17 Acreages of Mule Deer Activity Areas within the Three-County Study Area and the Combined Boundary for the Lease Tracts ....................................... 3-143

3.6-18 Acreages of Pronghorn Activity Areas within the Three-County Study Area and the Combined Boundary for the Lease Tracts ....................................... 3-145

3.6-19 Bat Species Reported from Abandoned Mines within the ULP Lease Tracts ........ 3-146

3.6-20 Small Game, Furbearer, and Nongame Mammal Species Expected To Occur within the Lease Tract Boundaries ....................................... 3-147

3.6-21 Threatened, Endangered, and Sensitive Species That May Occur in the Vicinity of the ULP Lease Tracts ....................................... 3-154

3.6-22 Species Listed, Proposed for Listing, or Candidates for Listing under the ESA That May Occur in the Vicinity of the ULP Lease Tracts ............................ 3-165

3.6-23 Number of Sensitive Species That May Occur on or near ULP Lease Tracts ....................................... 3-176

3.7-1 Specially Designated Areas on Public Lands within 25 mi of the ULP Lease Tracts ....................................... 3-181

3.7-2 Lands with Wilderness Characteristics within 25 mi of the ULP Lease Tracts ..... 3-182

3.7-3 Eligible Wild and Scenic River Segments within 25 mi of the ULP Lease Tracts ....................................... 3-186

BLM_0042679

**TABLES (Cont.)**

3.7-4 Number of Farms and Acreage of Agricultural Lands by County .......... 3-189

3.7-5 Active Uranium Mining Permits in Southwestern Colorado .......... 3-193

3.7-6 Uranium Projects in Southwestern Utah, 2010 .......... 3-194

3.8-1 ROI Employment, 2001–2010 .......... 3-201

3.8-2 ROI and State Unemployment Data, 2001–2011 .......... 3-201

3.8-3 ROI Employment by Sector, 2009 .......... 3-203

3.8-4 ROI Personal Income, 2000–2009 .......... 3-204

3.8-5 ROI Population, 2000–2023 .......... 3-204

3.8-6 ROI Urban Population and Income, 1999–2010 .......... 3-206

3.8-7 ROI Housing Characteristics, 2000 and 2009 .......... 3-207

3.8-8 ROI Jurisdictions .......... 3-208

3.8-9 ROI School District Data, 2010 .......... 3-208

3.8-10 ROI Physicians, 2010 .......... 3-209

3.8-11 ROI Public Safety Employment, 2009 .......... 3-210

3.8-12 ROI and County Crime Rates, 2009 .......... 3-210

3.9-1 Minority and Low-Income Populations within the 50-mi Radius Surrounding the Proposed Lease Tracts .......... 3-215

3.10-1 Annual Average Daily Traffic Volumes for Major Roads near the Lease Tracts, 2010 .......... 3-223

3.11-1 Cultural Resource Survey Coverage of the Lease Tracts .......... 3-230

3.11-2 Correlation of Lease Tract Cluster Designations .......... 3-231

3.11-3 Cultural Resource Survey Coverage, Site Tallies, and Site Density within 15 mi of Lease Tract Clusters .......... 3-231

**TABLES (Cont.)**

3.11-4 Cultural Resource Survey Coverage, Site Tallies, and Site Density within Each Lease Tract Cluster ........ 3-231

3.11-5 Eligible and Potentially Eligible Sites in the Lease Tracts ........ 3-233

3.12-1 Sensitive Visual Resource Areas with Potential Views of the North Group ........ 3-252

3.12-2 Sensitive Visual Resource Areas with Potential Views of the North Central Group ........ 3-253

3.12-3 Sensitive Visual Resource Areas with Potential Visibility of the South Central Group ........ 3-254

3.12-4 Sensitive Visual Resource Areas with Potential Views of the South Group ........ 3-256

4.1-1 Peak-Year Air Emissions from Reclamation under Alternative 1 ........ 4-3

4.1-2 Potential Impacts from Mining Activities on Soil Resources ........ 4-5

4.1-3 Potential Human Receptors, Uranium Sources, and Exposure Pathways to Exploration, Mining Development and Operations, and Reclamation Phases at the ULP Lease Tracts ........ 4-12

4.1-4 Dimensions of the Waste-Rock Piles per Mine Size Assumed for Human Health Impact Analysis ........ 4-16

4.1-5 Estimated Upper-Bound Emission Rates of Particulates, Radon, and Radionuclides for the Four Assumed Waste-Rock Pile Sizes ........ 4-20

4.1-6 Potential Maximum Radiation Doses and LCF Risks to a Resident as a Result of the Emission of Radon from the Four Assumed Waste-Rock Pile Sizes ........ 4-20

4.1-7 Potential Maximum Radiation Doses and LCF Risks to a Resident as a Result of the Emission of Particulates from the Four Assumed Waste-Rock Pile Sizes ........ 4-21

4.1-8 Potential Maximum Total Doses and LCF Risks to a Resident as a Result of the Emission of Radon and Particulates from the Four Assumed Waste-Rock Pile Sizes ........ 4-21

4.1-9 Seed Mixture Developed for Reseeding on the DOE ULP Lease Tracts ........ 4-28

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 108 of 426

**TABLES (Cont.)**

4.1-10 Potential Effects of the Uranium Leasing Program under Alternative 1 on Threatened, Endangered, and Sensitive Species .................................................. 4-33

4.1-11 Socioeconomic Impacts of Uranium Mining Reclamation in the Region of Influence under Alternative 1 ........................................................................ 4-51

4.3-1 Peak-Year Air Emissions from Mine Development, Operations, and Reclamation under Alternative 3 .................................................................... 4-73

4.3-2 Radiation Doses and LCF Risks Received by Underground Uranium Miners under Alternative 3 ........................................................................................ 4-91

4.3-3 Radon Emission Rates per Type of Mine during Mine Operations Assumed for Alternative 3 ............................................................................................ 4-94

4.3-4 Potential Maximum Radon Levels, Radiation Doses, Radon Concentrations, and LCF Risks to a Resident Associated with the Emission of Radon from Four Uranium Mine Sizes under Alternative 3 ................................................ 4-96

4.3-5 Collective Doses and LCF Risks to the General Public from Radon Emissions from Uranium Mines during the Peak Year of Operations under Alternative 3..... 4-99

4.3-6 Summary of Potential Impacts on Wildlife Associated with Alternative 3 ...........4-118

4.3-7 Potential Impacts on Aquatic Biota Associated with Alternative 3.......................4-127

4.3-8 Potential Effects of the Uranium Leasing Program under Alternative 3 on Threatened, Endangered, and Sensitive Species...............................................4-132

4.3-9 Socioeconomic Impacts of Uranium Mine Development, Operations, and Reclamation in the Region of Influence under Alternative 3 ...............................4-155

4.3-10 Recreation Sector Activity in the Region of Influence in 2012.............................4-158

4.3-11 Impacts from Reductions in Recreation Sector Employment Resulting from Uranium Mining Development in the Region of Influence, 2012 .................4-159

4.3-12 Distances from Lease Tracts to Ore Processing Mills.........................................4-164

4.3-13 Peak-Year Collective Population Transportation Impacts under Alternative 3......4-165

BLM_0042682

**TABLES (Cont.)**

4.3-14 Potential Haul Truck Traffic on Local Roads ........ 4-166

4.4-15 Potential Number of Truck Shipments to the White Mesa Mill Passing through Collector Road Intersections with U.S. and State Highways ........ 4-167

4.3-16 Potential Number of Truck Shipments to the Piñon Ridge Mill Passing through Collector Road Intersections with U.S. and State Highways ........ 4-169

4.3-17 Single-Shipment Collective Population Impacts from Transporting Ore from Lease Tracts to Piñon Ridge Mill ........ 4-173

4.3-18 Single-Shipment Collective Population Impacts from Transporting Ore from Lease Tracts to White Mesa Mill ........ 4-174

4.3-19 Hypothetical Single-Shipment Radiological Impacts on Individual Receptors ........ 4-175

4.3-20 Cultural Resource Sites That Could Be Directly Affected under Alternative 3 ........ 4-178

4.4-1 Peak-Year Air Emissions from Mine Development, Operations, and Reclamation under Alternative 4 ........ 4-194

4.4-2 Radon Emission Rates per Type of Mine during Mine Operations Assumed for Alternative 4 ........ 4-208

4.4-3 Collective Doses and LCF Risks to the General Public from Radon Emissions from Uranium Mines during the Peak Year of Operations under Alternative 4 ........ 4-209

4.4-4 Potential Effects of the Uranium Leasing Program under Alternative 4 on Threatened, Endangered, and Sensitive Species That Would Not Be Affected under Alternative 3 ........ 4-214

4.4-5 Socioeconomic Impacts from Uranium Mine Development, Operations, and Reclamation in the Region of Influence under Alternative 4 ........ 4-215

4.4-6 Peak-Year Collective Population Transportation Impacts under Alternative 4 ........ 4-219

4.4-7 Cultural Resource Sites That Could Be Directly Affected under Alternative 4 ........ 4-222

4.5-1 Peak-Year Air Emissions from Mine Development, Operations, and Reclamation under Alternative 5 ........ 4-236

4.5-2 Radon Emission Rates per Type of Mine during Mine Operations Assumed for Alternative 5 ........ 4-246

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 110 of 426

**TABLES (Cont.)**

4.5-3 Potential Maximum Radiation Doses, Radon Concentrations, and LCF Risks to a Resident Associated with the Emission of Radon from Three Sizes of Uranium Mines ....... 4-247

4.5-4 Collective Doses and LCF Risks to the General Public from Radon Emissions from Uranium Mines during the Peak Year of Operations under Alternative 5 ..... 4-248

4.5-5 Socioeconomic Impacts of Uranium Mine Development, Operations, and Reclamation in the Region of Influence under Alternative 5 ....... 4-254

4.5-6 Peak-Year Collective Population Transportation Impacts under Alternative 5 ...... 4-257

4.5-7 Cultural Resource Sites Expected To Be Directly Affected under Alternative 5 ....... 4-260

4.6-1 Measures Identified to Minimize Potential Impacts from Uranium Mining at the ULP Lease Tracts ....... 4-262

4.7-1 Potential Environmental Impacts of the Proposed Piñon Ridge Mill ....... 4-279

4.7-2 Potential Environmental Impacts of the Proposed Book Cliff Mine ....... 4-282

4.7-3 Potential Environmental Impacts from Operation of the White Mesa Mill ....... 4-288

4.7-4 Potential Environmental Impacts of the Daneros Mine ....... 4-291

4.7-5 Potential Environmental Impacts of the Whirlwind Mine ....... 4-293

4.7-6 Summary of Exploration Plans for the ULP Lease Tracts ....... 4-297

4.7-7 Summary of Reclamation Plans Implemented in 2009 to 2011 for the ULP Lease Tracts ....... 4-299

4.7-8 Potential Environmental Impacts of Oil and Gas Exploration and Development ....... 4-305

4.7-9 Potential Environmental Impacts of Livestock Grazing ....... 4-307

4.7-10 General Trends in the Region of Influence for Cumulative Effects ....... 4-310

4.7-11 Summary of Major Projects and Activities in the Region of Influence for Cumulative Effects ....... 4-314

BLM_0042684

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 111 of 426

**TABLES (Cont.)**

4.7-12 Potential Impacts of Select Projects Considered with the DOE ULP Alternatives ........ 4-322

5.2-1 Potentially Applicable State Requirements ........ 5-9

5.3-1 Potentially Applicable County Requirements ........ 5-11

6.1-1 Indian Tribal Governments Contacted by DOE with Regard to Their Interest in Being Consulted on the ULP PEIS ........ 6-2

6.3-1 NHPA Consultation Efforts ........ 6-6

B-1 Public Scoping Meeting Locations, Dates, and Attendance ........ B-4

B-2 Public Scoping Comments Considered To Be Within the Scope of the ULP PEIS ........ B-5

B-3 Public Scoping Issues Considered To Be Outside the Scope of the ULP PEIS ..... B-12

C.1-1 Number of Mines Considered per Mine Size and Alternative ........ C-4

C.1-2 Total Disturbed Acreage per Mine Size and Alternative during Exploration ........ C-4

C.1-3 Assumed Workforce per Labor Category and Alternative during Exploration ...... C-5

C.1-4 Assumed Total Costs per Alternative during Exploration ........ C-6

C.1-5 Assumed Equipment and Total Hours Operated per Mine Size and Alternative during Exploration ........ C-7

C.1-6 Assumed Total Material Amounts per Alternative during Exploration ........ C-8

C.1-7 Assumed Annual Air Emissions on an Individual Mine Basis during Exploration ........ C-9

C.1-8 Assumed Total Air Emissions during Exploration ........ C-10

C.1-9 Wastes Generated per Alternative during Exploration ........ C-10

C.2-1 Estimated Material Amounts and Labor Time per Mine Size during Development ........ C-11

C.2-2 Estimated Materials and Labor Time per Alternative during Development ........ C-11

BLM_0042685

**TABLES (Cont.)**

C.2-3 Number of Workers per Mine Size and Worker Salary per Labor Category ......... C-12

C.2-4 Annual Worker Salaries per Labor Category and Mine Size ................................ C-12

C.2-5 Number and Cost of Capital Equipment Units per Mine Size ............................. C-13

C.2-6 Total Capital Equipment Costs per Alternative .................................................... C-14

C.2-7 Estimated Total Capital Costs per Mine Size ........................................................ C-15

C.2-8 Estimated Total Capital Costs per Alternative ....................................................... C-16

C.2-9 Assumed Annual Air Emissions on an Individual Mine Basis during Development ..... C-17

C.2-10 Estimated Annual Air Emissions per Alternative during Development ................ C-18

C.2-11 Wastes Generated per Alternative during Development ..................................... C-18

C.2-12 Total Worker Peak-Year Annual Wages per Mine Size and Alternative .............. C-19

C.2-13 Peak-Year Annual Water Usage per Mine Size and Alternative during Operations ..... C-19

C.2-14 Total Peak-Year Annual Cost of Operations per Alternative ............................... C-20

C.2-15 Assumed Annual Air Emissions on an Individual Mine Basis during Operations ..... C-20

C.2-16 Estimated Peak-Year Annual Air Emissions per Alternative during Operations ... C-21

C.3-1 Assumed Workforce per Labor Category, Team, JD-7 Mine, and Alternative during Reclamation ..... C-22

C.3-2 Total Disturbed Acreage per Mine Size and Alternative during Reclamation ....... C-22

C.3-3 Assumed Total Costs per Alternative during Reclamation.................................... C-23

C.3-4 Assumed Equipment and Total Hours of Operation per Mine Size and Alternative during Reclamation ..... C-24

C.3-5 Assumed Amounts of Materials per Mine Size and Alternative during Reclamation ..... C-25

**TABLES (Cont.)**

C.3-6 Assumed Annual Air Emissions on an Individual Mine Basis during Reclamation .......... C-26

C.3-7 Assumed Total Air Emissions during Reclamation .......... C-27

C.3-8 Wastes Generated per Alternative during Reclamation .......... C-27

D.5-1 Meteorological Data Used in the COMPLY-R Calculations .......... D-15

D.5-2 Comparison of the Radon Doses Calculated by CAP88-PC and Those Calculated by COMPLY-R .......... D-15

D.10-1 Individual Exposure Scenarios .......... D-31

D.10-2 Mine Size for Each Lease Tract as Assumed for the Transportation Analysis for Alternatives 3, 4, and 5 .......... D-34

E-1 Endangered Species Act Consultation Correspondence .......... E-3

F-1 Consultation Correspondence .......... F-3

F-2 Correspondence Regarding the Establishment of a Programmatic Agreement for Section 106 Consultation .......... F-94

G-1 DOE Management Team .......... G-3

G-2 ULP PEIS Preparers .......... G-4

I.1-1 Draft ULP PEIS Public Hearing Locations in Colorado, Dates, and Estimated Attendance .......... I-2

I.4-1 Organizations That Submitted Comments in Writing via Letter, E-mail, or Web Portal or Orally at One of the Public Hearings for ULP .......... I-17

I.4-2 Individuals Who Submitted Comments in Writing via Letter, E-mail, or Web Portal or Orally at One of the Public Hearings for ULP .......... I-17

*This page intentionally left blank*

# NOTATION

The following is a list of acronyms and abbreviations, chemical names, and units of measure used in this document. Some acronyms used only in tables may be defined only in those tables.

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| AADT | annual average daily traffic |
| ACEC | Area of Critical Environmental Concern |
| ACHP | American Council on Historic Preservation |
| AEA | Atomic Energy Act |
| AEC | Atomic Energy Commission |
| APE | area of potential effects |
| AQCR | Air Quality Control Region |
| AQRV | air-quality-related value |
| ATSDR | Agency for Toxic Substances and Disease Registry |
| AUM | animal unit month |
| | |
| BA | biological assessment |
| BLM | Bureau of Land Management |
| BLS | Bureau of Labor Statistics |
| BMP | best management practice |
| BO | biological opinion |
| BOR | Bureau of Reclamation |
| | |
| CAA | Clean Air Act |
| CAAQS | Colorado Ambient Air Quality Standards |
| CASTNET | Clean Air Status and Trends Network |
| CCCD | Colorado Center for Community Development |
| CDA | Colorado Department of Agriculture |
| CDNR | Colorado Department of Natural Resources |
| CDOT | Colorado Department of Transportation |
| CDOW | Colorado Division of Wildlife |
| CDPHE | Colorado Department of Public Health and Environment |
| CDRMS | Colorado Division of Reclamation, Mining, and Safety |
| CDWR | Colorado Division of Water Resources |
| CEDE | committed effective dose equivalent |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CEQ | Council on Environmental Quality |
| CFR | *Code of Federal Regulations* |
| CNHP | Colorado Natural Heritage Program |
| COGCC | Colorado Oil and Gas Conservation Commission |
| CPW | Colorado Parks and Wildlife (formerly CDOW) |

BLM_0042689

| | |
|---|---|
| CRD | Comment Response Document |
| CRS | *Colorado Revised Statutes* |
| CWA | Clean Water Act |
| CWCB | Colorado Water Conservation Board |
| | |
| DCF | dose conversion factor |
| DEM | Digital Elevation Model |
| DNL | day-night average sound level |
| DOE | U.S. Department of Energy |
| DOE-LM | DOE Office of Legacy Management |
| DOI | U.S. Department of the Interior |
| DOT | U.S. Department of Transportation |
| DPS | distinct population segment (USFWS) |
| DRI | Desert Research Institute |
| | |
| EA | environmental assessment |
| EDE | effective dose equivalent |
| EF | enhanced Fujita (scale) |
| EFR | Energy Fuels Resources |
| EIA | Energy Information Administration |
| EIS | environmental impact statement |
| EMF | electromagnetic field |
| E.O. | Executive Order |
| EPA | U.S. Environmental Protection Agency |
| EPP | environmental protection plan |
| EPS | Economic and Planning Systems |
| ERNA | Ecological Research Natural Area |
| ESA | Endangered Species Act |
| | |
| FGR | Federal Guidance Report |
| FLM | Federal Land Manager |
| FONSI | Finding of No Significant Impact |
| FR | *Federal Register* |
| FTW | full-time worker |
| | |
| GAO | Government Accountability Office |
| GHG | greenhouse gas |
| GIS | geographic information system |
| | |
| HA | herd area |
| HAP | hazardous air pollutant |
| HEAST | Health Effect Assessment Summary Tables |
| HFC | hydrofluorocarbon |
| HI | hazard index |
| HMA | herd management area |
| HMR | hazardous materials regulation (DOT) |

| | |
|---|---|
| HQ | hazard quotient |
| I- | Interstate (Highway) |
| ICRP | International Commission on Radiological Protection |
| IDA | intentional destructive act |
| IPaC | Information, Planning, and Conservation System (USFWS) |
| IRIS | Integrated Risk Information System |
| ISM | Integrated Safety Management |
| KOP | key observation point |
| KREX | KREX News Channel |
| $L_{90}$ | sound level exceeded 90% of the time |
| LCF | latent cancer fatality |
| $L_{dn}$ | day-night average sound level |
| $L_{eq}$ | equivalent continuous sound level |
| Lg | surface wave |
| LHA | landscape health assessment |
| LR2000 | Land and Mineral Rehost 2000 System (BLM) |
| LSA | low specific activity |
| M&E | Monitoring & Evaluation (List) |
| MLg | surface wave magnitude |
| MOU | Memorandum of Understanding |
| MSHA | Mine Safety and Health Administration |
| NAAQS | National Ambient Air Quality Standard(s) |
| NAICS | North American Industry Classification System |
| NCA | National Conservation Area |
| NCDC | National Climatic Data Center |
| NCRP | National Council on Radiation Protection |
| NED | National Elevation Data |
| NEPA | National Environmental Policy Act |
| NESHAP | National Emission Standards for Hazardous Air Pollutants |
| NHPA | National Historic Preservation Act |
| NLCS | National Landscape Conservation System (BLM) |
| NMFS | National Marine Fisheries Service |
| NOI | Notice of Intent |
| NP | National Park |
| NPDES | National Pollutant Discharge Elimination System |
| NPS | National Park Service |
| NRC | U.S. Nuclear Regulatory Commission |
| NRCS | Natural Resources Conservation Service |
| NRHP | *National Register of Historic Places* |
| NWCC | National Wind Coordinating Committee |
| NWI | National Wetlands Inventory |

| | |
|---|---|
| OAHP | Office of Archaeology and Historic Preservation (Colorado) |
| OHV | off-highway vehicle |
| OMP | operations and maintenance plan |
| ONA | Outstanding Natural Area |
| ORV | Outstanding Remarkable Value |
| | |
| PA | programmatic agreement |
| PEA | programmatic environmental assessment |
| PEIS | programmatic environmental impact statement |
| PFC | perfluorocarbon |
| PFYC | Potential Fossil Yield Classification |
| P.L. | Public Law |
| PLS | pure live seed |
| PM | particulate matter |
| $PM_{2.5}$ | particulate matter with a mean aerodynamic diameter of 2.5 µm or less |
| $PM_{10}$ | particulate matter with a mean aerodynamic diameter of 10 µm or less |
| PSD | Prevention of Significant Deterioration |
| | |
| QDEH | Queensland Department of Environment and Heritage |
| | |
| RCRA | Resource Conservation and Recovery Act |
| RfC | reference dose concentration |
| RfD | reference dose |
| RILOR | reclamation in lieu of royalties |
| RMP | resource management plan |
| RNA | Research Natural Area |
| ROD | Record of Decision |
| ROI | region of influence |
| ROW | right-of-way |
| | |
| SAAQS | State Ambient Air Quality Standard(s) |
| SDWA | Safe Drinking Water Act |
| SH | State Highway |
| SHPO | State Historic Preservation Office |
| SIP | State Implementation Plan |
| SJPLC | San Juan Public Lands Center |
| SRE | Slick Rock East |
| SRMA | Special Recreation Management Area |
| SRW | Slick Rock West |
| SVRA | sensitive visual resource area |
| SWCTR | Southwest Colorado Travel Region |
| SWMP | stormwater management plan |
| SWReGAP | Southwest Regional Gap Analysis Project |

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 119 of 426

| | |
|---|---|
| TDS | total dissolved solids |
| TEDE | total effective dose equivalent |
| THC | total hydrocarbons |
| TIS | traffic impact study |
| TMDL | total maximum daily load |
| TSCA | Toxic Substances Control Act |
| TSP | total suspended particulates |
| | |
| UCC | Union Carbide Corporation |
| UDEQ | Utah Department of Environmental Quality |
| UDNR | Utah Department of Natural Resources |
| UDOGM | Utah Division of Oil, Gas, and Mining |
| UDOT | Utah Department of Transportation |
| UDWR | Utah Division of Wildlife Resources |
| UGS | Utah Geological Survey |
| ULP | Uranium Leasing Program |
| UMTRCA | Uranium Milling Tailings Radiation Control Act |
| UNSCEAR | United Nations Scientific Committee on the Effects of Radiation |
| US | U.S. Highway |
| USACE | U.S. Army Corps of Engineers |
| USC | *United States Code* |
| USDA | U.S. Department of Agriculture |
| USFS | U.S. Forest Service |
| USFWS | U.S. Fish and Wildlife Service |
| USGRCRP | U.S. Global Research Change Research Program |
| USGS | U.S. Geological Survey |
| | |
| VOC | volatile organic compound |
| VRI | visual resource inventory |
| VRM | visual resource management |
| | |
| WA | Wilderness Area |
| WAPA | Western Area Power Administration |
| WHO | World Health Organization |
| WL | working level |
| WLM | working level month |
| WRCC | Western Regional Climate Center |
| WSA | Wilderness Study Area |
| WSR | National Wild and Scenic Rivers |

BLM_0042693

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 120 of 426

**CHEMICALS**

| | |
|---|---|
| $CH_4$ | methane |
| CO | carbon monoxide |
| $CO_2$ | carbon dioxide |
| $CO_2e$ | carbon dioxide equivalent |
| | |
| K-40 | potassium-40 |
| | |
| $NO_2$ | nitrogen dioxide |
| $N_2O$ | nitrous oxide |
| $NO_x$ | nitrogen oxides |
| | |
| $O_3$ | ozone |
| | |
| Pb | lead |
| | |
| $SF_6$ | sulfur hexafluoride |
| $SO_2$ | sulfur dioxide |
| | |
| $U_3O_8$ | uranium oxide (triuranium octoxide) |
| | |
| $V_2O_5$ | vanadium oxide (divanadium pentoxide) |

**UNITS OF MEASURE**

| | |
|---|---|
| ac-ft | acre-foot (feet) |
| | |
| bbl | barrel(s) |
| | |
| °C | degree(s) Celsius |
| Ci | curie(s) |
| cm | centimeter(s) |
| $cm^3$ | cubic centimeter(s) |
| | |
| d | day(s) |
| dB | decibel(s) |
| dBA | a-weighted decibel(s) |
| | |
| °F | degree(s) Fahrenheit |
| ft | foot (feet) |
| $ft^3$ | cubic foot (feet) |
| | |
| g | gram(s) |
| gal | gallon(s) |

BLM_0042694

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 121 of 426

| | |
|---|---|
| h | hour(s) |
| ha | hectare(s) |
| hp | horsepower |
| Hz | hertz |
| | |
| in. | inch(es) |
| $in.^3$ | cubic inch(es) |
| | |
| kg | kilogram(s) |
| km | kilometer(s) |
| $km^2$ | square kilometer(s) |
| | |
| L | liter(s) |
| lb | pound(s) |
| | |
| m | meter(s) |
| $m^2$ | square meter(s) |
| $m^3$ | cubic meter(s) |
| mg | milligram(s) |
| mGy | milligray |
| mi | mile(s) |
| $mi^2$ | square mile(s) |
| min | minute(s) |
| mm | millimeter(s) |
| mo | month(s) |
| mph | mile(s) per hour |
| mrem | millirem |
| MW | megawatt(s) |
| | |
| pCi | picocurie(s) |
| ppb | part(s) per billion |
| ppm | part(s) per million |
| | |
| rem | roentgen equivalent man |
| | |
| s | second(s) |
| | |
| yd | yard(s) |
| $yd^3$ | cubic yard(s) |
| yr | year(s) |
| | |
| µg | microgram(s) |
| µm | micrometer(s) |
| µmho(s) | micromho(s) |
| µS | microsievert(s) |

BLM_0042695

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 122 of 426

*This page intentionally left blank*

BLM_0042696

# CONVERSION TABLE
## ENGLISH/METRIC AND METRIC/ENGLISH EQUIVALENTS

| Multiply | By | To Obtain |
|---|---|---|
| ***English/Metric Equivalents*** | | |
| acres | 0.004047 | square kilometers (km$^2$) |
| acre-feet (ac-ft) | 1,234 | cubic meters (m$^3$) |
| cubic feet (ft$^3$) | 0.02832 | cubic meters (m$^3$) |
| cubic yards (yd$^3$) | 0.7646 | cubic meters (m$^3$) |
| degrees Fahrenheit (ºF) –32 | 0.5555 | degrees Celsius (ºC) |
| feet (ft) | 0.3048 | meters (m) |
| gallons (gal) | 3.785 | liters (L) |
| gallons (gal) | 0.003785 | cubic meters (m$^3$) |
| inches (in.) | 2.540 | centimeters (cm) |
| miles (mi) | 1.609 | kilometers (km) |
| miles per hour (mph) | 1.609 | kilometers per hour (kph) |
| pounds (lb) | 0.4536 | kilograms (kg) |
| short tons (tons) | 907.2 | kilograms (kg) |
| short tons (tons) | 0.9072 | metric tons (t) |
| square feet (ft$^2$) | 0.09290 | square meters (m$^2$) |
| square yards (yd$^2$) | 0.8361 | square meters (m$^2$) |
| square miles (mi$^2$) | 2.590 | square kilometers (km$^2$) |
| yards (yd) | 0.9144 | meters (m) |
| ***Metric/English Equivalents*** | | |
| centimeters (cm) | 0.3937 | inches (in.) |
| cubic meters (m$^3$) | 0.00081 | acre-feet (ac-ft) |
| cubic meters (m$^3$) | 35.31 | cubic feet (ft$^3$) |
| cubic meters (m$^3$) | 1.308 | cubic yards (yd$^3$) |
| cubic meters (m$^3$) | 264.2 | gallons (gal) |
| degrees Celsius (ºC) +17.78 | 1.8 | degrees Fahrenheit (ºF) |
| hectares (ha) | 2.471 | acres |
| kilograms (kg) | 2.205 | pounds (lb) |
| kilograms (kg) | 0.001102 | short tons (tons) |
| kilometers (km) | 0.6214 | miles (mi) |
| kilometers per hour (kph) | 0.6214 | miles per hour (mph) |
| liters (L) | 0.2642 | gallons (gal) |
| meters (m) | 3.281 | feet (ft) |
| meters (m) | 1.094 | yards (yd) |
| metric tons (t) | 1.102 | short tons (tons) |
| square kilometers (km$^2$) | 247.1 | acres |
| square kilometers (km$^2$) | 0.3861 | square miles (mi$^2$) |
| square meters (m$^2$) | 10.76 | square feet (ft$^2$) |
| square meters (m$^2$) | 1.196 | square yards (yd$^2$) |

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 124 of 426

*This page intentionally left blank*

BLM_0042698

# 5 APPLICABLE LAWS AND REQUIREMENTS

This chapter presents the laws and other requirements that could affect implementation of the alternatives for managing the ULP described in the ULP PEIS.

A number of Federal environmental laws could potentially affect environmental protection, health, safety, compliance, and consultation at the lease tracts discussed in the ULP PEIS. In addition to certain environmental requirements that have been delegated to state authorities for enforcement and implementation, state legislatures have adopted laws to protect health and safety and the environment. County governments often use the powers delegated to them to pass ordinances and plans to protect their citizens and resources. It is DOE policy to conduct its operations in a manner that assures the protection of public health, safety, and the environment through compliance with all applicable Federal, state, and county requirements.

Federal environmental, cultural, and health and safety laws are summarized in Section 5.1. State of Colorado potentially applicable laws are listed in Section 5.2; ordinances and plans for Mesa, Montrose, and San Miguel Counties in Colorado, where the lease tracts are located, are presented in Section 5.3, and DOE MOU with BLM and CDRMS are presented in Section 5.4.

## 5.1 APPLICABLE FEDERAL LAWS AND REGULATIONS

This section describes the Federal environmental, cultural, safety, and health laws that could apply to the alternatives for the management of the ULP described in the ULP PEIS.

**American Indian Religious Freedom Act of 1978 (42 USC 1996).** This act reaffirms American Indian religious freedom under the First Amendment and sets U.S. policy to protect and preserve the inherent and constitutional right of American Indians to believe, express, and exercise their traditional religions. The Act requires that Federal actions avoid interfering with access to sacred locations and traditional resources that are integral to the practice of tribal religions.

**Antiquities Act of 1906, as amended (16 USC 431 to 433).** This act protects historic and prehistoric ruins, monuments, and antiquities, including paleontological resources, on Federally controlled lands from appropriation, excavation, injury, and destruction without permission.

**Archaeological and Historic Preservation Act of 1974, as amended (16 USC 469 to 469c).** This act provides for the preservation of historical and archaeological data (including relics and specimens) that might otherwise be irreparably lost or destroyed as the result of Federal actions. Under the law, Federal agencies must notify the Secretary of Interior whenever

BLM_0042699

they find that a Federal project may cause loss or destruction of significant scientific, prehistoric, or archeological data.

**Archaeological Resources Protection Act of 1979, as amended (16 USC 470 *et seq.*).** This act requires a permit for any excavation or removal of archaeological resources from Federal or American Indian lands. Excavations must be undertaken for the purpose of furthering archaeological knowledge in the public interest, and resources removed remain the property of the United States.

**Atomic Energy Act of 1954 (42 USC 2011 *et seq.*).** The AEA provides the statutory framework for DOE, as the successor agency to the AEC, to ensure a supply of domestic uranium adequate to meet the defense needs of the United States. The AEA also authorizes DOE to exercise regulatory authority over activities it conducts or those conducted on its behalf. An extensive system of standards and requirements has been established through DOE directives to protect health and minimize danger to life and property from activities under DOE's jurisdiction.

**Bald and Golden Eagle Protection Act of 1973, as amended (16 USC 668 through 668d).** The Bald and Golden Eagle Protection Act, as amended, makes it unlawful to take, pursue, molest, or disturb bald (American) and golden eagles, their nests, or their eggs anywhere in the United States. The DOI regulates activities that might adversely affect bald and golden eagles.

**Clean Air Act of 1970, as amended (42 USC 7401 *et seq.*).** The CAA is intended to "protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Section 118 of the CAA requires that each Federal agency with jurisdiction over any property or facility engaged in any activity that might result in the discharge of air pollutants comply with "all Federal, state, interstate, and local requirements" with regard to the control and abatement of air pollution.

Section 109 of CAA directs the EPA to set NAAQS for criteria pollutants. These standards were established for PM, $SO_2$, CO, ozone, $NO_2$, and lead. Section 111 of the CAA requires the establishment of national standards of performance for new or modified stationary sources of atmospheric pollutants, and Section 160 requires that specific emission increases be evaluated prior to permit approval to prevent significant deterioration of air quality. Specific standards for releases of hazardous air pollutants (including radionuclides) are required per Section 112. Radionuclide emissions are regulated under the NESHAP Program under 40 CFR Part 61.

**Clean Water Act of 1972, as amended (33 USC 1251 *et seq.*).** The CWA provides water quality standards for the nation's waterways, guidelines and limitations for effluent discharges from point-source discharges, and the NPDES permit program that is administered by

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 127 of 426

the EPA or by states under their own laws. Sections 401 through 405 of the Water Quality Act of 1987 added Section 402(p) to the CWA, which requires the EPA to establish regulations for permits for stormwater discharges associated with industrial activities. Section 404 of the CWA requires permits for the discharge of dredge or fill materials into navigable waters. Sections 303(d) and 305(b) update water quality conditions for all water bodies every 2 years. The water body that is identified as impaired will be required to be investigated for development of TMDL, which will be implemented to correct the impairment.

**Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 USC 9604; also known as Superfund).** CERCLA provides, among other things, authority for Federal and state governments to respond directly to hazardous substance incidents. The act requires reporting of spills, including radioactive spills, to the National Response Center.

**Endangered Species Act of 1973, as amended (16 USC 1531 *et seq.*).** The ESA provides a program for the conservation of threatened and endangered species and the ecosystems on which those species rely. The act is intended to prevent the further decline of endangered and threatened species and to restore those species and their critical habitats. Section 7 requires Federal agencies to assure that any action authorized, funded, or carried out by them is not likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of their critical habitat.

**Emergency Planning and Community Right-to-Know Act of 1986 (USC 11001 *et seq.*; also known as Superfund Amendments and Reauthorization Act [SARA] Title III).** This act requires emergency planning and notice to communities and Government agencies concerning the presence and release of specific chemicals. Its provisions help increase the public's knowledge of and access to information on chemicals at individual facilities, their uses, and releases into the environment. States and communities can use the information to improve chemical safety and protect public health and the environment.

**Federal Cave Resources Protection Act of 1988 (16 USC 4301 *et seq.*).** This act established requirements for the management and protection of caves and their resources on Federal lands, including allowing the land managing agencies to withhold the location of caves from the public and requiring permits for any removal or collection activities in caves on Federal lands.

**Federal Insecticide, Fungicide, and Rodenticide Act (7 USC 136 *et seq.*).** This act regulates the use, registration, and disposal of several classes of pesticides to ensure that they are applied in a manner that protects the public, workers, and the environment. Implementing regulations include recommended procedures for the disposal and storage of pesticides and worker protection standards.

BLM_0042701

**Federal Land Policy and Management Act, as amended (43 USC 1701 *et seq.*).** This act is the principal law governing how the BLM manages public lands. It guides the BLM in managing, protecting, developing, and enhancing public land and specifically requires the agency to manage public land resources for multiple uses and sustained yield for both present and future generations. The act governs the issuance of ROWs on public land and reclamation of public land.

**Federal Mine Safety and Health Act of 1977, as amended (30 USC 801 *et seq.*).** The Federal Mine Safety and Health Act authorizes the Secretary of Labor to establish mandatory health and safety standards for mines, including related surface operations. The act defines a mine as "(a) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (b) private ways and roads appurtenant to such [an] area, and (c) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities."

**Fish and Wildlife Coordination Act (16 USC 661 *et seq.*).** The Fish and Wildlife Coordination Act promotes effective planning and cooperation among Federal, state, public, and private agencies for the conservation and rehabilitation of the nation's fish and wildlife. The act requires consultation with the USFWS and state authorities whenever a Federal action involves impounding, diverting, channel deepening, or otherwise controlling or modifying the waters of any stream or other body of water.

**Noxious Weed Act of 1974, as amended (7 USC 2801 *et seq.*).** The act authorizes the Secretary of Agriculture to designate plants as noxious weeds by regulation. The movement of all such designated weeds in interstate or foreign commerce is prohibited except under permit. The 1990 amendment requires Federal agencies to develop and adequately fund a program for managing undesirable plants in order to control these plants on Federal lands under their jurisdiction.

**Migratory Bird Treaty Act of 1918, as amended (16 USC 703 *et seq.*).** This act, as amended, is intended to protect birds that have common migration patterns between the United States and Canada, Mexico, Japan, and Russia. The act stipulates that it is unlawful at any time, by any means, or in any manner to "kill any migratory bird unless and except as permitted by regulation."

**National Environmental Policy Act of 1969, as amended (42 USC 4321 *et seq.*).** NEPA establishes a national policy that promotes the awareness of the consequences of human activity on the environment and the consideration of environmental impacts during the planning and decision-making stages of a project. It requires Federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."

**National Historic Preservation Act of 1966, as amended (16 USC 470 *et seq.*).** NHPA provides that sites with significant national historic value be placed on the NRHP maintained by the Secretary of the Interior. Section 106 of the act requires a Federal agency to determine whether its proposed undertaking is the type of activity that could affect historic properties. If so, the agency must consult with the appropriate SHPO or Tribal Historic Preservation Officer. If an adverse effect is found, the consultation often ends with the execution of a Memorandum of Agreement that indicates how the adverse effect will be resolved.

**Native American Graves Protection and Repatriation Act of 1990 (25 USC 3001).** This act establishes a means for American Indians to request the return or repatriation of human remains and other cultural items presently held by Federal agencies or Federally assisted museums or institutions. The act also contains provisions regarding the intentional excavation and removal of, inadvertent discovery of, and illegal trafficking in American Indian human remains and cultural items. The law requires the establishment of a review committee with monitoring and policy-making responsibilities, the development of regulations for repatriation, and the development of procedures to handle unexpected discoveries of graves or grave items during activities on Federal or tribal lands. All Federal agencies that manage land and/or are responsible for archaeological collections obtained from their lands or generated by their activities must comply with this act.

**Noise Control Act of 1972, as amended (42 USC 4901 *et seq.*).** Section 4 of the Noise Control Act of 1972, as amended, directs all Federal agencies to carry out "to the fullest extent within their authority" programs within their jurisdictions in a manner that furthers a national policy that promotes an environment free from noise that would jeopardize health and welfare.

**Occupational Safety and Health Act of 1970 (29 USC 651 *et seq.*).** This act establishes standards for safe and healthful working conditions in places of employment throughout the United States. The act is administered and enforced by the Occupational Safety and Health Administration in the U.S. Department of Labor.

**Paleontological Resources Preservation Act (16 USC 470aaa *et seq.*).** This act promotes the preservation and use of paleontological resources on Federal lands by prohibiting the following: (1) taking or damaging paleontological resources located on Federal lands without a permit or permission; (2) selling or purchasing such resources received from Federal lands; and (3) submitting false records or identification for such resources removed from Federal lands.

**Pollution Prevention Act of 1990 (42 USC 13101 *et seq.*).** This act establishes a national policy for waste management and pollution control. Source reduction is given first preference, followed by environmentally safe recycling, then by treatment, and finally by disposal.

**Resource Conservation and Recovery Act of 1976, as amended (42 USC 6901 *et seq.*).** Under this act (abbreviated RCRA), which amended the Solid Waste Disposal Act of 1965, the EPA defines and identifies hazardous waste; establishes standards for its transportation, treatment, storage, and disposal; and requires permits for persons engaged in hazardous waste activities. Section 3006 of RCRA allows states to establish and administer these permit programs with EPA approval. The Federal Facility Compliance Act of 1992 (42 USC 6961 *et seq.*) amended RCRA to require that all Federal agencies having jurisdiction over a solid waste facility or disposal site, or engaged in the management of solid or hazardous waste, are subject to all applicable Federal, state, and local laws, regulations, and ordinances addressing solid and hazardous waste.

**Safe Drinking Water Act of 1974, as amended (42 USC 300(f) *et seq.*).** The primary objective of the Safe Drinking Water Act (SDWA) is to protect the quality of public drinking water supplies and sources of drinking water. The implementing regulations, administered by the EPA unless delegated to states, establish standards applicable to public water systems. These regulations include maximum contaminant levels (including those for radioactivity) in public water systems that have at least 15 service connections used by year-round residents or that regularly serve at least 25 year-round residents.

**Theft and Destruction of Government Property (18 USC 641 and 1361).** This legislation makes it illegal to steal or damage any property of the Federal Government and establishes provisions for fines and imprisonment.

**Toxic Substances Control Act of 1976 (15 USC 2601 *et seq.*).** This act (abbreviated TSCA) provides the EPA with the authority to require testing of chemical substances entering the environment and to regulate them as necessary. The law complements and expands existing toxic substance laws such as Section 112 of the CAA and Section 307 of the CWA. TSCA requires compliance with inventory reporting and chemical control provisions of the legislation to protect the public from the risks of exposure to chemicals.

**Wild and Scenic Rivers Act (16 USC 1271 *et seq.*).** The act establishes a National Wild and Scenic Rivers System and prescribes the methods and standards through which additional rivers may be added to the system. Rivers may be designated by Congress or, under certain conditions, the Secretary of the Interior; designated segments need not include the entire river. Each river is administered by either a Federal or state agency; for Federally administered rivers

in the lower 48 states, the designated boundaries generally average one quarter mile on either bank in order to protect river-related values.

## 5.2 STATE OF COLORADO ENVIRONMENTAL LAWS

Certain environmental requirements are implemented by states under their own state laws, as authorized by the EPA to state authorities for implementation and enforcement. It is DOE policy to conduct its operations in an environmentally safe manner that complies with all applicable requirements, including applicable state requirements. A list of state environmental laws potentially applicable to the alternatives for the management of the ULP, described in the ULP PEIS, is provided in Table 5.2-1.

## 5.3 COUNTY ENVIRONMENTAL ORDINANCES AND PLANS

Under Colorado state law, county planning commissions are authorized to make and adopt a master plan for the physical development of the unincorporated territory of the county. The lease tracts that are the subject of the ULP PEIS are located in Mesa, Montrose, and San Miguel Counties. County ordinances, plans, and permit requirements that could apply to the ULP management alternatives described in the ULP PEIS are listed in Table 5.3-1.

## 5.4 MEMORANDA OF UNDERSTANDING

In recognition of their shared roles and responsibilities and under their respective authorities, the DOE-LM Office of Site Operations and the CDRMS entered into an MOU in September 2012. The purpose of the MOU is to identify those roles and responsibilities, promote agency coordination in matters affecting the ULP, eliminate duplication, simplify administrative processes, and minimize or eliminate the adverse environmental effects of ULP mining operations.

The MOU between DOE and CDRMS states that DOE has sole authority over the selection of lessees as well as the negotiation, issuance, management, and termination of leases; DOE is also the lead bonding authority. To allow for its independent review, each agency is to receive copies of lessee documents pertaining to “site-specific Exploration Plans/Notices of Intent and Reclamation Permits/Plans of Operation.” DOE has the authority and responsibility to assure that lessees conduct all operations in compliance with the lease and with all applicable laws and regulations, while the CDRMS has the authority and responsibility to assure that operators conduct uranium and vanadium mining operations in compliance with applicable State of Colorado laws and regulations. Each agency is to conduct its inspections of operations in order to fulfill its regulatory oversight responsibilities, to notify the other agency of noncompliance issues, and to retain its enforcement authorities.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 132 of 426

In 2010, the DOE-LM Office of Site Operations entered into a MOU with the BLM concerning the management of withdrawn lands. The MOU identifies the individual and shared roles and responsibilities of each agency with respect to the ULP.

Pursuant to this 2010 MOU, DOE has sole authority over the selection of lessees as well as lease negotiation, issuance, management, and termination. DOE is responsible for assuring that all lease-wide stipulations it has agreed to with the BLM are incorporated into leases or, as appropriate, are included as stipulations in Exploration and Mining Plan approvals. DOE also has sole authority to assure that lessees conduct operations in compliance with lease language and all applicable laws and regulations; DOE must notify the BLM of any noncompliance and subsequent response actions. The BLM is to notify DOE of noncompliance, safety, and other issues noted by its staff members while they are performing their duties on the leased premises.

The MOU provides that DOE is to reclaim all leased tracts when they are no longer required to support the DOE mission and that DOE shall consult with the BLM prior to reclamation in order to ensure that all involved lands are reclaimed to BLM standards and needs.

BLM_0042706

**TABLE 5.2-1 Potentially Applicable State Requirements**

| Law | Citation | Requirement |
|---|---|---|
| Agreements for Transfer of Functions from Federal Government to State Government | *Colorado Revised Statutes* (CRS), Title 25, "Health," Article 11, "Radiation Control," Section 102, Agreements for transfer of functions from Federal Government to State Government | Authorizes the governor to enter into agreements with the Federal Government allowing the state to assume responsibilities within the state relating to the protection of persons and property from the hazards of radioactive materials and other sources of radiation. |
| Colorado Air Pollution Prevention and Control Act | CRS, Title 25, "Health," Article 7, "Air Quality Control," Section 101 *et seq.* | Requires development of an air quality control program in which the benefits of the air pollution control measures utilized bear a reasonable relationship to the economic, environmental, and energy impacts and other costs of such measures. |
| Colorado Mined Land Reclamation Act | CRS, Title 34, "Mineral Resources," Article 32, "Colorado Mined Land Reclamation Act," Section 101 *et seq.* | Requires permits for new mining operations and establishes procedures for renewals of existing permits; requires an environmental protection plan for uranium mines; establishes that uranium stockpile areas are subject to rules developed to prevent off-site impacts. |
| Colorado Natural Areas Act | CRS, Title 33, "Parks and Wildlife," Article 33, "Colorado Natural Areas," Section 101 *et seq.* | Establishes a statewide natural areas program to identify and protect certain natural areas. |
| Colorado Noxious Weed Act | CRS, Title 35, "Agriculture, Article 5.5, "Colorado Noxious Weed Act," Section 111, Cooperation with Federal and state agencies | Authorizes local governing bodies of county and municipality governing bodies to enter into cooperative agreements with Federal and state agencies for the integrated management of noxious weeds within their respective territorial jurisdictions. |
| Colorado Water Quality Control Act | CRS Title 25, "Health," Article 8, "Water Quality Control," Sections 501–503 | Requires a permit for the discharge of pollutants into any state waters. |
| Colorado Water Quality Control Act | CRS, Title 25, "Health," Article 8, "Water Quality Control," Section 506, Nuclear and radioactive wastes | Requires a permit to discharge, deposit, or dispose of any radioactive waste underground in liquid, solid, or explosive form. |

**TABLE 5.2-1 (Cont.)**

| Law | Citation | Requirement |
|---|---|---|
| Hazardous Waste | CRS Title 25, "Health," Article 15, "Hazardous Waste," Part 3, "State Hazardous Waste Management Plan," Section 308, Prohibited acts, enforcement | Prohibits disposal of hazardous waste at unpermitted facilities. |
| Groundwater Use | CRS, Title 37, "Water and Irrigation," Article 90, "Underground Water," Section 107, Application for use of groundwater | Requires anyone desiring to appropriate groundwater in designated groundwater basins to file an application prior to doing so. |
| Historical, Prehistorical, and Archaeological Resources | CRS, Title 24, "Government, State," Article 80, "State History, Archives, and Emblems," Part 4, "Historical, Prehistorical, and Archaeological Resources," Section 406, Permits | Requires permits for the investigation, excavation, gathering, or removal from the natural state of any historical, prehistorical, and archaeological resources within the state. |
| Maximum Permissible Noise Levels | CRS, Title 25, "Health," Article 12, "Noise Abatement," Section 103, Maximum permissible noise levels | Establishes the dB(A) and time periods that constitute permissible noise levels. |
| Nongame, Endangered, or Threatened Species Conservation Act | CRS, Title 33, "Parks and Wildlife," Article 2, "Nongame and Endangered Species Conservation," Section 101 *et seq.* | Authorizes regulations that establish (1) limitations relating to the taking, possession, transportation, exportation, processing, sale or offering for sale, or shipment regarding nongame wildlife and (2) a list of those species indigenous to the state determined to be endangered or threatened. |
| Pesticide Act | CRS, Title 35, "Agriculture," Article 9, "Pesticide Act," Section 101 *et seq.* | Controls the use of pesticides in the state. |
| Pollution Prevention Act of 1992 | CRS 25, "Health," Article 16.5, "Pollution Prevention," Section 101 *et seq.* | Establishes that the prevention of pollution is preferable to treatment and disposal of toxic substances and is the cornerstone of the future of environmental management. |
| Unmarked Human Graves | CRS, Title 24, "Government, State," Article 80, "State History, Archives, and Emblems," Part 13, "Unmarked Human Graves, Section 1301 *et seq.* | Establishes the notification requirements upon the discovery of suspected human skeletal remains. |

**TABLE 5.3-1 Potentially Applicable County Requirements**

| Ordinance/Plan/Permit | Citation | Requirements |
|---|---|---|
| **Mesa County** | | |
| Land Development Code | 2000 Mesa County Land Development Code/Road and Bridge Standards and Specifications | Establishes land use regulations and development review and approval procedures; requires permits for surface alterations, utility installation, stormwater construction, and driveways. Mining and extractive uses shall be subject to the Mesa County Mineral and Energy Resource Master Plan. |
| Update Building, Plumbing, Mechanical, Fuel Gas, Property Maintenance, Residential, Electrical, Energy Conservation Codes | Ordinance 008A | Adopts and slightly modifies the International Building Code and International Residential Code. |
| Noxious Weed Management Plan | Mesa County 2009-204 | Lists the noxious weeds covered by the plan and promotes noxious weed management. |
| **Montrose County** | | |
| Montrose County Zoning Resolution | Montrose County Zoning Resolution | Establishes county land use zones and requirements for those zones. The exploration of mineral resources and mining of minerals (other than sand and gravel) existing as of October 13, 1994, or the subsequent expansion of existing operations within existing property lines, is a use-by-right in the General Agricultural District; new mineral resource development and extraction operations and facilities are a special use within that district.<br><br>Applications, a complete site plan, and an impact mitigation plan are required for special uses.<br><br>Permits are required for any work performed within the public ROWs of Montrose County and within county road access. |

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 136 of 426

**TABLE 5.3-1 (Cont.)**

| Ordinance/Plan/Permit | Citation | Requirements |
| --- | --- | --- |
| **San Miguel County** | | |
| San Miguel County Land Use Code | Section 3-1, General | Requires a building permit or exemption to erect, construct, reconstruct, excavate for a foundation, or alter or change the use of any building or other structure or improvements of land. |
| | Section 5-11, Conditional Uses on Federal Lands | Establishes the standards for reviewing mineral exploration and mining on Federal land that is subject to Federal and state laws and regulations. |
| | Section 5-16, Mining | Contains provisions to mitigate the impacts of mining and protect the health, safety, and welfare of residents and travellers on county roads, streets, and highways used for hauling mined material. |
| | Section 5-321N, Development or Improvement of Roads, Driveways, and Recreational Trails | Requires that any proposed access to a county road must be issued a Driveway Access Permit. |
| | Section 5-607, Sewage Disposal | Requires a permit for new or replaced septic systems. |

BLM_0042710

# 6 CONSULTATION PROCESS FOR THE DOE ULP PEIS

DOE is complying with E.O. 13175, Section 7 of the ESA, and Section 106 of the NHPA by engaging in consultations with respective tribes, government agencies, and local historical groups. Sections 6.1, 6.2, and 6.3 describe the consultation efforts undertaken to date.

## 6.1 TRIBAL GOVERNMENT-TO-GOVERNMENT CONSULTATION

The Federal Government formally recognized its relationship with Indian tribal governments on November 6, 2000, with E.O. 13175, *Consultation and Coordination with Indian Tribal Governments*. In addition, DOE Order 144.1, *DOE American Indian Policy*, and memos from the DOE Secretary require that DOE consult and coordinate with Indian tribal governments, Indian tribal communities, and tribal individuals whose interests might be directly and substantially affected by DOE activities. On January 9, 2012, DOE initiated consultation and communication on the ULP PEIS with six Indian tribal governments that are known to have interests in the area and were identified for a previous NEPA effort. These six tribes are: (1) the Hopi Nation; (2) the Navajo Nation; (3) the Southern Ute Indian Tribe; (4) the Ute Indian Tribe; (5) the Ute Mountain Ute Tribe; and (6) the White Mesa Ute Community. DOE sent follow-up letters to each of the six tribes on May 2, 2012. Those letters expressed DOE's desire to continue to look into ways to improve the government-to-government consultation process with the Indian tribal governments and encouraged the tribes to participate during the public participation opportunities provided in the NEPA process for the ULP PEIS. Two tribes (the Navajo Nation and the Southern Ute Indian Tribe) chose to participate in the development of this ULP PEIS as cooperating agencies, while the remaining four chose to participate only as commenting agencies.

On September 28, 2012, DOE also contacted 19 additional tribes to consult on the ULP PEIS. These 19 tribes were identified based on BLM's previous activities in the areas around the ULP lease tracts and its knowledge of the ancestral range of tribes connected with the Mesa Verde region. DOE sent follow-up letters to each of the 19 tribes on November 20, 2012, similar to the May 2, 2012, letters to the six tribes contacted above. Three tribes (the Pueblo of Acoma Tribe, the Pueblo de Cochiti Tribe, and the Pueblo of Isleta Tribe) chose to participate in the development of this ULP PEIS as cooperating agencies, while the remaining 16 chose to participate only as commenting agencies. The list of cooperating and commenting agencies for the ULP PEIS, and their respective roles on their participation with regard the ULP PEIS process, are included in Section 1.9.

Since January 2012, monthly telephone conferences, as needed, have been held between DOE and the cooperating agencies to develop the Draft ULP PEIS.

All letters were sent to the tribes by Mr. David W. Geiser, Director, DOE-LM. Facsimiles of all the letters sent are presented in Appendix F. Table 6.1-1 lists the tribes and the lead for the each tribe.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 138 of 426

**TABLE 6.1-1 Indian Tribal Governments Contacted by DOE with Regard to Their Interest in Being Consulted on the ULP PEIS**

| | Name of Tribe | Tribal Lead |
|---|---|---|
| 1 | Hopi Tribal Council | The Honorable Leroy Shingoitewa |
| 2 | Jicarilla Apache Tribal Council | The Honorable Levi Pestata |
| 3 | Kewa Pueblo | The Honorable Sisto Quintana |
| 4 | Navajo Nation | The Honorable Ben Shelley |
| 5 | Pueblo de Cochiti | The Honorable Phillip Quintana |
| 6 | Pueblo of Acoma | The Honorable Randall Vicente |
| 7 | Pueblo of Isleta | The Honorable Frank E. Lujan |
| 8 | Pueblo of Jemez | The Honorable Joshua Madalena |
| 9 | Pueblo of Laguna | The Honorable Richard B. Luarkie |
| 10 | Pueblo of Nambe | The Honorable Phillip A. Perez |
| 11 | Pueblo of Picuris | The Honorable Gerald Nailor |
| 12 | Pueblo of Pojoaque | The Honorable George Rivera |
| 13 | Pueblo of San Felipe | The Honorable Anthony Ortiz |
| 14 | Pueblo of San Ildefonso | The Honorable Terry Aguilar |
| 15 | Pueblo of Sandia | The Honorable Malcolm Montoya |
| 16 | Pueblo of Santa Ana | The Honorable Ernest J. Lujan |
| 17 | Pueblo of Santa Clara | The Honorable Walter Dasheno |
| 18 | Pueblo of Taos | The Honorable Loriano B. Romero |
| 19 | Pueblo of Tesuque | The Honorable Ramos Romero |
| 20 | Pueblo of Zia | The Honorable Wilfred Shije |
| 21 | Southern Ute Indian Tribe | The Honorable Pearl Casias |
| 22 | Ute Indian Tribe | The Honorable Irene Cuch |
| 23 | Ute Mountain Ute Tribe | The Honorable Gary Hayes |
| 24 | White Mesa Ute Community | The Honorable Elayne Atcitty |
| 25 | Zuni Pueblo Tribe | The Honorable Arlen P. Quetawki, Sr. |

BLM_0042712

## 6.2 CONSULTATION FOR THE ESA

DOE has entered into consultation with the USFWS, in compliance with Section 7 of the ESA, concerning DOE's management of the ULP. Section 7 of the ESA requires Federal agencies to consider the effect of their undertakings on species listed under the ESA and to consult with the USFWS to ensure that their actions, or the actions that they fund, authorize, or permit, are not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of the critical habitat of such species.

DOE initiated the informal consultation with a letter dated November 7, 2011, from Ms. Tracy A. Ribeiro of DOE to Ms. Patty Gelatt indicating the need for consultation with the USFWS (see Appendix E, Table E-1). A response from Ms. Pamela Repp of the USFWS was received on November 17, 2011 (see Appendix E, Table E-1). The USFWS letter acknowledged receipt of the DOE letter requesting informal consultation. A meeting between DOE and the USFWS was held in the Grand Junction Office of the USFWS on November 9, 2011. The following points summarize the proceedings of that meeting.

- Since the ESA consultation is in support of a NEPA evaluation, the USFWS does not enter into formal consultation until a preferred alternative has been identified. Informal consultation based on current information regarding a preferred alternative can be conducted, and consultation might need to be redone if later in the PEIS process, the preferred alternative is different.

- The USFWS would respond in writing to DOE's letter of request to enter into informal consultation with the USFWS.

- Prior to the November 9, 2011 meeting, the USFWS had performed a preliminary review of the list of species provided on the DOE letter dated November 7, 2011 (described above). The USFWS provided initial feedback on which species it determined were not an issue based on the species locales. The USFWS also provided initial feedback on which species DOE should continue to review.

- The biological assessment (BA) that would be prepared by DOE should consider the entire 25,000 acres (10,000 ha).

- The BA would consider all listed species, even those not potentially present in the area.

In addition to the above discussion, the USFWS also discussed potential activities that could lead to water depletion and that could, in turn, adversely affect the four endangered fish species in the Colorado River; they asked that both water quality and water depletion be addressed in the BA. The USFWS has determined that there would be no impact on these four species and that consultation is not required for them if the water-related activities deplete less than 0.1 ac-ft/yr (32,585 gal/yr). Further, water rights have no bearing on water depletion

determinations; that is, any amounts of water depleted from the Colorado River Basin as a result of ULP activities must be addressed, regardless of water rights or ownership.

Water quality as it relates to the listed fish species is evaluated in the BA. With regard to water that would be brought onto the ULP lease tracts to support mining operations, some public water entities had previously consulted with the USFWS about water depletions. If the ULP lessees obtain water from these public water entities, these volumes will not need to be entered into the total volume counted as water depleted. However, since it will not be possible to determine the exact source of the water to be utilized for future ULP mining activities, the evaluation in the BA assumes that all consumptive water utilized is water depleted from the Colorado River basin. For water that would be removed during mining operations and then ponded, treated, and released, the water depletions and water quality related to the temporarily ponded water are also evaluated in the BA. Cumulative depletions for mining actions on the ULP lease tracts are also evaluated.

DOE has kept the USFWS informed about the ULP PEIS schedule, provided the USFWS with up-to-date information on the ESA consultation and the BA preparation relative to the overall ULP PEIS project schedule, and provided the USFWS with status updates on June 19, July 10, October 17, and November 19, 2012. DOE submitted the Final BA on May 14, 2013. DOE received the biological opinion (BO) from the USFWS on August 13, 2013. The USFWS indicated that with the findings as stated in the BO, the formal and informal consultation on the DOE ULP is concluded. The USFWS concurred with DOE's determination that was presented in the Final BA (dated May 14, 2013; see Appendix E for the full version).

The USFWS, through the BO, indicated the following recommendations be considered by DOE for inclusion in the Final ULP PEIS: (1) reinitiate consultation if conditions changed from those described in the discussion on the Gunnison sage-grouse and the yellow-billed cuckoo; (2) conduct surveys prior to on-the-ground ULP activities that could have impacts on the Gunnison's prairie dog; (3) promote conservation of sensitive plant species; (4) conduct annual monitoring of retention and sedimentation ponds; and (5) make corrections to errors found (e.g., map or text). These recommendations have been incorporated into this PEIS.

## 6.3 CONSULTATION FOR THE NHPA

DOE has initiated programmatic consultation, in compliance with Section 106 of the NHPA, concerning DOE's management of the ULP. Section 106 of the NHPA requires Federal agencies to consider the effect of their undertakings on historic properties and to consult with the appropriate SHPO, American Council on Historic Preservation (ACHP), and other parties that have an interest in the effects of the undertaking on historic properties. For the ULP, per the procedure that has historically been and is currently still being carried out, DOE has addressed consultation through the BLM and the lessees on specific undertakings when ULP activities/plans have been proposed. However, since the NHPA allows for the utilization of a programmatic agreement (PA) to govern large or complex projects, and since PAs can be used when effects on historic properties are expected to be similar and repetitive or regional in scope

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 141 of 426

or when these effects cannot be fully determined prior to approval of an undertaking, DOE has initiated the development of a PA for the ULP.

DOE initiated discussion regarding a PA with the BLM and the Colorado SHPO on May 30, 2013, in a teleconference. During the call, the ULP activities were summarized, and the related cultural resource activities were discussed. The SHPO suggested that a PA using a phased approach could be utilized, and the initial list of consulting parties was discussed. Following the teleconference, the BLM and DOE entered into discussions on how best to address coordination of efforts between the three BLM Field Offices and DOE. On July 22, 2013, Mr. David Shafer of DOE sent letters to the ACHP, the Colorado SHPO, and the BLM that formally requested the initiation of consultation with these entities, invited them to be a consulting party, and proposed pursuing a PA. On August 9, 2013, similar letters were sent to the 25 tribal groups originally contacted for government-to-government consultation and the local historical commissions for Mesa and San Miguel Counties. The letters to the tribes were addressed to the tribal leader, and copies were sent to the cultural resources contact, if known. Facsimiles of all the letters sent are presented in Appendix F (see Table F-2). During the weeks of August 19–23 and August 26–30, 2013, DOE-LM made calls to the ACHP, the tribes, and the historical commissions from which responses had not yet been received. On September 16 and 17, 2013, an e-mail or second letter was sent to the tribes and historical commissions from which responses had not yet been received. On October 8, 2013, DOE provided the initial version of the PA to the groups that had agreed to be consulting parties and hosted a conference call to discuss any questions or concerns. All communications after this first conference call were distributed to all of the initially identified parties, regardless of their response status, to ensure that the PA effort was made known and to encourage full participation. DOE issued two iterative versions of the PA on October 27, 2013, and November 29, 2013 requesting input and review. DOE hosted a second conference call on November 4, 2013 to again address any questions or concerns. DOE requested responses to the latest revision of the PA by December 12, 2013. The PA will be revised to address input and review from the consulting parties, and then routed to the responsive parties for concurrence. DOE-LM plans to have the PA in place before issuance of the ULP PEIS ROD. The DOE-LM contact efforts and responses from the groups invited to be consulting parties are summarized in Table 6.3-1.

BLM_0042715

**TABLE 6.3-1 NHPA Consultation Efforts**

| Group | Contact Attempts (if no response yet received) | Response to Invitation To Be a Consulting Party |
|---|---|---|
| CO SHPO | | Yes |
| BLM | | Yes |
| ACHP | | No |
| White Mesa Ute Tribe | 08/09/2013 – Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/16/2013 – Follow-up letter was sent<br>10/29/2013 – A letter was sent inviting participation in the PA process, providing a status of the PA process to date, inviting participation in a conference call on 11/04/2013, and providing a copy of the PA for input and review<br>11/06/2013 – A letter was sent inviting participation in the PA process and providing a summary of the conference call<br>12/03/2013 – A letter was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |
| Southern Ute Indian Tribe | | Yes |
| Ute Indian Tribe (Uintah & Ouray Reservation) | 08/09/2013 – Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/16/2013 – Follow-up e-mail was sent<br>10/16/2013 – An e-mail was sent that provided a status of the PA to date<br>10/27/2013 – An e-mail was sent inviting participation in the PA process and providing a copy of the PA for input and review<br>10/28/2013 – An e-mail invitation was sent for participation in a conference call on 11/04/2013<br>11/06/2013 – An e-mail was sent inviting participation in the PA process and providing a summary of the conference call<br>11/29/13 – An e-mail was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |

**TABLE 6.3-1 (Cont.)**

| Group | Contact Attempts (if no response yet received) | Response to Invitation To Be a Consulting Party |
|---|---|---|
| The Navajo Nation | | Yes |
| Hopi Tribe | | No |
| Ute Mountain Ute Tribe | | Yes |
| Jicarilla Apache Tribal Council | | No |
| Kewa Pueblo | 08/09/2013 – Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/16/2013 – Follow-up letter was sent<br>10/29/2013 – A letter was sent inviting participation in the PA process, providing a status of the PA process to date, inviting participation in a conference call on 11/04/2013, and providing a copy of the PA for input and review<br>11/06/2013 – A letter was sent inviting participation in the PA process and providing a summary of the conference call<br>12/03/2013 – A letter was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |
| Pueblo of Acoma | 08/09/2013 – Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/16/2013 – Follow-up e-mail was sent<br>10/16/2013 – An e-mail was sent that provided a status of the PA to date<br>10/27/2013 – An e-mail was sent inviting participation in the PA process and providing a copy of the PA for input and review<br>10/28/2013 – An e-mail invitation was sent for participation in a conference call on 11/04/2013<br>11/06/2013 – An e-mail was sent inviting participation in the PA process and providing a summary of the conference call<br>11/29/13 – An e-mail was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |

**TABLE 6.3-1  (Cont.)**

| Group | Contact Attempts (if no response yet received) | Response to Invitation To Be a Consulting Party |
|---|---|---|
| Pueblo de Cochiti | 08/09/2013 –  Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/16/2013 – Follow-up e-mail was sent<br>10/16/2013 – An e-mail was sent that provided a status of the PA to date<br>10/27/2013 – An e-mail was sent inviting participation in the PA process and providing a copy of the PA for input and review<br>10/28/2013 – An e-mail invitation was sent for participation in a conference call on 11/04/2013<br>11/06/2013 – An e-mail was sent inviting participation in the PA process and providing a summary of the conference call<br>11/29/13 – An e-mail was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |
| Pueblo of Isleta | | Yes |
| Pueblo of Jemez | | Yes |
| Pueblo of Laguna | | Yes |
| Pueblo of Nambe | 08/09/2013 –  Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/16/2013 – Follow-up letter was sent<br>10/29/2013 – A letter was sent inviting participation in the PA process, providing a status of the PA process to date, inviting participation in a conference call on 11/04/2013, and providing a copy of the PA for input and review<br>11/06/2013 – A letter was sent inviting participation in the PA process and providing a summary of the conference call<br>12/03/2013 – A letter was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |

BLM_0042718

**TABLE 6.3-1 (Cont.)**

| Group | Contact Attempts (if no response yet received) | Response to Invitation To Be a Consulting Party |
|---|---|---|
| Pueblo of Picuris | 08/09/2013 – Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/16/2013 – Follow-up e-mail was sent<br>10/16/2013 – An e-mail was sent that provided a status of the PA to date<br>10/27/2013 – An e-mail was sent inviting participation in the PA process and providing a copy of the PA for input and review<br>10/28/2013 – An e-mail invitation was sent for participation in a conference call on 11/04/2013<br>11/06/2013 – An e-mail was sent inviting participation in the PA process and providing a summary of the conference call<br>11/29/13 – An e-mail was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |
| Pueblo of Pojoaque | | Yes |
| Pueblo of San Felipe | | Yes |
| Pueblo of San Ildefonso | 08/09/2013 – Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/16/2013 – Follow-up e-mail was sent<br>10/16/2013 – An e-mail was sent that provided a status of the PA to date<br>10/27/2013 – An e-mail was sent inviting participation in the PA process and providing a copy of the PA for input and review<br>10/28/2013 – An e-mail invitation was sent for participation in a conference call on 11/04/2013<br>11/06/2013 – An e-mail was sent inviting participation in the PA process and providing a summary of the conference call<br>11/29/13 – An e-mail was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |
| Pueblo of Sandia | | No |
| Pueblo of Santa Ana | | No |
| Pueblo of Santa Clara | | Yes |
| Pueblo of Taos | | Yes |

**TABLE 6.3-1 (Cont.)**

| Group | Contact Attempts (if no response yet received) | Response to Invitation To Be a Consulting Party |
|---|---|---|
| Pueblo of Tesuque | 08/09/2013 – Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/16/2013 – Follow-up e-mail was sent<br>10/16/2013 – An e-mail was sent that provided a status of the PA to date<br>10/27/2013 – An e-mail was sent inviting participation in the PA process and providing a copy of the PA for input and review<br>10/28/2013 – An e-mail invitation was sent for participation in a conference call on 11/04/2013<br>11/06/2013 – An e-mail was sent inviting participation in the PA process and providing a summary of the conference call<br>11/29/13 – An e-mail was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |
| Pueblo of Zia | 08/09/2013 – Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/16/2013 – Follow-up e-mail was sent<br>10/16/2013 – An e-mail was sent that provided a status of the PA to date<br>10/27/2013 – An e-mail was sent inviting participation in the PA process and providing a copy of the PA for input and review<br>10/28/2013 – An e-mail invitation was sent for participation in a conference call on 11/04/2013<br>11/06/2013 – An e-mail was sent inviting participation in the PA process and providing a summary of the conference call<br>11/29/13 – An e-mail was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |
| The Zuni Tribe of the Zuni Reservation | | Yes, requested to be a signatory party |
| San Miguel Historical Commission | | Yes |
| Mesa County Historical Commission | | Yes |

**TABLE 6.3-1 (Cont.)**

| Group | Contact Attempts (if no response yet received) | Response to Invitation To Be a Consulting Party |
|---|---|---|
| Rimrocker Historical Society of Western Montrose County | | Yes |
| Assiniboine and Sioux Tribes, Fort Peck Indian Reservation | 08/09/2013 – Invitation letter was sent<br>At least one phone call was made to Tribal Elder's office and to Cultural Resource lead (if known)<br>09/17/2013 – Follow-up e-mail was sent<br>10/16/2013 – An e-mail was sent that provided a status of the PA to date<br>10/27/2013 – An e-mail was sent inviting participation in the PA process and providing a copy of the PA for input and review<br>10/28/2013 – An e-mail invitation was sent for participation in a conference call on 11/04/2013<br>11/06/2013 – An e-mail was sent inviting participation in the PA process and providing a summary of the conference call<br>11/29/13 – An e-mail was sent inviting participation in the PA process and providing an updated version of the PA for input and review | |

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 148 of 426

*This page intentionally left blank*

BLM_0042722

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 149 of 426

# 7 INDEX

## A

acoustic environment
- affected environment (Section 3.2)
- best management practices (Section 4.6.3)
- comparison across alternatives (Table 2.4-4, Section 2.4.2)
- impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.2, 4.2.2, 4.3.2, 4.4.2, 4.5.2)
- methodology (Appendix D.2)

affected environment (Chapter 3)

agricultural land
- affected environment (Section 3.7.2)

air quality
- affected environment (Section 3.1)
- best management practices (Section 4.6, Table 4.6-1)
- comparison across alternatives (Table 2.4-4, Section 2.4.1)
- impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, 4.5.1)
- methodology (Appendix D.1)
- regulatory environment (Section 3.1.4)

Alternative 1
- description (Section 2.2.1)
- impacts (Section 4.1)

Alternative 2
- description (Section 2.2.2)
- impacts (Section 4.2)

Alternative 3
- description (Section 2.2.3)
- impacts (Section 4.3)

Alternative 4 (preferred alternative)
- description (Sections 1.4, 2.2.4)
- identification as preferred (Section 2.6)
- impacts (Section 4.4)

Alternative 5 (No Action Alternative)
- description (Section 2.2.5)
- impacts (Section 4.5)

alternatives considered but not evaluated (Section 2.3)

American Indian tribes, *see* Native Americans

amphibians, *see* reptiles and amphibians

aquatic biota or species (Section 2.4.6.3)
- affected environment (Section 3.6.3)
- impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.6.3, 4.2.6.3, 4.3.6.3, 4.4.6.3, 4.5.6.3)
- methodology (Appendix D.6.2)

BLM_0042723

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 150 of 426

**B**

basis for impact analyses (Appendix C)
exploration (Section C.1)
mine development and operations phase (Section C.2)
reclamation phase (Section C.3)
best management practices (Section 4.6, Table 4.6-1)
biological assessment (Appendix E)
biological opinion (Appendix E)
birds
affected environment (Section 3.6.2.2)
protective regulations (Section 3.6.2.2.5)
Book Cliff (coal) Mine
cumulative impacts (Section 4.7.1.3, Table 4.7-6)

**C**

Cameo Station Power Plant
cumulative impacts (Section 4.7.2.10)
climate
affected environment (Section 3.1.1)
coal mining, *see* Book Cliff Mine and *see* mineral and coal resources and mining
Colorado state and county laws (Sections 5.5, 5.6)
comments and responses (Appendix I)
community services
methodology (Appendix D.8.4)
contractor disclosure statement (Appendix H)
consultation process (Sections 1.9, 6)
correspondence (Appendix E, Table E-1, Appendix F)
NHPA (National Historic Preservation Act) related (Section 6.3)
with Native American tribes (Sections 1.9, 1.10, 6.1; Appendix F)
with U.S. Fish and Wildlife Service (Sections 1.9, 1.10, 6.2; Appendix E, Table E-1)
cooperating agencies (Section 1.10)
criteria pollutant emissions, *see* air quality
Clean Air Act (Chapter 5)
existing air quality and emissions (Sections 3.1.2., 3.1.3)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, 4.5.1)
methodology (Appendix D.1)
regulations (Section 3.1.4)
cultural resources
affected environment (Section 3.11)
best management practices (Section 4.6, Table 4.6-1)
comparison across alternatives (Table 2.4-9, Section 2.4.11)
history (Section 3.11.1)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.11, 4.2.11, 4.3.11, 4.4.11. 4.5.11)
inventories at lease tracts (Section 3.11.2)

BLM_0042724

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 151 of 426

methodology (Appendix D.11)
traditional cultural properties (Section 3.11.3)
cumulative impacts (Sections 2.4.14, 4.7)
impacts from projects in region of influence for cumulative impacts (Table 4.7-12)
impacts from proposed action (Section 4.7.3)
list of projects in region of influence for cumulative impacts (Table 4.7-11)
methodology (Appendix D.14)
reasonably foreseeable future actions (Section 4.7.1)

**D**

Daneros Mine
cumulative impacts (Section 4.7.2.2.1, Table 4.7-4)
Ditch Bill easements
cumulative impacts (Section 4.7.1.8)
DOE ULP administrative process (Section 1.2.1)
doses, exposure, and risk
human-health-related
comparison across alternatives (Section 2.4.5)
methodology (Appendix D.5)
under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.5, 4.2.5, 4.3.5, 4.4.5, 4.5.5)
transportation-related
comparison across alternatives (Section 2.4.10)
methodology (Appendix D.10)
under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.10, 4.2.10, 4.3.10, 4.4.10, 4.5.10)

**E**

ecological resources
affected environment (Section 3.6)
best management practices (Section 4.6, Table 4.6-1)
comparison across alternatives (Table 2.4-7, Section 2.4.6)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.6, 4.2.6, 4.3.6, 4.4.6, 4.5.6)
methodology (Appendix D.6)
ecoregions (Figure 3.6-1)
education
affected environment (Section 3.8.2.3.1)
emissions, *see* criteria pollutant emissions
employment, unemployment, and income
affected environment (Section 3.8.1)
methodology (Appendix D.8.1)
endangered species, *see* threatened, endangered, and sensitive species
Energy Queen Mine
cumulative impacts (Section 4.7.2.2.4)
environmental justice
affected environment (Section 3.9)

BLM_0042725

comparison across alternatives (Table 2.4-8, Section 2.4.9)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.9, 4.2.9, 4.3.9, 4.4.9, 4.5.9)
methodology (Appendix D.9)
ESA (Endangered Species Act) (Sections 1.9, 1.10, 6.2; Appendix E, Table E-1)
Executive Order 13175
consultation (Sections 1.8 and 6)
exploration phase, *see* uranium mining phases

**F**

Federal laws (Section 5.1)
firefighters, *see* public safety
fish, *see* aquatic biota or species
floodplains (Section 3.6.1.1)
geological setting (Section 3.3.1)
lease requirements (Section 1.2.2)
Fry Canyon Mill CERCLA remediation
cumulative impacts (Section 4.7.1.4)
future actions, *see* uranium mining phases—reclamation
future projects
list (Section 4.7.1.9)
cumulative impacts (Section 4.7.1.9)

**G**

Gateway lease tracts
soil (Section 3.3.2.1)
geologic and soil resources
affected environment (Section 3.3)
best management practices (Section 4.6, Table 4.6-1)
comparison across alternatives (Table 2.4-4, Section 2.4.3)
geology (Section 3.3.1.5)
impacts under all alternatives (Section 4.1.3.1)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.3, 4.1.3.2, 4.2.3, 4.3.3, 4.4.3, 4.5.3)
methodology (Appendix D.3)
physiography (Section 3.3.1.1)
soil (Section 3.3.2)
grazing permits
cumulative impacts (Section 4.7.2.5, Table 4.7-9)
groundwater
affected environment (Section 3.4.2)

**H**

Hanging Flume replica reconstruction
cumulative impacts (Section 4.7.1.7)

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 153 of 426

health care
affected environment (Section 3.8.2.3.2)
housing
affected environment (Section 3.8.2.2)
methodology (Appendix D.8.3)
human health
affected environment (Section 3.5)
best management practices (Section 4.6, Table 4.6-1)
comparison across alternatives (Table 2.4-6, Section 2.4.5)
conceptual model (Section 4.1.5.1)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.5.2, 4.2.5, 4.3.5, 4.4.5, 4.5.5)

**I**

income, *see* employment, unemployment, and income
intentional destructive acts (Section 4.3.5.5)
irreversible and irretrievable commitment of resources (Section 2.5)

**J**

JD-7 Mine, *see* open-pit mine

**K**

No entries

**L**

land cover (Figure 3.6-2, Tables 3.6-1 and 3.6-2)
affected environment, *see* vegetation (Section 3.6.1)
land use
affected environment (Section 3.7, Figure 3.7-1)
comparison across alternatives (Table 2.4-5, Section 2.4.7)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.7, 4.2.7, 4.3.7, 4.4.7, 4.5.7)
methodology (Appendix D.7)
La Sal Mines Complex
cumulative impacts (Section 4.7.2.2.2)
latent cancer fatality (LCF), *see* doses, exposure, and risks
laws and regulations (Chapter 5)
leases, *see* ULP sample leases
lease tracts, *see* ULP lease tracts
Lisbon Natural Gas Processing Plant
cumulative impacts (Section 4.7.2.8)
low-income populations, *see* environmental justice

BLM_0042727

**M**

mammals
affected environment (Section 3.6.2.3)
map of lease tract site locations (Figure 1.4-1)
methodology for impact assessments (Appendix D)
mine development and operations, *see* uranium mining phases
mineral and coal resources and mining
affected environment (Section 3.7.4)
coal (Section 3.7.4.2)
oil and gas (Section 3.7.4.3)
other minerals and mineral materials (Section 3.7.4.4)
uranium (Section 3.7.4.1)
future cumulative impacts
coal (Section 4.7.2.3)
oil and gas (Section 4.7.2.4, Table 4.7-8)
minority populations, *see* environmental justice

**N**

Native American tribes
consultations (Sections 1.9, 1.10, 6.1; Appendix F)
traditional cultural properties (Section 3.11.3)
NEPA process, *see* scoping process
NHPA (National Historic Preservation Act) consultation (Section 6.3)
No Action Alternative, *see* Alternative 5
noise, *see* acoustic environment
NRHP *(National Register of Historic Places)* significance criteria (Section 3.11)

**O**

oil and gas exploration, *see* mineral and coal resources and mining
open-pit mine (Figure 2.1-2; Section 2.1.2.3)
organization of PEIS (Section 1.11)

**P**

Paradox lease tracts
soil (Section 3.3.2.3)
Paradox Valley Desalinization Plant
cumulative impacts (Section 4.7.2.9)
PEIS scope (Section 1.6)
PEIS organization (Section 1.11)
Piñon Ridge Mill (Section 2.1.4.1)
cumulative impacts (Section 4.7.1.1, Table 4.7-1)
police, *see* public safety

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 155 of 426

pollutant emissions, *see* criteria pollutant emissions
population
    affected environment (Section 3.8.2.1)
    methodology (Appendix D.8.2)
potash exploration
    cumulative impacts (Section 4.7.2.7)
power generation and transmission
    cumulative impacts (Section 4.7.2.6)
preferred alternative, *see* Alternative 4 (Section 2.2.4)
preparers (Appendix G)
proposed action, *see* Alternative 4 (Sections 1.5, 2.2.4)
public participation in scoping process, *see* scoping process
public safety
    affected environment (Section 3.8.2.3.3)
purpose and need for agency action (Section 1.4)

**Q**

No entries

**R**

radiation or radiological doses or impacts, *see* doses, exposure, and risks
rangeland resources
    affected environment (Section 3.7.3)
reclamation in lieu of royalties, *see* RILOR plans
recreation and tourism
    affected environment (Sections 3.7.6, 3.8.3)
    impacts under Alternatives 1, 3, 4, 5 (Section 4.1.8.1, 4.3.8.1, 4.4.8.1, 4.5.8.1)
    methodology (Appendix D.8.5)
references for main text (Chapter 8)
reforestation projects
    cumulative impacts (Section 4.7.1.5)
regulations and laws (Chapter 5)
reptiles and amphibians
    affected environment (Section 3.6.2.1)
resource areas being evaluated (Figure 2-1)
responses to comments (Appendix I)

**S**

scope of ULP PEIS (Section 1.6)
scoping process (Section 1.7.1)
    comments within PEIS scope (Section 1.7.1.1)
    comments outside PEIS scope (Section 1.7.1.2)
    public comment process (Section 1.7.2, Appendix I)

BLM_0042729

public scoping process (Section 1.7.1, Appendix B)
seismicity (Section 3.3.1.4)
sensitive species, *see* threatened, endangered, and sensitive species
sensitive visual resource areas (SVRAs), *see* visual resources
site-specific information on lease tracts (Section 1.3)
Slick Rock lease tracts
soil (Section 3.3.2.4)
socioeconomics or socioeconomic resources
affected environment (Section 3.8)
comparison across alternatives (Table 2.4-8, Section 2.4.8)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.8, 4.2.8, 4.3.8. 4.4.8, 4.5.8)
methodology (Appendix D.8)
soil resources, *see* geologic and soil resources
surface water
affected environment (Section 3.4.1)

**T**

terrestrial ecology, *see* wildlife or vegetation
threatened, endangered, and sensitive species (Section 2.4.6.4); also *see* ecological resources
affected environment (Section 3.6.4, Table 3.6-21)
impacts under Alternatives 1, 2 (Section 4.1.6.4, Table 4.1-10, Section 4.2.6.4)
impacts under Alternative 3 (Section 4.3.6.4, Table 4.3-6)
impacts under Alternative 4 (Section 4.4.6.4, Table 4.4-4)
impacts under Alternative 5 (Section 4.5.6.4)
methodology (Appendix D.6.3)
non-ESA sensitive species (Section 3.6.4.2)
timber
affected environment (Section 3.7.5)
tourism, *see* recreation and tourism
traffic, *see* transportation
transportation
affected environment (Section 3.10)
best management practices (Section 4.6, Table 4.6-1)
comparison across alternatives (Table 2.4-8, Section 2.4.10)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.10, 4.2.10, 4.3.10, 4.4.10, 4.5.10)
methodology (Appendix D.10)
tribal consultations, *see* Native American tribes

**U**

ULP background (Section 1.1)
ULP current status (Section 1.2)
ULP lease tracts
summary (Table 1.2-1)
locations (Figure 1.2-1, Section 1.3)

site-specific information (Section 1.3)
ULP sample leases (Appendix A)
underground mining, *see* uranium mining methods
uranium exploration and mining in the future
cumulative impacts (Sections 4.7.1.2, 4.7.2.2.6)
uranium mining methods (Section 2.1)
surface plant (Section 2.1.2.1)
underground (Section 2.1.2.2)
open pit (Section 2.1.2.3, also *see* open-pit mine)
uranium mining phases
exploration (Section 2.1.1)
mine development and operations (Section 2.1.2)
reclamation (Section 2.1.3)
ore processing (Section 2.1.4)
uranium ore production summary (Table 1.1-2)
Uravan Mineral Belt (Section 3.3.2.2)

**V**

vegetation, *see* ecological resources (Section 2.4.6.1)
affected environment (Section 3.6.1)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.6.1, 4.2.6.1, 4.3.6.1, 4.4.6.1, 4.5.6.1)
very large mine, *see* open-pit mine
visual resources
affected environment (Section 3.12)
best management practices (Section 4.6, Table 4.6-1)
comparison across alternatives (Table 2.4-9, Section 2.4.12)
four lease tract groups/areas (Section 3.12.2)
composite viewshed (Figure 3.12-9)
locations on map (Figure 3.12-1)
photographs of views (Figures 3.12-2 through 8)
impacts under Alternatives 1, 2 (Sections 4.1.12, 4.2.12)
impacts under Alternative 3 (Section 4.3.12)
on three lease tract groups (Sections 4.3.12.4.1, 4.3.12.4.2, 4.3.12.4.3)
impacts under Alternative 4
on four lease tract groups (Sections 4.4.12.2.1, 4.4.12.2.2, 4.4.12.2.3, 4.4.12.2.4)
impacts under Alternative 5 (Section 4.5.12)
management (Section 3.12.3)
methodology (Appendix D.12)
regional setting (Section 3.12.1)
sensitive visual resource areas or SVRAs (Figure 3.12-10)

**W**

waste management

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 158 of 426

affected environment (Section 3.13)
comparison across alternatives (Table 2.4-5, Section 2.4.13)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.13, 4.2.13, 4.3.13, 4.4.13, 4.5.13)
methodology (Appendix D.13)

water resources
affected environment (Section 3.4)
best management practices (Section 4.6, Table 4.6-1)
comparison across alternatives (Table 2.4-5, Section 2.4.4)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.4, 4.2.4, 4.3.4, 4.4.4, 4.5.4)
management (Section 3.4.3)
methodology (Appendix D.4)

Western Area Power Administration (WAPA)
ROW maintenance cumulative impacts (Section 4.7.1.6)

wetlands (Section 3.6.1.1)
Executive Order 11990 (Chapter 5)
geological setting (Section 3.3.1)
lease requirements (Section 1.2.2)
NWI mapping (Figure 3.6-6, Table 3.6-3)

Whirlwind Mine
cumulative impacts (Section 4.7.2.2.3, Table 4.7-5)

White Mesa Mill (Section 2.1.4.2)
cumulative impacts (Section 4.7.2.1, Table 4.7-3)

wilderness lands
affected environment (Section 3.7.1, Figure 3.7-1, Table 3.7-1)

wildlife, *see* ecological resources (Section 2.4.6.2)
affected environment (Section 3.6.2)
impacts under Alternatives 1, 2, 3, 4, 5 (Sections 4.1.6.2, 4.2.6.2, 4.3.6.2, 4.4.6.2, 4.5.6.2)
methodology (Appendix D.6.2)

wild horses and burros
affected environment (Section 3.7.3.2)

WIPP Vicinity (Section 1.4.3.7, Chapter 11)

**X, Y, Z**

No entries

BLM_0042732

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 159 of 426

# 8 REFERENCES

Ackerman, D.J., and F.E. Rush, 1984, *Hydrogeologic Reconnaissance of the San Miguel River Basin, Southwestern Colorado*, Open File Report 84-4133, U.S. Geological Survey.

Acoustical Society of America, 1983, *American National Standard Specification for Sound Level Meters, ANSI S1.4-1983,* New York, N.Y.

Acoustical Society of America, 1985, *American National Standard Specification for Sound Level Meters, ANSI S1.4A-1985 Amendment to ANSI S1.4-1983,* New York, N.Y., June 26.

ACS (American Cancer Society), 2011, *Cancer Facts & Figures*. Available at http://www.cancer.org/acs/groups/content/@epidemiologysurveilance/documents/document/acspc-029771.pdf. Accessed Oct. 2012.

AEC (U.S. Atomic Energy Commission), 1972, *Leasing of AEC Controlled Uranium Bearing Land, Colorado, Utah, New Mexico,* WASH-1523, Sept.

Ake, J., et al., 2005, "Deep-Injection and Closely Monitored Induced Seismicity at Paradox Valley, Colorado," *Bulletin of the Seismological Society of America*, 95(2):664–683.

Allred, T.M., and E.D. Andrews, 2000, *Hydrology, Geomorphology, and Sediment Transport of the San Miguel River, Southwest Colorado*, Water Resources Investigation Report 00-4075, U.S. Geological Survey.

AMA (American Medical Association), 2010, *Physician-Related Data Resources*, Chicago, Ill. Available at http://www.ama-assn.org/cgi-bin/sserver/datalist.cgi (data current as of May 2010).

AMEC Americas Limited, 2005, *Mackenzie Gas Project Effects of Noise on Wildlife*, prepared for Imperial Oil Resources Ventures Limited, July.

Anderson, R., and G. Stewart, 2003, *Riverine Fish Flow Investigations*, Federal Aid Project F-289-R6, Colorado Division of Wildlife, Fish Research Section, Fort Collins, Colo., June.

APLIC (Avian Power Line Interaction Committee), 2006, *Suggested Practices for Avian Protection on Power Lines: The State of the Art in 2006*, Edison Electric Institute, APLIC, and the California Energy Commission, Washington, D.C., and Sacramento, Calif. Available at http://www.aplic.org/SuggestedPractices2006(LR).pdf. Accessed March 25, 2008.

APLIC and USFWS (U.S. Fish and Wildlife Service), 2005, *Avian Protection Plan (APP) Guidelines*, April. Available at http://www.eei.org/industry_issues/environmental/land/wildlife_and_endangered_species/AvainProtectionPlanGuidelines.pdf. Accessed March 7, 2007.

BLM_0042733

ARB (California Air Resources Board), 2011, *2004 Inventory: Main Speciation Profiles*. Available at http://www.arb.ca.gov/ei/speciate/profphp04/pmprof_list.php. Accessed Dec. 15, 2011.

Argonne National Laboratory, 2012, *Input Data and Output Results of the Computer Models Employed for Human Health Impact Analyses in the Uranium Leasing Program PEIS*, prepared by Environmental Science Division, Argonne National Laboratory, for U.S. Department of Energy, Dec.

Argus (Argus Metals Corp.), 2008a, *Bluerock Updates Mining and Development Project Status of US Uranium Mining Operations*, Sept. 22. Available at http://www.bluerockresources.com/s/NewsReleases.asp?ReportID=320172&_Title=Bluerock-Updates-Mining-And-Development-Project-Status-Of-US-Uranium-Mining. Accessed Feb. 28, 2012.

Argus, 2008b, *Bluerock Receives First Ore Purchase Payment and Continues with Care and Maintenance of US Uranium Mining Operations*, Oct. 31. Available at http://www.bluerockresources.com/s/NewsReleases.asp?ReportID=326342&_Type=News-Releases&_Title=Bluerock-Receives-First-Ore-Purchase-Payment-And-Continues-With-Care-And-Ma. Accessed Feb. 28, 2012.

Armstrong, H., 1982, *Fossil Vertebrates, Invertebrates, and Plants of the Uravan Area,* Grand River Institute Project No. 8250 for the Bureau of Land Management, Montrose District Office, Colo.

Arnett, E.B., et al., 2007, *Impacts of Wind Energy Facilities on Wildlife and Wildlife Habitat*, Wildlife Society Technical Review 07-2, The Wildlife Society, Bethesda, Md., Sept.

ATSDR (Agency for Toxic Substances and Disease Registry), 2012, *Minimal Risk Levels (MRLs)*, Feb. Available at http://www.atsdr.cdc.gov/mrls/pdfs/atsdr_mrls_february_2012.pdf. Accessed March 19, 2012.

Backlund, P., et al., 2008, *The Effects of Climate Change on Agriculture, Land Resources, Water Resources, and Biodiversity in the United States*, U.S. Climate Change Science Program, Synthesis and Assessment Product 4.3, May.

Barber, J.R., et al., 2010, "The Costs of Chronic Noise Exposure for Terrestrial Organisms," *Trends in Ecology and Evolution* 25(3):180–189.

Barber, J.R., et al., 2011, "Anthropogenic Noise Exposure in Protected Natural Areas: Estimating the Scale of Ecological Consequences," *Landscape Ecol.* 26:1281–1295.

Belnap, J., and J. Herrick, 2006, *Recovery Time of Soil and Vegetation from Historical Geophysical Exploration in Southeastern Utah*, prepared for the U.S. Department of Energy and Bureau of Land Management.

Belnap, J., et al., 2001, *Biological Soil Crusts: Ecology and Management*, U.S. Department of the Interior, Bureau of Land Management, Technical Reference 1730-2.

Belnap, J., et al., 2009, "Sediment Losses and Gains across a Gradient of Livestock Grazing and Plant Invasion in a Cool, Semi-arid Grassland, Colorado Plateau, USA," *Aeolian Research* 1:27–43.

Beranek, L.L., 1988, *Noise and Vibration Control*, Revised Edition, Institute of Noise Control Engineering, Washington, D.C.

Bestgen, K.R., et al., 2011, *Status and Trends of Flannelmouth Sucker* Catostomus latipinnis, *Bluehead Sucker* Catostomus discolobus, *and Roundtail Chub* Gila robusta, *in the Dolores River, Colorado, and Opportunities for Population Improvement: Phase II Report*, prepared for Lower Dolores Plan, Working Group – Legislative Committee, Aug.

Bevanger, K., 1995, "Tetraonid Mortality Caused by Collisions with Power Lines in Boreal Forest Habitats in Central Norway," *Fauna Norvegica, Series C, Cinclus* 18:41–51.

BirdLife International, 2003, *Protecting Birds from Powerlines: A Practical Guide on the Risks to Birds from Electricity Transmission Facilities and How to Minimize Any Such Adverse Effects*, T-PVS/Inf (2003) 15, Convention on the Conservation of European Wildlife and Natural Habitats, Standing Committee, 23rd Meeting, Strasbourg, Dec. 1–4. Available at http://www.coe.int/T/E/Cultural_Co-operation/Environment/Nature_and_biological_diversity/Nature_protection. Accessed Oct. 23, 2006.

BLM (Bureau of Land Management), 1984, *Manual 8400—Visual Resource Management*. Available at http://www.blm.gov/nstc/VRM/8400.html. Accessed Dec. 2, 2011.

BLM, 1985, *San Juan/San Miguel Planning Area, Resource Management Plan*, Montrose District, Sept. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/documents.Par.92100.File.dat/SJSMROD.pdf. Accessed Dec. 12, 2011.

BLM, 1986a, *Manual H-8410-1—Visual Resource Inventory*. Available at http://www.blm.gov/nstc/VRM/8410.html. Accessed Dec. 1, 2011.

BLM, 1986b, *Manual 8431, Visual Resource Contrast Rating*. Available at http://www.blm.gov/nstc/VRM/8431.html. Accessed Jan. 30, 2012.

BLM, 1988, *Uncompahgre Basin Resource Management Plan and Environmental Impact Statement*, Montrose District, Colo., Uncompahgre Basin Resource Area, Sept. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/programs/land_use_planning/rmp/archives/Uncompahgre/final_rmp_eis.Par.41451.File.dat/Ubfrmp.pdf. Accessed Dec. 12, 2011.

BLM, 1995, *Uranium Closure/Reclamation Guidelines*, supplement to the BLM Solid Minerals Reclamation Handbook, BLM Handbook H-3042-1.

BLM, 1998, *BLM Manual Section 8270: Paleontological Resource Management*, July 13.

BLM, 2001, *Colorado Water Rights Fact Sheet*.

BLM, 2002, *Final Environmental Impact Statement Renewal of the Federal Grant for the Trans-Alaska Pipeline System Right-of-Way*, BLM/AK/PT-03/005+2880+990, U.S. Department of the Interior, Bureau of Land Management, Anchorage, Alaska, Nov.

BLM, 2007a, "Scenery, Visual Resources, and the Built Environment," Chapter 3.22 in Volume 1 of *San Juan Public Lands Draft Land Management Plan and Draft Environmental Impact Statement.* Available at http://ocs.fortlewis.edu/forestPlan/DEIS/pdf/Vol1%20Ch3.22%20Scenery,%20Visual%20Resources,%20Built%20Environment.pdf. Accessed Dec. 6, 2011.

BLM, 2007b, "Executive Summary," in *San Juan Public Lands Draft Land Management Plan and Draft Environmental Impact Statement.* Available at http://ocs.fortlewis.edu/forestPlan/DEIS/pdf/DLMP-DEIS%20Executive%20Summary.pdf. Accessed Dec. 12, 2011.

BLM, 2007c, *Potential Fossil Yield Classification (PFYC) System for Paleontological Resources on Public Lands*, Instruction Memorandum No. 2008-009, Oct. 15.

BLM, 2008a, *Special Status Species Management*, BLM Manual 6840, Release 6-125, U.S. Department of the Interior, Dec. 12.

BLM, 2008b, *Decision Record, Finding of No Significant Impact, and Final Environmental Assessment for the Whirlwind Mine Uranium Mining Project*, Grand Junction Field Office, Grand Junction, Colo., and Moab Field Office, Moab, Utah, Sept. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/grand_junction_field/PDF.Par.16552.File.dat/WhirlwinMineEAfinal.pdf. Accessed Feb. 22, 2012.

BLM, 2008c, *Denison Mines (USA) Corp. Sunday Mines Environmental Assessment,* CO-800-2007-104EA, prepared by Denison Mines, Denver, Colo., for U.S. Department of the Interior, BLM Dolores Public Lands Office, Dolores, Colo., Nov.

BLM, 2008d, *Integrated Vegetation Management*, BLM Handbook H1740-2, Release 1-1714, U.S. Department of the Interior, Washington, D.C., March 25.

BLM 2008f, *Assessment and Mitigation of Potential Impacts to Paleontological Resources*, Instruction Memorandum No. 2009-011, Oct. 10.

BLM, 2009a, *Draft Environmental Impact Statement—Proposed Red Cliff Mine Project and Federal Coal Lease by Application*, Jan. 6. Available at http://www.blm.gov/co/st/en/BLM_Programs/land_use_planning/rmp/red_cliff_mine/documents.html. Accessed Feb. 24, 2012.

BLM, 2009b, *Decision Record, Finding of No Significant Impact, and Environmental Assessment for the Daneros Mine Project*, Monticello Field Office, May. Available at https://www.blm.gov/ut/enbb/files/Daneros__EA_FONSI_DR_revised.pdf. Accessed Feb. 28, 2012.

BLM, 2009c, *A New Paleontology Law—Paleontological Resources: Preservation under the Omnibus Public Lands Act of 2009*.

BLM, 2009d, *Wild and Scenic River Eligibility Report for the Grand Junction Field Office*.

BLM, 2009e, *Uncompahgre Basin & San Juan/San Miguel Resource Management Plan Amendments, Environmental Assessment,* Nov.

BLM, 2010a, *Uncompahgre RMP Planning*, RMP Planning Fact Sheet 2.1, Uncompahgre Field Office.

BLM, 2010b, *Visual Resource Management*, RMP Planning Fact Sheet 3.3, Uncompahgre Field Office.

BLM, 2010c, *Fact Sheet: Gas Development in the North Fork,* Uncompahgre Field Office. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/documents.Par.8035.File.dat/North%20Fork%20O&G%20fact%20sheet_final.pdf. Accessed Feb. 28, 2012.

BLM, 2010d, *Dolores River Information—Dolores Public Lands Office*, March 25. Available at http://www.blm.gov/co/st/en/fo/sjplc/recreation/sjdolores.html. Accessed Feb. 22, 2012.

BLM, 2010e, *Final Wild and Scenic River Eligibility Report for the Uncompahgre Planning Area*, Uncompahgre Field Office, Colorado, June.

BLM, 2011a, *Notice of Public Scoping for Potassium Prospecting and Exploration,* Dolores Field Office, June 27. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/san_juan_public_lands/pdf.Par.22579.File.dat/20110624_SIGNED_SCOPING_LETTER_Potash.pdf. Accessed Feb. 22, 2012.

BLM, 2011b, *Environmental Assessment: La Sal No. 2 Uranium Sampling Project,* Moab Field Office, DOI-BLM-UT-Y010-2011-0162-EA. Sept. Available at http://www.blm.gov/pgdata/etc/medialib/blm/ut/moab_fo/ea_postings.Par.74657.File.dat/LaSalNo2EA.pdf. Accessed Feb. 28, 2012.

BLM, 2011c, *Determination of NEPA Adequacy: Hanging Flume Replica Construction,* Uncompahgre Field Office, DOI-BLM-CO-S050-2011-0028DNA, Aug. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/ufo_nepa_documents0.Par.80861.File.dat/11-28%20DNA%20Hanging%20Flume%20Replica%20Construction.pdf. Accessed Feb. 28, 2012.

BLM, 2011d, *RMP Planning Calendar,* Resource Management Planning, Resource Management Plan, Grand Junction, Colo., Field Office, U.S. Department of the Interior. Available at http://www.blm.gov/co/st/en/fo/gjfo/rmp.html. Accessed Dec. 6, 2011.

BLM, 2011e, *Greater Sage-Grouse Interim Management Policies and Procedures,* BLM IM 2012-043. Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2012/IM_2012-043.html. Accessed Feb. 7, 2012.

BLM, 2011f, *BLM National Greater Sage-Grouse Land Use Planning Strategy,* BLM IM 2012-044. Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2012/IM_2012-044.html. Accessed Feb. 7, 2012.

BLM, 2011g, *The National Landscape Conservation System: 15-Year Strategy, 2010–2025*, Report BLM/WO/GI-11/013+6100.

BLM, 2011h, *Land and Mineral Legacy Rehost 2000 System—LR2000*, last updated Sept. 23, 2011. Available at http://blm.gov/lr2000. Accessed Dec. 14, 2011.

BLM, 2011i, *Herd Management Areas and Herd Area Maps by State*, updated Nov. 1. Available at http://www.blm.gov/wo/st/en/prog/whbprogram/herd_management/HMA_and_HA_Maps.html. Accessed Feb. 22, 2012.

BLM, 2011j, *Environmental Assessment: East Paradox LHA Grazing Permit Renewals,* Uncompahgre Field Office, DOI-BLM-CO-S050-2011-0023 EA. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/ufo_nepa_documents0.Par.26626.File.dat/11-23%20EA%20E_Paradox%20LHA%20Grazing%20Permit%20Renewal.pdf. Accessed Feb. 22, 2012.

BLM, 2011k, *Uncompahgre Field Office Recreation: Visitation and Land Use*.

BLM, 2011l, *Environmental Assessment for the November 2011 Oil and Gas Lease Sale,* DOI-BLM-CO-130-2011-0043-EA, Grand Junction Field Office, July. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/programs/oil_and_gas/Lease_Sale/2011/november_2011.Par.35745.File.dat/GJ_Final%20Sale%20EA.pdf. Accessed Feb. 22, 2012.

BLM, 2011m, *Environmental Assessment: November 2011 Competitive Oil and Gas Lease Sale,* DOI-BLM-CO-S050-2011-0003 EA, Uncompahgre Field Office. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/programs/oil_and_gas/Lease_Sale/2011/november_2011.Par.75091.File.dat/UFO_Sale%20NoticeFinal%20EA.pdf. Accessed Feb. 24, 2012.

BLM, 2011n, *Northern Arizona Proposed Withdrawal Final Environmental Impact Statement*, BLM/AZ/PL-11/002, U.S. Department of the Interior, Bureau of Land Management, Oct.

BLM, 2011o, *Uncompahgre Planning Area Wilderness Characteristic Inventory: 2011 Update*, BLM Uncompahgre Field Office, Colorado. Available at: http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. Accessed Dec.11, 2012.

BLM, 2012a, *Environmental Assessment: Dolores River Restoration Treatments,* DOI-BLM-CO-S050-2012-0011 EA, Uncompahgre Field Office, March. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/ufo_nepa_documents0.Par.39048.File.dat/12-11%20EA%20Dolores%20RiverRestoration.pdf. Accessed May 8, 2012.

BLM, 2012b, *Land and Mineral Legacy Rehost 2000 System–LR 2000,* last updated July 10, 2012. Available at http://www.blm.gov/lr2000/index.htm. Accessed Sept. 10 and 11, 2012.

BLM, 2012c, *Environmental Assessment: Devil Canyon Fuels Reduction and Vegetation Restoration*, Monticello Field Office, DOI-BLM-UT-Y020-2012-0010-EA, Aug. Available at https://www.blm.gov/ut/enbb/files/Signed_EA,_Fonsi_and_Decision_Record.pdf. Accessed Oct. 12, 2012.

BLM, 2012d, *BLM Manual Section 6310: Conducting Wilderness Characteristics Inventory on BLM Lands (Public)*, March 15.

BLM, 2012e, *BLM Manual Section 6320: Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process (Public)*, March 15.

BLM, 2012f, *Wilderness Characteristics Assessment for the BLM Portions of the San Juan Public Lands*, BLM Tres Rios Field Office, Nov. 28.

BLM, 2012g, *Grand Junction Field Office Wilderness Characteristics Inventory Update: Documentation of Current Wilderness Inventory Conditions*, BLM Grand Junction Field Office, Colorado, July.

BLM, 2012h, *Environmental Assessment: Potash Exploration Project*, Tres Rios Field Office, DOI-BLM-CO-S010-2009-0076-EA, Oct. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/san_juan_public_lands/trfo_n epa_docs.Par.1940.File.dat/09-76%20RM_Potash_Final_EA_2012-1018.pdf. Accessed Dec. 19, 2012.

BLM, 2012i, *Grand Junction Field Office Draft Resource Management Plan and Environmental Impact Statement*, Dec. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/grand_junction_field/Draft_RMP/Draft_rmp_eis_v1.Par.57126.File.dat/GJFO_Draft_RMP_EIS_Vol-I.pdf. Accessed Sept. 2013.

BLM and CPW (Colorado Parks and Wildlife), 1989, *Colorado Desert Bighorn Sheep Management Plan.*

BLM and DOE (U.S. Department of Energy), 2010a, *Memorandum of Understanding between the U.S. Bureau of Land Management and the U.S. Department of Energy*, April.

BLM and DOE, 2010b, *Draft Programmatic Environmental Impact Statement for Solar Energy Development in Six Southwestern States*, DES 10-59, DOE/EIS-0403, Dec.

BLM, undated, *A Recreation and Visitors Strategy, Colorado Recreation Program.*

BLS (Bureau of Labor Statistics), 2011a, *Number of Fatal Work Injuries, 1992–2010,* U.S. Department of Labor. Available at http://www.bls.gov/iif/oshwc/cfoi/cfch0009.pdf. Accessed March 13, 2012.

BLS, 2011b, *2010 Survey of Occupational Injuries & Illnesses, Summary Estimates Charts Package,* Oct. 20. Available at http://www.bls.gov/iif/oshwc/osh/os/osch0044.pdf. Accessed March 13, 2012.

Boardman, R.L., et al., 1957, *Results of U.S. Geological Survey Exploration for Uranium-Vanadium Deposits in the Club Mesa Area, Uravan District, Montrose County, Colorado*, Trace Elements Memorandum Report 979, U.S. Geological Survey, May.

BOR (Bureau of Reclamation), 2009, *McPhee Dam*. Available at http://www.usbr.gov/projects/PrintFacilityAttributes.jsp?fac_Name=McPhee%20Dam.

BOR, 2011, *Dolores Project*. Available at http://www.usbr.gov/projects/Project.jsp?proj_Name=Dolores%20Project. Accessed Feb. 17, 2012.

BOR, 2012, *CRBSCP—Paradox Valley Unit—Title II*. Available at http://www.usbr.gov/projects/Project.jsp?proj_Name=CRBSCP%20-%20Paradox%20Valley%20Unit%20-%20Title%20II&pageType=ProjectPage. Accessed Feb. 17, 2012.

BOR, 2013a, *Paradox Valley Unit*. Available at http://www.usbr.gov/uc/wcao/progact/paradox/. Accessed July 26, 2013.

BOR, 2013b, *Scoping Report–Paradox Valley Unit EIS,* BOR Western Colorado Area Office, Colo., Jan.

Breit, G.N., and J.L. Fisher, 1988, *Variations in the Abundance of Occluded Light Hydrocarbons (C1–C5) and Their Relation to Diagenetic Changes, in the Salt Wash Member, Late Jurassic Morrison Formation, Slick Rock District, San Miguel County, Colorado*, Open File Report 88-586, U.S. Geological Survey.

Brown, B.T., et al., 1999, "The Influence of Weapons-Testing Noise on Bald Eagle Behavior," *Journal of Raptor Research* 33:227–232.

Brown, P.E., et al., 2000, "Evicting Bats When Gates Won't Work: Unstable Mines and Renewed Mining," in K.C. Vories and D. Throgmorton (editors), *Bat Conservation and Mining: A Technical Interactive Forum*, U.S. Department of the Interior, Office of Surface Mining; Bat Conservation International; Coal Research Center, Southern Illinois University at Carbondale.

BLM_0042740

CCCD (Colorado Center for Community Development), 1995, *Unaweep/Tabeguache Scenic and Historic Byway Management Plan*. Aug.

CDA (Colorado Department of Agriculture), 2010, *Noxious Weed Management Program, Colorado Weed Mapping*. Available at http://www.colorado.gov/cs/Satellite/Agriculture-Main/CDAG/1167928184069. Accessed Dec. 21, 2011.

CDA, 2011, *Noxious Weed Management Program, Noxious Weed List*. Available at http://www.colorado.gov/cs/Satellite?c=Page&cid=1174084048733&pagename=Agriculture-Main%2FCDAGLayout. Accessed Dec. 21, 2011.

CDM (CDM, Inc.), 2010, *Plan of Operations Amendment, Denison Mines (USA) Corp., La Sal Mines Complex, San Juan County, Utah,* prepared for Denison Mines (USA) Corp., Nov. Available at http://www.blm.gov/pgdata/etc/medialib/blm/ut/moab_fo/La_Sal_Mines_Complex_Documents.Par.78220.File.dat/La%20Sal%20Mines%20Complex%20Plan%20of%20Operations.pdf. Accessed Feb. 28, 2012.

CDMG (Colorado Division of Minerals and Geology), 2002, *Best Practices in Abandoned Mine Land Reclamation*, State of Colorado, Denver, Colo.

CDNR (Colorado Department of Natural Resources), 2008, *Colorado Mineral and Energy Industry Activities, 2007,* Colorado Geological Survey. Available at http://geosurvey.state.co.us/SiteCollectionDocuments/EnergyResources/MER_07_FINAL.pdf. Accessed Feb. 22, 2012.

CDNR, 2011, *Uranium Mining in Colorado 2011*, Division of Reclamation Mining and Safety, June 13.

CDNR, 2012, *Uranium Mining in Colorado 2012,* Division of Reclamation Mining and Safety, Jan. 13.

CDOT (Colorado Department of Transportation), 2011, *DTD DataAccess—Statistics, Maps, and Data—Traffic Data*. Available at http://apps.coloradodot.info/dataaccess/Traffic/index.cfm?fuseaction=TrafficMain&Menu. Accessed Nov. 4, 2011.

CDOT, 2012, *Unaweep Tabeguache.*

CDPHE (Colorado Department of Public Health and Environment), 2003, *Total Maximum Daily Load for Mercury in McPhee and Narraguinnep Reservoirs, Colorado, Phase I*, Technical Report.

CDPHE, 2008a, *Total Maximum Daily Load Assessment, Silver Creek, Dolores County, Colorado,* Technical Report, Water Quality Control Division. Available at http://www.colorado.gov/cs/Satellite/CDPHE-WQ/CBON/1251596042774. Accessed Oct. 22, 2012.

CDPHE, 2008b, *Total Maximum Daily Load Assessment San Miguel River Segments (cogusm03a, cogusm03b, cogusm06a, cogusm06b) Zinc and Cadmium, San Miguel County, Colorado,* Technical Report, Water Quality Control Division.

CDPHE, 2010, *Addenda/Errata to Total Maximum Daily Load Assessment, San Miguel River* (Segments *cogusm03a, cogusm06a, cogusm06b) Cadmium, San Miguel County, Colorado,* Technical Report, Water Quality Control Division.

CDPHE, 2011a, *2008 Air Pollutant Emissions Inventory*, on-line database, Denver, Colo. Available at http://www.colorado.gov/airquality/inv_maps_2008.aspx. Accessed Nov. 23, 2011.

CDPHE, 2011b, *Air Quality Standards, Designations and Emission Budgets*, 5 CCR 1001-14, Colorado Air Quality Control Commission, Denver, Colo. Available at http://www.cdphe.state.co.us/regulations/airregs/5CCR1001-14.pdf. Accessed Nov. 5, 2011.

CDPHE, 2011c, *Colorado 2010 Air Quality Data Report*, Denver, Colo. Available at http://www.colorado.gov/airquality/tech.aspx. Accessed Nov. 5, 2011.

CDPHE, 2011d, *Energy Fuels Piñon Ridge Uranium Mill License Decision*, Radiation Program, March 7.

CDPHE, 2012a, *Integrated Water Quality Monitoring and Assessment Report, State of Colorado,* 2012 Update to the 2010 305(b) Report, prepared pursuant to Section 303(d) and Section 305(b) of the Clean Water Act, Water Quality Control Division. Available at http://www.colorado.gov/cs/Satellite/CDPHE-WQCC/CBON/1251590894055. Accessed Oct. 22, 2012.

CDPHE, 2012b, *Colorado's Section 303(d) List of Impaired Waters and Monitoring and Evaluation List, Water Quality,* 2012 Update to the 2010 303(d) List, prepared pursuant to Section 303(d) and Section 305(b) of the Clean Water Act, Water Quality Control Division. Available at http://www.colorado.gov/cs/Satellite/CDPHE-WQCC/CBON/1251590894055. Accessed Oct. 22, 2012.

CDPHE, 2012c, Search results of public water supply systems within 5 miles from the ULP lease tracts, by the Source Water Assessment and Protection Program, CDPHE, Dec.

CDPHE, 2013, *Energy Fuels Piñon Ridge Uranium Mill License Decision*, Radiation Program, April 25.

CDRMS (Colorado Division of Reclamation, Mining, and Safety), 2011, *Monthly Coal Detail Report, January through December 2010*, Feb. 15. Available at http://mining.state.co.us/Reports/Detail2010.pdf. Accessed Feb. 17, 2012.

CDRMS, 2012a, *Mining and Safety Minerals Program Inspection Report for Burros Mine (in Lease Tract 13) (Permit # M-1977-297)*, Inspection Date: Oct. 16, 2012.

CDRMS, 2012b, *Minerals Program Inspection Report for Ellison Mine (in Lease Tract 13) (Permit #M-1978-342)*, Inspection Date: Oct. 16, 2012.

CDRMS, 2012c, *Minerals Program Inspection Report for Hawkeye Mine (in Lease Tract 13) (Permit # M-1978-311)*, Inspection Date: Oct. 16, 2012.

CDRMS, 2012d, *Monthly Coal Summary Report, January through December 2011*, Feb. 7. Available at http://mining.state.co.us/Reports/CoalSummary2011.pdf. Accessed Feb. 17, 2012.

CDRMS, 2012e, *County Operator Mining Data (Delta, Dolores, Mesa, Montezuma, Montrose, and San Miguel Counties)*. Available at http://mining.state.co.us/County%20Operator%20Mining%20Data.htm. Accessed Feb. 17, 2012.

CDRMS 2012f, *Uranium Mining in Colorado 2012 (Updated July 18, 2012)*, Denver, Colo.

CDWR (Colorado Division of Water Resources), 2005, *Rules and Regulations for Water Well Construction, Pump Installation, Cistern Installation, and Monitoring and Observation Hole/Well Construction*, 2-CCR-402-2, Denver, Colo.

CDWR, 2007, *General Information about Well Permits in Division IV*, Jan. 17.

CDWR, 2011, *Colorado's Decision Support Systems (CDSS)*. Available at http://cdss.state.co.us/Pages/CDSSHome.aspx. Accessed Dec. 23, 2011.

Cember, H., 1983, *Introduction to Health Physics,* Pergamon Press, Elmsford, N.Y.

CensusViewer, 2013a, *Population of Montrose County, Colorado: Census 2010 and 2000 Interactive Map, Demographics, Statistics, Graphs, Quick Facts*. Available at http://censusviewer.com/county/CO/Montrose. Accessed Sept. 2013.

CensusViewer, 2013b, *Population of San Miguel County, Colorado: Census 2010 and 2000 Interactive Map, Demographics, Statistics, Graphs, Quick Facts*. Available at http://censusviewer.com/county/CO/San%20Miguel. Accessed Sept. 2013.

CensusViewer, 2013c, *Population of Mesa County, Colorado: Census 2010 and 2000 Interactive Map, Demographics, Statistics, Graphs, Quick Facts*. Available at http://censusviewer.com/county/CO/Mesa. Accessed Sept. 2013.

CEQ (Council on Environmental Quality), 1997, *Environmental Justice Guidance under the National Environmental Policy Act,* Executive Office of the President, Washington, D.C.

CGS (Colorado Geological Survey), 2003, *Ground Water Atlas of Colorado*, Special Publication 53, Division of Minerals and Geology, Department of Natural Resources, Denver, Colo.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 170 of 426

Chafin, D.T., 2003, *Effect of the Paradox Valley Unit on the Dissolved-Solids Load of the Dolores River near Bedrock, Colorado, 1988–2001,* Water Resources Investigation Report 02-4275, U.S. Geological Survey.

Chapman, P.M., et al. (editors), 2009, *Ecological Assessment of Selenium in the Aquatic Environment: Summary of a SETAC Pellston Workshop*, Society of Environmental Toxicology and Chemistry (SETAC), Pensacola, Fla.

Chapman, S.S., et al., 2006, *Ecoregions of Colorado* (color poster with map, descriptive text, summary tables, and photographs; map scale 1:1,200,000), U.S. Geological Survey, Reston, Va.

Chenoweth, W.L., 1981, "The Uranium-Vanadium Deposits of the Uravan Mineral Belt and Adjacent Areas, Colorado and Utah," pp. 165–170 in *New Mexico Geological Society Guidebook*, R.C. Epis and J.F. Callender (editors), 32nd Field Conference, Oct. 8–10.

Chenoweth, W.L., 1987, "Paradox Valley, Colorado: A Collapsed Salt Anticline," pp. 339–342 in *Geological Society of America Centennial Field Guide—Rocky Mountain Section,* Vol. 2, S.S. Beus (editor).

Chronic, H., and F. Williams, 2002, *Roadside Geology of Colorado,* Second Edition, Mountain Press Publishing Co., Missoula, Mont.

CNHP (Colorado Natural Heritage Program), 2011a, *Rare Plant Guide List*. Available at http://www.cnhp.colostate.edu/download/projects/rareplants/list.asp?list=master. Accessed Dec. 16, 2011.

CNHP, 2011b, *Element Occurrences by Quadrangle*. Available at http://www.cnhp.colostate.edu/download/gis.asp#maps. Accessed Dec. 16, 2011.

COGCC (Colorado Oil and Gas Conservation Commission), 2012a, *COGCC Reports Portal—Production Data Inquiry for Delta, Dolores, Mesa, Montezuma, Montrose, and San Miguel Counties*, State of Colorado Department of Natural Resources. Available at http://cogcc.state.co.us/cogis. Accessed Feb. 17, 2012.

COGCC, 2012b, *Colorado Oil and Gas Information System—Production Data Inquiries for T43N, R18W, R19W, and R20W; T44N, R18W, and R19W; T45N, R18W; T46N, R17W; T47N, R17W; and T48N, R17W, and R18W*, State of Colorado Department of Natural Resources, Jan. 20.

Colorado Bat Working Group, 2005, *Colorado Working Bat Group Minutes 22 April 2005*, Available at http://www.cnhp.colostate.edu/teams/zoology/cbwg/pdfs/CDWG%20Minutes%202005.pdf. Accessed Sept. 19, 2012.

Colorado Bat Working Group, 2010a, *Bats of Colorado*. Available at http://www.cnhp.colostate.edu/teams/zoology/cbwg/batList.asp. Accessed Sept. 14, 2012.

BLM_0042744

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 171 of 426

Colorado Bat Working Group, 2010b, *The Colorado Bat Matrix*, Available at http://www.cnhp.colostate.edu/teams/zoology/cbwg/splash.asp. Accessed Sept. 27, 2012.

Colorado Department of Local Affairs, 2011, *Economic Base Analysis—Result*.

Colorado Field Ornithologists, 2010a, *Checklist of the Birds of Colorado—Mesa County*, Available at http://www.coloradocountybirding.com/checklists/checklist.php?id= 40&flag=pdf&name=Mesa. Accessed Nov. 4, 2011.

Colorado Field Ornithologists, 2010b, *Checklist of the Birds of Colorado—Montrose County*, Available at http://www.coloradocountybirding.com/checklists/checklist. php?id=44&flag=pdf&name=Montrose. Accessed Nov. 4, 2011.

Colorado Field Ornithologists, 2010c, *Checklist of the Birds of Colorado—San Miguel County*, Available at http://www.coloradocountybirding.com/checklists/checklist. php?id=58&flag=pdf&name=SanMiguel. Accessed Nov. 4, 2011.

Condon, S.M., 1997, *Geology of the Pennsylvanian and Permian Cutler Group and Permian Kaibab Limestone in the Paradox Basin, Southeastern Utah and Southwestern Colorado*, Bulletin 2000-P, U.S. Geological Survey.

Colorado State Demography Office, 2011, *Population Forecasts—Years (2000 to 2040)*.

Corona Research, Inc., 2009, *Colorado State Parks Marketing Assessment: Visitor Spending Analysis, 2008–2009*.

Cotter Corp. (Cotter Corporation N.S.L.), 2011, *JD-8 Mine Permit Amendment Application M-1984-014*, prepared by Cotter Corp., Nucla, Colo., and submitted to State of Colorado, Division of Reclamation, Mining and Safety, Denver, Colo., June 2.

Cotter Corp., 2012a, *SR-13A Mine Permit Amendment Application M-1977-311*, prepared by Cotter Corp., Nucla, Colo. and O'Connor Design Group, Inc., Grand Junction, Colo., and submitted to State of Colorado, Division of Reclamation, Mining and Safety, Denver, Colo., Sept. 19.

Cotter Corp., 2012b, *LP-21 Mine Permit Amendment Application M-1977-305*, prepared by Cotter Corp., Nucla, Colo., and O'Connor Design Group, Inc., Grand Junction, Colo., and submitted to State of Colorado, Division of Reclamation, Mining and Safety, Denver, Colo., Sept. 19.

Cotter Corp., 2012c, *CM-25 Mine Permit Amendment Application M-1977-307*, prepared by Cotter Corp., Grand Junction, Colo., and O'Connor Design Group, Inc., Grand Junction, Colo., and submitted to State of Colorado, Division of Reclamation, Mining and Safety, Denver, Colo., Sept. 19.

BLM_0042745

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 172 of 426

Cotter Corp., 2012d, *JD-6 Mine Permit Amendment Application M-1977-310*, prepared by Cotter Corp., Nucla, Colo., and submitted to State of Colorado, Division of Reclamation, Mining and Safety, Denver, Colo., Sept. 24.

Cotter Corp., 2012e, *SR-11 Mine Permit Amendment Application M-1977-451*, prepared by Cotter Corp., Nucla, Colo., and O'Connor Design Group, Inc., Grand Junction, Colo., and submitted to State of Colorado, Division of Reclamation, Mining and Safety, Denver, Colo., Sept. 24.

Cotter Corp., 2012f, *JD-9 Mine Permit Amendment Application M-1977-306*, prepared by Cotter Corp., Nucla, Colo., and O'Connor Design Group, Inc., Grand Junction, Colo., and submitted to State of Colorado, Division of Reclamation, Mining and Safety, Denver, Colo., Sept. 25.

Cotter Corp., 2012g, *SM-18 Mine Permit Amendment Application M-1978-116*, prepared by Cotter Corp., Nucla, Colo., and O'Connor Design Group, Inc., Grand Junction, Colo., and submitted to State of Colorado, Division of Reclamation, Mining and Safety, Denver, Colo., Sept. 26.

Countess Environmental, 2006, *WRAP Fugitive Dust Handbook*, prepared for Western Governors' Association, Denver, Colo., Sept. 7. Available at http://www.wrapair.org/forums/dejf/fdh/content/FDHandbook_Rev_06.pdf. Accessed Dec. 15, 2011.

Cowardin, L.M., et al., 1979, *Classification of Wetlands and Deepwater Habitats of the United States*, FWS/OBS-79/31, U.S. Fish and Wildlife Service, Dec.

CPW (Colorado Parks and Wildlife), 2008, *Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors*. Available at http://wildlife.state.co.us/SiteCollectionDocuments/DOW/Wildlife Species/LivingWithWildlife/RaptorBufferGuidelines2008.pdf. Accessed Sept. 14, 2012.

CPW, 2011a, *Natural Diversity Information Source Data*, Colorado Department of Natural Resources, Denver, Colo. Available at http://ndis.nrel.colostate.edu/wildlife.html. Accessed Dec. 15, 2011.

CPW, 2011b, *Sandhill Crane*, Colorado Department of Natural Resources, Denver, Colo. Available at http://wildlife.state.co.us/WildlifeSpecies/Profiles/Birds/Pages/SandhillCrane.aspx. Accessed May 1, 2012.

CPW, 2012a, *CPW Bat Sites, Uranium Lease Tracts*. Report transmitted from CPW to Argonne National Laboratory, Argonne, Ill., June 15.

Craig, L.C., 1982, *Uranium Potential of the Burro Canyon Formation in Western Colorado*, Open File Report 82-222, U.S. Geological Survey.

CSFS (Colorado State Forest Service), 2009, *Durango District 2009 Annual Report*. Available at http://csfs.colostate.edu/pdfs/FINAL_Durango_AR09.pdf. Accessed Feb. 21, 2012.

BLM_0042746

Cunnington, G.M., and L. Fahrig, 2010, "Plasticity in the Vocalizations of Anurans in Response to Traffic Noise," *Acta Oecologica* 36:463–470.

Curtis, G.P., et al., 2006, "Simulation of Reactive Transport of Uranium (VI) in Groundwater with Variable Chemical Conditions," *Water Resources Research* 42, W04404, doi:10.1029/2005WR003979.

CWCB (Colorado Water Conservation Board), 2012, *Instream Flow Program*. Available at http://cwcb.state.co.us/environment/instream-flow-program/Pages/main.aspx. Accessed Feb. 17, 2012.

Delaney, D.K., et al., 1999, "Effects of Helicopter Noise on Mexican Spotted Owls," *Journal of Wildlife Management* 63(1):60–76. Available at http://www.rmrs.nau.edu/publications/Delaney_1999b/Delaney_1999b.pdf. Accessed Aug. 13, 2009.

Denison (Denison Mines), 2008, *Sunday Mines Environmental Assessment*, CO-800-2007-104EA, prepared for the U.S. Bureau of Land Management, Nov.

Denison, 2012a, *White Mesa*, Toronto, Ontario. Available at http://www.denisonmines.com/Document/Details/96. Accessed Feb. 21 and May 2, 2012.

Denison, 2012b, *Denison Outlines 2012 Operating Plans and Releases 2011 Production and Sales Volume*, press release, Denison Mines, Toronto, Ontario, Jan. 16. Available at http://www.infomine.com/index/pr/PB148470.PDF. Accessed Feb. 21 and May 2, 2012.

Denman, A.R., et al., 2003, "Assessment of Health Risks to Skin and Lung of Elevated Radon Levels in Abandoned Mines," *Health Physics* 85(6), Dec.

Denver District Court, 2012, Judicial Review Order, Sheep Mountain Alliance and Towns of Telluride, and Ophir, Colorado v. Colorado Department of Public Health and Environment and Energy Fuels Resources, Case Number 2011CV861, June 13, 2012.

DOE (U.S. Department of Energy), 1995, *Final Environmental Assessment for the Uranium Lease Management Program*, DOE/EA-1037, Grand Junction Projects Office; also *Finding of No Significant Impact, Uranium Lease Management Program*, Aug. 22

DOE, 2003, *Estimating Radiation Risk from Total Effective Dose Equivalent (TEDE)*, ISCORS, Technical Report No. 1, DOE/EH-412/0015/0802 Rev. 1, Air, Water and Radiation Information Brief, Office of Environmental Policy and Guidance, Washington, D.C., Jan.

DOE, 2004, *Recommendations for the Preparation of Environmental Assessments and Environmental Impact Statements*, Second Edition, Environmental, Safety, and Health, Office of NEPA Policy and Compliance, Washington, D.C., Dec.

DOE, 2005, *Remediation of the Moab Uranium Mill Tailings, Grand and San Juan Counties, Utah, Final Environmental Impact Statement,* DOE/EIS-0355, July. Available at http://www.gjem.energy.gov/moab/eis/feis.htm. Accessed May 8, 2012.

DOE, 2007, *Uranium Leasing Program Final Programmatic Environmental Assessment,* DOE/EA-1535, also *Finding of No Significant Impact for the Uranium Leasing Program*, Office of Legacy Management, July.

DOE, 2009a, *Approval of Exploration Plan Submitted for DOE Lease Tract C-G-26*, OLM-SRS-2009-150, Office of Legacy Management, Oct. 19.

DOE, 2009b, *Approval of Exploration Plan Submitted for DOE Lease Tract C-LP-21,* OLM-SRS-2009-148, Office of Legacy Management, Oct. 26.

DOE, 2009c, *Approval of Exploration Plan Submitted for DOE Lease Tract C-SR-13A,* OLM-SRS-2009-167, Office of Legacy Management, Nov. 23.

DOE, 2009d, *DOE Uranium Leasing Program, U.S. Uranium Corporation—Work Scope for Reclamation in-Lieu-of Royalty*, OLM-SRS-2009-171, Nov. 30.

DOE, 2009e, *DOE Uranium Leasing Program, Golden Eagle Mining, Inc.—Work Scope for Reclamation in-Lieu-of Royalty,* OLM-SRS-2009-173, Nov. 30.

DOE, 2009f, *DOE Uranium Leasing Program, Energy Fuels Resources—Work Scope for Reclamation in-Lieu-of Royalty*, OLM-SRS-2009-174, Nov. 30.

DOE, 2009g, *DOE Uranium Leasing Program, Golden Eagle Uranium—Work Scope for Reclamation in-Lieu-of Royalty*, OLM-SRS-2009-172, Nov. 30.

DOE, 2009h, *Approval of Exploration Plan Submitted for DOE Lease Tract C-CM-24*, OLM-SRS-2009-106, Office of Legacy Management, Aug. 17.

DOE, 2009i, *Approval of Exploration Plan Submitted for DOE Lease Tract C-CM-25*, OLM-SRS-2009-149, Office of Legacy Management, Oct. 27.

DOE, 2010a, *Approval of Exploration Plan Submitted for DOE Lease Tract C-SR-15A*, OLM-LEK-2010-099, Office of Legacy Management, July 20.

DOE, 2010b, *Approval of Exploration Plan Submitted for DOE Lease Tract C-WM-17*, OLM-LEK-2010-099, Office of Legacy Management, July 20.

DOE, 2010c, *Approval of Phase II Plan Submitted for DOE Lease Tract C-G-26 Mine Development and Operation,* OLM-LEK-2010-105, Office of Legacy Management, Aug. 11.

DOE, 2010d, *DOE Uranium Leasing Program, Cotter Corporation—Work Scope for Reclamation in-Lieu-of Royalty*, OLM-SRS-2010-150, Nov. 22.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 175 of 426

DOE, 2010e, *DOE Uranium Leasing Program, Golden Eagle Uranium—Work Scope for Reclamation in-Lieu-of Royalty*, OLM-SRS-2010-154, Nov. 22.

DOE, 2010f, *DOE Uranium Leasing Program, Energy Fuels Resources—Work Scope for Reclamation in-Lieu-of Royalty*, OLM-SRS-2010-152, Nov. 22.

DOE, 2011a, *Uranium Leasing Program Mineral Leasing Procedures Manual, LMS/PRO/S04344-0.0*, prepared by S.M. Stoller Corporation for Office of Legacy Management, April 26.

DOE, 2011b, *Radiation Protection of the Public and the Environment*, Order DOE O 458.1, Office of Health, Safety and Security, Feb.

DOE, 2011c, *DOE Uranium Leasing Program, Energy Fuels Resources—Work Scope for Reclamation in-Lieu-of Royalty*, OLM-SRS-2011-161, Oct. 6, 2011.

DOE, 2011d, *DOE Uranium Leasing Program, Energy Fuels Resources—Work Scope for Reclamation in-Lieu-of Royalty*, OLM-SRS-2011-094, June 22, 2011.

DOE, 2011e, *DOE Order 458.1 Radiation Protection of the Public and the Environment*, Office of Health, Safety, and Security, Washington, D.C., Feb.

DOE, 2013, *Verification Monitoring Report for the Slick Rock, Colorado, Processing Sites,* MS/SRE-SRW/S09923, Office of Legacy Management, April.

DOE and CDRMS (Colorado Division of Reclamation, Mining, and Safety), 2012, *Memorandum of Understanding between the U.S. Department of Energy and the Colorado Division of Reclamation, Mining, and Safety*, Sept.

DOI (U.S. Department of the Interior), 2011, *Native American Consultation Database,* National NAGPRA Online Databases, National Park Service.

DOI, 2012, *Final Environmental Impact Statement, Aspinall Unit Operations,* Bureau of Reclamation, Jan. Available at http://www.usbr.gov/uc/envdocs/eis/AspinallEIS/Final%20Volume%20I.pdf. Accessed Feb. 27, 2012.

DOJ (U.S. Department of Justice), 2009a, "Table 10: Offenses Known to Law Enforcement, by State by Metropolitan and Nonmetropolitan Counties, 2009," *Crime in the United States*, Federal Bureau of Investigation, Criminal Justice Information Services Division.

DOJ, 2009b, "Table 80: Full-Time Law Enforcement Employees, by State by Metropolitan and Nonmetropolitan Counties, 2009," *Crime in the United States*, Federal Bureau of Investigation, Criminal Justice Information Services Division, Sept.

BLM_0042749

DOT (U.S. Department of Transportation), 2010a, *Traffic Safety Facts, Dolores County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_Dolores%20County_2010.HTM. Accessed Jan. 25, 2012.

DOT, 2010b, *Traffic Safety Facts, Mesa County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_Mesa%20County_2010.HTM. Accessed Jan. 25, 2012.

DOT, 2010c, *Traffic Safety Facts, Montrose County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_Montrose%20County_2010.HTM. Accessed Jan. 25, 2012.

DOT, 2010d, *Traffic Safety Facts, San Miguel County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_San%20Miguel%20County_2010.HTM. Accessed Jan. 25, 2012.

DOT, 2010e, *Traffic Safety Facts, San Juan County, Utah, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/STSI/49_UT/2010/Counties/Utah_San%20Juan%20County_2010.HTM. Accessed Jan. 25, 2012.

DRI (Desert Research Institute), 2011, *RAWS USA Climate Archive*. Available at http://www.raws.dri.edu/. Accessed Dec. 21, 2011.

Driver, C.J., 1994, *Ecotoxicity Literature Review of Selected Hanford Site Contaminants*, PNL-9394, U.S. Department of Energy, Pacific Northwest Laboratory, March.

Eckerman, K., et al., 1999, *Cancer Risk Coefficients for Environmental Exposure to Radionuclides*, EPA 402-R-99-001, Federal Guidance Report No. 12, prepared by Oak Ridge National Laboratory for U.S. Environmental Protection Agency, Office of Radiation and Indoor Air.

Edge Environmental, Inc., 2009, *Piñon Ridge Project Environmental Report, Montrose County, Colorado*, prepared for Energy Fuels Resources Corporation, Lakewood, Colo., Nov. Available at http://www.co.montrose.co.us/DocumentView.aspx?DID=857. Accessed Dec. 23, 2011.

EIA (Energy Information Administration), 2010, *2010 Domestic Uranium Production Report*, June. Available at http://www.eia.gov/uranium/production/annual/pdf/dupr.pdf. Accessed Feb. 23, 2012.

EIA, 2012, *Annual Energy Outlook 2012 with Projections to 2035*, DOE/EIA-0383(2012), June.

Eldred, K.M., 1982, "Standards and Criteria for Noise Control—An Overview," *Noise Control Engineering* 18(1):16–23.

Ellison, L.E., et al., 2003, *Colorado Bat Conservation Plan*, Colorado Committee of the Western Bat Working Group. Available at http://www.cnhp.colostate.edu/teams/zoology/cbwg/pdfs/ColoradoBatConservationPlanFebruary2004.pdf. Accessed Sept. 19, 2012.

Energy Fuels (Energy Fuels, Inc.), 2009, *Mine Operations Plan: Piñon Ridge Mill Facility Montrose County, Colorado*, Aug.

Energy Fuels, 2012a, *Piñon Ridge Mill*. Available at http://www.pinonridgemill.com/index.html. Accessed Feb. 21, 2012.

Energy Fuels, 2012b, *Energy Queen Mine*. Available at http://www.energyfuels.com/projects/energy-queen/index.html. Accessed Feb. 24, 2012.

Energy Fuels., 2012c, *Whirlwind Mine*. Available at http://www.energyfuels.com/projects/whirlwind/index.html. Accessed Feb. 28, 2012.

Energy Fuels, 2012d, *Piñon Ridge Mill: Schedule*. Available at http://www.pinonridgemill.com/schedule.html. Accessed May 7, 2012.

Energy Fuels, 2013a, *Daneros*, Toronto, Ontario, Canada. Available at http://www.energyfuels.com/projects/daneros. Accessed Oct. 18, 2013.

Energy Fuels, 2013b, *La Sal Complex*, Toronto, Ontario, Canada. Available at http://www.energyfuels.com/projects/la_sal_complex. Accessed Oct. 18, 2013.

Energy Fuels Resources Corp. and Greg Lewicki and Associates, 2008, *Whirlwind Mine Plan of Operations*, Vol. 1, prepared for Bureau of Land Management–Colorado, Grand Junction Field Office, and Bureau of Land Management–Utah, Moab Field Office, March. Available at http://www.uraniumwatch.org/whirlwindmine/ww_planofoperation.80331.pdf. Accessed Feb. 1, 2012.

EPA (U.S. Environmental Protection Agency), 1974, *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*, 550/9-74-004, Office of Noise Abatement and Control, March. Available at http://www.nonoise.org/library/levels74/levels74.htm. Accessed Sept. 26, 2011.

EPA, 1985, *Draft Background Information Document, Proposed Standard for Radon-222 Emissions to Air from Underground Uranium Mines,* EPA 520/1-85-010, Office of Radiation Program, Washington, D.C., Feb. 14.

EPA, 1988, *Limiting Values of Radionuclide Intake and Air Concentration and Dose Conversion Factors for Inhalation, Submersion, and Ingestion*, Federal Guidance Report No. 11, EPA-520/1-88-020, Office of Radiation Programs, Washington, D.C.

EPA 1989a, *Risk Assessments, Environmental Impact Statement, NESHAPS for Radionuclides, Background Information Document-Volume 2,* EPA/520/1-89-006-1, Office of Radiation Programs, Washington, D.C., Sept.

EPA 1989b, *User's Guide for the COMPLY-R Code (Revision 1)*, EPA 520/1-89-029, Office of Radiation Programs, Washington, D.C., Oct.

EPA, 1993, *External Exposure to Radionuclides in Air, Water, and Soil*, Federal Guidance Report No. 12, EPA 402-R-93-081, Office of Radiation and Indoor Air, Washington, D.C.

EPA, 1994, *Estimating Radiogenic Cancer Risks*, EPA 402-R-93-076, Office of Radiation and Indoor Air, Washington, D.C., June.

EPA, 2006, *How Air Pollution Affects the View*, EPA-456/F-06-001, April.

EPA, 2008, *Technical Report on Technologically Enhanced Naturally Occurring Radioactive Materials from Uranium Mining, Volume 1: Mining and Reclamation Background,* EPA 402-R-08-005, Office of Radiation and Indoor Air, Washington, D.C., April.

EPA, 2011a, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2009*, EPA 430-R-11-005, April 15. Available at http://www.epa.gov/climatechange/emissions/downloads11/US-GHG-Inventory-2011-Complete_Report.pdf. Accessed Nov. 5, 2011.

EPA, 2011b, *National Ambient Air Quality Standards (NAAQS)*. Available at http://www.epa.gov/air/criteria.html, last updated Nov. 8, 2011. Accessed Dec. 15, 2011.

EPA, 2011c, *The Green Book Nonattainment Areas for Criteria Pollutants*. Available at http://www.epa.gov/oaqps001/greenbk/, last updated Aug. 30, 2011. Accessed Nov. 5, 2011.

EPA, 2011d, *AirData: Access to Monitored Air Quality Data from EPA's Air Quality System (AQS) Data Mart*. Available at http://www.epa.gov/airdata/, last updated Dec. 14, 2011. Accessed Dec. 15, 2011.

EPA, 2012a, *Integrated Risk Information System (IRIS)*. Available at http://www.epa.gov/IRIS. Accessed March 17, 2012.

EPA, 2012b, *CASTNET Home*. Available at http://epa.gov/castnet/javaweb/index.html. Accessed Sept. 25, 2012.

EPA, 2013, *National Primary Drinking Water Regulations*. Available at http://water.epa.gov/drink/contaminants/index.cfm#List. Accessed Sept. 5, 2013.

EPS (Economic and Planning Systems), 2010, *Montrose County Socioeconomic Impact Study,* prepared by EPS, Mike Retzlaff, and Lloyd Levy Consulting (EPS #19841), for Montrose County, Colo., March.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 179 of 426

Erwin, W.J., and R.H. Stasiak, 1979, "Vertebrate Mortality during Burning of a Reestablished Prairie in Nebraska," *American Midland Naturalist* 101:247–249.

Fairbrother, A., et al., 1994, "Impairment of Growth and Immune Function of Avocet Chicks from Sites with Elevated Selenium, Arsenic, and Boron," *Journal of Wildlife Diseases* 30(2):222–233.

Faanes, C.A., 1987, *Bird Behavior and Mortality in Relation to Power Lines in Prairie Habitats*, Fish and Wildlife Technical Report 7, U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C.

Feeney, D., et al., 2004, *Big Game Migration Corridors in Wyoming*, Wyoming Open Spaces, University of Wyoming, Laramie, Wyo., April. Available at http://www.uwyoedu/openspaces/docs/MigrationCorridors.pdf. Accessed Sept. 26, 2006.

Ferry C., et al. 2002, "An Experimental Method for Measuring the Radon-222 Emanation Factor in Rocks," *Radiation Measurements* 35:570.

Filas, F., 2013, *Daneros Mine Large Mine Notice of Intent to Revise Mine Operations San Juan County, Utah*, Transmittal from Filas (Energy Fuels Resources (USA) Inc., Lakewood, Colo.), to W. Western (State of Utah Department of Natural Resources, Division of Oil, Gas and Mining, Salt Lake City, Utah), March 4. Available at https://fs.ogm.utah.gov/FILES/MINERALS/PERMITS/037/M0370126/2013/Incoming/03072013.pdf. Accessed Oct. 18, 2013.

Finch, W.I., and J.F. Davis, 1985, "Sandstone-Type Uranium Deposits—An Introduction," in *Geological Environments of Sandstone-Type Uranium Deposits*, Report IAEA-TECDOC-328, International Atomic Energy Agency, March.

Fire Departments Network, 2011, *Colorado Fire Departments*. Available at http://co.firedepartments.net/fire/county/Colorado.html.

Fischer, R.P., and L.S. Hilpert, 1952, *Geology of the Uravan Mineral Belt*, Bulletin 988-A, U.S. Geological Survey.

Fleischner, T.L., 1994, "Ecological Costs of Livestock Grazing in Western North America," *Conservation Biology* 8(3):629–644.

Foos, A., 1999, *Geology of the Colorado Plateau*, Geology Department, University of Akron, Ohio. Available at http://www.nature.nps.gov/geology/education/foos/plateau.pdf.

Foppen, R., and R. Reijnen, 1994, "The Effects of Car Traffic on Breeding Bird Populations in Woodland. II. Breeding Dispersal of Male Willow Warblers (*Phylloscopus trochilus*) in Relation to the Proximity of a Highway," *Journal of Applied Ecology* 32:95–101.

Ford, W.M., et al., 1999, "Effects of a Community Restoration Fire on Small Mammals and Herpetofauna in the Southern Appalachians," *Forest Ecology and Management* 114:233–243.

BLM_0042753

Forman, R.T.T., and L.E. Alexander, 1998, "Roads and Their Major Ecological Effects," *Annual Review of Ecology and Systematics* 29:207–231.

Francis, C.D., and J.R. Barber, 2013, "A Framework for Understanding Noise Impacts on Wildlife: An Urgent Conservation Priority," *Frontiers in Ecology and the Environment* 11(6):305–313.

Francis, C.D., et al., 2009, "Noise Pollution Changes Avian Communities and Species Interactions," *Current Biology* 19:1415–1419.

Fritz, J.N., 2006, *Potential Traditional Cultural Properties within 38 Uranium Leasing Tracts in Southwestern Colorado: A Background Ethnographic Analysis*, prepared for S.M. Stoller Corporation, Grand Junction, Colo., Nov. 1.

Gaines, W.L., et al., 2003, *Assessing the Cumulative Effects of Linear Recreation Routes on Wildlife Habitats on the Okanogan and Wenatchee National Forests*, General Technical Report PNW-GTR-586, U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station, Portland, Ore.

GAO (Government Accounting Office), 2007, *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources*, GAO-07-863, report to Congressional requesters, Aug.

Gelbard, J.L., and J. Belnap, 2003, "Roads as Conduits for Exotic Plant Invasions in a Semiarid Landscape," *Conservation Biology* 17(2):420–432.

George, J.L., et al. (editors), 2009, *Colorado Bighorn Sheep Management Plan 2009–2019*, Special Report Number 81, Colorado Department of Natural Resources, Division of Wildlife, Denver, Colo., Feb.

GJSentinel *(Grand Junction Daily Sentinel),* 2011, "Knockdown Phase at Cameo Power Plant," Aug. 15. Available at http://www.gjsentinel.com/news/articles/knockdown_phase_at_cameo_power. Accessed Feb. 23, 2012.

Golder Associates (Golder Associates, Inc.), 2009, *Hydrogeologic Report, Piñon Ridge Project, Montrose County, Colorado,* technical report, Exhibit F1 of the Mill License Application.

Gordus, A.G., et al., 2002, "Salt Toxicosis in Ruddy Ducks that Winter on an Agricultural Evaporation Basin in California," *Journal of Wildlife Diseases* 38(1):124–131.

Groves, C.R., and K. Steenhof, 1988, "Responses of Small Mammals and Vegetation to Wildfires in Shadscale Communities of Southwestern Idaho," *Northwest Science* 62:205–210.

Grout, M.A., and E.R. Verbeek, 1997, "Tectonic and Paleostress Significance of the Regional Joint Network of the Central Paradox Basin, Utah and Colorado," in *Laccolith Complexes of Southeastern Utah: Time of Emplacement and Tectonic Setting—Workshop Proceedings*, Friedman and Huffman (editors), Bulletin 2158, U.S. Geological Survey.

Habib, L, et al., 2007, "Chronic Industrial Noise Affects Pairing Success and Age Structure of Ovenbirds *Seiurus aurocapilla*," *Journal of Applied Ecology* 44:176–184.

Hand, J.L., et al., 2011, *Spatial and Seasonal Patterns and Temporal Variability of Haze and Its Constituents in the United States*, Interagency Monitoring of Protected Visual Environments (IMPROVE) Report V, June. Available at http://vista.cira.colostate.edu/improve/publications/Reports/2011/PDF/Cover_TOC.pdf. Accessed May 4, 2012.

Hanson, C.E., et al., 2006, *Transit Noise and Vibration Impact Assessment*, FTA-VA-90-1003-06, prepared by Harris Miller Miller & Hanson Inc., Burlington, Mass., for U.S. Department of Transportation, Federal Transit Administration, Washington, D.C., May. Available at http://www.hmmh.com/rail_manuals01fta.html. Accessed Feb. 29, 2012.

Harris, C.M. (editor), 1991, *Handbook of Acoustical Measurements and Noise Control*, Third Edition, McGraw-Hill Book Company, New York, N.Y.

Hawn, W.S., 2003, *Soil Survey of San Miguel Area, Colorado—Parts of Dolores, Montrose, and San Miguel Counties*, U.S. Department of Agriculture, Natural Resources Conservation Service in cooperation with the Colorado Agricultural Experiment Station, U.S. Department of the Interior, Bureau of Land Management.

Hazel, J.E., 2000, *Sedimentary Response to Intrabasinal Salt Tectonism in the Upper Triassic Chinle Formation, Paradox Basin, Utah*, Bulletin 2000-F, U.S. Geological Survey.

Hels, T., and E. Buchwald, 2001, "The Effect of Road Kills on Amphibian Populations," *Biological Conservation* 99:331–340.

Hinck, J.E., et al., 2010, "Biological Pathways of Exposure and Ecotoxicity Values for Uranium and Associated Radionuclides," Chapter D of *Hydrological, Geological, and Biological Site Characterization of Breccia Pipe Uranium Deposits in Northern Arizona*, A.E. Alpine (editor), Scientific Investigations Report 2010-5025, U.S. Geological Survey.

Hirsch, C.L., et al., 2006, *Range-wide Status of Colorado River Cutthroat Trout* (Oncorhynchus clarkia pleuriticus)*: 2005*, Colorado River Cutthroat Trout Conservation Team Report, Colorado Division of Wildlife, Fort Collins, Colo.

Hite, R.J., and S.W. Lohman, 1973, *Geologic Appraisal of Paradox Basin Salt Deposits for Waste Emplacement*, Open File Report 73-114, U.S. Geological Survey.

Hobbs, N.T., 1989, "Linking Energy Balance to Survival in Mule Deer: Development and Test of a Simulation Model," *Wildlife Monographs* 101:1–39.

Hockin, D., et al., 1992, "Examination of the Effects of Disturbance on Birds with Reference to Its Importance in Ecological Assessments," *Journal of Environmental Management* 36:253–286.

Hoerling, M., et al., 2008, *Climate Change in Colorado: A Synthesis to Support Water Resources Management and Adaptation*, report prepared by the Western Water Assessment for the Colorado Water Conservation Board.

Holmes, T.L., et al., 1993, "Responses of Wintering Grassland Raptors to Human Disturbance," *Wildlife Society Bulletin* 21:461–468.

Holsinger, K., 2012, *ULP PEIS: T&E Question,* e-mail from Holsinger (Uncompahgre Field Office, Montrose, Colo.) to G.M. Jones (Bureau of Land Management), Aug. 27.

Horn, J., and S. Moore-McMillian, 2009, *Documentation of Historic Mine Features on U.S. Department of Energy Uranium Lease Tracts in Western Colorado: Phase 3, Gateway Area, Mesa County, Colorado*, prepared for S.M. Stoller Corporation, Grand Junction, Colo., Sept.

Hunt, C.B., 1974, *Natural Regions of the United States and Canada*, W.H. Freeman and Company.

Hurshman, T., 1994, personal communication between Hurshman (Bureau of Land Management, Montrose District Office) and R. Bleil (Rust Geotech), Oct. 17.

Hutson, S.S., et al., 2004, *Estimated Use of Water in the United States in 2000*, Circular 1268 (county-level data download), U.S. Geological Survey. Available at http://water.usgs.gov/watuse/data/2000/index.html. Accessed Oct. 23, 2012.

IAEA (International Atomic Energy Agency), 2000, *Methods of Exploitation of Different Types of Uranium Deposits,* IAEA-TecDoc-1174, Sept. Available at http://www-pub.iaea.org/MTCD/publications/PDF/te_1174_prn.pdf. Accessed Feb. 1, 2012.

ICRP (International Commission on Radiological Protection), 1977, *Recommendations of the International Commission on Radiological Protection*, ICRP Publication 26, Pergamon Press, Oxford, U.K.

ICRP, 1979, *Limits for Intakes of Radionuclides by Workers*, ICRP Publication 30, Part 1, Pergamon Press, Oxford, U.K.

ICRP, 1980, *Limits for Intakes of Radionuclides by Workers*, ICRP Publication 30, Part 2, Pergamon Press, Oxford, U.K.

ICRP, 1981, *Limits for Intakes of Radionuclides by Workers*, ICRP Publication 30, Part 3, Pergamon Press, Oxford, U.K.

ICRP, 1991, *Recommendations of the International Commission on Radiological Protection*, ICRP Publication 60–1990, Pergamon Press.

ICRP, 1996, *Age-Dependent Doses to the Members of the Public from Intake of Radionuclides, Part 5, Compilation of Ingestion and Inhalation Coefficients*, ICRP Publication 72, Pergamon Press, Oxford, U.K.

ICRP, 2011, "ICRP Publication 115: Lung Cancer Risk from Radon and Progeny," *Annals of the ICRP* 40(1).

Information Services, 2001, *Gaining Ground or Shaky Ground? A Detailed Look at Tourism Employment in the Southwest Colorado Travel Region*, Final Report, Dec. Available at http://www.scan.org/tourism_report.pdf.

Ingelfinger, F., and S. Anderson, 2004, "Passerine Response to Roads Associated with Natural Gas Extraction in a Sagebrush Steppe Habitat," *Western North American Naturalist* 64(3):385–395.

IUC (International Uranium Corporation), 2003, *Description of the Affected Environment, White Mesa Mill, Blanding, Utah, for Transport by Slurry Pipeline and Disposal of the Moab Tailings,* Denver, Colo., May.

Ivahnenko, T., and J.L. Flynn, 2010, *Estimated Withdrawals and Use of Water in Colorado, 2005,* Scientific Investigations Report 2010-5002, U.S. Geological Survey.

Jackson, P.O., et al., 1980, *An Investigation of Radon-222 Emissions from Underground Uranium Mines,* Pacific Northwest Laboratory, Richland, Wash., Feb.

Joesting, H.R., and P.E. Byerly, 1958, *Regional Geophysical Investigations of the Uravan Area, Colorado*, Professional Paper 316-A, U.S. Geological Survey.

Jones, G., 2008, "Sensory Ecology: Noise Annoys Foraging Bats," *Current Biology* 18:1098–1100.

Karp, K.E., and D.R. Metzler, 2006, "Moab, Utah, UMTRA Site: The Last Large Uranium Mill Tailings Pile To Be Cleaned Up in the United States," pp. 671–682 in B.J. Merkel and A. Hasche-Berger (editors), *Uranium in the Environment: Mining Impact and Consequences*.

Kelly, J.M., and D.M. Janz, 2009, "Assessment of Oxidative Stress and Histopathology in Juvenile Northern Pike (*Esox lucius*) Inhabiting Lakes Downstream of a Uranium Mill, *Aquatic Toxicology* 92:240–249.

Kenny, J.F., et al., 2009, *Estimated Use of Water in the United States in 2005*, Circular 1344 (county-level data download), U.S. Geological Survey. Available at http://water.usgs.gov/watuse/data/2005/. Accessed Oct. 23, 2012.

BLM_0042757

Kirkham, R.M., and W.P. Rogers, 1981, *Earthquake Potential in Colorado: A Preliminary Evaluation*, Colorado Department of Natural Resources, Open File Report 78-3, Colorado Geological Survey.

Kirschbaum, M.A., and L.R.H. Biewick, 2012, "A Summary of the Coal Deposits in the Colorado Plateau: Arizona, Colorado, New Mexico, and Utah," in *Geological Assessment of Coal in the Colorado Plateau: Arizona, Colorado, New Mexico, and Utah*, M.A. Kirschbaum (editor), Professional Paper 1625-B, U.S. Geological Survey. Available at http://pubs.usgs.gov/pp/p1625b/. Accessed Sept. 12, 2012.

KKCO (KKCO NBC 11 News), 2007, "Xcel Officials Want to Shut Down Cameo Power Plant," Nov. 16. Available at http://www.nbc11news.com/home/headlines/11498461.html. Accessed Feb. 24, 2012.

Knick, S.T., and D.L. Dyer, 1997, "Distribution of Black-Tailed Jackrabbit Habitat Determined by GIS in Southwestern Idaho," *Journal of Wildlife Management* 61(1):75–85.

Knight, R.L., and D.N. Cole, 1991, "Effects of Recreational Activity on Wildlife in Wildlands," pp. 238–247 in *Transactions of the Fifty-Sixth North American Wildlife and Natural Resources Conference*, March 17–22, R.E. McCabe (editor), Wildlife Management Institute, Washington, D.C.

Knight, R.L., and J.Y. Kawashima, 1993, "Responses of Raven and Red-Tailed Hawk Populations to Linear Right-of-Ways," *Journal of Wildlife Management* 57(2):266–271.

Kotamarthi, V.R., and D.J. Holdridge, 2007, *Process-Scale Modeling of Elevated Wintertime Ozone in Wyoming*, ANL/EVS/R-07/7, prepared by Environmental Science Division, Argonne National Laboratory, for BP America, Dec. Available at http://www.ipd.anl.gov/anlpubs/2008/01/60757.pdf. Accessed Sept. 23, 2011.

Krausman, P.R., et al., 2004, "Effects of Military Operations on Behavior and Hearing of Endangered Sonoran Pronghorn," *Wildlife Monographs* 157:1-41.

KREX (KREX NewsChannel), 2011, "Plans Set for Teardown of Cameo Power Plant," Aug. 1. Available at http://www.krextv.com/news/around-the-region/Plans-Set-For-Teardown-of-Cameo-Power-Plant-126550668.html. Accessed Feb. 23, 2011.

Larkin, R.P., 1996, *Effects of Military Noise on Wildlife: A Literature Review*, Technical Report 96/21, U.S. Army Construction Engineering Research Laboratory, Champaign, Ill.

Lehman, R.N., and J.W. Allendorf, 1989, "The Effects of Fire, Fire Exclusion, and Fire Management on Raptor Habitats in the Western United States," in *Proceedings of the Western Raptor Management Symposium and Workshop, 1987, October 26–28, Boise, Idaho*, Scientific and Technical Series No. 12, National Wildlife Federation, Washington, D.C.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 185 of 426

Lemly, A.D., 1997, "Environmental Implications of Excessive Selenium: A Review," *Biomedical and Environmental Sciences* 10:415–435.

Leyda, J.D., 2011, *Ecological Effects of Uranium Mining–Colorado, USA*, Leyda Consulting, Inc. Available at http://uraniumwatch.org/doe_uraniumleasingprogram/exhibitA_LCI_UranMine-Ecol-Effcts.110908.pdf. Accessed Nov. 28, 2011.

Lincoln, F.C., et al., 1998, *Migration of Birds*, U.S. Fish and Wildlife Service Circular 16, U.S. Department of the Interior, Washington, D.C. Available at http://www.npwrc.usgs.gov/resource/birds/migratio/index.htm. Accessed Oct. 20, 2006.

Lyon, A.G., and S.H. Anderson, 2003, "Potential Gas Development Impacts on Sage Grouse Nest Initiation and Movement," *Wildlife Society Bulletin* 31(2):486–491.

Lyon, L.J., et al., 2000a, "Direct Effects of Fire and Animal Responses," in *Wildland Fire in Ecosystems: Effects of Fire on Fauna*, General Technical Report RMRS-GTR-42-Vol. 1, J.K. Smith (editor), U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Ogden, Utah. Available at http://www.fs.fed.us/rm/pubs/rmrs_gtr042_1.pdf. Accessed Aug. 14, 2009.

Lyon, L.J., et al., 2000b, "Fire Effects on Animal Populations," in *Wildland Fire in Ecosystems: Effects of Fire on Fauna*, General Technical Report RMRS-GTR-42-Vol. 1, J.K. Smith (editor), U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Ogden, Utah. Available at http://www.fs.fed.us/rm/pubs/rmrs_gtr042_1.pdf. Accessed Aug. 14, 2009.

Mackun, P., and S. Wilson, 2011, *Population Distribution and Change: 2000 to 2010*, U.S. Census Bureau, C2010BR-01, March.

Manci, K.M., et al., 1988, *Effects of Aircraft Noise and Sonic Booms on Domestic Animals and Wildlife: A Literature Synthesis*, NERC-88/29, U.S. Fish and Wildlife Service National Ecology Research Center, Ft. Collins, Colo.

Maxell, B.A., 2000, *Management of Montana's Amphibians: A Review of Factors That May Present a Risk to Population Viability and Accounts on the Identification, Distribution, Taxonomy, Habitat Use, Natural History, and the Status and Conservation of Individual Species*, a report (Order Number 43-0343-0-0224) to Northern Regional Office (Region 1), USDA Forest Service, Missoula, Mont., Sept. 20. Available at http://www.isu.edu/~petechar/iparc/Maxell_Mgmnt.pdf. Accessed Aug. 10, 2009.

McAda, C.W., 2003, *Flow Recommendations to Benefit Endangered Fishes in the Colorado and Gunnison Rivers*, final report, Upper Colorado River Endangered Fish Recovery Program, July.

McLellan, B.N., and D.M. Shackleton, 1988, "Grizzly Bears and Resource-Extraction Industries: Effects of Roads on Behaviour, Habitat Use and Demography," *Journal of Applied Ecology* 25:451–460.

BLM_0042759

Meehan K.A., 2001, *Effects of Exposure to Continuous Low Doses of Ionizing Radiation*, Cape Technikon Theses & Dissertations, Paper 156.

Menge, C.W., et al., 1998, *FHWA Traffic Noise Model® Technical Manual*, FHWA-PD-96-010 and DOT-VNTSC-FHWA-98-2, prepared by U.S. Department of Transportation, John A. Volpe National Transportation Systems Center, Cambridge, Mass., for U.S. Department of Transportation, Federal Highway Administration, Washington, D.C., Feb.

Meteyer, C.U., et al., 1997, "Sodium Toxicity and Pathology Associated with Exposure of Waterfowl to Hypersaline Playa Lakes of Southeast New Mexico," *Journal of Veterinary Diagnostic Investigation* 9:269–280.

Miller, D., 2012, *Data Request,* e-mail from Miller (Antiquities Section of Utah State History, Salt Lake City, Utah) to D. O'Rourke (Argonne National Laboratory, Argonne, Ill.), March 22.

Miller, N.P., 2002, "Transportation Noise and Recreational Lands," *Internoise 2002*, Dearborn, Mich., Aug. 19–21, 2002. Available at http://www.hmmh.com/cmsdocuments/N011.pdf. Accessed Dec. 22, 2011.

Mkandawire, M., and E.G. Dudel, 2005, "Accumulation of Arsenic in *Lemna gibba* L. (Duckweed) in Tailing Waters of Two Abandoned Uranium Mining Sites in Saxony, Germany," *Science of the Total Environment* 336:81–89.

Molenaar, C.M., 1987, "Correlation Chart — Paradox Basin and Vicinity," in *Geology of Cataract Canyon and Vicinity*, J.A. Campbell (editor), Four Corners Geological Society, 10th Field Conference.

Montrose County, 2010, *Montrose County Socioeconomic Impact Study*, Department of Community Development and Board of County Commissioners, March 31.

Mormon, S.A., 2010, "Arsenic: A Detective Story in Dusts," *Earth* 55(6):40–47, June.

Moore, S., and J. Horn, 2010, *Documentation of Five Historic Mine Features on U.S. Department of Energy Uranium Lease Tracts in Western Colorado: Phase 2, Uravan/Long Park Area, Montrose County, Colorado*, prepared for S.M. Stoller Corporation, Grand Junction Colo., Jan.

Moore-McMillian, S., and J. Omvig, 2009, *Documentation of Historic Mine Features on U.S. Department of Energy Uranium Lease Tracts in Western Colorado: Phase 1, Slick Rock Area, San Miguel County, Colorado*, prepared for S.M. Stoller Corporation, Grand Junction, Colo., July.

Morgan, T.A., et al., 2006, *The Four Corners Timber Harvest and Forest Products Industry, 2002*, Resource Bulletin RMRS-RB-7, U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, May.

BLM_0042760

Morris, R.E., et al., 2009, "Simulation of Wintertime High Ozone Concentrations in Southwestern Wyoming," presented at the 8th Annual CMAS Conference, Chapel Hills, N.C., Oct. 19–21. Available at http://www.cmascenter.org/conference/2009/abstracts/morris_simulation_wintertime_2009.pdf. Accessed Sept. 23, 2011.

Mullins, T.E., and V.L. Freeman, 1954, *Lithofacies of the Salt Wash Member of the Morrison Formation*, Trace Elements Investigations Report 341, U.S. Geological Survey.

Muscatello, J.R., and D.M. Janz, 2009, "Selenium Accumulation in Aquatic Biota Downstream of a Uranium Mining and Milling Operation," *Science of the Total Environment* 407:1318–1325.

Muscatello, J.R., et al., 2008, "Accumulation of Selenium in Aquatic Systems Downstream of a Uranium Mining Operation in Northern Saskatchewan, Canada," *Environmental Pollution* 156:387–393.

Muth, R.T., et al., 2000, *Flow and Temperature Recommendations for Endangered Fishes in the Green River Downstream of Flaming Gorge Dam*, final report, Upper Colorado River Endangered Fish Recovery Program, Denver, Colo., Sept.

Nash, T., 2002, *Hydrogeochemical Investigations of Historic Mining Districts, Central Western Slope of Colorado, Including Influence on Surface-Water Quality*, Digital Data Series DDS-73, U.S. Geological Survey, Denver, Colo.

National Research Council, 2011, *Uranium Mining in Virginia: Scientific, Technical, Environmental, Human Health and Safety, and Regulatory Aspects of Uranium Mining and Processing in Virginia,* prepublication copy, Washington, D.C., Dec. 19.

National Research Council, 2012, *Uranium Mining in Virginia: Scientific, Technical, Environmental, Human Health and Safety, and Regulatory Aspects of Uranium Mining and Processing in Virginia,* prepublication version, Washington, D.C.

NatureServe, 2011, *NatureServe Explorer: An Online Encyclopedia of Life, Version 7.1*, Arlington, Va. Available at http://www.natureserve.org/explorer. Accessed Dec. 16 and 19, 2011.

Naugle, D.E., et al., 2004, "West Nile Virus: Pending Crisis for Greater Sage-Grouse," *Ecology Letters* 7:704–713.

NCDC (National Climatic Data Center), 2011a, *Climates of the States (CLIM60): Climate of Colorado*, National Oceanic and Atmospheric Administration, Satellite and Information Service. Available at http://cdo.ncdc.noaa.gov/cgi-bin/climatenormals/climatenormals.pl. Accessed Nov. 5, 2011.

NCDC, 2011b, *Storm Events,* National Oceanic and Atmospheric Administration, Satellite and Information Service. Available at http://www4.ncdc.noaa.gov/cgi-win/wwcgi.dll?wwEvent~Storms. Accessed Dec. 22, 2011.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 188 of 426

NCDC, 2011c, *National Climatic Data Center*. Available at http://www.ncdc.noaa.gov/oa/ncdc.html. Accessed Dec. 21, 2011.

NCDC, 2012, *National Climatic Data Center*. Available at http://www.ncdc.noaa.gov/oa/ncdc.html. Accessed Dec. 12, 2012.

NCES (National Center for Education Statistics), 2011, *Search for Public School Districts*.

NCRP (National Council on Radiation Protection and Measurement), 2009, *Ionizing Radiation Exposure of the Population of the United States*, Report No. 160, Bethesda, Md.

Neff, J.C., et al., 2008, "Increasing Eolian Dust Deposition in the Western United States Linked to Human Activity," *Nat. Geosci.* 1:189–195.

Newman, G.J., and E.F. Redente, 2001, "Long-Term Plant Community Development as Influenced by Revegetation Techniques," *Journal of Range Management* 54(6):717–724.

NRC (U.S. Nuclear Regulatory Commission), 1979, *Final Environmental Statement Related to Operation of White Mesa Uranium Project Energy Fuels Nuclear, Inc.*, May.

NRC 1987, *Regulatory Guide 3.59 (Task WM 407-4) Methods for Estimating Radioactive and Toxic Airborne Source Terms for Uranium Milling Operations*, U.S. Nuclear Regulatory Commission, Office of Nuclear Regulatory Research, Washington, D.C., March.

NRCS (Natural Resources Conservation Service), 2009, *Soil Survey Geographic (SSURGO) Database for Mesa, Montrose, and San Miguel Counties, Colorado*.

NRCS, 2010, *The Twelve Orders of Soil Taxonomy*. Available at http://soils.usda.gov/technical/soil_orders. Accessed Feb. 11, 2010.

NRCS, 2012a, *Custom Soil Resource Report for Mesa County Area, Colorado; and Uncompahgre National Forest Area, Colorado, Parts of Mesa, Montrose, Ouray, and San Miguel Counties: Cross Section through Gateway Lease Tracts (Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 9.

NRCS, 2012b, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores, Montrose, and San Miguel Counties: Cross Section through Uravan Lease Tracts (Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 9.

NRCS, 2012c, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores, Montrose, and San Miguel Counties: Cross Section through Paradox (North) Lease Tracts (Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 9.

NRCS, 2012d, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores, Montrose, and San Miguel Counties: Cross Section through Paradox (South) Lease Tracts (Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 9.

BLM_0042762

Case No. 1:20-cv-02484-MSK    Document 39-3    filed 04/27/21    USDC Colorado    pg 189 of 426

NRCS, 2012e, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores, Montrose, and San Miguel Counties: Cross Section through Slick Rock (North) Lease Tracts (Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 10.

NRCS, 2012f, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores, Montrose, and San Miguel Counties: Cross Section through Slick Rock (South) Lease Tracts (Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 10.

NRCS, 2012g, *Custom Soil Resource Report for San Miguel Area, Colorado, Parts of Dolores, Montrose, and San Miguel Counties: Slick Rock Lease Tract 12 (Parts 1 and 2)*, U.S. Department of Agriculture, Jan. 10 and 11.

NRCS, 2012h, *Soil Quality/Soil Health Publications—Available Water Capacity*.

NSTC (National Science and Technology Council), 2008, *Scientific Assessment of the Effects of Global Climate Change on the United States*, report of the Committee on Environment and Natural Resources, May.

NWCC (National Wind Coordinating Committee), 2002, *Permitting of Wind Energy Facilities: A Handbook*, prepared by the NWCC Siting Subcommittee, Aug. Available at http://www.nationalwind.org/assets/publications/permitting2002.pdf. Accessed Sept. 26, 2011.

Olendorff, R.R., and R.N. Lehman, 1986, *Raptor Collisions with Utility Lines: An Analysis Using Subjective Field Observations*, prepared by U.S. Department of the Interior, Bureau of Land Management, Sacramento, Calif., for Pacific Gas and Electric Company, San Ramon, Calif., Feb.

Otak, Inc., 2009, *Visual Resource Inventory*, prepared for U.S. Department of the Interior, Bureau of Land Management, Uncompahgre Field Office, Montrose, Colo., Sept.

Ott, R., et al., 2010, *Perspectives on Ute Ethnohistory in West Central Colorado,* prepared by the Dominguez Archaeological Research Group, Inc., for the Ute Indian Tribe of the Uintah and Ouray Reservation; Ute Mountain Ute Tribe; Southern Ute Indian Tribe; and for the Bureau of Land Management's Colorado State Office and its Glenwood Springs, Grand Junction, and Uncompahgre Field Offices, Dec. 6.

Painter, T.H., et al., 2007, "Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover," *Geophys. Res. Lett.* 34, L12502, doi:10.1029/2007GL030284.

Painter, T.H., et al., 2010, "Response of Colorado River Runoff to Dust Radiative Forcing in Snow," *Proceedings of the National Academy of Sciences* 107(40):17,125–17,130. Available at www.pnas.org/cgi/doi/10.1073/pnas.0913139107. Accessed Sept. 2013.

Paschke, M.W., et al., 2005, "Long-Term Effects of Biosolids on Revegetation of Disturbed Sagebrush Steppe in Northwestern Colorado," *Restoration Ecology* 13(3):545–551.

BLM_0042763

Pater, L.L., et al., 2009, "Recommendations for Improved Assessment of Noise Impacts on Wildlife," *Journal of Wildlife Management* 73(5):788–795.

Peters (Peters Geosciences), 2011, *Updated Technical Report on Energy Fuels Resources Corporation's Energy Queen Project, San Juan County, Utah*, prepared for Energy Fuels, Inc., March 15.

Piñon Ridge Mill, 2012, *The Piñon Ridge Mill.* Available at http://www.Piñonridgemill.com/index.html. Accessed Feb. 21, 2012.

Pollmann, K., et al., 2006, "Metal Binding by Bacteria from Uranium Mining Waste Piles and Its Technological Applications," *Biotechnology Advances* 24:58–68.

Power Consulting, 2010, *A Socioeconomic Analysis of the Impact of the Proposed Piñon Ridge Uranium Project on Western Mesa, Montrose, and San Miguel Counties, Colorado*, prepared for Sheep Mountain Alliance, Dec.

Real, A., et al., 2004, "Effects of Ionising Radiation Exposure on Plants, Fish, and Mammals: Relevant Data for Environmental Radiation Protection," *Journal of Radiological Protection* 24:A123–A137.

Red Cliff Mine, 2012, *Red Cliff Mine: EIS Schedule*. Available at http://www.redcliffmine.com/schedule.htm. Accessed Feb. 22, 2012.

Reed, A.D., 2006, *Class I Cultural Resource Inventory of 38 Department of Energy Uranium Lease Withdrawal Areas, Mesa, Montrose, and San Miguel Counties, Colorado*, prepared by Alpine Archaeological Consultants, Inc., Montrose, Colo., for S.M. Stoller Corporation, Grand Junction, Colo., July 6.

Reed, A.D., and M.D. Metcalf, 1999, *Colorado Prehistory: A Context for the Northern Colorado River Basin,* Colorado Council of Professional Archaeologists, Denver, Colo.

Reijnen, R., and R. Foppen, 1994, "The Effects of Car Traffic on Breeding Bird Populations in Woodland. I. Evidence of Reduced Habitat Quality for Willow Warblers (*Phylloscopus trochilus*) Breeding Close to a Highway," *Journal of Applied Ecology* 32:85–94.

Ritter, B., 2007, *Colorado Climate Action Plan: A Strategy to Address Global Warming*, Nov.

Rogers, Z., 2011, personal communication from Rogers (Energy Fuels Resources Corporation, Lakewood, Colo.) to Y.-S. Chang (Argonne National Laboratory, Argonne, Ill.), Nov. 8.

Rosentreter, R., et al., 2007, *A Field Guide to Biological Soil Crusts of Western U.S. Drylands—Common Lichens and Bryophytes*, U.S. Government Printing Office, Denver, Colo.

RRC Associates and Rees Consulting, Inc., 2011, *Regional Housing Needs Assessment Ouray and San Miguel Counties*, Sept. Available at http://www.smrha.org/NeedsAsessment2011.pdf.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 191 of 426

Sakoda, A., et al., 2010, "Difference of Natural Radioactivity and Radon Emanation Fraction among Constituent Minerals of Rock or Soil," *Applied Radiation and Isotopes* 68(12):24–52.

Salek, M.E., 2011, *Colorado Highway Quickfacts*. Available at http://www.mesalek.com/colo/facts.html. Accessed Sept. 24, 2012.

Salt, A.N., and T.E. Hullar, 2010, "Responses of the Ear to Low Frequency Sounds, Infrasound and Wind Turbines," *Hearing Research* 268:12–21.

San Miguel County, 2008, *San Miguel Comprehensive Development Plan, Adopted August 3, 1978; Amended through February 13, 2008*. Available at http://www.sanmiguelcounty.org/departments/planning/documents/SMCMP.COUNTY.PART1.2008.pdf. Accessed Dec. 2, 2011.

Sargent, M.S., and K.S. Carter (editors), 1999, *Managing Michigan Wildlife: A Landowners Guide*, Michigan United Conservation Clubs, East Lansing, Michigan. Available at http://www.michigandnr.com/publications/pdfs/huntingwildlifehabitat/landowners_guide/Introduction/index.htm. Accessed Sept. 13, 2012.

Saunders, S., et al., 2008, *Hotter and Drier: The West's Changed Climate*, The Rocky Mountain Climate Organization and Natural Resources Defense Council, March. Available at http://www.nrdc.org/globalwarming/west/west.pdf. Accessed Sept. 2013.

Sawyer, H., et al., 2005, "Mule Deer and Pronghorn Migration in Western Wyoming," *Wildlife Society Bulletin* 33(4):1266–1273.

Sawyer, H., et al., 2006, "Winter Habitat Selection of Mule Deer before and during Development of a Natural Gas Field," *The Journal of Wildlife Management* 70(2):396–403.

Schooley, R.L., et al., 1996, "Can Shrub Cover Increase Predation Risk for a Desert Rodent?," *Canadian Journal of Zoology* 74:157–163.

Schwinning, S., et al., 2008, "Sensitivity of the Colorado Plateau to Change: Climate, Ecosystems, and Society," *Ecology and Society* 13(2):28 (online journal). Available at http://www.ecologyandsociety.org/vol13/iss2/art28/. Accessed Oct. 23, 2012.

See, R.B., et al., 1992, *Detailed Study of Selenium in Soil, Representative Plants, Water, Bottom Sediment, and Biota in the Kendrick Reclamation Project Area, Wyoming, 1988–90*, Water Resources Investigations Report 91-4131, U.S. Geological Survey, Cheyenne, Wyo.

SENES (SENES Consultants Limited), 2009, *Risk Assessment for Proposed Uranium and Vanadium Mill at the Piñon Ridge Property*, prepared by SENES Consultants Limited, Englewood, Colo., for Energy Fuels Resources Corporation, Lakewood, Colo., Nov.

Sharmasarkar, S., and G.F. Vance, 2002, "Soil and Plant Selenium at a Reclaimed Uranium Mine," *Journal of Environmental Quality* 31:1516–1521.

BLM_0042765

Sharpe, P.B., and B. Van Horne, 1998, "Influence of Habitat on Behavior of Townsend's Ground Squirrel (*Spermophilus townsendii*)," *Journal of Mammalogy* 79:906–918.

Shawe, D.R., 1970, *Structure of the Slick Rock District and Vicinity, San Miguel and Dolores Counties, Colorado*, Professional Paper 576-C, U.S. Geological Survey.

Shawe, D.R., 2011, *Uranium-Vanadium Deposits of the Slick Rock District, Colorado*, Professional Paper 576-F, U.S. Geological Survey.

Shawe, D.R., et al., 1968, *Stratigraphy of Slick Rock District and Vicinity, San Miguel and Dolores Counties, Colorado*, Professional Paper 576-A, U.S. Geological Survey.

Simmons, G.C., 1957, *Contact of the Burro Canyon Formation with the Dakota Sandstone, Slick Rock District, Colorado, and Correlation of the Burro Canyon Formation*, Trace Elements Investigations Report 552, U.S. Geological Survey.

Simmons, J.A., et al., 2008, "Forest to Reclaimed Mine Land Use Change Leads to Altered Ecosystem Structure and Function," *Ecological Applications* 18:104–118.

Skorupa, J.P., and H.M. Ohlendorf, 1991, "Contaminants in Drainage Water and Avian Risk Thresholds," pp. 345–368 in A. Dinar and D. Zilberman (editors), *The Economics and Management of Water and Drainage in Agriculture*, Kluwer Academic Publishers.

SJPLC (San Juan Public Lands Center), 2011, *San Juan Public Lands Draft Land Management Plan + Draft Environmental Impact Statement: Supplement to the Draft Environmental Impact Statement*, Aug. Available at http://ocs.fortlewis.edu/forestplan/supplement/cover.htm. Accessed May 8, 2012.

S.M. Stoller Corporation, 2012, Compiled Field Surveys of U.S. Department of Energy Uranium Leasing Program Mine Reclamation Sites, 2000–2012, prepared by S.M. Stoller Corporation, Contractor to U.S. Department of Energy Office of Legacy Management.

Sonoran Institute, 2009, *Uranium Mining, Tourism, and Outdoor Recreation in Gateway, Colorado*, July.

Spears, C.F., and E.V. Kleven, 1978, *Soil Survey of Mesa County Area, Colorado*, U.S. Department of Agriculture, Soil Conservation Service in Cooperation with the Colorado Agricultural Experiment Station, Feb.

Spendrup, J., 2013, personal communication from Spendrup (Spendrup Fan Co., Grand Junction, Colo.) to Y.-S. Chang (Argonne National Laboratory, Argonne, Ill.), Aug. 27.

Steele, B.A., 1985, *Preliminary Report on and Measured Sections of the Middle Jurassic Entrada Sandstone and Wanakah Formation near Placerville, Southwestern Colorado*, Open File Report 85-446, U.S. Geological Survey.

Steenhof, K., et al., 1993, "Nesting by Raptors and Common Ravens on Electrical Transmission Line Towers," *Journal of Wildlife Management* 57(2):271–281.

Stoesser, D.B., et al., 2007, *Preliminary Integrated Geologic Map Databases for the United States: Central States—Montana, Wyoming, Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Iowa, Missouri, Arkansas, and Louisiana*, Open File Report 2005-1351, Version 1.2, U.S. Geological Survey, Dec.

Strait, R., et al., 2007, *Final Colorado Greenhouse Gas Inventory and Reference Case Projections 1990–2020*, Center for Climate Strategies, Oct. Available at http://www.coloradoclimate.org/ewebeditpro/items/O14F13894.pdf. Accessed Nov. 5, 2011.

Streubel, D., 2000, *Ovis canadensis (Bighorn Sheep)*. Available at http://imnh.isu.edu/digitalatlas/bio/mammal/Hoofed/bish/sheep.htm. Accessed Sept. 12, 2012.

Sullivan, M., 2011, *Cultural Data for Uranium Leasing Program*, e-mail from Sullivan (Office of Archaeology and Historic Preservation, Denver, Colo.) to B. Verhaaren (Argonne National Laboratory, Argonne, Ill.), Dec. 2.

Sydnor, R.S., and E.F. Redente, 2000, "Long-Term Plant Community Development on Topsoil Treatments Overlying a Phytotoxic Growth Medium, *Journal of Environmental Quality* 29:1778–1786.

Thompson, D.J., and J.A. Jenks, 2007, "Cougar Mortality Attributed to Electrocution from Power Lines in South Dakota," *The Prairie Naturalist* 39(314):191–193.

Thornbury, W.D., 1965, *Regional Geomorphology of the United States*, John Wiley & Sons, Inc., New York, N.Y.

Topper, R., et al., 2003, *Groundwater Atlas of Colorado*, Special Publication 53, Colorado Geological Survey.

Tri-State (Tri-State Generation and Transmission Association, Inc.), 2011, *Baseload Resources: Nucla Station*. Available at http://www.tristategt.org/AboutUs/baseload-resources.cfm. Accessed Dec. 23, 2011.

Tri-State, 2012a, *Baseload Resources*. Available at http://www.tristategt.org/AboutUs/baseload-resources.cfm. Accessed Feb. 21, 2012.

Tri-State, 2012b, *Nucla-Sunshine Project*. Available at http://www.tristategt.org/Transmission/Nucla/Nucla-Sunshine-project.cfm. Accessed Feb. 21, 2012.

Tri-State, 2012c, *Phase 2 of Nucla-Sunshine Project On Schedule*. Available at http://www.poweringthewest.org/2011/09/16/phase-2-of-nucla-sunshine-project-on-schedule/. Accessed Feb. 22, 2012.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 194 of 426

Trinity Engineering Associates, Inc., 2007, *CAP88-PC Version 3.0 User Guide*, Cincinnati, Ohio, Dec. 9.

Trombulak, S.C., and C.A. Frissell, 2000, "Review of Ecological Effects of Roads on Terrestrial and Aquatic Communities," *Conservation Biology* 14(1):18–30.

Tweto, O., 1979, *Geologic Map of Colorado (Scale 1:500,000)*, U.S. Geological Survey, prepared in cooperation with the Colorado Geological Survey.

Two Bears, D., 2012, "Navajo Traditional History," *Native Voices on the Colorado River Tribal Series,* Native Voices Grand Canyon. Available at http://www.nativevoicesgrandcanyon.org/pdf%20files/Navajo%20newsletter1.pdf. Accessed March 9, 2012.

Twitty, E., 2008, *Guide to Assessing Historic Radium, Uranium, and Vanadium Mining Resources in Montrose and San Miguel Counties,* prepared by Mountain States Historical, Boulder, Colo., for Western Colorado Interpretive Association, Delta, Colo., July.

UCDC (Utah Conservation Data Center), 2012, *Common Name Wild Turkey—Rio Grande; Scientific Name*—Meleagris gallopavo intermedia, State of Utah Natural Resources, Division of Wildlife Resources, Salt Lake City, Utah. Available at http://dwrcdc.nr.utah.gov/rsgis2/Search/Display.asp?F1Nm=melegain. Accessed Nov. 13, 2012.

UDEQ (Utah Department of Environmental Quality), 2011, *Title V Operating Permit: Lisbon Natural Gas Processing Plant,* Division of Air Quality, Aug. 4. Available at http://168.178.6.8/daq_public_pdfs/120397-10034pmt.20110804.pdf. Accessed Feb. 28, 2012.

UDEQ, 2012a, *Denison/White Mesa Uranium Mill*. Available at http://www.deq.utah.gov/businesses/denison/index.htm. Accessed Feb. 21, 2012.

UDEQ, 2012b, *Denison/White Mesa Uranium Mill*. Available at http://www.radiationcontrol.utah.gov/Uranium_Mills/denison/index.htm. Accessed Oct. 24, 2012.

UDNR (Utah Department of Natural Resources), 2011, *Utah Mining 2010,* Circular 114, Utah Geological Survey. Available at http://geology.utah.gov/online/c/c-114.pdf. Accessed May 7, 2012.

UDNR, 2012, *Utah Minerals Program*, Division of Oil, Gas, and Mining. Available at http://linux1.ogm.utah.gov/WebStuff/wwwroot/minerals/mineralsoperatorsbypermit.php. Accessed Feb. 28, 2012.

UDOGM (Utah Division of Oil, Gas, and Mining), 2012, *Utah Oil and Gas: Annual Production Summary—Grand and San Juan Counties, Utah*, Department of Natural Resources. Available at http://oilgas.ogm.utah.gov/Data_Center/DataCenter.cfm#production. Accessed Feb. 17, 2012.

BLM_0042768

UDOT (Utah Department of Transportation), 2011, *Traffic on Utah Highways, 2010*, Systems Planning and Programming Division, Traffic Analysis Section. Available at http://www.udot.utah.gov/main/f?p=100:pg:0::::V,T:,529. Accessed Nov. 7, 2011.

UDWR (Utah Division of Wildlife Resources), 2003, *Utah Division of Wildlife Resources Statewide Management Plan for Mule Deer*, State of Utah Natural Resources, Division of Wildlife Resources, Salt Lake City, Utah. Available at http://www.wildlife.utah.gov/hunting/biggame/pdf/mule_deer_plan.pdf. Accessed June 12, 2006.

UDWR, 2005, *Statewide Management Plan for Elk*, Salt Lake City, Utah. Available at http://utah.ptfs.com/awweb/awarchive?type=file&item=10836. Accessed Oct. 23, 2012.

UDWR, 2008, *Utah Conservation Data Center*, State of Utah Natural Resources, Division of Wildlife Resources, Salt Lake City, Utah. Available at http://dwrcdc.nr.utah.gov/ucdc/default.asp. Accessed Oct. 3, 2008.

UGS (Utah Geological Survey), 2011, *Utah Mining 2010*, Circular 114, Utah Department of Natural Resources.

UGS, 2012, *Table 2.8—Coal Production and Recoverable Reserves in Utah by Coal Mine, 2011–2011*. Available at http://geology.utah.gov/emp/energydata/statistics/coal2.0/pdf/T2.8.pdf. Accessed Feb. 17, 2012.

UNSCEAR (United Nations Scientific Committee on the Effects of Atomic Radiation), 1993, *Sources and Effects of Ionizing Radiation, UNSCEAR 1993 Report to the General Assembly, with Scientific Annexes*, United Nations, New York, N.Y.

UNSCEAR, 2008, *Effects of Ionizing Radiation, UNSCEAR 2006 Report to the General Assembly with Scientific Annexes, Annex E Sources-to-Effects Assessment for Radon in Homes and Workplaces*, United Nations, New York, N.Y.

UNSCEAR, 2010, *Sources and Effects of Ionizing Radiation, UNSCEAR 2008 Report to the General Assembly with Scientific Annexes*, Vol. 1, United Nations, New York, N.Y.

U.S. Bureau of the Census, 1995, *Population of Counties by Decennial Census: 1900 to 1990*. Available at http://www.census.gov/population/cencounts/co190090.txt. Accessed Sept. 2013.

U.S. Bureau of the Census, 2011a, *County Business Patterns, 2009*.

U.S. Bureau of the Census, 2011b, *State and County Quickfacts*.

U.S. Bureau of the Census, 2011c, *USA Counties*.

U.S. Bureau of the Census, 2011d, *Population Estimates, All Incorporated Places 2000–2009*.

U.S. Bureau of the Census, 2011e, *American Factfinder*.

U.S. Bureau of the Census, 2011f, *American Factfinder, 2005–2009 American Community Survey 5-Year Estimates*.

U.S. Bureau of the Census, 2011g, *2010 Census Summary File 1: Table P5*.

U.S. Bureau of the Census, 2011h, *2009 American Community Survey 5-Year Estimates (2005–2009): Table B17017*.

U.S. Bureau of the Census, 2011i, *The Most Populous Counties and Incorporated Places in 2010 Colorado: 2000 and 2010*, CB11-CN.39, Feb. 23.

U.S. Bureau of the Census, 2011j, *The Most Populous Counties and Incorporated Places in 2010 Utah: 2000 and 2010*, CB11-CN.53, Feb. 24.

USDA (U.S. Department of Agriculture), 2004, *Understanding Soil Risks and Hazards: Using Soil Survey to Identify Areas with Risks and Hazards to Human Life and Property*, G.B. Muckel (editor).

USDA, 2007a, *Census of Agriculture: Colorado State and County Data, Volume 1, Geographic Area Series,* National Agricultural Statistics Service, Washington, D.C.

USDA, 2007b, *Census of Agriculture: Colorado State and County Data*, Volume 1, Chapter 2, *County Level Data, County Summary Highlights: 2007*, National Agricultural Statistics Service, Washington, D.C.

USDA, 2008, *Gypsy Moth Management in the United States: A Cooperative Approach,* U.S. Forest Service, June. Available at http://na.fs.fed.us/pubs/detail.cfm?id=8523. Accessed Feb. 27, 2012.

USDA, 2009a, *2007 Census of Agriculture—United States, Summary and State Date, Vol. 1 Geographic Area Series, Part 51*, Report AC-07-A-51, National Agricultural Statistics Service, Dec.

USDA, 2009b, *Environmental Assessment: Operation and Maintenance Plan for Manti–La Sal National Forest Ditch Bill Easements,* U.S. Forest Service, Dec. Available at http://www.fs.fed.us/r4/mantilasal/projects/ditch_bill/final_ea_122109.pdf. Accessed Feb. 28, 2012.

USDA, 2011a, *Decision Memo: Kimmerle Uranium Exploration Drilling, Manti-La Sal National Forest,* U.S. Forest Service, Sept. Available at http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/78849_FSPLT2_056443.pdf. Accessed Feb. 28. 2012.

USDA, 2011b, *Schedule of Proposed Actions (SOPA) 10/01/2011 to 12/31/2011, San Juan National Forest,* U.S. Forest Service, Oct. Available at http://www.fs.fed.us/sopa/components/reports/sopa-110213-2011-10.html. Accessed Feb. 21, 2012.

USDA, 2011c, *Decision Memo: Agricultural Irrigation and Livestock Watering System,* U.S. Forest Service, Oct. Available at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5343833.pdf. Accessed Feb. 28, 2012.

USDA, 2011d, *Nationwide Aerial Application of Fire Retardant on National Forest System Land: Record of Decision,* U.S. Forest Service, Dec. Available at http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/71615_FSPLT2_066634.pdf. Accessed Feb. 27, 2012.

USDA, 2012a, *Schedule of Proposed Actions (SOPA) 01/01/2012 to 03/31/2012, San Juan National Forest,* U.S. Forest Service. Available at http://www.fs.fed.us/sopa/components/reports/sopa-110213-2012-01.pdf. Accessed Feb. 27, 2012.

USDA, 2012b, *Colorado Ditch Bill Act,* U.S. Forest Service. Available at http://www.fs.usda.gov/detail/r2/landmanagement/?cid=STELPRDB5177473. Accessed Feb. 28, 2012.

USDA, 2012c, *Schedule of Proposed Actions (SOPA) 01/01/2012 to 03/31/2012, Grand Mesa, Uncompahgre and Gunnison National Forests,* U.S. Forest Service. Available at http://www.fs.fed.us/sopa/components/reports/sopa-110204-2012-01.pdf. Accessed Feb. 27, 2012.

USDA, 2012d, *Schedule of Proposed Actions (SOPA) 01/01/2012 to 03/31/2012, Manti-La Sal National Forest,* U.S. Forest Service. Available at http://www.fs.fed.us/sopa/components/reports/sopa-110410-2012-01.pdf. Accessed Feb. 28, 2012.

USDA and DOI (U.S. Department of the Interior), 2007, *Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development,* BLM/WO/ST-06/021+3071/REV 07, Denver, Colo. Available at http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/best_management_practices/gold_book.html. Accessed Nov. 2, 2012.

U.S. Department of Commerce, 2011, *Local Area Personal Income*, Bureau of Economic Analysis.

U.S. Department of Labor, 2010a, *Local Area Unemployment Statistics: County Data*, Bureau of Labor Statistics.

U.S. Department of Labor, 2010b, *Local Area Unemployment Statistics: State Data*, Bureau of Labor Statistics.

U.S. Department of Labor, 2011, *Local Area Unemployment Statistics: Monthly County Data*, Bureau of Labor Statistics.

USFS (U.S. Forest Service), 2005, *Threatened, Endangered, and Sensitive Plants and Animals*, Forest Service Manual (FMS) 2670, U.S. Department of Agriculture, Aug. 29.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 198 of 426

USFS and BLM, 2013, *Volume II: San Juan National Forest and Proposed Tres Rios Field Office Land and Resource Management Plan*, U.S. Department of Agriculture, USFS Region 2, San Juan National Forest, and U.S. Department of Interior, BLM Tres Rios Field Office, Sept. Available at www.blm.gov/co/st/en/fo/sjplc/land_use_planning.html or www.fs.usda.gov/main/sanjuan/landmanagement/planning. Accessed Oct. 9, 2013.

USFS et al., 2010, *Federal Land Managers' Air Quality Related Values Work Group (FLAG): Phase I Report—Revised (2010)*, Natural Resource Report NPS/NRPC/NRR–2010/232, Oct. Available at http://www.nature.nps.gov/air/pubs/pdf/flag/FLAG_2010.pdf. Accessed Sept. 19, 2012.

USFWS (U.S. Fish and Wildlife Service), 1990, *Humpback Chub Recovery Plan,* Denver, Colo. Available at http://ecos.fws.gov/docs/recovery_plan/900919c.pdf. Accessed Nov. 25, 2011.

USFWS, 2002a, *Bonytail (*Gila elegans*) Recovery Goals: Amendment and Supplement to the Bonytail Chub Recovery Plan*, USFWS Mountain-Prairie Region 6, Denver, Colo.

USFWS, 2002b, *Colorado Pikeminnow (*Ptychocheilus lucius*) Recovery Goals: Amendment and Supplement to the Colorado Squawfish Recovery Plan*, USFWS Mountain-Prairie Region 6, Denver, Colo.

USFWS, 2002c, *Razorback Sucker (*Xyrauchen texanus*) Recovery Goals: Amendment and Supplement to the Razorback Sucker Recovery Plan*, USFWS Mountain-Prairie Region 6, Denver, Colo.

USFWS, 2003, *Preliminary Estimates of Waterfowl Hunter Activity and Harvest during the 2001 and 2002 Hunting Seasons, Administrative Report–July 2003*, Division of Migratory Bird Management, Harvest Surveys Section, Laurel, Md.

USFWS, 2009a, *USFWS Block-Cleared Areas for Black-Footed Ferret Surveys in Colorado,* Sept. Available at http://www.fws.gov/mountain-prairie/species/mammals/blackfootedferret/statewide_block_clearance_map_090809_final.pdf. Accessed Feb. 7, 2012.

USFWS, 2009b, *Consultation Guidance for de Minimis Water Depletions in the Upper Colorado River Basin*, U.S. Fish and Wildlife Service, Mountain-Prairie Region, Lakewood, Colo.

USFWS, 2011a, *IPaC—Information, Planning, and Conservation System*. Available at http://ecos.fws.gov/ipac/. Accessed Dec. 16, 2011.

USFWS, 2011b, *Critical Habitat Portal, FWS Critical Habitat for Threatened and Endangered Species*. Available at http://criticalhabitat.fws.gov/crithab/. Accessed Dec. 16, 2011.

USFWS, 2011c, *The Effects of Noise on Wildlife*, Available at http://www.fws.gov/windenergy/docs/Noise.pdf. Accessed Nov. 14, 2011.

BLM_0042772

USFWS, 2012, *National Wetlands Inventory,* Interactive Mapping Program. Available at http://www.fws.gov/wetlands. Accessed Sept. 17, 2012.

USFWS, 2013a, "Endangered and Threatened Wildlife and Plants; Endangered Status for Gunnison Sage-Grouse; Proposed Rule," *Federal Register* 78:2485-2538.

USFWS 2013b, "Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Gunnison Sage-Grouse," *Federal Register* 78:2539-2570.

USGCRP (U.S. Global Change Research Program), 2009, *Global Climate Change Impacts in the United States: A State of Knowledge Report from the U.S. Global Change Research Program*, Cambridge University Press, New York, N.Y.

USGS (U.S. Geological Survey), 2001, *Federally Owned Coal, Federal Lands, and Coal Quality in the Colorado Plateau Region*, FS-001-01, Feb.

USGS, 2003, *Physiographic Regions*. Available at http://tapestry.usgs.gov/physiogr/physio.html. Accessed Dec. 21, 2011.

USGS, 2004, *National Gap Analysis Program, Provisional Digital Land Cover Map for the Southwestern United States*, Version 1.0, RS/GIS Laboratory, College of Natural Resources, Utah State University, Logan, Utah.

USGS, 2005, *Southwest Regional GAP Analysis Project—Land Cover Descriptions*, RS/GIS Laboratory, College of Natural Resources, Utah State University, Logan, Utah.

USGS, 2007, *National Gap Analysis Program, Digital Animal-Habitat Models for the Southwestern United States*, Version 1.0, Center for Applied Spatial Ecology, New Mexico Cooperative Fish and Wildlife Research Unit, New Mexico State University. Available at http://fws-nmcfwru.nmsu.edu/swregap/HabitatModels/default.htm. Accessed March 15, 2010, and Dec. 16, 2011.

USGS, 2011a, *Hydrologic Unit Maps*. Available at http://water.usgs.gov/GIS/huc.html. Accessed Dec. 21, 2011.

USGS, 2011b, *National Water Information System (NWIS)*.

USGS, 2012a, *Earthquake Data Base Search Results: 100 km Radius from Circle Center Point Latitude 38.336N, Longitude 108.859W*, National Earthquake Information Center, Sept. 10.

USGS, 2012b, *Glossary of Terms on EQ Maps*, Earthquake Hazards Program.

USGS Canyonlands Research Station, 2006, *An Introduction to Biological Soil Crusts*. Available at http://www.soilcrust.org/crust101.htm. Accessed Jan. 11, 2012.

Valdez, R.A., et al., 1992, *Dolores River Native Fish Suitability Study*, BIO/WEST Report No. TR-272-02, final report prepared for Utah Division of Wildlife Resources, Salt Lake City, Utah.

Walker, J.D., and J.W. Geissman, 2009, *Geologic Time Scale*, Geological Society of America.

WAPA (Western Area Power Administration), 2012a, *Transmission Line Management Issues on Forested Rights-of-Way: A Brief Overview*. Available at http://ww2.wapa.gov/sites/western/transmission/infrastruct/Documents/Western-FS-EIS/Projectoverview.pdf. Accessed Feb. 22, 2012.

WAPA, 2012b, *Proposed Project Description Summary*. Available at http://ww2.wapa.gov/sites/western/transmission/infrastruct/Documents/Western-FS-EIS/projectdescription.pdf. Accessed Feb. 22, 2012.

Watts, K.R., 2000, *Effects of the Paradox Valley Unit on Dissolved Solids, Sodium, and Chloride in the Dolores River near Bedrock, Colorado, Water Years 1988–98*, Water-Resources Investigations Report 00-4011, U.S. Geological Survey.

Watts, S.T., and S.T. Knick, 1996, "The Influence of Vegetation, Soils, and Disturbance on Townsend's Ground Squirrel Abundance," in *BLM/IDARNG Research Project Final Report,* Vol. 2, U.S. Geological Survey, Forest and Rangeland Ecosystem Science Center, Snake River Field Station, Boise, Idaho.

Weir, Jr., et al., 1983, *Regional Hydrology of the Dolores River Basin, Eastern Paradox Basin, Colorado, and Utah,* Water-Resources Investigations Report 83-4217, U.S. Geological Survey.

WEST, Inc., 2007, *Wildlife and Habitat Baseline Study for the Whiskey Ridge Wind Power Project, Kittitas County, Washington*, prepared for Whiskey Ridge Power Partners LLC, May. Available at http://www.efsec.wa.gov/wildhorse/Supplemental%20EIS/DSEIS/WHISKEYRIDGE_BASELINE%20REPORT_FINAL%20Revision%2008-05-08.pdf. Accessed Aug. 6, 2009.

Westerling, A.L., et al., 2006, "Warming and Earlier Spring Increase Western U.S. Forest Wildfire Activity," *Science* 313:940–943.

Whetstone Associates, 2011, *JD-8 Mine Environmental Protection Plan*, work performed under contract to Cotter Corp., Gunnison, Colo., June.

Whetstone Associates, 2012, *JD-6 Mine Environmental Protection Plan*, work performed under contract to Cotter Corp., Gunnison, Colo., Sept.

White, D., 2014, personal communication from White (Energy Fuels Resources (USA) Inc., Lakewood, Colo.) to M. Picel (Argonne National Laboratory, Argonne, Ill.), Jan. 8.

Whitfield, M.S., et al., 1983, *Regional Hydrology of the Blanding-Durango Area, Southern Paradox Basin, Utah, and Colorado*, Water Resources Investigations Report 83-4218, U.S. Geological Survey.

WHO (World Health Organization), 2007, *Extremely Low Frequency Fields*, Environmental Health Criteria 238, WHO Press, Geneva, Switzerland.

Widmann, B.L., 1997, "Fault Number 2286—Paradox Valley Graben," in *Quaternary Fault and Fold Database of the United States*, U.S. Geological Survey. Available at http://earthquakes.usgs.gov/regional/qfaults. Accessed Dec. 19, 2011.

Williams, G., 2012, *Subject: Notification of Ore Shipments from Cotter Corporation Canon City Mill*, letter from Williams to L. Kilpatrick.

Williams, G., 2013, personal communication from Williams (Cotter Corporation, Nucla, Colo.) to Y.-S. Chang (Argonne National Laboratory, Argonne, Ill.), Aug. 13.
Windingstad, R.M., et al., 1987, "Salt Toxicosis in Waterfowl in North Dakota," *Journal of Wildlife Diseases* 23(3):443–446.

Wobeser, G., and J. Howard, 1987, "Mortality of Waterfowl on a Hypersaline Wetland as a Result of Salt Encrustation," *Journal of Wildlife Diseases* 23(1):127–134.

Wong, I.G., and J.R. Humphrey, 1989, "Contemporary Seismicity, Faulting, and the State of Stress in the Colorado Plateau," *Geological Society of America* 101(9):1127–1146.

Woodward, C., 2012a, *CPW Bat Sites Uranium Least (sic) Tracts Analysis by Species*. Subject: CPW Internal Review Comments on DOE Uranium Leasing Program PDEIS. Attachment to e-mail from J. Holst (Energy Liaison, Colorado Parks and Wildlife, Southwest Region, Durango, Colo.) to L. Kilpatrick (Realty Officer, Office of Legacy Management, U.S. Department of Energy, Westminster, Colo.), June 15, 2012.

Woodward, C., 2012b, *CPW Bat Sites Uranium Lease Tracts Analysis, v2*, Subject: CPW Internal Review Comments on DOE Uranium Leasing Program PDEIS. Attachment to e-mail from J. Holst (Energy Liaison, Colorado Parks and Wildlife, Southwest Region, Durango, Colo.) to L. Kilpatrick (Realty Officer, Office of Legacy Management, U.S. Department of Energy, Westminster, Colo.), June 15, 2012.

WRCC (Western Regional Climate Center), 1997, *Average Annual Precipitation in Colorado.* Available at http://www.wrcc.dri.edu/pcpn/co.gif. Accessed Dec. 21, 2011.

WRCC, 2011a, *Western U.S. Climate Historical Summaries*. Available at http://www.wrcc.dri.edu/Climsum.html. Accessed Nov. 5, 2011.

WRCC, 2011b, *Climate of Colorado*. Available at http://www.wrcc.dri.edu/narratives/COLORADO.htm. Accessed Dec. 21, 2011.

www.nationalparked.com, 2011, *Black Canyon of the Gunnison, Visitation Statistics by Year*. Available at http://www.nationalparked.com/US/Black_Canyon_of_the_Gunnison/Visitation_History.php.

Xcel (Xcel Energy), 2010, *First-ever Solar-Coal Project Is Running,* June 29. Available at http://www.xcelenergy.com/About_Us/Energy_News/News_Archive/First-ever_solar-coal_project_is_running. Accessed Feb. 24, 2012.

Yarmoloy, C., et al., 1988, “Behavior Responses and Reproduction of Mule Deer, *Odocoileus hemionus*, Does Following Experimental Harassment with an All-Terrain Vehicle,” *Canadian Field-Naturalist* 102:425–429.

Yu, C., et al., 2001, *User's Manual for RESRAD Version 6*, ANL/EAD-4, Argonne National Laboratory, Argonne, Ill., July.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 203 of 426

# APPENDIX A:

# EXAMPLES OF EXISTING LEASES FOR THE URANIUM LEASING PROGRAM

BLM_0042777

*This page intentionally left blank*

# APPENDIX A:

# EXAMPLES OF EXISTING LEASES FOR THE URANIUM LEASING PROGRAM

Facsimiles of two generic leases are shown in this appendix. The leases could be modified in the future as a result of the ULP PEIS process. The first lease agreement was used for leases prior to May 2008 (i.e., the original leases issued in 1974, and the continuation of those leases up to and including the issuance of new leases for the 13 "active" lease tracts on April 30, 2008). The second lease agreement was used for the competitive bid solicitation process that DOE completed in June 2008 for the remaining lease tracts that were "inactive" at that time. As discussed in Section 1.2.1, the one primary difference between these two lease agreements is the manner in which the production royalty for each lease is calculated. Please note that for both leases, each lessee is required to pay an annual royalty fee, which is basically an annual rent payment, for which the amount is established by DOE and which is paid at the beginning of each lease year just to hold the lease for that year.

For the "active" leases (see the first lease shown in this appendix [page A-5]), the lessee must pay a production royalty, paid on a monthly basis during periods of active ore production, for ore produced from the lease tract and shipped to a uranium mill or other processing facility. This production royalty is a combination of a "base" royalty, calculated as a three percentage (2%, 10%, and 14%) step-function applied to the value of the ore produced, plus a bid royalty, calculated by applying the lessee's royalty bid percentage to the value of the ore produced. The base royalty is applied to the lease tract's total ore production, and the bid royalty is applied to the lease tract's ore production up to the "bid quantity," which is an amount specified for each lease tract in pounds of uranium produced.

For the newer leases (see the second lease shown in this appendix [page A-29]), the lessee must pay just the bid royalty, as calculated above; however, the bid royalty is applied to the lease tract's total ore production.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 206 of 426

*This page intentionally left blank*

BLM_0042780

April 2008 DE–RO01–08LM70XXX

URANIUM MINING LEASE

UNITED STATES DEPARTMENT OF ENERGY

THIS LEASE AGREEMENT, effective as of this 30th day of April, 2008, by and between the UNITED STATES OF AMERICA (hereinafter "Government"), represented by the UNITED STATES DEPARTMENT OF ENERGY (hereinafter "DOE"), whose principal place of business for the purpose of this Lease is 2597 B ¾ Road, Grand Junction, Colorado 81503 and

________________________________________________________________

whose principal place of business for the purpose of this Lease is ______________________________________________ (hereinafter "Lessee"):

WITNESSETH THAT:

DOE represents that it is in possession of certain Government owned uranium mining property in _______ County, ________________ more particularly described as Lease Tract C–X–X in Appendix "A" which is attached hereto and hereby made a part this Agreement (the "Property").

DOE desires that said property be explored, developed, and operated for the production of uranium-bearing ores.

This Lease is authorized by Section 67 of the Atomic Energy Act of 1954, as amended, and is issued pursuant to the provisions of the DOE's regulations governing the issuance of leases for mining deposits of uranium in lands held by the DOE (10 CFR Part 760).

NOW, THEREFORE, the parties do hereby agree as follows:

I. GRANT OF LEASE.

For considerations hereinafter stated and performance by the Lessee of the terms and conditions hereinafter provided, the DOE does hereby lease the Property to the Lessee, for the purposes of exploring for, developing, mining, and removing deposits of uranium, vanadium, and associated minerals, the Property described in Appendix "A", which is attached hereto and hereby made a part hereof, subject to the terms and conditions hereinafter set forth. The rights hereby granted are limited to exploration, development, mining, and removal of ore from within the vertical planes of the boundary lines of the Property, and the Lessee shall have no right hereunder to extend its workings beyond such vertical planes. Access to the Property is not guaranteed by the Government. The Lessee shall be responsible for securing such access.

II. TERM. This Lease shall remain in effect for a period of ten (10) years from the aforementioned effective date, except as it may be sooner relinquished or cancelled pursuant to

other provisions of this Lease. Near the end of that 10–year period, DOE will re-evaluate the leasing program to determine if the leases/leasing program should continue.

III. DEFINITIONS. As used herein:

(a) The term "Government" means the Government of the United States of America, including its authorized representatives associated with the Uranium Leasing Program.

(b) The term "DOE" means the United States Department of Energy, or duly authorized representatives thereof, including the Realty Officer except for the purpose of deciding an appeal under Article XXVII "DISPUTES".

(c) The term "Realty Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the Realty Officer acting within the limits of their authority as delegated by the Realty Officer.

(d) The term "associated minerals" means any minerals, other than the minerals covered by this Lease, which are (i) so intermingled with the deposits of the mineral or minerals for which this Lease is issued that separate development is, in the opinion of the Realty Officer, not warranted for mining or for economic reasons, or (ii) of such poor quality and in such small quantity that separate development is, in the opinion of the Realty Officer, undesirable for mining or for economic reasons.

(e) The term "applicable statutes and regulations" means all applicable Federal, state, and local statutes, regulations, and standards. These statutes include but are not limited to, those relating to mine safety; radiation; air, water, and land pollution; disposal of liquid and solid waste; and workmen's and unemployment compensation.

(f) The term "Exploration Plan" as described in Article XII "EXPLORATION PLAN" and Appendix "C" means a plan of activity proposed by the Lessee for the purpose of conducting approved operations to explore, test, or prospect for minerals covered by this Lease.

(g) The term "Mining Plan" as referenced in Article XIII "MINING PLAN" and Appendix "C" means a plan of activity proposed by the Lessee for the purpose of conducting surface and underground operations to develop or extract the minerals covered by this Lease.

IV. GENERAL PERFORMANCE REQUIREMENT. The Lessee shall conduct all activities in accordance with the terms and conditions of this Lease and with those in 10 CFR Part 760. Furthermore, the Lessee shall conduct exploration, development, and mining activities on the Property with all reasonable diligence, skill, and care, as is required to systematically advance lease operations toward, and ultimately achieve and maintain, production of uranium ore consistent with good and safe mining practice, and in accordance with market conditions. Reasonable diligence shall be assessed by the Realty Officer at his sole discretion on the basis of the Lessee's ongoing lease activities or the lack thereof. Site permitting activities and the

April 2008 DE–RO01–08LM70XXX

performance of cultural resource surveys and/or threatened and endangered species surveys shall be accepted by the Realty Officer as evidence supporting reasonable diligence.

V. ROYALTIES. The Lessee shall pay or cause to be paid, as directed by the DOE, the royalties specified in Appendix "B", which is attached hereto and hereby made a part hereof, at the rates and in the manner set forth therein.

VI. INTEREST ON OVERDUE PAYMENTS — FORFEITURE FOR NON-PAYMENT.

(a) All amounts that become payable by the Lessee to the Government under this Lease shall bear simple interest from the date due until paid unless paid within thirty (30) days of becoming due. The interest rate shall be established by DOE (on a quarterly basis as required) as the Federal Short-Term Rate (applied to and applicable to the calendar quarter in which the amount becomes due) plus three (3) percent. The Federal Short-Term Rate is the rate published monthly by the Internal Revenue Service pursuant to Section 1274(d) of the Internal Revenue Code. Additional interest shall be assessed for each subsequent calendar quarter until the amount is paid.

(b) Amounts shall be due at the earlier of the following dates:

(1) The date fixed under this Lease.

(2) The date of the first written demand for payment consistent with this Lease, including any demand resulting from a default cancellation.

(c) Notwithstanding the provisions of paragraphs (a) and (b) of this Article VI, and irrespective of interest payments made by the Lessee to DOE pursuant thereto, the Realty Officer, in his sole discretion, may cancel this Lease for failure by the Lessee to pay the entire principle amount of any annual royalty, base royalty, or bid royalty within sixty (60) calendar days after payment thereof is due from the Lessee to the DOE under the terms of this Lease. Such cancellation shall be effective upon Lessee's receipt of a written notice thereof from the Realty Officer. Failure of DOE to exercise its right to cancel shall not be deemed to be a waiver thereof.

VII . USE OF SURFACE.

(a) Subject to the other provisions of this Lease, the rights granted to the Lessee herein include the right to use so much of the surface of the Property as is required for the exploration for, and development, mining, and removal of ore, including the right to erect such buildings and other structures and install such machinery and other facilities as may be required for such operations; provided, that the Lessee shall recognize existing uses and commitments in the form of grazing, timbering, Bureau of Land Management special use permits, and public recreation, and improvements such as water developments, ditches, roads, trails, pipelines, telephone, telegraph, and power lines, fences, and rights-of-way; and Lessee shall conduct its operations so as to interfere as little as possible with such existing uses and improvements.

(b) The Property shall at all times be subject to other lawful uses heretofore or hereafter granted by the Government, through any authorized agency; provided, that such uses shall not prevent, obstruct, or unduly interfere with any right granted under this Lease.

VIII. LEASES FOR OTHER MINERALS. The granting of this Lease shall not preclude the issuance by the Government of other leases of the Property for the purposes of mining and extracting oil, gas, oil shale, coal, phosphate, potassium, sodium, sulphur, or other minerals which are or may in the future be leasable pursuant to Federal mineral leasing laws; provided, that any such leases hereafter issued shall provide that operations under such leases shall not prevent, obstruct, or unduly interfere with any right granted under this Lease.

IX. USE OF SALABLE MINERALS. No salable minerals, such as sand, gravel, or stone, found on the lands leased hereunder shall be used by the Lessee in its operations unless such salable minerals have been purchased from the Government under the provisions of the Materials Act of July 31, 1947, 30 U.S.C. 601, as amended, or from the owner of such salable minerals if other than the Government.

X. SECURITY AND SAFETY. The Lessee shall secure and post all areas that might reasonably be considered hazardous to the general public, including, but not limited to ore stockpile areas, loading areas, mining openings, and mine-rock waste piles, in accordance with all applicable statutes and regulations and specific requirements and stipulations set forth in Appendix "C". If necessary, the Lessee agrees to construct fences or other barriers around the perimeter of safety-hazard areas to minimize the potential for intrusion by humans, livestock, and wildlife. Radioactive materials exposed by the Lessee's operation shall be managed to ensure that the exposure of humans and ecosystems is as low as reasonably achievable.

XI. ENVIRONMENTAL REQUIREMENTS. The Lessee, at the Lessee's expense, shall comply with all applicable statutes and regulations and abide by the specific requirements and stipulations set forth in Appendix "C", which is attached hereto and hereby made a part hereof.

XII. EXPLORATION PLAN.

(a) Prior to commencing any surface-disturbing operations to explore, test, or prospect for minerals covered by this Lease, the Lessee shall file with the Realty Officer three (3) copies of a plan for the proposed exploration activities and shall obtain the Realty Officer's approval of such plan. The Exploration Plan shall be consistent with the "Notice of Intent to Conduct Prospecting Operations" (hereinafter "Notice") to be filed with the Colorado Mined Land Reclamation Board (hereinafter MLRB) in accordance with "Rule 5" of the "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended. The Exploration Plan shall include all information required by the "Notice", and in addition, must specifically include the following information:

(1) A site-specific environmental analysis;

(2) A description of specific measures to be taken to assure compliance with the requirements of Article XI "ENVIRONMENTAL REQUIREMENTS", including methods of reclamation contemplated by the Lessee; and

(3) The specific information outlined in Appendix "C" of this Lease.

(b) All Exploration Plans submitted to the Realty Officer pursuant to this Article XII and all proposed activities contained therein shall be reviewed by DOE in accordance with 10 CFR Part 1021 "National Environmental Policy Act Implementing Procedures".

(c) If preparation and filing of an Exploration Plan for the entire operation is dependent upon factors which cannot or will not be determined except during the progress of exploration activities, partial plans may be submitted and approved from time to time; provided however, that the Lessee shall not perform exploration activities not described in an approved plan.

(d) Changes may be made in the approved Exploration Plan by mutual written agreement of the Lessee and the Realty Officer. Approval is contingent upon the Lessee notifying all other appropriate agencies (as outlined in Appendix "C") of the proposed changes.

XIII. MINING PLAN.

(a) Prior to constructing any surface installation or commencing mine development on the leased lands, the Lessee shall file with the Realty Officer three (3) copies of a plan for the proposed mining operations and shall obtain the Realty Officer's approval of such plan. Such mining plan shall be consistent with the "Reclamation Permit Application" (hereinafter "Application") to be filed with the Colorado MLRB in accordance with "Rule 1.4" and "Rule 6" of the "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended. The Mining Plan shall include all information required by the "Application", and in addition, must specifically include the following information:

(1) A site-specific environmental analysis;

(2) A description of specific measures to be taken to assure compliance with the requirements of Article XI "ENVIRONMENTAL REQUIREMENTS", including methods of reclamation contemplated by the Lessee; and

(3) The specific information outlined in Appendix "C" of this Lease.

(b) All Mining Plans submitted to the Realty Officer pursuant to this Article XIII and all proposed activities contained therein shall be reviewed by DOE in accordance with 10 CFR Part 1021 "National Environmental Policy Act Implementing Procedures".

(c) If preparation and filing of a Mining Plan for the entire operation is dependent on factors which cannot or will not be determined except during the progress of mining activities, a

April 2008 DE–RO01–08LM70XXX

partial plan may be submitted and approved from time to time; provided however, that the Lessee shall not perform mining activities not described in an approved plan.

(d) Changes may be made in the approved Mining Plan by mutual written agreement of the Lessee and the Realty Officer. Approval is contingent upon the Lessee notifying all other appropriate agencies (as outlined in Appendix "C") of the proposed changes.

XIV. PERFORMANCE BOND.

(a) Upon approval of an Exploration Plan or Mining Plan, and prior to commencing any surface-disturbing operations, the Lessee shall be required to file a suitable performance bond of not less than $________ with satisfactory surety, payable to the United States Department of Energy. The bond shall be conditioned upon the faithful compliance with all applicable statutes and regulations, the terms and conditions of this Lease, and any Exploration Plans and Mining Plans, including amendments and supplements thereto, which have been approved by the Realty Officer.

(b) The Realty Officer shall set the amount of the initial bond and may, from time to time, require an increase or allow a decrease in the amount of the bond, as in his judgment the circumstances may require. In determining the amount of the bond, the Realty Officer shall take into consideration all applicable statutes and regulations and the character and nature of the reclamation requirements of the Lease, including the requirements of any approved Exploration Plans and Mining Plans and partial or supplementary plans, and the estimated costs of such reclamation.

(c) The Lessee and his sureties shall be liable for any damage to the Government resulting from the Lessee's failure to complete any work required upon the expiration, relinquishment, or cancellation of this Lease.

XV. INSPECTION. The DOE reserves the right, through its officers, employees, agents, and contractors, to enter upon the leased property and into all parts of any of Lessee's mines therein at all reasonable times for inspection and other purposes subject to the Lessee's standard operating procedures.

XVI. GOOD FAITH NEGOTIATIONS. At the request of the Realty Officer, the Lessee will negotiate in good faith with the DOE to reach an agreement under which the Lessee, for appropriate compensation, would correct undesirable conditions existing on the Property as a result of pre–1974 mining activities and such other conditions that may be identified from time to time by the Realty Officer. If for any reason, the Lessee is unable to perform the work required to correct such conditions in a timely manner, DOE reserves the right to contract with another entity to enter upon the leased property and perform said work.

April 2008 DE–RO01–08LM70XXX

XVII. INDEMNIFICATION OF GOVERNMENT.

(a) The Government, including its employees, all tiers of contractors, agents, and authorized representatives shall not be responsible for any mechanics' or miners' liens or other liens, encumbrances, or liabilities incurred by the Lessee in connection with the operation of the Property. The Lessee assumes all responsibility for and will hold the Government harmless from any and all claims and liability of any nature arising from the operation or occupancy of the premises.

(b) The Lessee agrees to protect and indemnify the Government against any payroll taxes or contributions imposed with respect to any employee of the Lessee by any applicable law dealing with old age pensions, unemployment compensation, accident compensation, health insurance and related subjects. The Lessee also agrees, at its own cost and expense, to insure to each person employed in, about, or upon the Property, the compensation provided for by law with respect to workmen's compensation and employer's liability insurance, properly safeguarding the Government, including its employees, all tiers of contractors, agents, and authorized representatives, against liability for injuries to persons, including injuries resulting in death, and loss of and damage to property in policies and amounts acceptable to the DOE and to furnish to the DOE written evidence of such insurance.

XVIII. REPORTING REQUIREMENTS.

(a) The Lessee shall provide the Realty Officer with copies of all permits and correspondence from local, state, or other Federal agencies or entities which pertain to the Lessee's activities on the Property.

(b) The Lessee shall provide to the Realty Officer, within twenty calendar days after the end of each month, an accurate record of the tonnage and $U_3O_8$ and $V_2O_5$ grades of each lot of ore delivered from the Property to a mill, buying station, or other purchaser during the previous month, including copies of all settlement sheets furnished to the Lessee for ores so delivered.

(c) The Lessee shall provide to the Realty Officer as soon as practicable after the end of each calendar quarter, the following documents, records, and/or maps:

(1) A formal (written and signed) summary of all activities conducted on the Property during such calendar quarter that, among other things, documents the Lessee's reasonable diligence required by Article IV "GENERAL PERFORMANCE REQUIREMENT".

(2) A map or maps showing the location of all exploration holes drilled on the Property during such calendar quarter, together with copies of any logs and assay records applicable to such drill holes.

(3) A mine map or maps showing the progress of mining on the Property as of the end of such calendar quarter.

(4) Lessee's estimate of the tonnage and $U_3O_8$ and $V_2O_5$ grades of all ores stockpiled on the Property as of the end of such calendar quarter.

(5) If no activity occurs on the Property during a calendar quarter, a letter submitted to the Realty Officer stating that no activity has occurred shall satisfy this reporting requirement.

(d) The Lessee further agrees to provide to the Realty Officer the results of any inspections of Lessee's mines or other facilities located on the Property, conducted by personnel of local, state, or other Federal agencies under applicable statutes and regulations. Furthermore, the Lessee agrees to notify the Realty Officer of any planned or scheduled inspections to be performed by local, state, or other federal agencies as soon as such schedule is known so that the Realty Officer may participate in said inspection if so desired.

(e) The Lessee is hereby notified that information obtained by DOE from the Lessee under this section shall be subject to the provisions of the Freedom of Information Act (5 U.S.C. 552).

XIX. TAXES. The Lessee agrees to pay when due all taxes lawfully assessed and levied pursuant to state or Federal law upon improvements, output of mines, and other interests, property, and assets of the Lessee in or upon the Property.

XX. ASSIGNMENT. The Lessee agrees that no transfer of this Lease, or of any interest therein or claim thereunder, by assignment, sublease, operating agreement, or otherwise, shall occur unless and until approved in writing by the Realty Officer.

XXI. RELINQUISHMENT OF LEASE. This Lease may be surrendered by the Lessee upon the Lessee's filing with the DOE, and the Realty Officer's approval of, a written application for relinquishment. Approval of the application shall be contingent upon the delivery of the Property to the DOE in a condition satisfactory to the Realty Officer, in accordance with the terms of this Lease, and upon the continued liability of the Lessee to make payment of all royalty and other debts theretofore accrued and due the DOE.

XXII. CANCELLATION OF LEASE. DOE may cancel this Lease if the Realty Officer determines that the Lessee has failed to comply with any provision of this Lease including reasonable diligence. Failure of DOE to exercise its rights to cancel shall not be deemed to be a waiver thereof.

XXIII. DELIVERY OF PREMISES. At the expiration of this Lease, or upon its earlier relinquishment or cancellation as herein provided, the Lessee shall, within one hundred eighty (180) days or other period mutually agreed to by the Lessee and Realty Officer, surrender the Property in a condition satisfactory to the Realty Officer, and shall, unless otherwise directed by

the Realty Officer in writing, remove from the Property at Lessee's expense all structures, machinery, equipment, tools, and improvements placed thereon by the Lessee; provided, that the Lessee shall not remove any timbers or improvements which are determined by the Realty Officer to be required to be left in the mine workings to protect such workings as a mining property. Furthermore, prior to the surrender of the Property, the Lessee shall remove from the Property at Lessee's expense all stockpiles of ore and/or protore materials placed thereon by the Lessee and remit the required royalties to DOE in accordance with Article V "ROYALTIES" and Appendix "B". Otherwise, the Lessee shall at the Lessee's expense return all stockpiles of ore and/or protore materials to a suitable location within the underground mine workings on the Property or other location on the Property as designated by the Realty Officer.

XXIV. EXAMINATION OF RECORDS.

(a) The DOE and the Comptroller General of the United States or duly authorized representatives of either shall, until three (3) years after final payment under this Lease, have access to and the right to examine any of the Lessee's directly pertinent books, documents, papers, or other records involving transactions related to this Lease. The Lessee shall make these records and documents available to the Government, at the Lessee's offices, at all reasonable times, without any charge.

(b) The Lessee agrees to include in first-tier subcontracts under this Lease a clause to the effect that the DOE or the Comptroller General or duly authorized representatives of either shall, until three (3) years after final payment under the subcontract, have access to and the right to examine any of the subcontractor's directly pertinent books, documents, papers, or other records involving transactions related to the subcontract.

(c) The periods of access and examination in paragraphs (a) and (b) above for records relating to (1) appeals under Article XXVII "DISPUTES", (2) litigation or settlement of claims arising from the performance of this Lease, or (3) costs and expenses of this Lease to which the DOE or the Comptroller General or duly authorized representatives of either has taken exception shall continue until such appeals, litigation, claims, or exceptions are disposed of.

XXV. OFFICIALS NOT TO BENEFIT. No member of or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this Lease, or to any benefit arising from it. However, this clause does not apply to this Lease to the extent that this Lease is made with a corporation for the corporation's general benefit.

XXVI. COVENANT AGAINST CONTINGENT FEES. The Lessee warrants that no person or selling agency has been employed or retained to solicit or secure this Lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Lessee for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to cancel this Lease without liability, or in its discretion to require the Lessee to pay to DOE the full amount of such commission, percentage, brokerage, or contingent fee.

April 2008 DE–RO01–08LM70XXX

XXVII. DISPUTES.

(a) Except as otherwise provided in this Lease, any dispute concerning a question of fact arising under this Lease which is not disposed of by agreement shall be decided by the Realty Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Lessee. The decision of the Realty Officer shall be final and conclusive unless within 30 days from the date of receipt of such copy, the Lessee mails or otherwise furnishes to the Realty Officer a written appeal addressed to the DOE. The decision of the DOE for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Lessee shall be afforded an opportunity to be heard, and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Lessee shall abide by the Realty Officer's decision.

(b) The provisions of paragraph (a) above does not preclude consideration of questions of law; provided, that nothing in this Lease shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

XXVIII. HEIRS AND SUCCESSORS-IN-INTEREST. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Lease, effective as of the date first above written, intending to be legally bound thereby.

UNITED STATES OF AMERICA
UNITED STATES DEPARTMENT OF ENERGY ______________________ (LESSEE)

| | |
|---|---|
| By ______________________ | By ______________________ |
| Title Realty Officer | Title ______________________ |
| Date ______________________ | Date ______________________ |

BLM_0042790

April 2008 DE–RO01–08LM70XXX

APPENDIX A

DESCRIPTION OF LEASED PROPERTY

The leased property described herein was referred to as "MINING LEASE NO. AT(05–1)–ML–60.8–____"during the period from 1974 to the enactment of this Lease.

*A full legal description of the lease premises along with all other site-specific and/or lease-specific information will be included in this Appendix "A".*

April 2008 DE–RO01–08LM70XXX

APPENDIX B

ROYALTIES

(a) At the beginning of each lease year during the term of this Lease, there shall become due and payable to the DOE an annual royalty of $__________. Annual royalties paid pursuant to this article shall be credited against base royalties and royalty bid payments which become payable during the term of this Lease. Annual royalties so paid shall not be refunded upon the expiration, relinquishment, or cancellation of this Lease. Additionally, annual royalty payments made during the lease term of MINING LEASE NO. AT(05–1)–ML–60.8–C–X–X that have not been applied against past production royalty payments, shall be brought forward and credited against base royalties and royalty bid payments which become payable during the term of this Lease.

(b) The Lessee agrees to pay to the DOE a base royalty, per dry ton of ore delivered from the Property to a mill or other receiving station, determined as provided in paragraph (h) of this Appendix "B", in the amount of (a) Two percent (2%) of the value per dry ton up to and including a value of Fifty Dollars ($50.00) per dry ton, plus (b) Ten percent (10%) of the value per dry ton in excess of Fifty Dollars ($50.00) per dry ton and up to and including One Hundred Twenty-Five Dollars ($125.00) per dry ton, plus (c) Fourteen percent (14%) of the value per dry ton in excess of a value of One Hundred Twenty-Five Dollars ($125.00) per dry ton.

(c) The Lessee agrees to pay to the DOE, in addition to the base royalty required to be paid pursuant to paragraph (b) of this Appendix "B", a royalty bid payment, per dry ton of ore delivered from the Property to a mill or other receiving station, in the amount of _______ percent (__%) of the value per dry ton, determined as provided in paragraph (g) of this Appendix "B"; provided, that such royalty bid payments shall not be payable with respect to ores mined from the Property and delivered to a mill or other receiving station after royalty bid payments have been made for ores containing a total of _________ pounds of $U_3O_8$ so delivered by the Lessee from the Property.

(d) Unless otherwise authorized by DOE in writing, all ores mined from the Property shall be stockpiled on the Property until such time as they are delivered to a mill or other receiving station.

(e) With respect to ores which are mined from the Property and delivered to a mill or other receiving station which is owned or controlled by the Lessee, the Lessee agrees to make base royalty and royalty bid payments, for all lots of such ore assayed or fed to process during each calendar month, within twenty (20) calendar days after the end of such calendar month. Such base royalty and royalty bid payments shall be treated as provisional payments with respect to any lot of ore for which the DOE requests an umpire assay, and an appropriate adjustment shall be made in the first base royalty and royalty bid payment following Lessee's receipt of the results of such umpire assay for such lot of ore.

(f) With respect to ores which are mined from the Property and delivered to a mill or other receiving station not owned or controlled by the Lessee, the Lessee agrees:

(1) That the DOE may receive base royalty and royalty bid payments directly from the owner or controller of the mill or other receiving station to which such ores are shipped by the Lessee if the DOE makes arrangements therefore satisfactory to the Lessee.

(2) That, in the absence of such arrangements, the Lessee shall make base royalty and royalty bid payments for all lots of such ore assayed or fed to process (includes delivery of such ore to an ore-buying station or sample plant) during each calendar month, within twenty (20) calendar days after payment for such lots is mailed to the Lessee; provided, that an appropriate extension of such twenty (20) day period shall be granted by the Realty Officer for any undue delay in the mails which causes a delay in delivery to the Lessee of payment for such lots of ore. Such base royalty and royalty bid payments shall be treated as provisional payments with respect to any lot of ore for which the DOE requests an umpire assay, and an appropriate adjustment shall be made in the first base royalty and royalty bid payment following finalization of payment to the Lessee for such ore.

(g) Payments of base royalty and royalty bid amounts due the DOE shall be deemed to have been made when received at the DOE Legacy Management Office in Grand Junction, Colorado.

(h) DOE shall establish the prices for uranium and vanadium that shall be used to calculate the fair-market value of lease tract ores. These prices shall be established on a quarterly basis, on or before the twentieth (20th) day after the end of the previous calendar quarter (in January, April, July, and October), and shall remain in effect during the calendar quarter in which they are established. DOE shall establish these prices as follows:

(1) Using an Excel spreadsheet, DOE shall monitor, record, and track the spot-market and long-term-market prices for uranium (quoted as dollars per pound $U_3O_8$) as reported weekly in *$U_x$ Weekly*. The spreadsheet will then (i) automatically calculate the monthly and quarterly arithmetic average prices for uranium (both spot-market and long-term-market), and (ii) automatically calculate a quarterly weighted-average price for uranium by applying the appropriate purchase contract percentages to the respective quarterly average prices. Using this spreadsheet, DOE shall also monitor, record, and track the Total Purchased (Weighted-Average Price) for uranium as reported annually by the Energy Information Administration in Table S1b. *Weighted-Average Price of Uranium Purchased by Owners and Operators of U.S. Civilian Nuclear Power Reactors (quoted as Dollars per Pound $U_3O_8$ Equivalent)*. The spreadsheet will then automatically calculate the arithmetic average between the quarterly weighted-average price for uranium and the Total Purchased (Weighted-Average Price) for uranium. The resulting figure is reported as the annualized quarterly weighted-average price for uranium.

(2) Using the same Excel spreadsheet, DOE shall monitor, record, and track the market price of vanadium (quoted as dollars per pound $V_2O_5$) as reported twice weekly in *Metal Bulletin (Non-Ferrous Primary Metals, Noble Alloys and Ores, Vanadium pentoxide)*. The

April 2008 DE–RO01–08LM70XXX

spreadsheet will then (i) automatically calculate the monthly and quarterly arithmetic average prices for vanadium, and (ii) automatically apply an adjustment factor of one-half (0.5) to each quarterly arithmetic average price for vanadium. The resulting figure is reported as the adjusted quarterly average price for vanadium.

(3) Paragraphs (h)(1) and (h)(2) can be summarized by the following three equations:

$$U = (Q_{WA} + TP_{WA}) / 2 \qquad (1)$$

where:

$U$ = Annualized Quarterly Weighted-Average Price for Uranium

$Q_{WA}$ = Quarterly Weighted-Average Price for Uranium

$TP_{WA}$ = Total Purchased (Weighted-Average Price) for Uranium

$$Q_{WA} = Q_{SM} * P_{SM} + Q_{LTM} * P_{LTM} \qquad (2)$$

where:

$Q_{SM}$ = Quarterly Arithmetic Average Price for the Uranium Spot Market

$P_{SM}$ = Purchase Contract Percentage for the Uranium Spot Market

$Q_{LTM}$ = Quarterly Arithmetic Average Price for the Uranium Long Term Market

$P_{LTM}$ = Purchase Contract Percentage for the Uranium Long Term Market

$$V = Q_{WA} * 0.5 \qquad (3)$$

where:

V = Annualized Quarterly Weighted-Average Price for Vanadium

$Q_{WA}$ = Quarterly Weighted-Average Price for Vanadium

(i) The Lessee shall be notified of these prices (annualized quarterly weighted-average price for uranium and adjusted quarterly average price for vanadium) by formal written correspondence. The Lessee shall use these prices to calculate the fair-market value of the ore in dollars per dry ton (calculated to the nearest cent [$0.01]), for all lots of such ore assayed during any calendar month. This fair-market value shall be determined by:

(1) Computing the number of recoverable pounds of contained $U_3O_8$ and $V_2O_5$ per dry ton of ore in the lots so assayed by (i) multiplying the total number of pounds of $U_3O_8$ and $V_2O_5$, respectively, contained in the lots of ore so assayed during such calendar month, by factors of 0.96 and 0.79, respectively (the average milling facility's recovery rates for $U_3O_8$ and $V_2O_5$, respectively, as acknowledged by DOE) and (ii) dividing each of the resulting numbers by the total number of dry tons of ore contained in the lots so assayed during such calendar month, and carrying the results to three decimal places for $U_3O_8$ and two decimal places for $V_2O_5$; and

(2) Adding together the dollar amounts obtained by (i) multiplying the number of recoverable pounds of $U_3O_8$ per dry ton of ore in the lots so assayed by the price per pound of $U_3O_8$ established by DOE and (ii) multiplying the number of recoverable pounds of $V_2O_5$ per dry ton of ore in the lots so assayed by the price per pound of $V_2O_5$ established by DOE.

(j) For ores that have been mined from the Property and delivered to a mill or other receiving station,, but not assayed or fed to process, the Lessee shall estimate the value of said ores using standard industry practices, and shall make base royalty and royalty bid payments to DOE equal to or greater than 95 percent (95%) of the estimated value of the base royalty and royalty bid payments due to DOE. Such base royalty and royalty bid payments shall be treated as provisional payments with respect to said ores until such time that said ores are assayed or fed to process and the final base royalty and royalty bid payments due to DOE are calculated and final base royalty and royalty bid payments are made.

(k) If price quotations for vanadium pentoxide become unavailable, the DOE and the Lessee will negotiate to establish a method of determining an appropriate market price per pound of $V_2O_5$ to be used in determining that portion of the value per dry ton of ore attributable to vanadium. Pending agreement on such method, the last prices established by paragraph (h)(2) above shall be used in determining the portion of the value per dry ton of ore attributable to vanadium, for the purpose of computing royalties under this Lease. If the parties fail to reach

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 222 of 426

agreement on an applicable method, the matter shall constitute a dispute to be decided in accordance with the Article XXVII "DISPUTES" of this Lease.

(l) The parties hereto agree that if the Lessee is paid for any constituent, other than uranium or vanadium, contained in ores mined from the Property, all amounts so paid shall be held in trust by the Lessee for the DOE until the Lessee and the DOE agree upon a base royalty to be paid to the DOE with respect to Lessee's sale of such constituent.

(m) Consistent with Article XXIII "DELIVERY OF PREMISES", the Lessee agrees, that within one hundred eighty (180) days following the expiration, relinquishment, or termination of this Lease as herein provided, all royalties associated with this lease (annual royalty, base royalty, and bid royalty) shall become due and payable to the DOE. For ores that have been mined from the Property, but not assayed or fed to process, the Lessee shall estimate the value of said ores using standard industry practices, and shall make base royalty and royalty bid payments to DOE equal to or greater than 95 percent (95%) of the estimated value of the base royalty and royalty bid payments due to DOE. Such base royalty and royalty bid payments shall be treated as provisional payments with respect to said ores until such time that said ores are assayed or fed to process and the final base royalty and royalty bid payments due to DOE are calculated and final base royalty and royalty bid payments are made.

BLM_0042796

April 2008                                                    DE–RO01–08LM70XXX

WEIGHING, SAMPLING, AND ASSAYING.

With respect to ores which are mined from the Property and delivered to a mill or other receiving station, the Lessee agrees to the following provisions:

(a)   The Lessee shall weigh, or cause to be weighed, each lot of ore delivered from the Property to its mill or other receiving station and shall furnish the DOE a record of the weight of such lot.  The scales used in weighing such ore shall be balanced daily and checked once each week or more often, as appears necessary, by either standard weights or by check-weighing against another scale.  Scale platforms will be kept clean and free of the sides of the pit, and the scales shall be inspected and certified every six months by the appropriate entity of the state in which the mill or receiving station is located, if such inspection is available; otherwise, a biannual inspection shall be made by a competent organization which is acceptable to both the Lessee and the DOE.

(b)   The Lessee shall sample, or cause to be sampled, each lot of ore according to standard and accepted practices in ore sampling, and such sampling shall be final and binding on both parties to this Lease.  The DOE or its representative may be present at the sampling of such ore.  The Lessee shall ensure that moisture determinations are made according to standard practices in ore sampling.  The Lessee shall ensure that each final sample is divided into four (4) pulps, one of which shall be promptly furnished to the DOE, one of which shall be retained by the Lessee for assay purposes, and two of which shall be held in reserve by the Lessee for possible umpire analysis.  The Lessee shall promptly assay, or cause to be assayed, its pulp for $U_3O_8$ and $V_2O_5$ content and shall transmit the assay results to the DOE, together with weight and moisture certificates for the lot sampled.  For the purpose of such reporting, all assays for $U_3O_8$ shall be adjusted to the nearest 0.001% and all assays for $V_2O_5$ shall be adjusted to the nearest 0.01%.

(c)   The DOE may assay its pulps at its own expense.  In case of disagreement with the Lessee's assay with respect to either $U_3O_8$ or $V_2O_5$ content, the DOE may, within 30 calendar days after receiving its pulp, mail to the Lessee a written request for an umpire assay.  Upon receipt of such written request, the Lessee shall promptly submit one of the pulps held in reserve to an assayer, whom the parties hereto shall agree upon, for umpire assay.  With respect to both $U_3O_8$ and $V_2O_5$ content, if the assay of the umpire is within the assays of the two parties, it shall be final.  If not, the assay which is nearer to that of the umpire shall prevail.  The party whose assay for $U_3O_8$ is further from that of the umpire shall pay the cost of the umpire's assay.  In the event that the umpire's assay for $U_3O_8$ is equally distant from the assay of each party, the cost shall be split equally.

(d)   The quantity of ore comprising a lot, as used herein, shall be determined by the Lessee, except that no lot shall exceed one thousand (1,000) tons of ore except as otherwise agreed in writing by the Realty Officer.

April 2008 DE–RO01–08LM70XXX

APPENDIX C

1. SPECIFIC REQUIREMENTS AND STIPULATIONS

The Lessee agrees to comply with all applicable statutes and regulations, including but not limited to the following items:

(a) Prior to resuming operations on the Property that were previously approved by DOE, the Lessee shall notify the Realty Officer in writing of its intentions to resume such operation and shall include any changes, additions, or modifications to the original plan that are now proposed. Upon receipt of such notification, the Realty Officer shall review the approved plan along with any new information provided by the Lessee and determine if additional stipulations are warranted. When all pertinent requirements are satisfied, DOE shall provide the Lessee with a written approval to proceed.

(b) All existing serviceable improvements not associated with the Lessee's operation, such as fences, gates, cattle guards, roads, trails, culverts, pipelines, bridges, and water development and control structures, authorized for use by the Lessee, shall be maintained in serviceable condition by the Lessee. Such improvements (if not owned by the Lessee) which are damaged or destroyed by the Lessee's operations shall be replaced, restored, or compensated for by the Lessee.

(c) The Lessee's operations shall not disturb public land survey corner markers or monuments or Atomic Energy Commission (AEC) survey markers without the prior written approval of the Realty Officer. Additionally, the Lessee shall pay all costs associated with the surveys required to preserve or reestablish the true point of any such marker or monument and the replacement of such marker or monument.

(d) Housing and other buildings and support facilities related to community development shall be constructed or located on the Property only upon the prior written approval of the Realty Officer. In constructing and locating such housing, other buildings, and support facilities, the Lessee shall comply with applicable county planning and zoning regulations, subdivision regulations, and mobile home regulations, and shall furnish evidence of such compliance to the Realty Officer upon request.

(e) Prior to any surface disturbing activity, the Lessee shall file a "Notice of Intent to Conduct Prospecting Operations" (Notice) or "Reclamation Permit Application" (Application), whichever is appropriate, with the Colorado Mined Land Reclamation Board (MLRB) in accordance with "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended. All subsequent modifications to the Notice or Application shall be addressed in accordance with the "Mineral Rules and Regulations" of the Colorado MLRB. The Lessee shall provide the Realty Officer with copies of all pertinent approval documentation including permits issued.

(f) Prior to any surface disturbing activity, the Lessee shall consult with the U.S. Department of Interior—Bureau of Land Management (BLM), the U.S. Department of Interior—Fish and Wildlife Service (USFWS), and/or the Colorado Department of Natural Resources—Division of Wildlife (CDOW), as appropriate, to determine whether threatened or endangered, or sensitive plant or wildlife species occur in the area to be disturbed or whether the agencies have other plant or wildlife concerns in the area to be disturbed. If required, the Lessee shall conduct surveys or provide other documentation to resolve this concern. The Lessee shall provide the Realty Officer with copies of all documents pertaining to this issue.

(g) Prior to any surface disturbing activity, the Lessee shall perform a cultural and historical survey of the area to be disturbed. If cultural or historical resources are found to exist, the Lessee shall consult with the State Historical Preservation Officer for the appropriate measures to be taken. If required, the Lessee shall prepare a mitigation plan to address the protection of the cultural or historical resources. The Lessee shall provide the Realty Officer with copies of all documents pertaining to this issue.

(h) Prior to any surface disturbance activity in a potential floodplain or wetland area, the Lessee shall consult with the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, and the appropriate state agency to determine whether a jurisdictional floodplain or wetland exists in the area to be disturbed. If required, the Lessee shall prepare a Floodplain/Wetlands Assessment that proposes mitigation measures to be taken to resolve this concern. The Lessee shall provide the Realty Officer with copies of all documents pertaining to this issue.

(i) The Lessee shall use existing roads where practicable, and shall conduct activities employing wheel or track vehicles in such a manner as to minimize surface damage. The Lessee shall wash all tracked vehicles or equipment prior to their being mobilized to the Property. The Lessee shall promptly repair any road damage resulting from the Lessee's operations, restoring such road to its previous condition or to a condition acceptable to the Realty Officer. Where existing access roads across the Property are used principally by the Lessee, the Lessee shall construct surface-water control and drainage structures (culverts, water bars, or grade dips) on such roads to minimize erosion. Plans for such structures shall be included in all Exploration Plans and Mining Plans submitted to the Realty Officer pursuant to Articles XII "EXPLORATION PLAN" and XIII "MINING PLAN" hereof, respectively. The Lessee shall construct new roads and trails on the Property only at locations and to specifications approved in advance in writing by the Realty Officer or an authorized representative of the Realty Officer, and shall construct and maintain such roads and trails in a manner that will minimize channeling and other erosion. The Realty Officer's approval of plans for new access road construction, culverts, water bars, or grade dips will be guided by standards established by BLM or the U.S. Department of Agriculture—Forest Service (USFS), where appropriate.

(j) The Lessee shall conduct all operations so as to protect all natural resources and the environment including streams, lakes, ponds, waterholes, seeps, and marshes, and protect fish and wildlife resources as required by applicable laws and regulations. The Lessee shall control all mine wastes, contaminants and pollutants, and sediments associated with stormwater runoff in

accordance with existing regulations, and shall comply with all environmental regulations regarding discharge into, or degradation of water resources including streams, springs, stock waters, or groundwater. The Lessee shall not use water from any water source without the written consent of the person having the rights to the use of such water source.

(k) Lessee shall keep the clearing of timber, stumps and snags, and any ground cover to a minimum consistent with the conduct of exploration, development, and mining activities approved hereunder. The Lessee shall abide by any restrictions concerning the bulk removal of vegetation (primarily piñon pine) that are established by the Realty Officer. The Lessee shall use due care to avoid scarring or removal of vegetative ground cover in areas not involved in such operations. Open parks (areas where there is a grass, shrub, and/or sagebrush cover) shall be disturbed as little as possible. If the shrub or brush cover is too high and must be cleared, it shall be cleared at or above ground level. The Lessee shall return all disturbed areas to their original condition or a condition acceptable to the Realty Officer promptly after damage to such areas has occurred and operations under this Lease are no longer being conducted in the disturbed areas.

(l) The Lessee agrees that all underground mine openings shall be supported by pillars, timber, or other ground support devices approved by the Federal or state agencies having jurisdiction over such underground workings. The Lessee further agrees, during the term of this Lease, to substantially fence or permanently close all mine openings/portals, subsidence holes, surface excavations, or other workings resulting from the Lessee's operation that may be considered hazardous to human health or the environment. Such protective measures shall be maintained in a proper and safe condition during the term of this Lease. Prior to abandoning operations, the Lessee shall submit a mine-site reclamation plan to the Realty Officer for approval. Such plan shall include the proposed method(s) of permanent closure for all mine openings/portals including shafts, adits, inclines/declines, ventilation shafts, and water discharge points. No underground workings or any part thereof shall be permanently abandoned and rendered inaccessible without the prior written approval of the Realty Officer. All mine-site reclamation shall be performed to the satisfaction of the Realty Officer in accordance with the approved reclamation plan

(m) Surface drill holes and associated disturbances resulting from exploration or development activities shall be abandoned in accordance with existing regulations and in a manner that will protect the surface. All disturbed areas identified by the Lessee as not being needed for future operational activities shall be promptly reclaimed by the Lessee. The Realty Officer, by written notice to the Lessee, shall designate any other areas where reclamation must be undertaken as a result of disturbances caused by the Lessee's operations.

(n) If antiquities or other objects of historic or scientific interest, including but not limited to historic or prehistoric features or ruins, artifacts, or vertebrate fossils are discovered by the Lessee in the performance of operations under this Lease, the Lessee shall cease operations in the vicinity of such discovery and immediately take appropriate steps to protect and save such objects of historic or scientific interest and shall notify the Realty Officer of such discovery. The Realty Officer shall assess the values involved and prescribe such protective measures as deemed necessary.

April 2008                                                          DE–RO01–08LM70XXX

(o)   The Lessee shall make every effort to prevent, control, or suppress any fire in the operating area and to report any uncontrolled fire to the appropriate BLM or USFS official, as designated by the Realty Officer.

(p)   The Lessee shall provide detailed haul route information to the Realty Officer for review prior to commencement of any haul activities.  The haul route information shall include, at a minimum, expected routes from the mine site to the proposed mill or other facility accepting material from the mine, expected number of trucks per day, size and approximate weights of the ore being shipped, and expected production rates and mining life timeframes.  It is expected that the Lessee will utilize only the specified routing.  The lessee shall notify the Realty Officer of any significant changes to the haul route plan.

(q)   The Lessee shall comply with Colorado State Access Code Section 43-2-147(4), C.R.S., and Section 24-4-103., C.R.S., effective 8/31/98.  Pursuant to said code, the Lessee may be required to participate in a Highway Access Pre-Consultation meeting with DOE and the Colorado Department of Transportation after the completion and submittal to DOE of the approved permit from the Colorado MLRB.  The details provided within the Mining Plan and permit, and the information provided under paragraph (p) above shall be used to determine the need for the Pre-Consultation meeting and to determine the potential impacts to county and state roads, highways and intersections from the Lessee's operations, and any resulting mitigation requirements from these impacts.  Any revisions or amendments to the permit, or any conversion from one permit type to another approved by the Colorado MLRB shall also be provided to the Realty Officer.  The permit revision, modification or conversion may be used to determine any additional impacts to the county roads or state highways from the Lessee's operations, and any resulting mitigation requirements from these additional impacts.  Access permits required under this requirement shall be provided to the Realty Officer.

(r)   The Lessee shall attend and participate in meetings between DOE and other Federal, state, and local agencies, as required.

(s)   Prior to entry into any existing lease tract mines or mine workings (or the resumption of mining operations therein), where mitigative measures have been previously undertaken to conserve potentially critical habitat for BLM–listed sensitive bat species, the Lessee shall consult with BLM and CDOW to mitigate the impacts of the Lessee's activities to the references bat species.

BLM_0042801

2. EXPLORATION PLAN FORMAT

It is not DOE's intent to require the Lessee to prepare multiple documents for submittal to the appropriate agencies for review and approval. Consequently, at the Lessee's discretion, a copy of the "Notice of Intent to Conduct Prospecting Operations" filed with the Colorado MLRB may be submitted to DOE for review and approval. That document will meet DOE's requirement for submittal of an Exploration Plan providing it contains, at a minimum, the following information:

a. Map showing general area to be explored

   1. Tentative location of drill holes or other exploration activity

   2. Location of roads (existing and proposed)

b. Approximate starting date and duration of drilling

c. Drilling information

   1. Type of drilling and/or other exploration equipment

   2. Size of hole and core, if any, to be recovered

   3. Type of logging

   4. Target horizon and depth

d. Road construction necessary for exploration

   1. Location of roads and drill sites

   2. Measures to be taken for erosion control

e. Abandonment

   1. Procedures for plugging drill holes including the disposition of drill hole cuttings

   2. Surface restoration (grading, revegetation, erosion control measures, etc.)

f. Provisions made to conform with existing state and federal regulations regarding control of fire, pollution of water and air, protection of other natural resources, and public health and safety, both during and upon abandonment of exploration activities

g. Specific measures to be taken to assure compliance with environmental and surface use stipulations of this Lease including the preparation of a site-specific environmental document that assures compliance with NEPA and other environmental regulations.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 229 of 426

April 2008 DE–RO01–08LM70XXX

3. MINING PLAN FORMAT

It is not DOE's intent to require the Lessee to prepare multiple documents for submittal to the appropriate agencies for review and approval. Consequently, at the Lessee's discretion, a copy of the "Reclamation Permit Application" filed with the Colorado MLRB may be submitted to DOE for review and approval. That document will meet DOE's requirement for submittal of a Mining Plan providing it contains, at a minimum, the following information:

a. Map showing location of:

  1. Ore body and proposed entry
  2. Any new roads required
  3. Mine plant and associated structures and facilities
  4. Waste dumps and ore storage areas

b. Mining

  1. Initial development plans
     A. Type of entry and haulage method proposed
     B. Stoping method
     C. Estimated rate of daily ore production and mine-life expectations
     D. Provisions to handle mine water
  2. Proposed ventilation and radiation control methods

c. Surface Plant

  1. Buildings, utility lines, and storage/stockpile areas
  2. Sewage and refuse disposal
  3. Compliance with any applicable county planning and zoning regulations
  4. Compliance with EPA stormwater discharge regulations

d. Surface restoration plans

  1. Topsoil removal and storage
  2. Grading and backfilling

BLM_0042803

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 230 of 426

3. Control of stormwater runoff

4. Revegetation (if required)

e. Abandonment

1. Permanent closure of all mine openings/portals resulting from, or utilized during, the Lessee's operations.

2. Removal of structures and associated features

3. Disposition of mine wastes (contouring, leveling, use for backfill, etc.)

f. Provisions made to conform with existing state and federal regulations regarding control of fire, pollution of water and air, protection of other natural resources, and public health and safety, both during and upon abandonment of mining activities.

g. Specific measures to be taken to assure compliance with environmental and surface use stipulations of the Lease including the preparation of a site-specific environmental document that assures compliance with NEPA and other environmental regulations.

BLM_0042804

June 2008 DE–RO01–08LM70XXX

URANIUM MINING LEASE

UNITED STATES DEPARTMENT OF ENERGY

THIS LEASE AGREEMENT, effective as of this ___ day of ___________, 2008, by and between the UNITED STATES OF AMERICA (hereinafter "Government"), represented by the UNITED STATES DEPARTMENT OF ENERGY (hereinafter "DOE"), whose principal place of business for the purpose of this Lease is 2597 B ¾ Road, Grand Junction, Colorado 81503 and ____________________________________________ whose principal place of business for the purpose of this Lease is ___________________________ (hereinafter "Lessee"):

WITNESSETH THAT:

DOE represents that it is in possession of certain Government owned uranium mining property in Montrose County, Colorado, more particularly described as Lease Tract C–X–X in Appendix "A" which is attached hereto and hereby made a part this Agreement (the "Property").

DOE desires that said Property be explored, developed, and operated for the production of uranium-bearing ores.

This Lease is authorized by Section 67 of the Atomic Energy Act of 1954, as amended, and is issued pursuant to the provisions of the DOE's regulations governing the issuance of leases for mining deposits of uranium in lands held by the DOE (10 CFR Part 760).

NOW, THEREFORE, the parties do hereby agree as follows:

I. GRANT OF LEASE.

For considerations hereinafter stated and performance by the Lessee of the terms and conditions hereinafter provided, the DOE does hereby lease to the Lessee, for the purposes of exploring for, developing, mining, and removing deposits of uranium, vanadium, and associated minerals, the Property described in Appendix "A", which is attached hereto and hereby made a part hereof, subject to the terms and conditions hereinafter set forth. The rights hereby granted are limited to exploration, development, mining, and removal of ore from within the vertical planes of the boundary lines of the Property, and the Lessee shall have no right hereunder to extend its workings beyond such vertical planes. Access to the Property is not guaranteed by the Government. The Lessee shall be responsible for securing such access.

II. TERM. This Lease shall remain in effect for a period of ten (10) years from the aforementioned effective date, except as it may be sooner relinquished or cancelled pursuant to other provisions of this Lease. Near the end of that 10–year period, DOE will re-evaluate the leasing program to determine if the leases/leasing program should continue.

June 2008 DE–RO01–08LM70XXX

III. DEFINITIONS. As used herein:

(a) The term "Government" means the Government of the United States of America, including its authorized representatives associated with the Uranium Leasing Program.

(b) The term "DOE" means the United States Department of Energy, or duly authorized representatives thereof, including the Realty Officer except for the purpose of deciding an appeal under Article XXVII "DISPUTES".

(c) The term "Realty Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the Realty Officer acting within the limits of their authority as delegated by the Realty Officer.

(d) The term "associated minerals" means any minerals, other than the minerals covered by this Lease, which are (i) so intermingled with the deposits of the mineral or minerals for which this Lease is issued that separate development is, in the opinion of the Realty Officer, not warranted for mining or for economic reasons, or (ii) of such poor quality and in such small quantity that separate development is, in the opinion of the Realty Officer, undesirable for mining or for economic reasons.

(e) The term "applicable statutes and regulations" means all applicable Federal, state, and local statutes, rules, regulations, and standards as they may be amended or replaced from time to time. These statutes include but are not limited to, those relating to mine safety; radiation; air, water, and land pollution; disposal of liquid and solid waste; and workmen's and unemployment compensation.

(f) The term "Exploration Plan" as described in Article XII "EXPLORATION PLAN" and Appendix "C" means a plan of activity proposed by the Lessee for the purpose of conducting approved operations to explore, test, or prospect for minerals covered by this Lease.

(g) The term "Mining Plan" as referenced in Article XIII "MINING PLAN" and Appendix "C" means a plan of activity proposed by the Lessee for the purpose of conducting surface and underground operations to develop or extract the minerals covered by this Lease.

(h) Article "Titles and Headings" as used throughout this Lease are inserted for convenience only, and shall not be deemed to be a part of this Lease or considered in construing this Lease.

IV. GENERAL PERFORMANCE REQUIREMENT. The Lessee shall conduct all activities in accordance with the terms and conditions of this Lease and with those in 10 CFR Part 760. Furthermore, the Lessee shall conduct exploration, development, and mining activities on the Property with all reasonable diligence, skill, and care, as is required to systematically advance lease operations toward, and ultimately achieve and maintain, production of uranium ore consistent with good and safe mining practice, and in accordance with market conditions.

Reasonable diligence shall be assessed by the Realty Officer at his sole discretion on the basis of the Lessee's ongoing lease activities or the lack thereof. Site permitting activities and the performance of cultural resource surveys and/or threatened and endangered species surveys shall be accepted by the Realty Officer as evidence supporting reasonable diligence.

V. ROYALTIES. The Lessee shall pay or cause to be paid, as directed by the DOE, the royalties specified in Appendix "B", which is attached hereto and hereby made a part hereof, at the rates and in the manner set forth therein.

VI. INTEREST ON OVERDUE PAYMENTS — FORFEITURE FOR NON-PAYMENT.

(a) All amounts that become payable by the Lessee to the Government under this Lease shall bear simple interest from the date due until paid unless paid within thirty (30) days of becoming due. The interest rate shall be established by DOE (on a quarterly basis as required) as the Federal Short-Term Rate (applied to and applicable to the calendar quarter in which the amount becomes due) plus three (3) percent. The Federal Short-Term Rate is the rate published monthly by the Internal Revenue Service pursuant to Section 1274(d) of the Internal Revenue Code. Additional interest shall be assessed for each subsequent calendar quarter until the amount is paid.

(b) Amounts shall be due at the earlier of the following dates:

(1) The date fixed under this Lease.

(2) The date of the first written demand for payment consistent with this Lease, including any demand resulting from a default cancellation.

(c) Notwithstanding the provisions of paragraphs (a) and (b) of this Article VI, and irrespective of interest payments made by the Lessee to DOE pursuant thereto, the Realty Officer, in his sole discretion, may cancel this Lease for failure by the Lessee to pay the entire principle amount of any annual royalty, base royalty, or bid royalty within sixty (60) calendar days after payment thereof is due from the Lessee to the DOE under the terms of this Lease. Such cancellation shall be effective upon Lessee's receipt of a written notice thereof from the Realty Officer. Failure of DOE to exercise its right to cancel shall not be deemed to be a waiver thereof.

VII . USE OF SURFACE.

(a) Subject to the other provisions of this Lease, the rights granted to the Lessee herein include the right to use so much of the surface of the Property as is required for the exploration for, and development, mining, and removal of ore, including the right to erect such buildings and other structures and install such machinery and other facilities as may be required for such operations; provided, that the Lessee shall recognize existing uses and commitments in the form of grazing, timbering, Bureau of Land Management special use permits, and public recreation, and improvements such as water developments, ditches, roads, trails, pipelines, telephone,

telegraph, and power lines, fences, and rights-of-way; and Lessee shall conduct its operations so as to interfere as little as possible with such existing uses and improvements.

(b) The Property shall at all times be subject to other lawful uses heretofore or hereafter granted by the Government, through any authorized agency; provided, that such uses shall not prevent, obstruct, or unduly interfere with any right granted under this Lease.

VIII. LEASES FOR OTHER MINERALS. The granting of this Lease shall not preclude the issuance by the Government of other leases of the Property for the purposes of mining and extracting oil, gas, oil shale, coal, phosphate, potassium, sodium, sulphur, or other minerals which are or may in the future be leasable pursuant to Federal mineral leasing laws; provided, that any such leases hereafter issued shall provide that operations under such leases shall not prevent, obstruct, or unduly interfere with any right granted under this Lease.

IX. USE OF SALABLE MINERALS. No salable minerals, such as sand, gravel, or stone, found on the Property shall be used by the Lessee in its operations unless such salable minerals have been purchased from the Government under the provisions of the Materials Act of July 31, 1947, 30 U.S.C. 601, as amended, or from the owner of such salable minerals if other than the Government.

X. SECURITY AND SAFETY. The Lessee shall secure and post all areas that might reasonably be considered hazardous to the general public, including, but not limited to ore stockpile areas, loading areas, mining openings, and mine-rock waste piles, in accordance with all applicable statutes and regulations and specific requirements and stipulations set forth in Appendix "C". If necessary, the Lessee agrees to construct fences or other barriers around the perimeter of safety-hazard areas to minimize the potential for intrusion by humans, livestock, and wildlife. Radioactive materials exposed by the Lessee's operation shall be managed to ensure that the exposure of humans and ecosystems is as low as reasonably achievable.

XI. ENVIRONMENTAL REQUIREMENTS. The Lessee, at the Lessee's expense, shall comply with all applicable statutes and regulations and abide by the specific requirements and stipulations set forth in Appendix "C", which is attached hereto and hereby made a part hereof.

XII. EXPLORATION PLAN.

(a) Prior to commencing any surface-disturbing operations to explore, test, or prospect for minerals covered by this Lease, the Lessee shall file with the Realty Officer three (3) copies of a plan for the proposed exploration activities and shall obtain the Realty Officer's approval of such plan. The Exploration Plan shall be consistent with the "Notice of Intent to Conduct Prospecting Operations" (hereinafter "Notice") to be filed with the Colorado Mined Land Reclamation Board (hereinafter MLRB) in accordance with "Rule 5" of the "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended. The Exploration Plan shall include all information required by the "Notice", and in addition, must specifically include the following information:

(1) A site-specific environmental analysis;

(2) A description of specific measures to be taken to assure compliance with the requirements of Article XI "ENVIRONMENTAL REQUIREMENTS", including methods of reclamation contemplated by the Lessee; and

(3) The specific information outlined in Appendix "C" of this Lease.

(b) All Exploration Plans submitted to the Realty Officer pursuant to this Article XII and all proposed activities contained therein shall be reviewed by DOE in accordance with 10 CFR Part 1021 "National Environmental Policy Act Implementing Procedures".

(c) If preparation and filing of an Exploration Plan for the entire operation is dependent upon factors which cannot or will not be determined except during the progress of exploration activities, partial plans may be submitted and approved from time to time; provided however, that the Lessee shall not perform exploration activities not described in an approved plan.

(d) Changes may be made in the approved Exploration Plan by mutual written agreement of the Lessee and the Realty Officer. Approval is contingent upon the Lessee notifying all other appropriate agencies (as outlined in Appendix "C") of the proposed changes.

XIII. MINING PLAN.

(a) Prior to constructing any surface installation or commencing mine development on the Property, the Lessee shall file with the Realty Officer three (3) copies of a plan for the proposed mining operations and shall obtain the Realty Officer's approval of such plan. Such mining plan shall be consistent with the "Reclamation Permit Application" (hereinafter "Application") to be filed with the Colorado MLRB in accordance with "Rule 1.4" and "Rule 6" of the "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended. The Mining Plan shall include all information required by the "Application", and in addition, must specifically include the following information:

(1) A site-specific environmental analysis;

(2) A description of specific measures to be taken to assure compliance with the requirements of Article XI "ENVIRONMENTAL REQUIREMENTS", including methods of reclamation contemplated by the Lessee; and

(3) The specific information outlined in Appendix "C" of this Lease.

(b) All Mining Plans submitted to the Realty Officer pursuant to this Article XIII and all proposed activities contained therein shall be reviewed by DOE in accordance with 10 CFR Part 1021 "National Environmental Policy Act Implementing Procedures".

June 2008 DE–RO01–08LM70XXX

(c) If preparation and filing of a Mining Plan for the entire operation is dependent on factors which cannot or will not be determined except during the progress of mining activities, a partial plan may be submitted and approved from time to time; provided however, that the Lessee shall not perform mining activities not described in an approved plan.

(d) Changes may be made in the approved Mining Plan by mutual written agreement of the Lessee and the Realty Officer. Approval is contingent upon the Lessee notifying all other appropriate agencies (as outlined in Appendix "C") of the proposed changes.

XIV. PERFORMANCE BOND.

(a) Upon approval of an Exploration Plan or Mining Plan, and prior to commencing any surface-disturbing operations, the Lessee shall be required to file a suitable performance bond of not less than $_______ with satisfactory surety, payable to the United States Department of Energy, and the bond shall be conditioned upon the faithful compliance with all applicable statutes and regulations, the terms and conditions of this Lease, and any Exploration Plans and Mining Plans, including amendments and supplements thereto, which have been approved by the Realty Officer.

(b) The Realty Officer shall set the amount of the initial bond and may, from time to time, require an increase or allow a decrease in the amount of the bond, as in his judgment the circumstances may require. In determining the amount of the bond, the Realty Officer shall take into consideration all applicable statutes and regulations and the character and nature of the reclamation requirements of the Lease, including the requirements of any approved Exploration Plans and Mining Plans and partial or supplementary plans, and the estimated costs of such reclamation.

(c) The Lessee and his sureties shall be liable for any damage to the Government resulting from the Lessee's failure to complete any work required upon the expiration, relinquishment, or cancellation of this Lease.

XV. INSPECTION. The DOE reserves the right, through its officers, employees, agents, and contractors, to enter upon the Property and into all parts of any of Lessee's mines therein at all reasonable times for inspection and other purposes subject to the Lessee's standard operating procedures.

XVI. GOOD FAITH NEGOTIATIONS. At the request of the Realty Officer, the Lessee will negotiate in good faith with the DOE to reach an agreement under which the Lessee, for appropriate compensation, would correct undesirable conditions existing on the Property as a result of pre–1974 mining activities and such other conditions that may be identified from time to time by the Realty Officer. If for any reason, the Lessee is unable to perform the work required to correct such conditions in a timely manner, DOE reserves the right to contract with another entity to enter upon the Property and perform said work.

XVII. INDEMNIFICATION OF GOVERNMENT.

(a) The Government, including its employees, all tiers of contractors, agents, and authorized representatives shall not be responsible for any mechanics' or miners' liens or other liens, encumbrances, or liabilities incurred by the Lessee in connection with the operation of the Property. The Lessee assumes all responsibility for and will hold the Government harmless from any and all claims and liability of any nature arising from the operation or occupancy of the Property.

(b) The Lessee agrees to protect and indemnify the Government against any payroll taxes or contributions imposed with respect to any employee of the Lessee by any applicable law dealing with old age pensions, unemployment compensation, accident compensation, health insurance and related subjects. The Lessee also agrees, at its own cost and expense, to insure to each person employed in, about, or upon the Property the compensation provided for by law with respect to workmen's compensation and employer's liability insurance, properly safeguarding the Government, including its employees, all tiers of contractors, agents, and authorized representatives, against liability for injuries to persons, including injuries resulting in death, and loss of and damage to property in policies and amounts acceptable to the DOE and to furnish to the DOE written evidence of such insurance.

XVIII. REPORTING REQUIREMENTS.

(a) The Lessee shall provide the Realty Officer with copies of all permits and correspondence from local, state, or other Federal agencies or entities which pertain to the Lessee's activities on the Property.

(b) The Lessee shall provide to the Realty Officer, within twenty calendar days after the end of each month, an accurate record of the tonnage and $U_3O_8$ and $V_2O_5$ grades of each lot of ore delivered from the Property to a mill, buying station, or other purchaser during the previous month, including copies of all settlement sheets furnished to the Lessee for ores so delivered.

(c) The Lessee shall provide to the Realty Officer as soon as practicable after the end of each calendar quarter, the following documents, records, and/or maps:

(1) A formal (written and signed) summary of all activities conducted on the Property during such calendar quarter that, among other things, documents the Lessee's reasonable diligence required by Article IV "GENERAL PERFORMANCE REQUIREMENT".

(2) A map or maps showing the location of all exploration holes drilled on the Property during such calendar quarter, together with copies of any logs and assay records applicable to such drill holes.

(3) A mine map or maps showing the progress of mining on the Property as of the end of such calendar quarter.

(4) Lessee's estimate of the tonnage and $U_3O_8$ and $V_2O_5$ grades of all ores stockpiled on the Property as of the end of such calendar quarter.

(5) If no activity occurs on the Property during a calendar quarter, a letter submitted to the Realty Officer stating that no activity has occurred shall satisfy this reporting requirement.

(d) The Lessee further agrees to provide to the Realty Officer the results of any inspections of Lessee's mines or other facilities located on the Property, conducted by personnel of local, state, or other Federal agencies under applicable statutes and regulations. Furthermore, the Lessee agrees to notify the Realty Officer of any planned or scheduled inspections to be performed by local, state, or other federal agencies as soon as such schedule is known so that the Realty Officer may participate in said inspection if so desired.

(e) The Lessee is hereby notified that information obtained by DOE from the Lessee under this section shall be subject to the provisions of the Freedom of Information Act (5 U.S.C. 552).

XIX. TAXES. The Lessee agrees to pay when due all taxes lawfully assessed and levied pursuant to state or Federal law upon improvements, output of mines, and other interests, property, and assets of the Lessee in or upon the Property.

XX. ASSIGNMENT. The Lessee agrees that no transfer of this lease, or of any interest therein or claim thereunder, by assignment shall occur within the first 30-month period of this lease. Additionally, no transfer of this lease, or of any interest therein or claim thereunder, by assignment, sublease, operating agreement, or otherwise, shall occur unless and until approved in writing by the Realty Officer.

XXI. RELINQUISHMENT OF LEASE. This Lease may be surrendered by the Lessee upon the Lessee's filing with the DOE, and the Realty Officer's approval of, a written application for relinquishment. Approval of the application shall be contingent upon the delivery of the Property to the DOE in a condition satisfactory to the Realty Officer, in accordance with the terms of this Lease, and upon the continued liability of the Lessee to make payment of all royalty and other debts theretofore accrued and due the DOE.

XXII. CANCELLATION OF LEASE. DOE may cancel this Lease if the Realty Officer determines that the Lessee has failed to comply with any provision of this Lease including reasonable diligence. Failure of DOE to exercise its rights to cancel shall not be deemed to be a waiver thereof.

XXIII. DELIVERY OF PREMISES. At the expiration of this Lease, or upon its earlier relinquishment or cancellation as herein provided, the Lessee shall, within one hundred eighty

(180) days or other period mutually agreed to by the Lessee and Realty Officer, surrender the Property in a condition satisfactory to the Realty Officer, and shall, unless otherwise directed by the Realty Officer in writing, remove from the Property at Lessee's expense all structures, machinery, equipment, tools, and improvements placed thereon by the Lessee; provided, that the Lessee shall not remove any timbers or improvements which are determined by the Realty Officer to be required to be left in the mine workings to protect such workings as a mining property. Furthermore, prior to the surrender of the Property, the Lessee shall remove from the Property at Lessee's expense all stockpiles of ore and/or protore materials placed thereon by the Lessee and remit the required royalties to DOE in accordance with Article V "ROYALTIES" and Appendix "B". Otherwise, the Lessee shall at the Lessee's expense return all stockpiles of ore and/or protore materials to a suitable location within the underground mine workings on the Property or other location on the Property as designated by the Realty Officer.

XXIV. EXAMINATION OF RECORDS.

(a) The DOE and the Comptroller General of the United States or duly authorized representatives of either shall, until three (3) years after final payment under this Lease, have access to and the right to examine any of the Lessee's directly pertinent books, documents, papers, or other records involving transactions related to this Lease. The Lessee shall make these records and documents available to the Government, at the Lessee's offices, at all reasonable times, without any charge.

(b) The Lessee agrees to include in first-tier subcontracts under this Lease a clause to the effect that the DOE or the Comptroller General or duly authorized representatives of either shall, until three (3) years after final payment under the subcontract, have access to and the right to examine any of the subcontractor's directly pertinent books, documents, papers, or other records involving transactions related to the subcontract.

(c) The periods of access and examination in paragraphs (a) and (b) above for records relating to (1) appeals under Article XXVII "DISPUTES", (2) litigation or settlement of claims arising from the performance of this Lease, or (3) costs and expenses of this Lease to which the DOE or the Comptroller General or duly authorized representatives of either has taken exception shall continue until such appeals, litigation, claims, or exceptions are disposed of.

XXV. OFFICIALS NOT TO BENEFIT. No member of or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this Lease, or to any benefit arising from it. However, this clause does not apply to this Lease to the extent that this Lease is made with a corporation for the corporation's general benefit.

XXVI. COVENANT AGAINST CONTINGENT FEES. The Lessee warrants that no person or selling agency has been employed or retained to solicit or secure this Lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Lessee for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to cancel this Lease without liability, or in its

June 2008 DE–RO01–08LM70XXX

discretion to require the Lessee to pay to DOE the full amount of such commission, percentage, brokerage, or contingent fee.

XXVII. DISPUTES.

(a) Except as otherwise provided in this Lease, any dispute concerning a question of fact arising under this Lease which is not disposed of by agreement shall be decided by the Realty Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Lessee. The decision of the Realty Officer shall be final and conclusive unless within 30 days from the date of receipt of such copy, the Lessee mails or otherwise furnishes to the Realty Officer a written appeal addressed to the DOE. The decision of the DOE for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Lessee shall be afforded an opportunity to be heard, and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Lessee shall abide by the Realty Officer's decision.

(b) The provisions of paragraph (a) above does not preclude consideration of questions of law; provided, that nothing in this Lease shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

XXVIII. HEIRS AND SUCCESSORS-IN-INTEREST. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

XXIX. MEMORANDUM FOR RECORDING. If the Lessee so requests, the parties agree to execute a mutually agreeable written memorandum of even date herewith sufficient to be entitled to be recorded under the laws of the State of Colorado, reciting that all of their right, title, and interest in and to the Property is held subject to this Lease, and that DOE has reserved the royalties described in this Lease, which memorandum Lessee may place of record in the appropriate County. Upon termination of this lease, lessee agrees to execute documentation, which will also be recorded appropriately, showing the lease has terminated.

XXX. NOTICE. Any notice, election, report, or other correspondence ("Documents") required or permitted hereunder shall be in writing and shall be addressed to the party to whom directed as follows:

(a) If to Lessee:

Company Name

Address (for US Mail **and** parcel delivery)

City, State, Zip Code

Attention:

Telephone:

Facsimile:

(b) If to DOE:

U.S. Department Of Energy

11025 Dover Street, Suite 1000

Westminster, CO 80021-5573

Attention: Steven R. Schiesswohl, Realty Officer

Telephone: (720) 377–9683

Facsimile: (720) 377–3829

Time-sensitive Documents shall be (i) sent by registered or certified United States mail, postage prepaid, return receipt requested; (ii) sent by a reputable overnight courier, or (iii) sent by facsimile transmission with confirmation of receipt. All other Documents can be delivered or sent as indicated above, or may be sent by regular United States mail.

Either party may, from time to time, change its address for the delivery of future documents hereunder by notice in accordance with this Section XXX. Except as provided for royalty payments in Appendix "B" paragraph (g), all documents generated in accordance with this Lease shall be deemed complete and effective on the date that the document was issued.

XXXI. SURVIVAL. The following shall survive termination of this Lease: Articles V, VII (a), X, XI, XIV, XV, XVII, XVIII, XIX, XXII, XXIII, XXIV, and XXX and the Appendices.

June 2008 DE–RO01–08LM70XXX

IN WITNESS WHEREOF, the parties hereto have executed this Lease, effective as of the date first above written, intending to be legally bound thereby.

UNITED STATES OF AMERICA
UNITED STATES DEPARTMENT OF ENERGY ______________________________ (LESSEE)

| | |
|---|---|
| By ______________________________ | By ______________________________ |
| Title ______ Realty Officer ______ | Title ______________________________ |
| Date ______________________________ | Date ______________________________ |

June 2008 DE–RO01–08LM70XXX

APPENDIX A

DESCRIPTION OF LEASED PROPERTY

The leased Property described herein was referred to as "MINING LEASE NO. AT(05–1)–ML–60.8–C–X–X" during the period from 1974 to the enactment of this Lease.

*Lease-specific legal description will be inserted here.*

June 2008 DE–RO01–08LM70XXX

APPENDIX B

ROYALTIES

(a) At the beginning of each lease year during the term of this Lease, there shall become due and payable to the DOE an annual royalty of $_______. Annual royalties paid pursuant to this article shall be credited against royalty bid payments which become payable during the term of this Lease. Annual royalties so paid shall not be refunded upon the expiration, relinquishment, or cancellation of this Lease.

(b) The Lessee agrees to pay to the DOE a royalty bid payment, per dry ton of ore delivered from the Property to a mill or other receiving station, in the amount of _________ percent (__%) of the value per dry ton, determined as provided in paragraph (g) of this Appendix "B". This royalty shall apply to all ores produced from the Property during the term of this Lease.

(c) Unless otherwise authorized by DOE in writing, all ores mined from the Property shall be stockpiled on the Property until such time as they are delivered to a mill or other receiving station.

(d) With respect to ores which are mined from the Property and delivered to a mill or other receiving station which is owned or controlled by the Lessee, the Lessee agrees to make royalty bid payments, for all lots of such ore assayed or fed to process during each calendar month, within twenty (20) calendar days after the end of such calendar month. Such royalty bid payments shall be treated as provisional payments with respect to any lot of ore for which the DOE requests an umpire assay, and an appropriate adjustment shall be made in the first royalty bid payment following Lessee's receipt of the results of such umpire assay for such lot of ore.

(e) With respect to ores which are mined from the Property and delivered to a mill or other receiving station not owned or controlled by the Lessee, the Lessee agrees:

(1) That the DOE may receive royalty bid payments directly from the owner or controller of the mill or other receiving station to which such ores are shipped by the Lessee if the DOE makes arrangements therefore satisfactory to the Lessee.

(2) That, in the absence of such arrangements, the Lessee shall make royalty bid payments for all lots of such ore assayed or fed to process (includes delivery of such ore to an ore-buying station or sample plant) during each calendar month, within twenty (20) calendar days after payment for such lots is mailed to the Lessee; provided, that an appropriate extension of such twenty (20) day period shall be granted by the Realty Officer for any undue delay in the mails which causes a delay in delivery to the Lessee of payment for such lots of ore. Such royalty bid payments shall be treated as provisional payments with respect to any lot of ore for which DOE requests an umpire assay, and an appropriate adjustment shall be made in the first royalty bid payment following finalization of payment to the Lessee for such ore.

June 2008 DE–RO01–08LM70XXX

(f) Royalty bid payments due the DOE shall be deemed to have been made when received at the DOE Legacy Management Office in Grand Junction, Colorado.

(g) DOE shall establish the prices for uranium and vanadium that shall be used to calculate the fair-market value of lease tract ores. These prices shall be established on a quarterly basis, on or before the twentieth (20th) day after the end of the previous calendar quarter (in January, April, July, and October), and shall remain in effect during the calendar quarter in which they are established. DOE shall establish these prices as follows:

(1) Using an electronic spreadsheet, DOE shall monitor, record, and track the spot-market and long-term-market prices for uranium (quoted as dollars per pound $U_3O_8$) as reported weekly in *$U_x$ Weekly*. The spreadsheet will then (i) automatically calculate the monthly and quarterly arithmetic average prices for uranium (both spot-market and long-term-market), and (ii) automatically calculate a quarterly weighted-average price for uranium by applying the appropriate purchase contract percentages to the respective quarterly average prices. Using this spreadsheet, DOE shall also monitor, record, and track the Total Purchased (Weighted-Average Price) for uranium as reported annually by the Energy Information Administration in Table S1b. *Weighted-Average Price of Uranium Purchased by Owners and Operators of U.S. Civilian Nuclear Power Reactors (quoted as Dollars per Pound $U_3O_8$ Equivalent)*. The spreadsheet will then automatically calculate the arithmetic average between the quarterly weighted-average price for uranium and the Total Purchased (Weighted-Average Price) for uranium. The resulting figure is reported as the annualized quarterly weighted-average price for uranium.

(2) Using the same electronic spreadsheet, DOE shall monitor, record, and track the market price of vanadium (quoted as dollars per pound $V_2O_5$) as reported twice weekly in *Metal Bulletin (Non-Ferrous Primary Metals, Noble Alloys and Ores, Vanadium pentoxide)*. The spreadsheet will then (i) automatically calculate the monthly and quarterly arithmetic average prices for vanadium, and (ii) automatically apply an adjustment factor of one-half (0.5) to each quarterly arithmetic average price for vanadium. The resulting figure is reported as the adjusted quarterly average price for vanadium.

(3) Paragraphs (g)(1) and (g)(2) can be summarized by the following three equations:

$$U = (Q_{WA} + TP_{WA}) / 2 \qquad (1)$$

where:

$U$ = Annualized Quarterly Weighted-Average Price for Uranium

$Q_{WA}$ = Quarterly Weighted-Average Price for Uranium

June 2008 DE–RO01–08LM70XXX

$TP_{WA}$ = Total Purchased (Weighted-Average Price) for Uranium

$$Q_{WA} = Q_{SM} * P_{SM} + Q_{LTM} * P_{LTM} \quad (2)$$

where:

$Q_{SM}$ = Quarterly Arithmetic Average Price for the Uranium Spot Market

$P_{SM}$ = Purchase Contract Percentage for the Uranium Spot Market

$Q_{LTM}$ = Quarterly Arithmetic Average Price for the Uranium Long Term Market

$P_{LTM}$ = Purchase Contract Percentage for the Uranium Long Term Market

$$V = Q_{WA} * 0.5 \quad (3)$$

where:

V = Annualized Quarterly Weighted-Average Price for Vanadium

$Q_{WA}$ = Quarterly Weighted-Average Price for Vanadium

(h) The Lessee shall be notified of these prices (annualized quarterly weighted-average price for uranium and adjusted quarterly average price for vanadium) by formal written correspondence. The Lessee shall use these prices to calculate the fair-market value of the ore in dollars per dry ton (calculated to the nearest cent [$0.01]), for all lots of such ore assayed during any calendar month. This fair-market value shall be determined by:

(1) Computing the number of recoverable pounds of contained $U_3O_8$ and $V_2O_5$ per dry ton of ore in the lots so assayed by (i) multiplying the total number of pounds of $U_3O_8$ and $V_2O_5$, respectively, contained in the lots of ore so assayed during such calendar month, by factors of 0.96 and 0.79, respectively (the average milling facility's recovery rates for $U_3O_8$ and $V_2O_5$, respectively, as acknowledged by DOE) and (ii) dividing each of the resulting numbers by the

total number of dry tons of ore contained in the lots so assayed during such calendar month, and carrying the results to three decimal places for $U_3O_8$ and two decimal places for $V_2O_5$; and

(2) Adding together the dollar amounts obtained by (i) multiplying the number of recoverable pounds of $U_3O_8$ per dry ton of ore in the lots so assayed by the price per pound of $U_3O_8$ established by DOE and (ii) multiplying the number of recoverable pounds of $V_2O_5$ per dry ton of ore in the lots so assayed by the price per pound of $V_2O_5$ established by DOE.

(i) For ores that have been mined from the Property and delivered to a mill or other receiving station, but not assayed or fed to process, the Lessee shall estimate the value of said ores using standard industry practices, and shall make royalty bid payments to DOE equal to or greater than 95 percent (95%) of the estimated value of the royalty bid payments due to DOE. Such royalty bid payments shall be treated as provisional payments with respect to said ores until such time that said ores are assayed or fed to process and the final royalty bid payments due to DOE are calculated and final royalty bid payments are made.

(j) If price quotations for vanadium pentoxide become unavailable, the DOE and the Lessee will negotiate to establish a method of determining an appropriate market price per pound of $V_2O_5$ to be used in determining that portion of the value per dry ton of ore attributable to vanadium. Pending agreement on such method, the last prices established by paragraph (g)(2) above shall be used in determining the portion of the value per dry ton of ore attributable to vanadium, for the purpose of computing royalties under this Lease. If the parties fail to reach agreement on an applicable method, the matter shall constitute a dispute to be decided in accordance with the Article XXVII "DISPUTES" of this Lease.

(k) The parties hereto agree that if the Lessee is paid for any constituent, other than uranium or vanadium, contained in ores mined from the Property, all amounts so paid shall be held in trust by the Lessee for the DOE until the Lessee and the DOE agree upon a base royalty to be paid to the DOE with respect to Lessee's sale of such constituent.

(l) Consistent with Article XXIII "DELIVERY OF PREMISES", the Lessee agrees, that within one hundred eighty (180) days following the expiration, relinquishment, or termination of this Lease as herein provided, all royalties associated with this Lease (annual royalty, base royalty, and bid royalty) shall become due and payable to the DOE. For ores that have been mined from the Property, but not assayed or fed to process, the Lessee shall estimate the value of said ores using standard industry practices, and shall make royalty bid payments to DOE equal to or greater than 95 percent (95%) of the estimated value of the royalty bid payments due to DOE. Such royalty bid payments shall be treated as provisional payments with respect to said ores until such time that said ores are assayed or fed to process and the final royalty bid payments due to DOE are calculated and royalty bid payments are made.

June 2008 DE–RO01–08LM70XXX

WEIGHING, SAMPLING, AND ASSAYING.

With respect to ores which are mined from the Property and delivered to a mill or other receiving station, the Lessee agrees to the following provisions:

(a) The Lessee shall weigh, or cause to be weighed, each lot of ore delivered from the Property to a mill or other receiving station and shall furnish the DOE a record of the weight of such lot. The scales used in weighing such ore shall be balanced daily and checked once each week or more often, as appears necessary, by either standard weights or by check-weighing against another scale. Scale platforms will be kept clean and free of the sides of the pit, and the scales shall be inspected and certified every six months by the appropriate entity of the state in which the mill or receiving station is located, if such inspection is available; otherwise, a biannual inspection shall be made by a competent organization which is acceptable to both the Lessee and the DOE.

(b) The Lessee shall sample, or cause to be sampled, each lot of ore according to standard and accepted practices in ore sampling, and such sampling shall be final and binding on both parties to this Lease. The DOE or its representative may be present at the sampling of such ore. The Lessee shall ensure that moisture determinations are made according to standard practices in ore sampling. The Lessee shall ensure that each final sample is divided into four (4) pulps, one of which shall be promptly furnished to the DOE, one of which shall be retained by the Lessee for assay purposes, and two of which shall be held in reserve by the Lessee for possible umpire analysis. The Lessee shall promptly assay, or cause to be assayed, its pulp for $U_3O_8$ and $V_2O_5$ content and shall transmit the assay results to the DOE, together with weight and moisture certificates for the lot sampled. For the purpose of such reporting, all assays for $U_3O_8$ shall be adjusted to the nearest 0.001% and all assays for $V_2O_5$ shall be adjusted to the nearest 0.01%.

(c) The DOE may assay its pulps at its own expense. In case of disagreement with the Lessee's assay with respect to either $U_3O_8$ or $V_2O_5$ content, the DOE may, within 30 calendar days after receiving its pulp, mail to the Lessee a written request for an umpire assay. Upon receipt of such written request, the Lessee shall promptly submit one of the pulps held in reserve to an assayer, whom the parties hereto shall agree upon, for umpire assay. With respect to both $U_3O_8$ and $V_2O_5$ content, if the assay of the umpire is within the assays of the two parties, it shall be final. If not, the assay which is nearer to that of the umpire shall prevail. The party whose assay for $U_3O_8$ is further from that of the umpire shall pay the cost of the umpire's assay. In the event that the umpire's assay for $U_3O_8$ is equally distant from the assay of each party, the cost shall be split equally.

(d) The quantity of ore comprising a lot, as used herein, shall be determined by the Lessee, except that no lot shall exceed one thousand (1,000) tons of ore except as otherwise agreed in writing by the Realty Officer.

June 2008 DE–RO01–08LM70XXX

APPENDIX C

SPECIFIC REQUIREMENTS AND STIPULATIONS

The Lessee agrees to comply with all applicable statutes and regulations, including but not limited to the following items:

(a) Prior to resuming operations on the Property that were previously approved by DOE, the Lessee shall notify the Realty Officer in writing of its intentions to resume such operation and shall include any changes, additions, or modifications to the original plan that are now proposed. Upon receipt of such notification, the Realty Officer shall review the approved plan along with any new information provided by the Lessee and determine if additional stipulations are warranted. When all pertinent requirements are satisfied, DOE shall provide the Lessee with a written approval to proceed.

(b) All existing serviceable improvements such as fences, gates, cattle guards, roads, trails, culverts, pipelines, bridges, and water development and control structures, authorized for use by the Lessee, shall be maintained in serviceable condition by the Lessee. Improvements damaged or destroyed by the Lessee's operations shall be replaced, restored, or compensated for by the Lessee.

(c) The Lessee's operations shall not disturb public land survey corner markers or monuments or Atomic Energy Commission (AEC) survey markers without the prior written approval of the Realty Officer. Additionally, the Lessee shall pay all costs associated with the surveys required to preserve or reestablish the true point of any such marker or monument and the replacement of such marker or monument.

(d) Housing and other buildings and support facilities related to community development shall be constructed or located on the Property only upon the prior written approval of the Realty Officer. In constructing and locating such housing, other buildings, and support facilities, the Lessee shall comply with applicable county planning and zoning regulations, subdivision regulations, and mobile home regulations, and shall furnish evidence of such compliance to the Realty Officer upon request.

(e) Prior to any surface disturbing activity, the Lessee shall file a "Notice of Intent to Conduct Prospecting Operations" (Notice) or "Reclamation Permit Application" (Application), whichever is appropriate, with the Colorado Mined Land Reclamation Board (MLRB) in accordance with "Mineral Rules and Regulations" of the Colorado MLRB, as these rules may be amended. All subsequent modifications to the Notice or Application shall be addressed in accordance with the "Mineral Rules and Regulations" of the Colorado MLRB. The Lessee shall provide the Realty Officer with copies of all pertinent approval documentation including permits issued.

(f) Prior to any surface disturbing activity, the Lessee shall consult with the U.S. Department of Interior—Bureau of Land Management (BLM), the U.S. Department of Interior—

Fish and Wildlife Service (USFWS), and/or the Colorado Department of Natural Resources—Division of Wildlife (CDOW), as appropriate, to determine whether threatened or endangered, or sensitive plant or wildlife species occur in the area to be disturbed or whether the agencies have other plant or wildlife concerns in the area to be disturbed. If required, the Lessee shall conduct surveys or provide other documentation to resolve this concern. The Lessee shall provide the Realty Officer with copies of all documents pertaining to this issue.

(g) Prior to any surface disturbing activity, the Lessee shall perform a cultural and historical survey of the area to be disturbed. If cultural or historical resources are found to exist, the Lessee shall consult with the State Historical Preservation Officer for the appropriate measures to be taken. If required, the Lessee shall prepare a mitigation plan to address the protection of the cultural or historical resources. The Lessee shall provide the Realty Officer with copies of all documents pertaining to this issue.

(h) Prior to any surface disturbance activity in a potential floodplain or wetland area, the Lessee shall consult with the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, and the appropriate state agency to determine whether a jurisdictional floodplain or wetland exists in the area to be disturbed. If required, the Lessee shall prepare a Floodplain/Wetlands Assessment that proposes mitigation measures to be taken to resolve this concern. The Lessee shall provide the Realty Officer with copies of all documents pertaining to this issue.

(i) The Lessee shall use existing roads where practicable, and shall conduct activities employing wheel or track vehicles in such a manner as to minimize surface damage. The Lessee shall wash all tracked vehicles or equipment prior to their being mobilized to the Property. The Lessee shall promptly repair any road damage resulting from the Lessee's operations, restoring such road to its previous condition or to a condition acceptable to the Realty Officer. Where existing access roads across the Property are used principally by the Lessee, the Lessee shall construct surface-water control and drainage structures (culverts, water bars, or grade dips) on such roads to minimize erosion. Plans for such structures shall be included in all Exploration Plans and Mining Plans submitted to the Realty Officer pursuant to Articles XII "EXPLORATION PLAN" and XIII "MINING PLAN" hereof, respectively. The Lessee shall construct new roads and trails on the Property only at locations and to specifications approved in advance in writing by the Realty Officer or an authorized representative of the Realty Officer, and shall construct and maintain such roads and trails in a manner that will minimize channeling and other erosion. The Realty Officer's approval of plans for new access road construction, culverts, water bars, or grade dips will be guided by standards established by BLM or the U.S. Department of Agriculture—Forest Service (USFS), where appropriate.

(j) The Lessee shall conduct all operations so as to protect all natural resources and the environment including streams, lakes, ponds, waterholes, seeps, and marshes, and protect fish and wildlife resources as required by applicable statutes and regulations. The Lessee shall control all mine wastes, contaminants and pollutants, and sediments associated with stormwater runoff in accordance with existing regulations, and shall comply with all environmental regulations regarding discharge into, or degradation of water resources including streams,

June 2008 DE–RO01–08LM70XXX

springs, stock waters, or groundwater. The Lessee shall not use water from any water source without the written consent of the person having the rights to the use of such water source.

(k) Lessee shall keep the clearing of timber, stumps and snags, and any ground cover to a minimum consistent with the conduct of exploration, development, and mining activities approved hereunder. The Lessee shall abide by any restrictions concerning the bulk removal of vegetation (primarily piñon pine) that are established by the Realty Officer. The Lessee shall use due care to avoid scarring or removal of vegetative ground cover in areas not involved in such operations. Open parks (areas where there is a grass, shrub, and/or sagebrush cover) shall be disturbed as little as possible. If the shrub or brush cover is too high and must be cleared, it shall be cleared at or above ground level. The Lessee shall return all disturbed areas to their original condition or a condition acceptable to the Realty Officer promptly after damage to such areas has occurred and operations under this Lease are no longer being conducted in the disturbed areas.

(l) The Lessee agrees that all underground mine openings shall be supported by pillars, timber, or other ground support devices approved by the Federal or state agencies having jurisdiction over such underground workings. The Lessee further agrees, during the term of this Lease, to substantially fence or permanently close all mine openings/portals, subsidence holes, surface excavations, or other workings resulting from the Lessee's operation that may be considered hazardous to human health or the environment. Such protective measures shall be maintained in a proper and safe condition during the term of this Lease. Prior to abandoning operations, the Lessee shall submit a mine-site reclamation plan to the Realty Officer for approval. Such plan shall include the proposed method(s) of permanent closure for all mine openings/portals including shafts, adits, inclines/declines, ventilation shafts, and water discharge points. No underground workings or any part thereof shall be permanently abandoned and rendered inaccessible without the prior written approval of the Realty Officer. All mine-site reclamation shall be performed to the satisfaction of the Realty Officer in accordance with the approved reclamation plan.

(m) Surface drill holes and associated disturbances resulting from exploration or development activities shall be abandoned in accordance with existing regulations and in a manner that will protect the surface. All disturbed areas identified by the Lessee as not being needed for future operational activities shall be promptly reclaimed by the Lessee. The Realty Officer, by written notice to the Lessee, shall designate any other areas where reclamation must be undertaken as a result of disturbances caused by the Lessee's operations.

(n) If antiquities or other objects of historic or scientific interest, including but not limited to historic or prehistoric features or ruins, artifacts, or vertebrate fossils are discovered by the Lessee in the performance of operations under this Lease, the Lessee shall cease operations in the vicinity of such discovery and immediately take appropriate steps to protect and save such objects of historic or scientific interest and shall notify the Realty Officer of such discovery. The Realty Officer shall assess the values involved and prescribe such protective measures as deemed necessary.

(o) The Lessee shall make every effort to prevent, control, or suppress any fire in the operating area and to report any uncontrolled fire to the appropriate BLM or USFS official, as designated by the Realty Officer.

(p) The Lessee shall provide detailed haul route information to the Realty Officer for review prior to commencement of any haul activities. The haul route information shall include, at a minimum, expected routes from the mine site to the proposed mill or other facility accepting material from the mine, expected number of trucks per day, size and approximate weights of the ore being shipped, and expected production rates and mining life timeframes. It is expected that the Lessee will utilize only the specified routing. The lessee shall notify the Realty Officer of any significant changes to the haul route plan.

(q) The Lessee shall comply with Colorado State Access Code Section 43-2-147(4), C.R.S., and Section 24-4-103., C.R.S., effective 8/31/98. Pursuant to said code, the Lessee may be required to participate in a Highway Access Pre-Consultation meeting with DOE and the Colorado Department of Transportation after the completion and submittal to DOE of the approved permit from the Colorado MLRB. The details provided within the Mining Plan and permit, and the information provided under paragraph (p) above shall be used to determine the need for the Pre-Consultation meeting and to determine the potential impacts to county and state roads, highways and intersections from the Lessee's operations, and any resulting mitigation requirements from these impacts. Any revisions or amendments to the permit, or any conversion from one permit type to another approved by the Colorado MLRB shall also be provided to the Realty Officer. The permit revision, modification or conversion may be used to determine any additional impacts to the county roads or state highways from the Lessee's operations, and any resulting mitigation requirements from these additional impacts. Access permits required under this requirement shall be provided to the Realty Officer.

(r) The Lessee shall attend and participate in meetings between DOE and other Federal, state, and local agencies, as required.

June 2008 DE–RO01–08LM70XXX

EXPLORATION PLAN FORMAT

It is not DOE's intent to require the Lessee to prepare multiple documents for submittal to the appropriate agencies for review and approval. Consequently, at the Lessee's discretion, a copy of the "Notice of Intent to Conduct Prospecting Operations" filed with the Colorado MLRB may be submitted to DOE for review and approval. That document will meet DOE's requirement for submittal of an Exploration Plan providing it contains, at a minimum, the following information:

a. Map showing general area to be explored

   1. Tentative location of drill holes or other exploration activity

   2. Location of roads (existing and proposed)

b. Approximate starting date and duration of drilling

c. Drilling information

   1. Type of drilling and/or other exploration equipment

   2. Size of hole and core, if any, to be recovered

   3. Type of logging

   4. Target horizon and depth

d. Road construction necessary for exploration

   1. Location of roads and drill sites

   2. Measures to be taken for erosion control

e. Abandonment

   1. Procedures for plugging drill holes including the disposition of drill hole cuttings

   2. Surface restoration (grading, revegetation, erosion control measures, etc.)

f. Provisions made to conform with existing state and federal regulations regarding control of fire, pollution of water and air, protection of other natural resources, and public health and safety, both during and upon abandonment of exploration activities

g. Specific measures to be taken to assure compliance with environmental and surface use stipulations of this Lease including the preparation of a site-specific environmental document that assures compliance with NEPA and other environmental regulations.

June 2008 DE–RO01–08LM70XXX

MINING PLAN FORMAT

It is not DOE's intent to require the Lessee to prepare multiple documents for submittal to the appropriate agencies for review and approval. Consequently, at the Lessee's discretion, a copy of the "Reclamation Permit Application" filed with the Colorado MLRB may be submitted to DOE for review and approval. That document will meet DOE's requirement for submittal of a Mining Plan providing it contains, at a minimum, the following information:

a. Map showing location of:

   1. Ore body and proposed entry

   2. Any new roads required

   3. Mine plant and associated structures and facilities

   4. Waste dumps and ore storage areas

b. Mining

   1. Initial development plans

      A. Type of entry and haulage method proposed

      B. Stoping method

      C. Estimated rate of daily ore production and mine-life expectations

      D. Provisions to handle mine water

   2. Proposed ventilation and radiation control methods

c. Surface Plant

   1. Buildings, utility lines, and storage/stockpile areas

   2. Sewage and refuse disposal

   3. Compliance with any applicable county planning and zoning regulations

   4. Compliance with EPA stormwater discharge regulations

d. Surface restoration plans

   1. Topsoil removal and storage

   2. Grading and backfilling

3. Control of stormwater runoff

4. Revegetation (if required)

e. Abandonment

1. Permanent closure of all mine openings/portals resulting from, or utilized during, the Lessee's operations.

2. Removal of structures and associated features

3. Disposition of mine wastes (contouring, leveling, use for backfill, etc.)

f. Provisions made to conform with existing state and federal regulations regarding control of fire, pollution of water and air, protection of other natural resources, and public health and safety, both during and upon abandonment of mining activities.

g. Specific measures to be taken to assure compliance with environmental and surface use stipulations of the Lease including the preparation of a site-specific environmental document that assures compliance with NEPA and other environmental regulations.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 256 of 426

*Final ULP PEIS* *Appendix A: Examples of Existing Leases for the ULP*

June 2008 DE–RO01–08LM70XXX

*This page intentionally left blank*

*A-54* *March 2014*

BLM_0042830

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 257 of 426

**APPENDIX B:**

**SUMMARY OF THE PUBLIC SCOPING PROCESS FOR THE ULP PEIS**

BLM_0042831

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 258 of 426

*This page intentionally left blank*

BLM_0042832

# APPENDIX B:

# SUMMARY OF THE PUBLIC SCOPING PROCESS FOR THE ULP PEIS

## B.1 INTRODUCTION AND BACKGROUND

The U.S. Department of Energy (DOE) issued the Notice of Intent (NOI) to prepare the Uranium Leasing Program (ULP) Programmatic Environmental Impact Statement (PEIS) on June 21, 2011 (see Volume 76 of the *Federal Register:* 76 FR 36098). It issued a supplemental notice on July 21, 2011 (76 FR 43678) that announced four public scoping meetings and extended the scoping period through September 9, 2011.

The issuance of the NOI marked the start of the National Environmental Policy Act (NEPA) process for the ULP PEIS that includes opportunities for public participation. This appendix presents a summary of the comments that were received during the scoping period of June 21 through September 9, 2011, for consideration in preparing the Draft PEIS. All comments, regardless of how they were submitted, were given equal consideration in the development of this Draft ULP PEIS.

## B.2 SCOPING PROCESS

The NOI and the supplemental notice identified three methods by which the public could provide scoping comments or suggestions for the scope of the ULP PEIS:

- In person at public scoping meetings;
- By electronic mail (e-mail) and regular mail; and
- By electronic comment submittal through the project web site.

DOE conducted scoping meetings for the ULP PEIS at the four locations and on the dates shown in Table B-1. The number of people who attended these meetings is also presented in Table B-1. Meetings were held in Montrose, Naturita, and Telluride, Colorado, and in Monticello, Utah. Each meeting started at 5:30 with registration to provide oral comments, and a brief presentation was given by DOE at 7:00 p.m. In addition to presenting oral comments at the scoping meetings, stakeholders could also e-mail comments, send comments by mail, or could fill out a comment form at the scoping meetings or on the project web site (http://ulpeis.anl.gov/).

During the scoping period, a total of 287 unique comment documents were received from individuals, organizations, and government agencies that addressed the scope of the ULP PEIS. A “comment document” can be a written document (web form or comment form that was distributed at the scoping meetings or by mail), an e-mail submission, or an oral presentation given during a scoping meeting that provides comments on the scope and content of the ULP PEIS. A single comment document may contain multiple comments on one or more issues. There were 61comment documents provided through the scoping meetings, 164 e-mails and letters, and

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 260 of 426

62 comment forms submitted through the project web site. Among the 287 comment documents received, 8 were from Federal, state, or local government agencies; and the remainder were from individuals or other organizations. Comment documents were received from 13 states; however, approximately 88% of the comments were from Colorado communities or communities near the DOE ULP lease tracts.

## B.3 SUMMARY OF SCOPING COMMENTS

All public scoping comments were reviewed and considered in determining the scope for this Draft ULP PEIS. Table B-2 summarizes the public scoping comments that were considered to be within the scope of the Draft ULP PEIS. Those that were considered outside the scope are summarized in Table B-3. The rationales for the determinations are also presented in both tables.

**TABLE B-1 Public Scoping Meeting Locations, Dates, and Attendance**

| Location | Date | No. in Attendance |
|---|---|---|
| Montrose, Colorado | August 8, 2011 | 65 |
| Telluride, Colorado | August 9, 2011 | 85 |
| Naturita, Colorado | August 10, 2011 | 51 |
| Monticello, Utah | August 11, 2011 | 1 |
| Total | | 202 |

BLM_0042834

**TABLE B-2 Public Scoping Comments Considered To Be Within the Scope of the ULP PEIS**

| Public Scoping Comment | Rationale |
|---|---|
| **1. Alternatives** | |
| 1A. Support for Alternative 1. | Alternative 1 is included in the range of reasonable alternatives that are evaluated in the Draft PEIS. Under this alternative, all the existing leases (there are 29) would be terminated, and reclamation would be completed on disturbed areas that remained on the lease tracts. DOE would continue to manage the withdrawn land but would not lease the land for uranium mining. |
| 1B. Support for Alternative 5 because uranium is a clean nuclear energy source that can be mined safely. Some commenters urged DOE to continue the leasing program as it was before the preparation of the PEIS, arguing that companies and individuals should have the right to mine and produce uranium and vanadium just as companies extract coal and other resources such as natural gas. | Alternative 5 is included in the range of reasonable alternatives that are evaluated in the Draft PEIS. Under this alternative, all 31 lease tracts are evaluated for potential exploration, mine development and operations, and reclamation. The 29 leases that were signed in 2008 would have expired in 2018, but these leases have been placed on hold for the duration that it would take to complete this PEIS. The leases would be extended for a duration equivalent to the time taken to complete the PEIS (e.g., if 3 years were added, the end date for the leases would be 2021). |
| 1C. Alternatives should include these: maintaining current withdrawals without issuing leases; expanding the lease program without issuing leases; issuing leases only on the previously active tracts for the purpose of reclamation; issuing fewer leases requiring interim reclamation; and requiring additional lease stipulations for protection of public lands. | Currently, 29 leases exist (this has been the case since 2008); however, a situation in which current withdrawals would be maintained without issuing leases would occur under Alternative 1. Reclamation that was needed and terminations of the 29 existing leases would also be done as part of Alternative 1. Current leases include adequate stipulations providing appropriate protection of public lands. |
| 1D. An Alternative that stipulates protection of the Dolores River and San Miguel River watersheds. Lease tracts in the Dolores River Canyon should be withdrawn from the ULP (i.e., Slick Rock Lease Tracts 13, 13A, and 14). | Leases for Lease Tracts 13 and 13A have been in existence since 1974 and still currently exist. Lease Tract 14 (Tracts 14-1, 14-2, and 14-3) is not presently leased. Future uranium mines on all three lease tracts would be expected to be at least 0.25 mi (0.40 km) from the Dolores River. As discussed in the rationale for 1C, Alternative 1 would result in the existing leases being terminated and the currently withdrawn lands being maintained by DOE without leasing for uranium mining. |
| 1E. An Alternative to keep the lease tracts in place but to prohibit any further mining or exploration until reclamation has been completed on existing or old leases. | DOE believes that the range of reasonable alternatives evaluated in the Draft PEIS addresses this concern. Under Alternatives 1 and 2, the existing leases would be terminated, and reclamation would be conducted. In addition, all legacy mine sites located on the DOE lease tracts have been reclaimed. |
| 1F. Vacate all leases and re-bid them with both a royalty component and a performance-based component. | DOE's ULP incorporates a royalty component that is inherently performance-based. The option of terminating all leases is incorporated in Alternatives 1 and 2. |

**TABLE B-2 (Cont.)**

| Public Scoping Comment | Rationale |
|---|---|
| **2. Impact Analysis** | |
| 2A. Cultural resources must be adequately studied, documented, and protected. DOE is encouraged to work closely with local Native Americans familiar with surrounding anthropological resources and cultural artifacts. Archaeological surveys should be conducted where future mining and disturbances might occur, and all recorded sites must be evaluated for significance. An antiquities preservation plan should be prepared for unavoidable impacts. | The analysis of cultural resources discussed in the Draft PEIS for the five alternatives evaluated addresses this concern. DOE initiated government-to-government consultation with six tribes. The status of these consultations to date is summarized in Chapter 6 of the Draft PEIS. The Draft PEIS does identify archaeological surveys to be conducted on a project-specific basis as exploration and mine development plans are submitted to DOE for approval. The preparation of an antiquities preservation plan and other plans would be done consistent with appropriate requirements. |
| 2B. Consider negative impacts on tourism, recreation, and property values, and the overall impact on the local economy and land use in surrounding communities. There is concern that uranium mining could create a boom-and-bust economy. | The impacts analysis in Chapter 4 for socioeconomics addresses this concern. |
| 2C. Estimate the number and types of jobs to be created under each alternative, and how each alternative might affect the number of employees needed from outside the region. The concern is that uranium mining would not provide many jobs, and that those jobs would be available only for the short term. | Same as 2B. |
| 2D. Evaluate impacts of uranium mining on water quality. Many commenters were concerned with the impacts on downstream water users. They thought that downstream water quality should be included in the impact analysis, and that water use for uranium mining and milling should be included in the analysis. | The impacts analysis for water resources addresses potential impacts on water quality from the ULP proposed action (i.e., from exploration, mine development and operations, and reclamation). Uranium ore milling or processing (e.g., at the proposed Piñon Ridge Mill or at White Mesa Mill) is outside the scope of the ULP proposed action. However, the cumulative impacts analyses conducted for the Draft ULP PEIS considered potential impacts from the proposed Piñon Ridge Mill and the White Mesa Mill. |
| 2E. Include best management practices (BMPs) to minimize stormwater runoff as well as a mitigation measure that would require all vent shafts to be grouted where they intercept aquifers. | BMPs, mitigation measures, and compliance measures are discussed in the Draft ULP PEIS (see Section 4.6 for a summary list) and were considered in the impact analyses for specific resource areas discussed in in Chapter 4. These measures include ones that address stormwater runoff. Final measures for mitigating potential impacts would be determined in the record of decision (ROD) for the ULP PEIS and incorporated into approved mine plans, as appropriate. |

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 263 of 426

**TABLE B-2 (Cont.)**

| Public Scoping Comment | Rationale |
|---|---|
| 2F. Provide description of uranium mining activities and a realistic estimate of activities that will occur on lease tracts until the end of the 10-year time frame. | Since project-specific mine plans were not available prior to the start of the preparation of this Draft ULP PEIS, existing information based on current permits was augmented with reasonable assumptions to simulate realistic but upper-bound mining scenarios (covering, for example, how many mines would operate at the same time, the size of the mines, tonnage produced per mine, amount of water used, number of workers, and types of equipment used). These assumptions provided the basis for the impacts evaluation discussed in Chapter 4 of this Draft PEIS, providing reasonable upper-bound estimates for consideration. These assumptions are discussed in Chapter 2 of this Draft PEIS. |
| 2G. DOE should undertake its duties under Section 7 of the Endangered Species Act (ESA). The PEIS must fully address impacts on native fish, on aquatic species and riparian habitat, and on the river corridor. The PEIS should exclude development on all designated critical habitat areas. Species downstream from the lease tracts on the Colorado River should be included in the analysis of biological resources. The PEIS should fully survey the area for rare and imperiled species and should include an ecosystems services analysis of the Dolores River watershed. | DOE is engaged in consultation with the USFWS per Section 7 of the ESA. A biological assessment is also being prepared as part of this consultation. This Draft ULP PEIS evaluates potential impacts on ecological resources in the area of the lease tracts, as well as on the threatened and endangered species identified through consultation with the USFWS. |
| 2H. Include impacts from the release of radioactive and other toxic materials into the atmosphere from mining and milling operations. | The Draft ULP PEIS addresses the potential impacts from the release of material associated with the ore production. The potential impacts of milling operations are outside the scope of the proposed action but are addressed as part of the cumulative impacts analysis in Section 4.7. |
| 2I. Evaluate the amount of disturbed land that will be a source of increased fugitive dust. There is high potential for air toxicity affecting a widespread area as a result of any weather events that would involve high winds over a dry desert. DOE should identify air emissions, evaluate adverse National Ambient Air Quality Standards (NAAQS) impacts on any Federal Class I or sensitive Class II areas (Colorado National Monument), and include plans to control dust. | The analyses for air quality included in Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, and 4.5.1 of this Draft ULP PEIS address this concern. |
| 2J. Evaluate impacts from the release of radon gas and radioactive particulates from mine openings and radon vents; also determine the emissions from mine operations and the impacts on air, climate change, soils, water, and vegetation. | The analysis for potential human health impacts addresses potential impacts from radon gas and uranium on workers and members of the general public within a 50-mi (80-km) radius based on the maximum distance that models allow for deriving dose estimates. Potential impacts on air, climate change, soils, water, and vegetation are addressed in Chapter 4. |

BLM_0042837

**TABLE B-2 (Cont.)**

| Public Scoping Comment | Rationale |
|---|---|
| 2K. Address the long-term impacts on human health, livestock, and wildlife, including food sources, both locally and regionally, due to mining and milling activities. The PEIS must consider health effects of mining and milling, including cancer incidence, on the human population in towns neighboring the mining operation, workers, and local residents. | The analyses of impacts on human health and ecological resources (on livestock and wildlife) address the concern about potential impacts from mining operations. The analysis of human health impacts in Chapter 4 considers the population within a 50-mi (80-km) radius of the lease tract. The analysis for potential impacts on ecological resources addresses resources in the three counties that encompass the 31 lease tracts. The cumulative impacts evaluated in this Draft ULP PEIS (see Section 4.7) address a 50-mi (80-km) radius of the lease tracts and include the White Mesa and Piñon Ridge Mills. |
| 2L. Describe the impacts from the increased use of area roads, as well as mitigation measures for traffic. The PEIS should evaluate potential adverse impacts on public health and safety, the risk of collisions with wildlife, and the effects on the environment from increased truck traffic that would pass through the Curecanti National Recreation Area. The PEIS should also analyze potential impacts of ore haul routes next to rivers and streams. | The analysis for transportation impacts from hauling ore from the DOE ULP lease tracts (including potential traffic impacts) is discussed in Chapter 4 of this Draft ULP PEIS. Measures to mitigate potential impacts from transportation are also summarized in Section 4.6. The analysis provides an estimate of the potential increase in the number of truck trips on the haul routes to the two mills (proposed Piñon Ridge Mill and the White Mesa Mill). Mitigation measures are discussed in Section 4.6 of this Draft PEIS. Any potential impacts on streams or rivers would result from an ore spill following a transportation accident, as discussed in Section 4.3.10.4 of this Draft ULP PEIS. The Cotter Corporation uranium mill in Cañon City, Colorado, is not discussed in this PEIS because it is currently inoperable, and Cotter Corporation has notified the Colorado Department of Public Health and Environment that the radioactive materials license for the mill will not be renewed. Accordingly, U.S. Highway 50, through the Curecanti National Recreation Area, is no longer an ore haulage route. |
| 2M. Address the impacts from erosion by wind and rain runoff. The PEIS must identify, review, consider, and reference all state geological studies and U.S. Geological Survey (USGS) studies of the Uravan Mineral Belt and surrounding areas. | Potential erosion impacts are evaluated in this Draft ULP PEIS (see Sections 4.1.3.1, 4.1.3.2, 4.2.3, 4.3.3, and 4.4.3). Relevant USGS studies, reports, and papers were reviewed to support the discussion and analyses presented in this Draft PEIS. |
| 2N. Consider the environmental sensitivity of Conservation Areas of the Colorado Natural Heritage Program, Areas of Critical Environmental Concern (ACECs), and Special Recreation Management Areas (SRMAs) in the Dolores River Canyon. Development in the three Wilderness Study Areas (WSAs) and 10 Citizen Wilderness Proposals in the affected area should be excluded. The PEIS should consider the views from the Dolores River Canyon at each lease location. There is a concern about the visual impacts that would result from ore trucks travelling along Highway 141, which has been designated the "Unaweep-Tabeguache Scenic and Historic Byway." | The analysis for visual resources addresses the potential impacts on views from sensitive areas, such as the Dolores River Canyon and the Unaweep-Tabeguache Scenic and Historic Byway. |

**TABLE B-2 (Cont.)**

| Public Scoping Comment | Rationale |
| --- | --- |
| 2O. Any aboveground equipment that makes noise louder than 75 dB that is located within 1 mi (1.6 km) of the Dolores River or any residence should be limited to operating only from 10 a.m. to 6 p.m. on weekdays, and all aboveground blasting anywhere should be limited to between 10 a.m. and 6 p.m. only on weekdays. The PEIS must assess the impacts of noise from intake and exhaust vent fans. The PEIS must include an assessment of the effects from noise on insects, birds, mammals, animal hunting habits, animal mating and reproduction, recreation, grazing, and human habitation. | Any mine plans that would be approved would include measures for mining activities to meet applicable Federal, state, and local requirements, including any requirements regarding noise. It is expected that most mining activities would occur during normal daytime work hours on weekdays. The analysis of potential noise impacts in Chapter 4 of this Draft PEIS addresses potential impacts from the equipment used, including impacts from intake and exhaust vent fans. The analysis for potential impacts on ecological resources also addresses noise. The responses of wildlife to noise would vary by species; the individual's physiological or reproductive condition; distance; and the type, intensity, and duration of the disturbance. Excessive noise levels can alter wildlife habitat use and activity patterns (e.g., exacerbating fragmentation impacts), increase the animals' stress levels, decrease their immune response, reduce reproductive success, increase predation risk, degrade communication, and cause hearing damage. Generally, deleterious physiological responses to noise occur at exposure levels of 55 to 60 dBA or more, although other potential impacts on wildlife would occur at lower levels. Noise levels tend to be lower than this exposure level at distances of more than 1,000 ft (300 m) from the noise source. With the exception of blasting, rock drilling, or pile driving, typical noise levels for heavy equipment range from 75 to 90 dBA at a distance of 50 ft (15 m). If only geometrical spreading and ground effects (among noise attenuation mechanisms) are considered, and if an upper range of 90 dBA is assumed, a noise level of 55 dBA would occur at about 1,100 ft (340 m) from the noise source. |
| 2P. Assess topsoil required for reclamation, assess gaps in reclamation soil requirements and availability, and determine the impacts if there was an insufficient amount of topsoil. | Mine plans are required to address reclamation procedures, and they address surface soil material needed for covering the waste-rock pile and other disturbed surfaces. The source of this top cover material is typically soil material removed from the lease tracts during the course of mine development and operations and retained on the site for subsequent use during the reclamation phase. |
| 2Q. Consider the proximity to the Dolores River and whether a 0.25-mi (0.40-km) buffer from the Dolores River and Calamity Creek should be supported. All water rights associated with the lease tracts should be considered in the PEIS, as well as a requirement for monitoring wells to be established around the perimeter of each lease tract. | Currently, a 0.25-mi (0.40-km) buffer from the Dolores River is being observed as far as the placement of new uranium mining operations on the DOE ULP lease tracts. The analysis for water resources in Chapter 4 focuses on the potential impacts on water quality, since the amount of water needed for the proposed action would be trucked onto the lease tracts and therefore supplied by the vendors used for this service. Requirements for monitoring wells and other requirements will be addressed by DOE and other regulatory agencies as mine plans are submitted for approval. |

**TABLE B-2 (Cont.)**

| Public Scoping Comment | Rationale |
| --- | --- |
| 2R. Assess the practice of ore stockpiling at the lease tracts and its impacts. This should include the amount of stockpiled ore, the radioactive and nonradioactive constituents of the stockpiled ore, the estimated length of time the ore will remain at the sites, and environmental impacts. | The ore that would be generated is not expected to be stockpiled for a length of time that would adversely affect human health and the environment. The Colorado Division of Reclamation, Mining, and Safety (CDRMS) has a requirement that ore cannot be stockpiled for longer than 180 days. However, the continual existence of ore stockpiles during active mining operations is to be expected; it gives the mining companies and their ore transportation contractors flexibility to operate in an efficient manner. |
| **3. Tribal Concerns** | |
| 3A. Address any associated environmental and spiritual impacts on all downstream Native American Nations. Must engage in Section 106 consultation. | The consultation with the Colorado State Historic Preservation Officer (SHPO) with regard to cultural resources would be conducted when project-specific information was submitted by the lessees to DOE for review and approval. |
| **4. Policy and Regulatory Issues** | |
| 4A. Adequate nuclear fuel supplies are available for the U.S. nuclear power industry for the foreseeable future. The development of western Colorado uranium reserves should be given a low priority until there is a clear need for a domestic nuclear fuel supply. | DOE has prepared this Draft ULP PEIS consistent with the purpose and need for agency action discussed in Chapter 1. |
| 4B. DOE should collaborate with other agencies, including the CDRMS, BLM, and EPA. | DOE is collaborating with various agencies, including the CDRMS, BLM, and EPA, on this PEIS process. Section 1.9 presents a list of the cooperating agencies and the commenting agencies. |
| 4C. There is a lack of oversight and safeguards, and penalties to companies are not high enough to assure environmental compliance or adherence to current safety laws on reclamation. | DOE's approval of mine plans would be contingent on the fact that these plans contained appropriate and adequate measures for the protection of human health and the environment. The leases specify conditions that must be met by the lessees. |
| 4D. The PEIS is redundant and repeats the efforts of numerous other environmental assessments performed by both private mining companies and governmental agencies in or adjacent to the DOE lease tracts. | DOE has prepared this Draft PEIS consistent with the purpose and need for agency action discussed in Chapter 1. This Draft ULP PEIS addresses the range of reasonable alternatives for the management of the DOE ULP consistent with NEPA requirements. |
| 4E. Local governments requested that affected counties be given an opportunity to meet with DOE separately from the public scoping meetings that were held. | DOE invited the Montrose, Mesa, San Miguel, and San Juan County Commissions to participate as cooperating agencies for the preparation of this PEIS, and they agreed. |

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 267 of 426

**TABLE B-2 (Cont.)**

| Public Scoping Comment | Rationale |
|---|---|
| 4F. Requests were received to hold meetings in other locations, such as Cañon City, Gateway, and Grand Junction, as well as with the White Mesa Ute Indian Community and in Blanding, Utah. | Public comment hearings for the Draft ULP PEIS will be held in Grand Junction in addition to Montrose, Naturita, and Telluride, Colorado. It is felt that public hearings at these four locations would provide the interested members of the public adequate opportunities to participate in a meeting format with regard to accessibility of venues and proximity to where interested members of the public reside. |
| 4G. The review and approval process should include a project-specific NEPA review for each proposed mining operation. The PEIS should include site-specific mitigation measures in addition to general mitigation measures. | Section 1.6 of this Draft ULP PEIS contains a discussion of the NEPA process that would be conducted once project-specific mine plans were submitted by the lessees to DOE for approval. Measures that could be implemented to minimize potential impacts are summarized in Section 4.6. Site-specific and project-specific mitigative measures would be specified in the approved mine plans and associated documentation. |
| 4H. Include a history of the compliance of existing lease holders with their lease agreements and applicable statutes and regulations. It should also include DOE or BLM lease and mine inspection reports. | A summary of the mining history that has occurred on the DOE ULP lease tracts is provided in this Draft ULP PEIS in Chapter 1. DOE enforces the requirements stipulated in the leases, and to date, no outstanding issues exist. |
| **5. Mining Methods** | |
| 5A. In assessing the environmental impacts, the PEIS should consider what traditional mining methods or other methods should be used (e.g., should both the in-situ leaching and the in-situ recovery methods be allowed, or should the method used be limited to one or the other?). | This Draft PEIS evaluated underground and surface open-pit mining methods. The in-situ leaching method was not evaluated because it is not considered to be a viable option due to the location of the ore in "dry" sedimentary strata (see 6A below). |
| **6. Uranium Resources** | |
| 6A. Most of the uranium resources in the Colorado Plateau province of western Colorado are located in sedimentary strata, where the distribution of ore is scattered and patchy. This results in large volumes of low-grade radioactive mine waste. | The location of ore described (i.e., in sedimentary strata) is precisely why the underground mining method and, to a lesser extent, the surface open-pit method are more practical methods for extracting the ore. These methods do result in waste rock (material that contains less than 0.05% of uranium) that is partially placed back into the mine workings (if groundwater is demonstrated to be not an issue) or reclaimed as a pile that is contoured to be consistent with its surroundings, covered with available topsoil material, and seeded (or revegetated). This approach has been proven to be an acceptable and protective means of managing the waste rock that is an unavoidable by-product of uranium mining. |

BLM_0042841

**TABLE B-3 Public Scoping Issues Considered To Be Outside the Scope of the ULP PEIS**

| Public Scoping Comment | Rationale |
|---|---|
| **1. Alternatives** | |
| 1A. Because of unstable uranium markets and the uncertainty regarding future commercial development of nuclear power facilities, uranium should be preserved for the future use of the American people until it becomes critical for national strategic energy purposes. | The timing for when uranium mining should be conducted for the purposes described does not meet the purpose and need for DOE's action. |
| 1B. Investigate the economic feasibility of renewable and alternative energy development. | The evaluation of renewable and alternative energy development does not meet the purpose and need for DOE's action described in Chapter 1 of this Draft PEIS. |
| 1C. Include an alternative that requires old, inactive, and/or abandoned mines to be reclaimed before new leases are granted or any new mines are established. | DOE has reclaimed all abandoned mines within its purview. The 29 leases that currently exist have been in place since 2008, and all mining activities are currently on-hold until the completion of this PEIS process. |
| 1D. Analyze a no-action alternative that would allow the 1995 leases to lapse with no reclamation conducted. | The option of not performing reclamation when leases lapse or are terminated is not consistent with the requirements of the leases, the ULP, or applicable laws. |
| 1E. Incorporate into the reclamation goals or standards the option of developing brownfields at some mines, so that the reclaimed land can be used for renewable energy production. | The development of brownfields is outside the scope of this Draft ULP PEIS. It does not respond to the purpose and need for DOE's action described in Chapter 1. |
| **2. Impacts Analysis** | |
| 2A. Analyze the economic benefits of fully reclaiming and rehabilitating all Federal and state lands in the Uravan Mineral Belt and compare that to the economic benefit of maintaining the existing uranium leases over the next 5 years. | The economic studies suggested are outside the scope of this Draft ULP PEIS. They do not respond to the purpose and need for DOE's action described in Chapter 1. |
| 2B. Analyze the costs to local and state governments to develop and maintain roads and develop and operate other infrastructure to support any future increase in uranium mining and milling activities. | An analysis of the costs to local and state governments to maintain roads to support an increase in uranium mining activities has not been included. However, the evaluation in the Draft ULP PEIS for transportation included discussion on potential traffic congestion, radiological impacts, and accident injuries and fatalities. It does not meet the purpose and need for DOE's action described in Chapter 1. |
| 2C. A market analysis should be conducted to determine how much uranium should be put on the market now versus in the future, when prices might be higher. | Conducting a market analysis to determine the optimal time for uranium ore to be generated relative to uranium ore prices is outside the scope of this Draft PEIS. It does not respond to the purpose and need for DOE's action described in Chapter 1. |

# APPENDIX C:

# EMISSION INVENTORIES, COSTS, AND OTHER ESTIMATES USED AS A BASIS FOR THE ULP PEIS IMPACT ANALYSES

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 270 of 426

*This page intentionally left blank*

BLM_0042844

# APPENDIX C:

# EMISSION INVENTORIES, COSTS, AND OTHER ESTIMATES USED AS A BASIS FOR THE ULP PEIS IMPACT ANALYSES

This appendix is a compilation of the emission inventories, cost assumptions and estimates, equipment and materials utilized, and workforce estimates used as the basis for the impact analyses conducted for the ULP PEIS. Estimates of waste volumes (other than those for the waste-rock piles) are also provided. Unless specified elsewhere, the level of effort (number of workers and worker hours), equipment and equipment hours, and cost estimates are based on RS Means construction data (RS Means 2009). Section C.1 presents information to support the analyses for the exploration phase. Sections C.2 and C.3 present similar information for the mine development and operations phase and the reclamation phase, respectively.

## C.1 EXPLORATION

Under Alternatives 3 through 5, exploration activities are assumed to occur on the lease tracts being evaluated in the ULP PEIS. Under Alternative 3, Lease Tracts 5, 6, 7, 8, 9, 11, 13, 13A, 15, 18, 21, and 25 are evaluated for potential uranium exploration and mining. Leases for these lease tracts were held in 2007 by Gold Eagle Mining, Inc., and Cotter Corporation. Lease Tract 7 was composed of two tracts (7 and 7A) in 2007, but since then it has been combined into one least tract. Hence, for the purposes of the ULP PEIS, Alternative 3 evaluates 12 lease tracts. Alternatives 4 and 5 evaluate all 31 lease tracts for potential future exploration and mining activities. Tables C.1-1 through C.1-9 tabulate various information developed for use as the basis for the impact analyses presented in Section 4 of the ULP PEIS.

**TABLE C.1-1 Number of Mines Considered per Mine Size and Alternative[a,b]**

| | No. of Mines per Alternative | | |
|---|---|---|---|
| Mine Size | Alt. 3 | Alt. 4 | Alt. 5 |
| Small | 2 | 6 | 0 |
| Medium | 4 | 10 | 16 |
| Large | 1 | 2 | 2 |
| Very large | 1 | 1 | 1 |
| **Total** | 8 | 19 | 19 |

[a] Alternatives 1 and 2 are not presented in the table because they do not involve potential future mines to be developed.

[b] The range in size and number of mines considered is based on past mining experience in the region (Cotter 2011a).

**TABLE C.1-2 Total Disturbed Acreage per Mine Size and Alternative during Exploration[a,b]**

| | Disturbed Acreage per Alternative[a] | | |
|---|---|---|---|
| Mine Size | Alt. 3 | Alt. 4 | Alt. 5 |
| Small | 0.11 | 0.33 | 0 |
| Medium | 0.44 | 1.10 | 1.76 |
| Large | 0.17 | 0.33 | 0.33 |

[a] Alternatives 1 and 2 are not presented in the table because they do not involve potential future mines to be developed. The very large mine size is not considered for exploration because it is only used in reference to the existing open-pit mine on Lease Tract JD-7.

[b] Based on a 20 × 60 ft drilling pad per borehole with two, four, and six exploratory boreholes assumed for each small, medium, and large mine, respectively.

BLM_0042846

**TABLE C.1-3 Assumed Workforce per Labor Category and Alternative during Exploration**

| | No. of Workers per Alternative[a] | | |
|---|---|---|---|
| Labor Category | Alt. 3 | Alt. 4 | Alt. 5 |
| Foreman | 2.4 | 5.9 | 7.0 |
| Laborer | 3.4 | 8.3 | 9.9 |
| Equipment operator | 2.0 | 4.8 | 5.7 |
| Truck driver[b] | 0.1 | 0.3 | 0.3 |
| Cement finisher | 0.3 | 0.8 | 1.0 |
| **Total** | 8.2 | 20.1 | 23.9 |

[a] No exploration activities for Alternatives 1 and 2.

[b] Also assumed to operate equipment.

**TABLE C.1-4 Assumed Total Costs per Alternative during Exploration[a]**

| | Cost ($ 2009) per Alternative | | |
|---|---|---|---|
| Cost Element | Alt. 3 | Alt. 4 | Alt. 5 |
| Drawings showing boring details | 4,810 | 11,840 | 14,060 |
| Report and recommendations from PE | 10,790 | 26,560 | 31,540 |
| Mobilization and demobilization | 2,569 | 6,606 | 6,606 |
| Mobilization and demobilization, over 500 mi | 13,734 | 35,316 | 35,316 |
| Air rotary drilling, 6-in.-diameter borehole, unconsolidated, depth of >100 ft | 397,667 | 978,873 | 1,162,411 |
| Air rotary drilling, 6-in.-diameter borehole, consolidated, depth of >100 ft | 132,655 | 326,536 | 387,762 |
| Air rotary drilling, 8-in.-diameter borehole, unconsolidated, depth of ≤100 ft | 31,488 | 77,509 | 92,042 |
| Air rotary drilling, 8-in.-diameter borehole, consolidated, depth of ≤100 ft | 17,806 | 43,830 | 52,048 |
| Casing for initial borehole | 183,082 | 450,663 | 535,163 |
| Sample collection during borehole advancement | 522,285 | 1,285,624 | 1,526,679 |
| Move drill rig around site | 72,246 | 191,609 | 232,444 |
| Drumming of drill cuttings | 202,581 | 498,474 | 591,867 |
| Decontamination of drill rig, etc. | 1,809 | 4,453 | 5,288 |
| Surface pads, concrete (3,000 lb/in.$^2$ or psi, 6-in.-thick concrete) | 187,534 | 461,623 | 548,177 |
| **Total direct costs** | 1,781,057 | 4,399,517 | 5,221,404 |
| Contractor's overhead and profit (6%) | 107,000 | 264,000 | 313,000 |
| *Subtotal contractor's costs* | 1,888,057 | 4,663,517 | 5,534,404 |
| Contractor's bond (1%) | 19,000 | 47,000 | 56,000 |
| *Total contractor's field costs* | 1,907,057 | 4,710,517 | 5,590,404 |
| Construction management (10%) | 191,000 | 471,000 | 559,000 |
| *Total field costs* | 2,098,057 | 5,181,517 | 6,149,404 |
| Architect/engineer costs (25%) | 524,000 | 1,295,000 | 1,538,000 |
| *Subtotal* | 2,622,057 | 6,476,517 | 7,687,404 |
| Program management (6%) | 157,000 | 389,000 | 462,000 |
| **Total exploration costs** | 2,779,000 | 6,866,000 | 8,149,000 |

[a] Exploration activities were assumed to be completed within a 1-year time frame.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 275 of 426

**TABLE C.1-5 Assumed Equipment and Total Hours Operated per Mine Size and Alternative during Exploration[a]**

| Items Assumed | Hours Operated per Mine Size | | | |
|---|---|---|---|---|
| | Small | Medium | Large | Very Large |
| Alternative 3 | | | | |
| Truck, highway, 24,500 GVW,[b] 4×2, 2-axle | 214 | 874 | 324 | 0 |
| Flatbed, 8×16 ft | 214 | 862 | 322 | 0 |
| Front-end loader, wheeled, 2.5-$yd^3$ capacity | 193 | 772 | 290 | 0 |
| Gas engine, vibrator | 221 | 882 | 331 | 0 |
| Water truck | 104 | 416 | 156 | 0 |
| Driller/auger | 111 | 452 | 168 | 0 |
| Cement truck | 141 | 561 | 211 | 0 |
| Alternative 4 | | | | |
| Truck, highway, 24,500 GVW, 4×2, 2-axle | 654 | 2,192 | 654 | 0 |
| Flatbed, 8×16 ft | 646 | 2,159 | 646 | 0 |
| Front-end loader, wheeled, 2.5-$yd^3$ capacity | 579 | 1,930 | 579 | 0 |
| Gas engine, vibrator | 661 | 2,203 | 661 | 0 |
| Water truck | 312 | 1,039 | 312 | 0 |
| Driller/auger | 339 | 1,135 | 339 | 0 |
| Cement truck | 421 | 1,401 | 421 | 0 |
| Alternative 5 | | | | |
| Truck, highway, 24,500 GVW, 4×2, 2-axle | 0 | 3,511 | 654 | 0 |
| Flatbed, 8×16 ft | 0 | 3,456 | 646 | 0 |
| Front-end loader, wheeled, 2.5-$yd^3$ capacity | 0 | 3,087 | 579 | 0 |
| Gas engine, vibrator | 0 | 3,525 | 661 | 0 |
| Water truck | 0 | 1,661 | 312 | 0 |
| Driller/auger | 0 | 1,817 | 339 | 0 |
| Cement truck | 0 | 2,241 | 421 | 0 |

[a] Exploration activities were assumed to be completed within a 1-year time frame.

[b] GVW = gross vehicle weight.

BLM_0042849

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 276 of 426

**TABLE C.1-6 Assumed Total Material Amounts per Alternative during Exploration[a]**

| Items Assumed | Amount of Materials per Mine Size | | | |
|---|---|---|---|---|
| | Small | Medium | Large | Total |
| Alternative 3 | | | | |
| Diesel fuel (gal) | 12,000 | 49,000 | 18,000 | 79,000 |
| Oil and grease (gal) | 300 | 1,100 | 400 | 1,800 |
| Water (gal) | 12,000 | 49,000 | 18,000 | 79,000 |
| 55-gal drums (each) | 385 | 1,539 | 577 | 2,501 |
| Concrete ($yd^3$) | 90 | 360 | 130 | 580 |
| Alternative 4 | | | | |
| Diesel fuel (gal) | 37,000 | 124,000 | 37,000 | 198,000 |
| Oil and grease (gal) | 800 | 2,700 | 800 | 4,300 |
| Water (gal) | 37,000 | 121,000 | 37,000 | 195,000 |
| 55-gal drums (each) | 1,154 | 3,846 | 1,154 | 6,154 |
| Concrete ($yd^3$) | 270 | 890 | 270 | 1,430 |
| Alternative 5 | | | | |
| Diesel fuel (gal) | 0 | 198,000 | 37,000 | 235,000 |
| Oil and grease (gal) | 0 | 4,400 | 800 | 5,200 |
| Water (gal) | 0 | 194,000 | 37,000 | 231,000 |
| 55-gal drums (each) | 0 | 6,153 | 1,154 | 7,307 |
| Concrete ($yd^3$) | 0 | 1,420 | 270 | 1,690 |

[a] Exploration activities were assumed to be completed within a 1-year time frame.

BLM_0042850

**TABLE C.1-7 Assumed Annual Air Emissions on an Individual Mine Basis during Exploration[a]**

| | Annual Air Emissions (tons) per Mine Size | | |
|---|---|---|---|
| Criteria Pollutant | Small | Medium | Large |
| Total hydrocarbons (THC) | 0.1 | 0.2 | 0.2 |
| Reactive organic compounds (ROCs) | 0.1 | 0.1 | 0.2 |
| Nitrogen oxides ($NO_x$) | 0.6 | 1.2 | 1.8 |
| Sulfur dioxide ($SO_2$) | 0.1 | 0.1 | 0.2 |
| Carbon monoxide (CO) | 0.3 | 0.5 | 0.8 |
| Total suspended particulates (TSP) | 0.1 | 0.2 | 0.3 |
| Particulate matter ≤10 μm ($PM_{10}$)[b] | 0.1 | 0.2 | 0.3 |
| Particulate matter ≤2.5 μm ($PM_{2.5}$)[c] | 0.1 | 0.1 | 0.2 |
| Carbon dioxide ($CO_2$)[d] | 68.6 | 138 | 206 |

[a] The latest emission factors were taken from the U.S. Environmental Protection Agency's (EPA's) WebFIRE application located at http://cfpub.epa.gov/webfire/.

[b] Assumes that the construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions) (SCAQMD 2007).

[c] Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$ (SCAQMD undated).

[d] The $CO_2$ emission factor for diesel fuel was taken from EPA (2008).

**TABLE C.1-8 Assumed Total Air Emissions during Exploration[a]**

| | Total Air Emission (tons) per Alternative | | |
|---|---|---|---|
| Criteria Pollutant | Alt. 3 | Alt. 4 | Alt. 5 |
| Total hydrocarbons (THC) | 2.2 | 5.4 | 6.5 |
| Reactive organic compounds (ROCs) | 2.1 | 5.2 | 6.2 |
| Nitrogen oxides ($NO_x$) | 17 | 43 | 51 |
| Sulfur dioxide ($SO_2$) | 2.0 | 4.8 | 5.7 |
| Carbon monoxide (CO) | 7.4 | 18.3 | 21.7 |
| Total suspended particulates (TSP) | 2 | 5 | 5 |
| Particulate matter ≤10 μm ($PM_{10}$)[b] | 2 | 4 | 5 |
| Particulate matter ≤2.5 μm ($PM_{2.5}$)[c] | 1 | 3 | 4 |
| Carbon dioxide ($CO_2$)[d] | 2,192 | 5,415 | 6,432 |

[a] The latest emission factors were taken from the EPA's WebFIRE application located at http://cfpub.epa.gov/webfire/.

[b] Assumes that the construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions) (SCAQMD 2007).

[c] Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$ (SCAQMD undated).

[d] The $CO_2$ emission factor for diesel fuel was taken from EPA (2008).

**TABLE C.1-9 Wastes Generated per Alternative during Exploration**

| | Waste Generated (gal) per Alternative | | |
|---|---|---|---|
| Waste Category | Alt. 3 | Alt. 4 | Alt. 5 |
| Sanitary[a] | 33,000 | 81,000 | 97,000 |
| Other | 15,000 | 36,000 | 43,000 |

[a] Amount of sanitary waste was estimated based on the total exploration workforce.

BLM_0042852

## C.2 MINE DEVELOPMENT AND OPERATIONS

Tables C.2-1 through C.2-16 tabulate various information developed for use as the basis for the impact analyses presented in Section 4 of the ULP PEIS.

**TABLE C.2-1 Estimated Material Amounts and Labor Time per Mine Size during Development**

| | Amount per Mine Size | | | |
|---|---|---|---|---|
| Cost Element | Small | Medium | Large | Very Large |
| Labor (person-hours) | 5,015 | 7,584 | 11,500 | 14,671 |
| Steel (tons) | 400 | 528 | 695 | 816 |
| Lumber (1,000 board feet) | 92 | 120 | 153 | 177 |
| Fuel (gal) | 4,981 | 7,663 | 11,494 | 14,559 |
| Lubricant (gal) | 1,250 | 1,750 | 2,750 | 3,500 |
| Explosives (tons) | 186 | 249 | 333 | 395 |
| Electricity (kWh) | 41,000 | 61,000 | 102,000 | 132,000 |

**TABLE C.2-2 Estimated Materials and Labor Time per Alternative during Development**

| | Amount per Alternative | | |
|---|---|---|---|
| Cost Element | Alt. 3 | Alt. 4 | Alt. 5 |
| Labor (person-hours) | 67,000 | 144,000 | 159,000 |
| Steel (tons) | 4,400 | 9,900 | 10,600 |
| Lumber (1,000 board feet) | 1,000 | 2,200 | 2,400 |
| Fuel (gal) | 67,000 | 144,000 | 159,000 |
| Lubricant (gal) | 16,000 | 35,000 | 38,000 |
| Explosives (tons) | 2,100 | 4,700 | 5,000 |
| Electricity (kWh) | 580,000 | 1,232,000 | 1,375,000 |

**TABLE C.2-3 Number of Workers per Mine Size and Worker Salary per Labor Category**

| Labor Category | No. of Workers per Mine Size | | | | Individual Annual Salary with Overhead and Profit ($) |
|---|---|---|---|---|---|
| | Small | Medium | Large | Very Large | |
| Mine workers | 6 | 10 | 16 | 50 | 81,250 |
| Mechanic | 0.1 | 0.1 | 0.1 | 0.1 | 81,250 |
| Geologist | 0.1 | 0.1 | 0.1 | 0.1 | 137,500 |
| Surveyor | 0.1 | 0.1 | 0.1 | 0.1 | 81,250 |
| Engineer | 0.1 | 0.1 | 0.1 | 0.1 | 81,250 |
| Environmental specialist | 0.1 | 0.1 | 0.1 | 0.1 | 75,000 |
| Other administrative support (e.g., accountant) | 0.1 | 0.1 | 0.1 | 0.1 | 83,333 |
| **Total** | 6.6 | 10.6 | 16.6 | 50.6 | |

**TABLE C.2-4 Annual Worker Salaries per Labor Category and Mine Size**

| Labor Category | Salary ($) per Mine Size | | | |
|---|---|---|---|---|
| | Small | Medium | Large | Very Large |
| Mine workers | 487,500 | 812,500 | 1,300,000 | 4,062,500 |
| Mechanic | 8,125 | 8,125 | 8,125 | 8,125 |
| Geologist | 13,750 | 13,750 | 13,750 | 13,750 |
| Surveyor | 8,125 | 8,125 | 8,125 | 8,125 |
| Engineer | 8,125 | 8,125 | 8,125 | 8,125 |
| Environmental specialist | 7,500 | 7,500 | 7,500 | 7,500 |
| Other administrative support (e.g., accountant) | 8,333 | 8,333 | 8,333 | 8,333 |
| **Total** | 541,458 | 866,458 | 1,353,958 | 4,116,458 |

**TABLE C.2-5 Number and Cost of Capital Equipment Units per Mine Size**

| Items Assumed | Number of Units per Mine Size[a] | | | | Unit Cost ($) |
|---|---|---|---|---|---|
| | Small | Medium | Large | Very Large | |
| Underground equipment | | | | | |
| Diesel skid steer loaders, 2-yd$^3$ capacity | 1 | 2 | 3 | –[a] | 55,000 |
| Diesel trucks (buggies), 5- to 10-ton capacity | 2 | 4 | 8 | – | 77,800 |
| Development drill, jumbo | 1 | 1 | 1 | – | 55,000 |
| Production drills, jacklegs | 3 | 6 | 9 | – | 300 |
| Exploration drills, longhole | 1 | 1 | 2 | – | 82,000 |
| Diesel boss buggies and utility vehicles | 2 | 3 | 4 | – | 12,200 |
| Surface Equipment | | | | | |
| Front-end loader, 2- to 3-yd$^3$ capacity | 1 | 1 | 1 | 1 | 342,000 |
| Loaders, 8- to 10-yd$^3$ capacity | – | – | – | 3 | 123,000 |
| Backhoe/skid loader or excavator | 1 | 1 | 1 | 1 | 157,000 |
| Highway haul trucks, 22- to 24-ton capacity | 2 | 2 | 3 | – | 599,000 |
| Dump truck, 12 yd$^3$ | – | – | – | 3 | 200,000 |
| Bulldozer, 200 hp | 1 | 1 | 1 | – | 315,000 |
| Bulldozer, 400 hp | – | – | – | 3 | 625,000 |
| Motor grader, 140 hp | 1 | 1 | 1 | 1 | 160,000 |
| Flatbed trailer with tractor or 1-ton vehicle | 1 | 1 | 1 | – | 10,000 |
| Maintenance truck | – | – | – | 1 | 158,000 |
| Pickup truck, ¾ ton, four-wheel drive | 1 | 1 | 2 | 4 | 30,000 |
| Snow plow | 1 | 1 | 1 | – | 62,000 |
| Power generators | 1 | 1 | 2 | – | 79,950 |
| Scraper | – | – | – | 4 | 77,200 |
| Truck, ≥60 tons | – | – | – | 4 | 599,000 |

[a] A dash indicates none.

BLM_0042855

**TABLE C.2-6 Total Capital Equipment Costs per Alternative**

| Items Assumed | Total Capital Equipment Cost ($ 2009) per Alternative | | |
|---|---|---|---|
| | Alt. 3 | Alt. 4 | Alt. 5 |
| Underground equipment | | | |
| Diesel skid steer loaders, 2-yd$^3$ capacity | 715,000 | 1,760,000 | 2,090,000 |
| Diesel trucks (buggies), 5- to 10-ton capacity | 2,178,400 | 5,290,400 | 6,224,000 |
| Development drill, jumbo | 385,000 | 990,000 | 990,000 |
| Production drills, jacklegs | 11,700 | 28,800 | 34,200 |
| Exploration drills, longhole | 656,000 | 1,640,000 | 1,640,000 |
| Diesel boss buggies and utility vehicles | 244,000 | 610,000 | 683,200 |
| Surface equipment | | | |
| Front-end loader, 2- to 3-yd$^3$ capacity | 2,736,000 | 6,498,000 | 6,498,000 |
| Loaders, 8- to 10-yd$^3$ capacity | 369,000 | 369,000 | 369,000 |
| Backhoe/skid loader or excavator | 1,256,000 | 2,983,000 | 2,983,000 |
| Highway haul trucks, 22- to 24-ton capacity | 8,985,000 | 22,762,000 | 22,762,000 |
| Dump truck, 12 yd$^3$ | 600,000 | 600,000 | 600,000 |
| Bulldozer, 200 hp | 2,205,000 | 5,670,000 | 5,670,000 |
| Bulldozer, 400 hp | 1,875,000 | 1,875,000 | 1,875,000 |
| Motor grader, 140 hp | 1,280,000 | 3,040,000 | 3,040,000 |
| Flatbed trailer with tractor or 1-ton vehicle | 70,000 | 180,000 | 180,000 |
| Maintenance truck | 158,000 | 158,000 | 158,000 |
| Pickup truck, ¾ ton, four-wheel drive | 360,000 | 720,000 | 720,000 |
| Snow plow | 434,000 | 1,116,000 | 1,116,000 |
| Power generators | 639,600 | 1,599,000 | 1,599,000 |
| Scraper | 308,800 | 308,800 | 308,800 |
| Truck, ≥60 tons | 2,396,000 | 2,396,000 | 2,396,000 |
| **Total** | 27,862,500 | 60,594,000 | 61,936,200 |

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 283 of 426

**TABLE C.2-7 Estimated Total Capital Costs per Mine Size**

| | Total Capital Cost ($ 2009) per Mine Size | | | |
|---|---|---|---|---|
| Cost Element | Small | Medium | Large | Very Large |
| Equipment purchase | 2,727,000 | 2,951,000 | 4,121,000 | 6,486,000 |
| Labor | 242,000 | 366,000 | 555,000 | 708,000 |
| Steel | 232,000 | 306,000 | 403,000 | 473,000 |
| Lumber | 23,000 | 30,000 | 38,000 | 44,000 |
| Fuel | 13,000 | 20,000 | 30,000 | 38,000 |
| Lubricant | 5,000 | 7,000 | 11,000 | 14,000 |
| Explosives | 124,000 | 166,000 | 222,000 | 263,000 |
| Tires | 9,000 | 14,000 | 20,000 | 26,000 |
| Construction materials | 223,000 | 317,000 | 451,000 | 554,000 |
| Electricity | 4,000 | 6,000 | 10,000 | 13,000 |
| **Total direct costs** | 3,602,000 | 4,183,000 | 5,861,000 | 8,619,000 |
| Contractor's overhead and profit (6%) | 216,000 | 251,000 | 352,000 | 517,000 |
| *Subtotal contractor's costs* | 3,818,000 | 4,434,000 | 6,213,000 | 9,136,000 |
| Contractor's bond (1%) | 38,000 | 44,000 | 62,000 | 91,000 |
| *Total contractor's field costs* | 3,856,000 | 4,478,000 | 6,275,000 | 9,227,000 |
| Construction management (10%) | 386,000 | 448,000 | 628,000 | 923,000 |
| *Total field costs* | 4,242,000 | 4,926,000 | 6,903,000 | 10,150,000 |
| Architecture/engineering costs (25%) | 1,061,000 | 1,232,000 | 1,726,000 | 2,538,000 |
| *Subtotal* | 5,303,000 | 6,158,000 | 8,629,000 | 12,688,000 |
| Program management (6%) | 318,000 | 369,000 | 518,000 | 761,000 |
| **Total capital costs** | 5,621,000 | 6,527,000 | 9,147,000 | 13,449,000 |

BLM_0042857

**TABLE C.2-8 Estimated Total Capital Costs per Alternative**

| | Total Capital Cost ($ 2009) per Alternative | | |
|---|---|---|---|
| Cost Element | Alt. 3 | Alt. 4 | Alt. 5 |
| Equipment purchase | 27,863,000 | 60,595,000 | 61,937,000 |
| Labor | 3,213,000 | 6,934,000 | 7,681,000 |
| Steel | 2,565,000 | 5,732,000 | 6,174,000 |
| Lumber | 246,000 | 555,000 | 593,000 |
| Fuel | 174,000 | 375,000 | 414,000 |
| Lubricant | 64,000 | 138,000 | 152,000 |
| Explosives | 1,396,000 | 3,108,000 | 3,359,000 |
| Tires | 118,000 | 257,000 | 283,000 |
| Construction materials | 2,717,000 | 5,958,000 | 6,524,000 |
| Electricity | 57,000 | 121,000 | 135,000 |
| **Total direct costs** | 38,413,000 | 83,773,000 | 87,252,000 |
| Contractor's overhead and profit (6%) | 2,305,000 | 5,026,000 | 5,235,000 |
| *Subtotal contractor's costs* | 40,718,000 | 88,799,000 | 92,487,000 |
| Contractor's bond (1%) | 407,000 | 888,000 | 925,000 |
| *Total contractor's field costs* | 41,125,000 | 89,687,000 | 93,412,000 |
| Construction management (10%) | 4,113,000 | 8,969,000 | 9,341,000 |
| *Total field costs* | 45,238,000 | 98,656,000 | 102,753,000 |
| Architecture/engineering costs (25%) | 11,310,000 | 24,664,000 | 25,688,000 |
| *Subtotal* | 56,548,000 | 123,320,000 | 128,441,000 |
| Program management (6%) | 3,393,000 | 7,399,000 | 7,706,000 |
| **Total capital costs** | 59,941,000 | 130,719,000 | 136,147,000 |

**TABLE C.2-9 Assumed Annual Air Emissions on an Individual Mine Basis during Development**[a]

| | Annual Air Emissions (tons) per Mine Size | | | |
|---|---|---|---|---|
| Criteria Pollutant | Small | Medium | Large | Very Large |
| Total hydrocarbons (THC) | 0.1 | 0.1 | 0.1 | 0.2 |
| Reactive organic componnds (ROCs) | 0.1 | 0.1 | 0.1 | 0.2 |
| Nitrogen oxides ($NO_x$) | 2.2 | 3.0 | 4.2 | 5.1 |
| Sulfur dioxide ($SO_2$) | 0.3 | 0.4 | 0.5 | 0.6 |
| Carbon monoxide (CO) | 6.5 | 8.8 | 11.8 | 14.0 |
| Total suspended particulates (TSP) | 11.3 | 15.5 | 20.6 | 58.1 |
| Particulate matter ≤10 µm ($PM_{10}$)[b] | 9.6 | 13.1 | 17.4 | 37.5 |
| Particulate matter ≤2.5 µm ($PM_{2.5}$)[c] | 1.2 | 1.6 | 2.1 | 5.0 |
| Carbon dioxide ($CO_2$)[d] | 56.8 | 84.3 | 126 | 162 |

[a] The latest emission factors were taken from the EPA's WebFIRE application located at http://cfpub.epa.gov/webfire/.

[b] Assumes that the construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions) (SCAQMD 2007).

[c] Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$ (SCAQMD undated).

[d] The $CO_2$ emission factor for diesel fuel was taken from EPA (2008).

**TABLE C.2-10 Estimated Annual Air Emissions per Alternative during Development**[a]

| Criteria Pollutant | Annual Air Emissions (tons) per Alternative | | |
|---|---|---|---|
| | Alt. 3 | Alt. 4 | Alt. 5 |
| Total hydrocarbons (THC) | 0.8 | 1.8 | 2.0 |
| Reactive organic compounds (ROCs) | 0.8 | 1.7 | 1.9 |
| Nitrogen oxides ($NO_x$) | 26 | 57 | 62 |
| Sulfur dioxide ($SO_2$) | 3.1 | 6.9 | 7.5 |
| Carbon monoxide (CO) | 74 | 165 | 176 |
| Total suspended particulates (TSP) | 262 | 520 | 554 |
| Particulate matter ≤10 µm ($PM_{10}$)[b] | 225 | 459 | 489 |
| Particulate matter ≤2.5 µm ($PM_{2.5}$)[c] | 36 | 73 | 78 |
| Carbon dioxide ($CO_2$)[d] | 745 | 1,601 | 1,767 |

[a] The latest emission factors were taken from the EPA's WebFIRE application located at http://cfpub.epa.gov/webfire/.

[b] Assumes that the construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions) (SCAQMD 2007).

[c] Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$ (SCAQMD undated).

[d] The $CO_2$ emission factor for diesel fuel was taken from EPA (2008).

**TABLE C.2-11 Wastes Generated per Alternative during Development**

| Waste Category | Waste Generated (gal) per Alternative | | |
|---|---|---|---|
| | Alt. 3 | Alt. 4 | Alt. 5 |
| Sanitary[a] | 136,000 | 292,000 | 322,000 |
| Other | 60,000 | 130,000 | 143,000 |

[a] Amount of sanitary waste was estimated based on total construction workforce.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 287 of 426

**TABLE C.2-12 Total Worker Peak-Year Annual Wages per Mine Size and Alternative**

| | Annual Wages ($) per Alternative | | |
|---|---|---|---|
| Mine Size | Alt. 3 | Alt. 4 | Alt. 5 |
| Small | 1,083,000 | 3,249,000 | 0 |
| Medium | 3,466,000 | 8,665,000 | 13,863,000 |
| Large | 1,354,000 | 2,708,000 | 2,708,000 |
| Very large | 4,116,000 | 4,116,000 | 4,116,000 |
| **Total** | 10,019,000 | 18,738,000 | 20,688,000 |

**TABLE C.2-13 Peak-Year Annual Water Usage per Mine Size and Alternative during Operations**[a]

| | | Total Annual Volume per Alternative (gal) | | |
|---|---|---|---|---|
| Mine Size | Monthly Volume per Mine Size (gal) | Alt. 3 | Alt. 4 | Alt. 5 |
| Small | 7,583 | 181,992 | 545,976 | 0 |
| Medium | 30,666 | 1,471,968 | 3,679,920 | 5,887,872 |
| Large | 45,999 | 551,988 | 1,103,976 | 1,103,976 |
| Very large[b] | 160,000 | 960,000 | 960,000 | 960,000 |
| **Total** | | 3,165,948 | 6,289,872 | 7,951,848 |

[a] Based on per-mine water use from Cotter (2011b) and Ribeiro (2012).

[b] Assumes water usage for 6 months only (summer) for dust suppression activities.

BLM_0042861

**TABLE C.2-14 Total Peak-Year Annual Cost of Operations per Alternative**

| | Annual Cost of Operations ($) per Alternative | | |
|---|---|---|---|
| Item | Alt. 3 | Alt. 4 | Alt. 5 |
| Mining equipment operations | 5,553,000 | $5,553,000 | 4,579,000 |
| Utilities (electricity) | 229,000 | 489,000 | 546,000 |
| Diesel fuel | 180,000 | 373,000 | 425,000 |
| Other materials (explosives) | 41,000 | 83,000 | 95,000 |
| Water | 21,000 | 36,000 | 45,000 |
| Worker salaries | 10,019,000 | 18,738,000 | 20,687,000 |
| **Total** | 16,043,000 | 25,272,000 | 26,377,000 |

**TABLE C.2-15 Assumed Annual Air Emissions on an Individual Mine Basis during Operations[a]**

| | Annual Air Emissions (tons) per Mine Size | | | |
|---|---|---|---|---|
| Criteria Pollutant | Small | Medium | Large | Very Large |
| Total hydrocarbons (THC) | 0.75 | 0.59 | 4.48 | 8.63 |
| Reactive organic compounds (ROCs) | 0.72 | 0.57 | 4.30 | 8.29 |
| Nitrogen oxides ($NO_x$) | 7.36 | 5.85 | 44.03 | 84.71 |
| Sulfur dioxide ($SO_2$) | 0.95 | 0.75 | 5.66 | 10.89 |
| Carbon monoxide (CO) | 3.42 | 2.84 | 20.30 | 38.90 |
| Total suspended particulates (TSP) | 7.11 | 0.56 | 4.23 | 8.15 |
| Particulate matter ≤10 µm ($PM_{10}$)[b] | 4.00 | 0.53 | 4.02 | 7.74 |
| Particulate matter ≤2.5 µm ($PM_{2.5}$)[c] | 0.79 | 0.47 | 3.58 | 6.89 |
| Carbon dioxide ($CO_2$)[d] | 672 | 532 | 4,025 | 7,748 |

a The latest emission factors were taken from the EPA's WebFIRE application located at http://cfpub.epa.gov/webfire/.

b Assumes that the construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions) (SCAQMD 2007).

c Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$ (SCAQMD undated).

d The $CO_2$ emission factor for diesel fuel was taken from EPA (2008).

**TABLE C.2-16 Estimated Peak-Year Annual Air Emissions per Alternative during Operations[a]**

| Criteria Pollutant | Annual Air Emissions (tons) per Alternative | | |
|---|---|---|---|
| | Alt. 3 | Alt. 4 | Alt. 5 |
| Total hydrocarbons (THC) | 14.0 | 28.0 | 31.6 |
| Reactive organic compounds (ROCs) | 13.4 | 26.9 | 30.4 |
| Nitrogen oxides ($NO_x$) | 137.7 | 275.5 | 313.1 |
| Sulfur dioxide ($SO_2$) | 17.7 | 35.4 | 40.1 |
| Carbon monoxide (CO) | 64.2 | 128.4 | 145.1 |
| Total suspended particulates (TSP) | 32 | 65 | 74 |
| Particulate matter ≤10 µm ($PM_{10}$)[b] | 23 | 45 | 51 |
| Particulate matter ≤2.5 µm ($PM_{2.5}$)[c] | 11.8 | 23.5 | 26.7 |
| Carbon dioxide ($CO_2$)[d] | 13,000 | 25,000 | 29,000 |

[a] The latest emission factors were taken from the EPA's WebFIRE application located at http://cfpub.epa.gov/webfire/.

[b] Assumes that the construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions) (SCAQMD 2007).

[c] Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$ (SCAQMD undated).

[d] The $CO_2$ emission factor for diesel fuel was taken from EPA (2008).

## C.3 RECLAMATION

The reclamation phase would occur under each of the five alternatives evaluated in the ULP PEIS. Tables C.3-1 through C.3-8 tabulate the information developed as a basis for the impact analyses discussed in Chapter 4. The basis for the estimated values used in Table C.3-1 is that it would take 3 months per mine site for 1 team to complete reclamation. Under Alternatives 1 and 2, 10 mine sites would be reclaimed (9 mines plus JD-7, the open-pit mine).

The assumptions made for Alternative 3 would be the same as those made for Alternatives 1 and 2 because essentially the same number of mines would be reclaimed.

The assumptions made for Alternatives 4 and 5 would be the same since the number of mines would be the same (i.e., 18 mines plus JD-7). Each of the 18 underground mines would require 3 months to reclaim by 1 team. It is assumed that there would be 5 reclamation teams for the 18 underground mines. Three of these teams would be able to work for 12 months rather than only 9 months, because they would be working at the southern lease tracts (i.e., where no snow would inhibit field work). Thus, 3 teams × 12 months = 36 months, plus 2 teams × 9 months = 18 months, for a total of 54 months available for reclamation. The open-pit mine (JD-7) would be reclaimed by a separate team consisting of 14 workers, and it is assumed that reclamation would take 12 months to complete.

BLM_0042863

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 290 of 426

**TABLE C.3-1 Assumed Workforce per Labor Category, Team, JD-7 Mine, and Alternative during Reclamation**

| | | | Total No. of Workers per Alternative | | | |
|---|---|---|---|---|---|---|
| Labor Category | No. of Workers per Team[a] | No. of Workers for JD-7 Mine | Alts. 1 and 2[b] | Alt. 3[c] | Alt. 4[d] | Alt. 5[e] |
| Foreman | 1 | 1 | 4 | 4 | 6 | 6 |
| Equipment operator | 3 | 10 | 19 | 19 | 25 | 25 |
| Truck driver[f] | 1 | 2 | 5 | 5 | 7 | 7 |
| Electrician/mechanic[g] | 0 | 1 | 1 | 1 | 1 | 1 |
| **Total** | 5 | 14 | 29 | 29 | 39 | 39 |

[a] Other than for work on JD-7 open-pit mine.

[b] Three teams plus the JD-7 team.

[c] Three teams plus the JD-7 team.

[d] Five teams plus the JD-7 team.

[e] Five teams plus the JD-7 team.

[f] Also assumed to operate equipment.

[g] Assumed for very large mine (JD-7) reclamation only.

**TABLE C.3-2 Total Disturbed Acreage per Mine Size and Alternative during Reclamation[a]**

| | Disturbed Acreage per Alternative | | |
|---|---|---|---|
| Mine Size | Alt. 3 | Alt. 4 | Alt. 5 |
| Small | 20 | 60 | 0 |
| Medium | 60 | 150 | 240 |
| Large | 20 | 40 | 40 |
| Very large | 210 | 210 | 210 |

[a] Alternatives 1 and 2 would each involve the reclamation of 257 acres (Cotter 2012) as shown in Table 2.2-1 and involve 10 lease tracts.

BLM_0042864

**TABLE C.3-3 Assumed Total Costs per Alternative during Reclamation**

| Cost Element | Costs ($ 2009) per Alternative | | | |
|---|---|---|---|---|
| | Alts. 1 and 2 | Alt. 3 | Alt. 4 | Alt. 5 |
| Remove aboveground structures | 58,436 | 62,085 | 136,157 | 149,067 |
| Seal portal(s) | 23,000 | 18,400 | 43,700 | 43,700 |
| Establish 3:1 slopes | 447,621 | 539,931 | 801,189 | 853,440 |
| Pock areas of steep slope to reduce future erosion | 486,831 | 587,229 | 871,371 | 928,200 |
| Spread available topsoil over pocking | 58,009 | 69,971 | 103,829 | 110,600 |
| Cut and fill and water bars on access road | 153,906 | 185,646 | 275,474 | 293,440 |
| Revegetate slope and access road | 1,297,055 | 1,564,541 | 2,321,577 | 2,472,985 |
| Place obstruction boulders at access entrance | 3,060 | 2,448 | 5,814 | 5,814 |
| Replace ore in mine | 13,472 | 17,963 | 35,925 | 41,314 |
| Remove 18 in. of subsurface from ore pad area | 98,760 | 131,680 | 263,360 | 302,864 |
| Rip compacted areas | 59,427 | 71,683 | 106,368 | 113,305 |
| Spread topsoil over disturbed areas | 40,072 | 48,335 | 71,723 | 76,401 |
| Backfill sedimentation pond | 28,122 | 33,922 | 50,335 | 53,618 |
| Seal ventilation shafts (72-in. diameter) | 85,190 | 68,152 | 161,861 | 161,861 |
| Seal power drop holes | 2,540 | 2,032 | 4,826 | 4,826 |
| Remove power drops | 4,690 | 3,752 | 8,911 | 8,911 |
| Rip vent and power drop pads | 8,327 | 10,045 | 14,905 | 15,877 |
| Push topsoil over vent and power drop pads | 3,955 | 4,770 | 7,078 | 7,540 |
| Revegetate area around vent and power drop pads | 60,917 | 73,480 | 109,034 | 116,145 |
| Conduct initial site mobilization | 49,840 | 39,872 | 94,696 | 94,696 |
| Conduct secondary seeding mobilization | 18,380 | 14,704 | 34,922 | 34,922 |
| **Total direct costs** | 3,001,610 | 3,550,640 | 5,523,056 | 5,889,526 |
| Contractor's overhead and profit (6%) | 180,000 | 213,000 | 331,000 | 353,000 |
| *Subtotal contractor's costs* | 3,181,610 | 3,763,640 | 5,854,056 | 6,242,526 |
| Contractor's bond (1%) | 32,000 | 38,000 | 60,000 | 63,000 |
| *Total contractor's field costs* | 3,213,610 | 3,801,640 | 5,914,056 | 6,305,526 |
| Construction management (10%) | 321,000 | 380,000 | 591,000 | 630,000 |
| *Total field costs* | 3,534,610 | 4,181,640 | 6,505,056 | 6,935,526 |
| Architecture/engineering costs (25%) | 883,000 | 1,045,000 | 1,626,000 | 1,733,000 |
| *Subtotal* | 4,417,610 | 5,226,640 | 8,131,056 | 8,668,526 |
| Program management (6%) | 266,000 | 314,000 | 488,000 | 521,000 |
| **Total reclamation costs (rounded)** | 4,684,000 | 5,541,000 | 8,619,000 | 9,189,000 |

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 292 of 426

**TABLE C.3-4 Assumed Equipment and Total Hours of Operation per Mine Size and Alternative during Reclamation**

| | Total Hours of Operation per Mine Size | | | |
|---|---|---|---|---|
| Items Assumed | Small | Medium | Large | Very Large |
| Alternatives 1 and 2 | | | | |
| Bulldozer, 310 hp | 903 | 0 | 0 | 3,719 |
| Diesel skid steer loaders, 2-yd$^3$ capacity | 725 | 0 | 0 | 2,614 |
| Motor grader, 140 hp | 233 | 0 | 0 | 729 |
| Excavator , 125 hp | 1,179 | 0 | 0 | 4,953 |
| Front-end loader, 2- to 3-yd$^3$ capacity | 1,149 | 0 | 0 | 626 |
| Grass drill and seeder | 725 | 0 | 0 | 2,614 |
| Dump trucks, 12 yd | 1,189 | 0 | 0 | 1,998 |
| Flatbed trailer with tractor or 1-ton vehicle | 144 | 0 | 0 | 16 |
| Pickup truck, ¾ ton, four-wheel drive | 0 | 0 | 0 | 4,400 |
| Alternative 3 | | | | |
| Bulldozer, 310 hp | 369 | 1,092 | 361 | 3,719 |
| Diesel skid steer loaders, 2-yd$^3$ capacity | 279 | 806 | 263 | 2,614 |
| Motor grader, 140 hp | 85 | 238 | 77 | 729 |
| Excavator, 125 hp | 487 | 1,445 | 479 | 4,953 |
| Front-end loader, 2- to 3-yd$^3$ capacity | 255 | 909 | 427 | 626 |
| Grass drill and seeder | 279 | 806 | 263 | 2,614 |
| Dump trucks, 12 yd | 331 | 1,152 | 498 | 1,998 |
| Flatbed trailer with tractor or 1-ton vehicle | 32 | 64 | 16 | 16 |
| Pickup truck, ¾ ton, four-wheel drive | 0 | 2,200 | 2,200 | 4,400 |
| Alternative 4 | | | | |
| Bulldozer, 310 hp | 1,108 | 2,731 | 723 | 3,719 |
| Diesel skid steer loaders, 2-yd$^3$ capacity | 838 | 2,016 | 527 | 2,614 |
| Motor grader, 140 hp | 254 | 595 | 153 | 729 |
| Excavator, 125 hp | 1,461 | 3,612 | 958 | 4,953 |
| Front-end loader, 2- to 3-yd$^3$ capacity | 766 | 2,273 | 853 | 626 |
| Grass drill and seeder | 838 | 2,016 | 527 | 2,614 |
| Dump trucks, 12 yd | 992 | 2,879 | 996 | 1,998 |
| Flatbed trailer with tractor or 1-ton vehicle | 96 | 160 | 32 | 16 |
| Pickup truck, ¾ ton, four-wheel drive | 0 | 4,400 | 2,200 | 4,400 |
| Alternative 5 | | | | |
| Bulldozer, 310 hp | 0 | 4,369 | 723 | 3,719 |
| Diesel skid steer loaders, 2-yd$^3$ capacity | 0 | 3,225 | 527 | 2,614 |
| Motor grader, 140 hp | 0 | 952 | 153 | 729 |
| Excavator, 125 hp | 0 | 5,780 | 958 | 4,953 |
| Front-end loader, 2- to 3-yd$^3$ capacity | 0 | 3,638 | 853 | 626 |
| Grass drill and seeder | 0 | 3,225 | 527 | 2,614 |
| Dump trucks, 12 yd | 0 | 4,607 | 996 | 1,998 |
| Flatbed trailer with tractor or 1-ton vehicle | 0 | 256 | 32 | 16 |
| Pickup truck, ¾ ton, four-wheel drive | 0 | 4,400 | 2,200 | 4,400 |

BLM_0042866

**TABLE C.3-5 Assumed Amounts of Materials per Mine Size and Alternative during Reclamation**

| Items Assumed | Amount of Materials per Mine Size | | | | |
|---|---|---|---|---|---|
| | Small | Medium | Large | Very Large | Total |
| Alternatives 1 and 2 | | | | | |
| Diesel fuel (gal) | 25,000 | 0 | 0 | 76,000 | 101,000 |
| Oil and grease (gal) | 1,300 | 0 | 0 | 3,800 | 5,100 |
| Water (gal) | 45,350 | 0 | 0 | 114,900 | 160,000 |
| Grass seed (40 lb/acre) (tons) | 0.9 | 0 | 0 | 4.2 | 5.14 |
| Hay, delivered (1 ton/acre) (tons) | 47 | 0 | 0 | 210 | 257 |
| Alternative 3 | | | | | |
| Diesel fuel (gal) | 9,000 | 29,000 | 12,000 | 76,000 | 126,000 |
| Oil and grease (gal) | 400 | 1,700 | 900 | 3,800 | 6,800 |
| Water (gal) | 29,000 | 53,400 | 29,000 | 114,900 | 226,000 |
| Grass seed (40 lb/acre) (tons) | 0.4 | 1.2 | 0.4 | 4.2 | 6.2 |
| Hay, delivered (1 ton/acre) (tons) | 20 | 60 | 20 | 210 | 310 |
| Alternative 4 | | | | | |
| Diesel fuel (gal) | 26,000 | 71,000 | 22,000 | 76,000 | 195,000 |
| Oil and grease (gal) | 1,200 | 4,100 | 1,400 | 3,800 | 10,500 |
| Water (gal) | 53,400 | 99,900 | 38,800 | 114,900 | 307,000 |
| Grass seed (40 lb/acre) (tons) | 1.2 | 3.0 | 0.8 | 4.2 | 9.2 |
| Hay, delivered (1 ton/acre) (tons) | 60 | 150 | 40 | 210 | 460 |
| Alternative 5 | | | | | |
| Diesel fuel (gal) | 0 | 111,000 | 22,000 | 76,000 | 209,000 |
| Oil and grease (gal) | 0 | 6,000 | 1,400 | 3,800 | 11,200 |
| Water (gal) | 0 | 151,200 | 38,800 | 114,900 | 305,000 |
| Grass seed (40 lb/acre) (tons) | 0.0 | 4.8 | 0.8 | 4.2 | 9.8 |
| Hay, delivered (1 ton/acre) (tons) | 0 | 240 | 40 | 210 | 490 |

**TABLE C.3-6 Assumed Annual Air Emissions on an Individual Mine Basis during Reclamation**[a]

| Criteria Pollutant | Annual Air Emissions (tons) per Mine Size | | | |
|---|---|---|---|---|
| | Small | Medium | Large | Very Large |
| Total hydrocarbons (THC) | 0.05 | 0.09 | 0.14 | 0.92 |
| Reactive organic compounds (ROCs) | 0.05 | 0.08 | 0.13 | 0.88 |
| Nitrogen oxides ($NO_x$) | 0.52 | 0.84 | 1.30 | 9.07 |
| Sulfur dioxide ($SO_2$) | 0.07 | 0.11 | 0.18 | 1.18 |
| Carbon monoxide (CO) | 0.24 | 0.41 | 0.66 | 4.33 |
| Total suspended particulates (TSP) | 2.00 | 2.97 | 7.88 | 157 |
| Particulate matter ≤10 μm ($PM_{10}$)[b] | 1.05 | 1.54 | 5.98 | 137 |
| Particulate matter ≤2.5 μm ($PM_{2.5}$)[c] | 0.19 | 0.29 | 1.22 | 28.1 |
| Carbon dioxide ($CO_2$)[d] | 48.6 | 80.4 | 128 | 854 |

[a] The latest emission factors were taken from the EPA's WebFIRE application located at http://cfpub.epa.gov/webfire/.

[b] Assumes that the construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions) (SCAQMD 2007).

[c] Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$ (SCAQMD undated).

[d] The $CO_2$ emission factor for diesel fuel was taken from EPA (2008).

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 295 of 426

**TABLE C.3-7 Assumed Total Air Emissions during Reclamation[a]**

| Criteria Pollutant | Total Air Emissions (tons) per Alternative | | | |
|---|---|---|---|---|
| | Alts. 1 and 2 | Alt. 3 | Alt. 4 | Alt. 5 |
| Total hydrocarbons (THC) | 1.2 | 1.5 | 2.4 | 2.6 |
| Reactive organic compounds (ROCs) | 1.2 | 1.5 | 2.3 | 2.5 |
| Nitrogen oxides ($NO_x$) | 12 | 15 | 23 | 25 |
| Sulfur dioxide ($SO_2$) | 1.6 | 2.0 | 3.0 | 3.3 |
| Carbon monoxide (CO) | 5.8 | 7.2 | 11.1 | 12.0 |
| Total suspended particulates (TSP) | 167 | 180 | 216 | 221 |
| Particulate matter ≤10 µm ($PM_{10}$)[b] | 142 | 150 | 172 | 175 |
| Particulate matter ≤2.5 µm ($PM_{2.5}$)[c] | 29 | 31 | 35 | 35 |
| Carbon dioxide ($CO_2$)[d] | 1,140 | 1,420 | 2,200 | 2,360 |

a The latest emission factors were taken from the EPA's WebFIRE application located at http://cfpub.epa.gov/webfire/.

b Assumes that the construction emission factor for fugitive dust $PM_{10}$ is 0.22 ton/acre-mo (average conditions) (SCAQMD 2007).

c Assumes that 21% of fugitive dust $PM_{10}$ is $PM_{2.5}$ and that 89% of combustion $PM_{10}$ is $PM_{2.5}$ (SCAQMD undated).

d The $CO_2$ emission factor for diesel fuel was taken from EPA (2008).

**TABLE C.3-8 Wastes Generated per Alternative during Reclamation**

| Waste Category | Waste Generated (gal) per Alternative | | | |
|---|---|---|---|---|
| | Alts. 1 and 2 | Alt. 3 | Alt. 4 | Alt. 5 |
| Sanitary[a] | 81,000 | 126,000 | 162,000 | 154,000 |
| Other | 36,000 | 56,000 | 72,000 | 68,000 |

a Amount of sanitary waste was estimated based on the total reclamation workforce.

BLM_0042869

## C.4 REFERENCES

Cotter, E., 2011a, personal communication from Cotter (S.M. Stoller Corporation, Grand Junction, Colo.) to M. Picel (Argonne National Laboratory, Argonne, Ill.), Nov. 10.

Cotter, E., 2011b, personal communication from Cotter (S.M. Stoller Corporation, Grand Junction, Colo.) to M. Picel (Argonne National Laboratory, Argonne, Ill.), Nov. 17.

Cotter, E., 2012, personal communication from Cotter (S.M. Stoller Corporation, Grand Junction, Colo.) to M. Picel (Argonne National Laboratory, Argonne, Ill.), Feb. 16.

EPA (U.S. Environmental Protection Agency), 2008, *Climate Leaders Greenhouse Gas Inventory Protocol Core Module Guidance: Direct Emissions from Mobile Combustion Sources*, EPA430-K-08-004, May. Available at http://www.epa.gov/climateleadership/documents/ resources/ mobilesource_guidance.pdf.EPA430-K-08-004.

Ribeiro, T., 2012, personal communication from Ribeiro (U.S. Department of Energy, Office of Legacy Management) to M. Picel (Argonne National Laboratory, Argonne, Ill.), Aug. 21.

RS Means (R.S. Means Company, Inc.), 2009, *Building Construction Cost Data 2009, 67th Annual Edition*, Kingston, Mass.

SCAQMD (South Coast Air Quality Management District), 2007, "Software User's Guide: URBEMIS2007 for Windows, Version 9.2, Emissions Estimation for Land Use Development Projects," Diamond Bar, Calif., Nov. Available at http://www.urbemis.com/software/ URBEMIS9%20Users%20Manual%20Appendices.pdf. Accessed Oct. 24, 2012.

SCAQMD, undated, "Handout #1." Available at www.aqmd.gov/CEQA/handbook/PM2_5/ handout1.doc. Accessed Oct. 24, 2012.

# APPENDIX D:

# IMPACT ASSESSMENT METHODOLOGIES

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 298 of 426

*This page intentionally left blank*

BLM_0042872

# APPENDIX D:

# IMPACT ASSESSMENT METHODOLOGIES

This appendix summarizes the methodologies used in evaluating the various environmental resource areas discussed in this draft programmatic environmental impact statement (PEIS). The environmental resource areas evaluated are as follows:

- Air quality;
- Acoustical environment;
- Geology and soils;
- Water resources;
- Human health;
- Ecological resources;
- Socioeconomics;
- Environmental justice;
- Land use;
- Transportation;
- Cultural resources;
- Visual resources; and
- Waste management.

In addition to these resource areas, the U.S. Department of Energy (DOE) has evaluated cumulative impacts that could result from implementation of the Uranium Leasing Program (ULP) proposed action in combination with past, present, and planned activities (including Federal and non-Federal activities) at or in the vicinity of the DOE ULP lease tracts.

## D.1 AIR QUALITY

Potential air quality impacts under each alternative were evaluated by estimating air pollutant emissions from two phases: (1) mine development and operations; and (2) reclamation. (Air emissions from the exploration phase were not estimated because of its short duration and the negligible amount of emissions it would generate in comparison with the other phases.) Air emissions were estimated for criteria pollutants, volatile organic compounds (VOCs), and carbon dioxide ($CO_2$, a primary greenhouse gas [GHG]) that would result from the activities associated with engine exhaust and fugitive dust emissions from heavy equipment and vehicles, wind erosion from the disturbed areas, and explosives use. Air emissions from traffic due to workers commuting were not included because only a small number of workers would be involved (typically 12 to 24 people) and the amount of any associated emissions would thus be small in comparison to the amount of air emissions generated from heavy equipment and other related activities. Detailed emission inventory tables, including data on emission factors, activity levels, fugitive dust control efficiencies, and total emissions, are presented in Appendix C.

To determine the annual emissions, emission factors for each activity were multiplied by activity-level data and the estimated number of items of equipment required for development, operations, and reclamation. Emission factors available in the standard references, which are most commonly used in emission inventories, were employed for these estimates. Except for the following, emission factors were taken from the WebFIRE database (EPA 2012a):

- For operations under average conditions, an emission factor of 0.22 ton/acre-month was used for uncontrolled emissions of particulate matter of less than or equal to 10 μm ($PM_{10}$) (Jones & Stokes Associates 2007). $PM_{2.5}$ emissions were assumed to be 21% of $PM_{10}$ emissions (AQMD 2012).

- For wind erosion, an emission factor of 0.38 ton/acre-yr was used for uncontrolled emissions of total suspended particulates (TSP). $PM_{10}$ and $PM_{2.5}$ emissions were assumed to be 50% and 7.5%, respectively, of TSP emissions (EPA 2012b).

- For blasting, emission factors of 92 and 10 lb/ton for uncontrolled emissions of $PM_{10}$ and $PM_{2.5}$, respectively, were used (QDEH 1999).

- For diesel combustion from heavy equipment, an emission factor of 22.23 lb/gal for $CO_2$ emissions was used (EPA 2008).

For operations and wind erosion, a fugitive dust control efficiency of 50% was assumed by spraying water on the exposed area twice a day. Projected activity-level data were based on assumptions discussed in Appendix C and the alternatives discussed in Chapter 2.

The significance of project-related emissions with regard to overall air quality was determined by comparing estimated annual project-related emissions of criteria pollutants and VOCs with annual emissions in the three counties that encompass the DOE ULP lease tracts (Mesa, Montrose, and San Miguel Counties) in 2008 and by comparing annual project-related emissions of $CO_2$ with annual GHG emissions in Colorado in 2010 and in the United States in 2009 (CDPHE 2011; EPA 2011; Strait et al. 2007).

## D.2 ACOUSTIC ENVIRONMENT

Potential noise impacts under each alternative were assessed by estimating the combined noise levels from noise-emitting sources associated with ULP activities and then performing noise propagation modeling. These levels were compared with the Colorado noise limit and the U.S. Environmental Protection Agency (EPA) guideline level to estimate the distance from the noise source area or haul routes at which noise would attenuate to these limits or guideline levels.

Primary sources of noise over the life of ULP activities would include operations of aboveground and underground heavy equipment, on-road and off-road vehicle traffic, and, if necessary, blasting. Aboveground equipment includes backhoes, dozers, graders, power

generators, and scrapers, while underground equipment includes rock drills; various types of loaders and trucks would be used both above and under the ground. The average noise levels from most of this heavy equipment range from 80 to 90 dBA, with the exception of 98 dBA for a rock drill at a distance of 50 ft (15 m) (Hanson et al. 2006). In general, the dominant noise source from most construction equipment is the diesel engine, which is continuously operating around a fixed location or has limited movement. Except for rock drills, noise levels for the type of construction equipment that would probably be used at the ULP lease tracts range from about 80 to 90 dBA at a distance of 50 ft (15 m) from the equipment. To estimate noise levels associated with ULP activities, a composite noise level of 95 dBA at a distance of 50 ft (15 m) from the mine site was conservatively assumed, if noisy equipment (such as rock drills) was not being used. Typically, this level could be reached when several pieces of noisy heavy equipment were operating simultaneously near each other at peak load. For impact analysis along the haul routes, a peak "pass-by" noise level of 84 dBA at a reference distance of 50 ft (15 m) from a heavy-duty truck traveling at 55 mph (88 km/h) was estimated (Menge et al. 1998).

Several important factors affect the propagation of sound in the outdoor environment, such as source characteristics, geometric spreading, ground effects, air absorption, meteorological effects (due to turbulence and variations in vertical wind speed and temperature), and screening by topography, structures, dense vegetation, and other natural or human-made barriers. At this programmatic level, no detailed information (e.g., types and capacities of heavy equipment, work schedules, specific locations of projects) was available, so screening-level estimates were made by considering only geometric spreading and ground effects, as shown here (Barry and Reagan 1978; Hanson et al. 2006):

$$L_p = L_{p,ref} - (20 + 10\ G) \log_{10} (D/D_{ref}) \text{ for point sources}$$

and

$$L_p = L_{p,ref} + 10 \log_{10} (N\pi D_{ref}/(5280 \times ST)) - (10 + 10\ G) \log_{10} (D/D_{ref}) \text{ for line sources,}$$

where

$L_p$ = A-weighted sound pressure level at a given distance (dBA),
$L_{p,\,ref}$ = A-weighted sound pressure level at a reference distance (dBA),
$G$ = Ground factor that accounts for ground effects (unitless),
$D$ = Distance from the noise to the receptor (ft),
$D_{ref}$ = Reference distance (ft; assumed to be 50 ft [15 m]),
$N$ = Number of vehicles per hour,
5,280 = Conversion factor from miles to feet,
$S$ = Average vehicle speed (mph) (assumed to be 55 mph [88 km/h]), and
$T$ = Time period over which noise level is computed (assumed to be 1 hour).

For hard ground, $G = 0$. For soft ground, $G$ depends on the effective path height ($H_{eff}$), as follows:

$G = 0.66$ if $H_{eff}$ is <5 ft (1.5 m);

$G = 0.75\ (1 - H_{eff}/42)$ if $H_{eff}$ is ≥5 ft [1.5 m] and <42 ft [12.8 m];

and

$G = 0$ if $H_{eff}$ is ≥42 ft (13 m).

For this analysis, the ground was assumed to be soft based on the land cover around the ULP lease tracts. The effective path height ($H_{eff}$) is the average of the source height and the receptor height. The source height for heavy equipment was assumed to be 7.9 ft (2.4 m), which is the average height of drivetrain and exhaust contributions (Wayson 1993). The receptor height was set at 5 ft (1.5 m), which is the approximate height of human ears from the ground.

Noise levels at receptor locations were estimated by using the above formulas. Day-night average noise levels ($L_{dn}$, or DNL) were derived by assuming a work schedule of 10 hours per day. For ULP activities, the distances at which noise levels reach the Colorado daytime maximum permissible limit of 55 dBA[1] and the EPA guideline level of 55 dBA $L_{dn}$ for residential areas (EPA 1974) were estimated. In addition, the residences within this distance range were counted, based on the assumption that the ULP activities would occur at the ULP lease tract boundaries. During operations, the distances at which noise levels from heavy-duty trucks along the haul routes would approach the Colorado limit and EPA guideline were estimated.

There are several specially designated areas (e.g., Dolores River Special Recreation Management Area [SRMA], Dolores River Canyon Wilderness Study Area [WSA]) and other nearby wildlife habitats around the DOE ULP lease tracts and haul routes where noise might be a concern. Negative impacts on wildlife begin between 55 and 60 dBA, a range that corresponds to the onset of adverse physiological impacts (Barber et al. 2010). Distances up to the lower threshold level from the mine sites and from the haul routes were estimated to identify the range of noise impacts on wildlife.

## D.3 GEOLOGY AND SOILS

The geologic setting established for the ULP lease tracts was based on a review of aerial maps, topographic maps, geologic maps, and the scientific literature. Geologic map data (shapefiles) were obtained from the U.S. Geological Survey (USGS; see Stoeser et al. 2007). References to the geologic time scale were based on the age ranges compiled by Walker and Geissman (2009).

---

[1] Colorado Revised Statutes, Title 25, "Health," Article 12, "Noise Abatement," Section 103: "Maximum permissible noise levels are source-oriented regulations (e.g., daytime level shall not exceed 55 dBA at 25 ft or more from the residence's property boundary)." For this analysis, the Colorado limit for residential areas was applied as a receptor-oriented regulation (e.g., daytime level shall not exceed 55 dBA at a residence) like other noise guidelines or regulations.

The impact assessment for soil resources relied on field observations, consultations with DOE ULP management staff, and reviews of the academic and professional literature to characterize site-specific soil conditions and identify the types of impact-producing activities related to mining within the lease tracts.

Soil conditions within each of the ULP lease tracts were characterized by using customized map data from the U.S. Department of Agriculture (USDA) Natural Resources Conservation Service (NRCS) web soil survey (NRCS 2012) as a starting point and supplementing it with information provided by state and local agencies, as available. Data on various factors, such as soil texture and composition, parent materials, landforms on which the soils developed, drainage class, permeability, surface runoff potential, rutting potential, whole soil erodibility factor (K factor), wind erodibility group/index, and land classification, were gathered to gain a general understanding of the soil's susceptibility to impacts that could result from ground-disturbing activities. Information on special soil features, such as biological crusts, was also obtained. Chapter 3 (on the affected environment) provides general soil maps and map unit descriptions for each of the four lease tract groupings (Gateway, Uravan, Paradox Valley, and Slick Rock). These maps are based on the soil units delineated on county soil surveys at scales of 1:12,000 to 1:100,000 (USDA 1999). The types of potential soil impacts are described in detail in Section 4.2.3.1, and information on the areas of potential disturbance (subject to these impacts) is provided in the soil resources discussion under each alternative in Chapter 4.

## D.4 WATER METHODOLOGY

The analysis of water resources considered impacts on surface water features and groundwater within the ULP lease tracts, the surrounding valleys, the entire groundwater basins, as well as upstream/upgradient and downstream/downgradient valleys and groundwater basins (if it was determined that there was connectivity and the potential for indirect impacts). The surface water features considered were streams, lakes, wetlands, surface springs and seeps, ephemeral washes/drainages, dry lakes, and floodplains.

Impacts on surface water and groundwater resources were mainly related to the alteration of natural hydrologic conditions (e.g., surface runoff, infiltration, and groundwater recharge/flow), degradation of water quality, and water usage. The ROI for the impacts on surface water is within the Upper Dolores, San Miguel, and Lower Dolores basins (USGS HUC-8 basins) where local surface runoff and groundwater discharge flows from the lease tracts to Dolores River, San Miguel River, and their tributaries. ROI for impacts on groundwater resource would be primarily on the lease tracts and would not exceed 5 mi (8 km) downgradient from mining activities in the lease tracts or any rivers and tributaries that local groundwater discharges to. ROI for impacts on water usage is primarily within Montrose, Mesa, and San Miguel Counties. The assessment of impacts related to hydrologic alterations and water quality was performed by using a variety of data sources (e.g., geologic maps, aerial photographs, professional reports on standard mine practices, and the scientific literature) to characterize water features and by exercising professional judgment to identify potential direct and indirect impacts from mining operations. For impacts related to water usage, water use during mine development and operations of the underground mines and for the JD-7 surface

open-pit mine was mainly for the workers' potable water supply and for dust control activities. Water volumes assumed are discussed in Section 2.2 and Appendix C.

## D.5 HUMAN HEALTH RISK

Potential human health impacts were analyzed for the mine exploration, development and operations, reclamation, and post-reclamation phases. The region of influence (ROI) for human health impacts was a 50-mi (80-km) radius of the lease tracts. Potential impacts to individuals are typically estimated to be at low levels (<2 mrem/yr) at distances greater than about 5 mi (8 km) from the source, a larger radius of 50 mi (80 km) was selected as the ROI to assess the potential impacts to the population as a whole (i.e., for collective dose evaluation). The maximum distance from the source that state-of-the art computer models can evaluate is also 50 mi (80 mi). At this distance, the individual doses would have dropped to negligible levels (<0.1–0.2 mrem/yr), which supports the selection of 50 mi (80 km) as the ROI. With regard to the exploration phase, any impacts that might result during that phase were expected to be minor, because exploratory drillings would disturb only small areas and because most of the mineralized cutting excavated from drilling would be placed back to fill the drill holes. Furthermore, the exploration phase would last for only a short period of time (i.e., a few weeks); therefore, potential impacts would be limited to only a few workers. For these reasons, potential human health impacts associated with the exploration phase were not quantified.

### D.5.1 Impact Assessment for the Operational Phase

For this phase, potential impacts on the workers and the general public living near the uranium lease tracts as well as within 50 mi (80 km) of the lease tracts were analyzed. Because the impacts would primarily result from radiation exposures, they (especially radon exposures) were the focus of the analyses conducted for this phase.

Potential impacts assessed for the workers (i.e., uranium miners) included physical hazards and radiation exposures. Physical hazards included nonfatal injuries and illnesses as well as fatal injuries. Statistical data for the mining industry published by the U.S. Department of Labor, Bureau of Labor Statistics (BLS 2011a,b) were used for assessing physical hazards. The potential radiation exposures of the workers, on the other hand, were assessed by using historical data compiled by the United Nations Scientific Committee on the Effects of Atomic Radiation (UNSCEAR 2010).

Radiation exposures of the general public would result primarily from radon emissions from the exhaust vents of the uranium mines. The radon emission rates for three hypothetical underground mines whose sizes ranged from small to medium to large were estimated on the basis of their respective uranium ore production rates, as assumed in the working assumptions. There is a linear correlation between the radon emission rate and the cumulative uranium ore production (EPA 1985). For radon emission rates, an operational period of 10 years was assumed for the uranium mines under consideration when human health impacts under Alternatives 3, 4,

and 5 were assessed. This operational period corresponds roughly to the assumed mining periods of operation for Alternatives 3, 4, and 5 evaluated in Chapter 4. The emission rates from the same mines would be lower if the operational period was shorter. An emission rate of 600 Ci/yr was assumed for a very large open-pit mine, which, according to the working assumptions, would be located on Lease Tract 7. This 600-Ci/yr emission rate was determined on the basis of the emission rates of actual open-pit mines compiled by the EPA in its background report on National Emission Standards for Hazardous Air Pollutants (NESHAP) and is at the upper end of the emission rates for the open-pit mines included in the report (EPA 1989a).

The computer code, CAP88-PC (Trinity Engineering Associates, Inc. 2007), which is supported and maintained by the EPA for demonstrating compliance with regulations, was used to estimate radon concentrations at various downwind locations. Potential maximum radiation doses resulting from radon emissions associated with different sizes of uranium mines were calculated. These calculation results were tabulated as functions of the distance from the emission point and can be used for inferring the potential radiation dose to an individual living close to the ULP lease tracts.

The collective dose to the general public living within 50 mi (80 km) of the lease tracts was also calculated by using CAP88-PC (Trinity Engineering Associates, Inc. 2007). However, rather than the radon emission rate from a single uranium mine, the total radon emission rate from all the uranium mines that would be operated at the same time was used. Because the actual number of mines that would be operated at any time is not known, potential human health impacts were analyzed only for the peak year of operations as defined in the working assumptions (Chapter 2). It is expected that potential collective exposures in any other year would be lower than those estimated for the peak year of operations. Because the exact locations of the active mines during the peak year of operations are not known, the potential range of the collective dose was inferred by placing the radon emission point at four alternative locations. These four alternative locations were selected to be the center points of four lease tract groups, which were formed by aggregating the uranium lease tracts whose geographic locations are close to each other. Figure D.5-1 depicts the four lease tract groups used for analyzing the population exposure. Population distributions within 50 mi (80 km) of the center of each lease tract group were developed by using 2010 Census Bureau data.

### D.5.2 Impact Assessment for the Reclamation Phase

For the reclamation phase, potential human health impacts were analyzed for the reclamation workers and the general public living close to the uranium lease tracts. Both chemical and radiological risks were analyzed. The major radiation sources of concern were the uranium isotopes and their decay products contained in the waste-rock piles. In addition to emitting radiation, the uranium compounds could pose chemical hazards to human health. The vanadium content in the uranium ores is about 5 to 10 times higher than the uranium content. As a result of intermixing from mining, the waste-rock piles could also contain vanadium, which, if inhaled or ingested, could have adverse effects on human health. To account for the possible range of radionuclide concentrations in waste rocks, maximum sampling data (reported as

BLM_0042879

**FIGURE D.5-1 Designated Grouping of the ULP Lease Tracts Used as a Basis for Human Health Impacts Evaluation**

212 mg/kg total uranium which would result in 70 pCi/g uranium and Ra-226 assuming secular equilibrium between uranium isotopes and their decay products) for Lease Tracts JD-6 and JD-8 ((Whetstone Associates 2011, 2012) was considered along with the possibility that the waste rock could contain up to 0.05% uranium (which is calculated to equate to 168 pCi/g uranium).

The reclamation workers were assumed to incur radiation exposures from working on top of the waste-rock pile through three pathways: external radiation; inhalation of radioactive dust particles and radon; and accidental soil ingestion. The exposures were analyzed by using Version 6.7 of the RESRAD computer code (Yu et al. 2001). For chemical exposures, the potential exposure pathways considered were inhalation of dust particles and incidental soil ingestion. The EPA guidance on human health risk assessment (EPA 1989b) was followed to evaluate the potential chemical risks that could result from exposures to uranium and vanadium compounds.

The general public living near the uranium lease tracts would incur radiation and chemical exposures primarily through the airborne release of particulates from the waste-rock piles. In addition, the release of radon could add to the potential radiation exposure. The emission rate of radon was calculated by using Version 6.7 of the RESRAD code (Yu et al. 2001). In the analysis of potential radiation exposures of reclamation workers, RESRAD calculated the radon flux from the surface of a waste-rock pile; this calculated radon flux was multiplied by the surface area of the waste-rock pile to obtain the radon emission rate. The release rate of dust particles was calculated following the guidance from *Regulatory Guide 3.59* (NRC 1987) on emissions from exposed uranium mill tailings sands due to wind erosion. The frequencies of different wind speed groups required in the dust particle emission calculation were calculated on the basis of meteorological data from the lease tracts (Rogers 2011).

On the basis of the emission rates of radon and particulates calculated by the methods discussed in the preceding paragraph, concentrations of radon, uranium isotopes and decay products, total uranium, and vanadium at various downwind locations from the emission point were obtained by using CAP88-PC (Trinity Engineering Associates, Inc. 2007). These concentrations at downwind locations were then used to infer potential radiation and chemical exposures for an individual living close to the uranium lease tracts during the reclamation phase.

### D.5.3 Impact Assessment for Post-Reclamation Phase

The receptor considered for analysis of the human health impacts in the post-reclamation phase was a nearby resident and recreationist who unknowingly entered the uranium lease tract. It was assumed that the recreationist would camp on top of a waste-rock pile for 2 weeks, collect wild berries, and hunt wildlife animals for consumption. Potential impacts from camping would result from the inhalation of radon diffusing from the waste-rock pile, inhalation of dust particles, accidental soil ingestion, and the direct external radiation emitted by radionuclides contained in the waste-rock pile. The RESRAD code was used for dose calculations. Although it is expected that a layer of soil materials would be spread on top of the waste-rock pile to facilitate the growth of vegetation, the thickness of the soil materials could vary. Therefore, in the analysis, a thickness ranging from 0 to 1 ft (0 to 0.3 m) was assumed, and the range of potential impact was calculated.

The residents living close to the uranium lease tracts could still be exposed to radon and dust particles emitted from the waste-rock piles. However, because of the cover soils spread on top of the waste-rock piles, the emission rates would be reduced. As a result, the potential dose associated with airborne emissions incurred by a resident after the reclamation phase would be less than the dose incurred during the reclamation phase.

A less likely exposure scenario for residents living close to the uranium lease tracts considers that the residents let their livestock graze in the uranium lease tracts and consume the meat and milk produced by the livestock. The RESRAD code was used for this analysis.

### D.5.4 Parameter Values for Modeling Potential Radiation and Chemical Exposures

For the impact analyses, a resident living close to or within 50 mi (80 km) of the uranium lease tracts was assumed to be at his residence for 350 days per year and to spend 8 hours outdoors and 16 hours indoors each day. Because the windows and doors of the residence would be closed most of the time, a dust or radon filtration factor of 0.4 was assumed (i.e., the indoor radon or airborne particulate level was assumed to be 40% of the outdoor level). The average inhalation rate was assumed to be 8,000 $m^3$/yr (the default value used in CAP88-PC), while the average soil ingestion rate was assumed to be 100 mg/d.

For reclamation workers, an exposure duration of 20 days was used for impact analyses. The inhalation rate was assumed to be 8,000 $m^3$/yr, and the soil ingestion rate was assumed to be 100 mg/d. An exposure duration of 2 weeks was assumed for the recreationist who camps on a waste-rock pile. This recreationist was assumed to ingest 1 lb (0.45 kg) of wild berries collected from the lease tracts and 100 lb (45.4 kg) of deer meat obtained through hunting activities. This individual was assumed to have the same inhalation and soil ingestion rate as a reclamation worker. For the nearby residents, the inhalation rate and soil ingestion rate were assumed to be the same as those for the recreationist. The ingestion rates of milk (92 L/yr) and meat (63 kg/yr) were set to the RESRAD default values.

For modeling radon emissions from a waste-rock pile, an emanation factor of 0.15 was assumed based on experimental measurement data taken from rock samples (Ferry et al. 2002; Sakoda et al. 2010). The RESRAD default value of $2 \times 10^{-6}$ $m^2$/s was assumed for the radon diffusion coefficient, while the porosity in a waste-rock pile was assumed to be 0.4, the RESRAD default value.

For CAP88-PC analysis, the emission of radon from an underground mine was modeled as a stack source, with a release height of 3 ft (1 m) and a diameter of 6.0 ft (2 m), taken from the diameter of the ventilation shaft in the *Final Environmental Assessment for the Whirlwind Mine Uranium Mining Project* (BLM 2008). An exit velocity of 16 ft/s (5 m/s) was assumed for the gas escaping from the exhaust vents. This exit velocity was obtained by considering the average ventilation rate in an underground mine, the number of exhaust vents, and the diameter of the exhaust vents. An average annual precipitation of 1 ft/yr (0.32 m/yr), ambient temperature of 50°F (10°C), and absolute humidity of 8 g/$m^3$ were selected to reflect site-specific conditions. An average mixing height of 4,900 ft (1,500 m), considering both morning and afternoon conditions, was also assumed for the analyses. For the analysis involving an open-pit mine, the emission of radon was assumed to come from an area source that occupied 100 acres (40 ha)—or 50% of the disturbed area—based on assumptions presented in Chapter 2 for the alternatives. The release height was 0 ft (0 m), and there was no plume rise for release from the open-pit mine.

### D.5.5 Dose Conversion Factors and Toxicity Values

The exposure concentration of radon is usually expressed as a working level (WL), which is a measure of the release of alpha energy by the short-lived progenies of radon. The exposures

are measured in working level months (WLMs). One WLM is equivalent to an exposure of 170 hours to a concentration of 1 WL. UNSCEAR recommends that an exposure of 1 WLM corresponds to 506 mrem of effective dose for workers (UNSCEAR 2008, 2010). For the general public, the corresponding effective dose of an exposure of 1 WLM is about 388 mrem (UNSCEAR 2008). The difference in the conversion from WLM to effective dose used for workers and the conversion used for the general public lies in the different inhalation rates considered for the conversion. The International Commission on Radiation Protection (ICRP 2011) indicates that, based on the pooled results from studies of radon-exposed miners, a lifetime excess risk of $5 \times 10^{-4}$ per WLM should be used for estimating radon progeny-induced lung cancer.

Potential radiation doses resulting from exposures to uranium isotopes and their decay products were calculated by using the ICRP 60-based dose conversion factors for inhalation and ingestion. The corresponding cancer risks were calculated by using the slope factors obtained from Federal Guidance Report No. 13 (Eckerman et al. 1999).

Potential chemical risks that could result from exposures to uranium and vanadium compounds were assessed by comparing the estimated exposures with threshold values. The threshold values used are reference concentrations (RfCs) for inhalation exposures and reference doses (RfDs) for ingestion exposures. The RfD used for assessing risks associated with vanadium exposure is 0.009 mg/kg-d, obtained from the EPA Integrated Risk Information System (IRIS) for $V_2O_5$ (EPA 2012c). The RfC used is 0.0001 mg/m$^3$ from the Agency for Toxic Substances and Disease Registry (ATSDR 2012). Because no RfC value is provided in IRIS or the Health Effect Assessment Summary Tables (HEASTs) for vanadium, the minimum risk level (MRL) proposed by the ATSDR for chronic exposure was used as a surrogate for RfC. The RfC used for assessing risks associated with uranium exposure is 0.0008 mg/m$^3$ (ATSDR 2012), which is the MRL proposed by ATSDR for chronic exposure to insoluble uranium compounds. The RfD used for uranium is 0.003 mg/kg-d, obtained from the IRIS database (EPA 2012c).

### D.5.6 Comparison of CAP88-PC Results and COMPLY-R Results

According to Title 40 in the *Code of Federal Regulations* (40 CFR Part 61), emissions of Rn-222 to the ambient air from an underground uranium mine must not result in any member of the general public receiving in any year an effective dose of 10 mrem or greater. Owners or operators of uranium mines must use COMPLY-R (EPA 1989c) or a model equivalent to COMPLY-R, provided they have received approval from EPA headquarters, to demonstrate compliance with this requirement. For human health impact analyses, in addition to the use of COMPLY-R, the CAP88-PC computer code (Trinity Engineering Associates, Inc. 2007) was also used for conducting analyses in the ULP PEIS because it has been supported and maintained by the EPA and used extensively in human health risk assessments for evaluating potential radiation exposures resulting from airborne emissions of radionuclides, including radon. Furthermore, the emissions considered by CAP88-PC can originate from point sources, such as the exhaust vents of underground uranium mines, or from area sources, such as the waste-rock piles accumulated from uranium-mining activities. In addition to being used to obtain air

concentrations for estimating the radiation dose to an individual, CAP88-PC can also be used to estimate the collective exposures to a population living or working around the emission sources. Consistency in the methodology was maintained by applying CAP88-PC to evaluate the potential exposures of the general public, both as individual members and collectively, associated with the different phases of uranium mine operations considered in the ULP PEIS.

In this section, the calculation results of CAP88-PC and COMPLY-R associated with the release of radon during the operation of a small underground uranium mine (which was defined by the working assumptions described in Chapter 2) are compared. This small uranium mine was assumed to produce 50 tons of uranium ore per day, with an annual production rate of 12,000 tons/yr (10,800 metric tons/yr). The mining activities were assumed to have been conducted for 10 years. Based on the equation proposed by the EPA (EPA 1985) that correlates the radon emission rate with the cumulative uranium ore production, a radon emission rate of 528 Ci/yr was calculated. The volumetric flow rate from the exhaust vent was calculated to be 450 $ft^3/s$ (13 $m^3/s$), corresponding to an exit speed of 16 ft/s (5 m/s) and a diameter of 6 ft (2 m) as used in the CAP88-PC analysis. The vent was assumed to be vertical with a height of 3 ft (1 m) above the ground. Both the ambient temperature and the temperature of the exhaust stream were 50°F (10°C). By using the joint frequency data (Rogers 2011) collected from a 30-ft (10-m) high meteorological tower installed by Energy Fuels Resources Corp. in the proposed Piñon Ridge Mill site in Montrose County, Colorado, the frequency and average wind speed in each of the 16 directional sectors were calculated (Table D.5-1). These data represent the site-specific conditions from April 2008 to March 2011.

Table D.5-2 compares the maximum radon doses calculated with CAP88-PC and those calculated with COMPLY-R at different distances from the radon emission point. The radon doses calculated with CAP88-PC were much smaller than those calculated with COMPLY-R for shorter distances, but the difference in calculated doses became smaller as the distance from the emission point increased. According to the users guide (EPA 1989c), COMPLY-R uses a conversion factor of 920 mrem/WLM to convert radon exposures to effective doses, and, by default, a receptor was assumed to spend 75% of the exposure time indoors. For the CAP88-PC results, an updated conversion factor of 388 mrem/WLM (UNSCEAR 2008) was used, and a receptor was assumed to spend 16 hours indoors and 8 hours outdoors each day for 350 days per year at the same location. Furthermore, the indoor radon level was assumed to be 40% of the outdoor level. If the same exposure-to-dose conversion factor is used in both sets of calculations, the radon dose calculated with COMPLY-R would be greater than that calculated with CAP88-PC for an exposure distance of less than 4,900 ft (1,500 m). However, at 4,900 ft (1,500 m) or more, the radon dose calculated with COMPLY-R would be smaller than that calculated with CAP88-PC.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 311 of 426

**TABLE D.5-1 Meteorological Data Used in the COMPLY-R Calculations**

| Wind from | Frequency | Speed (m/s) |
|---|---|---|
| N | 0.026 | 2.63 |
| NNE | 0.015 | 1.98 |
| NE | 0.015 | 1.53 |
| ENE | 0.018 | 1.43 |
| E | 0.04 | 1.7 |
| ESE | 0.137 | 2.16 |
| SE | 0.139 | 2.01 |
| SSE | 0.054 | 2.01 |
| S | 0.047 | 3.47 |
| SSW | 0.077 | 5.02 |
| SW | 0.07 | 4.54 |
| WSW | 0.061 | 3.1 |
| W | 0.07 | 2.58 |
| WNW | 0.094 | 2.41 |
| NW | 0.09 | 2.87 |
| NNW | 0.047 | 2.85 |

**TABLE D.5-2 Comparison of the Radon Doses Calculated by CAP88-PC and Those Calculated by COMPLY-R**

| | Radon Dose (mrem/yr) | | |
|---|---|---|---|
| Distance (m) | CAP88-PC | COMPLY-R | Ratio[a] |
| 500 | 7.8 | 35.7 | 4.56 |
| 1,000 | 5.6 | 12.0 | 2.13 |
| 1,500 | 3.7 | 6.5 | 1.75 |
| 2,000 | 2.7 | 4.3 | 1.61 |
| 3,000 | 1.6 | 2.5 | 1.53 |
| 4,000 | 1.2 | 1.7 | 1.39 |
| 5,000 | 1.0 | 1.3 | 1.34 |

[a] The ratio is calculated as COMPLY-R divided by CAP88-PC.

BLM_0042885

# D.6 ECOLOGICAL RESOURCES

## D.6.1 Vegetation

This section describes the methodology used to evaluate potential impacts on vegetation within the potentially affected area of the ULP lease tracts.

### D.6.1.1 Vegetation Included in the Assessment

Vegetation considered in the assessment included plant communities associated with the ecoregions and land cover types mapped for the potentially affected area (see data sources below). Habitats associated with wetland types, or other water-dependent habitats, known to occur in the potentially affected area were also included.

### D.6.1.2 Affected Area

The affected area considered in this assessment included the areas of direct and indirect effects. The area of direct effects was defined as the area that would be physically modified during project development (i.e., where ground-disturbing activities would occur). The area of direct effects encompassed the entire lease tracts, which included all project components and access roads.

The area of indirect effects was defined as the area where ground-disturbing activities would not occur but that could be indirectly affected by activities in the area of direct effects. This indirect effects area was defined as the area outside the lease tracts but within 5 mi (8 km) of the tract boundary. The area of indirect effects could be affected by all phases of project activities, including the construction and use of access roads, in the area of direct effects related to groundwater withdrawals, surface runoff, dust, and accidental spills. The distance from the lease tract boundary used to define this area of indirect effects was based on professional judgment and was considered sufficiently large to bound the area that would potentially be subject to indirect effects. The potential magnitude of indirect effects would decrease with increasing distance from the lease tract.

### D.6.1.3 Data Sources

The types of data used to determine the known or potential presence of plant communities in the vicinity of the DOE ULP lease tracts were collected from various sources and at different geographical and organizational levels. Sources of information included, but were not limited to, the following:

BLM_0042886

- Level III and Level IV ecoregions (Chapman et al. 2006);

- Gap analysis programs—Southwest Regional Gap Analysis Project (SWReGAP) (USGS 2004, 2005);

- State noxious weed lists; and

- National Wetlands Inventory (USFWS 2012).

#### D.6.1.4 Analysis Approach

Plant communities that were known to occur or could potentially occur within the affected area were included in the impact analysis. A landscape-level analysis was used to determine impacts by quantifying the total number of acres of each land cover type, encompassing a range of similar plant communities, within the area of direct effects.

The magnitudes of impacts on plant communities would depend on the locations of projects, project-specific designs, the mitigation measures applied (including avoidance, minimization, and compensation), and the status of plant communities in project areas.

The analysis of impacts on environmental resources from mining and reclamation activities was based, in part, on a set of assumptions regarding site preparation and reclamation activities. These assumptions were based on management practices at existing mines and current DOE guidance and were used for the evaluation of impacts at the programmatic level.

The actual extent of land disturbance within the footprint of any mine site would be specified in a detailed plan. However, to ensure an upper-bound assumption for the impact analyses, the entire project area was assumed to be cleared of all vegetation during site preparation. Development and operations were assumed to continue for 8 to 15 years. Ground disturbance was assumed to range from 10 acres (4 ha) for small mines to 20 acres (8 ha) for a large mine. In addition, the very large, 210-acre (80-ha) open-pit mine at JD-7 was assumed to resume operations under some of the alternatives.

It was assumed that immediately following the decommissioning of a mine, land surfaces would be recontoured to the greatest extent feasible. The operator would subsequently establish vegetation on the waste-rock area and other disturbed areas. It was assumed that reclamation activities would occur over a 2-year period and would include grading to create landforms conforming to the surrounding area, application of topsoil, and seeding. A seed mix (see Table 4.1-8) has been developed for use on reclamation activities for the ULP. The final determination of successful vegetation establishment would be made by DOE in coordination with the BLM and Colorado Division of Reclamation, Mining, and Safety (CDRMS).

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 314 of 426

### D.6.2 Wildlife and Aquatic Biota

Analysis of potential impacts on terrestrial and aquatic species and their habitats considered mine development, mine operations, and reclamation activities at and in the vicinity of the lease tracts. Direct and indirect impacts on ecological resources were evaluated on the basis of the following:

- The quality and quantity of habitats present;
- The potential magnitude of changes to habitat quality and quantity;
- The season when impacts could occur;
- The expected duration of impacts;
- The sensitivity of biological resources that could be affected by changes in habitat quality or quantity; and
- The rarity and importance of affected resources.

Impacting factors considered in evaluating effects from mining in the lease tracts included the following:

- Habitat loss, modification, and fragmentation;
- Barriers to movement;
- Changes in stream flow and water quality;
- Erosion and sedimentation;
- Air quality and fugitive dust;
- Introduction of invasive species;
- Exposure to contaminants (including radionuclides);
- Mortality and injury; and
- Noise and disturbance.

BLM_0042888

**D.6.2.1 Wildlife**

This section describes the methodology used to evaluate impacts on wildlife known to occur, or for which suitable habitat could occur, within the potentially affected area of the ULP lease tracts.

**D.6.2.1.1 Wildlife Species Included in the Assessment.** Wildlife species considered in the assessment included representative amphibian, reptile, bird, and mammal species. Representative species were selected among those species known to occur, or for which potentially suitable habitat occurs, within the lease tracts. To a large extent, the selection of representative species was based on whether a species (1) has key habitats within or near the lease tracts, (2) is important to humans (e.g., big game, small game, and furbearer species), (3) is representative of other species that share predominant habitats found in the lease tracts, (4) could make use of lease tract mines (e.g., bats), (5) has some type of regulatory protection (e.g., Migratory Bird Treaty Act), and/or (6) is among the species reported in the Environmental Protection Plans (EPPs) provided in Appendix I. To the extent practicable, representative species included wildlife species whose range included the three-county study area or at least extended throughout the region for all or most of the lease tracts.

**D.6.2.1.2 Affected Area.** For the wildlife impact assessment, the affected area included those portions of Mesa, Montrose, and San Miguel Counties that encompassed the lease tracts. The area of direct effects was defined as the area that would be physically modified during project development (i.e., where ground-disturbing activities would occur). The area of direct effects encompassed the entire lease tracts, which included all project components and access roads. The area of indirect effects was defined as the area where ground-disturbing activities would not occur but that could be indirectly affected by activities in the area of direct effects. This indirect effects area was defined as the area outside the lease tracts but within 5 mi (8 km) of the tract boundary. The distance from the lease tract boundary used to define this area of indirect effects was based on professional judgment and was considered sufficiently large to bound the area that would potentially be subject to indirect effects.

**D.6.2.1.3 Data Sources.** The types of data used to determine the known or potential presence of wildlife species and life history information on the species were collected from various sources and at different geographical and organizational levels. The most current, location-specific data at the highest resolution were used whenever available. Sources of information included, but were not limited to, the following:

- Colorado National Heritage Program (CNHP 2009) and Colorado Parks and Wildlife (formerly Colorado Division of Wildlife; CPW 2011);
- Gap analysis programs—SWReGAP (USGS 2004, 2005, 2007); and
- NatureServe (2011).

**D.6.2.1.4 Analysis Approach.** Because of the uncertainty regarding species distributions and the inherent challenges involved with tracking wildlife species in a lease tract, a conservative approach was used to determine the potential for species to occur on or in the vicinity of the lease tracts. The identification of potential wildlife species in the general area of the lease tracts was based on (1) county-level occurrences, (2) locations of species observations as determined by Colorado's wildlife and/or natural heritage agencies, and (3) occurrences of identified land cover for the species listed by SWReGAP (USGS 2005).

Spatial data provided by state natural heritage and regional gap analysis programs were used to determine whether potentially suitable habitat occurred in the affected area. Gap analysis program data consisted of vertebrate animal land cover models. When maps of key habitats for a big game or game bird species (e.g., crucial winter range) were available, the acreages of those habitats within each of the lease tracts were determined by using ESRI ArcGIS Version 9 software.

With regard to the assessment of wildlife, relative impact magnitude categories were as follows:

- *None*. No impacts are expected.
- *Small*. Effects would not be detectable or would be so minor that they would neither destabilize nor noticeably alter any important attribute of the resource. (For this analysis, impacts were considered small if ≤1% of identified habitat for a representative species would be lost in the ROI.)
- *Moderate*. Effects would be sufficient to alter noticeably but not destabilize important attributes of the resource. (For this analysis, impacts were considered moderate if ≥1% but <10% of identified habitat for a representative species would be lost in the region.)
- *Large*. Effects would be clearly noticeable and sufficient to destabilize important attributes of the resource. (For this analysis, impacts were considered large if 10% or more of identified habitat for a representative species would be lost in the region.)

Actual impact magnitudes on wildlife species would depend on the locations of projects, project-specific designs, mitigation measures applied (including avoidance, minimization, and compensation), and status of the species and their habitats in the project areas.

### D.6.2.2 Aquatic Biota

This section describes the methodology used to evaluate direct and indirect impacts on aquatic habitats and biota known to occur on or within the potentially affected area of the ULP lease tracts.

**D.6.2.2.1 Affected Area.** For the aquatic biota impact assessment, the affected area is similar to that for the wildlife assessment. The area of direct effects was defined as the area that would be physically modified during project development (i.e., where ground-disturbing activities would occur). The area of direct effects encompassed the entire lease tracts, which included all project components and access roads. The area of indirect effects was defined as the area where ground-disturbing activities would not occur but that could be indirectly affected by activities in the area of direct effects. This indirect effects area was defined as the area outside the lease tracts but within 5 mi (8 km) of the tract boundary. The distance from the lease tract boundary used to define this area of indirect effects was based on professional judgment and was considered sufficiently large to bound the area that would potentially be subject to indirect effects.

**D.6.2.2.2 Analysis Approach.** Aquatic habitat and communities were assessed by first determining the perennial and intermittent/ephemeral surface water features (streams and other water bodies) within or adjacent to the lease tracts. The occurrences of surface water features were based on data from the USGS national atlas (http://nationalatlas.gov/mapmaker) and available reports.

Descriptions of aquatic communities within the aquatic habitats were derived from state records, reports conducted on aquatic systems in the lease tracts, and existing NEPA documents for the lease tracts. For many of the ephemeral/intermittent washes and rivers, no data were available. Many of the surface water features in the lease tracts are ephemeral and are not expected to contain aquatic habitat or biota. However, with sufficient frequency and flow, ephemeral or intermittent surface water may contain a diverse seasonal community of opportunistic species or habitat specialists adapted to living in temporary aquatic environments. Such specialists may be present in a dormant state even in dry periods. Therefore, aquatic biota could be present at least temporarily. Also, mining activities could affect permanent water features located near some of the lease tracts. To better resolve whether aquatic habitat and biota are present within or near a lease tract, site-specific surveys of aquatic communities are presumed to be required prior to mine development.

It was assumed that impacts on aquatic habitat and communities could potentially result from direct disturbance; surface water and groundwater withdrawals; and changes in water, sediment, and contaminant inputs to surface water features. Based on best professional judgment, much greater weight was given to the magnitude of direct effects, because those effects could be difficult to mitigate. The potential for indirect impacts on surface water outside the lease tracts was evaluated on the basis of their proximity and connectivity to surface water inside the lease tracts. In most cases, it was assumed that mitigation would reduce most indirect effects to negligible levels. Actual impacts on aquatic habitat and biota would depend on the locations of mines relative to surface water, mine-specific designs, and mitigation measures applied (including avoidance, minimization, and compensation). Mitigation was considered if there was a potential for impacts on aquatic habitat and biota.

BLM_0042891

### D.6.3 Threatened, Endangered, and Sensitive Species

#### D.6.3.1 Species Included in the Assessment

Potential impacts on threatened, endangered, and sensitive species were evaluated in a manner similar to that used for plant communities and habitats and wildlife and aquatic resources (Sections D.6.1 and D.6.2), and impacts on these species and their habitats from mine development, mine operations, and reclamation activities at and in the vicinity of the lease tracts were considered. The following types of species were evaluated in the ULP PEIS as threatened, endangered, or sensitive species:

- Species listed as threatened or endangered under the Endangered Species Act (ESA) or that are proposed or candidates for listing under the ESA;
- Species that are listed by the BLM as sensitive;
- Species that are listed by the U.S. Forest Service (USFS) as sensitive; and
- Species that are listed as threatened or endangered by the State of Colorado.

Data used to determine baseline conditions and evaluate impacts of the ULP on threatened, endangered, and sensitive species were obtained from the following sources:

- USFWS Information, Planning, and Conservation (IPaC) System (USFWS 2011a);
- USFWS Critical Habitat Portal (USFWS 2011b);
- NatureServe Explorer (NatureServe 2011);
- CNHP Rare Plant Guide (CNHP 2011a);
- CNHP element occurrence records (CNHP 2011b);
- CPW Natural Diversity Information Source (CPW 2011); and
- SWReGAP (USGS 2007).

#### D.6.3.2 Affected Area

The affected area includes areas that may be directly or indirectly affected by activities conducted under the ULP. The area of direct effects for threatened, endangered, and sensitive species includes those portions of Mesa, Montrose, and San Miguel Counties that intersect the lease tracts. The area of indirect effects for threatened, endangered, and sensitive species encompasses a larger area of habitats that could be affected by indirect factors including, but not

limited to, groundwater withdrawal; changes in water quality, sedimentation, and erosion; dispersion of contaminants (including radionuclides); and fugitive dust dispersion. The spatial extent for the area of indirect effects was conservatively defined based on the species' biology and potential mechanisms of impacts. For example, the areas of indirect effects for aquatic species are generally larger than those for terrestrial species. The indirect effects area for terrestrial species was defined as the area outside the lease tracts but within 5 mi (8 km) of the tract boundary. However, the indirect effects area for aquatic species was determined to include downstream intermittent streams and water bodies to account for potential impacts of altered water quality and quantity related to ULP activities. For aquatic species, the indirect effects area included downstream portions of the Dolores and San Miguel Rivers, as well as downstream portions of the Colorado River. The distance between the confluence of the Dolores and Colorado Rivers and the Lease Tracts ranges between approximately 35 river miles (56 river km) from the Gateway Lease Tracts and greater than 70 river miles (112 river km) from the Slick Rock Lease Tracts. In general, the magnitude of indirect effects decreases with increasing distance from the lease tracts.

#### D.6.3.3 Analysis Approach

Because of the uncertainty regarding species distributions and the inherent challenges involved with tracking species in the lease tracts, a conservative approach was used to determine the potential for species to occur on or in the vicinity of the lease tracts. The identification of potential threatened, endangered, and sensitive species in the vicinity of the lease tracts was based on (1) county-level occurrences, (2) locations of species observations as determined by Colorado wildlife and/or natural heritage agencies, and (3) occurrences of potentially suitable habitat for the species listed by SWReGAP (USGS 2007).

Spatial data provided by the CNHP and SWReGAP were used to determine whether potentially suitable habitat occurred in the affected area. The SWReGAP habitat suitability models consisted only of vertebrate animal land cover models.

A spatial analysis was performed by using ESRI ArcGIS 10 software to determine the intersections of the ULP lease tracts with CNHP element occurrences and SWReGAP habitat suitability models. Based on this analysis, a determination was made regarding the species' known or potential occurrence on the lease tract. A lack of data did not preclude a species from potentially occurring in a given area. When there was a lack of CNHP records or SWReGAP habitat suitability models for a species, modeled land cover types were used to determine the potential suitability of the affected area with regard to what is known about the species' biology and habitat preferences.

Relative impact magnitude categories were as follows:

- *None.* No impacts are expected.

- *Small.* Effects would not be detectable or would be so minor that they would neither destabilize nor noticeably alter any important attribute of the resource.

- *Moderate.* Effects would be sufficient to alter noticeably but not destabilize important attributes of the resource.

- *Large.* Effects would be clearly noticeable and sufficient to destabilize important attributes of the resource.

Actual impact magnitudes on threatened, endangered, and sensitive species would depend on the locations of projects, project-specific designs, and mitigation measures applied (including avoidance, minimization, and compensation).

## D.7 LAND USE

The area of analysis focused on public and private lands within a 25-mi (40-km) radius of the ULP lease tracts. Existing right-of-way (ROW) authorizations and land designations under BLM's lands and realty program were identified (including specially designated lands with wilderness characteristics). Other information on agriculture, livestock grazing, wild horses and burros, mineral resources (and mining), oil and gas leasing, timber harvest, and recreation were obtained from Federal and state sources. Major sources of information included (1) BLM's resource management plans, the national landscape conservation system, public land statistics, and the Land and Mineral Legacy Rehost 2000 system (LR2000); (2) USDA's 2007 census of agriculture and resource bulletins; and (3) various reports and database searches from web sites sponsored by the Colorado Department of Natural Resources (CDNR), CDRMS, Colorado Oil and Gas Conservation Commission (COGCC), Utah Geological Survey, and Utah Division of Oil, Gas, and Mining.

The impacts analysis for land use considered issues such as land use conflicts within the lease tracts (e.g., mining, oil and gas leasing, livestock grazing, and recreation), whether or not lease tracts would be open to mineral entry (under the various alternatives), and visual impacts at specially designated lands. The main factors considered as part of the land use impacts analysis were the (1) proximity of lease tracts to specially designated areas, (2) nature of the resources and resource values present within the proximate specially designated areas, and (3) quality of the view of the lease tracts from these areas.

## D.8 SOCIOECONOMICS

The analysis of socioeconomic impacts from the mining activities at the DOE ULP lease tracts assessed impacts in an ROI. The ROI includes Mesa, Montrose, and San Miguel Counties in Colorado, in which the majority (up to 90%) of employees for the DOE ULP proposed mines would reside. The ROI includes county governments, city governments, and school districts. The assessment of the impacts from mining at the DOE ULP lease tracts covered impacts on employment, income, population, housing, community services, and traffic.

### D.8.1 Regional Employment and Income

The assessment of impacts from mining activities on regional employment and income was based on the use of regional economic multipliers in association with project expenditure data for the mine development and operations phase and the reclamation phase. Multipliers captured the indirect (off-site) effects of on-site activities associated with mining operational and reclamation activities. Data on expenditures were derived from numerous sources.

Cost data for each cost category were then mapped into the relevant North American Industry Classification System (NAICS) codes for use with multipliers from an IMPLAN model specified for each state (MIG 2011). IMPLAN input-output economic accounts show the flow of commodities to industries from producers and institutional consumers. The accounts also show consumption activities by workers, owners of capital, and imports from outside the region. The IMPLAN model contains 528 sectors representing industries in agriculture, mining, construction, manufacturing, the wholesale and retail trade, utilities, finance, insurance and real estate, and consumer and business services. The model also includes information for each sector on employee compensation; proprietary and property income; personal consumption expenditures; Federal, state, and local expenditures; inventory and capital formation; and imports and exports.

Impacts on employment were described in terms of the total number of jobs created in the ROI in the peak years for mine development, mine operations, and reclamation. The relative impact of the increase in employment in the ROI was calculated by comparing the total mining employment (without considering ULP-related activities), over the same period, with the employment that was assumed in order to estimate the number of jobs created by the ULP exploration, mine development and operations, and reclamation activities. Impacts were expressed in terms of the percentage point difference in the average annual employment growth rate with and without the DOE ULP mining activities. Forecasts were based on data provided by the U.S. Department of Commerce.

### D.8.2 Population

An important consideration in the assessment of the impacts from DOE ULP mining and reclamation activities was the number of workers, families, and children who would migrate into the ROI, either temporarily or permanently. The capacity of regional labor markets to supply a sufficient number of workers in the occupations required for mining and reclamation is closely related to the occupational profile of the ROI and occupational unemployment rates. To estimate the in-migration that would occur to satisfy direct labor requirements, the analysis developed estimates of the available labor in each direct labor category based on ROI unemployment rates applied to each occupational category. In-migration associated with indirect labor requirements was derived from estimates of the available labor supply in the ROI economy as a whole that would be able to satisfy the demand for labor by industry sectors in which mining and reclamation spending initially occurred. The national average household size (2.6) was used to calculate the number of additional family members who would accompany direct and indirect

in-migrating workers. Based on other analyses of energy project labor in-migration (Fahys-Smith 1983), it was assumed that 28% of the workers in-migrating into each ROI would bring their family members with them.

Impacts on population were described in terms of the total number of in-migrants arriving in the ROI in the peak year(s) of DOE ULP mining and reclamation. The relative impact of the increase in population in the ROI was calculated by comparing total DOE ULP in-migration over the period in which mining and reclamation was assumed to occur with baseline ROI population forecasts over the same period. Impacts were expressed in terms of the percentage point difference in the average annual population growth rate with and without the DOE ULP mining and reclamation activities. Forecasts were based on data provided by the Colorado State Demography Office.

### D.8.3 Housing

The in-migration of workers occurring during mine development and operations has the potential to affect the housing market in the ROI. The analysis considered these impacts by estimating the increase in demand for rental housing units in the peak year(s) of operations and reclamation that would result from the in-migration of both direct and indirect workers into the ROI. The impacts on housing were described in terms of the number of rental units required in the peak year of operations. The relative impact on the existing housing in the ROI was estimated by calculating the impact of mining-related housing demand on the number of vacant rental housing units in the peak year of operations.

### D.8.4 Community Services

In-migration associated with mining activities could translate into an increased demand for educational and public services (schools, police, firefighters, health services, and so on) in the ROI. Impacts of mining activities on community service employment were also calculated for the ROI in which the majority of new workers would locate. The analysis used estimates of the number of in-migrating workers and families to calculate the number of newly sworn police officers, firefighters, and general government employees who would be required to maintain the existing levels of service for each community service. Calculations were based on the existing number of employees per 1,000 persons for each community service. The analysis of the impact on educational employment estimated the number of teachers in each school district who would be required to maintain existing teacher-student ratios across all student age groups. Information on existing employment and levels of service was collected from the individual jurisdictions providing each service.

### D.8.5 Recreation

Mining activities could have impacts on recreation. Providing quantitative estimates of these potential impacts is difficult as it is unclear how mining operations and reclamation would

affect visits by recreationists. An approach to quantify the magnitude of the potential impacts on the economy (for tourism and recreation) was developed for the ULP PEIS in order to provide some perspective. The approach examined the impact of a 1%, 5%, and 10% reduction in ROI employment and income in the recreation sector. Impacts were estimated by using IMPLAN data for the ROI (MIG 2011). Impacts on employment were described in terms of the total number of jobs that would be lost in the ROI from a reduction in the recreation sector. The relative impact of the decrease in employment in the ROI was calculated by comparing total recreation employment over the period assumed for the proposed mining activities with recreation employment forecasts for the ROI (without the proposed action) for the same period.

## D.9 ENVIRONMENTAL JUSTICE

Exploration, mine development and operations, and reclamation of uranium mines at the DOE ULP lease tracts could affect environmental justice if any adverse human health and environmental impacts resulting from any phase were significantly high and if these impacts would disproportionately affect minority and low-income populations. If the analysis determined that human health and environmental impacts were not significant and if the analysis accounted for any cumulative or multiple adverse exposures from environmental hazards and unique factors associated with the populations that might result in differential routes of exposure, or other unique ecological, cultural, human health or socioeconomic impacts, then there could not be any disproportionately high and adverse impacts on minority and low-income populations. If the analysis determined a potential for human health or environmental impacts to be significant, disproportionality would be determined by comparing the proximity of any high and adverse impacts with the locations of low-income and minority populations. For example, the analysis would consider whether potentially significant human health risks would appreciably exceed the risk to the general population.

The analysis of environmental justice issues associated with the development of uranium mines considered impacts within the ULP lease tracts and an associated 50-mi (80-km) radius around the boundary of the proposed lease tracts. The geographic distribution of minority and low-income groups in the 50-mi (80-km) radius was based on demographic data from the U.S. Bureau of the Census (2011a,b). The following definitions were used to define minority and low-income population groups:

- *Minority*. Persons are included in the minority category if they identify themselves as belonging to any of the following racial groups: (1) Hispanic; (2) Black (not of Hispanic origin) or African American; (3) American Indian or Alaska Native; (4) Asian; or (5) Native Hawaiian or Other Pacific Islander.

  Beginning with the 2010 Census, where appropriate, the census form allows individuals to designate multiple population group categories to reflect their ethnic or racial origin. In addition, persons who classify themselves as being of multiple racial origins may choose up to six racial groups as the basis of their racial origins. The term minority includes all persons, including those classifying themselves in multiple racial categories, except those who classify

BLM_0042897

themselves as not of Hispanic origin and as White or "Other Race" (U.S. Bureau of the Census 2011a).

The CEQ guidance proposed that minority populations should be identified where either (1) the minority population of the affected area exceeds 50% or (2) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis.

The ULP PEIS applied both criteria in using Census Bureau data for census block groups, wherein consideration was given to minority populations that were both greater than 50% and 20 percentage points higher than they were in the state (the reference geographic unit).

- *Low-income*. These are individuals who fall below the poverty line. The poverty line takes into account family size and the ages of individuals in the family. In 2009, for example, the poverty line for a family of five with three children younger than 18 was $26,023. For any given family below the poverty line, all family members are considered as being below the poverty line for the purposes of analysis (U.S. Bureau of the Census 2011b).

## D.10 TRANSPORTATION

This section provides the methodology and key input parameters used for the transportation risk analysis performed in support of the ULP PEIS. The methodology followed the common approach identified in the DOE Handbook (DOE 2002). The analysis evaluated the transportation of mined uranium ore from the lease tracts to the uranium mills. Transportation impacts were estimated for shipment by truck because, historically, all such shipments in the area have been by truck. Shipment by rail would not be practical, because there are no rail lines located at or near any of the lease tracts or the uranium mills.

### D.10.1 Overview

The transportation risk assessment considered human health risks from routine (normal, incident-free) transport of radiological materials and from accidents. The risks associated with the nature of the cargo itself ("cargo-related impacts") were considered for routine transport. Risks related to the transportation vehicle regardless of type of cargo ("vehicle-related impacts") were considered for potential accidents. Radiological cargo-related accident risks were not quantified, as discussed in Section D.10.1.2. The transportation of hazardous chemicals was not quantified, because hazardous chemicals utilized are similar in types and volumes typical of general small industrial activity (e.g., use of diesel fuel to operate equipment).

BLM_0042898

#### D.10.1.1 Routine Transportation Risk

The radiological risk associated with routine transportation would be cargo-related and result from the potential exposure of people to low levels of external radiation near a loaded shipment. No direct physical exposure to radioactive material would occur during routine transport, because the uranium ore would be covered by a tarp during transport. No significant unintended releases would occur.

#### D.10.1.2 Accident Transportation Risk

The cargo-related radiological risk from transportation-related accidents would come from the potential release and dispersal of radioactive material into the environment during an accident and the subsequent exposure of people through multiple exposure pathways (e.g., exposure to contaminated soil, inhalation, or the ingestion of contaminated food). However, the bulk of the uranium ore, with an approximate uranium concentration range of about 0.2% $U_3O_8$ by weight, would be in cobbles and stones, which would minimize the potential for any significant release of uranium to the surrounding air, soil, or water. Thus, the radiological accident transportation risk from the shipment of uranium ore was not explicitly quantified, because the short-term dose to an individual involved in an accidental spill or the cleanup would be minimal (e.g., a small fraction of that received by a uranium miner, as discussed in Section 4.3.5.1). A miner is estimated to receive an *annual* dose of 433 mrem, primarily from radon inhalation because of the confined nature of the mine. Such confinement would be absent from an accident spill location, and a worker involved in cleanup might therefore be expected to receive a dose on the order of 1 mrem or less.

"Vehicle-related accident risks" refers to the potential for transportation-related accidents that would result in injuries and fatalities caused by physical trauma unrelated to the cargo.

### D.10.2 Routine Risk Assessment Methodology

The RADTRAN 5 computer code (Neuhauser and Kanipe 2003; Weiner et al. 2006) was used in the routine risk assessment to estimate the radiological impacts on collective populations. RADTRAN 5 was developed by Sandia National Laboratories to calculate population risks associated with the transportation of radioactive materials by truck, rail, air, ship, or barge. The code has been used extensively for transportation risk assessments since it was originally issued in the late 1970s as RADTRAN (RADTRAN 1) and has been reviewed and updated periodically. RADTRAN 1 was originally developed to facilitate the calculations presented in NUREG-0170 (NRC 1977).

#### D.10.2.1 Collective Population Risk

The radiological risk associated with routine transportation would result from the potential exposure of people to low-level external radiation in the vicinity of loaded shipments.

Even under routine transportation, some radiological exposure could occur. Because the radiological consequences (dose) would occur as a direct result of normal operations, the probability of routine consequences is taken to be 1 in the RADTRAN 5 code. Therefore, the dose risk is equivalent to the estimated dose.

For routine transportation, the RADTRAN 5 computer code considers major groups of potentially exposed persons. The RADTRAN 5 calculations of risk for routine highway transportation include exposures of the following population groups:

- *Persons along the route (off-link population).* Collective doses were calculated for all persons living or working within 0.5 mi (0.8 km) of each side of a transportation route. The total number of persons within the 1-mi (1.6-km) corridor was calculated separately for each route considered in the assessment.

- *Persons sharing the route (on-link population).* Collective doses were calculated for persons in all vehicles sharing the transportation route. This group included persons travelling in the same or the opposite direction in which the shipment was going, as well as persons in vehicles passing the shipment.

- *Persons at stops.* Collective doses can be calculated for people who might be exposed while a shipment was stopped en route. For truck transportation, these stops would include those for refueling, food, and rest. Truck stops were not considered in the ULP PEIS because of the relatively short shipment distances being considered.

- *Crew members.* Collective doses were calculated for truck drivers involved in the actual shipment of material. Workers involved in loading or unloading were not considered in the transportation analysis.

The doses calculated for the first three population groups were added together to yield the collective dose to the public. The dose calculated for the fourth group represents the collective dose to workers.

The RADTRAN 5 calculations for routine doses generically compute the dose rate as a function of distance from a point source or line source (Neuhauser and Kanipe 2003). Associated with the calculation of routine doses for each exposed population group are parameters such as the radiation field strength, source-receptor distance, duration of exposure, vehicle speed, stopping time, traffic density, and route characteristics (such as population density). The RADTRAN manual contains derivations of the equations used and descriptions of these parameters (Neuhauser and Kanipe 2003).

#### D.10.2.2 Highest-Exposed Individual Risk

In addition to the routine collective population risk, the risks to individuals receiving the highest impacts were estimated for a number of hypothetical exposure scenarios by using the RISKIND model (Yuan et al. 1995; Biwer et al. 1997). Receptors included members of the public exposed while standing along the route, during traffic delays, or while living near a facility, as summarized in Table D.10-1.

RISKIND was used to calculate the dose to each individual considered for an exposure scenario defined by an exposure distance, duration, and frequency specific to that receptor. The distances and durations of exposure were similar to those given in previous transportation risk assessments (DOE 1995, 1996, 1997, 1999, 2011). The scenarios were not meant to be exhaustive but were selected to provide a range of potential exposure situations.

The RISKIND external dose model considers direct external exposure and exposure from radiation scattered from the ground and air. RISKIND was used to calculate the dose as a function of distance from a shipment on the basis of the dimensions of the shipment (millirems per hour for stationary exposures and millirem per event for moving shipments). The code approximates the shipment as a cylindrical volume source, and the calculated dose includes contributions from secondary radiation scattering from buildup (scattering by the material contents), cloudshine (scattering by the air), and groundshine (scattering by the ground). As a conservative measure, credit for potential shielding between the shipment and the receptor was not considered.

### D.10.3 Accident Assessment Methodology

"Vehicle-related accident risk" refers to the potential for transportation accidents that could directly result in injuries and fatalities not related to the nature of the cargo in the shipment. This risk represents injuries and fatalities from physical trauma. Route-specific rates or county-wide average rates for transportation injuries and fatalities were used in the assessment (see Section D.10.4.1.3). Vehicle-related accident risks were calculated by multiplying the total distance travelled by the rates for transportation injuries and fatalities. In all cases, the vehicle-related accident risks were calculated on the basis of distances for round-trip shipments, because the presence or absence of cargo would not be a factor in accident frequency.

**TABLE D.10-1 Individual Exposure Scenarios**

| Receptor | Exposure Event |
|---|---|
| Person at roadside | 2 m |
| Person in traffic jam | 1.2 m for 30 minutes |
| Resident near route | 30 m |

### D.10.4 Input Parameters and Assumptions

The principal input parameters and assumptions used in the transportation risk assessment are discussed in this section. These shipments are subject to regulation by the U.S. Department of Transportation (DOT) and other entities, as appropriate. The Hazardous Materials Transportation Act of 1975, as amended in Volume 49 of the *United States Code* (49 USC 5105 *et seq.*), requires DOT to establish regulations for safely transporting hazardous materials (including radioactive materials) in commerce. Title 49 of the CFR contains DOT standards and requirements for packaging, transporting, and handling radioactive materials for all modes of transportation. DOT's hazardous materials regulations (HMRs) on the transportation of hazardous and radioactive materials can be found in 49 CFR Parts 171–180. Natural uranium ore is classified as a low-specific activity (LSA) material with no activity limit and no specific packaging requirements, as covered under 49 CFR Part 173 (Shippers – General Requirements for Shipments and Packaging). Requirements for motor carrier transportation can also be found in 49 CFR Parts 350–399.

#### D.10.4.1 External Dose Rate

For input to RADTRAN and RISKIND calculations, the dose rate at a distance of 7 ft (2 m) from the side of a uranium ore haul truck was estimated to be approximately 0.1 mrem/h. An ore content of 0.2% $U_3O_8$ by weight was modeled by using the MicroShield code (Grove 2006) with 25 tons of ore.

#### D.10.4.2 Route Characteristics

Uranium ore shipments would travel from the lease tracts to a uranium mill for processing. These shipments would not necessarily go to the mill that is nearest to a given lease tract. At the time of actual shipment, many factors (e.g., existing road conditions, traffic, weather, road maintenance or repairs, and mill capacities and costs) would be the criteria used to determine which mill should receive a given ore shipment. The transportation route selected for a shipment determines the total population of potentially exposed individuals and the expected frequency of transportation-related accidents.

#### D.10.4.3 Routine Impacts

For truck transportation, the route characteristics most important for a risk assessment include the total shipping distance between each origin site and destination site and the population density along the route. Shipping distances between the lease tracts and the proposed Piñon Ridge Mill and White Mesa Mill are presented in Section 4.3.10 and Table 4.3-10.

The population density in the uranium lease tracts is very low, less than one person per square kilometer in most locations. Higher population densities are encountered in the small towns of Naturita, Colorado, and Monticello, Utah—the only population centers along any of the

potential uranium shipment routes. For the ULP PEIS analysis, representative unit risk factors were developed on a per-kilometer basis for the collective population and worker (truck driver) doses. These factors were calculated by assuming that the longest potential route would be used.

For the lease tracts and uranium mills under consideration, the longest route is 266 km (165 mi), from New Verde Mine on Lease Tract 26 to White Mesa Mill. The route runs from New Verde Mine on local roads to State Highway (SH) 141, then through Naturita, traveling south to US 491, west into Utah to US 191, through Monticello, and south on US 191 to the White Mesa Mill. This route uses roads typical of most potential routes and runs through both rural and populated areas representative of the region. Population densities at the lease tract level from the 2010 Census were used in RADTRAN 5 to estimate the collective population risks along the route. The average collective dose to the public from uranium ore in the region was estimated to be approximately $1.54 \times 10^{-7}$ person-rem/km. The average dose to a truck driver was estimated to be approximately $8.08 \times 10^{-7}$ rem/km.

### D.10.4.4 Injury and Fatality Rates

Injury and fatality rates for use in estimating potential injuries and fatalities from truck accidents during the shipment of uranium ore were developed by using route-specific and county-specific data. The injury and accident fatality rates used in the analysis were $1.85 \times 10^{-7}$/km for injuries and $1.66 \times 10^{-8}$/km for fatalities. These rates were generated based on injuries, fatalities, and vehicle miles travelled as reported by the Colorado Department of Transportation (CDOT) for the years 2002 through 2007 for SH 90, SH 141, and SH 491 (CDOT 2002, 2003, 2004, 2005, 2006a, 2007a) in the vicinity of the lease tracts and along any potential route to either of the two uranium mills considered. These rates are high for heavy truck travel because they include all vehicle types. For comparison, a rate of $1.80 \times 10^{-8}$/km for fatalities was estimated from data on all large-truck vehicle miles (CDOT 2006b, 2007b, 2008, 2009, 2010) and all traffic fatalities (DOT 2010a–d) in Dolores, Mesa, Montrose, and San Miguel Counties for the years 2006 through 2010. This second value is in relatively good agreement with (within <10% of) the value of $1.66 \times 10^{-8}$/km for fatalities for all vehicles on the roads considered in the analysis.

For Utah, injury and fatality rates were derived from the available data for 2005 through 2009 for San Juan County. Data on vehicle miles travelled in the county for all vehicles were used in conjunction with the number of injuries and fatalities recorded (Utah 2005, 2006, 2007, 2008, 2009) to obtain rates of $2.77 \times 10^{-7}$/km for injuries and $2.41 \times 10^{-8}$/km for fatalities. Because these rates included contributions from vehicles other than heavy trucks as well as all roads in the county and not just US 491 and US 191 on the route to the White Mesa Mill (which represent relatively short distances), the Colorado injury and fatality rates were used for the analysis of all shipments to White Mesa Mill.

#### D.10.4.5 Ore Production Rates and Shipment Capacities

Because of the uncertainties associated with the actual locations and sizes of uranium mines that could operate in the future, the transportation analysis conducted for Alternatives 3 through 5 used an assumed mine size, which determines the number of ore shipments, for each lease tract listed in Table D.10-2. The mine sizes used (small, medium, large, and very large) with assumed uranium ore production rates (50, 100, 200, and 300 tons/d, respectively) are

**TABLE D.10-2 Mine Size for Each Lease Tract as Assumed for the Transportation Analysis for Alternatives 3, 4, and 5**

| Lease Tract | Assumed Mine Size | Ore Production Rate (tons/d) | Ore Shipments per Day[a] |
|---|---|---|---|
| C-JD-5 | Large | 200 | 8 |
| C-JD-5A | Small | 50 | 2 |
| C-JD-6 | Large | 200 | 8 |
| C-JD-7 | Very large | 300 | 12 |
| C-JD-8 | Medium | 100 | 4 |
| C-JD-8A | Small | 50 | 2 |
| C-JD-9 | Medium | 100 | 4 |
| C-SR-10 | Medium | 100 | 4 |
| C-SR-11 | Medium | 100 | 4 |
| C-SR-11A | Medium | 100 | 4 |
| C-SR-12 | Small | 50 | 2 |
| C-SR-13 | Medium | 100 | 4 |
| C-SR-13A | Medium | 100 | 4 |
| C-SR-14 | Medium | 100 | 4 |
| C-SR-15 | Small | 50 | 2 |
| C-SR-15A | Small | 50 | 2 |
| C-SR-16 | Small | 50 | 2 |
| C-SR-16A | Small | 50 | 2 |
| C-WM-17 | Small | 50 | 2 |
| C-SM-18 | Medium | 100 | 4 |
| C-AM-19 | Large | 200 | 8 |
| C-AM-19A | Medium | 100 | 4 |
| C-AM-20 | Small | 50 | 2 |
| C-LP-21 | Medium | 100 | 4 |
| C-LP-22 | Small | 50 | 2 |
| C-LP22A | Medium | 100 | 4 |
| C-LP-23 | Medium | 100 | 4 |
| C-CM-24 | Small | 50 | 2 |
| C-CM-25 | Small | 50 | 2 |
| C-G-26 | Small | 50 | 2 |
| C-G-27 | Small | 50 | 2 |

[a] Assumes an ore haul truck capacity of 25 tons.

discussed further in Section 2.2. The size of a mine on a specific lease tract was first selected roughly on the basis of past uranium ore production. If no previous ore production had occurred, the assumed mine sizes for those lease tracts were assigned so as to distribute uranium ore production in a generally even manner across the entire region considered, if all mines were to operate at the same time. In reality, such an occurrence would generate 2,900 tons of ore per day. The ore production was averaged over the region to highlight the general level of traffic that could occur in various areas.

## D.11 CULTURAL RESOURCES

The following procedures were employed to estimate the potential impacts of the alternatives proposed in the ULP PEIS. The process began with a review of available documentation of known cultural resources, including archaeological sites, historic structures, and traditional cultural properties. It began with a Class I cultural resource review of the lease tracts conducted by Alan Reed in 2006, the ethnographic background study and potential for traditional cultural properties analysis of the lease tracts conducted by J.N. Fritz in 2006, and the discussion of the historic mines on the lease tracts by E. Twitty in 2008. Information on cultural resource surveys conducted within the tracts since 2006 was obtained as geographic information system (GIS) layers from Colorado's Office of Archaeology and Historic Preservation (OAHP). For purposes of comparison, GIS data were also obtained for a 15-mi (24-km) buffer surrounding the lease tracts. Since some lease tracts were closer than 15 mi (24 km) from the Utah border, buffer information was requested from the Utah State Historic Preservation Office (SHPO) as well. The data obtained from the Colorado OAHP and the Utah SHPO were used to update the description of known cultural resources within the lease tracts.

The most recent GIS data from the OAHP were used to compare the number of acres surveyed within each lease tract with the area of each lease tract, to determine the percentage of each lease tract that had been surveyed. Then, for purposes of analysis, the lease tracts were grouped into the four proximity-based clusters used for visual resource analysis: North; North Central; South Central; and South. The total acreage surveyed and the number of sites recorded for each cluster were tallied and used to determine site densities for each cluster. On the basis of the assumption that the site densities in the unsurveyed areas would be similar to those of the surveyed areas for each cluster, the number of potential sites was projected for each cluster.

Two types of potential impacts were considered. Direct impacts are those in which the resource is directly destroyed, altered, or damaged by mining operations. Impacts such as vandalism and unpermitted collecting are considered indirect when they do not result from mining itself or the construction of access roads to the mines but are instead the result of increased human presence due to mine operations or increased access due to the construction of or improved maintenance on roads to the mines. On the basis of the site density within each cluster and the number of acres that would be disturbed by a mine in each mine category (small, medium, large, and very large), the number of sites likely to be directly affected by a mine in each category was projected. Under each alternative, a different number of small, medium, large, and very large mines would likely be developed. The number of direct impacts for each alternative was projected, based on the acreage likely to be disturbed. For indirect impacts, it was

assumed that all the sites projected for each cluster would have the potential to be indirectly affected. These were, of course, projections only. Pedestrian surveys would be necessary to determine the actual locations of sites. The number of sites directly affected could be reduced by changing the location of mining activities.

The GIS data from the Colorado OAHP does not identify traditional cultural properties. Unless already documented, the presence of such properties can be determined only by communications with the relevant cultural groups. Federally recognized Native American tribes are being contacted, but to date, none of them have identified any culturally important properties on or near the lease tracts.

## D.12 VISUAL RESOURCES

The visual impact analysis for the ULP PEIS utilizes distance zones specified within the Bureau of Land Management's (BLM's) visual resource management (VRM) system to identify potentially sensitive visual resource areas (SVRAs) that might be affected by one or more of the five alternatives. In order to assess these impacts, reverse viewshed analyses were conducted to identify which lands surrounding the lease tracts would have views of infrastructure and activities in at least some portion of the lease tracts. Reverse viewshed analyses were conducted for Alternatives 1, 3, and 4. A separate analysis was not conducted for Alternatives 2 and 5 because of the similarities in the visual impacts associated with Alternatives 1 and 4, respectively.

A primary component considered in conducting this analysis was the impact of distance on determining what could be seen from within a lease tract. The distance between the viewer and the mining activities (during exploration, mine development and operations, and reclamation) that are the source of visual contrast is a critical element in determining the level of perceived impact. For this analysis, the BLM distance zones in the VRM system were utilized. These zones are as follows:

- *Foreground–middleground* (0 to 5 mi [0 to 8 km]). This zone includes areas where management activities may be seen in detail. For instance, the outer boundary of this distance zone is defined as the point at which the texture and form of individual plants are no longer apparent in the landscape.

- *Background* (5 to 15 mi [8 to 24 km]). This zone includes the area beyond the foreground–middle ground up to 15 mi (24 km) and the area where some detail beyond the form or outline of the project is visible. For example, vegetation should be visible at least as patterns of light and dark.

- *Seldom seen* (beyond 15 mi [24 km]). This zone includes areas beyond 15 mi (24 km) (BLM 1986).

A GIS-based impact analysis was used to identify locations within the SVRAs from which some portions of the lands containing the lease tracts would be visible. Assuming an

BLM_0042906

unobstructed view of the ULP lease tract, viewers in these areas would be likely to perceive some level of visual contrast from the mining activities.

The "spatial analyst extension" of the ESRI ArcGIS 10 software was used to calculate viewsheds. (A viewshed is an area of landscape visible to the human eye from a fixed vantage point.) The viewshed analyses determined the potential visibility of the four lease tract groups or portions of these groups from lands within 25 mi (40 km). The ROI for visual resource analysis was set at 25 mi (40 km) because it is the approximate limit at which non-negligible visual contrasts from the structures and landforming activities in the proposed action could reasonably be expected to be visible in this region, assuming favorable viewing conditions and strong contrast between an object and its background. Viewshed calculations were performed by using National Elevation Dataset (NED) 10-meter Digital Elevation Model (DEM) with the earth curvature set to a refractivity coefficient of 0.13.

Because each of the four groups or a portion of the groups of lease tracts represents a large geographic area rather than specifically located points, a grid-based sample of points was used to calculate visibility.

Viewsheds were calculated based on an assumed height of 30 ft (9 m) to represent the mining sites and 5 ft (1.5 m) to represent the observer height.

The selected SVRAs included in the analysis were as follows:

- National Parks, National Monuments, National Recreation Areas, National Preserves, National Wildlife Refuges, National Reserves, National Conservation Areas, National Historic Sites;

- Congressionally authorized Wilderness Areas;

- Wilderness Study Areas;

- National Wild and Scenic Rivers;

- Congressionally authorized Wild and Scenic Study Rivers;

- National Scenic Trails and National Historic Trails;

- National Historic Landmarks and National Natural Landmarks;

- All-American Roads, National Scenic Byways, State Scenic Highways, and BLM-designated and U.S. Forest Service-designated Scenic Highways and Byways;

- BLM-designated Special Recreation Management Areas; and

- Areas of Critical Environmental Concern (ACECs) designated because of outstanding scenic qualities.

Although the viewshed analysis showed areas that may be subject to visual impacts from mining-related activities conducted within the lease tracts, the actual acreage that would be affected would likely be smaller than that indicated by the analysis, because of potential screening of views of the lease tracts by vegetation or structures. The viewshed analyses also did not account for the heights of vegetation or existing structures that might screen views. The analyses conducted for the ULP PEIS were limited to data available in GIS format at the time of analysis. They did not analyze any of the additional scenic resources that exist at the national, state, or local levels. Furthermore, although a GIS-based analysis is capable of having extremely high spatial accuracy, it is limited by the accuracy of the data used in the analysis, which were obtained from many sources and are subject to error.

After the GIS-based analysis was completed, views to the lease tracts from the SVRAs were simulated by using Google Earth software. Keyhole Markup Language (KML) files of the lease tracts and the SVRA boundaries were imported from ArcGIS. Analysts then selected a variety of viewpoints within the SVRAs that were depicted as having potential views of the lease tracts. The intent of this analysis was to evaluate the apparent size and viewing angle of the lease tracts from a potential viewing location and thereby determine the potential level of contrast that could be observed from the various activities associated with each alternative.

## D.13 WASTE MANAGEMENT

Wastes (other than waste rock) generated during the three phases of uranium mining (exploration, mine development and operations, and reclamation), such as liquids and solids from the treatment of water, spent oil, grease, and lubricant, and other trash were evaluated in terms of how this additional waste would affect the existing practices or availability of the disposal capacity for similar waste.

## D.14 CUMULATIVE IMPACTS

The methodology for cumulative impacts analysis is consistent with guidance provided by the CEQ (CEQ 1997; Connaughton 2005). It includes defining the ROI for cumulative impacts; identifying past, present, and reasonably foreseeable projects and activities (Federal and non-Federal) within the region; summarizing the impacts associated with those projects and activities (if available); and determining the magnitude and significance of the cumulative impacts.

The ROI for cumulative impacts was defined as 50 mi (80 km) for all resource areas, which is considered conservative. Past, present, and reasonably foreseeable projects and activities within the ROI for cumulative impacts were identified from a variety of sources, including NEPA assessments performed by various Federal and state agencies for nearby projects. Projects and activities within the ROI for cumulative impacts were also identified by

using NEPA registers from regional BLM field offices and schedules of proposed actions from nearby National Forests.

## D.15 REFERENCES FOR APPENDIX D

ATSDR (Agency for Toxic Substances and Disease Registry), 2012, *Minimal Risk Levels (MRLs)* Feb.

AQMD (South Coast Air Quality Management District), 2012, *Particulate Matter (PM) 2.5 Significance Thresholds and Calculation Methodology*.

Barber, J.R., et al., 2010, "The Costs of Chronic Noise Exposure for Terrestrial Organisms," *Trends in Ecology and Evolution* 25(3):180–189.

Barry, T.M., and J.A. Reagan, 1978, *FHWA Highway Traffic Noise Prediction Model*, FHWA-RD-77-108, prepared for the Federal Highway Administration, Washington, D.C., Dec.

Biwer, B.M., et al., 1997, *RISKIND Verification and Benchmark Comparisons*, ANL/EAD/TM-74, Argonne National Laboratory, Argonne, Ill., Aug.

BLM (Bureau of Land Management), 1986, *Visual Resource Inventory,* BLM Manual Handbook 8410-1, Release 8-28, U.S. Department of the Interior, Washington, D.C., Jan.

BLM, 2008, *Final Environmental Assessment for the Whirlwind Mine Uranium Mining Project*, Grand Junction Field Office, Grand Junction, Colo., and Moab Field Office, Moab, Utah, Sept.

BLS (Bureau of Labor Statistics), 2011a, *Number and Rate of Fatal Occupational Injuries, by Industry Sector, 2010*.

BLS, 2011b, *2010 Survey of Occupational Injuries & Illnesses, Summary Estimates Charts Package*, Oct. 20.

CDOT (Colorado Department of Transportation), 2002, *Crashes and Rates on State Highways, 2002*, Traffic Safety and Traffic Engineering Branch, Accident Management Unit.

CDOT, 2003, *Crashes and Rates on State Highways, 2003*, Traffic Safety and Traffic Engineering Branch, Accident Management Unit.

CDOT, 2004, *Crashes and Rates on State Highways, 2004*, Traffic Safety and Traffic Engineering Branch, Accident Management Unit.

CDOT, 2005, *Crashes and Rates on State Highways, 2005*, Traffic Safety and Traffic Engineering Branch, Accident Management Unit.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 336 of 426

CDOT, 2006a, *Crashes and Rates on State Highways, 2006*, Safety and Traffic Engineering Branch, Accident Management Unit.

CDOT, 2006b, *Roadway Statistics, 2006 State Highway Statistics—Daily Vehicle Miles of Travel (DVMT) for All Trucks by County*. Available at http://apps.coloradodot.info/dataaccess/Statistics/dsp_folder/Roadway/2006/2006TruckDVMTbyCounty.htm. Accessed Jan. 25, 2012.

CDOT, 2007a, *Crashes and Rates on State Highways, 2007*, Safety and Traffic Engineering Branch, Accident Management Unit.

CDOT, 2007b, *Roadway Statistics, 2007 State Highway Statistics—Daily Vehicle Miles of Travel (DVMT) for All Trucks by County*. Available at http://apps.coloradodot.info/dataaccess/Statistics/dsp_folder/Roadway/2007/2007TruckDVMTbyCounty.htm. Accessed Jan. 25, 2012.

CDOT, 2008, *Roadway Statistics, 2008 State Highway Statistics—Daily Vehicle Miles of Travel (DVMT) for All Trucks by County*. Available at http://apps.coloradodot.info/dataaccess/Statistics/dsp_folder/Roadway/2008/2008TruckDVMTbyCounty.htm. Accessed Jan. 25, 2012.

CDOT, 2009, *Roadway Statistics, 2009 State Highway Statistics—Daily Vehicle Miles of Travel (DVMT) for All Trucks by County*. Available at http://apps.coloradodot.info/dataaccess/Statistics/dsp_folder/Roadway/2009/2009TruckDVMTbyCounty.htm. Accessed Jan. 25, 2012.

CDOT, 2010, *Roadway Statistics, 2010 State Highway Statistics—Daily Vehicle Miles of Travel (DVMT) for All Trucks by County*. Available at http://apps.coloradodot.info/dataaccess/Statistics/dsp_folder/Roadway/2010/2010TruckDVMTbyCounty.pdf. Accessed Jan. 25, 2012.

CDPHE (Colorado Department of Public Health and Environment), 2011, *2008 Air Pollutant Emissions Inventory*, online database, Denver, Colo. Available at http://www.colorado.gov/airquality/inv_maps_2008.aspx. Accessed Nov. 23, 2011.

CEQ (Council on Environmental Quality), 1997, *Environmental Justice Guidance under the National Environmental Policy Act,* Executive Office of the President, Washington, D.C.

Chapman, S.S., et al., 2006, *Ecoregions of Colorado* (color poster with map, descriptive text, summary tables, and photographs; map scale 1:1,200,000), U.S. Geological Survey, Reston, Va.

CNHP (Colorado Natural Heritage Program), 2009, *Summary of Services*. Available at http://www.cnhp.colostate.edu/. Accessed Sept. 9, 2009.

CNHP, 2011a, *Colorado Natural Heritage Program—Rare Plant Guide List.* Available at http://www.cnhp.colostate.edu/download/projects/rareplants/list.asp?list=master. Accessed Dec. 16, 2011.

CNHP, 2011b, *Colorado Natural Heritage Program—Element Occurrences by Quad*. Available at http://www.cnhp.colostate.edu/download/gis.asp#maps. Accessed Dec. 16, 2011.

BLM_0042910

Connaughton, J.L., 2005, "Guidance on the Consideration of Past Actions in Cumulative Effects Analysis," letter from Connaughton (Chairman, Council on Environmental Quality) to Heads of Federal Agencies, June 24.

CPW (Colorado Parks and Wildlife), 2011, *Natural Diversity Information Source*, Colorado Department of Natural Resources, Division of Wildlife, Denver, Colo. Available at http://ndis.nrel.colostate.edu/index.html. Accessed Dec. 15, 2011.

DOE (U.S. Department of Energy), 1995, *Department of Energy Programmatic Spent Nuclear Fuel Management and Idaho National Engineering Laboratory Environmental Restoration and Waste Management Programs Final Environmental Impact Statement*, DOE/EIS-0203-F, Office of Environmental Management, Idaho Operations Office, Idaho Falls, Id., Apr.

DOE, 1996, *Final Environmental Impact Statement on a Proposed Nuclear Weapons Nonproliferation Policy Concerning Foreign Research Reactor Spent Nuclear Fuel, Appendix E: Evaluation of Human Health Effects of Overland Transportation*, DOE/EIS-0218F, Vol. 2, Assistant Secretary for Environmental Management, Washington, D.C., Feb.

DOE, 1997, *Final Waste Management Programmatic Environmental Impact Statement for Managing Treatment, Storage, and Disposal of Radioactive and Hazardous Waste*, DOE/EIS0200-F, Office of Environmental Management, Washington, D.C.

DOE, 1999, *Final Programmatic Environmental Impact Statement for Alternative Strategies for the Long-Term Management and Use of Depleted Uranium Hexafluoride*, DOE/EIS-0269, Office of Nuclear Energy, Science and Technology, Germantown, Md., April.

DOE, 2002, *A Resource Handbook on DOE Transportation Risk Assessment*, DOE/EM/NTP/HB-01, prepared by Transportation Risk Assessment Working Group Technical Subcommittee for DOE, Office of Environmental Management, National Transportation Program, Albuquerque, N.M., July.

DOE, 2011, *Draft Environmental Impact Statement for the Disposal of Greater-Than-Class-C (GTCC) Low-Level Radioactive Waste and GTCC-Like Waste*, DOE/EIS-0375-D, Office of Environmental Management, Washington, D.C., Feb.

DOT (U.S. Department of Transportation), 2010a, *Traffic Safety Facts, Dolores County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_Dolores%20County_2010.HTM. Accessed Jan. 25, 2012.

DOT, 2010b, *Traffic Safety Facts, Mesa County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_Mesa%20County_2010.HTM. Accessed Jan. 25, 2012.

DOT, 2010c, *Traffic Safety Facts, Montrose County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C. Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/STSI/8_CO/2010/Counties/Colorado_Montrose%20County_2010.HTM. Accessed Jan. 25, 2012.

DOT, 2010d, *Traffic Safety Facts, San Miguel County, Colorado, 2006–2010*, National Highway Transportation Safety Administration, Washington, D.C.

Eckerman, K., et al., 1999, *Cancer Risk Coefficients for Environmental Exposures to Radionuclides*, EPA 402-R-99-001, Federal Guidance Report No. 13, prepared by Oak Ridge National Laboratory for U.S. Environmental Protection Agency, Office of Radiation and Indoor Air.

EPA (U.S. Environmental Protection Agency), 1974, *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*, 550/9-74-004, Office of Noise Abatement and Control, March.

EPA, 1985, *Draft Background Information Document, Proposed Standard for Radon-222 Emissions to Air from Underground Uranium Mines,* EPA/520/1-85-010, Office of Radiation Programs, Washington, D.C., Feb. 14.

EPA, 1989a, *Risk Assessments, Environmental Impact Statement, NESHAPS for Radionuclides, Background Information Document—Volume 2,* EPA/520/1-89-006-1, Office of Radiation Programs, Washington, D.C. Sept.

EPA, 1989b, *Risk Assessment Guidance for Superfund, Vol. I: Human Health Evaluation Manual (Part A), Interim Guidance,* EPA/540/1-89/002, Office of Emergency and Remedial Response, Washington, D.C.

EPA, 1989c, *Users Guide for the COMPLY-R Code (Revision 1)*, EPA 520/1-89-029, Office of Radiation Programs, Washington, D.C., Oct.

EPA, 1993, *Diffuse NORM: Waste Characterization and Preliminary Risk Assessment,* Office of Radiation Programs, Washington, D.C.

EPA, 2004, *Unit Conversions, Emissions Factors, and Other Reference Data*, Nov. Available at http://www.epa.gov/cpd/pdf/brochure.pdf. Accessed Feb. 24, 2012.

EPA, 2008, *Climate Leaders Greenhouse Gas Inventory Protocol Coe Mobile Guidance: Direct Emissions from Mobile Combustion Sources,* EPA/430-K-08-004, May.

EPA, 2011, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2009,* EPA 430-R-11-005, April 15.

EPA, 2012a, *Search WebFIRE*. Available at http://cfpub.epa.gov/webfire/. Accessed Jan. 27, 2012.

EPA, 2012b, Section 11.9, "Western Surface Coal Mining (10/98)," and Section 13.2.4, "Aggregate Handling and Storage Piles (11/06)," in Volume 1, "Stationary Point and Area Sources," of *Compilation of Air Pollutant Emission Factors,* AP 42, Fifth Edition.

EPA, 2012c, *Integrated Risk Information System (IRIS)*. Available at http://www.epa.gov/IRIS. Accessed March 17, 2012.

Fahys-Smith, V., 1983, "Migration of Boom-town Construction Workers: The Development of an Analytic Framework," *Environmental Geochemistry and Health* 5:104–112.

Ferry, C., et al., 2002, "An Experimental Method for Measuring the Radon-222 Emanation Factor in Rocks," *Radiation Measurements* 35:570.

Grove, 2006, *MicroShield User's Manual Version 7*, Grove Software Inc., Lynchburg, Va.

Hanson, C.E., et al., 2006, *Transit Noise and Vibration Impact Assessment*, FTA-VA-90-1003-06, prepared by Harris Miller Miller & Hanson Inc., Burlington, Mass., for U.S. Department of Transportation, Federal Transit Administration, Washington, D.C., May.

ICRP (International Commission on Radiological Protection), 2011, "ICRP Publication 115: Lung Cancer Risk from Radon and Progeny," *Annals of the ICRP* 40(1).

Jones & Stokes Associates, 2007, *Software User's Guide: URBEMIS2007 for Windows, Version 9.2, Emissions Estimation for Land Use Development Projects*, prepared for South Coast Air Quality Management District, Diamond Bar, Calif., Nov. Available at http://www.urbemis.com/software/download.html. Accessed Feb. 24, 2012.

Menge, C.W., et al., 1998, *FHWA Traffic Noise Model® Technical Manual*, FHWA-PD-96-010 and DOT-VNTSC-FHWA-98-2, prepared by U.S. Department of Transportation, John A. Volpe National Transportation Systems Center, Cambridge, Mass., for U.S. Department of Transportation, Federal Highway Administration, Washington, D.C., Feb.

MIG (Minnesota IMPLAN Group, Inc.), 2011, *IMPLAN Version 3 Software System,* Hudson, Wisc.

NatureServe, 2011, *NatureServe Explorer—An Online Encyclopedia of Life.* Available at http://www.natureserve.org/explorer/. Accessed Dec. 16, 2011.

Neuhauser, K.S., and F.L. Kanipe, 2003, *RADTRAN 5 User Guide*, SAND2003-2354, Sandia National Laboratories, Albuquerque, N.M., July.

NRC (U.S. Nuclear Regulatory Commission), 1977, *Final Environmental Statement on the Transportation of Radioactive Material by Air and Other Modes*, NUREG-0170, Washington, D.C.

NRC, 1987, *Regulatory Guide 3.59 (Task WM 407-4) Methods for Estimating Radioactive and Toxic Airborne Source Terms for Uranium Milling Operations*, Office of Nuclear Regulatory Research, Washington, D.C., March.

NRCS (National Resources Conservation Service), 2012, *Soil Taxonomy, A Basic System of Soil Classification for Making and Interpreting Soil Surveys*, USDA Handbook 436, 2nd Edition, U.S. Department of Agriculture.

Rogers, Z., 2011, personal communication from Rogers (Energy Fuels Resources Corporation, Lakewood, Colo.) to Y.-S. Chang (Argonne National Laboratory, Argonne, Ill.), Nov. 8.

QDEH (Queensland Department of Environment and Heritage), 1999, *Emission Estimation Technique Manual for Explosives Detonation and Firing Ranges*, March.

Sakoda, A., et al., 2010, "Difference of Natural Radioactivity and Radon Emanation Fraction Among Constituent Minerals of Rock or Soil," *Applied Radiation and Isotopes* 68(12):2452.

Stoeser, D.B., et al., 2007, *Preliminary Integrated Geologic Map Databases for the United States—Central States: Montana, Wyoming, Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Iowa, Missouri, Arkansas, and Louisiana*, Open File Report 2005-1351, Version 1.2, original file updated in Dec. 2007, U.S. Geological Survey.

Strait, R., et al., 2007, *Final Colorado Greenhouse Gas Inventory and Reference Case Projections 1990—2020*, Center for Climate Strategies, Oct. Available at http://www.coloradoclimate.org/ewebeditpro/items/O14F13894.pdf. Accessed Nov. 5, 2011.

Trinity Engineering Associates, Inc., 2007, *CAP88-PC Version 3.0 User Guide*, Cincinnati, Ohio, Dec. 9.

UNSCEAR (United Nations Scientific Committee on the Effects of Atomic Radiation), 2008, Annex E, "Sources-to-Effects Assessment for Radon in Homes and Workplaces," in *Effects of Ionizing Radiation*, UNSCEAR 2006 Report to the General Assembly, with Scientific Annexes, United Nations, New York, N.Y.

UNSCEAR, 2010, *Sources and Effects of Ionizing Radiation*, UNSCEAR 2008 Report to the General Assembly, with Scientific Annexes, Vol. 1, United Nations, New York, N.Y.

U.S. Bureau of the Census, 2011a, *2010 Census Summary File 1: Table P5*.

U.S. Bureau of the Census, 2011b, *2009 American Community Survey 5-Year Estimates (2005–2009): Table B17017*.

USDA (U.S. Department of Agriculture), 1999, *Soil Taxonomy—A Basic System of Soil*.

USFWS (U.S. Fish and Wildlife Service), 2011a, *IPaC—Information, Planning, and Conservation System.* Available at http://ecos.fws.gov/ipac/. Accessed Dec. 16, 2011.

USFWS, 2011b, *Critical Habitat Portal*, FWS Critical Habitat for Threatened and Endangered Species. Available at http://criticalhabitat.fws.gov/crithab/. Accessed Dec. 16, 2011.

USFWS, 2012, *National Wetlands Inventory*, Interactive Mapping Program, U.S. Department of the Interior, Washington, D.C. Available at http://fws.gov/wetlands. Accessed Sept. 17, 2012.

USGS (U.S. Geological Survey), 2004, *National Gap Analysis Program, Provisional Digital Land Cover Map for the Southwestern United States*, Version 1.0, RS/GIS Laboratory, College of Natural Resources, Utah State University. Available at http://earth.gis.usu.edu/swgap/landcover.html. Accessed March 15, 2010.

USGS, 2005, *National Gap Analysis Program, Southwest Regional GAP Analysis Project—Land Cover Descriptions*, RS/GIS Laboratory, College of Natural Resources, Utah State University. Available at http://earth.gis.usu.edu/swgap/legend_desc.html. Accessed March 15, 2010.

USGS, 2007, *National Gap Analysis Program, Digital Animal-Habitat Models for the Southwestern United States. Version 1.0*. Center for Applied Spatial Ecology, New Mexico Cooperative Fish and Wildlife Research Unit, New Mexico State University. Available at http://fws-nmcfwru.nmsu.edu/swregap/default.htm. Accessed Dec. 16, 2011.

Utah (State of Utah), 2005, *Utah Crash Summary*, *2005*, Department of Public Safety.

Utah, 2006, *Utah Crash Summary*, *2006*, Department of Public Safety.

Utah, 2007, *Utah Crash Summary*, *2007*, Department of Public Safety. Available at http://publicsafety.utah.gov/highwaysafety/1997-2005.html. Accessed Feb. 10, 2012.

Utah, 2008, *Utah Crash Summary*, *2008*, Department of Public Safety.

Utah, 2009, *Utah Crash Summary*, *2009*, Department of Public Safety.

Walker, J.D., and J.W. Geissman (compilers), 2009, *Geologic Time Scale*, Geological Society of America, Cambridge University Press.

Wayson, R.L., 1993, "Sound Fundamentals, Part 2," *The Wall Journal*, Sept./Oct.

Weiner, R.F., et al., 2006, *RadCat 2.3 User Guide*, SAND2006-6315, Sandia National Laboratories, Albuquerque, N.M, Oct.

Whetstone Associates, 2011, *JD-8 Mine Environmental Protection Plan*, work performed under contract to Cotter Corp., Gunnison, Colo., June.

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 342 of 426

Whetstone Associates, 2012, *JD-6 Mine Environmental Protection Plan*, work performed under contract to Cotter Corp., Gunnison, Colo., Sept.

Yu, C., et al., 2001, *User's Manual for RESRAD Version 6*, ANL/EAD-4, Argonne National Laboratory, Argonne, Ill., July.

Yuan, Y.C., et al., 1995, *RISKIND —A Computer Program for Calculating Radiological Consequences and Health Risks from Transportation of Spent Nuclear Fuel*, ANL/EAD-1, Argonne National Laboratory, Argonne, Ill., Nov.

BLM_0042916

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 343 of 426

# APPENDIX E:

# CORRESPONDENCE ASSOCIATED WITH ENDANGERED SPECIES ACT (ESA) CONSULTATION, BIOLOGICAL OPINION, AND BIOLOGICAL ASSESSMENT

BLM_0042917

*This page intentionally left blank*

# APPENDIX E:

# CORRESPONDENCE ASSOCIATED WITH ENDANGERED SPECIES ACT (ESA) CONSULTATION, BIOLOGICAL OPINION, AND BIOLOGICAL ASSESSMENT

This appendix presents the biological assessment (BA) prepared for consultation with the U.S. Fish and Wildlife Service (USFWS) and the biological opinion (BO) that was issued by the USFWS. This appendix had previously presented species accounts for species listed under the Endangered Species Act (ESA), and it is now material that is also discussed in the BA or Section 4.3.6.4. This appendix also contains the correspondence between the U.S. Department of Energy (DOE) and the USFWS regarding ESA (Section 7) consultation. The correspondence began on November 7, 2011, and culminated on August 13, 2013, with a letter from the USFWS containing the BO (see page E-13).

Revisions made to the Draft ULP PEIS to prepare the Final ULP PEIS are identified with a line on the right margin of the pages. However, this same approach (i.e., providing lines on the right margin of the pages) to indicate new material was not done for this appendix. Instead, a description of the content of this appendix is provided as described in the paragraph above.

**TABLE E-1 Endangered Species Act Consultation Correspondence**

| Date of Letter | Page | Source | Recipient |
|---|---|---|---|
| November 7, 2011 | E-4 | U.S. Department of Energy, Office of Legacy Management (T.A. Ribeiro, Environmental Program Manager) | U.S. Fish and Wildlife Service, Western Colorado Field Office (P. Gelatt, Fish and Wildlife Biologist) |
| November 16, 2011 | E-9 | U.S. Fish and Wildlife Service, Western Colorado Field Office (P. Repp, Acting Western Colorado Field Supervisor) | U.S. Department of Energy, Office of Legacy Management (T.A. Ribeiro, Environmental Manager) |
| May 13, 2013 | E-11 | U.S. Department of Energy, Office of Legacy Management (T.A. Ribeiro, Environmental Program Manager) (biological assessment attached) | U.S. Fish and Wildlife Service, Ecological Services (P. Gelatt, Western Colorado Supervisor) |
| August 13, 2013 | E-13 | U.S. Fish and Wildlife Service, Ecological Services (P. Gelatt, Western Colorado Supervisor) | U.S. Department of Energy, Office of Legacy Management (T.A. Ribeiro) (contains biological opinion) |



**Department of Energy**
Washington, DC 20585

November 7, 2011

Ms. Patty Gelatt
Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
Western Colorado Field Office
764 Horizon Drive, Building B
Grand Junction, CO 81506-3946

Subject: Initiation of Endangered Species Act Informal Consultation for the Department of Energy's Uranium Leasing Program

Dear Ms. Gelatt:

The U.S. Department of Energy Office of Legacy Management (DOE) is preparing a Programmatic Environmental Impact Statement (PEIS) to evaluate potential impacts associated with the management of DOE's Uranium Leasing Program (ULP), under which DOE administers tracts of land for the exploration, development, and extraction of uranium and vanadium ores. The PEIS is being prepared in accordance with the National Environmental Policy Act of 1969 (NEPA), as amended, following implementing regulations developed by the President's Council on Environmental Quality in 40 CFR Parts 1500-1508 and DOE's NEPA implementing procedures provided in 10 CFR Part 1021. The PEIS will analyze potential impacts to environmental resources including those involving threatened or endangered species. The Notice of Intent for the PEIS was published in the Federal Register on June 21, 2011 (76 FR 36097). Public scoping meetings for the PEIS were conducted on August 8-11, 2011 at Montrose, Telluride, and Naturita, in Colorado, and at Monticello, in Utah.

DOE's ULP includes tracts of land located in Mesa, Montrose, and San Miguel Counties, Colorado, that cover a cumulative acreage of approximately 25,000 acres. The locations of the ULP lease tracts are shown in Figure 1 of the Attachment.

By this letter, DOE is initiating informal consultation with the U.S. Fish and Wildlife Service (USFWS) under the provisions of the Endangered Species Act of 1973, as amended (ESA). DOE has identified a preliminary list of species that may be listed as endangered, threatened, or species that are proposed or candidates for listing under the ESA that may occur in the counties where DOE's ULP lease tracts are located (see Table 1 of the Attachment). In addition, our preliminary determination indicates that there are no critical habitats on DOE's ULP lease tracts. The nearest critical habitats are indicated in Figure 2 of the Attachment and are about twenty miles from the nearest DOE ULP lease tract(s). DOE requests a letter from your office concurring with or commenting on this preliminary list and the preliminary determination of critical habitat locations. Finally, please provide any other information you consider appropriate during the consultation process.

Printed with soy ink on recycled paper

Ms. Patty Gelatt -2-

DOE and its PEIS contractor (Argonne National Laboratory) will be contacting you and members of your staff in the near future to coordinate this effort. DOE looks forward to further consultation and coordinating activities with the USFWS on potential impacts, if any, of the ULP to federally-listed species.

Please do not hesitate to contact me if you have any questions on the ULP project at (970) 248-6621, or by e-mail at Tracy.Ribeiro@lm.doe.gov. Please send any correspondence to:

U.S. Department of Energy
Office of Legacy Management
2597 Legacy Way
Grand Junction, CO 81503

Sincerely,

Tracy A. Ribeiro

Tracy A. Ribeiro
Environmental Program Manager

Enclosures

cc w/enclosures:
M. Picel, Argonne National Laboratory (e)
D. Geiser, DOE (e)
L. Kilpatrick, DOE (e)
T. Pauling, DOE (e)
S. Schiesswohl, DOE (e)
E. Cotter, Stoller (e)

ULP webpage
http://ulpeis.anl.gov

**ATTACHMENTS**

**FIGURE 1 – Location of DOE ULP Lease Tracts in Mesa, Montrose, and San Miguel Counties, Colorado**

BLM_0042922

**TABLE 1 – Species Listed as Endangered or Threatened Under the Endangered Species Act, or Species That are Proposed or Candidates for Listing Under the Endangered Species Act That May Occur in the Counties Where DOE ULP Lease Tracts are Located**

| Scientific Name | Common Name | Status[a] | Counties in Which Species May Occur | Counties in Which Critical Habitat May Occur |
|---|---|---|---|---|
| **Plants** | | | | |
| *Phacelia submutica* | Debeque phacelia | PT | Mesa | |
| *Eriogonum pelinophilum* | Clay-loving wild buckwheat | E | Montrose | |
| *Sclerocactus glaucus* | Colorado hookless cactus | T | Mesa, Montrose | |
| **Invertebrates** | | | | |
| *Boloria acrocnema* | Uncompahgre fritillary butterfly | E | San Miguel | |
| **Fish** | | | | |
| *Gila cypha* | Humpback chub | E | Mesa, Montrose, San Miguel | Mesa[b] |
| *Gila elegans* | Bonytail | E | Mesa, Montrose, San Miguel | Mesa[b] |
| *Oncorhynchus clarki stomias* | Greenback cutthroat trout | T | Mesa | |
| *Ptychocheilus lucius* | Colorado pikeminnow | E | Mesa, Montrose, San Miguel | Mesa[b] |
| *Xyrauchen texanus* | Razorback sucker | E | Mesa, Montrose, San Miguel | Mesa[b] |
| **Birds** | | | | |
| *Centrocercus minimus* | Gunnison sage-grouse | C | Mesa, Montrose, San Miguel | |
| *Centrocercus urophasianus* | Greater sage-grouse | C | Mesa, Montrose, San Miguel | |
| *Coccyzus americanus* | Yellow-billed cuckoo | C | Mesa, Montrose, San Miguel | |
| *Empidonax traillii extimus* | Southwestern willow flycatcher | E | San Miguel | |
| *Strix occidentalis lucida* | Mexican spotted owl | T | Montrose, San Miguel | |
| **Mammals** | | | | |
| *Cynomys gunnisoni* | Gunnison's prairie dog | C | Montrose | |
| *Lynx canadensis* | Canada lynx | T | Mesa, Montrose, San Miguel | |
| *Mustela nigripes* | Black-footed ferret | E | Montrose, San Miguel | |

[a] C = candidate; E = endangered; PT = proposed threatened; T = threatened

[b] Designated critical habitats for these species are located outside the DOE ULP lease tracts (on the Colorado and Gunnison Rivers).



**FIGURE 2** – **Location of Designated Critical Habitats Relative to the DOE ULP Lease Tracts**

BLM_0042924



Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 351 of 426

United States Department of the Interior

FISH AND WILDLIFE SERVICE
Ecological Services
764 Horizon Drive, Building B
Grand Junction, Colorado 81506-3946

IN REPLY REFER TO:
ES/CO: DOE
TAILS: 06E24100-2012-TA-0033

November 16, 2011

Tracy A. Ribeiro
Environmental Manager
US Department of Energy
Office of Legacy Management
Grand Junction, CO 81503

Dear Ms. Ribeiro:

This responds to your November 7, 2011, correspondence regarding the US Department of Energy, Office of Legacy Management (DOE) Uranium Leasing Program (ULP). We understand that you are preparing a Programmatic Environmental Impact Statement to evaluate the potential impacts of the ULP in Mesa, Montrose, and San Miguel Counties, Colorado.

You submitted a preliminary list of federally endangered, threatened, and candidate species that may occur in the counties where DOE's ULP lease tracts are located. We discussed your preliminary species list in our meeting on November 9, and concluded that it is an appropriate list with the following exceptions: 1) remove greater sage-grouse (*Centrocercus Urophasianus*) because this candidate species does not occur in Mesa, Montrose, or San Miguel Counties, and 2) add North American wolverine (*Gulo gulo luscus*) because this candidate species may occur in Mesa, Montrose, or San Miguel Counties. You should determine what species on the list occur in the ULP areas, or may be affected by the ULP. Your biological assessment should provide an analysis of how the ULP may affect listed species.

One or more candidate species potentially occur within the project area. Federal candidates for official listing as threatened or endangered have no legal protection under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.) (Act). However, it is within the spirit of the Act to consider project impacts to these species.

BLM_0042925

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 352 of 426

In the future, we recommend that DOE and its contractors use our web-based Information Planning and Conservation system (IPAC) (http://ecos.fws.gov/ipac/) to obtain an official species list. If the Service can be of further assistance, please contact Patty Gelatt at the letterhead address or (970) 243-2778, extension 26.

Sincerely,

Pamela Repp
Acting Western Colorado Field Supervisor

2

BLM_0042926



**Department of Energy**
Washington, DC 20585

Ms. Patty Gellatt
Western Colorado Supervisor
U.S. Fish and Wildlife Service, Ecological Services
764 Horizon Drive, Building B
Grand Junction, Colorado 81506

Subject: FINAL BIOLOGICAL ASSESSMENT FOR THE DEPARTMENT OF ENERGY URANIUM LEASING PROGRAM AND A REQUEST FOR FORMAL CONSULTATION

Dear Ms. Gellatt:

The U.S. Department of Energy (DOE) has prepared the enclosed final biological assessment (BA) to evaluate whether the continued management of the DOE Uranium Leasing Program (ULP) (involving exploration, mine development and operations, and reclamation for a period of 10 or more years) would have adverse effects on listed species under the Endangered Species Act (ESA). The BA is part of the ongoing informal consultation started in concert with a programmatic environmental impact statement (PEIS) under the National Environmental Policy Act (NEPA) for the ULP. The proposed action is for an approximate area of 25,000 acres located in the southwest corner of Colorado.

By letter dated November 7, 2011, (Ribeiro 2011), DOE indicated it was beginning a NEPA PEIS. As part of that effort, DOE requested informal consultation with the U.S. Fish and Wildlife Service (USFWS) and concurrence on a list of federally threatened or endangered species that may be in the vicinity of the ULP. DOE met with the USFWS on November 9, 2011, to discuss the list and other details associated with the BA investigation, such as water depletions. In a letter dated November 16, 2011, (Repp 2011) the USFWS provided a few revisions to the list of federally threatened or endangered species. Subsequent to these letters, the USFWS submitted a rule to propose Gunnison Sage Grouse as endangered under the ESA. On March 20, 2013, DOE provided a BA for review. After further review of documents associated with the four endangered fish species within the Upper Colorado River basin, DOE concluded that it was necessary to change the previous determination for these species. DOE is providing this final BA to replace the BA provided in March.

A total of 14 species listed or proposed for listing under the ESA are considered for Section 7 consultation in this BA; an additional three species that are candidates for listing under the ESA are discussed in coordination with USFWS conservation objectives. The species are listed in Table 3-3 of the BA.

With the implementation of various compliance and mitigation measures or best management practices, ULP activities are expected to have **no effect** on eight species (clay-loving wild buckwheat, Colorado hookless cactus, Debeque phacelia, Uncompahgre fritillary butterfly, greenback cutthroat trout, black-footed ferret, Canada lynx, and North American wolverine) and

Printed with soy ink on recycled paper

on the designated critical habitat for five species (clay-loving wild buckwheat, Debeque phacelia, Mexican spotted owl, southwestern willow flycatcher, and Canada lynx). DOE has determined that ULP activities **may affect, but are not likely to adversely affect**, five species (Mexican spotted owl, southwestern willow flycatcher, Gunnison sage-grouse, western yellow-billed cuckoo, and Gunnison's prairie dog). It has been determined that ULP activities may affect, and are likely to adversely affect the four Colorado River endangered fish species (bonytail, Colorado pikeminnow, humpback chub, and razorback sucker) and their critical habitat.

DOE requests your review of the final BA and your concurrence with these determinations. Since the ULP activities may affect, and are likely to adversely affect the four endangered fish species within the Upper Colorado River basin, DOE is also requesting initiation of formal consultation. Please call me at (303) 410-4817, or the ULP PEIS Document Manager - Mr. Ray Plieness at (303) 410-4806. Please address any correspondence to:

U.S. Department of Energy
Office of Legacy Management
2597 Legacy Way
Grand Junction, CO 81503

Sincerely,

Tracy Ribeiro
2013.05.14 16:57:24
-06'00'

Tracy A. Ribeiro
Environmental Program Manager

Enclosure

cc w/enclosure:
V. Bowie, GC-54 (e)
E. Cohen, GC-54 (e)
S. Dove, GC-31 (e)
S. Miller, GC-51 (e)
M. Picel, ANL (e)
D. Shafer, DOE-LM
R. Plieness, DOE-LM
E. Cotter, Stoller (e)
File: ULP 001.01 (A) (rc grand junction)

DOE Support\Managers\Ribeiro\5-13-13 BA Submission Ltr to USFWS



Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 355 of 426

United States Department of the Interior

FISH AND WILDLIFE SERVICE

Ecological Services
764 Horizon Drive, Building B
Grand Junction, Colorado 81506-3946

IN REPLY REFER TO:
ES-6-RO-95-F-001-GJ423
TAILS 06E24100-2013-F-0096

August 13, 2013

Tracy A. Ribeiro
U.S. Department of Energy
Office of Legacy Management
11025 Dover Street, Suite 1000
Westminster, Colorado 80021-5573

Dear Ms. Ribeiro:

In accordance with section 7 of the Endangered Species Act (ESA) of 1973, as amended (16 U.S.C. 1531 et seq.), and the Interagency Cooperation Regulations (50 CFR 402), the Fish and Wildlife Service (Service) reviewed your May 14, 2013 final biological assessment (BA) to evaluate whether continued management of the U.S. Department of Energy's (DOE) Uranium Leasing Program (ULP) (involving exploration, mine development and operations, and reclamation for a period of 10 or more years) would have adverse effects on listed species under the ESA. The final BA dated May 14, 2013, is part of the ongoing consultation started in concert with a programmatic environmental impact statement (PEIS). The proposed action is for an approximate area of 25,000 acres located in Mesa, Montrose, and San Miguel Counties in southwest Colorado. A total of 14 species either listed or proposed for listing were considered in your BA for section 7 consultation, along with an additional three species that are candidates for listing.

Colorado River Endangered Fishes

DOE has determined that ULP activities **may affect, and are likely to adversely affect**, the endangered Colorado River fish (bonytail *(Gila elegans)*, Colorado pikeminnow (*Ptychocheilus lucius*), humpback chub *(Gila Cypha)*, razorback sucker *(Xyrauchen texanus)*) and their critical habitat. The proposed action will cause an average annual depletion of 19.3 acre-feet per year to the Dolores River in the Upper Colorado River Basin and thus **may adversely affect** the endangered Colorado River fish and their critical habitat. Water depletions associated with ULP are addressed in a June 4, 2010 intra-Service biological opinion (BO) for water depletions less than 100 acre-feet in the upper Colorado River basin. A Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin was initiated on January 22, 1988. The Recovery Program was intended to be the reasonable and prudent alternative to avoid jeopardy and destruction or adverse modification of critical habitat to the endangered fishes

BLM_0042929

caused by depletions from the Upper Colorado River Basin. In order to further define and clarify the process of the Recovery Program, a section 7 agreement was implemented on October 15, 1993, by the Recovery Program participants. Incorporated into this agreement is a Recovery Implementation Program Recovery Action Plan (RIPRAP) which identifies actions currently believed to be required to recover the endangered fishes in the most expeditious manner.

Included in the Recovery Program was the requirement that a depletion fee would be paid by water users to help support the Recovery Program. The ULP fits under the umbrella of the June 4, 2010 re-issued BO that addresses small water depletions and exempts the depletion fee for depletions of 100 acre-feet or less. We have determined that the Recovery Program has made sufficient progress toward recovery to serve as Conservation Measures (formally reasonable and prudent alternatives) for new and historic project depletions of 100 acre-feet or less. Therefore, the depletion fee for the ULP is waived and further consultation is not required.

It is particularly important to avoid contamination of surface and ground water that flows into the Dolores River and in turn into critical habitat in the Colorado River. Uranium mining can contaminate surrounding drainages with uranium, other radioactive contaminants, ammonia, and selenium. The construction of mining facilities may also increase sedimentation in down gradient streams. The implementation of mitigation measures and Best Management Practice's (BMP's) described in Table 2-5 of the ULP BA related to aquatic habitats and water quality will reduce water quality impacts to the extent that they are insignificant

The 2010 BO determined that small water depletions addressed in the BO are not likely to jeopardize the continued existence of the endangered fish and not likely to destroy or adversely modify designated critical habitat.

The determination in this document is based on the information provided by the DOE. If new information becomes available, if a new species becomes listed, if incidental take occurs, if the total average annual amount of water depleted by this project changes, or if any other project element changes which alters the operation of the project from that which is described in your correspondence and which may affect any endangered or threatened species in a manner or to an extent not considered in this BO (see 50 CFR 402.16), formal section 7 consultation must be reinitiated. The DOE should condition its approval documents to retain jurisdiction should section 7 consultation need to be reinitiated.

<u>Mexican Spotted Owl and Southwest Willow Flycatcher</u>

DOE has determined that ULP activities **may affect, but are not likely to adversely affect**, the Mexican spotted owl (*Strix occidentalis lucida)*, and Southwestern willow flycatchers (*Empidonax traillii extimus)*. Therefore, pursuant to the ESA, DOE has requested the Service's concurrence with the effects determination. The Service concurs with the DOE's determination for these species because of the conservation measures described in Table 2-5 (pages 15-20 of the BA) will be implemented during all project phases. DOE assessed that suitable habitat for the southwestern willow flycatcher is unlikely to occur in the vicinity of the lease tracts as the species has not been observed near these areas. Although a Mexican spotted owl occurrence was documented near ULP Lease Tract 12, this bird was most likely migrating as no suitable

2

breeding habitat such as canyon lands and old growth forests exist on this tract. The Service recommends that surveys be conducted (as described in G17, Table 2-5) prior to any on-the-ground ULP activities, to insure that southwestern willow flycatchers and Mexican spotted owls are not present before irretrievable/irreversible commitment of mining company resources occurs. And as described in Table 2-5 (G12), if any federally listed threatened and endangered species are found during any phase of the project, you must consult with the Service as required by Section 7 of the ESA and determine an appropriate course of action to avoid, minimize, or mitigate impacts.

Candidate and Proposed Species

We would like to call DOE's attention to the proposed rule to list the Gunnison sage-grouse (*Centrocercus minimus)* as endangered, plus the proposed designation of critical habitat which were recently published in the Federal Register on January 13, 2013 (USFWS a & b, 2013). Your BA states that the Paradox lease tracts occur as near as 168 ft from the current Gunnison sage-grouse range in the Dry Creek Basin. However, on page 48 (Figure 3-4), the map shows that the western portion of the tract block consisting of the 5a-9 tracts overlaps with the current range of the Gunnison sage-grouse, which in that area, is also proposed critical habitat. Either the map is incorrect or the description in the text is incorrect. Similarly, north of Egnar, proposed critical habitat in the unoccupied range is overlapped by tracts 16 and/or 16A. In your letter of March 20, 2013, you have requested concurrence on your effect determination of not likely to adversely affect for the Gunnison sage-grouse. The Gunnison sage-grouse is currently a proposed species for listing. The DOE is not required to conference with the Service unless you determine that the proposed action is likely to jeopardize the continued existence of the Gunnison sage-grouse section 7(a)(4). All other conferencing regarding a proposed species and proposed critical habitat is voluntary on the DOE's and the Service's part. We appreciate your consideration and analysis of effects on the Gunnison sage-grouse. By your determination we assume that you have determined that your project does not jeopardize the continued existence of the Gunnison sage-grouse, but has some lesser effects. Currently, due to limited staff resources, the Service is not able to engage in voluntary conferencing on the Gunnison sage-grouse, but again we appreciate your analysis of the effects to the Gunnison sage-grouse from the proposed ULP. Should the proposal to list the species become final, all aspects of the ESA (including section 7 consultation) will apply.

You have requested concurrence on determination that the proposed project may affect, but is not likely to adversely affect the yellow-billed cuckoo (*Coccyzus americanus*). The yellow billed cuckoo is a Federal candidate for listing and is not subject to required section 7 consultation or conferencing under the ESA. Currently, the Service is not able to engage in voluntary conferencing on the yellow billed cuckoo, but we appreciate your analysis of the effects to the cuckoo from your proposed action. The Service is preparing a proposed rule for the yellow billed cuckoo that is expected to be available no later than the end of this fiscal year. Consequently, DOE may need to initiate a conference when proposed, or a consultation if listed, with site specific consultations as necessary.

Similarly, you have requested concurrence on your determination that the proposed project may affect, but is not likely to adversely affect the Gunnison's prairie dog (*Cynomys gunnisoni*). The Gunnison's prairie dog is also a Federal candidate for listing and is not subject to required section 7 consultation or conferencing under the ESA. You have determined that the current Gunnison's prairie dog range intersects or is in the vicinity of Uravan, Paradox, and Slick Rock ULP lease tracts. The Service recommends that surveys be conducted (as described in G17, Table 2-5) prior to any on-the-ground ULP activities to avoid impacts to Gunnison's prairie dog.

Other Listed Species and designated critical habitat

DOE has determined that ULP activities are expected to have **no effect** on eight species including; *Eriogonum pelinophilum* (clay-loving wild buckwheat), *Sclerocactus glaucus* (Colorado hookless cactus), *Phacelia submutica* (DeBeque phacelia), Uncompahgre fritillary butterfly (*Boloria acrocnema*), greenback cutthroat trout (*Oncorhynchus clarki stomias*), Black-footed ferret (*Mustela nigripes*), Canada lynx (*Lynx canadensis*), and North American wolverine (*Gulo gulo luscus*), and on the designated critical habitat for five species (clay-loving wild buckwheat, Debeque phacelia, Mexican spotted owl, southwestern willow flycatcher, and Canada lynx). The Service does not have any information indicating otherwise. The regulations implementing section 7 of the ESA (Interagency Cooperation) do not authorize or require the Service to review or concur with no effect determinations for listed species or designated critical habitat. However, we appreciated your providing us the no effect determination for our information, even if not required to do so under the ESA.

This concludes formal and informal consultation on the DOE ULP. As provided in 50 CFR 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if--1) the amount or extent of incidental take is exceeded; 2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; 3) the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or 4) a new species is listed or critical habitat designated that may be affected by the action.

Rare Plants

We would like to take this opportunity to call attention to plant species with a ranking from the Colorado Natural Heritage Program of G1 or G2 because these have been identified as the most imperiled and rarest plants in Colorado. These species include: *Astragalus equisolensis* (horseshoe milkvetch), *Camissonia eastwoodia* (Eastwood evening-primrose or Grand Junction suncup), *Cryptantha gypsophila* (Gypsum Valley cateye), *Erigeron kachinensis* (Kachina daisy), *Lupinus crassus* (Payson lupine), and *Lygodesmis doloresensis* (Dolores River skeletonplant). In the past, we have been petitioned to list several of these species including the horseshoe milkvetch, Gypsum Valley cateye, and the Dolores River skeletonplant. We did negative 90-day findings for all three species, but all are species of concern. Recent genetic tests suggest that the Gypsum Valley cateye is rarer than previously thought, being confined only to the Gypsum Valley. Actions associated with the leasing should be conducted in a manner to promote conservation of these species.

BLM_0042932

Migratory Birds

DOE has informed the Service that no in situ mining will occur with the ULP. Thus, effects connected with in-situ mining were not included in the ULP BA. The potential for uranium, radionuclides, selenium and other contaminants to impact migratory birds should be assessed for retention ponds that capture surface water, and for sedimentation ponds receiving water pumped from mines. Uranium bearing formations are usually associated with seleniferous strata (Boon 1989). Waterborne selenium concentrations ≥ 2 μg/L are considered hazardous to the health and long-term survival of fish and wildlife (Lemly 1996). Additionally, water with more than 20 μg/L is considered hazardous to aquatic birds (Skorupa and Ohlendorf 1991). Chronic effects of selenium manifest themselves in immune suppression to birds (Fairbrother et al. 1994) which can make affected birds more susceptible to disease and predation. Selenium toxicity will also cause embryonic deformities and mortality (See et al. 1992, Skorupa and Ohlendorf 1991, Ohlendorf 2002)

If submerged aquatic vegetation and/or aquatic invertebrates are present in ponds with high waterborne selenium concentrations, extremely high dietary levels of this contaminant can be available to aquatic migratory birds. Ramirez and Rogers (2000, 2002) documented selenium concentrations ranging from 434 to 508 μg/g in *Potamogeton vaginatus* (pondweed) collected from a uranium mine wastewater storage reservoir that had waterborne selenium concentrations ranging from 260 to 350 μg/L.

Annual monitoring of retention and sedimentation ponds should be conducted to determine waterborne selenium concentrations and to determine if submerged aquatic vegetation and/or aquatic invertebrates are present and provide a pathway for selenium bioaccumulation by birds using the evaporation ponds. If submerged aquatic vegetation and/or aquatic invertebrates are present in the evaporation pond and waterborne selenium is > 2 μg/L, please contact our office for further guidance.

Along with the previously mentioned contaminants, high salt concentrations may also occur in retention and sedimentation ponds, as well as at ponds at milling facilities. As water evaporates, ponds become increasingly saline; ultimately resulting in accumulation of evaporates/precipitates. On page S-67 of your March 2013 draft PEIS, it is recommended that mine-water treatment ponds should be fenced and netted to prevent use by wildlife including birds and bats. Contrary to what is stated on page 67 of your BA, birds do not avoid acidic and saline conditions in ponded water, and both situations can result in providing attractive nuisance ponds that result in avian mortality. There are numerous publications that address salt toxicity to birds. Wobeser and Howard (1987) discussed mortality of waterfowl on a hypersaline lake with a conductivity of 77,000-90,000 μmhos/cm. Windingstad et al. (1987) reported salt toxicosis in waterfowl in a lake with sodium concentrations over 17,000 mg/L. Salt toxicosis is associated with high sodium concentrations in bird brains, and they can suffer general dehydration, hemorrhages, salt encrustation of feathers, ocular lens opacities, and eventual mortality (Meteyer et al., 1997). Fencing (Table 2-5, D11), lining (Table 2-5, D4), **and** netting these ponds that contain high concentrations of salt and contaminants are the best management practices that provide barriers to prevent exposure to birds and other wildlife, and avoid take under the Migratory Bird Treaty Act. Please visit www.fws.gov/mountain-prairie/contaminants/oilpits.htm

for more information on pond netting.

Thank you for your cooperation in this consultation and your interest in conserving endangered species. If we can be of further assistance, please contact Barb Osmundson of the Western Colorado Field Office in Grand Junction at (970) 243-2778, extension 21.

Sincerely,

Patricia S. Gelatt
Western Colorado Supervisor

**References Cited:**

Boon, D.Y. 1989. Potential selenium problems in Great Plains soils. In L.W. Jacobs, ed. Selenium in agriculture and the environment. American Society of Agronomy, Inc, and Soil Science Society of America. SSSA Special Pub. No. 23. Madison, WI. pp: 107-121.

Fairbrother, A.F., M. Fix, T. O'Hara, and C.A. Ribic. 1994. Impairment of growth and immune function of avocet chicks from sites with elevated selenium, arsenic, and boron. Journal of Wildlife Diseases. 30(2):222-233.

Lemly, A.D. 1996. Selenium in aquatic organisms. Pages 427-445 *in* W.N. Beyer, G.H. Heinz, and A.W. Redmon-Norwood (eds.). Environmental contaminants in wildlife: Interpreting tissue concentrations. Lewis Publishers, Boca Raton, Florida.

Meteyer, C.U., R.R. Dubielzig, F. Joshua Dein, L.A. Baeten, M. IS. Moore, J.R. Jehl Jr., and K. Wesenberg. 1997. Sodium toxicity and pathology associated with exposure of waterfowl to hypersaline playa lakes of southeast New Mexico. J. Vet. Diagn. Invest. 9:269-280.

Ohlendorf, H.M. 2002. Ecotoxicology of selenium. In *Handbook of Ecotoxicology*, 2nd ed.; Hoffman, D.J., Rattner, B.A., Burton Jr., G.A., Cairns, Jr., J., Eds.; Lewis Publishers, Boca Raton, FL, 2003; pp 465-500.

Ramirez, P. and B. Rogers. 2000. Selenium in a Wyoming grassland community receiving wastewater from an in situ uranium mine. U.S. Fish and Wildlife Service Contaminant Report # R6/715C/00. Cheyenne, WY. Sept. 31.

Ramirez, P. Jr. and B.P. Rogers. 2002. Selenium in a Wyoming grassland community receiving wastewater from an *in situ* uranium mine. Arch. Environ. Contam. Toxicol. 42:431-436.

See, R.B., D.L. Naftz, D.A. Peterson, J.G. Crock, J.A. Erdman, R.C. Severson, P. Ramirez, Jr., and J.A. Armstrong. 1992. Detailed study of selenium in soil, representative plants,

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 361 of 426

water, bottom sediment, and biota in the Kendrick Reclamation Project Area, Wyoming, 1988-90. U.S. Geological Survey Water Resources Investigations Report 91-4131. 142 pp.

Skorupa, J.P., and H.M. Ohlendorf. 1991. Contaminants in drainage water and avian risk thresholds. Pages 345-368 *in* A. Dinar and D. Zilberman (eds.). The economics and management of water and drainage in agriculture. Kluwer Academic Publishers, Boston, MA.

USFWS. 2013a. Endangered and threatened wildlife and plants; endangered status for Gunnison sage-grouse; Proposed Rule. Fed. Regist. 78(8): 2485-2538.

USFWS. 2013b. Endangered and threatened wildlife and plants; designation of critical habitat for Gunnison sage-grouse; Proposed Rule. Fed. Regist. 78(8): 2539-2570.

Windingstad, R.M., F.X. Kartch, R.K.Strand, and M.R. Smith. 1987. Salt toxicosis in waterfowl in North Dakota. Journal of Wildlife Diseases 23(3): 443-446.

BOsmundson:DOEULPBOGJ423.docx:081313:KM

BLM_0042935

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 362 of 426

*This page intentionally left blank*

BLM_0042936



DEPARTMENT OF EN
UNI
Final Biological Assessment for the U.S. Department of Energy Uranium Leasing Program
May 2013
U.S. DEPARTMENT OF
ENERGY
Legacy Management

BLM_0042937

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 364 of 426

BLM_0042938

Final ULP PEIS Appendix E: ESA Consultation Correspondence, BO, and BA

# Final Biological Assessment for the U.S. Department of Energy Uranium Leasing Program

May 2013

U.S. DEPARTMENT OF
ENERGY
Legacy
Management

E-23 March 2014

BLM_0042939

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 366 of 426

*This page intentionally left blank*

BLM_0042940

CONTENTS

NOTATION ..... vii

1 INTRODUCTION ..... 1

1.1 Summary ..... 1

2 PROPOSED ACTION ..... 3

2.1 Description of the Action Area ..... 3
2.2 Description of the Proposed Action ..... 10
2.2.1 Production and Surface Disturbance ..... 10
2.2.2 Water ..... 11
2.3 Potentially Applicable Mitigation Measures and Best Management Practices ..... 12

3 EFFECTS OF THE URANIUM LEASING PROGRAM ..... 21

3.1 Common Effects of Uranium Mining on Species and Habitats ..... 21
3.1.1 Exploration ..... 21
3.1.2 Mine Development and Operations ..... 24
3.1.3 Reclamation ..... 29
3.2 Species That May Be Affected under the Proposed Action ..... 30
3.2.1 Endangered, Threatened, and Proposed Species ..... 30
3.2.1.1 Plants ..... 33
3.2.1.2 Invertebrates ..... 38
3.2.1.3 Fish ..... 38
3.2.1.4 Birds ..... 45
3.2.1.5 Mammals ..... 52
3.2.2 Candidate Species ..... 54
3.2.2.1 Birds ..... 56
3.2.2.2 Mammals ..... 57

4 CUMULATIVE EFFECTS ..... 61

4.1 Reasonably Foreseeable Future Actions ..... 61
4.1.1 Piñon Ridge Mill ..... 64
4.1.2 Planned Uranium Exploration ..... 65
4.1.3 Construction of Agricultural Water Facilities ..... 65
4.1.4 Other Future Projects ..... 66
4.2 Past and Present Actions ..... 66
4.2.1 White Mesa Mill ..... 66
4.2.2 Uranium Mining ..... 67
4.2.2.1 Daneros Mine ..... 67
4.2.2.2 La Sal Mines Complex ..... 67

CONTENTS (Cont.)

4.2.2.3 Whirlwind Mine ........ 68
4.2.2.4 Other Uranium Mining and Uranium Exploration ........ 68
4.2.2.5 Coal Mining ........ 69

4.3 Cumulative Impacts from the Proposed Action ........ 70

5 REFERENCES ........ 71

FIGURES

2-1 Locations of the ULP Lease Tracts ........ 7

2-2 Land Cover Types in the Vicinity of the DOE Lease Tracts ........ 9

3-1 Recorded Quad-Level Occurrences of the Clay-Loving Wild Buckwheat and Colorado Hookless Cactus, and Locations of Designated Critical Habitat for the Clay-Loving Wild Buckwheat, in the Vicinity of the ULP Lease Tracts ........ 34

3-2 Recorded Quad-Level Occurrences of the Debeque Phacelia and Uncompahgre Fritillary Butterfly, and Locations of Proposed Critical Habitat for the Debeque Phacelia, in the Vicinity of the ULP Lease Tracts ........ 37

3-3 Locations of Designated Critical Habitat for the Colorado River Endangered Fish Species in the Vicinity of the ULP Lease Tracts ........ 40

3-4 Recorded Quad-Level Occurrences and Distribution of Potentially Suitable Habitat for the Gunnison Sage-Grouse and Western Yellow-Billed Cuckoo in the Vicinity of the ULP Lease Tracts ........ 48

3-5 Recorded Quad-Level Occurrences and Distribution of Potentially Suitable Habitat for the Mexican Spotted Owl and Southwestern Willow Flycatcher, and Locations of Designated Critical Habitat for the Mexican Spotted Owl, in the Vicinity of the ULP Lease Tracts ........ 50

3-6 Recorded Quad-Level Occurrences and Distribution of Potentially Suitable Habitat for the Canada Lynx in the Vicinity of the ULP Lease Tracts ........ 55

3-7 Recorded Quad-Level Occurrences and Distribution of Potentially Suitable Habitat for the Gunnison's Prairie Dog and North American Wolverine in the Vicinity of the ULP Lease Tracts ........ 59

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 369 of 426

**FIGURES (Cont.)**

4-1 Region of Cumulative Impacts for the Proposed ULP ........ 62

4-2 Uranium Mining and Oil/Gas Wells in the Region of Cumulative Impacts........ 63

**TABLES**

2-1 Status Summary of the 31 DOE ULP Lease Tracts before October 18, 2011........ 4

2-2 Number of Mines, Ore Production Rates, and Disturbed Surface Areas Assumed for the Peak Year of Operations........ 11

2-3 Peak Water Requirements Assumed for the ULP Mines........ 13

2-4 Pond Volume, Discharge, and Retention Estimates for the Two Two-Pond Systems Currently at the ULP Mine Sites........ 13

2-5 Measures to Reduce Impacts of ULP Activities on Ecological Resources ........ 15

3-1 General Ecological Effects on Different Groups of Biota during Various Uranium Mining Phases........ 22

3-2 Seed Mixture Approved for Reseeding on the DOE ULP Lease Tracts........ 29

3-3 Summary of Effects Determination for Listed and Candidate Species ........ 31

BLM_0042943

Final ULP PEIS Appendix E: ESA Consultation Correspondence, BO, and BA

ULP Final Biological Assessment May 2013

This page intentionally left blank

vi

E-28 March 2014

BLM_0042944

# NOTATION

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| BA | biological assessment |
| BLM | Bureau of Land Management |
| BMP | best management practice |
| CDOW | Colorado Division of Wildlife |
| CDPHE | Colorado Department of Public Health and Environment |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | *Code of Federal Regulations* |
| CNHP | Colorado Natural Heritage Program |
| CPW | Colorado Parks and Wildlife (formerly CDOW) |
| DOE | U.S. Department of Energy |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy Act |
| NPDES | National Pollutant Discharge Elimination System |
| ROW | right-of-way |
| ULP | Uranium Leasing Program |
| USC | *United States Code* |
| USDA | U.S. Department of Agriculture |
| USFWS | U.S. Fish and Wildlife Service |
| WAPA | Western Area Power Administration |

## UNITS OF MEASURE

| | |
|---|---|
| acre-ft | acre-foot (feet) |
| °C | degree(s) Celsius |
| cm | centimeter(s) |
| d | day |
| dBA | a-weighted decibel(s) |
| °F | degree(s) Fahrenheit |
| ft | foot (feet) |
| g | gram(s) |
| gal | gallon(s) |
| h | hour(s) |
| ha | hectare(s) |
| in. | inch(es) |
| kg | kilogram(s) |
| km | kilometer(s) |
| $km^2$ | square kilometer(s) |
| L | liter(s) |
| lb | pound(s) |

Final ULP PEIS Appendix E: ESA Consultation Correspondence, BO, and BA

ULP Final Biological Assessment May 2013

| | |
|---|---|
| m | meter(s) |
| mGy | milligray |
| mi | mile(s) |
| $mi^2$ | square mile(s) |
| oz | ounce(s) |
| pCi | picocurie(s) |
| yr | year(s) |

viii

E-30 March 2014

BLM_0042946

# 1 INTRODUCTION

This document serves as the biological assessment (BA) for the U.S. Department of Energy's (DOE's) proposed action to implement the Uranium Leasing Program (ULP) under which DOE administers tracts of land (lease tracts) in western Colorado for exploration, development, and the extraction of uranium and vanadium ores. This BA was prepared by DOE as part of its compliance with the Endangered Species Act of 1973, as amended (ESA; see 16 USC §1531 et seq. in *United States Code*). A BA evaluates the potential effects of an agency's proposed action on species that are federally listed as threatened or endangered (and species that are proposed for such listing) and on designated and proposed critical habitat and determines whether any such species or habitats are likely to be adversely affected by the proposed action (see 50 CFR 402.12 in the *Code of Federal Regulations*). This BA is being provided to the U.S. Fish and Wildlife Service (USFWS) to document DOE's conclusions and the rationale to support those conclusions regarding the effects of the proposed action on protected resources, and it may be used by the USFWS in developing a biological opinion (Opinion) if it is determined that the proposed action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat.

## 1.1 SUMMARY

A total of 14 species listed or proposed for listing under the ESA are considered for Section 7 consultation in this BA; an additional 3 species that are candidates for listing under the ESA are discussed in coordination with USFWS conservation objectives. Required compliance measures, mitigation measures, and suggested best management practices (BMPs) (listed and defined in Table 2-5) for ULP mining activities would aid in eliminating, reducing, or offsetting impacts to these species. With the implementation of these measures, ULP activities are expected to have **no effect** on 8 species (clay-loving wild buckwheat, Colorado hookless cactus, Debeque phacelia, Uncompahgre fritillary butterfly, greenback cutthroat trout, black-footed ferret, Canada lynx, and North American wolverine) and on the designated critical habitat for 5 species (clay-loving wild buckwheat, Debeque phacelia, Mexican spotted owl, southwestern willow flycatcher, and Canada lynx). It has been determined that ULP activities **may affect, but are not likely to adversely affect**, 5 species (Mexican spotted owl, southwestern willow flycatcher, Gunnison sage-grouse, western yellow-billed cuckoo, and Gunnison's prairie dog). It has been determined that ULP activites **may affect, and are likely to adversely affect** the 4 Colorado River endangered fish species (bonytail, Colorado pikeminnow, humpback chub, and razorback sucker) and their critical habitat. Additional conservation measures are proposed to reduce or mitigate impacts to the Colorado River endangered fish. The cumulative impact assessment evaluates the incremental impact of other nonfederal activities within a 50-mi (80-km) area surrounding the ULP lease tracts. Cumulative effects of the ULP are not likely to jeopardize federally listed species or interfere with USFWS recovery efforts for these species.

Final ULP PEIS Appendix E: ESA Consultation Correspondence, BO, and BA

ULP Final Biological Assessment May 2013

This page intentionally left blank

E-32 March 2014

BLM_0042948

# 2 PROPOSED ACTION

## 2.1 DESCRIPTION OF THE ACTION AREA

At present, DOE manages 31 lease tracts under its ULP. These lease tracts are located in Mesa, Montrose, and San Miguel Counties, Colorado, on public lands administered by the Bureau of Land Management (BLM) under the provisions of Public Land Order 459 and others. Of these 31 lease tracts, 29 have active leases, and 2 do not. Lease Tracts 8A and 14 (composed of Tracts 14-1, 14-2, and 14-3) are currently not leased. Lease Tract 8A is a small tract that is isolated and may be located entirely outside the uranium-bearing formation, which could indicate a lack of ore. There was some interest in Lease Tracts 14-1 and 14-2 by potential lessees in the past; however, the third tract (14-3, which lies east of 14-1) is located almost entirely within the Dolores River corridor and was never leased. Table 2-1 lists the 31 lease tracts and the acreage, the current lease holder(s), and the field status of each tract. Figure 2-1 shows the locations of the lease tracts.

The ULP lease tracts are located primarily within the Colorado Plateaus Level III ecoregion (Chapman et al. 2006). An ecoregion is an area in which the ecosystems have a general similarity. The Colorado Plateaus ecoregion is characterized by a rugged tableland of mesas, plateaus, mountains, and canyons, often with abrupt changes in local relief (Chapman et al. 2006). Habitat types within this ecoregion include Douglas-fir forest and woodlands of pinyon-juniper and Gambel oak, as well as sagebrush steppe, desert shrubland, and salt desert scrub. The ULP lease tracts could support a variety of vegetation types; the predominant ones are pinyon-juniper woodlands and sagebrush-dominated shrublands.

Each of the lease tracts is located, at least in part, within the Semiarid Benchlands and Canyonlands Level IV ecoregion. Sandy soils support sagebrush steppe with warm season grasses, such as galleta grass (*Pleuraphis jamesii*) and blue grama (*Bouteloua gracilis*), and shrubs, primarily black sagebrush (*Artemisia nova*), winterfat (*Krascheninnikovia lanata*), mormon tea (*Ephedra viridis*), fourwing saltbush (*Atriplex canescens*), and shadscale (*Atriplex confertifolia*). Stony soils support pinyon-juniper woodlands of two-needle pinyon pine (*Pinus edulis*) and Utah juniper (*Juniperus osteosperma*). Scattered woodlands of Gambel oak (*Quercus gambelii*) occur at the higher elevations.

Western portions of Lease Tracts 11, 11A, and 12 include the Monticello-Cortez Uplands and Sagebrush Valleys Level IV ecoregion. Sagebrush steppe occurs on broad areas of silty soils and is characterized by Wyoming big sagebrush (*Artemisia tridentata wyomingensis*), western wheatgrass (*Pascopyrum smithii*), and Indian ricegrass (*Achnatherum hymenoides*) (Chapman et al. 2006). Scattered pinyon-juniper woodlands occur on shallow or stony soils along the rims of benches and minor escarpments. Two-needle pinyon pine, antelope bitterbrush (*Purshia tridentata*), and serviceberry (*Amelanchier* sp.) also occur in some areas.

A small area in the eastern portion of Lease Tract 13 is located within the Shale Deserts and Sedimentary Basins Level IV ecoregion. This arid ecoregion generally supports sparse mat saltbush shrubland and salt desert scrub (Chapman et al. 2006). Characteristic species include

TABLE 2-1 Status Summary of the 31 DOE ULP Lease Tracts before October 18, 2011

| | Lease Tract No. | Acreage | Lessee | County | Status[a] |
|---|---|---|---|---|---|
| 1 | 10 | 638 | Golden Eagle Uranium, LLC | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 2 | 11 | 1,303 | Cotter Corporation | San Miguel | One new underground mine permitted and being developed; reclamation of previously disturbed areas needed. |
| 3 | 11A | 1,297 | Golden Eagle Uranium, LLC | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 4 | 12 | 641 | Colorado Plateau Partners | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 5 | 13 | 1,077 | Gold Eagle Mining Inc. | San Miguel | Three existing, permitted underground mines; reclamation of previously disturbed areas is needed. |
| 6 | 13A | 420 | Cotter Corporation | San Miguel | Exploration plan (one hole) approved; drilling and reclamation of the explored area are completed. |
| 7 | 14 (1, 2, 3) | 971 | Not applicable | San Miguel | Lease tract has not been leased. |
| 8 | 15 | 350 | Gold Eagle Mining Inc. | San Miguel | One existing underground mine; reclamation of previously disturbed areas is needed. |
| 9 | 15A | 172 | Golden Eagle Uranium, LLC | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 10 | 16 | 1,790 | Golden Eagle Uranium, LLC | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 11 | 16A | 585 | Energy Fuels Resources Corp. | San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 12 | 5 | 151 | Gold Eagle Mining Inc. | Montrose | One existing, permitted underground mine; reclamation of previously disturbed areas is needed. |

**TABLE 2-1 (Cont.)**

| | Lease Tract No. | Acreage | Lessee | County | Status[a] |
|---|---|---|---|---|---|
| 13 | 5A (1, 2) | 25 | Golden Eagle Uranium, LLC | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 14 | 6 | 530 | Cotter Corporation | Montrose | One existing permitted underground mine; reclamation of previously disturbed areas is needed. |
| 15 | 7 | 493 | Cotter Corporation | Montrose | Two existing permitted mines—one underground mine and one large open-pit mine; reclamation of previously disturbed areas is needed. |
| 16 | 8 | 955 | Cotter Corporation | Montrose | One existing permitted underground mine; reclamation of previously disturbed areas is needed. |
| 17 | 8A | 78 | Not applicable | Montrose | Lease tract has not been leased. |
| 18 | 9 | 1,037 | Cotter Corporation | Montrose | One existing permitted underground mine; reclamation of previously disturbed areas is needed. |
| 19 | 17 (1, 2) | 475 | Golden Eagle Uranium, LLC | Montrose and San Miguel | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 20 | 18 | 1,181 | Cotter Corporation | Montrose | One existing permitted underground mine; reclamation of previously disturbed areas is needed. |
| 21 | 19 | 662 | Energy Fuels Resources Corp. | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 22 | 19A | 1,204 | Energy Fuels Resources Corp. | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 23 | 20 | 627 | Energy Fuels Resources Corp. | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 24 | 21 | 651 | Cotter Corporation | Montrose | Exploration plan (two holes) approved; drilling and reclamation of the explored area are completed; no area needs to be reclaimed under current conditions. |

TABLE 2-1 (Cont.)

| | Lease Tract No. | Acreage | Lessee | County | Status[a] |
|---|---|---|---|---|---|
| 25 | 22 | 224 | Golden Eagle Uranium, LLC | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 26 | 22A | 409 | Golden Eagle Uranium, LLC | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 27 | 23 (1, 2, 3) | 596 | Golden Eagle Uranium, LLC | Montrose | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| 28 | 24 | 201 | Energy Fuels Resources Corp | Montrose | Exploration plan (eight holes) approved; drilling and reclamation of explored area are completed; no area needs to be reclaimed under current conditions. |
| 29 | 25 | 639 | Cotter Corporation | Montrose | Exploration plan (one hole) approved; drilling and reclamation of explored area are completed; no area needs to be reclaimed under current conditions. |
| 30 | 26 | 3,989 | Energy Fuels Resources Corp | Mesa | Exploration plan (six holes) approved; drilling and reclamation of the explored area are completed; mine re-entry plan is approved, bulkhead partially removed, and assessment completed; portal is resecured; reclamation of previously disturbed areas is needed. |
| 31 | 27 | 1,766 | Energy Fuels Resources Corp | Mesa | No recent (post-1995) activity conducted; no area needs to be reclaimed under current conditions. |
| Total | | 25,137 | | | |

[a] On October 18, 2011, a federal district court stayed the 31 leases, and enjoined DOE from approving any activities on ULP lands. On February 27, 2012, the court amended its injunction to allow DOE, other federal, state, or local governmental agencies, and the ULP lessees to conduct only those activities on ULP lands that are absolutely necessary, as described in the court's Order. See *Colorado Environmental Coalition v. Office of Legacy Management*, No. 08-cv-01624, 2012 U.S. DIST. LEXIS 24126 (D. Colo. Feb. 27, 2012).

*Final ULP PEIS* *Appendix E: ESA Consultation Correspondence, BO, and BA*

*ULP Final Biological Assessment* *May 2013*

Lease Tract
Gateway Lease Tracts
Uravan Lease Tracts
Paradox Lease Tracts
Slick Rock Lease Tracts
Outlaw Mesa
Calamity Mesa
Dolores River
SINBAD VALLEY
Mesa County
Montrose County
San Juan County
Montrose County
PARADOX VALLEY
Uravan
San Miguel River
La Sal
Bedrock
Nucla
Naturita
Wild Steer Mesa
Montrose County
San Miguel County
DRY CREEK BASIN
BIG GYPSUM VALLEY
DISAPPOINTMENT VALLEY
San Juan County
San Miguel County
Egnar
San Miguel County
Dolores County
Dove Creek
Wyoming
Utah
Colorado
New Mexico
Miles
Kilometers
N
ULP078

FIGURE 2-1 Locations of the ULP Lease Tracts

7

E-37 March 2014

BLM_0042953

mat saltbush (*Atriplex corrugata*), shadscale, Nuttall's saltbush (*Atriplex nuttallii*), blackbrush (*Coleogyne ramosissima*), fourwing saltbush, Wyoming big sagebrush, bud sagebrush (*Picrothamnus desertorum*), galleta grass, and desert trumpet (*Baileya multiradiata*). The alkaline soils of floodplains support greasewood (*Sarcobatus vermiculatus*), alkali sacaton (*Sporobolus airoides*), seepweed (*Suaeda* sp.), and shadscale. Badland areas support little or no vegetation.

A small portion in the northeast corner of Lease Tract 26 is located within the Sedimentary Mid-Elevation Forests Level IV ecoregion of the Southern Rockies Level III ecoregion. This ecoregion supports ponderosa pine (*Pinus ponderosa*) forest, aspen (*Populus tremuloides*) forest, and Gambel oak woodland (Chapman et al. 2006). Some areas include mountain mahogany (*Cercocarpus* sp.) and two-needle pinyon pine. Shrubs occurring within the habitats of this ecoregion include antelope bitterbrush (*Purshia tridentata*), fringed sage (*Artemisia frigida*), serviceberry, and snowberry (*Symphoricarpos* sp.). Grasses within these habitats include Arizona fescue (*Festuca arizonica*), bluegrass (*Poa* sp.), junegrass (*Koeleria macrantha*), needlegrasses (*Stipa* spp.), mountain muhly (*Muhlenbergia montana*), pine dropseed (*Blepharoneuron tricholepis*), and mountain brome (*Bromus marginatus*).

Land cover types described and mapped under the Southwest Regional Gap Analysis Project (USGS 2004) are used to evaluate plant communities in and near the lease tracts (Figure 2-2). Each cover type encompasses a range of similar plant communities. The predominant vegetation community in most of the tracts is Colorado Plateau Pinyon-Juniper Woodland. Large areas of Inter-Mountain Basins Big Sagebrush Shrubland occur in Lease Tracts 9, 12, 19A, 20, and 21. Colorado Plateau Pinyon-Juniper Shrubland occurs over large areas of Lease Tracts 13, 13A, 14-1, and 18. Large areas of Rocky Mountain Gambel Oak-Mixed Montane Shrubland occur in Lease Tracts 10 and 12.

Lease Tracts 19A, 20, and 21 consist primarily of a composite of Colorado Plateau Pinyon-Juniper Woodland and Inter-Mountain Basins Big Sagebrush Shrubland. Lease tracts 13A, 14, and 18 are composed primarily of Colorado Plateau Pinyon-Juniper Woodland and Colorado Plateau Pinyon-Juniper Shrubland. Lease Tract 12 is a mosaic of Inter-Mountain Basins Montane Sagebrush Steppe, Inter-Mountain Basins Big Sagebrush Shrubland, and Rocky Mountain Gambel Oak-Mixed Montane Shrubland. Lease Tract 13 is a mosaic of Colorado Plateau Pinyon-Juniper Woodland, Colorado Plateau Pinyon-Juniper Shrubland, Inter-Mountain Basins Greasewood Flat, Inter-Mountain Basins Shale Badland, and Inter-Mountain Basins Mixed Salt Desert Scrub.

Rocky Mountain Lower Montane Riparian Woodland and Shrubland occurs along segments of Calamity Creek in Lease Tracts 26 and 27, along the Dolores River in Lease Tract 13, and along the withdrawn area of the northwest section of Lease Tract 13A. A small area of introduced riparian and wetland vegetation occurs in the northwest corner of Lease Tract 18 along Atkinson Creek.

Wetland areas are typically inundated or have saturated soils for at least a portion of the growing season (Cowardin et al. 1979). Wetlands generally support plant communities that are adapted to saturated soil conditions; however, stream beds, mudflats, gravel beaches, and rocky

BLM_0042954

*Final ULP PEIS* *Appendix E: ESA Consultation Correspondence, BO, and BA*

*ULP Final Biological Assessment* *May 2013*

0 5 10 15 Miles
0 5 10 15 Kilometers
N
Grand County
Mesa County
Delta County
Montrose County
Utah
Colorado
San Miguel County
Dolores County
San Juan County
Montezuma County
La Plata County
25 Mile Region
Lease Tract
Land Cover Type
Agriculture
Alpine sparse and barren
Bluff and badland
Cliff, canyon and talus
Conifer dominated forest, woodland, and savanna
Deciduous dominated forest, woodland, and shrubland
Developed
Floodplain and riparian
Freshwater marsh and swamp
Harvested forest
Shrubland, grassland, steppe, and prairie
Mining
Open water
Other disturbed or modified land
ULP037

**FIGURE 2-2 Land Cover Types in the Vicinity of the DOE Lease Tracts (USGS 2004)**

9

E-39 March 2014

BLM_0042955

shores are wetland areas that may not be vegetated. Although surface flows provide the water source for some wetlands (such as many riverine marshes), other wetlands (such as springs and seeps) are supported by groundwater discharge. Wetlands are often associated with perennial water sources, such as springs, perennial segments of streams, or lakes and ponds. However, some wetlands, such as vernal pools, have seasonal or intermittent sources of water. Wetlands in the area of the lease tracts are mapped by the National Wetlands Inventory (USFWS 2009i). Digital data are not available for this area of Colorado; nevertheless, wetlands are mapped and identified by type. Some wetlands occurring in these areas may not be mapped because of the inherent limitations of high-altitude image interpretation. Riverine wetlands occur in many canyon areas within the tracts, including along the Dolores River and named creeks. Small palustrine wetlands occur in several tracts, typically as a result of a dike or impoundment, and may represent livestock watering ponds.

## 2.2 DESCRIPTION OF THE PROPOSED ACTION

DOE is completing a programmatic environmental impact statement (PEIS) under the National Environmental Policy Act (NEPA) for the ULP. DOE's proposed action in the PEIS is to decide whether to continue the ULP for the remainder of the 10-year period covered by a previous NEPA review in July 2007 and, if it decides to continue the ULP, to determine which alternative to adopt in order to manage the ULP during that period. The preferred alternative in the PEIS is to continue the ULP with exploration, mine development and operation, and reclamation at the 31 lease tracts for the next 10-year period or for another reasonable period. This BA evaluates the actions associated with the preferred alternative of the PEIS.

### 2.2.1 Production and Surface Disturbance

Based on analyses of a reasonably foreseeable development scenario (as presented in the PEIS), it was assumed that there would be a total of 19 mines operating under the ULP at various production rates at the same time during what would be considered the peak year of operations. It is further assumed that there would be a smaller number of mines in operation in the years other than the peak year, and that this peak year could occur more than once (that is, there could be multiple years with the same number of mines operating at similar ore production rates). These assumptions are developed based on a review of information on past mining that have occurred at the ULP lease tracts, and on current expectations of the ULP lessees about the mining that they would likely conduct in the near future. Table 2-2 presents the assumed number of mines and associated production rates. The size of the mine (i.e., small, medium, large, or very large) was assigned on the basis of the assumed ore production rate. The disturbed surface area, which varies somewhat depending on the size of the mine, is also presented in the table.

The ore generated from the DOE ULP lease tracts could be taken to either of two mills for processing: White Mesa Mill or the proposed Piñon Ridge Mill. The White Mesa Mill is currently the only conventional uranium mill operating in the United States. This mill was originally licensed to operate by the U.S. Nuclear Regulatory Commission on March 31, 1980; it currently possesses 15 license amendments that allow it to process 18 different alternative ore

**TABLE 2-2 Number of Mines, Ore Production Rates, and Disturbed Surface Areas Assumed for the Peak Year of Operations**

| | Parameter Value per Size of Mine | | | | |
|---|---|---|---|---|---|
| Parameter Assumed | Small | Medium | Large | Very Large[a] | Total for All Sizes |
| Number of mines | 6 | 10 | 2 | 1 | 19 |
| Ore production rate (tons/d) | 300 (50 per mine) | 1,000 (100 per mine) | 400 (200 per mine) | 300 | 2,000[b] |
| Total disturbed surface area (acres) | 60 (10 per mine) | 150 (15 per mine) | 40 (20 per mine) | 210[a] | 460[c] |

[a] The one very large mine that is assumed is an open-pit mine (on Lease Tract 7), which has been explored and developed but is currently not in operation. The area developed is about 210 acres.

[b] Total tonnage per day that is assumed to be produced exceeds the milling capacity of 1,500 tons per day assumed to be available (at White Mesa and Piñon Ridge Mills) for processing uranium ore from the ULP lease tracts, but it is further assumed that the excess tonnage produced could be stockpiled for a few days, since the mills process ore 7 days per week, while production typically occurs on only 5 days per week.

[c] Total additional area that would be disturbed is 250 acres, since 210 acres from the open-pit mine is already accounted for from previous mining disturbance.

feeds. The White Mesa Mill also operates under a groundwater discharge permit and an air quality approval order. The mill is located off U.S. Highway 191, approximately 6 mi (10 km) south of Blanding, Utah.

The nearest ULP lease tract is Lease Tract 11A, which is approximately 33 mi (53 km) northeast of the mill. The White Mesa Mill also processes ore from the Colorado Plateau and Arizona Strip. The White Mesa Mill is licensed to process an average of 2,000 tons of ore per day and produce 8 million lb (3.6 million kg) of uranium oxide per year (Denison Mines 2012a).

### 2.2.2 Water

The potential for impacts on surface water and groundwater in the vicinity of the DOE ULP lease tracts during mine development and operations would result from erosion, runoff, dewatering, and groundwater-contamination-related causes. The impacts associated with consumptive water use, chemical spills, and wastewater could be minimized through permitting and BMP implementation. The lease tracts closest to the Dolores River and San Miguel River have the greatest potential for affecting water quality because of their proximity to perennial water bodies. The lease tracts located in the Slick Rock and Uravan lease tracts are the closest to the Dolores River and San Miguel River, respectively. Lease Tract 13 encompasses a 3-mi (5-km) reach of the Dolores River and is where erosion poses the greatest threat to water quality. An increase in erosion and runoff may increase the potential of sediment and pollutant loadings

to nearby rivers. Possible pollutants may include sediment-associated compounds, chemical dust control compounds, fuels and other chemicals used in mining, and mineral leachates. As recently evaluated by the CDPHE (2012a,b), the existing impaired surface water that exceeds Colorado standards is mainly located upstream and not associated with the DOE ULP lease tracts. During future mine development and operations, impacts of erosion by runoff are considered to be moderate in some areas near Lease Tracts 13 and 18. However, the potential of sediment and pollutant loadings could be minimized by implementing a stormwater control system, a diversion ditch, a sedimentation pond, and an appropriate monitoring system.

Consumptive water use during mine development and operations is primarily for use by the workers (e.g., showers and drinking water) and for dust suppression. Water consumption estimates for each of the various mine sizes during the peak year are provided in Table 2-3. It is assumed that for the peak year of operations that there would be a total of 19 mines of varying sizes (six small, 10 medium, two large and one very large) operating at the same time. In total, it is assumed that peak year mining activities under the ULP would require approximately 6,300,000 gal (19 acre-ft) of water over the course of the year (Table 2-3). These estimates were conservatively determined based on information and assumptions from previous ULP mining operations. Since local surface water and groundwater sources are scarce and often of poor quality, it is assumed that most of the water supply would be trucked to the site from sources outside the lease tracts. However, it is expected that water would come from the same hydrologic basin as that for the ULP lease tracts (Dolores River Basin) and that the consumed water would also be discharged within the same hydrologic basin. Although local water sources (surface water or groundwater) are not abundantly available in most ULP lease tracts, the source of water used by the lessees to support ULP activities may come from pumping withdrawals on or off the lease tract and would be purchased. The surface water and groundwater sources in the Dolores River Basin where the ULP lease tracts occur are considered over-appropriated by the Colorado Division of Water Resources (CDWR 2007). Therefore, water used to support ULP activities would likely come from purchased sources.

As many as four retention pond systems are assumed to be used for peak ULP mining activities. These pond systems would be primarily intended to capture surface water and prevent sediment from entering nearby streams and drainages. There are currently two pond systems in use at existing ULP mine sites (located at medium-size mines). Therefore, as many as two additional pond systems may be created in lease tracts during the proposed ULP. The volume, discharge, and retention values for the two pond systems that currently exist are provided in Table 2-4. Estimated time to fill these pond systems ranges between 50 and 63 days.

## 2.3 POTENTIALLY APPLICABLE MITIGATION MEASURES AND BEST MANAGEMENT PRACTICES

Under the proposed ULP, various measures would be implemented by developers during each mining phase to reduce the potential for ecological impacts. Measures may include required mitigation measures to reduce or offset impacts, as well as measures that may not be required but are deemed to be BMPs in the industry (e.g., some may be discretionary). Some required measures are established to comply with existing policy and regulations. These measures are

**TABLE 2-3 Peak Water Requirements Assumed for the ULP Mines[a]**

| Mine Size | No. of Mines | Monthly Water Volume per Mine (gal)[b] | Total Monthly Water Volume (gal) | Total Monthly Water Volume (acre-ft) |
|---|---|---|---|---|
| Small[c] | 6 | 7,600 | 46,000 | 0.14 |
| Medium[d] | 10 | 31,000 | 310,000 | 0.95 |
| Large[e] | 2 | 46,000 | 92,000 | 0.28 |
| Very large (pit)[f] | 1 | 160,000 | 160,000 | 0.49 |
| | Seasonal Water Use[g] | | gal | acre-ft |
| | Monthly (summer) | | 3,600,000 | 11 |
| | Monthly (winter) | | 2,700,000 | 8.3 |
| | Yearly | | 6,300,000 | 19 |

[a] All volume and use values are rounded up to two significant figures.

[b] Assumes all water is drawn from within the Dolores River Basin regardless of whether it is withdrawn from the mine site or trucked into the site.

[c] Water use assumptions for small mines are based on mine SM-18.

[d] Water use assumptions for medium mines are based on mine JD-8.

[e] For large mines, usage is assumed to be 1.5 times that of a medium-size mine.

[f] Water use assumptions for the extra-large pit mine are based on mine JD-7, for 6 months only.

[g] Assumes that the monthly usage is consistent year-round, except at the very-large open pit mine. At that mine, water would be used only during the summer months (6 months) for dust suppression activities.

**TABLE 2-4 Pond Volume, Discharge, and Retention Estimates for the Two Two-Pond Systems Currently at the ULP Mine Sites[a]**

| Lease Tract | Pond Volume (gal) | Discharge Rate: gal/minute | Discharge Rate: gal/month | Retention Time (months) |
|---|---|---|---|---|
| JD-7 | 330,000 | 3.6 | 160,000 | 2.1 |
| JD-9 | 470,000 | 6.4 | 280,000 | 1.7 |

[a] All values are rounded up to two significant figures.

BLM_0042959

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 386 of 426

listed by project phase in Table 2-5. The table notes whether DOE would consider each measure a required mitigation measure, a compliance measure, or a BMP. Although some BMPs may be discretionary, the effect determinations presented in Section 3.2 (summarized in Table 3-3) are provided based on the assumption that all measures listed in Table 2-5 will be implemented as part of the ULP.

BLM_0042960

**TABLE 2-5 Measures to Reduce Impacts of ULP Activities on Ecological Resources**

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| **General Multiphase Measures (G) – Measures that apply to all project phases** | | | | |
| G1 | Minimize the surface footprint of disturbed areas (buildings, roads, storage areas, stockpile areas, and loading areas) within the lease tracts to the extent possible. Use existing roads and disturbed areas to the extent possible (before constructing new roads or disturbing new areas). If access roads need to be constructed, improve and maintain them so they minimize the potential for wildlife/vehicle collisions and facilitate the movement of wildlife through the project area. | | X | |
| G2 | Observe practices used to handle and manage hazardous materials and other waste (such as during refueling and equipment maintenance) to minimize or prevent spills in order to reduce the potential for impacts on ecological resources. | | | X |
| G3 | Containerize solid waste and manage it in accordance with state and local regulations. | X | | |
| G4 | Avoid areas with unstable slopes in an effort to minimize or reduce the impacts from runoff and sedimentation on aquatic biota. | | X | |
| G5 | Establish buffer zones around sensitive habitats, and either exclude project facilities and activities from those areas or modify them within those areas, to the extent practicable. | | X | |
| G6 | Employ noise reduction devices (e.g., mufflers) to minimize impacts on wildlife and sensitive species populations. Use explosives only at specified times and specified distances from sensitive wildlife or surface waters, as established by DOE or other federal and state agencies. Operators should ensure that all equipment is adequately muffled and maintained in order to minimize disturbance to wildlife. As practicable, do not leave vehicles and equipment idling, since this not only contributes to air pollution but also produces noise that can have impacts on wildlife. | | | X |
| G7 | Avoid project-related traffic on unpaved surfaces to the extent possible and reduce speeds to lessen fugitive dust emissions. | | | X |
| G8 | Protect plants, wildlife, and their habitats from fugitive dust through measures included in a dust abatement plan. | | | X |

BLM_0042961

**TABLE 2-5 (Cont.)**

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| G9 | Assign a qualified biologist to be responsible for overseeing compliance with all mitigation measures related to the protection of ecological resources throughout all project phases, particularly in areas requiring avoidance or containing sensitive biological resources, such as sensitive species and important habitats. Additional qualified biological monitors could be assigned during all project phases, as determined through coordination with the BLM, USFWS, and Colorado Parks and Wildlife (CPW, formerly the Colorado Division of Wildlife or CDOW). | | | X |
| G10 | Provide all personnel with information necessary to identify and protect ecological resources (especially sensitive species). Provide them with knowledge of relevant mitigation measures before they enter the project work site. This practice would reduce the collection, harassment, or disturbance of plants, wildlife, and their habitats (particularly sensitive species) by educating employees and contractors about applicable state and federal laws, by providing instruction, and by increasing awareness. | | | X |
| G11 | Implement measures to mitigate and monitor impacts on sensitive species developed in coordination with the appropriate federal and state agencies (e.g., BLM, USFWS, and CPW). | | X | |
| G12 | If any federally listed threatened and endangered species are found during any phase of the project, consult with the USFWS as required by Section 7 of the ESA and determine an appropriate course of action to avoid or mitigate impacts. | X | | |
| G13 | To protect bats, implement measures developed in coordination with the appropriate federal and state agencies (e.g., BLM, USFWS, and CPW). | | X | |
| G14 | Implement measures to protect birds (including migratory species protected under the Migratory Bird Treaty Act) developed in coordination with the appropriate federal and state agencies (e.g., BLM, USFWS, and CPW). | X | | |
| G15 | Implement measures to protect raptors developed in coordination with the appropriate federal and state agencies (e.g., BLM, USFWS, and CPW). | | X | |
| G16 | Implement measures to ensure compliance with the regulatory requirements of the Bald and Golden Eagle Protection Act developed in coordination with the USFWS. | X | | |

TABLE 2-5 (Cont.)

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| G17 | Schedule activities to avoid, minimize, or mitigate impacts on wildlife. For example, avoid crucial winter ranges, especially during the periods when they are used. If there are plans to conduct activities during bird breeding seasons, a nesting bird survey should be conducted first. If active nests are detected, the nest area should be flagged, and no activity should take place near the nest (at a distance determined in coordination with the USFWS) until nesting is completed (i.e., until nestlings have fledged or the nest has failed) or until appropriate agencies agree that construction can proceed with the incorporation of agreed-upon monitoring measures. Coordinate the timing of activities with BLM, USFWS, and CPW. Prior to authorization of ground-disturbing activities, a habitat suitability analysis would be done, and for habitats found suitable, a protocol survey would be done. If nesting birds are found, seasonal and year-round buffers would be established with USFWS coordination. | | X | |
| G18 | Minimize increases in the number of nuisance animals (e.g. pets, raccoons, coyotes, and other wildlife) and pests in the project area, particularly any individuals or species that could affect human health and safety or that could adversely affect native plants and animals. A Nuisance Animal and Pest Control Plan could be developed that could identify nuisance and pest species likely to occur in the area, the risks associated with these species, species-specific control measures, and monitoring requirements. | | | X |
| G19 | Minimize the number of areas where wildlife could hide or be trapped (e.g., open sheds, pits, uncovered basins, and laydown areas). For example, cap uncovered pipes at the end of each workday to prevent animals from entering the pipes. If a sensitive species is discovered inside a component, do not move that component, or, if it must be moved, move it only to remove the animal from the path of activity, until the animal has escaped. | | | X |
| G20 | Monitor the potential for an increase in the predation of sensitive species from ravens and other species that are attracted to developed areas and that use tall structures opportunistically to spot vulnerable prey. Also address the monitoring of ravens and other predators in the nuisance animal and pest control plan. | | | X |
| G21 | Develop a Noxious Weed and Invasive Plant Control Plan to characterize how the establishment of invasive and noxious weeds in project area would be managed. | | X | |
| G22 | Ensure vegetation management is consistent with applicable regulations and agency policies for the control of noxious weeds and invasive plant species. | X | | |

TABLE 2-5 (Cont.)

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| **Exploration (E) – Measures that apply to exploration activities** | | | | |
| | Other than the general multiphase measures, there are no exploration-specific mitigation measures. | | | |
| **Mine Development and Operations (D) – In addition to general multiphase measures, measures that apply to mine development and operational activities** | | | | |
| D1 | Do not locate project activities in or near occupied habitats of sensitive animal species. Establish buffer zones around these areas (e.g., identified in the land use plan or substantiated by best available information or science) to prevent any destructive impacts associated with project activities. | | | X |
| D2 | Restrict activities at existing mine sites so that they do not further encroach toward perennial streams (e.g., the Dolores River and San Miguel River). Do not allow new mining activities within 0.25 mi (0.4 km) of perennial streams. | | X | |
| D3 | Design any necessary stream crossings to provide in-stream conditions that allow for and maintain the uninterrupted movement and safe passage of fish during all project periods. If stream crossings are required, take care to minimize the removal of any deadfall and overhanging vegetation, which provide shelter and shade to aquatic organisms. | | X | |
| D4 | Divert water pumped from mines to a lined sedimentation pond (or pond system) for treatment. Locate settling ponds in topographically low areas but not in any areas that are along drainages or near naturally flowing water. | | X | |
| D5 | Locate diversion structures upstream of the mine site to intercept surface water flow or shallow groundwater and channel it around the site. Tailor the location and length of the ditch to site-specific conditions, taking into account the location of mine waste-rock piles, site topography, and surface flow patterns. | | X | |
| D6 | Require any developers using on-site groundwater supplies to conduct a hydrologic study to further characterize the upgradient and downgradient aquifers, the groundwater flowing into the mine, the groundwater connections between the mine and areas outside the mine, the eventual fate of the water flowing from the mine, and any groundwater impacts from mining operations. | | | X |

BLM_0042964

TABLE 2-5 (Cont.)

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| D7 | Install groundwater monitoring wells downgradient of ore stockpile pads to monitor groundwater presence, abundance, and quality in compliance with EPA and U.S. Geological Survey standards. | | | X |
| D8 | Identify storm water control and pollution measures in a Storm Water Pollution Prevention Plan. Develop a wastewater management plan to characterize how wastewater generated from mine operations would be treated and discharged. The plan should include requirements for obtaining necessary discharge permits, such as National Pollution Discharge Elimination System (NPDES) permits. Follow monitoring requirements and NPDES regulations pertaining to the concentrations of potential pollutants released. Implementing the wastewater management plan would minimize the amount of contaminants entering aquatic habitats and reduce the potential for adverse effects on aquatic biota. | | X | |
| D9 | Locate the ore storage area on topographically high ground so ore does not come into contact with flowing or ponded water. Grade the ore storage area, and construct an earthen berm around it. Divert any runoff from the ore storage area to a sedimentation pond (or pond system) for testing and treatment. | | X | |
| D10 | Design lighting to provide the minimum amount of illumination needed to achieve safety and security objectives. Minimize the amount of off-site lighting. Turn off all unnecessary lighting at night to limit attracting migratory birds or sensitive species. | | | X |
| D11 | Build fences (as practicable) to exclude livestock and wildlife from all mine facilities. | | | X |
| D12 | Contain any runoff from mine waste-rock piles. | | | X |
| D13 | Limit the use of herbicides to nonpersistent, immobile substances. Use only those herbicides that have a low toxicity to wildlife and untargeted native plant species, as determined in consultation with the USFWS. Do not use any herbicides near or in surface water, streams (including ephemeral, intermittent, or perennial streams), riparian areas, or wetlands. Determine setback distances in coordination with federal and state resource management agencies. Before beginning any herbicide treatments, ensure that a qualified biologist has conducted surveys of bird nests and of sensitive species to identify the special measures or BMPs that are necessary to avoid and minimize impacts on migratory birds and sensitive species. The herbicides to be used would be approved by BLM and county weed control staff. The state, county, and BLM listed species scheduled for eradication that are found in the project area would be eradicated and reported to the county weed inspector. | | | X |

TABLE 2-5 (Cont.)

| | Measure Description | Compliance Measure[a] | Mitigation Measure[b] | BMP[c] |
|---|---|---|---|---|
| **Reclamation (R) – In addition to general multiphase measures, measures that would also apply to reclamation activities. Measures D10 through D13 above also apply to reclamation activities.** | | | | |
| R1 | Before mine entrances are closed after reclamation, conduct a summer and winter bat survey to determine the number and species of bats that could potentially occupy a site. Depending on the results of the surveys, undertake actions that could include the installation of bat gates. | | X | |
| R2 | Implement measures for revegetation, soil stabilization, and erosion reduction to ensure that all temporary use areas are restored. Promptly reseed disturbed sites upon project completion to minimize erosion and the establishment of noxious weeds. | | X | |
| R3 | If bat surveys under R1 indicate no presence of bats, promptly close off all mine openings when finished with mining activities before bats have an opportunity to establish roosts or hibernacula. | | X | |
| R4 | Use native, locally occurring species for reestablishing vegetation. Refer to Table 3-2 for the native seed mixture approved for reseeding on the DOE ULP lease tracts. | | | X |

[a] Compliance measures are those measures needed to fulfill regulatory requirements.

[b] Mitigation measures are those measures required by DOE to reduce or offset impacts and that are not needed to fulfill regulatory requirements.

[c] BMPs are those practices and activities generally implemented within the industry to conserve resources. These BMPs are not required by DOE but may be implemented to further reduce impacts.

# 3 EFFECTS OF THE URANIUM LEASING PROGRAM

This section summarizes potential impacts associated with site exploration, mine development and operations, and reclamation under the proposed ULP that could occur to species that are endangered, threatened under the ESA, or those species that are proposed or candidates for listing under the ESA. Required compliance measures, mitigation measures, and suggested BMPs for all projects under the ULP are identified in Section 2.3. Mining activities under the ULP can generally be considered under the three project phases just mentioned: (1) exploration, (2) mine development and operations, and (3) reclamation. Possible ecological impacts on different groups of biota that could result from ULP activities are summarized in Table 3-1. These impacts would be lessened to the extent that the listed activities could be avoided, minimized or mitigated.

The types of ecological resources that could be affected by ULP activities would depend on the specific location of the proposed project and its environmental setting. Ecological resources that could be affected include plants, terrestrial and aquatic invertebrates, fish, and terrestrial and avian wildlife, as well as their habitats. These groups of biota include species that are endangered, threatened, proposed, or candidates for listing under the ESA in the region surrounding the ULP lease tracts. General impacts on federally-listed, proposed, and candidate species associated with ULP activities are described in the text that follows, as are specific evaluations of mining impacts on federally listed species.

## 3.1 COMMON EFFECTS OF URANIUM MINING ON SPECIES AND HABITATS

### 3.1.1 Exploration

Potential impacts on federally-listed, proposed, and candidate species related to site exploration are listed in Table 3-1. Although some disturbance from mine exploration has occurred in each of these lease tracts, new exploration could occur in either disturbed or undisturbed areas of each lease tract. Exploration activities generally include drilling one or more bore holes for geologic sampling followed by reclamation of the explored area. Impacts from site exploration would result from the disturbance of soils, vegetation, and wildlife as a result of the presence and operation of exploration equipment. Impacts would include the removal of some vegetation, the potential loss of habitat for some wildlife species, and the indirect impacts from fugitive dust generation, noise, and the physical presence of humans and exploration equipment on wildlife species. Impacts on ephemeral drainages crossed by heavy equipment could also result in sediment deposition to downstream wetlands and water bodies. However, impacts would generally be temporary and at a smaller spatial scale than those occurring during other project phases. Some mortality to vegetation and less mobile wildlife could occur at the exploration site, and vehicles could collide with wildlife.

BLM_0042967

**TABLE 3-1 General Ecological Effects on Different Groups of Biota during Various Uranium Mining Phases**

| Potential Effect | Project Activity | Project Phase | Biota Potentially Affected[a] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Plants | Arthropods | Mollusks | Fish | Amphibians and Reptiles | Birds | Mammals |
| Habitat disturbance | Vehicle and foot traffic; geological sampling; access road development; site clearing and grading | Exploration, mine development and operations, reclamation | + | + | + | – | + | + | + |
| Injury or mortality of biota | Vehicle and foot traffic; geological sampling; access road development; site clearing and grading | Exploration, mine development and operations, reclamation | + | + | + | – | + | + | + |
| Erosion, sedimentation, and runoff to nearby wetland habitats | Site clearing and grading; access road construction and mine development; vehicle and foot traffic | Exploration, Mine development and operations, reclamation | + | + | + | + | + | – | – |
| Exposure to contaminants | Accidental uranium ore spills and releases of oil, fuel, and other materials | Exploration, Mine development and operations, reclamation | + | + | + | + | + | + | + |
| Fugitive dust damage to plant surfaces and impairment of photosynthesis; respiratory impairment in wildlife | Site clearing and grading; access road construction and mine development; exposure to tailings and other waste piles | Exploration, Mine development and operations, reclamation | + | + | – | – | + | + | + |
| Introduction of invasive plant species | Vehicle traffic, access road development, site clearing and grading | Exploration, mine development and operations, reclamation | + | + | + | + | + | + | + |

BLM_0042968

TABLE 3-1 (Cont.)

| Potential Effect | Project Activity | Project Phase | Biota Potentially Affected[a] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Plants | Arthropods | Mollusks | Fish | Amphibians and Reptiles | Birds | Mammals |
| Behavioral disturbance | Vehicle and foot traffic; geological sampling; access road development; site clearing and grading; human presence | Exploration, mine development and operations, reclamation | + | – | + | + | + | + | + |

[a] "+" indicates effects could potentially occur for at least some biota; "–" indicates no biota expected to be affected.

### 3.1.2 Mine Development and Operations

Potential impacts on ecological resources (including threatened, endangered, and sensitive species) related to mine development and operations are listed in Table 3-1. Mine development and operations are assumed to occur in each of the lease tracts under the proposed ULP. The overall impact of mine development and operations on vegetation and wildlife populations would depend on the locations of the mine site and mining activities, the relative abundance and rarity of the species that are affected, the types of habitat present, and the length of time that the effects or stressors would persist. Generally, the magnitude of an impact on threatened, endangered, and sensitive species is directly related to the amount of surface disturbance. Ground disturbance would range from 10 acres (4 ha) for small mines to 20 acres (8 ha) for large mines, with one 210-acre (81-ha) open-pit mine (Table 2-2).

Direct impacts on vegetation, wildlife, and their habitats associated with the development of mines include direct mortality to vegetation and less mobile wildlife and the destruction of habitat. Vegetation and habitats within the development footprint of the projects, utility rights of way (ROWs), access roads, and other infrastructure would be destroyed. These direct impacts could include destruction and fragmentation of habitats from site clearing and excavation, the storage of waste rock and topsoil materials, and the placement of infrastructure (buildings, ROWs, access roads, etc.).

Direct mortality from vehicle collisions could occur along access and haul roads, especially in wildlife concentration areas or migration corridors. When roads cut across migration corridors, the effects can be dangerous for both animals and humans. No mapped migration corridors for big game species occur on any of the lease tracts. Amphibians, being somewhat small and inconspicuous, are vulnerable to road mortality when they migrate between wetland and upland habitats. Reptiles are vulnerable on roads they use for thermal cooling and heating. Sage grouse are susceptible to road mortality in spring because they often fly to and from leks near ground level. They are also susceptible to vehicular collisions along dirt roads because they sometimes use them to take dust baths (Stritthol et al. 2000). In general, the species most vulnerable to vehicle collisions are day-active, slow-moving species (Hels and Buchwald 2001). However, road kills rarely cause population-level impacts. Avoidance of habitats near roads, especially due to traffic noise, tends to have a greater ecological impact than does mortality from vehicular collisions (Forman and Alexander 1998). Ore haul truck speeds would generally be slow on county or other dirt roads, which would minimize these trucks' potential to collide with big game.

Indirect impacts on vegetation, wildlife, and their habitats could result from exposure to contaminants, fugitive dust, erosion and sedimentation, the facilitated spread of invasive species, and behavioral effects resulting from the presence of humans and mining equipment (which also involves factors such as lighting and noise). These factors might reduce the function and quality of remaining habitats adjacent to mine sites. Although habitats adjacent to a mine site might remain unaffected, wildlife still might tend to make less use of these areas (primarily because of the disturbance that would occur within the project site). This indirect habitat loss impact could be of greater consequence than direct habitat loss (Sawyer et al. 2006). A utility line might also lead to a loss of usable feeding areas for those species that avoid close proximity to these

facilities due to their use by predators (BirdLife International 2003). For example, common ravens (*Corvus corax*) and some birds of prey might become more common along utility lines because of the presence of perch and nest sites (Knight and Kawashima 1993). Access road construction could create habitat for species, such as the horned lark (*Eremophila alpestris*), that are common along dirt roadways where they can forage on windblown seeds (Ingelfinger and Anderson 2004).

Based on the industry practice of considering ore with less than 0.05% of uranium as potential waste rock that could remain on a waste-rock pile on the surface (but graded, covered with top soil material, and revegetated) after reclamation, the assumed concentration of uranium that might be present in the waste rock is about 24 pCi/g as an average value, and the potential radiation exposure to plants to this concentration of uranium would be of low concern. Wetlands on the lease tracts might be affected by exploration, development, and operations; however, these impacts would be minimized under the direction of Executive Order 11990, "Protection of Wetlands," and under Section 404 of the Clean Water Act, where applicable. Although direct impacts on wetlands and bodies of water are unlikely, indirect impacts on these wetlands could occur. The implementation of minimization measures and mitigation measures identified in Section 2.3 and any additional BMPs would minimize the potential for indirect impacts on wetlands and bodies of water.

Mining activity might increase the exposure of wildlife to uranium and other radioactive decay products and to other chemical elements. Negative impacts on animals from uranium radionuclides occur from 0.2 to 40 mGy/h for terrestrial invertebrates, 0.14 to 40.0 mGy/h for birds, and 0.004 to 40.0 mGy/h for mammals (Hinck et al. 2010). The potential magnitude of impacts would be influenced by the life history strategy, habitat requirements, and mass of the organism (Hinck et al. 2010). Some birds might be at greater risk to radiation exposure than other wildlife due to their foraging and ingestion of grit, which would increase their radiation dose (Driver 1994). Species that spend considerable amounts of time underground in caves, mines, or burrows could potentially inhale, ingest, or be directly exposed to uranium and other radionuclides while digging, eating, preening, and/or hibernating. Herbivores could also be exposed by ingesting radionuclides that aerially deposited on vegetation or concentrated in surface waters at or near mine sites (BLM 2011b).

The accidental spill of uranium or vanadium ore into an ephemeral stream or, more notably, a perennial stream or river, such as the Dolores or San Miguel River, could pose a localized short-term impact on the aquatic resources. However, the potential for such an event is extremely low. For example, SENES (2009) determined that the frequency of a rollover and/or crash of an ore truck at a water crossing en route to the proposed Piñon Ridge Mill would be $8.4 \times 10^{-5}$/yr. In addition to uranium and vanadium, the ore contains other potentially toxic elements, such as aluminum, arsenic, barium, copper, iron, lead, manganese, selenium, and zinc. Most ore solids would settle in the body of water within a short distance from a spill site (Edge Environmental, Inc. 2009). It is expected that expedient and comprehensive cleanup actions would be required under U.S. Department of Transportation regulations and that an emergency response plan would be in place to respond to accidents and cargo spills (Edge Environmental, Inc. 2009). Overall, the potential for impacts on aquatic biota from an accidental spill would be minor to negligible.

Fugitive dust would be generated during site clearing, excavation, processing, and use of access roads. Deposition of fugitive dust could reduce photosynthesis and productivity in plant communities near project areas. Prolonged exposure to fugitive dust could alter a plant community's composition, reducing the occurrence of species less tolerant of disturbance, resulting in habitat degradation. Open-pit mines would generate greater levels of fugitive dust than would underground mines, since most of the project area would consist of exposed soils, rock materials, and operating mining equipment. Because fugitive dust would be produced throughout the life of the project, the deposition of fugitive dust could constitute a long-term impact on vegetation and wildlife habitat. Little information is available about the effects of fugitive dust on wildlife; however, fugitive dust emissions under the proposed ULP are not expected to result in any long-term individual-level or population-level effects on wildlife.

Disturbed soils could provide an opportunity for the introduction and spread of invasive species or noxious weeds. Seeds of these species could be inadvertently brought to a project site from infested areas by vehicles or equipment used at the site. Invasive species or noxious weeds might also colonize disturbed soils from established populations in nearby areas. Vehicle traffic to and from mine sites might contribute to the spread of seeds and propagules of these species, which could lead to expanding populations along roadways. Invasive species or noxious weeds might alter fire regimes, including increasing the frequency and intensity of wildfires, particularly as a result of the establishment of annual grasses such as cheatgrass (*Bromus tectorum*). Habitats that are not adapted to frequent or intense fires could experience long-term reductions in function and distribution.

Soils disturbed by land clearing or excavation might be subject to erosion. Soil erosion might also occur in areas where biological soil crusts are disturbed by equipment or foot traffic. The destruction of biological soil crusts could also alter nutrient cycling and availability, reduce water infiltration, reduce germination of native species, and increase the occurrence of non-native species, thereby affecting plant community characteristics (Fleischner 1994; Belnap et al. 2001; Gelbard and Belnap 2003; Rosentreter et al. 2007). Soil compaction from the operation of heavy equipment could reduce the infiltration of precipitation or snowmelt and result in increased runoff and subsequent erosion. Erosion could result in the localized loss of plant communities in areas where topsoil was lost and might include areas outside the mine site. Erosion might result in sedimentation in downgradient upland or wetland habitats and increased sediment deposition in ephemeral drainages or riparian habitats of receiving streams. Effects might include mortality or reduced growth of plants, changes in species composition, or reduced biodiversity. Species more tolerant of disturbance, including invasive species, might become dominant in affected plant communities.

Changes in surface drainage patterns, such as the elimination of ephemeral drainages (not likely to occur) or other changes in runoff patterns, could alter hydrologic characteristics of downstream wetland or riparian habitats and could result in changes in plant community composition or distribution. Increases in the volumes or velocities of flows could result in the erosion of substrates or vegetation in downstream habitats, while decreased flows could result in dessication of habitats. Underground mines would be less likely to result in large changes to surface water flow patterns and associated impacts on plant communities than would open-pit mines, which cause extensive modifications to landscape surfaces. The storage of waste-rock

material for underground mines, however, could disrupt surface drainage patterns. Leachate from waste-rock storage areas could affect the quality of surface water or groundwater and affect downgradient habitats. Groundwater pumped from mines could affect habitats receiving surface water flows as a result of reduced water quality or increased flow velocities or volumes. As discussed in Section 2.2.2, although local surface and groundwater availability is expected to be scarce, it is assumed that purchased water trucked in to the project site would be obtained from sources within the same hydrologic basin as the lease tracts.

Mining operations could affect groundwater flows if excavations intercepted groundwater resources. Reductions in groundwater flows could affect downgradient habitats that depend on groundwater discharges, such as springs, seeps, or streams with flows supplemented or maintained by groundwater. Plant communities could be degraded as a result of reductions in water availability.

During mine development and operations, wildlife disturbance might be of greater concern than habitat loss (Arnett et al. 2007). The response of wildlife to disturbances caused by noise and human presence would be species-specific. Responses for a given species could be affected by the physiological or reproductive conditions of individuals; their distance from the disturbance; and the type, intensity, and duration of the disturbance. Wildlife could respond to a disturbance in various ways, including attraction, habituation, or avoidance (Knight and Cole 1991). All three behaviors can be considered adverse impacts. Wildlife might cease foraging, mating, or nesting near areas where the disturbance occurred. For example, disturbance near active sage grouse leks could lead to lek abandonment, displacement, and reduced reproduction. In contrast, wildlife such as bears, foxes, and squirrels can habituate to disturbances and might be attracted to human activities, primarily when a food source was accidentally or deliberately made available.

Regular or periodic disturbance could cause adjacent areas to be less attractive to wildlife and result in long-term reduction of wildlife use in areas exposed to a repeated variety of disturbances, such as noise. Principal sources of noise would include vehicle traffic, the operation of machinery, and blasting. The potential effects of noise on wildlife could include acute or chronic physiological damage to the auditory system, increased energy expenditure, physical injury incurred during panicked responses, interference with normal activities (e.g., feeding), and impaired communication (AMEC Americas Limited 2005; Larkin 1996; Salt and Hullar 2010; USFWS 2011d). The response of wildlife to noise would vary by species; the animal's physiological or reproductive condition; distance; and the type, intensity, and duration of the disturbance.

Much of the research on wildlife-related noise effects has focused on birds. This research has shown that noise might affect territory selection, territorial defense, dispersal, foraging success, fledging success, and song learning (e.g., Reijnen and Foppen 1994; Foppen and Reijnen 1994; Larkin 1996). Some studies (e.g., Reijnen and Foppen 1994; Foppen and Reijnen 1994; Reijnen et al. 1995, 1996, 1997) have shown reduced densities of a number of species in forest habitats (26 of 43 species) and grassland habitats (7 of 12 species) adjacent to roads, with effects detectable from 66 to 11,581 ft (20 to 3,500 m) from the roads. Reijnen et al. (1996) identified a threshold effect sound level of 47 dBA for all species combined

BLM_0042973

and of 42 dBA for the most sensitive species. The observed reductions in population density are attributed to a reduction in habitat quality caused by elevated noise levels. This threshold sound level of 42 to 47 dBA, which is somewhat below the U.S. Environmental Protection Agency (EPA)-recommended limit for residential areas, is at or below the sound levels generated by truck traffic that would likely occur at distances of 250 ft (76 m) or more from the mine area or access roads, or the levels generated by typical construction equipment at distances of 2,500 ft (760 m) or more from the mine site.

Noise can reduce bird nesting success and alter species interactions, resulting in different avian communities (Francis et al. 2009). On the basis of a review of the literature by Hockin et al. (1992), the effects of disturbance on bird breeding and breeding success include reduced nest attendance, nest failures, reduced nest building, increased predation on eggs and nestlings, nest abandonment, inhibition of laying, increased absence from the nest, reduced feeding and brooding, exposure of eggs and nestlings to heat or cold, retarded chick development, and lengthening of the incubation period. The most adverse impacts associated with noise could occur if critical life-cycle activities are disrupted (e.g., mating and nesting). For instance, disturbance of birds during the nesting season can result in nest or brood abandonment. The eggs and young of displaced birds would be more susceptible to cold or predators.

During winter, the average mean flush distance for several raptor species is 387 ft (120 m) from people walking and 246 ft (75 m) from vehicles (Holmes et al. 1993). Disturbance from light traffic (e.g., 1 to 12 vehicles per day) during the breeding season might reduce nest-initiation rates and increase distances moved from sage grouse leks during nest site selection (Lyon and Anderson 2003). The density of sagebrush obligate passerines was reduced by 39% to 60% within a 328-ft (100-m) buffer around dirt roads with traffic volumes ranging from 10 to 700 vehicles per day. However, traffic volumes alone might not explain the observed effect. The birds might also have been responding to edge effects, habitat fragmentation, and increases in other passerine species along the road corridors. Thus, declines might persist even after traffic subsides, lasting until road areas are reclaimed and fully vegetated (Ingelfinger and Anderson 2004).

Various adverse effects of noise on raptors occur, but for some species, the effects are temporary because the raptors habituate to the noise (Brown et al. 1999; Delaney et al. 1999). As reviewed by Hockin et al. (1992), the effects of noise disturbance on bird breeding and breeding success include reduced nest attendance, nest failures, reduced nest building, increased predation on eggs and nestlings, nest abandonment, inhibition of laying, increased absence from the nest, reduced feeding and brooding, exposure of eggs and nestlings to heat or cold, retarded chick development, lengthened incubation period, increased physiological stress, increased energy expenditures, habitat avoidance, decreased population or nesting densities, altered species composition, and disruption and disorientation of movements. The most severe impacts associated with noise could occur if critical life-cycle activities are disrupted (e.g., mating and nesting). For instance, disturbance of birds during the nesting season could result in nest or brood abandonment.

Lighting could also disturb wildlife in the mine area. Lights directly attract migratory birds (particularly in inclement weather and during other low-visibility conditions), and they

could indirectly attract birds and bats by attracting flying insects. Lighting may be needed at mining facilities to security reasons and to light exploration drilling and mining operations. Any ULP-related activities that involve lighting have the potential to affect birds and bats, as well as their invertebrate prey.

### 3.1.3 Reclamation

General impacts on ecological resources (including threatened, endangered, and sensitive species) related to reclamation activities are listed in Table 3-1. Reclamation activities would generally occur on previously disturbed areas and would be associated primarily with covering the waste-rock pile and re-grading developed areas. Indirect impacts associated with reclamation activities could include the deposition of fugitive dust, erosion, sedimentation, and the introduction of non-native species, including noxious weeds.

Reclamation would restore habitat and establish ecological conditions suitable for plant and wildlife species. The effectiveness of any reclamation activities would depend on the specific actions taken. The best results would occur where the original site topography, hydrology, soils, and vegetation patterns are reestablished. During reclamation, topsoil would be seeded following final surface preparation. The seed mix approved by DOE, in consultation with BLM, for use in reclamation of all lease tracts is given in Table 3-2. Vegetation reestablishment might not be possible under all situations. The establishment of native vegetation communities that existed before development (e.g., pinyon-juniper woodlands and sagebrush shrublands) on the reclaimed sites could take up to several decades.

**TABLE 3-2 Seed Mixture Approved for Reseeding on the DOE ULP Lease Tracts**

| Species | | Broadcast Application Rate |
|---|---|---|
| Scientific Name | Common Name | (lb PLS/acre)[a] |
| *Pascopyrum smithii* | Arriba western wheatgrass | 4.0 |
| *Elymus trachycaulus* ssp. *trachycaulus* | Slender wheatgrass | 2.0 |
| *Oryzopsis (=Achnatherum) hymenoides* | Paloma Indian ricegrass | 4.0 |
| *Bouteloua gracilis* | Hachita blue grama | 2.0 |
| *Hilaria (=Pleuraphis) jamesii* (florets) | Galleta grass | 2.0 |
| *Stipa (=Hesperostipa) comata* | Needleandthread grass | 1.0 |
| *Stipa (=Nassella) viridula* | Lodorm green needlegrass | 2.0 |
| *Linum lewisii* | Lewis flax | 1.0 |
| *Penstemon cyanocaulis*[b] | Bluestem penstemon | 0.5 |
| *Sphaeralcea coccinea* or *Sphaeralcea parvifolia* | Scarlet or parvifolia globemallow | 0.3 |
| *Atriplex canescens* | Rincon fourwing saltbush | 3.0 |
| *Ceratoides (=Kraschenninikovia) lanata* | Winterfat | 1.0 |

[a] PLS = pure live seed.

[b] If *P. cyanocaulis* (bluestem penstemon) is unavailable, replace with *P. bandera* (Rocky Mountain penstemon).

Overall, reclamation impacts on vegetation and wildlife would be minor and of relatively short duration.

## 3.2 SPECIES THAT MAY BE AFFECTED UNDER THE PROPOSED ACTION

This section discusses the distribution, ecology, and life history of federally listed, proposed, and candidate species and their critical habitat (if applicable) that might occur in the region including and surrounding the ULP lease tracts and the potential for impacts as they relate to the proposed action. The ESA requires the action agencies (i.e., DOE) to consider the direct and indirect impacts of the proposed action on species and critical habitats, together with the effects of other activities that are interrelated to or interdependent with that action, that would be added to the environmental baseline (50 CFR 402.02). Impacts on the species under discussion can be short-term (one or two reproductive seasons) or long-term (affecting several generations). They can be direct (an immediate effect to an individual, population, or its habitat) or indirect (an effect that might occur over time or result from other actions). In addition, cumulative impacts might affect some of the species. For purposes of this BA, cumulative effects are defined as they are in 50 CFR 402.02, as "those effects of future Tribal, State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." A summary of potential impacts and avoidance, minimization, and mitigation measures that are used to develop effect determinations for each species is provided in Section 2.3.

For all species evaluated in this BA, natural history information provided by the USFWS (2012a), CPW (2012), and NatureServe (2012), along with recorded observations (quad-level) from the Colorado Natural Heritage Program (CNHP 2011b), are used to determine the potential for species or their habitat to occur in the affected area under the proposed action. For terrestrial vertebrates, the distribution of predicted suitable habitat was evaluated to provide additional information on the potential distribution of species habitat. Predicted suitable habitat for terrestrial vertebrates was determined from animal distribution models from the Southwest Regional Gap Analysis Program (SWReGAP) (USGS 2007). This information was used to determine the potential presence of suitable habitat in the vicinity of the ULP lease tracts. It is important to note that these GAP models (inferred predicted suitable habitat distributions) are available only for the terrestrial vertebrates considered in this BA. Species are discussed below in taxonomic (plants to mammals) and alphabetic order by common name. A summary of the effect determinations for all species evaluated in this BA is provided in Table 3-3.

### 3.2.1 Endangered, Threatened, and Proposed Species

Fourteen species that are listed as threatened or endangered under the ESA or that are proposed for listing have the potential to occur in the ULP counties evaluated in this BA or within the ULP affected area. These species include the following: three plants (clay-loving wild buckwheat, Colorado hookless cactus, and Debeque phacelia), one invertebrate (Uncompahgre fritillary butterfly), five fish (bonytail, Colorado pikeminnow, greenback cutthroat trout, humpback chub, and razorback sucker), three birds (Gunnison sage-grouse, Mexican spotted owl

**TABLE 3-3 Summary of Effects Determination for Listed and Candidate Species**

| Species | Status[a] | Critical Habitat[b] | Effect Determination[c] | Rationale[d] |
|---|---|---|---|---|
| **Species that are listed or proposed for listing under the ESA** | | | | |
| **Plants** | | | | |
| Clay-loving wild buckwheat (*Eriogonum pelinophilum*) | E | N | NE<br>NE (critical habitat) | 1<br>1 |
| Colorado hookless cactus (*Sclerocactus glaucus*) | T | N | NE | 1 |
| Debeque phacelia (*Phacelia submutica*) | T | Y, proposed | NE<br>NE (critical habitat) | 1<br>1 |
| **Invertebrates** | | | | |
| Uncompahgre fritillary butterfly (*Boloria acrocnema*) | E | N | NE | 1 |
| **Fish** | | | | |
| Colorado River Endangered Fish<br>Bonytail (*Gila elegans*)<br>Colorado pikeminnow (*Ptychocheilus lucius*)<br>Humpback chub (*Gila cypha*)<br>Razorback sucker (*Xyrauchen texanus*) | E | Y | LAA<br>LAA (critical habitat) | 2<br>2 |
| Greenback cutthroat trout (*Oncorhynchus clarki* ssp. *stomias*) | T | N | NE | 1 |
| **Birds** | | | | |
| Gunnison sage-grouse (*Centrocercus minimus*) | P | N | NLAA | 3 |
| Mexican spotted owl (*Strix occidentalis lucida*) | T | Y | NLAA<br>NE (critical habitat) | 3<br>1 |
| Southwestern willow flycatcher (*Empidonax traillii extimus*) | E | Y, designated and proposed | NLAA<br>NE (critical habitat) | 3<br>1 |
| **Mammals** | | | | |
| Black-footed ferret (*Mustela nigripes*) | E, XN | N | NE | 4 |
| Canada lynx (*Lynx Canadensis*) | T | Y | NE<br>NE (critical habitat) | 1<br>1 |

**TABLE 3-3 (Cont.)**

| Species | Status[a] | Critical Habitat[b] | Effect Determination[c] | Rationale[d] |
|---|---|---|---|---|
| **Species that are candidates for listing under the ESA** | | | | |
| **Birds** | | | | |
| Western yellow-billed cuckoo (*Coccyzus americanus occidentalis*) | C | N | NLAA | 3 |
| **Mammals** | | | | |
| Gunnison's prairie dog (*Cynomys gunnisoni*) | C | N | NLAA | 3 |
| North American wolverine (*Gulo gulo luscus*) | C | N | NE | 1 |

[a] Status definitions are as follows: E = listed as endangered under the ESA, T = listed as threatened under the ESA, P = proposed for listing under the ESA, XN = experimental nonessential population as defined under Section 10(j) of the ESA, C = candidate for listing under the ESA.

[b] If designated critical habitat for a species is known to occur, that is indicated with a "Y" for yes; if it is not known to occur, that is indicated with an "N" for no. Some species have proposed critical habitat that has not been finalized.

[c] The effect determinations are defined as follows: NE = no effect, NLAA = may affect but not likely to adversely affect, LAA = may affect and likely to adversely affect.

[d] The rationale for the effect determinations is as follows:

1. The species is endemic to a particular habitat or region outside the ULP affected area, or the specific habitats required by the species (including designated critical habitat, if applicable) are not present in the ULP affected area. The proposed ULP will have no effect on this species or its designated critical habitat (if applicable).
2. The species or its habitat (including designated critical habitat, if applicable) may occur in the ULP affected area. Activities associated with the proposed ULP are likely to impact the species or its habitat (including designated critical habitat, if applicable) and the proposed mitigation measures and BMPs are not likely to completely offset or eliminate some of these impacts. The proposed ULP may affect, and is likely to adversely affect this species and its critical habitat (if applicable).
3. The species or its habitat (including designated critical habitat, if applicable) may occur in the ULP affected area. However, impacts are considered to be relatively minor and can be minimized or avoided through the implementation of required minimization and mitigation measures and BMPs. The proposed ULP may affect, but is not likely to adversely affect this species or its habitat (including designated critical habitat, if applicable).
4. The black-footed ferret is presumed extirpated from southwestern Colorado. Nonessential experimental (XN) populations are unlikely to occur in the ULP affected area. Although the ULP affected area has not been block-cleared for the black-footed ferret, the proposed ULP is likely to have no effect on the black-footed ferret.

and southwestern willow flycatcher), and two mammals (black-footed ferret and Canada lynx). The habitat requirements, distribution relative to the ULP affected area, and effects determination for each of these species are described below. A summary of the effects determinations for these species is provided in Table 3-3.

#### 3.2.1.1 Plants

**3.2.1.1.1 Clay-Loving Wild Buckwheat.** The clay-loving wild buckwheat (*Eriogonum pelinophilum*) is a long-lived, low-growing, rounded subshrub that has dark green inrolled leaves that look needlelike and clusters of white to cream-colored flowers. It is pollinated by more than 50 species, including native bees and ants. Flowering occurs from late May to early September, and individual flowers only last fewer than 3 days (USFWS 2009a).

The clay-loving wild buckwheat is endemic to the rolling clay hills and flats near Delta and Montrose Counties, Colorado. It grows in whitish, alkaline, clay soils of the Mancos shale formation that are relatively barren of vegetation at elevations ranging from 5,179 to 6,445 ft (1,579 to 1,965 m). It occurs in the greatest density and frequency away from other shrubs. It is found within swales or drainages that are moister than surrounding areas. Plants sometimes associated with the clay-loving wild buckwheat include mat saltbrush, black sagebrush, shadscale, and Gardner's saltbrush (USFWS 2009a).

The clay-loving wild buckwheat was listed as endangered on July 13, 1984; approximately 120 acres (49 ha) in Delta County, Colorado, was also designated as critical habitat on that date (USFWS 1984). The current range of the clay-loving wild buckwheat is roughly 576 acres (233 ha) (USFWS 2009a). The current population size of the clay-loving wild buckwheat is roughly 278,000 individuals (USFWS 2009a).

The greatest threat to the clay-loving wild buckwheat is habitat loss and fragmentation from urban development (NatureServe 2012). Potential threats that might be associated with mining activities include surface disturbance from construction of facilities and roads as well as increased vehicle traffic and human presence. Other threats include agricultural development, nonnative invasive plants, livestock use, oil and gas development, and herbicide use (USFWS 2009a).

According to the CNHP, the nearest recorded occurrences of clay-loving wild buckwheat are in eastern Montrose County, approximately 40 mi (64 km) east of the ULP lease tracts. The nearest designated critical habitat in central Delta County is greater than 50 mi (80 km) northeast of the ULP lease tracts (Figure 3-1). Given the endemism of this species in Delta and Montrose Counties, it is unlikely that this species, its habitat, and designated critical habitat could occur in the ULP affected area. For this reason, uranium mining under the ULP will have **no effect** on the clay-loving wild buckwheat. Similarly, uranium mining under the ULP will have **no effect** on designated critical habitat for the clay-loving wild buckwheat.

*Final ULP PEIS* *Appendix E: ESA Consultation Correspondence, BO, and BA*

*ULP Final Biological Assessment* *May 2013*

Grand Junction
Little Dolores River
Dolores River
San Miguel River
Mesa County
Delta County
Grand County
Mesa County
Delta County
Montrose County
Mesa County
Montrose County
Utah
Colorado
PARADOX VALLEY
Nuca
Montrose County
Ouray County
San Juan County
Montrose County
Montrose County
San Miguel County
DRY CREEK BASIN
BIG GYPSUM VALLEY
DISAPPOINTMENT VALLEY
San Juan County
San Miguel County
Ouray County
San Miguel County
Telluride
San Miguel County
Dolores County
ULP lease tracts
Clay-loving wild buckwheat occurrences
Colorado hookless cactus occurrences
Clay-loving wild buckwheat and Colorado hookless cactus occurrences
Designated critical habitat for the clay-loving wild buckwheat
N
0 5 10
Miles
0 5 10
Kilometers
ULP074

**FIGURE 3-1 Recorded Quad-Level Occurrences of the Clay-Loving Wild Buckwheat and Colorado Hookless Cactus, and Locations of Designated Critical Habitat for the Clay-Loving Wild Buckwheat, in the Vicinity of the ULP Lease Tracts**

*34*

*E-64* *March 2014*

BLM_0042980

**3.2.1.1.2 Colorado Hookless Cactus.** The Colorado hookless cactus *(Sclerocactus glaucus)* was previously part of a larger complex of *S. glaucus*; however, this complex was split into three distinct species in 2009. All three species are listed as threatened under the ESA (USFWS 2009b). The Colorado hookless cactus is a barrel-shaped cactus that is from 1.2 to 4.8 in. (3.0 to 12.2 cm) tall. The stem is ribbed, with hooked spines radiating out from areoles along the ribs. It produces pink to violet bell or funnel-shaped flowers and short, barrel-shaped fruit from April to May (USFWS 2010a). After blooming, the cactus may shrink below the ground or become a dull grayish-green color, making the plant very hard to identify.

The Colorado hookless cactus is endemic to western Colorado in Delta, Montrose, Mesa, and Garfield Counties. Its range is estimated to be around 1,700–2,100 $mi^2$ (4,400–5,440 $km^2$) (USFWS 2010a; NatureServe 2012). The total known population is estimated to number more than 19,000 plants (USFWS 2010a). There are currently two population centers of the Colorado hookless cactus that may be morphologically and genetically distinct. The two populations are on alluvial river terraces of the Gunnison and Colorado Rivers, and in the Plateau and Roan Creek drainages. These populations are typically found at elevations ranging from 3,937 to 6,562 ft (1,200 to 2,000 m) (CNHP 2011a; USFWS 2011a). Populations are most abundant on south-facing slopes.

The Colorado hookless cactus was listed as threatened on November 13, 1979 (USFWS 1979). A recovery plan for the Colorado hookless cactus was created on April 14, 2010 (USFWS 2010a) that identified these recovery needs: (1) surveying to accurately document populations and suitable habitat, (2) protecting and restoring habitat and corridors to provide connectivity, and (3) protecting individual plants from direct and indirect threats. Critical habitat for the Colorado hookless cactus has not been designated.

Potential threats to the Colorado hookless cactus that may be associated with mining activities include surface disturbances from construction of facilities and roads as well as increased vehicle traffic and human presence. Construction associated with mining can fragment and destroy Colorado hookless cactus habitat. Roads and associated infrastructure can disturb individuals and habitat. The potential increase in the use of access roads by off-road vehicles could increase erosion, fugitive dust, soil compaction, and sedimentation and could crush cacti. The accumulation of dust on cacti could lead to a decrease in plant growth and water use efficiency. Increased erosion, soil compaction, and sedimentation could kill cacti. An increase in human presence could lead to the illegal collection and loss of individual plants. Other threats to the Colorado hookless cactus include livestock grazing (grazing occurs on 94% of the Colorado hookless cactus's potential habitat) and competition with invasive weed species (USFWS 2010a).

According to the CNHP, the nearest recorded occurrences of Colorado hookless cactus are in southern Delta County, approximately 23 mi (37 km) east of the nearest ULP lease tract (Lease Tract 27) (Figure 3-1). However, surveys for this species have not documented any individuals near any of the ULP lease tracts (Holsinger 2012). Given the endemism of this species to alluvial terraces of the Gunnison and Colorado Rivers, it is unlikely for this species or its habitat to occur in the ULP affected area. For this reason, uranium mining under the ULP will have **no effect** on the Colorado hookless cactus.

**3.2.1.1.3 Debeque Phacelia.** The Debeque phacelia *(Phacelia submutica)* is a low-growing annual herb with small white, tube-shaped flowers hidden within leaves (USFWS 2011b). Stems are usually 0.8 to 3 in. (2.0 to 7.6 cm) long, deep red, and covered in stiff hairs. Leaves are also covered with stiff hairs and are reddish when mature and egg shaped. The plant shows yearly variation in abundance due to environmental factors, with no plants growing one year and thousands growing the next. Seeds can remain dormant for up to 5 years. It flowers between late April and late June and sets seed from mid-May through late June (USFWS 2011b).

Habitat requirements of the Debeque phacelia include clay soils from the Atwell Gulch and Shire members of the Wasatch Formation that have little other vegetation (generally less than 10% plant coverage) at elevations ranging from 5,080 to 7,100 ft (1,548 to 2,164 m). The shrink-swell action of clay soils is essential to the species because seed banks are maintained in cracks formed in the soil. It has been found associated with other plants, including cheatgrass, pointed gumweed, Gordon's buckwheat, Nuttall's povertyweed, and tufted evening primrose. It is generally found on moderately steep slopes, benches, and ridge tops adjacent to valley floors (USFWS 2011b).

The Debeque phacelia was listed as threatened on July 27, 2011 (USFWS 2011c). On that date, the USFWS proposed to designate 24,987 acres (10,112 ha) within nine units in Mesa and Garfield Counties, Colorado, as critical habitat for this species (USFWS 2011b). On March 27, 2012, the USFWS revised the proposed designation to include a total of 25,484 acres (10,313 ha) of critical habitat in Mesa and Garfield Counties (USFWS 2012b). There are currently nine known populations of the Debeque phacelia. It is estimated that the current population size may be as large as 68,371 if climatic conditions are favorable (USFWS2011b). The estimated total number of plants ranges from 7,767 to 68,371 per year (USFWS 2011c). The current range of the Debeque phacelia is centered on DeBeque, Colorado, in Mesa and Garfield Counties. A polygon around all nine populations of the Debeque phacelia covers 86,230 acres (34,896 ha), with 626 acres (253 ha) being actually occupied by plants (USFWS 2011b).

Potential threats to the Debeque phacelia that may be associated with mining activities include surface disturbance from construction of facilities and roads as well as increased vehicle traffic and human presence. The disturbance of seed banks from within the soil will be detrimental to the Debeque phacelia (NatureServe 2012). Other threats to this species include livestock grazing and oil and gas development (USFWS 2011c).

According to the CNHP, the nearest recorded occurrences of Debeque phacelia are in central Mesa County, Colorado, approximately 45 mi (72 km) northeast of the nearest ULP lease tract (27). The locations of the proposed critical habitat units are approximately 53 mi (85 km) northeast of ULP Lease Tract 27 (Figure 3-2). This species has specific habitat requirements for clay soils in the Wasatch Formation; these habitats do not occur in the ULP affected area. For this reason, uranium mining under the ULP will have **no effect** on the Debeque phacelia or on proposed critical habitat for the plant.

Final ULP PEIS Appendix E: ESA Consultation Correspondence, BO, and BA

ULP Final Biological Assessment May 2013

Garfield County
Mesa County
Fruita
Grand Junction
Little Dolores River
Grand County
Mesa County
Mesa County
Delta County
Pitkin County
Gunnison County
Delta County
Gunnison County
Utah
Colorado
Dolores River
Delta County
Montrose County
Mesa County
Montrose County
Montrose County
Gunnison County
San Juan County
Montrose County
PARADOX VALLEY
Nucla
Montrose County
Ouray County
Montrose County
San Miguel County
DRY CREEK BASIN
BIG GYPSUM VALLEY
DISAPPOINTMENT VALLEY
San Juan County
San Miguel County
San Miguel River
Ouray County
San Miguel County
Telluride
San Miguel County
Dolores County
Gunnison County
Hinsdale County
Dolores River
ULP lease tracts
DeBeque phacelia occurrences
Uncompahgre fritillary butterfly occurrences
Approximate area encompassing proposed critical habitat for the Debeque phacelia
N
0 5 10
Miles
0 5 10
Kilometers
ULP075

**FIGURE 3-2 Recorded Quad-Level Occurrences of the Debeque Phacelia and Uncompahgre Fritillary Butterfly, and Locations of Proposed Critical Habitat for the Debeque Phacelia, in the Vicinity of the ULP Lease Tracts**

37

E-67 March 2014

BLM_0042983

**3.2.1.2 Invertebrates**

**3.2.1.2.1 Uncompahgre Fritillary Butterfly.** The Uncompahgre fritillary butterfly (*Boloria acrocnema*) is a butterfly (family Nymphalidae) that has a wing span of 1 to 1.2 in. (2 to 3 cm). Males have rusty brown wings with criss-crossed black bars. Females have lighter wings. The hind wing has a white jagged bar dividing the brown inner half and the purple-grey outer surface. The body is brownish black. Females lay eggs on the snow willow (*Salix nivalis*), and the larvae feed on that plant. Adults consume nectar from a range of flowering alpine plants. The butterfly has a biennial life history; eggs are laid in one year, the insects are caterpillars in the following year, and they mature into adults the next year. Adults live only 1 to 2 weeks (USFWS 2011d).

The Uncompahgre fritillary butterfly has the smallest total range of any North American butterfly species. Its habitat is limited in distribution to the San Juan Mountains and southern Sawatch Range in southwestern Colorado. All known colonies occur on public lands. Habitat requirements for this species include the snow willow, which provides food and shelter at elevations above 12,400 ft (3,780 m) (USFWS 1994a, 2011d; NatureServe 2012).

The Uncompahgre fritillary butterfly was listed as an endangered species on June 24, 1991 (USFWS 1991a). A recovery plan was finalized on March 17, 1994 (USFWS 1994a). Critical habitat for this species has not been designated. Currently, 11 known colonies of the butterfly exist (USFWS 2009c). Only 3 of those colonies are monitored, and the current population of those colonies is estimated to number between 3,400 and 23,000 (USFWS 2011d). The overall population size is currently unknown. The current range is estimated to be between 24,710 and 61,776 acres (10,000 and 25,000 ha) in size (NatureServe 2012).

The current threats to the Uncompahgre fritillary butterfly are minor and include collection by people and habitat degradation from widening of hiking trails and sheep grazing (USFWS 2011d). Potential threats to this species that may be associated with mining activities include habitat disturbance from construction of facilities and roads as well as increased vehicle traffic and human presence.

According to the CNHP, the nearest recorded occurrences of the Uncompahgre fritillary butterfly are approximately 60 mi (96 km) east of the ULP lease tracts (Figure 3-2). As discussed, this species has specific habitat requirements for alpine willow communities; these habitats do not occur in the ULP affected area. For this reason, uranium mining under the ULP will have **no effect** on the Uncompahgre fritillary butterfly.

**3.2.1.3 Fish**

**3.2.1.3.1 Colorado River Endangered Fish.** Four listed species of fish that inhabit the Colorado River Basin may occur in the ULP affected area: the bonytail, Colorado

pikeminnow, humpback chub, and razorback sucker. Each of these fish species historically inhabited tributaries of the Colorado River system, including portions of the Dolores and San Miguel Rivers in the ULP project counties. Current populations of these Colorado River endangered fish species no longer inhabit these tributary rivers in the vicinity of the ULP lease tracts. However, populations of these species, suitable habitat, and designated critical habitat for these species occur in the Colorado River, which is downgradient from all ULP lease tracts and is connected to several lease tracts (primarily Lease Tracts 13, 13A, and 14) by the Dolores River (Figure 3-3).

Direct impacts on the Colorado River endangered fish or their habitat associated with ULP activities would not occur. However, potential indirect threats to these species that might be associated with mining activities under the ULP include impacts on water quality and water withdrawals. Uranium mining can contaminate surrounding drainages and bodies of water with uranium, other radioactive contaminants, and other contaminants such as ammonium, which can negatively affect aquatic biota. Some contaminants can bio-accumulate in fish species (Karp and Metzler 2006; Fresques 2008; Metzler et al. 2008). The toxicity of uranium mill tailings has been shown to negatively affect aquatic biota in the Colorado River system (USFWS 1990). The effects of ammonium include reduced growth rate, reduced gamete production, body deformities and malformations, and degenerative gill and kidney appearance and function. The construction of mining facilities may also increase the amount of sediment in downgradient streams and rivers (Leyda 2011), which could also affect habitat quality (including designated critical habitat).

Water depletions associated with uranium mining may contribute to the destruction or adverse modification of designated critical habitat for the Colorado pikeminnow (USFWS 2011e) and could also affect all other Colorado River endangered fish. As discussed in Section 2.2.2 and Table 2-3, as much as 19.3 acre-ft of water may be needed to support ULP activities during the peak production year. It is assumed that all water would come from sources within the Dolores River Basin and may be obtained from pumping withdrawals on or off the lease tract, the purchase of municipal supplies, or the purchase and relinquishment of existing groundwater rights. Surface water and groundwater sources in the region surrounding the ULP lease tracts are over-appropriated according to the Colorado Division of Water Resources (CDWR 2007), and the USFWS considers actions that could result in a net water depletion in the upper Colorado River Basin to adversely affect the endangered fish and their designated critical habitat. Although the estimated peak annual water demand from the ULP activities (19.3 acre-ft) represents a relatively small depletion to the Colorado River, the volume exceeds the USFWS *de minimis* threshold of 0.1 acre-ft per year (USFWS 2009j)and requires ESA Section 7 consultation.

Other threats to the Colorado River endangered fish that might be associated with ULP activities include physical stream alteration, competition with and predation by introduced species, and pollution. Indirect impacts on the Dolores River and other tributaries to the Colorado River from ULP-related water withdrawals, runoff, sedimentation, or exposure to contaminants might be possible, which could affect these species and their habitats (including designated critical habitat) in the Colorado River (Table 3-1).

*Final ULP PEIS* *Appendix E: ESA Consultation Correspondence, BO, and BA*

*ULP Final Biological Assessment* *May 2013*

Fruita
Grand Junction
Colorado River
Dolores River
San Miguel River
Nucla
Grand County
Mesa County
Mesa County
Delta County
Delta County
Montrose County
Grand County
San Juan County
Mesa County
Montrose County
Utah
Colorado
San Juan County
Montrose County
Montrose County
San Miguel County
San Juan County
San Miguel County
San Miguel County
Dolores County
PARADOX VALLEY
DRY CREEK BASIN
BIG GYPSUM VALLEY
DISAPPOINTMENT VALLEY
Wyoming
Utah
Colorado
New Mexico
ULP lease tracts
Designated critical habitat for Colorado River endangered fish
(Bonytail chub, Colorado pikeminnow, humpback chub, and razorback sucker)
N
0 5 10 Miles
0 5 10 Kilometers
ULP076

**FIGURE 3 3 Locations of Designated Critical Habitat for the Colorado River Endangered Fish Species in the Vicinity of the ULP Lease Tracts**

*40*

E-70 *March 2014*

BLM_0042986

The implementation of mitigation measures and BMPs identified in Table 2-5, particularly those related to aquatic habitats and water quality (G4, D2, D3, D4, D5, D6, D7, D8, D9, D12), would reduce impacts of water quality and quantity to the Colorado River endangered fish species. Indirect impacts related to water contamination are expected to be minimized with the measures identified in Table 2-5 to levels that would not adversely affect the species or their habitats. Impacts related to water withdrawal and consumption from the Upper Colorado River Basin are possible (i.e., there are no measures to completely eliminate or offset water withdrawals from the Colorado River Basin). For this reason, it is determined that the proposed ULP **may affect, and is likely to adversely affect, both the Colorado River endangered fish and their critical habitat**.

Several conservation measures have been identified from previous Biological Assessments and Biological Opinions for related federal activities to offset or reduce negative impacts of project-related water use on Colorado River endangered fish. These conservation measures may be adopted to reduce ULP-related impacts on endangered fish. These conservation measures include the following:

- If water pumping is necessary, pump water from off-channel locations (e.g., ponds and ditches) not directly connected to mainstem rivers such as the Dolores River and

- Require water users to sign Recovery Agreements that state the water users won't interfere with the implementation of recovery actions and the USFWS will provide ESA compliance. The DOE will ensure Recovery Agreements are initiated by the lessees, or on the behalf of the lessees via a representative group, with the USFWS as appropriate.

The USFWS may provide other alternatives to help projects reduce affects from their activities during the consultation process. The natural history, habitat requirements, and listing history for each of these species is provided in the following text.

**Bonytail.** The bonytail (*Gila elegans*) is a species of fish in the family Cyprinidae. It is endemic to the Colorado River Basin. This species has a very slender, round, and long caudal peduncle; a subterminal mouth; and fins that are large and falcate. Adults have a relatively flat, concave head and a smooth dorsal hump and back. Young fish are typically silver-gray with white bellies. Adults have a dark olive back that contains small iridescent highlights (Mueller 2006). Adults grow to be about 21.7 in. (55 cm) in length and weigh 2.4 lb (1.1 kg) (USFWS 2002a). Hatchery-reared bonytail become sexually mature after 2 years (NatureServe 2012). The diet of the bonytail is unknown, but it is hypothesized that they eat insects, fishes, and plants (NatureServe 2012).

The historic range of the bonytail is unknown because it was extirpated from many areas before surveys were conducted, but it was common in warm-water reaches of larger rivers from Mexico to Wyoming (USFWS 2002a). Currently, no self-sustaining populations of bonytail exist in the wild, and only a small number of adults exist in the wild in Lake Mohave, Lake Havasu, and in the Green River and upper Colorado River subbasins (USFWS 2002a). The current

population size is estimated to be between 1 and 1,000 individuals (NatureServe 2012). Hatchery-reared adults have been released into rivers in the upper basin, but results indicate low survival and no reproduction or recruitment (USFWS 2002a).

The habitat requirements of the bonytail are uncertain, but the species has been observed in pools and eddies on mainstem rivers. Habitats necessary for conservation of the bonytail include river channels and flooded, ponded, or inundated riverine habitats (USFWS 2002a; BIO-WEST 2005). Bonytails in rivers probably spawn in spring over rocky substrates, and spawning in reservoirs has been observed over rocky shoals and shorelines (USFWS 2002a). Spawning was observed to occur in June and July at water temperatures of about 64.4°F (18°C) (USFWS 1994b). It is hypothesized that flooded bottomland habitats are important as nursery habitats for young (USFWS 2002a).

The bonytail was listed as an endangered species on April 23, 1980 (USFWS 1980). A recovery plan was approved on August 1, 2002 (USFWS 2002a). Approximately 312 mi (502 km) of river in the Colorado River Basin were designated as critical habitat for the bonytail on March 21, 1994. The critical habitat spans five states and includes portions of the Colorado, Green, and Yampa Rivers in the Upper Basin and the Colorado River in the Lower Basin (USFWS 1994b). The nearest location of designated critical habitat is within the Colorado River in Grand County, Utah, approximately 29 mi (46.4 km) northwest of the northern-most ULP lease tracts (Figure 3-3).

**Colorado Pikeminnow.** The Colorado pikeminnow (*Ptychocheilus lucius*) is a species of fish in the family Cyprinidae. It is a long-distance migrator, travelling an average of 411 mi (658 km). It reaches a maximum length of 5.9 ft (1.8 m) and weight of 79 lb (36 kg) and lives over 40 years (USFWS 2002b). It is an elongated fish, with a greenish, slender body with gold flecks on the dorsal surface. The mouth is large and nearly horizontal, with slender teeth (USFWS 2007). Reproduction occurs after 5 to 7 years (NatureServe 2012). Juveniles feed mainly on zooplankton and insect larvae, while larger fish (bigger than 4 in. [10 cm]) feed mainly on other fish (USFWS 2007; NatureServe 2012).

Spawning occurs in river canyons when water flows decline from June to August and when water temperatures are between 64.4 and 73.4°F (18 and 23°C) (USFWS 1994b, 2002b). Optimal temperature for egg hatching is 68°F (20°C) (NatureServe 2012). Adult habitats after spawning include pools, deep runs, and eddies maintained by high spring flows. Larvae drift downstream to nutrient-rich nursery backwaters (USFWS 2002b). Young of the year prefer shallow, alongshore, ephemeral backwaters with little or no current and silt or sand substrates (NatureServe 2012; USFWS 2007). When juveniles reach about 8 in. (20 cm) in length, they prefer deeper water with a faster velocity (USFWS 2007). During the winter, adults are most common in shallow, ice-covered shorelines (USFWS 1994b). Temperature tolerances range from less than 50°F to 95°F (10°C to 35°C) (USFWS 2007).

The Colorado pikeminnow is endemic to the Colorado River Basin. It was extirpated from the Lower Basin in the 1970s, but experimental introductions have been made into the Verde River in the Lower Basin. Currently, three wild reproducing populations occur in the Green River, San Juan River, and upper Colorado River subbasins. Current population estimates

Case No. 1:20-cv-02484-MSK Document 39-3 filed 04/27/21 USDC Colorado pg 415 of 426

are between 6,600 and 8,900 total for the three populations (6,000 to 8,000 in the Green River; 600 to 900 in the upper Colorado River; 19 to 50 in the San Juan River) (USFWS 2002b).

The Colorado pikeminnow was listed as an endangered species on March 11, 1967. An original recovery plan was approved on August 28, 2002, and the current recovery goals were approved on July 27, 2006 (USFWS 2002b). Approximately 1,148 mi (1,848 km) of river in the Colorado River Basin were designated as critical habitat for the Colorado pikeminnow on March 21, 1994. The critical habitat spans three states and includes portions of the Colorado, Green, Yampa, White, and San Juan Rivers in the Upper Basin (USFWS 1994b). The nearest location of designated critical habitat is within the Colorado River in Grand County, Utah, approximately 29 mi (46 km) northwest of the northern-most ULP lease tracts (Figure 3-3).

**Humpback Chub.** The humpback chub (*Gila cypha*) is a freshwater fish species in the family Cyprinidae. This species is less than 19.7 in. (50 cm) in total length. It has silvery sides and a brown back. Adults have a distinctive dorsal hump, a long snout, and small eyes. Humpback and roundtail chubs can look very similar, and the young in particular do not possess easily identifiable morphological differences (USFWS 1990). The humpback chub reproduces from May to July, depending on the location. Spawning occurs when water temperatures are near 68°F (20°C) and when spring water flows are at their highest (USFWS 1994b). Young and adults are bottom feeders and consume mainly insects and other invertebrates, but algae and fish are occasionally consumed.

The humpback chub is found in river canyons in a variety of habitats, including pools, riffles, and eddies. It has also been found near boulder-strewn canyons, travertine dams, rocky runs, riffles, and rapids (USFWS 1994b). Adult humpback chub inhabit deep (1 to 15 ft [0.3 to 4.6 m]) river regions, but young are generally found in shallower areas (less than 9.8 ft [3.0 m]) (USFWS 2002c).

The humpback chub is endemic to the Colorado River Basin and is presently restricted to remote, whitewater canyons. Human-made alterations to the Colorado River may have caused the humpback chub to disappear from certain areas before its presence was documented (USFWS 1990). Because of this uncertainty, the historical distribution of the humpback chub is not well known, but the earliest known record of the species is from the Grand Canyon from around 4,000 B.C. (USFWS 1990, 1994b).

The humpback chub was listed as an endangered species on March 11, 1967. An original recovery plan was approved on August 22, 1979, and the current second revised recovery plan was approved on September 19, 1990 (USFWS 1990). A revised recovery plan was approved on August 1, 2002 (USFWS 2002c). Approximately 379 mi (610 km) of river in the Colorado River Basin were designated as critical habitat for the humpback chub on March 24, 1994. The critical habitat spans three states and includes portions of the Colorado, Green, and Yampa Rivers in the Upper Basin and the Colorado and Little Colorado Rivers in the Lower Basin (USFWS 1994b). The largest remaining population of humpback chub in the Colorado River Basin occurs in the Little Colorado and Colorado Rivers in the Grand Canyon (USFWS 1994b). The nearest location of designated critical habitat is within the Colorado River in Grand County, Utah, approximately 29 mi (46.4 km) northwest of the northern-most ULP lease tracts (Figure 3-3).

BLM_0042989

**Razorback Sucker.** The razorback sucker (*Xyrauchen texanus*) is a species of fish in the family Catostomidae. This species has a long, high hump behind the head. The head and body are dark, and the sides are brownish, fading to a yellowish white abdomen. It reaches lengths of 36 to 39 in. (91 to 99 cm) and weighs up to 12 lb (5.4 kg) (USFWS 2007). The diet of adults includes planktonic crustaceans, diatoms, filamentous algae, midge larvae, and detritus.

Habitat requirements of the razorback sucker in rivers include deep runs, eddies, backwaters, and flooded off-channel environments in spring; runs and pools, often in shallow water associated with submerged sandbars, in summer; and low-velocity runs, pools, and eddies in winter (USFWS 2002d). Adults may travel long distances to spawning sites, and spawning usually occurs in rivers over gravel, cobble, or sand substrates during spring runoff at temperatures higher than 57.2°F (14°C) (USFWS 1991b, 2002d). Spawning can also occur over rocky shoals and shorelines. Young require nursery environments with quiet, warm, shallow water, such as tributary mouths, backwaters, or inundated floodplain habitats in rivers, such as coves or shorelines in reservoirs (USFWS 2002d).

The razorback sucker is endemic to the Colorado River Basin. The historic range of the razorback sucker extended through 3,500 mi (5,600 km) of the Colorado River Basin throughout Arizona, California, Colorado, Nevada, New Mexico, Utah, Wyoming, Baja California Norte, and Sonora of Mexico (USFWS 1991b). Currently, the razorback sucker inhabits only about 25% of its historical range in the upper Colorado River basin (USFWS 1991b, 2002d). Most wild fish are now found in Lake Mohave, which represents the largest population within the lower basin (USFWS 2007). This population dropped from 60,000 individuals in 1991 to 9,000 in 2000 (USFWS 2002d). Razorback suckers are currently found in small numbers in the Green River, upper Colorado River, and San Juan River subbasins; in the lower Colorado River; in reservoirs of Lakes Mead and Mohave; and in small tributaries of the Gila River subbasin (USFWS 2002d).

The razorback sucker was listed as an endangered species on October 23, 1991. A recovery plan was approved on August 28, 2002 (USFWS 2002d). Approximately 1,724 mi (2,758 km) of river in the Colorado River Basin was designated as critical habitat for the razorback sucker on March 21, 1994. The critical habitat spans six states and includes portions of the Green, Yampa, Duchesne, Colorado, White, Gunnison, and San Juan Rivers in the Upper Basin and portions of the Colorado, Gila, Salt, and Verde Rivers in the Lower Basin (USFWS 1994b). The nearest location of designated critical habitat is within the Colorado River in Grand County, Utah, approximately 29 mi (46.4 km) northwest of the northernmost ULP lease tracts (Figure 3-3).

**3.2.1.3.2 Greenback Cutthroat Trout.** The greenback cutthroat trout (*Oncorhynchus clarki* ssp. *stomias*) is a species of fish in the family Salmonidae. It is one of the most colorful subspecies of cutthroat trout (USFWS 1998). This species is characterized by dark, round spots on the sides and tail and two colorful blood-red stripes on each side of the throat under the jaw (USFWS 2011f). Mature males have crimson red along the ventral region during spawning season (USFWS 1998). The diet of the greenback cutthroat trout includes mainly aquatic and terrestrial insects, but these fish are opportunistic feeders (USFWS 2009d; Coleman and CNHP 2007). Males spawn at age two, and females reach sexual maturity when they reach a

length of about 7 in. (18 cm), usually after their third or fourth summer (USFWS 2011f; Coleman and CNHP 2007). They spawn in spring or early summer, depending on the elevation. Females dig redds in the gravel bed of streams, where they deposit eggs. Spawning occurs when water reaches about 41 to 46°F (5 to 8°C) (Coleman and CNHP 2007). Larger females can lay up to 6,000 eggs (USFWS 2009d).

The greenback cutthroat trout is the rarest of the cutthroat trout species. The historic range of the greenback cutthroat trout is not known, but it is hypothesized that all mountain and foothill habitats of the South Platte and Arkansas River drainages in Colorado are included (USFWS 2009d). Only nine naturally occurring populations are known to have persisted, but many additional populations have been established in lakes and streams from being introduced (USFWS 1998). The most stable population occurs in Rocky Mountain National Park (NatureServe 2012). Currently, 145 populations in 142 mi (228 km) of streams and 412 acres (167 ha) of lakes have been documented within greenback historic range (USFWS 2011f).

Habitat requirements of the greenback cutthroat trout differ depending on the life stage. Juveniles need the protective cover and low-velocity flow found in side channels and small tributaries. Spawning occurs in riffles with clean gravel. Overwintering fish prefer deep water, low-velocity flow, and protective cover. Adults prefer slow water areas for resting and fast water areas for feeding, with protective cover from boulders, logs, overhanging vegetation, or undercut banks (USFWS 2009d). Greenbacks also usually require clear, cold, well oxygenated water (USFWS 2009d).

The greenback cutthroat trout was listed as endangered in 1973 and reclassified as threatened on April 18, 1978 (USFWS 1978). A recovery plan was approved on March 1, 1998 (USFWS 1998). Critical habitat for this species has not been designated.

According to the CNHP, the nearest recorded occurrences of the greenback cutthroat trout are more than 100 mi (160 km) east of the ULP lease tracts. As discussed, this species is primarily restricted to headwater streams of the South Platte and Arkansas River drainages; these habitats do not occur in the ULP affected area. For these reasons, uranium mining under the ULP will have **no effect** on the greenback cutthroat trout. The species is not likely to occur in any aquatic habitats downstream from the ULP lease tracts.

#### 3.2.1.4 Birds

**3.2.1.4.1 Gunnison Sage-Grouse.** The Gunnison sage-grouse (*Centrocercus minimus*) is one of two sage-grouse species in the family Phasianidae; the other is the greater sage-grouse *(C. urophasianus)*. The Gunnison sage-grouse weighs about a third less than the greater sage-grouse, but the males of both species possess conspicuous filoplumes and yellow-green air sacs on the chest during the breeding season. Sage-grouse gather on leks during the spring, where males establish territories and strut for approximately 6 weeks. Sage-grouse are polygamous, and males do not provide any parental care. The majority of females establish nests within 4 mi (6.5 km) of an active lek. Gunnison sage-grouse lay about six to seven eggs and have one of the

lowest nest success rates of all upland game bird species (ranging from 10% to 63%) (Gunnison Sage-Grouse Rangewide Steering Committee 2005).

Sage-grouse are typically found in large expanses of sagebrush-dominated habitats. Various habitats such as riparian meadows, agricultural lands, and native grasses and forbs are also used if intermixed with sagebrush (USFWS 2010b). The Gunnison sage-grouse relies heavily on sagebrush for nesting, shelter, and food throughout the year. Forbs and insects are eaten during the summer and early fall, but its diet consists entirely of sage brush during the winter (USFWS 2006a).

Gunnison sage-grouse historically occupied 21,370 $mi^2$ (55,350 $km^2$) throughout southwestern Colorado, northwestern New Mexico, northeastern Arizona, and southeastern Utah (USFWS 2006a). Currently, only seven widely scattered and isolated populations occur in Colorado and Utah, occupying 1,511 $mi^2$ (3,913 $km^2$) in the Gunnison Basin, San Miguel Basin, Monticello-Dove Creek, Piñon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass (USFWS 2010b). Gunnison sage-grouse now occupy about 10% of the habitat that existed before the arrival of European settlers (BLM 2010). The breeding population size was estimated to be fewer than 4,000 individuals in 2000, with the largest population (2,000 to 3,000 individuals) occurring primarily in Gunnison and Saguache Counties in Colorado. The remaining six populations have fewer than 300 breeding individuals (NatureServe 2012).

The Gunnison sage-grouse became a candidate for federal listing on September 28, 2010 (USFWS 2010b). The listing of this species was determined to be warranted but was precluded by higher-priority listing actions. The USFWS assigned a listing priority number of 2 to this species because threats have a high magnitude and are imminent. On November 21, 2012, the USFWS submitted a rule to propose this species as endangered under the ESA (USFWS 2012d).

The main threat to the Gunnison sage-grouse is the fragmentation and degradation of sagebrush habitats due to conversion to cropland, energy development, and urban development (NatureServe 2012). Potential threats that may be associated with ULP activities include direct habitat loss, fragmentation, and degradation as well as direct disturbance of nests or leks. Mining may directly alter sagebrush habitat distribution and quality, as a result of the development of mining pits, mining infrastructure, access roads, and overburden placement in sagebrush habitats. Fragmentation of these habitats could force sage-grouse to choose less optimal habitats. The construction of any substantial structure or road, as well as the use of access roads, can cause the increased deposition of dust on plants and the invasion of non-native plants, potentially affecting the abundance and quality of sagebrush. Increased noise and traffic from human presence may also lead to a disruption of normal grouse behavior and productivity (Gunnison Sage-Grouse Rangewide Steering Committee 2005). Other threats include fencing (increases mortality because birds can collide with it and it increases the number of perch sites for nest predators), fires (increases weeds and degrades suitable habitat), and domestic grazing (changes plant communities and soils) (USFWS 2010b).

According to the CNHP, the nearest recorded occurrences of the Gunnison sage-grouse are from San Miguel County, Colorado, approximately 5 mi (8 km) southeast of the Paradox lease tracts (Lease Tract 17). According to the SWReGAP habitat suitability model, potentially

suitable habitat for the Gunnison sage-grouse may occur on or in the vicinity of all ULP lease tracts; however, none of the ULP lease tracts intersect the current range of this species (Figure 3-4). According to range data provided by the CPW Natural Diversity Information Source (CPW 2011), the Paradox lease tracts (5A, 6, 7, 8, 8A, 9, and 17) occur as near as 168 ft (51 m) from the current Gunnison sage-grouse range in the Dry Creek Basin. Portions of the species' current range occur adjacent to several Paradox lease tracts (Figure 3-4). Because the species' current range does not intersect any of the lease tract areas, ULP activities are unlikely to directly affect this species. Impacts on this species from ULP activities may still occur in the form of indirect effects or impacts on potentially suitable unoccupied habitat. However, it has been determined that with the implementation of all mitigation measures and BMPs identified in Table 2-5, uranium mining under the ULP **may affect, but is not likely to adversely affect,** the Gunnison sage-grouse.

**3.2.1.4.2 Mexican Spotted Owl.** The Mexican spotted owl *(Strix occidentalis lucida)* is one of three subspecies of the spotted owl *(S. occidentalis)* (USFWS 2011g). They are medium-sized owls without ear tufts (USFWS 2011g). They have dark eyes and an ashy-chestnut brown body with white and brown spots on their abdomen, back, and head (USFWS 2011h). Wing and tail feathers are dark brown with lighter brown and white bars (USFWS 2011g). Owls younger than 5 months old have a downy appearance. Subadults (5 to 26 months old) look like adults but have pointed tail feathers with a white terminal band. Adult tail feathers have rounded tips, and the terminal band is mottled brown and white (USFWS 2011g). Females are generally larger than males (USFWS 2011h). Most Mexican spotted owls are nonmigratory, but some individuals migrate to lower elevations during the winter (USFWS 2011g). The diet of Mexican spotted owls consists mainly of small and medium-sized rodents, but they also consume bats, birds, reptiles, and arthropods (USFWS 2011g).

Habitat requirements of the Mexican spotted owl include forested mountains and canyonlands. Forests used by the Mexican spotted owl are generally uneven-aged, are multistoried, and have high canopy cover. Larger trees (with an average diameter of 24 in. [61 cm]) are usually chosen for nesting sites. In canyon lands, important features for the Mexican spotted owl include steep canyon walls with isolated pinnacles and rims with large vertical cliffs. The canyon habitats also often include a variety of desert scrub and riparian vegetation communities. Cliff faces contain numerous caves and ledges that create protected microsites for nesting and roosting (USFWS 2011g). Foraging occurs in a wide range of habitats, including managed and unmanaged forests, pinyon-juniper woodlands, mixed-conifer and ponderosa pine forests, cliff faces and terraces between cliffs, and riparian zones.

Mexican spotted owls rely on existing structures for nesting (e.g., nests built by other birds on cliffs, debris platforms in trees, and tree cavities). Courtship begins in March; females lay 1 to 3 eggs in late March or early April; and incubation lasts about 30 days (USFWS 2011g). The current range of the Mexican spotted owl is nearly the same as the historical range and is estimated to include 7,720 to 965,250 mi$^2$ (20,000 to 2,500,000 km$^2$) across Utah, Colorado, Arizona, New Mexico, and the western portions of Texas, and several states in Mexico (NatureServe 2012; USFWS 2011g).

Final ULP PEIS Appendix E: ESA Consultation Correspondence, BO, and BA

ULP Final Biological Assessment May 2013

PARADOX VALLEY
DRY CREEK BASIN
BIG GYPSUM VALLEY
DISAPPOINTMENT VALLEY
Grand County
Mesa County
San Juan County
Montrose County
Ouray County
San Miguel County
Dolores County
Montezuma County
La Plata County
Wyoming
Utah
Colorado
New Mexico
ULP lease tracts
Gunnison sage-grouse occurrences
Western yellow-billed cuckoo occurrences
Gunnison sage-grouse overall range
Potentially suitable habitat for the Gunnison sage-grouse
0 5 10 Miles
0 5 10 Kilometers
N
ULP080

**FIGURE 3-4 Recorded Quad-Level Occurrences and Distribution of Potentially Suitable Habitat for the Gunnison Sage-Grouse and Western Yellow-Billed Cuckoo in the Vicinity of the ULP Lease Tracts**

48

E-78 March 2014

BLM_0042994

The Mexican spotted owl has experienced a long-term population decline of 30–50% (NatureServe 2012). Currently, 1,301 owl sites (used repeatedly by a single or a pair of owls for nesting, roosting, or foraging) are known in the U.S. portion of the owl's range (USFWS 2011g). The current population size is estimated to be 1,000 to 2,500 individuals. A little more than half of the U.S. population occurs in the Upper Gila Mountains Recovery Unit in Arizona and New Mexico. Many populations occur in isolated mountain ranges separated by large areas of unforested land (NatureServe 2012).

The Mexican spotted owl was listed as threatened on March 16, 1993 (USFWS 1993). A draft recovery plan was made available for comment on June 28, 2011 (USFWS 2011g). Approximately 7,239 $mi^2$ (18,749 $km^2$) of critical habitat was designated in Arizona, Colorado, New Mexico, and Utah on June 6, 1995. The designated critical habitat was changed first on February 1, 2001 (USFWS 2001a), and again on August 31, 2004 (USFWS 2004). Currently, critical habitat includes approximately 13,514 $mi^2$ (35,000 $km^2$) of habitat in Arizona, Colorado, New Mexico, and Utah (USFWS 2004).

The greatest threat to the Mexican spotted owl has been loss of habitat due to even-aged timber management (NatureServe 2012). Potential threats that may be associated with ULP activities include increased mortality, loss or fragmentation of habitat, and a decreased ability to hunt. Increased vehicle traffic associated with mining operations could increase the number of owls killed as a result of collisions with vehicles. The construction of mining facilities and access roads could remove or fragment Mexican spotted owl habitat. Recent research on acoustic predators (bats and owls) shows that even low levels of traffic noise mask the rustling sounds of rodents and reduce the ability of the predators to hear them. The noise of the mine operations may have a similar effect and prevent the owls from catching prey (Leyda 2011). Other threats include forest fires, predation, starvation, disease, and parasites (USFWS 2011g).

According to the CNHP, the nearest recorded occurrences of the Mexican spotted owl are from southern San Miguel County, Colorado. This quad-level occurrence intersects ULP Lease Tract 12. According to the SWReGAP habitat suitability model, potentially suitable habitat for this species may occur on and in the vicinity of all ULP lease tracts. However, this habitat is represented by migratory habitat as no suitable canyonlands and old growth forests occur on the lease tracts. Designated critical habitat for the Mexican spotted owl does not occur in the vicinity of the ULP lease tracts. However, designated critical habitat does occur in San Juan County, Utah, as close as 28 mi (45 km) west of the ULP lease tracts (Figure 3-5).

Mining activities under the ULP have the potential to affect the Mexican spotted owl and potentially suitable habitat for the Mexican spotted owl (Table 3-1; Figure 3-5). However, it has been determined that with the implementation of all mitigation measures and BMPs identified in Table 2-5, uranium mining under the ULP **may affect, but is not likely to adversely affect,** populations of the Mexican spotted owl. Uranium mining under the ULP is determined to have **no effect** on designated critical habitat for the Mexican spotted owl.

**3.2.1.4.3 Southwestern Willow Flycatcher.** The southwestern willow flycatcher *(Empidonax traillii extimus)* is one of four willow flycatcher subspecies *(E. traillii)*. This

Final ULP PEIS Appendix E: ESA Consultation Correspondence, BO, and BA

ULP Final Biological Assessment May 2013

Colorado River
Dolores River
San Miguel River
PARADOX VALLEY
DRY CREEK BASIN
BIG GYPSUM VALLEY
DISAPPOINTMENT VALLEY
Utah
Colorado
Wyoming
New Mexico
ULP lease tracts
Mexican spotted owl occurrences
Southwestern willow flycatcher occurrences
Designated critical habitat for the Mexican spotted owl
Spotted owl potentially suitable habitat
Southwestern willow flycatcher potentially suitable habitat
0 5 10 Miles
0 5 10 Kilometers
N
ULP077

**FIGURE 3-5 Recorded Quad-Level Occurrences and Distribution of Potentially Suitable Habitat for the Mexican Spotted Owl and Southwestern Willow Flycatcher, and Locations of Designated Critical Habitat for the Mexican Spotted Owl, in the Vicinity of the ULP Lease Tracts**

50

E-80 March 2014

BLM_0042996

subspecies is distinguished by subtle differences in color, morphology, and habitat use (USFWS 2002e). The southwestern willow flycatcher is less than 6 in. (15 cm) in length, weighs about 0.4 oz (12 g), and has a brownish-olive body, whitish throat, pale olive breast, pale yellow belly, and two light wing bars (USFWS 2002e, 2011i; NatureServe 2012). The bill is depressed and wide at the base (NatureServe 2012). The flycatchers mainly eat insects, including wasps, bees, moths, caterpillars, and butterflies; sometimes they eat berries as well (NatureServe 2012).

The southwestern willow flycatcher is a neotropical migrant that travels from breeding grounds in the United States to wintering grounds in Central and South America (USFWS 2005a). Essential habitat includes forested wetlands or scrub-shrub wetlands for breeding, foraging, migrating stopovers, dispersing, and shelter (USFWS 2005a). The flycatchers breed in southern California, southern Nevada, southern Utah, southern Colorado, Arizona, and New Mexico from sea level to around 8,000 ft (2,438 m) above sea level. Nesting occurs primarily in dense, swampy thickets of willow, buttonbush, tamarisk, vines, or other plants from 6.5 to 98 ft (2 to 30 m) in height (NatureServe 2012; USFWS 2005a). Nesting has been observed in patches ranging from 0.2 to 173 acres (0.2 to 70 ha) (USFWS 2005a). Nesting occurs from early June through the end of July. The clutch size is usually three or four, and both parents take care of the young (NatureServe 2012).

The current range of the southwestern willow flycatcher is similar to the historical range, but suitable habitat within that range has been greatly reduced (USFWS 2002e). The current range is estimated to be 7,700 to 965,250 mi$^2$ (20,000 to 2,500,000 km$^2$), and the population is found in relatively small, isolated, widely dispersed locales (NatureServe 2012). In 2000, 53% of the southwestern willow flycatchers were distributed across only 10 sites (USFWS 2002e). The population has experienced a long-term decline of 30–50%, and it is estimated to consist of between 1,200 and 1,300 pairs (NatureServe 2012).

The southwestern willow flycatcher was listed as an endangered species on March 29, 1995 (USFWS 2002e). A recovery plan was approved on August 30, 2002 (USFWS 2002e). Approximately 603 river mi (964 river km) were designated as critical habitat for the southwestern willow flycatcher on July 22, 1997 (USFWS 1997). On October 19, 2005, the designated critical habitat was amended to include a total of 741 mi (1,186 km) of critical habitat (USFWS 2005a). The currently designated critical habitat includes portions of Arizona, California, Nevada, New Mexico, and Utah. On August 8, 2011, the USFWS proposed to revise critical habitat for the species to include a total of 2,090 mi (3,364 km) of critical habitat in the states of Arizona, California, Colorado, Nevada, New Mexico, and Utah. The currently designated and the proposed critical habitat for the southwestern willow flycatcher does not occur in the vicinity of the ULP lease tracts.

The greatest threat to the southwestern willow flycatcher is loss or degradation of riparian habitat (USFWS 2002e). Potential threats to the southwestern willow flycatcher that may be associated with ULP activities include habitat loss or degradation associated with facility construction and operations, impacts on riparian habitats associated with project-related water withdrawals from the Upper Colorado River Basin, and increased human presence. Direct habitat loss might result from the construction of mining facilities and access roads. Water withdrawals from surface water or groundwater sources to support mining activities might affect riparian

habitats for the southwestern willow flycatcher. Human disturbances at nesting sites due to human presence or traffic noise may result in nest abandonment (USFWS 2011i). Additional threats include fire, livestock grazing, and brood parasitism by the brown-headed cowbird (USFWS 2002e).

According to the CNHP, the nearest recorded occurrences of the southwestern willow flycatcher are from southern Dolores County, Colorado, approximately 35 mi (56 km) southeast of the ULP lease tracts (Figure 3-5). Although the SWReGAP habitat suitability model predicted potentially suitable habitat for this species in the vicinity of all ULP lease tracts, particularly along the Dolores and San Miguel Rivers (Figure 3-5), suitable habitat is unlikely to occur in the vicinity of the lease tracts as the species has not been observed in the vicinity of these areas. Neither designated nor proposed critical habitat for the southwestern willow flycatcher occurs in the vicinity of the ULP lease tracts.

Mining activities under the ULP have the potential to affect the southwestern willow flycatcher and potentially suitable habitat for it (Table 3-1; Figure 3-5). However, it has been determined that with the implementation of all mitigation measures and BMPs identified in Table 2-5, uranium mining under the ULP **may affect, but is not likely to adversely affect,** populations of the southwestern willow flycatcher. Uranium mining under the ULP is determined to have **no effect** on designated or proposed critical habitat for the southwestern willow flycatcher.

#### 3.2.1.5 Mammals

**3.2.1.5.1 Black-Footed Ferret.** The black-footed ferret (*Mustela nigripes*) is the only ferret species native to North America. It is brownish in color with a slightly paler belly, and its face mask, legs, and the tip of its tail are black (NatureServe 2012; USFWS 2003). It is about 24 in. (60 cm) in length and weighs up to 2.4 lb (1.1 kg) (USFWS 2003). In captivity, the black-footed ferret reproduces in March and early April, and the gestation period is around 45 days. The average litter size is 3.5, and young disperse in the fall. Some females can reproduce as yearlings. Black-footed ferrets are nocturnal and can remain inactive for up to 6 days during the winter. Their main food item is prairie dogs, but ground squirrels, rabbits, deer mice, voles, pocket gophers, birds, and insects are also sometimes consumed (NatureServe 2012; USFWS 1988).

Historically, the black-footed ferret range extended throughout Arizona, Colorado, Kansas, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, Utah, Wyoming, Alberta, and Saskatchewan. The current range is estimated to be between 39 and 97 mi$^2$ (100 and 250 km$^2$) (NatureServe 2012). The black-footed ferret relies on prairie dog colonies for food, shelter, and denning and has only been found in the vicinity of colonies of black-tailed prairie dogs, white-tailed prairie dogs, and Gunnison's prairie dogs (USFWS 2003). Black-footed ferret habitat is the same habitat as that used by prairie dogs and includes grasslands, steppe, and shrub steppe. Prairie dog holes serve as resting and birth sites. Between

99 and 148 acres (40 and 60 ha) of prairie dog colony are needed to support one ferret (NatureServe 2012).

By the early 1970s, the black-footed ferret was near extinction due to the intentional poisoning of and introduction of disease to prairie dogs (USFWS 2003). Remaining ferrets are used for captive breeding, and a few reintroductions have successfully established reproducing populations (NatureServe 2012). The population size is now estimated to be between 250 and 1,000 individuals. As of 2005, approximately 400 reintroduced individuals are alive in the wild (NatureServe 2012).

The black-footed ferret was listed as an endangered species on March 11, 1967 (USFWS 1988). A recovery plan was approved on August 8, 1988 (USFWS 1988). The species may be extirpated from the state of Colorado, with the exception of reintroduced populations in the northwestern portion of the state (CPW 2012; USFWS 2012c). Black-footed ferrets were released in the Wolf Creek Management Area in Moffat and Rio Blanco Counties, Colorado, between 2001 and 2006 (BLM 2008a). These populations are considered to be experimental, nonessential populations under Section 10(j) of the ESA. It is unlikely that these experimental nonessential populations will occur in the affected area of the ULP lease tracts. The area of western Colorado containing the ULP lease tracts has not been block-cleared for black-footed ferrets (USFWS 2009h). If populations do occur in the vicinity of the ULP lease tracts, however, they will be considered as an endangered population under the ESA.

Primary threats to the black-footed ferret include prairie dog poisoning and shooting, canine distemper, sylvatic plague, and predation (USFWS 1988). Potential threats to black-footed ferrets or their potential habitat that may be associated with ULP activities include increased mortality due to collisions with vehicles and loss of habitat due to the construction of mining facilities and access roads.

Although the area surrounding the ULP lease tracts has not been cleared for black-footed ferrets, the species is presumably extirpated from the region. It is unlikely for populations (endangered or experimental, nonessential) of black-footed ferrets to occur in the affected area of the ULP lease tracts. For this reason, it has been determined that uranium mining under the ULP will have **no effect** on the black-footed ferret.

**3.2.1.5.2 Canada Lynx.** The Canada lynx *(Lynx canadensis)* is a medium-sized cat reaching 30 to 35 in. (76 to 89 cm) in length and weighing 18 to 23 lb (8.1 to 10.4 kg). It has large feet, long legs, tufts on its ears, and a short, black-tipped tail. During the winter, the lynx's fur is dense; it is grayish-brown mixed with buff or pale brown on the back and is grayish-white on the belly, legs, and feet. During the summer, its fur is more reddish to gray-brown (USFWS 2011k). Canada lynx prey on snowshoe hares, but if hare densities are low, they prey opportunistically on other small mammals (e.g., red squirrels, flying squirrels, ground squirrels, porcupines, beavers, mice, voles, shrews), birds, and fish (USFWS 2009f, 2011k). Home ranges are generally between 12 and 83 $mi^2$ (31 and 216 $km^2$) (USFWS 2009f). Breeding occurs in March and April for yearling females; litter sizes average three to four kittens. The male does not help with rearing the young (NatureServe 2012).

Habitat requirements of the Canada lynx include boreal forests, deciduous temperate forests, and subalpine forests that experience cold winters with deep, fluffy snow for extended periods. Hunting occurs in forests with dense understories. Denning occurs in forests where woody debris, such as logs and windfalls, provides protection for kittens (USFWS 2009f). The lynx density is lower in the contiguous United States than in Canada because of a smaller and patchier habitat range and an increased rate of competition for food (USFWS 2009f). Canada lynx in the contiguous United States occur in forested portions of Colorado, Idaho, Maine, Michigan, Minnesota, Montana, New Hampshire, New York, Oregon, Utah, Vermont, Washington, and Wisconsin. A lack of historic or current data on lynx in the contiguous United States makes it difficult to determine population estimates or trends for this region; however, the population is estimated to be fewer than 2,000 individuals (USFWS 2000; NatureServe 2012). The Canada lynx's current range (including Alaska and Canada) is estimated to be greater than 965,250 $mi^2$ (2,500,000 $km^2$) (NatureServe 2012).

The Canada lynx was listed as threatened on March 24, 2000 (USFWS 2000). On December 17, 2009, it became a candidate for federal listing in New Mexico; it was given a listing priority number of 12 because Canada lynxes regularly and frequently cross the state boundary between Colorado and New Mexico, which leaves them without federal protection in New Mexico (USFWS 2009g). A recovery plan for this species was outlined on September 14, 2005 (USFWS 2005b). On November 9, 2006, approximately 1,841 $mi^2$ (4,768 $km^2$) of habitat was designated as critical habitat for the Canada lynx (USFWS 2006b). On February 25, 2009, additional critical habitat was designated, bringing the total designated critical habitat to 39,000 $mi^2$ (101,010 $km^2$) in Maine, Minnesota, Montana, Wyoming, Idaho, and Washington (USFWS 2009f).

According to the CNHP, the nearest recorded occurrences of the Canada lynx are from Montezuma County, Colorado, approximately 35 mi (56 km) southeast of the ULP lease tracts. According to the SWReGAP habitat suitability model, potentially suitable habitat for the Canada lynx does not occur in the vicinity of the ULP lease tracts (Figure 3-6). Designated critical habitat for the Canada lynx does not occur in the vicinity of the ULP lease tracts. Given the species' preference for high-elevation coniferous forests, it is unlikely that the Canada lynx will occur in the affected area of the ULP lease tracts. For this reason, uranium mining under the ULP will have **no effect** on the Canada lynx or its critical habitat.

### 3.2.2 Candidate Species

Three species that are candidates for listing under the ESA have the potential to occur in the ULP counties evaluated in this BA. These species include one bird species, the western yellow-billed cuckoo, and two mammals, Gunnison's prairie dog and the North American wolverine. These species are discussed below. A summary of the effect determinations for these species is provided in Table 3-3.