



# Final Uranium Leasing Program Programmatic Environmental Impact Statement

Volume 3:
Appendix I: Comment Response Document

DOE/EIS-0472
March 2014



U.S. DEPARTMENT OF **ENERGY** | Legacy Management

BLM_0043235

BLM_0043236

Case No. 1:20-cv-02484-MSK   Document 39-5   filed 04/27/21   USDC Colorado   pg 3 of 124

# CONTENTS

APPENDIX I:     Comment Response Document ..................................................................... I-1

     I.1    Public Comment Process ................................................................... I-1
     I.2    Summary of Changes to the Draft PEIS ........................................... I-2
     I.3    Topics of Interest .............................................................................. I-4
     I.4    Comments and Responses.................................................................. I-16
          I.4.1    Organizations That Submitted Comments in Writing via Letter,
                 E-mail, or Web Portal or Orally at One of the Public Hearings ............... I-16
          I.4.2    Individuals Who Submitted Comments in Writing via Letter,
                 E-mail, or Web Portal or Orally at One of the Public Hearings ............... I-16
    Organizations.................................................................................................. I-23
    Members of the Public.................................................................................... I-147

# TABLES

I.1-1     Draft ULP PEIS Public Hearing Locations in Colorado, Dates, and
         Attendance ........................................................................................... I-2

I.4-1     Organizations That Submitted Comments in Writing via Letter, E-mail,
         or Web Portal or Orally at One of the Public Hearings for ULP ............................ I-17

I.4-2     Individuals Who Submitted Comments in Writing via Letter, E-mail,
         or Web Portal or Orally at One of the Public Hearings for ULP ............................ I-17

BLM_0043237

Case No. 1:20-cv-02484-MSK   Document 39-5   filed 04/27/21   USDC Colorado   pg 4 of 124

1
2
3
4
5
6
7
8
9
10
11
12           *This page intentionally left blank*
13
14
15

BLM_0043238

# APPENDIX I:

## COMMENT RESPONSE DOCUMENT

This Comment Response Document (CRD) is organized into four main sections as follows. (1) Section I.1 describes the public comment process for the *Draft Uranium Leasing Program Programmatic Environmental Impact Statement* (Draft ULP PEIS ), the procedure for managing and responding to the comments received for the Draft ULP PEIS, and a list of the dates and locations of the public hearings (see Table I.1-1). (2) Section I.2 summarizes the changes made to the ULP PEIS. (3) Section I.3 summarizes the topics of general interest associated with the PEIS as gleaned from the public comments received. (4) Section I.4 provides a compilation of all comment documents received and responses to the comments identified within each comment document.

## I.1  PUBLIC COMMENT PROCESS

A Notice of Availability (NOA) for the Draft ULP PEIS was published in the *Federal Register* on March 15, 2013 (78 FR 16483), and this began a 60-day public comment period that was to end on May 16, 2013. This comment period was later extended to May 31, 2013 (78 FR 23926), and it was subsequently re-opened on June 3, 2013 (78 FR 33090), with a closing date of July 1, 2013. The public comment period, including the extension and the re-opening, lasted 109 days. All comments received on the Draft ULP PEIS were considered in the preparation of the ULP PEIS and are presented in Section I.4.

An important part of the National Environmental Policy Act (NEPA) process involves giving the public the opportunity to provide input and comments on a Draft PEIS for consideration in the preparation of a Final PEIS. DOE issued the Draft ULP PEIS for review and comment by other Federal agencies, states, American Indian tribal governments, local governments, and the public. DOE distributed copies to those organizations and government officials known to have an interest in the PEIS and to those organizations and individuals who requested a copy. Copies were also made available on the project web site (http://www.ulpeis.anl.gov/), the DOE NEPA web site (http://energy.gov/nepa/), and in regional DOE public document reading rooms and public libraries. Announcements indicating the availability of the Draft ULP PEIS and the dates and times of the public hearings were published in local newspapers.

Each of the public hearings started with an open house that lasted about half an hour, with posters that explained the NEPA process and the alternatives and evaluations presented in the ULP PEIS. Copies of the Summary document and presentation were also made available to the public. Subject matter experts were on hand to answer any questions the public may have had as they viewed the poster display.

After the open house, DOE gave an overview of the Draft ULP PEIS, and attendees were given an opportunity to provide oral and written comments. Each oral comment presentation,

BLM_0043239

1  recorded by a court reporter as part of the hearing transcript, was considered as a comment
2  document. Written comments submitted by individuals during the hearings were likewise
3  considered to be comment documents. The transcripts for the four hearings are posted on the
4  project web site.
5
6      DOE received a total of 258 comment documents, which accounted for approximately
7  1,200 individual comments. Of the 258 comment records received, 18 were from organizations
8  or Federal or state agencies and 240 were from private citizens. Written comments were received
9  via letter, email, or through submission of a comment form provided at the public hearings or on
10 the project web site. Oral comments are included in transcripts documenting each of the public
11 hearings held on the Draft ULP PEIS (as listed in Table I.1-1).
12
13     Comment documents received were assigned a distinct identifier consisting of an
14 alphabet prefix and a number. Comment documents that were received as letters were assigned a
15 prefix of "L"; e-mails received an "E"; web comments got a "W"; and oral comments at public
16 meetings were given a "T." All comment documents received on the Draft ULP PEIS were
17 reviewed, and individual comments identified from each comment document were given a
18 distinct comment number. For example, if the comment letter that was assigned the number 1
19 had three comments identified, then the comments were given identifiers of L1-1, L1-2, and
20 L1-3, respectively.
21
22     Comments were reviewed and responses were prepared by policy experts, technical
23 subject matter experts, and NEPA experts. Comments were evaluated to determine whether
24 additional or corrected information was needed and whether additional or revised text would
25 clarify the information being conveyed. Sections that were revised to provide additional
26 information or clarification are indicated in the responses.
27
28
29 **I.2  SUMMARY OF CHANGES TO THE DRAFT PEIS**
30
31     This PEIS contains two new appendices including this one. Appendix E presents the
32 biological assessment (BA) prepared for consultation with the U.S. Fish and Wildlife Service
33 (USFWS) and the biological opinion (BO) that was issued by the USFWS. Appendix E had
34 previously presented species accounts for species listed under the Endangered Species Act, and it
35
36
37             **TABLE I.1-1  Draft ULP PEIS Public**
38             **Hearing Locations in Colorado, Dates, and**
39             **Attendance**

| Location | Date | Attendance |
|----------|------|------------|
| Grand Junction | April 22, 2013 | 52 |
| Montrose | April 23, 2013 | 40 |
| Telluride | April 24, 2013 | 54 |
| Naturita | April 25, 2013 | 22 |

BLM_0043240

1 is now material that is also discussed in the BA or Section 4.3.6.4. Appendix **I** (this appendix)
2 presents the comment response document or CRD. This appendix contains a discussion of the
3 public participation process conducted for the Draft ULP PEIS, a discussion on topics of interest
4 gleaned from the public comments received on the Draft ULP PEIS, and the comments received
5 with the corresponding responses.
6
7        In addition to the two new appendices, other changes were made to the ULP PEIS as a
8 result of comments received to clarify, add to, or correct the information that was presented in
9 the Draft ULP PEIS. Revisions made to the Draft ULP PEIS to prepare this Final ULP PEIS are
10 identified with a line on the right margin of the pages. However, this same approach
11 (i.e., providing lines on the right margin of the pages) to indicate new material was not done for
12 the two new appendices; instead, the reader is informed of this in the introductory text for the
13 given appendices. Below is a summary of the other changes made from the Draft to Final PEIS:
14
15        •    In response to comments, additional site-specific information about past
16             operations on the lease tracts was added (see Section 1.3)
17
18        •    Text describing the Purpose and Need for agency action (see Section 1.4) was
19             clarified.
20
21        •    Additional site-specific information available after the draft was issued was
22             incorporated into the analysis (see Section 4.3.5). The source documents were
23             cited and added to the reference list (see Chapter 8). No substantive changes
24             to the PEIS analysis resulted from the additional site-specific information.
25
26        •    Text was added to require, at a minimum, an Environmental Assessment to be
27             completed before approval of any mining plan (see Section 1.7). This revision
28             was made in response to public concerns that a National Environmental Policy
29             Act (NEPA) review with public participation would not be completed as
30             future mine plans are being considered.
31
32        •    The Final Biological Assessment and the Biological Opinion for the
33             Endangered Species Act or ESA consultation were completed after the Draft
34             PEIS was issued, and hence, were added to Final PEIS in an appendix (see
35             Appendix E) along with pertinent information from these documents.
36
37        •    Text was revised to provide clarifications on technical discussions pertaining
38             to human health, surface water, and cultural resource protection, based on
39             discussion with the EPA and BLM in their capacity as cooperators.
40
41        •    Text was added describing the development of a Programmatic Agreement or
42             PA to manage the process for evaluating and protecting cultural resources that
43             could be impacted by the ULP (see Chapter 6). The PA is under development
44             and will be completed before the ROD for the ULP PEIS.
45
46

BLM_0043241

1    **I.3  TOPICS OF INTEREST**
2
3          DOE has identified nine topics of interest based on the comments that were most
4    frequently received and/or the comments that indicated a broad public concern. These topics are
5    summarized in the list that follows and discussed in the text that comes after it. The order in
6    which topics are presented and discussed here does not indicate importance of one topic over
7    another.
8
9    •    PEIS analyses need to be more site-specific and more robust in scope.
10         Assumptions used need to be supported with citations.
11
12   •    Support Alternative 1, which states that DOE would terminate all leases, and
13         all operations would be reclaimed by lessees. DOE would continue to manage
14         the withdrawn lands, without uranium leasing, in accordance with applicable
15         requirements.
16
17   •    Support Alternative 4, which is DOE's preferred alternative identified in the
18         ULP PEIS. Under Alternative 4, DOE would continue the ULP with the
19         31 lease tracts for the next 10-year period or for another reasonable period.
20
21   •    Concern for NEPA-related issues, such as the appropriateness and adequacy
22         of the purpose and need described in the ULP PEIS; the adequacy of the range
23         of alternatives presented and evaluated; and the need for more specific
24         information to assure that appropriate follow-on NEPA reviews will be
25         conducted as specific mine plans are submitted for DOE approval.
26
27   •    Reclaim and clean up previously mined sites; conduct reclamation of mined
28         locations during long periods of inactivity.
29
30   •    Maintain mined uranium ore from the ULP lease tracts as a domestic supply.
31
32   •    Use the ULP lease tracts for generating renewable energy instead of uranium
33         ore production.
34
35   •    Although a long list of mitigation measures is presented in the ULP PEIS,
36         some are inadequate, and additional measures need to be included. The ULP
37         PEIS lacks a discussion on the effectiveness of the measures presented. It is
38         also not clear if some of these measures would be required and how they
39         would be implemented.
40
41   •    The cumulative impacts analysis does not cover enough area and does not
42         address some projects in the region of cumulative impacts, such as the oil and
43         gas wells present in the area. The conclusions or determinations of negligible
44         to minor potential cumulative impacts need to be re-evaluated.
45
46

BLM_0043242

1  **I.3.1  PEIS analyses need to be more site-specific and more robust in scope. Assumptions**
2        **used need to be supported with citations.**
3
4
5  **Topic Summary**
6
7        Commenters said that the analyses performed in the PEIS to estimate the impacts of the
8  program were inadequate. Many commenters asserted that the assumptions made to support the
9  analysis are arbitrary and not supported by citations. Commenters requested that more site-
10 specific data be included and evaluated so that conclusions presented can better support site-
11 specific decisions.
12
13       Many commenters were specifically concerned about the adequacy of the evaluations of
14 the impacts on human health, air quality, noise, water quality and water supply, endangered
15 species, socioeconomics, and transportation. Specifically, the concerns expressed were the
16 following: (1) human health impacts from exposure to potentially uranium-contaminated
17 "red-colored" dust some 50 or so mi (about 80 km) away from the ULP lease tracts; (2) climate
18 change impacts; (3) the Colorado River Basin and the impacts of the proposed action on water
19 quantity, water quality, and endangered Colorado River fish species; and (4) impacts on the
20 recreational activities that many people in the area enjoy, and the effects from a boom-and-bust
21 economy that might be created by the proposed action.
22
23 **Discussion**
24
25       The evaluations conducted for the PEIS were based on site-specific information (see
26 Section 1.3 for a summary of this information). The information is adequate to support the
27 alternatives evaluated and for making fully informed decisions relative to any of the alternatives.
28 Although site-specific information for future mines is not available until the lessees submit
29 specific mine plans, information is available from past mining activities (e.g., cultural resources,
30 threatened and endangered species, waste-rock and ore characteristics, and transportation
31 practices and routes) and is sufficient for supporting the analyses of potential impacts from future
32 mining activities for the five alternatives, including a thorough cumulative effects analysis.
33
34       The results of the evaluation (which incorporate site-specific information) are discussed
35 in detail in Chapter 4 and summarized in Sections 2.4.2 to 2.4.13 and Tables 2.4-4 to 2.4-9). The
36 PEIS was revised to add citations where necessary to indicate the sources for information used in
37 the PEIS analyses, including the sources consulted for developing the assumptions that were
38 used.
39
40       The human health analysis of the inhalation of dust pathway addressed potential impacts
41 from dust that could originate from the lease tracts. The analysis took into account the emission
42 potential and wind direction. This analysis (discussed in Section 4.3.5.3) indicates that inhalation
43 of dust is not a significant pathway and does not pose a health concern; that is, the potential
44 cancer risk to an individual in Telluride would be much lower than $1 \times 10^{-6}$/yr, based on the
45 estimates of risks presented in the PEIS, at a distance of 3.1 mi (5,000 m) from the lease tracts
46 and the much longer distance (greater than 3.1 mi [5,000 m]) from the lease tracts to Telluride.
47

BLM_0043243

1      Climate change was evaluated in the PEIS (see Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, and
2  4.5.1) in terms of greenhouse gases (GHGs) generated by the ULP proposed action for the five
3  alternatives, respectively. The results indicate that under all alternatives, the maximum potential
4  GHG emissions attributable to the ULP would be small. For perspective, ULP GHG emissions
5  would comprise a very small percentage of both Colorado and U.S. GHGs generated (up to
6  0.03% and 0.0005%, respectively). U.S. GHG emissions account for about one-fifth of global
7  GHG emissions, and GHG emissions from the ULP proposed action would contribute up to
8  about 0.0001% more. The amount of GHGs generated is generally used as a measure of the
9  potential impacts on climate change. ULP operations followed by power generation at nuclear
10  power plants would result in considerably smaller amounts of criteria and toxic air pollutants and
11  GHG emissions than would otherwise be released from fossil power plants. The text in the PEIS
12  has been revised (see the same sections mentioned previously) to explain further how potential
13  impacts from climate change were determined for the PEIS and what the results mean.
14
15      The evaluation of potential transportation impacts presented in this PEIS was done in
16  consultation with the Colorado Department of Transportations as reflected in Chapter 4 (see
17  Section 4.3.10 and Table 4.6-1).
18
19      The potential impacts to water depletion in the Upper Colorado watershed are evaluated
20  in this PEIS; and DOE has consulted with the USFWS with regards to how this water depletion
21  would potentially impact the Colorado four endangered fish species. PEIS text has been revised
22  to be consistent with the BA and BO (see Appendix E and Section 4.3.6.4).
23
24      DOE has initiated programmatic consultation, in compliance with Section 106 of the
25  NHPA, concerning DOE's management of the ULP. Section 106 of the NHPA requires Federal
26  agencies to consider the effect of their undertakings on historic properties and to consult with the
27  appropriate SHPO, American Council on Historic Preservation (ACHP), and other parties that
28  have an interest in the effects of the undertaking on historic properties. For the ULP, per the
29  procedure that has historically been and is currently still being carried out, DOE has addressed
30  consultation through the BLM and the lessees on specific undertakings when ULP
31  activities/plans have been proposed. However, since the NHPA allows for the utilization of a
32  programmatic agreement (PA) to govern large or complex projects, and since PAs can be used
33  when effects on historic properties are expected to be similar and repetitive or regional in scope
34  or when these effects cannot be fully determined prior to approval of an undertaking, DOE has
35  initiated the development of a PA for the ULP. DOE initiated discussion with the BLM and the
36  Colorado SHPO on May 30, 2013. The PA will be revised to address input and review from the
37  consulting parties, and then routed to the responsive parties for concurrence. DOE-LM plans to
38  have the PA in place before issuance of the ULP PEIS ROD.
39
40      See also Section I.3.2 for a discussion regarding the concern about the potential for
41  creating a boom-and-bust economy from uranium mining in the area.
42
43

BLM_0043244

1  **I.3.2  Support Alternative 1, which states that DOE would terminate all leases, and all**
2  **operations would be reclaimed by lessees. DOE would continue to manage the**
3  **withdrawn lands, without uranium leasing, in accordance with applicable**
4  **requirements.**
5
6
7  **Topic Summary**
8
9        Commenters requested that the ULP be terminated and that lessees be required to reclaim
10  their operations on their respective lease tracts. Commenters cited concerns over natural
11  resources, cultural resources, human health, transportation, and visual impacts of uranium
12  mining in Colorado for Alternatives 3, 4, and 5.
13
14        Many commenters noted that uranium mining is hazardous for human health and the
15  environment. They identified concerns about the radioactivity of waste rock piles and the safety
16  of workers and nearby residents. They also noted that mining is harmful to the environment,
17  likely to adversely affect air and water quality, and may disturb cultural resources. A few
18  commenters also noted that mining conflicted with multiple use policies and should not take
19  place on public lands.
20
21        They also noted that mining for uranium creates a boom-and-bust economic cycle and
22  that it would be preferable to promote economic growth based on more sustainable resources
23  (e.g., encourage tourism-based economic growth by promoting natural resources and aesthetics).
24  Some other commenters expressed concerns about potential increases in traffic, noise, dust, and
25  the carbon footprint.
26
27        Finally, some commenters asserted that additional uranium mining was unnecessary
28  because the United States already has a robust supply of uranium and is able to import
29  inexpensive uranium from countries like Canada and Australia.
30
31
32  **Discussion**
33
34        DOE has evaluated the range of reasonable alternatives to meet the purpose and need
35  discussed in Section 1.4. After carefully considering all public comments and the results of the
36  PEIS evaluation, DOE has retained Alternative 4 as the preferred alternative in this PEIS. See the
37  detailed discussion regarding the purpose and need in Section I.3.4 that follows.
38
39        The PEIS evaluation for potential impacts from the five alternatives as discussed in
40  Chapter 4 (the impacts are also summarized in Section 2.4) concludes that potential impacts on
41  the resource areas (including natural resources, cultural resources, human health, transportation,
42  and visual impacts) evaluated for the five alternatives generally would be negligible to moderate
43  and could be further minimized by implementing the compliance and mitigation measures and/or
44  best management practices (BMPs) described in Section 4.6 and Table 4.6-1. All three phases of
45  mining (exploration, mine development and operations, and reclamation) were evaluated for
46  Alternatives 3, 4, and 5, while only reclamation was evaluated for Alternatives 1 and 2, since

BLM_0043245

1 these two alternatives do not include continued future uranium mining. See also discussion in
2 Section I.3.1.
3
4       With regard to concerns about boom-and-bust economic cycles, the large-scale
5 development of uranium resources in the three-county area could mean the in-migration of
6 workers and their families from outside the region, producing a boom-and-bust scenario with
7 rapid growth in the population and economy, followed by equally rapid economic contraction,
8 unemployment, and out-migration. However, it is likely that all workers required for the mining
9 and reclamation activities analyzed in the PEIS would come from within the three-county area.
10 Thus, with no demographic impacts likely to occur, given the relatively small scale of
11 development under each of the alternatives, no boom-and-bust scenario would be likely to affect
12 either low-income and minority populations or the general population. In addition there is no
13 evidence to suggest that activities under the proposed ULP would have a negative effect on
14 recreation tourism.
15
16
17 **I.3.3  Support Alternative 4, which is DOE's preferred alternative identified in the ULP**
18 **PEIS. Under Alternative 4, DOE would continue the ULP with the 31 lease tracts for**
19 **the next 10-year period or for another reasonable period.**
20
21
22 **Topic Summary**
23
24       Many commenters voiced support for Alternative 4, under which DOE would continue
25 the ULP with the 31 lease tracts for the next 10-year period or for another reasonable period.
26 DOE identified Alternative 4 as its preferred alternative. Commenters cited their support of
27 uranium mining and the need to secure uranium resources. They also said that the jobs created by
28 the mining industry were beneficial to the region and its inhabitants. They noted their support for
29 the PEIS procedures and noted that the environmental impact analysis was robust. These
30 commenters said that the uranium mining was safe and had a low environmental impact and that
31 the lessees were good stewards of the environment. They mentioned that it would be preferable
32 to mine uranium in the United States, where environmental regulations are stringent and
33 enforced. Finally, they noted that nuclear energy is an important source of domestic energy
34 production.
35
36
37 **Discussion**
38
39       DOE has carefully considered all public comments and the results of the ULP PEIS
40 evaluation and has identified Alternative 4 as its preferred alternative in this ULP PEIS. The
41 potential impacts discussed in Chapter 4 are summarized in Sections 2.4.1 to 2.4.13 and in
42 Tables 2.4-4 to 2.4-9. See also the discussion in Section I.3.1. DOE believes that uranium mining
43 activities at the ULP lease tracts can continue to be conducted in a manner protective of the
44 environment and public health, as supported by the ULP PEIS analyses and results obtained. For
45 Alternative 4, mine development and operations could create about 229 direct jobs and
46 152 indirect jobs, generating about $14.8 million in income. Average unemployment for Mesa,
47 Montrose, and San Miguel Counties for 2011 was reported to be about 10.3%, 11%, and 7.6%,

BLM_0043246

1  respectively (see Section 3.8.1.1). See also the discussion in Section I.3.4 that follows regarding
2  concerns about the purpose and need discussed in Section 1.4 of the ULP PEIS.
3
4
5  **I.3.4   Concern for NEPA-related issues, such as the appropriateness and adequacy of the**
6  **purpose and need described in the ULP PEIS; the adequacy of the range of**
7  **alternatives presented and evaluated; and the need for more specific information to**
8  **assure that appropriate follow-on NEPA reviews will be conducted as specific mine**
9  **plans are submitted for DOE approval.**
10
11
12  **Topic Summary**
13
14       Many commenters identified NEPA issues in their submissions. Many commenters said
15  that the purpose and need as identified in the PEIS was inadequate. For example, some
16  commenters noted that DOE had oversimplified the Purpose and Need Statement, and, as such,
17  the alternatives identified in the PEIS were not in compliance with Congressional legislation.
18  Some commenters stated that the purpose and need requires an expansion of the scope of the
19  PEIS. Other commenters noted that the alternatives identified in the PEIS did not support the
20  Purpose and Need Statement or that the Purpose and Need Statement was inappropriate. For
21  example, one commenter noted that the Purpose and Need Statement inappropriately focuses on
22  the need to develop these reserves rather than on an analysis of whether it is the prudent time to
23  develop these reserves. Commenters requested that the Purpose and Need Statement be clarified
24  in the Final ULP PEIS.
25
26       Many other commenters mentioned that the alternatives identified in the ULP PEIS were
27  inadequate. For example, some commenters requested that a reclamation alternative, in which
28  the ULP is terminated and all disturbed areas are reclaimed, be added to the ULP PEIS. Other
29  commenters requested that an alternative that would keep the uranium ore in place until demand
30  is evident be included in the ULP PEIS. This alternative would call for current uranium demand
31  and prices, as well as projections of future uranium demand and prices, to be considered in
32  determining the number of lease tracts that are developed. Commenters requested that these
33  alternatives be included in the Final ULP PEIS.
34
35       Some commenters said that the ULP PEIS fails to satisfy NEPA because additional
36  follow-on NEPA review will not be required for future actions on the ULP lease tracts due to the
37  categorical exclusions provided under the program. To protect Federal lands, these commenters
38  requested that further NEPA reviews, or, at a minimum, an environmental assessment (EA), be
39  performed for future action on the lease tracts. Commenters said that that site-specific data
40  should be used to document the condition of the sites and the cumulative impacts of the program
41  and that future NEPA reviews consider a detailed analysis of the site-specific conditions and
42  foreseeable activities.
43
44       Other commenters voiced concerns about public participation in the ULP PEIS process.
45  Some commenters said that the public was not given sufficient time to comment on the PEIS

BLM_0043247

1  documents. Many commenters requested that the PEIS be re-done and re-released with these
2  issues addressed.
3
4
5  **Discussion**
6
7       DOE does not agree with the comments alleging that the purpose and need for the
8  proposed action requires expansion of the scope of the PEIS. As explained in PEIS Section 1.4,
9  "Purpose and Need for Agency Action," the underlying purpose and need for agency action was
10  established by the U.S. Congress in two provisions of the Atomic Energy Act (AEA):
11  42 U.S.C. § 2096, which authorized and directed DOE, among other things, to develop a supply
12  of domestic uranium; and 42 U.S.C. § 2097, which authorized DOE "to issue leases or permits
13  for prospecting for, exploration for, mining of, or removal of deposits of source material
14  [including uranium ore] in lands belonging to the United States to the extent DOE deems
15  necessary to effectuate the provisions of the AEA."
16
17       PEIS Section 1.4 follows the language of the second of those two AEA provisions
18  (42 U.S.C. § 2097) when it states that in support of those provisions, "DOE needs to determine
19  the future course of the ULP, including whether to continue leasing some or all of DOE's
20  withdrawn lands and other claims . . . for the exploration and production of uranium and
21  vanadium ores." PEIS Section 1.6, "Scope of This Draft PEIS," therefore describes the scope of
22  its analysis as the evaluation of the five alternatives for managing the ULP, and the evaluation of
23  "the three mining phases associated with the underground and surface open-pit mining methods,"
24  which "are the exploration phase, mine development and operations phase, and reclamation
25  phases." Therefore, the AEA provisions support the present scope of the ULP PEIS, and do not
26  require that the scope be expanded beyond the ULP to analyze the entire nuclear fuel cycle.
27  Further, no DOE decision to be based on this PEIS would change the nation's use of nuclear
28  fuels, including use of nuclear power reactors and management of associated radioactive
29  materials. These and other aspects of the back end of the nuclear fuel cycle are the subject of
30  numerous other NEPA reviews, including many EISs prepared by the Nuclear Regulatory
31  Commission.
32
33       The DPEIS's Purpose and Need section, in addition to citing the AEA, also cited the
34  Energy Policy Act of 2005, Public Law 109-58 (EPACT), and stated that EPACT "emphasized
35  the reestablishment of nuclear power (Sections 601 through 657)." Comments received alleges
36  that the DPEIS thereby expanded the purpose of the proposed action "through a suggestion that
37  the 2005 Energy Policy Act calls for more nuclear energy," and that the scope should be
38  expanded to include the nuclear fuel cycle for that reason. It was not DOE's intent to make that
39  suggestion in the DPEIS. The cited EPACT sections 601 through 657 constitute EPACT's
40  Title VI, entitled "Nuclear Matters," which addressed various nuclear matters and amended
41  several sections of the AEA. However, EPACT's Title VI did not "call for more nuclear energy,"
42  or amend the two provisions of the AEA that the DPEIS cited in the beginning of its Purpose and
43  Need Section: 42 U.S.C. §§ 2096-2097. In order to avoid any confusion regarding the
44  interpretation of the DPEIS's references to EPAct, DOE has amended the Purpose and Need
45  section of this PEIS, in Section 1.4, to explain that Congress expressed, in EPAct, a continued
46  commitment to "decreasing the dependence of the United States on foreign energy supplies"

BLM_0043248

1   (42 U.S.C. 16181(a)(3)); and to "[e]nhancing nuclear power's viability as part of the
2   United States energy portfolio" (42 U.S.C. §16271 (a)(1). The development of a supply of
3   domestic uranium supports the provisions of the AEA and the EPAct. However, the development
4   of a supply of domestic uranium is separate and distinct from the future utilization of nuclear
5   energy during the entire nuclear fuel cycle. The ULP is related to uranium supply, rather than to
6   future use, which is dependent upon the exact level of future demand for nuclear energy and is
7   therefore uncertain and speculative. The development of a domestic uranium supply, as
8   authorized and directed by Congress in the AEA, enables DOE to support future demand that is
9   uncertain at the present time, whatever its exact level may turn out to be in the future.
10
11   Alternative 1 evaluated in the Draft PEIS does provide a localized, in depth analysis—
12   this alternative involves the termination of the leases with reclamation at any areas requiring
13   such. DOE's land withdrawal relates to the extraction of uranium and vanadium resources from
14   the ULP lease tracts. As such, developing alternative energy is outside the scope of the ULP.
15
16   DOE does not agree with comments that the Purpose and Need Statement must specify
17   the lessee's mitigation requirements; however, the PEIS does contain a robust discussion of
18   mitigation requirements (see Section 4.6).
19
20   Regarding comments about follow-on NEPA reviews, the PEIS states in Section 1.7:
21   "After the ROD [Record of Decision] is issued, as plans (for exploration, mine development and
22   operation, and reclamation) are submitted by the lessees to DOE for approval, further NEPA
23   review for a given action would be conducted. The level of follow-on NEPA review to be done
24   (e.g., categorical exclusion determination, environmental assessment, or environmental impact
25   statement) would depend on the action being proposed by the lessees, as indicated in the plans
26   submitted. This NEPA review would be conducted to inform DOE's decision on approval of the
27   specific plans, including the conditions DOE would require to mitigate potential impacts." Based
28   on the comments received, Section 1.7 has been revised to state that for all future mining plans
29   submitted for approval, DOE will require, at a minimum, an EA with appropriate public
30   involvement to be prepared to further evaluate potential site-specific impacts. DOE will issue
31   categorical exclusion determinations for classes of actions such as routine maintenance activities
32   that DOE has determined by regulation do not have the potential to result in significant
33   environmental impacts. DOE makes its categorical exclusions publicly available on the internet.
34
35   Although some commenters said the public was not given sufficient time to comment on
36   the PEIS, DOE provided over twice the mandatory duration. The 60-day comment period
37   initially provided exceeded the required 45-day comment period. The comment period was
38   extended twice, so that the final comment period lasted for 109 days.
39
40   After deliberation, DOE determined that re-issuing of the ULP PEIS is not necessary.
41   DOE has adequately evaluated the range of reasonable alternatives and that the information and
42   analysis in the PEIS is adequate for all of the alternatives (see discussion in I.3.1 for a summary
43   of potential impacts discussed in the PEIS). DOE has reviewed the public comments and, while
44   DOE has made revisions to the document in response to comments, DOE has not made
45   substantial changes to the proposed action and no new significant information has been
46   discovered so as to warrant issuing a revised Draft ULP PEIS.

BLM_0043249

1  **I.3.5  Reclaim and clean np previously mined sites; conduct reclamation of mined locations**
2      **during long periods of inactivity.**
3
4
5  **Topic Summary**
6
7      Many commenters said that previously disturbed mining sites should be reclaimed before
8  any new mining moves forward. Commenters said that cleanup would provide the region with
9  many more jobs and lead to higher economic growth than that realized from uranium mining.
10 Some commenters voiced a preference for these types of jobs over jobs from the mining
11 industry.
12
13
14 **Discussion**
15
16     Reclamation of all legacy mines under DOE's oversight within the ULP has been
17 completed. There are currently 12 existing mines on eight lease tracts that will ultimately be
18 reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's
19 oversight or authority to reclaim. With regard to the number of jobs that could be generated from
20 the reclamation of the currently 12 existing mines on the ULP lease tracts, the estimates provided
21 in Alternative 1 (which evaluates reclamation of these 12 existing mines) indicate that up to
22 29 direct jobs and 16 indirect jobs could be generated.
23
24     Reclamation is required by Federal and state law and by provisions of the lease.
25 Consistent with state requirements, one lease holder has filed environmental protection plans
26 (EPPs), and another lease holder has submitted reclamation plans. State law requires lease
27 holders to enter Temporary Cessation (TC) if inactive for more than 180 days for an initial
28 period of 5 years. A second 5-year TC may be granted by the state. However, under no
29 circumstances shall the TC period be longer than 10 consecutive years. If TC reaches the 10-year
30 maximum, or a second 5-year period is not granted, an operator is required to either reactivate
31 for a year or fully comply with reclamation and EPP requirements.
32
33
34 **I.3.6  Maintain mined uranium ore from the ULP lease tracts as a domestic supply.**
35
36
37 **Topic Summary**
38
39     Many commenters noted in their submissions that they would prefer that uranium mined
40 in the United States not be exported to foreign governments. Some commenters voiced concerns
41 over national security interests, saying that uranium should not be sold to foreign governments to
42 prevent them from engaging in uranium enrichment activities as part of a program to develop
43 nuclear weapons. Other commenters voiced concerns over energy policy interests, saying that
44 uranium should not be exported to foreign governments because domestic nuclear energy needs
45 take precedence.
46

BLM_0043250

1    Other commenters requested that the uranium supply be maintained in the ground. These
2  commenters explained that there is no need to generate additional uranium supply because there
3  are already sufficient supplies of uranium stockpiled for domestic use. Few commenters said that
4  there was no market for uranium and others noted that this country already has a robust supply of
5  uranium. Commenters said that uranium ores should be kept in the ground until the time comes
6  when the stockpiled domestic supply needs to be augmented.
7
8
9  **Discussion**
10
11    DOE's proposed action in the PEIS does not address uranium ore exports, over which the
12  NRC, not DOE, has authority; and the scope of analysis in the PEIS does not analyze the
13  possibility that uranium ore from the ULP may be subject to export. The possibility that uranium
14  or uranium ore from the ULP may be subject to being exported does not undermine the PEIS's
15  stated purpose and need, and does not require that the PEIS's scope be expanded to analyze the
16  export of uranium or uranium ore. Any export of domestic uranium or uranium ore from any
17  source within the United States, including the ULP lease tracts, is strictly regulated by Nuclear
18  Regulatory Commission (NRC) under the terms of the AEA and the NRC regulations, which
19  impose requirements that must be satisfied before the NRC will grant a license to export any
20  domestic uranium or uranium ore. See AEA, 42 U.S.C. §§ 2099, 2151-2160d; NRC regulations,
21  10 C.F.R. §§ 110.19-110.46. For example, 42 U.S.C. § 2099 forbids the NRC from licensing any
22  person to export from the United States any uranium ore, or other source material, if the issuance
23  of such a license "would be inimical to the common defense and security" or the health and
24  safety of the public; 42 U.S.C. § 2155 gives the Executive Branch the authority to veto any
25  export of uranium ore. Many more specific requirements are imposed in the other above-cited
26  provisions of the AEA and the NRC regulations.
27
28    In addition, the possibility that uranium ore from the ULP may be subject to export, after
29  a prospective exporter goes through the process of applying for and receiving the necessary
30  permission from the NRC, does not undermine the stated purpose and need for agency action: to
31  support the AEA provisions which authorized and directed DOE to develop a supply of domestic
32  uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of
33  deposits of uranium ore in lands belonging to the United States to the extent DOE deems
34  necessary to effectuate the provisions of the AEA (42 U.S.C. §§ 2096-2097). An active ULP
35  program will be more successful in meeting that need than would an inactive program.
36
37
38  **I.3.7  Use the ULP lease tracts for generating renewable energy instead of uranium ore**
39      **production.**
40
41
42  **Topic Summary**
43
44    Some commenters said they would prefer that the land within the ULP lease tracts be
45  used to generate renewable energy. They noted that solar or wind resources were plentiful in the
46  region and that DOE should be doing more to promote renewables over nuclear energy.

BLM_0043251

1  Commenters noted that renewable energy resources such as solar and wind have less of an
2  impact on the region's environment and the health of area residents.
3
4
5  **Discussion**
6
7       The evaluation of the use of the ULP land for development of solar energy or renewable
8  energy is outside the scope of the PEIS; and is not consistent with the "Purpose and Need"
9  discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for
10 such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE
11 oversees numerous programs that are investigating and supporting a wide variety of energy
12 production technologies, including many based on renewable sources.
13
14
15 **I.3.8  Although a long list of mitigation measures is presented in the ULP PEIS, some are**
16 **         inadequate, and additional measures need to be included. The ULP PEIS lacks a**
17 **         discussion on the effectiveness of the measures presented. It is also not clear if some**
18 **         of these measnres would be required and how they would be implemented.**
19
20
21 **Topic Snmmary**
22
23       Commenters pointed out that mitigation measures identified in the ULP PEIS were
24 inadequate or requested that additional mitigation measures be added to the ULP PEIS. Several
25 commenters said that the buffer zone around the Dolores River was inadequate and requested
26 that it be expanded. Commenters noted several other mitigation measures that needed to be
27 strengthened or modified. For example, one commenter noted that to mitigate radionuclides from
28 blowing onto residences, it would be necessary not only to cover the waste rock piles with soil
29 but also to spray the soil with water or some other barrier. Commenters were also concerned
30 about the enforceability of the mitigation measures. They noted that resources would best be
31 protected if lessees were required to undertake the identified mitigation measures.
32
33
34 **Discussion**
35
36       As indicated in Section 4.6, measures that are identified as compliance and mitigation
37 measures would be implemented because they are required by law (compliance measures) or
38 have been identified to minimize potential impacts (mitigation measures) as included in the
39 leases. The ULP PEIS also indicates that mitigation measures that are currently not in the leases
40 would be included as leases are modified. Implementation of the compliance and mitigation
41 measures would be under the oversight of the corresponding oversight agencies. DOE is
42 responsible for assuring that lease requirements are met and thus would enforce mitigation
43 measures in leases.
44
45

BLM_0043252

1  **I.3.9  The cumulative impacts analysis does not cover enough area and does not address**
2  **some projects in the region of cumulative impacts, such as the oil and gas wells**
3  **present in the area. The conclusions or determinations of negligible to minor**
4  **potential cumulative impacts need to be re-evaluated.**
5
6
7  **Topic Summary**
8
9        Many commenters said that the cumulative impacts analysis was inadequate.
10  Commenters noted that some information was not included in the cumulative impacts analysis,
11  such as the impacts that could result from climate change and oil and gas activities. Other
12  commenters noted that the cumulative impacts analysis did not address the impacts from the
13  Piñon Ridge Mill. Commenters said the ULP PEIS lacked a detailed cumulative impacts study;
14  excluded an investigation of long-term economic development, transportation corridors, and
15  public health; and failed to consider the combined impacts of all past and present uranium
16  activities in this region. Commenters requested that these analyses be performed for the final
17  issuance of the ULP PEIS.
18
19
20  **Discussion**
21
22        DOE has reviewed the analysis of cumulative impacts in light of these comments to
23  ensure that it is adequately comprehensive to provide a basis for informed, environmentally
24  sound decision making.
25
26        GHG emissions attributable to the ULP would be small (see discussion in I.3.1). Climate
27  would not be expected to adversely affect ULP activities, including successful reclamation, or
28  the impacts of ULP activities on resource areas, which are conservatively estimated in this PEIS.
29
30        Oil and gas projects within the 50-mi (80-km) ROI considered in the PEIS are discussed
31  and evaluated in Section 4.7.2.4. A total of 3,121 wells are located within the ROI studied, as
32  shown in Figure 4.7-2. Table 4.7-8 summarizes potential impacts in the ROI during exploration
33  and future development of oil and gas lease parcels. The cumulative impacts evaluation in
34  Section 4.7.2.2 did analyze all past and present uranium activities within the 50-mi (80-km) ROI.
35  The proposed Piñon Ridge Mill is also evaluated relative to cumulative impacts, since it is within
36  the 50-mi (80-km) ROI addressed in this PEIS. Section 4.7.1.1 describes the Piñon Ridge Mill
37  project and its potential impacts on the environment and human health as discussed in reports
38  prepared by Energy Fuels. This information was then incorporated into Section 4.7.4 to
39  determine the cumulative impacts for this ULP PEIS.
40
41        Studies on long-term economic development, transportation corridors, and public health
42  as suggested by these commenters are not within the scope of this ULP PEIS. However, this ULP
43  PEIS does conservatively analyze the time frame for addressing the life-cycle of the proposed
44  action (i.e., considered the 10-year or longer time that mining activities could occur under the
45  lease terms), and it considers cumulative impacts from all reasonably foreseeable future actions
46  with the 50-mi (80-km) ROI under cumulative impacts.

BLM_0043253

1   **I.4  COMMENTS AND RESPONSES**
2
3          All comment documents received by DOE on the Draft ULP PEIS are provided in this
4   section. Each comment document received was assigned a comment document identifier. Oral
5   comments given at the public hearings were documented via transcripts prepared for each
6   hearing. Excerpts from the transcripts containing the oral comments provided by each
7   commenter at the hearings are also presented in this section. The transcripts can be found in their
8   entirety on the project web site at http://www.ulpeis.anl.gov/.
9
10         Comment documents received were organized into two categories. Section I.4.1 contains
11   all the comment documents received from organizations, and Section I.4.2 contains all comment
12   documents received from individual members of the public. At the beginning of each section in
13   Sections I.4.1 and I.4.2, a corresponding table that lists all of the organizations or individuals
14   from whom comment documents were received is included for reference. In these sections, a
15   side-by-side format is used, in which the comments identified from each comment document are
16   shown on the left side of the pages and the corresponding DOE responses are shown on the right
17   side of the pages.
18
19
20   **I.4.1  Organizations That Submitted Comments in Writing via Letter, E-mail, or Web**
21          **Portal or Orally at One of the Public Hearings**
22
23         Table I.4-1 tabulates all organizations (in alphabetical order) that submitted comments,
24   along with the comment document identifiers assigned to each. Comments identified within each
25   comment document are shown in brackets on the left side of the page(s), with the corresponding
26   response shown on the right side of the same page(s). The comment documents and responses
27   are presented at the end of Section I.4.
28
29
30   **I.4.2  Individuals Who Submitted Comments in Writing via Letter, E-mail, or Web Portal**
31          **or Orally at One of the Public Hearings**
32
33         Table I.4-2 tabulates all individuals (in alphabetical order) who submitted comments,
34   along with the comment document identifiers assigned to each. Comments identified within each
35   comment document are shown in brackets on the left side of the page(s), with the corresponding
36   response shown on the right side of the same page(s). The comment documents and responses
37   are presented at the end of Section I.4.

BLM_0043254

1
2
3

**TABLE I.4-1 Organizations That Submitted Comments in Writing via Letter, E-mail, or Web Portal or Orally at One of the Public Hearings for ULP**

| Name | Comment Document No. |
|---|---|
| Bureau of Land Management, Tres Rios Field Office | L33 |
| Citizens for Clean Air | L44 |
| Cotter Corporation | L50 |
| Curecanti Medical Society | L45 |
| Department of the Interior | L38 |
| Dolores River Coalition | L46 |
| Energy & Conservation Law | L47 |
| Hopi Tribe | L1 |
| Lower Colorado River Water Quality Partnership | L39 |
| Mesa County Department of Public Services | L32 |
| Montrose County | T29 |
| Montrose County, Board of County Commissioners | L3 |
| San Miguel County Board of Commissioners | L41 |
| Town of Telluride | L53 |
| U.S. Environmental Protection Agency, Region 8 | L43 |
| Uranium Watch and Living Rivers | L48 |
| Western Colorado Congress | L49 |
| Western Small Miners Association | L36 |

4
5
6
7
8

**TABLE I.4-2  Individuals Who Submitted Comments in Writing via Letter, E-mail, or Web Portal or Orally at One of the Public Hearings for ULP**

| Name | Comment Document No. |
|---|---|
| Acker, Thomas | T3 |
| Adams, Francine | E94 |
| Adamson, Susie | T20 |
| Allen, Chris | L10 |
| Andersen, Lori | E74 |
| Anderson, Gordon | E59 |
| Anderson, Gordon | E97 |
| Applegate, Josh | L16 |
| Arrington, Bob | E108 |
| Aubert, Josh | L22 |
| Bachman, Hether | E43 |
| Baker, Jefferson | L23 |
| Ballantyne, Marvin | T25 |
| Barford, Denise | E79 |
| Bennett, Jan | W16 |
| Beverly, Robert G. | L2 |

9

BLM_0043255

TABLE I.4-2  (Cont.)

| Name | Comment Document No. |
|------|----------------------|
| Boeschenstein, Bennett | E30 |
| Boling, Ashley | T42 |
| Bowen, Sandra | E2 |
| Brannon, Lee | E122 |
| Brouillette, Carrie | L24 |
| Brown, Charla | E31 |
| Brown, Charla | E56 |
| Brown, Charla | E117 |
| Brown, David | L5 |
| Brown, Ruthie | E12 |
| Cale, Dave | T9 |
| Callies, Lori | E78 |
| Cascade, Robyn | E49 |
| Case, Dudley | E4 |
| Cassidy, Michael | E107 |
| Catlin, Barbara | E32 |
| Chamberlin, Judith | W10 |
| Chowen, Carole | E8 |
| Clay, Margaret | E18 |
| Clow, Scott | T51 |
| Collins, Kami | L25 |
| Collins, Mark | T13 |
| Colt, Summer | L8 |
| Congour, David | E28 |
| Congour, David | E93 |
| Coombs, Mary | E37 |
| Cooper, Hilary | T47 |
| Cort, George | W7 |
| Cort, George | W14 |
| Cort, George | W18 |
| Coulter, Sara | E65 |
| Crawford, Dave | T27 |
| Crocker-Bedford, Cole and Kara-Lynn | L37 |
| Cunningham, Kirk | E96 |
| Daniels, Mel | E84 |
| Davidian, Jerry | W19 |
| Davison, John | E87 |
| de Bivort, Lawry | T48 |
| Delaney, Betty | E69 |
| Deuter, Catherine | E54 |
| Dix, Deborah | W15 |
| Douglas, A. Paul | E38 |
| Douglas, A. Paul | E80 |
| Dye, Angela | T40 |
| Edge, Kristine | E61 |
| Ekenrode, Carol | L6 |
| Ellis, Ryan | T5 |

BLM_0043256

TABLE I.4-2  (Cont.)

| Name | Comment Document No. |
|---|---|
| Ernst, Robert | E47 |
| Esty, Jon and Rosemary | E3 |
| Evans, Russell | E9 |
| Evans, Russell | E67 |
| Evans, Russell | E115 |
| Fenn, Virgil | T7 |
| Field, Sally | E113 |
| Fraser, Frances | E13 |
| Gabow, Bruce | E45 |
| Galloway, Danny | E58 |
| Galloway, Danny | E102 |
| Glynn, David | T45 |
| Goin, Wayne | E129 |
| Golden, Marcia | E40 |
| Gray, Dick | E57 |
| Gray, Dick | E99 |
| Green, Robert | E101 |
| Greene, Howard | E1 |
| Greene, Howard | E16 |
| Greene, Nicole | E24 |
| Greene, Nicole | E68 |
| Grieger, Shawna | L26 |
| Grossman, Robert | L51 |
| Hallenberg, Steven | T21 |
| Hallenborg, Lesley | E116 |
| Hallenborg, Steven | E123 |
| Halpern, Stuart | E95 |
| Harrison, Zackoree | E17 |
| Harrison, Zackoree | E90 |
| Hayes, Joe | E36 |
| Hayes, Joe | E105 |
| Hazelhurst, Sean | L11 |
| Heinrich, Mindi | L27 |
| Heuscher, Penny | E120 |
| Hiatt, Nina | E5 |
| Hiatt, Nina | E70 |
| Hiatt, Nina | E91 |
| Hills, Penny | T14 |
| Hoffmann, John | W5 |
| Hoodwin, Marcia | E111 |
| Hornback, Emily | E26 |
| Hutcheson, Lorraine | L28 |
| Johnson, Janet | T8 |
| Jones, David | W11 |
| Joy, Jay | E44 |
| Justice, Susan | E89 |
| Kanter, Holly | L17 |

BLM_0043257

**TABLE I.4-2  (Cont.)**

| Name | Comment Document No. |
|---|---|
| Keller, JR | L18 |
| Kemper, Katie | E50 |
| Kendall, Don | L19 |
| Kllanxhja, Piera | W6 |
| Kllanxhja, Piera | E35 |
| Kllanxhja, Piera | E118 |
| Kllanxhja, Piera | E119 |
| Kolachov, Nick | T50 |
| Konola, Claudette | T11 |
| Krute, Robert | E39 |
| Krute, Robert | E77 |
| Leas, Rebecca | E81 |
| Lee, Carol | E85 |
| Leeds, Frank | E127 |
| Leonard, Betsy | E10 |
| Leonard, Betsy | E62 |
| Light, Paul | E55 |
| Livingston, Catherine | E51 |
| Lobato, Tony | T53 |
| Lohmiller, Bruce | L4 |
| Lyne, Beverly | T1 |
| Magoon, Janet | E64 |
| Magtutu, Gabe | E103 |
| Mallard, Angela | L52 |
| Maragon, Lisa | E41 |
| Maragon, Lisa | E76 |
| Marquardt, Michael | E34 |
| Marvel, Gail | W4 |
| May, Joan | T49 |
| McKenney, Tom | E88 |
| McTavish, Jodie | T16 |
| Mercer, Karen | E66 |
| Michaelis, Karen | E14 |
| Miller, Glen | T6 |
| Miller, Linda | T41 |
| Mitchell, Dennis | T19 |
| Moreng, Joseph | E33 |
| Myers, Chris | T33 |
| Name Withheld | W2 |
| Name Withheld | W9 |
| Name Withheld | L27 |
| Niederkruger, Eric | T4 |
| Oakes, Meagan | W17 |
| Oday, Ky | L12 |
| Oglesby, Betty | T23 |
| Olmstead, Dennis | E104 |
| Palmer, Shauna | T34 |

BLM_0043258

**TABLE I.4-2  (Cont.)**

| Name | Comment Document No. |
| --- | --- |
| Parish, Barbara | E71 |
| Parker, Jennifer | W8 |
| Parker, Jennifer | T36 |
| Parker, Jennifer | L13 |
| Parker, Randy | T35 |
| Parker, Tehri | E25 |
| Peterson, Catherine | T37 |
| Pfaff, Kristin | T2 |
| Phillips, Benita | E121 |
| Phillips, Benita | T12 |
| Pierce, Carol | W3 |
| Prendergast, Jim | E7 |
| Quade, Wayne | T28 |
| Radley, Rad | E46 |
| Rahmann, Susan | L35 |
| Ramey, James | E109 |
| Reams, John | T54 |
| Rechel, Eric | T10 |
| Redmond, Mary | E53 |
| Rensenbrink, Willy | E92 |
| Rice King, Karen | E42 |
| Riddell, Jim | T26 |
| Ries, Erin | L7 |
| Roberts, Gary | E73 |
| Robinson, Rita | E21 |
| Rogers, Don | E22 |
| Rogers, Don | E75 |
| Rogers, Missy | E126 |
| Rozycki, Mike | T39 |
| Rupp, Marjorie | E52 |
| Sadowski, Vicki | T31 |
| Safken, Melody | E83 |
| Safken, Melody | E128 |
| Saftler, Michael | T44 |
| Sandberg, Nick | W12 |
| Sands, Ed | E29 |
| Saunders, Bob | T32 |
| Savant, Sam | W13 |
| Schoettler, Joanne | E82 |
| Schofield, Mark | E15 |
| Sharp, Rod | L20 |
| Siglin, Patrick | T18 |
| Smith, Wally | T24 |
| Stettner, Paul | E11 |
| Stettner, Paul | E63 |
| Stucklen, Deborah | W1 |
| Syldona, Maria | E6 |

BLM_0043259

TABLE I.4-2  (Cont.)

| Name | Comment Document No. |
|---|---|
| Szilagyi, Paul | T38 |
| Taylor, Kristin | L9 |
| Taylor, Linda | E124 |
| Terrill, Nancy | E27 |
| Terry, Noalani | E72 |
| Terry, Noalani | E106 |
| Thompson, Donald | E110 |
| Thompson, Jane | T57 |
| Thurston, Jennifer | T43 |
| Townsend, Carl | E48 |
| Turner, Greg | L29 |
| Unfred, Alisa | L14 |
| Unfred, Craig | L15 |
| van West, Rein and Jan | E86 |
| van West, Rein and Jan | E112 |
| Vandersloot, George | T30 |
| Vanek, Jolana | E114 |
| Varecha, Debbie | E98 |
| Wallace, Troy | T56 |
| Wetzel, Angela | L21 |
| Wheels, Kim | E125 |
| White, Carolyn | L40 |
| Wickham, Roger | L42 |
| Williams, Glen | T22 |
| Williams, Glen | T46 |
| Williams, Glen | T55 |
| Wilson, Kylynn | L30 |
| Wilson, Mary Lou | L31 |
| Wizer, Joyce | E19 |
| Wizer, Joyce | E20 |
| Wong, Choi | T15 |
| Wood, Linda | E100 |
| Woodward, Joan | T17 |
| Yoho-Wikse, Nicholas | T52 |
| Ziegler, Cynthia | E23 |
| Ziegler, Cynthia | E60 |

1
2

BLM_0043260

1
2
3
4
5
6
7
8
9
10
11
12
13                          **ORGANIZATIONS**
14

BLM_0043261

Case No. 1:20-cv-02484-MSK   Document 39-5   filed 04/27/21   USDC Colorado   pg 28 of 124

1
2
3
4
5
6
7
8
9
10
11
12
13        *This page intentionally left blank*
14
15

BLM_0043262

**Bureau of Land Management, Tres Rios Field Office, Commenter ID No. L33**

ULP PEIS DRAFT COOPERATORS REVIEW RECORD

| Reviewer<br>James Blair | | James_blair@blm.gov |
|---|---|---|
| BLM, Tres Rios FO | 970-882-6862 | 5/17/13 |

| Comment No. | Page No./Line No. | Reviewer's Comments and Recommendation | Comment Resolution |
|---|---|---|---|
| 01 | S-12 All | Good table. Thanks. | |
| 02 | 6-73 – Footnote 5 | States that the "final radioactive fuels license" is Energy Fuels "main asset". This may not be true, since Energy Fuels acquired many, if not all of Denison Mines assets, including several mines and an operating Mill in White Mesa Utah. | |
| 03 | 3-194/29 | "43mi (69 mi)" should probably be miles/kilometers | |

1

L33-1

L33-2

L33-3

L33-1    Comment noted. DOE appreciates the effort by BLM as a cooperating agency for the ULP PEIS process.

L33-2    The descriptor "main" has been revised to "an" - the footnote now reads: "…issued a final radioactive materials license to Energy Fuels Resources Corporation (which is an asset of Ontario's Energy Fuels Resources, Inc., located in Lakewood, Colorado),….".

L33-3    This has been corrected to 69 kilometers.

BLM_0043263

**Bureau of Land Management, Tres Rios Field Office, Commenter ID No. L33 (Cont.)**

L33-4   Replaced "prevents" with "reduces" per comment.

**DRAFT ULP PEIS (Dated May 2013) COOPERATORS REVIEW RECORD**

| Reviewer Linda Reed | | | Reviewer's Email lreed@blm.gov | |
|---|---|---|---|---|
| Reviewer's Organization BLM | | Reviewer's Phone 970 240 8322 | Date 4.18.13 | |
| Comment No. | Page No./ Line No. | Reviewer's Comments and Recommendation | Comment Resolution | |
| 1 | 4-299, Line 30 | Replace the word "prevents" with "reduces" | | L33-4 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

1

## Citizens for Clean Air, Commenter ID No. L44

June 28, 2013

Mr. Raymond Plieness
ULP PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy

Dear Mr. Plieness,

Regarding the Uranium Leasing Program (ULP) Programmatic Environmental Impact Statement (PEIS), members of *Citizens for Clean Air* are writing to voice our concerns on the uranium leasing of 25,000 acres in three counties, including our own Mesa County.

Our air shed is under considerable strain from a number of activities other than the proposed uranium resource development. Currently, ozone levels are hovering dangerously close to violating health and safety standards set by the EPA, threatening the air we breathe. The chemical VOC and NOx ozone precursors produced by oil and gas operations make the industry the greatest polluter.
The DOE preferred Alternative No. 4 states that potential impacts to regional ozone would not be of concern (line 17, 23,41). We strongly disagree; the potential impacts concern us. We cannot afford even a small percentage of additional VOCs and NOx caused by uranium mine development. We are already at risk of non-attainment status, which would put us under the control of federal authority.

L44-1

In addition, the DOE preferred Alternative No. 4 states that air quality impacts of PM10 and PM 2.5 emissions from mine development are estimated to be about 3.0% and 1.3% of the three-county total emissions (2.4.1 lines 12,13,14 pg.237). Last winter, a record 47 days of cold air inversions affected Grand Junction, Delta and Montrose residents below 6,000 feet. During that period, air quality levels exceeded federal standards of safety due to high concentrations of PM 10 and PM 2.5, recorded by the Mesa County Health Department. In addition to oil and gas industry contributions, the culprits were vehicle emissions, wood burning stoves, and other open burning emissions. Even small amounts of additional particulates due to uranium operations would be unacceptable, due to our current status of near non-attainment.

L44-2

A 2011 report on the Public Health Impacts of Uranium Mining conducted by the Southern Environmental Law Center supports our concerns. The report states that "The waste generated by uranium mining and milling contains many hazardous and toxic substances, including radon, selenium, molybdenum, uranium and thorium," and that "Radon released from mining and milling wastes and in the mines themselves poses a risk of lung cancer to both mine workers and surrounding communities."

L44-3

---

L44-1    For ozone, an area is considered to be in attainment of the National Ambient Air Quality Standards (NAAQS) when the 3-year average of the annual 4th highest daily maximum 8-hour ozone concentration at a site is less than or equal to 0.075 ppm (73 FR 16436, Mar 27, 2008). Currently, all counties encompassing the ULP lease tracts are designated as unclassifiable/attainment area. The nearest $O_3$ nonattainment areas include Denver metropolitan area and the Upper Green River Basin (UGRB) in southwest Wyoming, which includes the entire Sublette County, east-central Lincoln, and northwestern Sweetwater Counties. In 2012, the UGRB was designated as a marginal nonattainment area related to wintertime high ozone.

Ozone is primarily a summertime pollutant. The conditions conducive to high ozone concentrations typically include high temperature, low wind speeds, intense solar radiation, and an absence of precipitation. However, high ozone concentrations have recently been observed in several western rural areas during winter months, even when temperatures are below freezing and lower solar radiation prevails.

Air quality modeling indicated that these high-ozone incidents during wintertime result from several factors: elevated wintertime solar radiation due to the higher elevation and enhanced by high albedo of snow cover; shallow mixing layer below temperature inversion; no or few clouds; stagnant or light winds; and abundant ozone precursors (such as $NO_x$ and VOCs) from existing oil and gas development activities. Topographic and meteorological conditions around the ULP lease tracts are similar to those in Sublette County, Wyoming. Thus, elevated wintertime ozone is likely where high ozone-induced meteorological conditions prevail and ozone precursor emissions are abundant. Recently, ozone monitoring has begun in northwestern Colorado (e.g., Garfield and Rio Blanco Counties) and northeastern Utah (e.g., Uintah County), for which monitored ozone levels frequently exceed NAAQS mostly during winter months.

There are several $O_3$ monitoring stations south of I-70 along the state boundary between Colorado and Utah (EPA 2013), which have elevations similar to ULP lease tracts ranging 5,000-8,000 ft. Monitoring data at these stations exceed NAAQS on occasion only in the summer months and does not show any sign of wintertime high ozone.

In the three counties with typical rural setting, VOCs emissions occur everywhere where the atmospheric chemistry is in the $NO_x$ limited. For $NO_x$, on-road vehicular emissions account for slightly over 30%, followed by point sources and oil and gas-related emissions at about 22% each. As discussed in the Draft PEIS, ozone precursor emissions from ULP activities are estimated to be a small fraction of those that occur in the three ULP counties (up to 2.3%) and scattered over a wide area (about 50-mi stretch). These potential emissions from the ULP lease tracts could slightly increase the ozone levels but would be a minor contributor to total ozone levels in the area.

Lyman, S., and H. Shorthill (editors), 2013, *Final Report: 2012 Uintah Basin Winter Ozone & Air Quality Study*, Feb. 1. Available at http://rd.usu.edu/files/uploads/ubos_2011-12_final_report.pdf.

EPA (U.S. Environmental Protection Agency), 2013, *AirData, Access to monitored air quality data from EPA's Air Quality System (AQS) Data Mart*. Available at http://www.epa.gov/airdata/index.html

L44-2    For $PM_{10}$, an area is considered to be in attainment of the National Ambient Air Quality Standards (NAAQS) when 24-hour $PM_{10}$ concentrations are not exceeded over150 μg/m³ more than once per year on average over 3 years. For $PM_{2.5}$, an area is considered to be in attainment of NAAQS when 3-year average of 98th percentiles is lessthan 35 μg/m³. Currently, all

BLM_0043265

**Citizens for Clean Air, Commenter ID No. L44 (Cont.)**

As citizens, we recognize the need to be accountable for our personal contributions to air pollution due to home energy consumption, vehicle exhaust, wood burning, etc. *Citizens for Clean Air* is working locally to improve and implement existing regulations. At the same time, we expect and entrust the DOE to protect our right to breathe clean air. We feel that impacts to air quality have not been sufficiently considered in the PEIS, and urge the DOE to conduct a more comprehensive study on long-term impacts.

L44-3 (Cont.)

Finally, our area has still not recovered fully from the negative effects of a history of uranium mining and milling; mine reclamation has not been completed, leaving troublesome toxic soils, water contamination, and mill tailings resulting in fugitive air emissions.

Until a more comprehensive study of impacts on long-term air pollution is conducted by the DOE, we do not feel the implementation of the ULP is warranted.

L44-4

In the meantime, we strongly support reclaiming existing mines before initiating further uranium extraction activities.

Sincerely,

Karen Sjoberg
Chair
Citizens for Clean Air
c/o 514 Rado Dr. #F
Grand Junction, CO 81507

counties encompassing the ULP lease tracts are designated as unclassifiable/attainment areas. The nearest PM ($PM_{10}$ and $PM_{2.5}$) nonattainment areas include Wasatch Front in Utah, including Salt Lake City, Provo, and/or Ogden.

In the summertime, high wind events can lead to unusually high PM values. In addition, high PM values tend to occur during wintertime temperature inversions. Air quality trends are difficult to evaluate because meteorological conditions play a large role in the data collected from year to year. That is why the standard is evaluated over three-year period.

Per PM data for Grand Junction, elevated $PM_{10}$ concentrations are observed during warm months (EPA 2013). In contrast, elevated $PM_{2.5}$ concentrations tend to occur during cold months. Presumably $PM_{10}$ peaks are related to natural dust events while $PM_{2.5}$ peaks are associated with temperature inversion and emissions from vehicles, road sanding, wood-burning stoves, and other open burning emissions. Wood-burning and open burning restriction program and vehicle emissions inspection and maintenance program could relieve PM loadings into the atmosphere.

Most ULP activities would occur during daytime hours when air dispersion is favorable and thus potential impacts of these activities would be minimal associated with nighttime temperature inversion except for prolonged snow cover as the case is in wintertime high ozone. As discussed in the DPEIS, PM emissions from ULP activities are estimated to be a small fraction of those in three ULP counties total (up to 3.2%) and scattered over a wide area (about 50-mi stretch). As a result, these emissions from ULP lease tracts can slightly increase PM levels but become a minor contributor to total PM levels in the area.

L44-3    DOE has reviewed the analysis of air quality to assure that it is adequately comprehensive to provide a basis for informed, environmentally sound decision making.

This Final PEIS contains additional information about potential radon releases (see Sections 4.3.5, 4.4.5, and 4.5.5). DOE is required to meet Federal, state and local regulatory requirements for implementing DOE's preferred alternative. Mitigation measures have also been identified in this PEIS that would prevent or minimize potential impacts to air quality. Impacts to air quality from the range of reasonable alternatives for the ULP Program have been evaluated in Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, and 4.5.1. Cumulative impacts to air quality and human health are discussed in Section 4.7. Controls are in place to mitigate health impacts on uranium mine workers. The PEIS evaluated potential risk to workers and members of the general public (on-site recreationist and off-site residents). This evaluation made use of state-of-the-art models and health science information recommended by the EPA to estimate the radon emission rates associated with mining operations and the primary health risks of concern, the latent life-time cancer risks, for such evaluations. DOE's analysis likely overestimates human health impacts because the emission estimates were based on conservative assumptions that would yield higher radiation exposures. The results discussed in the PEIS indicate that for the peak year scenarios described in the PEIS, when conducted in compliance with applicable regulatory requirements, the identified mitigation measures can be implemented in a manner that is protective of human health and the environment.

L44-4    DOE has evaluated the potential impacts for 13 environmental resource areas (including air quality) and human health for the five alternatives considered to be the range of reasonable alternatives presented in the PEIS. DOE considers the evaluation to be adequate in supporting all five alternatives. See also discussion in Section I.3.2.

DOE has considered the results of the PEIS evaluation and the comments received on the Draft PEIS in identifying Alternative 4 as DOE's preferred alternative. Alternative 4 provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period.

BLM_0043266

**Citizens for Clean Air, Commenter ID No. L44 (Cont.)**

Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

BLM_0043267

## Cotter Corporation, Commenter ID No. L50



Robert Tuchman
Direct: 303/866.0645
Fax: 303/335.3945
robert.tuchman@bryancave.com

June 28, 2013

**Via U.S. Mail and E-mail ulpeis@anl.gov**

Mr. Raymond Plieness
ULP PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

Re:  Cotter Corporation (N.S.L.)'s Comments on the U.S. Department of Energy's
    Draft Uranium Leasing Program Programmatic Environmental Impact
    Statement

Dear Mr. Plieness:

This letter is submitted on behalf of Cotter Corporation (N.S.L.) ("Cotter") as part of the public comment process on the U.S. Department of Energy's ("DOE") draft Uranium Leasing Program Programmatic Environmental Impact Statement ("Draft PEIS"), dated March 2013. DOE requested comments on the Draft PEIS in its Notice of Availability of the Draft Uranium Leasing Program Programmatic Environmental Impact Statement ("NOA"), dated March 15, 2013, and stated it would accept comments through May 16, 2013. 78 Fed. Reg. 16,483, 16,484 (March 15, 2013). Subsequently, DOE extended the deadline for submitting comments on the Draft PEIS to May 31, 2013, 78 Fed. Reg. 23,926 (April 23, 2013), and then to July 1, 2013. 78 Fed. Reg. 33,090 (June 3, 2013).

First of all, thank you for providing Cotter with this opportunity to submit comments on the Draft PEIS, and for the efforts DOE has made in studying the Uranium Leasing Program ("ULP"), analyzing its impacts, and preparing the Draft PEIS. DOE has dedicated extensive resources to this work, which is appreciated by Cotter.

Cotter is submitting these comments because it has a strong interest in the ULP, and supports the program's continuation. Cotter has been in the business of processing and mining uranium and vanadium since 1956. Important to Cotter's business is developing and operating its uranium/vanadium properties in western Colorado, which include mines on the following ULP lease tracts: 6, 7, 8, 9, 11, 13A, 18, 21, and 25 ("Cotter Lease Tracts") Cotter is the current lessee of these lease tracts. *See* Draft PEIS at Tables 1.2-1 and 2.2-2. As DOE is also aware, combined recoverable reserves at the Cotter Lease Tracts are substantial. *See* Draft PEIS at

**Bryan Cave HRO**
1700 Lincoln Street, Suite 4100
Denver, CO 80203-4541
Phone (303) 861-7000
Fax (303) 866-0200
www.bryancave.com

**Bryan Cave LLP**
Atlanta
Boulder
Charlotte
Chicago
Colorado Springs
Dallas
Denver
Frankfurt
Hamburg
Hong Kong
Irvine
Jefferson City
Kansas City
London
Los Angeles
New York
Paris
Phoenix
San Francisco
Shanghai
Singapore
St. Louis
Washington, DC

**Bryan Cave**
**International Consulting**
*A Trade and Customs Consultancy*
www.bryancaveconsulting.com
Bangkok
Beijing
Jakarta
Kuala Lumpur
Manila
Shanghai
Singapore
Tokyo

L50-1

L50-1  Comment noted. DOE has reviewed the comments submitted by Cotter Corporation, has incorporated the information from the EPPs and the recommended corrections to PEIS text (see Responses to L50-13 to L50-22, and L50-25 to L50-28).

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness                                    Bryan Cave HRO
June 28, 2013
Page 2

Table 1.2-2 (estimating 8,310,010 pounds of uranium ore reserves at the nine Cotter Lease Tracts). Without the ULP, those ore reserves would not be mined in the foreseeable future, which would deny Cotter, the United States, and the region substantial economic benefits, as well as the benefits of clean electricity generation and other uses. Moreover, for over 30 years, Cotter has invested considerable sums in its mines to extract resources, to develop and maintain mine facilities, to explore for and define ore resources, and to ensure future mining opportunities when metals prices recover. Those investments would be lost if DOE were to discontinue the ULP and terminate Cotter's leases.

Given Cotter's strong interest in the ULP, and the significant benefits that will accrue to the public, the economy, and the region if the ULP is continued, Cotter respectfully requests that DOE review these comments, and incorporate them into the PEIS and the administrative record for these proceedings. Cotter may supplement these comments as it obtains additional information through the environmental impact statement process.

Cotter's comments are organized in two sections. The first section contains comments that are of a general nature. The second section contains page-specific comments organized by page number of the Draft PEIS.

### I.   GENERAL COMMENTS

#### A.   DOE Should Continue the ULP.

DOE's proposed action is to "decide whether to continue the ULP and, if it decides to continue the ULP, to determine which alternative to adopt in order to manage the ULP." Draft PEIS at 1-29. Compelling reasons exist to continue the ULP, as explained more fully below.

A threshold reason for continuing the ULP is to enable production of the substantial uranium and vanadium ore reserves remaining at the ULP's existing lease tracts. DOE estimates that 13.0 to 13.5 million pounds of uranium ore reserves remain at those lease tracts. Draft PEIS at Table 1.2-2, 2-32. It also estimates that over one-half of these reserves (8,310,010 pounds of uranium) exist at the Cotter Lease Tracts. *Id.* These estimates are supported by Cotter's own calculations showing millions of pounds of uranium and vanadium reserves at the Cotter Lease Tracts. Without the ULP, the remaining ore reserves would not be mined in the foreseeable future, which would result in a lost economic opportunity of substantial magnitude for Cotter, other mining companies, the public, the United States, and western Colorado. As to Cotter alone, the losses from terminating the ULP would be severe. Cotter would lose the future revenue from mining the millions of pounds of uranium and vanadium at the Cotter Lease Tracts. As indicated above, Cotter would also lose the opportunity to recover the substantial sums that it has invested in its mines over a period spanning more than 30 years. Forcing Cotter to incur these losses would be especially unfair given that Cotter has lease agreements with DOE covering each of the Cotter Lease Tracts, and is authorized by such lease agreements to mine and remove the uranium and vanadium at each lease tract. Draft PEIS at Table 1.2-1 and A-5 ("DOE does hereby lease the Property to the Lessee, for the purposes of exploring for, developing, mining, and removing deposits of uranium, vanadium, and associated minerals . . .").

L50-1
(Cont.)

L50-2

L50-2   DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of DOE's preferred alternative for the PEIS. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS. DOE also notes the report that Cotter Corporation attached with its comment letter as Exhibit 1. DOE has read this 2013 report (*Critical Analysis of World Uranium Resources: U.S. Scientific Investigations Report 2012-5239 authored by Susan Hall and Margaret Coleman*), but has not included it with this Appendix to conserve resources. DOE has reviewed the attachment and has noted the excerpts included in the comment.

BLM_0043269

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness                                    **Bryan Cave HRO**
June 28, 2013
Page 3

Cotter has relied on these lease agreements in making its expenditures in the mines and in developing its business and permitting plans.

The public will benefit substantially from the continuation of the ULP.  DOE joined recently with the U.S. Department of the Interior to analyze the world uranium supply and demand balance. Hall, Susan, and Coleman, Margaret, 2013, Critical Analysis of World Uranium Resources:  U.S. Scientific Investigations Report 2012-5239 (attached hereto as Exhibit 1).  The agencies found that "Global concerns about greenhouse gases, rising fossil-fuel prices, the need for additional energy in developing countries and energy security support the development of additional nuclear capacity."  *Id.* at 10.  However, the agencies also found that "mine development is proceeding too slowly to fully meet requirements for an expanded nuclear power reactor fleet in the near future (to 2035), and unless adequate secondary or unconventional resources can be identified, imbalances in supply and demand may occur."  *Id.* at 1; *see also id.* at 33.  The ULP contributes to the development of additional nuclear capacity and to reducing imbalances in uranium supply and demand.  Conversely, terminating the ULP would undermine those objectives.

The benefits of continuing the ULP include reducing our country's dependence on foreign sources of uranium and thereby increasing its energy independence.  Uranium has a critical role in power production in the United States, as approximately 20% of our nation's electricity comes from nuclear power plants.  *Id.* at 9.  DOE's Energy Information Administration explains:  "Nuclear power plays an important role in U.S. electricity, with 101 gigawatts (GW) of capacity accounting for 19% of electricity generation in 2012."  *See* U.S. Energy Information Administration, "Long-term outlook for nuclear generation depends on lifetime of existing capacity," dated April 25, 2013, available at http://www.eia.gov/todayinenergy/detail.cfm?id=10991 (attached hereto as Exhibit 2).  However, uranium is also a limited domestic resource, as the United States imports most of the uranium it uses. As explained in the above-referenced U.S. Scientific Investigations Report 2012-5239, "Following recent trends, most uranium purchased in the United States in 2009 (86 percent) originated from foreign producers, while 14 percent originated from U.S. mining operations . . . ."  U.S. Scientific Investigations Report 2012-5239 at 9.  *See also* Colorado Geological Survey, "Energy Resources – Uranium," available at http://geosurvey.state.co.us/energy/Uranium/Pages/Uranium.aspx (last updated Sept. 19, 2012) (reporting that the United States is the "world's largest generator of nuclear power," but over 90% of our uranium must be imported) (attached hereto as Exhibit 3).  Continuation of the ULP will make millions of pounds of domestically sourced, high-quality uranium available to our nation, and thereby reduce its dependence on foreign sources of this critical mineral.  *See* Draft PEIS at 2-71 (reporting that, for Alternative 4, the DOE's preferred alternative, "approximately 480,000 tons/yr of uranium ore would be removed from the DOE ULP lease tracts for processing at the mills and ultimately used for various energy purposes.").

The ULP will create economic benefits for western Colorado and the nation.  Depending on the alternative selected, DOE estimates that mining development and operational activities under the ULP would create direct employment of up to approximately 253 people during peak years and up to approximately 152 additional indirect jobs.  Draft PEIS at 4-148, 4-205, 4-207, 4-245.  Further, uranium mining under the ULP would produce millions of dollars in income.  *Id.*  These benefits will not occur if the ULP is terminated.  The continuation of the ULP would also generate substantial

L50-2
(Cont.)

L50-3

L50-3        Comment noted. See Response to L50-2.

**Cotter Corporation, Commenter ID No. L50 (Cont.)**

Mr. Raymond Plieness                                           Bryan Cave HRO
June 28, 2013
Page 4

royalties for the United States. While the Draft PEIS does not estimate the royalties that would be paid to the United States if existing ore reserves are mined, the dollar amount of such royalties should total in the millions. *See id.* at Table 1.1-1 (reporting that royalties generated from the production of 8.0 million pounds of uranium and 41.2 million pounds of vanadium in the DOE's previous three leasing programs totaled $ 62.9 million). Conversely, no royalties would be paid if the ULP is terminated.

Another compelling reason for continuing the ULP is the recent licensing of the Piñon Ridge Uranium Mill in western Montrose County, Colorado. *See* Colorado Department of Public Health and Environment, "Piñon Ridge Uranium Mill license application meets state regulatory requirements," dated April 25, 2013, available at http://www.colorado.gov/cs/Satellite/CDPHE-Main/CBON/ 1251641879212 (attached hereto as Exhibit 4). With the construction of that mill, "[a] surge in uranium exploration, mining, and permitting is anticipated . . ." Draft PEIS at 4-267. The mill is also expected to process ore from five to nine mines at any one time. *Id.* The economic benefits of this anticipated surge would be reduced substantially if the ULP is terminated and many of the feeder mines for the mill are thereby closed.

Based on the above, significant benefits will accrue to Cotter, other mining companies, the public, western Colorado, and our nation if the ULP is continued. Cotter therefore encourages DOE to continue that program.

**B.    Of the Alternatives Presented in the Draft PEIS, Cotter Supports Alternative 4 as the Final Preferred Alternative for the ULP.**

The Draft PEIS analyzes five alternatives for managing the ULP. Under Alternative 1, DOE would terminate all leases of ULP lands, and all operations would be reclaimed by lessees, with DOE continuing to manage the ULP lands. Draft PEIS at 2-1, 2-17, 2-19. No uranium leasing of the ULP's 31 existing lease tracts would occur now or in the future under this alternative. *Id.* Alternative 2 is the same as Alternative 1, except once reclamation is completed by lessees, DOE would relinquish the lands for potential management by the U.S. Bureau of Land Management ("BLM") in accordance with 43 C.F.R. Part 2370. *Id.* at 2-1, 2-21. If the U.S. Department of the Interior and BLM then determine that the lands are suitable to be managed as public domain lands, they would be managed by BLM under its multiple use policies. *Id.* DOE's ULP would end. *Id.* However, private parties, such as Cotter, could establish new uranium mining claims under the 1872 mining law. *Id.* at 2-21. Under Alternative 3, DOE would continue the ULP as it existed before July 2007, with the 13 active leases (including the Cotter leases),[1] for the next ten-year period or for another reasonable period, and DOE would terminate the remaining ULP leases. *Id.* at 2-1, 2-21, 2-23. Under Alternative 4, DOE would continue the ULP with the 31 existing lease tracts for the next ten-year period or for another reasonable period. *Id.* at 2-1. This alternative assumes that all 31 lease tracts would be available in the future for potential exploration and mining of uranium ores. Draft PEIS at 2-27. Further, leases on

---

[1] The 13 leases before July 2007 were for lease tracts 5, 6, 7, 7A, 8, 9, 11, 13, 13A, 15, 18, 21, and 25. Draft PEIS at 2-21. Lease tracts 7 and 7A were subsequently combined into lease tract 7. *Id.* Accordingly, under Alternative 3, only 12 lease tracts would continue to exist. *Id.*

L50-3
(Cont.)

L50-4

L50-4    Comment noted. DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of DOE's preferred alternative for the PEIS. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

BLM_0043271

Final ULP PEIS

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness                                    Bryan Cave HRO
June 28, 2013
Page 5

the ULP lease tracts would be continued for the next ten years or for another reasonable period, as appropriate. *Id.* Alternative 5 is the "No Action Alternative" under which DOE would continue the ULP with the 31 existing lease tracts for the remainder of the ten-year period on existing leases, and the leases would continue exactly as they were issued in 2008. *Id.* at 2-1. DOE projects that, under Alternative 5, all existing ULP leases would expire in 2021. *Id.* at 2-31.

In the NOA, DOE states that its "preferred alternative" is Alternative 4. 78 Fed. Reg. at 16,485; *see also* Draft PEIS at 2-72 (same). Of the alternatives presented in the Draft PEIS, Cotter strongly supports Alternative 4 as the final preferred alternative for the ULP, and encourages DOE to select that alternative. Cotter's reasons are identified below.

**Alternative 4 best fulfills the underlying purpose and need for DOE action.** Of the alternatives presented in the Draft PEIS, Alternative 4 best fulfills the "underlying purpose and need for agency action" identified in the Draft PEIS. This purpose and need is to "support the implementation of the Atomic Energy Act (AEA) (42 U.S.C. §§ 2096-2097), which authorized and directed DOE to develop a supply of domestic uranium and to issue leases for the mining of uranium and other source materials to effectuate the provisions of the AEA, and the implementation of the Energy Policy Act of 2005 (Public Law (P.L.) 109-58), which emphasized the reestablishment of nuclear power (Sections 601 through 657)." Draft PEIS at 1-27, 1-29. Alternative 4 fulfills this purpose and need by continuing the ULP with the 31 existing lease tracts, and thereby allowing DOE to continue to "develop a supply of domestic uranium." In contrast, terminating all ULP leases and ending DOE's uranium leasing program, as contemplated under Alternatives 1 and 2, would not "support the implementation of the AEA, "develop a supply of domestic uranium," "effectuate the provisions of the AEA," or advance the "reestablishment of nuclear power." Accordingly, those alternatives should not be selected. While Alternatives 3 and 5 would allow the ULP to continue in effect, they either limit the number of ULP leases that may remain in effect or restrict their duration. Those alternatives, therefore, do less to support the implementation of the AEA and to develop a supply of domestic uranium than does Alternative 4. For this reason, of the alternatives presented in the Draft PEIS, DOE should select Alternative 4 to manage the ULP.

**Alternative 4 best protects all lessees' rights in their ULP leases.** As explained above and in the Draft PEIS, Cotter is the current lessee of nine lease tracts managed under the ULP. Draft PEIS at Table 1.2-1. Other mining companies have leased additional lease tracts managed under the ULP. *Id.* Although each of the ULP leases has been stayed by order of the United States District Court for the District of Colorado, *Colorado Environmental Coalition v. Office of Legacy Management*, 819 F. Supp. 2d 1193, 1224 (D. Colo. 2011), the leases have not been terminated and have years remaining before the lease terms expire. *See* Draft PEIS at 2-31, A-5, and A-29. Alternative 4 protects all lessees' rights in their ULP leases by authorizing each of the leases to continue for the next ten years and then authorizing extensions of the leases. *Id.* at 2-27, 2-71 ("For Alternative 4, the leases would also likely be extended on a lease-by-lease basis."). In contrast, Alternatives 1 and 2 do not protect

L50-4
(Cont.)

L50-5   L50-5   Same response as L50-4.

L50-6   L50-6   See response to L50-4.

Appendix I: Comment Response Document

BLM_0043272

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness                                    Bryan Cave HRO
June 28, 2013
Page 6

lessees' rights in their leases because they require that DOE prematurely terminate all ULP leases.[2] *Id.*
at 2-1. Accordingly, DOE should not select those alternatives. Alternative 5 does not fully protect
Cotter's and other lessees' rights in their ULP leases because it does not authorize extensions of the
leases. *Id.* at 2-31, 2-71. Under Alternative 3, DOE would continue with exploration, mine
development and operations, and reclamation at the 13 ULP lease tracts for which leases existed prior
to July 2007, but would terminate the leases on the remainder of the ULP lease tracts. *Id.* at 2-1, 2-21.
Alternative 3 therefore falls short in protecting the rights of lessees holding such terminated leases.
Of the five alternatives presented in the Draft PEIS, Alternative 4 therefore best protects all lessees'
rights in their ULP leases.

**Alternative 4 allows Cotter and other lessees the opportunity to recover their
investments.** Cotter also supports Alternative 4 because it allows Cotter the opportunity to recover
the substantial sums that it has invested in the Cotter Lease Tracts. For over 30 years, Cotter has
invested such sums to: explore for and define ore resources; prepare the sites for mining; build and
maintain mine and storm water structures; produce ore; and conduct other mine operations. More
recently, Cotter has invested substantial sums in its lease tracts to satisfy the new permitting
requirements of the State of Colorado, including preparing environmental protection plans ("EPPs"),
drainage design plans, storm water management plans, mine plans, and other studies; collecting
geologic and environmental data; and submitting Amendment Applications ("Amendments") to the
Colorado Division of Reclamation, Mining and Safety ("Division"). Specifically, on September 30,
2011, the Division wrote to Cotter and requested that it submit EPPs and Amendments for its mines
on the Cotter Lease Tracts by October 1, 2012. After hiring two engineering firms and spending
considerable sums, Cotter timely complied with the Division's requests. This expense and effort
continue as Cotter responds to the Division's adequacy review questions on the Amendments. By
authorizing Cotter's ULP leases to continue in effect and to be extended, Alternative 4 allows Cotter
the opportunity to recover its investments in the Cotter Lease Tracts.

In contrast to Alternative 4, each of Cotter's ULP leases would terminate under Alternatives 1
and 2. Those alternatives would therefore deny Cotter the opportunity to recover the substantial
sums it has invested in the Cotter Lease Tracts, and should not be selected. Alternative 5 would limit
Cotter's recovery of its investments because it would not authorize extensions of Cotter's ULP leases.
Draft PEIS at 2-31, 2-71. Accordingly, Alternative 5 should not be selected. Under Alternative 3,
DOE would continue with exploration, mine development and operations, and reclamation at the 13
ULP lease tracts for which leases existed prior to July 2007, but would terminate the leases on the
remainder of the ULP lease tracts. *Id.* at 2-1, 2-21. Alternative 3 therefore falls short in protecting the
investments of lessees that hold such terminated leases.

---

[2] The Draft PEIS does not cite to legal authority that would authorize DOE to prematurely terminate
the ULP leases in these circumstances. Cotter does not here concede that such authority exists, and
reserves rights to challenge any attempt by DOE to prematurely terminate the Cotter leases.

L50-6
(Cont.)

L50-7

L50-7     See response to L50-4.

BLM_0043273

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Pheness                                   Bryan Cave HRO
June 28, 2013
Page 7

**Alternative 4 allows Cotter and other lessees the opportunity to recover the ore reserves at the ULP lease tracts.** Cotter supports Alternative 4 because it allows Cotter the opportunity to recover the substantial uranium and vanadium reserves at the Cotter Lease Tracts. As explained above and in the Draft PEIS, DOE estimates that those lease tracts contain 8,310,010 pounds of uranium ore reserves. Draft PEIS at Table 1.2-2. The vanadium ore reserves in the Cotter Lease Tracts are also substantial. By authorizing each of Cotter's ULP leases to remain in effect for ten years and to be extended, Alternative 4 allows Cotter the opportunity to recover such ore reserves.

Alternatives 1 and 2 would not allow recovery of any additional ore reserves, as all ULP leases would terminate under those alternatives. The economic harm from such lost opportunity would be significant. Accordingly, those alternatives should not be selected.

Alternative 5 would restrict Cotter's ability to recover the ore reserves at its lease tracts. Under Alternative 5, the lease period for a given lease is the remainder of the ten-year period in the lease with no extensions of the lease possible. Draft PEIS at 2-31, 2-71. Due to the shorter lease period, the number of years available for mining operations and ore generation under Alternative 5 (DOE assumes five years) is considerably less than under Alternative 4 (DOE assumes an "operational period" of ten years with extensions likely on a lease-by-lease basis). *Id.* at 2-25, 2-29, 2-71, 2-72. If restricted to the shorter lease period, Cotter would likely not have sufficient time to exhaust all ore reserves in its mines, and could be required to prematurely shut down mine activities and to commence termination and reclamation. DOE recognized this potential limitation in its discussion of why it preferred Alternative 4 over Alternative 5. *See* Draft PEIS at 2-72 (recognizing that the shorter period of time for mining operations and ore generation associated with Alternative 5 could mean that the ore in some of the mines might not be exhausted by the time the leases expired). Accordingly, Alternative 4 should be selected over Alternative 5.

Alternative 3 allows Cotter the opportunity to recover uranium and vanadium reserves at the Cotter Lease Tracts. Alternative 3 would nonetheless deny other mining companies, and thereby the State and the country, the opportunity to obtain the benefits of mining the ore reserves at their lease tracts if a ULP lease for that tract did not exist before July 2007. In that latter case, DOE would terminate the existing lease. Draft PEIS at 2-21.

**Alternative 4 will benefit the public.** Of the alternatives presented in the Draft PEIS, Alternative 4 will do the most to benefit the public. As explained above, DOE joined recently with the U.S. Department of the Interior to analyze the world uranium supply and demand balance, and found that "Global concerns about greenhouse gases, rising fossil-fuel prices, the need for additional energy in developing countries and energy security support the development of additional nuclear capacity." U.S. Scientific Investigations Report 2012-5239 at 10 (attached hereto as Exhibit 1). However, the agencies also found that "mine development is proceeding too slowly to fully meet requirements for an expanded nuclear power reactor fleet in the near future (to 2035), and unless adequate secondary or unconventional resources can be identified, imbalances in supply and demand may occur." *Id.* at 1; *see also id.* at 33. Alternative 4 contributes to the development of additional nuclear capacity and to reducing imbalances in uranium supply and demand by continuing the ULP

L50-8

L50-8   Comment noted. DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of DOE's preferred alternative for the PEIS. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

L50-9

L50-9   See response to L50-8.

Final ULP PEIS

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness
June 28, 2013
Page 8

Bryan Cave HRO

with the 31 lease tracts. Conversely, terminating all or a portion of the ULP leases, as would be true under Alternatives 1, 2, and 3, would undermine those objectives.

Alternative 4 would also reduce our country's dependence on foreign sources of uranium. As explained above, nuclear power accounts for about 20% of domestic U.S. generation of electricity. *Id.* at 9. Despite this significant reliance on nuclear power, most of our country's uranium is imported. *Id.*; *see also* Colorado Geological Survey, "Energy Resources – Uranium," available at http://geosurvey.state.co.us/energy/Uranium/Pages/Uranium.aspx (last updated Sept. 19, 2012) (attached hereto as Exhibit 3). While this imbalance in uranium supply has not become a "significant problem," it "could soon become a problem as more nuclear power plants are built around the world, as world supplies become more constrained, and as prices of uranium rise." Colorado Geological Survey, "Energy Resources – Uranium," available at http://geosurvey.state.co.us/energy/Uranium/Pages/Uranium.aspx (last updated Sept. 19, 2012) (attached hereto as Exhibit 3). By authorizing all ULP leases to continue, and thereby encouraging additional domestic uranium production, Alternative 4 would reduce our country's dependence on foreign sources of uranium.

L50-9
(Cont.)

Alternative 4 would also create economic benefits for western Colorado and our nation. Mining development and operational activities under Alternative 4 would create direct employment of 229 people during peak years and 152 additional indirect jobs. Draft PEIS at 2-49, 4-205, 4-207. Further, uranium mining under Alternative 4 would produce $14.8 million in income. *Id.* These benefits will not occur if all ULP leases are terminated, as contemplated by Alternatives 1 and 2. Alternative 4 would also generate substantial royalties for the United States. Conversely, no royalties would be paid if all ULP leases are terminated and the ULP is terminated.

**Summary.** Of the alternatives presented in the Draft PEIS, DOE should select Alternative 4 to manage the ULP. Alternative 4 best fulfills the purpose and need of the proposed action. Further, it would authorize each of the ULP leases to continue in effect and to be extended, and thereby would best preserve all lessees' rights in their ULP leases, and allow Cotter and other ULP lessees an opportunity to recover their investments in the ULP leases. It would also best allow Cotter and other ULP lessees an opportunity to exhaust the ore reserves at the ULP lease tracts. Such operations would also benefit the public interest by supporting the development of additional nuclear capacity, reducing our country's dependence on foreign sources of uranium, and creating economic benefits for western Colorado and our nation.

L50-10

L50-10    See response to L50-8

### C.    Cotter's EPPs Contain Measures to Minimize Potential Impacts from ULP Mining Activities.

Cotter is committed to conducting exploration on, and mining, the Cotter Lease Tracts in an environmentally sound manner. To the extent environmental impacts may arise, the Draft PEIS identifies ways they can be minimized or eliminated such as through "compliance measures, mitigation measures, or best management practices . . . ." Draft PEIS at 2-33, 4-251 to 4-265. DOE expects such measures and practices to minimize or reduce the potential impacts identified in the Draft PEIS. Draft PEIS at 4-251, 4-304.

L50-11

L50-11    Site-specific information provided in the EPPs prepared by Cotter Corporation has been incorporated into the PEIS. See Section 1.3 for a summary.

Appendix I: Comment Response Document

BLM_0043275

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness
June 28, 2013
Page 9

Bryan Cave HRO

In its discussion of compliance measures, DOE recognizes that the Division requires uranium mining companies to obtain permits for their mining operations and to submit and follow an EPP. *Id.* at 4-264. In these EPPs, "[r]unoff and run-on are specifically addressed on a site-by-site basis, as are issues concerning hydrology and reestablishment of vegetation." *Id.* DOE's discussion nonetheless does not analyze or otherwise reference any specific EPP that Cotter or other lessees have submitted to the Division to protect any of the ULP lease tracts and related resources.

**L50-11 (Cont.)**

For each of the Cotter Lease Tracts, Cotter has submitted to the Division an EPP and related measures in compliance with Colorado's Hard Rock/Metal Mining rules for protection of the environment. The EPPs evaluate the potential impacts of Cotter's future mining activities on the environment, and propose measures to minimize or eliminate those impacts. In addition to the EPPs, Cotter has submitted drainage design plans, storm water management plans, geotechnical stability reports, emergency response plans, and other relevant studies, data, and maps. Cotter procured this information at great expense and effort, and believes the implementation of these plans will protect the environment and human health.

Cotter's EPPs and related plans and studies support DOE's expectation that the compliance measures, mitigation measures, and best management practices identified in the Draft PEIS will minimize or reduce the potential impacts identified in the Draft PEIS. *See* Draft PEIS at 4-251, 4-304. Thus, the impacts referenced in Chapters 2 and 4 of the Draft PEIS serve as an upper bound of potential impacts arising from the ULP. Actual impacts should be less and, in certain cases, will be negligible or non-existent. DOE confirms this point in its discussion of cumulative impacts:

> [t]he potential incremental impacts of the five alternatives are based on conservative assumptions and mostly do not take credit for measures (compliance measures, mitigation measures, and BMPs) that would minimize the potential impacts. Hence, it is expected that the potential incremental impacts of the ULP would be less than those summarized in Table 4.7-12, since such measures would be implemented as required by project-specific mine plans and permits. For this reason, the overall incremental impact of the ULP alternatives is expected to be negligible.

*Id.* at 4-312 n.7.

**L50-12**

**L50-12**   See response to L50-11. The site-specific information presented in EPPs prepared by Cotter Corporation is consistent with input information used in the analyses for the PEIS.

### II.   PAGE-SPECIFIC COMMENTS

#### Chapter 1

**Page 1-13, Section 1.2.3, Paragraph 1.**

**Comment.** Section 1.2.3 provides site-specific information on eight of the 31 lease tracts where "existing permitted mines" are located. These lease tracts are identified in the Draft PEIS as 5, 6, 7, 8, 9, 11, 13, and 18. Cotter wishes to clarify that permitted mines also exist on lease tracts 13A, 21, and 25. While land has been reclaimed at those lease tracts, Cotter's reclamation permits for the SR-13A Mine, LP-21 Mine, and CM-25 Mine are effective and in good standing with the Division.

**L50-13**

**L50-13**   This section of the PEIS has been revised per comment. Same for next 9 comments.

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness                                    Brass Cave HRO
June 28, 2013
Page 10

**Page I-16, Section I.2.3.2, Paragraph 3.**

**Comment.** The third sentence of paragraph three in section 1.2.3.2 reports that "Production [at the JD-6 Mine] continued through November 2005, at which time mining was suspended and the mine was placed on standby status." Cotter respectfully submits that mining was not suspended at the JD-6 Mine in November 2005. Cotter continued to ship ore from the JD-6 Mine in 2006, and the mine was regulated as intermittently active up to December 15, 2012. Cotter also did not place the JD-6 Mine on standby status in November 2005. Accordingly, Cotter respectfully requests that DOE replace the third sentence of paragraph three in section 1.2.3.2 with the following: "Production and/or ore shipments from the mine continued into 2006."

**Page I-18, Section I.2.3.3, Paragraph 2.**

**Comment.** With respect to the JD-7 underground mine, the final sentence of paragraph two in section 1.2.3.3 reports "This work continued through November 2005, at which time development activities were suspended and the mine was placed on standby status." Cotter respectfully submits that development activities were not suspended at the JD-7 underground mine in November 2005. Cotter built storm water catchment ponds and diversion ditches at the mine in 2011, and the mine was regulated as intermittently active to December 15, 2012. Cotter also did not place the JD-7 underground mine on standby status in November 2005. Accordingly, Cotter respectfully requests that DOE replace the final sentence of paragraph two in section 1.2.3.3 with the following: "This work continued through November 2005."

**Page I-18, Section I.2.3.3, Paragraph 3.**

**Comment.** To provide a more complete summary of mining activity at the JD-7 Pit Mine, Cotter respectfully requests that DOE insert the following sentence immediately prior to the final sentence of paragraph 3 in section 1.2.3.3: "Mining activities subsequently resumed at the mine, which included in-pit development drilling from 1991 through 1993 and 1996 through 2004, and other activities through the third quarter of 2011."

**Page I-20, Section I.2.3.4, Paragraph 2.**

**Comment.** With respect to the JD-8 Mine, the fifth sentence of paragraph 2 in section 1.2.3.4 reports "The first ore shipment from the [JD-8] mine was made in June 2005 and production continued through November 2005, at which time mining was suspended and the mine was placed on standby status." Cotter respectfully submits that mining was not suspended at the JD-8 Mine in November 2005. Cotter continued to ship ore from the JD-8 Mine in 2006, and additional mining activities were subsequently conducted at the mine. Further, Cotter did not place the JD-8 Mine on standby status in November 2005. Accordingly, Cotter respectfully requests that DOE replace the fifth sentence of paragraph 2 in section 1.2.3.4 with the following: "The first ore shipment from the mine was made in June 2005, and production and/or ore shipments continued to 2006."

| L50-14 | L50-14 | This section of the PEIS has been revised per comment. |
| L50-15 | L50-15 | This section of the PEIS has been revised per comment. |
| L50-16 | L50-16 | This section of the PEIS has been revised per comment. |
| L50-17 | L50-17 | This section of the PEIS has been revised per comment. |

BLM_0043277

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness                                    Bryan Cave HRO
June 28, 2013
Page 11

### Page 1-23, Section 1.2.3.5, Paragraph 1.

**Comment.** With respect to the JD-9 Mine, the third sentence of the first paragraph on page 1-23 reports "Mine production activities continued through November 2005, at which time mining was suspended and the mine was placed on standby status." Cotter respectfully submits that mining was not suspended at the JD-9 Mine in November 2005. Cotter continued to ship ore from the JD-9 Mine in 2006, and additional mining activities were conducted at the mine in 2011. The Division also regulated the mine as intermittently active up to December 15, 2012. Further, Cotter did not place the JD-9 Mine on standby status in November 2005. Accordingly, Cotter respectfully requests that DOE replace the third sentence of the first paragraph on page 1-23 with the following: "The mine continued to operate and/or ship ore into 2006."

L50-18

L50-18   This section of the PEIS has been revised per comment.

### Page 1-23, Section 1.2.3.6, Paragraph 3.

**Comment.** With respect to the SR-11 Mine, the third and fourth sentences of paragraph three in section 1.2.3.6 report "Mine development work [at the SR-11 Mine] began almost immediately and continued through November 2005, at which time mining activities were suspended and the mine was placed on standby status. At that time, the decline had been advanced approximately 250 ft (76 m)." Cotter respectfully submits that mining activities were not suspended at the SR-11 Mine in November 2005. Mining activities were conducted at the mine in 2010 and 2011, and the mine was regulated as intermittently active up to December 15, 2012. Cotter also did not place the SR-11 Mine on standby status in November 2005. Further, as of November 2005, the decline at the SR-11 Mine had been advanced approximately 300 feet. Accordingly, to provide a more complete summary of mining activity at the SR-11 Mine, Cotter respectfully requests that DOE replace the third and fourth sentences of paragraph three in section 1.2.3.6 with the following: "Mine development work began almost immediately and continued through November 2005. At that time, the decline had been advanced approximately 300 feet."

L50-19

L50-19   This section of the PEIS has been revised per comment.

### Page 1-27, Section 1.2.3.8, Paragraph 2.

**Comment.** With respect to the SM-18 Mine, the sixth and seventh sentences of paragraph two in section 1.2.3.8 report "The mine was placed on standby status and remained so until October 2000. At that time, Cotter submitted a reclamation plan for a portion of its mining operations on Lease Tract 18." To provide a more complete summary of mining activity at the SM-18 Mine, Cotter respectfully requests that DOE replace the sixth and seventh sentences of paragraph two in section 1.2.3.8 with the following: "The mine was placed on standby status and remained so until 1990 when its permit status was revised to intermittently active. In October 2000, Cotter submitted a reclamation plan for a portion of its mining operations on Lease Tract 18."

L50-20

L50-20   This section of the PEIS has been revised per comment.

### Page 1-27, Section 1.2.3.8, Paragraph 3.

**Comment.** The fourth sentence of paragraph three in section 1.2.3.8 reports "Mining [at the SM-18 Mine] was suspended in November 2005 and the mine was placed on standby status." Cotter respectfully submits that mining activity was not suspended at the SM-18 Mine in November 2005.

L50-21

L50-21   This section of the PEIS has been revised per comment.

BLM_0043278

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness                                    Bryan Cave HRO
June 28, 2013
Page 12

Cotter continued to produce and/or ship ore from the mine in 2006, and additional mining activities were conducted at the mine in 2011. The Division has also regulated the mine as intermittently active into 2013. Further, Cotter did not place the SM-18 Mine on standby status in November 2005. Accordingly, Cotter respectfully requests that DOE replace the fourth sentence of paragraph 3 in section 1.2.3.8 with the following: "These shipments of lease tract ore from the mine continued into 2006."

L50-21
(Cont.)

### Chapter 2

#### Page 2-19, Section 2.2.1, Note b.

**Comment.** The first sentence of note b on page 2-19 reports "In early November 2005, when the mine on Lease Tract 11 was shut down, Cotter Corporation had disturbed just less than 5 acres (2 ha) and had advanced the decline approximately 330 ft (100 m)." Cotter respectfully submits that mining activities were not shut down at the SR-11 Mine in November 2005. Mining activities were conducted at the mine in 2010 and 2011, and the mine was regulated as intermittently active up to December 15, 2012. Further, as of November 2005, the decline at the SR-11 Mine had been advanced approximately 300 feet. Accordingly, to provide a more complete summary of mining activity at the SR-11 Mine, Cotter respectfully requests that DOE replace the first sentence of note b with the following: "In early November 2005, when construction of the decline was temporarily suspended, Cotter Corporation had disturbed just less than 5 acres (2 ha) and had advanced the decline approximately 300 ft (91 m)."

L50-22

L50-22    This section of the PEIS has been revised per comment.

#### Page 2-48, Section 2.4.6.4, Paragraph 2.

**Comment.** This paragraph reports that ULP activities under Alternative 3 "are likely to adversely affect" and "would likely adversely affect" the Colorado River endangered fish species and their critical habitat. These statements appear to be inconsistent with pages 2-65, 4-133 to 4-135, and 4-144, which report that ULP activities under Alternative 3 "are not likely to adversely affect" the Colorado River endangered fish species and their critical habitat. Please clarify DOE's position on this issue.

L50-23

L50-23    PEIS text has been revised in the pertinent sections in Chapter 2 and 4 consistent with the BA and BO ( see Appendix E for the BA and BO).

#### Page 2-65, Table 2.4-7.

**Comment.** The summary of Alternative 3's impacts on "Threatened, Endangered, and Sensitive Species" reports that ULP activities under Alternative 3 may affect, but are not likely to adversely affect, the Colorado River endangered fish species and their critical habitat." As explained above, DOE's statement appears to be inconsistent with DOE's statements on page 2-48, section 2.4.6.4, paragraph 2, which report that ULP activities under Alternative 3 "are likely to adversely effect" and "would likely adversely affect" the Colorado River endangered fish species and their critical habitat. Please clarify DOE's position on this issue.

L50-24

L50-24    See response to L50-23.

BLM_0043279

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness    Bryan Cave HRO
June 28, 2013
Page 13

### Chapter 3

**Page 3-189, Section 3.7.4.1, Table 3.7-5.**

**Comment.** The permit status of the LP-21, JD-9, JD-7, JD-6, SR-13A, SR-11, JD-7 Pit, and JD-8 Mines has recently changed to temporary cessation. By order dated May 7, 2013, the Colorado Mined Land Reclamation Board ("MLRB") accepted Cotter's Notices of Temporary Cessation for the LP-21, JD-9, JD-7 (includes JD-7 Pit and JD-7 Underground), JD-6, SR-13A, and SR-11 Mines. On May 15, 2013, the MLRB accepted Cotter's Notice of Temporary Cessation for the JD-8 Mine.

### Chapter 4

**Page 4-170, Section 4.3.11.2, Paragraph 1.**

**Comment.** The tenth and eleventh sentences in paragraph one of section 4.3.11.2 report "Of the lease tracts that would continue under Alternative 3, eight (5, 6, 7, 8, 9, 11, 13, and 18) have existing permitted mines. There are nine mines in these eight tracts." Cotter respectfully submits that lease tracts 13A, 21, and 25 also have existing permitted mines. While land has been reclaimed at those mines, Cotter's reclamation permits for the SR-13A Mine, LP-21 Mine, and CM-25 Mine are effective and in good standing with the Division.

Also, the thirteenth sentence of section 4.3.11.2 reports "At three lease tracts (13A, 21, and 25), exploratory drilling has been completed and land has been reclaimed, but there are no permitted mines." For the reason discussed above, the clause "but there are no permitted mines" should be deleted from DOE's statement.

**Page 4-170, Section 4.3.11.2.1, Paragraph 1.**

**Comment.** The third sentence of this section reports "The eight lease tracts with existing permitted mines are already served by access roads." This sentence appears to exclude lease tracts 13A, 21, and 25, and should be revised to include those lease tracts.

Also, the sixth sentence of this section reports "The remaining four lease tracts (13A, 15, 21, and 25) have been subjected to exploratory drilling and past mining but lack permitted mines." This sentence should be revised to reflect that lease tracts 13A, 21, and 25 have permitted mines.

**Page 4-171, Section 4.3.11.2.2, Paragraph 1.**

**Comment.** The first sentence of this section reports "As discussed above, mines already exist in eight of the lease tracts that could continue under Alternative 3, whereas only exploration and past mining has occurred in the remaining three lease tracts." This sentence should be revised to reflect that lease tracts 13A, 21, and 25 have permitted mines.

| | | |
|---|---|---|
| L50-25 | L50-25 | This section of the PEIS has been revised per comment. |
| L50-26 | L50-26 | This section of the PEIS has been revised per comment. |
| L50-27 | L50-27 | This section of the PEIS has been revised per comment |
| L50-28 | L50-28 | This section of the PEIS has been revised per comment. |

BLM_0043280

## Cotter Corporation, Commenter ID No. L50 (Cont.)

Mr. Raymond Plieness                          Bryan Cave HRO
June 28, 2013
Page 14

### III.   SUMMARY

For all the above reasons, Cotter supports DOE's continuation of the Uranium Leasing Program. Of the alternatives presented in the Draft PEIS, Cotter also supports Alternative 4 as the final preferred alternative for the ULP. Further, Cotter's EPPs and related plans and studies support DOE's expectation that the compliance measures, mitigation measures, and best management practices identified in the Draft PEIS will minimize or reduce the potential impacts identified in the Draft PEIS.

If DOE has any questions regarding these comments, please call me at 303-866-0645.

Sincerely yours,

Robert Tuchman

Robert Tuchman

enclosures

L50-29

L50-29   DOE notes Cotter Corporation's support of Alternative 4 which is DOE's preferred alternative identified in this PEIS. The EPPs prepared by Cotter Corporation have been reviewed and information from them incorporated into the site- or lease tract-specific evaluation and discussion included in this PEIS.

**Curecanti Medical Society, Commenter ID No. L45**

July 1, 2013

Mr. Ray Plieness
DOE PEIS Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

RE: ULP Draft PEIS

Dear Mr. Plieness,

This letter is being written on behalf of the Curecanti Medical Society, which represents over 80 physicians in the Montrose County area. It has come to our attention that further uranium mining is being considered for Montrose County, and the health risks of such an endeavor outweigh any benefits from a medical standpoint. It is more prudent medically to create jobs in other industries, especially renewable energy such as solar, wind, and geothermal, than to further develop nuclear power.

Uranium mining poses a grave danger to its workers, particularly if these workers smoke tobacco. The combination of uranium dust and smoking intensifies the risk of lung cancer tremendously. Furthermore, despite the best efforts made to control radioactive contamination at the site, accidents happen and the breach of containment over time is very possible. This would threaten groundwater, leading to increased risks of many cancers including thyroid especially. Radiation exposures are cumulative, and the community members will take any increased radiation exposure with them, sometimes not leading to lymphoma and leukemia for decades after the injury. Furthermore, radioactive contamination increases the risk of birth defects and genetic abnormalities, threatening the unborn in their developmental stages. Nuclear power plants have their own risks as recently witnessed in Japan at the Fukushima site, especially for those living downwind.

We oppose any mining of uranium as a result. We would suggest that the County Commissioners attract cleaner industries to our area that will not threaten our local environment for decades or even centuries to come. Solar and wind energy are inexhaustible resources for power generation and should be utilized. More jobs would be created over the long term in renewable energy industries than uranium mining, and the health of the workers as well as other members of the community both near and far would be protected as a result.

Best regards,

Patrick D. O'Meara, DO
President, Curecanti Medical Society, Montrose Memorial Hospital
800 S 3rd St, Montrose, CO 81401, 970-249-636

L45-1

L45-2

L45-3

L45-1   The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

L45-2   Controls are in place to mitigate health impacts on uranium mine workers. The PEIS evaluated potential risk to workers and members of the general public (on-site recreationist and off-site residents). This evaluation made use of state-of-the-art models and health science information recommended by the EPA to estimate the radon emission rates associated with mining operations and the primary health risks of concern, the latent life-time cancer risks, for such evaluations. DOE's analysis likely overestimates human health impacts because the emission estimates were based on conservative assumptions that would yield higher radiation exposures. The results discussed in the PEIS indicate that for the peak year scenarios described in the PEIS, when conducted in compliance with applicable regulatory requirements, the identified mitigation measures can be implemented in a manner that is protective of human health and the environment.

L45-3   See response to L45-1.

**Department of the Interior, Commenter ID No. L38**



United States Department of the Interior

OFFICE OF THE SECRETARY
Office of Environmental Policy and Compliance
Denver Federal Center, Building 67, Room 118
Post Office Box 25007 (D-108)
Denver, Colorado 80225-0007



IN REPLY REFER TO

May 29, 2013

9043.1
ER 13/157

Raymond Plieness
ULP PEIS Document Manager
U.S. Department of Energy, Office of Legacy Management
11025 Dover Street, Suite 1000
Westminster, CO 80021

RE:  Draft Programmatic Environmental Impact Statement (DPEIS) Department of Energy (DOE),
Uranium Leasing Program Programmatic Environmental Impact Statement (Draft ULP PEIS)
(DOE/EIS-0472D), Mesa, Montrose, and San Miguel Counties, Colorado

Dear Mr Plieness:

The Department of the Interior has reviewed the subject document and offers the following
comments for your consideration.

The U.S. Fish and Wildlife Service has no comments on the document, and advises that their
concerns will be addressed through the Endangered Species Act consultation process.

The Bureau of Land Management has already provided a number of technical/editorial
comments directly in their capacity as a cooperating agency.  These comments are hereby
incorporated into the Department of the Interior's comments.

Sincerely,

Robert F. Stewart

Robert F. Stewart
Regional Environmental Officer

L38-1

L38-1    Comment noted. DOE appreciates the effort by DOI as a cooperating agency for the ULP PEIS
process. See L33-1 to L33-5 for BLM comments and responses.

BLM_0043283

**Dolores River Coalition, Commenter ID No. L46**

The Dolores River Coalition

July 1, 2013

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminister, CO 80021

Sent via email to: ulpeis@anl.gov

ATTN: DOE ULP Draft PEIS Comments

Dear Mr. Plieness:

The Dolores River Coalition is a group of eighteen local, regional, state, and national groups working for comprehensive management and protections in the Dolores River Corridor and watershed. Uniting our coalition is our shared-principle that the Dolores River Basin is a unique national resource with significant ecological systems, cultural values, and recreational opportunities. Included in this letter are the coalition's general and collective areas of concern specific to the Dolores watershed. Individual organizations within our coalition will also be submitting comments that focus on the greater field office.

The Dolores River corridor is a signature landscape, and is the nexus of many collaborative stakeholder and agency processes. Dolores River Coalition members and affiliates have been actively involved with these various processes and collaborations including the Dolores River Dialogue and the Lower Dolores Working Group, the San Juan Public Lands SEIS and Land Use Plan, the Gothic Shale Master Leasing Plan, the DOI's Lands with Wilderness Character Inventories, the Wild and Scenic Rivers suitability determination process, and the BLM's various Resource Management Plan Revisions throughout the basin. Some of our member groups have also been involved in the San Miguel Gunnison Sage-Grouse working Group. Through these processes, we have been involved in land management decisions within the greater project area, and have advocated for responsible use of the land to preserve ecological, cultural, and recreational values.

The Uranium Leasing Program falls within the Dolores River corridor, an iconic and ecologically rich tributary of the Colorado River, and land management decisions in the Dolores River corridor affect the greater Colorado Plateau. The Uranium Leasing Program is thus a significant project that deems deep consideration. Following are areas of concern for our coalition.

Impacts to Native Fish

One of our primary concerns relates to native fish species. Native fish, including the Roundtail chub, the Bluehead sucker, and the Flannelmouth sucker, are species of concern in the Dolores River Basin and have been found to be outstandingly remarkable values associated with Wild and Scenic suitability. As part of a legislative effort on the portion of the river between the base of McPhee Dam and the town of Bedrock, an Implementation

1

L46-1

L46-1    The roundtail chub, bluehead sucker, and flannelmouth sucker are species listed as sensitive by the BLM and FS. These species are evaluated in the PEIS in Section 3.6.4.2 and Tables 3.6-21, 4.1-10, and 4.3-8. Measures to minimize potential impacts from uranium mining on the ULP lease tracts are provided in Table 4.6-1. These measures include measures to avoid, minimize, and mitigate impacts to waterbodies and aquatic habitats for aquatic biota such as these fish species (M-4). PEIS text has been revised consistent with the BA and BO, see Appendix E and Section 4.3.6.4.

BLM_0043284

## Dolores River Coalition, Commenter ID No. L46 (Cont.)

The Dolores River Coalition

Team has been underway since 2011 to create a plan for management of the three species. While threats have been identified, mitigation efforts have not been addressed in the Draft PEIS. Without a proper understanding of mitigation efforts, we cannot respond accurately to the range of alternatives. The USFWS' biological assessment (BA) has not been included in the PEIS. Without this analysis, the PEIS is incomplete. "No direct" or "indirect" impacts are indicated in the PEIS, yet without the BA, we cannot agree with this finding, and would like to see the BA before a determination is made for a preferred alternative. While the consultation section indicates that "the USFWS does not enter into formal consultation until a preferred alternative has been identified" (Draft ULP PEIS, 6-3), we believe that an additional draft-level comment period is necessary to address issues related to rare, sensitive, and endangered species. The Draft PEIS is premature and incomplete without this analysis.

L46-1 (Cont.)

While the U.S. District Court for the District of Colorado required the DOE to prepare an EIS, based on concerns around threatened and endangered species, the Range of Alternatives does not address mitigation efforts for these species. For instance, it is not clear how is the recent FWS intervention and finding of impact to the Colorado River Fish is going to be handled. The Draft PEIS indicates "Water quality as it relates to the listed fish species is being evaluated in the BA" (Draft ULP PEIS, 6-4), but this needs to be made available for public review and comment prior to a final decision. The threats to endangered species have been identified, and are dire, but mitigation efforts have not been discussed. Again, without a complete discussion on how to mitigate adverse affects, the PEIS is not complete.

*Potential threats to the bonytail chub that may be associated with ULP activities include impacts to water quality and water withdrawals. Uranium mining can contaminate surrounding water with high levels of ammonia and uranium, which can bioaccumulate in fish tissue (Karp and Metzler 2006; Fresques 2008; Metzler et al. 2008). The toxicity of uranium mine tailings has been shown to be devastating to aquatic life in the Colorado River system (USFWS 1990). The effects of ammonium include reduced growth rate, reduced gamete production, body deformities and malformations, and degenerative gill and kidney appearance and function. Mining activities may also increase the amount of sediment in the river (Leyda 2011). A catastrophic tailings pile failure could bury important nursery areas and destroy other fish habitat. Water depletions associated with uranium mining may contribute to the destruction or adverse modification of designated critical habitat for the bonytail chub (USFWS 2011e). Other threats include stream alteration, competition with and predation by introduced species, and pollution" (Draft ULP PEIS, E-7).*

L46-2

Other Species of Concern

The Dolores River corridor also provides habitat for Gunnison sage-grouse, big horn sheep, and threatened river otter, as well as sensitive plant species. While threats to these species were discussed in the PEIS, mitigation efforts were not addressed. We feel this analysis is inadequate as surface disturbance, including erosion and increased sedimentation, noise, and other factors will impact species. Further, there is no consideration made to protect endangered or threatened species existing in the Uranium Leasing Program area.

L46-3

2

L46-2   Measures to minimize potential impacts from uranium mining on the ULP lease tracts are provided in Table 4.6-1. These measures include measures to avoid, minimize, and mitigate impacts to waterbodies and aquatic habitats for aquatic biota (M-4). The Biological Assessment (BA) prepared for consultation with the U.S. Fish and Wildlife Service (USFWS) regarding potential impacts of the ULP on species listed under the ESA includes the same measures for ESA-listed fish species as presented in Table 4.6-1. The USFWS issued a Biological Opinion (BO) in August 2013. The BA and the BO are presented in Appendix E of this PEIS. PEIS text has been revised consistent with the BA and BO, see Appendix E and Section 4.3.6.4.

L46-3   Information on the Gunnison sage-grouse is provided in Sections 3.6.4, 4.1.6.4, and 4.3.6.4. As discussed in these sections, potentially suitable habitat for this species may occur in several lease tracts. However, based on information provided by industry and the Colorado Parks and Wildlife (CPW), the species has not been recorded on any of the lease tracts. On January 11, 2013, the USFWS proposed to list the Gunnison sage-grouse as an endangered species under the ESA. At that time, the USFWS proposed to designate 1.7 million acres of critical habitat for the species. The most recent available information for the Gunnison sage-grouse, including updated geospatial data pertaining to the species' critical habitat, has been incorporated to the PEIS. Measures to minimize potential impacts from uranium mining in the ULP lease tracts are provided in Table 4.6-1.

Information on the desert bighorn sheep is provided in Section 3.6.2.3 of the PEIS. As evident from Table 3.6-15 in that section, the ULP lease tracts encompass only a small portion of the desert bighorn sheep activity areas within the three-county ULP study area. Potential impacts on bighorn sheep are addressed in Section 4.3.6.2 of the PEIS. DOE did consult with Colorado Parks and Wildlife (CPW) regarding the desert bighorn sheep during the preparation of the PEIS. It is expected that the CPW would have been and will continue to be consulted when EPPs are prepared for individual mines developed as part of the ULP. Desert bighorn sheep habitat protection or offsite habitat enhancement may also be conditions of permits and lease requirements for mine sites.

BLM_0043285

## Dolores River Coalition, Commenter ID No. L46 (Cont.)

The Dolores River Coalition

We also have specific concerns about potential impacts to Gunnison sage-grouse. The Uranium Leasing Program area includes proposed Gunnison sage-grouse critical habitat in the area of Lease Tract 17 (1 and 2). Although the PEIS was released after the Fish and Wildlife Services (FWS) published their proposed rule to protect Gunnison sage-grouse through the Endangered Species Act (ESA) on January 10, 2013, the PEIS does not address the proposed listing. As noted in this proposed ESA rule, species recovery will require consideration of potential habitat beyond occupied habitat in order to link and expand subpopulations. We encourage the DOE not to move forward with new projects in or near critical habitat prior to the designation of critical habitat and a clear understanding with FWS regarding elements in a recovery plan.

Desert bighorn sheep, which are found in only three areas on the Western Slope of Colorado, have been identified as a priority management species for Colorado Parks and Wildlife. The Dolores River corridor includes habitat for desert bighorn sheep, and the greater area has been a successful desert bighorn transplant site for Colorado Parks and Wildlife (CPW). The Slick Rock area is known for desert bighorn, and lease tracts 13, 13A, 14 (1,2, and 3), 15, 15a, 16, and 16a could all potentially affect desert bighorn habitat and activity. The DOE needs to work closely with CPW to mitigate impacts to desert bighorn sheep including actions that may impact their behavior and affect lambing activities, movement corridors, and access to water sources.

### Water Resources

The Dolores River Coalition has been actively involved in water quality and flows efforts in the Lower Dolores River basin. Many collaborative efforts are at pivotal management points for improving native fish and riparian habitat. Further, a 319 Watershed Plan is in the final stages of development. The draft PEIS has not adequately addressed measures and methods to mitigate impacts to water resources. Several claims fall directly on the Dolores River and already threaten the river due to lack of adequate of clean up from previous activity. These claims (13, 13A, and 14-1, 2, and 3) should be prioritized for thorough remediation and withdrawn from the program.

Surface water in the Upper Dolores, San Miguel, and Lower Dolores watersheds and groundwater in the bedrock aquifers within Paradox Basin, along with alluvial aquifers in the various canyons were identified in the PEIS as water resources, though impacts to these resources were not thoroughly listed, and mitigation was again not addressed. Impacts to stream flow require further explanation. Minimal to moderate impacts to stream flow in the Dolores River could result in significant implications to the current efforts for improvements to native fish habitat and riparian restoration. As indicated in the draft, flows are regulated by the Dolores project, however specific flow regimes for native fish and recreation are also dependent on the natural downstream hydrograph that are part of the calculations for improving downstream habitat. Climatic changes may further exacerbate the effects in the coming decades, as identified in the Bureau of Land Management's Rapid Ecoregional Assessment of the Colorado Plateau. A twenty percent decrease in runoff due to seasonal shifts has been identified in the draft PEIS, along with

3

L46-3
(Cont.)

L46-4

L46-4   Those ecological resources of outstandingly remarkable value (ORV) discussed in the comment that are either listed under the ESA, listed as sensitive by the BLM or FS, or listed as threatened or endangered by the State of Colorado are evaluated in the PEIS (see Tables 3.6-21, 4.1-10, and 4.3-8). Assumptions on water usage and source are discussed in Section 2.2 (Tables 2.2-3, 2.2-5, and 2.2-7). These assumptions are consistent with site-specific information for ULP uranium past mining activities and EPPs prepared for some of the lease tracts. Follow-on NEPA reviews would address specific water needs, as appropriate.

Based on the state data, currently no impacts to streams were identified from the Lease Tracts. In addition, site-specific conditions for the Slick Rock tract are described in the EPP prepared by Cotter Corporation for Lease Tract 13A, and have been incorporated into the analyses done for the PEIS.

Because the Slick Rock UMTRCA processing site is located on Lease Tract 13A, data obtained for that project is discussed here. While alluvial groundwater data from the Slick Rock UMTRCA site indicate groundwater contamination, surface water data do not indicate contamination to the Dolores River due to the site. That is, surface water sampling results for the 2012 monitoring period demonstrated essentially no impact to the Dolores River from historical milling activities. CDPHE water quality benchmarks for nitrates, selenium, and uranium were not exceeded; one sample for manganese slightly exceeded the benchmark (.055 mg/L versus CDPHE benchmark of 0.05 mg/L). This particular sample was highly turbid; the data point is also observed to be anomalous relative to historical data. This information can be found in the *Verification Monitoring Report for the Slick Rock, Colorado, Processing Sites* dated April 2013.

The potential impacts on water quantity may include increased surface runoff, reduced groundwater recharge, and dewatering to the mines. As discussed in the PEIS (see Section 4.3.4), the groundwater loss to mines is limited to a few wet mines including Lease Tracts 7, 9, and 13.

Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

BLM_0043286

### Dolores River Coalition, Commenter ID No. L46 (Cont.)

The Dolores River Coalition

the mention of reduced runoff from uranium mining and milling, with the associated implications to the recharge rates of the aquifer, but measures to mitigate impacts from uranium development have not been addressed.

There is only superficial analysis of water quantity impacts from increased mining and milling in the region. The EIS needs to examine under the alternatives that if the leases are developed, the specific amount of water that will be used, and specifically where that water will be drawn. While depletions at individual sites will be less than Aspinall stipulations, the cumulative amounts could be significant in light of drought and climatic changes and related challenges to water supplies. It is irresponsible to not address numbers and impacts more accurately with drought and climatic changes that are affecting the basin and the greater Colorado Plateau (see BLM's Rapid Ecoregional Assessment of the Colorado Plateau). The consequences of allocating an increasingly scarce water supply to mining operations is not considered both in relation of the local and regional communities, and the greater Colorado Plateau.

L46-4
(Cont.)

The San Juan National Forest as well as the BLM's Tres Rios, Uncompahgre, and Grand Junction Field Offices have all assessed Wild and Scenic River eligibility and suitability through their recent and ongoing planning processes. Water and flow dependant outstandingly remarkable values (ORVs) associated with Wild and Scenic suitability along the Dolores River below McPhee Dam include rafting, native fish and ecological values such as the Canyon treefrog, New Mexico Privet, Eastwood's Monkey Flower, and Kachina daisy. The PEIS must ensure that any decision does not impact the ORVs along the Dolores River.

#### Economic Analysis

We have the opportunity to preserve the Dolores River Basin for future generations as a natural gem of the American West. Local leaders and community members have been actively working on a National Conservation Area for the Dolores River corridor to preserve this remarkable natural heritage. National and international recognition of this treasure will bring an increase in tourism and recreation dollars and provide long-term sustainable economy for the region. We must think about the long-term health of the region before we further impact the watershed for short-term economic gain. There is currently not enough demand for Uranium in the United States to warrant the leasing of these domestic reserves. A five percent increase in employment is not enough to justify the impacts. The DOE leasing program should be focused on remediation, which could provide jobs and income to local residents immediately. This is an alternative that needs to be analyzed and included in the range of alternatives.

L46-5

Another option is coordinating, or transferring surface management to the BLM, for clean energy development where possible, which would also provide local jobs and could be a model for clean and responsible energy development. A new alternative is needed to address the option of other beneficial uses of the surface that would provide economic benefits for the future of the area. These uses are compatible with future uranium extraction when the demand for domestic supply is there.

4

L46-5

Impacts to the environmental resources analyzed in the PEIS such as air emissions, radiological exposure to human health, soil erosion, water quality, subsistence, visual, property values impacts, and transportation would be negligible to moderate. As a result, impacts on recreation are also likely to be minor. Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

Reclamation of existing mine sites could improve the perception of the area to potential visitors, creating additional recreation employment and income in the region surrounding the area where potential leasing could occur.

Although the demand for uranium fluctuates, regardless of current demand levels, as stated in Section 1.4 of the PEIS, leasing programs are still required in order to develop a potential supply of domestic uranium, and to determine the future course of the ULP, including whether to continue leasing some or all of the withdrawn lands for the exploration and production of uranium and vanadium ores.

With regard to the available supply of uranium in the U.S. for domestic use, the development of a domestic uranium supply, as authorized and directed by Congress in the AEA, enables DOE to support future demand that is uncertain at the present time, whatever its exact level may turn out to be in the future.

The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. Surface use of a majority of the ULP land for such purposes as alternative energy development is not excluded by the ULP Program.

However, DOE oversees numerous programs to promote a wide variety of energy generation technologies, including many based on renewable resources, as well as programs that promote energy conservation and efficiency.

## Dolores River Coalition, Commenter ID No. L46 (Cont.)

The Dolores River Coalition

Additional areas of concern

- Air Quality: The air quality analysis fails to address a significant increase in dust creation from mining and milling activity and dispersion to downwind communities
- Comprehensive Landscape Management: Despite ongoing landscape management efforts, impacts to the Dolores River Corridor as a landscape were not addressed
- Climate Change: The PEIS fails to adequately address climate change impacts
- Cumulative Impacts
- Historical and Cultural Impacts
- Transportation: Leases 26 and 27 require travel on the Niche Route, which is a significantly dangerous route with a steep grade and numerous switchbacks. This route is frequented by not only grazing permittees but as well by public land users and tourists looking for adventure just off the Unaweep-Tabeguache Scenic & Historic State Byway (Colorado Highway 141). This route and location of these leases should be further assessed for safety.

L46-6

Range of Alternatives

The "Range of Alternatives" is not a complete range of potential alternatives. The DOE did not analyze an alternative that would reduce the number of leases. A "conservation" alternative should be included to permanently withdraw the leases on highly sensitive lands especially those adjacent to the river to prevent undue impacts to native fish species and habitat. These leases also affect river recreation, and are not suitable locations for uranium development. Further, leasing critical habitat for Gunnison sage-grouse should be re-evaluated based on the proposed ruling in January. We would like to see a conservation alternative that permanently withdraws the following leases:

L46-7

- Leases 13, 13A, and 14 (1, 2, 3) due to proximity to the Dolores River, impacts to water quality and native fish, and Desert Bighorn Sheep activity
- Leases 15 an 15a due to proximity to the river, water quality, and potential impacts to Wild and Scenic ORVs (canyon treefrog and monkey flower, both classified "rare or imperiled" in Colorado)
- Leases 18, 19, 19a, 20 for recreation impacts on and at the confluence of the San Miguel River
- Leases 17 (1) and 17 (2) for potential overlap in GuSG occupied habitat.

Thank you for the opportunity to participate in this important program. We appreciate your consideration of our comments. The Dolores River corridor is remarkable for its ecological, cultural, and recreational values. We look forward to a careful review of the potential impacts of DOE's Uranium Leasing Program, and encourage the agency to take additional steps to mitigate impacts to the values that are present in this special landscape.

Sincerely,

Amber Kelley

5

L46-6   DOE has evaluated the potential impacts for 13 environmental resource areas (including air quality, historical and cultural impacts, transportation, and cumulative impacts) for the five alternatives considered to be the range of reasonable alternatives presented in the PEIS. DOE considers the evaluation to be adequate in supporting all five alternatives. See also discussion in Section I.3.2.

Climate change was evaluated in the PEIS (see Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, and 4.5.1) in terms of greenhouse gas (GHG) generated by the ULP proposed action for the five alternatives, respectively. The results indicate that the ULP proposed action contributes a very small percentage to both Colorado, and U.S. GHG generated (up to 0.03% and 0.0005%, respectively). U.S. GHG emissions account for about one-fifth of global GHG emissions, and GHG emissions from ULP proposed action are up to about 0.0001%. The amount of GHG generated is generally used as a measure of the potential impacts on climate change. In contrast, ULP mining activities (followed by power generations at nuclear power plants) would displace considerable amounts of criteria and toxic air pollutants, and GHG emissions that would otherwise be released from fossil power plants. Hence, ULP mining activities could result in more positive impacts than adverse impacts relative to climate change. The text in the PEIS has been revised (see the same sections mentioned previously) to explain further how potential impacts from climate change were analyzed for the PEIS and what the results mean.

L46-7   The range of reasonable alternatives evaluated in the PEIS encompasses the scenarios or alternatives discussed by the commenter.

The reasonable alternatives in the PEIS range from no future leases to 31 lease tracts without requiring all leases tracts to be leased.

The concern about water quality due to the proximity to the Dolores River and its tributary has been considered. One of mitigation measures to assure protection of surface water body from contamination and sedimentation was to restrict activities within ¼ mile of perennial streams (Table 4.6-1).

The impacts of ULP activities in Lease Tracts on sensitive native fish populations and Wild and Scenic ORVs (canyon treefrog and Eastwood's monkeyflower) are discussed in Section 4.3.6.4 (Table 4.3-8). Information on the Gunnison sage-grouse is provided in Sections 3.6.4, 4.1.6.4, and 4.3.6.4. As discussed in these sections, potentially suitable habitat for this species may occur in several lease tracts. However, based on information provided by industry and CPW, the species has not been recorded on any of the lease tracts. On January 11, 2013, the U.S. Fish and Wildlife Service (Service) proposed to list the Gunnison sage-grouse as an endangered species under the ESA. At that time, the Service proposed to designate 1.7 million acres of critical habitat for the species. The Final PEIS has been updated with the most recent available information for the Gunnison sage-grouse, including updated geospatial data pertaining to the species' critical habitat.

Section 3.6.2.3.1, and to some extent Section 3.6.4.2.1, provide information on the occurrence and activity areas of the desert bighorn sheep in the ULP study area (see in particular Table 3.6-15 and Figure 3.6-8). The potential impacts of ULP activities on the desert bighorn sheep are discussed in Section 4.1.6.2 and 4.3.6.2. Among the measures to minimize potential impacts from ULP mining activities (see Section 4.6) is that there will be no new mining or other surface-disturbing activities within 0.25 mi of the Dolores River to avoid impacts on a desert bighorn sheep movement corridor.

Leases 18, 19, 19a, and 20 are located away from the San Miguel River.

Leases 17 (1) and 17 (2) do not overlap Gunnison sage-grouse proposed critical habitat.

BLM_0043288

### Dolores River Coalition, Commenter ID No. L46 (Cont.)

The Dolores River Coalition

San Juan Citizens Alliance
P.O. Box 1513
Cortez, CO 81321
970-565-7191

*On behalf of*

**Dolores River Coalition**
American Whitewater
Conservation Colorado
Colorado Mountain Club
Colorado Riverkeeper
Colorado River Outfitters Association
Dolores River Boating Advocates
Environmental Defense
Grand Canyon Trust
Living Rivers
Rocky Mountain Wild
San Juan Citizens Alliance
San Miguel Watershed Coalition
Sheep Mountain Alliance
Southern Utah Wilderness Alliance
The Wilderness Society and The Wilderness Support Center
Uncompahgre Valley Association
Utah Rivers Council
Western Colorado Congress

6

BLM_0043289

## Energy & Conservation Law, Commenter ID No. L47

### Energy & Conservation Law
*a public interest environmental law firm*

*1911 Main Avenue, Suite 238*                     Phone: (970) 375- 9231
*Durango, Colorado 81301*                          Email: stills @frontier.net

July 1, 2013

**by email attachment (pdf)**

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021
*Website:* http://ulpeis.anl.gov
*E-mail:* ulpeis@anl.gov

> **Re:    Comments on Uranium Lease Management Program Programmatic
> Environmental Impact Statement**

**Dear Ms. Kilpatrick,**

These comments are submitted on behalf of environmental and public information organizations
with long-established interests in the public lands and unique sense of place that characterizes the
eastern edge of the Colorado Plateau : Conservation Colorado, Information Network for
Responsible Mining, Center for Biological Diversity, Sheep Mountain Alliance, and Rocky
Mountain Wild, (all of which are Plaintiffs in the pending litigation, *CEC v. Office of Legacy
Management*, 08-cv-01624-WJM –MJW)("CEC v. OLM"). The comments are also submitted
on behalf of Grand Canyon Trust, Living Rivers, and Uranium Watch.

**I.     Introduction and Summary**

When not occupied by inactive, unreclaimed federal mines, these lands provide a spectacular
range of multiple uses, including important habitat for resident and migratory wildlife. A
growing number of people live and visit the area to enjoy the unique geology, ecology, and
reminders that these public lands are culturally important to a diverse array of people, including
the Ancient Puebloans, modern Native Tribes, early agriculturalists, and recently arrivals seeking
out the amenities that fuel the local and regional economies in Western Colorado and Southeast
Utah.

The landscape impacted by the yellowcake production from the Uranium Lease Management
Program (ULMP) forms the eastern edge of the Colorado Plateau and includes spectacular and
remote sections of western Colorado and eastern Utah perched on and above the canyons and
tributaries of the Colorado, San Juan, Dolores and San Miguel Rivers. The area is dominated by
a federal public land complex that is world-renown for unique and impressive mesas, canyons,
arches, and still-wild sections of river, all of which draw recreational users from around the

L47-1

L47-1    The possibility that uranium or uranium ore from the ULP may be subject to being exported
does not undermine the PEIS's stated purpose and need, and does not require that the PEIS's
scope be expanded to analyze the export of uranium or uranium ore. Any export of domestic
uranium or uranium ore from any source within the United States, including the ULP lease
tracts, is strictly regulated by Nuclear Regulatory Commission (NRC) under the terms of the
AEA and the NRC regulations, which impose requirements that must be satisfied before the
NRC will grant a license to export any domestic uranium or uranium ore. See AEA, 42 U.S.C.
§§ 2099, 2151-2160d; NRC regulations, 10 C.F.R. §§ 110.19-110.46. For example, 42 U.S.C.
§ 2099 forbids the NRC from licensing any person to export from the United States any
uranium ore, or other source material, if the issuance of such a license "would be inimical to
the common defense and security" or the health and safety of the public; 42 U.S.C. § 2155
gives the Executive Branch the authority to veto any export of uranium ore. Many more
specific requirements are imposed in the other above-cited provisions of the AEA and the NRC
regulations. Therefore, DOE's proposed action in the PEIS does not address uranium ore
exports, over which the NRC, not DOE, has authority; and the scope of analysis in the PEIS
does not analyze the possibility that uranium from the ULP may be subject to export.

BLM_0043290

### Energy & Conservation Law, Commenter ID No. L47 (Cont.)

world. The unique mix of cryptobiotic soils, vegetation, and wildlife signals a transition from the headwaters of the Colorado River high in the San Juan Mountains down into the canyon country of the Colorado Canyonlands. The mine-water discharges and stormwater runoff from these public lands flow into the Dolores River and Watershed to become part of the Colorado River System, upon which millions of people and an untold amount of wildlife depend. Pollution of the air and water at the White Mesa Uranium Mill near Blanding, Utah flows into the San Juan River, with some of the airborne pollution from White Mesa returning to the ULMP lands via dispersal and deposition mechanisms.

Although uranium mining in the Uravan Mineral Belt has never been economic without federal price supports, the uranium-bearing segments of these public lands should remain part of an inactive ULMP for some future date when the United States might need the uranium contained in these federal lands. Instead of describing the role of these federal uranium deposits in the United States' nuclear energy program, DOE's preferred alternative promotes immediate production in the name of domestic energy production while ignoring the fact that a South Korean utility holds a substantial stake in Energy Fuels which controls all conventional uranium milling options in the region, including the White Mesa mill and the proposed Piñon Ridge mill. This fact alone undermines DOE's stated purpose and need for its preferred alternative. Properly stated, the purpose and need for DOE's proposed action starts with an analysis of the fuel cycle needs and end with reactors and disposal of the radioactive materials. Exh 1 (2011 GAO Report on opportunities to sell excess uranium and addressing DOE's violations of federal law during management of excess U.S. uranium stockpiles). Although ignored in the DPEIS, analysis of the purpose and need for uranium mining in light of DOE-managed stockpiles of excess uranium will confirm that these federal lands should be managed, with no active leases, at least until such time as DOE has drawn down excess uranium stockpiles to reasonable quantities.

Instead of promoting export of what some have termed a strategic mineral, the current lessees should be required to reclaim the previous impacts from mining at these sites and to ensure these reserves are viable. Where appropriate, sites such as the Opera Box mine should be examined for their renewable energy potential, particularly solar. An example of a successful solar array is provided by "SMPA Community Solar, [which is ] a one megawatt, community-owned solar facility in Paradox valley." http://www.smpa.com/Service/SMPACommunitySolar.cfm DOE has considered solar development as a reasonable alternative for other uranium-impacted federal land in the region, including lands managed by the Grand Junction Office. Protective designations should be considered for all uranium-bearing public lands to avoid further impacts to the Dolores River Watershed and to acknowledge that these mines, although not important in light of modern uranium economics, are important historically. This Three R Alternative (reclaim, reserve, renewables) was proposed in the scoping comments, but was ignored in the DPEIS.

Since 2005, when DOE began to re-evaluate the ULMP program, DOE and its contractors have gone to great lengths to avoid revelation of the problems that plague these decades-old uranium lease tracts. In the 1950s, the Atomic Energy Commission pulled back its reliance on Uravan Mineral Belt mines based on its recognition that the carnotite at these sites was marginally economic, at best. Although most lease tracts were returned to the public domain, some of the largest U.S. defense contractors, and subsidiaries such as Cotter Corporation, continued to lease

2

L47-1 (Cont.)

L47-2

L47-3

L47-4

L47-5

L47-6

L47-7

---

L47-2   The purpose and need for the proposed action does not require expansion of the scope of the PEIS. As explained in PEIS Section 1.4, "Purpose and Need for Agency Action," the underlying purpose and need for agency action was established by the U.S. Congress in two provisions of the Atomic Energy Act (AEA): 42 U.S.C. § 2096, which authorized and directed DOE to develop a supply of domestic uranium; and 42 U.S.C. § 2097, which authorized DOE, among other things, "to issue leases or permits for prospecting for, exploration for, mining of, or removal of deposits of source material [including uranium ore] in lands belonging to the United States."

The Purpose and Need for agency action, as described in ULP PEIS Section 1.4, is to support the implementation of those two AEA provisions. Section 1.4 recognizes that in order to support these provisions "DOE needs to determine the future course of the ULP, including whether to continue leasing some or all of DOE's withdrawn lands and other claims . . . for the exploration and production of uranium ores for the remainder of the ten-year period that was covered by the July 2007 PEA." PEIS Section 1.6, "Scope of the ULP PEIS," therefore describes the scope of its analysis as the evaluation of the five alternatives for managing the ULP, and the evaluation of "the three mining phases associated with the underground and surface open-pit mining methods," which "are the exploration phase, mine development and operations phase, and reclamation phases." Therefore, the AEA provisions are consistent with the present scope of the ULP PEIS, and do not require that the scope be expanded beyond the ULP to analyze the entire nuclear fuel cycle. Further, no DOE decision to be based on this PEIS would change the nation's use of nuclear fuels, including use of nuclear power reactors and management of associated radioactive materials. These and other aspects of the back end of the nuclear fuel cycle are the subject of numerous other NEPA reviews, including many EISs prepared by the Nuclear Regulatory Commission.

L47-3   DOE has considered the comment.

L47-4   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

L47-5   The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

L47-6   DOE analyzed "reclaim" and "reserve" (Alternative 1) as part of its range of reasonable alternatives in the PEIS. The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

Based on results of analysis in the PEIS and BA and BO, impacts to the Dolores River Watershed would be minimal.

BLM_0043291

### Energy & Conservation Law, Commenter ID No. L47 (Cont.)

these tracts from DOE, with mining occurring only sporadically, if at all. Lax regulation and failure to enforce lease terms that require, among other things, compliance with Colorado law has allowed the undue and unnecessary degradation of the surface and subsurface of these federal public lands. Although the DPEIS relies on a set of outdated inspections of often-unsuccessful attempts to control erosion and to revegetate some of the sites, (S.M. Stoller Corporation, 2012), careful examination of the current site-specific conditions would likely confirm that it has been cheaper for the lessees to hold the leases, pay annual royalties, and forego production than to remediate decades of impacts and radiological contamination and accumulated damage in and around these lease tracts.

For instance, gamma surveys would confirm that some of these lease tracts are heavily contaminated by decades of sporadic mining activities and long-term stockpiling of ore at the mine sites. Surface radiological surveys must be coupled with core samples and a range of best available site-assessment techniques to update reclamation and remediation plans based almost entirely on visual inspections and assessments by persons with no expertise in radiological contamination. However, the radiological contamination and other site-specific conditions that caused BLM to reject the 2005 DOE proposal to return these lands to the public domain are not revealed in the DPEIS.

Instead of remedying problems known to various federal agencies, the DPEIS ignores a central holding of the District Court, which requires analysis of site specific impacts.

> The Court applauds DOE for planning to conduct an EIS for the ULMP that will include site-specific impacts. However, the question before the Court is whether DOE acted arbitrarily and capriciously in failing to analyze site-specific impacts in its 2007 EA. The Court concludes that it did.

CEC v. OLM, Opinion and Order #94 at 24. As the Court confirmed, DOE's practice of ignoring existing site conditions and foreseeable activities would result in a NEPA analysis that fails to inform the public regarding full extent of the radioactive contamination and other impacts that plague decades-old the ULMP program.

> Thus, a thorough cumulative effects analysis, including site-specific impacts, was not done during the process of creating the EA, nor was it done when actual site-specific activities were approved. If that trend were to continue, a thorough cumulative effects analysis, including site-specific impacts, might never occur.

*Id* at 23 FN 23.

> The Court orders that DOE on remand conduct a NEPA analysis that considers and analyzes site-specific impacts of the various alternatives considered. DOE has represented that it will do so through its completion of an EIS.

*Id.* at 31 *citing* ECF No. 82, at 6.

3

L47-7
(Cont.)

L47-8

L47-7  The State of Colorado and DOE continue to assure compliance with Colorado law and the lease terms.

Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. Reclamation is required by state and Federal law and by provisions of the lease. Consistent with state requirements, one lease holder has filed EPPs and another lease holder has submitted reclamation plans.

In correspondence from Douglas M. Koza, Acting for the Director of BLM's Colorado State Office, to Donna Bergman-Tabbert, Manager of DOE's Grand Junction Office, dated April 11, 2003, BLM stated that it was unwilling to accept the return of certain scattered parcels of expired ULP lease tracts (that had earlier been withdrawn for the ULP) to the public domain until such time as BLM can make a determination that the rest of the land included in the withdrawals is also suitable for return to BLM's administration. BLM further stated that if it determines that some or all of the withdrawn lands are suitable, BLM and DOE must reach an agreement on how DOE intends to maintain protective measures deemed necessary to deal with "any potential issues that may arise in the future, such as subsidence, erosion, or residual contamination resulting from uranium mining activities"; but that this agreement should not be developed until such time as DOE is ready to relinquish all of the withdrawn lands. BLM also stated that it will continue to work with DOE as additional mine closure and reclamation work is proposed for the remaining lease tracts; and that once "all remaining mine sites in the withdrawals are adequately reclaimed and appropriate measures are in place to adequately address any remaining contamination issues, BLM will make its final determination as to whether or not the withdrawn lands are suitable for return to BLM's administration."

L47-8  The evaluations conducted for the PEIS were based on site-specific information (see Section 1.3 for a summary of this information). The information is adequate to support the alternatives evaluated and for making fully informed decisions relative to any of the alternatives. Although site-specific information for future mines is not available until the lessees submit specific mine plans, information is available from past mining activities (e.g., cultural resources, threatened and endangered species, waste-rock and ore characteristics, and transportation practices and routes) and is sufficient for supporting the analyses of potential impacts from future mining activities for the five alternatives including a thorough cumulative effects analysis. The site-specific information reviewed for the PEIS is summarized in Section 1.3 of this PEIS.

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

Unfortunately, instead of following through on representations made to the District Court, the DPEIS ignores these explicit commands and continues the trend of ignoring site-specific impacts that Judge Martinez concluded constitutes a NEPA violation. Despite requests by the public and government officials and the order of a federal judge, the DPEIS again fails to provide detailed analysis of the past and present site-specific impacts at each least tract in light of the various alternatives. Such analysis is specifically relegated to later NEPA documents that include categorical exclusions. DPEIS at S-23. The DPEIS plan to relegate site-specific analysis to later NEPA analyses that may include categorical exclusions is compounded the open refusal to gather site-specific data for analysis in the DPEIS:

> This PEIS utilizes site-specific data that are available and contains a discussion of the NEPA process that would be conducted once site-specific and project-specific mine plans were submitted by the lessees to DOE for review and approval.

DPEIS at S-26. DOE's continued reliance on promises of future NEPA compliance has been squarely rejected as a means to avoid statutory duties and judicial orders. *CEC v. OLM*, Opinion and Order #94 *accord Sierra Club v. United States DOE*, 255 F. Supp. 2d 1177, 1190 (D. Colo. 2002)("Although Defendants' assurances of future NEPA review possess a certain pragmatic appeal, such assurances cannot obviate the need for compliance with NEPA regulations.").

Although Section 1.2.3 purports to provide site-specific information, no useful data is provided regarding the actual conditions at any of the sites or the (in)adequacy of ongoing maintenance, pollution controls, monitoring, lease terms, mining plans, or reclamation plans. As a result, the DPEIS again refuses to address the site specific impacts in a manner that discloses direct, indirect, and cumulative impacts of the ULMP, and therefore fails to remedy a central NEPA violation based on judicial findings fully applicable to the preparation of the DPEIS on remand. Order and Opinion at 24.

As a result, the DPEIS does not provide the "hard look" and interdisciplinary analysis required by NEPA. Instead of wasting further public resources by requiring the public to comment on DOE's incomplete and internal paperwork exercises, DOE should withdraw the DPEIS as incomplete and begin anew by publishing a scoping notice designed to address the difficult problems that have accrued over more than a half-century of mining and neglect of these federal public lands.

The new scoping notice should be issued with the additional Alternative 6 included: reclaim and hold these lands as uranium reserves, with some used for renewable energy.

Although requested in the scoping comments, DOE neglected to hold any meetings or conduct outreach to the communities most impacted by the active federal uranium program: Paradox and Gateway, Colorado which are located near several of the mines, and the White Mesa Ute Indian Community in Utah, which suffers past, present, and future impacts of milling the ore mined from the federal uranium program in the Uravan Mineral Belt. After a new scoping notice is issued, the cooperating agencies should have a full opportunity to ensure NRC promotes meaningful participation by the public and public officials to the fullest extent possible.

4

**L47-9**

**L47-9**    See response to L47-8.

Follow-on NEPA review would support future decisions. It would be used to determine whether additional specific mitigation measures would be implemented to assure protection of human health and environment. This approach is not only fully consistent with long-standing NEPA practice, such as use of tiering described in CEQ NEPA regulations (40 CFR1508.28), but also ensures a robust environmental review process enabling appropriate consideration of environmental factors, including mitigation, when issues are ripe for decision making.

**L47-10**

**L47-10**    DOE identified the communities and locations that would be reasonably close to the affected communities and provided an opportunity for those affected to attend. See rationale given to public comment 4F in Table B-2 in Appendix B. DOE is confident that the public hearings at Grand Junction, Montrose, Telluride, and Naturita provided the interested members of the public adequate opportunities to participate in a meeting format with regard to accessibility of venues and proximity to where interested members of the public reside.

NRC does not regulate the ULP.

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

In short, the DPEIS avoids the "hard look" mandated by NEPA, and prevents the public and agency decisionmakers from fully comprehending the full scope of policymaking and site-specific considerations presented by the ongoing ULMP.

L47-10
(Cont.)

### II.   Interim Protections

Because the DPEIS, like the PEA, fails to satisfy NEPA and the holdings underlying the permanent injunction, protective action is likely needed to prevent further unnecessary and undue degradation of the federal lands. Judge Martinez recognized that maintenance and stabilization of specific sites need not wait until the multi-year NEPA/ESA process is complete, but neither should these activities escape NEPA analysis based on DOE's continuing refusal to comply with NEPA. As stated in the 2011 scoping comments, because of the radiological contamination and deteriorated condition of many of these sites, Environmental Assessments could be initiated for the limited purposes of considering the necessary stabilization and maintenance on the 13 lease tracts that were active previous to 2007. Unfortunately, DOE has not provided detailed information on what activities are actually being conducted at the lease sites, opting instead for a list of things that may be occurring. *see e.g.* Exh. 2 (July 2013 bi-monthly update). Although these problems will be addressed in context of the injunction, it also confirms that the DPEIS does not provide current and full information that would allow informed decisions or public participation.

L47-11

Although NEPA prohibits segmented analysis, a tightly-defined set of interim EAs for one or two reclamation projects could correspond with the temporary and permanent reclamation proposals for these mines that are moving through the Colorado regulatory process. Filings by Cotter Corporation, Energy Fuels and Gold Eagle Mining confirm that none of these mines are expected to go into production until yellowcake reaches prices that have never been sustained. In particular, on Cotter-leased mines, interim reclamation is required and no mining is expected in the foreseeable future. Permanent reclamation has been ordered by the State agency on the leases held by Gold Eagle. All these documents should be in the lease files, as is required by the lease terms, although such documents have not yet been disclosed via the pending March 2013 FOIA request.

L47-12

As could have been predicted, and perhaps was predicted by UMETCO when it suspended operations and transferred these tracts to what appears to be a closely held and under-capitalized Gold Eagle Mining, the Uravan Mineral Belt mines are not economic and will require many tens of thousands, and perhaps hundreds of thousands, of dollars to characterize and remediate before they can be reclaimed. The aborted attempt by Cotter to mine its lease tracts in 2005-2006 confirms that the tracts do not contain economically recoverable ore in the current era of excess uranium stockpiles. As confirmed by FOIA response, the ore mined in 2005-2006 has not yet been processed, and was recently shipped from lessee Cotter's now-demolished mill in Cañon City, Colorado to lessee Energy Fuels' mill near White Mesa, Utah. The publicly announced closure of Energy Fuels' Whirlwind Mine and the Sunday Complex, located on nearby BLM-managed lands, and all other Colorado Plateau uranium mining operations confirm that there is no purpose or need served by carnotite mining, particularly in light of the current state of the mines and the difficulties faced by DOE management of excess uranium stockpiles. Exh. 1.

L47-13

L47-11   DOE has provided the plaintiffs in the lawsuit with bi-monthly summaries of all of the routine maintenance activities that were performed by the ULP lessees on the ULP lease tracts. See Section 1.2. In each of those summaries, DOE provided detailed information on what activities were actually conducted during the two-month period before DOE provided the summary to the plaintiffs. For example, the bi-monthly summary that this commenter attaches as its Exhibit 2 – which is entitled "Routine Maintenance Activities Performed by the ULP Lessees (April 25, 2013 through June 24, 2013)" – was provided by the Government to the attorneys for the plaintiffs (who are also the attorneys for this commenter) by e-mail on June 28, 2013.

L47-12   On October 18, 2011, a Federal district court stayed the 31 leases, and enjoined DOE from approving any activities on ULP lands. On February 27, 2012, the court amended its injunction to allow DOE, other Federal, state, or local governmental agencies, and the ULP lessees to conduct only those activities on ULP lands that are absolutely necessary, as described in the court's Order. See *Colorado Environmental Coalition v. Office of Legacy Management*, No. 08-cv-01624, 2012 U.S. DIST. LEXIS 24126 (D. Colo. Feb. 27, 2012).

DOE will request that the court dissolve the injunction to complete actions (including reclamation) under the alternative selected in the ROD.

L47-13   The lease tracts that Gold Eagle Mining holds were not leased by UMETCO.

5

BLM_0043294

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

### III.   Scope of Analysis

The DPEIS should provide the public and the local, state, and federal agencies with jurisdiction and control over the federal uranium industry in the Uravan Mineral Belt with information and interdisciplinary analysis mandated by National Environmental Policy Act ("NEPA"). Instead, the scope of analysis is limited only to a limited set of "available data" that fails to inform the public and denies decisionmakers a clear picture of impacts and alternative means to manage these federal public lands.  DPEIS at S-26

#### A.   Purpose and Need and Proposed Action

As explained in the public comments submitted in 2006 and 2007 and 2011 (incorporated herein by reference), and again during the litigation (incorporated herein by reference), the federal action that triggers NEPA was the 2005 expiration of the programmatic decisions and uranium leases issued in 1995 and the question of whether/how the Atomic Energy Act's uranium lease management program would go forward.  The 1995 PEA described the purpose of the Uranium Lease Management Program ("ULMP") being considered in the DPEIS:

> **2.0 Purpose and Need for Action**
>
> The purpose of the ULMP is to maintain and preserve the nation's immediately accessible supply of domestic uranium and vanadium ores, to maintain a viable domestic mining and milling infrastructure required to produce and mill these ores, and to provide assurance of a fair monetary return to the U.S. Government.

1995 PEA.  The DPEIS expands this purpose in context of federal energy policy through a suggestion that the 2005 Energy Policy Act calls for more nuclear energy.  DPEIS 1-28.  However, the scope of analysis in the DPEIS explicitly ignores the cumulative impacts created by an expanded nuclear industry that purportedly forms the purpose and need for the action, and thereby ignores the eventual disposal of the radioactive waste at each link in the nuclear fuel chain.  DPEIS at S-39-40 ("This Draft ULP PEIS does not discuss the impacts of these actions [: where ore would be] converted, enriched, and fabricated into nuclear fuel; used in commercial reactors; possibly reprocessed; and ultimately result in the generation of various radioactive wastes requiring specialized disposal.").  Further, in the ensuing years, the increased yellowcake price and so-called "nuclear renaissance" proved to be a "hedge-fund" driven promotion by the nuclear industry, with prices now in the $30/lb range for yellowcake.  World events such as Fukushima and the resulting decrease in nuclear reactor projections and the obsolesce of many existing reactors are also not factored into any analysis of the actual need for (lack thereof) to mine uranium in a period of global excess supply.  The DPEIS cannot rely on the incorrect and unexamined assumption that more reactors will mean that uranium mining should resume on these long-dormant lease tracts.  Even if more reactors are built than are retired, the costs of mining carnotite in the Uravan Mineral Belt will likely remain prohibitively expensive compared to costs of what is now a global commodity.  The DPEIS provides no analysis in these regards.

Further, the various mining alternatives forwarded by the DPEIS do not recognize that uranium mining on the Colorado Plateau has proven uneconomic, with or without federal price supports.

6

| L47-14 | L47-14 | See responses to L47-2 and L47-6. |

Reclamation in lieu of Royalties (RILOR) program is identified in Article XVI of the Lease Agreement (see Appendix A).

The DPEIS did not admit an oversupply, but rather noted a comment provided to DOE during the scoping process regarding oversupply, which DOE stated was out of scope for the PEIS.

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

At one time, price supports were provided by the AEC along with guaranteed purchase of ore. Outdated price supports are still provided by DOE decisions to hold already mined uranium ("AMU") stockpiles off the market, much of which may have come from these public lands. Exh. 1 (GAO Excess Uranium Report). DOE continues to ignore GAO determinations that management of U.S. uranium resources is conducted based on unlawful barter program. Exh. 1 GAO Excess Uranium Report. When DOE's Excess AMU program is taken into account, the purpose and need of mining uranium for domestic supply is revealed as farce that serves to conceal DOE's misappropriation of royalties for many years via and ineffective *ultra vires* reclamation *in lieu* of royalties program. *Id.* There is no justifiable need to delay reclamation on the premise of reviving uranium mining from DOE lease tracts where DOE is also paying millions of dollars per year to maintain of AMU in stockpiles. *Id.* Although previous and current bonds are likely to prove insufficient to reclaim these lands, DOE is not free to redirect royalties generated by the lease program into its own unlawful appropriations program. As has been confirmed at the notorious Hanford site, DOE and its contractors have a pattern of ignoring known problems and retaliating against those employees who defy agency culture by revealing serious problems.

Although the stated purpose of the DPEIS - promoting nuclear energy - requires an analysis of sufficient scope to addresses the impacts of expanding nuclear industry, cumulative impacts of the nuclear fuel supply chain, liability limitations for harms caused by nuclear fuel production, and DOE's management of the surplus of AMU are dismissed as irrelevant. Even if these impacts could be lawfully ignored, the DPEIS cannot ignore potentially beneficial effects of putting U.S.-owned uranium deposits in the Uravan Mineral Belt into reserve status, ensuring lessees satisfy unmet reclamation/mitigation requirements, and protecting the social/ecological importance of the federal public lands in the Uravan Mineral Belt. Instead of aggravating the problems linked to excess AMU stockpile, the proposed Alternative 6 would benefit the purpose and need. Instead, the DPEIS admits an oversupply of AMU while simply arbitrarily declaring that uranium oversupply is outside the scope of the analysis . DPEIS 1-34, B-12.

Another purpose and need for agency action is to reassess the ULMP in light of the current conditions at the sites and the inadequate leases, reclamation plans, and mining plans. By relying only on "available data" the DPEIS ignores serious problems at these sites, downplays the radiation impacts, and contravenes NEPA requirements to gather necessary data or explain why such efforts are impossible. 40 C.F.R. § 1502.22. Original data, such as gamma surveys, core samples, water well monitoring, and air samples must be gathered at each of these sites before DOE makes any programmatic decisions. Judge Martinez reviewed the site-specific information and concluded that such analysis cannot be delayed indefinitely by relegating them to later NEPA analyses. Opinion and Order at 24.

Records of the state of Colorado confirm that reclamation and maintenance on these 13 previously active lease tracts has been neglected for a period of years, if not decades. Because the mines have been commercially inactive for a minimum of ten years, none of the mining plans comply with Colorado's Mined Land Reclamation Act. *See* C.R.S. § 34-32-103(6)(a)(III)(" In no case shall temporary cessation of production be continued for more than ten years without terminating the operation and fully complying with the reclamation requirements of this article."). Also, the DPEIS ignores the information in the Environmental Protection Plans

7

L47-14
(Cont.)

L47-15

L47-15  DOE had adequate information that was essential to decision making. No additional information essential to decision making is required.

See also responses to L47-2 and L47-9.

EPP information has been evaluated and incorporated in the PEIS. See Section 1.3 for a summary.

BLM_0043296

### Energy & Conservation Law, Commenter ID No. L47 (Cont.)

required by Colorado law, which some of the lessees have not prepared, in violation of both Colorado law and the plain terms of the leases that require compliance with state and local laws. *See* C.R.S. § 34-32-103(3.5)(a)(III). The persistent violation of state law at many of these sites provides a sound basis to void such leases and for DOE to use existing bonds to hire a competent contractors to take initial steps toward reclamation of the sites, regardless of Colorado's failure to document the violations with formal citations and fines. The DPEIS does not address the fact that many tons of uranium ore mined from these tracts has sat unsecured for many years and some ore was actually backfilled into a mine instead of being shipped for processing into yellowcake.

The true purpose and need served by the programmatic decisions on the ULMP is to address site-specific problems and violations before the program continues or is expanded beyond 1995 approvals. Competent analysis will confirm that a properly implemented uranium leasing program would provide the orderly development of federal public lands and/or and management of uranium as reserves that was contemplated when the original uranium leasing program was created in the 1940s.

#### B. Site Specific Conditions are Ignored

The DPEIS confirms inadequate efforts to gather information on nature and extent of existing plans and on-the-ground activities on the lease tracts. Instead of asking for mining plans and reports on the condition of the sites, the agency records released in the as-yet incomplete FOIA request indicates that current lessees were asked for informal input.

By contrast, Colorado agencies, including the DRMS and the Water Quality Control Commission have been active addressing violation of state law, including the lack of adequate environmental permits at these mines. *See* http://mining.state.co.us/ImagedDocuments.htm These ongoing state permitting activities certainly involve federal jurisdiction and control; however they are not analyzed in the DPEIS. Avoiding NEPA analysis by relying on state regulation or alleged compliance with applicable laws is prohibited. *South Fork Band Council v. Department of the Interior,* 588 F.3d 718, 725-726 (9th Cir. 2009) *citing Klamath-Siskiyou Wildlands Center v. BLM,* 387 F.3d 989, 993 (9th Cir.2004). Instead, the analysis in the DPEIS must satisfy the NEPA and other federal duties that are involved, even where permitting decisions are being conducted by state agencies or other federal agencies under the auspices of MOUs or other non-NEPA documents. *See* DPEIS at Section 5.4 Memoranda of Understanding.

Although the information is contained in the Administrative Record from the litigation, the DPEIS does not disclose or analyze the conditions at the site that resulted in the repeated Bureau of Land Management ("BLM") decisions to decline the DOE request to send these lands back into BLM management that would result from terminating this program. The DPEIS must disclose and analyze the conditions that led BLM to correctly identify and rely on of the lack of maintenance, reclamation, and likely radioactive contamination on these lease sites as a reason these sites should not be returned to the public domain. The DPEIS does confirm that OLM cannot transfer these lands to BLM without first requiring the necessary but incomplete reclamation and decontamination, but the DPEIS does not identify the site-specific or off-site conditions that must be remedied or standards that must be met. DPEIS at 5-8. The DPEIS

8

| L47-15 (Cont.) | | |
|---|---|---|

| L47-16 | L47-16 | See response to L47-15. |
|---|---|---|

| L47-17 | L47-17 | In correspondence from Douglas M. Koza, Acting for the Director of BLM's Colorado State Office, to Donna Bergman-Tabbert, Manager of DOE's Grand Junction Office, dated April 11, 2003, BLM stated that it was unwilling to accept the return of certain scattered parcels of expired ULP lease tracts (that had earlier been withdrawn for the ULP) to the public domain until such time as BLM can make a determination that the rest of the land included in the withdrawals is also suitable for return to BLM's administration. BLM further stated that if it determines that some or all of the withdrawn lands are suitable, BLM and DOE must reach an agreement on how DOE intends to maintain protective measures deemed necessary to deal with "any potential issues that may arise in the future, such as subsidence, erosion, or residual contamination resulting from uranium mining activities"; but that this agreement should not be developed until such time as DOE is ready to relinquish all of the withdrawn lands. BLM also stated that it will continue to work with DOE as additional mine closure and reclamation work is proposed for the remaining lease tracts; and that once "all remaining mine sites in the withdrawals are adequately reclaimed and appropriate measures are in place to adequately address any remaining contamination issues, BLM will make its final determination as to whether or not the withdrawn lands are suitable for return to BLM's administration." |
|---|---|---|

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

merely asserts that transfer to public domain cannot take place until "all involved lands are reclaimed to BLM standards and needs." Id.

L47-17<br>(Cont.)

Besides continuation of the program, a number of other actions are involved at the programmatic and site-specific level. Specific program-level actions that require site-specific analysis and decisions that were not addressed in the DPEIS include:

- confirmation of existing reclamation liabilities and bond amounts for each site;
- determination of the party responsible for addressing existing impacts at each site;
- whether or not to issue leases on any specific lease tract;
- adopting program-wide lease terms and conditions;
- limiting activities on lease tracts to reclamation;
- continuation of any existing mine plans;
- road access, use, and maintenance;

L47-18

Although off-site impacts of mining must also be analyzed, the DPEIS simply brushes off the federal court order by limiting the programmatic analysis to the limited information in DOE databases and by relying on reasoning rejected by the district court. For example, the DPEIS explains its limited disclosure and analysis of transportation and road impacts where "[s]hipment of uranium ore is not presented over the life of the program because of the uncertainty associated with future uranium demand and mine development." DPEIS 4-246

L47-19

The DPEIS proposal to use categorical exclusions as part of NEPA tiering scheme that avoids programmatic analysis and public comment on foreseeable activities and cumulative impacts is simply unlawful. Order at 23 FN 23. Should a lawful DPEIS be released, later site-specific actions could be approved based on require notice and comment opportunities in environmental assessments ("EAs") tiered to the PEIS:

- issuance of leases;
- lessee requests to conduct exploration;
- lessee requests for mine plan approval or amendment;
- requests for approval of reclamation activities;
- construction and maintenance of water treatment facilities;
- construction, operation, and maintenance of radon vents;
- transport and disposal of radioactive materials.

L47-20

However, the narrow set of circumstances that could allow deferred analysis to subsequent NEPA tiers does not eliminate the duty to document and reveal the condition of the sites and cumulative impacts, as they exist in 2013, as a basis for programmatic determination and as a basis for later NEPA analysis that also involves public involvement. Despite clear judicial orders, OLM elected against site-specific analysis and determinations with the programmatic NEPA analysis, thereby preventing a "hard look" at both the program and foreseeable activities and knowable conditions at the sites. Where the scope of analysis is fatally flawed, a new scoping analysis should be conducted based on careful and detailed analysis of the site-specific conditions and foreseeable activities that must be considered in the ULMP DPEIS.

L47-21

9

L47-18   The PEIS provides programmatic analysis of foreseeable activities and consideration of cumulative impacts of the ULP. Before making decisions on future lease activities, DOE will conduct further NEPA review, as appropriate.

Based on comments received, Section 1.7 has been revised to state the following: For mining plans to be submitted for approval, DOE will require, at a minimum, an environmental assessment (EA) with appropriate public involvement to be prepared to further evaluate potential site impacts. This NEPA review would be conducted to inform DOE's decision on approval of the plans, including the conditions DOE would require to mitigate potential impacts.

L47-19   The Draft PEIS presents a complete analysis of estimated transportation impacts for peak year activities. Peak year activities were considered to represent a reasonable upper-bound level of activity to provide a conservative yet reasonable estimate on an annual basis (e.g., see Section 2.2.3.1:Basis for Impact Analyses for Alternative 3). The potential impacts estimated are small and potential impacts for multiple peak years would remain small.

L47-20   See response L47-8.

The PEIS provides programmatic analysis of foreseeable activities and consideration of cumulative impacts of the ULP. Before making decisions on future lease activities, DOE will conduct further NEPA review, as appropriate.

Based on comments received, Section 1.7 has been revised to state the following: For mining plans to be submitted for approval, DOE will require, at a minimum, an environmental assessment (EA) with appropriate public involvement to be prepared to further evaluate potential site impacts. This NEPA review would be conducted to inform DOE's decision on approval of the plans, including the conditions DOE would require to mitigate potential impacts.

DOE will issue categorical exclusion determinations for classes of actions such as maintenance activities that DOE has determined by regulation do not have the potential to result in significant environmental impacts. DOE makes its categorical exclusion determinations publicly available on the internet.

L47-21   See response to L47-20.

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

### C.   Reclamation Bonds and RILOR (Reclamation in Lieu of Royalties).

The post-2007 implementation of the ULMP included a novel and likely illegal appropriations scheme where OLM credited lessees with royalty payments for reclamation work on nearby public and private lands *See* Antideficiency Act 31 U.S.C. § 1341(a)(1)(prohibiting agency expenditures from exceeding appropriations), Adequacy of Appropriations Act, 41 U.S.C. § 11("No contract or purchase on behalf of the United States shall be made, unless the same is authorized by law or is under an appropriation adequate to its fulfillment . . ."), 31 U.S.C. § 3302(b)("Except as provided in section 3718(b) of this title, an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim."). The program appears to have been created and overseen by OLM and the private contractors that implement much of the ULMP.  The past impacts of this program, including the success and failure of the reclamation activities provide important information, but was not included in the DPEIS.

Because the RILOR program is not mentioned in the DPEIS, it must be assumed that the RILOR program has been abandoned.  However, there is merit to the concept of legislation making royalty payments available for reclamation of federal lands where historic management of the DOE leasing program and the 1872 Mining Law failed to protect the public lands from uranium miners who went bankrupt or otherwise abandoned reclamation responsibilities.

For purposes of NEPA, the past and present implementation of the RILOR program must be analyzed to determine whether or not the RILOR projects resulted in adequate reclamation of the unique hazards posed by uranium mining, including radioactive contamination of the soils and groundwater.  Gamma surveys of many sites confirm that radioactive issues plague these sites. The NEPA process is also a proper forum to analyze lack of transparency and accountability that may have allowed royalties to be credited against reclamation on lease tracts that should be done at the expense of the lessee, under terms of the lease.

Although reclamation activities are widespread throughout the project area, the DPEIS fails to describe the extent of these activities or confirm that ongoing reclamation of uranium mines is being carried out in the project area by BLM and the state of Colorado based on various funding sources, including stimulus funds.

Finally, the adequacy and availability of the OLM-approved reclamation bonds must be considered.  These bonds should serve as a source of immediately accessible funds to conduct necessary planning and permitting that must precede activities designed to achieve stabilization, reclamation, and decontamination on these lease tracts.  Instead, the DPEIS unlawfully relegates the consideration of bond adequacy and existing site-specific conditions to a later date.  DPEIS at 5-7. As stated above, such delay is prohibited.  CEC v. OLM, Order and Opinion at 23-4.

### D.   Connected, Cumulative, and Similar Actions Must be Considered

The DPEIS fails to analyze the impacts of various other actions that must be included in the scope of the analysis, including the impacts of milling.

10

| L47-22 | L47-22 | The reclamation of legacy mine sites on the ULP lease tracts is summarized in Section 1.3. Text presented in this section clarifies that some of the legacy mine sites were reclaimed using reclamation in lieu of royalty payments or RILORs. |

L47-23 | L47-23 | The RILOR program is identified in Article XVI of the Lease Agreement (see Appendix A).

Reclamation performed at legacy mines was identified in the PEIS in Section 1.3.

The reclamation provisions would be consistent with BLM's reclamation closure guidelines as stated in *Uranium Closure/Reclamation Guidelines* (BLM 1995) and CDRMS regulations.

L47-24 | Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS. The PEIS contains a thorough analysis of cumulative impacts, which evaluates the incremental impacts of DOE's proposed action in combination with past, present, and reasonably foreseeable actions by others. DOE's analysis considers other reclamation activities within the regions of influence for each environmental resource area.

L47-25 | On the ULP leases, no reclamation is occurring because of the Court's injunction.

DOE's administration of the ULP includes actions such as establishing the amount of reclamation performance bonding appropriate for the amount of environmental disturbance anticipated based on an evaluation of the lessees' proposed activities, including site-specific access routes, exploration drill-hole locations, mine-site support facility locations, and proposed methods of reclamation.

Existing bonds are based on the environmental disturbances of mining operations that are currently stayed. DOE will re-evaluate the bonds when new plans are submitted.

L47-26 | See response to L47-1.

### Energy & Conservation Law, Commenter ID No. L47 (Cont.)

#### 1.    National Mission of DOE in Managing Domestic Uranium Production

The Montrose Board of County Commissioner's rightly observed at the scoping meetings that the scope of analysis must consider the national mission of DOE. The DPEIS overtly refuses to include such analysis. Comments from scoping regarding national policy, local impacts, and excess AMU stockpiles are incorporated here by reference.

The national-level DOE mission is particularly important where lessees have identified East Asia as the likely destination for the ore mined from the public lands in the Uravan Mineral Belt. Recent published reports confirm that a major stockholder and customer of Energy Fuels is the South Korean utility company. Because all ore from the federal tracts will go to either its existing White Mesa Mill or the proposed Piñon Ridge Mill, the impact of exporting yellowcake must be analyzed for its impacts on domestic energy policy, not to mention the impacts of providing additional yellowcake into a global market/regulatory system that has proven incapable of meeting its non-proliferation goals.

L47-26 (Cont.)

#### 2.    Energy Fuels' Proposed Uranium Mill

Judge Martinez confirmed that the likely destination of the uranium mined from these lease tracts - the newly licensed Energy Fuels Piñon Ridge Uranium Mill - has become definite enough in its plans in 2011 that it must be analyzed in the NEPA analysis on remand. Order at 25-29. Now that a license has issued, there is no question that NEPA analysis is required for the proposed Piñon Ridge mill. Although it appears that Energy Fuels has scrapped plans to construct the now-licensed PR Mill until uranium prices rise substantially, lessee Energy Fuels is the only entity with an active license to accept and process uranium ore due to its recent acquisition of the mill near White Mesa, Utah, the likely destination of any ore mined from the ULMP in the next decade.

Cotter Corporation's radioactive materials license expired on December 2013. As a result, the only activities allowed at Cotter's Cañon City are remediation and closure, which may involve the excavation of uranium tailings for placement in a competent tailings facility. Although the past impacts of transporting and milling federal ore at Cañon City must be analyzed in a new DPEIS, Cotter Corporation no longer has a uranium mill capable of receiving and processing ore. This could explain the discussion of transferring leases from Cotter to Energy Fuels that was revealed in the as-yet incomplete FOIA response. Consolidation of leases by Energy Fuels is foreseeable, logical in light of recent changes in the milling options, and would impact Clean Water Act and Clean Air Act permitting for the lease tracts near or adjacent the mill site. This information, which pre-dates the publication of the DPEIS, must be revealed in a new DPEIS.

Further, NEPA analysis is required for the processing of ore from BLM managed lands at the White Mesa Mill for the undetermined number of years until the Piñon Ridge ULMP is made operational, if ever. *In Re Southern Utah Wilderness Alliance*, IBLA 2010-138 (invalidating NEPA analysis where BLM failed to consider the impacts of uranium mill; *see also* 40 C.F.R. § 1508.7 (requiring federal agencies to consider cumulative impacts associated with approved projects, "regardless of what agency (Federal or non-Federal) or person undertakes such other actions.").

L47-27

L47-27   The impacts of the White Mesa Mill were analyzed in the Cumulative Impacts section of the PEIS (see Section 4.7.2.1) and this section cites NRC (1979) as the source of information concerning potential environmental impacts (see Table 4.7-3).

11

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

Regardless whether mined from DOE or BLM-controlled minerals, some federal agency must prepare the required NEPA analysis of milling federal ore from the Uravan Mineral Belt into yellowcake. The DPEIS does not contain such an analysis and cannot identify any NEPA document containing such an analysis.

L47-27 (Cont.)

Energy Fuels has obtained preliminary and conditional approvals for various alternative water supplies, but the Bureau of Reclamation has confirmed that in order for Energy Fuels to pump groundwater or otherwise deplete Dolores River, a NEPA analysis must be conducted. Exh 3. Federal approvals are required before use of federal Dolores Project water and before San Miguel River water is diverted, stored, and delivered to the Paradox Valley. Exh. 4. These approvals, which are ongoing review by other federal agencies, must be documented in the DPEIS and must be analyzed in the ongoing formal Section 7 consultation with the U.S. Fish and Wildlife Service. Unfortunately, DOE, USFWS, and BLM have delayed their respective responses to ongoing FOIA requests, thereby excluding the public from both NEPA and ESA considerations.

L47-28

L47-28   DOE has consulted with the USFWS with regards to potential water depletion impacts from the proposed action. PEIS text has been revised to be consistent with the BA and BO (see Appendix E for the BA and BO).

Federal approval of Energy Fuels' Piñon Ridge tailings facility by the Environmental Protection Agency pursuant to the Clean Air Act's regulation of has not been finalized. Federal action by EPA regarding the uranium mill remains ongoing and contingent on review of potential groundwater impacts. When Energy Fuels closes, the tailings facility will be deeded to the United States and assigned to OLM for perpetual care and maintenance. EPA is also charged with regulating radon emissions from the mines, another ESA agency action that has not been presented to USFWS for consideration during the ongoing formal Section 7 consultation.

L47-29

L47-29   This PEIS evaluates potential impacts of Pinon Ridge in combination with the proposed action as discussed in the cumulative impacts section (see Section 4.7.1.1)

The need for careful, site specific analysis of pollution caused by ongoing milling and mining is confirmed by NRC's recently statement that ongoing radioactive pollution is addressed at mills on a case-by-case basis, and not through a specific regulatory structure. 76 Fed.Reg. 42075 (June 3, 2013 "Currently, there are no NRC regulations that require licensees to promptly remediate radiological contamination."). A similar regulatory gap exists in both the Colorado and Utah Agreement State programs. The *ad hoc* regulation of radiological contamination at operating uranium mills is particularly important where both of Energy Fuels' mills lack state and federal regulatory protections that address contamination during operations. Careful NEPA analysis of past, present, and foreseeable milling activity is also critical where uranium mills on the San Miguel River (Uravan and Durita sites) remain subject to a Colorado licensing regime that lacks the resources to remediate the groundwater and other problems to the satisfaction of DOE, EPA, and NRC.

L47-30

L47-30   See response to L47-29.

At White Mesa, problems include radon containment, groundwater contamination, off-site deposition of radioactive and other contaminants. Some of the more recent documentation includes on-line documents of USGS and EPA that document the impact of this federal program on eastern Utah communities, including the White Mesa Ute Community. *see e.g.* http://water.epa.gov/polwaste/nps/tribal/upload/wed2_6whitemesa.pdf.

Sediment samples collected from three ephemeral drainages east of the uranium mill site (including Entrance Spring) contained uranium concentrations exceeding background

12

L47-31

L47-31   The potential impacts reported for the White Mesa mill in reports prepared for the facility (not DOE reports) have been incorporated into the cumulative impacts analysis for the PEIS as discussed in Section 4.7. EPA is a cooperating agency for the PEIS process; NRC and USGS were both invited and elected to participate as commenting agencies. The scope for the ULP PEIS is consistent with the purpose and need described in Section 1.4 which does not support the evaluation of the nuclear fuel cycle involving mining, milling and perpetual care of radioactive tailings as stated in the comment. Further, no DOE decision to be based on this PEIS would change the nation's use of nuclear fuels, including use of nuclear power reactors and management of associated radioactive materials. These and other aspects of the back end of the nuclear fuel cycle are the subject of numerous other NEPA reviews, including many EISs prepared by the Nuclear Regulatory Commission.

Final ULP PEIS

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

values downwind of the predominant wind directions at the site. Sediment samples collected from ephemeral drainages on the south and west boundaries of the uranium mill site generally did not exceed background-uranium concentrations. Elevated concentrations of uranium and vanadium, indicating offsite transport, were found in plant tissue samples collected north-northeast, east, and south of the mill site, downwind of potential migration of radionuclides and trace elements from the White Mesa uranium mill the predominant wind directions at the site. The uranium and vanadium concentrations in plant tissue samples collected west of the uranium mill site were low.

http://pubs.usgs.gov/sir/2011/5231/. NEPA's action-forcing purposes require DOE to disclose and analyze the problem-plagued White Mesa Mill in a new DPEIS.

NRC, EPA, and USGS have extensive expertise and jurisdiction regarding uranium mining and milling that should have been relied upon in the DPEIS. Each of these agencies should be included as cooperating agencies in a new scoping notice that should precede the issuance of a new DPEIS for public comment.

In sum, the links of the nuclear fuel chain that involve mining, milling, and perpetual care of radioactive tailings are all federal endeavors that must be analyzed in accordance with the "one EIS" requirement of NEPA. As discussed in the "cooperating agencies" section of these comments, without a comprehensive analysis, many of the important impacts, alternatives, and mitigation measures will not be revealed to the public and relevant decisionmakers, particularly where NRC has confirmed that the federal regulatory program carried out by NRC, Utah, and Colorado contains serious regulatory gaps.

L47-31
(Cont.)

### 3. Other Uranium Mining, Road Access, and Off-lease land use within the Uravan Mineral Belt

The scoping comments explained that although the ULMP may only control a portion of the lands containing uranium ore, the DPEIS must analyze activities and impacts well beyond its property lines. These comments were confirmed by Judge Martinez, who rejected arguments to the contrary:

> [I]t makes sense to point out that DOE is incorrect in its arguments in its Response Brief for why off-lease land uses by leaseholders need not be analyzed under NEPA.

Order at 29. The importance of this basic NEPA requirement was confirmed by an explicit command to analyze road use, BLM mining, and other off-site activities and impacts

> DOE is ordered on remand to include in its NEPA-compliant analysis an analysis of the combined and cumulative impacts of the proposed action, including off-site activities by leaseholders.

Order at 30.

L47-32

L47-32   Cumulative impacts analysis discussed in the PEIS does address off-lease or areas outside property lines or outside the ULP lease tracts. See Section 4.7 for cumulative impacts discussion and Figure 4.7-1 for area included in the region of cumulative effects.

13

Appendix I: Comment Response Document

BLM_0043302

### Energy & Conservation Law, Commenter ID No. L47 (Cont.)

The district court has rebuked previous reliance on uncertainty regarding the ULMP as an excuse to limit the scope of the analysis. However, throughout the DPEIS, it appears that off-lease land uses were eliminated from serious consideration based on asserted uncertainty about mining, exploration, and reclamation. For example, the DPEIS focuses on a peak year, but the direct, indirect, and cumulative impacts of "[t]he shipment of uranium ore is not assumed over the life of the program because of the uncertainty associated with future uranium demand and mine development." DPEIS at 4-154, *accord* 4-158, 4-209, 4-246, D-34

L47-32
(Cont.)

As was confirmed by OLM at the scoping hearings, the Grand Junction area is also within the scope of this analysis, with public hearing held on the DPEIS. However, little attention is given to the ULMP impacts on Grand Junction. During the 2007 PEA/FONSI, OLM recognized that meetings should have been held in Blanding, not Monticello, due to the likelihood that the White Mesa Mill will be used to mill uranium from these lease tracts. However, this same mistake was made during scoping in 2011 and not surprisingly, only one person attended the Monticello meeting. No meetings were offered in Blanding or White Mesa, despite serious public health and environmental impacts that will befall those living near the mill where the federal ore is processed into yellowcake.

L47-33

As explained above, the restricting factor in the DPEIS is the lack of current site-specific data and evidence to support any analysis. The same analytical deficiencies apply to off-site lands within the Uravan Mineral Belt, whether applied to milling, transport, or off-site deposition of pollutants.

#### 4.    Mineral And Oil And Gas Development In and Around Lease Tracts

Numerous oil and gas leases and other projects have been proposed on and near the lease tracts. The DPEIS confirms that "[t]here are active oil and gas leases within most of the lease tracts," but only vaguely references where. DPEIS at 3-191. It appears that BLM, the manager of these leases and cooperating agency on the DPEIS, did not provide site-specific information regarding any of the Mineral Leasing Act activities. Instead, vague reference is made to LR2000 and other internet sources of information. Id.

Review of litigation documents would confirm that, without conducting any NEPA analysis, OLM has approved BLM's issuance of oil and gas leases on several of the lease tracts. Delayed FOIA responses prevent analysis of whether or not BLM complied with NEPA or ESA. It is quite likely that DOE and BLM employed a well-known compliance shell game by which each agency claims the other will comply with federal laws, but neither actually complies. Although the OLM may have previously insulated itself from considering the impacts of oil and gas development, the BLM is in possession of numerous records concerning the impacts of oil and gas exploration, oil and gas production, and oil and gas leases occurring on and around the uranium mining lease tracts. All of these impacts must be assessed in a new DPEIS that analyzes the site-specific impacts of leasing these same federal lands for both fluid mineral and uranium production. It is quite likely that oil and gas leasing is incompatible with uranium production activities and the protection of the public lands.

L47-34

14

L47-33    DOE identified the communities and locations that would be reasonably close to the affected communities and provided an opportunity for those affected to attend. See rationale given to public comment 4F in Table B-2 in Appendix B. DOE is confident that the public hearings at Grand Junction, Montrose, Telluride, and Naturita provided the interested members of the public adequate opportunities to participate in a meeting format with regard to accessibility of venues and proximity to where interested members of the public reside.

The evaluations conducted for the PEIS were based on site-specific information (see Section 1.3 for a summary of this information). The information is adequate to support the alternatives evaluated and for making fully informed decisions relative to any of the alternatives. Although site-specific information for future mines is not available until the lessees submit specific mine plans, information is available from past mining activities (e.g., cultural resources, threatened and endangered species, waste-rock and ore characteristics, and transportation practices and routes) and is sufficient for supporting the analyses of potential impacts from future mining activities for the five alternatives including a thorough cumulative effects analysis. The site-specific information consulted for the PEIS is summarized in Section 1.3 of this PEIS.

L47-34    The cumulative impacts analysis addresses oil and gas leases and projects (see Section 4.7.2.4, Figure 4.7-2, and Table 4.7-8).

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

**5. Multiple Use of the Lease Tracts**

The DPEIS (3-174) recognizes that the lease tracts remain subject to the multiple use management under the Federal Land Policy and Management Act ("FLPMA") which contemplates, "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. 1702(c).

As was candidly admitted during the 2007 PEA/FONSI, neither OLM nor DOE generally has any experience or expertise in carrying out management of public lands under this multiple use mandate. However, the DPEIS does not reflect the management activities and uses where these lands are co-managed by two agencies under FLPMA and the Atomic Energy Act. This is particularly important since these lands are also part of the larger BLM planning effort, which has not specifically addressed the management of these lease tracts in combination with the surrounding public lands.

The DPEIS wrongly assumes that mining activity displaces grazing and recognizes that grazing takes place on the lease tracts. DPEIS at *3-185- 186*. However, cattle not only use graze at these sites, ranchers have set out mineral blocks and water tanks that lure cattle onto the lease sites. No attempt is made to analyze the site-specific conditions these cattle or eventual consumers encounter when cattle lick a mineral supplement or drink from tanks placed on and near uranium mines pads, ore piles, and waste dumps. Where radium, thorium, uranium, selenium, radiation, and other contaminants are readily available to cattle, the DPEIS must analyze this impact and consider an alternative that prohibits grazing in contaminate areas. Of course, surveys must be conducted to identify radiologic and other contamination and then presented in the DPEIS for public review and comment.

**D. Reasonable Range of Alternatives and Mitigation Measures**

The DPEIS fails to consider all reasonable alternative courses of action, partially because the site-specific information and analysis was not provided. The range of alternatives and lack of site specific data prevents careful analysis and comparison of conditions found across these federal public lands based on actual ecological impacts of this decades-old ULMP.

A joint DOE/OLM program of site characterization should be developed in a new scoping process to ensure a DPEIS is presented for public comment that properly discloses the true scope of impacts, alternatives, and need for federal action to prevent the continuing, unnecessary, and undue degradation of these federal lands.

15

L47-35

L47-35   Text in the land use section (see Section 3.7) has been revised to state that mining activities at the lease tracts are expected to discourage cattle from grazing on or near the lease tracts. However, potential radiation dose/risk associated with grazing on a lease tract area after the lease tract is reclaimed is discussed in Section 4.1.5 of the PEIS. The estimates for radiation dose/cancer risk considered nearby residents obtaining their meat/milk needs entirely from their livestock, which is assumed to graze on a large waste rock pile in the lease tract for the entire duration. The livestock is also assumed to consume grass grown on the waste rocks and contaminated soil while grazing. The waste rocks were conservatively assumed to have a concentration of 23.7 pCi/g for Ra-226 (as well as for other radionuclides in the decay chain). This value is about 7 times the average measured concentration taken from waste rock samples. A maximum dose of 28 mrem/yr, with a corresponding LCF of 1 in 100,000 per year, was estimated. If the waste rocks would be covered with a layer of top material during reclamation, the radiation dose would be much lower. A more realistic estimate considering livestock grazing on an open area in a lease tract with residual surface contamination was also provided in the DPEIS. The estimated radiation dose is 2 mrem/yr (corresponding with an LCF of 1 in 1,000,000 per year). Furthermore, the meat/milk needs of a resident would most likely also come from other sources.

L47-36

L47-36   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS is adequate to support any of the alternatives.

The evaluations conducted for the PEIS were based on site-specific information (see Section 1.3 for a summary of this information). The information is adequate to support the alternatives evaluated and for making fully informed decisions relative to any of the alternatives. Although site-specific information for future mines is not available until the lessees submit specific mine plans, information is available from past mining activities (e.g., cultural resources, threatened and endangered species, waste-rock and ore characteristics, and transportation practices and routes) and is sufficient for supporting the analyses of potential impacts from future mining activities for the five alternatives including a thorough cumulative effects analysis. The site-specific information consulted for the PEIS is summarized in Section 1.3 of this PEIS.

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

### 1.  No Action Alternative

A proper "no action" alternative is not provided analysis and comparison against the action alternatives. Instead, the DPEIS proposes to leave unlawfully issued leases in place and to continue the 2007 programmatic decisions without alteration. DPEIS at S-38. By contrast, a NEPA-compliant "no action alternative" would examine the consequences of taking no action to reissue leases, expand the leasing program leases program, or otherwise continue the 1995 approvals which lapsed in 2005. Such a "no action alternative" would establish a scenario to support the need for the action alternatives that include the immediate actions necessary to achieve immediate stabilization and long-term reclamation of each tract.

Unfortunately, the poor conditions that result from no action at the sites does not require hypothetical. No maintenance or other activity has taken place at many of the lease tracts since the permanent injunction issued in 2011. Although Cotter has carried out some activities, court-mandated summaries of actual activities at Cotter leases has not been provided, with DOE providing mere examples of maintenance activities that might have been carried out during the injunction.

Instead of providing a no action alternative that would confirm the need for further reclamation and remedial activities, Alternative 5 (ULMP goes forward "exactly as it was approved in the July 2007 PEA/FONSI") is the "no action" alternative relied upon in the DPEIS. Reaffirming decisions made in 2007 on 1995 decisions that lapsed in 2005, without first complying with NEPA, ESA, NHPA, and other laws cannot be lawfully deemed a "no action alternative" in a 2013 NEPA analysis. This is particularly true where the 2007 PEA/FONSI was declared illegal by the district court.

While the no action alternative is important to examine during comparison of alternatives, the contaminated condition of the lease tracts, even those that were supposedly reclaimed, likely precludes adoption of a "no action" alternative. However, a NEPA-compliant "no action" alternative must still be presented and seriously analyzed as a means to compare the action alternatives, even if its adoption is unlikely or infeasible. Comparison of the action alternatives to a true No Action is an important feature of NEPA that must be included in a new DPEIS.

### 2.  Reserve, Reclaim, and Renewable Alternative

Although requested in the scoping notice, a sixth alternative should include the analysis of the reclamation and reserve purposes of DPEIS Alternative 1 (reclaim and manage without issuing leases), combined with the imposition of reclamation standards that would allow the brownfields created at some mines, such as Opera Box, to be used for renewable energy production. A similar solar brownfield program has been pursued at both the Rifle and Durango uranium tailings disposal sites. However, not all lease tracts are suited to renewable energy program due to remote locations and important ecological values.

16

| L47-37 | **L47-37** | Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS. |

DOE has properly formulated the no action alternative in accordance with CEQ regulations and guidance (Council on Environmental Quality [CEQ]: *Forty Most Asked Questions Concerning CEQ's NEPA Regulations* [46 FR 18026 (March 23, 1981) as amended] regarding "No Action." For a program, "No action" means no changes from current management direction, as under Alternative 5. For a project, "No Action" means "the proposed activity would not take place," as under Alternatives 1 and 2. In any case, this PEIS analyzes both interpretations and comparatively presents them so that the impacts of all reasonable alternatives can be understood on an absolute and relative basis.

| L47-38 | **L47-38** | In the case of Rifle and Durango, the sites identified, DOE has the jurisdictional authority to work with developers for alternative uses of these sites. In the case of the ULP program the withdrawals do not provide DOE with that authority as it remains with BLM. The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources. |

### Energy & Conservation Law, Commenter ID No. L47 (Cont.)

**E.   Impacts – Beneficial and Adverse**

The comments from the public, local government, and federal agencies in the administrative record filed with the district court in the pending litigation identify most of the impacts that need to be analyzed in the DPEIS. However, the comments of BLM and others were largely ignored. Because the materials are already in DOE's possession, the entire administrative record filed in *CEC v. Office of Legacy Management*, 08-cv-01624-WJM -MJW is incorporated here by reference.

The declarations and briefs filed during the litigation are also included by reference in these comments, as they provide information regarding the impacts that must be analyzed in the DPEIS.

Further, the DPEIS simply dismisses, with any analysis, the potential benefits of reserving the federal uranium while stimulating local employment by requiring prompt reclamation. These issues were raised in detail by the scoping comments and are reasserted here.

**F.   Cooperating Agencies**

Although various local, state, and federal agencies with jurisdiction to review/approve any aspect of the Energy Fuels mill must be included as either cooperating or co-lead agencies in the PEIS, water supply and milling impacts are simply ignored. S-22. Although Freedom of Information Act requests have gone unfulfilled, documents obtained and reviewed so far indicate the Environmental Protection Agency and Bureau of Reclamation have jurisdiction and control of uranium mining and milling activities that are currently under review, and must be included as cooperating agencies and must complete Section 7 Consultation before taking any action regarding the mining and milling of ULMP uranium.

Further, USGS has extensive expertise in pollution associated with uranium mining and milling, including the ongoing problems at Energy Fuels' mill, located near White Mesa, Utah. Not only was USGS not invited to participate, several key USGS reports and findings regarding impacts of uranium mining and milling in the region are not addressed in the DPEIS, despite being provided in previous comments and litigation filings.

**G.   Interim Activities**

During the preparation of a new DPEIS, OLM should begin a program of interim maintenance and site stabilization based on site specific environmental assessments that include meaningful public comment on the draft environmental assessments. Although site-specific NEPA analysis has not been conducted since 1994, extensive data collection was not conducted for the DPEIS. Data collection and site surveys should be considered part of the interim maintenance and site stabilization.

Colorado DRMS is engaged in efforts to remedy longstanding violations of the Mined Land Reclamation Act by DOE and its lessees. These state proceedings will likely result in activities necessary to comply with state orders. OLM is aware of the proceedings and the need for NEPA

17

**L47-39**

**L47-39**   See response to L47-38.

Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

**L47-40**

**L47-40**   U.S. EPA is a cooperating agency and the Bureau of Reclamation (BOR) does not have jurisdiction over the ULP. BOR activities at Paradox Valley are described in the PEIS in Section 4.7.2.9. The Draft PEIS was sent to the Department of the Interior (DOI), which provided comments. The DOI-BLM is a cooperating agency for the ULP PEIS process.

**L47-41**

**L47-41**   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS. State regulations and orders are being followed and lessees are required to meet State and federal laws. A Biological Assessment (BA) has been prepared as part of the consultation with the U.S. Fish and Wildlife Service (Service) regarding potential impacts of the ULP on species listed under the ESA. This BA and the Biological Opinion from the USWFS are included in the PEIS as Appendix E. PEIS text has been revised consistent with the BA and BO, see Appendix E and pertinent sections in Chapter 2 and 4.

DOE has appropriately prepared this PEIS in accordance with the National Environmental Policy Act of 1969 (NEPA), the Council of Environmental Quality's NEPA regulations, and DOE's NEPA implementing procedures. DOE does not need or plan to prepare a new DPEIS.

BLM_0043306

**Energy & Conservation Law, Commenter ID No. L47 (Cont.)**

and ESA compliance. Failure to prepare a lawful DPEIS cannot excuse OLM and its lessees from compliance with state and federal laws. Unfortunately, that is exactly what the federal lesees have been promoting during recent proceedings before Colorado's Mined Land Reclamation Board.

L47-41 (Cont.)

The DPEIS does not reveal that ore stockpiles have simply been dumped back into the mine where adequate permits and protections of water quality were not in place (JD-8). The DPEIS does not reveal how some new lease tract operations may or may not have met new Clean Water Act permit conditions that required immediate construction of mitigation for contaminated point source discharges (JD-7, JD-9). Despite the construction of new water management structures at these sites (JD-7, JD-9), DOE conducted no site-specific NEPA review and indeed fails in the DPEIS to acknowledge this work or identify its effectiveness as mitigation as surface water contamination control. Further, there is no recognition that none of the lessees intend to bring the lease tracts into production in the foreseeable future.

L47-42

Last the DPEIS ignores that fact that many necessary permits and approvals are not in place for these lease tracts, including radon emissions approvals required by the Clean Air Act, stormwater and discharge approvals required by the Clean Water Act, consultation under the Endangered Species Act, and Environmental Protection Plans required by the Mined Land Reclamation Act.

The time for lessees to conduct interim stabilization has passed where unabated violations exist and some of these sites. Although the comprehensive clean-up program must be analyzed within a full NEPA process, action to invalidate specific leases should be considered for tracts in current violation of state law. In particular, most of the Slick Rock tracts lack Environmental Protection Plans, valid mining plans, Colorado has ordered the federal lessee to comply with Colorado law or conduct permanent reclamation. Instead of compliance, the lessee has chosen permanent reclamation option. That said, the guise of interim protections or remedy of violations of Colorado laws cannot be allowed to avoid the programmatic and site specific NEPA analyses that is needed to address and remedy the past impacts of uranium mining.

L47-43

**E.    Threatened and Endangered Species/Migratory Birds/Other Wildlife**

Ongoing DOE consultation with the USFWS was confirmed by the April 17, 2013 email from Ray Pleiness to the USFWS confirming that the multi-federal agency action that includes the ULMP, Piñon Ridge uranium mill, and other components of federal uranium complex "is likely to adversely affect" federally listed species. Exh. 5. However, requested agency records, including the Biological Assessments, Biological Opinion, field surveys, data, and other analytic documents, have not been released by DOE, BLM, Bureau of Reclamation, or USFWS despite FOIA requests filed in March 2013.

L47-44

Because the information include in scoping comments appears to have been ignored, those comments, the 60 day notice of intent to sue, and litigation documents regarding ESA-listed species are incorporated here by reference, for sake of brevity.

18

---

L47-42    CDRMS directed Cotter to remove the ore stockpile by either shipping it or relocating it back underground. Cotter returned the stockpile to the underground mine under the direction of CDRMS. Mine JD-8 is a dry mine.

L47-43    DOE believes all the necessary permits and approvals are in place for these lease tracts.

L47-44    The PEIS analysis considered site-specific and cumulative impacts, including all contaminants of concern.

A Biological Assessment (BA) has been prepared as part of the consultation with the U.S. Fish and Wildlife Service (Service) regarding potential impacts of the ULP on species listed under the ESA. This BA and the Biological Opinion from the USWFS are included in the PEIS as Appendix E. PEIS text has been revised consistent with the BA and BO, see Appendix E and pertinent sections in Chapters 2 and 4.

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

Additional impacts that have been revealed and/or confirmed since scoping comment period closed in 2011. Federal approvals are required delivery of wet water to Piñon Ridge Mill that Energy Fuels plans to operate at 1500 ton per day capacity for some or all of the life of the mill, must be analyzed. These proposed depletions and diversions from the San Miguel River, Dolores River, and McPhee Reservoir are under current consideration by Bureau of Reclamation (Exh. 3) and BLM (Exh. 4), although the DPEIS does not make mention of either of these federal agency actions.

Uranium and ammonia are mentioned as impacting ESA-listed fish, but impacts of selenium, iron, radium, and various heavy metals are ignored. Pollution is identified in USFWS documents as a critical factor in avoiding jeopardy and extinction to protected species, but the DPEIS does not disclose or analyze the direct, indirect, or cumulative impact of a region-wide resurgence of uranium mining and milling. Site-specific and cumulative impacts to the ESA-listedand other sensitive species in the upper reaches of the Colorado River system must be disclosed in a new DPEIS that takes into account the actual pollutants of concern, particularly selenium and radium. The need to prepare and release a new DPEIS that addresses all listed and sensitive species is confirmed by an analysis of specific species.

1. Federally Endangered Fish

The DPEIS fails to address public scoping comments relating to endangered fish. As scoping comments noted, four federally endangered fish species are likely to be negatively affected by the leasing: the razorback sucker, the humpback chub, the bonytail chub and the Colorado pikeminnow. All four of the endangered Colorado River fish species may be present in the Colorado River just downstream from the confluence with the Dolores. In addition, some individuals of Colorado pikeminnow may be present in the Dolores River.

The Colorado pikeminnow was known to occur historically in the Dolores River as far upstream as the Paradox Valley (upstream from the confluence with the San Miguel River). Colorado pikeminnow were recorded in the river as recently as 1991, when four pikeminnow were captured within the lower 1.2 miles of the Dolores River[1]. The razorback sucker may occur in the Colorado River downstream from the confluence with the Dolores River and is stocked in the Colorado River upstream of the confluence with the Dolores River[2].

There are relatively large and healthy populations of humpback chub in the Colorado River near the confluence with the Dolores River[3]. One of the very few remaining wild populations of bonytail occurs in the Colorado River upstream from the confluence with the Dolores River, and since 1996 bonytail have been stocked in the Colorado River in Utah near the confluence with the Dolores River.23 In addition, critical habitat for all four of the endangered Colorado River

---

[1] Valdez, R.A., Masslich, W.J, and Wasowicz, A. 1992. Dolores River native fish habitat suitability study in Utah. Division of Wildlife Resources, ed: Salt Lake City, UT

[2] U.S. Fish and Wildlife Service. 2008. Programmatic biological opinion for water depletions associated with Bureau of Land Management's fluid mineral program within the Upper Colorado River Basin in Colorado in Ecological Services Office, ed: Grand Junction, CO.

[3] U.S. Fish and Wildlife Service. 2008. Programmatic biological opinion for water depletions associated with Bureau of Land Management's fluid mineral program within the Upper Colorado River Basin in Colorado in Ecological Services Office, ed: Grand Junction, CO.

19

---

L47-44
(Cont.)

L47-45

L47-45   Additional information pertaining to the life history, distribution, occurrence, and threats of the Colorado River endangered fish has been considered and incorporated in the Final PEIS (see Section 3.6).

BLM_0043308

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

fish has been designated in portions of the Colorado River downstream from the confluence of the Dolores River.

L47-45 (Cont.)

Roads that may be used to transport materials to and from the lease parcels may cross occupied and critical habitat for all four of the four endangered Colorado River fish species. The proposed leasing may affect these fish species in several ways. Streamflow regulation, habitat modification, competition and predation with nonnative fish species, pesticides and pollutants, are major threats to all four of the endangered CO river fish species. The reduction of flows in streams and rivers, due to the cumulative impacts of diversion of water, is one of the primary factors in the decline of these species.

L47-46

Degradation of water quality due to pesticides and pollutants has been implicated as a major factor in the declines of the four endangered Colorado River fish. Threats from pesticides and pollutants include accidental spills of petroleum products and hazardous materials, discharge of pollutants from uranium mill tailings and mines, and high selenium concentration in the water and food chain. Accidental spills of hazardous material into occupied habitat, and discharge of pollutants from uranium operations can cause mortality when lethal toxicity levels are exceeded. Discharge of pollutants can also result in chronic toxicity that negatively impacts survival and reproduction over time. Ore transport along roads adjacent to the Dolores River and its tributaries, and the Colorado River, could result in spills that would introduce ore and sediment containing elevated concentrations of many chemical and radioactive constituents to these water bodies. Road maintenance, including blading and the addition of magnesium chloride and sand to road surfaces could introduce additional sediments and chemical pollutants to the Dolores River and its tributaries. Vehicle, equipment cleaning, fueling and oil and chemical spills could introduce hydrocarbons, solvents, and other chemicals to soils and surface waters. These activities may degrade water quality, and negatively impact the four endangered Colorado River fish species.

L47-47

In addition, past activities, including past uranium mining and processing on ULP lease tracts and in the surrounding region, oil and gas development, and irrigation in areas with soils high in selenium, have resulted in water quality problems in the Dolores and Colorado Rivers. For example, uranium mill tailings on the DOE lease tracts near the Dolores River contaminated the alluvial aquifer with uranium, selenium, manganese, molybdenum, nitrate, radium 226, radium 228, benzene, and toluene. According to U.S. Fish and Wildlife Service (2007), " Uranium processing facilities operated during the late 1940's through the 1960's severely impacted the river and may have contributed to the decline of Colorado pikeminnow in the Dolores River drainage "[4]  Valdez et al. (2002) found that, "Native fish composition and abundance were found to be poor downstream of the San Miguel confluence, a river reach heavily impacted by poor water quality due to uranium tailings". Ongoing and future activities in the area, including uranium mining, oil and gas development, and irrigation, are also resulting in increased pollution in the Dolores and Colorado River basins. Proposed uranium mines and mills in the area (including the Whirlwind mine, the recently licensed Piñon Ridge mill, and the Paradox uranium

L47-48

[4]U.S. Fish and Wildlife Service, 2007. Recovery implementation program recovery action plan: recovery implementation program for endangered fish species in the upper Colorado River Basin in Region 6, ed: Denver, CO. *See also* Valdez RA, Masslich WJ, Wasowicz A, 1992. Dolores River native fish habitat suitability study in Utah Division of Wildlife Resources, ed:  Salt Lake City, UT.

20

**L47-46**   PEIS text has been revised consistent with the BA and BO, see Section 4.3.6.4. Measures to minimize potential impacts from uranium mining in the ULP lease tracts are provided in Table 4.6-1. These measures include measures to avoid, minimize, and mitigate impacts to waterbodies and aquatic habitats for aquatic biota such as these fish species (M-4). The BA and the BO from the USFWS regarding potential impacts of the ULP on species listed under the ESA have been included in this Final PEIS as Appendix E.

**L47-47**   See Response to L47-46.

**L47-48**   In the PEIS, water use estimates are discussed for each alternative in Section 2.2. Impacts to sensitive aquatic biota (including the Colorado River endangered fish) were evaluated based on these water use assumptions. Due to uncertainty on specific mine locations and activities, it is speculative to provide more detailed analyses of potential impacts to sensitive species. Site-specific analyses would be provided in the EPPs developed for individual mines. The EPP prepared for individual mines will address mitigation measures in greater detail. The Service, Colorado Parks and Wildlife (CPW), and BLM will have input on mitigation actions required under the ULP during their review of the EPP. Cumulative impacts of the ULP on sensitive fish species include impacts of other activities and are discussed in Section 4.7.

BLM_0043309

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

mill) may also result in runoff and discharge of contaminants into the Dolores River basin. In fact, discharge of treated water from dewatering activities at the Whirlwind Mine has exceeded state water quality standards for uranium and selenium on several occasions. Water pollution that will result from the development of the lease tracts may have direct, indirect and cumulative impacts on the four endangered Colorado River fish species. The DPEIS must analyze the cumulative impacts of current leasing with other impacts on the fish.

L47-48 (Cont.)

The proposed leasing may result in discharges or runoff of pollutants that may be toxic to fish and other aquatic life, including uranium, selenium, ammonia, arsenic molybdenum, aluminum, barium, copper, iron, lead, manganese, vanadium and zinc. These pollutants may also be introduced to the Dolores and Colorado River via atmospheric deposition and subsequent runoff of contaminants.

The DOE has not adequately analyzed the potential direct, indirect and cumulative impacts of water contamination that could result from the proposed leasing on the four endangered Colorado River fish and other sensitive aquatic and riparian species. It is imperative that the DOE consider the effects of degraded water quality that may result from the proposed leasing, mining activity and associated uranium milling activities – particularly in combination with the effects of other past, present, and reasonably foreseeable water degrading activities. Past uranium mining and processing along the Dolores River, oil and gas development, and irrigation in areas with soils high in selenium have already caused water quality problems in the Dolores and Colorado Rivers. For example, uranium mill tailings on DOE lease tracts near the Dolores River contaminated the alluvial aquifer with uranium, selenium, manganese, molybdenum, nitrate, radium 226, radium 228, benzene, and toluene during the last uranium boom in the Dolores River watershed.

Water quality impacts could result from all of the following activities that will occur as part of mining operations on ULP lease tracts: vegetation removal and clearing, mine water discharge, ore stockpiling, waste rock storage, ore transport, road maintenance, motorized vehicle and equipment cleaning and fueling, oil and chemical spills etc. Accelerated sediment erosion could occur from increased soil compaction and reduced infiltration as a result of vegetation removal, resulting in sediment transport and eventual deposition in the Dolores River and its tributaries. On some lease tracts, mine water containing elevated levels of a number of pollutants may be pumped from mines, treated, and discharged into the Dolores River, or permanent or ephemeral streams that flow into the Dolores River. Precipitation falling on ore stockpiles, waste rock stockpiles, and other contaminated areas within the mine project area would pick up pollutants and become stormwater. Ore transport along roads adjacent to the Dolores River and its tributaries, and the Colorado River, could result in spills that would introduce ore and sediment containing elevated concentrations of many chemical and radioactive constituents to these water bodies. Road maintenance, including blading and the addition of magnesium chloride and sand to road surfaces could introduce additional sediments and chemical pollutants to the Dolores river and its tributaries. Vehicle, equipment cleaning, fueling and oil and chemical spills could introduce hydrocarbons, solvents, and other chemicals to soils and surface waters.

Selenium is an element of particular concern, as elevated selenium can be taken up directly from water by aquatic organisms, resulting in acute toxicity at relatively high concentrations, and

L47-49

L47-49   Potential direct, indirect, and cumulative impacts of water quality to sensitive aquatic biota (including the Colorado River endangered fish) are discussed in the PEIS. The effects of additional metals (e.g., selenium, iron, and radium) on biota from uranium mining have been reviewed and text for the Colorado River fishes has been revised accordingly. The PEIS identifies several avoidance, minimization, and mitigation measures to eliminate or reduce impacts of water quality. These measures are identified in Table 4.6-1.

21

BLM_0043310

### Energy & Conservation Law, Commenter ID No. L47 (Cont.)

accumulate in the aquatic food chain. This can result in myriad adverse effects on fish and waterfowl populations, including impaired reproduction, deformities, reduced survival and other problems. Selenium contamination in the Colorado River basin has been implicated in the decline of the four endangered Colorado River fish species, and may be impeding their recovery. Selenium could leach from ore and waste-rock stockpiles, and enter the Dolores River and its tributaries via runoff of contaminated sediments during precipitation events, particularly large storm events and floods. Even runoff of very small amounts of selenium could result in accumulation of contaminated sediments in waterways over time, and cumulatively significant impacts on aquatic life through accumulation and bio-magnification in the food chain. There is evidence that high selenium levels may adversely affect reproduction and recruitment in these fishes. Selenium also tends to concentrate in low velocity areas that are important habitats for the Colorado pikeminnow and razorback suckers. It is critically important to note that runoff or discharge of water with very low concentrations of selenium can result in adverse impacts on fish (as well as other aquatic species, and terrestrial species that consume fish). One study in waters downstream from uranium mining and milling operations in Canada found that in areas where water concentrations of selenium are very low (less than or equal to 1ug/L, and lower than the 5ug/L water criterion established by U.S. EPA), selenium has been incorporated into the food chain via primary producers, gradually built up in sediments and benthic biota, and reached levels that have the potential to cause reproductive impairment in fish. In addition, a short pulse event can quickly load an aquatic environment with selenium, and that selenium could then be conserved in the ecosystem for long periods of time.[5] The Dolores River currently has elevated levels of selenium, in part due to past Uranium mining and milling activities in the Uravan mineral belt.

In an email dated April 17, 2013, from Tracy Ribeiro of the Department of Energy to Patty Gelatt of the U.S. Fish and Wildlife Service, it was disclosed that the Uranium Leasing Program may affect and are likely to adversely affect the four fish species.[6] The DPEIS does not reflect this change in classification of the anticipated impacts. DOE must analyze the impacts on the fish based on this increased assumption. Without such analysis DOE's decision to lease these parcels is arbitrary and capricious.

2.  BLM "Sensitive" Fish

Leasing would also impact three sensitive species of fish in the Dolores River through aquifer drawdown and contamination: bluehead sucker, flannelmouth sucker, and roundtail chub.[7] The

L47-49 (Cont.)

L47-50

---

[5] Such effects may not be limited to the four endangered Colorado River fish species. Runoff or discharge of water with very low concentrations of selenium can result in adverse impacts on many species of fish and fish-eating waterfowl and mammals. One study in waters downstream from uranium mining and milling operations in Canada found that in areas where water concentrations of selenium are very low, selenium has been incorporated into the food chain via primary producers, gradually built up in sediments and benthic biota, and reached levels that have the potential to cause reproductive impairment in fish. In addition, a short pulse event can quickly load an aquatic environment with selenium, and that selenium could then be conserved in the ecosystem for long periods of time. Muscatello JR, Belknap AM, Janz DM. 2008.

[6] See Exh 5, April 19, 2013 email RE: Revisions planned on BA for the Department of Energy Uranium Leasing Program (DOE ULP)

[7] See Exh 7, STATUS AND TRENDS OF FLANNELMOUTH SUCKER CATOSTOMUS LATIPINNIS, BLUEHEAD SUCKER CATOSTOMUS DISCOBOLUS, AND ROUNDTAIL CHUB GILA ROBUSTA, IN THE

L47-49 (Cont.)

---

L47-50    DOE has reviewed the analyses in this PEIS in light of the two exhibits mentioned in the attachments and determined that the analyses are adequate. The exhibits are not reproduced in this Appendix but are, however, summarized below:

**Exhibit 8: Lower Dolores River Implementation, Monitoring, and Evaluation Plan**

Exhibit 8 consists of the *Executive Summary The Lower Dolores River Implementation Monitoring and Evaluation Plan For Native Fish*. The *Summary* provides background information about modifications to the Dolores River, including water diversions and the construction of McPhee Dam in 1984, and changing uses of the Dolores River. The *Summary* describes recent actions and current status of the river, pointing out that the Dolores River Implementation, Monitoring and Evaluation Plan (Implementation Plan) describes the efforts that are being undertaken to improve populations of endangered fish while preserving and possibly maintaining the many values that the river provides to the surrounding communities. The *Summary* highlights the participating stakeholders, such as the Dolores River Dialogue (DRD), Lower Dolores Working Group (LDWG) and the Implementation Team members. The *Summary* goes on to describe how the Implementation Plan addresses management opportunities identified by fisheries scientists and how the Implementation Team will assess and ensure native fish viability. The *Summary* concludes by noting that Implementation Team members continue to seek broadly accepted solutions to protect and enhance the long-term viability of native fish populations in the Dolores River below McPhee Dam.

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

impacts on these fish will be similar to those described for the ESA listed fish species.[8] However, the close proximity of leasing and development to habitat for these fish will exacerbate these impacts.[9] DOE should have considered The Lower Dolores River Implementation, Monitoring, and Evaluation Plan for Native Fish.[10] DOE must analyze how leasing these parcels will affect these sensitive fish species. The DPEIS offers only a cursory analysis of impacts to these species. Importantly, the DPEIS does not consider the direct, indirect and cumulative impacts of water depletion on these species, despite the fact that low baseflows due to the cumulative impacts of water diversion has been identified as a major factor in the ongoing decline of these sensitive species. Further, the DPEIS contains no discussion of the cumulative impacts of the proposed action on these fish species.

#### 3    Gunnison's Sage Grouse

The EA makes a "not likely to adversely affect determination" for Gunnison sage-grouse. This determination is based on an inadequate analysis of the direct, indirect and cumulative impacts of the proposed action on Gunnison sage-grouse. On January 11, 2013, the USFWS proposed to list the Gunnison sage-grouse as an endangered species under the Endangered Species Act (ESA) (http://www.fws.gov/mountain-prairie-species/birds/gunnisonsagegrouse/78FR2486.pdf), and proposed to designate critical habitat for Gunnison sage-grouse (http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/78FR2540.pdf, see maps of proposed critical habitat at http://www.fws.gov/coloradoes/gusg/.) These proposed rules contain information on the status of Gunnison sage-grouse, threats to Gunnison sage-grouse and critical habitat for Gunnison sage-grouse, that was available prior to publication of the DPEIS on March 15th, 2013, but was not considered in the analysis of the potential impacts of the proposed action on Gunnison sage-grouse. This constitutes the best available science on Gunnison sage-grouse, and significant new information. The DPEIS analysis of impacts of the proposed action is incomplete without consideration of this information, rendering the finding of "not likely to adversely affect" for Gunnison sage-grouse arbitrary and capricious.

The DPEIS also fails to adequately analyze the direct, indirect and cumulative impacts on Gunnison sage-grouse. A number of the lease tracts occur within or adjacent to occupied habitat and proposed critical habitat, and roads that will likely be used to access the lease tracts are within or adjacent to occupied and proposed critical habitat. The DPEIS fails to adequately analyze the impacts of loss and fragmentation of sagebrush habitat due to development of the lease parcels. Gunnison sage-grouse are dependent on expansive, contiguous areas of sagebrush habitat to meet their life-history needs. Habitat loss and fragmentation due to energy development infrastructure is expected to have significant negative impacts on Gunnison sage-grouse. Development associated with the lease tracts will cumulatively contribute to the direct and functional loss of sagebrush habitat, and adversely affect the species by limiting already scarce habitat occupied by very small populations already at risk of extinction due to small

---

DOLORES RIVER, COLORADO, AND OPPORTUNITIES FOR POPULATION IMPROVEMENT: PHASE II REPORT
[8] *See* Exh 8 Executive Summary The Lower Dolores River Implementation Monitoring and Evaluation Plan For Native Fish (attached)
[9] *See* Exh 9 Dolores River – Nonpoint Source Pollution Watershed Plan (attached)
[10] *See Exh 10.*

23

L47-50 (Cont.)

L47-51

**Exhibit 9: Dolores River – Nonpoint Source Pollution Watershed Plan**

Exhibit 9 consists of the *Dolores River Nonpoint Source Pollution Watershed Management Plan* (the *Plan*). The *Plan* describes some of the results of a collaborative watershed planning effort to identify nonpoint sources of pollution that may be impacting aquatic life in the Lower Dolores River. However, based on information provided by industry and CPW, the species has additional information needed about such nonpoint source pollution, and potential management opportunities and other actions to reduce any such impacts. The particular focus of the *Plan* is the conservation of native fish. The *Plan* compiles information on the history and development of the Lower Dolores River watershed, assembles available water quality data and information for the Lower Dolores River, and identifies nonpoint pollutants concern for native fish, potential sources of nonpoint source pollution, data gaps, and potential management actions to mitigate the sources of nonpoint source pollution. Water quality parameters including temperature, sediment, uranium, salinity, and nutrients, most of which are generally at levels that comply with water quality standards established by the Colorado Water Quality Control Commission, are the focus of the *Plan*. These parameters are thought to have potential to be stressors on native fish reproduction and survival in the Lower Dolores River. Therefore, the *Plan* is intended to identify opportunities to mitigate such stressors, even for parameters that do not exceed regulatory thresholds.

L47-51    Information on the Gunnison sage-grouse is provided in Sections 3.6.4, 4.1.6.4, and 4.3.6.4. As discussed in these sections, potentially suitable habitat for this species may occur in several lease tracts. However, based on information provided by industry and CPW, the species has not been recorded on any of the lease tracts. On January 11, 2013, the U.S. Fish and Wildlife Service (Service) proposed to list the Gunnison sage-grouse as an endangered species under the ESA. At that time, the Service proposed to designate 1.7 million acres of critical habitat for the species. The most recent available information for the Gunnison sage-grouse, including updated geospatial data pertaining to the species' critical habitat, has been used to update the Final PEIS. Measures to minimize potential impacts from uranium mining in the ULP lease tracts are provided in Table 4.6-1.

**Energy & Conservation Law, Commenter ID No. L47 (Cont.)**

population size and genetic issues.  The USFWS notes that this is of particular concern within the six smaller populations, which include the populations at issue here.  The DPEIS fails to adequately consider the extent to which the infrastructure required for development of the lease tracts will contribute to direct, indirect (via behavioral avoidance of habitat) and cumulative loss and fragmentation of already scarce Gunnison sage-grouse habitat.

L47-51 (Cont.)

The DPEIS fails to adequately analyze the impacts of construction, maintenance and increased use of roads that will result from development of the lease tracts, including, but not limited to direct habitat loss, direct mortality, barriers to migration corridors or seasonal habitats, facilitation of predation, spread of invasive vegetative species, noise, and increased human disturbance.  The DPEIS fails to adequately analyze the impacts of construction of powerlines needed to bring power to the lease tracts, including direct impacts due to powerlines posing a collision and electrocution hazard, indirect effects of decreasing lek recruitment, increasing predation, fragmenting habitat, and facilitating the invasion of exotic annual plants.  Further, the DPEIS fails to adequately analyze the impacts of contaminants on Gunnison sage-grouse.

In addition, the DPEIS provides no analysis of the cumulative effects of the proposed action in combination with other reasonably foreseeable future actions in the region on Gunnison sage-grouse, including, but not limited to the proposed Pinon Ridge Uranium Mill.  Finally, the DPEIS states that "Given the implementation of appropriate minimization and mitigation measures, ULP activities under Alternative 1 may affect, but are not likely to adversely affect, the Gunnison sage-grouse."  However, the DPEIS does not specify what mitigation measures will be applied or include an analysis of the likelihood of effectiveness of mitigation measures and mitigating impacts to Gunnison sage-grouse.  The DPEIS relies on a vague promise of application of unspecified mitigation measures, which does not provide adequate certainty that mitigation measures will limit impacts such that the proposed action is "not likely to adversely affect" Gunnison sage-grouse.

L47-52    L47-52    See response to L47-51.

Additional impacts that have been revealed and/or confirmed since scoping was conducted in 2011, Depletions for the mill that Energy Fuels plans to operate at 1500 ton per day capacity for some or all of the life of the mill, must be analyzed.

Uranium and ammonia are mentioned as impacting ESA-listed fish, but impacts of selenium, iron, radium, and various heavy metals are ignored.  Pollution is identified in USFWS documents as a critical factor in avoiding jeopardy and extinction, but the DPEIS does not disclose or analyze the direct, indirect, or cumulative impact of a region-wide resurgence of uranium mining and milling.  Site-specific and cumulative impacts to the ESA-listed fish in the upper reaches of the Colorado River system must be disclosed in a new DPEIS that takes into account the actual pollutants of concern, particularly selenium and radium.

4.    Gunnison's Prairie Dog

The DPEIS makes an "unlikely to adversely affect" determination for Gunnison's prairie dog.  This determination is based on an inadequate, incomplete and unsupportive analysis of direct, indirect and cumulative impacts of uranium mines, exploration, mining, reclamation, transportation, milling and other related activities.

L47-53    L47-53    Measures to minimize potential impacts from uranium mining in the ULP lease tracts are provided in Table 4.6-1.  For the Gunnison's prairie dog, it was determined that, with the implementation of these measures, the ULP activities may affect, but are not likely to adversely affect the species.

24

### Energy & Conservation Law, Commenter ID No. L47 (Cont.)

The DPEIS states that (a) "[M]ining activity might increase the exposure of wildlife to uranium and other radioactive decay products and to other chemical elements," (b) negative impacts to mammals from uranium radionuclides occur "from 0.004 to 40.0 mGy/h," (c) "species that spend considerable amounts of time underground in caves, mines, or burrows could potentially inhale, ingest, or be directly exposed to uranium and other radionuclides while digging, eating, preening, and/or hibernating," (d) herbivores could be "exposed by ingesting radionuclides that aerially deposited on vegetation or concentrated in surface waters at or near mine sites," and (e) "in isolated hot spots, concentrations (of radionuclides) may be several times higher than recommended guidelines." DPEIS at 4-113.

The DPEIS goes on to state that (a) Gunnison's prairie dogs burrow in "well-drained soils," (b) "can exhibit periods of inactivity during winter that last for months," that (d) "individuals in some parts of the range hibernate," that (e) "their diet consists mainly of grasses, forbs, sedges and shrubs" and (f) "have experienced long-term population decline of 30-70%" and, as a result, "became a candidate for Federal listing on February 5, 2008." Id at E-20. The DPEIS goes on to say that "listed species, because of their low populations, would be far more sensitive to impacts than more common and widespread species. Their small population makes these species more vulnerable to the effects of habitat fragmentation, habitat alteration, habitat degradation, human disturbance and harassment, mortality of individuals, and the loss of genetic diversity." Thus, the imperiled Gunnison's prairie dog exhibits the exact population vulnerabilities, habitat requirements and life history strategies that the DPEIS indicates would make a species particularly prone to radionuclide exposure resulting from ULMP activities, including "in isolated hot spots" where concentrations "may be several times higher than recommended guidelines." Id at 4-113.

Yet, without any discussion of the relevance of these facts to Gunnison's prairie dogs, the DPEIS at Table 4.3-8 inexplicably concludes that activities under the ULP "may affect, but are not likely to adversely affect, the Gunnison's prairie dog." The DPEIS fails to establish negative effect exposure thresholds for Gunnison's prairie dog; it lacks discussion of the species' particular vulnerability to exposure; it lacks discussion of where, on a site-specific basis, populations currently exist in relation to existing and potential future exploration and mining sites; it lacks a discussion of the current population size within and immediately beyond the ULP, and fails to establish monitoring protocols to detecting mortality or thresholds for mortality rates or numbers that, if met or exceeded, could be expected to result in population-level impacts. The lack of these and other such analyses renders DOE's conclusion of "not likely to affect" arbitrary and capricious.

5.    Southwestern Willow Flycatcher

The DPEIS makes an "unlikely to adversely affect" determination for southwestern willow flycatcher. This determination is based on an incomplete, inadequate and unsupportive analysis of the direct, indirect and cumulative impacts of exploration, mining, reclamation, transportation, milling and other activities on the species.

The DPEIS states that, "The greatest threat to southwestern willow flycatcher is the loss or degradation of riparian habitat. Potential threats… that may be associated with ULP activities include facility development, water withdrawal, and increased human presence. Direct habitat loss may occur from the development of mining facilities and access roads. Reduction of water in riparian habitats degrades habitat that is essential to the southwestern willow flycatcher

L47-53
(Cont.)

L47-54

L47-54   Measures to minimize potential impacts from uranium mining in the ULP lease tracts are provided in Table 4.6-1. For the southwestern willow flycatcher, it was determined that, with the implementation of these measures, the ULP activities may affect, but are not likely to adversely affect the species.

25

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

habitat.  Human disturbances at nesting sites resulting from human presence or traffic noise may result in nest abandonment.  Additional threats include fire, livestock grazing, brood parasitism by brown-headed cowbird." DPEIS at E-16.  It states that, "Program activities on all lease tracts under Alternative 3 (and therefore 4) could affect this species" and that "indirect impacts on the species or its habitat from water withdrawals, noise, runoff, sedimentation, fugitive dust deposition, or those related to radiation exposure might be possible." DPEIS at Table 4.3.8.

The DPEIS lacks any analysis of the current quantity and location of occupied and potential suitable habitat of southwestern willow flycatcher in relation to the ULP lease tracts, transpiration systems, or milling sites.  It lacks any analysis of the quantity and quality of disturbance to that occupied and potential suitable habitat, or how such disturbance would relate to recovery goals for southwestern willow flycatcher under the Endangered Species Act.  While it lists brood parasitism from brown-headed cowbirds as a potential threat, the DPEIS lacks an analysis of how and where ULP activities, singularly and in combination with livestock grazing, fire, and other management, might enhance brown-headed cowbird populations, and, in turn, how southwestern willow flycatchers may be subject to increased brood parasitism. Similarly, the DPEIS lacks a sufficient analysis of biological exposure pathways for southwestern willow flycatcher (and other insectivorous species) that may bio-accumulate radiological and toxic compounds mobilized by ULP activities into soil, water, air, vegetation, and invertebrate (prey) populations.  The DPEIS similarly fails to establish clear exposure thresholds for biological effects to southwestern willow flycatcher and fails to discuss the potential for ULMP activities enabling those thresholds to be met.  It fails to quantify or analyze the likelihood of a threshold for "take" that would be expected to preclude recovery goals established in the Endangered Species Act as a result of ULP activities.  The DPEIS fails to discuss if and how much water withdrawals resulting from the ULP, other depleting activities, drought and climate change would affect occupied and potential suitable habitat for southwestern willow flycatcher (or other species, like yellow-billed cuckoo) in the action area; it fails also to describe relationships between water depletion and anticipated habitat loss, and how habitat loss would correspond to thresholds for take necessary to ensure recovery pursuant to ESA.

Absent such analyses and supporting data, the DPEIS' conclusions that, "direct impacts on the species or its habitat (riparian woodlands) are unlikely to occur," and that the ULP activities "may affect, but are not likely to adversely affect, the southwestern willow flycatcher" are unsupported, conjectural, arbitrary and capricious.

### 6.   Golden and Bald Eagles

The Bald and Golden Eagle Protection Act, originally passed in 1940, provides for the protection of the bald eagle and the golden eagle (as amended in 1962) by prohibiting the take, possession, sale, purchase, barter, offer to sell, purchase or barter, transport, export or import, of any bald or golden eagle, alive or dead, including any part, nest, or egg, unless allowed by permit (16 U.S.C. 668(a); 50 CFR 22). "Take" includes pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb (16 U.S.C. 668c; 50 CFR 22.3).

The DPEIS fails to adequately discuss bio-accumulation and biological exposure pathways for bald and golden eagles to uranium and other mining-related contaminants. Prey for bald and

26

L47-54
(Cont.)

L47-55

L47-55    Additional specific discussion of impacts to bald and golden eagles under the Bald and Golden Eagle Protection Act has been included in this PEIS (see Sections 3.6.4, 4.16, and 4.3.6).

BLM_0043315

Final ULP PEIS

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

golden eagles, including small burrowing mammals and fish, have the potential to uptake and concentrate contaminates mobilized into soil, air, water, vegetation by mining, exploration, reclamation, transportation and milling activities. Eagles, in turn, can accumulate toxins as they prey on small mammals, fish and other contaminate-exposed prey. By failing to provide a detailed analysis of biological exposure pathways for bald and golden eagles and its prey, and by failing to establish and analyze the potential for meeting toxicity thresholds for eagles, the DPEIS fails to ensure that ULP activities will not "poison, wound, kill… molest or disturb" bald and golden eagles.

L47-55
(Cont.)

### 7.   Bats & White-nose Syndrome

The DPEIS fails to adequately analyze direct, indirect and cumulative impacts of uranium mines, exploration, mining and reclamation activities on bats, including the indirect, cumulative and synergistic effects of mining-related activities on the spread of White-nose syndrome and resulting impacts to bat populations.

The DPEIS altogether fails to analyze the connection between the ULMP and White-nose Syndrome (WNS). First documented in 2006 in a cave in upstate New York, White-nose WNS has since spread to and been confirmed in 17 more states and four Canadian provinces. The fungal pathogen associated with the disease has been found on bats in two additional states, including western Oklahoma, which places it dramatically closer to the western United States. At least one million bats have died.

In affected bat colonies, mortality rates reach nearly 100 percent, virtually emptying caves once harboring tens of thousands of bats and leaving cave floors littered with small bones. The U.S. Fish and Wildlife Service ("FWS") has called WNS the "worst wildlife health crisis in memory". WNS now threatens more than half of North American bat species, including four of the six endangered bat species in the United States. WNS threatens even once-common species like the little brown bat, which is now considered to be in imminent danger of extinction due to the threat of WNS.

L47-56

Because of the transport of the disease by people, activities envisioned in the ULMP, including the movement of people and equipment into and out of mine shafts, have the potential to spread WNS among bat populations. To prevent its spread, it is vital that mineshafts in currently WNS-free areas, like and including Colorado and the ULMP tracts, be protected by a strict closure policy. Once WNS is introduced into a new area, bats themselves can transport the fungal pathogen locally, up to a few hundred miles radius. Restricting human access is critical to minimize transport of the fungus; the worst damage will have been done by the initial introduction of the fungus into a new region. The DPEIS fails to analyze or discuss WNS and provide mitigation, like a prohibition on mining activity, that will guard against WNS introduction to and spread within the ULMP and Colorado.

L47-56   Potential impacts on bats are addressed in Sections 4.1.6.2 and 4.3.6.2 of the PEIS; while measures to minimize potential impacts are provided in Section 4.6. To date, white-nose syndrome has not been reported in Colorado. Until the fungus that causes the disease occurs in Colorado, there would not be the potential for the spread of the disease due to the movement of people and equipment among ULP mines. Also, bats do not tend to make use of active mines (although renewed mining in an inactive mine could be a future concern if the disease is present in Colorado). One of the measures to minimize potential impacts to bats listed in Section 4.6 is the development and enactment of bat mitigation that is coordinated with the Colorado Bat Working Group and Colorado Parks and Wildlife (CPW). It is assumed that such mitigation would include following CPW's "White-Nose Syndrome Response Plan" prepared in 2012, available at: http://static.whitenosesyndrome.org/sites/default/files/resource/ 2012cpw_wns_response_plan.pdf and, presumably, the U.S. Fish and Wildlife's "A National Plan for Assisting States, Federal Agencies, and Tribes in Managing White-Nose Syndrome in Bats" prepared in 2011, available at: http://static.whitenosesyndrome.org/sites/default/ files/white-nose_syndrome_national_plan_may_2011.pdf.

Appendix I: Comment Response Document

BLM_0043316

### Energy & Conservation Law, Commenter ID No. L47 (Cont.)

8.    Migratory Birds

The Migratory Bird Treaty Act is a Federal law that carries out the United States' commitment to four international conventions with Canada, Japan, Mexico and Russia. Those conventions protect birds that migrate across international borders.

The take of all migratory birds, including bald eagles, is governed by the Migratory Birds Treaty Act's regulations. The Migratory Bird Treaty Act (MBTA) prohibits the taking, killing, possession, transportation, and importation of migratory birds, their eggs, parts, and nests except as authorized under a valid permit (50 CFR 21.11). Additionally, the MBTA authorizes and directs the Secretary of the Interior to determine if, and by what means, the take of migratory birds should be allowed and to adopt suitable regulations permitting and governing take (for example, hunting seasons for ducks and geese).

The DPEIS does not adequately analyze direct, indirect, and cumulative impacts of mining, exploration, reclamation, transportation and milling activities on migratory birds or therefore the potential take thereof. These activities have the potential to "take" migratory birds. For example, waste ponds at mines, exploration sites and uranium mills (even netted waste ponds) have the potential to attract, snare, or expose migratory birds to contaminated water, resulting in their mortality. Mining activities have the potential to pollute or deplete water from suitable habitat for migratory birds. Ore trucks can result in direct mortality of species through collision. Road and mine facility construction can directly or indirectly impact migratory species by destroying, displacing or fragmenting their suitable habitat. Biological stresses resulting from such disturbances have the potential to result in "take" migratory birds directly and in synergy with other land uses. For example, authors of these comments have photographed migratory waterfowl (white-faced ibis) using uranium mine ponds in northern Arizona; criminal proscription of Cotter Corporation confirms lethal results where migratory waterfowl are drawn to what appears to be water in an otherwise dry landscape. The DPEIS lacks detailed analyses of all of the above potential impacts to migratory birds, including their resulting "take" and mortality. Pending such analyses and supporting data, federal agencies cannot rely on the DPEIS, or similarly vacuous later-phase NEPA iterations, for concluding that "take" would not result from ULMF activities.

These and other threats pose an imminent threat to listed and other species and the proper means to address these ongoing problems involve both the NEPA process and the criminal enforcement of potentially ongoing violations of provisions of ESA and MBTA. The criminal prosecution of Cotter in 2006 confirms the lethal results where migratory waterfowl are drawn to what appears to be water in a dry landscape. Exh. 6 Criminal Plea Agreement.

**F.    National Historic Preservation Act**

The ongoing programmatic NEPA analysis of potentially impacted properties that included in or eligible for inclusion in the National Register of Historic Places must be conducted in conjunction with Section 106 consultation under the National Historic Preservation Act. 16 U.S.C. 470f (NHPA). Although NHPA Section 106 consultation must be conducted in

28

L47-57

L47-58

L47-57    The PEIS does provide an analysis of potential impacts to migratory birds in Section 4.3.6.2 and in Section 4.3.6.4 (specific migratory bird species that are listed as threatened or endangered) from mine exploration, development and operation, and reclamation. However, without site-specific information on mine locations and activities, it is too speculative to provide detailed analyses of potential impacts to migratory birds, particularly "take" and mortality. Site-specific analyses would be provided in the Environmental Protection Plans (EPPs) developed for individual mines. Section 4.6 of the PEIS includes measures aimed at protecting birds in order to be in compliance with the Migratory Bird Treaty Act. The Colorado Parks and Wildlife (CPW) will have input on mitigation actions required under the ULP during their review of the EPPs prepared for proposed mines. Permit and lease requirements for the mines will include requirements to adhere to all applicable laws and regulations, including compliance with the Migratory Bird Treaty Act.

L47-58    Historically, NHPA consultations have been conducted on the lease tracts for ULP activities as the potential areas of disturbance were identified on a site-by-site basis. Since the BLM has the oversight of the surface activities of the ULP lease tracts, the consultations were addressed via BLM's Programmatic Agreement with the CO SHPO. In the past, when the lessees would identify a potential area of activity, DOE, the BLM, and the lessee would confer on the activity and the potential location. A survey would then be completed by the BLM archeologist, if available, or the lessee would hire an appropriately-trained and BLM-approved archaeological contractor to perform the survey. Once the survey was completed and if cultural resources were identified, the potential impacts were assessed by BLM. As allowed under the BLM PA with the CO SHPO, BLM would make the determinations. Historically, when any potential impacts were identified, the lessee has voluntarily moved the proposed areas of disturbance away from areas identified as having cultural resources; the same consultation process would be followed on the new proposed area. LM is pursuing a programmatic agreement under the NHPA with consulting parties to formalize this process and provide better public awareness of the ULP activities with respect to cultural resources.

**Energy & Conservation Law, Commenter ID No. L47 (Cont.)**

coordination with NEPA, the DPEIS delays analysis of known and foreseen impacts to an undetermined later phase, after programmatic decisions have been made and implemented.

The DPEIS confirms that "[f]orty-two individual cultural sites on the lease tracts were eligible for, or potentially eligible for, inclusion in the NRHP." DPEIS at 3-227. An unspecified number of eligible or potentially eligible sites are located near the lease tracts, including poorly documented art panels located throughout the region, and particularly in the area between East Paradox Valley and the San Miguel River.

As stated in the scoping comments, many of the historic properties on and near the lease tracts are the subject of ongoing use and retain cultural, spiritual, and religious importance. However, surveys of these tracts and surrounding lands relied upon in the DPEIS are outdated and lack any comprehensive analysis of the context and setting of the sites.

As with other site-specific and cumulative impacts analyses, the DPEIS indicates that Section 106 consultation will not be conducted until reclamation DPEIS 4-53 or mining plans are submitted. *Id* at 4-148. In particular, DPEIS rejects scoping comments based on the erroneous proposition that the ULMP program NEPA analysis and decisions can completely evade 106 consultations.

> The consultation with the Colorado State Historic Preservation Officer (SHPO) with regard to cultural resources would be conducted when project-specific information was submitted by the lessees to DOE for review and approval.

DPEIS at B-10.

This rationale was rejected by the district court. Order at 24. Yet, the DPEIS confirms that the ULMP is an "undertaking" requiring Section 106 consultation. Relegating Section 106 consultation and analysis to a later date when DOE proposes to approve mining and reclamation plans via categorical exclusions ignores the DOE's duties under both NEPA and NHPA. Delaying consultation also ignores the real danger that a lessee or its employees would remove artifacts in order to avoid future Section 106 consultation. Disrespect and disregard for cultural sites pose serious threats to the cultural resources of the region, and both must be analyzed in a new DPEIS issued for public comment.

**IV. Conclusion**

The DPEIS is prepared largely without regard to the district court rulings, and appears to be an attempt to reinstate the 2007 status quo without subjecting a reasonable range of alternatives to the "hard look" mandate of NEPA and ESA's consultation requirements. Instead of conforming to judicial findings and orders, the DPEIS tracks the many shortfalls in a NOI that was prepared in 2011 as a failed litigation tactic.

Although the DOE has failed to lawfully and faithfully implement the ULMP, the commenting organizations remain engaged in the difficult task of repairing and reviving the Uranium Lease Management Program for use as an effective management tool on public lands containing

29

L47-58
(Cont.)

L47-59

L47-59   DOE considers the evaluation to be adequate in supporting all five alternatives in the range of reasonable alternatives discussed.

The evaluations conducted for the PEIS used site-specific information (see Section 1.3 for a summary of this information). DOE considers the information adequate to support the alternatives evaluated and for making any decisions relative to these alternatives. Although site-specific information for future mines are not available until the lessees submit specific mine plans, information available from past mining activities such as the understanding on cultural resources, threatened and endangered species, waste rock and ore characteristics, and transportation practices and routes is sufficient for supporting the analyses of potential impacts from future mining activities for the five alternatives.

As for the comment regarding that there is already a stockpile of uranium in the U.S. for domestic use, the development of a domestic uranium supply, as authorized and directed by Congress in the AEA, enables DOE to support future demand that is uncertain at the present time, whatever its exact level may turn out to be in the future.

## Energy & Conservation Law, Commenter ID No. L47 (Cont.)

uranium reserves.  Proper implementation of the lease program will remain impossible so long as the DPEIS refuses to disclose site specific conditions and reasonable alternatives.  If properly analyzed and implemented, this unique uranium reserve and leasing program provides DOE, the public , and various decisionmakers with a means of protecting uranium deposits in the Uravan Mineral Belt in light of the excess uranium in DOE managed stockpiles.

L47-59
(Cont.)

Sincerely,

*s/Travis E. Stills*
Travis E. Stills
Energy & Conservation Law

*s/Jeff Parsons*
Jeff Parsons
Western Mining Action Project

Attorney for Plaintiffs/Commenters

30

BLM_0043319

## Hopi Tribe, Commenter ID No. L1



**THE HOPI TRIBE**

LeRoy N. Shingoitewa
CHAIRMAN

Herman G. Honanie
VICE CHAIRMAN

March 26, 2013

Carol M. Borgstrom, Director
Office of NEPA Policy and Compliance
U.S. Department of Energy
1000 Independence Ave., SW
Washington, DC 20585

Dear Ms. Borgstrom,

This letter is in response to your correspondence dated March 7, 2013, regarding an enclosed Draft Uranium Leasing Program Programmatic Environmental Impact Statement (Draft PEIS, DOE/EIS-0472D) for the management of 31 lease tracts in the Department of Energy's (DOE) Uranium Leasing Program (ULP) in western Colorado.

The Hopi Tribe claims cultural affiliation to the prehistoric cultural groups in southwestern Colorado. The Hopi Cultural Preservation Office supports the identification and avoidance of prehistoric archaeological sites and we consider the prehistoric archaeological sites of our ancestors to be "footprints" and Traditional Cultural Properties. Therefore, we appreciate the Department of Energy's solicitation of our input and your efforts to address our concerns.

Therefore, the Hopi Cultural Preservation Office requests consultation on any proposal in southwestern Colorado to adversely affect prehistoric cultural resources. Enclosed are our letters dated July 31 and August 1, 2006, in which we supported the No Action alternative in the Draft Programmatic Environmental Assessment DOE/EA-1535D. In our August 1, 2006, letter we reviewed the Class I Cultural Resources Inventory that identifies 23 prehistoric sites in the project area and states, "Prehistoric site densities are high because the lease tracts tend to be located in a narrow elevation range and ecological zone favored by prehistoric peoples for occupation."

In the enclosed letter dated August 8, 2011, we stated we understood this PEIS will analyze the reasonably foreseeable environmental impacts, including the site-specific impacts, of alternatives for the management of the ULP, under which the DOE administers tracts of land for the exploration, development, and extraction of and vanadium ores on 25,000 acres in western Colorado.

The legacy of past uranium mining has left wounds on our land, our water, and our people. These wounds are not scars, for they have not healed. The legacy of uranium mining has devastated the people and the land, and continues to destroy the land and lives of *Hopiisinom*, Native Americans, and Americans alike. The Hopi Tribes has repeatedly stated that past contamination from uranium mining should be cleaned up before any additional uranium mining is approved. We have stated that we believe the Federal, State and local governments should focus on and address the existing threat to human life, and that

*abe 4/9/13*

P.O. BOX 123        KYKOTSMOVI, AZ 86039        (928) 734-3000

L1-1

L1-2

**L1-1**  Comment and request noted. Continued consultation with the Hopi Nation will be done by DOE as mining plans are submitted that may affect Hopi Traditional Cultural Properties and National Register eligible prehistoric sites.

**L1-2**  Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

DOE notes the comment about replacing the 1872 Mining Law, however, this is outside the scope of the PEIS.

Final ULP PEIS

## Hopi Tribe, Commenter ID No. L1 (Cont.)

Carol M. Borgstrom
March 26, 2013
Page 2

Congress should replace the 1872 Mining Law with a Sacred Sites Act and mining law fit for life in the 21st Century and into the future.

> L1-2
> (Cont.)

We have now reviewed the enclosed Draft PEIS DOE/EOS-0472D and we understand there are 112 cultural resources within the 12 tracts under Alternatives 3, and direct impacts could occur to 8 of these known cultural resources. Under Alternative 4, the preferred alternative, of the 128 known cultural resources on 31 lease tracts 21 could be directly impacted. Direct impacts could occur to 23 known cultural resources on 31 tracts under Alternative 5. Indirect effects could occur to all known cultural resource sites under Alternatives 3, 4, and 5. Adverse impacts on traditional cultural properties are also counted among the direct impacts to cultural resources under Alternatives 3, 4 and 5.

Therefore, as we indicated in our August 8, 2011 letter, we strongly support Alternatives 1 and 2 in which DOE would terminate the leases for the ULP, and lessees would be required to reclaim their operations on their respective leases. We strongly oppose Alternatives 3, 4, and 5.

If Alternative 3, 4, or 5 are selected for implementation, we expect continuing consultation on cultural resource survey reports and treatment plans for the mitigation of adverse effects to National Register eligible prehistoric sites and Hopi Traditional Cultural Properties that may exist within the lease areas that cannot be avoided by ground disturbing activities.

> L1-3

L1-3    Comment noted. Continued consultation with the Hopi Nation will be done by DOE as mining plans are submitted that may affect Hopi Traditional Cultural Properties and National Register eligible prehistoric sites.

*Patuwaquatsi,* means "ocean" and is used literally by some as "water is life." For over a thousand years, the springs and waters of the Hopi Mesas have provided life to *Hopisinom, Koyaanisqatsi,* told in Hopi history and prophesy, is life out of balance, or a state of life that calls for another way of living. This state of life characterizes the risks we face together in modern times. If Americans are to live together in America in the 21st Century, we must call together for another way of living. The laws of the past that are now being used against all American people must be consigned to the past, and replaced with laws that support life, not destruction and death.

If you have any questions or need additional information, please contact Terry Morgart at the Hopi Cultural Preservation Office at 928-734-3619 or tmorgart@hopi.nsn.us. Thank you for your consideration.

Respectfully,

Leigh J. Kuwanwisiwma, Director
Hopi Cultural Preservation Office

Enclosures: July 31 and August 1, 2006, August 8, 2011 letters to DOE

xc: Ray Plieness, DOE Office of Legacy Management, 11025 Dover Street, Suite 1000, Westminster, CO 80021
    Colorado State Historic Preservation Office

Appendix I: Comment Response Document

BLM_0043321

## Hopi Tribe, Commenter ID No. L1 (Cont.)



**THE HOPI TRIBE**

LeRoy N. Shingoitewa
CHAIRMAN

Herman G. Honanie
VICE-CHAIRMAN

August 8, 2011

Laura E. Kilpatrick, Realty Officer
Re: ULP PEIS
U.S. Department of Energy, Office of Legacy Management
2597 Legacy Way
Grand Junction, Colorado 81503

Dear Ms. Kilpatrick,

This letter is in response to your correspondence dated July 28, 2011, regarding participation in the Programmatic Environmental Assessment (PEIS) for the Department of Energy's (DOE) Uranium Leasing Program (ULP). The Hopi Tribe claims cultural affiliation to the prehistoric cultural groups in southwestern Colorado. The Hopi Cultural Preservation Office supports the identification and avoidance of prehistoric archaeological sites and we consider the prehistoric archaeological sites of our ancestors to be "footprints" and Traditional Cultural Properties. Therefore, we appreciate the Department of Energy's solicitation of our input and your efforts to address our concerns.

Therefore, the Hopi Cultural Preservation Office requests consultation on any proposal in southwestern Colorado to adversely affect prehistoric cultural resources Enclosed are our letters dated July 31 and August 1, 2006, in which we supported the No Action alternative in the Draft Programmatic Environmental Assessment DOE/EA-1535D. In our August 1, 2006, letter we reviewed the Class I Cultural Resources Inventory that identifies 23 prehistoric sites in the project area and states, "Prehistoric site densities are high because the lease tracts tend to be located in a narrow elevation range and ecological zone favored by prehistoric peoples for occupation."

We understand this PEIS will analyze the reasonably foreseeable environmental impacts, including the site-specific impacts, of alternatives for the management of the ULP, under which the DOE administers tracts of land for the exploration, development, and extraction of and vanadium ores on 25,000 acres in western Colorado.

The Hopi Tribes has repeatedly stated that past contamination from uranium mining should be cleaned up before any additional uranium mining is approved. We oppose the continued use of the archaic 1872 Mining Law to justify uranium mining. We have stated that we

P.O. BOX 123          KYKOTSMOVI, AZ 86039          (928) 734-3000

BLM_0043322

**Hopi Tribe, Commenter ID No. L1 (Cont.)**

Laura E. Kilpatrick
August 8, 2011
Page 2

believe the Federal, State and local governments should focus on and address the existing threat
to human life, and that Congress should replace the 1872 Mining Law with a Sacred Sites Act
and mining law fit for DOE in the 21st Century and into the future. Therefore, we will support the
alternatives in which DOE would terminate the leases for the ULP, and lessees would be
required to reclaim their operations on their respective leases.

    We will be unable to send a representative to the scoping meetings or to be a cooperating
agency in the development of this PEIS. However, please provide us with a copy of the draft
PEIS for review and comment. If you have any questions or need additional information, please
contact Terry Morgart at the Hopi Cultural Preservation Office at 928-734-3619 or
tmorgart@hopi.nsn.us. Thank you for your consideration.

Respectfully,

Leigh J. Kuwanwisiwma, Director
Hopi Cultural Preservation Office

Enclosures: July 31 and August 1, 2006 letters to DOE

xc: Laura Kilpatrick, DOE, Office of Legacy Management, 11025 Dover St., Suite 1000, Westminster, CO 80021
    Colorado State Historic Preservation Office

BLM_0043323

## Hopi Tribe, Commenter ID No. L1 (Cont.)



THE

OPI TRIBE

Ivan L. Sidney
CHAIRMAN

Todd Honyaoma, Sr.
VICE CHAIRMAN

August 1, 2006

Tracy Plessinger, Project Lead
Uranium Leasing PEA Comments
Department of Energy, Office of Legacy Management
2597 B 3/4 Road
Grand Junction, Colorado 81503

Dear Ms. Plessinger,

This letter is in response to your correspondence dated July 19, 2006, with an enclosed Class I cultural resources inventory for the Department of Energy continuing its Uranium Leasing Program currently consisting of 38 lease tracts located in western Colorado. As you know from our July 31, 2006, letter regarding this proposal, the Hopi Tribe claims ancestral and cultural affiliation to prehistoric cultural groups in western Colorado, and therefore we appreciate your continuing solicitation of our input and your efforts to address our concerns.

As you also know from our July 31st letter, the Hopi Cultural Preservation Office supports the identification and avoidance of prehistoric archaeological sites and Traditional Cultural Properties. In that letter we commented on th draft Environmental Assessment that states that the No Action alternative would benefit cultural resources, as cultural sites would not be disturbed. Therefore, we stated that we support the No Action alternative in the draft Environmental Assessment.

We have now reviewed the *Class I Cultural Resources Inventory of 38 Department of Energy Uranium Lease Withdrawal Areas, Mesa, Montrose, and San Miguel Counties, Colorado,* by Alpine Archaeological Consultants. The inventory report states that one of the earliest inventories in western Colorado was conducted to achieve the research objective of determining whether Ancestral Pueblo sites extended north of the San Juan Mountains. We are interested in the current state of research on this objective. We understand that 30 sites, 23 of which are prehistoric have been identified in the project area.

The inventory report states "Prehistoric site densities are high because the lease tracts tend to be located in a narrow elevation range and ecological zone that was favored by prehistoric peoples for occupation." Therefore, we reiterate our support for the No Action alternative in the draft Environmental Assessment.

Should you have any questions or need additional information, please contact Terry Morgart at the Hopi Cultural Preservation Office. Thank you for your consideration.

Respectfully,

Leigh J. Kuwanwisiwma, Director
Hopi Cultural Preservation Office

xc: Colorado State Historic Preservation Office

P.O. BOX 123 — KYKOTSMOVI, AZ. — 86039 — (928) 734-3000

BLM_0043324

**Hopi Tribe, Commenter ID No. L1 (Cont.)**



THE **H**OPI TRIBE

Ivan L. Sidney
CHAIRMAN

Todd Honyaoma, Sr.
VICE CHAIRMAN

July 31, 2006

Tracy Plessinger, Project Lead
Uranium Leasing PEA Comments
Department of Energy, Office of Legacy Management
2597 B 3/4 Road
Grand Junction, Colorado 81503

Dear Ms. Plessinger,

This letter is in response to your correspondences of February, 2006, and July 11, 2006, with an enclosed *Uranium Leasing Program Draft Programmatic Environmental Assessment, DOE/EA-1535D*, regarding the Department of Energy continuing its Uranium Leasing Program currently consisting of 38 lease tracts located in western Colorado. The Hopi Tribe claims ancestral and cultural affiliation to prehistoric cultural groups in western Colorado, and therefore we appreciate your continuing solicitation of our input and your efforts to address our concerns.

The Hopi Cultural Preservation Office supports the identification and avoidance of prehistoric archaeological sites and Traditional Cultural Properties. The draft Environmental Assessment states that under the Expanded Program alternative, the preferred alternative, approximately 9 to 12 cultural resource sites could be expected to occur within areas of new disturbance, that under the Existing Program alternative approximately 2 to 3 sites could occur within areas of disturbance, and that the No Action alternative would benefit cultural resources, as cultural sites would not be disturbed.

Therefore, we support the No Action alternative in this draft Environmental Assessment.

Should you have any questions or need additional information, please contact Terry Morgart at the Hopi Cultural Preservation Office. Thank you for your consideration.

Respectfully,

Leigh J. Kuwanwisiwma, Director
Hopi Cultural Preservation Office

xc: Colorado State Historic Preservation Office

P.O. BOX 123 — KYKOTSMOVI, AZ.— 86039 — (928) 734-3000

**Lower Colorado River Water Quality Partnership, Commenter ID No. L39**

**Lower Colorado River Water Quality Partnership**

**CAP**

CENTRAL ARIZONA PROJECT

David V. Modeer
General Manager
Central Arizona Project
P.O. Box 43020
Phoenix, Arizona 85080-3020
623-869-2333

Jeffrey Kightlinger
General Manager
Metropolitan Water District of
Southern California
P.O. Box 54153
Los Angeles, California 90054
213-217-6000

SOUTHERN NEVADA
WATER AUTHORITY

Patricia Mulroy
General Manager
Southern Nevada
Water Authority
1001 South Valley View
Las Vegas, Nevada 89153
702-258-3100

May 30, 2013                    **VIA EMAIL AND FEDEX**

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
Forrestal Building
11025 Dover Street, Suite 1000
Westminster, CO 80021

Dear Mr. Plieness:

Comments on the Draft Programmatic Environmental Impact Statement
for the U.S. Department of Energy Uranium Leasing Program

This letter is being sent in response to the U.S. Department of Energy's
(DOE) Draft Programmatic Environmental Impact Statement (PEIS) for
its Uranium Leasing Program located in western Colorado. As the major
providers of drinking water in the lower Colorado River Basin, the Central
Arizona Project, Metropolitan Water District of Southern California, and
Southern Nevada Water Authority have a vested interest in Colorado
River water quality issues. Our agencies deliver water from the Colorado
River to over 25 million people in the American Southwest. We
collaborate through the Lower Colorado River Water Quality Partnership
(Partnership) to address water quality issues facing the Colorado River and
our respective agencies. Protecting the Colorado River's water quality is
of paramount importance and, as such, any potential for its degradation
through increased uranium mining in areas proximate to the Colorado
River or its tributaries is an issue of concern to the Partnership.

The draft PEIS analyzes foreseeable environmental impacts related to a
range of alternatives for managing DOE's Uranium Leasing Program.
The current program includes 31 tracts of land collectively covering
approximately 25,000 acres in Mesa, Montrose, and San Miguel counties
in western Colorado for exploration, mine development and operations,
and reclamation of uranium sites. We understand that all existing or
proposed mining activity within the lease tracts is on hold while DOE
evaluates five alternatives ranging from continuing to manage lease tracts
to terminating all leases and the Uranium Leasing Program.

The draft PEIS discusses potential impacts on water quality under the five
alternatives and determines that impacts would be minor for the
exploration and reclamation phases. The Partnership believes DOE must
exercise caution on its Uranium Leasing Program as the exploration and
mining of radioactive material near a drinking water source has resulted in

L39-1

L39-1   Potential impacts to surface and groundwater quality are evaluated in the PEIS (see
Sections 4.1.4, 4.2.4, 4.3.4, 4.4.4, and 4.5.4). See also discussion in Section I.3.2 for a
summary of potential impacts.

The proposed action would be implemented in accordance with Federal, state, and local
requirements including those for the protection of water quality.

## Lower Colorado River Water Quality Partnership, Commenter ID No. L39 (Cont.)

Mr. Ray Plieness
May 30, 2013
Page 2

past environmental and public health impacts. The U. S. Environmental Protection Agency established drinking water standards for uranium and other radiological compounds due to their toxicity and carcinogenicity. Historically, uranium mining has led to considerable environmental damage, with subsequent cleanup efforts taking decades to complete. For example, DOE continues its efforts to remove a 16-million-ton uranium mill tailings pile that was left along the bank of the Colorado River near Moab, Utah as a result of mining and milling operations between the 1950s and 1980s. Until removed, this tailings pile continues to threaten millions of downstream consumers and adversely impacts the public's confidence in the safety of the Colorado River water supply. The threat of uranium mining on environmental and water resources was clearly acknowledged by Interior Secretary Ken Salazar when he issued a 20-year moratorium in 2012 to prevent new mining claims within areas near Grand Canyon National Park and the Colorado River.

As a result of mining operations, surface water and groundwater quality could potentially be contaminated by the accidental release of chemicals, mixing of water with varying geochemical characteristics, or cross contamination among aquifers. The draft PEIS states that no public water system is present within five miles of the uranium lease tracts; however, some of the tracts are located along the Dolores and San Miguel rivers, which are both tributaries to the Colorado River. Consequently, mine development and operations could threaten the Colorado River, which provides a critical supply of drinking water, agricultural irrigation water, water for wildlife habitat, and water for recreation throughout the western United States. The final PEIS should require a comprehensive water quality monitoring program to collectively track the impacts from all lease activities, inform stakeholders of any relevant developments, and ensure long-term protection of the Colorado River and its tributaries from threats of uranium and other regulated constituents.

Mining activity would also increase ground disturbance and could lead to greater erosion and sediment loading along tributaries of the Colorado River, potentially affecting salinity levels. High salinity water can impact agricultural crop yields, groundwater recharge and water recycling efforts, and scaling potential of household appliance—all of which can have significant economic impacts to downstream users. Our agencies participate in the Colorado River Basin Salinity Control Forum and are committed to efforts to control salinity inputs throughout the Colorado River watershed. Perhaps the most significant of these efforts is a deep well injection project within the Paradox Valley and in the vicinity of the Uranium Leasing Program. The draft PEIS references the Paradox Valley Unit project, but does not cite current or accurate information. We request that the final PEIS revise its description and work with U.S. Bureau of Reclamation to correct inaccuracies regarding the Paradox Valley Unit project. Moreover, as site-specific mining plans are developed for each lease tract, the cumulative potential impacts of large-scale exploration and mining activities on salinity loading to the Colorado River must be evaluated, mitigated, and communicated to stakeholders.

Although DOE proposes implementing compliance measures, mitigation measures, and best management practices to prevent water quality impacts, the draft PEIS indicates that detailed measures would be identified in future uranium exploration and development plans. It is imperative that the final PEIS identifies and evaluates the effectiveness of these proposed measures to lessen the threat to water quality and carefully consider whether greater restrictions are necessary. For example, the final PEIS should evaluate its basis for a ¼-mile setback from perennial streams for proposed mining activities. The Partnership believes a greater distance may be necessary to ensure protection of the Colorado River and its tributaries. Climate change projections indicate the potential for extreme storm events resulting in increased runoff and higher river flows, further emphasizing the need for adequate setbacks. Also,

L39-1
(Cont.)

L39-2

L39-3

L39-2   Potential impacts to surface and groundwater quality are evaluated in the PEIS (see Sections 4.1.4, 4.2.4, 4.3.4, 4.4.4, and 4.5.4). See also discussion in Section I.3.2 for a summary of potential impacts.

The text in Section 4.7.2.9 has been revised to provide an updated description of the Paradox Valley Unit Project.

L39-3   The PEIS does include a 1/4 mile buffer from the Dolores River for future mining. In addition to this 1/4 mile buffer above, the measures presented in M-4 in Table 4.6-1 provide adequate protection.

BLM_0043327

**Lower Colorado River Water Quality Partnership, Commenter ID No. L39 (Cont.)**

Mr. Ray Plieness
May 30, 2013
Page 3

additional evaluation is needed to determine if select lease tracts with the greatest potential to affect
water quality should be removed from further development consideration. The Partnership believes that
mining activities within Lease Tract 13, which encompasses a 3-mile reach of the Dolores River, may
potentially have significant water quality impacts and should be withdrawn from the Uranium Leasing
Program. Lastly, considering the potential for cumulative impacts, subsequent environmental reviews
must include an evaluation of worst-case scenarios should mitigation measures fail.

L39-3
(Cont.)

The Partnership recognizes the considerable efforts taken by DOE to evaluate the environmental effects
of its Uranium Leasing Program; a careful evaluation of these effects is critical as the program lies
within areas that may have the potential to impact Colorado River drinking water supplies. The
Partnership firmly believes that all possible efforts should be made to safeguard the public's drinking
water sources, and therefore, DOE and other federal agencies with oversight over mining operations in
the Colorado River Basin must use their authority to prevent any potential for deterioration of this
critical water supply for millions of people.

L39-4

We thank you for your efforts to fully investigate the water quality impacts of this project and we
appreciate the opportunity to provide input to your planning process. We look forward to receiving the
final PEIS and future environmental documentation for lease tracts within the Uranium Leasing Program
which may pose a threat to water quality in the Colorado River and its tributaries.

Sincerely,

David Modeer
General Manager
Central Arizona Project

Jeffrey Kightlinger
General Manager
Metropolitan Water District
of Southern California

Patricia Mulroy
General Manager
Southern Nevada Water
Authority

cc:   Secretary Ernest Moniz, U.S. Department of Energy
      Secretary Sally Jewell, U.S. Department of the Interior

L39-4   The affected environment and potential impacts discussed in Sections 3 and 4, respectively,
provide information regarding water quality in the area. The evaluation in the PEIS addressed
existing impacts on water bodies in three watersheds (USGS HUC 8 watershed) that
encompass all ULP lease tracts. These three watersheds ultimately drain into the Dolores
River, which is a tributary of the Colorado River. On the basis of recent results from the state
water quality monitoring program (CDPHE's report and 303 [d] list), no impaired water body
was found in the three watersheds that are associated with ULP lease tracts (Chapter 3). A
variety of causes of potential future impacts have been analyzed in Chapter 4. Although these
potential impacts are minor to moderate, the mitigation measures presented in the PEIS cover a
range of controls that when implemented should minimize any potential impacts.

**Mesa County Department of Public Services, Commenter ID No. L32**



**MESA COUNTY DEPARTMENT OF PUBLIC WORKS**
Administration - Building - Engineering – Road and Bridge
Traffic - **Planning** - Solid Waste Management

750 Main Street • P.O. Box 20,000 • Grand Junction, Colorado 81502-5022
Ph (970) 244-1636 Fax (970) 244-1769

Friday, May 10, 2013

Ray Plieness
ULP PEIS Document Manager
US Department of Energy
Office of Legacy Management
2597 Legacy Way
Grand Junction, CO 81503
ulpeis@anl.gov

Re: Uranium Leasing Program PEIS

Dear Mr. Plieness:

Thank you for the opportunity to comment on the Draft Uranium Leasing Program PEIS. Mesa County has been a Coppermiting Agencing through the scoping and review of earlier drafts and we do not have any concerns with this document. Our comments made during earlier reviews have been adequately addressed in this draft we have no further comment at this time.

Thank you for your consideration. Please contact me if you have any questions at (970)244-1759 or email at randy.price@mesacounty.us.

Sincerely,

Randy Price
Mesa County Senior Planner

| L32-1 | L32-1 | Comment noted. DOE appreciates the effort by Mesa County as a cooperating agency for the ULP PEIS process. |

BLM_0043329

**Montrose County, Commenter ID No. T29**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

39

1           And then the other thing is remediation.
2   And as far as remediation goes, we need to worry about
3   more than just filling in the hole and bringing in the
4   topsoil, we need to adequately have -- utilize
5   standards of reclamation, including the improper soil
6   profiles, and of course we need to independently
7   monitor to make sure that it is monitored to come back
8   to its native state.
9           And as far as the monitoring goes, we need
10  to have benchmarks of acceptability.  In other words,
11  they're not released from the -- from their -- they're
12  not released from the lease requirements until they
13  meet these benchmarks.  They're independently verified
14  as to having the native vegetation come back into its
15  natural state.
16          So those are two things that I think we need
17  to -- that I'd like to identify.
18          MR. CAMERON:  All right.  Thank you, Wayne.
19  Is there anybody else who wants to speak to the
20  Department and to the community?  Anybody want to make
21  any comments?
22          Yes, sir.  Want to come up?  And just please
23  introduce yourself.
24          DAVID WHITE:  Okay.  I'm David White, I'm a     ← T29-1
25  Montrose County Commissioner.  And we've already

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T29-1    DOE appreciates the effort by Montrose County as a cooperating agency for the ULP PEIS process. DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of DOE's preferred alternative for the PEIS. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

**Montrose County, Commenter ID No. T29 (Cont.)**



Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

40

1  submitted our comments in writing.  We are in support
2  of the DOE's position, alternative number 4; I just
3  want to reaffirm that here in person.  Didn't know
4  what the comment period would look like.

5          I also would like to point out that in this
6  document that's available to everyone here tonight,
7  that on page S 27, the comments that have been made
8  this evening relative to the price of uranium as well
9  as clean-up and whatnot, those are addressed.  And for
10  the record, the economic issues are not within the
11  scope and purpose and need for DOE's action per this
12  document.  Just wanted to get that on the record.

13          But the County is definitely in support of
14  alternative number 4.  Thank you.

15          MR. CAMERON:  Thank you, Commissioner White.
16  Anybody else want to speak?

17          Yes, come on up.

18          AUDIENCE MEMBER:  I didn't sign in to the
19  sheet.

20          MR. CAMERON:  That's okay, just introduce
21  yourself.

22          GEORGE VANDERSLOOT:  My name is George
23  Vandersloot.  Some of you know me; a lot of you don't.
24  I'm known as an outdoor person.  I'm concerned about
25  our environment.  I do a lot of mountain climbing,

(866) 448 - DEPO     www.CapitalReportingCompany.com     © 2013

T29-1
(Cont.)

T29-2     T29-2     Comment noted.

BLM_0043331

**Montrose County, Board of County Commissioners, Commenter ID No. L3**

 

MONTROSE COUNTY
COLORADO

BOARD OF COUNTY COMMISSIONERS

RECEIVED APR 1 8 2013

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

Mr. Plieness:

As the elected officials of Montrose County, Colorado, we are submitting comments on the Draft Programmatic Environmental Impact Statement (PEIS) issued for the Uranium Leasing Program (ULP).

Montrose County recognizes the substantial interdisciplinary effort that has been made in bringing the PEIS process to this point. Our own staff has contributed significant time to this action through participation in the cooperating agency process. At this time, we are not offering any line and page specific comments. Instead, we feel it is more appropriate to provide a general comment on the PEIS.

It is our position that DOE identified a reasonable range of alternatives through the scoping process. The detailed PEIS produced through this process is evidence of the thorough analysis that has been performed on each of the selected alternatives. The preferred alternative (Alternative 4) strikes an appropriate balance between environmental concerns and the continuation of the ULP. The ULP is a critical mechanism for allowing access to domestic uranium and vanadium resources. The ability to access these federally administered mineral resources is still important today. We concur with the findings of the PEIS that the impacts from continuation of the program would range from negligible to minimal.

Based on the aforementioned considerations, we hereby state our unanimous support for the preferred alternative (Alternative 4) identified in the Draft PEIS.

Sincerely,

Ron Henderson
Chairman

David White
Vice-Chairman

Gary Ellis
Commissioner

L3-1

P.O. Box 1289 . Montrose, CO 81401 . Telephone: 970-249-7755  Fax: 970-249-7761

L3-1   Comment noted. DOE appreciates the effort by Montrose County as a cooperating agency for the ULP PEIS process.

BLM_0043332

**San Miguel County Board of Commissioners, Commenter ID No. L41**



# SAN MIGUEL COUNTY
## BOARD OF COMMISSIONERS

ELAINE FISCHER       ART GOODTIMES       JOAN MAY

June 10, 2013

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite1000
Westminster, CO 80021

RECEIVED JUN 17 2013

Dear Mr. Plieness,

Thank you for the opportunity to comment on the Department of Energy Uranium Leasing Program Programmatic Environmental Impact Statement. San Miguel County is a cooperating agency in the DOE's PEIS review and has contributed significant resources toward participating in this process and reviewing the study.

This issue is of great concern to San Miguel County for the following reasons:

- San Miguel County is particularly rich in uranium,
- 47 of the existing mines in the PEIS area exist within our county borders,
- San Miguel County would experience significant environmental and socioeconomic impacts if the leasing program were implemented,
- Citizens of our county have spoken passionately and knowledgeably against expanding the uranium leasing program in this region.

In light of these criteria we ask that you carefully consider the following comments.

The San Miguel County Board of County Commissioners (SMC) believes that there is no justification for the Department of Energy to consider leasing or re-leasing any uranium lease tracts in San Miguel County at this time.

There is no demand in our country for new uranium. The United States has sufficient stockpiles of raw and spent uranium, estimated between 500 and 600 million tons, that has full potential to be utilized if and when nuclear power becomes more viable in the United States.

L41-1

The citizens of San Miguel County who spoke at the various hearings on the Uranium Leasing Program stated accurately that it is the desire of citizens of our country to retain our uranium resources rather than sell them to other countries. The uranium resources that would be developed in the Uravan Mineral District are unlikely to be used to supply domestic nuclear power needs, but would be intended for international export.

L41-2

---

**L41-1**  DOE appreciates the effort by San Miguel County as a cooperating agency for the ULP PEIS process. DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of DOE's preferred alternative for the PEIS. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

With regard to concerns that there is already a stockpile of uranium in the U.S. for domestic use, the development of a domestic uranium supply, as authorized and directed by Congress in the AEA, enables DOE to support future demand that is uncertain at the present time, whatever its exact level may turn out to be in the future.

**L41-2**  The possibility that uranium or uranium ore from the ULP may be subject to being exported does not undermine the PEIS's stated purpose and need, and does not require that the PEIS's scope be expanded to analyze the export of uranium or uranium ore. Any export of domestic uranium or uranium ore from any source within the United States, including the ULP lease tracts, is strictly regulated by Nuclear Regulatory Commission (NRC) under the terms of the AEA and the NRC regulations, which impose requirements that must be satisfied before the NRC will grant a license to export any domestic uranium or uranium ore. See AEA, 42 U.S.C. §§ 2099, 2151-2160d; NRC regulations, 10 C.F.R. §§ 110.19-110.46. For example, 42 U.S.C. § 2099 forbids the NRC from licensing any person to export from the United States any uranium ore, or other source material, if the issuance of such a license "would be inimical to the common defense and security" or the health and safety of the public; 42 U.S.C. § 2155 gives the Executive Branch the authority to veto any export of uranium ore. Many more specific requirements are imposed in the other above-cited provisions of the AEA and the NRC regulations.

Therefore, DOE's proposed action in the PEIS does not address uranium ore exports, over which the NRC, not DOE, has authority; and the scope of analysis in the PEIS does not analyze the possibility that uranium ore from the ULP may be subject to export.

In addition, the possibility that uranium ore from the ULP may be subject to export, after a prospective exporter goes through the process of applying for and receiving the necessary permission from the NRC, does not undermine the stated purpose and need for agency action: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of deposits of uranium ore in lands belonging to the United States to the extent DOE deems necessary to effectuate the provisions of the AEA (42 U.S.C. §§ 2096-2097). An active ULP program will be more successful in meeting that need than would an inactive program.

BLM_0043333

**San Miguel County Board of Commissioners, Commenter ID No. L41 (Cont.)**

San Miguel County, Colorado
Page 2 of 6

Currently, the only operating mill in the United States is the White Mesa Mill in the Uravan district; it is owned by Energy Fuels Inc., and has the capacity to process larger supplies of ore if mining increases within the district. Energy Fuels Inc. has stated on numerous occasions that it is seeking new contracts to supply uranium yellowcake to markets in Asia and already holds long-term production contracts with Korean Electric Power Corporation, which is one of Energy Fuels largest shareholders.

The DOE Uranium Leasing Program is authorized by the Atomic Energy Act of 1954 as amended (68 Stat. 919, 42 U.S.C. 2011 et seq., especially 42 U.S.C. 2098) and is further codified at 10 CFR 760 titled *Domestic* Uranium Program and held as *Reserves* for the future needs of the United States and its citizens. We feel it is a wise decision to retain our uranium reserves safely in the ground in order to meet our future domestic demands.

We believe that the Purpose and Need Statement in the Draft PEIS inappropriately focuses on the need to develop these reserves rather than an analysis of whether it is the prudent time to develop these reserves. Given the lack of demand for uranium ore and given the great need to restore previously leased mine sites, we strongly disagree with the argument that reserves should be considered for development at this time. Rather, the lease tracts should be analyzed and managed in order to guarantee the stability and preservation of these valuable reserves as well as maintain the ecological health of the surface.

San Miguel County hereby requests that the DOE analyze additional alternatives to those presented in the PEIS. Specifically, the PEIS should contain an alternative with a hierarchical ranking of the lease tracts based on their environmental sensitivity. If it is determined to be necessary to develop these reserves to meet our domestic energy needs, it should be done in a way that protects the environment to the greatest possible degree. This hierarchy should take into account where there is existing disturbance as well as which sites are ecologically and visually most sensitive. The necessary development should occur in that sequence, and only at such time as uranium is needed for domestic purposes.

An additional alternative should look at terminating the uranium leases and reclaiming the tracts, and then developing those tracts for renewable energy, in consideration of our region's strong potential for the development of renewables, especially solar power. This alternative would allow the DOE to meet its mission to provide for domestic energy needs without the need to develop the uranium reserves for which there is no sale waste disposal, and which the citizens of San Miguel County oppose. This would be SMC's preferred alternative.

We also believe that the PEIS must discuss the mechanism by which DOE will ensure that all of these reserves, if developed, are developed for domestic use and not developed for export to other countries.

In addition, we believe that the PEIS must address the impacts and costs of the full cradle-to-grave life cycle of the produced uranium. There are currently about 50,000 tons of spent nuclear fuel rods stored in cooling pools around the 104 nuclear facilities in the United States. Another 15,000 tons of cooled radioactive waste is stored in casks around these

L41-2 (Cont.)

L41-3

L41-4

---

L41-3    Contrary to these Comments, the purpose and need for the proposed action does not require expansion of the scope of the PEIS. As explained in PEIS Section 1.4, "Purpose and Need for Agency Action," the underlying purpose and need for agency action was established by the U.S. Congress in two provisions of the Atomic Energy Act (AEA): 42 U.S.C. § 2096, which authorized and directed DOE to develop a supply of domestic uranium; and 42 U.S.C. § 2097, which authorized DOE "to issue leases or permits for prospecting for, exploration for, mining of, or removal of deposits of source material [including uranium ore] in lands belonging to the United States."

The Purpose and Need for agency action, as described in the ULP PEIS Section 1.4, is to support the implementation of those two AEA provisions. Section 1.4 recognizes that order to support these provisions, "DOE needs to determine the future course of the ULP, including whether to continue leasing some or all of DOE's withdrawn lands and other claims . . . for the exploration and production of uranium ores for the remainder of the ten-year period that was covered by the July 2007 PEA." PEIS Section 1.5, "Scope of the ULP PEIS," therefore describes the scope of its analysis as the evaluation of the five alternatives for managing the ULP, and the evaluation of "the three mining phases associated with the underground and surface open-pit mining methods," which "are the exploration phase, mine development and operations phase, and reclamation phase." Therefore, the AEA provisions are consistent with the present scope of the ULP PEIS, and do not require that the scope be expanded beyond the ULP to analyze the entire nuclear fuel cycle. See also response to L41-2 regarding concerns about export of uranium.

The PEIS considers mitigation measures (see Table 4.6-1) that would assure environmental protection.

DOE analyzed "reclaim" and "reserve" (Alternative 1) as part of its range of reasonable alternatives in the PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

BLM's multiple use of the surface at the ULP lease tracts does not include development of renewable energy such as solar energy. The ULP lease tracts are located within BLM's excluded areas for solar energy zones or SEZs identified in BLM's Solar PEIS (http://solaris.anl.gov/documents/fpeis/).

L41-4    See response to comment L41-3. As stated in that response, the PEIS scope does not include the entire nuclear fuel cycle.

As for waste management and disposal for the proposed action (as analyzed for the five alternatives in Section 4.1.13, 4.2.13, 4.3.13, 4.4.13, and 4.5.13), in addition to waste rock (which is mostly retained at the mine site location and graded to a preferred slope, provided with a protective top-cover and seeded during reclamation), other waste generated would be of smaller quantities that would either be taken to a local landfill or to the mill or a low-level radioactive waste disposal facility, consistent with past mining practices. Local landfills have the capacity to accept the waste and there are licensed low-level radioactive waste disposal facilities that could accept the small quantities of low-level radioactive waste generated.

BLM_0043334

**San Miguel County Board of Commissioners, Commenter ID No. L41 (Cont.)**

San Miguel County, Colorado
Page 3 of 6

facilities that were to be disposed of in the now defunct Yucca Mountain site. There are currently no suitable repositories for this waste.

Because our county is uranium rich, SMC feels a great responsibility to ensure that nuclear waste be disposed of or stored in a way that is not harmful to current and future inhabitants of our planet. Currently, there is no safe plan for storage or disposal, and until such time as such a plan is formulated we cannot support removing more uranium from its safe, i.e. un-mined, stores below the ground.

The production of radioactive waste is clearly a reasonably foreseeable consequence of the development of these reserves and cannot be considered to be outside the scope of this PEIS analysis. The lack of a permanent depository for radioactive waste has been of considerable concern and action at the national level, including through the findings President's Blue Ribbon Commission and its goals to identify a future depository site. Similarly, a federal court decision on the "waste confidence rule" directed the Nuclear Regulatory Commission to delay approvals of new projects until the waste storage problem is addressed. Developing our uranium reserves may also contribute to this problem before a solution has been identified.

| L41-4 (Cont.)

The PEIS acknowledges this is the case in section 2-3. We believe that it is irresponsible and irrational to authorize the development and production of additional radioactive waste without a strategy for disposal of existing and future waste materials. To burden future generations with the perpetual management and containment of these radioactive wastes is unacceptable.

While the Draft PEIS makes some plausible projections of future use of the lease tracts regarding size, number and location of future mining activity, the projections are pure speculation. The impacts of future development based on such assumptions are consequently also purely speculative and of little value in predicting the true impacts to air quality, water quality, visual impacts, social and economic impacts, impacts to wildlife, transportation impacts and cumulative impacts.

| L41-5

We were pleased to note that the PEIS concedes the need for additional NEPA process at the time any site-specific development and operations are proposed in the future. As categorical exclusions are referenced as one of the NEPA options, SMC believes the PEIS needs to make more specific commitments regarding what level of exploration, development and operations will trigger NEPA review and to what specific level.

The Draft PEIS acknowledges the need to include site-specific analyses, however it is our view that these analyses can only be done at the project-specific level and have not been accomplished adequately in the Draft PEIS.

| L41-6

Site-specific information should be provided in the PEIS, such as clearly documenting the current site and environmental conditions at each of the lease tracts, the state of previous reclamation activities and future needs for reclamation, existing mining plans and future mining activities, transportation and road use, the availability of water supplies, and other

L41-5    The projections or assumptions for future uranium mining activities at the ULP lease tracts presented in the PEIS are based on site-specific information (see Section 1.3 for a summary of this information) in addition to historical mine development and operations on the lease tracts. The assumptions are made as realistically as possible but also provide a conservative basis for analyzing upper bound potential impacts from which decisions can be made. Future mining conditions or scenarios can be compared with the assumptions made in this PEIS to gauge potential impacts to human health and the various environmental resources. Whether or not the scenario described in the PEIS is exactly what happens in the future relative to mining at the ULP lease tracts, the science behind that evaluation for that future scenario remains the same as what was done for the PEIS. That is, the actual number of mines, sizes, and specific location might vary, but the specific level of potential impacts for the particular future scenario can be extrapolated from the results discussed in the PEIS.

L41-6    The evaluations conducted for the PEIS used site-specific information available (see Section 1.3 for a summary of this information). DOE considers the information adequate to support the alternatives evaluated and for making any decisions relative to these alternatives. Although site-specific information for future mines are not be available until the lessees submit specific mine plans, information available from past mining activities such as the understanding on cultural resources, threatened and endangered species, waste rock and ore characteristics, and transportation practices and routes is sufficient for supporting the analyses of potential impacts from future mining activities for the five alternatives. The site-specific information consulted for the PEIS is summarized in Section 1.3 of this PEIS. Follow-on NEPA review would support future decisions. It would be used for determine whether additional specific mitigations measures would be implemented to assure protection of human health and environment.

In Section 1.7 of the PEIS, DOE describes the NEPA review process that follows or could be tiered off this PEIS and it includes the preparation of additional site-specific reviews such as EAs, as needed. Based on comments received, Section 1.7 has been revised to state that for all future mining plans submitted for approval, DOE will require, at a minimum, an EA with appropriate public involvement to be prepared to further evaluate potential site specific impacts.

BLM_0043335

## San Miguel County Board of Commissioners, Commenter ID No. L41 (Cont.)

San Miguel County, Colorado
Page 4 of 6

relevant details in order to form a complete understanding of the state of each tract. These site-specific impacts should be analyzed for each alternative and be available in order to have a complete analysis of the cumulative impacts.

L41-6 (Cont.)

DOE's analysis lacks an economic study providing justification for why these tracts are being leased now in the context of availability of lower cost alternative energy sources and low demand in the domestic market for uranium. Such economic information is imperative to a complete analysis, but is lacking. The analysis must incorporate the true cost and risks to the taxpayer in generating power with nuclear energy and the life cycle disposal and maintenance of the waste generated throughout the process.

L41-7

Additionally, the PEIS does not adequately explain how Alternative 4 was selected as the preferred alternative.

L41-8

As we've already stated, we would prefer to see additional alternatives. But given the limited choices of alternatives, Alternative 1 would be preferable to the other listed alternatives,. Existing lease parcels must be fully remediated before new parcels or the re-leasing of parcels is considered.

L41-9

Regarding specific tracts in the PEIS, Lease Tract 14 is currently unleased. We believe that due to its proximity to the Dolores River it should remain unleased under any alternative.

L41-10

Additionally, we are very concerned with the impacts of Tracts 13 and 13A on the Dolores River. We believe Tract 13 needs immediate attention to mitigate ongoing impacts to the Dolores River. Both of these tracts should have their leases terminated and held in reserve because of their proximity to the river and because of the clear evidence that their development negatively impacts the river visually and ecologically. The lack of site-specific data for all of the Slick Rock tracts is of concern to SMC because the area is used for agriculture and recreation and it is important to maintain the ecological health of the river and surrounding areas. Groundwater monitoring results for the nearby Slick Rock UMTRCA tailings depository show numerous groundwater contamination problems that are affecting the river. A detailed analysis of these issues at Slick Rock is crucial to making the best decisions for the management of the leasing tracts.

L41-11

SMC relies on NEPA documents prepared by the DOE and other federal agencies to provide detailed information and data related to actual site conditions in the county. The PEIS does not provide the actual monitoring data or detailed assessment of site conditions that we need in order to facilitate the improved decision-making that NEPA intends. At the Slick Rock tracts in particular, measurable impacts and contamination exist that should form the basis of the PEIS. These should include an analysis of the unique impacts associated with the off-site migration of radionuclides, heavy metals and sedimentation into surface and ground waters. A complete Superfund-level analysis should be conducted before making programmatic level decisions.

L41-12

A buffer of one-quarter mile as recommended in the PEIS, based on ongoing impacts, is demonstratively inadequate to protect water quality in the Dolores River. All development

L41-13

L41-7    The economic study suggested is outside the scope of the PEIS and does not meet the purpose and need described in Section 1.4 of the PEIS.

L41-8    DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of DOE's preferred alternative for the PEIS. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

L41-9    Comment noted. Based on scoping and all the input from our cooperating agencies the alternatives presented provide the range of reasonable alternatives.

Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

L41-10   While it is currently not leased, the PEIS evaluation included Lease Tract 14 for completeness and DOE may consider leasing it in the future if warranted. Currently, there is a quarter mile buffer from the Dolores River in which no new mining can take place.

L41-11   State permits and inspection reports to date reflect the activities of the lessee in addressing existing concerns with Lease Tract 13. Site-specific conditions for the Slick Rock tracts are described in the EPP prepared by Cotter Corporation for Lease Tract 13A, and have been incorporated into the analyses done for the PEIS. While alluvial groundwater data from the Slick Rock UMTRCA site indicate groundwater contamination, surface water data do not indicate contamination to the Dolores River due to the site. That is, surface water sampling results for the 2012 monitoring period demonstrated essentially no impact to the Dolores River from historical milling activities. CDPHE water quality benchmarks for nitrates, selenium, and uranium were not exceeded; one sample for manganese slightly exceeded the benchmark (.055 mg/L versus CDPHE benchmark of 0.05 mg/L). This particular sample was highly turbid; the data point is also observed to be anomalous relative to historical data. This information can be found in the *"Verification Monitoring Report for the Slick Rock, Colorado, Processing Sites "* dated April 2013.

L41-12   See response to L41-11.

L41-13   DOE agrees with the need to protect all water sources consistent with mitigation measures identified in Table 4.6.1 item M-4.

BLM_0043336

**San Miguel County Board of Commissioners, Commenter ID No. L41 (Cont.)**

San Miguel County, Colorado
Page 5 of 6

activities on these sites must be required to implement storm-water detention such that water impacted by the activities is not leaving the site of the operations and entering the watershed. DOE must require that these facilities be maintained through all periods of cessation until the sites are fully reclaimed and can be shown to be stabilized from erosion.

L41-13 (Cont.)

Another reason we see alternative 1 as our preferred of the available alternatives, is that the PEIS claims (pg. S-26) that "all legacy mine sites located on the DOE lease tracts have already been reclaimed." This conflicts with Table S.1-2 that lists the status of eight of the lease tracts as "reclamation of previously disturbed area is needed." In addition, a site visit by SMC to the lease tracts in the Slick Rock area revealed that not only are long inactive, unreclaimed areas contributing to pollution of the Dolores River, but reclaimed areas have also not been successfully stabilized. The condition of these historic mining sites highlights the long-term environmental impacts of a boom/bust uranium industry where unreclaimed areas sit inactive for decades. It also highlights the inability of reclamation to restore the pre-mining resource values.

L41-14

San Miguel County, with its riches in uranium reserves, also has an abundance of abandoned and neglected uranium mining sites, likely numbering in the several hundreds. There is still a need to clean up Cold War-era mines and mills and we should be aware of the previous costs of this legacy to taxpayers. The Slick Rock UMTRCA cleanup, for example, cost over $50 million to complete. Yet, in a separate matter, SMC had to take on the burden of negotiating directly with Energy Fuels Resources to increase the state-required bond from $12 million to $15 million during the licensing of a new mill in Paradox Valley. The lack of sufficient bonding to protect the citizens of San Miguel County in the event that problems develop at mines on the lease tracts or at connected facilities in the region remains a concern to us.

L41-15

The PEIS does not adequately address the impacts of climate change on the proposed leasing program, specifically how hotter and drier conditions may exacerbate currently evident difficulties in successful reclamation. DOE must address the current and anticipated threats expected from impacts climate change will have on the leasing program.

L41-16

The mitigation measures described in the PEIS are very generalized and non-specific. SMC believes that these measures must be much more detailed to be effective. Some of the described mitigation measures are only recommendations and have no practical enforceable value. Mitigation must have specific criteria, standards and outcomes to be effective. This again illustrates the need for more detailed site-specific NEPA to be applied to all mining activities. This is further supported by the fact that if mitigation measures are in place on the permitted mines, they have clearly not been adequate or effective.

L41-17

DOE stated in the public hearing in Telluride on April 24th that mitigation could be included in the leases. It is unclear to us how this would be accomplished as 29 of the 31 tracts already have existing leases.

L41-18

L41-14   Legacy mines described in the quoted text are from historical operations and are different from the mines that are described for the present operations on the lease tracts. The schedule or timing for reclamation of the mines on the eight lease tracts mentioned in the comment are to be completed as stipulated by the leases. See also response to L41-9 regarding reclamation completed.

L41-15   See response to L41-14 with regards to reclamation of legacy mines.

Lease tract operations are currently covered by reclamation bonds, calculated by DOE based on site-specific conditions and deemed sufficient to reclaim those conditions in coordination with CDRMS.

L41-16   While current science does not enable reliable analysis of specific climate impacts on a specific region, potential hotter and drier conditions attributable to future climate change would not be expected to affect ULP activities, including successful reclamation, which would occur in the next few decades. The analysis of potential impacts on resource areas in this PEIS is conservative and accounts for potential adverse effects of climate change on the resource areas.

L41-17   The measures presented in Table 4.6-1 are categorized into compliance measures, mitigation measures, and BMPs. Section 4.6 and the footnotes A, B, and C on Table 4.6-1 explain that compliance and mitigation measures will be implemented. Further, the discussion on mitigation measures has been revised to provide additional discussion linking measures identified in Table 4.6-1 with specific resource area discussion (i.e., to make the connection as to what potential impacts from which resource area would be mitigated). .

See also response to L41-6 for site-specific NEPA concerns.

L41-18   The PEIS does indicate that leases would be modified, as needed, in order to specify the compliance and mitigation measures identified in the PEIS (see Section 4.6 and footnote B of Table 4.6-1). The existing leases require DOE approval prior to resuming operations per article Appendix C.1.a which will require any new mitigation measures to be included in those plans.

**San Miguel County Board of Commissioners, Commenter ID No. L41 (Cont.)**

San Miguel County, Colorado
Page 6 of 6

The PEIS needs to be very clear that requirements will be in place that all operations be conducted in a manner that minimizes environmental impacts. This should be clearly stated in the Purpose and Need Statement.

L41-19

SMC is concerned about the potential impacts to San Miguel County residents of noise from activities on the lease tracts. Section 3.2.3 Noise Regulations states, "ULP activities would have to follow applicable federal, state, and local guidelines and regulations on noise." However, Section 4.4.2.2 states, "when construction would occur near a lease tract boundary, noise levels near four residences around Lease Tracts 13, 13A, 16 and 16a could exceed the Colorado limit." These statements appear to be in conflict. We believe it is the responsibility of DOE through lease restrictions or other mechanisms to ensure that noise levels from activities on the UPL lease tracts conform with State law regarding noise levels at all residential receptors at all times.

L41-20

SMC is concerned with the potential for radon gas exposure to the public. This is particularly true for a potential residential receptor adjacent to Tract 13A. It needs to be clearly stated in the mitigation requirements that radon gas at a residential receptor may not be elevated above background levels by activities on the lease tracts. Radon levels must be monitored directly at the property boundary of these receptors and not estimated through modeling.

L41-21

The public hearings held by the DOE showed significant opposition throughout the communities that would be affected by the proposed leasing program. Our constituents and many of those across the lease tract area do not support the rationale that our uranium reserves should be developed. We ask that DOE carefully consider the arguments of citizens who attended the hearings.

L41-22

Given the limited choices of alternatives, it is the considered opinion of SMC that alternative one be adopted by DOE. But in order to adequately address the uranium leasing needs of our region and our country, additional alternatives should be considered that more completely address the full impacts of this program, which the listed alternatives do not address.

L41-23

Thank you for your careful consideration of our comments in this very important decision.

Sincerely,

SAN MIGUEL COUNTY, COLORADO
BOARD OF COUNTY COMMISSIONERS

Joan May, Chair

---

L41-19   The statement requested (as supported by our analysis) is made in Section 2.6 and S.4 in the discussion of DOE's preferred alternative. This statement does not fit into the Purpose and Need section and is therefore not included there as suggested.

L41-20   The statement in Section 3.2.3 is correct that all ULP activities would have to follow applicable Federal, state, and local guidelines and regulations on noise. And the statement in Section 4.4.2.2 is also correct in that it presents the results of the analysis and states that noise levels from the activities evaluated could exceed the Colorado limit at the four residences around lease tracts 13, 13A, 16 and 16a. These statements are not in conflict but rather are made to provide basis for assuring that appropriate planning for mining activities includes designs and mitigation measures to prevent the occurrence or minimize the potential impact.

L41-21   DOE would comply with Federal, state, and local requirements with regard to radon. The compliance measures and mitigation measures listed in Table 4.6-1 are identified to support compliance including to NESHAPS or 40 CFR Part 61 Subpart B that radon doses to nearby residents do not exceed the dose limit of 10 mrem/yr. EPA determines the potential exposure levels from the activities evaluated could exceed the Colorado limit at the four residences around uranium mining activities through the use of the COMPLY-R model, and the compliance and mitigation measures listed in Table 4.6-1 (M-11: Protect human health from radiological exposures) are to assure the availability of site-specific input information to the COMPLY-R model.

L41-22   The public hearings did include public that opposed and also included public that supported DOE's proposed action.

DOE has carefully considered all public comments and the results of the PEIS evaluation and has identified Alternative 4 as DOE's preferred alternative in this PEIS.

L41-23   Comment noted. DOE appreciates the effort by San Miguel County as a cooperating agency for the ULP PEIS process. DOE evaluated the range of reasonable alternatives as required by NEPA.

BLM_0043338

### Town of Telluride, Commenter ID No. L53



**Stuart Fraser**
**Mayor**

June 25, 2013

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

Dear Mr. Plieness,

This letter details a number of the Town of Telluride's concerns regarding the Draft Programmatic Environmental Impact Statement (PEIS) for the Department of Energy's (DOE) Uranium Leasing Program (ULP). The history of environmental and human health consequences due to uranium mining and milling operations across the Colorado Plateau are well known. The list of contaminated sites on the Western Slope of Colorado—from Maybell, Naturita and Uravan, Rifle, Slick Rock to Durango—has left a legacy of severe contamination and costly cleanup, which has principally been funded by the federal government, with little or no contribution from the private parties responsible for such contamination. As a result of such poor treatment and history, the Town of Telluride is concerned about any renewed uranium mining activities in the area. With that in mind, Telluride finds that Alternative 1 is our preferred alternative and that there are several concerns regarding the choice of Alternative 4 as the DOE preferred alternative. Though the DOE is authorized and directed by the Atomic Energy Act to issue mining leases and permits to develop a domestic supply of uranium, domestic demand must be taken into consideration, and whether or not there is a need for uranium at present. Current market conditions strongly suggest that the domestic and even international market for processed uranium is saturated and does not warrant the development of extensive new domestic sources at this time. Due to the incredible toxicity and harmful effects of uranium mining from cradle to grave (and even after- throughout storage of the hazardous waste), Telluride is concerned the costs outweigh the benefits of re-activating mining in Mesa, Montrose, and San Miguel counties.

As an interal matter, the Town of Telluride and our local residents are concerned about the possible significant and long term regional environmental and human health impacts of re-leasing the uranium mines in the Mesa, Montrose, and San Miguel Counties.

The Town of Telluride is concerned about the negative impact renewed mining would have on the region's air quality. The Town and immediate regions are blessed with relatively clean air along with plentiful and reliable sources of uncontaminated drinking water. Air modeling research from Dr. Mark Williams—University of Colorado INSTAAR—has clearly illuminated that airborne materials (also known as aerosols and solutes) from the west end of Mesa, Montrose and San Miguel counties, along with southeastern Utah, are transported easterly

L53-1

L53-2

L53-3

L53-4

**L53-1**   Comment noted. DOE has carefully considered all public comments and the results of the PEIS evaluation and has identified Alternative 4 as DOE's preferred alternative in this PEIS.

**L53-2**   With regard to concerns that there is already a stockpile of uranium in the U.S. for domestic use, the development of a domestic uranium supply, as authorized and directed by Congress in the AEA, enables DOE to support future demand that is uncertain at the present time, whatever its exact level may turn out to be in the future.

**L53-3**   The PEIS evaluated potential impacts for human health and the various resource areas. These evaluations provide adequate information regarding potential impacts from the proposed action and for DOE's identification of Alternative 4 as its preferred alternative.

Mesa County Board of Commissioners and Montrose County Board of Commissioners support DOE's preferred alternative.

**L53-4**   Telluride is located about 50 mi or more east to southeast of ULP lease tracts. Wind roses for Pinon Ridge Mill (Figure 3.1-1) indicate that westerly and northwesterly winds are considerably frequent. These winds can transport pollutants to the east or southeast, toward Telluride. However, wind rose for Nucla (about 11 mi east of Pinon Ridge Mill) (Figure 3.1-2) shows that easterly winds (heading to the west) predominate due to the orientation of nearby valleys. Although the area is located in the prevailing westerlies for upper air, surface winds vary drastically from location to location due to complex terrains and diverse land covers.

$PM10$ and $PM2.5$ emissions associated with ULP activities are estimated to account for up to 3.2% and 1.4%, respectively, of the three county totals (Table 4.5-1). ULP lease tracts are scattered over 50-mi stretch, and terrain features and elevations around each lease tract are dissimilar. Thus, air emissions from ULP lease tracts are not transporting to one direction, rather spreading over all directions. In addition, high mountain ranges (over 8,000 ft) intervening between Telluride and ULP lease tracts act as a barrier, for which surface-level emissions are not readily crossing over the ranges. (High-level emissions from large power plants with tall stacks can be transported to the farther distances along with westerly upper winds.)

Considering all these factors, ULP activities could influence air quality on surrounding areas but potential impacts on ambient air quality around Telluride are anticipated to be negligible to minor.

BLM_0043339

### Town of Telluride, Commenter ID No. L53 (Cont.)

by the prevailing winds. Dr. Williams has also established that these aerosols and solutes will be released in both precipitation and non-precipitation events (dust storms) as they reach the San Miguel Mountains as our mountains are the first major orographic barrier to be encountered following initial transport. Additional mining and transport from new sources will involve increased wind borne radionuclide particles. The question is not whether this will occur, but how significant is the increase of airborne and wind borne radionuclide particles as a direct result of potential mining for uranium. The Town is concerned about the negative effects mining will have on the quality of our air, visual impacts, and impacts on human health.

      The Town is also concerned about the negative impact renewed mining would have on the region's water quality- both for surface and groundwater sources. The increased presence of radionuclide particles that will contaminate our surface water bodies, currently used as our municipal drinking water source, is of critical concern to the Town of Telluride. On a broader scale, the Town is also concerned with the potential for surface and ground water contamination that may net be limited to our region, but might actually impact a wide range of users within the larger Colorado River basin area, downstream of the proposed uranium mining area. Groundwater and surface water sources are typically interconnected and if one source is contaminated, the water quality of a large area could be at risk. Also, that some of the mining sites are a mere .25 miles away from the Dolores River seems an insufficient setback to adequately protect that water supply, which may also fail to protect the aquatic and ecological needs of that river. An additional concern is the direct or incidental de-watering of aquifer water supplies. In light of increasingly hot and dry seasons and continuing regional drought conditions, maintaining the region's water quality is an incredibly important concern of the Town of Telluride.

      In addition to various environmental concerns, the Town of Telluride has several concerns regarding human health impacts as a result of uranium mining in the surrounding counties. We appreciate that some may feel that new and improved regulations may ameliorate the well-known and acknowledged environmental and health impacts of the uranium mining industry. However, the Town of Telluride has grave doubts about essentially performing a "new experiment" for uranium mining when the ill effects of the prior highly impactful experiment have yet to be fully understood or even remediated. The emission of radon is the acknowledged primary source of potential human health radiation exposure. Such exposure has been known to cause birth defects, infant mortality, and increased childhood and other cancers. The Town is concerned that re-initiating mining activities could unnecessarily expose residents to toxic materials. It is crucially important that should mining activities continue, radon levels are kept to a minimum, monitored continually, and evaluated regularly to ensure the greatest protection for local residents.

      Further, while the PEIS goes into great detail regarding all the various sites and mining activities on each site, there is little discussion of the waste generated from mining activities and the responsibilities and costs of cleanup. It would be incredibly irresponsible to re-initiate mining activities without a comprehensive plan to deal with the proper storage and disposal of existing and future hazardous waste materials. The Town is concerned about the lack of accountability expressed in regard to waste products generated by the Uranium Leasing Program. The Summary and Comparison of Potential Environmental Impacts under the different alternatives in regard to waste management on page S-48 is insufficient and the Town would like to see a more detailed and secure evaluation in order to ensure adequate protection of the environment and human health from uranium mining wastes.

L53-4 (Cont.)

L53-5

L53-6

L53-7

---

**L53-5**    The town of Telluride is located more than 50 miles upstream from the nearest ULP lease tracts. We do not expect any direct negative impacts on the areas upstream from the ULP lease tracts. This study has provided an extensive analysis of existing and future impacts associated with the ULP lease tracts. On the basis of recent results from the state water quality monitoring program (CDPHE's report and 303 [d] list), we did not find that any impaired water body in the area is evidently associated with ULP lease tracts (Chapter 3). A variety of causes of potential future impacts have also been analyzed in Chapter 4. Although these potential impacts are minor to moderate, mitigation measures included in the PEIS cover a wide range of approaches so that when implemented, potentials impacts can be minimized.

**L53-6**    Mining activities will comply with applicable regulations and implement necessary mitigation measures.

      The human health evaluation performed for the PEIS (see Sections 4.1.5, 4.2.5, 4.3.5, 4.4.5, and 4.5.5; and the cumulative impacts section in 4.7) included estimates for potential radon exposure to off-site residents, and these results show that the estimates for DOE's preferred alternative indicate that the potential cancer risk, i.e., the probability of developing a cancer, associated with living close to a uranium mine would be less than $4 \times 10^{-5}$ per year at a distance of 500 m, the risk would decrease to $2 \times 10^{-5}$ per year at a distance of 1,500 m, and decrease further to $1 \times 10^{-5}$ per year at a distance of 2,500 m. If there are multiple uranium mines close by, then the cancer risk would increase, depending on the distance to each mine. Risk from multiple years of exposure can be determined by multiplying the annual risk given in the PEIS with the number of years of exposure. The estimated risks are in addition to the risks from the background environment. Because of the high uranium content in soils in this area, the cancer risk from the background environment was estimated to be about $3 \times 10^{-4}$ per year (corresponding to 430 mrem/yr).

      Mitigation measures are identified in Section 4.6 to assure that uranium mining activities at the ULP lease tracts are implemented in a manner that is protective of human health and the environment.

**L53-7**    Wastes generated from the mining activities are discussed in Sections 4.1.13, 4.2.13, 4.3.13, 4.4.13, and 4.5.13.

      As described in these sections, the bulk of waste generated would be waste rock that would be reclaimed on site; remaining waste would be mostly trash generated in the course of daily operations (e.g., lunch room garbage, packaging material from supplies). This waste would be taken to a local landfill. Any other material or wastes that could contain low-level radioactivity are either taken to the mill for processing or to a licensed low level radioactive waste disposal facility.

### Town of Telluride, Commenter ID No. L53 (Cont.)

In regards to noise created at and around the mining sites, the Town of Telluride requests that ULP activities conform to federal, state, and local noise regulations. In the PEIS, Alternatives 1 and 4 both acknowledge that noise levels could exceed Colorado maximum limits (S-45). Further, the PEIS contradicts itself when it states in the Cumulative Impacts section that "[p]lanned and ongoing actions … are not expected to exceed the maximum permissible noise levels (S-76)." The Town would like more assurances and consistency in the PEIS's acoustic analyses. Should the noise levels exceed maximum permissible levels it would seem that, contrary to the PEIS, noise-related cumulative impacts would not be minor.

Finally, regarding transportation impacts, the Town is already conscious of and sensitive to its carbon footprint which is exacerbated by transportation in and around the valley. Since Alternative 4 would increase transportation related effects such as pollution and traffic due to the round-trip trips of the uranium ore shipments, Telluride is concerned with the additions to the region's carbon footprint. Conversely, Alternative 1 does not require transport of uranium ore and therefore will result in no change to regional traffic, emission, and carbon footprint impacts.

Overall, the Town prefers Alternative 1 because it is the least impactful on the environment, ecology, and human health. The only impacts would be from reclamation activities and would be minor. Although reclamation of these historic mining sites cannot restore the pre-mining resources values, Alternative 1 would allow for the next best case scenario. Additionally, Alternative 1 provides for long-term localized improvements to wildlife habitats. In contrast, Alternative 4 has an unsatisfactorily high impact on the environment, ecology, human health, and other social factors in the region. Should the DOE decide to pursue Alternative 4, the Town would like to see a more detailed site-specific and/or project-specific NEPA analysis applied to all mining activities and more detailed mitigation measures in the PEIS as a whole. Further, the Town cannot overstate the importance of including detailed waste treatment, storage, and a disposal plan for all waste generated from the renewed mining.

The Town of Telluride feels the compliance and mitigation measures included in the draft PEIS are appropriate, but believes that the best mitigation measure is to terminate all leases and reclaim the disturbed tracts. The Town's concerns will be greatly reduced if there is no ongoing or renewed uranium mining in western Colorado. The Town would like to see a demonstrated domestic need for uranium to justify any Alternative other than Alternative 1. The Town is in agreement with San Miguel County that analysis is needed to understand whether this is a prudent time to develop these reserves, especially in light of the availability of lower cost alternative energy sources. The DOE might consider the viability of reclaiming these lands and developing alternative renewable energy, including solar, instead. The history of uranium mining has demonstrated the boom/bust nature of the industry and consequently the un-reclaimed mining sites that sit inactive for decades. Under Alternative 1 the DOE retains the control and authority to re-lease the sites should domestic need arise in the future. Until then the uranium should be preserved and the land withdrawn and reclaimed.

Finally, notwithstanding the concerns listed here, the Town feels it important to keep these lands withdrawn and in the control of the Department of Energy, so long as the lands are managed consistent with our concerns.

L53-8

L53-9

L53-10

L53-11

L53-12

L53-13

L53-14

L53-15

L53-8    As discussed in the PEIS, noise levels would attenuate to either Colorado or EPA noise limit at a distance of up to about 1,650 ft (500 m) from mine activities. Four residences (near lease tracts 13, 13A, 16, and 16A) are located within this distance from the lease tracts boundaries. If mine activities would occur near both the lease tract boundary and these residences, noise limits would be exceeded at these residences. In this case, noise mitigation measures (e.g., use of engine silencers, use of low-noise equipment, limit of operating hours, noise barriers for stationary noisy sources) could be implemented to minimize noise impacts on nearby sensitive receptors. In addition, a noise impact analysis based on specific operational conditions considering noise levels based on the actual number and type of heavy equipment, work schedule, topography, meteorological conditions, and others, could be done.

In general, about 3 mi is the farthest distance that noise would be discernible (over the background level but does not mean at high level) except extremely loud noise, e.g., large explosion. About 5 mi might be possible if all other factors are exceptionally favorable (e.g., meteorological conditions, ground effects, low background noise, etc.). Different from cumulative impacts of air quality, if noise levels from two sources at a receptor are different by more than 10 dB, lower noise source does not contribute to composite noise levels. In other words, if noise levels from two sources at a receptor are 65 dB and 52 dB, then composite noise level is slightly higher than 65 dB (65.2 dB). In general, noise is not additive unless similar level noise sources are located equidistant from a receptor (in this case, composite noise levels will be 3 dB higher than higher noise level between the two, and this change is the just noticeable difference). During the daytime hours, noise can't travel over a long distance due to skyward refraction caused by temperature lapse (i.e., temperature decreases with increasing height, so sound tends to bend towards the sky). During the nighttime hours, sound can travel over a longer distance (compared to the distances estimated based on isothermal atmospheric conditions vertically) due to temperature inversion (opposite to temperature lapse). In most cases, noise dissipates rapidly with distance and noises from two or more sources are not cumulative unless these sources are located equidistant from a receptor and have similar noise levels. In the DPEIS, 10-hour daytime work schedule is assumed. In this case, the influence of radius from a lease tract is less than 1 mi. If nighttime schedule is included, then the influence of radius from a lease tract will be up to 2-3 mi. Overall, considering the separation distances of and sizes of lease tracts, cumulative noise impacts would be minor, although noise exceedances would be anticipated at several receptors if mine activities would occur nearby.

L53-9    The transport of uranium ore would result in impacts as provided in the EIS. As discussed in Section 4.5.10.1.1, the potential peak year uranium ore truck travel of 2.72 million mi for Alternative 5 could result in an increase of about 22% in truck miles travelled on the affected roads on an annual basis. However, the additional truck miles travelled is also less that 4% of the total vehicle miles travelled annually on these roads in a peak year. Compared to all state roads (i.e., includes interstates but no county or local roads) in Mesa, Montrose, and San Miguel counties, the peak year truck miles are less than 3% of the total truck miles traveled in those counties in 2011.

L53-10   Comment noted.

L53-11   See response to L53-1.

L53-12   See response to L53-1.

L53-13   The possibility that uranium or uranium ore from the ULP may be subject to being exported does not undermine the PEIS's stated purpose and need, and does not require that the PEIS's scope be expanded to analyze the export of uranium or uranium ore. Any export of domestic uranium or uranium ore from any source within the United States, including the ULP lease

**Town of Telluride, Commenter ID No. L53 (Cont.)**

Sincerely yours,

Stuart Fraser
Mayor of Telluride

Ann Brady
Telluride Councilmember

Thom Carnevale
Telluride Councilmember

Chris Myers
Telluride Councilmember

Kristen Permakoff
Telluride Councilmember

Bob Saunders
Telluride Councilmember

Brian Werner
Telluride Councilmember

tracts, is strictly regulated by Nuclear Regulatory Commission (NRC) under the terms of the AEA and the NRC regulations, which impose requirements that must be satisfied before the NRC will grant a license to export any domestic uranium or uranium ore. See AEA, 42 U.S.C. §§ 2099, 2151-2160d; NRC regulations, 10 C.F.R. §§ 110.19-110.46. For example, 42 U.S.C. § 2099 forbids the NRC from licensing any person to export from the United States any uranium ore, or other source material, if the issuance of such a license "would be inimical to the common defense and security" or the health and safety of the public; 42 U.S.C. § 2155 gives the Executive Branch the authority to veto any export of uranium ore. Many more specific requirements are imposed in the other above-cited provisions of the AEA and the NRC regulations.

Therefore, DOE's proposed action in the PEIS does not address uranium ore exports, over which the NRC, not DOE, has authority; and the scope of analysis in the PEIS does not analyze the possibility that uranium ore from the ULP may be subject to export.

In addition, the possibility that uranium ore from the ULP may be subject to export, after a prospective exporter goes through the process of applying for and receiving the necessary permission from the NRC, does not undermine the stated purpose and need for agency action: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of deposits of uranium ore in lands belonging to the United States to the extent DOE deems necessary to effectuate the provisions of the AEA (42 U.S.C. §§ 2096-2097). An active ULP program will be more successful in meeting that need than would an inactive program.

L53-14   Use of land for renewable energy development is outside the scope of this PEIS and does not meet the "Purpose and Need" discussed in Section 1.4.

L53-15   See response to L53-13.

## U.S. Environmental Protection Agency, Region 8, Commenter ID No. L43

 **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
1595 Wynkoop Street
DENVER, CO 80202-1129
Phone 800-227-8917
http://www.epa.gov/region08

Ref: 8EPR-N

**JUN 21 2013**

Mr. Ray Plieness
PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, Colorado 80021

Re: Draft Uranium Leasing Program Programmatic
Environmental Impact Statement CEQ #20130060

Dear Mr. Plieness:

The U.S. Environmental Protection Agency (EPA) Region 8 has reviewed the Draft Uranium Leasing Program (ULP) Programmatic Environmental Impact Statement (PEIS) prepared by the U.S. Department of Energy (DOE). Our comments are provided for your consideration pursuant to our responsibilities and authority under Section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. Section 4332(2)(C), and Section 309 of the Clean Air Act, 42 U.S.C. Section 7609.

**Project Description**

The DOE prepared the Draft PEIS to analyze the reasonably foreseeable potential environmental impacts, including site-specific impacts, and a range of reasonable alternatives for the management of the ULP. DOE's ULP administers 31 tracts of land covering an aggregate of approximately 25,000 acres (10,000 ha) in Mesa, Montrose, and San Miguel Counties in western Colorado for exploration, mine development and operations and reclamation of uranium mines. There are 29 existing lease tracts in the project area; two of the tracts are not currently leased. The following five alternatives are considered in the Draft PEIS:

- Alternative 1 would involve terminating the existing leases and conducting reclamation as needed;
- Alternative 2 would involve terminating the leases and conducting reclamation as needed and then relinquishing all the land to the Bureau of Land Management;
- Alternative 3 would continue with exploration, mine development and operations, and reclamation at the 13 lease tracts for which leases expired prior to July 2007 and terminating the remainder of the leases;

1

BLM_0043343

**U.S. Environmental Protection Agency, Region 8, Commenter ID No. L43 (Cont.)**

- Alternative 4, the DOE's preferred alternative, would continue, with some changes, the leases for the next 10 years or another reasonable period, as appropriate; and
- Alternative 5, the no action alternative, would continue the leases exactly as they are written for the remainder of the 10-year period plus the time necessary to complete the PEIS.

**The EPA's Comments and Recommendations**

The EPA provided scoping comments and we participated as a cooperating agency for this project. The DOE addressed many of our comments in this Draft PEIS resulting in a better explanation of the environmental impacts of the program. Through this process, we have narrowed our recommendations for information that the DOE consider including in the Final PEIS or future project-specific NEPA documents. The following comments and recommendations focus on waste rock piles, human health risk and water impacts.

**Waste Rock Piles**

Covering the waste rock with an adequate amount of soil is necessary to reduce emissions of radioactive particulates and radon thereby reducing potential for exposure to radiation. Within the PEIS there are inconsistencies in the descriptions of waste rock pile reclamation, making it unclear whether there will be adequate soil cover. Page 4-22 states that during reclamation, waste rock piles will be covered by a layer of soil to facilitate vegetation growth and page 2-29 states that waste rock would be graded with the slope of the area and then seeded to conform to its surroundings. Also, Table 4.7-7 indicates that some waste-rock piles have been covered with soil, but it is not clear whether there are other waste-rock piles that remain uncovered. We recommend that the Final PEIS clarify that all waste rock will be covered with a protective layer of soil.

We support the mitigation measure in Table 4.6-1 stating that the operator will use modeling and/or monitoring to determine the adequate thickness for surface soil covering waste rock piles, and we recommend that future project-level NEPA documents include the procedures and methods that will be used to determine the minimum cover thickness required to effectively reduce the emissions of radioactive particulates.

**Human Health Risk Assessment**

*COMPLY-R*

The DOE used the CAP88-PC model to estimate radiation doses and associated risks for all scenarios considered (e.g., hypothetical small, medium, large and very large mines). For comparison purposes, the COMPLY-R model was used to estimate radiation doses and associated risks for a hypothetical small mine. COMPLY-R is required for determining compliance with the radon National Emission Standard for Hazardous Air Pollutants (NESHAP) of 10 millirem (mrem) per year, found in 40 CFR Part 61 Subpart B. The Draft PEIS does not include results from COMPLY-R for a medium, large, or very large mine and it is unclear how radiation doses will compare to the NESHAP when COMPLY-R, the required computer code, is used for these hypothetical larger mines. We recommend that the Final PEIS provide a table of modeled COMPLY-R results for each hypothetical mine size and compare the results to the NESHAP standard.

L43-1

L43-2

2

**L43-1** Text has been revised to state clearly that all waste rock piles will be covered with a protective layer of soil consistent with mitigation measures identified in M-11 (see Section 2.2.4.1)

Future project-level NEPA reviews would include the procedures and methods that will be used to determine the minimum cover thickness required to effectively reduce the emissions of radioactive particulates, as appropriate.

**L43-2** The COMPLY-R estimates for medium and large mines have been added to Table 4.3-4 in Section 4.3.5.3. The radiation doses associated with a medium and large mine are 2 and 4 times of those associated with a small mine. COMPLY-R is more appropriately used to model point sources such as vent holes from underground mines. The very large mine that is included in the PEIS analysis is an open-pit mine (and no future underground mine would be expected to be as large as this very large mine), and is more appropriately modeled as an area source using a model such as CAP88-PC. Hence, in order to provide consistent estimates across all mine sizes considered in the PEIS, CAP88-PC was also used to estimate doses (for the small, medium, large, and very large mines) in addition to those for COMPLY-R (for the small, medium, and large mines). Estimates for both models are presented in Table 4.3-4 in Section 4.3.5.3.

**U.S. Environmental Protection Agency, Region 8, Commenter ID No. L43 (Cont.)**

*Risk Assessment Scenarios*

The Draft PEIS includes an exposure analysis for a mine worker during the operational phase of the mine. It does not include an exposure analysis for a worker performing reclamation in that mine. We recommend that the Final PEIS include an exposure analysis for a worker performing reclamation in the mine or explain why exposures from reclamation in the mine are not included in the risk assessment.

The Draft PEIS does not include an analysis of the risk to a recreationist during the operations phase. There is a potential for recreationists to have greater (short-term) exposure to radiation and radon compared to off-site residents. We recommend that the Final PEIS analyze the risk from the operations phase to a recreationist. As an alternative, the DOE could explain why this receptor was not included in the analysis.

Some of the scenarios analyzed in the risk analysis appear to lack relevant site-specific information. The Draft PEIS assesses the risk assuming resident exposure to one operating mine or a single waste-rock pile. It is not clear whether a resident could be exposed to more than one operating mine and/or waste-rock pile at a time. We recommend that the Final PEIS clarify and update the analysis based on the number of operating mines and waste rock piles a resident may be exposed to. Alternatively, if this information cannot be determined at this time, we recommend that the DOE update the analysis in a future project-level NEPA document.

*Radon Risk from Daneros and Whirlwind Mines*

Table 4.7-4 states that radon emissions would quickly disperse and that there would be no impact to the general public from the Daneros mine and Table 4.7-5 states that no general public health impacts are predicted from the Whirlwind mine. Although the risk may be very small, stating that the risk is zero is inaccurate. We recommend that the Final PEIS include the dose for the nearest member of the public from Rn-222 from each of these mines, or if a quantitative assessment is not available, we recommend stating that the dose will be limited to below the 40 CFR Part 61 Subpart B regulatory limit of 10mrem/year.

**Water Resources**

*Water Use*

The Draft PEIS states that 6.3 million gallons per year of water will be trucked in for use at the mines. The impact of this water use on the local water supply is not provided. Knowing the source of this water and other water demands and trends for different water uses such as irrigation, municipal and domestic use is important for understanding the potential water supply impacts. We recommend that the Final PEIS describe the anticipated water source or sources, and include a water supply analysis for all types of uses in future project-specific NEPA documents.

*Surface Water*

Water resources in the region affected by this action include surface water in the Upper Dolores, San Miguel and Lower Dolores Rivers. Under all five alternatives, impacts on water quality could occur as a

3

L43-3

L43-4

L43-5

L43-6

L43-3    Radiation dose rate of a worker performing reclamation in the mine would be bounded by that of a miner. Text stating this has been added to Section 4.1.5.3.

Although the radiation dose rate to a recreationist may be higher during the operations phase than after the operations phase, the exposure time would be much shorter. As a result, the total dose could be smaller. The presence of mining equipment, mining infrastructure and workers would deter recreationists from entering a lease tract with mining activities going on. Text accompanying estimates for this scenario has been added to the PEIS (see Section 4.3.5.4).

It is possible that exposure to a resident receptor could be from multiple waste rock piles or mines in the future; presently this condition does not exist for any of the mine operations. If this situation occurred in the future, prior to approving mining plans, follow-on NEPA reviews when information regarding such circumstances is known would be required, as appropriate.

L43-4    Text has been revised per comment. The revised text states that the dose would be limited to 10 mrem/yr or less which is the regulatory limit per 40 CFR Part 61 Subpart B. No quantitative information is presented in the documents examined for these two projects. See Tables 4.7-4 and 4.7-5.

L43-5    It is likely that water use for ULP activities would be obtained from sources within the Dolores River Basin mainly across three counties, as discussed in Sections 4.3.4.2 and 4.4.4.2. The possible sources are the existing water right owners in the mining industry, and municipal water. In the Environmental Protection Plan (EPP) for JD-8 and JD-6, it is stated that water is expected to be obtained from the Nucla and Naturita Municipal Systems. Cotter Corporation has obtained their water supply from these municipal systems for previous mining operational needs. As indicated in Section 4.4.4.2, the expected water use for the proposed action is about 0.1% of the public water supply demand compared to regional water use in these three counties. As recommended, text has been revised in Sections 4.3.4.2 and 4.4.4.2 to state that further specific evaluations would be included in future project-specific NEPA reviews.

L43-6    The existing leases require DOE approval prior to resuming operations per article Appendix C.1.a which will require mitigation measures identified in the PEIS to be implemented as a condition of approval of the plans. DOE plans to evaluate if the current leases should be modified to directly incorporate compliance and mitigation measures identified in the PEIS in addition to the present approval process. Additional measures provided in the mine plans would be addressed in follow-on NEPA reviews at that time per EPA's recommendation.

An evaluation for the existing surface water quality near the lease tracts is discussed in Section 3.4.1.2. The evaluation was performed using the recent state water quality data. State permits and inspection reports to date reflect the activities of the lessee in addressing existing concerns with Lease Tract 13.

Data that have been collected for the UMTRA Slick Rock Site were reviewed to provide an indication of impact to the Dolores River from Lease Tract 13 because the Slick Rock East Site is located on Lease Tract 13. The data indicate no impacts to date to surface water quality of the Dolores River from past milling and mining activities on Lease Tract 13. Surface water samples have been collected from the Dolores River at Slick Rock from 1987 to 2012. There are three sample locations in the area that support the ongoing investigations of the UMTRA Slick Rock Site. The background collection point is located in the river directly in front of the Burro Mine site. The other two surface water collection points are located approximately 2,100 feet and 2,600 feet downstream of the background point, respectively. To date, the surface water data collected have indicated very low concentrations (background levels) with the highest concentration of uranium (as a metal) reported to be 0.055 mg/L (from 2006

**U.S. Environmental Protection Agency, Region 8, Commenter ID No. L43 (Cont.)**

result of land disturbance and underground mining activities associated with mine development, operations, and reclamation. These impacts would be minimized by the implementation of compliance and mitigation measures and/or best management practices that will be identified in the mine plans. We recommend that the DOE consider requiring the compliance and mitigation measures that are identified in mine plans in future project-specific NEPA and leasing documents.

The Draft PEIS states that the radioactive and chemical constituents of concern are not expected to reach a surface water body near the mining site. We recommend that the Final PEIS explain that this conclusion is based upon new mining activity being restricted within 0.25 miles of perennial streams. We also recommend that the Final PEIS clarify that this mitigation measure applies to springs and other surface water that can be accessed by wildlife and livestock.

Although the DOE is planning to restrict mining activity within ¼ mile of the Dolores River in the future, past mining activities within ¼ mile of the river may have resulted in adverse impacts. Based on the description of the lease tracts in Section 1.2.3, it appears that mining activity may have taken place within ¼ mile of the Dolores River. A description of any known impacts would provide a better understanding of existing conditions. We recommend that the Final PEIS include a description of identified impacts to the Dolores River or its adjacent aquatic resources.

*Drinking Water*

We appreciate the DOE's efforts to provide information regarding specific mine locations so that we could compare those locations to public drinking water supply sources. We are not currently aware of any public drinking water supplies or source water protection zones that are within the leasing areas. In order to ensure the public is aware of the public drinking water supply sources (e.g., surface water sources including groundwater under the direct influence of surface water sources, and groundwater sources) and to ensure that those sources are protected from potential impacts associated with uranium mining, the EPA recommends that the Final PEIS include a map of the current source water protection areas compared to the lease areas. The source water protection zones are available directly from the Colorado Department of Public Health and Environment Source Water Protection Program Coordinator, John Duggan at (303) 692-3534.

The Draft PEIS states on page 3-73 that groundwater wells located along the pathways of groundwater flow from the lease tracts to the areas of groundwater discharge would have relatively high potential to be affected if groundwater within the lease tracts is adversely affected. The document identifies 15 domestic wells within 1,000 feet of lease tracts that are located along these pathways. It does not explain why potential impacts would be limited to wells within 1,000 feet. We recommend that the DOE consider the hydrogeology in assessing potential impacts to domestic wells and identify in the Final PEIS all domestic wells that could be impacted even if they are greater than 1000 feet from the lease tracts or describe the rationale for limiting the analysis area to 1000 feet.

We recommend that the DOE identify and assure protection of all Underground Sources of Drinking Water (USDWs) in the leasing area in the Final PEIS or future project-specific NEPA documents. Federal Safe Drinking Water Act regulations define a USDW as an aquifer or portion thereof: (a) (1) which supplies any public water system; or (2) which contains a sufficient quantity of ground water to supply a public water system; and (i) currently supplies drinking water for consumption;

L43-6 (Cont.)

L43-7

sampling); and the highest isotopic data to date reported as 0.99 pCi/L for uranium-234 (in 2001) and 0.73 pCi/L for uranium-238 (in 2000). PEIS text has been revised to include this information and citation.

L43-7   Based on the comment, Section 3.4., has been revised to reflect the latest information from the CDPHE water protection program database on source water protection zones for public water supply system. The revised text does still indicate that there are no source water protection zones located in the lease tract area. Upon further discussion with EPA with regards to the recommendation of adding a map to the Final PEIS. it was determined that this would not be needed consistent with the preferences of the state of Colorado. All wells outside of 1,000 ft. from the lease tracts are not on the potential groundwater flow pathways. Text has been revised in Section 3.4.2 to include this information.

Text has been added to the PEIS to state that additional measures to assure protection of all Underground Sources of Drinking Water (USDWs) would be addressed in future project-specific NEPA reviews.

4

**U.S. Environmental Protection Agency, Region 8, Commenter ID No. L43 (Cont.)**

or (ii) contains fewer than 10,000 milligram per liter total dissolved solids and (b) which is not an exempted aquifer (See 40 CFR Section 144.3).

L43-7
(Cont.)

**EPA's Rating and Recommendations**

Consistent with Section 309 of the CAA, it is the EPA's responsibility to provide an independent review and evaluation of the potential environmental impacts of this project. Based on the procedures the EPA uses to evaluate the adequacy of the information and the potential environmental impacts of the proposed action, the EPA is rating this Draft PEIS as Environmental Concerns - Insufficient Information (EC-2). The "EC" rating indicates that the EPA review has identified environmental impacts that need to be avoided in order to protect the environment. The "2" rating indicates that the EPA review has identified a need for additional information, data, analysis or discussion in the Final EIS in order for the EPA to fully assess environmental impacts from the proposed project. A description of the EPA's rating system is enclosed.

L43-8

L43-8    DOE appreciates the effort by the EPA as a cooperating agency for the ULP PEIS process.

We appreciate the opportunity to comment on these documents, and hope our suggestions for improving them assist you. We would be happy to meet to discuss these comments and our suggested solutions. If you have any questions or would like to discuss our comments, please contact me at (303) 312-6925 or Vanessa Hinkle of my staff at (303) 312-6561.

Sincerely,



Suzanne J. Bohan
Director, NEPA Compliance and Review Program
Office of Ecosystems Protection and Remediation

Enclosure

5

Printed on Recycled Paper

**Uranium Watch and Living Rivers, Commenter ID No. L48**

# Uranium Watch

76 South Main Street, # 7 | P.O. Box 344
Moab, Utah 84532
435-259-9450

July 1, 2013

Mr. Raymond Plieness
ULP PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, Colorado 80021
*ulpeis@anl.gov*

RE: Draft Uranium Leasing Program Programmatic Environmental Impact Statement
(Draft ULP PEIS, DOE/EIS– 0472D), for public comment.

Dear Mr. Plieness:

Below please find the Comment on the Department of Energy's (DOE's) Draft Uranium
Leasing Program Programmatic Environmental Impact Statement (DPEIS), DOE/EIS–
0472D. These comments are submitted on behalf of Uranium Watch and Living Rivers
of Moab, Utah.

**I. GENERAL COMMENTS**

1.1. The DPEIS must provide a full accounting of how the mines on the ULP have been
operated and regulated in the past. Information of the previous mitigative measures,
reclamation requirements, radioactive cleanup standards, control of ground and surface
water contamination, surface runoff, surface disturbance and contamination, exploration
drill hole reclamation and handling of drill cuttings, baseline radiation surveys,

1.2. The DPEIS must include information regarding the regulations that were applicable
to the mines during exploration, development, production, periods of non-operation,
reclamation, and other aspects of mine operation since the commencement of mining
activity. There is no data regarding how the mines may or may not have been in
compliance with DOE and State of Colorado uranium mining regulations over time.

L48-1

L48-2

L48-1    Site-specific information that provides the discussion requested is summarized in Section 1.3 of the PEIS.

L48-2    See response to L48-1; also Chapter 5 of the PEIS contains a summary of regulations related to the ULP proposed action. Additionally, see the site-specific information in Section 1.3.

BLM_0043348

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                                    2
July 1, 2013

1.3. The DPEIS is full of statements, data, opinions, and conclusions that have no citations. The reader of the DPEIS has no idea where the information came from or whether it has any basis in fact. The PEIS must include specific citations (including pages and paragraphs) for all substantive information and data in the PEIS.

L48-3

1.4. The DPEIS has no information regarding how the lease tracts have been managed in the past and the nature, extent, and results of monitoring, inspections, and mitigative efforts. The PEIS must include this information. The public can only assume that past actions, or inactions, will guide future actions, or inactions

L48-4

1.5. Commenters do not believe that there is any reasonable basis for continuing the Uranium Lease Program (ULP) into the future. The main purpose for continuing the program is to delay the reclamation of the individual lease tracts. As contemplated by the DOE, the leasing program will go on indefinitely, with no end in site. As has been shown by the history of uranium mining in the region, most uranium mines remain in a non-operational status, with accompanying site degradation, for decades.

L48-5

1.6. Commentors support Alternative 1, where the DOE would terminate all leases, all operations would be reclaimed by lessees, and the DOE would continue to manage the withdrawn lands, without uranium leasing, in accordance with applicable requirements. Site reclamation activities should commence as soon as possible. This is the only alternative that is protective of the health and wellbeing of the public and the environment.

L48-6

1.7. The PEIS must include a full accounting of the money that has been spent by the DOE to administer and enforce the ULP. This would include federal monies spent to reclaim ULP sites. It would include the costs to the DOE and other federal and state agencies to administer and enforce the ULP and the state and federal statutes and regulations that are applicable to the ULP mining operations. It would also include an estimation of future costs to the DOE and other federal and state agencies to administer and enforce the ULP and applicable statutes and regulations for each of the PEIS alternatives.

L48-7

1.8. Lysimeter monitoring: The PEIS mentions several mines where lysimeters have been place downgradient to determine whether near-surface soils or rock formations contain moisture that could affect (or be a affected by) the mine site. However, there is no information about what, exactly, is the significance of the data, what is being done with the data, and how the data is being used by the mine operator, DOE, or State of Colorado.

L48-8

1.9. The DEIS fails to include a program for the long-term monitoring, care, and maintenance of the lease tracts after reclamation is completed. Such a program, with interim actions to monitor and maintain existing reclaimed areas must be part of the DOE ULP.

L48-9

L48-3    Citations were included to support information presented in the DPEIS. The document has been reviewed to augment citations as needed in the process of preparing this Final PEIS. All references and supporting documentation are available on the web site at http://ulpeis.anl.gov/documents/dpeis/references/index.cfm.

L48-4    The evaluations conducted for the PEIS used site-specific information, including information regarding past mining (see Section 1.3 for a summary of this information). DOE considers the information adequate to support the alternatives evaluated and for making any decisions relative to these alternatives. Although site-specific information for future mines will not be available until the lessees submit specific mine plans, information available from past mining activities such as the understanding on cultural resources, threatened and endangered species, waste rock and ore characteristics, and transportation practices and routes is sufficient for supporting the analyses of potential impacts from future mining activities for the five alternatives. The site-specific information reviewed for the PEIS is summarized in Section 1.3 of this PEIS.

L48-5    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

L48-6    Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

L48-7    The discussion on cost in administering the ULP to date and in the future is outside the scope of the PEIS. However, the PEIS does include an analysis of the cost to carry out exploration, mine development/mine operations, and reclamation as these items are relevant to determining potential impacts to socioeconomics aspects. However, for information, the annual royalties were recalculated and reallocated to the 1996 lease agreements, and again to the 2008 lease agreements to be equal to or exceed the administrative costs of the program.

L48-8    Cotter Corporation has installed lysimeters downgradient of four of its mine sites (6, 8, 9, and 18) to determine if water is infiltrating the waste-rock piles and leaching contaminants into the subsurface soils and potentially into groundwater. Cotter has been monitoring these lysimeters on a monthly basis for approximately six years. To date, three of the four lysimeters (8, 9, and 18) have been continuously dry (never had any water to monitor). The lysimeter at 6 has had a minimal amount of water on two different occasions (and not consecutive months). Although there was not enough water to sample for the entire suite of potential contaminants, preliminary indications noted minimal levels of uranium in the water. Monitoring results are reported to the CDRMS as part of the sites routine environmental monitoring.

L48-9    Reclaimed sites are monitored (1) for a period of at least 3-5 years after reclamation is complete to ensure that the site is stable and that revegetation efforts are successful, and (2) periodically after that to identify any issues that may arise in the future.

BLM_0043349

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                3
July 1, 2013

**2. DPEIS, Section 1.1, Background, page 1-1 to 1-5.**

COMMENT

2.1.  The PEIS must provide information on the ore produced from 1949 to 1962 from each lease tract or mine.  This information is important in order to determine the applicability of 40 C.F.R. Part 61 Subpart B to the mines and mine complexes in the lease tracks.  A mine that has or will produce over 100,000 tons of ore over the life of the mine is subject to the Subpart B standard and requirements.  That information should be readily available to the public.

**3. DPEIS, Section 1.1, page 1-2, lines 16 to 20.**

COMMENT

3.1.  The PEIS states that in 1974 lease agreements stated that a new lessee could incorporate an existing mine.  The PEIS must provide information regarding which 1949 – 1962 mines were incorporated into subsequent operations and which 1949 – 1962 mines were not incorporated into new operations.

**4. DPEIS, Section 1.1, page 1-2, lines 31-32.**

COMMENT

4.1.  This Section appears to indicate that all legacy sites were reclaimed and none of the reclaimed sites have been incorporated into subsequent new operations.  This should be clarified.  Information regarding past reclamation projects and the relationship between these projects and the current and proposed leases must be included.  On reason for this is existing site degradation associated with current lease tracts; for example, erosion in reclaimed areas.

**5. DPEIS, Section 1.1, page 1-2, line 32, to page 1-5, lines 1 to 2.**

COMMENT

5.1.  The PEIS must identify the locations and extent of the reclaimed legacy sites.

5.2.  The PEIS must fully discuss and describe the reclamation actions the the current state of the reclaimed areas.  The DOE spent less than $8,000 to reclaim each site, therefore, the reclamation actions would have been minimal.

5.3.  The PEIS must provide information regarding the current radiological contamination at the reclaimed legacy sites, how radiological contamination was addressed, and the cleanup action levels or standards used at each site.

| | | |
|---|---|---|
| L48-10 | L48-10 | The tonnage of uranium ore generated to date at the ULP lease tracts is summarized in Table 1.1-2. |
| L48-11 | L48-11 | Subsequent to the execution of the 1974 lease agreements, only lessees on 7 leases have chosen to resume mining activities at prior existing mines; thereby incorporating those mines into their current operations and accepting the liability for final reclamation of the site. These actions included operations on lease tracts C-SR-10, C-SR-11, C-SR-13, C-SR-13A, C-SR-15, C-G-26, and C-G-27. |
| L48-12 | L48-12 | Reclamation of all legacy mines under DOE's oversight within the ULP has been completed in accordance with existing guidelines and regulations. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS. |
| | | Text in Section 1.3 has been revised to provide further clarification regarding legacy mines already reclaimed. |
| L48-13 | L48-13 | See response to L48-12. |

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                                    4
July 1, 2013

5.4.  The PEIS must identify the location and extent of the reclaimed legacy sites.  The PEIS must include information regarding the State of Colorado requirements for plugging of exploration holes, handling of cuttings, pre- and post-drilling radiological surveys, and return of surface soils to pre-drilling radiological levels.

**L48-13 (Cont.)**

### 6. DPEIS, Section 1.1, page 1.7 - 1.9, Table 1.2-1.

COMMENT

6.1  The Summary of the 31 DOE ULP lease tracks in 2011 indicates that there are no more areas that need to be reclaimed under current conditions for tracks 10, 11A, 12, 15A, 16, 16A, 5A, 17, 19, 19A, 20, 21, 22, 22 A, 23, 25, and 27. The DOE must provide the bases for these determinations.

**L48-14**

**L48-14** Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

### 7. DPEIS, Section 1.2.1, page 1-11, lines 24 to 28.

COMMENT

7.1.  This provision must also include reclamation performance bonding for existing environmental disturbance, not just foreseeable disturbance.

7.2.  Provisions must also include assessment of current disturbance and reclamation of areas that are not part of current operation plans.

**L48-15**

**L48-15** Lease tract operations are currently covered by reclamation bonds, calculated by DOE based on site-specific conditions and deemed sufficient to reclaim those conditions in coordination with CDRMS.

See also response to L48-14.

### 8. DPEIS, Section 1.2.1, page 1-12, lines 24 to 26.

COMMENT

8.1  The DOE has no basis for the proposed 3 to 5 year post-reclamation monitoring. There is no basis for the assumption that the required levels vegetation reestablishment will occur in 3 to 5 years. Throughout the Colorado Plateau there are hundreds of lands disturbed by uranium mining activities. Such historic disturbance is clearly visible on aerial photographs, many decades after the original disturbance. Based on historic disturbance, it will take many decades for the original vegetation to return to original vegetation levels of size, extent, and diversity.

8.2.  Sites must be monitored for compliance with revegetation standards, erosion, off-site contamination of soils—far into the future.

**L48-16**

**L48-16** Past reclamation experiences are the basis for the 3 to 5 years post-reclamation monitoring assumption. Re-seeding performed for reclamation completed to date has demonstrated this time period to be adequate to provide reasonable assurances of sustainability for vegetation cover.

### 9. DPEIS, Section 1.2.2, Lease Requirements, page 1-13, lines 9 to 12.

COMMENT

9.1.  The PEIS should include a discussion of the National Environmental Policy Act (NEPA) process for the DOE review of site-specific mining plans.

**L48-17**

**L48-17** This discussion is included in Section 1.7 of the PEIS.

BLM_0043351

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                                 5
July 1, 2013

**10. DPEIS, Section 1.2.3, Site Specific Information for the ULP Lease Tracts, page 1-13 to 1-27.**

COMMENT

10.1.  This section contains maps of the mine areas.  The maps do not place the mines on a topographic map that would show the location, topography, roads, surface water, and other pertinent information regarding the mine site location.  The PEIS must contain better maps: maps that show the section/township/range, topographic features, surface water, and other pertinent information regarding site locations.

**11. DPEIS, Section 1.2.3, Site Specific Information for the ULP Lease Tracts, page 1-13, lines 25 to 27.**

COMMENT

11.1.  This section references 8 "permitted mines."  This section must provide information regarding the permitting agencies and the applicable permitting regulations.  The PEIS must include substantive information about these permits, including permit applications, permit number, year permitted, permit activities, reclamation, bonds, mine plans, mitigative measures, length of operation under the permit and other information relevant to the permitted activities at the lease tracts.

**12. DPEIS, Table 1.2-2, Estimated Ore Reserve at the ULP Lease Tracts, page 1-14.**

COMMENT

12.1.  Table 1.2-2 does not provide information regarding the estimated "ore reserves."  Rather, it provides information regarding the estimated amount of uranium that would be removed from the ore after processing at a uranium mill (measured in pounds).  Table 1.2-2 must also include the estimated amount of "ore" remaining in the mines, measured in tons.

**13. DPEIS, Section 1.5, Scope of the Draft PEIS.**

COMMENT

13.1.  The major, but unacknowledged, purpose of the alternatives that allow for continuation of the leasing program is the indefinite delay of full mine reclamation.  That has been the result of the leasing program over the past 30 years, since the majority of mines operated in the 1980s.

13.2.  The DPEIS states that it evaluates the three mining phases associated with the underground and open-pit mining methods.  The phases include exploration, mine development and operations, and reclamation.  The leaves out the phase associated with

| | |
|---|---|
| L48-18 | L48-18 |
| L48-19 | L48-19 |
| L48-20 | L48-20 |
| L48-21 | L48-21 |

L48-18    The maps contained in this section are intended to show the reader the location and extent of site-specific, mining-related features associated with the "actively permitted" mining operations located on each particular lease tract.

L48-19    Text has been revised that permits need to be obtained from CDRMS, the state agency that oversees mining activities on the ULP lease tracts.

Permit-specific information can be found in the permit amendment reports for some of the lease tracts on the CDRMS web site.

L48-20    Citing the "tonnages" of ore remaining for each lease tract is not practicable. The "ore reserves" information presented in this table is based on numerous calculations derived from past exploration activities and includes the summation of multiple tonnages of ore at various grades.

L48-21    The intended purpose in evaluating the range of reasonable alternatives is to provide an understanding of the potential impacts for informed decision making. Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

State law requires lease holders to enter Temporary Cessation (TC) if inactive for more than 180 days for an initial period of 5 years. A second 5 year TC may be granted by the State. However, under no circumstances shall the TC period be longer than 10 consecutive years. If TC reaches the 10 year maximum, or a second 5 year period is not granted, an operator is required to either reactivate for a year or fully comply with reclamation and Environmental Protection Plan requirements.

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                                 6
July 1, 2013

the greatest amount of time since the inception of the production of ore at the mines on lease tracts that are currently permitted. A rough analysis of tracts 5, 6, 7, 8, 9, 11, 13, and 18, from the years they commenced production of ore to the present (or when reclamation commenced), shows that from 79% to 94% of time (with an average of 87%) the mines have been non-operational (on standby). Some mines would be slightly less, taking into consideration the exploration and mine development phase. The length of time of non-operation ranges from 7 to 30 years, with an average of 24 years. Some mines were developed, but never went into production. The DPEIS fails to provide any information that would lead to the conclusion that that the future of the ULP would be any different. This means that the primary phase associated with the ULP is a lengthy period of non-operation, often lasting decades. Based on the past, any future mining activity would, in fact, consist primarily of "non-activity."

13.3. The PEIS must acknowledge this significant phase and provide a full and accurate characterization and analysis of this phase and its environmental consequences. This must include both the previous and future periods of non-operation.

**14. DPEIS, Section 2.1, Uranium Mining Methods and Phases, pages 2-3 to 2-17.**

COMMENT

14.1. This section of the DPEIS appears to ignore the existing mining development on the lease tracts. The PEIS must include information on the operations, methods, and phases associated with existing permits and mining operations (historic and current). The PEIS should include a table showing each previous phase and the length of each phase. This should include the major phase associated with the lease tracts: the non-operational phase.

14.2. The PEIS must also address requirements and actions associated with short-term and long-term periods of non-operation in order to keep the mine sites safe, address environmental degradation, and prevent migration of contaminants both on and off site. The PEIS must address the need for lease tract management plans for periods of short-term and long-term periods of non-operation.

14.3. Periods of non-operation at various uranium mines in the Colorado Plateau have resulted in site hazardous conditions and site degradation, including: removal of waste rock, migration of radioactive and non-radioactive contaminants both on and off-site, erosion, uncontrolled flow of storm water, vandalism, accumulation of trash and unused equipment, flooding of wet mines, accumulation of hazardous materials (e.g., blasting materials and transformers), and unplugged vents and holes. The DOE must require interim site management plans for all lease tracts, no matter what alternative is chosen.

| | | |
|---|---|---|
| L48-21 (Cont.) | | |
| L48-22 | L48-22 | Site-specific information including that requested is summarized in Section 1.3 of the PEIS. |
| L48-23 | L48-23 | See response to L48-21. |
| L48-24 | L48-24 | See response to L48-21. |

BLM_0043353

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                                        7
July 1, 2013

**15.  DPEIS, Section 2.1.3, Uranium Mining Methods and Phases, Reclamation, page 2-13.**

COMMENT

15.1.  The PEIS must also consider and analyze the need for reclamation at lease tracts if the ULP continues.  Existing mining operations have structures, waste dumps piles, equipment, erosion, contamination and other features that could and should be remediated NOW, rather than waiting for some unknown future time when mining activities have been completed.  Thus far, 8 lease tracts have has essentially open-ended lease arrangements, so that the mines sit for decades without active mining and without reclamation.  During those periods there are hazards at the sites and unaddressed degradation of the lease tracts.  Reclamation should be a continuous process, not something left for a half-century or more into the future, as will be the case with some tracts under a new leasing program.

15.2.  The discussion of reclamation activities does not mention covering the waste dumps with soil and rock to reduce radon and radioactive and hazardous particulate emissions, cleanup of soils and sediments contaminated by radionuclides (both on and off the mine site), radionuclide and other Reclamation Performance Standards, road and mine access reclamation, establishment of vegetation test plots, and other aspects of the reclamation process.  This information must be part of the PEIS.

**16.  DPEIS, Section 2.2.3, 2.2.4, and 2.2.5, Five Alternatives Evaluated, Alternatives 3 - 5, pages 2-21 to 2-32.**

COMMENT

16.1.  The discussion of Alternatives 3, 4, and 5 makes certain assumptions regarding development, production, and reclamation schedules.  These sections anticipate peak production periods and reclamation periods.  The DPEIS assumes 10 years or more of production.  Given the history of these lease tracts since the mid-1970s, there is little basis for these scenarios.  For example, for the 8 permitted tracts ore production lasted from a few months to 7 years.  A rough average is about 4 years of production.  Some mines on these lease tracts were developed, but never produced ore.  The PEIS must acknowledge the fantasy nature of these operation and peak production scenarios, and consider more realistic scenarios.  The most realistic scenario is the one where there is little or no mine development on the lease tracts over the next 10 to 20 years.

16.2.  The PEIS must consider a situation where the holder of a current leases is not able to conduct further mine operations and must reclaim the site, pursuant directives by the State of Colorado.  The PEIS must consider whether, under those circumstances, that lease tract will be available to another lessee in the future.

L48-25

L48-25   Reclamation of mine areas within the lease tracts is stipulated in the leases. Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

Text has been revised to clarify that all waste rock piles would be covered with a protective top layer material and vegetation to reduce particulate and radon emissions (see Section 2.2.4.1) and as identified in mitigation measure M11.

L48-26

L48-26   The assumptions were made to provide a conservative but realistic upper bound scenario so that the PEIS evaluations can be used to support the range of reasonable alternatives considered.

Re-leasing a lease tract would be considered if this occurs within the timeframe covered by the PEIS and if the ULP exists.

A mitigation measure providing a buffer of 1/4 mile from the Dolores River is included in Section 4.6 (Table 4.6-1).

See response to L48-1.

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                                                    8
July 1, 2013

16.3.  This section must also consider past mine development as well as future mine development at the lease tracts.

16.4.  No mine development should be allowed within a minimum of 1 mile from the Dolores River corridor.  No mine development should be allowed in an area where there is the potential for any run-off from the mine site to reach the Dolores River.

16.5.  These sections contain numerous factual statements and assumptions, but fails to provide footnotes with citations for these statements.  The PEIS must provide citations for substantive facts and opinions.

L48-26 (Cont.)

**17.  DPEIS, Section 2.4.2, Summary and Comparison of the Potential Impacts from the Five Alternatives: Acoustic Environment, page 2-38.**

COMMENT

17.1.  This section must consider the noise from ventilation fans that are placed near the surface at the top of ventilation boreholes.  These fans made a very loud roaring noise that can be heard for over a mile, depending on the topography.  Next to a fan, it sounds like one is next to a major highway or on the tarmac of an airport.  The noise from these fans, which can operate 24 hours a day, must be considered.

L48-27

L48-27    The PEIS has been revised to add a discussion and evaluation of potential impacts from ventilation fans (see Sections 4.1.2, 4.2.2, 4.3.2, 4.4.2 and 4.5.2).

**18.  DPEIS, Section 2.4.5, Summary and Comparison of the Potential Impacts from the Five Alternatives: Human Health, pages 2–40 to 2–42.**

COMMENT

18.1.  The section on Human Health should have included citations for the data and assumptions.

L48-28    Citations have been added (citations were included in Section 4 of the DPEIS).

18.2.  The DPEIS estimates that the waste rock would contain an average of 23.7 pCi/gm of radium-226.  This should be compared with the EPA criteria for cleanup of radionuclides in rocks and soils at uranium processing sites.  The cleanup standard is .5 picocuries per gram (pCi/g), averaged over the first 15 centimeters (cm) below the surface, and 15 pCi/g, averaged over 15 cm thick layers more than 15 cm below the surface.[1]  The Environmental Protection Agency (EPA) has established site-specific radiation standards for the cleanup of uranium mine sites.  The DOE must develop remedial action standards for radioactivity at all lease tracts.

L48-28

The use of 23.7 pCi/g of radium-226 in the PEIS evaluation is meant to provide a conservative analysis accounting for the possibility of mixing of small amounts of uranium ore in the waste rock pile.  This is not to say that the waste rock piles would actually contain this concentration of radium-226.  Calculations based on this value would result in higher doses than that for the 5 pCi/g standard.

Also see response to L48-25.

18.1.  The DPEIS makes no mention of radon and radionuclide particulate exposure from contaminated soils, evaporation ponds, water treatment facilities, water catchment basins, and other sources of radioactive contamination both onsite and offsite.  There is no discussion of the collection of baseline data, establishment of radiological Reclamation

L48-29

L48-29    The exposures to the radiation sources during the active mining phase are included in the radiation dose monitoring data of uranium miners, which are discussed in the PEIS.  The water and sediments in evaporation ponds, water treatment facilities, and water catchment basins would be sampled and if necessary, treated then disposed of in licensed facilities after the active mining period; therefore, the potential exposure to the residual radioactivity in these sources would be greatly reduced, and is expected to be less significant than the exposure to the radioactivity contained in waste-rock piles.  Exposure to radioactivity in waste-rock piles are evaluated in the PEIS for both on-site and off-site receptors through the inhalation of radon and particulate pathways during the reclamation and post-reclamation phases.  Baseline exposures through inhalation of radon and particulate pathways were established with sampling data and are discussed in Section 3.5 and listed in Table 3.5-3.

[1] 40 C.F.R. Part 192 § 192.32(b)(2).

BLM_0043355

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                                    9
July 1, 2013

Performance Standards, and the regulation of radionuclide emissions from other sources
at the lease tract sites. These aspects of radionuclide exposure must be included in the
PEIS.

18.2. The PEIS must acknowledge that EPA standard for radon emissions will only be
applicable to underground mines that have or are expected to produce over 100,000 tons
of ore.[2] The PEIS must acknowledge that there are no radiation dose standards for the
emission of radon from mines that are expected to produce 100,000 tons or ore or less.

18.3. The PEIS must consider and acknowledge that, except for the measurement of
radon emissions from mines that have or are expected to produce 100,000 tons of ore,
there are no other radionuclide emission or dose standards from uranium, and uranium
progeny, including radon. There are no requirements to measure these emissions,
calculate doses, or monitor onsite or offsite emissions or doses. Emissions from existing
and new contaminated soils, ore storage piles, ore pads, waste dumps, evaporation ponds,
water treatment facilities, catchment basin, and other radionuclide sources will not be
measured. So, whatever the DOE imagines the doses or emissions to be, there are no
standards or monitoring requirements, other than Subpart B.

18.4. The discussion of accidents and fatalities associated with uranium mining (page
2-42) should include a citation for the information that provides a basis for these
conclusions. The PEIS should include updated information for uranium mine workers,
not just any mine worker. For example, from 2007 to 2010 there were two operating
uranium mines in nearby La Sal, Utah. The operation of these 2 mines produced one
fatality.

18.5. The PEIS must acknowledge and analyze the increased potential for uranium mine
worker accidents due to the lack of mine and uranium-mine experience. The fewer
months and years that a worker has experience, the more likely it is for an accident. Due
to the many years since the height of uranium mine production and high turnover of
workers, it is likely that many of the workers would have extensive experience and
extensive training in underground uranium mine operations.

18.6. The PEIS must analyze the requirements for mine rescue teams and emergency
responders to be available in case of mine accidents, given the isolated location of the
lease tracts.

---

[2] 40 C.F.R. Part 61 Subpart B.

|  |  |
|---|---|
| L48-29 (Cont.) |  |
| L48-30 | L48-30  Text has been revised in these sections to provide the clarification. |
| L48-31 | L48-31  See response to L48-30. |
| L48-32 | L48-32  The citation of the statistical data based on which the numbers of worker injury and fatality were estimated is provided in Section 4.3.5.1. Statistical data for uranium mining were not available; therefore, data for general mining were used. |
|  | The prediction of injuries and fatalities provided in the PEIS should be interpreted from a statistical perspective. The numbers among individual mines could be different. These statements have been added to Section 4.3.5.1 of the PEIS. |
| L48-33 | L48-33  Statistical data on mining injuries and fatalities do not contain information on worker training and experience. Therefore, predictions of injuries and fatalities factoring into account the level of worker training and experience cannot be made. However, a statement has been added in Section 4.3.5.1 of the PEIS to acknowledge that proper training and extensive experience would reduce mining accidents, thereby reducing injuries and fatalities. |
| L48-34 | L48-34  The lessees are required to provide response rescue teams for their operations and this information is included in the Environmental Protection Plans (EPPs) that are required by the Colorado Division of Reclamation, Mine, and Safety (CDRMS). |

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                                    10
July 1, 2013

**19. DPEIS, Section 2.4. Proposed Actions and Alternatives. Summary and Comparison of the Potential Impacts from the Five Alternatives. Ecological Resources, pages 2-43 to 2-71.**

COMMENT

19.1. Section 4 fails to include the impacts during the lengthy non-operational phase of mining operations. The whole discussion of the impacts fails to include existing impacts, which should be characterized in the PEIS as to the length of time of the impacts, nature, and extent.
L48-35

19.2. The PEIS must include a complete assessment of all current and past impacts to Ecological Resources for the mine lease program. It must include a complete assessment of the impacts associated with the primary operational phase; that is, lengthy periods of non-operation.
L48-36

19.3. Section 4 fails to include the historic and current site conditions and impacts in the estimations of the Impact Level. This information must be included in the PEIS.
L48-37

19.4. The failure of the DPEIS to include the current and historic site impacts and failure to include the lengthy periods of non-operation as a major phase associated with the mine leases calls into question the veracity of the PEIS and any opinions and conclusions therein.
L48-38

19.5. Section 2.4.1, Air Quality (page 2-36) fails to include the total CO2 emissions from exploration, operation, periods of non-operation, and reclamation of the lease tracts. This data must be included in the PEIS.
L48-39

19.6. Throughout the discussion of the impact to various aspects of Ecological Resources, the DEIS refers to "potential" or "likely" impacts and fails to state whether those potential, likely, or anticipated impacts have, in fact, already occurred. The PEIS must include the actual impacts from the ULP up to the present, not just "potential" impacts. The PEIS must fully discuss the ongoing impacts from existing conditions from now until reclamation actually occurs, which may be decades away if the ULP program continues or is expanded.
L48-40

19.7. Section 2.4.6.1, Vegetation, fails to discuss the existing impacts to vegetation, length of time of those impacts, their nature, and extent. It fails to recognize the long periods when no mining activity will occur and no reclamation activities will take place. The PEIS must include an evaluation of the impacts to vegetation due to extensive periods of non-operation and delay of reclamation.
L48-41

19.8. Section 2.4.6.3, Biota, states that "potential impacts from mine development and operations would last at least 10 years prior to reclamation." Page 2-47, lines 20 to 21.
L48-42

L48-35    Section 2.4.6 summarizes the impacts on ecological resources that are described in greater detail in Chapter 4. The measures to minimize potential impact from ULP mining identified in Section 4.6 will be implemented over the lifetime of a mine site. Thus, significant adverse ecological impacts from periods of mining inactivity are not anticipated. The discussion of ecological resources in Section 3.6 and Section 4.1.6 describe existing conditions on the lease tracts, which includes inactive and reclaimed mine site areas.

L48-36    See response to L48-35.

L48-37    See response to L48-35.

L48-38    See response to L48-35.

L48-39    In Chapter 4, $CO_2$ emissions associated with exploration, mine development, mine operations, and reclamation activities of the lease tracts are estimated (see Tables 4.1-1, 4.3-1, 4.4-1, and 4.5-1) and are compared with total greenhouse gas emissions for Colorado (2010) and U.S. (2009). However, discussion on $CO_2$ emission data and potential impacts of ULP activities is omitted in Section 2.4.1 (page 2-36 to 2-37). This data and relevant discussion will be included in Section 2.4-1 of the final PEIS.

L48-40    See response to L48-35.

L48-41    Section 2.4.6.1 is a summary of the impacts described in greater detail in Chapter 4. When the selected alternative is implemented, long periods of inactivity are not expected. Existing conditions on the lease tracts, which result in part from past impacts, are described in the Affected Environment, Section 3.6.1, and in Section 4.1.6.1.

L48-42    See response to L48-35.

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                   11
July 1, 2013

Here the DPEIS totally ignores past periods of time for mine development and operations at the lease tracts, which include lengthy periods of non-operation. Many of the impacts are sustained and exacerbated during these periods of permittee indifference and DOE and State of Colorado regulatory incompetence and indifference. The DPEIS ignores the fact that there will be lengthy periods of non-operation in the future for all the mineral lease sites. The PEIS must take into consideration the full history of each uranium lease site and the past and expected periods of non-operation.

L48-42 (Cont.)

19.9. Section 2.4.8, Socioeconomics, fails to consider the impacts from the boom and bust uranium mining economy. This section fails to consider the social and economic impacts from periods of non-operation, when workers are laid off, with little idea of when or if they may return to work at the mine. The PEIS must fully examine the Socioeconomic impacts to the community from past ups and downs of the uranium industry in the area.

L48-43

**20. DPEIS, Proposed Actions and Alternatives, Summary and Comparison of the Potential Impacts from the Five Alternatives, Section 2.6, Preferred Alternative Identified, page 2-72.**

This section states: *DOE's preferred alternative for the management of the ULP is Alternative 4. DOE would continue to allow, after appropriate NEPA analysis, the exploration, mine development and operations, and reclamation of uranium mines on the 31 lease tracts that are being managed under the DOE ULP.* Page 2-72, lines 7 to 10.

**COMMENT**

20.1. The DPEIS neglects to state that, under Alternative 4, the DOE would permit extended periods of non-operation of existing and future mining operations on the lease tracts. The DPEIS does not include an "appropriate NEPA analysis" of this major phase of ULP lease track operations. It appears that the DOE has no intention whatsoever of including an "appropriate NEPA analysis" of the environmental impacts associated with the past and future lengthy periods of non-operation. This is a clear violation of the NEPA process.

L48-44

20.2. This section also states: *Under Alternative 4, the lease period would be for the next 10 years or for another reasonable period . . . .* Page 2-72, lines 12 to 13. Here the DPEIS fails to even attempt to frame "another reasonable time period" or state what is meant by "reasonable." Give a 10-year lease period, plus the average period on mine standby, or non-operation of 24-years, the DOE must think that a "reasonable" time period is at least 34 years.

L48-45

L48-43   As presented in Table 2.4-8, mining and development operations under Alternative 5 could create as many as 253 direct jobs and 152 indirect jobs. This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI. Although some communities could be affected disproportionately, it is likely that employment would draw from each of the counties because the leases extend across the ROI. In addition, the larger towns of Grand Junction and Montrose are within commuting distance and could help prevent boom and bust economies in smaller communities. Sections 4.3.8, 4.4.8, and 4.5.8 acknowledge that " individual municipalities in smaller rural communities might experience a temporary increase in population from workers if they moved to communities closer to mining projects rather than commuting from longer distances elsewhere in the ROI" and that that impact on individual communities could vary. However, because the number of employees required for mining operations and development would represent such a small increase in employment, the impacts of a boom and bust economy was not considered in detail.

Section 3.8 of the PEIS discusses current and historic economic environment in the ROI. An overview of periods of boom and bust economic conditions in the ROI has been added.

L48-44   State law requires lease holders to enter Temporary Cessation (TC) if inactive for more than 180 days for an initial period of 5 years. A second 5 year TC may be granted by the State. However, under no circumstances shall the TC period be longer than 10 consecutive years. If TC reaches the 10 year maximum, or a second 5 year period is not granted, an operator is required to either reactivate for a year or fully comply with reclamation and Environmental Protection Plan requirements.

L48-45   DOE would consider the extension of a lease for another reasonable period on a case-by-case basis and would do so within the framework of NEPA and the administrative requirements of the ULP.