## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                                    12
July 1, 2013

20.3. This section also states: *Hence, the number of years available for ore generation would be shorter under Alternative 5 and might not give the lessees enough flexibility to time their mining activities to coincide with periods when the economic market for uranium ore was favorable.* Page 2-72, lines 15 to 17. The PEIS must include information on the history of the "periods when the economic market for uranium ore was favorable" for the development of the lease tract mining operations. It must also include information on the current market conditions over the past 10 years and the expected future market conditions. Given that the spot price of uranium recently dropped below $40.00 and that uranium mining companies are making decisions based on the drop in price, not a price upturn, the DOE must be forthright in its discussion of the length of time it will take for the economic market for uranium ore to become favorable. Meanwhile, the PEIS must also analyze the impacts of the ULP program while the uranium investors and mining companies wait for the favorable uranium economic market to magically reappear.

**21. DPEIS, Section 3.4.1.2, Affected Environment, Water Resources, Surface Water, Existing Water Quality, pages 3-58 to 3-66.**

COMMENT

21.1. This section fails to include information on the contamination of surface water resources from uranium, radium, and other radionuclides. The section fails to include information regarding the possible sources of such contamination from the lease tracts and other historic uranium mine and mill sources. The PEIS must include this information.

21.2. This section fails to include Summit Canyon, originating in eastern Utah. The Canyon is shown on the map in Figure 3.4-5, Location of Impaired Water Bodies. There is no mention of a reclaimed uranium mine and historic discharge of uranium mine water at the head of Summit Canyon from the Calliham Mine.[3] There is no mention of the existing Sage Mine[4] waste rock pile on the side of Summit Canyon. There is no information regarding the uranium, radium, and other radioactive and non-radioactive constituents in sediments in Summit Canyon or in other ephemeral streams and washes in the ULP impacted area. The information should be included in the PEIS.

---

[3] http://linux1.ogm.utah.gov/WebStuff/wwwroot/minerals/mineralsfilesbypermitinfo.php
[4] Id.

L48-46

L48-47

L48-48

L48-46    The evaluation of the economic market is outside the scope of the PEIS and does not meet the purpose and need described in Section 1.4. The stated purpose and need for agency action: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium that would adequately meet the nation's defense needs, and to issue leases or permits for prospecting for, exploration for, mining of, or removal of deposits of uranium ore in lands belonging to the United States. 42 U.S.C. §§ 2096-2097. Those two AEA provisions are consistent with the need of assuring an adequate supply of domestic uranium, from an active program of issuing leases or permits for exploring, mining, and removing deposits of uranium ore. An active ULP program will be more successful in meeting that need than would an inactive program.

L48-47    The section identified all impaired water bodies within the three watersheds that encompass all ULP lease tracts. The impaired water bodies were determined by the state through its water quality program. Radiation, uranium (U), and radium (Ra) are the part of monitoring parameters that were measured for assessment of water quality. As indicated in this section, we found that no impaired water, which includes no elevated radiation, U, and Ra in water, is evidently associated with the historical mining activities within the ULP lease tracts based on the CDPHE's report and 303 (d). In Colorado, there are a few impaired water bodies that have elevated radiation and U. None of them are located in the watersheds that were evaluated in the section.

L48-48    On the basis of CDPHE's information on surface water quality, we have not found any impaired water body from Summit Canyon to Dolores River, which is downstream from the two mines, Calliham and Sage. The mining operation at Calliham was terminated in 1981 (or 1982) and resumed briefly in 1991-1992. There was an operation violation that was reported in 1982 for the Calliham mine as "waste water produced on the maintenance and wash pads" being directly released into the environment. The waste water contained solvents and oils from the equipment surface. However, there was no report of discharge of uranium mine water as cited in the comment.

BLM_0043359

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                                13
July 1, 2013

**22. DPEIS, Section 3.6.4.1.2. Affected Environment: Ecological Resources: Threatened, Endangered and Sensitive Species: Species Listed Under the Endangered Species Act: Birds, pages 3-164 to 3-167.**

COMMENT

22.1. The discussion of Gunnison Sage-Grouse and the map at Figure 3.6-15 (Distribution of Potentially Suitable Habitat for the Gunnison Sage-Grouse in the Vicinity of the ULP Lease Tracts) fails to mention or show the occupied and unoccupied critical habitat for Gunnison Sage-Grouse just over the boarder in San Juan County, Utah. The fact that there is critical habitat in Utah adjacent to the lease tract is ignored. It is hard to understand this significant oversight. The US Fish and Wildlife Service map of the Gunnison Sage-grouse Critical Habitat, Unit 1: Monticello-Dove Creek; San Juan County, Utah; Montrose, San Miguel, and Dolores Counties, Colorado clearly shows the connections between the critical habitats that straddle the Utah-Colorado border.[5] Birds have not been known to recognize state boundaries.

**23. PEIS, Section 3.7.4.1. Affected Environment: Land Use, Mineral Resources and Mining, Uranium, Table 3.7-6, page 3-190.**

COMMENT

23.1. The following corrections and additions should be made to Table 3.7-6:

A. Pandora/Snowball/Beaver should read "Pandora/Beaver/La Sal." The La Sal portal, not the Snowball, recently produced ore.

B. The Pandora/Beaver/La Sal Site Status: This mine complex is no longer in production. The mine complex has temporarily ceased operation, and it is not known when, or if, operations will resume.[6]

C. The Velvet may have a permit, but it is not for production. It will have to submit a new plan of operations to the Utah Division of Oil, Gas, and Mining and Bureau of Land Management (BLM) and have that approved before they could commence mining.

---

[5] http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/Unit1_Monticello-DoveCreek011013.pdf
[6] http://linux1.ogm.utah.gov/WebStuff/wwwroot/minerals/mineralsfilesbypermit.php?M0370026
http://linux1.ogm.utah.gov/WebStuff/wwwroot/minerals/mineralsfilesbypermit.php?M0370012

L48-49

L48-49    On January 11, 2013, the U.S. Fish and Wildlife Service (Service) proposed to list the Gunnison sage-grouse as an endangered species under the ESA. At that time, the Service proposed to designate 1.7 million acres of critical habitat for the species. Portions of the proposed critical habitat include the overall range data presented in Figure 3.6-15. The most recent available geospatial data pertaining to the species' critical habitat will be used to update the map and text for the Final PEIS.

L48-50

L48-50    The information on Table 3.7-6 has been revised, as applicable.

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                14
July 1, 2013

D. The Daneros Mine is also no longer in production.[7] The mine complex has
temporarily ceased operation. The mine owner has proposed expansion to a large mining
operation. It will take a few years to complete the application and approval process for a
large mining operation.[8]

E. The mine identified as the La Sal, Laramide Resources, Ltd., should be identified as
the "La Sal No. 2."

L48-50
(Cont.)

F. The Table should include the Sage Mine, at the head of Summit Canyon just over the
boarder in Utah. It is permitted by DOGM, but not by the BLM, though it is on BLM
land. The Sage is the mine in Utah that is nearest to a DOE lease tract.

### 24. DPEIS, Section 4.3, Alternative 3, page 4-72.

This section states (in part): *The three phases involved in uranium mining (exploration,
mine development and operations, and reclamation) are evaluated for this alternative.
The exploration phase is assumed to require a relatively short duration of time, from 2
weeks to a month for each mine; however, it can occur annually over the course of
several years. Mine development and operations would be conducted for about 10 years.
Reclamation would be conducted within a time frame of 2 to 3 years after operations
ceased.*

### COMMENT

24.1. Again, the DPEIS ignores the primary phase of uranium mining: extensive periods
of non-operation. Also, the time frames for the mine development and reclamation are
not realistic. In order for the EIS to provide an honest and complete assessment of future
time frames for exploration, development, operational, and reclamation, it must include
all data on the exploration, development, operation, **non-operation**, and reclamation
phases for all of the lease tracts mining operations. This history would provide a more
reasonable basis for the time-frame guesstimations in the PEIS.

L48-51

21.2. The PEIS must also include the information regarding the reclamation that needs to
be conducted now at each of the lease tracts. The DOE cannot continue to use the ULP to
delay indefinitely reclamation at the lease tracts. There are existing waste rock piles and
other impacted areas that will not be part of future mine development and operations.
Those areas, plus any radioactive contamination above background levels must be
cleaned up NOW, not at some indefinite time in the future.

L48-52

L48-51   Reclamation is required by Federal and state law and by provisions of the lease. Consistent
with state requirements, one lease holder has filed EPPs and another lease holder has submitted
reclamation plans. State law requires lease holders to reclaim within five years of inactivity.
The state has the authority to extend this time period for an additional five years.

L48-52   See response to L48-51.

---

[7] http://linux1.ogm.utah.gov/WebStuff/wwwroot/minerals/mineralsfilesbypermit.php?N0370121
[8] http://linux1.ogm.utah.gov/WebStuff/wwwroot/minerals/mineralsfilesbypermit.php?M0370126

BLM_0043361

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                              15
July 1, 2013

24.3. Alternative 3 must also include an evaluation of the impacts from site cleanup and reclamation **prior** to any new development and operations at the lease tracts.

L48-53

**25. DPEIS, Section 4.3.1.2, Alternative 3, Air Quality, Mine Development and Operations, page 4-74.**

COMMENT

25.1. The section on Air Quality completely neglects to characterize and describe the impacts from the on-site and off-site emissions of uranium and uranium progeny. This includes impacts from dispersion from existing site contamination. This section of the DPEIS fails to include information on the cumulative radon emissions from the underground mine workings, including radon emissions that fall under the 40 C.F.R. Part 61 Subpart B standard and those that do not. The information must be included in PEIS.

L48-54

25.2. The section on Air Quality complete fails to include data and information regarding non-radioactive toxic emissions from waste rock, ore, ore pads, contaminated soil, and other site sources. The PEIS must include this information.

L48-55

**26. DPEIS, Section 4.3.1.3: Alternative 3, Air Quality, Reclamation, page 4-75.**

COMMENT

26.1. The section on Reclamation does not include consideration of reclamation and clean up prior to future development of the lease tracts. The PEIS must also include this information and analysis. Continuation of the ULP program must not be used as a justification for delays in cleanup and reclamation of existing lease tract contamination and environmental impacts, as it has for decades.

L48-56

**27. DPEIS, Section 4.3.2.2: Alternative 3, Air Quality, Acoustic Environment, Mine Development and Operations, page 4-76 to 4-78.**

COMMENT

27.1. The section on acoustic impacts during development and operations fails to include a discussion of the noise from the operation of the underground mining ventilation system. This is an example of a lack of familiarity with the actual uranium mining operations on the part of the DOE and the developers of the PEIS. The roaring noise from these ventilation systems can be extremely loud and travels for some distance. The ventilation fans on the surface can operate 24 hours a day, 7 days a week. The noise disturbs the human and animal environment. The PEIS must include an assessment of

L48-57

L48-53   See response to L48-52.

L48-54   Potential impacts due to emissions of radon, uranium, and uranium progenies during the exploration, operation, reclamation, and post-reclamation phases of uranium mining are discussed in the Human Health Impact sections of the PEIS. Radiation exposures associated with existing environmental conditions were also estimated and presented in the "Affected Environment" section in Chapter 3.

L48-55   The comment states that the section on Air Quality fails to include data and information regarding non-radioactive toxic emissions from waste rock, ore, ore pads, contaminated soil, and other site sources. It should be noted that non-radioactive toxic air emissions were estimated for site preparation, use of explosives, wind erosion, and combustion of diesel fuel in engines during exploration and mine construction activities and the use of various heavy equipment (such as dump trucks, bulldozers, motor graders, etc.) and drilling equipment during operations and reclamation activities. The air emissions from site erosion include those from various sources including waste rock, ore, ore pads, soil and other site sources.

L48-56   The comment states that the section on Reclamation does not include consideration of reclamation and clean-up prior to future development of the lease tracts. Air emissions were predicted for reclamation activities associated with the development of the various mines as a function of PEIS alternatives, as shown in Table 4.1-1 for Alternatives 1 and 2, Table 4.3-1 for Alternative 3, Table 4.4-1 for Alternative 4, and Table 4.5-1 for Alternative 5. For more details, please see Tables C.3-6 and C.3-7 in Appendix C ("Emission Inventories, Costs, and Other Estimates Used as a Basis for the ULP PEIS Impact Analyses") in the Draft PEIS.

L48-57   In the DPEIS, a 10-hour daytime work schedule is assumed for noise impact analysis. If ventilation fans can operate around the clock as commenter mentioned, potential noise impacts on nearby sensitive receptors (e.g., residences, wildlife habitat) are anticipated, especially during the nighttime hours when the background noise levels are lowest. On a calm, clear night typical of the ULP lease tracts setting, the air temperature would likely increase with height (temperature inversion) because of strong radiative cooling. Such a temperature profile tends to focus noise downward toward the ground. There would be little, if any, shadow zone within 1-2 mi of the noise source in the presence of a strong temperature inversion. Potential impacts of ventilation fans operation on nearby sensitive receptors will be included in the Final PEIS.

BLM_0043362

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                      16
July 1, 2013

the noise levels associated with the operation of the mine ventilation system and their impacts.

| L48-57 (Cont.) |

**28.  DPEIS, Section 4.3.3: Environmental Impacts, Alternative 3, Geology and Soil Resources, page 4-79 to 4-81.**

COMMENT

28.1.  The PEIS evaluation of Geology and Soil Resources must include information on the current and cumulative impacts to Geology and Soils from the ULP.

| L48-58 |

L48-58   Sections 3.3, 4.1.3, 4.2.3, 4.3.3, 4.4.3, and 4.5.3 include the information and evaluation regarding geology and soils for the ULP lease tracts.

28.2.  The PEIS must include an assessment of erosion on all lease tracts and fully document erosion at existing lease tracts, including erosion on lease tract areas that were previously "reclaimed." Uranium Watch has observed clear evidence of erosion at a previously reclaimed area on a lease tract near Slick Rock. It is apparent that past reclamation efforts have not been totally successful. All existing lease tract reclamation projects should be fully assessed to evaluate the effectiveness of previous reclamation efforts. Any erosion or other problems associated with past reclamation must be addressed.

| L48-59 |

The evaluation is based on the site-specific information summarized in Section 1.3. Erosion issues have not been identified.

L48-59   See response to L48-58

28.3.  Existing site radioactive contamination above background at previously reclaimed areas must be cleaned up. The DOE has allowed high levels of radioactive contamination to remain in reclaimed and un-reclaimed areas of the lease tract sites. The DOE has totally has failed in its responsibility to establish radiation-contamination action levels for the ULP program. The DOE must establish such standards for lease tract reclamation.

| L48-60 |

L48-60   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

**29.  DPEIS, Section 4.3.4: Environmental Impacts, Alternative 3, Water Resources, page 4-82 to 4-88 .**

COMMENT

29.1.  The DPEIS describes various elements potentially affecting Water Resources and the potential environment impacts from the continuation and expansion of the ULP. However, the DPEIS fails to characterize and consider the current and historic impacts from the various elements. The PEIS must include the ongoing and cumulative impacts to Water Resources from the existing and historic lease tract development. The PEIS must not limit its consideration of impacts to future or expected impacts. The PEIS must include a full description and assessment of what is going on now with respect impacts to Water Resources.

| L48-61 |

L48-61   The current impacts to water resources have been discussed in Chapter 3. The analysis of future impacts is based on the historical information and site-specific information summarized in Section 1.3 of the PEIS.

29.2.  The PEIS must include a radiological assessment of existing stormwater retention basins. Historic stormwater retention basins, or ponds, are known to have higher levels

| L48-62 |

L48-62   As discussed in Chapter 3, no impaired water body was found associated with lease tracts and their stormwater retention basins based on the state water quality monitoring data including measuring parameters of radiation, U, and Ra.

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                         17
July 1, 2013

of radiation than the surrounding mine site. The cumulative impacts from the
accumulation of radionuclides in the sediments of retention basins must be evaluated.

> L48-62
> (Cont.)

29.3. The PEIS must include a discussion of radiological monitoring for contamination
of Water Resources.

> L48-63

L48-63   The implementation of relevant mitigation measures, permitting, BMPs, and Federal and state
regulations is discussed in Section 4.6. These will include radiological monitoring for water
resources.

29.4. The PEIS must include an assessment of radiological contamination of Water
Resources as a result of soils, sediments, surface run off, and groundwater that has
migrated, is migrating, or may migrate to off-site locations.

> L48-64

L48-64   The analysis indicates that off-site migration of radiological contaminants is minimal. The
BMPs and mitigation measures are recommended in the Section 4.6 and Table 4.6-1.

29.5. The DPEIS (page 4-85, lines 29 to 32) states that a "total of 3,200,000 gal/yr (9.8
ac-ft/yr) would be used by all eight mines operating during the peak year." The DPEIS
assumes that the water for the various mining operations would be trucked to the sites,
because sources of water near the lease tracts are scarce and often of poor quality. The
DPEIS fails to provide information regarding the amount of water that would be needed
to develop, operate, and reclaim each lease tract. The DPEIS fails to include information
about the actual off-site sources of water and how the DOE will determine if the owner of
the rights to the water actually has the right to use the water for purposes of mining at the
specific lease tracts. There are often questions regarding whether owners of water rights
have filed the appropriate applications to make use of the water for mining at specific
mine sites. The DOE has an obligation to assure that all water used for lease tract mining
has been the subject of the required water-rights appropriation process. Until such
processes are complete, the DOE's determination that the impacts on local water sources
would be minor is totally premature.

> L48-65

L48-65   The amount of water and source of the water needed for the proposed action is discussed in the
PEIS in Section 2.2.

29.6. The DPEIS states: *The potential for groundwater contamination is likely to be
limited to wet mines in Lease Tracts 7 and 9 in Paradox and Lease Tract 13 in Slick
Rock.* Page 4-86, lines 42 to 43. The PEIS must include information on the history of the
impacts of any past mining activity at the wet mines. This would include a history of any
National Pollutant Discharge Elimination System (NPDES) and Ground Water Discharge
permits, compliance with applicable ground water and discharge standards, mine water
treatment systems, evaporation ponds, monitoring systems, mine-water treatment waste
disposal, and any other information related to past and current impacts from the wet
mines in Lease Tracts 7 and 9 in Paradox and Lease Tract 13 in Slick Rock. The PEIS
must include an assessment of all past and current impacts that are unique to these wet
mines.

> L48-66

L48-66   On the basis of available data, no groundwater contamination has been identified from these
wet mines. Site-specific information regarding the lease tracts has been incorporated into the
PEIS analysis. The site-specific information is presented in Section 1.3.

29.7. The DPEIS states: *There are 5 domestic wells within or near the edge of Lease
Tract 13, and 14 domestic wells are located along the potential groundwater flow
pathways from Lease Tracts 7, 9, and 18 to the groundwater discharge area.* Page 4-87,
lines 1 to 3. The PEIS must include information about, and an assessment of, the
cumulative impacts to the domestic wells within, near, and along potential ground-water
flow pathways from Lease Tracts 13, 14, 7, 9, and 18.

> L48-67

L48-67   Because of the presence of these private wells, several actions are recommended in this section
to minimize the impacts. As analyzed in this section, impact is minimal to private wells if
suggested mitigation measures, permitting, BMPs, and Federal and state regulations are
implemented.

BLM_0043364

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                                                 18
July 1, 2013

29.8. The DPEIS states: *The impacts of groundwater contamination could be minimized by the following actions (Table 4.5-1) . . . .* Page 4-87, lines 5 to 6. The DPEIS then lists five (5) possible mitigative measures. However, the DPEIS neglects to provide information regarding the effectiveness of those proposed measures. The PEIS must include information regarding the effectiveness of the proposed mitigative measures.

29.9. The DPEIS discussion of the impacts to Water Resources from Reclamation at Section 4.3.4.3 (page 4-87 to 4-88) provides only minimal information regarding the impacts during and after reclamation. The DPEIS fails to assess the long-term impacts from the delays in reclamation due to the continuation of the ULP and additional decades added to previous decades when reclamation will be delayed. The PEIS must assess the impacts from the extensive delays in reclamation as a result of the ULP, including past, current, and future delays in reclamation actions.

29.30. The PEIS discussion of the impacts of to Water Resources from Reclamation must include information regarding the extent of backfilling at the mines and the characteristics and impacts associated with the backfill materials. This includes cumulative impacts.

29.31. The PEIS must include the impacts from all current, historic, and future land disturbances, erosion, and contaminant migration in the Dolores River water shed.

**30. DPEIS, Section 4.3.5.4: Environmental Impacts, Alternative 3, Human Health, Worker Exposures – Uranium Miners, pages 4-88 to 4-90.**

COMMENT

30.1. The DPEIS relies on scientific notation (e.g., 7E-05) to evaluate risk and other aspects of worker health and the overall operation of uranium mines. Many of the people who will read the PEIS and try to make sense of this data will not be familiar with this form of presenting data. Therefore, the PEIS must show data and other information in a more usable form; that is, using a lot of zeros or using words, rather than using the type of scientific notation currently in the DPEIS. The data and information in the PEIS must be readily accessible to the public.

30.2. The assessment of uranium miner exposures should include information based on a review of the impacts to workers from the most recent underground uranium mine operations. The PEIS must include data regarding number of workers, number of accidents, number of mine fatalities, citations and penalties associated with exposure to radon and potential for over-exposure to radon (e.g., keeping workers out of high-radon areas and requiring respiration equipment), relationship between experience in underground uranium mines and accidents, exposure to noise, exposure to dust and particulates, exposure to silica and chemicals. The data is there on the Mine Safety and

| | |
|---|---|
| L48-68 | **L48-68** The proposed actions cover a wide range of approaches including underground water control, surface water and shallow groundwater flow diversion, active pumping and treatment, and monitoring system. These are among the most effective approaches. |
| L48-69 | **L48-69** For delayed reclamation, the impacts would be the same as those in the exploration phase and are evaluated for the exploration. |
| L48-70 | **L48-70** The extent of backfilling is site-specific and would be addressed in specific mine plans. |
| L48-71 | **L48-71** The current impacts from erosion and contaminant migration associated with the Lease Tracts in the Dolores River watershed have been evaluated in Chapter 3 and the future impacts are discussed in Chapter 4. |
| L48-72 | **L48-72** The estimated human health risk results are put into perspective to facilitate the reader's understanding of the report. In addition to presenting the estimated LCFs in scientific notation, explanations on the corresponding probabilities are also provided. For example, for an LCF of 1E-5, the explanation is "the probability of developing a cancer is 1 in 100,000." The PEIS has this type of explanation throughout the document whenever LCFs are presented. |
| L48-73 | **L48-73** Available records on physical hazards associated with underground mining operation as provided in the comment will be reviewed and included in the PEIS. However, speculation on how future uranium mining operations will be conducted, which are governed by existing regulations, is outside the scope of the PEIS. Mitigation measures to reduce the exposure of workers and the general public to noise, dust and particulates, hazardous chemicals and radionuclides, etc. are provided in the PEIS. |

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                    19
July 1, 2013

Health Administration (MSHA) Mine Data Retrieval System website.[9] There is data
available regarding the uranium mines that provided ore to the White Mesa Mill, the only
operating conventional uranium mill in the United States. The operators of those mines
have been Reliances Resources, a contractor to Denison Mines (USA) Corp., the owner/
operator of the White Mesa Mill, and Energy Fuels Resources, the company that recently
purchased Denison Mines. The uranium mines that operated within the last 8 years and
provided ore to the mill include: Pandora Complex, La Sal Complex, Tony M, Rim,
Daneros, Sunday, Arizona 1, and Pinenut.

30.3. The DPEIS (page 4-88, lines 25 to 32) makes certain assumptions regarding fatal
and non-fatal accidents at uranium mines, based on the data for all mining operations.
Since actual data on fatal and non-fatal **uranium** mine accidents is readily available on
the MSHA website, the PEIS discussion of worker health must be based on this data, not
on unsubstantiated assumptions based on all mine-accident data. The PEIS must include
actual information regarding the number of workers and workdays at the Pandora
Complex and the totals for all uranium mines associated with fatalities and accidents.

30.3. There was a mine fatality at the Pandora Complex (ID 4200470) in May 26,
2010.[10] The fatal accident was not the result of a statistical expectation of a fatal mine
accident. It was caused by the incompetence of the mine operator; that is, "because
management, policies, procedures, and controls were inadequate."[11] This was
exacerbated by the lack of underground mining experience on the part of the worker, who
did not question the procedures and his supervisor's directions regarding the work
assignment that led to his fatality. The mine operator has since challenged the monetary
penalties associated with the accident and the failure to report the accident in a timely
manner. [12] No penalties have been paid by the mine operator thus far. A review of the
violations for the Pandora Complex provides extensive information regarding the amount
and nature of the penalties. Reliance Resources, the operator of the Pandora Complex,
was a contractor to Denison Mines, the previous mine owner. The current Pandora
Complex owner, Energy Fuels Resources Inc., employes many of the same people as
Denison Mines and has leased some of the DOE ULP properties. Therefore, the PEIS
must include a more realistic assessment of the potential for fatal accidents associated
with the ULP, should mining operations commence.

30.4. The PEIS must include information on worker health that reflects some of the
realities of uranium mine worker health and safety over the past 10 years. This would

[9] http://www.msha.gov/drs/drshome.htm

[10] http://www.msha.gov/FATALS/2010/FTL10m08.asp

[11] http://www.msha.gov/FATALS/2010/ftl10m08.pdf

[12] A mine operator is required to report a serious accident within 15 minutes. MSHA learned of
the fatal accident via a media report several hours after the accident and the fatality
determination. Both the mine owner and the operator were cited and fined for failing to report the
accident. Only the mine operator contested the fine.

| | | |
|---|---|---|
| L48-73 (Cont.) | | |
| L48-74 | L48-74 | See response to L48-73. |
| L48-75 | L48-75 | See response to L48-73. |
| L48-76 | L48-76 | See response to L48-73. |

BLM_0043366

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                                                          20
July 1, 2013

include mine accidents and fatalities, the amount of penalties, they nature of the health
and safety violations, the nature of the health and safety violations associated with
exposure to radon, the nature of the health and safety violations associated with keeping
workers out of high radon areas with barriers and warning signs, contested penalties,
hazards associated with the reopening of old mine workings where radon has
accumulated, and any other aspect of worker health and safety revealed by data and
information on uranium mining operations over the past 10 years.

L48-76
(Cont.)

30.5. The PEIS assessment of worker health must also include information regarding the
compensation of a miner's family by the mine owner and/or operator, should a fatal
accident occur. In the case of the fatal accident at the Pandora Complex, it is my
understanding that the family, including a daughter who is a minor, did not receive
anything from the mine owner or mine operator. Future uranium mine workers and their
families should know that they might not receive any compensation from the responsible
party for an accident or fatality caused by the mine owner or operator. They should know
they will be on their own, unless they sue the mine owner and/or operator.

L48-77     L48-77     See response to L48-73.

30.6. The PEIS must include consideration of the lack of workers in the ULP area who
have experience in underground uranium mines and the relationship between lack of
experience and mine accidents.

L48-78     L48-78     Speculation of worker qualifications is outside the scope of the PEIS.

30.7. The PEIS must include information regarding the reliance of mine owners and
operators on local emergency responders, who are not trained to do underground mine
rescue work. According to MSHA regulations, an underground uranium mine must have
a trained mine rescue team available at all times to reach the mine within 2-hours.
However, at the Pandora Complex and La Sal Complex, the mine owner and operators
relied on local emergency responders during mine accidents and during the 2010 mine
fatality. The PEIS must have a full discussion of the use of such local emergency
workers and an assessment of the possible misuse of such workers in emergency
situations. Examples of misuse of emergency workers include sending untrained workers
underground, failure to provide workers with protective clothing and protection against
radon exposure, and failure to inform a pregnant emergency workers of the potential to be
exposed to radiological hazards.

L48-79     L48-79     A mitigation measure regarding the development of an emergency rescue plan and ensuring the
availability of a trained rescue team will be added to the PEIS.

**31. DPEIS, Section 4.3.5: Environmental Impacts, Alternative 3, Human Health,
pages 4-88 to 4-102.**

COMMENT

31.1. The PEIS must include information regarding previous exposures of the public
from radon and other radionuclides from the lease tracts. The DOE must collect and
make available any of the data and information submitted to the EPA regarding the dose
to the nearest residents in compliance with the reporting requirements in 40 C.F.R. Part
61 Subpart B. The DOE must request and make available information regarding the lease

L48-80     L48-80     Available radon data have been used to provide estimates of potential risk to a receptor
postulated to be exposed to adits or mine openings (see Section 4.1.5).

In addition, the area that encompass the ULP lease tracts has high background levels of radon
due to natural deposition of uranium in soils. Background radon levels, ambient gamma
radiation, and radionuclide concentrations in surface water and groundwater are provided in
the "Affected Environment" section for comparison with estimated levels of radon and
radiation exposures from mining related activities in the lease tracts as presented in the PEIS.

BLM_0043367

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                                 21
July 1, 2013

tract mine operators' compliance with the EPA application and approval process for the
ventilation of an underground uranium mine (40 C.F.R. §§ 61.07 and 61.08) and the
annual radon dose compliance reports. The annual reports are required for any lease tract
mine that has, or will, produce over 100,000 tons of ore.

L48-80
(Cont.)

31.2. The PEIS must include information regarding the monitoring, or lack of
monitoring, and regulation of radionuclide releases from the soils, waste rock, and other
surface facilities at the mine sites. This would include monitoring for off-site dispersal of
radionuclides. It would also include the emission and dispersion of radionuclides from
lease tracks since the inception of the ULP.

L48-81

31.3. The PEIS must include a complete assessment of current surface and subsurface
radiological contamination at existing lease tracts, including areas that have already been
"reclaimed" and areas that will be disturbed by future mining activities. Data must be
provided in the form of dose rate in millirems per year (mrem/yr), so that it can be
compared to the dose standard for radon exposure. Any dose measured in micro rems per
hour (μrem/hr) should be translated into mrem/yr.[13]

L48-82

31.4. The PEIS must provide information regarding the average dose rate from the
Disturbed Area, the maximum dose rate for the Mine Site Disturbed Area, Survey
Boundary, and Entire Survey Data Set and the source of the highest dose rate. This must
be compared with both the EPA and the Nuclear Regulatory Commission (NRC)
radiation dose standards associated with the exposure of members of the public to
radionuclides from uranium industry operations. The EPA standard for the dose to the
nearest resident from the release of radon from underground uranium mines is 10 mrem/
yr; the NRC Radiation Dose Limit to Individual Members of the Public is 100 mrem/yr.[14]

L48-83

31.5. Surface and subsurface contamination must also be shown in pico Cures per gram
(pCi/gm) of radium 226 and compared to existing EPA standards for the cleanup of
radium and uranium at uranium mills and uranium mines. The EPA standard for the
cleanup of contaminated soils at uranium mill sites is 5 pCi/g of radium 226, averaged
over the first 15 centimeters (cm) below the surface, and 15 pCi/g radium 226, averaged
for layers more than 15 cm below the surface.[15] The 5 pCig/ is a health-based standard.
Recently, the EPA establish an action level for the cleanup of the North East Church Rock
Uranium Mine of 2.24 pCi/g radium 226.[16] The DOE must identify and take into
consideration all EPA site-specific action levels for the cleanup of uranium mines and any
statements by the EPA regarding the minimum cleanup levels applicable to uranium
mining operations.

L48-84

---

[13] Multiply μrem/hr by 8.766 to get mrem/yr.

[14] 10 C.F.R. § 20.1301.

[15] 40 C.F.R. §192.32(b)(2)(i and ii)

[16] http://yosemite.epa.gov/r9/sfund/r9sfdocw.nsf/ViewByEPAID/NNN000306132

| | |
|---|---|
| L48-81 | Mitigation measures which include monitoring of radon emitted from uranium mines are provided in the PEIS. The monitoring data can be used to more realistically evaluate the dispersal of radon to offsite locations and the exposures of the public in order to demonstrate compliance with the dose limit of 10 mrem/yr promulgated by the EPA. |
| L48-82 | Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS. Reclamation at the ULP lease must comply with the lease agreements and state requirements (i.e., CDRMS requirements for reclamation). |
| L48-83 | Dose rates cannot be compared with the dose limit directly. The PEIS considers different receptors with exposure patterns thought to represent those of the general public and calculates the radiation doses the receptors would incur; the radiation doses then were compared with the dose limit. The calculated radiation doses and the comparison are provided in the PEIS. |
| L48-84 | Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS. |

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                     22
July 1, 2013

31.6. The DOE must establish health-based radiation standards for the cleanup of radioactive contamination at the ULP sites. The DOE must also consider a cleanup level that is equal to background, prior to any lease tract mining activities.

L48-85

31.7. Table 4.3-3 Radon Emission Rates per Type of Mine during Mine Operations Assumed for Alternative 3 (page 4-93) is based on estimates from decades-old EPA studies. There is recent data available to the DOE regarding the relationship between the size of the mine, years of operation, ore production, and rate of radon emissions per mine. This information is available in the Annual Subpart B Compliance Reports submitted to the State of Utah Division of Air Quality (DAQ) and the EPA Region 8 for the La Sal Mines Complex (Pandora, La Sal, Beaver Shaft, and Snowball), Rim, Tony M., and Daneros Mines in Utah. These reports are available from the DAQ via a government records act request. Ore production data for these mines is found in a recent Energy Fuels Resources Report.[17] Additionally, the ULP uranium mining operations that had produced, or were expected to produce over 100,000 tons of ore were also required to submit Annual Subpart B Compliance Reports to the EPA Region 8 office for operations after 1989. There a number of lease tract mining operations that fall within that category. The DOE is obligated use the most current and relevant data related to the radon emission rates. The DOE must use all available radon emission data from the lease tracts and determine whether operations that were required to submit Annual Subpart B Compliance Reports to the EPA actually did so.

L48-86

31.8. The PEIS must acknowledge that there is no EPA regulation that requires the measurement of radon emissions from open pit uranium mines and from mines that are not expected to produce over 100,000 tons of ore. Therefore, there will be no way to verify any of the information or data regarding radon emissions and doses, including cumulative emissions and doses from all mining operations in a specific area. The total dose to a receptor from a combination of uranium mine operations would be unknown, if any of the mines are not subject to the Subpart B standard and reporting requirements. Therefore, if a receptor is near a mine that is not subject to the Subpart B standard, it will be impossible to ascertain whether or not the 10 mrem dose standard is being exceeded. There will be no legal basis for using any of the mitigative measures described in the DPEIS (page 4-96). Yet, the DPEIS fails to acknowledge this reality, and is misstating the facts through the omission of pertinent information. This must be corrected in the PEIS.

L48-87

31.9. Table 4.3-4, Potential Maximum Radon Levels, Radiation Doses, Radon Concentrations, and LCF Risks to a Resident Associated with the Emission of Radon from Four Uranium Mine Sizes under Alternative 3 (page 4-94), shows that the radiation dose to the nearest receptor for large mines would be above the 10 mrem/yr standard for receptors up to 2,000 meters from the mines, based on the DOE's estimations. Under

L48-88

[17] 2012 Annual Information Form, Energy Fuels Inc., December 20, 2012.
http://www.uraniumwatch.org/energyfuels/EF_CSA_2012AnnualInfo.121221.pdf

L48-85    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

L48-86    See response to L48-80.

L48-87    DOE has included mitigation measures (that are not compliance measures) precisely to provide additional protection where there might not be a regulatory basis. The mitigation measures included in Table 4.6-1 include measures to provide protection from potential radon emissions. Mitigation measures are currently included in the lease agreements and mitigation measures identified in the PEIS would be added to the leases, when leases are modified.

L48-88    The results presented in the PEIS show that there is potential that operations of a uranium mine without taking any mitigation measure could exceed radon emission standards. However, the likelihood of actual operations exceeding the emission standards cannot be assessed without actual measurement data of radon emission rates. Based on the conservatism and uncertainty associated with the PEIS results, the suggested statements for inclusion in the PEIS may not be appropriate.

BLM_0043369

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                    23
July 1, 2013

EPA regulation, a mine could emit radon over the limit for over a year before the exceedance was revealed in an annual Subpart B compliance report and mitigative measures undertaken. The PEIS must acknowledge that it is likely that large mines with nearby receptors will operate in violation of radon emission standards. The PEIS must also acknowledge that reopening of existing underground workings will result in a spike in radon emissions as accumulated radon is exhausted from the mine workings.

31.10. Table 4.3-4 (page 4-94) does not state that there is currently no federal requirement for the monitoring of radon from the smaller mining operations and any open-pit mine, no matter how large. Therefore, there will be no way to verify the emissions rates for these mines as shown in Table 4.3-4. The PEIS must acknowledge this fact. Data on potential maximum radon levels, doses, risks, and concentrations must also include any historic data regarding the emission of radon from the ULP mines that were subject to the Subpart B standard, monitoring, and reporting requirements.

31.11. The DOE estimations of uranium mining operations during peak operating years (or any other mining operation scenario) has no factual basis. The mine operation estimations do not reflect the recent history of uranium mining operations. If the only operating uranium mill is the White Mesa Mill and if the owners of the White Mesa Mill are producing ore from their own mines and continue to do so, there is little room for uranium ore production at tracts leased to other mining companies.

31.12. The DPEIS (page 4-96) lists various measures that could be used to assure compliance with the NESHAP dose limit of 10 mrem/yr. The DPEIS neglects to mention that the DOE has no authority over the radon emission levels from the underground workings and no authority to order or enforce any of the proposed mitigative measures. The EPA has authority for the enforcement of the underground uranium mine NESHAP. The PEIS must be clear about the agency that administers and enforces the radioactive NESHAP for Colorado.

31.13. The DPEIS (page 4-96) lists supposed "mandatory" measures for obtaining actual radon emission rates, including monitoring "the radon discharge concentration continuously whenever the mine ventilation system is operational." The DPEIS fails to reference the regulations that would mandate such measures, or the agency that would administer and enforce such requirements. Here, the DOE fails to define "operational."

31.14. The EPA has the authority over the radon emissions for mines subject to the 40 C.F.R. Part 61 Subpart B standard. Subpart B already requires the continuous monitoring of any mines subject to that standard. Monitoring is required whether or not the mine is "operational," as long as the vents are open. Radon is emitted from the underground workings whether or not active mining is going on and whether or not ventilation fans are in operation, as long as the mine is subject to the standard and radon is being emitted. However, for mines that are not subject to the standard (i.e., open-pit mines and mines producing 1000 tons of ore or less), there is currently no EPA requirement to measure the radon emission rates or calculate the dose to the nearest receptor. So, the dose to a

| | |
|---|---|
| L48-88 (Cont.) | |
| L48-89 | **L48-89** A footnote has been added to Table 4.3-4 to acknowledge that there is no Federal requirement for monitoring small mines (those not falling within the requirements of the Subpart B standard). |
| L48-90 | **L48-90** The evaluation discussed in the PEIS assumed the White Mesa and Pinon Ridge Mills to be operational and evaluated peak year scenarios to account for a conservative scenario so that potential impacts can be determined. This is the primary purpose of the PEIS evaluations - to provide the information on potential impacts to support identification of DOE's preferred alternative and as input for future site-specific mining activities. |
| L48-91 | **L48-91** Text has been revised to indicate that the EPA is the oversight authority for NESHAP compliance (see Section 4.3.5). |
| L48-92 | **L48-92** The existing leases require DOE approval prior to resuming operations per article Appendix C.1.a which will require any new mitigation measures to be included in those plans. |
| L48-93 | **L48-93** The mitigation measures in the PEIS are measures that can be adopted to reduce potential exposures of workers and the public. They are not discussions on regulatory requirements, even though they may be similar to existing ones. |

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                           24
July 1, 2013

receptors in the vicinity of a mine that is not subject to the Subpart B standard and
monitoring requirements will remain unknown. This should be made perfectly clear in
the PEIS.

L48-93
(Cont.)

31.15. It would be possible for the DOE to require monitoring of radon discharge from
all ULP mines and require the calculation of the dose to the nearest receptors. The PEIS
must discuss the type of radon monitoring that would be required at ULP mines that are
not subject to the EPA radioactive NESHAPS standard.

L48-94

L48-94   The mitigation measures in the PEIS are measures that can be adopted to reduce potential
exposures of workers and the public. They are not discussions on regulatory requirements,
even though they may be similar to existing ones.

31.16. It is important for the DOE and the public to know how much ore has historically
been produced at all of the lease tract mines, because historic ore production counts when
determining whether a mine is subject to the Subpart B standard.

L48-95

L48-95   This information has been included in Section 1.3.

31.17. The DPEIS (page 4-96) lists supposed "mandatory" measures for obtaining actual
radon emission rates, including calculating and recording "a weekly radon-222 emission
rate for the mine." The DPEIS fails to reference the regulations that would mandate such
measures, or the agency that would administer and enforce such requirements. Currently,
the EPA and the Utah Division of Air Quality (DAQ) do not require the calculation and
recording of weekly radon-222 emissions. This done on a monthly basis. If a mine that
is subject to the Subpart B standard exceeds the standard, the mine owner is required
submit monthly, not weekly, monitoring results.

L48-96

L48-96   See response to L48-94.

31.18. The DPEIS (page 4-96) lists supposed "mandatory" measures "for reducing
impacts to the general public." The DPEIS fails to reference the regulations that would
mandate such measures, or the agency that would administer and enforce such
requirements. The DPEIS fails to discuss the fact that both the EPA and MSHA have
authority over the mine ventilation system. The ventilation system is operated for the
purpose of reducing the radon dose to the underground workers. MSHA has authority
over this aspect of the system.

L48-97

L48-97   See response to L48-94.

31.19. The DPEIS does not say how the various measure would reduce the impact to the
general public. In fact, it is not the general public that will be considered; it is specific
receptor points in the vicinity of the mines. Measures such as rerouting the ventilation
flow might not be feasible if it means increased worker exposure. Modifications to the
vent stack, once ventilation borehole has been drilled and the vent is installed, would be
infeasible. Vent stacks, referred to as "risers," are heavy, metal structures, some of which
also house a ventilation fan. New vent stack height and diameter would be determined at
the time of installation, and the mines would also rely on previously installed boreholes
and risers. It would be possible to decrease the diameter and/or increase the height of the
stack, but not likely.

L48-98

L48-98   The measures included in Table 4.6-1 in the M11 category do describe the specifics and the
intended protection provided by the measures.

31.20. The DOE must require the use of bulkheads whenever feasible to close off
previously mines areas as a condition of the lease agreement.

L48-99

L48-99   DOE will assure protection to human health consistent with regulations and evaluate the use of
bulkheads to close off mine areas , as needed in coordination with CDRMS.

31.21. The DOE must require off-site monitoring to provide actual verification of the
amount of radon and other radionuclides emissions impacting nearby receptors and the

L48-100

L48-100  DOE will consider the need for monitoring beyond what is required in M-11 Table 4.6-1 on a
case-by-case basis in coordination with CDRMS.

BLM_0043371

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                             25
July 1, 2013

general public within a 50-mile radius. Right now, exposure to a member the public from a uranium mine is by-guess-and-by-golly, no matter how far they are from a lease tract mine.

L48-100 (Cont.)

31.22. The DPEIS makes a lot of assumptions regarding the health impacts to the public, but there is no mention of any need to collect data on the current health of nearby residents or the surrounding communities to be able to establish baseline conditions. Nor, is there any mention of long-term studies of community health during since the inception of the ULP or of plans for future health studies. Therefore, there is no basis for, and will continue to be no basis for, any of the DOE's assumptions regarding the impacts to public health from the ULP.

L48-101

31.23. The DPEIS only includes risks associated with cancer, rather than fully discussing all potential health impacts from exposure to radiological and non-radiological contaminants from the ULP mining operation, including cumulative impacts. The PEIS must address all health impacts and health risks, not just those associated with cancer.

L48-102

31.24. The DPEIS fails to provide any information regarding a radionuclide cleanup standard for contaminated rock, soils, and sediments. It fails to provide information regarding limits on the release of radon from the waste-rock piles during and after reclamation. It fails to provide information regarding long-term monitoring and maintenance of the reclaimed sites. In sum, there is no information about the control of radiation and non-radioactive contamination over the long term. The PEIS must include that information.

L48-103

31.25. The PEIS must include a full accounting of previous radon emissions and doses, based on data and information provided to the EPA in compliance with 40 C.F.R. Part 61 Subpart B. The PEIS must include a full accounting of how mines that have been subject to Subpart B have complied with the application, approval, monitoring, and reporting requirements in the past.

L48-104

31.26. The PEIS must examine the risks associated with radioactive particulates that are lodged in the lungs where they will emit radiation to the lungs and other parts of a body indefinitely. The PEIS must take into consideration any new scientific studies and reports related to the damage caused by radioactive particles that are lodged in a person's body for various durations, including permanently.

L48-105

31.27. The DPEIS assessment of health impacts is full of statements, opinions, and data with few accompanying citations to scientific literature. There is no way for the public to verify any of the statements and data. The PEIS assessment of health impacts must include citations to specific scientific literature, including the specific pages and paragraphs.

L48-106

31.28. The assessment of General Public Exposures – Recreationist Scenario at Section 4.3.5.4 (page 4-100 to 4-101) does not mention that there is currently no requirement for warning signs near operating radon vents, waste rock piles, contaminated soils and

L48-107

L48-101  The human health analysis in the PEIS is based on site-specific information (see Section 1.3 for a summary) and is sufficient for decisions regarding the five alternatives in the range of reasonable alternatives presented in the PEIS.

L48-102  While there are other health effects associated with radiation exposures, cancer risks are determined to be the limiting risks for the general population and could be used as the sole basis for assessing human health effects from environmental radiation exposures (EPA 1989). The PEIS follows the EPA guidance for assessing human health risks from radiation exposures.

Potential human health risks considering the chemical effects of uranium and vanadium are also estimated in the PEIS (see Section 4.1.5). Per EPA guidance, for exposure levels less than the EPA hazard index of 1, adverse health effects are not expected, which is the case found for the general public in the evaluations done for this PEIS (see Section 4.1.5.5 and 4.3.5.4).

L48-103  When mines are closed, the cleanup will be performed according to the appropriate requirements. Potential radon releases would be minimized and would be protective once a site is successfully revegetated (typically three to five years)

L48-104  See response to L48-86.

L48-105  Radiation doses/risks associated with inhalation of radionuclides are included in the dose/risk results presented in the PEIS. The inhalation doses/risks concern the total exposures of human body to radiation within 30 years after the intake of radionuclides. The retention and excretion of radionuclides, along with their daughter products generated after the intake, inside the human body are considered based on their physiological data; while radionuclides are inside the human body, the radiation they emit and absorbed by different organs are counted toward the inhalation doses/risks. The inhalation doses/risks are estimated using the most updated dose conversion factors/slope factors available at present.

L48-106  The methodology and dose/risk coefficients employed by the PEIS for human health impact analyses are also used by the risk assessment community and the regulatory agencies such as EPA and NRC. Discussions on potential human health effects and data supporting the effects are available in the documents referenced by the PEIS for the dose/risk coefficients.

L48-107  DOE leases require the lessees to maintain their operations in a safe and secure manner, which could include fencing as necessary (see Appendix A, item X. Security and Safety).

The radiation exposures of recreationists would be greatly reduced with implementation of mitigation measures (e.g., providing a protective cover layer of sufficient thickness to waste rock piles).

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                            26
July 1, 2013

sediments, and other potentially hazardous areas of the ULP lease tracts. Therefore, people engaged in recreational activities might not be aware that they are on or near areas where they might be exposed to radon, radioactive particulates, or other hazardous materials and hazardous conditions associated with ULP sites. The DOE must require fencing and warning signs at radon ventilation boreholes, waste rock piles, reclaimed areas, contaminated areas, and any other areas that present a health and safety hazard at any of the ULP lease tracts.

L48-107
(Cont.)

**32. DPEIS, Section 4.3.6, Environmental Impacts, Alternative 3, Ecological Resources, page 4-102 to 4-147.**

COMMENT

32.1. The DPEIS fails to include a full assessment of past impacts to Ecological Resources and a full assessment of the current, unremediated impacts. The PEIS must include a full assessment of all historic impacts, the extent of remediation, the effectiveness of remediation efforts (particularly with respect revegetation), and the impacts caused by the extensive delay in reclamation due to the ULP's failure to require ongoing remedial actions at each of the lease tracts. The PIES must contain a full assessment of the impacts to Ecological Resources caused by the continued delay in remediation via the proposed indefinite extension of the ULP.

L48-108

L48-108   See response to L48-35.

32.2. The PEIS must include an assessment of past recovery of plant communities in the lease tract areas that have been impacted. The PEIS must substantiate statements such as, "Plant communities would be expected to fully recover from impacts of underground mines, and impacts would be minor." Page 4-102, lines 29 to 30.

L48-109

L48-109   Existing conditions on the lease tracts, which result, in part, from past impacts, are described in the Affected Environment, Section 3.6.1, and in Section 4.1.6.1. Details regarding conditions at individual mine sites and lease tracts, including reclamation, can be found in S.M. Stoller Corporation, 2012, referenced in the DPEIS and available on the ULP PEIS web site. Conclusion statements, such as that noted from page 4-103, are generally supported by information in the preceding paragraphs describing the impacts and appropriate mitigation. The degree of recovery of plant communities is based on the degree and type of the impacting factor. The impact level (e.g., minor, moderate) is based on several factors, as described in Table 2.4-1. The statement noted applies only to the indirect impact of fugitive dust. Text has been added to clarify.

32.3. The PEIS must justify its conclusion that "streams located within lease tracts, such as the Dolores River (Lease Tracts 13 and 13A) or Atkinson Creek (Lease Tract 18), would not likely be directly affected because mines would be required to be located at a distance from these streams (e.g., 1,300 ft [0.25 mi] from the Dolores River)." Page 4-104, lines 31 to 38. The PEIS must explain why a .25 mile distance from those water ways is adequate to protect the Dolores River and Atkinson Creek. The PEIS must include all data on the actual distance from the Dolores River from the edge of existing surface impacts of Lease Tracts 13 and 13A, the historic impacts to the Dolores River from Lease Tracts 13 and 13A, the current impacts to the Dolores River from Lease Tracts 13 and 13A, the history of erosion and materials from Lease Tracts 13 and 13A migrating offsite, and all other impacts to the Dolores River from Lease Tracts 13 and 13A. This would include the history of inspections, violations, mitigative measures, success of mitigative measures associated with the offsite migration of materials from Lease Tracts 13 and 13A.

L48-110

L48-110   As noted in the statement referenced, the quarter-mile distance explains why the Dolores River would not likely be *directly* affected (i.e., ground-disturbing activities related to mine development). Indirect impacts (such as from erosion and sedimentation) could potentially occur, and are discussed in the succeeding sentences and paragraphs.

32.3. The DPEIS provides a long description of potential impacts to groundwater, then concludes that "impacts on groundwater flows would be small and would result in minor

L48-111

L48-111   Text has been added to refer the reader to Section 4.3.4 (Water Resources), which includes a discussion of impacts to groundwater flow and concludes that impacts would be minimal. Historical impacts to groundwater are also discussed in that section.

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

impacts on downgradient habitats, which would be expected to fully recover." Page 4-105, lines 32 to 33. The DPEIS provides no basis for this conclusion. The DPEIS provides no information regarding the historic and current impacts to groundwater flows and downgradient habitats. The DPEIS completely disregards the cumulative impacts from individual lease tract mining operations. These omissions must be corrected in the final PEIS. The PEIS must look at the sum of all the previous, current, and potential impacts, including impacts caused by extensive delays in reclamation and mitigative measures.

L48-111 (Cont.)

32.4. The PEIS must include a full description and evaluation of all of the mitigative measures that have been imposed on the mining operations since the inception of the ULP. The PEIS must include an assessment of the mitigative measures that have been undertaken and their effectiveness.

L48-112

L48-112   Section 4.6 of the PEIS lists measures to minimize potential impacts from ULP mining. The evaluation of potential impacts to various resources discussed in Chapter 4 of the PEIS describes the applicability of these measures for mitigating potential impacts for a given environmental resource area or for human health.

32.5. Section 4.3.6.2.2, Wildlife Disturbance (page 4-108 to 4-110) includes an assessment of potential disturbances caused by noise. This section should also include an assessment of the disturbances caused by the continual high levels of noise caused by the operation of the fans in the mine vent stacks. This would include impacts to nesting, feeding, breeding, rearing of young, and other animal behaviors that are impacted by exposure to constant noise from an unnatural source.

L48-113

L48-113   Information on noise levels from fans in the mine vent stacks will be added to the PEIS. As appropriate, potential noise impacts to wildlife from the fans will be discussed in Section 4.3.6.2.2.

32.6. The PEIS must include information regarding how impacts to wildlife has been monitored and will be monitored in the area of the ULP.

L48-114

L48-114   There is currently no active wildlife monitoring of the inactive or abandoned mines in the ULP area. The Environmental Protection Plans (EPPs) prepared for mines under the proposed ULP will require monitoring of ecological resources. The monitoring program will be developed with input from the U.S. Fish and Wildlife Service and Colorado Parks and Wildlife. Additional ecological monitoring and mitigation would be required as part of lease and permit requirements for mine sites.

**33. DPEIS, Section 4.4, Alternative 4, page 4-185 to 4-226.**

**COMMENT**

L48-115

See comments for Alternative 3, which are also applicable to Alternative 4.

**34. DPEIS, Section 4.5, Alternative 5, page 4-226 - 4-251.**

**COMMENT**

L48-116

See comments for Alternative 3, which are also applicable to Alternative 5.

L48-115   See responses to L48-51 to L48-114.

L48-116   See responses to L48-51 to L48-114.

**35. DPEIS, Section 4.6, Measures to Minimize Potential Impacts from the ULP Mining Activities, page 4-251 to 4-265.**

**COMMENT**

35.1. Section 4.6. states: *These measures apply to the three phases of the proposed action (exploration, mine development and operations, and reclamation), as applicable.* Page 251, lines 35 to 37. The DPEIS blatantly ignores the longest phase of the proposed action, that of non-operation, where permitted mines sit for years with no active mining

L48-117

L48-117   Reclamation is required by Federal and state law and by provisions of the lease. State law requires lease holders to reclaim within five years of inactivity. The state has the authority to extend this time period for an additional five years.

## Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)

DOE/ULP PEIS Comments                                                    28
July 1, 2013

activities. The PEIS must provide a full description of the measures that will be required for periods of short-term cessation of mining activities (less than one year) and long-term periods of non-operation in order to maintain the lease tracts in a safe and secure condition. The measures must address all health, safety, and environmental issues in order to prevent site degradation and adverse environmental impacts. The DOE must require yearly inspections and have a schedule for review of the non-operational status so that mines cannot be left for years in a non-operational status without reclamation. The PEIS must also address the current operational status of the existing leases and proposed measures to address all health, safety, and environmental issues.

L48-117 (Cont.)

35.2. Mitigative measures during periods of non-operation must include radiological warning signs on the mine openings and any uncovered mine vents.

L48-118

35.3. Section 4.6 must also indicate which measures have been applied to the lease tracts historically and assess their effectiveness.

L48-119

35.4. Section 4.6 must indicate which measures are currently being implemented at the lease tracts. The PEIS must contain a full discussion of how the current lease tract facilities and operations have or have not met the proposed measures listed in Section 4.6. The public needs to know now how unreclaimed surface and subsurface operations meet, or do not meet, the proposed regulations, measures, and BMPs laid out in Section 4.6.

L48-120

35.5. The PEIS must identify mitigative measures that must be undertaken now to protect the environment and mitigate the impacts that are caused by the current site conditions.

L48-121

35.6. Section 4.6 lists various Best Management Practices (BMPs), but does not state who will make sure these practices are implemented. There is no information regarding inspections or enforcement of the BMPs. This information must be included in the PEIS.

L48-122

**36. DPEIS, Section 4.7, Cumulative Impacts, page 4-265 to 4-326.**

36.1. Section 4.7 fails to include the cumulative impacts from the ULP and other uranium mining activities in the ULP area from the time uranium mining commenced. The DPEIS fails to fully characterize and assess the full range of cumulative impacts from the uranium mining activities associated with the ULP. The DPEIS goes out of its way to minimize historic and current, ongoing impacts. This must be corrected in the PEIS.

L48-123

36.2. The information in Section 4.7.2.1.1 regarding the Daneros Mine (page 280) is out of date. The mine has suspended operation. The mine owner has submitted a plan of operations for a large mining operation, which would greatly expand the surface impacts of the mine. The PEIS must contain current information regarding the status of the Daneros Mine.

L48-124

L48-118   The leases already stipulate the recommended mitigation measure. The following text is excerpted from the leases: "Article X: SECURITY AND SAFETY. The Lessee shall secure and post all areas that might reasonably be considered hazardous to the general public, including, but not limited to ore stockpile areas, loading areas, mining openings, and mine-rock waste piles, in accordance with all applicable statutes and regulations and specific requirements and stipulations set forth in Appendix "C." If necessary, the Lessee agrees to construct fences or other barriers around the perimeter of safety-hazard areas to minimize the potential for intrusion by humans, livestock, and wildlife. Radioactive materials exposed by the Lessee's operation shall be managed to ensure that the exposure of humans and ecosystems is as low as reasonably achievable."

L48-119   The PEIS has been revised to add discussion as to which mitigation measures listed in Table 4.6-1 are applicable to minimize potential impacts to a given resource.

L48-120   Current site conditions are being maintained and are in compliance with Federal, state, and local regulatory requirements assuring protection of human health and the environment.

L48-121   Current site conditions are being maintained and are in compliance with Federal, state, and local regulatory requirements assuring protection of human health and the environment.

L48-122   Text has been revised to clarify that mitigation measures and BMPs, as appropriate, would be implemented by the lessees per lease agreement and permit requirements.

L48-123   The Draft PEIS addressed historic and current impacts through the discussion of the affected environment presented in Section 3 for the various resource areas evaluated with no intent to minimize such information. Section 3 presents all relevant information considered to provide the basis for gauging potential impacts from the proposed alternatives discussed in Section 4.

L48-124   This section has been revised to update the information regarding the Daneros mine.

BLM_0043375

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                                         29
July 1, 2013

36.3. The information in Section 4.7.2.1.2 regarding the La Sal Mines Complex (page 280) is out of date. The Complex in not in operation.

L48-125

L48-125   This section has been revised to update the information.

36.4. Table 4.7-7 contains a long list of reclamation work that has been done at the various lease tracts. However, there is no information regarding how long the safety hazards and environmental degradation conditions continued prior to the reclamation work. There is no information regarding who was responsible for maintaining the sites in a safe and environmentally sound condition, who undertook the reclamation work, when it was undertaken, who paid for the work, and other particulars about these reclamation activities. The history of how well the DOE and the ULP lessees maintained these sites in the past must be part of the PEIS.

L48-126

L48-126   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. And any environmental issues associated with the legacy sites should have been addressed with the reclamation work completed. Site-specific information including reclamation work done is summarized in Section 1.3 of the PEIS.

There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

36.5. The PEIS must assess the long-term stability and effectiveness of the reclamation work described in Table 4.7-7.

L48-127

36.5. The long-term impacts from previously reclaimed areas must be included in the PEIS.

L48-128

L48-127   All legacy mines under the oversight of DOE has been reclaimed and as such are expected to be protective to human health and the environment.

36.6. The comparison of the cumulative impacts related to the Acoustic environment (page 4-307) fails to include any assessment of the potential impacts from the operation of mine ventilation fans that operate at the top of the surface risers. The PEIS must include an assessment of the noise levels from these fans, impacts, and mitigative measures.

L48-129

L48-128   See response to L48-127.

L48-129   Potential impacts of ventilation fans operation on nearby sensitive receptors will be included in the Final PEIS.

**37. CONCLUSION**

L48-130   See response to L48-127.

37.1. In sum, there are gaping holes in the DPEIS that must be addressed in the final PEIS. The DOE has no rational basis for the continued degradation of the lease tract areas and the continual delays in the cleanup and remediation of these lands.

L48-130

L48-131   The stated purpose and need for agency action in Section 1.4: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of deposits of uranium ore in lands belonging to the United States. 42 U.S.C. §§ 2096-2097. Those two AEA provisions are consistent with the need of assuring a supply of domestic uranium, from an active program of issuing leases or permits for exploring, mining, and removing deposits of uranium ore.

37.2. The DOE should not relay on an outdated, unneeded federal program to supply uranium to the commercial nuclear power industry.

L48-131

37.3. The DOE should end the ULP program, reclaim all impacted areas, and maintain the sites under a long-term care program.

L48-132

Thank you for the opportunity to comment.

L48-132   Comment noted. DOE's preferred alternative is Alternative 4 after careful consideration of public comments received on the Draft PEIS and the results of the evaluation discussed in this PEIS.

Sarah M. Fields
Director
Uranium Watch

and

**Uranium Watch and Living Rivers, Commenter ID No. L48 (Cont.)**

DOE/ULP PEIS Comments                                    30
July 1, 2013

John Weisheit
Conservation Director
Living Rivers
P.O. Box 466
Moab, Utah 84532

BLM_0043377

**Western Colorado Congress, Commenter ID No. L49**



**WESTERN COLORADO CONGRESS**                    *An Alliance for Community Action*

July 1, 2013

Mr. Ray Plieness
DOE PEIS Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

RE: ULP Draft PEIS

Dear Mr. Plieness,

Thank you for the opportunity to provide comment on the Department of Energy's (DOE) Uranium Leasing Program (ULP) draft Programmatic Environmental Impact Statement (PEIS). Western Colorado Congress (WCC) appreciates the chance to reiterate our thoughts and concerns related to the prospect of increased uranium mining in our region and our desire to move western Colorado toward sustainable, healthy communities and landscapes.

WCC and its hundreds of members in Montrose, Mesa, San Miguel and Garfield counties have a long history with uranium and its impacts. We have learned the hard way that uranium mining and milling brings real costs to the environment and people. There are hundreds of abandoned mines throughout our region, leaving behind piles of radioactive tailings. Reclamation efforts have yet to be successfully demonstrated with previous DOE-leased mines. The ULP covers 25,000 acres across of land across our communities and will undoubtedly have regional impacts on our economies, environment and peoples. Given this context, it is crucial that any further uranium development should be done only in a manner that protects public health, safety and welfare, if at all.

L49-1

Upon review of the ULP PEIS, we appreciate the Agency's response to scoping requests that it work with cooperating agencies to thoroughly evaluate the wide-range of impacts uranium mining would have on wildlife, cultural resources, public lands, etc. We also appreciate the intentions expressed in Alternative 1, which focuses on reclamation and cancels the leasing program within the 10 year timeframe.

L49-2

However, the range of alternatives did not analyze an alternative that would permanently reduce the number of leases or include possibilities for renewable energy development. We also have concerns regarding the breadth of analysis within the PEIS overall. Throughout the document, there is a lack of localized, in-depth information upon which to evaluate the impacts of future mining. The cumulative impacts analysis is superficial as it is limited to a 50-mile "buffer zone"

L49-3

Community Alliance of the Yampa Valley · *Routt County*   Ridgway-Ouray Community Council · *Ouray County*           128 North Sixth Street
Grand Valley Citizens Alliance · *Garfield County*   Uncompahgre Valley Association · *Montrose County*                        PO Box 1931
              Western Colorado Congress of Mesa County                                                      Grand Junction, CO 81502
                                                                                                              970-256-7650; 970-245-0888 fax
☑ WCC is a member group of the *Western Organization of Resource Councils and Community Shares of Colorado*         info@wccongress.org

**L49-1**     DOE believes that its preferred alternative would be protective of the environment and public health based on the past mining activities already conducted at the lease tracts and the results of the evaluation discussed in the PEIS for Alternative 4.

**L49-2**     Comment noted. DOE appreciates the participation of the cooperating agencies on the ULP PEIS.

**L49-3**     DOE considers the range of reasonable alternatives presented in the PEIS to be sufficient in meeting the purpose and need described in Section 1.4.

The projections or assumptions for future uranium mining activities at the ULP lease tracts presented in the PEIS are based on site-specific information (see Section 1.3 for a summary of this information), in addition to historical mine development and operations on the lease tracts. The assumptions are made as realistically as possible but also provide a conservative basis for analyzing upper bound potential impacts from which decisions can be made. Future mining conditions or scenarios can be compared with the assumptions made in this PEIS to gauge potential impacts to human health and the various environmental resources. Whether or not the scenario described in the PEIS is exactly what happens in the future relative to mining at the ULP lease tracts, the science behind that evaluation for that future scenario remains the same as what was done for the PEIS. That is, the actual number of mines, sizes, and specific location might vary, but the specific level of potential impacts for the particular future scenario can be extrapolated from the results discussed in the PEIS.

The cumulative analysis is based on a 50-mile radius based on the region of influence covered by the human health and environmental justice resource areas. The geographic extent of cumulative impacts is less for the remainder of the resource areas for air emissions. It has been shown from experience and proven by the analysis done for the ULP PEIS that areas farther away would not be expected to be impacted by the activities on the ULP lease tracts for the various resource areas evaluated in the PEIS.

While current science does not enable reliable analysis of specific climate impacts on a specific region, potential hotter and drier conditions attributable to future climate change would not be expected to affect ULP activities, which would occur in the next few decades.

### Western Colorado Congress, Commenter ID No. L49 (Cont.)

surrounding the lease tracts, ignoring impacts on the region as a whole, while at the same time it does not investigate site specific impacts to communities. We also question the PEIS's analysis of the long-term and far reaching impacts of past, present and possible future uranium development in our region as a whole. For example, although the cumulative impact study states that it took abandoned mines into consideration, the remediation claims in the PEIS are based on outdated information as opposed to actual field analysis. The PEIS also fails to analyze these impacts, especially effects on water supply, within the context of changing climate conditions.

L49-3 (Cont.)

The PEIS states that potential impacts across the five alternatives are "negligible to moderate." However, under the DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during the peak of operations, a drastic increase in current uranium activity. Western Colorado continues to bear the impacts of past mining that has left behind a legacy of toxic waste and radioactive contamination that is still being remediated by taxpayer monies. There are over 1,200 abandoned uranium mines in Colorado alone; some of these sites are in violation of the Clean Water Act and continue to threaten the Dolores and San Miguel Rivers as well as the larger Colorado River Basin. The fact that we are still dealing with these real and lasting impacts of mining activity from the past 50 years fails to inspire confidence that the inevitable impacts of any proposed new mining will be adequately mitigated and remediated.

Thus, in any alternative, the DOE should physically investigate, identify, and evaluate the conditions of existing mines and lease tracts before proposing new mines. The DOE should also prioritize the creation of a transparent process that leads to a written and modern standard of reclamation that restores soils, water and physical properties to their original conditions.

L49-4

L49-4   The projections or assumptions for future uranium mining activities at the ULP lease tracts presented in the PEIS are based on site-specific information (see Section 1.3 for a summary of this information) in addition to historical mine development and operations on the lease tracts. DOE has evaluated the potential future impacts based on the present laws, standards and practices of the uranium mining industry which is the basis of our determination for the PEIS.

WCC is particularly concerned with the conclusions reached regarding cumulative socio-economic impacts. The PEIS does not have a comprehensive study of impacts to our region's long-term economic development. For DOE to usher a process that results in the best alternative possible, it should also address bonding, royalty rates, and uranium market conditions. The economic risks of uranium are just too high to ignore.

Throughout its history, uranium has been a boom and bust industry, tying communities to a volatile and speculative global market. Prices fluctuate dramatically and jobs disappear. Across the Uravan Mineral District, uranium companies have gone bankrupt, leaving billions in remediation costs to taxpayers. Furthermore, as shown in in the 2009 Sonoran Institute Study "Uranium Mining, Tourism, and Outdoor Recreation in Gateway, Colorado," tying up public lands for uranium development prevents alternative, sustainable forms of investment from coming into the region. Western Colorado's future depends on clean jobs and sustainable economic development that supports our local communities into the future, building on industries such as agriculture, recreation, and tourism while developing our potential as a renewable energy producer.

L49-5

L49-5   The determination of whether additional mines are implemented on the lease tracts if Alternative 3, 4 or 5 is selected will be based on economic decisions of the lease holders. The leases require reclamation bonds as well as requirements to protect the public and the environment consistent with laws, regulations and mitigation measures.

The PEIS also states that there are "minor" environmental justice issues associated with increased uranium mining in the area, that there are in fact "no minority or low-income populations" within the region to feel the cumulative effects. However, under the preferred alternative, struggling rural communities in Colorado and Utah would risk all the environmental, socio-economic and public health impacts while the product is developed by international

L49-6

L49-6   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In any case, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no disproportionately high and adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur

## Western Colorado Congress, Commenter ID No. L49 (Cont.)

corporations seeking international buyers on the open market. This inherently leads to economically vulnerable communities suffering a disproportionate share of adverse environmental effects while industry profits.

L49-6 (Cont.)

Building upon these concerns, WCC encourages the DOE to offer a "Clean Alternative" that prioritizes contributing to our local economies by putting people back to work reclaiming old mines and developing our region's potential as a renewable energy producer rather than initiating new mines. Reclamation itself has the potential to be a long-term employer on the Western Slope. Uranium cleanup efforts not only restore our public lands but also creates jobs locally in our rural communities where they are needed most.

L49-7

Also, the uranium market today is oversupplied and there is little room for the US to compete. The PEIS itself states that these lease tracts would have little impact on the nuclear fuel cycle, confirming that these deposits have a lower quality of uranium ore and are comparatively small. So rather than enabling development of US uranium and allowing collateral damage to its landscapes for diminishing benefits, the DOE should reserve this resource in the ground, where it is safe and stable.

L49-8

Finally, this region of Colorado has been recognized for its solar energy potential. A recent Gallup poll in March of this year shows that Americans want a stronger emphasis placed on domestic renewable energy development, and the recent 2013 Conservation in the West poll shows the majority of Coloradoans strongly favor solar energy (56%) over nuclear (10%). A Clean Alternative could encourage the renewal of uranium brownfields by developing renewable energy projects on already disturbed sites, furthering Colorado's commitment to a 20% renewable energy standard and the creation of a proposed 600,000 clean energy jobs.

L49-9

In conclusion, members of WCC have experienced the real-time and long-term impacts of uranium mining and milling in our communities. We persist in asking that any potential uranium development of any kind should happen to the highest standards to protect our present and future environment and public safety. Given this, we find the current PEIS to be lacking in its analysis and conclusions and thus cannot support any of the proposed alternatives as they do not address our full range of concerns. However, with more localized information available, we believe that the PEIS can be an opportunity for the Agency to offer a clean, sustainable alternative that would greatly benefit our Western Slope communities. We look forward to continuing this conversation with the DOE as we move through this process.

L49-10

Thank you for your consideration.

Sincerely,

Rein van West

Rein van West
President, Western Colorado Congress

given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

L49-7   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

L49-8   With regard to the concern that there is already a stockpile of uranium in the U.S. for domestic use, the development of a domestic uranium supply, as authorized and directed by Congress in the AEA, enables DOE to support future demand that is uncertain at the present time, whatever its exact level may turn out to be in the future.

L49-9   The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

L49-10   DOE retained Alternative 4 as its preferred alternative after careful consideration of public comments received on the Draft PEIS and the results of the evaluation discussed in this PEIS.

BLM_0043380

**Western Colorado Congress, Commenter ID No. L49 (Cont.)**



**WESTERN COLORADO CONGRESS**     *An Alliance for Community Action*

July 1, 2013

Mr. Ray Plieness
DOE PEIS Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

RE: ULP Draft PEIS

Dear Mr. Plieness,

In conjunction with our organizational comments to the Department of Energy regarding its Uranium Management Leasing Program (ULP) draft Programmatic Environmental Impact Statement (PEIS), Western Colorado Congress would like to include a statement of support for the comments submitted by Energy and Conservation Law on behalf plaintiff organizations in CEC v. OLM litigation.

L49-11

Thank you for your consideration.

Sincerely,

Rein van West

Rein van West
President
Western Colorado Congress

L49-11     Comment noted.

Community Alliance of the Yampa Valley • Routt County  Ridgway-Ouray Community Council • Ouray County
Grand Valley Citizens Alliance • Garfield County    Uncompahgre Valley Association • Montrose County
Western Colorado Congress of Mesa County
☑ WCC is a member group of the Western Organization of Resource Councils and Community Shares of Colorado

128 North Sixth Street
PO Box 1931
Grand Junction, CO 81502
970-256-7650; 970-245-0688 fax
info@wccongress.org

BLM_0043381

## Western Small Miners Association, Commenter ID No. L36





Western Small Miners Association
P. O. Box 041
Naturita, CO 81422

May 20, 2013

RECEIVED
MAY 2 8 2013

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

Re: Draft Uranium Leasing Program (ULP) Programmatic Environmental Impact Statement (DOE/EIS-0472D)

Dear Mr. Plieness,

We would like to express our support for Preferred Alternative #4 -the U.S. Department of Energy (DOE) would continue the ULP with the 31 lease tracts for the next 10-year period or for another reasonable period. Our support is unequivocal and based on many levels. We will mention but a few.

By way of background, and with all due respect to others who will provide you comments, we suspect the Western Small Miners Association (WSMA) may be the most experienced and impacted group that the DOE will hear from. WSMA is headquartered in Naturita, Colorado. Our membership demographic includes individuals who live and work in Arizona, Colorado, New Mexico, Nevada, and Utah. Our membership varies greatly in occupation, including: miners, ranchers, farmers, energy producers, small businesses and conservationists.

We, and our families, have been living on and working this land for our country since before they were set aside for the United States Atomic Energy Commission (AEC) in 1948. Our DNA includes that of the Cold War Patriots, honorees of U.S. Senate Resolution 151, where "these patriotic men and women" were "recognized for their contribution, service and sacrifice towards the defense of our great nation." For generations, we have raised our families in this land while participating in multiple aspects of the programs conducted by the DOE ULP and its predecessors, including mining, administration, leasing and many successful reclamation projects. Most importantly, our Members continue to live, work and raise our families in this land and in its communities today. We are your neighbors.

First things first; we believe the preferred alternative is good for America. We believe the DOE can best meet its charge from the U.S. Congress of developing a domestic supply of uranium from these proven mineralized lands in the heart of the Uravan Mineral Belt. We believe the U.S. must act now to address its unhealthy reliance on the foreign supply of uranium for over 90% of U.S. consumption, which via its use as fuel for nuclear reactors provides the U.S. with its only carbon free base load electrical generation and nearly 20% of all electricity in the U.S. We think that is good for the environment as well.

Second, the PEIS clearly addresses the potential environmental impacts across thirteen resources / systems and supports the choice of the preferred alternative #4. The PEIS properly discusses the established measures to minimize potential impacts from ULP Mining. These compliance measures, mitigation measures and Best Management practices present a proven and safe framework for

| | |
|---|---|
| L36-1 | L36-1 DOE retained Alternative 4 as its preferred alternative after careful consideration of public comments received on the Draft PEIS and the results of the evaluation discussed in this PEIS. |
| L36-2 | L36-2 Comment noted. See also response to L36-1. |
| L36-3 | L36-3 Comment noted. DOE believes that the requirements with which the lessees have to comply, along with the mitigation measures and BMPs that will be implemented for uranium mining activities at the ULP, would result in minimal impacts to the environment and would be protective of human health. |

## Western Small Miners Association, Commenter ID No. L36 (Cont.)

uranium from other countries (where the environmental protections and worker safety protections are not as strong as in the U.S.) Is not global environmentalism or humanitarianism. Rather, it seems selfish, self-serving and suspect NIMBY (not in my backyard) desires.

**L36-3 (Cont.)**

Third, we believe it important to emphasize that there is no place in the U.S. with better existing infrastructure to conduct such mining activities. To abandon these lands and start over anywhere else would create unnecessary environmental impacts and costs. Why would you?

**L36-4**

L36-4    Comment noted.

Fourth, we would emphasize the vanadium mineralization of these lease tracts. There is no other location blessed with dual mineralization of strategic minerals in economic concentrations. The bonus of vanadium, and the promise of superior grid level and facility level energy storage with vanadium redox batteries, is unique to this land. This energy storage solution provides great promise to increase the ability of intermittent wind and solar power to actually match patterns of real energy consumption.

**L36-5**

L36-5    Comment noted.

Fifth, as stated earlier, we are a group who live, work and raise our families in this land. We take pride in our stewardship of the land and have for generations. No one can care more about the health, safety and well being of our children than we do. That said, we value determinations based upon science and upon today's operating standards and regulations (and candidly think little of opposition arguments based on either unsubstantiated fear-mongering or how things were conducted in the very different times and circumstances past).

**L36-6**

L36-6    See response L36-3.

Lastly, the re-development of the uranium and vanadium mining industry is critical to the economic well being of the region. We ask that the DOE continue to look long and hard at the contributions made by the people of this region for generations, and to properly weight and consider the positive economic impact of the preferred alternative. We also ask for your diligent effort to conclude this process, as delays only serve to hurt those with much to give in support of your mission and efforts.

**L36-7**

L36-7    See response L36-1.

We appreciate the tremendous level of effort, documentation and analysis the DOE has put into this body of work. We thank you for your consideration of our comments and trust you will accept them in the positive spirit they are provided.

Sincerely,

John Reams
President
WSMA

BLM_0043383

1
2
3
4
5
6
7
8
9
10
11
12
13                         *This page intentionally left blank*
14

BLM_0043384

1
2
3
4
5
6
7
8
9
10
11
12
13                                  **MEMBERS OF THE PUBLIC**
14

BLM_0043385

1
2
3
4
5
6
7
8
9
10
11
12
13                          *This page intentionally left blank*
14

BLM_0043386

**Acker, Thomas, Commenter ID No. T3**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

26

1  management of the site.

2         Thank you.

3         MR. CAMERON:  Okay.  Thank you.  Thank  you

4  very much.

5         Our next commenter is Kristin Pfaff.

6         KRISTIN PFAFF:  Hi, I'm Kristin Pfaff, I'm a

7  nursing student at Colorado Mesa; I'm here with my

8  fellow students.

9         One of my fellow students, Choi, and I just

10  completed a report on the mine and its potential

11  impacts, and I wanted to echo what Beverly said and

12  just encourage a thorough investigation of all the

13  lingering potential human health threats that could

14  remain long after the mine is gone.

15         And I guess personally, I would bring up

16  that in my observations over the past 10 years, I've

17  noticed an increase in the intensity of the spring

18  dust storms that we have, and I'm hoping the

19  Environmental Impact Statement will focus some

20  research on the impacts of what is being carried in

21  the surrounding valleys during those storms.  Thank

22  you.

23         MR. CAMERON:  Thank you, Kristin.

24         And Thomas Acker?

25         THOMAS ACKER:  I am interested in the aspect

T3-1

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T3-1    The human health evaluation performed for this PEIS is discussed in Sections 4.1.5, 4.2.5, 4.3.5, 4.4.5, and 4.5.5, for Alternatives 1 to 5, respectively. The evaluation considers the potential for latent cancer fatalities from the exploration, mine development/mine operations, and reclamation for the five alternatives. The estimates for the alternatives indicate that potential impacts to off-site residents and on-site recreationists would be within regulatory requirements.

Reclamation of all legacy mines under the oversight of DOE has been completed. DOE requires reclamation of all future new mines as is stipulated in the leases.

**Acker, Thomas, Commenter ID No. T3 (Cont.)**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

27

1  related to how these activities will create issues for

2  our community.  Right now we're trying to develop the

3  riverfront, the Las Colonias project.  In interviewing

4  the community members from the way back in the '30s,

5  '40s and more recently, they talk about when they were

6  little kids playing in the tailings piles.

7       And we all know that there's a cancer rate

8  in our area that is doubled that of Colorado and also

9  four times that of the national rate.

10      These are issues that I think we should

11  consider, given what we're proposing, that we go back

12  to an energy source.  Which in listening to the

13  Germans, where they have, you know, recognized that

14  this is a diminishing return, that it's a source that

15  they're trying to use less and less, recognizing the

16  difficulties with storage and all the other related

17  issues that this industry would create.

18      We are a community; I would hope that we

19  recognize we still have a legacy of lots of issues

20  that haven't been taken care of.  And that is

21  something -- I think the most important thing that we

22  should consider here.

23      And finally, as a person living in a

24  democratic society, I have to question the process

25  here and ask, we've gotten to a point where we have a

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T3-1
(Cont.)

T3-2

T3-2    DOE's preferred alternative is Alternative 4 after careful consideration of all comments
received on the Draft PEIS and the results of the PEIS evaluation.

**Acker, Thomas, Commenter ID No. T3 (Cont.)**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

28

1  preferred process, which is number 4.  I have to ask

2  myself, the Department of Energy, if they've made up

3  their minds and there's a preferred process, I really

4  am curious to know how much impact any of our

5  statements will have on the decision making process.

6  It's a concern of mine as a small-d democrat.  Thank

7  you.

8          MR. CAMERON:  Thank you, Thomas.  And I know

9  that the DOE staff and other experts will, when we

10  finish the meeting -- not only are you going to be

11  able to ask them questions about the information, but

12  they might want to explore some of the comments that

13  they've heard tonight such as that one.  So thank you

14  very much for those comments.

15          We're going to go to Eric Niederkruger.

16          If you could come up to the podium?

17          ERIC NIEDERKRUGER:  Good evening.  I

18  submitted written comments, and I have just a few

19  brief comments now in person I'd like to say.

20          First off, I'd like to thank everybody who

21  came here tonight, despite the billions of dollars

22  that have been spent to keep you at home watching

23  television.

24          I get melancholy when I look around my

25  virtual neighborhood and i hear such bittersweet terms

T3-2
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

## Adams, Francine, Commenter ID No. E94

From:        Francine Adams
To:          mail_ulpeis
Subject:     Clean Up and Clean Energy!
Date:        Thursday, June 27, 2013 6:33:09 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher in a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

| E94-1 |

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak production. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

| E94-2 |

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

| E94-3 |

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

| E94-4 |

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

| E94-5 |

Sincerely,

Francine Adams

---

E94-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E94-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy renewables" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E94-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E94-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Adams, Francine, Commenter ID No. E94 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E94-5    See responses to E94-1 and E94-2.

BLM_0043391

**Adamson, Susie, Commenter ID No. T20**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

22

1  whole life, and this is important, because we don't

2  have this resource too much in this country.  Uranium

3  is hard to find, and we have to buy it from countries

4  we are not friends with.  They will cut us off one

5  day.

6         This stuff does not kill you.  It's in my

7  pocket.

8         There is another problem, too.  We have a

9  small group of people in this country that fight

10 everything over and over again.  A lot of them in

11 Telluride, who brought the last lawsuit, they used

12 more energy, they used more gas in their cars, and

13 they used more heat in their homes.  Yet they fight

14 everything.

15        They would close our coal plant down, they

16 will close this down, they'll close our oil and gas

17 down. And this has got to stop, because it's costing

18 all of us a fortune to live.

19        That's my comment.  Thank you.

20        MR. CAMERON:  Thank you, Dennis.

21        And Susie, can you come up?

22        SUSIE ADAMSON:  Okay.  Maybe you guys can

23 understand me.  I hope so.  My name is Susie Adamson;

24 I'm a Colorado native; I was born here.

25        MR. CAMERON:  Susie, can I can interrupt

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T20-1

T20-1   Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

**Adamson, Susie, Commenter ID No. T20 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

23

1  you, because we need to make sure that Elizabeth can
2  see you.  So if you can just move... Beautiful.  Okay.
3       Go ahead, Susie.
4       SUSIE ADAMSON:  I'm an old lady now.  I'm
5  almost 80.  Environmental groups over and over put
6  (inaudible) on companies that are trying to do
7  legitimate business and let people have a job.
8       I hate what's happening out there.  And
9  people have enough money to throw it away while people
10  that need the jobs starve to death.  I think you guys
11  better keep it going where the 31 can go.  They have
12  to have the jobs. We have to have the uranium.
13       There's also minerals up there that are
14  worth a ton of money to our development.  They're rare
15  earths.  We need to get these.  We're not going to get
16  them from China much longer, so let's get rid of the
17  lawsuit-happy people, okay?  I'm tired of the
18  lawsuits.
19       Shoot, we have (inaudible) that have been in
20  the planning stages for 75 years and we can't get it
21  because of environmental (inaudible).  It's gone too
22  far.  It's time to stop.  It's time to let this go.
23  And I appreciate you trying to get it going.  Thank
24  you.
25       MR. CAMERON:  Thank you very much, Susie.

T20-1
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

BLM_0043393

## Allen, Chris, Commenter ID No. L10



Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

RECEIVED
APR 2 9 2013

Re: Draft Uranium Leasing Programmatic EIS

Attn: Ray Plieness, PEIS Document Manager:

I wish to offer my support to alternative 4, allowing all 31 uranium leasing tracts to be retained for development. I consider myself a conservationist, and see no reason to not allow uranium mining to be carried out in this country.

The EIS, like the EA before it, recognizes that the modern uranium industry is a responsible steward of the land, and conducts its business with a consciousness that should be the envy of the world. Combined with the exhaustive efforts of your organization in developing a very thorough and detailed examination of each aspect of the environment, and the ways in which the leasing options could impact them and how best to mitigate those impacts, I am very comfortable with the selection of an alternative that allows economic development to exist alongside our laudable conservation efforts.

**L10-1**

One cannot ignore the many economic benefits of developing this resource; not only do these mining operations create jobs and wealth, (and trigger local economic growth via supporting businesses, housing, and the like) but the commodity being developed is an important one. As a conservationist, I want an energy source that is environmentally benign, while still providing me, my family, and my business with the energy we need to carry on with our daily lives. Nuclear energy fits that bill. It is a clean source that does not contribute to climate change, and has the capability of producing enormous amounts of electricity with a very minimal footprint.

**L10-2**

I find it unfortunate that some are so short-sighted that they would reflexively oppose such a program on ideological grounds. I trust instead to the work of scientists, engineers, specialists, and economists, and to my own reason to show me the appropriate route to take as a community and a society.

I am convinced that nuclear power is a desirable energy alternative, and that the uranium recovery that supports it can and should be done domestically, and with minimal detriment to the rest of the environment. I am left, unavoidably, with supporting Alternative 4 as the most appropriate decision for the Department of Energy to make.

**L10-3**

Thank you for your time and efforts, and for accepting my comments.

Respectfully,

Chris Allen
578 Rio Linda Lane
Grand Junction, CO 81507

**L10-1**  DOE evaluated potential environmental impacts for the five alternatives it considered to be the range of reasonable alternatives for management of the ULP and considered all public comments received on the Draft PEIS in its determination of Alternative 4 as DOE's preferred alternative.

**L10-2**  The PEIS presents the results of evaluation of environmental impacts for 13 resources that included socioeconomics and air quality (which also addressed climate change aspects).

Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

**L10-3**  The evaluations presented in the PEIS provided the information for DOE's decision-making for the five alternatives it considered to be the range of reasonable alternatives for the management of the ULP.

BLM_0043394

## Andersen, Lori, Commenter ID No. E74

From: mail_ulpeis
To:
Subject: FW: Clean Up and Clean Energy!
Date: Monday, June 03, 2013 11:30:45 AM

-----Original Message-----
From: Lori Andresen []
Sent: Monday, June 03, 2013 10:07 AM
To: mail_ulpeis
Subject: Clean Up and Clean Energy!

Dear

Dear Mr. Pileness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E74-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative", one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning up old mines and developing sustainable, renewable energy economies.

E74-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; In general failing to consider the combined impacts of all past and present uranium activities in this region.

E74-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation from private companies to profit.

E74-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E74-5

Sincerely,

Lori Andresen

---

E74-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E74-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E74-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E74-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043395

**Andersen, Lori, Commenter ID No. E74 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E74-5    See responses to E74-1 and E74-2.

**Anderson, Gordon, Commenter ID No. E59**

From:       Gordon Anderson
To:         mail_vipers
Subject:    Clean Up and Clean Energy!
Date:       Friday, May 31, 2013 9:41:14 PM

Dear

Dear Mr. Pikeness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Gordon Anderson

E59-1

E59-2

E59-3

E59-4

E59-5

E59-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy are outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E59-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E59-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E59-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043397

**Anderson, Gordon, Commenter ID No. E59 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E59-5   See responses to E59-1 and E59-2.

BLM_0043398

## Anderson, Gordon, Commenter ID No. E97

From: Gordon Anderson
To: mail_users
Subject: Clean Up and Clean Energy!
Date: Thursday, June 27, 2013 7:12:49 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Gordon Anderson

E97-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E97-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E97-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E97-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043399

**Anderson, Gordon, Commenter ID No. E97 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E97-5     See responses to E97-1 and E97-2.

BLM_0043400

## Applegate, Josh, Commenter ID No. L16

Mr. Ray Plieness
Office of Legacy Management
DOE
11025 Dover Street, Suite 1000
Westminster, CO 80021



April 23, 2013

RE: Draft Uranium Leasing Program Programmatic Environmental Impact Statement

Dear Sir,

I am writing to support the adoption of Alternative 4 in this PEIS, on two grounds: first, that the economic benefits are too great to ignore, and second that the environmental impacts are minimal.

On the first point, it is fairly obvious that continuing the lease program will bring with it a potential for great job growth and economic expansion in the region. This is traditionally a mining area, and mining is the economic backbone of the region. There simply does not exist another industry that can support the local communities in the way that resource extraction can.

Perhaps less obvious to the casual observer is the wider national economic benefit of the uranium leasing program. Right now, the United States imports 90% or more of the uranium we use. As nuclear power grows in importance both here and around the world, the price of uranium will go up, at which point it would be in our nation's economic interest to have our own supply.

The second reason for my support of Alternative 4 is environmental. It is certainly proper to have concern for the environmental effects of development, and by extension, it was appropriate to complete a NEPA analysis. A review of the EIS shows two things: (1) a very complete analysis has been done of the potential environmental impacts, and (2) those impacts will be light.

To summarize, the economic advantages of the ULP far outweigh the environmental risks; therefore Alternative 4, as your office has aptly *recognized*, is the appropriate choice going forward.

Signed,

Josh Applegate
637 Howard St.
Delta, CO 81416

| L16-1 | L16-1 | Comment noted. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS. |
| L16-2 | L16-2 | DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of Alternative 4 as DOE's preferred alternative. |

**Arrington, Bob, Commenter ID No. E108**

From:      Bob Arrington
To:        mail_uipers
Subject:   Clean Up and Clean Energy!
Date:      Friday, June 28, 2013 11:59:17 AM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E108-1

Under DOE's preferred alternative, scores of existing leases would operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

E108-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

E108-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

E108-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E108-5

Sincerely,

Bob Arrington

E108-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E108-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E108-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E108-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043402

**Arrington, Bob, Commenter ID No. E108 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E108-5    See responses to E108-1 and E108-2.

**Aubert, Josh, Commenter ID No. L22**

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021



April 19, 2013

Ref: Uranium Leasing EIS

Dear Mr. Plieness,

This letter is in support of Alternative 4 for the ULP PEIS. Keeping all of these leases is in the interest of American national and economic security, and is an important part of any strategy to make and keep our nation energy independent.

Despite what you may hear from some extremist naysayers, nuclear power is the key to switching from fossil fuels to a cleaner, more permanent energy source.

As more and more electricity worldwide is generated from nuclear plants, uranium will become increasingly scarcer. Even if the United States stubbornly does not build additional nuclear power plants (as we should), it would still behoove us to mine uranium, as we already import more than 90% of the uranium we use already.

Once the enormous economic and environmental benefits of nuclear energy are fully realized in this country, we could be in a position to desperately need this resource.

In terms of the environmental impact of the program, all studies and indicators suggest that it would be minimal at worst. The mines that would be developed on the leases are for the most part comparatively small, and would be built in areas that already boast a considerable legacy of mining. With the environmental and production technologies, efficiencies, and procedures in place nowadays, the impact is reduced further still.

The ULP brings significant local economic advantages as well, in addition to the national ones. These mines will give rise to hundreds of jobs, and generate economic growth and revenue for the local counties and municipalities.

There is no other industry in the area that can match the economic benefit that mining can, and that should weigh heavily on any decision.

Overall, there are great benefits to keeping the 31 leases intact, and very little downside. For these reasons, I urge you to adopt Alternative 4 in your record of decision.

Sincerely,

Josh Aubert
2674 Cambridge Rd
Grand Junction, CO 81506

L22-1

L22-1   Comment noted. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

L22-2

L22-2   In addition to complying with regulatory requirements, mining activities under DOE's preferred alternative would also be conducted in accordance with lease agreements which include the implementation of mitigation measures identified to further minimize potential impacts.

L22-3

L22-3   Potential socioeconomic impacts were evaluated in the PEIS (see Sections 4.1.8 to 4.5.8) and the positive benefit of jobs being generated is discussed in these sections.

BLM_0043404

**Bachman, Hether, Commenter ID No. E43**

From: Hether Bachman
To: mail_ulpeis
Subject: uranium mining
Date: Wednesday, May 29, 2013 12:30:35 PM

As someone who lives in this area, I am strongly against allowing the proposed uranium mining on the 31 tracts of land in Mesa, Montrose, and San Miguel counties in Colorado. Uranium is toxic - both to the workers, and to anyone breathing the airborne dust from the mining operations. It will also result in increased traffic and road degeneration from the trucking and large equipment operations to harvest it. It is a bad idea to allow this to occur. I encourage to please vote against these mining operations. Thank you.

Hether Bachman

E43-1

E43-1   Comment noted.

The PEIS evaluated potential impacts to human health including the potential for inhalation of airborne dust from the ULP lease tracts during mining operations (see Sections 4.1.5, 4.2.5, 4.3.5, 4.4.5, and 4.5.5). Potential transportation impacts are also evaluated and discussed in Sections 4.1.10, 4.2.10, 4.3.10, 4.4.10, and 4.5.10, respectively for Alternatives 1 to 5.

BLM_0043405

**Baker, Jefferson, Commenter ID No. L23**

Ray Plieness, PEIS Document Manager                          April 17th, 2013
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

RE: Draft Uranium Leasing Programmatic Environmental Impact Statement

Dear Mr. Plieness,
Please accept this letter as my comment on the referenced lease plan EIS.
Uranium is essential to our national energy security, as we currently import the vast majority
(>90%) of our uranium from other countries. Nuclear energy will continue to grow in importance
around the world, and therefore uranium supplies will become ever more valuable.

They will also become more and more expensive, as our current uranium suppliers begin to
either hoard their supplies for their own use, or charge more for selling it. With this in mind, it
seems to make good sense to get ahead of the curve, and start securing our own sources.
We have a plentiful quantity of uranium in this area, enough to provide for a healthy nuclear
industry for well into the future. Moreover, allowing its development will have economic benefits
locally, as well as nationally.

There are some who would rather we not develop this resource, who instead wish to stop any
mining, and presumably adopt a rather more primitive lifestyle. This is not a realistic proposition,
of course, and certainly not a good option for the local communities who depend on responsible
extractive industries for their survival.

In addition, the most environmentally friendly position to take is in fact to allow the development
of the leases in the Uranium Leasing Plan, since we can mine that uranium in a far more
ecologically sensitive manner than any other country on earth.
The simple fact is that we are going to use uranium – would we rather it be mined responsibly,
within our borders and under our control, or that it be dug up in countries with little in the way of
environmental regulations and controls?

Since the most benefit will come to both the economy and the environment if Alternative 4 is
adopted, and the leases continued, I recommend that be the option selected by the Department
of Energy.

Sincerely,

Jefferson Baker
439 South Placer Court
Grand Junction, CO 81504



| L23-1 | L23-1 | Comment noted. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS. |

| L23-2 | L23-2 | See Response to L23-1. To the commenter's point made about the capability of mining responsibly and observing environmental /mine regulations and controls, mining activities under DOE's preferred alternative would be conducted in compliance with regulatory requirements and lease agreements (which include implementation of mitigation measures identified to further minimize potential impacts). |

BLM_0043406

**Ballantyne, Marvin, Commenter ID No. T25**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

29

1  both of those mines are Chinese mines.  And I think

2  this is domestic, we need to hold on to our own and

3  not ship it out. I think that's really important.

4        I was in the manufacturing business for 30

5  years.  And I know without the trace metals and these

6  things, I wouldn't have been in business.  And if we

7  run out of these, China is going to run it.

8        And if you think that's wrong, we wouldn't

9  have any of those solar problems -- solar projects,

10 because it takes certain metals to make those bearings

11 work.  And without those, we are dead.

12       And I think we need to make sure that we do

13 it domestic, though.  I think that's important.

14 Because China is buying up our destiny, and we're

15 selling it to them.  And we have to watch out for

16 this.  Thank you.

17       MR. CAMERON:  Thank you very much, Wally.

18 And Marvin Ballantyne is coming up to speak to us.

19       Marvin?

20       MARVIN BALLANTYNE:  Thank you.  Good

21 evening, my name is Marvin Ballantyne, I'm a member of

22 Western Colorado Congress, but I'm just speaking on my

23 own here tonight.

24       You know, whatever alternative is approved

25 here does not make mining happen.  Mining is a

(866) 448 - DEPO   www.CapitalReportingCompany.com   © 2013

T25-1

T25-1  Section 3.6.2 of the PEIS provides an extensive overview of the wildlife in the lease tract area (Section 3.6.4 addresses special status wildlife species). Sections 4.3.6.2 provides an overview of the potential impacts of uranium mining on wildlife (Section 4.3.6.4 discusses potential impacts on special status wildlife species). Section 4.6 provides a number of measures that would protect wildlife. These are both directly aimed at wildlife species or afford protection indirectly (e.g., protection measures for water resources and soils).

The purpose of the environmental justice analysis conducted for the PEIS was to identify high and adverse impacts to low-income and minority populations. While there are minority and low-income individuals in the 50-mile region of cumulative influence evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In any case, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor, and therefore, there would be no high or adverse impacts on the minority or low-income population groups or the general population.

Waste generated in addition to waste rock (which is mostly rock material removed to get to the ore deposits and is stockpiled and retained at the mine site location and then subsequently graded to a preferred slope, provided with a protective top-cover material, and seeded during reclamation) is either taken to a local landfill with a small amount of low-level radioactive waste, taken to the mill for processing along with the ore produced, or taken to a low-level radioactive waste disposal facility.

BLM_0043407

**Ballantyne, Marvin, Commenter ID No. T25 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

30

1  function of the market; there's no market right now

2  for uranium, and there may not be for a long time, no

3  matter what you do about it.  Because there's many

4  places we can get uranium a lot cheaper than the west

5  end of this county.

6          What's been supplying in part for a long

7  time, I understand, is the Russian weapons.  And that

8  program is going to end, but it's going to switch from

9  government to private, where Russians can sell their

10  uranium, their bomb-grade uranium directly to the

11  power plants.  They have to diminish its power a

12  little bit first by diluting it, but there's still a

13  lot of uranium that can last for years.

14          And then the United States has 20,000

15  warheads that they haven't done anything with, I

16  understand. That's the supply.

17          Besides that, around the world, there are a

18  lot of places uranium is mined much less expensively

19  than the United States.  And in the United States,

20  almost all uranium is coming from in situ mines right

21  now, I believe, where it's much, much cheaper than

22  digging it out of the ground and milling it like what

23  has to be done in the west end.

24          Thank you for doing the PEIS draft.  I'm

25  happy that it's the draft; I think there are a number

T25-1
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

BLM_0043408

## Ballantyne, Marvin, Commenter ID No. T25 (Cont.)

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

31

1  of issues that need to be looked at again.  People

2  talked about some impacts tonight.  It was in the

3  summary that I read that kept saying that there were

4  minimal impacts, that as an example, wildlife and

5  outdoor recreation.

6        Some of the other things I noticed in the

7  PEIS under Environmental Justice, it stated that --

8  this is a quote here -- there are no minority or low

9  income populations within the region of cumulative

10 impacts.

11        And I have to wonder about that.  Did

12 anybody look?  We're complaining about jobs in the

13 west end, but the EIS and the PEIS says there's no

14 economic hardship?  That's crazy.

15        Under Waste Management, the conclusion is

16 that impact is expected to be minor.  How could that

17 possibly be true of a mining operation?

18        Anyway.  And on the subject of jobs, it said

19 that the preferred alternative -- I guess it says the

20 impacts of uranium mining would be generally

21 considered beneficial.

22        I'd like to submit that maybe that's not

23 true over the long term; we've got boom, bust, boom,

24 bust.  Every time the boom was related to a federal

25 underwriting of the price of uranium.  And that's

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T25-1
(Cont.)

T25-2

T25-2    Section 3.8 of the PEIS discusses employment and job sectors in the ROI, including how employment has changed over time. An overview of periods of boom and bust economic conditions in the ROI has been added.

Sections 4.1.8.1, 4.2.8, 4.3.8.1, 4.4.8.1, and 4.5.8.1 of the PEIS examine how a reduction in the recreation economy in the ROI could impact the local economy. In addition, text has been added to reflect non-economic impacts to recreation from uranium mining and operations in the ROI.

## Ballantyne, Marvin, Commenter ID No. T25 (Cont.)

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

32

1  going to happen in the future, so how is this going to

2  work for providing sustainable, long-term good paying

3  jobs.

4          And since 1980, jobs have actually been

5  increasing.  And sustainable if they're recreation,

6  hunting, fishing, hiking, mountain climbing, many of

7  those things that are perfectly benign as far as

8  environmental concerns.

9          They pay okay, they don't -- they're not

10  destructive, and they are long term.  And I would

11  submit that even talking about uranium at this point

12  can be damaging to the opportunity for investment in

13  outdoor activity businesses.

14          We can build a hotel in an area where you

15  want to, but was it going to be tainted by a uranium

16  mine or mill?  I think not.

17          And finally, the jobs.  Lots and lots and

18  lots of jobs can be created by DOE and the federal

19  government getting behind the clean-up of 1,200

20  uranium mines that are already there and are not

21  producing, haven't been doing anything for years, but

22  they're an environmental hazard, and something that's

23  not pretty to look at.

24          So I would encourage DOE and our federal

25  government to get after the whole idea of cleaning up

T25-2
(Cont.)

T25-3

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

**T25-3**   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

### Ballantyne, Marvin, Commenter ID No. T25 (Cont.)

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

33

1  what's there to a healthy standard.  And that would

2  provide lots of jobs.  And they can start right now;

3  you don't have to wait for the price of uranium to go

4  from $45 a pound to 75 or more, which I don't think is

5  going to happen.  Thank you very much.

6          MR. CAMERON:  Thank you, Marvin.  And this

7  is Jim Riddell.  Then we're going to go to Dave

8  Crawford.

9          Jim?

10          JIM RIDDELL:  Thanks.  I'm Jim Riddell, and

11  I'm a member of the Uncompahgre Valley Association,

12  which is part of the Western Colorado Congress.  But

13  as Marvin said, I'm not speaking on behalf of the

14  organization, just as an individual.

15          Most of you probably have been into this

16  area we're describing here.  And if you drive through

17  that area, you come across a really remarkable feature

18  of engineering that I suspect most of you have seen.

19  If you haven't, I encourage you to see it.

20          It's a thing that was built about a hundred

21  years ago called the hanging flume.  And how many of

22  you have ever rafted or floated under the hanging

23  flume?  Okay, several other people.  I appreciate

24  that.

25          It's really a spectacular feature there.

T25-3
(Cont.)

(866) 448 - DEPO     www.CapitalReportingCompany.com     © 2013

BLM_0043411

## Barford, Denise, Commenter ID No. E79

From: denise barford
To: mail_ulpeis
Subject: Clean Up and Clean Energy!
Date: Tuesday, June 04, 2013 2:19:34 PM

Dear

Dear Mr. Pilleness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely, denise barford

denise barford

E79-1

E79-2

E79-3

E79-4

E79-5

E79-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E79-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E79-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E79-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Barford, Denise, Commenter ID No. E79 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E79-5    See responses to E79-1 and E79-2.

BLM_0043413

**Bennett, Jan, Commenter ID No. W16**

Thank you for your comment, jan bennett.

The comment tracking number that has been assigned to your comment is ULPD50016.

Comment Date: June 4, 2013   16:41:53PM
Uranium Leasing Program PEIS
Comment ID: ULPD50016

First Name: jan
Middle Initial: k
Last Name: bennett
Organization: ubiorbi
Address: po box 40422
Address 2:
Address 3:
City: denver
State: CO
Zip: 80204
Country: USA
Privacy Preference: Don't withhold name or address from public record
Attachment:

Comment Submitted:

Environmental impacts?? BAD. How can it be good? How can uranium bring peace or sensible management of our resource. It will no benefit the people of Colorado. It will be used for purposes of war or forms of energy that are potentially deadly to mankind. The Indians oppose it. They are the true custodians of this country, it has been in their hands for 20,000 years. White immigrants have destroyed same in the matter of ~100 years. It has to stop now. We do not have the mental discipline to use this dangerous resource intelligently.

W16-1

W16-1   Comment noted.

BLM_0043414

**Beverly, Robert G., Commenter ID No. L2**

Robert G. Beverly
3001 N. 12th Street, Unit 1
Grand Junction, CO 81506-4113

Phone: (970) 242 – 2753
e-mail:

April 1, 2013

Mr. Ray Plieness
Office of Legacy Management
U.S. Department of Energy
11025 Dover St., Suite1000
Westminster, CO 80021

Subject: Uranium Leasing Program PEIS

Dear Mr. Plieness:

Unfortunately I will be out of the state when all of the hearings on the proposed uranium operations in Mesa, Montrose and Delta Counties will be held and cannot present verbal testimony. In place, I am submitting this letter and enclosure.

I worked for the Mining and Metals Division of Union Carbide for 28 years as Director of Environmental and Public Affairs and in this position became closely affiliated with uranium mining and milling. Before that, starting in 1954, I was manager of National Lead's Grand Junction pilot plant processing various uranium ores. I also chaired Colorado Governor's Radiation Advisory Committee for many years and served on several state and federal committees involving uranium mining and milling. Thus, with several decades of experience in the raw materials phase of nuclear energy, I am intimately familiar with the subject that this EIS addresses.

I was senior author of a paper, "Impacts of Uranium Mining on the Environment," which I presented in 1983 in Canberra, Australia at an international symposium on radioactive waste management. To my knowledge this is the only paper of note addressing uranium <u>mining</u>. There are several that have been prepared on uranium milling.

I am enclosing the summary of this 40-page paper. Basically, it shows that uranium mining, both underground and open pit, had <u>no impact on the environment</u> or, where there were measurable amounts of radioactive material detected in the environment, which were adjacent to open pit mines and milling operations, the amounts were <u>less than one percent</u> of the recommended maximum for unrestricted areas.

Union Carbide operated a major uranium milling operation in Uravan, Colorado across the San Miguel River from a company town where over a thousand people lived. Toward the end of our operations we had an epidemiological study conducted of all of the people that lived in Uravan more than a year. This study detected no measurable health effects that could in any way be connected to the uranium operation in close vicinity.

From this broad experience in studying the environmental impacts of uranium mining and milling, I, without hesitation, recommend that the proposed mining and milling operations in Western Colorado should proceed as proposed. They will have significant beneficial financial impact and no significant environmental impact. Concerns that some groups living 65 miles from the proposed activities are completely unfounded.

I hope this information will be helpful in your preparation of the final EIS.

Sincerely,

*[signature]*

Robert G. Beverly

L2-1

L2-2

L2-1   Comment noted. DOE acknowledges the commenter's submittal of the enclosure which presents information regarding uranium milling and mining and its potential impacts.

L2-2   Comment noted. DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of DOE's preferred alternative. Allternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

**Boeschenstein, Bennett, Commenter ID No. E30**

From:        Bennett Boeschenstein
To:          mail_ulpeis
Subject:     Clean Up and Clean Energy!
Date:        Friday, May 24, 2013 6:39:36 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher in a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.    [E30-1]

Under the ULP's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations.  Instead, DOE should substantively consider a "Clean Alternative", one that prioritizes mine reclamation and safer energy alternatives.  Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.    [E30-2]

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.    [E30-3]

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health.  The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area.  Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.    [E30-4]

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy.  Every Coloradan has the right to a clean environment, a strong economy and a healthy community.    [E30-5]

Sincerely,

Bennett Boeschenstein

E30-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E30-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E30-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E30-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Boeschenstein, Bennett, Commenter ID No. E30 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E30-5    See responses to E30-1 and E30-2.

BLM_0043417



**Boling, Ashley, Commenter ID No. T42**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

49

1  emergency response for those events.

2       Remediation must be timely and complete.

3  Citizens cannot settle for less and the private

4  endeavors must post adequate bonds so the taxpayer

5  is not left with the bill.  It's interesting to

6  note at the headwaters of the San Miguel, we have a

7  Superfund site.  Right up there, and so far, it's

8  not complying with the consent decree.  At the end

9  of the San Miguel, we have another Superfund site.

10       MR. CAMERON:  Okay.  Linda, can --

11       LINDA MILLER:  I'm done.  I don't

12  want the San Miguel to be a sacrifice area.  Thank

13  you.

14       MR. CAMERON:  Thank you very much,

15  Linda.  Ashley Boling and then Linda Thurston.

16       ASHLEY BOLING:  Hi.  My name is

17  Ashley Boling.  I live in San Miguel County.  I'm a

18  father.  I'm a resident for the last 23 years here.

19       Just to be clear with everyone in this

20  room, I'm against any further uranium mining, any

21  current or proposed in the future uranium mining

22  and/or milling.

23       I recognize a lot of people in the crowd

24  here.  Could you raise your hand if anyone is here

25  from Energy Fuels Corporation.  Anyone here?

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T42-1

| T42-1 | Comment noted. |
|-------|----------------|

BLM_0043418

**Boling, Ashley, Commenter ID No. T42 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

50

1  Anyone here from Cotter Corporation?  You are.

2  Anyone here from Denison Mining Corporation?  Okay.

3  I'm just curious.  Could you raise your hand if you

4  don't live in San Miguel County.

5             MR. CAMERON:  And I just want to

6  point out to the audience that it's great that

7  Ashley is asking these questions, but you don't

8  have to respond if you don't want to.

9        Go ahead, Ashley.

10            ASHLEY BOLING:  Thanks for making

11  that clear.

12        I think I have four minutes and I would

13  like to respond or at least speak my mind.  I have

14  been to a few meetings in Montrose County and San

15  Miguel County.  I haven't been to meetings in other

16  states because it's not really an issue about

17  mining uranium or building a proposed uranium mill.

18  My understanding is in the rest of the 49 states

19  and jurisdictions of the United States, nobody

20  wants one in their backyard, so it's not really an

21  issue.

22        But it happens to be an issue here.  I

23  live about four and a half miles west of here in

24  San Miguel County, and that's 50-some miles

25  downwind from the proposed increased mining and

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T42-2

T42-2    The PEIS analysis evaluates a 50-mile radius from the ULP lease tracts. Potential impacts for the environmental resource areas and human health are indicated to be negligible to minor (see Section 1.3.2 for summary discussion of potential impacts for each of the resource areas analyzed).

In addition, inspection reports to date prepared to document inspections of previous mining activities on the lease tracts have not indicated any non-conformance with regulatory requirements or lease agreements. See Section 1.3 for a summary.

**Boling, Ashley, Commenter ID No. T42 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

51

```
 1  increased milling and that concerns me.  I have a
 2  ten-year-old son.  That concerns me too.
 3            I have been to other meetings and I have
 4  asked the question of elected officials and of
 5  people who are getting paid to represent us and
 6  protect us, like CDPHE.  I have asked this question
 7  and I'll ask it again:  Show me an example of
 8  uranium extraction and/or processing and milling on
 9  our planet that has a 100 percent safety record,
10  where there has never been any spills -- and I'm
11  sorry.  I can't call the Deepwater Horizon event a
12  spill, the worst environmental catastrophe in the
13  United States, and no one from either BP or
14  Haliburton or Transocean has been indicted or gone
15  to jail because of that, and people were killed
16  initially in that explosion.  I'm going off on a
17  tangent there.
18            But show me an example of this industry
19  where it's been safe.  And if it's so safe and DOE
20  and others involved are so confident that this
21  mining of uranium and the milling and processing
22  and enriching of it -- and then selling it to other
23  countries like China, who then can sell it to North
24  Korea to further their uranium industries and do
25  who knows what with it after that.
```

T42-2
(Cont.)

(866) 448 - DEPO     www.CapitalReportingCompany.com     © 2013

**Boling, Ashley, Commenter ID No. T42 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

52

1    Show me an example where it's safe and
2  I'm willing to listen.  I've done some research.  I
3  haven't been able to find one on our planet.  We
4  can't contain or dispose of or effectively use this
5  very dangerous, highly toxic substance.  It's a
6  gamble to me, and I'm not willing to take the
7  gamble.  I'm very conservative.
8    So that's my charge, my question, to the
9  Department of Energy and others.  Show me an
10  example where it's safe and we can control it, and
11  there's never a truck that turns over and no one's
12  water ever gets polluted and I will believe you.
13    I will conclude with this before you tell
14  me my time's up.  Albert Einstein said of uranium
15  and its use in producing electricity:  What an
16  absurdly ridiculous way to boil water.
17    MR. CAMERON:  Okay.  Thank you.
18  Linda Thurston.
19    JENNIFER THURSTON:  Did you call me
20  Linda?
21    MR. CAMERON:  I did.  Is that wrong?
22    JENNIFER THURSTON:  For the record,
23  my name is Jennifer Thurston.  I live in Norwood,
24  Colorado and I'm from San Miguel County, the heart
25  of the Uranium Leasing Program, the most wonderful

T42-2
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

## Bowen, Sandra, Commenter ID No. E2

From:       Sandy Bowen
To:         mail_ulpeis
Subject:    public comment uranium mining
Date:       Sunday, April 21, 2013 5:16:20 PM

Dear Sir:

I would like to protest the expansion of uranium mining recently proposed for Mesa, Montrose and San Miguel counties in western Colorado.

Uranium mining anywhere is dangerous--aren't there enough law suits brought by miners as it is?--but to allow it in these areas would be foolhardy. The San Miguel drains into the Dolores, and that in turn enters the Colorado River just over the Utah line from Colorado. The waters from these rivers supply millions of people and thousands of acres of agricultural land. In addition, the land drained by these rivers is not only some of the most beautiful in the region, with millions of tourist dollars spent there every year, but also some of the most expensive land.

What can you possibly do to mitigate pollution disasters in those areas? What is the current American market for this product?

Please make careful and thoroughly researched choices.

Sandra L. Bowen

E2-1

E2-1     DOE identified Alternative 4 as its preferred alternative in this PEIS after careful consideration of public comments received and the results of the PEIS evaluation. DOE considers Alternative 4 to best suit the "Purpose and Need" for DOE action with regard to the ULP. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

Mitigation measures are identified in lease agreements and summarized in Section 4.6.

BLM_0043422

## Brannon, Lee, Commenter ID No. E122

From:      Lee Brannon
To:        mall_ulpeis
Subject:   Clean Up and Clean Energy!
Date:      Sunday, June 30, 2013 11:51:30 PM

Dear

Dear Mr. Pileness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.   [E122-1]

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak production. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.   [E122-2]

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.   [E122-3]

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area.  Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.   [E122-4]

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.   [E122-5]

Sincerely,

Lee Brannon

---

E122-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in PEIS (see Table 4.6-1).

E122-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy renewables" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E122-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E122-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043423

**Brannon, Lee, Commenter ID No. E122 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E122-5   See responses to E122-1 and E122-2.

BLM_0043424

## Brouillette, Carrie, Commenter ID No. L24

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021



4/16/2013

Re: Uranium Leasing PEIS

Dear Mr. Plieness,

I am writing to express my strong support for Alternative 4 in the Uranium Leasing PEIS. This Alternative will allow the current leasing to stand on all 31 tracts.

Having reviewed the documentation, and having lived in the region for several years, I believe that the environmental impacts will be minor. The PEIS examined the potential impacts to several areas of the environment, and the determination seems to be that the current leasing plan will not be detrimental.

This is an area that has supported mining on a fairly large scale for many, many years, without destroying the land, or causing problems with air or water quality. Wildlife still flourishes in the region, providing ample opportunities for big-game hunting. Other outdoor recreational pursuits have also taken place in the region unhindered by the mining activity which provides the economic base for the area. There is nothing present in the uranium leasing plans for these 31 leases that would do anything to upset that balance.

These are not gigantic, open pit, strip mines like the ones often portrayed on television – these leases will mainly support small-to-medium size mines which employ modern technology and procedures to ensure that the recovery of the uranium is accomplished in a safe, responsible, environmentally friendly manner.

Given the economic importance of the resource, I can see no reason to terminate the leases. I therefore encourage the DOE to stick with the plan, and adopt Alternative 4.

Regards,

Carrie Brouillette

Carrie Brouillette
3329 Woodgate Drive
Grand Junction, CO 81506

| | | |
|---|---|---|
| L24-1 | L24-1 | Comment noted. DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of DOE's preferred alternative for the PEIS. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS. |
| L24-2 | L24-2 | See response to L24-1. |

BLM_0043425

## Brown, Charla, Commenter ID No. E31

From:      Charla Brown
To:        mail_vipers
Subject:   Clean Up and Clean Energy!
Date:      Saturday, June 29, 2013 1:33:40 PM


Dear

Dear Mr. Piloness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. | E31-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak production. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. | E31-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. | E31-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. | E31-4

I believe DOE can offer a program that supports promising, sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. | E31-5

Sincerely,

Charla Brown

---

E31-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E31-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E31-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E31-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Brown, Charla, Commenter ID No. E31 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E31-5   See responses to E31-1 and E31-2.

**Brown, Charla, Commenter ID No. E56**

From: Charla Brown
To: mail_uopes
Subject: Clean Up and Clean Energy!
Date: Friday, May 24, 2013 8:08:56 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to use a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. — E56-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. — E56-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. — E56-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. — E56-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. — E56-5

Sincerely,

Charla Brown

E56-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E56-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy renewables" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E56-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E56-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043428

**Brown, Charla, Commenter ID No. E56 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E56-5    See responses to E56-1 and E56-2.

BLM_0043429

**Brown, Charla, Commenter ID No. E117**

From: Charla Brown
To: mail_uipes
Subject: Clean Up and Clean Energy!
Date: Friday, May 31, 2013 8:21:47 PM

Dear

Dear Mr. Pkeness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. — E117-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. — E117-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. — E117-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. — E117-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. — E117-5

Sincerely,

Charla Brown

E117-1  DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E117-2  Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E117-3  DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E117-4  DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043430

**Brown, Charla, Commenter ID No. E117 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E117-5    See responses to E117-1 and E117-2.

BLM_0043431

**Brown, David, Commenter ID No. L5**



DRAFT URANIUM LEASING PROGRAM PROGRAMMATIC
ENVIRONMENTAL IMPACT STATEMENT (DOE/EIS-0472-D)
U.S. Department of Energy

**WRITTEN COMMENT FORM**
*Public comment period closes on May 31, 2013*

Mr. ☐   Mrs. ____   Ms. ____   Mr. & Mrs. ____   Dr. ____

Name: DAVID BROWN

Title: _____

Organization: _____

Address: 35 Pilot Knob Lane

City: Telluride   State: CO   Zip Code: 81435

Phone: _____   E-Mail Address: _____

Comment: I want you to reserve the uranium in the ground
for future domestic use. DO NOT extract it for China Now
REMEDIATE the public lands already destroyed by uranium
industry to prevent further contamination of the Dolores
Watershed & create new jobs Now!
Use PUBLIC land for renewables, to generate new
jobs now & clean energy for the US

L5-1
L5-2
L5-3

*Please use other side if more space is needed.*

**WITHHOLDING OF PERSONAL INFORMATION:** Information you provide on this form may be published as part of the public record for this project, including publication on the Internet. Individual respondents may request confidentiality by checking **one** of the two boxes below. The DOE will honor such requests to the extent allowed by law. All submission from organizations and businesses, or from individuals identifying themselves as representatives or officials of organizations or businesses, will be available to the public in their entirety.

☐ Withhold my name and address from the public record.

☐ Withhold only my address from the public record

Comment form may be mailed to:
Mr. Ray Plieness
DOE ULP PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

Comment form may be sent by electronic mail to:
ulpeis@anl.gov

L5-1   Alternative 1 does evaluate leaving the uranium ore in the ground. However, for DOE's preferred alternative (i.e., Alternative 4), the possibility that uranium ore from the ULP may be subject to export, after a prospective exporter goes through the process of applying for and receiving the necessary permission from the NRC, does not undermine the stated purpose and need for agency action: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of deposits of uranium ore in lands belonging to the United States to the extent DOE deems necessary to effectuate the provisions of the AEA (42 U.S.C. §§ 2096-2097). An active ULP program will be more successful in meeting that need than would an inactive program.

L5-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

L5-3   The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by this PEIS. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

**Brown, Ruthie, Commenter ID No. E12**

From: Ruthie Brown
To: mail_ulpeis
Subject: Clean Up and Clean Energy!
Date: Thursday, May 23, 2013 10:05:54 PM

Dear

Dear Mr. Piloness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak production. Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution. Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP. Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential.

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in-depth, localized information. The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health. The PEIS lacks a detailed analysis of water quality, wildlife and water supplies. The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit. To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Ruthie Brown

E12-1

E12-2

E12-3

E12-4

E12-5

---

E12-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium or production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E12-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E12-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E12-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043433

**Brown, Ruthie, Commenter ID No. E12 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E12-5    See responses to E12-1 and E12-2.

BLM_0043434

**Cale, Dave, Commenter ID No. T9**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

37

1  uranium market has been depressed since 2007.  There

2  was a blip. It's been depressed -- it's been depressed

3  since the 1980s.

4          And we see that it will not be considered,

5  because it's outside of the scope of their

6  administration. That wouldn't seem to ring true.

7          MR. CAMERON:  Janet, I'm going to have to

8  ask you to sum up for us.

9          MS. JOHNSON:  Okay, I'll sum up what I want.

10  I want a new PEIS; we want it with the standard of

11  reclamation, and not speculative, but market demand

12  based leasing.  Thank you.

13          MR. CAMERON:  Thank you.

14          Is it Dave?  Dave Cak?

15          AUDIENCE MEMBER:  Cale?

16          MR. CAMERON:  Dave Cak?

17          DAVE CALE:  Hi, my name is Dave Cale.  I

18  speak as a little guy, small citizen of the community

19  who believes still in the right to the availability

20  and the purity of our air, our water, our soil, or

21  ecological balance.

22          I don't see -- and maybe I overlooked it,

23  but I don't see anything addressing in the PEIS

24  talking about agriculture in the Uravan belt, which

25  probably has changed over the years since the original

(866) 448 - DEPO   www.CapitalReportingCompany.com   © 2013

T9-1

T9-1    Agriculture and rangeland resources within the lease tracts are discussed in the affected environment chapter in Sections 3.7.2 and 3.7.3. The impact discussion on land use (see Section 4.1.7, 4.2.7, 4.3.7, 4.4.7, and 4.5.7) focused on the management of withdrawn lands and land use conflicts. Impacts to agriculture and other businesses are discussed in the socioeconomics sections (see Sections 4.1.8, 4.2.8, 4.3.8,4.4.8, and 4.5.8)

BLM_0043435

**Cale, Dave, Commenter ID No. T9 (Cont.)**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

38

1  leases.  I don't see a lot of discussion about

2  existing businesses and how these will be impacted by

3  the plan to open up these leases.

4           My biggest concern with this is two things:

5  Risk and trust.  And I think given historically

6  looking at undertakings like this and the promises

7  that are made, I know there's also bigger, newer,

8  better, and it's always for a reason, a job, or

9  whatever; but in hindsight, it's always a different

10  story.  Clean-ups, the expenses, it's always a

11  different picture.

12           I would vote for alternative 1, reclaiming

13  and remediating the existing territory back to its

14  natural state as close as it can be made.

15           Finally, I just want to say that, you know,

16  there's always the argument for jobs, which is great,

17  but I think that needs to be put in perspective.  And

18  is the value of the jobs greater than the tax dollars

19  that are spent to clean up, the messes that are made;

20  is it greater than the value of the lost jobs that may

21  come from the agricultural community, the existing

22  businesses, the existing industries that are in place,

23  and is the value of the jobs greater than the

24  environmental degradation that results from reopening

25  the mires?  Thank you.

(866) 448 - DEPO     www.CapitalReportingCompany.com     © 2013

T9-1 (Cont.)

T9-2

T9-3

T9-2   Comment noted. DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of DOE's preferred alternative for the PEIS. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

T9-3   Comment noted. See response to T9-2.

Callies, Lori, Commenter ID No. E78

From:       mail_users
To:         Uranium mining
Subject:    Monday, June 03, 2013 11:27:31 PM
Date:

Thank you for the extension time to comment. I do not want uranium mining in Colorado or elsewhere in my country.

Sincerely,

Lori Callies

Corte Madera, CA 94925

*"Nature never repeats herself, and the possibilities of one human soul will never be found in another."*
*@Elizabeth Cady Stanton*

E78-1

E78-1     Comment noted.

BLM_0043437

## Cascade, Robyn, Commenter ID No. E49

| | |
|---|---|
| From: | Robyn Cascade |
| To: | mail_vipers |
| Subject: | Clean Up and Clean Energy! |
| Date: | Thursday, May 30, 2013 7:53:31 PM |

Dear

Dear Mr. Pileness:

I reside on the western slope of Colorado. I have seen the environmental degradation and the negative impact on human health caused by uranium mining. I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative", one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor"" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Robyn Cascade

E49-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E49-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E49-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E49-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Cascade, Robyn, Commenter ID No. E49 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E49-5   See responses to E49-1 and E49-2.

BLM_0043439

**Case, Dudley, Commenter ID No. E4**

From:
To:         mail\_users
Subject:    Comments and concerns on Department of Energy Draft PEIS
Date:       Sunday, May 12, 2013 2:42:37 PM

Dear Mr. Pläness:

I have a number of concerns and comments on the Draft PEIS:

1. The economic benefits (e.g. jobs) of this uranium mining are very limited.  There may in fact be more economic benefits (e.g. jobs) from cleaning up the existing uranium mine sites than expanding uranium mining in western Colorado.   — E4-1

2. Adequate market demand for uranium at this time has not been demonstrated.  And without a high uranium price (approximately $85 per pound) on the commodities markets the mining of these deposits are not economically feasible.

3. Cheaper supplies of uranium of a higher quality are available from Canada and Australia.   — E4-2

4. The U.S. already has a 100 year supply of uranium in Oak Ridge Tennessee which can be used for civilian nuclear plants.  So there is no need to mine any more uranium in the U.S.  And any uranium which is mined in the U.S. will just be sold overseas since the U.S. has no need for any more uranium at this time.  Do we really want to be supplying China with uranium?

5. The Draft PEIS has not taken into account the effects of climate change on uranium mining in western Colorado.   — E4-3

6. The Draft PEIS does not adequately address radon releases, water usage, and water contamination (e.g. selenium contamination) from the proposed uranium mining.   — E4-4

7. The bonding for the uranium mining is inadequate and in fact there should be separate and increased bonding for uranium mining, since uranium mining has the potential of being much more harmful than any other type of mining.   — E4-5

Thank you for your attention to my comments and concerns.

Dudley Case

**E4-1** The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI. This evaluation included that involving reclamation of the mine locations once mining operations are completed.

Reclamation of the legacy mines under the oversight of DOE has been completed. The economic benefits of cleaning up mine areas that are not under DOE oversight is outside the scope of this PEIS.

**E4-2** The possibility that uranium ore from the ULP may be subject to export, after a prospective exporter goes through the process of applying for and receiving the necessary permission from the NRC, does not undermine the stated purpose and need for agency action: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of deposits of uranium ore in lands belonging to the United States to the extent DOE deems necessary to effectuate the provisions of the AEA (42 U.S.C. §§ 2096-2097). An active ULP program will be more successful in meeting that need than would an inactive program.

**E4-3** In Chapter 4 for all five alternatives (see Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, and 4.5.1), estimates of greenhouse gas ( GHG) emissions from ULP activities are provided and compared with Colorado and U.S. GHG emissions. And from this comparison, the PEIS concluded that potential impacts from mine development and operations on global climate change would be negligible.

**E4-4** The evaluation of potential human health impacts does address potential radon releases from mining activities for the alternatives evaluated (see sections on Human Health in Chapter 4); water usage and water quality are addressed in sections on Water Resources in Chapter 4. The information provided is considered adequate to support the identification of Alternative 4 as DOE's preferred alternative.

**E4-5** The manner that the amount of bonds is calculated is included in the lease agreements. Reclamation bonds are calculated by DOE based on site-specific conditions and deemed sufficient to reclaim those conditions in coordination with CDRMS.

## Cassidy, Michael, Commenter ID No. E107

From:     Michael Cassidy
To:       mail_users
Subject:  Clean Up and Clean Energy!
Date:     Friday, June 28, 2013 9:06:30 AM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

No mining should be permitted near the Dolores or San Miguel Rivers! | E107-1

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. | E107-2

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative", one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. | E107-3

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. | E107-4

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor"" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. | E107-5

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. | E107-6

Sincerely,

Michael Cassidy

---

E107-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E107-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E107-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E107-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Cassidy, Michael, Commenter ID No. E107 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E107-5    See responses to E107-1 and E107-2.

BLM_0043442

*Final ULP PEIS*

*Appendix I: Comment Response Document*

## Catlin, Barbara, Commenter ID No. E32

From: Barbara Catlin
To: mail_ulpeis
Subject: Clean Up and Clean Energy!
Date: Saturday, May 25, 2013 11:00:40 AM

Dear

Dear Mr. Pileness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

| E32-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

| E32-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

| E32-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor"" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

| E32-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

| E32-5

Sincerely,

Barbara Catlin

---

**E32-1** DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

**E32-2** Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

**E32-3** DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

**E32-4** DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043443

**Catlin, Barbara, Commenter ID No. E32 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E32-5    See responses to E32-1 and E32-2.

BLM_0043444

**Chamberlin, Judith, Commenter ID No. W10**

Thank you for your comment, Judith Chamberlin.

The comment tracking number that has been assigned to your comment is ULPD50010.

Comment Date: April 28, 2013  14:54:10PM
Uranium Leasing Program PEIS
Comment ID: ULPD50010

First Name: Judith
Middle Initial:
Last Name: Chamberlin
Organization:
Address: 700 Sabeta Dr.
Address 2:
Address 3:
City: Ridgway
State: CO
Zip: 81432
Country: USA
Privacy Preference: Don't withhold name or address from public record
Attachment:

Comment Submitted:

I am very concerned about the health and environmental impacts of more Uranium mining in the western slope counties of Colorado. Although there may be potential short term job creation, there are other safer, more environmentally responsible methods for creating jobs. Uranium based economies are unstable; it is a boom and bust industry that has historically failed to bring long term economic gain to our region.   | W10-1 |

Cleaning up old mine sites can create permanent jobs on the Western slope. Uranium clean up efforts not only strengthens our regional economies but creates jobs locally in our rural communities.   | W10-2 |

The DOE can create energy by developing renewable energy projects on these disturbed sites; this same region has been recognized for its great solar energy potential!   | W10-3 |

Thank you for your consideration.
Sincerely,
Judith Chamberlin

W10-1    The evaluations conducted for the PEIS address potential impacts to human health and various environmental resources including potential socioeconomic impacts. See discussion in Section I.2.1 regarding the concern for a "boom and bust" industry that could be brought on by the ULP proposed action.

W10-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

W10-3    The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

BLM_0043445

## Chowen, Carole, Commenter ID No. E8

From:      Carole Chowen
To:        mail_uproc
Subject:   Clean Up and Clean Energy!
Date:      Thursday, May 23, 2013 8:48:23 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests. For DOE to usher in a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.    **E8-1**

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak production. Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution. Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP. Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential.    **E8-2**

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in depth, localized information. The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health. The PEIS lacks a detailed analysis of water quality, wildlife and water supplies. The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.    **E8-3**

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS states only "minor"" environmental justice concerns are associated with increased uranium mining in this area. Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit. To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees.    **E8-4**

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.    **E8-5**

Sincerely,

Carole Chowen

---

**E8-1**   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

**E8-2**   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

**E8-3**   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

**E8-4**   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043446

**Chowen, Carole, Commenter ID No. E8 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E8-5    See responses to E8-1 and E8-2.

BLM_0043447

## Clay, Margaret, Commenter ID No. E18

From: Margaret Clay
To: mail_ulpeis
Subject: Clean Up and Clean Energy!
Date: Friday, May 24, 2013 7:06:47 AM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E18-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution. Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP. Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential.

E18-2

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in-depth, localized information. The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health. The PEIS lacks a detailed analysis of water quality, wildlife and water supplies. The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

E18-3

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS states only "minor'" environmental justice concerns are associated with increased uranium mining in this area. Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit. To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees.

E18-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E18-5

Sincerely,

Margaret Clay

E18-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E18-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E18-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E18-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043448

**Clay, Margaret, Commenter ID No. E18 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E18-5    See responses to E18-1 and E18-2.

BLM_0043449

**Clow, Scott, Commenter ID No. T51**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

82

1         And so I would say as a resident, that I

2  entirely disagree with the options here, the

3  alternatives.  I'm more an Alternative 1 than 2.

4  So I do not agree with the way things are going and

5  I just wanted to make sure that that was heard

6  here.  Thank you.

7              MR. CAMERON:  Thank you.  Thank you,

8  Nick.  And I just want to thank all of you for

9  coming out tonight.

10         Did you want to make a comment?

11              SCOTT CLOW:  Yes.

12              MR. CAMERON:  Come on down.  And we

13  have one other person, so we have two more

14  commenters.

15         Go ahead.  Please introduce yourself,

16  sir.

17              SCOTT CLOW:  Sure.  I'll be brief

18  because I know it's late.  My name is Scott Clow.

19  I live in Dolores, Colorado.

20         I just wanted to -- I wasn't going to say

21  anything tonight, but one of the gentlemen who

22  spoke earlier made a comment about the other 49

23  states.  Currently the uranium that's mined in

24  Southwest Colorado is transported over to Utah

25  where there is a milling facility for uranium and

T51-1

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T51-1  The PEIS includes an analysis of potential cumulative impacts of the proposed action in combination with past, present, and reasonably foreseeable actions within a 50-mile radius of the ULP lease tracts. This analysis follows a methodology that is consistent with CEQ guidelines. DOE believes that the cumulative analysis presented in Section 4.7 is adequate to support its identification of Alternative 4 as DOE's preferred alternative.

**Clow, Scott, Commenter ID No. T51 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

83

1  vanadium.  And that facility has essentially been

2  turned into a national sacrifice area.  They ship

3  waste materials, 11e.(2) byproduct material,

4  regulated by the Nuclear Regulatory Commission

5  there.  They make money for taking that stuff and

6  they make money for extracting some uranium and

7  vanadium out of it.

8          The reason I mention that is this program

9  follows a scheme that we see in a lot of EIS

10  documents where we look at a very single, okay,

11  we're looking at this Uravan Belt and leasing

12  programs on it.  We are not seeing the big picture.

13  We need to consider the comprehensive impacts of a

14  program like this.  It's not just here in San

15  Miguel County.  It's not just San Juan County,

16  Utah.

17          The people I work for in my day job are

18  averse to hearings like this, although I suspect

19  they will comment.  They were displaced from their

20  homeland by this industry in the first couple

21  rounds of lease programs that were described in the

22  presentation, and they don't live there anymore.

23  There's an old mill site that's still very

24  radioactive.  If you run a Geiger counter over it,

25  it goes wild.  And that's -- they don't want to be

T51-1
(Cont.)

T51-2

T51-2      See response to T51-1.

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013



**Clow, Scott, Commenter ID No. T51 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

84

1  there anymore.

2          So I just wanted to say:  You need to

3  consider a cradle-to-grave -- no pun intended --      T51-2
                                                         (Cont.)
4  cumulative impact beyond this small region.  You

5  need to consider the ramifications of the entire

6  industry.  Thank you.

7          MR. CAMERON:  We have one more

8  gentleman up there.  Please introduce yourself,

9  sir.

10         NICHOLAS YOHO-WIKSE:  Hello.  My

11 name is Nicholas Yoho-Wikse.  I grew up near the

12 Nevada test site in Las Vegas and also in

13 California.  I've lived in this area quite a few

14 years.  I have worked at La Cocina restaurant here

15 and with a green building firm, Steeprock Joinery,

16 for several years and with the Galloping Goose and

17 volunteering for the adaptive ski program for four

18 or five years.  I have some humble residences here

19 as well as in other states and countries.

20         I'm here representing basically interests

21 of a few of my own companies and other end-stage

22 consumers of uranium products in the medical,

23 energy, weaponry, and other areas of uranium

24 consumers.  We feel this -- the interests I

25 represent feel this is an ideal spot for the mining

(866) 448 - DEPO     www.CapitalReportingCompany.com     © 2013

**Collins, Kami, Commenter ID No. L25**

April 22nd, 2013



Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

Re: Uranium leasing

Mr. Plieness,

American energy security and independence is a topic that is extremely important to many Americans, and one that many of us feel should be a top priority of the U.S. government. Your Preferred Alternative in this Uranium Leasing Program EIS helps contribute to the attainment of that independence, and for that I wish to extend my thanks and support.

The United States currently imports more than 90% of its uranium from other countries. There are several reasons why that is a bad idea:

First, we have enough uranium here at home to meet our needs. The U.S. is home to several hundred thousand tons of uranium ore – which we know about. That is enough to at least begin to decrease our dependency on foreign sources from places like China and Russia.

Second, with unemployment still high in many parts of the Four Corners regions, developing that resource would put Americans back to work. The region is one that is well-steeped in mining history and culture. The people here are naturally hard working, and are proud of the contributions we make to the nation's energy supply.

Third, the price of uranium is predicted to go up considerably in the coming years, as more nuclear plants come back online, demand rises, and countries begin to save their native supplies for their own use.

Fourth, nuclear power is a clean, zero-carbon energy source, the use of which should be encouraged as a bridge fuel – if not the energy source of the future. Nuclear power does not contribute to global climate change, and can safely provide millions with reliable electricity for years. The stock for this energy should come from us, not from an overseas competitor.

L25-1

L25-1    Comment noted. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

L25-2

L25-2    DOE considered all public comment received and the results of the PEIS evaluations in identifying Alternative 4 as DOE's preferred alternative for the ULP.

BLM_0043453

**Collins, Kami, Commenter ID No. L25 (Cont.)**

Finally, Americans have the ability to mine and process this uranium in a much cleaner and responsible manner than many of the overseas suppliers might – places like Namibia, Russia, and Kazakhstan. It would be better for the environment as a whole if this mining were to take place under the regulatory structure, social pressures, and technologically innovative environment that exists in the United States.

We may or may not have enough uranium here at home to completely replace all foreign sources, but developing our own resources would put our nation in a much better position to negotiate prices, manage supplies, react to external events, and simply steer our own ship when it comes to providing the raw material for our energy needs.

L25-2
(Cont.)

With all of these points in mind, I ask the Department of Energy to select a management alternative for these lands that represents the best and highest use, provides the most benefits for the American people, and promotes American energy security – that clearly means adopting Alternative 4.

Thank you,

Kami Collins
2745 Tessman Road
Delta, CO 81416

BLM_0043454

**Collins, Mark, Commenter ID No. T13**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

45

1  but a boondoggle, that uranium business is nothing but

2  the taxpayer boondoggle, because all of these

3  companies are getting subsidized either by the

4  Canadian government or our government.  And I, as a

5  taxpayer, am tired of paying for these companies to

6  exist.  They need to be standalones, support

7  themselves.

8          And I think Eric made a mistake when he said

9  it should be a $2 million bond.  I think he meant to

10  say $2 billion bond.

11          MR. CAMERON:  Thanks, Benita.

12          And Mark Collins?

13          MARK COLLINS:  I have six questions for

14  everybody to consider and not to be answered now.

15          Does radioactive material cause DNA in

16  people to mutate?  Can radioactive material become a

17  lot more dangerous than radioactive from carbon

18  monoxide gas, similar to volcanic elements originally?

19          If there is a natural disaster at a large

20  nuclear waste dump, such as a volcanic eruption, could

21  all life on the planet be gone?

22          If one tiny radioactive particle becomes

23  attached to a person or is inside of a person, will

24  that particle remain radioactive and cause cancer?

25          Why does a nuclear plant scan employees for

T13-1

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T13-1   Radioactive material has the potential to cause mutations in DNA. A discussion with further references can be found at http://lowdose.energy.gov/faqs.aspx under the heading "What are the genetic effects of ionizing radiation?" A range of elements, including carbon, have radioactive isotopes. The radioactive decay of an element can emit alpha, beta, gamma, and/or neutron radiation. The radioactive decay of some elements is more dangerous than for carbon and some are less dangerous.

Generally, natural disasters such as hurricanes, tsunamis, earthquakes, and volcanoes cause widespread human health hazards and physical damage that dwarf any secondary effects such as disruption of utilities, damage to infrastructure, and hazardous material spills or leaks. A volcanic eruption could result in some release of radioactive material to the atmosphere. It is likely that most life on the planet would still be present.

Until all radioactive atoms in that particle decay, that particle remains radioactive. However, that particle will not necessarily cause cancer. Human bodies are naturally radioactive because of common elements such as radioactive potassium, carbon, and other elements in the environment that we eat, drink, and breath. Further discussion on this subject with references can be found at http://hps.org/publicinformation/ate/faqs/faqradbods.html.

Nuclear plant employees are scanned to ensure that they are not contaminated with radioactive material if an accidental leak at the facility were to occur. It is one component of a nuclear plant's safety program to protect workers and the public.

Uranium is a natural radioactive element as discussed in Section 3.5.1.1 of the PEIS. All isotopes of uranium eventually decay to form radioactive isotopes of other elements. The radioactive decay of radioactive material in medical machines or scanning machines does not result in explosions.

**Collins, Mark, Commenter ID No. T13 (Cont.)**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

46

```
 1  radiation contamination?
 2          Can uranium or any radioactive material in
 3  medical machines or scanning machines become another
 4  element, still radioactive and unstable, that could
 5  explode those radioactive particles?  In other words,
 6  can uranium become another natural radioactive
 7  element?
 8          These are questions that might be answered,
 9  however, without provable records with the public
10  directly involved in those records established.  The
11  records or answers are not believable, at least to me.
12          If there is a group or individual that would
13  like to talk to me afterwards for solutions to
14  radioactive material and to assist the Government, we
15  can do that.
16          MR. CAMERON:  Thank you, Mark.
17          And now we're going to hear from Penny
18  Hills.
19          PENNY HILLS:  I don't have a prepared
20  statement.
21          MR. CAMERON:  You don't need to have a
22  prepared statement.  If you want to offer your
23  thoughts and feelings, that's fine too.
24          PENNY HILLS:  I would like to say that at
25  the moment I don't have a job.  I used to have a job
```

T13-1
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

BLM_0043456

**Colt, Summer, Commenter ID No. L8**



DRAFT URANIUM LEASING PROGRAM PROGRAMMATIC
ENVIRONMENTAL IMPACT STATEMENT (DOE/EIS-0472-D)
U.S. Department of Energy

## WRITTEN COMMENT FORM
*Public comment period closes on May 31, 2013*

Mr. _____  Mrs. _____  Ms. _X_  Mr. & Mrs. _____  Dr. _____

Name:    SUMMER   COLT

Title:    COLORADO  RESIDENT

Organization:   NON-AFFILIATED

Address:   _____

City: _____  State: _____  Zip Code: _____

Phone: (970)275-0280   E-Mail Address: summercolt@gmail.com

Comment: I FULLY SUPPORT THE COMPLETE TERMINATION OF ANY
& ALL URANIUM/VANADIUM MINING IN SOUTHWESTERN COLORADO
& THE WORLD @ LARGE. I DO NOT SUPPORT WAR OR THE
NEED TO HAVE URANIUM FOR DEFENSE REASONS. THE LANDS
THAT HAVE BEEN MINED IN THE URAVAN AREA NEED TO
BE RECLAIMED & REPAIRED. I ONLY SUPPORT ALTERNATIVE
IN-PLACE MEASURES & EXPLORATION. THE LANDS UNDER
QUESTION MUST BE RETURNED TO THE TAX PAYERS & ANY

*Please use other side if more space is needed.*   URANIUM LEASES, TERMINATED. ——→

WITHHOLDING OF PERSONAL INFORMATION: Information you provide on this form may be published as part of the public record for this project, including publication on the Internet. Individual respondents may request confidentiality by checking one of the two boxes below. The DOE will honor such requests to the extent allowed by law. All submission from organizations and businesses, or from individuals identifying themselves as representatives or officials of organizations or businesses, will be available to the public in their entirety.

☐ Withhold my name and address from the public record.

☒ Withhold only my address from the public record

Comment form may be mailed to:
Mr. Ray Plieness
DOE ULP PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

Comment form may be sent by electronic mail to:
ulpeis@anl.gov

L8-1

L8-2

L8-3

L8-1    Comment noted.

L8-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

L8-3    DOE considered all public comments and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

**Colt, Summer, Commenter ID No. L8 (Cont.)**

| | |
|---|---|
| I SUPPORT ALTERNATIVE #1 | L8-3 (Cont.) |
| THE COST OF DEALING WITH THE WASTE BY-PRODUCTS IS NEVER INCLUDED IN THE PRICE OF THE URANIUM MILLED. | |
| I FULLY SUPPORT PUTTING THE URANIUM TAILINGS BACK INTO THE MINES THEY CAME FROM! | L8-4 |
| I SUPPORT THAT JOBS CAN BE CREATED IN RECLAMATION OF THE EXISTING OLD MINING SITES & THOSE SITES CAN BE USED FOR WIND & SOLAR ENERGIES. | |
| IF WE KEEP SUPPORTING THE DEGRADATION OF THIS PLANET THERE WILL BE NO PLANET LEFT TO MINE. | L8-5 |

L8-4    Discussion of mill tailings disposal and associated cost is outside the scope of this PEIS.

L8-5    See response to L8-2 as far as jobs for reclamation; and the evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

BLM_0043458

## Congour, David, Commenter ID No. E28

From:        mail_vipeis
To:
Subject:     FW: Clean Energy vs. Nuclear
Date:        Friday, May 24, 2013 1:51:13 PM


-----Original Message-----
From: Dave Congour [ ]
Sent: Friday, May 24, 2013 1:26 PM
To: mail_ulpeis
Subject: Clean Energy vs. Nuclear

Dear

Dear Mr. Pleness:

I own a solar thermal heating company, Colorado Clean Energy Systems, LLC. I believe in developing the only safe source of nuclear energy, that of the Sun. Ultra-reliable, isolated by 93 million miles, and with no nuclear waste issues, the Sun provides more than enough energy to supply all of our energy needs, if we simply commit ourselves to using it.   **E28-1**

Most of the arguments against solar come from naysayers who benefit from the status quo, or are ignorant of energy issues. As an engineer, I see harvesting solar energy as simply an technical challenge.

I know that DOE was founded to deal with nuclear energy and weaponry. I also know that it has had a long and hard road changing it from the original cold war mindset.

As a resident of Montrose, Colorado, I am aware of the severe pollution problems that inevitably accompany the process of removing toxic minerals from underground.   I believe that the process of mining uranium in western Colorado is primarily in the interest of those who would make money off of the it, and not for the residents of western Colorado.   **E28-2**

If we truly want clean and safe energy, along with all of the jobs that such energy systems would create, it's time for DOE to get off of the nuclear bandwagon, and put more talented staff into backing the growing but struggling solar industry.

Thank you for listening to my opinion.

Sincerely,

David Congour
Owner, Colorado Clean Energy Systems, LLC www.ccenrg.com

Dave Congour

**E28-1** The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

**E28-2** See response to E28-1.

**Congour, David, Commenter ID No. E93**

From:     Dave Congour
To:       mail_upers
Subject:  Promote solar energy, not toxic energy
Date:     Thursday, June 27, 2013 6:31:48 PM

Dear

Dear Mr. Pikness:

I own a small solar thermal company in western Colorado (www.ccenrg.com). It so happens that it's 98 degrees outside, and the sun is beating down with such intensity that everyone in our state is doing all they can to get out of the sun.  Doesn't it make sense to use this otherwise wasted energy, rather than digging up our pristine lands, spreading around the most toxic minerals known to mankind, and spending obscene amounts of money to utilize the uranium once it has been processed, only then having to rebury it for eternity because the byproducts are so toxic?

If small solar energy companies such as mine received a tiny fraction of the money that is spent in the nuclear industry on obtaining energy from uranium, we could provide most of the energy needed to run our economy. Yes, there is the "storage problem", but it is simply an engineering challenge.  Local solar energy initiatives contribute to distributed energy systems, rather than large, centralized power systems.  I was once an engineer with Western Area Power Administration, and know how tenuous our power grid is. Decentralized power increases energy security in a world prone to vandalism and terrorism (not to mention increasing forest fires).

I am also a member of the Uncompahgre Valley Association, which has tracked the issues surrounding toxic waste resulting from the previous uranium booms of the last century.  We simply don't need more of our lands ruined by toxic mine tailings.

Please put me down in opposition to the continued leasing of public lands for uranium mining.

Thank you
David J. Congour
Montrose, Colorado.


Dave Congour

| | | |
|---|---|---|
| E93-1 | E93-1 | The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources. |
| E93-2 | E93-2 | Comment noted. |

BLM_0043460

## Coombs, Mary, Commenter ID No. E37

From: Mary Coombs
To: mail_ulpeis
Subject: Clean Up and Clean Energy!
Date: Sunday, May 26, 2013 11:47:48 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to have a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. | E37-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. | E37-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. | E37-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. | E37-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. | E37-5

Sincerely,

Mary Coombs

---

E37-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E37-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E37-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E37-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043461

**Coombs, Mary, Commenter ID No. E37 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E37-5    See responses to E37-1 and E37-2.

BLM_0043462

## Cooper, Hilary, Commenter ID No. T47

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

68

1  purpose.  They were intended for use by the public.

2  That use being natural resource development and

3  production.  Back in the day, recreation really

4  wasn't that much of a consideration, but they are

5  there for recreation, for hiking, hunting, fishing,

6  et cetera.  And I know the miners, they don't have

7  a problem with the hunting and fishing and bike

8  riding.

9          So it just amazes me that the

10 recreationists, who want to come in every once in a

11 while, insist that there be no other disturbance so

12 they can enjoy their pristine playgrounds, which

13 these grounds aren't pristine.  They're just BLM

14 grounds that are intended for multiple purpose.

15 Thank you.

16          MR. CAMERON:  Thank you very much.

17 And next we're going to hear from Hilary Cooper.

18          HILARY COOPER:  My name is Hilary

19 Cooper.  I'm the director of Sheep Mountain

20 Alliance and we are submitting extensive comments

21 as well, so I will keep my comments short.

22          I want to say thank you very much to all

23 the very well-articulated comments that have been

24 stated tonight.  Wow.  You guys are all very well

25 informed and passionate about this area.  And I

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

| T47-1 | T47-1 | Comment noted. |

**Cooper, Hilary, Commenter ID No. T47 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

69

1  also want to thank Paul and Glen for coming.  This
2  is a tough audience.  I have been in the inverse
3  before, and it's very difficult to speak and I
4  appreciate your opinions.  We all have different
5  opinions but we are all allowed our opinion.
6          I will say that the documents -- I have
7  been plowing my way through them -- will serve as
8  very informative data for future information.
9  They're very thorough in their presentation of
10  potential impacts and some of the activities that
11  are going on out there.
12          I will say that the follow-through,
13  taking that data and translating it into potential
14  impacts was woefully inadequate, and that's why we
15  ask that you guys go back to the drawing table and
16  take another look at your data, including the Fish
17  and Wildlife information that has come recently to
18  you, which could have been gathered from what was
19  in your document in the first place, and go back
20  and do another analysis with a more thorough set of
21  alternatives.
22          I'm going to try to keep my comments
23  specific to the PEIS and its shortcomings.  First,
24  remediation.  Clean it up when you mess it up.
25  We're all taught that lesson in kindergarten.

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T47-1
(Cont.)

T47-2   T47-2   DOE considers the evaluation to be adequate in supporting all five alternatives in the range of reasonable alternatives discussed. PEIS text has been revised consistent with the BA and BO, see Appendix E and Section 4.3.6.4.

T47-3   T47-3   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

Lease agreements in place contain requirements for reclamation of existing and future permitted mines on the ULP lease tracts.

BLM_0043464

### Cooper, Hilary, Commenter ID No. T47 (Cont.)

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

70

1        Who's responsible for the cleanup?
2    Ultimately, as I understand, in places like New
3    Mexico and Arizona, because these have been federal
4    programs, the mining companies, the mining
5    industry, is allowed to walk away, because they are
6    federal programs.  So they are being challenged in
7    court, but ultimately they will probably be allowed
8    to walk away, and the federal taxpayers will be
9    responsible for cleanup.
10        The remediation, you really need to look
11    at your best management practices and work on some
12    very specific measurable outcomes that actually
13    clean up contamination.  It's not too difficult to
14    go out to those sites right now and see with our
15    eyes that they are not cleaned up.  If we can see
16    the contamination that's happening on those sites,
17    it would even be more obvious that those sites have
18    not been cleaned up.
19        If a site is in violation of the Clean
20    Water Act, is that remediated?  I'm having a hard
21    time making that connection there.  But you claim
22    remediation for those sites.  They are not
23    remediated.  Cleaning it up will also bring jobs to
24    the region, which would be good for everyone.
25        Permanent withdraw, you don't have any

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T47-3
(Cont.)

E47-4

T47-4    DOE considered the potential impacts to the Dolores River in the PEIS evaluations and has also included a mitigation measure for a quarter mile buffer from the Dolores River of any future mining activities. DOE does not consider the permanent withdrawal of any of the 31 lease tracts from the ULP to be within the range of reasonable alternatives that meets the purpose and need discussed in Section 1.4 of the PEIS.

**Cooper, Hilary, Commenter ID No. T47 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

71

```
 1   options for permanent withdraw in -- specifically,
 2   on Sheep Mountain Alliance's behalf, for the river
 3   parcels on the Dolores River and other ecologically
 4   sensitive lands.  I think Jennifer Thurston did an
 5   excellent job commenting on the overall impacts to
 6   the -- from the other parcels.  We are most
 7   concerned with the Dolores River parcels, and we
 8   ask that you consider an alternative that would
 9   permanently withdraw, not just withdraw and
10   transfer to the BLM or hold for future use.
11   Permanently withdraw from resource extraction and
12   clean up.
13           Consider renewables as a cleaner, safer
14   energy option.  These are ultimately going to be
15   brown fields.  Really no ecological system,
16   services are going to be able to be restored on
17   these sites.  We should be considering
18   alternatives.  You guys are the Department of
19   Energy, not just the department of uranium, so
20   let's consider other energy sources for these sites
21   that will also bring immediate jobs to the region.
22           Reserves.  This is not going to be a very
23   popular opinion with everybody around here, but we
24   are just trying to address specifically your
25   purpose and need, because I understand, as a
```

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T47-4
(Cont.)

T47-5

T47-6

T47-5   The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

T47-6   Alternative 1 does evaluate leaving the uranium ore in the ground.

**Cooper, Hilary, Commenter ID No. T47 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

72

```
 1   government agency, that's what you're tasked with.
 2   We need to -- we encourage you to reserve the
 3   uranium ore in the ground where it can be safely
 4   stored and possibly considered for future, real
 5   domestic need.  I have noted in all your documents
 6   that your purpose and need is for domestic supply.
 7   We know dang well -- I think Glen even admits --
 8   that this uranium will be taken out of the ground
 9   and shipped to Canada and make its way wherever.
10          MR. CAMERON:  And, Hilary, could you
11   wrap up for us, please.
12          HILARY COOPER:  Really?
13          MR. CAMERON:  Yeah, it's been...
14          HILARY COOPER:  So keep it here,
15   keep it in the ground for future need if there is a
16   future need.  Taxpayers right now are paying for
17   the DOE to store and manage already existing ore
18   supplies and a recycling program.
19          Royalties, you mentioned the royalties.
20   I believe what you meant was the payment in lieu of
21   program.  You're not actually receiving those
22   royalties right now.  You're getting -- you're
23   allowing for people not to pay their annual
24   royalties in lieu of a remediation program.
25          Climate change, I mean, I could go on
```

T47-6
(Cont.)

T47-6
(Cont.)

T47-7

T47-8

(866) 448 - DEPO   www.CapitalReportingCompany.com   © 2013

T47-7    As a clarification, DOE is not receiving royalties during the period of the court injunction. Before the injunction, DOE approved reclamation on some lease tracts in lieu of royalties.

T47-8    Climate change was evaluated in the PEIS (see Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, and 4.5.1) in terms of greenhouse gas (GHG) generated by the ULP proposed action for the five alternatives, respectively. The results indicate that the ULP proposed action contributes a very small percentage to both Colorado, and U.S. GHG generated (up to 0.03% and 0.0005%, respectively). U.S. GHG emissions account for about one-fifth of global GHG emissions, and GHG emissions from ULP proposed action are up to about 0.0001%. The amount of GHG generated is generally used as a measure of the potential impacts on climate change . In contrast, ULP operations (followed by power generations at nuclear power plants) would displace considerable amounts of criteria and toxic air pollutants, and GHG emissions that would otherwise be released from fossil power plants. Accordingly, ULP operations would contribute to more positive impacts than adverse impacts on climate change. The text in the PEIS has been revised (see the same sections mentioned previously) to explain further how potential impacts from climate change were evaluated for the PEIS and what the results mean.

BLM_0043467

**Cooper, Hilary, Commenter ID No. T47 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

73

1 forever.  That wasn't really adequately addressed

2 at all.

3          The Dolores River, it's iconic, it's

4 scenic, it's the most important river ecosystem in

5 an arid, drought-impacted region.  It supplies

6 water to the Colorado River.  The Colorado River is

7 currently the most endangered river in the U.S.

8 This is a huge impact to the Dolores River, and you

9 have got to do a better job considering all of your

10 information.

11          MR. CAMERON:  Could you finish up.

12          HILARY COOPER:  We ask that you go

13 back, conduct a more thorough evaluation of all the

14 information you have put together, do some

15 fieldwork on the ground, fieldwork on the sites

16 that exist, and come back to us with a more

17 thorough analysis with better alternatives.  Thank

18 you.

19          MR. CAMERON:  Thank you, Hilary.

20 Summer Colt?

21          AUDIENCE MEMBER:  She left.

22          MR. CAMERON:  How about Allison

23 Wolff?

24          AUDIENCE MEMBER:  I believe she had

25 to leave too.

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T47-8 (Cont.)

T47-9

T47-9  The PEIS evaluates the potential for impact to the Dolores, San Miguel, and Colorado Rivers and the aquatic biota inhabiting those rivers. Measures to minimize potential impacts of ULP activities are provided in Table 4.6-1, which includes measures to avoid and minimize impacts to waterbodies and aquatic habitats for aquatic biota (see measures M-4 and M-7). As discussed in Section 4.3.6.1 and Table 4.6-1 (see M-4), impacts on the Dolores River and other jurisdictional streams within lease tracts would not likely be directly affected because mines would be required to be located at a distance from these streams (e.g., 1,300 ft [0.25 mi]). A Biological Assessment (BA) has been prepared for consultation with the U.S. Fish and Wildlife Service (USFWS) regarding potential impacts of the ULP on species listed under the ESA (including the Colorado River endangered fish species). PEIS text has been revised consistent with the BA and BO, see Appendix E and Section 4.3.6.4.

T47-10

T47-10  DOE considers the PEIS evaluation to be adequate in supporting decisions regarding the five alternatives in the range of reasonable alternatives. Site-specific information that has been incorporated provides adequate characterization of the ULP lease tracts.

**Cort, George, Commenter ID No. W7**

Thank you for your comment, George Cort.

The comment tracking number that has been assigned to your comment is ULPD50007.

Comment Date: April 20, 2013   18:57:04PM
Uranium Leasing Program PEIS
Comment ID: ULPD50007

First Name: George
Middle Initial: E
Last Name: Cort
Organization:
Address: 16960 Wildwood Dr.
Address 2:
Address 3: 16960 Wildwood Dr.
City: Montrose
State: CO
Zip: 81403
Country: USA
Privacy Preference: Don't withhold name or address from public record
Attachment:

Comment Submitted:

I support alternative 4. I am a graduate engineer familiar nuclear energy issues and am convinced that the mining can be done with very little damage to the environment. But it will provide many needed jobs in a depressed area as well as tax revenue. Furthermore, the uranium produced will provide clean energy with no greenhouse gas. I do not understand the reasons for the objections of the so-called environmental groups.

W7-1

W7-1    Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

BLM_0043469

**Cort, George, Commenter ID No. W14**

Thank you for your comment, George Cort.

The comment tracking number that has been assigned to your comment is ULPD50014.

Comment Date: May 24, 2013   15:37:17PM
Uranium Leasing Program PEIS
Comment ID: ULPD50014

First Name: George
Middle Initial: E
Last Name: Cort
Organization:
Address: 16960 Wildwood Dr.
Address 2:
Address 3: 16960 Wildwood Dr.
City: Montrose
State:
Zip:
Country: USA
Privacy Preference: Don't withhold name or address from public record
Attachment:

Comment Submitted:

Add to # ULPD50007. I also support alt. 5. I attended the Montrose meeting. I heard no verbal statements that negatively addressed environment, the EIS or the mining project. Instead the statements concerned economics and the market and alternative supplies of uranium. These issues are not the concern of the DOE or the environment but are the risks undertaken by the mining company. Potential environmental impacts of alternatives 4 and 5 are small and can be dealt with- benefits are very great.

W14-1

W14-1     See response to W7-1.

BLM_0043470

**Cort, George, Commenter ID No. W18**

Thank you for your comment, George Cort.

The comment tracking number that has been assigned to your comment is ULPD50018.

Comment Date: June 7, 2013  18:14:24PM
Uranium Leasing Program PEIS
Comment ID: ULPD50018

First Name: George
Middle Initial:
Last Name: Cort
Organization:
Address: 16960 Wildwood Dr.
Address 2:
Address 3: 16960 Wildwood Dr.
City: Montrose
State: CO
Zip: 81403
Country: USA
Privacy Preference: Don't withhold name or address from public record
Attachment:

Comment Submitted:

I am a past member of the Sierra Club and New Mexico Citizens for Clean Air and Water (NMCCAW). I was a chapter chairman and wrote newspaper columns in support of NMCCAW's positions. The organization was very successful in bringing about the control of emissions from the coal-fired Four Corners Power Plant. I learned, much to my disappointment that others in those two organizations were much more interested in liberal politics than in environmental progress. I attended the Montrose meeting on April 23rd and heard no rational opposition to the favored alternatives 4 and 5. It was surprising to me as well to hear very little fear mongering from the opponents. Perhaps there was more of that in Telluride, in recognition of the fact that Montrose residents are well-informed and not susceptible to such tactics as fear mongering. I reiterate my support for alternatives 4 and 5.

W18-1

W18-1   Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

BLM_0043471

*Final ULP PEIS*

*Appendix I: Comment Response Document*

## Coulter, Sara, Commenter ID No. E65

| From: | Sara Coulter |
|---|---|
| To: | mail_ulpeis |
| Subject: | Clean Up and Clean Energy! |
| Date: | Saturday, June 01, 2013 10:38:19 AM |

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. — E65-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. — E65-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. — E65-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. — E65-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. — E65-5

Sincerely,

Sara Coulter

---

E65-1 DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E65-2 Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E65-3 DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E65-4 DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043472