**Coulter, Sara, Commenter ID No. E65 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E65-5    See responses to E65-1 and E65-2.

BLM_0043473

**Crawford, Dave, Commenter ID No. T27**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

37

1  recreation and the potential with cleaning the

2  environment, there also is a potential for jobs coming

3  from clean energy development, which would nicely

4  coexist with the conditions of the legacy of the

5  previous mining operations.  Thank you.

6          MR. CAMERON:  Thank you for those remarks.

7  Okay.  Dave?  Dave Crawford?

8          DAVE CRAWFORD:  My nave is Dave Crawford;

9  I'm a resident of Montrose.  I come to these meetings

10  frequently; I hear people coming up with some

11  interesting ideas.  No one mines uranium because of

12  the pleasure of going underground and extracting

13  minerals.  They go there because there's an economic

14  viability.  That's the only conceivable reason why

15  anybody would go underground.

16          And the processes that are taking place are

17  extraordinary.  People who are mining right now are

18  trying to stay ahead of it, because they know there

19  are new regulations heading their way.

20          The mine up here that mines coal has got two

21  shelves, six feet long; two shelves with six feet

22  each. Coal.  Imagine what uranium has got.  Okay.

23  Yeah.

24          I just can't imagine why we're still

25  speaking as though we're back in the '60s or the '70s.

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T27-1    T27-1    Comment noted. DOE considered all comments received on the Draft PEIS and the results of
the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

**Crawford, Dave, Commenter ID No. T27 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

38

1  When I was on the board with the environmentalists, I
2  believed it was a really good idea.  I see
3  environmental (inaudible) the political sector, and
4  has nothing to do with the sweet little animal we've
5  got to protect or whatever it is they come up with.
6  It's moot.  It's now political.
7         We went from peace movement and antiwar
8  movement to antiadministration movement to the
9  antigovernment movement to the antimilitary movement
10 to the antiAmerican movement.  That's where we are,
11 and the environmental movement is part of it.  Trust
12 me, I was one of them.  Thank you.
13         Wayne?
14         WAYNE QUADE:  Thank you.  Well, good evening
15 everybody.  I'm a resident of Montrose, and I've
16 worked with environmentalists in my past job.  Two
17 things that I'd just like to bring out and discuss, or
18 have discussed, basically involve the costs and
19 remediation.
20         As far as the cost, I'm talking about the
21 fact that these leases are far too cheap.  They do not
22 consider the environmental cost to both the community
23 and the environment.  And we're not recouping what we
24 could recoup through the -- really the fire sale
25 prices that they're offering these leases.

T27-1
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

BLM_0043475

## Crocker-Bedford, Cole and Kara-Lynn, Commenter ID No. L37

Cole & Kara-Lynn Crocker-Bedford
21173 Hwy 141 Box 8
Slick Rock, CO 81325
Cell 928-856-0282
E-mail crocker-bedford@slickrockuranium.org

ECEIVE
MAY 29 2013

May 20, 2013

Subject: Comments on the Draft PEIS for the Uranium Leasing Program

Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

Dear Mr. Plieness:

Enclosed are our comments on the Draft Programmatic Environmental Impact Statement (DPEIS) for the Uranium Leasing Program (ULP). As landowners of a 280-acre tract one mile north of the former town of Slick Rock, Colorado, we provided scoping comments for the Programmatic Environmental Assessment (PEA) for the ULP on November 13, 2005. On August 6, 2006, we provided 11 pages of comments on the draft PEA for the ULP. And on August 29, 2011, we provide 6 pages of scoping comments in advance of the current Draft PEIS for the ULP.

Below we will begin by expressing concerns about our health and happiness at our residence, and the health of our land. Then we will deal with an ongoing concern that the DOE has missed a critically important alternative, because the DOE has overly simplified its purpose and need statement – seemingly to the point of being illegal. Finally, we will discuss a major effect of alternative 2 that is missing from the analyses. Owing to a lack of time, we forego discussing effects on the Dolores River Special Recreation Management Area and the potential Dolores River Canyon National Conservation Area, and we limit our specific points to lease tracts that are near the former town of Slick Rock.

Within T44N, R19W, we own the West Half of the East Half of Section 24, the NE of the SE of Section 24, the NE of the NW of Section 24, and the SE of the SW of Section 13. Our permanent residence is located in the northeastern 10 acres of the NW of the SE of Section 24. Our residence lies 1.2 air miles north of the center of the true location of the former town of Slick Rock. And by the way, the DPEIS consistently depicts the former town of Slick Rock as being 1 air mile east of its true location. For example, Figure 3.3-10 shows the former town as being across the Dolores River from the mouth of Burro Canyon, but in reality the center of the town was one mile west of there at the intersection of county road S8 and county road Q1, with the town's biggest buildings having been southwest of that road intersection.

L37-1

L37-1    The location of Slick Rock has been revised for Figure 3.3-10 based on geo-located (i.e., same as Google Earth) information.

### Crocker-Bedford, Cole and Kara-Lynn, Commenter ID No. L37 (Cont.)

Crocker-Bedford's Comments on the Draft PEIS for the ULP                                    2

Concern Over Potential Radon and Other Radionuclides at Our Residence
Lease tract 13A lies immediately east and southeast of the southern half of our land, and
in fact DOE's Uranium Reserve includes the minerals under the southern 120-acres of
our property. Our residence is located from 0.4 mile to 1.0 mile from historical mine
portals within lease tract 13A. The prevailing winds tend to flow from these historical
portals toward our house. The winds within the lower canyon tend to follow the direction
of the river, and so run from south toward north along the southern portion of lease tract
13A within the canyon. Then, near the northern portion of the lease tract within the
canyon, the prevailing wind tends to shift and blow from the east to the west, following
the bend in the canyon directly toward our house. During the nights when the general
winds cease, air slides down the sides of the canyon over the mine portals and then flows
along the canyon bottom to our house. In short, the prevailing winds, as well as
nighttime cold air drainage, take air from the vicinity of portals near the bottom of the
Morrison Formation and move the air over our house. According to Table 2.4-6,
radiation from radionuclides from the exhaust of just a medium sized mine could easily
exceed the EPA's allowable limit for exposure at a residence when the residence is within
one mile of the source and downwind from the source (up to 16 mrem/yr, as compared to
the EPA maximum allowable of 10 mrem/yr). The bottom of page 4-94 of the DPEIS
states: "at a distance of 3,300 feet (1000 m) from a small underground mine, the
maximum dose was calculated to be 35.7 mrem/yr", and the first paragraph of page 4-95
states that doses from a medium sized mine would be two times higher and doses from a
large mine would be 4 times higher. The Veta Mad Mine is a medium-sized mine only
3200 feet from our house, so if it is operated we could receive at our house seven (7!)
times EPA's allowable dose of 10 mrem/yr. We had no idea that uranium mining could
pose such danger when we purchased our property in 1995.

The radon mitigation measures to protect nearby residents (measures M-11 in Table 4.6-
1) call for monitoring actual radon emissions and then modeling radon exposure to the
closest residence by using COMPLY-R as required by 40 CFR Part 61, Subpart B.
Measures M-11 in Table 4.6-1 also describe several methods to send the radon gas
elsewhere. One method is to reroute the ventilation of the radon gas. It is obvious that a
significant portion of radon gas that would be vented into the canyon from a mine within
lease tract 13A would reach our house. **Rather than waiting to measure a bad
outcome and damaging our health in the meantime, we demand that all radon gases
during mine development and operations in lease tract 13A be vented to sites above
and east of the top of the highest cliffs, where there is no residence and little human
use of any type.** There is already at least one airshaft above and east of the top of the
highest cliffs in lease tract 13A, and these cliffs are 1,000 feet higher than our house. If
that airshaft is used to exhaust the radon -- while the mine portals within the canyon at
the base of the Morrison Formation and other shafts within the canyon are used as air
intakes – then the radon to our house and land will be minimal. Please add the above
mitigation measure as a preemptive solution against radon gas at our residence from mine
development and operations within lease tract 13A.

L37-2

L37-2   The estimates for radon are based on conservative assumptions and input data in order to
bound potential impacts from the proposed action. However, implementation of the proposed
action would be undertaken in such a manner as to assure compliance with regulatory
requirements. Mitigation measures would also be implemented to further reduce the potential
impacts.

L37-3

L37-3   The measure discussed by the commenter is embodied in the measures identified in M-11 in
Table 4.6-1 that are identified as compliance measures (i.e., required by law and would have to
be implemented), however, the actual method to be implemented would be determined on
case-by-case basis.

BLM_0043477

## Crocker-Bedford, Cole and Kara-Lynn, Commenter ID No. L37 (Cont.)

Crocker-Bedford's Comments on the Draft PEIS for the ULP                    3

Mitigation measure M-11 also includes covering waste rock with soil at the time of reclamation to prevent radionuclides from blowing off site. However, the Draft PEIS has no mitigation measure to protect nearby residences from radionuclides blowing from waste rock or ore during mining operations. **We ask that the PEIS include a mitigation measure that requires lightly sprinkling with water – or ideally using a hydromulch or wax or other barrier – over the mined ore and mine waste rock during operations, when a residence is downwind less than 1 mile.**

Lease tract 15 is as little as only 0.7 mile west of our residence. However, the mine portals in lease tract 15 are all at least 1.0 mile west of our residence. Moreover, the mine portals (and we assume airshafts) are all far higher than our residence and are not within the well-defined canyon, so we doubt that overly high radionuclides would reach our house from lease tracts 15 or 15A. Nevertheless, we appreciate the mitigation measure M-11 in Table 4.6-1, to "Model the dose to the nearest member of the public by using COMPLY-R, as required by 40 CFR Part 61, Subpart B." Page 4-95 of the DPEIS notes than if more than one mine is being operated in the vicinity of a residence, then the modeling of health effects and EPA compliance must be the sum or the effects of the two or more mines.

Concern Over Radionuclides Washing onto Our Property and Into the Dolores River
The reclaimed waste rock sites within lease tract 13A currently exhibit gamma radiation levels that are mostly above 70 uR/hr and are commonly above 100 uR/hr, with the highest reading being 287 uR/hr (letter and attachment by Glen Williams of Cotter Corporation to Dustin Czapla of the Colorado Division of Reclamation, Mining and Safety, dated April 16, 2013). These measurements are several to many times above the ambient baseline gamma radiation of 13 uR/hr in the Slick Rock area (DOE's 1995 EA for Remedial Action at the Slick Rock Uranium Mill Tailings). The mapped high readings in the attachment to Mr. William's letter usually end abruptly with blank mapping, which suggest to us that additional contamination down hill and down wind of the measured locations were simply not measured. Many times we have seen muddy water pouring from lease tract 13A onto our property, and muddy water from lease tract 13A pouring into the Dolores River. In several places the Draft PEIS seems to assert that having a ¼ mile buffer between mining activities and the Dolores River will prevent the flow of sediment and radionuclides into the river during storm events. This statement might be true if the Slick Rock area had very dense grasses and dense organic matter, through which storm water flowed over shallow gradients. However, the Slick Rock area (above the river's floodplain) is highly dominated by rock and bare ground and steep slopes. Rock and bare ground do not stop sediment, especially given the steep gradients. In fact, rock and bare ground induce stormwater sediment to collect into channels and quickly run downhill to the Dolores River, and we personally have many times observed this at tracts 13 and 13A. In the case of tract 13A, some of the mud from storm events runs onto our property. **Rather than relying only on a ¼ mile buffer to protect the Dolores River, the PEIS needs to require stormwater sediment catchments below mine ore piles, and even below waste rock sites in tract 13A.** And based on the radiation at the reclaimed waste rock sites (see above), as well as our personal

L37-4

L37-4    Air emissions such as fugitive dust may be covered by a permit issued by CDPHE. Where such permits are not needed or required, CDRMS requires an operator to control dust if it has the potential to be hazardous. CRS 34-32-116(i) states all surface areas of the affected lands, including spoils piles, shall be stabilized and protected so as to effectively control erosion and attendant air and water pollution.

L37-5

L37-5    Comment noted.

L37-6

L37-6    Cotter Corporation's C-SR-13A mine was reclaimed in 2003. The waste rock pile was re-contoured, the available surface soil material (limited amount) was spread across the disturbed area, and it was reseeded. The site stabilized fairly quickly, except for one or two major storm events that caused some minor rilling through the site. Three other legacy mine sites on the lease tract were reclaimed by DOE in a similar fashion. As the commenter alludes, the whole area has limited vegetation and is quite susceptible to erosion during significant storm events. The area is also host to multiple uranium-bearing geologic formations that crop out on the surface and have been eroding away naturally for centuries. Inevitably, some mining related radiological contamination has been transported down stream by past storm events, but some of it also is naturally occurring.

The runoff from lease tract C-SR-15 is a similar situation. Approximately 350 acres of land is drained by the drainages that the commentor mentions. The mines on the lease tract are surface mines or shallow underground mines, because the ore-bearing formation in the area crops out all along Cougar point. Accordingly, storm water from significant storm events has and will likely continue to carry radiological contamination (mining-related and naturally occurring) downslope and downstream.

## Crocker-Bedford, Cole and Kara-Lynn, Commenter ID No. L37 (Cont.)

Crocker-Bedford's Comments on the Draft PEIS for the ULP                                    4

observation that some reclaimed sites have had much of the placed top soil washed away thereby exposing the waste rock, and have small gullies cutting into the waste rock, it seems that **even reclaimed waste rock sites need stormwater sediment catchments below them.**

In addition, stormwater sediment catchments need to be large enough and deep enough to actually collect the water and sediment during storm events. The catchment below the active mine in lease tract 11 has filled in until it could now hold a pool of water and sediment of only about 25 feet diameter and only 18 inches deep at its deepest, which is far too little to collect the potential stormwater sediment runoff from that mine site.

While many times we have actually witnessed muddy water pouring from lease tracts 13 and 13A, several locations within the southwestern ten acres of the SW of the SE of Section 24 within our property have been mildly contaminated by uranium ore or waste rock from the Cougar Mine (which is 0.9 air mile away in lease tract 15), according to two DOE reports and survey map enclosed with the March 27, 1996, letter to us from Steven C. Hamp of the Department of Energy. Most of the elevated gamma radiation readings are only 10 uR/hr above background, though DOE measured one location at 70 uR/hr above background. The DOE reports also showed that the contamination measured at the several locations on our property ranged from 5 to 14 pCi/gram of soil, and occurred in a swale. It seems very likely that the slot canyon on BLM land (immediately south of county road Q1), which transported the residual mine ore and waste to our property and the private property south of ours, has much higher readings than our property. In short, stormwater transport of mine waste and ore has occurred, despite past ULP requirements to prevent transport of radionuclides during storm events.

L37-6 (Cont.)

### Water in Nearby Domestic Wells
We agree with the DPEIS that it is unlikely that contamination will occur in domestic water wells in the Slick Rock area, because the domestic wells tend to pump from the Navajo Formation while the uranium mining is in the Morrison Formation several hundred feet higher. Nevertheless, we would like to see a mitigation measure that states: **if a domestic water well is polluted by uranium mining activities, then clean water will forever more be trucked to a holding tank for that residence, free of charge to the residents.**

| L37-7 | L37-7 | Measures are identified for water protection. DOE will address the suggested mitigation measure on a case-by-case basis consistent with state law. |

### Concern over Noise at Our Residence
In many places the DPEIS asserts that no residence will be subjected to noise louder than the Colorado State standard of 55 dBA during the day and 50 dBA during the night. However, the operational measures to assure this level (measures M-3 on page 4-253 of the DPEIS) are all listed as merely BMP's, which are defined as practices "generally implemented within the industry to conserve resources" but "are not necessarily required by DOE". **The existing measures M-3 should be changed from BMP's to required Mitigation Measures.**

| L37-8 | L37-8 | This mitigation measure has been added as a compliance measure. See Table 4.6-1 in M-3. |

BLM_0043479

## Crocker-Bedford, Cole and Kara-Lynn, Commenter ID No. L37 (Cont.)

Crocker-Bedford's Comments on the Draft PEIS for the ULP                    5

Although on the one hand the DPEIS seems to require meeting the Colorado State noise
standards for nearby residences, in other places the DPEIS states that the State Standards
could be exceeded. For example, the bottom of page 4-189 states: "when construction
would occur near a lease tract boundary, noise levels at four residences around Lease
Tracts 13, 13A, 16, and 16A could exceed the Colorado limit." Similarly, page 2-56
states that mining activities in lease tracts 13, 13A, 16 and 16A could exceed Colorado's
daytime limit of 55 dBA at residences. Please add to measures M-3 a new **Compliance
Measure** that conforms to the law: **Limit noise from mine activities at residences to
no more than 55 dBA during the day and 50 dBA during the night.**

The Colorado State standard was created for residential neighborhoods in cities, where
there is a huge amount of distant background noise, as well as nearby noises such as
lawnmowers and many cars. The Colorado State residential noise standard will <u>not</u>
provide us with the quiet that drew us to our property and that allows us to hear nature's
sounds. Page 3-20 of the DPEIS states that background noise levels in urban settings can
be as high as 80 dBA during the day, while background noise levels in rural settings
average about 40 dBA during the day. From these two statements, we assume that the
inference is that background noises in typical residential areas are perhaps 50 dBA during
the day. If so, then the Colorado State standard of 55 dBA for the typical residential area
makes a lot of sense, because the standard for daytime noise would only be 5 dBA higher
than background, and page 3-19 of the DPEIS states that "a 3-dB change over an existing
noise level is considered a barely discernable difference" while "a 10-dB increase is
subjectively perceived as a doubling in loudness and almost always causes an adverse
community response."

However, the Colorado State noise standards for residential areas are such that our
property in our near wilderness setting would be horribly impacted by nearby mine
development and operations. The bottom of DPEIS page 3-20 points out that background
sound levels "in areas far removed from manmade noise sources would be similar to
wilderness background noise levels", which are on the order of 20 dBA according to the
top of page 3-20. Because "a 10 dB increase is subjectively perceived as a doubling in
loudness and almost always causes an adverse community response" (DPEIS page 3-19),
then the Colorado State Noise limit at our house would be perceived by us a seriously
major increase in objectionable noise. During the day 20 dBA to 30 dBA equals one
doubling, and 30 dBA to 40 dBA equals a second doubling, and 40 dBA to 50 dBA
equals a third doubling, and 50 dBA to 55 dBA equals half a doubling, for a total of 3.5
doublings – and recall that page 3-19 stated that even one doubling causes adverse
community response. Page 3-20 of the DPEIS points out that in outdoor locations with
no wind, etc, that background sound may be less than 10 dBA at night. Therefore, at our
property a nighttime increase to 50 dBA as allowed by the Colorado State Standards
would entail a horrible change in noise as indicated by four doublings (from 10 dBA to
20 dBA, then from 20 dBA to 30 dBA, then from 30 dBA to 40 dBA, and then from 40
dBA to 50 dBA). In short, while a mere "doubling in loudness … almost always causes
an adverse community response" (DPEIS page 3-19), noise on our property could
increase 16 fold even if the mining activities are managed so their noises reaching our
residence do not exceed Colorado State standards.

L37-9

L37-10

L37-9    See response to L37-8.

L37-10    DOE appreciates the conditions that the commenter describes. Required noise standards would
be met in the implementation of ULP activities in addition to the implementation of mitigation
measures and BMPs; see Section 4.6 and Table 4.6-1.

BLM_0043480

## Crocker-Bedford, Cole and Kara-Lynn, Commenter ID No. L37 (Cont.)

Crocker-Bedford's Comments on the Draft PEIS for the ULP                                6

We see no way to develop and operate a mine in lease tract 13A or 15 without its noises seriously adversely affecting our lives. However, we take solace in the concept that most aboveground activities would be of relatively short duration (e.g., mine development or site reclamation), or intermittent and occurring only rarely or only a few to several times per day (e.g., blasting, and the loading of ore into trucks and trucking the ore offsite). Unlike our previous concerns in this letter over radionuclides, which we never imagined could be a health problem to us before reading the DPEIS, when we purchased our property in 1995 we knew that if a mine were ever developed and operated that our peace and quiet would be seriously disturbed. That was the chance we took and we accept that. **We therefore only ask that the constant noise of air intakes and vents and their fans and fan motors be directed into the sky by engineered sound barriers. Please add a Mitigation Measure to set M-3 on page 4-253: Air intakes and vents, and their fans and fan motors, within the Dolores River Canyon in lease tracts 13, 13A, 14-1, 14-2, 14-3, 15, 15A, 16 and 16A, shall have engineered sound barriers that direct their noises skyward so that the constant noises of air intake and venting does not reverberate through the canyon to nearby residences.**

L37-10
(Cont.)

Concern over Light Pollution at Our Residence
A major reason that we bought our land and built our residence was the dark nighttime sky. We appreciate that the DOE has done a good job at assessing light pollution, and describing measures to minimize light solution. **We ask, though, that the last two measures of the M-10 list on DPEIS page 4-261 be changed from the column BMP to the column Mitigation Measure, at least for lease tracts 13, 13A, 15, and 15A.**

L37-11

L37-11   DOE believes that BMPs will be effective. DOE is cognizant of their proximity to the lease tracts and will actively manage developments and implementation.

Concern that the DOE has Overly Simplified its Purpose and Need Statement, and So Has Not Developed a Legal Alternative
We believe that the DOE has seriously, overly simplified its Purpose and Need Statement, and so has no alternative that fully complies with the laws and the intent of Congressional legislation. Our August 29, 2011, letter to DOE during the scoping of the current PEIS stated:
"A terrible flaw in the 2007 final PEA for the ULP was that none of its alternatives was developed in consideration of the widely divergent environmental effects of mining at different sites, nor in consideration of domestic demand for uranium fuel and payments to the US Treasury. Thus, all of the PEA's alternatives provided far less than optimal service to the public, the taxpayer, and the environment. The new PEIS needs to incorporate in its alternatives the concept to first mine those locations that have the least environmental impact, while deferring the mining of more sensitive sites until the future when improvements in mining methods will no doubt allow mining to be softer on the environment and when increased demand for uranium may warrant the environmental damages. None of the alternatives planned for the PEIS in the June 21, 2011, Federal Register address this issue. It is critical that the ULP tracts, and in some cases portions of tracts, be ranked according to their

L37-12

L37-12   DOE believes that the five alternatives evaluated in the PEIS as the range of reasonable alternatives are adequate in addressing the purpose and need discussed in Section 1.4. See also discussion in 1.3.3.

**Crocker-Bedford, Cole and Kara-Lynn, Commenter ID No. L37 (Cont.)**

Crocker-Bedford's Comments on the Draft PEIS for the ULP                    7

environmental sensitivity, so that at least one alternative of the PEIS can be built
around deferring mining in more environmentally sensitive tracts. Simply leasing
tracts because they are currently under lease, as in some alternatives in the June
21 [2011] Federal Register, does not consider environmental sensitivity."
After listing several factors to consider with respect to environmental sensitivity (such as
proximity to the Dolores River and the Dolores River Special Recreation Management
Area), our August 29, 2011, letter stated:
"Also in general, a tract is more environmentally sensitive to new disturbance if it
has been fully reclaimed (e.g., tracts 12, 13A, 14, 14A, 15, 15A, and 19), whereas
continued exploratory or operational disturbance at the location of existing
disturbance might not change the existing physical or biological environment"
(e.g. tract 13).

In our scoping letter, we also noted that current uranium demand and prices, as well as
projections of future uranium demand and prices, should be considered in the
development of at least one alternative that considers the number of tracts to lease now in
comparison to the number of tracts to lease in the future. We pointed out that such
consideration would best serve the US Treasury and Taxpayer, and best serve the concept
of uranium reserves for the future needs of America and its people. In fact, our scoping
letter pointed out that 10 CFR 760.1(c) calls for seeking the highest bid, or the most
return to the treasury, for an individual lease. Because uranium reserves in much of the
world and the United States have been or are being depleted, the price of uranium ore
will no doubt increase in the future. Therefore, to attain the most return to the treasury
per 10 CFR 760.1(c), and to have uranium reserves for America in the future, many of
the uranium reserve tracts should be deferred from leasing at this time.

Unfortunately, the DPEIS rejected all of our recommendations above, because the DPEIS
used an overly simplified Purpose and Need Statement (DPEIS page 1-27 and 1-28):
"The underlying purpose and need for agency action is to support the
implementation of the Atomic Energy Act (AEA) (42 U.S.C. 2096-2097), which
authorized and directed the DOE to develop a supply of domestic uranium and to
issue leases for the mining of uranium and other source materials to effectuate the
provisions of the AEA, and the implementation of the Energy Policy Act of 2005
(Public Law [P.L.] 109-58), which emphasized the reestablishment of nuclear
power (Section 601 through 657).

Because our scoping comments two paragraphs above did not meet the DPEIS' overly
simplified Purpose and Need Statement, Page B-12 of the DPEIS rejected our
recommendations to defer a portion of the lease tracts at this time owing to low market
prices at this time, and also rejected our recommendation to defer some of the uranium
reserves for extraction when needed by a future America.

We cannot find anywhere in the DPEIS any discussion of why the DOE did not consider
an alternative that offers for lease at this time tracts that are less environmentally
sensitive, "while deferring the mining of more sensitive sites until the future when
improvements in mining methods will no doubt allow mining to be softer on the

L37-12
(Cont.)

BLM_0043482

## Crocker-Bedford, Cole and Kara-Lynn, Commenter ID No. L37 (Cont.)

Crocker-Bedford's Comments on the Draft PEIS for the ULP                8

environment and when increased demand for uranium may warrant the environmental damages." In fact, our scoping letter stated "that the Purpose and Need statement of the PEIS should be very clear with respect to leasing and operating to minimize adverse environmental effects." Nevertheless, we suspect that the DOE has rejected our recommendation because it does not meet the DPEIS' overly simplified Purpose and Need Statement.

Many times during Cole's 30 years of service in federal land management agencies, he saw top managers create overly simplified purpose and need statements as a way to circumvent laws or portions of laws and regulations that encumbered or complicated the action that those managers wished to take. Whether not intentional, this is the effect of the overly simplified Purpose and Need Statement in DOE's DPEIS. The alternative that we proposed in our scoping comments and that we quote at the beginning of this section of this letter, would need to be considered if the DOE had cited Section 951(a)(8) of the Energy Policy Act of 2005 (P.L. 109-58) that called for "reducing the environmental impact of nuclear related activities." And if the DOE had cited the Code of Federal Regulations, Title 10, Part 760, Section 760.1(k)(1), where it states: "The lessee will be required to conduct operations so as to minimize [emphasis ours] adverse environmental effects."

The alternative that we recommended in our August 29, 2011, scoping letter (almost all of its pages 2-4) and at the beginning of this section of this letter, including our recommendation to defer some tracts for future leasing and future needs by America, would be a viable alternative if the DPEIS' Purpose and Need Statement had considered that the Atomic Energy Act of 1954 -- as amended (68 Stat. 919, 42 U.S.C. 2011 et seq., especially 42 U.S.C. 2098), and which is further codified at 10 CFR 760 titled Domestic Uranium Program -- had called for Uranium **Reserves** to serve the future needs of the United States and its citizens. In fact, for several decades the uranium leasing tracts have been recognized on public USGS maps as "Atomic Energy Reserves" or as "Department of Energy Uranium **Reserves**", and the USGS could not have repeatedly named the tracts as "Reserves" unless the Atomic Energy Agency (AEA) and later the DOE had thought of them as reserves. **If the intent of the 1954 Atomic Energy Act had been to make immediately available for mining all of the uranium in the AEA/DOE lease tracts, then there would have been no reason to place the tracts under the AEA/DOE for leasing, because if the mineral estate in the tracts of land had remained under the management of the BLM then they all would have been available for uranium mining all of the time under the 1872 Mining Law.** Instead, the primary purpose of the Atomic Energy Act of 1954, with respect to the Uranium Reserves, was to reserve some areas of high quality ore bodies of uranium for the future needs of America, when they might be needed.

Concern that Alternative 2 of the DPEIS Does Not Consider Return to the Treasury
The DPEIS treats its Alternative 2 (turning over the lease tracts to the BLM) as having basically the same as effects as Alternative 1 (deferring the leasing of DOE's Uranium Reserves at this time, but retaining the minerals in the tracts under DOE management for

L37-12 (Cont.)

L37-13

L37-13   Comment noted. Royalties are described in the leases. Cost considerations are not discussed to distinguish alternatives as NEPA documents such as this PEIS focus on the evaluation of environmental impacts.

BLM_0043483

## Crocker-Bedford, Cole and Kara-Lynn, Commenter ID No. L37 (Cont.)

Crocker-Bedford's Comments on the Draft PEIS for the ULP                                    9

leasing at some point in the future). The PEIS needs to point out that Alternative 2 would
cost the Treasury and the Taxpayer the royalties that must be paid for mining within
DOE's Uranium Reserve lease tracts, because under the 1872 mining law the BLM
cannot collect any royalty from hard rock mining.

L37-13
(Cont.)

Thank you for addressing our comments in the Final PEIS.

Most sincerely,

*Cole Crocker-Bedford*

Cole Crocker-Bedford

*Kara-Lynn Crocker-Bedford*

Kara-Lynn Crocker-Bedford

BLM_0043484

## Cunningham, Kirk, Commenter ID No. E96

From: Kirk Cunningham
To: mail_uipes
Subject: Clean Up and Clean Energy!
Date: Thursday, June 27, 2013 6:46:42 PM

Dear

Dear Mr. Pileness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. — E96-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. — E96-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. — E96-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor"" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. — E96-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. — E96-5

Sincerely,

Kirk Cunningham

---

E96-1 DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E96-2 Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E96-3 DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E96-4 DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043485

**Cunningham, Kirk, Commenter ID No. E96 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E96-5    See responses to E96-1 and E96-2.

BLM_0043486

## Daniels, Mel, Commenter ID No. E84

From:     Mel Daniels
To:       mail_ulpeis
Subject:  Clean Up and Clean Energy!
Date:     Friday, June 14, 2013 1:13:16 PM

Dear

Dear Mr. Plleness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. [E84-1]

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. [E84-2]

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. [E84-3]

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. [E84-4]

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. [E84-5]

Sincerely,

Mel Daniels

---

**E84-1**   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

**E84-2**   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

**E84-3**   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

**E84-4**   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043487

**Daniels, Mel, Commenter ID No. E84 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E84-5    See responses to E84-1 and E84-2.

BLM_0043488

## Davidian, Jerry, Commenter ID No. W19

Thank you for your comment, Jerry Davidian.

The comment tracking number that has been assigned to your comment is ULPD50019.

Comment Date: June 26, 2013  15:22:45PM
Uranium Leasing Program PEIS
Comment ID: ULPD50019

First Name: Jerry
Middle Initial:
Last Name: Davidian
Organization:
Address: [Withheld by requestor]
Address 2:
Address 3:
City: [Withheld by requestor]
State: [Withheld by requestor]
Zip: [Withheld by requestor]
Country: [Withheld by requestor]
Privacy Preference: Withhold address from public record
Attachment:

Comment Submitted:

I request that the DOE elect to follow either Alternative 1 or 2, in their final draft of the EIS relating to uranium leasing. There is inadequate social or economic justification for the resumption of the uranium leasing program and the environmental risks and uncertainties greatly outweigh any perceived benefits. | W19-1

While nuclear energy has seen nothing but setbacks in the past five years, the renewable energy industry has experienced exponential growth and economic efficiency gains during that time. | W19-2

There is no current need for the extraction of uranium. The stores which exist on federal lands should be kept intact and in the ground. It is the safest, most intelligent decision and the only rational choice at this time. | W19-3

The Department of Energy needs to focus its resources on new, environmentally sound alternatives. During the next decades, rather than creating additional environmental hazards or cleanup projects, expanding renewable projects will be a much more valuable use of DOE resources. | W19-4

Do not renew the leases or enter into new leases. Leave the uranium in the ground where it is safe and available to future generations, should there ever be any valid reason to extract it. It is a resource which belongs to the American people and it should not be squandered or extracted for the benefit of foreign interests. There is no reason to take any environmental risk at this time and quite possibly there never will be. | W19-5

End the leasing program and leave the uranium reserves safely underground.

W19-1   Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

W19-2   The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

W19-3   Alternative 1 does evaluate leaving the uranium ore in the ground. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative..

W19-4   See response to W19-2.

W19-5   See responses to W19-1 through W19-4.

BLM_0043489

## Davison, John, Commenter ID No. E87

From:     Jon Davison
To:       mail_uleis
Subject:  Against Uranium leasing.
Date:     Wednesday, June 26, 2013 2:21:32 PM

Dear Mr. Plieness,

I'll keep it short. I'm sure we're both busy. San Miguel and Montrose counties don't need more uranium mining and milling. We are now a tourist economy. We don't want to jeopardize that for a handful of job. The uranium industry has never cleaned up all the messes they've left in the past. Chances are they will never build a nuclear plant in this area. So what is the benefit to the citizens of Colorado? I could go on, but I'll spare you.

Best Wishes,
Jon Davison
Placerville, CO.

E87-1

E87-1    Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

BLM_0043490

Final ULP PEIS

## de Bivort, Lawry, Commenter ID No. T48

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

74

1          MR. CAMERON:  Okay.  Lawry de

2  Bivort, and you can give us the correct

3  pronunciation of that.

4          LAWRY DE BIVORT:  I'm Lawry de

5  Bivort and I'm a resident of Telluride, and I'm a

6  veteran of over four decades of research and

7  development in Washington D.C., including for DOE

8  and NRC and EPA and all kinds of alphabet agencies.

9          I'm going to be making some comments that

10  are critical of your process here, but I ask you

11  not to take it personally, because I have been on

12  your side of this barrier.  I have composition

13  books plenty, full of notes from hearings and

14  comments and so forth, so I know what you are going

15  through and I know how, in some ways, impossible

16  the job is that you have been given.

17          I have not had a chance to look at

18  the EIS.  I'm a quick reader, but 1,200 pages will

19  tax even me.  So I have some comments and

20  questions.

21          First is that your selection or declared

22  preference for Alternative 4 is curious to me,

23  because preferences, by definition, are just a

24  matter of one's values.  So what I'm really curious

25  about is what values did you take into account in

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T48-1

T48-1     Comment noted. DOE considered all comments received on the Draft PEIS and the results of
the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

Appendix I: Comment Response Document

BLM_0043491

**de Bivort, Lawry, Commenter ID No. T48 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

75

1  deciding on this preference?

2          You are meeting a lot of very good and

3  very interesting people here, despite your

4  limitation on people to four minutes.  I invite you

5  to get to know the region, get to know the people,

6  before you start selecting preferences.

7          I would question also your selection of a

8  preference, given the fact that the PEIS is still

9  in draft form.  Certainly you would want to

10  complete the EIS before making judgments about what

11  you prefer, at least I would.

12          Second is we are all up here under this

13  four-minute limitation, despite some very smart

14  people who have already appeared before you, and

15  you're not responding to the questions or comments

16  that are being made.  This is a huge mistake.  It

17  is in some ways an arrogance.  We should be in

18  dialogue, not this controlled thing where we appear

19  as petitioners to you who control the draft.  This

20  is not right.  We should be in dialogue.

21          Third thing is about the resources

22  involved in this interaction.  Your EIS, I'm told

23  by a charming lady outside, is 1,200 pages long.

24  Now, I know how much effort it takes to put

25  together a 1,200-page government EIS, and I know

T48-1
(Cont.)

T48-2

T48-2   DOE's public participation process is consistent with NEPA recommendations. The time limit at the public hearings was established to provide all members of the public that attended the hearing an opportunity to speak or provide oral  comments. In addition to providing oral comments at the public hearings, written comments were also accepted, thus providing the opportunity to offer additional more exhaustive comments.

BLM_0043492

## de Bivort, Lawry, Commenter ID No. T48 (Cont.)

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

76

1  the kinds of fees that the federally funded
2  research and development centers charge.  So you
3  guys have had access, as you properly should, to
4  lots of money.  Off the top of my head, I would say
5  you've burned through 2.5 to 3 million dollars for
6  this EIS, and you're not finished.  You can tell me
7  if I'm wrong, but I doubt it.
8          The EIS, if it's like other EISs that
9  I've both written and studied, will be highly
10  technical.  You'll be using analytic tools, models,
11  and so forth.  Those require a lot of study to do.
12  We need to figure out, we need to assess, how good
13  your EIS is technically.  We can't do that with a
14  few minutes spent preparing four-minute
15  commentaries.
16          So you all are being paid to draft this
17  EIS; we're not.  You have the resources to buy
18  access to the analytical tools and models, travel,
19  G&A, overhead, et cetera.  I don't think Argonne
20  charges profit, does it?  But we don't have any of
21  that.  You have given us the CED for the EIS, which
22  is great, but where are the resources to study it,
23  to analyze it.
24          MR. CAMERON:  I'm going to have to
25  ask you to wrap it up for us, Lawry.

T48-2
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

BLM_0043493

**de Bivort, Lawry, Commenter ID No. T48 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

77

1          LAWRY DE BIVORT:  Okay.  We

2   certainly have the intellectual, analytic,

3   scientific, institutional, and professional

4   horsepower right here in this region to assist your

5   PEIS on a fully technical level and the validity of

6   DOE's preference for Alternative 4.

7          So one of my questions to you is:  How

8   much money will the government make available in

9   the form of grants to affected communities to study

10  the draft PEIS, and what will be the process for

11  activating such a grant or grants?

12          Lastly, it's imperative that if you are

13  sincere about hearing from the affected

14  communities -- and I'd like to think that you are.

15  At least one of you is taking extensive notes,

16  which I know you will be shaking out your wrist

17  tonight.  If you are sincere in hearing from the

18  affected communities, that the period for the

19  assessment of the draft PEIS be increased

20  adequately and appropriately.

21          MR. CAMERON:  Lawry, I'm going to

22  have to ask you to finish.

23          LAWRY DE BIVORT:  I am finished.

24          MR. CAMERON:  Thank you very much.

25          LAWRY DE BIVORT:  You're welcome.

(866) 448 - DEPO     www.CapitalReportingCompany.com     © 2013

T48-2
(Cont.)

T48-3

T48-3     Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

**de Bivort, Lawry, Commenter ID No. T48 (Cont.)**



Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

1  you would have wished that you would have had a
2  nuclear explosion in your vicinity.
3          MR. CAMERON: And I'm going to have
4  to ask you to wrap up.
5          NICHOLAS YOHO-WIKSE: Okay. That's
6  about it. My main point is that there's a lot of
7  good people in this area. It's a dynamic,
8  intelligent population. The mining is going to
9  take place somewhere, and I think the people here
10 will keep it in a better way than it would have
11 been in other places.
12         MR. CAMERON: Thank you. And I
13 think if you could stick around after we are done
14 just so we can get the correct spelling of your
15 name for the transcript.
16         And we're going to wrap up now. The
17 Department and our experts, if you need to talk to
18 them, ask them anything, Lawry, they're going to be
19 out by the posters, and I'm going to ask Ray
20 Stleness to come up and close the meeting out for
21 us.
22         LAWRY DE BIVORT: This is a question
23 that's relevant to everyone. What kind of
24 follow-up to the comments and questions that have
25 been put to you this evening will you be giving?

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T48-4

T48-4    A comment response document or CRD is included in this PEIS as Appendix I. This appendix
contains all the comments received on the Draft PEIS. Responses to the comments are also
provided (see Section L4).

## Delaney, Betty, Commenter ID No. E69

| | |
|---|---|
| From: | Betty Delaney |
| To: | mail_uibes |
| Subject: | Clean Up and Clean Energy! |
| Date: | Saturday, June 01, 2013 3:09:38 PM |

Dear

Dear Mr. Pleeness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. — E69-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. — E69-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. — E69-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. — E69-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. — E69-5

Sincerely,

Betty Delaney

---

E69-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E69-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E69-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E69-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Delaney, Betty, Commenter ID No. E69 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E69-5    See responses to E69-1 and E69-2.

BLM_0043497

## Deuter, Catherine, Commenter ID No. E54

From:        Cat Deuter
To:          mail_views
Subject:     Clean Up and Clean Energy!
Date:        Friday, May 31, 2013 7:34:31 PM

Dear

Dear Mr. Pileness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to use a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,
Catherine Deuter

Cat Deuter

E54-1

E54-2

E54-3

E54-4

E54-5

E54-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E54-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E54-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E54-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043498

**Deuter, Catherine, Commenter ID No. E54 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E54-5    See responses to E54-1 and E54-2.

BLM_0043499

### Dix, Deborah, Commenter ID No. W15

Thank you for your comment, Deborah Dix.

The comment tracking number that has been assigned to your comment is ULPD50015.

Comment Date: June 3, 2013   12:32:14PM
Uranium Leasing Program PEIS
Comment ID: ULPD50015

First Name: Deborah
Middle Initial:
Last Name: Dix
Organization:
Address: [Withheld by requestor]
Address 2:
Address 3:
City: [Withheld by requestor]
State: [Withheld by requestor]
Zip: [Withheld by requestor]
Country: [Withheld by requestor]
Privacy Preference: Withhold address from public record
Attachment:

Comment Submitted:

You used govt data, mining companies data, all pro mining groups
Where is the info on health problems done by other researchers
Did you use the NAS study about uranium mining in Virginia
                                                                        | W15-1

I do not think the govt of America should be pushing uranium mining or Nuclear power and the people of America should not have
to pay for nukes plants, uranium mining cleanups.

Do you look at the fines to mining at all
                                                                        | W15-2
All federal lands should have a ban on mining, our lands belong to us, not Canadian mining companies

We want a ban on all federal lands!

Deborah Dix

W15-1   Evaluations done for the PEIS relied first on available science and information from the
regulatory agencies such as the EPA, USFWS, USGS, and state agencies. (Health studies done
by other groups were examined and used to guide the analysis, if relevant - the NAS study
about uranium mining in Virginia was also referenced; however, very limited quantitative
analysis was included in that study.) The primary health problem of concern associated with
uranium mining, as identified in various studies, is the increased risk of cancer, which is
assessed in the PEIS. In addition to the increased risk of cancer, the potential of adverse health
effect associated with the chemical toxicity of uranium was also assessed in the PEIS.

W15-2   DOE believes that the five alternatives evaluated in the PEIS as the range of reasonable
alternatives are adequate in meeting the purpose and need. DOE considered the termination of
the ULP in Alternatives 1 and 2. DOE considered the results of the evaluation presented in the
PEIS in addition to public comments received in its identification of DOE's preferred
alternative for the PEIS. Alternative 4 which provides for the continuation of the ULP (with
exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for
the next 10-year period or for another reasonable period is DOE's preferred alternative
identified in this PEIS.

BLM_0043500

## Douglas, A. Paul, Commenter ID No. E38

| From: | A Paul Douglas |
|---|---|
| To: | mail_uipeis |
| Subject: | Clean Up and Clean Energy! |
| Date: | Monday, May 27, 2013 1:41:10 PM |

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. — E38-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak production. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work reclaiming old mines and developing sustainable, renewable energy economies. — E38-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. — E38-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. — E38-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. — E38-5

Sincerely,

A Paul Douglas

E38-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E38-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E38-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E38-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Douglas, A. Paul, Commenter ID No. E38 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E38-5   See responses to E38-1 and E38-2.

BLM_0043502

## Douglas, A. Paul, Commenter ID No. E80

From: A Paul Douglas
To: mail_ulpeis
Subject: Clean Up and Clean Energy!
Date: Tuesday, June 04, 2013 3:45:56 PM

Dear

Dear Mr. Ploness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to ensure a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

A Paul Douglas

E80-1

E80-2

E80-3

E80-4

E80-5

E80-1 DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E80-2 Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E80-3 DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E80-4 DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Douglas, A. Paul, Commenter ID No. E80 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E80-5   See responses to E80-1 and E80-2.

BLM_0043504



**Dye, Angela, Commenter ID No. T40**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

44

```
1        Those are my comments.  Thank you.
2             MR. CAMERON:  Thank you, Mike.
3  Angela Dye.
4             ANGELA DYE:  Angela Dye, local
5  resident of Telluride.
6        I do not support Alternative 4 as your
7  preferred alternative, neither do I support the
8  leasing or mining of uranium for all the previous
9  reasons that folks have said.  It's an onerous
10 resource and we don't know how to handle it.  So I
11 think it needs to be left in the ground until we
12 know how to handle the waste.  We obviously have
13 not figured that out yet.
14       I would like to add to some of the
15 comments as well as endorse some of the things that
16 have been said.  Basically to clean up the spills,
17 the remaining tailings of the uranium that has been
18 excavated so far, especially along our rivers and
19 streams.
20       I would like to also point out that we
21 have 12 pages of mitigation measures that are in
22 ten point type in landscape format.  That is an
23 incredible number of mitigation measures to try to,
24 in fact, deal with.  They are way too extensive.
25 They are vague and without measurable outcomes or a
```

(866) 448 - DEPO   www.CapitalReportingCompany.com   © 2013

T40-1

T40-1   Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

T40-2

T40-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

T40-3

T40-3   Mitigation measures are listed in Table 4.6-1 so that they could be considered for implementation. The effectiveness of the measures would be determined in accordance with lease agreements and approved mine plans.

BLM_0043505



**Dve, Angela, Commenter ID No. T40 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

45

```
1  time frame.
2        And specifically under three areas --
3  under visual resources, for instance, that's the
4  longest list under Alternative 4 of effects to
5  landmarks and significant landscapes in our region.
6  And that is related part and parcel to our
7  livelihood here.
8        Under transportation, the increase in the
9  amount of truck traffic is on a scenic byway;
10 again, part of our livelihood, and it also affects
11 bicycle tourism.  And, in general, I do not see
12 where recreation has been adequately evaluated.
13       Under socioeconomics, I don't believe
14 that they account at all for our current
15 activities, which include agriculture, grazing and
16 organic farming, as well as recreation.
17       So in summary, I do not support your
18 alternative.  I appreciate the opportunity to
19 comment.  I think we should focus on renewables and
20 conservation and add provisions for climate change
21 and our weather events.  Thank you.
22            MR. CAMERON:  Thank you.  This is
23 Linda Miller, then we'll go to Ashley Boling.
24            LINDA MILLER:  Linda Miller of
25 Telluride.  Thank you for this opportunity.
```

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T40-3
(Cont.)

T40-4

T40-5

T40-6

T40-4    Sections 4.1.8.1, 4.2.8, 4.3.8.1, 4.4.8.1, and 4.5.8.1 of the PEIS examine how a reduction in the recreation economy in the ROI could impact the local economy. In addition, text has been added to reflect non-economic impacts to recreation in the ROI.

T40-5    Section 3.8 of the PEIS discusses economic conditions in the ROI, including agricultural activities and recreation. In addition, text has been added to reflect non-economic impacts to recreation in the ROI.

T40-6    See response to T40-1. The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

Text has been revised to supplement the climate change discussion in Chapter 4 "Air Quality" sections.

## Edge, Kristine, Commenter ID No. E61

From: Kristine Edge
To: mail_ulpeis
Subject: Clean Up and Clean Energy!
Date: Friday, May 31, 2013 11:09:37 PM

Dear

Dear Mr. Pillness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E61-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

E61-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

E61-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

E61-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E61-5

Sincerely,

Kristine Edge

---

E61-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E61-2   eclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E61-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E61-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043507

**Edge, Kristine, Commenter ID No. E61 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E61-5    See responses to E61-1 and E61-2.

BLM_0043508

**Ekenrode, Carol, Commenter ID No. L6**



**DRAFT URANIUM LEASING PROGRAM PROGRAMMATIC
ENVIRONMENTAL IMPACT STATEMENT (DOE/EIS-0472-D)**
U.S. Department of Energy

**WRITTEN COMMENT FORM**
*Public comment period closes on May 31, 2013*

Mr. _____   Mrs. _____   Ms. ⓧ   Mr. & Mrs. _____   Dr. _____

Name: CAROL EUKENRODE

Title: _____

Organization: _____

Address: 35 PILOT KNOB LANE

City: Telluride   State: CO   Zip Code: 81435

Phone: 970 708 0692   E-Mail Address: _____

Comment: I want you to Reserve the uranium in the ground for
future domestic use. DO NOT EXtract it for China Now.
Remediate the public lands already destroyed by uranium
industry to prevent further Contamination of the
Dolores Watershed & Create new jobs Now.
Use public land for RENewables, to generate new
jobs Now & clean energy for the U.S

*Please use other side if more space is needed*

**WITHHOLDING OF PERSONAL INFORMATION:** Information you provide on this form may be published as part
of the public record for this project, including publication on the Internet. Individual respondents may request
confidentiality by checking one of the two boxes below. The DOE will honor such requests to the extent allowed by law.
All submission from organizations and businesses, or from individuals identifying themselves as representatives or officials
of organizations or businesses, will be available to the public in their entirety.

☐ Withhold my name and address from the public record.

☐ Withhold only my address from the public record

Comment form may be mailed to:
Mr. Ray Plieness
DOE ULP PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

Comment form may be sent by electronic mail to:
ulpeis@anl.gov

L6-1

L6-2

L6-3

L6-1    Comment noted. DOE considered all comments received on the Draft PEIS and the results of
the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

L6-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed.
There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed
under the ULP. Other mines in the region are not under the ULP and not under DOE's
oversight or authority to reclaim. DOE analyzed this alternative as part of its range of
reasonable alternatives in the PEIS.

L6-3    The evaluation of the use of the ULP land for development of solar energy or renewable
energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need"
discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for
such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE
oversees numerous programs that are investigating and supporting a wide variety of energy
production technologies, including many based on renewable sources.

**Ellis, Ryan, Commenter ID No. T5**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

29

1  bandied about such as "legacy."  I've been very

2  blessed in my life and I very much want to implicate a

3  sense in my descendants of honor.  Several generations

4  from now, may all our natives be remembered with honor

5  and joy.

6          Unfortunately, long before then, the true

7  scope of the Fukushima reactor meltdown from Japan has

8  begun to be felt in our Pacific Northwest and, indeed,

9  much of the world.  It's a current event issue that is

10  being suppressed by the mainstream media that we

11  should all be very concerned about in addition to this

12  issue.

13          I'm not suggesting that uranium is fuel

14  incarnate; I am suggesting it is our biggest challenge

15  to fully remediate.

16          In sum, I'm not a big fan of big federal

17  government, and no energy source is more intertwined

18  with the big federal government than nuclear power.

19          This alone is enough for me, but there's so

20  much more.  Remember the word "legacy."  In this case,

21  it is a euphemism for toxic radioactive waste.

22          Thank you.

23          MR. CAMERON:  Thank you, Eric.

24          We're going to go to Ryan Ellis next.  ←

25          RYAN ELLIS:  Hello, my name is Ryan Ellis.

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

**Ellis, Ryan, Commenter ID No. T5 (Cont.)**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

30

1  I'm an environmental engineer for Energy Fuels. And
2  Energy Fuels has eight of the lease blocks that are
3  included in this program. I just want to state my
4  comment that these eight lease blocks provide a big
5  portion of our resources, and they're important to us
6  to help supply domestic uranium and provide jobs in
7  the community. Thank you.
8        MR. CAMERON: Thank you, Ryan.
9        Glen Miller, do you want to speak to us?
10       This is Glen Miller.
11       GLEN MILLER: I'm Glen Miller. I live in
12  Grand Junction. What was that radio show? "I use to
13  work in that town." I worked with the USGS Map and
14  Geology and whatnot in that area back a half century
15  ago. And I'll be brief.
16       I think we need to continue to allow DOE to
17  manage those leases, not BLM. A lot of people don't
18  agree with me, but I have some facts -- well, they
19  seem to be facts -- they're not from the federal
20  government, but the National Science Foundation that
21  energy from nuclear sources is our safest form of a
22  great volume amount of energy.
23       I'll give you some numbers: Mortality
24  rates. If nuclear is 1 in terms of mortality rate,
25  rooftop fatality, manufacturing, the whole thing --

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T5-1

T5-1    Comment noted. DOE considered the results of the evaluation presented in the PEIS in addition to public comments received in its identification of DOE's preferred alternative for the PEIS. Alternative 4 which provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

## Ernst, Robert, Commenter ID No. E47

**From:** mail_ulpeis
**To:**
**Subject:** FW: ULP PEIS reference
**Date:** Thursday, May 30, 2013 1:19:26 PM

**From:** Ernst, Robert
**Sent:** Thursday, May 30, 2013 12:40 PM
**To:** mail_ulpeis
**Subject:** ULP PEIS reference

A reference cited in this PEIS is not listed in the references. The reference is the 2007 DOE PEA. It is not listed in the references in the PEIS.

The 2007 PEA is cited in the PEIS on page 1-5, line 6.

In July 2007, DOE issued a programmatic environmental assessment (PEA) for the ULP, in which it examined three alternatives for the management of the ULP for the next 10 years (DOE 2007). In that same month, DOE issued a Finding of No Significant Impact (FONSI), in

I don't see DOE, 2007 PEA in the references.

I think it should definitely be in the references.

**Robert Ernst, M.Sc.**
Geologist
BLM – Uncompahgre Field Office
2465 So. Townsend Ave.
Montrose, CO 81401
970.240.5305

CONFIDENTIALITY NOTICE

This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

E47-1

E47-1    The PEA of 2007 has been added to the reference list (see Section 8).

BLM_0043512

**Esty, Jon and Rosemary, Commenter ID No. E3**

From:     Jon Esty
To:       mail_uipes
Subject:  DOE's PEIS for Uranium Exploration
Date:     Monday, April 22, 2013 4:20:38 PM

Dear Mr. Plimess,
We are writing to you to express our concerns for the record to the Dept. of Energy's plan to initiate increased exploration for uranium in Mesa, Montrose, and San Miguel Counties in SW Colorado. Pushing for increased exploration of this resource is something that should not be done for numerous environmental and public health reasons.

First of all, there are a couple of dozen uranium sites in the area whose owners have decided not to mine because of low demand, high cost of refining, impact on air and water resources, etc.   The DOE should also support efforts by the State of Colorado to require owners of these mines to clean them up if they are no longer going to be used.  It should be the business of the DOE to be aware of all the reasons why existing mines are not now producing, not be a cheerleader for more mine development.

Secondly, serious attention must be paid to the air and water pollution and its affects on nearby residents, agriculture, and tourist industry.  For example, residents of Ouray County such as ourselves experience high winds laden with dust particularly in the springtime from the west.  Blowing contaminated dust from uranium mining activities only adds to the problem we experience.  Water supplies are steadily declining so any potential contamination of this precious resource must be carefully evaluated.  Clean water is basically a much more valuable resource than uranium.  We cannot allow the mining industry to freely destroy it.

Finally, the DOE should be promoting and discovering ways to develop clean, renewal solar and wind energy on these sites. Wind and sunshine is something we have plenty of here and utilization of this resource needs to be explored much more than it is now. It should be the mission of the DOE to look to future sources of energy and not get stuck with advocating a source which is fraught with so many problems as uranium and nuclear power.

Thank you for your kind attention,

Jon & Rosemary Esty

| E3-1 | E3-1 | Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative. DOE oversees the conduct of activities on the ULP lease tracts consistent with lease agreements including provisions in the lease agreements that lessees comply with Federal, state, and local requirements such as those required by CDRMS on reclamation. |
| E3-2 | E3-2 | The PEIS include evaluations on air quality, water quality, human health, land use, and socioeconomics. See discussion in Section I.3.2 for a summary of potential impacts evaluated. |
| E3-3 | E3-3 | The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources. |

BLM_0043513

**Evans, Russell, Commenter ID No. E9**

From:        Russell Evans
To:          mail_ulpeis
Subject:     Clean Up and Clean Energy!
Date:        Thursday, May 23, 2013 9:05:35 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests. For DOE to usher in a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution. Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP. Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential.

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in-depth, localized information. The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health. The PEIS lacks a detailed analysis of water quality, wildlife and water supplies. The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS states only "minor'" environmental justice concerns are associated with increased uranium mining in this area. Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit. To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees.

I believe DOE can offer a program that supports sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Russell Evans

E9-1

E9-2

E9-3

E9-4

E9-5

E9-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E9-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E9-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E9-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Evans, Russell, Commenter ID No. E9 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E9-5    See responses to E9-1 and E9-2.

BLM_0043515

## Evans, Russell, Commenter ID No. E67

From:     Russell Evans
To:       mail_uppes
Subject:  Clean Up and Clean Energy!
Date:     Friday, June 28, 2013 11:29:53 PM

Dear

Dear Mr. Pilkness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E67-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

E67-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

E67-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health.  The PEIS states only "minor"' environmental justice concerns are associated with increased uranium mining in this area.  Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

E67-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy.  Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E67-5

Sincerely,

Russell Evans

---

E67-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E67-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E67-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E67-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043516

**Evans, Russell, Commenter ID No. E67 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E67-5       See responses to E67-1 and E67-2.

## Evans, Russell, Commenter ID No. E115

From: Russell Evans
To: mall_ulpeis
Subject: Clean Up and Clean Energy!
Date: Saturday, June 01, 2013 1:31:32 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to support a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases would operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Russell Evans

E115-1

E115-2

E115-3

E115-4

E115-5

E115-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E115-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E115-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E115-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043518

**Evans, Russell, Commenter ID No. E115 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E115-5    See responses to E115-1 and E115-2.

BLM_0043519

**Fenn, Virgil, Commenter ID No. T7**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

31

1 people fall off roofs -- is five times as dangerous.

2       Wind is six times more dangerous; hydro is

3 15 times more dangerous.  And I'll just mention coal,

4 and we've got a lot of coal.  But coal is, in the

5 United States -- this is per megawatt produced --

6 1,600 times more dangerous in terms of fatalities.

7       We have a lot of uranium, and as far as I

8 can tell, some sort of nuclear power and solar power

9 is the future.  We're not going to run out of it.  If

10 we had (inaudible), I'm sure they're going to be

11 developed.  That would increase uranium in the ground.

12 We have the factor -- the utility of it, a factor of

13 15.

14       So those are some things to think about in

15 the long term.  It's safe and there's an awful lot of

16 it. Thank you.

17       MR. CAMERON:  Okay.  Than you, Glen.

18       Virgil Fenn?

19       VIRGIL FENN:  That would be me.  I'm up here

20 to appeal -- mainly I want to pitch a book.  I'd like

21 you to open your mind, both sides of it there, and do

22 some research.

23       There is more misinformation --

24       AUDIENCE MEMBERS:  Use the mic, Virgil.  We

25 can't hear you.

(866) 448 - DEPO    www.CapitalReportingCompany.com   © 2013

Final ULP PEIS

Appendix I: Comment Response Document

**Fenn, Virgil, Commenter ID No. T7 (Cont.)**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

32

1          MR. FENN:  I'm appealing to both the

2    environmentalists and those saying we need more

3    energy, even if it's nuclear, to be more open minded

4    to kind of review your assumptions.

5          In particular, I want to try to get you to

6    read this book.  It just came out this last fall, so

7    you won't find it in the library yet.  It did come out

8    in paperback at 25 bucks.  Search for "Thorium:

9    Energy Cheaper than Coal."  This talks about a lot of

10   things we're talking about here with facts, with

11   references, and all of that.

12         One example is talking about the linear no-

13   threshold hypothesis when it comes to damage from

14   nuclear radiation.  There's no doubt that extreme

15   radiation is very deadly.  So is a whole lot of water.

16         And you just assume that the less radiation,

17   the damage just goes down to zero.  You come up with

18   the wrong answer.  It turns out that low radiation

19   can, over a long period of time, can, in fact, be

20   beneficial.  There's proof of that.

21         And that's all in this book and in the

22   references.  I would just please ask you to do some

23   more homework.  This whole subject is a lot like sex

24   for teenagers.  You know, you go to your teenager and

25   say let's talk about sex, they say, Sure, Pop, what do

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T7-1

T7-1    Comment noted. DOE considered the results of the evaluation presented in the PEIS in
addition to public comments received in its identification of DOE's preferred alternative for
the PEIS. Alternative 4 which provides for the continuation of the ULP (with exploration and
mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year
period or for another reasonable period is DOE's preferred alternative identified in this PEIS.

BLM_0043521

Final ULP PEIS

Appendix I: Comment Response Document

## Fenn, Virgil, Commenter ID No. T7 (Cont.)

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

33

1  you want to know?  But in fact, they really don't know

2  it all yet. Don't assume that you know it all yet

3  either, please.  Thank you.

4      MR. CAMERON:  Thank you very much.

5      Janet Johnson?

6      JANET JOHNSON:  I think it's important for

7  us to remember this evening that our area has

8  suffered, for 50 years, a disproportionality in the

9  cost of what happens when you are the front end and

10 the back end of the uranium industry.

11      The costs have been to us, so far, on the

12 DOE minds, to remediate, 1.25 million.  The mills in

13 Colorado, in our Uravan mineral belt area, $1 billion

14 to the tax payers.  The rate of compensation that we

15 pay out to people who have died or their families of

16 the people who have died or gotten sick, that's in the

17 millions of dollars already. And we'll just continue

18 growing, because we continue -- we have to continue

19 with the people who are the nuclear workers.

20      The Legacy Management Program itself is paid

21 for by taxpayer dollars.  These are initial costs,

22 these aren't costs that will be going on in

23 perpetuity.

24      The costs to us have also been our health,

25 our economies, our environment, our waters.

T7-1
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

BLM_0043522

### Field, Sally, Commenter ID No. E113

From:        Sally Field
To:          mail_ulpeis
Subject:     Uranium Mining
Date:        Friday, June 28, 2013 7:29:23 PM
Attachments: image001.jpg

Dear Sirs:

Consideration of uranium mining in the Uravan area is irresponsible and senseless in my opinion. To
see the devastation and continued pollution from this is sickening and not sustainable. An educated
person readily sees that renewable energies are the way to go. And yes, renewable energy will
create jobs and there would be jobs to clean up what has not been cleaned up after HOW many
years..... as the pollution from these ridiculous OLD mining ideas continue to be promoted.

Please stop these horrific practices. No uranium mining if you understand we need air, water, soil
trees etc. to live. Enough.
Thank you.
Sally Field

Sally Field

E113-1

E113-1   Comment noted. DOE considered all comments received on the Draft PEIS and the results of
the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

The evaluation of the use of the ULP land for development of solar energy or renewable
energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need"
discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for
such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE
oversees numerous programs that are investigating and supporting a wide variety of energy
production technologies, including many based on renewable sources.

BLM_0043523

**Fraser, Frances, Commenter ID No. E13**

From: Frances Fraser
To: mail_ules
Subject: Clean Up and Clean Energy!
Date: Thursday, May 23, 2013 10:06:53 PM

Dear

Dear Mr. Pilcness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. | E13-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations.  Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives.  Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution.  Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP.  Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential. | E13-2

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in depth, localized information.  The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health.  The PEIS lacks a detailed analysis of water quality, wildlife and water supplies.  The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. | E13-3

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination.  The PEIS states only "minor"" environmental justice concerns are associated with increased uranium mining in this area.  Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit.  To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees. | E13-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy.  Every Coloradan has the right to a clean environment, and a strong economy and a healthy community. | E13-5

Sincerely,

Frances Fraser

---

E13-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E13-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E13-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E13-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043524

**Fraser, Frances, Commenter ID No. E13 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E13-5    See responses to E13-1 and E13-2.

BLM_0043525

## Gabow, Bruce, Commenter ID No. E45

From: mail_ulpeis
To:
Subject: FW: uranium mining
Date: Thursday, May 30, 2013 9:28:28 AM

From: bruce gabow []
Sent: Wednesday, May 29, 2013 9:17 PM
To: mail_ulpeis
Subject: uranium mining

Why don't we focus on making companies clean up their uranium messes before permitting them to make more messes. Cleanups create jobs!
Sincerely,
Bruce Gabow

E45-1

E45-1    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

## Galloway, Danny, Commenter ID No. E58

From:           Danny Galloway
To:             mail_ulpeis
Subject:        Clean Up and Clean Energy!
Date:           Thursday, June 27, 2013 10:24:44 PM

Dear

Dear Mr. Pileness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E58-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

E58-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

E58-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health.  The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area.  Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

E58-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy.  Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E58-5

Sincerely,

Danny Galloway

---

**E58-1**    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

**E58-2**    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy renewables" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

**E58-3**    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

**E58-4**    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Galloway, Danny, Commenter ID No. E58 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E58-5   See responses to E58-1 and E58-2.

BLM_0043528

## Galloway, Danny, Commenter ID No. E102

| From: | Danny Galloway |
|---|---|
| To: | mail_ulpeis |
| Subject: | Clean Up and Clean Energy! |
| Date: | Friday, May 31, 2013 9:30:00 PM |

Dear

Dear Mr. Piloness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

*E102-1*

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

*E102-2*

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

*E102-3*

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation from private companies to profit.

*E102-4*

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

*E102-5*

Sincerely,

Danny Galloway

---

E102-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E102-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E102-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E102-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043529

**Galloway, Danny, Commenter ID No. E102 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E102-5    See responses to E102-1 and E102-2.

BLM_0043530

Final ULP PEIS

**Glynn, David, Commenter ID No. T45**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

62

1 Cañon City and endless other locations where leaks
2 and explosions have occurred scientifically prove
3 this industry is significantly uncontainable and
4 unsustainable.
5            MR. CAMERON:  Thank you.  We are
6 going to hear from David Glynn, then Glen Williams.
7            DAVID GLYNN:  My name is David
8 Glynn.  I'm a resident of Ophir, Colorado.  I'm for
9 Alternative 1.
10           I would like to speak to the end game of
11 uranium.  We are really looking at the beginning,
12 and the beginning is not connected so far with the
13 end game.  There's no need for the beginning of
14 this process, if we are not for the end.  Now, the
15 end game of uranium is nuclear weapons and nuclear
16 power plants.  Nuclear weapons are an abomination.
17 I can't say it any clearer.  The nuclear industry
18 produces all kinds of waste that we have no
19 solution for in its storage and to make it and keep
20 it safe.
21           Then there's always the chance of nuclear
22 disaster.  Chernobyl, Three Mile Island, Fukushima,
23 and then a disaster waiting to happen like the one
24 that this country avoided two months after
25 Fukushima.  Now, this was a near disaster that went

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T45-1

| T45-1 | Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative. |

Appendix I: Comment Response Document

BLM_0043531

## Glynn, David, Commenter ID No. T45 (Cont.)

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

63

1  pretty much virtually unreported.  It happened

2  along the Missouri River.  The Missouri River flows

3  into the Mississippi, which flows into the Gulf of

4  Mexico.  Thousands of miles of the best farmland in

5  the world were threatened, and yet the media paid

6  very little attention to this.

7       What they did cover was the stage that

8  I'm going to give you here, the setup.  The

9  disaster that was nearly -- or that was avoided on

10 the Missouri, Fort Calhoun, Omaha, Nebraska,

11 nuclear power plant totally surrounded by the

12 floodwaters of the Missouri River.

13      Now, to be fair, this particular plant

14 was offline at the moment, but a spent fuel rod was

15 not offline.  This facility was surrounded by the

16 Missouri River floodwaters.  The primary levy

17 protecting the facility failed, so they put up an

18 emergency, water-inflatable, rubber berm, 8 foot

19 high.  They punctured it in the process of putting

20 it up.  Not too safe.  Floodwaters have, what,

21 debris in them that can easily puncture a rubber

22 membrane.  8 feet tall.

23      The water rose over halfway up that berm.

24 The reactor room floor was 3 feet below the level

25 of the floodwaters, 3 feet below.  Downriver --

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

**Glynn, David, Commenter ID No. T45 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

64

1  another power plant 70 miles downriver, the Cooper

2  power-generating station, nuclear facility.

3  Reactor room floor 2 feet above the floodwaters, 2

4  feet above.

5          During this flood -- which lasted, by the

6  way, not days and hours, but months -- was an

7  electrical fire in the control panel for the

8  pumping station cooling system for the spent rod.

9  Power was out for only two hours.  The water did

10  not reach the boiling point, but we did have that

11  fire.  It did happen.

12          Now, one thing else I want to get at here

13  is the connection, the dot that was not connected.

14  Okay.  Remember these levels:  3 feet below the

15  floodwaters; protected by an 8-foot berm that was

16  already halfway submerged; the other reactor, 2

17  feet above the flood stage.

18          Now, across the state of Iowa, the

19  neighboring state, one watershed away, a super cell

20  released its moisture over the Dubuque area along

21  the Mississippi River.  The Mississippi River,

22  which is a bigger river, much bigger than the

23  Missouri, during that event, up to 20 inches of

24  rain fell in a six-hour period.  The Mississippi

25  River rose 5 feet in 24 hours.  Add that 5 feet --

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

BLM_0043533

## Glynn, David, Commenter ID No. T45 (Cont.)

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

65

1  if that storm cell would have released its energy
2  just a little west, the Calhoun nuclear power plant
3  would have been inundated.  The waters would have
4  gone over the top of that inflatable berm.
5        The Cooper station may have been 3 feet
6  below the floodwaters if that had happened.  So
7  what do we do with the nuclear industry, with
8  something that is so toxic?  We've got nuclear
9  weapons and we have got nuclear disaster lurking.
10       MR. CAMERON:  I'm going to have to
11 ask you to wrap up.
12       DAVID GLYNN:  I will wrap it up.
13       So my point is this:  You've got all of
14 this beautiful farmland.  What would have happened
15 if we would have had that super cell release its
16 energy just a little west and we would have
17 possibly, potentially contaminated thousands of
18 miles of the best farmland in the world.  We are
19 playing Russian roulette with the nuclear industry.
20       MR. CAMERON:  Thank you, David.
21 Glen Williams, please, and then we'll go to Hilary
22 Cooper.
23       GLEN WILLIAMS:  My name is Glen
24 Williams.  I'm a resident of San Miguel County for
25 the last 30-plus years in the Norwood area.  I have

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T45-2

T45-2     See response to T45-1.

## Goin, Wayne, Commenter ID No. E129

| From: | Wayne Goin |
|---|---|
| Sent: | Friday, November 22, 2013 10:35 PM |
| To: | mail_ulpeis |
| Subject: | Clean Up and Clean Energy! |

Dear

Dear Mr. Plieness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative", one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor"" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Wayne Goin

1

BLM_0043535

### Golden, Marcia, Commenter ID No. E40

**From:** Marcia Golden
**To:** mail_ulpeis
**Subject:** Clean Up and Clean Energy!
**Date:** Monday, May 27, 2013 11:18:48 PM

Dear

Dear Mr. Piliness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public land across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher in a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak production. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Marcia Golden

| | |
|---|---|
| E40-1 | |
| E40-2 | |
| E40-3 | |
| E40-4 | |
| E40-5 | |

E40-1  DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E40-2  Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E40-3  DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E40-4  DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043536

**Golden, Marcia, Commenter ID No. E40 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E40-5   See responses to E40-1 and E40-2.

BLM_0043537

## Gray, Dick, Commenter ID No. E57

| From: | Dick Gray |
|---|---|
| To: | mail_ulpeis |
| Subject: | Clean Up and Clean Energy! |
| Date: | Friday, May 31, 2013 8:42:31 PM |

Dear

Dear Mr. Pileness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.   **E57-1**

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak uranium development. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.   **E57-2**

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.   **E57-3**

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health.  The PEIS states only "minor'" environmental justice concerns are associated with increased uranium mining in this area.  Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.   **E57-4**

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy.  Every Coloradan has the right to a clean environment, a strong economy and a healthy community.   **E57-5**

Sincerely,

Dick Gray

---

**E57-1** DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

**E57-2** Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

**E57-3** DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

**E57-4** DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043538

**Gray, Dick, Commenter ID No. E57 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E57-5 See responses to E57-1 and E57-2.

BLM_0043539

### Gray, Dick, Commenter ID No. E99

From: Dick Gray
To: mail_ulpeis
Subject: Clean Up and Clean Energy!
Date: Thursday, June 27, 2013 8:99:10 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E99-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

E99-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

E99-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

E99-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E99-5

Sincerely,

Dick Gray

---

E99-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E99-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E99-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E99-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043540

**Gray, Dick, Commenter ID No. E99 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E99-5    See responses to E99-1 and E99-2.

## Green, Robert, Commenter ID No. E101

| From: | Robert Green |
|---|---|
| To: | mail_ulpeis |
| Subject: | Clean Up and Clean Energy! |
| Date: | Thursday, June 27, 2013 10:23:31 PM |

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to insure a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. — E101-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. — E101-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. — E101-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. — E101-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. — E101-5

Sincerely,

Robert Green

---

E101-1  DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E101-2  Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy renewables" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E101-3  DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E101-4  DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043542

**Green, Robert, Commenter ID No. E101 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E101-5     See responses to E101-1 and E101-2.

BLM_0043543

**Greene, Howard, Commenter ID No. E1**

From:
To:      mail_upes
Subject: I oppose uranium mining in western Colorado for the reasons below
Date:    Friday, April 19, 2013 8:36:36 PM

-Uranium based economies are unstable; it is a boom and bust industry that has historically failed to bring long term economic gain to our region

-The "yellow cake" market is volatile and has been in a slump since the 1980's. Any new mining would be tying up public lands for a purely speculative industry and curbing real investment from coming into the region

-Cleaning up old mine sites can create permanent jobs on the Western slope. Uranium clean up efforts not only strengthens our regional economies but creates jobs locally in our rural communities.

-The DOE can create energy by developing renewable energy projects on these disturbed sites; this same region has been recognized for its great solar energy potential!

Howard

E1-1

E1-2

E1-3

E1-1    Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

E1-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

E1-3    The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

BLM_0043544

**Final ULP PEIS**

*Appendix I: Comment Response Document*

### Greene, Howard, Commenter ID No. E16

| | |
|---|---|
| **From:** | Howard Greene |
| **To:** | mail_ulpeis |
| **Subject:** | Clean Up and Clean Energy! |
| **Date:** | Friday, May 24, 2013 1:21:15 AM |

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.  **E16-1**

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution. Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP. Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential.  **E16-2**

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in depth, localized information. The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health. The PEIS lacks a detailed analysis of water quality, wildlife and water supplies. The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.  **E16-3**

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS states only "minor"" environmental justice concerns are associated with increased uranium mining in this area. Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit. To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees.  **E16-4**

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.  **E16-5**

Sincerely,

Howard Greene

**E16-1**   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

**E16-2**   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

**E16-3**   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

**E16-4**   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043545

**Greene, Howard, Commenter ID No. E16 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E16-5   See responses to E16-1 and E16-2.

BLM_0043546

## Greene, Nicole, Commenter ID No. E24

| From: | Nicole Greene |
|---|---|
| To: | mel_uipes |
| Subject: | Clean Up and Clean Energy! |
| Date: | Friday, May 24, 2013 9:56:41 AM |

Dear

Dear Mr. Plieness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. | E24-1

Under DOE's preferred alternative, scores of existing leases would operate alongside 19 new mines during peak production. Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution. Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP. Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential. | E24-2

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in-depth, localized information. The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health. The current PEIS included a detailed analysis of water quality, wildlife and water supplies. The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. | E24-3

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS states only "minor'" environmental justice concerns are associated with increased uranium mining in this area. Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit. To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees. | E24-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. | E24-5

Sincerely,

Nicole Greene

---

E24-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E24-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E24-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E24-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043547

**Greene, Nicole, Commenter ID No. E24 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E24-5    See responses to E24-1 and E24-2.

BLM_0043548

## Greene, Nicole, Commenter ID No. E68

From: Nicole Greene
To: mail_ulpeis
Subject: Clean Up and Clean Energy!
Date: Saturday, June 01, 2013 2:22:16 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak production. Instead, DOE should substantively consider a "Clean Alternative", one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Nicole Greene

E68-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E68-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E68-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E68-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043549

**Greene, Nicole, Commenter ID No. E68 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E68-5    See responses to E68-1 and E68-2.

BLM_0043550

## Grieger, Shawna, Commenter ID No. L26

Ray Plieness
PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021


RECEIVED
MAY – 6 2013

April 25, 2013

Dear Mr. Plieness,

This letter is in response to the Draft Uranium Leasing Program Programmatic Environmental Impact Statement. I would like to record my support for your department's preferred alternative, number 4, and urge you to use it as your final management plan. In doing so, I also want to be on the record as opposing any termination of the leases.

The United States is facing several energy challenges; we are looking for ways to minimize carbon emissions, and gradually replace carbon-based energy sources; we want a reliable, long term energy alternative; and we wish to cut our reliance on foreign energy sources.

L26-1

Nuclear energy has the capacity to solve each of those problems; it is a non-carbon alternative; it is perhaps the most reliable and consistent source of electrical generation available; and we have a great deal of uranium in the United States, the greatest concentrations right here in Colorado, Utah, and Arizona. The Uranium Leasing Program that this EIS was drafted for is critical to a responsible national energy policy that includes nuclear, using domestic sources of uranium.

It is disappointing that there are those who either do not recognize the value of nuclear energy, or choose to disregard the benefits for the sake of an agenda. I wish that the people who champion the idea that all mining activity should be stopped – starting with the termination of these uranium leases – would step back for a minute and really look at the consequences of their proposals. They would see real people hurting, families struggling with extremely tough financial decisions because the jobs are not available to them that would be if mining were again permitted. They would see small business owners making the heart-wrenching decision to shut their doors, and young people moving away from their homes and families to areas that allow economic opportunity.

They would also see the unintended environmental consequences of their actions; uranium still being mined, but under far worse environmental conditions in parts of the world where environmental controls are viewed as a luxury. They would also see either a severe socio-economic disruption caused by a lack of reliable energy, or more likely, an increased reliance on coal and natural gas.

L26-2

The point is that there is no risk involved in allowing these leases to continue – the EIS has examined every part of the regional environment, and set in place plans to protect each – but enormous risks in cancelling them.

Please adopt Alternative 4, and allow responsible uranium mining to take place in this region, for the benefit of the entire country.

Yours cordially,

Shawna Grieger
642 Monarch Ct.
Grand Junction, CO 81504

L26-1   Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative. Alternative 4 provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period.

L26-2   See response to L26-1.

BLM_0043551

## Grossman, Robert, Commenter ID No. L51



Mr. Ray Plieness, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover St., Suite 1000
Westminster, CO 80021

1 July 2013

Re: DOE/EIS 0472-D

Greetings Mr. Plieness:

I am responding to the request for public comment on the Draft Uranium Leasing Program Programmatic Environmental Impact Statement DOE/EIS 0472-D published March 2013. As an expert in the field of Boundary Layer Meteorology most of my comments will bear upon air quality and evaporation.

Additionally, as a part-time resident of the area, I do also have concerns about the effects of increased transportation in the remote area of western Colorado considered on visibility, air dispersion of fine and toxic particles, the daily activities of non-mining residents, tourism, and wildlife habitat impacts.

*Importantly, I draw attention to the statement that the underlying law allowing this review of leases specifically requires that the mined uranium be for domestic use, not foreign use. Therefore, if this review is addressing access to these leases for foreign or domestic companies for other than domestic use within the USA or outlying States of Alaska and Hawaii, then the review has no meaning and the entire exercise is flawed. I would consider this point the basis of legal action. So please state in any revision of this document that the intent is only applied to domestic use of the mined material and that there is no intention now or in the future that the mined material would be sold to foreigners.*

I draw this statement from the NEPA Regulation PART 1502--ENVIRONMENTAL IMPACT STATEMENT:

"Statements shall be concise, clear, and to the point, *and shall be supported by evidence that the agency has made the necessary environmental analyses.*" Italics are mine to emphasize the fact that for these sections requiring expert knowledge of the atmospheric boundary layer, I could find no evidence of analysis, only conclusions. In this respect the PEIS needs more transparency so that citizens can rationally comment on it.

I draw this statement from the DOE PEIS document, which covers the intent of my comments:

*"Potential impacts from uranium mining at the DOE ULP lease tracts on air quality, water quality, human health, socioeconomics, transportation, views from sensitive areas, and cultural resources should be evaluated.* Chapter 4 of this Draft ULP PEIS analyzes the potential impacts associated with human health and environmental resource areas

L51-1

L51-2

L51-1   The possibility that uranium or uranium ore from the ULP may be subject to being exported does not undermine the PEIS's stated purpose and need, and does not require that the PEIS's scope be expanded to analyze the export of uranium or uranium ore. Any export of domestic uranium or uranium ore from any source within the United States, including the ULP lease tracts, is strictly regulated by Nuclear Regulatory Commission (NRC) under the terms of the AEA and the NRC regulations, which impose requirements that must be satisfied before the NRC will grant a license to export any domestic uranium or uranium ore. See AEA, 42 U.S.C. §§ 2099, 2151-2160d; NRC regulations, 10 C.F.R. §§ 110.19-110.46. For example, 42 U.S.C. § 2099 forbids the NRC from licensing any person to export from the United States any uranium ore, or other source material, if the issuance of such a license "would be inimical to the common defense and security" or the health and safety of the public; 42 U.S.C. § 2155 gives the Executive Branch the authority to veto any export of uranium ore. Many more specific requirements are imposed in the other above-cited provisions of the AEA and the NRC regulations.

Therefore, DOE's proposed action in the PEIS does not address uranium ore exports, over which the NRC, not DOE, has authority; and the scope of analysis in the PEIS does not analyze the possibility that uranium ore from the ULP may be subject to export.

In addition, the possibility that uranium ore from the ULP may be subject to export, after a prospective exporter goes through the process of applying for and receiving the necessary permission from the NRC, does not undermine the stated purpose and need for agency action: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of deposits of uranium ore in lands belonging to the United States to the extent DOE deems necessary to effectuate the provisions of the AEA (42 U.S.C. §§ 2096-2097). An active ULP program will be more successful in meeting that need than would an inactive program.

L51-2   Appendix D of the Draft ULP PEIS describes the impacts assessment methodologies applied in the analysis. Section D.1 provides information on the approach that was taken which involved estimating air pollutant emissions from mine development and operations and reclamation, and then comparing estimated annual project-related emissions of criteria pollutants and VOCs with annual emissions in the three counties that encompass the DOE ULP lease tracts. This comparison (provided in Table 4.7-12 in Chapter 4 of the Draft PEIS) indicated that these emissions would only constitute a small percentage of the three-county combined emissions. Given the small percentages estimated, further air dispersion modeling is not warranted. The emission factors applied in the Air Quality analysis are based on the EPA WebFIRE database, which contains emissions factors developed by the EPA for criteria pollutants and HAP for industrial and non-industrial processes (see URL: http://cfpub.epa.gov/webfire/). For each EPA emissions factor, WebFIRE contains descriptive information such as industry and source category type, control device information, the pollutants emitted, and supporting documentation (e.g., test reports), and was designed to be a way of publicly providing as much information as possible in the development of each emission factor. The WebFIRE approach is highly transparent. It should be noted that the WebFIRE emission factors are in general independent of the local meteorological conditions for the type of construction and reclamation equipment projected to be used in the PEIS (e.g., the amount of $CO_2$ emitted by an automobile is nearly independent of the wind speed, etc.). With timely receipt and incorporation of data from most performance tests, the EPA will be able to ensure that emission factors in WebFIRE, when updated, represent the most current range of operational practices.

BLM_0043552

**Grossman, Robert, Commenter ID No. L51 (Cont.)**



2

listed. Pot[ential] impacts on noise, so[il] [re]sources, land use, ecology, environmental justice, and waste m[ana]gement are also analyze[d]. [T]he italics are from DOE.

The way I understand it, the NEPA has two central purposes: to ensure informed agency decision-making and to provide the public with information an opportunity for meaningful involvement in the NEPA analysis. In the second respect, the NEPA requirement is similar to the peer review processes used throughout the atmospheric science professional and scientific communities, which have characterized my career. I find that the lack of competent supporting data and analysis in this DPEIS falls short of satisfying these two purposes. Therefore the current version of the DPEIS should be withdrawn for further work. I supply details below.

In fact, I find the approach used in the **Air Quality** portion of the document to be seriously outdated and not indicative of the state of the science in the 21st Century.

It appears that no air dispersion modeling was used in this PEIS but that air quality was based upon the use of an emissions factor as described below from a draft EPA document currently under review:

"Emissions factors are used to develop emissions estimates for processes and activities in cases where direct measurements are unavailable. Emissions factors are typically developed to represent long-term (e.g., annual)average emissions and, accordingly, data used for developing the emissions factors is usually based on emissions testing collected during normal process operating conditions. Short-term emissions from a particular process will vary significantly over time (i.e., within-process variability) because of fluctuations in normal process operating conditions, control device operating conditions, raw materials, *ambient conditions, and other factors. Because of the relatively short duration of emissions tests and the limited range of conditions they represent, the available emissions and process data used to develop an emissions factor are not sufficient to account for these short-term emissions fluctuations."* The italics are mine.

I bring this up because the PEIS contains no reference to atmospheric modeling, air dispersion modeling and relies heavily upon an EPA site called WebFIRE for emissions estimates. WebFIRE is not transparent concerning winds or locations associated with the various categories. Note that there is an admission of the lack of reasonable estimates of uncertainty in these emissions estimates and that they are likely either zero-wind speed or based upon long-term, annual wind speed averages from undefined locations. Local, and highly variable, wind and surface conditions in the area, briefly discussed, were not taken into account. In fact, this reviewer could not find any estimate of uncertainty associated with the emissions. So-called average values based on obscure references without any estimate of uncertainty provides no information to local planners, governments, or citizens. **This fact alone invalidates the entire document's intent with respect to air quality and visibility. It is compounded by the lack of transparency with regard to how the emissions estimates for the region considered were arrived at.**

There are two ways to form an average using a model: 1. Apply average conditions to the model and determine a single outcome. This is called a deterministic solution; a single number, as published in the PEIS, with no account of variability. For instance there is no way to statistically determine if this average exceeded a threshold or was different from another average. 2. Apply 'realistic' and variable conditions to the model over the period of interest, accumulate the results into a frequency

L51-2 (Cont.)

L51-3

The WebFIRE emission factors do not currently account for uncertainty but a study was recently conducted to evaluate and develop adjustments to account for the uncertainty of WebFIRE air emission factors by RTI International on behalf of EPA (see URL: http://www.epa.gov/ttnchie1/conference/ei15/session14/neulicht.pdf). It appears that the results of this recent study have not been integrated in the WebFIRE database as of July 22, 2013. However, inclusion of uncertainties in the WebFIRE emission factors would not change the conclusion that emissions from PEIS activities would only constitute a small percentage of the three-county combined emissions.

L51-3    We we agree that meteorological variability and wind field modeling can be important issues, but at this time, site-specific proposals and detailed plans have not been developed, and such considerations are appropriate when such site-specific proposals have been made by the lessees. At that time, site-specific NEPA reviews as required would be conducted.

BLM_0043553

**Grossman, Robert, Commenter ID No. L51 (Cont.)**

3

distribution, and statistically analyze that frequency distribution with respect to thresholds and other averages. This, probabilistic solution, is much closer to reality than 1. above, which provides no information, and comes from an age of low computational ability long gone. Since most advanced-nation's meteorological services use probabilistic or ensemble modeling routinely these days, DOE should do the same. It is not impossible in the 21st Century as it was only two decades ago.

Furthermore, internal variability within the dispersion model needs to be checked and associated with 'reality'. This is done by slightly changing inputs and monitoring the output; there are very sophisticated ways to do this. This is because the atmosphere is inherently non-linear with feedbacks. So it might be, as with most current atmospheric models, that internal variability should also be a part of the analysis.

For instance, local, "unavailable" wind conditions could be modeled by any number of excellent mesoscale models set up for the PEIS region, and those wind conditions at very high time resolution could be applied to dispersion models at each of the mine sites. Of course that is complicated, computer intense work and subsequent analysis but that is what the taxpayers who support you expect. Professionals do the best work possible instead of 'squeek through'; something the occasional student is successful at when the professor is tired.

Variability is important. Just ask the planners in New York City and New Orleans about accounting for atmospheric variability with respect to hurricanes. The late Professor Herbert Riehl, founder of the world-class Colorado State University Atmospheric Science Department, often would joke about climatic averages and variability citing low annual average precipitation at a given desert station and then say that was due to one storm a decade ago that flooded the region.

**I submit my testimony regarding air-dispersion in the region of interest during a court-ordered Judicial Arbitration Hearing in Nucla, Colorado, 7-13 Nov 2012 regarding the Pinon Ridge Uranium Mill** as evidence that these factors must be taken into account: properly documented zero-wind emissions to be applied to a realistic, ensemble air-dispersion model with the ability to account for ambient dust scouring, complex terrain, variable upper winds and with realistic (15-min averages with gusts) surface wind information as input. The region is subject to violent, hours-to-days-long wind storms as documented by regional observations and specifically analyzed by myself as contained in the attached testimony. So I read with amazement this statement in the PEIS Summary: "While the existence of ore stockpiles during active mining operations is expected, the duration is not expected to affect human health or the environment. The Colorado State regulations prohibit the stockpiling of or at mine sites for more than 180 days." Several strong wind events could occur within that period dispersing those ore piles and increasing evaporation by an order of magnitude. And what is to stop a miner from getting rid of pile 1 in 180 days while constructing pile 2 or 3?

The PEIS states this with regard to **Visual Impacts** for Alternative 3, noting that Alternative 4 is more intense usage: "Visual Impacts: The operation of open-pit and underground mines also might create dust, which could be composed of fine particles generated from the mechanical disturbance of rock and soil, bulldozing, blasting, and vehicles traveling on dirt roads. Particles might also be

| | |
|---|---|
| L51-3 (Cont.) | |
| L51-4 | L51-4    All phases and aspect of uranium mining at the ULP lease tracts including protocols for stockpiling ore have to comply with the lease agreements, Federal, state, and local requirements. These regulations have been established to provide protection of the environment and human health. |
| L51-5 | L51-5    Text has been added to the Air Quality section as suggested to assure consistency between the Visual Impacts and Air Quality sections (see 4.4.1). |

BLM_0043554

*Final ULP PEIS*

**Grossman, Robert, Commenter ID No. L51 (Cont.)**

4

mobilized by wind blowing over ore stockpiles (National Research Council 2012). The suspension and visibility of dust would be influenced by vehicle speeds, road surface materials, and weather conditions (DOE 1995a)." This is not mentioned or accounted for in the Air Quality section. In other words, there is no analysis of the cumulative impact of a major regional mining operation on air dispersion of dust and potential toxic materials from mine sites, uncovered or partially covered trucks, and dusty roads. As stated earlier, this can and should be modeled in a revised PEIS. All of the fine particle dispersion noted above is subject to the same violent wind storms mentioned earlier.

L51-5<br/>(Cont.)

As an expert in land-atmosphere interaction and boundary layer meteorology, **I want to bring attention to the estimates of water usage for these mining operations.** Water in the region is a well-known limiting resource. There is not enough to go around for everyone to have 100% of what they need. Water law in the West is very complex so sources are often under judicial review. Conservation Districts constantly lament the 'over-commitment' of water resources. Two things are not discussed in the PEIS with respect to this limiting factor: regional climate change, availability or impact on water resources associated with increased mining, and water storage/evaporation from tailing and used materials ponds. Results from regional climate models, increasing in sophistication since first introduced almost twenty years ago, all point to increasing temperature and decreasing moisture for the region. Regional water balance is rapidly changing as evaporation increases and precipitation decreases, decreasing the amount 'in storage' as ground water, lakes, rivers, and reservoirs. This was not taken into account. Further, the increase in temperature, associated with clear sky conditions, will affect the estimates of evaporation from lakes, reservoirs, and rivers. This is due to the effect of temperature on the atmosphere's ability to contain water vapor, called the saturation vapor pressure, encapsulated in the famous Clausius-Clapeyron equation. This equation is highly non-linear as the graph below indicates:

L51-6



Notice differences in saturation vapor pressure increase with increasing temperatures. Above about 20C, small increases in temperature result in large changes in saturation vapor pressure.

L51-6   Because water would be trucked in from outside the local area during reclamation, there would be no diversion of water from domestic, commercial, industrial, or agricultural uses. Moreover as mining and reclamation activities analyzed as part of the proposed leasing program would be small in scale, it is unlikely that competition for workers, equipment and other resources, including water, would be sufficient to threaten the continued operation of existing private or public sector activities. Environmental justice impacts of mining and reclamation activities under the proposed program, such as radiological air emissions, soil erosion, water quality, subsistence, visual, property values impacts, are expected to be minor, and there would be no impacts on water use for cultural, religious activities.

The effect of climate change for the near term (within future 20 years) is more uncertain than those for the mid-long term (future 50-100 years). Because of this uncertainty, the water use for mining activities was estimated from the current water use.

Section 3.4.3 explains that water rights in Colorado are governed by using the Doctrine of Prior Appropriation and are granted by a water court system and administered by the CDWR. Water allocation for each mining project would be identified when the specific mining plan is developed and the water development plan for the water supply would address options of either applying for a state water right permit or purchasing from another region. The PEIS analyzes the impact of uranium mining leasing and does not make judgments about whether water should be appropriated to prioritize agriculture, industry and local business, or uranium mining. The PEIS does state that employment required for mining and development operations would be relatively low, would not likely disrupt communities, and could provide an additional $15.6 million in income.

*Appendix I: Comment Response Document*

BLM_0043555

### Grossman, Robert, Commenter ID No. L51 (Cont.)

5

Evaporation can be calculated in various ways but a standard is the use of a gradient-type formula involving the difference between the saturation vapor pressure at the surface of the body of water using water surface temperature and that of the ambient air, in this case very dry desert air, with a, sometimes complex, exchange coefficient that accounts for the atmospheric transport. Thus small changes in water surface temperature can result in large changes in evaporation for unchanging wind speed or exchange coefficient. This can be due to a combination of climate change and poor assumptions regarding the estimate of water surface temperature used for the calculation. I suggest that because of these two errors, evaporation is seriously underestimated for the PEIS and needs to be seriously reexamined. I even suggest that some of the technicians involved make field trips to the region with instrumentation as it is evident that they had no first-hand knowledge of the area.

I would argue from a **Socio-Economic point-of-view** that in a region of decreasing water resources, local agriculture and domestic (township, business, light and heavy industry) use trump uranium mining. The former form the backbone of economic and social cohesion in the area. There is no way uranium mining can come close to the positive impact the other two uses make in the region. This is substantiated in the PEIS, which states that employment would not increase much for Alternatives 3 and 4 (on the order of 1%). In other words, the industrialization of the landscape does not help local population, which is increasing in the area, but those far from the disturbance area; they get the bulk of the monetary profit, not local folk. The local population and cultural artifacts, some of which are in current use by tribes, will experience more harm than good for this proposal. This citizen can see no positive impact in that regard. What I see in the document is a lot of discussion about the potential for harm ("could", "if", "might" as operative words) with no balance of positive impacts from the proposal. They should be elucidated.

For **Transportation Impacts** I'll use Alternative 3, noting that Alternative 4 is more intense. For Alternative 3, assuming 25 tons of uranium ore per truck and round-trip travel, the traffic volume would be 80 truck trips per day (40 round trips per day) and 10 truck trips per hour (for 8-hour operation). Since local surface water and groundwater sources are scarce and often of relatively poor quality with high TDS, it is assumed that the water supply would be trucked to the site from another region. This works out to a minimum of 9,600 round-trips from mine to mill during the peak year. From the accompanying TABLE 4.3-13 Peak-Year Collective Population Transportation Impacts under Alternative 3 this works out to 115 deaths and 1,344 injuries for that year if Pinon Ridge Mill was in operation and used; higher if the ore was milled at White Mesa Mill. Yet the PEIS states that no fatalities are expected to occur. This needs to be resolved. Roads in the region, even US and State Highways are remote, unforgiving with steep shoulders, often run close to or directly to the side of major waterways. Spills will be inevitable and the PEIS does not discuss how they will be handled.

**In summary,** based on my observations and analysis of the region, I would expect the DPEIS to address the following:

1. The effect of violent wind storms on air dispersion of ore, radionuclides (including those that may be attached to dust) and toxic material including the scouring of material by ambient dust during the storms and using available 15-min averaged wind data and gusts. For areas without observations and a more general approach, use ensemble winds generated from a mesoscale model tuned to the area in question and then use ensemble air dispersion model results for a statistical analysis and summary. During low wind conditions in summer, estimate the impact of dust devils on increased disturbed land and roads.
2. The effect of climate change on water resources needed for the various alternatives as storage is forecast to decline.

L51-6 (Cont.)

L51-7

L51-8

L51-7   The transportation impacts presented in Table 4.3-13 are for the peak year as noted in the table title. Thus, the range of fatalities for one year of operation of the lease program is 0.012 to 0.060 according to the examples presented. The "Accidents per Round Trip" table heading above injuries and fatalities denotes that the empty return trip by the uranium haul trucks after each loaded ore shipment was considered in the total distance used for the injury and fatality estimates. Single shipment impacts are presented in Table 4.3-17. Accidental transportation spills are presented in Section 4.3.10.4.

L51-8   In the PEIS, potential air quality impacts from activities at ULP lease tracts were analyzed by comparing estimated emissions from activities on the lease tracts to total emissions for three counties (Mesa, Montrose, and San Miguel). At this DPEIS stage, no specific proposals have been made and site-specific information (such as the size and location of project, construction and operating schedules, staffing, and equipment inventories) are not available. Without such data, conducting detailed air quality modeling would be premature. During permit review for specific projects, detailed and realistic emission inventories and air dispersion modeling including near-field and far-field analyses (e.g., visibility, acid deposition, and/or ozone) at sensitive receptors (such as residences, wildlife habitats, nearby federal Class I areas and Colorado's sensitive Class II areas) would be required by leasing and permitting agencies.

Site-specific analysis of noise impacts would also be required when a proponent applies for a lease and a permit.

**Grossman, Robert, Commenter ID No. L51 (Cont.)**

6

3. The assumptions used in the calculation of evaporation from tailing ponds, other evaporative ponds, and needs for dust mitigation.
4. The cumulative effect of increased truck traffic on feeder roads on dispersion of fine particles and visibility.
5. The effect of ducting in the lower atmosphere on sound propagation.

My review of the DPEIS has revealed that the DPEIS lacks evidence concerning emission, fate, and transport of pollutants and dust in context of the complex topography and actual meteorological conditions at and near mines that are found on mesa tops, canyon walls, and in river corridors. Likewise, the DPEIS is not based on modern methodology and modeling is non-existent. Methods are available that would provide the evidence and analysis on which one could judge the emissions and transport of pollution from these mines. The DPEIS does not allow me or other experts to provide informed comments, the DPEIS should be withdrawn, revised, and reissued.

L51-8
(Cont.)

Sincerely,

Robert L. Grossman, PhD,
    American Meteorological Society Certified Meteorological Consultant #392
6215 Baseline Rd. Boulder, CO 80303
and
99 Indian Ridge Trail, Norwood, CO 81423
grossman@colorado.edu

BLM_0043557

## Hallenberg, Steven, Commenter ID No. T21

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

24

1       Mr. Hallenburg, do you want to say
2   something? And then we're going to go to Glen
3   Williams, Betty Oglesby and Wally Smith.  And this is
4   Steven Hallenberg.
5       STEVEN HALLENBURG:  Good evening.
6   Respectfully, I'd like to submit my name is Steven
7   Hallenburg, I live here in Montrose, Colorado.  Been
8   here since 1990.  I work in an industry that is
9   governed by regulations.  I work for a local company.
10  I live here; I work here.  But it's driven by
11  regulations.
12      And as you saw in some of the presentation
13  here, they refer to the CFR, and they refer to other
14  things. That's great, and that's what they should do.
15  I'm not opposed to the mining of uranium, but just
16  some of the facts that are related to this.
17      The Energy Fuels company, that's a Canadian
18  company.  And it has been reported in the Denver paper
19  that this uranium will be going out of the country.
20  Now, if you watched the presentation, right at the
21  beginning, it said that it was for domestic use.
22      Well, I believe in that.  I think that if we
23  are going to mine uranium, vanadium, or these rare
24  earths, then it should be utilized in this country.
25  That is the whole point of using our resource, okay?

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T21-1

T21-1    The possibility that uranium or uranium ore from the ULP may be subject to being exported does not undermine the PEIS's stated purpose and need, and does not require that the PEIS's scope be expanded to analyze the export of uranium or uranium ore. Any export of domestic uranium or uranium ore from any source within the United States, including the ULP lease tracts, is strictly regulated by Nuclear Regulatory Commission (NRC) under the terms of the AEA and the NRC regulations, which impose requirements that must be satisfied before the NRC will grant a license to export any domestic uranium or uranium ore. See AEA, 42 U.S.C. §§ 2099, 2151-2160d; NRC regulations, 10 C.F.R. §§ 110.19-110.46. For example, 42 U.S.C. § 2099 forbids the NRC from licensing any person to export from the United States any uranium ore, or other source material, if the issuance of such a license "would be inimical to the common defense and security" or the health and safety of the public; 42 U.S.C. § 2155 gives the Executive Branch the authority to veto any export of uranium ore. Many more specific requirements are imposed in the other above-cited provisions of the AEA and the NRC regulations.

Therefore, DOE's proposed action in the PEIS does not address uranium ore exports, over which the NRC, not DOE, has authority; and the scope of analysis in the PEIS does not analyze the possibility that uranium ore from the ULP may be subject to export.

In addition, the possibility that uranium ore from the ULP may be subject to export, after a prospective exporter goes through the process of applying for and receiving the necessary permission from the NRC, does not undermine the stated purpose and need for agency action: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of deposits of uranium ore in lands belonging to the United States to the extent DOE deems necessary to effectuate the provisions of the AEA (42 U.S.C. §§ 2096-2097). An active ULP program will be more successful in meeting that need than would an inactive program.

BLM_0043558

**Hallenberg, Steven, Commenter ID No. T21 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

25

1    So I think it's a bit of a conflict when I
2  see the fact that this is a Canadian company.  These -
3  - this uranium is going to be going through China,
4  just so we're clear here, all right?
5    So many of our resources that we mine,
6  whether it's oil, gas, or some of these minerals, they
7  don't just stay here.  I believe ideally it would be
8  good if they were.  And I'm not opposed to jobs at
9  all.
10    But finally, what I would like to say is
11  having, you know, worked in and in a regulated type of
12  business, which is the gas industry, I would just like
13  to say that the air quality and the water quality,
14  it's a very sensitive thing that we deal with living
15  in this area.
16    And any of you that live here -- obviously I
17  know some of you, I mean, we want the best of both
18  worlds. We want to be able to use this resource, maybe
19  provide jobs; but if we don't have, you know,
20  independent inspection agencies actually monitoring
21  the air and monitoring the water constantly while
22  these -- if this goes through, then I think it's just
23  a total lack of, you know, proper oversight that we
24  need for our very sensitive ecological area.  Thank
25  you.

T21-1
(Cont.)

T21-2

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T21-2    Comment noted. DOE considered all comments received on the Draft PEIS and the results of
the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

## Hallenborg, Lesley, Commenter ID No. E116

| From: | Lesley Hallenborg |
|---|---|
| To: | mail_ulpeis |
| Subject: | Clean Up and Clean Energy! |
| Date: | Saturday, June 29, 2013 10:07:26 AM |

Dear

Dear Mr. Piloness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.  `E116-1`

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.  `E116-2`

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.  `E116-3`

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health.  The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area.  Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.  `E116-4`

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy.  Every Coloradan has the right to a clean environment, a strong economy and a healthy community.  `E116-5`

Sincerely,

Lesley Hallenborg

---

E116-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E116-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E116-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E116-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043560

**Hallenborg, Lesley, Commenter ID No. E116 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E116-5    See responses to E116-1 and E116-2.

BLM_0043561

**Hallenborg, Steven, Commenter ID No. E123**

From:        Steven Hallenborg
To:          mail_users
Subject:     Clean Up and Clean Energy!
Date:        Monday, July 01, 2013 8:35:29 AM

Cear

Dear Mr. Pikeness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

| E123-1 |

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

| E123-2 |

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

| E123-3 |

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health.  The PEIS states only "minor'" environmental justice concerns are associated with increased uranium mining in this area.  Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

| E123-4 |

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy.  Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

| E123-5 |

Sincerely,

Steven Hallenborg

E123-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E123-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E123-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E123-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Hallenborg, Steven, Commenter ID No. E123 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E123-5   See responses to E123-1 and E123-2.

BLM_0043563

**Halpern, Stuart, Commenter ID No. E95**

From: Stuart Halpern
To: mail_ujoes
Subject: Clean Up and Clean Energy!
Date: Thursday, June 27, 2013 6:34:12 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Stuart Halpern

E95-1

E95-2

E95-3

E95-4

E95-5

E95-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E95-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E95-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E95-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043564

**Halpern, Stuart, Commenter ID No. E95 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E95-5   See responses to E95-1 and E95-2.

BLM_0043565

**Harrison, Zackoree, Commenter ID No. E17**

From:       Zackoree Harrison
To:         mail_ulpeis
Subject:    Clean Up and Clean Energy!
Date:       Friday, May 24, 2013 6:36:31 AM


Dear

Dear Mr. Piloness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests.  For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E17-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations.  Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives.  Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution.  Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP.  Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential.

E17-2

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in depth, localized information.  The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health.  The current PEIS lacks a detailed analysis of water quality, wildlife and water supplies.  The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

E17-3

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination.  The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area.  Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit.  To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees.

E17-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy.  Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E17-5

Sincerely,

Zackoree Harrison

E17-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E17-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E17-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E17-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Harrison, Zackoree, Commenter ID No. E17 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E17-5   See responses to E17-1 and E17-2.

BLM_0043567

**Final ULP PEIS**

*Appendix I: Comment Response Document*

**Harrison, Zackoree, Commenter ID No. E90**

| | |
|---|---|
| From: | Zackoree Harrison |
| To: | mail_ulpeis |
| Subject: | Clean Up and Clean Energy! |
| Date: | Thursday, June 27, 2013 4:52:57 PM |

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. — E90-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. — E90-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. — E90-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation from private companies to profit. — E90-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. — E90-5

Sincerely,

Zackoree Harrison

---

E90-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E90-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E90-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E90-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043568

**Harrison, Zackoree, Commenter ID No. E90 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E90-5   See responses to E90-1 and E90-2.

BLM_0043569

## Hayes, Joe, Commenter ID No. E36

From: Joe Hayes
To: mail_users
Subject: Clean Up and Clean Energy!
Date: Friday, June 28, 2013 7:17:20 AM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E36-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak production. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

E36-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

E36-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

E36-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E36-5

Sincerely,

Joe Hayes

---

E36-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E36-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E36-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E36-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Hayes, Joe, Commenter ID No. E36 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E36-5   See responses to E36-1 and E36-2.

BLM_0043571

**Hayes, Joe, Commenter ID No. E105**

From:      Joe Hayes
To:        mail_ulpeis
Subject:   Clean Up and Clean Energy!
Date:      Sunday, May 26, 2013 1:07:10 PM

Dear

Dear Mr. Pleness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations.  Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives.  Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health.  The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area.  Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Joe Hayes

E105-1

E105-2

E105-3

E105-4

E105-5

E105-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E105-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E105-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E105-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Hayes, Joe, Commenter ID No. E105 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E105-5   See responses to E105-1 and E105-2.

**Hazelhurst, Sean, Commenter ID No. L11**

April 18th, 2013



RECEIVED
APR 2 9 2013

Office of Legacy Management
U.S. Department of Energy
ATTN: Mr. Ray Plieness
11025 Dover Street, Suite 1000
Westminster, CO 80021

Ref: Draft Uranium Leasing PEIS

Dear Mr. Plieness,

I am writing to support Alternative 4 of the above referenced Programmatic Environmental Impact Statement. This Alternative would provide the greatest benefit to the American people, in that it allows development of uranium resources, which are vital to promoting U.S. energy independence and contribute to a cleaner environment.

Nuclear power is a safe, clean, inexpensive, and sustainable source of electricity, which could provide for our nation's energy needs for generations to come. We are lucky to be blessed with an abundance of uranium in the western U.S., and it should be a national priority to develop those resources. Right now, over 90% of the uranium we use comes from foreign countries. There is no reason for us to be enriching these other countries when we have the resources, ability, and need to produce it at home. Why, for instance, when much of western Colorado is suffering double digit unemployment, would we be content with sending mining jobs overseas rather than putting our own people to work in an industry that is historically part of the region?

It would also be a mistake to think that in developing our own uranium resources that we would be causing damage to the planet. First, this PEIS has outlined in great detail the potential impacts to the environment of development, and has indicated, like earlier studies, that there would be no significant effects. It has also described mitigation procedures to be followed. Secondly, this level of attention would most likely not be placed on similar mining operations elsewhere in the world. Not only is our regulatory environment much more stringent, but the methods we use are more advanced than in many parts of the world. I for one would rather see our own uranium being produced with more "green"-friendly practices than see it done more carelessly elsewhere.

I hope that you will continue to support a domestic uranium industry by adopting your preferred alternative, number 4.

Signed,
Sean Hazelhurst
1410 Windsor Park Drive
Fruita, CO 81521

L11-1

**L11-1**   Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative. Alternative 4 provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period.

L11-2

**L11-2**   See response to L11-1.

BLM_0043574

**Heinrich, Mindi, Commenter ID No. L27**



April 22, 2013

Mr. Ray Plieness
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

RECEIVED
MAY - 6 2013

Re: ULP PEIS

Dear Mr. Plieness,

I believe that Alternative 4 should be selected for this PEIS, based on the minimal environmental impact associated with retaining and developing the leases, as well as the socio-economic benefits that would be realized.

Mining is not a new phenomenon to this region -- in fact this area has a long history of mining, and sports a considerable number of existing and abandoned mines. Mining has co-existed with other resources in the region for quite some time. The impacts are well established, easily dealt with or mitigated, and not incompatible with existing natural features. Moreover, the development in question would not result in the construction of particularly large and impactful mining operations, but rather lead to mainly small or medium size mines.

The procedures and policies put in place by the mining industry ensure that extraction is done in a safe, efficient, responsible manner. The technology employed in today's mines protects the health of the workers, public, and environment, and is much more efficient than in times past, resulting in less waste and damage. These policies and procedures are augmented by strict environmental laws which help ensure that American mineral products, such as uranium, are harvested in the most sensitive manner possible.

These are buttressed even further on public lands with the inclusion of NEPA analyses, which are applied to all operations on government owned property. The EIS conducted in this case was a very thorough and intense examination of the many different elements of the surrounding area, including analysis of potential impacts to water quality and supply, air quality, endangered and threatened species and wildlife habitat, vegetation, erosion, and other factors. The conclusion reached was that keeping the leasing program in place would have no detrimental impact on the region's environment.

In light of these findings, I agree with the DOE's assessment that Alternative 4 reflects the best option going forward.

Regards,

*Mindi Heinrich*

Mindi Heinrich
1369 B Aspen Way
Delta, CO 81416

L27-1

L27-1   Comment noted. DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative. Alternative 4 provides for the continuation of the ULP (with exploration and mine development /mine operation, and reclamation) at the 31 lease tracts for the next 10-year period or for another reasonable period.

**Heuscher, Penny, Commenter ID No. E120**

| From: | Penny Heuscher |
|---|---|
| To: | mail_pieces |
| Subject: | Clean Up and Clean Energy! |
| Date: | Sunday, June 30, 2013 9:41:17 AM |

Dear

Dear Mr. Pilpness:

Although this comment is intended for action regarding Western Colorado, I would like to remind you that there is a high incidence of CANCER in the Navajo Nation in Northeastern Arizona close to Colorado. The Cornfields Chapter, four years ago began a Cornfields Chapter Cancer fund to assist twelve members including children with the effort to travel for medical care. It has been documented that the incidence of cancer is contributed to the tailings left on nearby lands and due to water contamination.

This and previous documentation of tailings effects in our Colorado uranium miners and their children who breathed the dust the miners brought home on their clothes provides the basis and the reasoning for the Department of Energy to include cleanup projects in the PEIS.

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative", one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. The CORNFIELDS CHAPTER does FUNDING RAISING BY SELLING THEIR WOVEN RUGS TO RAISE MONEY FOR THEIR URANIUM AFFECTED CANCER PATIENTS.

Our lands take many years to recover from mining and therefore bonding must be adequate to provide long term results showing the land has been reclaimated. The DOE after certifying total recovery would then release the company from obligation. When public lands as well as private lands are mined proof of reclamation must be provided.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E120-1

E120-2

E120-3

E120-4

E120-5

E120-6

E120-1   Comment noted. Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and are not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

E120-2   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E120-3   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E120-4   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E120-5   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

## Heuscher, Penny, Commenter ID No. E120 (Cont.)

Sincerely,

Penny Heuscher

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E120-6   See responses to E120-1 and E120-2.

BLM_0043577

**Hiatt, Nina, Commenter ID No. E5**

From:       Nina Hiatt
To:         mail_uleis
Subject:    Clean Up and Clean Energy!
Date:       Thursday, May 23, 2013 7:47:46 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution. Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP. Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential.

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in-depth, localized information. The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health. The PEIS lacks a detailed analysis of water quality, wildlife and water supplies. The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit. To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Nina Hiatt

E5-1

E5-2

E5-3

E5-4

E5-5

E5-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E5-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E5-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E5-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043578

**Hiatt, Nina, Commenter ID No. E5 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E5-5   See responses to E5-1 and E5-2.

BLM_0043579

### Hiatt, Nina, Commenter ID No. E70

| From: | Nina Hiatt |
|---|---|
| To: | mail_uloes |
| Subject: | Clean Up and Clean Energy! |
| Date: | Thursday, June 27, 2013 3:50:52 PM |

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E70-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

E70-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

E70-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

E70-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E70-5

Sincerely,

Nina Hiatt

E70-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E70-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E70-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E70-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043580

**Hiatt, Nina, Commenter ID No. E70 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E70-5    See responses to E70-1 and E70-2.

BLM_0043581