**Townsend, Carl, Commenter ID No. E48 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E48-5    See responses to E48-1 and E48-2.

BLM_0043818

## Turner, Greg, Commenter ID No. L29

Ray Plieness, DOE
Office of Legacy Management
11025 Dover Street, Suite 1000
Westminster, CO 80021


RECEIVED
MAY − 6 2013

April 22, 2013

Re: Draft uranium leasing document

Dear Mr. Plieness,

I wish to thank the Department of Energy for this opportunity for public comment on the important matter of uranium leasing. As a resident of western Colorado, I would like to take advantage of the opportunity to express to you my staunch support for uranium mining and nuclear energy in general, and for Alternative 4 (the preferred alternative), specifically.

The politics of nuclear power are complicated and long-standing; but the reality on the ground is somewhat clearer for those who would benefit from expanded development of our uranium resources. For us it means jobs, income, and prosperous, growing communities. Conversely, terminating the uranium leasing program, as described in some of the other alternatives, would do nothing but prolong unemployment, and dash the hopes of a brighter economic future for many western communities.

An EA completed in 2007 found that the Uranium Leasing Program would pose no significant impacts to the environment. While that was challenged by certain extremist groups, and ultimately thrown out by a friendly court, the current lengthier and more detailed EIS bears out the findings of the original study. It should be remembered that the mines proposed and foreseen in the program are not gigantic open pits – they are smaller, underground mines utilizing technology that both increases efficiency and leaves a smaller imprint. It should not come as any surprise that the wider environmental impacts would be negligible.

Decisions such as this should be based on honest study, scientific analysis, and empirical evidence – not on emotion and political agendas. The groups that are advancing those agendas, and pushing for alternatives that could cancel the leases, seem to not only disregard the hard work and objective scientific efforts that have gone into the NEPA process thus far, but also give absolutely no consideration to the socio-economic factors involved in these decisions, or to how important those factors are to people.

Those of us who live, work, and raise families in western Colorado DO understand how important this issue is, because we are the ones who either benefit from the development of these leases, or suffer from their termination. We understand other things as well. We understand how important the product, uranium, is to the nation's energy supply and security. We understand the need to preserve our natural heritage, and we also understand that development and conservation are not mutually exclusive.

I hope and trust that the DoE understands these things as well, and am encouraged by your selection of Alternative 4 as your preference.

Sincerely,

Greg Turner
P.O. Box 1059
Delta, CO 81416

| | | |
|---|---|---|
| L29-1 | L29-1 | Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative. |
| L29-2 | L29-2 | See response to L29-1. |

**Unfred, Alisa, Commenter ID No. L14**

Ray Plieness
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021



APR 2 9 2013

April 22, 2013

Ref: Draft Uranium Leasing Programmatic EIS

Dear Mr. Plieness,

I strongly support Alternative 4, the DoE's preferred alternative, which preserves all of the 31 uranium leasing tracts for potential development.

Uranium is a highly valuable national resource that is found in abundant quantities in parts of the western United States. As a feedstock for clean, sustainable nuclear energy, its value is likely to grow over time. This resource can be mined with very little risk to human and environmental health, especially here in the U.S. Its recovery will provide many high-paying jobs, and residual economic benefits to local areas. And it will also add to the likelihood of American energy independence.

With all of these benefits, it's hard to believe there would be any serious resistance to a comprehensive plan to mine it.

The organized efforts to block these mining leases have nothing to do with environmental protection or human health, neither of which is threatened by any reasonably foreseeable development within the ULP planning area.

The opposition is centered around a corrupted and misguided political agenda to halt mining and all other mineral development on public lands. These groups represent a handful of extremists who do not reflect the views of the overwhelming majority of the people who live in the areas that will directly benefit from the development.

As we have seen with previous litigation, write-in campaigns and the like, they are a very noisy element of society that is not content with letting the process work. That is why they have shown such contempt for your agency's efforts in analyzing the environmental impacts of the program, such as the 2007 EA. I have little doubt that they will display similar contempt for your Preferred Alternative.

But please know that they are just a particularly vocal special interest group, without much in the way of public support, and nothing in the way of facts and science. Your office has done a superb job in developing this PEIS, like the EA before it, and I applaud you for your efforts.

I close with a final appeal to listen to reason, science, and the wishes of the people who live in this area and work in these mines, and adopt your well-though-out preferred Alternative 4.

Sincerely,

Alisa Unfred
623 Hamlet Street
Grand Junction, CO 81506

| | | |
|---|---|---|
| L14-1 | L14-1 | Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative. |
| L14-2 | L14-2 | See response to L14-1. |

BLM_0043820

## Unfred, Craig, Commenter ID No. L15

April 23rd, 2013

Ray Plieness, PEIS Document Manager
Draft Uranium Leasing Programmatic Environmental Impact Statement
11025 Dover Street, Suite 1000
Westminster, CO 80021




Dear Mr. Plieness and staff,

As a resident of western Colorado, where a considerable amount of the nation's uranium resources are located, I would like to support the preferred alternative '4' which would continue the uranium leasing program on all 31 tracts.

I subscribe to an "all-the-above" approach to energy development strategy for America, and believe that nuclear power needs to be a major part of any comprehensive energy plan. It is estimated that this region contains hundreds of thousands of tons of uranium, enough that we could begin to decrease our dependence on foreign uranium imports, which currently meet about 92% of America's uranium needs. Mining and processing this resource in America will give jobs to hundreds of American workers and stimulate the local economies. These will not be low-wage jobs either, but high-paying, high skill, and in many cases, high tech jobs. This leasing program presents a dual opportunity for America – greater energy self-sufficiency, and economic growth, at a time when both are sorely needed.

This PEIS is the product of many hours of concerted effort on the part of many people, organizations, and agencies, and has more than adequately satisfied the NEPA requirements. As a matter of fact, considering the nearly identical conclusions, one could say that the 2007 Environmental Assessment, which resulted in a finding of "no significant impact" from the project on the environment, was in retrospect also adequate. Nevertheless, the more detailed and specific EIS covered each and every aspect of the regional environment, and came to the conclusion that the leasing program posed no significant risks.

In light of the EIS's findings, it is very appropriate that the DoE selected alternative 4 as its preferred alternative. That alternative leaves available the opportunities presented to this country by uranium – clean, abundant, affordable energy for long into the future. The other alternatives, unfortunately, offer only to deny these opportunities by terminating all or part of the leasing program. This would be a tragically short-sighted mistake.

Selecting Alternative 4 fits with and advances the DOE's mission to "ensure America's security and prosperity by addressing its energy, environmental and nuclear challenges through transformative science and technology solutions."

America is a land blessed with an abundance of energy resources, and it is as irresponsible of us to not develop it for the present and future good of our nation and our people, as it would be to do so in an environmentally hazardous manner. This EIS, and the efforts of hundreds in government and private industry ensure that development will take place in the responsible manner demanded by the American people.

Alternative 4 offers the best route for applying an "all-the-above" energy strategy, creating local wealth and job growth, and securing America's energy future. I trust that the Department will continue to realize this, and proceed as planned with the leasing program.

Sincerely,

Craig Unfred
623 Hamlet Street
Grand Junction, CO 81506

| L15-1 | L15-1 | Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative. |
| L15-2 | L15-2 | See response to L15-1. |

## van West, Rein and Jan, Commenter ID No. E86

From: Rein van West
To: mail_uipers
Subject: Clean Up and Clean Energy!
Date: Friday, June 28, 2013 7:25:12 PM

Dear

Dear Mr. Pikeness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. Thank you for taking my comment.

Sincerely,

Rein and Jan van West

Rein van West

E86-1

E86-2

E86-3

E86-4

E86-5

E86-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E86-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E86-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E86-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043822

**van West, Rein and Jan, Commenter ID No. E86 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E86-5    See responses to E86-1 and E86-2.

BLM_0043823

## van West, Rein and Jan, Commenter ID No. E112

From: mail_ulpeis
To:
Subject: FW: Clean Up and Clean Energy!
Date: Tuesday, June 25, 2013 11:12:38 AM

-----Original Message-----
From: Rein van West [
Sent: Monday, June 24, 2013 5:03 PM
To: mail_ulpeis
Subject: Clean Up and Clean Energy!

Dear

Dear Mr. Pfieness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions. | E112-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative", one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies. | E112-2

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region. | E112-3

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit. | E112-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community. | E112-5

Sincerely,

Rein and Jan van West
Ridgway, CO

---

E112-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties would be based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E112-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E112-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E112-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043824

**van West, Rein and Jan, Commenter ID No. E112 (Cont.)**

Rein van West

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E112-5    See responses to E112-1 and E112-2.

BLM_0043825

**Vandersloot, George, Commenter ID No. T30**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

40

1  submitted our comments in writing.  We are in support

2  of the DOE's position, alternative number 4; I just

3  want to reaffirm that here in person.  Didn't know

4  what the comment period would look like.

5          I also would like to point out that in this

6  document that's available to everyone here tonight,

7  that on page S 27, the comments that have been made

8  this evening relative to the price of uranium as well

9  as clean-up and whatnot, those are addressed.  And for

10  the record, the economic issues are not within the

11  scope and purpose and need for DOE's action per this

12  document.  Just wanted to get that on the record.

13          But the County is definitely in support of

14  alternative number 4.  Thank you.

15          MR. CAMERON:  Thank you, Commissioner White.

16  Anybody else want to speak?

17          Yes, come on up.

18          AUDIENCE MEMBER:  I didn't sign in to the

19  sheet.

20          MR. CAMERON:  That's okay, just introduce

21  yourself.

22          GEORGE VANDERSLOOT:  My name is George

23  Vandersloot.  Some of you know me; a lot of you don't.

24  I'm known as an outdoor person.  I'm concerned about

25  our environment.  I do a lot of mountain climbing,

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T30-1

T30-1  Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

## Vandersloot, George, Commenter ID No. T30 (Cont.)

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

41

1  spend a lot of time in the canyons in western

2  Colorado, eastern Utah, places like that.

3          I support alternative 4 here.  I think we

4  need to develop our natural resources.  I've been on

5  the ground for the last couple of months in the

6  vicinity of tracts 21, 22 and 23.  I don't see a

7  problem with mining uranium there.

8          I do have a background in mining and

9  environmental work, and I think alternative 4 would be

10  a good alternative.

11          MR. CAMERON:  That's terrific.  Thank you,

12  sir.

13          Anybody else want to talk to the Department

14  and the community tonight before we go to informal

15  questions?  Okay.

16          And in a minute, I'm going to give the mic

17  back to Ray, see if he has anything to add.  But I

18  just want to say that the Department and their experts

19  and anybody that has one of these name tags on are

20  going to be here to answer any questions you have

21  about what you heard tonight, about the process to

22  engage the Department or about what concerns that you

23  might have.

24          And we're doing that over here where these

25  posters are because the posters have a lot of

T30-1
(Cont.)

(866) 448 - DEPO     www.CapitalReportingCompany.com     © 2013

BLM_0043827

## Vanek, Jolana, Commenter ID No. E114

From: JOLANA VANKOVA
To: mail_ulpeis
Subject: Comment on Uranium program of DOE in South West Colorado
Date: Friday, June 28, 2013 7:56:44 PM

I am writing to you regarding leases that DOE has in Mesa, Montrose and other other counties, uranium leases.

It has been proven that uranium is dangerous, and as energy source it eventually must be replaced with other - sustainable - materials. -Taking it out of the ground in the mentioned areas would be going back in time, to the time we humans were fairly ignorant about side-effects of uranium. Impact of uranium mining on water, wild life, and humans often many miles away has been well documented. So what now with DOE leases that would have the best benefit for long term ?

What is even more of concern is that majority of the uranium mined these days is NO LONGER for defense of the USA, but purely to allow foreign companies to profit by exporting the uranium product, as they stated in public meetings, even to the enemies of the United States.

My recommendation regarding the mentioned DOE uranium leases is as such:

1) Cancel the program outright;

2) Cancel the program - AND use the land of the mentioned leases to create areas of SUSTAINABLE renewable energy. Solar would most likely be very compatible , as the areas get great sun majority of the year.

Thank you,

Jolana Vanek
San Miguel County

E114-1

E114-2

E114-1   The possibility that uranium or uranium ore from the ULP may be subject to being exported does not undermine the PEIS's stated purpose and need, and does not require that the PEIS's scope be expanded to analyze the export of uranium or uranium ore. Any export of domestic uranium or uranium ore from any source within the United States, including the ULP lease tracts, is strictly regulated by Nuclear Regulatory Commission (NRC) under the terms of the AEA and the NRC regulations, which impose requirements that must be satisfied before the NRC will grant a license to export any domestic uranium or uranium ore. See AEA, 42 U.S.C. §§ 2099, 2151-2160d; NRC regulations, 10 C.F.R. §§ 110.19-110.46. For example, 42 U.S.C. § 2099 forbids the NRC from licensing any person to export from the United States any uranium ore, or other source material, if the issuance of such a license "would be inimical to the common defense and security" or the health and safety of the public; 42 U.S.C. § 2155 gives the Executive Branch the authority to veto any export of uranium ore. Many more specific requirements are imposed in the other above-cited provisions of the AEA and the NRC regulations.

Therefore, DOE's proposed action in the PEIS does not address uranium ore exports, over which the NRC, not DOE, has authority; and the scope of analysis in the PEIS does not analyze the possibility that uranium ore from the ULP may be subject to export.

In addition, the possibility that uranium ore from the ULP may be subject to export, after a prospective exporter goes through the process of applying for and receiving the necessary permission from the NRC, does not undermine the stated purpose and need for agency action: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of deposits of uranium ore in lands belonging to the United States to the extent DOE deems necessary to effectuate the provisions of the AEA (42 U.S.C. §§ 2096-2097). An active ULP program will be more successful in meeting that need than would an inactive program.

E114-2   Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

Final ULP PEIS

Appendix I: Comment Response Document

## Varecha, Debbie, Commenter ID No. E98

**From:** Debbie Varecha
**To:** mail_ulpeis
**Subject:** Clean Up and Clean Energy!
**Date:** Thursday, June 27, 2013 7:21:48 PM

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.
I am totally appauled at your decisions to ruin our area for the money and charge the clean up to me. Stop listening to the corporations and they are not people and listen to the real people...not the tea party or other bought republicans...74 years old and seen this action over and over STOP IT NOW please Debbie

Sincerely,

Debbie Varecha

E98-1

E98-2

E98-3

E98-4

E98-5

E98-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E98-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E98-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E98-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043829

**Varecha, Debbie, Commenter ID No. E98**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E98-5    See responses to E98-1 and E98-2.

BLM_0043830

**Wallace, Troy, Commenter ID No. T56**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-25-2013

20

1   that if DOE was to find that they were not going to

2   lease the properties out anymore, there is no

3   reason for them to manage them and they should

4   return them to the public domain so that those

5   minerals could be mined by private individuals on

6   BLM ground.  It's multiple purpose and mining is

7   part of that program, so that's all I have.  Thank

8   you very much.

9         MR. CAMERON:  Thank you, Glen.  I

10  saw that you looked a little bit confused when I

11  called you down here because I said Glen Miller

12  instead of Glen Williams, and we actually did have

13  a gentleman named Glen Miller at the Grand Junction

14  meeting, but that's Glen Williams.  Troy Wallace.

15        TROY WALLACE:  I had second thoughts

16  about talking, but working on the newspaper, I get

17  a lot of comments that have to do with junk science

18  from watching all these movies about zombies and

19  other things like that, and I just want to

20  encourage the use of sound science.

21        My uncle and grandfather worked in Uravan

22  and my mother and my grandmother lived there.  My

23  grandmother is still living today and she's in her

24  90s and my grandfather died in his 90s.  So I

25  really don't think that it limits your life span.

T56-1

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T56-1   Comment noted. The evaluations presented in the PEIS utilized methodologies and information reflecting the science that is recommended by regulatory agencies for such evaluations. Based on the results of the PEIS evaluation and with implementation of mitigation measures, DOE believes that its preferred alternative can be conducted in a manner that would be protective of human health and the environment.



**Wallace, Troy, Commenter ID No. T56 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-25-2013

21

1   And as far as I know, I'm not a mutant and she

2   lived in Uravan before I was born.  I think there's

3   a lot of junk science that has influenced all these

4   impact statements and everything else.

5        Basically that's what I have to say, is

6   just we need to go by science and not by emotions

7   from other areas.

8             MR. CAMERON:  Thanks, Troy.  Is

9   there anybody else who wants to come up and talk to

10  us?

11       Jane, do you want to reconsider?

12             JANE THOMPSON:  My name is Jane

13  Thompson, and I'm the president of the Rimrock

14  Historical Society.  We are working very hard right

15  now to preserve the history of the Uravan Mineral

16  Belt, the town of Uravan, and the uranium mining

17  industry, which we are all very proud of.

18       I would also like to say that I'm third

19  generation to live in Uravan.  My grandparents

20  moved there when there were no houses.  They lived

21  in a tent town.  The Rimrockers just leased from

22  the County 17 acres in Uravan that the County just

23  had acquired from Dow Chemical, and we plan to

24  build a museum and an RV park to sustain the

25  museum.  And we would appreciate the support and we

T56-1
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

BLM_0043832

## Wetzel, Angela, Commenter ID No. L21

Mr. Ray Plieness          April 16th, 2013
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021

Re: Uranium Leasing Programmatic Environmental Impact Statement

Dear Sir,

Thank you for taking comments on this important PEIS. Uranium, as the feedstock for nuclear energy, represents a very important part of the U.S. and regional economy, and mining it in the study area should be allowed to proceed.

Nuclear energy can and should play a very central role in America's energy future. It is clean, safe and abundant. Any concerns we now may have over the supply of fuel would be put to rest by a well-developed nuclear industry. In addition, any concerns over climate change would also be addressed by the proliferation of domestic nuclear power.

To attain these benefits, we need to harvest our uranium resources. Currently, we as a nation are importing over 90% of our uranium from foreign sources. This is insane, when other nations are in the process of securing their own supplies, and considering that we have an extensive supply right in our own backyard. Uranium should be looked at as a valuable national strategic resource, and therefore the best and highest use of any federal land that contains this resource is its recovery.

The best part is that there need not be a trade-off of other important values. Our justifiable (and in fact overdue) concern for the environment is not diminished by continuing or extending the uranium leasing plans currently in place.

Modern mining practices, combined with reasonable mitigation and protective regulations, help ensure that development and conservation can co-exist. This EIS has properly catalogued the various ecological components and concerns, and described the procedures in place for addressing them.

Considering the importance to the nation of uranium, and the fact that it can be harvested with minimal impact to the environment, I support Alternative 4, and ask that your office do the same.

Sincerely,

Angela Wetzel
490 Coronado Ct. Unit D
Clifton, CO 81520


RECEIVED
APR 3 0 2013

| | | |
|---|---|---|
| L21-1 | L21-1 | Comment noted. The "purpose and need" described in Section 1.4 is consistent with the comment made here. |
| L21-2 | L21-2 | Based on the results of the PEIS evaluation and with implementation of mitigation measures, DOE believes that its preferred alternative (Alternative 4) can be conducted in a manner that would be protective of human health and the environment. |

BLM_0043833

## Wheels, Kim, Commenter ID No. E125

From:     Kim Wheels
To:      mail_uples
Subject:    DOE URANIUM LEASING PROGRAM
Date:      Monday, July 01, 2013 1:20:57 PM

**To: Ray Plieness, PEIS Manager**

I'm a resident of Ophir, CO, and recreate in western Montrose County frequently. I have a background in mechanical engineering, which includes work for the nuclear power industry. While I support use of existing, already-mined (and already used) uranium as a transition fuel to a 100% renewable energy world, I am not in support of reopening the mines and mills in western Colorado. My reasons are listed below, but if I was to pick 2 to highlight, they would be:

1 - Western CO does not have sufficient water resources (currently or future forecasted) needed to mine, mill & process uranium as is being proposed. Current water rights are already a source of battle among neighbors. We don't have extra resources, and we can't afford to risk having our existing water sources contaminated.

2 - An increase in dust and pollution from traffic will exacerbate our increasing problems with dust events layering in our snowpack. Springtime dust layers, in an already decreasing volume of water content in our snowpack, increase the speed of snowmelt and decrease snow stability. As our local climate changes with increasing worldwide greenhouse gas emissions, we are already experiencing decreased snowmelt water supply to last us through dry summers.

Please... the DOE must reconsider the environmental impacts of reintroducing uranium mining and milling into western Colorado. Doing so will have detrimental consequences for upcoming decades in which we are already seeing an altered landscape of resources.

Sincerely,
Kim Wheels

**Clean, renewable energy sources, and prompt clean-up of this federal uranium legacy provides the realistic and sensible future for western Colorado.**

- A recent Gallup Poll shows that American want a stronger emphasis placed on domestic renewable energy production over oil and gas, coal and especially nuclear.
- A recent Colorado poll found that the majority of Coloradans strongly favor (56%) solar energy over nuclear energy (10%).
- Colorado has created aggressive goals to develop a renewable energy standard of 20% by 2020 as well as establishing the state as a national leader in this sector and developing up to 600,000 clean-energy jobs.
- The potential for renewable energy development, specifically solar, is high in the ULP.
- The uranium leases in the ULP are are ideal for brownfield renewable energy development, providing clean domestic energy and jobs to the region.

**The US reserve uranium should be managed for future use in the US, not short term exploitation by foreign interests**

- The PEIS does not reveal that US uranium would be mined and sent to Canadian-controlled mills for

E125-1

E125-2

E125-3

E125-4

---

E125-1    Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation (including potential impacts to water resources and quality) in identifying Alternative 4 as DOE's preferred alternative.

E125-2    A discussion regarding dust layering in snowpacks has been added in the PEIS (see Section 3.1)

E125-3    The evaluation of the use of the ULP land for development of solar energy or renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for such purposes is not excluded by the ULP Program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies, including many based on renewable sources.

E125-4    The possibility that uranium or uranium ore from the ULP may be subject to being exported does not undermine the PEIS's stated purpose and need, and does not require that the PEIS's scope be expanded to analyze the export of uranium or uranium ore. Any export of domestic uranium or uranium ore from any source within the United States, including the ULP lease tracts, is strictly regulated by Nuclear Regulatory Commission (NRC) under the terms of the AEA and the NRC regulations, which impose requirements that must be satisfied before the NRC will grant a license to export any domestic uranium or uranium ore. See AEA, 42 U.S.C. §§ 2099, 2151-2160d; NRC regulations, 10 C.F.R. §§ 110.19-110.46. For example, 42 U.S.C. § 2099 forbids the NRC from licensing any person to export from the United States any uranium ore, or other source material, if the issuance of such a license "would be inimical to the common defense and security" or the health and safety of the public; 42 U.S.C. § 2155 gives the Executive Branch the authority to veto any export of uranium ore. Many more specific requirements are imposed in the other above-cited provisions of the AEA and the NRC regulations.

Therefore, DOE's proposed action in the PEIS does not address uranium ore exports, over which the NRC, not DOE, has authority; and the scope of analysis in the PEIS does not analyze the possibility that uranium ore from the ULP may be subject to export.

In addition, the possibility that uranium ore from the ULP may be subject to export, after a prospective exporter goes through the process of applying for and receiving the necessary permission from the NRC, does not undermine the stated purpose and need for agency action: to support the AEA provisions which authorized and directed DOE to develop a supply of domestic uranium, and to issue leases or permits for prospecting, exploration, mining, or removal of deposits of uranium ore in lands belonging to the United States to the extent DOE deems necessary to effectuate the provisions of the AEA (42 U.S.C. §§ 2096-2097). An active ULP program will be more successful in meeting that need than would an inactive program.

With regard to concerns that there is already a stockpile of uranium in the U.S. for domestic use, the development of a domestic uranium supply, as authorized and directed by Congress in the AEA, enables DOE to support future demand that is uncertain at the present time, whatever its exact level may turn out to be in the future.

Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed

BLM_0043834

## Wheels, Kim, Commenter ID No. E125 (Cont.)

export to Canada, Korea, China.

- Taxpayers are already paying for DOE to manage and store billions of dollars worth of already mined uranium stockpiles.
- Tell DOE that until it cleans up the mess it made during the Cold War, further uranium mining should not be allowed.
- Should the US actually need these uranium reserves in the future, the most secure long term storage solution is for it to remain in the ground.
- The PEIS ignored dismal conditions at these mines, which reveal that remediation and contamination clean up should be an immediate priority.

**The DOE must investigate, disclose, and evaluate actual conditions at each of uranium mines and lease tracts.**

- "Remediation" claims in the PEIS are based on outdated information and assumptions as opposed to actual field analysis.
- Remediation would cost jobs now. Uranium extraction is uncertain dependent on the price/demand of uranium going up considerably.
- Some of these sites are in violation of Clean Water Act standards, are contaminating the Dolores River and should be clean up immediately.

**DOE did not analyze an alternative that would reduce the number of leases.**

- There is no consideration made to protect endangered or threatened species existing in the ULP.
- There is no consideration made for withdrawing the sites adjacent to the Dolores River to prevent water quality impacts.
- The recent State of the Rockies poll found that the majority of Coloradans feel that environmentally sensitive places should be protected from energy development.

**The PEIS fails to adequately address climate change impacts.**

- There is only superficial analysis of water quantity impacts from increased mining and milling in the region.
- The consequences of allocating an increasingly scarce water supply to mining operations intended to produce uranium for foreign demand is not considered.
- Air quality analysis fails to address a significant increase in dust creation from mining and milling activity and dispersion to downwind communities.

**The impacts that fall within the Dolores River Corridor, one of the iconic tributaries of the Colorado River. Impacts to this landscape and the habitat it provides for hundreds of species and recreation opportunities were not sufficiently analyzed.**

- A cluster of the claims falls directly on the Dolores River and threatens the river daily due to lack of clean up.
- The Dolores Corridor provides habitat for Gunnison sage grouse, big horn sheep, endangered Colorado River fish and threatened river otter among others. Threats to these species were not adequately considered.
- We have the opportunity to preserve the Dolores River Basin for future generations as a natural gem of the American West. National and international recognition of this treasure will bring an increase in tourism and recreation dollars and provide long-term sustainable economy for the region. **We must think long term before we destroy sustainable development for short-term economic gain that will line the pockets of those outside the communities.**

**The DOE must reconsider the PEIS using real field analysis of current site conditions, economic analysis of remediation and reuse of the sites vs re leasing and eventual taxpayer clean up and USFWS analysis of wildlife impacts**

E125-4 (Cont.)

E125-5

E125-6

E125-7

E125-8

E125-9

---

under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

E125-5   The evaluations conducted for the PEIS used site-specific information (see Section 1.3 for a summary of this information). DOE considers the information adequate to support the alternatives evaluated and for making any decisions relative to these alternatives. Although site-specific information for future mines will not be available until the lessees submit specific mine plans, information available from past mining activities such as the understanding on cultural resources, threatened and endangered species, waste rock and ore characteristics, and transportation practices and routes is sufficient for supporting the analyses of potential impacts from future mining activities for the five alternatives.

Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

E125-6   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives.

As discussed in Section 4.3.6.1 and Table 4.6-1 (see M-4), impacts on the Dolores River and other jurisdictional streams within lease tracts would not likely be directly affected because mines would be required to be located at a distance from these streams (e.g., 1,300 ft [0.25 mi]). A Biological Assessment (BA) has been prepared for consultation with the U.S. Fish and Wildlife Service (USFWS) regarding potential impacts of the ULP on species listed under the ESA (including the Colorado River endangered fish species). A Biological Opinion (BO) was issued by the USFWS in August 2013. PEIS text has been revised consistent with the BA and BO, see Appendix E and Section 4.3.6.4.

E125-7   Climate change was evaluated in the PEIS (see Sections 4.1.1, 4.2.1, 4.3.1, 4.4.1, and 4.5.1) in terms of greenhouse gas (GHG) generated by the ULP proposed action for the five alternatives, respectively. The results indicate that the ULP proposed action contributes a very small percentage to both Colorado, and U.S. GHG generated (up to 0.03% and 0.0005%, respectively). U.S. GHG emissions account for about one-fifth of global GHG emissions, and GHG emissions from ULP proposed action are up to about 0.0001%. The amount of GHG generated is generally used as a measure of the potential impacts on climate change . In contrast, ULP operations (followed by power generations at nuclear power plants) would displace considerable amounts of criteria and toxic air pollutants, and GHG emissions that would otherwise be released from fossil power plants. Accordingly, ULP operations would contribute to more positive impacts than adverse impacts on climate change. The text in the PEIS has been revised (see the same sections mentioned previously) to explain further how potential impacts from climate change were analyzed for the PEIS and what the results mean.

E125-8   The PEIS acknowledges the potential for impact to the Dolores, San Miguel, and Colorado Rivers and the aquatic biota inhabiting those rivers. Measures to minimize potential impacts from uranium mining in the ULP lease tracts are provided in Table 4.6-1. These measures include measures to avoid and minimize impacts to waterbodies and aquatic habitats for aquatic biota (see measures M-4 and M-7).  As discussed in Section 4.3.6.1 and Table 4.6-1 (see M-4), impacts on the Dolores River and other jurisdictional streams within lease tracts would not likely be directly affected because mines would be required to be located at a

**Wheels, Kim, Commenter ID No. E125 (Cont.)**

--
Kim Wheels

distance from these streams (e.g., 1,300 ft [0.25 mi]). A Biological Assessment (BA) has been prepared for consultation with the U.S. Fish and Wildlife Service. A Biological Opinion was issued by the USFWS in August of 2013. See Section 6 and Appendix E.

Information on the desert bighorn sheep is provided in Section 3.6.2.3 of the PEIS. As evident from Table 3.6-15 in that section, the ULP lease tracts encompass only a small portion of the desert bighorn sheep activity areas within the three-county ULP study area. Potential impacts on bighorn sheep are addressed in Section 4.3.6.2 of the PEIS. DOE did consult with Colorado Parks and Wildlife (CPW) regarding the desert bighorn sheep and other sensitive species during the preparation of the PEIS. Since issuing the Draft PEIS, the DOE has become aware that the river otter is a state threatened species that could occur in the Dolores River in or near the lease tracts. Evaluation of this species was added to the Final PEIS. Exclusion buffers from the Dolores River and sage grouse habitats, as well as desert bighorn sheep habitat protection or offsite habitat enhancement, may also be conditions of permits and lease requirements for mine sites.

E125-9   The PEIS evaluation has incorporated site-specific information available and has analyzed current conditions adequately (see Section 1.3 and Chapter 3). The economic study suggested is outside the PEIS scope and does not meet the purpose and need described in Section 1.4. DOE has been in consultation with the USFWS and has included as Appendix E in this Final PEIS - the biological assessment (BA) submitted by DOE to the USFWS and the biological opinion (BO) received from the USFWS.

BLM_0043836

## White, Carolyn, Commenter ID No. L40



**Carolyn White**
1041 Ouray Avenue
Grand Junction, CO 81501

RECEIVED
ofg
JUN −3 2013

May 28, 2013

Ray Plieness, PEIS Manager
Office of Legacy Management
US DOE
11025 Dover Street, Suite 1000
Westminster, CO 80021
ulpeis@anl.gov

Dear Mr. Pleiness

I am concerned about the Programmatic Environmental Impact Statement on uranium leasing in Mesa, Montrose and San Miguel counties. Before any action is taken to allow more land in western Colorado being made available for uranium development, we need to slow down and figure out how we can work with what we have rather than open up more public lands to speculative mining.

More than other states, Colorado has experience with uranium mining and our lands have suffered from the waste and radioactive contamination left behind. Surely we should start with reclamation of those lands before more are leased out. We can reclaim old mines and in doing so also provide local jobs.

The Western Slope attracts people from all over the States and other countries with its beautiful lands and recreational opportunities. Uranium mining is not compatible with those.

We need a clean environment for a healthy community and strong economy. But that cannot be from uranium mining. Let's keep it clean; preserve our public lands.

Co-Slvnte

L40-1

L40-1   Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

BLM_0043837

## Wickham, Roger, Commenter ID No. L42

National Parks Conservation Association
777 6th Street, NW, Suite 700
Washington, DC 20001

June 6, 2013

Attention: Theresa Pierno
Acting President

LETTER OF PROTEST TO LAND
LEASING IN WESTERN CO FOR
OIL & GAS OR URANIUM MINING

Dear Ms Pierno

Please find enclosed my check for a 100 dollar contribution to protect parks from Fracking. Also enclosed is my signed petition to President Barack Obama.

I have read your letter in great detail and find you are fighting the same battle as many Americans are fighting across the United States right now. In the western portion of Colorado there are large amounts of gas available by using Fracking. Fracking requires large amounts of water to do this particular operation. All of the Western Colorado water ways (the Gunnison, San Juan, San Miguel, Deloris and the Green to name a few) flow into the Colorado River. Any mishaps in the Oil and Gas Companies operation could feed into the Colorado. This in turn could cause problems in Lake Powell, Grand Canyon, Lake Mead and irrigation and clean drinking water down river. The Colorado touches the lives of millions of people.

We have a Film Festival in Telluride Colorado once a year. Each year there is a theme. This year it was centered on what the Oil and Gas Companies are doing to our environment. One thing that we learned was when drilling these deep wells that to protect the upper portions of the well and domestic water they use cement to surround the drilling hole. It was stated that 1 in 10 wells the cement protection fail in the early stages of operation. In many of the fields in Western Colorado there are areas where up to 1800 wells are already drilled with 48,000 drilled wells in the state. This could mean 180 to 4,800 wells may have a problem and could be leaking toxic materials into the domestic water supply and the waterways that feed into the Colorado. There are three documentaries that I would like to suggest you obtain and watch. They are Gasland 1 and 2 by Josh Fox and Bidder 70. All three will show on PBS in the near future. These documentaries are filled with information that could be used in your fight against Fracking. Also enclosed is an article from our local news paper (The Daily Planet) one of the ways documentary film makers, environmentalist, scientist, and just plan Americans are doing to fight Fracking . It is very difficult when the federal agencies and state agencies are making it so easy for the Oil and Gas Companies to come into a neighborhood and let them do just about anything they want.

In our local area we are also fighting a Uranium issue. A Canadian company has obtained the rights to put in a uranium processing plant 50 miles west of Telluride. This company as reported will move the yellow cake to Canada for resale. I am sure this issue came up in your fight to keep the Russian processing plant away from the Grand Canyon. You were able to obtain relief from this processing plant. We in our area have not been so fortunate. Once again this Canadian processing plant will be very near the Deloris

**L42-1**

**L42-1** The scope of the PEIS is uranium mining on the ULP lease tracts. However, oil and gas activities within the 50-mile region of influence were addressed in the cumulative impacts analysis discussed in Section 4.7 of the PEIS. Additional information on BLM's oil and gas leases has been added to this document.

**L42-2**

**L42-2** Potential impacts to water resources are evaluated in the PEIS (see Sections 4.1.4, 4.2.4, 4.3.4, 4.4.4, and 4.5.4). See also discussion in Section I.3.2 for a summary of potential impacts.

The concern about water quality due to the proximity to the Dolores River and its tributary has been considered. One of the mitigation measures to assure protection of surface water body from contamination and sedimentation was the inclusion of a mitigation measure to restrict activities within ¼ mile of perennial streams (Table 4.6-1).

The proposed action would be implemented in accordance with Federal, state, and local requirements including those for the protection of water quality.

**Wickham, Roger, Commenter ID No. L42 (Cont.)**

River which flows into the Colorado. This could be another potential affecting the National Parks. We may have lost the battle on the processing plant. Our county is now fighting the DOE and BLM protectors to stop leasing BLM land for uranium mining. It seems without a steady flow of uranium into the processing plant it will be difficult to make the processing plant financially viable. Attached is an article from our local newspaper (The Daily Planet) about what our County is trying to do on the leasing issue. Presently I am unaware of any official coordinated plan between the County of San Miguel, the Town of Telluride and the Town of Mountain Village to stop the Fracking and Uranium leases in our area.

Having been in the airline industry for over 30 years it is not if there is going to be an emergency it is only when. I personally believe that there will be major environmental repercussions either with oil and gas or uranium spreading through our National Parks into local water supplies and water users down river and across the United States. The Colorado not only provides recreation and clean water it is a major supplier of water to Phoenix and also the California Imperial Valley. The Colorado provides water and irrigation water to millions of people. So what happens if it is corrupted or more likely what will happen when it is corrupted? Who do these millions of people go to for relief?

L42-2
(Cont.)

If NPCA is interested in stopping Fracking and Uranium mining and processing in Western Colorado, please let me know or advise our County Commissioner, Joan May.

Sincerely

Roger M. Wickham

Roger M. Wickham
PO Box 532
Placerville, CO 81430
rmwickham@hotmail.com

C.C.

Joan May, San Miguel Country Commissioner.
333 W Colorado Ave.
Telluride, CO. 81435

BLM Colorado State Office
2850 Youngfield ST
Lakewood, CO. 80215

Mr. Raymond Plieness,
ULP PEIS Document Manager
Office of Legacy Management,
US Department of Energy,
11025 Dover Street, Suite 1000
Westminster, CO. 80021

National Park Service
1849 C Street NW
Washington, DC. 20240

BLM_0043839

**Williams, Glen, Commenter ID No. T22**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

26

```
1          MR. CAMERON:  Thank you, Steven.
2          Glen?  Glen Williams?  And then we'll go to
3  Betty.
4          GLEN WILLIAMS:  Yeah, I'm Glen Williams, and
5  I work for Cotter Corporation in Nucla; I've been over
6  there for 30-plus years.  And the last couple of
7  years, I've been heavily involved in doing permit
8  amendments for all of our mines that we have.  We've
9  got eight of the mines that they have listed right now
10 that have mines on them.
11         And I know with the way the regs in this
12 state are right now, I've been dealing with these
13 permits for the last two years trying to get the
14 amendments, and all the things you have to satisfy as
15 far as surface water quality, ground water quality,
16 any air emissions they're concerned about, all of
17 that, it's nothing like the old days back in the '70s
18 or so when people just used to set up a compressor and
19 start drilling and start mining.
20         You have to meet a whole list of criteria to
21 satisfy just to get your permit so you can start
22 breaking ground.
23         And so personally, I'm all for either
24 alternative 3, 4 or 5.  But I think 4 or 5 are the
25 best, personally.
```

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T22-1

T22-1    Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

BLM_0043840

**Williams, Glen, Commenter ID No. T22 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-23-2013

27

1         And I do have an issue with just one of the
2   things I saw up there about the four species of fish
3   that potentially will be impacted.  I believe there's
4   only four lease tracts, probably, right above the San
5   Miguel in Uravan that might have potential to impact
6   those fish.
7         But again, with the criteria we have to deal
8   with with the State just to get that mine permit,
9   surface water quality and ground water quality are big
10  issues for them.  And I really don't expect that there
11  will be any problem with any of those fish that you
12  guys have listed in there that you're thinking about.
13        So again, I'm all for the alternative 4, 5
14  or 3.  So thank you.
15        MR. CAMERON:  Thank you, Glen.
16        And Betty?
17        BETTY OGLESBY:  Thank you.  I'm Betty
18  Oglesby, and I lived in this area from '70 to '92.
19  Actually, I worked for Glen Williams back in the late
20  '70s and early '80s.  So I do approve this, I support
21  it.  I don't think there's a negative impact here; I
22  don't think there is a negative air quality impact.
23        I lived there, I raised my kids there, I
24  worked for the mine, I've been there.  I've lived it.
25  And I do not believe there's an impact to the fish in

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T22-2

T22-2    PEIS text has been revised consistent with the BA and BO, see Appendix E and
Section 4.3.6.4.

BLM_0043841

**Williams, Glen, Commenter ID No. T46**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

65

1 if that storm cell would have released its energy
2 just a little west, the Calhoun nuclear power plant
3 would have been inundated.  The waters would have
4 gone over the top of that inflatable berm.
5      The Cooper station may have been 3 feet
6 below the floodwaters if that had happened.  So
7 what do we do with the nuclear industry, with
8 something that is so toxic?  We've got nuclear
9 weapons and we have got nuclear disaster lurking.
10      MR. CAMERON:  I'm going to have to
11 ask you to wrap up.
12      DAVID GLYNN:  I will wrap it up.
13      So my point is this:  You've got all of
14 this beautiful farmland.  What would have happened
15 if we would have had that super cell release its
16 energy just a little west and we would have
17 possibly, potentially contaminated thousands of
18 miles of the best farmland in the world.  We are
19 playing Russian roulette with the nuclear industry.
20      MR. CAMERON:  Thank you, David.
21 Glen Williams, please, and then we'll go to Hilary
22 Cooper.
23      GLEN WILLIAMS:  My name is Glen
24 Williams.  I'm a resident of San Miguel County for
25 the last 30-plus years in the Norwood area.  I have

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T46-1

T46-1    Comment noted. DOE considered all comments received on the DPEIS and the results of the
PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

BLM_0043842

**Williams, Glen, Commenter ID No. T46 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

66

1  got a lot of history in mining, and I know for a

2  fact that the way the permitting goes these days

3  with the State of Colorado to obtain a mine permit,

4  there is extensive bonding requirements that the

5  State has to go through and they make you put up

6  the money to cover any reclamation that might be

7  associated with the mining operation.

8        If there are any wet mines -- which most

9  of these DOE leases, I believe, are dry -- the

10  state, in your permitting process, will make you do

11  monitor wells to check the groundwater and the area

12  around the mining operation to see if there's going

13  to be any contamination, unlike way in the past

14  which they never did before.  And the standards for

15  reclamation are enforced by the DRMS, the Division

16  of Reclamation, Mining and Safety.  An operator has

17  to submit a mine plan to DOE if you are operating

18  on a DOE lease, but that mine plan also has to be

19  consistent in your permitting process with the

20  state.

21        Another thing is the -- I heard earlier

22  something about these BLM lands shouldn't be leased

23  if we are not getting any royalties off them.  I

24  can tell you for a fact that there are significant

25  royalties paid on these leases for the minerals

(866) 448 - DEPO     www.CapitalReportingCompany.com     © 2013

T46-1
(Cont.)

T46-2

T46-2     Comment noted. As noted by the commenter, reclamation at all legacy mine sites under DOE's
          oversight has been completed.

**Williams, Glen, Commenter ID No. T46 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

67

1  produced on them, both the uranium and vanadium.

2         Another item that I just remember hearing

3  was how DOE should reclaim the legacy mining sites,

4  and I believe that almost all of the legacy mining

5  sites on the DOE lease tracts have been reclaimed.

6  There may be a lot of sites that are on BLM lands

7  which are not covered by this leasing program, but

8  that's under the suspice of the State of Colorado

9  to reclaim those at this point, because those are

10  historic mining operations that were done before

11  they had the reclamation permits that they have

12  now.

13         The last thing I would like to cover is

14  that from my perspective, being associated with

15  mining for an extensive period of time, miners

16  don't have any problem with people hunting,

17  fishing, hiking, riding bikes in the area, you

18  know, on these public lands that are multiple

19  purpose. And I'm constantly amazed that people who

20  base their livelihood on recreation, like people in

21  this area do, they insist or seem to want to insist

22  that there be nothing else other than recreation

23  where they want to play.

24         To me, it's just an unreasonable

25  requirement because those lands are multiple

T46-2
(Cont.)

T46-3

T46-3    Comment noted.

**Williams, Glen, Commenter ID No. T46 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

68

1 purpose. They were intended for use by the public.

2 That use being natural resource development and

3 production. Back in the day, recreation really

4 wasn't that much of a consideration, but they are

5 there for recreation, for hiking, hunting, fishing,

6 et cetera. And I know the miners, they don't have

7 a problem with the hunting and fishing and bike

8 riding.

9          So it just amazes me that the

10 recreationists, who want to come in every once in a

11 while, insist that there be no other disturbance so

12 they can enjoy their pristine playgrounds, which

13 these grounds aren't pristine. They're just BLM

14 grounds that are intended for multiple purpose.

15 Thank you.

16          MR. CAMERON: Thank you very much.

17 And next we're going to hear from Hilary Cooper.

18          HILARY COOPER: My name is Hilary

19 Cooper. I'm the director of Sheep Mountain

20 Alliance and we are submitting extensive comments

21 as well, so I will keep my comments short.

22          I want to say thank you very much to all

23 the very well-articulated comments that have been

24 stated tonight. Wow. You guys are all very well

25 informed and passionate about this area. And I

T46-3
(Cont.)

(866) 448 - DEPO     www.CapitalReportingCompany.com     © 2013

BLM_0043845

**Williams, Glen, Commenter ID No. T55**



Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-25-2013

19

1   and how well they were taken care of.
2           So with that, I support Alternative 4
3   with all these others.  Thank you.
4           MR. CAMERON:  Thank you, John.
5   We're going to go to Glen Miller next and then Troy
6   Wallace.
7           GLEN WILLIAMS:  My name is Glen
8   Williams with Cotter Corporation out of Nucla.  I'm
9   a big proponent of responsible natural resource
10  development.  And I believe that all these lease
11  tracts that the DOE has, we should try to develop
12  them and produce the ores we can responsibly
13  produce from them as much as we can.
14          The program has been in place for a long
15  time.  I believe it's effective.  I believe it's
16  employed quite a few people, paid a lot of
17  royalties to DOE, and I just feel that with the way
18  the mine permitting is going these days, bonds are
19  substantial and they cover everything I have seen
20  that needs to be covered with any of the
21  reclamation activities that are required on these
22  mines these days.  And I feel that it's a good way
23  to go.  It will help the area.
24          The one alternative that I would not
25  recommend is the Alternative 1.  It seems to me

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T55-1   T55-1   Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

T55-2   T55-2   See response to T55-1.

BLM_0043846

**Williams, Glen, Commenter ID No. T55 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-25-2013

20

1 that if DOE was to find that they were not going to

2 lease the properties out anymore, there is no

3 reason for them to manage them and they should

4 return them to the public domain so that those

5 minerals could be mined by private individuals on

6 BLM ground.  It's multiple purpose and mining is

7 part of that program, so that's all I have.  Thank

8 you very much.

9         MR. CAMERON:  Thank you, Glen.  I

10 saw that you looked a little bit confused when I

11 called you down here because I said Glen Miller

12 instead of Glen Williams, and we actually did have

13 a gentleman named Glen Miller at the Grand Junction

14 meeting, but that's Glen Williams.  Troy Wallace.

15         TROY WALLACE:  I had second thoughts

16 about talking, but working on the newspaper, I get

17 a lot of comments that have to do with junk science

18 from watching all these movies about zombies and

19 other things like that, and I just want to

20 encourage the use of sound science.

21         My uncle and grandfather worked in Uravan

22 and my mother and my grandmother lived there.  My

23 grandmother is still living today and she's in her

24 90s and my grandfather died in his 90s.  So I

25 really don't think that it limits your life span.

T55-2
(Cont.)

(866) 448 - DEPO     www.CapitalReportingCompany.com     © 2013

BLM_0043847

## Wilson, Kylynn, Commenter ID No. L30

April 23, 2013



RECEIVED
MAY – 6 2013

Attn: Ray Plieness
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021
E-mail: ulpeis@anl.gov

Re: Draft Uranium Leasing Program EIS

Dear Mr. Plieness,

I am very supportive of the Department of Energy's Preferred Alternative in this PEIS, Alternative 4, and of the Uranium Leasing Program in general.

Alternative 4 retains all of the current lease tracts in the ULP, allowing potential mining of this resource. The western U.S. contains some of the most highly graded and prolific deposits of uranium in the world, and it is in our national interest to recover these resources.

The other alternatives, disappointingly, for the most part terminate the leasing program, with little thought attached to the consequences for the regional economy, national energy policy, or trade concerns. At the present time, the U.S. only gets about 8% of its uranium domestically — there is no logical reason for this, with such an abundant source here at home, and with an available workforce ready and hoping to be able to extract it.

The end product also needs to be considered. The uranium that is mined from this program will go towards expanding the production of carbon-free nuclear power, which could easily supply a far greater percentage of our electricity that it does currently. This is a far more economical approach than focusing on the much more expensive solar and wind technologies. As admirable as these alternatives are, they will only ever make up a tiny fraction of the overall electrical supply, due to the facts that they are interruptible and require large amounts of land. Nuclear is a much wiser short-and long-term solution.

As such, Alternative 4 is the most prudent and sound alternative available, and I would like to recommend that your agency adopt it going forward.

Respectfully,

Kylynn Wilson

53593 Banner Road

Olathe, CO 81425

L30-1

L30-1   Comment noted. DOE considered all comments received on the DPEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

L30-2

L30-2   See response to L30-1.

BLM_0043848

## Wilson, Mary Lou, Commenter ID No. L31

Ray PliNess, PEIS Document Manager
Office of Legacy Management
U.S. Department of Energy
11025 Dover Street, Suite 1000
Westminster, CO 80021
E-mail: ulpeis@anl.gov



April 19, 2013

Re: Draft Uranium Leasing PEIS

Dear Mr. Pliness,

I support the Department of Energy's preferred alternative, Alternative 4, which would retain all 31 lease tracts for potential development of uranium resources. The draft EIS has done a thorough and commendable job of analyzing the potential environmental impacts of the Uranium Leasing Plan, to include analysis of water and air quality, wildlife habitat, endangered species, cumulative effects of economic activity, and other factors. The conclusion is that today's responsible and modern mining technologies and practices will have very little adverse effect on these important environmental elements.

This mining plan is important for the economic and environmental security of the United States.

Our supply of recoverable uranium could support a much faster and more widespread development of nuclear energy in this county. Nuclear energy represents a safe, environmentally benign, and abundant source of domestic electrical generation that should form a major component of any national energy plan.

We are not Russia or Japan – Americans have the technology, skill, and experience to be able to develop the nuclear industry in a manner that is safer for both humans and the environment than any other county on earth.

This industry can and should be allowed to develop, and should not have to rely on foreign sources of uranium – likely mined under far less environmentally sensitive circumstances – when we have such a wealth of the resource right here.

In addition to contributing to America's national energy needs, this leasing program will have many local benefits as well, including the creation of many good-paying jobs that will bolster the local, regional, and state economies.

The revenue generated from the mines, and from the wider tax base created by the direct and indirect job growth, will have a positive effect on local, state and even federal government coffers as well. The leasing plan will provide the economic base to allow for local community

L31-1

L31-2

L31-3

L31-1   Comment noted. DOE considered all comments received on the PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative.

L31-2   See response to L31-1.

L31-3   See response to L31-1.

BLM_0043849

## Wilson, Mary Lou, Commenter ID No. L31 (Cont.)

development, both private and public, to occur and make our regions even better places to live and raise families.

All of these benefits come with very few environmental costs – as the documents point out, the proposed mitigation policies, modern mining technologies, and extensive regulatory oversight will ensure that our other natural resources are properly conserved and cared for.

L31-3
(Cont.)

This is an extremely beneficial program that is occurring in areas with deep cultural, historic, and economic ties to mining. The only reason to oppose the retention of these leases would be to advance an extreme anti-development agenda, held to by a handful of radical activists.

It would be a shame to see obstructivist tactics succeed in manipulating the process into shutting down such worthy projects that will bring so many benefits to so many.

In closing, I again wish to state that I unequivocally support Alternative 4, which will continue the leasing plan for all 31 tracts, and help provide economic and energy security for our region and our nation.

L31-3
(Cont.)

Sincerely,

Mary Lou Wilson
917 Main Street
Grand Junction, CO 81501

BLM_0043850

## Wizer, Joyce, Commenter ID No. E19

| | |
|---|---|
| **From:** | Joyce Wizer |
| **To:** | mail_wipeis |
| **Subject:** | Clean Up and Clean Energy! |
| **Date:** | Friday, May 24, 2013 7:51:24 AM |

Dear

Dear Mr. Pikeness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests. For DOE to ensure a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

E19-1

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution. Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP. Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential.

E19-2

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in-depth, localized information. The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health. The PEIS lacks a detailed analysis of water quality, wildlife and water supplies. The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

E19-3

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination.  The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area.  Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit. To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees.

E19-4

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining.  The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

E19-5

Sincerely,

Joyce Wizer

E19-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E19-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E19-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E19-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Wizer, Joyce, Commenter ID No. E19 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E19-5   See responses to E19-1 and E19-2.

BLM_0043852

## Wizer, Joyce, Commenter ID No. E20

From: Joyce Wizer
To: mail_ulpeis
Subject: Clean Up and Clean Energy!
Date: Friday, May 24, 2013 7:54:36 AM

Dear

Dear Mr. Pileness:

It is not practical to mine uranium when we have no safe way to store radioactive waste. Please leave the uranium in place and pursue safer, renewable, sources of energy.

Sincerely,
Joyce Wizer
Rifle, Colorado

E20-1

E20-1   The majority of the waste generated from uranium mining is in the form of waste rock which contains radioactivity at levels similar to what is typically in the area (i.e., background), as the waste rocks would be primarily overburden material that needs to be removed in order to get to the ore deposits. The waste rock (kept as a pile or piles) would remain on the mine site, be contoured, provided with an adequate thickness of top cover material, and revegetated. Waste that contains low-level radioactivity would either be taken to the mill for proper disposition and/or taken to a licensed low-level radioactive waste disposal facility. Wastes that are generally trash or garbage (e.g., from lunch rooms or packaging material) would be taken to a local landfill for disposal.

The evaluation of the use of the land for development of renewable energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

BLM_0043853

## Wong, Choi, Commenter ID No. T15

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

48

1  But not necessarily poison.  What good is that doing

2  us?  Why don't we clean up the poison first and then

3  have a big party?

4          MR. CAMERON:  Thank you, Penny.  And next

5  we're going to hear from, is it Pier?

6          AUDIENCE MEMBER:  I'm not going to...

7          MR. CAMERON:  No?  Okay.

8          Is there anybody else that wants to comment

9  that had not signed up yet?  Anybody out here that

10  wants to make a comment to us?

11          Yes.  Can you come up?

12          AUDIENCE MEMBER:  Yeah.

13          MR. CAMERON:  And just introduce yourself to

14  us, please.

15          CHOI WONG:  Hi, my name is Choi Wong, I'm a

16  nursing student from Colorado Mesa University.  I am

17  not prepared for this speech.  I am from China.  I

18  moved here seven years ago, because I think Colorado

19  is a real pretty place, and all the residents here are

20  really nice.

21          And recently my classmate and I have done

22  research, a project on the uranium mining in Paradox,

23  Colorado.  And I researched Energy Fuels as my

24  company, and I want to understand how the company

25  impacts the environment.

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T15-1

T15-1   Uranium mining conducted by Energy Fuels is not within the scope of the PEIS. Potential socioeconomics and human health impacts from the proposed action for the ULP lease tracts are presented in Chapter 4 of the PEIS. The largest number of direct and indirect jobs that could be generated during mine operations would be about 253 and 152, respectively. Potential human health impacts evaluations indicated that potential risk from living about 2500 meters away from a mine location would be 1 in 100,000 per year of exposure in addition to the 3 in 10,000 per year from exposure to background sources of radiation (i.e., potential risk would potentially be 0.00031 instead of 0.00030).

Final ULP PEIS

Appendix I: Comment Response Document

## Wong, Choi, Commenter ID No. T15 (Cont.)

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

49

1    And after looking at the Energy Fuels home
2  page, I understand that they will bring jobs to
3  Colorado. And I really appreciate that, because they
4  want to help us out when economy is really bad.
5    But at the same time, it's really important
6  for us to keep in mind the long-term effect of the
7  uranium mining.
8    The jobs will bring money to the economy for
9  a short term, but it's really important for us to
10  think about will this money help the residents of
11  Colorado to pay for their healthcare causes when they
12  are diagnosed with cancer or anything related to the
13  mining.
14    And I just thought that is important for us
15  to think about the short-term economy impact compared
16  to a long-term healthcare impact.
17    MR. CAMERON:  Okay.  Thank you.
18    Does anybody else want to make a comment?
19  And let's go to you first; come up and introduce
20  yourself, please.
21    And then we'll go to you.
22    JODIE MCTAVISH:  My name is Jodie McTavish,
23  and I worked at the Department of Energy as support
24  services in the Laboratory.  And we spent years
25  analyzing the samples and dealing with the remediation

T15-1
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

BLM_0043855

## Wood, Linda, Commenter ID No. E100

From:     Linda Wood
To:       mail_ubers
Subject:  Clean Up and Clean Energy!
Date:     Thursday, June 27, 2013 9:29:44 PM

Dear

Dear Mr. Pioness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, expand renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative," one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Linda Wood

E100-1

E100-2

E100-3

E100-4

E100-5

E100-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E100-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E100-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E100-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

<u>**Wood, Linda, Commenter ID No. E100 (Cont.)**</u>

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E100-5   See responses to E100-1 and E100-2.

BLM_0043857

**Woodward, Joan, Commenter ID No. T17**

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

51

1  long-term health effects that affect people and create

2  cancer and all the other health issues that are

3  related to this industry.

4       MR. CAMERON:  Thank you, Jodie.

5       And yes, ma'am, would you join us up here?

6       JOAN WOODWARD:  Good evening.  I hadn't

7  planned to speak tonight, partly because I don't have

8  much of a voice.  So I'll make this very brief.

9       The individual who's sitting with the

10 environmental engineer, Energy Fuels, I believe was

11 the name, he said there were two reasons, as I recall,

12 why the project should go forward:  One was the need

13 for jobs and the other was a need for more energy

14 production.

15       In terms of the need for energy production

16 domestically, my understanding is we don't need

17 uranium; we have more than enough other resources.

18 The natural gas industry is doing very well.  We don't

19 need uranium here with all of the consequences.

20       In terms of the jobs, I don't think there

21 are that many jobs that would actually be generated at

22 this point in opening up some of these leases.  I also

23 think we could put those people to work much better in

24 terms of alternative energy rather than uranium.

25       I am concerned as well about water -- other

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T17-1

T17-1  With regard to concerns that there is already a stockpile of uranium in the U.S. for domestic use, the development of a domestic uranium supply, as authorized and directed by Congress in the AEA, enables DOE to support future demand that is uncertain at the present time, whatever its exact level may turn out to be in the future.

The consideration of alternative energy development on the ULP lease tracts is outside the scope of the PEIS.

T17-2

T17-2  Potential impacts to water resources are evaluated in the PEIS (see Sections 4.1.4, 4.2.4, 4.3.4, 4.4.4, and 4.5.4). See also discussion in I.3.2 for a summary of potential impacts.

The concern on water quality due to the proximity to the Dolores River and its tributary has been considered. One of mitigation measures to assure protection of surface water body from contamination and sedimentation was the inclusion of a mitigation measure to restrict activities within ¼ mile of perennial streams (Table 4.6-1).

The proposed action would be implemented in accordance with Federal, state, and local requirements including those for the protection of water quality.

### Woodward, Joan, Commenter ID No. T17 (Cont.)

Capital Reporting Company
In Re: UUP PEIS Public Hearings 04-22-2013

52

```
1  people have commented on that -- both the extraction
2  of water for processing and the pollution of water.
3  It doesn't take much at all, so I'm very concerned
4  about that.
5        Taxpayers always seem to end up footing the
6  bill for the nuclear industry.  I don't think you can
7  cite any mine or mill or plant that the taxpayers
8  didn't have to come up with the money to pay for an
9  awful lot of it.
10       I agree with Eric that a very substantial
11 bond would absolutely have to be a requirement before
12 we can even think about doing this.
13       Finally, I don't understand why we're even
14 talking about leasing at this point when we have not
15 accomplished the reclamation on any of these sites.
16 There has been virtually nothing done on a lot of
17 these sites in terms of soil and waters.  So until we
18 can have it proven to us this is in good faith, and
19 can, in fact, be done safely, we shouldn't be
20 considering new leases.  Thank you.
21       MR. CAMERON:  Thank you very much.
22       Do we have any final comments?  Okay.  Well,
23 thank you all.  And I think Ray would like to say a
24 few words in closing to all of you.  And the
25 Department and experts are going to be here if you
```

(866) 448 - DEPO   www.CapitalReportingCompany.com   © 2013

T17-2
(Cont.)

T17-3

T17-3   For the lease tract operations that are currently covered by reclamation bonds, the bonds were calculated by DOE based on site-specific conditions and deemed sufficient to reclaim those conditions in coordination with CDRMS.

T17-4

T17-4   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are not under the ULP and not under DOE's oversight or authority to reclaim. DOE analyzed this alternative as part of its range of reasonable alternatives in the PEIS.

**Yoho-Wikse, Nicholas, Commenter ID No. T52**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

84

1   there anymore.

2          So I just wanted to say:  You need to

3   consider a cradle-to-grave -- no pun intended --

4   cumulative impact beyond this small region.  You

5   need to consider the ramifications of the entire

6   industry.  Thank you.

7          MR. CAMERON:  We have one more

8   gentleman up there.  Please introduce yourself,

9   sir.

10          NICHOLAS YOHO-WIKSE:  Hello.  My

11   name is Nicholas Yoho-Wikse.  I grew up near the

12   Nevada test site in Las Vegas and also in

13   California.  I've lived in this area quite a few

14   years.  I have worked at La Cocina restaurant here

15   and with a green building firm, Steeprock Joinery,

16   for several years and with the Galloping Goose and

17   volunteering for the adaptive ski program for four

18   or five years.  I have some humble residences here

19   as well as in other states and countries.

20          I'm here representing basically interests

21   of a few of my own companies and other end-stage

22   consumers of uranium products in the medical,

23   energy, weaponry, and other areas of uranium

24   consumers.  We feel this -- the interests I

25   represent feel this is an ideal spot for the mining

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T52-1

T52-1   DOE considered all comments received on the Draft PEIS and the results of the PEIS evaluation in identifying Alternative 4 as DOE's preferred alternative. The withdrawal of the land comprising the ULP lease tracts was based on similar reasons given by the commenter with regard to the land containing prime uranium ore deposits.

BLM_0043860

**Yoho-Wikse, Nicholas, Commenter ID No. T52 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

85

1  of uranium, perhaps even perfect.  It takes about

2  one pound of uranium -- it takes about 3 million

3  pounds of coal to get the same power out of one

4  pound of uranium.

5        People here want to base their economy on

6  marijuana farms and their pleasure mountain, their

7  pleasure ski mountain.  But I think it's a wise

8  idea, perhaps, to have a balance of conservative

9  and liberal interests, and Colorado works that way

10  quite a bit with ranchers and farmers and military

11  industries balanced with the ski area population.

12        There's a high cost to, quote,

13  sustainable energy.  What do you think it takes to

14  make solar panels?  Do you think that's free?  Do

15  you think people don't break their backs on

16  assembly lines?  You don't think the materials to

17  make those are going to run out?

18        One of the best reasons for mining

19  uranium here -- because we will get it elsewhere.

20  We'll get it somewhere else, for sure.  But there

21  will be pretty good controls here, not perfect by

22  any means.  But there will be a strong lobby in

23  this area to keep the industry relatively, quote,

24  safe, if anything can be safe.

25        The area is also close to several

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T52-1
(Cont.)

T52-2

T52-2  Uranium mining experience that resides in the area is evident based on past mining activities. DOE believes that its preferred alternative involving continued mining activities at the lease tracts would continue to make use of all the valuable mining experience accumulated assuring protection of human health and the environment.

**Yoho-Wikse, Nicholas, Commenter ID No. T52 (Cont.)**

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

86

1  end-stage consumers of uranium products:  New

2  Mexico, California, Nevada, and Washington have

3  various medical weaponry facilities, energy

4  facilities, that would use the materials.  We

5  basically support the gradual, continuous use of

6  nuclear products.  It would be unwise to completely

7  disband the industry, as well as it would be to

8  mine all the uranium immediately.

9       We need to let our technicians gradually

10  increase their skills.  The efficiency with both

11  nuclear energy for power and also with weaponry

12  will gradually increase.  We don't have the staff

13  right now to be able to give you perfect weapons or

14  perfect power plants.  We generally support renewed

15  underground testing of nuclear weapons.  Mines you

16  might call them; they are not just weapons.

17       I disagree with this gentleman here who

18  says that a nuclear weapon is so much more horrible

19  than other weapons.  I think it's no different than

20  your pocketknife, good sir.  But I do agree with

21  you that all weapons are obscene.

22       I would say also that this is the least

23  of your worries.  We have labs we can put in here.

24  You will not have a public commentary.  You will

25  not know about them.  And if an accident happens,

T52-2
(Cont.)

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

BLM_0043862

## Yoho-Wikse, Nicholas, Commenter ID No. T52 (Cont.)

Capital Reporting Company
In Re: ULP PEIS Public Hearings 04-24-2013

87

1  you would have wished that you would have had a

2  nuclear explosion in your vicinity.

3          MR. CAMERON:  And I'm going to have

4  to ask you to wrap up.

5          NICHOLAS YOHO-WIKSE:  Okay.  That's

6  about it.  My main point is that there's a lot of

7  good people in this area.  It's a dynamic,

8  intelligent population.  The mining is going to

9  take place somewhere, and I think the people here

10 will keep it in a better way than it would have

11 been in other places.

12          MR. CAMERON:  Thank you.  And I

13 think if you could stick around after we are done

14 just so we can get the correct spelling of your

15 name for the transcript.

16          And we're going to wrap up now.  The

17 Department and our experts, if you need to talk to

18 them, ask them anything, Lawry, they're going to be

19 out by the posters, and I'm going to ask Ray

20 Plieness to come up and close the meeting out for

21 us.

22          LAWRY DE BIVORT:  This is a question

23 that's relevant to everyone.  What kind of

24 follow-up to the comments and questions that have

25 been put to you this evening will you be giving?

(866) 448 - DEPO    www.CapitalReportingCompany.com    © 2013

T52-3

T52-3   Comment noted. See response to T52-2.

## Ziegler, Cynthia, Commenter ID No. E23

| | |
|---|---|
| From: | Cynthia Ziegler |
| To: | mail_ulpeis |
| Subject: | Clean Up and Clean Energy! |
| Date: | Friday, May 24, 2013 9:32:49 AM |

Dear

Dear Mr. Pikness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interests. For DOE to ensure a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a Clean Alternative, one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines, so create jobs by cleaning-up old sites before making new legacies of pollution. Also, DOE should elevate solar energy above dangerous uranium within the scope of its ULP. Solar is a viable energy alternative that does not risk public health or environmental quality, and western Colorado is renowned for its potential.

In order for future DOE uranium development to be done safely, impact analyses must include thorough programmatic review alongside in-depth, localized information. The Uranium Leasing Program runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on economy, environment and public health. The PEIS lacks a detailed analysis of water quality, wildlife and water supplies. The cumulative impact analysis is also weak, excluding a comprehensive study of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet our communities would again become dependent on a boom & bust market; we would also face unavoidable environmental and land use degradation for private companies to profit. To help curtail these issues, DOE should create bonding and royalty requirements for ULP Lessees.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Cynthia Ziegler

E23-1

E23-2

E23-3

E23-4

E23-5

E23-1   DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E23-2   Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E23-3   DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E23-4   DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

BLM_0043864

**Ziegler, Cynthia, Commenter ID No. E23 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E23-5    See responses to E23-1 and E23-2.

BLM_0043865

### Ziegler, Cynthia, Commenter ID No. E60

**From:** Cynthia Ziegler
**To:** mail_ulpeis
**Subject:** Clean Up and Clean Energy!
**Date:** Friday, May 31, 2013 11:04:06 PM

Dear

Dear Mr. Pieness:

I am writing to voice my concerns regarding the Department of Energy's (DOE) Uranium Leasing Program (ULP) and its recent Programmatic Environmental Impact Statement (PEIS).

The ULP covers roughly 25,000 acres of public lands across western Colorado, and future uranium development should only be done in a manner that protects public health, safety and welfare. The current PEIS is inadequate and it needs to expand its alternatives, bolster impact analyses, support renewable energy, and protect long-term public interest. For DOE to usher a process that results in the best choice, any analysis should also address bonding, royalty rates, uniform and holistic standards for mine reclamation, and uranium market conditions.

Under DOE's preferred alternative, scores of existing leases could operate alongside 19 new mines during peak operations. Instead, DOE should substantively consider a "Clean Alternative", one that prioritizes mine reclamation and safer energy alternatives. Western Colorado has thousands of un-reclaimed uranium mines and at the same time is renowned for its solar energy potential. DOE should put people back to work cleaning-up old mines and developing sustainable, renewable energy economies.

In order for future DOE uranium development to be done safely, impact analyses must include a thorough programmatic review alongside in-depth, localized information. Western Colorado has already carried the disproportionate burdens of an industry that left behind a legacy of waste and radioactive contamination. The PEIS lacks a detailed cumulative impacts study, excluding investigation of long-term economic development, transportation corridors, and public health; in general failing to consider the combined impacts of all past and present uranium activities in this region.

The ULP runs across Mesa, Montrose and San Miguel Counties; it will inherently have regional implications on our economy, environment and public health. The PEIS states only "minor" environmental justice concerns are associated with increased uranium mining in this area. Yet, our communities would again become dependent on a boom & bust market and face unavoidable environmental and land use degradation for private companies to profit.

I believe DOE can offer a program that supports promising sustainable jobs without increased uranium mining. The DOE should contribute to our local economies by putting people back to work reclaiming old mines and developing renewable energy. Every Coloradan has the right to a clean environment, a strong economy and a healthy community.

Sincerely,

Cynthia Ziegler

E60-1

E60-2

E60-3

E60-4

E60-5

E60-1    DOE believes it has adequately evaluated the range of reasonable alternatives (including reclamation) and that the information and analysis in the PEIS are adequate to support any of the alternatives. Use of ULP lease tracts to develop renewable energy is outside the scope of the PEIS and the authorization of the public land orders. DOE requires all mining activities conducted on the lease tracts to be compliant with lease terms and Federal, state, and local regulations that address protection of the public and the environment.

Royalty rates are established in the lease at the time of solicitation. DOE establishes bonding to be the amount adequate to reclaim the lessee's proposed activities as identified in the PEIS in Section 1.2.1. Royalties are based on uranium ore production tonnage and would be applicable to only Alternatives 3, 4, and 5.

The reclamation provisions would be consistent with lease requirements, BLM's reclamation closures guidelines, and CDRMS's regulations as stated in Section 2.1.3 in the PEIS and included in Appendix C. As a cooperating agency, U.S. EPA Region 8 has provided guidance on reclamation requirements that was included in the mitigation measures discussed in the PEIS (see Table 4.6-1).

E60-2    Reclamation of all legacy mines under DOE's oversight within the ULP has been completed. There are currently 12 existing mines on eight lease tracts that will ultimately be reclaimed under the ULP. Other mines in the region are outside of the ULP and are not under DOE's oversight or authority to reclaim.

The evaluation of the use of the ULP land for development of "clean energy that prioritizes mine reclamation and safer energy alternatives" (except for renewable energy) is encompassed by Alternatives 1 and 2 of the ULP PEIS. The evaluation of the use of the land for development of solar energy is outside the scope of the PEIS and is not consistent with the "Purpose and Need" discussed in Section 1.4 of the PEIS. However, surface use of a majority of the ULP land for purposes such as development of renewable energy is not excluded by the ULP program. Although out of scope in this PEIS, DOE oversees numerous programs that are investigating and supporting a wide variety of energy production technologies including many based on renewable sources.

E60-3    DOE has conducted a thorough analysis of cumulative impacts. Cumulative impacts Section 4.7 did analyze all past and present uranium activities within the 50-mile region of influence. The cumulative impacts analyses addressed all of the 13 resource areas (including those mentioned in this comment) and are evaluated in the PEIS in Section 4.7.2.

E60-4    DOE has studied the demographics within the regions of influence of the proposed action in accordance with the Council of Environmental Quality guidance on environmental justice and did not identify any minority or low-income populations. While there are a small number of minority and low-income individuals in the 50-mile region of influence for cumulative impacts evaluated in the PEIS, they account for less than 50% of the population, and do not exceed 20 percentage points above the state average, in any census block group. In addition, the impacts in most environmental resource areas and human health analyzed in this PEIS are minor. There would be no high or adverse impacts on the minority or low-income population groups or the general population.

Large-scale development of uranium resources in the three-county area could mean the in-migration of workers and their families from outside the region. However, it is likely that all workers required for the mining and reclamation activities analyzed in the PEIS would come from within the three-county area. With no demographic impacts therefore likely to occur given the relatively small-scale of development under each of the alternatives, no boom and bust scenario is likely to affect either low-income and minority populations or the general population.

**Ziegler, Cynthia, Commenter ID No. E60 (Cont.)**

The socioeconomic evaluation for the alternatives indicates that as many as 253 direct jobs and 152 indirect jobs could be created (for Alternative 5 which would create the most number of the five alternatives). This additional employment constitutes a 0.6 percent increase in total employment in the three-county ROI.

Average unemployment for Mesa, Montrose, and San Miguel counties for 2011 was reported to be about 10.3%, 11%, and 7.6%, respectively (see Section 3.8.1.1).

E60-5    See responses to E60-1 and E60-2.

BLM_0043867

Case No. 1:20-cv-02484-MSK   Document 39-10   filed 04/27/21   USDC Colorado   pg 51 of 135

1
2
3
4
5
6
7
8
9
10
11
12
13          *This page intentionally left blank*
14

BLM_0043868

BLM









*January 2009*

# Approved Resource Management Plan Amendments/Record of Decision (ROD) for Designation of Energy Corridors on Bureau of Land Management-Administered Lands in the 11 Western States





NATIONAL
SYSTEM
PUBLIC LANDS

BLM_0043869

BLM_0043870

# MISSION STATEMENT

It is the mission of the Bureau of Land Management (BLM), an agency of the Department of the Interior, to manage BLM-administered lands and resources in a manner that best serves the needs of the American people.  Management is based upon the principles of multiple use and sustained yield while taking into account the long-term needs of future generations for renewable and nonrenewable resources.

**BLM/WO-GI-09-005-1800**

BLM_0043871

BLM_0043872

# CONTENTS

LIST OF ACRONYMS ................................................................................................. vii

RECORD OF DECISION ............................................................................................. 1

INTRODUCTION ..................................................................................................... 1

PROTESTS ON THE PROPOSED PLAN AMENDMENTS ............................................. 2

THE DECISION ....................................................................................................... 2

What the Decision to Amend the Resource Management Plans Provides...................... 3

What the Decision to Amend the RMPs Does Not Provide ............................................. 3

OVERVIEW OF THE ALTERNATIVES ................................................................. 4

Alternative 1 – No Action Alternative, Continuation of Current Management ............. 4

Alternative 2 – Proposed Action Alternative: Designation of Section 368
Corridors and Amendment of RMPs ................................................................. 5

NOTICE OF MODIFICATIONS AND CLARIFICATIONS MADE TO
THE PROPOSED PLANAMENDMENTS ........................................................... 9

Modifications ................................................................................................ 9

Clarifications ................................................................................................ 9

MANAGEMENT CONSIDERATIONS IN SELECTING THE APPROVED PLAN
AMENDMENTS ....................................................................................................... 10

Energy Policy Act of 2005 ............................................................................. 11

Interagency Cooperation ............................................................................... 11

Transmission Needs in the West ..................................................................... 11

Environmental Reviews ................................................................................. 12

Corridor Siting Process ................................................................................. 13

Improved Permitting Process ......................................................................... 16

*iii*

Additional Corridors .................................................................................................... 17

Environmental Impact Considerations ........................................................................ 17

CONSISTENCY AND CONSULTATION REVIEW ............................................................ 18

Governors' Consistency Review .................................................................................. 18

Cooperating Agencies ................................................................................................. 19

Tribal Governments .................................................................................................... 19

NHPA—Section 106 Consultation .............................................................................. 20

ESA—Section 7 Compliance ....................................................................................... 21

MITIGATION MEASURES ............................................................................................... 24

PUBLIC INVOLVEMENT ................................................................................................ 24

Scoping ....................................................................................................................... 24

State and Local Governments ..................................................................................... 25

Public Comments on the Draft PEIS .......................................................................... 25

Ongoing Project Communication with the Public ...................................................... 26

Release of the Final PEIS ............................................................................................ 27

AVAILABILITY OF THE PLAN ........................................................................................ 27


APPROVED RESOURCE MANAGEMENT PLAN AMENDMENTS ..................................... 31

INTRODUCTION ............................................................................................................ 31

CONSIDERATION OF OTHER BLM PLANS AND POLICIES ....................................... 34

PLAN IMPLEMENTATION ............................................................................................. 35

General Implementation Schedule .............................................................................. 36

Maintaining the Plan ................................................................................................... 36

Changing the Plan ....................................................................................................... 36

LIST OF PREPARERS .................................................................................................... 37

BLM_0043874

REFERENCES CITED .......................................................................................... 37

BLM DIRECTOR RECOMMENDATION ........................................................ 39

ASSISTANT SECRETARY APPROVAL ......................................................... 39


APPENDIX A: APPROVED LAND USE PLAN AMENDMENTS FOR
            SECTION 368 CORRIDORS ................................................... A-1


APPENDIX B: INTERAGENCY OPERATING PROCEDURES ............................ B-1

## LIST OF TABLES

Table 1:    Miles of Locally Designated Energy Corridors Incorporated into the
            Proposed Section 368 Energy Corridors on Federal Land, by State, and
            Federal Agency ................................................................................ 6

Table 2:    Distribution of Proposed Energy Corridors on Federal Land by Managing
            Federal Agency ................................................................................ 8

Table 3:    BLM Land Use or Equivalent Plans Amended by Designating
            EPAct Section 368 Energy .............................................................. 32

Table A:    Approved BLM Land Use Plan Amendments for Designating EPAct
            Section 368 Energy Corridors ......................................................... A-3

## LIST OF FIGURES

Figure 1:    Proposed Section 368 Energy Corridors on Federal Lands in the
             11 Western States ........................................................................... 7

Figure 2:    Four-Step Corridor Siting Process for Identifying Section 368 Energy
             Corridor Locations ......................................................................... 15

Figure A-1:  BLM Resource Management Plans in Arizona Amended
             by This ROD ................................................................................ A-19

Figure A-2:  BLM Resource Management Plans in California Amended
             by This ROD ................................................................................ A-20

Figure A-3:  BLM Resource Management Plans in Colorado Amended
             by This ROD ................................................................................ A-21

BLM_0043875

Figure A-4:  BLM Resource Management Plans in Idaho Amended
             by This ROD ................................................................................. A-22

Figure A-5:  BLM Resource Management Plans in Montana Amended
             by This ROD ................................................................................. A-23

Figure A-6:  BLM Resource Management Plans in Nevada Amended
             by This ROD ................................................................................. A-24

Figure A-7:  BLM Resource Management Plans in New Mexico Amended
             by This ROD ................................................................................. A-25

Figure A-8:  BLM Resource Management Plans in Oregon Amended
             by This ROD ................................................................................. A-26

Figure A-9:  BLM Resource Management Plans in Utah Amended
             by This ROD ................................................................................. A-27

Figure A-10: BLM Resource Management Plans in Washington Amended
             by This ROD ................................................................................. A-28

Figure A-11: BLM Resource Management Plans in Wyoming Amended
             by This ROD ................................................................................. A-29

BLM_0043876

# LIST OF ACRONYMS

The following is a list of acronyms and abbreviations, chemical names, and units of measure used in this ROD.

## GENERAL ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| APE | Area of Potential Effect |
| ARPA | Archaeological and Historic Preservation Act of 1974 |
| ASLM | DOI Assistant Secretary of Land and Minerals Management |
| ASME | American Society of Mechanical Engineers |
| | |
| BLM | Bureau of Land Management |
| BMP | best management practice |
| BOR | Bureau of Reclamation |
| | |
| CDEAC | Clean and Diversified Energy Advisory Committee |
| CEQ | Council on Environmental Quality |
| CFR | *Code of Federal Regulations* |
| CRMP | cultural resources management plan |
| | |
| DEM | Digital Elevation Model |
| DO | District Office |
| DOC | U.S. Department of Commerce |
| DOD | U.S. Department of Defense |
| DOE | U.S. Department of Energy |
| DOI | U.S. Department of the Interior |
| | |
| E.O. | Executive Order |
| EFH | essential fish habitat |
| EMF | electromagnetic field |
| EPA | U.S. Environmental Protection Agency |
| EPAct | Energy Policy Act of 2005 |
| ESA | Endangered Species Act of 1973 |
| | |
| FAA | Federal Aviation Administration |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FO | Field Office |
| FR | *Federal Register* |
| FS | U.S. Department of Agriculture's Forest Service |
| FY | fiscal year |

*vii*

BLM_0043877

| | |
|---|---|
| GIS | geographic information system |
| GPS | global positioning system |
| | |
| IOP | interagency operating procedure |
| | |
| LRMP | land resource and management plan |
| | |
| MFP | Management Framework Plan |
| MOA | Military Operating Area (also Memorandum of Agreement) |
| MOU | Memorandum of Understanding |
| | |
| NACo | National Association of Counties |
| NAGPRA | Native American Graves Protection and Repatriation Act |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act |
| NERC | North American Electric Reliability Corporation |
| NHPA | National Historic Preservation Act of 1966 |
| NIPP | National Infrastructure Protection Plan |
| NMFS | National Marine Fisheries Service |
| NOA | Notice of Availability |
| NOI | Notice of Intent |
| NPS | National Park Service |
| | |
| OSHA | Occupational Safety and Health Administration |
| | |
| P.L. | Public Law |
| PA | Programmatic Agreement |
| PEIS | Programmatic Environmental Impact Statement |
| POC | point-of-contact |
| POD | plan of development |
| | |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| ROW(s) | right(s)-of-way |
| | |
| SHPO | State Historic Preservation Office(r) |
| SIO | Scenic Integrity Objective |
| SMS | Scenery Management System |
| SSP | sector-specific plan |
| SWPPP | storm water pollution prevention plan |
| | |
| THPO | Tribal Historic Preservation Officer |
| | |
| U.S. | United States |
| USC | *United States Code* |
| USDA | U.S. Department of Agriculture |

BLM_0043878

USFWS               U.S. Fish and Wildlife Service

VRM                 Visual Resource Management

WGA                 Western Governors' Association

BLM_0043879

$x$

BLM_0043880

# RECORD OF DECISION

## INTRODUCTION

On August 8, 2005, the President signed into law the Energy Policy Act of 2005 (EPAct) (Public Law 109-58). In Section 368 of EPAct, Congress directed the Secretaries of Agriculture, Commerce, Defense, Energy, and the Interior to designate, under their respective authorities, corridors for oil, gas, and hydrogen pipelines and electricity transmission and distribution facilities on Federal land in the 11 contiguous Western States; perform any environmental reviews that may be required to complete the designation of such corridors; incorporate the designated corridors into the relevant agency land use and resource management plans; ensure that additional corridors for oil, gas, and hydrogen pipelines and electricity transmission and distribution facilities on Federal land are promptly identified and designated as necessary; and expedite applications to construct or modify oil, gas, and hydrogen pipelines and electricity transmission and distribution facilities within such corridors. Congress further directed the Secretaries to take into account the need for upgraded and new electricity transmission and distribution facilities to improve reliability, relieve congestion, and enhance the capability of the national grid to deliver electricity. Finally, Congress specified that Section 368 corridors should specify the centerline, width, and compatible uses of the corridors.

This document records the decision that the Department of the Interior (DOI) reached to designate corridors on Bureau of Land Management (BLM) lands by amending 92 land use plans in the 11 contiguous Western States. The Western States are Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. The DOI is basing this decision on the analyses presented in the *Final Programmatic Environmental Impact Statement, Designation of Energy Corridors on Federal Land in the 11 Western States (DOE/EIS-0386)* (DOE and DOI 2008). This Programmatic Environmental Impact Statement (PEIS) provided the methodology used to locate energy transport corridors in the 11 Western States and identified the corridor locations that were ultimately derived from this process. In addition, the PEIS presented the effects on the environment associated with potential future projects undertaken within the designated corridors.

The PEIS was prepared by the involved agencies in accordance with the National Environmental Policy Act of 1969 (NEPA). The Department of Energy (DOE) and the BLM for the DOI were the lead agencies in preparation of this PEIS. The Department of Agriculture (USDA), Forest Service (FS); Department of Defense (DOD); and DOI Fish and Wildlife Service (USFWS), were the cooperating Federal agencies in preparation of the PEIS. These agencies are collectively referred to as "the Agencies" in this Record of Decision (ROD). The USFS and the DOD will also be amending land use plans to designate corridors. The USFWS will not amend land use plans to designate corridors. Future project proponents will need to comply with existing laws, policies, and regulations for right-of-way (ROW) permits across USFWS managed lands.

*1*

Designation of energy transport corridors on Federal lands in the West is a significant step in addressing some of the critical energy infrastructure issues in the West. Energy corridors on Federal lands provide pathways for future pipelines as well as long-distance electrical transmission lines that are expected to help relieve congestion, improve reliability, and enhance the national electric grid. Future use of the corridors should reduce the proliferation of ROWs across the landscape and minimize the environmental footprint from development.

Section 368 corridors are sited to avoid, to the maximum extent possible, significant known resource and environmental conflicts. Corridors are sited to the maximum extent possible to promote renewable energy development in the West, which is currently constrained in part by a lack of transmission capacity. Interagency operating procedures (IOPs) developed and evaluated in the PEIS and adopted with this ROD are expected to foster long-term, systematic planning for energy transport development in the West, provide industry with a coordinated and consistent interagency permitting process, and provide practicable measures to avoid or minimize environmental harm from future development within the corridors. This ROD completes the DOI's responsibilities under EPAct Section 368 to examine and designate energy transport corridors in the West and provides a forward-looking response to the nation's energy needs.

## PROTESTS ON THE PROPOSED PLAN AMENDMENTS

This ROD sets forth the decision of the DOI Assistant Secretary, Land and Minerals Management (ASLM), to approve a number of proposed plan amendments. Approval at the ASLM level in the DOI reflects both the Federal cooperative process that brought together bureaus, services, and offices within the DOI, USDA, DOE, DOD and Department of Commerce (DOC) and the mandate from Congress that the Secretaries of the these Departments cooperatively designate energy transport corridors. Approval at the ASLM level in DOI means the plan amendments described in this ROD are not subject to any protest to the BLM Director, who is subordinate to the Assistant Secretary, as described in BLM's planning regulations at 43 CFR 1610.5-2. Thus, the BLM protest process is not applicable to the land use plan amendments approved here.

## THE DECISION

Section 368 directs the Secretary of the Interior (the Secretary) to designate energy transport corridors under existing authorities, such as those provided by Section 503 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1763) (FLPMA). By signing this ROD, the ASLM amends the affected BLM land use plans under the authority of FLPMA and in accordance with BLM planning regulations (43 CFR Part 1600). The approved plan amendments are consistent with the requirements of Section 368 of the Energy Policy Act of 2005. The decision also adopts IOPs to meet the Section 368 requirement to improve the ROW application process and to meet NEPA requirements to provide practicable means to avoid or minimize environmental harm which may result from future ROW grants within the designated

*2*

corridors. The approved BLM plan amendments are presented in Appendix A of this ROD and the IOPs are presented in Appendix B of this ROD.

## What the Decision to Amend the Resource Management Plans (RMPs) Provides

This ROD records the decision of the ASLM to amend relevant BLM land use plans (identified in Appendix A of this document) and to incorporate Section 368 corridors therein. This decision to amend the land use plans is supported by the information and findings in the PEIS (DOE/EIS-0386). The PEIS identified potential Section 368 corridors; evaluated effects of potential future development within designated corridors; identified mitigation measures for such effects; and developed IOPs applicable to planning, construction, operation, and decommissioning of future projects within the corridors.

Designation of energy transport corridors in BLM land use plans identifies the preferred locations for development of energy transport projects on lands managed by the BLM (BLM lands). As specified in Section 368, these corridors identify a centerline, width, and compatible uses. Appendix A lists the plans that are hereby amended, the responsible BLM office, the corridor identifier, the width, and compatible uses. Where Section 368 corridors follow corridors that were previously designated in local land use plans, the attributes identified in the PEIS (i.e., corridor centerline, width, and compatible uses) will apply.

This decision also adopts IOPs for the administration of energy transport development within the corridors. The PEIS identified these IOPs to meet the requirements of Section 368 to expedite the permitting process (see Appendix B). The IOPs provide coordinated, consistent interagency management procedures for permitting ROWs within the corridors. The IOPs also identify mandatory requirements that will help ensure that future projects developed within Section 368 corridors are planned, constructed, operated, and eventually decommissioned in a manner that protects and enhances environmental resources and long-term sustainability.

## What the Decision to Amend the RMPs Does Not Provide

Section 368 directs the Secretary to designate energy transport corridors on Federal land under existing authorities, such as those provided by the FLPMA. Section 368 provides no new authorities to the Secretary for this action. The Secretary is not designating corridors on Tribal, state, or private lands under this authority. This ROD applies only to lands managed by the BLM. Nor does Section 368 provide the Secretary with authority to require energy producers, transporters, and users to be more efficient in their generation, transport, or use of energy or to require utilities to upgrade their systems within Section 368 corridors

Designation of Section 368 corridors and amendment of affected RMPs does not authorize any projects, mandate that future projects be confined to the corridors, or preclude BLM from denying a project in a designated corridor or requesting design revisions to meet unanticipated siting issues there. Future ROW proposals will need to comply with other applicable laws,

BLM_0043883

regulations, and policies. ROW applicants will not be prevented from proposing projects outside the designated corridors for BLM's consideration, although such proposals may need to go through the land use plan amendment process to be accommodated.

# OVERVIEW OF THE ALTERNATIVES

The Agencies[1] analyzed two alternatives in the PEIS: the No Action Alternative and the Proposed Action Alternative. The Proposed Action is the environmentally preferred alternative and is selected in this ROD. Various other alternatives were proposed and considered, but all were eliminated from further study because of their inability to meet the intent of Section 368. All facets of both alternatives would comply with Federal laws, rules, regulations, and policies.

## Alternative 1 — No Action Alternative, Continuation of Current Management

Under the No Action Alternative, the Secretary would not designate Section 368 energy corridors on BLM lands in the West. The BLM would continue to follow current permitting practices to approve project proposals. The No Action Alternative would not amend any land use plans. Management prescriptions in existing plans would not be modified under this alternative.

In general, all BLM lands, unless otherwise designated, segregated, or withdrawn, are available for ROW authorization under FLPMA. Under the No Action Alternative, the BLM would continue to evaluate applications for ROWs and alternative ROW routes following current Federal and state regulations, policies, and permitting processes and requirements. Where necessary, amendment of RMPs to allow project-specific ROWs would occur on a project-by-project basis. Although Federal agencies including the BLM have improved processing of multi-agency projects in recent years, there are still barriers to efficient processing of applications. At present, some of these barriers include inconsistent agency procedures for granting ROWs, inconsistent agency views on whether proposed energy infrastructure projects would address near- or long-term energy needs, a lack of coordination among agencies that administer contiguous tracts of land when responding to applications for a ROW across their respective jurisdictions, and the lack of coordination within agency offices regarding the appropriate geographic locations of corridors or ROWs. This alternative also does not meet the need to enhance the national grid through coordinated, interstate planning.

***Rationale for non-selection:*** The No Action Alternative does not meet the purpose and need expressed by Section 368 of EPAct. Under the No Action Alternative, future long-distance energy transport projects would be unlikely to cross Federal lands within common, shared,

---

[1] This ROD derives from the PEIS completed by the Agencies named in the Introduction and pertains only to the DOI, Bureau of Land Management. The term "Agencies" is used here when referring to the work completed by these entities for the PEIS.

BLM_0043884

energy transport corridors, resulting in a proliferation of widely spaced project-specific ROWs fragmenting the Federal landscape. There would be less ability to collocate developmental infrastructure, such as roads and landing areas, for multiple projects and a greater likelihood that environmental effects would be dispersed across the landscape. Long-term, systematic energy transmission planning on the part of governments or the public would continue to be difficult to achieve.

## Alternative 2 — Proposed Action Alternative:  Designation of Section 368 Corridors and Amendment of RMPs

The Proposed Action Alternative (Proposed Action) is the environmentally preferred alternative. Under the Proposed Action, 92 BLM RMPs would be amended to designate approximately 5,000 miles of Section 368 energy corridors on BLM lands in the 11 Western States (Figure 1). These corridors represent preferred locations on BLM lands for future electric transmission lines and oil, gas, and hydrogen pipelines. Section 368 corridors are identified in all 11 Western States and are designated for either pipeline or transmission line use or both (multimodal). The Agencies identified a width of 3,500 feet for Section 368 corridors unless otherwise specified due to environmental or management constraints or existing local designations. The Proposed Action incorporates energy corridors (or portions of these corridors) that are currently identified in local BLM land use plans in all states except in Wyoming (Table 1); Wyoming has no locally designated corridors that meet Section 368 corridor criteria.

The Agencies that prepared the PEIS coordinated corridor locations across jurisdictional boundaries to ensure continuity of long-distance energy transport across Federal land in the West. The Agencies, primarily the BLM and the FS, through adoption of the IOPs for management of future ROW applications within corridors, are establishing consistent management procedures within and among their respective administrative units to improve the ROW application process and to ensure robust environmental protections during future project development within the designated corridors.

A total of about 6,000 miles of corridors will be designated on Federal land under the Proposed Action.  About 82 percent of the more than 6,000 miles of total corridors would occur on BLM-administered lands. In comparison, Forest Service lands would have about 16 percent of the corridors, with 2 percent on other lands (U.S. Fish and Wildlife Service, National Park Service, Department of Defense, and Bureau of Reclamation) (Table 2).

***Rationale for selection:*** Corridor designation itself does not immediately affect the environment, though effects to the environment may occur during future project development under both alternatives.  Future project development under either the No Action or the Proposed Action would only take place after compliance with applicable laws and regulations including the National Environmental Policy Act (NEPA). Nevertheless, the Proposed Action, designation of Section 368 corridors by amendment of land use plans, offers significant advantages over the No Action Alternative.

The Proposed Action fulfills the direction expressed by Congress in EPAct Section 368. Under the Proposed Action, the Secretary of the Interior designates corridors for oil, gas, and hydrogen

BLM_0043885

pipelines and for electricity transmission and distribution facilities on BLM land in the 11 contiguous Western States and incorporates the designated corridors into the relevant land use plans. These Section 368 corridors meet the EPAct requirements to improve reliability, relieve congestion, and enhance the capability of the national grid to deliver electricity. The Proposed Action ensures that additional corridors for oil, gas, and hydrogen pipelines and electricity transmission and distribution facilities on Federal land are promptly identified and designated, as the need arises. The Proposed Action identifies IOPs to expedite applications for construction or modification of oil, gas, and hydrogen pipelines and electricity transmission and distribution facilities within such corridors. Finally, the Proposed Action specifies the centerline, width, and compatible uses of each Section 368 corridor. EPAct also directed the Secretary to perform any environmental reviews that may be required to complete the designation of such corridors, and the PEIS that accompanies this decision has accomplished that review.

**TABLE 1:  Miles of Locally Designated Energy Corridors Incorporated into the Proposed Section 368 Energy Corridors on Federal Land, by State and Federal Agency**

| State | Number of Proposed Corridors Incorporating Locally Designated Corridors[a] | Miles of Locally Designated Energy Corridors (total miles of proposed Section 368 energy corridors in parentheses) | | | | | |
|---|---|---|---|---|---|---|---|
| | | BLM | FS | USFWS | BOR[b] | DOD | NPS |
| Arizona | 13 (16) | 356 (454) | 166 (181) | 0 (0) | 0 (0) | 0 (5) | 7 (10) |
| California | 16 (20) | 405 (600) | 122 (223) | 0 (0) | 0 (1) | 0 (0) | 0 (0) |
| Colorado | 9 (19) | 178 (308) | 36 (112) | 1 (3) | 0 (0) | 0 (2) | 0 (1) |
| Idaho | 1 (14) | 0 (296) | 6 (16) | 0 (0) | 0 (1) | 0 (0) | 0 (0) |
| Montana | 4 (8) | 9 (56) | 13 (180) | 0 (0) | 0 (0) | 0 (0) | 0 (0) |
| Nevada | 16 (34) | 799 (1,535) | 1 (29) | 0 (25) | 11 (18) | 2 (10) | 5 (5) |
| New Mexico | 1 (4) | 18 (290) | 0 (0) | 0 (4) | 0 (0) | 0 (0) | 0 (0) |
| Oregon | 8 (12) | 333 (431) | 0 (134) | 0 (0) | 0 (0) | 0 (0) | 0 (0) |
| Utah | 6 (14) | 88 (619) | 30 (62) | 0 (2) | 0 (0) | 0 (9) | 0 (0) |
| Washington | 1 (2) | 0 (1) | 48 (50) | 0 (0) | 0 (0) | 0 (0) | 0 (0) |
| Wyoming | 0 (18) | 0 (413) | 0 (3) | 0 (0) | 0 (23) | 0 (0) | 0 (0) |
| Total | 75 (131) | 2,186 (5,002)[c] | 422 (990)[c] | 1 (34)[c] | 11 (44)[c] | 2 (26) | 12 (16)[c] |

[a]  Proposed Section 368 corridors having portions that are locally designated. Not all portions of these corridors are locally designated. Total number of proposed Section 368 energy corridors is in parentheses.

[b]  BOR = Bureau of Reclamation.

[c]  Slight difference between indicated total and the sum of the stated entries is due to rounding.

BLM_0043886



**FIGURE 1:  Proposed Section 368 Energy Corridors on Federal Lands in the 11 Western States**

BLM_0043887

**TABLE 2:  Distribution of Proposed Energy Corridors on Federal Land, by Managing Federal Agency**

| State | Total Miles of Proposed Corridors | Miles of Proposed Corridors on Federal Land, by Managing Federal Agency | | | | | |
|---|---|---|---|---|---|---|---|
| | | BLM | FS | USFWS | BOR[a] | DOD | NPS[a] |
| Arizona | 650 | 454 | 181 | 0 | 0 | 5 | 10 |
| California | 823 | 600 | 223 | 0 | 1 | 0 | 0 |
| Colorado | 426 | 308 | 112 | 3 | 0 | 2 | 1 |
| Idaho | 314 | 296 | 16 | 0 | 1 | 0 | 0 |
| Montana | 236 | 56 | 180 | 0 | 0 | 0 | 0 |
| Nevada | 1,622 | 1,535 | 29 | 25 | 18 | 10 | 5 |
| New Mexico | 293 | 290 | 0 | 4 | 0 | 0 | 0 |
| Oregon | 565 | 431 | 134 | 0 | 0 | 0 | 0 |
| Utah | 692 | 619 | 63 | 2 | 0 | 9 | 0 |
| Washington | 51 | 1 | 50 | 0 | 0 | 0 | 0 |
| Wyoming | 438 | 413 | 3 | 0 | 23 | 0 | 0 |
| Total | 6,112[b] | 5,002 | 990[b] | 34[b] | 44[b] | 26 | 16[b] |

[a]   BOR = Bureau of Reclamation; NPS = National Park Service.

[b]   Slight difference between indicated total and the sum of the stated entries is due to rounding.

There are significant environmental considerations which also support the selection of the Proposed Action. Consolidation of ROW development is expected to help reduce the proliferation of separate ROWs across the landscape.  As the result of an intensive 2½-year siting process, Section 368 corridors avoid major, known, environmental conflicts to the maximum extent possible. Interagency operating procedures (IOPs) developed and evaluated in the PEIS and adopted with this ROD are anticipated to foster long-term, systematic planning for energy transport development in the West, provide industry with a coordinated and consistent interagency permitting process, and provide practicable measures to avoid or minimize environmental harm from future development within the corridors. These benefits provide substantial reasons for selecting the Proposed Action as the decision.

BLM_0043888

# NOTICE OF MODIFICATIONS AND CLARIFICATIONS MADE TO THE PROPOSED PLAN AMENDMENTS

## Modifications

After careful review of the information provided by the Governors of Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming during the Governors' Consistency Review and additional internal review, the BLM made the following modification:

> **New Mexico Corridor segment 81-272:** A segment of corridor 81-272 in New Mexico, which falls within the Mimbres planning area (see Figure A-7) will not be designated in this ROD. Corridor designation in this area will be addressed as part of ongoing BLM local land use planning efforts on public lands.

## Clarifications

The following clarifications and minor corrections have been made to the Final PEIS and are reflected in the approved resource management plan amendments presented in this ROD:

- Appendix A of the Final PEIS, which lists proposed corridor designation land amendments, incorrectly identifies for Arizona a Lower Sonoran RMP. The current RMP is the Lower Gila South Resource Management Plan (RMP), administered by the Lower Sonoran Field Office (FO).

- In Arizona, both the Hassayampa and Kingman Field Offices administer the Lower Gila North Management Framework Plan (MFP), the Hassayampa, Safford, and Tucson FOs administer the Phoenix RMP, and the Safford and Tucson FOs administer the Safford RMP.

- The Arizona Strip RMP listed in Appendix A of the Final PEIS is the Arizona Strip Field Office RMP.

- Figure A-3 in Appendix A of this ROD corrects several corridor labels for Colorado that are incorrect in Part 5 of the Map Atlas, Volume III of the Final PEIS. The corrected corridors shown in Figure A-3 are Corridor 132-133 (incorrectly labeled as 132-222), Corridor 126-133 (incorrectly labeled as 126-217), and Corridor 87-277 (incorrectly labeled as 87-139).

- Because of its relatively small size and the scale of the maps presented in the Final PEIS, Corridor 136-139 in Colorado was not shown in the Colorado maps presented

*9*

BLM_0043889

in Parts 2 and 5 of the Map Atlas, Volume III of the Final PEIS. This corridor is shown in Figure A-3 in Appendix A of this ROD.

- The typographic error of the Black Rock-High Rock Immigrant Trail NCA RMP in Nevada has been corrected.

- For Nevada, the responsible agency offices listed as FOs in the Final PEIS have been revised to District Offices (DOs), the Carson City Consolidated RMP has been changed to the Carson City FO Consolidated RMP, and the Las Vegas FO name has been changed to the Southern Nevada DO.

- The Final PEIS identifies the Surprise RMP as under the jurisdiction of Nevada. Surprise RMP (and Field Office) is under the jurisdiction of BLM California for the public lands they administer in Nevada.

- The San Juan RMP identified for Utah has been renamed the Monticello RMP.

- The ROD identifies six approved Utah RMPs (Kanab RMP, Moab RMP, Richfield RMP, Price RMP, Monticello RMP, and Vernal RMP) that contain statements that right-of-way corridor designations in those plans are consistent with the corridor designations proposed in the Final PEIS, and thus further amendment of these RMPs will not be necessary. These RMPs are included in Appendix A of this ROD.

- The Final PEIS identifies three RMPs (House Range RMP, Pony Express RMP, and Warm Springs RMP) in Utah that would require amendment for corridor designation. Due to restrictions to plan amendments imposed by Section 2815(d) of Public Law 106-65, the National Defense Authorization Act for Fiscal Year 2000 (October 5, 1999), these three plans cannot be amended at this time. Should these restrictions be lifted, the amendments to these plans would become effective and the BLM would provide public notice of the effective date(s) of the amendments. These three plans are included in Appendix A of this ROD.

- The RMPs listed in Tables 3 and Appendix A have been corrected for Oregon; The Andrews-Steens RMP for Lakeview District is changed to the Andrews RMP for Burns District.

- A number of the IOPs (Appendix B) have been edited. These edits are for technical corrections or clarity and are not substantive, and are not indicated in the text.

## MANAGEMENT CONSIDERATIONS IN SELECTING THE APPROVED PLAN AMENDMENTS

Many considerations contributed to the selection of the plan amendments approved by this ROD. The Agencies needed to comply with the provisions of Section 368 of the EPAct, and to identify a framework for interagency coordination to do so. Other considerations included:

- Assessing transmission needs in the West;

BLM_0043890

- Accomplishing the necessary environmental reviews;

- Siting the corridors across the landscape;

- Meeting the Section 368 requirements to expedite the permitting process;

- Establishing procedures to identify and designate future Section 368 corridors, as necessary; and

- Ensuring that the environmental considerations identified in the PEIS would be addressed when the corridors are developed.

## Energy Policy Act of 2005

The primary consideration of the Secretary was to meet the requirements of the Energy Policy Act of 2005 (P.L. 109-58), which directs him to designate corridors for oil, gas, and hydrogen pipelines and electricity transmission and distribution facilities, incorporate the designated corridors into relevant RMPs, and meet the other considerations specified in Section 368 of the EPAct. Section 368 specifically addresses the need for electricity infrastructure and directs the Agencies to take into account the need for upgraded and new infrastructure, and to take actions to improve reliability, relieve congestion, and enhance the capability of the national grid to deliver energy.

## Interagency Cooperation

Section 368 directed five agencies to work together to designate corridors on Federal lands in the 11 Western States. In 2006, the Agencies completed a Memorandum of Understanding (MOU) to define their working relationships. The DOE was designated the lead agency with the BLM as the co-lead. The FS, DOD, and USFWS were identified as cooperating Federal agencies. The Department of Commerce did not sign the MOU but remained a consulting agency. Only those Agencies that manage Federal land (DOD, DOI, and USDA) where Section 368 energy corridors are designated are issuing RODs for such designation. The Agencies established an interagency Executive Team to coordinate work on the PEIS and selected Argonne National Laboratory as the contractor for the PEIS.

## Transmission Needs in the West

The requirements of Section 368 reflect Congress's recognition of the importance of energy transport infrastructure to meet the nation's needs. The Agencies took into account various factors in considering the need for energy transport infrastructure in order to identify corridors for designation.

*11*

BLM_0043891

The West has a critical need for long-distance energy transport infrastructure due in part to the West's unique geography and population distribution, where fuel sources and energy generation facilities are often remotely located and large population centers are spread far apart. These factors result in an electricity transmission grid typified by high-voltage transmission lines spanning very long distances. While these long-distance lines are necessary to provide consumers with reliable and affordable power, the required length of these lines and the complex mix of federally administered public lands with private, Tribal, and state-owned lands make planning and siting energy transport infrastructure a challenge.

Many different entities recognize the need for energy transmission infrastructure in the West, for example:

- The Western Governors' Association (WGA) has recognized this need and identified planning factors to consider when addressing this need (WGA 2001, 2008a, 2008b).

- The North American Energy Reliability Corporation (NERC) forecasts continued need for electricity resources and notes the increasing strain on the transmission system (NERC 2007).

- Numerous sources identify the need for transmission infrastructure to promote development of renewable resources such as wind, solar, and geothermal in the West (Black & Veatch 2007, 2008; CDEAC 2006a; DOE 2008; State of Nevada 2007).

- The DOE completed a nationwide analysis of electricity transmission congestion and identified critical congestion areas, congestion areas of concern, and conditional congestion areas in the West (DOE 2006).

Transmission system congestion can lead to rapid rises in electricity prices, and severe congestion may lead to loss of electricity supplies and blackouts in some areas. Although conservation and distributive energy systems may relieve some of the future need for long-distance transmission, current studies and estimates point to the need for this infrastructure for decades in the future (CDEAC 2006b). These studies and considerations offered the basis for identifying the need for energy transmission in the West as well as providing substantive data used in the first steps to identify corridor locations.

## Environmental Reviews

Section 368 required the Agencies to conduct any "environmental reviews" necessary to complete the designation of Section 368 energy corridors.[2] The Agencies concluded that preparing a PEIS at this time to support land use plan amendments and to examine the range of potential effects of future development projects within the corridors is appropriate to meet the requirement to conduct environmental reviews.

---

2   NEPA § 102(2)(c), 42 U.S.C. 4332(2)(c).

BLM_0043892

Council on Environmental Quality (CEQ) regulations encourage agencies to "integrate the NEPA process with other planning at the earliest possible time to ensure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."[3] The NEPA process provided an established and familiar vehicle to examine potential environmental concerns and to allow for early public participation in the Section 368 energy corridor designation process through a mechanism familiar to interested members of the public. The designation of several thousand miles of energy transportation corridors is a large task. The PEIS allowed the Agencies to seek public input through open comment periods and public forums where concerns regarding Section 368 energy corridors could be raised. Public review and comment on the Draft PEIS resulted in a number of changes that were incorporated into the Final PEIS.

The decision to designate thousands of miles of corridors in 11 Western States is a broad-scale action. It is not possible at this time to identify the effects of building a particular transmission line on a specific viewshed; nor is it known if, when, or in which corridor such projects will actually be proposed and constructed. In the absence of project-specific location, design, and operation information, it is not possible to evaluate specific environmental impacts associated with future ROW proposals. It is, however, possible and useful to provide a programmatic assessment of the types of resources or environmental concerns likely to occur within the corridors and the types of effects likely to occur from future development. Based on this analysis, the PEIS also identifies management practices to reduce future impacts (IOPs) and possible mitigation measures when impacts occur. The PEIS may greatly assist subsequent, site-specific analyses for individual project proposals by allowing the Agencies to incorporate or tier to the relevant provisions of this PEIS into those later analyses.

## Corridor Siting Process

The Agencies followed a systematic, four-step process for identifying corridor locations on Federal lands in the West (Figure 2). Each step built upon the previous one in which alternative corridor locations were examined and rejected. The final selection of corridor locations includes consideration of numerous alternative locations for various corridor segments. This siting process considered current transmission infrastructure serving traditional sources of energy generation, such as coal and gas-fired power plants, as well as areas which could serve the future development of renewable energy including geothermal, hydropower, solar and wind generation. Additional emphasis was given to electricity transmission because of the interconnected nature of the electric grid and because of the congestion and reliability issues that currently face the West. Throughout the corridor siting process, comments received from the public and other stakeholders on corridor locations were considered with regard to both the need for energy corridors in specific locations and the desire to avoid or minimize future impacts to environmental resources.

---

[3]   40 CFR 1501.2.

BLM_0043893

The Agencies identified a number of criteria for siting corridors. Key among these are the following.

- Section 368 identified the need for an enhanced electrical transmission grid as a driver for corridor designation. Thus, the initial step in the corridor siting process (see below) was to identify an enhanced regional electric grid for the West.

- Corridors that did not support connectivity within this grid were not considered in this analysis.

- Corridors could only be on Federal land, excluding Tribal, state, and private lands from this analysis.

- Corridors had to include feasible development opportunities by meeting essential engineering requirements.

- Corridors had to comply with legal and regulatory requirements and, to the maximum extent possible, avoid known environmental concerns or incompatible land uses.

- Corridors had to be compatible with local BLM land use plans, which identify local areas that are compatible or incompatible with energy transport development and that have been developed in consultation with local communities.

- Corridors should follow existing corridor designations or infrastructure to the extent practicable, to reduce the need for corridor locations on undeveloped land.

The Agencies adopted the siting process summarized below to implement these siting criteria.

**Step 1:** The Agencies developed an "unrestricted" conceptual West-wide network of energy transport paths that addressed the need to connect energy supply areas (including renewable sources) with demand centers, provided for the long-distance transport of energy, and met the requirements and objectives of Section 368, regardless of land ownership or environmental or regulatory issues. This unrestricted grid was based on studies such as those noted in the Transmission Needs in the West section above, as well as on information provided by the public during scoping.

**Step 2:** The Agencies refined and revised the locations of individual segments of the conceptual network defined in Step 1 to avoid non-Federal lands as well as major known environmental, land use, and regulatory constraints. The Agencies analyzed geographic information system (GIS)-based data from multiple sources (BLM, USDA FS, USFWS, State Historic Preservation Offices, U.S. Geological Service, DOE, and DOD), resulting in a preliminary corridor network that avoided private, state, and Tribal lands; many important known natural and cultural resources; and many areas incompatible with energy transport corridors because of regulatory or land use constraints.

**Step 3:** Local Federal land managers and resources staff evaluated the preliminary corridor locations identified in Step 2. Working with the interagency team, these managers adjusted the corridor locations in their administrative units to further avoid important or sensitive resources, to ensure consistency with resource management objectives described in each unit's land use plans, and to ensure compatibility with adjacent agency units.

BLM_0043894



**FIGURE 2:  Four-Step Corridor Siting Process for Identifying Section 368 Energy Corridor Locations.**

*15*

BLM_0043895

**Step 4:** The Agencies further evaluated and revised corridor locations, as appropriate, in response to concerns expressed by the public, states, Tribes, local governments, nongovernmental organizations, and other stakeholders during the public comment period for the Draft PEIS and during on-going government-to-government consultations. The Agencies also further refined corridor locations to incorporate new information from Federal land and resource managers to ensure consistency with local Federal land management responsibilities and to avoid sensitive resources to the fullest extent possible.

The resulting Section 368 corridors represent 3 years of intensive effort among multiple agencies, Tribes, state and local governments, individuals and groups to identify the best locations for energy transport systems on the public lands. The final set of Section 368 corridors represents consideration of many different alternative locations for corridor segments and represents those that best meet the criteria established in Section 368 and identified above.

## Improved Permitting Process

Section 368 directs the Agencies to establish procedures under their respective authorities to expedite the application process for energy-related projects within Section 368 designated corridors. The Agencies are adopting uniform IOPs (Appendix B) for reviewing applications for energy ROWs within designated Section 368 corridors as part of this direction.

Applicants seeking permits to develop long-distance energy transport infrastructure are expected to benefit from consistent procedures (IOPs) that are applicable across administrative boundaries and among different agencies. The IOPs offer uniform processing and performance criteria for energy transportation ROWs in Section 368 corridors for planning, construction, operation, and decommissioning. The IOPs are expected to reduce duplication, increase coordination, and ensure consistency among all participants in the permitting process.

The affected agencies, primarily BLM and the Forest Service, will provide implementation guidance subsequent to the issuance of their respective RODs. This guidance will direct Federal agencies to:

- Select a single project manager as a point-of-contact (POC) for the project to oversee the processing of an application;
- Require a single environmental review document for the project;
- Develop a single cost-recovery agreement and fee schedule, and seek a unified billing process for the applicant; and
- Undertake other such measures to streamline the application process.

The Section 368 streamlining process will be based on the principles of the Service First program implemented by the BLM, FS, National Park Service (NPS), and USFWS (Public Law 106-291, October 11, 2000, Section 330, 43 USC 1701). Applications received by any of the Agencies will undergo an initial review to determine if the application meets Section 368 planning criteria, including a determination if the project crosses multiple jurisdictional

*16*

BLM_0043896

boundaries within a state or is an interstate project. If a proposal is approved as a Section 368 corridor project, only one application will be necessary to proceed with the authorization process.

The POC assigned to the proposed project is expected to have knowledge, experience, and credentials similar to current BLM national project managers. The BLM national project managers are very familiar with the policies and procedures of multiple agencies and jurisdictions, have experience working with large projects and sophisticated applicants, and can manage third-party contracts, if necessary. The POC will oversee all processing of the applications, including environmental reviews, construction activities, post-construction monitoring, and closeout issues, if needed.

## Additional Corridors

Congress also directed the Agencies to ensure that additional corridors for oil, gas, and hydrogen pipelines and electricity transmission and distribution facilities on Federal land are promptly identified and designated, as necessary. The BLM will accommodate the need for future energy transport corridors through its normal land use planning process, which provides the standard procedure for designating corridors as the need arises. Where proposals for a ROW appear to meet the criteria established for Section 368 corridors, the BLM may work through the Service First program to designate a long-distance interagency corridor.

## Environmental Impact Considerations

The environmental analysis in the PEIS discloses that there would be no effects to the environment from corridor designation itself. Amending the land use plans does not authorize any ground-disturbing activities, and there are no irreversible or irretrievable commitments of resources from corridor designation.

The BLM also recognizes that designating corridors is likely to direct future development to these locations, and that future development will involve many environmental considerations. The PEIS analyzed, at a programmatic level, the effects from future project development on the environment. Based on these analyses, the Agencies developed IOPs that are expected to promote regulatory compliance with appropriate authorities; assure full consideration of impacts to ground and surface water, vegetation, paleontological resources, ecological resources, cultural resources, Tribal traditional cultural resources, and visual resources; and provide a robust suite of management procedures to avoid or minimize environmental harm throughout the life of any future project within a Section 368 corridor.

The Agencies also identified mitigation measures that could be implemented to address the various types of impacts. These mitigation measures are not mandatory, since mitigation procedures need to be suitable to specific situations not identified in a programmatic analysis,

BLM_0043897

but these measures do establish consistent procedures for common impacts that may be adopted as appropriate in the course of project development.

## CONSISTENCY AND CONSULTATION REVIEW

### Governors' Consistency Review

As set forth in the BLM's planning regulations, the purpose of the Governor's consistency review is to ensure consistency of the PRMP with officially approved or adopted resource-related plans, and the policies and programs contained therein, of other Federal agencies, State and local governments, and Indian Tribes, so long as the guidance and resource management plans are also consistent with the purpose, policies and programs of Federal laws and regulations applicable to public lands (43 CFR 1610.3-2(a)). The BLM Land Use Planning Handbook (H-1601-1, March 11, 2005, at Glossary-2) states that, "consistency means the proposed land use plan does not conflict with officially approved plans, programs, and policies of Tribes, other Federal Agencies, and state and local governments (to the extent practical with Federal law, regulation, and policy)." This does not require the BLM to adhere to or adopt the plans of other agencies or jurisdictional entities, but rather to give consideration to such plans and make an effort to resolve inconsistencies to the extent practical.

On October 31, 2008, the BLM initiated the 60-day Governors' Consistency Review of the Final PEIS. The BLM received letters from the Governors of Idaho, New Mexico, Utah, and Wyoming; a letter was also received from the Governor of Montana, after the deadline for responses.

While these letters raised a number of issues, none provided information regarding inconsistencies although two letters have resulted in modifications and clarifications to the Final PEIS which are addressed in this ROD:

- The following footnote is added to Table 3 based on a clarification raised by the Governor of Utah with reference three Utah land use plans (The Pony Express RMP, the House Range RMP, and the Warm Springs RMP):

    *This plan cannot be amended at this time due to restrictions to plan amendments imposed by Section 2815(d) of Public Law 106-65, the National Defense Authorization Act for Fiscal Year 2000 (October 5, 1999). Should these restrictions be lifted, the amendments to this plan would become effective and the BLM would provide public notice of the effective date of the amendments.*

- The Governor of New Mexico identified concerns with the southern leg of corridor 81-272, through the Las Cruces area of New Mexico. A segment of corridor 81-272 in New Mexico, which falls within the Mimbres planning area (see Figure A-7) will not be designated in this ROD. Designation of a corridor in this area will be addressed as part of on-going local land use planning efforts on BLM lands.

*18*

BLM_0043898

## Cooperating Agencies

The BLM issued invitations to stakeholders (including counties) to apply for Cooperating Agency status in the fall of 2005. Three Federal agencies participated in the PEIS as cooperating agencies including USDA FS, DOD, and USFWS. Two states, three county governments, three conservation districts, and one Tribe requested and received cooperating agency status.[4] The non-Federal entities sought cooperating agency status by directly contacting the Agencies and requesting cooperating agency status. The role of the cooperating agencies was to provide information to the Agencies addressing environmental, economic, and social issues for consideration during the corridor designation process. The California Energy Commission and California Public Utilities Commission represented the State of California and, in coordination with the BLM and FS, established an interagency team of Federal and state agencies to ensure that the state's energy and infrastructure needs, renewable energy generation policy goals, and environmental concerns were considered in the PEIS. The other cooperating agencies also provided information on Tribal, state, or local issues that assisted the Agencies in siting corridors and developing the PEIS.

## Tribal Governments

The Federal/Tribal government-to-government relationship is set forth in an Executive Memorandum of April 29, 1994, Government-to-Government Relations with Native American Tribal Governments, as supplemented on November 6, 2000, by E.O. 13175. In addition, regulations implementing Section 106 of the National Historic Preservation Act of 1966 (NHPA), 16 U.S.C. 470f, require Federal agencies to consult with Indian Tribes for undertakings on Tribal lands and for historic properties of significance to the Tribes that may be affected by an undertaking (36 CFR 800.2 (c)(2)). The BLM works directly with Tribal governments on a government-to-government basis.

Section 368 of the EPAct applies only to Federal land and there are no Section 368 corridors designated on Tribal lands. The Agencies recognized, however, that designation of energy corridors on Federal lands, and especially on lands adjacent to Tribal land, is of interest to affected Tribes and that future development within corridors would have implications for resources important to Indian Tribes located on Federal lands. The BLM participated in government-to-government consultation for the PEIS as part of an interagency team. The interagency team established a consultation protocol to make sure that the individual agencies coordinated consultation on the PEIS and that Tribal interests were heard and considered. A single point of contact was established at Argonne National Laboratory to answer Tribal requests for information and to track consultation. An interagency Tribal Working Group coordinated consultation among the agencies and Tribes. The Agencies frequently relied on local agency

---

[4]   The cooperating entities were the States of California and Wyoming; the Coeur d'Alene Tribe; Lincoln, Sweetwater, and Uinta counties, Wyoming; and Lincoln, Sweetwater and Uinta County conservation districts, Wyoming.

BLM_0043899

representatives to facilitate contacts and meetings with Tribes with whom they had established relationships. Tribes were invited to consult at various times and welcomed to enter the consultation process via any route convenient to them.

All 250 federally recognized Tribes with ancestral ties to the 11 Western States were contacted via multiple mailings to inform them of the PEIS and to invite government-to-government consultation. All were provided copies of the Draft PEIS for comment, with special attention given to those Tribes whose reservations would abut or be approached by the proposed corridors. Eighty Tribes responded to these invitations. All sought and were provided additional information regarding the PEIS, and 40 Tribes engaged in face-to-face meetings with Agency representatives. In addition to concerns raised in meetings with the Agencies, 19 Tribes submitted oral or written public comments on the Draft PEIS.

Tribes contributed substantively to the development of the PEIS, the siting of corridors on BLM lands, and the development of the IOPs. These contributions assisted the Agencies by strengthening the analysis in the PEIS and avoiding certain locations of particular Tribal concern. The BLM will continue to consult with interested Tribes and to implement government-to-government consultation on a project-specific basis as development proceeds.

## NHPA — Section 106 Consultation

The Agencies elected to use the NEPA process documented in the PEIS to comply with Section 106 of the NHPA, as allowed per 36 CFR Section 800.8(c). The Agencies made this decision due to the scope and scale of this undertaking, which is the designation of over 6,000 miles of energy transport corridors in 11 Western States. Using the NEPA process to comply with Section 106 reduces redundancies when complying with both laws, offers the broadest possible opportunities and greatest convenience for the public to review and consult on the Agencies' proposed actions, and ensures that concerns pertaining to historic properties are fully integrated into the PEIS and the ROD.

The Section 106 regulations clearly state that integrating the Section 106 compliance process with NEPA does not waive Agency obligations under either law. While the regulations do permit the Agencies to take advantage of the NEPA process, the Agencies must still adhere to the fundamental direction for compliance with Section 106. The Agencies have accordingly completed the following steps to comply with Section 106:

- Notifying the Advisory Council on Historic Preservation (ACHP) and the State Historic Preservation Officers (SHPOs) of the intent to use the NEPA process to comply with Section 106;

- Identifying consulting parties through the NEPA scoping process;

- Identifying historic properties and assessment of effects (the PEIS includes a programmatic evaluation of the types of historic properties likely to occur within the corridors and the types of impacts that could occur during project development);

BLM_0043900

- Consulting with Tribes, SHPOs, the ACHP, and other interested parties as identified through the NEPA scoping and consultation process;

- Identifying measures to avoid, minimize, or mitigate adverse effects; and

- Review of the draft PEIS by Tribes, SHPOs, Tribal Historic Preservation Officers (THPOs), the ACHP, and other interested parties and resolution of issues raised through consultation and coordination with affected parties.

Future development projects within the designated corridors have the potential to affect historic properties; these projects will be fully subject to compliance with the NHPA. In addition, the Agencies have identified a number of IOPs relevant to cultural resource and related Tribal resource concerns that will apply to future development projects. The IOPs are expected to help to coordinate historic preservation reviews among the various Federal land managing agencies during future development, and constitute measures to avoid, minimize, or mitigate the impacts from future project development within these corridors. These measures have been developed in consultation with the SHPOs, ACHP, federally recognized Tribes, and the public through ongoing consultation and through the review and comment process for the Draft PEIS. The BLM's responsibilities for Section 106 for corridor designation will be satisfied by a binding commitment to the IOPs with the signing of this ROD.

## ESA — Section 7 Compliance

### ESA Section 7 Requirements

Section 7(a)(2) of the ESA requires federal agencies to ensure, in consultation with either the Secretary of Interior or the Secretary of Commerce and based on the "best scientific and commercial data available," that their proposed actions are not "likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification of the [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). However, not all proposed actions of Federal agencies are subject to the consultation requirement. The Section 7 regulations state that consultation is required only when a Federal agency determines that its proposed action "…may affect listed species or critical habitat." 50 CFR § 401.14(a).

### Agency Status under ESA Section 7

The DOI, USDA, and DOD have concluded that they are action agencies for ESA purposes because each manages Federal land where proposed energy corridors may be designated under Section 368. Each action agency is tasked with designating energy corridors on Federal land and incorporating these corridors into appropriate land use plans by amending them.

The DOE has determined that it is not an action agency because it does not manage any Federal lands where proposed energy corridors would be designated under Section 368. As such, the Proposed Action does not involve any action by this agency to incorporate proposed corridors into any land use plans that it may have issued.

BLM_0043901

**Basis for the Action Agencies' "No Effect" Determination under Section 7 of ESA**

In determining whether a proposed action "may affect" a listed species, or conversely, whether there will be "no effect," a Federal agency must determine: what activities are encompassed by its proposed action, what the effects of those activities are likely to be on the environment, and whether those effects will "pose any effect" on a listed species or critical habitat. Only those proposed actions that "may affect" a listed species or critical habitat are subject to the ESA's Section 7 consultation requirements.

Consistent with Section 7 of the ESA, when an action agency determines that a Federal action will have no effect on listed species or critical habitat, the agency will make a "no effect" determination. In that case, the ESA regulations do not require concurrence from the U.S. Fish and Wildlife Service or the National Marine Fisheries Service (Services), and the agency's obligations under Section 7(a)(2) for that action are complete.

As described in the PEIS, the BLM examined whether its adoption of land use plan amendments to designate Section 368 corridors "may affect" a listed species or critical habitat, or conversely, whether its action would have "no effect." The BLM determined that designating Federal land under section 368 through land use plan amendments would have no effect on listed species or on critical habitat. First, designating energy corridors through amendments of land use plans has no direct effects on listed species or critical habitats. The land use plan amendments designate an area, identified by centerline, corridor width, and compatible use, that will be the preferred area to be used for Section 368 purposes. Corridor designation does not establish a precedent or create any legal right that would allow ground-disturbing activities within a designated corridor. Any individual application for a ROW, permit or other authorization for Section 368 purposes at a particular location within a designated energy corridor could only be granted, in the future, after it is subject to a full policy and legal review, including a review under ESA and other applicable statutes. Moreover, there is no guarantee that any particular authorization will be granted. The action agencies have discretion not only to grant or deny an application for a ROW, permit or other authorization for Section 368 purposes within a designated corridor, but also to grant an application for an authorization outside of a designated energy corridor.

Second, the designation of corridors will have no indirect effects on listed species or critical habitat. While it is reasonable to expect that some future actions that may affect listed species or critical habitat will be taken within the designated corridors, under the ESA regulations, the effects of any such future action do not constitute "indirect effects" unless the BLM finds that such effects will be "caused by" the designation of the Section 368 corridors and "reasonably certain to occur."

The action agencies considered preparing a biological assessment and initiating consultation with the Services under Section 7(a)(2). After considering various approaches, however, the action agencies determined that preparing a biological assessment before a site-specific project had been proposed would be based largely on conjecture and speculation. The corridor designations do not identify the timing, place, or design of any future site-specific projects that would occur on these lands. Nor do the corridor designations create any legal right that would allow or authorize ground-disturbing activities without further agency decision-making and compliance with applicable statutes, including the ESA. There is therefore simply no way to know before such a site-specific proposal is made whether the impacts to be assessed would be those of an

BLM_0043902

overhead electricity transmission line or buried oil or gas pipeline or some combination of uses. Further, without knowing the specifics of when and where a project would occur within a corridor, it would be impossible to know what species, if any, would be affected by these future projects. When a specific project is proposed in the future, sufficiently detailed information will be available for analyzing the effect of the project on listed species or critical habitat under Section 7(a)(2) before the BLM issues a right of way, or any other form of authorizations or otherwise approves any ground-disturbing activity.

Therefore, based on our understanding of the ESA regulations, the BLM determined that the effects of future projects taken in accordance with the corridor designations are not indirect effects of the corridor designation. The BLM does not have sufficient information at this stage about future projects to conclude that the effects of future projects meet the regulatory definition of "indirect effects." I also note that, because no actual projects can be identified at this time, the BLM's decision to amend land use plans to designate Section 368 corridors does not alter the environmental baseline or provide a basis for a determination of "incidental take," which is typically part of the consultation process.

BLM_0043903

# MITIGATION MEASURES

The PEIS includes a programmatic evaluation of the direct, indirect, and cumulative effects that could occur if development takes place in the future within the corridors. For each category of project construction and operation impacts, the PEIS lists the types of environmental impacts that are likely to occur during project development. This ROD identifies and adopts IOPs to ensure that future effects from project development are appropriately addressed. The IOPs identify practicable means to avoid or minimize environmental harm and include provisions for monitoring during future development within the corridors.

In addition to these mandatory IOPs, the PEIS identifies specific mitigation measures that could be used to minimize, avoid, or compensate for the specific effects of a proposed project. Federal land managers may require use of these measures (as well as others not identified in the PEIS) as appropriate and applicable depending on project design and corridor conditions. Additional measures to mitigate environmental effects may also be developed during subsequent NEPA analyses at the planning and project development stages.

# PUBLIC INVOLVEMENT

The Agencies engaged in numerous efforts to reach all stakeholders and constituents that might have an interest in this project. These included formal notices, scoping and public meetings, a 90-day comment period on the Draft PEIS, notification and outreach letters, press releases, newspaper ads, email contacts, and an active and comprehensive website accessible throughout the project. In addition, agency staffs engaged in extensive outreach to many groups by meetings, conferences, updates, and briefings. The project has benefited significantly from the high level of public engagement.

## Scoping

The Agencies published a Notice of Intent (NOI) to prepare a PEIS, amend relevant agency land use plans, and conduct public scoping meetings, as well as a notice of floodplain and wetlands involvement, in Volume 70, page 56647, of the *Federal Register* (70 FR 56647) on September 28, 2005. The NOI advertised the opportunity for the public to become involved through the NEPA scoping process, in which interested parties may comment on the scope and content of the PEIS.

BLM_0043904

The Agencies held two scoping meetings in each of the 11 Western States from September 28 to November 28, 2005[5]. A total of 538 individuals from government, industry, environmental organizations, and the general public attended the meetings. The public was also invited to submit comments via mail, fax, telephone, and the Web. Three hundred comments were received from the scoping process. Comments and a summary of scoping issues were posted online for public access. All comments received equal consideration in the preparation of the Draft PEIS. The majority of the comments were associated with electricity and natural gas issues.

The Agencies also provided the public with maps of the preliminary corridor routes and alternatives in June 2006 and invited comment on the preliminary routes identified at that time. The Agencies received 200 comments and used the information provided by the public to assist in developing the Proposed Action presented in the Draft PEIS. The maps and the comments are also posted on the project website (http://corridoreis.anl.gov).

## State and Local Governments

In a letter sent by DOE on February 2, 2006, the Agencies invited each of the 11 western Governors and their respective staff members to meet with the Agencies' project managers. The meetings provided the project team with the opportunity to brief the governors and their staff members on the status of the PEIS. Discussion centered on the issues brought up during the public scoping period, data that each state could provide related to corridor location constraints and opportunities, and state-specific items related to energy planning environmental concerns and stakeholder involvement. Several states and state agencies commented on the Draft PEIS. Where there were issues or upon state request, the Agencies met with state representatives to discuss and, if possible, resolve issues.

The Agencies also worked through the National Association of Counties (NACo) to alert western counties to project milestones, such as scoping and the release of the Draft PEIS, and provide updates or briefings when requested. Six counties responded to the invitation to be a cooperating agency, and a number of counties provided comments on the Draft PEIS. Where counties noted conflicts with the corridor locations and local issues, the Agencies worked closely with the affected counties to modify the corridors and to resolve the issues.

## Public Comments on the Draft PEIS

The Agencies published a Notice of Availability (NOA) of the Draft PEIS in the *Federal Register* at 72 FR 64591 on November 16, 2007, and broadcast a press release throughout the 11 Western States that highlighted the release of the Draft PEIS. They also notified the governors

---

[5] Denver, CO (Oct. 25); Albuquerque, NM (Oct. 26); Salt Lake City, UT (Oct. 26); Cheyenne, WY (Oct. 27); Helena, MT (Oct. 27); Boise, ID (Nov. 1); Sacramento, CA (Nov. 1); Las Vegas, NV (Nov. 2); Portland, OR (Nov. 2); Phoenix, AZ (Nov. 3); Seattle, WA (Nov. 3).

BLM_0043905

and all federally recognized Tribes in the 11 Western States of the upcoming release of the Draft PEIS. An email news release on the availability of the Draft PEIS was sent to over 2,200 individuals and organizations that had signed up for email project updates at the project's public website, located at http://corridoreis.anl.gov, and NACo was also notified that the Draft PEIS was available for public comment. In addition, all individuals and organizations that had participated in the public scoping process were notified about the availability of the Draft PEIS.

The Agencies invited the public to comment on the Draft PEIS from November 16, 2007, until February 14, 2008, and provided four methods to deliver public comments on the Draft PEIS: fax, regular mail, at public meetings, and over the Web. The Agencies conducted public meetings at the same locations as the scoping meetings, with additional meetings in Window Rock, AZ, Grand Junction, CO, and Washington D.C. The draft PEIS was available in several formats, including via the Web. Importantly, all of the spatial data used in the Draft PEIS and the maps produced for the Draft PEIS were available for access and use (in several data formats) to any member of the public via the project's public website, so that any person could view the spatial data used in preparation of the Draft PEIS (including digital maps and data files of the proposed corridor locations).

Approximately 14,000 individuals and/or organizations provided comments on the Draft PEIS with the total number of substantive comments exceeding 3,500. Substantive comments came primarily from the utility and energy sector, environmental and nongovernmental organizations, and individuals in the Western States. The Agencies prepared responses to the comments received on the Draft PEIS (see Volume IV) and revised the Final PEIS to incorporate appropriate changes suggested by the public. Where changes to corridors affected various constituents, such as counties, Tribes, or states, the Agencies consulted with those concerned entities to ensure that changes would be acceptable to all parties.

In addition to the public comment period, project managers from the Agencies held a number of informational meetings on the Draft PEIS with interested members of the public, industry and environmental organizations, and state and local governments. Many of the meetings helped to better frame the formal comments submitted by these entities. It should be noted that none of the meetings resulted in formal comments on the Draft PEIS. Formal comments could only be provided through the four methods described above.

## Ongoing Project Communication with the Public

Agencies personnel at all levels have engaged in outreach activities to stakeholders across the spectrum, including governors' and state offices, local governments, industry, and numerous public interest organizations and advocacy groups in many diverse forums including meetings, conferences, workshops, training classes, and other gatherings. Agencies' staff have provided information and updates on the project, answered questions and discussed concerns with participants, and offered contact information for follow-up questions or discussions.

In addition to these outreach efforts, the Agencies have maintained a public involvement website since the beginning of the project. The public website has provided ongoing information and updates on the PEIS, posted public comments from scoping and on the Draft PEIS and now

BLM_0043906

contains the Final PEIS. In addition, the website contains technical documents, maps of the corridor locations, a spatial database of land ownership and land resources that is available for download to local computers, project background information, and overall project status and schedule. Members of the public can request electronic email updates and news, which are then automatically sent to them.

As of October 16, 2008, approximately 59,314 Web visitors had viewed 750,000 Web pages. More than 2,230 individuals and/or organizations signed up to receive project updates via email. More than 58,000 text documents and 41,000 draft corridor maps have been downloaded from the website.

## Release of the Final PEIS

The BLM published the NOA of the Final PEIS in the *Federal Register* on Nov. 28, 2008 (73 FR 72521). The BLM will continue to actively seek the views of the public, using outreach techniques such as news releases and website information to offer opportunities for public participation and inform the public of new and ongoing project proposals, site-specific planning, and opportunities and timeframes for comment. The BLM will also continue to coordinate, both formally and informally, with the numerous Federal, Tribal, state, and local agencies and officials interested and involved in the management of energy transport projects in the 11 Western States.

## AVAILABILITY OF THE PLAN

**ROD Availability**

Electronic copies of this ROD and the Approved Plan Amendments are available via the Internet at http://corridoreis.anl.gov.

Paper and electronic copies may be viewed at:

*Arizona*
Arizona State Office, One North Central Avenue, Suite 800, Phoenix, AZ 85004
Arizona Strip Field Office, 345 East Riverside Drive, St. George, UT 84790
Hassayampa Field Office, 21605 North 7th Avenue, Phoenix, AZ 85027
Kingman Field Office, 2755 Mission Boulevard, Kingman, AZ 86401
Lake Havasu Field Office, 2610 Sweetwater Avenue, Lake Havasu City, AZ 86406
Lower Sonoran Field Office, 21605 North 7th Avenue, Phoenix, AZ 85027
Safford Field Office, 711 14th Avenue, Safford, AZ 85546
Tucson Field Office, 12661 East Broadway, Tucson, AZ 85748
Yuma Field Office, 2555 E. Gila Ridge Road, Yuma, AZ 85365

*California*
Alturas Field Office, 708 W. 12th St. Alturas, CA 96101

BLM_0043907

Barstow Field Office, 2601 Barstow Road, Barstow, CA 92311
Bishop Field Office, 351 Pacu Lane, Suite 100, Bishop, CA 93514
California State Office, 2800 Cottage Way, Suite W-1623, Sacramento, CA 95825
Eagle Lake Field Office, 2950 Riverside Drive, Susanville, CA 96130
El Centro Field Office, 1661 S. 4th Street, El Centro CA 92243
Folsom Field Office, 63 Natoma Street, Folsom, CA 95630
Needles Field Office, 1303 S. Hwy 95, Needles, CA 92363
Palm Springs-South Coast Field Office, 690 W. Garnet Ave., North Palm Springs, CA 92258
Redding Field Office, 355 Hemsted Drive, Redding, CA 96002
Ridgecrest Field Office, 300 S. Richmond Rd. Ridgecrest, CA 93555
Surprise Field Office, 602 Cressler Street, Cedarville, CA 96104

*Colorado*
Colorado State Office, 2850 Youngfield Street, Lakewood, CO 80215
Glenwood Springs Field Office, 50629 Hwys 6 & 24, Glenwood, CO 81601
Grand Junction Field Office, 2815 H Road, Grand Junction, CO 81506
Gunnison Field Office, 216 N. Colorado, Gunnison, CO 81230
Kremmling Field Office, 2103 Park Ave, Kremmling, CO 80459
Little Snake Field Office, 455 Emerson St., Craig, CO 81625
Royal Gorge Field Office, 3170 E. Main St., Canon City, CO 81212
BLM/USFS San Juan Public Land Center, 15 Burnett Court, Durango, CO 81301
Uncompahgre Field Office, 2456 S. Townsend Ave., Montrose, CO 81401
White River Field Office, 220 E. Market St., Meeker, CO 81641

*Idaho*
Bruneau Field Office, 3948 Development Avenue, Boise, ID 83705
Burley Field Office, 15 East 200 South, Burley, ID 83318
Coeur d'Alene Field Office, 3815 Schreiber Way, Coeur d'Alene, ID 83815
Four Rivers Field Office, 3948 Development Avenue, Boise, ID 83705
Idaho Falls District Office, 1405 Hollipark Drive, Idaho Falls, ID 83401
Idaho State Office, 1387 S. Vinnell Way, Boise, ID 83709
Jarbidge Field Office, 2536 Kimberly Road, Twin Falls, ID 83301
Owyhee Field Office, 20 First Avenue West, Marsing, ID 83639
Pocatello Field Office, 4350 Cliffs Drive, Pocatello, ID 83204
Shoshone Field Office, 400 W. F Street, Shoshone, ID 83352
Upper Snake Field Office, 1405 Hollipark Drive, Idaho Falls, ID 83401

*Montana*
Billings Field Office, 5001 Southgate Drive, Billings, MT 59101
Butte Field Office, 106 N. Parkmont, Butte, MT 59702
Dillon Field Office, 1005 Selway Drive, Dillon, MT 59725
Missoula Field Office, 3255 Fort Missoula Road, Missoula, MT 59804
Montana State Office, 5001 Southgate Drive, Billings, MT 59101

*Nevada*
Battle Mountain District Office, 50 Bastian Road, Battle Mountain, NV 89820

BLM_0043908

Carson City District Office, 5665 Morgan Mill Road, Carson City, NV 89701
Elko District Office, 3900 East Idaho Street, Elko, NV 89801
Elko District Office, 3900 E. Idaho Street, Elko NV 89801
Ely District Office, 702 North Industrial Way, Ely, NV 89301
Nevada State Office, 1340 Financial Blvd, Reno NV 89502
Southern Nevada District Office, 4701 North Torrey Pines Drive, Las Vegas, NV 89130
Winnemucca District Office, 5100 East Winnemucca Boulevard, Winnemucca, NV 89445

*New Mexico*
Carlsbad Field Office, 620 E. Greene St., Carlsbad, NM 88220
Farmington District Office, 1235 La Plata Highway, Farmington, NM 87401
Las Cruces Field Office, 1800 Marquess Street, Las Cruces, NM 88005
New Mexico State Office, 1474 Rodeo Road, Santa Fe, NM 87505
Rio Puerco Field Office, 435 Montano NE, Albuquerque, NM 87107
Roswell Field Office, 2909 West Second Street, Roswell, NM 88201
Socorro Field Office, 901 S. Hwy 85, Socorro, NM 87801

*Oregon*
Baker District Office, 3285 11th Street, Baker City, OR 97814
Burns District Office, 28910 Hwy 20 West, Hines, OR 97738
Eugene District Office, 2890 Chad Drive, Eugene, OR 97440
Lakeview District Office, 1301 S. "G" Street, Lakeview, OR 97630
Lakeview District Office, 1301 South G Street, Lakeview, OR 97630
Medford District Office, 3040 Biddle Road, Medford, OR 97504
Oregon/Washington State Office, 333 S.W. 1st. Avenue, Portland, OR 97204
Prineville District Office, 3050 N.E. 3rd Street, Prineville, OR 97754
Roseburg District Office, 777 NW Garden Valley Blvd., Roseburg, OR 97470
Salem District Office, 1717 Fabry Rd. SE, Salem, OR 97306
Vale District Office, 100 Oregon Street, Vale, OR 97918

*Utah*
Cedar City Field Office, 176 East D.L. Sargent Drive, Cedar City, UT 84721
Fillmore Field Office, 35 East 500 North, Fillmore, UT 84631
Grand Staircase-Escalante National Monument, Kanab Headquarters, 190 East Center, Kanab, UT 84741
Kanab Field Office, 318 North 100 East, Kanab, UT 84741
Moab Field Office, 82 East Dogwood, Moab, Utah 84532
Monticello Field Office, 365 North Main, Monticello, Utah 84535
Price Field Office, 125 South 600 West, Price, UT 84501
Richfield Field Office, 150 East 900 North, Richfield, UT 84701
Salt Lake Field Office, 2370 South 2300 West, Salt Lake City, UT 84119
St. George Field Office, 345 East Riverside Drive, St. George, UT 84790
Utah State Office, 440 West 200 South, Suite 500, Salt Lake City, UT 84145
Vernal Field Office, 170 South 500 East, Vernal, UT 84078

*Washington*

BLM_0043909

Spokane District Office, 1103 N Fancher Road, Spokane, WA 99212

***Wyoming***
Casper Field Office, 2987 Prospector Drive, Casper, WY 82604-2968
Cody Field Office, 1002 Blackburn, Cody, WY  82414-8464
Kemmerer Field Office, 312 Highway 189 North, Kemmerer, WY 83101-9711
Lander Field Office, 1335 Main, Lander, WY 82520-0589
Rawlins Field Office, 1300 North Third, Rawlins, WY 82301-2407
Rock Springs Field Office, 280 Highway 191 N., Rock Springs, WY 82901-3447
Worland Field Office, 101 South 23rd, Worland, WY 82401-0119
Wyoming State Office, 5353 Yellowstone, Cheyenne, WY 82009

BLM_0043910

# APPROVED RESOURCE MANAGEMENT PLAN AMENDMENTS

## INTRODUCTION

Designation of Section 368 energy corridors under the Proposed Action requires the BLM to amend specific land use plans, listed below, thereby incorporating the designated corridors in the plans. There are no changes to corridor locations or attributes from those identified in the PEIS for BLM lands except as noted above in the section titled "Modifications and Clarifications." This section identifies a change based on the Governors' Consistency Review, in which a segment of corridor 81-272 in New Mexico, which falls within the Mimbres planning area (see Figure A-7) will not be designated in this ROD.

The plan amendments include (1) the identification of specific Section 368 energy corridors by centerline, width, and compatible energy uses and restrictions (such as pipeline only or electricity transmission with a restricted tower height) and (2) the adoption of mandatory interagency operating procedures that would be implemented on a corridor- and project-specific basis (Appendix B). The Section 368 corridor specifications are identified in Appendix A and in a Geographic Information System (GIS) database that accompanies the PEIS and is available online at http://corridoreis.anl.gov.

Current land use plans are called resource management plans (RMPs); in the past, such plans were called management framework plans (MFPs), and some MFPs are still in use. Analyses conducted in programmatic environmental impact statement (PEIS) DOE/EIS 0386 (*Designation of Energy Corridors on Federal Land in the 11 Western States*) support the amendment of specific land use plans identified herein.

Only those land use plans where Section 368 energy corridors are designated are amended by this ROD. Corridor-related amendments are incorporated into existing land use plans upon signature of this ROD. Plans that are currently undergoing revision for reasons unrelated to Section 368, but not scheduled for completion until after the ROD is signed, will incorporate the corridor designations into their ongoing plan revisions upon signature of this ROD. Plans that have recently been revised before this ROD is signed will be amended upon signature of this ROD.

BLM_0043911

**TABLE 3: BLM Land Use or Equivalent Plans Amended by Designating EPAct Section 368 Energy Corridors[a,b]**

| State | Land Use Plan | Agency Office(s) |
|---|---|---|
| Arizona | Arizona Strip Field Office RMP | Arizona Strip FO |
| | Kingman RMP | Kingman FO |
| | Lake Havasu RMP | Lake Havasu FO |
| | Lower Gila North MFP | Hassayampa, Kingman FO |
| | Lower Gila South RMP | Lower Sonoran FO |
| | Phoenix RMP | Hassayampa FO, Safford FO, Tucson FO |
| | Safford RMP | Safford FO, Tucson FO |
| | Yuma RMP | Yuma FO |
| California | Alturas RMP | Alturas FO |
| | Bishop RMP | Bishop FO |
| | Cal-Neva MFP | Eagle Lake FO |
| | California Desert Conservation Area Plan | Barstow FO, El Centro FO, Lake Havasu FO, Needles FO, Ridgecrest FO, Palm Springs-South Coast FO |
| | Eagle Lake RMP | Eagle Lake FO |
| | Redding RMP | Redding FO |
| | Sierra RMP | Folsom FO |
| | South Coast RMP | Palm Springs-South Coast FO |
| | Surprise RMP | Surprise FO |
| Colorado | Glenwood Springs RMP | Glenwood Springs FO |
| | Grand Junction RMP | Grand Junction FO |
| | Gunnison RMP | Gunnison FO |
| | Kremmling RMP | Kremmling FO |
| | Little Snake RMP | Little Snake FO |
| | Royal Gorge RMP | Royal Gorge FO |
| | San Juan/San Miguel RMP | Dolores FO, Uncompahgre FO |
| | Uncompahgre Basin RMP | Uncompahgre FO |
| | White River RMP | White River FO |
| Idaho | Big Desert MFP | Upper Snake FO |
| | Bruneau MFP | Bruneau FO |
| | Cassia RMP | Burley FO |
| | Coeur d'Alene RMP | Coeur d'Alene FO |
| | Jarbidge RMP | Bruneau FO, Four Rivers FO, Jarbidge FO |
| | Kuna MFP | Four Rivers FO |
| | Malad MFP | Pocatello FO |
| | Medicine Lodge RMP | Upper Snake FO |
| | Monument RMP | Burley FO, Shoshone FO |
| | Owyhee RMP | Four Rivers FO, Owyhee FO |
| | Twin Falls MFP | Burley FO |
| Montana | Billings RMP | Billings FO |
| | Dillon RMP | Dillon FO |
| | Garnet RMP | Missoula FO |
| | Headwaters RMP | Butte FO |

*32*

**TABLE 3: (Cont.)**

| State | Land Use Plan | Agency Office(s) |
|---|---|---|
| Nevada | Black Rock-High Rock Immigrant Trail NCA RMP | Winnemucca DO |
| | Carson City FO Consolidated RMP | Carson City DO |
| | Elko RMP | Elko DO |
| | Ely RMP | Ely DO |
| | Las Vegas RMP | Southern Nevada DO |
| | Paradise-Denio MFP | Winnemucca DO |
| | Sonoma Gerlach MFP | Winnemucca DO |
| | Tonopah RMP | Battle Mountain DO |
| | Wells RMP | Elko DO |
| New Mexico | Carlsbad RMP | Carlsbad FO |
| | Farmington RMP | Farmington FO |
| | Mimbres RMP | Las Cruces DO |
| | Rio Puerco RMP | Rio Puerco FO |
| | Roswell RMP | Roswell FO |
| | Socorro RMP | Socorro FO |
| | White Sands RMP | Las Cruces DO |
| Oregon | Andrews RMP | Burns DO |
| | Baker RMP | Baker DO |
| | Brothers-Lapine RMP | Prineville DO |
| | Eugene RMP | Eugene DO |
| | Klamath Falls RMP | Lakeview DO |
| | Lakeview RMP | Lakeview DO |
| | Medford RMP | Medford DO |
| | Roseburg RMP | Roseburg DO |
| | Salem RMP | Salem DO |
| | Southeastern Oregon RMP | Vale DO |
| | Three Rivers RMP | Burns DO |
| | Two Rivers RMP | Prineville DO |
| | Upper Deschutes RMP | Prineville DO |
| Utah | Cedar-Beaver-Garfield-Antimony RMP | Cedar City FO |
| | Grand Staircase-Escalante National Monument Management Plan | Grand Staircase-Escalante NM |
| | House Range RMP[e] | Fillmore FO |
| | Kanab RMP[d] | Kanab FO |
| | Moab RMP[d] | Moab FO |
| | Pinyon MFP | Cedar City FO |
| | Pony Express RMP[c] | Salt Lake FO |
| | Price River RMP[d] | Price FO |
| | Richfield RMP[d] | Richfield FO |
| | Monticello RMP[d] | Monticello FO |
| | St. George (Dixie) RMP | St. George FO |
| | Vernal RMP[d] | Vernal FO |
| | Warm Springs RMP[e] | Fillmore FO |
| Washington | Spokane RMP | Spokane DO |

BLM_0043913

**TABLE 3: (Cont.)**

| | State Land Use Plan | Agency Office(s) |
|---|---|---|
| Wyoming | Casper RMP | Casper FO |
| | Cody RMP | Cody FO |
| | Grass Creek RMP | Worland FO |
| | Great Divide RMP | Rawlins FO |
| | Green River RMP | Rock Springs FO |
| | Kemmerer RMP | Kemmerer FO |
| | Lander RMP | Lander FO |
| | Washakie RMP | Worland FO |

[a]   DO = district office; FO = field office; MFP = Management Framework Plan; RMP = Resource Management Plan.

[b]   This list represents the most current plans, and differs from the list in the Final PEIS with regard to some plan names and agency offices.

[c]   This plan cannot be amended at this time due to restrictions to plan amendments imposed by Section 2815(d) of Public Law 106-65, the National Defense Authorization Act for Fiscal Year 2000 (October 5, 1999). Should these restrictions be lifted, the amendments to this plan would become effective and the BLM would provide public notice of the effective date of the amendments.

[d]   This recently approved RMP contains statements that the ROW corridor designation decisions presented in the RMP are consistent with the PEIS Proposed Action. Since this RMP is consistent with the PEIS, further amendment of this plan will not be necessary.

# CONSIDERATION OF OTHER BLM PLANS AND POLICIES

In the event there are inconsistencies or discrepancies between previously approved RMPs and the plan amendments approved in this ROD, the decisions in this ROD will prevail. Where energy transport corridors previously designated in local RMPs have been impacted by this action, Section 368 criteria shall apply. In some situations, for example, the corridor width and/or compatible uses have been changed; these changes are effective with the signature of this ROD. The IOPs will be effective for all Section 368 corridors upon signature of this ROD. Appendix A and the accompanying GIS database provide the geographical specifications (centerline and width) and compatible uses as specified by EPAct Section 368. Appendix B provides the IOPs that are applicable to development within these corridors.

These corridors provide important connectivity across jurisdictional boundaries for long-distance energy transport projects which will enhance the western electricity grid. Corridors represent the preferred locations for future long-distance energy transport projects on BLM lands. All future resource authorizations and actions will conform to the decisions contained in this ROD as provided by 43 CFR 1610.5-3. All existing operations and activities authorized under permits, contracts, cooperative agreements, or other instruments will be modified, as necessary, to conform to these plan amendments within a reasonable timeframe, if otherwise authorized by law, regulation, contract, permit, cooperative agreements, or other instrument of occupancy and

BLM_0043914

use. The plan amendments approved in this ROD do not, however, repeal valid existing rights on public lands.

# PLAN IMPLEMENTATION

Section 368 directs the Agencies to establish procedures under their respective authorities to expedite the application process for energy-related projects within Section 368 designated corridors. It is expected that within 6 months from the approval of this ROD, a Memorandum of Understanding (MOU) will be developed by the BLM and Forest Service that will clearly delineate how to process applications for facilities within the Section 368 corridors. At a minimum, the MOU would address implementation of those IOPs for reviewing applications for energy ROWs within designated Section 368 corridors. Additional measures likely to be addressed include:

- Implementation procedures to create a virtual "one-stop shop" application process that will become the foundation of the Section 368 expedited application procedures. The process will be based on the principles of the Service First program implemented by the BLM, FS, NPS, and USFWS. Service First was initially a joint BLM and FS initiative designed to improve customer service by providing streamlined, one-stop shopping across agency jurisdictional boundaries for public land users. Authority for Service First was provided by legislation in 1997 covering only the BLM and the FS. That legislation was recently amended to include the NPS and USFWS. Agencies that are not a part of Service First may join the Service First agencies through necessary agreements in order to process applications (Public Law 106-291, October 11, 2000, Section 330, 43 USC 1701).

- Guidance on the types of further environmental and regulatory reviews that will be required for projects seeking to use Section 368 corridors and implementation of the IOPs.

- Selecting a project manager who will serve as the point of contact (POC) for a proposed project. The POC will have knowledge, experience, and credentials similar to current BLM national project managers. The POC will oversee all processing of the applications, including environmental reviews, construction activities, post-construction monitoring, and close-out issues, as appropriate.

- Procedures to identify and designate future Section 368 corridors.

BLM_0043915

## General Implementation Schedule

The decision to designate Section 368 corridors by amending RMPs goes into effect upon signature of this ROD.

An MOU between the Forest Service and the BLM establishing compatible implementation procedures will go into effect subsequent to the signing of the ROD, estimated as June 2009.

Directives providing guidance to state and field offices for the BLM will go into effect subsequent to the signing of the MOU, estimated as December 2009.

## Maintaining the Plan

Land use plan decisions and supporting information associated with these RMP amendments will be maintained to reflect minor changes in data. Maintenance is limited to refining, documenting, and/or clarifying these land use plan amendments, as provided at 43 CFR 1610.5-4.

Plan maintenance will be documented in supporting records. Plan maintenance does not require formal public involvement, interagency coordination, or preparation of an environmental assessment or environmental impact statement.

## Changing the Plan

The plan amendments approved by this decision may be changed, should conditions warrant, through a future plan amendment or revision process. Future plan changes may become necessary if, as set forth at 43 CFR 1610.5-5, a need exists to consider monitoring and evaluation findings, new data, new or revised policy, a change in circumstances or a proposed action that may result in a change in the scope of resource uses or a change in the terms, conditions, and decisions of the approved plan. Generally, an amendment is issue-specific, but a programmatic amendment process is also possible. Plan amendments are accomplished with public input and the appropriate level of environmental analysis.

Data used in development of the plan amendments in this decision are dynamic. The data and maps used are for land use planning purposes and will be refined as site-specific planning and on-the-ground implementation occurs. Updating data is considered plan maintenance, which will occur over time as the land use plans are implemented.

BLM_0043916

# LIST OF PREPARERS

Kathryn Winthrop, Project Manager, BLM

Ron Montagna, Rights-of-Way Management, BLM

Ray Brady, Energy Team Lead, BLM

# REFERENCES CITED

Black & Veatch Corporation, 2007, *Arizona Renewable Energy Assessment*, B&V Project Number 145888, Overland Park, Kan.

Black & Veatch Corporation, 2008, Renewable Energy Transmission Initiative, B&V Project Number 149148, Walnut Creek, Calif.

BLM (Bureau of Land Management), 2008, *BLM Manual 6840, Special Status Species Management*, Release 6-125, U.S. Department of the Interior, Dec. 12.

CDEAC (Clean and Diversified Energy Advisory Committee, 2006a, *CDEA Solar Task Force Report*, prepared by the Clean and Diversified Energy Advisory Committee for the Western Governors' Association Clean and Diversified Energy Initiative, Denver, CO, January.

CDEAC, 2006b, *CDEA Transmission Task Force Report (05-30-06)*, prepared by the Clean and Diversified Energy Advisory Committee for the Western Governors' Association Clean and Diversified Energy Initiative, Denver, CO, May.

DOE, 2006a, *National Electric Transmission Congestion Study*, Washington, D.C., August. Available at http://www.oe.energy.gov/DocumentsandMedia/Congestion_Study_2006-9MB.pdf. Accessed May 2, 2007.

DOE, 2008, *20% Wind Energy by 2030*, DOE/GO-102008-2578, U.S. Department of Energy, Office of Energy Efficiency and Renewable Energy, Washington, D.C., May.

DOE and DOI, 2008, Programmatic Environmental Impact Statement, Designation of Energy Corridors on Federal Land in the 11 Western States (DOE/EIS-0386), U.S. Department of Energy and U.S. Department of the Interior, Bureau of Land Management, Washington, D.C. November.

NERC (North American Energy Reliability Corporation), 2007, *2007 Long-Term Reliability Assessment: 2007-2016*, North American Electrical Reliability Corporation, Princeton, N.J.

State of Nevada, 2007, *Governor Jim Gibbons' Nevada Renewable Energy Transmission Access Advisory Committee Phase I Report*, Reno, Nev.

WGA (Western Governors' Association), 2001, *Conceptual Plans for Electric Transmission in the West*, prepared by the Transmission Working Group, Western Governors' Association, Denver, Colo.

BLM_0043917

WGA, 2008a, *Western Renewable Energy Zones*. Available at http://www.westgov.org/wga/initiatives/wrez/index.htm. Accessed August 4, 2008.

WGA, 2008b, *Work Plan to Identify Renewable Energy Zones and Associated Transmission in the Western Interconnection*, April 21. Available at http://www.westgov.org/wga/initiatives/wrez/wrez-workplan.pdf. Accessed August 6, 2008.

BLM_0043918

## BLM DIRECTOR RECOMMENDATION

Having considered a full range of reasonable alternatives, associated effects, and public input, I recommend adoption of the attached Resource Management Plan Amendments.

James L. Caswell
Director
Bureau of Land Management

Date     1/14/09

## DEPUTY ASSISTANT SECRETARY APPROVAL

In consideration of the foregoing, I approve the attached Resource Management Plan Amendments. Amending these plans will serve to designate energy transport corridors in these plans, as called for by Section 368 of the Energy Policy Act of 2005, 42 U.S.C. 15926.

Foster L. Wade*
Deputy Assistant Secretary
Land and Minerals Management
Department of the Interior

Date     1/14/09

*Foster L. Wade has been delegated the authority to sign this Record of Decision for the Department of the Interior.

BLM_0043919

# APPENDIX A:
# APPROVED LAND USE PLAN AMENDMENTS
# FOR
# SECTION 368 CORRIDORS

BLM_0043920

# APPENDIX A:
# APPROVED LAND USE PLAN AMENDMENTS
# FOR
# SECTION 368 CORRIDORS

The U.S. Department of the Interior, Bureau of Land Management (BLM), develops land use plans to establish, among other things, resource condition goals and objectives for a planning area. Current land use plans are called resource management plans (RMPs); in the past, such plans were called management framework plans (MFPs), and some MFPs are still in use. Analyses conducted in programmatic environmental impact statement (PEIS), DOE/EIS 0386 (*Designation of Energy Corridors on Federal Land in the 11 Western States)* support the amendment of specific land use plans identified herein.

## A.1  LAND USE PLANS AMENDED BY THIS ROD

BLM_0043921

**TABLE A:  Approved BLM Land Use Plan Amendments Designating Section 368 Energy Corridors[a]**

| State | Land Use Plan Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|-------|--------------------------|--------------------|----------|--------------------------|-------------------------------------|--------------|
| Arizona | Arizona Strip Field Office RMP | Arizona Strip FO | 113-116 | 5,280 | | Increased width is consistent with locally-designated corridors in existing plan. |
| | Arizona Strip Field Office RMP | Arizona Strip FO | 116-206 | | | |
| | Arizona Strip Field Office RMP | Arizona Strip FO | 68-116 | 5,280 | | Increased width is consistent with locally-designated corridors in existing plan. |
| | Kingman RMP | Kingman FO | 41-46 | 5,280 | Underground only | Additional width and limited mode are consistent with existing plan. |
| | Kingman RMP | Kingman FO | 41-47 | 5,280 | | Additional width is consistent with existing plan. |
| | Kingman RMP | Kingman FO | 46-269 | 5,280 | Underground only | Additional width and underground only mode are consistent with existing plan. |
| | Kingman RMP | Kingman FO | 46-270 | | | |
| | Kingman RMP | Kingman FO | 47-231 | 5,280 | Electric only | Additional width and limited mode are consistent with existing plan. |
| | Lake Havasu RMP | Lake Havasu FO | 41-46 | 10,560 | | Additional width is consistent with existing plan. |
| | Lake Havasu RMP | Lake Havasu FO | 30-52 | 5,280 | | Additional width is consistent with existing plan. |
| | Lake Havasu RMP | Lake Havasu FO | 41-47 | 5,280 | | Additional width is consistent with existing plan. |

*A–3*

BLM_0043922

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|-------|-------------------------------|--------------------|----------|--------------------------|-------------------------------------|--------------|
| Arizona (Cont.) | Lake Havasu RMP | Lake Havasu FO | 46-269 | 5,280 | Underground only | Additional width is consistent with existing plan. |
| | Lake Havasu RMP | Lake Havasu FO | 46-269 | 10,560 | | Additional width is consistent with existing plan. |
| | Lower Gila North MFP | Hassayampa FO, Kingman FO | 30-52 | | | |
| | Lower Gila North MFP | Hassayampa FO, Kingman FO | 46-269 | | | |
| | Lower Gila North MFP | Hassayampa FO, Kingman FO | 46-270 | | | |
| | Lower Gila South RMP | Lower Sonoran FO | 30-52 | | | |
| | Lower Gila South RMP | Lower Sonoran FO | 115-208 | 5,280 | | Additional width is consistent with existing plan. |
| | Lower Gila South RMP | Lower Sonoran FO | 115-238 | | | |
| | Phoenix RMP | Hassayampa FO, Safford FO, Tucson FO | 61-207 | 2,900–16,300 | | Widths vary in vicinity of Agua Fria NM to provide flexibility in ROW location consistent with existing plan. |
| | Safford RMP | Safford FO, Tucson FO | 81-213 | | | |
| | Yuma RMP | Yuma FO | 30-52 | 5,280 | | Increased width is consistent with existing plan. |
| | Yuma RMP | Yuma FO | 115-238 | 5,280 | | Increased width is consistent with existing plan. |
| California | Alturas RMP | Alturas FO | 15-104 | 500 | | Reduced width is consistent with existing plan. |
| | Alturas RMP | Alturas FO | 16-104 | 500 | | Reduced width is consistent with existing plan. |

*A-4*

BLM_0043923

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|-------|-------|-------|-------|-------|-------|-------|
| California (Cont.) | Alturas RMP | Alturas FO | 8-104 | 500 | | Reduced width is consistent with existing plan. |
| | Alturas RMP | Alturas FO | 7-8 | 500 | | Reduced width is consistent with existing plan. |
| | Bishop RMP | Bishop FO | 18-23 | 1,320 | | Reduced width is consistent with existing plan. |
| | California Desert Conservation Area Plan | Barstow FO | 23-25 | 10,560 | | Increased width is consistent with existing plan. |
| | California Desert Conservation Area Plan | El Centro FO | 115-238 | 10,560 | | Increased width is consistent with existing plan. |
| | California Desert Conservation Area Plan | Ridgecrest FO | 18-23 | 10,560 | | Increased width is consistent with existing plan. |
| | California Desert Conservation Area Plan | Ridgecrest FO | 23-106 | 10,560 | | Increased width is consistent with existing plan. |
| | California Desert Conservation Area Plan | Ridgecrest FO | 23-25 | 10,560 | | Increased width is consistent with existing plan. |
| | California Desert Conservation Area Plan | Barstow FO | 27-225 | 10,560 | | Increased width is consistent with existing plan. |
| | California Desert Conservation Area Plan | Barstow FO | 27-266 | 10,560 | | Increased width is consistent with existing plan |
| | California Desert Conservation Area Plan | Barstow FO | 27-41 | 10,560 | | Increased width is consistent with existing plan. |
| | California Desert Conservation Area Plan | Needles FO | 27-225 | 10,560 | | Increased width is consistent with existing plan. |
| | California Desert Conservation Area Plan | Needles FO | 27-41 | 3,500–10,560 | | Increased width is consistent with existing plan. |
| | California Desert Conservation Area Plan | Palm Springs-South Coast FO | 30-52 | 10,560 | | Increased width is consistent with existing plan. |
| | Eagle Lake RMP | Eagle Lake FO | 15-104 | | | |
| | Redding RMP | Redding FO | 101-263 | | | |
| | Redding RMP | Redding FO | 261-262 | | | |
| | Sierra RMP | Folsom FO | 6-15 | | | |

BLM_0043924

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|---|---|---|---|---|---|---|
| | South Coast RMP | Palm Springs-South Coast FO | 115-238 | 1,000–3,500 | Electric only | Reduced width and mode are consistent with restrictions on the same corridor across adjacent Forest Service lands. |
| | Surprise RMP | Surprise FO | 16-104 | | | |
| Colorado | Glenwood Springs RMP | Glenwood Springs FO | 132-276 | | Electric only, multimodal | Electric-only limitation on a portion of this corridor is to provide separation integrity in Wyoming and Colorado. |
| | Grand Junction RMP | Grand Junction FO | 132-136 | 21,120–26,400 | | Additional width is consistent with existing plan. |
| | Grand Junction RMP | Grand Junction FO | 132-133 | 3,500–5,280 | Underground only | Underground-only limitation is to provide electric transmission-pipeline separation integrity for this corridor throughout its length in Wyoming and Colorado. Increased width is consistent with the current plan and in anticipation of multiple facilities. |
| | Grand Junction RMP | Grand Junction FO | 132-276 | | Electric only | Electric-only limitation is to provide separation integrity for this corridor in Wyoming and Colorado. |
| | Gunnison RMP | Gunnison FO | 87-277 | 1,000–5,280 | | Variable widths above and below the default are consistent with the existing plan. |
| | Kremmling RMP | Kremmling FO | 144-275 | | | |
| | Little Snake RMP | Little Snake FO | 126-133 | 3,500–4,500 | | Increased width is consistent with the existing plan. |

BLM_0043925

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|-------|-------------------------------|--------------------|----------|--------------------------|-------------------------------------|--------------|
| Colorado (Cont.) | Little Snake RMP | Little Snake FO | 132-133 | 3,500–5,950 | Underground only | Underground-only limitation is to provide separation integrity for this corridor throughout its length in Wyoming and Colorado. Increased width is consistent with the current plan and in anticipation of multiple facilities. |
| | Little Snake RMP | Little Snake FO | 132-276 | | Electric only | Electric-only limitation is to provide separation integrity for this corridor in Wyoming and Colorado. |
| | Little Snake RMP | Little Snake FO | 133-142 | | | |
| | Little Snake RMP | Little Snake FO | 138-143 | | Electric only | Electric-only limitation is to provide separation integrity for this corridor in Wyoming and Colorado. |
| | Little Snake RMP | Little Snake FO | 144-275 | | | |
| | Little Snake RMP | Little Snake FO | 73-133 | | Underground only | Underground-only limitation is to provide separation integrity for this corridor throughout its length in Wyoming and Colorado. |
| | Royal Gorge RMP | Royal Gorge FO | 87-277 | | | |
| | San Juan/San Miguel RMP | Dolores FO | 130-131 (N) | | Electric only | Limited to electric-only because no underground use is anticipated. |
| | San Juan/San Miguel RMP | Dolores FO | 130-274 | | | |
| | San Juan/San Miguel RMP | Uncompahgre FO | 130-131 (N) | | Electric only | Limited to electric-only because no underground use is anticipated. |
| | San Juan/San Miguel RMP | Uncompahgre FO | 130-131 (S) | | | |
| | San Juan/San Miguel RMP | Uncompahgre FO | 130-274 | | | |
| | San Juan/San Miguel RMP | Uncompahgre FO | 130-274 (E) | | Underground only | The underground-only limitation is to reduce potential visual impacts. |
| | Uncompahgre Basin RMP | Uncompahgre FO | 132-136 | | | |

A-7

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|-------|-------------------------------|--------------------|----------|--------------------------|------------------------------------|--------------|
| Colorado (Cont.) | Uncompahgre Basin RMP | Uncompahgre FO | 134-136 | | | |
| | Uncompahgre Basin RMP | Uncompahgre FO | 134-139 | | Electric only | Limitation to electric-only is to protect fragile soils. |
| | Uncompahgre Basin RMP | Uncompahgre FO | 136-139 | | | |
| | Uncompahgre Basin RMP | Uncompahgre FO | 139-277 | | Electric only | Limitation to electric-only is to protect fragile soils. |
| | Uncompahgre Basin RMP | Uncompahgre FO | 136-277 | | | |
| | White River RMP | White River FO | 126-133 | 3,500–9,000 | | Increased width is consistent with the current plan. |
| | White River RMP | White River FO | 132-133 | 2,250–10,500 | Underground only | Underground-only limitation is to provide separation integrity for this corridor throughout its length in Wyoming and Colorado. Increased width is consistent with the current plan and in anticipation of multiple facilities. |
| | White River RMP | White River FO | 132-276 | | Electric only | Electric-only limitation is to provide separation integrity for this corridor in Wyoming and Colorado. |
| Idaho | Big Desert MFP | Upper Snake FO | 50-203 | | | |
| | Bruneau MFP | Bruneau FO | 36-228 | | | |
| | Cassia RMP | Burley FO | 112-226 | | | |
| | Cassia RMP | Burley FO | 49-202 | | | |
| | Coeur d'Alene RMP | Coeur d'Alene FO | 229-254 | 2,000 | | Reduced width is consistent with adjacent Idaho Panhandle NF. |
| | Jarbidge RMP | Four Rivers FO | 29-36 | 1,000–3,500 | | Reduced width in some locations to reduce potential impacts to nesting raptors in the Snake River Birds of Prey NCA. |

BLM_0043927

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|---|---|---|---|---|---|---|
| Idaho (Cont.) | Jarbidge RMP | Four Rivers FO | 36-228 | 1,000–3,500 | | Reduced width in some locations to reduce potential impacts to nesting raptors in the Snake River Birds of Prey NCA. |
| | Jarbidge RMP | Jarbidge FO | 29-36 | | | |
| | Jarbidge RMP | Jarbidge FO | 36-112 | | | |
| | Jarbidge RMP | Jarbidge FO | 36-226 | | | |
| | Jarbidge RMP | Jarbidge FO | 36-228 | | | |
| | Kuna MFP | Four Rivers FO | 29-36 | 1,000–3,500 | | Reduced width in some locations to reduce potential impacts to nesting raptors in the Snake River Birds of Prey NCA. |
| | Malad MFP | Pocatello FO | 49-202 | | | |
| | Medicine Lodge RMP | Upper Snake FO | 50-203 | | | |
| | Monument RMP | Burley FO | 49-112 | | | |
| | Monument RMP | Burley FO | 49-202 | | | |
| | Monument RMP | Shoshone FO | 112-226 | | | |
| | Monument RMP | Shoshone FO | 36-112 | | | |
| | Monument RMP | Shoshone FO | 49-112 | | | |
| | Owyhee RMP | Four Rivers FO | 36-228 | 1,000–3,500 | | Reduced width in some locations to reduce potential impacts to nesting raptors in the Snake River Birds of Prey NCA. |
| | Owyhee RMP | Owyhee FO | 11-228 | | | |
| | Owyhee RMP | Owyhee FO | 24-228 | | | |
| | Owyhee RMP | Owyhee FO | 36-228 | 1,000–3,500 | | Width is restricted to reduce potential impacts to nesting raptors in the Snake River Birds of Prey NCA. |
| | Twin Falls MFP | Burley FO | 111-226 | | | |
| | Twin Falls MFP | Burley FO | 36-226 | | | |
| Montana | Billings RMP | Billings FO | 79-216 | | | |
| | Dillon RMP | Dillon FO | 50-203 | | | |

BLM_0043928

**TABLE A (Cont.)**

*A-10*

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|---|---|---|---|---|---|---|
| Montana (Cont.) | Dillon RMP | Dillon FO | 50-51 | | | |
| | Garnet RMP | Missoula FO | 229-254 | 1,000 | Electric only | Reduced width and mode limitations to shift potential visual impacts away from transportation routes and follow existing infrastructure. |
| | Headwaters RMP | Butte FO | 51-204 | | | |
| | Headwaters RMP | Butte FO | 51-205 | | | |
| | Headwaters RMP | Butte FO | 229-254 | 1,000 | Electric only | Reduced width and mode limitations to shift potential visual impacts away from transportation routes and follow existing infrastructure. |
| Nevada | Black Rock-High Rock Immigrant Trail NCA RMP | Winnemucca DO | 16-24 | 2640 | | Reduced width limits potential impacts where corridor crosses a narrow extension of the NCA. |
| | Carson City Consolidated RMP | Carson City DO | 15-17 | 10,560 | | Increased width is consistent with existing plan. |
| | Carson City Consolidated RMP | Carson City DO | 15-104 | | | |
| | Carson City Consolidated RMP | Carson City DO | 17-18 | 10,560 | | Increased width is consistent with existing plan. |
| | Carson City Consolidated RMP | Carson City DO | 18-224 | 10,560 | | Increased width is consistent with existing plan. |
| | Carson City Consolidated RMP | Carson City DO | 18-23 | 10,560 | | Increased width is consistent with existing plan. |
| | Elko RMP | Elko DO | 17-35 | 1,000–15,840 | | Reduced width in some portions of this corridor is to minimize potential impacts on sage grouse habitat. In other locations, the increased width is consistent with the existing plan. |
| | Ely RMP | Ely DO | 37-232 | 2,640 | | Reduced width is consistent with existing plan. |

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|-------|-------------------------------|--------------------|----------|--------------------------|-------------------------------------|--------------|
| Nevada (Cont.) | Ely RMP | Ely DO | 39-113 | | | |
| | Ely RMP | Ely DO | 44-110 | 2,640 | | Reduced width is consistent with existing plan. |
| | Ely RMP | Ely DO | 110-114 | | | |
| | Ely RMP | Ely DO | 110-233 | 2,640 | | Reduced width is consistent with existing plan. |
| | Ely RMP | Ely DO | 113-114 | | | |
| | Ely RMP | Ely DO | 113-116 | 5,280 | | Increased width is consistent with plans in adjacent BLM St. George and Arizona Strip Field Offices. |
| | Ely RMP | Ely DO | 232-233 (E) | | | |
| | Ely RMP | Ely DO | 232-233 (W) | 2,640 | | Reduced width is consistent with existing plan. |
| | Las Vegas RMP | Southern Nevada FO | 18-224 | | | |
| | Las Vegas RMP | Southern Nevada FO | 223-224 | 2,050–3,500 | | Width is constrained by proximity to Red Rocks NCA and military training requirements. |
| | Las Vegas RMP | Southern Nevada DO | 224-225 | | | |
| | Las Vegas RMP | Southern Nevada DO | 225-231 | | | |
| | Las Vegas RMP | Southern Nevada DO | 27-225 | | | |
| | Las Vegas RMP | Southern Nevada DO | 37-223 (N) | | | |
| | Las Vegas RMP | Southern Nevada DO | 37-223 (S) | 2,400 | Underground only | Width and above-ground uses are constrained by military training requirements. |
| | Las Vegas RMP | Southern Nevada DO | 37-232 | 2,640 | | Reduced width is consistent with existing plan. |
| | Las Vegas RMP | Southern Nevada DO | 37-39 | | | |
| | Las Vegas RMP | Southern Nevada DO | 39-113 | | | |
| | Las Vegas RMP | Southern Nevada DO | 39-231 | 500–3,500 | | Reduced width following existing pathway through Sunrise Mountain WSA. |

*A-11*

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|---|---|---|---|---|---|---|
| Nevada (Cont.) | Las Vegas RMP | Southern Nevada DO | 47-231 | 2,000 | | Width is reduced to minimize potential impacts to Piute-El Dorado Valley ACEC, consistent with existing plan. |
| | Paradise-Denio MFP | Winnemucca DO | 16-24 | | | |
| | Paradise-Denio MFP | Winnemucca DO | 17-35 | | | |
| | Sonoma Gerlach MFP | Winnemucca DO | 15-17 | 10,560 | | Increased width is consistent with existing plan. |
| | Sonoma Gerlach MFP | Winnemucca DO | 16-104 | 1,000–3,500 | | Reduced width in one location to limit potential visual impacts. |
| | Sonoma Gerlach MFP | Winnemucca DO | 16-17 | | | |
| | Sonoma Gerlach MFP | Winnemucca DO | 16-24 | 2,640 | | Reduced width to limit potential impacts to Black Rock-High Rock NCA. |
| | Sonoma Gerlach MFP | Winnemucca DO | 17-18 | 10,560 | | Increased width is consistent with existing plan. |
| | Sonoma Gerlach MFP | Winnemucca DO | 17-35 | | | |
| | Tonopah RMP | Battle Mountain DO | 18-224 | | | |
| | Wells RMP | Elko DO | 111-226 | 15,840 | | Increased width is consistent with existing plan. |
| | Wells RMP | Elko DO | 17-35 | 15,840 | | Increased width is consistent with existing plan. |
| | Wells RMP | Elko DO | 35-111 | | | |
| | Wells RMP | Elko DO | 35-43 | | | |
| | Wells RMP | Elko DO | 43-111 | 2,640 | | Reduced width is consistent with existing plan. |
| | Wells RMP | Elko DO | 43-44 | 15,840 | | Increased width is consistent with existing plan. |
| | Wells RMP | Elko DO | 44-110 | 2,640 | | Reduced width is consistent with existing plan. |
| | Wells RMP | Elko DO | 44-239 | 15,840 | | |
| New Mexico | Carlsbad RMP | Carlsbad FO | 89-271 | | | |

BLM_0043931

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|---|---|---|---|---|---|---|
| New Mexico (Cont.) | Farmington RMP | Farmington FO | 80-273 | | | |
| | Mimbres RMP | Las Cruces DO | 81-213 | | | |
| | Rio Puerco RMP | Rio Puerco FO | 80-273 | | | |
| | Roswell RMP | Roswell FO | 89-271 | | | |
| | Socorro RMP | Soccoro FO | 81-272 | | | |
| | White Sands RMP | Las Cruces DO | 81-272 | | | |
| Oregon | Andrews RMP | Burns DO | 7-24 | | | |
| | Baker RMP | Baker DO | 250-251 | | | |
| | Brothers-Lapine RMP | Prineville DO | 11-228 | | | |
| | Brothers-Lapine RMP | Prineville DO | 7-11 | | | |
| | Eugene RMP | Eugene DO | 4-247 | | | |
| | Klamath Falls RMP | Lakeview DO | 7-8 | | | |
| | Klamath Falls RMP | Lakeview DO | 7-11 | | | |
| | Klamath Falls RMP | Lakeview DO | 7-24 | | | |
| | Lakeview RMP | Lakeview DO | 7-11 | | | |
| | Lakeview RMP | Lakeview DO | 7-24 | | | |
| | Medford RMP | Medford DO | 4-247 | | | |
| | Roseburg RMP | Roseburg DO | 4-247 | | | |
| | Salem RMP | Salem DO | 10-246 | 1,320–3,500 | Electric only, multimodal | Reduced width and electric-only restrictions on some portions of this corridor are to protect fragile soils and community watershed values and are consistent with existing plan. |
| | Salem RMP | Salem DO | 230-248 | 145–3,500 | | Reduced widths apply where the corridor is confined by protected lands on each side. |
| | Salem RMP | Salem DO | 4-247 | | | |
| | Salem RMP | Salem DO | 5-201 | | | |
| | Southeastern Oregon RMP | Vale DO | 7-24 | | | |

BLM_0043932

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|---|---|---|---|---|---|---|
| Oregon (Cont.) | Southeastern Oregon RMP | Vale DO | 16-24 | | | |
| | Southeastern Oregon RMP | Vale DO | 24-228 | | | |
| | Southeastern Oregon RMP | Vale DO | 11-228 | 1,500–3,500 | | Reduced width on a portion of this corridor is to minimize impacts to Owyhee-Below-the-Dam ACEC. |
| | Southeastern Oregon RMP | Vale DO | 24-228 | | | |
| | Southeastern Oregon RMP | Vale DO | 250-251 | | | |
| | Three Rivers RMP | Burns DO | 11-228 | | | |
| | Two Rivers RMP | Prineville DO | 11-103 | | | |
| | Upper Deschutes RMP | Prineville DO | 7-11 | | | |
| | Upper Deschutes RMP | Prineville DO | 11-103 | | | |
| | Upper Deschutes RMP | Prineville DO | 11-228 | | | |
| Utah | Cedar-Beaver-Garfield-Antimony RMP | Cedar City FO | 113-114 | | | |
| | Grand Staircase-Escalante National Monument Management Plan | Grand Staircase-Escalante NM | 68-116 | | | |
| | House Range RMP[e] | Fillmore FO | 114-241 | | | |
| | House Range RMP[e] | Fillmore FO | 116-206 | | | |
| | Kanab RMP[f] | Kanab FO | 116-206 | | | |
| | Moab RMP[f] | Moab FO | 66-212 | 2,300–29,300 | | Widths vary above and below the default 3,500 feet consistent with the current plan and to adjust to the variable conditions in Moab Canyon. |
| | Pinyon MFP | Cedar City FO | 110-114 | | | |
| | Pinyon MFP | Cedar City FO | 113-114 | | | |
| | Pinyon MFP | Cedar City FO | 114-241 | | | |
| | Pony Express RMP[e] | Fillmore FO | 116-206 | | | |
| | Pony Express RMP[e] | Salt Lake FO | 114-241 | | | |

A-14

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|-------|-------|-------|-------|-------|-------|-------|
| Utah (Cont.) | Pony Express RMP[e] | Salt Lake FO | 116-206 | | | |
| | Pony Express RMP[e] | Salt Lake FO | 44-239 | | | |
| | Pony Express RMP[e] | Salt Lake FO | 66-209 | | Electric only | Limitation to electric-only because of unstable soils. |
| | Pony Express RMP[e] | Salt Lake FO | 66-212 | | | |
| | Price RMP[f] | Price FO | 66-212 | | | |
| | Richfield RMP[f] | Richfield FO | 116-206 | | | |
| | Monticello RMP[f] | Monticello FO | 66-212 | | | |
| | St. George (Dixie) RMP | St. George FO | 113-114 | | | |
| | St. George (Dixie) RMP | St. George FO | 113-116 | 5,280 | | Additional width is consistent with existing plan. |
| | Vernal RMP[f] | Vernal FO | 126-217 | | | |
| | Vernal RMP[f] | Vernal FO | 126-218 | | | |
| | Vernal RMP[f] | Vernal FO | 126-258 | | | |
| | Warm Springs RMP[e] | Fillmore FO | 110-114 | | | |
| | Warm Springs RMP[e] | Fillmore FO | 114-241 | | | |
| Washington | Spokane RMP | Spokane DO | 102-105 | | | |
| Wyoming | Casper RMP | Casper FO | 78-255 | | | |
| | Casper RMP | Casper FO | 79-216 | | | |
| | Cody RMP | Cody FO | 79-216 | | | |
| | Grass Creek RMP | Worland FO | 79-216 | | | |
| | Great Divide RMP | Rawlins FO | 129-218 | | | |
| | Great Divide RMP | Rawlins FO | 129-221 | | | |
| | Great Divide RMP | Rawlins FO | 138-143 | | | |
| | Great Divide RMP | Rawlins FO | 73-129 | | | |
| | Great Divide RMP | Rawlins FO | 73-133 | | Underground only | Limited to underground-only to reduce visual impacts. |
| | Great Divide RMP | Rawlins FO | 73-138 | | | |
| | Great Divide RMP | Rawlins FO | 78-138 | | | |
| | Great Divide RMP | Rawlins FO | 78-255 | | | |

BLM_0043934

**TABLE A  (Cont.)**

| State | Land Use Plan to Be Amended[b] | Responsible Office | Corridor | Nondefault Width (ft)[c] | Nondefault Energy Transport Mode[c] | Rationale[d] |
|-------|-------------------------------|--------------------|----------|--------------------------|-------------------------------------|--------------|
| Wyoming (Cont.) | Great Divide RMP | Rawlins FO | 78-85 | | | |
| | Green River RMP | Rock Springs FO | 121-220 | | Electric only | Limited to electric-only because no underground use is anticipated. |
| | Green River RMP | Rock Springs FO | 121-221 | | | |
| | Green River RMP | Rock Springs FO | 121-240 | | | |
| | Green River RMP | Rock Springs FO | 126-218 | | Underground only, multimodal | Limited to underground-only on a portion because of high lightning and wildfire hazard and visual impacts. |
| | Green River RMP | Rock Springs FO | 129-221 | | | |
| | Green River RMP | Rock Springs FO | 218-240 | | | |
| | Green River RMP | Rock Springs FO | 219-220 | | Electric only | |
| | Green River RMP | Rock Springs FO | 220-221 | | Electric only | |
| | Kemmerer RMP | Kemmerer FO | 121-240 | | | |
| | Kemmerer RMP | Kemmerer FO | 218-240 | | | |
| | Kemmerer RMP | Kemmerer FO | 55-240 | | | |
| | Lander RMP | Lander FO | 79-216 | | | |
| | Washakie RMP | Worland FO | 79-216 | | | |

**Footnotes on next page.**

BLM_0043935

**TABLE A  (Cont.)**

---

<sup>a</sup>   DO= District Office; E = east; FO = Field Office; MFP = Management Framework Plan; N = north; NCA = National Conservation Area; RMP = Resource Management Plan; S = south; W = west.

<sup>b</sup>   Land use plans amended to designate the energy corridors under EPAct Section 368.

<sup>c</sup>   Unless otherwise shown, corridor designations will be for the default width of 3,500 feet and for compatible multimodal uses.

<sup>d</sup>   Designation and use of energy transport corridors under EPAct Section 368 and in accordance with the IOPs and mitigating measures in the PEIS are consistent with other resource values and uses in the planning area.  Where appropriate, the rationale for designation of the nondefault corridor width or energy transport mode of specific corridors is presented.

<sup>e</sup>   This plan cannot be amended at this time due to restrictions to plan amendments imposed by Section 2815(d) of Public Law 106-65, the "National Defense Authorization Act for Fiscal Year 2000" (October 5, 1999). Should these restrictions be lifted, the amendments to this plan would become effective and the BLM would provide public notice of the effective date of the amendments.

<sup>e</sup>   This recently approved RMP contains statements that the ROW corridor designation decisions presented in the RMP are consistent with the PEIS Proposed Action. Since this RMP is consistent with the PEIS, further amendment of this plan will not be necessary.

*A-17*

BLM_0043936

## A.2  STATE-BY-STATE MAPS SHOWING PLAN BOUNDARIES AND SECTION 368 CORRIDORS FOR THE LAND USE PLAN AMENDMENTS

*A-18*

BLM_0043937



**FIGURE A-1:  BLM Resource Management Plans in Arizona Amended by this ROD**

BLM_0043938



**FIGURE A-2: BLM Resource Management Plans in California Amended by this ROD**

BLM_0043939



**FIGURE A-3:  BLM Resource Management Plans in Colorado Amended by this ROD**

BLM_0043940



**FIGURE A-4:  BLM Resource Management Plans in Idaho Amended by this ROD**

*A-22*

BLM_0043941

A-23



**FIGURE A-5:  BLM Resource Management Plans in Montana Amended by this ROD**

BLM_0043942



**FIGURE A-6:  BLM Resource Management Plans in Nevada Amended by this ROD**

*A-24*

BLM_0043943



**FIGURE A-7: BLM Resource Management Plans in New Mexico Amended by this ROD**

*A-25*

BLM_0043944



**FIGURE A-8: BLM Resource Management Plans in Oregon Amended by this ROD**

BLM_0043945



**FIGURE A-9: BLM Resource Management Plans in Utah Amended by this ROD**

*A-27*

BLM_0043946



**FIGURE A-10:  BLM Resource Management Plans in Washington Amended by this ROD**

BLM_0043947



**FIGURE A-11:  BLM Resource Management Plans in Wyoming  Amended by this ROD**

BLM_0043948

*A-30*

BLM_0043949

# APPENDIX B:
# INTERAGENCY OPERATING PROCEDURES

BLM_0043950

# APPENDIX B:
# INTERAGENCY OPERATING PROCEDURES

These Interagency Operating Procedures (IOPs) are adopted as part of the plan amendments and are mandatory, as appropriate, for projects proposed within the Section 368 corridors. Not all IOPs will be appropriate for all projects; those that apply to pipelines, for instance, are not appropriate to transmission lines. These IOPs are practicable means to avoid or minimize environmental harm from future project development that may occur within the designated corridors.

The IOPs set forth below are not intended and should not be construed to alter applicable provisions of law or regulation or to reduce the protections afforded thereby to the resources addressed in the IOPs.

These IOPs are adopted as proposed in the Final PEIS, with minor technical edits and clarifications.

## B.1  PROJECT PLANNING

### Regulatory Compliance

1.  The appropriate agency, assisted by the applicant, must conduct project-specific NEPA analyses in compliance with Section 102 of NEPA. The scope, content, and type of analysis shall be determined on a project-by-project basis by the Agencies and the applicants.

2.  The appropriate agency, assisted by the project applicant, must comply with Section 106 of the NHPA on a project-by-project basis. Consultation with SHPOs, any federally recognized Tribes, and other appropriate parties as per regulations (36 CFR 800) must begin early in the planning process and continue throughout project development and execution. The ACHP retains the option to comment on all undertakings (36 CFR 800.9).

3.  The appropriate agency, assisted by the project applicant, must consult with the USFWS and the NMFS as required by Section 7 of ESA. The specific consultation requirements, as set forth in regulations at 50 CFR Part 402, would be applied on a project-by-project basis. Applicants shall identify known occupied sites, such as nest sites, for threatened and endangered species and special status species (BLM 2008).

4.  The appropriate agency, assisted by the project applicant, must coordinate and consult with NMFS regarding potential impacts to essential fish habitat (EFH) as required by the 1996 reauthorization of the Magnuson-Stevens Fishery Conservation and Management Act.

*B-2*

## Agency Coordination

1. Applicants seeking to develop energy transport projects within corridors located on or near DOD facilities or flight training areas (see Appendix L of the PEIS for applicable corridors) must, early in the planning process and in conjunction with the appropriate agency staff, inform and coordinate with the DOD regarding the characteristics and locations of the anticipated project infrastructure.

2. Early in the planning process, applicants seeking a ROW authorization within a Section 368 energy corridor that is located within 5 miles of a unit of the NPS should contact the appropriate Agency staff and work with the NPS regarding the characteristics and locations of anticipated project infrastructure. In those instances where corridors cross lands within the boundaries of a unit of the NPS, the National Park Service Organic Act and other relevant laws and policies shall apply.

3. In those instances where projects using energy corridors are proposed to also cross National Wildlife Refuge System lands, the National Wildlife System Administration Act and other relevant laws and policies pertinent to national wildlife refuges shall apply.

4. For electricity transmission projects, the applicant shall notify the Federal Aviation Administration (FAA) as early as practicable in the planning process in order to identify appropriate aircraft safety requirements.

5. All project applications must reflect applicable findings, mitigation, and/or standards contained in regional land management plans, such as the Northwest Forest Plan, when such regional plans have been incorporated into agency planning guidelines and requirements. Modification of some standards may be needed to reasonably allow for energy transport within a corridor.

## Government-to-Government Consultation

1. The appropriate agency, assisted by the project applicant, must initiate government-to-government consultation with affected Tribes at the outset of project planning and shall continue consultation throughout all phases of the project, as necessary. Agencies should determine how to consult in a manner that reflects the cultural values, socioeconomic factors, and administrative structures of the interested Tribes.

2. The agency POC may require the project proponent to prepare an ethnographic study when Tribal consultation indicates the need. The study shall be conducted by a qualified professional selected in consultation with the affected Tribe.

BLM_0043952