**Figure 3.11-1**
**Exposure Rates Based on October 2007 Gamma Survey**



BLM_0045229

**This page intentionally left blank.**

BLM_0045230

- Most Radium-226 concentrations at the Site range between 0.5 and approximately 1 pCi/g, close to the detection limit in some cases. However, isolated areas of elevated Radium-226 (ranging up to 24 pCi/g based on sample results) do occur, coinciding with a former drainage in the southeastern portion of the site and a sparsely vegetated area coinciding with parts of the western drainage.

- Radon-222 flux rates ranged between 0.41 and 3.78 pCi/m$^2$/s within the footprint of the proposed tailings area. Although Radon-222 flux rates are dependant on Radium-226 concentrations in the soil, they also vary based on soil moisture, soil type, barometric pressure, wind speed and temperature. Accordingly, flux measurements taken at the same location exhibited considerable fluctuation between monitoring events, depending on the season.

- Gamma exposure rates on the Site ranged from 101.8 mrem/yr near the highway to 127.2 mrem/yr on the south end of the Site. These dose rates represent the gamma radiation received from terrestrial and cosmic sources. The higher exposure rate at the south end of the Site is likely due to the higher Radium-226 concentrations found in the soil within this area, especially in the drainages.

- Radionuclide concentrations in vegetation are near method detection limits (MDLs) and do not correlate to radionuclide concentrations in soil for the same sample locations.

- Ambient Radon-222 concentrations ranged from 0.6 to 4.1 pCi/L and are within the expected ranges for this geographical area. The higher concentrations were recorded in the winter months when wind speeds are generally lower and there is less dispersion of radiation.

In summary, it is clear that the drainage areas within the southern quarter of the Site exhibit radiological anomalies from natural and possibly historic anthropogenic sources within the area. The natural source of the elevated radioactivity in the southern portion of the Site originates from erosion of the Salt Wash Member of the Morrison Formation, which outcrops along the flank of the mesa south of the Site. The Salt Wash Member is the uranium host for the nearby uranium mines. This natural source is evident by the elevated radioactivity within the drainages, especially in the extreme southern portion of the site where alluvial fans contain predominantly pebbles and cobbles of conglomeratic sandstone and sandstone with small clay galls. This detritus can be traced back to the exposed Morrison and Burro Canyon formations located further up the mesa.

Possible historic anthropogenic sources within the area include:

- Runoff and windblown dust from former ore stockpiles and existing waste rock dumps at the underground uranium mines located on the mesa south of the Site. These mining activities could have increased erosion and contributed higher levels of radioactivity (especially from the ore stockpiles) to the drainages.

- Runoff from the topsoil stockpile placed in an 80-acre parcel just south of the site in 1980 from an open pit uranium mining operation. This topsoil was removed from the area to the east where the overburden from the open pit was ultimately placed. The

BLM_0045231

topsoil was placed in a series of thin lifts and reseeded for eventual use in reclamation. The area stripped of the topsoil contained several drainages, which likely contained alluvial materials with higher radiation levels similar to those observed at the Site. The open pit was not mined down completely to the ore zone (i.e., a 20-foot layer of barren rock was left over the ore), so it is unlikely that that windblown dust from this open pit mining operation contributed to higher radioactivity levels in the area.

### 3.11.5 Background Air Quality Radionuclides

Energy Fuels contracted with Kleinfelder to prepare a *Meteorology, Air Quality, and Climatology, Report* for the Site (Kleinfelder, 2009i). As part of the report, Kleinfelder gathered background radionuclide data from monitors, which were installed at five locations. Data collection methods and analysis protocols are provided in that report. Table 3.11-4 presents a summary of the results of the radionuclide monitoring data.

**Table 3.11-4**
**Radionuclide Annual Average Concentrations (µCi/mL)**

| Sites | Uranium | Lead-210 | Radium-226 | Thorium-230 |
|---|---|---|---|---|
| Site 1 | $3.26 \times 10^{-18}$ | $2.52 \times 10^{-15}$ | $4.54 \times 10^{-19}$ | $-1.85 \times 10^{-19}$ [1] |
| Site 2 | $3.36 \times 10^{-18}$ | $2.69 \times 10^{-15}$ | $6.82 \times 10^{-18}$ | $5.10 \times 10^{-18}$ |
| Site 3 | $3.46 \times 10^{-18}$ | $2.36 \times 10^{-15}$ | $1.37 \times 10^{-18}$ | $4.79 \times 10^{-18}$ |
| Site 4 | $3.33 \times 10^{-18}$ | $2.22 \times 10^{-15}$ | $-2.01 \times 10^{-18}$ * | $3.91 \times 10^{-18}$ |
| Site 5 | $3.29 \times 10^{-18}$ | $2.54 \times 10^{-15}$ | $1.20 \times 10^{-18}$ | $2.28 \times 10^{-18}$ |

[1] Some radionuclides have annual averages less than zero. The negative concentrations are a result of quality control procedures by the analyzing laboratory. Occasionally, field samples have a lower radionuclide count than the laboratory blank sample used to set the "zero" point, thus, some samples have a negative concentration. Presenting negative concentrations rather than data qualifiers allows for temporal trend analysis of the data and is consistent with Section 7.5 of the NRC's Regulatory Guide 4.14. Therefore, the negative concentrations are an acceptable representation of the radionuclide concentrations collected in the Site area.

The report states, that while ambient air standards for radionuclide particulates have not been developed by the EPA, the DOE published a derived concentration guide (DCG) for inhalation doses of different radionuclides. The DCG values represent the radionuclide concentration that if inhaled, would cause a member of the public to receive an unacceptable dose of radiation. The DOE considers 100 mrem/yr an unacceptable dose of radiation. Table 3.11-5 provides the DCG values for the four radionuclides found at the Site.

**Table 3.11-5**
**Summary of DOE-Derived Concentration**
**Guide Values for Inhalation[1]**

| Radionuclide | DCGs uCi/mL |
|---|---|
| Uranium | $2.0 \times 10^{-12}$ |
| Lead-210 | $9.0 \times 10^{-13}$ |
| Radium-226 | $1.0 \times 10^{-12}$ |
| Thorium-230 | $4.0 \times 10^{-12}$ |

[1]  Source: Kleinfelder, 2009i.

In comparison with the results in Table 3.11-4, the annual average concentrations at Sites 1, 2, 3, 4, and 5 are all at least 100 times less than the DCGs.

BLM_0045232

### 3.11.6 Background Radionuclides in Animal Tissue

A separate survey, *Baseline Survey of Radionuclides in Animal Tissues at the Proposed Piñon Ridge Mill Site* (Whicker, 2008), was designed to allow comparison of similar measurements during and after mill operations to assess radiological impact to animals. The report states that because uranium is radioactive, its decay leads to the formation of 17 decay products that are also radioactive (Eisenbud and Gesell, 1997). A few of these are sufficiently abundant and long-lived that they have potential biological significance. Because of the ubiquitous presence of uranium in soil and rocks, some of these radionuclides can be measured in biological tissues anywhere on earth in the complete absence of uranium mining or milling activities.

The study involved radionuclide analysis of three cottontail rabbits, three jackrabbits, and tissues from three cows. The specific tissues obtained for analysis were lung, liver, muscle, and bone. The tissues were carefully dissected, cleaned, bagged, and frozen. They were then submitted to Paragon Analytics of Fort Collins, Colorado for analysis of uranium, Th-230, Ra-226, Po-210, and Pb-210. Thirty-seven different tissue samples were submitted and a total of 106 radionuclide-specific results were obtained and reported.

The analysis reported the following results:

- In the case of the uranium measurements, of the 22 samples analyzed, only 12 exceeded the reporting limit. The other values are classified as "U", or undetected. It is clear that the uranium contents of bone exceed those of muscle tissue, with 7 of the 12 samples containing detectable levels being bone. The error bars, representing variations among individual animals as well as laboratory uncertainties, were relatively large, with coefficients of variation (standard deviation/mean value) ranging from 0.16 to 0.62.

- All sample results from the Th-230 analyses were below the minimum detectable concentrations. This is not surprising because thorium occurs in the environment in chemical forms that are extremely insoluble, and as a result its transport through food chains is very low or negligible. Thorium isotopes are not taken up to any significant degree by plants, and when it is ingested by animals, often in the form of dust particles, the absorption fraction is very low, typically $< 10^{-4}$.

- The results for Ra-226 analyses in bone samples were much more informative and useful than for the other radionuclides. All bone samples contained Ra-226 at sub-pCi/g levels when expressed on a wet mass basis, but well above the minimum detectable concentrations, and considerably higher than measurements for human bone summarized by Eisenbud and Gesell (1997). The coefficients of variation (CV) representing differences among individual animals and laboratory uncertainties were relatively small for the jackrabbits (0.15) and cows (0.14), but higher for the cottontails (0.50). The data indicate that rabbit bone was about three-fold higher in Ra-226 than the cow bone samples.

- Measurements of Po-210 in animal tissues showed that 19 of the 27 sample analyses were below the minimum analytical detection limits, and those that exceeded the detection limits were very low (< 1 pCi/g wet tissue). Although the data reflect very low and variable levels of Po-210 in tissues, there was a tendency for the more detectable levels to occur in cow samples, particularly the liver and lung samples. The liver and kidney are known as main repositories of the small amounts of Po-210 that might be found in the body.

BLM_0045233

- Fifteen of 28 samples contained Pb-210 at levels below the minimum detectable concentration, while 13 were above. There were no apparent differences between species, but the differences between tissues were obvious. The pattern was for bone to contain the highest concentrations, lung to contain the lowest levels, while liver tissues contained intermediate amounts. Lead is well-known to be found primarily in bone, with intermediate levels in liver and kidney. Variability among individuals of the same species was relatively high, with CV values ranging from 0.34 to 1.76.

The study recommended that Ra-226 levels in bone collected from both species of rabbits be targeted as the most sensitive and useful indicator of any future changes in radiobiological conditions on the Site. The rabbits are abundant on the Site and remain on the Site over their lifetime while cattle, mule deer, and elk do not reside permanently on site. Furthermore, Ra-226 levels are readily measurable in bone with relatively small variability.

BLM_0045234

# Section 4.0
# Environmental Impacts, Mitigation, and Monitoring

## 4.1  LAND USE

### 4.1.1  Environmental Impacts

### 4.1.1.1  General Impacts

**Regional and Local Land Use Patterns.** As discussed in Section 3.1.1.1, public lands comprise the majority of land within the vicinity of the Site. Seventy percent of the land within a 50 mile (80 km) radius of the Site is undeveloped public land that is administered by the Bureau of Land Management (BLM) or U.S. Forest Service (Forest Service). The Proposed Action would not impact the ongoing management of these public lands for multiuse purposes. No changes in land use or conflicts with county zoning regulations are expected as a result of the Proposed Action.

The BLM manages 88 percent of the land within a 5 mile (8 km) radius of the Site. Some BLM-administered lands are used for seasonal livestock grazing, and some include DOE uranium lease tracts with currently inactive uranium mines. Private lands within 5 miles (8 km) of the Site are largely undeveloped and used for seasonal livestock grazing. Grazing lands in this area are zoned as General Agricultural Districts. There are five residences between 2.5 and 6 miles (4 and 10 km) of the Site (see Figure 3.1-2). There could be some impact from traffic to surrounding landowners who access their land from SH 90. Overall, impacts to surrounding land uses from the Proposed Action would be minimal.

**Agriculture.** The Proposed Action would result in the long-term loss of approximately 90 to 124 AUMs due to its displacement of 880 acres of seasonal rangeland. This loss in acreage would not adversely affect the volume of grazing forage in other grazing allotments, including the BLM's East Paradox Common Allotment, which is adjacent to the Site. No commercial crops are produced within 5 miles (8 km) of the Site, and the Proposed Action would not directly impact the use of land to grow crops elsewhere. The Mill Facility is designed as a zero discharge facility and would comply with all applicable federal and state emission standards. Therefore, the Proposed Action is not expected to affect crops. The Proposed Action would not affect the limited harvesting of trees for private use (e.g. fenceposts and firewood) that occurs on public lands within the vicinity of the Site.

**Mineral Resources and Mining.** The Proposed Action would stimulate uranium/vanadium ore production within the region. Existing mines, many of which have been placed on standby due to market conditions, could re-activate and have the capacity to supply the Mill Facility with feedstock ore. According to Energy Fuels, permitted mines within 180 miles (290 km) of the Site contain an estimated 4.7 million tons of uranium ore, which is sufficient to supply the Mill Facility with 500 tpd for 27 years (Filas, 2009). Therefore, no changes in land use are expected to be associated with the mining of feedstock ore for the Mill Facility. The Proposed Action would not affect other regional mining activities, including coal, natural gas, and oil production.

**Recreation.** The Proposed Action would result in minimal impacts to recreational activities in western Montrose County. The Site is approximately 7 miles (11 km) from the nearest launch site on the Dolores River. The Mill Facility would not impact river access or deter recreational users from floating or fishing on the river. The Mill Facility would not impact hunting on public or private lands within the vicinity of the Site.

---

BLM_0045235

**Land Use Planning Issues.** On September 30, 2009, the Montrose County Commissioners authorized use of the Site for mineral processing ("Mineral Resource Operation Facility") under a Special Use Permit (Montrose County, 2009a). The Proposed Action does not conflict with the county's updated master plan.

#### 4.1.1.2   Construction, Operations, and Closure Impacts

#### 4.1.1.2.1   Construction

Land use impacts during construction would include traffic-related impacts to nearby residents and recreationists and rangeland impacts. Traffic associated with construction could impact nearby landowners who use SH 90 to access their property. During the Dolores River's floating season, which typically extends between April 30 and June 15, floaters who take out at the Bedrock launch site potentially could encounter additional traffic on SH 90. Bicyclists along SH 141 could also encounter increased truck traffic. The Site would be removed from use as seasonal rangeland, which would result in the loss of approximately 90 to 124 AUMs. To the extent that hunting has been allowed on the Site in the past, construction would remove 880 acres for use by game and bird hunters.

#### 4.1.1.2.2   Operations

Land use impacts during operations would be comparable to impacts during construction. Nearby residents and recreationists would encounter increased traffic, especially ore-hauling trucks, along SH 90 and SH 141. During the anticipated 40 year operational life of the Mill Facility, the entire 880 acre site would be unavailable for use as hunting land or seasonal rangeland. The latter would result in the on-going loss of 90 to 124 AUMs. Because existing mines within the region are capable of supplying the Mill Facility with feedstock ore throughout its operational life, no changes in land use are expected to be associated with the mining of feedstock ore for the Mill Facility, except that it would allow some of the mines currently on standby to resume production.

#### 4.1.1.2.3   Closure

The Mill *Decommissioning Plan* (Kleinfelder, 2009b) for the Mill Facility establishes a long-term stable land configuration with a self-sustaining ecosystem that provides for environmental protection and public safety. The tailings cells, which are designed to cover approximately 90 acres, would be capped with an engineered soil cover that would satisfy relevant EPA/NRC surface stabilization requirements (i.e., 200 years and, to the extent practicable, 1,000 years without active controls). The reclaimed tailings cells and 68 acres of surrounding land would be fenced and transferred to the DOE or the State of Colorado for long-term surveillance and monitoring as described in the *Tailing Cell Closure Design Report* (Kleinfelder, 2009c). Energy Fuels would be required to provide the DOE or the State with the funds needed for the long-term surveillance and monitoring program pursuant to relevant NRC/State regulations (i.e., 10 CFR Part 40, Appendix A, Criterion 10 and 6 CCR 1007-1 Part 18 CDPHE, 2001).

Upon closure, and concurrence of NRC and State authorities on such closure, all areas of the Site, except the Restricted Tailings Cell Area, would be released for unrestricted use (i.e., returned to prior use – rangeland). Mill Facility closure would thus make 722 acres available for seasonal grazing, which, at the land's current carrying capacity, would support between 72 and 102 AUMs. Rangeland improvements during closure could increase the Site's carrying capacity and allow for the grazing of more AUMs. Mill closure would potentially return 722 acres to hunting use. The 158 acre Restricted Tailings Cell Area would be permanently removed from grazing use, resulting in the permanent loss of 16 to 22 AUMs. Mill closure would reduce traffic

BLM_0045236

impacts to surrounding landowners and recreationists. In the absence of other facilities available to mill raw uranium/vanadium ore, lands developed to supply ore to the Mill Facility could become redundant and the land reclaimed to its original use.

## 4.1.2   Protective/Mitigation Measures

Energy Fuels would implement the following measures to mitigate land use-related impacts resulting from the Proposed Action:

- All building and parking facility designs at the Site would conform with Montrose County development standards and would be submitted to the Montrose County Building Department for approval prior to construction.

- Upon closure, all areas of the Site except the Restricted Tailings Cell Area would be returned to rangeland.

- Upon closure, Energy Fuels would cap the tailings cells with an engineered soil cover and fence the entire Restricted Tailings Cell Area pursuant to relevant EPA/NRC/State surface stabilization requirements and guidance. Energy Fuels would provide the DOE or State of Colorado with the funds necessary to conduct long-term surveillance and monitoring of the Restricted Tailings Cell Area and funds for maintenance of fencing for 200 to 1,000 years.

## 4.1.3   Monitoring

Pursuant to applicable CDPHE regulations adopted in accordance with the Atomic Energy Act and NRC regulations, Energy Fuels would provide the necessary funds to the DOE or State of Colorado to conduct long-term surveillance and monitoring of the Restricted Tailings Cell Area.

## 4.2   TRANSPORTATION

### 4.2.1   Environmental Impacts

#### 4.2.1.1   General Impacts

Traffic associated with the Proposed Action would include heavy vehicles (trucks) transporting ore, chemical reagents, and supplies to the Site, as well as light-vehicles transporting workers to the Site. Traffic would also include trucks transporting product shipments (yellowcake and vanadium oxide) from the Site. This section of the ER evaluates the potential impacts related to estimated increases in truck and light-vehicle traffic on the segments of Colorado and Utah highways that would be traversed by project-related traffic. It also evaluates the effects of project-related traffic on traffic congestion; the estimated crash rates that would result from increased traffic; the potential impacts on workers and the public from shipments of ore and chemical reagents to the Site, and shipments of yellowcake and vanadium oxide from the Site; and accidents involving the transport of materials and products to and from the Site.

CDOT Region 5 maintains federal and state highways in Montrose County, including SH 90 and SH 141. Region 4 of the Utah Department of Transportation (UDOT) maintains U.S. Highway 191 and SH 46 in San Juan County, Utah. Energy Fuels would construct and maintain the Site Access Road leading from SH 90 to the Site. The first 150 feet of this road would be paved and the remainder would be gravel. The road is designed to accommodate heavy trucks and provide good surface drainage as described in the *Site Drainage Analysis and Design Report* (Kleinfelder, 2009d). Gravel roads branching off the main access road would provide access to the ore pad and administration building. Secondary dirt or gravel roads would be constructed to provide access to all facility locations as described in the *Special Use Permit Application* (Visus, 2009). Road maintenance would include magnesium chloride or equivalent treatments and

BLM_0045237

water spray for dust suppression. Transportation impacts could result from traffic associated with the Proposed Action, especially along SH 90 and on SH 141 between Naturita and the SH 90 junction. Impacts could include vehicle crashes and potential spills or releases of ore, chemical reagents, or yellowcake from transport trucks. Impacts could also occur from vehicle/livestock collisions and increased road maintenance requirements. Other potential impacts from the projected increase in traffic, including noise levels, visual aesthetics, dust generation, and vehicle/wildlife collisions, are discussed in subsequent sections of the ER.

### 4.2.1.2   Construction, Operations, and Closure Impacts

#### 4.2.1.2.1   Construction

Traffic associated with construction would include heavy-vehicles delivering materials and equipment to the Site and light-vehicles transporting workers to the Site. Approximately 2,250 truckloads of materials and equipment would be delivered during the first two quarters of construction (Golder, 2009b). Deliveries would include gravel and concrete from the local community and fencing, building steel and siding, culverts, piping, electrical, and grounding materials from regional sources. Another 4,350 truckloads of equipment and materials would be delivered between the 3rd and 7th quarters of construction. These deliveries would include gravel, fencing supplies, concrete, and petroleum products from the local area, and structural steel, plate work, and building, liner, and piping materials from all areas of the continental United States (Golder, 2009b).

Based on the anticipated materials delivery schedule, and the assumption that two construction workers would carpool to the Site in a single vehicle, Table 4.2-1 shows the average daily number of vehicles that would travel to the Site during each quarter of construction. Peak traffic would occur in the 4th quarter of construction.

**Table 4.2-1**
**Average Daily Traffic Associated with Construction**
**(Number of Vehicles per Day)**

| Calendar Quarter | Work Qtr. | Total Construction Traffic | | Traffic Originating from the East[3] | | Traffic Originating from the West[3] | |
|---|---|---|---|---|---|---|---|
| | | Light Vehicles[1] | Heavy Vehicles[2] | Light Vehicles | Heavy Vehicles | Light Vehicles | Heavy Vehicles |
| 3rd Qtr 2010 | 1 | 13 | 13 | 11 | 12 | 1 | 1 |
| 4th Qtr 2010 | 2 | 23 | 13 | 20 | 12 | 2 | 1 |
| 1st Qtr 2011 | 3 | 63 | 9 | 56 | 8 | 6 | 1 |
| 2nd Qtr 2011 | 4 | 100 | 17 | 90 | 15 | 10 | 2 |
| 3rd Qtr 2011 | 5 | 100 | 10 | 90 | 9 | 10 | 1 |
| 4th Qtr 2011 | 6 | 75 | 12 | 68 | 11 | 8 | 1 |
| 1st Qtr 2012 | 7 | 5 | 1 | 5 | 1 | 1 | 0 |

[1]  Light--vehicle traffic includes one vehicle for every two workers (Filas, 2009).
[2]  Based on material deliveries per quarter – *Construction Plan* (Golder, 2009b).
[3]  Assumes 90 percent of construction traffic comes from the east and 10 percent comes from the west (TurnKey, 2008).

**Peak Trips Per Day During Construction.** During construction, daily (one-way) trips to and from the Site would range from a low of 12 trips during the 7th quarter to a high of 234 trips during the 4th quarter. Table 4.2-2 shows the estimated peak number of daily trips on regional road segments during construction. The table presents additional data that are useful for evaluating the impacts of project-related traffic along affected highway segments. Such

**Table 4.2-2**
**Peak Number of Daily Trips during Construction[1]**

| Highway Segment | Milepost Start | End | 2008 Baseline Conditions[2] AADT[3] | Trucks | DHV[4] | Project Traffic Lt Vehicle Trips[5] | Truck Trips[6] | Estimated increase in traffic Total Trips | Truck Trips | Est. DHV |
|---|---|---|---|---|---|---|---|---|---|---|
| **Colorado State Highway 90** | | | | | | | | | | |
| County Road 5.75 to Paradox | 0.00 | 9.49 | 200 | 40 | 11% | 20 | 4 | 12% | 10% | 12% |
| Paradox to Bedrock | 9.49 | 14.80 | NA[7] | NA | 11% | 20 | 4 | -- | -- | 11% |
| Bedrock to Piñon Ridge Site | 14.80 | 23.00 | 530 | 82 | 11% | 20 | 4 | 4.5% | 4.9% | 11% |
| Piñon Ridge Mill Site to Vancorum | 23.00 | 33.87 | 530 | 82 | 11% | 180 | 30 | 39.6% | 36.6% | 13% |
| **Colorado State Highway 97** | | | | | | | | | | |
| SH97 (Nucla Rd) to CR EE28 in Naturita | 0.00 | 0.32 | 2,000 | 146 | 11% | 18 | 0 | 0.9% | 0.0% | 11% |
| Naturita to Nucla | 0.32 | 3.93 | 1,600 | 85 | 11% | 18 | 0 | 1.1% | 0.0% | 11% |
| **Colorado State Highway 141** | | | | | | | | | | |
| US491/SH141 junction to Egnar | 0.00 | 9.38 | 730 | 127 | 11% | 0 | 16 | 2.2% | 12.6% | 11% |
| Egnar to K8 Road | 9.38 | 11.27 | 730 | 173 | 12% | 0 | 16 | 2.2% | 9.2% | 12% |
| K8 Road to SE of SH141/145 junction | 11.27 | 44.12 | 480 | 129 | 12% | 0 | 16 | 3.3% | 12.4% | 12% |
| SE of SH141/145 junction to NW of SH145 | 44.12 | 55.51 | 590 | 176 | 11% | 72 | 16 | 14.9% | 9.1% | 12% |
| NW of SH145 to Naturita | 55.51 | 60.21 | 1,500 | 222 | 10% | 72 | 16 | 5.9% | 7.2% | 10% |
| East of SH97 to West of SH97 in Naturita | 60.21 | 60.45 | 1,700 | 173 | 11% | 180 | 16 | 11.5% | 9.2% | 12% |
| West of SH97 to Main Street in Naturita | 60.45 | 60.70 | 2,400 | 228 | 11% | 180 | 16 | 8.2% | 7.0% | 11% |
| Main Street to West 2nd Avenue in Naturita | 60.70 | 60.80 | 1,200 | 132 | 11% | 180 | 16 | 16.3% | 12.1% | 12% |
| Naturita to SH141/SH90 junction at Vancorum | 60.80 | 62.44 | 660 | 121 | 12% | 180 | 16 | 29.7% | 13.2% | 14% |
| 2 miles north of SH141/SH90 junction | 62.44 | 64.40 | 340 | 46 | 13% | 0 | 16 | 4.7% | 34.8% | 13% |
| 2 miles north of SH90 junction to Gateway | 64.40 | 110.53 | 460 | 91 | 12% | 0 | 16 | 3.5% | 17.6% | 12% |
| Foy Road intersection to Gateway | 110.53 | 153.77 | 680 | 121 | 12% | 0 | 16 | 2.4% | 13.2% | 12% |
| Gateway to Whitewater | 153.77 | 154.11 | 1,400 | 336 | 12% | 0 | 16 | 1.1% | 4.8% | 12% |
| **U.S. Highway 491** | | | | | | | | | | |
| Junction of US491 and SH141 to County Road 6 | 63.27 | 67.95 | 2,400 | 562 | 11% | 0 | 0 | 0.0% | 0.0% | 11% |
| County Road 6 to Utah border | 67.95 | 69.60 | 2,100 | 573 | 11% | 0 | 0 | 0.0% | 0.0% | 11% |
| **Colorado State Highway 145** | | | | | | | | | | |
| Lone Cone Road to Market Street in Norwood | 99.49 | 101.07 | 2,800 | 274 | 11% | 72 | 0 | 2.6% | 0.0% | 11% |
| Market Street to Spruce Street in Norwood | 101.07 | 101.56 | 2,600 | 200 | 11% | 72 | 0 | 2.8% | 0.0% | 11% |
| Spruce Street to Summet Street in Norwood | 101.56 | 102.60 | 2,000 | 194 | 11% | 72 | 0 | 3.6% | 0.0% | 11% |
| Norwood to Redvale | 102.60 | 110.11 | 1,300 | 126 | 11% | 72 | 0 | 5.5% | 0.0% | 11% |
| Redvale to SH145/SH141 intersection | 110.11 | 116.88 | 1,200 | 110 | 10% | 72 | 0 | 6.0% | 0.0% | 10% |
| **Utah State Highway 46** | | | | | | | | | | |
| Jct of SH 46 & SH 191 to La Sal Jct Post Office | 0.00 | 9.05 | 600 | 210 | NA | 0 | 4 | 0.7% | 1.9% | '-- |
| La Sal Jct Post Office to Colorado state line | 9.05 | 21.60 | 335 | 118 | NA | 20 | 4 | 7.2% | 3.4% | '-- |

BLM_0045239

Environmental Impacts, Mitigation, and Monitoring — Section 4

| Highway Segment | Milepost | | 2008 Baseline Conditions[2] | | | Project Traffic | | Estimated increase in traffic | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Start | End | AADT[3] | Trucks | DHV[4] | Lt Vehicle Trips[5] | Truck Trips[6] | Total Trips | Truck Trips | Est. DHV |
| **U.S. Highway 191** | | | | | | | | | | |
| SR95 junction to Blanding | 47.26 | 50.41 | 2,760 | 735 | NA | 0 | 4 | >0.1% | 0.5% | -- |
| 800 South to 200 North in Blanding | 50.41 | 51.66 | 6,915 | 2,187 | NA | 0 | 4 | >0.1% | 0.2% | -- |
| Blanding to Verdure | 51.66 | 65.16 | 2,120 | 744 | NA | 0 | 4 | 0.2% | 0.5% | -- |
| Verdure to 400 South in Monticello | 65.16 | 71.46 | 2,455 | 946 | NA | 0 | 4 | 0.2% | 0.4% | -- |
| 400 South to US491 in Monticello | 71.46 | 71.86 | 2,610 | 1,039 | NA | 0 | 4 | 0.2% | 0.4% | -- |
| US491/US191 Jct to 600 North in Monticello | 71.86 | 72.40 | 3,160 | 1,341 | NA | 0 | 4 | 0.1% | 0.3% | -- |
| 600 North in Monticello to SR211 | 72.40 | 86.14 | 3,415 | 1,538 | NA | 0 | 4 | 0.1% | 0.3% | -- |
| SR211 to La Sal Junction (SH46) | 86.14 | 103.45 | 3,735 | 1,703 | NA | 0 | 4 | 0.1% | 0.2% | -- |
| La Sal Junction to Old Airport Road | 103.45 | 117.80 | 3,705 | 1,709 | NA | 0 | 4 | 0.1% | 0.2% | -- |
| Old Airport Road to La Sal Loop | 117.89 | 123.19 | 5,030 | 2,096 | NA | 0 | 4 | >0.1% | 0.2% | -- |
| La Sal Loop to 400 East Moab | 123.19 | 124.48 | 9,635 | 3,586 | NA | 0 | 4 | >0.1% | 0.1% | -- |
| 400 East to Center Street in Moab | 124.48 | 125.70 | 14,510 | 4,753 | NA | 0 | 4 | >0.1% | >0.1% | -- |
| Center Street to 500 West in Moab | 125.70 | 126.98 | 9,185 | 2,599 | NA | 0 | 4 | >0.1% | 0.2% | -- |
| 500 West, Moab to SR128 | 126.98 | 128.18 | 9,240 | 2,202 | NA | 0 | 4 | >0.1% | 0.2% | -- |
| SR128 to Colorado River | 128.18 | 129.80 | 8,225 | 1,593 | NA | 0 | 4 | >0.1% | 0.3% | -- |
| Colorado River to SR279 | 129.80 | 130.26 | 6,545 | 2,043 | NA | 0 | 4 | >0.1% | 0.2% | -- |
| SR279 to SR313 | 130.26 | 136.73 | 4,835 | 1,958 | NA | 0 | 4 | >0.1% | 0.2% | -- |
| SR313 to I-70 Crescent Junction | 136.73 | 157.20 | 5,140 | 2,623 | NA | 0 | 4 | >0.1% | 0.2% | -- |
| **Interstate-70** | | | | | | | | | | |
| SR24 Hanksville Buckmaster Draw | 149.20 | 157.94 | 4,085 | 1,601 | NA | 0 | 4 | >0.1% | 0.2% | -- |
| SR6 West SR191 North | 157.94 | 160.41 | 8,090 | 3,573 | NA | 0 | 4 | >0.1% | 0.1% | -- |
| SR19 West Green River | 160.41 | 164.55 | 8,870 | 4,359 | NA | 0 | 4 | >0.1% | >0.1% | -- |
| SR19 East Green River | 164.55 | 175.59 | 8,765 | 4,744 | NA | 0 | 4 | >0.1% | >0.1% | -- |
| Ranch exit (Floy) | 175.59 | 182.17 | 8,465 | 5,003 | NA | 0 | 4 | >0.1% | >0.1% | -- |
| SR191 Crescent Junction to Moab | 182.17 | 187.42 | 6,800 | 3,882 | NA | 0 | 4 | >0.1% | >0.1% | -- |

[1]  Assumes peak construction-related traffic occurs in the 4th quarter of construction (Golder, 2009b).

[2]  2008 traffic counts for Colorado highways from CDOT, 2009b; 2008 traffic counts for Utah highways from Butterfield, 2009.

[3]  AADT = average annual daily traffic.

[4]  DHV : the 30th highest annual hourly traffic volume reported as percent of AADT.

[5]  Estimated light-vehicle trips assume one vehicle for every two construction workers (Filas, 2009), 90 percent of traffic originates from the east and 10 percent originates from the west (TurnKey, 2008). Based on supply of short-term housing accommodations, the analysis assumes that 50 percent of east-bound construction worker traffic originates in Naturita, 40 percent originates in Norwood, and 10 percent originates in Nucla.

[6]  Estimated truck (heavy-vehicle) trips are based on material delivery schedule described in the *Mine Operations Plan* (Energy Fuels 2009d). Assumes that 90 percent of heavy-vehicle traffic originates from the east and 10 percent originates from the west. Assumes that half of heavy-vehicle traffic to the east travels north on SH 141 and half travels south on SH 141 (TurnKey, 2008).

[7]  NA = data not available.

BLM_0045240

information includes 2008 Average Annual Daily Traffic (AADT) for all vehicles, the number of trucks in the AADT, and current and projected Design Hour Volumes (DHV). The DHV helps assess how additional traffic would affect the existing use of a highway segment, and indicates potential areas of congestion. All road segments affected by the Proposed Action are classified as rural arterial or rural collector roads by the respective Colorado and Utah Departments of Transportation. Rural areas are expected to have a DHV between 11 and 12 percent (DOE, 2007).

Table 4.2-2 shows that nearly all affected segments of Colorado highways have DHVs within or slightly below the expected rural DHV. Currently, only the DHV for the two-mile stretch of SH 141 north of its intersection with SH 90 at Vancorum exceeds 12 percent. Although DHV data are not available for affected segments of Utah highways, the estimated increases in construction-related trips along these segments do not appear to be large enough to cause congestion.

During construction, the most heavily used public road segments would be SH 90 between the Site and Vancorum, and SH 141 between Vancorum and Naturita. Most construction-related traffic would be associated with the workforce. Based on the material delivery schedule shown in Table 4.2-1, and the assumption that there would be an average of two workers per vehicle per trip, average daily traffic on SH 90 between Vancorum and the Site would increase by 39.6 percent and the DHV would increase from 11 percent to 13 percent during the 4th quarter of construction. Average daily traffic on SH 141 between Vancorum and Naturita would increase by 29.7 percent and the DHV would increase from 12 percent to 14 percent. The greatest increases in truck traffic would occur along SH 90, between the Site and Vancorum, and on a two-mile segment of SH 141 north of Vancorum. Truck traffic would increase by 36.6 percent along this segment of SH 90, and by 34.8 percent on this segment of SH 141 during the 4th quarter of construction.

**Vehicular Crashes.** An estimated 21,233,869 miles would be traveled on regional public roads over the seven quarter (630 day) construction period. Based on a fatal accident rate of 0.0218 fatalities per million vehicle miles traveled on rural roads in Colorado and Utah (CDOT, 2009c; NHTSA, 2009), approximately 0.46 fatal accidents could be associated with the construction traffic. The DOE used CDOT methodology and 2004 CDOT crash data to estimate a 0.033 injury accident rate per one million miles of travel on rural state highways (DOE, 2007). Based on this, approximately 0.7 injury accidents could occur during construction.

### 4.2.1.2.2 Operations

During operations, trucks transporting ore to the Site would comprise a substantial portion of operational traffic. According to the *Mine Operations Plan* (Energy Fuels, 2009d), daily ore deliveries would include between 12 and 18 trucks traveling from mines in Colorado and between 8 and 12 trucks traveling from mines in Utah (see Table 4.2-3).

**Table 4.2-3**
**Average Daily Ore Delivery Traffic**
**(Number of Vehicles per Day)**

| Ore Source | County, State | Trucks per day[1] |
|---|---|---|
| Green River Area | Emery County, UT | 3 to 4 |
| Monticello South Area | San Juan County, UT | 2 to 3 |
| La Sal/Lisbon Area | San Juan, UT | 3 to 5 |
| Long Park Area | Montrose, CO | 0 to 1 |
| Gateway Area | Mesa County, CO | 6 to 8 |
| Southern Area | San Miguel County, CO | 3 to 4 |
| Monogram Mesa | Montrose County, CO | 3 to 5 |
| [1]   Source:  *Mine Operations Plan* (Energy Fuels, 2009d). | | |

BLM_0045241

USDOT is the primary regulatory authority for uranium ore haulage. To allow for efficient interstate commerce, the Colorado and Utah Departments of Transportation have adopted the USDOT regulations in their entirety (Energy Fuels, 2009d – *Mine Operations Plan*). USDOT regulations for transport of radioactive materials are codified in Title 49 CFR. All ore shipments would be conducted in accordance with USDOT hazardous materials shipping regulations and requirements (49 CFR Parts 171, 172, 173, 177, 178, and 179). Additionally, ore shipments would be tarped to reduce the potential for accidental spillage or fugitive dust during transportation (SENES Consultants - SENES, 2009a). *The Ore Transportation Plan* (Appendix B of the *Mine Operations Plan*) describes Energy Fuels' procedures and methods for shipping uranium ore from a mine site to an off-site mill (Energy Fuels, 2009d). The ore trucks would, in most cases, be dedicated to hauling ore from a specific mine or mines to the Mill. Prior to being released for unrestricted use, the trucks would be thoroughly washed and screened to verify that they meet regulatory standards for radiation levels.

Additional heavy-vehicle truck traffic during operations would include water trucks, tankers, and semi-trailers delivering chemical reagents and fuel. Chemical reagents, diesel fuel, and propane used to process ores would be delivered to the Site by licensed haulers in approved USDOT containers. Reagents would be transported to the Site in tankers or prepackaged totes, barrels, and bulk bags. The bulk materials are typically transported by closed tanker trucks. Bulk material transported in open trucks would be covered with tarps to reduce dusting and falling debris during transportation (SENES, 2009a). Light-vehicle traffic would include miscellaneous delivery trucks (*e.g.* UPS and FedEx), straight-day and shift workers, and visitors. With the exception of some shift worker traffic, most of this traffic would occur during daylight hours. Table 4.2-4 shows the average daily number of vehicles that would travel to the Site during operations.

**Table 4.2-4**
**Average Daily Traffic Associated with Operations**
**(Number of Vehicles per Day)**

| Traffic Type | Days/ week | Light Vehicles To/From East[1] | Light Vehicles To/From West[1] | Heavy Vehicles To/From East | Heavy Vehicles To/From West |
|---|---|---|---|---|---|
| Ore deliveries[2] | 7 | | | 12 to 17 | 9 to 12 |
| Straight-day workers[3] | 5 | 12 | 1 | | |
| Shift workers[4] | 7 | 13 | 2 | | |
| Water trucks[5] | 5 | | | 11 | |
| Reagent and fuel deliveries[6] | 5 | | | 2 | 6 |
| Miscellaneous. deliveries[7] | 5 | 3 | 0 | | |
| Visitor traffic[8] | 5 | 9 | 1 | | |

[1]  Assumes 90 percent of light-vehicle traffic originates from the east and 10 percent originates from the west (TurnKey, 2008).
[2]  Source:  *Mine Operations Plan* (Energy Fuels, 2009d).
[3]  Assumes 25 straight-day workers, and one light-vehicle for every two workers (Filas, 2009).
[4]  Assumes three 15 man shifts working 7 days/week, and one light vehicle for every three workers (Filas, 2009).
[5]  Assumes one delivery of potable water and 10 deliveries of non-potable water per day – *Water and Wastewater Plan* (Energy Fuels, 2009f).
[6]  Includes six deliveries of chemical reagents from the west and two propane deliveries from the east – *Special Use Permit Application* (Visus, 2009).
[7]  Includes smaller shipments of materials and parts - *Special Use Permit Application* (Visus, 2009).
[8]  Source:  *Special Use Permit Application* (Visus, 2009).

Case No. 1:20-cv-02484-MSK   Document 40-5   filed 04/27/21   USDC Colorado   pg 15 of 271

Additional traffic associated with operations would include product shipments from the Mill Facility. At a feedstock rate of 500 tpd, the Mill Facility would produce 2,200 pounds of yellowcake (2.5 drums) and 7,300 pounds of vanadium per day. A transport truck can carry 25 to 27 tons of cargo, or 55 to 60 drums of yellowcake. The drums would be classified by the USDOT as Type A packaging (10 CFR Part 71) and would be capped with USDOT-approved lid and clamping ring (SENES, 2009a). Approximately 50 truckloads of vanadium and 15 truckloads of yellowcake would be shipped from the Mill Facility annually (Visus, 2009). This corresponds to one truckload shipment of vanadium per week and one yellowcake truckload shipment every 3 weeks.

Most shipments of processed yellowcake and vanadium would utilize Interstate-70 or Interstate-40 for transport to their final destination. From the Mill Facility, northbound shipments would travel east on SH 90 to SH 141, north on SH 141 to U.S. Highway 50, and north on U.S. Highway 50 to Interstate-70 near Grand Junction. Yellowcake shipments to uranium hexaflouride conversion facilities in Metropolis, Illinois and Port Hope, Ontario, Canada would follow this route. Product shipments to southern parts of the country, including ports located in Texas, would travel east on SH 90 and south on SH 141 to U.S. Highway 491, then south on U.S. Highway 491 and U.S. Highway 160 to Interstate-40 near Gallup, New Mexico. With the exception of SH 90, all of these roads are designated hazardous materials routes.

**Average Trips Per Day During Operation.** During operations, daily trips to and from the Site would be relatively constant, consisting primarily of ore, material and water deliveries, and worker traffic. Based on the delivery and visitor schedules shown in Table 4.2-4, and the assumption that there would be an average of two straight-day workers per vehicle per trip and three shift workers per vehicle per trip, Table 4.2-5 shows the projected number of average daily trips and DHVs on affected road segments during operations.

As with the construction phase, the most heavily used public road segments would be SH 90 between the Site and Vancorum and SH 141 between Vancorum and Naturita. Total traffic would increase 24 percent along this segment of SH 90 and 18 percent along this segment of SH 141. Trucks delivering ore to the Site would represent a substantial increase in truck traffic along many road segments, including all of SH 90 and SH141 between Naturita and Gateway. On average, traffic on SH 90 would increase 20.5 percent and truck traffic would increase 80 percent. Projected increases in DHV along SH 90 due to Proposed Action traffic would exceed typical DHVs for rural roads between County Road 5.75 and Paradox (DHV increase from 11 percent to 13 percent) and the Site to Vancorum (DHV increase from 11 percent to 14 percent). Although traffic on SH 141 between Naturita and Gateway would increase by an average of only 7.7 percent, truck traffic would increase 29 percent. DHVs due to Proposed Action traffic would increase from 12 percent to 13 percent between Naturita and Vancorum, and from 13 percent to 14 percent two miles north of the SH 90/SH 141 junction. Projected increases in DHV due to Proposed Action traffic on other road segments do not exceed typical DHVs for rural roads.

**Impacted Roadway Intersections.** Based on anticipated ore haul routes and worker commuting patterns, the intersections that would be most affected by traffic associated with the Mill Facility would be the Site Access Road/SH 90 intersection and the SH 90/SH 141 intersection. SH 90 and SH 141 both have an "RB" access classification from CDOT, which is the basis for CDOT turn lane warrants. In 2008, Energy Fuels commissioned an independent engineering study to assess future traffic conditions and project-related traffic at these two intersections. This study reported that, according to CDOT estimates, background traffic on SH 90 would increase at an average rate of 3.40 percent per year between 2007 and 2030, and traffic on SH 141 would increase at an average annual rate of 3.85 percent (TurnKey, 2008).

BLM_0045243

Environmental Impacts, Mitigation, and Monitoring                                                                                    Section 4

**Table 4.2-5**
**Average Number of Daily Trips during Operations[1]**

| Highway Segment | Milepost | | 2008 Baseline Conditions[2] | | | Project Traffic | | Estimated increase in traffic | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Start | End | AADT[3] | Trucks | DHV[4] | Lt Vehicle Trips[5] | Truck Trips[6] | Total Trips | Truck Trips | Est. DHV |
| **Colorado State Highway 90** | | | | | | | | | | |
| County Road 5.75 to Paradox | 0.00 | 9.49 | 200 | 40 | 11% | 4 | 34 | 19.0% | 85.0% | 13% |
| Paradox to Bedrock | 9.49 | 14.80 | NA[7] | NA | 11% | 10 | 34 | -- | -- | 12% |
| Bedrock to Piñon Ridge Site | 14.80 | 23.00 | 530 | 82 | 11% | 10 | 38 | 9.1% | 46.3% | 12% |
| Piñon Ridge Mill Site to Vancorum | 23.00 | 33.87 | 530 | 82 | 11% | 70 | 58 | 24.2% | 70.7% | 14% |
| **Colorado State Highway 97** | | | | | | | | | | |
| SH97 (Nucla Rd) to CR EE28 in Naturita | 0.00 | 0.32 | 2,000 | 146 | 11% | 26 | 2 | 1.4% | 1.4% | 11% |
| Naturita to Nucla | 0.32 | 3.93 | 1,600 | 85 | 11% | 26 | 0 | 1.6% | 0.0% | 11% |
| **Colorado State Highway 141** | | | | | | | | | | |
| US491/SH141 junction to Egnar | 0.00 | 9.38 | 730 | 127 | 11% | 0 | 8 | 1.1% | 6.3% | 11% |
| Egnar to K8 Road | 9.38 | 11.27 | 730 | 173 | 12% | 0 | 8 | 1.1% | 4.6% | 12% |
| K8 Road to SE of SH141/145 junction | 11.27 | 44.12 | 480 | 129 | 12% | 0 | 8 | 1.7% | 6.2% | 12% |
| SE of SH141/145 junction to NW of SH145 | 44.12 | 55.51 | 590 | 176 | 11% | 6 | 14 | 3.4% | 8.0% | 11% |
| NW of SH145 to Naturita | 55.51 | 60.21 | 1,500 | 222 | 10% | 6 | 14 | 1.3% | 6.3% | 11% |
| East of SH97 to West of SH97 in Naturita | 60.21 | 60.45 | 1,700 | 173 | 11% | 70 | 34 | 6.1% | 19.7% | 12% |
| West of SH97 to Main Street in Naturita | 60.45 | 60.70 | 2,400 | 228 | 11% | 70 | 50 | 5.0% | 21.9% | 12% |
| Main Street to West 2nd Avenue in Naturita | 60.70 | 60.80 | 1,200 | 132 | 11% | 70 | 50 | 10.0% | 37.9% | 12% |
| Naturita to SH141/SH90 junction at Vancorum | 60.80 | 62.44 | 660 | 121 | 12% | 70 | 50 | 18.2% | 41.3% | 13% |
| 2 miles north of SH141/SH90 junction | 62.44 | 64.40 | 340 | 46 | 13% | 6 | 22 | 8.2% | 47.8% | 14% |
| 2 miles north of SH90 junction to Gateway | 64.40 | 110.53 | 460 | 91 | 12% | 6 | 22 | 6.1% | 24.2% | 12% |
| Foy Road intersection to Gateway | 110.53 | 153.77 | 680 | 121 | 12% | 0 | 8 | 1.2% | 6.6% | 12% |
| Gateway to Whitewater | 153.77 | 154.11 | 1,400 | 336 | 12% | 0 | 8 | 0.6% | 2.4% | 12% |
| **U.S. Highway 491** | | | | | | | | | | |
| Junction of US491 and SH141 to County Road 6 | 63.27 | 67.95 | 2,400 | 562 | 11% | 0 | 8 | 0.3% | 1.4% | 11% |
| County Road 6 to Utah border | 67.95 | 69.60 | 2,100 | 573 | 11% | 0 | 8 | 0.4% | 1.4% | 11% |
| Colorado State Highway 145 | | | | | | | | | | |
| Lone Cone Road to Market Street in Norwood | 99.49 | 101.07 | 2,800 | 274 | 11% | 6 | 0 | 0.2% | 0.0% | 11% |
| Market Street to Spruce Street in Norwood | 101.07 | 101.56 | 2,600 | 200 | 11% | 6 | 0 | 0.2% | 0.0% | 11% |
| Spruce Street to Summet Street in Norwood | 101.56 | 102.60 | 2,000 | 194 | 11% | 6 | 0 | 0.3% | 0.0% | 11% |
| Norwood to Redvale | 102.60 | 110.11 | 1,300 | 126 | 11% | 6 | 0 | 0.5% | 0.0% | 11% |
| Redvale to SH145/SH141 intersection | 110.11 | 116.88 | 1,200 | 110 | 10% | 6 | 0 | 0.5% | 0.0% | 10% |
| **Utah State Highway 46** | | | | | | | | | | |
| Jct of SH 46 & SH 191 to La Sal Jct Post Office | 0.00 | 9.05 | 600 | 210 | NA | 0 | 34 | 5.7% | 16.2% | '-- |
| La Sal Jct Post Office to Colorado state line | 9.05 | 21.60 | 335 | 118 | NA | 4 | 34 | 11.3% | 28.8% | '-- |

BLM_0045244

| Highway Segment | Milepost | | 2008 Baseline Conditions[2] | | | Project Traffic | | Estimated increase in traffic | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Start | End | AADT[3] | Trucks | DHV[4] | Lt Vehicle Trips[5] | Truck Trips[6] | Total Trips | Truck Trips | Est. DHV |
| **U.S. Highway 191** | | | | | | | | | | |
| SR95 junction to Blanding | 47.26 | 50.41 | 2,760 | 735 | NA | 0 | 6 | 0.2% | 0.8% | -- |
| 800 South to 200 North in Blanding | 50.41 | 51.66 | 6,915 | 2,187 | NA | 0 | 6 | 0.1% | 0.3% | -- |
| Blanding to Verdure | 51.66 | 65.16 | 2,120 | 744 | NA | 0 | 6 | 0.3% | 0.8% | -- |
| Verdure to 400 South in Monticello | 65.16 | 71.46 | 2,455 | 946 | NA | 0 | 6 | 0.2% | 0.6% | -- |
| 400 South to US491 in Monticello | 71.46 | 71.86 | 2,610 | 1,039 | NA | 0 | 6 | 0.2% | 0.6% | -- |
| US491/US191 Jct to 600 North in Monticello | 71.86 | 72.40 | 3,160 | 1,341 | NA | 0 | 6 | 0.2% | 0.4% | -- |
| 600 North in Monticello to SR211 | 72.40 | 86.14 | 3,415 | 1,538 | NA | 0 | 6 | 0.2% | 0.4% | -- |
| SR211 to La Sal Junction (SH46) | 86.14 | 103.45 | 3,735 | 1,703 | NA | 0 | 6 | 0.2% | 0.4% | -- |
| La Sal Junction to Old Airport Road | 103.45 | 117.80 | 3,705 | 1,709 | NA | 0 | 20 | 0.5% | 1.2% | -- |
| Old Airport Road to La Sal Loop | 117.89 | 123.19 | 5,030 | 2,096 | NA | 0 | 20 | 0.4% | 1.0% | -- |
| La Sal Loop to 400 East Moab | 123.19 | 124.48 | 9,635 | 3,586 | NA | 0 | 20 | 0.2% | 0.6% | -- |
| 400 East to Center Street in Moab | 124.48 | 125.70 | 14,510 | 4,753 | NA | 0 | 20 | 0.1% | 0.4% | -- |
| Center Street to 500 West in Moab | 125.70 | 126.98 | 9,185 | 2,599 | NA | 0 | 20 | 0.2% | 0.8% | -- |
| 500 West, Moab to SR128 | 126.98 | 128.18 | 9,240 | 2,202 | NA | 0 | 20 | 0.2% | 0.9% | -- |
| SR128 to Colorado River | 128.18 | 129.80 | 8,225 | 1,593 | NA | 0 | 20 | 0.2% | 1.3% | -- |
| Colorado River to SR279 | 129.80 | 130.26 | 6,545 | 2,043 | NA | 0 | 20 | 0.3% | 1.0% | -- |
| SR279 to SR313 | 130.26 | 136.73 | 4,835 | 1,958 | NA | 0 | 20 | 0.4% | 1.0% | -- |
| SR313 to I-70 Crescent Junction | 136.73 | 157.20 | 5,140 | 2,623 | NA | 0 | 20 | 0.4% | 0.8% | -- |
| **Interstate-70** | | | | | | | | | | |
| SR24 Hanksville Buckmaster Draw | 149.20 | 157.94 | 4,085 | 1,601 | NA | 0 | 20 | 0.5% | 1.2% | -- |
| SR6 West SR191 North | 157.94 | 160.41 | 8,090 | 3,573 | NA | 0 | 20 | 0.5% | 0.6% | -- |
| SR19 West Green River | 160.41 | 164.55 | 8,870 | 4,359 | NA | 0 | 20 | 0.2% | 0.5% | -- |
| SR19 East Green River | 164.55 | 175.59 | 8,765 | 4,744 | NA | 0 | 20 | 0.2% | 0.5% | -- |
| Ranch exit (Floy) | 175.59 | 182.17 | 8,465 | 5,003 | NA | 0 | 20 | 0.2% | 0.5% | -- |
| SR191 Crescent Junction to Moab | 182.17 | 187.42 | 6,800 | 3,882 | NA | 0 | 20 | 0.3% | 0.5% | -- |

[1]  Assumes daily trips remain relatively constant over operational life of Mill.

[2]  2008 traffic counts for Colorado highways from CDOT, 2009b; 2008 traffic counts for Utah highways from Butterfield, 2009.

[3]  AADT = average annual daily traffic.

[4]  DHV:  the 30th highest annual hourly traffic volume reported as percent of AADT.

[5]  Estimated light-vehicle trips are based on two straight-day workers per vehicle, three shift workers per vehicle, and 20 visitor trips. Analysis assumes 90 percent of these trips originate from the east and 10 percent originate from the west and that six miscellaneous delivery trips originate from the east.

[6]  Estimated heavy-vehicle trips per day include 29 trips of ore shipments from the east and 21 trips of ore shipments from the west – *Mine Operations Plan* (Energy Fuels, 2009d), 22 trips of water deliveries from Naturita - *Water and Wastewater Plan* (Energy Fuels, 2009f), 12 delivery trips from the west, and four delivery trips from the east - *Special Use Permit Application* (Visus, 2009).

[7]  NA = data not available.

BLM_0045245

Table 4.2-6 shows the estimated peak-hour volumes of background and project-related traffic at the intersection of the Site Access Road and SH 90. Based on these findings and the traffic study's recommendations, Energy Fuels plans to construct a left-turn deceleration lane for westbound traffic on SH 90 so that traffic can access the Site safely. A 10-foot wide shoulder would also be constructed on the south (eastbound) side of SH 90, east of the Site Access Road. The entire length of highway widening would be 2,175 feet. Additional warning signs may be placed along the highway on either side of the Site Access Road to warn on-coming vehicles of truck traffic entering the highway (Visus, 2009).

**Table 4.2-6**
**2030 Afternoon Peak Hour Traffic Volume at Intersection of Site Access Road and SH 90[1]**

| Traffic Source | Eastbound | | | Westbound | | | Northbound | |
|---|---|---|---|---|---|---|---|---|
| | Left | Thru | Right | Left | Thru | Right | Left | Right |
| Future Background Traffic | NA[2] | 41 | 0 | 0 | 41 | NA | 0 | 0 |
| Project Traffic | NA | 0 | 7 | 17 | 0 | NA | 8 | 28 |
| Total | NA | 41 | 7 | 17 | 41 | NA | 8 | 28 |

[1] Source: TurnKey, 2008.
[2] NA = Not Applicable.

Table 4.2-7 shows the estimated peak-hour volumes of background and project-related traffic at the intersection of SH 90 and SH 141. According to CDOT criteria, background traffic warrants a northbound left-turn deceleration lane on SH 141 at its intersection with SH 90. The need for this lane would exist regardless of the additional traffic associated with the Proposed Action (TurnKey, 2008).

**Table 4.2-7**
**2030 Afternoon Peak Hour Traffic Volume at Intersection of SH 90 and SH 141[1]**

| Traffic Source | Eastbound | | | Westbound | | | Northbound | | |
|---|---|---|---|---|---|---|---|---|---|
| | Left | Thru | Right | Left | Thru | Right | Left | Thru | Right |
| Future Background Traffic | 2 | NA | 36 | 50 | 33 | NA | NA | 50 | 2 |
| Project Traffic | 14 | NA | 14 | 8 | 0 | NA | NA | 0 | 9 |
| Total | 16 | NA | 50 | 58 | 33 | NA | NA | 50 | 11 |

[1] Source: TurnKey, 2008.
[2] NA = Not Applicable.

## Transportation Risks

<u>Routine Transportation.</u> No significant dust or fume emissions are expected during routine shipment of chemical reagents and other hazardous materials. Therefore, no significant nonradiological risks and/or health related impacts to the driver or members of the public are expected from the routine transportation of these materials.

Similarly, no significant dust emissions are expected during the routine transport of ore, which accounts for the majority of material shipments associated with the Mill. The ore would be covered with tarps to reduce dusting and falling debris during transportation. The ore being shipped from mines contains a substantial amount of moisture and has a lower percentage of fines than ore that has been crushed. Minor spillages of ore from trucks in transit would add little additional radioactivity to the mineralized natural environment of the Colorado Plateau. The DOE performed an analysis to estimate exposures to the public from transportation shipments containing uranium ore (DOE, 2007) and the results are provided in Section 4.11.

BLM_0045246

Transportation Emergencies. Procedures for addressing vehicular accidents (*i.e.* spillage and crashes) associated with transporting radioactive and nonradioactive materials to and from the Site are described in the *Emergency Response Plan* for the Mill Facility (Energy Fuels, 2009e). The trucking companies transporting ore, chemical reagents, and fuel to the Mill and yellowcake and vanadium oxide from the Mill to other processing facilities are required by USDOT regulations to have emergency response plans and capabilities in place to respond to accidents and cargo spills. As part of its contracting program, Energy Fuels would verify that these plans are in place.

Transportation accidents occurring off the Site would be handled by the appropriate off-site emergency responders (e.g. Colorado State Patrol, Utah Highway Patrol) and contracted emergency responders. Additionally, carriers of low-level radioactive materials, such as ore and yellowcake, and nonradioactive materials such as vanadium oxide, would have the option of incorporating Energy Fuels' emergency response teams into their emergency response plans for some transportation accidents and spills. Energy Fuels' response teams would be available to assist with radiological screening, surveying, and clean-up at off-site accident locations. Response team members would have expertise in radiation control and possess specialized monitoring equipment that that is generally not available to most law enforcement agencies, fire departments, and other first responders. For most highway transportation accidents, the hauling contractor would send a clean-up crew from a pre-qualified contractor to the accident site. In these cases the Energy Fuels emergency response team would provide assistance as requested by the incident commander on the scene (Energy Fuels, 2009e).

If involved in a severe accident, truck shipments of anhydrous ammonia to the Mill Facility could result in a significant environmental impact (SENES, 2009a). The number of shipments of anhydrous ammonia to the Mill is expected to be approximately 3 times the number of yellowcake shipments from the Mill. However, ammonia is expected to be shipped from a supplier closer to the mill (Salt Lake City) than the conversion facility in Illinois. Therefore *Risk Assessment* estimates that the frequency of a rollover and crush of ammonia truck that could result in a catastrophic release of ammonia would be much smaller than that of a yellowcake truck. In the event of a minor release of ammonia, impacts to members of the public are expected to be small. However, the driver could be exposed to elevated ammonia concentrations before he could be evacuated from the scene of the accident. If a large amount of ammonia were released, members of the public and the driver could be exposed to high ammonia concentrations. In the event of a traffic accident resulting in an ammonia spill, UDOT and/or CDOT HazMat Teams would respond to the accident and would initiate appropriate evacuation and corrective actions, as necessary.

**Vehicular Crashes.** During operations, an estimated 2,801,174 miles would be traveled on regional public roads each year. Based on a fatal accident rate of 0.0218 fatalities per million vehicle miles traveled on rural roads in Colorado and Utah (CDOT, 2009c; NHTSA, 2009), this could result in 0.06 fatal highway crashes each year. Based on DOE's estimated 0.033 injury accident rate per one million miles of travel on rural state highways (DOE, 2007), approximately 0.09 injury accidents per year could occur during operations.

The *Risk Assessment* (SENES, 2009a) for the Piñon Ridge Mill Facility estimated that the frequency of transportation accidents (*i.e.* rollover and crash) involving yellowcake would be 0.00079 per year. The frequency of transportation accidents involving ore deliveries would be 000.017 per year (SENES, 2009a). These estimates are based on several assumptions, including USDOT hazardous material transportation accident statistics including the transportation route length between the Mill Facility and the conversion facility in Metropolis,

BLM_0045247

Illinois, the annual number of yellowcake shipments, the distance between mines and the Mill Facility, and the annual number of ore deliveries.

### 4.2.1.2.3   Closure

Traffic associated with closure would include light-vehicles transporting workers to the Site, tractor-trailer trucks delivering water and materials (*e.g.* aggregate and rock riprap) to the Site, and trucks removing decontaminated building materials and equipment from the Site. Heavy machinery required for site closure, including bulldozers, excavators, motor graders, scrapers, and compactors, would be mobilized to the Site on heavy-haul vehicles and remain there as long as needed.

Based on a 6 day per week work schedule, Energy Fuels estimates that closure activities would continue for 2 years and 9 months (855 days). Energy Fuels assumes that there would typically be about seven equipment operators per day performing reclamation work. With supervisory and radiation program personnel, approximately 10 workers would travel to the Site daily. Daily crew size could range from 2 to 15 equipment operators, depending on the scheduled work according to the *Mill Decommissioning and Reclamation Cost Estimate* (Energy Fuels, 2009h). Table 4.2.8 shows the average daily number of vehicles that would travel to the Site during each quarter of closure.

**Table 4.2.8**
**Average Daily Traffic Associated with Closure[1]**
**(Number of Vehicles per Day)**

| Closure Quarter | Scheduled Activities[1] | Light Vehicles | Heavy Vehicles |
|---|---|---|---|
| Quarter 1 | Planning and Site Monitoring | 3 to 5[2] | -- |
| Quarter 2 | Planning and Site Monitoring | 3 to 5[2] | -- |
| Quarter 3 | Planning and Site Monitoring | 3 to 5[2] | -- |
| Quarter 4 | Planning and Site Monitoring | 3 to 5[2] | -- |
| Quarter 5 | Planning and Site Monitoring | 3 to 5[2] | -- |
| Quarter 6 | Facility Decommissioning and Demolition, Tailing Cell Closure | 8 to 12[3] | 2 to 3[4] |
| Quarter 7 | Tailing Cell Closure | 8 to 12[3] | 2 to 3[4] |
| Quarter 8 | Site Reclamation | 8 to 12[3] | 2 to 3[4] |
| Quarter 9 | Site Monitoring and De-watering | 3 to 5[2] | 2 to 3[4] |
| Quarter 10 | Final Closure | 8 to 12[3] | 1 to 2[4] |
| Quarter 11 | Final Closure | 8 to 12[3] | 1 to 2[4] |

[1]   Source: *Emergency Response Plan* (Energy Fuels, 2009e).
[2]   Assumed number of worker vehicles based on Energy Fuels' estimate of two to five workers per day (Norquist, 2009).
[3]   Assumed number of worker vehicles based on Energy Fuels' estimate of 10 to 15 workers per day – *Mill Decommissioning and Reclamation Cost Estimate* (Energy Fuels, 2009h).
[4]   Assumed number of tractor-trailer units hauling riprap and other materials, and water trucks - *Mill Decommissioning and Reclamation Cost Estimate* (Energy Fuels, 2009h).

**Peak Trips per Day during Closure.** Traffic associated with closure would be the highest between the 6th and 8th quarters of closure. During these periods, traffic could peak at 30 one-way trips to and from the Site per day. Closure-related traffic would be likely to originate in the local area. As with the construction and operational phases, SH 90 between the Site and

Vancorum, and SH 141 between Vancorum and Naturita would be the most heavily used public road segments. The peak number of daily trips associated with closure is approximately 5 to 6 percent of 2008 traffic levels on these road segments. Based on CDOT's projected traffic increases on SH 90 and SH 141 through 2030, the peak number of daily trips during closure would increase traffic on affected roadways by less than 3 percent.

**Vehicular Crashes.** Assuming that most closure-related traffic occurs between Naturita and the Site, between 198,760 and 339,820 miles would be traveled on regional public roads over the 11 quarter (855 day) closure period. Based on a fatal accident rate of 0.0218 fatalities per million vehicle miles traveled on rural roads in Colorado and Utah (CDOT, 2009c; NHTSA, 2009), between 0.004 and 0.007 fatal accidents could be associated with the closure traffic. Based on DOE's estimated 0.033 injury accident rate per one million miles of travel on rural state highways (DOE, 2007), between 0.007 and 0.01 injury accidents could occur during closure. Historically, vehicle accident rates have fallen over time, and future accident rates are likely to vary substantially from current ones. Nonetheless, these estimates suggest that the risks of vehicular crashes associated with closure would be low.

## 4.2.2 Protective/Mitigation Measures

Energy Fuels would implement the following measures to mitigate transportation-related impacts resulting from the Proposed Action:

- Energy Fuels has obtained a Site Access Permit from the CDOT that provides for safe Site access and egress (CDOT, 2008). Consistent with the terms of the access permit, Energy Fuels would widen SH 90 over a length of 2,175 feet at the Site Access intersection by constructing a left-turn deceleration lane for westbound traffic on SH 90, and a 10-foot wide shoulder on the south (eastbound) side of SH 90, east of the Site Access Road (CDOT, 2008).

- Energy Fuels would encourage its workers to carpool in order to reduce project-related traffic.

- To reduce project-related traffic during construction, Energy Fuels would encourage its contractors to provide busses or vans at central collection points in nearby towns to transport construction workers to and from the Site.

- Dust suppression measures would include magnesium chloride or equivalent treatments and water sprays on gravel roads on the Site.

- All ore shipments would be transported in dedicated ore haulage trucks, and would be conducted in accordance with USDOT hazardous materials shipping regulations and requirements.

- Energy Fuels would verify that the trucking contractors transporting ore, chemical reagents, and fuel to the Mill and yellowcake and vanadium oxide from the Mill have emergency response plans in place to respond to highway accidents and cargo spills. Guidelines for evaluating the effectiveness of ore transportation carriers' emergency response plans are provided in Appendix B to the *Mine Operations Plan* (Energy Fuels 2009d).

- Ore shipments would be tarped to reduce the potential for accidental spillage or fugitive dust during transportation.

BLM_0045249

- Chemicals reagents, diesel fuel, and propane used to process ores would be delivered to the Site by licensed haulers in USDOT-approved containers.

- Energy Fuels' emergency response teams would be available to assist with radiological screening, surveying, and clean-up at off-site accident locations and would provide verification sampling of cleanup actions.

### 4.2.3   Monitoring

Upon request, Energy Fuels would provide truck haulage records to Montrose County for all material and feedstock shipments delivered to the Mill Facility. The records would include the date of delivery, type and quantity of materials, place of feedstock origin, and other data the county may request.

## 4.3   GEOLOGY AND SOILS

### 4.3.1   Environmental Impacts

#### 4.3.1.1   General Impacts

Geology

Geology-related potential impacts could occur during construction, operation, or during closure. Potential impacts could result from geologic hazards discussed in Section 3.3.1 such as slope instability, flooding and headward erosion, karst or dissolution features, faulting, seismicity, liquefaction, collapsible soils, and volcanism.

**Site Selection.** 6 CCR 1007-1 Part 18 Appendix A (CDPHE, 2001) gives Colorado criteria for licensing a uranium mill and deposition of tailings. Criterion 1 relates to site selection, and favors minimal potential for erosion and disturbance in the long-term. Criterion 3 favors placement below grade, or "reasonably equivalent isolation of tailings from natural erosional forces."

The Site was selected to minimize impacts from geologic hazards. Energy Fuels has conducted extensive geological and geotechnical studies to characterize the selected Site, as discussed in Section 3.3.1, to verify its suitability and establish construction requirements. The *Geologic Report* (Kleinfelder, 2009e) describes the faulting in the area and the potential magnitude of seismic events and the *Geotechnical Design Recommendations* (Kleinfelder, 2008h) discusses measures necessary for constructing foundations on the Site soils. Various other reports address specific mill area requirements, such as *Project Design Criteria* (Golder, 2008f), *Ore Stockpile Pad Design* Report (Golder, 2008g), *Tailings Cell Design Report* (Golder, 2008a), *Evaporation Pond Design* (Golder, 2008h), *Roadway Pavement Design* (Kleinfelder, 2008i) and *Phase 2 Geotechnical Field and Laboratory Test Program* (Golder, 2008b). Various other reports referred to below address erosion potential and control measures. Tailings cells would be mostly below grade, minimizing the height of disturbance and allowing for construction of very gradual, erosion-resistant embankment slopes during closure in compliance with Criterion 6 of Appendix A of 6 CCR 1007-1, Part 18 (CDPHE, 2001).

**Surface Stability.** The stability of the subsurface beneath the Mill and waste disposal facilities was considered in that instabilities could lead to differential settling and dissolution features could result in collapse of the overlying soils. The Site is underlain by alluvium which includes some superficial collapsible soils and the presence of the salts of the Hermosa Formation in the valley core suggests the potential for dissolution structures (such structures are called karst in limestone terrain).

BLM_0045250

Kleinfelder (2008a) summarized the alluvial valley fill as 15 to 20 feet of silty sand and clayey sand, overlying silty sand up to 80 feet thick over bedrock. Carbonate cement layers (caliche) were found in 13 of 20 geotechnical borings and uncemented gravel was found in two borings at 21 and 37 feet depth. No saturated soils were observed, either perched or at the base of the alluvium. The uppermost materials contain some poorly packed, collapsible soils, which would require removal prior to laying foundations. Kleinfelder stated that local soils, including the surficial collapsible material, could be moisture conditioned (wet to optimum moisture) and re-laid and compacted to achieve a competent base for spread foundations. For a plant with heavy loading, Kleinfelder proposed a number of alternate pier and pile designs which can transfer the load to deeper, extended competent intervals. Golder (2008b) separated and tested fine fractions from soil samples, and found limited plasticity in those fractions, and native moisture content lower than the plastic limit in all samples. The Site alluvium would therefore be a suitable foundation, provided that some loose soils were removed or replaced and re-compacted and deep foundations installed under critical plant areas.

Kleinfelder investigated a small hole at the surface north of the Site. This hole, which was suspected to be a karst feature, is underlain by the Hermosa Formation. Kleinfelder concluded that it was a local feature and to have no equivalents under the Site itself. The potential for bedrock salt dissolution undermining any portion of the Site is not significant, because the bedrock topography is not conducive to it. The salt diapir which once occupied the core of the anticline has largely been eroded and bedrock and the water table within the valley slope at low angles to the Dolores River. Groundwater discharges to the Dolores River and has no lower outlet which would allow it to tunnel below the elevation of the river, into the modern bedrock surface. The water table at the Site has a low point at approximately elevation 5,140 ft above mean sea level (amsl), while the Dolores River elevation in the Paradox Valley is between 4,930 and 4,940 ft amsl, just 200 ft lower in 7.5 miles, an average slope of 0.5 percent.

Thus, there would be no insurmountable soil stability problems in terms of bearing competence or destabilization by natural events. Appropriate foundation design would preclude any subsidence due to soil instability, or probable seismic disturbance. The alluvium is well-drained and has limited plasticity.

**Slope Disturbance and Rock Falls.** Construction on slopes may lead to potential instabilities. Slope disturbance is unlikely because most of the Site is flat and not susceptible to mass movement. Steeper slopes occur where the Site extends to the mesa at its southern end; however, the Mill Facility would not be constructed on the valley side where there is potential for slope disturbance.

Rock falls and slides could potentially cause damage to the Mill Facility if they were to occur; however, the valley sides to the southwest of the Site are stable. Old-growth pinyon and juniper cover these slopes, and no signs of recent mass movements (slides) or breakaway boulders having fallen from the rim of Davis Mesa in historical time are present. Faults parallel the valley side, formed by the collapse of the former anticlinal dome. The trees, however, clearly indicate that no significant movement on these faults has occurred for at least a century. Trenching over known faults in the valley floor indicated no displacement of Quaternary soils. Falls and slides therefore pose no plausible risk to the Mill Facility.

No blasting is anticipated to be required during construction. Stormwater diversionary berms at the south end of the Site would remain after decommissioning and closure, and would impede or divert rolling rock falls which might be loosened by activity on Davis Mesa above the Site.

BLM_0045251

**Seismicity.** The hazards of seismicity include potential damage to the Mill Facility due to ground acceleration, and destabilization of the subsurface beneath the plant (at the extreme, liquefaction of unconsolidated materials, addressed below). Criterion 4E of 6 CCR 1007-1, Part 18, Appendix A (CDPHE, 2001) states that a tailings cell "may not be located near a capable fault that could cause a maximum credible earthquake (MCE) larger than the impoundment could reasonably be expected to withstand."

The historic seismicity of the area is low, and associated with distant faults or with the Paradox Valley Unit (PVU) brine injection, which has been scaled back, with concomitant decrease in quake intensity.

The probability of natural earthquake occurrence and magnitude was assessed by Kleinfelder (2009e). The Design Earthquake (the magnitude the plant would be designed to resist with a factor of safety) has magnitude 4.8 at a distance of 10 miles from the Site, and causes a ground acceleration of 0.161 g (16 percent of the acceleration of gravity, or 5 ft/s$^2$). All facilities, including the plant, offices, foundations, containments, stormwater structures, and roadways would be designed in accordance with Montrose County building codes. The county currently relies on the Uniform Building Code (UBC) but is transitioning to the International Building Code (IBC), which includes a more comprehensive analysis of earthquakes. Under the IBC, the facility would be designed based on the Design Earthquake with a suitable safety factor. The final design would then checked for stability using the acceleration of gravity associated with the MCE. The MCE has a probability of occurrence of 2 percent in 50 years, corresponding to a return period of 2,475 years.

Failure of a tailings embankment because of an earthquake would be unlikely because the site is in a zone of low to moderate seismicity (Kirkham and Rogers, 1981) based on the number of sizable earthquakes that have occurred in the historical and more recent record. The three tailings cells were designed in accordance with the International Building Code (IBC) based on a Magnitude 4.8 earthquake occurring at a distance of approximately 10 miles from the site. Minimum static and pseudo-static factors of safety ranged from 2.0 to 4.9 and 1.7 to 2.7, respectively, during the life of the cells, with the highest factors of safety occurring during the post-closure period (Golder, 2008a).

Continued operation by the BOR of the PVU brine waste injection may continue to generate low magnitude movements in the deep subsurface. Since 2000, when the injection rates were substantially reduced, seismicity associated with the PVU has been less than 2.5 magnitude (not detectable by most persons). This low level activity is continual which may indicate a steady relief of stress and reduced potential of delivering a large magnitude event.

Faults beneath the Site are "non-capable" (analogous to a volcano being extinct) according to the Colorado Geological Survey (Kleinfelder, 2009e) and are believed to not have moved since the Pleistocene at the most recent (75,000 to 125,000 years). No evidence of soil displacements was found in several Site trenches overlying bedrock faults, except for one shallow dislocation between 5 and 7 feet depth, without any extension at depth in the trench or geophysical investigations (Kleinfelder, 2009e). The investigation results indicate that the Site meets the requirements of Criterion 4E of Appendix A of 6 CCR 1007-1 Part 18 (CDPHE, 2001), because there are no capable faults as defined in section III(g) of Appendix A of 10 CFR PART 100 that could cause a MCE larger than that which the tailings cells could be expected to withstand.

**Liquefaction.** Liquefaction of unconsolidated soils is a hazard that may occur even when a building survives the shaking of an earthquake. Modern buildings in Japan and China have

BLM_0045252

toppled, intact, when large quakes have shaken saturated alluvium and overcome intergranular friction and the material lost cohesion. Liquefaction potential depends on water saturation. The water table in bedrock beneath the Site is more than 400 feet deep and the alluvium of the Paradox Valley is essentially unsaturated throughout (maximum measured sample moisture was 13 percent). Therefore, liquefaction potential at the Site is negligible. Even if saturation were to be assumed (for conservative design purposes), the factor of safety against liquefaction of the alluvium by the MCE was estimated by Golder (2008b) to be generally in excess of 10.

Because the entire alluvial thickness appears to be unsaturated, the liquefaction potential in an earthquake is insignificant by NRC criteria (NRC, 2003a). Conservatively assuming saturation, the factor of safety of the alluvium in its native condition resisting liquefaction under the MCE seismic event is 10 or more over most of the Site, and 2.9 in one location within a single borehole (Golder, 2008b). Based on the absence of shallow groundwater, liquefaction of Site soils during an earthquake event would be highly unlikely and it would be improbable that an earthquake could cause significant damage to the Mill Facility including tailing cells, in any phase, from construction through operation and closure.

**Volcanism.** There would be no impact to the Mill Facility due to volcanism because it does not pose a credible hazard in the area. Igneous activity in the area is extinct, and there is no potential for a Paracutin type event (Paracutin was a surprise eruption in a cornfield in Mexico; but it lies in an active volcanic belt).

Soils

Potential impacts to soil resources within the Site would be associated with development activities from the construction, operation, and closure of the Mill Facility. Construction activities would include site clearing and grading activities required to install the project components which include the Mill, administration building, ore stockpile pad, tailing cells, evaporation ponds, and surface water control features, as well as disturbance associated with general site grading requirements, roads, soil stockpiles, and other minor ancillary facilities.

**Site Selection.** Site selection for permanent deposition of tailings is favored in 6 CCR 1007-1 Part 18 Appendix A (CDPHE, 2001) which has topography providing good wind protection (Criterion 4B) and is capable of sustaining a vegetative cover, or be rock-covered (Criterion 4D). Most frequent winds are light breezes from the southeast associated with nighttime valley drainage, and the location of the Site below Davis Mesa provides shelter from stronger westerly winds in the spring (Kleinfelder 2009i, *Meteorology, Air Quality and Climatology Report*). Tailings cells would be closed with an evapotranspiration (ET) cover over a soil radon barrier. The top of the ET cover would consist of soil and rock mulch, and the tailings cell outslopes would be covered with rock blankets to prevent erosion. The embankment outslopes would have gradual slopes between 5H:1V and 10H:1V and would be seeded with a native grass mix to further stabilize the surfaces as discussed in the *Tailings Cell Closure Design Report* (Kleinfelder, 2009c). The location of the Site in the valley bottom on gentle slopes, with no proposed infringement on steeper slopes south of the Site, minimizes the potential for erosion and other soil stability impacts.

**Disturbances.** Impacts to soils from the Proposed Action would occur from the loss of soil production associated with the long-term disturbance and occupation of the area by the Mill Facility. Although topsoil salvaging would occur during clearing and grading, soil productivity could diminish through the loss of topsoil, or from the mixing of topsoil with less productive subsoils. Soil productivity could be degraded by soil compaction and damage or loss of soil structure from the movement of heavy construction equipment, soil mixing or displacement

BLM_0045253

during grading, and site development activities. The long-term storage of topsoil in stockpiles could decrease soil quality by the loss in organic matter or biological activity. Soil disturbance from clearing and grading could increase the potential for soil loss and sedimentation from wind and water erosion. This may occur because increased soil exposure would occur from the loss of vegetation cover, loss of biological or physical soil crusts, and from physical disturbance. Soils disturbance could increase the potential for noxious weed infestation which typically decreases soil productivity.

As indicated in Table 4.3-1, approximately 415 acres of soils would be disturbed by site development activities. Table 4.3-1 gives affected acreage of each soil mapping unit and the percentage of each.

**Table 4.3-1**
**Acres and Percent of Total Disturbance Affected by the Proposed Action by Soil Mapping Unit**

| NRCS Soil Mapping Unit | Mapping Unit Name | Acres Affected by Proposed Action | Percent of Total Disturbance |
|---|---|---|---|
| 15 | Barx | 51.2 | 12.3 |
| 18 | Begay | 76.2 | 18.4 |
| 56 | Mikim | 106.2 | 25.6 |
| 73 | Paradox | 164.1 | 39.6 |
| 87 | Rock Outcrop | < 0.1 | 0.0 |
| 104 | Vanada | 16.9 | 4.1 |
| | Total | 414.6 | 100.0 |

**Prime Farmland Assessment.** Prime farmland is land that has the best combination of physical and chemical characteristics for producing food, feed, forage, fiber, and oilseed crops and that is available for these uses. These soils have the combination of soil properties, growing season, and moisture supply needed to produce sustained high yields of crops in an economic manner if they are treated and managed according to acceptable farming methods. Approximately 398 acres of long-term soils disturbance or about 96 percent of the total soil disturbance would occur within soil series that are designated as prime farmland, if irrigated. However, none of these affected soils have been irrigated or farmed in the past. Therefore, no impacts to prime farmlands would occur from the Proposed Action.

**Topsoil and Reclamation Suitability.** Although the soils that would be affected are not considered prime farmland because they have not been irrigated or farmed, the majority of the soils that would be affected have chemical and physical characteristics which rate them as suitable topsoil and reclamation materials (see Table 3.3-3). The combination of chemical and physical properties of the affected soils should ensure successful site restoration to native vegetation communities and rangeland uses once the Mill Facility has been closed, as long as the topsoil materials are properly salvaged and stockpiled during the initial construction phase of the project. As specified in the *Technical Specifications* (Golder, 2008i), topsoil would be stripped to depths of 6 to 12 inches and stockpiled for later use during reclamation and closure. Topsoil salvaging procedures in the *Technical Specifications* (Golder, 2008i) stipulated that topsoil salvaging would occur in a manner to minimize contamination with other soil horizons, and to ensure topsoil removal does not result in erosion or excessive sedimentation. Further, topsoil stockpiles would not be disturbed and would be protected from wind and water erosion, compaction, and contamination. Topsoil stockpiles would be graded to prevent erosion and an effective cover of non-noxious, quick-growing, annual and perennial plants would be established to stabilize the stockpiles and to ensure long-term viability of the topsoil. The topsoil stockpiles

BLM_0045254

would be seeded and mulched during the first appropriate growing season after topsoil stripping and stockpiling.

The *Specifications for Closure and Reclamation of Mill Facilities* (Golder, 2009c) which describes: topsoil redistribution, soil preparation, fertilization, seed mix, seeding methods, seeding timing, and mulching that would be implemented to restore the Site. These standard reclamation specifications would allow for successful revegetation of the Site. The reclamation objectives are to establish a long-term self-sustaining ecosystem that stabilizes the Site, provides environmental protection and public safety, and returns the majority of the Site to rangeland use. The NRCS recommended a reclamation seed mix (see Table 4.3-2) that was developed for the ecological site conditions of the Site and which is suitable for all of the soils that would be affected by the Proposed Action.

**Table 4.3-2**
**NRCS Recommended Seed Mixture**

| Common name (Scientific Name – Kartesz) | Variety | Seeding Rate (LBS/Acre – PLS)[1] |
|---|---|---|
| Needle and Thread *(Stipa comate)* | | 1.8 |
| Indian Ricegrass *(Oryzopsis hymenoides)* | | 1.8 |
| Thickspike Wheatgrass *(Elymus lanceolatus)* | Critana | 1.8 |
| Sandberg Bluegrass *(Poa Secunda)* | Sandberg | 0.9 |
| Bottlebrush Squirreltail *(Elymus elmoides)* | | 0.9 |
| Blue Grama *(Bouteloua graceilis)* | Alma | 0.9 |
| Galleta *(Hilaria jamesii)* | Viva | 0.9 |
| | Total | 9.0 lbs/Ac |

[1] Double rate if broadcast seeded.

To enhance the diversity of some of the reclaimed areas, shrubs and forbs could also be included in the seed mixture. Potential shrubs species that could be included in the seed mix include four-wing saltbush, gardner saltbush, and winterfat. Forbs species that could be included in the seed mixture include blue flax, penstemon and lupine, among other forb species adapted to site conditions. Shrub and forb species should not be included in the seed mix on or in the vicinity of the tailing cells where deeper rooted shrub species might penetrate into the engineered caps or could attract wildlife to this area.

As soon as feasible after construction, interim reclamation of disturbed areas that are not required for operations should be reseeded with the recommended seed mixture for erosion control and stabilization purposes and to minimize the area of surface disturbance.

**Water and Wind Erosion.** None of soils that would be affected by development activities have a high wind or water erosion hazard. Although a large area of disturbance would occur during clearing and grading, the Mill Facility has been designed to occupy or disturb the minimum area necessary for construction and operations. The area is generally flat which minimizes the

BLM_0045255

potential for slope wash erosion. Prior to clearing and grading, the Site would be surveyed and staked to minimize disturbance to surrounding areas outside of the construction footprint as outlined in the *Technical Specifications* (Golder, 2008i).

As outlined in the *Site Drainage Analysis and Design Report* (Kleinfelder, 2009d), the potential for erosion would be minimized by diverting un-impacted or undisturbed surface water drainage around the Mill Facility through designed diversion berms and channels that are directed into natural drainage channels east and west of the Site. Diverting runoff around the Site would minimize potential sedimentation by minimizing runoff volumes over disturbed areas of the Site. Diversionary berms would be armored with DOT liners and riprap; channels would be lined with grouted riprap and would have rock energy dissipation aprons where channels discharge to arroyos. Culverts would have rock outlet protection and sand bag baffles and/or settling basins at the upstream end to retain sediments.

During construction, grading of the Site would be managed to control runoff, erosion, and sediment transport by utilizing a variety of sediment control measures including hay bales, silt fences, and temporary detention basins. The purpose of these controls would be to minimize the amount of sediment runoff from the Property Boundary to levels that approximate conditions prior to initiating construction. The mill, ore pad, tailings cells, and evaporation ponds have been designed as "zero discharge" facilities where there would be no offsite stormwater discharge. Precipitation and stormwater runoff that contacts these areas would be contained on-site in lined ponds or cells and recycled for use in the mill and/or evaporated. Stormwater runoff from the administration facility and other structures not within the footprint of the zero-discharge area (e.g. monitoring stations, water supply well field, secondary roads, soil stockpiles) would be controlled using best management practices (BMPs) for stormwater and erosion control. These measures may include surface water diversion channels, energy dissipating structures, slope projection and sediment catchment basins.

Facility decommissioning would entail demolition of the mill and removal of the ore pad, mill pad, and evaporation ponds. These materials would be placed in the final tailings cell. Erosion, sediment and dust control measures used in the operational phase would remain in place during decommissioning. Temporary controls would be substituted for permanent controls at such time the permanent controls are removed as part of closure and reclamation.

**Hydric Soils.** As noted in Table 4.3-1 and in Section 4.3.2.2 approximately 4.23 acres of the Vananda silty clay soil series (Va) would be disturbed by the Proposed Action. According to the NRCS (2008) this soil is designated as being partially hydric, however field investigations (Kleinfelder, 2008c and 2009f) did not encounter any hydric soils within the Site.

**Soil Engineering Properties.** The *Geotechnical Design Recommendations* (Kleinfelder, 2008h) characterizes the engineering properties of the native soil and overburden materials at the Site for engineering design purposes. This work consisted of subsurface exploration, laboratory testing, design meetings, and engineering analysis to provide geotechnical design recommendations that would be incorporated into the facility designs. The report concluded that the native overburden soils may be used as engineered fill anywhere on the Site provided they are processed and moisture conditioned as specified in the report. *The Technical Specifications* (Golder, 2008i) for construction provide detailed specifications and procedures for construction of soil foundations.

As the tailings cells are regraded and covered in a phased manner according to the *Tailings Cell Closure Design Report* (Kleinfelder, 2009c), survey monuments would be installed to enable

BLM_0045256

monitoring of settlement as the tailings gradually dewater. The *Tailings Cell Closure Design Report* details placement of the interim cover, dewatering, and regrading of fill cap construction, and placement of low-maintenance rock armor in accordance with the criteria listed in Criterion 6 of Appendix A 6 CCR 1007-1, Part 18 (CDPHE, 2001). The survey monuments would be monitored from the time interim cover is placed until each cell is closed through facility closure, and thereafter on a decreasing frequency schedule, to verify that there is no unacceptable differential settling which could threaten the integrity of the cells' covers in the post-closure period.

### 4.3.1.2   Construction, Operations, and Closure Impacts

### 4.3.1.2.1   Construction

**Geology.** Potential geologic impacts during construction include seismic destabilization, inadequate foundation preparation, erosion of disturbed areas, and stormwater disruption. Volcanism and rock slides are counted above as having vanishingly small potential.

There is little potential of seismicity disrupting or compromising construction through geologic phenomena. Trenched soils show no evidence of dislocations since at least the Pleistocene (75,000 to 125,000 years) (Kleinfelder, 2009e), and all facilities are or would be designed to meet IBC requirements as described above. Because of the absence of saturated material in the alluvium beneath the Site, seismic liquefaction of the soils would be highly unlikely (Golder, 2008b).

Subgrade soils would be compacted in place or excavated and replaced with compacted material to the compaction level required for each component of the Mill Facility. Foundations would generally consist of spread foundations on removed, replaced, and moisture-conditioned compacted soils. Deep foundations would be utilized for critical locations within the mill with larger load bearing requirements. These measures are described below in Section 4.3.1.2, Soils.

Surface water control structures would be constructed at the start of construction activities, so that full erosion and sedimentation control would be in place before most surface disturbance would occur (Golder, 2009b). BMP temporary erosion and surface water control measures would be used during construction of the Site Access Road and permanent surface water control structures (Golder, 2009a). Disturbed soils and constructed berms would be stabilized as soon as is practicable, using DOT liner and riprap on stormwater diversionary dikes, grouted riprap in runoff diversion channels, and vegetation on low to moderate slopes.

**Soils.** In construction, the Site would be disturbed and modified, surficial soils stripped and stockpiled, subsoils excavated and/or compacted, foundations (deep and shallow) installed for the plant, and an access road constructed. Foundation requirements are addressed in this section, because geotechnical measures would be implemented during that phase. The Site would be vulnerable to substantial erosion, if not properly managed during the construction phase.

The Site Access Road and surface water control structures would be the first items constructed at the Site under the *Construction Plan* (Golder 2009b), so that complete runoff and sedimentation controls would be in place prior to facility construction. During the construction of the Site Access Road and surface water control structures, temporary erosion and sediment control measures would be installed (Golder, 2009a). These include the use of silt fences and straw bale filters where appropriate, water sprays to control dust, and stabilization of disturbed

Case No. 1:20-cv-02484-MSK   Document 40-5   filed 04/27/21   USDC Colorado   pg 30 of 271

areas and embankments as soon as is practicable. While the facility is being constructed, permanent surface water controls would be in place, and mobilized sediment would be contained to the extent practicable.

The primary access that would be constructed to the Site consists of 150 feet of paved road off SH 90 and then a gravel road over a prepared subbase. This design minimizes the possibility of tracking sediment onto the highway. Smaller, temporary gravel tracking pads would be utilized during construction to minimize tracking from wet or muddy areas of the Site.

Stockpiled topsoil and subsoil would be graded and seeded to prevent erosion of piles. Diversion channels would be constructed around each pile to minimize stormwater run-on.

Foundation work would be critical. Energy Fuels has gathered geotechnical data to support design of foundation subbase soils for each component of the Mill Facility and load bearing piers for plant areas.

The Site Access Road and ore haulage roads would be built according to American Association of State Highway and Transportation Officials (AASHTO), U.S. Department of the Interior (DOI) and CDOT specifications and design manuals for mine haulage roads. Roadway design and references are given in the *Roadway Pavement Design Recommendations* (Kleinfelder, 2008i). Main roadways would be two-lane, 22-ft wide with 2-ft shoulders. Subgrade materials were assessed from the *Geotechnical Design Recommendations* (Kleinfelder, 2008h), the *Phase 2 Geotechnical Field and Laboratory Test Program Report* (Golder, 2008b), and the *Geologic Report* (Kleinfelder, 2009e). Loose surficial materials would be removed, and the road bed subgrade scarified and moisture-conditioned to within 2 percent of optimum moisture content, and compacted to 95 percent standard Proctor density, measured in place by ASTM D698. Optimum moisture and Proctor density were determined in a soil mechanics laboratory from tests of density and compaction energy at varying moisture content. The compacted surface would be proof-rolled with a heavy vehicle, and any areas that deformed would be removed and replaced to achieve stable subgrade. Aggregate specifications in the road bed also follow DOI and CDOT specifications.

The ore pad design is described the Ore *Stockpile Pad Design Report* (Golder, 2008g). Borehole and soil testing data from three holes in the ore pad area were used to assess soil characteristics. Surficial soils include collapsible loess and loose alluvium. As with the road subgrade, loose materials would be removed, the remaining soil scarified, moisture-conditioned and compacted to 95 percent standard Proctor prior to installing liners. The 1 acre ore pad would have a concrete liner and the 5-acre pad would have a reinforced geosynthetic liner of very low permeability under protective fill layers.

Design of the tailings cells is described in the *Tailings Cell Design Report* (Golder, 2008a). There were 26 boreholes drilled in the tailings cell area to furnish geotechnical data. Cells would be excavated up to approximately 100 ft below grade with perimeter embankments above grade. Embankment foundations would have loose surficial material removed and the subgrade moisture-conditioned and compacted. Moisture conditioning and compaction of the excavated sidewalls and floor of the tailings cells would be required prior to installing multi-layer cell liners and leak collection and recovery systems, which are described elsewhere.

Mill foundation design has not been finalized but would generally consist of spread foundations on soils that have been removed, moisture conditioned, replaced, and compacted in accordance with the technical specifications. Deep foundations would be limited to critical locations within

BLM_0045258

the mill with higher loading levels. In general, surficial soils would be stripped and stockpiled for later reclamation. Excavated and compacted subgrade would be placed in lifts totaling at least 5 feet thick to support building floor slabs. Alternate load bearing structures discussed in *Geotechnical Design Recommendations* (Kleinfelder, 2008h) for critical areas were drilled piers penetrating to at least 35 feet, on a spacing no more than 30 pile diameters, with reinforcing steel and concrete fill. Piles would be load tested at 200 percent of design pile load plus downdrag.

Preliminary design has outlined geotechnical considerations and measures and alternatives to obtain foundations that would withstand the MCE and prevent differential settling. Final design would optimize factors of safety of foundation work for those potential impacts, and cost effectiveness. Surface water control measures including diversion structures and an elevated pad area for the mill would protect mill foundations against surface water infiltration and erosion.

### 4.3.1.2.2   Operations

**Geology.** Impacts of a geologic nature that might occur during operations include seismic activity, settlement and erosion. Volcanism and rock slides are counted above as having vanishingly small potential. Geotechnical stability of soils beneath the Site is addressed below in Section 4.3.1.2, Soils.

Impacts of seismicity might include damage to the plant and structures, and destabilization of foundation subgrade. All components would be designed to withstand the MCE, determined from historic seismicity records and assessment of the energetic capability of capable faults within 100 miles of the Site (USGS referenced in Kleinfelder, 2009e). The MCE has a lateral acceleration of 0.161g.

As discussed above, the three tailings cells were designed in accordance with the IBC based on a Magnitude 4.8 earthquake occurring at a distance of approximately 10 miles from the site. Minimum static and pseudo-static factors of safety ranged from 2.0 to 4.9 and 1.7 to 2.7, respectively, during the life of the cells, with the highest factors of safety occurring during the post-closure period (Golder, 2008a).

In early operations, disturbed soil areas would have been stabilized and "permanent" (life of project) stormwater, erosion and sediment control structures would be in place. Regular monitoring and maintenance of the Mill Facility would include inspection and repair of these control structures. Erosion controls would include seeding and mulching disturbed areas with low to moderate slopes and soil stockpiles; if this vegetation is set back by unfavorable weather, such areas would be re-seeded.

**Soils.** During operations, surface disturbances outside of the Mill and ancillary facilities would have been stabilized with vegetation and other methods. Potential impacts during construction might consist of seismic disturbance, erosion of surface water control structures, or settling caused by incompetent foundation materials.

There is little potential of seismicity disrupting or compromising operations through soil (geotechnical) destabilization. Trenched soils show no evidence of dislocations since at least the Pleistocene (75,000 to 125,000 years) (Kleinfelder, 2009e). The Mill Facility including tailings cells would be designed to meet IBC requirements for earthquake protection. Because of the absence of saturated material in the alluvium beneath the Site, the factor of safety against any seismic liquefaction in the alluvium under the MCE event is generally greater than 10, even if saturation is conservatively assumed (Golder, 2008b).

BLM_0045259

A Stormwater Management Plan (SWMP) has been prepared for the Site (Golder, 2009a) that details the inspection and maintenance requirements for stormwater control facilities, which are designed to keep these structures functioning properly and minimize erosion and sedimentation on the Site. Seeded areas could fail to grow due to unfavorable weather and leave some disturbances susceptible to erosion. Inspection of reclaimed areas would be a routine part of stormwater monitoring, and action would be taken to correct such possible impacts by regrading and re-seeding at the first appropriate opportunity. Although the soils within the Site are only moderately susceptible to wind erosion, air emissions would be monitored on- and off-site to ensure compliance with state regulations for fugitive dust (i.e., $PM_{10}$).

Foundation pretreatment is addressed above in Construction, because that is when it would be implemented. Excessive differential settling would represent a failure of construction. Sufficient geotechnical data has been gathered to support foundation design according to accepted criteria, to give high factors of safety for all components during the life of the project.

### 4.3.1.2.3  Closure

**Geology.** Closure of the Mill Facility would entail demolition of the Mill and most of the ancillary facilities with disposal in the tailings vault, followed by reclamation of newly disturbed areas in accordance with the *Mill Decommissioning Plan* (Kleinfelder, 2009b). Impacts of a geological nature that might occur during closure include erosion of newly exposed foundation subgrade. Fugitive contaminants that might have been released during operations might also be found to have contaminated soils outside the facility. After closure, the main concern would be the long term integrity of the closed tailings cells and its potential compromise by seismicity or erosion.

Operational surface water control structures (e.g., stormwater ponds), evaporation ponds, and a truck wash station, would be the last components to be removed during closure, so that erosion and contaminant control measures would be maintained during the demolition period. As these control structures are closed and reclaimed, BMP temporary measures would be used to control erosion and sediment. Diversionary dikes at the south end of the Site and channels to the natural drainages would remain as permanent protection for the closed tailings cells.

A radiological survey of the facility and vicinity would be conducted to identify soil contamination that may have occurred during operations. Soils discovered to be contaminated above regulatory thresholds outlined in Criterion 6(6) of Appendix A of 6 CCR 1007-1, Part 18 (CDPHE, 2001), would be excavated and placed in the final tailings cell as described in the *Mill Decommissioning Plan* (Kleinfelder 2009b).

With the exception of the tailing cells, the surface would be restored by regrading to approximately the original (pre-construction) configuration. The primary earthwork involved in this restoration would be removal of the ore pad and mill pad, with redistribution of contaminated soils in the final tailings cell and clean soil in cut areas that require backfilling to achieve original grades. Regraded surfaces would be disked, harrowed and reseeded using the procedures and seed mixes described in the *Specifications for Closure and Reclamation of Mill Facilities* (Golder, 2009c).

The main road would be slightly realigned around the northeast toe of Tailing Cell C to provide space for the final 10H:1V outslope of that cell. Otherwise, the main access road would be left in place for the subsequent user of the land surface outside of the Restricted Tailings Cell Area as well as for access to monitoring wells and air monitoring stations.

BLM_0045260

The tailings cell and closure cover have been designed to meet CDPHE requirements for long-term stability including resistance to pluvial erosion (i.e., 1,000-year storm event) and the MCE. Minimum static and pseudo-static factors of safety ranged from 2.0 to 4.9 and 1.7 to 2.7, respectively, during the life of the cells, with the highest factors of safety occurring during the post-closure period (Golder, 2008a). Stormwater diversionary structures at the south end of the facility would remain in place to divert the 1,000-year, 24-hour storm event flow around the cells and into the surrounding drainages. To resist erosion, the top of the reclaimed tailings cells would be covered with a rock mulch and vegetation, and the gentle 5H:1V to 10H:1V side slopes would be covered with rock. Drainages would also be constructed between the tailings cells and armored with large, durable rock to convey surface water runoff from the toe of the tailings cells to the surrounding natural drainages.

**Soils.** Demolition activities would resemble construction activities in that large areas of disturbed soils would be exposed to possible erosion. Long term differential settling could also disrupt the integrity of the tailings cells.

Surface water controls would be left in place for the entire Site until dismantling and removal of the plant is complete, to maintain control of sediment mobilization. Only when demolition is complete and contaminated soils are placed in the last tailings cell would surface water control structures, including stormwater and evaporation ponds, be closed and reclaimed (Golder 2009c). The stormwater diversionary dikes at the south end of the Site and channels carrying runoff to the surrounding natural drainages would be left in perpetuity to divert surface water from the tailings cells, the only facility component to remain post-closure.

Radiological surveys to identify areas of soil contamination in the vicinity of the Site are discussed in the *Mill Decommissioning Plan* (Kleinfelder 2009b). Soils found to be contaminated above regulatory thresholds would be removed and placed in the final tailings cell prior to closing it.

During the post-closure period, reclaimed areas would be monitored for soil stability and potential invasive plant species, and appropriate measures taken to correct soil or vegetation deficiencies.

Tailings cells have been designed consistent with 6 CCR 1007-1 Part 18 Appendix A to be mostly below grade and founded in compacted silts and fine-grained sands, while above-grade embankments around the cells and runoff diversionary structures at the south end of the property would limit runoff to direct precipitation received on the tailings cells. Survey markers set in cell caps would be monitored regularly from the time the interim cover was placed on each cell until the final cover settlement reached near-steady state conditions. Placement of cover materials would be done in a phased manner to allow for incremental consolidation and dewatering of the encapsulated tailings material.

### 4.3.2   Protective/Mitigation Measures

Energy Fuels would implement the following measures to mitigate geology and soil-related impacts resulting from the Proposed Action:

- The Site was selected in part for its isolation from geologic hazards such as slope instabilities, significant seismicity, and erosion potential. Extensive geotechnical and geophysical studies (Kleinfelder, 2009e) showed no subsurface cavities (karst) or insurmountable soil stability issues. The research and investigations showed that the risk of geologic hazards is low.

BLM_0045261

- All facilities (Mill, tailings cells, evaporation ponds, and ancillary facilities) would be designed to withstand the maximum credible earthquake's ground acceleration in accordance with IBC requirements.

- In areas where collapsible soils have been identified at the surface within the Mill Facility footprint, soils would be removed and a competent compacted soil base would be created.

- Engineering control of surface water runoff including diversion, soil stabilization, rip rap, etc. as described in the *Stormwater Management Plan* (Golder, 2009a) would be incorporated into the design of the Mill Facility.

- Timing of construction and removal of surface water control structures (first built, last dismantled) would maintain erosion and sediment control during construction, operations, and closure.

- BMPs for erosion control, as outlined in the *Stormwater Management Plan* (Golder, 2009a), would be implemented during construction of the access road and surface water structures.

- Post-closure monitoring and maintenance of the reclaimed facilities would be conducted to verify long-term stability prior to transfer of the reclaimed tailings cells to the State of Colorado or the DOE for long-term surveillance and monitoring.

### 4.3.3   Monitoring

During construction, Energy Fuels would monitor all BMPs in accordance with the *Stormwater Management Plan* (Golder, 2009a). During topsoil salvaging efforts, Energy Fuels would ensure that a qualified representative would observe these operations to verify and confirm suitable topsoil salvaging depths are being utilized to prevent potential loss of this resource.

During operation, soil sampling would be conducted as described in detail in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b). Soils would be sampled at 1) four locations, randomly collocated with the 2007 baseline soil sample locations, which are representative of the site and outside of the windblown sample areas; 2) five locations at each of the air monitoring stations; and 3) four locations collocated with the surface water samplers. Samples would be analyzed for RA-226, U-nat, Pb-210, Th-230, and Th-232. Every 5 years surface sampling of windblown soils would be conducted at locations downwind of the tailings cells, evaporation ponds, and ore pad. Following spill cleanup activities, soil sampling would be conducted around the Mill Facility and tailings pipelines on a per occurrence basis in order to confirm that contaminated soils within the spill area is remediated.

Post-closure monitoring and maintenance of the site would include inspections and assessments of facility reclamation efforts to ensure successful reestablishment of vegetation, erosion control and site stability and the integrity of soil covers. Corrective measures would be implemented as necessary to control erosion, allow for establishment of vegetation or to control any potential noxious weed infestations and to meet other post-closure requirements established by the CDPHE. The soil sampling protocol following closure of the Mill Facility is described in Section 4.11.

BLM_0045262

## 4.4    WATER RESOURCES

### 4.4.1   Environmental Impacts

NRC guidance - NUREG 1748 (NRC, 2003a) Section 6.4.4, Water Resources Impacts, lists a number of potential impacts which might be applicable at any facility, including discharges, impacts to water quality, hydrologic alterations and impacts, water withdrawals and impacts to other users, protective measures and cumulative impacts.

#### 4.4.1.1   General Impacts

<u>Surface Water</u>

**Surface Water Hydrology.** Potential impacts to surface water hydrology are principally alteration of runoff patterns and reduction of flow, whether it reaches the Dolores River as surface flow or infiltrates to groundwater. If groundwater (i.e., water supply wells) is not capable of supplying all of the Mill Facility water demand, water would be obtained from the City of Naturita or other off-site sources to make up the deficiency. This would impact the San Miguel River as a withdrawal of water tributary to that stream, under water rights held by the Town of Naturita and/or others.

The Site was selected according to the precepts of Criterion 1 of Appendix A of 6 CCR 1007-1, Part 18 (CDPHE, 2001a), namely to favor remoteness from populated areas, and minimal potential for hydrologic and erosion impacts.

The Mill Facility is designed as a zero-discharge facility; that is, no industrial wastewater would be released to the environment, either as a surface discharge or infiltration to groundwater. There would be sewage adsorption fields for domestic wastewater (septic systems) for the Mill and administrative facilities. Water management systems are described in the *Water and Wastewater Plan* (Energy Fuels, 2009f) and *Facility Operating Plan* (Visus and Energy Fuels, 2009a).The *Facility Operating Plan* is a comprehensive narrative of the facility design, operations, and controls for 10 process area subdivisions, written as a component of the Mill License Application but intended to be a continually updated working document. Standard Operating Procedures would be developed for each process area, including water supply, septic systems, tailings cells, and evaporation ponds, in consultation with operators and approved by the Plant Manager and the RSO.

Stormwater runoff would be managed as three streams, as documented in the *Stormwater Management Plan* (Golder 2009a).

- Off-site runoff would be diverted around the Mill Facility by diversionary dikes and channels to natural watercourses (arroyos).

- Precipitation and runoff from most of the Mill Facility would be captured and routed to stormwater ponds (east and west). Stormwater and supernatant water from tailings cells would be subject to re-use to ensure no discharge from the facility and to reduce water demand. Stormwater ponds are designed to contain the 100-year, 24-hour storm event runoff.

- Stormwater pond overflow, from an event exceeding the 100-year design event, would overflow to evaporation ponds. These ponds are designed principally to contain and evaporate raffinate solution, the process fluid from which uranium and vanadium have been extracted. Although some of the raffinate is recycled, a portion of this solution would not be reusable due to elevated dissolved solid concentrations. Evaporation

BLM_0045263

ponds have the capacity to contain working raffinate solution, accumulated salts, and direct precipitation and overflow from the stormwater ponds up to the 1,000-year, 24-hour storm event. The 100-year storm event is calculated to yield 3 inches of rain, and the 1,000-year event could yield 4.4 inches, as reported in the *Site Drainage Analysis and Design Report* (Kleinfelder, 2009d).

A water right is being obtained for capture of runoff from the facility, which is a taking of waters of the State because it would be contained to prevent any off-site migration, and subjected to beneficial use as industrial water. This water right claim is for the maximum annual precipitation recorded for the Site vicinity (21 inches) over the area of capture (245 acres), in the amount of 428 acre-feet/year This would cover 143 acres to a depth of 3 feet, and equal the irrigation requirement given by the USDA for alfalfa in Montrose County (Colorado Department of Agriculture, 1999). The *average* annual precipitation, however, would yield just 252 acre-feet.

Septic adsorption fields would constitute the only near surface water discharge from the Mill Facility. There would be separate septic adsorption fields for office and mill restrooms, 50 x 12 feet and 100 x 40 ft in area, respectively (Kleinfelder, 2008j). Water from sinks, spigots, and showers would be collected separately and routed for re-use in the Mill, to minimize water consumption and disposal. The flow of septic and gray water systems would be no more than the 3 gpm potable water supply.

The proposed diversion and channeling of stormwater runoff around the facility would concentrate the runoff which might otherwise fan over the slope at the base of the valley side, slightly modifying where infiltration occurs. In runoff events, which cause flow in East Paradox Creek, impacts to the hydrology of the Mill Facility should have small significance to discharge to the Dolores River, the receiving stream. The 240 acres that would comprise the zero-discharge portion of the Site represents only 0.7 percent of the approximately 50-square mile drainage basin from which the creek receives runoff.

**Surface Water Quality.** The facility would have minimal surface water discharge potential to impact water quality in the Dolores River, the receiving stream for the catchment area in which the Site is located. Fugitive particulates might escape the confines of the plant and accumulate on the surface and then impact surface runoff quality. Fugitive emissions of dusts and vapors would be tightly controlled under emissions controls in the *Facility Operating Plan* (Visus and Energy Fuels, 2009a) and *Air Quality Permit Application* (Kleinfelder, 2009a). These controls would include: water sprays on ore stockpiles, tailings beaches, and any dry portions of the evaporation ponds; baghouses for dust generating areas such as the feed hopper, and scrubbers for emissions from processing equipment and tanks. A small amount of windblown material would likely accumulate on the downwind side of the ore pad and tailings cells. There could also be minor tracking of contaminated soils into those portions of the Site that would not be included in the zero-discharge area. However, the soil monitoring program described in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b) and summarized in Section 4.4.3 below, would allow for detection and cleanup of contamination during operations.

As described in the *Material Containment Plan* (Energy Fuels, 2009c), the *SPCC Plan* (Energy Fuels, 2009b), and *Facility Operating Plan* (Visus and Energy Fuels, 2009a), chemical reagents, fuels and oils, process solutions, mineral concentrates, raffinate, and tailings solutions would all be enclosed within containment systems compatible with the materials being stored or transferred. All containment systems would also have engineered secondary containment and in some cases tertiary containment. Leak detection and leak monitoring would also be

BLM_0045264

incorporated into these containment systems as described in Section 4.4.3. The containment systems would minimize the potential for runoff contacting materials that could contaminate the surface water.

Discharge from domestic wastewater septic adsorption fields would be less than 3 gpm (the potable water supply), and would flow into thick alluvium located on broad and relatively flat portions of the Site. It would be highly unlikely for this discharge to find surface expression downgradient of the Site. Furthermore, the wastewater would be treated through adsorption and microbial degradation processes in the septic systems and adsorption fields.

Surface water runoff from the portion of the Site outside of the zero-discharge area would not typically reach the Dolores River. With the exception of large storm events and rapid snowmelt events, the surface water runoff would infiltrate into the soils on-site before reaching East Paradox Creek. Similarly, much of the runoff entering East Paradox Creek would also likely infiltrate into the creek bottom before reaching the Dolores River. Therefore, runoff from the Site would have little potential to impact river water quality by discharge. Stormwater diversion channels at the south end of the site would tend to concentrate flows around the facility; however, these flows would not be in contact with milling or waste disposal activities.

Groundwater in the southeast portion of Paradox Valley also discharges to the Dolores River. The water that flows in the base of the alluvium and the groundwater flowing in the bedrock aquifer system within the valley all contacts the Hermosa Formation or mixes with groundwater that does, before discharging to the Dolores River via the river alluvium, which contains high salinity brines. The BOR's PVU pumps the brines from the Dolores River alluvium to reduce salinity loading of the Colorado River. Groundwater withdrawals from the bedrock aquifer and interception of a small amount of runoff from the facility would decrease combined groundwater discharge from the southeast portion of Paradox Valley to the river. This could cause a slight decrease in groundwater flow to the river during operations, but it is unlikely this would be measurable.

Groundwater

**Groundwater Hydrology.** Potential impacts related to groundwater hydrology include aquifer depletion and alteration of flow directions. A secondary potential impact of aquifer depletion is damage to other groundwater users, as loss of yield in existing wells. In some environments, inelastic compaction and irreversible loss of storage in the aquifer may occur due to depletion.

The water demand for the 500 tpd operation is 141 gpm of process water, and 3 gpm of potable water (CH2MHill, 2009). The intent is to purchase the potable water from the City of Naturita as well as any shortcomings in process water the aquifer cannot supply up to the 141 gpm. It is not clear what yield the aquifer can sustain, because it is fractured and drawdown is spatially too complicated to interpret from a short-term pumping test. For reference, the 141 gpm is equal to 0.31 cubic feet per second (cfs), 0.61 acre-feet/d, 227 acre-feet/yr, or the irrigation requirement of 75 acres of alfalfa. Energy Fuels has applied for a groundwater right for 175 gpm.

The water demand (224 acre-feet/yr) is less than the annual average capture of rainwater by the Mill Facility zero-discharge area (252 acre-feet/yr). Evaporation from stormwater ponds (which cover about 1 acre) can be expected to be approximately 4 acre-feet/yr. Evaporation from the evaporation ponds, which cover 40 acres but would contain saline water, could be as much as 160 acre-feet/yr).

BLM_0045265

Because the bedrock aquifer is fractured by faults and jointing parallel to the Paradox Valley and the anticline, the drawdown would likely be strongly elliptical (anisotropic), with highly heterogeneous storage. The cone of depression may extend quite far to the north, but be interrupted to the south. The configuration of the bedrock aquifer and its connection to other Mesozoic strata under Davis Mesa are not well known, and therefore, prediction of the drawdown is speculative until operations could begin, and pumping is sustained. Early in operations, a longer term data collection and analysis of aquifer performance would be undertaken to gauge the long term sustainability of the aquifer, and to monitor for potential impacts to other well users. In the short term, a 3-day pumping test has indicated the aquifer may be capable of producing up to 175 gpm (Golder, 2008e).

Figure 4.4-1 shows locations of proposed water supply wells PW-1 through PW-5, and existing off-site water wells. PW-1, PW-2 and PW-3 were subjected to pumping tests reported in the *Water Supply Evaluation* (Golder, 2008e). During operational startup, observation wells would measure potentiometric levels to monitor aquifer performance during sustained pumping, using dataloggers to record water levels automatically over several weeks. Monitoring of the observation wells would also continue through the life of the project, but at less frequent intervals. As discussed in Section 4.3.3, off-site wells and springs would also be monitored to determine if operation of the supply wells were affecting the water production or water quality of these water supplies.

Water withdrawals to supply the Site would change the groundwater flow patterns. Drawdown propagating outward from pumping wells would reverse the flow direction east of the wells, from northeasterly to southwesterly. This would alter what is upgradient and downgradient with respect to the Mill Facility to some degree during operations. Some groundwater may be drawn back from the contact between the bedrock aquifer and the Hermosa Formation, until the northeast edge of the aquifer is depleted. Aquifer consolidation is not a concern for the Triassic bedrock. This is a phenomenon which occurs in unlithified clayey silts, in such places as the Gulf Coast. The Triassic strata are competent. Following operations, recharge on the valley side would return the groundwater regime to its original condition. The current groundwater flow pattern and the projected modification of flows due to groundwater pumping are shown schematically in Figure 4.4-2.

The capture and containment of runoff from parts of the Mill Facility would marginally decrease recharge of the alluvium. Use of water from runoff capture in the Mill would help to offset the amount of groundwater that would need to be pumped from the bedrock aquifer for supply. Energy Fuels has applied for a water right to capture and use this surface water for industrial purposes.

**Groundwater Quality.** Leaks and spills of chemical reagents in the Mill Facility constitute a potential impact to groundwater quality. Measures to minimize the potential for leaks and spills, and to contain such occurrences as might occur, are detailed in the *Facility Operating Plan* (Visus and Energy Fuels 2009a), *SPCC Plan* (Energy Fuels, 2009b), and *Material Containment Plan* (Energy Fuels 2009c). The SPCC Plan focuses on storage and spill response for petroleum products such as diesel fuel and oils. The *Material Containment Plan* addresses the storage and spill response procedures for ore feedstocks, chemical reagents, processing streams, tailings, and raffinate. Measures are also described in the BMPs in the *Stormwater Management Plan* (Golder, 2009a). Structural spill prevention measures would include:

- Installation of secondary containment for all tanks, processing equipment, pipes, storage areas, and floor sumps (floor sumps would also be equipped with monitoring systems to detect leaks in primary containment);

BLM_0045266



Figure 4.4-1

Location of Water Supply Wells
and
Off-Site Wells

BLM_0045267



**Figure 4.4-2**

**Schematic Cross Section Showing
Groundwater Flow, Before and After Pumping**

BLM_0045268

- Storage of chemical reagents and other materials in enclosed buildings, bins, and tanks to prevent contact with precipitation and surface water runoff;

- Installation of multiple liner systems with leak collection and recovery systems between the primary and secondary liners in the tailings cells and evaporation ponds; and

- Installation of synthetic liners in the stormwater ponds and below the ore pad.

Non-structural components of the various plans emphasize comprehensive employee training, covering but not limited to material management practices, good housekeeping, stormwater management, spill response and safety training, as appropriate to the employee's tasks. Training would be conducted by qualified professionals, with periodic refresher training, and would be fully documented. Non-routine maintenance tasks would require Radiation Work Permits and job safety analysis, as described in the *Facility Operating Plan* (Visus and Energy Fuels, 2009a). Any spills or leaks that might occur would be dealt with and reported according to the *SPCC Plan* and the *Material Containment Plan* (Energy Fuels, 2009b and 2009c).

Implementation of the measures outlined in the *Stormwater Management Plan*, *SPCC Plan*, and the *Material Containment Plan* and installation of the various structural components listed above would protect groundwater against impacts to the aquifer and water quality. Groundwater monitoring outlined in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b) would allow for detection of impacts should they occur or verification of the absence of impacts (see Section 4.4.3).

Tailings cells are designed for permanent encapsulation of wastes and would remain on the Site after closure. The cells would be subject to specific regulation to prevent any foreseeable leakage of solutions from tailings impoundments to groundwater, namely Criteria 5, 6, 7 and 10 of 6CCR 1007-1 Part 18 Appendix A (CDPHE, 2001). Criteria 5 and 10 incorporate basic groundwater protection standards from 40 CFR Part 192, D and E (EPA, 1983) and 10 CFR Part 40 Appendix A.

Criterion 5A states that the primary groundwater protection standard is the design of impoundments for byproduct material, to prevent migration of wastes to water or subsurface at any time during operation or through closure. It specifies that a liner left in place must be mechanically sound, on a sound foundation and cover all soil that might otherwise contact the waste. Criterion 5E specifies there be leakage detection systems between liner layers, and requires dewatering of tailings prior to closing of the cell to reduce head in the cells as much as possible. Criterion 6 specifies a final cover effective for 200 years, and to the extent practicable, 1,000 years, limiting radiation and radon escape, and protecting against erosion. Criterion 7 sets requirements for the leak detection. Other criteria of 6 CCR 1007-1 Part 18 Appendix A relate to site selection and design, airborne releases, and terms of licenses.

The tailings cells design, which meets the criteria listed in 6 CCR 1007-1, is presented in the *Tailings Cell Design Report* (Golder, 2008a). Cells are designed for long term stability and containment under static and seismic loading (up to the MCE), through a 13-year active life and for a 1,000-year post-closure period. The cells would be mostly below grade with primary and secondary liners with intervening leak collection and recovery systems. A tailings dewatering underdrain would also be present on top of the primary liner to dewater the tailings and limit hydraulic head on the primary liner. The evaporation ponds would have the same liner design and leak collection and recovery systems as the tailings cells; however, they would not have or need an underdrain for dewatering purposes. The design of the evaporation ponds is included in the *Evaporation Pond Design Report* (Golder, 2008h).

BLM_0045269

The primary and secondary liners of the tailings cells would both be 60 mil HDPE (high density polyethylene) geomembranes. The lower liner would be underlain by a geosynthetic clay liner (GCL) consisting of bentonite between geotextile layers, with a reported hydraulic conductivity less that $10^{-9}$ cm/s, and that laid on a compacted soil foundation. The upper liner would be light reflective to resist long-term ultraviolet light damage. The leak collection layer also follows specification in 40 CFR 264.221 by reference from 6 CCR 1701-1 Part 18 (CDPHE, 2001); it consists of a geonet sandwiched between unwoven geotextile layers connecting to a sump where fluid may be measured and, if necessary, recovered. Testing of the GCL material with a solution of similar composition to the tailings and raffinate solution but with lower pH (i.e., more acidic) did not significantly increase the permeability of the GCL (Golder, 2008a). The underdrain above the primary liner consists of perforated HDPE piping in trenches backfilled with gravel, connected to a sump built over the leak collection sump.

#### 4.4.1.2   Construction, Operations, and Closure Impacts

#### 4.4.1.2.1   Construction

**Surface Water.** During construction there is the potential for damage to partially constructed runoff control structures. Access roads and stormwater control structures would be completed before any other facility construction begins (Kleinfelder, 2009d and Golder, 2009b) and so would be in place to manage runoff and sediment through the construction of all other facilities. During construction of the permanent runoff control structures, temporary erosion control measures would be used following BMPs described in the *Stormwater Management Plan* (Golder, 2009a), and consisting of silt fences, straw bale filters, and such measures. A detailed *Construction Stormwater Management Plan* would also be developed either during final design of the facility or by the general construction contractor prior to site construction. Implementation of the stormwater management plans would minimize the potential for erosion and sediment-laden runoff.

As soon as stormwater control structures are in place, and thereafter for the life of the Mill Facility, direct precipitation runoff (what falls on the Mill Facility) would be captured. A water right has been applied for this surface water in the amount of 428 acre-feet/yr, calculated from the maximum recorded annual precipitation in the Site vicinity. Water that is captured in stormwater and evaporation ponds during the construction phase may be used for dust control. The water right claims this water for industrial use, including mineral processing, truck and equipment washing and fire protection which would apply in the operations phase, and for dust suppression.

During construction of the stormwater control structures, there is the potential of stormwater eroding disturbed areas and contributing sediments to East Paradox Creek. Energy Fuels would implement temporary sediment control measures, such as erosion control matting, silt fences, straw bale wattles, and swales outlined in the BMPs to control erosion during construction, and temporarily halt construction that would create muddy and rutted conditions until the soil dries out sufficiently to support the appropriate equipment. Disturbed areas outside of the facility footprint would be vegetated as soon as is practical. BMP control measures would continue to be used in those areas until soils are fully stabilized.

**Groundwater.** Water supply wells would be installed prior to any other construction and water would be available from the wells as required through the life of project. Impacts to the bedrock aquifer (dewatering) may therefore begin during construction. Spills of equipment fuel could occur and enter the subsurface. Once installed, stormwater control structures would intercept

water that would otherwise have infiltrated or run off. This reduction of surface infiltration to groundwater has been claimed by Energy Fuels as a water right for industrial use.

Water for dust suppression would be a small and intermittent demand compared to plant use and is not expected to make measurable impacts to the water table. A *Stormwater Management Plan* and a *SPCC Plan* specific to construction activities would be developed and implemented on site at the start of construction. On-site fuel tanks would be in secondary containment and BMPs would be in effect to prevent or mitigate any spills or leaks.

### 4.4.1.2.2   Operations

**Surface Water.** Potential hydrological impacts during the 40 years of anticipated operations could include flooding of the facility and spreading of contamination, erosion or breaching of stormwater control channels, and reduction of flow to the Dolores River due to precipitation captured in the zero-discharge area of the Site.

In the life of the project, the probability of a 100-year storm event occurring approaches 50 percent. Because full stormwater containment and facility integrity are essential, critical elements of the stormwater control structures have been designed to manage the 1,000-year, 24-hour storm event. Those elements, described in the *Stormwater Management Plan* (Golder, 2009a) consist of:

- Stormwater ponds with capacity to hold the 100-year storm runoff from the Mill Facility, with overflow to evaporation ponds which can readily hold the difference between 100 and 1,000 year events. Tailings cells would always have sufficient freeboard to contain direct precipitation of the 1,000-year storm event.
- Diversionary dikes at the south end of the facility and channels, suitably armored against erosion, to carry runoff from Davis Mesa around the Mill Facility to natural drainages.
- Elevated ore pad and Mill with perimeter berms and channels to prevent run-on. Tailings cells and evaporation ponds would also be protected by berms and/or embankments from run-on.

The process fluid remaining after uranium and vanadium have been extracted (raffinate solution) would be directed to evaporation ponds. Although some of this solution would be recyclable, the high dissolved solids content of the raffinate solution would make it necessary to dispose of the remaining fluids by evaporation. Fountains or sprinklers would be used to enhance evaporation during the warmer months. The evaporation ponds would have sufficient capacity to contain the raffinate solution, accumulated precipitated salts, and the direct precipitation and stormwater pond overflow from the 1,000-year 24-hour storm event.

During operations, all areas of soil disturbance would be stabilized by permanent structural controls, including riprap, rock mulch and vegetation to minimize soil erosion. A ditch along the side of the main access road would flow through a water quality swale to settle sediments and buffer the flow leaving the site through the culvert under SH 90. These protective measures would constitute hydrologic alteration of the Site, but they would have small (no measurable) significance to surface water quantity outside the perimeter of those protective measures.

During operations, water in stormwater ponds may be used in the Mill to both maintain stormwater capture capacity and to reduce water supply requirements. The stormwater control structures would contain runoff resulting from precipitation up to the 1,000-year 24-hour storm event. Implementation of the *Stormwater Management Plan* (Golder, 2009a) with routine

BLM_0045271

inspections and maintenance of stormwater control structures would minimize the potential for these structures to fail during a storm event. A large storm could possibly cause runoff erosion in diversionary channels, and add to turbidity in East Paradox Creek. Grouted riprap armoring of the channels and energy dissipation structures where the channels empty into the arroyos are designed to prevent runoff erosion, and to carry the 100-year storm runoff. The facility is designed to contain runoff and withstand run-on from a 1,000-year storm, but if a large storm were to affect the Site or Site vicinity, Energy Fuels would assess impacts and report to CDPHE.

Structural stormwater management components and BMPs would be inspected on a monthly basis. Inspections may be conducted after storm events when weaknesses might be more apparent. Inspectors would observe sediments or pollutants in the drainage system, stockpile stability, and the condition of culverts. Inspections would be documented and files held on site. Semi-annual comprehensive site compliance inspections would duplicate monthly stormwater inspections, but also assess the stormwater control's adequacy, and proper implementation. The *Stormwater Management Plan* (Golder, 2009a) would be revised if appropriate.

Maintenance concerns identified during inspections would be addressed by mill operations personnel. Maintenance could include repairing and cleaning ditches and channels, regrading and stabilizing eroded areas, unplugging culverts, replenishing gravel on roads and pads, installing temporary or permanent erosion or surface water controls, and repairing or replacing damaged surface water samplers.

Stormwater monitoring is described in the *Stormwater Management Plan* (Golder, 2009a).and in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b). When flowing, stormwater samples would be collected on a quarterly basis from three samplers located in the three primary drainages crossing the Site near the Property Boundary and one sampler located in a drainage upgradient of the Site.

Energy Fuels would prepare an annual report summarizing stormwater compliance, to be submitted to CDPHE. It would report:

- Performance of the stormwater management system;
- Water quality monitoring results;
- Changes to BMPs or stormwater management plan;
- Employee training;
- Spills; and
- Summaries of semi-annual comprehensive facility inspections and any actions taken.

**Groundwater.** The principal potential impact to groundwater during operations would be depletion of the bedrock aquifer by the supply wells. This could possibly impact other groundwater users, in terms of lowering the water levels in their wells, or drying up springs. It could also deplete discharge to the Dolores River. Other potential impacts to groundwater include leaks and spills affecting water quality. Capture of incident precipitation by the stormwater control structures would continue to intercept water that would either have infiltrated the alluvium or run off to the Dolores River.

Energy Fuels has negotiated an agreement to purchase water from the City of Naturita in the event that groundwater supply wells should not meet all of the Mill's demand in the long term. The city water is held as water rights in wells connected to the San Miguel River. This supply

BLM_0045272

would suffice for the life of the project, or until Energy Fuels develops an alternative supply. The Naturita Town Council has approved supplying up to 150,000 gallons of water per 24-hour period for up to 40 years (*Water and Wastewater Plan* – Energy Fuels, 2009f), which would represent 75 percent of the water needed to operate the Mill.

There are other groundwater wells and springs in the southeast Paradox Valley, which are completed in or flow from the same valley margin Triassic aquifer. Those wells and springs located northwest of the Site may experience some drawdown due to groundwater withdrawals at the Site, if the drawdown is highly elliptical. However, those wells to the northwest should also continue to get most of their recharge from the valley side. Impacts are therefore possible, though not quantifiable until groundwater withdrawals begin at the Site.

Water wells southeast of the Site should be unaffected by Site groundwater withdrawals. The slump block of Morrison Formation just southeast of the Site rests on the Hermosa Formation and the valley margin Triassic aquifer is interrupted or limited. Limited hydraulic connection means that impacts are unlikely to be transmitted from the Site to those wells. In the event that impacts to other users due to Energy Fuels' water withdrawals do occur, Energy Fuels would adjust water withdrawals at its supply wells and negotiate mitigating measures with those users per Condition 14 of its Special Use Permit with Montrose County (Montrose County, 2009a). Groundwater monitoring of potential aquifer depletion is discussed in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b) and summarized in Section 4.4.3 below.

One other "user" of groundwater is the BOR's PVU, which extracts saline groundwater from the alluvium next to the Dolores River crossing of the Paradox Valley, filters it by reverse osmosis, and returns the treated water to the river. The extracted concentrated brine is disposed of by pumping it into the deep Leadville Formation. The project was developed, to reduce the salt load carried by the Colorado River. Any diminishment of groundwater flow toward the river and in contact with the Paradox Member, either by interception of runoff in the vicinity of the Site or by reducing the flow in bedrock, would augment this salt reduction, if it were indeed measurable.

There would be a very low probably of impacting the groundwater quality from leaks or releases during operations because:

- The multiple liner systems below waste disposal facilities and the secondary containment measures in the mill are designed to minimize the potential for a release to the environment. Spill response measures and monitoring of soils and groundwater are designed to limit the impact of a spill or release should it occur.
- Groundwater is absent below most of the tailings cells (i.e., Tailing Cells B and C) and all of the evaporation ponds. Where water is present below the M and Tailings Cell A, it is of poor quality, limited in extent, and more than 450 feet deep. Low permeable formations between the surface and the groundwater would also prevent seepage from reaching the groundwater.

### 4.4.1.2.3   Closure

**Surface Water.** During closure, decommissioning would potentially expose some soils to possible erosion. The *Mill Decommissioning Plan* (Kleinfelder 2009b) specifies that stormwater control structures, along with a truck wash station, would be the last components dismantled, so that controls would be intact through the facility decommissioning. When the stormwater control structures (unit isolating berms, stormwater ponds, evaporation ponds) are dismantled, temporary erosion and sediment control measures as described in the BMPs would be applied (erosion matting, straw bales, etc). Stormwater diversion structures at the south end of the Site and channels directing runoff away from closed tailings cells would be permanent, and monitored for integrity through the post-closure monitoring period.

BLM_0045273

Potential impacts to surface water quality during closure would consist of erosion of disturbed soils and transport of added sediment to East Paradox Creek. This would be minimized to some extent by conducting the closure in a phased manner. Tailings Cells A and B would already have been reclaimed prior to closure. Phased closure would then consist of construction of the interim tailings cover, demolition of the mill, removal of the ore pads and evaporation ponds, cleanup of contaminated soils, and placement of the engineered cap over the final tailings cell. Because contaminated material from the Mill, ore pad, and evaporation ponds would be transported to, and placed in, the final tailings cell, there would also be potential for residual amounts of radioactive material to be spilled or blown as dust during closure activities. Travel ways would be scanned, cleaned up, and sampled as specified in the *Mill Decommissioning Plan* (Kleinfelder, 2009b).

As discussed above, potential impacts would be controlled with both permanent and temporary stormwater and erosion BMPs. The reclamation and closure plans (Golder, 2009c and Kleinfelder, 2009b) are designed to restore the majority of the Site and drainage patterns to the pre-construction configuration. The tailings cells and permanent surface water controls associated with tailings reclamation would be the exception, as the reclaimed cells would be above the original grade and drainage would be directed around and off the tailings areas.

In post-closure, only the diversionary dike at the south end of the Site and channels bypassing the sealed tailings cells would remain, which should not measurably alter the natural hydrology. All disturbed areas would have been stabilized. Those areas returned to their approximate original contours would be revegetated. The slightly elevated tailings cell caps would be armored with rock on the gradual outslopes of the embankments and rock mulch on top, as well as sown with grasses. The spaces between tailings cells would be armored with large rock to safely pass the 1,000-year storm event.

**Groundwater.** Potential impacts in closure include protracted depletion of the aquifer after withdrawals cease, shifts in groundwater quality as the aquifer does recover, and the return of groundwater flow rates toward the Dolores River to baseline conditions. There is every reason to expect that the bedrock aquifer would gradually recover its pre-construction water storage through recharge when pumping ceases. As the dewatering rate of the aquifer cannot yet be predicted, neither can the recovery rate.

In closure, the stormwater control structures, except for diversionary dikes and channels, would be removed, and the approximately 240 acre-feet/yr of average precipitation on that area would return to evapotranspiration, infiltration, and runoff. Precipitation on the tailings cells would not infiltrate below grass roots over the cell liners, but would either be consumed by evapotranspiration or seep across the surface soil layer of cell cover to the rock blanket on cell flanks, and into the alluvium (Kleinfelder, 2009c). Infiltration previously intercepted by the zero-discharge area would resume flow at the base of the alluvium or in the bedrock aquifer, to eventually discharge to the Dolores River.

Any water supply replacement measures implemented by Energy Fuels to mitigate impacts to other users would be maintained until such times as the impacts recover to an effective approximation of the baseline condition.

When pumping ceases, recovery of the aquifer would return flow to the northeasterly flow path of baseline. This change of directions would cause shifts in monitoring well chemistry, approximately reversing shifts that would occur when pumping began. Water supply wells would be either abandoned or transferred to the landowner.

There would be a very low probably of impacting the groundwater quality during and after closure. The tailings and other materials disposed in the tailings cells (i.e., mill demolition debris,

BLM_0045274

evaporation pond salts, liner materials, and contaminated would all be dewatered and protected from surface water infiltration by the tailings cell cover. The cover would also provide protection against erosion and emanation of radiation (i.e., direct gamma or radon emission).

### 4.4.2 Protective/Mitigation Measures

The following protective/mitigation measures would be implemented to mitigate potential impacts to surface water and groundwater:

- The Mill Facility is designed to be a zero-discharge site. This means no industrial wastewater would leave the milling and waste disposal areas of the Site. Septic adsorption fields would treat the only water released to the environment.

- Stormwater containment structures would be constructed to contain direct precipitation on the zero-discharge area of 240 acres including the Mill, ore pad, tailings cells, and evaporation ponds to prevent any runoff, sediment transport or solute migration from the facility. Stormwater control structures would be completed prior to facility construction so as to minimize erosion and impacts to drainages during construction. The stormwater structures would be removed only after facility decommissioning.

- Permanent diversionary dikes at the south end of the Site would prevent run-on during the life of the Mill Facility, and divert runoff from the closed tailings cells. Diversion channels would carry intercepted runoff to existing drainages.

- The Mill Facility and its stormwater control structures are designed to withstand and fully contain the 1,000-year, 24-hour storm event.

- Regular inspections and maintenance of stormwater structures, as required in the *Stormwater Management Plan*, would keep the stormwater management system operating as designed.

- The *Material Containment Plan* and the *SPCC Plan* detail extensive structural (physical containment) and non-structural (institutional practices, training, reporting) measures to prevent spills of chemicals, reagents or products. Quarterly stormwater inspections, semi-annual facility inspections, and Standard Operating Procedures in the *Facility Operating Plan* for each process area also are independently protective of the environment and water quality in particular.

- Aquifer depletion by water supply wells would be closely monitored at startup and during the project's life to project long-term performance and develop a water supply strategy that is protective of the resource and other groundwater users.

- The groundwater monitoring program would include off-site wells and springs, to detect and manage any aquifer depletion impacts. The on-site and vicinity groundwater monitoring program would detect contamination of groundwater by the Mill Facility.

- The surface water monitoring program would allow for evaluating water quality of the Site's runoff over time and provide early detection of potential surface water impacts.

- Tailings cells and evaporation ponds would be constructed with leak collection and recovery systems between the primary and secondary liners. An engineered cover,

BLM_0045275

constructed at closure, would limit percolation into the dewatered tailings and provide long-term erosion protection.

- Operation of the LCRS in the tailings cells and evaporation ponds would result in little to no hydraulic head on the secondary and tertiary liners; therefore, the driving force behind any seepage from these facilities would be minimal.

### 4.4.3   Monitoring

<u>Surface Water</u>

Surface water monitoring would consist of monitoring the surface water samplers and stormwater monitoring in accordance with the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b). Sampling of water from impoundments (the east and west stormwater ponds) is not required. There are no on-site or off-site streams or rivers that would be subject to drainage from potentially contaminated areas; therefore, monthly sampling of these types of surface water is also not required.

The surface water sampling program has been developed to collect surface water on an event basis rather than a fixed calendar schedule, given the intermittent nature of runoff events in the area. Quarterly surface water samples are scheduled, although the actual number of sampling events each year is dependent on precipitation during the sampling period. The type of runoff event, rain gauge recording, and presence or lack of runoff at each sampling location would be documented for each event.

In accordance with the *Stormwater Management Plan* (Golder, 2009a), Energy Fuels would inspect and monitor the stormwater facilities and discharges on a monthly, quarterly, and semi-annual basis as follows:

- Monthly – inspections of structural stormwater management measures, erosion and sediment controls, and other structural BMPs;
- Quarterly – sampling of stormwater runoff according to the general surface water monitoring program; and
- Semiannually – comprehensive site compliance evaluations.

Surface water monitoring data would be submitted on an annual basis to the CDPHE. The reports would include a summary of the monitoring activities, sampling data sheets and analytical reports as well as an evaluation of data trends.

<u>Groundwater</u>

Groundwater monitoring would be conducted as described in detail in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b). Baseline sampling locations include five on-site monitoring wells three production wells (two on-site and one off-site), seven exploratory holes (four on-site and three off-site), and four domestic wells and one spring location within approximately 5 miles of the Site.

This operational monitoring program is designed to detect potential impacts of operations on groundwater through quarterly monitoring, as Energy Fuels continues to monitor groundwater throughout pre-operational, operational, and post-operational phases of the Mill. Samples would be collected monthly through the first year of operation and quarterly thereafter. The effect

BLM_0045276

caused by pumping the production wells would be assessed by monitoring water levels in the observation piezometers near the production wells and by monitoring water quality and flow at off-site wells and an off-site spring in the vicinity of the Site. Energy Fuels would monitor the off-site wells and spring to evaluate if their water productivity and/or quality are impacted by operation of the production wells.

The monitoring efforts are grouped into four categories:

- Monitoring groundwater presence and quality in wells located hydraulically upgradient and downgradient of the project.
- Monitoring perched water and groundwater, if present, for potential leakage of the process water and raffinate in close proximity to the mill and tailings disposal cells;
- Monitoring groundwater piezometers to observe the water level response to pumping the production wells; and
- Monitoring pre-existing Chinle formation water wells and springs located within five miles of the site.

The locations of the monitoring wells, observation piezometers, vicinity wells and springs, and off-site water wells and the spring are provided in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b). The final locations and number of wells may be adjusted based on operational constraints and future findings regarding groundwater presence and quality.

**Upgradient and Downgradient Wells.** The upgradient portion of the aquifer, relative to the Mill Facility, is situated between the edge of Davis Mesa and the southern boundary of the Site and the aquifer terminates north of the location of Tailings Cell A (Golder, 2009d). Therefore, the downgradient part of the aquifer is west/northwest of the Site.

The upgradient monitoring wells, progressing from the south; include MW-7, MW-6, MW-5 and MW-8B. Well MW-1 (which is dry) is designated to monitor for leakage downgradient of the evaporation ponds. Upon completion of construction of Tailings Cell A and prior to commencement of mill operations, a downgradient monitoring well (MW-10) would be installed at the western edge of the tailings cell. Monitoring of proposed wells at four additional locations downgradient of the Mill, tailings cells, and evaporation ponds would be conducted to provide warning of raffinate or process water leakage. Proposed wells MW-11S and MW-11D would be sited downgradient of the Mill and proposed wells MW-12S, MW-12D, MW-13S, MW-13D, and MW-14S would be sited downgradient of the three tailings cells. Energy Fuels would use these wells to monitor the presence and quality of water perched at the bottom of the alluvium (shallow S-designated wells and MW-1) and at the bottom of the Chinle/Moenkopi formations or first groundwater (deep D-designated wells), where present.

Additionally, wells installed north of the aquifer limit would be monitored quarterly to provide continued documentation of the absence of groundwater at these locations. These wells, which include MW-1, MW-2, MW-3, and MW-4, would be monitored for water levels and would be sampled if water levels and production are sufficient for sample collection.

For upgradient and downgradient monitoring wells (MW-5, MW-6, MW-7, MW-8B, MW-10, MW-11S/D, MW-12S/D, MW-13S/D, and MW-14S) samples would be collected monthly during the first year of operations and quarterly thereafter (if an adequate volume of water exists for sample collection). These monitoring wells are not used for drinking water or watering of livestock or crops. Groundwater samples would be analyzed for a monthly/quarterly suite of parameters described in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b). The

parameters include U-nat, Ra-226, Ra-228, Th-230, and Pb-210. Once each year, the sampling suite would be expanded to include the annual suite of parameters shown in the table.

**Potential Leakage of Process Wells.** Three well pairs and one single well are planned at the western side (downgradient) of the Mill and tailings cells to monitor potential leakage of process water and raffinate. Four wells (one of each well pair and the single well) would be designated as shallow (S) completions and would be screened at the bottom of the alluvium, near the contact with the underlying formation (either the Chinle or the Hermosa). The remaining three wells would be designated as deep (D) completions and would be screened at the first groundwater occurrence, or if groundwater is not present, at the contact between the Chinle/Moenkopi Formation and the Hermosa Formation. These monitoring well locations are summarized below:

- Well MW-11S and MW-11D: located at the western side of the Mill;
- Wells MW-12S and MW-12D: located at the western edge of Tailings Cell A;
- Wells MW-13S and MW-13D: located at the western edge of Tailings Cell B; and
- Well MW-14S: located at the western edge of Tailings Cell C (only shallow completion of monitoring well MW-14 is planned for this location due to anticipated absence of the Chinle and Moenkopi formations).

These wells would be installed upon completion of the Mill and neighboring tailings cells to avoid interference with construction activities. Wells would be located outside the reclamation footprint of the Mill and tailings facilities and would remain operational during the post-operational phase of the project.

Monitoring well MW-1 (currently installed) is designated to monitor potential leakage from the evaporation pond area. The well is located near the northwestern side of the evaporation pond area and is screened in the alluvium, near the contact with the Hermosa Formation. The well is similar in completion to the wells designated as shallow (S) completions for monitoring water perched at the bottom of the alluvium. To date, no water has been observed at well MW-1.

The wells close to the Mill Facility (MW-11 through MW-14) are downgradient wells and are part of the upgradient/downgradient well system described above.

**Observation Piezometers and Production Wells.** Throughout operations, groundwater levels would be monitored to assess the response of the aquifer to groundwater withdrawal from pumping the production wells. Water levels would be monitored in six piezometers, to be installed in the vicinity of the production wells similar to those installed (and subsequently abandoned) as part of the long-term aquifer tests (Golder, 2008c and 2008e). Monitoring of the piezometers would be initiated prior to the start of operations to establish baseline conditions and would continue during the life of the project unless operation of the production well field is terminated or Montrose County approves otherwise. The existing groundwater observation piezometers include:

- PW-1 OB-A;
- PW-1 OB-B;
- PW-2 OB-A;
- PW-2 OB-B;

BLM_0045278

- PW-3 OB-A; and
- PW-3 OB-B.

Additional production wells (including, but not limited to PW-4 and PW-5) would be installed prior to commencement of operations. Each of the future production wells would be tested for aquifer properties using two observation piezometers at each production well. Following aquifer testing at the production wells, the piezometers would continue to function as water level monitoring systems.

While production wells are operating, water levels in the observation piezometers would be monitored twice each month during the aquifer's transient state induced by pumping. If the aquifer attains steady state (recharge balances the pumping rate(s)) as indicated by stable water levels in the observation piezometers, the frequency of monitoring would be reduced to monthly readings. Should the saturated thickness of the aquifer at the location of the observation piezometers for a production well be reduced by pumping to 50 percent of its original thickness, the pumping rate at that production well would be adjusted (reduced) to prevent further groundwater drawdown. If adjusting the pumping rate proves ineffective, the production well would be shut down until the aquifer recovers sufficiently to resume pumping.

Water quality samples would not be collected from the observation piezometers; however, samples would be collected from each of the production wells on a quarterly basis during the first year of operation and annually thereafter. The samples would be analyzed for the monthly/quarterly suite of parameters provided in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b) and include: U-nat, Ra-226, Ra-228, Th-230, and Pb-210. Once each year, the sampling suite would be expanded to include an annual suite of parameters. With the exception of well PW-3, the production wells are not used for drinking water or watering of livestock or crops. Production well PW-3, which is located within 1.25 miles (2 km) of the tailings cells, is used for watering of livestock in addition to providing a raw water supply to the Mill. Therefore, this well would be analyzed for both dissolved and suspended radionuclides.

**Pre-existing Off-Site Water Wells and Spring.** To assess the response of the aquifer to groundwater withdrawal from pumping the production wells, off-site wells and an off-site spring in the vicinity of the site would be monitored. Monitoring of the off-site wells and spring was initiated prior to the start of operations to establish baseline conditions and would continue during the life of the project unless operation of the production well field is terminated. Appendix A of the *Hydrogeologic Report* (Golder 2009d) provides a description of the wells and springs identified in the vicinity of the site through database searches and field investigations. Appendix B provides the measures that Energy Fuels would implement if any of the off-site water sources owned by others (i.e., five wells and one spring) exhibit a significant decrease in productivity or deterioration in water quality.

<u>Off-Site Wells</u> With permission of the owners, five functional wells would be monitored prior to and during operations to determine whether water productivity and/or quality are impacted by operation of the production wells.

Monitoring of the wells includes pumping each well at full capacity of the pump/valve system for approximately 20 minutes, and measuring and recording the pumping rate every 5 minutes. Water quality field parameters (pH, specific conductivity, temperature, oxidation reduction potential and dissolved oxygen) would also be recorded on 5-minute intervals. Should pumping cause the water level to drop to or below the pump intake level, the rate is adjusted to continue

BLM_0045279

pumping without running the well dry. If accessible, static water levels would be taken prior to the start of the pumping test and after the test is completed. The off-site wells would be monitored for productivity and water levels on a quarterly basis during the pre-operational period and during the first two years of mill operations. Thereafter, the wells would be monitored annually for productivity and water levels.

Water sampling and analysis would be conducted on an annual basis during both the pre-operational and operational periods. The water sample would be collected during the second half of the flow test. Samples would be analyzed for the annual suite of parameters provided in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b), which is the same parameter suite analyzed for the groundwater samples collected from monitoring wells at the Site. Although these off-site wells are used for domestic and livestock watering purposes, they are located greater than 1.25 miles (2 km) from the Property Boundary. Sampling frequency may be increased at a well if water production or quality exhibits a significant change over time. A water sample would also be collected any time that a water quality field parameter (other than temperature) changes by 20 percent or more between monitoring events.

<u>Off-Site Springs</u> Three springs have been identified within the drainage basin. These springs include Stone Spring, Merrill Spring, and Oublier Spring. Stone Spring is located approximately 5 miles northwest of the Site on public land administered by the BLM. The spring flows from a 120-foot long tunnel in the Chinle Formation and is piped approximately 1,000 feet to two residences. When inspected in June 2009, it was flowing at approximately 10 gpm; however, the flow varies seasonally and the spring reportedly stopped flowing for a 3-month period in 2003. Merrill Spring is located just east of Stone Spring on public land administered by the BLM. The spring also emanates from the Chinle Formation, but was not flowing when inspected in June 2009. Oublier Spring is located approximately 5 miles southeast of the Site on BLM-administered land. This spring flows from near the base of the Salt Wash Member of the Morrison Formation, which is stratigraphically considerably higher than the Chinle Formation.

Merrill Spring would not be monitored given that it was not flowing in June 2009, a time when springs and seeps have typically exhibited higher flows. Oublier Spring also would not be monitored given that it is completed above the production wells in a different formation. Stone Spring, located 5 miles downgradient (northwest) from the Site, would be monitored quarterly for flow rate during the pre-operational period and during the first two years of operations. Thereafter, flow monitoring would continue on a semi-annual basis (late spring and early fall) during operations. Sampling and analysis would be performed on a semi-annual basis both prior to operations and during operations. Sampling would take place in the late spring, when flow is expected to be highest, and in late fall during the low-flow season. Water samples would be analyzed for the parameters provided in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b). Flow measurements would be taken after any stored hydraulic head is first dissipated. The flow rate and water quality field parameters would be measured and, if scheduled, the water sampled.

**Reporting.** Groundwater monitoring data would be submitted on an annual basis to the CDPHE. Annual reports compile data for the entire period and include a summary of the monitoring activities, sampling data sheets and analytical reports, and contain an evaluation of data trends.

BLM_0045280

## 4.5     ECOLOGICAL RESOURCES

### 4.5.1   Environmental Impacts

#### 4.5.1.1   General Impacts

Vegetation

Three dominant vegetation communities located within the Site include 1) pinyon-juniper vegetation along the bluffs in the southwest portion of the Site, 2) big sagebrush habitat located in a narrow strip adjacent to the pinyon-juniper habitat and on the northeast half of the Site, and 3) a mixed grassland habitat located in the central portion of the Site between both big sagebrush habitats (see Figure 3.5-2 in Section 3.5.1.2, Vegetation).

Wetlands

Only one non-jurisdictional wetland feature, a retention pond, is located within the Site (Kleinfelder, 2008c). It is situated upslope from the proposed Mill Facility and is further separated from the Mill Facility by an earthen berm. Water runoff at the Site would be naturally diverted prior to reaching the retention pond. No disturbance is proposed for this area. No direct or indirect impacts to this wetland feature and associated vegetation are expected during construction, operation, or closure of the Mill Facility. Wetlands are not discussed further in this ER.

Invasive, Non-Native Species

Table 3.5-6 (Section 3.5.1.4, Invasive, Non-Native Species) provides a list of 21 noxious weeds that require management and control within the State of Colorado and are known or suspected to occur within Montrose County, of which two (redstem filaree and cheatgrass (downy brome)) have been observed within the Site (Kleinfelder, 2009g; WestWater, 2009) and an additional eight within the project vicinity (Lyon and Sovell, 2000). In addition to noxious weeds identified by the State of Colorado and Montrose County for management and control, areas of the Site have been invaded by other non-native species including, Russian thistle, broom snakeweed, and herb sophia. Infestations of invasive, non-native species can adversely alter ecological communities by out-competing native species, especially if soil surfaces are disturbed (Whitson et al., 2004). Once noxious weeds become established, their distribution expands without natural controls including native competitors, predators, and pathogens (Lyon and Sovell, 2000).

Federally Listed Threatened and Endangered Species

**Canada Lynx.** Direct and indirect effects to lynx by the Proposed Action may occur as a result of increased vehicular traffic. Lynx that have been reintroduced to Colorado suffer mortality as they move through and/or into new areas (CDOW, 2009b). Human-induced deaths are the primary causes of lynx mortality in Colorado with 30.4 percent of deaths attributable to either gunshot (known or probable deaths; 18.3 percent) or vehicular collision (12.1 percent of all mortality sources). Mortality by vehicle is a significant source of mortality for lynx in other parts of their range as well (Aubry et al., 2000; Ruediger et al., 2000). CDOT determined locations of potential lynx road crossing events in western Colorado (Crooks et al., 2008). Although radio-collared lynx selectively avoid highways, evidence suggests they crossed several roads in Montrose County and San Miguel County including SH 145. Similar to bobcats (McCord and Cardoza, 1982), lynx are generally active during crepuscular periods in summer and most active during afternoon and evening in winter (Kolbe and Squires, 2007). Restriction of most traffic to daylight hours would reduce but not eliminate risks of collisions of project-related vehicles with lynx.

BLM_0045281

Case No. 1:20-cv-02484-MSK   Document 40-5   filed 04/27/21   USDC Colorado   pg 54 of 271

**Black-Footed Ferret.** Black-footed ferrets were reintroduced to Rio Blanco and Moffat counties in northwest Colorado in 1999 at one site (Coyote Basin) on the Colorado-Utah border west of Rangely and in 2001 at a second site (Wolf Creek) south of Dinosaur National Monument. The Coyote Basin site is approximately 128 miles north and the Wolf Creek site is 135 miles north of the Site. No black-footed ferrets introduced at either location in Colorado would be affected by construction, operation, or closure of the Mill Facility. Therefore, ferrets are not addressed further in this ER.

**Mexican Spotted Owl.** At the time they were listed, there were only 20 historic records (13 records accepted) of Mexican spotted owls in Colorado, mostly from the San Juan Mountains in southwestern Colorado. USFWS (1995) identified the following potential threats to the species: catastrophic fire, recreation, urbanization, timber harvest, and road construction. The USFWS identified less severe threats including land exchange, oil and gas leasing, mineral development, and grazing while noting that individual actions may generate low impact to the species but in combination, they may generate high cumulative impact because of synergistic interactions (USFWS, 1995).

If Mexican spotted owls occur within the Site or vicinity, available information indicates they would most likely be in the pinyon-juniper vegetation south of the Site. No removal of pinyon-juniper vegetation is proposed, therefore no direct impact to potential spotted owl habitat is expected. However, noise generated during construction and operation could directly impact Mexican spotted owls. The USFWS established 92 dBA as the sound-only injury threshold for northern spotted owls in the Pacific Northwest (USFWS, 2003b). In the analysis, the USFWS noted that noise levels of 44 dBA would be detected, 57 dBA would be the threshold for alert behavior, and noise ≥70 dBA would cause a disturbance to northern spotted owls (USFWS, 2003b). It can be expected that Mexican spotted owls may react similarly to noise levels as northern spotted owls.

**Endangered Colorado River Fish (Bonytail Chub, Humpback Chub, Colorado Pikeminnow and Razorback Sucker).** No critical habitat for the bonytail or humpback chub has been designated in the Dolores River and it is unlikely that they occur in the Dolores or San Miguel rivers. Likewise, none of the ephemeral streams within the Site is suitable habitat for Colorado pikeminnows or razorback suckers. The pikeminnow occurs within the Colorado River and they occur within the Dolores River approximately 1.2 miles upstream from the confluence with the Colorado River (USFWS, 2002b). The primary threats to endangered Colorado River fish species are streamflow regulation, habitat modification, predation by non-native fish species, hybridization, and pesticides and pollutants (USFWS, 2002a). There is no critical habitat for any of the species near the Site.

The accidental spill of uranium/vanadium ore into the Dolores River or San Miguel River would potentially pose a localized short-term impact on the aquatic environment and endangered Colorado River fish. Part of the released load could be washed away by the stream and carried a long distance from the accident site. The frequency of a rollover and/or crash of an ore truck at water crossings is calculated at $8.4 \times 10^{-5}$ per year (once every 12,000 years) (SENES, 2009a). The accidental spill of yellowcake into the water could also potentially pose a localized short-term impact on the aquatic environment and endangered Colorado River fish as discussed above. The frequency of a rollover and crash of a truck carrying yellowcake is estimated to be $4 \times 10^{-6}$ (once every 250,000 years).

The number of shipments of anhydrous ammonia to the Mill Facility is expected to be approximately 3 times more frequent than yellowcake shipments from the Mill. However,

BLM_0045282

ammonia is expected to be shipped from a supplier closer to the Mill than the yellowcake conversion facility in Illinois. Therefore, it is expected that the frequency of a rollover and crush of an ammonia truck, which could result in catastrophic release of ammonia, would be much smaller than that of a yellowcake truck (SENES, 2009a). Petroleum products would be transported to the Site over much shorter distance; however, the number of deliveries would be greater than that of ammonia, resulting in greater risk of accidental spills.

Uranium/vanadium ore can also contain aluminum, arsenic, barium, copper, iron, lead, manganese, selenium, vanadium, and zinc, all of which are potentially toxic to aquatic species (DOE, 2007). Ore solids, however, have high specific gravity and most would be expected to settle to the riverbed within a short distance from the accident site (SENES, 2009a). DOE (2007) also concluded that it is unlikely that any adverse impacts to biota would occur because of the relatively low toxicity and low concentrations of the potentially hazardous constituents of uranium/vanadium ore. Alternatively, the uranyl form of yellowcake is more highly soluble and would persist farther downstream than ore; spills of yellowcake could adversely affect streams with elevated water concentrations (SENES, 2009a). The probabilities associated with either an ore spill or a yellowcake spill in a river are negligible. Further, expected expedient and comprehensive clean up actions would be required under USDOT regulations. An Emergency Response Plan would be in place for responding to accidents and cargo spills. This, coupled with low or moderate impacts to fish, would result in a small risk of adverse affects to endangered Colorado River fish (SENES, 2009a).

Petroleum products can be toxic to algae, invertebrates, and fish. During 96-hour tests of acute toxicity, the LC50 (lethal concentration for 50 percent of the subjects) for juvenile coho salmon exposed to diesel fuel ranged between 2,186 and 3,017 mg/l (World Health Organization, 1996). Effects of such contamination, if an accidental release occurred, are unlikely to affect any of the four fish species because potentially occupied habitats in the Colorado River are approximately 65 miles downstream from the Site. Petroleum products in the water column would dissipate and not be present in toxic concentrations at the confluence with the Colorado River.

**Colorado Hookless Cactus.** An intensive survey of potential Colorado hookless cactus habitat present within the Site (pinyon-juniper woodland) was performed on August 24, 2009 but no hookless cactus was found (WestWater, 2009). Colorado hookless cactus has not been found in the Paradox Valley area in previous survey efforts (USFWS, 1990b; Lyon and Sovell, 2000; Ferguson, 2009). Construction, operation, and closure of the Mill Facility would have no effect on Colorado hookless cactus, and, therefore it is not discussed further in this ER.

**Clay-Loving Buckwheat.** The clay-loving buckwheat is endemic to the adobe hills and flats immediately adjacent to Delta and Montrose counties, Colorado. Occupied habitat and designated critical habitat are approximately 60 miles northeast of the Site. Botanical surveys conducted by Kleinfelder (2009g) and WestWater (2009) did not document this species. The clay-loving buckwheat is highly unlikely to occur within the Site and vicinity, and, therefore, construction, operation, and closure of the Mill Facility would have no effect on the species or critical habitat and it is not discussed further in this ER.

<u>Candidate Species</u>

**Western Yellow-billed Cuckoo.** According to the USFWS (2007c), the threats currently facing the western DPS of yellow-billed cuckoo include habitat modification and destruction, and pesticides. Cuckoo breeding habitats have also been reduced by groundwater pumping and tamarisk. The overuse of riparian habitat by livestock grazing, especially on plants like willows and cottonwood saplings, also plays a factor (USFWS, 2007c). However, there is no occupied

BLM_0045283

habitat within or near the Site or within Montrose County. Wildlife surveys conducted by Kleinfelder (2009h) and WestWater (2009) did not document this species. Western yellow-billed cuckoos are highly unlikely to occur within the Site and vicinity. Construction, operation, and closure of the Mill Facility would have no effect on the species or potentially suitable habitat. Therefore, it is not discussed further in this ER.

**Gunnison's Prairie Dog.** Only Gunnison's prairie dogs that inhabit montane habitats (higher elevation, cooler and moister plateaus, benches, and intermountain valleys) found in the northeastern portion of the species' range in central and southcentral Colorado and north-central New Mexico have been identified as candidate species for listing under the ESA. Populations of Gunnison's prairie dogs within the Paradox Valley are not included in the USFWS' recent finding and would not be considered as candidate species (USFWS, 2008b).

Gunnison's prairie dogs have inhabited the Site in the past; abandoned burrows (not occupied during the current year) were adjacent to the Site in Section 7, Township 46 North, Range 17 West. Gunnison's prairie dogs inhabit the Paradox Valley and were observed at two locations, east and west of Site during surveys conducted in August, 2009 (WestWater, 2009). Similar to other species of prairie dogs, Gunnison's prairie dog construct burrow systems with entrances usually on slopes or small rises rather than in depressions, a strategy to protect burrows from flooding (Pizzimenti and Hoffmann, 1973). Similar to other species of prairie dogs, Gunnison's prairie dogs have been adversely affected by converting native habitats to agricultural land (Knowles, 2002). Prairie dog control through intentional poisoning and recreational shooting has reduced their abundance and outbreaks of sylvatic plague have been especially devastating to Gunnison's prairie dog (USFWS, 2008b).

Prairie dogs will often burrow in previously disturbed areas (Koford, 1958; Knowles, 1982). Soil disturbances including pipelines, range ripping and furrowing, and past cultivation, as well as heavily grazed sites where livestock concentrate often provide suitable prairie dog habitat and may be potential sites likely to be colonized by prairie dogs (U.S. Forest Service, 2001).

**Gunnison Sage Grouse.** Gunnison Sage-grouse is a former candidate species and potentially, a future candidate species for listing under ESA because USFWS is obligated under a District Court settlement to reconsider removing it from the list of candidates and publish a new finding on or before June 30, 2010. Gunnison Sage-grouse has remained a Species of Special Concern in Colorado where it has declined because of habitat loss due to housing and human development, livestock grazing, water diversion projects, and increased deer and elk populations; the Colorado Wildlife Commission eliminated hunting in areas occupied by Gunnison Sage-grouse in 2000 (CDOW, 2009b).

Of the threats to Gunnison Sage-grouse, by far the greatest is the permanent loss and associated fragmentation and degradation of sagebrush habitat associated with urban development and/or conversion (Gunnison Sage-grouse Rangewide Steering Committee, 2005). In the San Miguel Basin Gunnison Sage-Grouse Conservation Area which includes the Site, habitat occupied by Gunnison Sage-grouse is only 45 percent of all habitat that could potentially be occupied, including former habitat that is vacant. There are 41,360 acres of presumably suitable habitat in the San Miguel Basin that is classified as vacant or of unknown use. Less than 7 percent of identified vacant habitat is dominated by sagebrush (Gunnison Sage-grouse Rangewide Steering Committee, 2005). An additional 62,000 acres in the San Miguel Basin Gunnison Sage-Grouse Conservation Area was identified as potential sage grouse habitat but only 34 percent of that is currently dominated by big sagebrush (Gunnison Sage-grouse Rangewide Steering Committee, 2005). Consequently the sagebrush vegetation in

BLM_0045284

Paradox Valley has high potential value to Gunnison Sage-grouse. Construction and operation of the Mill Facility would impact 247.6 acres of big sagebrush, which would reduce the amount of available sagebrush within Paradox Valley.

The Site and vicinity is not within currently occupied Gunnison Sage-grouse habitat, but the big sagebrush shrubland at the Site and within the Paradox Valley is potential habitat (San Miguel Basin Sage Grouse Working Group, 1998). The Site is within a corridor, partially vegetated by pinyon-juniper woodlands that separates occupied Gunnison Sage-grouse habitat in Dry Creek Basin from potential habitat in the East Paradox Valley (CDOW, 2008). Overall range for Gunnison Sage-grouse is approximately 1.5 miles south of the Site within the Dry Creek Basin, although the closest lek is farther than 11 miles south and wintering habitat is 12 miles south of the Site.

<u>BLM Sensitive Species and State of Colorado Species of Special Concern</u>

**Mammals.** Four of the six species of bats that are included in Table 3.5-2 could occur within the Site and vicinity. The Proposed Action could impact bats by adversely affecting summer and/or winter roosts, hibernacula, and foraging habitats, contaminating surface water, generating noise that could interfere with echolocation, and through night lighting that may alter their behavior. Noise from traffic and other sources is believed to interfere with bats' echolocation of insect prey (Jones, 2008).

There is suitable habitat for Botta's pocket gopher and northern pocket gopher within the Site, including foraging habitat that consists of forbs (thistles), succulent grasses (bromes), prickly pear, and saltbush (CDOW, 2009d and 2009e), but neither species of pocket gopher was observed during surveys conducted in 2007 and 2008 (Kleinfelder, 2009h). Both species are Colorado Species of Special Concern (see Table 3.5-2). The Proposed Action could impact pocket gophers by direct mortality during ground clearing and excavating actions and by vehicles in general.

Northern river otters have been reintroduced from diverse geographic locations in North America since 1976 and have become established in the Dolores River and San Miguel River (Boyle, 2006), but they are not expected to occur within the Site. Water pollution, control of streamflows, and human-caused mortality (trapping, shooting, predation by dogs) have adversely affected otters in Colorado (Boyle, 2006).

**Birds.** Only four of the bird species that have been identified as sensitive species by the BLM and/or are a protected species in Colorado and included in Table 3.5-2 are believed to possibly occur within the Site: Gunnison's Sage-grouse, bald eagle, American peregrine falcon, and western burrowing owl. Gunnison's Sage-grouse was discussed above as a candidate species for listing under the ESA.

Bald eagles have been killed by vehicles during winter and at other times as they feed on roadside carrion (USFWS, 1999) and increased vehicular traffic associated with the Mill Facility may increase the risk, especially because the Site and wider area vicinity is identified as bald eagle winter range (CDOW, 2009b). Bald eagle winter range is an area where bald eagles have been observed between November 15 and April 1.

Bald eagles would be likely to feed on any deer carrion if present along that portion of SH 90 or other segments of SH 90 and other routes connecting from the west through La Sal, Utah and from the east through Vancorum, Colorado.

BLM_0045285

American peregrine falcons are a species of concern in Colorado and are a BLM-sensitive species. Disturbance of the adults could lead to egg or chick abandonment, leaving them vulnerable to predators and the elements. In extreme cases of disturbance, for example the sudden appearance of a human or machinery very close to a nest, the adult may leave so quickly as to knock eggs or chicks out of the nest (White et al., 2002). There are nine active peregrine falcon eyries within an approximate 20-mile radius of the Site, but the closest is 4 miles away near the confluence of East Paradox Creek and the Dolores River. Noise associated with the Mill Facility is not expected to affect peregrine falcons. They are not discussed further in this ER.

Threats to the burrowing owl include loss of habitat through prairie dog eradication programs, agricultural and urban conversion, the absence of grazing that keeps vegetation low, insecticides and pesticides, and collisions with moving and stationary structures (USFWS, 2003c; McDonald et al., 2004). Impacts to burrowing owls could occur directly, through mortality, if nests and nestlings are destroyed (Marks and Ball, 1983). During surveys conducted in spring 2008 and summer 2009, western burrowing owls were documented adjacent to and in the vicinity (approximately 0.8 to 1.5 miles away) of the Site (Kleinfelder, 2009h; WestWater, 2009); however, burrowing owls were not documented within the Site. Potential suitable habitat (e.g., abandoned Gunnison's prairie dog burrows, other small mammal burrows) was identified along the western portion of the Site within the mixed grasslands habitat, although no sign of owls inhabiting the abandoned burrows was found (WestWater, 2009). No disturbance is proposed at these burrows; therefore, no direct or potentially direct impact to this species is expected.

**Reptiles.** The midget faded rattlesnake is the only sensitive species of reptiles likely to be present within the Site, based on known distributions and habitat affinities. Surveys conducted in 2007 and 2008 (Kleinfelder, 2009b) and 2009 (WestWater, 2009) did not observe this species within the Site. They are not discussed further in this ER.

**Amphibians**. Although five amphibian species are included in Table 3.5-2 as BLM-sensitive species and species of special concern in Colorado, only canyon tree frogs and northern leopard frogs potentially occur within or adjacent to the Site. The canyon tree frog occurs along intermittently flowing streams in deep, rocky canyons (CDOW, 2009f). Threats to the canyon tree frog are habitat related (Lyon and Sovell, 2000), and include reduction in water quality often from uranium mill tailings (Center for Native Ecosystems, 2009). The mill process areas, ore pad, tailings cells, and evaporation ponds are designed as "zero discharge" facilities. Precipitation and runoff that contacts these areas would be contained on site in lined ponds and cells and recycled for use in the Mill Facility. The system is designed to withstand a 1,000-year storm event. Therefore, contamination from the Mill Facility is not expected within drainages that may provide habitat for the canyon tree frog. None of the ephemeral drainages on-site provide habitat for any of the species. The groundwater table is either absent or greater than 400 feet below ground surface at the proposed locations of the mill, tailings cells, and evaporation ponds (Golder, 2009a); therefore, water quality within waterbodies potentially connected to groundwater sources should not be affected. Tree frogs were not documented during surveys conducted in 2007 and 2008 (Kleinfelder, 2009h) or 2009 (WestWater, 2009). The Proposed Action is not expected to affect canyon tree frogs or potentially suitable habitat and therefore, they are not discussed further in this ER.

Northern leopard frogs inhabit wet meadows, and the banks and shallows of marshes, ponds, streams, and irrigation ditches (CDOW, 2009f). Threats to this species include habitat loss, degradation, and fragmentation caused by construction within pristine areas, urbanization and

BLM_0045286

growth of suburbs, logging, building of roads and trails, and grazing within riparian vegetation (Smith and Keinath, 2007; Lyon and Sovell, 2000). Other threats to this species include negative interactions with non-native species (i.e., bullfrogs), bacterial infection, mortality from roads, or impacts from sedimentation and toxic runoff from roads that may negatively affect amphibians in nearby ponds (Smith and Keinath, 2007). Recently, USFWS (2009e) announced initiation of a status review for the leopard frog in western states to determine if listing under the ESA may be warranted. Northern leopard frogs could occur within the small stock pond on the Site or East Paradox Creek located north of the Site, although leopard frogs were not observed in the vicinity of the stock pond during survey efforts in 2007 and 2008 (Kleinfelder, 2009h) or 2009 (WestWater, 2009). Effects to potential northern leopard frog habitat at the stock pond are not expected. No permanent connection to East Paradox Creek occurs; therefore, no effects to potential habitat in the creek from the Proposed Action are expected. It is expected that there would be no impact to Northern leopard frogs due to the Proposed Action and they are not discussed further in this ER.

**Fish.** None of the four fish species that are of special concern in Colorado and BLM-sensitive species occur within the Site; there are no rivers or perennial streams near the Site, and none of the ephemeral drainages on-site provide habitat for any of the species. Fish could be adversely affected by accidental spills and releases of ore, yellowcake, chemical reagents, and petroleum products during transport to or from the Mill Site as discussed above for Colorado River endangered fish species.

**Invertebrates.** One invertebrate species identified as sensitive by the BLM, the Great Basin silverspot butterfly (also called the Nokomis fritillary butterfly), occurs within Montrose County and has been recorded at least 7 miles west of the Site. It is possible that introduced thistles documented within the Site and its vicinity could serve as nectar sources during adult flight, based on the known proximity of this species to the Site. Elimination of grazing and/or increase of non-native, invasive species could change the vegetation composition present within the Site and eliminate potential nectar sources used by this species during adult flight. It is expected that there would be no impact to the Great Basin silverspot butterfly and they are not discussed further in this ER.

**Vascular Plants.** Of the 24 sensitive vascular plants included in Table 3.5-2, only five possibly occur within the Site in pinyon-juniper woodlands and/or big sagebrush shrublands: Grand Junction milkvetch, Naturita milkvetch, sandstone milkvetch, Paradox lupine (Payson lupine), and Paradox breadroot. However, none of the five species were observed during on-site surveys conducted in 2007 and 2008 (Kleinfelder, 2009h), or in 2009 (WestWater, 2009).

No sensitive vascular plants have been identified within the Site and therefore, no impacts are expected to these species. Sensitive plants associated with pinyon-juniper woodland should not be affected by the Proposed Action disturbance is not proposed within the pinyon-juniper woodlands. They are not discussed further in this ER.

<u>Terrestrial Wildlife</u>

**Big Game.** The Proposed Action could potentially result in direct mortality or injury to various wildlife species. For example, wildlife-vehicle collisions are documented for mule deer; mule deer mortality increases with traffic volume during winter (Arnold, 1978; Reed, 1981; Romin and Bissonette, 1996). The Site is entirely within mule deer overall range, mule deer winter range, and mule deer severe winter range. In addition, routes to be used for transporting ore from various mines in Utah and Colorado to the Mill Facility pass through resident mule deer population areas, mule deer winter ranges, severe winter ranges, and winter concentration

BLM_0045287

ranges in Colorado, and crucial or substantial winter ranges in Utah. In some of the seasonal ranges in Colorado, CDOW has defined mule deer highway crossing zones, which are areas where mule deer traditionally cross roads, presenting potential conflicts between mule deer and motorists. CDOT has documented vehicle-related mortality of mule deer and elk during winter within the crossing zones and at other locations on SH 90 proximate to the Site (Znamenacek, 2009).

Similarly, the Site is entirely within elk overall range, elk winter range, elk severe winter range, and an elk winter concentration area. In addition, routes to be used for transporting ore from various mines in Utah and Colorado to the Mill Facility pass through resident elk populations, elk winter ranges, severe winter ranges, and winter concentration ranges in Colorado, and elk crucial ranges in Utah. Transportation routes also cross pronghorn crucial yearlong range and winter range in Utah and Colorado. Elk and pronghorn could also be directly impacted by vehicular collisions.

Mule deer, elk, and pronghorn mortalities occur when they attempt to jump fences and their legs become ensnared between the top two fence wires (Harrington and Conover, 2006). Mule deer fence-related mortality is generally higher than elk fence mortality because deer cross fences more frequently, particularly highway rights-of-way fences, and juvenile ungulates (including pronghorn) were most susceptible to fence mortality (Harrington and Conover, 2006). More deaths were caused by woven-wire fence with single strand barbed-wire top than woven-wire with two top barbed-wire strands or four-strand barbed wire fences (Harrington and Conover, 2006).

Most indirect effects to mule deer are associated with degradation and/or alterations to habitats (habitat loss). The Proposed Action could potentially impact mule deer and elk by reducing the amount of habitat available and/or causing diminished use of habitats adjacent to human activities. Increased presence of humans in wildlife habitats also contributes to indirect (sometimes called "secondary") impact. Examples typically include increased recreation demand (including off-highway vehicle use), increased habitat conversion, habitat degradation by human encroachment, and increased illegal harvest (Comer, 1982).

The Proposed Action could potentially alter mule deer and elk distributions on winter ranges some distance away from the Property Boundary similar to effects associated with construction of new roads and/or oil and gas activities within winter ranges because mule deer generally avoid roads (Rost and Bailey, 1979; Easterly et al., 1991). Elk also avoid roads and traffic (Rost and Bailey, 1979: Lyon, 1983; Witmer and DeCalesta, 1985; Rowland et al., 2000). Animals could be displaced to surrounding habitats, already supporting other animals, and local densities would increase in those areas. Such increased densities could lead to density-dependent effects including overcrowding and overutilization of habitats, increased intraspecific competition, and increased prevalence of disease, predation, and physiological stress. Density-dependent demographic responses (e.g., decreased survivorship, decreased fecundity) are possible, though unlikely to be documented, and could potentially contribute to declining local populations.

The Site coincides with habitats utilized by black bears (black bear overall range). CDOW recognizes potential conflicts between humans and black bears and has developed recommendations for bear-proofing homes that would also be applicable to work places. In particular, garbage attracts bears and such attractants can draw bears into situations where they destroy property and/or become a threat to human safety, possibly leading to their destruction. A resource list of bear resistant containers is available from CDOW (2009h). Use of

bear-proof containers and frequent refuse collection would minimize potential for conflicts on construction sites.

Poaching wildlife, the illegal taking or possession of any game, fish, or non-game wildlife, is a possible consequence of additional human populations in the vicinity of wildlife habitats (Comer, 1982). CDOW (2009i) has estimated that poachers may kill as many animals as licensed hunters and has developed a program, "Operation Game Thief," to inform the public about poaching, to encourage the public to report poaching incidents.

**Small Game.** Increased traffic associated with the Proposed Action could potentially increase vehicle-related mortality of small game species, primarily mammals (Table 3.24-2 in Section 3). Desert cottontails, black-tailed jackrabbits, coyotes, bobcats, and mourning doves are small game species that are known to occur on the Site. Indirect effects would occur as a result of long-term loss of habitats from construction and operation of the Proposed Action: 247.6 acres of big sagebrush shrubland and 167.0 acres of mixed grassland habitats would be removed. Loss of 414.6 acres of big sagebrush shrubland and mixed grassland habitats, combined, is not expected to result in a significant impact to any of the small game species because each species is more of a habitat-generalist than a habitat-specialist. That is, each species is adaptable and capable of utilizing multiple habitat types in the area surrounding the Site rather than being restricted to one particular habitat or set of conditions (for example, Colwell and Futuyma, 1971).

**Waterfowl and Turkeys.** No waterfowl habitats (i.e., retention pond) within the Site would be affected by construction or operation of the Proposed Action. The raffinate solution present within the evaporation ponds and ponded tailings solution within the tailings cells may attract waterfowl, including snow geese. However, use of bird netting over the evaporation ponds should exclude waterfowl from entering the ponds, and bird balls used in the tailings cells should camouflage the ponded tailings solution present and discourage landing in the toxic solution. The Proposed Action is not expected to affect the waterfowl and they are not discussed further in this ER.

There is no habitat within the Site currently utilized by Merriam's turkey although access to the Site by SH 90 to the west and on SH 141 along the Dolores Canyon between Gateway and Vancorum passes through turkey overall range. Increased project-related traffic could result in turkey mortalities but the extent to which that would occur is impossible to estimate. The Proposed Action is not expected to affect turkeys and they are not discussed further in this ER.

**Migratory Birds.** There are 18 species of migratory birds in the area surrounding the Site that have significantly declining population trends based on BBS route data. Brewer's sparrow is dependent on big sagebrush and the local population has been significantly declining (P<0.01) during the past 15 years. Other species with declining trends that may nest in sagebrush and/or grasslands on the Site include killdeer, Say's phoebe, vesper sparrow, black-throated sparrow, blue grosbeak, western meadowlark, Brewer's blackbird, brown-headed cowbird. Removal of vegetation during nesting would risk mortality of birds, eggs, and/or nestlings. Direct mortality coupled with loss of nesting habitat could contribute to the species' observed decline in the area surrounding the Site. Project effects could include direct mortality of birds and eggs during the nesting period as well, removal of nesting habitat, and degradation of nesting habitat due to noise and human activities.

**Non-Game Wildlife.** Increased project-related traffic during construction, operation, and closure could result in non-game wildlife mortalities, especially for mammals and reptiles Individuals of

BLM_0045289

some wildlife species may be directly impacted by the Proposed Action if they are killed by vehicles traveling to and from the Site. Species most susceptible to vehicle-related mortality include those that are inconspicuous (lizards, snakes, small mammals), those with limited mobility, burrowing species (mice and voles), wildlife with behavioral activity patterns (crepuscular activity) making them vulnerable, and wildlife that may scavenge roadside carrion (Leedy, 1975; Bennett, 1991; Forman and Alexander, 1998; Trombulak and Frissel, 2000).

Direct removal of 247.6 acres of sagebrush shrubland could potentially affect 30 species of non-game vertebrates and removal of 167.0 acres of mixed grassland could potentially affect 22 species if all (potentially-occurring species actually inhabit the Site. Observations made during on-site surveys conducted in 2007 and 2008 (Kleinfelder, 2009h) and in August 2009 (WestWater, 2009) indicate that not all species that inhabit sagebrush shrubland and/or mixed grassland would be present. Non-game wildlife species are would potentially be displaced from habitats that are cleared of vegetation. Displacement from adjacent habitats would most likely be a long-term effect once construction ends and operation begins. If adjacent habitats are at carrying capacity for the species, displaced individuals could adversely be affected by competition for resources, increased susceptibility to predation, or disease that may be facilitated by crowding. The Proposed Action could decrease individuals' reproductive success by increasing neonate or nest abandonment and possibly by interfering with breeding behaviors, sustenance, and growth of fetuses and/or young, conception rates, and fetal survival. These direct impacts may negatively affect population growth through diminished rates of survivorship and fecundity. Populations may also be negatively affected if individuals emigrate from habitats affected by project-related disturbances.

Aquatic Species

None of the fish species that occur in the Dolores River and tributaries occur within the Site; there are no rivers or perennial streams near the Site, and none of the ephemeral drainages on-site provide habitat for any of the species. Fish could be adversely affected by accidental spills and releases of ore, yellowcake, chemical reagents, and petroleum products during transport to or from the Mill Site as discussed above for Colorado River endangered fish species.

### 4.5.1.2   Construction, Operations, and Closure Impacts

### 4.5.1.2.1   Construction

Vegetation

Construction of the Proposed Action would directly impact vegetation, primarily by removal. Direct impact within the Mill License Boundary is expected to be long-term (for the life of the project). Although the entire Mill License Boundary would not be void of vegetation, the entire area is being considered for direct impact (307.8 acres). The majority of the development within the Mill License Boundary would affect big sagebrush shrublands, removing approximately 236.5 acres. Approximately 71.3 acres of mixed grasslands would be affected. No pinyon-juniper would be removed; therefore no direct impact to this dominant vegetation type is expected. Long-term disturbance (for the life of the project) outside the Mill License Boundary would be approximately 46.1 acres and would include 8.8 acres of big shagebrush habitat and 37.3 acres of mixed grassland habitat. Disturbance that would be revegetated during the life of the project (soil stockpile and pipelines) would be approximately 60.7 acres and would include 2.3 acres of big sagebrush and 58.4 acres of mixed grasslands (Table 4.5-1).

Table 4.5-1 provides the acres of habitat removed within the Mill License Boundary and outside the Mill License Boundary (both long-term and temporary disturbance) for each dominant

vegetation type within the Property Boundary (see Table 3.5-1 in Section 3.5.1.2, Vegetation). The amounts of impacted big sagebrush and mixed grasslands are minor compared to the extent of each vegetation type within the region surrounding the Site. For example, there are 70,396 acres dominated by big sagebrush vegetation and 29,119 acres of grass/forb rangeland (corresponding to mixed grasslands) that have been identified within the San Miguel Basin Gunnison Sage-Grouse Conservation Area (Gunnison Sage-Grouse Rangewide Steering Committee, 2005), within which the Site is located. Consequently, the Proposed Action would impact 0.4 percent of sagebrush and 0.6 percent of grasslands in this portion of the San Miguel Basin Gunnison Sage-Grouse Conservation Area.

**Table 4.5-1**
**Acreage and Percent of Site Total Impacted**

| Dominant Vegetation Community | Disturbance within Mill License Boundary [1] (acres) | Disturbance Outside Mill License Boundary – Long-Term [2] (acres) | Disturbance Outside Mill License Boundary – Short-Term [3] (acres) | Total Disturbance within Property Boundary (acres) | Total Type within the San Miguel Basin (acres) | Percentage of Vegetation Type Disturbance by Proposed Action |
|---|---|---|---|---|---|---|
| Pinyon-Juniper Woodland | 0.0 | 0.0 | 0.0 | 0.0 | 6,050 | 0.0 |
| Big Sagebrush | 236.5 | 8.8 | 2.3 | 247.6 | 70,396 | 0.4 |
| Mixed Grasslands | 71.3 | 37.3 | 58.4 | 167.0 | 29,119 | 0.6 |
| Total | 307.8 | 46.1 | 60.7 | 414.6 | -- | -- |

[1] Includes Mill, three tailings cells, 10 to 20 evaporation ponds, an ore pad, and ancillary facilities such as roads and parking lots.
[2] Includes ancillary facilities such as roads, parking lots, guard house, and administrative buildings outside the Mill License Boundary.
[3] Includes soil stockpiles and pipelines outside the Mill License Boundary that would be revegetated after disturbance and at least throughout the life of the project.

Invasive, Non-Native Species

Because noxious weeds are often able to establish in cleared, disturbed areas following surface disturbance, primarily along roads and areas of development, construction of the Proposed Action could increase the presence of these weed species and/or introduce them into areas that are not currently infested with non-native species through increased vehicle traffic, equipment placement and operation, foot traffic, and other surface-disturbing activities associated with the Proposed Action. Establishment of noxious weeds could alter the native plant communities, which may out-compete native, more desirable plant species and be less palatable than native vegetation, indirectly impacting wildlife (CDOW, 2008).

Federally Listed Threatened and Endangered Species

**Canada Lynx.** Construction-related traffic would increase daily traffic on SH 90 and other access routes which would increase the potential for lynx mortality. Estimated existing traffic and estimated increases in traffic due to construction of the Mill Facility are discussed Section 4.2, Transportation. The increased traffic due to construction of the Mill Facility could potentially contribute to mortality of Canada lynx if dispersing animals are in the region; however, the extent of that contribution is impossible to predict.

**Mexican Spotted Owls.** The closest construction area to pinyon-juniper habitat where noise would be generated is the subsoil stockpile (480 feet away). Noise produced by some construction equipment (jackhammers, mounted impact hammer, graders) could generate noise ≥70 dBA which would be sufficient to disturb northern spotted owls (USFWS, 2003b). In most of

BLM_0045291

the pinyon-juniper habitat, noise would range between 57 dBA (threshold causing alert behavior in northern spotted owls) and 70 dBA during construction. Based on responses to noise by northern spotted owls, Mexican spotted owls, if they were present in the pinyon-juniper woodlands, could be affected by noise produced during construction. However, their presence within the Site is highly unlikely and adverse effects to Mexican spotted owls due to construction noise would be minimal and discountable.

**Endangered Colorado River Fish.** Impacts to the four endangered Colorado River fish due to construction are not anticipated unless there was an accidental release of petroleum products into the Dolores River or San Miguel River while en route to the Site. Potential effects are discussed above in Section 4.5.1.1, General Impacts.

Candidate Species

**Gunnison's Prairie Dog.** Soil disturbance during construction of the Mill Site could provide habitat suitable for colonization by prairie dogs during or following construction. If they did colonize the Site, they could be susceptible to direct mortality by construction equipment.

**Gunnison Sage-Grouse.** Construction of the Mill Facility would impact 247.6 acres of big sagebrush, which would reduce the amount of available sagebrush within Paradox Valley. Construction could potentially interfere with attempted movements by Gunnison Sage-grouse between occupied habitat in Dry Creek Basin and potentially suitable habitat in the East Paradox Valley. Consequently, the Mill Facility could potentially affect efforts to re-establish Gunnison Sage-grouse populations in East Paradox Valley (CDOW, 2008).

BLM Sensitive Species and State of Colorado Species of Special Concern

**Mammals.** Construction of the Mill Facility would generate noise. Night lighting would likely occur at during construction and could act as barriers to bat movements (Kuijper et al., 2008), reduce bat activity in the immediate vicinity (Stone et al., 2009), or have an opposite effect (mercury vapor lamps) by attracting nocturnal insects (Svensson and Rydell, 1998; Rydell and Racey, 1993). Alternatively, monochromatic orange sodium lamps neither attract insects nor bats (Rydell and Baagoe, 1996) and use of these lamps might minimize potential effects of night lighting on bats. Loss of foraging habitat can adversely affect bats (Adams, 2003) and potential use by foraging bats of the retention pond on the southern end of the Site may be limited by noise and other disturbances associated with construction. Construction of the Proposed Action would impact 247.6 acres of big sagebrush and 167.0 acres of mixed grasslands that provide feeding habitats for these species (CDOW, 2009b).

Removal of foraging habitat, or alteration in vegetation cover and vegetation composition from introduced, invasive species may negatively affect the pocket gophers, if present.

An accidental release of petroleum products into the Dolores River or San Miguel while en route to the Mill Site could potentially be harmful to river otters. Otters could be affected by oiling fur with loss of insulating properties, ingestion with accumulation of petroleum residues in tissues, and changes in habitat use (Boyle, 2006). Risk of accidental spills and releases is described above for Colorado River endangered fish in Section 4.5.1.1, General Impacts.

**Birds.** Increased traffic resulting from with construction of the Mill Facility would increase the potential for vehicular collisions with wildlife and potential mortality for bald eagles scavenging along roadsides.

BLM_0045292

Although western burrowing owls are relatively tolerant of passive human disturbance, such as increased traffic or construction noise (Martin, 1973; Marks and Ball, 1983), the owls could be indirectly impacted during their breeding season from noise and vibration associated with construction and increased human presence, habitat loss including destruction or degradation of foraging habitat adjacent to occupied or potentially occupied burrows, and decrease in prey species (California Burrowing Owl Consortium, 1993; Marks and Ball, 1983). Such disturbance may displace individuals to surrounding habitat, possibly resulting in overcrowding and increased competition for food resources and nesting sites. Colorado Partners in Flight (2000a) recommend a disturbance buffer of 100 to 300 meters (328 to 984 feet) to minimize disturbance to nesting or foraging western burrowing owls, especially during the breeding season (February 1 through August 31); therefore, any activity or project component within 300 meters may indirectly impact this species.

**Fish.** Impacts to fish species during construction are not anticipated unless there is an accidental release of petroleum products into the Dolores River or San Miguel River while en route to the Site. Potential effects are discussed above for the Colorado River endangered fish species in Section 4.5.1.1, General Impacts.

Terrestrial Wildlife

**Big Game.** Increased traffic due to construction of the Mill Facility could potentially contribute to mortality of mule deer, elk, and possibly pronghorn.

The distances across mule deer ranges that are crossed by all existing transportation routes to and from the Site are provided in Table 4.5-2. In addition, the distances of known mule deer highway crossing zones that are crossed within those ranges are provided, but only for Colorado highways because similar information is not provided in Utah (Utah Division of Wildlife Resources, 2009). Known mule deer crossing zones are areas where increased mortality due to project-related traffic is assumed to be most likely, especially in those areas where the number of construction-related vehicles would result in an increase above the 2008 average annual daily traffic volumes by a relatively high amount. With these assumptions, mule deer mortality would could potentially increase on several routes during construction including 1) SH 90, east and west of the Site in Colorado where it passes through a resident population of mule deer, severe winter ranges and/or winter concentration areas, 2) on SH 141 in San Miguel County and Montrose County where the highway passes through mule deer winter range, severe winter range, and winter concentration range, and 3) on SH 46 in Utah, which connects U.S. Highway 191 to SH 90 while passing through mule deer crucial range defined by Utah Division of Wildlife Resources (2009).

The Site is entirely within elk overall range, elk winter range, elk severe winter range, and an elk winter concentration area. In addition, routes to be used during construction would pass through resident elk populations, elk winter ranges, severe winter ranges, and winter concentration ranges in Colorado, and elk crucial ranges in Utah. The distances across these elk ranges that are crossed by existing transportation routes to the Mill Facility are provided in Table 4.5-3. Based on similar assumptions to those discussed for mule deer, elk vehicle-related mortality would most likely increase during construction 1) on SH 90, east and west of the Piñon Ridge Mill in Colorado where it passes through a resident population of elk, as well as through elk severe winter range, 2) on SH 141 in Montrose County where the highway coincides with elk winter range and severe winter range, and 3) on SH 46 in Utah, which connects U.S. Highway 191 to SH 90 while passing through elk crucial winter range.

BLM_0045293

**Table 4.5-2**

**Highways Used During Construction and Operation of the Mill Facility that Coincide with Mule Deer Residential Populations and Winter Ranges in Colorado and Utah, Including Estimates of Existing (2008) Traffic Volumes and Additional Traffic Expected from Project-Related Vehicles**

| County – State | Highway (direction from Site) | Distance (miles) of Intersecting Highway | | 2008 Average Daily Traffic Volume | Average Construction Traffic | | Average Operation Traffic | |
|---|---|---|---|---|---|---|---|---|
| | | Mule Deer Range | Range with Highway Crossing Zone | | Number of Vehicle trips per day | Percent Increase from 2008 | Number of Vehicle trips per day | Percent Increase from 2008 |
| **Mule Deer Resident Population[1]:** | | | | | | | | |
| Dolores – CO | SH 491(s) | 6.1 | 2.2 | 2,250 | 0 | 0 | 8 | 0.4 |
| Dolores – CO | SH 141(s) | 15.0 | 2.7 | 605 | 16 | 2.5 | 8 | 1.2 |
| Montrose – CO | SH 141(s) | 7.4 | 6.5 | 400 | 195 | 29.7 | 120 | 18.2 |
| San Miguel – CO | SH 145(s) | 4.1 | 4.1 | 2,175 | 72 | 3.3 | 6 | 0.3 |
| Montrose – CO | SH 145(s) | 9.9 | 9.9 | 1,250 | 72 | 5.8 | 6 | 0.5 |
| Montrose – CO | SH 97(s) | 3.9 | 0 | 1,800 | 18 | 1.0 | 28 | 1.6 |
| Montrose – CO | SH 90(w) | 1.7 | 1.7 | 200 | 24 | 12.0 | 38 | 19.0 |
| **Range Totals** | | **48.1** | **27.1** | | | | | |
| **Mule Deer Winter Range[1]:** | | | | | | | | |
| San Miguel – CO | SH 141(s) | 39.2 | 18.3 | 535 | 88 | 16.4 | 8 | 1.5 |
| Montrose – CO | SH 141(s) | 11.3 | 8.9 | 1,865 | 196 | 10.5 | 120 | 6.4 |
| San Miguel – CO | SH 145(s) | 4.1 | 4.1 | 2,175 | 72 | 3.3 | 6 | 0.4 |
| Montrose – CO | SH 145(s) | 13.3 | 13.3 | 1,250 | 72 | 5.8 | 6 | 0.5 |
| Montrose – CO | SH 97(s) | 3.9 | 0 | 1800 | 18 | 1.0 | 28 | 1.6 |
| Montrose – CO | SH 90(w) | 23.0 | 5.7 | 365 | 24 | 6.6 | 48 | 13.2 |
| Montrose – CO | SH 90(e) | 10.9 | 4.4 | 530 | 210 | 39.6 | 128 | 24.2 |
| Montrose – CO | SH 141(n) | 33.4 | 20.7 | 400 | 16 | 4.0 | 28 | 7.0 |
| Mesa – CO | SH 141(n) | 57.8 | 23.4 | 680 | 16 | 2.4 | 28 | 4.9 |
| **Range Totals** | | **196.9** | **98.8** | | | | | |
| **Mule Deer Severe Winter Range[1]:** | | | | | | | | |
| San Miguel – CO | SH 141(s) | 30.0 | 18.3 | 535 | 16 | 3.0 | 8 | 1.5 |
| Montrose – CO | SH 141(s) | 11.3 | 8.9 | 1,865 | 210 | 11.3 | 120 | 6.4 |
| Montrose – CO | SH 145(s) | 10.2 | 10.2 | 1,250 | 72 | 5.8 | 6 | 0.5 |
| Montrose – CO | SH 97(s) | 3.9 | 0 | 1,800 | 18 | 1.0 | 28 | 1.6 |
| Montrose – CO | SH 90(w) | 15.2 | 5.7 | 365 | 24 | 6.6 | 48 | 13.2 |
| Montrose – CO | SH 90(e) | 10.9 | 4.4 | 530 | 210 | 39.6 | 128 | 24.2 |
| Montrose – CO | SH 141(n) | 28.0 | 20.6 | 400 | 16 | 4.0 | 28 | 7.0 |
| Mesa – CO | SH 141(n) | 57.8 | 23.4 | 680 | 16 | 2.4 | 28 | 4.9 |
| **Range Totals** | | **167.3** | **91.5** | | | | | |
| **Mule Deer Winter Concentration Range[1]:** | | | | | | | | |
| San Miguel – CO | SH 141(s) | 12.6 | 12.6 | 535 | 16 | 3.0 | 8 | 1.5 |
| Montrose – CO | SH 141(s) | 11.3 | 8.9 | 1,865 | 210 | 11.3 | 120 | 6.4 |
| Montrose – CO | SH 145(s) | 12.1 | 12.1 | 1,250 | 72 | 5.8 | 28 | 2.2 |
| Montrose – CO | SH 97(s) | 3.9 | 0 | 1,800 | 18 | 1.0 | 26 | 1.4 |
| Montrose – CO | SH 90(e) | 8.6 | 4.4 | 530 | 210 | 39.6 | 128 | 24.2 |
| Mesa – CO | SH 141(n) | 5.0 | 4.9 | 680 | 16 | 2.4 | 8 | 1.2 |
| **Range Totals** | | **53.5** | **42.9** | | | | | |
| **Mule Deer Crucial Winter Range[2]:** | | | | | | | | |
| San Juan – UT | US 191(s) | 11.4 | N/A | 3,575 | 4 | 0.1 | 6 | 0.2 |
| San Juan – UT | SH 46(w) | 16.6 | N/A | 468 | 24 | 7.2 | 38 | 8.1 |
| San Juan – UT | US 191(n) | 10.2 | N/A | 3,705 | 4 | 0.1 | 20 | 0.5 |
| **Range Totals** | | **38.2** | **N/A** | | | | | |
| **Mule Deer Substantial Winter Range[2]:** | | | | | | | | |
| San Juan – UT | US 191(n) | 1.9 | N/A | 3,575 | 4 | 0.1 | 6 | 0.2 |

[1] CDOW, NDIS (CDOW, 2009b):

- Resident Population - year-round range for a population of animal. The residents use all of the area all year; it

Section 4     Environmental Impacts, Mitigation, and Monitoring

| County – State | Highway (direction from Site) | Distance (miles) of Intersecting Highway | | 2008 Average Daily Traffic Volume | Average Construction Traffic | | Average Operation Traffic | |
| | | Mule Deer Range | Range with Highway Crossing Zone | | Number of Vehicle trips per day | Percent Increase from 2008 | Number of Vehicle trips per day | Percent Increase from 2008 |
|---|---|---|---|---|---|---|---|---|

- cannot be subdivided into seasonal ranges although it may be included within the overall range of the larger population.
- Winter Range - that part of the overall range where 90 percent of the individuals are located during the average five winters out of ten from the first heavy snowfall to spring green-up, or during a site specific period of winter as defined for each DAU.
- Severe Winter Range - that part of the overall range where 90 percent of the individuals are located when the annual snowpack is at its maximum and/or temperatures are at a minimum in the two worst winters out of ten.
- Winter Concentration Area – that part of the winter range where densities are at least 200 percent greater than the surrounding winter range density during the same period used to define winter range in the average five winters out of ten.
- Mule Deer Highway Crossing Zones - Those areas where mule deer movements traditionally cross roads, presenting potential conflicts between mule deer and motorists.
- Critical (Crucial) Value Habitat - an area that provides for "sensitive" biological and/or behavioral requisites necessary to sustain the existence and/or perpetuation of a wildlife species.
- Substantial Value Habitat - an area that provides for "frequent" use by a wildlife species.

[2] Utah Gap Analysis, 1997.

**Table 4.5-3**

**Highways Used During Construction and Operation of the Mill Facility that Coincide with Elk Residential Populations and Winter Ranges in Colorado and Utah, Including Estimates of Existing (2008) Traffic Volumes and Additional Traffic Expected from Project-Related Vehicles**

| County – State | Highway (direction from Site) | Distance (miles) of Intersecting Highway with Elk Range | 2008 Average Daily Traffic Volume | Average Construction Traffic | | Average Operation Traffic | |
| | | | | Number of Vehicle trips per day | Percent Increase from 2008 | Number of Vehicle trips per day | Percent Increase from 2008 |
|---|---|---|---|---|---|---|---|
| **Elk Resident Population Range[1]:** | | | | | | | |
| Montrose – CO | SH 90(w) | 4.2 | 365 | 24 | 6.6 | 48 | 13.2 |
| **Elk Winter Range[1]:** | | | | | | | |
| Dolores – CO | SH 141(s) | 1.8 | 730 | 16 | 2.2 | 9 | 1.1 |
| San Miguel - CO | SH 141(s) | 31.6 | 535 | 16 | 3.0 | 8 | 1.5 |
| Montrose – CO | SH 141(s) | 11.3 | 1,865 | 196 | 10.5 | 120 | 6.4 |
| San Miguel - CO | SH 145(s) | 4.1 | 2,175 | 72 | 3.3 | 6 | 0.3 |
| Montrose – CO | SH 145(s) | 13.3 | 1,250 | 72 | 5.8 | 6 | 0.5 |
| Montrose – CO | SH 97(s) | 3.9 | 1,800 | 18 | 1.0 | 28 | 1.6 |
| Montrose – CO | SH 90(w) | 23.0 | 365 | 24 | 6.6 | 48 | 13.2 |
| Montrose – CO | SH 90(e) | 10.9 | 530 | 210 | 39.6 | 128 | 24.2 |
| Montrose – CO | SH 141(n) | 33.4 | 400 | 16 | 4.0 | 28 | 7.0 |
| Mesa – CO | SH 141(n) | 57.8 | 680 | 16 | 2.4 | 8 | 1.2 |
| **Range Totals** | | | | | | | |
| **Elk Severe Winter Range[1]:** | | | | | | | |
| San Miguel - CO | SH 141(s) | 29.4 | 535 | 16 | 3.0 | 8 | 1.5 |
| Montrose – CO | SH 141(s) | 11.3 | 1,865 | 196 | 10.5 | 120 | 6.4 |
| Montrose – CO | SH 145(s) | 1.3 | 1,200 | 72 | 6.0 | 6 | 0.5 |
| Montrose – CO | SH 97(s) | 3.9 | 1,800 | 18 | 1.0 | 28 | 1.6 |
| Montrose – CO | SH 90(w) | 15.2 | 365 | 24 | 6.6 | 48 | 13.2 |
| Montrose – CO | SH 90(e) | 10.9 | 530 | 210 | 39.6 | 128 | 24.2 |
| Montrose – CO | SH 141(n) | 28.0 | 400 | 16 | 4.0 | 28 | 7.0 |

BLM_0045295

| County – State | Highway (direction from Site) | Distance (miles) of Intersecting Highway with Elk Range | 2008 Average Daily Traffic Volume | Average Construction Traffic | | Average Operation Traffic | |
|---|---|---|---|---|---|---|---|
| | | | | Number of Vehicle trips per day | Percent Increase from 2008 | Number of Vehicle trips per day | Percent Increase from 2008 |
| Mesa – CO | SH 141(n) | 16.6 | 680 | 16 | 2.4 | 8 | 1.2 |
| | Range Totals | | | | | | |
| Elk Winter Concentration Range[1]: | | | | | | | |
| San Miguel - CO | SH 141(s) | 1.4 | 480 | 16 | 3.3 | 8 | 1.7 |
| Elk Crucial Yearlong Range[1]: | | | | | | | |
| San Juan – UT | US 191(s) | 4.8 | 3,415 | 4 | 0.1 | 6 | 0.2 |
| Elk Crucial Winter Range[2]: | | | | | | | |
| San Juan – UT | US 191(s) | 11.8 | 2,120 | 4 | 0.2 | 6 | 0.3 |
| San Juan – UT | SH 46(w) | 11.6 | 335 | 24 | 7.2 | 38 | 11.3 |

[1] CDOW, NDIS (CDOW, 2009b):
- Resident Population - year-round range for a population of animal. The residents use all of the area all year; it cannot be subdivided into seasonal ranges although it may be included within the overall range of the larger population.
- Winter Range - that part of the overall range where 90 percent of the individuals are located during the average five winters out of ten from the first heavy snowfall to spring green-up, or during a site specific period of winter as defined for each DAU.
- Severe Winter Range- that part of the overall range where 90 percent of the individuals are located when the annual snowpack is at its maximum and/or temperatures are at a minimum in the two worst winters out of ten.
- Winter Concentration Area – that part of the winter range where densities are at least 200 percent greater than the surrounding winter range density during the same period used to define winter range in the average five winters out of ten.
- Critical (Crucial) Value Habitat - an area that provides for "sensitive" biological and/or behavioral requisites necessary to sustain the existence and/or perpetuation of a wildlife species.

[2] Utah Gap Analysis, 1997.

U.S. Highway 191 in San Juan County, Utah and SH 141 in San Miguel County, Colorado also pass through pronghorn cruciai yearlong range and winter range, respectiveiy (Table 4.5-4). However, given the existing (2008) traffic ieveis and relatively few project-related trips per day through those ranges, increased pronghorn mortality due to traffic associated with construction of the Proposed Action is expected to be minimal.

BLM_0045296

**Table 4.5-4**
**Highways Used During Construction and Operation of the Mill Facility that Coincide with Pronghorn Residential Populations and Winter Ranges in Colorado and Utah, Including Estimates of Existing (2008) Traffic Volumes and Additional Traffic Expected from Project-Related Vehicles**

| County - State | Highway (direction from Site) | Distance (miles) of Intersecting Highway with Elk Range | 2008 Average Daily Traffic Volume | Average Construction Traffic | | Average Operation Traffic | |
|---|---|---|---|---|---|---|---|
| | | | | Number of Vehicle trips per day | Percent Increase from 2008 | Number of Vehicle trips per day | Percent Increase from 2008 |
| Pronghorn Resident Population and Winter Range[1]: | | | | | | | |
| San Miguel - CO | SH 141(s) | 14.0 | 480 | 16 | 3.3 | 8 | 1.7 |
| Pronghorn Crucial Yearlong Range[2]: | | | | | | | |
| San Juan - UT | US 191(s) | 19.0 | 3,575 | 4 | 0.1 | 6 | 0.2 |

[1] CDOW, NDIS (CDOW, 2009b):
- Resident Population - year-round range for a population of animal. The residents use all of the area all year; it cannot be subdivided into seasonal ranges although it may be included within the overall range of the larger population.
- Winter Range - that part of the overall range where 90 percent of the individuals are located during the average five winters out of ten from the first heavy snowfall to spring green-up, or during a site specific period of winter as defined for each DAU.

[2] Utah Gap Analysis, 1997.
- Critical (Crucial) Value Habitat - an area that provides for "sensitive" biological and/or behavioral requisites necessary to sustain the existence and/or perpetuation of a wildlife species.

Construction of the Mill Facility would take nearly two years to complete and would possibly coincide with two consecutive winters. Mule deer and elk wintering on or in the vicinity of the Site would potentially be displaced by construction activity. A barbed-wire fence would be constructed to extend from the existing highway right-of-way fence along the south side of SH 90 to surround the Property Boundary within Section 8, including the southern upslope portion extending to Davis Mesa and vegetated with pinyon-juniper woodland. Mule deer, elk, and pronghorn mortalities occur when they attempt to jump fences and their legs become ensnared between the top two fence wires (Harrington and Conover, 2006). Additional mortality can also occur if the Property Boundary fence would cause mule deer and elk to cross SH 90 more often than they would in its absence. Increased crossing rates are assumed to increase animals' risk of collision with vehicles. Increased mortality could potentially occur for fawns that are unable to cross fences (usually woven wire fence) and die next to the fence. Ninety percent of ungulate carcasses found adjacent to fences were fawns lying in a curled position, probably after being separated from their mothers (Harrington and Conover, 2006).

Most indirect effects to mule deer and other wildlife are associated with degradation and/or alterations to habitats (habitat loss). The Proposed Action could potentially impact mule deer and elk by reducing the amount of habitat available and/or causing diminished use of habitats adjacent to human activities. Increased presence of humans in wildlife habitats induced by the action also contributes to indirect (sometimes called "secondary") impact. Examples typically include increased recreation demand (including off-highway vehicle use), increased habitat conversion, habitat degradation by human encroachment, and increased illegal harvest (Comer, 1982).

Analysis of potential effects by direct loss of habitat on mule deer and elk by construction of the Proposed Action is based on 1) total exclusion of ungulates from within the barbed-wire fenced Property Boundary that would result in loss of functional habitat, 2) CDOW's estimates of mule

BLM_0045297

deer and elk populations in 2008 within respective DAUs, 3) mapped extents of winter range, severe winter range, and winter concentration areas within each DAU, 4) CDOW's definitions for population use of various wintering ranges by mule deer and elk (see footnote 4 in Table 4.5-5), and 5) assumed random distribution of each population within ranges according to CDOW's definitions in item number 4.

As defined, winter range supports 90 percent of the population during the average five winters out of ten while severe winter ranges are smaller areas within winter range that support 90 percent of the population during the worst, most severe two out of ten winters. Winter concentration areas are also smaller areas within winter range on which animal densities are (at least) 200 percent greater than the surrounding winter range density during average five of ten winters. Consequently, densities of animals on winter concentration areas, $a$, and densities on remaining non-concentration areas, $b$, must equal the overall animal density on the winter range, $w$, relative to the proportion of winter concentration area, $p$, within the winter range and the proportion of the winter non-concentration area, $q$, (where $q = 1 - p$). Thus, $w = a \times p + b \times q$. Because the animal density on winter concentration areas, $a$, is 3 times greater (equivalent to 200 percent greater) than densities on winter non-concentration areas, $b$, $a = 3b$. Solving for $b$: $b = (w / (3p + q))$.

These assumptions, definitions, and computations were used to estimate densities of mule deer and elk within winter ranges, severe winter range, winter concentration areas, and winter non-concentration areas and then, based on the area within each range that would be directly removed by construction of the Proposed Action, an estimate of how many animals (mule deer and elk) would have been supported by the affected winter ranges was computed and is provided in Table 4.5-5. The amount of mule deer winter range that would be excluded by the Proposed Action (854.16 acres of the Site surrounded by a boundary fence) would support approximately 22 mule deer during average five out of ten winters, based on 2008 population estimates for deer in DAU 24. No mule deer winter concentration areas would be directly affected by the project. The project would affect the non-concentration portion of the winter range so that, if mule deer became distributed on winter concentration areas (where densities are at least 200 percent greater than the surrounding winter range) during average five out of ten winters, then habitat on the non-concentration area affected by the Proposed Action would have supported 14 mule deer. However, the direct loss of severe winter range due to construction of the Proposed Action would have otherwise supported 48 mule deer on the Site during the worst two out of ten winters (Table Terrestrial-4.5-5).

The effects of construction, however, could alter mule deer and elk distributions on winter ranges some distance away from the Property Boundary. A study of mule deer response to natural gas wellfield development in Wyoming revealed that wintering mule deer avoided roads with high traffic volumes (263 to 350 vehicles per day) by an average distance of 4 miles. Mule deer avoided roads with moderate traffic volumes (19 to 30 vehicles per day) by an average of 1 mile, but their avoidance of roads with low volumes (up to 12 vehicles per day) averaged 0.5 mile (Sawyer et al., 2006). Wintering elk also are affected by roads and were found to reduce their use of habitats by distances up to 0.75 mile from roads, less than their avoidance of roads during summer, which was up to 1.7 miles from roads. Greater avoidance of roads by summering elk was likely due to higher traffic volume and recreational use in summer than in winter (Sawyer et al., 2007).

BLM_0045298

**Table 4.5-5**
**Areas of Mule Deer and Elk Winter Ranges that Would Be Potentially Affected by Construction and Operation of the Mill Facility with Estimated Densities of Animals on Each Range and Numbers of Animals Supported by Each Affected Winter Range**

| Winter Range Type | Total Area (acres) of Habitat In DAU | Density of Animals in Winter Range (animals per acre) | Area (acres) of Range Directly Affected by Project | Estimated Number of Animals Supported by Affected Winter Range |
|---|---|---|---|---|
| Mule Deer - DAU Population in 2008 = 27,160 deer | | | | |
| Winter Range [1] | 943,119 | 0.026 | 854.16 | 22.1 |
| Severe Winter Range [2] | 430,942 | 0.057 | 854.16 | 48.4 |
| Winter Concentration Area [3] | 264,796 | 0.050 | 0 | 0 |
| Winter Non-Concentration Area [4] | 678,323 | 0.017 | 854.16 | 14.2 |
| Elk - DAU Population in 2008= 19,530 elk | | | | |
| Winter Range [1] | 1,291,978 | 0.014 | 854.16 | 11.6 |
| Severe Winter Range [2] | 654,724 | 0.027 | 854.16 | 22.9 |
| Winter Concentration Area [3] | 281,113 | 0.028 | 792.99 | 22.6 |
| Winter Non-Concentration Area [4] | 1,010,865 | 0.009 | 61.17 | 0.6 |

[1] Winter Range - that part of the overall range where 90 percent of the individuals are located during the average 5 winters out of 10 from the first heavy snowfall to spring green-up, or during a site specific period of winter as defined for each DAU.
[2] Severe Winter Range- that part of the overall range where 90 percent of the individuals are located when the annual snowpack is at its maximum and/or temperatures are at a minimum in the two worst winters out of ten.
[3] Winter Concentration Area – that part of the winter range where densities are at least 200 percent greater than the surrounding winter range density during the same period used to define winter range in the average five winters out of ten.
[4] Winter Non-Concentration Area – that portion of the winter range that is not a winter concentration area and supports densities at least 200 percent lower than winter concentration areas in the average five winters out of ten.

**Small Game.** Impacts to small game species during construction would be similar to those described above in Section 4.5.1.1, General Impacts.

**Migratory Birds.** The Migratory Bird Treaty Act prohibits "taking" migratory birds, parts, nests and eggs of trust species covered by the Act. Most migratory birds nest between May 15 and July 15 and based on the based the possibility for a "take," BLM has adopted Best Management Practices (BLM, 2007) that include imposing a timing limitation on use authorizations to mitigate vegetative disturbing activities during the primary portion of the nesting season between May 15 and July 15. Construction of the project would require removing 247.6 acres of big sagebrush shrubland and 167.0 acres of mixed grassland (see Table 4.5-1). Numerous species of migratory birds nest in both vegetation types including Brewer's sparrow (a Bird of Conservation Concern) and others that were observed on-site.

The Proposed Action would require construction of an additional overhead electrical power line. San Miguel Power Association, Inc. (SMPA) plans to supply electric power to the facility via an existing 69 kilovolt overhead distribution line paralleling SH 90. The new electrical power line would extend from SH 90 to the Site for approximately 1.03 miles. Some migratory birds, especially raptors, are susceptible to electrocution on power lines, which can occur whenever a bird touches a conductor while perched on a grounded crossarm, or touches two phase conductors or a conductor and groundwire simultaneously while in flight (Janss and Ferrer, 1999; Bevanger, 1994). Bird species susceptible to electrocution use powerlines and power poles as hunting and resting perches and/or nesting structures, as well as have large wingspans to connect two sources of electricity (Avian Power Line Interaction Committee - APLIC, 1996). Species found within the Site that may be affected by electrocution belong to the following orders: Falconiformes (eagles, hawks, kites, falcons, and osprey), Strigiformes (owls), and Passeriformes (perching birds; Janss, 2000; Bevanger, 1998; Roig-Soles and Navazo-Lopez,

BLM_0045299

1997). Electrocution of some species may increase temporally during juvenile dispersal, as observed for owls (Sergio et al., 2004) and eagles (Harmatta et al., 1999).

Power lines built prior to the 1970s may put birds at a higher risk for electrocution, because older power lines often have conductors and groundwires close together, and/or conductors placed on top of the cross bars as opposed to below the cross bars, which create more potential to electrocute birds (APLIC, 1996). Another feature that may increase the number of birds electrocuted is the material that power poles are made from:  steel or wood. It has been demonstrated that steel power poles electrocute more birds than wooden power poles, because the steel components act as electric conductors for perched birds. Although electrocutions occur with high and low voltage lines, most electrocutions do occur on lower voltage, distribution lines (APLIC, 1996).

In the past 35 years several power line designs have been created, which have decreased the electrocution rate for most bird species. Modifications to existing transmission lines or that have been incorporated into new transmission lines have been effective at reducing the number of casualties resulting from electrocution. Because the Site does not have a lot of perching sites there is potential for use of the new power line to be used as perch sites that would be frequented by hunting raptors. However, potential for electrocution of raptors should be minimized from new transmission line designs, including spacing of conductors and adequate insulation.

Other migratory bird species with declining trends are likely to nest in the pinyon-juniper habitat (western wood-pewee, black-billed magpie, rock wren, black-headed grosbeak), but there will not be any vegetation removed in pinyon-juniper habitat. Noise levels in pinyon-juniper habitat generated during construction of the Mill Facility would be above ambient noise levels. If increased noise occurs during nesting, species such as those above, and juniper titmouse (a Bird of Conservation Concern) could abandon nests within the affected area. If that occurred, it would be a short-term effect to individuals or nesting pairs and would not be likely to pose additional risk of population declines for those species by the Proposed Action.

**Non-Game Wildlife.** Impacts to non-game wildlife during construction would be similar to those discussed above in Section 4.5.1.1, General Impacts.

Aquatic Species

Impacts to non-game fish species due to construction are not anticipated unless there is an accidental release of petroleum products into the Dolores River or San Miguel River while en route to the Site. Potential effects are discussed above in Section 4.5.1.1, General Impacts.

#### 4.5.1.2.2   Operations

Vegetation

Indirect impact to vegetation may occur during operation of the Mill Facility if the Proposed Action displaces native and domestic herbivores, causing excessive browsing and/or grazing on vegetation resources that would otherwise not occur. Indirect impact to native vegetation could also occur if invasive, non-native species become established in disturbed areas and result in infestations that may limit or prohibit growth of native and/or desirable species. Weed seeds or cuttings of some species could be transported naturally (wind and water) or accidentally (vehicles or other equipment) to the disturbed areas. Also, weed seeds may be present in the native soil materials and the removal of vegetative cover and soil disturbance may promote weed establishment at the expense of the native species. Soil disturbance and potential weed

BLM_0045300

distribution due to surface disturbance, increased vehicle traffic, equipment placement and operation, foot traffic, and other activities associated with the Proposed Action may promote the spread of invasive plants and noxious weeds. Surface disturbance at the soil stockpiles that would be revegetated within one growing season of construction would be less likely to be infested by weeds than if left as exposed soil for longer periods.

<u>Invasive, Non-Native Species</u>

The potential for invasive, non-native species to become established, as described above and during construction, will continue during operation. Introduction of additional noxious and invasive weed species may occur as a result of ore trucks entering the Site from mines outside the county or state, including species not currently located at or within the vicinity of the Site.

<u>Federally Listed Threatened and Endangered Species</u>

**Canada Lynx.** Increased traffic (see Section 4.2, Transportation) due to long-term operation of the Mill Facility could potentially contribute to mortality of Canada lynx if dispersing animals are in the region. The extent of that contribution, however, is impossible to predict. Increased secondary impacts in the region surrounding the Mill Facility, not necessarily including the project area *per se,* (Comer, 1982) are possible due to an increased human population base and/or access, whether as a result of the requirements of the action itself (the workforce needed to construct or operate the Proposed Action) or as a consequence of the action (need for ancillary goods, services, opportunities resulting from the project).

Potential indirect or secondary effects could potentially include increased recreation demand (including off-highway vehicle – OHV use), increased habitat conversion, habitat degradation by human encroachment, and increased illegal harvest (Comer, 1982). Illegal shooting of lynx within the region surrounding the Site and/or within the region could potentially increase above existing levels due to similar secondary impacts and improved access. Improved access could lead to increased legal furbearer harvest. Inadvertent legal use of traps targeting other species could result in taking a lynx (USFWS, 2009a); however, the level of risk for mortality due to shooting or trapping is impossible to estimate.

**Mexican Spotted Owls.** Maximum noise at the Property Boundary during operations has been estimated at 60 dBA. Within the closest pinyon-juniper habitat to the Mill Facility (approximately 750 feet away), the maximum noise level is estimated at 64 dBA, less than the expected level sufficient to disturb Mexican spotted owls but loud enough to possibly cause alert behaviors if owls were present.

**Endangered Colorado River Fish.** Operation of the Mill Facility would require water to be withdrawn at the rate of 141 gpm from the Chinle Formation which is hydrologically connected to Dolores River and is within the Upper Colorado River Basin. The water withdrawal equates to an average annual depletion of 227 acre-feet. The USFWS has determined that water depletions within the Upper Colorado River Basin are likely to adversely affect the four endangered fish species and their designated critical habitats. However, the USFWS has also determined that depletion impacts can be offset by 1) one-time contribution to the Recovery Program in the amount of $18.99 per acre-foot (the current rate for Fiscal Year 2009-2010) of the project's annual depletion, and 2) appropriate legal protection of in-stream flows pursuant to State law, and accomplishment of activities necessary to recover the endangered fish species as specific under the Recovery Implementation Program Recovery Action Plan (RIPRAP). Because there is no federal action agency with responsibility for the Proposed Action, Energy Fuels is not required to contribute to the Recovery Program (Gelatt, 2009). Once mill operations

BLM_0045301

begin, however, Energy Fuels proposes to make a one-time contribution of $4,310.73 to the RIPRAP or to another program that is focused on the conservation and recovery of endangered Colorado River fish.

The potential impacts to endangered Colorado River fish from the minute probabilities associated with a spill of uranium/vanadium ore, yellowcake, chemical reagents, or petroleum products in the Dolores River or San Miguel River during operations are the same as those discussed above for endangered Colorado River fish in Section 4.5.1.1, General Impact.

<u>Candidate Species</u>

**Gunnison's Prairie Dog.** During operations, Gunnison's prairie dogs could possibly pass through the chain-link fence and/or burrow beneath. Depths of Gunnison's prairie dog burrows range from 33 inches to over 6.5 feet (Pizzimenti and Hoffmann, 1973) and burrow diameters may be as small as 3.6 inches (Verdolin et al., 2008). Most common mesh sizes for chain-link fence are 2 inches or more (2.25 and 2.375 inches). Gunnison's prairie dogs could suffer direct mortality or injury if they access the evaporation ponds or tailings cells. The raffinate solution and tailings solution is potentially acutely and chronically toxic to wildlife because of low pH and elevated metal concentrations (Visus, 2009).

**Gunnison Sage-grouse.** The Proposed Action could potentially hinder re-establishment of Gunnison Sage-grouse populations in East Paradox Valley during operations. In general, sage-grouse are sensitive to disturbance from roads and noise during breeding (Braun et al., 2002). Females avoid nesting and utilizing brood-rearing habitats in areas with high levels of human presence related to oil and gas industrial activities (Holloran, 2005). The traffic and noise associated with operations and traffic on SH 90 could similarly affect Gunnison Sage-grouse if they do occupy habitats in the Paradox Valley.

<u>BLM Sensitive Species and State of Colorado Species of Special Concern</u>

**Mammals.** Night lighting would be present during operations, and could act as barriers to bat movements such as described during construction. Loss of foraging habitat can adversely affect bats. Potential use by foraging bats of the retention pond on the southern end of the Site may be limited by noise and other disturbances associated with operations. The Proposed Action would impact 247.6 acres of big sagebrush and 167.0 acres of mixed grasslands that provide feeding habitats for these species (CDOW, 2009b).

Revegetation of disturbed sites with grasses may attract Botta's pocket gophers. Potential impacts to pocket gophers would be similar to that described above for Gunnison's prairie dog if they were to enter the evaporation ponds and tailings cells.

The potential impacts to river otters associated with a spill of uranium/vanadium ore, yellowcake, chemical reagents, or petroleum products in the Dolores River or San Miguel River during operations are the same as those discussed above for endangered Colorado River fish in Section 4.5.1.1, General Impact.

**Birds.** Increased traffic during operations would increase the potential for vehicular collisions with wildlife and potential mortality for bald eagles scavenging along roadsides.

Project components within 300 meters of potential burrowing owl nesting sites (i.e., abandoned Gunnison's prairie dog burrows) include the barbed wire perimeter fencing, spoil storage sites, access roads, and pipelines to water wells. The barbed wire fence could provide additional

BLM_0045302

elevated perches near potential nest burrows in grassland areas used for foraging, potentially benefiting the western burrowing owl. However, the spoil storage sites would be approximately 30 feet high, altering the existing, relatively flat and open landscape. It is possible that burrowing owls would permanently vacate the abandoned prairie dog burrows along the western portion of the Site adjacent to the spoil storage sites, although the amount of disturbance that burrowing owls will tolerate before nest desertion is unknown (Marks and Ball, 1983).

Western burrowing owls and other burrowing mammals inhabit mixed grasslands. Approximately 167.0 acres of mixed grassland habitat would be removed and/or disturbed during construction of the Mill Facility, removing potential suitable grassland habitat available within the Site that could be used by burrowing mammals, providing potential habitat for western burrowing owls. Indirect effects are possible to potential western burrowing owl foraging habitat such as mixed grasslands within 300 meters (984 feet) of disturbances that provide low vegetation cover and allows visibility and access to prey. Access roads would traverse through mixed grassland habitat, increasing fugitive dust and potentially affecting burrowing owl prey species.

One threat identified for the western burrowing owl includes collisions with moving vehicles and barbed wire fence because this species flies low to the ground (USFWS, 2003b). It is possible that an increase in traffic associated with the Proposed Action and erection of barbed wire fence along the perimeter of the Site may increase owl mortality.

**Fish.** The potential impacts to fish species of special concern associated with a spill of uranium/vanadium ore, yellowcake, chemical reagents, or petroleum products in the Dolores River or San Miguel River during operations are the same as those discussed above for endangered Colorado River fish in Section 4.5.1.1, General Impact.

Terrestrial Wildlife

**Big Game.** Increases in traffic during operations are discussed above in Section 4.2, Transportation. Increased traffic could potentially increase mule deer mortality on several routes. Similarly, elk vehicle-related mortality would most likely increase during operation of the Mill Facility. Increased pronghorn mortality due to traffic associated with operations is expected to be minimal. As described for project effects during construction, mule deer and elk wintering in the vicinity of the Site could suffer direct mortality due to additional fencing proposed along the perimeter of the Property Boundary.

Most indirect effects to mule deer and other wildlife are associated with degradation and/or alterations to habitats (habitat loss). The Proposed Action would impact mule deer and elk by reducing the amount of habitat available and/or causing diminished use of habitats adjacent to human activities, as described above under construction. There would be long-term similar losses of habitats supporting elk on winter range, severe winter range and winter concentration areas. Because densities of elk on winter ranges are less than mule deer densities, numbers of elk supported by lost habitat are less than effects to mule deer.

Due to increased traffic, mule deer are likely to disperse away from the location as described above for construction. Similar dispersion of wintering elk away from the Site during operations is also expected and could result in lower winter habitat functionality as a result.

**Small Game.** Impacts to small game species during operations would be similar to those described above in Section 4.5.1.1, General Impacts. Small game birds and mammals are not expected to be affected by compounds present in the evaporation pond or the tailings cells.

BLM_0045303

Case No. 1:20-cv-02484-MSK   Document 40-5   filed 04/27/21   USDC Colorado   pg 76 of 271

Construction of a 6-foot chain-link fence topped with three-strand barbed wire surrounding each facility is expected to be a completely effective deterrent to small game mammals (assumed to be lagomorphs and carnivores). Bird netting would be placed on wooden support poles elevating it over the evaporation pond. The netting would completely seal off access to the pond because nets would be fastened at the base to wood furring strips. The bird netting is designed with two-inch openings to prevent access from waterfowl and presumably would prevent small game birds (e.g., mourning doves) from penetrating the 2-inch net mesh. However, as discussed below for migratory bird species, the 2-inch net mesh currently included in the netting design is larger than mesh recommended by USFWS for excluding most migratory bird species from pits or ponds.

Three tailing cells have been proposed, each covering approximately 30 acres. Each tailings cell would provide capacity for approximately 13 years after which, the cell would be closed with a vegetative cap and the next cell put into use concurrently. During the operative life of the tailings cell, the tailings solution from the tailings slurry would collect on the surface and be recovered and pumped back to the mill for reuse by a floating pump barge. At most, the tailings solution could encompass an area of approximately 30 acres. The tailings solution can be acutely and chronically toxic to wildlife because of its low pH and elevated metal concentrations (Visus, 2009).

To discourage bird use of the fluctuating levels of tailings solution that collects within the tailings cells, Energy Fuels has proposed to place bird balls on top of the ponded portion of the cells to effectively eliminate birds from landing on the water. Bird balls float on top of exposed water and prevent birds from landing on the water by creating a physical barrier and disguising the surface of the water within the tailings cells. USFWS (2009f) has identified the use of bird balls as a potential solution to excluding wildlife and preventing mortality at various industrial wastewater impoundments including cyanide ponds, coal-fired power plant evaporation ponds, and acidic water impoundments. For example, bird balls have been used effectively to deter birds from using ponds at the Yatela gold mine in Mali, significantly reducing the amount of bird deaths associated with leach ponds from 554 per year to just two bird deaths per year (AngloGold Ashanti, 2004 and 2005).

Use of bird balls are generally accepted as an effective means of excluding small game birds (e.g., mourning doves) from the ponded water within the tailings cells. Mill Facility personnel would inspect the tailings cells on a daily basis and identify and record any wildlife mortalities, and where possible, implement measures to reduce or eliminate future occurrences.

**Migratory Birds.** Impacts to migratory birds during construction could potentially result from birds landing in the tailings cells or evaporation ponds. This would be greatly reduced by the use of netting and bird balls as discussed above for Small Game.

**Non-Game Wildlife.** Impacts to non-game wildlife during construction would be similar to those discussed above in Section 4.5.1.1, General Impacts. In addition, direct mortality could occur if non-game wildlife are able to access the evaporation ponds and/or tailings cells as discussed above for Small Game.

Aquatic Species

Potential impacts to fish species of special concern during operations would be associated with a spill of uranium/vanadium ore, yellowcake, chemical reagents, or petroleum products in the Dolores River or San Miguel River during operations are the same as those discussed above for endangered Colorado River fish in Section 4.5.1.1, General Impact.

BLM_0045304

### 4.5.1.2.3   Closure

<u>Vegetation</u>

The majority of the Site would be returned to rangeland use, with the exception of the tailings cells, which would be capped with an engineered soil cover. The engineered covers are designed to isolate the byproduct material and eliminate the potential for the byproduct to enter groundwater (Kleinfelder, 2009c). The tailings cell cover would be covered with rock mulch while the outslopes would be covered with rock. All areas would be seeded; however, vegetation on the tailings cells would likely be more sparse than surrounding areas due to the rock armor. On other areas of the Site, successful and timely revegetation efforts are critical to establishing good vegetative growth and minimizing weeds.

<u>Invasive, Non-Native Species</u>

The potential for invasive, non-native species to become established, as described above and during construction, would continue during closure.

<u>Federally Listed Threatened and Endangered Species</u>

**Canada Lynx.** Risk of vehicle collisions with lynx would be less during closure than during construction or operations.

**Mexican Spotted Owls.** Risk of impact to Mexican spotted owl due to noise during closure is unknown because the species' distribution at that time cannot be predicted.

**Endangered Colorado River Fish.** Impacts to endangered Colorado River fish species due to closure are not anticipated unless there was an accidental release of petroleum products into the Dolores River or San Miguel River while en route to the Site. Potential effects are discussed above in Section 4.5.1.1, General Impacts.

<u>Candidate Species</u>

**Gunnison's Prairie Dog.** Impact to Gunnison's prairie dogs are not expected during closure. A bio-intrusion barrier would be placed on top of the tailings cell materials which would consist of three-inch rock (cobbles) in a native soil matrix to restrict burrowing animals up to the size of prairie dogs (Kleinfelder, 2009c; Golder, 2009c).

**Gunnison Sage-Grouse.** During the closure of the Mill Facility, Gunnison Sage-grouse could be impacted by noise as discussed above for construction and operations.

<u>BLM Sensitive Species and State of Colorado Species of Special Concern</u>

**Mammals.** Similar effects to bats' echolocation due to noise expected during construction would also affect bats during site closure.

**Birds.** Traffic associated with closure would be considerably less than during construction or operations and therefore, the risk of vehicle collisions with bald eagles would be less.

Risk of impact to western burrowing owls due to noise 40 years from now is unknown because the species' distribution at that time cannot be predicted.

BLM_0045305

**Fish.** Impacts to aquatic species during closure are not anticipated unless there is an accidental release of petroleum products into the Dolores River or San Miguel River while en route to the Site. Potential effects are discussed above in Section 4.5.1.1, General Impacts.

Terrestrial Wildlife

**Big Game.** Risk of vehicle collisions with mule deer and elk would be less during closure than during construction and operations.

**Small Game.** Impacts to small game species during closure would be similar to those described above in Section 4.5.1.1, General Impacts. It is expected that burrowing animals up to the size of prairie dogs would be restricted from the tailings cells by the bio-intrusion barrier.

**Migratory Birds.** During closure, much of the same equipment that was used during construction is expected. Noise effects to breeding migratory birds are likely to be similar to effects during construction and operation.

**Non-Game Wildlife.** Impacts to non-game wildlife during closure would be similar to those discussed above in Section 4.5.1.1, General Impacts.

Aquatic Species

Impacts to aquatic species during closure are not anticipated unless there is an accidental release of petroleum products into the Dolores River or San Miguel River while en route to the Site. Potential effects are discussed above in Section 4.5.1.1, General Impacts.

**4.5.2   Protective/Mitigation Measures**

Vegetation

The following protective/mitigation measures would be implemented to mitigate impacts to vegetation resources from construction, operation, and closure of the Proposed Action:

- Energy Fuels would develop and implement a weed control plan to minimize potential impacts and expansion of noxious weeds (CDOW, 2008).

- During construction, Energy Fuels would retain and stockpile topsoil (6 to 12 inches) and vegetative matter to use during interim and final reclamation of the Site as described in the *Specifications for Closure and Reclamation of Mill Facilities* (Golder, 2009c). Topsoil stockpiles would be seeded and mulched, using certified weed-free seed mix and mulch during the first appropriate growing season after topsoil stripping and stockpiling to minimize infestation of invasive and noxious weeds and stabilization during the life of the project.

- During construction, sediment control measures would be utilized, including weed-free hay bales, silt fences, and temporary detention basins as described in the *Stormwater Management Plan* (Golder, 2009a).

- Dust suppression would be used on roads (magnesium chloride, water), ore pads, tailings cells, and evaporation ponds to eliminate fugitive dust from negatively affecting native vegetation within the Site.

- Energy Fuels would implement the measures included in the *Tailings Cell Closure Design Report* (Kleinfelder, 2009c) the *Specifications for Closure and Reclamation of Mill Facilities* (Golder, 2009c), the *Mill Decommissioning Plan* (Kleinfelder, 2009b), and

BLM_0045306

the *Mill Decommissioning and Reclamation Cost Estimate* (Energy Fuels, 2009h) which describe methods for recontouring, topsoil redistribution, soil preparation, fertilization, and revegetation, including a recommended seed mixture, mulching, seeding methods, and timing.

- Energy Fuels would exclude livestock from revegetated and rehabilitated areas to promote complete revegetation. Exclusion would continue until the vegetation in the reclaimed area is established and self-sustaining.

- Energy Fuels would include revegetation status in the reports required by CDPHE.

Wetlands

Although no USACE jurisdictional wetland features or Waters of the United States are expected to be impacted during construction, operation, and closure of the Mill Facility, the following design measures would be implemented to avoid impacts to wetland features:

- Energy Fuels would locate project components and access roads away from the non-jurisdictional retention pond.

- According to Energy Fuels' Stormwater Management Plan (Golder, 2009a), the Mill Facility (the area within the Mill License Boundary) is designed as a "zero discharge" facility, so that all runoff would be contained on-site in lined ponds and cells and recycled for use in the mill. No contaminated water would enter natural drainages or groundwater systems according to the *Facility Operating Plan* (Visus and Energy Fuels, 2009a).

- Surface water runoff outside of the Mill License Boundary would be routed via diversion berms into natural drainage channels on the east and west sides of the Mill License Boundary (Visus, 2009).

- Tailings cells and evaporation pond would be equipped with multiple liners and leak collection and recovery systems to provide containment of 11e.(2) byproduct material during operations. During closure, the tailings would be dewatered and the mill, ore pad, and evaporation ponds would be removed and placed in the final tailings cell. The tailings cells would be capped with an engineered cover that is designed to provide containment of 11e.(2) byproduct material for 200 years, and, to the extent practicable, 1,000 years with no active maintenance or controls to minimize the potential for the 11e.(2) byproduct material to impact groundwater (Kleinfelder, 2009c and Criterion 6(1)(i)).

- Energy Fuels would follow measures in their SPCC (Energy Fuels, 2009b) and Material Containment Plan (Energy Fuels, 2009c) which include methods to contain spills and prevent oils/chemicals from reaching Waters of the U.S.

Invasive, Non-Native Species

The following protective/mitigation measures would be implemented to mitigate impacts from noxious weeds during construction, operation, and closure of the Proposed Action:

- Energy Fuels would develop and implement a Weed Control Plan to minimize potential impacts and expansion of noxious weeds (CDOW, 2008).

- Weed-free sedimentation barriers would be used.

- The soil stockpile would be revegetated during the first growing season to minimize infestation of invasive and noxious weeds.

BLM_0045307

- Revegetation would occur during the first growing season following closure.

- Energy Fuels would conduct weed control monitoring and implement weed control measures, as necessary, on a biannual basis (spring and fall) to limit the occurrence of noxious weeds on the property. The program would start prior to construction and continue until the site is successfully reclaimed. Records would be kept of the weed surveys and herbicide applications.

<u>All Wildlife Species</u>

The following protective/mitigation measures will be implemented to mitigate impacts to threatened, endangered, and candidate species, BLM sensitive species and State of Colorado Species of Special Concern, and terrestrial wildlife from construction, operation, and closure of the Proposed Action:

- Employees would receive environmental awareness training during project orientation. Energy Fuels would provide information about: native wildlife including ESA-listed species, BLM sensitive species and Colorado State special status species, and terrestrial wildlife within the Site and vicinity, sensitivity to various kinds of impacts; consequences of poaching; information about federal and state wildlife laws.

- Recreational hunting would not be allowed on Site. Energy Fuels would encourage its employees and contractors to report any incidents of poaching immediately to the CDOW, such as through the program "Operation Game Thief." Energy Fuels would place "No Hunting" signs on the Property Boundary.

- Energy Fuels would erect a 6-foot chain-link fence topped with three strands of angled barbed wire around the tailings cells and evaporation ponds to eliminate entry of larger terrestrial wildlife (Visus, 2009). A fine mesh wire fence or hardware cloth apron extending 2 feet below the ground surface would be buried around the outside perimeter of the chain-link fence to minimize or eliminate burrowing animals from entering tailings cells and evaporation ponds. Fine mesh fencing extending to 3 feet above ground around the inside perimeter of the chain-link fence would be placed to prevent smaller, ground-dwelling wildlife (i.e., pocket gophers and other rodents, lizards, and snakes) from entering tailings cells and evaporation ponds. Energy Fuels would inspect the fence daily, and repair, as necessary.

- Bird netting would be placed over the evaporation pond to eliminate birds and other wildlife species from entering potentially toxic raffinate solution. Netting would be securely fastened to the pond-top perimeter to seal off access to the ponds at ground-level.

- Bird balls would be used in the ponded portion of tailings cells to disguise the tailings solution and prevent birds from landing on the tailings solution (USFWS, 2009f).

<u>Threatened, Endangered, and Candidate Species</u>

The following protective/mitigation measures would be implemented to mitigate impacts to threatened, endangered, and candidate species from construction, operation, and closure of the Proposed Action:

- Energy Fuels may cooperate in ongoing efforts to reopen sagebrush habitats/remove pinyon-juniper woodlands on Monogram Mesa to mitigate for impacts to Gunnison Sage-grouse by the Proposed Action. The off-site mitigation could create usable habitat further

south and east of the Site and close the gap between occupied habitat in Dry creek Basin and potentially suitable habitat in East Paradox Valley.

- Energy Fuels would follow measures in their *SPCC Plan* (Energy Fuels, 2009b) and *Material Containment Plan* (Energy Fuels, 2009c) which include methods to contain spills and prevent oils/chemicals from reaching Waters of the U.S.

<u>BLM Sensitive Species and State of Colorado Species of Special Concern</u>

The following protective/mitigation measures would be implemented to mitigate impacts to BLM sensitive species and State of Colorado Species of Special Concern from construction, operation, and closure of the Proposed Action:

- To minimize attracting bats and disrupting bat feeding behaviors, Energy Fuels would utilize monochromatic orange sodium lamps that do not attract insects or bats, except in those locations where health, safety, or security considerations require additional lighting. Night lighting would be the direct cut-off variety that point down and minimize lateral light glare.

- Energy Fuels would conduct burrowing owl surveys prior to construction and soil storage site use. If this species is present, Energy Fuels would maintain a 328- to 984-foot (100 to 300 meter) disturbance buffer around nest burrows to prevent possible disturbance to adjacent burrows and foraging habitat (Colorado Partners in Flight, 2000a). Energy Fuels would avoid affecting occupied burrows until vacated. If destruction of potential burrows is unavoidable, Energy Fuels would consider creating artificial burrows away from impacted areas (see Marks and Ball, 1983).

- Energy Fuels would minimize fugitive dust on adjacent burrowing owl foraging habitat from access roads and milling operations through application of magnesium chloride and/or water on the roads and pads.

<u>Terrestrial Wildlife</u>

The following protective/mitigation measures would be implemented to mitigate impacts to terrestrial wildlife from construction, operation, and closure of the Proposed Action:

- Risks of collisions of project-related vehicles with big game and other terrestrial wildlife would be reduced but not eliminated with the majority of ore, reagent, and fuel deliveries scheduled during daylight hours.

- Energy Fuels would erect barbed wire perimeter fencing around the Property Boundary to permit big game passage to the extent possible. Fence would be no taller than 42 inches with at least 12-inch spacing between the top two wires to minimize big game entanglement with the fence. Bottom wire would be at least 16 to 18 inches off the ground to allow passage of young deer and elk. If domestic cows with calves are present in adjacent pastures and calf penetration is an issue, fencing could be designed so that the bottom wire could be lowered although bottom wires 16 inches off the ground would hold livestock. Energy Fuels would visually inspect and maintain the fence, as needed, so that wires are taut to minimize entanglement.

- Vegetation removal would occur prior to May 15 or after July 15 to avoid take of migratory bird species, nests, or eggs (BLM, 2007).

- Energy Fuels would require that contractors install raptor-safe transmission lines and they would be inspected to determine if raptor perch deterrents are warranted.

BLM_0045309

- Energy Fuels would use bear-resistant containers and collect refuse frequently to minimize potential for conflicts with bears at the Site.

- The Site would be revegetated with species that are palatable for livestock and wildlife. Weeds would be controlled to maintain native vegetation.

- Energy Fuels would coordinate with CDOW to develop a Habitat Improvement Plan (HIP) to provide off-site compensatory mitigation that would improve wildlife habitat within the vicinity of the Site (CDOW, 2008). Potential projects could include:

  o Weed management and control actions on big game winter ranges and/or Gunnison Sage-grouse nesting, brood-rearing, and/or wintering ranges;
  o Road decommissioning with habitat restoration;
  o Control of pinyon-juniper vegetation encroachment into sagebrush-dominated habitats to enhance habitat for wintering big game, Gunnison Sage-grouse, and sagebrush obligate wildlife species.
  o Options/practices to include maintaining open space, excluding subdivisions and keeping an agricultural base of operations compatible with wildlife, excluding fencing or other developments that are restrictive to wildlife migration and movement, or grazing management systems.
  o Grazing management to include options, with the owner's or permittee's concurrence, to improve habitat quality for wildlife.
  o Habitat improvements may be considered as standard procedures for managing habitat, or for offsite mitigation where important habitats could potentially be improved to restore habitat functions impacted in other areas (i.e., reintroduce controlled burns, develop water resources, eliminate cheatgrass, etc.).

<u>Aquatic Species</u>

The protective/mitigation measures for Aquatic Species would be the same as those listed for Wetlands.

### 4.5.3   Monitoring

Every 5 years, prior to renewing the Mill License with the CDPHE, Energy Fuels would conduct surveys at the Site and immediate vicinity for Threatened, Endangered, and Candidate Species, BLM Sensitive Species, and State of Colorado Species of Special Concern, as well as for wildlife. The potential species present would be determined by a qualified biologist using information provided by the BLM, CDOW, and the USFWS. The RSO would review the survey results and summarize the findings for submittal to the CDPHE as part of the license renewal application.

Revegetation monitoring of disturbed areas would be conducted following seeding of disturbed areas. This includes reclamation concurrent with operations when practical. Species used for revegetation will include native grasses and forbs as specified in the *Specifications for Closure and Reclamation of Mill Facilities Report* (Golder 2009c). Revegetated areas would be monitored to document the success of the seeding efforts and identify areas where further efforts (e.g. reseeding, installing temporary structural erosion controls, etc.) may need to be employed. Revegetation is a stormwater BMP; therefore, its progress would be evaluated on a monthly basis during BMP Inspections. Disturbed areas are considered satisfactorily revegetated when the vegetative cover is sufficient to minimize erosion.

Energy Fuels would conduct a weed survey of the Site in the spring and in the fall and would implement subsequent weed control measures to minimize the occurrence and spread of

BLM_0045310

noxious weed species. Weed survey results would be reported to the CDPHE in the annual report along with measures and practices employed for weed control including Pesticide Application Records.

A discussion of radiological monitoring associated with ecological resources is provided in Section 4.11, Public and Occupational Health.

## 4.6    AIR QUALITY

### 4.6.1   Environmental Impacts

#### 4.6.1.1   General Impacts

Energy Fuels submitted an air permit application to the CDPHE Air Pollution Control Division (APCD) for authorization to construct the Mill Facility (Kleinfelder, 2009a) and would be required to obtain approval of the Construction Permit prior to commencing construction of the Mill Facility. Once the Construction Permit has been approved, Energy Fuels will have 18 months to begin construction unless a time extension is approved due to various acceptable circumstances. The air permit application is based on processing 1,000 tpd of uranium/vanadium ore; however, the Mill Facility would initially process 500 tpd of uranium/vanadium ore. Energy Fuels plans to ultimately ramp up to processing 1,000 tpd of uranium/vanadium ore so to avoid potential circumvention of the air quality rules, the air permit application must be based on the planned 1,000 processing rate even though other regulatory permits would initially be based on the 500 tpd processing rate.

Energy Fuels submitted several Air Pollutant Emission Notices (APENs) to APCD (Kleinfelder, 2009a and 2009j) detailing estimated project emissions during operations. Emissions associated with construction and closure, for the most part, are not required to be addressed in the APENs or the air permit application. Therefore, most of this discussion focuses on potential impacts during operation of the Mill Facility. Emissions of radionuclides and associated potential impacts are discussed in Section 4.11, Public and Occupational Health.

#### 4.6.1.2   Construction, Operations, and Closure Impacts

##### 4.6.1.2.1   Construction

Emissions during construction would be limited to those associated with land-clearing and construction equipment and would include particulate matter emissions in the form of fugitive dust and combustion emissions associated with fuel-burning equipment. Because the land development for the Proposed Action is expected to continue longer than 6 months in duration and would cover an area greater than 25 acres in size, Energy Fuels would be required to prepare an APEN form for land development. Energy Fuels would also be required to follow measures described in the Fugitive Dust Control Plan included in the APEN to minimize fugitive dust.

##### 4.6.1.2.2   Operations

The APCD uses the information provided in the APENs to determine whether the development project requires an air permit. The APCD completed their preliminary analysis and requested additional information. Energy Fuels provided the additional information in November 2009 (Kleinfelder, 2009j).

Emissions from the Mill Facility would be considered either non-fugitive emissions or fugitive emissions. Fugitive emissions are emissions from facilities or activities that could not reasonably pass through a stack, chimney, vent, or other equivalent opening. In determining if a facility is a

BLM_0045311

"major source" or "minor source," only non-fugitive emissions would be considered for comparison against the thresholds for facilities that are not considered a "Categorical Source" by the EPA (of which the Mill Facility is not). Potential emissions from the Mill Facility do not exceed the thresholds for a major source permit and therefore, Energy Fuels is seeking a "minor source permit" from the APCD. Based on the estimated emissions, the Prevention of Significant Deterioration (PSD) thresholds would also not be exceeded.

In conversations between Energy Fuels and APCD, $PM_{10}$ is the only emission that is anticipated to be a concern and therefore, Energy Fuels conducted baseline monitoring for $PM_{10}$ to get a background concentrations at the Site as reported in the *Meteorology, Air Quality, and Climatology Report* (Kleinfelder, 2009i). Impact modeling will be conducted to demonstrate that $PM_{10}$ emissions added to this background measurement would not cause an exceedance of either the National Ambient Air Quality Standards or the Colorado Ambient Air Quality Standards.

<u>Emissions Inventory and Controls</u>

Kleinfelder (2009a) estimated both the controlled and uncontrolled potential to emit emission values. These are summarized in Table 4.6-1 and are provided in detail in the APENs submittal (Kleinfelder, 2009j).

The process components for the Mill Facility have been categorized into the following specific areas:

- Area 100 – Ore Handling and Grinding
- Area 200 – Leaching
- Area 300 – CCD Thickeners and Tailings Disposal
- Area 400 – Uranium Solvent Extraction (SX)
- Area 500 – Uranium Precipitation
- Area 600 – Vanadium Oxidation and SX
- Area 700 – Vanadium Precipitation
- Area 800 – Reagents
- Area 900 – Utilities and Buildings
- Area 1000 – General Plant.

A description of the specific process areas is provided in Section 2.0, Alternatives. Potential emission sources as well as emission controls for each area are briefly described below.

**Ore Handling and Grinding.** Sources of fugitive particulate matter emissions include ore delivery truck travel on the main haul road, unloading the ore from the trucks onto the dumping platform, transferring the ore from the dumping platform to the ore pad, and wind erosion of the ore stockpiles. The feed system processes including unloading ore into the grizzly screen to the apron feeder, transferring ore from the apron feeder to the conveyor belt, and transferring ore from the conveyor belt to the Mill would also be sources of particulate matter emissions. Once the ore is mixed with water and ground into slurry, particulate matter emissions are considered to be negligible. Particulate matter emissions would be controlled by enforcement of low speed limits, treatment of roads with magnesium chloride, motion sensing water sprays, and spraying the ore stockpiles and the ore pad travel routes with water. Drive-through curtains would be placed over the open side of the feed hopper building and water sprays would be located at the grizzly screen. Air from the grizzly screen, coarse feed hopper, and apron feeder area would be vented to a dust collecting baghouse. A dust scrubber would be connected to the discharge end of the SAG Mill with a control efficiency of 99 percent.

BLM_0045312

**Table 4.6-1**
**Potential Emissions Associated with Operation of the Mill Facility**

| Emission Type | PM | PM10 | PM2.5 | NOx | SO2 | CO | VOC | Total HAPs | Sulfuric Acid | Ammonia |
|---|---|---|---|---|---|---|---|---|---|---|
| **Controlled PTE** | | | | | | | | | | |
| Fugitive Source Total (tons per year) | 151.07 | 52.97 | 5.80 | 0.00 | 0.00 | 0.00 | 214.00 | 0.03 | 14.21 | 0.00 |
| Non-Fugitive Source Total (tons per year) | 10.45 | 8.75 | 8.50 | 7.24 | 1.78 | 9.54 | 37.05 | 0.20 | 7.76 | 5.15 |
| Total (Fugitive and Non-Fugitive) | 161.52 | 61.71 | 14.30 | 7.24 | 1.78 | 9.54 | 251.05 | 0.23 | 21.96 | 5.15 |
| **Uncontrolled PTE** | | | | | | | | | | |
| Non-Fugitive Source Total (tons per year) | 59.95 | 54.73 | 52.52 | 18.57 | 1.78 | 9.54 | 37.05 | 0.59 | 7.76 | 5.41 |

BLM_0045313

**Acid Leaching.** Sulfuric acid emissions would be generated from the acid leaching process prior to the reactions going to completion and therefore, the pre-leach and leach tanks are enclosed and vented to a wet Venturi scrubber. The pre-leach thickener and pre-leach clarifier tanks are open tanks and would not generate a significant amount of emissions because the chemical reaction is anticipated to be at completion prior to entering these tanks. The Area 200 Venturi scrubber would yield 99 percent control for sulfuric acid emissions.

**Counter Current Decantations Thickeners.** No emissions were calculated for this process.

**Tailing Cells.** Emissions from the tailings cells would include wind erosion of the tailing cell beaches which would create fugitive particulate matter emissions and radionuclides (which are discussed in Section 4.11), and evaporation of the tailings cell solution which would emit VOCs and sulfuric acid mist. During the cooler months, it is anticipated that the beaches would remain moist; however during the hotter months, the beaches would be sprayed with tailings water or raffinate to control particulate matter emissions.

**Evaporation Ponds.** Emissions from the evaporation ponds would include wind erosion of the evaporation pond beaches which would create fugitive particulate matter emissions and evaporation of the solution which would emit VOCs and sulfuric acid mist. During the cooler months, it is anticipated that the beaches would remain moist; however during the hotter months, the beaches would be sprayed with a raffinate spray to control particulate matter emissions.

**Uranium Solvent Extraction.** Particulate emissions would be generated by the diatomaceous earth used in the polishing filters; however, a dust collector with 99 percent control efficiency would be used to control particulate emissions (to less than 1 pound per year) from the bag breaker and mixing tank. Other emissions from this process area include evaporative VOC emissions from the mixer settler tanks and other process tanks.

**Uranium Precipitation.** All emissions associated with this process area are assumed to be negligible.

**Vanadium Oxidation and Solvent Extraction.** Emissions from this process area are mostly evaporative VOCs associated with the mixer settler tanks and other process tanks. Other emissions (inorganic) are assumed to be negligible.

**Vanadium Precipitation and Packaging.** Emissions from this process area would include ammonia emissions; however, the vanadium precipitation tanks and rotary kiln would be vented to a packed-bed wet scrubber to remove the ammonia fumes providing 99 percent control efficiency. Particulate emissions would be generated by the rotary kiln, vanadium dryer, belt filter, casting wheel, and fusion furnace; however, these sources would be vented to scrubbers providing 99 percent control efficiency.

**Reagent Delivery, Preparation, and Storage.** Most of the reagents are exempt from emissions reporting. Sulfuric acid and ammonia are non-criteria reportable pollutants. There would be some sulfuric acid emissions; however, ammonia emissions would be negligible because the storage tank is a pressure vessel designed to prevent vapor from escaping.

Diatomaceous earth, ammonium sulfate, and flocculant would emit particulate matter emissions during the unloading and mixing operations; however, the diatomaceous earth and ammonium sulfate systems are equipped with dust filters for emission control.

BLM_0045314

**Utilities and Buildings.** Emissions from the boilers would result from propane combustion. All three boilers are connected to a single 100-foot-high stack that would vent combustion exhaust to the atmosphere. The boilers would employ 30 ppm low NO$_x$ burners for emission control. Although three boilers exist, only two would be in operation at any given time with the third as a backup.

The gasoline storage tank would generate VOC emissions. Both propane tanks are exempt from emissions reporting based on Colorado Regulation 3, Part II.D.1.zz because the tanks have capacities less than 60,000 gallons and the tanks are pressure vessels sufficient to prevent vapor loss (requirements of Regulation 7, Section IV). All three diesel tanks are exempt from emissions reporting by Regulation 3, Section II.D.1.fff because the tanks have less than 400,000 gallons annual throughput.

**General Plant.** Emissions from the firewater pump engine and standby generator would be generated from diesel combustion; however, neither system employ emission controls as the equipment is used for emergency purposes only. The worker vehicles and product shipment trucks would emit fugitive particulate matter emissions from traveling on the main haul road. Additionally, vehicle traffic on secondary unpaved roads due to security and equipment monitoring would also generate fugitive particulate emissions.

Reasonably Available Control Technology (RACT) Analysis

A review of the APCD regulations pertaining to Reasonably Available Control Technology (RACT) was conducted by Kleinfelder (2009j). Pursuant to 5 CCR-1001-5 3.C.2.a, a facility is required to apply RACT for regulated criteria pollutants in areas that are classified as either nonattainment or that are in attainment with a maintenance program. The Site is in an area that is in attainment and is not under a maintenance program for any regulated criteria pollutant (PM$_{10}$/PM$_{2.5}$, VOCs, NO$_x$, SO$_x$, and CO). Therefore, RACT is not triggered for any criteria pollutant per this rule.

Pursuant to 5 CCR-1001-9 7.V.A, a facility may not dispose of a volatile organic compound (VOC) by evaporation or spillage unless RACT is utilized. According to discussions with the APCD, this regulation is considered to be applicable because the solvent extraction process results in VOC-containing liquids (primarily kerosene) to be discharged to the evaporation ponds and tailings cells where it can then evaporate. Therefore, a RACT analysis is required and has been conducted for reducing VOC emissions from the Proposed Action (Kleinfelder (2009j).

The RACT analysis specifies the effectiveness of control strategies for reducing VOC emissions from the process, tailings cells, and evaporation ponds. Emissions that remain after application of RACT analysis would be considered fugitive emissions subject to approval of the APCD.

**Approach.** RACT is considered to be the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available, considering technological and economic feasibility. Accordingly, the RACT analysis identified reasonably available control technologies and evaluated the economic and technological feasibility of those options. The analysis also evaluated changes to the operational practices, materials used, management practices, and other environmental factors/consequences.

**Conclusions.** Several processing upgrades and waste minimization techniques as well as a review of process control technologies were identified for the RACT assessment. Process upgrades and waste minimization practices that were identified and that would be implemented include the following:

BLM_0045315

Covered uranium and vanadium SX tanks: Covered uranium and vanadium SX tanks would reduce VOC emissions from the process by approximately 90 percent during normal operation and by approximately 75 percent overall considering the tanks may be occasionally opened. The reduction in VOC emissions with the covers is estimated to be 109 tons per year. This option is considered both technologically feasible and economically feasible.

A crud centrifuge and raffinate buffer tank: The raffinate buffer tank and crud centrifuge would be used, respectively, to collect the solvent extraction solution during an upset condition and recover the organic solution from emulsified and entrained mixtures. This technique alone would reduce the amount of kerosene added to the system by approximately 279 tons per year, given two major upset conditions, and therefore by direct mass balance, would reduce the annual VOC emissions from the evaporation ponds by 279 tons per year. This option is considered both technologically feasible and economically feasible.

High efficiency pressure leaf filters: Pressure leaf filters are high efficiency particle removal filters. These filters, used in place of typical sand filters, are designed to effectively remove suspended solids and contaminants from aqueous solutions to minimize the potential for emulsification during the SX process. Use of these filters is estimated to reduce the amount of kerosene added to the organic makeup solution by 25 tons or more per year. This option is considered both technologically feasible and economically feasible.

Energy Fuels also anticipates that some of the residual organics in the raffinate would not evaporate, but rather be permanently entrained with the tailings cells, which would be capped at the time of closure. The process upgrades and waste minimization measures proposed by Energy Fuels would significantly reduce the potential losses of organic compounds thus reducing the amount of organic solution going to the evaporation ponds. Annual kerosene usage would be reduced from 663 tons per year (tpy) to 250 tpy by incorporating feasible process upgrades and waste minimization practices. By mass balance approach, process emissions (non-fugitive emissions) would be reduced from 145 tpy to 36 tpy (a reduction of 109 tpy) and fugitive emissions would be reduced from 518 tpy to 214 tpy (a reduction of 304 tpy) for a total reduction of 413 tpy of VOCs.

In addition to process upgrades for waste minimization, Kleinfelder (2009j) conducted an evaluation of process controls that could be used to remove VOCs from the raffinate solution. The feasibility of implemented each of the control technologies was also evaluated and it was determined that the control technologies are infeasible for direct add-on control of the process effluent without first removing the VOC out of solution into an air stream. The process control technologies evaluated and the reasons for the determination of technically non-feasible include:

Steam stripping: The raffinate stream contains suspended solids and may also contain emulsified crud not suitable for use in a steam stripping column. Also, the raffinate would require extensive pretreatment due to its low pH.

Air stripping: Kerosene has low volatility and would not rapidly enter into the vapor phase, causing this control technology to be highly inefficient.

Biological organic compound destruction: This control technology is very sensitive to environmental factors because living organisms are used.  Due to the fact that the raffinate has high metal concentrations and a low pH, this type of control would not be technologically feasible.

BLM_0045316

<u>Chemical oxidation</u>: Kerosene would not be highly reactive to an oxidation process and other constituents in the raffinate would likely react much faster, causing unknown reactions and emissions, this technology is not considered technologically feasible.

<u>Adsorption</u>: Non-polar compounds, such as kerosene, can be adsorbed onto the surface of activated carbon. Activated carbon is used with non polar compounds however, the ability to desorb (remove) the organic compounds is difficult and the carbon could become easily contaminated by other compounds, suspended solids, and emulsified materials. Therefore, this technology would not be considered technologically feasible.

<u>Membrane separation</u>: Due to the low molecular weight of kerosene and presence of suspended particulates, this technology would not be considered technologically feasible.

<u>Liquid-liquid extraction</u>: Because the raffinate is a mixture or aqueous acids, suspended solids, emulsified materials, and organics, this process would not be considered technologically feasible.

An economic feasibility assessment is not required because no add-on control technology was known to be technologically feasible.

### 4.6.1.2.3   Closure

Emissions during closure would be similar to those during operations. Energy Fuels would implement their Fugitive Dust Control Plan to minimize impacts from fugitive dust emissions.

### 4.6.2   Protective/Mitigation Measures

- Energy Fuels would implement the following protective/mitigation measures to reduce impacts to air quality as a result of the Proposed Action:

- Energy Fuels would enforce low speed limits on roads within the Mill Facility to reduce particulate matter emissions.

- The unpaved main haul road would be treated with magnesium chloride with the first application typically in the spring and two to three additional treatments through the summer, as necessary. Supplemental watering of the road to control fugitive particulate matter emissions may occur during dry and windy periods.

- Motion sensing water sprays would be located at the dumping platform dump points for emission control. Both the ore stockpiles and the ore pad travel routes would be sprayed with either water or a raffinate solution from the Mill.

- Emissions at the feed hopper building area would be controlled through the use of drive-through curtains over the open side of the building as well as water sprays located at the grizzly screen. Further, air from the grizzly screen, coarse feed hopper, and apron feeder area would be vented to a dust collecting baghouse and then through a stack to the atmosphere.

- The vibratory feeder area and discharge end of the SAG mill would be connected to a dust scrubber with a control efficiency of 99 percent.

- The pre-leach and leach tanks would be enclosed and vented to a Venturi scrubber which would provide 99 percent control for sulfuric acid emissions.

BLM_0045317

- During the hotter months, the beaches of the tailings cells and evaporation ponds would be sprayed with tailings water or raffinate to control particulate matter emissions.

- Tanks in the vanadium precipitation and packaging area would be vented to a packed-bed wet scrubber to remove the ammonia fumes providing 99 percent removal efficiency for particulate emissions.

- The diatomaceous earth and ammonium sulfate systems would be equipped with dust filters for emission control.

- Ammonia would be stored in a pressure vessel designed to prevent vapor from escaping.

- Low $NO_x$ burners would be used on the boilers for emission control.

- The uranium and vanadium SX tanks would be covered to reduce VOC emissions from the process by approximately 90 percent during normal operation and by approximately 75 percent overall considering the tanks may be occasionally opened.

- Solvent extraction solution would be collected during an upset condition and the organic solution would be recovered from emulsified and entrained mixtures reducing the amount of kerosene added to the system by 279 tons per year.

- Pressure leaf filters would be used to reduce the amount of kerosene added to the organic makeup solution by 25 tons or more per year.

- Energy Fuels would prepare and implement a Fugitive Dust Control Plan to minimize impacts from fugitive dust during construction and closure.

### 4.6.3   Monitoring

Air quality and meteorological monitoring would occur in accordance with the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b). During construction and operation of the Mill, data would be collected at five air monitoring stations (network) located on site (three stations) and one each upwind and downwind of the site vicinity in order to obtain a representative block of data for assessment. Monitoring would continue through the operational phase and until closure and reclamation activities have been satisfactorily completed. The five monitoring locations, see below, would be the same as those used for baseline data collection (Kleinfelder, 2009i).

For $PM_{10}$ samples, air particulate filters would be run for 24 continuous hours on a 1-in-3 day sampling schedule. Filters would be changed between sampling days. The filters would be submitted to the laboratory for analysis of $PM_{10}$ content on a monthly basis.

Meteorological data would be collected continuously at Air Monitoring Sites No. 1 and No. 2 and retrieved on a daily basis via an automated Data Collection System (DCS). The following parameters are measured based on EPA MMGRMA guidance (EPA, 2000): wind speed, direction and sigma theta; vertical wind speed; temperature; relative humidity; delta temperature; barometric pressure; solar radiation; precipitation (Site No. 1 only); and evaporation (Site No. 1 only).

BLM_0045318

## 4.7    NOISE

### 4.7.1   Environmental Impacts

#### 4.7.1.1   General Impacts

#### 4.7.1.2   Construction, Operations, and Closure Impacts

##### 4.7.1.2.1   Construction

Noise levels 50 feet away from typical construction equipment used to construct an industrial site are provided in Table 4.7-1 (WSDOT, 2008). Assuming that noise due to construction would be classified as point sources, the standard reduction for point source noise is 6 dB per doubling of distance (with hard surface conditions such as bare ground, rock, or pavement) from the source (WSDOT, 2008). Ground conditions may further attenuate noise from a point source by an additional reduction of 1.5 dB per doubling of distance (under soft site conditions, including irregular ground and vegetated surfaces) from the source so that noise reduction could be 7.5 dB per doubling of distance. Distances at which noise from construction equipment would attenuate to 40 dBA under hard site and soft site conditions are included in Table 4.7-1.

**Table 4.7-1**
**Average Maximum Noise (Lmax) at 50 feet from Construction Equipment[1]**

| | | | Distance (feet) to Attenuate to Assumed Ambient Noise Level of 40 dBA | |
| | Equipment | Noise dBA (Lmax measured at 50 feet) | Soft Site Reduction At 7.5 dB per double of distance | Hard Site Reduction At 6 dB per double of distance |
|---|---|---|---|---|
| Construction Activity | Shovel | 87 | 3,850 | 11,403 |
| | Warning Horn | 83 | 2,660 | 7,184 |
| | Compactor | 83 | 2,660 | 7,184 |
| | Dozer | 82 | 2,425 | 6,400 |
| | Excavator | 81 | 2,211 | 5,702 |
| | Grader | 80 | 2,016 | 5,080 |
| | Roller | 80 | 2,016 | 5,080 |
| | Front End Loader | 79 | 1,838 | 4,525 |
| | Backhoe | 78 | 1,676 | 4,032 |
| | Dump Truck | 76 | 1,393 | 3,200 |
| | Pickup Truck | 75 | 1,270 | 2,851 |
| | Flatbed Truck | 74 | 1,158 | 2,540 |
| Drilling | Mounted Impact Hammer | 90 | 5,080 | 16,127 |
| | Auger Drill Rig | 84 | 2,917 | 8.063 |
| | Rock Drill | 81 | 2,211 | 5,702 |
| Materials Handling | Concrete Pump Truck | 81 | 2,211 | 5,702 |
| | Crane | 81 | 2,211 | 5,702 |
| | Concrete Mixer Truck | 79 | 1,838 | 4,525 |
| Stationary Equipment | Jackhammer | 89 | 4,631 | 14,367 |
| | Pneumatic Tools | 85 | 3,200 | 9,051 |
| | Generator | 81 | 2,211 | 5,702 |
| | Pump | 81 | 2,211 | 5,702 |
| | Air Compressor | 78 | 1,676 | 4,032 |
| | Welder Torch | 74 | 1,158 | 2,540 |

[1] Source:  WSDOT, 2008.

During construction of the Mill Facility, it is estimated that an average of 65 trucks per day would arrive at the Site, with the highest vehicle estimates occurring during the second and third quarter of 2011. Most construction-related traffic (90 percent) is expected to arrive from the east on SH 90 and would consist mostly of light vehicles transporting workers to the Site (Table 4.7-

BLM_0045319

2). Construction-related traffic would increase daily traffic on SH 90 east of the Site by nearly 40 percent above the 2008 average annual daily traffic volume. Less of an increase in construction traffic (only 4.5 percent) is expected on SH 90, arriving from west of the Site.

All project-related construction traffic, when added to the 2008 daily volume on SH 90 (530 vehicles per day) would produce the estimated noise levels 50 feet away from the highway (Table 4.7-2). Distances estimated for traffic noise on SH 90 to attenuate to background levels (assumed to be 40 dBA) under soft site or hard site conditions are also included in Table 4.7-2. The expected increase in vehicular traffic during construction would generate the highest noise levels because of traffic volume on SH 90 arriving from Vancorum, east of the Site. However, the distance for construction traffic noise from the highway to attenuate to background levels of 40 dBA is estimated to increase by only about 300 feet (soft site reduction) or by 2,440 feet (hard site reduction), a very conservative estimate.

**Table 4.7-2**
**Estimated Noise Generated by Project-Related Traffic on SH 90 during Construction**

| Approach Direction on SH 90 | Daily Traffic on SH 90 Due to Construction | | Total Volume (added to 2008 baseline) | Estimated Hourly Traffic Volume | Estimated Noise (dBA) Level at 50 feet [1] | Distance (feet) to Attenuate to Assumed Ambient Noise Level of 40 dBA | |
|---|---|---|---|---|---|---|---|
| | Trucks | Light Vehicles | | | | Soft Site Reduction At 4.5 dB per double of distance | Hard Site Reduction At 3 dB per double of distance |
| East | 30 | 180 | 740 | 74.0 | 61.9 | 1,590 | 8,580 |
| West | 4 | 20 | 554 | 55.4 | 60.8 | 1,290 | 7,060 |

[1] Derived from the progressive relationship between traffic volume and associated noise provided in WSDOT's (2008) Table 7-3, hourly traffic volumes, traveling at 65 miles per hour.

There are five known residences and one structure within 5.5 miles of the Site. The loudest construction noises would be associated with clearing and grading, materials handling, and stationary equipment in Table 4.7-1 would attenuate to background noise at each of the five residences.

### 4.7.1.2.2   Operations

During the operation of the Mill Facility, there would be an estimated 20 to 30 trucks per day (40 to 60 trips per day) hauling ore to the Mill Facility. Of those, a maximum of 18 trucks per day (38 ore truck trips per day) are expected to arrive on SH 90 from the east and a maximum of 12 trucks per day (24 truck trips per day) are expected from Utah, traveling on SH 90 from the west. In addition to ore deliveries, traffic during operations would include water trucks, tankers, and semi-trailers delivering materials and fuel, miscellaneous delivery trucks, straight-day and shift workers, and visitors. With the exception of some shift worker traffic, most of this traffic would occur during daylight hours. Operational traffic on SH 90, arriving from the west, would include 38 truck trips and 10 light vehicle trips daily, increasing the existing traffic level by over 13 percent. Operational traffic arriving from the east would increase more than 24 percent of the 2008 average daily traffic volume.

All project-related operations traffic, when added to the 2008 daily volume on SH 90 (530 vehicles per day) would produce the estimated noise levels 50 feet away from the highway (Table 4.7-3). Distances estimated for traffic noise on SH 90 to attenuate to background levels (assumed to be 40 dBA) under soft site or hard site conditions are also included in Table 4.7-3.

BLM_0045320

**Table 4.7-3**
**Estimated Noise Generated by Project-Related Traffic on SH 90 during Operation**

| Approach Direction on SH 90 | Daily Traffic on SH 90 Due to Operation | | Total Volume (added to 2008 baseline) | Estimated Hourly Traffic Volume | Estimated Noise (dBA) Level at 50 feet [1] | Distance (feet) to Attenuate to Assumed Ambient Noise Level of 40 dBA | |
|---|---|---|---|---|---|---|---|
| | Trucks | Light Vehicles | | | | Soft Site Reduction At 4.5 dB per double of distance | Hard Site Reduction At 3 dB per double of distance |
| East | 58 | 70 | 658 | 65.8 | 61.5 | 1,470 | 7,670 |
| West | 38 | 10 | 578 | 57.8 | 61.0 | 1,340 | 6,400 |

[1] Derived from the progressive relationship between traffic volume and associated noise provided in WSDOT's (2008) Table 7-3, hourly traffic volumes, traveling at 65 miles per hour.

Ore unloading and loading activities would be the primary source of noise generated during operations. In particular, the backup alarms from the front-end loaders and highway trucks are expected to generate the loudest noises at the Mill Facility. Warning horns are expected to attenuate to background levels 2,660 feet away (soft-site reduction) or 7,184 feet away (hard-site reduction). Soft-site conditions surrounding the Site are more realistic due to vegetative ground cover. Other operations, which generate high noise levels, would be located within enclosed buildings (e.g., the SAG mill). For comparison, the estimated maximum noise level occurring at the Property Boundary was modeled using conservative assumptions and determined to be 60 dBA (Baker, 2008). This level is well below the most restrictive maximum permissible noise level of 75 dBA established by Montrose County for gravel mining operations located within 1,320 feet of an existing residence or an existing platted subdivision. The estimated maximum noise level at the Property Boundary occurs at the south end of the Site, approximately 800 feet south of the Mill if the attenuation rate of 6 dB per doubling of distance is assumed (hard-site reduction) or about 460 feet if the attenuation rate of 7.5 dB per doubling of distance is applied (soft-site reduction).

#### 4.7.1.2.3   Closure

During the closure of the Mill Facility, much of the same equipment that was used during construction is expected (see Table 4.7-1). Traffic associated with closure would be the highest between the 6th and 8th quarters of closure during which traffic could peak at 30 one-way trips to and from the Site per day (60 trips). Closure-related traffic patterns would likely be similar to construction and operational traffic on SH 90 but traffic volumes would be less than during construction and operation. Traffic noise on SH 90 would be less than estimates made for construction (Table 4.7-2) or operation (Table 4.7-3), above.

### 4.7.2   Protective/Mitigation Measures

There are no protective/mitigation measures identified to mitigate noise-related impacts resulting from the Proposed Action.

### 4.7.3   Monitoring

There is no noise-related monitoring proposed.

## 4.8   HISTORIC AND CULTURAL RESOURCES

### 4.8.1   Environmental Impacts

#### 4.8.1.1   General Impacts

A determination of "no historic properties affected," pursuant to 36 CFR 800.5 of the NHPA, is recommended for both the 880-acre Site and the 80-acre well field, contingent upon the

BLM_0045321

avoidance of all sites recommended eligible and upon concurrence by OAHP of all sites recommended not eligible (ERO, 2007 and 2009b).

The Proposed Action has the potential to affect nine archaeological sites (5MN8271, 5MN8272, 5MN8273, 5MN8274, 5MN8276, 5MN8277, 5MN8278, 5MN8281, and 5MN8283). All of these sites are located in planned disturbance areas. Four of the nine sites located in planned disturbance areas were trenched to evaluate their potential for subsurface cultural deposits; all were negative. One additional site (5MN8276) was collected to exhaust its date potential. An additional four sites (5MN8275, 5MN8279, 5MN8280, and 5MN8282) may be impacted in the future, depending on project development. Baseline documentation exhausted the research potential of these four sites, along with the remaining sites located in planned disturbance areas. None of these 13 sites identified were eligible for NRHP listing.

At the time of the 2007 Class III inventory on the 880 acres, sites 5MN8269 and 5MN8270, which are recommended as NHPA eligible, were not located in an area of proposed surface disturbance. Subsequently, groundwater monitoring wells and access roads were proposed for the area surrounding these two sites. A treatment plan was then submitted to and approved by the Colorado State Historic Preservation Officer in October 2008. In March 2009, ERO submitted the first addendum to the cultural inventory report (ERO, 2009b), which describes mitigation treatments for the two potentially impacted sites. Treatment included excavating 6.5 ft x 6.5 ft area (2 m x 2 m) area over what is called Feature 1 at site 5MN8269. Excavation resulted in the identification of a small slab-lined hearth surrounded by an associated activity area, with a date range of 760 to 510 B.C. (ERO, 2009b). Site 5MN8270 treatment included a geomorphological assessment and 100 percent collection of surface artifacts. ERO concluded that the work exhausts all data potential for 5MN8270 and completely mitigates Feature 1 at 5MN8269 (ERO, 2009b).

Isolated finds, by definition, are not eligible for listing on the NRHP. Because these resources are not eligible for listing on the NRHP, they do not need to be considered further in project planning. Energy Fuels has prepared an *Unanticipated Discovery Plan* which outlines the proposed cultural resource compliance procedures to be followed during construction and other surface disturbing activities (see *Operational Monitoring Plan* – Visus and Energy Fuels, 2009b). The discovery procedures needed to identify, record, and evaluate any buried cultural resources detected during surface disturbance activities are summarized in the plan. Also presented are the criteria for site evaluations and procedures to be followed in the rare case of the discovery of human remains.

### 4.8.1.2   Construction, Operations, and Closure Impacts

#### 4.8.1.2.1   Construction

The greatest potential for an unanticipated discovery of cultural resources would likely occur during construction when most surface disturbing activities would occur. However, cultural resource sites in the area tend to be located near or on the mesas with NRHP eligible sites found in the central portion of the valley where construction activities would be concentrated. Energy Fuels would follow measures in their *Unanticipated Discovery Plan* if cultural resources are encountered as described in *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b).

#### 4.8.1.2.2   Operations

There is little potential for disturbance of known cultural sites or unanticipated discovery during operations because surface disturbance should be minimal during this period and would have to be cleared with the RSO prior to startup (Visus and Energy Fuels, 2009b). Most of the projected

BLM_0045322

surface disturbance that would occur during operations would be for the construction of Tailings Cells B and C. If surface disturbing activities encounter cultural resources during operations, Energy Fuels would follow their *Unanticipated Discovery Plan* (see *Operational Monitoring Plan* – Visus and Energy Fuels, 2009b) if cultural resources are found.

### 4.8.1.2.3   Closure

The potential for impact to cultural resources during closure would be minimal because the work would be generally confined to previously disturbed areas. Energy Fuels would follow their *Unanticipated Discovery Plan* if cultural resources are found.

### 4.8.2   Protective/Mitigation Measures

Energy Fuels would implement the following measures to mitigate potential impacts to Cultural Resources under the Proposed Action. Adherence to these stipulations would adequately protect unidentified cultural resources and prevent adverse effects on potential eligible and need data properties:

- All four sites located in the 80-acre well field would be avoided by ground disturbance, where feasible, regardless of eligibility status.

- Where outstanding, Energy Fuels' cultural resources consultant would continue and complete Native American consultation.

- If newly discovered cultural resources are identified during project implementation, work in that area would stop and the SHPO would be notified immediately (36 CFR §800.13) according to Energy Fuels' *Unanticipated Discovery Plan* (see *Operational Monitoring Plan* – Visus and Energy Fuels, 2009b).

- Strict adherence to the confidentiality of information on the description and location of archeological resources (43 CFR 7.18).

- Inform all persons associated with construction and maintenance of the Proposed Action that they would be subject to prosecution for knowingly disturbing historic or archaeological sites, or for collecting artifacts.

### 4.8.3   Monitoring

ERO conducted mitigation treatments on sites 5MN8269 and 5MN8270. If project-related, ground-disturbing activities take place in the area around Feature 1 of site 5MN8269, additional monitoring would be recommended. Sites 5MN8284, 5MN8286, and 5MN9206, recommended as NHRP-eligible, would be avoided and protected. If project-related ground-disturbing activities occur in their vicinity, monitoring would be necessary. Energy Fuels would implement the cultural resources monitoring procedures provided in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b).

BLM_0045323

## 4.9      VISUAL/SCENIC RESOURCES

### 4.9.1   Environmental Impacts

#### 4.9.1.1   General Impacts

#### 4.9.1.2   Construction, Operations, and Closure Impacts

##### 4.9.1.2.1   Construction

Visual impacts during construction would be temporary and would include the presence of large vehicles and construction equipment and materials necessary to construct the Mill Facility. The stripping of vegetation over a large area and the creation of the soil stockpiles on the west end of the site would also present a temporary visual impact until such time that the soil stockpiles are revegetated and the facilities are constructed.

##### 4.9.1.2.2   Operations

Visual resource impacts from the Site would be most prominent when the evaporation ponds are completed to full 80-acre capacity sometime near the later portion of its 40-year production life. Operation of the Mill, and the initial series of evaporation ponds and tailings cells, would be noticeable in the middleground viewsheds for observers traveling on SH 90. The evaporation ponds and the administration building would be approximately 675 feet from the road at their closest point. An approximately 9,000 $ft^2$ administration building and associated parking area would be a similar distance from SH 90 and would be clearly visible to observers using the road.

The ponds and eventual three tailings cells (covering 30 acres each) would have low-profile containment embankments, with the majority of their storage capacity located below the existing ground level. The embankments, protective 6-foot-high fencing, and bird netting over the evaporation ponds may be noticeable to observers. Embankment soil color and shape would be in contrast with the existing foreground and background landscape features. Figure 4.9-1 depicts a preliminary facility rendering looking north from the top of Davis Mesa. Impacts to visual resources would be the most prominent from ridge- and mesa-top viewpoints, although fewer observers would see the Site from these locations. SH 90 can be seen running through the valley north of the evaporation ponds.

The Mill Facility and associated ore pad would be approximately 0.75 miles south of SH 90 and would sit about 100 feet higher in elevation than SH 90. The Mill Facility buildings would have varying heights up to 85 feet and would be visible in the middle-background from SH 90 but are not expected to dominate the view of the casual observer. Tailings cell and pond embankments would screen some portions of the buildings. Outdoor lighting at the Mill Facility would change the nighttime viewshed in that the Site would be illuminated in a place where no lights previously existed.

Visual resources observed from the key observation points (KOPs) shown in Figures 3.9-1 and 3.9-2, Section 3.9, on SH 90 are not expected to be significantly impacted by the Site. However, middle and background viewsheds would be altered. To a large extent, the existing open pit mine overburden pile, vegetation alterations, waste rock dumps, mine buildings, and access roads present in the landscape around the Site currently draw the attention of observers on SH 90. The Site would be an obvious addition to the human developments in the area, but it would not dominate the landscape.

BLM_0045324



**Figure 4.9-1**
**Piñon Ridge Mill Site Facility Rendering from the top of Davis Mesa**

### 4.9.1.2.3    Closure

Following mill decommissioning, the Site would be regraded and reclaimed, and the tailings cells would be closed and covered (reference tailings closure). Visual impacts would be limited to the fenced area of the covered tailings cells that would look similar to the reclaimed Durita site.

### 4.9.2    Protective/Mitigation Measures

Utilizing the perspective of the KOPs identified in Section 3.9, the following measures would be implemented to mitigate potential impacts to visual/scenic resources from the Site:

- All aboveground facilities would be painted to blend with the surrounding landscape characteristics with an appropriate color selected from the BLM Standard Environmental Colors chart or a similar color reference.

- Outdoor lighting would be down-directed, with fixtures having a 90 degree cutoff, in order to eliminate glare and minimize upward light scattering.

- An efficient lighting scheme would be designed so that the minimum amount of lighting required for safety and security is provided.

- Fences would be coated or painted with non-reflective surfacing, or an appropriate color that blends with the surroundings.

BLM_0045325

- Minimize disturbance and control erosion by avoiding steep slopes and by minimizing the amount of construction and ground clearing needed for roads, staging areas, and crane pads.

- To the extent practicable, facility construction and placement would utilize natural features in the landscape to screen operations from observers.

- All disturbed areas would be re-contoured and re-vegetated to blend with the natural topography as soon as possible after disturbance, where practicable.

- Dust abatement measures would be practiced on the gravel roads and parking lots, as needed.

### 4.9.3   Monitoring

Extensive monitoring strategies for visual/scenic resources are not planned for the Mill Facility. However, short-term visual resource analysis from KOPs would be necessary to determine if the above mitigation measures are employed effectively. Changes could be made to the mitigation measures to better resolve impacts, based on KOP analysis.

## 4.10    SOCIOECONOMICS

### 4.10.1  Environmental Impacts

#### 4.10.1.1  General Impacts

Most socioeconomic impacts, including those related to population, employment, housing, community services, and government revenues, would be associated with the size of the workforces needed to construct, operate, and close the Mill Facility. Direct workforce requirements would be greatest during the construction phase. The direct workforce requirements would be supplemented by indirect employment largely associated with mining and transporting feedstock ore to the Mill Facility. Fiscal impacts associated with the Proposed Action would continue throughout construction, operation, and closure.

**Local Workforce.** An analysis of the regional demographic and economic characteristics of western Montrose County and the nearby communities of Norwood, in northern San Miguel County, Colorado, and La Sal, in eastern San Juan County, Utah, suggests that this area could provide approximately 61 workers to the Mill Facility (see Table 4.10-1). This estimate is based on several assumptions, including the age of people most likely to be interested in working at the Mill Facility, the portion of people commuting to other counties for work who would be interested in working at the Mill Facility, and the portion of applicants that would qualify for work at the Mill Facility.

**Population Impacts.** NRC Guidance for Environmental Reports for Uranium Mills requires that a proposed project's impacts on population distribution be evaluated for all areas within 50 miles (80 km) of the proposed site (NRC, 1982a). An 50 mile (80 km) radius around the Site includes portions of Delta, Dolores, Mesa, Montezuma, Montrose, Ouray, and San Miguel counties in Colorado, and Grand and San Juan counties in Utah (see Figure 3.10-1).

A sizeable portion of the permanent workforce is expected to come from the local area. Therefore, the Proposed Action is not likely to impact regional population distributions. While the project may attract some workers from Norwood and La Sal, the majority of permanent mill workers would be likely to reside in western Montrose County. Thus, communities in western Montrose County are most likely to experience the socioeconomic impacts from the Proposed Action.

BLM_0045326

**Table 4.10-1**
**Estimated Potential Local Workforce**

| Employment measure | Nucla CCD | Town of Norwood | La Sal CDP |
|---|---|---|---|
| 2008 population[1] | 2,812 | 462 | 353 |
| Percent of Population 20 to 39 years of age[2] | 21.3% | 22.4% | 29.5% |
| July 2009 county unemployment rate[3] | 8.2% | 5.3% | 9.6% |
| Unemployed workers 20 to 39 years of age | 49 | 5 | 10 |
| Employed workers 20 – 39 years of age | 550 | 98 | 94 |
| Percent of CCD workers working in other counties[4] | 29.1% | 7.3% | 5.2% |
| Workers in other counties interested in working at the mill[5] | 80 | 4 | 2 |
| Prospective applicants at the mill | 129 | 9 | 12 |
| Potential workers from the local area[6] | 52 | 4 | 5 |

[1] 2008 Census population estimate for Norwood (U.S. Census Bureau, 2009a). County growth rate between 2000 and 2008 applied to 2000 Census population for Nucla CCD and La Sal CDP (U.S. Census Bureau, 2000a; CDOLA, 2009a; Utah Governor's Office of Planning & Budget, 2009).
[2] Source: CDOLA, 2009a; Utah Governor's Office of Planning and Budget, 2009.
[3] Source: U.S. Bureau of Labor Statistics, 2009b.
[4] Source: U.S. Census Bureau, 2000a.
[5] Assumes that 50 percent of workers commuting outside the county for work would be interested in working at the Mill.
[6] Assumes that 40 percent of applicants possess the relevant job skills and pass drug tests.

**Environmental Justice Impacts.** NRC Environmental Review Guidance for Licensing Actions Associated with NMSS Programs - NUREG-1748 (NRC, 2003a) requires that the impacts on minority and low-income populations of projects in rural areas be evaluated across a 4-mile radius around the proposed site. As discussed in Section 4.10.4, there are only two housing structures with no more than five residents within 4 miles of the Site. Because the surrounding area is so sparsely populated, the Proposed Action would not result in a disproportionately high and adverse human health or environmental impact on minority or low income populations.

**Economic Impacts (Income and Employment).** The Proposed Action would have direct economic benefits through its creation of jobs related to construction, operations, and closure of the Mill Facility. The Proposed Action would provide additional indirect benefits to local and regional businesses through the purchases of goods and services, such as power, fuel, equipment, and parts. Businesses providing consumer goods and services would also benefit from the increased demand of the workers. This type of indirect demand, also known as induced demand, would be further stimulated by the increased purchasing power of people employed by businesses that support the Mill Facility and its workers.

**Housing Impacts.** A sizeable portion of the permanent workforce is expected to currently reside in the local area, and the Proposed Action is not expected to have a long-term impact on the residential housing market. Housing impacts during each phase of the Proposed Action are discussed in the Construction, Operations, and Closure sections of this Section.

**Land Value Impacts.** The potential exists that the Proposed Action would negatively affect property values in the Paradox Valley (Corbell, 2009). Land values are influenced by public perceptions, and it is difficult to predict the long-term perceptions of the Mill Facility. Agricultural and residential sale prices in San Juan County, Utah, provide an indication of the impact of perceptions of a Mill Facility on surrounding property values. The White Mesa Mill, which is located 6 miles south of Blanding Utah, is currently the only operating uranium mill in the United

States. According to the County Assessor, farmland in San Juan County typically sells in 40 to 80 acre parcels for between $400 and $500 an acre, and there is no discernable difference between the value of farmland around Blanding and the value of farmland in other parts of the county (Randall, 2009). A comparison of residential sale prices in Blanding and Monticello (the only other incorporated town in San Juan County) found a minimal difference between average residential sale prices in each town. In mid-October 2009, the average selling price of homes on fewer than 5 acres was $160,010 in Blanding and $162,375 in Monticello. The median price, which indicates the mid-range value of selling prices, was $145,000 in Blanding and $143,000 in Monticello (National Association of Realtors, 2009). By both measures, the difference in residential sales prices between the two towns is less than 2 percent. While far from a rigorous analysis, this indicates that the long-term impacts to agricultural and residential land values in the Paradox Valley from the Proposed Action would be minimal.

**Community Services Impacts.** Existing community service facilities in western Montrose County are currently underutilized, and the Proposed Action is not expected to have long-term impacts on local service providers. The paragraphs below provide an overview of the community service impacts that are discussed in greater detail in the Construction, Operations, and Closure sections of this Section.

Schools. Neither school district in the local area faces capacity or staff constraints. In 2008, both enrollments and pupil/teacher ratios in the West End RE-2 School District and the Norwood R-2J School District were lower than they have been in school years earlier in the decade.

Medical Services. The Basin Clinic in Naturita and Uncompahgre Medical Center in Norwood would provide primary health care to mill workers and their families. Neither facility currently faces staffing or facility constraints in treating additional patients. Both facilities are likely to benefit from any additional demand in primary health care services from mill workers and their dependents as these individuals would be insured patients whose payment for services would help defray the clinics' costs of providing medical services to uninsured and under-insured patients.

Public Safety. The handling of on-site emergencies at the Mill Facility would follow Energy Fuels' *Emergency Response Plan (*Energy Fuels, 2009e), which was developed in consultation with local law enforcement agencies and fire departments and would be further refined and updated with their input during operations to insure that adequate personnel and equipment would be available to support emergency response efforts. On-site training exercises would also be conducted with local agencies at least once per year to establish lines of communications and responsibilities for various types of incidents (Energy Fuels, 2009e).

Water and Wastewater Services. The Proposed Action would not have an adverse impact on water or wastewater treatment facilities in the local area. The planned source of process water at the Mill Facility is groundwater, which would be pumped from a series of on-site and adjacent off-site wells. Potable water would be imported to the site from Naturita. Process wastewater would be treated onsite and recycled in a zero discharge system (Energy Fuels, 2009f).

**Fiscal Impacts.** The fiscal impacts associated with the Proposed Action would occur primarily through property tax and sales and use tax paid by Energy Fuels. All of Montrose County is designated by the State of Colorado as an Enterprise Zone. Therefore, Energy Fuels would be eligible for tax credits that would apply to the company's income tax liability to the State of Colorado.

BLM_0045328

Property Tax. Local governmental taxing entities assess property taxes largely to fund local school operations and local government services. A 29 percent assessment rate applies to all business and industrial property in Colorado. Table 4.10-2 shows the taxing districts that would assess property taxes on the Mill site and each district's 2008 tax rate (*i.e.* mill levy).

**Table 4.10-2**
**Taxing Districts and 2008 Mill Levies**
**Applicable to the Piñon Ridge Mill Site[1,2]**

| Taxing District | 2008 Mill Levy |
|---|---|
| Montrose County | 18.039 |
| RE-2 West End School District | 25.918 |
| Montrose Library District – Naturita | 3.83 |
| Southwest Water Conservation District | 0.216 |
| San Miguel Water Conservancy District | 0.052 |
| Total mill levy (Tax Area 25018) | 48.055 |

[1] Source: Montrose County, 2009d.
[2] Source: Montrose County, 2009e.

Sales and Use Tax. Sales and use taxes paid on direct and indirect sales related to the Mill Facility would provide revenues to state, county, and local governments. Sales tax applies to goods that are purchased in the taxing area in which they are used, while use tax applies to goods that are purchased outside the taxing area in which they are used. The State of Colorado assesses a 2.9 percent sales tax and a 2.9 percent use tax. Montrose County assesses a 1.75 percent sales tax, 1 percent of which funds the Road and Bridge Department, and 0.75 percent of which funds public safety programs. The county has a 1 percent use tax that applies to purchases of vehicles and building materials. Use taxes on building projects in Montrose County are based on 1 percent of the estimated costs associated with physical structures only and are paid at the time the building permit is issued (White, 2009). The towns of Naturita and Nucla each impose a 4 percent sales tax and the City of Montrose imposes a 3 percent sale tax (Colorado Department of Revenue, 2009b).

Colorado Enterprise Zone Tax Credits. The Colorado Enterprise Zone Program is designed to encourage job creation and capital investment in economically depressed areas by providing tax credits to businesses that promote economic development activities. Montrose County is part of Colorado Enterprise Zone 10 (Keckler, 2009, and Colorado Office of Economic Development and International Trade, 2009). Because the Site is located in an enterprise zone, Energy Fuels would be eligible for tax credits and incentives that would apply to the company's income tax liability to the State of Colorado. Enterprise zone tax credits include:

- A 3 percent investment tax credit on equipment purchased for exclusive use in an enterprise zone.

- A $500 job tax credit on each new employee hired at a new facility located in an enterprise zone.

- A 2-year $200 job tax credit for each new business facility employee who is insured under a qualifying employer-sponsored health insurance program.

Enterprise Zone tax credits do not apply to sales and use tax or property taxes.

The following sections discuss in greater detail the socioeconomic impacts that are likely to occur in each phase of the Proposed Action.

BLM_0045329

### 4.10.1.2 Construction, Operations, and Closure Impacts

### 4.10.1.2.1 Construction

**Workforce.** Energy Fuels expects that approximately 20 percent of the construction workforce would consist of workers residing in western Montrose County (the Nucla CCD), the Town of Norwood and the La Sal Census Designated Place (CDP). Construction of the Mill would involve two major types of subcontractors: general (civil, structural, mechanical, and piping), and electrical/instrumentation. A number of specialty contractors would also be required for pre-engineered buildings, scaffolding, tank erection, insulation, fire protection, liner installation, power supply, and support activities. The primary trades required for construction of the Mill would include millwrights, welders, pipe fitters, electricians, and unskilled laborers (Golder, 2009b). Energy Fuels intends to ask contractors to employ as many skilled and unskilled workers as possible from the local area as possible. Contractors typically have construction crews that travel to various job sites, so local workers would either have suitable specialized skills or fill general construction jobs.

According to the *Construction Plan* for the Piñon Ridge Mill, the project would be constructed over a 21 month (seven quarter) period. The construction workforce would increase from 25 workers in the 1st quarter to a peak of 200 workers in the 4th and 5th quarters as discussed in the *Construction Plan* (Golder, 2009b). Based on the assumption that local workers would comprise 20 percent of the construction workforce, Table 4.10-3 shows the estimated number of local and non-local workers.

**Table 4.10-3**
**Construction Workforce Estimates[1]**

| Calendar Quarter | Work Quarter | Total Workers[1] | Local Workers[2] | Non-local Workers |
|---|---|---|---|---|
| 3rd Qtr 2010 | 1 | 25 | 5 | 20 |
| 4th Qtr 2010 | 2 | 45 | 9 | 36 |
| 1st Qtr 2011 | 3 | 125 | 25 | 100 |
| 2nd Qtr 2011 | 4 | 200 | 40 | 160 |
| 3rd Qtr 2011 | 5 | 200 | 40 | 160 |
| 4th Qtr 2011 | 6 | 150 | 30 | 120 |
| 1st Qtr 2012 | 7 | 10 | 2 | 8 |

[1] Source: *Construction Plan* (Golder, 2009b).
[2] Includes residents of the Nucla CCD, Town of Norwood, and La Sal CDP

The construction workforce is estimated to peak at 200 construction workers. In 2008, annual wages paid in the construction sector in Montrose County averaged $38,480 (U.S. Bureau of Labor Statistics, 2009a). Table 4.10-4 shows the typical wage range in western Colorado for a variety of construction occupations that would be required to build the mill (CDLE, 2009).

The IMPLAN economic impact model was used to estimate the total economic impact of the Mill Facility Montrose County. The modeling results estimated that in-county expenditures on construction would generate 326 direct, indirect, and induced full- and part-time jobs over the 21-month construction period. The IMPLAN modeling results also indicated that construction would generate approximately $14.3 million in total labor income (including wages and salaries, benefits, and proprietors' income) and $35.5 million in total sales to Montrose County businesses (Berger, 2009).

BLM_0045330

**Table 4.10-4**
**Annual Wages for Construction-Related**
**Occupations in Western Colorado, 2008[1]**

| Occupation | Range of Annual Wages[2] |
|---|---|
| Cement masons and concrete finishers | $29,036 - $42,412 |
| Construction laborers | $20,339 - $33,189 |
| Construction trades workers | $24,967 - $45,506 |
| Earth drillers | $37,091 - $47,990 |
| Electricians | $28,470 - $52,948 |
| Industrial machinery mechanics | $38,097 - $55,130 |
| Paving/surfacing/tamping equipment supervisors | $37,502 - $42,863 |
| Pipelayers | $26,234 - $39,863 |
| Plumbers, pipefitters and steamfitters | $32,843 - $52,772 |

[1] Source: CDLE, 2009.
[2] Excludes benefits.

**Population Impacts.** The Proposed Action is expected to attract construction workers from across western Colorado and eastern Utah. Construction workers are transient workers who do not tend to relocate permanently to communities near the job site, and, therefore, would not impact regional population trends.

**Housing Impacts.** The construction workforce associated with the Proposed Action would not impact the demand for long-term housing in the local area. During peak construction periods (the 4th and 5th quarters of construction), approximately 160 non-local construction workers could be expected to need short-term housing. As discussed in Section 3.10.6.2, short-term housing accommodations near the Site include 77 motel rooms and 11 short-term apartment/house/mobile home rentals in Naturita, Norwood and Paradox. There are also 119 RV sites in Naturita and Norwood, and a mobile home park in La Sal that could provide additional opportunities for RV placement. At its peak, the mill's construction workforce would be likely to fully occupy available short-term rentals in the local area. This could lead to upward pressure on short-term housing prices including motel rates, month-to-month apartment rents and RV site fees.

**Community Services Impacts.** Potential impacts to community services during construction include those related to schools, medical services, public safety, and water and wastewater services.

<u>Schools.</u> Because dependents do not typically accompany construction workers to temporary job sites, construction would likely result in only small increases in local school enrollments.

<u>Medical Services.</u> During construction, the Basin Clinic in Naturita would provide first-call emergency medical services to injured construction workers. In the case of emergencies requiring on-site treatment, it is likely that emergency medical technicians with the Nucla/Naturita Fire Protection District or Paradox Volunteer Fire Department would be called upon for assistance. Construction of the Mill Facility could place additional short-term burdens on these volunteer response units, particularly between the 3rd and 6th quarters of construction, when between 125 and 200 construction workers would be at the Site.

<u>Public Safety.</u> The need for site security during construction would be addressed by a security fence with gated access installed around the site. A guard posted at the main entrance along SH 90 would control access to the Site during working hours. The gate would be locked and the

BLM_0045331

site secured at all other times (Golder, 2009b). During the 12-month period covering the 3rd through sixth quarters of construction, local law-enforcement officials could face an increase in traffic- and alcohol-related offenses committed by construction workers during their off-hours. Thus, construction of the Mill Facility could place additional short-term burdens on local law enforcement officials.

<u>Water and Wastewater Services.</u> Construction of the Mill Facility is not expected to impact water or wastewater treatment facilities in the local area. Groundwater would be used for construction-related activities, but at levels lower than those projected for operations. Sanitary wastes generated during construction would be collected in portable, self-contained toilets and hauled to an appropriate disposal site and would not impact local waste services.

**Fiscal Conditions.** Over the 21 month construction period, the sales and use tax revenues associated with construction expenditures would include approximately $2.48 million to the State of Colorado, $286,118 to Montrose County, and $33,769 to each of the towns of Naturita and Nucla (see Table 4.10-5). These estimates are based on several assumptions, all of which are intended to produce conservative revenue estimates. Estimated sales and use tax revenues to the State of Colorado consider all direct capital expenditures related to construction and a portion of household spending of income derived from mill construction. Sales tax revenues from household spending were estimated by adjusting the IMPLAN model's estimated total labor income to exclude benefits and tax liabilities. Benefits were estimated to account for 28 percent of total income, and taxes (*e.g.* income taxes and social security insurance) were estimated to account for 13 percent of income minus benefits (Berger, 2009). The resulting estimate of disposable income was further adjusted to account for spending on taxable items only. Nationally, 37.1 percent of household income is spent on housing and health care, which are not taxable (U.S. Bureau of Labor Statistics, 2007). Therefore, the sales tax revenues associated with household spending estimated in this analysis apply to 62.9 percent of the IMPLAN model's estimated disposable income.

Estimated sales and use tax revenues to Montrose County are based on 1 percent of the estimated costs associated with constructing physical structures on the Site, and 0.75 percent of direct purchases made in Montrose County. Energy Fuels expects that they would spend approximately $6.3 million in Montrose County on construction materials such as fencing, concrete, road base, and asphalt (Monok, 2009). A sales tax of 0.75 percent would be due on these construction materials at the point of purchase in Montrose County (Barnett, 2009). Estimated sales tax on household spending was adjusted to account for spending on taxable items only.

Due to limited commercial and retail outlets in Naturita and Nucla, the analysis assumed that only 15 percent of household spending on taxable items would occur in each of these towns. It is likely that, over time, economic activity associated with the mill would support local business expansion and stimulate local spending. Although the majority of household spending associated with construction of the Mill is likely to occur in other municipalities, not enough is know about where this spending would occur to estimate sales tax revenues to other local governments.

BLM_0045332

**Table 4.10-5**
**Estimated Sales and Use Tax Revenues – Construction Phase**

| Taxing Entity | Estimated Sales and Use Tax |
|---|---|
| Colorado sales and use tax[1] | $2,483,217 |
| Montrose County sales and use tax[2] | $286,118 |
| Naturita sales tax[3] | $33,769 |
| Nucla sales tax[3] | $33,769 |

[1] Includes sales and use taxes on direct mill expenditures and 62.9 percent of household spending.
[2] Includes 1 percent Montrose County use tax on building materials, 0.75 percent sales tax on in-county purchases, and 62.9 percent of household spending.
[3] Assumes that 15 percent of taxable household spending occurs within town limits.

During the 21 month construction period, the Proposed Action would generate approximately $37,796 in property taxes. Property taxes were estimated by multiplying the unimproved land value of the Site by a 29 percent assessment rate and then by the 2008 mill levy. Table 4.10-6 shows the estimated distribution of property tax revenues across the site's taxing entities.

**Table 4.10-6**
**Estimated Property Tax Revenues – Construction Phase[1]**

| Taxing District | Property Taxes |
|---|---|
| Montrose County | $14,187 |
| RE-2 West End School District | $20,384 |
| Montrose Library District - Naturita | $3,012 |
| Southwest Water Conservation District | $170 |
| San Miguel Water Conservancy District | $41 |
| Total property taxes | $37,796 |

[1] Based on real property value of land only (Vigil, 2009) and 2008 mill levies (Montrose County, 2009d).

#### 4.10.1.2.2  Operations

**Workforce.** At a processing rate of 500 tpd of uranium/vanadium ore, the Mill Facility would employ 85 workers. This operational workforce would include 25 people working in management and administrative capacities on a straight day (8 hour) schedule, 5 days per week; and 60 people (four 15 person crews) working in milling and processing facilities on a rotating 24-hour shift schedule (three 8 hour shifts per day), 7 days per week (Visus, 2009).

Energy Fuels anticipates that the operational workforce would include some construction workers, such as electricians, instrumentation workers, boiler makers, and mechanics, who transition to permanent positions on the maintenance crews. Energy Fuels expects that approximately 80 percent of the operational workforce would consist of workers already residing in the local area. (The analysis of the potential local workforce shown in Table 4.10-1 indicates that this is a realistic expectation.) This suggests that the mill would attract approximately 17 new full-time workers to the area (see Table 4.10-7). Given the region's mining history, Energy Fuels expects that some of these new residents would be previous out-migrants who left Montrose County in search of job opportunities elsewhere. Whether the workers are former

BLM_0045333

residents who are returning or new residents to the area, this is the approximate size of the mill's workforce that would impact the population in western Montrose County and would create the demand for additional housing and public services.

**Table 4.10-7**
**Operational Workforce Estimates (Direct Employment)**

| Worker category[1] | Total Workers[1] | Local Workers[2] | Non-Local Workers |
|---|---|---|---|
| Straight-day schedule | 25 | 20 | 5 |
| Shift schedule | 60 | 48 | 12 |
| Total operational workers | 85 | 68 | 17 |

[1] *Special Use Permit Application* (Visus, 2009).
[2] Includes residents of the Nucla CCD, Town of Norwood and La Sal CDP.

Wages for most jobs at the Mill Facility would range between $40,000 and $75,000 per year, including benefits (Visus, 2009). Table 4.10-8 shows the typical wage range in western Colorado for a variety of occupations that would be required to operate the mill (CDLE, 2009). Note that the reported wages do not include benefits, which typically add 35 to 50 percent to an employee's annual compensation package.

**Table 4.10-8**
**Annual Wages for Industrial-Facility**
**Related Occupations in Western Colorado, 2008[1]**

| Occupation | Range of Annual Wages[2] |
|---|---|
| Electricians | $28,470 - $52,948 |
| General maintenance and repair workers | $24,130 - $40,665 |
| Industrial machinery mechanics | $38,097 - $55,130 |
| Machinery maintenance workers | $28,395 - $60,708 |
| Millwrights | $40.477 - $49,056 |
| Office and administrative support occupations | $19,789 - $35,809 |
| Office and administrative support supervisors | $25,358 - $51,539 |
| Plant and system operators | $39,852 - $58,933 |

[1] Source: CDLE, 2009.
[2] Excludes benefits.

In addition to the direct employment, the Proposed Action would generate indirect employment by stimulating regional mining activities. According to the *Mine Operations Plan* for the Piñon Ridge Mill, approximately 228 workers would be employed mining and transporting ore to the Mill (see Table 4.10-9). Most of these jobs would be in counties that supply ore to the Mill. Energy Fuels anticipates that mines in Montrose, Mesa, and San Juan (Utah) counties would supply the majority of the feedstock to the Mill (Energy Fuels, 2009d). Table 4.10-10 shows typical wage ranges of mining-related occupations (excluding benefits) in Western Colorado.

BLM_0045334

Environmental Impacts, Mitigation, and Monitoring

**Table 4.10-9**
**Indirect Employment Associated with Mill Operations[1]**

| Indirect employment source | Number of workers |
|---|---|
| Mining employment | 210 |
| Haulage contractors (truckers) | 18 |
| Total mining-related employment | 228 |

[1] Source: *Mine Operations Plan* (Energy Fuels, 2009d).

**Table 4.10-10**
**Annual Wages in Mining and**
**Transportation-Related Occupations in Western Colorado, 2008[1]**

| Occupation | Range of Annual Wages[2] |
|---|---|
| Excavating and loading machine workers | $37,427 - $55,148 |
| Extraction workers | $29,796 - $54,940 |
| Transportation and material moving occupations | $21,246 - $42,515 |
| Truck drivers, heavy and tractor trailer | $31,047 - $43,984 |

[1] Source: CDLE, 2009.
[2] Excludes benefits.

The IMPLAN model indicated that the mill would generate approximately 315 direct, indirect, and induced full- and part-time jobs in every year of its operation. Many of these jobs would be related to mining activities in Montrose and adjacent counties. Other jobs associated with economic activity generated by the mill would be located in commercial centers in Montrose County, including Naturita and Nucla. The modeling results also suggested that the project would generate $18.7 million annually in regional labor income and $140 million in regional business sales every year that the Mill is in operation (Berger, 2009).

**Population Impacts.** Operational workers are permanent employees who tend to settle in the area where their jobs are located. Energy Fuels anticipates that residents of the local area would comprise 80 percent of the mill's operational workforce. Because the mill is expected to attract fewer than 20 workers from outside the area, the Proposed Action would not be likely to cause substantial shifts in regional population distributions. It is likely that small communities near the Mill, including Naturita, Nucla, Bedrock, and Paradox, would see an influx of population.

**Housing Impacts.** Because of the small influx of new residents, the mill's operational workforce is not expected to face severe housing constraints that could lead to escalating housing prices in the local area. If indirect employment related to economic activity associated with the Mill led to further population gains, there could be short-term increases in housing prices. It is likely that the local housing market would respond relatively quickly to any increase in the demand for housing through the provision of new residential construction.

**Community Services Impacts.** Potential impacts to community services during operations include those related to schools, medical services, public safety, and water and wastewater services.

BLM_0045335

Schools. Because fewer than 20 operational workers are expected to relocate their families to western Montrose County, Mill operations would result in a relatively small increase in local school enrollments, well within the capacities of local schools.

Medical Services. Operation of the Mill Facility would not be likely to have an adverse impact on medical service providers in the local area. On-site emergency management systems would include an ambulance and heliport for emergency medical response. Treatment of on-site accidents would follow the Energy Fuels' *Emergency Response Plan* (Energy Fuels, 2009e). Energy Fuels expects that most emergency response actions at the Mill would be handled by trained employees under the direction of the RSO (Energy Fuels, 2009e).

Public Safety. The Proposed Action is not expected to have long-term adverse impacts on the provision of public safety services in the local area. Energy Fuels intends to implement several measures to insure site security during Mill operations as outlined in the *Security Plan* (Energy Fuels, 2009i). The portion of the site licensed for uranium processing would be surrounded by a chain-link fence topped with barbed wire. A secondary road would be constructed around the perimeter of the fence to allow for daily security inspections. All access points to the Site would be gated and controlled. A guardhouse would be installed near the main entrance to control all traffic entering the site from SH 90. The guardhouse would be manned 24 hours per day, 7 days per week (Visus, 2009).

The handling of on-site emergencies during operation would follow Energy Fuels' Emergency Response Plan, which was developed in consultation with local law enforcement agencies and fire departments to insure that adequate personnel and equipment would be available to support emergency response efforts (Energy Fuels, 2009e). As discussed previously, Energy Fuels would also conduct training sessions with local responders to establish procedures and methods for dealing various potential incidents. On-site fire management systems include a firewater loop with hydrants and hose reels. Sprinkler systems and fire extinguishers are also located in the various buildings, where appropriate (Visus, 2009).

The small influx of operational workers into the local area would not be likely to increase the response demands placed on local law enforcement officials.

Water and Wastewater Services. Operation of the Mill Facility is not expected to have an adverse impact on water or wastewater treatment facilities in the local area. During operations, groundwater would be used for process components, dust suppression systems, the truck wash, fire hydrants, and water trucks. At a processing rate of 500 tpd, the Mill's process water and potable water consumption rate is estimated to be 144 gpm. This corresponds to a daily consumption rate of 207,360 gallons per day. In the event that groundwater sources cannot supply the Mill Facility's full process water requirements, Energy Fuels has a backup purchase agreement with the Town of Naturita for a maximum of 150,000 gallons of untreated water per 24 hour period for up to 40 years (Energy Fuels, 2009f).

Energy Fuels intends to install a separate potable water system using water imported to the Site. Energy Fuels plans to purchase approximately 30,000 gallons of potable water per week from the Town of Naturita (Energy Fuels, 2009f). This represents less than 1 percent of the treatment plant's unused treatment capacity.

Process wastewater would be treated on-site and recycled in a zero discharge system as described in the *Water and Wastewater Plan* (Energy Fuels, 2009f). Sanitary wastewater would

BLM_0045336

be conveyed to an on-site septic system for treatment, and the Proposed Action would not require wastewater service from a public wastewater treatment system (Energy Fuels, 2009f).

The anticipated influx of new residents associated with operations is not likely to be large enough to impact local water and wastewater treatment facilities. The Mustang Water Authority's water treatment plant currently uses 25 percent of its capacity (Carter, 2009). Wastewater treatment plants in both Naturita and Nucia currently use approximately 30 percent of their respective capacities (Carver, 2009; LaBondy, 2009).

**Fiscal Conditions.** Spending associated with operations would result in annual sales tax revenues of approximately $241,516 to the State of Colorado, $120,000 to Montrose County, and $58,841 to each of the towns of Naturita and Nucia (see Table 4.10-11). These estimated sales tax revenues consider direct spending by the Mill on expenditures that Energy Fuels expects would be subject to sales tax (Vigil, 2009) and 62.9 percent of estimated disposable income derived from mill operations (Berger, 2009). This analysis assumed that commercial and retail opportunities expand in Naturita and Nucia during Mill operations, and that 20 percent of taxable household spending would occur in each of these two towns. Although some household spending associated with income derived from Mill operations is likely to occur outside Montrose County, not enough is know about where this spending would occur to estimate sales tax revenues to other local governments.

**Table 4.10-11**
**Estimated Annual Sales Tax Revenues - Operational Phase**

| Taxing entity | Annual Sales Tax |
|---|---|
| Colorado sales tax[1] | $241,516 |
| Montrose County sales tax[2] | $120,000 |
| Naturita sales tax[3] | $58,841 |
| Nucla sales tax[3] | $58,841 |

[1] Includes sales tax on taxable mill expenditures and 62.9 percent of household spending.
[2] Assumes that 80 percent of taxable spending occurs in Montrose County.
[3] Assumes that 20 percent of taxable household spending occurs within town limits.

The annual property taxes that would be paid on the Mill Facility are estimated to range between $1.9 million in Year 1 and $1.1 million in Year 10 over the first 10 years of the Mill's life (see Table 4.10-12). Property taxes were estimated by multiplying the property value of the Mill Facility by the assessment rate and then by the 2008 mill levy. Energy Fuels provided information concerning expected real and personal property values, including annual depreciation schedules, at the Mill (Vigil, 2009).

**Table 4.10-12**
**Estimated Property Taxes During First Ten Years of Mill Operation[1]**

| Tax-Paying Year | Montrose County General[2] | RE 2 West End School District | Montrose Library District - Naturita | Southwest Water Conservation District[2] | San Miguel Water Conservancy District[2] | Total Property Taxes |
|---|---|---|---|---|---|---|
| Year 1 | $701,375 | $1,007,718 | $148,914 | $8,398 | $2,022 | $1,868,428 |
| Year 2 | $666,647 | $957,822 | $141,541 | $7,982 | $1,922 | $1,775,913 |
| Year 3 | $631,918 | $907,925 | $134,167 | $7,567 | $1,822 | $1,683,399 |

BLM_0045337

| Tax-Paying Year | Montrose County General[2] | RE 2 West End School District | Montrose Library District - Naturita | Southwest Water Conservation District[2] | San Miguel Water Conservancy District[2] | Total Property Taxes |
|---|---|---|---|---|---|---|
| Year 4 | $597,190 | $858,028 | $126,794 | $7,151 | $1,721 | $1,590,885 |
| Year 5 | $562,462 | $808,131 | $119,421 | $6,735 | $1,621 | $1,498,370 |
| Year 6 | $527,733 | $758,235 | $112,047 | $6,319 | $1,521 | $1,405,856 |
| Year 7 | $493,005 | $708,338 | $104,674 | $5,903 | $1,421 | $1,313,341 |
| Year 8 | $474,236 | $681,371 | $100,689 | $5,679 | $1,367 | $1,263,341 |
| Year 9 | $439,508 | $631,474 | $93,315 | $5,263 | $1,267 | $1,170,827 |
| Year 10 | $404,780 | $581,577 | $85,942 | $4,847 | $1,167 | $1,078,313 |

[1] Estimates based on information provided by Vigil, 2009 and Montrose County, 2009d.
[2] Tax district is subject to TABOR revenue caps.

It is important to note that these property tax estimates are based on 2008 mill levies, which may change over the life of the project. In particular, taxing districts that are subject to revenue limits set by the Colorado Taxpayers' Bill of Rights, also known as the TABOR Amendment, are required to adjust their mill levies downward if an increase in assessed valuation causes that tax entity to exceed its TABOR revenue cap. The calculation of TABOR revenue caps takes into account an inflationary cost adjustment, population growth, and new construction. Montrose County, the Southwest Water Conservation District, and the San Miguel Water Conservancy District are subject to TABOR revenue restrictions. Therefore, an increase in assessed valuation that caused the property tax revenues to any of these districts to exceed their TABOR limit would require that the tax district lower its mill levy, thereby lowering the property tax liability of all taxpayers in the district. The RE-2 West End School District and Montrose County Library District have "de-Bruced" and can keep additional tax revenues that would result from increasing assessed valuations (CDOLA, 2009e).

### 4.10.1.2.3  Closure

**Workforce.** Mill closure would result in the loss of the 85 operational jobs. Some mill workers, such as supervisors, radiation program workers, and equipment operators could be retained through the project's closure phase. Energy Fuels expects that decommissioning and reclaiming the Mill Facility would be conducted over approximately a 3-year period. The typical daily workforce would include approximately 10 people: seven equipment operators performing the reclamation work, and three supervisory/radiation program workers. Daily crew size could range from two to 15 operators, depending on the amount of scheduled work as discussed in the *Mill Decommissioning and Reclamation Cost Estimate* (Energy Fuels, 2009h). Given its small size and the availability of skilled mill employees trained in radiation protection procedures, it is likely that the closure workforce would be comprised of local workers that worked at the Mill during the operations phase.

Current wages for equipment operators are approximately $18.75 per hour (Energy Fuels, 2009h). This corresponds to an average wage rate of $39,000 per year, excluding benefits. Wage levels are likely to change considerably by the time scheduled Mill closure would occur in the year 2052.

**Population.** In the event that former mill workers would have to leave western Montrose County in order to secure employment, Mill closure could lead to population losses in local communities. If local economies expanded and diversified over the Mill's 40 year operational life, it is likely that potential population losses due to Mill closure would be mitigated by job

BLM_0045338

creation in other local businesses. Subsequent socioeconomic impacts associated with Mill closure would largely depend on potential population losses, which, in turn, would be influenced by the amount of economic development that occurs in western Montrose County over the next 42 years.

**Housing.** Potential population losses associated with Mill closure would result in depressed housing market conditions; that is, falling housing prices and slowing residential sales. Depending on the size of the local economy, Mill closure could result in falling housing prices regardless of out-migration.

**Community Services.** Population losses due to Mill closure could result in falling school enrollments. Mill closure would not be expected to have an adverse impact on medical service providers and public safety officials, nor on local water and wastewater treatment facilities.

**Fiscal Conditions**. Based on current tax rates, over the 33 month closure period, sales and use tax revenues associated with closure would include $194,868 to the State of Colorado, $116,687 to Montrose County, and $2,612 to each of the towns of Naturita and Nucla (see Table 4.10-13). Energy Fuels estimates that it will spend approximately $6,458,400 on rocks and sand products during closure (Energy Fuels, 2009h). This analysis assumes that these materials would be purchased in Montrose County. An estimated $662,857 in total labor income would be associated with mill closure. Estimated sales tax revenue from household spending is based on adjustments to total labor income to consider the portion of disposable income spent on taxable items only.

**Table 4.10-13**
**Estimated Sales and Use Tax Revenues – Closure Phase**

| Taxing Entity | Estimated Sales and Use Tax |
|---|---|
| Colorado sales and use tax[1] | $194,868 |
| Montrose County sales and use tax[2] | $116,678 |
| Naturita sales tax[3] | $2,612 |
| Nucla sales tax[3] | $2,612 |

[1] Includes sales tax on taxable mill expenditures and 62.9 percent of household spending.
[2] Includes sales tax on taxable mill expenditures and assumes that 80 percent of taxable household spending occurs in Montrose County.
[3] Assumes that 25 percent of taxable household spending occurs within town limits.

Based on the closure schedule for the Mill Facility, most of these revenues would be expected in the 2nd and 3rd years of closure as discussed in the *Mill Decommissioning and Reclamation Cost Estimate* (Energy Fuels, 2009h). Final closure would result in the loss of sales tax revenue associated with mill expenditures and household spending of income derived from mill operations, and the loss of property tax revenue based on real and personal property values at the Mill Facility.

## 4.10.2 Protective/Mitigation Measures

Energy Fuels would implement the following measures to mitigate socioeconomic-related impacts resulting from the Proposed Action:

BLM_0045339

- Energy Fuels would encourage contractors to employ local workers on construction crews to minimize impacts on short-term housing and community services caused by an influx of temporary workers.

- Energy Fuels would encourage skilled tradesmen from the local area (e.g. electricians, instrumentation workers, boiler makers, and mechanics) who are part of the mill's construction workforce to transition to permanent positions on the mill's maintenance crews to minimize impacts on community services due to population fluctuations.

- Energy Fuels would minimize the demand on local emergency responders through implementation of the *Emergency Response Plan* (Energy Fuels, 2009e).

- Site security measures would include a security fence with limited access points, a manned guardhouse at the site entrance to control all traffic entering the Site from SH 90, and a secondary road around the perimeter of the fence to allow for daily security inspections which would minimize impacts of law enforcement officials caused by security breaches. These measure would be implemented according to Energy Fuels' *Security Plan* (Energy Fuels, 2009i).

### 4.10.3 Monitoring

No monitoring has been proposed for mitigation measures related to socioeconomic-related impacts.

## 4.11   PUBLIC AND OCCUPATIONAL HEALTH

### 4.11.1 Environmental Impacts

### 4.11.1.1 General Impacts

Through the life of the Mill, the Mine Safety and Health Administration (MSHA) and CDPHE would be the primary health and safety regulators (MSHA for nonradiological issues and CDPHE for radiological issues). The governing agencies, their respective regulations, and the subjects of the various regulations include, but are not limited to:

- **Mine Safety & Health Administration (30 CFR)**
  - Subpart C (Part 56.4), Fire Prevention and Control (Flammable and combustible liquids and gases)
  - Subpart D (Part 56.5), Air Quality and Physical Agents (exposure limits, monitoring, control, and restricted chemicals
  - Subpart K, Metal and Nonmetal Mine Safety and Health
  - Subpart O (Part 56.16), Materials Storage and Handling
  - Part 56.20014, Prohibited areas for food and beverages (toxic material areas)
  - Mine Improvement and New Emergency Response Act of 2006 (MINER Act), (Emergency Response Plan requirement)

- **Colorado Department of Public Health and Environment**
  - 6 CCR 1007-1, Part 3, Licensing of Radioactive Material
  - 6 CCR 1007-1, Part 4, Standards for Protection against Radiation
  - 6 CCR 1007-1, Part 18, Licensing Requirements for Uranium and Thorium Processing

- **Environmental Protection Agency (40 CFR)**
  - Part 61, Subpart W, National Emissions Standards - Radon from Mill tailings

BLM_0045340

- o Part 68, Chemical Accident Prevention Provisions.
- o Part 190, Environmental Radiation Protection Standards For Nuclear Power Operations
- o Part 192, Health And Environmental Protection Standards For Uranium And Thorium Mill Tailings
- o Part 302, Designation, Reportable Quantities, and Notification
- o Part 355, Emergency Planning and Notification.

- **Colorado Dept of Labor and Employment, Division of Oil and Public Safety**
  - o 7 CCR 1101-5, Boiler and Pressure Vessel Regulations
  - o 7 CCR 1101-14, Storage Tank Regulations

- **U.S. Department of Transportation and Colorado Department of Transportation**
  - o 49 C.F.R., Parts 100 – 185
  - o 2 CCR 601-8, Traffic Regulations Governing the Use of the Tunnels on the State Highway System
  - o 8 CCR 1507-25, Rules and Regulations Concerning the Permitting, Routing & Transportation of Hazardous and Nuclear Materials and the Intrastate Transportation of Agricultural Products in the State of Colorado

Throughout construction and operation of the Mill Facility as well as during closure and post-closure monitoring, Energy Fuels would be required to implement radiological and safety programs that comply with 6 CCR 1007-1 to protect the health and safety of workers and the public. CDPHE and MSHA would review, approve, and enforce these plans, requiring revisions and updates, where necessary, throughout the life of the Mill Facility. The plans include:

- *Facility Operating Plan* (Visus and Energy Fuels, 2009a). This plan provides a comprehensive narrative of the Mill Facility design, operation, system controls, and maintenance procedures for each mill component. At the start of milling operations, comprehensive operating procedures would be developed for each area of the Mill to guide mill operators in performing routine and non-routine tasks.

- *Health and Safety Plan* (Energy Fuels, 2009h). This plan is designed to inform mill personnel of the rules, procedures, and work practices that are in place to protect them from injury. The plan presents the following information: guidelines for reporting unsafe conditions in the workplace; policy on employee conduct; safety personnel organizational structure; use of personal protection equipment; health and safety programs and procedures (e.g., HazCom Program, Administrative Procedures, General Health and Safety Procedures, and Radiological Health and Safety Procedures); and procedures for radiation work permits.

- *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b). This plan presents the protocols for ongoing monitoring of environmental resources, process waste attributes and controls, and Health and Safety aspects during operation of the Mill Facility. Specifically, this plan provides monitoring schedules and procedures to assess radiation doses and the radionuclides in the mill effluents and environment during operations.

- *Emergency Response Plan* (Energy Fuels, 2009e). This plan identifies possible incidents (i.e., fire/explosion, chemical spill, transportation accident; medical, severe weather) that may occur and provides identification, response, and notification procedures for those incidents. The plan identifies the responsibilities of personnel in the

event of emergencies and describes on-site and off-site protective actions. The plan lists the required response equipment that would be available to personnel, and describes the required training of on-site personnel. It also includes provisions for annual on-site emergency response training exercises with local response personnel including firefighters, medical personnel, and members of the county sheriff's department.

- *Material Containment Plan* (Energy Fuels, 2009c). This plan provides employees with information to safely store and handle materials necessary for milling uranium and vanadium as well as information regarding expedient and comprehensive spill response procedures. The materials include chemical reagents, fuels, ore, processing streams, and tailings and raffinate waste streams. The plan provides detailed Material Safety Data Sheets for the various materials, which include information, such as: potential health hazards, potential safety/environmental hazards, handling methods, first aid procedures, containment requirements, maintenance requirements, and spill response and notification.

- *Spill Prevention, Control and Countermeasure Plan* (Energy Fuels, 2009b). The SPCC Plan provides spill response and reporting procedures for petroleum products including diesel and gasoline fuels, motor oil, hydraulic oil, transmission fluid, and used oil. The plan provides procedures for preventive maintenance (tank and containment system integrity, security, buried pipe protection, secondary containment protection, field repairs, spill containment kits) and procedures for transfer operations. Energy Fuels would provide SPCC training as a part of every new employee's training.

Prior to working at the Mill, employees would be required to take 40 hours of comprehensive MSHA training that focuses on both nonradiological health and safety concerns and appropriate safeguards at the Mill. Additionally, employees who work in radiological control areas would be trained as "radiation workers" in accordance with 6 CCR 1007-1, Part 4 (CDPHE, 2005b). During this time, they would be trained in the requirements and procedures of the plans described above. New employees would receive additional hands-on task training in the mill from mill supervisors, safety personnel, and senior operators. Safety refresher courses would also be given periodically by safety and operations personnel on a routine basis. Annual retraining would be conducted as required by MSHA and CDPHE. Qualified employees would be given the opportunity to take more advanced emergency response training including use of self-contained breathing apparatus and emergency medical procedures.

Routine operation of the Mill would result in nonradiological and radiological impacts to mill workers, surrounding flora and fauna, and the general public. These impacts, which are quantified in this section of the ER would be small. This section also examines the potential for accidents and possible impacts resulting from accidents.

### 4.11.1.1.1 Nonradiological Impacts

Nonradiological impacts to public and occupational health include the potential for accidents and exposure to chemical reagents, fuels, feedstock, and process and waste streams during construction, operations, and closure of the Mill. The potential for accidents and exposures to chemicals would be minimized by implementation of and adherence to the federal and state regulations governing health and safety at the Mill Facility.

### 4.11.1.1.2 Radiological Impacts

As provided in Section 3.11, radiation is energy given off by matter in the form of rays or high-speed particles. Radiation that originates from cosmic rays, radon in the air, naturally-occurring

BLM_0045342

radioactive materials in soil, water and food such as uranium, and other naturally occurring radionuclides can damage plant, animal, and human cells. For exposure to low levels of radiation, the impacted cells may not be damaged or the damage may be repaired within the cell. However, a high radiation dose may cause physical damage within the cell or the cell may become cancerous years later. Similar to many chemical agents, as the radiation dose increases, the potential for physical damage and illness increases.

Radioactivity is the number of atoms in the material that decay and release ionizing radiation in a given time period. The amount of energy deposited in living tissue by ionizing radiation is called the "dose" and is measured in millirems (mrem). On average, people living in Colorado receive a dose of about 400 mrem each year from natural background radiation. Approximately two-thirds of this background dose originates from radon in the air with the remainder comprised of cosmic radiation, radioactive carbon, and potassium contained within the body, and gamma radiation emitted by radioactive materials in the ground (i.e., radium, uranium, and thorium).

Under CDPHE regulations (6 CCR 1007-1, Part 4.6.1.1), mill workers are limited to an annual radiation exposure limit of 5,000 mrem/year. Today, the annual effective dose (i.e., incremental dose above background) received by a mill worker is typically less than 100 mrem/year. The maximum exposure limit set by CDPHE, codified at 6 CCR 1007-1, 4.14, (as well as the NRC) (10 CFR 20, Subpart D-Radiation Dose Limits for Individual Members of the Public) for the general public at the Property Boundary and beyond is 100 mrem/year above background. Adherence to this limit is verified through sampling and monitoring. Exposure at the nearest residence is expected to be 10 mrem/year or less. Given that the nearest downwind residents are located 3 to 4 miles east of the property (see Figure 3.10-2), it is unlikely that an increase in radiation above background levels could be detected at these locations. The exposure limits for mill workers and the general public have been set conservatively by regulatory agencies based on input from health professionals and numerous health studies. Energy Fuels must maintain radiation levels below these regulatory limits.

Radiological impact of mill operations to the mill employees and visitors would be managed, measured, assessed and documented by the Radiation Safety Officer (RSO) and staff. Doses are determined from mill area air samples, breathing zone air samples, uranium in urine bioassay samples, and by direct measurement of radiation in the Mill. Procedures for collecting the samples and making the measurements are presented in the *Health and Safety Plan* (Energy Fuels, 2009h). Radiation doses would be evaluated regularly, including on a daily basis for some operations. Employee dose reports from the RSO would be sent to employees. Additionally, copies would be sent to mill management and to the Radiation Safety Committee to ensure doses are being maintained "as low as reasonably achievable" (ALARA).

## 4.11.1.1.3 Accident Scenarios

A list of possible radiological and nonradiological accident scenarios associated with construction and operation of the Mill Facility are provided in Table 5.1 of the *Risk Assessment* (SENES, 2009a). Accidents occurring at the Mill Facility may include fire, explosion, chemical releases, or involve transportation. Accidents involving chemical reagents or process solutions may expose workers and/or the public to radiological and nonradiological impacts from inhalation or ingestion, skin or eye irritation, or mild to serious burns. To limit the possibility and seriousness of accidents and to provide for response action in the event of an accident, Energy Fuels has prepared and would implement various health and safety plans, described above. The plans will help ensure that (SENES, 2009a):

BLM_0045343

- The normal operation of the mill is safe for workers, members of the public, and is protective of the environment, and that potential impacts from radioactive and other hazardous materials will be maintained ALARA.
- The frequency and probability of accidents and malfunctions are reduced; and
- During a potential accident and malfunction event, the consequences and potential impact to health, safety, and environment will be minimized.

Additional information regarding the risks associated with possible accidents during milling operations is presented in Section 4.11.1.3.3.

### 4.11.1.2 Construction

#### 4.11.1.2.1 Nonradiological Impacts

Nonradiological public and occupational health impacts during construction of the Mill Facility would be similar to those at any construction site. The risks of events such as trips and falls, strains, electrocution, crushing, and pinching associated with project activities such as working at heights, working with heavy equipment both during construction and during routine operation of the plant would not be different from those on any other industrial project of similar scope and duration (SENES, 2009a). Potential spills during construction would likely be associated with equipment refueling and maintenance. Construction contractors would be required to have and implement a Health and Safety Plan and a SPCC Plan. The Health and Safety Plan would meet MSHA requirements under 30 CFR Subpart K and the SPCC Plan would meet EPA's requirements under the Oil Pollution Prevention regulation (40 CFR Part 112).

Montrose County and the State would inspect the Mill Facility buildings; the State would conduct electrical and gas inspections and the County would inspect the structural components. Occupancy would be permitted if the buildings pass the inspections.

#### 4.11.1.2.2 Radiological Impacts

Radiological impacts above the naturally-occurring radiological baseline conditions at the Site (see Section 3.11), would be minimal during the construction period. Ore could be delivered ear the end of the construction period, but it would not be processed until the Mill is operational. Fugitive dust from stockpiled ore would be controlled through the use of water sprays and chemical dust suppressants, as necessary. A temporary license boundary would be established around the ore pad and radiological controls would be implemented for personnel and equipment entering and leaving the licensed area.

### 4.11.1.3 Operations

#### 4.11.1.3.1 Nonradiological Impacts

**Mill Workers and General Public**

As discussed above, trips, falls, strains, electrocution, crushing, and pinching associated with project activities such as working at heights, working with heavy equipment, and working around moving parts and electrical systems would all present potential hazards during operations. Additionally, the Mill Facility would use a variety of chemical reagents and other materials, which would be delivered from offsite vendors on a routine basis and stored onsite. Table 4.11-1 provides a list of the more common materials that would be used and stored onsite. Standards for the use and storage of nonradioactive, hazardous chemicals are promulgated and enforced by federal and state agencies such as MSHA, CDPHE, CDOPS, and the EPA. Specific

BLM_0045344

quantities or uses of chemicals that require certain controls, procedures, safety measures, or reporting protocols are defined in the standards.

**Table 4.11-1**
**Materials that May Be Used or Stored Onsite**

| Material | Purpose | Maximum Quantity On-Site | Storage Location |
|---|---|---|---|
| Kerosene | Uranium Solvent Extraction | 38,100 | West of Solvent Extraction Building |
| Anhydrous Ammonia | Vanadium Solvent Extraction | 12,000 | West of Solvent Extraction Building |
| Ammonium Sulfate | Vanadium Precipitation and Packaging | 6,280 cubic feet (solid power) and 11,800 gallon (solution) | Precipitation and Packaging Building |
| Sodium Hydroxide | Vanadium Solvent Extraction | 1,100 gallons (50% Solution) and 4,500 gallons (8% Solution) | Solvent Extraction Building |
| Sodium Carbonate | Uranium Solvent Extraction Vanadium Solvent Extraction | 26,400 gallons of slurry (31% by weight) 15,200 gallons dilute solution (15% by weight) 68,00 lbs (1,100 CF) (dry, temporary while delivered only, not sorted on-site as a solid) | Southeast of Precipitation and Packaging Building |
| Sulfuric Acid | Leach Circuit | 258,000 gallons | Southeast of Mill Facility |
| Sodium Chlorate | Vanadium Solvent Extraction Leach Circuit | 98,100 gallons (3% by weight) | Precipitation and Packaging Building |
| Hydrogen Peroxide | Uranium Precipitation and Packaging | 7,100 gallons | Precipitation and Packaging Building |
| Alamine 336 | Uranium Solvent Extraction | 1,100 gallons | Warehouse |
| Isodecanol | Uranium Solvent Extraction | 1,100 gallons | Warehouse |
| Diesel Fuel | Equipment Fuel | 15,900 gallons | Northwest of Solvent Extraction Building |
| Gasoline | Equipment Fuel | 2,000 gallons | Northwest of Solvent Extraction Building |
| Propane | Heating | 36,000 gallons | West of Reagent Unloading Area Administration Building |

The materials would be delivered to the Site by licensed haulers in USDOT-approved containers. These materials and fuels would be stored on-site in closed tanks and/or weatherproof buildings. The containers would be properly labeled and meet applicable storage regulations for the stored media, including secondary containment. Energy Fuels employees and contractors would be trained based on the plans listed above in proper handling, storage and use of the chemicals, reagents and fuels consumed on-site.

Chemicals, reagents and diesel fuel would be delivered to an area located outside the restricted area (i.e., Mill License Boundary) so that delivery trucks would not have access to mill process areas where licensed material is located and radiation levels are controlled and closely monitored. Trucks delivering chemicals and fuels to the Mill Facility would park within a concrete

BLM_0045345

apron that would be curbed and would drain to a containment area, and the storage tanks would be located within a reinforced concrete containment structure which would also protect them from vehicular traffic. Diesel and gasoline would be stored on-site in double-walled storage tanks situated within a common concrete containment, with a floor sump and protective aprons to collect spillage during fueling.

Bulk shipments of liquid reagents and fuels (e.g., sulfuric acid, sodium chlorate, kerosene, and diesel fuel) would be pumped to tanks that are located within various areas of the Mill Facility. Product lines, to the storage tanks and from the storage tanks to the processing buildings, are designed to be chemically resistant to corrosion (e.g., carbon steel or HDPE) and would be enclosed within a second line with leak detection. Process and reagent lines, which are not within a concrete secondary containment area, are placed inside an outer pipe sleeve, lined pipe rack, or lined trench. In each case, the secondary containment discharges into a concrete containment area with a double-contained floor sump. If the inner pipe develops a leak, the solution will drain by gravity to the double containment area and then to the sump. This system provides for containment and detection of leaks. Maintenance personnel would inspect leak detection points daily (Visus and Energy Fuels, 2009b).

Bulk shipments of dry chemicals and reagents such as sodium carbonate and ammonium sulfate would be blown or mixed with water to create a slurry and pumped into storage tanks located within the Mill License Boundary. Similarly, propane would be delivered directly to tanks located within a fenced area outside the Mill License Boundary. Packaged shipments of chemical reagents such as sodium hydroxide and diatomaceous earth would be offloaded at the warehouse along with parts, lubricants, and other chemicals needed in the daily operation of the Mill Facility. These products would be packaged in drums, plastic totes, and crates.

During operations, similar to many other industrial operations, releases of large amounts of hazardous chemicals (see Table 4.11-1), which could adversely affect public and occupational health and safety, are possible (SENES, 2009a). However, they are generally considered unlikely, given commonly applied safety practices, extensive and comprehensive regulations and the history of safe use of these chemicals. The frequency of catastrophic failure of large storage tanks are in the order of $10^{-4}$ per year (i.e., once every 10,000 years), while the frequency for catastrophic failure of pressure vessels, such as an ammonia storage tank, is in the order of $10^{-5}$ per year or once every 100,000 years for any similar tank or pressure vessel (Center for Chemical Process Safety of the American Institute of Chemical Engineers – CCPS, 1989). The risks associated with this class of events are no different than at any similar industrial facility, and are independent of the radiological characteristics of a uranium mill. In fact, the risks would be expected to be less than at similar industrial facilities due to the rigorous work control and training programs required at Atomic Energy Act licensed facilities.

Strong bases such as ammonia ($NH_3$) and sodium hydroxide ($NaOH$) and strong acids such as sulfuric acid ($H_2SO_4$) will strongly react with each other, and with water, if accidentally mixed. Therefore, their storage tanks would be located in separate secondary containment areas. In addition, precautions would be taken to ensure that these chemicals do not inadvertently come into contact with each other during operations. A spill of toxic or corrosive chemicals, such as sulfuric acid, inside the mill processing areas would pose no significant impact to the public; however, workers in close vicinity of the spill may come into contact with such chemicals. The application of common safety practices and associated safety training for handling and use of chemicals is expected to lower the likelihood of large release events and therefore lower the risk to acceptable levels.

BLM_0045346

The mill process areas, ore pad, tailings cells, and evaporation ponds are designed as "zero discharge" facilities. Accidents, while highly unlikely, involving the feedstock, the processing streams, or the waste streams could pose nonradiological risks to workers due to high temperatures and extremely low pH of some processing solutions. The risks would be mitigated by implementation of Energy Fuels' plans listed above. Emissions from the vanadium fusion and packaging circuit would be controlled through the use of scrubber systems to minimize worker exposure to particles of vanadium and other metals. The mill facilities with potential for release of dust or toxic fumes (e.g. dryers, precipitation tanks, leach tanks) would also be equipped with baghouses and/or wet scrubbers to minimize emissions of dust or fumes to the atmosphere (SENES, 2009a).

Catastrophic failure of a storage tank, as discussed above, is a very unlikely scenario. However, in a more probable accident, it is possible that the line connected to the storage tank could be ruptured, in which case the release rate would be substantially less. In either event, the *Emergency Response Plan* (Energy Fuels, 2009e) would be implemented to protect workers and the public, as well as to provide containment and control over the release. Procedures for safely responding to releases of various chemicals are provided in the *Material Containment Plan* (Energy Fuels, 2009c).

The impact of the use and handling of hazardous chemicals during routine mill operations on the members of the public and wildlife is expected to be zero. SENES prepared a *Risk Assessment* for the project in which multiple accident scenarios were identified and the non-radiation and radiation risks were quantified based on frequency and severity of impact. Overall, the off-site impacts of credible accidents involving hazardous chemicals were determined to be small, while impacts to workers could be moderate (SENES, 2009a). However, the risks of on-site impacts to workers would be mitigated by formal and rigorous training requirements and operational and emergency response procedures.

## Wildlife

The tailings and raffinate solutions in the tailings cells and evaporation ponds can be acutely and chronically toxic to wildlife because of their low pH and elevated metal concentrations (Visus, 2009). The liners would also be slick and relatively steep (3H:1V), which could prevent larger hoofed mammals from exiting a tailings cell or evaporation pond should they accidentally enter the area. Therefore, wildlife would be excluded from the tailings cells and evaporation ponds by implementation of the following measures.

- A 6-ft high chain-link fence topped by three strands of barbed wire would be installed around the entire perimeter of the tailings cells and evaporation ponds. The fence would be inspected daily and repaired, as necessary, to prevent access to the area by wildlife.
- Bird balls would be placed on top of the ponded portion of the tailings area to prevent birds from landing on the water. The hollow balls are made of plastic and float on top of the water concealing the water surface and creating a physical barrier.
- Woven bird netting would be installed over and along the sides of the evaporation pond network. The bird netting has two-inch openings and is clipped to stainless steel cables suspended in a grid between wooden support poles. The 25-ft long wooden poles are implanted 8.5 feet into the ground (i.e., the netting is located 16.5 feet above ground) and supported by wire strung from a series of concrete anchor points.

BLM_0045347

- Mill personnel would inspect the tailings cells and evaporation ponds on a daily basis. As part of their inspection, they would identify and record any wildlife mortalities and, where possible, implement measures to reduce or eliminate future occurrences.

#### 4.11.1.3.2 Radiological Impacts

The potential for radiological impacts exists throughout the various operations required to process uranium. Risks would be avoided or mitigated through implementation of the mill design and health and safety plans which are presented in the license application. These plans were designed to comply with the following regulations and related guidance:

- CDPHE 6 CCR 1007 -1 Parts 4 – Standards for Protection Against Radiation
- CDPHE 6 CCR 1007 -1, Part 18 - Licensing Requirements for Uranium and Thorium Processing
- CDPHE 6 CCR 1007 -1, Part 18, Appendix A - Criteria Relating to the Operation of Uranium Mills and the Disposition of the Tailings or Wastes From These Operations
- US EPA 40 CFR 190 – Environmental Radiation Protection Standards for Nuclear Power Operations
- U.S. EPA 40 CFR 192 – Health and Environmental Protection Standards for Uranium and Thorium Mill Tailings
- U.S. EPA 40 CFR 61, Subpart W – National Emissions Standard for Radon Emissions from Operating Mill Tailings
- American National Standards Institute Practices for Respiratory Protection, ANSI Z88.2
- U.S. Nuclear Regulatory Commission Regulatory Guide 8.30  - Health Physics Surveys at Uranium Recovery Facilities
- U.S. Nuclear Regulatory Commission Regulatory Guide 8.31 – ALARA Programs at Uranium Recovery Facilities
- U.S. Nuclear Regulatory Commission Regulatory Guide 8.22 – Bioassay at Uranium Mills
- MSHA 30 CFR 57.5037 to 57.5047 – Radiation Protection Standards (as may be applicable to surface operations)

**Radiological Exposure Pathways – General**

Energy Fuels has provided a *Radiological Exposure Pathways Report* (Savignac, 2009a), which describes the activities associated with the Mill Facility that may result in radiation exposure to the individuals working at the mill or the public near the Mill. Excerpts from that report follow.

Radiological exposure pathways originate with a source of radioactive materials. The radionuclides pass through an exposure medium, such as air or water, are transmitted and produce a radiation dose to plants, animals, and/or humans. The potential sources of radionuclides at the Mill Facility are discussed below:

- Of the 15 radionuclides presented in the underlined uranium-238 decay series, the following radionuclides have sufficiently long half-lives to be transferred from their source, through the exposure medium to plants, animals, and/or humans:
    - U-238
    - U-234
    - Th-230
    - Ra-226
    - Pb-210

BLM_0045348

- U-238 and U-234 would be largely present in the Mill where the uranium is separated from the ore and concentrated to create the final product, yellowcake, which consists mainly of $UO_3$ and $UO_4$ and their hydrates. The yellowcake would be packaged in drums and shipped via truck from the Mill Facility for further processing. Yellowcake would be a source of exposure to humans inside the mill from process liquids leaking and drying on equipment and the floor and during the drying and packaging process.

- U-238, Ra-226, Th-230, and Pb-210 would be present in the dust generated by ore transfer operations at the ore pad. Rn-222 would also be released from the ore present on the ore pad. Dust may be generated at the ore pad by truck travel on the ore pad, dumping the ore from truck onto the pad, and picking up the ore and dumping it into the grizzly. Dust would also be generated from wind erosion of the ore pile. The fugitive dust and radon would be pathway sources for exposure to humans and animals. Dust from these operations would be controlled with water sprays.

- Ra-226, Th-230, Pb-210 and limited amounts of U-238 and U-234 would be present in the tailings placed in the tailings cells. No more than two 40-acre cells may be open at any one time (NESHAPS regulations in 40 CFR 61) and available for dusting. In the case of the Mill Facility, no more than two of the 30-acre cells would be open at one time, limiting the exposed tailings beaches to 60 acres. Sprinkling of tailings solution or raffinate on the beaches would minimize dust generation but some tailings solids may dry out on the beaches and become airborne. Radon would be produced from the beaches and, to some degree, from tailings solutions. The dust and radon would be pathway sources for exposure to humans and animals. Liquids containing these sources would be prevented from entering pathways to plants, animals, and/or humans by the lining system under the tailings.

- Th-232 and its decay products may be present in some uranium ores. The decay chain consists of 12 elements of which radium and thorium are long-lived radionuclides. Because ore would be coming from a variety of mines in the area and thorium exists in limited quantities in a few of the ores, only limited amounts of Th-232 would be anticipated in the mill feed. Th-232 would pass through the mill and would be discharged and contained within the lined tailing impoundment. Until such time as Th-232 would be present in large quantities in ore sent to the mill, Th-232 in ore dust and/or in tailing dust would not be considered a major pathway for radiation exposures.

- Uranium decay series elements would be present in low concentrations in the uranium ore processed at the mill. The Mill Facility would have four stacks that would release particles of uranium and its progeny:

  - The semi-autogeneous grinding (SAG) mill process vent stack from the SAG mill dust scrubber
  - The leach train vent gas scrubber stack
  - The vanadium dryer dust collector and packaged bed scrubber stack

  These four stacks would release limited quantities of radionuclides from effluent control systems in the Mill as documented by Kleinfelder (2009i) and Two-Lines (2009). These stacks would be considered minor pathway sources. The uranium vacuum dryer is a zero discharge system and would not emit radionuclides.

BLM_0045349

**Radiation Exposure Pathways – Mill Workers**

The pathways that may result in radiological impact to mill employees and visitors would be exposure to gamma rays from radionuclides in the Mill and exposure from the inhalation of yellowcake, ore dust, and radon progeny. The radiological risks associated with the individual milling operations are described below according to their potential exposure pathways (i.e., air, water, flora/fauna). An analysis of the possible radiological accident scenarios follows the exposure pathways discussion.

**Air Exposure Pathways.** Inhalation would be the main pathway of radionuclides from the Mill Facility to employees and people in the vicinity of the Mill. Airborne radioactivity may be generated during the individual milling activities: 1) ore receiving/grinding, 2) leaching, 3) uranium recovery, and 4) during tailings disposal. Transportation of ore and yellowcake may also result in airborne radioactivity.

Ore Receiving/Grinding. The ore pad, located outside the mill buildings, is where the ore would be unloaded from the ore trucks for temporary storage before being transferred to the mill feed and grinding circuits. Typically, the ore would be delivered to the dumping platform where the trucks would dump their ore without entering onto the ore pad and the restricted area of the licensed facility. However, there may be an occasion where the ore would be delivered directly to the ore pad. Should it be necessary for an ore truck to enter onto the ore pad, it would be decontaminated in the truck wash and scanned before leaving.

Upon delivery to the dumping platform or the ore pad, the ore could be moist or dry depending on its source. The surface of the ore can dry quickly, especially in the warmer summer months, which could result in the generation of wind-blown dust. Water sprays and/or misters would be used at the dumping platform and the ore pad to minimize fugitive dust emissions during unloading and ore handling. The dumped ore would be moved to the ore stockpile area on the ore pad or directly to the feed hopper using front end loaders. During this transfer of the ore, fugitive dust would be controlled by spraying the stockpiles and roadways with water. Radon and particulates generated from ore handling and storage on the ore pads would be pathways to humans.

The ore would be moved to the ore feed system via a front end loader. The loader opening into the feed hopper building would be covered with a split, heavy-duty plastic curtain to minimize fugitive dust. In addition, a series of water sprayers or misters would provide for direct dust control at the grizzly. Within the feed hopper area, the primary dust control would be provided by a dust-collecting baghouse. The mill operations personnel would operate and maintain the baghouse dust collection system in compliance with the air quality permit issued by the Air Pollution Control Division of CDPHE. Particulates and radon from the ore feed system would present a potential pathway to humans.

Stationary air monitoring devices would be located in the ore handling areas to measure concentrations of uranium dust. Personnel working in these areas would wear breathing zone monitors to test the air they breathe and half-mask particulate (i.e., canister type) respirators if warranted. Additionally, the front-end loader operator may wear a breathing zone monitor within the loader cab.

The ore feed system would transfer the ore to the SAG mill where water would be added and the ore would be ground into a slurry. Particulate matter emissions are considered to be negligible in this area since the ore is mixed with water and ground into a slurry. However,

BLM_0045350

during this grinding process, radionuclides would be released to the air inside the mill. During operations, these emissions would be monitored by the mill RSO and staff and would be addressed in their evaluation of radiation doses to mill personnel. Ultimately, radon (Rn-222) would be discharged to the atmosphere by the mill ventilation system or by diffusion through the ventilation system and open doors and windows to the atmosphere, which would present potential pathways to humans. Particulate airborne emissions would be sent to a dust collector and mill stack, which would be another potential pathway.

A stationary air monitoring device would be located at the SAG Mill feed point to measure concentrations of uranium dust. Personnel working in the SAG Mill area would wear breathing zone monitors on occasion to test the air they breathe. They would also be provided with canister-type particulate respirators for use in dustier locations.

Leaching and Solvent Extraction. The slurried ore from the SAG mill would be temporarily contained in two large pulp storage tanks and then fed into the leaching, thickening, and clarifying units that feed the solvent extraction system where uranium and vanadium are recovered and concentrated. These are all wet processes that do not generate dust. Some dust could be generated if spills in any of these areas are allowed to dry out. In the pre-leach and leach circuits, sulfuric acid and radionuclide emissions would be sent to a scrubber that would be vented through a stack, presenting a potential pathway. Maintenance and operations personnel working inside the leach building, counter current decantation pump house, and solvent extraction buildings would, at times, wear breathing zone monitors to test the air they breathe. Stationary air monitoring devices may also be utilized in these buildings if warranted by data obtained from the breathing zone monitors.

Uranium Precipitation and Packaging. A stationary air monitoring device would be located in the solvent extraction building to measure concentrations of radioactive dust particles that could result from dried leaks or spills. Mill personnel working in this area may also be required to occasionally wear breathing zone samplers.

The precipitation tanks would be completely enclosed. When reagents are added to the solution, acidic and caustic fumes would be generated. These fumes would be vented to the wet Venturi scrubber located in the northeast end of the precipitation and packaging building. The system would consist of a suction fan, gas scrubber, and a scrubber pump that recycles the captured particles in the bottom of the scrubber to the pre-leach circuit. The scrubbed air would be vented to the atmosphere through a stack. The scrubber system would be electrically interlocked with the feed pumps so that the circuit would shut down if the emission controls are not operating.

The yellowcake packaging area would have its own heating, ventilating, and air conditioning system, and two sets of doors (vestibules) would remain closed at the exits to provide additional containment of air-borne particles. Only required operations personnel would be allowed within the packaging area and they would be required to wear appropriate personal protective equipment (PPE) including air-purifying respirators, gloves, and coveralls. A viewing area would be provided above the packaging area for guests and non-operations personnel. The packaging area would be routinely washed down to prevent the accumulation of dust on the surfaces of equipment and walls.

As air is heated and water evaporates in the yellowcake dryer, the moist air would be drawn through the dryer's baghouse unit where particles would be captured on the filter socks. When the socks become loaded, an automatic shaker would shake the sock cage and the dust would

BLM_0045351

fall back through the baghouse port into the dryer. The air flowing from the baghouse would be drawn by a vacuum to a condenser where the water and any remaining particulates would be removed from the air and pumped to the uranium thickener feed box. The clean air would be vented back to the yellowcake packaging room.

In addition to the dust and vapor control measures, a stationary air monitoring device would be located in the packaging area to measure concentrations of uranium in the air. Personnel working in the packaging area and drying room would wear breathing zone monitors and would be required to wear canister-type particulate respirators. Additionally, routine bioassays would be conducted on these personnel to determine the total uranium that has been inhaled and ingested.

Tailings and Raffinate Disposal. The mill tailings would be discharged from the milling operation and are the milling byproduct from which most of the uranium has been removed. The Th-230, Ra-226, and Pb-210 originally present in the ore would still be present in the tailings after the milling process. The tailings would be discharged from the mill as a sand-water slurry to the tailings cell where most of the tailings remain wet or damp. The presence of a pool of tailings liquid over a portion of the tailings cell would suppress the generation of tailings dust. However, solid tailings in the beaches above the pond water level could dry and become a source of wind-blown tailings particles, especially during the warmer summer months. The uncovered beach area is limited to 80 acres (two phased cells at 40 acres each) or less under federal regulations (40 CFR 61, Subpart W). In the case of the Mill Facility, the tailings cells are 30 acres each, limiting the exposed area to 60 acres total. Energy Fuels would minimize the generation of tailings dust by spraying tailings liquid over the solid tailings during operations. These solutions would contain high concentrations of salts and would be effective in forming a hard crust over the tailings. The liquid in the pond and the salt crust would suppress most of the radon emissions from the tailings (NUREG-0706, Vol. 1, p 5-8, footnote b). When a tailings cell has been filled to capacity, it would be capped with a soil cover to eliminate the potential for wind-blown tailings dust and reduce radon emissions to below federal (40 CFR 61, Subpart T) and CDPHE (6 CCR 1007-1, Part 18, Appendix A) mandated limits.

The stationary air monitoring devices installed to collect baseline air quality data would also function to measure concentrations of radioactive particulates generated from the tailings cells and evaporation ponds. These results would be compared with the Mill Facility's air emission permit limits. The air monitoring devices are located at three onsite locations and two offsite locations both east and west of the Mill Facility. Periodic windblown surveys would also be conducted to assess concentrations in the soil, both east and west of the tailings cells.

Equipment Released from the Mill. Equipment operating within the Mill License Boundary would be surveyed (and results documented) when leaving the site to prevent release of radioactivity above regulatory limits to be released to public areas. Any vehicle or equipment leaving the license boundary area would be scanned for radiation by a technician. If the piece of equipment passes the radiation scan, it would be allowed to exit the site. If the vehicle or piece of equipment does not pass the radiation scan, it would be directed to the truck wash station for decontamination. The truck wash would be a touchless system utilizing high pressure sprays to remove any dirt or mud.

**Water Exposure Pathways.** The Site is located in a semi-arid environment. There are no rivers or perennial streams near the Site, and groundwater is limited to the south portion of the Site and lies at approximately 400 hundred feet or more in depth. The dry washes that cross the Site from south to north occasionally contain running water for a short period of time after a

BLM_0045352

significant rain event. Engineering controls, such as diversion channels, would be used to direct this running water away from the facility limiting the potential for this water to come in direct contact with the mill infrastructure. Runoff from the zero-discharge area would be collected and contained on-site in the lined stormwater ponds, which would be monitored and maintained by mill personnel. The stormwater ponds would discharge to the evaporation pond should a large (i.e., plus 100-year) storm event occur (Kleinfelder, 2009a). Contaminants that might be carried in runoff from the Site would be contained within this system of surface drainage controls and disposed of in the stormwater and evaporation ponds. Because of the lack of inhabitants near the Mill Facility and the lack of waterborne sources of radioactivity, potential radiological impacts to humans from the surface water pathway is negligible.

The Mill Facility components that may provide water exposure pathways for radiation are identified and the associated protective features that have been designed for each are described below.

Ore Pad Facility. Approximately 1 acre of the ore pad would be lined with concrete and the remaining 5 acres would be lined with a geosynthetic clay liner covered with a protective layer of compacted native soils and roadbase (i.e., gravel) materials. The ore pad is designed as a zero-discharge facility with berms surrounding its perimeter to isolate drainage and with the pad base sloped to a lined stormwater pond. The stormwater pond is separated from the ore pad by a concrete sediment trap and sediments collected in the trap would be excavated as needed and placed back on the pad. The stormwater pond design incorporates a single composite liner system consisting of a HDPE geomembrane overlying a geosynthetic clay liner, overlying prepared subgrade soils. The pond is sized to contain runoff from the 100-year design storm event and pass the 1,000-year design storm event (to subsequent containment) with additional capacity provided by one foot of freeboard. Water collected in the stormwater pond would be pumped back onto the ore stockpile for dust control, as needed, or used in the mill process.

Process Lines. Process lines, which are not within a concrete secondary containment area, would be placed inside an outer pipe sleeve, lined pipe rack, or lined trench. In each case, the secondary containment would discharge into a concrete containment area with a double-contained floor sump. If the inner pipe developed a leak, the solution would drain by gravity to the double containment area and then to the sump. This system would provide for containment and detection of leaks. Mill maintenance personnel would inspect leak detection points daily.

The larger tailings and raffinate disposal and recycle lines would be located in a lined trench that would daylight at the tailings cell and evaporation ponds. With the exception of vehicle crossing points, the trench would be open and leakage would be detected through visual observation of the pipes. The lined trench would slope down from the mill to the tailings cells and evaporation ponds; therefore, if a leak were to occur in a disposal line, the solution would be contained within the trench liner and flow into a tailings cell or evaporation pond. Tailings personnel would inspect the tailings pipelines daily.

Tailings and Raffinate Disposal. Tailings would be pumped to three tailings 30-acre tailings cells (A, B, and C) over the life of the Mill Facility. Based on a production rate of 500 tpd, each tailings cell would have a design life of approximately 13 years and a minimum capacity to accommodate storage of 2.45 million tons of tailings with 3 feet of freeboard. The tailings cells are designed as permanent, zero-discharge, single-use facilities and would be lined accordingly. The tailings cells would be designed for stability and tailings containment under static and seismic (pseudo-static) loading conditions for both operating and post-closure conditions. The tailings would be deposited into the cells via pumping from the mill to perimeter discharge pipes

BLM_0045353

located at the surface of the active tailings cells, feeding perforated drop pipes extending down the lined slope on textured geomembrane rubsheets.

The tailings cells would be each designed with a primary and secondary liner system, an intervening leak collection and recovery system (LCRS), and a tailings underdrain system, consistent with the State of Colorado Rules and Regulations Pertaining to Radiation Control (6 CCR 1007-1, Part 18). Additionally, the tailings pool within each cell would be equipped with a surface water pump-back system as the water input rate is expected to exceed the rate at which water can percolate through the tailings to the underdrain system.

LCRS sumps have been included in the design of each tailings cell, with Tailings Cell A having two LCRS sumps. The LCRS design provides for capture and conveyance of the seepage through the upper (primary) tailings cell liner to a sump. Water collected in the LCRS sumps would be pumped back into the tailings pond. A critical consideration of this system is to maintain minimal hydraulic head on the lower (secondary) composite liner, thereby preventing a driving hydraulic force required for any seepage to occur to the environment.

Per Criterion 5E(3) of 6 CCR 1007-1, Part 18, Appendix A (CDPHE, 2001), the tailings cells have been designed with an underdrain system installed on top of the primary geomembrane liner at the base of the impoundment. This feature provides added effectiveness to the proposed liner system by lowering the hydraulic pressure within the overlying tailings, thereby reducing the driving head for seepage.

The liner system for the evaporation ponds would be identical to the tailings liner system with two exceptions: 1) the upper primary liner would be black (rather than white) to enhance evaporation rates; and 2) a geonet would be used for the LCRS along the side slopes of the cells instead of a drainage geocomposite. The evaporation system would consist of ten 4-acre ponds with the potential for future expansion to 80 acres as ponds fill with precipitated salts. Each cell would have a dedicated LCRS for seepage collection. The LCRS would be continuous beneath the primary liner and would drain to a sump equipped with water level indicators. Portable submersible pumps would be used to pump any water collected in the LCRS sump back to the evaporation cell.

## Radiation Exposure Pathways – Flora and Fauna

The radiological impact on plants and animals results from pathways such as deposition of ore and tailings dust and consumption of water and vegetation by animals, and the uptake of water and nutrients by plants. Inhalation of radionuclides by animals near the Site may occur, but the magnitude of exposures should be very small as cattle only graze in the area on a seasonal basis and deer and elk also migrate in and out of the area on a seasonal basis. The maximum gamma exposure rate in the vicinity of a typical uranium mill tailing site is only a few mrem/yr. That exposure rate could approximate the maximum exposure rate to plants. That rate is very low and would not impact plants significantly. As a point of comparison, DOE guideline for dose to biota is ≤ 1 Rad / day (DOE, 2002).

Because the Mill is designed as a zero-discharge facility, the only potential source of radionuclides in the food chain pathway is the atmospheric deposition on the soil, vegetation, and through agricultural products. It was indicated in the *Estimates of Radiation Doses Report* (Two Lines, 2009) that the agricultural productivity of the land surrounding the Site is modest. Therefore, the fraction of total annual livestock feed requirements to be satisfied by pasture grass or locally grown stored feed was set at 50 percent or 0.5. The subsequent modeling

BLM_0045354

indicated that the dose to the public through the food chain is very small (Two Lines, 2009). This is because both uranium and radium have very low solubility in fat and, therefore, would be expected to have very poor bioaccumulation through the food chain (SENES, 2009a). Uranium and radium are also transported poorly from soils to plants (SENES, 2009a).

Although some fugitive dust would be expected downwind of the tailings cells and ore pad, the soil monitoring program outlined in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b) is designed to minimize these occurrences through periodic sampling and, where appropriate, excavation of contaminated soils and placement within a tailings cell. Vegetation favored by cattle and wildlife would also be periodically sampled along the property boundary and at on-site and off-site air monitoring stations and analyzed to track and assess radioactivity levels in these grasses. In accordance with recommendations made in the *Baseline Survey of Radionuclides in Animal Tissues* (Whicker, 2008), Energy Fuels would also collect on-site samples of rabbit bone tissue for analysis of naturally occurring radionuclides on 5 year intervals.

## Radiation Exposure Pathways – General Public

The MILDOS AREA modeling of off-site radiation dose indicates that the Mill Facility would have a minimal radiological impact within a 50-mile (80 km) radius. All of the doses would be below the 100 mrem/yr dose limit for individual members of the public, including radon and its progeny, but excluding natural background radiation (6 CCR 1007-1- 4.14 – CDPHE, 2005b).

Two Lines Inc. Radiation Risk Consultants conducted an assessment of off-site radiation doses from normal operations and the results are provided under a separate report, *Estimates of Radiation Doses to Members of the Public from the Piñon Ridge Mill* (Two Lines, 2009). Potential doses to the public from operations were modeled using calculated emissions data from point sources and expected radionuclide concentrations in surface materials that constitute the area sources. The emissions data were calculated by Kleinfelder and submitted in the Air Pollution Emissions Notices (APENs) (Kleinfelder 2009a) and APEN Response #1 Submittal (Kleinfelder 2009j). The expected radionuclide concentrations of area sources were based on the radionuclide concentrations of the ore with the expectation that uranium removal was 96 percent efficient.

The source terms considered in the model included the following (Two Lines, 2009):

- Mill Point Sources: Operational mill point sources include the feed hopper dust collector, SAG mill stack, leach building stack, vanadium dryer stack, and ore handling. As with some conventional mills, the Piñon Ridge Mill would not have fine ore storage.

- Ore: Approximately 100,000 tons of ore received could be stored on the ore pad. Emissions from the ore were modeled as described in NRC Regulatory Guide 3.59 (NRC, 1987). Material releases from wind erosion were accounted for in the model. Mean concentrations of uranium in the ore were assumed to be in equilibrium with decay products. The average effective area of the ore storage pad was set to 3 acres. This is a conservative average value based on an estimated maximum value of approximately 3 acres (Visus and Energy Fuels, 2009a).

- Tailings Cells: Wind erosion from the initial tailings cells were included in the source terms. It was assumed that uranium removal was 96 percent efficient. Uranium decay products were assumed to be in equilibrium with the original concentrations. Four

BLM_0045355

scenarios for location of tailings beaches during the life of the mill were modeled. These four scenarios indicate the points in time in which two tailings cells would be active simultaneously and the maximum area of tailings beaches would be exposed. Initially, each tailings impoundment will be below grade, which likely inhibits particulate transport. For simplicity, each tailings scenario was modeled separately as a single time step rather than attempting to use multiple time steps. This is a legitimate approach because mill operation would be essentially constant over the lifespan of each scenario (see Figure 6 – Two Lines, 2009).

Meteorological conditions greatly influence resuspension and dispersion of radionuclides from point and area sources. The Site has two meteorological stations that record wind speed, wind direction, and stability class simultaneously among other parameters. As suggested in the Yuan MILDOS-AREA Report (Yuan, 1989), wind data from the 10 m tower were used for the MILDOS modeling (Two Lines, 2009).

Food pathway parameters were set a at default value of 0.5 or 50 percent. This means for either individual or population receptors ½ of the total livestock feed requirement is satisfied by pasture, which is subject to contamination by potential mill releases. Potential dose from food pathways represents a very small number relative to inhalation doses, regardless of the food chain parameter. Because there is no dairy farm in the area, the milk pathway was not modeled (Two Lines, 2009).

A total of 27 receptor locations were modeled for the Piñon Ridge Mill analyses. These receptor locations include fifteen perimeter locations (fence line), six residences within 3 miles (5 km) of the Site, and six population centers within a 50-mile (80 km) radius of the Site (see Figures 2, 3, and 4 – Two Lines, 2009). The population distribution within 50 miles (80 km) of the Site was calculated by taking the average population density of the county in question and multiplying the area ($km^2$) of the annulus in question (for example, north 1 -2 km, southeast 60-70 km, etc.) by that county's population density (people/$km^2$) (see Figure 4 – Two Lines, 2009). This approach may somewhat skew the population density in the less-densely populated regions of a given county, but it likely has little influence on the total population dose which is spread over 7,760 $mi^2$ (20,000 $km^2$) (Two Lines, 2009).

MILDOS calculates doses for several different organs with and without radon. EPA regulations 40 CFR 190 (Health and Environmental Protection Standards for Uranium and Thorium Mill Tailings) are doses excluding radon exposure since the 40 CFR 190 criterion is 25 mrem per year to any organ (except the thyroid for which the criterion is 75 mrem) or the whole body, excluding dose due to radon. The critical organs are the bone surface and the lung. The infant is the critical age group for lung dose and the teen, for bone dose. Doses to these organs as well as the effective doses were summarized for each age group. In addition, the total effective dose equivalent (TEDE), including radon decay products, was calculated for each age group (Two Lines, 2009).

The calculated estimates of the TEDE and the 40 CFR190 effective, bone and lung doses are given in Table 4.11-2 for the maximum receptor, regardless of age group or scenario, at each fence line receptor. This data includes contributions from tailings, ore storage, ore handling and operational point sources.

BLM_0045356

**Table 4.11-2**
**Estimated Maximum Doses to Receptor Points at the Property**
**Boundary for All Age Groups and Operational Scenarios**

| Receptor ID | TEDE (mrem/yr) | 40 CFR 190 Dose (mrem/yr) | | |
|---|---|---|---|---|
| | | Eff | Bone | Lung |
| Fence 1 | $4.34 \times 10^{+00}$ | $7.85 \times 10^{-01}$ | $3.56 \times 10^{+00}$ | $4.79 \times 10^{+00}$ |
| Fence 2 | $2.11 \times 10^{+00}$ | $6.48 \times 10^{-01}$ | $2.06 \times 10^{+00}$ | $4.27 \times 10^{+00}$ |
| Fence 3 | $1.20 \times 10^{+00}$ | $1.34 \times 10^{-01}$ | $6.38 \times 10^{-01}$ | $7.94 \times 10^{-01}$ |
| Fence 4 | $2.27 \times 10^{+00}$ | $2.62 \times 10^{-01}$ | $7.70 \times 10^{-01}$ | $1.77 \times 10^{+00}$ |
| Fence 5 | $1.44 \times 10^{+00}$ | $9.62 \times 10^{-02}$ | $1.21 \times 10^{-01}$ | $7.10 \times 10^{-01}$ |
| Fence 6 | $3.53 \times 10^{+00}$ | $6.03 \times 10^{-01}$ | $4.17 \times 10^{-01}$ | $4.60 \times 10^{+00}$ |
| Fence 7 | $7.16 \times 10^{+00}$ | $3.52 \times 10^{-01}$ | $2.34 \times 10^{+00}$ | $2.01 \times 10^{+00}$ |
| Fence 8 | $3.68 \times 10^{+00}$ | $1.68 \times 10^{-01}$ | $1.45 \times 10^{+00}$ | $8.53 \times 10^{-01}$ |
| Fence 9 | $3.55 \times 10^{+00}$ | $1.13 \times 10^{+00}$ | $1.38 \times 10^{+01}$ | $3.04 \times 10^{+00}$ |
| Fence 10 | $3.87 \times 10^{+00}$ | $2.01 \times 10^{+00}$ | $2.44 \times 10^{+01}$ | $5.49 \times 10^{+00}$ |
| Fence 11 | $3.56 \times 10^{+00}$ | $1.83 \times 10^{+00}$ | $2.17 \times 10^{+01}$ | $7.07 \times 10^{+00}$ |
| Fence 12 | $3.49 \times 10^{+00}$ | $1.77 \times 10^{+00}$ | $1.84 \times 10^{+01}$ | $7.96 \times 10^{+00}$ |
| Fence 13 | $6.76 \times 10^{+00}$ | $3.44 \times 10^{+00}$ | $2.17 \times 10^{+01}$ | $1.97 \times 10^{+01}$ |
| Fence 14 | $9.04 \times 10^{+00}$ | $2.42 \times 10^{+00}$ | $8.47 \times 10^{+00}$ | $1.55 \times 10^{+01}$ |
| Fence 15 | $6.12 \times 10^{+00}$ | $2.04 \times 10^{+00}$ | $6.51 \times 10^{+00}$ | $1.33 \times 10^{+01}$ |
| **Maximum** | $\mathbf{9.04 \times 10^{+00}}$ | $\mathbf{3.44 \times 10^{+00}}$ | $\mathbf{2.44 \times 10^{+01}}$ | $\mathbf{1.97 \times 10^{+01}}$ |

The maximum TEDE at any actual receptor locations (residences and population centers) for various age groups at the property boundary is summarized in Table 4.11-3. It is important to note that in Colorado, individuals are exposed to an average rate of 400 mrem/yr (see Section 3.11).

**Table 4.11-3**
**Maximum Total Effective Dose Equivalent (mrem/yr) for**
**Various Age Cohorts at Actual Receptor Locations**

| Receptor | Total Effective Dose Equivalent (mrem/yr) |
|---|---|
| Infant | $4.62 \times 10^{-01}$ |
| Child | $4.39 \times 10^{-01}$ |
| Teen | $4.32 \times 10^{-01}$ |
| Adult | $4.31 \times 10^{-01}$ |

For the nearest residences, the maximum radiation dose was 0.462 mrem/yr at the Boren residence. This value is 0.5 percent of the maximum allowable dose of 100 mrem/yr. For the population centers within 50 miles (80 km) of the Site, the maximum dose is estimated to be 0.172 mrem/yr at Bedrock, CO, or 0.2 percent of the maximum allowable dose of 100 mrem/yr. For the other nearby towns used as one of the receptor locations the calculated maximum dose ranged from 0.0218 to 0.125 mrem/yr.

BLM_0045357

Using populations out to 50 miles (80 km), population doses (person-rem/yr) from site releases were calculated for both TEDE and the dose to the bronchial epithelium of receptors. Population dose results are shown in Table 4.11-4 (Two Lines, 2009).

**Table 4.11-4**
**Dose to Populations Surrounding the Piñon Ridge Site**

| Dose | Dose to population (person-rem/yr) | | |
|---|---|---|---|
| | Within 50 miles (80 km) | Outside 50 miles (80 km) | All |
| TEDE | $7.39 \times 10^{+01}$ | $3.14 \times 10^{+00}$ | $3.88 \times 10^{+00}$ |
| Bronchial dose | $4.04 \times 10^{+01}$ | $1.99 \times 10^{+01}$ | $6.03 \times 10^{+01}$ |

The maximum estimated annual population dose would be 0.739 person-rem/yr to the population within 50 miles (80 km) and 3.88 person-rem/yr to the entire U.S. population. It should be noted that there is no regulatory limit for population dose.

Estimated radiation doses to members of the public due to operations and material storage at the Mill Facility would be well below the criteria set in EPA 40 CFR 190 and CDPHE regulations 6 CCR 1007-1,Parts 4 and 18 (CDPHE 2005b and 2001). Incremental doses would be within the range of background variability. In no case did the estimated effective dose or dose to any single organ exceed 25 mrem per year as specified in 40 CFR 190 and Criteria 8 in Appendix A to Part 18 of CDPHE regulations. The effective doses from air-borne particulate matter were below the CDPHE Part 4.5.4 constraint limit of 10 mrem per year. The maximum calculated effective dose to any adult member of the public from all sources including radon was less than 100 mrem/yr, as specified in 4.14.1.1 of CDPHE regulations (Two Lines, 2009).

Doses to nearby residents would be well below doses that are received from natural background radiation. Doses from natural background each year to the total population ("collective dose") surrounding the site out to a distance of 50 miles (80 km) would be approximately 16,000 times higher than the annual doses that potentially result from the operation of the Mill Facility (Two Lines, 2009).

Transportation. The DOE performed an analysis, using four representative scenarios, to estimate exposures of the public from transportation shipments containing uranium ore in the Uranium Leasing Program Final EA (DOE, 2007). Table 4.11-5 presents the estimated radiological dose to the public from these four exposure scenarios. The largest radiation dose would be for the nearby resident, who would receive a dose of 0.22 mrem per year from the passing haul trucks.

**Table 4.11-5**
**Exposure of the Public from Routine Transportation of Uranium Ore**

| Scenario | Estimated Public Dose |
|---|---|
| Individual in a vehicle in a traffic jam next to uranium ore truck for 30 minutes | 0.026 mrem |
| Individual in a vehicle who passes an ore truck going the opposite direction | $7.4 \times 10^{-6}$ mrem |
| Individual in a vehicle stopped at an intersection when a uranium ore truck passes | $1.5 \times 10^{-5}$ mrem |
| Resident located 33 feet from a road used by uranium ore trucks for 1 year | 0.22 mrem / yr |
| Source: DOE, 2007. | |

BLM_0045358

## 4.11.1.3.3 Accident Scenarios

The *Risk Assessment* (SENES, 2009a) describes the environmental effects of possible accidents involving the release of nonradioactive and radioactive materials that could occur at the mill site. The methodology used to generate Table 4.11-6 is detailed in the *Risk Assessment* report (SENES, 2009a). SENES reviewed the Mill Facility's components and activities to determine potential, credible, accident scenarios. The sources of hazards were attributed to the following onsite materials: radioactive materials, flammable materials, and other toxic materials. A list of possible accident scenarios by mill component was then generated (SENES, 2009a – Table 5.1). The accident scenarios were classified and grouped based on the type of the accidents and their potential health and environmental impacts in order to reduce duplication between different process components. For each group a bounding accident scenario was selected to encompass the impacts of all accident scenarios in that group. The radioactive bounding case scenarios were:

- Conventional accidents and personnel injury due to typical project activities such as working at heights, working with heavy or processing equipment during construction or plant operation
- Spill of radioactive materials from storage tanks, transfer lines, valves, pumps, and other process equipment as well as during offloading
- Spill of nonradioactive materials and fuel from storage tanks, transfer lines, valves, pumps, and other process equipment as well as during offloading
- Failure of air cleaning systems and release of toxic fumes and/or radioactive dust
- Spill of tailings slurry from transfer line, pumps, or due to tailings cell embankment failure
- Fire involving flammable liquids in the storage area and SX circuit
- Propane explosion in boilers, kiln, dryer, and fusion furnace
- Airplane crash and catastrophic failure of all containments
- Tornado and high wind and dispersion of contaminants from stockpiles
- Flood and dispersion of contaminants from stockpiles
- Building fire
- Transportation accident resulting in potential release of materials to the environment (streams)
- Transportation accident resulting in a fire and release to air
- Transportation accident and release of ammonia to air

The bounding scenarios were then assessed for risk based on the potential frequency in combination with the potential severity of the impact. Table 4.11-6, excerpted from the Risk *Assessment* (SENES, 2009a), provides a summary of the assessment.

The Risk Assessment (SENES, 2009a) concluded that, with the exception of an airplane crash into the mill, that potential impacts to workers and the public from potential accidents were low to moderate and that the overall risk from accidents was low.

BLM_0045359

**Table 4.11-6**
**Summary of Probabilities and Impacts for Accident Scenarios**

| Accident Scenario | Workers | | | Members of Public and Environment | | |
|---|---|---|---|---|---|---|
| | Probability | Impact [1] | Risk | Probability | Impact [1] | Risk |
| Conventional Accidents and Personnel Injury | Medium | Low | Low | - | - | - |
| Unscheduled Explosion | Low | Moderate | Low | Low | Low | Low |
| Spill of Radioactive Materials | Low | Moderate | Low | Low | Low | Low |
| Spill of Non-Radioactive Materials and Fuel | Low | Moderate | Low | Low | Moderate | Low |
| Failure of Air Cleaning Systems | Low | Moderate | Low | Low | Moderate | Low |
| Spill of Tailings Slurry | Low | Low | Low | Low | Low to Moderate | Low |
| Fire Involving Flammable Liquids | Low | Moderate | Low | Low | Low | Low |
| Propane Explosion | Low | Moderate | Low | Low | Low | Low |
| Airplane Crash | Extremely Low | High | Low | Low | Moderate | Low |
| Tornado and High Wind | Low | Moderate | Low | Low | Low | Low |
| Flood | Low | Low | Low | Low | Low | Low |
| Building Fire | Low | Moderate | Low | Low | Low | Low |
| Transportation Accident and Materials Release | Low | Moderate | Low | Low | Moderate | Low |
| Transportation Accident Fire | Low | Moderate | Low | Low | Moderate | Low |
| Transportation Accident and Release of Ammonia | Low | Moderate | Low | Low | Moderate | Low |

[1]  Source: NUREG-1748 (NRC, 2003a)
      SMALL(Low) Impact: The environmental effects are not detectable or are so minor that they will neither
      destabilize nor noticeably alter any important attribute of the resource considered
      MODERATE Impact: The environmental effects are sufficient to alter noticeably, but not destabilize, important
      attributes of the resource considered.
      LARGE (Hight) Impact: The environmental effects are clearly noticeable and are sufficient to destabilize
      important attributes of the resource considered.

SENES also concluded that the radioactive materials handled at a uranium mill have relatively low specific activities (amount of radioactivity per unit mass, e.g., uCi/gram). The low specific activities require the release of exceedingly large quantities of material in order to potentially result in any measurable public health impacts; driving forces (energy sources, e.g) for such releases are generally lacking or extremely unlikely in the milling operation. In light of past experience, it is believed that even if major accidents did occur radiation exposures would be too small to cause any measurable deleterious effect on the health of the human population. A well trained workforce operating under rigorous emergency response procedures would minimize occupational impacts from occurrence of accidents and unplanned events. The bounding scenarios ranked in Table 4.11-6 are analyzed in detail in the Risk Assessment (SENES, 2009a).

BLM_0045360

#### 4.11.1.4 Closure

**Nonradiological Impacts**

Nonradiological impacts to public and occupational health during closure include the potential for spills and releases of chemical reagents, fuels, feedstock, and process and waste streams that could expose workers to corrosive, toxic, or flammable chemicals. These types of risks would be minimized by implementing programs for training, air sampling, respiratory protection, exposure determination and inspections. Actions that would be taken reduce risks would include removing all known reagents and processing materials and cleaning out tanks, pipes, and other equipment to the extent practicable in an area of the mill prior to the start of demolition activities. Special care would be taken to thoroughly clean and ventilate tanks and other confined spaces that may contain explosive or toxic gases prior to using an acetylene torch to cut metal tanks and equipment into smaller pieces. Appropriate respiratory protection and personal protection equipment (PPE) (including clothing, hard hats, eyewear, and chemical, gloves and suits) for the task to be performed and chemicals that are involved would be worn during demolition activities. The demolition contractor would be required to provide detailed work plans showing the steps involved in each phase of the demolition work.

The risks of events such as trips and falls, strains, electrocution, crushing, and pinching associated with project activities such as working at heights, working with heavy equipment, or working in confined spaces would generally be greater than during operations due to the daily change in the work environment that would result from demolition activities. As secondary containment facilities are removed, there is also a greater risk of spills or releases to the environment of fuels, reagents, and other materials. Construction contractors would be required to have and implement a Health and Safety Plan and a SPCC Plan. The Health and Safety Plan would meet MSHA requirements under 30 CFR Subpart K and the SPCC Plan would meet EPA's requirements under the Oil Pollution Prevention regulation (40 CFR Part 112).

**Radiological Impacts**

Radiological impacts to the public and occupational health during closure of the site would primarily be related to residual radioactivity above background, which remains on equipment, structures and in soils. Closure of the Site would occur in accordance with Energy Fuels' Mill Decommissioning Plan (Kleinfelder, 2009b), which was developed in accordance with applicable State of Colorado regulations (e.g. Parts 4 and 18) and NRC technical guidance documents (e.g. NUREG 1757 – NRC, 2006).

Radiological protection procedures described in the *Health and Safety Plan* (Energy Fuels, 2009i), including the ALARA program, would apply to decommissioning operations. These would include exposure monitoring by collection of mill area air samples, breathing zone air samples, uranium in urine bioassay samples, and by direct measurement of radiation.

To minimize exposures while efficiently demolishing the site facilities, the decommissioning activities for the mill components would occur generally in the following order according to the *Mill Decommissioning Plan* (Kleinfelder, 2009b):

- Preparation of Detailed Decommissioning Plan
- Removal of Uncontaminated Systems, Equipment, and Structures
- Removal of Contaminated Systems and Equipment
- Removal of Contaminated Structures

BLM_0045361

- Soil Remediation
- Surface Restoration
- Surface and Ground Water Protection.( ongoing throughout decommissioning)

To minimize impacts, an ALARA analysis would be prepared as part of the detailed decommissioning plan. The ALARA analysis would consider appropriate potential benefits including (Kleinfelder, 2009b):

- collective dose averted,
- regulatory costs avoided,
- changes in land values,
- esthetics, and
- reduction in public opposition.

Prior to decommissioning, the inventory and radiological assessment (surveying) of mill systems and equipment would be updated to show the levels of contamination. Based on the results of these surveys and the approved radiological release limits, the systems and equipment would be classified as uncontaminated (i.e. available for unrestricted release to the public domain) or contaminated. Uncontaminated equipment and structures would be demolished using standard demolition techniques (Kleinfelder, 2009b).

After uncontaminated systems and equipment are removed from the mill area, the systems and equipment that are known or very likely to be contaminated above release limits would be removed from the mill area and placed into the vault in Tailing Cell C, described in the *Tailing Cell Closure Design Report* (Kleinfelder, 2009c).

Methods employed to remove contaminated systems and equipment would be mechanical, manual, or a combination of both. Methods would be selected by the decommissioning contractor and Energy Fuels based on considerations of worker safety, protection against release of contaminants using ALARA principles, and cost-effectiveness. As necessary for dust suppression, water sprays would be used; run-off (if any) from this activity would be collected in the stormwater ponds and discharged to the evaporation ponds.

Any contaminated materials that are intended to leave the site, both salvaged mill materials as well as equipment used in mill decommissioning, would be decontaminated below approved limits before being released from the site. Decontamination would be performed at the truck decontamination station located at the northeast corner of the mill pad (Kleinfelder, 2009b).

Contaminated structures would be decontaminated as necessary to facilitate safe handling and free release and would be demolished using primarily mechanical methods, with specific equipment selected by the demolition contractor and Energy Fuels based on considerations of worker safety, protection against release of contaminants using ALARA principles, and cost-effectiveness. Scaling and high-pressure washing would likely be employed to remove surface contamination. As necessary for dust suppression, water sprays would be used and run-off (if any) from this activity would be collected in the stormwater ponds and discharged to the evaporation ponds (Kleinfelder, 2009b).

Foundations of structures and equipment would be removed and disposed of in the vault. The exception would be those foundations below uncontaminated structures and located in areas where the mill pad was cut or excavated below natural grade. These foundations may be left in place and covered during final site grading (Kleinfelder, 2009b).

BLM_0045362

When mill operations cease, residual liquids would be transferred to one or more evaporation ponds as needed to evaporate the remaining liquid, and the solids would be removed to the tailings. Liners would be cleaned to remove wind-transportable solids and left in place until the disposal vault is ready. At that time liners would be cut into pieces and placed into the disposal vault. Eventually, only one pond would remain in operation to receive and evaporate the liquid collected in the tailing dewatering and leak collection systems. This last pond would remain in operation until drainage to the tailing Cell C dewatering system ceases. If necessary to expedite closure, native soil may be mixed into the residual liquid in the last pond to form a solid that can be excavated from the pond and placed in the disposal vault. The last pond liner can then be removed and placed in the disposal vault, as well (Kleinfelder, 2009b).

After removal of mill systems, equipment, and structures, the soil within and adjacent to the mill would be surveyed to determine if contaminant levels meet the concentration limits in 6 CCR 1007-1, Part 18, Appendix A, Criterion 6(6) including consideration of the "radium benchmark dose" as defined therein. Soil remediation would be performed in the following sequence after mill equipment and structures have been removed (Kleinfelder, 2009b):

- Initial survey;
- Soil clean-up;
- Final soil clean-up;
- Verification survey; and
- Final closure of Tailing Cell C (Cells A and B closed previously).

Final regrading of the Site would follow the verification survey. Some elements of regrading and revegetation related directly to the closure of Tailing Cell C may be delayed until that activity is complete.

A gamma (direct radiation) survey would be performed to evaluate potential areas where soil contamination might exceed radium 226 closure concentrations and/or exceed the radium benchmark dose that has been calculated for the site (6 CCR 1007-1, Part 18, Appendix A, Criterion 6(6)), based on gamma-radium correlations established in the baseline radiological investigation (ERG, 2009) and use of the RESRAD computer code to determine acceptable concentrations of other radionuclides to meet radium benchmark dose criteria. The initial gamma survey would be performed on grids with 100-foot (30-meter) spacing across the disturbance area with closer survey intervals applied as needed to delineate the extent of contamination. The gamma survey would be followed up by soil sampling would be conducted on a 30-foot (10-meter) grid at locations that register gamma readings correlating with Ra-226 concentrations exceeding 5 pCi/g above background. Samples would be tested for Ra-226 concentrations at depth intervals of 0 to 15 cm, and over a 15 cm thick layer of soils more than 15 cm below the surface. The necessity of conducting Th-232/Ra-228 testing (refer to NUREG 1620 (NRC, 2003b)) as part of the initial survey would be determined from analyses of ore, tailings, and process fluids conducted during mill operations.

Where surveys indicate that the above criteria have not been achieved, the soil would be removed to meet the criteria. Contaminated soil would be excavated and transported to the tailings Cell C vault for disposal (Kleinfelder, 2009b).

After soil clean-up has been performed, and before closure of the final tailings cell, a verification survey would be conducted on a 30-foot (10-meter) grid on areas used (and possibly contaminated) during the decommissioning process, or that were found to have excessive Ra-226 levels in the soil during the initial survey. Soil samples would be collected as described for

BLM_0045363

the initial survey at grid points where gamma readings indicate that Ra-226 in excess of closure criteria may persist after clean-up, and at random grid locations constituting up to 10 percent of the initial survey grid points.

Surface water runoff from direct precipitation on the mill area would be collected in the two stormwater ponds during decommissioning. When the soil clean-up is completed and before the verification survey is performed, these stormwater ponds would be removed and the sediments, liners, discharge pipes (to the evaporation pond), and control apparatus would be placed in the vault.

After the radiological survey confirms that all of the affected soils have been removed from a given location, the area would be graded and stabilized according to the *Specifications for Closure and Reclamation of Mill Facilities* (Golder, 2009c).

With the exception of the tailing cells, the mill site area surface would be restored by regrading to approximately the original (pre-construction) configuration, as illustrated in the closure design (Kleinfelder, 2009c). The surface water diversions constructed for the mill would be left in place to divert runoff away from the tailing cells. The regraded surfaces would be revegetated using the procedures and seed mixes described in *Specifications for Closure and Reclamation of Mill Facilities* (Golder, 2009c).

After decommissioning, the tailing cells would be the only mill features remaining that could be impacted by, or cause impact to, surface water. Surface water control structures originally constructed to divert sheet flow away from the mill and the tailing cells would be left in place and protected with riprap as described in the site drainage design (Kleinfelder, 2009d). The *Tailing Cell Closure Design Report* (Kleinfelder, 2009c) addresses erosion control measures, including grading and rock cover, to protect the tailing cells against erosion by surface water runoff. Those erosion control measures would be designed to protect the tailings from release for at least 1,000 years, accomplished by designing for erosion protection against the peak runoff from the probable maximum precipitation (PMP) event, as required by 6 CCR 1007-1, Part 18, Appendix A (CDPHE, 2001). The Tailing Cell Closure Design Report (Kleinfelder, 2009c) and post-closure monitoring would provide long-term protection against releases that could reach groundwater (Kleinfelder, 2009b).

Energy Fuels would meet the specific radionuclide concentration and public dose limits on the Site required for unrestricted use after decommissioning in accordance with 6 CCR 1007-1, Part 18, RH 18.8 (Decommissioning Requirements); in Part 18 Appendix A, Criteria 5A, 6(6) and 6(7) and NUREG-1757 Vol. 2 (NRC, 2006). The required site-specific assessment and dose modeling would be conducted.

Energy Fuels would cover the tailings cells in accordance with the *Tailing Cell Closure Design Report* (Kleinfelder, 2009c). The tailing cover, in combination with the tailing cell liners, would provide the system of barriers for the long-term containment of tailings. The tailing cell closure design is based primarily on the following performance objectives:

- Provide containment of byproduct for 1,000 years (Criterion 6(1)(i));
- Limit Radon flux from the cover surface to <20 pCi/$m^2$s (Criterion 6(1)(ii)); and
- Limit infiltration of moisture into, and release of contaminated liquid from, the tailings (Criteria 5B(1), 5E(3), 6(7), 7).

BLM_0045364

The tailing cells have been designed (Golder, 2008a) and would be constructed to provide long-term stability and minimal potential for erosion of slopes (Criteria 4C, 5A(5)) and prevent downward migration of contaminants that could impact groundwater (Criteria 5A(1), 5A(2), 5E(1), 5E(3)). The components of the tailing cell impoundment structures, liner, and dewatering system have been designed to satisfy the long-term containment criteria. These components would not be removed or altered by the tailing cover design and construction.

## 4.11.2 Protective/Mitigation Measures

General

- Implementation of the *Health and Safety Plan* (Energy Fuels, 2009j), *Emergency Response Plan* (Energy Fuels, 2009e), *Material Containment Plan* (Energy Fuels, 2009c), *SPCC Plan* (Energy Fuels, 2009b), and *Facility Operating Plan* (Visus and Energy Fuels, 2009a).

- Design of mill components to limit potential releases including "zero discharge" wastewater systems, "zero to low emission" air treatment systems, and provisions for secondary containment in mill and waste disposal systems.

- Compliance with applicable regulatory requirements, such as those of CDPHE, MSHA, USDOT, CDOPS, and the EPA.

- Implementation of comprehensive monitoring programs for workers and the environment.

- Implementation of a comprehensive training program.

- Restriction of wildlife access to the Site.

- Implementation of comprehensive site security.

- The trucking companies transporting ore, chemical reagents and fuel would implement an emergency response plan.

- Access to the Mill Facility would be limited to mill employees and authorized visitors. All personnel must enter and exit the restricted area (i.e., the Mill License boundary) through a controlled point.

- The mill facility, tailings cells, and evaporation ponds are designed as "zero discharge" stormwater and process water facilities.

- Emergency management plans for the Mill Facility would be prepared as part of the licensing effort with CDPHE.

- The primary Mill Facility is designed with concrete curbs, spill collection sumps and other forms of secondary containment in areas where reagents, process solutions and finished products (e.g., uranium oxide concentrate and vanadium oxide concentrate) are handled and stored.

- All process and waste solutions would be contained within the Mill and waste disposal system components of the Site.

Nonradiological

- A firewater loop with hydrants and hose reels at key locations would be installed.

BLM_0045365

- A sprinkler systems and fire extinguishers in accordance with building codes and county and state requirements would be installed.

- Piping would be designed to be chemically resistant and would be double-walled or contained within lined trenches in those areas outside the buildings where secondary containment systems would not otherwise be present.

- Leak detection and emergency shutoff systems would be installed in critical areas to minimize the volume of a release should a leak or equipment failure occur.

- Spill control kits would be present at strategic locations and employees would be trained in the proper methods for controlling, cleaning up and reporting spills of the various chemicals and process solutions present in the Mill.

<u>Radiological</u>

- Energy Fuels would construct the Mill Facility according to the *Site Drainage Analysis and Design Report* (Kleinfelder, 2009d), *Ore Stockpile Pad Design Report* (Golder, 2008g), *Tailings Cell Design Report* (Golder, 2008a) and *Evaporation Pond Design Report* (Golder, 2008h).

- Energy Fuels would implement the *Facility Operating Plan* (Visus and Energy Fuels, 2009a), Health and Safety Plan (Energy Fuels, 2009j), *Emergency Response Plan* (Energy Fuels, 2009e), *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b), *Material Containment Plan* (Energy Fuels, 2009c) and SPCC Plan (Energy Fuels, 2009b).

- Energy Fuels would create a detailed decommissioning plan prior to decommissioning based on the general *Mill Decommissioning Plan* (Kleinfelder, 2009b).

- Energy Fuels would implement the *Tailing Cell Closure Design Report* (Kleinfelder, 2009c), *Stormwater Management Plan* (Golder, 2009a) and *Specifications for Reclamation of Mill Facilities* (Golder, 2009c).

- Air emissions would be minimized through use of modern pollution control equipment (e.g., baghouses, scrubbers) and through a variety of methods including the use of water sprays at the ore dumping platform, ore stockpiles and conveyor hopper.

- A dust collecting baghouse would be installed at the conveyor hopper to capture any dust generated during ore feeding into the hopper and conveyor system.

- A dust scrubber would be installed at the SAG Mill to capture any dust generated during mixing prior to the ore being mixed with water.

- Gas scrubbers would be installed at all emission points in the process train.

- The yellowcake dryer would totally contained the yellowcake with zero discharge.

- Other improvements would include using automated equipment within hermetically sealed rooms to package the yellowcake and vanadium oxide produced.

- The intent of the technical improvements and emission control devices proposed for the Mill Facility is to limit exposure of mill employees and the general public to ALARA levels of radiation and fugitive dust.

- Other protections include regular power washing of equipment and vehicles, monitoring the amount of time workers are exposed to radiation, and implementation of good housekeeping and personal hygiene measures.

BLM_0045366

- Despite the large buffer area between the Property Boundary and the closest residences, Energy Fuels must still meet regulatory limits for radiation dose at the Property Boundary.

Closure

- Energy Fuels would be required to post a decommissioning and reclamation bond that would cover the cost of a third-party contractor to close and reclaim the site including costs for state administration of the Project, contingencies, and long-term surveillance and monitoring as required by NRC guidelines.

- The decommissioning and reclamation bond would remain in full force during operations and would be periodically updated for inflation and changing onsite conditions (e.g., mill expansion, interim reclamation).

- The tailing cells would be covered to limit the release of radon to 20 picoCuries per meter squared per second ($pCi/m^2/s$).

- All other areas within the Site would be restored to radium concentration limits of 5 picoCuries per gram (pCi/g) in the top 15 centimeters (cm) of soil and 15 pCi/g in 15 cm intervals below 15 cm depth above background and/or concentrations of radionuclides as determined per the radium benchmark dose approach of 6 CCR 1007-1, Part 18, Appendix A Criteria 6(6).

- Radiation monitoring would be provided for all employees, including contract employees, assisting in reclamation.

- Radiological contamination surveys would be conducted in the lunch rooms, change rooms, and offices at a typical frequency of once every week during active reclamation tasks.

- Decontamination procedures for personnel would include a radioactive activity scan of skin and clothing prior to leaving the site each day.

- All equipment coming in contact with tailings would be cleaned and surveyed in a designated area prior to removal from the site.

### 4.11.3 Monitoring

Nonradiological and radiological monitoring would be conducted in accordance with the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b).

Nonradiological

Monitoring of nonradiological chemical constituents in the ore slurry, tailings sand and supernatant, raffinate and evaporative salts would be conducted on a quarterly basis to characterize these materials. These samples would be analyzed for various metals, major ions, and physical constituents as well as radiological parameters described below. The results would be evaluated to identify any constituents at levels that may adversely affect public or occupational health during normal operations or in the event of an accident, emergency or release. Other areas of the mill and off-site would be monitored on-site and in surrounding areas on a situational basis. This monitoring would be conducted if abnormal concentrations are suspected due to a chemical leak or accident at the Mill Facility. The methods and locations of monitoring would be situation and chemical specific and would be determined by the RSO on a per event basis (Visus and Energy Fuels, 2009b).

BLM_0045367

In addition, environmental monitoring would be conducted through the Effluent Monitoring Program for several media including surface water, groundwater, and air as provided above in the individual resource sections.

Radiological

Numerous monitoring systems would be utilized at the Mill Facility to maintain worker exposures to radioactive material ALARA and to verify that the work environment would be safe. The radiation monitoring program and procedures would be directed by the Facility's Radiation Safety Officer (RSO). Routine work in the mill would be performed in accordance with approved Radiation Health (RH) Procedures. Non-routine work tasks (i.e., activities for which established procedures do not exist) would require a Radiation Work Permit (RWP), administered by the RSO, that outlines the health and safety measures required while doing the work (Procedure RH-060 in Appendix D of the *Health and Safety Plan*, Energy Fuels, 2009j). An RWP would be required for any work with radioactive materials which has not been described in a written operating or maintenance procedure. According to Energy Fuels' *Health and Safety Plan* (Energy Fuels, 2009j), activities that may require a RWP include:

- Work on equipment (pumps, piping etc) in the near vicinity of any unshielded (shutter open) nuclear source.
- Work on the all bag houses or pollution control equipment which may contain radioactive material.
- Work involving processing equipment, e.g. work in a tank containing or suspected to contain concentrated uranium (yellowcake or pregnant solution) in a dry form or in such a form that contamination by ingestion or inhalation of radioactive materials could occur.
- Work offsite where occupational or environmental monitoring is necessary.
- Work as directed by the RSO or the Assistant RSO.

Radiological constituents would be monitored aggressively and frequently in occupational areas of the mill as part of the Health and Safety and ALARA programs. The results would be evaluated to identify any constituents at levels that may adversely affect public or occupational health during normal operations or in the event of an accident, emergency or release. The following specific radioactive measurements are included in the Radiological Monitoring Program:

- Direct Gamma Radiation;
- Personnel External Dosimetry via TLD/OSLs;
- Airborne Particulates - Long Lived Radionuclides;
- Radon Progeny in air;
- Surface Contamination Surveys;
- Bioassay, including Urinalysis and In Vivo Programs as necessary.

Procedures for these Radiation Safety Monitoring programs are included in the Piñon Ridge Mill *Health and Safety Plan* (Energy Fuels, 2009j).

Breathing-zone and area air samples would be used to estimate radionuclide intakes (and internal dose) via inhalation by mill workers. Additionally, exposure to soluble uranium would be limited to a weekly intake of 10 mg based on chemical toxicity. Air monitoring results would be reviewed by the RSO or designee within two working days after receipt of the analytical results. Under routine mill operating conditions, breathing zone air samples would be used to assess

BLM_0045368

radionuclide concentrations in air when those concentrations could be greater than 0.1 Derived Air Concentration (DAC). In contrast, area air samples would be used exclusively to measure air concentrations in areas where the radionuclide concentrations range from 0.01 to 0.1 DAC. Below 0.01 DAC, air samples would not be required but would be collected periodically to verify radionuclide concentrations in these areas remain low. Using the above criteria, the RSO would make the decision as to the types of air sampling and frequencies most appropriate for the work conditions (Visus and Energy Fuels, 2009b).

Elevated air concentrations of Rn-222 and its progeny may occur near ore storage bins, near crushing and grinding circuits, or in enclosed locations where large quantities of dry ore is stored. Indoor radon progeny (daughters), working level (WL), measurements in work areas would be the preferred sampling and measurement method utilized. However, the need for continuous radon progeny concentration measurements may be required, as determined by the RSO. The modified Kusnetz method for measuring radon progeny in working levels would be used to assess radon progeny concentrations. Automated equipment and systems for continuous radon in air measurement may also be used (Visus and Energy Fuels, 2009b).

Gamma radiation surveys would be performed at least semiannually throughout the mill and facility representative of where workers are potentially exposed. The RSO would evaluate methods to lower exposure rates to levels that are ALARA.

Surface contamination surveys (both for fixed and removal contamination) would be routinely conducted to maintain levels of radioactive material within both radiologically restricted and unrestricted areas ALARA to workers and the public (Visus and Energy Fuels, 2009b).

Bioassays would be required for all mill operation personnel potentially exposed to yellowcake. The urinalysis program that would be conducted at the mill would follow the intent of NRC Regulatory Guides 8.22, "Bioassay at Uranium Mills" and 8.25, "Acceptable Concepts, Models, Equations, and Assumptions for a Bioassay Program." In- vivo lung counts would be conducted in response to confirmed urinalysis results in accordance with the criteria in NRC Regulatory Guide 8.22, "Bioassay at Uranium Mills" (Visus and Energy Fuels, 2009b).

Certain process materials in the mill would be inspected for, sampled, and analyzed to determine radiological and chemical compositions. The results of these samples would be used to model doses, calculate exposures, or evaluate occupational and public safety at the mill (Visus and Energy Fuels, 2009b).

In addition, environmental monitoring would be conducted through the Effluent Monitoring Program for several media including soil, surface water, groundwater, air, vegetation and animal tissue as follows (Visus and Energy Fuels, 2009b). The data collected from environmental samples would be used to assess undesirable trends relative to the results of the pre operational baseline characterization program. The operational radiological monitoring program will be conducted in accordance per NRC Regulatory Guide 4.14, Table 2. Additionally, the environmental monitoring data can be used to model doses to off-site receptors or evaluate the accuracy of modeled doses.

- Soil: Surface soil sample would be collected at four random locations across the Site, at each of the five air monitoring stations, and collocated with the four surface water samplers on an annual basis. In addition, the top 1 cm of soil would be collected from at least three locations each downwind of the evaporation ponds, each active tailings cell, and the ore pad.  Soil sample would be analyzed for uranium, radium-226, and lead-210.

BLM_0045369

- <u>Surface Water:</u> Four surface water samplers are located within the three major downgradient drainages and one upgradient drainage. Samples would be collected following storm events creating sufficient run-off to sample on a quarterly basis for each type of run-off event (i.e. storm event and snowmelt). Samples would be analyzed for uranium, radium-226, radium-228, thorium-230, and lead-210 as well as nonradiological parameters described above.

- <u>Groundwater:</u> Groundwater would be monitored at the following locations and frequencies:
  - Thirteen on-site groundwater monitoring wells (four upgradient and nine downgradient of the mill) would be sampled monthly during the first year of operations and quarterly thereafter.
  - At least five production on-site and off-site production wells would be monitored for water levels biweekly to monthly during transient and static states, respectively. These wells would be sampled quarterly.
  - Five off-site wells would be monitored for productivity and field parameters quarterly and sampled annually.
  - One off-site spring (Stone Spring) would be monitored for flow and field parameters quarterly for the first two years of operation and semiannually thereafter. The spring would be sampled semiannually throughout operations.

  Groundwater samples would be analyzed for dissolved uranium, radium-226, radium-228, thorium-230, and lead-210 as well as nonradiological parameters described above. Production well PW-3 would be analyzed for total radionuclides as well because it would be used for stock watering as well. The wells would be monitored to warn of contamination from the mill site and to evaluate changes in on-site and off-site water quality induced by pumping of the productions wells.

- <u>Total Suspended Particulates (TSP):</u> TSP would be monitored at three on-site and two off-site air monitoring stations continuously. Filters on the TSP samplers would be exchanged on approximately a biweekly basis, depending on loading. The TSP filters would be composited quarterly for each site and analyzed for uranium, radium-226, thorium-230, and lead-210.

- <u>Radon-222:</u> Radon-222 would be sampled continuously on track-etch detectors at each of the five air monitoring stations. The detectors would be exchanged on a quarterly basis.

- <u>Gamma:</u> Environmental dosimeters (e.g. OSLs) are located each of the five air monitoring stations to measure environmental gamma. The detectors would be exchanged on a quarterly basis.

- <u>Leak Collection and Recovery Systems:</u> The tailings cells and evaporation pond cells would each have multiple liners with a dedicated leak collection and recovery system (LCRS) located below the primary liner for seepage collection. Any seepage through the primary liner would be collected in the LCRS and routed via gravity flow to an LCRS sump located in each tailings cell and evaporation cell. The LCRS sumps would be equipped with water level indicators, and portable submersible pumps, as necessary, to automatically remove any water collected in the sump to the respective tailings cell or evaporation pond cell. Additionally, the LCRS risers would be instrumented to

BLM_0045370

automatically report to the mill control and alarm system, providing continuous, online monitoring.

- Surface seepage: If observed, surface seepage would be sampled and analyzed for the same constituents as surface water.

Closure

A detailed decommissioning plan would be required prior to commencement of closure of the site and would include an Effluent Monitoring Program. The Effluent Monitoring Program would be an extension of the monitoring program conducted during operations. It would include provisions for the collection and analysis of airborne and liquid effluents, for assessing radiation exposures to members of the public, and for demonstrating compliance with applicable regulations.

Energy Fuels would demonstrate, through the mill operations and decommissioning protocols, that it has an Effluent Control Program to control radioactive material in effluents and to comply with all applicable standards and permit requirements related to the release of radioactive material in effluents, as required in applicable sections of CDPHE Part 4 and 18 (CDPHE, 2005b and 2001).

## 4.12    WASTE MANAGEMENT

### 4.12.1 Environmental Impacts

#### 4.12.1.1 General Impacts

Activities associated with construction, operation, and closure of the Mill Facility would generate nonradiological and radiological solid and liquid waste streams. The possible waste streams are identified in the following sections as well as the controls and disposal methods for each. As provided in the sections above, to avoid and prevent waste management impacts, Energy Fuels has prepared and would implement the following plans:

#### 4.12.1.2 Construction, Operations, and Closure Impacts

#### 4.12.1.2.1 Construction

Waste generated during construction of the Mill Facility would be similar to waste generated at a typical construction site and would not include the generation of any radiological waste. Energy Fuels would require, through contractual provisions, that contractors involved in construction implement the appropriate plans and procedures described in this ER (e.g., SWMP and SPCC Plan) to protect the environment from waste-related impacts. An appropriate number of port-a-potties and dumpster containers would be available and would be properly maintained. Waste generated during construction would be handled as described in Section 4.12.1.2.2, Operations – Nonradiological below.

#### 4.12.1.2.2 Operations

Nonradiological

Nonradiological waste would include any waste generated outside of the licensed area (e.g., administration building, warehouse, shop) and waste generated within the licensed area that has been scanned and verified to be below radiological screening levels. Radioactive waste materials that could not be decontaminated to meet general release criteria would be disposed

BLM_0045371

of in a tailings cell (e.g., worn out equipment such as pumps) or in appropriated off-site disposal facility. Operation of the Mill Facility would generate various types of nonradiological waste, including those discussed below.

**Solid Waste.** Solid waste would include items such as lunch room wastes, cardboard, paper, packing materials, empty cans, etc. The solid waste would be stored in an area inaccessible to wildlife (e.g., bears) and then sent to a landfill. Recyclable materials such as scrap metal, aluminum cans, paper, etc would be stored in separate bins for shipment to recycling facilities.

**Special Waste.** Special waste would include items such as batteries, tires, fluorescent light bulbs with mercury, paint, used oil, used antifreeze, etc. Recyclable batteries, tires, light bulbs, and similar materials would be stored, picked up, and recycled. Used oil and antifreeze would also be stored and recycled. Empty spray paint cans would be punctured over a 55-gallon drum and emptied of any residuals. When the paint drum fills up, it would be recycled or appropriately disposed. Oil cans, paint cans, and similar containers would be drained of their contents, crushed, and disposed of with the solid waste.

**Hazardous Waste.** Energy Fuels would, to the extent practicable, avoid using products that generate hazardous waste. Hazardous waste could include items such as used solvents and old pesticides. Solvent stations would typically consist of wash sinks over small drums of solvent. The solvent would be reused until it is too contaminated with oils and grit and then the drums would be recycled by a vendor and replaced with new drums of solvent. Occasionally other materials are purchased for specialized applications that may be considered hazardous waste if not totally consumed. If only partially consumed, these materials would be properly stored and used at a later time or disposed of at an appropriate hazardous waste facility. Hazardous waste would be stored and handled in accordance with RCRA regulations that are enforced by CDPHE.

**Gray Water.** Gray water would be used water from the showers, sinks, and laboratory. The source water for the gray water would be the potable water system, and 100 percent of the gray water would be recycled into the process water system (see Section 4.12.1.2.2) through the process water tank.

**Septic Systems.** Effluent from the sanitary facilities would flow by gravity to engineered leach field septic systems designed according to state and county health and sanitation requirements regarding sewage disposal. The sanitary septic system would handle waste from the urinals and commodes in the mill. The 3,475 square foot septic system was designed by Kleinfelder to handle 3,885 gallons per day (Kleinfelder 2008j). The water from the potable water system would flow to the bathrooms and then from the urinals and commodes into the septic system. The administration building would have a potable water supply that would feed through the building. All building drains, water coolers, commodes and urinals would drain to the sanitary septic system. The 544 square foot system was designed by Kleinfelder to dispose of 608 gallons per day (Kleinfelder 2008j).

Radiological

Following the extraction and recovery of the uranium and vanadium from the ore, the remaining waste products from the milling operation are disposed onsite, in engineered facilities designed to protect the environment (i.e., tailings cells and evaporation ponds). These facilities are designed to contain 40 years of waste material at a milling rate of 500 tons per day. The waste products are referred to as 11e.(2) byproduct material and are not considered hazardous waste. Section 11e.(2) of the Atomic Energy Act (as revised in 1978 and in 2005 by the Energy Policy

BLM_0045372

Act) provides the following definition for byproduct material: "the tailings or waste produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." The provisions in 40 CFR 261 list solid wastes that are considered hazardous waste and which are regulated under Subtitle C of the Resource Conservation and Recovery Act (RCRA). To be a hazardous waste, the material must be a solid waste. Under 40 CFR 261.4(a)(4), source, special nuclear, or byproduct material as defined by the Atomic Energy Act is not considered a solid waste and is, therefore, not a hazardous waste. The 11.e(2) byproduct materials are described below.

**Tailings Slurry.** The milling process includes grinding and leaching the ore with sulfuric acid to liberate uranium and vanadium from the solid matrix. These metals enter into solution and are separated from the barren solid waste in the CCD thickeners. The pregnant metal-bearing solution flows from the top of the first thickener and is directed to the next step in the processing circuit. The solid waste, consisting predominantly of a thick, low-pH slurry of fine-grained sands, is pumped from the bottom of the last thickener to the tailings box. At the tailings box, the solid waste stream is mixed with the barren process water from the SX system, called raffinate, and is then pumped to an active tailings cell.

The tailings cells would be permanent disposal facilities consisting of three liners with an LCRS system between the primary and secondary liners. In the tailings cell, the solids would settle out of solution while most of the process water would remain at the top of the tailings cell, where it would be recovered and pumped back to the mill for reuse. Although this solution is projected to have a low pH (3.3) and high dissolved solids content, it would be reusable for some applications within the mill. An underdrain on top of the primary liner would also allow for recovery of water draining from the base of the tailings. The main radioactive materials remaining in the tailings are Thorium-230 and Radium-226, which are decay products of Uranium-238 pesent in the uranium ore.

**Raffinate.** Once the supply water is utilized in the milling process, it is termed process water. The process water is utilized in all areas of the plant and is recycled wherever practicable. After uranium and vanadium have been recovered from the process stream in the solvent extraction building, the barren solution (i.e. raffinate) is pumped to the tailings box where it is used to dilute the tailings as described above. Excess raffinate, which has a projected pH of 4.4 and high levels of dissolved solids (typically 70,000 to 100,000 parts per million total dissolved solids) can not be recycled cost-effectively. This excess solution would be pumped to the evaporation pond where the water would be allowed to evaporate and the dissolved solids would precipitate out of solution (mostly as sulfate compounds) in the bottom of the lined ponds. Based on samples collected at other uranium milling facilities, radionuclide activity levels in the precipitated compounds would be very low compared to the activity levels in the tailings.

The evaporation ponds would be lined in a similar fashion to the tailings cells. The initial, total lined evaporation pond area would be approximately 40 acres. Evaporation of the raffinate solution is enhanced by mechanical means (i.e., the use of bubblers, fountains, or misters) within the central area of the ponds. As evaporation ponds fill with salts, new ponds would be constructed thus increasing the evaporation pond area to 80 acres over the life of the facility.

### 4.12.1.2.3 Closure

At the time of cessation of mill operations, some radiological and nonradiological wastes would remain in the mill systems and inventory as described in the *Mill Decommissioning Plan* (Kleinfelder, 2009b). Mill closure activities associated with and closure procedures for the

BLM_0045373

tailings cells and the evaporation ponds (radiological waste) are provided in Section 4.11.1.2.3 above. Specific nonradiological waste-handling plans would include:

- Removal of product – any remaining milling product would be removed for sale or placed in the disposal vault (vault) in Tailing Cell C (Kleinfelder, 2009b);

- Disposal of process liquids – organic and inorganic process liquids would be stripped and neutralized as necessary for either on-site disposal in the evaporation pond or off-site recycling or disposal at a licensed facility;

- Removal of circuit residues – liquid mill circuits would be flushed to the evaporation pond and solid residues would be collected for disposal in the tailings vault;

- Removal of pond solids – evaporation pond solids would be allowed to dry, then mixed with soil as needed to excavate and handle as dry solids for disposal in the vault;

- Removal of reagents – reagents that are uncontaminated would be returned to the vendor. Contaminated reagents would be handled as process liquids; and

- Oil and Lubricants – oil and lubricants that are uncontaminated would be returned to the vendor; if contaminated they would be sent to a licensed mixed waste facility for treatment and disposal.

## 4.12.2 Protective/Mitigation Measures

- Energy Fuels would dispose of all wastes in accordance with applicable local, state, and federal regulations.

- Waste minimization practices would be developed and implemented to the extent practicable.

## 4.12.3 Monitoring

Routine sampling of the raffinate solution (discharged to the evaporation ponds) and the tailings solution and sands (discharged to the tailings cells) would be conducted to provide continuous tail grade characterization of these byproduct wastes during the operational phase of the Mill Facility. Samples of the tailings slurry would be collected daily. Additionally, quarterly samples of the tailings sands and supernatant solution would be collected at the tailings cells. Samples of the raffinate and evaporitic salts would be collected at the evaporation ponds on a quarterly basis. These samples would be analyzed for the parameters listed in Table 9-2 in the *Operational Monitoring Plan* (Visus and Energy Fuels, 2009b) to characterize the materials for environmental planning purposes.

BLM_0045374

# Section 5.0
# Summary of Impacts

| Resource | Construction | Operations | Closure |
|---|---|---|---|
| **Land Use** | | | |
| Regional and Local Land Use Patterns | Construction would not impact regional land use patterns. Landowners accessing surrounding lands from SH 90 would be affected by construction traffic potentially increased up to 40 percent above existing levels (see Transportation). | Operation would not impact regional land use patterns. Landowners accessing surrounding lands from SH 90 would be affected by operation traffic potentially increased up to 24 percent above existing levels. | Closure would not impact regional land use patterns. Landowners accessing surrounding lands from SH 90 would be affected by closure traffic less than during construction and operation. |
| Agriculture | Construction would remove 880 acres of seasonal grazing land and 90 to 124 AUMs. No commercial crop production would be affected by construction. | Seasonal grazing lands and AUMs removed during construction would continue to be removed during operations. | Closure would allow 722 acres to return as seasonal grazing land and 72 to 102 AUMs. There would be a permanent loss of 158 acres of seasonal grazing land and 16 to 22 AUMs for tailing cells. |
| Mineral Resources and Mining | Construction of the Mill would stimulate uranium/vanadium ore production in the region and allow reopening of some idle mines. | Operation of the Mill would stimulate uranium/vanadium ore production in the region and allow reopening of some idle mines. | Closure of the Mill could impact uranium/vanadium ore production in the region. |
| Recreation | Increased traffic could potentially impact Dolores River floaters en route to Bedrock launch site and bicyclists on SH 141 and SH 90. There would be 880 acres removed for hunting big game and small game within the Site during construction. | Increased traffic could potentially impact Dolores River floaters and bicyclists on SH 141 and SH 90, especially by ore trucks. Loss of 880 acres for hunting big game and small game within the Site would continue during operations. | Traffic impact to Dolores River floaters and bicyclists on SH 141 and SH 90 would be less than during construction and operation. 722 acres would potentially be returned to hunting use. |
| Land Use Planning Issues | The Site would become an area for commercial and industrial development, authorized by Montrose County, rather than rangeland. | The Site would continue as a commercial and industrial site. | Closure would allow 772 acres of the Site to be returned to rangeland. |
| **Transportation** | | | |
| Regional Traffic | Impact from increased traffic on SH 90 between the Site and SH 141 junction could potentially be 40 percent above 2008 levels, and 30 percent above existing levels on SH 141 between Naturita and 2 miles north of SH 90 junction. | Impact from increased traffic during operations on SH 90 between the Site and SH 141 junction could potentially be 24 percent above 2008 levels, and 18 percent above existing levels on SH 141 between Naturita and 2 miles north of SH 90 junction. | Traffic associated with closure would be less than during construction and operations. Impact would be concomitantly less as well. |
| Vehicular Crashes | Increased construction traffic could potentially result in 0.46 fatal and 0.7 injury highway crashes during the 630 day construction period. | The Proposed Action could potentially result in 0.06 fatal and 0.09 injury highway crashes each year of Mill operation. | The Proposed Action could potentially result in between 0.004 and 0.007 fatal, and 0.007 and 0.01 injury highway crashes during the 855 day closure period. |
| **Geology and Soils** | | | |
| Soil Productivity | Construction would result in disturbance of 414.6 acres of soil with potential for erosion and loss in productivity. Subgrade soils would be compacted in place or excavated and replaced with compacted materials required for construction of the Mill Facility. | During operations, surface disturbance outside of the Mill License Boundary and ancillary facilities have been stabilized with vegetation and other methods. Potential impacts during construction might consist of erosion and sedimentation of surface drainages. | The primary earthwork involved in restoration would be removal of the ore pad, evaporation ponds, and mill pad, with redistribution of these contaminated soils in the final tailings cells. These areas outside the tailings cells would be regraded to original contours, topsoiled, and seeded. |
| Geologic Hazards | Impacts resulting from geologic hazards are not anticipated during construction. The Maximum Credible Earthquake has a probability of occurrence of 2 percent in 50 years, corresponding to a return period of 2,475 years. Liquefaction potential at the Site is negligible. Volcanism is not a threat. | All Mill Facilities would be designed in accordance with Montrose County building codes, now transitioning to the International Building Code (IBC), which includes a more comprehensive analysis of earthquakes. Under the IBC, the facility would be designed based on the Design Earthquake, which has a magnitude 4.8 at a distance of 10 miles from the Site. | Impacts resulting from geologic hazards are not anticipated during closure because the reclaimed tailings cells would have high factors of safety for earthquakes and the gradual, rock armored slopes are designed to pass the PMP storm event. |
| **Water Resources** | | | |
| Surface Water | Impacts to surface water quantity and quality are not expected during construction because Energy Fuels would obtain a Construction Stormwater Permit and follow BMPs in their Stormwater Management Plan. During construction of the stormwater control structures, there is the potential of stormwater eroding disturbed areas and contributing sediments to East Paradox Creek. Access roads and stormwater control structures would be completed before any other facility construction begins and would be in place to manage runoff and sediment through the construction of all other facilities. | Operation would result in capture of runoff from the Mill Facility in quantities up to 428 acre-feet/year under maximum annual precipitation. Impacts to surface water quality are not expected because the facility is designed as zero discharge. A large storm could possibly cause runoff erosion in diversionary channels, and add to turbidity in East Paradox Creek. | During closure, decommissioning would potentially expose some soils to possible erosion. Contaminated material from the Mill and evaporation ponds would be transported to, and placed in, the final tailings cell. There would also be potential for residual amounts of radioactive material to be spilled or blown as dust during closure activities. In post-closure, only the diversionary dike at the south end of the Site and channels bypassing the sealed tailings cells would remain, which should not measurably alter the natural hydrology. |
| Groundwater | Groundwater withdrawals from the bedrock aquifer would begin during construction and would be closely monitored to evaluate impacts on the aquifer. Stormwater control structures would intercept water that would otherwise have infiltrated or run off. This reduction of surface infiltration to groundwater has been claimed by Energy Fuels as a water right for industrial use. | Groundwater withdrawals from the bedrock aquifer and interception of a small amount of runoff from the facility would decrease combined groundwater discharge from the southeast portion of Paradox Valley to the river. This could potentially cause a slight decrease in groundwater flow to the river during operations, but it is unlikely this would be measurable. The water demand (224 acre-feet/year) is less than the annual average capture of rainwater by the zero-discharge area (252 acre-feet/year). | Potential impacts in closure include the gradual return of the groundwater system to its original baseline conditions with flows toward the Dolores River. |
| Water Use | Water use during construction would be minimal and would be mostly limited to that required for dust control and moisture conditioning of compacted soils. | There would be a consumptive use of 144 gallons per minute of water for operations. Drawdown of the aquifer could potentially impact surrounding wells. | Water use during closure would be minimal and would be mostly limited to that required for dust control and moisture conditioning of compacted soils. |

BLM_0045375

| Resource | Construction | Operations | Closure |
|---|---|---|---|
| **Ecological Resources** | | | |
| Vegetation | Construction would cause long-term removal of 236.5 acres of big sagebrush shrubland and 71.3 acres of mixed grassland within the Mill License Boundary; long-term removal of 8.8 acres of big sagebrush shrubland and 37.3 acres of mixed grassland outside of the Mill License Boundary; short-term removal of 2.3 acres of big sagebrush shrubland and 58.4 acres of mixed grassland outside of the Mill License Boundary. | Operation of the Proposed Action would displace native and domestic herbivores, causing browsing and/or grazing on vegetation resources that would otherwise not occur. Surface disturbance, increased vehicle traffic, equipment placement and operation, foot traffic, and other activities associated with operation may promote the spread of invasive plants and noxious weeds and affect native vegetation. | The majority of the Site would be returned to rangeland use, with the exception of the tailings cells, which would be capped with an engineered soil cover and revegetated. Revegetation would include spreading the salvaged topsoil over disturbed areas, seeding with a native seed mix, and mulching. Closure monitoring would include repair of eroded areas, implementation of weed-control measures, and reseeding areas with sparse vegetation. |
| Wetlands | No direct or indirect impacts are expected during construction. | No direct or indirect impacts are expected during operations. | No direct or indirect impacts are expected during closure. |
| Invasive, Non-native Species | Infestations of non-native species are already present. Additional noxious weed growth is possible in disturbed areas following surface disturbance, primarily along roads and areas of development; however, the spread of noxious weeds would be controlled through implementation of Energy Fuels' weed control program. | Additional noxious and invasive weed species could potentially be introduced by ore trucks entering the Site from mines outside the county or state, including invasive species not currently located at or within the vicinity of the Site; however, the spread of noxious weeds would be controlled through implementation of Energy Fuels' weed control program. | The potential for invasive, non-native species to become established, as during construction, would continue during closure; however, the spread of noxious weeds would be controlled through implementation of Energy Fuels' weed control program. |
| Federally Listed Threatened and Endangered Species | Increased traffic would increase the potential for mortality of Canada lynx<br><br>Noise generated during construction could exceed 70 dBA in pinyon-juniper habitat and could disturb Mexican spotted owls if they are present.<br><br>Accidental spills of petroleum products into the Dolores or San Miguel rivers could impact the four Colorado River endangered fish; however, the risk of a spill to the rivers is negligible. A spill would not be toxic 65 miles downstream where the fish species occur. | Increased traffic would increase the potential for mortality of Canada lynx. Restriction of most traffic to daylight hours would reduce but not eliminate risks of collisions of project-related vehicles with lynx.<br><br>Noise generated during construction could exceed 57 dBA in pinyon-juniper habitat and could cause alert behaviors in Mexican spotted owls if they are present.<br><br>Water depletions within the Upper Colorado River Basin could potentially affect the four endangered fish species and their designated critical habitats. Operation of the Mill Facility would withdraw water at an average annual depletion of 227 acre-feet. During operations, an accidental spill of ore, yellowcake, chemical reagents, or petroleum products could temporarily impact a short section of the river. The risk to endangered species is negligible because they are located 65 miles from potential spills. | The potential for vehicle collisions with lynx would be less than during construction or operation.<br><br>Noise generated during construction could exceed 70 dBA in pinyon-juniper habitat and could disturb Mexican spotted owls if they are present.<br><br>No impacts to the four endangered fish species due to closure are anticipated. Impacts from potential spills would be the same as described for construction. |
| Candidate Species | Soil disturbance during construction of the Mill Facility could provide habitat suitable for colonization by Gunnison's prairie dogs during or following construction. If they do colonize, they could be susceptible to direct mortality by construction equipment.<br><br>Construction could potentially interfere with attempted movements by Gunnison Sage-grouse between occupied habitat in Dry Creek Basin and potentially suitable habitat in the East Paradox Valley. | Gunnison's prairie dogs could be impacted they access the evaporation ponds or tailings cells.<br><br>The Mill Facility could potentially hinder re-establishment of Gunnison Sage-grouse populations in East Paradox Valley during operations because sage-grouse are sensitive to disturbance from roads and noise during breeding and females avoid nesting and utilizing brood-rearing habitats in areas with high levels of human presence. | No impact to Gunnison's prairie dogs is expected during closure.<br><br>Site demolition and earthwork activities would tend to limit sage-grouse migration into the area because of the associated noise and traffic. |
| BLM Sensitive Species and State of Colorado Species of Special Concern | Noise from traffic and other sources during construction could potentially interfere with bats' echolocation of insect prey; however, most construction activity would occur during daylight hours when bats are not active.<br><br>Removal of foraging habitat, or alteration in vegetation cover and vegetation composition from introduced, invasive species may negatively affect pocket gophers, if present.<br><br>Accidental spills of petroleum products into the Dolores or San Miguel rivers could occur and affect Northern river otters, if present. The risk of a spill into the rivers is negligible.<br><br>Increased traffic would increase the potential for bald eagles to be killed while feeding on roadside carrion. | Night lighting could potentially act as barriers to bat movements, reduce bat activity in the immediate vicinity or have an opposite effect, depending on light sources, by attracting nocturnal insects.<br><br>Pocket gophers, if present, could potentially be impacted by passing through chain-link fencing to the evaporation ponds and the tailings cells.<br><br>During operations, an accidental spill of ore, yellowcake, chemical reagents, or petroleum products could spill into the rivers potentially impacting river otters. The risk of a spill into the rivers is negligible.<br><br>Increased traffic would increase the potential for bald eagles to be killed while feeding on roadside carrion. | Potential effects to bats during closure would be similar to those expected during construction.<br><br>Pocket gophers would be effectively excluded from the tailings cells by the bio-intrusion barrier.<br><br>An accidental spill of petroleum products into the Dolores or San Miguel rivers could affect otters, if present. The risk of a spill into the rivers is negligible.<br><br>Increased traffic would increase the potential for bald eagles to be killed while feeding on roadside carrion. |

BLM_0045376

| Resource | Construction | Operations | Closure |
|---|---|---|---|
| | Western burrowing owls could be indirectly impacted during their breeding season from noise and vibration associated with construction and increased human presence, habitat loss including destruction or degradation of foraging habitat adjacent to occupied or potentially occupied burrows, and decrease in prey species.<br><br>Midget faded rattlesnake could be impacted during construction if cover or hibernacula are removed, or if traffic associated with the Proposed Action increases road mortality.<br><br>An accidental spill of petroleum products into the Dolores or San Miguel rivers could affect fish. The risk of a spill into the rivers is negligible. | Burrowing owls might not re-colonize the abandoned prairie dog burrows located west of the Site in the vicinity of the soil stockpiles because of increased human activity.<br><br>Midget faded rattlesnake could be adversely impacted during operation if cover or hibernacula are removed, or if traffic associated with the Proposed Action increases road mortality.<br><br>During operations, an accidental spill of ore, yellowcake, chemical reagents, or petroleum products could spill into the rivers potentially impacting fish. The risk of a spill into the rivers is negligible. | Impacts to burrowing owls during construction would be similar to those during closure but the presence of burrowing owls cannot be predicted.<br><br>Midget faded rattlesnake could be adversely impacted during closure if cover or hibernacula are removed, or if traffic associated with the Proposed Action increases road mortality.<br><br>An accidental spill of petroleum products into the Dolores or San Miguel rivers could affect fish. The risk of a spill into the rivers is negligible. |
| Terrestrial Wildlife | Construction of fencing along the Property Boundary could potentially cause mule deer and elk mortality. Habitat supporting mule deer and elk would be removed during construction potentially causing displacement of other animals from adjacent winter range and severe winter range. Functions of habitat could diminish. Increased poaching of big game could occur with increased population.<br><br>Increased traffic would increase the potential vehicle collisions with big game, small game, and non-game species.<br><br>Construction during the migratory bird nesting season between May 15 and July 15 could potentially result in a take of nesting migratory birds. Increased noise could cause birds to abandon nests. | Construction of fencing along the Property Boundary could potentially cause mule deer and elk mortality. Habitat supporting mule deer and elk would be removed during construction potentially causing displacement of other animals from adjacent winter range and severe winter range. Functions of habitat could diminish. Increased poaching of big game could occur with increased population.<br><br>Increased traffic would increase the potential vehicle collisions with big game, small game, and non-game species.<br><br>Most migratory bird species would be excluded from evaporation ponds and tailings cells by the use of bird netting and bird balls; however, there could potentially be impact to smaller non-game wildlife if they are not effectively excluded from the evaporation ponds or tailings cells. | Risk of vehicle collisions with big game, small game, and non-game species would be less than that during construction and operations.<br><br>The presence of and effects to migratory birds, small game, and non-game species during closure cannot be predicted. |
| Aquatic Species | Potential impact to aquatic species could occur from an accidental spill of petroleum products into the Dolores or San Miguel rivers. The risk of a spill into the rivers is negligible. | During operations, impacts to aquatics species could potentially occur from spills of ore, chemical reagents, petroleum products, or yellowcake into the Dolores or San Miguel rivers. The risk of a spill into the rivers is negligible. | An accidental spill of petroleum products into the Dolores River or San Miguel Rivers could potentially affect aquatic species. The risk of a spill into the rivers is negligible. |
| **Air Quality** | | | |
| Emissions | Emissions during construction would be limited to fugitive dust emission associated with construction equipment and emissions from the diesel engines. There would be no exceedance of either National Ambient Air Quality Standards or Colorado Ambient Air Quality Standards. | Emissions during operations would include both fugitive and non-fugitive emissions, primarily $PM_{10}$ and VOC emissions. There would be no exceedance of either National Ambient Air Quality Standards or Colorado Ambient Air Quality Standards. | Emissions during closure would be similar to those during construction. There would be no exceedance of either National Ambient Air Quality Standards or Colorado Ambient Air Quality Standards. |
| **Noise** | | | |
| Mill Site | Maximum estimated noise generated by construction equipment within the Site would attenuate to background levels (40 dBA) 5,000 feet away. | Maximum estimated noise generated by operation equipment (87 dBA at 50 feet) within the Mill Facility would attenuate to background levels (40 dBA) 2,600 feet away. | Maximum noise due to construction equipment during closure would be the same as noise generated during construction. |
| Traffic | Project related traffic during construction, added to existing (2008) traffic volumes, would generate noise on SH 90 attenuating to background levels 1,590 feet away east of the Mill Site and 1,290 feet away on SH 90 west of the Site. | Project related traffic during operation, added to existing (2008) traffic volumes, would generate noise on SH 90 attenuating to background levels 1,470 feet away east of the Mill Facility and 1,340 feet away on SH 90 west of the Mill Facility. | Traffic volumes would be less than during construction and operation and are expected to generate less noise on SH 90. |
| **Historic and Cultural Resources** | | | |
| Archeological Sites | NRHP-eligible sites would be avoided during construction. If previously unidentified cultural resources are encountered during construction, Energy Fuels would implement the *Unanticipated Discovery Plan* and confer with SHPO, as appropriate. | NRHP-eligible sites would be avoided during operations. If previously unidentified cultural resources are encountered during operations, Energy Fuels would implement the *Unanticipated Discovery Plan* and confer with SHPO, as appropriate. | NRHP-eligible sites would be avoided during closure. If previously unidentified cultural resources are encountered during closure, Energy Fuels would implement the *Unanticipated Discovery Plan* and confer with SHPO, as appropriate. |
| **Visual and Scenic Resources** | | | |
| Visibility | Large vehicles and construction equipment could be seen from Key Observation Points on SH 90. Areas stripped of vegetation and soil stockpiles would also be visible during the construction period. | Visual resources observed from Key Observation Points on SH 90 are not expected to be substantially impacted. However, middle and background viewsheds would be altered for the 40 year life of the Mill Facility. The administration building and associated parking area would be 675 feet from SH 90 and would be clearly visible to observers using the road. Outdoor lighting at the Mill Facility would change the nighttime viewshed in a place where no lights previously existed. | Large vehicles and construction equipment could be seen from Key Observation Points on SH 90. |

BLM_0045377

| Resource | Construction | Operations | Closure |
|---|---|---|---|
| **Socioeconomic Resources** | | | |
| Environmental Justice | No construction-related impact to minority populations, low income population, or Indian Tribes is expected. | No operation-related impact to minority populations, low income population, or Indian Tribes is expected. | No closure-related impact to minority populations, low income population, or Indian Tribes is expected. |
| Workforce | Construction workforce would increase from 25 workers in the 1st quarter to 200 workers in the 4th and 5th quarters, and fall to 10 workers during the 7th (final) quarter of construction. Local workers are expected to comprise 20 percent of the construction workforce. Additional indirect employment impacts of 126 workers. | Operational workforce would include 85 workers. Local workers are expected to comprise 80 percent of the operational workforce. Additional indirect employment impacts of 230 workers, mostly related to mining-activities. | Closure will cause the loss of 85 operational jobs. Closure workforce would include 10 workers. Local workers are expected to comprise the entire closure workforce. Minimal indirect employment impacts. |
| Economic Benefits | $14.3 million in regional labor income and $35.5 million in regional business sales during 21 month construction period. | $18.7 million in annual regional labor income and $140 million in regional business sales every year the Mill Facility is in operation | $662,857 in regional labor income and $1.65 million in regional business sales during 33 month closure period. |
| Population | Construction of the Mill Facility is expected to attract construction workers from across western Colorado and eastern Utah. Construction workers are transient workers who would typically not relocate permanently to communities near the job site and would not impact regional population trends. | No impact on regional population distributions because fewer than 20 mill workers would be expected to relocate to Paradox Valley. Some population gains in local communities of Naturita, Nucla, Bedrock, and Paradox. | No impact on regional or local population distributions is expected during closure although Mill closure could lead to population losses in local communities. |
| Housing | The Mill's peak construction workforce would be likely to fully occupy available short-term rentals in the local area, causing upward pressure on short-term housing prices, including motels and RV sites. | Because of the small influx of new residents, the Mill's operational workforce is not expected to face severe housing constraints or a rapid increase in prices in the local area. | Mill closure could result in falling housing prices regardless of out-migration of workers and population loss. |
| Land Values | Initial public perceptions could impact land values in the Paradox Valley. | The Proposed Action is not expected to have a long-term impact on agricultural and residential land values in the Paradox Valley. | Closure would have no impact on agricultural and residential land values in the Paradox Valley. |
| Community Services | The Mill's peak construction workforce could place increased demands on local medical services, volunteer fire departments, and public safety officers. | Mill operations would not impact local public safety services. Likely increase in insured patients using local medical services. | Mill closure could result in falling school enrollments. Mill closure would not be expected to have an adverse impact on medical service providers and public safety officials, nor on local water and wastewater treatment facilities. |
| Sales Tax Revenues | During 21 month construction period, sales and use tax revenues are estimated at $2.48 million to State of Colorado, $288,118 to Montrose County, and $286,118 to Montrose County, and $33,769 to each of the towns of Naturita and Nucla. | During Mill operations, annual sales and use tax revenues are estimated at $241,516 to the State of Colorado, $120,000 to Montrose County, and $58,841 to each of the towns of Naturita and Nucla. | During 33 month closure period, sales and use tax revenues are estimated at $194,868 to the State of Colorado, $116,678 to Montrose County, and $2,612 to each of the towns of Naturita and Nucla. Final Mill closure would result in the loss of sales tax revenue associated with Mill expenditures and household spending of income derived from mill operations. |
| Property Tax Revenues | Construction would generate approximately $37,796 in property taxes, derived by multiplying the unimproved land value of the Mill Site by a 29 percent assessment rate and then by the 2008 mill levy. | Property taxes are estimated to range between $1.9 in Year 1 and $1.1 million in Year 10 over the first 10 years of Mill operations. | Final Mill closure would result the loss of property tax revenue based on real and personal property values at the Mill Facility. |
| **Public and Occupational Health** | | | |
| Nonradiological | Potential nonradiological impacts associated with construction (i.e., trips and falls, strains, electrocution, crushing, pinching, fuel spills or releases, etc.) would be similar to those at any industrial construction site and would be prevented or mitigated by Energy Fuels' adherence to the applicable plans and reports described in Section 4.11. | The Mill Facility would be operated in compliance with MSHA regulations to protect workers and the public. During operations, potential nonradiological impacts include spills and releases of chemical reagents, fuels, feedstock and waste streams that could impact workers. Energy Fuels would implement the applicable plans and reports to protect workers from possible risks. | During closure, potential nonradiological impacts would be the same as operation but to a lesser extent. |
| Radiological | Potential radiological impacts during construction would be limited to the possible delivery of ore near the end of the construction period. Radiological controls would be implemented in the ore delivery area as identified in Section 4.11. | Potential radiological impacts would be present throughout most of the mill processes. The Mill Facility would be operated in compliance with CDPHE regulations to protect workers and the public. Energy Fuels must maintain radiation levels, to which workers are exposed, below regulatory limits. To protect the public, Energy Fuels must maintain radiation levels to 100 mrem/year (or less) above background at the Property Boundary. Energy Fuels would comply with the applicable plans and reports prepared for the Mill Facility (see Section 4.11). | During closure, potential impacts would be associated with residual radioactivity above background remaining on equipment, structures, and in soils. Energy Fuels would implement the radiological protection procedures applicable plans and reports to protect workers and the public. Post closure, the Site would be surveyed and monitored in accordance with state and federal regulations. |
| **Waste Management** | | | |
| Nonradiological | Waste generated during construction would be typical of any industrial building site and would be disposed of in compliance with applicable local and state regulations. | Waste resulting from operation of the Mill Facility would be recycled where possible; disposed of in compliance with local and state regulations; and in the case of potential hazardous waste generation, Energy Fuels would abide by RCRA regulations, which are enforced by CDPHE. The septic system would be designed according to state and county requirements. | Waste generated during closure would be disposed of in compliance with local and state regulations. |
| Radiological | Construction would not generate radiological waste. | The radiological waste generated during operation (i.e., 11e.(2) byproduct material) would be disposed of in the tailings cells and evaporation pond and would be in compliance with state and federal regulations. | At the time of closure, remaining radiological waste would be disposed of in Tailing Cell C, and the tailings cell area would be covered and monitored in compliance with state and federal regulations. |

BLM_0045378

# Section 6.0
# Cumulative Impacts

## 6.1    INTRODUCTION

NRC Environmental Review Guidance for Licensing Actions Associated with NMSS Programs (NUREG-1748) requires the evaluation of any past, present or reasonably foreseeable future actions that could result in cumulative impacts when combined with the proposed action (NRC, 2003). NRC guidance does not specify an appropriate geographic scope over which to evaluate cumulative impacts. Guidance issued by the Council on Environmental Quality (CEQ) states that, "It is not practical to analyze the cumulative effects of an action on the universe; the list of environmental effects must focus on those that are truly meaningful." To be meaningful, "cumulative effects analysis should be conducted on the scale of human communities, watersheds or airsheds using the concept of project impact zone" (CEQ, 1997). In other words, the cumulative impact analysis should address the area that might be affected by the Proposed Action.

Consistent with NRC and CEQ Guidance, the cumulative impact analysis considers the effects of past, present, and reasonably foreseeable actions along with the Proposed Action within a project impact zone (Cumulative Impact Area). The Cumulative Impact Area is identified as being bounded to the north by the Gateway community in Mesa County, to the south by U.S. Highway 491 in Dolores County, to the east by the Uncompahgre Plateau, and to the west by U.S. Highway 191 in San Juan County, Utah. This region contains the airsheds, watersheds, and transportation routes that would be most affected by the Proposed Action. The resources that could be affected by existing and future activities within this vicinity are discussed in the sections below.

## 6.2    PAST ACTIONS IN THE VICINITY OF THE PIÑON RIDGE MILL SITE

The Site and Cumulative Impact Area are centered in a zone of uranium and vanadium deposits known as the Uravan Mineral Belt. This mineralized zone contains a substantial portion of the nation's known reserves of uranium ore, and is the oldest uranium mining region in the United States (DOE, 2007). Historically, almost 1,200 mines were located within the Uravan Mineral Belt, which produced over 63 million pounds of uranium and 330 million pounds of vanadium between 1948 and 1978 (CDNR, 2009b). The Cumulative Impact Area also includes the La Sal and Big Indian Mining Districts in southeastern Utah. Due to falling uranium prices, uranium production fell dramatically across the area in the mid-1980s, and ultimately came to a halt throughout the Cumulative Impact Area. The uranium mines in the Cumulative Impact Area either went on standby or were reclaimed. As discussed in Section 1.0, with the exception of the White Mesa Mill in Blanding, Utah, mills in the area were closed and reclaimed. Improving market conditions in the early 2000s resulted in the resumption of limited mining operations, the reopening of some reclaimed mines (e.g., the Whirlwind Mine) and extensive exploration activity throughout the area (CDNR, 2009a).

According to the CDNR, as of September 2009 there were 33 actively permitted uranium mining projects, including four producing mines, in Colorado's Uravan Mineral Belt. The four producing mines – Sunday, West Sunday, St. Jude, and Topaz mines– are in San Miguel County and are operated by Denison (CDNR, 2009a). These mines ship their ore to Denison's White Mesa Mill.

BLM_0045379

Case No. 1:20-cv-02484-MSK   Document 40-5   filed 04/27/21   USDC Colorado   pg 152 of 271

Denison also operates another three mines within the Cumulative Impact Area – Beaver, Pandora, and Rim mines–in the La Sal region of San Juan County that also ship ore to the White Mesa Mill. Not all of Denison's mines are operating at this time, as they are currently milling alternate feeds and stockpiling ore for resumption of ore milling operations in early 2010. Several smaller mines in both Colorado and Utah have also shipped ore to the White Mesa Mill during the past several years, but are currently inactive because current uranium spot prices (upon which Denison bases its purchasing schedules) are relatively low. Energy Fuels placed its Whirlwind Mine near Gateway on standby in November 2008 after failing to secure a contract with Denison. Energy Fuels continues to move forward with the rehabilitation of the Energy Queen Mine near La Sal, Utah. Uranium exploration activity, although still occurring throughout the region, has cooled significantly over the past two years in response to lower uranium prices.

In addition to uranium mining, mineral development within the vicinity of the Site has included oil and natural gas development. To date, most of this activity has been in San Miguel County, Colorado and San Juan County, Utah. The pace of oil and natural gas development is also highly dependent on market conditions. Periods of active drilling occurred in the mid-1970s to early- 1980s and most recently in the early- to mid- 2000s. The pace of drilling fell dramatically in 2008 due to falling oil and gas prices and the downturn in national economic activity.

Ranching activity has remained stable within the Cumulative Impact Area, although some loss of farm and ranch land has occurred over the past two decades. As discussed in Section 3.0, with the exception of the Gateway Canyons Resort in Gateway, recreation activity in the area is not intensive and only supports a small portion of the population on a seasonal basis. The economy within the Cumulative Impact Area, as represented by Nucla, Naturita, and other small rural towns, was depressed economically prior to the current recession and remains in that state.

## 6.3    PRESENT AND REASONABLY FORESEEABLE ACTIONS

To evaluate present and reasonably foreseeable actions that may occur within the Cumulative Impact Area that, when combined with the impacts of the Proposed Action, could potentially contribute to cumulate effects, a review of the BLM National Environmental Policy Act (NEPA) registers for the Grand Junction and Uncompahgre field offices in Colorado and for the Utah State Office was completed. Mining applications under review by the Colorado Division of Reclamation, Mining and Safety (DRMS) and Utah Division of Oil, Gas and Mining (DOGM) were also reviewed. Finally, the Montrose Economic Development Corporation (EDC) and towns of Naturita and Nucla were contacted to determine if there were any economic development projects underway.

Based on the review of NEPA registers and mining applications, it was determined that 18 uranium exploration projects, three oil and gas projects, and one building construction project (an interpretive site at the Hanging Flume Overlook Historic Site in the Unaweep Canyon) were within the vicinity of the Proposed Action and could potentially cause future impacts that might be additive or cumulative with those associated with the Proposed Action. According to the Montrose EDC, there are no anticipated new industrial or commercial projects in Montrose County (Head, 2009). A restaurant (steakhouse) in Nucla is the only anticipated new business in either Naturita or Nucla (Lear, 2009 and Smith, 2009b). The projects that could contribute to cumulative impacts when combined with the Proposed Action are shown in Table 6.3-1 and on Figure 6.3-1.

BLM_0045380

**Table 6.3-1**
**Potential Projects in the Vicinity of the Site**

| Site Name and Operator | County | Project Type |
|---|---|---|
| **Uranium/Vanadium Exploration Projects** | | |
| Antler Claims – Vern Shumway[1] | San Juan, UT | Uranium Exploration |
| Black Ridge Mine – Mitch Shumway[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Bridger Jack Mine – South American Minerals[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Copper Mineral Claim – John Rud[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Daneros Mine – Utah Energy Corp.[2] | San Juan, UT | Uranium/Vanadium Mine |
| Fry 120 Drilling Program – John Rud[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Hilltop Mine – South American Minerals[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Hop Creek Exploration Drilling – CO Plateau Partners[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Lake Canyon Project – Uranium Energy Corp[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Lark Royal Claims – Utah Energy Corp.[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Last Chance #3 & #4 Mines – Nuvemco LLC[1] | Montrose, CO | Uranium/Vanadium Exploration |
| Midway Mine – Uranium One Exploration[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Nash Mineral Claim – John Rud[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Round Mountain Project – Global Uranium Corp[1] | San Juan, UT | Uranium Exploration |
| RS Claims – John Rud[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Shroud Mine – Uranium One Exploration[1] | San Juan, UT | Uranium/Vanadium Exploration |
| South Beaver Mine – Uranium One Exploration[1] | San Juan, UT | Uranium/Vanadium Exploration |
| Stump Mine – Uranium One Exploration[1] | San Juan, UT | Uranium/Vanadium Exploration |
| **Oil and Natural Gas Development Projects** | | |
| Middle Mesa Gas Wells (15 wells) – EnCana[4] | San Juan, UT | Natural Gas Wells |
| South Nucla Unit Field Development (20 gas wells) – Redwine Resources[4] | Montrose, CO | Natural Gas Wells |
| Wray Mesa Natural Gas Well Pad – EnCana[4] | Montrose, CO | Natural Gas Well |
| **Other projects** | | |
| Hanging Flume Overlook Interpretive Site | Montrose, CO | Historic Center Interpretive Center |

[1] Source: UDNR-DOGM, 2009.
[2] Source: BLM, 2009c.
[3] Source: Colorado DRMS, 2009.
[4] Source: BLM, 2009d.

Ultimately, the cumulative impacts associated with the Proposed Action are dependant on the future price of uranium. Most forecasters predict a gradual rise in the price of uranium, based on the increasing development of nuclear power plants throughout the world and the 2013 expiration of the Russian disarmament program that has, to date, created a substantial quantity of low enriched uranium for nuclear fuel in the United States and abroad. The following reasonably foreseeable actions are based on this scenario. If uranium prices were to remain at their current levels, impacts associated with the Proposed Action would be lower. If uranium prices increased dramatically, exploration activities would also be likely to increase; however, a dramatic increase in uranium mining within the Cumulative Impact Area is unlikely due to constraints in present and reasonably foreseeable mill capacity as discussed in Section 6.4.

BLM_0045381



**Figure 6.3-1**

**Proposed Projects
in the Vicinity of the Piñon Ridge Mill Site**

BLM_0045382

### 6.3.1   Uranium Mining Projects

Construction and operation of the proposed Piñon Ridge Mill would allow Energy Fuels to commence mining operations at its Whirlwind and Energy Queen Mines. It would also allow for permitting and development of additional uranium/vanadium deposits controlled by Energy Fuels, as well the resumption of mining at some of the permitted mines within the Cumulative Impact Area controlled by mining companies other than Energy Fuels and Denison. The locations of permitted uranium mines relative to the Site are shown in Figure 6.3-2. As discussed in the *Mine Operations Plan* (Energy Fuels, 2009d), the Mill is expected to be able to process ore from five to nine mines in the area at any one time. These mines are primarily located in western Montrose, Mesa, and San Miguel counties in Colorado and eastern San Juan County in Utah. Some feeder mines could also be located in Grand and Emery counties in Utah. The mines feeding the Mill are expected to change over the course of the 40-year mill life as projects are mined out and reclaimed and other projects come on line.

The mines that would feed the Mill are predominantly existing underground mines with relatively small disturbance footprints, typically encompassing between 5 and 30 acres of surface disturbance depending on the size of the mine. Although some new disturbance would occur as the mines develop further, most of the surface disturbance associated with the mines (*i.e.*, roads, portals, mine buildings, ore pads, and waste dumps) already exists. Section 4.0 evaluated the potential traffic-related impacts of ore haulage from mines to the Mill, and the potential employment impacts of mining personnel associated with Mill operations. An estimated 228 mining workers (miners, support personnel, and truckers) would be required to provide the 175,000 tons of ore consumed annually (500 tpd) by the Proposed Action (Energy Fuels, 2009d). Section 4.0 did not evaluate the mines' socioeconomic impacts. The text addresses the socioeconomic impacts of the Proposed Action – which consists of the Mill only. Section 4.0 discusses indirect employment associated with mining (miners and truckers only), and the fiscal analysis includes the spending of mining-income associated with the Mill. The fiscal analysis does not include direct spending by mines, indirect spending associated with the mines, or any taxes paid by the mines.

### 6.3.2   Uranium Exploration Projects

According to the Colorado DRMS and Utah DOGM, there are several proposed uranium exploration projects, most of which are located in San Juan County. In Montrose County, the BLM Uncompahgre Field Office is evaluating exploration data concerning underground mining at the Last Chance #3 and #4 mines. Activities limited to exploration are not likely to contribute to cumulative impacts as exploration typically involves few workers, low traffic volumes, and no emissions. If any of the exploration projects noted in Table 6.3-1 lead to new or renewed mining activity, there could be additional land use and biological impacts within the vicinity of the Site, as well as cumulative impacts due to increased traffic, particularly ore-haul trucks, and surface disturbance. Air emissions from underground uranium mining operations are regulated, and the potential for fugitive dust and combustion emissions is low (40 CFR, Part 61, Subpart b). Mine developers would be required to obtain air permits from the CDPHE APCD or the Utah Department of Environmental Quality – Division of Air Quality, which would minimize the potential for cumulative air quality impacts. Potential cumulative socioeconomic impacts associated with an expanded mining and ore-haul workforce, such as increasing populations and potential increases in school enrollments and housing demand could occur.

BLM_0045383



Figure 6.3-2

Permitted Uranium Mines
in the Vicinity of the Piñon Ridge Mill Site

BLM_0045384

### 6.3.3   Oil and Gas Development Projects

According to the BLM Uncompahgre Field Office, three oil and gas projects, with a total of 36 proposed wells on BLM land, are currently under NEPA review. Oil and gas development typically requires 7 to 10 weeks for construction, drilling and completion (BLM, 2008). During this time, assorted heavy equipment and pickup trucks would add to traffic in the vicinity of the Site. Workers would travel daily to a well location; however, the heavy equipment needs would not result in daily transit during well development. There would be brief periods of highly intensive heavy equipment travel (*e.g.* 4 to 10 trucks for a few days). Depending on the number of wells developed at any one time, localized traffic increases would likely be experienced in the region. The proposed oil and gas development would result in additional land use and biological impacts in the region; however, as with uranium mining, oil and gas drill rig impacts are limited to the localized area of a drill pad, which typically covers 5 to 10 acres. The cumulative effects on land use and biota in the region would be an increase in the acreage of public lands that would be affected by mineral exploration. The three oil and gas projects under consideration could result in additional surface disturbance of 180 to 360 acres.

### 6.3.4   Other Projects

The Hanging Flume is a historic structure situated above the San Miguel and Dolores rivers that supplied water for placer gold mining in the late 1800s. The Hanging Flume Site is listed on the National Register of Historic Places and is accessed via a 0.5-mile graveled road leading west from SH 141. In September 2009, the BLM Uncompahgre Field Office approved construction of the Hanging Flume Overlook Interpretive Site to replace the existing graveled parking area that is situated above the Unaweep Canyon rim. Phase One of the project, which includes a graveled vehicle parking area to accommodate six to eight vehicles, two interpretive kiosks, and two to three picnic tables, is scheduled for completion in early 2010. Phase Two includes the construction of a concrete or hardened trail to the river overlook, and is scheduled for construction in the fall of 2010. During late 2010 and early 2011, when construction activities at the Piñon Ridge Site and the Interpretive Site are scheduled to occur, the cumulative impact of increased traffic along SH 141 could result. In particular, a high volume of trucks hauling gravel and other construction materials would be expected along SH 141 through the Unaweep Canyon. Short-term traffic impacts would be mitigated through speed control, dust control, appropriate signage, employee training, and scheduling. Over the long term, the Hanging Flume Interpretive Site will mitigate traffic concerns in the Unaweep Canyon as the BLM considers the current pullout to the Hanging Flume Site to be poorly situated for highway safety (BLM, 2009x).

### 6.4   POTENTIAL CUMULATIVE IMPACTS ASSOCIATED WITH INCREASED URANIUM MINING IN THE VICINITY OF THE PIÑON RIDGE MILL SITE

The potential cumulative impacts from development of uranium resources within the region depends largely on the number of mining claims and DOE leases that are brought into production. Mine development is constrained by actual and potential milling capacity in the foreseeable future. Table 6.4-1 shows the estimated capacity (tpd) and operational status of uranium mills that have been announced, are in the permitting process, or are already permitted. Figure 6.4-1 shows the location of these mills in relation to the Cumulative Impact Area.

BLM_0045385



### Figure 6.4-1

Existing and Proposed Mills
in the Vicinity of the Piñon Ridge Mill Site

BLM_0045386

**Table 6.4-1**
**Status of Potential Uranium Mills[1]**

| Mill | Location | Owner | Estimated Milling Capacity | Estimated Operational Status |
|---|---|---|---|---|
| White Mesa Mill | Blanding, UT | Denison Mines (USA) Corp. | 1,500 tpd[1] | Operating |
| Piñon Ridge Mill | Bedrock, CO | Energy Fuels Resources Corporation. | 500 tpd | Projected 2012 start date |
| Cañon City Mill | Cañon City, CO | Cotter Corpation | 1,500 tpd[2] | Inactive |
| Shootaring Mill | Ticaboo, UT | Uranium One, Inc. | 750 tpd[2] | Inactive |
| MRI Mill | Green River, UT | Mancos Resources, Ltd. | 1,200 tpd[2] | Baseline investigation phase initiated |
| | | Total | 5,450 tpd | |

[1] Source: Denison, 2009.
[2] Source: BLM, 2008.

If all the uranium mills shown in Table 6.4-1 were operational and processing ore at the full capacity of 5,450 tpd, this would result in approximately 227 ore-truck round trips per day (454 total trips) based on 24 tons per shipment. Approximately 28 acres of surface disturbance is likely to be associated with every 100 tpd of production (BLM, 2008). This equates to 1,526 acres of cumulative surface disturbance to supply ore to 5,450 tpd of milling capacity. Energy Fuels estimates that cumulative employment associated with this production rate would include approximately 2,000 workers, including mill workers, miners, mining support personnel and truckers (Filas, 2009).

Cumulative impacts in the vicinity of the Mill Site are likely to be lower than this because not all of the mills plan to process ore from mines in western Colorado and eastern Utah. Cotter intends to process ore shipped from the Mount Taylor Mine at its Cañon City Mill (Cotter, 2009). The Mount Taylor Mine, which is owned by Rio Grande Resources Corporation, an affiliate of Cotter, is located near Grants, New Mexico. Ore would most likely be transported from the mine to Cañon City by train, well outside the Cumulative Impact Area. Denison recently announced its intention to supply the White Mesa Mill with ore from its Arizona 1 deposit in north central Arizona. Denison intends to start production at the Arizona 1 deposit in 2010, and to haul ore by truck to the White Mesa Mill (Denison, 2009). Ore would most likely be transported from the mine to the mill along US Highway 191, south of the Cumulative Impact Area. This ore would be in addition to the ore currently produced at its La Sal, Utah and San Miguel County, Colorado mines, which are located at the east and south edges of the Cumulative Impact Area, respectively. With the addition of the ore feed from its Arizona Mines, White Mesa's potential need for additional ore from mines within the Cumulative Impact Area is significantly reduced.

Excluding the Cañon City and White Mesa mills, the remaining mills have a processing capacity of 2,450 tpd. If the Piñon Ridge, Shootaring and MRI mills were all operational and processing ore at their full capacities, this would result in approximately 102 ore-truck round-trips per day (204 total trips) based on 24 tons per shipment. Supplying ore to 2,450 tpd of mill capacity would result in approximately 686 acres of cumulative surface disturbance and a workforce of about 1,000 mill workers, miners, mine support workers, and truckers (Filas, 2009). However, both the inactive Shootaring Mill and the proposed MRI Mill are outside of the Cumulative Impact Area. Although they could draw uranium ore from the western portion of the Cumulative Impact Area, they would likely rely more heavily on ore produced from uranium mining districts in closer proximity. These include the Yellow Cat, San Rafael, Temple Mountain, and Henry

BLM_0045387

Mountain Mining Districts, all of which are outside of the Cumulative Impact Area. Accordingly, impacts associated with these activities would be spread over a much greater area.

Based on the cumulative analysis in this Section and the impact analysis in Section 4.0, it is unlikely that the cumulative impacts that could potentially occur as a result of the Proposed Action and past, present and reasonably foreseeable future actions could not be mitigated.

BLM_0045388

# Section 7.0
# Cost Benefit Analysis

## 7.1    ECONOMIC AND SOCIAL EFFECTS OF THE PROPOSED PIÑON RIDGE MILL

This section of the ER builds upon the analysis of potential impacts presented in Section 4.0 to evaluate the potential economic and social effects of the Proposed Action. There are limitations on the extent to which the economic and social benefits and costs of the Proposed Action can be evaluated. Some of the project's benefits and costs are measurable, such as product sales, capital costs, operating and maintenance costs, decommissioning costs, regulatory compliance costs, labor income, tax revenues, and regional output. On the other hand, some potential environmental costs of the Proposed Action and their potential economic and social consequences are not readily quantifiable. Pursuant to NRC Regulatory Guide 3.8 (NRC, 1982a) and NUREG 1748 (NRC, 2003a), this section compares the value of the costs and benefits that can be quantified through a cost-benefit analysis, and discusses qualitatively the costs and benefits that cannot be measured monetarily.

## 7.1.1   Benefits

The Proposed Action would be a private venture and, as such, would not have a direct public purpose. However, because the Proposed Action would support the expansion of domestic uranium sources, much of which would eventually be used in nuclear reactors to generate electricity, it would have a public benefit. Existing statues obligate the U.S. Secretary of Energy to have a "continuing responsibility" for the domestic uranium mining industry "to encourage use of domestic uranium" (42 USC §§2201b and 22966b-3). The NRC recognizes that the viability of the industry is a federal concern and that there is a public interest in the domestic uranium supply. Between 1996 and 2008, annual uranium production decreased by 38 percent in the United States (EIA, 2009b). In 2008, 14 percent of the 53 million pounds of uranium oxide ($U_3O_8$) purchased by U.S. civilian nuclear power plants was supplied by domestic sources, and 86 percent was supplied by foreign sources. Australian-origin and Canadian-origin uranium together accounted for 42 percent of the 53 million pounds. Uranium originating in Kazakhstan, Russia and Uzbekistan accounted for 33 percent, and the remaining 11 percent originated from Brazil, Czech Republic, Namibia, Niger, South Africa, and the United Kingdom (EIA, 2009b).

Potential benefits associated with the Proposed Action would include the value of the Mill's products: uranium oxide ($U_3O_8$), also known as yellowcake, and processed vanadium. Yellowcake is the raw material for nuclear fuel that, after conversion and enrichment, is processed into fuel rods. When placed in a reactor, the fuel rods provide the heat to produce steam to generate electricity. With the exception of hydropower (which accounts for 3 percent of the U.S. supply of electricity), nuclear power is the only source of carbon emissions-free, reliable baseload electricity. Worldwide, there are currently 436 nuclear power plants producing 15 percent of the global electrical power supply. In the United States, 104 nuclear power plants are producing 20 percent of the domestic supply of electricity (World Nuclear Association, 2009a). The EIA forecasts that the annual demand for electricity in the United States will increase by 26 percent between 2007 and 2030 (EIA, 2009c). Meeting this increase in demand through domestically supplied uranium has the potential to increase national energy independence and address climate change concerns.

Yellowcake is also used in small nuclear reactors to produce isotopes for medical, industrial and research purposes around the world. The primary use of vanadium oxide, or black-flake, is as an alloying agent in the manufacture of high strength, low-alloy steels, which are known for their increased strength and durability. Vanadium is used in several applications, including surgical

BLM_0045389

instruments, tool and die steels, engineering alloy steels used in axles, crankshafts and gears, stainless steels, rail steels, and titanium alloys. Additionally, vanadium serves as a catalyst in numerous industrial processes. Work is currently underway to develop a new, large-scale battery technology known as vanadium redox battery, which would enhance the benefits of renewable energy sources. This newly proposed vanadium battery will have the ability to store large quantities of electrical energy with minimum storage losses and can quickly discharge energy to the electrical grid.

Thus, the potential benefits of the output associated with the Proposed Action are spread across the national and global economies. The major potential benefits to the state and local communities would include tax revenues, employment income, and regional output that would be generated by the Mill. Property tax revenues would accrue to Montrose County, the RE-2 West End School District, Montrose Library District, Southwest Water Conservation District, and San Miguel Water Conservancy District throughout Mill Facility construction, operations, and closure. During all of these phases, the State of Colorado, Montrose County, the towns of Naturita and Nucla, and numerous other localities across the region and state would receive sales tax revenue from the sale of taxable goods to the Mill Facility, its employees and other workers whose jobs are supported by the Mill Facility. The potential employment benefits of the Proposed Action include the income derived from the estimated 326 jobs that would be created during Mill construction, the 315 jobs that would be generated by the Mill's annual operations, and the 15 jobs related to Mill closure.

The potential benefits of the Mill's products, its fiscal and employment impacts, and the increase in income and regional productivity can be quantified monetarily and are included in the cost-benefit analyses shown in Tables 7.1-1 and 7.1-2.

### 7.1.2   Costs

The primary internal costs associated with the Proposed Action include the capital costs of land acquisition and improvement, and facility construction; operating and maintenance costs; plant decommissioning, closure, and site reclamation costs; and regulatory costs associated with permitting and oversight.

The Proposed Action would also have external costs that would not be borne directly by Energy Fuels. Some of these costs can be estimated quantitatively. For example, the Site's transition from grazing land to industrial use would result in the long-term loss of 722 acres of seasonal grazing land. This loss would continue throughout Mill construction, operations and closure. The restricted tailings area, which includes approximately 158 acres, would be permanently lost as seasonal grazing land. The grazing losses can be estimated by considering the Site's livestock carrying capacity, grazing fees and lost grazing acreage. Similarly, there is an opportunity cost to the surrounding community of the Mill's consumptive use of 227 acre feet of water per year. From an economic perspective, the opportunity cost of this water use is the amount that would have been paid for water withdrawn from the supply system by the next (or marginal) user. Along with the internal costs noted above, these external costs are quantified and included in the cost benefit analyses presented in Tables 7.1-1 and 7.1-2.

There are several potential external costs associated with the Proposed Action that are not amenable to monetary quantification. These costs, which would be widely disbursed among members of surrounding and extended communities, are summarized in Section 5.0 and discussed below.

BLM_0045390

- Increased truck traffic on rural county highways. Potential traffic impacts to surrounding landowners and recreationists during construction and operations.

- Displacement of native species and herbivores, and the potential spread of invasive plants and noxious weeds due to long-term surface disturbance and heavy truck traffic into the Site.

- Potential drawdown of groundwater in off-site wells in the vicinity of the Proposed Action.

- Potential impacts on endangered fish species due to water withdrawals (227 acre feet per year) from the Upper Colorado River Basin.

- Wildlife losses associated with habitat disturbance and loss and increased traffic would be likely to include burrowing owls, sage grouse, prairie dogs, pocket gophers, mule deer, elk, pronghorn, turkeys, waterfowl and migratory birds.

- Fugitive dust emissions from equipment and diesel engine emissions during construction. Fugitive and non-fugitive air emissions (primarily $PM_{10}$ and VOC) during operations.

- Potential increases in the price and limited availability of short-term housing during Mill construction.

Building upon the potential costs to environmental resources noted above, it is widely recognized that there are some values for natural resources that are not amenable to monetary quantification, and thereby excluded from cost-benefit analyses of activities that impact environmental resources. For example, some people may derive benefits from knowing that undeveloped open space and wildlife habitat exist in the Paradox Valley, or from knowing that these amenities would be available for future generations to enjoy. Although survey techniques (known as contingent valuation methodology) have been developed to estimate non-use and other values for natural resources that are not expressed in monetary terms, their use in government agency cost-benefit analyses has been limited. Although they are not included in the cost-benefit analysis for the Proposed Action, some non-market values for natural resources would be likely to be affected to a limited extent.

### 7.1.3   Cost-Benefit Analysis

NRC guidance recommends that the benefits and costs of a proposed action that can be expressed monetarily should be discounted to present values (NRC, 1982). Based on Office of Management and Budget (OMB) guidance, the NRC recommends that present value calculations be presented using real discount rates of 3 percent and 7 percent (NRC, 2004). The 3 percent rate approximates the real rate of return on long-term government debt, which serves as a proxy for the real rate of return on savings. This rate is appropriate when the primary effect of a regulation is on private consumption. Alternatively, the 7 percent rate approximates the marginal pretax real rate of return on an average investment in the private sector, and is the appropriate discount rate whenever the main effect of a regulation is to displace or alter the use of capital in the private sector.

Table 7.1-1 compares the present value of the Proposed Action's costs and benefits at a 3 percent discount rate, and Table 7.1-2 compares the project's costs and benefits at a 7 percent discount rate. The project's benefit-cost ratio is 5 to 1 at a 3 percent discount rate, and 6 to 1 at a 7 percent discount rate.

BLM_0045391

**Table 7.1-1**
**Cost Benefit Analysis for the Piñon Ridge Mill – 3 percent discount rate**

| Benefits | Present Value | Costs | Present Value |
|---|---|---|---|
| | | **Internal Costs** | |
| Mill Output (sales)[1] | $2,331,925,894 | Land Acquisition, Facility Construction[4] | $130,167,485 |
| | | Operating and Maintenance Costs[4] | $551,033,049 |
| Tax Revenues: | $34,046,386 | Decommissioning and Closure Costs[4] | $3,268,461 |
| State of Colorado[2] | $7,813,734 | Regulatory Costs[5] | $3,459,294 |
| Montrose County[2,3] | $10,701,863 | Permitting Fees | $388,350 |
| Town of Naturita[2] | $1,353,024 | Regulatory Oversight | $3,070,944 |
| Town of Nucla[2] | $1,353,024 | **Total Internal Costs** | **$687,928,289** |
| RE-2 West End School District[2] | $11,073,815 | | |
| Montrose Library District[2] | $1,636,419 | **External Costs** | |
| Southwest Water Conservation District[2] | $92,289 | Loss of Grazing Land[6] | $8,371 |
| San Miguel Water Conservancy District[2] | $22,218 | Consumptive Water Use[7] | $58,545 |
| | | **Total External Costs** | **$66,916** |
| Labor Income[1] | $432,635,820 | | |
| Regional Output (sales)[1] | $840,621,472 | | |
| | | | |
| **Total Benefits** | **$3,639,229,572** | **Total Costs** | **$687,995,205** |
| | | | |
| Benefit Cost Ratio:5.3:1 | | | |

[1]  Based on IMPLAN modeling results.
[2]  Based on annual Mill property values provided by Energy Fuels (Vigil, 2009) and property tax rates provided by the Montrose County Assessor's Office (Montrose County, 2009d).
[3]  Based on annual sales tax revenue estimated in Section 4.0.
[4]  Based on information in the *Mill Decommissioning and Reclamation Cost Estimate* (Energy Fuels, 2009h).
[5]  Based on permitting and oversight cost information provided by Energy Fuels (Filas, 2009).
[6]  Based on grazing lease information provided by BLM (Stindt, 2009).
[7]  Based on water rate information provided by Town of Naturita (Carver, 2009).

BLM_0045392

**Table 7.1-2**
**Cost Benefit Analysis for the Piñon Ridge Mill – 7 percent discount rate**

| Benefits | Present Value | Costs | Present Value |
|---|---|---|---|
| | | **Internal Costs** | |
| Mill Output (sales)[1] | $1,294,685,842 | Land acquisition, facility construction[4] | $125,301,411 |
| | | Operating and maintenance costs[4] | $317,814,607 |
| Tax Revenues: | $21,818,758 | Decommissioning and closure costs[4] | $611,357 |
| State of Colorado[2] | $5,188,044 | Regulatory Costs[5] | $2,031,613 |
| Montrose County[2,3] | $6,763,927 | Permitting Fees | $373,832 |
| Town of Naturita[2] | $762,760 | Regulatory Oversight | $1,657,781 |
| Town of Nucla[2] | $762,760 | **Total Internal Costs** | **$445,758,988** |
| RE-2 West End School District[2] | $7,202,458 | | |
| Montrose Library District[2] | $1,064,334 | **External Costs** | |
| Southwest Water Conservation District[2] | $60,025 | Loss of grazing land[6] | $4,566 |
| San Miguel Water Conservancy District[2] | $14,450 | Consumptive Water Use[7] | $33,766 |
| | | **Total External Costs** | **$38,332** |
| Labor Income[1] | $245,233,657 | | |
| Regional output (sales)[1] | $479,224,412 | | |
| | | | |
| **Total Benefits** | **$2,040,962,669** | **Total Costs** | **$445,797,320** |
| Benefit Cost Ratio: 4.6:1 | | | |

[1] Based on IMPLAN modeling results.
[2] Based on annual Mill property values provided by Energy Fuels (Vigil, 2009) and property tax rates provided by the Montrose County Assessor's Office (Montrose County, 2009d).
[3] Based on annual sales tax revenue estimated in Section 4.0.
[4] Based on information provided in the Mill *Decommissioning and Reclamation Cost Estimate* (Energy Fuels, 2009h)
[5] Based on permitting and oversight cost information provided by Energy Fuels (Filas, 2009).
[6] Based on grazing lease information provided by BLM (Stindt, 2009).
[7] Based on water rate information provided by Town of Naturita (Carver, 2009).

BLM_0045393

**This page intentionally left blank.**

BLM_0045394

# Section 8.0
# References

Adams, R.A. 2003. *Bats of the Rocky Mountain West*. University of Colorado Press, Boulder, Colorado.

Ake, J., K. Mahrer, L. Block, D. O'Connell. 2002. *What's Shaking in Bedrock? The Paradox Valley Deep-Well Injection Program*: in Outcrop, Newsletter of the Rocky Mountain Association of Geologists, V. 51, No. 4, March 2002.

Ake, J., K. Mahrer, D. O'Connell, and L. Block. 2005. *Deep-injection and Closely Induced Seismicity at Paradox Valley, Colorado*: Bulletin of the Seismological Society of America 95, pp. 664-683.

Allbee, J. 2009. Statistical Analyst, Colorado State Patrol. *2000 - 2007 Fatal and Injury Crashes as Covered by Colorado State Patrol*. Personal Communication and e-mail Correspondence with Edge Environmental, Inc. August 19.

American Institute of Petroleum Geologists, 2009 – Annual Conference. *Geological Road Log Uravan Mineral Belt Field Trip*.

Amundson, M.A. 2002. *Yellowcake Towns*. Uranium Mining Communities in the American West.

Andrews, R. and R. Righter. 1992. *Colorado Birds: a Reference to their Distribution and Habitat*. Denver Museum of Natural History. Denver, Colorado.

AngloGold Ashanti. 2004. Report to Society 2004. Case Studies: *Mali. 7.9 – The use of "bird balls" at Yatela gold mine*, Mali. Available at: http://www.anglogold.com/subwebs/InformationForInvestors/ReportToSociety04/values_bus_principles/environment/e_cs_mali_7_9.htm.

AngloGold Ashanti. 2005. Report to Society 2005. Case Studies: Mali. 5.4 – Protecting birdlife at Sakiola and Yatela. Available at: http://www.anglogoldashanti.co.za/subwebs/InformationForInvestors/ReportToSociety05/values_bus_principles/environment/e_cs_mali_5_4.htm.

Anthony, S., T. D'Amato, A. Doran, S. Elzinga, J. Powell, I. Schonle, and K. Uhing. 2007. *Noxious Weeds of Colorado*, Ninth Edition. Colorado Weed Management Association, Centennial, Colorado.

Arnold, D.A. 1978. *Characteristics and Cost of Highway Deer Kills*. Pages 92-101 *in* The 1978 John S. Wright Forestry Conference, C.M. Kirkpatrick (editor). Purdue University, Department of Forestry and Natural Resources and Indiana Cooperative Extension Service. Lafayette, Iowa.

Aubry, K.B., G.M. Koehler, and J.R. Squires. 2000. *Ecology of Canada lynx in Southern Boreal Forests*. Pages 373-396 in L.F. Ruggiero, K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvey, and J.R. Squires (editors). Ecology and Conservation of Lynx in the United States. University of Colorado Press, Boulder, Colorado.

Avian Power Line Interaction Committee. 1996. *Suggested Practices for Raptor Protection on Power Lines: the State of the Art in 1996*. Edison Electric Institute and the Raptor Research Foundation. Washington, D.C.

BLM_0045395

Baker, D. 2008. CH2M Hill Engineers, Portland, Email Communication, forwarded to Energy Fuels, Inc. May.

Baker, P. 2009. Minerals Program Manager, Utah Department of Natural Resources, Division of Oil, Gas and Mining. Personal Communication with Edge Environmental, Inc. September 8.

Barnett, S. 2009. Project Manager, Montrose County. Personal Communication with Edge Environmental, Inc. September 21.

Bennett, A.F. 1991. *Roads, Roadsides, and Wildlife Conservation*: A Review. Pages 99-117 in D.A. Saunders and R.J. Hobbs (editors). Nature Conservation 2: The Role of Corridors. Surrey Beatty & Sons, Chipping Norton, Australia.

BBC Research and Consulting. (BBC). 2008a. *The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado*. Prepared for the Colorado Division of Wildlife. October 31, 2004, updated September 18, 2008.

BBC Research and Consulting. 2008b. *Montrose County Demographic and Economic Analysis*. December. Available at: http://www.winstonassociates.com/MontroseCounty/File_Drawer.html.

Beidleman, C.A. 2000. *Partners in Flight Land Bird Conservation Plan* – Colorado. Partners in Flight, Estes Park, Colorado.

Bellrose, F.C. 1980. *Ducks, Geese, and Swans of North America*. Wildlife Management Institute, Stackpole Books, Harrisburg, Pennsylvania.

Belnap, J., and O. L. Lange (eds.). 2001. *Biological Soil Crusts: Structure, Function, and Management*, Vol. 150, pp. 1-503, Springer-Verlag, Berlin.

Bevanger, K. 1994. Bird Interactions with Utility Structures:  Collision and Electrocution, Causes and Mitigating Measures. Ibis 136:412-425.

Blume, F. and A. F. Sheehan. 2003. *Quantifying Seismic Hazard in the Southern Rocky Mountains through GPS Measurements of Crustal Deformation*: in Engineering Geology in Colorado: Contributions, Trends, and Case Histories: eds. D. Boyer, P. Santi, and W. Rogers, Association of Engineering Geologists Special Publication No. 15, Colorado Geological Survey Special Publication 55.

Boice, J.D. Jr., M. Mumma, S. Schweitzer, and W. J. Blot. 2003. *Cancer Mortality in a Texas County with Prior Uranium Mining and Milling Activities, 1950-2001*. J. Radiol. Prot. 23 247-262.

Boice, J.D. Jr., M.T. Mumma, and W.J. Blot. 2007. *Cancer and Noncancer Mortality in Populations Living Near Uranium and Vanadium Mining and Milling Operations in Montrose County, Colorado, 1950-2000*. Radiat. Res. 167, 711-726.

Boice, J. D. Jr., S.S. Cohen, M.T. Mumma, B. Chadda, and W.J. Blot. 2008. *A cohort Study of uranium millers and miners of Grants, New, Mexico, 1979-2005*. J Radiol Prot, September 1, 2008; 28(3): 303-25.

Boyle, S. 2006. *North American River Otter (Lontra Canadensis) A Technical Conservation Assessment*. USDA Forest Service. Species Conservation Project.

Braun, C.E. 1995. *Distribution and Status of Sage Grouse in Colorado*. Prairie Naturalist 27:1-9.

BLM_0045396

Braun, C.E., T Britt, and R.O. Wallestad. 1977. *Guidelines for Maintenance of Sage Grouse Habitat.* Wildlife Society Bulletin 5:99-106.

Braun, C.E., K.M. Giesen, R.W. Hoffman, T.E. Remington, and W.D. Snyder. 1994. *Upland Bird Management Analysis Guide, 1994-1998.* Division Report 19. Colorado Division of Wildlife, Denver, Colorado.

Braun, C.E., O.O. Oedekoven, and C.L. Aldridge. 2002. *Oil and Gas Development in Western North America: Effects on Sagebrush Steppe Avifauna with Particular Emphasis on Sage Grouse.* Transactions of the 67th North American Wildlife and Natural Resources Conference 67:337-349.

Brodkin, M.A. 1992. *Response of Rana pipiens to Graded Doses of the Bacterium Pseudomonas aeruginosa.* Journal of Herpetology 26: 490-495.

Brown, D. E. (editor). 1994. *Biotic Communities Southwestern United States and Northwestern Mexico*, University of Utah Press, Salt Lake City, Utah.

Buckland, S. T., D. L. Borchers, A. Johnston, P. A. Henrys, T. A. Marques. 2007. *Line Transect Methods for Plant Surveys*, Biometrics 63: 989-996.

Bureau of Land Management (BLM). 1984. *BLM Manual 8400-Visual Resource Management.* Bureau of Land Management, Lands and Renewable Resources. Washington, D.C.

Bureau of Land Management. 1985. *San Juan/San Miguel Planning Area Resource Management Plan and Record of Decision.* USDI-Bureau of Land Management, Montrose District, Colorado.

Bureau of Land Management. 1986. *BLM Manual 8431-Visual Resource Contrast Rating.* Bureau of Land Management, Lands and Renewable Resources. Washington, D.C.

Bureau of Land Management. 2000. *Colorado BLM State Director's Sensitive Species List (Animals and Plants).* Available at: http://www.blm.gov/co/st/en/BLM_Programs/botany/Sensitive_Species_List_.html.

Bureau of Land Management. 2007. *Migratory Bird Treaty Act – Interim Management Guidance.* Instruction Memorandum No. 2008-050. Washington, D.C.

Bureau of Land Management. 2008. Grand Junction Field Office and Moab Field Office. Final *Environmental Assessment for the Whirlwind Mine Uranium Mining Project.* September.

Bureau of Land Management. 2009a. Monticello Field Office. *Daneros Uranium Mine. Decision Record and Final Environmental Assessment.* May 2009. Available at: http://www.blm.gov/ut/st/en/fo/monticello/daneros_mine.html.

Bureau of Land Management. 2009b. *Colorado-Utah Black-footed Ferret Project.* Little Snake Field Office. Available at: http://www.blm.gov/co/st/en/fo/lsfo/programs/wildlife.html.

Bureau of Land Management. 2009c. Utah State Office. Environmental Notification Bulletin Board. Available at: http://www.blm.gov/ut/st/en/info/nepa/enbb.html. November 2.

Bureau of Land Management. 2009d. Uncompahgre Field Office. *Hanging Flume Confluence Overlook Interpretive Site Environmental Assessment.* Approved September 22.

BLM_0045397

Bureau of Land Management. 2009e. Grand Junction Field Office. NEPA Register. Available at: http://www.blm.gov/co/st/en/BLM_Information/nepa/gjfo.html.

Bureau of Land Management 2009f. Uncompahgre Field Office, NEPA Register. Available at: http://www.blm.gov/co/st/en/fo/ufo.html. November 2.

Butterfield, T. 2009. Research Analyst, Utah Department of Transportation Systems Planning and Programming. Traffic Data provided to Edge Environmental, Inc. July 29.

California Burrowing Owl Consortium. 1993. *Burrowing Owl Survey Protocol and Mitigation Guidelines*.

Cannon, S. 2009. Postmaster, La Sal Post Office. Personal Communication with Edge Environmental, Inc. September 16.

Carter, J. 2009. Manager, Mustang Water Authority. Personal Communication with Edge Environmental, Inc. September 9.

Carver, J. 2009. Water Treatment Facility Manager, Town of Naturita. Personal Communication with Edge Environmental, Inc. September 22.

Cater, F. W., Jr. 1954. *Geology of the Bull Canyon Quadrangle, Colorado.* U. S. Geological Survey Geologic Quadrangle Map GQ-33, scale 1:24,000.

Cater, F.W., Jr. 1955a. *Geology of the Naturita NW Quadrangle, Colorado*. U.S. Geological Survey. Geologic Quadrangle Map G!-65, scale 1:24,000.

Cater, F.W., Jr. 1955b. *Geology of the Davis Mesa Quadrangle, Colorado.* U. S. Geological Survey. Geologic Quadrangle Map GQ-71, scale 1:24,000.

Cater, F.W., Jr. 1970. *Geology of the Salt Anticline Region in Southwestern Colorado: with L. C. Craig*. U.S. Geological Survey Professional Paper 637, 80 p.

Cater, F.W., Jr. A.P. Butler, and E.J. McKay. 1955. *Geology of the Uravan Quadrangle, Colorado*. U.S. Geological Survey Geologic Quadrangle Map GQ-78, scale 1:24,000.

Center for Chemical Process Safety of the American Institute of Chemical Engineers (CCPS, AIChE). 1989. Guidelines for Process Equipment Reliability Data, with Data Tables. New York.

CH2M Hill Engineers, Inc. (CH2M HILL). 2009. Basic Engineering Report Selected Drawings. Piñon Ridge Project. Montrose County, Colorado. February. **Exhibit A1 of the Mill License Application.**

Chenoweth. W. L. 1981. *The Uranium-Vanadium Deposits of the Uravan Mineral Belt and Adjacent Areas, Colorado and Utah*. U.S. Department of Energy, Grand Junction, Colorado.

Chenoweth, W. L. 1987. *Paradox Valley, Colorado; A collapsed salt anticline*: Geological Society of America Centennial Field Guide Vol. 2. Rocky Mountain Section of the Geological Society of America, pp. 339–342.

Clark, T.W. 1985. *Black-footed Ferret Recovery: Just a matter of Time*. Endangered Species Technical Bulletin 2:1-3.

Clark, T.W., and M.R. Stromberg. 1987. *Mammals in Wyoming*. University of Kansas Museum of Natural History, Public Education Series No. 10. Lawrence, Kansas.

BLM_0045398

Colorado Department of Agriculture. 1999. *Colorado's Net Irrigation Requirements for Agriculture*, 1995. Available at: http://www.cde.state.co.us/artemis/ag/AG92IR71999INTERNET.pdf.

Colorado Department of Agriculture. 2009a. *Noxious Weed Management Program*. Available at: http://www.colorado.gov/cs/Satellite/Agriculture-Main/CDAG/1174084048733. September 15, 2009.

Colorado Department of Agriculture. 2009b. *Montrose County: Noxious Weed Management Program*. Available at: http://www.ag.state.co.us/NoxiousWeed/counties/Montrose.html. Accessed September 15, 2009.

Colorado Department of Education. 2009. Colorado Education Statistics. Available at: http://www.cde.state.co.us/index_stats.htm.

Colorado Department of Labor and Employment (CDLE). 2009. Labor Market Information. Available at: http://lmigateway.coworkforce.com/lmigateway.

Colorado Department of Local Affairs (CDOLA). 2009a. County Population Estimates and Projections. State Demography Office. Available at: http://www.dola.state.co.us/demog.

Colorado Department of Local Affairs. 2009b. *Draft 2008 Housing Unit and Group Living Quarter Estimates*. Available at: http://www.dola.state.co.us/demog/ctf08.html.

Colorado Department of Local Affairs. 2009c. Annual Reports, Taxable Real and Personal Property Assessed by Counties. Division of Property Taxation. Available at: *http://dola.colorado.gov/dpt/publications/annual_report_index.htm.*

Colorado Department of Local Affairs. 2009d. Local Government Energy and Mineral Impact Assistance Program Thirty-Second Annual Report. January. Available at http://dola.colorado.gov/dlg/fa/eiaf/index.html.

Colorado Department of Local Affairs. 2009e. 5.5% Property Tax Revenue Limit Calculations for Tax Entities in Montrose County as of September 16, 2009. Available at: http://www.dola.state.co.us/dlg/ta/budgeting/5.5_limit/dlg53_entity_montrose.html.

Colorado Department of Natural Resources (CDNR). 2009a. *Uranium Mining in Colorado, 2009*. Division of Reclamation, Mining and Safety. September 21. Available at: http://mining.state.co.us.

Colorado Department of Natural Resources. 2009b. Division of Reclamation, Mining and Safety. *Uranium Mining in Colorado*, 2009. June 22. Available at: http://mining.state.co.us.

Colorado Department of Natural Resources, 2009c. Division of Reclamation, Mining and Safety. Monthly Coal Detail Reports. Available at: http://mining.state.co.us/Coal%20Reports.htm.

Colorado Department of Public Health and Environment (CDPHE). 2001. State Board of Health Licensing Requirements for Uranium and Thorium Processing. Regulation 6 CCR 1007-1, Part 18.

Colorado Department of Public Health and Environment. 2005a. Licensing of Radioactive Material. Regulation 6 CCR 1007-1, Part 3.

BLM_0045399

Colorado Department of Public Health and Environment. 2005b. Standards for Protection Against Radiation. Regulation 6 CCR 1007-1, Part 4.

Colorado Department of Public Health and Environment. 2007. Water Quality Control Commission. Regulation 35, Classifications and Numeric Standards for Gunnison and Lower Dolores River Basin. July.

Colorado Department of Public Health and Environment. 2008a. Water Quality Control Commission. Regulation 31 – The Basic Standards and Methodologies for Surface Water. May.

Colorado Department of Public Health and Environment. 2008b. Water Quality Control Commission. Regulation 93, Section 303(d) List - Water Quality Limited Segments Requiring TMDLs. April.

Colorado Department of Public Health and Environment. 2008c. Water Quality Control Commission. Regulation 41 – The Basic Standards for Ground Water. May.

Colorado Department of Public Health and Environment. 2009a. Colorado Air Quality Control Commission.  Annual Report to the Public 2008-2009. Available at: http://www.cdphe.state.co.us/ap/down/RTTP08-09fullweb.pdf.

Colorado Department of Public Health and Environment. 2009b. Information on projects supported by the American Recovery and Reinvestment Act Projects. Available at: http://www.cdphe.state.co.us/op/wqcc/New/ARRA/WPCRF_IUP_Append_I_2009.pdf.

Colorado Department of Revenue. 2009a. Metallic Minerals Severance Tax. Available at: http://taxcolorado.com.

Colorado Department of Revenue. 2009b. Local sales and use tax information. Available at: http://www.taxcolorado.com.

Colorado Department of Transportation (CDOT). 2008. State Highway Access Permit. SH90/23.028/Right. Permit # 508015. April 29.

Colorado Department of Transportation. 2009a. American Recovery and Reinvestment Act. July 17. Available at: http://www.dot.state.co.us.

Colorado Department of Transportation. 2009b. Traffic data. Available at: http://www.dot.state.co.us.

Colorado Department of Transportation. 2009c. Highway Safety Statistics. Available at: http://www.dot.state.co.us/Safety/stats.cfm?.

Colorado Department of Transportation. 2009d. Traffic Counts. Available at: http://www.dot.state.co.us/app_DTD_DataAccess/Traffic/.

Colorado Division of Wildlife (CDOW). 2007. Recommended Survey Protocol and Actions to protect Nesting Burrowing Owls. 3/2007. Available at: http://www.cde.state.co.us/artemis/nr1_2/nr12b942007internet.pdf.

Colorado Division of Wildlife. 2008. Pinion Ridge Mill Facility (Energy Fuels Resources Corporation). Written Communication to Land Use Director, Montrose County, Colorado. Colorado Division of Wildlife, Denver, Colorado.

Colorado Division of Wildlife. 2009a. Big Game Hunting in Southwest Colorado. Available at: http://www.wildlife.state.co.us.

Colorado Division of Wildlife. 2009b. Natural Diversity Information Source. Colorado State University. Available at: http://ndis.nrel.colostate.edu/.

BLM_0045400

Colorado Division of Wildlife. 2009c. Lynx Update – May 25, 2009. Available at: http://wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern/Mammals/Lynx/Lynx Overview.htm.

Colorado Division of Wildlife. 2009d. *Colorado Gunnison's and White-tailed Prairie Dog Conservation Strategy. Draft.* Available at: http://wildlife.state.co.us/WildlifeSpecies/GunnisonsWhitetailPrairieDogConsStrat egy.htm.

Colorado Division of Wildlife. 2009e. *Gunnison Sage-Grouse. Species of Special Concern.* Available at: http://wildlife.state.co.us/WildlifeSpecies/Profiles/Birds/Gunnisonsagegrouse.htm.

Colorado Division of Wildlife. 2009f. *Colorado Herpetofauna Atlas.* Available at: http://ndis.nrel.colostate.edu/herpatlas/coherpatlas/.

Colorado Division of Wildlife. 2009g. Hunting (with links to harvest of Big Game, Mountain Lion, Small Game, Turkey, and Waterfowl). Available at: http://wildlife.state.co.us/hunting/.

Colorado Division of Wildlife. 2009h. *Living with Bears in Colorado.* Available at: http://wildlife.state.co.us/WildlifeSpecies/LivingWithWildlife/Mammals/LivingWithB earsL1.htm.

Colorado Division of Wildlife. 2009i. *Operation Game Thief.* Available at: http://wildlife.state.co.us/RulesRegs/LawEnforcement/OperationGameThief/.

Colorado Earthquake Hazard Mitigation Council. 2008. *Colorado Earthquake Hazards.*

Colorado Geological Survey (CGS). 2002. *We Don't Have Earthquakes in Colorado, Do We?:* Division of Minerals and Geology, Colorado Geological Survey, Rock Talk, Vol. 5, No. 2, April.

Colorado Natural Heritage Program (CNHP). 2009a. *Colorado Rare Plant Field Guide.* Colorado Rare Plant Technical Committee, Colorado Natural Heritage Program. Fort Collins, Colorado. Available at: http://cnhp.colostate.edu/rareplants/intro.html.

Colorado Natural Heritage Program. 2009b. Elements by 7.5 Minute USGS Quadrangle. CNHP Maps for Download. Colorado Natural Heritage Program. Fort Collins, Colorado. Available at: http://www.cnhp.colostate.edu/download/gis.asp.

Colorado Office of Economic Development and International Trade. 2009. Information on the Colorado Enterprise Zone Program. Available at: http://www.AdvanceColorado.com/EnterpriseZone.

Colorado Oil & Gas Conservation Commission (COGCC). 2009a. GIS Mapping Data. Available at: http://cogcc.state.co.us/.

Colorado Oil & Gas Conservation Commission. 2009b. Colorado Oil & Gas Information System production data. Available at: http://cogcc.state.co.us/.

Colorado Partners in Flight. 2008. Land Bird Conservation Plan - Physiographic Area 87. Available at: http://www.rmbo.org/pif/bcp/phy87/pj.html.

Colorado State Patrol. 2009. 2008 Fatal and Injury Crashes as Covered by Colorado State Patrol. Available at: http://csp.state.co.us.

Colwell, R.K., and D.J. Futuyma. 1971. *On the Measurement of Niche Breadth and Overlap.* Ecology 52:567-576.

BLM_0045401

Comer, R.D. 1982. *Understanding Secondary Effects of Development on Wildlife Resources in Mitigation Planning*. Pages 16-31 in Issues and Technology in the Management of Impacted Western Wildlife. Thorne Ecological Institute Technical Publication No. 14. Boulder, Colorado.

Condon, S. M. 1997. *Geology of the Pennsylvanian and Permian Cutler Group and Permian Kaibob Limestone in the Paradox Basin, Southeastern Utah and Southwestern Colorado*. U.S. Geological Survey Bulletin 2000-P.

Conway, C. J. and J. C. Simon. 2003. *Comparison of Detection Probability Associated with Burrowing Owl Survey Methods*. Journal of Wildlife Management 67:501-511.

Corbell, B, 2009. *Montrose County Approves Uranium Mill for Paradox Valley*. October 7. Available at: www.watchnewspapers.com.

Cotter Corporation. 2009. Letter from John Hamrick, Vice President Milling to Steve Tarlton, Unit Leader Radiation Management Unit, Hazardous Materials and Waste Management Division, Colorado Department of Public Health and Environment. March 31.

Council on Environmental Quality. 1997. Cumulative Effects under the National Environmental Policy Act. Available at: http://ceq.eh.doe.gov/epa/ccenepa/cceepa.htm.

Crooks, K., C. Haas., S. Baruch-Mordo, K. Middledorf, S. Magle, T. Shenk, K. Wilson, and D. Theobald. 2008. *Roads and Connectivity in Colorado: Animal-Vehicle Collisions, Wildlife Mitigation Structures, and Lynx-Roadway Interactions*. Colorado Department of Transportation Report Number CDOT-2008-4. Denver, Colorado.

Cully, J.R. 1997. *Growth and Life-history Changes in Gunnison's Prairie Dogs after a Plague Epizootic*. Journal of Mammalogy 78:146-157.

Daubenmire, R. F. 1970. *Steppe Vegetation of Washington*. Washington State University Agricultural Experiment Station Technical Bulletin No. 62. 131 p.

Davis, N. 2009. Vista Realty. Personal Communication with Energy Fuels Resources. June 8.

Dean Runyan Associates. 2008. *The Economic Impact of Travel on Colorado*. Prepared for the Colorado Tourism Office. June.

Del-Mont Consultants, Inc. 2009. *CDOT Access Design and Notice to Proceed*. November. **Exhibit L6 of the Mill License Application.**

Dexter Dyer. 2003. *Field Guide to Bacteria*. Comstock Press. 355 p.

Doesken, R., R. Pielke, Sr., and A.P. Odilia. 2003. *Climate of Colorado. Climatography of the United States No. 60*. State Climate Office. Available at: http://ccc.atmos.colostate.edu/climateofcolorado.php.

Easterly, T., A. Wood, and T. Litchfield. 1991. *Responses of Pronghorn and Mule Deer to Petroleum Development on Crucial Winter Range in the Rattlesnake Hills*. Wyoming Game and Fish Department. Cheyenne, Wyoming.

Economic and Planning Systems, Inc. 2003. Final report: *Montrose County Housing Needs Assessment*. Prepared for West Central Housing Development Organization. March.

BLM_0045402

Eisenbud, M. and T. Gesell. 1997. *Environmental radioactivity from natural, industrial and military sources.* Fourth edition. Academic Press, New York.

Elston, Shoemaker, and Landis. 1964. *Uncompaghre front and salt anticline region of Paradox Basin.* AAPG Bull 46-10.

Energy Fuels Resources Corporation (Energy Fuels). 2009a. Well Permits and Water Rights Applications. October. **Exhibit L1 of the Mill License Application.**

Energy Fuels Resources Corporation. 2009b. Spill *Prevention, Control and Countermeasure Plan for the Piñon Ridge Mill. Bedrock, Colorado.* September. **Exhibit J8 of the Mill License Application.**

Energy Fuels Resources Corporation. 2009c. *Material Containment Plan for the Piñon Ridge Mill. Bedrock, Colorado.* September. **Exhibit J7 of the Mill License Application.**

Energy Fuels Resources Corporation. 2009d. *Mine Operations Plan Piñon Ridge Mill Facility.* Montrose, Colorado. August. **Exhibit B3 to the Mill License Application.**

Energy Fuels Resources Corporation. 2009e. *Emergency Response Plan. Bedrock, Colorado.* October. **Exhibit J5 to the Mill License Application.**

Energy Fuels Resources Corporation. 2009f. *Water and Wastewater Plan for the Piñon Ridge Mill.* October. **Exhibit L2 to the Mill License Application.**

Energy Fuels Resources Corporation. 2009g. First Quarter 2009 Data Report (Fourth Quarter of Baseline) For Ambient Air Monitoring Energy Fuels Resources Corporation Uranium Mill Licensing Support Piñon Ridge Mill.Energy Information Administration (EIA). 2007. International Energy Annual: Systemfor the Analysis of Global Energy Markets.

Energy Fuels Resources Corporation. 2009h. *Pinon Ridge Mill Decommissioning and Reclamation Cost Estimate.* October. **Exhibit K4 of the Mill License Application.**

Energy Fuels Resources Corporation. 2009i. *Security Plan Piñon Ridge Facility.Montrose County,Colorado.* October. E**xhibit M1 of the Mill License Application.**

Energy Fuels Resources Corporation. 2009j. *Piñon Ridge Mill Health and Safety* Plan. Montrose County, Colorado. October. **Exhibit J1 to the Mill License Application.**

Environmental Restoration Group, Inc. (ERG). 2009. *Baseline Radiological Investigation Report in Support of the Application for a License for Source Material Milling. Piñon Ridge Uranium Mill. Montrose County, Colorado.* October. **Exhibit I1 to the Mill License Application.**

ERO Resources Corporation (ERO). 2007. *Class III Cultural Resource Inventory and Evaluative Testing Results for Energy Fuels Resources Piñon Mill Development Project, Montrose County, Colorado.* ERO Project #3987. December. **Exhibit M2 of the Mill License Application.**

BLM_0045403

ERO Resources Corporation. 2009a. *Class III Cultural Resource Inventory and Evaluative Testing Results for Energy Fuels Resources Pinon Mill Development Project, Montrose County, Colorado*. Archaeological Treatment of Sites 5MN8269 and 5MN8270. ERO Project #4299. March. **Exhibit M3 of the Mill License Application.**

ERO Resources Corporation. 2009b. *Addendum Class III Cultural Resource Inventory for Energy Fuels Resources Piñon Ridge Mill Project, Cooper Property, Montrose County, Colorado*. ERO Project #4483. July. **Exhibit M3 of the Mill License Application.**

Fagerstone, K.A. 1987. *Black-footed Ferret, Long-tailed Weasel, Short-tailed Weasel, and Least Weasel*. Pages 548-573 in M. Novak, JA. Baker, ME. Obbard, and B. Malloch (editors). Wild Furbearer Management and Conservation in North America. Ministry of Natural Resources, Ontario, Canada.

Ferguson, J. 2009. Retired Wildlife Biologist, BLM Uncompahgre Field Office. Personal Communication with WestWater Engineering.

Filas, F. 2008. Environmental Manager, Energy Fuels Resources Corporation. E-mail Commuication with Brian Hart, January 16.

Filas, F. 2009. Environmental Manager, Energy Fuels Resources Corporation. Personal E-mail Communication with Edge Environmental, Inc. August 13 and September 7.

Fitzgerald, J.P., C.A. Meaney, and D.M. Armstrong. 1994. *Mammals of Colorado*. Denver Museum of Natural History and University Press of Colorado. Niwot, Colorado.

Flora of North America. 2008. *Eriogonum pelinophilum*. Available at: http://www.efloras.org/florataxon.aspx?flora_id=1&taxon_id=250060457.

Flyways. 2009. *Waterfowl Hunting Management in North America*. General Flyways Information. Available at: http://www.flyways.us/flyways/info.

Fonze, E. 2009. River Recreation Manager, BLM Uncompahgre Field Office. Personal Communication with Edge Environmental, Inc. July 1.

Forman R.T., and L.E. Alexander. 1998. *Roads and their Major Ecological Effects*. Annual Review of Ecology and Systematics. 29:207-231.

Freethey, G. W., and Cordy, G. E. 1991. *Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin*, U.S. Geological Survey Professional Paper 1411-C.

Gelatt, P. 2009. U.S. Fish and Wildlife Service, Ecological Services, Western Colorado Field Office, Grand Junction, Colorado. Personal Communication with Edge Environmental, Inc. October.

Gallie, J.A., and L.C. Drickamer. 2008. Ecological Interactions Between Two Ecosystem Engineers: Gunnison's Prairie Dog and Botta's Pocket Gopher. Southwestern Naturalist 53:51-60.

Gateway Canyons Resort. 2009. Future Expansion. Available at http://www.gatewaycanyons.com/future.php.

BLM_0045404

Golder Associates, Inc (Golder). 2008a. *Tailings Cell Design Report. Piñon Ridge Project. Montrose County, Colorado.* October. **Exhibit A6 to the Mill License Application.**

Golder Associates, Inc. 2008b. *Phase 2 Geotechnical Field and Laboratory Test Program. Piñon Ridge Project. Montrose County, Colorado.* September. **Exhibit E2 of the Mill License Application.**

Golder Associates, Inc. 2008c. *Phase 3 Long-Term Pumping Test Data Report. Piñon Ridge Project. Montrose County, Colorado.* September. **Exhibit F2 of the Mill License Application.**

Golder Associates, Inc. 2008d. *Work Plan Groundwater Sampling Energy Fuels Resource Corporation Uranium Mill Licensing Support Piñon Ridge Mill Site Montrose County, Colorado.* May.

Golder Associates, Inc. 2008e. *Water Supply Evaluation. Piñon Ridge Project. Montrose County, Colorado. November.* **Exhibit F3 of the Mill License Application.**

Golder Associates, Inc. 2008f. *Project Design Criteria*, Revision B, *Piñon Ridge Geotechnical Services*, Project No. 073-81694.

Golder Associates, Inc. 2008g. *Ore Stockpile Pad Design Report. Piñon Ridge Project. Montrose County, Colorado.* October. **Exhibit A5 of the Mill License Application.**

Golder Associates, Inc. 2008h. *Evaporation Pond Design Report. Piñon Ridge Project. Montrose County, Colorado.* October. **Exhibit A7 of the Mill License Application.**

Golder Associates, Inc. 2008i. *Technical Specifications Piñon Ridge Project.* Piñon Ridge Geotechnical Services. Project No. 073-81694. Montrose County, Colorado. September. **Exhibit A8 of the Mill License Application.**

Golder Associates, Inc. 2009a. *Stormwater Management Plan. Piñon Ridge Project. Montrose County, Colorado.* October. **Exhibit L4 of the Mill License Application.**

Golder Associates, Inc. 2009b. *Construction Plan, Piñon Ridge Project. Montrose, Colorado. October.* **Exhibit B1 of the Mill License Application.**

Golder Associates, Inc. 2009c. *Specifications for Closure and Reclamation of Mill Facilities. Piñon Ridge Project. Montrose County, Colorado.* October. **Exhibit K3 of the Mill License Application.**

Golder Associates, Inc. 2009d. *Hydrogeologic Report. Piñon Ridge Project. Montrose County, Colorado. October.* **Exhibit F1 of the Mill License Application.**

Golder Associates, Inc. 2009e. 2008-2009 *Surface Water Monitoring Summary Report. Piñon Ridge Project. Montrose County, Colorado.* October. **Exhibit G2 of the Mill License Application.**

Gramlich. I.S. 1908. A History of Paradox Valley to 1908. Original unpublished manuscript.

Greager, H.E. 1990. *The Killing of Indian Henry.* Condensed version Short Stories from In the Company of Cowboys.

Greager, H.E. 1992. *The Hell That Was Paradox.*

BLM_0045405

Gunnison Sage-grouse Rangewide Steering Committee. 2005. *Gunnison Sage-grouse Rangewide Conservation Plan*. Colorado Division of Wildlife, Denver, Colorado.

Gutiérrez, R.J., Franklin, A.B., and W.S. LaHaye. 1995. *Spotted owl (Strix occidentalis). The Birds of North America* No. 179. A. Poole and F. Gill (editors). The Academy of Natural Sciences, Philadelphia and The American Ornithologists Union, Washington, D.C.

Haag, S. 2009. Director, Basin Clinic. Personal Communications with Edge Environmental, Inc. June 23.

Hahne, F. 1989. *Early Uranium Mining in the United States*. World Nuclear Association. London. September.

Hall, E.R., and K.R. Kelson. 1959. *The Mammals of North America*. The Ronald Press Company. New York, New York.

Ham, C. 2009. Supervisory Outdoor Recreation Planner, BLM Grand Junction Field Office. Personal Communication with Edge Environmental, Inc. August 19.

Hammerson, G.A. 1986. *Amphibians and Reptiles in Colorado*. Colorado Division of Wildlife, Denver, Colorado.

Hanshaw, Bruce B., and G.A. Hill. 1969. *Geochemistry and Hydrogynamics of the Paradox Basin Region, Utah, Colorado and New Mexico*.Chemical Geology, volume 4, p. 263-294.

Harmata, A.R., G.J. Montopoli, B. Oakleaf, P.J. Harmata, and M. Restani. 1999. *Movements and Survival of Bald Eagles Banded in the Greater Yellowstone Ecosystem*. Journal of Wildlife Management. 63:  781-793.

Harrington, J.L., and M.R. Conover. 2006. *Characteristics of Ungulate Behavior and Mortality Associated with Wire Fences*. Wildlife Society Bulletin 34:1295-1305.

Head, S. 2009. Executive Director, Montrose Economic Development Corporation. Personal Communication with Edge Environmental, Inc. November 2.

Hillman, C.N., and T.W. Clark. 1980. Mustela nigripes. Mammalian Species No. 126: 1-3.

Hite, Robert S. and S. W. Lohman. 1973. *Geologic Appraisal of Paradox Basin Salt Deposits for Waste Emplacement*, U.S. Geological Survey, USGS-4339-6.

Holloran, M.J. 2005. *Greater Sage Grouse (Centrocercus urophasianus) Population Response to Natural Gas Field Development in Western Wyoming*. Ph.D. Dissertation, University of Wyoming. Laramie, Wyoming.

Hunt, C.B. 1967. *Physiography of the United States: San Francisco*, W.H. Freeman, 480 p.

Janss, G.F.E., and M. Ferrer. 1999. *Mitigation of raptor electrocution on steel power poles*. Wildlife Society Bulletin. 27: 263-273.

Johansen, S. 2009. Records Department, Montrose County West End Sheriff's Substation. Personal E-mail Communication with Edge Environmental, Inc. June.

Johnson, T. 2009. Office Technician, Montrose County Assessor's Office. Personal Communication and E-mail Correspondence with Edge Environmental, Inc. July 24.

BLM_0045406

Jones, G. 2008. *Sensory Ecology: Noise Annoys Foraging Bats*. Current Biology 18(23):R1098-R1100.

Keckler, R. 2009. Coordinator, Colorado Enterprise Zone Region 10. Personal Communication with Edge Environmental, Inc. September 21.

Kelley, V.C. 1955. Tectonics of the Four Corners region: In Geology of Parts of Paradox, Black Mesa, and San Juan Basins, Four Corners Geological Society, Field Conference Guidebook, pp. 108-117.

Kershaw, L. A. MacKinnon, and J. Pojar. 1998. *Plants of the Rocky Mountains*. Lone Pine Publishing, Auburn, Washington.

Kirkham, R. M. and W. P. Rogers. 1981. *Earthquake Potential in Colorado*: Colorado Geological Survey Bulletin, 43, 171 p.

Kolbe, J.A., and J.R. Squires. 2007. *Circadian Activity Patterns of Canada Lynx in Western Montana*. Journal of Wildlife Management71:1607-1611.

Kleiner, E. F. 1968. *Comparative study of grasslands of Canyonlands National Park*. Unpublished dissertation, University of Utah, Salt Lake City. 58 pp.

Kleiner, E. F., and K. T. Harper. 1977. *Occurrence of four major perennial grasses in relation to edaphic factors in a pristine community*. Journal of Range Management 30(4):286-289.

Kleinfelder. 2008a. *Amendment No. 2 Geological Investigations Work Plan Piñon Ridge Uranium Mill. Montrose County, Colorado*. Prepared for Energy Fuels Resources Corporation. October.

Kleinfelder. 2008b. *Work Plan Surface Water Sampling. Energy Fuels Resources Corporation Uranium Mill Licensing Support. Piñon Ridge Mill. Montrose County, Colorado*. December.

Kleinfelder. 2008c. *Preliminary Delineation of Jurisdictional Waters of the United States. Energy Fuels Resource Corporation Piñon Ridge Uranium Mill Licensing Support*. June. **Exhibit L3 of the Mill License Application.**

Kleinfelder. 2008d. *Work Plan for Ambient Air Monitoring Revision 1. Energy Fuels Resources Corporation. Uranium Mill Licensing Support. Piñon Ridge Mill. Montrose County, Colorado*. July. **Exhibit H3 of the Mill License Application.**

Kleinfelder Inc. 2008e. *Second Quarter 2008 Data Report (First Quarter of Baseline) For Ambient Air Monitoring Energy Fuels Resources Corporation Uranium Mill Licensing Support Piñon Ridge Mill.*

Kleinfelder. 2008f. *Third Quarter 2008 Data Report (Second Quarter of Baseline) For Ambient Air Monitoring Energy Fuels Resources Corporation Uranium Mill Licensing Support Piñon Ridge Mill.*

Kleinfelder. 2008g. *Fourth Quarter 2008 Data Report (Third Quarter of Baseline) For Ambient Air Monitoring Energy Fuels Resources Corporation Uranium Mill Licensing Support Piñon Ridge Mill.*

Kleinfelder. 2008h. *Geotechnical Design Recommendations Mill and Infrastructure Piñon Ridge Project Montrose County, Colorado*. October. **Exhibit A2 of the Mill License Application.**

BLM_0045407

Kleinfelder. 2008i. Roadway Pavement Design Recommendations Piñon Ridge Project Montrose County, Colorado. October. **Exhibit A3 of the Mill License Application.**

Kleinfelder West Inc. 2008j. *Absorption Field Septic System Design Mill Facility and Administration Building, Piñon Ridge Project, Montrose County, Colorado.* June 17.

Kleinfelder. 2009a. *Air Pollution Emission Notice for Permit to Construct.* Submitted to Air Polution Control Division Colorado Department of Public Health and Environment. July. **Exhibit L8 of the Mill License Application.**

Kleinfelder  2009b. *Mill Decommissioning Plan. Energy Fuels Resources Corporation Uranium Mill Licensing Support. Piñon Ridge Mill. Montrose County, Colorado.* October. **Exhibit K1 of the Mill License Application.**

Kleinfelder. 2009c. Tailing Cell Closure Design Report, Rev. 1. Energy Fuels Resources Corporation. Piñon Ridge Project. Montrose County, Colorado. October. **Exhibit K2 of the Mill License Application.**

Kleinfelder. 2009d. *Site Drainage Analysis and Design Report. Piñon Ridge Project. Montrose County, Colorado.* February. **Exhibit A4 of the Mill License Application.**

Kleinfelder. 2009e. *Geologic Report. In Support of the Application for a License for a Source Material Milling. Piñon Ridge Uranium Mill. Montrose County, Colorado.* June. **Exhibit E1 of the Mill License Application.**

Kleinfelder. 2009f. *Soil Survey for the Environmental Report in Support of the Application for License for Source Material Milling, Piñon Ridge Uranium Mill, Montrose County, Colorado*: Technical Report prepared for Energy Fuels Resources Corporation, Rev. 0. January. **Exhibit D1 of the Mill License Application.**

Kleinfelder. 2009g. *Vegetation Survey of the Environmental Report In Support of the Application for License for Source Material Milling. Piñon Ridge Uranium Mill. Montrose County, Colorado.* February. **Exhibit D2 of the Mill License Application.**

Kleinfelder. 2009h. *Wildlife Survey of the Environmental Report In Support of the Application for Source Material Milling. Piñon Ridge Uranium Mill. Montrose County, Colorado.* February. **Exhibit D3 of the Mill License Application.**

Kleinfelder. 2009i. *Meteorology, Air Quality, and Climatology Report. Prepared for Energy Fuels Resources in support of the application for a license for source material milling. Submitted to Radiation Management Unit of CDPHE.* October. **Exhibit H1 of the Mill License Application.**

Kleinfelder. 2009j. *Air Pollution Emission Notice for Permit to Construct Revision A. Piñon Ridge Uranium Mill. Montrose County, Colorado.* October. **Exhibit L8 of the Mill License Application.**

Knowles, C.J. 1982. *Habitat Affinity, Populations, and Control of Black-tailed Prairie Dogs on the Charles M. Russell National Wildlife Refuge.* Ph.D. Dissertations, University of Montana, Missoula, Montana.

Knowles, C. 2002. *Status of White-Tailed and Gunnison's Prairie Dogs. National Wildlife Federation*, Missoula, MT and Environmental Defense, Washington, D.C.

BLM_0045408

Koford, C.B. 1958. *Prairie dogs, whitefaces, and Blue Grama*. Wildlife Monographs 3: 1-78.

Kuestermeyer, A. 1984. Pincock, Allen, & Hoyt, Inc. *Capital and Operating Cost Estimation for Milling of Uranium Ores in United States*. Colorado School of Mines Quarterly, Vol. 79, No. 4. Tucson, Arizona. October.

Kuijper, D.P.J., J. Schut1, D. van Dullemen, H. Toorman, N. Goossens, J. Ouwehand, and H.J.G.A. Limpens. 2008. *Experimental Evidence of Light Disturbance along the Commuting Routes of Pond Bats (Myotis dasycneme)*. Lutra 51:37-49.

LaBondy, S. 2009. Engineer, WestWater Engineering, Grand Junction, Colorado, Representative for Nucla Sanitation District. Personal Communication with Edge Environmental, Inc. September 9.

LanDesign Consulting Engineers. 2008. *CDOT Access Permit and Traffic Study*. May. **Exhibit L5 of the Mill License Application.**

Lear, D. 2009. Town Clerk, Town of Naturita. Personal Communication with Edge Environmental, Inc. July 16.

Leedy, D.L. 1975. *Highway-Wildlife Relationships. Volume 1; A State-of-the-Art Report. Federal Highway Administration* Report Number FHWA-RD-76-4. Washington D.C.

Leon, C. 2009. Employment Specialist, Colorado Rural Workforce Consortium, Delta Workforce Office. Colorado Department of Labor and Employment. Personal Communication with Edge Environmental, Inc. July 14.

Linacre, E.T. 1994. *Estimating U.S. Class A Pan Evaporation from Few Climate Data*. Water International, Vol. 19, pp. 5-14.

Lockhart, J.M., E.T. Thorne, and D.R. Gober. 2006. *A Historical Perspective on Recovery of the Black-footed Ferret and the Biological and Political Challenges Affecting its Future*. Pages 6-19 in J.E. Rolle, B.J. Miller, J.L. Godbey, and D.E. Biggins (editors). Recovery of the Black-footed Ferret – Progress and Continuing Challenges. USGS Scientific Investigations Report 2005-5293. U.S. Geological Survey, Reston, Virginia.

Louis Berger Group (Berger). 2009. *Socioeconomic Baseline and Impact Analysis for the Proposed Piñon Ridge Uranium Mill. Montrose County, Colorado*. Prepared for Energy Fuels Resources Corporation by The Louis Berger Group. November. **Exhibit C1 to the Mill License Application.**

Lupo, J.F., and Morrison, K.F. 2005. *Innovative Geosynthetic Liner Design Approaches and Construction in the Mining Industry*. Geotechnical Special Publication (GSP) 140, Proceedings, Geo-Frontiers 2005, Austin, Texas.

Lyon, L.J. 1983. *Road Density Models describing Habitat Effectiveness for Elk*. Journal of Forestry 81:592-595.

Lyon, P. and J. Sovell, 2000. *A Natural Heritage Assessment, San Miguel and Western Montrose Counties, Colorado*. Colorado Natural Heritage Program.

Lyon, P., C. Pague, R. Rondeau, L. Renner, C. Slater, and C. Richard. 1996. *Natural Heritage Inventory of Mesa County, Colorado. Colorado Natural Heritage Program*, Ft. Collins, Colorado; prepared for Mesa County Commissioners. December.

BLM_0045409

MacBeth. 2000. *Munsell Soil Color Charts* (revised washable edition 2000). New Windsor, New York. MacBeth Division of the Kollmorgen Corporation.

Malvestuto, S.P. 1983. *Sampling the Recreational Fishery*. Pages 397-419, in L.A. Nielsen and D.L. Johnson (editors). Fisheries Techniques. American Fisheries Society, Bethesda, Maryland.

Marks, J.S., and I.J. Ball. 1983. *Burrowing Owl (Athene cunicularia)*. Pages 227-242 *in* J.S. Armbruster (editor). *Impacts of Coal Surface Mining on 25 Migratory Bird Species of High Federal Interest*. U.S. Fish and Wildlife Service FWS/OBS-83/35.

Martin, D.J. 1973. *Selected Aspects of Burrowing Owl Ecology and Behavior*. The Condor: 75: 446-456.

Mayhew. 1965. *Complex Salt and Brines of the Paradox Basin*. 2nd Salt Symposium Proceedings.

McCord, C.M, and J.E. Cardoza. 1982. *Bobcat and Lynx*. Pages 728-766 inJ.A. Chapman and G.A Feldhamer (editors). Wild Mammals of North America. The Johns Hopkins University Press, Baltimore, Maryland.

McDonald, D., N.M. Korfanta, and S.J. Lantz. 2004. *The Burrowing Owl (Athene cunicularia): a Technical Conservation Assessment*. USDA-Forest Service, Rocky Mountain Region. Available at: http://www.fs.fed.us/r2/projects/scp/assessments/burrowingowl.pdf.

McKean, W.T. (editor). 1976. *Winter Guide to Central Rocky Mountain Shrubs*. Colorado Department of Natural Resources, Division of Wildlife. Denver, Colorado.

Meyer, J.J. 2008. *USACE WoUS Final Wetland Delineation*. Kleinfelder West, Inc. Doc. Control Number DEN8R058.

Moeller, D. 1999. *Radiation: Facts Versus Fears*. American Council on Science and Health. April.

Moeller D. 2006. *Comparision of natural background dose rates for residents of the Amargosa Valley, NV, to those in Leadville, CO, and the states of Colorado and Nevada*. Health Phys 91:338-353; 2006.

Monok, B. 2009. Energy Fuels Resources. Personal Communication and E-mail Correspondence with Edge Environmental, Inc. July - September.

Montrose County. 2009a. *Resolution of the Montrose County Board of County Commissioners Concerning: Special Use Application No. SU-08-0047 for the Piñon Ridge Uranium Mill*. Available at: http://www.montrosecounty.net/images/PinonRidge.resoution_.pdf.

Montrose County. 2009b. GIS Department. Montrose County Mapping Data. Available at: http://montrosecounty.net/gis.

Montrose County. 2009c. Montrose County Manager, Montrose County Adopted Budget, 2009. Available at: http://www.montrosecounty.net/county_management/.

Montrose County. 2009d. Assessor's Office. Abstract of Assessment and Levies, Montrose County, Colorado. January. Available at http://www.montrosecount.net/assessor/abstracts_of_assessments_and_levies/.

BLM_0045410

Montrose County. 2009e. Assessor's Office.  Property Records Search, Parcel # 4273-054-00-007. Available at: http://eagleweb.montrosecounty.net.

Montrose Economic Development Corporation. 2009. Available at: http://www.montroseedc.org.

Mutel, C. F. and J. C. Emerick. 1992. *From Grassland to Glacier*. Johnson Book, Boulder, Colorado.

National Association of Realtors, 2009. On-line search of residential sales listings. Available at: www.realtor.com/realestateandhomes-search/. October 20.

National Council on Radiation Protection and Measurements. 2006. *Ionizing radiation exposure of the population of the United States*. NCRP Report No. 160.

National Highway Traffic Safety Administration (NHTSA). 2009. *Traffic Safety Facts for Colorado and Utah, 2000 – 2008*. Available at: http://www.nrd-nhtsa.dot.gov.

National Park Service. 2005. *Colorado–A Classic Western Quarrel: A History of the Road Controversy at Colorado National Monument*. Chapter 1: The Roots of Conflict 1881-1911. February 9.

Natural Resource Conservation Service (NRCS). 2009a Published Soil Surveys for Colorado. Available at: http://soils.usda.gov/survey/printed_surveys/state.asp?state=Colorado&abbr=CO.

Natural Resource Conservation Service. 2009b. *Soils Series Handbook*. Available at: http://soils.usda.gov/technical/handbook.

NatureServe. 2009. *NatureServe Explorer: An online encyclopedia of life* [web application]. Version 7.1. NatureServe, Arlington, Virginia. Available at: http://www.natureserve.org/explorer. Accessed: September 16, 2009.

Norquist, B. 2009. Energy Fuels Resources. Personal Communication with Edge Environmental, October 22.

Norwood Inn and Rental Properties. 2009. Lodging information available at: http://norwoodinn.net.

Nucla-Naturita Area Chamber of Commerce. 2009. Lodging information. Available at: http://nucla-naturita.com/index.html.

Odell, R. 1999. *Getting the Cake in the Can: A Short United States Uranium History from the Rocky Mountain Scout Viewpoint*. Casper, Wyoming.

Oliver, C. 2009. President of the Board of Directors, Paradox Pipeline Company. Personal Communication with Edge Environmental, Inc. September 9.

Paradox Valley School. 2009. Population estimates. Available at: Randall, H, 2009. Assessor, San Juan County, Utah. Personal communication with Edge Environmental, Inc. October 15. RBC Capital Markets. 2009. *Uranium Market Outlook* – Second Quarter 2009.

Randall, H, 2009. Assessor, San Juan County, Utah. Personal Communication with Edge Environmental, Inc. October 15.

RealTravel. 2008. July 28. *The Big Drive. Bedrock Travel Guide*. Available at: http://realtravel.com.

BLM_0045411

Reed, A. and M. Metcalf. 1999. *Colorado Prehistory: A Context for the Northern Colorado River Basin.* Colorado Council of Professional Archaeologists. Denver, Colorado.

Reed, D.F. 1981. *Conflicts with Civilization.* Pages 509-535 *in* O.C. Wallmo (editor). Mule and Black-tailed Deer of North America. University of Nebraska Press, Lincoln, Nebraska.

Reeve, A.F., and T.C. Vosburgh. 2006. *Shooting Prairie Dogs.* Pages 119-128 in J.E. Rolle, B.J. Miller, J.L. Godbey, and D.E. Biggins (editors). Recovery of the Black-footed Ferret – Progress and Continuing Challenges. USGS Scientific Investigations Report 2005-5293. U.S. Geological Survey, Reston, Virginia.

Ricker, W.R. 1975. *Computation and Interpretation of Biological Statistics of Fish Populations.* Fisheries Research Board of Canada Bulletin 191. Ottawa, Canada.

Robson, S.G and E.R. Banta. 1995. *Ground Water Atlas of the United States, "Arizona, Colorado, New Mexico, Utah,* HA730-C". Available at: http://capp.water.usgs.gov/gwa/ch_c/C-text6.html.

Rockwell, W. 1965. *Uncompahgre County.* Denver, Colorado.

Rocky Mountain Association of Geologists (RMAG). 1982. 1981 *Guidebook: Geology of the Paradox Basin.* 233 p.

Roig-Soles, J. and V. Navazo-Lopez. 1997. *A Five-year Spanish Research Project on Bird Electrocution and Collision with Electric Lines.* Pages 317-325  *in* J.R.Williams,  J.W. Goodrich-Mahoney, J.R. Wisniewski, and J. Wisniewski (editors).  Environmental Concerns in Rights-of-Way Management.

Romin, L.A. and J.A. Bissonette. 1996. T*emporal and Spatial Distribution of Highway Mortality of Mule Deer on Newly Constructed Roads at Jordanelle Reservoir, Utah.* Great Basin Naturalist 56:1-11.

Rogers, Z. 2009. Environmental Engineer, Energy Fuels Resources. Personal E-Mail Communication provided to Edge Environmental, Inc. June 22.

Rosentreter, R., M. Bowker, and J. Belnap. 2007. *A Field Guide to Biological Soil Crusts of Western U. S. Drylands.* U. S. Government Printing Office. Denver, Colorado.

Rost, G.R. and J.A. Bailey. 1979. *Distribution of Mule Deer and Elk in Relation to Roads.* Journal of Wildlife Management 43:634-741.

Rowland, M.M., M.J. Wisdom, B.K. Johnson, and J.G. Kie. 2000. *Elk Distribution and Modeling in Relation to Roads.* Journal of Wildlife Management 64:672-684.

Ruediger, B., J. Claar, S. Gniadek, B. Holt, L. Lewis, S. Mighton, B. Naney, G. Patton, R. Rinaldi, J. Trick, A. Vandehey, F. Wahl, N. Warren, D. Wenger, and A. Williamson. 2000. *Canada Lynx Conservation Assessment and Strategy.* USDA-Forest Service, USDI-Fish and Wildlife Service, USDI-Bureau of Land Management, and USDI-National Park Service. Missoula, Montana.

Ryan, R. 2009. River Recreation Manager, BLM Durango Field Office. Personal Communication with Edge Environmental, Inc. July 15.

Rydell, J., H.J. Baagoe. 1996. *Bats and Streetlamps.* Bats Magazine 14(4). Available at: http://www.batcon.org/index.php/media-and-info/bats-achives.html.

BLM_0045412

Rydell,J., and P.A. Racey. 1993. *Street Lamps and the Feeding Ecology of Insectivorous Bats.* (Abstract) Symposium on Recent Advances in Bat Biology, Zoological Society of London.

San Juan Public Lands. 2007. *San Juan Draft Land Management Plan and Draft Environmental Impact Statement.* Volume 3, Appendix E, BLM Structured Recreation Management Areas. Available at: http://ocs.fortlewis.edu/forestPlan/DEIS/v3.asp.

San Miguel Basin Sage Grouse Working Group. 1998. *Gunnison Sage Grouse Conservation Plan San Miguel Basin, Colorado.* Colorado Division of Wildlife, Montrose, Colorado.

Sauer, J. R., J. E. Hines, and J. Fallon. 2008. *The North American Breeding Bird Survey, Results and Analysis 1966 - 2007.* Version 5.15.2008. U.S. Geological Survey, Patuxent Wildlife Research Center. Laurel, Maryland.

Savignac, Ph.D., N. 2009a. *Radiological Exposure Pathways Report in Support of the Application for a License for Source Material Milling. Piñon Ridge Uranium Mill. Montrose County, Colorado.* November. **Exhibit J3 of the Mill License Application.**

Sawyer, H., R. Nielson, D. Strickland, and L. McDonald. 2006. 2006 Annual Report. *Sublette Mule Deer Study (Phase II): Long-term Monitoring Plan to Assess Potential Impacts of Energy Development on Mule Deer in the Pinedale Anticline Project Area.* Western EcoSystems Technology, Inc. Cheyenne, Wyoming.

Sawyer, H., R.M. Nielson, F.G. Lindzey, L. Keith, J.H. Powell, and A.A. Abraham. 2007. *Habitat Selection of Rocky Mountain Elk in a Nonforested Environment.* Journal of Wildlife Management 71:868-874.

Sawyer, H., M.J. Kauffman, and R.M. Nielson. 2009. *Influence of Well Pad Activity on Winter Habitat Selection Patterns of Mule Deer.* Journal of Wildlife Management 73:1052-1061.

Schrock, J. 2008. Economist, Colorado Legislative Council. *Severance Tax and FML Revenue Memorandum.* December 30.

Schrupp, D.L., W.A. Reiners, T.G. Thompson, L.E. O'Brien, J.A. Kindler, M.B. Wunder, J.F. Lowsky, J.C. Buoy, L. Satcowitz, A.L. Cade, J.D. Stark, K.L. Driese, T.W. Owens, S.J. Russo, and F. D'Erchia. 2000. *Colorado Gap Analysis Program: A Geographic Approach to Planning for Biological Diversity* - Final Report, USGS Biological Resources Division, Gap Analysis Program and Colorado Division of Wildlife, Denver, Colorado.

Selby, G. 2007. *Great Basin Silverspot Butterfly (Speyeria nokomis nokomis* [W.H. Edwards]): a technical conservation assessment. USDA Forest Service, Rocky Mountain Region. Available at: http://www.fs.fed.us/r2/projects/scp/assessments/greatbasinsilverspotbutterfly.pdf.

SENES Consultants Limited (SENES). 2009a. *Risk Assessment for Proposed Uranium and Vanadium Mill at the Piñon Ridge Property.* November. **Exhibit J4 of the Mill License Application.**

SENES Consultants Limited. 2009b. *Update of Environmental Assessment of a credible Transportation Accident Scenario for Cameco McArthur Operation.* Prepared for Cameco Corporation.

BLM_0045413

Sergio, F., L. Marchesi, P. Pedrini, M. Ferrer, and V. Penteriani. 2004. *Electrocution Alters the Distribution of a Top Predator, the eagle owl Bubo bubo.* Journal of Applied Ecology. 41: 836-845.

Sheehan, A. F., J. D. Godchaux, and N. Hughes. 2003. *Colorado Front Range Seismicity and Seismic Hazard, in Engineering Geology in Colorado: Contributions, Trends, and Case Histories,* eds. D. Boyer, P. Santi, and W. Rogers, Association of Engineering Geologists Special Publication No. 15, Colorado Geological Survey Special Publication 55.

Shenk, T. 2005. *General Locations of Lynx (Lynx canadensis) Reintroduced to Southwestern Colorado from February 4, 1999 through February 1, 2005.* Colorado Division of Wildlife, Fort Collins, Colorado.

Shogren, J.F. 1998. *Private Property and the Endangered Species Act.* University of Texas Press. Austin, Texas.

Smith, D. 2009a. GIS Analyst, Utah Department of Natural Resources, Division of Oil Gas and Mining. Personal Communication and Email Correspondence with Edge Environmental, Inc. August 10.

Smith, E, 2009b. Town Clerk, Town of Nucla. Personal Communication with Edge Environmental, Inc. September 9.

Smith, B.E. and D.A. Keinath. 2007. *Northern Leopard Frog (Rana pipiens): A Technical Conservation Assessment.* Prepared for USDA Forest Service, Rocky Mountain Region, Species Conservation Project.

Southwest Data Center. 2009. Accessed by Energy Fuels Resources on June 9, 2009. Available at: *http://www.southwestdata.org/website/moco/discrete/disclaimer.htm.*

Spangler, C. 2009. Human Resources Director, San Miguel Power Association. Personal Communication with Edge Environmental, Inc. July 16.

Spence, W., C. J. Langer, and G. L. Choy. 1996. *Rare, Large Earthquakes at the Laramide Deformation Front – Colorado (1882) and Wyoming (1984)*: Bulletin Seismological Society of America 86, pp. 1804-1819.

Stebbins, R.C. 1985. *A Field Guide to Western Reptiles and Amphibians.* Houghton Mifflin Company, Boston, Massachusetts.

Stindt, D. 2009. Rangeland Management Specialist, U.S. Forest Service, Norwood Field Office. Personal Communication with Edge Environmental, Inc. August 14.

Strauss, R. 1982. *Structure in the Vicinity of the C-JD-7 Mining Area, Paradox Valley, Montrose, Colorado*: M.Sc. Thesis. Michigan Technological University.

Stone, E.L., G. Jones, and S. Harris. 2009. *Street Lighting Disturbs Commuting Bats.* Current Biology 19(13):1123-1127.

Stubbendieck, J. S.L. Hatch, and C.H. Butterfield. 1992. *North American Range Plants.* University of Nebraska Press, Lincoln, Nebraska.

Sullivan, S. 2009. Maintenance and Operations Superintendent for Tri-State Generation's Nucla Station. Personal Communication with Edge Environmental, Inc. July 17.

BLM_0045414

Sunbelt Geophysics, 2008, Pilot Test Results, Additional Geophysical Investigations, Piñon Ridge Mill Site, Montrose County, Colorado: Prepared for Kleinfelder by David Hyndman. March 2008.

Svensson, A.M., and J. Rydell. 1998. *Mercury Vapour Lamps Interfere with the Bat Devence of Typanate Moths (Operophtera spp.; Geometridae)*. Animal Behaviour 55:223-226.

Tepedino, V.J. 1999. *The Reproductive Biology of Rare Rangeland Plants and their Vulnerability to Insecticides*. Chapter III.5 in Grasshopper Integrated Pest-Management User Handbook. USDA Animal and Plant Health Inspection Services Technical Bulletin No. 1809. Washington, D.C.

Thilenius, J. F., G. R. Brown, and A. L. Medina. 1995. *Vegetation on semi-arid rangelands, Cheyenne River Basin, Wyoming*. General Technical Report RM-GTR-263. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado.

Topper, R., K. Spray, W. Bellis, J. Hamilton, and P. Barkmann. 2003. Ground Water Atlas of Colorado. Colorado Geological Survey, Division of Minerals and Geology, Department of Natural Resources, Special Publication 53, pp. 123 – 128.

Travsky, A. and G.P. Beauvais. 2004. *Species Assessment for the Midge Faded Rattlesnake (Crotalus viridis concolor) in Wyoming*. Prepared for Bureau of Land Management, Cheyenne, Wyoming.

Trombulak, S.C., and C.A. Frissell. 2000. Review of Ecological Effects of Roads on Terrestrial and Aquatic Communities. Conservation Biology 14:18-30.

TurnKey Consulting, LLC (TurnKey). 2008. Final Traffic Assessment. Prepared for Energy Fuels Resources Piñon Ridge Mill. March 10. **Exhibit L5 to the Mill License Application.**

Tweto. 1979. Geologic Map of Colorado, 1:500,000. USGS Special Map.

Two Lines, Inc. 2009. *Estimates of Radiation Doses to Members of the Public from the Piñon Ridge Mill*. Grand Junction, Colorado. November. **Exhibit J2 of the Mill License Application.**

Unified Soil Classification System (USCS) originated by Casagrande. 1947. and fully developed in Howard, 1977: Lab classification of soils. Earth Science Training Manual 4, U.S. Bureau of Reclamation 56p.

U.S. Army Corps of Engineers (USACE). 2006. *Interim regional supplement to the Corps of Engineers Wetland Delineation Manual: Arid West Region*. Eds. J. S. Wakeley, R. W. Lichvar, and C. V. Noble. ERDC/EL TR-06-16. Vicksburg, MS: U. S. Army Engineer Research and Development Center.

U.S. Bureau of Economic Analysis. 2009. Regional Economic Accounts. Available at: http://www.bea.gov/regional/reis.

U.S. Bureau of Labor Statistics. 2007. *Household Income Before Taxes: Shares of Average Annual Expenditures and Sources of Income* (Table 46). Consumer Expenditure Survey, 2007. Available at: http://www.bls.gov/cex/2007/share/income.pdf.

BLM_0045415

U.S. Bureau of Labor Statistics. 2009a. *Quarterly Census of Employment and Wages*. Accessed through the Colorado Department of Labor and Employment, Labor Market Information. Available at: http://lmigateway.coworkforce.com/lmigateway.

U.S. Bureau of Labor Statistics. 2009b. *Local Area Unemployment Statistics*. Available at: http://www.bls.gov/cps/home.htm.

U.S. Bureau of Reclamation (BOR). 2009. *Information on the Colorado River Basin Salinity Control Project, Paradox Valley Unit, Title II*. Available at: http://www.usbr.gov.

U.S. Census Bureau. 2000a. Census 2000, *Summary Tape File 3*. Available at: http://www.census.gov.

U.S. Census Bureau, 2000b. Census 2000, *Summary Tape File 3. Data on commuting patterns accessed through Colorado Department of Labor and Employment, Labor Market Information*. Available at: http://lmigateway.coworkforce.com/lmigateway.

U.S. Census Bureau. 2009a. *2008 population estimates*. Available at: http://www.census.gov.

U.S. Census Bureau, 2009b. *Annual Building Permit Data*. Available at: http://www.census.gov/const/www/permitsindex.html.

U.S. Department of Agriculture (USDA). 1972. *Economic Research Service. Water and related land resources. Dolores River Basin, Colorado and Utah*: a report based on a cooperative study by Colorado Water Conservation Board and United States Department of Agriculture. USDA, Denver, Colorado.

U.S. Department of Agriculture. 1999. 1997 *Census of Agriculture*. Available at: http://www.agcensus.usda.gov.

U.S. Department of Agriculture. 2004. *2002 Census of Agriculture*. Available at: http://www.agcensus.usda.gov.

U.S. Department of Agriculture. 2008. *Web Soil Survey*. Accessed August 20, 2008. Available at: http://websoilsurvey.nrcs.usda.gov/app/.

U.S. Department of Agriculture. 2009. *2007 Census of Agriculture*. Available at: http://www.agcensus.usda.gov.

U.S. Department of Energy (DOE). 2000. Nevada Operations Office. *United States Nuclear Tests, July 1945 through September 1992* (DOE/NV--209-REV15). December.

U.S. Department of Energy. 2002. *A Graded Approach for Evaluating Radiation Doses to Aquatic and Terrestrial Biota*.

U.S. Department of Energy. 2007. *Uranium Leasing Program Environmental Assessment*. U.S. Dept of Energy, Office of Legacy Management. Document Number Y0011700.

U.S. Department of Energy. 2009a. *The History of Nuclear Energy*. DOE/NE-0088. Office of Nuclear Energy, Science and Technology. Washington, D.C.

U.S. Department of the Interior (USDI). 2009. Bureau of Reclamation. *CRBSCP-Paradox Valley Unit-Title II*: Project Data Sheet. Available at: http://www.usbr.gov/projects/Project.jsp?proj_Name=CRBSCP+-+Paradox+Valley+Unit+-+Title+II.

BLM_0045416

U.S. Department of Labor. 2009a. *State Occupational Injuries, Illnesses, and Fatalities*. Bureau of Labor and Statistics. Available at: http://stats.bls.gov/iif/oshstate.htm#CO.

U.S. Department of Labor. 2009b. *Census of Fatal Occupational Injuries*. Bureau of Labor and Statistics. Available at: http://data.bls.gov/PDQ/outside.jsp?survey=fi.

U.S. Energy Information Administration (EIA). 2007. *International Energy Annual; System for the Analysis of Global Energy Markets*.

U.S. Energy Information Administration. 2009a. *Domestic Uranium Production Report, 2nd Quarter 2009*. Released August 14, 2009. Available at: www.eia.doe.gov/cneaf/nuclear/dupr/qupd.html.

U.S. Energy Information Administration. 2009b. *Uranium Marketing Annual Report. Released 2009*. Available at: www.eia.doe.gov/cneaf/nuclear/unar/unar.html.

U.S. Energy Information Administration. 2009c. *Annual Energy Outlook*. March.

U.S. Environmental Protection Agency (EPA). 1974. *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*. Report EPA/ONAC 550/9-74-004. Washington, D.C.

U.S. Environmental Protection Agency. 1983. *Health and Environmental Protection Standards for Uranium and Thorium Mill Tailings*. EPA Title 40, Part 192. Washington, D.C.

U.S. Environmental Protection Agency. 2000. *Meteorological Monitoring Guidance for Regulatory Modeling Applications (MMGRA)*; EPA 454/R-99-005.

U.S. Fish and Wildlife Service (USFWS). 1967. *Native Fish and Wildlife. Endangered Species Threatened with Extinction*. Federal Register 32(48): 6.

U.S. Fish and Wildlife Service. 1970. *Wildlife and Fisheries, Appendix D, United States List of Endangered Native Fish and Wildlife*. Federal Register 35(199): 16047-16048.

U.S. Fish and Wildlife Service. 1979. *Endangered and Threatened Wildlife and Plants; Determination That* Sclerocactus glaucus *is a Threatened Species*. Federal Register 44 (198): 58868 - 58870.

U.S. Fish and Wildlife Service. 1980. *Determination that the Bonytail Chub (Gila elegans) is an Endangered Species*. Federal Register 45(80):27710-27713.

U.S. Fish and Wildlife Service. 1984. *Endangered and Threatened Wildlife and Plants; Final Rule To Determine Eriogonum pelinophilum to be an Endangered Species and To Designate Its Critical Habitat*. Federal Register 49:28562-28565.

U.S. Fish and Wildlife Service. 1987. *Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin*. U.S. Fish and Wildlife Service, Region 6, Denver, Colorado.

U.S. Fish and Wildlife Service. 1988. *Clay-Loving Buckwheat Eriogonum pelinophilum Reveal Recovery Plan*. Region 6, U.S. Fish and Wildlife Service, Denver, Colorado.

U.S. Fish and Wildlife Service. 1990a. *Humpback Chub Recovery Plan*. U.S. Fish and Wildlife Service, Denver, Colorado.

BLM_0045417

U.S. Fish and Wildlife Service. 1990b. *Uinta Basin Hookless Cactus Sclerocactus glaucus Recovery Plan*. U.S. Fish and Wildlife Service Region 6, Denver, Colorado.

U.S. Fish and Wildlife Service. 1991a. *Endangered and Threatened Wildlife and Plants: the Razorback Sucker (Xyrauchan texanus) Determined to be an Endangered Species*. Final Rule. Federal Register 56(205):54957-54967.

U.S. Fish and Wildlife Service. 1991b. *Endangered and Threatened Wildlife and Plants; Uncompahgre Fritillary Butterfly Determined to be Endangered*. Final Rule. Federal Register 56: 28712-28718

U.S. Fish and Wildlife Service. 1993. *Endangered and Threatened Wildlife and Plants; Final Rule to List the Mexican Spotted Owl as a Threatened Species*. Federal Register 58 (49): 14248 – 14271.

U.S. Fish and Wildlife Service. 1994. *Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the Colorado River Endangered Fishes: Razorback Sucker, Colorado Squawfish, Humpback Chub, and Bonytail Chub*. Federal Register 59(54):13374-13400.

U.S. Fish and Wildlife Service. 1995. *Recovery Plan for the Mexican Spotted Owl*: Vol.1. Albuquerque, New Mexico.

U.S. Fish and Wildlife Service. 1999a. *Endangered and Threatened Wildlife and Plants; Proposed Rule to Remove the Bald Eagle in the Lower 48 States from the List of Endangered and Threatened Wildlife*. Federal Register 64(128):36453-36464.

U.S. Fish and Wildlife Service. 1999b. *Endangered and Threatened Wildlife and Plants; Final Rule To Remove the American Peregrine Falcon From the Federal List of Endangered and Threatened Wildlife, and To Remove the Similarity of Appearance Provision for Free-Flying Peregrines in the Conterminous United States*; Final Rule. Federal Register 64(164): 46542-46558.

U.S. Fish and Wildlife Service. 2000a. *Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Contiguous U.S. Distinct Population Segment of the Canada Lynx and Related Rule*; Final Rule. Federal Register 65(58):16052-16086.

U.S. Fish and Wildlife Service. 2000b. *Endangered and Threatened Wildlife and Plants; Notice of Designation of the Gunnison Sage Grouse as a Candidate Species*. Federal Register 65:82310-.82312.

U.S. Fish and Wildlife Service. 2001. *Endangered and Threatened Wildlife and Plants; 12-Month Finding for a Petition to List the Yellow-billed Cuckoo (Coccyzus americanus) in the Western Continental United States*. Federal Register 66(143):38611-38626.

U.S. Fish and Wildlife Service. 2002a. *Bonytail (Gila elegans) Recovery Goals: amendment and supplement to the Bonytail Chub Recovery Plan*. Mountain-Prairie Region (6). Denver, Colorado.

U.S. Fish and Wildlife Service. 2002b. *Humpback chub (Gila cypha) Recovery Goals: amendment and supplement to the Humpback Chub Recovery Plan*. Mountain-Prairie Region (6). Denver, Colorado.

BLM_0045418

U.S. Fish and Wildlife Service. 2002c. *Colorado Pikeminnow (Ptychocheilus lucius) Recovery Goals. Amendment and Supplement to the Colorado Squawfish Recovery Plan.* U.S. Fish and Wildlife Service, Denver, Colorado.

U.S. Fish and Wildlife Service. 2002d. *Razorback Sucker (Xyrauchen texanus) Recovery Goals. Amendment and Supplement to the Razorback Sucker Recovery Plan.* U.S. Fish and Wildlife Service, Denver, Colorado.

U.S. Fish and Wildlife Service. 2003a. *Endangered and Threatened Wildlife and Plants; Notice of Remanded Determination of Status for the Contiguous United States Distinct Population Segment of the Canada Lynx; Clarification of Findings, Final Rule.* Federal Register 68(128): 40076-40101.

U.S. Fish and Wildlife Service. 2003b. *Estimates of Distances at Which Incidental Take of Murrelets and Spotted Owls Due to Harassment are Anticipated from Sound-generating, Forest-management Activities in Olympia National Forest.* U.S. Fish and Wildlife Service, Western Washington Field Office, Lacey, Washington.

U.S. Fish and Wildlife Service. 2003c. *Status Assessment and Conservation Plan for the Western Burrowing Owl in the United States.* Biological Technical Publication: BTP-R6001-2003.

U.S. Fish and Wildlife Service. 2004. *Endangered and Threatened Wildlife and Plants; Final Designation of Critical Habitat for the Mexican Spotted Owl; Final Rule.* Federal Register 69 (168): 53182–53230.

U.S. Fish and Wildlife Service. 2006a. *Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx; Final Rule.* Federal Register 71(217): 66007-66061.

U.S. Fish and Wildlife Service. 2006b. *Endangered and Threatened Wildlife and Plants; Final Listing Determination for the Gunnison Sage-Grouse as Threatened or Endangered.* Federal Register 71:19954-19982.

U.S. Fish and Wildlife Service. 2006c. *Protection of Bald Eagles; Definition.* Federal Register 71(32): 8265-8268.

U.S. Fish and Wildlife Service. 2007a. *Endangered and Threatened Wildlife and Plants; Review of Native Species That Are Candidates for Listing as Endangered or Threatened; Annual Notice of Findings on Resubmitted Petitions; Annual Description of Progress on Listing Actions.* Federal Register 72(234):69034-69106.

U.S. Fish and Wildlife Service. 2007b. *Endangered and Threatened Wildlife and Plants; 12-month Finding on a Petition To List Sclerocactus brevispinus (Pariette cactus) as an Endangered or Threatened Species; Taxonomic Change From Sclerocactus glaucus to Sclerocactus brevispinus, S. glaucus, and S. wetlandicus.* Federal Register 72(180):53211-53222.

U.S. Fish and Wildlife Service. 2007c. *Species Assessment and Listing Assignment Form. Coccyzus americanus.* U.S. Fish and Wildlife Service, Sacramento Field Office. Sacramento, California.

U.S. Fish and Wildlife Service. 2007d. *Endangered and Threatened Wildlife and Plants; Removing the Bald Eagle in the Lower 48 States from the List of Endangered and Threatened Wildlife.* Federal Register. 72(130): 37346 – 37372.

BLM_0045419

U.S. Fish and Wildlife Service. 2008a. *Bonytail chub (Gila elegans) Life History. U.S. Fish and Wildlife Service.* Available at: http://ecos.fws.gov/docs/life_histories/E020.html>.

U.S. Fish and Wildlife Service. 2008b. *Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition To List the Gunnison's Prairie Dog as Threatened or Endangered.* Federal Register 73:6660-6684.

U.S. Fish and Wildlife Service. 2009a. Colorado Field Office County List Updated June 2009. USDI-Fish and Wildlife Service, Ecological Services, Colorado Field Offices. Grand Junction, Colorado.

U.S. Fish and Wildlife Service. 2009b. *Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx*; Final Rule. Federal Register 74(36):8616-8702.

U.S. Fish and Wildlife Service. 2009c. *Endangered and Threatened Wildlife and Plants; Taxonomic Change of Sclerocactus Glaucus to Three Separate Species.* Federal Register 74(177): 47112-47117.

U.S. Fish and Wildlife Service. 2009d. *Endangered and Threatened Wildlife and Plants; 90-Day Finding on a Petition To Revise Critical Habitat for Eriogonum pelinophilum (Clay-Loving Wild Buckwheat)*. Western Colorado Ecological Services Office, Grand Junction, Colorado.

U.S. Fish and Wildlife Service. 2009e. *Northern Leopard Frog in West May Warrant Federal Protection*. News Release, Arizona Ecological Services Field Office. Available at: http://www.fws.gov/southwest/es/arizona.

U.S. Fish and Wildlife Service. 2009f. *Region 6 Environmental Contaminants: Contaminant Issues – Industrial Wastewater Impoundments*. Available at: http://www.fws.gov/mountain-prairie/contaminants/contaminants3.html.

U.S. Fish and Wildlife Service and Bureau of Land Management. 2007. *Recommendations for Avoiding Adverse Effects on Threatened, Endangered, Proposed, Candidate, and BLM Sensitive Plants on BLM Lease Lands in Colorado*. Draft. Grand Junction Field Office, Grand Junction, Colorado.

U.S. Fish and Wildlife Service and National Marine Fisheries Service. 1998. *Consultation Handbook. Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act*. Available at: http://www.fws.gov/endangered/consultations/index.html.

U.S. Geological Survey. 2008. *Quaternary Fault and Fold Database*. Available at: http://Qfaults.cr.usgs.gov/.

U.S. North American Bird Conservation Initiative Committee (U.S. NABCI Committee). 2000. Bird *Conservation Region Descriptions. A Supplement to the North American Bird Conservation Initiative Bird Conservation Regions Map*. U.S. Fish and Wildlife Service, Arlington Virginia.

U.S. Nuclear Regulatory Commission (NRC). 1977. Regulatory Guide 4.13, Rev. 1. *Performance, Testing, and Procedural Specifications for Thermoluminescence Dosimetry; Environmental Applications*. July.

U.S. Nuclear Regulatory Commission. 1980a. Regulatory Guide 4.14, Rev. 1. *Radiological Effluent and Environmental Monitoring at Uranium Mills*.

BLM_0045420

U.S. Nuclear Regulatory Commission. 1980b. NUREG-0706, *Final Generic Environmental Impact Statement on Uranium Milling*, Project M-25, Office of Nuclear Material Safety and Safeguards, U.S. Nuclear Regulatory Commission, Vol. 1, dated September, 1980.

U.S. Nuclear Regulatory Commission. 1982a. Regulatory Guide 3.8. *Preparation of Environmental Reports for Uranium Mills*. October.

U.S. Nuclear Regulatory Commission. 1982b, NUREG/CR-2684. *Rock Riprap Design Methods and Their Applicability to Long-Term Protection of Uranium Mill Tailings Impoundments*.

U.S. Nuclear Regulatory Commission. 1987. Methods for Estimating Radioactive and Toxic Airborne Source Terms for Uranium Milling Operations.

U.S. Nuclear Regulatory Commission. 1988a. *Onsite Meteorological Measurement Program for Uranium Recovery Facilities – Data Acquisition and Reporting*: Regulatory Guide 3.63.

U.S. Nuclear Regulatory Commission. 1988b. *Decision Methods for Dose Assessment to Comply with Radiological Criteria for License Termination*, NUREG-1549.

U.S. Nuclear Regulatory Commission. 1989. Regulatory Guide 3.64, *Calculation of Radon Flux Attenuation by Earthen Uranium Mill Tailings Covers*. U.S. Nuclear Regulatory Commission. Washington. D.C.

U.S. Nuclear Regulatory Commission. 1993. NUREG-5849, *Manual for Conducting Radiological Surveys in Support of License Termination*.

U.S. Nuclear Regulatory Commission. 2002. NUREG-1623, *Design of Erosion Protection for Long-Term Stabilization*.

U.S. Nuclear Regulatory Commission. 2003a. NUREG-1748, *Environmental Review Guidance for Licensing Actions Associated with NMSS Programs*. Final Report. Office of Nuclear Material Safety and Safeguards. Washington, D.C.

U.S. Nuclear Regulatory Commission. 2003b. *Standard Review Plan for the Review of a Reclamation Plan for Mill Tailings Sites Under Title II of the Uranium Mill Tailings Radiation Control Act of 1978*. Final Report, NUREG-1620, Rev. 1. June.

U.S. Nuclear Regulatory Commission. 2006. *Consolidated Decommissioning Guidance. Decommissioning Process for Materials Licensees*, Final Report, NUREG-1757 Vol.1, Rev. 2.

U.S. Nuclear Regulatory Commission. 2007. Regulatory Guide 4.15, Rev. 2. *Quality Assurance for Radiological Monitoring Programs (Inceptions through Normal Operations to License Termination) – Effluent Streams and the Environment*. July.

U.S. Nuclear Regulatory Commission. 2009. *Uranium Recovery Regulations. Title I Program*. Washington, D.C.

Utah Department of Health Office of Epidemiology Environmental Epidemiology Program. 2007. *A Follow-Up Study of Cancer Incidence in Monticello City, Utah – 1973-2004*. Monticello City, San Juan County, Utah. December.

Utah Department of Natural Resources, Division of Oil, Gas & Mining (UDNR-DOGM). *Proposed Explorations in San Juan County*. November 2, 2009.

BLM_0045421

Utah Department of Public Safety (UDPS). 2009. Highway Safety Office. *Utah Crash Summaries*. Available at: http://publicsafety.utah.gov/highwaysafety/1997-2005.html.

Utah Division of Wildlife Resources. 2009. Utah Conservation Data Center. Available at: http://dwrcdc.nr.utah.gov/ucdc/.

Utah Gap Analysis, 1997. An Environmental Information System. USDI National Biological Service and Utah State University, Logan, Utah

Utah Governor's Office of Planning and Budget. 2009. *County Population Estimates and Projections. Department of Economic Analysis.* Available at: http://governor.utah.gov/dea/upec.html.

Valdez, R.A., P.B. Holden, and T.B. Hardy. 1990. *Habitat Suitability Index Curves for Humpback Cub of the Upper Colorado River Basin*. Rivers 1:31-42.

Valdez, R.A., P.G. Mangan, R. Smith, and B. Nilson. 1982. *Upper Colorado River Fisheries Investigations (Rifle Colorado to Lake Powell, Utah)*. Pages 100-279 in W.H. Miller, J.J. Valentine, D.L Archer, H.M. Tyus, R.A. Valdez, and L. Kaeding (editors). Part 2 – Field Investigations. Colorado River Fisheries Project, U.S. Bureau of Reclamation, Salt Lake City, Utah.

Vanicek, C.D. and R.H. Kramer. 1969. *Life history of the Colorado squawfish, Ptychocheilus lucius, and the Colorado chub, Gila robusta, in the Green River in Dinosaur National Monument, 1964-1966*. Transactions of the American Fisheries Society 98(2):193-208.

Verdolin, J.L., K. Lewis, and C.N. Slobodchikoff. 2008. *Morphology of Burrow Systems: a Compariosn Of Gunnison's (Cynomys gunnisoni), White-Tailed (C. leucurus), Black-Tailed (C. ludovicianus), and Utah (C. parvidens) Prairie Dogs*. Southwestern Naturalist 53:201-207.

Vigil, J. 2009. Chief Financial Officer, Energy Fuels Resources. Personal Communication and E-mail Correspondence with Edge Environmental, Inc. September 22.

Visus Consulting Group, Inc. (Visus). 2009. *Special Use Permit Application, Piñon Ridge Mill Facility. Submitted to the Montrose County Land Department*. April. **Exhibit L7 of the Mill License Application.**

Visus Consulting Group, Inc. and Energy Fuels Resources Corporation. 2009a. *Facility Operating Plan. Piñon Ridge Mill Facility. Montrose, Colorado.* November. **Exhibit B2 to the Mill License Application.**

Visus Consulting Group, Inc. and Energy Fuels Resources Corporation. 2009b. *Operational Monitoring Plan. Piñon Ridge Mill Facility. Montrose County, Colorado. October.* **Exhibit J6 to the Mill License Application.**

Von Stroh, G. 2009. First Quarter 2009, *Colorado Multi-Family Housing Vacancy and Rental Survey. Conducted for the Colorado Division of Housing, Apartment Realty Association and Pierce-Eislen*. Available at: http://www.dola.state.co.us/cdh/researchers/index.htm#vacancy.

Waller, S. 2009. Appraiser, Montrose County Assessor's Office. Personal Communication with Edge Environmental, Inc. August 26.

Ward, J.P., A.B. Franklin, S.E. Rinevich, and F. Clemente. 1995. Chapter 1: *Distribution and Abundance of Mexican Spotted Owls*. Pages 1-48 in K.J. Cook (editor).

BLM_0045422

Recovery Plan for the Mexican Spotted Owl. Volume II. USDI-Fish and Wildlife Service, Albuquerque, New Mexico.

Washington State Department of Transportation (WSDOT). 2008. Chapter 7.0-Noise Impact Assessment. Pages 7.1 - 7.54 in Biological Assessment Preparation for Transportation Projects, Advanced Training Manual Version 10-08. Environmental Affairs Office. Olympia, Washington.

Weber, W. A., and R. C. Wittmann. 2001. *Colorado Flora Western Slope*, Third Edition. University Press of Colorado, Boulder, Colorado.

Weir, J. E., Maxfield, E.B., and E.A. Zimmerman. 1983. *Regional Hydrology of the Dolores River Basin, Eastern Paradox Basin, Colorado and Utah*, U.S. Geological Survey, Water-Resources Investigations Report 83-4217.

Western Water Assessment (WWA). 2008. *Climate Change in Colorado*. Available at: http://cwcb.state.co.us/Home/ClimateChange/ClimateChangeInColoradoReport/.

WestWater Engineering (WestWater). 2009. *Biological Survey Report Energy Fuels-Piñon Ridge Mill, Montrose County Colorado*. WestWater Engineering, Grand Junction, Colorado. **Exhibit D4 of the Mill License Application.**

Wetland Training Institute, Inc. (WTI). 2006. *Pocket Guide to Hydric Soil Field Indicators*, V.6.0., R.J. Pierce (ed.), Wetland Training Institute, Inc. Glenwood, New Mexico, WTI 2006-1,152 p.

Whicker, F. W. 2008. *Baseline Survey of Radionuclides in Animal Tissues at the Proposed Piñon Ridge Millsite*. Department of Environmental & Radiological Health Sciences. Colorado State University. Fort Collins, Colorado. August. **Exhibit I2 of the Mill License Application.**

White, C. M., N. J. Clum, T. J. Cade, and W. G. Hunt. 2002. Peregrine falcon (*Falco peregrinus*). The birds of North America online. Cornell Lab of Ornithology, Ithaca, New York, USA. http://bna.birds.cornell.edu/bna/species/660.

White, S. 2009. Director, Montrose County Planning Director. Personal Communication and E-mail Correspondence with Edge Environmental, Inc. September 18.

Whitfield, M.S., Thordarson, W., Oatfield, W.J., Zimmerman, E.A., and B.F. Rueger. 1983. *Regional Hydrology of the Blanding-Durango Area, Southern Paradox Basin, Utah and Colorado*, U.S. Geological Survey, Water-Resources Investigations Report 83-4218.

Whitson, T. D., L. C. Burrill, S. A. Dewey, D. W. Cudney, B. E. Nelson, R. D. Lee, and Robert Parker. 2004. *Weeds of the West*, Ninth Edition. Western Society of Weed Science in cooperation with Cooperative Extension Services, University of Wyoming. Laramie, Wyoming.

Wick, E.J., T.A. Lytle, and C.M. Haynes. 1981. *Colorado Squawfish and Humpback Chub Population and Habitat Monitoring*, 1979-1980. Endangered Wildlife Investigations SE-3-3. Colorado Division of Wildlife, Denver, Colorado.

Winternitz, B.L. 1998. *Bald Eagle*. in H.E. Kingery (editor). The Colorado Breeding Bird Atlas. Colorado Bird Atlas Partnership; Colorado Division of Wildlife. Denver, Colorado.

Witmer, G.W. and D.S. DeCalesta. 1985. *Effect of Forest Roads on Habitat Use by Roosevelt Elk*. Northwest Science 59:122-125.

BLM_0045423

Woodling, J. 1985. *Colorado's Little Fish – A Guide to the Minnows and Other Lesser Known Fishes in the State of Colorado.* Colorado Division of Wildlife. Denver, Colorado.

World Health Organization. 1996. *Environmental Health Criteria 171 – Diesel Fuel And Exhaust Emissions.* United Nations Environment Programme, International Labour Organisation, World Health Organization. Available at: http://www.inchem.org/documents/ehc/ehc/ehc171.htm.

World Nuclear Association. 2007. Available at: http://www.world-nuclear.org.

World Nuclear Association. 2009a. *World Nuclear Power Reactors and Uranium Requirements*, released October 1, 2009. Available at: http://www.world-nuclear.org/info/reactors.html.

World Nuclear Association. 2009b. *World Uranium Mining*, released July, 2009. Available at: http://www.world-nuclear.org/info/inf23.html.

Yuan, Y.C., J.H.C. Wang and A. Zielen. 1989. *MILDOS-AREA: An Enhanced Version of MILDOS for Large-area Sources.* Argonne National Laboratory (ANL) report ANL/ES-161. June.

Znamenacek, Z. 2009. Colorado Department of Transportation, Traffic Division, Grand Junction, Colorado. Personal communication with Edge Environmental, Inc. October.

BLM_0045424

# Section 9.0
# Consultation and Coordination

## List of Preparers – Edge Environmental, Inc.

| Name | Environmental Report Responsibility |
|------|-------------------------------------|
| Bloomstran, M. | Project Management, Air Quality, Project Description, Document Review |
| Buseck, R. | Vegetation, Invasive Non-Native Species, Wetlands |
| Duce, D. | Soils, Prime and Unique Farmlands |
| Gagnon, N. | Hydrology, Water Quality, Transportation, Alternatives |
| Goodman, S.[1] | Land Use, Transportation, Socioeconomics, Environmental Justice, Cumulative, Cost-Benefit |
| Gulliver, T.[2] | Geology, Water Resources |
| Last, C. | Alternatives, Public and Occupational Health, Waste Management, Document Review |
| Moro, J. | Cultural Resources, Native American Religious Concerns, Visual Resources |
| Reeve, A. | Terrestrial and Aquatic Wildlife, Special Status Species, Noise |
| Thomas, J. | GIS Coordinator, Mapping |
| [1] SLG Consulting, Inc.  [2] Norwest Corporation | |

## List of Persons Contacted during Preparation of the Environmental Report

| Name | Title | Affiliation |
|------|-------|-------------|
| Adams, D. | Senior Professional | Kleinfelder |
| Albee, J. | Statistical Analyst | Colorado State Patrol |
| Allen, K. | Air Quality Task Manager | Kleinfelder |
| Baker, P. | Minerals Program Manager | Utah Department of Natural Resources, Division of Oil, Gas and Mining |
| Barnett, S. | Project Manager | Montrose County |
| Bridges, L. | Principal Professional | Kleinfelder |
| Brown, S. | Certified Health Physicist | SENES Consultants Limited |
| Butterfield, T. | Research Analyst | Utah Department of Transportation Systems Planning and Programming |
| Cannon, S. | Postmaster | La Sal Post Office |
| Carter, J. | Manager | Mustang Water Authority |
| Croll, K. | Archaeologist | ERO Resources Corporation |
| Davis, N. | Realtor | Vista Realty |
| Doyle, S. | Project Environmental Scientist | Golder Associates, Inc. |
| Egidi, P. | Environmental Protection Specialist | CDPHE, Hazardous Materials & Waste Management Division |
| Elliot, J. | Staff Geotechnical Engineer | Golder Associates, Inc. |
| Esker, J. | Staff Meteorologist | Kleinfelder |
| Ethington, E. | Geologist | CDPHE, Hazardous Materials & Waste Management Division |
| Ferguson, J. | Retired Wildlife Biologist | BLM Uncompahgre Field Office |
| Filas, F. | Environmental Manager | Energy Fuels Resources Corporation |
| Fonze, E. | River Recreation Manager | BLM Uncompahgre Field Office |
| Fransioli, P. | Quality Assurance Manager | Kleinfelder |
| Fulbright, J. | Air Monitoring Team Leader | Energy Fuels Resources Corporation |
| Gjerapic, G. | Senior Project Engineer | Golder Associates, Inc. |
| Haag, S. | Director | Basin Clinic |

BLM_0045425

| Name | Title | Affiliation |
|------|-------|-------------|
| Ham, C. | Supervisory Outdoor Recreation Planner | BLM Grand Junction Field Office |
| Head, S. | Executive Director | Montrose Economic Development Corporation |
| Janney, D. | Geoscience Lead | Kleinfelder |
| Johansen, S. | Records Department | Montrose County West End Sheriff's Substation |
| Johnson, J. | Principal and Project Director | Golder Associates, Inc. |
| Johnson, T. | Office Technician | Montrose County Assessor's Office |
| Keckler, R. | Coordinator | Colorado Enterprise Zone Region 10 |
| Kluthe, T. | Staff Professional | Kleinfelder |
| Kuhn, A. | Project Manager | Kleinfelder |
| LaBondy, S. | Engineer | WestWater Engineering |
| Lafrenz, E. | Senior Air Quality Professional | Kleinfelder |
| Larmore, S. | Principal Investigator | ERO Resources Corporation |
| Larson, C. | Principal Professional | Kleinfelder |
| Lear, D. | Town Clerk | Town of Naturita |
| Leon, C. | Employment Specialist | Colorado Rural Workforce Consortium, Delta Workforce Office |
| Little, C. | Owner | TwoLines, Inc. |
| McKinney, R. | Senior Program Manager | Kleinfelder |
| Meyer, J. | Staff Professional I | Kleinfelder |
| Monnig, N. | Staff Hydrologist | Golder Associates, Inc. |
| Monok, B. | Mill Operations Consultant | Energy Fuels Resources Corporation |
| Montoya, M. | President | Visus Consulting Group, Inc. |
| Morrison, K.F. | Senior Project Manager | Golder Associates, Inc. |
| Oliver, C. | President | Board of Directors, Paradox Pipeline Company |
| Osborne, J. | Engineering Manager | Energy Fuels Resources Corporation |
| Popielak, R. | Senior Consultant | Golder Associates, Inc. |
| Rogers, Z. | Environmental Engineer and Air Monitoring Manager | Energy Fuels Resources Corporation |
| Ryan. R. | River Recreation Manager | BLM Durango Field Office |
| Savignac, N. | Consulting Engineer | Kleinfelder |
| Schierman, M. | Senior Health Physicist | Environmental Restoration Group, Inc. |
| Smith, D. | GIS Analyst | Utah Department of Natural Resources, Division of Oil, Gas and Mining |
| Smith, E. | Town Clerk | Town of Nucla |
| Spangler, C. | Human Resources Director | San Miguel Power Association |
| Steele, G. | Vice President – Corporate Marketing | Energy Fuels Resources Corporation |
| Steyskal, M. | Air Quality Professional | Kleinfelder |
| Stindt, D. | Rangeland Management Specialist | U.S. Forest Service, Norwood Field Office |
| Sullivan, S. | Maintenance and Operations Superintendent | Tri-State Generation's Nucla Station |
| Tarlton, S. | Unit Leader | CDPHE, Hazardous Materials & Waste Management Division |
| Tschida, A. | Geotechnical Manager | Kleinfelder |
| Vigil, J. | Chief Financial Officer | Energy Fuels Resources Corporation |
| Waller, S. | Appraiser | Montrose County Assessor's Office |
| Whicker, F. | Professor Emeritus | Colorado State University, Department of Environmental & radiological Health Sciences |
| White, S. | Planning Director | Montrose County |
| Whitfield, A. | Archaeologist | ERO Resources Corporation |

BLM_0045426

# Appendix A

# U.S. Regulatory History of Uranium Mills

BLM_0045427

BLM_0045428

# U.S. Regulatory History of Uranium Mills

Because of the military importance of uranium during the cold war, the federal government encouraged and supported the development of a domestic uranium industry starting in 1946 with the passage of the Atomic Energy Act (AEA). The federal programs, which were initiated by the Atomic Energy Commission (AEC), included guaranteed prices for uranium ore production and guaranteed cost recovery and return on investment for mills. The AEC's programs gradually phased out in the late 1960s and ended in December 1970. The uranium industry contracted substantially in size during this phase-out period; however, the industry grew rapidly in the mid-to late-1970s to supply uranium for the expanding nuclear power plant market.

In response to increasing health and safety concerns regarding uranium milling, the Energy Reorganization Act (ERA) was passed in 1974, which resulted in the creation of the Nuclear Regulatory Commission (NRC or Commission). This was followed in 1978, with the Uranium Mill Tailings Radiation Control Act (UMTRCA), which established NRC as the lead agency for regulating the production containment and monitoring of uranium and thorium mill tailings, which are defined in the AEA under section 11e.(2) as byproduct material. The U.S. Department of Energy (DOE) was required, under UMTRCA, to remediate inactive mill sites and conduct long-term surveillance and monitoring of mill sites after reclamation. The U.S. Environmental Protection Agency (EPA) also played an important role as they issued standards for the control of uranium mill tailings in 1983, which were then integrated into NRC's regulations. NRC implements and enforces those regulations through its licensing process. Colorado is one of five Agreement States that have since been authorized by the NRC to license AEA section 11e.(2) byproduct material under state regulations that are as strict or stricter than the federal regulations.

Since its inception in the mid-1970s, the statutory and regulatory program associated with the uranium industry has undergone massive development with the assistance of federal/state governmental entities, regulators, industry members, and interested stakeholders. There were many "lessons learned" as all of the uranium mills, to date, were built and began operating prior to the development of the current regulations. This has resulted in substantial monitoring, cleanup, and closure costs for older mill facilities, which had little or no controls in place for disposal of byproduct material. The regulatory program implemented by NRC and the Agreement States for uranium recovery facilities is now a mature and comprehensive program that ensures adequate protection of public health and safety and the environment. A detailed regulatory history of uranium mills, also commonly referred to as uranium recovery facilities, is provided below.

**Atomic Energy Commission.** Prior to World War II, the most important use for ores containing radioactive constituents such as uranium was for medical purposes.[1]  In 1939, the splitting of the atom created a viable military use for uranium and, after World War II, the United States Congress enacted the AEA[2] in recognition of the strategic value of possessing significant and secure supplies of uranium for military purposes. The AEA created the AEC and Congress empowered the AEC to procure and control uranium supplies, as well as to create a domestic uranium recovery industry, to build nuclear weapons and to develop and regulate a nuclear power industry.

---

[1] Earle Gray, *The Great Uranium Cartel* at 16 (McClelland & Stewart) (1982).
[2] Atomic Energy Act of 1946, Pub. L. No. 79-585, 60 Stat. 755 (1946).

BLM_0045429

Initially, the AEC recognized that the United States was primarily dependent on uranium ores from the Belgian Congo and, to a lesser extent, Canada for such materials. In order to alleviate this dependency, the AEC sought to stimulate creation of a domestic uranium recovery industry by enacting policies that encouraged private companies and individuals to explore for uranium reserves and to fully develop such reserves. The AEC's biggest obstacle was the lack of a market for domestically-produced uranium in light of the significant exploration, extraction, and processing costs associated with the recovery of such uranium reserves. As a result, the AEC developed a program that guaranteed prices for uranium ore production, that provided bonuses for the initial production at new mines, and that reimbursed producers for transportation and other costs.[3] These incentives were provided through a series of "Domestic Uranium Production Circulars" issued by the AEC. The AEC also established a number of ore-buying stations in areas of anticipated ore production.

In addition to the need for exploration, location, and mining of uranium ores, the AEC recognized that it needed to encourage the development of a domestic uranium milling industry. Accordingly, the AEC set out to encourage the private development of milling facilities by creating an incentive system in the form of agreement by the AEC to purchase processed uranium on terms that allowed private companies to recover the cost of constructing and operating a mill during the life of a particular contract.[4] Under this program, uranium mills were privately constructed and operated pursuant to AEC contracts which guaranteed cost recovery and a reasonable return on investment.[5]

By 1951, the AEC was able to announce that the United States was second among the free nations in uranium mining and processing; by 1955 that the United States was the single largest producer of uranium ore in the world; by 1957 that its emphasis was no longer on expanding production but in maintaining and developing ore reserves for future needs; and by 1963, in a report to the President, that the United States was now self-sufficient in uranium mining and milling and need not depend on foreign sources.[6]

In an announcement issued May 24, 1956, the AEC established a new domestic procurement program for the period from April 1, 1962 through December 31, 1966. This action was taken "in recognition of the need for a continuing Government market in order to maintain a high rate of exploration and development."  One of the main purposes of this program was to provide assurances of a uranium market during the 1962-1966 timeframe, and, thus, assure the continued development of a domestic mining and processing industry until a commercial market developed that could support this industry.

The new program established a minimum price of $8 per pound for concentrate purchased by the AEC subsequent to March 31, 1962. According to the AEC, "[t]he $8 price was determined on the basis of a study of existing contracts, known sources of supply and estimated costs of production."[7]  The program guaranteed a Government market for all uranium concentrates produced by domestic mills from domestic ores, subject to a limitation of 500 tons per year from

---

[3] Gray *supra* note 1 at 42-43.
[4] United States Nuclear Regulatory Commission, *Final Generic Environmental Impact Statement*, NUREG-0706, Volume 1, at 2-1 (September 1980) (hereinafter "GEIS").
[5] *See generally American Mining Congress, Commingled Uranium Mill Tailings-A Historical Perspective,* (March 4, 1985).
[6] Civilian Nuclear Power—A Report to the President, p. 58.
[7] AEC Release No. 150.

BLM_0045430

any one mining property or mining operation. The AEC ore purchase and price guarantees were to be discontinued after March 31, 1962.

The last major change in the AEC procurement policy was announced on November 17, 1962. The announcement established a new program—the "stretch-out" program—for the period of January 1, 1967 through December 31, 1970. AEC requirements through 1970, as then currently estimated, were significantly below the amounts which it had committed to purchase. To effect a better balance between AEC receipts and requirements and to assure an ongoing, operating industry capable of supplying the anticipated (but still non-existent) commercial market, the AEC offered mill operators the option of deferring a portion of the concentrate contracted for delivery to the AEC in 1963-1966, and delivering it in 1967 and 1968. In return, in 1969 and 1970, the AEC would purchase an additional quantity of concentrate equal to the amount deferred. The price to be paid for the deferred material in 1967 and 1968 was to be $8 per pound, the same as in the 1962-1966 contracts. The price to be paid in 1969 and 1970 for concentrates produced from ore mined from properties controlled by the mill contractor would be calculated by use of a formula based on average allowable costs of production during the 1963-1968 period, as determined by an audit of mining and milling costs. The price per pound would be eighty-five (85) percent of the allowable production cost per pound plus $1.60, subject to a maximum price of $6.70 per pound. The price for all concentrates produced from ores purchased from independent producers would be $6.70 per pound of concentrate. The contracts permitted mill operators to cease deliveries to the AEC upon a showing that continued production at the 1969-1970 contract price would result in a net loss. Many of the older mills, mines, and buying stations closed.

**Nuclear Regulatory Commission.** As discussed above, amidst growing concern by congress regarding the health and safety aspects of the uranium industry, the ERA was passed and resulted in the creation of the NRC in January 1975, which assumed the regulatory control of uranium milling as well as enrichment operations and nuclear power generation. Other non-regulatory functions of the AEC, such as the promotion of atomic energy, were transferred to the Energy Research and Development Administration (ERDA), which, in 1977, became the DOE.

In 1978, Congress enacted the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA) to provide the express statutory authority to regulate the production, containment, and monitoring of uranium and thorium mill tailings. UMTRCA was based upon a finding that uranium and thorium mill tailings located at active (i.e., licensed) and inactive (i.e., abandoned) mill sites may pose a significant, potential radiation health hazard to members of the public. In Section 11e.(2) of UMTRCA, tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content were defined as byproduct material, which is now commonly referred to as section 11e.(2) byproduct material. In the implementing regulations, contaminated mill equipment and other materials generated during cleanup and decommissioning were also included in the definition of byproduct material.

In Title I of UMTRCA, Congress established a program to identify and remediate so-called "inactive" sites; that is, sites at which uranium milling operations had occurred in the past or that contained tailings and other wastes produced during such operations and that were not covered by an existing license.  Under the program set out in Title I of UMTRCA, DOE is authorized to enter into "cooperative agreements" with States containing inactive sites for the purpose of remediating those sites. Remedial actions undertaken by DOE under Title I are required to have the NRC's concurrence and to conform with generally applicable standards developed by the EPA for the protection of public health and safety and the environment from potential

BLM_0045431

radiological and non-radiological hazards associated with tailings and other uranium milling wastes.[8] Following remediation of these inactive sites, title to the tailings and wastes from the sites and to the land used for their disposal resides with DOE, and the sites are to be maintained by DOE in perpetuity pursuant to license issued by the NRC.[9] In addition, the NRC is authorized to require that DOE, as the custodian of remediated inactive sites, undertake such monitoring, maintenance, and emergency measures as the NRC may deem necessary to protect public health and safety.[10] The NRC can also require DOE to take other actions that the NRC deems necessary to comply with EPA's generally applicable standards for protection against potential radiological and non-radiological hazards associated with uranium mill tailings and related wastes.[11]

In parallel with the Title I program is Title II, wherein Congress granted EPA and NRC expansive authority to regulate directly all aspects of the management and disposition of uranium mill tailings and related wastes generated at "active" (i.e., licensed) uranium mill tailings sites.[12] Like Title I, Title II establishes a tripartite jurisdictional scheme involving EPA, NRC, and DOE,[13] each of which have a defined role, which for NRC and DOE are similar yet different. Under Title II, NRC has the lead on addressing regulation and closure of sites, and DOE has only the long-term surveillance and monitoring responsibility that it also has under Title I. EPA's responsibilities are essentially the same under both Titles I and II.

Pursuant to Section 275 of the AEA, Congress assigned EPA the authority to promulgate generally applicable standards for the protection of public health and safety and the environment from the potential radiological and non-radiological hazards associated with the possession, transfer, and disposal of 11e.(2) byproduct material.[14] For the non-radiological hazards associated with 11e.(2) byproduct material, these generally applicable standards are to provide equivalent protection to that provided by EPA's Resource Conservation and Recovery Act (RCRA) standards.[15] As a result, 11e.(2) byproduct material is specifically exempted from EPA regulation under RCRA[16] and permitting authority over such material is deliberately withheld from EPA.

Implementing UMTRCA's mandate, EPA issued its first set of generally applicable standards in 1983 which applied only to "inactive" mill tailings sites (i.e., sites regulated under Title I of UMTRCA that were no longer operated under an active license).[17] This occurred 3 years after

---

[8] 42 U.S.C. § 7918 (1994).

[9] 42 U.S.C. § 7914 (1994); *see also* 10 CFR § 40.28.

[10] 42 U.S.C. § 2113(b)(5).

[11] In many respects, the role assigned to DOE under Title of UMTRCA is akin to that of a super "potentially responsible party" or (PRP) under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.*, since DOE is responsible for remediating Title I sites and maintaining them in perpetuity, and the agency is responsible for most of the costs associated with those efforts. Indeed, because of the unique role performed by DOE at Title I sites, Congress deemed it appropriate to specifically exclude those sites from the reach of CERCLA. *See* 42 U.S.C. § 9601(22).

[12] Under Section 274 of the AEA, States can enter into agreements with NRC under which the States assume the authority of the NRC with respect to the regulation of uranium mill tailings and related wastes.

[13] In 1974, the AEC was terminated and divided into a promotional and a regulatory agency. The Energy Research and Development Administration, the precursor to the current DOE, was the promotional agency. The new regulatory agency was NRC.

[14] 42 U.S.C. § 2022(b).

[15] 42 U.S.C. § 2114(a)(3).

[16] *See* 40 CFR § 261.4.

[17] 48 Fed. Reg. 590 (January 5, 1983).

BLM_0045432

NRC issued its Generic Environmental Impact Statement (GEIS) and its initial regulations for uranium milling. EPA established 20 picocuries per meter squared per second (20 pCi/m²/s) radon standard for emissions from reclaimed tailings facilities. EPA's inactive site regulations also established what has come to be known as the "5/15" clean-up standard for radium-226 in soil, primarily due to "windblown" tailings or tailings spills. Under this standard, radium concentrations in soil are to be reduced to levels of no more than 5 pCi/g above background levels in the first 15 cm of soil and no more than 15 pCi/g above background levels in each descending 15 cm soil horizon averaged over 100 square meter segments. In addition, EPA required that disposal systems be designed to provide "reasonable assurance" of achieving the radon emission standard for 1,000 years, but no less than 200 years and to do so without the need for "active" maintenance.

Under UMTRCA, Congress specifically designated NRC as the lead agency for implementing and enforcing EPA's generally applicable standards through licensing.[18] Section 275(d) of the AEA provides that "[i]mplementation and enforcement of the standards promulgated [by EPA] pursuant to subsection (b) of this section shall be the responsibility of the NRC in the conduct of its licensing activities under this Act."[19] In addition, Congress expanded NRC's regulatory authority under Section 84 of the AEA to develop its own requirements for the management of 11e.(2) byproduct material.

The NRC's regulations providing for the safe disposal, containment, and long-term oversight of 11e.(2) byproduct material are contained in Criteria set forth in 10 CFR Part 40, Appendix A. Appendix A sets forth broad, performance-oriented criteria governing uranium recovery activities and waste disposal. At a time when emerging environmental regulations were typically extremely prescriptive (e.g., EPA), Appendix A may be classified as somewhat "ahead of its time" because NRC sought to develop performance-oriented Criteria rather than prescriptive regulations so that uranium recovery licensees could address site-specific circumstances effectively.[20] In total, Appendix A contains thirteen Criteria designed to require licensees to properly locate, manage, and decontaminate and decommission their sites. These Criteria have been adopted in total by the State of Colorado.

In 1983, in response to discontent among licensees seeking to propose site-specific alternatives, Congress amended Section 84 of the AEA to allow NRC to approve licensee-proposed alternatives to the NRC's requirements if the licensee-proposed alternatives provide a level of protection that is "equivalent to, to the extent practicable, or more stringent than" the level of protection afforded by NRC standards.[21] Congress' 1983 amendments also clarified NRC's responsibilities under Section 84(a) of the AEA by specifically requiring that EPA/NRC consider environmental and economic costs and balance those costs against potential risks when developing standards and requirements for the management of 11e.(2) byproduct material.[22]

**Agreement States.** Under the AEA, Congress sought to create a pervasive, comprehensive statutory and regulatory regime in which the AEC/NRC would have the primary authority for

---

[18] 42 U.S.C. § 2022(d).

[19] *Id.*

[20] NRC Staff developed these Appendix A Criteria "mindful of the fact that the problem of mill tailings management is highly site-specific. The precise details of a program can be worked out only when the unique conditions of a site are known." Indeed, the word "requirements" in the Introduction to "Appendix A" was replaced with the word "criteria", NUREG 0706, Volume II A-81, 82.

[21] 52 Fed. Reg. 43, 553 (1987).

[22] Pub. L. No. 97-415 § 22 (1983).

---

BLM_0045433

implementation and enforcement of AEA requirements for the licensing of source, special nuclear,[23] and byproduct material. However, Congress also empowered NRC to withdraw its regulatory authority over AEA materials and to enter into an "agreement" permitting State regulatory authorities to regulate such materials in accordance with the AEA.

Congress enumerated the requirements for States to assume such authority in Section 274 of the AEA entitled *Cooperation With States*.[24]  Under Section 274, Congress authorized the NRC to enter into agreements with State regulatory authorities "providing for discontinuance of the regulatory authority of the Commission …with respect to any one or more of the following materials within the State:

> (1)     byproduct materials as defined in section 11e.(1);
> (2)     byproduct materials as defined in section 11e.(2);
> (3)     source materials;
> (4)     special nuclear materials in quantities not sufficient to form a critical mass."[25]

With respect to 11e.(2) byproduct material, Congress noted that "[t]he NRC shall also retain authority under any such agreement to make a determination that all applicable standards and requirements have been met prior to termination of a license for byproduct material, as defined in section 11e.(2)."[26] Thus, 11e.(2) byproduct material facilities require final "sign-off" by the NRC of a State-approved closure prior to final site closure and license termination.

In June of 1981, representatives of Agreement States complained that NRC was not permitting those States to develop their own site-specific requirements for uranium mill tailings to operate in lieu of the requirements promulgated by NRC, even if those State alternatives provided levels of protection equivalent to those afforded by NRC regulations. Indeed, Senator Pete Domenici summarized the testimony succinctly:

> "NRC is saying that regardless of what the law says with reference to an equivalent, to the extent practicable, or more stringent than, that their interpretation now is since they have no EPA standard, it will be [the NRC standards] or nothing else."[27]

Similar problems were reported by a number of licensees, who found NRC unwilling to accept any licensee-proposed alternatives to the standards promulgated by the NRC. In response, Congress amended the AEA to modify certain sections previously added by UMTRCA.[28] In particular, Section 274 of the AEA was amended to provide Agreement States with explicit authority to adopt "alternatives (including, where appropriate, site-specific alternatives) to the requirements adopted and enforced by the Commission" provided they achieve a level of

---

[23] States under Section 274 of the AEA are only permitted to regulate special nuclear material in quantities not sufficient to form a critical mass. Regulation of special nuclear material in quantities sufficient to form a critical mass is expressly reserved to the NRC.
[24] 42 U.S.C. § 2021.
[25] 42 U.S.C. § 2021(b)(1-4) (emphasis added).
[26] 42 U.S.C. § 2021(c).
[27] Implementation of the Uranium Mill Tailings Radiation Control Act of 1978: Hearings Before the Subcomm. On Nuclear Regulation of the Senate Comm. on Environment and Public Works, 97th Cong. 17 (1981).
[28] Pub. L. No. 97-415, 96 Stat. 2067 (1983).

---

BLM_0045434

protection "equivalent to, to the extent practicable, or more stringent than" the level of protection afforded by NRC's standards.[29]

As the Agreement State program is currently constituted, in order for the NRC to withdraw its regulatory authority over one or more AEA materials listed in Section 274(b), the petitioning State must demonstrate to the NRC the following:

> (1)     that the State desires to assume regulatory responsibility for the relevant AEA material(s); and
>
> (2)     that the State has a radiation control program adequate to protect public health and safety from the potential hazards of the relevant AEA material(s)[30]

Further, the relevant State must adequately demonstrate to the NRC that its radiation safety program for AEA materials is compatible with AEA/NRC requirements.[31] When the NRC determines that the proposed agreement with the relevant State should become effective, the AEA requires that such agreement be published once a week for four consecutive weeks so that the public may submit comments.[32] After such comments are reviewed, the NRC will determine whether or not the agreement should be executed or whether revisions to such agreement are required.

Pursuant to the AEA, the NRC retains the authority to suspend or cancel a State's Section 274 Agreement if it determines that such program is either insufficient to protect public health and safety or is incompatible with the AEA and the NRC's regulatory program. With respect to ongoing review of Agreement State programs, NRC has developed a system of compatibility categories into which all aspects of a State radiation control program, including its statutory and regulatory sources of authority, are classified. STP (Office of State and Tribal Programs) Procedure SA-200 defines the relevant compatibility categories for Agreement States to follow when creating radiation safety program regulations:

> (1)     Category A is defined as "[b]asic radiation protection standard or related definitions, signs, labels or terms necessary for a common understanding of radiation protection principles. *The State program element should be essentially identical to that of NRC;*"
>
> (2)     Category B is defined as "[p]rogram element with significant direct transboundary implications. *The State program element should be essentially identical to that of NRC;*"
>
> (3)     Category C is defined as "[p]rogram element, the essential objectives of which should be adopted by the State to avoid conflicts, duplications or gaps. *The manner in which the essential objectives are addressed need not be the same as NRC, provided the essential objectives are met;*"[33]

These compatibility requirements serve as a primary basis for NRC's STP's Integrated Materials Performance Evaluation Program (IMPEP). Under the IMPEP reviews of Agreement State

---

[29] *Id. codified at* 42 U.S.C. § 2021(o).
[30] 42 U.S.C. § 2021(d).
[31] 42 U.S.C. § 2021(d)(2).
[32] 42 U.S.C. § 2021(e)(1).
[33] United States Nuclear Regulatory Commission, Office of State and Tribal Programs, *Compatibility Categories and Health and Safety Identification for NRC regulations and Other Program Elements,* STP Procedure SA-200 (October 8, 2004). Previously, Category A compatibility regulations required identical language to that of NRC.

---

radiation safety programs are conducted to ensure that such programs are adequately protective of public health and safety and are compatible with AEA/NRC requirements.

**Long-Term Surveillance and Monitoring Program.** Under UMTRCA, DOE is designated as the primary responsible party for long-term surveillance and monitoring of all 11e.(2) byproduct material and the land(s) on which such material is deposited. Under Section 83 of the AEA, as amended, as stated above, Congress mandated that title to all 11e.(2) byproduct material and the land(s) on which such material is deposited be transferred to either (1) the United States or (2) the State in which such material is deposited.[34] In each case where a mill tailings site has been transferred for long-term surveillance and monitoring, the site has been transferred to DOE as States generally do not wish to avail themselves of the opportunity to take title to such sites.

As a result, in January of 1998, DOE, in conjunction with NRC, generated a protocol for the transfer and licensing of mill tailings sites to DOE for long-term surveillance and monitoring following site closure and license termination. This *Working Protocol of Long-Term Licensing of Commercial Uranium Mills* sets forth a number of principles for NRC and DOE to follow in affecting the transfer of these sites. For example, the Protocol specifies that NRC will require current licensees to demonstrate that all applicable NRC requirements have been met before the NRC will terminate current licenses. In addition, the Protocol provides that NRC "will not terminate any site-specific license until the site licensee has demonstrated that all issues with state regulatory authorities have been resolved."[35]  This provision of the Protocol was consistent with NRC's interpretation of "concurrent jurisdiction" at the time.

As a general proposition, regardless of whether a mill tailings facility is located in an Agreement or non-Agreement State, the NRC has the final "sign-off" on whether site closure and license termination is proper.[36]  As a result, the NRC has generally required that DOE be informed of the status of mill tailings sites destined for site closure and license termination and that DOE concur with all proposed site-specific issues such as groundwater containment and monitoring, institutional controls, and engineered barriers. Licensees have maintained, however, that this "concurrence" requirement is merely inter-agency courtesy, as any final NRC decision regarding final site closure is binding on DOE.

When an 11e.(2) byproduct material site has satisfied its NRC-approved reclamation plan, pursuant to 10 CFR § 40.51, the licensee is then required to transfer title to all 11e.(2) byproduct material and the lands within the long-term surveillance site boundary to DOE or the State in which the site is located.[37] This transfer must be completed at no cost to the government (i.e., federal or state government) and must be accompanied by a transfer of funds equal to the amount prescribed in Appendix A, Criterion 10 or to another amount designated by NRC. At the time of transfer, as required by 10 CFR § 40.51(c), DOE or the State will possess the site as a licensee of NRC in perpetuity and subject to all appropriate site-specific license conditions, as imposed by the NRC.[38]

---

[34] 42 U.S.C. § 2113(b)(1)(A).

[35] *See* United State Nuclear Regulatory Commission, *License Termination/Site Transfer Protocol Between the U.S. Department of Energy and the U.S. Nuclear Regulatory Commission* (1998).

[36] *Id.*

[37] 10 CFR § 40.51((b).

[38] 10 CFR § 40.51(c).

BLM_0045436

# Appendix B

# Population Distribution Data

BLM_0045437

# Population Distribution Data

Current and future populations within an 80 km radius of the proposed Piñon Ridge Mill site were estimated for 16 compass sectors, by concentric circles of 0.1, 0.5, 1.0, 2.0, 3.0, 4.0, 5.0, 10.0, 20.0, 30.0, 40.0, 50.0, 60.0, 70.0, and 80.0 km from the center of the mill site, for a total of 240 sectors. Population estimates for each sector were derived using county population forecasts from the Colorado Department of Local Affairs (CDOLA), Demography Office, and Utah Governor's Office of Planning and Budget. Population subtotals by sector and compass point, as well as the total population for the expected first year of mill operation (2012), census years through the anticipated life of the mill (2020 and 2030), and the final year of CDOLA population forecasts are shown in Tables B1 through B4. Graphic representations of these population distributions are shown in Figures B1 through B4.

Sectoral populations were estimated by combining county-level population forecasts with the most recent available population data for Census Tract Block Groups. in the United States. ArcInfo and Xcel were used to extract data from U.S. Census 2008 population distribution estimates for Census Tract Block Groups located wholly or partially within the 80 km radius of the center of the proposed mill site. Urban areas within each county were generally assigned their own block group. To assign a population to each sector, a percentage area of each sector within one or more block groups was calculated for all the block groups.

Sectoral population estimates calculated using the percentage Block Group approach were modified to account for public land within the 80 km radius that does not contain residents. These areas, which include BLM, and U.S. Forest Service administered lands, were assigned a zero population. Population estimates for sectors containing federal lands were recalculated to account for the portion of acreage comprised of federal lands and distributed across the remaining area.

**References**

Utah Governor's Office of Planning and Budget. 2009. County Population Estimates and Projections. Department of Economic Analysis. Available at: http://governor.utah.gov/dea/upec.html.

U.S. Census Bureau. 2009. 2008 Census Tract Block Group population estimates obtained through ArcInfo and Xcel.

**Table B-1**
**2012 Population within 50 mile (80 km) Radius of the Site**

| Sector | Radium in km | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0.1 | 0.5 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 10.0 | 20.0 | 30.0 | 40.0 | 50.0 | 60.0 | 70.0 | 80.0 | |
| N-NNE | 0.02 | 0.44 | 1.37 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 266 | 1,232 | 2,132 | 3,634 |
| NNE-NE | 0.02 | 0.44 | 1.37 | 5 | 0 | 0 | 0 | 0 | 0 | 25 | 0 | 6 | 45 | 719 | 3,736 | 4,537 |
| NE – ENE | 0.02 | 0.44 | 1.37 | 5 | 6 | 1 | 0 | 0 | 124 | 50 | 0 | 66 | 1,537 | 928 | 13,223 | 15,943 |
| ENE-E | 0.02 | 0.44 | 1.37 | 5 | 9 | 13 | 2 | 0 | 318 | 405 | 5 | 0 | 2,876 | 6,446 | 22,429 | 32,511 |
| E-ESE | 0.02 | 0.44 | 1.37 | 5 | 4 | 2 | 26 | 78 | 458 | 607 | 2,479 | 316 | 72 | 2,426 | 3,433 | 9,908 |
| ESE – SE | 0.02 | 0.44 | 1.37 | 5 | 6 | 0 | 5 | 78 | 37 | 499 | 491 | 471 | 547 | 2,868 | 1,761 | 6,770 |
| SE – SSE | 0.02 | 0.44 | 1.37 | 5 | 1 | 0 | 0 | 0 | 33 | 127 | 728 | 409 | 682 | 451 | 119 | 2,555 |
| SSE –S | 0.02 | 0.44 | 1.37 | 3 | 0 | 0 | 0 | 0 | 12 | 174 | 459 | 7 | 67 | 363 | 799 | 1,887 |
| S – SSW | 0.02 | 0.44 | 1.37 | 3 | 0 | 0 | 0 | 0 | 15 | 164 | 41 | 174 | 696 | 461 | 787 | 2,343 |
| SSW – SW | 0.02 | 0.44 | 1.37 | 3 | 0 | 0 | 0 | 0 | 25 | 5 | 232 | 320 | 391 | 923 | 1,732 | 3,632 |
| SW – WSW | 0.02 | 0.44 | 1.37 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 661 | 754 | 1,011 | 1,135 | 96 | 3,664 |
| WSW – W | 0.02 | 0.44 | 1.37 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 406 | 813 | 1,255 | 770 | 875 | 4,144 |
| W – WNW | 0.02 | 0.44 | 1.37 | 0 | 0 | 0 | 0 | 0 | 0 | 28 | 342 | 420 | 670 | 882 | 970 | 3,315 |
| WNW – NW | 0.02 | 0.44 | 1.37 | 0 | 1 | 0 | 0 | 6 | 217 | 125 | 114 | 167 | 47 | 1,371 | 8,508 | 10,559 |
| NW – NNW | 0.02 | 0.44 | 1.37 | 6 | 9 | 7 | 0 | 89 | 195 | 68 | 89 | 420 | 629 | 929 | 1,644 | 4,086 |
| NNW – N | 0.02 | 0.44 | 1.37 | 3 | 2 | 1 | 0 | 3 | 0 | 0 | 0 | 102 | 381 | 680 | 2,163 | 3,337 |
| Total | 0.3 | 7 | 21 | 54 | 38 | 24 | 32 | 254 | 1,437 | 2,303 | 6,048 | 4,447 | 11,170 | 22,583 | 64,407 | 112,826 |

Sources:  CDOLA, 2009; Utah Governor's Office of Planning & Budget, 2009 and U.S. Census Bureau, 2009c.

BLM_0045439

**Table B-2**
**2020 Population within 50 mile (80 km) Radius of the Site**

| Sector | Radius in km | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0.1 | 0.5 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 10.0 | 20.0 | 30.0 | 40.0 | 50.0 | 60.0 | 70.0 | 80.0 | |
| N-NNE | 0.02 | 0.55 | 1.71 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 313 | 1,452 | 2,513 | 4,284 |
| NNE-NE | 0.02 | 0.55 | 1.71 | 6 | 0 | 0 | 0 | 0 | 0 | 31 | 0 | 7 | 53 | 899 | 4,664 | 5,662 |
| NE – ENE | 0.02 | 0.55 | 1.71 | 7 | 7 | 2 | 0 | 0 | 154 | 62 | 0 | 83 | 1,914 | 1,156 | 16,516 | 19,902 |
| ENE-E | 0.02 | 0.55 | 1.71 | 7 | 11 | 16 | 3 | 0 | 397 | 504 | 7 | 0 | 3,581 | 8,027 | 27,932 | 40,486 |
| E-ESE | 0.02 | 0.55 | 1.71 | 7 | 6 | 2 | 32 | 98 | 570 | 756 | 3,087 | 395 | 90 | 3,042 | 4,301 | 12,388 |
| ESE – SE | 0.02 | 0.55 | 1.71 | 7 | 7 | 0 | 6 | 97 | 47 | 623 | 617 | 591 | 687 | 3,601 | 2,211 | 8,498 |
| SE – SSE | 0.02 | 0.55 | 1.71 | 6 | 1 | 0 | 0 | 0 | 42 | 160 | 914 | 509 | 793 | 521 | 137 | 3,084 |
| SSE –S | 0.02 | 0.55 | 1.71 | 4 | 0 | 0 | 0 | 0 | 15 | 219 | 577 | 8 | 77 | 420 | 932 | 2,255 |
| S – SSW | 0.02 | 0.55 | 1.71 | 4 | 0 | 0 | 0 | 0 | 19 | 205 | 51 | 205 | 804 | 533 | 915 | 2,739 |
| SSW – SW | 0.02 | 0.55 | 1.71 | 4 | 0 | 0 | 0 | 0 | 31 | 6 | 287 | 363 | 418 | 964 | 1,798 | 3,874 |
| SW – WSW | 0.02 | 0.55 | 1.71 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 686 | 783 | 1,049 | 1,178 | 99 | 3,804 |
| WSW – W | 0.02 | 0.55 | 1.71 | 0 | 0 | 0 | 0 | 0 | 0 | 25 | 421 | 844 | 1,302 | 799 | 908 | 4,301 |
| W – WNW | 0.02 | 0.55 | 1.71 | 0 | 0 | 0 | 0 | 0 | 0 | 29 | 355 | 436 | 696 | 916 | 1,006 | 3,440 |
| WNW – NW | 0.02 | 0.55 | 1.71 | 0 | 2 | 0 | 0 | 7 | 270 | 156 | 118 | 177 | 51 | 1,495 | 9,327 | 11,606 |
| NW – NNW | 0.02 | 0.55 | 1.71 | 7 | 11 | 9 | 0 | 111 | 243 | 85 | 104 | 475 | 689 | 1,018 | 1,802 | 4,556 |
| NNW – N | 0.02 | 0.55 | 1.71 | 4 | 2 | 2 | 0 | 3 | 0 | 0 | 0 | 120 | 449 | 802 | 2,547 | 3,931 |
| **Total** | 0.36 | 9 | 26 | 67 | 48 | 30 | 40 | 316 | 1,790 | 2,864 | 7,225 | 4,997 | 12,967 | 26,824 | 77,608 | 134,811 |
| Sources: CDOLA, 2009; Utah Governor's Office of Planning & Budget, 2009; U.S. Census Bureau, 2009c | | | | | | | | | | | | | | | | |

BLM_0045440

**Table B-3**
**2030 Population within 50 mile (80-km) Radius of the Site**

| Sector | Radius in km | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0.1 | 0.5 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 10.0 | 20.0 | 30.0 | 40.0 | 50.0 | 60.0 | 70.0 | 80.0 | |
| N-NNE | 0.03 | 0.68 | 2.13 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 382 | 1,773 | 3,068 | 5,231 |
| NNE-NE | 0.03 | 0.68 | 2.13 | 7 | 0 | 0 | 0 | 0 | 0 | 38 | 0 | 9 | 65 | 1,140 | 5,912 | 7,174 |
| NE – ENE | 0.03 | 0.68 | 2.13 | 9 | 9 | 2 | 0 | 0 | 192 | 77 | 0 | 103 | 2,383 | 1,439 | 20,841 | 25,058 |
| ENE-E | 0.03 | 0.68 | 2.13 | 9 | 14 | 20 | 4 | 0 | 494 | 628 | 8 | 0 | 4,458 | 9,968 | 34,651 | 50,255 |
| E-ESE | 0.03 | 0.68 | 2.13 | 9 | 7 | 2 | 40 | 122 | 710 | 941 | 3,844 | 495 | 114 | 3,829 | 5,172 | 15,286 |
| ESE – SE | 0.03 | 0.68 | 2.13 | 9 | 9 | 0 | 7 | 121 | 58 | 781 | 778 | 745 | 867 | 4,541 | 2,788 | 10,707 |
| SE – SSE | 0.03 | 0.68 | 2.13 | 8 | 1 | 0 | 0 | 0 | 53 | 202 | 1,152 | 639 | 946 | 618 | 163 | 3,785 |
| SSE –S | 0.03 | 0.68 | 2.13 | 5 | 0 | 0 | 0 | 0 | 19 | 276 | 727 | 10 | 92 | 499 | 1,112 | 2,744 |
| S – SSW | 0.03 | 0.68 | 2.13 | 5 | 0 | 0 | 0 | 0 | 24 | 259 | 65 | 246 | 955 | 634 | 1,090 | 3,281 |
| SSW – SW | 0.03 | 0.68 | 2.13 | 5 | 0 | 0 | 0 | 0 | 39 | 8 | 359 | 426 | 467 | 1,055 | 1,954 | 4,315 |
| SW – WSW | 0.03 | 0.68 | 2.11 | 1 | 0 | 0 | 0 | 0 | 4 | 3 | 746 | 851 | 1,140 | 1,280 | 108 | 4,136 |
| WSW – W | 0.03 | 0.68 | 1.62 | 0 | 0 | 0 | 0 | 0 | 0 | 27 | 458 | 917 | 1,415 | 868 | 987 | 4,675 |
| W – WNW | 0.03 | 0.68 | 1.55 | 0 | 0 | 0 | 0 | 0 | 0 | 31 | 386 | 474 | 756 | 995 | 1,094 | 3,740 |
| WNW – NW | 0.03 | 0.68 | 2.05 | 0 | 2 | 0 | 0 | 9 | 336 | 194 | 128 | 191 | 55 | 1,608 | 10,017 | 12,544 |
| NW – NNW | 0.03 | 0.68 | 2.13 | 9 | 13 | 11 | 0 | 138 | 303 | 105 | 125 | 541 | 740 | 1,094 | 1,936 | 5,017 |
| NNW – N | 0.03 | 0.68 | 2.13 | 5 | 3 | 2 | 0 | 4 | 0 | 0 | 0 | 147 | 548 | 979 | 3,104 | 4,794 |
| **Total** | 0.45 | 11 | 33 | 83 | 59 | 37 | 50 | 393 | 2,230 | 3,571 | 8,777 | 5,795 | 15,384 | 32,322 | 93,996 | 162,743 |
| Sources: CDOLA, 2009; Utah Governor's Office of Planning & Budget, 2009; U.S. Census Bureau, 2009c | | | | | | | | | | | | | | | | |

BLM_0045441

**Table B-4**
**2035 Population within 50 mile (80-km) Radius of the Site**

| Sector | Radius in km | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0.1 | 0.5 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 10.0 | 20.0 | 30.0 | 40.0 | 50.0 | 60.0 | 70.0 | 80.0 | Total |
| N-NNE | 0.03 | 0.74 | 2.30 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 415 | 1,926 | 3,332 | 5,681 |
| NNE-NE | 0.03 | 0.74 | 2.30 | 8 | 0 | 0 | 0 | 0 | 0 | 41 | 0 | 9 | 71 | 1,228 | 6,369 | 7,729 |
| NE – ENE | 0.03 | 0.74 | 2.30 | 9 | 10 | 2 | 0 | 0 | 207 | 83 | 0 | 111 | 2,576 | 1,556 | 22,470 | 27,028 |
| ENE-E | 0.03 | 0.74 | 2.30 | 9 | 15 | 21 | 4 | 0 | 534 | 678 | 9 | 0 | 4,819 | 10,765 | 37,412 | 54,270 |
| E-ESE | 0.03 | 0.74 | 2.30 | 9 | 8 | 3 | 43 | 131 | 767 | 1,017 | 4,156 | 539 | 124 | 4,181 | 5,551 | 16,532 |
| ESE – SE | 0.03 | 0.74 | 2.30 | 9 | 10 | 0 | 8 | 131 | 63 | 849 | 852 | 815 | 948 | 4,968 | 3,051 | 11,706 |
| SE – SSE | 0.03 | 0.74 | 2.30 | 9 | 1 | 0 | 0 | 0 | 57 | 221 | 1,260 | 698 | 1,023 | 668 | 176 | 4,117 |
| SSE –S | 0.03 | 0.74 | 2.30 | 6 | 0 | 0 | 0 | 0 | 21 | 302 | 795 | 11 | 99 | 539 | 1,196 | 2,972 |
| S – SSW | 0.03 | 0.74 | 2.30 | 6 | 0 | 0 | 0 | 0 | 26 | 283 | 71 | 266 | 1,032 | 684 | 1,170 | 3,542 |
| SSW – SW | 0.03 | 0.74 | 2.30 | 5 | 0 | 0 | 0 | 0 | 43 | 9 | 392 | 456 | 492 | 1,101 | 2,034 | 4,535 |
| SW – WSW | 0.03 | 0.74 | 2.28 | 1 | 0 | 0 | 0 | 0 | 5 | 3 | 777 | 886 | 1,187 | 1,333 | 112 | 4,306 |
| WSW – W | 0.03 | 0.74 | 1.75 | 0 | 0 | 0 | 0 | 0 | 0 | 28 | 477 | 955 | 1,473 | 904 | 1,028 | 4,867 |
| W – WNW | 0.03 | 0.74 | 1.68 | 0 | 0 | 0 | 0 | 0 | 0 | 33 | 402 | 494 | 787 | 1,036 | 1,139 | 3,893 |
| WNW – NW | 0.03 | 0.74 | 2.22 | 0 | 2 | 0 | 0 | 9 | 363 | 210 | 134 | 198 | 56 | 1,653 | 10,288 | 12,919 |
| NW – NNW | 0.03 | 0.74 | 2.30 | 9 | 15 | 12 | 0 | 149 | 237 | 114 | 134 | 571 | 760 | 1,123 | 1,988 | 5,204 |
| NNW – N | 0.03 | 0.74 | 2.30 | 5 | 3 | 2 | 0 | 5 | 0 | 0 | 0 | 159 | 596 | 1,063 | 3,368 | 5,204 |
| **Total** | 0.5 | 12 | 36 | 90 | 64 | 40 | 54 | 425 | 2,413 | 3,872 | 9,458 | 6,169 | 16,459 | 34,729 | 100,683 | 174,505 |
| Sources: CDOLA, 2009; Utah Governor's Office of Planning & Budget, 2009; U.S. Census Bureau, 2009c | | | | | | | | | | | | | | | | |

BLM_0045442

Appendix B                                                    Population Distribution Data



**Figure B-1**

**Population Distribution
within 50 miles (80 km) of the Site 2012**

BLM_0045443



**Figure B-2**

**Population Distribution
within 50 miles (80 km) of the Site 2020**

BLM_0045444



**Figure B-3**

**Population Distribution
within 50 miles (80 km) of the Site 2030**



Figure B-4

Population Distribution
within 50 miles (80 km) of the Site 2035

Population
- 0 - 200
- 201 - 1000
- 1001 - 2500
- 2501 - UP

BLM_0045446



| | |
|---|---|
| Home | History |
| About the Mill | About Nuclear Energy |
| Economic Development | Photos |
| Commitment to Transparency | Contact |
| Schedule | Links |
| About Energy Fuels | |







## Schedule

Montrose County approved Energy Fuels' Special Use Permit on September 30, 2009. Energy Fuels subsequently submitted the Material License Application and Environmental Report to the State of Colorado on November 18, 2009.

On March 7, 2011 , the State of Colorado issued a Radioactive Materials License to Energy Fuels.  Also, on October 26, 2011, Energy Fuels received EPA approval for the mill. While there are other permits needed before construction can begin, the Radioactive Materials License is the primary permit needed to build and operate the Piñon Ridge Mill.

Subject to the outcome of current litigation on the License and financing, Energy Fuels anticipates starting construction in late 2012 or 2013.

2008 ©Piñon Ridge Mill

BLM_0045447

# ENVIRON

ENVIRON International Corporation

**Final Report**

**DEVELOPMENT OF 2012 OIL AND GAS EMISSIONS PROJECTIONS
FOR THE PICEANCE BASIN**

Prepared by
Amnon Bar-Ilan
Rajashi Parikh
John Grant
Alison K. Pollack
ENVIRON International Corporation
773 San Marin Drive, Suite 2115
Novato, CA 94998

Doug Henderer
Daniel Pring
Buys & Associates, Inc.
300 E. Mineral Ave., Suite 10
Littleton, CO 80122

Kathleen Sgamma
Independent Petroleum Association of Mountain States (IPAMS)
410 17th Street, Suite 1920
Denver, CO 80202

Phase III Oil & Gas Emissions Inventory Project
http://www.wrapair.org/forums/ssjf/documents/eictts/oilgas.html

January 21, 2009

773 San Marin Drive, Suite 2115, Novato, CA 94998                415.899.0700

BLM_0045448

*January 2009*

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**.................................................................................................1

**GEOGRAPHIC GROUPING**.............................................................................2

**PARAMETERS PROJECTED** ...........................................................................3

**PROJECTION METHODOLOGIES FOR GEOGRAPHIC GROUPINGS** .........................5

    Garfield County ...........................................................................6
    Rio Blanco County.........................................................................13
    Mesa County ...............................................................................18
    Moffat County..............................................................................23
    Routt County ...............................................................................28
    All Other Counties .......................................................................32

**SCALING FACTOR DEVELOPMENT AND UNCONTROLLED 2012 EMISSIONS**......38

    Garfield, Rio Blanco, Mesa, Moffat and Routt Counties .................................38
    All Other Production Counties in the Piceance Basin .......................................38

**CONTROLLED 2012 EMISSIONS**.....................................................................41

    Nonroad Diesel Engine Standards and Fuel Sulfur Standards...........................41
    New Source Performance Standards for Stationary Spark-Ignited Engines.............41
    State of Colorado Regulation 7 – Glycol Dehydrators .....................................42
    State of Colorado Regulation 7 – Condensate Tanks .......................................43

**SUMMARY RESULTS**.......................................................................................44

**REFERENCES**...................................................................................................49

## TABLES

Table 1.   Scaling parameter for each oil and gas source category considered in this inventory ...............................................................................................3

Table 2.   Comparison of actual and predicted gas production volumes for Garfield County for the years 1999 – 2006 using the Rulison-type projection analysis ..........10

Table 3.   Comparison of actual and predicted gas production volumes for Rio Blanco County for the years 1999 – 2006 using the Rulison-type projection analysis ..........15

Table 4.   Comparison of actual and predicted gas production volumes for Mesa County for the years 1999 – 2006 using the Rulison-type projection analysis .......................20

Table 5.   Scaling factors for the five parameters used in the projection analysis for the six geographic groupings in the Piceance Basin.......................................39

BLM_0045449

*January 2009*

**E N V I R O N**

Table 6.   Summary of federal and state "on-the-books" regulations affecting the oil and gas source categories considered in this inventory ........................................................40

Table 7.   Federal NSPS emissions standards for engines less than 25 horsepower ..................41

Table 8.   Federal NSPS emissions standards for engines greater than 25 horsepower but less than 100 horsepower ..............................................................................................42

Table 9.   Federal NSPS emissions standards for engines greater than 25 horsepower but less than 100 horsepower ..............................................................................................42

Table 10.  2012 emissions of all criteria pollutants by county for the Piceance Basin ................47

Table 11.  2012 NOx emissions [ton/yr] by county and by source category for the Piceance Basin ...................................................................................................................47

Table 12.  2012 VOC emissions [ton/yr] by county and by source category for the Piceance Basin ...................................................................................................................48

## FIGURES

Figure 1.   Well count historical data (from the IHS database) for Garfield County and projections to 2012 ..........................................................................................6

Figure 2.   Spud count historical data (from the IHS database) for Garfield County and projections to 2012 ..........................................................................................7

Figure 3.   Gas production historical data (from the IHS database) for Garfield County and projections to 2012 ..............................................................................8

Figure 4.   A Rulison-type curve showing well decline for an individual typical well in the Piceance Basin ........................................................................................9

Figure 5.   Condensate production historical data (from the IHS database) for Garfield County and projections to 2012 ..........................................................11

Figure 6.   Oil production historical data (from the IHS database) for Garfield County and projections to 2012 ..........................................................................12

Figure 7.   Well count historical data (from the IHS database) for Rio Blanco County and projections to 2012 ..........................................................................13

Figure 8.   Spud count historical data (from the IHS database) for Rio Blanco County and projections to 2012 ..........................................................................14

Figure 9.   Gas production historical data (from the IHS database) for Rio Blanco County and projections to 2012 ..........................................................................15

Figure 10.  Condensate production historical data (from the IHS database) for Rio Blanco County and projections to 2012 ..............................................................16

Figure 11.  Oil production historical data (from the IHS database) for Rio Blanco County and projections to 2012 ..........................................................................17

Figure 12.  Well count historical data (from the IHS database) for Mesa County and projections to 2012 ..........................................................................................18

Figure 13.  Spud count historical data (from the IHS database) for Mesa County and projections to 2012 ..........................................................................................19

Figure 14.  Gas production historical data (from the IHS database) for Mesa County and projections to 2012 ..........................................................................................20

Figure 15.  Condensate production historical data (from the IHS database) for Mesa County and projections to 2012 ..............................................................21

Figure 16.  Oil production historical data (from the IHS database) for Mesa County and projections to 2012 ..........................................................................................22

Figure 17.  Well count historical data (from the IHS database) for Moffat County and projections to 2012 ..........................................................................................23

BLM_0045450

Figure 18.  Spud count historical data (from the IHS database) for Moffat County and projections to 2012 ..................................................................................24

Figure 19.  Gas production historical data (from the IHS database) for Moffat County and projections to 2012 ..........................................................................25

Figure 20.  Condensate production historical data (from the IHS database) for Moffat County and projections to 2012 ..............................................................26

Figure 21.  Oil production historical data (from the IHS database) for Moffat County and projections to 2012 ..........................................................................27

Figure 22.  Well count historical data (from the IHS database) for Routt County and projections to 2012 ..................................................................................28

Figure 23.  Spud count historical data (from the IHS database) for Routt County and projections to 2012 ..................................................................................29

Figure 24.  Gas production historical data (from the IHS database) for Routt County and projections to 2012 ..........................................................................30

Figure 25.  Condensate production historical data (from the IHS database) for Routt County and projections to 2012 ..............................................................31

Figure 26.  Oil production historical data (from the IHS database) for Routt County and projections to 2012 ..........................................................................32

Figure 27.  Well count historical data (from the IHS database) for all other production counties in the Piceance Basin combined and projections to 2012 ..............................................................................................................33

Figure 28.  Spud count historical data (from the IHS database) for all other production counties in the Piceance Basin combined and projections to 2012 ..............................................................................................................34

Figure 29.  Gas production historical data (from the IHS database) for all other production counties in the Piceance Basin combined and projections to 2012 ..............................................................................................................35

Figure 30.  Condensate production historical data (from the IHS database) for all other production counties in the Piceance Basin combined and projections to 2012 ............................................................................................36

Figure 31.  Oil production historical data (from the IHS database) for all other production counties in the Piceance Basin combined and projections to 2012 ..............................................................................................................37

Figure 32.  2012 NOx emissions by source category and by county in the Piceance Basin ..................................................................................................45

Figure 33.  2012 VOC emissions by source category and by county in the Piceance Basin ..................................................................................................45

Figure 34.  2012 NOx emissions contributions by source category in the Piceance Basin ..............................................................................................46

Figure 35.  2012 VOC emissions contributions by source category in the Piceance Basin ..............................................................................................46

BLM_0045451



# INTRODUCTION

This document outlines the projection methodologies used in generating the 2012 emissions projections from oil and gas sources in the Piceance Basin.  These methodologies will use as a starting point the 2006 baseline Piceance Basin oil and gas emissions inventory, described in the baseline emissions report entitled "Development of Baseline 2006 Emissions from Oil and Gas Activity in the Piceance Basin".

This methodology description is broken down into subsections which describe:

- <u>Geographic grouping of data</u> – regional differences in production or activity are factored into the projection methodology by geographic region
- <u>Projected parameters</u> – five basic parameters are projected forward to 2012 for purposes of developing scaling factors: well counts, spud counts, gas production, oil production and condensate production
- <u>Scaling factors and developing uncontrolled emissions projections</u> – the projected parameters are used to develop scaling factors (incorporating geographic groupings), and these scaling factors are applied to the 2006 baseline emissions
- <u>Application of "on-the-books" regulations and control measures</u> – existing regulations are summarized for their impacts on the future year emissions and applied to adjust the uncontrolled 2012 inventory.

Projections for years beyond 2012 (not addressed in this methodology) will likely include additional parameters and will be based on these 2012 projections as the start year.  The methodology for developing far future year projections will be detailed in a separate analysis.

Following the discussion of the methodology, the results of the 2012 emissions projections for the Piceance Basin are presented in graphical and tabular formats.

BLM_0045452

## GEOGRAPHIC GROUPING

The projections for 2012 have been conducted separately for 6 geographic groupings in the Piceance Basin:

1. Garfield County
2. Rio Blanco County
3. Mesa County
4. Moffat County
5. Routt County
6. All other counties in the Piceance Basin combined

It should be noted that while Chaffee, Eagle, and Lake Counties are included in the "all other counties" grouping, there is no production or active wells in these counties and they are not considered further in this analysis.

The reason for conducting this grouping is that the majority of 2006 gas production occurs in Garfield County, and the majority of oil production occurs in Rio Blanco County. Mesa, Moffat, and Routt Counties have small but non-negligible production as well. In 2006, Garfield County accounts for approximately 81% of gas production in the Piceance Basin, while Rio Blanco County accounts for approximately 79% of oil production in the Piceance Basin. Similarly, in 2006, Garfield County accounts for approximately 60% of active wells in the basin, while Rio Blanco accounts for approximately 27% of active wells in the basin. Garfield County alone accounts for approximately 74% of spuds occurring in the basin in 2006, indicating that it is the predominant area of activity for future development. For this reason the focus of the geographic grouping is Garfield and Rio Blanco Counties, with the additional groupings listed above used to provide detailed projections for the entire Piceance Basin.

BLM_0045453

*January 2009*



# PARAMETERS PROJECTED

The 2012 projections for oil and gas emissions in the Piceance Basin rely on scaling 5 parameters:

- Well counts
- Spud counts
- Gas production
- Oil production
- Condensate production

These five parameters are considered because each parameter applies to the emissions projections of one or more source categories.  Note that the analysis uses data from the IHS database, which defines condensate production as liquid hydrocarbon production from wells which are classified as gas wells.  Similarly, oil production is defined as liquid hydrocarbon production from wells which are classified as oil wells.  The classification of gas vs. oil wells in the IHS database is based on the gas-oil ratio (GOR) of the well, using a cutoff GOR defined by the Colorado Oil and Gas Conservation Commission (COGCC).  This is the only distinction made between condensate and oil production.

The mapping of source category to projection parameter is shown below in Table 1.

**Table 1.** Scaling parameter for each oil and gas source category considered in this inventory.

| Source | SCC | Description | Projection Parameter |
|--------|-----|-------------|----------------------|
| Unpermitted | 2310000100 | Heaters | well count |
| Unpermitted | 2310000220 | Drill rigs | spud count |
| Unpermitted | 2310000230 | Workover rigs | well count |
| Unpermitted | 2310000300 | Pneumatic devices | well count |
| Unpermitted | 2310000700 | Fugitives | well count |
| Unpermitted | 2310000801 | Truck loading of condensate liquid | condensate production |
| Unpermitted | 2310000802 | Truck loading of oil | oil production |
| Unpermitted | 2310000820 | Gas plant truck loading | condensate production |
| Unpermitted | 2310001610 | Venting - initial completions | spud count |
| Unpermitted | 2310001620 | Venting - recompletions | spud count |
| Unpermitted | 2310001630 | Venting - blowdowns | gas production |
| Unpermitted | 2310002230 | Condensate tanks | condensate production |
| Regulation 7 | 2310002240 | Oil tanks | oil production |
| Unpermitted | 2310003100 | Exempt engines | well count |
| Unpermitted | 2310003200 | Pneumatic pumps | well count |
| Unpermitted | 2310003500 | Flaring | gas production |
| APENS | 20200201 | Compressor Engines | gas production |
| APENS | 20200202 | Compressor Engines | gas production |
| APENS | 20200203 | Compressor Engines | gas production |
| APENS | 20200252 | Compressor Engines | gas production |
| APENS | 20200253 | Compressor Engines | gas production |
| APENS | 20200254 | Compressor Engines | gas production |
| APENS | 31000101 | Permitted Fugitives | oil production |
| APENS | 31000102 | Oil Production, Miscellaneous Well: General | oil production |
| APENS | 31000123 | Oil Production, Well Casing Vents | oil production |
| APENS | 31000130 | Oil Production, Fugitives: Compressor Seals | oil production |
| APENS | 31000132 | Oil Production, Atmospheric Wash Tank: Flashing Loss | oil production |

BLM_0045454

*January 2009*

**ENVIRON**

| Source | SCC | Description | Projection Parameter |
|--------|-----|-------------|---------------------|
| APENS | 31000199 | Oil Production, Processing Operations: Not Classified | oil production |
| APENS | 31000201 | Natural Gas Production, Gas Sweetening: Amine Process | gas production |
| APENS | 31000202 | Natural Gas Production, Gas Stripping Operations | gas production |
| APENS | 31000203 | Compressor Engines | gas production |
| APENS | 31000205 | Natural Gas Production, Flares | gas production |
| APENS | 31000207 | Permitted Fugitives | gas production |
| APENS | 31000209 | Natural Gas Production, Incinerators Burning Waste Gas or Augmented Waste Gas | gas production |
| APENS | 31000215 | Natural Gas Production, Flares Combusting Gases >1000 BTU/scf | gas production |
| APENS | 31000216 | Natural Gas Production, Flares Combusting Gases <1000 BTU/scf | gas production |
| APENS | 31000220 | Natural Gas Production, All Equipt Leak Fugitives | gas production |
| APENS | 31000225 | Natural Gas Production, Compressor Seals | gas production |
| APENS | 31000227 | Glycol Dehydrator | gas production |
| APENS | 31000228 | Glycol Dehydrator | gas production |
| APENS | 31000230 | Natural Gas Production, Hydrocarbon Skimmer | gas production |
| APENS | 31000299 | Natural Gas Production, Other Not Classified | gas production |
| APENS | 31000301 | Glycol Dehydrator | gas production |
| APENS | 31000302 | Glycol Dehydrator | gas production |
| APENS | 31000303 | Glycol Dehydrator | gas production |
| APENS | 31000304 | Glycol Dehydrator | gas production |
| APENS | 31000305 | Natural Gas Processing Facilities, Gas Sweeting: Amine Process | gas production |
| APENS | 31000306 | Natural Gas Processing Facilities, Process Valves | gas production |
| APENS | 31000309 | Natural Gas Processing Facilities, Compressor Seals | gas production |
| APENS | 31000311 | Natural Gas Processing Facilities, Flanges and Connections | gas production |
| APENS | 31000404 | Process Heaters | well count |
| APENS | 31000405 | Process Heaters | well count |
| APENS | 31000406 | Process Heaters | well count |
| APENS | 31000502 | Liquid Separator | well count |
| APENS | 31088801 | Permitted Fugitives | gas production |
| APENS | 31088803 | Permitted Fugitives | gas production |
| APENS | 31088804 | Permitted Fugitives | gas production |
| APENS | 31088805 | Permitted Fugitives | gas production |
| APENS | 31088811 | Permitted Fugitives | gas production |
| APENS | 40400311 | Tank Losses | oil production |
| APENS | 40400322 | Tank Losses | oil production |

BLM_0045455

*January 2009*



# PROJECTION METHODOLOGIES FOR GEOGRAPHIC GROUPINGS

For each geographic grouping, the methodology for obtaining the 2012 value of each projection parameter (well count, spud count, condensate production, oil production and gas production) is described below.  In general, well count projections in various geographic groupings were developed by obtaining the historical well count data for the geographic grouping using the IHS database, and projecting a trend line forward from 2006 to 2012.  Spud count projections in various geographic groupings were developed by deriving an average ratio of annual spud counts to well counts for a number of historical years, and then applying this ratio to the projected well counts to estimate annual spud counts for future years.  Gas production projections were developed by using typical Rulison-type well decline data for the Piceance Basin (Williams Production RMT Company, 2006) to predict the added annual gas production from the well count projections for each geographic grouping.  Condensate production projections were developed by scaling the future year condensate production to the previous year condensate production using the same growth or decline rates as developed for gas production.  Finally oil production projections were developed by obtaining the historical oil production data for the geographic grouping using the IHS database, and projecting a trend line forward from 2006 to 2012.  Note that in general, oil production from conventional oil wells was not projected to grow or decline in this period.

The IHS database is a tool to query oil and gas statistical well and production data, and uses as its reference data the databases maintained by various state OGCC's (or equivalent).  Previous work (Bar-Ilan et al., 2008) has confirmed that IHS data is consistent with the database maintained by COGCC.

BLM_0045456

*January 2009*

E N V I R O N

## Garfield County

*Well Counts* – Well counts in Garfield County have been plotted for the years 1970 – 2006 below in Figure 1, including projections to 2012.



**Figure 1**. Well count historical data (from the IHS database) for Garfield County and projections to 2012.[1]

Well counts were linearly projected for the years 2007 – 2008 based on historical data from 2003 – 2006, since this period was considered representative of the recent significant increase in activity in the Piceance Basin. Starting in 2009, a second linear projection was used but the slope of the second linear projection from 2009 – 2012 was reduced by 50% compared to that of the period 2007 – 2008. The basis for this reduction in the growth rate of new wells includes:

1. Saturation of available areas for drilling in Garfield County and encroachment on population centers;
2. New Colorado Oil and Gas Conservation Commission (COGCC) regulations which will have the effect of slowing drilling and production;
3. More onerous permitting requirements, fees, and restrictions mandated by new COGCC regulations; and
4. A severe downturn in the economy, including a drop in commodity prices and lack of available capital to sustain the previous level of drilling and production activity.

---

[1] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045457

*January 2009*

**E N V I R O N**

*Spud Counts* – Spud counts in Garfield County have been plotted for the years 1970 – 2006 below in Figure 2, including projections to 2012.



**Garfield County Spuds**

**Figure 2**. Spud count historical data (from the IHS database) for Garfield County and projections to 2012. [2]

Spud count projections were developed for the period 2007 – 2012 by first developing a ratio of the number of spuds in each year from 2003 – 2006 to the number of new wells added in each of those years. This represented the historic rate of drilling as compared to the rate of new well addition, accounting for factors such as unsuccessful drilling and wells which were plugged and abandoned. This data for the years 2003 – 2006 was averaged to develop a single historical drilling rate estimate of 1.085. This drilling rate estimate was then applied to the number of new wells added as predicted by the well count projection (see Figure 1) in order to determine the number of spuds in each year from 2007 – 2012.

It should be noted that the discontinuity between the projected spud counts for 2007 and the historic counts for 2006 is the result of applying the above methodology to the well counts, which are projected linearly from 2007 – 2009. However, the linear projection for well counts in the 2010 – 2012 period results in a steady drilling rate for that period, and therefore a constant annual spud count for that period.

---

[2] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045458

*January 2009*

$\overline{E\ N\ V\ I\ R\ O\ N}$

*Gas Production* – Gas production in Garfield County has been plotted for the years 1970 – 2006 below in Figure 3, including projections to 2012.



**Figure 3**. Gas production historical data (from the IHS database) for Garfield County and projections to 2012. [3]

The analysis to determine gas production projections in Garfield County relied on geologic reservoir data provided by the companies which was used to develop a production decline curve for typical gas wells in the Piceance Basin (Williams Production RMT Company, 2006). This is referred to as a Rulison-type curve and is shown below in Figure 4. As seen in Figure 4 the gas production of a new well brought on-line peaks in the first year of operation of the well and then declines following an approximately exponential decline curve. The methodology used to determine future year gas production in the county incorporated this Rulison curve data, as shown below in Equation (1):

Equation (1)    $P_i = \left[ \left( N_{wells,i} - N_{wells,i-1} \right) \times 0.5 \times V_{Rulison,0} + \sum_{j=0}^{30} \left( N_{wells,j} - N_{wells,j-1} \right) \times V_{Rulison,j} \right] \times f$

where:

    $P_i$ is the gas production in the geographic grouping in future year $i$ [mscf]
    $N_{wells,i}$ is the number of wells in the geographic grouping in future year $i$ [# of wells]
    $V_{Rulison,0}$ is the first-year predicted production per well following a Rulison curve [mscf/well]
    $V_{Rulison,j}$ is the predicted production per well following a Rulison curve for year $j$ [mscf/well]
    $j$ tracks the years of life of a well in the Piceance Basin, assumed to be a maximum of 20

---

[3] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045459

*January 2009*



*f* is a correlation factor for wells that are plugged and abandoned and producing well fields that differ from the Rulison type curve (assumed to be 0.77 for Garfield County)

Equation (1) essentially uses the well count predictions of Figure 1 for a period of 20 previous years, assuming the same Rulison profile for all new wells added, and provides a prediction of the total production in the geographic grouping in a future year as the sum of these Rulison production values for each of the previous 20 years. The factor of 0.5 in Equation (1) is to account for the fact that in any current year new wells are added throughout the year. The correlation factor *f* was introduced to account for wells that are no longer active (e.g. plugged and abandoned) throughout the 20-year past calculation for each future year and also to account for production variances between well fields and the standard Rulison Type curve.



**Figure 4**. A Rulison-type curve showing well decline for an individual typical well in the Piceance Basin. [4]

An analysis was conducted to justify the use of the Rulison-type curve and to determine whether the particular curve shown in Figure 4 was sufficiently accurate to be representative of both the Piceance Basin generally, and the production characteristics of gas wells in Garfield County specifically (although it should be noted that Garfield County represents the majority of gas production in the Piceance Basin). The analysis was conducted by using Equation (1) to predict Garfield County gas production for years prior to 2007, for which IHS data was already available and could be used to compare the accuracy of this method. The results are shown below in Table 1 for calendar years 1999 – 2006 and show that this method, with the specific correlation factor selected, is reasonably accurate in predicting past county-level gas production volumes.

---

[4] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045460

**E N V I R O N**

**Table 2.** Comparison of actual and predicted gas production volumes for Garfield County for the years 1999 – 2006 using the Rulison-type projection analysis.

| Year | Actual Garfield County Gas Production [MCF] | Predicted Garfield County Gas Production [MCF] | Percentage Difference |
|------|---------------------------------------------|------------------------------------------------|-----------------------|
| 1999 | 56,774,759 | 55,404,456 | 2.4% |
| 2000 | 70,267,049 | 70,146,103 | 0.2% |
| 2001 | 88,232,728 | 89,849,168 | 1.8% |
| 2002 | 116,426,850 | 111,792,416 | 4.0% |
| 2003 | 149,570,684 | 146,162,876 | 2.3% |
| 2004 | 209,361,039 | 207,638,579 | 0.8% |
| 2005 | 269,946,918 | 269,702,464 | 0.1% |
| 2006 | 345,585,682 | 346,556,011 | 0.3% |

As Table 2 shows there is reasonable agreement between the predicted gas production in Garfield County using the Rulison curve method of Equation (1) and the actual gas production in the County as obtained from the IHS database for the years 1999 – 2006. Since this is the period in which recent oil and gas development activity has begun in the Piceance Basin this period was used for the comparison purposes. The predicted gas production deviates no more than 4% from the actual gas production for any previous year in the period 1999 – 2006 and therefore it was concluded that this method is sufficiently accurate for prediction of future year production.

This Rulison-type analysis indicates that a large number of new wells are needed to sustain an overall growth rate for all production in the basin, since added production from new wells decreases immediately after the well's first year of production. It should be noted that the well count projections for the basin in the 2007 – 2012 period do not indicate that a sufficient number of new wells will be added each year to sustain a growth in production, and the curve shown in Figure 3 indicates an overall decline in production beginning in 2009.

BLM_0045461

*January 2009*

**E N V I R O N**

*Condensate Production* – Condensate production in Garfield County has been plotted for the years 1970 – 2006 below in Figure 5, including projections to 2012.



**Figure 5**. Condensate production historical data (from the IHS database) for Garfield County and projections to 2012. [5]

It was assumed that condensate production is a direct function of gas production, since "condensate" in this analysis refers to liquid hydrocarbon production that is an associated product of natural gas at gas wells. Therefore scaling factors were developed for each year from 2007 – 2012 that were the ratio of gas production in that year to gas production in the previous year. These scaling factors were then applied to the condensate production for each year from 2007 – 2012, and form the projections shown in Figure 5. It should be noted that this methodology is expected to result in a projection trend identical in form to that of the gas production projections, as shown in a comparison of Figures 3 and 5.

---

[5] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045462

*January 2009*

**ENVIRON**

*Oil Production* – Oil production in Garfield County has been plotted for the years 1970 – 2006 below in Figure 6, including projections to 2012.



Figure 6. Oil production historical data (from the IHS database) for Garfield County and projections to 2012.

Garfield County does not have a significant amount of oil production. No data indicated that there would be any likely growth in oil production, and so oil production was projected to be negligible in the years 2007 – 2012. [6]

---

[6] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045463

*January 2009*

**ENVIRON**

**Rio Blanco County**

*Well Counts* – Well counts in Rio Blanco County have been plotted for the years 1970 – 2006 below in Figure 7, including projections to 2012.

**Rio Blanco County Well Count**



**Figure 7**. Well count historical data (from the IHS database) for Rio Blanco County and projections to 2012. [7]

Similar to the methodology for well count projections for Garfield County, well counts were linearly projected for Rio Blanco County based on data from 2004 – 2006. A best-fit linear projection was used for projecting well counts in 2007 – 2008, and then the slope of this linear projection was reduced by 50% and a second linear projection was used for 2009 – 2012. Similar to Garfield County, the well count projections were reduced in 2009 – 2012 to account for an anticipated decline in activity in this county based on data provided by participating companies.

---

[7] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045464

*January 2009*

ENVIRON

*Spud Counts* – Spud counts in Rio Blanco County have been plotted for the years 1970 – 2006 below in Figure 8, including projections to 2012.

**Rio Blanco County Spuds**



**Figure 8**. Spud count historical data (from the IHS database) for Rio Blanco County and projections to 2012. [8]

Similar to the methodology used to develop spud count projections for Garfield County, an average drilling rate in Rio Blanco County relative to the number of new wells added in the County was developed for the years 2004 – 2006. This factor was determined to be 2.184 for Rio Blanco County, indicating that significantly more drilling is needed to account for the projected well count in the County, and is likely an indication that more wells are being plugged and abandoned in this County than in Garfield County. Similar to Garfield County, the Rio Blanco spud count projections display a discontinuity due to the well count-based methodology used to project spud counts. Also similar to Garfield County, the Rio Blanco spud counts are constant for the period 2009 – 2012 since the well counts are linearly projected.

---

[8] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045465

*January 2009*

**ENVIRON**

*Gas Production* – Gas production in Rio Blanco County has been plotted for the years 1970 – 2006 below in Figure 9, including projections to 2012.



**Figure 9**. Gas production historical data (from the IHS database) for Rio Blanco County and projections to 2012. [9]

A methodology similar to Equation (1) was used for Rio Blanco County gas production projections in 2007 – 2012. The same Rulison-type curve for gas well production decline over the life of a typical well was used in the analysis for Rio Blanco County. As with Garfield County, an analysis was conducted to determine the ability of this projection methodology to accurately back-cast gas production in Rio Blanco County. An optimized correlation factor was selected for Rio Blanco County to provide a best fit for the back-cast data comparison. The correlation factor selected for Rio Blanco County was 1.1. The results of the back-casting analysis are shown below in Table 3.

**Table 3.** Comparison of actual and predicted gas production volumes for Rio Blanco County for the years 1999 – 2006 using the Rulison-type projection analysis.

| Year | Actual Rio Blanco County Gas Production [MCF] | Predicted Rio Blanco County Gas Production [MCF] | Percentage Difference |
|------|------|------|------|
| 1999 | 27,732,550 | 27,439,433 | 1.1% |
| 2000 | 30,828,314 | 34,048,447 | 10.4% |
| 2001 | 31,318,584 | 30,627,071 | 2.2% |
| 2002 | 36,255,332 | 27,904,033 | 23.0% |
| 2003 | 34,282,392 | 29,431,521 | 14.1% |
| 2004 | 33,553,262 | 29,846,380 | 11.0% |
| 2005 | 36,625,402 | 35,483,626 | 3.1% |
| 2006 | 43,633,074 | 42,560,353 | 2.5% |

---

[9] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045466

*January 2009*

**ENVIRON**

Table 3 shows a significantly higher deviation from predicted values for Rio Blanco County than for Garfield County. The deviation may be due to external factors not directly associated with this Rulison-type analysis. Rio Blanco County has significant oil production and some of the county-level gas production is associated production from these oil wells. This production is not expected to follow this analysis. It should also be noted that historic gas production in Rio Blanco County in the period 1999 – 2006 is erratic, indicating that other external factors are influencing total gas production in the county. Despite these deviations, this analysis was used to project gas production for the period 2007 – 2012 following the same methodology as used for Garfield County.

*Condensate Production* – Condensate production in Rio Blanco County has been plotted for the years 1970 – 2006 below in Figure 10, including projections to 2012.

**Rio Blanco County Gas Well Condensate Production (bbl)**



**Figure 10**. Condensate production historical data (from the IHS database) for Rio Blanco County and projections to 2012. [10]

Similar to the methodology used for Garfield County, the Rio Blanco County condensate production for the period 2007 – 2012 was projected using scaling factors derived from the gas production projections for Rio Blanco County, as shown in Figure 9. The trends are therefore identical for both gas and condensate production projections in Rio Blanco County for this period.

---

[10] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045467

E N V I R O N

*Oil Production* – Oil production in Rio Blanco County has been plotted for the years 1970 –
2006 below in Figure 11, including projections to 2012.



**Rio Blanco County Oil Well Oil Production (bbl)**

**Figure 11**. Oil production historical data (from the IHS database) for Rio Blanco County and
projections to 2012. [11]

Oil production in Rio Blanco County has historically been declining from a peak production
level in 1977 of approximately 22,000,000 barrels annually. In the recent past, in the period
2002 – 2006 oil production has been relatively constant at a rate of approximately 5,000,000
bbl/year. It is conservatively projected that oil production would continue to remain at this
annual level for the period 2007 – 2012.

---

[11] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045468

*January 2009*



## Mesa County

*Well Counts* – Well counts in Mesa County have been plotted for the years 1970 – 2006 below in Figure 12, including projections to 2012.



**Figure 12**. Well count historical data (from the IHS database) for Mesa County and projections to 2012. [12]

Similar to the methodology for well count projections for Garfield County, well counts were linearly projected for Mesa County based on data from 2004 – 2006. A best-fit linear projection was used for projecting well counts in 2007 – 2008, and then the slope of this linear projection was reduced by 50% and a second linear projection was used for 2009 – 2012. Similar to Garfield County, the well count projections were reduced in 2009 – 2012 to account for an anticipated decline in activity in this county based on data provided by participating companies.

[12] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

*January 2009*

E N V I R O N

*Spud Counts* – Spud counts in Mesa County have been plotted for the years 1970 – 2006 below in Figure 13, including projections to 2012.



**Figure 13**. Spud count historical data (from the IHS database) for Mesa County and projections to 2012. [13]

Similar to the methodology used to develop spud count projections for Garfield County, an average drilling rate in Mesa County relative to the number of new wells added in the County was developed for the years 2005 – 2006. This factor was determined to be 1.438 for Mesa County. Similar to Garfield County, the Mesa County spud count projections display a discontinuity due to the well count-based methodology used to project spud counts. Also similar to Garfield County, the Mesa County spud counts are constant for the period 2009 – 2012 since the well counts are linearly projected.

---

[13] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045470

*January 2009*                                                  **E N V I R O N**

*Gas Production* – Gas production in Mesa County has been plotted for the years 1970 – 2006 below in Figure 14, including projections to 2012.



**Figure 14.** Gas production historical data (from the IHS database) for Mesa County and projections to 2012. [14]

A methodology similar to Equation (1) was used for Mesa County gas production projections in 2007 – 2012. The same Rulison-type curve for gas well production decline over the life of a typical well was used in the analysis for Mesa County. As with Garfield County, an analysis was conducted to determine the ability of this projection methodology to accurately back-cast gas production in Mesa County. An optimized correlation factor was selected for Mesa County to provide a best fit for the back-cast data comparison. The correlation factor selected for Mesa County was 0.53. The results of the back-casting analysis are shown below in Table 4.

**Table 4.** Comparison of actual and predicted gas production volumes for Mesa County for the years 1999 – 2006 using the Rulison-type projection analysis.

| Year | Actual Mesa County Gas Production [MCF] | Predicted Mesa County Gas Production [MCF] | Percentage Difference |
|------|----------------------------------------|--------------------------------------------|------------------------|
| 1999 | 5,709,569 | 7,046,807 | 23.4% |
| 2000 | 5,599,412 | 7,338,168 | 31.1% |
| 2001 | 5,017,255 | 6,839,407 | 36.3% |
| 2002 | 7,675,838 | 5,324,341 | 30.6% |
| 2003 | 9,313,157 | 6,234,402 | 33.1% |
| 2004 | 7,725,671 | 5,744,337 | 25.6% |
| 2005 | 10,599,890 | 9,363,378 | 11.7% |
| 2006 | 15,359,972 | 18,734,154 | 22.0% |

---

[14] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045471

Table 4 shows a significantly higher deviation from predicted values for Mesa County than for either Garfield or Rio Blanco Counties.  Historic gas production in Mesa County in the period 1999 – 2006 is erratic (similar to Rio Blanco County), indicating that other external factors are influencing total gas production in the county.  However, it should also be noted that the total gas production in Mesa County in 2006 accounts for only approximately 3.5% of total gas production in the Piceance Basin.  Therefore the deviation from historic data was not determined to be a significant deterrent to using this methodology for future year projections for the period 2007 – 2012 following the same methodology as used for Garfield and Rio Blanco Counties. The trend line of the projections for Mesa was similar to those of Rio Blanco and Garfield, with a peak in 2008 followed by a decline to 2012.

*Condensate Production* – Condensate production in Mesa County has been plotted for the years 1970 – 2006 below in Figure 15, including projections to 2012.

**Mesa County Gas Well Condensate Production (bbl)**



**Figure 15**. Condensate production historical data (from the IHS database) for Mesa County and projections to 2012. [15]

Similar to the methodology used for Garfield and Rio Blanco Counties, the Mesa County condensate production for the period 2007 – 2012 was projected using scaling factors derived from the gas production projections for Mesa County, as shown in Figure 14.  The trends are therefore identical for both gas and condensate production projections in Mesa County for this period.

---

[15] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045472

*January 2009*

**E N V I R O N**

*Oil Production* – Oil production in Mesa County has been plotted for the years 1970 – 2006 below in Figure 16, including projections to 2012.



**Mesa County Oil Well Oil Production (bbl)**

**Figure 16**. Oil production historical data (from the IHS database) for Mesa County and projections to 2012. [16]

Although erratic, oil production in Mesa County has generally been declining from a peak production level in 1975 of just over 10,000 barrels annually. Given no additional information on oil production in Mesa County, and considering the relatively small contribution of Mesa County to the total oil production for the Piceance Basin, it was conservatively projected that oil production would continue to remain at the annual production level in 2006 (the last year for which a full data set was available) for the projection period of 2007 – 2012.

---

[16] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045473

*January 2009*



**Moffat County**

*Well Counts* – Well counts in Moffat County have been plotted for the years 1970 – 2006 below in Figure 17, including projections to 2012.



**Figure 17**. Well count historical data (from the IHS database) for Moffat County and projections to 2012. [17]

Similar to the methodology for well count projections for Garfield County, well counts were linearly projected for Moffat County based on data from 2002 – 2006. A best-fit linear projection was used for projecting well counts in 2007 – 2008, and then the slope of this linear projection was reduced by 50% and a second linear projection was used for 2009 – 2012. Similar to Garfield County, the well count projections were reduced in 2010 – 2012 to account for an anticipated decline in activity in this county based on data provided by participating companies.

---

[17] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045474

*January 2009*

$\overline{\underline{\text{E N V I R O N}}}$

*Spud Counts* – Spud counts in Moffat County have been plotted for the years 1970 – 2006 below in Figure 18, including projections to 2012.



**Figure 18**. Spud count historical data (from the IHS database) for Moffat County and projections to 2012. [18]

Similar to the methodology used to develop spud count projections for Garfield County, an average drilling rate in Moffat County relative to the number of new wells added in the County was developed for the years 2003 – 2006. This factor was determined to be 1.438 for Moffat County. Similar to Garfield County, the Moffat County spud count projections display a discontinuity due to the well count-based methodology used to project spud counts. Also similar to Garfield County, the Moffat County spud counts are constant for the period 2009 – 2012 since the well counts are linearly projected.

---

[18] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045475

*January 2009*

**ENVIRON**

*Gas Production* – Gas production in Moffat County has been plotted for the years 1970 – 2006 below in Figure 19, including projections to 2012.



**Figure 19**. Gas production historical data (from the IHS database) for Moffat County and projections to 2012.

Historic gas production in Moffat County was determined to be too variable to predict future year production levels with any reasonable accuracy. Given the low levels of activity in Moffat County, and the fact that Moffat County gas production in 2006 contributed only 4.6% to the total Piceance Basin gas production, it was assumed that gas production would remain constant at 2006 levels for the period 2007 – 2012. Given the erratic historical production levels, it should be noted that gas production in this county could be expected to either decline, or to grow, or to both decline and grow in the period 2007 – 2012.

BLM_0045476

*January 2009*

ENVIRON

*Condensate Production* – Condensate production in Moffat County has been plotted for the years 1970 – 2006 below in Figure 20, including projections to 2012.

**Moffat County Gas Well Condensate Production (bbl)**



**Figure 20**. Condensate production historical data (from the IHS database) for Moffat County and projections to 2012. [19]

Similar to the methodology used for gas production in Moffat County, as described above, condensate production for the period 2007 – 2012 was projected to remain at 2006 levels. Similar to gas production, the condensate production is highly variable and determined to be too difficult to reasonably project. Given the related nature of condensate and gas production, it was considered a reasonable assumption to project condensate production similarly to gas production.

---

[19] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045477

*January 2009*

<span style="float:right">**E N V I R O N**</span>

*Oil Production* – Oil production in Moffat County has been plotted for the years 1970 – 2006 below in Figure 21, including projections to 2012.

**Moffat County Oil Well Oil Production (bbl)**



**Figure 21**. Oil production historical data (from the IHS database) for Moffat County and projections to 2012. [20]

Oil production in Moffat County has generally been declining since 1989 (although peak production levels occurred in 1983 at approximately 1.36 million barrels annually). Similar to Mesa County, no additional information on planned future oil production in Moffat County was provided by participating companies, therefore it was conservatively projected that oil production would continue to remain at the annual production level in 2006 (the last year for which a full data set was available) for the projection period of 2007 – 2012.

---

[20] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045478

*January 2009*

E N V I R O N

**Routt County**

*Well Counts* – Well counts in Routt County have been plotted for the years 1970 – 2006 below in Figure 22, including projections to 2012.



**Figure 22**. Well count historical data (from the IHS database) for Routt County and projections to 2012. [21]

Well counts in Routt County have been small relative to the other counties described in this analysis, and therefore were conservatively projected to remain at 2006 counts for the period 2007 – 2012.

---

[21] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045479

*January 2009*

**ENVIRON**

*Spud Counts* – Spud counts in Routt County have been plotted for the years 1970 – 2006 below in Figure 23, including projections to 2012.



**Figure 23**. Spud count historical data (from the IHS database) for Routt County and projections to 2012. [22]

In the period 1992 – 2006 there have been only 16 spuds total in Routt County, the majority of these occurring only in 2000 and 2001.  For the remaining years in the period 1992 – 2006 there have been no annual spuds in the County.  Therefore it was assumed that there would be no additional spuds in the period 2007 – 2012.

---

[22] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045480

*January 2009*

**ENVIRON**

*Gas Production* – Gas production in Routt County has been plotted for the years 1970 – 2006 below in Figure 24, including projections to 2012.



**Figure 24**. Gas production historical data (from the IHS database) for Routt County and projections to 2012. [23]

Gas production in Routt County has been in significant decline since reaching a peak of approximately 900,000 mcf in 1982.  Given the small amount of gas production in Routt County (only a small fraction of a percent of total Piceance Basin gas production), it was conservatively assumed that gas production would remain at 2006 annual levels for the period 2007 – 2012.

---

[23] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045481

*January 2009*

**ÉNVIRON**

*Condensate Production* – Condensate production in Routt County has been plotted for the years 1970 – 2006 below in Figure 25, including projections to 2012.

**Routt County Gas Well Condensate Production (bbl)**



**Figure 25**. Condensate production historical data (from the IHS database) for Routt County and projections to 2012. [24]

Condensate production in Routt County has historically been negligibly small. The period 2003 – 2006 has seen a negligible but non-zero annual condensate production, and therefore it was conservatively assumed that condensate production would remain at the 2006 annual level for the period 2007 – 2012.

---

[24] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045482

ENVIRON

*Oil Production* – Oil production in Routt County has been plotted for the years 1970 – 2006 below in Figure 26, including projections to 2012.



**Figure 26**. Oil production historical data (from the IHS database) for Routt County and projections to 2012. [25]

Oil production in Routt County has historically been somewhat variable. From a peak in 1982 of approximately 250,000 barrels annually, the county-level oil production has been declining to a minimum of 56,000 barrels annually in 2004. However, in both 2005 and 2006 there has been an increase in oil production, and given no additional information from participating companies, it was conservatively assumed that oil production would remain at the 2006 level for the period 2007 – 2012.

---

[25] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045483

*January 2009*



## All Other Counties

*Well Count* – Well counts in all other Piceance Basin production counties combined have been plotted for the years 1970 – 2006 below in Figure 27, including projections to 2012.



**Figure 27**. Well count historical data (from the IHS database) for all other production counties in the Piceance Basin combined and projections to 2012. [26]

Combined well counts for Delta, Gunnison and Pitkin Counties have historically been zero or negligibly small. However, as a conservative estimate, well counts are assumed to remain at the 2006 count in the period 2007 – 2012. Well counts are distributed into each of these three counties according to each of their 2006 fractions of total well counts in this combined geographic grouping.

[26] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045484

*January 2009*

**ENVIRON**

*Spud Counts* – Spud counts in all other Piceance Basin production counties combined have been plotted for the years 1970 – 2006 below in Figure 28, including projections to 2012.



**Delta, Gunnison, and Pitkin County Combined Spuds**

**Figure 28**. Spud count historical data (from the IHS database) for all other production counties in the Piceance Basin combined and projections to 2012. [27]

Combined spud counts for Delta, Gunnison and Pitkin Counties have historically been zero or negligibly small. However, there has been an increase in the number of annual spuds in the combined county grouping in the period 2003 – 2006, therefore it is conservatively estimated that spud counts in the combined county grouping remain at the 2006 count for the period 2007 – 2012. Spud counts are distributed into each of these three counties according to each of their 2006 fractions of total spud counts in this combined geographic grouping.

---

[27] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045485

*January 2009*

**ENVIRON**

*Gas Production* – Gas production in all other Piceance Basin production counties combined has been plotted for the years 1970 – 2006 below in Figure 29, including projections to 2012.



**Delta, Gunnison, and Pitkin County Combined Gas Production (mcf)**

**Figure 29**. Gas production historical data (from the IHS database) for all other production counties in the Piceance Basin combined and projections to 2012. [28]

Combined gas production for Delta, Gunnison and Pitkin Counties has historically been quite variable and often negligibly small in the period 1970 – 2004. In the period 2004 – 2006 there has been an increase in gas production in this combined county grouping (although this geographic grouping only represents 0.1% of total 2006 Piceance Basin gas production), likely driven by the small increase in drilling in this period. This increase is projected to continue, and a linear best-fit projection is used for the period 2007 – 2008. Similar to Garfield and Rio Blanco Counties, it is projected that this level of activity will decrease in the period 2009 – 2012, and therefore a second linear projection is used for this period with a slope that is reduced 50% from the linear projection for 2007 – 2008.

---

[28] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045486

*January 2009*

**E N V I R O N**

*Condensate Production* – Condensate production in all other Piceance Basin production counties combined has been plotted for the years 1970 – 2006 below in Figure 30, including projections to 2012.



**Delta, Gunnison, and Pitkin County Combined Gas Well Condensate Production (bbl)**

**Figure 30**. Condensate production historical data (from the IHS database) for all other production counties in the Piceance Basin combined and projections to 2012. [29]

For consistency, the same methodology is used to develop projections for condensate production in Delta, Gunnison and Pitkin Counties in the period 2007 – 2012 as for gas production in this combined county grouping (as shown in Figure 29).

---

[29] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045487

*January 2009*

$\overline{\mathsf{E\ N\ V\ I\ R\ O\ N}}$

*Oil Production* – Oil production in all other Piceance Basin production counties combined has been plotted for the years 1970 – 2006 below in Figure 31, including projections to 2012.



**Figure 31**. Oil production historical data (from the IHS database) for all other production counties in the Piceance Basin combined and projections to 2012. [30]

Oil production has historically been negligible in the combined county grouping of Delta, Gunnison and Pitkin Counties, and is projected to remain zero throughout the period 2007 – 2012.

[30] (Includes data supplied by IHS Inc., its subsidiary and affiliated companies; Copyright (2009) all rights reserved).

BLM_0045488

*January 2009*



## SCALING FACTOR DEVELOPMENT AND UNCONTROLLED 2012 EMISSIONS

Scaling factors were generated for each geographic grouping for each parameter considered here: well count, spud count, gas production, condensate production and oil production.  The ratio of the value of each of these parameters in each geographic grouping in 2012 to their values in 2006 is the scaling factor for that parameter for purposes of this projection.  A more detailed description is given below for each geographic grouping.

### Garfield, Rio Blanco, Mesa, Moffat and Routt Counties

The projected 2012 values of each of the five parameters for Garfield, Rio Blanco, Mesa, Moffat and Routt Counties were ratioed to the value of the respective parameter in 2006, following Equation (2):

Equation (2)   $f_i = {W_{2012}}\big/{W_{2006}}$

where:

$f_i$ is the scaling factor for Garfield, Rio Blanco, Mesa, Moffat or Routt Counties for parameter $i$ (well count, spud count, gas production, condensate production, or oil production)
$W_{2006}$ is the value of parameter $i$ in 2006
$W_{2012}$ is the projected value of parameter $i$ in 2012

### All Other Production Counties in the Piceance Basin

Because all other production counties were combined for purposes of projecting well counts, spud counts, gas production, condensate production and oil production, the projected parameters were apportioned to each county in this grouping based on the 2006 fractions of that county's well count, spud count, gas production, condensate production or oil production.  The scaling factors for each county in this grouping are estimated according to Equation (3):

Equation (3)   $f_i = c_{i,county} \times \left( {Q_{2012}}\big/{Q_{2006}} \right)$

where:

$f_i$ is the scaling factor for each county in the "combined counties" grouping for parameter $i$ (well count, spud count, gas production, condensate production or oil production)
$c_{i,county}$ is the fraction of parameter $i$ for all combined counties that is assigned to each specific county based on 2006 data
$Q_{2006}$ is the value of parameter $i$ in 2006 for all other combined counties
$Q_{2012}$ is the projected value of parameter $i$ in 2012 for all other combined counties

Emissions were therefore projected to 2012 for each county in the Piceance Basin using the scaling factors derived above for each county.  Uncontrolled 2012 emissions were estimated according to Equation (4):

---

BLM_0045489

*January 2009*



Equation (4)    $E_{j,county,2012} = f_{i,county} \times E_{j,county,2006}$

where:

> $E_{j,county,2012}$ are the projected emissions in a specific county in 2012 for source category *j*
> $E_{j,county,2006}$ are the 2006 baseline emissions in a specific county for source category *j*
> $f_i$ is the scaling factor for each county for parameter *i* (well count, spud count, gas production, condensate production or oil production)

The scaling factor based on the appropriate parameter (well count, spud count, gas production, condensate production, or oil production) is selected for each source category as described in Table 1. The scaling factors for the five parameters used in this analysis for each of the six geographic groupings in the Piceance Basin are presented in Table 5 below.

**Table 5.** Scaling factors for the five parameters used in the projection analysis for the six geographic groupings in the Piceance Basin.

| Geographic Grouping | Well Count | Spud Count | Gas Production | Condensate Production | Oil Production |
|---|---|---|---|---|---|
| Garfield County | 1.68 | 0.41 | 1.12 | 1.12 | 0.00 |
| Rio Blanco County | 1.12 | 0.79 | 1.04 | 1.04 | 1.00 |
| Mesa County | 1.81 | 0.39 | 1.63 | 1.63 | 1.00 |
| Moffat County | 1.20 | 0.45 | 1.00 | 1.00 | 1.00 |
| Routt County | 1.00 | 0.00 | 1.00 | 1.00 | 1.00 |
| All Other Production Counties Combined | 1.00 | 1.00 | 2.69 | 2.78 | 0.00 |

BLM_0045490



## CONTROLLED 2012 EMISSIONS

This methodology considered any "on-the-books" federal or state regulations that would affect the uncontrolled 2012 emissions projections described above.

Table 6 below lists the "on-the-books" federal and state regulations that affect emissions source categories in the oil and gas industry, and the action taken to adjust the 2012 emissions inventory appropriately. A more detailed description follows of the methodology used to address each of these regulations as they affected the uncontrolled 2012 Piceance Basin emissions projections.

The uncontrolled 2012 emissions were adjusted based on the proposed actions or control factors developed for each regulation described in Table 6 to account for how these regulations may affect any oil and gas source category considered in this inventory. The methodology recognizes that there are a number of voluntary and/or required control measures that have been partially implemented since 2006, and/or will be implemented completely by the calendar year 2012. However, these controls were not incorporated into this base case 2012 projection, but rather could form part of the controls to be included in a future control scenario.

**Table 6**. Summary of federal and state "on-the-books" regulations affecting the oil and gas source categories considered in this inventory.

| Source Category | Regulation | Enforcing Agency | Effective Date | Implementation in the 2012 Piceance Basin Emissions Projections |
|---|---|---|---|---|
| **Federal** | | | | |
| Drill Rigs, Workover Rigs | Nonroad engine Tier standards (1-4) (EPA, 2005) | US EPA | Phase in from 1996 - 2014 | EPA NONROAD model used to create county-level control factors for the drill rig SCC to account for fleet turnover. |
| Drill Rigs, Workover Rigs | Nonroad diesel fuel sulfur standards (EPA, 2006) | US EPA | Phase in beginning in 2010 | Assume 15 ppm sulfur in nonroad diesel fuel throughout Piceance Basin. Control factors derived from EPA NONROAD model (see above). |
| All New Spark-Ignited Stationary Engines | New Source Performance Stds. (NSPS) (EPA, 2008) | US EPA | Phase in from 2008 - 2011 | Control factors developed considering the specific composition of engines in the inventory but determined to not be applicable to the Piceance Basin engine inventory due to gas production decline (see below). |
| **State** | | | | |
| Engines | Regulation 7 (CDPHE, 2008) | CDPHE | Phase in from 2007 – 2011 | NOx and VOC controls required for new or relocated engines in Colorado on a phase-in schedule. However, by 2012 the federal NSPS is fully phased in and equally stringent, so this regulation was not applied. |
| Glycol Dehydrators | Regulation 7 (CDPHE, 2008) | CDPHE | May 2008 | Apply a control factor of 90% on still vent emissions for any glycol dehydrator emitting more than 15 tpy VOC. |
| Condensate Tanks | Regulation 7 (CDPHE, 2008) | CDPHE | May 2008 | Apply 95% control to any tank emitting more than 20 tpy VOC. |

BLM_0045491

*January 2009*

**Nonroad Diesel Engine Standards and Fuel Sulfur Standards**

The EPA NONROAD2005 model was run with fuel inputs based on a 2002 study entitled "WRAP Mobile Sources Emission Inventory Update" (Pollack, et al., 2006). The model outputs were used to develop county-level emissions per unit population for "other oil field equipment" (SCC 2270010010) for the calendar year 2006, and then separately for the calendar year 2012. These emissions per unit population reflect the predicted fleet mix of engines – for various tier standards from baseline uncontrolled engines through Tier IV engines – and are used as a representation of fleet turnover for drilling rigs and workover rigs. The ratios of the per unit emissions in 2012 to those in 2006 for each county of interest were taken to be the control factors accounting for federal non-road tier standards.

In addition, the NONROAD model runs with the fuel inputs used for developing the tier standards control factors were also used to develop the control factors for $SO_x$ emissions factors for drilling rigs and workover rigs. The model is capable of tracking the expected reduction in fuel sulfur content from the baseline 2006 year – assumed to be the same as the WRAP 2002 inventory – and the 2012 future year. A similar approach was used as for the federal tier standards to develop control factors. The ratio of per unit $SO_x$ emissions in 2012 to those in 2006 were taken to be a control factor to apply to uncontrolled 2012 $SO_x$ emissions for drilling rigs and workover rigs to account for federal non-road diesel fuel standards.

**New Source Performance Standards for Stationary Spark-Ignited Engines**

The EPA has promulgated a new regulation covering new stationary, spark-ignited engines of various horsepower classes. The regulation is assumed to apply to central compressor engines, wellhead and lateral compressor engines, and artificial lift engines as well as any other miscellaneous APEN exempt engines that are stationary, spark-ignited natural gas engines. The regulation requires new engines of various horsepower classes to meet increasingly stringent NOx and VOC emission standards over the phase-in period of the regulation.

For engines less than 25 horsepower, Table 7 shows the requirements of the NSPS regulation.

**Table 7**. Federal NSPS emissions standards for engines less than 25 horsepower.

| HP Range[a] | Emissions Standards Requirement in (g/hp-hr)[b] | | |
|---|---|---|---|
| | HC + NOx | NMHC + NOx[c] | CO |
| ≤ 25 Hp | | | |
| Class I | 16.1 (12.0) | 14.8 (11.0) | 610 (455) |
| Class I -A | 50-37 | - | - |
| Class I -B | 40 (30) | 37 (27.6) | |
| Class II | 12.1 (9.0) | 11.3 (8.4) | |

[a]  Class I-A: Engines with displacement less than 66 cubic centimeters (cc); Class 1-B: Engines with displacement greater than or equal to 66cc and less than 100cc; Class I: Engines with displacement greater than or equal to 100 cc and less than 225 cc

[b]  Modified and reconstructed engines manufactured prior to July 1, 2008, must meet the standards applicable to engines manufactured after July 1, 2008

[c]  NMHC+NOX standards are applicable only to natural gas fueled engines at the option of the manufacturer, in lieu of HC+NOX standards

For engines in the horsepower range 25 – 100 horsepower, Table 8 shows the requirements of the NSPS regulation.

BLM_0045492

*January 2009*

E N V I R O N

**Table 8.** Federal NSPS emissions standards for engines greater than 25 horsepower but less than 100 horsepower.

| HP Range | Manufacture Date | Emissions Standards Requirement (g/hp-hr) | |
|---|---|---|---|
| | | HC + NOx | CO |
| 25<HP<100 | 1-Jul-08 | 3.8 | 6.5 |
| | 1-Jul-08 (severe duty) | 3.8 | 200 |

For engines in the horsepower range 100 – 1,350 horsepower, Table 9 shows the requirements of the NSPS regulation.

**Table 9.** Federal NSPS emissions standards for engines greater than 25 horsepower but less than 100 horsepower.

| Engine Type and Fuel | HP Range | Manufacture Date | Emissions Standards Requirement (g/hp-hr) | | |
|---|---|---|---|---|---|
| | | | NOx | CO | VOC |
| Non-Emergency SI Natural Gas and Non-Emergency SI Lean Burn LPG | 100≤HP<500 | 1-Jul-08 | 2 | 4 | 1 |
| | | 1-Jan-11 | 1 | 2 | 1 |
| Non-Emergency SI Lean Burn Natural Gas and LPG | 500≥HP<1350 | 1-Jan-08 | 2 | 4 | 1 |
| | | 1-Jul-10 | 1 | 2 | 1 |
| Non-Emergency SI Natural Gas and Non-Emergency SI Lean Burn LPG (except lean burn 500≥HP<1350) | HP≥500 | 1-Jul-07 | 2 | 4 | 1 |

A detailed analysis was carried forward to analyze the effects of this rule on the permitted and unpermitted engine fleet in the Piceance Basin. The analysis assumed that new compressors were added if new compression was needed, and that the driver for new compression requirement is growth in gas production. The analysis further assumed that if there was no growth in gas production or a decline in gas production for any part of the 2007 – 2012 time period, that no new compression would be installed and existing compressors would continue to operate (i.e. that no engine turnover would occur). This is a conservative assumption, but was considered reasonable based on information from participating companies on the typical in-use service life of compressor engines. However, this analysis recognizes that further study is needed to better quantify typical in-use median life for gas compressor engines of various size ranges, and this analysis should be revised if additional data becomes available.

The detailed engine-level analysis to quantify the effects of the NSPS on the Piceance Basin fleet concluded that the small effect of the NSPS on the fleet during the period from Jan. 2008 – Jul. 2008 was outweighed by the subsequent decline in gas production projected for the basin from Jul. 2008 – 2012. The resulting control factor was sufficiently close to 1 to be considered negligible for this analysis, and therefore no additional effects of the NSPS regulation were considered.

**State of Colorado Regulation 7 – Glycol Dehydrators**

As part of the State of Colorado Regulation 7 – the regulation to control VOC emissions – there are control requirements for large glycol dehydrators emitting 15 tpy or greater of VOC. To

BLM_0045493

E N V I R O N

implement this rule the APENs database was used, since it is assumed that any glycol dehydrator emitting greater than 15 tpy would be permitted in Colorado. The regulation requires a 90% control of VOC emissions from existing and new dehydrators that meet the emissions requirement, beginning in May 2008. For purposes of this inventory it was assumed that the regulation would be fully implemented by the 2012 projection year, with a rule effectiveness of 1. The still vent emissions for any glycol dehydrator whose total VOC emissions were equal to or greater than 15 tpy were identified, and controlled by 90% per the requirements of the regulation.

**State of Colorado Regulation 7 – Condensate Tanks**

This part of the State of Colorado Regulation 7 requires that new and existing condensate tanks emitting greater than 20 tpy VOC would be required to install controls meeting a 95% VOC control efficiency (i.e. flaring or equivalent control system) beginning in May of 2008. Because condensate tanks were treated wholly as an unpermitted source category for purposes of this inventory, an analysis was conducted to determine the portion of the baseline 2006 condensate tank emissions and the projection year 2012 uncontrolled emissions that would be applicable to this regulation. For existing condensate tanks, the APENs database was used to determine the fraction of tanks by number with emissions exceeding the 20 tpy VOC threshold for the regulation. This was determined to be 51.7% for the Piceance Basin. A control factor of 95% was applied to the portion of condensate tank emissions corresponding to the base year 2006 emissions. For additional emissions arising from growth in condensate production in the Piceance Basin in the period 2007 – 2012, COGCC data was used to determine that approximately 63% of new wells drilled were multiple wells drilled from a single pad (Colorado Oil & Gas Conservation Commission, 2008). It was assumed that these would be routed to a large tank battery capable of storing condensate production from multiple wells. The remaining 37% of new wells drilled would be served by a single, stand-along condensate tank. It was conservatively assumed that for all 63% of wells with large tank batteries these tanks would emit greater than 20 tpy, and thus be applicable to the regulation. A control factor of 95% was applied to 63% of the additional per well condensate tank emissions resulting from growth in condensate production from the baseline year of 2006.

BLM_0045494

E N V I R O N

## SUMMARY RESULTS

The scaling factors were applied to the baseline 2006 inventory, and "on-the-books" regulations were applied to the uncontrolled 2012 emissions projections to generate the final 2012 emissions projections and results are presented below.

Figure 32 shows that Garfield and Rio Blanco Counties account for the majority of Piceance Basin projected NOx emissions in 2012, with minor NOx emissions contributions from Mesa and Moffat Counties. This is consistent with the county-level NOx emissions fractional allocation in 2006. Figure 33 shows that Garfield County alone accounts for the large majority of projected VOC emissions in 2012.

Figure 34 shows that compressor engines are the predominant NOx emissions source category in 2012, accounting for approximately 64% of total basin-wide NOx emissions. The proportional contribution of drill rigs to the NOx inventory in 2012 is smaller than in 2006, likely because of the projection of decreased drilling activity in the Piceance Basin in this period. Figure 35 shows that venting from initial completions and blowdowns and VOC emissions from glycol dehydrators and pneumatic devices combined make up approximately 60% of total VOC emissions in the Piceance Basin in 2012. Similar to the baseline 2006 inventory, venting from initial completions remains the largest VOC source category.

BLM_0045495

*January 2009*

ENVIRON



**Figure 32.** 2012 NOx emissions by source category and by county in the Piceance Basin.



**Figure 33.** 2012 VOC emissions by source category and by county in the Piceance Basin.

BLM_0045496

Case No. 1:20-cv-02484-MSK Document 40-5 filed 04/27/21 USDC Colorado pg 269 of 271

**Figure 34.** 2012 NOx emissions contributions by source category in the Piceance Basin.

**Figure 35.** 2012 VOC emissions contributions by source category in the Piceance Basin.

*January 2009*

**ENVIRON**

**Table 10.** 2012 emissions of all criteria pollutants by county for the Piceance Basin.

| County | NOx [tons/yr] | VOC [tons/yr] | CO [tons/yr] | SOx [tons/yr] | PM [tons/yr] |
|---|---|---|---|---|---|
| Chaffee | 0 | 0 | 0 | 0 | 0 |
| Delta | 82 | 66 | 120 | 0 | 2 |
| Eagle | 0 | 0 | 0 | 0 | 0 |
| Garfield | 4,672 | 13,854 | 3,583 | 5 | 188 |
| Gunnison | 59 | 226 | 46 | 0 | 2 |
| Lake | 0 | 0 | 0 | 0 | 0 |
| Mesa | 1,368 | 1,807 | 1,236 | 3 | 39 |
| Moffat | 965 | 1,508 | 726 | 1 | 21 |
| Pitkin | 0 | 41 | 0 | 0 | 0 |
| Rio Blanco | 2,785 | 3,445 | 1,948 | 67 | 122 |
| Routt | 20 | 15 | 9 | 0 | 0 |
| **Totals** | **9,951** | **20,962** | **7,668** | **77** | **374** |

**Table 11.** 2012 NOx emissions [ton/yr] by county and by source category for the Piceance Basin.

| County | Compressor Engines | Drill Rigs | Exempt engines | Heaters | Workover Rigs | Glycol Dehydrators | Flaring | Other Categories | Totals |
|---|---|---|---|---|---|---|---|---|---|
| Chaffee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delta | 78 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 82 |
| Eagle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Garfield | 2,426 | 1,155 | 145 | 600 | 54 | 10 | 114 | 170 | 4,672 |
| Gunnison | 33 | 22 | 0 | 1 | 0 | 1 | 2 | 0 | 59 |
| Lake | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mesa | 990 | 183 | 14 | 59 | 5 | 6 | 27 | 83 | 1,368 |
| Moffat | 819 | 72 | 9 | 45 | 4 | 9 | 6 | 1 | 965 |
| Pitkin | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rio Blanco | 2,134 | 233 | 29 | 178 | 16 | 32 | 11 | 151 | 2,785 |
| Routt | 17 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 20 |
| **Totals** | **6,497** | **1,668** | **197** | **886** | **79** | **58** | **161** | **405** | **9,951** |

BLM_0045498

*January 2009*



**Table 12.**  2012 VOC emissions [ton/yr] by county and by source category for the Piceance Basin.

| County | Compressor Engines | Pneumatic devices | Pneumatic pumps | Venting – blowdowns | Venting – initial completions | Venting – recompletions | Glycol Dehydrator | Unpermitted Fugitives | Permitted Fugitives | Condensate Tanks | Other Categories | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chaffee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delta | 19 | 2 | 1 | 1 | 9 | 1 | 7 | 1 | 0 | 0 | 24 | 66 |
| Eagle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Garfield | 1019 | 1,919 | 734 | 1977 | 3,336 | 441 | 1,173 | 1,023 | 121 | 1521 | 592 | 13,854 |
| Gunnison | 5 | 3 | 1 | 8 | 64 | 9 | 113 | 2 | 0 | 7 | 15 | 226 |
| Lake | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mesa | 253 | 190 | 72 | 125 | 529 | 70 | 150 | 101 | 47 | 66 | 205 | 1,807 |
| Moffat | 74 | 143 | 45 | 100 | 208 | 28 | 687 | 71 | 8 | 77 | 70 | 1,508 |
| Pitkin | 0 | 0 | 0 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 | 41 |
| Rio Blanco | 364 | 569 | 149 | 233 | 674 | 89 | 200 | 268 | 227 | 223 | 448 | 3,445 |
| Routt | 3 | 8 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 1 | 0 | 15 |
| **Totals** | **1,736** | **2,833** | **1,002** | **2,444** | **4,820** | **637** | **2,371** | **1,468** | **403** | **1,895** | **1,354** | **20,962** |

BLM_0045499