In an additional overarching comment, some commenters also fundamentally objected to the EPA's consideration of exposure estimates in reaching conclusions on the primary $O_3$ standard. These commenters' general assertion was that NAAQS must be established so as to be protective, with an adequate margin of safety, regardless of the activity patterns that feed into exposure estimates. They contended that "[a]ir quality standards cannot rely on avoidance behavior in order to protect the public health and sensitive groups" and that "[i]t would be unlawful for EPA to set the standard at a level that is contingent upon people spending most of their time indoors" (*e.g.*, ALA *et al.*, p. 124). To support these comments, for example, ALA *et al.* analyzed ambient monitoring data from Core-Based Statistical Areas (CBSAs) with design values between 66–70 ppb (Table 17, pp. 145–151 in ALA *et al.*) and 62–65 ppb (Table 18, pp. 153–154 in ALA et al.) and pointed out that there are many more days with ambient concentrations above the benchmark levels than were estimated in the EPA's exposure analysis (*i.e.*, at and above the benchmark level of 60, 70 and 80 ppb).

The EPA disagrees with these commenters' conclusions regarding the appropriateness of considering exposure estimates, and notes that NAAQS must be "requisite" (*i.e.*, "sufficient, but not more than necessary" (*Whitman*, 531 U.S. at 473)) to protect the "public health" ("the health of the public" (*Whitman*, 531 U.S. at 465)). Estimating exposure patterns based on extensive available data[130] is a reasonable means of ascertaining that standards are neither under- nor over-protective, and that standards address issues of public health rather than health issues pertaining only to isolated individuals.[131] Behavior patterns are critical in assessing whether ambient concentrations of $O_3$ may pose a public health risk.[132] Exposures to ambient or near-ambient $O_3$ concentrations have only been shown to result in potentially adverse effects if the ventilation rates of people in the exposed populations are raised to a sufficient degree (*e.g.*, through physical exertion) (U.S. EPA, 2013, section 6.2.1.1).[133] Ignoring whether such elevated ventilation rates are actually occurring, as advocated by these commenters, would not provide an accurate assessment of whether the public health is at risk. Indeed, a standard established without regard to behavior of the public would likely lead to a standard which is more stringent than necessary to protect the public health.

While setting the primary $O_3$ standard based only on ambient concentrations, without consideration of activity patterns and ventilation rates, would likely result in a standard that is over-protective, the EPA also concludes that setting a standard based on the assumption that people will adjust their activities to avoid exposures on high-pollution days would likely result in a standard that is under-protective. The HREA's exposure assessment does not make this latter assumption.[134] The time-location-activity diaries that provided the basis for exposure estimates reflect actual variability in human activities. While some diary days may reflect individuals spending less time outdoors than would be typical for them, it is similarly likely that some days reflect individuals spending more time outdoors than would be typical. Considering the actual variability in time-location-activity patterns is at the least a permissible way of identifying standards that are neither over- nor under-protective.[135]

Further, the EPA sees nothing in the CAA that prohibits consideration of the $O_3$ exposures that could result in effects of public health concern. While a number of judicial opinions have upheld the EPA's decisions in other NAAQS reviews to place little weight on particular risk or exposure analyses (*i.e.*, because of scientific uncertainties in those analyses), none of these opinions have suggested that such analyses are irrelevant because actual exposure patterns do not matter. See, *e.g. Mississippi*, 744 F. 3d at 1352–53; *ATA III*, 283 F. 3d at 373–74. Therefore, because behavior patterns are critical in assessing whether ambient concentrations of $O_3$ may pose a public health risk, the EPA disagrees with the views expressed by these commenters objecting to the consideration of $O_3$ exposures in reaching decisions on the primary $O_3$ standard.

In addition to these overarching comments, a number of commenters supported their views on standard level by highlighting specific aspects of the scientific evidence, exposure/risk information, and/or CASAC advice. Key themes expressed by these commenters included the following: (1) Controlled human exposure studies provide strong evidence of adverse lung function decrements and airway inflammation in healthy adults following exposures to $O_3$ concentrations as low as 60 ppb, and at-risk populations would be likely to experience more serious effects or effects at even lower concentrations; (2) epidemiologic studies provide strong evidence for associations with mortality and morbidity in locations with ambient $O_3$ concentrations below 70 ppb, and in many cases in locations with concentrations near and below 60 ppb; (3) quantitative analyses in the HREA are biased such that they understate $O_3$ exposures and risks, and the EPA's interpretation of lung function risk estimates is not appropriate and not consistent with other NAAQS; and (4) the EPA must give deference to CASAC advice, particularly CASAC's policy advice to set the standard level below 70 ppb. The next sections discuss comments related to each of these points, and provide the EPA's responses to those comments. More detailed discussion of individual comments, and the EPA's responses, is provided in the Response to Comments document.

i. Effects in Controlled Human Exposure Studies

Some commenters who advocated for a level of 60 ppb (or absent that, for 65 ppb) asserted that controlled human exposure studies have reported adverse respiratory effects in healthy adults following exposures to $O_3$ concentrations as low as 60 ppb. These commenters generally based their conclusions on the demonstration of $FEV_1$ decrement ≥ 10% and increased airway inflammation following exposures of healthy adults to 60 ppb $O_3$. They concluded that even more serious effects would occur in at-risk

---

[130] The CHAD database used in the HREA's exposure assessment contains over 53,000 individual daily diaries including time-location-activity patterns for individuals of both sexes across a wide range of ages (U.S. EPA, 2014a, Chapter 5).

[131] CASAC generally agreed with the EPA's methodology for characterizing exposures of concern (Frey, 2014a, pp. 5–6).

[132] See 79 FR 75269 ("The activity pattern of individuals is an important determinant of their exposure. Variation in $O_3$ exposures among various microenvironments means that the amount of time spent in each location, as well as the level of activity, will influence an individual's exposure to ambient $O_3$. Activity patterns vary both among and within individuals, resulting in corresponding variations in exposure across a population and over time" (internal citations omitted).

[133] For healthy young adults exposed at rest for 2 hours, 500 ppb is the lowest $O_3$ concentration reported to produce a statistically significant $O_3$-induced group mean $FEV_1$ decrement (U.S. EPA, 2013, section 6.2.1.1).

[134] The EPA was aware of the possibility of averting behavior during the development of the HREA, and that document includes sensitivity analyses to provide perspective on the potential role of averting behavior in modifying $O_3$ exposures. As discussed further above (II.B.2.c), these sensitivity analyses were limited and the results were discussed in the proposal within the context of uncertainties in the HREA assessment of exposures of concern.

[135] See *Mississippi*, 744 F. 3d at 1343 ("[d]etermining what is 'requisite' to protect the 'public health' with an 'adequate' margin of safety may indeed require a contextual assessment of acceptable risk. See *Whitman*, 531 U.S. at 494–95 (Breyer, J. concurring . . .))"

populations exposed to 60 ppb $O_3$, and that such populations would experience adverse effects following exposures to $O_3$ concentrations below 60 ppb.

While the EPA agrees that information from controlled human exposure studies conducted at 60 ppb can help to inform the Administrator's decision on the standard level, the Agency does not agree that this information necessitates a level below 70 ppb. In fact, as discussed in the proposal, a revised $O_3$ standard with a level of 70 ppb can be expected to provide substantial protection against the effects shown to occur following various $O_3$ exposure concentrations, including those observed following exposures to 60 ppb. This is because the degree of protection provided by any NAAQS is due to the combination of all of the elements of the standard (*i.e.*, indicator, averaging time, form, level). In the case of the fourth-high form of the $O_3$ NAAQS, which the Administrator is retaining in the current review (II.C.3), the large majority of days in areas that meet the standard will have 8-hour $O_3$ concentrations below the level of the standard, with most days well below the level. Therefore, as discussed in the proposal, in considering the degree of protection provided by an $O_3$ standard with a particular level, it is important to consider the extent to which that standard would be expected to limit population exposures of concern to the broader range of $O_3$ exposure concentrations shown in controlled human exposure studies to result in health effects. The Administrator's consideration of such exposures of concern is discussed below (II.C.4.c).

Another important part of the Administrator's consideration of exposure estimates is the extent to which she judges that adverse effects could occur following specific $O_3$ exposures. While controlled human exposure studies provide a high degree of confidence regarding the extent to which specific health effects occur following exposures to $O_3$ concentrations from 60 to 80 ppb, the Administrator notes that there are no universally accepted criteria by which to judge the adversity of the observed effects. Therefore, in making judgments about the extent to which the effects observed in controlled human exposure studies have the potential to be adverse, the Administrator considers the recommendations of ATS and advice from CASAC (II.A.1.c, above).

As an initial matter, with regard to the effects shown in controlled human exposure studies following $O_3$ exposures, the Administrator notes the following:

1. The largest respiratory effects, and the broadest range of effects, have been studied and reported following exposures to 80 ppb $O_3$ or higher, with most exposure studies conducted at these higher concentrations. Specifically, 6.6-hour exposures of healthy young adults to 80 ppb $O_3$, while engaged in quasi-continuous, moderate exertion, can decrease lung function, increase airway inflammation, increase respiratory symptoms, result in airway hyperresponsiveness, and decrease lung host defenses.

2. Exposures of healthy young adults for 6.6 hours to $O_3$ concentrations as low as 72 ppb, while engaged in quasi-continuous, moderate exertion, have been shown to both decrease lung function and result in respiratory symptoms.

3. Exposures of healthy young adults for 6.6 hours to $O_3$ concentrations as low as 60 ppb, while engaged in quasi-continuous, moderate exertion, have been shown to decrease lung function and to increase airway inflammation.

To inform her judgments on the potential adversity to public health of these effects reported in controlled human exposure studies, as in the proposal, the Administrator considers the ATS recommendation that "reversible loss of lung function in combination with the presence of symptoms should be considered adverse" (ATS, 2000a). She notes that this combination of effects has been shown to occur following 6.6-hour exposures to $O_3$ concentrations at or above 72 ppb. In considering these effects, CASAC observed that "the combination of decrements in $FEV_1$ together with the statistically significant alterations in symptoms in human subjects exposed to 72 ppb ozone meets the American Thoracic Society's definition of an adverse health effect" (Frey, 2014c, p. 5).

Regarding the potential for adverse effects following exposures to lower concentrations, the Administrator notes the CASAC judgment that the adverse combination of lung function decrements and respiratory symptoms "almost certainly occur in some people" following exposures to $O_3$ concentrations below 72 ppb (Frey, 2014c, p. 6). In particular, when commenting on the extent to which the study by Schelegle et al. (2009) suggests the potential for adverse effects following $O_3$ exposures below 72 ppb, CASAC judged that:

[I]f subjects had been exposed to ozone using the 8-hour averaging period used in the standard (rather than the 6.6-hour exposures evaluated in the study), adverse effects could have occurred at lower concentration.

Further, in our judgment, the level at which adverse effects might be observed would likely be lower for more sensitive subgroups, such as those with asthma (Frey, 2014c, p. 5).

Though CASAC did not provide advice as to how far below 72 ppb adverse effects would likely occur, the Administrator agrees that such effects could occur following exposures at least somewhat below 72 ppb.

The Administrator notes that while adverse effects could occur following exposures at least somewhat below 72 ppb, the combination of statistically significant increases in respiratory symptoms and decrements in lung function has not been reported following 6.6-hour exposures to average $O_3$ concentrations of 60 ppb or 63 ppb, though studies have evaluated the potential for such effects (Adams, 2006; Schelegle et al., 2009; Kim et al., 2011). In the absence of this combination, the Administrator looks to published ATS recommendations and CASAC advice in order to inform her judgments regarding the potential adversity of the effects that have been observed following $O_3$ exposures as low as 60 ppb.

With regard to ATS, she first notes the recommendations that "a small, transient loss of lung function, by itself, should not automatically be designated as adverse" and that "[f]ew . . . biomarkers have been validated sufficiently that their responses can be used with confidence to define the point at which a response should be equated to an adverse effect warranting preventive measures" (ATS, 2000a).[136] Based on these recommendations, compared to effects following exposures at or above 72 ppb, the Administrator has less confidence in the adversity of the respiratory effects that have been observed following exposures to 60 or 63 ppb.

She further notes that some commenters who advocated for a level of 60 ppb also focused on ATS recommendations regarding population-level risks. These commenters specifically stated that lung function decrements "may be adverse in terms of 'population risk,' where exposure to air pollution increases the risk to the population even though it might not harm lung function to a degree that is, on its own, 'clinically important' to an individual" (*e.g.*, ALA et al., p. 118). These commenters asserted that the EPA

---

[136] With regard to this latter recommendation, as discussed above (II.A.1.c), the ATS concluded that elevations of biomarkers such as cell numbers and types, cytokines, and reactive oxygen species may signal risk for ongoing injury and more serious effects or may simply represent transient responses, illustrating the lack of clear boundaries that separate adverse from nonadverse events.

has not appropriately considered the potential for such population-level risk. Contrary to the views expressed by these commenters, the Administrator carefully considers the potential for population risk, particularly within the context of the ATS recommendation that "a shift in the risk factor distribution, and hence the risk profile of the exposed population, should be considered adverse, even in the absence of the immediate occurrence of frank illness" (ATS, 2000a). Given that exposures to 60 ppb $O_3$ have been shown in controlled human exposure studies to cause transient and reversible decreases in group mean lung function, the Administrator notes the potential for such exposures to result in similarly transient and reversible shifts in the risk profile of an exposed population. However, in contrast to commenters who advocated for a level of 60 ppb, the Administrator also notes that the available evidence does not provide information on the extent to which a short-term, transient decrease in lung function in a population, as opposed to a longer-term or permanent decrease, could affect the risk of other, more serious respiratory effects (*i.e.,* change the risk profile of the population). This uncertainty, together with the additional ATS recommendations noted above, indicates to the Administrator that her judgment that there is uncertainty in the adversity of the effects shown to occur at 60 ppb is consistent with ATS recommendations.[137]

With regard to CASAC advice, the Administrator notes that, while CASAC clearly advised the EPA to consider the health effects shown to occur following exposures to 60 ppb $O_3$, its advice regarding the adversity of those effects is less clear. In particular, she notes that CASAC was conditional about whether the lung function decrements observed in some people at 60 ppb (*i.e.,* $FEV_1$ decrements ≥ 10%) are adverse. Specifically, CASAC stated that these decrements "*could be adverse* in individuals with lung disease" (Frey, 2014c, p. 7, emphasis added) and that they provide a "*surrogate* for adverse health outcomes for people with asthma and lung disease" (Frey, 2014c, p. 3, emphasis added). Further, CASAC did not recommend considering standard levels low enough to eliminate $O_3$-induced $FEV_1$ decrements ≥ 10% (Frey,

2014c). With regard to the full range of effects shown to occur at 60 ppb (*i.e.,* $FEV_1$ decrements, airway inflammation), CASAC stated that exposures of concern for the 60 ppb benchmark are "*relevant for consideration*" with respect to people with asthma (Frey, 2014c, p. 6, italics added). In addition, "[t]he CASAC concurs with EPA staff regarding the finding based on scientific evidence that a level of 60 ppb corresponds to the lowest exposure concentration demonstrated to result in lung function decrements large enough to be judged an abnormal response that ATS and that *could be adverse* in individuals with lung disease" (Frey, 2014c, p. 7, italics added). The Administrator contrasts these statements with CASAC's clear advice that "the combination of decrements in $FEV_1$ together with the statistically significant alterations in symptoms in human subjects exposed to 72 ppb ozone meets the American Thoracic Society's definition of an adverse health effect" (Frey, 2014c, p. 5).

Based on her consideration of all of the above recommendations and advice noted above, the Administrator judges that, compared to exposure concentrations at and above 72 ppb, there is greater uncertainty with regard to the adversity of effects shown to occur following $O_3$ exposures as low as 60 ppb. However, based on the effects that have been shown to occur at 60 ppb (*i.e.,* lung function decrements, airway inflammation), and CASAC advice indicating the importance of considering these effects (though its advice regarding the adversity of effects at 60 ppb is less clear), she concludes that it is appropriate to give some consideration to the extent to which a revised standard could allow such effects.

In considering estimates of exposures of concern for the 60, 70, and 80 ppb benchmarks within the context of her judgments on adversity, the Administrator notes that, due to interindividual variability in responsiveness, not every occurrence of an exposure of concern will result in an adverse effect. As discussed above (II.B.2.b.i), this point was highlighted by some commenters who opposed revision of the current standard, based on their analysis of effects shown to occur following exposures to 72 ppb $O_3$. This point was also highlighted by some commenters who advocated for a level of 60 ppb, based on the discussion of $O_3$-induced inflammation in the proposal. In particular, this latter group of commenters highlighted discussion from the proposal indicating that "[i]nflammation induced by a single $O_3$

exposure can resolve entirely but, as noted in the ISA (U.S. EPA, 2013, p. 6–76), 'continued acute inflammation can evolve into a chronic inflammatory state'" (*e.g.,* ALA *et al.,* p. 48). Consistent with these comments, and with her consideration of estimated exposures of concern in the proposal, the Administrator judges that the types of respiratory effects that can occur following exposures of concern, particularly if experienced repeatedly, provide a plausible mode of action by which $O_3$ may cause other more serious effects. Because of this, as in the proposal, the Administrator is most concerned about protecting against repeated occurrences of exposures of concern.

The Administrator's consideration of estimated exposures of concern is discussed in more detail below (II.C.4.b.iv, II.C.4.c). In summary, contrary to the conclusions of commenters who advocated for a level of 60 ppb, the Administrator judges that a revised standard with a level of 70 ppb will effectively limit the occurrence of the $O_3$ exposures for which she is most confident in the adversity of the resulting effects (*i.e.,* based on estimates for the 70 and 80 ppb benchmarks). She further concludes that such a standard will provide substantial protection against the occurrence of $O_3$ exposures for which there is greater uncertainty in the adversity of effects (*i.e.,* based on estimates for the 60 ppb benchmark).

As noted above, commenters also pointed out that benchmark concentrations are based on studies conducted in healthy adults, whereas at-risk populations are likely to experience more serious effects and effects at lower $O_3$ exposure concentrations. In considering this issue, the EPA notes CASAC's endorsement of 60 ppb as the lower end of the range of benchmarks for evaluation, and its advice that "the 60 ppb-8hr exposure benchmark is relevant for consideration with respect to adverse effects on asthmatics" (Frey, 2014c, p. 6). As discussed in detail below (II.C.4.c), the Administrator has carefully considered estimated exposures of concern for the 60 ppb benchmark. In addition, though the available information does not support the identification of specific benchmarks below 60 ppb that could be appropriate for consideration for at-risk populations, and though CASAC did not recommend consideration of any such benchmarks, the EPA expects that a revised standard with a level of 70 ppb will also reduce the occurrence of exposures to $O_3$ concentrations at least somewhat below 60 ppb (U.S. EPA,

---

[137] ATS provided additional recommendations to help inform judgments regarding the adversity of air pollution-related effects (e.g., related to "quality of life"), though it is not clear whether, or how, such recommendations should be applied to the respiratory effects observed in controlled human exposure studies following 6.6-hour $O_3$ exposures (ATS, 200a, p. 672).

2014a, Figures 4–9 and 4–10).[138] Thus, even if some members of at-risk populations may experience effects following exposures to $O_3$ concentrations somewhat below 60 ppb, a revised level of 70 ppb would be expected to reduce the occurrence of such exposures.[139] Therefore, the EPA has considered $O_3$ exposures that could be relevant for at-risk populations such as children and people with asthma, and does not agree that controlled human exposure studies reporting respiratory effects in healthy adults following exposures to 60 ppb $O_3$ necessitate a standard level below 70 ppb.

ii. Epidemiologic Studies

Commenters representing environmental and public health organizations also highlighted epidemiologic studies that, in their view, provide strong evidence for associations with mortality and morbidity in locations with ambient $O_3$ concentrations near and below 60 ppb. These commenters focused both on the epidemiologic studies evaluated in the PA's analyses of study location air quality (U.S. EPA, 2014c, Chapter 4) and on studies that were not explicitly analyzed in the PA, and in some cases on studies that were not included in the ISA.

The EPA agrees that epidemiologic studies can provide perspective on the degree to which $O_3$-associated health effects have been identified in areas with air quality likely to have met various standards. However, as discussed below, we do not agree with the specific conclusions drawn by these commenters regarding the implications of epidemiologic studies for the standard level. As an initial matter in considering epidemiologic studies, the EPA notes its decision, consistent with CASAC advice, to place the most emphasis on information from controlled human exposure studies (II.B.2 and II.B.3, above). This decision reflects the greater certainty in using information from controlled human exposure studies to link specific $O_3$ exposures with health effects, compared to using air quality information from epidemiologic studies of $O_3$ for this purpose.

While being aware of the uncertainties discussed above (II.B.2.b.ii), in considering what epidemiologic studies can tell us, the EPA notes analyses in the PA (U.S. EPA, 2014c, section 4.4.1) indicating that a revised standard with a level at or below 70 ppb would be expected to maintain distributions of short-term ambient $O_3$ concentrations below those present in the locations of all of the single-city epidemiologic studies analyzed. As discussed in the PA (U.S. EPA, 2014c, section 4.4.1), this includes several single-city studies conducted in locations that would have violated the current standard, and the study by Mar and Koenig (2009) that reported positive and statistically significant associations with respiratory emergency department visits with children and adults in a location that would have met the current standard over the entire study period, but would have violated a standard with a level of 70 ppb.[140] While these analyses provide support for a level at least as low as 70 ppb, the Administrator judges that they do not provide a compelling basis for distinguishing between the appropriateness of 70 ppb and lower standard levels.

As in the proposal, the EPA acknowledges additional uncertainty in interpreting air quality in locations of multicity epidemiologic studies of short-term $O_3$ for the purpose of evaluating alternative standard levels (U.S. EPA, 2014c, sections 3.1.4.2, 4.4.1). In particular, the PA concludes that interpretation of such air quality information is complicated by uncertainties in the extent to which multicity effect estimates (i.e., which are based on combining estimates from multiple study locations) can be attributed to ambient $O_3$ in the subset of study locations that would have met a particular standard, versus $O_3$ in the study locations that would have violated the standard. While giving only limited weight to air quality analyses in these study areas because of this uncertainty, the EPA also notes PA analyses indicating that a standard level at or below 70 ppb would require additional reductions, beyond those required by the current standard, in the ambient $O_3$ concentrations that provided the basis for statistically significant $O_3$ health effect associations in multicity epidemiologic studies. As

was the case for the single-city studies, and contrary to the views expressed by the commenters noted above, the Administrator judges that these studies do not provide a compelling basis for distinguishing between the appropriateness of alternative standard levels at or below 70 ppb.

In some cases, commenters highlighted studies that were assessed in the 2008 review of the $O_3$ NAAQS, but were not included in the ISA in the current review. These commenters asserted that such studies support the occurrence of $O_3$ health effect associations in locations with air quality near or, in some cases, below 60 ppb. Specifically, commenters highlighted a number of studies included in the 2007 Staff Paper that were not included in the ISA, claiming that these studies support a standard level below 70 ppb, and as low as 60 ppb.

As an initial matter with regard to these studies, the EPA notes that the focus of the ISA is on assessing the most policy-relevant scientific evidence. In the current review, the ISA considered over 1,000 new studies that have been published since the last review. Thus, it is not surprising that, as the body of evidence has been strengthened since the last review, some of the studies considered in the last review are no longer among the most policy relevant. However, based on the information included in the 2007 Staff Paper, the EPA does not agree that the studies highlighted by commenters provide compelling support for a level below 70 ppb. In fact, as discussed in the Staff Paper in the last review (U.S. EPA, 2007, p. 6–9; Appendix 3B), the $O_3$ concentrations reported for these studies, and the concentrations highlighted by commenters, were based on averaging across multiple monitors in study areas. Given that the highest monitor in an area is used to determine whether that area meets or violates the NAAQS, the averaged concentrations reported in the Staff Paper are thus not appropriate for direct comparison to the level of the $O_3$ standard. When the Staff Paper considered the $O_3$ concentrations measured at individual monitors for the subset of these study areas with particularly low concentrations, they were almost universally found to be above, and in many cases well above, even the current standard level of 75 ppb.[141] Based on the above

---

[138] Air quality analyses in the HREA indicate that reducing the level of the primary standard from 75 ppb to 70 ppb will result in reductions in the $O_3$ concentrations in the upper portions of ambient distributions. This includes 8-hour ambient $O_3$ concentrations at, and somewhat below, 60 ppb (U.S. EPA, 2014a, Figures 4–9 and 4–10).

[139] The uncertainty associated with the potential adversity of any such effects would be even greater than that discussed above for the 60 ppb benchmark.

[140] As noted above (II.B.2.b.ii and II.B.3), the studies by Silverman and Ito (2010) and Strickland et al. (2010) provided support for the Administrator's decision to revise the current primary $O_3$ standard, but do not provide insight into the appropriateness of specific standard levels below 75 ppb.

[141] For one study conducted in Vancouver, where data from individual monitors did indicate ambient concentrations below the level of the current standard (Vedal et al., 2003), the Staff Paper noted that the study authors questioned whether $O_3$, other gaseous pollutants, and PM in this study may be

Continued

considerations, and consistent with the Administrator's overall decision to place less emphasis on air quality in locations of epidemiologic studies to select a standard level, the EPA disagrees with commenters who asserted that epidemiologic studies included in the last review, but not cited in the ISA or PA in this review, necessitate a level below 70 ppb. In fact, the EPA notes that these studies are consistent with the majority of the U.S. studies evaluated in the PA in the current review, in that most were conducted in locations that would have violated the current O₃ NAAQS over at least part of the study periods.

iii. Exposure and Risk Assessments

Some commenters supporting levels below 70 ppb also asserted that quantitative analyses in the HREA are biased such that they understate O₃ exposures of concern and risks of O₃-induced FEV₁ decrements. Many of these comments are discussed above within the context of the adequacy of the current standard (II.B.2.b.i), including comments pointing out that exposure and risk estimates are based on information from healthy adults rather than at-risk populations; comments noting that the exposure assessment evaluates 8-hour O₃ exposures rather than the 6.6-hour exposures used in controlled human exposure studies; and comments asserting that the EPA's exposure and risk analyses rely on people staying indoors on high pollution days (i.e., averting behavior).

As discussed in section II.B.2.b.i above, while the EPA agrees with certain aspects of these commenters' assertions, we do not agree with their overall conclusions. In particular, there are aspects of the HREA's quantitative analyses that, if viewed in isolation, would tend to either overstate or understate O₃ exposures and/or health risks. While commenters tended to focus on those aspects of the assessments that support their position, they tended to ignore aspects of the assessments that do not support their position (points that were often raised by commenters on the other side of the issue). Rather than viewing the potential implications of these aspects of the HREA assessments in isolation, the EPA considers them together, along with

other issues and uncertainties related to the interpretation of exposure and risk estimates.

For example, some commenters who advocated for a level below 70 ppb asserted that the exposure assessment could underestimate O₃ exposures for highly active populations, including outdoor workers and children who spend a large portion of time outdoors during summer. In support of these assertions, commenters highlighted sensitivity analyses conducted in the HREA. However, as noted in the HREA (U.S. EPA, 2014a, Table 5–10), this aspect of the assessment is likely to have only a "low to moderate" impact on the magnitude of exposure estimates. To put this magnitude in perspective, HREA sensitivity analyses conducted in a single urban study area indicate that, regardless of whether exposure estimates for children are based on all available diaries or on a subset of diaries restricted to simulate highly exposed children, a revised standard with a level of 70 ppb is estimated to protect more than 99% of children from experiencing two or more exposures of concern at or above 70 ppb (U.S. EPA, 2014a, Chapter 5 Appendices, Figure 5G–9).[142][143] In contrast to the focus of commenters who supported a level below 70 ppb, other aspects of quantitative assessments, some of which were highlighted by commenters who opposed revising the current standard (II.B.2), tend to result in overestimates of O₃ exposures. These aspects are characterized in the HREA as having either a "low," a "low-to-moderate," or a "moderate" impact on the magnitudes of exposure estimates.

In its reviews of the HREA and PA, CASAC recognized many of the uncertainties and issues highlighted by commenters. Even considering these uncertainties, CASAC endorsed the approaches adopted by the EPA to assess O₃ exposures and health risks, and CASAC used exposure and risk estimates as part of the basis for their recommendations on the primary O₃ NAAQS (Frey, 2014c). Thus, as discussed in section II.B.2.b.i above, the

EPA disagrees with commenters who claim that the aspects of the quantitative assessments that they highlight lead to overall underestimates of exposures or health risks.[144]

Some commenters further contended that the level of the primary O₃ standard should be set below 70 ppb in order to compensate for the use of a form that allows multiple days with concentrations higher than the standard level. These groups submitted air quality analyses to support their point that the current fourth-high form allows multiple days per year with ambient O₃ concentrations above the level of the standard. While the EPA does not dispute the air quality analyses submitted by these commenters, and agrees that fourth-high form allows multiple days per year with ambient O₃ concentrations above the level of the standard (3 days per year, on average over a 3-year period), the Agency disagrees with commenters' assertion that, because of this, the level of the primary O₃ standard should be set below 70 ppb. As discussed above (II.A.2), the quantitative assessments that informed the Administrator's proposed decision, presented in the HREA and considered in the PA and by CASAC, estimated O₃ exposures and health risks associated with air quality that "just meets" various standards with the current 8-hour averaging time and fourth-high, 3-year average form. Thus, in considering the degree of public health protection appropriate for the primary O₃ standard, the Administrator has considered quantitative exposure and risk estimates that are based a fourth-high form, and therefore on a standard that, as these commenters point out, allows multiple days per year with ambient O₃ concentrations above the level of the standard.

iv. CASAC Advice

Many commenters, including those representing major medical, public health, or environmental groups; some state agencies; and a large number of individual commenters, focused on CASAC advice in their rationale supporting levels below 70 ppb, and as low as 60 ppb. These commenters generally asserted that the EPA must

---

acting as surrogate markers of pollutant mixes that contain more toxic compounds, "since the low measured concentrations were unlikely, in their opinion, to cause the observed effects" (U.S. EPA, 2007, p. 6–16). The Staff Paper further noted that another study conducted in Vancouver failed to find statistically significant associations with O₃ (Villeneuve et al., 2003).

[142] More specifically, based on all children's diaries, just under 0.1% of children are estimated to experience two or more exposures of concern at or above 70 ppb. Based on simulated profiles of highly exposed children, this estimate increased to just over 0.1% (U.S. EPA, 2014a, Chapter 5 Appendices, Figure 5G–9).

[143] In addition, when diaries were selected to mimic exposures that could be experienced by outdoor workers, the percentages of modeled individuals estimated to experience exposures of concern were generally similar to the percentages estimated for children (i.e., using the full database of diary profiles) in the worst-case cities and years (i.e., cities and years with the highest exposure estimates) (U.S. EPA, 2014, section 5.4.3.2, Figure 5–14).

[144] As discussed in II.B.2.b above, in weighing the various uncertainties, which can bias exposure results in different directions but tend to have impacts that are similar in magnitude (U.S. EPA, 2014a, Table 5–10), and in light of CASAC's advice based on its review of the HREA and the PA, the EPA continues to conclude that the approach to considering estimated exposures of concern in the HREA, PA, and the proposal reflects an appropriate balance, and provides an appropriate basis for considering the public health protectiveness of the primary O₃ standard.

give deference to CASAC. In some cases, these commenters expressed strong objections to a level of 70 ppb, noting CASAC policy advice that such a level would provide little margin of safety.

The EPA agrees that CASAC advice is an important consideration in reaching a decision on the standard level (see *e.g.* CAA section 307 (d)(3)),[145] though not with commenters' conclusion that CASAC advice necessitates a standard level below 70 ppb. As discussed above (II.C.4.a), the Administrator carefully considered CASAC advice in the proposal, and she judged that her proposed decision to revise the level to within the range of 65 to 70 ppb was consistent with CASAC advice, based on the available science.

As in the proposal, in her final decision on level the Administrator notes CASAC's overall conclusion that "based on the scientific evidence from clinical studies, epidemiologic studies, animal toxicology studies, as summarized in the ISA, the findings from the exposure and risk assessments as summarized in the HREA, and the interpretation of the implications of all of these sources of information as given in the Second Draft PA . . . there is adequate scientific evidence to recommend a range of levels for a revised primary ozone standard from 70 ppb to 60 ppb" (Frey, 2014c, p. 8). Thus, CASAC used the health evidence and exposure/risk information to inform its range of recommended standard levels, a range that included an upper bound of 70 ppb based on the scientific evidence, and it did not use the evidence and information to recommend setting the primary $O_3$ standard at any specific level within the range of 70 to 60 ppb. In addition, CASAC further stated that "the choice of a level within the range recommended based on scientific evidence [*i.e.,* 70 to 60 ppb] is a policy judgment under the statutory mandate of the Clean Air Act" (Frey, 2014c, p. ii).

In addition to its advice based on the scientific evidence, CASAC offered the "policy advice" to set the level below 70 ppb, stating that a standard level of 70 ppb "may not meet the statutory requirement to protect public health with an adequate margin of safety" (Frey, 2014c, p. ii). In supporting its policy advice to set the level below 70 ppb, CASAC noted the respiratory effects that have been shown to occur in controlled human exposure studies following exposures from 60 to 80 ppb

$O_3$, and the extent to which various standard levels are estimated to allow the occurrence of population exposures that can result in such effects (Frey, 2014c, pp. 7–8).

The EPA agrees that an important consideration when reaching a decision on level is the extent to which a revised standard is estimated to allow the types of exposures shown in controlled human exposure studies to cause respiratory effects. In reaching her final decision that a level of 70 ppb is requisite to protect public health with an adequate margin of safety (II.C.4.c, below), the Administrator carefully considers the potential for such exposures and effects. In doing so, she emphasizes the importance of setting a standard that limits the occurrence of the exposures about which she is most concerned (*i.e.,* those for which she has the most confidence in the adversity of the resulting effects, which are repeated exposures of concern at or above 70 or 80 ppb, as discussed above in II.C.4.b.i). Based on her consideration of information from controlled human exposure studies in light of CASAC advice and ATS recommendations, the Administrator additionally judges that there is important uncertainty in the extent to which the effects shown to occur following exposures to 60 ppb $O_3$ are adverse to public health (discussed above, II.C.4.b.i and II.C.4.b.iii). However, based on the effects that have been shown to occur, CASAC advice indicating the importance of considering these effects, and ATS recommendations indicating the potential for adverse population-level effects (II.C.4.b.i, II.C.4.b.iii), she concludes that it is appropriate to give some consideration to the extent to which a revised standard could allow the respiratory effects that have been observed following exposures to 60 ppb $O_3$.

When considering the extent to which a revised standard could allow $O_3$ exposures that have been shown in controlled human exposures studies to result in respiratory effects, the Administrator is most concerned about protecting the public, including at-risk populations, against repeated occurrences of such exposures of concern (II.C.4.b.i, above). In considering the appropriate metric for evaluating repeated occurrences of exposures of concern, the Administrator acknowledges that it is not clear from the evidence, or from the ATS recommendations, CASAC advice, or public comments, how particular numbers of exposures of concern could impact the seriousness of the resulting effects, especially at lower exposure

concentrations. Therefore, the Administrator judges that focusing on HREA estimates of two or more exposures of concern provides a health-protective approach to considering the potential for repeated occurrences of exposures of concern that could result in adverse effects. She notes that other possible metrics for considering repeated occurrences of exposures of concern (*e.g.,* 3 or more, 4 or more, etc.) would result in smaller exposure estimates.

As discussed further below (II.C.4.c), the Administrator notes that a revised standard with a level of 70 ppb is estimated to eliminate the occurrence of two or more exposures of concern to $O_3$ concentrations at or above 80 ppb and to virtually eliminate the occurrence of two or more exposures of concern to $O_3$ concentrations at or above 70 ppb (Table 1, above). For the 70 ppb benchmark, this reflects about a 90% reduction in the number of children estimated to experience two or more exposures of concern, compared to the current standard.[146] Even considering the worst-case urban study area and worst-case year evaluated in the HREA, a standard with a level of 70 ppb is estimated to protect more than 99% of children from experiencing two or more exposures of concern to $O_3$ concentrations at or above 70 ppb (Table 1).

Though the Administrator judges that there is greater uncertainty with regard to the occurrence of adverse effects following exposures as low as 60 ppb, she notes that a revised standard with a level of 70 ppb is estimated to protect the vast majority of children in urban study areas (*i.e.,* about 96% to more than 99% in individual areas) from experiencing two or more exposures of concern at or above 60 ppb. Compared to the current standard, this represents a reduction of more than 60% in exposures of concern for the 60 ppb benchmark (Table 1). Given the Administrator's uncertainty regarding the adversity of the effects following exposures to 60 ppb $O_3$, and her health-protective approach to considering repeated occurrences of exposures of concern, the Administrator judges that this degree of protection is appropriate and that it reflects substantial protection against the occurrence of $O_3$-induced effects, including effects for which she judges the adversity to public health is uncertain.

---

[145] The EPA notes, of course, that the CAA places the responsibility for judging what standard is requisite with the Administrator and only requires that, if her decision differs in important ways from CASAC's advice, she explain her reasoning for differing.

[146] Percent reductions in this section refer to reductions in the number of children in HREA urban study areas (averaged over the years evaluated in the HREA) estimated to experience exposures of concern, based on the information in Table 1 above.

While being less concerned about single occurrences of exposures of concern, especially at lower exposure concentrations, the Administrator also notes that a standard with a level of 70 ppb is estimated to (1) virtually eliminate all occurrences of exposures of concern at or above 80 ppb; (2) protect ≥ about 99% of children in urban study areas from experiencing any exposures of concern at or above 70 ppb; and (3) to achieve substantial reductions (*i.e.,* about 50%), compared to the current standard, in the occurrence of one or more exposures of concern at or above 60 ppb (Table 1).

Given the information and advice noted above (and in II.C.4.b.i, II.C.4.b.iii), the Administrator judges that a revised standard with a level of 70 ppb will effectively limit the occurrence of the $O_3$ exposures for which she has the most confidence in the adversity of the resulting effects (*i.e.,* based on estimates for the 70 and 80 ppb benchmarks). She further judges that such a standard will provide a large degree of protection against $O_3$ exposures for which there is greater uncertainty in the adversity of effects (*i.e.,* those observed following exposures to 60 ppb $O_3$), contributing to the margin of safety of the standard. See M*ississippi, 744 F. 3d at 1353 ("By requiring an 'adequate margin of safety', Congress was directing EPA to build a buffer to protect against uncertain and unknown dangers to human health"). Given the considerable protection provided against repeated exposures of concern for all of the benchmarks evaluated, including the 60 ppb benchmark, the Administrator judges that a standard with a level of 70 ppb will provide an adequate margin of safety against the adverse $O_3$-induced effects shown to occur following exposures at or above 72 ppb, and judged by CASAC likely to occur following exposures somewhat below 72 ppb.[147]

Contrary to the conclusions of commenters who advocated for a level below 70 ppb, the Administrator notes that her final decision is consistent with CASAC's advice, based on the scientific evidence, and with CASAC's focus on

setting a revised standard to further limit the occurrence of the respiratory effects observed in controlled human exposure studies, including effects observed following exposures to 60 ppb $O_3$. Given her judgments and conclusions discussed above, and given that the CAA reserves the choice of the standard that is requisite to protect public health with an adequate margin of safety for the judgment of the EPA Administrator, she disagrees with commenters who asserted that CASAC advice necessitates a level below 70 ppb, and as low as 60 ppb. The Administrator's final conclusions on level are discussed in more detail below (II.C.4.c).

c. Administrator's Final Decision Regarding Level

Having carefully considered the public comments on the appropriate level of the primary $O_3$ standard, as discussed above and in the Response to Comments document, the Administrator believes her scientific and policy judgments in the proposal remain valid. In conjunction with her decisions to retain the current indicator, averaging time, and form (II.C.1 to II.C.3, above), the Administrator is revising the level of the primary $O_3$ standard to 70 ppb. In doing so, she is selecting a primary $O_3$ standard that is requisite to protect public health with an adequate margin of safety, in light of her judgments based on an interpretation of the scientific evidence and exposure/risk information that neither overstates nor understates the strengths and limitations of that evidence and information and the appropriate inferences to be drawn therefrom.

The Administrator's decision to revise the level of the primary $O_3$ standard to 70 ppb builds upon her conclusion that the overall body of scientific evidence and exposure/risk information calls into question the adequacy of public health protection afforded by the current standard, particularly for at-risk populations and lifestages (II.B.3).[148] Consistent with the proposal, her decision on level places the greatest emphasis on the results of controlled human exposure studies and on quantitative analyses based on information from these studies, particularly analyses of $O_3$ exposures of concern. As in the proposal, and as discussed further below, she views the results of the lung function risk assessment, analyses of $O_3$ air quality in

locations of epidemiologic studies, and epidemiology-based quantitative health risk assessments as providing information in support of her decision to revise the current standard, but a more limited basis for selecting a particular standard level among a range of options. See *Mississippi,* 744 F. 3d at 1351–52 (studies can legitimately support a decision to revise the standard, but not provide sufficient information to justify their use in setting the level of a revised standard).

Given her consideration of the evidence, exposure/risk information, advice from CASAC, and public comments, the Administrator judges that a standard with a level of 70 ppb is requisite to protect public health with an adequate margin of safety. She notes that the determination of what constitutes an adequate margin of safety is expressly left to the judgment of the EPA Administrator. See *Lead Industries Association* v. *EPA,* 647 F.2d at 1161–62; *Mississippi,* 744 F. 3d at 1353. She further notes that in evaluating how particular standards address the requirement to provide an adequate margin of safety, it is appropriate to consider such factors as the nature and severity of the health effects, the size of sensitive population(s) at risk, and the kind and degree of the uncertainties present (I.B, above). Consistent with past practice and long-standing judicial precedent, the Administrator takes the need for an adequate margin of safety into account as an integral part of her decision-making on the appropriate level, averaging time, form, and indicator of the standard.[149]

In considering the need for an adequate margin of safety, the Administrator notes that a standard with a level of 70 ppb $O_3$ would be expected to provide substantial improvements in public health, including for at-risk groups such as children and people with asthma. The following paragraphs summarize the basis for the Administrator's conclusion that a revised primary $O_3$ standard with a level of 70 ppb is requisite to protect the public health with an adequate margin of safety.

As an initial matter, consistent with her conclusions on the need for revision of the current standard (II.B.3), in reaching a decision on level the Administrator places the most weight on information from controlled human exposure studies. In doing so, she notes that controlled human exposure studies provide the most certain evidence indicating the occurrence of health

---

[147] As discussed above (II.C.4.b.i), when commenting on the extent to which the study by Schelegle *et al.* (2009) suggests the potential for adverse effects following $O_3$ exposures below 72 ppb, CASAC stated the following: "[I]f subjects had been exposed to ozone using the 8-hour averaging period used in the standard [rather than the 6.6-hour exposures evaluated in the study], adverse effects could have occurred at lower concentration. Further, in our judgment, the level at which adverse effects might be observed would likely be lower for more sensitive subgroups, such as those with asthma" (Frey, 2014c, p. 5).

[148] At-risk populations include people with asthma; children and older adults; people who are active outdoors, including outdoor workers; people with certain genetic variants; and people with reduced intake of certain nutrients.

[149] See, *e.g. NRDC* v. *EPA,* 902 F. 2d 962, 973–74 (D.C. Cir. 1990).

effects in humans following specific $O_3$ exposures. In particular, she notes that the effects reported in controlled human exposure studies are due solely to $O_3$ exposures, and interpretation of study results is not complicated by the presence of co-occurring pollutants or pollutant mixtures (as is the case in epidemiologic studies). The Administrator also observes that her emphasis on information from controlled human exposure studies is consistent with CASAC's advice and interpretation of the scientific evidence (Frey, 2014c).

With regard to the effects shown in controlled human exposure studies following specific $O_3$ exposures, as discussed in more detail above (II.B, II.C.4.b.i), the Administrator notes that (1) the largest respiratory effects, and the broadest range of effects, have been studied and reported following exposures to 80 ppb $O_3$ or higher (i.e., decreased lung function, increased airway inflammation, increased respiratory symptoms, AHR, and decreased lung host defense); (2) exposures to $O_3$ concentrations as low as 72 ppb have been shown to both decrease lung function and result in respiratory symptoms; and (3) exposures to $O_3$ concentrations as low as 60 ppb have been shown to decrease lung function and to increase airway inflammation.

While such controlled human exposure studies provide a high degree of confidence regarding the occurrence of health effects following exposures to $O_3$ concentrations from 60 to 80 ppb, there are no universally accepted criteria by which to judge the adversity of the observed effects. To inform her judgments on the potential adversity to public health of effects reported in controlled human exposure studies, the Administrator considers ATS recommendations and CASAC advice, as described in detail above (II.B.2, II.C.4.b.i, II.C.4.b.iii, II.C.4.b.iv). Based on her consideration of such recommendations and advice, the Administrator is confident that the respiratory effects that have been observed following exposures to 72 ppb $O_3$ or above can be adverse. In addition, she judges that adverse effects are likely to occur following exposures somewhat below 72 ppb (II.C.4.b.i). However, as described above (II.C.4.b.i, II.C.4.b.iii, II.C.4.b.iv), the Administrator is notably less confident in the adversity to public health of the respiratory effects that have been observed following exposures to $O_3$ concentrations as low as 60 ppb, given her consideration of the following: (1) ATS recommendations indicating uncertainty in judging adversity based

on lung function decrements alone; (2) uncertainty in the extent to which a short-term, transient population-level decrease in $FEV_1$ would increase the risk of other, more serious respiratory effects in that population (i.e., per ATS recommendations on population-level risk); and (3) compared to 72 ppb, CASAC advice is less clear regarding the potential adversity of effects at 60 ppb.

Taken together, the Administrator concludes that the evidence from controlled human exposure studies provides strong support for her conclusion that a revised standard with a level of 70 ppb is requisite to protect the public health with an adequate margin of safety. She bases this conclusion, in part, on the fact that such a standard level would be well below the $O_3$ exposure concentration shown to result in the widest range of respiratory effects (i.e., 80 ppb), and below the lowest $O_3$ exposure concentration shown to result in the adverse combination of lung function decrements and respiratory symptoms (i.e., 72 ppb). See *Lead Industries*, 647 F. 2d at 1160 (setting NAAQS at level well below the level where the clearest adverse effects occur, and at a level eliminating most ''sub-clinical effects'' provides an adequate margin of safety).

As discussed above (II.C.4.b.i), the Administrator also notes that a revised $O_3$ standard with a level of 70 ppb can provide substantial protection against the broader range of $O_3$ concentrations that have been shown in controlled human exposure studies to result in respiratory effects, including exposure concentrations below 70 ppb. The degree of protection provided by any NAAQS is due to the combination of all of the elements of the standard (i.e., indicator, averaging time, form, level) and, in the case of the fourth-high form of the revised primary $O_3$ standard (II.C.3), the large majority of days in areas that meet the revised standard will have 8-hour $O_3$ concentrations below 70 ppb, with most days having 8-hour $O_3$ concentrations well below this level. In addition, the degree of protection provided by the $O_3$ NAAQS is also dependent on the extent to which people experience health-relevant $O_3$ exposures in locations meeting the NAAQS. As discussed above, for a pollutant like $O_3$ where adverse responses are critically dependent on ventilation rates, the Administrator notes that it is important to consider activity patterns in the exposed population. Not considering activity patterns, and corresponding ventilation rates, can result in a standard that provides more protection than is requisite. Therefore, as discussed in the

proposal, in considering the degree of protection provided by a revised primary $O_3$ standard, the Administrator considers the extent to which that standard would be expected to limit population exposures of concern (i.e., which take into account activity patterns and estimated ventilation rates) to the broader range of $O_3$ exposure concentrations shown to result in health effects.

Due to interindividual variability in responsiveness, the Administrator notes that not every occurrence of an exposure of concern will result in an adverse effect (II.C.4.b.i). Moreover, repeated occurrences of some of the effects demonstrated following exposures of concern could increase the likelihood of adversity (U.S. EPA, 2013, Section 6.2.3, p. 6–76). In particular, she notes that the types of respiratory effects that can occur following exposures of concern, particularly if experienced repeatedly, provide a plausible mode of action by which $O_3$ may cause other more serious effects. Therefore, as in the proposal, the Administrator is most concerned about protecting at-risk populations against repeated occurrences of exposures of concern. In considering the appropriate metric for evaluating repeated occurrences of exposures of concern, the Administrator acknowledges that it is not clear from the evidence, or from the ATS recommendations, CASAC advice, or public comments, how particular numbers of exposures of concern could impact the seriousness of the resulting effects, especially at lower exposure concentrations. Therefore, the Administrator judges that focusing on HREA estimates of two or more exposures of concern provides a health-protective approach to considering the potential for repeated occurrences of exposures of concern that could result in adverse effects.

Based on her consideration of adversity discussed above, the Administrator places the most emphasis on setting a standard that appropriately limits repeated occurrences of exposures of concern at or above the 70 and 80 ppb benchmarks. She notes that a revised standard with a level of 70 ppb is estimated to eliminate the occurrence of two or more exposures of concern to $O_3$ concentrations at or above 80 ppb and to virtually eliminate the occurrence of two or more exposures of concern to $O_3$ concentrations at or above 70 ppb for all children and children with asthma, even in the worst-case year and location evaluated.

While she is less confident that adverse effects will occur following exposures to $O_3$ concentrations as low as 60 ppb, as discussed above, the

BLM_0047374

Administrator judges that it is also appropriate to consider estimates of exposures of concern for the 60 ppb benchmark. Consistent with this judgment, although CASAC advice regarding the potential adversity of effects at 60 ppb was less definitive than for effects at 72 ppb, CASAC did clearly advise the EPA to consider the extent to which a revised standard is estimated to limit the effects observed following 60 ppb exposures (Frey, 2014c). Therefore, the Administrator considers estimated exposures of concern for the 60 ppb benchmark, particularly considering the extent to which the health protection provided by a revised standard includes a margin of safety against the occurrence of adverse $O_3$-induced effects. The Administrator notes that a revised standard with a level of 70 ppb is estimated to protect the vast majority of children in urban study areas (i.e., about 96% to more than 99% of children in individual areas) from experiencing two or more exposures of concern at or above 60 ppb. Compared to the current standard, this represents a reduction of more than 60%.

Given the considerable protection provided against repeated exposures of concern for all of the benchmarks evaluated, including the 60 ppb benchmark, the Administrator judges that a standard with a level of 70 ppb will incorporate a margin of safety against the adverse $O_3$-induced effects shown to occur following exposures at or above 72 ppb, and judged likely to occur following exposures somewhat below 72 ppb.

While the Administrator is less concerned about single occurrences of $O_3$ exposures of concern, especially for the 60 ppb benchmark, she judges that estimates of one or more exposures of concern can provide further insight into the margin of safety provided by a revised standard. In this regard, she notes that a standard with a level of 70 ppb is estimated to (1) virtually eliminate all occurrences of exposures of concern at or above 80 ppb; (2) protect the vast majority of children in urban study areas from experiencing any exposures of concern at or above 70 ppb (i.e., ≥ about 99%, based on mean estimates; Table 1); and (3) to achieve substantial reductions, compared to the current standard, in the occurrence of one or more exposures of concern at or above 60 ppb (i.e., about a 50% reduction; Table 1). The Administrator judges that these results provide further support for her conclusion that a standard with a level of 70 ppb will incorporate an adequate margin of safety against the occurrence of $O_3$ exposures

that can result in effects that are adverse to public health.

The Administrator additionally judges that a standard with a level of 70 ppb would be expected to result in important reductions, compared to the current standard, in the population-level risk of $O_3$-induced lung function decrements (≥10%, ≥15%) in children, including children with asthma. Specifically, a revised standard with a level of 70 ppb is estimated to reduce the risk of two or more $O_3$-induced decrements by about 30% and 20% for decrements ≥15 and 10%, respectively (Table 2, above). However, as discussed above (II.C.4.b.i), the Administrator judges that there are important uncertainties in using lung function risk estimates as a basis for considering the occurrence of adverse effects in the population given (1) the ATS recommendation that "a small, transient loss of lung function, by itself, should not automatically be designated as adverse" (ATS, 2000a); (2) uncertainty in the extent to which a transient population-level decrease in $FEV_1$ would increase the risk of other, more serious respiratory effects in that population (i.e., per ATS recommendations on population-level risk); and (3) that CASAC did not advise considering a standard that would be estimated to eliminate $O_3$-induced lung function decrements ≥10 or 15% (Frey, 2014c). Moreover, as at proposal, the Administrator notes that the variability in lung function risk estimates across urban study areas is often greater than the differences in risk estimates between various standard levels (Table 2, above).[150] Given this, and the resulting considerable overlap between the ranges of lung function risk estimates for different standard levels, the Administrator puts limited weight on the lung function risk estimates for distinguishing between the degrees of public health protection provided by alternative standard levels. Therefore, the Administrator judges that while a standard with a level of 70 ppb would be expected to result in important reductions, compared to the current standard, in the population-level risk of $O_3$-induced lung function decrements (>10%, 15%) in children, including children with asthma, she also judges that estimated risks of $O_3$-induced lung function decrements provide a more limited basis than exposures of concern for distinguishing between the

appropriateness of the health protection afforded by a standard level of 70 ppb versus lower levels.

The Administrator also considers the epidemiologic evidence and the quantitative risk estimates based on information from epidemiologic studies. As discussed in the proposal, and above in the EPA's responses to significant comments, although the Administrator acknowledges the important uncertainties in using the $O_3$ epidemiologic studies as a basis for selecting a standard level, she notes that these studies can provide perspective on the degree to which $O_3$-associated health effects have been identified in areas with air quality likely to have met various standards. Specifically, the Administrator notes analyses in the PA (U.S. EPA, 2014c, section 4.4.1) indicating that a revised standard with a level of 70 ppb would be expected to require additional reductions, beyond those required by the current standard, in the short- and long-term ambient $O_3$ concentrations that provided the basis for statistically significant $O_3$ health effect associations in both the single-city and multicity epidemiologic studies evaluated. As discussed above in the response to comments, while the Administrator concludes that these analyses support a level at least as low as 70 ppb, based on a study reporting health effect associations in a location that met the current standard over the entire study period but that would have violated a revised standard with a level of 70 ppb,[151] she further judges that they are of more limited utility for distinguishing between the appropriateness of the health protection estimated for a standard level of 70 ppb and the protection estimated for lower levels. Thus, the Administrator notes that a revised standard with a level of 70 ppb will provide additional public health protection, beyond that provided by the current standard, against the clearly adverse effects reported in

---

[150] For example, the average percentage of children estimated to experience two or more decrements ≥10% ranges from approximately 6 to 11% for a standard level of 70 ppb, up to about 9% for a level of 65 ppb, and up to about 6% for a level of 60 ppb (Table 2, above).

[151] As discussed above (II.B.2.c.ii and II.B.3), the study by Mar and Koenig (2009) reported positive and statistically significant associations with respiratory emergency department visits in a location that would have met the current standard over the entire study period, but violated a standard with a level of 70 ppb. In addition, air quality analyses in the locations of two additional studies highlighted in sections II.B.2 and II.B.3 (Silverman and Ito, 2010; Strickland et al., 2010) were used in the PA to inform staff conclusions on the adequacy of the current primary $O_3$ standard. However, they did not provide insight into the appropriateness of standard levels below 75 ppb and, therefore, these analyses were not used to inform conclusions on potential alternative standard levels lower than 75 ppb (U.S. EPA, 2014c, Chapters 3 and 4). See *Mississippi*, 744 F. 3d at 1352–53 (study appropriate for determining causation may not be probative for determining level of a revised standard).

epidemiologic studies. She judges that a standard with a level of 70 ppb strikes an appropriate balance between setting the level to require reductions in the ambient $O_3$ concentrations associated with statistically significant health effects in epidemiologic studies, while not being more protective than necessary in light of her considerable uncertainty in the extent to which studies clearly show $O_3$-attributable effects at lower ambient $O_3$ concentrations. This judgment is consistent with the Administrator's conclusions based on information from controlled human exposure studies, as discussed above.

With regard to epidemiology-based risk estimates, the Administrator takes note of the CASAC conclusion that "[a]lthough the estimates for short-term exposure impacts are subject to uncertainty, the data supports a conclusion that there are meaningful reductions in mean premature mortality associated with ozone levels lower than the current standard" (Frey, 2014a, p. 10). While she concludes that epidemiology-based risk analyses provide only limited support for any specific standard level, consistent with CASAC advice the Administrator judges that, compared to the current standard, a revised standard with a level of 70 ppb will result in meaningful reductions in the mortality and respiratory morbidity risk that is associated with short-or long-term ambient $O_3$ concentrations.

Given all of the evidence and information discussed above, the Administrator judges that a standard with a level of 70 ppb is requisite to protect public health with an adequate margin of safety, and that a level below 70 ppb would be more than "requisite" to protect the public health. In reaching this conclusion, she notes that a decision to set a lower level would place a large amount of emphasis on the potential public health importance of (1) further reducing the occurrence of $O_3$ exposures of concern, though the exposures about which she is most concerned are estimated to be almost eliminated with a level of 70 ppb, and lower levels would be expected to achieve virtually no additional reductions in these exposures (see Table 1, above); (2) further reducing the risk of $O_3$-induced lung function decrements >10 and 15%, despite having less confidence in judging the potential adversity of lung function decrements alone and the considerable overlap between risk estimates for various standard levels that make it difficult to distinguish between the risk reductions achieved; (3) further reducing ambient $O_3$ concentrations, relative to those in

locations of epidemiologic studies, though associations have not been reported for air quality that would have met a standard with a level of 70 ppb across all study locations and over entire study periods, and despite her consequent judgment that air quality analyses in epidemiologic study locations are not informative regarding the additional degree of public health protection that would be afforded by a standard set at a level below 70 ppb; and (4) further reducing epidemiology-based risk estimates, despite the important uncertainties in those estimates. As discussed in this section and in the responses to significant comments above, the Administrator does not agree that it is appropriate to place significant weight on these factors or to use them to support the appropriateness of standard levels below 70 ppb $O_3$. Compared to an $O_3$ standard level of 70 ppb, the Administrator concludes that the extent to which lower standard levels could result in further public health improvements becomes notably less certain.

Thus, having carefully considered the evidence, information, CASAC advice, and public comments relevant to her decision on the level of the primary $O_3$ standard, as discussed above and in the Response to Comments document, the Administrator is revising the level of the primary $O_3$ standard to 70 ppb. She is mindful that the selection of a primary $O_3$ standard that is requisite to protect public health with an adequate margin of safety requires judgments based on an interpretation of the scientific evidence and exposure/risk information that neither overstate nor understate the strengths and limitations of that evidence and information and the appropriate inferences to be drawn therefrom. Her decision places the greatest emphasis on the results of controlled human exposure studies and on quantitative analyses based on information from these studies, particularly analyses of $O_3$ exposures of concern. As in the proposal, and as discussed above, she views the results of the lung function risk assessment, analyses of $O_3$ air quality in locations of epidemiologic studies, and epidemiology-based quantitative health risk assessments as providing information in support of her decision to revise the current standard, but a more limited basis for selecting a particular standard level among a range of options.

In making her decision to revise the level of the primary $O_3$ standard to 70 ppb, the Administrator judges that a revised standard with a level of 70 ppb

strikes the appropriate balance between limiting the $O_3$ exposures about which she is most concerned and not going beyond what would be required to effectively limit such exposures. Specifically, the Administrator judges it appropriate to set a standard estimated to eliminate, or almost eliminate, repeated occurrences of exposures of concern for the 70 and 80 ppb benchmarks. She further judges that a lower standard level would not be appropriate given that lower levels would be expected to achieve virtually no additional reductions in repeated occurrences of exposures of concern for these benchmarks. For the 60 ppb benchmark, a level of 70 ppb is estimated to protect the vast majority of children (including children with asthma) in urban study areas from experiencing two or more exposures of concern, reflecting important reductions in such exposures compared to the current standard and indicating that the revised primary $O_3$ standard provides an adequate margin of safety. Given these results, including the considerable protection provided against repeated exposures of concern for the 60 ppb benchmark, the Administrator judges that a standard with a level of 70 ppb incorporates an adequate margin of safety against the occurrence of adverse $O_3$-induced effects.

For all of the above reasons, the Administrator concludes that a primary $O_3$ standard with an 8-hour averaging time; a 3-year average, fourth-high form; and a level of 70 ppb is requisite to protect public health, including the health of at-risk populations, with an adequate margin of safety. Therefore, in this final rule she is setting the level of the primary $O_3$ standard at 70 ppb.

### D. Decision on the Primary Standard

For the reasons discussed above, and taking into account information and assessments presented in the ISA, HREA, and PA, the advice and recommendations of the CASAC Panel, and the public comments, the Administrator has decided to revise the existing 8-hour primary $O_3$ standard. Specifically, the Administrator is revising the level of the primary $O_3$ standard to 70 ppb. The revised 8-hour primary standard, with a level of 70 ppb, would be met at an ambient air monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration is less than or equal to 70 ppb. Data handling conventions are specified in the new Appendix U that is adopted, as discussed in section V below.

At this time, EPA is also promulgating revisions to the Air Quality Index (AQI) for $O_3$ to be consistent with the revisions to the primary $O_3$ standard and the health information evaluated in this review of the standards. These revisions are discussed below in section III.

## III. Communication of Public Health Information

Information on the public health implications of ambient concentrations of criteria pollutants is currently made available primarily through EPA's AQI program. The AQI has been in use since its inception in 1999 (64 FR 42530). It provides accurate, timely, and easily understandable information about daily levels of pollution. It is designed to tell individual members of the public how clean or unhealthy their air is, whether health effects might be a concern, and, if so, measures individuals can take to reduce their exposure to air pollution.[152] See CAA section 127. The AQI focuses on health effects individuals may experience within a few hours or days after breathing unhealthy air. The AQI establishes a nationally uniform system of indexing pollution concentrations for $O_3$, CO, $NO_2$, PM and $SO_2$. The AQI converts pollutant concentrations in a community's air to a number on a scale from 0 to 500. Reported AQI values enable the public to know whether air pollution concentrations in a particular location are characterized as good (0–50), moderate (51–100), unhealthy for sensitive groups (101–150), unhealthy (151–200), very unhealthy (201–300), or

hazardous (301–500). The AQI index value of 100 typically corresponds to the level of the short-term NAAQS for each pollutant. For the 2008 $O_3$ NAAQS, an 8-hour average concentration of 75 ppb corresponds to an AQI value of 100. An AQI value greater than 100 means that a pollutant is in one of the unhealthy categories (i.e., unhealthy for sensitive groups, unhealthy, very unhealthy, or hazardous) on a given day; an AQI value at or below 100 means that a pollutant concentration is in one of the satisfactory categories (i.e., moderate or good). An additional consideration in selecting breakpoints is for each category to span at least a 15 ppb range to allow for more accurate air pollution forecasting. Decisions about the pollutant concentrations at which to set the various AQI breakpoints, that delineate the various AQI categories, draw directly from the underlying health information that supports the NAAQS review.

### A. Proposed Revisions to the AQI

Recognizing the importance of revising the AQI in a timely manner to be consistent with any revisions to the NAAQS, EPA proposed conforming changes to the Agency's proposed decision on revisions to the $O_3$ NAAQS. These conforming changes included setting the 100 level of the AQI at the same level as the revised primary $O_3$ NAAQS and also making adjustments based on health information from this NAAQS review to AQI breakpoints at the lower end of each range (i.e., AQI values of 50, 150, 200 and 300). The EPA did not propose to change the level at the top of the index (i.e., AQI value of 500) that typically is set equal to the Significant Harm Level (40 CFR 51.16), which would apply to state contingency plans.

The EPA proposed to revise the AQI for $O_3$ by setting an AQI value of 100 equal to the level of the revised $O_3$ standard (65–70 ppb). The EPA also proposed to revise the following breakpoints: an AQI value of 50 to within a range from 49–54 ppb; an AQI value of 150 to 85 ppb; an AQI value of 200 to 105 ppb, and an AQI value of 300 to 200 ppb. All these levels are averaged over 8 hours. The EPA proposed to set an AQI value of 50, the breakpoint between the good and moderate categories, at 15 ppb below the value of the proposed standard, i.e. to within a range from 49 to 54 ppb. The EPA took comment on what level within this range to select, recognizing that there is no health message for either at-risk or healthy populations in the good category. Thus, the level selected should be below the lowest concentration (i.e.,

60 ppb) that has been shown in controlled human exposure studies of young, healthy adults exposed to $O_3$ while engaged in quasi-continuous moderate exercise for 6.6 hours to cause moderate lung function decrements (i.e., $FEV_1$ decrements $\geq 10\%$, which could be adverse to people with lung disease) and airway inflammation.[153] The EPA proposed to set an AQI value of 150, the breakpoint between the unhealthy for sensitive groups and unhealthy categories, at 85 ppb. At this level, controlled human exposure studies of young, healthy adults indicate that up to 25% of exposed people are likely to have moderate lung function decrements (i.e., 25% have $FEV_1$ decrements $\geq 10\%$; 12% have $FEV_1$ decrements $\geq 15\%$) and up to 7% are likely to have large lung function decrements (i.e., $FEV_1$ decrements $\geq 20\%$) (McDonnell et al., 2012; Figure 7). Large lung function decrements would likely interfere with normal activity for many healthy people. For most people with lung disease, large lung function decrements would not only interfere with normal activity but would increase the likelihood that they would seek medical treatment (72 FR 37850, July 11, 2007). The EPA proposed to set an AQI value of 200, the breakpoint between the unhealthy and very unhealthy categories, at 105 ppb. At this level, controlled human exposure studies of young, healthy adults indicate that up to 38% of exposed people are likely to have moderate lung function decrements (i.e., 38% have $FEV_1$ decrements $\geq 10\%$; 22% have $FEV_1$ decrements $\geq 15\%$) and up to 13% are likely to have large lung function decrements (i.e., $FEV_1$ decrements $\geq 20\%$). The EPA proposed to set an AQI value of 300, the breakpoint between the very unhealthy and hazardous categories, at 200 ppb. At this level, controlled human exposure studies of healthy adults indicate that up to 25% of exposed individuals are likely to have large lung function decrements (i.e., $FEV_1$ decrements $\geq 20\%$), which would interfere with daily activities for many of them and likely cause people with lung disease to seek medical attention.

The EPA stated that the proposed breakpoints reflect an appropriate balance between reflecting the health evidence that is the basis for the proposed primary $O_3$ standard and providing category ranges that are large enough to be forecasted accurately, so

---

[152] EPA issued the AQI in 1999, updating the previous Pollutant Standards Index (PSI) to send "a clear and consistent message to the public by providing nationally uniform information on air quality." The rule requires metropolitan areas of 350,000 and larger to report the AQI [and associated health effects] daily; all other AQI-related activities—including real-time ozone and particle pollution reporting, next-day air quality forecasting and action days—are voluntary and are carried out at the discretion of state, local and tribal air agencies. In the 1999 rule, we acknowledged these other programs, noting, for example, that while states primarily use the AQI "to provide general information to the public about air quality and its relationship to public health," some state, local or tribal agencies use the index to call "action days." Action days encourage additional steps, usually voluntary, that the public, business or industry could take to reduce emissions when higher levels of pollution are forecast to occur. As the 1999 rule notes, agencies may have several motivations for calling action days, including: providing health information to the public; attaining or maintaining NAAQS attainment status; meeting specific emission reduction targets; and managing or reducing traffic congestion. State, local and tribal agencies should consider whether non-voluntary emissions or activity curtailments are necessary (as opposed to a suite of voluntary measures) for days when the AQI is forecasted to be on the lower end of the moderate category.

[153] Exposures to 50 ppb have not been evaluated experimentally, but are estimated to potentially affect only a small proportion of healthy adults and with only a half to a third of the moderate to large lung function decrements observed at 60 ppb (McDonnell et al., 2012; Figure 7).

that the new AQI for $O_3$ can be implemented more easily in the public forum for which the AQI ultimately exists. However, the EPA recognized alternative approaches to viewing the evidence and information and solicited comment on the proposed revisions to the AQI.

With respect to reporting requirements (40 CFR part 58, section 58.50), EPA proposed to revise 40 CFR part 58, section 58.50 (c) to determine the areas subject to AQI reporting requirements based on the latest available census figures, rather than the most recent decennial U.S. census.[154] This change is consistent with our current practice of using the latest population figures to make monitoring requirements more responsive to changes in population.

*B. Comments on Proposed Revisions to the AQI*

EPA received many comments on the proposed changes to the AQI. Three issues came up in the comments, including: (1) Whether the AQI should be revised at all, even if the primary standard is revised; (2) whether an AQI value of 100 should be set equal to the level of the primary standard and the other breakpoints adjusted accordingly; and, (3) whether the AQI reporting requirements should be based on the latest available census figures rather than the most recent decennial census.

With respect to the first issue, some industry commenters stated that the AQI should not be revised at all, even if the level of the primary $O_3$ standard is revised. In support of this position, these commenters stated that the proposed conforming changes to the AQI would lower $O_3$ levels in each category, and would mean that air quality that is actually improving would be reported as less healthy. According to commenters, the revised AQI would fail to capture these improvements and potentially mislead the public into thinking that air quality has degraded and that EPA and state regulators are not doing their jobs. These commenters noted that there is no requirement to revise the AQI, and that the CAA does not tie the AQI to the standards, stating that the purpose of section 319(a) of the CAA is to provide a consistent, uniform means of gauging air quality. These commenters further asserted that EPA's proposed changes run counter to that uniformity by changing the air quality significance of a given index value and category and that retention of the

current AQI breakpoints would allow continued uniform information on air quality. Commenters stated that it is important that the EPA clearly communicates that the immediate increases in moderate rated days are due to AQI breakpoint adjustment and not due to a sudden decline in air quality. One commenter estimated the increased proportion of days in the moderate category and above in 10 metropolitan areas for 2013 and also for 2025 for 4 cities from the original 10 that were estimated to attain a standard below 70 ppb, to compare with 2013. This commenter noted that the change in the proposed AQI breakpoint between "good" and "moderate" would result in a larger number of days that did not meet the "good" criteria. They went further to claim that the change in breakpoints would result in fewer "good" days in the year 2025 (using the new breakpoint) than occurred in 2013 (using the old breakpoints) despite substantial improvement in air quality over that time period.

On the other hand, state and local agencies and their organizations, environmental and medical groups, and members of the public overwhelmingly supported revising the AQI when the level of the standard is revised. Even state agencies that did not support revising the standard, expressed support for revising the AQI at the same time as the standard, if the standard is revised.

Recognizing the importance of the AQI as a communication tool that allows members of the public to take exposure reduction measures when air quality poses health risks, the EPA agrees with these comments about revising the AQI at the same time as the primary standard. The EPA agrees with state and local agency commenters that its historical approach of setting an AQI value of 100 equal to the level of the revised 8-hour primary $O_3$ standard is appropriate, both from a public health and a communication perspective.

EPA disagrees with commenters who stated that the AQI should not be linked to the primary standards. As noted in the August 4, 1999, rulemaking (64 FR 149, 42531) that established the current AQI, the EPA established the nationally uniform air quality index, called the Pollutant Standards Index (PSI), in 1976 to meet the needs of state and local agencies with the following advantages: It sends a clear and consistent message to the public by providing nationally uniform information on air quality; it is keyed as appropriate to the NAAQS and the Significant Harm Level which have a scientific basis relating air quality and public health; it is simple and easily understood by the public; it provides a

framework for reflecting changes to the NAAQS; and it can be forecasted to provide advance information on air quality. Both the PSI and AQI have historically been normalized across pollutants by defining an index value of 100 as the numerical level of the short-term (*i.e.,* averaging time of 24-hours or less) primary NAAQS for each pollutant. Moreover, this approach does not mislead the public. Since the establishment of the AQI, the EPA and state and local air agencies and organizations have developed experience in educating the public about changes in the standards and, concurrently, related changes to AQI breakpoints and advisories. When the standards change, EPA and state and local agencies have tried to help the public understand that air quality is not getting worse, it's that the health evidence underlying the standards and the AQI has changed. EPA's Air Quality System (AQS), the primary repository for air quality monitoring data, is also adjusted to reflect the revised breakpoints. Specifically, all historical AQI values in AQS are recomputed with the revised breakpoints, so that all data queries and reports downstream of AQS will show appropriate trends in AQI values over time.[155]

In general, commenters who supported revising the AQI when the standard is revised, also supported setting an AQI value of 100 equal to the level of the 8-hour primary $O_3$ standard. The EPA agrees with these commenters. With respect to an AQI value of 100, the EPA is taking final action to set an AQI value of 100 equal to the level of the 8-hour primary standard at 70 ppb $O_3$.

With respect to proposed changes to other AQI breakpoints, some state and local agency commenters expressed general support for all the changes in $O_3$ breakpoints (in Table 2 of Appendix G). In addition, we received a few comments specifically about the breakpoint between the good and moderate categories. One state expressed the view that forecasting the AQI for $O_3$ is not an exact science, so it is important to provide a range large enough to reasonably predict $O_3$

---

[154] Under 40 CFR 58.50, any MSA with a population exceeding 350,000 is required to report AQI data.

---

[155] Although we do not contest the assertion that the new AQI breakpoints will lead to fewer green days in the near future, we do not agree that commenters' analysis sufficiently demonstrates that there would be fewer green days in 2025 than in 2013. In their analysis, they compared observed 2013 data with modeled 2025 data without doing any model performance evaluation for AQI categories or comparison of current year modeled and observed data. The current year observations are not directly comparable to the future-year modeling data without some such evaluation and, as such, we cannot support their quantitative conclusions.

**65368**    **Federal Register** / Vol. 80, No. 206 / Monday, October 26, 2015 / Rules and Regulations

concentrations for the following day (≥ 20 ppb). Although not supporting revision of the standard, this state recommended that if the primary standard was revised to 70 ppb, the lower end of moderate category should be set at 50 ppb to allow for a 20 ppb spread in that category. Several commenters recommending a breakpoint between the good and moderate categories of no higher than 50 ppb stated that this breakpoint should be set on health information, pointing to epidemiologic data and the World Health organization guidelines. The Agency agrees that AQI breakpoints should take into consideration health information when possible, and also that it is important for AQI categories to span ranges large enough to support accurate forecasting. The EPA is setting the breakpoint at the lower end of the moderate category at 55 ppb, which is 15 ppb below the level of the standard of 70 ppb. This is consistent with past practice of making a proportional adjustment to this AQI breakpoint, relative to an AQI value of 100 (i.e., 70 ppb), and also retains the current practice of providing a 15 ppb range in the moderate category to allow for accurate forecasting. This level is below the lowest concentration (i.e., 60 ppb) that has been shown in controlled human exposure studies of healthy adults to cause moderate lung function decrements (i.e., $FEV_1$ decrements ≥ 10%, which could be adverse to people with lung disease), large lung function decrements (i.e., $FEV_1$ decrements ≥ 20%) in a small proportion of people, and airway inflammation, notwithstanding the Administrator's judgment that there is uncertainty in the adversity of the effects shown to occur at 60 ppb.

We received fewer comments on proposed changes to the AQI values of 150, 200 and 300. Again, some state and local agency commenters expressed general support for proposed changes to the AQI. Some states specifically supported these breakpoints. However, a commenter suggested setting an AQI value at the lower end of the unhealthy category, at a level much lower than 85 ppb, since they state that it is a key threshold that is often used in air quality action day programs as a trigger to encourage specific behavior modifications or reduce emissions of $O_3$ precursors (e.g., by taking public transportation to work). This commenter stated that setting the AQI at 85 ppb would, in the Agency's own rationale, not require the triggering of these pollution reduction measures until air quality threatened to impact

25% of people exposed. We disagree with this commenter because EPA does not have any requirements for voluntary programs. State and local air agencies have discretion to set the trigger for voluntary action programs at whatever level they choose, and they are currently set at different levels, not just at the unhealthy breakpoint specified in the comment. For example, Houston, Galveston and Brazoria TX metropolitan area calls ozone action days when air quality reaches the unhealthy for sensitive groups category. For more information about action days programs across the U.S. see the AirNow Web site (www.airnow.gov) and click on the link to AirNow Action Days. The unhealthy category represents air quality where there are general population-level effects. We believe that setting the breakpoint between the unhealthy for sensitive groups and unhealthy categories, at 85 ppb where, as discussed in section IIIA above, controlled human exposure studies of young, healthy adults exposed to $O_3$ while engaged in quasi-continuous moderate exercise for 6.6 hours indicate that up to 25% of exposed people are likely to have moderate lung function decrements and up to 7% are likely to have large lung function decrements (McDonnell et al., 2012; Figure 7) is appropriate. A smaller proportion of inactive or less active individuals would be expected to experience lung function decrements at 85 ppb. Moreover, a breakpoint at 85 ppb allows for category ranges large enough for accurate forecasting. Accordingly, the EPA is adopting the proposed revisions to the AQI values of 150, 200 and 300.

As noted earlier, the EPA proposed to revise 40 CFR part 58, section 58.50(c) to determine the areas subject to AQI reporting requirements based on the latest available census figures, rather than the most recent decennial U.S. census.

A total of five state air monitoring agencies provided comments on this proposed change. Four agencies supported the proposal. One state commenter did not support the proposal, noting that the change would unnecessarily complicate AQI reporting and possibly increase reporting burdens in an unpredictable manner.

The EPA notes that the majority of monitoring network minimum requirements listed in Appendix D to Part 58 include a reference to "latest available census figures." Minimum network requirements for $O_3$, $PM_{2.5}$, $SO_2$, and $NO_2$ all include this language in the regulatory text and monitoring agencies have successfully adopted these processes into their planning

activities and the subsequent revision of their annual monitoring network plans which are posted for public review. Annual population estimates are easily obtainable from the U.S. Census Bureau and the EPA does not believe the burden in tracking these annual estimates is excessive or complicated.[156] Although the changes in year to year estimates are typically modest, there are MSAs that are approaching (or have recently exceeded) the 350,000 population AQI reporting limit and there is great value in having the AQI reported for these areas when the population threshold is exceeded versus waiting potentially up to 10 years for a revision to the decennial census. Accordingly, the EPA is finalizing the proposed revision to 40 CFR part 58, section 58.50(c) to require the AQI reporting requirements to be based on the latest available census figures.

One state requested additional guidance on the frequency of updating the AQI reporting threshold, and recommended linking the AQI reporting requirement evaluation with the annual air monitoring network plan requirements, and recommended requiring AQI reporting to begin no later than January 1 of the following year. The EPA notes that the census bureau estimates appear to be released around July 1 of each year which would not provide sufficient time for monitoring agencies to incorporate AQI reporting in their annual plans for that year, which are also due by July 1 each year. EPA believes that it should be unnecessary for monitoring agencies to wait until the implementation of the following year's annual plan (i.e., approximately 18 months later) to begin AQI reporting. Accordingly, EPA is not at this time including a specific deadline for commencement of AQI reporting for newly-subject areas in 40 CFR part 58, but will work with agencies to implement additional AQI reporting as needed to ensure that information is being disseminated in a timely fashion.

### C. Final Revisions to the AQI

For the reasons discussed above, the EPA is revising the AQI for $O_3$ by setting an AQI value of 100 equal to 70 ppb, 8-hour average, the level of the revised primary $O_3$ standard. The EPA is also revising the following breakpoints: An AQI value of 50 is set at 54 ppb; an AQI value of 150 is set at 85 ppb; an AQI value of 200 is set at 105 ppb; and an AQI value of 300 is set at 200 ppb. All of these levels are averaged over 8 hours. The revisions to all of the

---

[156] http://www.census.gov/popest/data/metro/totals/2014/CBSA-EST2014-alldata.html.

breakpoints are based on estimated health outcomes at relevant ambient concentrations and to allow for each category to span at least a 15–20 ppb category range to allow for more accurate air pollution forecasting. The EPA believes that the revised breakpoints provide a balance between adjustments to reflect the health information supporting the revised $O_3$ standard and providing category ranges that are large enough to be forecasted accurately, so that the AQI can be implemented more easily in the public forum for which the AQI ultimately exists. With respect to AQI reporting requirements (40 CFR part 58, section 58.50), the EPA is revising 40 CFR part 58, section 58.50(c) to make the AQI reporting requirements based on the latest available census figures, rather than the most recent decennial U.S. census. This change is consistent with our current practice of using the latest population figures to make monitoring requirements more responsive to changes in population.

## IV. Rationale for Decision on the Secondary Standard

### A. Introduction

This section (IV) presents the rationale for the Administrator's decisions regarding the need to revise the current secondary standard for $O_3$, and the appropriate revision. Based on her consideration of the full body of welfare effects evidence and related analyses, including the evidence of effects associated with cumulative seasonal exposures of the magnitudes allowed by the current standard, the Administrator has concluded that the current secondary standard for $O_3$ does not provide the requisite protection of public welfare from known or anticipated adverse effects. She has decided to revise the level of the current secondary standard to 0.070 ppm, in conjunction with retaining the current indicator, averaging time and form.

The Administrator has made this decision based on judgments regarding the currently available welfare effects evidence, the appropriate degree of public welfare protection for the revised standard, and currently available air quality information on seasonal cumulative exposures that may be allowed by such a standard. In so doing, she has focused on $O_3$ effects on tree seedling growth as a proxy for the full array of vegetation-related effects of $O_3$, ranging from effects on sensitive species to broader ecosystem-level effects. Using this proxy in judging effects to public welfare, the Administrator has concluded that the requisite protection

from adverse effects to public welfare will be provided by a standard that limits cumulative seasonal exposures to 17 ppm-hrs or lower, in terms of a 3-year W126 index, in nearly all instances, and she has also concluded that such control of cumulative seasonal exposures may be achieved by revising the level of the current standard to 70 ppb. Based on all of these considerations, the Administrator has decided that a secondary standard with a level of 0.070 ppm, and the current form and averaging time, will provide the requisite protection of public welfare from known or anticipated adverse effects.

As discussed more fully below, this decision is based on a thorough review, in the ISA, of the latest scientific information on $O_3$-induced environmental effects. This decision also takes into account (1) staff assessments in the PA of the most policy-relevant information in the ISA regarding evidence of adverse effects of $O_3$ to vegetation and ecosystems, information on biologically-relevant exposure metrics, WREA analyses of air quality, exposure, and ecological risks and associated ecosystem services, and staff analyses of relationships between levels of a W126-based metric and a metric based on the form and averaging time of the current standard summarized in the PA and in the proposal notice; (2) CASAC advice and recommendations; and (3) public comments received during the development of these documents, either in connection with CASAC meetings or separately, and on the proposal notice.

This decision draws on the ISA's integrative synthesis of the entire body of evidence, generally published through July 2011, on environmental effects associated with the presence of $O_3$ and related photochemical oxidants in the ambient air (U.S. EPA, 2013, ISA chapters 9–10), and includes more than four hundred new studies that build on the extensive evidence base from the last review. In addition to reviewing the most recent scientific information as required by the CAA, this rulemaking incorporates the EPA's response to the judicial remand of the 2008 secondary $O_3$ standard in *State of Mississippi* v. *EPA*, 744 F. 3d 1334 (D.C. Cir. 2013) and, in accordance with the court's decision in that case, fully explains the Administrator's conclusions as to the level of air quality that provides the requisite protection of public welfare from known or anticipated adverse effects. In drawing conclusions on the secondary standard, the decision described in this rulemaking is a public welfare policy judgment made by the

Administrator. The Administrator's decision draws upon the available scientific evidence for $O_3$-attributable welfare effects and on analyses of exposures and public welfare risks based on impacts to vegetation, ecosystems and their associated services, as well as judgments about the appropriate weight to place on the range of uncertainties inherent in the evidence and analyses. As described in sections IV.B.3 and IV.C.3 below, such judgments in the context of this review include judgments on the weight to place on the evidence of specific vegetation-related effects estimated to result across a range of cumulative seasonal concentration-weighted $O_3$ exposures; on the weight to give associated uncertainties, including those related to the variability in occurrence of such effects in areas of the U.S., especially areas of particular public welfare significance; and on the extent to which such effects in such areas may be considered adverse to public welfare.

Information related to vegetation and ecosystem effects, biologically relevant exposure indices, and vegetation exposure and risk assessments were summarized in sections IV.A through IV.C of the proposal (79 FR at 75314–75329), respectively, and key observations from the proposal are briefly outlined in sections IV.A.1 to IV.A.3 below. Subsequent sections of this preamble provide a more complete discussion of the Administrator's rationale, in light of key issues raised in public comments, for concluding that the current standard is not requisite to protect public welfare from known or anticipated adverse effects (section IV.B), and that it is appropriate to revise the current secondary standard to provide additional public welfare protection by revising the level while retaining the current indicator, form and averaging time (section IV.C). A summary of the final decisions on revisions to the secondary standard is presented in section IV.D.

1. Overview of Welfare Effects Evidence

a. Nature of Effects

In the more than fifty years that have followed identification of $O_3$'s phytotoxic effects, extensive research has been conducted both in and outside of the U.S. to examine the impacts of $O_3$ on plants and their associated ecosystems (U.S. EPA, 1978, 1986, 1996a, 2006a, 2013). As was established in prior reviews, $O_3$ can interfere with carbon gain (photosynthesis) and allocation of carbon within the plant, making fewer carbohydrates available

for plant growth, reproduction, and/or yield. For seed-bearing plants, these reproductive effects will culminate in reduced seed production or yield (U.S. EPA, 1996a, pp. 5–28 and 5–29). Recent studies, assessed in the ISA, together with this longstanding and well-established literature on $O_3$-related vegetation effects, further contribute to the coherence and consistency of the vegetation effects evidence (U.S. EPA, 2013, chapter 9).

The strongest evidence for effects from $O_3$ exposure on vegetation is from controlled exposure studies, which "have clearly shown that exposure to $O_3$ is causally linked to visible foliar injury, decreased photosynthesis, changes in reproduction, and decreased growth" in many species of vegetation (U.S. EPA, 2013, p. 1–15). Such effects at the plant scale can also be linked to an array of effects at larger spatial scales, with the currently available evidence indicating that "ambient $O_3$ exposures can affect ecosystem productivity, crop yield, water cycling, and ecosystem community composition" (U.S. EPA, 2013, p. 1–15; Chapter 9, section 9.4). The current body of $O_3$ welfare effects evidence confirms and strengthens support for the conclusions reached in the last review on the nature of $O_3$-induced welfare effects and is summarized in the ISA as follows (U.S. EPA, 2013, p. 1–8).

The welfare effects of $O_3$ can be observed across spatial scales, starting at the subcellular and cellular level, then the whole plant and finally, ecosystem-level processes. Ozone effects at small spatial scales, such as the leaf of an individual plant, can result in effects along a continuum of larger spatial scales. These effects include altered rates of leaf gas exchange, growth, and reproduction at the individual plant level, and can result in broad changes in ecosystems, such as productivity, carbon storage, water cycling, nutrient cycling, and community composition.

Based on assessment of this extensive body of science, the EPA has determined that, with respect to vegetation and ecosystems, a causal relationship exists between exposure to $O_3$ in ambient air and visible foliar injury effects on vegetation, reduced vegetation growth, reduced productivity in terrestrial ecosystems, reduced yield and quality of agricultural crops and alteration of below-ground biogeochemical cycles (U.S. EPA, 2013, Table 1–2). In consideration of the evidence of $O_3$ exposure and alterations in stomatal performance, "which may affect plant and stand transpiration and therefore possibly affecting hydrological cycling," the ISA concludes that "[a]lthough the direction of the response

differed among studies," the evidence is sufficient to conclude a likely causal relationship between $O_3$ exposure and the alteration of ecosystem water cycling (U.S. EPA, 2013, section 2.6.3). The evidence is also sufficient to conclude a likely causal relationship between $O_3$ exposure and the alteration of community composition of some terrestrial ecosystems (U.S. EPA, 2013, section 2.6.5). Related to the effects on vegetation growth, productivity and, to some extent, below-ground biogeochemical cycles, the EPA has additionally determined that a likely causal relationship exists between exposures to $O_3$ in ambient air and reduced carbon sequestration (also termed carbon storage) in terrestrial ecosystems (U.S. EPA, 2013, p. 1–10 and section 2.6.2). Modeling studies available in this review consistently found negative impacts of $O_3$ on carbon sequestration, although the severity of impact was influenced by "multiple interactions of biological and environmental factors" (U.S. EPA, 2013, p. 2–39).

Ozone in the troposphere is also a major greenhouse gas and radiative forcing agent,[157] with the ISA formally concluding that "the evidence supports a causal relationship between changes in tropospheric $O_3$ concentrations and radiative forcing" (U.S. EPA, 2013, p. 1–13 and section 2.7.1). While tropospheric $O_3$ has been ranked third in importance after carbon dioxide and methane, there are "large uncertainties in the magnitude of the radiative forcing estimate attributed to tropospheric $O_3$, making the impact of tropospheric $O_3$ on climate more uncertain than the effect of the longer-lived greenhouse gases" (U.S. EPA, 2013, p. 2–47). The ISA notes that "[e]ven with these uncertainties, global climate models indicate that tropospheric $O_3$ has contributed to observed changes in global mean and regional surface temperatures" and concludes that "[a]s a result of such evidence presented in climate modeling studies, there is likely to be a causal relationship between changes in tropospheric $O_3$ concentrations and effects on climate" (U.S. EPA, 2013, p. 2–47).[158] The ISA additionally states that "[i]mportant

uncertainties remain regarding the effect of tropospheric $O_3$ on future climate change" (U.S. EPA, 2013, p. 10–31).

b. Vegetation Effects

Given the strong evidence base and the findings of causal or likely causal relationships with $O_3$ in ambient air, including the quantitative assessments of relationships between $O_3$ exposure and occurrence and magnitude of effects, this review has given primary consideration to three main kinds of vegetation effects, some of which contribute to effects at scales beyond the plant level, such as at the ecosystem level and on ecosystem services. The three kinds of effects are addressed below in the following order: 1) Visible foliar injury, 2) impacts on tree growth, productivity and carbon storage, and 3) crop yield loss.

Visible foliar injury resulting from exposure to $O_3$ has been well characterized and documented over several decades of research on many tree, shrub, herbaceous, and crop species (U.S. EPA, 2013, p. 1–10; U.S. EPA, 2006a, 1996a, 1986, 1978). Ozone-induced visible foliar injury symptoms on certain plant species, such as black cherry, yellow-poplar and common milkweed, are considered diagnostic of exposure to $O_3$ based on the consistent association established with experimental evidence (U.S. EPA, 2013, p. 1–10). The evidence has found that visible foliar injury occurs only when sensitive plants are exposed to elevated $O_3$ concentrations in a predisposing environment; a major modifying factor is the amount of available soil moisture during the year (U.S. EPA, 2013, section 9.4.2).

The significance of $O_3$ injury at the leaf and whole plant levels depends on an array of factors, and therefore, it is difficult to quantitatively relate visible foliar injury symptoms to vegetation effects such as individual tree growth, or effects at population or ecosystem levels (U.S. EPA, 2013, p. 9–39). The ISA notes that visible foliar injury "is not always a reliable indicator of other negative effects on vegetation" (U.S. EPA, 2013, p. 9–39). Factors that influence the significance to the leaf and whole plant include the amount of total leaf area affected, age of plant, size, developmental stage, and degree of functional redundancy among the existing leaf area (U.S. EPA, 2013, section 9.4.2). Although there remains a lack of robust exposure-response functions that would allow prediction of visible foliar injury severity and incidence under varying air quality and environmental conditions, "[e]xperimental evidence has clearly

---

[157] As described in the ISA, "[r]adiative forcing by a greenhouse gas or aerosol is a metric used to quantify the change in balance between radiation coming into and going out of the atmosphere caused by the presence of that substance" (U.S. EPA, 2013, p. 1–13).

[158] Climate responses, including increased surface temperature, have downstream climate-related ecosystem effects (U.S. EPA, 2013, p. 10–7). As noted in section I.D above, such effects may include an increase in the area burned by wildfires, which, in turn, are sources of $O_3$ precursor emissions.

established a consistent association of visible injury with $O_3$ exposure, with greater exposure often resulting in greater and more prevalent injury" (U.S. EPA, 2013, section 9.4.2, p. 9–41).

By far the most extensive field-based dataset of visible foliar injury incidence is that obtained by the U.S. Forest Service Forest Health Monitoring/Forest Inventory and Analysis (USFS FHM/FIA) biomonitoring network program (U.S. EPA, 2013, section 9.4.2.1; Smith, 2012; Coulston *et al.*, 2007). A recently published trend analysis of data from the sites located in 24 states of the northeast and north central U.S. for the 16-year period from 1994 through 2009 (Smith, 2012) describes evidence of visible foliar injury occurrence in the field as well as some insight into the influence of changes in air quality and soil moisture on visible foliar injury and the difficulty inherent in predicting foliar injury response under different air quality and soil moisture scenarios (Smith, 2012; U.S. EPA, 2013, section 9.4.2.1). Study results showed that incidence and severity of foliar injury were dependent on local site conditions for soil moisture availability and $O_3$ exposure (U.S. EPA, 2013, p. 9–41). Although the study indicated that moderate $O_3$ exposures continued to cause visible foliar injury at sites throughout the study area, there was an overall declining trend in the incidence of visible foliar injury as peak $O_3$ concentrations declined (U.S. EPA, 2013, p. 9–40).

Ozone has been shown to affect a number of important U.S. tree species with respect to growth, productivity, and carbon storage. Ambient $O_3$ concentrations have long been known to cause decreases in photosynthetic rates and plant growth. As discussed in the ISA, research published since the 2006 AQCD substantiates prior conclusions regarding $O_3$-related effects on forest tree growth, productivity and carbon storage, and further strengthens the support for those conclusions. A variety of factors in natural environments can either mitigate or exacerbate predicted $O_3$-plant interactions and are recognized sources of uncertainty and variability. Such factors include multiple genetically influenced determinants of $O_3$ sensitivity, changing sensitivity to $O_3$ across vegetative growth stages, co-occurring stressors and/or modifying environmental factors (U.S. EPA, 2013, section 9.4.8). In considering of the available evidence, the ISA states, "previous $O_3$ AQCDs concluded that there is strong evidence that exposure to $O_3$ decreases photosynthesis and growth in numerous plant species" and that "[s]tudies published since the 2008

review support those conclusions" (U.S. EPA, 2013, p. 9–42). The available studies come from a variety of different study types that cover an array of different species, effects endpoints, levels of biological organization and exposure methods and durations. The $O_3$-induced effects at the scale of the whole plant may translate to the ecosystem scale, with changes in productivity and carbon storage. As stated in the ISA, "[s]tudies conducted during the past four decades have demonstrated unequivocally that $O_3$ alters biomass allocation and plant reproduction" (U.S. EPA, 2013, p. 1–10).

The strong evidence of $O_3$ impacts on trees includes robust exposure-response (E–R) functions for reduced growth, termed relative biomass loss (RBL),[159] in seedlings of 11 species. These functions were developed under the National Health and Environmental Effects Research Laboratory-Western Ecology Division program, a series of experiments that used open top chambers (OTCs) to investigate seedling growth response for a single growing season under a variety of $O_3$ exposures (ranging from near background to well above current ambient concentrations) and growing conditions (U.S. EPA, 2013, section 9.6.2; Lee and Hogsett, 1996). The evidence from these studies shows that there is a wide range in sensitivity across the studied species in the seedling growth stage over the course of a single growing season, with some species being extremely sensitive and others being very insensitive over the range of cumulative $O_3$ exposures studied (U.S. EPA, 2014c, Figure 5–1). At the other end of the organizational spectrum, field-based studies of species growing in natural stands have compared observed plant responses across a number of different sites and/or years when exposed to varying ambient $O_3$ exposure conditions. For example, a study conducted in forest stands in the southern Appalachian Mountains during a period when $O_3$ concentrations exceeded the current standard found that the cumulative effects of $O_3$ decreased seasonal stem growth (measured as a change in circumference) by 30–50 percent for most of the examined tree species (*i.e.*, tulip poplar, black cherry, red maple, sugar maple) in a high-$O_3$ year in comparison to a low-$O_3$ year (U.S. EPA, 2013, section 9.4.3.1; McLaughlin *et al.*, 2007a). The study also reported that

high ambient $O_3$ concentrations can increase whole-tree water use and in turn reduce late-season streamflow (McLaughlin *et al.*, 2007b; U.S. EPA, 2013, p. 9–43).

The magnitude of $O_3$ impact on ecosystem productivity and on forest composition can vary among plant communities based on several factors, including the type of stand or community in which the sensitive species occurs (*e.g.*, single species *versus* mixed canopy), the role or position of the species in the stand (*e.g.*, dominant, sub-dominant, canopy, understory), and the sensitivity of co-occurring species and environmental factors (*e.g.*, drought and other factors). For example, recent studies found $O_3$ to have little impact on white fir, but to greatly reduce growth of ponderosa pine in southern California locations, with associated reductions in ponderosa pine abundance in the community, and to cause decreased net primary production of most forest types in the mid-Atlantic region, with only small impacts on spruce-fir forest (U.S. EPA, 2013, section 9.4.3.4).

There is previously and newly available evidence of the potential for $O_3$ to alter biomass allocation and plant reproduction in seasons subsequent to exposure (U.S. EPA, 2013, section 9.4.3). For example, several studies published since the 2006 AQCD further demonstrate that $O_3$ can alter the timing of flowering and the number of flowers, fruits and seeds in herbaceous and woody plant species (U.S. EPA, 2013, section 9.4.3.3). Further, limited evidence in previous reviews reported that vegetation effects from a single year of exposure to elevated $O_3$ could be observed in the following year. For example, growth affected by a reduction in carbohydrate storage in one year may result in the limitation of growth in the following year. Such "carry-over" effects have been documented in the growth of some tree seedlings and in roots (U.S. EPA, 2013, section 9.4.8; Andersen *et al.*, 1997). In the current review, additional field-based evidence expands the EPA's understanding of the consequences of single and multi-year $O_3$ exposures in subsequent years.

A number of studies were conducted at a planted forest at the Aspen free-air carbon-dioxide and ozone enrichment (FACE) experiment site in Wisconsin. These studies, which occurred in a field setting (more similar to natural forest stands than OTC studies), observed tree growth responses when grown in single or two species stands within 30-m diameter rings and exposed over a period of ten years to existing ambient conditions and elevated $O_3$

---

[159] These functions for RBL estimate reduction in a year's growth as a percentage of that expected in the absence of $O_3$ (U.S. EPA, 2013, section 9.6.2; U.S. EPA, 2014b, section 6.2).

concentrations. Some studies indicate the potential for carry-over effects, such as those showing that the effects of $O_3$ on birch seeds (reduced weight, germination, and starch levels) could lead to a negative impact on species regeneration in subsequent years, and that the $O_3$-attributable effect of reduced aspen bud size might have been related to the observed delay in spring leaf development. These effects suggest that elevated $O_3$ exposures have the potential to alter carbon metabolism of overwintering buds, which may have subsequent effects in the following year (Darbah, *et al.*, 2008, 2007; Riikonen *et al.*, 2008; U.S. EPA, 2013, section 9.4.3). Other studies found that, in addition to affecting tree heights, diameters, and main stem volumes in the aspen community, elevated $O_3$ over a 7-year study period was reported to increase the rate of conversion from a mixed aspen-birch community to a community dominated by the more tolerant birch, leading the authors to conclude that elevated $O_3$ may alter intra- and inter-species competition within a forest stand (U.S. EPA, 2013, section 9.4.3; Kubiske *et al.*, 2006; Kubiske *et al.*, 2007). These studies confirm earlier FACE results of aspen growth reductions from exposure to elevated $O_3$ during the first seven years of stand growth and of cumulative biomass impacts associated with changes in annual production in studied tree communities (U.S. EPA, 2013, section 9.4.3; King *et al.*, 2005).

Robust and well-established E–R functions for RBL are available for 11 tree species: black cherry, Douglas fir, loblolly pine, ponderosa pine, quaking aspen, red alder, red maple, sugar maple, tulip poplar, Virginia pine, and white pine (U.S. EPA, 2013; U.S. EPA, 2014c). While these 11 species represent only a small fraction (0.8 percent) of the total number of native tree species in the contiguous U.S. (1,497), this small subset includes eastern and western species, deciduous and coniferous species, and species that grow in a variety of ecosystems and represent a range of tolerance to $O_3$ (U.S. EPA, 2013, section 9.6.2; U.S. EPA, 2014b, section 6.2, Figure 6–2, Table 6–1). Supporting the E–R functions for each of these species are studies in OTCs, with most species studied multiple times under a wide range of exposure and/or growing conditions, with separate E–R functions developed for each combination of species, exposure condition and growing condition scenario (U.S. EPA, 2013, section 9.6.1). Based on these separate E–R functions, species-specific composite E–R functions have been

developed and successfully used to predict the biomass loss response from tree seedling species over a range of cumulative exposure conditions (U.S. EPA, 2013, section 9.6.2). These 11 composite functions, as well as the E–R function for eastern cottonwood (derived from a field study in which $O_3$ and climate conditions were not controlled),[160] are described in the ISA and graphed in the WREA to illustrate the predicted responses of these species over a wide range of cumulative exposures (U.S. EPA, 2014b, section 6.2, Table 6–1 and Figure 6–2; U.S. EPA, 2013, section 9.6.2). For some of these species, the E–R function is based on a single study (*e.g.*, red maple), while for other species there were as many as 11 studies available (*e.g.*, ponderosa pine). In total, the E–R functions developed for these 12 species (the 11 with robust composite E–R functions plus eastern cottonwood) reflect 52 tree seedling studies. A stochastic analysis in the WREA, summarized in section IV.C of the proposal, indicates the potential for within-species variability in these relationships for each species. Consideration of biomass loss estimates in the PA and in discussions below, however, is based on conventional methods and focuses on estimates for the 11 species for which the robust datasets from OTC experiments are available, in consideration of CASAC advice.

The "detrimental effect of $O_3$ on crop production has been recognized since the 1960s" (U.S. EPA, 2013, p. 1–10, section 9.4.4). On the whole, the newly available evidence supports and strengthens previous conclusions that exposure to $O_3$ reduces growth and yield of crops. The ISA describes average crop yield loss reported across a number of recently published meta-analyses and identifies several new exposure studies that support prior findings for a variety of crops of decreased yield and biomass with increased $O_3$ exposure (U.S. EPA, 2013, section 9.4.4.1, Table 9–17). Studies have also "linked increasing $O_3$ concentration to decreased photosynthetic rates and accelerated aging in leaves, which are related to

yield" and described effects of $O_3$ on crop quality, such as nutritive quality of grasses, macro- and micronutrient concentrations in fruits and vegetable crops and cotton fiber quality (U.S. EPA, 2013, p. 1–10, section 9.4.4). The findings of the newly available studies do not change the basic understanding of $O_3$-related crop yield loss since the last review and little additional information is available in this review on factors that influence associations between $O_3$ levels and crop yield loss (U.S. EPA, 2013, section 9.4.4.). However, the evidence available in this review continues to support the conclusion that $O_3$ in ambient air can reduce the yield of major commodity crops in the U.S. Further, the recent evidence increases our confidence in the use of crop E–R functions based on OTC experiments to characterize the quantitative relationship between ambient $O_3$ concentrations and yield loss (U.S. EPA, 2013, section 9.4.4).

The new evidence has strengthened support for previously established E–R functions for 10 crops (barley, field corn, cotton, kidney bean, lettuce, peanut, potato, grain sorghum, soybean and winter wheat), reducing two important areas of uncertainty, especially for soybean, as summarized in more detail in section IV.A of the proposal. The established E–R functions for relative yield loss (RYL)[161] were developed from OTC-type experiments from the National Crop Loss Assessment Network (NCLAN) (U.S. EPA, 2013, section 9.6.3; U.S. EPA, 2014b, section 6.2; U.S. EPA, 2014c, Figure 5–4 and section 6.3). With regard to the first area of uncertainty reduced, evaluations in the ISA found that yield loss in soybean from $O_3$ exposure at the SoyFACE (Soybean Free Air Concentration Enrichment) field experiment was reliably predicted by soybean E–R functions developed from NCLAN data (U.S. EPA, 2013, section 9.6.3.1),[162] demonstrating a robustness of the NCLAN-based E–R functions for predicting relative yield loss from $O_3$ exposure. A second area of uncertainty that was reduced is that regarding the

---

[160] The CASAC cautioned the EPA against placing too much emphasis on the eastern cottonwood data. In comments on the draft PA, the CASAC stated that the eastern cottonwood response data from a single study "receive too much emphasis," explaining that these "results are from a gradient study that did not control for ozone and climatic conditions and show extreme sensitivity to ozone compared to other studies" and that "[a]lthough they are important results, they are not as strong as those from other experiments that developed E–R functions based on controlled ozone exposure" (Frey, 2014c, p. 10).

[161] These functions for RYL estimate reduction in a year's growth as a percentage of that expected in the absence of $O_3$ (U.S. EPA, 2013, section 9.6.2; U.S. EPA, 2014b, section 6.2).

[162] The NCLAN program, which was undertaken in the early to mid-1980s, assessed multiple U.S. crops, locations, and $O_3$ exposure levels, using consistent methods, to provide the largest, most uniform database on the effects of $O_3$ on agricultural crop yields (U.S. EPA 1996a; U.S. EPA, 2006a; U.S. EPA, 2013, sections 9.2, 9.4, and 9.6, Frey, 2014c, p. 9). The SoyFACE experiment was a chamberless (or free-air) field-based exposure study conducted in Illinois from 2001—2009 (U.S. EPA, 2013, section 9.2.4).

BLM_0047383

application of the NCLAN E–R functions to more recent cultivars currently growing in the field. Recent studies, especially those focused on soybean, provide little evidence that crops are becoming more tolerant of $O_3$ (U.S. EPA, 2006a; U.S. EPA, 2013, sections 9.6.3.1 and 9.6.3.4 and p. 9–59). The ISA comparisons of NCLAN and SoyFACE data referenced above also "confirm that the response of soybean yield to $O_3$ exposure has not changed in current cultivars" (U.S. EPA, 2013, p. 9–59; section 9.6.3.1). Additionally, a recent assessment of the relationship between soybean yield loss and $O_3$ in ambient air over the contiguous area of Illinois, Iowa, and Indiana found a relationship that correlates well with previous results from FACE- and OTC-type experiments (U.S. EPA, 2013, section 9.4.4.1).

c. Biologically Relevant Exposure Metric

In assessing biologically based indices of exposure pertinent to $O_3$ effects on vegetation, the ISA states the following (U.S. EPA, 2013, p. 2–44).

The main conclusions from the 1996 and 2006 $O_3$ AQCDs [Air Quality Criteria Documents] regarding indices based on ambient exposure remain valid. These key conclusions can be restated as follows: ozone effects in plants are cumulative; higher $O_3$ concentrations appear to be more important than lower concentrations in eliciting a response; plant sensitivity to $O_3$ varies with time of day and plant development stage; [and] quantifying exposure with indices that cumulate hourly $O_3$ concentrations and preferentially weight the higher concentrations improves the explanatory power of exposure/response models for growth and yield, over using indices based on mean and peak exposure values.

The long-standing body of available evidence upon which these conclusions are based includes a wealth of information on aspects of $O_3$ exposure that are important in influencing plant response (U.S. EPA, 1996a; U.S. EPA, 2006a; U.S. EPA, 2013). Specifically, a variety of "factors with known or suspected bearing on the exposure-response relationship, including concentration, time of day, respite time, frequency of peak occurrence, plant phenology, predisposition, etc.," have been identified (U.S. EPA, 2013, section 9.5.2). In addition, the importance of the duration of the exposure and the relatively greater importance of higher concentrations over lower concentrations in determining plant response to $O_3$ have been consistently well documented (U.S. EPA, 2013, section 9.5.3). Based on improved understanding of the biological basis for plant response to $O_3$ exposure, a large number of "mathematical approaches

for summarizing ambient air quality information in biologically meaningful forms for $O_3$ vegetation effects assessment purposes" have been developed (U.S. EPA, 2013, section 9.5.3), including those that cumulate exposures over some specified period while weighting higher concentrations more than lower (U.S. EPA, 2013, section 9.5.2). As with any summary statistic, these exposure indices retain information on some, but not all, characteristics of the original observations.

Based on extensive review of the published literature on different types of exposure-response metrics, including comparisons between metrics, the EPA has focused on cumulative, concentration-weighted indices, recognizing them as the most appropriate biologically based metrics to consider in this context (U.S. EPA, 1996a; U.S. EPA, 1996b; U.S. EPA, 2006a; U.S. EPA, 2013). In the last two reviews of the $O_3$ NAAQS, the EPA concluded that the risk to vegetation comes primarily from cumulative exposures to $O_3$ over a season or seasons [163] and focused on metrics intended to characterize such exposures: SUM06 [164] in the 1997 review (61 FR 65716, December 13, 1996) and W126 in the 2008 review (72 FR 37818, July 11, 2007). Although in both reviews the policy decision was made not to revise the form and averaging time of the secondary standard, the Administrator, in both cases, also concluded, consistent with CASAC advice, that a cumulative, seasonal index was the most biologically relevant way to relate exposure to plant growth response (62 FR 38856, July 18, 1997; 73 FR 16436, March 27, 2008). This approach for characterizing $O_3$ exposure concentrations that are biologically relevant with regard to potential vegetation effects received strong support from CASAC in the last review and again in this review, including strong support for use of such a metric as the form for the secondary standard (Henderson, 2006, 2008; Samet, 2010; Frey, 2014c).

Alternative methods for characterizing $O_3$ exposure to predict plant response have, in recent years,

included flux models, which some researchers have claimed may "better predict vegetation responses to $O_3$ than exposure-based approaches" because they estimate the ambient $O_3$ concentration that actually enters the leaf (i.e., flux or deposition). However, the ISA notes that "[f]lux calculations are data intensive and must be carefully implemented" (U.S. EPA, 2013, p. 9–114). Further, the ISA states, "[t]his uptake-based approach to quantify the vegetation impact of $O_3$ requires inclusion of those factors that control the diurnal and seasonal $O_3$ flux to vegetation (e.g., climate patterns, species and/or vegetation-type factors and site-specific factors)" (U.S. EPA, 2013, p. 9–114). In addition to these data requirements, each species has different amounts of internal detoxification potential that may protect species to differing degrees. The lack of detailed species- and site-specific data required for flux modeling in the U.S. and the lack of understanding of detoxification processes have continued to make this technique less viable for use in vulnerability and risk assessments at the national scale in the U.S. (U.S. EPA, 2013, section 9.5.4).

Therefore, consistent with the ISA conclusions regarding the appropriateness of considering cumulative exposure indices that preferentially weight higher concentrations over lower for predicting $O_3$ effects of concern based on the well-established conclusions and supporting evidence described above, and in light of continued CASAC support, we continue to focus on cumulative concentration-weighted indices as the most biologically relevant metrics for consideration of $O_3$ exposures eliciting vegetation-related effects. Quantifying exposure in this way "improves the explanatory power of exposure/response models for growth and yield over using indices based on mean and peak exposure values" (U.S. EPA, 2013, section 2.6.6.1, p. 2–44). In this review, as in the last review, we use the W126-based cumulative, seasonal metric (U.S. EPA, 2013, sections 2.6.6.1 and 9.5.2) for consideration of the effects evidence and in the exposure and risk analyses in the WREA.

This metric, commonly called the W126 index, is a non-threshold approach described as the sigmoidally weighted sum of all hourly $O_3$ concentrations observed during a specified daily and seasonal time window, where each hourly $O_3$ concentration is given a weight that increases from zero to one with increasing concentration (U.S. EPA, 2014c, p. 5–6; U.S. EPA 2013, p. 9–101).

[163] In describing the form as "seasonal," the EPA is referring generally to the growing season of $O_3$-sensitive vegetation, not to the seasons of the year (i.e., spring, summer, fall, winter).

[164] The SUM06 index is a threshold-based approach described as the sum of all hourly $O_3$ concentrations greater or equal to 0.06 ppm observed during a specified daily and seasonal time window (U.S. EPA, 2013, section 9.5.2). The W126 index is a non-threshold approach, described more fully below.

The first step in calculating the seasonal W126 index, as described and considered in this review, is to sum the weighted ambient $O_3$ concentrations during daylight hours (defined as 8:00 a.m. to 8:00 p.m.) within each calendar month, resulting in monthly index values (U.S. EPA, 2014b, pp. 4–5 to 4–6). As more completely described in the WREA, the monthly $O_3$ index values are calculated from hourly $O_3$ concentrations as follows:

$$Monthly\ \mathbf{W126} = \sum_{d=1}^{N}\sum_{h=8}^{19} \frac{C_{dh}}{1+4403*\exp(-126*C_{dh})}$$

where $N$ is the number of days in the month, $d$ is the day of the month (d = 1, 2, . . ., N), $h$ is the hour of the day (h = 0, 1, . . ., 23), and $C_{dh}$ is the hourly $O_3$ concentration observed on day $d$, hour $h$, in parts per million. The seasonal W126 index value for a specific year is the maximum sum of the monthly index values for three consecutive months. Three-year W126 index values are calculated by taking the average of seasonal W126 index values for three consecutive years (U.S. EPA, 2014b, pp. 4–5 to 4–6; Wells, 2014a).

2. Overview of Welfare Exposure and Risk Assessment

This section outlines the information presented in section IV.C of the proposal regarding the WREA conducted for this review, which built upon similar analyses performed in the last review. The WREA focuses primarily on analyses related to two types of effects on vegetation: Reduced growth (biomass loss) in both trees and agricultural crops, and foliar injury. The assessments of $O_3$-associated reduced growth in native trees and crops (specifically, RBL and RYL, respectively) include analysis of associated changes in related ecosystem services, including pollution removal, carbon sequestration or storage, and hydrology, as well as economic impacts on the forestry and agriculture sectors of the economy. The foliar injury assessments include cumulative analyses of the proportion of USFS biosite index scores[165] above zero (or five, in a separate set of analyses) with increasing W126 exposure index estimates, with and without consideration of soil moisture conditions. The implications of visible foliar injury in national parks were considered in a screening level assessment and three case studies.[166]

Growth-related effects were assessed for W126-based exposure estimates in five scenarios of national-scale[167] air quality: Recent conditions (2006 to 2008), the existing secondary standard, and W126 index values of 15 ppm-hrs, 11 ppm-hrs, and 7 ppm-hrs, using 3-year averages (U.S. EPA, 2014b, chapter 4). For each of these scenarios, 3-year average W126 exposure index values were estimated for 12 kilometer (km) by 12 km grid cells in a national-scale spatial surface. The method for creating these grid cell estimates generally involved two steps (summarized in Table 5–4 of the PA).

The first step in creating the grid cell estimates for each scenario was calculation of the average W126 index value (across the three years) at each monitor location. For the recent conditions scenario, this value was based on unadjusted $O_3$ concentrations from monitoring data. For the other four scenarios, the W126 index value for each monitor location was calculated from model-adjusted hourly $O_3$ concentrations. The adjusted concentrations were based on model-predicted relationships between $O_3$ at each monitor location and reductions in $NO_X$. Adjustments were applied independently for each of the nine U.S. regions (see U.S. EPA, 2014b, section 4.3.4.1).[168] The existing standard scenario was created first, with the result being a national dataset for which the highest monitor location in each U.S. region had a design value equal to the level of the current standard.[169] The W126 scenarios were created from the hourly concentrations used to create the existing standard scenario, with model-

based adjustments made at all monitor sites in those regions with a site not already at or below the target W126 value for that scenario (U.S. EPA, 2014b, section 4.3.4.1).[170]

After completing step one for all the scenarios, the second step involved creating the national-scale spatial surfaces (composed of 3-year W126 index values at grid cell centroids). These were created by applying the Voronoi Neighbor Averaging (VNA) spatial interpolation technique to the monitor-location, 3-year W126 index values (described in step 1).[171] This step of creating the gridded spatial surfaces resulted in further reduction of the highest values in each modeling region, as demonstrated by comparing the W126 index values from steps one and two for the existing standard scenario. After the step-one adjustment of the monitor location concentrations such that the highest location in each NOAA region just met the existing standard (using relationships mentioned above), the maximum 3-year average W126 values in the nine regions ranged from 18.9 ppm-hrs in the West region to 2.6 ppm-hrs in the Northeast region (U.S. EPA, 2014b, Table 4–3). After application of the VNA technique in the second step, however, the highest 3-year average W126 values across the national surface grid cells, which were in the Southwest region, were below 15 ppm-hrs (U.S. EPA, 2014b, Figure 4–7).[172]

All of the assessments based on growth impacts relied on the W126 index estimates from the national-scale spatial surfaces (created from the 3-year average monitor location values as described above). Among the analyses related to visible foliar injury, a small component of the screening-level

[165] Sampling sites in the FIA/FHM $O_3$ biomonitoring program, called "biosites", are plots of land on which data are collected regarding the incidence and severity of visible foliar injury on a variety of $O_3$-sensitive plant species. Biosite index scores are derived from these data (U.S. EPA, 2014b, section 7.2.1).

[166] All of the analyses are described in detail in the WREA and summarized in the PA and in section IV.C of the proposal (U.S. EPA, 2014a; U.S.

EPA, 2014b; 79 FR 75324–75329, December 17, 2014).

[167] Although the scenarios and the grid cell $O_3$ concentrations on which they are based were limited to the contiguous U.S., we have generally used the phrase "national-scale" in reference to the WREA scenarios and surfaces.

[168] The U.S. regions referenced here and in section IV.C below are NOAA climate regions, as shown in Figure 2B–1 of the PA.

[169] The adjustment results in broad regional reductions in $O_3$ and includes reductions in $O_3$ at some monitors that were already at or below the target level. These reductions do not represent an optimized control scenario, but rather characterize one potential distribution of air quality across a region that meets the scenario target (U.S. EPA, 2014b, sections 4.3.4.2 and 4.4).

[170] In regions where the air quality adjustment was applied, it was based on emissions reductions determined necessary for the highest monitor in that region to just equal the existing standard or the W126 target for the scenario. Concentrations at all other monitor locations in the region were also adjusted based on the same emissions reductions assumptions.

[171] The VNA technique is described in the WREA (U.S. EPA, 2014b, Appendix 4A).

[172] Thus, it can be seen that application of the VNA interpolation method to estimate W126 index values at the centroid of every 12 km x 12 km grid cell rather than only at each monitor location results in a lowering of the highest values in each region.

BLM_0047385

national park assessment and also the three national park case studies involved summarizing 3-year W126 index estimates from the four air quality scenarios. However, the visible foliar injury cumulative proportion analyses and a component of the national park screening-level assessment relied on national-scale spatial surfaces of single-year, unadjusted W126 index values created for each year from 2006 through 2010 using the VNA interpolation technique applied to the monitor location index values for these years (U.S. EPA, 2014b, section 4.3.2, Appendix 4A).

Because the W126 estimates generated for the different air quality scenarios assessed are inputs to the vegetation risk analyses for tree biomass and crop yield loss, and also used in some components of the visible foliar injury assessments, limitations and uncertainties in the air quality analyses, which are discussed in detail in the WREA and some of which are mentioned here, are propagated into those analyses (U.S. EPA, 2014b, chapters 4 and 8 and section 8.5, Table 4–5). An important uncertainty in the analyses is the application of regionally determined emissions reductions to meet the existing standard (U.S. EPA, 2014b, section 8.5.1). The model adjustments are based on emissions reductions in NOx and characterize only one potential distribution of air quality across a region when all monitor locations meet the standard, as well as for the W126 scenarios (U.S. EPA, 2014b, section 4.3.4.2).[173]

An additional uncertainty related to the W126 index estimates in the national surfaces for each air quality scenario, and to the creation of the single-year surfaces used in the visible foliar injury cumulative analysis, comes with the creation of the national-scale spatial surfaces of grid cells from the monitor-location O3 data.[174] In general, spatial interpolation techniques perform better in areas where the O3 monitoring network is denser. Therefore, the W126 index values estimated using this technique in rural areas in the West, Northwest, Southwest, and West North Central regions where there are few or no monitors (U.S. EPA, 2014b, Figure 2–1) are more uncertain than those estimated for areas with denser monitoring. Further, as described above, this interpolation method generally underpredicts the highest W126 exposure index values. Due to the important influence of higher exposures in determining risks to plants, the potential for the VNA interpolation approach to dampen peak W126 index values could result in an underestimation of risks to vegetation in some areas.[175]

The vegetation analyses performed in the WREA, along with key observations, insights, uncertainties and limitations were summarized in sections IV.C.2 through IV.C.3 of the proposal. Highlights for the three categories of biomass loss and foliar injury assessments are summarized here.

a. Tree Growth, Productivity and Carbon Storage

These assessments rely on the species-specific E–R functions described in section IV.A.1.b above. For the air quality scenarios described above, the WREA applied the species-specific E–R functions to develop estimates of O3-associated RBL and associated effects on productivity, carbon storage and associated ecosystem services (U.S. EPA, 2014b, Chapter 6). More specifically, the WREA derived species-specific and weighted RBL estimates for grid cells across the continental U.S. and summarized the estimates by counties and national parks. Additional WREA case study analyses focused on selected urban areas. The WREA estimates indicate substantial heterogeneity in plant responses to O3, both within species (e.g., study-specific variation), between species, and across regions of the U.S. National variability in the estimates (e.g., eastern vs western U.S.) is influenced by there being different sets of resident species (with different E–R functions) in different areas of the U.S., as well as differences in number of national parks and O3 monitors. For example, the eastern U.S. has different resident species compared to the western U.S., and the eastern U.S. has far more such species. Additionally, there are more national parks in the western than the eastern U.S., yet fewer O3 monitors (U.S. EPA, 2014b, chapter 8).

Relative biomass loss nationally (across all of the air quality surface grid cells) was estimated for each of the 12 studied species from the composite E–R functions for each species described above and information on the distribution of those species across the U.S. (U.S. EPA, 2014b, section 6.2.1.3 and Appendix 6A). In consideration of CASAC advice (summarized in section IV.A.1.b above), the WREA derived RBL and weighted RBL (wRBL) estimates separately, both with and without the eastern cottonwood, and the PA and proposal gave primary focus to analyses that exclude cottonwood. These analyses provided estimates of per-species and cross-species RBL in the different air quality scenarios. Air quality scenario estimates were also developed in terms of proportion of basal area affected at different magnitudes of RBL. The wRBL analysis integrated the species-specific estimates, providing an indication of potential magnitude of ecological effect possible in some ecosystems. The county analyses also included analyses focused on the median species response. The WREA also used the E–R functions to estimate RBL across tree lifespans and the resulting changes in consumer and producer/farmer economic surplus in the forestry and agriculture sectors of the economy. Case studies in five urban areas provided comparisons across air quality scenarios of estimates for urban tree pollutant removal and carbon storage or sequestration.

The array of uncertainties associated with estimates from these tree RBL analyses are summarized in the proposal and described in detail in the WREA, including the potential for the air quality scenarios to underestimate the higher W126 index values and associated implications for the RBL-related estimates, as referenced above.

b. Crop Yield Loss

These assessments rely on the species-specific E–R functions described in section IV.A.1.b above. For the different air quality scenarios, the WREA applied the species-specific E–R functions to develop estimates of O3 impacts related to crop yield, including annual yield losses estimated for 10 commodity crops grown in the U.S. and how these losses affect producer and consumer economic surpluses (U.S. EPA, 2014b, sections 6.2, 6.5). The WREA derived estimates of crop RYL nationally and in a county-specific analysis, relying on information regarding crop distribution (U.S. EPA, 2014b, section 6.5). As with the tree analyses described above, the county analysis included estimates based on

---

[173] The adjustment is applied to all monitor locations in each region. In this way, the adjustment results in broad regional reductions in O3 and includes reductions in O3 at some monitors that were already meeting or below the target level. Thus, the adjustments performed to develop a scenario meeting a target level at the highest monitor in each region did result in substantial reduction below the target level in some areas of the region. This result at the monitors already well below the target indicates an uncertainty with regard to air quality expected from specific control strategies that might be implemented to meet a particular target level.

[174] Some uncertainty is inherent in any approach to characterizing O3 air quality over broad geographic areas based on concentrations at monitor locations.

[175] In the visible foliar injury dataset used for the cumulative analysis, underestimation of W126 index values at sites with injury would contribute to overestimates of the cumulative proportion of sites with injury plotted for the lower W126 values.

the median $O_3$ response across the studied crop species (U.S. EPA, 2014b, section 6.5.1, Appendix 6B).

Overall effects on agricultural yields and producer and consumer surplus depend on the ability of producers/ farmers to substitute other crops that are less $O_3$ sensitive, and the responsiveness, or elasticity, of demand and supply (U.S. EPA, 2014b, section 6.5). The WREA discusses multiple areas of uncertainty associated with the crop yield loss estimates, including those associated with the model-based adjustment methodology as well as those associated with the projection of yield loss using the Forest and Agriculture Sector Optimization Model (with greenhouse gases) at the estimated $O_3$ concentrations (U.S. EPA, 2014b, Table 6–27, section 8.5). Because the W126 index estimates generated in the air quality scenarios are inputs to the vegetation risk analyses for crop yield loss, any uncertainties in the air quality scenario estimation of W126 index values are propagated into those analyses (U.S. EPA, 2014b, Table 6–27, section 8.5). Therefore, the air quality scenarios in the crop yield analyses have the same uncertainties and limitations as in the biomass loss analyses (summarized above), including those associated with the model-based adjustment methodology (U.S. EPA, 2014b, section 8.5).

c. Visible Foliar Injury

The WREA presents a number of analyses of $O_3$-related visible foliar injury and associated ecosystem services impacts (U.S. EPA, 2014b, Chapter 7). In the initial analysis, the WREA used the biomonitoring site data from the USFS FHM/FIA Network (USFS, 2011),[176] associated soil moisture data during the sample years, and national surfaces of ambient air $O_3$ concentrations based on spatial interpolation of monitoring data from 2006 to 2010 in a cumulative analysis of the proportion of biosite records with any visible foliar injury, as indicated by a nonzero biosite index score (U.S. EPA, 2014b, section 7.2). This analysis was done for all records together, and also for subsets based on soil moisture conditions (normal, wet or dry).

In each cumulative analysis, the biosite records were ordered by W126 index and then, moving from low to high W126 index, the records were cumulated into a progressively larger dataset. With the addition of each new

data point (composed of biosite index score and W126 index value for a biosite and year combination) to the cumulative dataset, the percentage of sites with a nonzero biosite index score was derived and plotted versus the W126 index estimate for the just added data point. The cumulative analysis for all sites indicates that (1) as the cumulative set of sites grows with addition of sites with progressively higher W126 index values, the proportion of the dataset for which no foliar injury was recorded changes (increases) noticeably prior to about 10 ppm-hrs (10.46 ppm-hrs), and (2) as the cumulative dataset grows still larger with the addition of records for higher W126 index estimates, the proportion of the cumulative dataset with no foliar injury remains relatively constant (U.S. EPA, 2014b, Figure 7–10). The data for normal moisture years are very similar to the dataset as a whole, with an overall proportion of about 18 percent for presence of any foliar injury. The data for relatively wet years have a much higher proportion of biosites showing injury, approximately 25% when all data are included, and a proportion of approximately 20% when data for W126 index estimates up to about 5–8 ppm-hrs are included (U.S. EPA, 2014b, Figure 7–10).[177] The overall proportion showing injury for the subset for relatively dry conditions is much lower, less than 15% for the subset (U.S. EPA, 2014b, section 7.2.3, Figures 7–10). While these analyses indicate the potential for foliar injury to occur under conditions that meet the current standard, the extent of foliar injury that might be expected under different exposure conditions is unclear from these analyses.

Criteria derived from the cumulative analyses were then used in two additional analyses. The national-scale screening-level assessment compared W126 index values estimated within 214 national parks using the VNA technique described above for the individual years from 2006 to 2010 with benchmark criteria developed from the biosite data analysis (U.S. EPA, 2014b, Appendix 7A and section 7.3). Separate case study analyses described visits, as well as visitor uses and expenditures for three national parks, and the 3-year

W126 index estimates in those parks for the four air quality scenarios (U.S. EPA, 2014b, section 7.4). Uncertainties associated with these analyses, included those associated with the W126 index estimates, are discussed in the WREA, sections 7.5 and 8.5.3, and in WREA Table 7–24, and also summarized in the PA (e.g., U.S. EPA, 2014c, section 6.3).

3. Potential Impacts on Public Welfare

As provided in the CAA, section 109(b)(2), the secondary standard is to "specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator . . . is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." Effects on welfare include, but are not limited to, "effects on soils, water, crops, vegetation, man-made materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being" (CAA section 302(h)). The secondary standard is not meant to protect against all known or anticipated $O_3$-related effects, but rather those that are judged to be adverse to the public welfare, and a bright-line determination of adversity is not required in judging what is requisite (78 FR 8312, January 15, 2013; see also 73 FR 16496, March 27, 2008). Thus, the level of protection from known or anticipated adverse effects to public welfare that is requisite for the secondary standard is a public welfare policy judgment to be made by the Administrator. In the current review, the Administrator's judgment is informed by conclusions drawn with regard to adversity of effects to public welfare in decisions on secondary $O_3$ standards in past reviews.

As indicated by the Administrator in the 2008 decision, the degree to which $O_3$ effects on vegetation should be considered to be adverse to the public welfare depends on the intended use of the vegetation and the significance of the vegetation to the public welfare (73 FR 16496, March 27, 2008). Such judgments regarding public welfare significance in the last $O_3$ NAAQS decision gave particular consideration to $O_3$ effects in areas with special federal protections, and lands set aside by states, tribes and public interest groups to provide similar benefits to the public welfare (73 FR 16496, March 27, 2008). For example, in reaching his conclusion regarding the need for revision of the secondary standard in the 2008 review, the Administrator took

---

[176] Data were not available for several western states (Montana, Idaho, Wyoming, Nevada, Utah, Colorado, Arizona, New Mexico, Oklahoma, and portions of Texas).

[177] As discussed in section IV.C.2 below, as the cumulative set increases, with increasing W126 values, the overall prevalence of visible foliar injury in the cumulative set is more and more influenced by data for the lower W126 values. Accordingly, the "leveling off" observed above ~10 ppm-hrs in the 'all sites' analysis likely reflects the counterbalancing of visible foliar injury occurrence at the relatively fewer higher $O_3$ sites by the larger representation within the subset of the lower W126 conditions associated with which there is lower occurrence or extent of foliar injury.

note of "a number of actions taken by Congress to establish public lands that are set aside for specific uses that are intended to provide benefits to the public welfare, including lands that are to be protected so as to conserve the scenic value and the natural vegetation and wildlife within such areas, and to leave them unimpaired for the enjoyment of future generations" (73 FR 16496, March 27, 2008). As further recognized in the 2008 notice, "[s]uch public lands that are protected areas of national interest include national parks and forests, wildlife refuges, and wilderness areas" (73 FR 16496, March 27, 2008).[178][179] Such areas include Class I areas[180] which are federally mandated to preserve certain air quality related values. Additionally, as the Administrator recognized, "States, Tribes and public interest groups also set aside areas that are intended to provide similar benefits to the public welfare, for residents on State and Tribal lands, as well as for visitors to those areas" (73 FR 16496, March 27, 2008). The Administrator took note of the "clear public interest in and value of maintaining these areas in a condition that does not impair their intended use and the fact that many of these lands contain $O_3$-sensitive species" (73 FR 16496, March 27, 2008).

The concept described in the 2008 notice regarding the degree to which effects on vegetation in specially protected areas, such as those identified above, may be judged adverse also applies beyond the species level to the ecosystem level, such that judgments

can depend on the intended use[181] for, or service (and value) of, the affected vegetation, ecological receptors, ecosystems and resources and the significance of that use to the public welfare (73 FR 16496, March 27, 2008). Uses or services provided by areas that have been afforded special protection can flow in part or entirely from the vegetation that grows there. Aesthetic value and outdoor recreation depend, at least in part, on the perceived scenic beauty of the environment (U.S. EPA, 2014b, chapters 5 and 7). Further, analyses have reported that the American public values—in monetary as well as nonmonetary ways—the protection of forests from air pollution damage. In fact, studies that have assessed willingness-to-pay for spruce-fir forest protection in the southeastern U.S. from air pollution and insect damage have found that values held by the survey respondents for the more abstract services (existence, option and bequest)[182] were greater than those for recreation or other services (U.S. EPA, 2014b, Table 5–6; Haefele et al., 1991; Holmes and Kramer, 1995).

The spatial, temporal and social dimensions of public welfare impacts are also influenced by the type of service affected. For example, a national park can provide direct recreational services to the thousands of visitors that come each year, but also provide an indirect value to the millions who may not visit but receive satisfaction from knowing it exists and is preserved for the future (U.S. EPA, 2014b, chapter 5, section 5.5.1). Similarly, ecosystem services can be realized over a range of temporal scales. An evaluation of adversity to the public welfare might also consider the likelihood, type, and magnitude of the effect, as well as the potential for recovery and any uncertainties relating to these

conditions, as stated in the preamble of the 2012 final notice of rulemaking on the secondary standards for oxides of nitrogen and sulfur (77 FR 20232, April 3, 2012).

The three main categories of effects on vegetation discussed in section IV.A.1.b above differ with regard to aspects important to judging their public welfare significance. Judgments regarding crop yield loss, for example, depend on considerations related to the heavy management of agriculture in the U.S., while judgments regarding the other categories of effects generally relate to considerations regarding forested areas. For example, while both tree growth-related effects and visible foliar injury have the potential to be significant to the public welfare through impacts in Class I and other protected areas, they differ in how they might be significant and with regard to the clarity of the data that describe the relationship between the effect and the services potentially affected.

With regard to effects on tree growth, reduced growth is associated with effects on an array of ecosystem services including reduced productivity, altered forest and forest community (plant, insect and microbe) composition, reduced carbon storage and altered water cycling (U.S. EPA, 2013, Figure 9–1, sections 9.4.1.1 and 9.4.1.2; U.S. EPA, 2014b, section 6.1). For example, forest or forest community composition can be affected through $O_3$ effects on growth and reproductive success of sensitive species in the community, with the extent of compositional changes dependent on factors such as competitive interactions (U.S. EPA, 2013, sections 9.4.3 and 9.4.3.1). Depending on the type and location of the affected ecosystem, services benefitting the public in other ways can be affected as well. For example, other services valued by people that can be affected by reduced tree growth, productivity and carbon storage include aesthetic value, food, fiber, timber, other forest products, habitat, recreational opportunities, climate and water regulation, erosion control, air pollution removal, and desired fire regimes (U.S. EPA 2013, sections 9.4.1.1 and 9.4.1.2; U.S. EPA, 2014b, section 6.1, Figure 6–1, section 6.4, Table 6–13). Further, impacts on some of these services (e.g., forest or forest community composition) may be considered of greater public welfare significance when occurring in Class I or other protected areas.

Consideration of the magnitude of tree growth effects that might cause or contribute to adverse effects for trees, forests, forested ecosystems or the public welfare is complicated by aspects

---

[178] For example, the National Park Service Organic Act of 1916 established the National Park Service (NPS) and, in describing the role of the NPS with regard to "Federal areas known as national parks, monuments, and reservations", stated that the "fundamental purpose" for these federal areas "is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. 1.

[179] As a second example, the Wilderness Act of 1964 defines designated "wilderness areas" in part as areas "protected and managed so as to preserve [their] natural conditions" and requires that these areas "shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, [and] the preservation of their wilderness character . . ." 16 U.S.C. 1131 (a).

[180] Areas designated as Class I include all international parks, national wilderness areas which exceed 5,000 acres in size, national memorial parks which exceed 5,000 acres in size, and national parks which exceed six thousand acres in size, provided the park or wilderness area was in existence on August 7, 1977. Other areas may also be Class I if designated as Class I consistent with the CAA.

[181] Ecosystem services have been defined as "the benefits that people obtain from ecosystems" (U.S. EPA, 2013, Preamble, p. 1xxii; UNEP, 2003) and thus are an aspect of the use of a type of vegetation or ecosystem. Similarly, a definition used for the purposes of the EPA benefits assessments states that ecological goods and services are the "outputs of ecological functions or processes that directly or indirectly contribute to social welfare or have the potential to do so in the future" and that "[s]ome outputs may be bought and sold, but most are not marketed" (U.S. EPA, 2006b). Ecosystem services analyses were one of the tools used in the last review of the secondary standards for oxides of nitrogen and sulfur to inform the decisions made with regard to adequacy and as such, were used in conjunction with other considerations in the discussion of adversity to public welfare (77 FR 20241, April 3, 2012).

[182] Public surveys have indicated that Americans rank as very important the existence of resources, the option or availability of the resource and the ability to bequest or pass it on to future generations (Cordell et al., 2008).

of, or limitations in, the available information. For example, the evidence on tree seedling growth effects, deriving from the E–R functions for 11 species (described in section IV.A.1 above), provides no clear threshold or breakpoint in the response to $O_3$ exposure. Additionally, there are no established relationships between magnitude of tree seedling growth reduction and forest ecosystem impacts and, as noted in section IV.A.1.b above, other factors can influence the degree to which $O_3$-induced growth effects in a sensitive species affect forest and forest community composition and other ecosystem service flows from forested ecosystems. These include (1) the type of stand or community in which the sensitive species is found (*i.e.,* single species versus mixed canopy); (2) the role or position the species has in the stand (*i.e.,* dominant, sub-dominant, canopy, understory); (3) the $O_3$ sensitivity of the other co-occurring species ($O_3$ sensitive or tolerant); and (4) environmental factors, such as soil moisture and others. The lack of such established relationships complicates judgments as to the extent to which different estimates of impacts on tree seedling growth would indicate significance to the public welfare and thus be an important consideration in the level of protection for the secondary standard.

During the 1997 review of the secondary standard, views related to this issue were provided by a 1996 workshop of 16 leading scientists in the context of discussing their views for a secondary $O_3$ standard (Heck and Cowling, 1997). In their consideration of tree growth effects as an indicator for forest ecosystems and crop yield reduction as an indicator of agricultural systems, the workshop participants identified annual percentages, of RBL for forest tree seedlings and RYL for agricultural crops, considered important to their judgments on the standard. With regard to forest ecosystems and seedling growth effects as an indicator, the participants selected a range of 1–2% RBL per year "to avoid cumulative effects of yearly reductions of 2%." With regard to crops, they indicated an interest in protecting against crop yield reductions of 5% RYL yet noted uncertainties surrounding such a percentage which led them to identifying 10% RYL for the crop yield endpoint (Heck and Cowling, 1997). The workshop report provides no explicit rationale for the percentages identified (1–2% RBL and 5% or 10% RYL); nor does it describe their connection to ecosystem impacts of a specific

magnitude or type, nor to judgments on significance of the identified effects for public welfare, *e.g.,* taking into consideration the intended use and significance of the affected vegetation (Heck and Cowling, 1997). In recognition of the complexity of assessing the adversity of tree growth effects and effects on crop yield in the broader context of public welfare, the EPA's consideration of those effects in both the 1997 and 2008 reviews extended beyond the consideration of various benchmark responses for the studied species, and, with regard to crops, additionally took note of their extensive management (62 FR 38856, July 18, 1997; 73 FR 16436, March 27, 2008).

While, as noted above, public welfare benefits of forested lands can be particular to the type of area in which the forest occurs, some of the potential public welfare benefits associated with forest ecosystems are not location dependent. A potentially extremely valuable ecosystem service provided by forested lands is carbon storage, a regulating service that is "of paramount importance for human society" (U.S. EPA, 2013, section 2.6.2.1 and p. 9–37). As noted above, the EPA has concluded that this ecosystem service has a likely causal relationship with $O_3$ in ambient air. The service of carbon storage is potentially important to the public welfare no matter in what location the sensitive trees are growing or what their intended current or future use. In other words, the benefit exists as long as the tree is growing, regardless of what additional functions and services it provides. Another example of locations potentially vulnerable to $O_3$-related impacts but not necessarily identified for such protection might be forested lands, both public and private, where trees are grown for timber production. Forests in urbanized areas also provide a number of services that are important to the public in those areas, such as air pollution removal, cooling, and beautification. There are also many other tree species, such as species identified by the USFS and various ornamental and agricultural species (*e.g.,* Christmas trees, fruit and nut trees), that provide ecosystem services that may be judged important to the public welfare but whose vulnerability to $O_3$ impacts has not been quantitatively characterized (U.S. EPA, 2014b, Chapter 6).

As noted above, in addition to tree growth-related effects, $O_3$-induced visible foliar injury also has the potential to be significant to the public welfare through impacts in Class I and other similarly protected areas. Visible

foliar injury is a visible bioindicator of $O_3$ exposure in species sensitive to this effect, with the injury affecting the physical appearance of the plant. Accordingly visible foliar injury surveys are used by federal land managers as tools in assessing potential air quality impacts in Class I areas. These surveys may focus on plant species that have been identified as potentially sensitive air quality related values (AQRVs) due to their sensitivity to $O_3$-induced foliar injury (USFS, NPS, FWS, 2010). An AQRV is defined by the National Park Service as a "resource, as identified by the [federal land manager] for one or more Federal areas that may be adversely affected by a change in air quality," and the resource "may include visibility or a specific scenic, cultural, physical, biological, ecological, or recreational resource identified by the [federal land manager] for a particular area" (USFS, NPS, USFWS, 2010).[183] No criteria have been established, however, regarding a level or prevalence of visible foliar injury considered to be adverse to the affected vegetation, and, as noted in section IV.A.1.b above, there is not a clear relationship between visible foliar injury and other effects, such as reduced growth and productivity.[184] Thus, key considerations with regard to public welfare significance of this endpoint

---

[183] The identification, monitoring and assessment of AQRVs with regard to an adverse effect is an approach used for assessing the potential for air pollution impacts in Class I areas from pending permit actions (USFS, NPS, USFWS, 2010). An adverse impact is recognized by the National Park Service as one that results in diminishment of the Class I area's national significance or the impairment of the ecosystem structure or functioning, as well as impairment of the quality of the visitor experience (USFS, NPS, USFWS, 2010). Federal land managers make such adverse impact determinations on a case-by-case basis, using technical and other information that they provide for consideration by permitting authorities. The National Park Service has developed a document describing an overview of approaches related to assessing projects under the National Environmental Policy Act and other planning initiatives affecting the National Park System (*http://www.nature.nps.gov/air/Pubs/pdf/AQGuidance_2011-01-14.pdf*).

[184] The National Park Service identifies various ranges of W126 index values in providing approaches for assessing air quality-related impacts of various development projects which appear to be based on the 1996 workshop report (Heck and Cowling, 1997), and may, at the low end, relate to a benchmark derived for the highly sensitive species, black cherry, for growth effects (10% RBL), rather than visible foliar injury (Kohut, 2007; Lefohn *et al.,* 1997). As noted in section IV.A.1.b above, visible foliar injury is not always a reliable indicator of other negative effects on vegetation (U.S. EPA, 2013, p. 9–39). We also note that the USFS biomonitoring analyses of visible foliar injury biomonitoring data commonly make use of a set of biosite index categories for which risk assumptions have been assigned, providing a relative scale of possible impacts (Campbell *et al,* 2007); however, little information is available on the studies, effects and judgments on which these categories are based.

have related to qualitative consideration of the plant's aesthetic value in protected forested areas. Depending on the extent and severity, $O_3$-induced visible foliar injury might be expected to have the potential to impact the public welfare in scenic and/or recreational areas during the growing season, particularly in areas with special protection, such as Class I areas.

The ecosystem services most likely to be affected by $O_3$-induced visible foliar injury (some of which are also recognized above for tree growth-related effects) are cultural services, including aesthetic value and outdoor recreation. In addition, several tribes have indicated that many of the species identified as $O_3$ sensitive (including bioindicator species) are culturally significant (U.S. EPA, 2014c, Table 5–1). The geographic extent of protected areas that may be vulnerable to such public welfare effects of $O_3$ is potentially appreciable. Sixty-six plant species that occur on U.S. National Park Service (NPS) and U.S. Fish and Wildlife Service lands [185] have been identified as sensitive to $O_3$-induced visible foliar injury, and some also have particular cultural importance to some tribes (U.S. EPA, 2014c, Table 5–1 and Appendix 5–A; U.S. EPA, 2014b, section 6.4.2). Not all species are equally sensitive to $O_3$, however, and quantitative E–R relationships for $O_3$ exposure and other important effects, such as seedling growth reduction, are only available for a subset of 12 of the 66, as summarized in section IV.A.1.b above. A diverse array of ecosystem services has been identified for these twelve species (U.S. EPA, 2014c, Table 5–1). Two species in this group that are slightly more sensitive than the median for the group with regard to effects on growth are the ponderosa pine and quaking aspen (U.S. EPA, 2014b, section 6.2), the ranges for which overlap with many lands that are protected or preserved for enjoyment of current and future generations (consistent with the discussion above on Class I and other protected areas), including such lands located in the west and southwest regions of the U.S. where ambient $O_3$ concentrations and associated cumulative seasonal exposures can be highest (U.S. EPA, 2014c, Appendix 2B).[186]

With regard to agriculture-related effects, the EPA has recognized other complexities, stating that the degree to which $O_3$ impacts on vegetation that could occur in areas and on species that are already heavily managed to obtain a particular output (such as commodity crops or commercial timber production) would impair the intended use at a level that might be judged adverse to the public welfare has been less clear (73 FR 16497, March 27, 2008). As noted in section IV.B.2 of the proposal, while having sufficient crop yields is of high public welfare value, important commodity crops are typically heavily managed to produce optimum yields. Moreover, based on the economic theory of supply and demand, increases in crop yields would be expected to result in lower prices for affected crops and their associated goods, which would primarily benefit consumers. These competing impacts on producers and consumers complicate consideration of these effects in terms of potential adversity to the public welfare (U.S. EPA, 2014c, sections 5.3.2 and 5.7). When agricultural impacts or vegetation effects in other areas are contrasted with the emphasis on forest ecosystem effects in Class I and similarly protected areas, it can be seen that the Administrator has in past reviews judged the significance to the public welfare of $O_3$-induced effects on sensitive vegetation growing within the U.S. to differ depending on the nature of the effect, the intended use of the sensitive plants or ecosystems, and the types of environments in which the sensitive vegetation and ecosystems are located, with greater significance ascribed to areas identified for specific uses and benefits to the public welfare, such as Class I areas, than to areas for which such uses have not been established (FR 73 16496–16497, March 27, 2008).

In summary, several considerations are recognized as important to judgments on the public welfare significance of the array of effects of different $O_3$ exposure conditions on vegetation. While there are complexities associated with the consideration of the magnitude of key vegetation effects that might be concluded to be adverse to ecosystems and associated services, there are numerous locations where $O_3$-sensitive tree species are present that may be vulnerable to impacts from $O_3$ on tree growth, productivity and carbon storage and their associated ecosystems and services. Cumulative exposures that may elicit effects and the significance of the effects in specific situations can vary due to differences in exposed species sensitivity, the importance of the observed or predicted $O_3$-induced effect, the role that the species plays in the ecosystem, the intended use of the

affected species and its associated ecosystem and services, the presence of other co-occurring predisposing or mitigating factors, and associated uncertainties and limitations. These factors contribute to the complexity of the Administrator's judgments regarding the adversity of known and anticipated effects to the public welfare.

*B. Need for Revision of the Secondary Standard*

The initial issue to be addressed in this review of the secondary standard for $O_3$ is whether, in view of the currently available scientific evidence, exposure and risk information and air quality analyses, as reflected in the record, the standard should be retained or revised. In drawing conclusions on adequacy of the current $O_3$ secondary standard, the Administrator has taken into account both evidence-based and quantitative exposure- and risk-based considerations, as well as advice from CASAC and public comment. Evidence-based considerations draw upon the EPA's assessment and integrated synthesis of the scientific evidence from experimental and field studies evaluating welfare effects related to $O_3$ exposure, with a focus on policy-relevant considerations, as discussed in the PA. Air quality analyses inform these considerations with regard to cumulative, seasonal exposures occurring in areas of the U.S. that meet the current standard. Exposure- and risk-based considerations draw upon the EPA assessments of risk of key welfare effects, including $O_3$ effects on forest growth, productivity, carbon storage, crop yield and visible foliar injury, expected to occur in model-based scenarios for the current standard, with appropriate consideration of associated uncertainties.

In evaluating whether it is appropriate to revise the current standard, the Administrator's considerations build on the general approach used in the last review, as summarized in section IV.A of the proposal, and reflect the body of evidence and information available during this review. The approach used is based on an integration of the information on vegetation effects associated with exposure to $O_3$ in ambient air, as well as policy judgments on the adversity of such effects to public welfare and on when the standard is requisite to protect public welfare from known or anticipated adverse effects. Such judgments are informed by air quality and related analyses, quantitative assessments, when available, and qualitative assessment of impacts that could not be quantified. The Administrator has taken into

[185] See *http://www2.nature.nps.gov/air/Pubs/pdf/flag/NPSozonesenspFLAG06.pdf.*

[186] Basal area for resident species in national forests and parks are available in files accessible at: *http://www.fs.fed.us/foresthealth/technology/nidrm2012.shtml.* Basal area is generally described as the area of ground covered by trees.

account both evidence of effects on vegetation and ecosystems and public uses of these entities that may be important to the public welfare. The decision on adequacy of the protection provided by the current standard has also considered the 2013 remand of the secondary standard by the D.C. Circuit such that this decision incorporates the EPA's response to this remand.

Section IV.B.1 below summarizes the basis for the proposed decision by the Administrator that the current secondary standard should be revised. Significant comments received from the public on the proposal are discussed in section IV.B.2 and the Administrator's final decision is described in section IV.B.3.

### 1. Basis for Proposed Decision

In evaluating whether it was appropriate to propose to retain or revise the current standard, as discussed in section IV.D of the proposal, the Administrator carefully considered the assessment of the current evidence in the ISA, findings of the WREA, including associated limitations and uncertainties, considerations and staff conclusions and associated rationales presented in the PA, views expressed by CASAC, and public comments that had been offered up to that point. In the paragraphs below, we summarize the proposal presentation of the PA considerations with regard to adequacy of the current secondary standard, advice from the CASAC, and the Administrator's proposed conclusions, drawing from section IV.D of the proposal, where a fuller discussion is presented.

### a. Considerations and Conclusions in the PA

The PA evaluation is based on the longstanding evidence for $O_3$ effects and the associated conclusions in the current review of causal and likely causal relationships between $O_3$ in ambient air and an array of welfare effects at a range of biological and ecological scales of organization, as summarized in section IV.A.1 above (and described in detail in the ISA). Drawing from the ISA and CASAC advice, the PA emphasizes the strong support in the evidence for the conclusion that effects on vegetation are attributable to cumulative seasonal $O_3$ exposures, taking note of the improved "explanatory power" (for effects on vegetation) of the W126 index over other exposure metrics, as summarized in section IV.A.1.c above. The PA further recognizes the strong basis in the evidence for the conclusion that it is appropriate to use a cumulative

seasonal exposure metric, such as the W126 index, to judge impacts of $O_3$ on vegetation; related effects on ecosystems and services, such as carbon storage; and the level of public welfare protection achieved for such effects (U.S. EPA, 2014c, p. 5–78). As a result, based on the strong support in the evidence and advice from CASAC in the current and past reviews, the PA concludes that the most appropriate and biologically relevant way to relate $O_3$ exposure to plant growth, and to determine what would be adequate protection for public welfare effects attributable to the presence of $O_3$ in ambient air, is to characterize exposures in terms of a cumulative seasonal form, and in particular the W126 metric (U.S. EPA, 2014c, pp. 5–7 and 5–78). Accordingly, in considering the evidence with regard to level of protection provided by the current secondary standard, the PA considers air quality data and exposure-response relationships for vegetation effects, particularly those related to forest tree growth, productivity and carbon storage, in terms of the W126 index (U.S. EPA, 2014c, section 5.2; 79 FR 75330–75333, December 17, 2014).

In considering the extent to which such growth-related effects might be expected to occur under conditions that meet the current secondary standard, the PA focused particularly on tree seedling RBL estimates for the 11 species for which robust E–R functions have been developed, noting the CASAC concurrence with use of $O_3$-related tree biomass loss as a surrogate for related effects extending to the ecosystem scale (U.S. EPA, 2014c, p. 5–80, Frey, 2014c, p. 10). The PA evaluation relied on RBL estimates for these 11 species derived using the robust OTC-based E–R functions, noting that analyses newly performed in this review have reduced the uncertainty associated with using OTC E–R functions to predict tree growth effects in the field (U.S. EPA, 2014c, section 5.2.1; U.S. EPA, 2013, section 9.6.3.2).

In considering the RBL estimates for different $O_3$ conditions associated with the current standard, the PA focused primarily on the median of the species-specific (composite) E–R functions. In so doing, in the context of considering the adequacy of protection afforded by the current standard, the PA takes note of CASAC's view regarding a 6% median RBL (Frey, 2014c, p. 12). Based on the summary of RBL estimates in the PA, the PA notes that the median species RBL estimate, across the 11 estimates derived from the robust species-specific E–R functions, is at or above 6% for W126 index values of 19

ppm-hrs and higher (U.S. EPA, 2014c, Tables 6–1 and 5C–3).

In recognition of the potential significance to public welfare of vegetation effects in Class I areas, the proposal described in detail findings of the PA analysis of the occurrence of $O_3$ concentrations associated with the potential for RBL estimates above benchmarks of interest in Class I areas that meet the current standard, focusing on 22 Class I areas for which air quality data indicated the current standard was met and cumulative seasonal exposures, in terms of a 3-year average W126 index, were at or above 15 ppm-hrs (79 FR 75331–75332, Table 7, December 17, 2014; U.S. EPA, 2014c, Table 5–2). The PA noted that W126 index values (both annual and 3-year average values) in many such areas, distributed across multiple states and NOAA climatic regions, were above 19 ppm-hrs. The highest 3-year average value was over 22 ppm-hrs and the highest annual value was over 27 ppm-hrs, exposure values for which the corresponding median species RBL estimates markedly exceed 6%, which CASAC has termed "unacceptably high" (U.S. EPA, 2014c, section 5.2). The PA additionally considered the species-specific RBL estimates for two tree species (quaking aspen and ponderosa pine) that are found in many of these Class I areas and that have a sensitivity to $O_3$ exposure that places them slightly more sensitive than the median of the group for which robust E–R functions have been established (U.S. EPA, 2014c, sections 5.2 and 5.7). As further summarized in the proposal, the PA describes the results of this analysis, particularly in light of advice from CASAC regarding the significance of the 6% RBL benchmark, as evidence of the occurrence in Class I areas, during periods when the current standard is met, of cumulative seasonal $O_3$ exposures of a magnitude for which the tree growth impacts indicated by the associated RBL estimates might reasonably be concluded to be important to public welfare (79 FR 75332; U.S. EPA, 2014c, sections 5.2.1 and 5.7).

The proposal also noted that the PA additionally considered findings of the WREA analyses of $O_3$ effects on tree growth and an array of ecosystem services provided by forests, including timber production, carbon storage and air pollution removal (79 FR 75332–75333; U.S. EPA, 2014b, sections 6.2–6.8; U.S. EPA, 2014c, section 5.2). While recognizing that these analyses provide quantitative estimates of impacts on tree growth and associated services for several different air quality scenarios,

the PA takes note of the large uncertainties associated with these analyses (see U.S. EPA, 2014b, Table 6–27) and the potential for these findings to underestimate the response at the national scale. While noting the potential usefulness of considering predicted and anticipated impacts to these services in assessing the extent to which the current information supports or calls into question the adequacy of the protection afforded by the current standard, the PA also recognizes significant uncertainties associated with the absolute magnitude of the estimates for these ecosystem service endpoints which limited the weight staff placed on these results (U.S. EPA, 2014c, sections 5.2 and 5.7).

As described in the proposal, the PA also considered $O_3$ effects on crops, taking note of the extensive and long-standing evidence of the detrimental effect of $O_3$ on crop production, which continues to be confirmed by evidence newly available in this review (79 FR 75333; U.S. 2014c, sections 5.3 and 5.7). With regard to consideration of the quantitative impacts of $O_3$ exposures under exposure conditions associated with the current standard, the PA focused on RYL estimates that had strong support in the current evidence (as characterized in the ISA, section 9.6) in light of CASAC comments regarding RYL benchmarks (Frey, 2014c, pp. iii and 14). In considering such evidence-based analyses, as well as the exposure/risk-based information for crops, the PA notes the CASAC comments regarding the use of crop yields as a surrogate for consideration of public welfare impacts, which noted that "[c]rops provide food and fiber services to humans" and that "[e]valuation of market-based welfare effects of $O_3$ exposure in forestry and agricultural sectors is an appropriate approach to take into account damage that is adverse to public welfare" (Frey, 2014c, p. 10; U.S. EPA, 2014c, section 5.7). The PA additionally notes, however, as recognized in section IV.A.3 above that the determination of the point at which $O_3$-induced crop yield loss becomes adverse to the public welfare is still unclear, given that crops are heavily managed (e.g., with fertilizer, irrigation) for optimum yields, have their own associated markets and that benefits can be unevenly distributed between producers and consumers (79 FR 75322; U.S. EPA, 2014c, sections 5.3 and 5.7).

With regard to visible foliar injury, as summarized in the proposal, the PA recognizes the long-standing evidence that has established that $O_3$ causes diagnostic visible foliar injury symptoms on studied bioindicator species and also recognizes that such $O_3$-induced impacts have the potential to impact the public welfare in scenic and/or recreational areas, with visible foliar injury associated with important cultural and recreational ecosystem services to the public, such as scenic viewing, wildlife watching, hiking, and camping, that are of significance to the public welfare and enjoyed by millions of Americans every year, generating millions of dollars in economic value (U.S. EPA, 2014b, section 7.1). In addition, several tribes have indicated that many of the $O_3$-sensitive species (including bioindicator species) are culturally significant (U.S. EPA, 2014c, Table 5–1). Similarly, the PA notes CASAC comments that "visible foliar injury can impact public welfare by damaging or impairing the intended use or service of a resource," including through "visible damage to ornamental or leafy crops that affects their economic value, yield, or usability; visible damage to plants with special cultural significance; and visible damage to species occurring in natural settings valued for scenic beauty or recreational appeal" (Frey, 2014c, p. 10). Given the above, and taking note of CASAC views, the PA recognizes visible foliar injury as an important $O_3$ effect which, depending on severity and spatial extent, may reasonably be concluded to be of public welfare significance, especially when occurring in nationally protected areas, such as national parks and other Class I areas.

As summarized in the proposal, the PA additionally takes note of the evidence described in the ISA regarding the role of soil moisture conditions that can decrease the incidence and severity of visible foliar injury under dry conditions (U.S. EPA, 2014c, sections 5.4 and 5.7). As recognized in the PA, this area of uncertainty complicates characterization of the potential for visible foliar injury and its severity or extent of occurrence for given air quality conditions and thus complicates identification of air quality conditions that might be expected to provide a specific level of protection from this effect (U.S. EPA, 2014c, sections 5.4 and 5.7). While noting the uncertainties associated with describing the potential for visible foliar injury and its severity or extent of occurrence for any given air quality conditions, the PA notes the occurrence of $O_3$-induced visible foliar injury in areas, including federally protected Class I areas that meet the current standard, and suggests it may be appropriate to consider revising the standard for greater protection. In so doing, however, the PA recognizes that

the degree to which $O_3$-induced visible foliar injury would be judged important and potentially adverse to public welfare is uncertain (U.S. EPA, 2014c, section 5.7).

As noted in the proposal, with regard to other welfare effects, for which the ISA determined a causal or likely causal relationships with $O_3$ in ambient air, such as alteration of ecosystem water cycling and changes in climate, the PA concludes there are limitations in the available information that affect our ability to consider potential impacts of air quality conditions associated with the current standard.

Based on the considerations described in the PA, summarized in the proposal and outlined here, the PA concludes that the currently available evidence and exposure/risk information call into question the adequacy of the public welfare protection provided by the current standard and provide support for considering potential alternative standards to provide increased public welfare protection, especially for sensitive vegetation and ecosystems in federally protected Class I and similarly protected areas. In this conclusion, staff gives particular weight to the evidence indicating the occurrence in Class I areas that meet the current standard of cumulative seasonal $O_3$ exposures associated with estimates of tree growth impacts of a magnitude that may reasonably be considered important to public welfare.

b. CASAC Advice

The proposal also summarized advice offered by the CASAC in the current review, based on the updated scientific and technical record since the 2008 rulemaking. The CASAC stated that it "[supports] the conclusion in the Second Draft PA that the current secondary standard is not adequate to protect against current and anticipated welfare effects of ozone on vegetation" (Frey, 2014c, p. iii) and that the PA "clearly demonstrates that ozone-induced injury may occur in areas that meet the current standard" (Frey, 2014c, p. 12). The CASAC further stated "[w]e support the EPA's continued emphasis on Class I and other protected areas" (Frey, 2014c, p. 9). Additionally, the CASAC indicated support for the concept of ecosystem services "as part of the scope of characterizing damage that is adverse to public welfare" and "concur[red] that trees are important from a public welfare perspective because they provide valued services to humans, including aesthetic value, food, fiber, timber, other forest products, habitat, recreational opportunities, climate regulation, erosion control, air

pollution removal, and hydrologic and fire regime stabilization'' (Frey, 2014c, p. 9). Similar to comments from CASAC in the last review, and comments on the proposed reconsideration, the current CASAC also endorsed the PA discussions and conclusions on biologically relevant exposure metrics and the focus on the W126 index accumulated over a 12-hour period (8 a.m.–8 p.m.) over the 3-month summation period of a year resulting in the maximum value (Frey, 2014c, p. iii).

In addition, CASAC stated that ''relative biomass loss for tree species, crop yield loss, and visible foliar injury are appropriate surrogates for a wide range of damage that is adverse to public welfare,'' listing an array of related ecosystem services (Frey, 2014c, p. 10). With respect to RBL for tree species, CASAC states that it is appropriate to identify in the PA ''a range of levels of alternative W126-based standards that include levels that aim for not greater than 2% RBL for the median tree species'' and that a median tree species RBL of 6% is ''unacceptably high'' (Frey, 2014c, pp. 13 and 14). With respect to crop yield loss, CASAC points to a benchmark of 5%, stating that a crop RYL for median species over 5% is ''unacceptably high'' and described crop yield as a surrogate for related services (Frey, 2014c, p. 13).

c. Administrator's Proposed Conclusions

At the time of proposal, the Administrator took into account the information available in the current review with regard to the nature of $O_3$-related effects on vegetation and the adequacy of protection provided by the current secondary standard. The Administrator recognized the appropriateness and usefulness of the W126 metric in evaluating $O_3$ exposures of potential concern for vegetation effects, additionally noting support conveyed by CASAC for such a use for this metric. Further, the Administrator took particular note of (1) the PA analysis of the magnitude of tree seedling growth effects (biomass loss) estimated for different cumulative, seasonal, concentration-weighted exposures in terms of the W126 metric; (2) the monitoring analysis in the PA of cumulative exposures (in terms of W126 index) occurring in locations where the current standard is met, including those locations in or near Class I areas, and associated estimates of tree seedling growth effects; and (3) the analyses in the WREA illustrating the geographic distribution of tree species for which E–R functions are available and estimates of $O_3$-related growth impacts for

different air quality scenarios, taking into account the identified potential for the WREA's existing standard scenario to underestimate the highest W126-based $O_3$ values that would be expected to occur.

With regard to considering the adequacy of public welfare protection provided by the current secondary standard at the time of proposal, the Administrator focused first on welfare effects related to reduced native plant growth and productivity in terrestrial systems, taking note of the following: (a) The ISA conclusion of a causal relationship between $O_3$ in the ambient air and these welfare effects, and supporting evidence related to $O_3$ effects on vegetation growth and productivity, including the evidence from OTC studies of tree seedling growth that support robust E–R functions for 11 species; (b) the evidence, described in section IV.D.1 of the proposal and summarized above, of the occurrence of cumulative seasonal $O_3$ exposures for which median species RBL estimates are of a magnitude that CASAC has termed ''unacceptably high'' in Class I areas during periods where the current standard is met; (c) actions taken by Congress to establish public lands that are set aside for specific uses intended to provide benefits to the public welfare, including lands that are to be protected so as to conserve the scenic value and the natural vegetation and wildlife within such areas for the enjoyment of future generations, such as national parks and forests, wildlife refuges, and wilderness areas (many of which have been designated Class I areas); and (d) PA conclusions that the current information calls into question the adequacy of the current standard, based particularly on impacts on tree growth (and the potential for associated ecosystem effects), estimated for Class I area conditions meeting the current standard, that are reasonably concluded to be important from a public welfare standpoint in terms of both the magnitude of the vegetation effects and the significance to public welfare of such effects in such areas.

At the time of proposal, the Administrator also recognized the causal relationships between $O_3$ in the ambient air and visible foliar injury, reduced yield and quality of agricultural crops, and alteration of below-ground biogeochemical cycles associated with effects on growth and productivity. As to visible foliar injury, she took note of the complexities and limitations in the evidence base regarding characterizing air quality conditions with respect to the magnitude and extent of risk for visible foliar injury, and she

additionally recognized the challenges of associated judgments with regard to adversity of such effects to public welfare. In taking note of the conclusions with regard to crops, she recognized the complexity of considering adverse $O_3$ impacts to public welfare due to the heavy management common for achieving optimum yields and market factors that influence associated services and additionally took note of the PA conclusions that placing emphasis on the protection afforded to trees inherently also recognizes a level of protection afforded for crops.

Based on her consideration of the conclusions in the PA, and with particular weight given to PA findings pertaining to tree growth-related effects, as well as with consideration of CASAC's conclusion that the current standard is not adequate, the Administrator proposed to conclude that the current standard is not requisite to protect public welfare from known or anticipated adverse effects and that revision is needed to provide the requisite public welfare protection, especially for sensitive vegetation and ecosystems in federally protected Class I areas and in other areas providing similar public welfare benefits. The Administrator further concluded that the scientific evidence and quantitative analyses on tree growth-related effects provide strong support for consideration of alternative standards that would provide increased public welfare protection beyond that afforded by the current $O_3$ secondary standard. She further noted that a revised standard would provide increased protection for other growth-related effects, including for carbon storage and for areas for which it is more difficult to determine public welfare significance, as recognized in section IV.B.2 of the proposal, as well as other welfare effects of $O_3$, including visible foliar injury and crop yield loss.

2. Comments on the Need for Revision

In considering comments on the need for revision, we first note the advice and recommendations from CASAC with regard to the adequacy of the current standard. In its review of the second draft PA, CASAC stated that it ''supports the scientific conclusion in the Second Draft PA that the current secondary standard is not adequate to protect against current and anticipated welfare effects of ozone on vegetation'' (Frey, 2014c).

General comments received from the public on the proposal that are based on relevant factors and either supported or opposed the proposed decision to revise

BLM_0047393

the current $O_3$ secondary standard are addressed in this section. Comments on specific issues or information that relate to consideration of the appropriate elements of a revised secondary standard are addressed below in section IV.C. Other specific comments related to standard setting, as well as general comments based on implementation-related factors that are not a permissible basis for considering the need to revise the current standard, are addressed in the Response to Comments document.

Public comments on the proposal were divided with regard to support for the Administrator's proposed decision to revise the current secondary standard. Many state and local environmental agencies or government bodies, tribal agencies and organizations, and environmental organizations agreed with the EPA's proposed conclusion on the need to revise the current standard, stating that the available scientific information shows that $O_3$-induced vegetation and ecosystem effects are occurring under air quality conditions allowed by the current standard and, therefore, provides a strong basis and support for the conclusion that the current secondary standard is not adequate. In support of their view, these commenters relied on the entire body of evidence available for consideration in this review, including evidence assessed previously in the 2008 review. These commenters variously pointed to the information and analyses in the PA and the conclusions and recommendations of CASAC as providing a clear basis for concluding that the current standard does not provide adequate protection of public welfare from $O_3$-related effects. Many of these commenters generally noted their agreement with the rationale provided in the proposal with regard to the Administrator's proposed conclusion on adequacy of the current standard, and some gave additional emphasis to several aspects of that rationale, including the appropriateness of the EPA's attention to sensitive vegetation and ecosystems in Class I areas and other public lands that provide similar public welfare benefits and of the EPA's reliance on the strong evidence of impacts to tree growth and growth-related effects.

Comments from tribal organizations additionally noted that many Class I areas are of sacred value to tribes or provide treaty-protected benefits to tribes, including the exercise of gathering rights. Tribal organizations also noted the presence in Class I areas of large numbers of culturally important plant species, which they indicate to be impacted by air quality conditions

allowed by the current standard. The impacts described include visible foliar injury, loss in forest growth and crop yield loss, which these groups describe as especially concerning when occurring on lands set aside for the benefit of the public or that are of sacred value to tribes or provide treaty-protected benefits to tribes.

As described in section IV.B.3 below, the EPA generally agrees with the view of these commenters regarding the need for revision of the current secondary standard and with CASAC that the evidence provides support for the conclusions that the current secondary standard is not adequate to protect public welfare from known or anticipated adverse effects, particularly with respect to effects on vegetation.

A number of industries, industry associations, or industry consultants, as well as some state governors, attorneys general and environmental agencies, disagreed with the EPA's proposed conclusion on the adequacy of the current standard and recommended against revision. In support of their position, these commenters variously stated that the available evidence is little changed from that available at the time of the 2008 decision, and that the evidence is too uncertain, including with regard to growth-related effects and visible foliar injury, to support revision, and does not demonstrate adverse effects to public welfare for conditions associated with the current standard, with some commenters stating particularly that the EPA analysis of Class I areas did not document adverse effects to public welfare. They also cited the WREA modeling analyses as indicating that any welfare improvements associated with a revised standard would be marginal; in particular, compared to the benefits of achieving the current standard. Further, they state that, because of long-range transport of $O_3$ and precursors, it is not appropriate for the EPA to draw conclusions about the level of protection offered by the current standard based on current air quality conditions; in support of this view, these commenters point to different modeling analyses as demonstrating that under conditions where the current standard is met throughout the U.S., the associated W126 values would all be below the upper end of the range proposed as providing requisite public welfare protection and nearly all below the lower end of 13 ppm-hrs.

As an initial matter, we note that, as noted in sections I.C and IV.A above, the EPA's 2008 decision on the secondary standard was remanded back to the Agency because in setting the

2008 secondary standard, the EPA failed to specify what level of air quality was requisite to protect public welfare from known or anticipated adverse effects or explain why any such level would be requisite. So, in addressing the court remand, the EPA has more explicitly considered the extent to which protection is provided from known or anticipated effects that the Administrator may judge to be adverse to public welfare, and has described how the air quality associated with the revised standard would provide requisite public welfare protection, consistent with CAA section 109(b)(2) and the court's decision remanding the 2008 secondary standard. In undertaking this review, consistent with the direction of the CAA, the EPA has considered the current air quality criteria.

While we recognize, as stated in the proposal, that the evidence newly available in this review is largely consistent with the evidence available at the time of the last review (completed in 2008) with regard to the welfare effects of $O_3$, we disagree with the commenters' interpretations of the evidence and analyses available in this review and with their views on the associated uncertainties. As summarized in section IV.A above, the ISA has determined causal relationships to exist between several vegetation and ecosystem endpoints and $O_3$ in ambient air (U.S. 2013, section 9.7). The ISA characterized the newly available evidence as largely consistent with and supportive of prior conclusions, as summarized in section IV.A above. This is not to say, however, that there is no newly available evidence and information in this review or that it is identical to that available in the last review. In some respects, the newly available evidence has strengthened the evidence available in the last review and reduced important uncertainties. As summarized in section IV.A.1.b above, newly available field studies confirm the cumulative effects and effects on forest community composition over multiple seasons. Additionally, among the newly available evidence for this review are analyses documented in the ISA that evaluate the RBL and RYL E–R functions for aspen and soybean, respectively, with experimental datasets that were not used in the derivation of the functions (U.S. 2013, section 9.6.3). These evaluations confirm the pertinence of the tree seedling RBL estimates for aspen, a species with sensitivity roughly midway in the range of sensitivities for the studied species, across multiple years in older trees.

With regard to crops, the ISA evaluations demonstrate a robustness of the E–R functions to predict $O_3$-attributable RYL and confirm the relevance of the crop RYL estimates for more recent cultivars currently growing in the field. Together, the information newly available in this review confirms the basis for the E–R functions and strengthens our confidence in interpretations drawn from their use in other analyses newly available in this review that have been described in the WREA and PA.

With regard to comments on uncertainties associated with estimates of RBL, we first note that these established, robust E–R functions, which the EPA gave particular emphasis in this review, are available for seedling growth for 11 tree species native to the U.S., as summarized in section IV.A.1.b above and described in the proposal. These E–R functions are based on studies of multiple genotypes of 11 tree species grown for up to three years in multiple locations across the U.S. (U.S. EPA, 2013, section 9.6.1). We have recognized the uncertainty regarding the extent to which the studied species encompass the $O_3$ sensitive species in the U.S. and also the extent to which they represent U.S. vegetation as a whole (U.S. EPA, 2014b, section 6.9). However, the studied species included both deciduous and coniferous trees with a wide range of sensitivities and species native to every region across the U.S. and in most cases are resident across multiple states and NOAA climatic regions (U.S. EPA, 2014b, Appendix 6A). While the CASAC stated that there is "considerable uncertainty in extrapolating from the [studied] forest tree species to all forest tree species in the U.S.," it additionally expressed the view that it should be anticipated that there are highly sensitive vegetation species for which we do not have E–R functions and others that are insensitive.[187] In so doing, the CASAC stated that it "should not be assumed that species of unknown sensitivity are tolerant to ozone" and "[i]t is more appropriate to assume that the sensitivity of species without E–R functions might be similar to the range of sensitivity for those species with E–R functions" (Frey, 2014c, p. 11). Accordingly, we disagree with commenters' view that effects on these species are not appropriate

considerations for evaluation of the adequacy of the current standard.

In support of their view that RBL estimates are too uncertain to inform a conclusion that the current standard is not adequately protective of public welfare, some commenters state that some of the 11 E–R functions are based on as few as one study. The EPA agrees that there are two species for which there is only one study supporting the E–R function (Virginia pine and red maple). We also note, however, that those two species are appreciably less sensitive than the median (Lee and Hogsett, 1996; U.S. EPA, 2014c, Table 5C–1). Thus, in the relevant analyses, they tend to influence the median toward a relatively less (rather than more) sensitive response. Further, there are four species for which the E–R functions are based on more than five studies,[188] contrary to the commenters' claims of there being no functions supported by that many studies. That said, the EPA has noted the relatively greater uncertainty in the species for which fewer studies are available, and it is in consideration of such uncertainties that the EPA focused in the proposal on the median E–R function across the 11 species, rather than a function for a species much more (or less) sensitive than the median. The EPA additionally notes that it gave less emphasis to the E–R function available for one species, eastern cottonwood, based on CASAC advice that the study results supporting that E–R function were not as strong as the results of the other experiments that support the other, robust E–R functions and that the eastern cottonwood study results showed extreme sensitivity to $O_3$ compared to other studies (Frey, 2014c, p. 10). Accordingly, the EPA has appropriately considered the strength of the scientific evidence and the associated uncertainties in considering revision of the secondary standard.

Other commenters stated that the scientific evidence does not support revising the NAAQS, pointing to uncertainty related to interpretation of the RBL estimates (based on tree seedling studies) with regard to effects on older tree lifestages. Some of these commenters' claim that mature canopy trees experience reduced $O_3$ effects. The EPA agrees that the quantitative information for $O_3$ growth effects on older tree lifestages is available for a more limited set of species than that available for tree seedlings. We note,

however, that this is an area for which there is information newly available in this review. A detailed analysis of study data for seedlings and older lifestages of aspen shows close agreement between the $O_3$-attributable reduced growth observed in the older trees and reductions predicted from the seedling E–R function (U.S. EPA, 2013, section 9.6.3.2; discussed in the PA, section 5.2.1 as noted in the proposal, p. 75330). This finding, newly available in this review and documenting impacts on mature trees, improves our confidence in conclusions drawn with regard to the significance of RBL estimates for this species, which is prevalent across multiple regions of the U.S.[189] It is also noteworthy that this species is generally more sensitive to $O_3$ effects on growth than the median of the 11 species with robust E–R functions (as shown in U.S. EPA 2014c, Table 5C–1). Other newly available studies, summarized in section IV.A.1.b above and section IV.B.1.b of the proposal, provide additional evidence of $O_3$ impacts on mature trees, including a meta-analysis reporting older trees to be more affected by $O_3$ than younger trees (U.S. EPA, 2013, p. 9–42; Wittig et al., 2007). We additionally note that CASAC "concur[red] that biomass loss in trees is a relevant surrogate for damage to tree growth that affects ecosystem services such as habitat provision for wildlife, carbon storage, provision of food and fiber, and pollution removal" additionally stating that "[b]iomass loss may also have indirect process-related effects such as on nutrient and hydrologic cycles" leading them to conclude that "[t]herefore, biomass loss is a scientifically valid surrogate of a variety of adverse effects to public welfare" (Frey, 2014c, p. 10).

As noted in section IV.A above and discussed below, the Administrator's final decision on the adequacy of the current standard draws upon, among other things, the available evidence and quantitative analyses as well as judgments about the appropriate weight to place on the range of uncertainties inherent in the evidence and analyses. The strengthening in this review, as compared with the last review, of the basis for the robust E–R functions for tree seedling RBL, as well as other newly available quantitative analyses,

---

[187] Use of RBL estimates in the proposal, and in this final decision, focuses on the RBL for the studied species as a surrogate for a broad array of growth-related effects of potential public welfare significance, consistent with the CASAC advice.

[188] These four species, aspen, Douglas fir, ponderosa pine and red alder, range broadly in sensitivities that fall above, below and at the median for the 11 species (Lee and Hogsett, 1996; U.S. EPA, 2014c, Table 5C–1).

[189] The WREA notes a few additional, limited analyses using modeling tools and data from previous publications that indicate there may be species-specific differences in the extent of similarities between seedling and adult growth response to $O_3$, with some species showing greater and some lesser response for seedlings as compared to mature tree, but a general comparability (U.S. EPA 2014b, section 6.2.1.1 and p. 6–67).

will, accordingly, contribute to judgments made by the Administrator with regard to these effects in reaching her final decisions in this review.

Amongst the newly available information in this review is a new analysis describing W126-based exposures occurring in counties containing Class I areas for which monitoring data indicated compliance with the current standard. The PA gave particular attention to this analysis in consideration of the adequacy of the current standard, and this analysis was also described in the proposal (U.S. EPA, 2014c, Appendix 5B and pp. 5–27 to 5–29; 79 FR 75331–75332, December 17, 2014). Some of the commenters who disagreed with the EPA's conclusion on adequacy of the current standard variously stated that this analysis does not demonstrate growth effects are occurring in Class I areas and that the analysis is too uncertain for reliance on by the Administrator in her judgment on adequacy of the current standard. While the EPA agrees with commenters that data on the occurrence of growth effects in the areas and time periods identified are not part of this analysis, we note that this is because such data have not been collected and consequently cannot be included. As a result, the EPA has utilized measurements of $O_3$ in or near these areas in combination with the established E–R functions to estimate the potential for growth impacts in these areas under conditions where the current standard is met. The EPA additionally notes that species for which E–R functions have been developed have been documented to occur within these areas (see Table 3).

The EPA disagrees with commenters regarding the appropriateness of this analysis for the Administrator's consideration. This analysis documents the occurrence of cumulative growing season exposures in these ecosystems which the EPA and CASAC have interpreted, through the use of the established E–R functions for tree seedling growth effects summarized in section IV.A.1.b above (and described in the ISA, PA and proposal), as indicating the potential for growth effects of significance in these protected areas. To the extent that these comments imply that the Administrator may only consider welfare effects that are certain in judging the adequacy of the current standard, we note that section 109(b)(2) of the CAA plainly provides for consideration of both known and anticipated adverse effects in establishing or revising secondary NAAQS.

In support of some commenters' view that this analysis is too uncertain to provide a basis for the Administrator's proposed conclusion that the current standard is not adequate, one commenter observed that the $O_3$ monitors used for six of the 22 Class I areas in the analysis, although in the same county, were sited outside of the Class I areas. This was the case due to the analysis being focused on the highest monitor in the county that met the current standard. To clarify the presentation, however, we have refocused the presentation, restricting it to data for monitors sited in or within 15 kilometers of a Class I area,[190] and note that the results are little changed, continuing to call into question the adequacy of the current standard. As shown in Table 3, the dataset in the refocused presentation, which now spans 1998 up through 2013, includes 17 Class I areas for which monitors were identified in this manner. For context, we note that this represents nearly a quarter of the Class I areas for which there are $O_3$ monitors within 15 km.[191]

In recognition of the influence that other environmental factors can exert in the natural environment on the relationship between ambient $O_3$ exposures and RBL, potentially modifying the impact predicted by the E–R functions, the PA and proposal took particular note of the occurrence of 3-year average W126 index values at or above 19 ppm-hrs. In the re-focused analysis in Table 3, there are 11 areas, distributed across four states in two NOAA climatic regions, for which the 3-year W126 exposure index values ranged at or above 19 ppm-hrs, a value for which the corresponding median species RBL estimate for a growing season's exposure is 6%, a magnitude termed "unacceptably high" by CASAC (Frey, 2014c, p. 13). The highest 3-year W126 index values in these 11 areas ranged from 19.0 up to 22.2 ppm-hrs, a cumulative seasonal exposure for which the median species RBL estimate is 9% for a single growing season. The annual W126 index values range above 19 ppm-hrs in 15 of the areas in the re-focused table provided here; these areas are distributed across six states (AZ, CA, CO, KY, SD, UT) and four regions (West, Southwest, West North Central and Central).[192] The highest index values in the areas with annual index values above 19 ppm-hrs range from 19.1 to 26.9 ppm-hrs. As is to be expected from the focus on a smaller dataset, the number of states with 1-year W126 index values above 19 ppm-hrs is smaller in the refocused analysis (15 as compared to 20), although the number of regions affected is the same. More importantly, however, the number of areas with 3-year W126 index values at or above 19 ppm-hrs is the same, 11 Class I areas across two regions, supporting the prior conclusions.

TABLE 3—$O_3$ CONCENTRATIONS FOR CLASS I AREAS DURING PERIOD FROM 1998 TO 2013 THAT MET THE CURRENT STANDARD AND WHERE 3-YEAR AVERAGE W126 INDEX VALUE WAS AT OR ABOVE 15 ppm-hrs

| Class I area (distance away, if monitor is not at/within boundaries) | State/County | Design value (ppb)* | 3-Year average W126 (ppm-hrs)* (# ≥ 19 ppm-hrs, range) | Annual W126 (ppm-hrs)* (# ≥ 19 ppm-hrs, range) | Number of 3-year periods |
|---|---|---|---|---|---|
| Bridger Wilderness Area [QA, DF] (8.9 km). | WY/Sublette | 70–72 | 16.2–17.0 | 13.9–18.8 | 4 |
| Canyonlands National Park [QA, DF, PP]. | UT/San Juan | 70–73 | 15.4–19.5 (2, 19.1–19.5) | 9.6–23.6 (4, 19.2–23.6) | 8 |
| Chiricahua National Monument [DF, PP] (12 km). | AZ/Cochise | 69–73 | 15.2–19.8 (1, 19.8) | 11.7–21.9 (2, 19.8–21.9) | 10 |
| Grand Canyon National Park [QA, DF, PP]. | AZ/Coconino | 68–74 | 15.3–22.2 (7, 19.1–22.2) | 10.1–26.9 (6, 19.8–26.9) | 12 |
| Desolation Wilderness [PP] (3.9 km) .. | CA/El Dorado | 75 | 19.8 (1, 19.8) | 15.6–22.9 (2, 21.0–22.9) | 1 |

[190] The 15 km distance was selected as a natural breakpoint in distance of $O_3$ monitoring sites from Class I areas and as still providing similar surroundings to those occurring in the Class I area. We note that given the strict restrictions on structures and access within some of these areas, it is common for monitors intended to collect data pertaining to air quality in these types of areas to be sited outside their boundaries.

[191] There is an $O_3$ monitor within fewer than 15% of all Class I areas, and fewer than half of all Class I areas have a monitor within 15 km.

[192] This compares to 20 areas in eight states and four regions in the earlier analysis.

**65386**   **Federal Register** / Vol. 80, No. 206 / Monday, October 26, 2015 / Rules and Regulations

TABLE 3—O₃ CONCENTRATIONS FOR CLASS I AREAS DURING PERIOD FROM 1998 TO 2013 THAT MET THE CURRENT STANDARD AND WHERE 3-YEAR AVERAGE W126 INDEX VALUE WAS AT OR ABOVE 15 ppm-hrs—Continued

| Class I area (distance away, if monitor is not at/within boundaries) | State/County | Design value (ppb)* | 3-Year average W126 (ppm-hrs)* (# ≥ 19 ppm-hrs, range) | Annual W126 (ppm-hrs)* (# ≥ 19 ppm-hrs, range) | Number of 3-year periods |
|---|---|---|---|---|---|
| Lassen Volcanic National Park DF, PP. | CA/Shasta ................. | 72–74 | 15.3–15.6 | 11.5–19.1 (1, 19.1) | 2 |
| Mammoth Cave National Park BC, C, LP, RM, SM, VP, YP (0.1 km). | KY/Edmonson ........... | 74 | 15.7 | 12.3–22.0 (1, 22.0) | 1 |
| Maroon Bells-Snowmass Wilderness Area QA, DF (0.8 km). | CO/Gunnison ............. | 68–73 | 15.6–20.2 (1, 20.2) | 13.0–23.8 (3, 21.3–23.8) | 8 |
| Mazatzal Wilderness DF, PP (10.9 km). | AZ/Maricopa .............. | 74–75 | 17.8–19.9 (1, 19.9) | 10.3–26.2 (3, 19.7–26.2) | 2 |
| Mesa Verde National Park DF ......... | CO/Montezuma ......... | 67–73 | 15.4–20.7 (1, 20.7) | 10.7–23.4 (4, 19.5–23.4) | 11 |
| Petrified Forest National Park C ...... | AZ/Navajo ................. | 70 | 15.4–16.9 | 12.7–18.6 | 2 |
| Rocky Mountain National Park QA, DF, PP (0.9 km). | CO/Larimer ................ | 73–74 | 15.3–18.4 | 8.3–26.2 (4, 19.4–26.2) | 5 |
| Saguaro National Park DF, PP (0.1 km)**. | AZ/Pima ..................... | 69–74 | 15.4–19.0 (1, 19.0) | 7.3–22.9 (3, 19.6–22.9) | 6 |
|  | AZ/Gila ...................... | 72–75 | 16.6–20.9 (2, 19.0–20.9) | 13.8–25.5 (4, 19.0–25.5) | 5 |
| Superstition Wilderness Area PP (6.3, 14.9 km and 7.2 km)**. | AZ/Maricopa .............. | 70–75 | 15–20.2 (1, 20.2) | 6.3–23.9 (4, 19.6–23.9) | 4 |
|  | AZ/Pinal .................... | 72–75 | 15.3–21.1 (1, 21.1) | 10.2–24.7 (4, 21.4–24.7) | 7 |
| Weminuche Wilderness Area QA, DF, PP (14.9 km). | CO/La Plata .............. | 70–74 | 15.1–19.1 (1, 19.1) | 10.8–21.0 (2, 20.8–21.0) | 6 |
| Wind Cave National Park QA, PP ...... | SD/Custer ................. | 70 | 15.4 | 12.3–20.5 (1, 20.5) | 1 |
| Zion National Park QA, DF, PP (3.6 km). | UT/Washington .......... | 70–73 | 17.0–20.1 (2, 19.4–20.1) | 14.2–23.2 (3, 19.8–23.2) | 6 |

* Based on hourly O₃ concentration data retrieved from AQS on June 25, 2014, and additional CASTNET data downloaded from *http://java. epa.gov/castnet/epa_jsp/prepackageddata.jsp* on June 25, 2014. Design values shown above are derived in accordance with Appendix P to 40 CFR Part 50. Annual W126 index values are derived as described in section IV.A.1 above; three consecutive year annual values are averaged for 3-year averages. Prior to presentation, both types of W126 index values are rounded to one decimal place. The list of monitoring site identifiers and individual statistics is available in the docket for this rulemaking.

** No monitor was sited within these Areas and multiple monitors were sited within 15 km. Data for the closest monitor per county are presented.

† Superscript letters refer to species present for which E–R functions have been developed. QA=Quaking Aspen, BC=Black Cherry, C=Cottonwood, DF=Douglas Fir, LP=Loblolly Pine, PP=Ponderosa Pine, RM=Red Maple, SM=Sugar Maple, VP=Virginia Pine, YP=Yellow (Tulip) Poplar. Sources include USDA–NRCS (2014, *http://plants.usda.gov*), USDA–FS (2014, *http://www.fs.fed.us/foresthealth/technology/nidrm2012.shtml*) UM–CFCWI (2014, *http://www.wilderness.net/printFactSheet.cfm?WID=583*), NPS (*http://www.nps.gov/pefo/planyourvisit/upload/Common-Plants-Site-Bulletin-sb-2013.pdf*) and Phillips and Comus (2000).

As support for their view that the Class I area analysis is too uncertain to provide a basis for the Administrator's proposed conclusion that the current standard is not adequate, some commenters stated that forests in Class I areas were composed of mature trees and that the tree seedling E–R functions do not predict growth impacts in mature forests. The EPA disagrees with the commenters' statement that Class I areas are only made up of mature trees. Seedlings exist throughout forests as part of the natural process of replacing aging trees and overstory trees affected by periodic disturbances.[193] Seedlings also tend to occur in areas affected by natural disturbances, such as fires, insect infestations and flooding, and such disturbances are common in many natural forests. As noted above, information newly available in this review strengthens our understanding regarding O₃ effects on mature trees for

aspen, an important and O₃-sensitive species (U.S. EPA, 2013, section 9.6.3.2).

One commenter additionally stated that the EPA has not shown reduced biomass to be adverse to public welfare, variously citing individual studies, most of which are not considering O₃, as support for their view that such an effect of O₃ may not occur in the environment and may be of no significance if it does. With regard to the occurrence of O₃-related reduced growth in the field, we note the strength of the evidence from field OTC studies on which the E–R functions are based, and evidence from comparative studies with open-air chamberless control treatments suggests that characteristics particular to the OTC did not significantly affect plant response (U.S. EPA, 2013, p. 9–5). Thus, we view the OTC systems as combining aspects of controlled exposure systems with field conditions to facilitate a study providing data that represent the role of the studied pollutant in a natural system.

Further, we disagree with the commenters on the significance of O₃-

attributable reduced growth in natural ecosystems. Even in the circumstances cited by the commenter (e.g., subsequent to large-scale disturbances, nutrient limited system, multigeneration exposure), O₃ can affect growth of seedlings and older trees, with the potential for effects on ecosystem productivity, handicapping the sensitive species and affecting community dynamics and associated community composition, as well as ecosystem hydrologic cycles (U.S. EPA, 2013, p. 1–8). For example, two recent studies report on the role of O₃ exposure in affecting water use in a mixed deciduous forest and indicated that O₃ increased water use in the forest and also reduced growth rate (U.S. EPA, 2013, p. 9–43, McLaughlin, 2007a, 2007b). Contrary to the lesser effects implied by the commenters, the authors of these two studies noted implications of their findings with regard to the potential for effects to be amplified under conditions of increased temperature and associated reduced water availability (McLaughlin, 2007a). We additionally note comments from

[193] Basic information on forest processes, including the role of seedlings is available at: *http://www.na.fs.fed.us/stewardship/pubs/NE_forest_regeneration_handbook_revision_130829_desktop.pdf.*

the CASAC, summarized above, in which it concurs with a focus on biomass loss and the use of RBL estimates, calling biomass loss in trees a "relevant surrogate for damage to tree growth" that affects an array of ecosystem services (Frey, 2014c, p. 10), and identifies 6% RBL as "unacceptably high" (Frey, 2014c, p. 13). The evidence we presented includes evidence related to RBL estimates above that benchmark. Thus, while we agree that some reductions in tree growth may not be concluded to be adverse to public welfare, we disagree with commenters that we have not presented the evidence, which includes RBL estimates well above the 6% magnitude identified by CASAC, that supports the Administrator's judgments on adversity that may be indicated by such estimates and her conclusion that adequate protection is not provided by the current standard, as described in section IV.B.3 below.

Some commenters disagree with the EPA's consideration of the Class I areas analysis, stating that it is not appropriate for the EPA to evaluate the level of protection offered by the current primary $O_3$ standard under current conditions due to the long-range transport of $O_3$ and $O_3$ precursors to Class I areas from upwind non-attainment areas. It is the view of these commenters that once the upwind areas make emissions reductions to attain the current standard, downwind areas will see improvements in air quality and decreasing W126 levels. In support of this view, commenters point to several modeling analyses. Some commenters point to air quality modeling conducted by an environmental consultant that projects all sites to have W126 index values below 13 ppm-hrs when emissions are adjusted such that all upwind monitors are modeled to meet the current standard. Detailed methodology, results and references for the commenter's modeling analysis were not provided, precluding a thorough evaluation and comparison to the EPA's modeling. While the EPA agrees that transport of $O_3$ and $O_3$ precursors can affect downwind monitors, we disagree with commenters regarding the conclusions that are appropriate to draw from modeling simulations for the reasons noted below.

As support for their view that the current standard provides adequate protection, some commenters pointed to estimates drawn from the EPA's air quality modeling performed for the RIA, stating that this modeling for an alternative standard level of 70 ppb indicates "only a handful" of monitoring sites approaching as high as

13 ppm-hrs as a 3-year average (e.g., UARG, p. 76). These commenters further point to the WREA modeling, noting that those estimates project that attainment of the current standard would result in only 5 sites above 15 ppm-hrs. Based on these statements, these commenters state that the current standard is likely to provide conditions with no site having a monitor over 17 ppm-hrs and a "minimal number" likely exceeding 13 ppm-hrs (e.g., UARG, p. 77). We disagree with commenters' interpretation of the modeling information from the two different assessments. As we summarized in section IV.C.1 of the proposal with regard to the WREA modeling, the modeling estimates are each based on a single set of precursor emissions reductions that are estimated to achieve the desired target conditions, which is also the case for the RIA modeling[194] (U.S. EPA, 2014c, pp. 5–40 to 5–41; see also section 1.2.2 of the 2014 RIA).

As noted in section IV.A.2 above, and in the proposal, the model-adjusted air quality in the WREA scenario for the current standard does not represent an optimized control scenario that just meets the current standard, but rather characterizes one potential distribution of air quality across a region when all monitor locations meet the standard (79 FR 75322; U.S. EPA, 2014b, section 4.3.4.2). Alternate precursor emissions reductions would be expected to produce different patterns of $O_3$ concentrations and associated differences in W126 index values. Specifically, the precursor emissions reductions scenarios examined in the WREA focuses on regional reductions over broad areas rather than localized cuts that may focus more narrowly on areas violating the current standard (U.S. EPA, 2014b, p. 4–35). The assumption of regionally determined across-the-board emissions reductions is a source of potential uncertainty with the potential to overestimate W126 scenario benefits (U.S. EPA, 2014b, Table 4–5 [row G]). The application of emissions reductions to all locations in each region to bring down the highest monitor in the region to meet the

current standard could potentially lead to W126 index underestimates at some locations, as noted in the WREA: "[w]hile the scenarios implemented in this analysis show that [] bringing down the highest monitor in a region would lead to reductions below the targeted level through the rest of the region, to the extent that the regional reductions from on-the-books controls are supplemented with more local controls the additional benefit may be overestimated" (U.S. EPA, 2014b, p. 4–36; U.S. EPA, 2014c, pp. 5–40 to 5–41). This point was emphasized by CASAC in their comments on the 2nd draft WREA. CASAC noted that, "[m]eeting a target level at the highest monitor requires substantial reductions below the targeted level through the rest of the region" and stated that "[t]his artificial simulation does not represent an actual control strategy and may conflate differences in control strategies required to meet different standards" (Frey, 2014b, p. 2).

Due to the uncertainty about what actual future emissions control strategies might be and their associated emissions reductions, and the impact such uncertainty might have on modeling estimates involving reductions from recent conditions, we believe it is important to place weight on ambient air monitoring data for recent conditions in drawing conclusions regarding W126 index values that would be expected in areas that meet the current standard. The analysis of air quality data for Class I areas described in the proposal, and updated in Table 3 above (1998–2013), indicates the occurrence of 3-year W126 exposure index values well above 19 ppm-hrs, a cumulative exposure value for which CASAC termed the associated median RBL estimate "unacceptably high," in multiple Class I areas that meet the current standard (79 FR 75312, December 17, 2014, Table 7; updated in Table 3 above). Additionally, analysis of recent air quality data (2011–2013) for all locations across the U.S. indicates 10 monitor locations distributed across two NOAA climatic regions that meet the current standard and at which 3-year W126 index values are above 19 ppm-hrs, with the highest values extending up to 23 ppm-hrs (Wells, 2015b).

In support of their view that the EPA's modeling supports the conclusion that W126 index values of interest are achieved under the current secondary standard, some commenters additionally state that the W126 values in the WREA are overestimated in unmonitored rural areas due to the much greater prevalence of urban monitors across the U.S. The EPA

---

[194] Although commenters cite to both analyses as if providing the same information, there are many differences in specific aspects of the RIA approach from that of the WREA, which derive, at least in part, from their very different purposes. The RIA is not developed for consideration in the NAAQS review. Rather, it is intended to provide insights and analysis of an illustrative control strategy that states might adopt to meet the revised standard. The EPA does not consider this analysis informative to consideration of the protection provided by the current standard, and the results of the RIA have not been considered in the EPA's decisions on the $O_3$ standards.

disagrees with this conclusion. In order to estimate $O_3$ concentrations in grid cells across a national-scale spatial surface, the WREA applied the VNA spatial interpolation technique after applying the HDDM technique to adjust $O_3$ concentrations at monitoring sites based on the emissions reductions necessary to just meet the current standard. In estimating concentrations in unmonitored areas, the VNA method considers only the "neighboring" monitors, using an inverse distance squared weighting formula, which assigns the greatest influence to the nearest neighboring monitor (U.S. EPA, 2014b, p. 4A–6). By this approach, monitors in less-densely monitored areas contribute to the concentration estimates over much larger areas than do monitors in more-densely monitored areas. In an urban area, neighboring monitors may be quite close to one another, such that any one monitor may only be influencing concentration estimates for a handful of spatial grid cells in the immediate vicinity. By contrast, monitors in rural areas may influence hundreds of grid cells. A specific example of this is the monitor in Great Basin National Park in eastern Nevada. The VNA algorithm assigns very high weights to this monitor for all of the grid cells covering a 100 km radius around it, simply because there are no other monitors in that area and it is the closest. On the other hand, a monitor near downtown Las Vegas may only get a high weight for, and thus exert influence on the concentration estimate in, the one grid cell containing it. We agree with the commenter that urban monitors may influence the spatial surface for some distance away from the urban areas, although the influence wanes with increasing distance from that area and decreasing distance to the next closest monitor. As we lack data for the intervening locations, however, we have no reason to conclude that the VNA surface is overestimating the W126 index values. Further, as was summarized in section IV.A.2 above, and in the WREA, the PA and the proposal (U.S. EPA, 2014b, Table 6–27, section 8.5; U.S. EPA, 2014c, p. 5–49; 79 FR 75323, December 17, 2014), the VNA approach results in a lowering of the highest W126 index values at monitoring sites, which contributes to underestimates of the *highest* W126 index values in each region.

In support of their view that the current standard is adequate, some industry commenters additionally cite WREA analyses for the current standard scenario, including the W126 index

estimates in national parks, as showing that the current standard provides more than adequate protection, with alternative scenarios providing only marginal and increasingly uncertain benefits. As we noted in the proposal and section IV.A.2 above, there are an array of uncertainties associated with the W126 index estimates, in the current standard scenario and in the other scenarios, which, as they are inputs to the vegetation risk analyses (79 FR 75323; December 17, 2014). As a result, consistent with the approach in the proposal, the Administrator has not based her decision with regard to adequacy of the current standard in this review on these air quality scenario analyses.

In support of their view that the current standard provides adequate protection and should not be revised, some commenters described their concerns with any consideration of visible foliar injury in the decision regarding the secondary standard. These commenters variously stated that visible foliar injury cannot be reliably evaluated for adversity given lack of available information, is not an adverse effect on public welfare that must be addressed through a secondary standard, and is not directly relatable to growth suppression (and the EPA's use of RBL captures that effect anyway). Additionally, some state that any associated ecosystem services effects are not quantifiable. In sum, the view of these commenters is that it is not appropriate for the Administrator to place any weight on this $O_3$ effect in determining the adequacy of the current standard. As an initial matter, the EPA agrees with the comment that the current evidence does not include an approach for relating visible foliar injury to growth suppression,[195] as recognized in section IV.A.1.b above. Further, we note that, similar to decisions in past $O_3$ reviews, the Administrator's proposed decision in this review recognized the "complexities and limitations in the evidence base regarding characterizing air quality conditions with respect to

the magnitude and extent of risk for visible foliar injury" and the "challenges of associated judgments with regard to adversity of such effects to public welfare" (79 FR 75336; December 17, 2014). Contrary to the implications of the commenters, although the Administrator took into consideration the potential for adverse effects on public welfare from visible foliar injury, she placed weight primarily on growth-related effects of $O_3$, both in her proposed decision on adequacy and with regard to proposed judgments on what revisions would be appropriate. Although visible foliar injury may impact the public welfare and accordingly has the potential to be adverse to the public welfare (as noted in section IV.B.2 of the proposal), the Administrator placed less weight on visible foliar injury considerations in identifying what revisions to the standard would be appropriate to propose. In considering these effects for this purpose, she recognized "significant challenges" in light of "the variability and the lack of clear quantitative relationship with other effects on vegetation, as well as the lack of established criteria or objectives that might inform consideration of potential public welfare impacts related to this vegetation effect" (79 FR 75349; December 17, 2014). As summarized in section IV.A.1.a above, the evidence demonstrates a causal relationship of $O_3$ with visible foliar injury. Accordingly, we note that the uncertainty associated with visible foliar injury is not with regard to whether $O_3$ causes visible foliar injury. Rather, the uncertainty is, as discussed in sections IV.A.1.b and IV.A.3 above, with the lack of established, quantitative exposure-response functions that document visible foliar injury severity and incidence under varying air quality and environmental conditions and information to support associated judgments on the significance of such responses with regard to associated public welfare impacts. As with the Administrator's proposed decisions on the standard, such considerations also informed her final decisions, described in sections IV.B.3 and IV.C.3 below.

In support of their view that the current standard should be retained, some commenters note the WREA finding for the current standard scenario of no U.S. counties with RYL estimates at or above 5%, the RYL value emphasized by CASAC and state that policy reasons provide support for not focusing on crops in the decision; other commenters state that additional studies on crops and air quality are needed. As

---

[195] The current evidence indicates that "[t]he significance of $O_3$ injury at the leaf and whole plant levels depends on how much of the total leaf area of the plant has been affected, as well as the plant's age, size, developmental stage, and degree of functional redundancy among the existing leaf area" and "in some cases, visible foliar symptoms have been correlated with decreased vegetative growth . . . and with impaired reproductive function" (U.S. EPA, 2013, p. 9–39). The ISA concludes, however, "it is not presently possible to determine, with consistency across species and environments, what degree of injury at the leaf level has significance to the vigor of the whole plant" (U.S. EPA, 2013, p. 9–39).

described previously in this section, and in section IV.A.2 above, an aspect of uncertainties associated with the WREA air quality scenarios, including the current standard scenario, is underestimation of the highest W126 index values, contributing to underestimates in the effects associated with the current standard scenario. The EPA agrees with commenters that additional studies on crops and air quality will be useful to future reviews. Additionally, however, as noted above, the Administrator's proposed conclusion on adequacy of the current standard, as well as her final decision described in section IV.B.3 below, gives less weight to consideration of effects on agricultural crops in recognition of the complicating role of heavy management in that area.

Lastly, we note that many commenters cited the costs of compliance as supporting their view that the standard should not be revised, although as we have described in section I.B above, the EPA may not consider the costs of compliance in determining what standard is requisite to protect public welfare from known or anticipated adverse effects.

3. Administrator's Conclusions on the Need for Revision

Having carefully considered the advice from CASAC and public comments, as discussed above, the Administrator believes that the fundamental scientific conclusions on the welfare effects of $O_3$ in ambient air reached in the ISA and summarized in the PA and in section IV.B of the proposal remain valid. Additionally, the Administrator believes the judgments she reached in the proposal (section IV.D.3) with regard to consideration of the evidence and quantitative assessments and advice from CASAC remain appropriate. Thus, as described below, the Administrator concludes that the current secondary standard is not requisite to protect public welfare from known and anticipated adverse effects associated with the presence of $O_3$ in the ambient air and that revision is needed to provide additional protection.

In considering the adequacy of the current secondary $O_3$ standard, the Administrator has carefully considered the available evidence, analyses and conclusions contained in the ISA, including information newly available in this review; the information, quantitative assessments, considerations and conclusions presented in the PA; the advice and recommendations from CASAC; and public comments. The Administrator gives primary consideration to the evidence of growth

effects in well-studied tree species and information, presented in the PA and represented with a narrower focus in section IV.B.2 above, on cumulative exposures occurring in Class I areas when the current standard is met. This information indicates the occurrence of exposures associated with Class I areas during periods when the current standard is met for which associated estimates of growth effects, in terms of the tree seedling RBL in the median species for which E–R functions have been established, extend above a magnitude considered to be "unacceptably high" by CASAC. This analysis estimated such cumulative exposures occurring under the current standard for nearly a dozen areas, distributed across two NOAA climatic regions of the U.S. The Administrator gives particular weight to this analysis, given its focus in Class I areas. Such an emphasis on lands afforded special government protections, such as national parks and forests, wildlife refuges, and wilderness areas, some of which are designated Class I areas under the CAA, is consistent with such emphasis in the 2008 revision of the secondary standard (73 FR 16485, March 27, 2008). As noted in section IV.A above, Congress has set such lands aside for specific uses that are intended to provide benefits to the public welfare, including lands that are to be protected so as to conserve the scenic value and the natural vegetation and wildlife within such areas, and to leave them unimpaired for the enjoyment of future generations. The Administrator additionally recognizes that states, tribes and public interest groups also set aside areas that are intended to provide similar benefits to the public welfare for residents on those lands, as well as for visitors to those areas.

As noted in prior reviews, judgments regarding effects that are adverse to public welfare consider the intended use of the ecological receptors, resources and ecosystems affected. Thus, the Administrator recognizes that the median RBL estimate for the studied species is a quantitative tool within a larger framework of considerations pertaining to the public welfare significance of $O_3$ effects on the public welfare. Such considerations include effects that are associated with effects on growth and that the ISA has determined to be causally or likely causally related to $O_3$ in ambient air, yet for which there are greater uncertainties affecting our estimates of impacts on public welfare. These other effects include reduced productivity in terrestrial ecosystems, reduced carbon

sequestration in terrestrial ecosystems, alteration of terrestrial community composition, alteration of below-grown biogeochemical cycles, and alteration of terrestrial ecosystem water cycles, as summarized in section IV.A.1. Thus, in her attention to CASAC's characterization of a 6% estimate for tree seedling RBL in the median studied species as "unacceptably high", the Administrator, while mindful of uncertainties with regard to the magnitude of growth impact that might be expected in mature trees, is also mindful of related, broader, ecosystem-level effects for which our tools for quantitative estimates are more uncertain and those for which the policy foundation for consideration of public welfare impacts is less well established. She finds her consideration of tree growth effects consistent with CASAC advice regarding consideration of $O_3$-related biomass loss as a surrogate for the broader array of $O_3$ effects at the plant and ecosystem levels.

The Administrator also recognizes that $O_3$-related effects on sensitive vegetation can occur in other areas that have not been afforded special federal protections, including effects on vegetation growing in managed city parks and residential or commercial settings, such as ornamentals used in urban/suburban landscaping or vegetation grown in land use categories that are heavily managed for commercial production of commodities such as timber. In her consideration of the evidence and quantitative information of $O_3$ effects on crops, the Administrator recognizes the complexity of considering adverse $O_3$ impacts to public welfare due to the heavy management common for achieving optimum yields and market factors that influence associated services. In so doing, she notes that her judgments that place emphasis on the protection of forested ecosystems inherently also recognize a level of protection for crops. Additionally, for vegetation used for residential or commercial ornamental purposes, the Administrator believes that there is not adequate information specific to vegetation used for those purposes, but notes that a secondary standard revised to provide protection for sensitive natural vegetation and ecosystems would likely also provide some degree of protection for such vegetation.

The Administrator also takes note of the long-established evidence of consistent association of the presence of visible foliar injury with $O_3$ exposure and the currently available information that indicates the occurrence of visible foliar injury in sensitive species of

vegetation during recent air quality in public forests across the U.S. She additionally notes the PA conclusions regarding difficulties in quantitatively relating visible foliar injury symptoms to vegetation effects such as growth or related ecosystem effects. As at the time of the last review, the Administrator believes that the degree to which such effects should be considered to be adverse depends on the intended use of the vegetation and its significance. The Administrator also believes that the significance of $O_3$-induced visible foliar injury depends on the extent and severity of the injury and takes note of studies in the evidence base documenting increased severity and/or prevalence with higher $O_3$ exposures. However, the Administrator takes note of limitations in the available information with regard to judging the extent to which the extent and severity of visible foliar injury occurrence associated with conditions allowed by the current standard may be considered adverse to public welfare.

Based on these considerations, and taking into consideration the advice and recommendations of CASAC, the Administrator concludes that the protection afforded by the current secondary $O_3$ standard is not sufficient and that the standard needs to be revised to provide additional protection from known and anticipated adverse effects to public welfare, related to effects on sensitive vegetation and ecosystems, most particularly those occurring in Class I areas. The Administrator additionally recognizes that states, tribes and public interest groups also set aside areas that are intended to provide similar benefits to the public welfare for residents on those lands, as well as for visitors to those areas. Given the clear public interest in and value of maintaining these areas in a condition that does not impair their intended use, and the fact that many of these areas contain $O_3$-sensitive vegetation, the Administrator further concludes that it is appropriate to revise the secondary standard in part to provide increased protection against $O_3$-caused impairment to vegetation and ecosystems in such areas, which have been specially protected to provide public welfare benefits. She further notes that a revised standard would provide increased protection for other growth-related effects, including for crop yield loss, reduced carbon storage and for areas for which it is more difficult to determine public welfare significance, as recognized in section IV.A.3 above, as well other welfare

effects of $O_3$, such as visible foliar injury.

*C. Conclusions on Revision of the Secondary Standard*

The elements of the standard—indicator, averaging time, form, and level—serve to define the standard and are considered collectively in evaluating the welfare protection afforded by the secondary standard. Section IV.C.1 below summarizes the basis for the proposed revision. Significant comments received from the public on the proposal are discussed in section IV.C.2 and the Administrator's final decision on revisions to the secondary standard is described in section IV.C.3.

1. Basis for Proposed Revision

At the time of proposal, in considering what revisions to the secondary standard would be appropriate, the Administrator considered the ISA conclusions regarding the weight of the evidence for a range of welfare effects associated with $O_3$ in ambient air and associated areas of uncertainty; quantitative risk and exposure analyses in the WREA for different adjusted air quality scenarios and associated limitations and uncertainties; staff evaluations of the evidence, exposure/risk information and air quality information in the PA; additional air quality analyses of relationships between air quality metrics based on form and averaging time of the current standards and a cumulative seasonal exposure index; CASAC advice; and public comments received as of that date in the review. In the paragraphs below, we summarize the proposal presentation with regard to key aspects of the PA considerations, advice from the CASAC, air quality analyses of different air quality metrics and the Administrator's proposed conclusions, drawing from section IV.E of the proposal.

a. Considerations and Conclusions in the PA

As summarized in the proposal, in identifying alternative secondary standards appropriate to consider in this review, the PA focused on standards based on a cumulative, seasonal, concentration-weighted form consistent with the CASAC advice in the current and last review. Based on conclusions of the ISA, as also summarized in section IV.A above, the PA considered a cumulative, seasonal, concentration-weighted exposure index to provide the most scientifically defensible approach for characterizing vegetation response to ambient $O_3$ and comparing study findings, as well as for defining indices

for vegetation protection, as summarized in the proposal section IV.E.2.a. With regard to the appropriate index, the PA considered the evidence for a number of different such indices, as described in the proposal, and noted the ISA conclusion that the W126 index has some important advantages over other similarly weighted indices. The PA additionally considered the appropriate diurnal and seasonal exposure periods in a given year by which to define the seasonal W126 index and based on the evidence in the ISA and CASAC advice, as summarized in the proposal, decided on the 12-hour daylight window (8:00 a.m. to 8:00 p.m.) and the 3-consecutive-month period providing the maximum W126 index value.

Based on these considerations, the PA concluded it to be appropriate to retain the current indicator of $O_3$ and to consider a secondary standard form that is an average of the seasonal W126 index values (derived as described in section IV.A.1.c above) across three consecutive years (U.S. EPA, 2014c, section 6.6). In so doing, the PA recognized that there is limited information to discern differences in the level of protection afforded for cumulative growth-related effects by potential alternative W126-based standards of a single-year form as compared to a 3-year form (U.S. EPA, 2014c, pp. 6–30). The PA concluded a 3-year form to be appropriate for a standard intended to provide the desired level of protection from longer-term effects, including those associated with potential compounding, and that such a form might be concluded to contribute to greater stability in air quality management programs, and thus, greater effectiveness in achieving the desired level of public welfare protection than might result from a single-year form. (U.S. EPA, 2014c, section 6.6).

As summarized in the proposal, the PA noted that, due to the variability in the importance of the associated ecosystem services provided by different species at different exposures and in different locations, as well as differences in associated uncertainties and limitations, it is essential to consider the species present and their public welfare significance, together with the magnitude of the ambient concentrations in drawing conclusions regarding the significance or magnitude of public welfare impacts. Therefore, in development of the PA conclusions, staff took note of the complexity of judgments to be made by the Administrator regarding the adversity of known and anticipated effects to the

public welfare and recognized that the Administrator's ultimate judgments on the secondary standard will most appropriately reflect an interpretation of the available scientific evidence and exposure/risk information that neither overstates nor understates the strengths and limitations of that evidence and information. In considering an appropriate range of levels to consider for an alternative standard, the PA primarily considered tree growth, crop yield loss, and visible foliar injury, as well as impacts on the associated ecosystem services, while noting key uncertainties and limitations.

In specifically evaluating exposure levels, in terms of the W126 index, as to their appropriateness for consideration in this review with regard to providing the desired level of vegetation protection for a revised secondary standard, the PA focused particularly on RBL estimates for the median across the 11 tree species for which robust E–R functions are available. Table 4 below presents these estimates (U.S. EPA, 2014c, Appendix 5C, Table 5C–3; also summarized in Table 8 of the proposal). In so doing and recognizing the longstanding, strong evidence base supporting these relationships, the PA also noted

uncertainties regarding inter-study variability for some species, as well as with regard to the extent to which tree seedling E–R functions can be used to represent mature trees. As summarized in the proposal, the PA conclusions on a range of W126 levels appropriate to consider are based on specific advice from CASAC with regard to median tree seedling RBL estimates that might be considered unacceptably high (6%), as well as its judgment on a RBL benchmark (2%) for identification of the lower end of a W126 index value range for consideration that might give more emphasis to the more sensitive tree seedlings (Frey, 2014c, p. 14).[196]

TABLE 4—TREE SEEDLING BIOMASS LOSS AND CROP YIELD LOSS ESTIMATED FOR O₃ EXPOSURE OVER A SEASON

| W126 index value for exposure period | Tree seedling biomass loss[A] | | Crop yield loss[B] | |
|---|---|---|---|---|
| | Median value | Individual species | Median value | Individual species |
| 23 ppm-hrs ........ | Median species w. 7.6% loss | ≤ 2% loss: 3/11 species ....<br>≤ 5% loss: 4/11 species ....<br>≤10% loss: 8/11 species<br>≤15% loss: 10/11 species<br>>40% loss: 1/11 species | Median species w. 8.8% loss | ≤ 5% loss: 4/10 species<br>>5,<10% loss: 1/10 species<br>>10,<20% loss: 4/10 species<br>>20: 1/10 species |
| 22 ppm-hrs ........ | Median species w. 7.2% loss | ≤ 2% loss: 3/11 species ....<br>≤ 5% loss: 4/11 species ....<br>≤10% loss: 7/11 species<br>≤15% loss: 10/11 species<br>>40% loss: 1/11 species | Median species w. 8.2% loss | ≤ 5% loss: 4/10 species<br>>5,<10% loss: 1/10 species<br>>10,<20% loss: 4/10 species<br>>20: 1/10 species |
| 21 ppm-hrs ........ | Median species w. 6.8% loss | ≤ 2% loss: 3/11 species ....<br>≤ 5% loss: 4/11 species ....<br>≤10% loss: 7/11 species<br>≤15% loss: 10/11 species<br>>40% loss: 1/11 species | Median species w. 7.7% loss | ≤ 5% loss: 4/10 species<br>>5,<10% loss: 3/10 species<br>>10,<20% loss: 3/10 species |
| 20 ppm-hrs ........ | Median species w. 6.4% loss | ≤ 2% loss: 3/11 species ....<br>≤ 5% loss: 5/11 species ....<br>≤10% loss: 7/11 species<br>≤15% loss: 10/11 species<br>>40% loss: 1/11 species | Median species w. 7.1% loss | ≤ 5% loss: 5/10 species<br>>5,<10% loss: 3/10 species<br>>10,<20% loss: 2/10 species |
| 19 ppm-hrs ........ | Median species w. 6.0% loss | ≤ 2% loss: 3/11 species ....<br>≤5% loss: 5/11 species .....<br>≤10% loss: 7/11 species<br>≤15% loss: 10/11 species<br>>30% loss: 1/11 species | Median species w. 6.4% loss | ≤ 5% loss: 5/10 species<br>>5, <10% loss: 3/10 species<br>>10,<20% loss: 2/10 species |
| 18 ppm-hrs ........ | Median species w. 5.7% loss | ≤ 2% loss: 5/11 species ....<br>≤ 5% loss: 5/11 species ....<br>≤10% loss: 7/11 species<br>≤15% loss: 10/11 species<br>>30% loss: 1/11 species | Median species w. 5.7% loss | ≤ 5% loss: 5/10 species<br>>5,<10% loss: 3/10 species<br>>10,<20% loss: 2/10 species |
| 17 ppm-hrs ........ | Median species w. 5.3% loss | ≤ 2% loss: 5/11 species ....<br>≤5% loss: 5/11 species .....<br>≤10% loss: 9/11 species<br>≤15% loss: 10/11 species<br>>30% loss: 1/11 species | Median species w. 5.1% loss | ≤ 5% loss: 5/10 species<br>>5, <10% loss: 3/10 species<br>>10,<20% loss: 2/10 species |
| 16 ppm-hrs ........ | Median species w. 4.9% loss | ≤ 2% loss: 5/11 species ....<br>≤ 5% loss: 6/11 species ....<br>≤10% loss: 10/11 species<br>>30% loss: 1/11 species | Median species w. ≤5.0% loss | ≤ 5% loss: 5/10 species<br>>5,<10% loss: 4/10 species<br>>10,<20% loss: 1/10 species |
| 15 ppm-hrs ........ | Median species w. 4.5% loss | ≤ 2% loss: 5/11 species ....<br>≤5% loss: 6/11 species .....<br>≤10% loss: 10/11 species<br>>30% loss: 1/11 species | Median species w. ≤5.0% loss | ≤ 5% loss: 6/10 species<br>>5, <10% loss: 4/10 species |
| 14 ppm-hrs ........ | Median species w. 4.2% loss | ≤ 2% loss: 5/11 species ....<br>≤ 5% loss: 6/11 species ....<br>≤10% loss: 10/11 species<br>>30% loss: 1/11 species | Median species w. ≤5.0% loss | ≤ 5% loss: 6/10 species<br>>5,<10% loss: 4/10 species |
| 13 ppm-hrs ........ | Median species w. 3.8% loss | ≤ 2% loss: 5/11 species ....<br><5% loss: 7/11 species .....<br><10% loss: 10/11 species<br>>20% loss: 1/11 species ... | Median species w. ≤5.0% loss | ≤ 5% loss: 6/10 species<br>>5, <10% loss: 4/10 species |

[196] The CASAC provided several comments related to 2% RBL for tree seedlings both with regard to its use in summarizing WREA results and with regard to consideration of the potential significance of vegetation effects, as summarized in sections IV.D.2 and IV.E.3 of the proposal.

TABLE 4—TREE SEEDLING BIOMASS LOSS AND CROP YIELD LOSS ESTIMATED FOR O₃ EXPOSURE OVER A SEASON—Continued

| W126 index value for exposure period | Tree seedling biomass loss [A] | | Crop yield loss [B] | |
|---|---|---|---|---|
| | Median value | Individual species | Median value | Individual species |
| 12 ppm-hrs ........ | Median species w. 3.5% loss | ≤ 2% loss: 5/11 species .... ≤ 5% loss: 8/11 species .... ≤10% loss: 10/11 species >20% loss: 1/11 species | Median species w. ≤5.0% loss | ≤ 5% loss: 8/10 species >5,<10% loss: 2/10 species |
| 11 ppm-hrs ........ | Median species w. 3.1% loss | ≤ 2% loss: 5/11 species .... ≤5% loss: 8/11 species ..... ≤10% loss: 10/11 species >20% loss: 1/11 species | Median species w. ≤5.0% loss | ≤ 5% loss: 9/10 species >5, <10% loss: 1/10 species |
| 10 ppm-hrs ........ | Median species w. 2.8% loss | ≤ 2% loss: 5/11 species .... ≤ 5% loss: 9/11 species .... <10% loss: 10/11 species >20% loss: 1/11 species | Median species w. ≤5.0% loss | ≤ 5% loss: 9/10 species >5,<10% loss: 1/10 species |
| 9 ppm-hrs .......... | Median species w. 2.4% loss | ≤ 2% loss: 5/11 species .... ≤ 5% loss: 10/11 species .... >20% loss: 1/11 species | Median species w. ≤5.0% loss | ≤ 5% loss: all species |
| 8 ppm-hrs .......... | Median species w. 2.0% loss | ≤ 2% loss: 5/11 species .... ≤ 5% loss: 10/11 species .. >15% loss: 1/11 species | Median species w. ≤5.0% loss | ≤ 5% loss: all species |
| 7 ppm-hrs .......... | Median species w. <2.0% loss | ≤ 2% loss: 7/11 species .... ≤5% loss: 10/11 species ... >15% loss: 1/11 species | Median species w. ≤5.0% loss | ≤ 5% loss: all species |

[A] Estimates here are based on the E–R functions for 11 species described in the WREA, section 6.2 and discussed in the PA, section 5.2.1. The cottonwood was excluded to address CASAC comments (Frey, 2014c; U.S. EPA, 2014b, U.S. EPA, 2014c, Appendix 6F). The median is the median of the 11 composite E–R functions (U.S. EPA, 2014c, Appendix 5C).
[B] Estimates here are based on the 10 E–R functions for crops described in the WREA, section 6.2 and discussed in the PA, section 5.3.1. The median is the median of the 10 composite E–R functions (U.S. EPA, 2014b; U.S. EPA, 2014c, Appendix 5C).

With regard to secondary standard revisions appropriate to consider in this review, as summarized in the proposal, the PA concluded it to be appropriate to consider a W126-based secondary standard with index values within the range of 7 to 17 ppm-hrs and a form averaged over 3 years (U.S. EPA, 2014c, section 6.7). The PA additionally recognized the role of policy judgments required of the Administrator with regard to the public welfare significance of identified effects, the appropriate weight to assign the range of uncertainties inherent in the evidence and analyses, and ultimately, in identifying the requisite protection for the secondary O₃ standard.

The PA additionally recognized that to the extent the Administrator finds it useful to consider the public welfare protection that might be afforded by revising the level of the current standard, this is appropriately judged by evaluating the impact of associated O₃ exposures in terms of the cumulative seasonal W126-based index, an exposure metric considered appropriate for evaluating impacts on vegetation (U.S. EPA, 2014c, section 6.7). Accordingly, the PA included several air quality data analyses that might inform such consideration (U.S. EPA, 2014c, section 6.4). Additional air quality analyses were performed subsequent to the PA, described in the proposal and are summarized below.

b. CASAC Advice

Advice received from the CASAC during the current review, similar to that in the last review, recommended retaining O₃ as the indicator, while also recommending consideration of a secondary standard with a revised form and averaging time based on the W126 index (Frey, 2014c, p. iii). The CASAC concurred with the 12-hour period (8 a.m. to 8 p.m.) and 3-month summation period resulting in the maximum W126 index value, as described in the PA, while recommending a somewhat narrower range of levels from 7 ppm-hrs to 15 ppm-hrs. While the CASAC recommended a W126 index limited to a single year, in contrast with the PA's conclusion that it was appropriate to consider the W126 index averaged across three years, it also noted that the Administrator may prefer, as a policy matter, to base the secondary standard on a 3-year averaging period. In such a case, the CASAC recommended revising downward the level for such a metric to avoid a seasonal W126 index value above a level in their recommended range in any given year of the 3-year period, indicating an upper end of 13 ppm-hrs as an example for such a 3-year average W126 index range (Frey, 2014c, p. iii and iv).

c. Air Quality Analyses

The proposal additionally summarized several analyses of air quality that considered relationships between metrics based on a 3-year W126 index and based on the form and averaging time of the current standard, the "fourth-high" metric (U.S. EPA, 2014c, Chapter 2, Appendix 2B and section 6.4; Wells, 2014a), as well as describing the uncertainties and limitations associated with these analyses. The proposal concluded that these analyses suggest that, depending on the level, a standard of the current averaging time and form can be expected to control cumulative seasonal O₃ exposures to such that they may meet specific 3-year average W126 index values. The fourth-high and W126 metrics, and changes in the two metrics over the past decade, were found to be highly correlated (U.S. EPA, 2014c, section 6.4 and Appendix 2B; Wells, 2014a). From these analyses, it was concluded that future control programs designed to help meet a standard based on the fourth-high metric are also expected to result in reductions in values of the W126 metric (Wells, 2014a). Further, the second analysis also found that the Southwest and West NOAA climatic regions, which showed the greatest potential for sites to measure elevated cumulative, seasonal O₃ exposures without the occurrence of elevated daily maximum 8-hour average O₃ concentrations, exhibited the greatest reduction in W126 metric value per unit reduction in fourth-high metric (Wells, 2014a, Figures 5b and 12 and Table 6).

Analyses of the most recent periods studied in the two analyses (2009–2011 and 2011–2013) had similar findings regarding the highest W126 metric values occurring at monitoring sites that meet alternative levels of the fourth-high metric (U.S. EPA, 2014c, section 6.4; Wells, 2014a). In both analyses, the highest W126 metric values were in the Southwest and West NOAA climatic regions. In both analyses, no monitoring sites for which the fourth-high metric was at or below 70 ppb had a W126 metric value above 17 ppm-hrs (U.S. EPA, 2014c, Figure 2B–3b; Wells, 2014a, Table 4). All U.S. regions were represented in these subsets. In the 2011–2013 subset of sites for which the fourth-high metric was at or below a potential alternative primary standard level of 65 ppb, no monitoring sites had W126 metric values above 11 ppm-hrs (Wells, 2014a, Table 4).

d. Administrator's Proposed Conclusions

At the time of proposal, the Administrator concluded it to be appropriate to continue to use $O_3$ as the indicator for a secondary standard that is intended to address effects associated with exposure to $O_3$ alone and in combination with related photochemical oxidants. While the complex atmospheric chemistry in which $O_3$ plays a key role has been highlighted in this review, no alternatives to $O_3$ have been advanced as being a more appropriate surrogate for ambient photochemical oxidants and their effects on vegetation. The CASAC agreed that $O_3$ should be retained as the indicator for the standard (Frey, 2014c, p. iii). In proposing to retain $O_3$ as the indicator, the Administrator recognized that measures leading to reductions in ecosystem exposures to $O_3$ would also be expected to reduce exposures to other photochemical oxidants.

The Administrator proposed to retain the current averaging time and form and to revise the level of the current secondary standard to a level within the range of 0.065 to 0.070 ppm. She based this proposal on her provisional conclusions regarding the level of cumulative seasonal $O_3$ exposures that would provide the requisite protection against known or anticipated adverse effects to the public welfare and on a policy option that would provide this level of protection. With regard to the former, the Administrator concluded that in judging the extent of public welfare protection that might be afforded by a revised standard and whether it meets the appropriate level of protection, it is appropriate to use a cumulative, seasonal concentration-weighted exposure metric. For this purpose, the Administrator concluded it to be appropriate to use the W126 index value, averaged across three years, with each year's value identified as that for the 3-month period yielding the highest seasonal value and with daily $O_3$ exposures within a 3-month period cumulated for the 12-hour period from 8:00 a.m. to 8:00 p.m.

To identify the range of cumulative seasonal exposures, in terms of the W126 index, expected to be associated with the appropriate degree of public welfare protection, the Administrator gave primary consideration to growth-related impacts, using tree seedling RBL estimates for a range of W126 exposure index values and CASAC advice regarding such estimates. Additionally taking into account judgments on important uncertainties and limitations inherent in the current available scientific evidence and quantitative assessments, and judgments regarding the extent to which different RBL estimates might be considered indicative of effects adverse to public welfare, the Administrator proposed that ambient $O_3$ concentrations resulting in cumulative seasonal $O_3$ exposures of a level within the range from 13 ppm-hrs to 17 ppm-hrs, in terms of a W126 index averaged across three consecutive years, would provide the requisite protection against known or anticipated adverse effects to the public welfare. In identifying policy options for a revised secondary standard that would control exposures to such an extent, the Administrator considered the results of air quality analyses that examined the responsiveness of cumulative exposures (in terms of the W126 index) to $O_3$ reductions in response to the current and prior standard for which the form and averaging time are summarized as a fourth-high metric, and also examined the extent to which cumulative exposures (in terms of the W126 index) may be limited by alternative levels of a metric based on the current standard averaging time and form. Based on the results of these analyses, she proposed that revision of the level of the current secondary standard to within the range of 0.065 to 0.070 ppm would be expected to provide the requisite public welfare protection, depending on final judgments concerning such requisite protection.

2. Comments on Proposed Revision

Significant comments from the public regarding revisions to the secondary standard are addressed in the subsections below. We first discuss comments related to our consideration of growth-related effects and visible foliar injury in identifying appropriate revisions to the standard (sections IV.C.2.a and IV.C.2.b). Next, we address comments related to the use of the W126 metric in evaluating vegetation effects and public welfare protection and comments related to the form and averaging time for the revised standard (sections IV.C.2.c and IV.C.2.d). Comments on revisions to the level of the standard are described in section IV.C.2.e, and those related to the way in which today's rulemaking addresses the 2013 court remand are addressed in section IV.C.2.f. Other significant comments related to consideration of a revised secondary standard, and that are based on relevant factors, are addressed in the Response to Comments document.

a. Consideration of Growth-Related Effects

In considering public comments received on the consideration of growth-related effects of $O_3$ in the context of the proposed decision on a revised secondary standard, we first note related advice and comments from the CASAC provided during development of the PA, stating, as summarized in section IV.B.1.b above, that "relative biomass loss for tree species, crop yield loss, and visible foliar injury are appropriate surrogates for a wide range of damage that is adverse to public welfare" (Frey, 2014c, p. 10). Additionally, in the context of different standard levels they considered appropriate for the EPA to consider, CASAC stated that it is appropriate to "include[] levels that aim for not greater than 2% RBL for the median tree species" and that a median tree species RBL of 6% is "unacceptably high" (Frey, 2014c, p. 14).[197] With respect to crop yield loss, CASAC points to a benchmark of 5%, stating that a crop RYL for median species over 5% is "unacceptably high" (Frey, 2014c, p. 13).

In addition, regarding consideration of RBL benchmarks for tree seedlings, the CASAC stated that "[a] 2% biomass loss is an appropriate scientifically based value to consider as a benchmark of adverse impact for long-lived perennial species such as trees, because effects are cumulative over multiple

---

[197] The CASAC made this comment while focusing on Table 6–1 in the second draft PA and the entry for 17 ppm-hrs (Frey, 2014c, p. 14). That table was revised for inclusion in the final PA in consideration of CASAC comments on the E–R function for eastern cottonwood, and after that revision, the median RBL estimate for 17 ppm-hrs in the final table (see Table 4 above) is below the value of 6% that CASAC described in this way.

years" (Frey, 2014c, p. 14).[198] With regard to this benchmark, the CASAC also commented that "it is appropriate to identify a range of levels of alternative W126-based standards that includes levels that aim for not greater than 2% RBL for the median tree species" in the PA (Frey, 2014c, p. 14). The CASAC noted that the "level of 7 ppm-hrs is the only level analyzed for which the relative biomass loss for the median tree species is less than or equal to 2 percent," indicating that 7 ppm was appropriate as a lower bound for the recommended range (Frey, 2014c, p. 14).[199]

With regard to consideration of effects on crops, in addition to their comments regarding a median species RYL over 5% yield loss, noted above (Frey, 2014c, p. 13), the CASAC further noted that "[c]rop loss appears to be less sensitive [than these other indicators, largely because of the CASAC judgment that a 5% yield loss represents an adverse impact, and in part due to more opportunities to alter management of annual crops" (Frey, 2014c, p. 14).

Comments from the public with regard to how the EPA considered growth-related effects in the proposed decision on a revised secondary standard varied. Generally, those commenters who recommended against revision of the standard expressed the view that RBL estimates based on the established E–R functions for the 11 studied species, and their pertinence to mature trees, were too uncertain to serve as a basis for judgments regarding public welfare protection afforded by the secondary standard. The EPA generally disagrees with this view, as discussed in section IV.B.2 above, and addressed in more detail in the Response to Comments document.

Some commenters also took note of the unclear basis for CASAC's 2% benchmark, stating that the CASAC advice on this point is "not wholly scientific," given that it referenced the 1996 workshop, which provided little specificity as to scientific basis for such a benchmark; based on this, the

commenters described this CASAC advice as a policy judgment and described the important role of the EPA's judgment in such instances. As noted in section IV.E.3 of the proposal, we generally agree with these commenters regarding the unclear scientific basis for the 2% value. Consistent with this advice from CASAC, however, the range of levels for a revised secondary standard that the PA concluded was appropriate for the Administrator to consider did include a level for which the estimated median RBL across the 11 studied tree species would be 2%, as well as a level for which the median RBL would be below 2% (U.S. EPA, 2014c, section 6.7 and Tables 6–1 and 5C–3), and, as described in the proposal, the Administrator considered the conclusions of the PA in reaching her proposed decision that it was appropriate to consider a range for the revised secondary standard that did not focus on this benchmark. The Administrator has further considered and explained any differences from CASAC's recommendations on this point in her final decision, as described in section IV.C.3 below.

Some of the state and local environmental agencies and organizations and environmental groups that supported the EPA's proposed decision to revise the secondary standard additionally indicated their view that the EPA should give more weight to growth-related effects by setting the standard at a level for which the estimated median RBL would be at or below 2% in the median studied species. In support of this recommendation, the commenters cited the CASAC advice and stated that the EPA's rationale deviates from that advice with regard to consideration of RBL. In so doing, the commenters implied incorrectly that the EPA's proposal did not put the most weight on the median RBL. In fact, in considering RBL as a metric for growth effects, the Administrator's proposed conclusions focused solely on the median RBL estimates, indicating that appreciable weight was given to growth-related effects and on the median RBL. Additionally, the commenters implied that the EPA misconstrued the CASAC comment on 6% RBL to indicate that it was acceptable. Yet, the proposal notes CASAC's view that a 6% RBL is "unacceptably high" nine times, and, in section IV.B.3 above, the Administrator takes note of this view in reaching the decision that the current standard should be revised. The EPA considers this statement from CASAC, in the context of considering effects related to different W126 index values, to be of

a different nature than CASAC advice discussed above that options for the EPA consideration "include" a level that aims for median RBL at or below 2%.

The comments that state that the standard should control cumulative exposures to levels for which the estimated median species RBL is at or below 2% provided little rationale beyond citing to CASAC advice. We note, however, that the CASAC did not specify that the revised secondary standard be set to limit cumulative exposures to that extent. Nor, in identifying a range of alternatives for the EPA to consider, did CASAC recommend that the EPA consider *only* W126 index levels associated with median RBL estimates at or below 2%. Rather, the CASAC stated that "it is appropriate to identify a range of levels of alternative W126-based standards that *includes* {emphasis added} levels that aim for not greater than 2% RBL for the median tree species" (Frey, 2014c, p. 14) and seven of the nine levels in the CASAC-recommended range of W126 index levels were associated with higher RBL estimates (as shown in Table 4 above).

In citing to CASAC advice, commenters quoted the CASAC characterization of a 2% RBL as "an appropriate scientifically based value to consider as a benchmark of adverse impact for long-lived perennial species such as trees, because effects are cumulative over multiple years" (Frey, 2014, p. 14). Presumably to indicate reasoning for this statement, the subsequent sentence in the same CASAC letter referenced findings for biomass loss in aspen exposed to elevated $O_3$ over seven years, citing Wittig et al., 2009. As noted in the proposal, however, the way in which these findings would provide a basis for CASAC's view with regard to 2% is unclear, as the original publication that is the source for the 7-year biomass loss value (King, et al., 2005) and which is cited in Wittig et al. (2009) indicates yearly RBL values during this 7-year exposure that are each well above 2%, and, in fact, are all above 20% (King, et al., 2005). In the same paragraph, the CASAC letter additionally referenced the report of the 1996 workshop sponsored by the Southern Oxidants Study group (Heck and Cowling, 1997, noted in section IV.A.3 above). The workshop report identified 1–2% per year growth reduction (based on a stated interest in avoiding 2% cumulative effects) as an appropriate endpoint for consideration of growth effects in trees, although an explicit rationale for the identified percentages is not provided

---

[198] The CASAC provided several comments related to 2% RBL for tree seedlings both with regard to its use in summarizing WREA results and with regard to consideration of the potential significance of vegetation effects, as summarized in sections IV.D.2 and IV.E.3 of the proposal.

[199] The CASAC made this comment while focusing on Table 6–1 in the second draft PA, which included odd-numbered W126 index values and in which the median RBL values were based on 12 species. That table was revised for inclusion in the final PA in consideration of CASAC comments on the E-R function for eastern cottonwood, such that the median RBL species estimate for both 7 ppm-hrs and 8 ppm-hrs are less than or equal to 2.0% in the final table (see Table 4 above and Table 5C–3 of the final PA).

BLM_0047405

(Frey, 2014c, p. 14).[200] Like the 1996 workshop, the CASAC describes 2% RBL as providing the basis for consideration of 7 ppm-hrs, the lower end of their recommended W126 range (Frey, 2014c, p. 14). As a result, the specific scientific basis for judging a value of 2% RBL in the median studied species as an appropriate benchmark of adverse impact for trees and other long-lived perennials is not clear, which, as described in the proposal, contributed to the Administrator noting the greater uncertainty regarding the extent to which estimates of benefits in terms of ecosystem services and reduced effects on vegetation at $O_3$ exposures below her identified range of 13 to 17 ppm-hrs might be judged significant to the public welfare.

Some commenters recommended revision of the standard to 7 ppm-hrs as a W126 form stating that such a change is needed to protect against climate change. In so doing, one commenter expressed the view that the relatively lesser weight the EPA placed on the WREA estimates of carbon storage (in terms of $CO_2$) in consideration of a proposed revision to the secondary standard is inconsistent with the emphasis that the EPA placed on $CO_2$ emissions reductions estimated for the proposed Clean Power Plan (79 FR 34830, 34931–33). As support for this view of inconsistency, the commenter compared the WREA 30-year estimate of the amount of $CO_2$ removed from the air and stored in vegetation with estimated reductions in $CO_2$ emissions from power plants over a 4-year period. We note, however, some key distinctions between the two types of estimates which appropriately lead to different levels of emphasis by the EPA in the two actions. First, we note that the lengths of time pertaining to the two estimates that the commenter states to be "roughly equal" (*e.g.*, ALA et al., p. 211) differ by more than a factor of seven (4 years compared to 30). Second, the CPP estimates are for reductions in $CO_2$ produced and emitted from power plants, while the WREA estimates are for amounts of $CO_2$ removed from the air and stored in vegetation as a result of plant photosynthesis occurring across the U.S. This leads to two important differences. The first is whether a ton of additional carbon uptake by plants is equal to a ton of reduced emissions from fossil fuels. This is still an active area of discussion due in part to the potentially transient

nature of the carbon storage in vegetation. The second is that there are much larger uncertainties involved in attempting to quantify the additional carbon uptake by plants which requires complex modeling of biological and ecological processes and their associated sources of uncertainty. Therefore, as summarized in section IV.C.3 below, the Administrator is judging, as at the time of proposal, that the quantitative uncertainties are too great to support identification of a revised standard based specifically on the WREA quantitative estimates of carbon storage benefits to climate. In so doing, she notes that a revised standard, established primarily based on other effects for which our quantitative estimates are less uncertain, can be expected to also provide increased protection in terms of carbon storage.

*b. Consideration of Visible Foliar Injury*

In considering public comments received on the EPA's consideration of visible foliar injury in its decision on a revised secondary standard, the EPA first notes related advice and comments from the CASAC received during development of the PA. The CASAC stated that "[w]ith respect to the secondary standard, the CASAC concurs with the EPA's identification of adverse welfare effects related to . . . damage to resource use from foliar injury" (Frey, 2014, p. iii). In its comments on levels of a W126-based standard, the CASAC, seemingly in reference to the WREA visible foliar injury analyses, additionally stated that "[a] level below 10 ppm-hrs is required to reduce foliar injury" (Frey, 2014, pp. iii and 15), with "W126 values below 10 ppm-hr required to reduce the number of sites showing visible foliar injury" (Frey, 2014, p. 14).

Public comments were generally split between two views, either that visible foliar injury was not appropriate to consider in decisions regarding the standard, based on variously identified reasons, or that it should be considered and it would lead the EPA to focus on a W126 value below approximately 10 ppm-hrs. Comments of the former type are discussed in section IV.B.2 above, with, in some cases, additional detail in the Response to Comments document. Commenters expressing the latter view variously cite CASAC advice and figures from the WREA cumulative analysis of USFS biosite data with WREA W126 index value estimates. The EPA disagrees that only a reduction in cumulative exposures to W126 index values below 10 ppm-hrs will affect the occurrence or extent of visible foliar injury. In so doing, we note that the

extensive evidence, which is summarized in the ISA (including studies of the USFS biomonitoring program), analyses in the 2007 Staff Paper and also observations based on the WREA dataset do not support this conclusion.

The evidence regarding visible foliar injury as an indicator of $O_3$ exposure is well established and generally documents a greater extent and severity of visible foliar injury with higher $O_3$ exposures and a modifying role of soil moisture conditions (U.S. EPA, 2013, section 9.4.2). As stated in the ISA, "[v]isible foliar injury resulting from exposure to $O_3$ has been well characterized and documented over several decades of research on many tree, shrub, herbaceous and crop species" and "[o]zone-induced visible foliar injury symptoms on certain bioindicator plant species are considered diagnostic as they have been verified experimentally" (U.S. EPA, 2013, p. 9–41). Further, a recent study highlighted in the ISA, which analyzed trends in the incidence and severity of foliar injury, reported a declining trend in the incidence of foliar injury as peak $O_3$ concentrations declined (U.S. EPA, 2013, p. 9–40; Smith, 2012). Another study available in this review that focused on $O_3$-induced visible foliar injury in forests of west coast states observed that both percentage of biosites with injury and average biosite index were higher for sites with average cumulative $O_3$ concentrations above 25 ppm-hrs in terms of SUM06 (may correspond to W126 of approximately 21 ppm-hrs [U.S. EPA, 2007, p. 8–26, Appendix 7B]) as compared to groups of sites with lower average cumulative exposure concentrations, with much less clear differences between the two lower exposure groups (Campbell et al., 2007, Figures 27 and 28 and p. 30). A similar finding was reported in the 2007 Staff Paper which reported on an analysis that showed a smaller percentage of injured sites among the group of sites with $O_3$ exposures below a SUM06 metric of 15 ppm-hrs or a fourth-high metric of 74 ppb as compared to larger groups that also included sites with SUM06 values up to 25 ppm-hrs or fourth-high metric up to 84 ppb, respectively (U.S. EPA 2007, pp. 7–63 to 7–64).

With regard to the comments referencing the WREA cumulative analysis of USFS FHM/FIA biosite data or related CASAC comments, we note some clarification of this analysis. This analysis does not show, as implied by the comments, that at W126 index values above 10 ppm-hrs, there is little change with increasing W126 index in

---

[200] The report of the 1996 workshop provides no more explicit rationale for the percentages identified or specification with regard to number or proportion of species for which such percentages should be met (Heck and Cowling, 1997).

the proportion of records with any visible foliar injury (biosite index above 0). As the analysis is a cumulative analysis, each point graphed in the analysis includes the records for the same and lower W126 index values, so the analysis does not compare results for groups of records with differing, non-overlapping W126 index values. Rather, the points represent groups with records (and W126 index values) in common and the number of records in the groups is greater for higher W126 index values (U.S. EPA, 2014b, section 7.2). Additionally, we note that the pattern observed in the cumulative analysis is substantially influenced by the large number of records for which the W126 index estimates are at or below 11 ppm-hrs, more than two thirds of the dataset (Smith and Murphy, 2015, Table 1).

To more fully address the comments related to this WREA analysis, we have drawn several additional observations from the WREA dataset, re-presenting the same data in a different format in a technical memorandum in the docket (Smith and Murphy, 2015). Contrary to the implication of the statements from the commenters and CASAC that no reduction in the occurrence of visible foliar injury can be achieved with exposures above 10 ppm-hrs, both the proportion of records with injury and the average biosite index are lower for groups of records with W126 index estimates at or below 17 ppm-hrs compared to the group for the highest W126 index range. This is true when considered regardless of soil moisture conditions (all records), as well as for dry, normal and wet records, separately (Smith and Murphy, 2015, Table 2). The pattern of the two measures across record groups with lower W126 index values differs with moisture level, with the wetter than normal records generally showing decreasing proportions of injured sites and decreasing average biosite index with lower W126 index values, while little difference in these measures is seen among the middle W126 values although they are lower than the highest W126 index group and higher than the lowest W126 index group (Smith and Murphy, 2015, Table 2). In summary, the EPA disagrees with commenters, noting that the available information, including additional observations from the WREA dataset, indicate declines in the occurrence of visible foliar injury across decreasing W126 index values that are higher than 10 ppm-hrs.

c. Use of W126 Metric in Evaluating Vegetation Effects and Public Welfare Protection

In considering public comments received on the EPA's use of the W126 exposure index in its decision on a revised secondary standard, the EPA first notes related advice and comments from the CASAC received during development of the PA. Although we recognize that CASAC's comments on the W126 index were provided in the context of its recommendation for a secondary standard of that form, we find them to also relate to our use of the W126 metric in evaluating the magnitude and extent of vegetation effects that might be expected and conversely the level of protection that might be provided under different air quality conditions. In comments on the first draft PA, the CASAC stated that "discussions and conclusions on biologically relevant exposure metrics are clear and compelling and the focus on the W126 form is appropriate" (Frey and Samet, 2012a). With regard to specific aspects of the W126 index, the CASAC concurred with the second draft PA focus on "the biologically-relevant W126 index accumulated over a 12-hour period (8 a.m.–8 p.m.) over the 3-month summation period of a single year resulting in the maximum value of W126" (Frey, 2014c, p. iii).

The CASAC advice on levels of the W126 index on which to focus for public welfare protection recommended a level within the range of 7 ppm-hrs to 15 ppm-hrs (Frey, 2014c, p. iii). We note, however, as summarized in section IV.E.3 of the proposal, that this advice was provided in the context of the CASAC review of the second draft PA, which concluded that a range from 7 to 17 ppm-hrs was appropriate to consider. In considering the upper end of this range, the CASAC consulted Table 6–1 of the second draft PA which indicated for a W126 index value of 17 ppm-hrs an RBL estimate of 6%, a magnitude that CASAC described as "unacceptably high" and that contributed to a lack CASAC support for W126 exposures values higher than 15 ppm-hrs (Frey, 2014c, p. 14; U.S. EPA 2014d, Table 6–1). As noted in section IV.E.3 of the proposal, revisions to the RBL estimate table in the final PA, which were made in consideration of other CASAC comments, have resulted in changes to the median species RBL estimate associated with each W126 index value, such that the median species RBL estimate for a W126 index value of 17 ppm-hrs in this table in the final PA was 5.3%, rather than the "unacceptably high" value of 6% (U.S.

EPA, 2014c, Table 6–1; U.S. EPA, 2014d, Table 6–1; Frey, 2014c, p. 14).[201] Additionally, the CASAC recognized that the Administrator may, as a policy matter, prefer to use a 3-year average, and stated that in that case, the range of levels should be revised downward (Frey, 2014c, p. iii–iv).

The majority of comments on the W126 index concurred with its use for assessing $O_3$ exposures, while some commenters additionally expressed the view that this index should be used as the form of the secondary standard (as discussed in section IV.C.2.d below). Most submissions from state and local environmental agencies or governments, as well as organizations of state agencies, that provided comments on the magnitude of cumulative exposure, in terms of the W126 index, appropriate to consider for a revised secondary standard, recommended that the EPA focus on an index value within the EPA's proposed range of 13 to 17 ppm-hrs, as did the industry commenters. These commenters variously noted their agreement with the rationale provided by the EPA in the proposal or cited to CASAC comments, including for a downward adjustment of its recommended values if a 3-year average W126 was used rather than a single year index. Some other commenters, including two groups of environmental organizations, submitted comments recommending a focus on a W126 index level as low as 7 ppm-hrs based on reasons generally focused on consideration of visible foliar injury.

Some aspects of these comments have been addressed in sections IV.C.2.a and IV.C.2.b above. In the Response to Comments document, we have additionally addressed other comments that recommend a focus on W126 index values for specific reasons other than generally citing the CASAC recommended range. Further, in her consideration of a target level of protection for the revised secondary standard in section IV.C.3 below, the Administrator has considered comments from the CASAC regarding the basis for their recommended range.

An additional comment from an organization of western state air quality managers indicated a concern with the use of W126 for vegetation in arid and high altitude regions, such as those in the western states, which the

---

[201] We additionally note that the median species RBL estimate for 17 ppm-hrs in the final PA is nearly identical to the estimate for 15 ppm-hrs (the value corresponding to the upper end of the CASAC-identified range) that was in the second draft PA (5.2%) which was the subject of the CASAC review (U.S. EPA, 2014c, Table 6–1; U.S. EPA, 2014d, Table 6–1).

commenter hypothesized may have reduced sensitivity. The commenters did not provide evidence of this hypothesis, calling for further research in order to characterize the sensitivity of vegetation in such areas. The EPA agrees that additional research would be useful in more completely characterizing the response of species in such areas, as well as other less well studied areas, but does not find support in the currently available evidence for the commenter's suggestion that species in arid and high altitude regions may be less sensitive than those in other areas.[202]

Among the small number of commenters recommending against using the W126 metric to assess $O_3$ exposure, a few expressed the view that some other, not-yet-identified cumulative exposure metric should be used. These commenters cited a variety of concerns that they state are not addressed by the W126 index: that plant exposure to and uptake of $O_3$ are not always equivalent because of variations in stomatal conductance and plant defenses and their respective diel patterns, which will also influence plant response; that the duration between harmful $O_3$ exposures affects the plant's ability to repair damage; and, that night-time exposures may be important. These commenters do not identify an alternative to the W126 index that they conclude to better represent exposures relevant to considering $O_3$ effects on vegetation and particularly for growth effects. The EPA has considered the items raised by these commenters, recognizing some as areas of uncertainty (U.S. EPA, 2013, pp. 9–109 to 9–113), yet has concluded that based on the information available at this time, exposure indices that cumulate and differentially weight the higher hourly average concentrations while also including the "mid-level" values offer the most appropriate approach for use in developing response functions and comparing studies of $O_3$ effects on vegetation (U.S. EPA, 2013, p. 9–117). When considering the response of vegetation to $O_3$ exposures represented by the threshold (e.g., SUM06) and non-threshold (e.g., W126) indices, the ISA notes that "the W126 metric does not have a cut-off in the weighting scheme as does SUM06 and thus it includes consideration of potentially damaging exposures below 60 ppb" and that "[t]he

W126 metric also adds increasing weight to hourly concentrations from about 40 ppb to about 100 ppb" (U.S. EPA, 2013, p. 9–104). This aspect of W126 is one way it differs from cut-off metrics such as the SUM06 where all concentrations above 60 ppb are treated equally and is identified by the ISA as "an important feature of the W126 since as hourly concentrations become higher, they become increasingly likely to overwhelm plant defenses and are known to be more detrimental to vegetation" (U.S. EPA, 2013, p. 9–104). Further, we note the concurrence by CASAC with the EPA's focus on the W126 exposure index, as noted above.

Some commenters also raised concerns regarding the sensitivity of vegetation in desert areas where plants take in ambient air during nighttime rather than daylight hours, such that little exposure occurs from 8 a.m. to 8 p.m., stating that the W126 index as defined by the EPA to cumulate hourly $O_3$ from 8 a.m. to 8 p.m. may result in an overly stringent exposure level in areas with such vegetation. The EPA recognizes that plants, such as cacti, that commonly occur in desert systems exhibit a particular type of metabolism (referred to as CAM photosynthesis) such that they only open their stomata at night (U.S. EPA, 2013, p. 9–109). We note, however, that few if any $O_3$ exposure studies of these species are available [203] to further inform our characterization of these species' responses to $O_3$, and we have no basis on which to conclude that an exposure level based on the studied species and a daylight exposure metric would be overly or underly stringent in areas where only species utilizing CAM photosynthesis occur. As summarized above, the CASAC advice concurred with the use of an 8am to 8pm diurnal period for the W126 exposure index. Thus, we conclude that for our purposes in this review the focus on daylight hours is appropriate. Our use of the W126 index in this review has been for purposes of characterizing the potential harm and conversely the potential protection that might be afforded from the well-characterized effects of $O_3$ on vegetation, while recognizing associated uncertainties and limitations. We note that different ecosystems across the U.S. will be expected to be of varying sensitivities with regard to the effects of $O_3$. For example, large water bodies without vegetation extending above the water's surface would be expected to be less sensitive than forests of sensitive

species. The EPA notes, however, that the NAAQS are set with applicability to all ambient air in the U.S., such that the secondary $O_3$ standard provides protection in areas across the U.S. regardless of site-specific aspects of vegetation sensitivity to $O_3$. In considering the evidence on $O_3$ and associated welfare effects, we recognize variability in sensitivity that may relate to a number of factors, as discussed in the ISA (U.S. EPA, 2013, section 9.4.8). This variability is among the Administrator's considerations in setting the secondary standard for $O_3$ that is requisite to protect public welfare against anticipated or known adverse effects.

Further, some commenters who agreed with a focus on the W126 exposure index also stated that the EPA's definition of the index for the daylight hours of 8 a.m. to 8 p.m. and a 3-month period was not appropriate, stating that derivation of the W126 metric should involve summing concentrations for all 24 hours in each day and all months in each year to avoid underestimating $O_3$ exposure that the commenters viewed as pertinent. Support for the EPA's definition of the W126 index, with which CASAC concurred (Frey, 2014c, p. iii), is based on the assessment of the evidence in the ISA (U.S. 2013, section 9.5.3.2) and the context for use of the W126 index in relating $O_3$ exposure to magnitude and/or extent of $O_3$ response. This context has a particular focus on growth effects for the purposes of judging the potential for public welfare impacts, as well as the level of protection, associated with different exposure circumstances. We note that the ISA stated there is a lack of information that would allow consideration of the extent to which nocturnal exposures that may be of interest occur (U.S. EPA, 2013, p. 9–109). Additionally, in our use of the W126 index, we are relying on E–R functions based on studies that were generally of 3-month duration and involved controlled exposures during the daylight period. Accordingly we have relied on the E–R function derived for 12-hour and 3-month W126 indices, as described in section IV.A.1 above. To apply these E–R functions to the W126 estimates derived using 24 hours-per-day index values would inaccurately represent the response observed in the study (producing an overestimate). Similarly, with regard to the 3-month duration, "[d]espite the possibility that plants may be exposed to ambient $O_3$ longer than 3 months in some locations, there is generally a lack of exposure experiments conducted for longer than

---

[202] For example, we note that among the 11 species for which robust E–R functions have been established for $O_3$ effects on tree seedling growth, the sensitivity of ponderosa pine, a species occurring in arid and high altitude regions of the western U.S., is similar to the median (U.S. EPA, 2014c, Table 5C–1).

[203] No $O_3$ exposure studies on cacti or other species that utilize CAM photosynthesis are reported in the ISA (U.S. EPA, 2013).

3 months" (U.S. EPA, 2014c, p. 9–112). Thus, in consideration of the lack of support in the current evidence for characterizing exposure for purposes of estimating RBL based on cumulative exposures derived from a combination of daytime and nighttime exposures and consideration of year-round $O_3$ concentrations across the U.S., we disagree with the commenters' view of the appropriateness of using an exposure index based on 24-hour, year-round $O_3$ concentrations.

The commenters supporting the use of the W126 exposure index were divided with regard to whether the EPA should focus on an annual index or one averaged over three years. Some of the commenters indicating support for the EPA's proposed focus on a 3-year average W126 index stated that this was appropriate in light of the wide variations in W126 index values that can occur on a year-to-year basis as a result of the natural variation of climatic conditions that have a direct impact on $O_3$ formation; in their view, these factors are mitigated by use of a 3-yr average, which thus provides "stability" in the assessment dampening out the natural variation of climatic conditions that have a direct impact on $O_3$ formation. Others noted that use of a 3-year average may be supported as matter of policy. We generally concur with the relevance of these points, among others, to a focus on the 3-year average W126. Other commenters expressed the view that the EPA should focus on an annual W126 index, generally making these comments in the context of expressing their support for a secondary standard with a W126 form. These commenters variously cited CASAC advice and its rationale for preferring a single year W126 form, stated that vegetation damage occurs on an annual basis, and/ or questioned the EPA's statements of greater confidence in conclusions as to $O_3$ impacts based on a 3-year average exposure metric.

The EPA agrees with commenters that, as discussed in the PA and the proposal, depending on the exposure conditions, $O_3$ can contribute to measurable effects on vegetation in a single year. We additionally recognize that, as described in the PA and proposal, there is generally a greater significance for effects associated with multiple-year exposures. The proposal described a number of considerations raised in the PA as influencing the Administrator's decision to focus on a 3-year average W126 index (79 FR 75347, December 17, 2014). These included, among others, the observation of a greater significance for effects associated with multiple-year exposures, and the

uncertainties associated with consideration of annual effects relative to multiple-year effects.

Further, we note that among the judgments contributing to the Administrator's decision on the level of protection appropriate for the secondary standard are judgments regarding the weight to place on the evidence of specific vegetation-related effects estimated to result across a range of cumulative seasonal concentration-weighted $O_3$ exposures and judgments on the extent to which such effects in such areas may be considered adverse to public welfare (79 FR 75312, December 17, 2014). Thus, conclusions regarding the extent to which the size and/or prevalence of effects on vegetation in a single year and any ramifications for future years represent an adverse effect to the public welfare, conclusions that are also inherently linked to overall magnitudes of exposures, are dependent on the Administrator's judgment. Accordingly, the decision regarding the need to focus on a 1-year or 3-year W126 index value is also a judgment of the Administrator, informed by the evidence, staff evaluations and advice from CASAC, as described in section IV.C.3 below.

d. Form and Averaging Time

In considering comments received on the proposed form for the revised standard, the EPA first notes the advice and comments from the CASAC, received in its review of the second draft PA. Similar to its advice in the last review, the CASAC recommended "establishing a revised form of the secondary standard to be the biologically relevant W126 index" (Frey, 2014c, p. iii). With regard to its reasons for this view, the CASAC cites the PA in stating that it "concurs with the justification in [section 5.7] that the form of the standard should be changed from the current 8-hr form to the cumulative W126 index" (Frey, 2014c, p. 12). In addressing specific aspects of this index, the CASAC concurred with the EPA's focus on the 3-month period with the highest index value and further states that "[a]ccumulation over the 08:00 a.m.–08:00 p.m. daytime 12-hour period is a scientifically acceptable and recommended means of generalizing across latitudes and seasons" (Frey, 2014c, p. 13). As section 5.7 of the PA discusses the W126 index in the context of the support in the evidence for use of the W126 exposure index for assessing impacts of $O_3$ on vegetation and the extent of protection from such impacts, we interpret CASAC's statement on this point to indicate that the basis for CASAC's view with regard to the form

for the secondary standard relates to the appropriateness of the W126 exposure index for those assessment purposes.[204] [205]

The public comments on the form for a revised secondary standard were divided. Most of the state and local environmental agencies or governments, and all of the tribal agencies and organizations that provided comments on the form for the secondary standard concurred with the EPA's proposed decision, as did the industry commenters. These commenters generally indicated agreement with the rationale provided in the proposal that drew from the EPA analyses of recent air quality data examining relationships at sites across the U.S. between values of the fourth-high metric (the current design value) and values of a 3-year average W126-based metric, stating that this analysis showed that a standard in the form of the fourth-high metric, as proposed, can provide air quality consistent with or below the range of 3-year W126 exposure index values identified in the proposal. Some commenters additionally stated that the choice of form was a policy decision for the EPA and that little or no additional protection of public welfare would be gained by adopting a W126-based form. Some of these commenters provided analyses of data for their state or region that further supported this view. As

---

[204] Section 5.7 of the PA states that "the evidence continues to provide a strong basis for concluding that it is appropriate to judge impacts of $O_3$ on vegetation, related effects and services, and the level of public welfare protection achieved, using a cumulative, seasonal exposure metric, such as the W126-based metric," references the support of CASAC for a W126-based secondary standard, and then concludes that "based on the consistent and well-established evidence described above, . . . the most appropriate and biologically relevant way to relate $O_3$ exposure to plant growth, and to determine what would be adequate protection for public welfare effects attributable to the presence of $O_3$ in the ambient air, is to characterize exposures in terms of a cumulative seasonal form, and in particular the W126 metric" (U.S. EPA, 2014c, p. 5–78).

[205] The CASAC also mentioned its support for revising the secondary standard to a W126 index-based form in its review of Chapter 6 of the second draft PA (Frey, 2014c, p. 13). Similar to section 5.7, in that chapter of the PA staff concluded that "specific features associated with the W126 index still make it the most appropriate and biologically relevant cumulative concentration-weighted form for use in the context of the secondary $O_3$ NAAQS review" (U.S. EPA, 2014c, p. 6–5) and also concluded that "it is appropriate to consider a revised secondary standard in terms of the cumulative, seasonal, concentration-weighted form, the W126 index" (U.S. EPA, 2014c, p. 6–57).

[206] The term design value is commonly used to refer to the metric for the standard. Consistent with the summary in section I.D above, a design value is the statistic that describes the air quality of a given location in terms of the indicator, form and averaging time of the standard such that it can then be compared to the level of the standard.

described in section IV.C.3 below, the EPA generally agrees with these commenters.

Some commenters, including a regional organization of state agencies and two groups of environmental organizations, submitted comments recommending revision of the standard to a cumulative, seasonal form based on the W126 index. In support of their position, these commenters generally cited CASAC advice, variously additionally indicating their view that the standard form should be a metric described as biologically relevant, and that the existing form, with a level in the proposed range, would not provide adequate ecosystem protection. Some commenters additionally suggested that the EPA cannot lawfully retain the form and averaging time that were initially established for purposes of the primary standard when the EPA has identified the W126 index as a metric appropriate for judging vegetation-related effects on public welfare. With regard to the EPA air quality analyses, summarized in the proposal, of the W126 index values at sites where $O_3$ concentrations met different levels of fourth-high metric, some of these commenters stated that the analyses showed widespread variation in W126 values for each fourth-high metric examined. Further, some commenters disagreed with the EPA that the analyses indicated that a revised standard level within the proposed range would be expected to limit W126 exposures in the future to the extent suggested by the analyses of data from the past.

We agree with public commenters and CASAC regarding the appropriateness of the W126 index (the sum of hourly concentrations over a specified period) as a biologically relevant metric for assessing exposures of concern for vegetation-related public welfare effects, as discussed in the proposal, PA and ISA. Accordingly, we agree that this metric is appropriate for use in considering the protection that might be expected to be afforded by potential alternative secondary standards, as discussed in section IV.C.2.c above. We disagree with commenters, however, that use of the W126 metric for this purpose dictates that we must establish a secondary standard with a W126 index form.

In support of this position, we note the common use, in assessments conducted for NAAQS reviews, of exposure metrics that differ in a variety of ways from the ambient air concentration metrics of those standards.[206] Across reviews for the various NAAQS pollutants, we have used a variety of exposure metrics to evaluate the protection afforded by the standards. These exposure metrics are based on the health or welfare effects evidence for the specific pollutant and commonly, in assessments for primary standards, on established exposure-response relationships or health-based benchmarks (doses or exposures of concern) for effects associated with specific exposure circumstances. Some examples of exposure metrics used to evaluate health impacts in primary standard reviews include the concentration of lead in blood of young children and a 5-minute exposure concentration for sulfur dioxide. In contrast, the health-based standards for these two pollutants are the 3-month concentration of lead in total suspended particles and the average across three years of the 99th percentile of 1-hour daily maximum concentration of sulfur dioxide in ambient air, respectively (73 FR 66964, November 12, 2008; 75 FR 35520, June 22, 2010). In somewhat similar manner, in the 2012 PM review, the EPA assessed the extent to which the existing 24-hour secondary standard for $PM_{2.5}$, expressed as a 24-hour concentration (of $PM_{2.5}$ mass per cubic meter of air) not to be exceeded more than once per year on average over three years, could provide the desired protection from effects on visibility in terms of the 90th percentile, 24-hour average $PM_{2.5}$ light extinction, averaged over three years, based on speciated $PM_{2.5}$ mass concentrations and relative humidity data (79 FR 3086, January 15, 2013). Additionally, in the case of the screening-level risk analyses in the 2008 review of the secondary standard for lead, concentrations of lead in soil, surface water and sediment were evaluated to assess the potential for welfare effects related to lead deposition from air, while the standard is expressed in terms of the concentration of lead in particles suspended in air (73 FR 67009, November 12, 2008).

Further, depending on the evidence base, some NAAQS reviews may consider multiple exposure metrics in assessing risks associated with a particular pollutant in ambient air in order to judge the adequacy of an existing standard in providing the required level of protection. And a standard with an averaging time of one

duration may provide protection against effects elicited by exposures of appreciably shorter or longer durations. For example, in the current review of the primary $O_3$ standard, as described in section II above, we have considered the potential for effects associated with both short- and long-term exposures and concluded, based on a combination of air quality and risk analyses and the health effects evidence, that the existing standard with its short (8-hour) averaging time provides control of both the long and short term exposures (e.g., from one hour to months or years) that may be of concern to public health. Similarly, during the 1996 review of the $NO_2$ primary standard, while health effects were recognized to result from both long-term and short-term exposures to $NO_2$, the primary standard, which was a long-term (annual) standard, was concluded to provide the requisite protection against both long- and short-term exposures (61 FR 52852, Oct 8 1996). In the subsequent review of the $NO_2$ primary standard in which the available air quality information indicated that the annual standard was not providing the needed control of the shorter term exposures, an additional short-term standard was established (75 FR 6474, February 9, 2010).

Thus, we note that different metrics may logically, reasonably, and for technically sound reasons, be used in assessing exposures of concern or characterizing risk as compared to the metric of the standard which is used to control air quality to provide the desired degree of protection. That is, exposure metrics are used to assess the likely occurrence and/or frequency and extent of effects under different air quality conditions, while the air quality standards are intended to control air quality to the extent requisite to protect from the occurrence of public health or welfare effects judged to be adverse. In this review of the secondary standard for $O_3$, the EPA agrees that, for the reasons summarized in section IV.A.1 above and described in the ISA, the W126 index—and not an 8-hour daily maximum concentration that has relevance in human health risk characterization, as described in section II above—is the appropriate metric for assessing exposures of concern for vegetation, characterizing risk to public welfare, and evaluating what air quality conditions might provide the desired degree of public welfare protection. We disagree, however, that the secondary standard must be established using that same metric.

Moreover, we note that the CAA does not require that the secondary $O_3$ standard be established in a specific

---

[206] The term design value is commonly used to refer to the metric for the standard. Consistent with the summary in section I.D above, a design value is the statistic that describes the air quality of a given location in terms of the indicator, form and averaging time of the standard such that it can then be compared to the level of the standard.

BLM_0047410

form. Section 109(b)(2) provides only that any secondary NAAQS "shall specify a level of air quality the attainment and maintenance of which is, in the judgment of the Administrator, based on [the air quality] criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air. . . . [S]econdary standards may be revised in the same manner as promulgated." The EPA interprets this provision to leave it considerable discretion to determine whether a particular form is appropriate, in combination with the other aspects of the standard (averaging time, level and indicator), for specifying the air quality that provides the requisite protection, and to determine whether, once a standard has been established in a particular form, that form must be revised. Moreover, nothing in the Act or the relevant case law precludes the EPA from establishing a secondary standard equivalent to the primary standard in some or all respects, as long as the Agency has engaged in reasoned decision-making.[207]

With regard to the commenter's emphasis on advice from CASAC on the form of the secondary standard, the EPA agrees with the importance of giving such advice careful consideration. The EPA further notes, however, that the Administrator is not legally precluded from departing from CASAC's recommendations, when she has provided an explanation of the reasons for such differences.[208] Accordingly, in reaching conclusions on the revised secondary standard in this review, the Administrator has given careful consideration to the CASAC advice in this review and, when she has differed from CASAC recommendations, she has fully explained the reasons and judgments that led her to a different conclusion, as described in section IV.C.3 below.

In disagreeing with the EPA's conclusions drawn from analyses of recent air quality data on the extent to which cumulative seasonal exposures might be limited to within or below the identified 3-year average W126 index values by controlling air quality using different values for the fourth-high

[207] In fact, the D.C. Circuit has upheld secondary NAAQS that were identical to the corresponding primary standard for the pollutant (*e.g., ATA III,* 283 F.3d at 375, 380 [D.C. Cir. 2002, upholding secondary standards for PM₂.₅ and O₃ that were identical to primary standards]).

[208] See CAA sections 307(d)(3) and 307(d)(6)(A); see also *Mississippi* v. *EPA,* 744 F.3d 1334, 1354 (D.C. Cir. 2013) ("Although EPA is not bound by CASAC's recommendations, it must fully explain its reasons for any departure from them").

metric, one group of environmental organizations emphasized the range of W126 index values that occur at monitors with concentrations at or below specific values for the fourth-high metric. For monitor observations for which the fourth-high metric was at or below 70 ppb, this commenter group stated that some sites have 3-year average W126 index values above 17 ppm-hrs and noted a maximum 3-year W126 index value of 19.1 ppm-hrs, while additionally noting occurrences of other W126 values above the CASAC range of 7 to 15 ppm-hrs. This commenter additionally stated that the air quality data "do not support a claim of congruence" between the fourth-high and W126 metrics (*e.g.,* ALA et al., p. 196), that there is no basis for concluding that there is some fundamental underlying relationship that assures meeting the fourth-high metric will mean meeting any of the W126 options, and that the relationship between the metrics is non-linear with significant spread in the data (citing visual inspection of a graph).

The EPA does not agree with the commenter's statements regarding the relationship between the two metrics.[209] We have not, as stated by the commenter, claimed there to be "congruence" between the two metrics (*e.g.,* ALA et al., p. 196), or that the two metrics coincide exactly. Rather, at any location, values of both metrics are a reflection of the temporal distribution of hourly O₃ concentrations across the year and both vary in response to changes in that distribution. While the EPA's air quality analysis shows that the specific relationship differs among individual sites, it documents an overall strong, positive, non-linear relationship between the two metrics (Wells, 2014a, p. 6, Figures 5a and 5b; Wells, 2015b). Further, this analysis finds the amount of year-to-year variability in the two metrics tended to decrease over time with decreasing O₃ concentrations, especially for the W126 metric, as described in section IV.E.4 of the proposal (Wells, 2014a; Wells, 2015b).

With regard to the highest 3-year average W126 exposure index values that might reasonably be expected in the future in areas where a revised standard with a fourth-high form is met, we disagree with the commenters as to the

[209] The EPA additionally notes that commenters contradict their own assertion when, after stating their view that no relationship exists between the 4th high and W126 metrics, the commenter then states that there is a nonlinear relationship and yet then relies on a predicted *linear* relationship to estimate W126 values occurring when air quality meets different values for the 4th high metric at 11 national parks.

significance of the W126 index value of 19.1 ppm-hrs in the 13-year dataset. This value, for a site during the period 2006–2008, is the only occurrence at or above 19 ppm-hrs in the nearly 4000 3-year W126 index values—across the 11 3-year periods extending back in time from 2013—for which the fourth-high metric for the same monitor location is at or below 70 ppb. This is clearly an isolated occurrence.

In considering this comment, we have expanded the technical memorandum that was available at the time of proposal (Wells, 2014a). The expanded memorandum describes the same air quality analyses for 3-year periods from 2001 through 2013 as the 2014 memorandum, and includes additional summary tables for all 3-year periods from 2001 through 2013 as well as tables for the most recent period, 2011–2013 (Wells, 2015b). After the 3-year W126 index value of 19 ppm-hrs, the next three highest 3-year average W126 index values, which are the only other such values above 17 ppm-hrs in the 13-year dataset, and which also occur during periods in the past, round to 18 ppm-hrs (Wells, 2015b). Additionally, we note that reductions in the fourth-high metric over the 13-year period analyzed are strongly associated with reductions in the cumulative W126 index (Wells, 2014a, Figure 11, Table 6; Wells, 2015b). Specifically, the regression analysis of changes in W126 index between the 2001–2003 period and the 2011–2013 period with changes in the fourth-high metric across the same periods indicates a fairly linear and positive relationship between reductions of the two types of metrics, with, on average, a change of approximately 0.7 ppm-hr in the W126 index per ppb change in the fourth-high metric value. From this information we conclude that W126 exposures above 17 ppm-hrs at sites for which the fourth-high metric is at or below 70 ppb would be expected to continue to be rare in the future, particularly as steps are taken to meet a 70 ppb standard.

With regard to the comment that the relationship between the two metrics varies across locations, the EPA agrees that there is variation in cumulative seasonal O₃ exposure (in terms of a 3-year average W126 index) among locations that are at or below the same fourth-high metric. As noted in the proposal, the analysis illustrates this variation, with the locations in the West and Southwest NOAA climatic regions tending to have the highest cumulative seasonal exposures for the same fourth-high metric value. In considering expectations for the future in light of this observation, however, we note that

the regional regressions of reductions in W126 metric with reductions in the fourth-high metric indicate that the Southwest and West regions, which had the greatest potential for sites having 3-year W126 index values greater than the various W126 values of interest when fourth-high values are less than or equal to the various fourth-high metric values of interest, also exhibited the greatest reduction in the W126 index values per unit reduction in the fourth-high values (Wells, 2015b). Thus, in considering the potential for occurrences of values above 17 ppm-hrs in the future in areas that meet a fourth-high of 70 ppb, the EPA notes that the analysis indicates that those areas that exhibited the greatest likelihood of occurrence of a 3-year W126 index above a level of interest (e.g., the commenters' example in the Southwest region of a value of 19.1 ppm-hrs [2006–2008] in comparison to the W126 level of 17 ppm-hrs) also exhibit the greatest improvement in W126 per unit decrease in fourth-high metric.[210] It is expected that future control programs designed to meet a standard with a fourth-high form would provide similar improvements in terms of the W126 metric.

As part of their rationale in support of revising the current form and averaging time, one commenter pointed to the regional variation in the highest W126 index values expected at sites that just meet a fourth-high metric of 70 ppb, based on the EPA's analysis of recent air quality data available at the time of the proposal (Wells, 2014a). This commenter observed that, while in some U.S. regions, locations that meet a potential alternative standard with the current form and a level of 70 ppb also have 3-year average W126 index values no higher than 17 ppm-hrs, the highest W126 index values in other parts of the country are lower. As a result, the commenter concluded that such a standard would result in regionally differing levels of welfare protection. The commenter additionally states that, for extreme values, a W126 form for the secondary standard would also offer different levels of protection, although with the primary standard setting the upper boundary for such values.

The EPA recognizes that a standard with the current form might be expected to result in regionally differing

distributions of W126 exposure index values (including different maximum values) depending on precursor sources, local meteorology, and patterns of O₃ formation. Variation in exposures is to be expected with any standard (secondary or primary) of any form. In fact, variation in exposures and any associated variation in welfare or health risk is generally an inherent aspect of the Administrator's judgment on a specific standard, and any associated variation in welfare or health protection may play a role in the Administrator's judgment with regard to public welfare or public health protection objectives for a national standard. In considering the comment, however, we have focused only on the extent to which the commenter's conclusion that a secondary standard of the current form and averaging time would provide regionally varying welfare protection might indicate that the specified air quality is more (or less) than necessary to achieve the purposes of the standard. In so doing, we additionally respond to a separate comment that the EPA needs to address how the revised secondary standard is neither more or less than necessary to protect the public welfare.

The CAA requirement in establishing a standard is that it be set at a level of air quality that is requisite, meaning "sufficient, but not more than necessary" (Whitman v. American Trucking Ass'ns, 531 U.S. 457, 473 [2001]). We note that the air quality that is specified by the revised primary standard has been concluded to be "necessary" and it may be reasonable and appropriate to consider the stringency of the secondary standard in light of what is identified as "necessary" for the primary standard. The EPA considered the stringency of the O₃ secondary standard in this way in the 1979 decision (44 FR 8211, February 8, 1979), which was upheld in subsequent litigation (API v Costle, 665 F.2d 1176 [D.C. Cir. 1991]). We note that, in similar manner, the commenter considered public welfare protection that might be afforded by the primary standard in noting that the primary standard would be expected to provide welfare protection from extreme values.[211]

In addressing the remand of the 2008 secondary standard in this rulemaking, as discussed in section IV.C.2.e below, the EPA recognizes that it must explain the basis for concluding that the standard selected by the Administrator specifies air quality that will provide the degree of public welfare protection needed from the secondary standard (Mississippi v. EPA, 744 F.3d 1334, 1360–61 [D.C. Cir. 2013]). In this review, the Administrator describes the degree or level of public welfare protection needed from the secondary standard and fully explains the basis for concluding that the standard selected specifies air quality that will provide that degree of protection. If the Administrator concludes that the level of air quality specified by the primary standard would provide sufficient protection against known or anticipated adverse public welfare effects, the EPA believes that a secondary standard with that indicator, level, form and averaging time could be considered to be requisite. If the level of air quality that areas will need to achieve or maintain for purposes of the primary standard also provides a level of air quality that is adequate to provide the level of protection identified for the secondary standard, there would be little purpose in requiring the EPA to establish a less stringent secondary standard. For these reasons, the expectation of regionally differing cumulative exposures under a secondary standard of the current form and averaging time does not lead us to conclude that the air quality specified by such a standard would be more (or less) than necessary (and thus not requisite) for the desired level of public welfare protection.

e. Revisions to the Standard Level

Some comments specifically addressed the level for a revised secondary standard of the current form and averaging time. Of the comments that addressed this, some from states or industry groups generally supported a level within the proposed range, frequently specifying the upper end of the range (70 ppb), while comments

---

[210] Additionally, O₃ levels at any location are influenced by upwind precursor emissions, and many rural areas, including the site referenced by the commenter, are impacted by precursor emissions from upwind urban areas, such that as emissions are reduced to meet a revised standard in the upwind locations, reductions in those upwind emissions will contribute to reductions at the downwind sites (Wells, 2014a; ISA, pp. 3–129 to 3–133).

[211] As described earlier in this section, the EPA has also considered the air quality specified by one secondary standard in a decision on the need for a second secondary standard. In the decision not to adopt a second PM₂.₅ secondary standard specific to visibility-related welfare effects, the Administrator, after describing the public welfare protection objective related to visibility effects, considered analyses that related air quality associated with the existing secondary standard to that expected for the proposed visibility-focused secondary standard. From these analyses, she

concluded sufficient protection against visibility effects would be provided by the existing standard, and to the extent that the existing standard would provide more protection than had been her objective for such effects, adoption of a second secondary standard focused on visibility would not change that result (78 FR 3227–3228, January 15, 2013). This decision responded to a court remand of the prior EPA decision that visibility protection would be afforded by a secondary standard set equal to the primary standard based on the court's conclusion that the EPA had not adequately described the Administrator's objectives for visibility-related public welfare protection under the standard (American Farm Bureau, 559 F.3d at 530–531).

from tribes and tribal organizations, and a few others, recommended a level no higher than 65 ppb. The Administrator has considered such comments in reaching her decision on the appropriate revisions to the standard, described in section IV.C.3. Detailed aspects of these comments are discussed in the Response to Comments document.

### f. 2013 Court Remand and Levels of Protection

Both industry groups and a group of environmental advocacy organizations submitted comments on the extent to which the proposal addressed the July 2013 remand of the secondary standard by the U.S. Court of Appeals for the D.C. Circuit. The former generally concluded that the proposal had adequately addressed the remand, while the latter expressed the view that the EPA had failed to comply with the court's remand because it had failed to identify the target levels of vegetation protection for which the proposed range of standards would provide the requisite protection, claiming that the identified W126 index range of 13–17 ppm-hrs was not based on a proposed level of protection against biomass loss, carbon storage loss, or foliar injury that the EPA had identified as requisite for public welfare.

We agree with the comments that state that we have addressed the court's remand. More specifically, with this rulemaking, including today's decision and the Administrator's conclusions described in section IV.C.3 below, the EPA has fully addressed the remand of the 2008 secondary $O_3$ standard. In *Mississippi* v. *EPA*, the D.C. Circuit remanded the 2008 secondary $O_3$ standard to the EPA for reconsideration because it had not adequately explained why that standard provided the requisite public welfare protection. 744 F.3d 1334, 1360–61 (D.C. Cir. 2013). In doing so, the court relied on the language of CAA section 109(b)(2), and the court's prior decision, *American Farm Bureau Federation* v. *EPA*, 559 F.3d 512, 528–32 (D.C. Cir. 2009), which came to the same conclusion for the 2006 secondary $PM_{2.5}$ standard. Both decisions recognize that the plain language of section 109(b)(2) requires the EPA to "specify a level of air quality the maintenance of which . . . is requisite to protect the public welfare from any known or anticipated adverse effects" (*Mississippi*, 744 F.3d at 1360 [citing *American Farm Bureau*, 559 F.3d at 530]). Further, explaining that it was insufficient for the EPA "merely to compare the level of protection afforded by the primary standard to possible secondary standards and to find the two

roughly equivalent" (*Mississippi*, 744 F.3d at 1360), the court rejected the EPA's justification for setting the secondary standard equivalent to the primary standard because that justification was based on comparing the protection from the primary standard to that expected from one possible standard with a cumulative, seasonal form (21 ppm-hrs) without stating that such a cumulative seasonal standard would be requisite to protect welfare or explaining why that would be so. Because the EPA had "failed to determine what level of protection was 'requisite to protect the public welfare'" (*Mississippi*, 744 F.3d at 1362), the court found that the EPA's rationale failed to satisfy the requirements of the Act.

Today's rulemaking both satisfies the requirements of section 109(b)(2) of the Act and addresses the issues raised in the court's remand. In this rulemaking, the Administrator has established a revised secondary standard that replaces the remanded 2008 secondary standard. In so doing, based on her consideration of the currently available evidence and quantitative exposure and air quality information, as well as advice from CASAC and input from public comments, the Administrator has described the requisite public welfare protection for the secondary standard and explained how the standard selected specifies air quality that will provide that protection. As explained in detail in IV.C.3 below, in this review the Administrator is describing the public welfare protection she finds requisite in terms of seedling RBL in the median species, which serves as a surrogate for a broader array of $O_3$ effects at the plant and ecosystem levels. This description of the desired protection sufficiently articulates the standard that the Administrator is using to evaluate welfare protection. Further, the Administrator has considered air quality analyses in determining how to achieve the air quality conditions associated with the desired protection. Based on these analyses, the Administrator is determining that revising the level of the secondary standard to 70 ppb, while retaining the current form, averaging time, and indicator, specifies a level of air quality that will provide the requisite public welfare protection.

To the extent the comments suggest that the EPA is required in establishing a standard to identify a precise and quantified level of public welfare protection that is requisite with respect to every potentially adverse public welfare impact (*e.g.*, visible foliar injury, crop yield loss) that is considered in establishing the standard, we disagree. While the D.C. Circuit has required the

EPA to "qualitatively describe the standard governing its selection of particular NAAQS," it has expressly "rejected the notion that the Agency must establish a measure of the risk to safety it considers adequate to protect public health every time it establishes a NAAQS" (*ATA III*, 283 F.3d at 369 [internal marks and citations omitted]). That is, the EPA must "engage in reasoned decision-making," but is not required to "definitively identify pollutant levels below which risks to public health are negligible" (*ATA III*, 283 F.3d at 370). This principle recognizes that the Act requires the EPA to establish NAAQS even when the risks or effects of a pollutant cannot be quantified or precisely identified because of scientific uncertainty concerning such effects at atmospheric concentrations (*ATA III*, 283 F.3d at 370). Though these decisions specifically address setting a primary standard under CAA section 109(b)(1), we believe the same principles apply to the parallel provision in section 109(b)(2) governing secondary standards. Accordingly, while the EPA recognizes that it must explain the basis for concluding that the standard selected by the Administrator specifies air quality that will provide the protection against adverse effects on public welfare needed from the secondary standard (*Mississippi* v. *EPA*, 744 F.3d 1334, 1360–61 [D.C. Cir. 2013]), the CAA does not require the EPA to precisely quantify the measure of protection that is necessary to protect the public welfare in establishing a secondary standard. In light of the Administrator's description of the desired public welfare protection in IV.C.3 below, which has both qualitative and quantitative components, the EPA is not required to further reduce this description to a precise, quantitative target level of vegetation protection. Moreover, nothing in the CAA or in case law requires the EPA to identify a target level of protection for any particular public welfare effect, such as vegetation effects, but rather leaves the Administrator discretion in judging how to describe the public welfare protection that she concludes is requisite. In IV.C.3 below, the Administrator explains her reasoning for giving primary focus to growth-related effects in describing the requisite welfare protection, rather than to other welfare effects such as foliar injury, for which there are more uncertainties and less predictability with respect to the severity of the effects that would be expected from varying $O_3$ exposures in the natural environment

and the significance of the associated impacts to public welfare.

3. Administrator's Conclusions on Revision

In reaching her decision on the appropriate revisions to the secondary standard, the Administrator has drawn on (1) the ISA conclusions regarding the weight of the evidence for a range of welfare effects associated with O₃ in ambient air, quantitative findings regarding air quality and ecosystem exposures associated with such effects, and associated limitations and uncertainties; (2) staff evaluations in the PA of the evidence summarized in the ISA, the exposure/risk information developed in the WREA and analyses of air quality monitoring information; (3) additional air quality analyses of relationships between air quality metrics based on form and averaging time of the current standard and the W126 cumulative seasonal exposure index; (4) CASAC advice; and (5) consideration of public comments. After giving careful consideration to all of this information, the Administrator believes that the conclusions and policy judgments supporting her proposed decision remain valid.

The Administrator concludes it is appropriate to continue to use O₃ as the indicator for a secondary standard intended to address adverse effects to public welfare associated with exposure to O₃ alone and in combination with related photochemical oxidants. In this review, no alternatives to O₃ have been advanced as being a more appropriate surrogate for ambient photochemical oxidants. Advice from CASAC concurs with the appropriateness of retaining the current indicator. Thus, as is the case for the primary standard (discussed above in section II.C.1), the Administrator has decided to retain O₃ as the indicator for the secondary standard. In so doing, she recognizes that measures leading to reductions in ecosystem exposures to O₃ would also be expected to reduce exposures to other photochemical oxidants.

In her decision on the other elements of the standard, the Administrator has considered the body of evidence and information in a systematic fashion, giving appropriate consideration to the important findings of the ISA as to the effects of O₃ in ambient air that may present risks to the public welfare, measures of exposure best formulated for assessment of these effects, associated evidence regarding ecosystem exposures and air quality associated with such effects; judgments regarding the weight to place on strengths, limitations and uncertainties

of this full body of information; and public welfare policy judgments on the appropriate degree of protection and the form and level of a revised standard that will provide such protection. In reaching her decision, the Administrator recognizes that the Act does not require that NAAQS be set at zero-risk or background levels, but rather at levels that reduce risk sufficiently to protect public welfare from known or anticipated adverse effects. In addition, we note that the elements of the standard (indicator, level, form, and averaging time) are considered together in assessing the protection provided by a new or revised standard, and the EPA's approach for considering the elements of a new or revised standard is part of the exercise of the judgment of the Administrator.

As an initial matter, the Administrator recognizes the robustness of the longstanding evidence, described in the ISA, of O₃ effects on vegetation and associated terrestrial ecosystems. The newly available studies and analyses have strengthened the evidence for the current review that provides the foundation for the Administrator's consideration of O₃ effects, associated public welfare protection objectives, and the revisions to the current standard needed to achieve those objectives. In light of the extensive evidence base in this regard, the Administrator focuses on protection against adverse public welfare effects of O₃ related effects on vegetation. In so doing, she takes note of effects that compromise plant function and productivity, with associated effects on ecosystems. She is particularly concerned about such effects in natural ecosystems, such as those in areas with protection designated by Congress for current and future generations, as well as areas similarly set aside by states, tribes and public interest groups with the intention of providing similar benefits to the public welfare. She additionally recognizes that providing protection for this purpose will also provide a level of protection for other vegetation that is used by the public and potentially affected by O₃ including timber, produce grown for consumption and horticultural plants used for landscaping.

A central issue in this review of the secondary standard, as in the last review (completed in 2008), has been consideration of the role for a cumulative seasonal exposure index. In the last review, the Administrator proposed such an index as one of two options for the form of a revised standard. The Administrator's decision in that review was to retain the existing

form and averaging time, while revising the standard level to provide the desired level of protection. As described in section IV.A above, this decision was remanded to the EPA in 2013 by the DC Circuit. In the current review, the ISA evaluates the evidence and concludes that, among the approaches investigated, quantifying exposure with a cumulative seasonal index best captures the aspects of exposure that relate to effects on vegetation, particularly those related to growth and yield. The PA considered this finding both in the context of assessing potential impacts, and, conversely, the protection from such impacts that might be realized, as well as in the context of using a cumulative seasonal exposure index as a form for the secondary standard. In the proposal, the Administrator focused on the former context, as an exposure index, while additionally soliciting comment on use of the index as the form for the revised standard. Advice from CASAC, all of which was received prior to the proposal, has largely emphasized the latter context, and that was also the focus of some comments.

In considering revisions to the secondary standard that will specify a level of air quality to provide the necessary public welfare protection, the Administrator focuses on use of a cumulative seasonal exposure index, including specifically the W126 index as defined in the proposal, for assessing exposure, both for making judgments with regard to the potential harm to public welfare posed by conditions allowed by various levels of air quality and for making the associated judgments regarding the appropriate degree of protection against such potential harm. In so doing, the Administrator takes note of the conclusions in the ISA and PA, with which the CASAC concurred, that, based on the currently available evidence, a cumulative seasonal concentration-weighted index best captures the aspects of ecosystem exposure to O₃ in ambient air that impact vegetation. In considering the public comments in this area, she notes the broad support for use of such a metric as an exposure index, with many additionally supporting its use as the form for a revised standard, in light of CASAC advice on that point. Thus, based on the substantial support in the evidence and CASAC advice, and in consideration of public comments, the Administrator concludes that it is appropriate to use such a cumulative seasonal concentration-weighted index for purposes of assessing the potential

public welfare risks, and similarly, for assessing the potential protection achieved against such risks on a national scale.

The Administrator has considered conclusions of the ISA and PA, as well as advice from CASAC and public comments, regarding different cumulative, concentration-weighted metrics, and different temporal definitions of aspects of these metrics. The Administrator takes note of the PA conclusions in support of the W126 exposure index, recognized by the ISA for its strength in weighting potentially damaging $O_3$ concentrations that contributes to the advantages it offers over other weighted cumulative indices. With regard to the relevant definitions for the temporal aspects of this index, conclusions in the ISA and PA, and such considerations in the last review, have led to a focus on a maximum 3-month, 12-hour index, defined by the 3-consecutive-month period within the $O_3$ season with the maximum sum of W126-weighted hourly $O_3$ concentrations during the period from 8:00 a.m. to 8:00 p.m. each day (as explained in section IV.A.1.c above). The Administrator takes note of the support in the ISA and PA, as well as CASAC recommendations for consideration of the W126 index defined in this way. While recognizing that no one definition of an exposure metric used for the assessment of protection for multiple effects at a national scale will be exactly tailored to every species or each vegetation type, ecosystem and region of the country, as discussed in section IV.C.2 above, the Administrator judges that on balance, a W126 index derived in this way, and averaged over three years, as discussed below, will be appropriate for such purposes.

In considering the appropriate exposure index to facilitate assessment of the level of protection afforded to the public welfare by alternative secondary standards in the proposal, the Administrator concluded that a 3-year average W126 index was appropriate for these purposes. A number of considerations raised in the PA influenced the Administrator's conclusion at the time of proposal, in combination with public welfare judgments regarding the weight to place on the evidence of specific vegetation-related effects estimated to result across a range of cumulative seasonal concentration-weighted $O_3$ exposures and judgments on the extent to which such effects in such areas may be considered adverse to public welfare (79 FR 76347, 75312, December 17, 2014,). Some comments were received from the

public on this aspect of the proposed decision, as discussed in section IV.C.2 above, and have been considered in the conclusions reached here.

The Administrator continues to place weight on key aspects raised in the PA and summarized in the proposal on the appropriateness of considering a 3-year average index. The Administrator notes the PA consideration of the potential for multiple consecutive years of critical $O_3$ exposures to result in larger impacts on forested areas than intermittent occurrences of such exposures due to the potential for compounding effects on tree growth. The Administrator additionally notes the evidence, as considered in the PA and summarized in the proposal, for some perennial species of some effects associated with a single year's exposure of a critical magnitude that may have the potential for some "carry over" of effects on plant growth or reproduction in the subsequent season. Further, the Administrator notes the occurrence of visible foliar injury and growth or yield loss in annual plants or crops associated with exposures of a critical magnitude. While the Administrator appreciates that the scientific evidence documents the effects on vegetation resulting from individual growing season exposures of specific magnitude, including those that can affect the vegetation in subsequent years, she is also mindful, both of the strengths and limitations of the evidence, and of the information on which to base her judgments with regard to adversity of effects on the public welfare. The Administrator also recognizes uncertainties associated with interpretation of the public welfare significance of effects resulting from a single-year exposure, and that the public welfare significance of effects associated with multiple years of critical exposures are potentially greater than those associated with a single year of such exposure.

As she did for the proposal, the Administrator has considered advice from CASAC in this area, including the CASAC comments that it favors a W126-based secondary standard with a single year form, that its recommended range of levels relates to such a form, and that a lower range (e.g., with 13 ppm-hrs at the upper end) would pertain to a 3-year form. The Administrator also notes CASAC's recognition that her decision on use of a 3-year average over a single-year W126 index may be a matter of policy. While recognizing the potential for effects on vegetation associated with a single-year exposure, the Administrator concludes that use of a 3-year average metric can address the potential for adverse effects to public

welfare that may relate to shorter exposure periods, including a single year.

While the Administrator recognizes the scientific information and interpretations, as well as CASAC advice, with regard to a single-year exposure index, she also takes note of uncertainties associated with judging the degree of vegetation impacts for annual effects that would be adverse to public welfare. Even in the case of annual crops, the assessment of public welfare significance is unclear for the reasons discussed below related to agricultural practices. The Administrator is also mindful of the variability in ambient air $O_3$ concentrations from year to year, as well as year-to-year variability in environmental factors, including rainfall and other meteorological factors, that influence the occurrence and magnitude of $O_3$-related effects in any year, and contribute uncertainties to interpretation of the potential for harm to public welfare over the longer term. As noted above, the Administrator also recognizes that the public welfare significance of effects associated with multiple years of critical exposures are potentially greater than those associated with a single year of such exposure. Based on all of these considerations, the Administrator recognizes greater confidence in judgments related to public welfare impacts based on a 3-year average metric. Accordingly, the considerations identified here lead the Administrator to conclude it is appropriate to use an index averaged across three years for judging public welfare protection afforded by a revised secondary standard.

In reaching a conclusion on the amount of public welfare protection from the presence of $O_3$ in ambient air that is appropriate to be afforded by a revised secondary standard, the Administrator has given particular consideration to the following: (1) The nature and degree of effects of $O_3$ on vegetation, including her judgments as to what constitutes an adverse effect to the public welfare; (2) the strengths and limitations of the available and relevant information; (3) comments from the public on the Administrator's proposed decision, including comments related to identification of a target level of protection; and (4) CASAC's views regarding the strength of the evidence and its adequacy to inform judgments on public welfare protection. The Administrator recognizes that such judgments include judgments about the interpretation of the evidence and other information, such as the quantitative analyses of air quality monitoring,

BLM_0047415

exposure and risk. She also recognizes that such judgments should neither overstate nor understate the strengths and limitations of the evidence and information nor the appropriate inferences to be drawn as to risks to public welfare. The CAA does not require that a secondary standard be protective of all effects associated with a pollutant in the ambient air but rather those known or anticipated effects judged adverse to the public welfare (as described in section IV.A.3 above). This Administrator additionally recognizes that the choice of the appropriate level of protection is a public welfare policy judgment entrusted to the Administrator under the CAA taking into account both the available evidence and the uncertainties.

The Administrator finds the coherence and strength of the weight of evidence concerning effects on vegetation from the large body of available literature compelling. The currently available evidence addresses a broad array of $O_3$-induced effects on a variety of tree species across a range of growth stages (*i.e.,* seedlings, saplings and mature trees) using diverse field-based (*e.g.,* free air, gradient and ambient) and OTC exposure methods. The Administrator gives particular attention to the effects related to native tree growth and productivity, recognizing their relationship to a range of ecosystem services, including forest and forest community composition. She is also mindful of the significance of community composition changes, particularly in protected areas, such as Class I areas. At the same time, she recognizes, while the evidence strongly supports conclusions regarding $O_3$ impacts on growth and the evidence showing effects on tree seedlings, as well as on older trees, there are limitations in our ability to predict impacts in the environment or to estimate air quality or exposures that will avoid such impacts. Such limitations relate to the variability of environmental factors or characteristics that can influence the extent of $O_3$ effects.

In recognition of the CASAC advice and the potential for adverse public welfare effects, the Administrator has considered the nature and degree of effects of $O_3$ on the public welfare. In so doing, the Administrator recognizes that the significance to the public welfare of $O_3$-induced effects on sensitive vegetation growing within the U.S. can vary, depending on the nature of the effect, the intended use of the sensitive plants or ecosystems, and the types of environments in which the sensitive vegetation and ecosystems are located.

Any given $O_3$-related effect on vegetation and ecosystems (*e.g.,* biomass loss, visible foliar injury), therefore, may be judged to have a different degree of impact on the public depending, for example, on whether that effect occurs in a Class I area, a residential or commercial setting, or elsewhere. The Administrator notes that such a distinction is supported by CASAC advice in this review. In her judgment, like those of the Administrator in the last review, it is appropriate that this variation in the significance of $O_3$-related vegetation effects should be taken into consideration in making judgments with regard to the level of ambient $O_3$ concentrations that is requisite to protect the public welfare from any known or anticipated adverse effects. As a result, the Administrator concludes that of those known and anticipated $O_3$-related vegetation and ecosystem effects identified and discussed in this notice, particular significance should be ascribed to those that may occur on sensitive species that are known to or are likely to occur in federally protected areas such as Class I areas or on lands set aside by states, tribes and public interest groups to provide similar benefits to the public welfare, for residents on those lands, as well as visitors to those areas.

Likewise, the Administrator also notes that less protection related to growth effects may be called for in the case of other types of vegetation or vegetation associated with other uses or services. For example, the maintenance of adequate agricultural crop yields is extremely important to the public welfare and currently involves the application of intensive management practices. With respect to commercial production of commodities, the Administrator notes that judgments about the extent to which $O_3$-related effects on commercially managed vegetation are adverse from a public welfare perspective are particularly difficult to reach, given that the extensive management of such vegetation (which, as CASAC noted, may reduce yield variability) may also to some degree mitigate potential $O_3$-related effects. The management practices used on these lands are highly variable and are designed to achieve optimal yields, taking into consideration various environmental conditions. In addition, changes in yield of commercial crops and commercial commodities, such as timber, may affect producers and consumers differently, further complicating the question of assessing overall public welfare impacts. Thus, the Administrator

concludes, while research on agricultural crop species remains useful in illuminating mechanisms of action and physiological processes, information from this sector on $O_3$-induced effects is considered less useful in informing judgments on what specific standard would provide the appropriate public welfare protection. In so doing, the Administrator notes that a standard revised to increase protection for forested ecosystems would also be expected to provide some increased protection for agricultural crops and other commercial commodities, such as timber.

The Administrator also recognizes that $O_3$-related effects on sensitive vegetation can occur in other areas that have not been afforded special federal or other protections, including effects on vegetation growing in managed city parks and residential or commercial settings, such as ornamentals used in urban/suburban landscaping or vegetation grown in land use categories involving commercial production of commodities, such as timber. For vegetation used for residential or commercial ornamental purposes, the Administrator believes that there is not adequate information at this time to establish a secondary standard based specifically on impairment of these categories of vegetation, but notes that a secondary standard revised to provide protection for sensitive natural vegetation and ecosystems would likely also provide some degree of protection for such vegetation.

Based on the above considerations, in identifying the appropriate level of protection for the secondary standard, the Administrator finds it appropriate to focus on sensitive trees and other native species known or anticipated to occur in protected areas such as Class I areas or on other lands set aside by the Congress, states, tribes and public interest groups to provide similar benefits to the public welfare, for residents on those lands, as well as visitors to those areas. In light of their public welfare significance, the Administrator gives particular weight to protecting such vegetation and ecosystems. Given the reasons for the special protection afforded such areas (identified in section I.A.3 above), she recognizes the importance of protecting these natural forests from $O_3$-induced impacts, including those related to $O_3$ effects on growth, and including those extending in scale from individual plants to the ecosystem. The Administrator also recognizes that the impacts identified for $O_3$ range from those for which the public welfare significance may be more easily judged, but for which quantitative relationships

BLM_0047416

with $O_3$ in ambient air are less well established, such as impacts on forest community composition in protected wilderness areas, carbon storage and other important ecosystem services, to specific plant-level effects, such as growth impacts (in terms of RBL) in tree seedlings, for which our quantitative estimates are more robust.

For considering the appropriate public welfare protection objective for a revised standard, the Administrator finds appropriate and useful the estimates of tree seedling growth impacts (in terms of RBL) associated with a range of W126-based index values developed from the robust E–R functions for 11 tree species, that were described in the PA and proposal and are summarized in Table 4 above. In making judgments based on those observations, however, the Administrator has considered the broader evidence base and public welfare implications, including associated strengths, limitations and uncertainties. Thus, in drawing on estimates from this table, she is not making judgments simply about a specific magnitude of growth effect in seedlings that would be acceptable or unacceptable in the natural environment. Rather, the Administrator is using the estimates in the table, as suggested by CASAC and emphasized by some commenters, as a surrogate or proxy for consideration of the broader array of vegetation-related effects of potential public welfare significance, that include effects on growth of individual sensitive species and extend to ecosystem-level effects, such as community composition in natural forests, particularly in protected public lands, as well as forest productivity. In so doing, she notes that CASAC similarly viewed biomass loss as "a scientifically valid surrogate of a variety of adverse effects to public welfare" (Frey, 2014c, p. 10). Thus, in considering the appropriate level of public welfare protection for the revised standard, the Administrator gives primary attention to the relationship between W126 exposures and estimates of RBL in tree seedlings in Table 4, finding this to be a useful quantitative tool to inform her judgments in this matter.

In considering the RBL estimates in Table 4 above (drawn from the final PA), the Administrator takes note of comments from CASAC that also give weight to these relationships in formulating its advice and notes the CASAC comments on specific RBL values (Frey, 2014c). In so doing, she considers and contrasts comments and

their context on RBL estimates of 2% and 6% for the median studied species.

With regard to the CASAC advice regarding 2% RBL for the median studied tree species, the Administrator notes, as an initial matter, the unclear basis for such a focus, as described in section IV.C.2 above and in the proposal. Further, she notes that the CASAC advice related to this RBL value was that it would be appropriate for the range of levels identified in the PA for the Administrator's consideration to "include[] levels that aim for not greater than 2% RBL for the median tree species" (Frey, 2014c, p. 14). As described in the proposal, the range identified in the PA, which the Administrator considered, extended down to W126 index levels for which the estimated RBL in the median tree species is less than or equal to 2%, consistent with the CASAC advice. In addition, the Administrator notes that only the lowest portion of this range (7–8 ppm-hrs) corresponds to an estimated RBL for the median tree species of less than or equal to 2%, with the remainder of CASAC's range (up to 15 ppm-hrs) associated with higher annual RBL estimates. Thus, the Administrator understands CASAC to have identified 2% RBL for the median tree species as a benchmark falling within, and at one end of, the range of levels of protection that the CASAC considers appropriate for the revised standard to provide. However, the fact that the CASAC range included levels for which the RBL estimates were appreciably greater than 2% indicates that CASAC did not judge it necessary that the revised standard be based on the 2% RBL benchmark. Accordingly, the Administrator proposed revisions to the secondary standard based on options related to higher RBL estimates and associated exposures. After also considering public comments, the Administrator continues to consider the uncertainty regarding the extent to which associated effects on vegetation at lower $O_3$ exposures would be adverse to public welfare to be too great to provide a foundation for public welfare protection objectives for a revised secondary standard.

With regard to the CASAC comments on a 6% RBL estimate, the Administrator takes particular note of their characterization of this level of effect in the median studied species as "unacceptably high" (Frey, 2014c, pp. iii, 13, 14). These comments were provided in the context of CASAC's considering the significance of effects associated with a range of alternatives for the secondary standard. Moreover, the range recommended by CASAC excluded W126 index values for which

the median species was estimated to have a 6% RBL,[212] based on the information before CASAC at the time (Frey, 2014c, p. 12–13). Accordingly, the EPA interprets these comments regarding 6% RBL to be of a different nature than the CASAC advice regarding a 2% median RBL, both because these two comments are framed to address different questions and because CASAC treated them differently in its recommended range.

In the Administrator's consideration of the RBL estimates to inform judgments on $O_3$ exposures of concern to public welfare and the appropriate protection that the secondary standard should provide from such exposures, she has given particular consideration to the current evidence for the relationship of reduced growth of sensitive tree species with ecosystem effects (as described in the ISA), CASAC's view of 6% RBL for the median studied species as unacceptably high, and the role of the Administrator's judgments regarding public welfare impacts of effects in specially protected natural systems, such as Class I areas. With regard to a point of focus among the median RBL estimates extending below 6% for purposes of judging the appropriate public welfare protection objectives for a revised secondary standard, the Administrator is mindful of the CASAC advice to consider lower levels if using a 3-year average, rather than annual, W126 index value.

In considering the CASAC advice, the Administrator notes that her judgments on a 3-year average index focus on the level of confidence in conclusions that might be drawn with regard to single as compared to multiple year impacts, as described above. For example, the Administrator, while recognizing the strength of the evidence with regard to quantitative characterization of $O_3$ effects on growth of tree seedlings and crops, and in addition to noting the additional difficulties for assessing the welfare impacts of $O_3$ on crops, takes note of the uncertainty associated with

---

[212] As summarized in IV.E.3 of the proposal), revisions to this table in the final PA, made in consideration of other CASAC comments, have resulted in changes to the median species RBL estimates such that the median species RBL estimate for a W126 index value of 17 ppm-hrs in this table in the final PA (5.3%) is nearly identical to the median species estimate for 15 ppm-hrs (the value corresponding to the upper end of the CASAC-identified range) in the second draft PA (5.2%), the review of which was the context for CASAC's advice on this point (Frey, 2014c). The median RBL estimate ranges from 5.3% to 3.8% across the range of W126 exposures (17 ppm-hrs to 13 ppm-hrs) that the Administrator proposed to conclude would provide the appropriate public welfare protection for a revised secondary standard.

drawing conclusions with regard to the extent to which small percent reductions in annual growth contribute to adverse effects on public welfare and the role of annual variability in environmental factors that affect plant responses to $O_3$. Moreover, as explained above, the Administrator concludes that concerns related to the possibility of a single unusually damaging year, inclusive of those described by the CASAC, can be addressed through use of a 3-year average metric. Thus, similar to the CASAC's view that a lower level would be appropriate with a 3-year form, the Administrator considers it appropriate to focus on a standard that would generally limit cumulative exposures to those for which the median RBL estimate would be somewhat lower than 6%.

In focusing on cumulative exposures associated with a median RBL estimate somewhat below 6%, the Administrator considers the relationships in Table 4, noting that the median RBL estimate is 6% for a cumulative seasonal W126 exposure index of 19 ppm-hrs. Considering somewhat lower values, the median RBL estimate is 5.7% (which rounds to 6%) for a cumulative seasonal W126 exposure index of 18 ppm-hrs and the median RBL estimate is 5.3% (which rounds to 5%) for 17 ppm-hrs. In light of her decision that it is appropriate to use a 3-year cumulative exposure index for assessing vegetation effects (described above), the potential for single-season effects of concern, and CASAC comments on the appropriateness of a lower value for a 3-year average W126 index, the Administrator concludes it is appropriate to identify a standard that would restrict cumulative seasonal exposures to 17 ppm-hrs or lower, in terms of a 3-year W126 index, in nearly all instances. In reaching this conclusion, based on the current information to inform consideration of vegetation effects and their potential adversity to public welfare, she additionally judges that the RBL estimates associated with marginally higher exposures in isolated, rare instances are not indicative of effects that would be adverse to the public welfare, particularly in light of variability in the array of environmental factors that can influence $O_3$ effects in different systems and uncertainties associated with estimates of effects associated with this magnitude of cumulative exposure in the natural environment.

While giving primary consideration to growth effects using the surrogate of RBL estimates based on tree seedling effects, the Administrator also recognizes the longstanding and robust evidence of $O_3$ effects on crop yield. She takes note of CASAC concurrence with the PA description of such effects as of public welfare significance and agrees. As recognized in the proposal, the maintenance of adequate agricultural crop yields is extremely important to the public welfare. Accordingly, research on agricultural crop species remains important for further illumination of mechanisms of action and physiological processes. Given that the extensive management of such vegetation, which as CASAC noted may reduce yield variability, may also to some degree mitigate potential $O_3$-related effects, however, judgments about the extent to which $O_3$-related effects on crop yields are adverse from a public welfare perspective are particularly difficult to reach. Further, management practices for agricultural crops are highly variable and generally designed to achieve optimal yields, taking into consideration various environmental conditions. As a result of this extensive role of management in optimizing crop yield, the Administrator notes the potential for greater uncertainty with regard to estimating the impacts of $O_3$ exposure on agricultural crop production than that associated with $O_3$ impacts on vegetation in natural forests. For all of these reasons, the Administrator is not giving the same weight to CASAC's statement regarding crop yield loss as a surrogate for adverse effects on public welfare, or the magnitude that would represent an adverse impact to public welfare, as to the CASAC's comments on RBL as a surrogate for an array of growth-related effects. Similarly, given the considerations summarized above and in the proposal, the Administrator concludes that agricultural crops do not have the same need for additional protection from the NAAQS as forested ecosystems and finds protection of public welfare from crop yield impacts to be a less important consideration in this review for the reasons identified, including the extensive management of crop yields and the dynamics of agricultural markets. Thus, the Administrator is not giving a primary focus to crop yield loss in selecting a revised secondary standard. She notes, however, that a standard revised to increase protection for forested ecosystems would also be expected to provide some increased protection for agricultural crops.

The Administrator has additionally considered the evidence and analyses of visible foliar injury. In so doing, the Administrator notes the ISA conclusion that "[e]xperimental evidence has clearly established a consistent association of visible injury with $O_3$ exposure, with greater exposure often resulting in greater and more prevalent injury" (U.S. EPA, 2013, section 9.4.2, p. 9–41). The Administrator also recognizes the potential for this effect to affect the public welfare in the context of affecting values pertaining to natural forests, particularly those afforded special government protection, as discussed in section IV.A.3 above. However, she recognizes significant challenges in judging the specific extent and severity at which such effects should be considered adverse to public welfare, in light of the variability in the occurrence of visible foliar injury and the lack of clear quantitative relationships with other effects on vegetation, as well as the lack of established criteria or objectives that might inform consideration of potential public welfare impacts related to this vegetation effect.

Further, the Administrator takes note of the range of evidence on visible foliar injury and the various related analyses, including additional observations drawn from the WREA biosite dataset in response to comments, as summarized in section IV.C.2 above. In so doing, she does not agree with CASAC's comment that a level of W126 exposure below 10 ppm-hrs is required to reduce foliar injury, noting some lack of clarity in the WREA and PA presentations of the WREA cumulative proportion analysis findings and their meaning (described in section IV.C.2.b above). She notes that the additional observations summarized in section IV.C.2 above indicate declines in proportions of sites with any visible foliar injury and biosite index scores with reductions in cumulative W126 exposure across a range of values extending at the high end well above 20 ppm-hrs, down past and including 17 ppm-hrs. In considering this information, however, the Administrator takes note of the current lack of robust exposure-response functions that would allow prediction of visible foliar injury severity and incidence under varying air quality and environmental conditions, as recognized in section IV.A.1.b above. Thus, while the Administrator notes that the evidence is not conducive to use for identification of a specific quantitative public welfare protection objective, due to uncertainties and complexities described in sections IV.A.1.b and IV.A.3 above, she concludes that her judgments above, reached with a focus on RBL estimates, would also be expected to provide an additional

desirable degree of protection against visible foliar injury in sensitive vegetation. Accordingly, she considers a conclusion on the appropriateness of selecting a standard that will generally limit cumulative exposures above 17 ppm-hrs to be additionally supported by evidence for visible foliar injury, while not based on specific consideration of this effect.

With the public welfare protection objectives identified above in mind, the Administrator turns to her consideration of form and level for the revised secondary standard. In considering whether the current form should be retained or revised in order to provide the appropriate degree of public welfare protection, the Administrator has considered the analyses of air quality data from the last 13 years that describe the cumulative exposures, in terms of a 3-year W126 index, occurring at monitoring sites across the U.S. when the air quality metric at that location, in terms of the current standard's form and averaging time, is at or below different alternative levels. The Administrator notes both the conclusions drawn from analyses of the strong, positive relationship between these metrics and the findings that indicate the amount of control provided by the fourth-high metric.

The Administrator has also considered advice from CASAC and public commenters that support revision of the form to the W126 exposure index. The Administrator concurs with the underlying premise that $O_3$ effects on vegetation are most directly assessed using a cumulative seasonal exposure metric, specifically the W126 exposure index. The Administrator additionally recognizes, based on analyses of the last 13 years of monitoring data, and consideration of modeling analyses with associated limitations and uncertainties, that cumulative seasonal exposures appear to have a strong relationship with design values based on the current form and averaging time. She additionally notes the correlation of reductions in W126 index values with reductions in precursor emissions over the past decade that were targeted at meeting the current $O_3$ standards (with fourth-high form), which indicate the control of cumulative seasonal exposures that can be achieved with a standard of the current form and averaging time.

With regard to recommendations from the CASAC that the form for the revised secondary standard should be the biologically relevant exposure metric, and related comments from the public indicating that the secondary standard must have such a form, the

Administrator disagrees. In so doing, she notes that CAA section 109 does not impose such a requirement on the form or averaging time for the NAAQS, as explained in IV.C.2 above. She further notes that the averaging time and form of primary standards are often not the same as the exposure metrics used in reviews of primary standards, in which specific information on quantitative relationships between different exposure metrics and health risk is more often available than it is in reviews of secondary NAAQS. As discussed in section IV.C.2 above, with examples, a primary standard with a particular averaging time and form may provide the requisite public health protection from health effects that are most appropriately assessed using an exposure metric of a different averaging time and form and indicator, and the same principle can apply when establishing or revising secondary standards. The Administrator recognizes that the exposure metric and the standard metric can be quite similar, as in the case of consideration of short-term health effects with the primary $O_3$ standard. She also notes, however, as illustrated by the examples described in section IV.C.2 above, that it is not uncommon for the EPA to retain or adopt elements of an existing standard that the Administrator judges in combination across all elements, including in some cases a revised level, to provide the requisite protection under the Act, even if those elements do not neatly correspond to the exposure metric. Accordingly, she concludes that the Act does not require that the secondary $O_3$ standard be revised to match the exposure metric identified as biologically relevant in this review, as long as the revised standard provides the degree of protection required under CAA section 109(b)(2).

Based on the considerations described here, including the use of an exposure metric that CASAC has agreed to be biologically relevant and appropriate, related considerations summarized in the proposal with regard to air quality analyses and common uses of exposure metrics in other NAAQS reviews, the Administrator finds that, in combination with a revised level, the current form and averaging time for a revised secondary standard can be expected to provide the desired level of public welfare protection. Accordingly, she next turns to the important consideration of a level that, in combination with the form and averaging time, will yield a standard that specifies the requisite air quality for protection of public welfare. In so

doing, she has recognized the recommendation by CASAC for revision of the form and averaging time and provided the basis for her alternative view, as described above. Further, in the context of the Administrator's decision on objectives for public welfare protection of a revised secondary standard, and with consideration of the advice from CASAC on levels for a W126-based standard, the Administrator has also reached the conclusion, as described above, that in order to provide the appropriate degree of public welfare protection, the revised secondary standard should restrict cumulative seasonal exposures to 17 ppm-hrs or lower, in terms of a 3-year average W126 index, in nearly all instances. Thus, the Administrator finds it appropriate to revise the standard level to one that, in combination with the form and averaging time, will exert this desired degree of control for cumulative seasonal exposures.

In considering a revised standard level, the Administrator has, in light of public comments, revisited the information she considered in reaching her proposed decision on a level within the range of 65 to 70 ppb, and additional information or insights conveyed with public comments. The primary focus of the Administrator's considerations in reaching her proposed decision was the multi-faceted analysis of air quality data from 2001 through 2013 documented in the technical memo in the docket (Wells, 2014a), as well as the earlier analyses and related information described in the PA (as summarized in section IV.E.4 of the proposal). This analysis describes the occurrences of 3-year W126 index values of a magnitude from 17 ppm-hrs through 7 ppm-hrs at monitor locations where $O_3$ concentrations met different alternative standards with the current form and averaging time, and has been expanded in consideration of public comments to present in summary form the more extensive historical dataset accompanying this analysis (Wells, 2015b). Focusing first on the air quality analyses for the most recent period for which data are available (2011–2013) and with the protection objectives identified above in mind, the Administrator observes that across the sites meeting the current standard of 75 ppb, the analysis finds 25 sites distributed across different NOAA climatic regions with 3-year average W126 index values above 17 ppm-hrs, with the values at nearly half of the sites extending above 19 ppm-hrs, with some well above. In comparison, she observes that across sites meeting an alternative

standard of 70 ppb, the analysis for the period from 2011–2013 finds no occurrences of W126 metric values above 17 ppm-hrs and less than a handful of occurrences that equal 17 ppm-hrs. The more than 500 monitors that would meet an alternative standard of 70 ppb during the 2011–2013 period are distributed across all nine NOAA climatic regions and 46 of the 50 states (Wells, 2015b and associated dataset in the docket).

The Administrator notes that some public commenters, who disagreed with her proposed decision on form and averaging time, emphasized past occurrences of cumulative W126 exposure values above the range identified in the proposal (of 13 to 17 ppm-hrs). For example, these commenters emphasize data from farther back across the full time period of the dataset analyzed in the technical memorandum (2001–2013), identifying a value of 19.1 ppm-hrs at a monitor for which the fourth-high metric is 70 ppb for the 3-year period of 2006–2008. The Administrator notes, as discussed in section IV.C.2 above, that this was one of fewer than a handful of isolated occurrences of sites for which the fourth-high was at or below 70 ppb and the W126 index value was above 17 ppm-hrs, all but one of which were below 19 ppm-hrs. The Administrator additionally recognizes her underlying objective of a revised secondary standard that would limit cumulative exposures in nearly all instances to those for which the median RBL estimate would be somewhat lower than 6%. She observes that the single occurrence of 19 ppm-hrs identified by the commenter among the nearly 4000 3-year W126 index values from across the most recently available 11 3-year periods of data at monitors for which the fourth-high metric is at or below 70 ppb is reasonably regarded as an extremely rare and isolated occurrence (Wells, 2015b). As such, it is unclear whether it would recur, particularly as areas take further steps to reduce $O_3$ to meet revised primary and secondary standards. Further, based on the currently available information, the Administrator does not judge RBL estimates associated with marginally higher exposures in isolated, rare instances to be indicative of adverse effects to the public welfare. Thus, the Administrator concludes that a standard with a level of 70 ppb and the current form and averaging time may be expected to limit cumulative exposures, in terms of a 3-year average W126 exposure index, to values at or below 17 ppm-hrs, in nearly all instances, and

accordingly, to eliminate or virtually eliminate cumulative exposures associated with a median RBL of 6% or greater.

The Administrator recognizes that any standard intended to exert a very high degree of control on cumulative seasonal exposures, with the objective of limiting exposures above 17 ppm-hrs across the U.S., in nearly all instances, will, due to regional variation in meteorology and sources of $O_3$ precursors, result in cumulative seasonal exposures well below 17 ppm-hrs in many areas. Even implementation of a standard set in terms of the cumulative seasonal exposure metric, while limiting the highest exposures, would, due to regional variation in meteorology and sources of $O_3$ precursors, result in many areas with much lower exposures. Such variation in exposures occurring under a specific standard is not unexpected and the overall distribution of exposures estimated to occur with air quality conditions associated with different alternative standards is a routine part of the consideration of public health protection in reviews of primary standards, and can also play a role in the review of secondary standards. For these reasons, and in light of the discussion in section IV.C.2.d above on consideration of "necessary" protection, the Administrator notes that an expectation of differing exposures is not, in itself, a basis for concluding that the air quality would be more (or less) than necessary (and thus not requisite) for the desired level of public welfare protection.

The Administrator has also considered the protection afforded by a revised standard against other effects studied in this review, such as visible foliar injury and reduced yield for agricultural crops, and also including those associated with climate change. While noting the evidence supporting a relationship of $O_3$ in ambient air with climate forcing effects, as concluded in the ISA, the Administrator judges the quantitative uncertainties to be too great to support identification of a standard specific to such effects such that she concludes it is more important to focus, as she has done above, on setting a standard based on providing protection against vegetation-related effects which would be expected to also have positive implications for climate change protection through the protection of ecosystem carbon storage.

The Administrator additionally considers the extent of control for cumulative seasonal exposures exerted by a revised standard level of 65 ppb, the lower end of the proposed range. In

focusing on the air quality analyses for the most recent 3-year period for which data are available, the Administrator observes that across the sites meeting a fourth-high metric of 65 ppb, the analysis finds no occurrences of W126 metric values above 11 ppm-hrs and 35 occurrences of a value between 7 ppm-hrs and 11 ppm-hrs, scattered across NOAA climatic regions. The Administrator finds these magnitudes of cumulative seasonal exposures to extend appreciably below the objectives she identified above for affording public welfare protection. In considering this alternative level, she additionally notes that data for only 276 monitors (less than 25 percent of the total with valid fourth-high and W126 metric values) were at or below a fourth-high value of 65 ppb during the period from 2011–2013. In so noting, she recognizes the appreciably smaller and less geographically extensive dataset available and the associated uncertainty for conclusions based on such an analysis.

Thus, based on the support provided by currently available information on air quality, the evidence base of $O_3$ effects on vegetation and her public welfare policy judgments, and after carefully taking the above comments and considerations into account, fully considering the scientific views of the CASAC, and also taking note of CASAC's policy views, the Administrator has decided to retain the current indicator, form and averaging time and to revise the secondary standard level to 70 ppb. In the Administrator's judgment, based on the currently available evidence and quantitative exposure and air quality information, a standard set at this level, in combination with the currently specified form, averaging time and indicator would be requisite to protect the public welfare from known or anticipated adverse effects. A standard set at this level provides an appreciable increase in protection compared to the current standard. The Administrator judges that such a standard would protect natural forests in Class I and other similarly protected areas against an array of adverse vegetation effects, most notably including those related to effects on growth and productivity in sensitive tree species. The Administrator believes that a standard set at 70 ppb would be sufficient to protect public welfare from known or anticipated adverse effects and believes that a lower standard would be more than what is necessary to provide such protection. This judgment by the Administrator appropriately recognizes

that the CAA does not require that standards be set at a zero-risk level, but rather at a level that reduces risk sufficiently so as to protect the public welfare from known or anticipated adverse effects. Accordingly, the Administrator concludes that it is appropriate to revise the level for the secondary standard to 70 ppb (0.070 ppm), in combination with retaining the current form, indicator, and averaging time, in order to specify the level of air quality that provides the requisite protection to the public welfare from any known or anticipated adverse effects associated with the presence of $O_3$ in the ambient air.

*D. Decision on the Secondary Standard*

For the reasons discussed above, and taking into account information and assessments presented in the ISA and PA, the advice and recommendations of CASAC, and the public comments, as well as public welfare judgments, the Administrator is revising the level of the current secondary standard. Specifically, the Administrator has decided to revise the level of the secondary standard to a level of 0.070 ppm, in conjunction with retaining the current indicator, averaging time and form. Accordingly the revised secondary standard is 0.070 ppm $O_3$, as the annual fourth-highest daily maximum 8-hour average concentration, averaged over three years.

**V. Appendix U: Interpretation of the Primary and Secondary NAAQS for $O_3$**

*A. Background*

The EPA is finalizing the proposed Appendix U to 40 CFR part 50: Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone. The proposed Appendix U addressed the selection of ambient $O_3$ monitoring data to be used in making comparisons with the NAAQS, data reporting and data handling conventions for comparing ambient $O_3$ monitoring data with the level of the NAAQS, and data completeness requirements. The EPA solicited public comment on four elements where the proposed Appendix U differed from Appendix P to 40 CFR part 50, which addressed data handling conventions for the previous $O_3$ NAAQS. These included the following: (1) the addition of a procedure to combine data collected from two or more $O_3$ monitors operating simultaneously at the same physical location, (2) the addition of a provision allowing the Regional Administrator to approve "site combinations", or the combination of data from two nearby

monitoring sites for the purpose of calculating a valid design value, (3) a change from the use of one-half of the method detection limit (½ MDL) to zero (0.000 ppm) as the substitution value in 8-hour average data substitution tests, and 4) a new procedure for calculating daily maximum 8-hour average $O_3$ concentrations for the revised NAAQS.

The EPA is also finalizing, as proposed, exceptional events scheduling provisions in 40 CFR 50.14 that will apply to the submission of information supporting claimed exceptional events affecting pollutant data that are intended to be used in the initial area designations for any new or revised NAAQS. The new scheduling provisions will apply to initial area designations for the 2015 $O_3$ NAAQS.

*B. Data Selection Requirements*

The EPA proposed this section in Appendix U to clarify which data are to be used in comparisons with the revised $O_3$ NAAQS. The EPA is finalizing this section in Appendix U as proposed.

First, the EPA proposed to combine data at monitoring sites with two or more $O_3$ monitoring instruments operating simultaneously into a single site-level data record for determining compliance with the NAAQS, and proposed an analytical approach to perform this combination (79 FR 75351– 75352, December 17, 2014). Several commenters supported the EPA's proposed approach, including the State of Iowa, where 15 of the 20 monitoring sites currently operating two $O_3$ monitors simultaneously are located. Commenters supporting the proposal noted that a similar approach is already being used for lead and particulate monitoring, and that the proposed approach will help states meet data completeness requirements.

A few commenters supported the EPA's proposed approach with the additional restrictions that the monitoring instruments must use identical methods and be operated by the same monitoring agency. The EPA notes that at the time of this rulemaking, all monitors reporting $O_3$ concentration data to the EPA for regulatory use were FEMs. All current $O_3$ FEMs use an ultraviolet photometry sampling methodology and have been found to meet the performance criteria in 40 CFR part 53. Therefore, the EPA has no reason to believe that $O_3$ concentration data should not be combined across monitoring methods at the site level. Regarding the commenters' suggestion that data should not be combined when two or more monitors at the same site are operated by different monitoring agencies, the EPA is aware of only one

instance where this presently occurs. In this instance, the monitors have been assigned distinct site ID numbers in the AQS database, so that data will not be combined across these monitors. Should future instances arise where two or more monitoring agencies decide to operate $O_3$ monitors at the same site, the EPA encourages these agencies to work together to establish a plan for how the data collected from these monitors should be used in regulatory decision making.

One state objected to combining data across monitors because the secondary monitors at their sites were used only for quality assurance purposes and data from these monitors should not be combined with data reported from the primary monitors. The EPA notes that concentration data collected to meet quality assurance requirements (*i.e.* precision and bias data) are reported and stored in a separate location within the AQS database and are not used for determining compliance with the NAAQS. The required quality assurance data are derived from $O_3$ standards and not from a separate $O_3$ monitor. However, if a separate $O_3$ monitor is used strictly for quality assurance purposes and does not meet the applicable monitoring requirements, it can be distinguished in AQS in such a manner that data from the secondary monitor would not be combined with data from the primary monitor.

Another commenter objected to the proposal because it would reduce the total number of comparisons made with the NAAQS. While this is true, the number of physical locations being compared with the NAAQS will not decrease under the proposed approach, and in fact may increase due to additional sites meeting the data completeness requirements.

Finally, two commenters submitted similar comments citing the EPA's evaluation of collocated $O_3$ monitoring data and precision data in the ISA (U.S. EPA, 2013, section 3.5.2), and stated that although the median differences in concentrations reported by the pairs of monitoring instruments were near zero, the extreme values were close to +/− 3.5%. The commenter argued that since the $O_3$ NAAQS are based on the fourth-highest annual value, data should not be combined across monitors because of the imprecision in the extreme values. The EPA disagrees, noting that the data presented in the ISA are based on hourly concentrations, while design values for the $O_3$ NAAQS are based on a 3-year average of 8-hour average concentrations. Thus, the random variability in the hourly $O_3$ concentration data due to monitoring

imprecision will be reduced when concentrations are averaged for comparison with the NAAQS. Additionally, the precision data are typically collected at concentrations at or above the level of the NAAQS, thus the EPA expects that the level of precision documented in the ISA analysis is consistent with the level of precision in the fourth-highest daily maximum concentrations used for determining compliance with the NAAQS.

The EPA is finalizing this addition in Appendix U as proposed. In addition, the AQS database will be updated to require state agencies to designate a primary monitor at $O_3$ monitoring sites that report data under more than one Pollutant Occurrence Code (POC), a numeric indicator in AQS used to identify individual monitoring instruments. $O_3$ design value calculations in AQS will be updated so that the data will automatically be combined across POCs at a site, and a single design value will be reported for each site. The EPA notes that the substitution approach described above will only be applied to design value calculations for the revised $O_3$ standards, and that design values for previous $O_3$ standards will continue to be calculated at the monitor level, in accordance with the applicable appendices of 40 CFR part 50.

Second, the EPA proposed to add a provision in Appendix U that would allow the Regional Administrator to approve "site combinations", or to combine data across two nearby monitors for the purpose of calculating a valid design value. Although data handling appendices for previous $O_3$ standards do not explicitly mention site combinations, the EPA has approved over 100 site combinations since the promulgation of the first 8-hour $O_3$ NAAQS in 1997. Thus, the EPA's intention in proposing this addition was merely to codify an existing convention, and to improve transparency by implementing site combinations in AQS design value calculations.

Public commenters unanimously supported this proposed addition. Two commenters suggested that the EPA should require monitoring agencies to provide technical documentation supporting the similarities between sites approved for combining data, including a requirement for simultaneous monitoring whenever possible. One state requested that the EPA provide more detailed acceptability criteria for approving site combinations, while another state urged the EPA not to create a regulatory burden by

prescribing detailed requirements codified in regulations.

The EPA is finalizing this addition as proposed in Appendix U. The EPA believes that approval of site combinations should be handled on a case-by-case basis, and that any requests for supporting documentation should be left to the discretion of the Regional Administrator. The EPA may issue future guidance providing general criteria for determining an acceptable level of similarity in air quality concentrations between monitored locations, but is not prescribing detailed criteria for approval of site combinations in this rulemaking.

Additionally, the AQS database will be updated with new fields for monitoring agencies to request site combinations, and an additional field indicating Regional Administrator approval. All pre-existing site combinations will be initially entered into the database as having already been approved by the Regional Administrator. Since this provision has already been used in practice under previous $O_3$ standards, site combinations will be applied to AQS design value calculations for both the revised $O_3$ standards and previous $O_3$ standards.

*C. Data Reporting and Data Handling Requirements*

First, the EPA proposed a change in Appendix U to the pre-existing 8-hour average data substitution test (40 CFR part 50, Appendix P, section 2.1) which is used to determine if a site would have had a valid 8-hour average greater than the NAAQS when fewer than 6 hourly $O_3$ concentration values are available for a given 8-hour period. The EPA proposed to change the value substituted for the missing hourly concentrations from one-half of the method detection limit of the $O_3$ monitoring instrument ($\frac{1}{2}$MDL) to zero (0.000 ppm).

Several commenters supported the proposed change, stating that the use of a constant substitution value instead of $\frac{1}{2}$ MDL, which can vary across $O_3$ monitoring methods, would simplify design value calculations. One commenter noted that with a substitution value of zero, the data substitution test for an 8-hour average value greater than the NAAQS is equivalent to a sum of hourly $O_3$ concentrations greater than 0.567 ppm (*i.e.,* if the sum is 0.568 ppm or higher, the resulting 8-hour average must be at least 0.071 ppm, which is greater than the revised $O_3$ NAAQS of 0.070 ppm). Finally, one commenter opposed the proposed change in favor of some type

of mathematical or statistical interpolation approach, but did not provide a specific recommendation.

The EPA is finalizing the proposed change in Appendix U, with the addition of a short clause making note of the equivalent summation approach described above. The purpose of the data substitution test is to identify 8-hour periods that do not meet the requirements for a valid 8-hour average, yet the reported hourly concentration values are so high that the NAAQS would have been exceeded regardless of the magnitude of the missing concentration values. The EPA believes that zero, being the lowest measured $O_3$ concentration physically possible, is the most appropriate value to substitute in this situation. Additionally, the EPA does not support the use of interpolation or other means of filling in missing monitoring data for $O_3$ NAAQS comparisons. Such an approach would be contrary to the EPA's long-standing policy of using only quality-assured and certified ambient air quality measurement data to determine compliance with the $O_3$ NAAQS.

Second, the EPA proposed a new procedure in Appendix U for determining daily maximum 8-hour $O_3$ concentrations for the revised NAAQS.[213] The EPA proposed to determine the daily maximum 8-hour $O_3$ concentration based on 17 consecutive moving 8-hour periods in each day, beginning with the 8-hour period from 7:00 a.m. to 3:00 p.m., and ending with the 8-hour period from 11:00 p.m. to 7:00 a.m. In addition, the EPA proposed that a daily maximum value would be considered valid if 8-hour averages were available for at least 13 of the 17 consecutive moving 8-hour periods, or if the daily maximum value was greater than the level of the NAAQS. This procedure is designed to eliminate "double counting" exceedances of the NAAQS based on overlapping 8-hour periods from two consecutive days with up to 7 hours in common, which was allowed under previous 8-hour $O_3$ NAAQS. A dozen public commenters expressed support for the proposed procedure, including several states.

One regional air quality management organization and three of its member states submitted similar comments stating that they agreed with the principle of eliminating "double counting" exceedances of the NAAQS

---

[213] This procedure will be adopted only for the revised $O_3$ NAAQS. Design values for the 1997 8-hour $O_3$ NAAQS and the 2008 8-hour $O_3$ NAAQS will continue to be calculated according to Appendix I and Appendix P of 40 CFR part 50, respectively.

based on overlapping 8-hour periods, but suggested an alternative calculation procedure that would accomplish the same objective. The alternative procedure iteratively finds the highest 8-hour period in a given year, then removes this 8-hour period and all other 8-hour periods associated with that day, including any overlapping 8-hour periods on adjacent days, from the data until a daily maximum value is determined for each day of the year with sufficient monitoring data. The EPA examined a similar iterative procedure in a previous data analysis supporting the proposal (Wells, 2014b, Method 1). The EPA compared this procedure to the procedure proposed by the commenters using the data from the original analysis and found the resulting daily maximum 8-hour values to be nearly identical (Wells, 2015a). Additionally, the commenters' procedure suffers from the same limitations the EPA identified previously in the original analysis: added complexity in design value calculations, longer computational time, and challenges to real-time $O_3$ data reporting systems, which would have to re-calculate daily maximum 8-hour values for the entire year each time the system was updated with new data.

Three states submitted comments stating that they agreed with the proposed calculation procedure, but disagreed with the proposed requirements for determining a valid daily maximum 8-hour $O_3$ concentration. These states were primarily concerned that the proposed requirements would only allow a monitoring site to have four missing 8-hour averages during a day before the entire day would be invalidated, compared with six missing 8-hour averages allowed previously. Two of these states also stated concerns that the proposed requirements would be more difficult to meet while maintaining compliance with existing monitoring requirements such as biweekly quality assurance checks. The EPA compared annual data completeness rates calculated using the Appendix U requirements to annual data completeness rates calculated using the requirements under the previous $O_3$ standards across all U.S. monitoring sites based on data from 2004–2013 (Wells, 2015a). The national mean annual data completeness rate was 0.1% higher under the proposed Appendix U requirements than under the previous $O_3$ standards, and the national median annual data completeness rates were identical. In addition, the EPA notes that the Appendix U requirements allow

for biweekly quality assurance checks and other routine maintenance to be performed between 5:00 a.m. and 9:00 a.m. local time without affecting data completeness. Thus, the EPA does not believe that the proposed daily data completeness requirements in Appendix U will be more difficult for monitoring agencies to meet.

Finally, two public commenters opposed the proposed procedures for determining daily maximum 8-hour concentrations. These commenters expressed similar concerns, primarily that not considering 8-hour periods starting midnight to 6:00 a.m. is less protective of public health than the procedure used to determine daily maximum 8-hour concentrations for the previous $O_3$ standards. The EPA believes that this approach provides the appropriate degree of protection for public health, noting that the hourly concentrations from midnight to 7:00 a.m. are covered under the 8-hour period from 11:00 p.m. to 7:00 a.m., which is included in the design value calculations proposed in Appendix U. At the same time, the proposed approach ensures that individual hourly concentrations may not contribute to multiple exceedances of the NAAQS, which the EPA believes is inappropriate given that people are only exposed once.

The EPA is finalizing as proposed in Appendix U the procedure for determining daily maximum 8-hour concentrations. The EPA does not believe that daily maximum 8-hour concentrations for two consecutive days should be based on overlapping 8-hour periods, since the exposures experienced by individuals only occur once. The EPA believes that the new procedure will avoid this outcome while continuing to make use of all hourly concentrations in determining attainment of the standards, without introducing unnecessary complexity into design value calculations, and without creating additional difficulties for monitoring agencies to meet the data completeness requirements.

*D. Exceptional Events Information Submission Schedule*

The "Treatment of Data Influenced by Exceptional Events; Final Rule" (72 FR 13560, March 22, 2007), known as the Exceptional Events Rule and codified at 40 CFR 50.14, contains generic deadlines for an air agency to submit to the EPA specified information about exceptional events and associated air pollutant concentration data. As discussed in this section and in more detail in the $O_3$ NAAQS proposal, without revisions to 40 CFR 50.14, an

air agency may not be able to flag and submit documentation for some relevant data either because the generic deadlines may have already passed by the time a new or revised NAAQS is promulgated or because the generic deadlines require submission of documentation at least 12 months prior to the date by which the EPA must make a regulatory decision, which may be before air agencies have collected some of the potentially affected data. Specific to the revised $O_3$ NAAQS, revisions to 40 CFR 50.14 are needed because it is not possible for air agencies to flag and submit documentation for any exceptional events that occur in October through December of 2016 by 1 year before the designations are made in October 2017, as is required by the existing generic schedule.

The EPA is finalizing exceptional events scheduling provisions in 40 CFR 50.14, as proposed and as supported by multiple commenters, that will apply to the submission of information supporting claimed exceptional events affecting pollutant data that are intended to be used in the initial area designations for any new or revised NAAQS. The new scheduling provisions will apply to initial area designations for the revised $O_3$ NAAQS. The provisions that we are promulgating use a "delta schedule" that calculates the timelines associated with flagging data potentially influenced by exceptional events, submitting initial event descriptions and submitting exceptional events demonstrations based on the promulgation date of a new or revised NAAQS. The general data flagging deadlines in the Exceptional Events Rule at 40 CFR 50.14(c)(2)(iii) and the general schedule for submission of demonstrations at 40 CFR 50.14(c)(3)(i) continue to apply to data used in regulatory decisions other than those related to the initial area designations process under a new or revised NAAQS.[214]

The EPA acknowledges the concern raised by several commenters that a strengthened $O_3$ NAAQS may result in numerous demonstrations for exceptional events occurring between 2014 and 2016, the data years that the EPA will presumably use for initial area designation decisions made in October 2017.[215] Commenters noted that the proposed schedule is particularly burdensome for agencies needing to submit exceptional events packages for

---

[214] The EPA intends to consider changes to these retained scheduling requirements as part of the planned notice and comment rulemaking revisions to the 2007 Exceptional Events Rule.

[215] Governors may also use 2013 data to formulate their recommendations regarding designations.

the third year to be used in a 3-year design value (*i.e.,* 2016 data). Several commenters recommended that the EPA either establish no defined schedule for data flagging and exceptional events demonstration submittal or allow a minimum of 2 years from the setting of any new or revised NAAQS for air agencies to provide a complete exceptional events demonstration. Given the CAA requirement that the EPA follow a 2-year designations schedule, the EPA cannot remove submittal schedules entirely for data influenced by exceptional events or provide a minimum 2-year period from the setting of a new or revised NAAQS for documentation submittal. Neither of these options would ensure that the EPA has time to consider event-influenced data in initial area designation decisions. Rather, the EPA is promulgating in this action an exceptional events schedule that provides air agencies with the maximum amount of time available to prepare exceptional events demonstrations and will still allow the EPA sufficient time to consider such exceptional events demonstrations in the designations process in advance of the date by which the EPA must send 120-day notification letters to states.[216] The EPA recognizes that the schedule promulgated in this action is compressed, particularly for the third year of data to be used in a 3-year design value, and we will work cooperatively with air agencies to accommodate this scenario.

Under the schedule promulgated in this action and assuming initial area designation decisions in October 2017 for the revised O₃ NAAQS, affected air agencies would need to flag data, submit initial event descriptions and submit demonstrations for exceptional events occurring in 2016 by May 31, 2017. This schedule provides approximately 5 months between the EPA's receipt of the demonstration package and the expected date of designation decisions and approximately 1 month between the EPA's receipt of a package and the date by which the EPA must notify states and tribes of intended modifications to the Governors' recommendations for designations (*i.e.,* 120-day letters).

While, for the third year of data anticipated to be used in a 3-year design value for the revised O₃ NAAQS, the promulgated schedule provides for demonstration submission 5 months after the end of the calendar year, the EPA expects that most submitting

---

[216] See Section VIII.B for additional detail on the initial area designations process for the revised O₃ NAAQS.

---

agencies will have additional time to prepare documentation as we expect the majority of potential O₃-related exceptional events to occur during the warmer months (*e.g.,* March through October). Additionally, the EPA will soon propose rule revisions to the 2007 Exceptional Events Rule and will release through a **Federal Register** Notice of Availability a draft guidance document to address Exceptional Events Rule criteria for wildfires that could affect O₃ concentrations. We expect to promulgate Exceptional Events Rule revisions and finalize the new guidance document before the October 2016 date by which states, and any tribes that wish to do so, are required to submit their initial designation recommendations for the revised O₃ NAAQS. Considered together, the EPA believes the exceptional events scheduling dates promulgated in this action, the upcoming Exceptional Events Rule revisions, the forthcoming guidance, and the existing guidance and examples of submitted demonstrations currently on the EPA's exceptional events Web site at *http://www2.epa.gov/air-quality-analysis/treatment-data-influenced-exceptional-events*, will help air agencies submit information in a timely manner.

Applying the "delta schedule" promulgated in this action for air quality data collected in 2013 through 2014 that could be influenced by exceptional events and be considered during the initial area designations process for the revised O₃ NAAQS, results in extending to July 1, 2016, the otherwise applicable generic deadlines of July 1, 2014, and July 1, 2015, respectively, for flagging data and providing an initial description of an event (40 CFR 50.14(c)(2)(iii)). The schedule promulgated in this action also results in a July 1, 2016, date for flagging data and providing an initial description of an event for air quality data collected in 2015. The July 1, 2016, date for data collected in 2015 is the same as that which would apply under the existing generic deadline in the 2007 Exceptional Events Rule. Under the schedule promulgated in this action, October 1, 2016 is the deadline for submitting exceptional events demonstrations for data years 2013 through 2015. As noted previously, under the schedule promulgated in this action, affected air agencies would need to flag, submit initial event descriptions and submit demonstrations for exceptional events occurring in 2016 by May 31, 2017. The EPA believes these revisions will provide adequate time for air agencies to review potential O₃

exceptional events influencing compliance with the revised O₃ NAAQS, to notify the EPA by flagging the relevant data and providing an initial event description in AQS, and to submit documentation to support exceptional events demonstrations. The schedule revisions promulgated in this action will also allow the EPA to consider and act on the submitted information during the initial area designation process.

While the EPA will make every effort to designate areas for any new or revised NAAQS on a 2-year schedule, the EPA recognizes that under some circumstances we may need up to an additional year for the designations process to ensure that air agencies and the EPA base designations decisions on complete and sufficient information. The promulgated schedule accounts for the possibility that the EPA might announce after promulgating a new or revised NAAQS that we are extending the designations schedule beyond 2 years using authority provided in CAA section 107(d)(B)(i). If the EPA determines that we will follow a 3-year designation schedule, the deadline is 2 years and 7 months after promulgation of a new or revised NAAQS for states to flag data influenced by exceptional events, submit initial event descriptions and submit exceptional events demonstrations for the last year of data that will be used in the designations (*e.g.,* if the EPA were to designate areas in October 2018, the exceptional events submittal deadline for 2017 data would be May 31, 2018). If the EPA notifies states and tribes of a designations schedule between 2 and 3 years, the deadline for states to flag data affected by exceptional events, submit initial event descriptions, and submit exceptional events demonstrations associated with data from the last year to be considered would be 5 months prior to the date specified for designation decisions.

Therefore, using the authority provided in CAA section 319(b)(2) and in the 2007 Exceptional Events Rule at 40 CFR 50.14(c)(2)(vi), the EPA is modifying the schedule for flagging data and submitting exceptional events demonstrations considered for initial area designations by replacing the deadlines and information in Table 1 in 40 CFR 50.14 with the deadlines and information presented in Table 5. As we did in the O₃ NAAQS proposal, we are also providing Table 6 to illustrate how the promulgated schedule might apply to the designations process for the revised O₃ NAAQS and to designations

processes for other future new or revised NAAQS.[217]

Additionally, in conjunction with promulgating exceptional events

schedules for initial area designations for new or revised NAAQS, the EPA, as proposed, is removing obsolete regulatory language in 40 CFR

50.14(c)(2)(iv) and (v) and 40 CFR 50.14(c)(3)(ii) and (iii) associated with exceptional events schedules for all historical standards.

TABLE 5—SCHEDULE FOR FLAGGING AND DOCUMENTATION SUBMISSION FOR DATA INFLUENCED BY EXCEPTIONAL EVENTS FOR USE IN INITIAL AREA DESIGNATIONS

| Exceptional events/Regulatory action | Exceptional events deadline schedule [d] |
|---|---|
| Flagging and Initial event description deadline for data years 1, 2 and 3 [a]. | If state and tribal initial designation recommendations for a new/revised NAAQS are due August through January, then the flagging and initial event description deadline will be the July 1 prior to the recommendation deadline. If state and tribal recommendations for a new/revised NAAQS are due February through July, then the flagging and initial event description deadline will be the January 1 prior to the recommendation deadline. |
| Exceptional events demonstration submittal deadline for data years 1, 2 and 3 [a]. | No later than the date that state and tribal recommendations are due to the EPA. |
| Flagging, initial event description and exceptional events demonstration submittal deadline for data year 4 [b] and, where applicable, data year 5 [c]. | By the last day of the month that is 1 year and 7 months after promulgation of a new/revised NAAQS, unless either option a or b applies.<br>a. If the EPA follows a 3-year designation schedule, the deadline is 2 years and 7 months after promulgation of a new/revised NAAQS.<br>b. If the EPA notifies the state/tribe that it intends to complete the initial area designations process according to a schedule between 2 and 3 years, the deadline is 5 months prior to the date specified for final designations decisions in such EPA notification. |

[a] Where data years 1, 2, and 3 are those years expected to be considered in state and tribal recommendations.

[b] Where data year 4 is the additional year of data that the EPA may consider when it makes final area designations for a new/revised NAAQS under the standard designations schedule.

[c] Where data year 5 is the additional year of data that the EPA may consider when it makes final area designations for a new/revised NAAQS under an extended designations schedule.

[d] The date by which air agencies must certify their ambient air quality monitoring data in AQS is annually on May 1 of the year following the year of data collection as specified in 40 CFR 58.15(a)(2). In some cases, however, air agencies may choose to certify a prior year's data in advance of May 1 of the following year, particularly if the EPA has indicated its intent to promulgate final designations in the first 8 months of the calendar year. Data flagging, initial event description and exceptional events demonstration deadlines for ''early certified'' data will follow the deadlines for ''year 4'' and ''year 5'' data.

---

[217] The range of dates identified in Table 6 is illustrative of the dates for the revised $O_3$ NAAQS. Users could increment these dates by any constant number (for example by 6 years for a hypothetical NAAQS promulgated in 2021) to develop a table with dates relevant to NAAQS promulgated in the future.

BLM_0047425

Table 6. Examples by Month of Applying the Promulgated Revised Schedule for Flagging and Documentation Submission for Data Influenced by Exceptional Events for Use in Initial Area Designations

| Exceptional Events / Regulatory Action | Exceptional Events Deadline Schedule[c] | Month of NAAQS Promulgation, State and Tribal Recommendation, and Final Designations | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May[d] | Jun[d] | Jul[d] | Aug[d] | Sep | Oct |
| | | Oct 2015 | Nov 2015 | Dec 2015 | Jan 2016 | Feb 2016 | Mar 2016 | Apr 2016 | May 2016 | Jun 2016 | Jul 2016 | Aug 2016 | Sep 2016 | Oct 2016 |
| Flagging and initial event description deadline for data years 1, 2, and 3.[a] | If state and tribal initial designation recommendations for a new/revised NAAQS are due August through January, then the flagging and initial event description deadline will be the July 1 prior to the recommendation deadline. If state and tribal recommendations for a new/revised NAAQS are due February through July, then the flagging and initial event description deadline will be the January 1 prior to the recommendation deadline. | July 1, 2016 (data years 2013, 2014, 2015) | July 1, 2016 (data years 2013, 2014, 2015) | July 1, 2016 (data years 2013, 2014, 2015) | July 1, 2016 (data years 2013, 2014, 2015) | Jan 1, 2017 (data years 2013, 2014, 2015) | Jan 1, 2017 (data years 2013, 2014, 2015) | Jan 1, 2017 (data years 2013, 2014, 2015) | Jan 1, 2017 (data years 2013, 2014, 2015) | Jan 1, 2017 (data years 2014, 2015, 2016) | Jan 1, 2017 (data years 2014, 2015, 2016) | July 1, 2017 (data years 2014, 2015, 2016) | July 1, 2017 (data years 2014, 2015, 2016) | July 1, 2017 (data years 2014, 2015, 2016) |
| Exceptional events demonstration submittal deadline for data years 1, 2, and 3.[a] | No later than the date that state and tribal recommendations are due to EPA. | by Oct 2016 (data years 2013, 2014, 2015) | by Nov 2016 (data years 2013, 2014, 2015) | by Dec 2016 (data years 2013, 2014, 2015) | by Jan 2017 (data years 2013, 2014, 2015) | by Feb 2017 (data years 2013, 2014, 2015) | by Mar 2017 (data years 2013, 2014, 2015) | by Apr 2017 (data years 2013, 2014, 2015) | by May 2017 (data years 2013, 2014, 2015) | by June 2017 (data years 2014, 2015, 2016) | by July 2017 (data years 2014, 2015, 2016) | by Aug 2017 (data years 2014, 2015, 2016) | by Sep 2017 (data years 2014, 2015, 2016) | by Oct 2017 (data years 2014, 2015, 2016) |
| AQS quality assurance and data certification | Annually on May 1 of the year following the year of data collection | May 1 | May 1 | May 1 | May 1 | May 1 | May 1 | May 1 | May 1 | May 1 | May 1 | May 1 | May 1 | May 1 |
| Flagging, initial event description and exceptional events demonstration submittal deadline for data year 4[b] and, where applicable, data year 5.[c] | By the last day of the month that is 1 year and 7 months after promulgation of a new/revised NAAQS, unless either option a or b applies. a. If the EPA follows a 3 year designation schedule, the deadline is 2 years and 7 months after promulgation of a new/revised NAAQS. b. If the EPA notifies the state/tribe that it intends to complete the initial area designations process according to a schedule between 2 and 3 years, the deadline is 5 months prior to the date specified for final designations decisions in such EPA notification. | by May 31, 2017 (data year 2016) | by June 30, 2017 (data year 2016) | by July 31, 2017 (data year 2016) | by Aug 31, 2017 (data year 2016 and potentially 2017) | by Sep 30, 2017 (data year 2016 and potentially 2017) | by Oct 31, 2017 (data year 2016 and potentially 2017) | by Nov 30, 2017 (data year 2016 and potentially 2017) | by Dec 31, 2017 (data year 2016 and potentially 2017) | by Jan 31, 2018 (data year 2017) | by Feb 28/29, 2018 (data year 2017) | by Mar 31, 2018 (data year 2017) | by Apr 30, 2018 (data year 2017) | by May 31, 2018 (data year 2017) |
| **State & Tribal Recommendations to EPA** | | **Oct 2016** | **Nov 2016** | **Dec 2016** | **Jan 2017** | **Feb 2017** | **Mar 2017** | **Apr 2017** | **May 2017** | **June 2017** | **July 2017** | **Aug 2017** | **Sep 2017** | **Oct 2017** |
| **EPA notifies States/Tribes of intended modifications to recommendations (EPA sends 120-day letters)** | | **June 2017** | **July 2017** | **Aug 2017** | **Sep 2017** | **Oct 2017** | **Nov 2017** | **Dec 2017** | **Jan 2018** | **Feb 2018** | **Mar 2018** | **Apr 2018** | **May 2018** | **June 2018** |
| **Administrator Promulgates Final Designations** | | **Oct 2017** | **Nov 2017** | **Dec 2017** | **Jan 2018** | **Feb 2018** | **Mar 2018** | **Apr 2018** | **May 2018** | **June 2018** | **July 2018** | **Aug 2018** | **Sep 2018** | **Oct 2018** |

[a] Where data years 1, 2, and 3 are those years expected to be considered in state and tribal recommendations.
[b] Where data year 4 is the additional year of data that the EPA may consider when it makes final area designations for a new/revised NAAQS under the standard designations schedule.
[c] Where data year 5 is the additional year of data that the EPA may consider when it makes final area designations for a new/revised NAAQS under an extended designations schedule.
[d] The date by which air agencies must certify their ambient air quality monitoring data in AQS is annually on May 1 of the year following the year of data collection as specified in 40 CFR 58.15(a)(2). In some cases, however, air agencies may choose to certify a prior year's data in advance of May 1 of the following year, particularly if the EPA has indicated its intent to promulgate final designations in the first 8 months of the calendar year. Data flagging, initial event description and exceptional events demonstration deadlines for "early certified" data will follow the deadlines for "year 4" and "year 5" data.

BLM_0047426

## VI. Ambient Monitoring Related to $O_3$ Standards

### A. Background

The EPA proposed to revise the state-by-state $O_3$ monitoring seasons; the PAMS monitoring requirements; the FRM for measuring $O_3$; and the FEM performance requirement specifications for automated $O_3$ analyzers. The EPA also proposed to make additional minor changes to the FEM analyzer performance testing requirements for $NO_2$ and particulate matter in part 53.

The EPA is finalizing changes to the length of the required $O_3$ monitoring season for 32 states and the District of Columbia. Section VI.B of this preamble provides an overview of the proposed changes to the length of the required $O_3$ monitoring seasons, a summary of significant public comments and our responses, and a summary of the final decisions made to the $O_3$ monitoring seasons for each state.

The EPA is finalizing changes to the PAMS monitoring requirements in 40 CFR part 58, Appendix D Section 5. Section VI.C of this preamble provides background on the PAMS program and current monitoring requirements, a summary of the proposed changes to the PAMS requirements, a summary of significant public comments and our responses, and a summary of the changes to the PAMS requirements in this final rule.

The EPA is finalizing changes to the FRM for $O_3$ in Section VI.D of this preamble and to the associated FEM performance requirement specifications for automated $O_3$ analyzers in Section VI.E. A summary of significant public comments and our responses are provided and a summary of the final changes to the FRM and FEM requirements in this final rule. The EPA is also finalizing minor additional changes to Part 53 including conforming changes to the FEM performance testing requirements in Table B–1 and Figure B–5 for $NO_2$; extending the period of time for the Administrator to take action on a request for modification of a FRM or FEM from 30 days to 90 days in part 53.14; and removing an obsolete provision for manufacturers to submit Product Manufacturing Checklists for fine and coarse particulate matter monitors in part 53.9.

### B. Revisions to the Length of the Required $O_3$ Monitoring Seasons

Unlike the ambient monitoring requirements in 40 CFR part 58 for other criteria pollutants that mandate year-round monitoring at State and Local Air Monitoring Stations (SLAMS), $O_3$ monitoring is only required during the seasons of the year that are conducive to $O_3$ formation. These seasons vary in length from place-to-place as the conditions conducive to the formation of $O_3$ (i.e., seasonally-dependent factors such as ambient temperature, strength of solar insolation, and length of day) differ by location. In some locations, conditions conducive to $O_3$ formation are limited to the summer months of the year. In other states with warmer climates (e.g., California, Nevada, and Arizona), the currently required $O_3$ season is year-round. Elevated levels of winter-time $O_3$ have also been measured in some western states where precursor emissions can interact with sunlight off the snow cover under very shallow, stable boundary layer conditions (U.S. EPA 2013).

The EPA has determined that the proposed lengthening of the $O_3$ monitoring seasons in 32 states and the District of Columbia is appropriate. Ambient $O_3$ concentrations in these areas could approach or exceed the level of the NAAQS, more frequently and during more months of the year compared with the current season lengths. It is important to monitor for $O_3$ during the periods when ambient concentrations could approach the level of the NAAQS to ensure that the public is informed when exposure to $O_3$ could reach or has reached a level of concern.

The EPA completed an analysis to address whether extensions of currently required monitoring seasons are appropriate (Rice, 2014). In this analysis, we used all available data in AQS, including data from monitors that collected $O_3$ data year-round during 2010–2013. More than half of $O_3$ monitors are voluntarily operated on a year-round basis by monitoring agencies. We determined the number of days where one or more monitors had a daily maximum 8-hour $O_3$ average equal to or above 0.060 ppm in the months outside each state's current $O_3$ monitoring season and the pattern of those days in the out-of-season months. We believe that a threshold of 0.060 ppm, taking into consideration reasonable uncertainty, serves as an appropriate indicator of ambient conditions that may be conducive to the formation of $O_3$ concentrations that approach or exceed the NAAQS. We also considered regional consistency, particularly for those states with little available data. We note that seasonal $O_3$ patterns vary year-to-year due primarily to highly variable meteorological conditions conducive to the formation of elevated $O_3$ concentrations early or late in the season in some years and not others. The EPA believes it is important that $O_3$ monitors operate during all periods when there is a reasonable possibility of ambient levels approaching the level of the NAAQS.

Basing $O_3$ monitoring season requirements on the goal of ensuring monitoring when ambient $O_3$ levels approach or exceed the level of the NAAQS supports established monitoring network objectives described in Appendix D of Part 58, including the requirement to provide air pollution data to the general public in a timely manner [218] and to support comparisons of an area's air pollution levels to the NAAQS. The operation of $O_3$ monitors during periods of time when ambient levels approach or exceed the level of the NAAQS ensures that unusually sensitive people and sensitive groups are alerted to $O_3$ levels of potential health concern allowing them to take precautionary measures. The majority of $O_3$ monitors in the U.S. report to AIRNOW,[219] as well as to state-operated Web sites and automated phone reporting systems. These programs support many objectives including real-time air quality reporting to the public, $O_3$ forecasting, and the verification of real-time air quality forecast models.

#### 1. Proposed Changes to the Length of the Required $O_3$ Monitoring Seasons

The EPA proposed to extend the length of the required $O_3$ monitoring season in 32 states and the District of Columbia. The proposed changes were an increase of one month for 22 states (Connecticut, Delaware, Idaho, Illinois, Iowa, Kansas, Maryland, Massachusetts, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Texas (northern portion only), Virginia, and West Virginia) and the District of Columbia, an increase of one and one half months for Wisconsin, an increase of two months for four states (Indiana, Michigan, Montana, and North Dakota), an increase of four months for Florida and South Dakota, an increase of five months for Colorado, and an increase of seven months for Utah. For Wyoming, we proposed to add three months at the beginning of the season and remove one month at the end of the season, resulting in a net increase of two months. Ozone season requirements are currently split by Air Quality Control Region (AQCR) in Louisiana and Texas. We proposed lengthening the required season in the northern part of Texas (AQCR 022, 210,

---

[218] Public reporting requirements are detailed in 40 CFR part 58 Appendix G, Uniform Air Quality Index (AQI) and Daily Reporting.

[219] See http://airnow.gov/.

BLM_0047427

211, 212, 215, 217, and 218) by one month and leaving the year-round $O_3$ season in the southern part of Texas (AQCRs 106, 153, 213, 214, and 216) unchanged. No changes were proposed for the AQCRs in Louisiana. As noted earlier, in a few states with limited available data and few exceedance days outside the currently-required season (Iowa, Missouri, and West Virginia), the proposed changes were made by considering supporting information from the surrounding states. These changes involved the proposed addition of one month (March) to the currently-required $O_3$ seasons for these states.

The EPA also proposed that $O_3$ monitors at all National Core Multipollutant Monitoring Stations (NCore) be operated year-round, January through December, regardless of the length of the required $O_3$ season for the remainder of the SLAMS within each state.

We noted that the EPA Regional Administrators have previously approved deviations from the required $O_3$ monitoring seasons as allowed by paragraph 4.1(i) of 40 CFR part 58, Appendix D. We proposed to retain the rule language permitting such deviations from the required $O_3$ monitoring seasons, but note that finalized changes to $O_3$ monitoring season requirements would revoke all existing Regional Administrator-granted waiver approvals. As appropriate, monitoring agencies could seek new approvals for seasonal deviations. Any seasonal deviations based on the Regional Administrator's waiver of requirements must be described in the state's annual monitoring network plan and updated in the AQS.

Given the timing of the final rulemaking and any associated burden on state/local monitoring agencies to implement the extended $O_3$ seasons, we proposed that implementation of the revised $O_3$ seasons would become effective at SLAMS (including NCore sites) on January 1, 2017. We solicited comment on whether the revised seasons could be implemented beginning January 1, 2016, for all monitors or for a subset of monitors, such as those currently operating year-round or on a schedule that corresponds to the proposed $O_3$ season.

2. Comments on the Length of the Required $O_3$ Monitoring Seasons

We received several comments on the proposed revisions to $O_3$ monitoring seasons. Several commenters supported the proposed $O_3$ season length changes and agreed that $O_3$ monitoring seasons should reflect the times of year when $O_3$ may approach or exceed the level of the

NAAQS. A few commenters noted the complexities that would arise in the implementation of multi-state planning agreements if states that shared an MSA had different required $O_3$ monitoring seasons. Two state agencies that supported season length changes also recommended changes to neighboring states' $O_3$ seasons. New York recommended that Connecticut's proposed $O_3$ season be further extended (adding the month of October) to match the proposed season in New York (March–October) because they share a major MSA and nonattainment area, and the highest design value monitor in the nonattainment area is often in Connecticut. The results from the EPA's analysis did not support the addition of October for Connecticut. The EPA recognizes that there may be value in having a consistent $O_3$ season across multi-state planning areas. We recommend that monitoring agency representatives from New York and Connecticut contact their respective EPA Regional Office to jointly develop a monitoring plan to provide coverage of the MSA for a longer period of time. Consistent with the results from the EPA's analysis and consistent with our proposal, the EPA is finalizing the March–October season in New York and the March–September season in Connecticut.

Although no changes were proposed for Arkansas, the Arkansas Department of Environmental Quality recommended that the $O_3$ season in the nonattainment area that includes Crittenden County, Arkansas (March–November) be consistent with the $O_3$ seasons in Tennessee (March–October) and Mississippi (March–October) by either shortening the $O_3$ season in Arkansas or lengthening the $O_3$ season by one month in Tennessee and Mississippi. Based on the results from the EPA's analysis and consistent with our proposal, the EPA is not finalizing any changes to the current $O_3$ seasons in Arkansas, Tennessee, or Mississippi. There is currently one monitor operating in Crittenden County. We recommend that Arkansas work with their EPA Regional Administrator to consider a waiver for the monitor(s) in Crittenden County to allow a deviation (shortened season) from the required $O_3$ season if the agency demonstrates that such a deviation is appropriate for consistency in the nonattainment area.

Two commenters noted the need to extend seasons to capture wintertime $O_3$ events. One commenter urged the EPA to extend monitoring to year-round in the intermountain west (specifically Wyoming) to adequately capture summer and winter $O_3$ problem days

and noted especially two monitors in the Pinedale area of Wyoming that should be operated year-round. The EPA's analysis showed that there were no days that were ≥ 0.060 ppm in Wyoming for the months of October–December and that the Wyoming Department of Environmental Quality is currently operating about 70% of their $O_3$ monitors year-round including all $O_3$ monitors in Sublette County, which includes the Pinedale area. Another commenter supported lengthening the seasons for states in the western U.S. where wintertime $O_3$ could be an issue in light of the unique and growing $O_3$ pollution problems caused by oil and gas development activities. They also recommended that the EPA expand the $O_3$ monitoring season to year-round for North Dakota, South Dakota, and Montana beyond what was proposed. The number of observed days that were ≥ 0.060 ppm in the months outside the season proposed for these states (one day for North Dakota and no days observed for South Dakota and Montana) do not support a further extension to the length of the $O_3$ monitoring season beyond what was proposed. These states are already operating a large percentage of their monitors year-round (89% in North Dakota, 100% in South Dakota, and 78% in Montana). The EPA is finalizing the seasons as proposed in Wyoming (January–September), North Dakota (March–September), South Dakota (March–October), and Montana (April–September). The EPA encourages these states to continue year-round operation of their monitors to determine what areas are affected by elevated levels of winter-time $O_3$.

The commenters who opposed lengthening the $O_3$ monitoring seasons noted concerns with the threshold (0.060 ppm) used as the basis for the changes and the length of time (2010–2013) for which ambient data were retrieved and analyzed. Many of those with concerns recommended that levels in the proposed range (e.g., 0.065 ppm or 0.070 ppm) or the current NAAQS level of 0.075 ppm be used as the appropriate threshold for determining the $O_3$ season. With regard to the 0.060 ppm threshold used, this value is consistent with the 85 percent threshold used to require additional $O_3$ monitoring based on Appendix D requirements, which include the MSA population and design value.[220] As noted previously, year-to-year variability occurs in seasonal $O_3$ patterns based on highly variable and unpredictable meteorological

---

[220] See 40 CFR part 58, appendix D, Table D–2.

conditions, which can support the formation of early or late season elevated $O_3$ concentrations in some years and not in other years. This threshold serves as an appropriate indicator of ambient conditions that may be conducive to the formation of $O_3$ concentrations that approach or exceed the level of the NAAQS.

Certain logistical complexities were noted if longer seasons were required, including site access during winter and the challenge of getting the monitoring equipment ready in time. Four states noted concerns with operator safety and anticipated their inability to access sites due to early spring snowfall. The EPA agrees that site access could be an issue depending on weather conditions and notes that specific site monitoring season deviations may be appropriate. We suggest that this be addressed through the monitoring season waiver process with the EPA Regional Administrator. Any deviations based on the Regional Administrator's waiver of requirements must be described in the state's annual monitoring network plan and updated in AQS.

Several commenters had concerns about the additional cost and resources needed to expand the $O_3$ monitoring seasons. There was some disagreement with the EPA's total annual average cost estimate of $230,000 which took into account the number of $O_3$ monitors already operating year-round across the country. Commenters noted specifically that the proposed extension of required monitoring seasons would increase operational costs and potentially impact the resources available for other monitoring efforts. The added cost of operating $O_3$ monitors over a longer period was noted by some commenters, referencing both the cost of staff to operate the monitors, as well as the additional wear and tear those $O_3$ monitors would experience over a longer operational period. They noted that extending their required monitoring season by adding the month of March would increase staffing requirements for monitor operation and quality assurance. They also noted that the life expectancy of equipment would be reduced due to increased wear and tear. The EPA acknowledges that operational costs for $O_3$ monitoring networks will incrementally increase in states where required seasons have been lengthened. We encourage monitoring agencies to review available technology and operational procedures to institute practices that could potentially reduce such costs, such as the automation of quality control and calibration checks and remote access to evaluate monitor operations. As noted earlier, all states

operated at least a portion of their $O_3$ monitoring network outside of the required $O_3$ season during the 2010–2013 data period and reported the data to AQS. In addition, many states are operating more than the minimum number of monitors required to support the basic monitoring objectives described in 40 CFR part 58, Appendix D. Some states have a large percentage of their total $O_3$ monitors operating outside the currently-required $O_3$ season and some states have a small percentage. In situations where states are already operating a large number of their $O_3$ monitors outside their current $O_3$ season, the actual cost increase will be less. In cases where states have a small number of monitors operating outside their current $O_3$ season, in addition to automation and remote access, those states could investigate with their Regional Administrator the process in 40 CFR 58.14 for reducing the total number of operating monitors that are above the number required by 40 CFR, part 58, appendix D to offset the cost of extending the $O_3$ monitoring season in their state.

Two commenters had concerns about the 4-year period of time evaluated in the EPA's analysis and noted that the 4-year period of time evaluated does not take into account meteorological anomalies and other weather induced situations and is not consistent with the 3 years used to calculate design values. One state agency's comments referenced their own analysis showing concentrations going back 20 years. They noted that 2010 was an unusual year and inclusion of such an unusual year in the 4-year period (2010–2013) of the EPA's analysis provides too much weight on those data. As noted earlier, year-to-year variability occurs in seasonal $O_3$ patterns based on variable meteorological conditions and given the impracticality of forecasting such conditions that affect $O_3$ photochemistry, the EPA believes it is important that $O_3$ monitors operate when there is a reasonable possibility of ambient levels approaching the level of the NAAQS. Another state agency commented that 4 years appeared to be an unusual number of years given that design values are based on 3 years. To support the proposed rule in 2014, the EPA's analysis of $O_3$ seasons began in 2013. At that time the EPA's analysis considered the most recent 3 years of certified data (2010–2012) and updated the analysis to add a fourth year (2013) when the data were quality-assured, certified, and available in AQS. We used 4 years of data, including the most recent year (2013) to include an

additional year of potentially-variable meteorological conditions to propose changes to the seasons. The EPA treated all years equally and did not put any more weight on the 2010 data than any of the other years used in the analysis. The EPA believes that using recently-available data across multiple years to capture varying meteorological conditions was appropriate to support the decisions on extending the $O_3$ seasons. One commenter disagreed with the EPA's definition of year-round (at least 20 daily observations in all 12 months of at least 1 year of the 4-year period). The definition of year-round was used to estimate the number of monitors being operated outside a state's required $O_3$ season and also used for the EPA's Information Collection Request (ICR). All available data in AQS were used for the $O_3$ season analysis, including data from year-round monitors.

Two commenters noted that "regional consistency" is not a scientific reason and is not needed for making changes to the $O_3$ seasons. One commenter noted that significant geographical, meteorological and demographic differences exist between neighboring states that may not warrant identical monitoring seasons. The EPA notes that regional consistency was considered, but only important for a few states where little data were available and the neighboring states had more available data and a sufficient number of days that were ≥ 0.060 ppm to support the proposed $O_3$ season changes. Regional consistency was not important for other states.

Some commenters expressed support for the proposed requirement that NCore $O_3$ sites operate year-round. They questioned whether data from NCore stations outside the $O_3$ season will be used for designations and requested that the EPA exclude those data from the designations process. Consistent with the designations process for all criteria pollutants, the states, tribes, and the EPA use all data available in AQS that meet the quality assurance requirements in 40 CFR part 58, Appendix A for the designations process. Given that $O_3$ data from NCore stations will meet these requirements, there is no rational basis for excluding these data from comparison to the NAAQS. Accordingly, such data from NCore stations cannot be excluded and will be treated in a manner equivalent to all other $O_3$ data in AQS. The EPA expects that the highest $O_3$ values will occur during the required $O_3$ season; therefore, we don't anticipate that NCore data from the out-of-season months will contribute to the design value used in

the designations process. The EPA is finalizing the requirement for year-round O$_3$ monitoring at NCore stations.

The EPA Regional Administrators have previously approved deviations from the required O$_3$ monitoring seasons through rulemakings (64 FR 3028, January 20, 1999; 67 FR 57332, September 10, 2002; and 69 FR 52836, August 30, 2004). The current ambient monitoring rule, in paragraph 4.1(i) of 40 CFR part 58, Appendix D (71 FR 61319, October 17, 2006), allows the EPA Regional Administrators to approve changes to the O$_3$ monitoring season without rulemaking. The EPA is retaining the rule language allowing such deviations from the required O$_3$ monitoring seasons without rulemaking. In the finalized revision to paragraph 4.1(i) of 40 CFR part 58, Appendix D, the EPA is clarifying the minimum considerations that should be taken into account when reviewing requests, and clarifying that changes to the O$_3$ seasons finalized in this rule revoke all previously approved seasonal deviations. The EPA clarifies that all O$_3$ season waivers will be revoked when this final rule becomes effective. We encourage monitoring agencies with existing waivers to engage their EPA Regions as soon as possible to evaluate whether new or continued waivers are appropriate given the level of the revised O$_3$ NAAQS.

We received three comments for and three comments against early implementation of the revised O$_3$ seasons by the start of the applicable O$_3$ season in each state by January 1, 2016. Those commenters in favor of early implementation of the revised O$_3$ seasons are already operating a large percentage of O$_3$ monitors year-round or outside the current O$_3$ monitoring season in their state. Those commenters against early implementation cited concerns with the need for additional time to implement the revised O$_3$ seasons, especially in areas where access in order to service and support the monitoring equipment may be problematic during winter weather conditions, and the undue burden on already constrained state resources. One commenter noted that given the date for the final rule (October 1, 2015) that there is insufficient time for public review of their annual monitoring network plan due July 1, 2015, for early implementation in 2016. The EPA encourages those agencies who are able to implement the O$_3$ season changes early to do so by the start of the applicable O$_3$ season in their state in 2016. However, taking into consideration the timing and potential burden on monitoring agencies, the EPA

is finalizing the requirement for implementing the revised O$_3$ seasons no later than the start of the applicable O$_3$ monitoring season in 2017, as proposed.

### 3. Final Decisions on the Length of the Required O$_3$ Monitoring Seasons

Final changes to the required O$_3$ monitoring seasons are summarized in this section as well as in revised Table D–3 in 40 CFR part 58, Appendix D.

Detailed state-by-state technical information has been placed in the docket to document the basis for the EPA's decision on each state. This information includes state-by-state maps and number of days that were ≥ 0.060 ppm; distribution charts of the number of days that were ≥ 0.060 ppm by month and state; and detailed information regarding AQS site IDs, dates and concentrations of all occurrences of the 8-hour daily maximum of at least 0.060 ppm between 2010 and 2013. Summaries have also been prepared for each state including the former and proposed O$_3$ monitoring seasons.

No changes to the required O$_3$ monitoring season were proposed or finalized for these states: Alabama, Alaska, Arizona, Arkansas, California, Georgia, Hawaii, Kentucky, Northern Louisiana (AQCR [221] 019, 022), Southern Louisiana (AQCR 106), Maine, Mississippi, Nevada, New Mexico, Oklahoma, Oregon, Tennessee, Southern Texas (AQCR 106, 153, 213, 214, 216), Vermont, Washington, Puerto Rico, Virgin Islands, Guam, and American Samoa. All existing O$_3$ season deviations or waivers are revoked.

Changes to the required O$_3$ monitoring seasons are finalized as follows for these states and the District of Columbia and all existing O$_3$ season deviations or waivers are revoked.

Colorado: Proposed addition of January, February, October, November, and December is finalized. The required season is revised to January–December.

Connecticut: Proposed addition of March is finalized, revising season to March–September.

Delaware: Proposed addition of March is finalized, revising season to March–October.

District of Columbia: Proposed addition of March is finalized, revising season to March–October.

Florida: Proposed addition of January, February, November, and December is finalized. The required season is revised to January–December.

Idaho: Proposed addition of April is finalized, revising season to April–September.

Illinois: Proposed addition of March is finalized, revising season to March–October.

Indiana: Proposed addition of March and October is finalized, revising season to March–October.

Iowa: Proposed addition of March is finalized, revising season to March–October.

Kansas: Proposed addition of March is finalized, revising season to March–October.

Maryland: Proposed addition of March is finalized, revising season to March–October.

Massachusetts: Proposed addition of March is finalized, revising season to March–September.

Michigan: Proposed addition of March and October is finalized, revising season to March–October.

Minnesota: Proposed addition of March is finalized, revising season to March–October.

Missouri: Proposed addition of March is finalized, revising season to March–October.

Montana: Proposed addition of April and May is finalized, revising season to April–September.

Nebraska: Proposed addition of March is finalized, revising season to March–October.

New Hampshire: Proposed addition of March is finalized, revising season to March–September.

New Jersey: Proposed addition of March is finalized, revising season to March–October.

New York: Proposed addition of March is finalized, revising season to March–October.

North Carolina: Proposed addition of March is finalized, revising season to March–October.

North Dakota: Proposed addition of March and April is finalized, revising season to March–September.

Ohio: Proposed addition of March is finalized, revising season to March–October.

Pennsylvania: Proposed addition of March is finalized, revising season to March–October.

Rhode Island: Proposed addition of March is finalized, revising season to March–September.

South Carolina: Proposed addition of March is finalized, revising season to March–October.

South Dakota: Proposed addition of March, April, May, and October is finalized, revising season to March–October.

Texas (Northern AQCR 022, 210, 211, 212, 215, 217, 218): Proposed addition of November is finalized, revising season to March–November.

Utah: Proposed addition of January, February, March, April, October,

---

[221] Air Quality Control Region.

November, and December is finalized. The required season is revised to January–December.

Virginia: Proposed addition of March is finalized, revising season to March–October.

West Virginia: Proposed addition of March is finalized, revising season to March—October.

Wisconsin: Proposed addition of March and April 1—15 is finalized, revising season to March—October 15.

Wyoming: Proposed addition of January, February, March, and removal of October is finalized, revising season to January—September.

Finally, we are finalizing the required $O_3$ monitoring season for all NCore stations to be year-round (January—December) regardless of the required monitoring season for the individual state in which the NCore station is located.

## C. Revisions to the PAMS Network Requirements

Section 182 (c)(1) of the CAA required the EPA to promulgate rules for enhanced monitoring of $O_3$, $NO_X$, and VOCs for nonattainment areas classified as serious (or above) to obtain more comprehensive and representative data on $O_3$ air pollution. In addition, Section 185B of the CAA required the EPA to work with the National Academy of Sciences (NAS) to conduct a study on the role of $O_3$ precursors in tropospheric $O_3$ formation and control. As a result of this study, the NAS issued the report entitled, "Rethinking the Ozone Problem in Urban and Regional Air Pollution", (NAS, 1991).

In response to the CAA requirements and the recommendations of the NAS report, on February 12, 1993 (58 FR 8452), the EPA revised the ambient air quality surveillance regulations to require PAMS in each $O_3$ nonattainment area classified as serious, severe, or extreme ("PAMS areas"). As noted in the EPA's Technical Assistance Document (TAD) for Sampling and Analysis of Ozone Precursors (U.S. EPA, 1998), the current objectives of the PAMS program are to: (1) Provide a speciated ambient air database that is both representative and useful in evaluating control strategies and understanding the mechanisms of pollutant transport by ascertaining ambient profiles and distinguishing among various individual volatile organic compounds (VOCs); (2) provide local, current meteorological and ambient data to serve as initial and boundary condition information for photochemical grid models; (3) provide a representative, speciated ambient air database that is characteristic of source

emission impacts to be used in analyzing emissions inventory issues and corroborating progress toward attainment; (4) provide ambient data measurements that would allow later preparation of unadjusted and adjusted pollutant trends reports; (5) provide additional measurements of selected criteria pollutants for attainment/ nonattainment decisions and to construct NAAQS maintenance plans; and (6) provide additional measurements of selected criteria and non-criteria pollutants to be used for evaluating population exposure to air toxics as well as criteria pollutants.

The original requirements called for two to five fixed sites per PAMS area depending on the area's population. Four types of PAMS sites were identified including upwind (Type 1), maximum precursor emission rate (Type 2), maximum $O_3$ concentration (Type 3), and extreme downwind (Type 4) sites. Each PAMS site was required to measure $O_3$, nitrogen oxide (NO), $NO_2$, speciated VOCs, selected carbonyl compounds, and selected meteorological parameters. In addition, upper air meteorological monitoring was required at one site in each PAMS area.

In the October 17, 2006 monitoring rule (71 FR 61236), the EPA revised the PAMS requirements to only require two sites per PAMS area. The intent of the revision was to "allow PAMS monitoring to be more customized to local data needs rather than meeting so many specific requirements common to all subject $O_3$ nonattainment areas; the changes also gave states the flexibility to reduce the overall size of their PAMS programs—within limits—and to use the associated resources for other types of monitoring they consider more useful." In addition to reducing the number of required sites per PAMS area, the 2006 revisions also limited the requirement for carbonyl measurements (specifically formaldehyde, acetaldehyde, and acetone) to areas classified as serious or above for the 8-hour $O_3$ standards. This change was made in recognition of carbonyl sampling issues which were believed to cause significant uncertainty in the measured concentrations.

Twenty-two areas were classified as serious or above $O_3$ nonattainment at the time the PAMS requirements were promulgated in 1993. On July 18, 1997 (62 FR 38856), the EPA revised the averaging time of the $O_3$ NAAQS from a 1-hour averaging period to an 8-hour averaging period. On June 15, 2005 (70 FR 44470), the EPA revoked the 1-hour; however, PAMS requirements were identified as requirements that had to be

retained in the anti-backsliding provisions included in that action. Therefore, PAMS requirements continue to be applicable to areas that were classified as serious or above nonattainment for the 1-hour $O_3$ standards as of June 15, 2004. Currently, 25 areas are subject to the PAMS requirements with a total of 75 sites. As will be discussed in detail later, the current PAMS sites are concentrated in the Northeast U.S. and California with relatively limited coverage in the rest of the country (Cavender, 2014).

The first PAMS sites began operation in 1994, and have been in operation for over 20 years. Since the start of the program, there have been many changes to the nature and scope of the $O_3$ problem in the U.S. as well as to our understanding of it. The $O_3$ standards has been revised multiple times since the PAMS program was first implemented. On July 18, 1997, the EPA revised the $O_3$ NAAQS to a level of 0.08 parts per million (ppm), with a form based on the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration. On March 28, 2008 (73 FR 16436), the EPA revised the $O_3$ standards to a level of 0.075 ppm, with a form based on the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration. These changes in the level and form of the $O_3$ NAAQS, along with notable decreases in $O_3$ levels in most parts of the U.S., have changed the landscape of $O_3$ NAAQS violations in the U.S. At the time of the first round of designations for the 8-hour standards (June 15, 2005), only 5 areas were classified as serious or above for the 8-hour standards as compared to 22 areas that were classified as serious or above for the 1-hour standards. While the number of serious and above areas decreased, the number of nonattainment areas remained nearly the same. In addition to the change in the landscape of $O_3$ nonattainment issues, much of the equipment used at PAMS sites is outdated and in need of replacement. New technologies have been developed since the inception of the PAMS program that should be considered for use in the network to simplify procedures and improve data quality. For these reasons, the EPA determined that it would be appropriate to re-evaluate the PAMS program as explained below.

In 2011, the EPA initiated an effort to re-evaluate the PAMS requirements in light of changes in the needs of PAMS data users and the improvements in monitoring technology. The EPA consulted with the Clean Air Science Advisory Committee (CASAC), Air

BLM_0047431

Monitoring and Methods Subcommittee (AMMS) to seek advice on potential revisions to the technical and regulatory aspects of the PAMS program; including changes to required measurements and associated network design requirements. The EPA also requested advice on appropriate technology, sampling frequency, and overall program objectives in the context of the most recently revised $O_3$ NAAQS and changes to atmospheric chemistry that have occurred over the past 10–15 years in the significantly impacted areas. The CASAC AMMS met on May 16 and May 17, 2011, and provided a report with their advice on the PAMS program on September 28, 2011 (U.S. EPA, 2011f). In addition, the EPA met multiple times with the National Association of Clean Air Agencies (NACAA) Monitoring Steering Committee (MSC) to seek advice on the PAMS program. The MSC includes monitoring experts from various State and local agencies actively engaged in ambient air monitoring and many members of the MSC have direct experience with running PAMS sites. Specific advice obtained from the CASAC AMMS and the MSC that was considered in making the proposed changes to the PAMS requirements is discussed in the appropriate sections below.

Based on the findings of the PAMS evaluation and the consultations with the CASAC AMMS and NACAA MSC, the EPA proposed to revise several aspects of the PAMS monitoring requirements including changes in (1) network design, (2) VOC sampling, (3) carbonyl sampling, (4) nitrogen oxides sampling, and (5) meteorology measurements. The following paragraphs summarize the proposed changes, the comments received, and the final changes and supporting rationale.

1. Network Design

As discussed above, the current PAMS network design calls for two sites (a Type 2, and a Type 1 or Type 3) per PAMS area. In their report (U.S EPA, 2011f), the CASAC AMMS found "that the existing uniform national network design model for PAMS is outdated and too resource intensive," and recommended "that greater flexibility for network design and implementation of the PAMS program be transferred to state and local monitoring agencies to allow monitoring, research, and data analysis to be better tailored to the specific needs of each $O_3$ problem area." While stating that the current PAMS objectives were appropriate, the AMMS report also stated that "objectives may need to be revised to include both a

national and regional focus because national objectives may be different from regional objectives." The NACAA MSC also advised the EPA that the existing PAMS requirements were too prescriptive and may hinder state efforts to collect other types of data that were more useful in understanding their local $O_3$ problems.

The EPA agrees with CASAC that the PAMS objectives include both local and national objectives, and believes that the current PAMS network design is no longer suited for meeting either sets of objectives. As part of the PAMS evaluation, it was determined that at the national level the primary use of the PAMS data has been to evaluate photochemical model performance. Due to the locations of the current PAMS areas and the current network design, existing PAMS sites are clustered along the northeast and west coasts leading to significant redundancy in these areas and very limited coverage throughout the remainder of the country (Cavender, 2014). The resulting uneven spatial coverage greatly limits the value of the PAMS data for evaluation of model performance. CASAC (U.S. EPA, 2011f) noted the spatial coverage issue and advised that the EPA should consider requiring PAMS measurements in areas in addition to "areas classified as serious and above for the $O_3$ NAAQS to improve spatial coverage." The EPA also agrees with CASAC and NACAA that the PAMS requirements should be revised to provide monitoring agencies greater flexibility in meeting local objectives.

The EPA proposed changes to the network design requirements to better serve both national and local objectives. The EPA proposed a two part network design. The first part of the design included a network of fixed sites ("required PAMS sites") intended to support $O_3$ model development and the tracking of trends of important $O_3$ precursor concentrations. The second part of the network design required states with $O_3$ non-attainment areas to develop and implement Enhanced Monitoring Plans (EMPs) which were intended to allow monitoring agencies the needed flexibility to implement additional monitoring capabilities to suit the needs of their area.

To implement the fixed site portion of the network design, the EPA proposed to require PAMS measurements at any existing NCore site in an $O_3$ nonattainment area in lieu of the current PAMS network design requirements.[222]

The NCore network is a multi-pollutant monitoring network consisting of 80 sites (63 urban, 17 rural) sited in typical neighborhood scale locations and supports multiple air quality objectives including some of the objectives of the PAMS program including the development and evaluation of photochemical models (including both $PM_{2.5}$ and $O_3$ models), development and evaluation of control strategies, and the tracking of regional precursor trends.

The EPA recognized that in limited situations existing NCore sites may not be the most appropriate locations for making PAMS measurements. For example, an existing PAMS site in an $O_3$ nonattainment area may be sited at a different location than the existing NCore site. In this case, it may be appropriate to continue monitoring at the existing PAMS site to support ongoing research and to maintain trends information. To account for these situations, the EPA also proposed to provide the EPA Regional Administrator the authority to approve an alternative location for a required PAMS site where appropriate. The EPA also solicited comments on alternative frameworks using other benchmarks such as attainment status or population to ensure an appropriately sized fixed PAMS monitoring network. The EPA received several comments on the proposed changes to the network design, primarily from state and local monitoring agencies. The following paragraphs summarize the major comments made on the proposed network design and our response, and final network design requirements.

Most commenters agreed with the need to revise the existing network design. One commenter agreed that "requiring PAMS monitoring at already existing NCore locations will benefit national and local objectives to understand ozone formation and would also provide significant cost efficiencies." Another commenter stated that they supported the proposed changes, "especially the flexibility provided by EMPs designed to meet local objectives and achieve a better understanding of photochemical precursors." Another commenter supporting the changes stated that the "proposed network revision will provide states the flexibility to use their resources effectively." One commenter stated that the proposed changes "reflect a more efficient use of state and local monitoring resources by availing

---

[222] The EPA noted that the proposed change would expand the PAMS applicability beyond that required in 182(c)(1) of the CAA. Thus, in this final

rule, the EPA is relying on the authority provided in Sections 103(c), 110(a)(2)(B), 114(a) and 301(a)(1) of the CAA to expand the PAMS applicability to areas other than those that are serious or above $O_3$ nonattainment.

monitoring agencies of existing NCore infrastructure to fulfill PAMS requirements."

A number of concerns were also raised with the proposed network design. Several commenters stated that the proposal "would drastically reduce the PAMS network in the Northeast." One commenter stated that "this is not acceptable for the Northeast and Mid-atlantic Corridor, which requires monitoring of the complex transport from multiple large metropolitan areas in the region." One commenter recognized that the EPA had intended to allow states to use EMPs to address upwind and downwind data needs, but raised concerns that states with historically important upwind and downwind sites in the Ozone Transport Region [223] (OTR) may not be required to develop an EMP since those sites would be in states that are attaining the $O_3$ NAAQS. One commenter suggested that "the EPA consider the entire OTR when designing a PAMS network rather than pockets of nonattainment areas in the region." The EPA agrees that the reduction of sites in the OTR is a potential issue and that many important existing PAMS sites would not be part of the required PAMS sites based on the proposed network design. As noted by several commenters, the EPA intended the state directed EMPs to give states flexibility in determining data needed to understand local $O_3$ formation, including transport in the Northeast. However, the EPA also agrees that as proposed many states in the OTR would not be required to develop EMPs and, therefore, may not be provided PAMS resources. To address these concerns and ensure adequate network coverage in the OTR, the EPA is adding a requirement that all states in the OTR develop and implement an EMP regardless of $O_3$ attainment status. This change will help ensure that an EMP appropriate for the entire OTR can be implemented.

Concerns were raised by some states that existing NCore sites may not be the most appropriate location for making PAMS measurements. One commenter noted that their NCore site was inland but that their "most significant ozone problems occur along the shoreline due to transport along the lake", and that "the NCore site cannot provide insight into these important lakeshore ozone processes." Another commenter stated that "while it was laudable to leverage

sites where data is already being collected, it is unclear whether NCore sites adequately meet the objectives of the PAMS program", and that "the current NCore network may not be adequate to depict boundary conditions or areas of maximum emissions." One commenter stated that "in some nonattainment areas an NCore site may be an appropriate location for a PAMS monitor, but in other areas it would be preferable to install the PAMS monitoring in a location downwind of a source region where higher ozone exposures occur" and that "State and local boundaries should not be part of the network design criteria." One commenter noted that while the EPA had proposed to allow waivers, it was unclear if waivers would be allowed where the alternative site was in a different CBSA or state than the required PAMS site. As stated in our proposal, the EPA recognizes that in some cases existing PAMS sites (or other sites) may be better suited to meet local and national data needs. For this reason, we had proposed to allow waivers in these situations. We do agree that it is appropriate in some cases to allow these waivers to cross CBSA and state boundaries. Therefore, we have added specific language to the final waiver provisions to clarify that waivers can be allowed to cross CBSA and state boundaries. Where a monitoring agency receives a waiver from siting a monitor in reliance on a monitor operated by a different monitoring agency (e.g., across state lines), the waiver will be conditioned on the monitor being properly included in the other agency's network plan, and operated in accordance with the requirements of Part 58, including the relevant appendices.

In addition to the concerns raised about closing important existing PAMS sites discussed above, some commenters raised concerns that many of the newly required PAMS sites would be in locations that were expected to attain the revised $O_3$ NAAQS soon after the new sites would be installed. One commenter noted that "requiring marginal nonattainment areas to install PAMS sites would result in a large undertaking at an area that would most likely be back in attainment at or around the time the PAMS site started collecting data." One commenter stated that by tying the network requirement to NAAQS attainment "threatens to underserve areas that are very close to exceeding the revised ozone NAAQS and results in significant gaps in the spatial coverage of the PAMS network" and "has the potential to introduce

undesirable uncertainty on the size and spatial extent of the PAMS network over the long term." Another commenter was concerned that the proposed network would be unstable, and would experience frequent changes as areas came into attainment or went out of attainment thus reducing the value of the data collected, and resulting in inefficient use of resources. One commenter noted that "a more stable monitoring network design will allow for the examination of trends from spatially robust, long running sites and will allow states to firmly establish the infrastructure costs."

The EPA noted in the proposal that the size and locations of the proposed required PAMS network is sensitive to the level of the revised $O_3$ NAAQS and future $O_3$ concentrations. We recognize and agree that if current downward trends in $O_3$ concentrations continue, many initially required sites may no longer be required to make PAMS measurements soon after the sites were installed. Non-required sites could be closed, soon after being installed, at the state's discretion. We agree this would result in an inefficient use of resources. We also note that if these sites were closed following a potential reclassification to attainment, the loss of those sites could lead to a network with poor spatial coverage. Therefore, the EPA is making changes to the proposed revisions to the network design to improve the stability of the fixed site network. As explained below, the final requirements are based on options for which we requested comments in the proposal and the comments we have received.

We requested comments on additional options to define the fixed PAMS network component of the new network design. These options were further discussed in a memorandum to the docket (Cavender, 2014). One option discussed was to require PAMS measurements at all NCore sites irrespective of the $O_3$ attainment status of the area. One commenter noted that "requiring PAMS monitoring at all NCore sites, regardless of ozone attainment status, provides the most spatially robust and stable monitoring network." We noted that this requirement would result in a network of approximately 80 sites, which would be larger than the current network. In the supporting memorandum, we noted that a fixed network of 80 sites would strain existing resources and would not allow adequate resources to implement the state directed EMPs.

Another option discussed in the proposal included requiring PAMS measurements at NCore sites in $O_3$

[223] Section 184(c) of the CAA establishes the OTR as comprised of the states of Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Consolidated Metropolitan Statistical Area that includes the District of Columbia.

nonattainment areas with a population greater than 1,000,000. We noted that this option would result in a network of between 31 and 37 sites depending on the level of the revised $O_3$ NAAQS. We also noted that focusing the applicability of PAMS to those NCore sites in larger CBSAs would still provide the desired improvement in geographic distribution while reducing the number of required sites down to a level that would provide sufficient resources to implement the state-directed EMP portion of the network. One commenter stated that they "supported a 1,000,000 population threshold because it would help prioritize resources to areas based on the greatest human health impacts." In addition, a number of commenters, while not commenting on the need for a population limit, did raise concerns about their ability to acquire and retain staff with the necessary expertise to collect PAMS measurements in less urbanized areas. As with the proposed network design, we recognize that the total number of sites and the ultimate spatial coverage under this option is also sensitive to changes in $O_3$ concentrations. If current downward trends in $O_3$ concentrations continue, many initially required sites would not be required soon after they were installed. As with the proposed option, this option could result in an unstable network resulting in an inefficient use of resources and inadequate spatial coverage to meet the network goals discussed above.

Upon further consideration and in response to the comments received, we are finalizing a network design that includes a requirement for states to make PAMS measurements at all NCore sites in CBSAs with a population of 1,000,000 people or more, irrespective of $O_3$ attainment status. We believe this requirement will result in an appropriately sized network (roughly 40 sites) that will provide adequate spatial coverage to meet national model evaluation needs (Cavender, 2015). Redundancy is greatly reduced while important network coverage is added in the midwest, southeast, and mountain west. The improved spatial coverage will also strengthen the EPA's ability to track trends in precursor concentrations regionally.

Because the network requirement is not tied to attainment status, this final requirement will ensure network stability and allows for more efficient use of available resources. This final requirement also removes uncertainty as to applicability and aids planning and logistics involved with implementing the new requirements. Monitoring

agencies can determine the applicability of the fixed site requirements to their areas today, and begin to make plans for investments in equipment, shelter improvements, and staffing and training needs necessary to implement the fixed site requirements without having to wait for the designations process to be completed. In addition, this final requirement should alleviate concerns raised by monitoring agencies in more rural locations over the ability to attract and retain staff with the skills necessary to make PAMS measurements.

By adding the PAMS measurements to existing NCore sites, significant efficiencies can be obtained which should further reduce the costs of the fixed site network as NCore sites currently make many of the PAMS measurements. Furthermore, adding the additional PAMS measurements (e.g., speciated VOCs, carbonyls, and mixing height) to existing NCore sites will improve our ability to assess other pollutants (e.g., air toxics and $PM_{2.5}$).

Although, as discussed in comment and summarized above, we believe there are good reasons for not tying the requirement for fixed PAMS sites to $O_3$ attainment status, we continue to believe that requiring PAMS measurements in areas that historically have had low $O_3$ concentrations is unlikely to provide data of significant value to warrant the expense and effort of making such measurements. Therefore, we have included a provision that would allow a monitoring agency to obtain a waiver, based on Regional Administrator approval, in instances where CBSA-wide $O_3$ design values are equal to or less than 85% of the 8-hour $O_3$ NAAQS and where the site is not considered an important upwind or downwind site for other nonattainment areas. The EPA selected 85% as the threshold for this waiver provision as it has been used historically to identify locations needing additional monitoring for both the $O_3$ and $PM_{2.5}$ NAAQS. The EPA will work with the monitoring agencies and the Regions to help ensure consistent implementation of this waiver provision.

The second part of the proposed PAMS network design included monitoring agency directed enhanced $O_3$ monitoring activities intended to provide data needed to understand an area's specific $O_3$ issues. To implement this part of the PAMS network design, the EPA proposed to add a requirement for states with $O_3$ nonattainment areas to develop an EMP. The purpose of the EMP was to improve monitoring for ambient concentrations of $O_3$, $NO_X$, total

reactive nitrogen ($NO_y$)[224], VOC, and meteorology. The EPA suggested that types of activities that might be included in the state's EMP could include additional PAMS sites (e.g., upwind or downwind sites), additional $O_3$ and $NO_X$ monitoring, ozonesondes or other aloft measurements, rural measurements, mobile PAMS sites, additional meteorological measurements, and episodic or intensive studies. The intent of the EMPs is to allow monitoring agencies flexibility in determining and collecting the information they need to understand their specific $O_3$ problems.

We received comments on the proposed requirement for an EMP in states with $O_3$ nonattainment areas. Most comments supported the requirement, but other comments raised a number of concerns. A number of commenters questioned the need for EMPs in Marginal and Moderate $O_3$ nonattainment areas. They noted that in most cases, Marginal $O_3$ nonattainment areas were expected to come into compliance without state-specific controls. One commenter stated that "nonattainment areas projected to attain the standard without additional state-level actions may not need the PAMS resources and additional monitoring to develop a better understanding of their ozone issues." One commenter noted that "marginal ozone nonattainment areas are given only a few requirements because it is assumed that the areas will reach attainment within three years." Another commenter stated "requiring enhanced monitoring for any marginal or moderate area should only be implemented where such analyses show the need for this data." The EPA agrees that based on current trends in $O_3$ concentrations and the EPA's own projections, states in Marginal nonattainment areas likely will comply with the revised NAAQS without additional state-directed controls, and as such, an EMP is not necessary in Marginal $O_3$ attainment areas. Accordingly, the EPA is finalizing a requirement for EMPs in areas classified as Moderate or above $O_3$ nonattainment and, thereby, removing the applicability of the requirement for Marginal areas. We believe this final requirement will provide the desired flexibility to allow states to identify enhanced monitoring needs while focusing resources for EMPs in areas of greater need of enhanced monitoring data.

Commenters expressed concerns over the lack of detail on what an approvable EMP would entail. As proposed, the

[224] $NO_y$ includes NO, $NO_2$, and other oxidized nitrogen compounds ($NO_2$).

EMPs would be reviewed and approved by the EPA Regional Administrator as part of the annual monitoring plan review process. One commenter recommended that the "EPA detail the requirements of the EMPs for ozone nonattainment areas in future implementation guidance." One commenter stated that the "EPA should provide some coordination between regional offices and technical guidance to state agencies that would be of assistance in developing and executing the EMPs." The requirements for the EMPs were intentionally left quite general in order to maximize the flexibility for states in identifying their specific data needs. Regional approval of the plans is required to ensure the enhanced monitoring planned will be commensurate with grant funds provided for EMPs. Nonetheless, the EPA understands the need for guidance on developing EMPs and commits to working with monitoring agencies and the regions to develop appropriate guidance on developing and reviewing EMPs.

2. Speciated VOC Measurements

Measurement of speciated VOCs important to $O_3$ formation is a key aspect of the PAMS program. The existing PAMS requirements allow for a number of options in measuring speciated VOCs at PAMS sites which include (1) hourly measurements using an automatic gas chromatograph ("autoGC"), (2) eight 3-hour samples daily using canisters, or (3) one morning and one afternoon sample with a 3-hour or less averaging time daily using canisters plus continuous Total Non-methane Hydrocarbon (TNMHC) measurements.

The EPA believes that the current options provided for VOC measurement limit the comparative value of the data being collected, and proposed that required PAMS sites must measure and report hourly speciated VOCs, which effectively would require them to use an autoGC to measure VOCs in lieu of canisters. More complete and consistent speciated VOC data nationally would better help meet certain objectives of the PAMS program described above (e.g., a speciated ambient air database useful in evaluating control strategies, analyzing emissions inventory issues, corroborating progress toward attainment, and evaluating population exposure to air toxics). Furthermore, as noted by the CASAC AMMS, hourly VOC data are "particularly useful in evaluating air quality models and performing diagnostic emission attribution studies. These data can be provided on a near real-time basis and

presented along with other precursor species (e.g., oxides of nitrogen and carbon monoxide) collected over similar averaging times." Longer time-averaged data are of significantly lower value for model evaluation. In addition, creating consistent monitoring requirements across the network would provide better data for analyzing regional trends and spatial patterns.

At the time the original PAMS requirements were promulgated, the canister options were included because the EPA recognized that the technologies necessary to measure hourly average speciated VOCs concentrations were relatively new and may not have been suitable for broad network use. At that time, GCs designed for laboratory use were equipped with auto-samplers designed to "trap" the VOC compounds from a gas sample, and then "purge" the compounds onto the GC column. The EPA did not believe that autoGCs were universally appropriate due to the technical skill and effort necessary at that time to properly operate an autoGC.

While the basic principles of autoGC technology have not changed, the hardware and software of modern autoGCs are greatly improved over that available at the time of the original PAMS requirements. Based on advice from the CASAC AMMS, the EPA initiated an evaluation of current autoGCs potentially suitable for use in the PAMS network. Based on the preliminary results, the EPA believes that typical site operators, with appropriate training, will have the skill necessary to operate a modern autoGC successfully. Considering the advances in autoGC technology, the added value obtained from hourly data, and the proposed move of PAMS measurements to NCore sites in $O_3$ nonattainment areas, the EPA proposed to require hourly speciated VOC sampling at all PAMS sites. The EPA noted that this proposed requirement would effectively prevent the use of canisters to collect speciated VOCs at the required PAMS sites but that canister sampling may continue to be an appropriate method for collecting speciated VOCs at other locations as part of discretionary monitoring designed within the EMPs.

While the EPA believes that the proposed transition to hourly speciated VOC sampling is the appropriate strategy to take advantage of improved technology and to broaden the utility of collected data, we are also mindful of the additional rigidity that the proposed mandatory use of autoGCs may have for monitoring agencies, especially those that have experience with and have established effective and reliable

canister sampling programs. Therefore, the EPA requested comment on the proposed requirement for hourly VOC sampling as well as the range of alternatives that might be appropriate in lieu of a strict requirement.

The EPA received a number of comments on the requirement to measure hourly VOCs at required PAMS sites. Many commenters agreed with requiring hourly VOC data. One commenter agreed that "hourly VOC data collection is the most appropriate and useful for PAMS monitors" and that "it is only appropriate to approve an alternative data collection interval if it is believed that the high ozone in an area is due to other pollutants, such as $NO_X$ or methane." One commenter stated they "supported the movement towards hourly PAMS VOC speciated measurements with flexibility to use canisters if programmatic or logistical needs indicate."

However, some commenters raised concerns with the hourly VOC requirement. Some commenters questioned if autoGCs would be capable of measuring important VOC species in their environment. One commenter noted that in their location (high desert) "the largest VOC present in our inventory is creosote, a compound not commonly measured with this instrumentation." One commenter stated that the "Southeastern United States is dominated by biogenic VOC emissions" and questioned "the benefits of an autoGC in understanding ozone formation in any potential nonattainment area in our State." [225] Some questioned the detection capabilities of autoGCs as compared to canister sampling. One commenter found that the method detection limit (MDL) for their canister sampling was "consistently equal to or less than the autoGC instrumentation" based on the EPA's autoGC evaluation laboratory report (RTI, 2014). Another commenter noted that the MDLs for many of the compounds and systems reported in the laboratory report were too high to be useful at PAMS sites. Another commenter stated that they found that "retention-time shifts made it difficult for instant identification of chemical peaks" and that "states should be allowed the flexibility to continue using canisters instead of autoGC."

As noted in the preamble, and the comments received, the EPA is currently completing an evaluation of

[225] The EPA notes that isoprene (the dominant biogenic compound in the Southeast) is well measured using autoGCs. The EPA is also evaluating the potential of modern autoGC's to measure alpha and beta pinene; however that work is not complete.

BLM_0047435

commercially available autoGCs. A copy of the report for the laboratory phase of the study is available in the docket (RTI, 2014). As noted in the laboratory report, the MDL estimates made for the laboratory study were not conducted according to normal MDL testing procedures and as such the results should only be used to compare the various instruments being tested against each other.[226] As part of the evaluation, the EPA identified the manufacturer's specifications for MDL. Most of the systems that are being evaluated have a manufacturer's estimated MDL in the range of 0.1 ppb to 0.5 ppb. Based on the evaluation of MDL capabilities and typical ambient concentrations of $O_3$ precursors, the EPA believes that autoGCs are an appropriate method for gathering VOC data at most urban locations. However, canister sampling may be more appropriate in locations with low VOC concentrations.

For the reasons discussed above and in the proposed rule, the EPA is finalizing a requirement for hourly speciated VOC measurements at required PAMS sites. The EPA believes that hourly VOC measurements will provide a more complete and consistent speciated VOC database to help meet the PAMS program objectives described above. Hourly VOC data are particularly useful in evaluating air quality models and performing diagnostic emission attribution studies. Longer time-averaged data are of lower value for model evaluation. Consistent monitoring requirements across the network will provide better data for analyzing regional trends and spatial patterns.

However, the EPA agrees that there may be locations where an autoGC may not be the most appropriate method for VOC measurement and that it is appropriate to allow for canister sampling in limited situations. Accordingly, the EPA is adding a waiver option (to be approved by the EPA Regional Administrator) to allow three 8-hour average samples every 3rd day as an alternative in cases where VOCs are not well measured by autoGC due to low concentrations of target compounds

or where the predominant VOC compounds cannot be measured using autoGC technology (e.g., creosote in high desert environments). This alternative sampling frequency was selected to be consistent with the sampling frequency selected for carbonyls, which is discussed later in this preamble.

3. Carbonyl Measurements

Carbonyls include a number of compounds important to $O_3$ formation that cannot currently be measured using the autoGCs or canisters used at PAMS sites to measure speciated VOCs. The current method for measuring carbonyls in the PAMS program is Compendium Method TO–11A (U.S. EPA, 1999). In this method, carbonyl compounds are adsorbed and converted into stable hydrazones using dinitrophenylhydrazine (DNPH) cartridges. These cartridges are then analyzed for the individual carbonyl compounds using liquid chromatography (LC) techniques. Three carbonyls are currently required to be measured in the PAMS program— formaldehyde, acetaldehyde, and acetone.

In 2006, the EPA revised the PAMS requirements such that carbonyl sampling was only required in areas classified as serious or above nonattainment for $O_3$ under the 8-hour $O_3$ standard which effectively reduced the applicability of carbonyl sampling to a few areas in California. This change was made in recognition that there were a number of issues with Method TO– 11A that raised concerns with the uncertainty in the carbonyl data being collected. These issues include interferences (humidity and $O_3$) and breakthrough (i.e., overloading of the DNPH cartridge) at high concentrations. While solutions for these issues have been investigated, these improvements have not been incorporated into Method TO–11A.

A recent evaluation of the importance of VOCs and carbonyls to $O_3$ formation determined that carbonyls, especially formaldehyde, are very important to $O_3$ formation (Cavender, 2013). CASAC AMMS (U.S. EPA, 2011f) also noted the importance of carbonyls stating that "There are many compelling scientific reasons to measure carbonyls. They are a very important part of $O_3$ chemistry almost everywhere." Although the EPA recognizes the issues that have been raised about the current method of measuring carbonyls, due to the importance of carbonyls to understanding $O_3$ chemistry, the EPA proposed to require all required PAMS sites to measure carbonyls.

Several commenters agreed with the need for carbonyl data at PAMS sites. However, a number of commenters questioned the proposed frequency of eight 3-hour samples every day during the PAMS sampling season (June through August). Several commenters indicated that the frequency was too high. One commenter noted that the requirement would require 800 samples per season at each PAMS site and pointed out that this requirement, which was required at the inception of the PAMS program in the 1990s was "found to be prohibitively expensive, technically unsustainable, and qualitatively compromised." Another commenter stated that "this level of sampling would require a substantial amount of agency resources and seems unduly burdensome." A number of commenters also questioned the commercial availability of an 8-channel carbonyl sampler that would be needed to take eight 3-hour samples daily. In light of the comments and upon further review, the EPA agrees that the proposed frequency is unduly burdensome and is finalizing a requirement with a lower frequency.

A number of alternative frequencies were suggested in the comments. Several commenters suggested a frequency of three 8-hour samples on either a 1-in-6 day or 1-in-3 day basis. Another commenter suggested a frequency of eight 3-hour samples on a 1 in 6 day basis. The EPA notes that sampling on a 1-in-6 day frequency would lead to as little as 15 sampling days per PAMS sampling season. The EPA believes that 15 sampling days is too few to provide a meaningful representation of carbonyl concentrations over the PAMS sampling period. A sampling frequency of 1-in-3 days would lead to 30 sampling days per season with each day of the week being represented at least 4 times per sampling season. With regards to samples per day, a 3-hour sampling duration provides a better diurnal representation of carbonyl sampling compared with an 8-hour sampling duration; however 8-hour sampling can provide information useful for evaluating diurnal differences in carbonyl concentrations. Upon further consideration and in light of the comments received, the EPA is finalizing a carbonyl sampling requirement with a frequency of three 8-hour samples on a 1-in-3 day basis. This final requirement will result in approximately 90 samples per PAMS sampling season which the EPA believes is not unduly burdensome and

[226] Several factors combined to result in the high relative MDL estimates reported in laboratory report. The MDL testing in the laboratory was conducted during concurrent tests for interferences from humidity and temperature. In addition, the MDL testing was conducted at relatively high concentrations compared to the concentrations testing would be conducted at for conventional MDL testing. Finally, as noted in the laboratory report, a number of instruments were having technical difficulties during the testing which greatly impacted their MDL results. The EPA is continuing the autoGC evaluation and has conducted a field study during the summer of 2015. A final report is expected in early 2016.

**65426**    **Federal Register** / Vol. 80, No. 206 / Monday, October 26, 2015 / Rules and Regulations

will provide a reasonable representation of carbonyl concentrations.

A number of commenters noted the ongoing development of continuous formaldehyde instruments, and recommended that EPA allow for continuous formaldehyde measurements as an alternative to the manual cartridge based TO–11A method. The EPA agrees that continuous formaldehyde, with the ability to obtain hourly averaged measurements, would be a significantly more valuable that the longer averaged measurements. As a result, the EPA has added an option to allow for continuous formaldehyde as an alternative to the carbonyl measurements using TO–11A.

### 4. Nitrogen Oxides Measurements

It is well known that NO and $NO_2$ play important roles in $O_3$ formation (U.S. EPA, 2013, Section 3.2.2). Under the current network design, Type 2 PAMS sites are required to measure $NO_X$ (which by definition is the sum of NO and $NO_2$), and Types 1, 3, and 4 sites are required to measure $NO_y$. NCore sites are currently required to measure $NO_y$ but are not required to measure $NO_2$ separately.

In conventional $NO_X$ analyzers, $NO_2$ is determined as the difference between the measured NO and $NO_X$ concentrations. However, due to the non-selective reduction of oxidized nitrogen compounds by the molybedenum converter used in conventional $NO_X$ monitors, the $NO_2$ measurement made by conventional $NO_X$ monitors can be biased high due to the varying presence of NOz compounds that may be reported as $NO_2$. The unknown bias from the NOz compounds is undesirable when attempting to understand $O_3$ chemistry.

Improvements in reactive nitrogen measurements have been made since the original PAMS requirements were promulgated that allow for improved $NO_2$ measurements. Selective photolytic converters have been developed that are not significantly biased by NOz compounds (Ryerson et al., 2000). Monitors using photolytic converters are commercially available and have been approved as FEMs for the measurement of $NO_2$. In addition, methods that directly read $NO_2$ have been developed that allow for very accurate readings of $NO_2$ without some of the issues inherent to the "difference method" used in converter-based $NO_X$ analyzers. However, these direct reading $NO_2$ analyzers generally do not provide an NO estimate, and would need to be paired with a converter-based $NO_X$ monitor or $NO_y$ monitor in order to also measure NO.

As discussed above, the EPA is finalizing a PAMS network design such that PAMS measurements will be required at existing NCore sites in CBSAs with a population of 1,000,000 people or more. NCore sites currently are required to measure NO and $NO_y$. NCore sites are not currently required to measure $NO_2$. Due to the importance of accurate $NO_2$ data to the understanding of $O_3$ formation, the EPA proposed to require $NO_2$ measurements at required PAMS sites. Since existing NCore sites currently measure $NO_y$, either a direct reading $NO_2$ analyzer or a photolytic-converter $NO_X$ analyzer could be used to meet the proposed requirement. The EPA believes conventional $NO_X$ analyzers would not be appropriate for making PAMS measurements due to the uncertainty caused by interferences from NOz compounds.

A number of commenters questioned the need for both $NO_y$ and $NO_2$ measurements at PAMS sites. One commenter stated that "in dense urban areas an $NO/NO_2/NO_X$ instrument may be adequate but in a more rural area an $NO/NO_y$ instrument may be preferable." Another commenter stated that due to the size of the grid cells used in grid models that "the impact of NOz interferences would be very small compared to other modeling uncertainties such as emission inventories and mixing heights." Another commenter suggested that "EPA should provide clear and specific guidance on how agencies can request that the $NO_y$ monitoring be eliminated from the NCore suite based on comparative data between the $NO_2$ and $NO_y$ monitors."

The comments suggest that the model's ability to simulate the partitioning of reactive nitrogen is unimportant because there may be other errors in the model. The EPA believes that measurements should be routinely collected so that it can be demonstrated that the chemistry, meteorology, and emissions in the model are all of sufficient reliability for use in informing air quality management decisions. Monitoring sites rarely fall into simple categories of urban or rural, and the speciation of $NO_y$ varies considerably as a function of meteorology and time of day at a given site. The state-of-the-science in regulatory air quality modeling is such that accurate measurements of key $O_3$ precursors must be available to demonstrate the credibility of the model predictions. The increased availability of special field study observations is leading to increased scrutiny of the chemical mechanisms used in regulatory modeling. Comprehensive and accurate

measurement sites are needed to demonstrate the adequacy of the models and to respond to these challenges.

Measurements of NO, $NO_2$, and $NO_y$ concentrations are critical to understanding atmospheric aging and photochemistry. These measurements will provide essential information about whether $NO_y$ compounds are fresh or aged which is important for understanding both local photochemistry (*i.e.* through indicator ratios to distinguish $NO_X$ vs VOC limited conditions) as well as for characterizing transport from upwind regions. These evaluations may be conducted using observations, box modeling or through complex photochemical grid based modeling. Accurate speciated and total $NO_y$ measurements are necessary for all three types of analysis. For these reasons, the EPA is finalizing the requirement for required PAMS sites to measure true $NO_2$ in addition to NO and $NO_y$.

### 5. Meteorology Measurements

The current PAMS requirements require monitoring agencies to collect surface meteorology at all required PAMS sites. As noted in the EPA's Technical Assistance Document (U.S. EPA, 1998) for the PAMS program, the PAMS requirements do not provide specific surface meteorological parameters to be monitored. As part of the implementation efforts for the original PAMS program, a list of recommended parameters was developed and incorporated into the TAD which includes wind direction, wind speed, temperature, humidity, atmospheric pressure, precipitation, solar radiation, and ultraviolet (UV) radiation. Currently, NCore sites are required to measure the above parameters with the exceptions of atmospheric pressure, precipitation, solar radiation, and UV radiation. In recognition of the importance of these additional measurements for understanding $O_3$ formation, the EPA proposed to specify that required PAMS sites are required to collect wind direction, wind speed, temperature, humidity, atmospheric pressure, precipitation, solar radiation, and UV radiation. Since NCore sites are currently required to measure several of these surface meteorological parameters, the net impact of the proposal was to add the requirement for the monitoring of atmospheric pressure, precipitation, solar radiation, and UV radiation at affected NCore sites. The EPA received no significant comments on this portion of the proposal, and therefore is finalizing the requirement as proposed.

The existing PAMS requirements also require the collection of upper air meteorological measurements at one site in each PAMS area. The term upper air meteorological is not well defined in the existing PAMS requirements. As part of the implementation efforts for the original PAMS program, mixing height was added to the PAMS TAD as a recommended meteorological parameter to be monitored. Most monitoring agencies installed radar profilers to meet the requirement to collect upper air meteorology. Radar profilers provide data on wind direction and speed at multiple heights in the atmosphere. Radio acoustic sounding system (RASS) profilers are often included with radar profilers to obtain atmospheric temperature at multiple heights in the atmosphere and to estimate mixing height. The EPA recognizes that the upper air data on wind speed and wind direction from radar profilers can be very useful in $O_3$ modeling. However, many of the current PAMS radar profilers are old and in need of replacement or expensive maintenance. In addition, the cost to install and operate radar profilers at all required PAMS sites would be prohibitive. Therefore, the EPA did not propose to add upper air wind speed and direction as required meteorological parameters to be monitored at required PAMS sites. Where monitoring agencies find the radar profiler data valuable, continued operation of existing radar profilers or the installation of new radar profilers would be appropriate to consider as part of the state's EMP.

As discussed above, mixing height is one upper air meteorological measurement that has historically been measured at PAMS sites. A number of methods can be used to measure mixing height in addition to radar profiler technology discussed above. Recent developments in ceilometer technology allow for the measurement of mixing height by changes in particulate concentrations at the top of the boundary layer (Eresmaa et al., 2006). Ceilometers provide the potential for continuous mixing height data at a fraction of the cost of radar profilers. Due to the importance of mixing height measurements for $O_3$ modeling, the EPA proposed to add the requirement for monitoring agencies to measure mixing height at required PAMS sites.

A number of commenters questioned the need for mixing height measurements at PAMS sites. One commenter stated, "the photochemical modeling community has a long history of relying upon National Weather Service measurements for mixing height." Another commenter stated that

"in some areas of the country the models used to predict mixing height are adequate, but in other mountainous or marine areas model-predicted mixing height data is inadequate." Accurate estimates of mixing height are important for appropriately characterizing concentrations of $O_3$ and $O_3$ precursors. Mixing height is also important for characterizing how modeled $O_3$ may change as a result of changing $NO_X$ and VOC concentrations. For instance, if the modeled mixing height is too low causing unrealistically high concentration of $NO_X$, then $O_3$ destruction could be predicted when $O_3$ production may be happening in the atmosphere. When this or the opposite situation exists in modeling it may lead $O_3$ response to emissions changes that are less reliable for air quality planning purposes. While models are believed to do a reasonable job of predicting mixing height during the day, there is considerably more uncertainty in predicting this parameter during morning and evening transition periods and at night. Model $O_3$ predictions are particularly sensitive to mixing height during the time periods for which uncertainty in this parameter is greatest.

Several commenters noted that nearby National Oceanic and Atmospheric Administration (NOAA) Automated Surface Observing System (ASOS) sites may be a better alternative for collection of mixing height data. As indicated in the proposal, the EPA is aware of the network of ceilometers operated by NOAA as part of ASOS. The EPA has been in discussions with NOAA regarding the potential for these systems to provide the needed mixing height data. However, the ASOS ceilometers are not currently equipped to provide mixing height data and NOAA has no current plans to measure continuous mixing height in the future. Nonetheless, the EPA will continue to work with NOAA to determine if the ASOS ceilometers can be upgraded to meet the need for mixing height data, and included proposed regulatory language that will allow states a waiver to use nearby mixing height data from ASOS (or other sources) to meet the requirement to collect mixing height data at required PAMS sites when such data are suitable and available.

The EPA is finalizing the requirement for the measurement of mixing height at required PAMS sites due to the importance of mixing height in $O_3$ modeling. A waiver option, to be approved by the Regional Administrator, is also being included to allow mixing height measurements to be obtained from other nearby sites (e.g., NOAA ASOS sites).

## 6. PAMS Season

Currently, PAMS measurements are required to be taken during the months of June, July, and August. This 3-month period is referred to as the "PAMS Season." As part of the PAMS re-evaluation, the EPA considered changes to the PAMS season. The 3-month PAMS season was originally selected to represent the most active period for $O_3$ formation. However, the EPA notes that in many areas the highest $O_3$ concentrations are observed outside of the PAMS season. As an example, the highest $O_3$ concentrations in the mountain-west often occur during the winter months. Data collected during the current PAMS season would have limited value in understanding winter $O_3$ episodes.

The CASAC AMMS (U.S. EPA, 2011f) noted in their report to the EPA that "it would be desirable to extend the PAMS monitoring season beyond the current June, July, August sampling period." But that "the monitoring season should not be mandated and rigid; it should be flexible and adopted and coordinated on a regional airshed basis." The EPA agrees with CASAC on the need for flexibility in determining when PAMS measurements should be taken to meet local monitoring needs but also agrees with CASAC that the flexibility "should not conflict with national goals for the PAMS program." A significant benefit of the standard PAMS season is that it ensures data availability from all PAMS sites for national- or regional-scale modeling efforts.

While the EPA agrees with the potential benefit of extending the availability of PAMS measurements outside of the current season, we also considered the burden of requiring monitoring agencies to operate additional PAMS measurements (e.g., hourly speciated VOC) for periods that in some cases, might be much longer than the current 3-month season, for example, if the PAMS season was extended to match each state's required $O_3$ monitoring season. Being mindful of the potential burden associated with a lengthening of the PAMS season as well as the potential benefits of the additional data, the EPA proposed to maintain the current 3-month PAMS monitoring season for required PAMS sites rather than extending the PAMS season to other periods where elevated $O_3$ may be expected. No significant comments were received on the proposed PAMS season, and as such, for the reasons stated here and in the proposal, the EPA is not changing the 3-month PAMS season of June, July, and August.

The EPA believes that the 3-month PAMS season will provide a consistent data set of $O_3$ and $O_3$ precursor measurements for addressing the national PAMS objectives. Monitoring agencies are strongly encouraged to consider collecting PAMS measurements in additional periods beyond the required PAMS season as part of their EMP. The monitoring agencies should consider factors such as the periods of expected peak $O_3$ concentrations and regional consistency when determining potential expansion of their specific monitoring periods beyond the required PAMS season.

### 7. Timing and Other Implementation Issues

The EPA recognizes that the changes to the PAMS requirements will require resources and a reasonable timeline in order to be successfully implemented. The PAMS program is funded, in part, as part of the EPA's section 105 grants. The EPA believes that the current national funding level of the PAMS program is sufficient to support these final changes, but changes in the distribution of PAMS funds will need to be made. The network design changes will require some monitoring agencies to start collection of new PAMS measurements, while other monitoring agencies will see reductions in PAMS measurement requirements. The EPA will work with the NAACA, AAPCA, and other monitoring agencies to develop an appropriate PAMS grant distribution strategy.

In addition to resources, the affected monitoring agencies will need time to implement the revised PAMS requirements. For the required PAMS sites, monitoring agencies can determine now which NCore sites will be required to make PAMS measurements based on readily available census data. However, monitoring agencies will still need time to evaluate and seek approval for alternative sites or alternative VOC methods. In addition, monitoring agencies will need time to make capital investments (primarily for the installation of autoGCs, $NO_2$ monitors, and ceilometers), prepare appropriate QA documents, and develop the expertise needed to successfully collect PAMS measurements via training or otherwise. In order to ensure monitoring agencies have adequate time to plan and successfully implement the revised PAMS requirements, the EPA is requiring that monitoring agencies identify their plans to implement the PAMS measurements at NCore sites in their Annual Network Plan due July 1, 2018, and to begin making PAMS

measurements at NCore sites by June 1, 2019. The EPA believes some monitoring agencies may be able to begin making PAMS measurements sooner than June 2019 and encourages early deployment where possible.

Monitoring agencies will need to wait until $O_3$ designations are made to officially determine the applicability of the EMP requirement. The EPA proposed to allow two years after designations to develop EMPs, and that the EMPs would be submitted as part of their Annual Network Plan. Several commenters stated that due to the level of planning and coordination required for the EMPs, that the plans should instead be included as part of the 5-year network assessment. While the EPA agrees that the EMPs will require a substantial amount of planning and coordination, the next 5 year network assessment will not be due until July 1, 2020—nearly 5 years from the date of this final rulemaking. The EPA believes that it would be inappropriate to wait 5-years from the date of this rulemaking to develop plans for enhanced $O_3$ monitoring. In addition, the EPA believes that the first round of EMP development should receive additional focus and review that may not be afforded as part of the larger network assessment. Finally, most monitoring agencies will be aware of their likely $O_3$ attainment status well in advance of the official designations. In order to ensure timely development of the initial EMPs, the EPA is requiring affected monitoring agencies to submit their initial EMPs no later than two years following designations. States in the OTR do not need to wait until designations to determine EMP applicability and may not be classified as Moderate or above. As such, the final rule includes a requirement for states in the OTR to submit their initial EMPs by October 1, 2019 (which is consistent with the expected timeline for the remaining EMPs). However, subsequent review and revisions to the EMPs are to be made as part of the 5-year network assessments beginning with the assessments due in 2025.

### D. Addition of a New FRM for $O_3$

The use of FRM analyzers for the collection of air monitoring data provides uniform, reproducible measurements of concentrations of criteria pollutants in ambient air. FRMs for various pollutants are described in several appendixes to 40 CFR part 50. For most gaseous criteria pollutants (including $O_3$ in Appendix D of part 50), the FRM is described as a particular measurement principle and calibration procedure to be implemented, with

further reference to specific analyzer performance requirements specified in 40 CFR part 53.

The EPA allows new or alternative monitoring technologies—identified as FEMs—to be used in lieu of FRMs, provided that such alternative methods produce measurements closely comparable to corresponding FRM measurements. Part 53 sets forth the specific performance requirements as well as the performance test procedures required by the EPA for determining and designating both FRM and FEM analyzers by brand and model.

To be used in a determination of compliance with the $O_3$ NAAQS, ambient $O_3$ monitoring data must be obtained using either a FRM or a FEM, as defined in parts 50 and 53. For $O_3$, nearly all the monitoring methods currently used by state and local monitoring agencies are FEM (not FRM) continuous analyzers that utilize an alternative measurement principle based on quantitative measurement of the absorption of UV light by $O_3$. This type of $O_3$ analyzer was introduced into monitoring networks in the 1980s and has since become the predominant type of method used because of its all-optoelectronic design and its ease of installation and operation.

The existing $O_3$ FRM specifies a measurement principle based on quantitative measurement of chemiluminescence from the reaction of ambient $O_3$ with ethylene (ET–CL). Ozone analyzers based on this FRM principle were once widely deployed in monitoring networks, but now they are no longer used for routine $O_3$ field monitoring because readily available UV-type FEMs are substantially less difficult to install and operate. In fact, the extent of the utilization of UV-type FEMs over FRMs for $O_3$ monitoring is such that FRM analyzers have now become commercially unavailable. The last new commercial FRM analyzer was designated by the EPA in 1979. The current list of all approved FRM and FEMs capable of providing ambient $O_3$ data for use in NAAQS attainment decisions may be found on the EPA's Web site and in the docket for this action (U.S. EPA, 2014e). However, that list does not indicate whether or not each listed method is still commercially available.

### 1. Proposed Changes to the FRM for $O_3$

Although the existing $O_3$ FRM is still a technically sound methodology, the lack of commercially available FRM $O_3$ analyzers severely impedes the use of FRM analyzers, which are needed for quality control purposes and as the standard to which candidate FEMs are

required to be compared. Therefore, the EPA proposed to establish a new FRM measurement technique for $O_3$ based on NO-chemiluminescence (NO–CL) methodology. This new chemiluminescence technique is very similar to the existing ET–CL methodology with respect to operating principle, so the EPA proposed to incorporate it into the existing $O_3$ FRM as a variation of the existing ET–CL methodology, coupled with the same existing FRM calibration procedure.

A revised Appendix D to 40 CFR part 50 was proposed to include both the original ET–CL methodology as well as the new NO–CL methodology, such that use of either measurement technique would be acceptable for implementation in commercial FRM analyzers. Currently, two $O_3$ analyzer models (from the same manufacturer) employing the NO–CL methodology have been designated by the EPA as FEMs and would qualify for re-designation as FRMs under the revised $O_3$ FRM. The rationale for selecting the new NO–CL FRM methodology, including what other methodologies were also considered, and additional information to support its selection are discussed in the preamble to the proposal for this action (79 FR 75366–75368). No substantive change was proposed to the existing $O_3$ FRM calibration procedure, which would be applicable to both chemiluminescence FRM methodologies.

The proposed FRM in part 50, Appendix D also included numerous editorial changes to provide clarification of some provisions, some revised wording, additional details, and a more refined numbering system and format consistent with that of two other recently revised FRMs (for $SO_2$ and CO).

As noted in the proposal, there is substantial similarity between the new and previously existing FRM measurement techniques, and comparative field data show excellent agreement between ambient $O_3$ measurements made with the two techniques (U.S. EPA 2014f). Therefore, the EPA believes that there will be no significant impact on the comparability between existing ambient $O_3$ monitoring data based on the original ET–CL methodology and new monitoring data that may be based on the NO–CL methodology.

The proposed FRM retains the original ET–CL methodology, so all existing FEMs, which were designated under part 53 based on demonstrated comparability to that ET–CL methodology, will retain their FEM designations. Thus, there will be no negative consequences or disruption to

monitoring agencies, which will not be required to make any changes to their $O_3$ monitors due to the revised $O_3$ FRM. New FEMs would be designated under part 53, based on demonstrated acceptable comparability to either FRM methodology.

### 2. Comments on the FRM for $O_3$

Comments that were received from the public on the proposed new $O_3$ FRM technique are addressed in this section. Most commenters expressed general support for the proposed changes, although a few commenters expressed some concerns. The most significant issue discussed in comments was the relatively small but nevertheless potentially significant interference of water vapor observed in the ET–CL technique. As some comments pointed out, this interference is positive and could possibly affect NAAQS attainment decisions. The available NO–CL FEM analyzers include a sample dryer, which minimizes this interference. As noted previously, very few, if any, ET–CL FRM analyzers are still in operation. The ET–CL (with and without a sample dryer), the proposed NO–CL FRM, and all designated FEM analyzers have demonstrated compliance with the substantially reduced water vapor interference equivalent limit specified in 40 CFR part 53.

The proposed FRM mentioned the need for a sample air dryer for both ET–CL and NO–CL FRM analyzers. In response to these comments, the wording of the ET–CL FRM has been augmented to clarify the requirement for a dryer in all newly designated FRMs (the only change being made by the EPA to the existing ET–CL FRM as proposed). Also, the interference equivalent limit for water vapor in part 53 was proposed to be substantially reduced from the current 0.02 ppm to 0.002 ppm. The interference equivalent test for water vapor applicable to the new NO–CL candidate FRM analyzers (specified in Table B–3 of part 53) was proposed to be more stringent than the corresponding existing test for ET–CL FRM analyzers by requiring that water vapor be mixed with $O_3$. This mixing requirement was not part of the existing test for ET–CL candidate analyzers (denoted by footnote 3 in Table B–3). However, in further response to these commenters' concerns, the EPA has modified Table B–3 to extend this water vapor mixing requirement to newly designated ET–CL analyzers, as well. These measures should insure that potential water vapor interference is minimized in all newly designated FRM analyzers.

Several comments indicated concern that currently-designated FEM analyzers retain their designation without retesting if the new FRM were promulgated. The current ET–CL FRM is being retained; therefore, it is not necessary to make these new requirements retroactive to existing designated FEM analyzers. The existing FEM analyzers will not be required to be retested, and their FEM designation will be retained so that there will be no disruption to current monitoring networks.

Although beyond the scope of this rulemaking, other comments concerned potential hazards of the NO compressed gas supply required for NO–CL analyzer operation, and the current non-availability of a photolytic converter to provide an alternative source of NO from a less hazardous nitrous oxide gas supply. With regard to the photolytic converter, the EPA would approve such a converter as a source of NO if requested by an FRM analyzer manufacturer, upon demonstration of adequate functionality.

A few commenters liked the "scrubberless UV absorption" (SL–UV) measurement technique. The EPA has identified the SL–UV method as a potentially advantageous candidate for the $O_3$ FRM, but could not propose adopting it until additional test and performance information becomes available. A related comment requested clarification that promulgation of the proposed revised FRM would not preclude future consideration of other $O_3$ measurement techniques such as SL–UV. In response, the EPA can always consider new technologies for FRMs under 40 CFR 53.16 (Supersession of reference methods). However, a revised or amended FRM that included the SL–UV technique, as set forth in Appendix D of 40 CFR part 50, would have to be promulgated as part of a future rulemaking, before a SL–UV analyzer could be approved as an FRM under 40 CFR part 53.

One comment suggested that the value for the absorption cross section of $O_3$ at 254 nm used by the FRM's calibration procedure should be changed. The comment indicated that the nearly 2% difference effectively lowers the $O_3$ NAAQS by that amount. Using the corrected value would resolve much of the difference observed between $O_3$ measurements calibrated against the UV standard reference photometer versus those calibrated using NO gas phase titration and it would allow the EPA to adopt the less complex and more economical Gas Phase Titration (GPT) technique as the primary calibration standard for the

FRM. The EPA will await the results of further studies determining the value of the $O_3$ cross section at 254 nm before making a change to the calibration procedures and will not finalize changes to the calibration procedures in this final rule.

*E. Revisions to the Analyzer Performance Requirements*

1. Proposed Changes to the Analyzer Performance Requirements

In close association with the proposed $O_3$ FRM, the EPA also proposed changes to the associated analyzer performance requirements for designation of FRMs and FEMs for $O_3$, as set forth in 40 CFR part 53. These changes were largely confined to Table B–1, which specifies performance requirements for FRM and FEM analyzers for $SO_2$, CO, $O_3$, and $NO_2$, and to Table B–3, which specifies test concentrations for the various interfering agent (interferent) tests. Minor changes were also proposed for Figure B–5 and the general provisions in subpart A of part 53. All of these proposed changes are described and discussed more fully in the preamble to the proposal for this action (79 FR 75368–75369).

Modest changes proposed for Table B–3 would add new interferent test concentrations specifically for $NO–CL$ $O_3$ analyzers, which include a test for $NO_2$ interference.

Several changes to Table B–1 were proposed. Updated performance requirements for "standard range" analyzers were proposed to be more consistent with current $O_3$ analyzer performance capabilities, including reduced limits for noise allowance, lower detectable limit (LDL), interference equivalent, zero drift, span drift, and lag, rise, and fall times. The previous limit on the total of all interferents was proposed to be withdrawn as unnecessary and to be consistent with that same change made previously for $SO_2$ and CO analyzers. Also, the span drift limit at 20% of the upper range limit (URL) was proposed to be withdrawn because it has similarly been shown to be unnecessary and to maintain consistency with that same change made previously for $SO_2$ and CO analyzers.

The form of the precision limits at both 20% and 80% of the URL was proposed to be changed from ppm to percent. The proposed new limits (in percent) were set to be equivalent to the previously existing limits (in ppm) and thus remain effectively unchanged. This change in form of the precision limits in Table B–1 has been previously made for $SO_2$ and CO analyzers, and was

proposed to extend also to analyzers for $NO_2$, (again with equivalent limits) for consistency and to simplify Table B–1 across all types of analyzers to which the table applies. A new footnote proposed for Table B–1 clarifies the new form for precision limits as "standard deviation expressed as percent of the URL." Also proposed was a revision to Figure B–5 (Calculation of Zero Drift, Span Drift, and Precision) to reflect the changes proposed in the form of the precision limits and the withdrawal of the limits for total interference equivalent.

Concurrent with the proposed changes to the performance requirements for candidate $O_3$ analyzers, the EPA conducted a review of all designated FRM and FEM $O_3$ analyzers currently in production or being used, and verified that all meet the proposed new performance requirements. Therefore, none would require withdrawal or cancellation of their current FRM or FEM respective designations.

Finally, the EPA proposed new, optional, "lower range" performance limits for $O_3$ analyzers operating on measurement ranges lower (*i.e.,* more sensitive) than the standard range specified in Table B–1. The new performance requirements are listed in a new "lower range" column in Table B–1 and will provide for more stringent performance in applications where more sensitive $O_3$ measurements are needed.

Two minor changes were proposed to the general, administrative provisions in Subpart A of part 53. These include an increase in the time allowed for the EPA to process requests for approval of modifications to previously designated FRMs and FEMs in 53.14 and the withdrawal of a requirement for annual submission of Product Manufacturing Checklists associated with FRMs and FEMs for $PM_{2.5}$ and $PM_{10–2.5}$ in 53.9. No comments were received on these proposed changes and the EPA will be finalizing these revisions in this rulemaking.

2. Comments on the Analyzer Performance Requirements

Several comments were received related to the proposed changes to the analyzer performance requirements of part 53, and most were supportive. Comments from a few monitoring agencies suggested that the more stringent performance requirements proposed might be difficult to achieve or would increase monitor maintenance and cost. The EPA is also clarifying that these requirements apply only to the performance qualification requirements for designations of new FRM and FEM

analyzers and will have no impact on a monitoring agency's operation of existing $O_3$ analyzers.

More specific comments from an analyzer manufacturer pointed out that the proposed lower limits for noise and LDL may be too stringent, the former because low-cost portable analyzers may have shorter absorption cells, and the latter because of limitations of current calibration technology. After further consideration of available analyzer performance data in light of these comments, the EPA agrees and is changing the noise limits from the proposed values of 1 ppb and 0.5 ppb (for the standard and lower ranges, respectively) to 2.5 ppb and 1 ppb (respectively). The EPA is also changing the LDL limit from the proposed values of 3 ppb and 1 ppb (respectively) to 5 ppb and 2 ppb (respectively). These new limits are still considerably more stringent than the previous limits (for the standard range) and are also consistent with those recommended by the commenter and the current performance capabilities of existing analyzer/calibration technology.

This commenter also pointed out that the proposed lower limit for 12-hour zero drift, together with the way the prescribed test is carried out, resulted in the test being dominated by analyzer noise rather than drift. The EPA agrees with this comment in general but believes that further study is needed before any specific changes can be proposed for the 12-hour zero drift test, particularly since any such changes would affect analyzers for other gaseous pollutants, as well.

Other comments suggested that there was no need for the proposed new, low-range performance requirements, because of cost and that available calibrators would be inadequate for calibration of such low ranges. The EPA disagrees with these comments and believes, as noted in the proposal preamble, that there is a definite need for low-level $O_3$ measurements in some applications and that suitable calibration for such low-level measurement ranges can be adequately carried out. As stated previously, the new "low range" specifications for $O_3$ analyzers are optional.

Several comments pointed out some typographical errors related to footnotes in Table B–3, as proposed; these errors have been corrected in the version of Table B–3 being finalized today.

EPA is finalizing the proposed amendments to both the $O_3$ FRM in Appendix D of part 50 and provisions in part 53, modified as described above, in response to the comments received.

## VII. Grandfathering Provision for Certain PSD Permits

This section addresses the grandfathering provision for certain Prevention of Significant Deterioration (PSD) permit applications that is being finalized in this rule. Section VIII.C of this preamble contains a description of the PSD and Nonattainment New Source Review (NNSR) permitting programs and additional discussion of the implementation of those programs for the O$_3$ NAAQS.

### A. Summary of the Proposed Grandfathering Provision

The EPA proposed to amend the PSD regulations to add a transition plan that would address the extent to which the revised O$_3$ NAAQS will apply to pending PSD permit applications. This transition plan is reflected in a grandfathering provision that applies to permit applications that meet certain milestones in the review process prior to either the signature date or effective date of the revised O$_3$ NAAQS. Absent such a grandfathering provision in the EPA's regulations, the EPA interprets section 165(a)(3)(B) of the CAA and the implementing PSD regulations at 40 CFR 52.21(k)(1) and 51.166(k)(1) to require that PSD permit applications include a demonstration that emissions from the proposed facility will not cause or contribute to a violation of any NAAQS that is in effect as of the date the PSD permit is issued. The proposal included a grandfathering provision that would enable eligible PSD applications to make the demonstration that the proposed project would not cause or contribute to a violation of any NAAQS with respect to the O$_3$ NAAQS in effect at the time the relevant permitting benchmark for grandfathering was reached, rather than the revised O$_3$ NAAQS. We proposed that the grandfathering provision would apply specifically to either of two categories of pending PSD permit applications: (1) Applications for which the reviewing authority has formally determined that the application is complete on or before the signature date of the final rule revising the O$_3$ NAAQS; and (2) applications for which the reviewing authority has first published a public notice of the draft permit or preliminary determination before the effective date of the revised NAAQS.

In the proposal, we also noted that for sources subject to the federal PSD program under 40 CFR 52.21, the EPA and air agencies that have been delegated authority to implement the federal PSD program for the EPA would apply the grandfathering provision to any PSD application that satisfies either of the two criteria that make an application eligible for grandfathering. Accordingly, if a particular application does not qualify under the first criterion based on a complete application determination, it may qualify under the second criterion based on a public notice announcing the draft permit or preliminary determination. Conversely, a source may qualify for grandfathering under the first criterion, even if it does not satisfy the second.

The EPA also proposed revisions to the PSD regulations at 40 CFR 51.166 that would afford air agencies that issue PSD permits under a SIP-approved PSD permit program the discretion to adopt provisions into the SIP that allow for grandfathering of pending PSD permits under the same circumstances as set forth in the federal PSD regulations. With regard to implementing the grandfathering provision, we also explained that air agencies with EPA-approved PSD programs in their SIPs would have additional flexibility for implementing the proposed grandfathering provision to the extent that any alternative approach is at least as stringent as the federal provision. In addition, the proposal recognized that some air agencies do not make formal completeness determinations; thus, only the latter criterion based on the issuance of a public notice would be relevant in such cases and the state could elect to adopt only that criterion into its SIP. Accordingly, the EPA proposed to add a grandfathering provision to 40 CFR 51.166 containing the same two criteria as proposed for 40 CFR 52.21.

### B. Comments and Responses

Many of the comments supported the concept of grandfathering. Some of these comments, mostly by state and local air agencies, supported the grandfathering provision as proposed. Many others recommended alternative approaches to grandfathering based on several different dates. Several comments recommended that air agencies be allowed to grandfather certain PSD permit applications and issue a PSD permit based on the 2008 O$_3$ NAAQS after the area is designated nonattainment for the revised O$_3$ NAAQS. An opposing set of comments, representing a coalition of eight environmental groups and one health advocacy group, strongly objected to the proposal for grandfathering, claiming that the EPA did not have any authority under the CAA to exempt or grandfather permit applicants from the statutory PSD permitting requirements. We are addressing some of these comments below and others in the Response to Comment Document that is included in the docket for this rule.

Comments that recommended broadening the scope of the proposed grandfathering provision suggested a variety of approaches. Some air agency and industry comments recommended that the EPA adopt a grandfathering provision applicable only to those PSD applications for which the reviewing authority has determined the application to be complete on or before the signature date of the revised NAAQS. Other air agency and industry comments recommended that grandfathered status be determined only on the basis of whether the relevant permitting milestone has been achieved by the effective date of the revised NAAQS.

The EPA disagrees with these comments; the final rule uses separate dates for the two grandfathering milestones, as proposed. If the effective date of the revised NAAQS were used as the date for the complete application milestone, this could lead to pressure on state permitting authorities to prematurely issue completeness determinations in order to qualify for the grandfathering provision in the time period between signature of this final rule and the effective date. Using the signature date of the revised O$_3$ NAAQS as the date for the grandfathering milestone based on the completeness determination is thus intended to help preserve the integrity of the completeness determination process. Permit applications that have not yet been determined complete can be supplemented or revised to address the revised O$_3$ standards before the completeness determination is issued. Conversely, the amount and type of work required for a preliminary determination or a draft permit reduces the risk that such a document would be released prematurely merely to qualify for grandfathering. Similarly, because these documents are released for the purpose of providing an adequate opportunity for public participation in the permitting process, it would not behoove a reviewing authority to precipitately release such documents merely to satisfy the grandfathering milestone. Accordingly, the EPA does not have the same concerns about using the effective date of this final rule for the preliminary determination or draft permit milestone and further finds it reasonable to provide additional time for satisfying this milestone. Moreover, using the proposed milestones and corresponding dates is consistent with the milestones and corresponding dates that were used in the grandfathering provisions for the 2012 PM$_{2.5}$ NAAQS.

Several other comments recommended that the grandfathering provision apply to all PSD applications for which a final PSD permit will be issued prior to the effective date of the area designations for the revised NAAQS. Some of these comments explained that without some transition provisions in the final rule, it may be impossible for a source to demonstrate attainment if the current ambient air monitoring data indicates a revised, lowered standard is not being met. The comments also suggested that the extended period for grandfathering a source from the revised NAAQS would provide states with additional time to establish offset banks or similar systems for new nonattainment areas.

Other comments recommended that air agencies be allowed to grandfather either all or certain PSD permit applications received before the effective date of the final nonattainment designations for the revised O₃ NAAQS. These comments supported allowing air agencies to issue PSD permits to grandfathered sources even after the area in which the source proposes to locate is designated nonattainment for the revised O₃ NAAQS. One comment saw this as being necessary because the development of the regulatory framework that will support the revised NAAQS, such as development of a credit market or even a transition into NNSR permitting, does not instantaneously accompany the revised standard. Hence, the comment added that "[d]uring the Interim Period (the time between the revision of the NAAQS rule and development of the regulatory framework) the project may be unable to secure offsets and no offsets would be available for purchase." Another comment explained that the extended period for grandfathering sources from the revised O₃ NAAQS was needed to "minimize disruption to complex projects that may have been under development since before the EPA published the proposed NAAQS revision." This comment noted the "PSD projects commonly undergo years of engineering and other development resources before an air permit application can be prepared."

The EPA does not agree with the comments recommending that the EPA use a date after the effective date of the revised O₃ NAAQS as the date by which the permit application must reach the relevant milestone to qualify for grandfathering. The EPA does not believe it is appropriate to unreasonably or unnecessarily delay implementation of these revised standards under the PSD program. As explained in more detail below, the purpose of the

grandfathering provision is to provide a reasonable transition mechanism for certain PSD applications and the EPA believes that the milestones proposed and finalized here strike the appropriate balance in providing for such a reasonable transition. Moreover, in some cases, some of these recommended approaches could enable a situation where a PSD permit would be issued to a source during a future period when the area is designated nonattainment for the revised O₃ NAAQS. As explained below, the EPA does not believe that this specific outcome is permissible under the CAA.

The EPA does not agree with the comments suggesting that the grandfathering provision should be expanded to apply to any PSD application received before the effective date of the final nonattainment designations for the revised O₃ NAAQS. Because the process for reviewing PSD permit applications and issuing a final PSD permit is time consuming, such an approach could allow issuance of PSD permits to grandfathered sources even after the area in which the source proposes to locate is designated nonattainment for the revised O₃ NAAQS. The EPA does not agree that grandfathering should be extended in a way that would allow a source located in an area designated as nonattainment for a pollutant at the time of permit issuance to obtain a PSD permit for that pollutant rather than a NNSR permit. The EPA does not interpret the CAA or its implementing regulations to allow such an outcome. The PSD requirements under CAA section 165 only apply in areas designated attainment or unclassifiable for the pollutant. *Alabama Power* v. *Costle*, 636 F.2d 323, 365–66, 368 (D.C. Cir. 1980). Accordingly, the PSD implementing regulations at 40 CFR 52.21(i)(2) contain an exemption that provides that the substantive PSD requirements shall not apply to a pollutant if the owner or operator demonstrates that the facility is located in an area designated nonattainment for that pollutant under CAA section 107 of the Act. *See also* 40 CFR 51.166(i)(2) (allowing for the same exemption in SIP-approved PSD permitting programs). In addition, under CAA section 172(c)(5) implementation plans must require that permits issued to new or modified stationary sources "anywhere in the nonattainment area" meet the requirements of CAA section 173, which contains the NNSR permit requirements. *See* 40 CFR part 51, Appendix S, IV.A (providing that, if a major new source or major modification that would locate in an area designated

as nonattainment for a pollutant for which the source or modification would be major, approval to construct may be granted only if the specific conditions for NNSR are met, including obtaining emission offsets and an emission limitation that specifies the lowest achievable emissions rate). Moreover, given the adverse air quality conditions that already exist in a nonattainment area and the congressional directive to reach attainment as expeditiously as practicable, construction of a major stationary source that significantly increases emissions in such an area should be expected to address all of the NNSR requirements, which are designed to ensure that a new or modified major stationary source will not interfere with reasonable progress toward attainment, even if this could cause delay to the permit applicant.

With respect to the comments that suggested the effective date of the NAAQS should be used as the date for both milestones, the EPA does not agree that such a change is necessary. The purpose of the grandfathering provision is to provide a reasonable transition mechanism in the following circumstances: first, the PSD application is one for which both the applicant and the reviewing authority have committed substantial resources; and, second, this situation is one where the need to satisfy the demonstration requirement under CAA section 165(a)(3) could impact the reviewing authority's ability to meet the statutory deadline for issuing a permit within one year of the completeness determination. In situations where the reviewing authority has not yet issued a completeness determination as of the signature date of the revised O₃ NAAQS, both the permit applicant and the reviewing authority have sufficient notice of the revised standard so that it can be addressed before the completeness determination is issued and the one-year clock begins to run. The grandfathering provision issued in this rulemaking is crafted to draw a reasonable balance that accommodates the requirements under both CAA sections 165(a)(3) and 165(c). Any modification of the dates further than is necessary to accommodate these concerns could upset this balance.

With respect to the comments that suggested adopting a grandfathering provision applicable only to those PSD applications for which the reviewing authority has determined the application to be complete on or before the signature date of the revised NAAQS, the EPA is not making this change because we understand that not all reviewing authorities issue formal completeness determinations. Including

a grandfathering provision based on the publication of a public notice of the draft permit or preliminary determination provides a reasonable transition mechanism for PSD applications in situations where the reviewing authority does not issue formal completeness determinations, but the applicant and the reviewing authority have both committed substantial resources to the pending permit application at the time the revisions to the $O_3$ NAAQS are finalized.

An opposing set of comments—submitted by a consortium of eight environmental groups and one health advocacy group—challenged the proposed grandfathering provision on the basis that the EPA did not have the legal authority to grandfather sources from PSD requirements. These commenters argued that the plain language of CAA section 165 forecloses the EPA's proposed approach and raised several other legal considerations. The EPA disagrees with these comments, including the interpretations of the CAA that they offer. As summarized in the rationale for the final action below in section VII.C of this preamble, the EPA believes that the CAA provides it authority and discretion to establish a PSD grandfathering provision such as the one being adopted today through a rulemaking process. The EPA is providing a further, detailed analysis fully responding to this set of comments, as well as other comments related to the grandfathering provision, in the Response to Comment Document in the docket for this rule.

### C. Final Action and Rationale

After consideration and evaluation of all the public comments received on the grandfathering provision, the EPA is finalizing this provision as proposed, with minor revisions that enhance the clarity of the grandfathering provision, without changing its substantive effect. While these revisions lead to slight differences in wording for the grandfathering provision for the 2012 $PM_{2.5}$ NAAQS and the grandfathering provision finalized in this rulemaking, those differences are not intended to create a different meaning; rather, the grandfathering provision finalized in this rulemaking is intended to have the same substantive effect and meaning for the revised $O_3$ standards as the grandfathering provision for the 2012 $PM_{2.5}$ NAAQS had for the revised PM standards. Other than those clarifying revisions, this final rule includes the same rule language for the grandfathering provision as previously proposed for the PSD regulations at 40

CFR 52.21(i)(12) and 51.166(i)(11), respectively. The provision in the final rule reflects the same two milestones and corresponding dates as the proposed grandfathering provision. Thus, under the grandfathering provision as finalized, either of the following two categories of pending PSD permit applications would be eligible for grandfathering: (1) Applications for which the reviewing authority has formally determined that the application is complete on or before the signature date of the revised $O_3$ NAAQS, or (2) applications for which the reviewing authority has first published a notice of a draft permit or preliminary determination before the effective date of the revised $O_3$ NAAQS. The EPA believes that it continues to be appropriate to include the two proposed milestones for pending permit applications to be eligible for grandfathering. While a completeness determination is often the first event, some air agencies do not determine applications complete as part of their permit process.

Under 40 CFR 52.21, a permit application may qualify for grandfathering under either of the two sets of milestones and dates contained in the provision. Where the EPA is the reviewing authority, the EPA intends to apply the grandfathering provision to PSD applicants pursuant to PSD regulations at 40 CFR 52.21 primarily through the use of the completeness determination milestone because the EPA Regional Offices make a formal completeness determination for any PSD application that they receive and review. The EPA is including the second criterion in 40 CFR 52.21 so that pending applications can still qualify for grandfathering under the second criterion if any air agency that incorporates 40 CFR 52.21 into a SIP-approved program does not make formal completeness determinations as part of its permit review process.

The EPA is also amending the PSD regulations at 40 CFR 51.166 to enable states and other air agencies that issue PSD permits under SIP-approved PSD programs to adopt a comparable grandfathering provision. Nevertheless, such air agencies have discretion to not grandfather PSD applications or to apply grandfathering under their approved PSD programs in another manner as long as that program is at least as stringent as the provision being added to 40 CFR 51.166. Accordingly, an air agency may elect to rely on both sets of milestones and dates or it may grandfather on the sole basis of only one set. However, the EPA anticipates that once a decision is made concerning the

use of either set of milestones and dates, the air agency will apply grandfathering consistently to all pending PSD permit applications.

As explained in more detail in the proposal, absent a regulatory grandfathering provision, the EPA interprets section 165(a)(3)(B) of the CAA and the implementing PSD regulations at 40 CFR 52.21(k)(1) and 51.166(k)(1) to require that PSD permit applications include a demonstration that emissions from the proposed facility will not cause or contribute to a violation of any NAAQS that is in effect as of the date the PSD permit is issued. However, reading CAA section 165(a)(3)(B) in context with other provisions of the Act and the legislative history, the EPA interprets the Act to provide the EPA with authority to establish grandfathering provisions through regulation. The EPA has explained its interpretation of its authority to promulgate grandfathering provisions in previous rulemaking actions, most recently in the rule establishing the grandfathering provision for the 2012 $PM_{2.5}$ NAAQS (78 FR 3086, 3254–56, January 15, 2013), as well as in the proposal for this final action. The EPA is providing additional discussion of this authority in the Response to Comment Document contained in the docket for this final action.

To summarize briefly, the addition of this grandfathering provision is permissible under the discretion provided by the CAA for the EPA to craft a reasonable implementation regulation that balances competing objectives of the statutory PSD program found in CAA section 165. Specifically, section 165(a)(3) requires a permit applicant to demonstrate that its proposed project will not cause or contribute to a violation of any NAAQS, while section 165(c) requires that a PSD permit be granted or denied within one year after the permitting authority determines the application for such permit to be complete. Section 109(d)(1) of the CAA requires the EPA to review existing NAAQS and make appropriate revisions every five years. When these provisions are considered together, a statutory ambiguity arises concerning how the requirements under CAA section 165(a)(3)(B) should be applied to a limited set of pending PSD permit applications when the $O_3$ NAAQS is revised. The Act does not clearly address how the requirements of CAA section 165(a)(3)(B) should be met for PSD permit applications that are pending when the NAAQS are revised, particularly when the EPA also determines that complying with the

BLM_0047444

demonstration requirement for the revised NAAQS could hinder compliance with the requirement under section 165(c) to issue a permit within one year of the completeness determination for a certain subset of pending permits. The CAA also does not address how the requirements of CAA sections 165(a)(3) and 165(c) should be balanced in light of the statutory requirement to review the NAAQS every five years. As Congress has not spoken precisely to this issue, the EPA has the discretion to apply a permissible interpretation of the Act that balances the statutory requirements to make a decision on a permit application within one year and to ensure the new and modified sources will only be authorized to construct after showing they can meet the substantive permitting criteria. *See Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44 (1984).

In addressing these gaps in the CAA and the tension that may arise in section 165 in these circumstances, the EPA also applies CAA section 301, where the Administrator is authorized "to prescribe such regulations as are necessary to carry out his functions under this chapter." Sections 165(a)(3) and 165(c) of the CAA make clear that the interests behind CAA section 165 include both protection of air quality and timely decision-making on pending permit applications. The legislative history illustrates congressional intent to avoid delays in permit processing. S. Rep. No. 94–717, at 26 (1976) ("nothing could be more detrimental to the intent of this section and the integrity of this Act than to have the process encumbered by bureaucratic delay"). Thus, when read in combination, these provisions of the CAA provide the EPA with the discretion to issue regulations to grandfather pending permit applications from having to address a revised NAAQS where necessary to achieve both CAA objectives—to protect the NAAQS and to avoid delays in processing PSD permit applications. Accordingly, the EPA is seeking in this action to balance the requirements in the CAA to make a decision on a permit application within one year and to ensure that new and modified sources will only be authorized to construct after showing they can meet the substantive permitting criteria that apply to them. The EPA is achieving this balance by determining through rulemaking which $O_3$ NAAQS apply to certain permit applications that are pending when the EPA finalizes the revisions to the $O_3$ NAAQS in this final rule. We are clarifying, for the limited

purpose of satisfying the requirements under section 165(a)(3)(B) for those permits, which $O_3$ NAAQS are applicable to those permit applications and must be addressed in the source's demonstration that its emissions do not cause or contribute to a violation of the NAAQS.

This approach is consistent with a recent opinion by the U.S. Court of Appeals for the Ninth Circuit, which recognized the EPA's traditional exercise of grandfathering authority through rulemaking. The court observed that this approach was consistent with the statutory requirement to "enforce whatever regulations are in effect at the time the agency makes a final decision" because it involved identifying "an operative date, incident to setting the new substantive standard, and the grandfathering of pending permit applications was explicitly built into the new regulations." *Sierra Club* v. *EPA,* 762 F.3d 971, 983 (9th Cir. 2014). As discussed in more detail in the EPA's Response to Comment Document contained in the docket for this rule, this case supports the EPA's action in this rulemaking. The court favorably discussed prior adoption of regulatory grandfathering provisions that are similar to the action in this rulemaking, such as the grandfathering provision that the EPA promulgated when revising the PM$_{2.5}$ NAAQS that became effective in 2013. *See id.* at 982–83.[227]

This adoption of a grandfathering provision in this action is also consistent with previous actions in which the EPA has recognized that the CAA provides discretion for the EPA to establish grandfathering provisions for PSD permit applications through regulations. Some examples of previous

[227] This case specifically involved an action by the EPA to issue an individual PSD permit, which grandfathered a specific permit applicant from certain requirements without any revision to the regulations that were in effect. The court's reasoning in this case distinguishes that type of permit-specific grandfathering from establishing grandfathering provisions through a rulemaking process. While the court was not persuaded that there was a conflict between the requirements of sections 165(a)(3) and 165(c) of the CAA that supported the permit-specific grandfathering at issue in that case, it did not extend that uncertainty to its discussion of the EPA's rulemaking authority. In fact, in its favorable discussion of the EPA's authority to grandfather pending permit applications through regulation, the court noted that the power of an administrative agency "to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress" though "such decision cannot be made on an ad hoc basis." *Sierra Club* v. *EPA,* 762 F.3d 971, 983 (9th Cir. 2014) (internal quotations and marks omitted). This indicates that the court believed there is a gap in the CAA that supports including grandfathering provisions in regulations.

references to the EPA's authority to grandfather certain applications through rulemaking include 45 FR 52683, August 7, 1980; 52 FR 24672, July 1, 1987; and most recently 78 FR 3086, January 15, 2013.

This grandfathering provision does not apply to any applicable PSD requirements related to $O_3$ other than the requirement to demonstrate that the proposed source does not cause or contribute to a violation of the revised $O_3$ NAAQS. Sources with projects qualifying under the grandfathering provision will be required to meet all the other applicable PSD requirements, including applying BACT to all applicable pollutants, demonstrating that emissions from the proposed facility will not cause or contribute to a violation of the $O_3$ NAAQS in effect at the time of the relevant grandfathering milestone, and addressing any Class I area and additional $O_3$-related impacts in accordance with the applicable PSD requirements. In addition, this grandfathering provision would not apply to any permit application for a new or modified major stationary source of $O_3$ located in an area designated nonattainment for $O_3$ on the date the permit is issued.

## VIII. Implementation of the Revised $O_3$ Standards

This section provides background information for understanding the implications of the revised $O_3$ NAAQS and describes the EPA's plans for providing revised rules or additional guidance on some subjects in a timely manner to assist states with their implementation efforts under the requirements of the CAA. This section also describes existing EPA rules, interpretations of CAA requirements, and other EPA guidance relevant to implementation of the revised $O_3$ NAAQS. Relevant CAA provisions that provide potential flexibility with regard to meeting implementation timelines are highlighted and discussed. This section also contains a discussion of how existing requirements to reduce the impact on $O_3$ concentrations from the stationary source construction in permit programs under the CAA are affected by the revisions to the $O_3$ NAAQS. These are the PSD and Nonattainment New Source Review (NNSR) programs. As discussed in section VII of this preamble, to facilitate a smooth transition to the PSD requirements for the revised $O_3$ NAAQS, the EPA is finalizing as part of this rulemaking a grandfathering provision that applies to certain PSD permit applications that are pending and have met certain milestones in the permitting process

BLM_0047445

when the revised O₃ NAAQS is signed or before the effective date of the revised O₃ NAAQS, depending on the milestone.

In the preamble for the O₃ NAAQS proposal, the EPA solicited comments on several issues related to implementing the revised O₃ NAAQS that the agency anticipated addressing in future guidance or regulatory actions, but for which the EPA was not at that time proposing any action. The EPA received numerous comments on those and other implementation issues. Consistent with what the EPA indicated in the O₃ NAAQS proposal (79 FR 75370), the agency is not responding to the implementation comments that are not related to a specific proposal. However, the EPA intends to take these comments under advisement as the agency develops rules and guidance to assist with implementation of the revised NAAQS. Because the EPA did specifically propose and is finalizing provisions in the regulations addressing grandfathering for certain PSD permit applications and requirements, as discussed in section VII of this preamble, the EPA is responding to comments on the proposed PSD grandfathering provisions.

## A. NAAQS Implementation Plans

### 1. Cooperative Federalism

As directed by the CAA, reducing pollution to meet national air quality standards always has been a shared task, one involving the federal government, states, tribes and local air quality management agencies. The EPA develops regulations and strategies to reduce pollution on a broad scale, while states and tribes are responsible for implementation planning and any additional emission reduction measures necessary to bring specific areas into attainment. The agency supports implementation planning with technical resources, guidance, and program rules where necessary, while air quality management agencies use their knowledge of local needs and opportunities in designing emission reduction strategies that will work best for their industries and communities.

This partnership has proved effective since the EPA first issued O₃ standards more than three decades ago. For example, 101 areas were designated as nonattainment for the 1-hour O₃ standards issued in 1979. As of the end of 2014, air quality in all but one of those areas meets the 1-hour standard. The EPA strengthened the O₃ standards in 1997, shifting to an 8-hour standard to improve public health protection, particularly for children, the elderly,

and other sensitive individuals. The 1997 standards drew significant public attention when they were proposed, with numerous parties voicing concerns about states' ability to comply. However, after close collaboration between the EPA, states, tribes and local governments to reduce O₃-forming pollutants, significant progress has been made. Air quality in 108 of the original 115 areas designated as nonattainment for the 1997 O₃ NAAQS now meets those standards. Air quality in 18 of the original 46 areas designated as nonattainment for the 2008 O₃ NAAQS now meets those standards.

The revisions to the primary and secondary O₃ NAAQS discussed in sections II.D and IV.D of this preamble trigger a process under which states [228] make recommendations to the Administrator regarding area designations. Then, the EPA promulgates the final area designations. States also are required to review capacity and authorities in their existing SIPs to ensure the CAA requirements associated with the new standards can be carried out, and modify or supplement their existing SIPs as needed. The O₃ NAAQS revisions also apply to the transportation conformity and general conformity determinations, and affect which preconstruction permitting requirements apply to sources of O₃ precursor emissions, and the nature of those requirements.

The EPA has regulations in place addressing the general requirements for SIPs, and there are also provisions in these existing rules that cover O₃ SIPs (40 CFR part 51). States likewise have provisions in their existing SIPs to address air quality for O₃ and to implement the existing O₃ NAAQS. In the course of the past 45 years of regulating criteria pollutants, including O₃, the EPA has also provided general guidance on the development of SIPs and administration of construction permitting programs, as well as specific guidance on implementing the O₃ NAAQS in some contexts under the CAA and the EPA regulations.

The EPA has considered the extent to which existing EPA regulations and guidance are sufficient to implement the revised standards. The CAA does not require that the EPA promulgate new implementing regulations or issue new guidance for states every time that a NAAQS is revised. Likewise, the CAA does not require the issuance of additional implementing regulations or

guidance by the EPA before a revised NAAQS becomes effective. It is important to note that the existing EPA regulations in 40 CFR part 51 applicable to SIPs generally and to particular pollutants, including O₃ and O₃ precursors, continue to apply unless and until they are updated. Accordingly, the discussion below provides the EPA's current thoughts about the extent to which revisions to existing regulations and additional guidance are appropriate to aid in the implementation of the revised O₃ NAAQS.

### 2. Additional New Rules and Guidance

The EPA has received comments from a variety of states and organizations asking for rules and guidance associated with a revised NAAQS to be issued in a timely manner. As explained above, and consistent with the proposal, the EPA is not responding to these comments at this time because they are not related to any changes to existing regulations that EPA proposed in this rule. Moreover, although issuance of such rules and guidance is not a part of the NAAQS review process, *National Ass'n of Manufacturers* v. *EPA*, 750 F. 3d 921, 926–27 (D.C. Cir. 2014), toward that end, the EPA intends to develop appropriate revisions to necessary implementation rules and provide additional guidance in time frames that are useful to states when developing implementation plans that meet CAA requirements.

Certain requirements under the PSD preconstruction permit review program apply immediately to a revised NAAQS upon the effective date of that NAAQS, unless the EPA has established a grandfathering provision through rulemaking. To ensure a smooth transition to a revised O₃ NAAQS, the EPA is finalizing a grandfathering provision similar to the provision finalized in the 2012 PM₂.₅ NAAQS Rule. *See* section VII.C of this preamble for more details on the PSD program and the final grandfathering provision.

Promulgation or revision of the NAAQS starts a clock for the EPA to designate areas as either attainment or nonattainment. State recommendations for area designations are due to the EPA within 12 months of promulgating or revising the NAAQS. In an effort to allow states to make more informed recommendations for these particular standards, the EPA intends to issue additional guidance concerning the designations process for these standards within four months of promulgation of the NAAQS, or approximately eight months before state recommendations are due. The EPA generally completes

---

[228] This and all subsequent references to "state" are meant to include state, local, and tribal agencies responsible for the implementation of an O₃ control program.

area designations two years after promulgation of a NAAQS. *See* section VIII.B of this preamble for additional information on the initial area designation process.

Under CAA section 110, a NAAQS revision triggers the review and, as necessary, revision of SIPs to be submitted within three years of promulgation of a revised NAAQS. These SIPs are referred to as "infrastructure SIPs." The EPA issued general guidance on submitting infrastructure SIPs on September 13, 2013.[229] It should be noted that this guidance did not address certain state planning and emissions control requirements related to interstate pollution transport. This guidance remains relevant for the revised $O_3$ NAAQS. *See* section VIII.A.4 of this preamble for additional information on infrastructure SIPs.

While much of the existing rules and guidance for prior ozone standards remains applicable to the new standards, the EPA intends to propose to adopt revised rules on some subjects to facilitate air agencies' efforts to implement the revised $O_3$ NAAQS within one year after the revised NAAQS is established. The rules would address nonattainment area classification methodologies and attainment dates, attainment plan and NNSR SIP submission due dates, and any other necessary revisions to existing regulations for other required implementation programs. The EPA anticipates finalizing these rules by the time areas are designated nonattainment. Finalizing rules and guidance on these subjects by this time would assist air quality management agencies with development of any CAA-required SIPs associated with nonattainment areas. *See* section VIII.A.5 of this preamble for additional information on nonattainment SIPs and section VIII.C.3 for additional information on nonattainment New Source Review requirements applicable to new major sources and major modifications of existing sources.

### 3. Background $O_3$

The EPA and state, local and tribal air agencies, strive to determine how to most effectively and efficiently use the CAA's various provisions to provide required public health and welfare

protection from the harmful effects of $O_3$. In most cases, reducing man-made emissions of $NO_X$ and VOCs within the U.S. will reduce $O_3$ formation and provide additional health and welfare protection. The EPA recognizes, however, that there can be infrequent events where daily maximum 8-hour $O_3$ concentrations approach or exceed 70 ppb largely due to the influence of wildfires or stratospheric intrusions, which contribute to U.S. background (USB) levels but may also qualify for consideration under the Exceptional Events Rule. See section I.D; but see section II.A.2.a above (percentage of anthropogenic $O_3$ tends to increase on high $O_3$ days relative to percentage of background, including in intermountain west).

The term "background" $O_3$ is often used to refer to $O_3$ that originates from natural sources of $O_3$ (*e.g.*, wildfires and stratospheric $O_3$ intrusions) and $O_3$ precursors, as well as from man-made international emissions of $O_3$ precursors. Using the term generically, however, can lead to confusion as to what sources of $O_3$ are being considered. Relevant to the $O_3$ implementation provisions of the CAA, we define background $O_3$ the same way the EPA defines USB: that $O_3$ that would exist in the absence of any man-made emissions inside the U.S.

While the great majority of modeled $O_3$ exceedances have local and regional emissions as their primary cause, there can be events where $O_3$ levels approach or exceed the concentration level of the revised $O_3$ standards in large part due to background sources. These cases of high USB levels on high $O_3$ days typically result from stratospheric intrusions of $O_3$ or wildfire $O_3$ plumes. These events are infrequent and the CAA contains provisions that can be used to help deal, in particular, with stratospheric intrusion and wildfire events with $O_3$ contributions of this magnitude, including providing varying degrees of regulatory relief for air agencies and potential regulated entities. The EPA intends to work closely with states to identify affected locations and ensure that the appropriate regulatory mechanisms are employed.

Statutory and regulatory relief associated with U.S. background $O_3$ may include:[230]

• Relief from designation as a nonattainment area through exclusion of data affected by exceptional events;

• Relief from the more stringent requirements of higher nonattainment area classifications through treatment as a rural transport area, through exclusion of data affected by exceptional events, or through international transport provisions;

• Relief from having to demonstrate attainment and having to adopt more than reasonable controls on local sources through international transport provisions.

Further discussion of these mechanisms is provided in sections VIII.B.2 (exceptional events), VIII.B.1 (rural transport areas), and VIII.E.2 (international transport).

Although these relief mechanisms require some level of assessment or demonstration by a state and/or the EPA to invoke, they have been used successfully in the past under appropriate circumstances. For example, the EPA has historically acted on every exceptional events demonstration that has affected a regulatory decision regarding initial area designations. *See e.g., Idaho: West Silver Valley Nonattainment Area— Area Designations for the 2012 primary annual $PM_{2.5}$ NAAQS* Technical Support Document, pp. 10–14, December 2014. For the revised $O_3$ standards, the areas that would most likely need to use the mechanisms discussed in this section as part of attaining the revised $O_3$ standards are locations in the western U.S. where we have estimated the largest seasonal average values of background $O_3$ occur. We expect some of these areas to use the provisions in the Exceptional Events Rule during the designations process for the revised $O_3$ standards. The EPA will then give priority to exceptional events demonstrations submitted by air agencies with areas whose designation decision could be influenced by the exclusion of data under the Exceptional Events Rule. In addition, as discussed in more detail in sections V.D and VIII.B.2 of this action, to streamline the exceptional events process, the EPA will soon propose revisions to the 2007 Exceptional Events Rule and will release through a **Federal Register** Notice of Availability a draft guidance document to address Exceptional Events Rule criteria for wildfires that could affect $O_3$ concentrations. We expect to

---

[229] *See* memorandum from Stephen D. Page to Regional Air Directors, "Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)" September 13, 2013, which is available at *http://www3.epa.gov/airquality/urbanair/sipstatus/docs/Guidance_on_Infrastructure_SIP_Elements_Multipollutant_FINAL_Sept_2013.pdf*.

[230] Note that the relief mechanisms discussed here do not include the CAA's interstate transport provisions found in sections 110(a)(2)(D) and 126. The interstate transport provisions are intended to address the cross-state transport of $O_3$ and $O_3$ precursor emissions from man-made sources within the continental U.S. rather than background $O_3$ as it is defined in this section. As noted in section II.A.2.a above, many of the instances where

commenters pointed to remote monitored locations having $O_3$ exceedances due to background $O_3$ in fact reflected sizeable contributions from domestic sources, including interstate contributions (including from the Los Angeles Basin and other California locations).

promulgate Exceptional Events Rule revisions and finalize the new guidance document before the October 2016 date by which states, and any tribes that wish to do so, are required to submit their initial designation recommendations for the revised O$_3$ NAAQS.

## 4. Section 110 State Implementation Plans

The CAA section 110 specifies the general requirements for SIPs. Within three years after the promulgation of revised NAAQS (or such shorter period as the Administrator may prescribe [231]) each state must adopt and submit "infrastructure" SIPs to the EPA to address the requirements of section 110(a)(1) and (2), as applicable. These "infrastructure SIP" submissions establish the basic state programs to implement, maintain, and enforce revised NAAQS and provide assurances of state resources and authorities. States are required to develop and maintain an air quality management infrastructure that includes enforceable emission limitations, a permitting program, an ambient monitoring program, an enforcement program, air quality modeling capabilities, and adequate personnel, resources, and legal authority. Because the revised primary NAAQS and secondary NAAQS are identical, the EPA does not at present discern any need for there to be any significant substantive difference in the infrastructure SIP elements for the two standards and thus believes it would be more efficient for states and the EPA if each affected state submits a single section 110 infrastructure SIP that addresses both standards at the same time (i.e., within three years of promulgation of the O$_3$ NAAQS). Accordingly the EPA is not extending the SIP deadline for purposes of a revised secondary standard.

It is the responsibility of each state to review its air quality management program's compliance with the infrastructure SIP provisions in light of each new or revised NAAQS. Most states have revised and updated their infrastructure SIPs in recent years to address requirements associated with the 2008 O$_3$ NAAQS. We expect that the result of these prior updates is that, in most cases, states will already have adequate state regulations previously adopted and approved into the SIP to address a particular requirement with respect to the revised O$_3$ NAAQS. For

such portions of the state's infrastructure SIP provisions, the state may provide a "certification" specifying that certain existing provisions in the SIP are adequate to meet applicable requirements. Although the term "certification" does not appear in the CAA as a type of infrastructure SIP submittal, the EPA sometimes uses the term in the context of infrastructure SIPs, by policy and convention, to refer to a state's SIP submission. If a state determines that its existing SIP provisions are adequate in light of the revised O$_3$ NAAQS with respect to a given infrastructure SIP element (or sub-element), then the state may make a "certification" that the existing SIP contains provisions that address those requirements of the specific CAA section 110(a)(2) infrastructure elements. In the case of a certification, the submittal does not have to include another copy of the relevant provision (e.g., rule or statute) itself. Rather, the submission may provide citations to the already SIP-approved state statutes, regulations, or non-regulatory measures, as appropriate, which meet the relevant CAA requirement. Like any other SIP submission, such certification can be made only after the state has provided reasonable notice and opportunity for public hearing. This "reasonable notice and opportunity for public hearing" requirement for infrastructure SIP submittals appears at section 110(a), and it comports with the more general SIP requirement at section 110(l) of the CAA. Under the EPA's regulations at 40 CFR part 51, if a public hearing is held, an infrastructure SIP submission must include documentation by the state that the public hearing was held in accordance with the EPA's procedural requirements for public hearings. See 40 CFR part 51, Appendix V, paragraph 2.1(g), and 40 CFR 51.102. In the event that a state's existing SIP does not already meet applicable requirements, then the infrastructure SIP submission must include the modifications or additions to the state's SIP in order to update it to meet the relevant elements of section 110(a)(2).

## 5. Nonattainment Area Requirements

Part D of the CAA describes the various program requirements that apply to states with nonattainment areas for different NAAQS. Clean Air Act Section 182 (found in subpart 2 of part D) includes the specific SIP requirements that govern the O$_3$ program, and supplements the more general nonattainment area requirements in CAA sections 172 and 173. Under CAA section 182, states

generally are required to submit attainment demonstration SIPs within three or four years after the effective date of area designations promulgated by the EPA, depending on the classification of the area.[232] These SIP submissions need to show how the nonattainment area will attain the primary O$_3$ standard "as expeditiously as practicable," but no later than within the relevant time frame from the effective date of designations associated with the classification of the area.

The EPA believes that the overall framework and policy approach of the implementation rules associated with the 2008 O$_3$ NAAQS provide an effective and appropriate template for the general approach states would follow in planning for attainment of the revised O$_3$ standard.[233] However, to assist with the implementation of the revised O$_3$ standards, the EPA intends to develop and propose an additional O$_3$ NAAQS Implementation Rule that will address certain subjects specific to the new O$_3$ NAAQS finalized here. This will include establishing air quality thresholds associated with each nonattainment area classification (i.e., Marginal, Moderate, etc.), associated attainment deadlines, and deadlines for submitting attainment planning SIP elements (e.g., RACT for major sources, RACT VOC control techniques guidelines, etc.). The rulemaking will also address whether to revoke the 2008 O$_3$ NAAQS, and to impose appropriate anti-backsliding requirements to ensure that the protections afforded by that standard are preserved. The EPA intends to propose this implementation rule within one year after the revised O$_3$ NAAQS is promulgated, and finalize this implementation rule by no later than the time the area designations process is finalized (approximately two years after promulgation of the revised O$_3$ NAAQS).

We know that developing the implementation plans that outline the steps a nonattainment area will take to

---

[231] While the CAA allows the EPA to set a shorter time for submission of these SIPs, the EPA does not currently intend to do so for this revision to the O$_3$ NAAQS.

[232] Section 181(a)(1) of the CAA establishes classification categories for areas designated nonattainment for the primary O$_3$ NAAQS. These categories range from "Marginal," the lowest O$_3$ classification with the fewest requirements associated with it, to "Extreme," the highest classification with the most required programs. Areas with worse O$_3$ problems are given more time to attain the NAAQS and more associated emission control requirements.

[233] Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements; Final Rule (80 FR 12264; March 6, 2015) and Implementation of the 2008 National Ambient Air Quality Standards for Ozone: Nonattainment Area Classifications Approach, Attainment Deadlines and Revocation of the 1997 Ozone Standards for Transportation Conformity Purposes (77 FR 30160; May 21, 2012).

meet an air quality standard requires a significant amount of work on the part of state, tribal or local air agencies. The EPA routinely looks for ways to reduce this workload, including assisting with air quality modeling by providing inputs such as emissions, meteorological and boundary conditions; and sharing national-scale model results that states can leverage in their development of attainment demonstrations.

### B. O₃ Air Quality Designations

1. Area Designation Process

After the EPA establishes or revises a NAAQS, the CAA directs the EPA and the states to take steps to ensure that the new or revised NAAQS is met. One of the first steps, known as the initial area designations, involves identifying areas of the country that either meet or do not meet the new or revised NAAQS, along with any nearby areas that contribute to areas that do not meet the new or revised NAAQS.

Section 107(d)(1) of the CAA provides that, "By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 109, the Governor of each state shall . . . submit to the Administrator a list of all areas (or portions thereof) in the state" that designates those areas as nonattainment, attainment, or unclassifiable. The EPA must then promulgate the area designations according to a specified process, including procedures to be followed if the EPA intends to modify a state's initial recommendation.

Clean Air Act Section 107(d)(1)(B)(i) further provides, "Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas (or portions thereof) . . . as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended for up to one year in the event the Administrator has insufficient information to promulgate the designations." By no later than 120 days prior to promulgating area designations, the EPA is required to notify states of any intended modifications to their recommendations that the EPA may deem necessary. States then have an opportunity to demonstrate why any proposed modification is inappropriate. Whether or not a state provides a recommendation, the EPA must timely

promulgate the designation that the agency deems appropriate.

While section 107 of the CAA specifically addresses states, the EPA intends to follow the same process for tribes to the extent practicable, pursuant to CAA section 301(d) regarding tribal authority and the Tribal Authority Rule (63 FR 7254, February 12, 1998). To provide clarity and consistency in doing so, the EPA issued a 2011 guidance memorandum on working with tribes during the designation process.[234]

As discussed in sections II and IV of this preamble, the EPA is revising both the primary and secondary O₃ NAAQS. Accordingly, the EPA intends to complete designations for both NAAQS following the standard 2-year process discussed above. In accordance with section 107(d)(1) of the CAA, state Governors (and tribes, if they choose) should submit their initial designation recommendations for a revised primary and secondary NAAQS by 1 year after October 1, 2015. If the EPA intends to modify any state recommendation, the EPA would notify the appropriate state Governor (or tribal leader) no later than 120 days prior to making final designation decisions. A state or tribe that believes the modification is inappropriate would then have the opportunity to demonstrate to the EPA why it believes its original recommendation (or a revised recommendation) is more appropriate. The EPA would take any additional input into account in making the final designation decisions.

The CAA defines an area as nonattainment if it is violating the NAAQS or if it is contributing to a violation in a nearby area. Consistent with previous area designations processes, the EPA intends to use area-specific analysis of multiple factors to support area boundary decisions. The EPA intends to evaluate information related to the following factors for designations: air quality data, emissions and emissions-related data, meteorology, geography/topography, and jurisdictional boundaries. Additional guidance on the designation process and how these factors may be evaluated and inform the process will be issued by the EPA early in 2016 to assist states in developing their recommendations.

Areas that are designated as nonattainment are also classified at the time of designation by operation of law according to the severity of their O₃ problem. The classification categories are Marginal, Moderate, Serious, Severe, and Extreme. Ozone nonattainment areas are subject to specific mandatory measures depending on their classification. As indicated previously, the thresholds for the classification categories will be established in a future O₃ implementation rule.

Clean Air Act section 182(h) authorizes the EPA Administrator to determine that an area designated nonattainment can be treated as a rural transport area. Regardless of its classification, a rural transport area is deemed to have fulfilled all O₃-related planning and control requirements if it meets the CAA's requirements for areas classified Marginal, which is the lowest classification specified in the CAA. In accordance with the statute, a nonattainment area may qualify for this determination if it meets the following criteria:

• The area does not contain emissions sources that make a significant contribution to monitored O₃ concentrations in the area, or in other areas; and

• The area does not include and is not adjacent to a Metropolitan Statistical Area.

Historically, the EPA has listed four nonattainment areas as rural transport areas under this statutory provision.[235] The EPA has not issued separate written guidance to further elaborate on the interpretation of these CAA qualification criteria. However, the EPA developed draft guidance in 2005 that explains the kinds of technical analyses that states could use to establish that transport of O₃ and/or O₃ precursors into the area is so overwhelming that the contribution of local emissions to an observed 8-hour O₃ concentration above the level of the NAAQS is relatively minor and determine that emissions within the area do not make a significant contribution to the O₃ concentrations measured in the area or in other areas.[236] While this guidance

---

[234] Page, S. (2011). Guidance to Regions for Working with Tribes during the National Ambient Air Quality Standards (NAAQS) Designations Process, Memorandum from Stephen D. Page, Director, EPA Office of Air Quality Planning and Standards to Regional Air Directors, Regions I–X, December 20, 2011. Available: http://www.epa.gov/ttn/oarpg/t1/memoranda/20120117naaqsguidance.pdf.

[235] For the 1979 1-hour O₃ standard, Door County Area, Wisconsin; Edmonson County Area, Kentucky; Essex County Area (Whiteface Mountain), New York; and Smyth County Area (White Top Mountain), Virginia were recognized by the EPA as rural transport areas. No rural transport areas were recognized for the 1997 or 2008 8-hour O₃ standards.

[236] U.S. Environmental Protection Agency (2005). Criteria For Assessing Whether an Ozone Nonattainment Area is Affected by Overwhelming Transport [Draft EPA Guidance]. U.S. Environmental Protection Agency, Research Triangle Park, NC. June 2005. Available at http://

was not prepared specifically for rural transport areas, it could be useful to states for developing technical information to support a request that the EPA treat a specific $O_3$ nonattainment area as a rural transport area. The EPA will work with states to ensure nonattainment areas eligible for treatment as rural transport areas are identified.

2. Exceptional Events

During the initial area designations process, the EPA intends to evaluate multiple factors, including air quality data, when identifying and determining boundaries for areas of the country that meet or do not meet the revised $O_3$ NAAQS. In some cases, these data may be influenced by exceptional events. Under the Exceptional Events Rule, an air agency can request and the EPA can agree to exclude data associated with event-influenced exceedances or violations of a NAAQS, including the revised $O_3$ NAAQS, provided the event meets the statutory requirements in section 319(b) of the CAA, which requires that:
- the event "affects air quality;"
- the event "is not reasonably controllable or preventable;"
- the event is "caused by human activity that is unlikely to recur at a particular location or [is] a natural event," [237] and
- that "a clear causal relationship must exist between the measured exceedances of a [NAAQS] and the exceptional event. . . ."

The EPA's implementing regulations, the Exceptional Events Rule, further specify certain requirements for air agencies making exceptional events demonstrations.[238]

The ISA contains discussions of natural events that may contribute to $O_3$ or $O_3$ precursors. These include stratospheric $O_3$ intrusion and wildfire events.[239] As indicated above, to satisfy the exceptional events requirements and to qualify for data exclusion under the Exceptional Events Rule, an air agency must develop and submit a

demonstration, including evidence, addressing each of the identified criteria. The extent to which a stratospheric $O_3$ intrusion event or a wildfire event contributes to $O_3$ levels can be uncertain, and in most cases requires detailed analyses to determine.

Strong stratospheric $O_3$ intrusion events, most prevalent at high elevation sites during winter or spring, can be identified based on measurements of low relative humidity, evidence of deep atmospheric mixing, and a low ratio of CO to $O_3$ based on ambient measurements. Accurately determining the extent of weaker intrusion events remains challenging (U.S. EPA 2013, p. 3–34). Although states have submitted only a few exceptional events demonstrations for stratospheric $O_3$ intrusion, the EPA recently approved a demonstration from Wyoming for a June 2012 stratospheric $O_3$ event.[240]

While stratospheric $O_3$ intrusions can increase monitored ground-level ambient $O_3$ concentrations, wildfire plumes can either suppress or enhance $O_3$ depending upon a variety of factors including fuel type, combustion stage, plume chemistry, aerosol effects, meteorological conditions and distance from the fire (Jaffe and Wigder, 2012). As a result, determining the impact of wildfire emissions on specific $O_3$ observations is challenging. The EPA recently approved an exceptional events demonstration for wildfires affecting 1-hour $O_3$ levels in Sacramento, California in 2008 that successfully used a variety of analytical tools (e.g., regression modeling, back trajectories, satellite imagery, etc.) to support the exclusion of $O_3$ data affected by large fires.[241]

In response to previously expressed stakeholder feedback regarding implementation of the Exceptional Events Rule and specific stakeholder concerns regarding the burden of exceptional events demonstrations, the EPA is currently engaged in a rulemaking process to amend the Exceptional Events Rule. As part of an upcoming notice and comment rulemaking effort (and related activities, including the issuance of relevant guidance documents), the EPA sees opportunities to standardize best

practices for collaboration between the EPA and air agencies, clarify and simplify demonstrations, and improve tools and consistency.

Additionally, the EPA intends to develop guidance to address implementing the Exceptional Events Rule criteria for wildfires that could affect ambient $O_3$ concentrations. Wildfire emissions are a component of background $O_3$ (Jaffe and Wigder, 2012) and in some locations can significantly contribute to periodic high $O_3$ levels (Emery, 2012). The threat from wildfires can be mitigated through management of wildland vegetation. Planned and managed fires are one tool that land managers can use to reduce fuel load, unnatural understory and tree density, thus helping to reduce the risk of catastrophic wildfires. Allowing some wildfires to continue and the thoughtful use of prescribed fire can influence the occurrence of catastrophic wildfires, which may reduce the probability of fire-induced smoke impacts and subsequent health effects. Thus, appropriate use of prescribed fire may help manage the contribution of wildfires to both background and periodic peak $O_3$ air pollution. Several commenters expressed concern that the revised $O_3$ NAAQS could limit the future use of prescribed fire. Under the current Exceptional Events Rule, prescribed fires meeting the rule criteria may also qualify as exceptional events. The EPA intends to further clarify the Exceptional Events Rule criteria for prescribed fire on wildland in its upcoming rulemaking.

The EPA is committed to working with federal land managers, other federal agencies, tribes and states to effectively manage prescribed fire use to reduce the impact of wildfire-related emissions on $O_3$ through policies and regulations implementing these standards.

*C. How do the New Source Review (NSR) requirements apply to the revised $O_3$ NAAQS?*

1. NSR Requirements for Major Stationary Sources for the Revised $O_3$ NAAQS

The CAA, at parts C and D of title I, contains preconstruction review and permitting programs applicable to new major stationary sources and major modifications of existing major sources. The preconstruction review of each new major stationary source and major modification applies on a pollutant-specific basis, and the requirements that apply for each pollutant depend on whether the area in which the source is situated is designated as attainment (or

---

*www.epa.gov/scram001/guidance/guide/owt_guidance_07-13-05.pdf.*

[237] A natural event is further described in 40 CFR 50.1(k) as "an event in which human activity plays little or no direct causal role."

[238] 72 FR 13,560 (March 22, 2007), "Treatment of Data Influenced by Exceptional Events," Final Rule; *see also* 40 CFR parts 50 and 51.

[239] The preamble to the Exceptional Events Rule (72 FR 13560) identifies both stratospheric $O_3$ intrusions and wildfires as natural events that could also qualify as exceptional events under the CAA and Exceptional Event Rule criteria. Note that $O_3$ resulting from routine natural emissions from vegetation, microbes, animals and lightning are not exceptional events authorized for exclusion under the section 319 of the CAA.

[240] U.S. EPA (2014) Treatment of Data Influenced by Exceptional Events: Examples of Reviewed Exceptional Event Submissions. U.S. Environmental Protection Agency, Research Triangle Park, NC. *available at http://www.epa.gov/ttn/analysis/exevents.htm.*

[241] U.S. EPA (2014) Treatment of Data Influenced by Exceptional Events: Examples of Reviewed Exceptional Event Submissions. U.S. Environmental Protection Agency, Research Triangle Park, NC. Examples of $O_3$-related exceptional event submissions, *available at http://www.epa.gov/ttn/analysis/exevents.htm.*

unclassifiable) or nonattainment for that pollutant. In areas designated attainment or unclassifiable for a pollutant, the PSD requirements under part C apply to construction at major sources. In areas designated nonattainment for a pollutant, the NNSR requirements under part D apply to major source construction. Collectively, those two sets of permit requirements are commonly referred to as the "major New Source Review" or "major NSR" programs.

Until an area is formally designated with respect to the revised $O_3$ NAAQS, the NSR provisions applicable under that area's current designation for the 2008 $O_3$ NAAQS (including any applicable anti-backsliding requirements) will continue to apply. That is, for areas designated as attainment/unclassifiable for the 2008 $O_3$ NAAQS, PSD will apply for new major stationary sources and major modifications that trigger major source permitting requirements for $O_3$; areas designated nonattainment for the 2008 $O_3$ NAAQS must comply with the NNSR requirements for new major stationary sources and major modifications that trigger major source permitting requirements for $O_3$. When the new designations for the revised $O_3$ NAAQS become effective, under the current rules, those designations will generally serve to determine whether PSD or NNSR applies to $O_3$ and its precursors. The PSD regulations at 40 CFR 51.166(i)(2) and 52.21(i)(2) provide that the substantive PSD requirements do not apply for a particular pollutant if the owner or operator of the new major stationary source or major modification demonstrates that the area in which the source is located is designated nonattainment for that pollutant under CAA section 107. Thus, new major sources and modifications will generally be subject to the PSD program requirements for $O_3$ if they are locating in an area that does not have a current nonattainment designation under CAA section 107 for $O_3$. These rules further provide that nonattainment designations for a revoked NAAQS, as contained in 40 CFR part 81, are not viewed as current designations under CAA section 107 for purposes of determining the applicability of such PSD requirements.[242]

The EPA's major NSR regulations define the term "regulated NSR pollutant" to include any pollutant for which a NAAQS has been promulgated

and any pollutant identified in EPA regulations as a constituent or precursor to such pollutant.[243] Both the PSD and NNSR regulations identify VOC and $NO_X$ as precursors to $O_3$. Accordingly, the major NSR programs for $O_3$ are applied to emissions of VOC and $NO_X$ as precursors of $O_3$.[244]

2. Prevention of Significant Deterioration (PSD) Program

The statutory requirements for a PSD permit program set forth under part C of title I of the CAA (sections 160 through 169) are addressed by the EPA's PSD regulations found at 40 CFR 51.166 (minimum requirements for an approvable PSD SIP) and 40 CFR 52.21 (PSD permitting program for permits issued under the EPA's federal permitting authority). Both sets of regulations already apply for $O_3$ when the area is designated attainment or unclassifiable for $O_3$ and when the new source or modification triggers PSD requirements for $O_3$.

For PSD, a "major stationary source" is one that emits or has the potential to emit 250 tons per year (tpy) or more of any regulated NSR pollutant, unless the new or modified source is classified under a list of 28 source categories contained in the statutory definition of "major emitting facility" in section 169(1) of the CAA. For those 28 source categories, a "major stationary source" is one that emits or has the potential to emit 100 tpy or more of any regulated NSR pollutant. A "major modification" is a physical change or a change in the method of operation of an existing major stationary source that results first, in a significant emissions increase of a regulated NSR pollutant for the project, and second, in a significant net emissions increase of that pollutant at the source. See 40 CFR 51.166(b)(2)(i), 40 CFR 52.21(b)(2)(i).

Among other things, for each regulated NSR pollutant emitted or increased in significant amounts, the PSD program requires a major stationary source or a major modification to apply Best Available Control Technology and to conduct an air quality impact analysis to demonstrate that the proposed source or project will not cause or contribute to a violation of any NAAQS or PSD increment (see CAA section 165(a)(3)–

(4), 40 CFR 51.166(j)–(k), 40 CFR 52.21(j)–(k)). The PSD requirements may also include, in appropriate cases, an analysis of potential adverse impacts on Class I areas (see CAA sections 162 and 165).[245] The EPA has generally interpreted the requirement for an air quality impact analysis under CAA section 165(a)(3) and the implementing regulations to include a requirement to demonstrate that emissions from the proposed facility will not cause or contribute to a violation of any NAAQS that is in effect as of the date a PSD permit is issued.[246] See, e.g., 73 FR 28321, 28324, 28340 (May 16, 2008); 78 FR 3253 (Jan. 15, 2013); Memorandum from Stephen D. Page, Director, Office of Air Quality Planning & Standards, "Applicability of the Federal Prevention of Significant Deterioration Permit Requirements to New and Revised National Ambient Air Quality Standards" (April 1, 2010). Consistent with this interpretation, the demonstration required under CAA section 165(a)(3) and 40 CFR 51.166(k) and 52.21(k) will apply to any revised $O_3$ NAAQS when such NAAQS become effective, except to the extent that a pending permit application is subject to a grandfathering provision that the EPA establishes through rulemaking. In addition, the other existing requirements of the PSD program will remain applicable to $O_3$ after the revised $O_3$ NAAQS takes effect.

Because the complex chemistry of $O_3$ formation in the atmosphere poses significant challenges for the assessing the impacts of individual stationary sources on $O_3$ formation, the EPA's judgment historically has been that it is not technically sound to designate a

---

[242] This description of paragraph (i)(2) of the PSD regulations at 40 CFR 51.166 and 52.21 reflects revisions made in the final 2008 $O_3$ NAAQS SIP Requirements Rule. See 80 FR 12264 at 12287 (March 6, 2015).

[243] The definition of "regulated NSR pollutant" is found in the PSD regulations at 40 CFR 51.166(b)(49) and 52.21(b)(50), and in the NNSR regulations at 40 CFR 51.165(a)(1)(xxxvii).

[244] VOC and $NO_X$ are defined as precursors of ozone in the PSD regulations at 40 CFR 51.166(b)(49)(i)(b)(1) and 52.21(b)(50)(i)(b)(1), and in the NNSR regulations at 40 CFR 51.165(a)(1)(xxxvii)(B) and (C)(1) and part 51, Appendix S, II.A.31(ii)(b)(1).

[245] Congress established certain Class I areas in section 162(a) of the CAA, including international parks, national wilderness areas, and national parks that meet certain criteria. Such Class I areas, known as mandatory federal Class I areas, are afforded special protection under the CAA. In addition, states and tribal governments may establish Class I areas within their own political jurisdictions to provide similar special air quality protection.

[246] An exception occurs in cases where the EPA has included a grandfathering provision in its PSD regulations for a particular pollutant. The EPA historically has exercised its discretion to transition the implementation of certain new requirements through grandfathering, under appropriate circumstances, either by rulemaking or through a case-by-case determination for a specific permit application. In 2014, the United States Court of Appeals for the Ninth Circuit vacated a decision by the EPA to issue an individual PSD permit grandfathering a permit applicant from certain requirements. See Sierra Club v. EPA, 762 F.3d 971 (9th Cir. 2014). In light of that decision, the EPA is no longer asserting authority to grandfather permit applications on a case-by-case basis. This decision is addressed in more detail in the discussion of the grandfathering provisions that the EPA is issuing through this rulemaking in section VII of this preamble.

specific air quality model that must be used in the PSD permitting process to make this demonstration for O₃. To address ambient impacts of emissions from proposed individual stationary sources on O₃, the EPA proposed amendments to Appendix W to 40 CFR part 51 in July 2015 that would, among other things, revise the Appendix W provisions relating to the analytical techniques for demonstrating that an individual PSD source or modification does not cause or contribute to a violation of the O₃ NAAQS (80 FR 45340, July 29, 2015). Until any revisions are finalized and in effect, PSD permit applicants should continue to follow the current provisions in the applicable regulations and Appendix W in order to demonstrate that a proposed source or modification does not cause or contribute to a violation of the O₃ NAAQS.

a. What transition plan is the EPA providing for implementing the PSD requirements for the revised O₃ NAAQS?

In this rulemaking, the EPA is amending the PSD regulations at 40 CFR 51.166 and 40 CFR 52.21 to include a grandfathering provision that will allow reviewing authorities to continue to review certain pending PSD permit applications in accordance with the O₃ NAAQS that was in effect when a specific permitting milestone was reached, rather than the revised O₃ NAAQS. The EPA is finalizing the grandfathering provision as proposed with two timing dates—the signature date of the revised O₃ NAAQS rule for complete applications and the effective date of the revised O₃ NAAQS for a draft permit or preliminary determination. A more detailed discussion of the final provision, comments received and our responses to those comments is provided in section VII of this preamble, which addresses this change to the PSD regulations, as well as the Response to Comment Document contained in the docket for this rulemaking.

b. What screening and compliance demonstration tools are used to implement the PSD program?

The EPA has historically allowed the use of screening and compliance demonstration tools to help facilitate the implementation of the NSR program by reducing the source's burden and streamlining the permitting process for circumstances where the emissions or ambient impacts of a particular pollutant could be considered *de minimis*. For example, the EPA has established significant emission rates, or SERs, that are used as screening tools to

determine when a pollutant would be considered to be emitted in a significant amount and, accordingly, when the NSR requirements should be applied to that pollutant. *See* 40 CFR 51.166(b)(23) and 52.21(b)(23). For O₃, the EPA established a SER of 40 tpy for emissions of each O₃ precursor—VOC and NOₓ. For PSD, the O₃ SER applies independently to emissions of VOC and NOₓ (emissions of precursors are not added together) to determine when the proposed major stationary source or major modification must undergo PSD review for that precursor and whether individual PSD requirements, such as BACT, apply to that precursor.[247]

In the context of the PSD air quality impact analysis, the EPA has also used a value called a significant impact level (SIL) as a compliance demonstration tool. The SIL, expressed as an ambient concentration of a pollutant, may be used first to determine the geographical scope of the ambient impact analysis that must be completed for the applicable pollutant to satisfy the air quality demonstration requirement under CAA section 165(a)(3). A second use is to guide the determination of whether the impact of the source is considered to cause or contribute to a violation of any NAAQS. The EPA has not established a SIL for O₃. The EPA is currently considering development of a SIL for O₃ through either guidance or a rulemaking process. Such a SIL would complement proposed revisions to Appendix W mentioned above (80 FR 45340, July 29, 2015) and would assist in the implementation of the PSD air quality analysis requirement for protection of the O₃ NAAQS. However, the EPA is not making revisions in this rulemaking to address the PSD air quality analysis for O₃. Until any rulemaking to amend existing PSD regulations for O₃ is completed, permitting decisions should continue to be based on the existing provisions in the applicable regulations.

Several commenters addressed statements that the EPA made concerning screening tools for O₃ in the preamble to the O₃ NAAQS proposal. These statements were not linked to any proposed amendments to EPA regulations. Aside from adopting the grandfathering provision addressed in section VII of this preamble, the EPA is not revising the PSD requirements for O₃ in this final rule. Therefore, the EPA

is not responding to those comments at this time, consistent with the EPA's general approach to comments on implementation topics described above.

c. Other PSD Transition Issues

The EPA anticipates that the existing O₃ air quality in some areas currently designated attainment or unclassifiable for O₃ will not meet the revised O₃ NAAQS upon its effective date and that some of these areas will ultimately be designated "nonattainment" for the revised O₃ NAAQS through the formal area designation process set forth under the CAA (see section VIII.B above). However, until the EPA issues such nonattainment designations, proposed new major sources and major modifications situated in any area designated attainment or unclassifiable for the 2008 O₃ NAAQS will continue to be required to address O₃ in a PSD permit.[248] As mentioned above, the PSD permitting program requires that proposed new major stationary sources and major modifications must demonstrate that the emissions from the proposed source or modification will not cause or contribute to a violation of any NAAQS. In the notice of proposed rulemaking, the EPA provided information concerning its views on the possibility that some PSD permit applications could satisfy the air quality analysis requirements for O₃ by obtaining air quality offsets (called PSD offsets).[249] Several commenters expressed concern that without some transition provisions in the final rule exempting PSD permit applications for sources located in such areas from meeting the air quality analysis requirements for the revised O₃ NAAQS, such applications might not be able to satisfy the demonstration requirement, as the current ambient air monitoring data indicate the revised lower standards are not being met. The O₃ NAAQS proposal included no proposed revisions to PSD regulations on this

[247] *See In re Footprint Power Salem Harbor Development, LP,* 16 E.A.D ___, PSD Appeal No. 14–02, at 20–25 (EAB, Sept. 2, 2014) (including description of EPA's position on application of BACT to ozone precursors) *available at http://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/PSD+Permit+Appeals+(CAA)?OpenView.*

[248] Any proposed major stationary source or major modification subject to PSD for O₃ that does not receive its PSD permit by the effective date of a new O₃ nonattainment designation for the area where the source would locate would then be required to satisfy all of the applicable NNSR preconstruction permit requirements for O₃, even if such source had been grandfathered under the PSD regulations from the demonstration requirement under CAA section 165(a)(3) for O₃.

[249] The EPA has historically recognized in regulations and through other actions that sources applying for PSD permits may have the option of utilizing offsets as part of the required PSD demonstration under CAA section 165(a)(3)(B). *See, e.g., In re Interpower of New York, Inc.,* 5 E.A.D. 130, 141 (EAB 1994) (describing an EPA Region 2 PSD permit that relied in part on offsets to demonstrate the source would not cause or contribute to a violation of the NAAQS). 52 FR 24698 (July 1, 1987); 78 FR 3261–62 (Jan. 15, 2013).

topic and the EPA is not making any revisions to the PSD requirements for $O_3$ in this action to address this issue. Therefore, the EPA is not responding to those comments at this time, consistent with its general approach to comments on implementation topics described above. However, to help address this concern raised by commenters, the EPA is considering issuing additional guidance on how PSD offsets can be implemented.

### 3. Nonattainment NSR

Part D of title I of the CAA includes preconstruction review and permitting requirements for new major stationary sources and major modifications when they locate in areas designated nonattainment for a particular pollutant. The relevant part D requirements are typically referred to as the nonattainment NSR (NNSR) program. The EPA regulations for the NNSR program are contained in 40 CFR 51.165, 52.24 and part 51 Appendix S. The EPA's minimum requirements for a NNSR program to be approvable into a SIP are contained in 40 CFR 51.165. Appendix S to 40 CFR part 51 contains an interim NNSR program. This interim program enables implementation of NNSR permitting in nonattainment areas that lack a SIP-approved NNSR permitting program for the particular nonattainment pollutant, and the interim program can be applied during the time between the date of the relevant nonattainment designation and the date on which the EPA approves into the SIP a NNSR program or additional components of an NNSR program for a particular pollutant.[250] This interim program is commonly known as the Emissions Offset Interpretative Rule, and is applicable to all criteria pollutants, including $O_3$.[251]

The EPA is not modifying any existing NNSR requirements in this rulemaking. Under the CAA, area designations for new or revised NAAQS are addressed subsequent to the effective date of the new or revised NAAQS. If the EPA determines that any revisions to the existing NNSR requirements, including those in Appendix S, are appropriate, the EPA expects, at a later date contemporaneous with the designation process for the revised $O_3$ NAAQS, to propose those revisions. If any changes are proposed to Appendix S requirements, the EPA

anticipates that it would intend for those changes to become effective no later than the effective date of the area designations. This timing would allow air agencies that lack an approved NNSR program for $O_3$ to use the relevant Appendix S provisions to issue NNSR permits addressing $O_3$ on and after the effective date of designations of new nonattainment areas for $O_3$ until such time as a NNSR program for $O_3$ is approved into the SIP.[252]

For NNSR, new major stationary sources and major modifications for $O_3$ must comply with the Lowest Achievable Emission Rate (LAER) requirements as defined in the CAA and NNSR rules, and must perform other analyses and satisfy other requirements under section 173 of the CAA. For example, under CAA section 173(c) emissions reductions, known as emissions offsets, must be secured to offset the increased emissions of the air pollutant (including the relevant precursors) from the new or modified source by an equal or greater reduction, as applicable, of such pollutant. The appropriate emissions offset needed for a particular source will depend upon the classification for the $O_3$ nonattainment area in which the source or modification will locate, such that areas with more severe nonattainment classifications have more stringent offset requirements. This ranges from 1.1:1 for areas classified as Marginal to 1.5:1 for areas classified as Extreme. *See, e.g.,* CAA section 182, 40 CFR 51.165(a)(9) and 40 CFR part 51 Appendix S section IV.G.2.

To facilitate continued economic development in nonattainment areas, many states have established offset banks or registries.[253] Such banks or registries can help new or modified major stationary source owners meet offset requirements by streamlining identification and access to available emissions reductions. Some states have established offset banks to help ensure a consistent method for generating, validating and transferring $NO_X$ and VOC offsets. Offsets in these areas are generated by emissions reductions that meet specific creditability criteria set forth by the SIP consistent with the EPA regulations. *See* 40 CFR 51.165(a)(3)(ii)(A)-(J) and part 51 Appendix S section IV.C. The EPA

received comments expressing concern about the limited availability of offsets in nonattainment areas. Since the EPA did not propose, and is not finalizing, any amendments related to the NNSR offset provisions, the EPA is not responding to those comments at this time, consistent with the EPA's general approach to comment on implementation topics as described above.

### D. Transportation and General Conformity

#### 1. What are transportation and general conformity?

Conformity is required under CAA section 176(c) to ensure that federal actions are consistent with ("conform to") the purpose of the SIP. Conformity to the purpose of the SIP means that federal activities will not cause new air quality violations, worsen existing violations, or delay timely attainment of the relevant NAAQS or interim reductions and milestones. Conformity applies to areas that are designated nonattainment, and those nonattainment areas redesignated to attainment with a CAA section 175A maintenance plan after 1990 ("maintenance areas").

The EPA's Transportation Conformity Rule (40 CFR 51.390 and part 93, subpart A) establishes the criteria and procedures for determining whether transportation activities conform to the SIP. These activities include adopting, funding or approving transportation plans, transportation improvement programs (TIPs) and federally supported highway and transit projects. For further information on conformity rulemakings, policy guidance and outreach materials, *see* the EPA's Web site at *http://www.epa.gov/otaq/stateresources/transconf/index.htm.* The EPA may issue future transportation conformity guidance as needed to implement a revised $O_3$ NAAQS.

With regard to general conformity, the EPA first promulgated general conformity regulations in November 1993. (40 CFR part 51, subpart W, 40 CFR part 93, subpart B) Subsequently the EPA finalized revisions to the general conformity regulations on April 5, 2010. (75 FR 17254–17279). Besides ensuring that federal actions not covered by the transportation conformity rule will not interfere with the SIP, the general conformity program also fosters communications between federal agencies and state/local air quality agencies, provides for public notification of and access to federal agency conformity determinations, and allows for air quality review of

---

[250] *See* Appendix S, Part I; 40 CFR 52.24(k).

[251] As appropriate, certain NNSR requirements under 40 CFR 51.165 or Appendix S can also apply to sources and modifications located in areas that are designated attainment or unclassifiable in the Ozone Transport Region. *See, e.g.,* CAA 184(b)(2), 40 CFR 52.24(k).

[252] States with SIP-approved NNSR programs for $O_3$ should evaluate that program to determine whether they can continue to issue permits under their approved program or whether revisions to their program are necessary to address the revised $O_3$ NAAQS.

[253] *See,* for example, emission reduction credit banking programs in Ohio (OAC Chapter 3745–1111) and California (H&SC Section 40709).

individual federal actions. More information on the general conformity program is available at *http://www.epa.gov/air/genconform/*.

2. When would transportation and general conformity apply to areas designated nonattainment for the revised $O_3$ NAAQS?

Transportation and general conformity apply one year after the effective date of nonattainment designations for the revised $O_3$ NAAQS. This is because CAA section 176(c)(6) provides a 1-year grace period from the effective date of initial designations for any revised NAAQS before transportation and general conformity apply in areas newly designated nonattainment for a specific pollutant and NAAQS.

3. Impact of a Revised $O_3$ NAAQS on a State's Existing Transportation and/or General Conformity SIP

In this final rule, the EPA is revising the $O_3$ NAAQS, but is not making specific changes to its transportation or general conformity regulations. Therefore, states should not need to revise their transportation and/or general conformity SIPs. While we are not making any revisions to the general conformity regulations at this time, we recommend, when areas develop SIPs for a revised $O_3$ NAAQS, that state and local air quality agencies work with federal agencies with large emitting activities that are subject to the general conformity regulations to establish an emissions budget for those facilities and activities in order to facilitate future conformity determinations under the conformity regulations. Finally, states with existing conformity SIPs and new nonattainment areas may also need to revise their conformity SIPs in order to ensure the state regulations apply in any newly designated areas.

Because significant tracts of land under federal management may be included in nonattainment area boundaries, the EPA encourages state and local air quality agencies to work with federal agencies to assess and develop emissions budgets that consider emissions from projects subject to general conformity, including emissions from fire on wildland, in any baseline, modeling and SIP attainment inventory. Where appropriate, states, land managers, and landowners may also consider developing plans to ensure that fuel accumulations are addressed

Information is available from DOI and USDA Forest Service on the ecological role of fire and on smoke management

programs and basic smoke management practices.[254]

If this is the first time that transportation conformity will apply in a state, such a state is required by the statute and EPA regulations to submit a SIP revision that addresses three specific transportation conformity requirements that address consultation procedures and written commitments to control or mitigation measures associated with conformity determinations for transportation plans, TIPs or projects. (40 CFR 51.390) Additional information and guidance can be found in the EPA's "Guidance for Developing Transportation Conformity State Implementation Plans" (*http://www.epa.gov/otaq/stateresources/transconf/policy/420b09001.pdf*).

*E. Regional and International Pollution Transport*

1. Interstate Transport

The CAA contains provisions that specifically address and require regulation of the interstate transport of air pollution that does not otherwise qualify for data exclusion under the Act's exceptional events provisions. As previously noted, emissions from events, such as wildfires, may qualify as exceptional events and may be transported across jurisdictional boundaries. The EPA intends to address the transport of event-related emissions in our upcoming proposed revisions to the Exceptional Events Rule and draft guidance document addressing the Exceptional Events Rule criteria for wildfires that could affect $O_3$ concentrations. The EPA encourages affected air agencies to coordinate with their EPA regional office to identify approaches to evaluate the potential impacts of transported event-related emissions and determine the most appropriate information and analytical methods for each area's unique situation.

*CAA section 110(a)(2)(D)(i)(I), Interstate Transport*—CAA section 110(a)(2)(D)(i)(I) requires states to develop and implement a SIP to address the interstate transport of emissions. Specifically, this provision requires the SIP to prohibit "any source or other type of emissions activity within the state" that would "significantly contribute to nonattainment" of any NAAQS in another state, or that would "interfere with maintenance" of any NAAQS in another state. When EPA promulgates or

revises a NAAQS, each state is required to submit a SIP addressing this interstate transport provision within 3 years.

*CAA section 126, Interstate Transport*—CAA section 126(b) provides states and political subdivisions with a mechanism to petition the Administrator for a finding that "any major source or group of stationary sources emits or would emit any air pollution in violation of the prohibition of [CAA section 110(a)(2)(D)(i)(I)]." [255] Where the EPA makes such finding, the source is allowed to operate beyond a 3-month period after such finding only if the EPA establishes emissions limitations and a compliance schedule designated to bring the source into compliance as expeditiously as practicable, but no later than three years after such finding. This mechanism is available to downwind states and political subdivisions, regardless of designation status, that would be affected by emissions from upwind states.

2. International Transport

The agency is active in work to reduce the international transport of $O_3$ and other pollutants that can contribute to "background" $O_3$ levels in the U.S. Under the Convention on Long-Range Transboundary Air Pollution (LRTAP) of the United Nations Economic Commission for Europe, the U.S. has been a party to the Protocol to Abate Acidification, Eutrophication, and Ground-level Ozone (known as the Gothenburg Protocol) since 2005. The U.S. is also active in the LRTAP Task Force for Hemispheric Transport of Air Pollution. The U.S. has worked bilaterally with Canada under the US-Canada Air Quality Agreement to adopt an Ozone Annex to address transboundary $O_3$ impacts and continues to work with China on air quality management activities. This work includes supporting China's efforts to rapidly deploy power plant pollution controls that can achieve $NO_X$ reductions of at least 80 to 90%. The U.S. also continues to work bilaterally with Mexico on the Border 2020 program to support efforts to improve environmental conditions in the border region. One of the main goals of the program is to reduce air pollution, including emissions that can cause transboundary $O_3$ impacts.

---

[254] USDA Forest Service and Natural Resources Conservation Service, Basic Smoke Management Practices Tech Note, October 2011, *http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb1046311.pdf*.

[255] The text of section 126 codified in the United States Code cross references section 110(a)(2)(D)(ii) instead of section 110(a)(2)(D)(i). The courts have confirmed that this is a scrivener's error and the correct cross reference is to section 110(a)(2)(D)(i), See *Appalachian Power Co.* v. *EPA*, 249 F.3d 1032, 1040–44 (D.C. Cir. 2001).

BLM_0047454

Clean Air Act section 179B recognizes the possibility that certain nonattainment areas may be impacted by $O_3$ or $O_3$ precursor emissions from international sources beyond the regulatory jurisdiction of the state. The EPA's science review suggests that the influence of international sources on U.S. $O_3$ levels will be largest in locations that are in the immediate vicinity of an international border with Canada or Mexico. The science review also cites two recent studies which indicate that intercontinental transport of pollution, along with other natural sources and local pollutant sources, can affect $O_3$ air quality in the western U.S. under specific conditions. (U.S. EPA 2013, p. 3–140). Section 179B allows states to consider in their attainment plans and demonstrations whether an area might meet the $O_3$ NAAQS by the attainment date "but for" emissions contributing to the area originating outside the U.S. If a state is unable to demonstrate attainment of the NAAQS in such an area impacted by international transport after adopting all reasonably available control measures (*e.g.,* RACM, including RACT, as required by CAA section 182(b)), the EPA can nonetheless approve the CAA-required state attainment plan and demonstration using the authority in section 179B.

When the EPA approves this type of attainment plan and demonstration, and there would be no adverse consequence for a finding that the area failed to attain the NAAQS by the relevant attainment date. States can also avoid potential sanctions and FIPs that would otherwise apply for failure to submit a required SIP submission or failure to submit an approvable SIP submission. For example, section 179B explicitly provides that the area shall not be reclassified to the next highest classification or required to implement a section 185 penalty fee program if a state meets the applicable criteria.

Section 179B authority does not allow an area to avoid a nonattainment designation or for the area to be classified with a lower classification than is indicated by actual ambient air quality. Section 179B also does not provide for any relaxation of mandatory emissions control measures (including contingency measures) or the prescribed emissions reductions necessary to achieve periodic emissions reduction progress requirements. In this way, section 179B insures that states will take actions to mitigate the public health impacts of exposure to ambient levels of pollution that violate the NAAQS by imposing reasonable control measures on the sources that *are* within the jurisdiction of the state while also authorizing EPA to approve such attainment plans and demonstrations even though they do not fully address the public health impacts of international transport. Also, generally, monitoring data influenced by international transport may not be excluded from regulatory determinations. However, depending on the nature and scope of international emissions events affecting air quality in the U.S., the event-influenced data may qualify for exclusion under the Exceptional Events Rule. The EPA encourages affected air agencies to coordinate with their EPA regional office to identify approaches to evaluate the potential impacts of international transport and to determine the most appropriate information and analytical methods for each area's unique situation. The EPA will also work with states that are developing attainment plans for which section 179B is relevant, and ensure the states have the benefit of the EPA's understanding of international transport of ozone and ozone precursors.

The EPA has used section 179B authority previously to approve attainment plans for Mexican border areas in El Paso, TX ($O_3$, $PM_{10}$, and CO plans); and Nogales, AZ ($PM_{10}$ plan). The 24-hour $PM_{10}$ attainment plan for Nogales, AZ, was approved by EPA as sufficient to demonstrate attainment of the NAAQS by the Moderate classification deadline, but for international emissions sources in the Nogales Municipality, Mexico area (77 FR 38400, June 27, 2012).

States are encouraged to consult with their EPA Regional Office to establish appropriate technical requirements for these analyses.

## IX. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *http://www2.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is an economically significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. Any changes made in response to OMB recommendations have been documented in the docket. The EPA prepared an analysis of the potential costs and benefits associated with this action. This analysis is contained in the document, *Regulatory Impact Analysis of the Final National Ambient Air Quality Standards for Ground-Level Ozone,* October 2015. A copy of the analysis is available in the RIA docket (EPA–HQ–OAR–2013–0169) and the analysis is briefly summarized here. The RIA estimates the costs and monetized human health and welfare benefits of attaining three alternative $O_3$ NAAQS nationwide. Specifically, the RIA examines the alternatives of 65 ppb and 70 ppb. The RIA contains illustrative analyses that consider a limited number of emissions control scenarios that states and Regional Planning Organizations might implement to achieve these alternative $O_3$ NAAQS. However, the CAA and judicial decisions make clear that the economic and technical feasibility of attaining ambient standards are not to be considered in setting or revising NAAQS, although such factors may be considered in the development of state plans to implement the standards. Accordingly, although an RIA has been prepared, the results of the RIA have not been considered in issuing this final rule.

### B. Paperwork Reduction Act

The information collection requirements in this final rule have been submitted for approval to the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA). The information collection requirements are not enforceable until OMB approves them. The Information Collection Request (ICR) document prepared by the EPA for these revisions has been assigned EPA ICR #2313.04.

The information collected and reported under 40 CFR part 58 is needed to determine compliance with the NAAQS, to characterize air quality and associated health and ecosystems impacts, to develop emission control strategies, and to measure progress for the air pollution program. We are extending the length of the required $O_3$ monitoring season in 32 states and the District of Columbia and the revised $O_3$ monitoring seasons will become effective on January 1, 2017. We are also revising the PAMS monitoring requirements to reduce the number of required PAMS sites while improving spatial coverage, and requiring states in moderate or above $O_3$ non-attainment areas and the $O_3$ transport region to develop an enhanced monitoring plan as part of the PAMS requirements. Monitoring agencies will need to comply with the PAMS requirements by June 1, 2019. In addition, we are revising the $O_3$ FRM to establish a new, additional technique for measuring $O_3$ in the ambient air. It will be

BLM_0047455

incorporated into the existing O₃ FRM, using the same calibration procedure in Appendix D of 40 CFR part 50. We are also making changes to the procedures for testing performance characteristics and determining comparability between candidate FEMs and reference methods.

For the purposes of ICR number 2313.04, the burden figures represent the burden estimate based on the requirements contained in this rule. The burden estimates are for the 3-year period from 2016 through 2018. The implementation of the PAMS changes will occur beyond the time frame of this ICR with implementation occurring in 2019. The cost estimates for the PAMS network (including revisions) will be captured in future routine updates to the Ambient Air Quality Surveillance ICR that are required every 3 years by OMB. The addition of a new FRM in 40 CFR part 50 and revisions to the O₃ FEM procedures for testing performance characteristics in 40 CFR part 53 does not add any additional information collection requirements.

The ICR burden estimates are associated with the changes to the O₃ seasons in this final rule. This information collection is estimated to involve 158 respondents for a total cost of approximately $24,597,485 (total capital, labor, and operation and maintenance) plus a total burden of 339,930 hours for the support of all operational aspects of the entire O₃ monitoring network. The labor costs associated with these hours are $20,209,966. Also included in the total are other costs of operations and maintenance of $2,254,334 and equipment and contract costs of $2,133,185. The actual labor cost increase to expand the O₃ monitoring seasons is $2,064,707. In addition to the costs at the state, local, and tribal air quality management agencies, there is a burden to EPA of 41,418 hours and $2,670,360. Burden is defined at 5 CFR 1320.3(b). State, local, and tribal entities are eligible for state assistance grants provided by the federal government under the CAA which can be used for related activities. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations in 40 CFR are listed in 40 CFR part 9.

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small

entities. Rather, this rule establishes national standards for allowable concentrations of O₃ in ambient air as required by section 109 of the CAA. See also *American Trucking Associations* v. *EPA*, 175 F. 3d at 1044–45 (NAAQS do not have significant impacts upon small entities because NAAQS themselves impose no regulations upon small entities). Similarly, the revisions to 40 CFR part 58 address the requirements for states to collect information and report compliance with the NAAQS and will not impose any requirements on small entities. Similarly, the addition of a new FRM in 40 CFR part 50 and revisions to the FEM procedures for testing in 40 CFR part 53 will not impose any requirements on small entities.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded federal mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The revisions to the O₃ NAAQS impose no enforceable duty on any state, local, or tribal governments or the private sector beyond those duties already established in the CAA. The expected costs associated with the monitoring requirements are described in the EPA's ICR document, and these costs are not expected to exceed $100 million in the aggregate for any year.

Furthermore, as indicated previously, in setting NAAQS the EPA cannot consider the economic or technological feasibility of attaining ambient air quality standards, although such factors may be considered to a degree in the development of state plans to implement the standards (see *American Trucking Associations* v. *EPA*, 175 F. 3d at 1043 [noting that because the EPA is precluded from considering costs of implementation in establishing NAAQS, preparation of a RIA pursuant to the UMRA would not furnish any information which the court could consider in reviewing the NAAQS]). With regard to the sections of the rule preamble discussing implementation of the revisions to the O₃ NAAQS, the CAA imposes the obligation for states to submit SIPs to implement the NAAQS for O₃. To the extent the EPA's discussion of implementation topics in this final rule may reflect some interpretations of those requirements, those interpretations do not impose obligations beyond the duties already established in the CAA and thus do not constitute a federal mandate for purposes of UMRA. The EPA is also adopting a grandfathering provision for

certain PSD permits in this action, as described above. However, that provision does not impose any mandate on any state, local, or tribal government or the private sector, but rather provides relief from requirements that would otherwise result from the new standards. In addition, the EPA is not requiring states to revise their SIPs to include such a provision.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175. It does not have a substantial direct effect on one or more Indian tribes. This rule provides increased protection from adverse effects of ozone for the entire country, including for sensitive populations, and tribes are not obligated to adopt or implement any NAAQS. In addition, tribes are not obligated to conduct ambient monitoring for O₃ or to adopt the ambient monitoring requirements of 40 CFR part 58. Even if this action were determined to have tribal implications within the meaning of Executive Order 13175, it will neither impose substantial direct compliance costs on tribal governments, nor preempt tribal law. Thus, consultation under Executive Order 13175 was not required.

Nonetheless, consistent with the "EPA Policy on Consultation and Coordination with Indian Tribes", the EPA offered government-to-government consultation on the proposed rule. No tribe requested government-to-government consultation with the EPA on this rule. In addition, the EPA conducted outreach to tribal environmental professionals, which included participation in the Tribal Air call sponsored by the National Tribal Air Association, and two other calls available to tribal environmental professionals. During the public comment period we received comments on the proposed rule from seven tribes and three tribal organizations.

*G. Executive Order 13045: Protection of Children From Environmental Health & Safety Risks*

This action is subject to Executive Order 13045 because it is an

BLM_0047456

economically significant regulatory action as defined by Executive Order 12866, and the EPA believes that the environmental health risk addressed by this action may have a disproportionate effect on children. The rule will establish uniform NAAQS for O₃; these standards are designed to protect public health with an adequate margin of safety, as required by CAA section 109. However, the protection offered by these standards may be especially important for children because children, especially children with asthma, along with other at-risk populations [256] such as all people with lung disease and people active outdoors, are at increased risk for health effects associated with exposure to O₃ in ambient air. Because children are considered an at-risk lifestage, we have carefully evaluated the environmental health effects of exposure to O₃ pollution among children. Discussions of the results of the evaluation of the scientific evidence, policy considerations, and the exposure and risk assessments pertaining to children are contained in sections II.B and II.C of this preamble.

*H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use*

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. The purpose of this rule is to establish revised NAAQS for O₃, establish an additional FRM, revise FEM procedures for testing, and revises air quality surveillance requirements. The rule does not prescribe specific pollution control strategies by which these ambient standards and monitoring revisions will be met. Such strategies will be developed by states on a case-by-case basis, and the EPA cannot predict whether the control options selected by states will include regulations on energy suppliers, distributors, or users. Thus, the EPA concludes that this rule is not likely to have any adverse energy effects and does not constitute a significant energy action as defined in Executive Order 13211.

*I. National Technology Transfer and Advancement Act*

This rulemaking involves environmental monitoring and measurement. Consistent with the Agency's Performance Based

Measurement System (PBMS), the EPA is not requiring the use of specific, prescribed analytical methods. Rather, the Agency is allowing the use of any method that meets the prescribed performance criteria. Ambient air concentrations of O₃ are currently measured by the FRM in 40 CFR part 50, Appendix D (Measurement Principle and Calibration Procedure for the Measurement of Ozone in the Atmosphere) or by FEM that meet the requirements of 40 CFR part 53. Procedures are available in part 53 that allow for the approval of an FEM for O₃ that is similar to the FRM. Any method that meets the performance criteria for a candidate equivalent method may be approved for use as an FEM. This approach is consistent with EPA's PBMS. The PBMS approach is intended to be more flexible and cost-effective for the regulated community; it is also intended to encourage innovation in analytical technology and improved data quality. The EPA is not precluding the use of any method, whether it constitutes a voluntary consensus standard or not, as long as it meets the specified performance criteria.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action will not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations or indigenous peoples. The action described in this notice is to strengthen the NAAQS for O₃.

The primary NAAQS are established at a level that is requisite to protect public health, including the health of sensitive or at-risk groups, with an adequate margin of safety. The NAAQS decisions are based on an explicit and comprehensive assessment of the current scientific evidence and associated exposure/risk analyses. More specifically, EPA expressly considers the available information regarding health effects among at-risk populations, including that available for low-income populations and minority populations, in decisions on NAAQS. Where low-income populations or minority populations are among the at-risk populations, the decision on the standard is based on providing protection for these and other at-risk populations and lifestages. Where such populations are not identified as at-risk populations, a NAAQS that is established to provide protection to the at-risk populations would also be expected to provide protection to all

other populations, including low-income populations and minority populations.

The ISA, HREA, and PA for this review, which include identification of populations at risk from O₃ health effects, are available in the docket, EPA–HQ–OAR–2008–0699. The information on at-risk populations for this NAAQS review is summarized and considered earlier in this preamble (see section II.A). This final rule increases the level of environmental protection for all affected populations without having any disproportionately high and adverse human health or environmental effects on any population, including any minority populations, low-income populations or indigenous peoples. This rule establishes uniform national standards for O₃ in ambient air that, in the Administrator's judgment, protect public health, including the health of sensitive groups, with an adequate margin of safety.

Although it is part of a separate docket (EPA–HQ–OAR–2013–0169) and is not part of the rulemaking record for this action, EPA has prepared a RIA of this decision. As part of the RIA, a demographic analysis was conducted. While, as noted in the RIA, the demographic analysis is not a full quantitative, site-specific exposure and risk assessment, that analysis examined demographic characteristics of persons living in areas with poor air quality relative to the proposed standard. Specifically, Chapter 9, section 9.10 (page 9–7) and Appendix 9A of the RIA describe this proximity and socio-demographic analysis. This analysis found that in areas with poor air quality relative to the revised standard,[257] the representation of minority populations was slightly greater than in the U.S. as a whole. Because the air quality in these areas does not currently meet the revised standard, populations in these areas would be expected to benefit from implementation of the strengthened standard, and, thus, would be more affected by strategies to attain the revised standard. This analysis, which evaluates the potential implications for minority populations and low-income populations of future air pollution control actions that state and local agencies may consider in implementing the revised O₃ NAAQS described in this decision notice are discussed in Appendix 9A of the RIA. The RIA is available on the Web, through the EPA's Technology Transfer Network Web site at *http://www.epa.gov/ttn/naaqs/standards/ozone/s_o3_index.html* and

---

[256] As used here and similarly throughout this document, the term population refers to people having a quality or characteristic in common, including a specific pre-existing illness or a specific age or lifestage.

[257] This refers to monitored areas with O₃ design values above the revised and alternative standards.

in the RIA docket (EPA–HQ–OAR–2013–0169). As noted above, although an RIA has been prepared, the results of the RIA have not been considered in issuing this final rule.

### K. Congressional Review Act (CRA)

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is a "major rule" as defined by 5 U.S.C. 804(2).

### References

Adams, WC. (2006). Comparison of chamber 6.6 hour exposures to 0.04–0.08 ppm ozone via square-wave and triangular profiles on pulmonary responses. Inhalation Toxicol. 18:127–136. http://dx.doi.org/10.1080/08958370500306107.

Adams, WC. (2002). Comparison of chamber and face-mask 6.6-hour exposures to ozone on pulmonary function and symptoms responses. Inhal Toxicol 14:745–764. http://dx.doi.org/10.1080/08958370290084610.

Akinbami, LJ; Lynch, CD; Parker, JD; Woodruff, TJ. (2010). The association between childhood asthma prevalence and monitored air pollutants in metropolitan areas, United States, 2001–2004. Environ Res 110:294–301. http://dx.doi.org/10.1016/j.envres.2010.01.001.

Alexis, N; Urch, B; Tarlo, S; Corey, P; Pengelly, D; O'Byrne, P; Silverman, F. (2000). Cyclooxygenase metabolites play a different role in ozone-induced pulmonary function decline in asthmatics compared to normals. Inhal Toxicol 12:1205–1224.

American Thoracic Society. (2000a). What constitutes an adverse health effect of air pollution? Am. J. Respir. Crit. Care Med. 161:665–673.

American Thoracic Society. (2000b). Guidelines for methacholine and exercise challenge testing—1999. Am. J. Respir. Crit. Care Med. 161:309–329.

American Thoracic Society. (1985). Guidelines as to what constitutes an adverse respiratory health effect, with special reference to epidemiological studies of air pollution. Am. Rev. Respir. Dis. 131:666–668.

Andersen, CP; Wilson, R; Plocher, M; Hogsett, WE. (1997). Carry-over effects of ozone on root growth and carbohydrate concentrations of ponderosa pine seedlings. Tree Physiol 17:805–811.

Basha, MA; Gross, KB; Gwizdala, CJ; Haidar, AH; Popovich, J, Jr. (1994). Bronchoalveolar lavage neutrophilia in asthmatic and healthy volunteers after controlled exposure to ozone and filtered purified air. Chest 106:1757–1765.

Bell, ML; Peng, RD; Dominici, F. (2006). The exposure-response curve for ozone and risk of mortality and the adequacy of current ozone regulations. Environ Health Perspect 114:532–536.

Bloom, B; Cohen, RA; Freeman, G. (2011). Summary health statistics for U.S. children: National Health Interview Survey, 2010. National Center for Health

Statistics. Vital Health Stat 10 (250). http://www.cdc.gov/nchs/data/series/sr_10/sr10_250.pdf.

Brauer, M; Blair, J; Vedal, S. (1996). Effect of ambient ozone exposure on lung function in farm workers. Am J Respir Crit Care Med 154:981–987.

Brown, JS; Bateson, TF; McDonnell, WF. (2008). Effects of exposure to 0.06 ppm ozone on FEV$_1$ in humans: A secondary analysis of existing data. Environ Health Perspect 116:1023–1026. http://dx.doi.org/10.1289/ehp.11396.

Brown, JS. (2007). The effects of ozone on lung function at 0.06 ppm in healthy adults. June 14, 2007. Memo to the Ozone NAAQS Review Docket. EPA–HQ–OAR–2005–0172–0175. http://www.epa.gov/ttn/naaqs/standards/ozone/s_o3_cr_td.html.

Brunekreef, B; Hoek, G; Breugelmans, O; Leentvaar, M. (1994). Respiratory effects of low-level photochemical air pollution in amateur cyclists. Am J Respir Crit Care Med 150:962–966.

Cakmak, S; Dales, RE; Judek, S. (2006). Respiratory health effects of air pollution gases: Modification by education and income. Arch Environ Occup Health 61:5–10. http://dx.doi.org/10.3200/AEOH.61.1.5–10.

Campbell, SJ; Wanek, R; Coulston, JW. (2007). Ozone injury in west coast forests: 6 years of monitoring—Introduction. Portland, OR: U.S. Department of Agriculture.

Cavender, K. (2015). Summary of Final PAMS Network Design. Memorandum to the Ozone NAAQS Review Docket, EPA–HQ–OAR–2008–0699.

Cavender, K. (2014). Network Design Considerations for the PAMS Network: Memorandum to the Ozone NAAQS Review Docket, EPA–HQ–OAR–2008–0699.

Cavender, K. (2013). Revisions to the PAMS Compound Target List: Memorandum to the Ozone NAAQS Review Docket, EPA–HQ–OAR–2008–0699.

Centers for Disease Control and Prevention. (2004). The health consequences of smoking: A report of the Surgeon General. Washington, DC: U.S. Department of Health and Human Services. http://www.surgeongeneral.gov/library/smokingconsequences/.

Cordell, HK; Betz, CJ; Fly, M; Mou, S; Green, GT. (2008) How do Americans View Wilderness. A WILDERNESS Research Report in the Internet Research Information Series. National Survey on Recreation and the Environment. This research is a collaborative effort between the U.S. Department of Agriculture Forest Service's Southern Research Station and its Forestry Sciences Laboratory in Athens, Georgia; the University of Georgia in Athens; and the University of Tennessee in Knoxville, Tennessee. http://warnell.forestry.uga.edu/nrrt/nsre/IRISWild/IrisWild1rptR.pdf.

Dales, RE; Cakmak, S; Doiron, MS. (2006). Gaseous air pollutants and hospitalization for respiratory disease in the neonatal period. Environ Health

Persepct 114:1751–1754. http://dx.doi.org/10.1289/ehp.9044.

Darbah, JNT; Kubiske, ME; Nelson, N; Oksanen, E; Vaapavuori, E; Karnosky, DF. (2008). Effects of decadal exposure to interacting elevated $CO_2$ and/or $O_3$ on paper birch (Betula papyrifera) reproduction. Environ Pollut 155:446–452. http://dx.doi.org/10.1016/j.envpol.2008.01.033.

Darbah, JNT; Kubiske, ME; Nelson, N; Oksanen, E; Vaapavuori, E; Karnosky, DF. (2007). Impacts of elevated atmospheric $CO_2$ and $O_3$ on paper birch (Betula papyrifera): Reproductive fitness. Scientific World Journal 7:240–246. http://dx.doi.org/10.1100/tsw.2007.42.

Darrow, LA; Klein, M; Sarnat, JA; Mulholland, JA; Strickland, MJ; Sarnat, SE; Russell, AG; Tolbert, PE. (2011a). The use of alternative pollutant metrics in time-series studies of ambient air pollution and respiratory emergency department visits. J Expo Sci Environ Epidemiol 21:10–19. http://dx.doi.org/10.1038/jes.2009.49.

Eresmaa, N, Karppinen, SM; Joffre, SM; Rasanene, J; Talvitie, H. (2006). Mixing Height Determination by Ceilometer, Atmospheric Chemistry and Physics, 6. 1485–1493.

Franze, T; Weller, MG; Niessner, R; Pöschl, U. (2005). Protein nitration by polluted air. Environ Sci Technol 39:1673–1678. http://dx.doi.org/10.1021/es0488737.

Frey, HC; Samet, JM. (2012a). Letter from Dr. H. Christopher Frey, Chair and Dr. Jonathan M. Samet, Immediate Past Chair, Clean Air Scientific Advisory Committee, to Administrator Lisa P. Jackson. Re: CASAC Review of the EPA's Policy Assessment for the Review of the Ozone National Ambient Air Quality Standards (First External Review Draft—August 2012). EPA–CASAC–13–003. November 26, 2012.

Frey, HC; Samet, JM. (2012b). Letter from Dr. H. Christopher Frey, Chair and Dr. Jonathan M. Samet, Immediate Past Chair, Clean Air Scientific Advisory Committee, to Administrator Lisa P. Jackson. Re: CASAC Review of the EPA's Health Risk and Exposure Assessment for Ozone (First External Review Draft—Updated August 2012) and Welfare Risk and Exposure Assessment for Ozone (First External Review Draft—Updated August 2012). EPA–CASAC–13–002. November 19, 2012.

Frey, HC. (2014a). Letter from Dr. H. Christopher Frey, Chair, Clean Air Scientific Advisory Committee, to Administrator Gina McCarthy. Re: CASAC Review of the EPA's Health Risk and Exposure Assessment for Ozone (Second External Review Draft—February, 2014). EPA–CASAC–14–005. July 1, 2014.

Frey, HC. (2014b). Letter from Dr. H. Christopher Frey, Chair, Clean Air Scientific Advisory Committee, to Administrator Gina McCarthy. CASAC Review of the EPA's Welfare Risk and Exposure Assessment for Ozone (Second External Review Draft). EPA–CASAC–14–003. June 18, 2104.

Frey, HC. (2014c). Letter from Dr. H. Christopher Frey, Chair, Clean Air Scientific Advisory Committee, to Administrator Gina McCarthy. CASAC Review of the EPA's *Second Draft Policy Assessment for the Review of the Ozone National Ambient Air Quality Standards.* EPA–CASAC–14–004. June, 26, 2014.

Gielen, MH; Van Der Zee, SC; Van Wijnen, JH; Van Steen, CJ; Brunekreef, B. (1997). Acute effects of summer air pollution on respiratory health of asthmatic children. Am J Respir Crit Care Med 155:2105–2108.

Goodman, JE; Prueitt, RL; Sax, SN; Bailey, LI; Rhomberg, LR. (2013). Evaluation of the causal framework used for setting the National Ambient Air Quality Standards. Crit. Rev. Toxicol. 43(10):829–849.

Haefele, M., R.A. Kramer, and T.P. Holmes. (1991). Estimating the Total Value of a Forest Quality in High-Elevation Spruce-Fir Forests. The Economic Value of Wilderness: Proceedings of the Conference. Gen. Tech. Rep. SE–78 (pp. 91–96). Southeastern For. Exper. Station. Asheville, NC: USDA Forest Service.

Heck, WW; Cowling, EB. (1997). The need for a long term cumulative secondary ozone standard—An ecological perspective. EM January:23–33.

Henderson, R. (2008). Letter from Dr. Rogene Henderson, Chair, Clean Air Scientific Advisory Committee, to Administrator Stephen Johnson. Subject: Clean Air Scientific Advisory Committee Recommendations Concerning the Final Rule for the National Ambient Air Quality Standards for Ozone. EPA–CASAC–08–009. April 7, 2008.

Henderson, R. (2006). Letter from Dr. Rogene Henderson, Chair, Clean Air Scientific Advisory Committee, to Administrator Stephen Johnson. Subject: Clean Air Scientific Advisory Committee's (CASAC) Peer Review of the Agency's 2nd Draft Ozone Staff Paper. EPA–CASAC–07–001. October 24, 2006.

Hill, AB. (1965). The environment and disease: Association or causation? Proc R Soc Med 58:295–300.

Hoek, G; Brunekreef, B; Kosterink, P; Van den Berg, R; Hofschreuder, P. (1993). Effect of ambient ozone on peak expiratory flow of exercising children in the Netherlands. Arch Environ Occup Health 48:27–32. *http://dx.doi.org/10.1080/00039896.1993.9933390.*

Holmes, T; Kramer, R. (1995). "An Independent Sample Test of Yea-Saying and StartingPoint Bias in Dichotomous-Choice Contingent Valuation." Journal of Environmental Economics and Management 28:121–132.

Hoppe, P; Peters, A; Rabe, G; Praml, G; Lindner, J; Jakobi, G; Fruhmann, G; Nowak, D. (2003). Environmental ozone effects in different population subgroups. Int J Hyg Environ Health 206:505–516. *http://dx.doi.org/10.1016/1438-4639-00250.*

Horstman, DH; Ball, BA; Brown, J; Gerrity, T; Folinsbee, LJ. (1995). Comparison of pulmonary responses of asthmatic and nonasthmatic subjects performing light exercise while exposed to a low level of ozone. Toxicol Ind Health 11:369–385.

Howden, LM; Meyer, JA. (2011). U.S. Census Bureau, 2010 Census Briefs, C2010BR–03, Age and Sex Composition: 2010, U.S. Department of Commerce, Economics and Statistics Administration, U.S. Census Bureau, Washington, DC 20233. *http://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf.*

Hwang, BF; Lee, YL; Lin, YC; Jaakkola, JJK; Guo, YL. (2005). Traffic related air pollution as a determinant of asthma among Taiwanese school children. Thorax 60:467–473.

Islam, T; McConnell, R; Gauderman, WJ; Avol, E; Peters, JM; Gilliland, FD. (2008). Ozone, oxidant defense genes and risk of asthma during adolescence. Am J Respir Crit Care Med 177:388–395. *http://dx.doi.org/10.1164/rccm.200706-863OC.*

Jacob DJ; Winner DA. (2009). Effect of climate change on air quality. Atmos Environ 43:51–63.

Jerrett, M; Burnett, RT; Pope, CA, III; Ito, K; Thurston, G; Krewski, D; Shi, Y; Calle, E; Thun, M. (2009). Long-term ozone exposure and mortality. N Engl J Med 360:1085–1095. *http://dx.doi.org/10.1056/NEJMoa0803894.*

Jorres, R; Nowak, D; Magnussen, H; Speckin, P; Koschyk, S. (1996). The effect of ozone exposure on allergen responsiveness in subjects with asthma or rhinitis. Am J Respir Crit Care Med 153:56–64.

Katsouyanni, K; Samet, JM; Anderson, HR; Atkinson, R; Le Tertre, A; Medina, S; Samoli, E; Touloumi, G; Burnett, RT; Krewski, D; Ramsay, T; Dominici, F; Peng, RD; Schwartz, J; Zanobetti, A. (2009). Air pollution and health: A European and North American approach (APHENA). (Research Report 142). Boston, MA: Health Effects Institute. *http://pubs.healtheffects.org/view.php?id=327.*

Kim, CS; Alexis, NE; Rappold, AG; Kehrl, H; Hazucha, MJ; Lay, JC; Schmitt, MT; Case, M; Devlin, RB; Peden, DB; Diaz-Sanchez, D. (2011). Lung function and inflammatory responses in healthy young adults exposed to 0.06 ppm ozone for 6.6 hours. Am J Respir Crit Care Med 183:1215–1221. *http://dx.doi.org/10.1164/rccm.201011-1813OC.*

King, JS; Kubiske, ME; Pregitzer, KS; Hendrey, GR; McDonald, EP; Giardina, CP; Quinn, VS; Karnosky, DF. (2005). Tropospheric O₃ compromises net primary production in young stands of trembling aspen, paper birch and sugar maple in response to elevated atmospheric CO₂. New Phytol 168:623–635. *http://dx.doi.org/10.1111/j.1469-8137.2005.01557.x.*

Kohut, R. (2007). Assessing the risk of foliar injury from ozone on vegetation in parks in the U.S. National Park Service's Vital Signs Network. Environ Pollut 149:348–357.

Kreit, JW; Gross, KB; Moore, TB; Lorenzen, TJ; D'Arcy, J; Eschenbacher, WL. (1989). Ozone-induced changes in pulmonary function and bronchial responsiveness in asthmatics. J Appl Physiol 66:217–222.

Kubiske, ME; Quinn, VS; Heilman, WE; McDonald, EP; Marquardt, PE; Teclaw, RM; Friend, AL; Karnoskey, DF. (2006).

Interannual climatic variation mediates elevated CO₂ and O₃ effects on forest growth. Global Change Biol 12:1054–1068. *http://dx.doi.org/10.1111/j.1365-2486.2006.01152.x.*

Kubiske, ME; Quinn, VS; Marquardt, PE; Karnosky, DF. (2007). Effects of elevated atmospheric CO₂ and/or O₃ on intra- and interspecific competitive ability of aspen. Plant Biol (Stuttg) 9:342–355. *http://dx.doi.org/10.1055/s-2006-924760.*

Lee, EH; Hogsett, WE. (1996). Methodology for calculating inputs for ozone secondary standard benefits analysis: Part II. Research Triangle Park, NC: U.S. Environmental Protection Agency.

Lefohn, AS; Hazucha, MJ; Shadwick, D; Adams, WC. (2010). An alternative form and level of the human health ozone standard. Inhal Toxicol 22:999–1011. *http://dx.doi.org/10.3109/08958378.2010.505253.*

Lefohn, AS; Jackson, W; Shadwick, DS; Knudsen, HP. (1997). Effect of surface ozone exposures on vegetation grown in the southern Appalachian Mountains: Identification of possible areas of concern. Atmos Environ 31:1695–1708. *http://dx.doi.org/10.1016/S1352-2310(96)00258-0.*

Lin, S; Bell, EM; Liu, W; Walker, RJ; Kim, NK; Hwang, SA. (2008a). Ambient ozone concentration and hospital admissions due to childhood respiratory diseases in New York State, 1991–2001. Environ Res 108:42–47. *http://dx.doi.org/10.1016/j.envres.2008.06.007.*

Lin, S; Liu, X; Le, LH; Hwang, SA. (2008b). Chronic exposure to ambient ozone and asthma hospital admissions among children. Environ Health Perspect 116:1725–1730. *http://dx.doi.org/10.1289/ehp.11184.*

Mar, TF; Koenig, JQ. (2009). Relationship between visits to emergency departments for asthma and ozone exposure in greater Seattle, Washington. Ann Allergy Asthma Immunol 103:474–479.

McCarthy, G. (2012). Letter from Gina McCarthy, Assistant Administrator, U.S. Environmental Protection Agency to Robert Ukeiley. January 4, 2012. *http://www.epa.gov/scram001/10thmodconf/review_material/Sierra_Club_Petition_OAR-11-002-1093.pdf.*

McDonnell, WF; Stewart, PW; Smith, MV; Kim, CS; Schelegle, ES. (2012). Prediction of lung function response for populations exposed to a wide range of ozone conditions. Inhal Toxicol 24:619–633.

McDonnell, WF; Chapman, RS; Horstman, DH; Leigh, MW; Abdul-Salaam, S. (1985). A comparison of the responses of children and adults to acute ozone exposure.

McLaughlin, SB; Nosal, M; Wullschleger, SD; Sun, G. (2007a). Interactive effects of ozone and climate on tree growth and water use in a southern Appalachian forest in the USA. New Phytol 174:109–124. *http://dx.doi.org/10.1111/j.1469-8137.2007.02018.x.*

McLaughlin, SB; Wullschleger, SD; Sun, G; Nosal, M. (2007b). Interactive effects of ozone and climate on water use, soil

BLM_0047459

moisture content and streamflow in a southern Appalachian forest in the USA. New Phytol 174:125–136. http://dx.doi.org/10.1111/j.1469-8137.2007.01970.x.

Medina-Ramon, M; Zanobetti, A; Schwartz, J. (2006). The effect of ozone and PM₁₀ on hospital admissions for pneumonia and chronic obstructive pulmonary disease: A national multicity study. Am J Epidemiol 163:579–588. http://dx.doi.org/10.1093/aje/kwj078.

Mortimer, KM; Neas, LM; Dockery, DW; Redline, S; Tager, IB. (2002). The effect of air pollution on inner-city children with asthma. Eur Respir J 19:699–705. http://dx.doi.org/10.1183/09031936.02.00247102.

Mudway, IS; Kelly, FJ. (2004). An investigation of inhaled ozone dose and the magnitude of airway inflammation in healthy adults. Am J Respir Crit Care Med 169:1089–1095.

National Academy of Sciences. (1991). Rethinking the Ozone Problem in Urban and Regional Air Pollution, Committee on Tropospheric Ozone, National Resource Council, National Academy Press, Washington, DC 20001. ISBN: 0–309–56037–3.

National Institutes of Health, National Heart Lung and Blood Institute. (2007). Expert panel report 3: Guidelines for the diagnosis and management of asthma. (07–4051). Bethesda, MD: National Institute of Health.

National Research Council. (2008). Estimating Mortality Risk Reduction and Economic Benefits from Controlling Ozone Air Pollution. Washington, DC: *The National Academies Press.*

Nicholich, M. (2007). Some additional statistical analyses of the FEV1 pulmonary response data from the W.C. Adams data (2006). Appendix A. In: ExxonMobil comments, Docket No. EPA–HQ–OAR–2005–0172, October 9, 2007.

Page, S. (2010). Memorandum from Stephen D. Page, Director, Office of Air Quality Planning & Standards, U.S. EPA, to Air Division Directors and Deputies, Regions I–X. Re: Applicability of the Federal Prevention of Significant Deterioration Permit Requirements to New and Revised National Ambient Air Quality Standards. April 1, 2010.

Page, S. (2011). Memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards, U.S. EPA, to Regional Air Directors, Regions I–X. Re: Guidance to Regions for Working with Tribes during the National Ambient Air Quality Standards (NAAQS) Designations Process. December 20, 2011. http://www.epa.gov/ttn/oarpg/t1/memoranda/20120117naaqsguidance.pdf.

Page, S. (2013). Memorandum from Stephen D. Page, Director, EPA Office of Air Quality Planning and Standards to Regional Air Directors, Regions I–X. Re: Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2). September 13, 2013.

http://www.epa.gov/oar/urbanair/sipstatus/infrastructure.html.

Phillips, SJ; Comus, PWA. (2000). Natural History of the Sonoran Desert. University of California Press, 628 pages.

Pope, CA, III; Burnett, RT; Thun, MJ; Calle, EE; Krewski, D; Ito, K; Thurston, GD. (2002). Lung cancer, cardiopulmonary mortality, and long-term exposure to fine particulate air pollution. JAMA 287:1132–1141.

Rice, J. (2014). Ozone Monitoring Season Analysis. Memorandum to the Ozone NAAQS Review Docket, EPA–HQ–OAR–2008–0699.

Riikonen, J; Kets, K; Darbah, J; Oksanen, E; Sober, A; Vapaavuori, E; Kubiske, ME; Nelson, N; Karnosky, DF. (2008). Carbon gain and bud physiology in Populus tremuloides and Betula papyrifera grown under longterm exposure to elevated concentrations of $CO_2$ and $O_3$. Tree Physiol 28:243–254. http://dx.doi.org/10.1093/treephys/28.2.243.

RTI International. (2014). Gas Chromatograph (GC) Evaluation Study: Laboratory Evaluation Phase Report. http://www.epa.gov/ttnamti1/files/ambient/pams/labevalreport.pdf.

Ryerson, TB; Williams, EJ; Fehsenfeld, FC. (2000). An Efficient Photolysis System for Fast-Response NO₂ Measurements, Journal of Geophysical Research, Volume 105, Issue D21.

Salam, MT; Islam, T; Gauderman, WJ; Gilliland, FD. (2009). Roles of arginase variants, atopy, and ozone in childhood asthma. J Allergy Clin Immunol 123:596–602. http://dx.doi.org/10.1016/j.jaci.2008.12.020.

Samet, JM. (2011). Letter from Dr. Jonathan M. Samet, Chair, Clean Air Scientific Advisory Committee to Administrator Lisa P. Jackson. Re: Clean Air Scientific Advisory Committee (CASAC) Response to Charge Questions on the Reconsideration of the 2008 Ozone National Ambient Air Quality Standards. EPA–CASAC–11–004. March 30, 2011. http://yosemite.epa.gov/sab/sabproduct.nsf/0/F08BEB48C1139E2A8525785E006909AC/$File/EPA-CASAC-11-004-unsigned+.pdf.

Samet, JM. (2010). Letter from Dr. Jonathan M. Samet, Chair, Clean Air Scientific Advisory Committee to Administrator Lisa P. Jackson. Re: Review of EPA's Proposed Ozone National Ambient Air Quality Standard (**Federal Register**, Vol. 75, Nov. 11, January 19, 2010). EPA–CASAC–10–007. February 19, 2010. http://yosemite.epa.gov/sab/sabproduct.nsf/264cb1227d55e02c852574020744644a/610BB57CFAC8A41C835257 6CF007076BD/$File/EPA-CASAC-10-007-unsigned.pdf.

Samet, JM; Bodurow, CC. (2008). Improving the presumptive disability decision-making process for veterans. In JM Samet; CC Bodurow (Eds.). Washington, DC: National Academies Press. http://www.nap.edu/openbook.php?record_id=11908.

Samoli, E; Zanobetti, A; Schwartz, J; Atkinson, R; Le Tertre, A; Schindler, C; Pérez, L; Cadum, E; Pekkanen, J; Paldy,

A; Touloumi, G; Katsouyanni, K. (2009). The temporal pattern of mortality responses to ambient ozone in the APHEA project. J Epidemiol Community Health 63:960–966. http://dx.doi.org/10.1136/jech.2008.084012.

Sasser, E. (2014). Memorandum from Erika Sasser, Acting Director, Health and Environmental Impacts Division, Office of Air Quality Planing and Standards, U.S. EPA, to Holly Stallworth, Designated Federal Office, Clean Air Scientific Advisory Committee. Re: Request for Revised Ozone HREA Chapter 7 Appendix Tables. May 9, 2014. http://www.epa.gov/ttn/naaqs/standards/ozone/s_o3_2008_rea.html.

Scannell, C; Chen, L; Aris, RM; Tager, I; Christian, D; Ferrando, R; Welch, B; Kelly, T; Balmes, JR. (1996). Greater ozone-induced inflammatory responses in subjects with asthma. Am J Respir Crit Care Med 154:24–29.

Schelegle, ES; Adams, WC; Walby, WF; Marion, MS. (2012). Modelling of individual subject ozone exposure response kinetics. Inhal Toxicol 24:401–415. http://dx.doi.org/10.3109/08958378.2012.683391.

Schelegle, ES; Morales, CA; Walby, WF; Marion, S; Allen, RP. (2009). 6.6-hour inhalation of ozone concentrations from 60 to 87 parts per billion in healthy humans. Am J Respir Crit Care Med 180:265–272. http://dx.doi.org/10.1164/rccm.200809-1484OC.

Schiller, JS; Lucas, JW; Ward, BW; Peregoy, JA. (2012). Summary health statistics for U.S. adults: National Health Interview Survey, 2010. National Center for Health Statistics. Vital Health Stat 10(252). http://www.cdc.gov/nchs/data/series/sr_10/sr10_252.pdf.

Silverman, RA; Ito, K. (2010). Age-related association of fine particles and ozone with severe acute asthma in New York City. J Allergy Clin Immunol 125:367–373.
http://dx.doi.org/10.1016/j.jaci.2009.10.061.

Smith, JT.; Murphy, DL. (2015). Additional Observations From WREA Datasets for Visible Foliar Injury. Memorandum to the Ozone NAAQS Review Docket, EPA–HQ–OAR–2008–0699.

Smith, G. (2012). Ambient ozone injury to forest plants in Northeast and North Central USA: 16 years of biomonitoring. Environ Monit Assess 184:4049–4065. http://dx.doi.org/10.1007/s10661-011-2243-z.

Smith, RL; Xu, B; Switzer, P. (2009). Reassessing the relationship between ozone and short-term mortality in U.S. urban communities. Inhal Toxicol 21:37–61. http://dx.doi.org/10.1080/08958370903161612.

Stafoggia, M; Forastiere, F; Faustini, A; Biggeri, A; Bisanti, L; Cadum, E; Cernigliaro, A; Mallone, S; Pandolfi, P; Serinelli, M; Tessari, R; Vigotti, MA; Perucci, CA. (2010). Susceptibility factors to ozone-related mortality: A population-based case-crossover analysis. Am J Respir Crit Care Med 182:376–384. http://dx.doi.org/10.1164/rccm.200908-1269OC.

Stieb, DM; Szyszkowicz, M; Rowe, BH; Leech, JA. (2009). Air pollution and emergency department visits for cardiac and respiratory conditions: A multi-city time-series analysis. Environ Health Global Access Sci Source 8:25. *http://dx.doi.org/10.1186/1476-069X-8-25.*

Strickland, MJ; Darrow, LA; Klein, M; Flanders, WD; Sarnat, JA; Waller, LA; Sarnat, SE; Mulholland, JA; Tolbert, PE. (2010). Short-term associations between ambient air pollutants and pediatric asthma emergency department visits. Am J Respir Crit Care Med 182:307–316. *http://dx.doi.org/10.1164/rccm.200903-1201OC.*

Tolbert, PE; Klein, M; Peel, JL; Sarnat, SE; Sarnat, JA. (2007). Multipollutant modeling issues in a study of ambient air quality and emergency department visits in Atlanta. J Expo Sci Environ Epidemiol 17:S29–S35. *http://dx.doi.org/10.1038/sj.jes.7500625.*

Ulmer, C; Kopp, M; Ihorst, G; Frischer, T; Forster, J; Kuehr, J. (1997). Effects of ambient ozone exposures during the spring and summer of 1994 on pulmonary function of schoolchildren. Pediatr Pulmonol 23:344–353. *http://dx.doi.org/10.1002/(SICI)1099-0496(199705)23:53.0.CO;2-K.*

United Nations Environment Programme. (2003). Millennium Ecosystem Assessment: Ecosystems and human well-being: A framework for assessment. Washington, DC: Island Press.

U.S. Department of Agriculture, U.S. Forest Service (2014). Tree basal area data. *http://www.fs.fed.us/foresthealth/technology/nidrm2012.shtml.*

U.S. Department of Agriculture, National Resources Conservation Service (2014), The PLANTS Database (*http://plants.usda.gov,* 2014), National Plant Data Center, Baton Rouge, LA.

U.S. Department of Agriculture, Agricultural Research Service. (2012). Effects of Ozone Air Pollution on Plants. *http://www.ars.usda.gov/Main/docs.htm?docid=12462.*

U.S. Department of Health, Education, and Welfare. (1970). Air Quality Criteria for Photochemical Oxidants. Washington, DC: National Air Pollution Control Administration; publication no. AP–63. Available from NTIS, Springfield, VA; PB–190262/BA.

U.S. Environmental Protection Agency. (2015) Climate Change in the United States: Benefits of Global Action. U.S. Environmental Protection Agency. Office of Atmospheric Programs. EPA 430–F–15–001, June 2015. Available at *www.epa.gov/cira.*

U.S. Environmental Protection Agency. (2014a). Health Risk and Exposure Assessment for Ozone. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA–452/P–14–004a. *http://www.epa.gov/ttn/naaqs/standards/ozone/s_o3_index.html.*

U.S. Environmental Protection Agency. (2014b). Welfare Risk and Exposure Assessment for Ozone. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA–452/P–

14–005a. *http://www.epa.gov/ttn/naaqs/standards/ozone/s_o3_index.html.*

U.S. Environmental Protection Agency. (2014c). Policy Assessment for Ozone. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA–452/R–14–006. *http://www.epa.gov/ttn/naaqs/standards/ozone/s_o3_index.html.*

U.S. Environmental Protection Agency. (2014d) Policy Assessment for Ozone, Second External Review Draft. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA–452/P–14–002.

U.S. Environmental Protection Agency (2014e). List of Designated Reference and Equivalent Methods. U.S. Environmental Protection Agency, Office of Research and Development, Research Triangle Park, NC 27711. *http://epa.gov/ttn/amtic/files/ambient/criteria/reference-equivalent-methods-list.pdf.*

U.S. Environmental Protection Agency (2014f). Performance of the Proposed New Federal Reference Method for Measuring Ozone Concentrations in Ambient Air. U.S. Environmental Protection Agency, Office of Research and Development, Research Triangle Park, NC. EPA/600/R–14/432.

U.S. Environmental Protection Agency (2013). Integrated Science Assessment of Ozone and Related Photochemical Oxidants (Final Report). U.S. Environmental Protection Agency, Washington, DC. EPA/600/R–10/076F. *http://www.epa.gov/ttn/naaqs/standards/ozone/s_o3_2008_isa.html.*

U.S. Environmental Protection Agency (2012). Integrated Science Assessment of Ozone and Related Photochemical Oxidants (Third External Review Draft). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R–10/076C, 2012.

U.S. Environmental Protection Agency (2011a). Integrated Review Plan for the Ozone National Ambient Air Quality Standards. U.S. Environmental Protection Agency, National Center for Environmental Assessment and Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA 452/R–11–006. April 2011. *http://www.epa.gov/ttn/naaqs/standards/ozone/data/2011_04_OzoneIRP.pdf.*

U.S. Environmental Protection Agency (2011b) Integrated Science Assessment for Ozone and Related Photochemical Oxidants: First External Review Draft, U.S. Environmental Protection Agency, Washington, DC. EPA/600/R–10/076A.

U.S. Environmental Protection Agency (2011c). Integrated Science Assessment of Ozone and Related Photochemical Oxidants (Second External Review Draft). U.S. Environmental Protection Agency, Washington, DC. EPA/600/R–10/076B.

U.S. Environmental Protection Agency (2011d). Ozone National Ambient Air Quality Standards: Scope and Methods Plan for Health Risk and Exposure Assessment. U.S. Environmental Protection Agency, Office of Air Quality

Planning and Standards, Research Triangle Park, NC. EPA–452/P–11–001. April 2011. *http://www.epa.gov/ttn/naaqs/standards/ozone/s_o3_2008_pd.html.*

U.S. Environmental Protection Agency (2011e). Ozone National Ambient Air Quality Standards: Scope and Methods Plan for Welfare Risk and Exposure Assessment. U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA–452/P–11–002. April 2011. *http://www.epa.gov/ttn/naaqs/standards/ozone/s_o3_2008_pd.html.*

U.S. Environmental Protection Agency (2011f). Review of EPA's Photochemical Assessment Monitoring Stations (PAMS) Network Re-engineering Project. U.S. Environmental Protection Agency, Office of the Administrator. Science Advisory Board, Washington DC. EPA–CASAC–11–010.

U.S. Environmental Protection Agency (2010). Final Assessment: Integrated Science Assessment for Carbon Monoxide. U.S. Environmental Proteciton Agency, Washington, DC, EPA/600/R–09/019F.

U.S. Environmental Protection Agency (2009a). Assessment of the Impacts of Global Change on Regional U.S. Air Quality: A Synthesis of Climate Change Impacts on Ground Level-Ozone. An Interim Report of the U.S. EPA Global Change Research Program. U.S Environmental Protection Agency, Washington, DC. EPA/600/R–07/094.

U.S. Environmental Protection Agency (2009b). Integrated Science Assessment for Particulate Matter (Final Report). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R–08/139F, 2009.

U.S. Environmental Protection Agency (2008). Responses to Significant Comments on the 2007 Proposed Rule on the National Ambient Air Quality Standards for Ozone. U.S. Environmental Protection Agency, Washington, DC, March 2008. *http://www.epa.gov/ttn/naaqs/standards/ozone/data/2008_03_rtc.pdf.*

U.S. Environmental Protection Agency (2007). Review of the National Ambient Air Quality Standards for Ozone: Policy Assessment of Scientific and Technical Information, OAQPS Staff Paper. EPA–452/R–07–007.

U.S. Environmental Protection Agency (2006a). Air Quality Criteria for Ozone and Related Photochemical Oxidants (2006 Final). U.S. Environmental Protection Agency, Washington, DC. EPA/600/R–05/004aF–cF. March 2006. *http://www.epa.gov/ttn/naaqs/standards/ozone/s_o3_cr_cd.html.*

U.S. Environmental Protection Agency (2006b). Ecological Benefits Assessment Strategic Plan. EPA–240–R–06–001. Office of Administrator, Washington, DC. *http://yosemite.epa.gov/ee/epa/eed.nsf/Webpages/ecologbenefitsplan.html.*

U.S. Environmental Protection Agency (2005). Guidelines for carcinogen risk

assessment. Risk Assessment Forum, U.S. EPA, Washington, DC. EPA/630/P–03/001F. http://www.epa.gov/cancerguidelines/.

U.S. Environmental Protection Agency (1999). Compendium Method TO–11A, Determination of Formaldehyde in Ambient Air using Adsorbent Cartridge Followed by High Performance Liquid Chromatography (HPLC). U.S. Environmental Protection Agency, Office of Research and Development, Cincinnati, OH. EPA/625/R–96/010b.

U.S. Environmental Protection Agency (1998). Technical Assistance Document (TAD) for Sampling and Analysis of Ozone Precursors. U.S. Environmental Protection Agency, Office of Research and Development, Research Triangle Park. EPA/600–R–98/161.

U.S. Environmental Protection Agency (1996a). Air quality criteria for ozone and related photochemical oxidants. U.S. Environmental Protection Agency, Research Triangle Park, NC. EPA/600/P–93/004aF, cF.

U.S. Environmental Protection Agency (1996b). Review of national ambient air quality standards for ozone: Assessment of scientific and technical information: OAQPS staff paper. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA/452/R–96/007. http://www.ntis.gov/search/product.aspx?ABBR=PB96203435.

U.S. Environmental Protection Agency (1992). Summary of selected new information on effects of ozone on health and vegetation: Supplement to 1986 air quality criteria for ozone and other photochemical oxidants. Research Triangle Park, NC: Office of Health and Environmental Assessment, Environmental Criteria and Assessment Office; EPA report no. EPA/600/8–88/105F. Available from NTIS, Springfield, VA; PB92–235670.

U.S. Environmental Protection Agency (1989). Review of the National Ambient Air Quality Standards for Ozone: Policy Assessment of Scientific and Technical Information. OAQPS Staff Paper. Office of Air Quality Planning and Standards, Research Triangle Park, NC.

U.S. Environmental Protection Agency (1986). Air quality criteria for ozone and other photochemical oxidants. Research Triangle Park, NC. EPA–600/8–84–020aF–EPA–600/8–84–020eF. http://www.ntis.gov/search/product.aspx?ABBR=PB87142949.

U.S. Environmental Protection Agency (1978). Air quality criteria for ozone and other photochemical oxidants. Washington, DC. EPA/600/8–78/004.

USFS (U.S. Forest Service). (2011). Forest Health Monitoring Network.

U.S. Forest Service; National Park Service; U.S. Fish and Wildlife Service. (2010). Federal land managers' air quality related values work group (FLAG): Phase I report—revised (2010). Natural Resource Report NPS/NRPC/NRR—2010/232. National Park Service, Denver, CO. http://www.nature.nps.gov/air/Pubs/pdf/flag/FLAG_2010.pdf.

U.S. National Park Service. (2003). Ozone Sensitive Plant Species on National Park Service and U.S. Fish and Wildlife Service Lands: Results of a June 24–25, 2003 Workshop. Baltimore, MD. http://www.nature.nps.gov/air/pubs/pdf/baltfinalreport1.pdf.

U.S. National Park Service. (2006). Ozone Sensitive Plant Species, by Park, November 2006. http://www.nature.nps.gov/air/Permits/ARIS/docs/Ozone_Sensitive_ByPark_3600.pdf.

Ulmer, C; Kopp, M; Ihorst, G; Frischer, T; Forster, J; Kuehr, J. (1997). Effects of ambient ozone exposures during the spring and summer of 1994 on pulmonary function of schoolchildren. Pediatr Pulmonol 23:344–353. http://dx.doi.org/10.1002/(SICI)1099-0496(199705)23:5<344::AID-PPUL6>3.0.CO;2-K.

Vagaggini, B; Cianchetti, S; Bartoli, M; Ricci, M; Bacci, E; Dente, FL; Di Franco, A; Paggiaro, P. (2007). Prednisone blunts airway neutrophilic inflammatory response due to ozone exposure in asthmatic subjects. Respiration 74:61–58. http://dx.doi.org/10.1159/000096078.

Vagaggini, B; Taccola, M; Conti, I; Carnevali, S; Cianchetti, S; Bartoli, ML; Bacci, E; Dente, FL; Di Franco, A; Giannini, D; Paggiaro, PL. (2001). Budesonide reduces neutrophilic but not functional airway response to ozone in mild asthmatics. Am J Respir Crit Care Med 164:2172–2176.

Vedal, S; Brauer, M; White, R; Petkau, J. (2003). Air pollution and daily mortality in a city with low levels of pollution. Environ. Health Perspect. 111:45–51.

Villeneuve, PJ; Chen, L; Rowe, BH; Coates, F. (2007). Outdoor air pollution and emergency department visits for asthma among children and adults: A case-crossover study in northern Alberta, Canada. Environ Health Global Access Sci Source 6:40. http://dx.doi.org/10.1186/1476-069X-6-40.

Wegman, LN. (2012). Memorandum from Lydia N. Wegman, Director, Health and Environmental Impacts Division, Office of Air Quality Planning and Standards, U.S. EPA, to Holly Stallworth, Designated Federal Officer, Clean Air Scientific Advisory Committee. Re: Updates to Information Presented in the Scope and Methods Plans for the Ozone NAAQS Health and Welfare Risk and Exposure Assessments. May 2, 2012.

Wells, B. (2015a). Data Analyses Supporting Responses to Public Comments for the O₃ NAAQS. Memorandum to the Ozone NAAQS Review Docket, EPA–HQ–OAR–2008–0699.

Wells, B. (2015b). Expanded Comparison of Ozone Metrics Considered in Current NAAQS Review. Memorandum to the Ozone NAAQS Review Docket, EPA–HQ–OAR–2008–0699.

Wells, B. (2014a). Comparison of Ozone Metrics Considered in Current NAAQS Review. Memorandum to the Ozone NAAQS Review Docket, EPA–HQ–OAR–2008–0699.

Wells, B. (2014b). Analysis of Overlapping 8-hour Daily Maximum Ozone Concentrations. Memorandum to the

Ozone NAAQS Review Docket, EPA–HQ–OAR–2008–0699.

Wittig, VE; Ainsworth, EA; Naidu, SL; Karnosky, DF; Long, SP. (2009). Quantifying the impact of current and future tropospheric ozone on tree biomass, growth, physiology and biochemistry: A quantitative meta-analysis. Global Change Biol 15:396–424. http://dx.doi.org/10.1111/j.1365-2486.2008.01774.x.

Wittig, VE; Ainsworth, EA; Long, SP. (2007). To what extent do current and projected increases in surface ozone affect photosynthesis and stomatal conductance of trees? A meta-analytic review of the last 3 decades of experiments [Review]. Plant Cell Environ 30:1150–1162. http://dx.doi.org/10.1111/j.1365-3040.2007.01717.x.

Wolff, GT. (1995). Letter to EPA Administrator Carol Browner: "CASAC Closure on the Primary Standard Portion of the Staff Paper for Ozone," EPA–SAB–CASAC–LTR–96–002, November 30, 1995.

Wong, CM; Vichit-Vadakan, N; Vajanapoom, N; Ostro, B; Thach, TQ; Chau, PY; Chan, EK; Chung, RY; Ou, CQ; Yang, L; Peiris, JS; Thomas, GN; Lam, TH; Wong, TW; Hedley, AJ; Kan, H; Chen, B; Zhao, N; London, SJ; Song, G; Chen, G; Zhang, Y; Jiang, L; Qian, Z; He, Q; Lin, HM; Kong, L; Zhou, D; Liang, S; Zhu, Z; Liao, D; Liu, W; Bentley, CM; Dan, J; Wang, B; Yang, N; Xu, S; Gong, J; Wei, H; Sun, H; Qin, Z. (2010). Part 5. Public health and air pollution in Asia (PAPA): A combined analysis of four studies of air pollution and mortality. In Public Health and Air Pollution in Asia (PAPA): Coordinated Studies of Short-Term Exposure to Air Pollution and Daily Mortality in Four Cities (pp. 377–418). Boston, MA: Health Effects Institute. http://pubs.healtheffects.org/view.php?id=348.

Zanobetti, A; Schwartz, J. (2011). Ozone and survival in four cohorts with potentially predisposing diseases. Am J Respir Crit Care Med 184:836–841. http://dx.doi.org/10.1164/rccm.201102-0227OC.

Zanobetti, A; Schwartz, J. (2008). Mortality displacement in the association of ozone with mortality: An analysis of 48 cities in the United States. Am J Respir Crit Care Med 177:184–189. http://dx.doi.org/10.1164/rccm.200706-823OC.

Zanobetti, A; Schwartz, J. (2006). Air pollution and emergency admissions in Boston. MA. J Epidemiol Community Health 60:890–895. http://dx.doi.org/10.1136/jech.2005.039834.

## List of Subjects

### 40 CFR Part 50

Environmental protection, Air pollution control, Carbon monoxide, Lead, Nitrogen dioxide, Ozone, Particulate matter, Sulfur oxides.

### 40 CFR Part 51

Environmental protection, Administrative practices and

procedures, Air pollution control, Intergovernmental relations.

*40 CFR Part 52*

Environmental Protection, Administrative practices and procedures, Air pollution control, Incorporation by reference, Intergovernmental relations.

*40 CFR Part 53*

Environmental protection, Administrative practice and procedure, Air pollution control, Reporting and recordkeeping requirements.

*40 CFR Part 58*

Environmental protection, Administrative practice and procedure, Air pollution control, Intergovernmental relations, Reporting and recordkeeping requirements.

Dated: October 1, 2015.

**Gina McCarthy,**

*Administrator.*

For the reasons set forth in the preamble, chapter I of title 40 of the Code of Federal Regulations is amended as follows:

**PART 50—NATIONAL PRIMARY AND SECONDARY AMBIENT AIR QUALITY STANDARDS**

■ 1. The authority citation for part 50 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Amend § 50.14 by:
■ a. Revising paragraphs (c)(2)(iii) and (vi) and (c)(3)(i); and
■ b. Removing and reserving paragraphs (c)(2)(iv) and (v) and (c)(3)(ii) and (iii).

The revisions read as follows:

**§ 50.14   Treatment of air quality monitoring data influenced by exceptional events.**

\*      \*      \*      \*      \*

(c) \* \* \*

(2) \* \* \*

(iii) Flags placed on data as being due to an exceptional event together with an initial description of the event shall be submitted to EPA not later than July 1st of the calendar year following the year in which the flagged measurement occurred, except as allowed under paragraph (c)(2)(vi) of this section.

\*      \*      \*      \*      \*

(vi) Table 1 identifies the data submission process for a new or revised NAAQS. This process shall apply to those data that will or may influence the initial designation of areas for any new or revised NAAQS.

TABLE 1—SCHEDULE FOR FLAGGING AND DOCUMENTATION SUBMISSION FOR DATA INFLUENCED BY EXCEPTIONAL EVENTS FOR USE IN INITIAL AREA DESIGNATIONS

| Exceptional events/regulatory action | Exceptional events deadline schedule [d] |
| --- | --- |
| Flagging and initial event description deadline for data years 1, 2 and 3.[a]. | If state and tribal initial designation recommendations for a new/revised NAAQS are due August through January, then the flagging and initial event description deadline will be the July 1 prior to the recommendation deadline. If state and tribal recommendations for a new/revised NAAQS are due February through July, then the flagging and initial event description deadline will be the January 1 prior to the recommendation deadline. |
| Exceptional events demonstration submittal deadline for data years 1, 2 and 3.[a]. | No later than the date that state and tribal recommendations are due to EPA. |
| Flagging, initial event description and exceptional events demonstration submittal deadline for data year 4 [b] and, where applicable, data year 5.[c]. | By the last day of the month that is 1 year and 7 months after promulgation of a new/revised NAAQS, unless either option a or b applies. |
| | a. If the EPA follows a 3-year designation schedule, the deadline is 2 years and 7 months after promulgation of a new/revised NAAQS. |
| | b. If the EPA notifies the state/tribe that it intends to complete the initial area designations process according to a schedule between 2 and 3 years, the deadline is 5 months prior to the date specified for final designations decisions in such EPA notification. |

[a] Where data years 1, 2, and 3 are those years expected to be considered in state and tribal recommendations.
[b] Where data year 4 is the additional year of data that the EPA may consider when it makes final area designations for a new/revised NAAQS under the standard designations schedule.
[c] Where data year 5 is the additional year of data that the EPA may consider when it makes final area designations for a new/revised NAAQS under an extended designations schedule.
[d] The date by which air agencies must certify their ambient air quality monitoring data in AQS is annually on May 1 of the year following the year of data collection as specified in 40 CFR 58.15(a)(2). In some cases, however, air agencies may choose to certify a prior year's data in advance of May 1 of the following year, particularly if the EPA has indicated its intent to promulgate final designations in the first 8 months of the calendar year. Data flagging, initial event description and exceptional events demonstration deadlines for "early certified" data will follow the deadlines for "year 4" and "year 5" data.

(3) *Submission of demonstrations.* (i) Except as allowed under paragraph (c)(2)(vi) of this section, a State that has flagged data as being due to an exceptional event and is requesting exclusion of the affected measurement data shall, after notice and opportunity for public comment, submit a demonstration to justify data exclusion to EPA not later than the lesser of 3 years following the end of the calendar quarter in which the flagged concentration was recorded or 12 months prior to the date that a regulatory decision must be made by

EPA. A State must submit the public comments it received along with its demonstration to EPA.

\*      \*      \*      \*      \*

■ 3. Section 50.19 is added to read as follows:

**§ 50.19   National primary and secondary ambient air quality standards for ozone.**

(a) The level of the national 8-hour primary ambient air quality standard for ozone ($O_3$) is 0.070 parts per million (ppm), daily maximum 8-hour average, measured by a reference method based on appendix D to this part and

designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(b) The 8-hour primary $O_3$ ambient air quality standard is met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration is less than or equal to 0.070 ppm, as determined in accordance with appendix U to this part.

(c) The level of the national secondary ambient air quality standard for $O_3$ is 0.070 ppm, daily maximum 8-hour

average, measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(d) The 8-hour secondary $O_3$ ambient air quality standard is met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration is less than or equal to 0.070 ppm, as determined in accordance with appendix U to this part.

■ 4. Revise appendix D to part 50 to read as follows:

## Appendix D to Part 50—Reference Measurement Principle and Calibration Procedure for the Measurement of Ozone in the Atmosphere (Chemiluminescence Method)

1.0 *Applicability.*

1.1 This chemiluminescence method provides reference measurements of the concentration of ozone ($O_3$) in ambient air for determining compliance with the national primary and secondary ambient air quality standards for $O_3$ as specified in 40 CFR part 50. This automated method is applicable to the measurement of ambient $O_3$ concentrations using continuous (real-time) sampling and analysis. Additional quality assurance procedures and guidance are provided in 40 CFR part 58, appendix A, and in Reference 14.

2.0 *Measurement Principle.*

2.1 This reference method is based on continuous automated measurement of the intensity of the characteristic chemiluminescence released by the gas phase reaction of $O_3$ in sampled air with either ethylene ($C_2H_4$) or nitric oxide (NO) gas. An ambient air sample stream and a specific flowing concentration of either $C_2H_4$ (ET–CL method) or NO (NO–CL method) are mixed in a measurement cell, where the resulting chemiluminescence is quantitatively

measured by a sensitive photo-detector. References 8–11 describe the chemiluminescence measurement principle.

2.2 The measurement system is calibrated by referencing the instrumental chemiluminescence measurements to certified $O_3$ standard concentrations generated in a dynamic flow system and assayed by photometry to be traceable to a National Institute of Standards and Technology (NIST) standard reference photometer for $O_3$ (see Section 4, Calibration Procedure, below).

2.3 An analyzer implementing this measurement principle is shown schematically in Figure 1. Designs implementing this measurement principle must include: an appropriately designed mixing and measurement cell; a suitable quantitative photometric measurement system with adequate sensitivity and wavelength specificity for $O_3$; a pump, flow control, and sample conditioning system for sampling the ambient air and moving it into and through the measurement cell; a sample air dryer as necessary to meet the water vapor interference limit requirement specified in subpart B of part 53 of this chapter; a means to supply, meter, and mix a constant, flowing stream of either $C_2H_4$ or NO gas of fixed concentration with the sample air flow in the measurement cell; suitable electronic and measurement processing capability; and other associated apparatus as may be necessary. The analyzer must be designed and constructed to provide accurate, repeatable, and continuous measurements of $O_3$ concentrations in ambient air, with measurement performance that meets the requirements specified in subpart B of part 53 of this chapter.

2.4 An analyzer implementing this measurement principle and calibration procedure will be considered a federal reference method (FRM) only if it has been designated as a reference method in accordance with part 53 of this chapter.

2.5 *Sampling considerations.* The use of a particle filter on the sample inlet line of a chemiluminescence $O_3$ FRM analyzer is required to prevent buildup of particulate

matter in the measurement cell and inlet components. This filter must be changed weekly (or at least often as specified in the manufacturer's operation/instruction manual), and the sample inlet system used with the analyzer must be kept clean, to avoid loss of $O_3$ in the $O_3$ sample air prior to the concentration measurement.

3.0 *Interferences.*

3.1 Except as described in 3.2 below, the chemiluminescence measurement system is inherently free of significant interferences from other pollutant substances that may be present in ambient air.

3.2 A small sensitivity to variations in the humidity of the sample air is minimized by a sample air dryer. Potential loss of $O_3$ in the inlet air filter and in the air sample handling components of the analyzer and associated exterior air sampling components due to buildup of airborne particulate matter is minimized by filter replacement and cleaning of the other inlet components.

4.0 *Calibration Procedure.*

4.1 *Principle.* The calibration procedure is based on the photometric assay of $O_3$ concentrations in a dynamic flow system. The concentration of $O_3$ in an absorption cell is determined from a measurement of the amount of 254 nm light absorbed by the sample. This determination requires knowledge of (1) the absorption coefficient ($\alpha$) of $O_3$ at 254 nm, (2) the optical path length (l) through the sample, (3) the transmittance of the sample at a nominal wavelength of 254 nm, and (4) the temperature (T) and pressure (P) of the sample. The transmittance is defined as the ratio $I/I_0$, where I is the intensity of light which passes through the cell and is sensed by the detector when the cell contains an $O_3$ sample, and $I_0$ is the intensity of light which passes through the cell and is sensed by the detector when the cell contains zero air. It is assumed that all conditions of the system, except for the contents of the absorption cell, are identical during measurement of I and $I_0$. The quantities defined above are related by the Beer-Lambert absorption law,

$$\text{Transmittance} = \frac{I}{I_0} = e^{-\alpha cl} \qquad (1)$$

Where:

$\alpha$ = absorption coefficient of $O_3$ at 254 nm = 308 ±4 atm − 1 cm − 1 at 0 °C and 760 torr,[1, 2, 3, 4, 5, 6, 7]

c = $O_3$ concentration in atmospheres, and
l = optical path length in cm.

A stable $O_3$ generator is used to produce $O_3$ concentrations over the required calibration

concentration range. Each $O_3$ concentration is determined from the measurement of the transmittance ($I/I_0$) of the sample at 254 nm with a photometer of path length l and calculated from the equation,

$$c(atm) = -\frac{1}{\alpha l}\left(\ln\frac{I}{I_0}\right) \qquad (2a)$$

or

$$c(ppm) = -\frac{10^6}{\alpha l}\left(\ln\frac{I}{I_0}\right). \qquad (2b)$$

The calculated $O_3$ concentrations must be corrected for $O_3$ losses, which may occur in the photometer, and for the temperature and pressure of the sample.

4.2 *Applicability.* This procedure is applicable to the calibration of ambient air $O_3$ analyzers, either directly or by means of a transfer standard certified by this procedure. Transfer standards must meet the requirements and specifications set forth in Reference 12.

4.3 *Apparatus.* A complete UV calibration system consists of an $O_3$ generator, an output port or manifold, a photometer, an appropriate source of zero air, and other components as necessary. The configuration must provide a stable $O_3$ concentration at the system output and allow the photometer to accurately assay the output concentration to the precision specified for the photometer (4.3.1). Figure 2 shows a commonly used configuration and serves to illustrate the calibration procedure, which follows. Other configurations may require appropriate variations in the procedural steps. All connections between components in the calibration system downstream of the $O_3$ generator must be of glass, Teflon, or other relatively inert materials. Additional information regarding the assembly of a UV photometric calibration apparatus is given in Reference 13. For certification of transfer standards which provide their own source of $O_3$, the transfer standard may replace the $O_3$ generator and possibly other components shown in Figure 2; see Reference 12 for guidance.

4.3.1 *UV photometer.* The photometer consists of a low-pressure mercury discharge lamp, (optional) collimation optics, an absorption cell, a detector, and signal-processing electronics, as illustrated in Figure 2. It must be capable of measuring the transmittance, $I/I_0$, at a wavelength of 254 nm with sufficient precision such that the standard deviation of the concentration measurements does not exceed the greater of 0.005 ppm or 3% of the concentration. Because the low-pressure mercury lamp radiates at several wavelengths, the photometer must incorporate suitable means to assure that no $O_3$ is generated in the cell by the lamp, and that at least 99.5% of the radiation sensed by the detector is 254 nm

radiation. (This can be readily achieved by prudent selection of optical filter and detector response characteristics.) The length of the light path through the absorption cell must be known with an accuracy of at least 99.5%. In addition, the cell and associated plumbing must be designed to minimize loss of $O_3$ from contact with cell walls and gas handling components. See Reference 13 for additional information.

4.3.2 *Air flow controllers.* Air flow controllers are devices capable of regulating air flows as necessary to meet the output stability and photometer precision requirements.

4.3.3 *Ozone generator.* The ozone generator used must be capable of generating stable levels of $O_3$ over the required concentration range.

4.3.4 *Output manifold.* The output manifold must be constructed of glass, Teflon, or other relatively inert material, and should be of sufficient diameter to insure a negligible pressure drop at the photometer connection and other output ports. The system must have a vent designed to insure atmospheric pressure in the manifold and to prevent ambient air from entering the manifold.

4.3.5 *Two-way valve.* A manual or automatic two-way valve, or other means is used to switch the photometer flow between zero air and the $O_3$ concentration.

4.3.6 *Temperature indicator.* A device to indicate temperature must be used that is accurate to ±1 °C.

4.3.7 *Barometer or pressure indicator.* A device to indicate barometric pressure must be used that is accurate to ±2 torr.

4.4 *Reagents.*

4.4.1 *Zero air.* The zero air must be free of contaminants which would cause a detectable response from the $O_3$ analyzer, and it must be free of NO, $C_2H_4$, and other species which react with $O_3$. A procedure for generating suitable zero air is given in Reference 13. As shown in Figure 2, the zero air supplied to the photometer cell for the $I_0$ reference measurement must be derived from the same source as the zero air used for generation of the $O_3$ concentration to be assayed (I measurement). When using the photometer to certify a transfer standard

having its own source of $O_3$, see Reference 12 for guidance on meeting this requirement.

4.5 *Procedure.*

4.5.1 *General operation.* The calibration photometer must be dedicated exclusively to use as a calibration standard. It must always be used with clean, filtered calibration gases, and never used for ambient air sampling. A number of advantages are realized by locating the calibration photometer in a clean laboratory where it can be stationary, protected from the physical shock of transportation, operated by a responsible analyst, and used as a common standard for all field calibrations via transfer standards.

4.5.2 *Preparation.* Proper operation of the photometer is of critical importance to the accuracy of this procedure. Upon initial operation of the photometer, the following steps must be carried out with all quantitative results or indications recorded in a chronological record, either in tabular form or plotted on a graphical chart. As the performance and stability record of the photometer is established, the frequency of these steps may be reduced to be consistent with the documented stability of the photometer and the guidance provided in Reference 12.

4.5.2.1 *Instruction manual.* Carry out all set up and adjustment procedures or checks as described in the operation or instruction manual associated with the photometer.

4.5.2.2 *System check.* Check the photometer system for integrity, leaks, cleanliness, proper flow rates, etc. Service or replace filters and zero air scrubbers or other consumable materials, as necessary.

4.5.2.3 *Linearity.* Verify that the photometer manufacturer has adequately established that the linearity error of the photometer is less than 3%, or test the linearity by dilution as follows: Generate and assay an $O_3$ concentration near the upper range limit of the system or appropriate calibration scale for the instrument, then accurately dilute that concentration with zero air and re-assay it. Repeat at several different dilution ratios. Compare the assay of the original concentration with the assay of the diluted concentration divided by the dilution ratio, as follows

$$E = \frac{A_1 - A_2/R}{A_1} \times 100\% \qquad (3)$$

Where:

E = linearity error, percent
$A_1$ = assay of the original concentration
$A_2$ = assay of the diluted concentration
R = dilution ratio = flow of original
        concentration divided by the total flow

The linearity error must be less than 5%. Since the accuracy of the measured flow-rates will affect the linearity error as measured this way, the test is not necessarily conclusive. Additional information on verifying linearity is contained in Reference 13.

4.5.2.4 *Inter-comparison.* The photometer must be inter-compared annually, either directly or via transfer standards, with a

NIST standard reference photometer (SRP) or calibration photometers used by other agencies or laboratories.

4.5.2.5 *Ozone losses.* Some portion of the $O_3$ may be lost upon contact with the photometer cell walls and gas handling components. The magnitude of this loss must be determined and used to correct the calculated $O_3$ concentration. This loss must not exceed 5%. Some guidelines for quantitatively determining this loss are discussed in Reference 13.

4.5.3 *Assay of $O_3$ concentrations.* The operator must carry out the following steps to properly assay $O_3$ concentrations.

4.5.3.1 Allow the photometer system to warm up and stabilize.

4.5.3.2 Verify that the flow rate through the photometer absorption cell, F, allows the cell to be flushed in a reasonably short period of time (2 liter/min is a typical flow). The precision of the measurements is inversely related to the time required for flushing, since the photometer drift error increases with time.

4.5.3.3 Ensure that the flow rate into the output manifold is at least 1 liter/min greater than the total flow rate required by the photometer and any other flow demand connected to the manifold.

4.5.3.4 Ensure that the flow rate of zero air, Fz, is at least 1 liter/min greater than the flow rate required by the photometer.

4.5.3.5 With zero air flowing in the output manifold, actuate the two-way valve to allow the photometer to sample first the manifold zero air, then Fz. The two photometer readings must be equal $(I = I_0)$.

**Note:** In some commercially available photometers, the operation of the two-way valve and various other operations in section 4.5.3 may be carried out automatically by the photometer.

4.5.3.6 Adjust the $O_3$ generator to produce an $O_3$ concentration as needed.

4.5.3.7 Actuate the two-way valve to allow the photometer to sample zero air until the absorption cell is thoroughly flushed and record the stable measured value of Io.

4.5.3.8 Actuate the two-way valve to allow the photometer to sample the $O_3$ concentration until the absorption cell is thoroughly flushed and record the stable measured value of I.

4.5.3.9 Record the temperature and pressure of the sample in the photometer absorption cell. (See Reference 13 for guidance.)

4.5.3.10 Calculate the $O_3$ concentration from equation 4. An average of several determinations will provide better precision.

$$[O_3]_{OUT} = \left(\frac{-1}{\alpha l}\ln\frac{I}{I_0}\right)\left(\frac{T}{273}\right)\left(\frac{760}{P}\right) \times \frac{10^6}{L} \tag{4}$$

Where:

$[O_3]_{OUT}$ = $O_3$ concentration, ppm
$\alpha$ = absorption coefficient of $O_3$ at 254 nm =
    308 atm−1 cm−1 at 0° C and 760 torr
l = optical path length, cm
T = sample temperature, K
P = sample pressure, torr
L = correction factor for $O_3$ losses from
    4.5.2.5 = $(1 − \text{fraction of } O_3 \text{ lost})$.

**Note:** Some commercial photometers may automatically evaluate all or part of equation 4. It is the operator's responsibility to verify that all of the information required for equation 4 is obtained, either automatically by the photometer or manually. For "automatic" photometers which evaluate the first term of equation 4 based on a linear approximation, a manual correction may be required, particularly at higher $O_3$ levels. See the photometer instruction manual and Reference 13 for guidance.

4.5.3.11 Obtain additional $O_3$ concentration standards as necessary by repeating steps 4.5.3.6 to 4.5.3.10 or by Option 1.

4.5.4 *Certification of transfer standards.* A transfer standard is certified by relating the output of the transfer standard to one or more $O_3$ calibration standards as determined according to section 4.5.3. The exact procedure varies depending on the nature and design of the transfer standard. Consult Reference 12 for guidance.

4.5.5 *Calibration of ozone analyzers.* Ozone analyzers must be calibrated as follows, using $O_3$ standards obtained directly according to section 4.5.3 or by means of a certified transfer standard.

4.5.5.1 Allow sufficient time for the $O_3$ analyzer and the photometer or transfer standard to warm-up and stabilize.

4.5.5.2 Allow the $O_3$ analyzer to sample zero air until a stable response is obtained and then adjust the $O_3$ analyzer's zero control. Offsetting the analyzer's zero adjustment to +5% of scale is recommended to facilitate observing negative zero drift (if any). Record the stable zero air response as "Z".

4.5.5.3 Generate an $O_3$ concentration standard of approximately 80% of the desired upper range limit (URL) of the $O_3$ analyzer. Allow the $O_3$ analyzer to sample this $O_3$ concentration standard until a stable response is obtained.

4.5.5.4 Adjust the $O_3$ analyzer's span control to obtain the desired response equivalent to the calculated standard concentration. Record the $O_3$ concentration and the corresponding analyzer response. If substantial adjustment of the span control is necessary, recheck the zero and span adjustments by repeating steps 4.5.5.2 to 4.5.5.4.

4.5.5.5 Generate additional $O_3$ concentration standards (a minimum of 5 are recommended) over the calibration scale of the $O_3$ analyzer by adjusting the $O_3$ source or by Option 1. For each $O_3$ concentration standard, record the $O_3$ concentration and the corresponding analyzer response.

4.5.5.6 Plot the $O_3$ analyzer responses (vertical or Y-axis) versus the corresponding $O_3$ standard concentrations (horizontal or X-axis). Compute the linear regression slope and intercept and plot the regression line to verify that no point deviates from this line by more than 2 percent of the maximum concentration tested.

4.5.5.7 *Option 1:* The various $O_3$ concentrations required in steps 4.5.3.11 and 4.5.5.5 may be obtained by dilution of the $O_3$ concentration generated in steps 4.5.3.6 and 4.5.5.3. With this option, accurate flow measurements are required. The dynamic calibration system may be modified as shown in Figure 3 to allow for dilution air to be metered in downstream of the $O_3$ generator. A mixing chamber between the $O_3$ generator and the output manifold is also required. The flow rate through the $O_3$ generator (Fo) and the dilution air flow rate (FD) are measured with a flow or volume standard that is traceable to a NIST flow or volume calibration standard. Each $O_3$ concentration generated by dilution is calculated from:

$$[O_3]'_{OUT} = [O_3]_{OUT}\left(\frac{F_O}{F_O + F_D}\right) \tag{5}$$

Where:

$[O_3]'_{OUT}$ = diluted $O_3$ concentration, ppm
FO = flow rate through the $O_3$ generator, liter/min
FD = diluent air flow rate, liter/min

**Note:** Additional information on calibration and pollutant standards is provided in Section 12 of Reference 14.

5.0 *Frequency of Calibration.*

5.1 The frequency of calibration, as well as the number of points necessary to establish the calibration curve, and the frequency of other performance checking will vary by analyzer; however, the minimum frequency, acceptance criteria, and subsequent actions are specified in Appendix D of Reference 14: Measurement Quality Objectives and Validation Templates. The user's quality control program shall provide guidelines for initial establishment of these variables and for subsequent alteration as operational experience is accumulated. Manufacturers of analyzers should include in their instruction/operation manuals information and guidance as to these variables and on other matters of operation, calibration, routine maintenance, and quality control.

6.0 *References.*

1. E.C.Y. Inn and Y. Tanaka, "Absorption coefficient of Ozone in the Ultraviolet and Visible Regions", J. Opt. Soc. Am., 43, 870 (1953).
2. A. G. Hearn, "Absorption of Ozone in the Ultraviolet and Visible Regions of the Spectrum", Proc. Phys. Soc. (London), 78, 932 (1961).
3. W. B. DeMore and O. Raper, "Hartley Band Extinction Coefficients of Ozone in the Gas Phase and in Liquid Nitrogen, Carbon Monoxide, and Argon", J. Phys. Chem., 68, 412 (1964).
4. M. Griggs, "Absorption Coefficients of Ozone in the Ultraviolet and Visible Regions", J. Chem. Phys., 49, 857 (1968).
5. K. H. Becker, U. Schurath, and H. Seitz, "Ozone Olefin Reactions in the Gas Phase. 1. Rate Constants and Activation Energies", Int'l Jour. of Chem. Kinetics, VI, 725 (1974).
6. M. A. A. Clyne and J. A. Coxom, "Kinetic Studies of Oxy-halogen Radical Systems", Proc. Roy. Soc., A303, 207 (1968).
7. J. W. Simons, R. J. Paur, H. A. Webster, and E. J. Bair, "Ozone Ultraviolet Photolysis. VI. The Ultraviolet Spectrum", J. Chem. Phys., 59, 1203 (1973).
8. Ollison, W.M.; Crow, W.; Spicer, C.W. "Field testing of new-technology

ambient air ozone monitors." J. Air Waste Manage. Assoc., 63 (7), 855–863 (2013).

9. Parrish, D.D.; Fehsenfeld, F.C. "Methods for gas-phase measurements of ozone, ozone precursors and aerosol precursors." Atmos. Environ., 34 (12–14), 1921–1957(2000).

10. Ridley, B.A.; Grahek, F.E.; Walega, J.G. "A small, high-sensitivity, medium-response ozone detector suitable for measurements from light aircraft." J. Atmos. Oceanic Technol., 9 (2), 142–148(1992).

11. Boylan, P., Helmig, D., and Park, J.H. "Characterization and mitigation of water vapor effects in the measurement of ozone by chemiluminescence with nitric oxide." Atmos. Meas. Tech. 7, 1231–1244 (2014).

12. Transfer Standards for Calibration of Ambient Air Monitoring Analyzers for Ozone, EPA publication number EPA–454/B–13–004, October 2013. EPA, Office of Air Quality Planning and Standards, Research Triangle Park, NC 27711. [Available at *www.epa.gov/ttnamti1/files/ambient/qaqc/Ozone TransferStandardGuidance.pdf.*]

13. Technical Assistance Document for the Calibration of Ambient Ozone Monitors, EPA publication number EPA–600/4–79–057, September, 1979. [Available at *www.epa.gov/ttnamti1/files/ambient/ criteria/4–79–057.pdf.*]

14. QA Handbook for Air Pollution Measurement Systems—Volume II. Ambient Air Quality Monitoring Program. EPA–454/B–13–003, May 2013. [Available at *http://www.epa.gov/ ttnamti1/files/ambient/pm25/qa/QA-Handbook-Vol-II.pdf.*]



Figure 1. Gas-phase chemiluminescence analyzer schematic diagram, where PMT means photomultiplier tube.

BLM_0047467



Figure 2. Schematic diagram of a typical UV photometric calibration system.



Figure 3. Schematic diagram of a typical UV photometric calibration system (Option 1).

■ 5. Add appendix U to Part 50 to read as follows:

## Appendix U to Part 50—Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone

### 1. General

(a) This appendix explains the data handling conventions and computations necessary for determining whether the primary and secondary national ambient air quality standards (NAAQS) for ozone ($O_3$) specified in § 50.19 are met at an ambient $O_3$ air quality monitoring site. Data reporting, data handling, and computation procedures to be used in making comparisons between reported $O_3$ concentrations and the levels of the $O_3$ NAAQS are specified in the following sections.

(b) Whether to exclude or retain the data affected by exceptional events is determined by the requirements under §§ 50.1, 50.14 and 51.930.

(c) The terms used in this appendix are defined as follows:

*8-hour average* refers to the moving average of eight consecutive hourly $O_3$ concentrations measured at a site, as explained in section 3 of this appendix.

*Annual fourth-highest daily maximum* refers to the fourth highest value measured at a site during a year.

*Collocated monitors* refers to the instance of two or more $O_3$ monitors operating at the same physical location.

*Daily maximum 8-hour average $O_3$ concentration* refers to the maximum calculated 8-hour average value measured at a site on a particular day, as explained in section 3 of this appendix.

*Design value* refers to the metric (i.e., statistic) that is used to compare ambient $O_3$ concentration data measured at a site to the NAAQS in order to determine compliance, as explained in section 4 of this appendix.

*Minimum data completeness requirements* refer to the amount of data that a site is required to collect in order to make a valid determination that the site is meeting the NAAQS.

*Monitor* refers to a physical instrument used to measure ambient $O_3$ concentrations.

$O_3$ *monitoring season* refers to the span of time within a year when individual states are required to measure ambient $O_3$ concentrations, as listed in Appendix D to part 58 of this chapter.

*Site* refers to an ambient $O_3$ air quality monitoring site.

*Site data record* refers to the set of hourly $O_3$ concentration data collected at a site for use in comparisons with the NAAQS.

*Year* refers to calendar year.

### 2. Selection of Data for use in Comparisons With the Primary and Secondary Ozone NAAQS

(a) All valid hourly $O_3$ concentration data collected using a federal reference method specified in Appendix D to this part, or an equivalent method designated in accordance with part 53 of this chapter, meeting all applicable requirements in part 58 of this chapter, and submitted to EPA's Air Quality System (AQS) database or otherwise available to EPA, shall be used in design value calculations.

(b) All design value calculations shall be implemented on a site-level basis. If data are reported to EPA from collocated monitors, those data shall be combined into a single site data record as follows:

(i) The monitoring agency shall designate one monitor as the primary monitor for the site.

(ii) Hourly $O_3$ concentration data from a secondary monitor shall be substituted into

the site data record whenever a valid hourly $O_3$ concentration is not obtained from the primary monitor. In the event that hourly $O_3$ concentration data are available for more than one secondary monitor, the hourly concentration values from the secondary monitors shall be averaged and substituted into the site data record.

(c) In certain circumstances, including but not limited to site closures or relocations, data from two nearby sites may be combined into a single site data record for the purpose of calculating a valid design value. The appropriate Regional Administrator may approve such combinations after taking into consideration factors such as distance between sites, spatial and temporal patterns in air quality, local emissions and meteorology, jurisdictional boundaries, and terrain features.

### 3. Data Reporting and Data Handling Conventions

(a) Hourly average $O_3$ concentrations shall be reported in parts per million (ppm) to the third decimal place, with additional digits to the right of the third decimal place truncated. Each hour shall be identified using local standard time (LST).

(b) Moving 8-hour averages shall be computed from the hourly $O_3$ concentration data for each hour of the year and shall be stored in the first, or start, hour of the 8-hour period. An 8-hour average shall be considered valid if at least 6 of the hourly concentrations for the 8-hour period are available. In the event that only 6 or 7 hourly concentrations are available, the 8-hour average shall be computed on the basis of the hours available, using 6 or 7, respectively, as the divisor. In addition, in the event that 5 or fewer hourly concentrations are available, the 8-hour average shall be considered valid if, after substituting zero for the missing hourly concentrations, the resulting 8-hour average is greater than the level of the

NAAQS, or equivalently, if the sum of the available hourly concentrations is greater than 0.567 ppm. The 8-hour averages shall be reported to three decimal places, with additional digits to the right of the third decimal place truncated. Hourly $O_3$ concentrations that have been approved under § 50.14 as having been affected by exceptional events shall be counted as missing or unavailable in the calculation of 8-hour averages.

(c) The daily maximum 8-hour average $O_3$ concentration for a given day is the highest of the 17 consecutive 8-hour averages beginning with the 8-hour period from 7:00 a.m. to 3:00 p.m. and ending with the 8-hour period from 11:00 p.m. to 7:00 a.m. the following day (i.e., the 8-hour averages for 7:00 a.m. to 11:00 p.m.). Daily maximum 8-hour average $O_3$ concentrations shall be determined for each day with ambient $O_3$ monitoring data, including days outside the $O_3$ monitoring season if those data are available.

(d) A daily maximum 8-hour average $O_3$ concentration shall be considered valid if valid 8-hour averages are available for at least 13 of the 17 consecutive 8-hour periods starting from 7:00 a.m. to 11:00 p.m. In addition, in the event that fewer than 13 valid 8-hour averages are available, a daily maximum 8-hour average $O_3$ concentration shall also be considered valid if it is greater than the level of the NAAQS. Hourly $O_3$ concentrations that have been approved under § 50.14 as having been affected by exceptional events shall be included when determining whether these criteria have been met.

(e) The primary and secondary $O_3$ design value statistic is the annual fourth-highest daily maximum 8-hour $O_3$ concentration, averaged over three years, expressed in ppm. The fourth-highest daily maximum 8-hour $O_3$ concentration for each year shall be determined based only on days meeting the

validity criteria in 3(d). The 3-year average shall be computed using the three most recent, consecutive years of ambient $O_3$ monitoring data. Design values shall be reported in ppm to three decimal places, with additional digits to the right of the third decimal place truncated.

### 4. Comparisons With the Primary and Secondary Ozone NAAQS

(a) The primary and secondary national ambient air quality standards for $O_3$ are met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour $O_3$ concentration (i.e., the design value) is less than or equal to 0.070 ppm.

(b) A design value greater than the level of the NAAQS is always considered to be valid. A design value less than or equal to the level of the NAAQS must meet minimum data completeness requirements in order to be considered valid. These requirements are met for a 3-year period at a site if valid daily maximum 8-hour average $O_3$ concentrations are available for at least 90% of the days within the $O_3$ monitoring season, on average, for the 3-year period, with a minimum of at least 75% of the days within the $O_3$ monitoring season in any one year.

(c) When computing whether the minimum data completeness requirements have been met, meteorological or ambient data may be sufficient to demonstrate that meteorological conditions on missing days were not conducive to concentrations above the level of the NAAQS. Missing days assumed less than the level of the NAAQS are counted for the purpose of meeting the minimum data completeness requirements, subject to the approval of the appropriate Regional Administrator.

(d) Comparisons with the primary and secondary $O_3$ NAAQS are demonstrated by examples 1 and 2 as follows:

EXAMPLE 1—SITE MEETING THE PRIMARY AND SECONDARY $O_3$ NAAQS

| Year | Percent valid days within $O_3$ monitoring season (Data completeness) | 1st highest daily max 8-hour $O_3$ (ppm) | 2nd highest daily max 8-hour $O_3$ (ppm) | 3rd highest daily max 8-hour $O_3$ (ppm) | 4th highest daily max 8-hour $O_3$ (ppm) | 5th highest daily max 8-hour $O_3$ (ppm) |
|---|---|---|---|---|---|---|
| 2014 ....................................................... | 100 | 0.082 | 0.080 | 0.075 | 0.069 | 0.068 |
| 2015 ....................................................... | 96 | 0.074 | 0.073 | 0.065 | 0.062 | 0.060 |
| 2016 ....................................................... | 98 | 0.070 | 0.069 | 0.067 | 0.066 | 0.060 |
| Average ................................................... | 98 | ...................... | ...................... | ...................... | 0.065 | |

As shown in Example 1, this site meets the primary and secondary $O_3$ NAAQS because the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentrations (i.e., 0.065666 ppm, truncated to 0.065 ppm) is less than or equal to 0.070 ppm. The minimum data completeness requirements are also met (i.e., design value is considered valid) because the average percent of days within the $O_3$ monitoring season with valid ambient monitoring data is greater than 90%, and no single year has less than 75% data completeness.

EXAMPLE 2—SITE FAILING TO MEET THE PRIMARY AND SECONDARY O3 $O_3$ NAAQS

| Year | Percent valid days within $O_3$ monitoring season (Data completeness) | 1st highest daily max 8-hour $O_3$ (ppm) | 2nd highest daily max 8-hour $O_3$ (ppm) | 3rd highest daily max 8-hour $O_3$ (ppm) | 4th highest daily max 8-hour $O_3$ (ppm) | 5th highest daily max 8-hour $O_3$ (ppm) |
|---|---|---|---|---|---|---|
| 2014 ....................................................... | 96 | 0.085 | 0.080 | 0.079 | 0.074 | 0.072 |

EXAMPLE 2—SITE FAILING TO MEET THE PRIMARY AND SECONDARY O3 O₃ NAAQS—Continued

| Year | Percent valid days within O₃ monitoring season (Data completeness) | 1st highest daily max 8-hour O₃ (ppm) | 2nd highest daily max 8-hour O₃ (ppm) | 3rd highest daily max 8-hour O₃ (ppm) | 4th highest daily max 8-hour O₃ (ppm) | 5th highest daily max 8-hour O₃ (ppm) |
|---|---|---|---|---|---|---|
| 2015 ........................................................... | 74 | 0.084 | 0.083 | 0.072 | 0.071 | 0.068 |
| 2016 ........................................................... | 98 | 0.083 | 0.081 | 0.081 | 0.075 | 0.074 |
| Average ..................................................... | 89 | .................... | .................... | .................... | 0.073 | |

As shown in Example 2, this site fails to meet the primary and secondary O₃ NAAQS because the 3-year average of the annual fourth-highest daily maximum 8-hour average O₃ concentrations (i.e., 0.073333 ppm, truncated to 0.073 ppm) is greater than 0.070 ppm, even though the annual data completeness is less than 75% in one year and the 3-year average data completeness is less than 90% (i.e., design value would not otherwise be considered valid).

## PART 51—REQUIREMENTS FOR PREPARATION, ADOPTION, AND SUBMITTAL OF IMPLEMENTATION PLANS

■ 6. The authority citation for part 51 continues to read as follows:

**Authority:** 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

### Subpart I—Review of New Sources and Modifications

■ 8. Amend § 51.166 by adding paragraph (i)(11) to read as follows:

### § 51.166   Prevention of significant deterioration of air quality.

\*       \*       \*       \*       \*

(i) \* \* \*

(11) The plan may provide that the requirements of paragraph (k)(1) of this section shall not apply to a permit application for a stationary source or modification with respect to the revised national ambient air quality standards for ozone published on October 26, 2015 if:

(i) The reviewing authority has determined the permit application subject to this section to be complete on or before October 1, 2015. Instead, the requirements in paragraph (k)(1) of this section shall apply with respect to the national ambient air quality standards for ozone in effect at the time the reviewing authority determined the permit application to be complete; or

(ii) The reviewing authority has first published before December 28, 2015 a public notice of a preliminary determination or draft permit for the permit application subject to this section. Instead, the requirements in

paragraph (k)(1) of this section shall apply with respect to the national ambient air quality standards for ozone in effect at the time of first publication of a public notice of the preliminary determination or draft permit.

\*       \*       \*       \*       \*

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 8. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 et seq.

■ 9. Amend § 52.21 by adding paragraph (i)(12) to read as follows:

### § 52.21   Prevention of significant deterioration of air quality.

\*       \*       \*       \*       \*

(i) \* \* \*

(12) The requirements of paragraph (k)(1) of this section shall not apply to a permit application for a stationary source or modification with respect to the revised national ambient air quality standards for ozone published on October 26, 2015 if:

(i) The Administrator has determined the permit application subject to this section to be complete on or before October 1, 2015. Instead, the requirements in paragraph (k)(1) of this section shall apply with respect to the national ambient air quality standards for ozone in effect at the time the Administrator determined the permit application to be complete; or

(ii) The Administrator has first published before December 28, 2015 a public notice of a preliminary determination or draft permit for the permit application subject to this section. Instead, the requirements in paragraph (k)(1) of this section shall apply with respect to the national ambient air quality standards for ozone in effect on the date the Administrator first published a public notice of a preliminary determination or draft permit.

\*       \*       \*       \*       \*

## PART 53—AMBIENT AIR MONITORING REFERENCE AND EQUIVALENT METHODS

■ 10. The authority citation for part 53 continues to read as follows:

**Authority:** Sec. 301(a) of the Clean Air Act (42 U.S.C. 1857g(a)), as amended by sec. 15(c)(2) of Pub. L. 91–604, 84 Stat. 1713, unless otherwise noted.

### Subpart A—General Provisions

### § 53.9   [Amended]

■ 11. Amend § 53.9 by removing paragraph (i).

■ 12. Amend § 53.14 by revising paragraph (c) introductory text to read as follows:

### § 53.14   Modification of a reference or equivalent method.

\*       \*       \*       \*       \*

(c) Within 90 calendar days after receiving a report under paragraph (a) of this section, the Administrator will take one or more of the following actions:

\*       \*       \*       \*       \*

### Subpart B—Procedures for Testing Performance Characteristics of Automated Methods for SO₂, CO, O₃, and NO₂

■ 13. Amend § 53.23 by revising paragraph (e)(1)(vi) to read as follows:

### § 53.23   Test procedures.

\*       \*       \*       \*       \*

(e) \* \* \*

(1) \* \* \*

(vi) Precision: Variation about the mean of repeated measurements of the same pollutant concentration, denoted as the standard deviation expressed as a percentage of the upper range limits.[258]

\*       \*       \*       \*       \*

■ 14. Revise Table B–1 to Subpart B of Part 53 to read as follows:

---

[258] NO₂ precision in Table B–1 is also changed to percent to agree with the calculation specified in 53.23(e)(10)(vi).

TABLE B–1 TO SUBPART B OF PART 53—PERFORMANCE LIMIT SPECIFICATIONS FOR AUTOMATED METHODS

| Performance parameter | Units[1] | SO$_2$ Std. range[3] | SO$_2$ Lower range[2,3] | O$_3$ Std. range[3] | O$_3$ Lower range[2,3] | CO Std. range[3] | CO Lower range[2,3] | NO$_2$ (Std. range) | Definitions and test procedures |
|---|---|---|---|---|---|---|---|---|---|
| 1. Range | ppm | 0–0.5 | <0.5 | 0–0.5 | <0.5 | 0–50 | <50 | 0–0.5 | Sec. 53.23(a) |
| 2. Noise | ppm | 0.001 | 0.0005 | 0.0025 | 0.001 | 0.2 | 0.1 | 0.005 | Sec. 53.23(b) |
| 3. Lower detectable limit | ppm | 0.002 | 0.001 | 0.005 | 0.002 | 0.4 | 0.2 | 0.010 | Sec. 53.23(c) |
| 4. Interference equivalent | | | | | | | | | |
| Each interferent | ppm | ±0.005 | [4]±0.005 | ±0.005 | ±0.005 | ±1.0 | ±0.5 | ±0.02 | Sec. 53.23(d) |
| Total, all interferents | ppm | – | – | – | – | – | – | 0.04 | Sec. 53.23(d) |
| 5. Zero drift, 12 and 24 hour. | ppm | ±0.004 | ±0.002 | ±0.004 | ±0.002 | ±0.5 | ±0.3 | ±0.02 | Sec. 53.23(e) |
| 6. Span drift, 24 hour | | | | | | | | | |
| 20% of upper range limit. | Percent | – | – | – | – | – | – | ±20.0 | Sec. 53.23(e) |
| 80% of upper range limit. | Percent | ±3.0 | ±3.0 | ±3.0 | ±3.0 | ±2.0 | ±2.0 | ±5.0 | Sec. 53.23(e) |
| 7. Lag time | Minutes | 2 | 2 | 2 | 2 | 2.0 | 2.0 | 20 | Sec. 53.23(e) |
| 8. Rise time | Minutes | 2 | 2 | 2 | 2 | 2.0 | 2.0 | 15 | Sec. 53.23(e) |
| 9. Fall time | Minutes | 2 | 2 | 2 | 2 | 2.0 | 2.0 | 15 | Sec. 53.23(e) |
| 10. Precision | | | | | | | | | |
| 20% of upper range limit. | | – | – | – | – | – | – | | Sec. 53.23(e) |
| | Percent[5] | 2 | 2 | 2 | 2 | 1.0 | 1.0 | 4 | Sec. 53.23(e) |
| 80% of upper range limit. | | – | – | – | – | – | – | | Sec. 53.23(e) |
| | Percent[5] | 2 | 2 | 2 | 2 | 1.0 | 1.0 | 6 | Sec. 53.23(e) |

[1] To convert from parts per million (ppm) to μg/m³ at 25 °C and 760 mm Hg, multiply by M/0.02447, where M is the molecular weight of the gas. Percent means percent of the upper measurement range limit.

[2] Tests for interference equivalent and lag time do not need to be repeated for any lower range provided the test for the standard range shows that the lower range specification (if applicable) is met for each of these test parameters.

[3] For candidate analyzers having automatic or adaptive time constants or smoothing filters, describe their functional nature, and describe and conduct suitable tests to demonstrate their function aspects and verify that performances for calibration, noise, lag, rise, fall times, and precision are within specifications under all applicable conditions. For candidate analyzers with operator-selectable time constants or smoothing filters, conduct calibration, noise, lag, rise, fall times, and precision tests at the highest and lowest settings that are to be included in the FRM or FEM designation.

[4] For nitric oxide interference for the SO$_2$ UVF method, interference equivalent is ±0.0003 ppm for the lower range.

[5] Standard deviation expressed as percent of the URL.

**Table B-3 to Subpart B of Part 53—Interferent Test Concentration,[1] Parts per Million**

| Pollutant | Analyzer type | Hydrochloric acid | Ammonia | Hydrogen sulfide | Sulfur dioxide | Nitrogen dioxide | Nitric oxide | Carbon dioxide | Ethylene | Ozone | m-Xylene | Water vapor | Carbon monoxide | Methane | Ethane | Naphthalene |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SO$_2$ | Ultraviolet fluorescence | | | [5] 0.1 | [4] 0.14 | 0.5 | 0.5 | | | 0.5 | 0.2 | 20,000 | | | | 0.05 |
| SO$_2$ | Flame photometric | | 0.01 | | [4] 0.14 | | | 750 | | | | [3] 20,000 | 50 | | | |
| SO$_2$ | Gas chromatography | | 0.1 | | [4] 0.14 | | | 750 | | | | [3] 20,000 | 50 | | | |
| SO$_2$ | Spectrophotometric -wet chemical (pararosanaline) | 0.2 | 0.1 | 0.1 | [4] 0.14 | 0.5 | | 750 | | 0.5 | | | | | | |
| SO$_2$ | Electrochemical | 0.2 | 0.1 | 0.1 | [4] 0.14 | 0.5 | 0.5 | | 0.2 | 0.5 | | [3] 20,000 | | | | |
| SO$_2$ | Conductivity | 0.2 | 0.1 | | [4] 0.14 | 0.5 | | 750 | | | | | | | | |
| SO$_2$ | Spectrophotometric -gas phase, including DOAS | | | | [4] 0.14 | 0.5 | | | | 0.5 | 0.2 | | | | | |
| O$_3$ | Ethylene chemiluminescene | | 0.1 | | | | | 750 | | [4] 0.08 | | 20,000 | | | | |
| O$_3$ | NO-chemiluminescene | | 0.1 | | | 0.5 | | 750 | | [4] 0.08 | | 20,000 | | | | |
| O$_3$ | Electrochemical | | [3] 0.1 | | 0.5 | 0.5 | | | | [4] 0.08 | | | | | | |
| O$_3$ | Spectrophotometric -wet chemical (potassium iodide) | | [3] 0.1 | | 0.5 | 0.5 | 0.5 | | | [4] 0.08 | | | | | | |

BLM_0047473

| Pollutant | Method | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $O_3$ | Spectrophotometric-gas phase, including ultraviolet absorption and DOAS | | | | 0.5 | 0.5 | 0.5 | | | [4] 0.08 | 0.02 | 20,000 | | | |
| CO | Non-dispersive Infrared | | | | | | | 750 | | | | 20,000 | [4] 10 | | |
| CO | Gas chromatography with flame ionization detector | | | | | | | | | | | 20,000 | [4] 10 | | 0.5 |
| CO | Electrochemical | | | | | | 0.5 | | 0.2 | | | 20,000 | [4] 10 | | |
| CO | Catalytic combustion-thermal detection | | 0.1 | | | | | 750 | 0.2 | | | 20,000 | [4] 10 | 5.0 | 0.5 |
| CO | IR fluorescence | | | | | | | 750 | | | | 20,000 | [4] 10 | | 0.5 |
| CO | Mercury replacement-UV photometric | | | | | | | | 0.2 | | | | [4] 10 | | 0.5 |
| $NO_2$ | Chemiluminescent | | [3] 0.1 | | 0.5 | [4] 0.1 | 0.5 | | | | | 20,000 | | | |
| $NO_2$ | Spectrophotometric-wet chemical (azo-dye reaction) | | | | 0.5 | [4] 0.1 | 0.5 | 750 | 0.5 | | | | | | |
| $NO_2$ | Electrochemical | 0.2 | [3] 0.1 | | 0.5 | [4] 0.1 | 0.5 | 750 | 0.5 | | | 20,000 | 50 | | |
| $NO_2$ | Spectrophotometric-gas phase | | [3] 0.1 | | 0.5 | [4] 0.1 | 0.5 | | 0.5 | | | 20,000 | 50 | | |

BLM_0047474

[1.] Concentrations of interferents listed must be prepared and controlled to ±10 percent of the stated value.
[2.] Analyzer types not listed will be considered by the Administrator as special cases.
[3.] Do not mix with the pollutant.
[4.] Concentration of pollutant used for test. These pollutant concentrations must be prepared to ±10 percent of the stated value.
[5.] If candidate method utilizes an elevated-temperature scrubber for removal of aromatic hydrocarbons, perform this interference test.
[6.] If naphthalene test concentration cannot be accurately quantified, remove the scrubber, use a test concentration that causes a full scale response, reattach the scrubber, and evaluate response for interference.

BLM_0047475

## CALCULATION OF ZERO DRIFT, SPAN DRIFT, AND PRECISION

Applicant_____  Date_____

Analyzer_____  Pollutant_____

| TEST PARAMETERS | | CALCULATIONS | TEST DAY (n) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| ZERO DRIFT | 12 HOUR | $12ZD = C_{max} - C_{min}$ | | | | | | | | | | | | | | | |
| | 24 HOUR | $Z = (L_1 + L_2)/2$ | | | | | | | | | | | | | | | |
| | | $24ZD = Z_n - Z_{n-1}$ | | | | | | | | | | | | | | | |
| | | $24ZD = Z'_n - Z'_{n-1}$ | | | | | | | | | | | | | | | |
| SPAN DRIFT | 24 HOUR | $S_n = \dfrac{1}{6}\sum_{i=7}^{12} P_i$ | | | | | | | | | | | | | | | |
| | | $SD_n = \dfrac{S_n - S_{n-1}}{S_{n-1}} \times 100\%$ | | | | | | | | | | | | | | | |
| | | $SD_n = \dfrac{S_n - S'_{n-1}}{S'_{n-1}} \times 100\%$ | | | | | | | | | | | | | | | |
| PREC-ISION | 20% URL ($P_{20}$) | $P_{20}$ = % STANDARD DEVIATION OF ($P_1...P_6$) | | | | | | | | | | | | | | | |
| | 80% URL ($P_{80}$) | $P_{80}$ = % STANDARD DEVIATION OF ($P_7...P_{12}$) | | | | | | | | | | | | | | | |

Figure B-5. Form for calculating zero drift, span drift, and precision (§ 53.23(e)).

Federal Register / Vol. 80, No. 206 / Monday, October 26, 2015 / Rules and Regulations

BLM_0047476

**65466**      **Federal Register** / Vol. 80, No. 206 / Monday, October 26, 2015 / Rules and Regulations

*   *   *   *   *

## Subpart C—Procedures for Determining Comparability between Candidate Methods and Reference Methods

■ 17. Amend § 53.32 by revising paragraph (g)(1)(iii) to read as follows:

### § 53.32   Test procedures for methods for $SO_2$, CO, $O_3$, and $NO_2$.

*   *   *   *   *

(g) *   *   *

(1) *   *   *

(iii) The measurements shall be made in the sequence specified in table C–2 of this subpart.

*   *   *   *   *

### Figure E–2 to Subpart E of Part 53 [Removed]

■ 18. Amend subpart E by removing figure E–2 to subpart E of part 53.

## PART 58—AMBIENT AIR QUALITY SURVEILLANCE

■ 19. The authority citation for part 58 continues to read as follows:

**Authority:** 42 U.S.C. 7403, 7405, 7410, 7414, 7601, 7611, 7614, and 7619.

## Subpart B—Monitoring Network

■ 20. Amend § 58.10 by adding paragraphs (a)(9) through (11) to read as follows:

### § 58.10   Annual monitoring network plan and periodic network assessment.

(a) *   *   *

(9) The annual monitoring network plan shall provide for the required $O_3$ sites to be operating on the first day of the applicable required $O_3$ monitoring season in effect on January 1, 2017 as listed in Table D–3 of appendix D of this part.

(10) A plan for making Photochemical Assessment Monitoring Stations (PAMS) measurements, if applicable, in accordance with the requirements of appendix D paragraph 5(a) of this part shall be submitted to the EPA Regional Administrator no later than July 1, 2018. The plan shall provide for the required

PAMS measurements to begin by June 1, 2019.

(11) An Enhanced Monitoring Plan for $O_3$, if applicable, in accordance with the requirements of appendix D paragraph 5(h) of this part shall be submitted to the EPA Regional Administrator no later than October 1, 2019 or two years following the effective date of a designation to a classification of Moderate or above $O_3$ nonattainment, whichever is later.

*   *   *   *   *

■ 21. Section § 58.11 is amended by revising paragraph (c) to read as follows:

### § 58.11   Network technical requirements.

*   *   *   *   *

(c) State and local governments must follow the network design criteria contained in appendix D to this part in designing and maintaining the SLAMS stations. The final network design and all changes in design are subject to approval of the Regional Administrator. NCore and STN network design and changes are also subject to approval of the Administrator. Changes in SPM stations do not require approvals, but a change in the designation of a monitoring site from SLAMS to SPM requires approval of the Regional Administrator.

*   *   *   *   *

■ 22. Amend § 58.13 by adding paragraphs (g) and (h) to read as follows:

### § 58.13   Monitoring network completion.

*   *   *   *   *

(g) The $O_3$ monitors required under appendix D, section 4.1 of this part must operate on the first day of the applicable required $O_3$ monitoring season in effect January 1, 2017.

(h) The Photochemical Assessment Monitoring sites required under 40 CFR part 58 Appendix D, section 5(a) must be physically established and operating under all of the requirements of this part, including the requirements of appendix A, C, D, and E of this part, no later than June 1, 2019.

## Subpart F—Air Quality Index Reporting

■ 23. Amend § 58.50 by revising paragraph (c) to read as follows:

### § 58.50   Index reporting.

*   *   *   *   *

(c) The population of a metropolitan statistical area for purposes of index reporting is the latest available U.S. census population.

## Subpart G—Federal Monitoring

■ 24. Amend appendix D to part 58, under section 4, by revising section 4.1(i) and table D–3 to appendix D of part 58, and by revising section 5 to read as follows:

### Appendix D to part 58—Network Design Criteria for Ambient Air Quality Monitoring

*   *   *   *   *

*4. Pollutant-Specific Design Criteria for SLAMS Sites*

*   *   *   *   *

4.1 *   *   *

(i) Ozone monitoring is required at SLAMS monitoring sites only during the seasons of the year that are conducive to $O_3$ formation (*i.e.*, "ozone season") as described below in Table D–3 of this appendix. These $O_3$ seasons are also identified in the AQS files on a state-by-state basis. Deviations from the $O_3$ monitoring season must be approved by the EPA Regional Administrator. These requests will be reviewed by Regional Administrators taking into consideration, at a minimum, the frequency of out-of-season $O_3$ NAAQS exceedances, as well as occurrences of the Moderate air quality index level, regional consistency, and logistical issues such as site access. Any deviations based on the Regional Administrator's waiver of requirements must be described in the annual monitoring network plan and updated in AQS. Changes to the $O_3$ monitoring season requirements in Table D–3 revoke all previously approved Regional Administrator waivers. Requests for monitoring season deviations must be accompanied by relevant supporting information. Information on how to analyze $O_3$ data to support a change to the $O_3$ season in support of the 8-hour standard for the entire network in a specific state can be found in reference 8 to this appendix. Ozone monitors at NCore stations are required to be operated year-round (January to December).

TABLE D–3 [1] TO APPENDIX D OF PART 58. OZONE MONITORING SEASON BY STATE

| State | Begin Month | End Month |
|---|---|---|
| Alabama | March | October. |
| Alaska | April | October. |
| Arizona | January | December. |
| Arkansas | March | November. |
| California | January | December. |
| Colorado | January | December. |
| Connecticut | March | September. |
| Delaware | March | October. |
| District of Columbia | March | October. |

TABLE D–3[1] TO APPENDIX D OF PART 58. OZONE MONITORING SEASON BY STATE—Continued

| State | Begin Month | End Month |
|---|---|---|
| Florida | January | December. |
| Georgia | March | October. |
| Hawaii | January | December. |
| Idaho | April | September. |
| Illinois | March | October. |
| Indiana | March | October. |
| Iowa | March | October. |
| Kansas | March | October. |
| Kentucky | March | October. |
| Louisiana (Northern) AQCR 019, 022 | March | October. |
| Louisiana (Southern) AQCR 106 | January | December. |
| Maine | April | September. |
| Maryland | March | October. |
| Massachusetts | March | September. |
| Michigan | March | October. |
| Minnesota | March | October. |
| Mississippi | March | October. |
| Missouri | March | October. |
| Montana | April | September. |
| Nebraska | March | October. |
| Nevada | January | December. |
| New Hampshire | March | September. |
| New Jersey | March | October. |
| New Mexico | January | December. |
| New York | March | October. |
| North Carolina | March | October. |
| North Dakota | March | September. |
| Ohio | March | October. |
| Oklahoma | March | November. |
| Oregon | May | September. |
| Pennsylvania | March | October. |
| Puerto Rico | January | December. |
| Rhode Island | March | September. |
| South Carolina | March | October. |
| South Dakota | March | October. |
| Tennessee | March | October. |
| Texas (Northern) AQCR 022, 210, 211, 212, 215, 217, 218 | March | November. |
| Texas (Southern) AQCR 106, 153, 213, 214, 216 | January | December. |
| Utah | January | December. |
| Vermont | April | September. |
| Virginia | March | October. |
| Washington | May | September. |
| West Virginia | March | October. |
| Wisconsin | March | October 15. |
| Wyoming | January | September. |
| American Samoa | January | December. |
| Guam | January | December. |
| Virgin Islands | January | December. |

[1] The required $O_3$ monitoring season for NCore stations is January through December.

*     *     *     *     *

**5. Network Design for Photochemical Assessment Monitoring Stations (PAMS) and Enhanced Ozone Monitoring**

(a) State and local monitoring agencies are required to collect and report PAMS measurements at each NCore site required under paragraph 3(a) of this appendix located in a CBSA with a population of 1,000,000 or more, based on the latest available census figures.

(b) PAMS measurements include:

(1) Hourly averaged speciated volatile organic compounds (VOCs);

(2) Three 8-hour averaged carbonyl samples per day on a 1 in 3 day schedule, or hourly averaged formaldehyde;

(3) Hourly averaged $O_3$;

(4) Hourly averaged nitrogen oxide (NO), true nitrogen dioxide ($NO_2$), and total reactive nitrogen ($NO_y$);

(5) Hourly averaged ambient temperature;

(6) Hourly vector-averaged wind direction;

(7) Hourly vector-averaged wind speed;

(8) Hourly average atmospheric pressure;

(9) Hourly averaged relative humidity;

(10) Hourly precipitation;

(11) Hourly averaged mixing-height;

(12) Hourly averaged solar radiation; and

(13) Hourly averaged ultraviolet radiation.

(c) The EPA Regional Administrator may grant a waiver to allow the collection of required PAMS measurements at an alternative location where the monitoring agency can demonstrate that the alternative location will provide representative data useful for regional or national scale modeling and the tracking of trends in $O_3$ precursors.

The alternative location can be outside of the CBSA or outside of the monitoring agencies jurisdiction. In cases where the alternative location crosses jurisdictions the waiver will be contingent on the monitoring agency responsible for the alternative location including the required PAMS measurements in their annual monitoring plan required under § 58.10 and continued successful collection of PAMS measurements at the alternative location. This waiver can be revoked in cases where the Regional Administrator determines the PAMS measurements are not being collected at the alternate location in compliance with paragraph (b) of this section.

(d) The EPA Regional Administrator may grant a waiver to allow speciated VOC measurements to be made as three 8-hour averages on every third day during the PAMS

BLM_0047478

season as an alternative to 1-hour average speciated VOC measurements in cases where the primary VOC compounds are not well measured using continuous technology due to low detectability of the primary VOC compounds or for logistical and other programmatic constraints.

(e) The EPA Regional Administrator may grant a waiver to allow representative meteorological data from nearby monitoring stations to be used to meet the meteorological requirements in paragraph 5(b) where the monitoring agency can demonstrate the data is collected in a manner consistent with EPA quality assurance requirements for these measurements.

(f) The EPA Regional Administrator may grant a waiver from the requirement to collect PAMS measurements in locations where CBSA-wide $O_3$ design values are equal to or less than 85% of the 8-hour $O_3$ NAAQS and where the location is not considered by the Regional Administrator to be an important upwind or downwind location for other $O_3$ nonattainment areas.

(g) At a minimum, the monitoring agency shall collect the required PAMS measurements during the months of June, July, and August.

(h) States with Moderate and above 8-hour $O_3$ nonattainment areas and states in the Ozone Transport Region as defined in 40 CFR 51.900 shall develop and implement an Enhanced Monitoring Plan (EMP) detailing enhanced $O_3$ and $O_3$ precursor monitoring activities to be performed. The EMP shall be submitted to the EPA Regional Administrator no later than October 1, 2019 or two years following the effective date of a designation to a classification of Moderate or above $O_3$ nonattainment, whichever is later. At a minimum, the EMP shall be reassessed and approved as part of the 5-year network assessments required under 40 CFR 58.10(d). The EMP will include monitoring activities deemed important to understanding the $O_3$ problems in the state. Such activities may include, but are not limited to, the following:

(1) Additional $O_3$ monitors beyond the minimally required under paragraph 4.1 of this appendix,

(2) Additional $NO_X$ or $NO_y$ monitors beyond those required under 4.3 of this appendix,

(3) Additional speciated VOC measurements including data gathered during different periods other than required under paragraph 5(g) of this appendix, or locations other than those required under paragraph 5(a) of this appendix, and

(4) Enhanced upper air measurements of meteorology or pollution concentrations.

■ 25. Appendix G of Part 58 is amended by revising table 2 to read as follows:

**Appendix G to Part 58—Uniform Air Quality Index (AQI) and Daily Reporting**

\*     \*     \*     \*     \*

## TABLE 2—BREAKPOINTS FOR THE AQI

| These breakpoints | | | | | | | Equal these AQI's | |
|---|---|---|---|---|---|---|---|---|
| $O_3$ (ppm) 8-hour | $O_3$ (ppm) 1-hour[1] | $PM_{2.5}$ (µg/m³) 24-hour | $PM_{10}$ (µg/m³) 24-hour | CO (ppm) 8-hour | $SO_2$ (ppb) 1-hour | $NO_2$ (ppb) 1-hour | AQI | Category |
| 0.000–0.054 | — | 0.0–12.0 | 0–54 | 0.0–4.4 | 0–35 | 0–53 | 0–50 | Good. |
| 0.055–0.070 | — | 12.1–35.4 | 55–154 | 4.5–9.4 | 36–75 | 54–100 | 51–100 | Moderate. |
| 0.071–0.085 | 0.125–0.164 | 35.5–55.4 | 155–254 | 9.5–12.4 | 76–185 | 101–360 | 101–150 | Unhealthy for Sensitive Groups. |
| 0.086–0.105 | 0.165–0.204 | [3]55.5–150.4 | 255–354 | 12.5–15.4 | [4]186–304 | 361–649 | 151–200 | Unhealthy. |
| 0.106–0.200 | 0.205–0.404 | [3]150.5–250.4 | 355–424 | 15.5–30.4 | [4]305–604 | 650–1249 | 201–300 | Very Unhealthy. |
| 0.201–([2]) | 0.405–0.504 | [3]250.5–350.4 | 425–504 | 30.5–40.4 | [4]605–804 | 1250–1649 | 301–400 | Hazardous. |
| ([2]) | 0.505–0.604 | [3]350.5–500.4 | 505–604 | 40.5–50.4 | [4]805–1004 | 1650–2049 | 401–500 | |

[1] Areas are generally required to report the AQI based on 8-hour ozone values. However, there are a small number of areas where an AQI based on 1-hour ozone values would be more precautionary. In these cases, in addition to calculating the 8-hour ozone index value, the 1-hour ozone index value may be calculated, and the maximum of the two values reported.

[2] 8-hour $O_3$ values do not define higher AQI values (>301). AQI values > 301 are calculated with 1-hour $O_3$ concentrations.

[3] If a different SHL for $PM_{2.5}$ is promulgated, these numbers will change accordingly.

[4] 1-hr $SO_2$ values do not define higher AQI values (≥200). AQI values of 200 or greater are calculated with 24-hour $SO_2$ concentration.

[FR Doc. 2015–26594 Filed 10–23–15; 8:45 am]

**BILLING CODE 6560–50–P**

BLM_0047479



United States
Environmental Protection
Agency

EPA-600-R-16-236ES
December 2016
www.epa.gov/hfstudy



# Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States




## Executive Summary

Office of Research and Development
Washington, DC

BLM_0047480



BLM_0047481



*Aerial photograph of hydraulic fracturing well sites near Williston, North Dakota.*
*Image ©J Henry Fair / Flights provided by LightHawk*

# Executive Summary

People rely on clean and plentiful water resources to meet their basic needs, including drinking, bathing, and cooking. In the early 2000s, members of the public began to raise concerns about potential impacts on their drinking water from hydraulic fracturing at nearby oil and gas production wells. In response to these concerns, Congress urged the U.S. Environmental Protection Agency (EPA) to study the relationship between hydraulic fracturing for oil and gas and drinking water in the United States.

The goals of the study were to assess the potential for activities in the hydraulic fracturing water cycle to impact the quality or quantity of drinking water resources and to identify factors that affect the frequency or severity of those impacts. To achieve these goals, the EPA conducted independent research, engaged stakeholders through technical workshops and roundtables, and reviewed approximately 1,200 cited sources of data and information. The data and information gathered through these efforts served as the basis for this report, which represents the culmination of the EPA's study of the potential impacts of hydraulic fracturing for oil and gas on drinking water resources.

The hydraulic fracturing water cycle describes the use of water in hydraulic fracturing, from water withdrawals to make hydraulic fracturing fluids, through the mixing and injection of hydraulic fracturing fluids in oil and gas production wells, to the collection and disposal or reuse of produced water. These activities can impact drinking water resources under some circumstances. Impacts can range in frequency and severity, depending on the combination of hydraulic fracturing water cycle activities and local- or regional-scale factors. The following combinations of activities and factors are more likely than others to result in more frequent or more severe impacts:

- Water withdrawals for hydraulic fracturing in times or areas of low water availability, particularly in areas with limited or declining groundwater resources;

BLM_0047482

- Spills during the management of hydraulic fracturing fluids and chemicals or produced water that result in large volumes or high concentrations of chemicals reaching groundwater resources;
- Injection of hydraulic fracturing fluids into wells with inadequate mechanical integrity, allowing gases or liquids to move to groundwater resources;
- Injection of hydraulic fracturing fluids directly into groundwater resources;
- Discharge of inadequately treated hydraulic fracturing wastewater to surface water resources; and
- Disposal or storage of hydraulic fracturing wastewater in unlined pits, resulting in contamination of groundwater resources.

The above conclusions are based on cases of identified impacts and other data, information, and analyses presented in this report. Cases of impacts were identified for all stages of the hydraulic fracturing water cycle. Identified impacts generally occurred near hydraulically fractured oil and gas production wells and ranged in severity, from temporary changes in water quality to contamination that made private drinking water wells unusable.

The available data and information allowed us to qualitatively describe factors that affect the frequency or severity of impacts at the local level. However, significant data gaps and uncertainties in the available data prevented us from calculating or estimating the national frequency of impacts on drinking water resources from activities in the hydraulic fracturing water cycle. The data gaps and uncertainties described in this report also precluded a full characterization of the severity of impacts.

The scientific information in this report can help inform decisions by federal, state, tribal, and local officials; industry; and communities. In the short-term, attention could be focused on the combinations of activities and factors outlined above. In the longer-term, attention could be focused on reducing the data gaps and uncertainties identified in this report. Through these efforts, current and future drinking water resources can be better protected in areas where hydraulic fracturing is occurring or being considered.

# Drinking Water Resources in the United States

In this report, drinking water resources are defined as any water that now serves, or in the future could serve, as a source of drinking water for public or private use. This includes both surface water resources and groundwater resources (Text Box ES-1). In 2010, approximately 58% of the total volume of water withdrawn for public and non-public water supplies came from surface water resources and approximately 42% came from groundwater resources (Maupin et al., 2014).[1] Most people (86% of the population) in the United States relied on public water supplies for their drinking water in 2010, and approximately 14% of the population obtained drinking water from non-public water supplies. Non-public water supplies are often private water wells that supply drinking water to a residence.

Future access to high-quality drinking water in the United States will likely be affected by changes in climate and water use. Since 2000, about 30% of the total area of the contiguous United States has experienced moderate drought conditions and about 20% has experienced severe drought conditions. Declines in surface water resources have

---

[1] Public water systems provide water for human consumption from surface or groundwater through pipes or other infrastructure to at least 15 service connections or serve an average of at least 25 people for at least 60 days a year. Non-public water systems have fewer than 15 service connections and serve fewer than 25 individuals.

2

BLM_0047483

**Text Box ES-1: Drinking Water Resources**

In this report, drinking water resources are considered to be any water that now serves, or in the future could serve, as a source of drinking water for public or private use. This includes both surface water bodies and underground rock formations that contain water.

**Surface water resources** include water bodies located on the surface of the Earth. Rivers, springs, lakes, and reservoirs are examples of surface water resources. Water quality and quantity are often considered when determining whether a surface water resource could be used as a drinking water resource.



**Groundwater resources** are underground rock formations that contain water. Groundwater resources are found at different depths nearly everywhere in the United States. Resource depth, water quality, and water yield are often considered when determining whether a groundwater resource could be used as a drinking water resource.

led to increased withdrawals and net depletions of groundwater in some areas. As a result, non-fresh water resources (e.g., wastewater from sewage treatment plants, brackish groundwater and surface water, and seawater) are increasingly treated and used to meet drinking water demand.

Natural processes and human activities can affect the quality and quantity of current and future drinking water resources. This report focuses on the potential for activities in the hydraulic fracturing water cycle to impact drinking water resources; other processes or activities are not discussed.

# Hydraulic Fracturing for Oil and Gas in the United States

Hydraulic fracturing is frequently used to enhance oil and gas production from underground rock formations and is one of many activities that occur during the life of an oil and gas production well

(Figure ES-1). During hydraulic fracturing, hydraulic fracturing fluid is injected down an oil or gas production well and into the targeted rock formation under pressures great enough to fracture the oil- and gas-

BLM_0047484



**Figure ES-1. General timeline and summary of activities at a hydraulically fractured oil or gas production well.**

bearing rock.[1] The hydraulic fracturing fluid usually carries proppant (typically sand) into the newly-created fractures to keep the fractures "propped" open. After hydraulic fracturing, oil, gas, and other fluids flow through the fractures and up the production well to the surface, where they are collected and managed.

Hydraulically fractured oil and gas production wells have significantly contributed to the surge in domestic oil and gas production, accounting for slightly more than 50% of oil production and nearly 70% of gas production in 2015 (EIA, 2016a, b). The surge occurred when hydraulic fracturing was combined with directional drilling technologies around 2000. Directional drilling allows oil and gas production wells to be drilled horizontally or directionally along the targeted rock formation, exposing more of the oil- or gas-bearing rock formation to the production well. When combined with directional drilling technologies, hydraulic fracturing expanded oil and gas production to oil- and gas-bearing rock formations previously considered uneconomical. Although hydraulic fracturing is commonly associated with oil and gas production from deep, horizontal wells drilled into shale (e.g., the Marcellus Shale in Pennsylvania or the Bakken Shale in North Dakota), it has been used in a variety of oil and gas production wells (Text Box ES-2) and other types of oil- or gas-bearing

rock (e.g., sandstone, carbonate, and coal).

Approximately 1 million wells have been hydraulically fractured since the technique was first developed in the late 1940s (Gallegos and Varela, 2015; IOGCC, 2002). Roughly one third of those wells were hydraulically fractured between 2000 and approximately 2014. Wells hydraulically fractured between 2000 and 2013 were located in pockets of activity across the United States (Figure ES-2). Based on several different data compilations, we estimate that 25,000 to 30,000 new wells were drilled and hydraulically fractured in the United States each year between 2011 and 2014, in addition to existing wells that were hydraulically fractured to increase production.[2] Following the decline in oil and gas prices, the number of new wells drilled and hydraulically fractured appears to have decreased, with about 20,000 new wells drilled and hydraulically fractured in 2015.

Hydraulically fractured oil and gas production wells can be located near or within sources of drinking water. Between 2000 and 2013, approximately 3,900 public water systems were estimated to have had at least one hydraulically fractured well within 1 mile of their water source; these public water systems served more than 8.6 million people year-round in 2013. An additional 3.6 million people were estimated to have obtained drinking water from non-

---

[1] The targeted rock formation (sometimes called the "target zone" or "production zone") is the portion of a subsurface rock formation that contains the oil or gas to be extracted.

[2] See Table 3-1 in Chapter 3.

BLM_0047485

## Text Box ES-2: Hydraulically Fractured Oil and Gas Production Wells

Hydraulically fractured oil and gas production wells come in different shapes and sizes. They can have different depths, orientations, and construction characteristics. They can include new wells (i.e., wells that are hydraulically fractured soon after construction) and old wells (i.e., wells that are hydraulically fractured after producing oil and gas for some time).

**Well Depth**

Wells can be relatively shallow or relatively deep, depending on the depth of the targeted rock formation.



Milam County, Texas
Well depth = 685 feet

San Augustine County, Texas
Well depth = 19,349 feet

*Well depths and locations from FracFocus.org.*

**Well Orientation**

Wells can be vertical, horizontal, or deviated.



**Well Construction Characteristics**

Wells are typically constructed using multiple layers of casing and cement. The subsurface environment, state and federal regulations, and industry experience and practices influence the number and placement of casing and cement.



*Well diagrams are not to scale.*

### Oil and Gas Production Well Dictionary

| | |
|---|---|
| Casing | Steel pipe that extends from the ground surface to the bottom of the drilled hole |
| Cement | A slurry that hardens around the outside of the casing; cement fills the space between casings or between a casing and the drilled hole and provides support for the casing |
| Conductor casing | Casing that prevents the in-fill of dirt and rock in the uppermost few feet of drilled hole |
| Intermediate casing | Casing that seals off intermediate rock formations that may have different pressures than deeper or shallower rock formations |
| Production casing | Casing that transports fluids up and down the well |
| Surface casing | Casing that seals off groundwater resources that are identified as drinking water or useable |
| Targeted rock formation | The part of a rock formation that contains the oil and/or gas to be extracted |

5

BLM_0047486



**Figure ES-2. Locations of approximately 275,000 wells that were drilled and likely hydraulically fractured between 2000 and 2013. Data from DrillingInfo (2014).**

public water supplies in counties with at least one hydraulically fractured well.[1] Underground, hydraulic fracturing can occur in close vertical proximity to drinking water resources. In some parts of the United States (e.g., the Powder River Basin in Montana and Wyoming), there is no vertical distance between the top of the hydraulically fractured oil- or gas-bearing rock formation and the bottom of treatable water, as determined by data from state oil and gas agencies and state geological survey data.[2] In other parts of the country (e.g., the Eagle Ford Shale in Texas), there can be thousands of feet of rock that separate treatable water from the hydraulically fractured oil- or gas-bearing rock formation. When hydraulically fractured oil and gas production wells are located near or within drinking water resources, there is a greater potential for activities in the hydraulic fracturing water cycle to impact those resources.

---

[1] This estimate only includes counties in which 30% or more of the population (i.e., two or more times the national average) relied on non-public water supplies in 2010. See Section 2.5 in Chapter 2.

[2] In these cases, water that is naturally found in the oil- and gas-bearing rock formation meets the definition of drinking water in some parts of the basin. See Section 6.3.2 in Chapter 6.

BLM_0047487

# Approach: The Hydraulic Fracturing Water Cycle

The EPA studied the relationship between hydraulic fracturing for oil and gas and drinking water resources using the hydraulic fracturing water cycle (Figure ES-3). The hydraulic fracturing water cycle has five stages; each stage is defined by an activity involving water that supports hydraulic fracturing. The stages and activities of the hydraulic fracturing water cycle include:

- **Water Acquisition:** the withdrawal of groundwater or surface water to make hydraulic fracturing fluids;
- **Chemical Mixing:** the mixing of a base fluid (typically water), proppant, and additives at the well site to create hydraulic fracturing fluids;[1]
- **Well Injection:** the injection and movement of hydraulic fracturing fluids through the oil and gas production well and in the targeted rock formation;
- **Produced Water Handling:** the on-site collection and handling of water that returns to the surface after hydraulic fracturing and the transportation of that water for disposal or reuse;[2] and
- **Wastewater Disposal and Reuse:** the disposal and reuse of hydraulic fracturing wastewater.[3]

Potential impacts on drinking water resources from the above activities are considered in this report. We do not address other concerns that have been raised by stakeholders about hydraulic fracturing (e.g., potential air quality impacts or induced seismicity) or other oil and gas exploration and production activities (e.g., environmental impacts from site selection and development), as these were not included in the scope of the study. Additionally, this report is not a human health risk assessment; it does not identify populations exposed to hydraulic fracturing-related chemicals, and it does not estimate the extent of exposure or estimate the incidence of human health impacts.

Each stage of the hydraulic fracturing water cycle was assessed to identify (1) the potential for impacts on drinking water resources and (2) factors that affect the frequency or severity of impacts. Specific definitions used in this report are provided below:

- An **impact** is any change in the quality or quantity of drinking water resources, regardless of severity, that results from an activity in the hydraulic fracturing water cycle.
- A **factor** is a feature of hydraulic fracturing operations or an environmental condition that affects the frequency or severity of impacts.
- **Frequency** is the number of impacts per a given unit (e.g., geographic area, unit of time, number of hydraulically fractured wells, or number of water bodies).
- **Severity** is the magnitude of change in the quality or quantity of a drinking water resource as measured by a given metric (e.g., duration, spatial extent, or contaminant concentration).

---

[1] A base fluid is the fluid into which proppants and additives are mixed to make a hydraulic fracturing fluid; water is an example of a base fluid. Additives are chemicals or mixtures of chemicals that are added to the base fluid to change its properties.

[2] "Produced water" is defined in this report as water that flows from and through oil and gas wells to the surface as a by-product of oil and gas production.

[3] "Hydraulic fracturing wastewater" is defined in this report as produced water from hydraulically fractured oil and gas wells that is being managed using practices that include, but are not limited to, injection in Class II wells, reuse in other hydraulic fracturing operations, and various aboveground disposal practices. The term "wastewater" is being used as a general description of certain waters and is not intended to constitute a term of art for legal or regulatory purposes. Class II wells are used to inject wastewater associated with oil and gas production underground and are regulated under the Underground Injection Control Program of the Safe Drinking Water Act.

BLM_0047488



*Figure not to scale*

**Figure ES-3. The five stages of the hydraulic fracturing water cycle. The stages (shown in the insets) identify activities involving water that support hydraulic fracturing for oil and gas. Activities may take place in the same watershed or different watersheds and close to or far from drinking water resources. Thin arrows in the insets depict the movement of water and chemicals. Specific activities in the "Wastewater Disposal and Reuse" inset include (a) disposal of wastewater through underground injection, (b) wastewater treatment followed by reuse in other hydraulic fracturing operations or discharge to surface waters, and (c) disposal through evaporation or percolation pits.**

Factors affecting the frequency or severity of impacts were identified because they describe conditions under which impacts are more or less likely to occur and because they could inform the development of future strategies and actions to prevent or reduce impacts. Although no attempt was made to identify or evaluate best practices, ways to reduce the frequency or severity of impacts from activities in the hydraulic fracturing water cycle are described in this report when they were reported in the scientific literature. Laws, regulations, and policies also exist to pro-

tect drinking water resources, but a comprehensive summary and broad evaluation of current or proposed regulations and policies was beyond the scope of this report.

Relevant scientific literature and data were evaluated for each stage of the hydraulic fracturing water cycle. Literature included articles published in science and engineering journals, federal and state government reports, non-governmental organization reports, and industry publications. Data sources included federal- and state-collected data sets, databases maintained by federal and

BLM_0047489

state government agencies, other publicly available data, and industry data provided to the EPA.[1] The relevant literature and data complement research conducted by the EPA under its *Plan to Study the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources* (Text Box ES-3).

A draft of this report underwent peer review by the EPA's Science Advisory Board (SAB). The SAB is an independent federal advisory committee that often conducts peer reviews of high-profile scientific matters relevant to the EPA. Members of the SAB and *ad hoc* panels formed under the auspices of the SAB are nominated by the public and selected based on factors such as technical exper-

tise, knowledge, experience, and absence of any real or perceived conflicts of interest. Peer review comments provided by the SAB and public comments submitted to the SAB during their peer review, including comments on major conclusions and technical content, were carefully considered in the development of this final document.

A summary of the activities in the hydraulic fracturing water cycle and their potential to impact drinking water resources is provided below, including what is known about human health hazards associated with chemicals identified across all stages of the hydraulic fracturing water cycle. Additional details are available in the full report.

---

**Text Box ES-3: The EPA's *Study of the Potential Impacts of Hydraulic Fracturing for Oil and Gas on Drinking Water Resources***

The EPA's study is the first national study of the potential impacts of hydraulic fracturing for oil and gas on drinking water resources. It included independent research projects conducted by EPA scientists and contractors and a state-of-the-science assessment of available data and information on the relationship between hydraulic fracturing and drinking water resources (i.e., this report).



Throughout the study, the EPA consulted with the Agency's independent Science Advisory Board (SAB) on the scope of the study and the progress made on the research projects. The SAB also conducted a peer review of both the *Plan to Study the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources* (U.S. EPA, 2011; referred to as the *Study Plan* in this report) and a draft of this report.

Stakeholder engagement also played an important role in the development and implementation of the study. While developing the scope of the study, the EPA held public meetings to get input from stakeholders on the study scope and design. While conducting the study, the EPA requested information from the public and engaged with technical, subject-matter experts on topics relevant to the study in a series of technical workshops and roundtables. For more information on the EPA's study, including the role of the SAB and stakeholders, visit www.epa.gov/hfstudy.

---

[1] Industry data was provided to the EPA in response to two separate information requests to oil and gas service companies and oil and gas production well operators. Some of these data were claimed as confidential business information under the Toxic Substances Control Act and were treated as such in this report.

BLM_0047490

# Water Acquisition

*The withdrawal of groundwater or surface water to make hydraulic fracturing fluids.*



### Relationship to Drinking Water Resources
Groundwater and surface water resources that provide water for hydraulic fracturing fluids can also provide drinking water for public or non-public water supplies.

Water is the major component of nearly all hydraulic fracturing fluids, typically making up 90–97% of the total fluid volume injected into a well. The median volume of water used, per well, for hydraulic fracturing was approximately 1.5 million gallons (5.7 million liters) between January 2011 and February 2013, as reported in FracFocus 1.0 (Text Box ES-4). There was wide variation in the water volumes reported per well, with 10th and 90th percentiles of 74,000 gallons (280,000 liters) and 6 million gallons (23 million liters) per well, respectively. There was also variation in water use per well within and among states (Table ES-1). This variation likely results from several factors, including the type of well,

the fracture design, and the type of hydraulic fracturing fluid used. An analysis of hydraulic fracturing fluid data from Gallegos et al. (2015) indicates that water volumes used per well have increased over time as more horizontal wells have been drilled.

Water used for hydraulic fracturing is typically fresh water taken from available groundwater and/or surface water resources located near hydraulically fractured oil and gas production wells. Water sources can vary across the United States, depending on regional or local water availability; laws, regulations, and policies; and water management practices. Hydraulic fracturing operations in the humid eastern United States generally rely on surface water

---

**Text Box ES-4: FracFocus Chemical Disclosure Registry**

The FracFocus Chemical Disclosure Registry is a publicly-accessible website (www.fracfocus.org) managed by the Ground Water Protection Council (GWPC) and the Interstate Oil and Gas Compact Commission (IOGCC). Oil and gas production well operators can disclose information at this website about water and chemicals used in hydraulic fracturing fluids at individual wells. In many states where oil and gas production occurs, well operators are required to disclose to FracFocus well-specific information on water and chemical use during hydraulic fracturing.

The GWPC and the IOGCC provided the EPA with over 39,000 PDF disclosures submitted by well operators to FracFocus (version 1.0) before March 1, 2013. Data in the disclosures were extracted and compiled in a project database, which was used to conduct analyses on water and chemical use for hydraulic fracturing. Analyses were conducted on over 38,000 unique disclosures for wells located in 20 states that were hydraulically fractured between January 1, 2011, and February 28, 2013.

Despite the challenge of adapting a dataset originally created for local use and single-PDF viewing to answer broader questions, the project database created by the EPA provided substantial insight into water and chemical use for hydraulic fracturing. The project database represents the data reported to FracFocus 1.0 rather than all hydraulic fracturing that occurred in the United States during the study time period. The project database is an incomplete picture of all hydraulic fracturing due to voluntary reporting in some states for certain time periods (in the absence of state reporting requirements), the omission of information on confidential chemicals from disclosures, and invalid or erroneous information in the original disclosures or created during the development of the database. The development of FracFocus 2.0, which became the exclusive reporting mechanism in June 2013, was intended to increase the quality, completeness, and consistency of the data submitted by providing dropdown menus, warning and error messages during submission, and automatic formatting of certain fields. The GWPC has announced additional changes and upgrades for FracFocus 3.0 to enhance data searchability, increase system security, provide greater data accuracy, and further increase data transparency.

BLM_0047491

Table ES-1. Water use per hydraulically fractured well between January 2011 and February 2013. Medians and percentiles were calculated from data submitted to FracFocus 1.0 (Appendix B).

| STATE | NUMBER OF FRACFOCUS 1.0 DISCLOSURES | MEDIAN VOLUME PER WELL (GALLONS) | 10TH PERCENTILE (GALLONS) | 90TH PERCENTILE (GALLONS) |
|---|---|---|---|---|
| Arkansas | 1,423 | 5,259,965 | 3,234,963 | 7,121,249 |
| California | 711 | 76,818 | 21,462 | 285,306 |
| Colorado | 4,898 | 463,462 | 147,353 | 3,092,024 |
| Kansas | 121 | 1,453,788 | 10,836 | 2,227,926 |
| Louisiana | 966 | 5,077,863 | 1,812,099 | 7,945,630 |
| Montana | 207 | 1,455,757 | 367,326 | 2,997,552 |
| New Mexico | 1,145 | 175,241 | 35,638 | 1,871,666 |
| North Dakota | 2,109 | 2,022,380 | 969,380 | 3,313,482 |
| Ohio | 146 | 3,887,499 | 2,885,568 | 5,571,027 |
| Oklahoma | 1,783 | 2,591,778 | 1,260,906 | 7,402,230 |
| Pennsylvania | 2,445 | 4,184,936 | 2,313,649 | 6,615,981 |
| Texas | 16,882 | 1,420,613 | 58,709 | 6,115,195 |
| Utah | 1,406 | 302,075 | 76,286 | 769,360 |
| West Virginia | 273 | 5,012,238 | 3,170,210 | 7,297,080 |
| Wyoming | 1,405 | 322,793 | 5,727 | 1,837,602 |

resources, whereas operations in the arid and semi-arid western United States generally rely on groundwater or surface water. Geographic differences in water use for hydraulic fracturing are illustrated in Figure ES-4, which shows that most of the water used for hydraulic fracturing in the Marcellus Shale region of the Susquehanna River Basin came from surface water resources between approximately 2008 and 2013. In comparison, less than half of the water used for hydraulic fracturing in the Barnett Shale region of Texas came from surface water resources between approximately 2011 and 2013.

Hydraulic fracturing wastewater and other lower-quality water can also be used in hydraulic fracturing fluids to offset the need for fresh water, although the proportion of injected fluid that is reused hydraulic fracturing wastewater varies by location (Figure ES-4).[1] Overall, the proportion of water used in hydraulic fracturing that comes from reused hydraulic fracturing wastewater appears to be low. In a survey of literature values from 10 states, basins, or plays, the median percentage of the injected fluid volume that came from reused hydraulic fracturing wastewater was 5% between approximately 2008 and 2014.[2] There was an increase in the reuse of hydraulic fracturing wastewater as a percentage of the injected hydraulic fracturing fluid in both Pennsylvania and West Virginia between approximately 2008 and 2014. This increase is likely due to the limited availability of Class II wells, which are commonly used to dispose of oil and gas wastewater, and the costs of trucking wastewater to Ohio, where Class II wells are

[1] Reused hydraulic fracturing wastewater as a percentage of injected fluid differs from the percentage of produced water that is managed through reuse in other hydraulic fracturing operations. For example, in the Marcellus Shale region of the Susquehanna River Basin, approximately 14% of injected fluid was reused hydraulic fracturing wastewater, while approximately 90% of produced water was managed through reuse in other hydraulic fracturing operations (Figure ES-4a).

[2] See Section 4.2 in Chapter 4.

11



**Figure ES-4. Water budgets illustrative of hydraulic fracturing water management practices in (a) the Marcellus Shale in the Susquehanna River Basin between approximately 2008 and 2013 and (b) the Barnett Shale in Texas between approximately 2011 and 2013. Class II wells are used to inject wastewater associated with oil and gas production underground and are regulated under the Underground Injection Control Program of the Safe Drinking Water Act. Data sources are described in Figure 10-1 in Chapter 10.**

more prevalent.[1] Class II wells are also prevalent in Texas, and the reuse of wastewater in hydraulic fracturing fluids in the Barnett Shale appears to be lower than in the Marcellus Shale (Figure ES-4).

Because the same water resource can be used to support hydraulic fracturing and to provide drink-

ing water, withdrawals for hydraulic fracturing can directly impact drinking water resources by changing the quantity or quality of the remaining water. Although every water withdrawal affects water quantity, we focused on water withdrawals that have the potential to significantly impact drinking water re-

---

[1] See Chapter 8 for additional information on Class II wells.

12

sources by limiting the availability of drinking water or altering its quality. Water withdrawals for a single hydraulically fractured oil and gas production well are not expected to significantly impact drinking water resources, because the volume of water needed to hydraulically fracture a single well is unlikely to limit the availability of drinking water or alter its quality. If, however, multiple oil and gas production wells are located within an area, the total volume of water needed to hydraulically fracture all of the wells has the potential to be a significant portion of the water available and impacts on drinking water resources can occur.

To assess whether hydraulic fracturing operations are a relatively large or small user of water, we compared water use for hydraulic fracturing to total water use at the county level (Text Box ES-5). In most counties studied, the average annual water volumes reported in FracFocus 1.0 were generally less than 1% of total water use. This suggests that hydraulic fracturing operations represented a relatively small user of water in most counties. There were exceptions, however. Average annual water volumes reported in FracFocus 1.0 were 10% or more of total water use in 26 of the 401 counties studied, 30% or more in nine counties, and 50% or more in four counties.[1] In these counties, hydraulic fracturing operations represented a relatively large user of water.

The above results suggest that hydraulic fracturing operations can significantly increase the volume of water withdrawn in particular areas. Increased water withdrawals can result in significant impacts on drinking water resources if there is insufficient water available in the area to accommodate all users. To assess the potential for these impacts, we compared hydraulic fracturing water use to estimates of water availability at the county level.[2] In most counties studied, average annual water volumes reported for

hydraulic fracturing were less than 1% of the estimated annual volume of readily-available fresh water. However, average annual water volumes reported for hydraulic fracturing were greater than the estimated annual volume of readily-available fresh water in 17 counties in Texas. This analysis suggests that there was enough water available annually to support the level of hydraulic fracturing reported to FracFocus 1.0 in most, but not all, areas of the country. This observation does not preclude the possibility of local impacts in other areas of the country, nor does it indicate that local impacts have occurred or will occur in the 17 counties in Texas. To better understand whether local impacts have occurred, and the factors that affect those impacts, local-level studies, such as the ones described below, are needed.

Local impacts on drinking water quantity have occurred in areas with increased hydraulic fracturing activity. In 2011, for example, drinking water wells in an area overlying the Haynesville Shale ran out of water due to higher than normal groundwater withdrawals and drought (Louisiana Ground Water Resources Commission, 2012). Water withdrawals for hydraulic fracturing contributed to these conditions, along with other water users and the lack of precipitation. Groundwater impacts have also been reported in Texas. In a detailed case study, Scanlon et al. (2014) estimated that groundwater levels in approximately 6% of the area studied dropped by 100 feet (31 meters) to 200 feet (61 meters) or more after hydraulic fracturing activity increased in 2009.

In contrast, studies in the Upper Colorado and Susquehanna River basins found minimal impacts on drinking water resources from hydraulic fracturing. In the Upper Colorado River Basin, the EPA found that high-quality water produced from oil and gas wells in the Piceance tight sands provided nearly all of the water for hydraulic fracturing in the study area (U.S. EPA,

[1] Hydraulic fracturing water consumption estimates followed the same general pattern as the water use estimates presented here, but with slightly larger percentages in each category (Section 4.4 in Chapter 4).
[2] County-level water availability estimates were derived from the Tidwell et al. (2013) estimates of water availability for siting new thermoelectric power plants (see Text Box 4-2 in Chapter 4 for details). The county-level water availability estimates used in this report represent the portion of water available to new users within a county.

13

**Text Box ES-5: County-Level Water Use for Hydraulic Fracturing**

To assess whether hydraulic fracturing operations are a relatively large or small user of water, the average annual water use for hydraulic fracturing in 2011 and 2012 was compared, at the county-level, to total water use in 2010.

For most counties studied, average annual water volumes reported for individual counties in FracFocus 1.0 were less than 1% of total water use in those counties. But in some counties, hydraulic fracturing operations reported in FracFocus 1.0 represented a relatively large user of water.

**Examples of Water Use in Two Counties: Wilson County, Texas, and Mountrail County, North Dakota**





Depending on local water availability, hydraulic fracturing water withdrawals may be **less likely** to significantly impact drinking water resources under this kind of scenario.

Depending on local water availability, hydraulic fracturing water withdrawals may be **more likely** to significantly impact drinking water resources under this kind of scenario.

*Hydraulic fracturing water use is a function of the water use per well and the total number of wells hydraulically fractured within a county. Average annual water use for hydraulic fracturing was calculated at the county-level using data reported in FracFocus 1.0 in 2011 and 2012 (Appendix B).

†The U.S. Geological Survey compiles national water use estimates every five years in the National Water Census. Total water use at the county-level was obtained from the most recent census, which was conducted in 2010 (Maupin et al., 2014).

**2010 Total Water Use Categories**

| | |
|---|---|
| Public supply | Water withdrawn by public and private water suppliers that provide water to at least 25 people or have a minimum of 15 connections |
| Domestic | Self-supplied water withdrawals for indoor household purposes such as drinking, food preparation, bathing, washing clothes and dishes, flushing toilets, and outdoor purposes such as watering lawns and gardens |
| Industrial | Water used for fabrication, processing, washing, and cooling |
| Irrigation | Water that is applied by an irrigation system to assist crop and pasture growth or to maintain vegetation on recreational lands (e.g., parks and golf courses) |
| Livestock | Water used for livestock watering, feedlots, dairy operations, and other on-farm needs |
| Mining | Water used for the extraction of naturally-occurring minerals, including solids (e.g., coal, sand, gravel, and other ores), liquids (e.g., crude petroleum), and gases (e.g., natural gas) |

14

2015b). Due to this high reuse rate, the EPA did not identify any locations in the study area where hydraulic fracturing contributed to locally high water use. In the Susquehanna River Basin, multiple studies and state reports have identified the potential for hydraulic fracturing water withdrawals in the Marcellus Shale to impact surface water resources. Evidence suggests, however, that current water management strategies, including passby flows and reuse of hydraulic fracturing wastewater, help protect streams from depletion by hydraulic fracturing water withdrawals. A passby flow is a prescribed, low-streamflow threshold below which water withdrawals are not allowed.

The above examples highlight factors that can affect the frequency or severity of impacts on drinking water resources from hydraulic fracturing water withdrawals. In particular, areas of the United States that rely on declining groundwater resources are vulnerable to more frequent and more severe impacts from all water withdrawals, including withdrawals for hydraulic fracturing. Extensive groundwater withdrawals can limit the availability of belowground drinking water resources and can also change the quality of the water remaining in the resource. Because groundwater recharge rates can be low, impacts can last for many years. Seasonal or long-term drought can also make impacts more frequent and more severe for groundwater and surface water resources. Hot, dry weather reduces or prevents groundwater recharge and depletes surface water bodies, while water demand often increases simultaneously (e.g., for irrigation). This combination of factors—high hydraulic fracturing water use and relatively low water availability due to declining groundwater resources and/or frequent drought—was found to be present in southern and western Texas.

Water management strategies can also affect the frequency and severity of impacts on drinking water resources from hydraulic fracturing water withdrawals. These strategies include using hydraulic fracturing wastewater or brackish groundwater for hydraulic fracturing, transitioning from limited groundwater resources to more abundant surface water resources, and using passby flows to control water withdrawals from surface water resources. Examples of these water management strategies can be found throughout the United States. In western and southern Texas, for example, the use of brackish water is currently reducing impacts on fresh water sources, and could, if increased, reduce future impacts. Louisiana and North Dakota have encouraged well operators to withdraw water from surface water resources instead of high-quality groundwater resources. And, as described above, the Susquehanna River Basin Commission limits surface water withdrawals during periods of low stream flow.

**Water Acquisition Conclusions**

With notable exceptions, hydraulic fracturing uses a relatively small percentage of water when compared to total water use and availability at large geographic scales. Despite this, hydraulic fracturing water withdrawals can affect the quantity and quality of drinking water resources by changing the balance between the demand on local water resources and the availability of those resources. Changes that have the potential to limit the availability of drinking water or alter its quality are more likely to occur in areas with relatively high hydraulic fracturing water withdrawals and low water availability, particularly due to limited or declining groundwater resources. Water management strategies (e.g., encouragement of alternative water sources or water withdrawal restrictions) can reduce the frequency or severity of impacts on drinking water resources from hydraulic fracturing water withdrawals.

15

BLM_0047496

# Chemical Mixing

*The mixing of a base fluid, proppant, and additives at the well site to create hydraulic fracturing fluids.*

**Relationship to Drinking Water Resources**

Spills of additives and hydraulic fracturing fluids can reach groundwater and surface water resources.



Hydraulic fracturing fluids are engineered to create and grow fractures in the targeted rock formation and to carry proppant through the oil and gas production well into the newly-created fractures. Hydraulic fracturing fluids are typically made up of base fluids, proppant, and additives. Base fluids make up the largest proportion of hydraulic fracturing fluids by volume. As illustrated in Text Box ES-6, base fluids can be a single substance (e.g., water in the slickwater example) or can be a mixture of substances (e.g., water and nitrogen in the energized fluid example). The EPA's analysis of hydraulic fracturing fluid data reported to FracFocus 1.0 suggests that water was the most commonly used base fluid between January 2011 and February 2013 (U.S. EPA, 2015a). Non-water substances, such as gases and hydrocarbon liquids, were reported to be used alone or blended with water to form a base fluid in fewer than 3% of wells in FracFocus 1.0.

Proppant makes up the second largest proportion of hydraulic fracturing fluids (Text Box ES-6). Sand (i.e., quartz) was the most commonly reported proppant between January 2011 and February 2013, with 98% of wells in FracFocus 1.0 reporting sand as the proppant (U.S. EPA, 2015a). Other proppants can include man-made or specially engineered particles, such as high-strength ceramic materials or sintered

bauxite.[1]

Additives generally make up the smallest proportion of the overall composition of hydraulic fracturing fluids (Text Box ES-6), yet have the greatest potential to impact the quality of drinking water resources compared to proppant and base fluids. Additives, which can be a single chemical or a mixture of chemicals, are added to the base fluid to change its properties (e.g., adjust pH, increase fluid thickness, or limit bacterial growth). The choice of which additives to use depends on the characteristics of the targeted rock formation (e.g., rock type, temperature, and pressure), the economics and availability of desired additives, and well operator or service company preferences and experience.

The variability of additives, both in their purpose and chemical composition, suggests that a large number of different chemicals may be used in hydraulic fracturing fluids across the United States. The EPA identified 1,084 chemicals that were reported to have been used in hydraulic fracturing fluids between 2005 and 2013.[2,3] The EPA's analysis of FracFocus 1.0 data indicates that between 4 and 28 chemicals were used per well between January 2011 and February 2013 and that no single chemical was used in all wells (U.S. EPA, 2015a). Three chemicals—methanol, hydrotreated light petroleum distillates, and hydro-

---

[1] Sintered bauxite is crushed and powdered bauxite that is fused into spherical beads at high temperatures.

[2] This list includes 1,084 unique Chemical Abstracts Service Registration Numbers (CASRNs), which can be assigned to a single chemical (e.g., hydrochloric acid) or a mixture of chemicals (e.g., hydrotreated light petroleum distillates). Throughout this report, we refer to the substances identified by unique CASRNs as "chemicals."

[3] Dayalu and Konschnik (2016) identified 995 unique CASRNs from data submitted to FracFocus between March 9, 2011, and April 13, 2015. Two hundred sixty-three of these CASRNs are not on the list of unique CASRNs identified by the EPA (Appendix H). Only one of the 263 chemicals was reported at greater than 1% of wells, which suggests that these chemicals were used at only a few sites.

BLM_0047497

**Text Box ES-6: Examples of Hydraulic Fracturing Fluids**

Hydraulic fracturing fluids are engineered to create and extend fractures in the targeted rock formation and to carry proppant through the production well into the newly-created fractures. While there is no universal hydraulic fracturing fluid, there are general types of hydraulic fracturing fluids. Two types of hydraulic fracturing fluids are described below.

**Slickwater**

Slickwater hydraulic fracturing fluids are water-based fluids that generally contain a friction reducer. The friction reducer makes it easier for the fluid to be pumped down the oil and gas production well at high rates. Slickwater is commonly used to hydraulically fracture shale formations.



Bradford County, Pennsylvania
Well depth = 7,255 feet
Total water volume = 4,763,000 gallons

**Energized Fluid**

Energized fluids are mixtures of liquids and gases. They can be used for hydraulic fracturing in under-pressured gas formations.



Rio Arriba County, New Mexico
Well depth = 7,640 feet
Total water volume = 105,000 gallons

*Maximum percent by mass of the total hydraulic fracturing fluid. Data obtained from FracFocus.org.*

**Additive Dictionary**

| | |
|---|---|
| Acid | Dissolves minerals and creates pre-fractures in the rock |
| Biocide | Controls or eliminates bacteria in the hydraulic fracturing fluid |
| Breaker | Reduces the thickness of the hydraulic fracturing fluid |
| Clay control | Prevents swelling and migration of formation clays |
| Corrosion inhibitor | Protects iron and steel equipment from rusting |
| Foamer | Creates a foam hydraulic fracturing fluid |
| Friction reducer | Reduces friction between the hydraulic fracturing fluid and pipes during pumping |
| Iron control | Prevents the precipitation of iron-containing chemicals |
| Scale inhibitor | Prevents the formation of scale buildup within the well |
| Surfactant | Reduces the surface tension of the hydraulic fracturing fluid |

17

Table ES-2. Chemicals reported in 10% or more of disclosures in FracFocus 1.0. Disclosures provided information on chemicals used at individual well sites between January 1, 2011, and February 28, 2013.

| Chemical Name (CASRN)[a] | Percent of FracFocus 1.0 Disclosures[b] | Chemical Name (CASRN)[a] | Percent of FracFocus 1.0 Disclosures[b] |
|---|---|---|---|
| Methanol (67-56-1) | 72 | Naphthalene (91-20-3) | 19 |
| Hydrotreated light petroleum distillates (64742-47-8) | 65 | 2,2-Dibromo-3-nitrilopropionamide (10222-01-2) | 16 |
| Hydrochloric acid (7647-01-0) | 65 | Phenolic resin (9003-35-4) | 14 |
| Water (7732-18-5)[c] | 48 | Choline chloride (67-48-1) | 14 |
| Isopropanol (67-63-0) | 47 | Methenamine (100-97-0) | 14 |
| Ethylene glycol (107-21-1) | 46 | Carbonic acid, dipotassium salt (584-08-7) | 13 |
| Peroxydisulfuric acid, diammonium salt (7727-54-0) | 44 | 1,2,4-Trimethylbenzene (95-63-6) | 13 |
| Sodium hydroxide (1310-73-2) | 39 | Quaternary ammonium compounds, benzyl-C12-16-alkyldimethyl, chlorides (68424-85-1) | 12 |
| Guar gum (9000-30-0) | 37 | | |
| Quartz (14808-60-7)[c] | 36 | Poly(oxy-1,2-ethanediyl)-nonylphenyl-hydroxy (mixture) (127087-87-0) | 12 |
| Glutaraldehyde (111-30-8) | 34 | | |
| Propargyl alcohol (107-19-7) | 33 | Formic acid (64-18-6) | 12 |
| Potassium hydroxide (1310-58-3) | 29 | Sodium chlorite (7758-19-2) | 11 |
| Ethanol (64-17-5) | 29 | Nonyl phenol ethoxylate (9016-45-9) | 11 |
| Acetic acid (64-19-7) | 24 | Tetrakis(hydroxymethyl)phosphonium sulfate (55566-30-8) | 11 |
| Citric acid (77-92-9) | 24 | | |
| 2-Butoxyethanol (111-76-2) | 21 | Polyethylene glycol (25322-68-3) | 11 |
| Sodium chloride (7647-14-5) | 21 | Ammonium chloride (12125-02-9) | 10 |
| Solvent naphtha, petroleum, heavy aromatic (64742-94-5) | 21 | Sodium persulfate (7775-27-1) | 10 |

[a]"Chemical" refers to chemical substances with a single CASRN; these may be pure chemicals (e.g., methanol) or chemical mixtures (e.g., hydrotreated light petroleum distillates).
[b]Analysis considered 34,675 disclosures that met selected quality assurance criteria. See Table 5-2 in Chapter 5.
[c]Quartz and water were reported as ingredients in additives, in addition to proppants and base fluids.

chloric acid—were reported in 65% or more of the wells in FracFocus 1.0; 35 chemicals were reported in at least 10% of the wells (Table ES-2).

Concentrated additives are delivered to the well site and stored until they are mixed with the base fluid and proppant and pumped down the oil and gas production well (Text Box ES-7). While the overall concentration of additives in hydraulic fracturing fluids is generally small (typically 2% or less of the total volume of the injected fluid), the total volume of additives delivered to the well site can be large. Because over 1 million gallons (3.8 million liters) of hydraulic

fracturing fluid are generally injected per well, thousands of gallons of additives can be stored on site and used during hydraulic fracturing.

As illustrated in Text Box ES-7, additives are often stored in multiple, closed containers [typically 200 gallons (760 liters) to 375 gallons (1,420 liters) per container] and moved around the site in hoses and tubing. This equipment is designed to contain additives and blended hydraulic fracturing fluid, but spills can occur. Changes in drinking water quality can occur if spilled fluids reach groundwater or surface water resources.

BLM_0047499

## Text Box ES-7: Chemical Mixing Equipment



----- low pressure lines    →→→→ high pressure lines

*Source: Adapted from Olson (2011) and BJ Services Company (2009)*

### Typical Layout of Chemical Mixing Equipment

This illustration shows how the different pieces of equipment fit together to contain, mix, and inject hydraulic fracturing fluid into a production well.

Water, proppant, and additives are blended together and pumped to the manifold, where high pressure pumps transfer the fluid to the frac head.

Additives and proppant can be blended with water at different times and in different amounts during hydraulic fracturing. Thus, the composition of hydraulic fracturing fluids can vary during the hydraulic fracturing job.

### Well Pad During Hydraulic Fracturing

Equipment set up for hydraulic fracturing.



*Source: Schlumberger*

### Chemical Mixing Equipment Dictionary

| | |
|---|---|
| Blender | Blends water, proppant, and additives |
| Chemical additive unit | Transports additives to the site and stores additives onsite |
| Flowback tanks | Stores liquid that returns to the surface after hydraulic fracturing |
| Frac head | Connects hydraulic fracturing equipment to the production well |
| High pressure pumps | Pressurize mixed fluids before injection into the production well |
| Hydration unit | Creates and stores gels used in some hydraulic fracturing fluids |
| Manifold | Transfers fluids from the blender to the frac head |
| Proppant | Stores proppant (often sand) |
| Water tanks | Stores water |

19

BLM_0047500

Several studies have documented spills of hydraulic fracturing fluids or additives. Nearly all of these studies identified spills from state-managed spill databases. Data gathered for these studies suggest that spills of hydraulic fracturing fluids or additives were primarily caused by equipment failure or human error. For example, an EPA analysis of spill reports from nine state agencies, nine oil and gas well operators, and nine hydraulic fracturing service companies characterized 151 spills of hydraulic fracturing fluids or additives on or near well sites in 11 states between January 2006 and April 2012 (U.S. EPA, 2015c). These spills were primarily caused by equipment failure (34% of the spills) or human error (25%), and more than 30% of the spills were from fluid storage units (e.g., tanks, totes, and trailers). Similarly, a study of spills reported to the Colorado Oil and Gas Conservation Commission identified 125 spills during well stimulation (i.e., a part of the life of an oil and gas well that often, but not always, includes hydraulic fracturing) between January 2010 and August 2013 (COGCC, 2014). Of these spills, 51% were caused by human error and 46% were due to equipment failure.

Studies of spills of hydraulic fracturing fluids or additives provide insights on spill volumes, but little information on chemical-specific spill composition. Among the 151 spills characterized by the EPA, the median volume of fluid spilled was 420 gallons (1,600 liters), although the volumes spilled ranged from 5 gallons (19 liters) to 19,320 gallons (73,130 liters). Spilled fluids were often described as acids, biocides, friction reducers, crosslinkers, gels, and blended hydraulic fracturing fluid, but few specific chemicals were mentioned.[1] Considine et al. (2012) identified spills related to oil and gas development in the Marcellus Shale that occurred between January 2008 and August 2011 from Notices of Violations issued by the Pennsylvania Department of Environmental Protection. The authors identified spills greater than 400 gallons (1,500 liters) and spills less than 400 gallons (1,500 liters).

Spills of hydraulic fracturing fluids or additives have reached, and therefore impacted, surface water resources. Thirteen of the 151 spills characterized by the EPA were reported to have reached a surface water body (often creeks or streams). Among the 13 spills, reported spill volumes ranged from 28 gallons (105 liters) to 7,350 gallons (27,800 liters). Additionally, Brantley et al. (2014) and Considine et al. (2012) identified fewer than 10 total instances of spills of additives and/or hydraulic fracturing fluids greater than 400 gallons (1,500 liters) that reached surface waters in Pennsylvania between January 2008 and June 2013. Reported spill volumes for these spills ranged from 3,400 gallons (13,000 liters) to 227,000 gallons (859,000 liters).

Although impacts on surface water resources have been documented, site-specific studies that could be used to describe factors that affect the frequency or severity of impacts were not available. In the absence of such studies, we relied on fundamental scientific principles to identify factors that affect how hydraulic fracturing fluids and chemicals can move through the environment to drinking water resources. Because these factors influence whether spilled fluids reach groundwater and surface water resources, they affect the frequency and severity of impacts on drinking water resources from spills during the chemical mixing stage of the hydraulic fracturing water cycle.

The potential for spilled fluids to impact groundwater or surface water resources depends on the characteristics of the spill, the environmental fate and transport of the spilled fluid, and spill response activities (Figure ES-5). Site-specific characteristics affect how spilled liquids move through soil into the subsurface or over the land surface. Generally, highly permeable soils or fractured rock can allow spilled liquids to move quickly into and through the subsurface, limiting the opportunity for spilled liquids to move over land to surface water resources. In low permeability soils, spilled liquids are less able to move into the subsurface and are more likely to move over the

---

[1] A crosslinker is an additive that increases the thickness of gelled fluids by connecting polymer molecules in the gelled fluid.

BLM_0047501

land surface. In either case, the volume spilled and the distance between the location of the spill and nearby water resources affects whether spilled liquids reach drinking water resources. Large-volume spills are generally more likely to reach drinking water resources because they are more likely to be able to travel the distance between the location of the spill and nearby water resources.

In general, chemical and physical properties, which depend on the identity and structure of a chemical, control whether spilled chemicals evaporate, stick to soil particles, or move with water. The EPA identified measured or estimated chemical and physical properties for 455 of the 1,084 chemicals used in hydraulic fracturing fluids between 2005 and 2013.[1] The properties of these chemicals varied



Figure ES-5. Generalized depiction of factors that influence whether spilled hydraulic fracturing fluids or additives reach drinking water resources, including spill characteristics, environmental fate and transport, and spill response activities.

---

[1] Chemical and physical properties were identified using EPI Suite™. EPI Suite™ is a collection of chemical and physical property and environmental fate estimation programs developed by the EPA and Syracuse Research Corporation. It can be used to estimate chemical and physical properties of individual organic compounds. Of the 1,084 hydraulic fracturing fluid chemicals identified by the EPA, 629 were not individual organic compounds, and thus EPI Suite™ could not be used to estimate their chemical and physical properties.

BLM_0047502

widely, from chemicals that are more likely to move quickly through the environment with a spilled liquid to chemicals that are more likely to move slowly through the environment because they stick to soil particles.[1] Chemicals that move slowly through the environment may act as longer-term sources of contamination if spilled.

Spill prevention practices and spill response activities are designed to prevent spilled fluids from reaching groundwater or surface water resources and minimize impacts from spilled fluids. Spill prevention and response activities are influenced by federal, state, and local regulations and company practices. Spill prevention practices include secondary containment systems (e.g., liners and berms), which are designed to contain spilled fluids and prevent them from reaching soil, groundwater, or surface water. Spill response activities include activities taken to stop the spill, contain spilled fluids (e.g., the deployment of emergency containment systems), and clean up spilled fluids (e.g., removal of contaminated soil). It was beyond the scope of this report to evaluate the implementation and efficacy of spill prevention practices and spill response activities.

The severity of impacts on water quality from spills of hydraulic fracturing fluids or additives depends on the identity and amount of chemicals that reach groundwater or surface water resources, the toxicity of the chemicals, and the characteristics of the receiving water resource.[2] Characteristics of the receiving groundwater or surface water resource (e.g., water resource size and flow rate) can affect the magnitude and duration of impacts by reducing the concentration of spilled chemicals in a drinking water resource. Impacts on groundwater resources have the potential to be more severe than impacts on surface water resources because it takes longer to naturally reduce the concentration of chemicals in groundwater and because it is generally difficult to remove chemicals from groundwater resources. Due to a lack of data, particularly in terms of groundwater monitoring after spill events, little is publicly known about the severity of drinking water impacts from spills of hydraulic fracturing fluids or additives.

**Chemical Mixing Conclusions**

Spills of hydraulic fracturing fluids and additives during the chemical mixing stage of the hydraulic fracturing water cycle have reached surface water resources in some cases and have the potential to reach groundwater resources. Although the available data indicate that spills of various volumes can reach surface water resources, large volume spills are more likely to travel longer distances to nearby groundwater or surface water resources. Consequently, large volume spills likely increase the frequency of impacts on drinking water resources. Large volume spills, particularly of concentrated additives, are also likely to result in more severe impacts on drinking water resources than small volume spills because they can deliver a large quantity of potentially hazardous chemicals to groundwater or surface water resources. Impacts on groundwater resources are likely to be more severe than impacts on surface water resources because of the inherent characteristics of groundwater. Spill prevention and response activities are designed to prevent spilled fluids from reaching groundwater or surface water resources and minimize impacts from spilled fluids.

---

[1] These results describe how some hydraulic fracturing chemicals behave in infinitely dilute aqueous solutions, which is a simplified approximation of the real-world mixtures found in hydraulic fracturing fluids. The presence of other chemicals in a mixture can affect the fate and transport of a chemical.

[2] Human health hazards associated with hydraulic fracturing fluid chemicals are discussed in Chapter 9 and summarized in the "Chemicals in the Hydraulic Fracturing Water Cycle" section below.

BLM_0047503

# Well Injection

*The injection and movement of hydraulic fracturing fluids through the oil and gas production well and in the targeted rock formation.*



## Relationship to Drinking Water Resources
Belowground pathways, including the production well itself and newly-created fractures, can allow hydraulic fracturing fluids or other fluids to reach underground drinking water resources.

Hydraulic fracturing fluids primarily move along two pathways during the well injection stage: the oil and gas production well and the newly-created fracture network. Oil and gas production wells are designed and constructed to move fluids to and from the targeted rock formation without leaking and to prevent fluid movement along the outside of the well. This is generally accomplished by installing multiple layers of casing and cement within the drilled hole (Text Box ES-2), particularly where the well intersects oil-, gas-, and/or water-bearing rock formations. Casing and cement, in addition to other well components (e.g., packers), can control hydraulic fracturing fluid movement by creating a preferred flow pathway (i.e., inside the casing) and preventing unintentional fluid movement (e.g., from the inside of the casing to the surrounding environment or vertically along the well from the targeted rock formation to shallower formations).[1] An EPA survey of oil and gas production wells hydraulically fractured between approximately September 2009 and September 2010 suggests that hydraulically fractured wells are often, but not always, constructed with multiple casings that have varying amounts of cement surrounding each casing (U.S. EPA, 2015d). Among the wells surveyed, the most common number of casings per well was two: surface casing and production casing (Text Box ES-2). The presence of multiple cemented casings that extend from the ground surface to below the designated drinking water resource is one of the primary well construction features that protects underground drinking water resources.

During hydraulic fracturing, a well is subjected to greater pressure and temperature changes than during any other activity in the life of the well. As hydraulic fracturing fluid is injected into the well, the pressure applied to the well increases until the targeted rock formation fractures; then pressure decreases. Maximum pressures applied to wells during hydraulic fracturing have been reported to range from less than 2,000 pounds per square inch (psi) [14 megapascals (MPa)] to approximately 12,000 psi (83 MPa).[2] A well can also experience temperature changes as cooler hydraulic fracturing fluid enters the warmer well. In some cases, casing temperatures have been observed to drop from 212°F (100°C) to 64°F (18°C). A well can experience multiple pressure and temperature cycles if hydraulic fracturing is done in multiple stages or if a well is re-fractured.[3] Casing, cement, and other well components need to be able to withstand these changes in pressure and temperature, so that hydraulic fracturing fluids can flow to the targeted rock formation without leaking.

The fracture network created during hydraulic fracturing is the other primary pathway along

---

[1] Packers are mechanical devices installed with casing. Once the casing is set in the drilled hole, packers swell to fill the space between the outside of the casing and the surrounding rock or casing.

[2] For comparison, average atmospheric pressure is approximately 15 psi.

[3] In a multi-stage hydraulic fracturing operation, specific parts of the well are isolated and hydraulically fractured until the total desired length of the well has been hydraulically fractured.

23

BLM_0047504

which hydraulic fracturing fluids move. Fracture growth during hydraulic fracturing is complex and depends on the characteristics of the targeted rock formation and the characteristics of the hydraulic fracturing operation. In general, rock characteristics, particularly the natural stresses placed on the targeted rock formation due to the weight of the rock above, affect how the rock fractures, including whether newly-created fractures grow vertically (i.e., perpendicular to the ground surface) or horizontally (i.e., parallel to the ground surface) (Text Box ES-8). Because hydraulic fracturing fluids are used to create and grow fractures, fracture growth during hydraulic fracturing can be controlled by limiting the rate and volume of hydraulic fracturing fluid injected into the well.

Publicly available data on fracture growth are currently limited to microseismic and tiltmeter data collected during hydraulic fracturing operations in five shale plays in the United States. Analyses of these data by Fisher and Warpinski (2012) and Davies et al. (2012) indicate that the direction of fracture growth generally varied with depth and that upward vertical fracture growth was often on the order of tens to hundreds of feet in the shale formations studied (Text Box ES-8). One percent of the fractures had a fracture height greater than 1,148 feet (350 meters), and the maximum fracture height among all of the data reported was 1,929 feet (588 meters). These reported fracture heights suggest that some fractures can grow out of the targeted rock formation and into an overlying formation. It is unknown whether these observations apply to other hydraulically fractured rock formations because similar data from hydraulic fracturing operations in other rock formations are not currently available to the public.

The potential for hydraulic fracturing fluids to reach, and therefore impact, underground drinking water resources is related to the pathways along which hydraulic fracturing fluids primarily move during hydraulic fracturing: the oil and gas production well itself and the fracture network created during hydraulic fracturing. Because the well can be a pathway for fluid movement, the mechanical integrity of the well is an important factor that affects the frequency and severity of impacts from the well injection stage of the hydraulic fracturing water cycle.[1] A well with insufficient mechanical integrity can allow unintended fluid movement, either from the inside to the outside of the well (pathway 1 in Figure ES-6) or vertically along the outside of the well (pathways 2-5). The existence of one or more of these pathways can result in impacts on drinking water resources if hydraulic fracturing fluids reach groundwater resources. Impacts on drinking water resources can also occur if gases or liquids released from the targeted rock formation or other formations during hydraulic fracturing travel along these pathways to groundwater resources.

The pathways shown in Figure ES-6 can exist because of inadequate well design or construction (e.g., incomplete cement around the casing where the well intersects with water-, oil-, or gas-bearing formations) or can develop over the well's lifetime, including during hydraulic fracturing. In particular, casing and cement can degrade over the life of the well because of exposure to corrosive chemicals, formation stresses, and operational stresses (e.g., pressure and temperature changes during hydraulic fracturing). As a result, some hydraulically fractured oil and gas production wells may develop one or more of the pathways shown in Figure ES-6. Changes in mechanical integrity over time have implications for older wells that are hydraulically fractured because these wells may not be able to withstand the stresses applied during hydraulic fracturing. Older wells may also be hydraulically fractured at shallower depths, where cement around the casing may be inadequate or missing.

Examples of mechanical integrity problems have been documented in hydraulically fractured oil and gas production wells. In one case, hydraulic

---

[1] Mechanical integrity is the absence of significant leakage within or outside of the well components.

BLM_0047505

## Text Box ES-8: Fracture Growth

Fracture growth during hydraulic fracturing is complex and depends on the characteristics of the targeted rock formation and the characteristics of the hydraulic fracturing operation.

### Primary Direction of Fracture Growth

In general, the weight of the rock above the point of hydraulic fracturing affects the primary direction of fracture growth. Therefore, the depth at which hydraulic fracturing occurs affects whether fractures grow vertically or horizontally.



When hydraulic fracturing occurs at depths less than approximately 2,000 feet, the primary direction of fracture growth is horizontal, or parallel to the ground surface.



When hydraulic fracturing occurs at depths greater than approximately 2,000 feet, the primary direction of fracture growth is vertical, or perpendicular to the ground surface.

### Fracture Height

Fisher and Warpinski (2012) and Davies et al. (2012) analyzed microseismic and tiltmeter data collected during thousands of hydraulic fracturing operations in the Barnett, Eagle Ford, Marcellus, Niobrara, and Woodford shale plays. Their data provide information on fracture heights in shale. Top fracture heights varied between shale plays and within individual shale plays.



The **top fracture height** is the vertical distance upward from the well, between the fracture tip and the well.





Source: Davies et al. (2012)

| Shale Play | Approximate Median Top Fracture Height [feet (meters)] |
|---|---|
| Eagle Ford | 130 (40) |
| Woodford | 160 (50) |
| Barnett | 200 (60) |
| Marcellus | 400 (120) |
| Niobrara | 160 (50) |

25



**Figure ES-6. Potential pathways for fluid movement in a cemented well. These pathways (represented by the white arrows) include: (1) a casing and tubing leak into the surrounding rock, (2) an uncemented annulus (i.e., the space behind the casing), (3) microannuli between the casing and cement, (4) gaps in cement due to poor cement quality, and (5) microannuli between the cement and the surrounding rock. This figure is intended to provide a conceptual illustration of pathways that can be present in a well and is not to scale.**

fracturing of an inadequately cemented gas well in Bainbridge Township, Ohio, contributed to the movement of methane into local drinking water resources.[1] In another case, an inner string of casing burst during hydraulic fracturing of an oil well near Killdeer, North Dakota, resulting in a release of hydraulic fracturing fluids and formation fluids that impacted a groundwater resource.

The potential for hydraulic fracturing fluids or other fluids to reach underground drinking water resources is also related to the fracture network created during hydraulic fracturing. Because fluids

---

[1] Although ingestion of methane is not considered to be toxic, methane can pose a physical hazard. Methane can accumulate to explosive levels when allowed to exsolve (degas) from groundwater in closed environments.

BLM_0047507

travel through the newly-created fractures, the location of these fractures relative to underground drinking water resources is an important factor affecting the frequency and severity of potential impacts on drinking water resources. Data on the relative location of induced fractures to underground drinking water resources are generally not available, because fracture networks are infrequently mapped and because there can be uncertainty in the depth of the bottom of the underground drinking water resource at a specific location.

Without these data, we were often unable to determine with certainty whether fractures created during hydraulic fracturing have reached underground drinking water resources. Instead, we considered the vertical separation distance between hydraulically fractured rock formations and the bottom of underground drinking water resources. Based on computer modeling studies, Birdsell et al. (2015) concluded that it is less likely that hydraulic fracturing fluids would reach an overlying drinking water resource if (1) the vertical separation distance between the targeted rock formation and the drinking water resource is large and (2) there are no open pathways (e.g., natural faults or fractures, or leaky wells). As the vertical separation distance between the targeted rock formation and the underground drinking water resource decreases, the likelihood of upward migration of hydraulic fracturing fluids to the drinking water resource increases (Birdsell et al., 2015).

Figure ES-7 illustrates how the vertical separation distance between the targeted rock formation and underground drinking water resources can vary across the United States. The two example environments depicted in panels a and b represent the range of separation distances shown in panel c. In Figure ES-7a, there are thousands of feet between the bottom of the underground drinking water resource and the hydraulically fractured rock formation. These conditions are generally reflective of deep shale formations (e.g., Haynesville Shale),

where oil and gas production wells are first drilled vertically and then horizontally along the targeted rock formation. Microseismic data and modeling studies suggest that, under these conditions, fractures created during hydraulic fracturing are unlikely to grow through thousands of feet of rock into underground drinking water resources.

When drinking water resources are co-located with oil and gas resources and there is no vertical separation between the hydraulically fractured rock formation and the bottom of the underground drinking water resource (Figure ES-7b), the injection of hydraulic fracturing fluids impacts the quality of the drinking water resource. According to the information examined in this report, the overall occurrence of hydraulic fracturing within a drinking water resource appears to be low, with the activity generally concentrated in some areas in the western United States (e.g., the Wind River Basin near Pavillion, Wyoming, and the Powder River Basin of Montana and Wyoming).[1] Hydraulic fracturing within drinking water resources introduces hydraulic fracturing fluid into formations that may currently serve, or in the future could serve, as a drinking water source for public or private use. This is of concern in the short-term if people are currently using these formations as a drinking water supply. It is also of concern in the long-term, because drought or other conditions may necessitate the future use of these formations for drinking water.

Regardless of the vertical separation between the targeted rock formation and the underground drinking water resource, the presence of other wells near hydraulic fracturing operations can increase the potential for hydraulic fracturing fluids or other subsurface fluids to move to drinking water resources. There have been cases in which hydraulic fracturing at one well has affected a nearby oil and gas well or its fracture network, resulting in unexpected pressure increases at the nearby well, damage to the nearby well, or spills at the surface of the nearby well. These well communication events, or "frac hits,"

[1] Section 6.3.2 in Chapter 6.

27

BLM_0047508



**Figure ES-7. Examples of different subsurface environments in which hydraulic fracturing takes place. In panel a, there are thousands of feet between the base of the underground drinking water resource and the part of the well that is hydraulically fractured. Panel b illustrates the co-location of ground water and oil and gas resources. In these types of situations, there is no separation between the shallowest point of hydraulic fracturing within the well and the bottom of the underground drinking water resource. Panel c shows the estimated distribution of separation distances for approximately 23,000 oil and gas production wells hydraulically fractured by nine service companies between 2009 and 2019 (U.S. EPA, 2015d). The separation distance is the distance along the well between the point of shallowest hydraulic fracturing in the well and the base of the protected groundwater resource (illustrated in panel a). The error bars in panel c display 95% confidence intervals.**

have been reported in New Mexico, Oklahoma, and other locations. Based on the available information, frac hits most commonly occur when multiple wells are drilled from the same surface location and when wells are spaced less than 1,100 feet (335 meters) apart. Frac hits have also been observed at wells up to 8,422 feet (2,567 meters) away from a well undergoing hydraulic fracturing.

Abandoned wells near a well undergoing hydraulic fracturing can provide a pathway for vertical fluid movement to drinking water resources if those wells were not properly plugged or if the plugs and cement have degraded over time. For example,

an abandoned well in Pennsylvania produced a 30-foot (9-meter) geyser of brine and gas for more than a week after hydraulic fracturing of a nearby gas well. The potential for fluid movement along abandoned wells may be a significant issue in areas with historic oil and gas exploration and production. Various studies estimate the number of abandoned wells in the United States to be significant. For instance, the Interstate Oil and Gas Compact Commission estimates that over 1 million wells were drilled in the United States prior to the enactment of state oil and gas regulations (IOGCC, 2008). The location and condition of many of these wells are unknown,

28

and some states have programs to find and plug abandoned wells.

**Well Injection Conclusions**

Impacts on drinking water resources associated with the well injection stage of the hydraulic fracturing water cycle have occurred in some instances. In particular, mechanical integrity failures have allowed gases or liquids to move to underground drinking water resources. Additionally, hydraulic fracturing has occurred within underground drinking water resources in parts of the United States. This practice introduces hydraulic fracturing fluids into underground drinking water resources. Consequently, the mechanical integrity of the well and the vertical separation distance between the targeted rock formation and underground drinking water resources are important factors that affect the frequency and severity of impacts on drinking water resources. The presence of multiple layers of cemented casing and thousands of feet of rock between hydraulically fractured rock formations and underground drinking water resources can reduce the frequency of impacts on drinking water resources during the well injection stage of the hydraulic fracturing water cycle.

# Produced Water Handling

*The on-site collection and handling of water that returns to the surface after hydraulic fracturing and the transportation of that water for disposal or reuse.*



<u>Relationship to Drinking Water Resources</u>
Spills of produced water can reach groundwater and surface water resources.

After hydraulic fracturing, the injection pressure applied to the oil or gas production well is released, and the direction of fluid flow reverses, causing fluid to flow out of the well. The fluid that initially returns to the surface after hydraulic fracturing is mostly hydraulic fracturing fluid and is sometimes called "flowback" (Text Box ES-9). As time goes on, the fluid that returns to the surface contains water and economic quantities of oil and/or gas that are separated and collected. Water that returns to the surface during oil and gas production is similar in composition to the fluid naturally found in the targeted rock formation and is typically called "produced water." The term "produced water" is also used to refer to any water, including flowback, that returns to the surface through the production well as a by-product of oil and gas production. This latter definition of "produced water" is used in this report.

Produced water can contain many constituents, depending on the composition of the injected hydraulic fracturing fluid and the type of rock hydraulically fractured. Knowledge of the chemical composition of produced water comes from the collection and analysis of produced water samples, which often requires advanced laboratory equipment and techniques that can detect and quantify chemicals in produced water. In general, produced water has been found to contain:

- Salts, including those composed from chloride, bromide, sulfate, sodium, magnesium, and calcium;
- Metals, including barium, manganese, iron, and strontium;
- Naturally-occurring organic compounds, including benzene, toluene, ethylbenzene, xylenes (BTEX), and oil and grease;
- Radioactive materials, including radium; and
- Hydraulic fracturing chemicals and their chemical transformation products.

The amount of these constituents in produced water varies across the United States, both within

29

BLM_0047510



**Text Box ES-9: Produced Water from Hydraulically Fractured Oil and Gas Production Wells**

Water of varying quality is a byproduct of oil and gas production. The composition and volume of produced water varies by well, rock formation, and time after hydraulic fracturing. Produced water can contain hydraulic fracturing fluid, formation water, and chemical transformation products.

Produced Water

**Hydraulic Fracturing Fluid**
Base fluid, proppant, and additives in hydraulic fracturing fluids.

**Chemical Transformation Products**
New chemicals that are formed when chemicals in hydraulic fracturing fluids undergo chemical reactions, degrade, or transform.

**Formation Water**
Water naturally found in the pore spaces of the targeted rock formation. Formation water is often salty and can have different amounts and types of metals, radioactive materials, hydrocarbons (e.g., oil and gas), and other chemicals.

**Water Produced Immediately After Hydraulic Fracturing**

Generally, the fluid that initially returns to the surface is mostly a mixture of the injected hydraulic fracturing fluid and its reaction and degradation products.

**Water Produced During Oil or Gas Production**

The fluid that returns to the surface when oil and/or gas is produced generally resembles the formation water.

Produced Water (Also called "flowback")

Produced Water

The volume of water produced per day immediately after hydraulic fracturing is generally greater than the volume of water produced per day when the well is also producing oil and/or gas.

and among different rock formations. Produced water from shale and tight gas formations is typically very salty compared to produced water from coalbed methane formations. For example, the salinity of produced water from the Marcellus Shale has been reported to range from less than 1,500 milligrams per liter (mg/L) of total dissolved solids to over 300,000 mg/L, while produced water from coalbed methane formations has been reported to range from 170 mg/L of total dissolved solids to nearly 43,000 mg/L.[1] Shale and sandstone formations also commonly contain radioactive materials, including uranium, thorium, and radium. As a result, radioactive materials have been detected in produced water from these formations.

Produced water volumes can vary by well, rock formation, and time after hydraulic fracturing. Vol-

[1] For comparison, the average salinity of seawater is approximately 35,000 mg/L of total dissolved solids.

30

BLM_0047511

umes are often described in terms of the volume of hydraulic fracturing fluid used to fracture the well. For example, Figure ES-4 shows that wells in the Marcellus Shale typically produce 10-30% of the volume injected in the first 10 years after hydraulic fracturing. In comparison, some wells in the Barnett Shale have produced 100% of the volume injected in the first three years.

Because of the large volumes used for hydraulic fracturing [about 4 million gallons (15 million liters) per well in the Marcellus Shale and the Barnett Shale], hundreds of thousands to millions of gallons of produced water need to be collected and handled at the well site. The volume of water produced per day generally decreases with time, so the volumes handled on site immediately after hydraulic fracturing can be much larger than the volumes handled when the well is producing oil and/or gas (Text Box ES-9).

Produced water flows from the well to on-site tanks or pits through a series of pipes or flowlines (Text Box ES-10) before being transported offsite via trucks or pipelines for disposal or reuse. While produced water collection, storage, and transportation systems are designed to contain produced water, spills can occur. Changes in drinking water quality can occur if produced water spills reach groundwater or surface water resources.

Produced water spills have been reported across the United States. Median spill volumes among the datasets reviewed for this report ranged from approximately 340 gallons (1,300 liters) to 1,000 gallons (3,800 liters) per spill.[1] There were, however, a small number of large volume spills. In North Dakota, for example, there were 12 spills greater than 21,000 gallons (79,500 liters), five spills greater than 42,000 gallons (160,000 liters), and one spill of 2.9 million gallons (11 million liters) in 2015. Common causes of produced water spills included human error and equipment leaks or failures. Common sources of pro-

duced water spills included hoses or lines and storage equipment.

Spills of produced water have reached groundwater and surface water resources. In U.S. EPA (2015c), 30 of the 225 (13%) produced water spills characterized were reported to have reached surface water (e.g., creeks, ponds, or wetlands), and one was reported to have reached groundwater. Of the spills that were reported to have reached surface water, reported spill volumes ranged from less than 170 gallons (640 liters) to almost 74,000 gallons (280,000 liters). A separate assessment of produced water spills reported to the California Office of Emergency Services between January 2009 and December 2014 reported that 18% of the spills impacted waterways (CCST, 2015).

Documented cases of water resource impacts from produced water spills provide insights into the types of impacts that can occur. In most of the cases reviewed for this report, documented impacts included elevated levels of salinity in groundwater and/or surface water resources.[2] For example, the largest produced water spill reported in this report occurred in North Dakota in 2015, when approximately 2.9 million gallons (11 million liters) of produced water spilled from a broken pipeline. The spilled fluid flowed into Blacktail Creek and increased the concentration of chloride and the electrical conductivity of the creek; these observations are consistent with an increase in water salinity. Elevated levels of electrical conductivity and chloride were also found downstream in the Little Muddy River and the Missouri River. In another example, pits holding flowback fluids overflowed in Kentucky in 2007. The spilled fluid reached the Acorn Fork Creek, decreasing the pH of the creek and increasing the electrical conductivity.

Site-specific studies of historical produced water releases highlight the role of local geology in the movement of produced water through the environ-

---

[1] See Section 7.4 in Chapter 7.

[2] Groundwater impacts from produced water management practices are described in Chapter 8 and summarized in the "Wastewater Disposal and Reuse" section below.

BLM_0047512

**Text Box ES-10: On-Site Storage of Produced Water**

Water that returns to the surface after hydraulic fracturing is collected and stored on site in pits or tanks.





Above: Flowback pit. (Source: U.S. DOE/NETL)
Right: Flowback tanks. (Source: U.S. EPA)




**Produced Water Storage Immediately after Hydraulic Fracturing**

After hydraulic fracturing, water is returned to the surface. Water initially produced from the well after hydraulic fracturing is sometimes called "flowback." This water can be stored onsite in tanks or pits before being taken offsite for injection in Class II wells, reuse in other hydraulic fracturing operations, or aboveground disposal.

*Source: Adapted from Olson (2011) and BJ Services Company (2009)*

**Produced Water Storage During Oil or Gas Production**

Water is generally produced throughout the life of an oil and gas production well. During oil and gas production, the equipment on the well pad often includes the wellhead and storage tanks or pits for gas, oil, and produced water.





Above: Produced water storage pit. (Source: U.S. EPA)
Left: Produced water storage tanks. (Source: U.S. EPA)

32

ment. Whittemore (2007) described a site in Kansas where low permeability soils and rock caused produced water to primarily flow over the land surface to nearby surface water resources, reducing the amount of produced water that infiltrated soil. In contrast, Otton et al. (2007) explored the release of produced water and oil from two pits in Oklahoma. In this case, produced water from the pits flowed through thin soil and into the underlying, permeable rock. Produced water was also identified in deeper, less permeable rock. The authors suggest that produced water moved into the deeper, less permeable rock through natural fractures. Together, these studies highlight the role of preferential flow paths (i.e., paths of least resistance) in the movement of produced water through the environment.

Spill response activities likely reduce the severity of impacts on groundwater and surface water resources from produced water spills. For example, in the North Dakota example noted above, absorbent booms were placed in the affected creek and contaminated soil and oil-coated ice were removed from the site. In another example, a pipeline leak in Pennsylvania spilled approximately 11,000 gallons (42,000 liters) of produced water, which flowed into a nearby stream. In response, the pipeline was shut off, a dam was constructed to contain the spilled produced water, water was removed from the stream, and the stream was flushed with fresh water. In both examples, it was not possible to quantify how spill response activities reduced the severity of impacts on groundwater or surface water resources. However, actions taken after the spills were designed to stop produced water from entering the environment (e.g., shutting off a pipeline), remove produced water from the environment (e.g., using absorbent booms), and reduce the concentration of produced water

constituents introduced into water resources (e.g., flushing a stream with fresh water).

The severity of impacts on water quality from spills of produced water depends on the identity and amount of produced water constituents that reach groundwater or surface water resources, the toxicity of those constituents, and the characteristics of the receiving water resource.[1] In particular, spills of produced water can have high levels of total dissolved solids, which affects how the spilled fluid moves through the environment. When a spilled fluid has greater levels of total dissolved solids than groundwater, the higher-density fluid can move downward through groundwater resources. Depending on the flow rate and other properties of the groundwater resource, impacts from produced water spills can last for years.

**Produced Water Handling Conclusions**

Spills of produced water during the produced water handling stage of the hydraulic fracturing water cycle have reached groundwater and surface water resources in some cases. Several cases of water resource impacts from produced water spills suggest that impacts are characterized by increases in the salinity of the affected groundwater or surface water resource. In the absence of direct pathways to groundwater resources (e.g., fractured rock), large volume spills are more likely to travel further from the site of the spill, potentially to groundwater or surface water resources. Additionally, saline produced water can migrate downward through soil and into groundwater resources, leading to longer-term groundwater contamination. Spill prevention and response activities can prevent spilled fluids from reaching groundwater or surface water resources and minimize impacts from spilled fluids.

---

[1] Human health hazards associated with chemicals detected in produced water are discussed in Chapter 9 and summarized in the "Chemicals in the Hydraulic Fracturing Water Cycle" section below.

BLM_0047514

# Wastewater Disposal and Reuse

*The disposal and reuse of hydraulic fracturing wastewater.*



### Relationship to Drinking Water Resources

Disposal practices can release inadequately treated or untreated hydraulic fracturing wastewater to groundwater and surface water resources.

In general, produced water from hydraulically fractured oil and gas production wells is managed through injection in Class II wells, reuse in other hydraulic fracturing operations, or various aboveground disposal practices (Text Box ES-11). In this report, produced water from hydraulically fractured oil and gas wells that is being managed through one of the above management strategies is referred to as "hydraulic fracturing wastewater." Wastewater management choices are affected by cost and other factors, including: the local availability of disposal methods; the quality of produced water; the volume, duration, and flow rate of produced water; federal, state, and local regulations; and well operator preferences.

Available information suggests that hydraulic fracturing wastewater is mostly managed through injection in Class II wells. Veil (2015) estimated that 93% of produced water from the oil and gas industry was injected in Class II wells in 2012. Although this estimate included produced water from oil and gas wells in general, it is likely indicative of nationwide management practices for hydraulic fracturing wastewater. Disposal of hydraulic fracturing wastewater in Class II wells is often cost-effective, especially when a Class II disposal well is located within a reasonable distance from a hydraulically fractured oil or gas production well. In particular, large numbers of active Class II disposal wells are found in Texas (7,876), Kansas (5,516), Oklahoma (3,837), Louisiana (2,448), and Illinois (1,054) (U.S. EPA, 2016). Disposal of hydraulic fracturing wastewater in Class II wells has been associated with earthquakes in several states, which may reduce the availability of injection in Class II wells as a wastewater disposal option in these states.

Nationwide, aboveground disposal and reuse of hydraulic fracturing wastewater are currently practiced to a much lesser extent compared to injection in Class II wells, and these management strategies appear to be concentrated in certain parts of the United States. For example, approximately 90% of hydraulic fracturing wastewater from Marcellus Shale gas wells in Pennsylvania was reused in other hydraulic fracturing operations in 2013 (Figure ES-4a). Reuse in hydraulic fracturing operations is practiced in some other areas of the United States as well, but at lower rates (approximately 5-20%). Evaporation ponds and percolation pits have historically been used in the western United States to manage produced water from the oil and gas industry and have likely been used to manage hydraulic fracturing wastewater. Percolation pits, in particular, were commonly reported to have been used to manage produced water from stimulated wells in Kern County, California, between 2011 and 2014.[1] Beneficial uses (e.g., livestock watering and irrigation) are also practiced in the western United States if the water quality is considered acceptable, although available data on the use of these practices are incomplete.

Aboveground disposal practices generally release treated or, under certain conditions, untreated wastewater directly to surface water or the land surface (e.g., wastewater treatment facilities, evaporation pits, or irrigation). If released to the land surface,

---

[1] Hydraulic fracturing was the predominant stimulation practice. Other stimulation practices included acid fracturing and matrix acidizing. California updated its regulations in 2015 to prohibit the use of percolation pits for the disposal of fluids produced from stimulated wells.

34

**Text Box ES-11: Hydraulic Fracturing Wastewater Management**

Produced water from hydraulically fractured oil and gas production wells is often, but not always, considered a waste product to be managed. Hydraulic fracturing wastewater (i.e., produced water from hydraulically fractured wells) is generally managed through injection in Class II wells, reuse in other hydraulic fracturing operations, and various aboveground disposal practices.

**Injection in Class II Wells**

Most oil and gas wastewater—including hydraulic fracturing wastewater—is injected in Class II wells, which are regulated under the Underground Injection Control Program of the Safe Drinking Water Act.



Class II wells are used to inject wastewater associated with oil and gas production underground. Fluids can be injected for disposal or to enhance oil or gas production from nearby oil and gas production wells.

**Reuse in Other Hydraulic Fracturing Operations**

Hydraulic fracturing wastewater can be used, in combination with fresh water, to make up hydraulic fracturing fluids at nearby hydraulic fracturing operations.



Reused Hydraulic Fracturing Wastewater

Reuse in other hydraulic fracturing operations depends on the quality and quantity of the available wastewater, the cost associated with treatment and transportation of the wastewater, and local water demand for hydraulic fracturing.

**Aboveground Disposal Practices**

Aboveground disposal of treated and untreated hydraulic fracturing wastewater can take many forms, including release to surface water resources and land application.

Some **wastewater treatment facilities** treat hydraulic fracturing wastewater and release the treated wastewater to surface water. Solid or liquid by-products of the treatment process can be sent to landfills or injected underground.



**Evaporation ponds** and **percolation pits** can be used for hydraulic fracturing wastewater disposal. Evaporation ponds allow liquid waste to naturally evaporate. Percolation pits allow wastewater to move into the ground, although this practice has been discontinued in most states.

Federal and state regulations affect aboveground disposal management options. For example, existing federal regulations generally prevent the direct release of wastewater pollutants to waters of the United States from onshore oil and gas extraction facilities east of the 98th meridian. However, in the arid western portion of the continental United States (west of the 98th meridian), direct discharges of wastewater from onshore oil and gas extraction facilities to waters of the United States may be permitted if the produced water has a use in agriculture or wildlife propagation and meets established water quality criteria when discharged.

35

BLM_0047516

treated or untreated wastewater can move through soil to groundwater resources. Because the ultimate fate of the wastewater can be groundwater or surface water resources, the aboveground disposal of hydraulic fracturing wastewater, in particular, can impact drinking water resources.

Impacts on drinking water resources from the aboveground disposal of hydraulic fracturing wastewater have been documented. For example, early wastewater management practices in the Marcellus Shale region in Pennsylvania included the use of wastewater treatment facilities that released (i.e., discharged) treated wastewater to surface waters (Figure ES-8). The wastewater treatment facilities were unable to adequately remove the high levels of total dissolved solids found in produced water from Marcellus Shale gas wells, and the discharges con-

tributed to elevated levels of total dissolved solids (particularly bromide) in the Monongahela River Basin. In the Allegheny River Basin, elevated bromide levels were linked to increases in the concentration of hazardous disinfection byproducts in at least one downstream drinking water facility and a shift to more toxic brominated disinfection byproducts.[1] In response, the Pennsylvania Department of Environmental Protection revised existing regulations to prevent these discharges and also requested that oil and gas operators voluntarily stop bringing certain kinds of hydraulic fracturing wastewater to facilities that discharge inadequately treated wastewater to surface waters.[2]

The scientific literature and recent data from the Pennsylvania Department of Environmental Protection suggest that other produced water constituents



*Data from the Pennsylvania Department of Environmental Protection (2015).*

**Figure ES-8. Changes in wastewater management practices over time in the Marcellus Shale area of Pennsylvania.**

---

[1] Disinfection byproducts form through chemical reactions between organic material and disinfectants, which are used in drinking water treatment. Human health hazards associated with disinfection byproducts are described in Section 9.5.6 in Chapter 9.

[2] See Text Box 8-1 in Chapter 8.

BLM_0047517

(e.g., barium, strontium, and radium) may have been introduced to surface waters through the release of inadequately treated hydraulic fracturing wastewater. In particular, radium has been detected in stream sediments at or near wastewater treatment facilities that discharged inadequately treated hydraulic fracturing wastewater. Such sediments can migrate if they are disturbed during dredging or flood events. Additionally, residuals from the treatment of hydraulic fracturing wastewater (i.e., the solids or liquids that remain after treatment) are concentrated in the constituents removed during treatment, and these residuals can impact groundwater or surface water resources if they are not managed properly.

Impacts on groundwater and surface water resources from current and historic uses of lined and unlined pits, including percolation pits, in the oil and gas industry have been documented. For example, Kell (2011) reported 63 incidents of non-public water supply contamination from unlined or inadequately constructed pits in Ohio between 1983 and 2007, and 57 incidents of groundwater contamination from unlined produced water disposal pits in Texas prior to 1984. Other cases of impacts have been identified in several states, including New Mexico, Oklahoma, Pennsylvania, and Wyoming.[1] Impacts among these cases included the detection of volatile organic compounds in groundwater resources, wastewater reaching surface water resources from pit overflows, and wastewater reaching groundwater resources through liner failures. Based on documented impacts on groundwater resources from unlined pits, many states have implemented regulations that prohibit percolation pits or unlined storage pits for either hydraulic fracturing wastewater or oil and gas wastewater in general.

The severity of impacts on drinking water resources from the aboveground disposal of hydraulic fracturing wastewater depends on the volume and quality of the discharged wastewater and the characteristics of the receiving water resource. In general, large surface water resources with high flow rates can reduce the severity of impacts through dilution, although impacts may not be eliminated. In contrast, groundwater is generally slow moving, which can lead to an accumulation of hydraulic fracturing wastewater contaminants in groundwater from continuous or repeated discharges to the land surface; the resulting contamination can be long-lasting. The severity of impacts on groundwater resources will also be influenced by soil and sediment properties and other factors that control the movement or degradation of wastewater constituents.

**Wastewater Disposal and Reuse Conclusions**

The aboveground disposal of hydraulic fracturing wastewater has impacted the quality of groundwater and surface water resources in some instances. In particular, discharges of inadequately treated hydraulic fracturing wastewater to surface water resources have contributed to elevated levels of hazardous disinfection byproducts in at least one downstream drinking water system. Additionally, the use of lined and unlined pits for the storage or disposal of oil and gas wastewater has impacted surface and groundwater resources. Unlined pits, in particular, provide a direct pathway for contaminants to reach groundwater. Wastewater management is dynamic, and recent changes in state regulations and practices have been made to limit impacts on groundwater and surface water resources from the aboveground disposal of hydraulic fracturing wastewater.

[1] See Section 8.4.5 in Chapter 8.

BLM_0047518

# Chemicals in the Hydraulic Fracturing Water Cycle

Chemicals are present in the hydraulic fracturing water cycle. During the chemical mixing stage of the hydraulic fracturing water cycle, chemicals are intentionally added to water to alter its properties for hydraulic fracturing (Text Box ES-6). Produced water, which is collected, handled, and managed in the last two stages of the hydraulic fracturing water cycle, contains chemicals added to hydraulic fracturing fluids, naturally occurring chemicals found in hydraulically fractured rock formations, and any chemical transformation products (Text Box ES-9). By evaluating available data sources, we compiled a list of 1,606 chemicals that are associated with the hydraulic fracturing water cycle, including 1,084 chemicals reported to have been used in hydraulic fracturing fluids and 599 chemicals detected in produced water. This list represents a national analysis; an individual well would likely have a fraction of the chemicals on this list and may have other chemicals that were not included on this list.

In many stages of the hydraulic fracturing water cycle, the severity of impacts on drinking water resources depends, in part, on the identity and amount of chemicals that enter the environment. The properties of a chemical influence how it moves and transforms in the environment and how it interacts with the human body. Therefore, some chemicals in the hydraulic fracturing water cycle are of more concern than others because they are more likely to move with water (e.g., spilled hydraulic fracturing fluid) to drinking water resources, persist in the environment (e.g., chemicals that do not degrade), and/or affect human health.

Evaluating potential hazards from chemicals in the hydraulic fracturing water cycle is most useful at local and/or regional scales because chemical use for hydraulic fracturing can vary from well to well and because the characteristics of produced water are influenced by the geochemistry of hydraulically fractured rock formations. Additionally, site-specific characteristics (e.g., the local landscape, and soil and subsurface permeability) can affect whether and how chemicals enter drinking water resources, which influences how long people may be exposed to specific chemicals and at what concentrations. As a first step for informing site-specific risk assessments, the EPA compiled toxicity values for chemicals in the hydraulic fracturing water cycle from federal, state, and international sources that met the EPA's criteria for inclusion in this report.[1,2]

The EPA was able to identify chronic oral toxicity values from the selected data sources for 98 of the 1,084 chemicals that were reported to have been used in hydraulic fracturing fluids between 2005 and 2013. Potential human health hazards associated with chronic oral exposure to these chemicals include cancer, immune system effects, changes in body weight, changes in blood chemistry, cardiotoxicity, neurotoxicity, liver and kidney toxicity, and reproductive and developmental toxicity. Of the chemicals most frequently reported to FracFocus 1.0, nine had toxicity values from the selected data sources (Table ES-3). Critical effects for these chemicals include kidney/renal toxicity, hepatotoxicity, developmental toxicity (extra cervical ribs), reproductive toxicity, and decreased terminal body weight.

---

[1] Specifically, the EPA compiled noncancer oral reference values and cancer oral slope factors (Chapter 9). A reference value describes the dose of a chemical that is likely to be without an appreciable risk of adverse health effects. In the context of this report, the term "reference value" generally refers to reference values for noncancer effects occurring via the oral route of exposure and for chronic durations. An oral slope factor is an upper-bound estimate on the increased cancer risk from a lifetime oral exposure to an agent.

[2] The EPA's criteria for inclusion in this report are described in Section 9.4.1 in Chapter 9. Sources of information that met these criteria are listed in Table 9-1 of Chapter 9.

BLM_0047519

Table ES-3. Available chronic oral reference values for hydraulic fracturing chemicals reported in 10% or more of disclosures in FracFocus 1.0.

| Chemical Name (CASRN)[a] | Chronic Oral Reference Value (milligrams per kilogram per day) | Critical Effect | Percent of FracFocus 1.0 Disclosures[b] |
|---|---|---|---|
| Propargyl alcohol (107-19-7) | 0.002[c] | Renal and hepatotoxicity | 33 |
| 1,2,4-Trimethylbenzene (95-63-6) | 0.01[c] | Decreased pain sensitivity | 13 |
| Naphthalene (91-20-3) | 0.02[c] | Decreased terminal body weight | 19 |
| Sodium chlorite (7758-19-2) | 0.03[c] | Neuro-developmental effects | 11 |
| 2-Butoxyethanol (111-76-2) | 0.1[c] | Hemosiderin deposition in the liver | 23 |
| Quaternary ammonium compounds, benzyl-C12-16-alkyldimethyl, chlorides (68424-85-1) | 0.44[d] | Decreased body weight and weight gain | 12 |
| Formic acid (64-18-6) | 0.9[e] | Reproductive toxicity | 11 |
| Ethylene glycol (107-21-1) | 2[c] | Kidney toxicity | 47 |
| Methanol (67-56-1) | 2[c] | Extra cervical ribs | 73 |

[a]"Chemical" refers to chemical substances with a single CASRN; these may be pure chemicals (e.g., methanol) or chemical mixtures (e.g., hydrotreated light petroleum distillates).
[b]Analysis considered 35,957 disclosures that met selected quality assurance criteria. See Table 9-2 in Chapter 9.
[c]From the EPA Integrated Risk Information System database.
[d]From the EPA Human Health Benchmarks for Pesticides database.
[e]From the EPA Provisional Peer-Reviewed Toxicity Value database.

Chronic oral toxicity values from the selected data sources were identified for 120 of the 599 chemicals detected in produced water. Potential human health hazards associated with chronic oral exposure to these chemicals include liver toxicity, kidney toxicity, neurotoxicity, reproductive and developmental toxicity, and carcinogenesis. Chemical-specific toxicity values are included in Chapter 9.

**Chemicals in the Hydraulic Fracturing Water Cycle Conclusions**

Some of the chemicals in the hydraulic fracturing water cycle are known to be hazardous to human health. Of the 1,606 chemicals identified by the EPA, 173 had chronic oral toxicity values from federal, state, and international sources that met the EPA's criteria for inclusion in this report. These data alone, however, are insufficient to determine which chemicals have the greatest potential to impact drinking water resources and human health. To understand whether specific chemicals can affect human health through their presence in drinking water, data on chemical concentrations in drinking water would be needed. In the absence of these data, relative hazard potential assessments could be conducted at local and/or regional scales using the multi-criteria decision analysis approach outlined in Chapter 9. This approach combines available chemical occurrence data with selected chemical, physical, and toxicological properties to place the severity of potential impacts (i.e., the toxicity of specific chemicals) into the context of factors that affect the likelihood of impacts (i.e., frequency of use, and chemical and physical properties relevant to environmental fate and transport).

BLM_0047520

# Data Gaps and Uncertainties

The information reviewed for this report included cases of impacts on drinking water resources from activities in the hydraulic fracturing water cycle. Using these cases and other data, information, and analyses, we were able to identify factors that likely result in more frequent or more severe impacts on drinking water resources. However, there were instances in which we were unable to form conclusions about the potential for activities in the hydraulic fracturing water cycle to impact drinking water resources and/or the factors that influence the frequency or severity of impacts. Below, we provide perspective on the data gaps and uncertainties that prevented us from drawing additional conclusions about the potential for impacts on drinking water resources and/or the factors that affect the frequency and severity of impacts.

In general, comprehensive information on the location of activities in the hydraulic fracturing water cycle is lacking, either because it is not collected, not publicly available, or prohibitively difficult to aggregate. This includes information on the:

- Above- and belowground locations of water withdrawals for hydraulic fracturing;
- Surface locations of hydraulically fractured oil and gas production wells, where the chemical mixing, well injection, and produced water handling stages of the hydraulic fracturing water cycle take place;
- Belowground locations of hydraulic fracturing, including data on fracture growth; and
- Locations of hydraulic fracturing wastewater management practices, including the disposal of treatment residuals.

There can also be uncertainty in the location of drinking water resources. In particular, depths of groundwater resources that are, or in the future could be, used for drinking water are not always known. If comprehensive data about the locations of both drinking water resources and activities in the hydraulic fracturing water cycle were available, it would have been possible to more completely identify areas in the United States in which hydraulic fracturing-related activities either directly interact with drinking water resources or have the potential to interact with drinking water resources.

In places where we know activities in the hydraulic fracturing water cycle have occurred or are occurring, data that could be used to characterize the presence, migration, or transformation of hydraulic fracturing-related chemicals in the environment before, during, and after hydraulic fracturing were scarce. Specifically, local water quality data needed to compare pre- and post-hydraulic fracturing conditions are not usually collected or readily available. The limited amount of data collected before, during, and after activities in the hydraulic fracturing water cycle reduces the ability to determine whether these activities affected drinking water resources.

Site-specific cases of alleged impacts on underground drinking water resources during the well injection stage of the hydraulic fracturing water cycle are particularly challenging to understand (e.g., methane migration in Dimock, Pennsylvania; the Raton Basin of Colorado; and Parker County, Texas[1]). This is because the subsurface environment is complex and belowground fluid movement is not directly observable. In cases of alleged impacts, activities in the hydraulic fracturing water cycle may be one of several causes of impacts, including other oil and gas activities, other industries, and natural processes. Thorough scientific investigations are often necessary to narrow down the list of potential causes to a single source at site-specific cases of alleged impacts.

Additionally, information on chemicals in the hydraulic fracturing water cycle (e.g., chemical iden-

---

[1] See Text Boxes 6-2 (Dimock, Pennsylvania), 6-3 (Raton Basin), and 6-4 (Parker County, Texas) in Chapter 6.

BLM_0047521

tity; frequency of use or occurrence; and physical, chemical, and toxicological properties) is not complete. Well operators claimed at least one chemical as confidential at more than 70% of wells reported to FracFocus 1.0 (U.S. EPA, 2015a).[1] The identity and concentration of these chemicals, their transformation products, and chemicals in produced water would be needed to characterize how chemicals associated with hydraulic fracturing activities move through the environment and interact with the human body. Identifying chemicals in the hydraulic fracturing water cycle also informs decisions about which chemicals would be appropriate to test for when establishing pre-hydraulic fracturing baseline conditions and in the event of a suspected drinking water impact.

Of the 1,606 chemicals identified by the EPA in hydraulic fracturing fluid and/or produced water, 173 had toxicity values from sources that met the EPA's criteria for inclusion in this report. Toxicity values from these selected data sources were not available for 1,433 (89%) of the chemicals, although many of these chemicals have toxicity data available from other data sources.[2] Given the large number of

chemicals identified in the hydraulic fracturing water cycle, this missing information represents a significant data gap that makes it difficult to fully understand the severity of potential impacts on drinking water resources.

Because of the significant data gaps and uncertainties in the available data, it was not possible to fully characterize the severity of impacts, nor was it possible to calculate or estimate the national frequency of impacts on drinking water resources from activities in the hydraulic fracturing water cycle. We were, however, able to estimate impact frequencies in some, limited cases (i.e., spills of hydraulic fracturing fluids or produced water and mechanical integrity failures).[3] The data used to develop these estimates were often limited in geographic scope or otherwise incomplete. Consequently, national estimates of impact frequencies for any stage of the hydraulic fracturing water cycle have a high degree of uncertainty. Our inability to quantitatively determine a national impact frequency or to characterize the severity of impacts, however, did not prevent us from qualitatively describing factors that affect the frequency or severity of impacts at the local level.

# Report Conclusions

This report describes how activities in the hydraulic fracturing water cycle can impact—and have impacted—drinking water resources and the factors that influence the frequency and severity of those impacts. It also describes data gaps and uncertainties that limited our ability to draw additional conclusions about impacts on drinking water resources from activities in the hydraulic fracturing water cycle. Both types of information—what we know and what we do not know—provide stakeholders with scien-

tific information to support future efforts.

The uncertainties and data gaps identified throughout this report can be used to identify future efforts to further our understanding of the potential for activities in the hydraulic fracturing water cycle to impact drinking water resources and the factors that affect the frequency and severity of those impacts. Future efforts could include, for example, groundwater and surface water monitoring in areas with hydraulically fractured oil and gas production wells or tar-

[1] Chemical withholding rates in FracFocus have increased over time. Konschnik and Dayalu (2016) reported that 92% of wells reported in FracFocus 2.0 between approximately March 2011 and April 2015 used at least one chemical that was claimed as confidential.

[2] Chapter 9 describes the availability of data in other data sources. The quality of these data sources was not evaluated as part of this report.

[3] See Chapter 10.

41

BLM_0047522

geted research programs to better characterize the environmental fate and transport and human health hazards associated with chemicals in the hydraulic fracturing water cycle. Future efforts could identify additional vulnerabilities or other factors that affect the frequency and/or severity of impacts.

In the near term, decision-makers could focus their attention on the combinations of hydraulic fracturing water cycle activities and local- or regional-scale factors that are more likely than others to result in more frequent or more severe impacts. These include:

- Water withdrawals for hydraulic fracturing in times or areas of low water availability, particularly in areas with limited or declining groundwater resources;
- Spills during the management of hydraulic fracturing fluids and chemicals or produced water that result in large volumes or high concentrations of chemicals reaching groundwater resources;
- Injection of hydraulic fracturing fluids into wells with inadequate mechanical integrity, allowing gases or liquids to move to groundwater resources;
- Injection of hydraulic fracturing fluids directly into groundwater resources;
- Discharge of inadequately treated hydraulic fracturing wastewater to surface water resources; and
- Disposal or storage of hydraulic fracturing wastewater in unlined pits, resulting in contamination of groundwater resources.

The above combinations of activities and factors highlight, in particular, the vulnerability of groundwater resources to activities in the hydraulic fracturing water cycle. By focusing attention on the situations described above, impacts on drinking water resources from activities in the hydraulic fracturing water cycle could be prevented or reduced.

Overall, hydraulic fracturing for oil and gas is a practice that continues to evolve. Evaluating the potential for activities in the hydraulic fracturing water cycle to impact drinking water resources will need to keep pace with emerging technologies and new scientific studies. This report provides a foundation for these efforts, while helping to reduce current vulnerabilities to drinking water resources.



Source: U.S. EPA

42

# References

Birdsell, DT; Rajaram, H; Dempsey, D; Viswanathan, HS. (2015). Hydraulic fracturing fluid migration in the subsurface: A review and expanded modeling results. Water Resoures Research 51:7159-7188. http://dx.doi.org/10.1002/2015WR017810.

BJ Services Company. (2009). BJ fracturing manual 2.0 (Revision No. 1). Houston, TX.

Brantley, SL; Yoxtheimer, D; Arjmand, S; Grieve, P; Vidic, R; Pollak, J; Llewellyn, GT; Abad, J; Simon, C. (2014). Water resource impacts during unconventional shale gas development: The Pennsylvania experience. International Journal of Coal Geology 126:140-156. http://dx.doi.org/10.1016/j.coal.2013.12.017.

CCST (California Council on Science and Technology). (2015). An independent scientific assessment of well stimulation in California Volume II: Potential environmental impacts of hydraulic fracturing and acid stimulations. Sacramento, CA. https://ccst.us/publications/2015/2015SB4-v2.pdf.

COGCC (Colorado Oil and Gas Conservation Commission). (2014). Risk-based inspections: Strategies to address environmental risk associated with oil and gas operations. (COGCC-2014-PROJECT #7948). Denver, CO.  https://cogcc.state.co.us/Announcements/RiskBasedInspection/RiskBasedInspectionStrategy.pdf.

Considine, T; Watson, R; Considine, N; and Martin, J. (2012). Environmental impacts during Marcellus Shale gas drilling: Causes, impacts, and remedies. (Report 2012-1). Buffalo, NY: Shale Resources and Society Institute. http://cce.cornell.edu/EnergyClimateChange/NaturalGasDev/Documents/UBSRSI-Environmental%20Impact%20Report%202012.pdf.

Davies, RJ; Mathias, SA; Moss, J; Hustoft, S; Newport, L. (2012). Hydraulic fractures: How far can they go? Marine and Petroleum Geology 37:1-6. http://dx.doi.org/10.1016/j.marpetgeo.2012.04.001.

Dayalu, A; Konschnik, K. (2016). FracFocus Chemical Disclosure Registry 1.0 and 2.0: Data conversion and cleaning methods paper. Cambridge, MA: Harvard Law School. https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/EFNV5J.

DrillingInfo, Inc. (2014). DI Desktop June 2014 download [Database]. Austin, TX. http://info.drillinginfo.com/di-desktop-downloads/.

EIA (U.S. Energy Information Administration). (2016a). Hydraulic fracturing accounts for about half of current U.S. crude oil production. http://www.eia.gov/todayinenergy/detail.cfm?id=25372.

EIA (U.S. Energy Information Administration). (2016b). Hydraulically fractured wells provide two-thirds of U.S. natural gas production. http://www.eia.gov/todayinenergy/detail.cfm?id=26112.

Fisher, M; Warpinski, N. (2012). Hydraulic fracture height growth: Real data. Society of Petroleum Engineers Production and Operations 27:8-19. http://dx.doi.org/10.2118/145949-PA.

Gallegos, TJ; Varela, BA. (2015). Trends in hydraulic fracturing distributions and treatment fluids, additives, proppants, and water volumes applied to wells drilled in the United States from 1947 through 2010: Data analysis and comparison to the literature. (Scientific Investigations Report 2014-5131). Reston, VA: U.S. Geological Survey. http://dx.doi.org/10.3133/sir20145131.

BLM_0047524

Gallegos, TJ; Varela, BA; Haines, SS; Engle, MA. (2015). Hydraulic fracturing water use variability in the United States and potential environmental implications. Water Resources Research 51:5839-5845. http://dx.doi.org/10.1002/2015WR017278.

IOGCC (Interstate Oil and Gas Compact Commission). (2002). States experience with hydraulic fracturing. A survey of the interstate oil and gas compact commission. http://groundwork.iogcc.ok.gov/sites/default/files/09IOG5571_StatesExperience%20w-HydFrac.pdf.

IOGCC (Interstate Oil and Gas Compact Commission). (2008). Protecting our country's resources: The states' case, orphaned well plugging initiative. http://iogcc.myshopify.com/products/protecting-our-countrys-resources-the-states-case-orphaned-well-plugging-initiative-2008.

Kell, S. (2011). State oil and gas agency groundwater investigations and their role in advancing regulatory reforms, a two-state review: Ohio and Texas. Ground Water Protection Council. http://fracfocus.org/sites/default/files/publications/state_oil__gas_agency_groundwater_investigations_optimized.pdf.

Konschnik, K; Dayalu, A. (2016). Hydraulic fracturing chemicals reporting: Analysis of available data and recommendations for policymakers. Energy Policy 88:504-514. http://dx.doi.org/10.1016/j.enpol.2015.11.002.

Louisiana Ground Water Resources Commission. (2012). Managing Louisiana's groundwater resources: An interim report to the Louisiana Legislature. Baton Rouge, LA: Louisiana Department of Natural Resources. http://dnr.louisiana.gov/index.cfm?md=pagebuilder&tmp=home&pid=907.

Maupin, MA; Kenny, JF; Hutson, SS; Lovelace, JK; Barber, NL; Linsey, KS. (2014). Estimated use of water in the United States in 2010. (USGS Circular 1405). Reston, VA: U.S. Geological Survey. http://dx.doi.org/10.3133/cir1405.

Olson, JE. (2011). Hydraulic fracturing overview. Presented at Summer Institute B: Energy, Climate and Water in the 21st Century, TXESS Revolution, Texas Earth and Space Science Revolution Professional Development for Educators, June 2011, Austin, TX. http://www.txessarchive.org/documents/K_hydraulicfracturingoverview_ppt.pdf.

Otton, JK; Zielinski, RA; Smith, BD; Abbott, MM. (2007). Geologic controls on movement of produced-water releases at U.S. geological survey research Site A, Skiatook Lake, Osage County, Oklahoma. Applied Geochemistry 22:2138-2154. http://dx.doi.org/10.1016/j.apgeochem.2007.04.015.

Pennsylvania Department of Environmental Protection. (2015a). Oil and gas reporting website, statewide data downloads by reporting period. Waste and production files downloaded for Marcellus/unconventional wells, July 2009 through December 2014. Harrisburg, PA. https://www.paoilandgasreporting.state.pa.us/publicreports/Modules/DataExports/DataExports.aspx.

Scanlon, BR; Reedy, RC; Nicot, JP. (2014). Will water scarcity in semiarid regions limit hydraulic fracturing of shale plays? Environmental Research Letters 9. http://dx.doi.org/10.1088/1748-9326/9/12/124011.

Tidwell, VC; Zemlick, K; Klise, G. (2013). Nationwide water availability data for energy-water modeling. Albuquerque, New Mexico: Sandia National Laboratories. http://prod.sandia.gov/techlib/access-control.cgi/2013/139968.pdf.

BLM_0047525

U.S. EPA (U.S. Environmental Protection Agency). (2011). Plan to study the potential impacts of hydraulic fracturing on drinking water resources [EPA Report]. (EPA/600/R-11/122). Washington, DC: Office of Research and Development. http://www2.epa.gov/hfstudy/plan-study-potential-impacts-hydraulic-fracturing-drinking-water-resources-epa600r-11122.

U.S. EPA (U.S. Environmental Protection Agency). (2015a). Analysis of hydraulic fracturing fluid data from the FracFocus Chemical Disclosure Registry 1.0 [EPA Report]. (EPA/601/R-14/003). Washington, DC: Office of Research and Development. http://www2.epa.gov/hfstudy/analysis-hydraulic-fracturing-fluid-data-fracfocus-chemical-disclosure-registry-1-pdf.

U.S. EPA (U.S. Environmental Protection Agency). (2015b). Case study analysis of the impacts of water acquisition for hydraulic fracturing on local water availability [EPA Report]. (EPA/600/R-14/179). Washington, DC: Office of Research and Development. https://www.epa.gov/hfstudy/case-study-analysis-impacts-water-acquisition-hydraulic-fracturing-local-water-availability.

U.S. EPA (U.S. Environmental Protection Agency). (2015c). Review of state and industry spill data: Characterization of hydraulic fracturing-related spills [EPA Report]. (EPA/601/R-14/001). Washington, DC: Office of Research and Development. http://www2.epa.gov/hfstudy/review-state-and-industry-spill-data-characterization-hydraulic-fracturing-related-spills-1.

U.S. EPA (U.S. Environmental Protection Agency). (2015d). Review of well operator files for hydraulically fractured oil and gas production wells: Well design and construction [EPA Report]. (EPA/601/R-14/002). Washington, DC: Office of Research and Development. http://www2.epa.gov/hfstudy/review-well-operator-files-hydraulically-fractured-oil-and-gas-production-wells-well-design.

U.S. EPA (U.S. Environmental Protection Agency). (2016). Technical development document for the effluent limitations guidelines and standards for the oil and gas extraction point source category. (EPA-820-R-16-003). Washington, DC: Office of Water. http://water.epa.gov/scitech/wastetech/guide/oilandgas/unconv.cfm.

Veil, J. (2015). U.S. produced water volumes and management practices in 2012. Oklahoma, City, OK: Ground Water Protection Council. http://www.gwpc.org/sites/default/files/Produced%20Water%20Report%202014-GWPC_0.pdf.

Whittemore, DO. (2007). Fate and identification of oil-brine contamination in different hydrogeologic settings. Applied Geochemistry 22:2099-2114. http://dx.doi.org/10.1016/j.apgeochem.2007.04.002.

BLM_0047526

# Photo Credits

Front cover (top): Illustrations of activities in the hydraulic fracturing water cycle. From left to right: Water Acquisition, Chemical Mixing, Well Injection, Produced Water Handling, and Wastewater Disposal and Reuse.

Front cover (bottom): Aerial photographs of hydraulic fracturing activities. Left: Near Williston, North Dakota. Image ©J Henry Fair / Flights provided by LightHawk. Right: Springville Township, Pennsylvania. Image ©J Henry Fair / Flights provided by LightHawk.

Front cover (inside): ©Daniel Hart Photography (2013). Used with permission.

Back cover (inside): Daniel Hart, U.S. EPA.

Back cover: Top left image courtesy of U.S. DOE/NETL. All other images courtesy of the U.S. EPA.

<u>**Preferred Citation**</u>
U.S. EPA (U.S. Environmental Protection Agency). 2016. Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States. Executive Summary. Office of Research and Development, Washington, DC. EPA/600/R-16/236ES.

46



BLM_0047528





**United States
Environmental Protection
Agency**

Office of Research and Development (8101R)
U.S. Environmental Protection Agency
Washington, DC 20460

Official Business
Penalty for Private Use
$300



Recycled/Recyclable
Printed with vegetable-based ink on paper that
contains a minimum of 50% post-consumer
fiber and is processed chlorine free.

https://archive.epa.gov/epawaste/nonhaz/industrial/special/web/html/hydrofrac.html
Last updated on 4/19/2016



# Wastes - Non-Hazardous Waste - Industrial Waste

You are here: EPA Home    Wastes    Industrial Waste    Special Wastes    Crude Oil and Natural Gas    Proper Waste Management

- Special Waste Home
- Cement Kiln Dust
- Crude Oil and Natural Gas
- Fossil Fuel Combustion
- Mineral Processing
- Mining

# Proper Management of Oil and Gas Exploration and Production Waste

Wastes generated from crude oil and natural gas exploration and production (E&P wastes) are generally subject to regulation under RCRA Subtitle D and state regulations, and many state governments have specific regulations and guidance for E&P wastes. In addition, some states are developing legislation and regulations in response to the increase in the use of hydraulic fracturing, including requirements related to waste management.

> **Related Information**
> Natural Gas Extraction by Hydraulic Fracturing

As the use of hydraulic fracturing has increased, so too have concerns about potential impacts on public health and the environment, including potential impacts arising from improper management of wastes from E&P activities. Proper waste management is important for all E&P wastes, including those that are associated with hydraulic fracturing activities.

Wastes from Hydraulic Fracturing | State Regulations | Voluntary Management Practices

### Wastes Associated with Hydraulic Fracturing

Natural gas plays a key role in our nation's clean energy future. The United States has vast reserves of natural gas that are commercially viable as a result of advances in horizontal drilling and hydraulic fracturing technologies enabling greater access to gas in shale formations. Responsible development of America's shale gas resources offers important economic, energy security, and environmental benefits.

Oil and gas exploration and production well installation operations typically comprise three stages:

1. **Well Drilling and Completion Stage**
   Wastes Produced:
   - Drilling Fluids (drilling muds)
   - Cuttings
   - Produced Water
2. **Well Stimulation Stage (hydraulic fracturing)**
   Wastes Produced:
   - Fracturing Fluid Returns
   - Produced Water
3. **Well Production Stage**
   Wastes Produced:
   - Produced Water

During hydraulic fracturing specially engineered fluids containing chemical additives and proppant (eg., sand) are pumped under high pressure into a well to create and hold open fractures within the geologic formation. Hydraulic fracturing is often performed in stages, and following each stage, some fluids return to the surface as fracturing fluid returns ('flowback').

It is important to note that the use of horizontal drilling in conjunction with hydraulic fracturing can often result in large volumes of flowback, a key attribute distinguishing wastes generated during hydraulic fracturing in unconventional reservoirs from wastes generated during other types of E&P activities. For example, larger volumes of flowback require larger on-site storage capacity, either using land-based units (pits) or tanks.

**State Regulations for Management of Wastes from Oil and Gas and E&P Activities**

While many E&P wastes are exempt from regulation as hazardous waste under the Resource Conservation and Recovery Act (RCRA) Subtitle C, these wastes are generally subject to non-hazardous waste regulation under RCRA Subtitle D and applicable state regulations. Many state governments have specific regulations and guidance for E&P wastes.

Over the last several years, many states have been developing and updating legislation and regulations in light of the increase in the use of hydraulic fracturing, including requirements related to waste management. E&P activity occurring on federal lands is regulated under the jurisdiction of the Department of Interior's Bureau of Land Management (BLM), subject to BLM regulations and guidance. EPA strongly believes that the management of E&P wastes should occur in a manner that prevents releases of hazardous constituents to the environment, particularly releases that may impact groundwater and surface water resources.

US EPA reviewed the waste-related provisions of state regulations as of March 2014, for oil and natural gas waste pits and storage tanks for 26 of 33 gas producing states (ie., states with the most significant shale gas activity). The review examined only the state statutes and regulations and did not include a review of permitting decisions, compliance monitoring, or enforcement actions. EPA consulted the following sources:

- State Regulations and Statutes
- State Review of Oil and Natural Gas Environmental Regulations (STRONGER) Board state reviews
- 2009 Department of Energy (DOE) Report: State Regulations Designed to Protect Water Resources
- Drilling Waste Management Information System: an online resource for technical and regulatory information on practices for managing drilling muds and cuttings; including current practices, state and federal regulations, guidelines for optimal management practices, and case studies for successful applications; developed by Argonne National Laboratory for DOE.

In addition, EPA staff contacted each of the 26 reviewed states' primary regulatory agencies to verify cited regulations and ensure recent and ongoing updates to regulations were reflected in the review.

**Summary:**
- All 26 reviewed states have oil and gas regulations.
- State regulations vary greatly in scope and detail.
- Regulatory programs can include regulatory parameters such as liner requirements, clear definitions of waste fluids and characterization requirements, operational controls, maintenance, closure, and financial assurance requirements.
- Several areas do not appear to have specific requirements; for example, groundwater monitoring, air monitoring, or post closure monitoring.
- Numerous states have recently updated regulations to include disclosure requirements for the chemicals used in the practice of hydraulic fracturing.

State regulations continue to evolve as hydraulic fracturing issues become more prevalent and additional information becomes available. Below are individual state summaries, and a link to a resource for state regulatory programs.

State E&P regulation summary (PDF) (41 pp, 393 KB)

**Voluntary Management Practices for Oil and Gas E&P Wastes**

In concert with the application of state regulatory requirements, there are a variety of voluntary management practice guidances (often referred to in industry as "Best Management Practices," or "BMPs") for operators to evaluate and use in the development of site-specific E&P waste management plans.

EPA strongly urges operators to evaluate and, as appropriate, employ practices best suited to prevent releases during the generation and management of E&P wastes including wastes from hydraulic fracturing. EPA agrees with the statement from the Bureau of Land Management that voluntary management guidances for oil and gas E&P wastes should be matched and adapted to meet the site-specific requirements of the project and local environment. Operators should also integrate source reduction and recycling measures into their operations, where practicable.

EPA conducted a literature review/internet search and developed a list of more than 80 publicly available sources of voluntary management practices for oil and gas E&P wastes as they relate to pits, tanks, and land application/disposal. From this list, EPA focused on fourteen key documents/websites that are widely used and developed summaries of the pit, tank, and land application-related management practices contained in the fourteen selected sources.

There is much existing guidance developed and being used by industry, federal, state, and non-governmental organizations. The scope ranges from local to state, regional, national, and international. The guidance documents/websites compiled in this review are readily available to the public. In addition, there are ongoing efforts by the various stakeholder groups to continuously develop additional guidances and improve existing ones.

The report contains six sections:

1. introduction
2. methodology
3. list of publicly available sources of voluntary management practices for oil and gas E&P wastes as they relate to pits, tanks, and land application/disposal
4. list of selected guidance documents/websites for further analysis
5. summaries of the relevant practices in the selected guidances
6. our findings

The summaries in Section 5 contain the following information for each document: sponsoring organization, document/website title, date of publication, website location, general description, and excerpts of the specific sections that concern pits, tanks, and/or land application.

<u>Compilation of Publicly Available Sources or Voluntary Management Practices for Oil and Gas Exploration & Production (E&P) Wastes as They Address, Pits, Tanks, and Land Application (PDF)</u> (98 pp, 722 K)

# FAQ: What is the Jenks optimization method?

## Question

What is the Jenks optimization method?

## Answer

Some Esri products use the Jenks optimization method to classify features using natural breaks in data values. The Jenks optimization method is also known as the goodness of variance fit (GVF). It is used to minimize the squared deviations of the class means. Optimization is achieved when the quantity GVF is maximized:

1. Calculate the sum of squared deviations between classes (SDBC).

GVF = ------------------

2. Calculate the sum of squared deviations from the array mean (SDAM).

3. Subtract the SDBC from the SDAM (SDAM-SDBC). This equals the sum of the squared deviations from the class means (SDCM).

The method first specifies an arbitrary grouping of the numeric data. SDAM is a constant and does not change unless the data changes. The mean of each class is computed and the SDCM is calculated. Observations are then moved from one class to another in an effort to reduce the sum of SDCM and therefore increase the GVF statistic. This process continues until the GVF value can no longer be increased.

**Further Reading**

• Jenks, George F. 1967. "The Data Model Concept in Statistical Mapping", International Yearbook of Cartography 7: 186-190.

Note:
The steps presented in this article are to provide the concept of involved events and are not be used as a specific solution. For more specific assistance, please call our Technical

BLM_0047533

# Mesa County
# 2013 Citizen Attitude Survey

## -FINAL REPORT-

**Submitted to**



**ETC Institute**
**725 W. Frontier Circle**
**Olathe, KS**
**66061**

**April 2013**

BLM_0047534

# Contents

**Section 1:** Executive Summary ..................................................................................... 1

**Section 2**:  Charts and Graphs ..................................................................................... 5

**Section 3**:  Tabular Data............................................................................................... 15

**Section 4**:  Tabular Data............................................................................................... 19

**Section 5**:  Survey Instrument ..................................................................................... 43

BLM_0047535

# *Section 1:*
# *Executive Summary*

BLM_0047536