

LEGEND

TIMING LIMITATIONS

STANDARD LEASE TERMS

NO LEASE

NO SURFACE OCCUPANCY STIPULATIONS

CONTROLLED SURFACE USE STIPULATIONS

DRAWN BY: DAF

Lease Options
Within The Analysis
Area For Alternative 5
Figure 8-8

DATE: 2/18/98

BLM_0047962

Oil and Gas Leasing FEIS

Blank

BLM_0047963

# Alternative Consequences Summary

## TABLE S-4. SUMMARY OF ENVIRONMENTAL CONSEQUENCES FOR EACH ALTERNATIVE

| ENVIRON-MENTAL FACTORS | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | 1 - NO ACTION | 2 - PREFERRED | 3 - NO LEASE | 4 - STANDARD LEASE TERMS | 5 - NO LEASE ROADLESS AND SPNM |
| **Biological Diversity** | Same as Alternative 4. | No increased impacts to biological diversity on NSO designated areas.* Temporary loss of biological diversity may result on sites cleared for roads, well pads and pipelines. Some loss of biological diversity, especially in areas opened for logging following O&G activities. | Effects only on existing leases. | Temporary loss in biological diversity resulting from roads, well pad and pipeline construction, Loss of biological diversity of wildlife species, especially in areas opened for logging following O&G activity. | No increased impacts to biological diversity in Roadless and SPNM areas. Impacts on remaining areas same as Alternative 2. |
| **Vegetation** | Same as Alternative 4. | Same as Alternative 4. | Effects only on existing leases. | Vegetation removal for pads, roads, pipelines would remove sites from wood fiber and/or forage production. Abandoned drill sites and road locations may be restored to full vegetation over long-term. May result in slightly increased ASQ. | Same as Alternative 4. |
| **Soils** | Same as Alternative 4. | NSO recommended for sensitive soils in riparian and alpine/tundra environments would prevent irretrievable/irreversible impacts in these areas. Potential for displacement, compaction and mixing on construction locations in remainder of analysis area. | Effects only on existing leases. | Construction activities result in displacement, compaction and mixing of soil material. Increased potential for erosion and slope failures. Impacts vary with slope and soil type. Forest Plan guidelines provide mitigation through road design and revegetation requirements. | No effect from O&G activity in Roadless and SPNM areas. Same impacts as Alternative 2 in remainder of analysis area. |
| **Air Quality** | Minimal impact to air quality. Some dust from road use. | Minimal impact to air quality. Some dust from road use. | Effects only on existing leases. | Minimal impact to air quality. Some dust from road use. | Minimal impact to air quality. Some dust from road use. |
| **Water Quality** | Some increase in sediment. Overall impact low. Some risk of spills at drill sites and stream crossings. | Some increase in sediment, but most sensitive areas protected. Accidental spills could occur. Overall impact low. | Effects only on existing leases. | Some increase in sediment. No special protection of sensitive areas. Overall impact moderate. Risk of spill similar to other alternatives. | Some increase in sediment. Impacts confined to areas of existing development. Overall, impacts very low. |

BLM_0047964

Oil and Gas Leasing FEIS

---

# TABLE S-4. SUMMARY OF ENVIRONMENTAL CONSEQUENCES FOR EACH ALTERNATIVE

| ENVIRON-MENTAL FACTORS | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | 1 - NO ACTION | 2 - PREFERRED | 3 - NO LEASE | 4 - STANDARD LEASE TERMS | 5 - NO LEASE ROADLESS AND SPNM |
| **Range and Livestock Grazing** | Same as Alternative 4. | Same as Alternative 4. | Effects only on existing leases. | Surface disturbance would remove forage. Increased access and activity may result in temporary reduction of permitted livestock or change in management system in areas of activity. Potential for introduction of noxious and undesirable plants along roads, well pads and pipelines. Increased access could aid in range management activities. | No effect from O&G activity in Roadless and SPNM areas. Impacts same as Alternative 4 for remainder of analysis area. |
| **Roads** | Same as Alternative 4. | No impacts in No Lease and NSO stipulated areas. Impacts same as Alternative 4 in remainder of analysis area. | Effects only on existing leases. | Potential for new road construction in entire analysis area. Road reconstruction would generally increase standard of existing road. Road use would increase during exploration and development stages. | No impacts in Roadless, SPNM and other No Lease and NSO areas identified in Alternative 2. Impacts same as Alternative 4 on remainder of analysis area. |
| **Visual Resources** | Alternative 4 impacts lessened through use of vegetative and topographic screening, facility placement, design and color to meet VQO in Retention and Low VAC areas. | Impacts lessened from No Action by retaining VQO in Scenic Byway Corridors in addition to Retention VQO and Low VAC areas. | Effects only on existing leases. | Potential impacts to visual resources greatest during exploratory drilling, less during development and production. Negative impacts to Retention VQO with and without Low VAC (19% of analysis area). | No effect from O&G activity in Roadless and SPNM areas. Impacts same as Alternative 2 in remainder of analysis area. |

BLM_0047965

## TABLE S-4. SUMMARY OF ENVIRONMENTAL CONSEQUENCES FOR EACH ALTERNATIVE

| ENVIRON-MENTAL FACTORS | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | 1 - NO ACTION | 2 - PREFERRED | 3 - NO LEASE | 4 - STANDARD LEASE TERMS | 5 - NO LEASE ROADLESS AND SPNM |
| **Recreation Opportunities** | Recreation opportunities in developed facilities and SPNM areas would be protected. Potential for ROS class to be changed to more developed class in dispersed recreation and Roadless areas. Potential decrease in backcountry recreation opportunities. | Recreation opportunities would be protected in identified developed, dispersed and major trail recreation complexes and in several Roadless Areas. Potential for ROS class to be changed to more developed class in dispersed recreation and Roadless areas. Potential decrease in backcountry recreation opportunities. | Effects only on existing leases. | Improved road standards and increased traffic will alter ROS class to more developed conditions and potentially decrease recreation experience of Forest visitors. Opportunity for backcountry recreation will be reduced. | No effect from O&G activities in Roadless, SPNM and recreation complexes. Impacts same as Alternative 2 in remainder of analysis area. |
| **Cultural and Historical Resources** | Same as Alternative 4. | Same as Alternative 4. | Effects only on existing leases. | Cultural survey is required prior to any ground disturbing activity. Any identified cultural resources must be protected by avoidance, or recorded and excavated. | No effect from O&G activity in Roadless and SPNM areas. Impacts in remainder of analysis area same as Alternative 4. |
| **Aquatic/ Riparian/ Wetland Habitats** | Same as Alternative 4. | Same as Alternative 4. | Effects only on existing leases. | Potential impacts from road construction, culvert location and stream crossings resulting in vegetation removal and increased sediment loads, which would decrease spawning habitat, result in macroinvertebrate and fish fry mortality. Increased potential for toxic spills entering waterways. | No effect from O&G activity within Roadless and SPNM areas. Impacts in remainder of analysis area same as Alternative 4. |

BLM_0047966

Oil and Gas Leasing FEIS

## TABLE S-4.  SUMMARY OF ENVIRONMENTAL CONSEQUENCES FOR EACH ALTERNATIVE

| ENVIRON-MENTAL FACTORS | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | 1 - NO ACTION | 2 - PREFERRED | 3 - NO LEASE | 4 - STANDARD LEASE TERMS | 5 - NO LEASE ROADLESS AND SPNM |
| **Wildlife** | Same as Alternative 4. | Impacts to wildlife and habitat mitigated through NSO, CSU and TL in special habitats. Potential for habitat loss, disturbance and displacement to less desirable habitats on areas with SLT. Impacts compounded in areas opened for logging after O&G activity. | Effects only on existing leases. | Forest Plan provides limited protection: -Timing restrictions for bighorn sheep lambing areas; -Timing restriction for raptor nesting; -Road use restrictions to maintain habitat effectiveness in MIS habitat (4B); -Road construction/use restrictions in big game winter range (5A&5B). Remainder of area open to Standard Lease Terms, which would result in habitat loss, disturbance, displacement to less desirable habitats, potential increase in conflicts on private land. Impacts compounded in areas opened for logging after O&G activity. | No direct impacts to wildlife in Roadless and SPNM areas. Impacts same as Alternative 2 on remainder of analysis area. |
| **Wildfire** | Potential for human caused wildfire would be similar for all alternatives, except for Alternative 3, which would have a slightly smaller potential for wildfire, due to less oil and gas activities. Improved access and increased human activity has the potential to result in increasing human caused wildfires. Increased access could allow more efficient suppression of wildfires, however, both man-caused or naturally occurring. | | | | |
| **Economic and Social Setting** | Average of 10 more jobs (above No Lease figure) for 3 months; additional $4,000 State revenue; additional $8,000 County revenue from drilling on new leases. | Average of 10 more jobs (above No Lease figure) for 3 months; additional $4,000 State revenue; additional $8,000 County revenue from drilling on new leases. | Average of 10 full time drilling jobs; $32,000 State revenue; $64,000 County revenue from drilling on existing leases, annually. | Average of 10 more jobs (above No Lease figure) for 3 months; additional $4,000 State revenue; additional $8,000 County revenue from drilling on new leases. | Average of 10 more jobs (above No Lease figure) for 3 months; additional $4,000 State revenue; additional $8,000 County revenue from drilling on new leases. |
| **Reasonably Foreseeable Development Scenario** | The projected activity would occur, but typically in areas least restrictive to industry. | | The 7 projected wells outside existing leases and units would not be drilled. | No effect on the RFD. | The projected activity would shift to areas available for oil and gas leasing. |

BLM_0047967

| ENVIRON-MENTAL FACTORS | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | 1 - NO ACTION | 2 - PREFERRED | 3 - NO LEASE | 4 - STANDARD LEASE TERMS | 5 - NO LEASE ROADLESS AND SPNM |
| **Oil and Gas Resources - Availability** | All legally available lands within the analysis area would be available for leasing; however, stipulations modify the Standard Lease Terms in some Affected Environments.<br><br>951,450 ac. available. | Oil and gas resources would be available for leasing except in selected Roadless Areas and Research Natural Areas. Special stipulations modify Standard Lease Terms.<br><br>813,180 ac. available. | Oil and gas resources within the analysis area would not be available for leasing.<br><br>0 ac. available. | All legally available lands within the analysis area would be available for leasing. No special stipulations would be applied.<br><br>951,450 ac. available. | Oil and gas resources within Roadless Areas and areas of SPNM would not be available for leasing. Otherwise this alternative is similar to Alternative 2.<br><br>552,300 ac. available. |
| **Oil and Gas Resources - Effect on Industry** | Costs for the recovery of oil and gas resources would be higher than that of Alternative 4, but lower than Alternatives 2 & 5. | Generally, the costs related to the recovery of oil and gas resources would be higher than that of Alternative 4. | No opportunity to recover oil and gas resources (except on existing leases). | Least cost alternative for the recovery of oil and gas resources. May result in more interest in leasing. | Same as Alternative 2, but fewer lands available for leasing. |

**TABLE S-4. SUMMARY OF ENVIRONMENTAL CONSEQUENCES FOR EACH ALTERNATIVE**

\* No effect unless stipulation is waived, excepted or modified.

# Effects of Alternatives on Consumers, Civil Rights, Minority Groups and Women

None of the alternatives would affect civil rights, minority groups or women.

Any alternative could affect consumers if oil and gas prices are kept lower or higher due to increased or decreased supplies of these items. Alternative 3 would remove all NFS lands from future leasing. The resultant loss of revenues could affect consumers during the 15 year planning period.

# Effects of Alternatives on Prime Farmland, Rangeland and Forest Land

"Prime" rangeland and "prime" forest land does not apply to lands in the analysis area. None of the alternatives would affect prime farmland. Under all alternatives, National Forest System lands would be managed with a sensitivity to the effects on adjacent lands.

BLM_0047968

Oil and Gas Leasing FEIS

# Effects of Alternatives on Wetlands and Floodplains

The 36 CFR 228 regulations preclude surface occupancy of riparian areas. The management of wetlands and floodplains are subject to Executive Orders 11990 and 11988, respectively. The purpose of the executive orders are to avoid to the extent possible the long and short term adverse impacts associated with the destruction or modification of wetlands and floodplains. Development of oil and gas wells in riparian areas could cause significant effects to the water quality and aquatic habitat.

# The Preferred Alternative

The preferred alternative is Alternative 2. This alternative provides resource protection while leaving the majority of the National Forest System lands available for leasing.

BLM_0047969



United States
Department of
Agriculture

**FOREST SERVICE**

DELTA, COLORADO



# FINAL
# OIL AND GAS LEASING
# ENVIRONMENTAL
# IMPACT STATEMENT

## GRAND MESA,
## UNCOMPAHGRE
## AND GUNNISON
## NATIONAL FORESTS

# Volume I



**APRIL 1993**



Cooperating Agency
**USDI BUREAU OF LAND MANAGEMENT**

BLM_0047970

# Final Environmental Impact Statement
# Oil and Gas Leasing Analysis

## Grand Mesa, Uncompahgre and Gunnison National Forests

**Delta, Garfield, Gunnison, Mesa, Montrose, Ouray and San Miguel Counties, in the State of Colorado**

**April 1993**

| | |
|---|---|
| **Lead Agency:** | USDA Forest Service |
| **Cooperating Agency:** | USDI Bureau of Land Management |
| **Responsible Official:** | Robert L. Storch, Forest Supervisor<br>Grand Mesa, Uncompahgre and Gunnison<br>  National Forests<br>2250 Highway 50<br>Delta, Colorado 81416 |
| **For Further Information Contact:** | Daryl Gusey<br>Grand Mesa, Uncompahgre and Gunnison<br>  National Forests<br>2250 Highway 50<br>Delta, Colorado 81416 |

**Abstract:** The Environmental Impact Statement documents the analysis of five alternatives developed for possible management of oil and gas leasing on approximately 1/3 of the 3 million acres administered by the Grand Mesa, Uncompahgre and Gunnison National Forests Supervisor. Portions of the Forests not included in this analysis are areas of no known potential for oil and gas resources and areas of low potential in which the oil and gas industry have shown no interest, to date. Alternatives include: 1) Current management (as specified in the current Forest Plan, 2) leasing approximately 125,980 acres under Standard Lease Terms, 687,200 acres under supplemental stipulations, and discretionarily removing 138,270 acres from leasing, 3) No new leasing Forest-wide, 4) Leasing the entire analysis area under Standard Lease Terms, 5) the same as alternative 2 with the exception that all Roadless Areas and Semi-primitive Non-motorized Areas (3A Management Areas) would be No Lease. The document also discloses the information necessary for the Forest Supervisor to determine those specific lands that will be authorized for leasing. These decisions will be documented in a separate Record of Decision, which will also amend the Forest Plan.

BLM_0047971

BLM_0047972

# Preface

## *We want you to read and consider the information presented in this EIS!*

This is a complicated Environmental Impact Statement. It contains detailed information about activities and effects associated with the potential leasing and development of oil and gas resources on the Grand Mesa, Uncompahgre and Gunnison National Forests.

The information is organized in the order of the analysis and decision-making process. This analysis and decision-making process is described in Chapter I. **Understanding Chapter I is essential to understanding the rest of the EIS.** Some of Chapter I is background common to any National Forest undertaking an oil and gas *Leasing Analysis*, and some of it is **unique to this Forest and to this EIS**.

**To serve as an aid** in tracking your position in the document, the "footers", or notes at the bottom of every page, are keyed to major headings of the EIS. These major headings are shown in the Table of Contents at the beginning of the EIS, and at the beginning of each chapter.

Our objective has been to meet the twin aims of NEPA: to disclose and inform. We have disclosed, for public review, the environmental consequences of choices being considered by the decision-maker. By so doing we have informed the public, and most importantly the decision-maker, of the potential consequences of these choices.

**Read This Page First**

i

BLM_0047974

# Table of Contents

BLM 0047975

BLM_0047976

# Table of Contents

**Chapter I - Purpose and Need**                                         **I-1**

Introduction                                                            I-1
Changes Made Between Draft and Final                                    I-1
Forest Service Minerals Management Policy                               I-2
Current Situation                                                       I-5
Lands Involved                                                          I-5
Decisions to be Made                                                    I-7
This EIS                                                                I-11
The Need for Decisions                                                  I-12
The Leasing Process                                                     I-13
Reasonably Foreseeable Development                                      I-19
Forest Plan Amendments                                                  I-20
Issue Identification                                                    I-21

**Chapter II - Alternatives**                                            **II-1**

Introduction                                                            II-1
Activities and Assumptions Relating to Oil and Gas Development          II-1
Descriptions of Alternatives                                           II-8
Comparison of Alternatives                                             II-14

**Chapter III - Affected Environment**                                   **III-1**

Introduction                                                           III-1
Affected Environments                                                  III-3

**Chapter IV - Environmental Consequences**                              **IV-1**

Introduction                                                           IV-1
Environmental Consequences of Lease Options                            IV-1
Environmental Consequences of Alternatives                             IV-39
Additional Discussions                                                 IV-86

**Chapter V - List of Preparers**                                        **V-1**

**Chapter VI - Response to Public Comments**                             **VI-1**

**Chapter VII - Acronyms / Glossary**                                    **VII-1**

**Chapter VIII -Bibliography**                                           **VIII-1**

**Appendix A - Forest Service Manual Interim Directive 2820-91-1**       **A-1**

**Appendix B - BLM Form 3100-11 (June 1988)**                            **B-1**

**Appendix C - Stipulations**                                            **C-1**

**Appendix D - Stipulation for Lands of the National Forest System
Under Jurisdiction of the Department of Agriculture**                   **D-1**

Note: See beginning of each chapter for
detailed table of contents.

BLM_0047977

Oil and Gas Leasing Analysis FEIS

**Appendix E - Reasonably Foreseeable Development Activity**
**within the Grand Mesa, Uncompahgre and Gunnison**
**National Forests** ......................................................................... E-1

**Appendix F - Slope Disturbance Diagrams** ................................. F-1

**Appendix G - Typical Oil and Gas Activities** ............................. G-1

**Appendix H - Mitigation** ............................................................. H-1

**Appendix I - Wilderness/Roadless Opportunities within Reasonable Distance**
**of the Forest Oil and Gas Analysis Area** ..................................... I-1

**Appendix J - Road Maintenance Level** ...................................... J-1

**Appendix K - Table of Required Permits** .................................. K-1

**Appendix L - Existing Leases** .................................................... L-1

**Appendix M - Oil and Hazardous Spills Contingency Plan** ...... M-1

**Appendix N - Biological Assessment** ......................................... N-1

**Appendix O - Biological Evaluation** .......................................... O-1

**Index** ........................................................................................... ii-1

Note: See beginning of each chapter for
detailed table of contents.

BLM_0047978

# Chapter I -
# Purpose and Need

BLM_0047979

BLM_0047980

# Table of Contents

Introduction                                                                                          I-1
Changes Made Between Draft and Final                                                                  I-1
Forest Service Minerals Management Policy                                                             I-2
Current Situation                                                                                     I-5
Lands Involved                                                                                        I-5
Decisions to be Made                                                                                  I-7
This EIS                                                                                              I-11
    The Two-Tiered Analysis Process                                              I-11
        The First Level of Analysis                          I-11
        The Second Level of Analysis                         I-11
    Land Availability (36 CFR 228.102(d))                                        I-11
    Leasing Specific Lands (36 CFR 228.102(e); ID 2822.9)                        I-12
The Need for Decisions                                                                                I-12
The Leasing Process                                                                                   I-13
    A Lease                                                                       I-13
        Competitive Leases                                    I-14
        Noncompetitive Leases                                 I-14
    Royalties                                                                     I-14
    Bonding                                                                       I-14
    Stipulations                                                                  I-15
    Waivers, Exceptions and Modifications                                         I-16
    Implementation: The Staged Decision Process                                   I-17
Reasonably Foreseeable Development                                                                    I-19
Forest Plan Amendments                                                                                I-20
Issue Identification                                                                                  I-21
    Public Involvement and Scoping                                                I-21
    Consultation with Other Agencies                                              I-22
    Issues                                                                        I-22
        Wildlife, Fisheries, and Range Issues                 I-22
        Recreation Issues                                     I-23
        Watershed Issues                                      I-24
        Management/Administration Issues                       I-25
        Road Issues                                           I-25
        Socioeconomic Issues                                  I-26
        Oil and Gas Operations Issues                         I-26
        Miscellaneous Issues                                  I-27
    The Major Issues                                                              I-27

## List of Tables

Table I-1. Affected Environments within Analysis Area                                                 I-6

BLM 0047981

Oil and Gas Leasing Analysis FEIS

# List of Figures

Figure I-1.  Analysis Area                                                                                    I-4

Table of Contents

BLM_0047982

# Chapter I -
# Purpose and Need

## Introduction

The purpose of this Final Environmental Impact Statement (FEIS) is to evaluate the potential effects of alternative programs for oil and gas leasing on the Grand Mesa, Uncompahgre and Gunnison National Forests; to amend the Land and Resource Management Plan (Forest Plan) to adequately address availability of lands for oil and gas leasing; to provide direction to implement the leasing decisions; and to give the interested public an opportunity to participate in the process and comment on the proposal. The alternatives range from *No Lease* to *No Action* to *Lease with Standard Lease Terms* (see Chapter II - Alternatives).

Oil and natural gas are important resources for the people of the United States. They are the primary sources of energy for most mechanical equipment, lighting, heating, transportation, communications, and agriculture. Petroleum products are important components in food production, agriculture, medicine, and manufacturing of fibers and plastics. The Federal Government seeks to reduce its dependency on oil and gas from other nations by continuing to locate and develop its own reserves.

The current Forest Plan does not adequately address the availability of lands on the Forest for oil and gas leasing. As a result, leasing on the Forest has been suspended pending the decisions made as a result of this document. The Record of Decision (ROD) to this document will discuss what lands will be available and authorized for oil and gas leasing and with what constraints (stipulations).

This chapter discusses why we have prepared this Final Environmental Impact Statement. This chapter describes Forest Service policy relating to minerals management on National Forest System lands; the current leasing situation in the Rocky Mountain Region of the Forest Service; the decisions to be made in the Record of Decision (ROD) for this document; the lands involved in the decisions; the need for the decisions; implementation of the decisions; the oil and gas leasing process; and the issues that surfaced during public involvement and scoping.

This FEIS is tiered (40 CFR Parts 1502.20 and 1508.28) to the Forest Plan FEIS. Copies of the Forest Plan FEIS are available from the Supervisor's Office and at all Ranger District Offices on the Forest; in the Regional Forester's Office; in the Supervisor's Office of all National Forests contiguous to this Forest and in most public libraries in or near this Forest.

The Bureau of Land Management (BLM) is a cooperating agency in the preparation of this document. BLM personnel have participated in scoping, interdisciplinary (ID) team meetings and have prepared specialist reports in the areas of groundwater, geology, and the Reasonably Foreseeable Development (RFD) scenario.

## Changes Made Between Draft and Final

Numerous changes have been made to the Draft Oil and Gas Leasing EIS to reflect the comments we received from the public and other agencies, to supplement the information disclosed in the Draft, to update information that has changed in the past months, and to correct typographical and

BLM_0047983

grammatical errors. The discussion below highlights the major changes to the document. Other changes are pointed out, as necessary, in the Response to Comments in Chapter VI.

In Chapter I, information on the current situation has been updated, a discussion of a most development scenario was added to the section on the Reasonably Foreseeable Development (RFD) scenario, and clarification of discussions were added based on public comment. It should also be noted that all leases now have a ten year term as a result of language included in the Energy Policy Act of 1992.

In Chapter II, Alternative 2 - Preferred was revised. The Whetstone Mountain, Flat Top Mountain and portions of the Priest Mountain Roadless Areas, and the Kebler Pass corridor (which includes portions of the West Elk and Raggeds Roadless Areas) have been added to the list of areas not available for oil and gas leasing. A discussion of recreation use and opportunities was added to the Alpine/Tundra environmental consequence table and Figures II-1 through II-5 were clarified by displaying Standard Lease Terms in yellow.

In Chapter III, the air quality discussion was revised and several maps were updated, revised, and added as needed.

In Chapter IV, the air quality environmental consequences section was revised; sections on the impacts to State Highways and to recreation use and opportunities in Alpine/Tundra were added; Table IV-4 which displays the lease options by Roadless Areas was added; and further discussions of coal bed methane and the potential for timber harvest and cumulative effects are included in this FEIS.

In Chapter VI, Response to Comments were added.

A stipulation for Major Trails was added to Appendix C; the stipulation displayed in Appendix D is new; information was added to the RFD in Appendix E; and Appendices K through O were added to the document.

Appendix K is a Table of Required Permits (before drilling).

Appendix L lists existing oil and gas leases as of 2/11/93.

Appendix M is the Forest's Oil and Hazardous Spill Contingency Plan.

Appendix N is the Biological Assessment (Threatened, Endangered, and Proposed species).

Appendix O is the Biological Evaluation (sensitive species and species of concern).

# Forest Service Minerals Management Policy

The availability of mineral and energy resources within the National Forests and Grasslands significantly affects the development, economic growth, and defense of the Nation . The mission of the Forest Service in relation to minerals management is to encourage, facilitate, and administer the orderly exploration, development, and production of mineral and energy resources on National Forest System (NFS) lands to help meet the present and future needs of the Nation (Forest Service Manual 2800 Zero Code - WO Amendment 2800-91-1 page 3).

Most of the statutes that govern the management of NFS lands suggest that all uses of NFS lands are to be considered on their merits and decisions should be made as to which mix of land uses would best meet the needs of the public. The Federal Land Policy and Management Act of 1976 (FLPMA)

BLM 0047984

specifies that public lands are to be managed in a manner that recognizes the need for a domestic source of minerals. The Multiple-use Sustained Yield Act declared that the NFS lands are to be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes, but also expressly provides that the Act shall not be construed to affect the use or administration of mineral resources on these lands. The Department of Agriculture believes that mineral development is an important and beneficial use of NFS lands, and that the effect of the relevant statutes is to require that such use be considered in concert with other resources and values. Experience has shown that, in most cases, land uses, including oil and gas exploration and development can be compatible, or that conflicts with other resources can be adequately managed to allow oil and gas operations. When this is not possible, decisions must be made as to which set of resource values and land uses would provide the public the greatest benefit.

The Federal Onshore Oil and Gas Leasing Reform Act (FOOGLRA or the Leasing Reform Act) of 1987 authorized the Secretary of Agriculture to develop procedures and regulations governing leasing for oil and gas resources, including bonding and reclamation requirements, within the National Forest System. This authority was formerly exercised by the United States Department of Interior (USDI) Bureau of Land Management (BLM). Regulations governing the role of the Forest Service in oil and gas leasing operations on NFS lands were issued March 20, 1990 (36 CFR 228 Subpart E). These regulations promote cooperation between the Forest Service, BLM, industry, and the public.

In announcing the regulations, Forest Service Chief F. Dale Robertson said, *"We recognize that a component of the Nation's energy supplies must derive from the public resources on National Forests and rangeland, and also recognize the mandate to conserve the environmental quality of these regions. The regulations were created to assure that oil and gas production on NFS lands continues, but only in an environmentally sound manner."*

The Chief's thoughts are reflected in the Forest Service Manual (FSM) which states that the Forest Service administers its mineral program to (from FSM 2802):

*"1. Encourage and facilitate the orderly exploration, development, and production of mineral and energy resources within the National Forest System in order to maintain a viable, healthy minerals industry and to promote self-sufficiency in those mineral and energy resources necessary for economic growth and the national defense.*

*2. Ensure that exploration, development, and production of mineral and energy resources are conducted in an environmentally sound manner and that these activities are considered fully in the planning and management of other National Forest resources.*

*3. Ensure that lands disturbed by mineral and energy activities are reclaimed for other productive uses."*

Similarly, from FSM 2822.03: *"The Forest Service considers mineral exploration and development to be important parts of its management program. It cooperates with the Department of Interior (USDI) in administering lawful exploration and development of leasable minerals. While the Forest Service is mainly involved with surface resource management and protection, it recognizes that mineral exploration and development are ordinarily in the public interest and can be compatible in the long term, if not immediately, with the purposes for which the National Forest System lands are managed."*

BLM_0047985



**Analysis Area**

Figure I-1

Drawn By : DAF   7/92

LEGEND

— FOREST BOUNDARY

ANALYSIS AREA

(145) STATE HIGHWAY

(70) INTERSTATE HIGHWAY

(50) U.S. HIGHWAY

(702) FOREST ROAD

SCALE IN MILES
0  5  10    20    30

## Current Situation

On October 26, 1988, oil and gas leasing was suspended on five National Forests in R2, including the Grand Mesa, Uncompahgre and Gunnison. A review of the Forest's Land and Resource Management Plan (Forest Plan) and associated environmental documents indicated that additional documentation was needed to fully support Forest Service leasing consent decisions in accordance with the Leasing Reform Act. The Forest Plan predates the Leasing Reform Act and contains only general management direction for oil and gas exploration and development.

Oil and gas activities may still occur on leases issued prior to the suspension of oil and gas leasing. In 1990, R2 had over four million acres under lease for oil and gas. An estimated $36 million was collected on National Forest System lands in 1990; from rentals, bonuses, and royalties from mineral activities (including coal). Program administration costs were $2.2 million.

This Forest has existing oil and gas leases that cover approximately 185,000 acres, with the majority of the leases concentrated on the north end. The existing leases and their administration will not be affected by this analysis. In fiscal year 1992 (FY 92), the Forest had seven wells actively producing natural gas, located on both the Paonia and Collbran Ranger Districts. The seven wells produced a total of 400,000 thousand cubic feet (MCF) of natural gas and 1132 barrels of oil in FY 92.

## Lands Involved

The lands involved in the *Leasing Analysis* are located in west-central Colorado and comprise the Grand Mesa, Uncompahgre and Gunnison National Forests (see map Fig. I-1). The Grand Mesa and Uncompahgre National Forests were administratively combined in 1954 and the Gunnison was added in 1973 for a total 2,953,186 acres of National Forest System land. The Forest includes portions of Delta, Garfield, Gunnison, Hinsdale, Mesa, Montrose, Ouray, Saguache, San Juan, and San Miguel Counties.

The Forest is characterized by a large amount of intermingled ownership. Within the Forest boundary, there are 210,217 acres in private, State, or other Federal agency ownership.

Direction for *Leasing Analyses* issued by the Chief's office (Interim Directive 2820-91-1; January 2, 1992, Appendix A), states that Forest's should give priority to areas of the Forest in which there is interest in leasing (Interim Directive 2820-91-1; 2822.94a). The direction defines interest in leasing as:

1. *An interest in leasing has been expressed by the oil and gas industry;*
2. *There has been oil and gas production nearby;*
3. *The geologic environment is favorable for oil and gas to have accumulated;*
4. *There are State, private, or Federal leases in the vicinity;*
5. *Geophysical exploration has been done recently; or*
6. *The BLM indicates that lands have been nominated for lease.*

Based on this direction, the analysis area covered in this FEIS includes those areas of high and moderate potential for oil and gas resources and those areas of low and no known potential for oil and gas resources that are currently leased. The areas with low and no known potential for oil and gas resources do not meet the criteria for interest, listed above. Note also, that in those areas of low and no known potential for oil and gas resources only 8200 acres of the roughly 1.5 million acres legally available are currently leased. This is an indication of the lack of interest in leasing of those lands.

BLM_0047987

Oil and Gas Leasing Analysis FEIS

The resulting analysis area is displayed on Figure I-1. The analysis area contains approximately 951,450 acres. No NFS lands have been formally withdrawn from mineral leasing. (Wilderness, Wilderness Study Areas and further planning areas are legally unavailable for leasing [36 CFR 228.102(b)(3)], however, there are none within the analysis area.) An amendment to the regulations removed the exclusion of some Roadless Areas from oil and gas *Leasing Analysis* (published in the Federal Register 11/1/91). The intended effect is to enable the Forest Service to include Roadless Areas in oil and gas *Leasing Analyses*.

Within the analysis area there are a number of land categories, each of which suggests a different management strategy, or decision, in terms of oil and gas leasing. Based on public comments and/or Interdisciplinary Team concerns, the following *Affected Environments* were identified, mapped and digitized for the purpose of this analysis, and are described in Chapter III - Affected Environment. Site specificity in this document is represented by the discussions of each of the *Affected Environments*.

| TABLE I-1. AFFECTED ENVIRONMENTS WITHIN ANALYSIS AREA | |
|---|---|
| **Affected Environment** | **Acres\*** |
| General Forest (Analysis Area) | 951,450 |
| Floodplains | 10,200 |
| Aquatic/Riparian/Wetland Habitats | 27,600 |
| Alpine/Tundra Areas | 2,100 |
| High Geologic Hazard Areas | 52,000 |
| Moderate Geologic Hazard Areas | 629,000 |
| Roadless Areas | 345,030 |
| Research Natural Areas | 655 |
| Sensitive Areas | 29,000 |
| Retention VQO | 7,800 |
| Retention VQO and Low VAC | 7,210 |
| Scenic Byway Corridors | 18,140 |
| Semi-primitive Non-motorized (3A Management Areas) | 13,700 |
| Administrative Sites | 35 |
| Recreation Complexes (Developed, Dispersed, Trails) | 62,975 |
| Watersheds of Special Interest to Municipalities | 117,000 |

BLM_0047988

| TABLE I-1. AFFECTED ENVIRONMENTS WITHIN ANALYSIS AREA | |
|---|---|
| **Affected Environment** | **Acres\*** |
| Slopes 40-60% | 33,530 |
| Slopes > 60% | 3,415 |
| Big Game Winter Range | 207,450 |
| Elk Calving Areas | 45,230 |
| Big Game Migration Routes and Staging Areas | -- \*\* |
| Bighorn Sheep Lambing and Breeding Areas | 9335 |
| Big Game Summer Range (Concentrated Use) | 81,440 |
| Sage Grouse Leks | 160 |
| Utility Corridors/Electronic Sites | 4535 |
| Primary Rangeland (6B Management Areas) | 395,000 |
| Lands Suited for Timber Harvest | 287,000 |

\* Note: Many of these environments overlap. Acreages do NOT add up to the analysis area total.
\*\* See discussion page III-99.

# Decisions to be Made

Three decisions will be made.

**1. Identify which lands, if any, will be administratively available for leasing to private individuals or firms and the stipulations that must be applied to their respective leases.**

**2. Identify which of the lands that are administratively available, if any, the BLM will be authorized to lease - subject to later review of the identified lease parcel and consent by the Forest Service.**

**3. Amend the Forest Plan to reflect the leasing decisions that have been made.**

Regulations prescribe Forest Service responsibilities in the issuance of Federal oil and gas leases and the management of subsequent oil and gas operations on NFS lands (36 CFR 228.100(a)). These regulations (36 CFR 228.102(c)) require the authorized Forest officer (in this case, the Forest Supervisor) to conduct a *Leasing Analysis* that:

BLM_0047989

Oil and Gas Leasing Analysis FEIS

*(1) Identifies on maps those areas that will be:* (emphasis added)

> *i. Open to development subject to the terms and conditions of the standard oil and gas lease form (including an explanation of the typical standards and objectives to be enforced under the standard lease terms);*
>
> *ii. Open to development but subject to constraints that will require the use of lease stipulations such as those prohibiting surface use on areas larger than 40 acres or such other standards as may be developed in the plan for stipulation use (with discussion as to why the constraints are necessary and justifiable); and*
>
> *iii. Closed to leasing, distinguishing between those areas that are being closed through exercise of management direction, and those closed by law, regulation, etc.*

*(2) Identifies alternatives to the areas listed above, including that of not allowing leasing.*

*(3) Projects the type/amount of post-leasing activity that is reasonably foreseeable as a consequence of conducting a leasing program consistent with that described in the proposal and for each alternative.*

*(4) Analyzes the reasonable foreseeable impacts of projected post-leasing activity.*

This FEIS documents the *Leasing Analysis* for the Grand Mesa, Uncompahgre and Gunnison National Forests. The regulations require *Leasing Analyses* to comply with the National Environmental Policy Act (NEPA) of 1969, implementing regulations at 43 CFR 1500-1508 and Forest Service implementing policies and procedures set forth in Forest Service Manual 1950 and Forest Service Handbook 1909.15 (36 CFR 228.102(a)).

The *Leasing Analysis* will result in a decision as to which lands, if any, will be administratively available for leasing and what terms and stipulations would be attached to the lease (36 CFR 228.102 (d)).

The *Leasing Analysis* will also identify which of the lands that are administratively available, the BLM will be authorized to lease, subject to (36 CFR 228.102(e)):

> *(1) Verifying that oil and gas leasing of the specific lands has been adequately addressed in a NEPA document, and is consistent with the Forest land and resource management plan.*
>
> *(2) Ensuring that conditions of surface occupancy identified in 36 CFR 228.102 (c)(1) are properly included as stipulations in resulting leases.*
>
> *(3) Determining that operations and development could be allowed somewhere on each proposed lease, except where stipulations will prohibit surface occupancy.*

In much simpler terms, the decision to be made is which of the following five lease options would apply for each of the *Affected Environments* to be analyzed for oil and gas leasing:

BLM_0047990

- No Lease (NL)

- Lease with No Surface Occupancy (NSO)

- Lease with Controlled Surface Use (CSU)

- Lease with Timing Limitations (TL)

- Lease with Standard Lease Terms (SLT)

**For every *Affected Environment* within the analysis area, we are deciding whether that *Affected Environment* is available (the "d" decision) and authorized (the "e" decision) for oil and gas leasing.** The "d" and "e" decisions refer to decisions specifically required in 36 CFR 228.102 (d) and (e). We are making decisions to a map resolution of approximately 40 acres.

This is distinct from a Forest-wide program decision regarding the level of or emphasis on oil and gas leasing. That decision has essentially already been made and is well articulated in the minerals program objectives (FSM 2802) presented on page I-2. The "discretion" of the Forest Service in regulating surface use is to ensure that oil and gas activities on National Forest System lands are conducted in a manner that is environmentally sound and consistent with other surface resource values. This includes not allowing leasing or surface occupancy where surface resource values need to be protected .

The level of oil and gas leasing on a given Forest with existing oil and gas resources is determined largely by the market for these resources and industry's perceptions about the profitability of exploration and development. One factor influencing this judgement is the nature of the stipulations and restrictions imposed by the Forest Service as the surface management agency. The Forest Service has the authority to impose reasonable restrictions on oil and gas leasing activities only after "less restrictive stipulations were considered and determined to be insufficient" (Uniform Format for Oil and Gas Lease Stipulations, as adopted by Chief's 2820 letter dated 5/31/1989). Sufficiency in this case refers back to the minerals program objectives items 2 and 3 (see page I-3). We are required to discuss *"why the constraints* (stipulations) *are necessary and justifiable"* (36 CFR 228.102(c)(1)(ii)).

The decisions to be made in this analysis do not determine the emphasis for oil and gas leasing and development on the Forest; but rather, **determine whether each *Affected Environment* analyzed will be available and authorized for leasing and what stipulations are necessary to sufficiently protect resource values to an acceptable standard, within the existing minerals program emphasis .**

**However, once the management strategy for the specific *Affected Environments* is decided (a lease option has been chosen for each *Affected Environment*), the additive consequence of these decisions represent a Forest-wide program. The consequences of this "program" also need to be considered in making a final decision.** One requirement of 36 CFR 228.102(c)(3) is to *"project the type/amount of post leasing activity that is reasonably foreseeable as a consequence of conducting a leasing program consistent with that described in the proposal and for each alternative"* (emphasis added). We are obligated to compare this overall program (i.e., the preferred alternative (Alt. 2)) with at least 3 other alternatives: 1) the No Action alternative (Alt. 1), interpreted as continuation of current leasing policies reflected in the Forest Plan, 2) a No leasing alternative (no new leases) Forest-wide (Alt. 3), and 3) leasing all available areas with Standard Lease Terms (Alt. 4). One additional alternative has been developed in response to the significant issue of roadless and undeveloped areas (Alt. 5).

This dual *"Affected Environments"* plus "Forest-wide program" effects analysis suggests a two-tiered analysis process.

BLM_0047991

We must first consider the effects of the five lease options on each *Affected Environment*. Then we must examine (and disclose) the consequences of the resultant Forest-wide program and compare them with the consequences of the other "Alternatives".

The real DECISIONS TO BE MADE are which of the five lease options (including no lease) do we choose for each of these *Affected Environments*, considering both the onsite effects and the overall effect on the Forest program.

*No Surface Occupancy, Controlled Surface Use, Timing Limitations* and *Standard Lease Terms* make *Affected Environments* available, but with differing surface use requirements. *No Lease* applied to a given *Affected Environment* means it is not available for oil and gas leasing.

Our direction for making these decisions is the encouragement of oil and gas resource exploration, development and production, while imposing those restrictions necessary to ensure that the activities are environmentally sound and consistent with Forest Plan multiple use objectives.

Upon completion of the *Leasing Analysis*, the Forest Service shall promptly notify the BLM that Forest-wide leasing decisions have been made. These decisions will be displayed in the Record of Decision (ROD) that will accompany the FEIS. The BLM, responsible for the management of all Federally-owned leasable minerals, may offer and lease NFS lands authorized for leasing in the ROD.

The Forest Supervisor will make the decisions only after studying the comments received from the public on the Draft EIS. This FEIS responds to those comments. The ROD, which will accompany the FEIS, will describe all decisions. The decisions will be represented on a series of quadrangle scale (1:24000) maps that will be used in implementation. Information disclosed on the maps will include what stipulations are required and a discussion of why stipulations are necessary and justifiable (36 CFR 228.102 (c)(ii)). Because of the number of maps involved and the costs to reproduce them, they will not be distributed with the FEIS. However, they will be made available for review upon request at several locations, including the Regional Office in Denver, the Supervisor's Office in Delta and at Ranger District Offices.

The ROD will not authorize any ground-disturbing activities. Site-specific ground disturbing activities are identified at the time an Application for Permit to Drill (APD) and Surface Use Plan of Operations (SUPO) has been provided to the Forest Service for approval. (See the discussion on implementation, pages I-17 to I-19.) At that time, the Forest Service will analyze the proposal (in an Environmental Assessment [EA] or EIS) and issue a decision document (Finding of No Significant Impact [FONSI] or ROD).

The Forest Supervisor will determine whether the proposed changes are significant or non-significant (36 CFR 219.10 (f)). If the Forest Supervisor decides that the leasing availability decision is a non-significant change to the Forest Plan the reasoning will be explained in the decision document. If the Supervisor feels the decision results in a substantial change to the Forest Plan the Regional Forester must decide how the plan will be amended. The Regional Forester will prepare a decision document based on environmental analysis and public disclosure.

This document will disclose the information needed for the Forest Supervisor to determine if a Forest Plan Amendment will be required, and whether or not that amendment is significant. The Supervisor may refine the availability determinations made in the Forest Plan, identify specific mitigation requirements to be applied at the time of leasing and allow more specific mitigation to be identified at the time a Surface Use Plan of Operations (SUPO) is being analyzed.

BLM_0047992

## This EIS

### *The Two-Tiered Analysis Process*

From our discussion above it is apparent that there are two points in the decision-making process for this FEIS (making the "d" and "e" decisions) which need to be supported by environmental analysis. The first point decides which of the five lease options should be imposed. The second point considers the overall effects of the entire program compared with other possible programs (alternatives) within the discretionary choice of the agency. The sequence of the analysis documented in this FEIS and which supports the decision ultimately documented in the Record of Decision, follows this approach.

## The First Level of Analysis

Typical oil and gas exploration and development activities are described in Appendix G. A discussion of the restrictions associated with each of the five lease options and how they effect oil and gas activities is found on pages I-15 to I-16. In Chapter III, each of the *Affected Environments* is described. In Chapter IV, the environmental consequences of leasing under each of the five lease options is described for each *Affected Environment*.

Using this information, the Forest Supervisor, through a facilitated interdisciplinary review and decision meeting held on April 16, 1992, identified his choices for which lease option would be applied to each of the *Affected Environments*. This resulted in a tentatively *Preferred Alternative* or proposed action, in NEPA terms (Alternative 2). The other Forest program alternatives which deserve consideration were identified at the same time (Alternatives 1, 3, 4, 5 ).

## The Second Level of Analysis

Table II-5 (pages II-9 through II-10), describes the Forest-wide program alternatives that are carried all the way through the analysis; including the No Action Alternative (Alt. 1), the complete No Lease Alternative (Alt. 3), and the alternative of making everything *"open to development subject to the terms and conditions of the standard oil and gas lease form"* (36 CFR 228.102(c)(1)(i)) (Alt. 4). The Reasonably Foreseeable Development Scenario (RFD), in Appendix E, describes the anticipated oil and gas activity within the analysis area. How this RFD fits into the overall analysis is discussed in the section below. The environmental consequences of the five Forest-wide program alternatives are described in Chapter IV (pages IV-39 - IV-86).

In a second review and decision meeting held on May 12, 1992 the Forest Supervisor used this information to finalize the *Preferred Alternative* (Alternative 2) for the purpose of the draft. After reviewing public comment on the DEIS, the *Preferred Alternative* was modified at a November 20, 1992 meeting, and is presented in this FEIS.

### *Land Availability (36 CFR 228.102(d))*

To comply with the procedural requirements of the leasing regulations (which require compliance with NEPA), a set of maps displaying alternative patterns of lands available for leasing on the Forest have been prepared. The maps include the stipulations that will apply to all available land areas and the resource values driving the need for the stipulations. A generalized stipulation map is included in this document. Maps at a 1:24000 scale are available for review at the Regional Office in Denver, the Supervisors Office in Delta, at each Ranger District on the Forest (maps of that District only), and the BLM office in Denver.

Each alternative map shows the areas *"open to development subject to the terms and conditions of the standard oil and gas lease form, open to development but subject to constraints that will require the*

BLM_0047993

*use of lease stipulations "* and areas *"closed to leasing."* Notations will be made on the maps to indicate *"those areas that are being closed through exercise of management direction, and those closed by law, regulation, etc."* (36 CFR 228.102(c)).

The array of alternatives is designed to meet the requirements of both the oil and gas regulations and NEPA. The range of alternatives includes:

- Make all lands not available for leasing (Alternative 3);

- Make all lands **available with standard stipulations** (Alternative 4);

- Make some lands available with **mixtures of standard and supplemental stipulations** (Alternatives 1, 2 and 5).

### *Leasing Specific Lands (36 CFR 228.102(e); ID 2822.9)*

Having selected the lands that are "administratively available for leasing", the Forest Supervisor will proceed to the second decision, which is to determine which of those available lands to specifically authorize for leasing. The specific lands decision will be made on the basis of knowledge of the possible environmental effects (summarized in Chapter II and in Chapter IV) gathered from the availability analysis and the ability of the Forest Supervisor to *"verify that oil and gas leasing on the specific lands has been adequately addressed according to the requirements of the National Environmental Policy Act, that conditions of surface occupancy are properly included as stipulations in the leases,"* and that *"operations and development could be allowed somewhere on each proposed lease, except where stipulations will prohibit all surface occupancy."*

## The Need for Decisions

There are legal and practical needs for these decisions. The legal needs for these decisions have been described above (see Decisions to be Made, page I-7). The Forest Supervisor also has several other reasons to make these decisions, at this time:

**1. Since the suspension of leasing on the Forest there have been numerous requests for leases;**

**2. Additional lease requests are anticipated and;**

**3. The Forest Plan does not adequately address oil and gas leasing in respect to the Leasing Reform Act.**

During the period between suspension of leasing activity following passage of the Leasing Reform Act and the present, firms applied to the BLM for leases on portions of the Grand Mesa, Uncompahgre, and Gunnison National Forests. The BLM and the Forest Service could not properly act upon lease requests prior to completion of a *Leasing Analysis*. The Forest currently has ten lease requests needing action. As a result of this *Leasing Analysis*, the Forest Supervisor needs to determine which lands are available for leasing, and which of the ten outstanding lease requests should be authorized. (Lease requests over two years old are deleted from the database.)

The Forest currently has 124 existing leases (as of 1/27/93). (See Appendix L.) About fifty percent (50%) of these leases are expected to expire within ten years. The others are not expected to expire because they have wells currently producing or have wells capable of producing oil or gas and have been extended. The lands currently leased will be analyzed, so that, if they do expire, the decision will have

BLM_0047994

been made whether to offer them for resale and what stipulations would be attached to the lease if they were to be leased again. It is possible that currently leased lands would not be available for lease or would be available with stipulations that are not in the current lease.

Prior to this analysis, the Forest reacted to lease requests, individually. This involved the preparation of individual environmental analyses. When lease requests are studied on an individual basis, it is difficult to determine the cumulative environmental effects of the operations. This FEIS is an opportunity to plan for the orderly management of the Forest, resolve potential conflicts in land or resource use, and study the aggregate and cumulative effects of oil and gas leasing from a Forest-wide perspective.

Each administrative unit of the NFS is governed by a Forest Plan. Forest Plans provide broad, programmatic direction for the management of a National Forest. This direction is in the form of goals, objectives, land use determinations, management prescriptions, and standards and guidelines to be applied to individual projects. The existing Forest Plan includes general management direction to make lands administratively available for oil and gas leasing, but does not include decisions for leasing specific lands. Forest Plans normally do not document site-specific decisions; that is the role of project-level environmental analysis.

# The Leasing Process

In many places in the United States, NFS lands are underlain by geological formations which do, or may, contain valuable quantities of oil or natural gas. Private firms purchase "leases" on many of these lands to search for oil or gas, to drill exploratory wells, and to extract any oil or gas located below them.

## A Lease

The government conveys limited rights to the purchaser of a lease (see BLM form 3100-11, Appendix B). The lessee has the exclusive right to: (1) drill for, mine, extract, remove and dispose of all the oil and gas (except helium) in the leasehold, and (2) build and maintain necessary supporting facilities for the term of the lease. The oil and gas lease does not convey the right to build housing, cultivate the land, or remove any minerals other than oil and gas. Lease rights provide that drilling and development take precedence over rights the government may subsequently grant other users of the area, such as ranchers or recreationists. If the government has previously granted privileges by permit to others such as ranchers, those granted by the earlier permit will take precedence over the lease rights. A lease is normally issued for a period of five or ten years and is extended if it is producing oil or gas in "paying" quantities or has produced or is capable of producing in paying quantities (43 CFR 3107).

Individuals, associations of citizens, and corporations organized under the laws of the United States or any State, are entitled to lease Federal lands for these purposes under authority of the Mineral Leasing Act of 1920 as amended, and the Mineral Leasing Act for Acquired Lands of 1947 unless the lands have been specifically withdrawn by the responsible Federal agency. Leases also may be issued to a legal guardian or trustee on behalf of a minor. Aliens, whose country of origin does not deny similar privileges to U.S. citizens may hold interest in leases, but only through stock ownership of United States corporations that hold leases. Aliens may not hold interest in Federal oil and gas leases through units in publicly-traded limited partnerships.

**Competitive** and **noncompetitive** leases may be obtained for oil and gas exploration and development on lands owned or controlled by the Federal Government. The Leasing Reform Act requires all public lands available for oil and gas leasing to be offered first by competitive leasing at an oral action.

BLM_0047995

Oil and Gas Leasing Analysis FEIS

Noncompetitive leases may be issued only if the competitive process results in no bids. Both competitive and noncompetitive leases are issued for a ten-year period. Both are extended for the duration that they are producing oil and gas in paying quantities. The maximum competitive lease size is 2,560 acres (four sections) in the lower 48 states and 5,760 acres in Alaska. The maximum noncompetitive lease size is 10,240 acres in all states.

## Competitive Leases

The BLM conducts oral auctions for oil and gas leases on at least a quarterly basis, when there are available parcels of land. A Notice of Competitive Lease Sale lists lease parcels to be offered at auction. The Sale Notice is published at least 45 days before the date of the auction and identifies any lease stipulations to uses or restrictions on surface occupancy. There are three sources for Federal lands available for lease:

1. Existing leases which have expired, and leases which have been terminated, canceled, or relinquished.

2. Parcels identified by informal expressions of interest from either the public or BLM for management reasons.

3. Lands included in offers filed for noncompetitive leases (effective January 3, 1989).

On the day of the auction, successful bidders must submit a properly executed lease bid form and make a payment consisting of a share of the sale costs ($75 per lease), one year advance rental ($1.50 per acre), and not less than the $2.00 per acre minimum bonus. The balance of the bonus bid must be received within 10 working days of the auction.

The bid form (Appendix B) constitutes the legally binding lease offer.

## Noncompetitive Leases

Noncompetitive leases may be issued only for parcels which have been offered competitively and failed to receive a bid. Lands in expired, terminated, canceled or relinquished leases are not available for noncompetitive leasing until they have been offered competitively. After an auction, all lands that were offered competitively without receiving a bid are available for issuance of noncompetitive leases for a period of two years.

Noncompetitive offers must be submitted on BLM Form 3100-11 (June 1988), Offer to Lease and Lease for Oil and Gas (Appendix B), and they must include a $75 filing fee, and one year advance rental ($1.50 per acre).

Noncompetitive lease offers filed on the first business day following the auction are considered as having been filed simultaneously. The priority among multiple offers received on the first business day for the same parcel are determined by drawings open to the public.

### *Royalties*

The United States receives a royalty of 12 1/2% based on the value of production removed or sold. It is paid either in value (dollars) or in kind (oil or gas).

### *Bonding*

Prior to starting drilling operations, the lessee must submit a surety or personal bond as described in the BLM regulations (43 CFR 3104). The bond for an individual lease is $10,000. Lessees may furnish

The Leasing Process

BLM_0047996

a State-wide bond of $25,000 or a nation-wide bond of $150,000. If their bonds are not adequate to ensure complete and timely reclamation, the Forest Service will require a bond based on the estimated reclamation costs. This can be an increase in the instrument held by the BLM or a separate instrument held by the Forest Service. The Forest Service, at any time, may review the bond and require additional bonding. Usually increased bond amounts are determined as part of the APD appraisal process. The Forest Service may also, at the operators request, reduce or release liability to the extent that reclamation has been completed.

## *Stipulations*

The *Standard Lease Terms*, contained on BLM Form 3100-11 (June 1988), Offer to Lease and Lease for Oil and Gas (See Appendix B), provide the lessee the right to use the leased land as needed to explore for, drill for, extract, remove and dispose of oil and gas deposits located under the leased lands. The lessee must conduct operations in a manner that minimizes adverse impacts to the land, air, water, cultural, biological, visual, and other resources, as well as other land uses or users. Federal environmental protection laws such as the Clean Water Act, Endangered Species Act, and Historic Preservation Act, will be applied to all lands and are included in the standard lease stipulations. The *Standard Lease Terms* require that if threatened or endangered species, objects of historic, cultural or scientific value, or substantial unanticipated environmental effects are encountered during operations, all work affecting the resource will stop and the land management agency will be contacted. Operations which would destroy or harm these species or objects are prohibited.

*Standard Lease Terms* provide for reasonable measures to minimize adverse impacts to surface resources. *Standard Lease Terms* include, but are not limited to, modifications to the siting or design of facilities, timing of operations, and specifications of interim and final reclamation measures.

A lease does not convey an unlimited right to explore or an unlimited right to develop any oil or gas resources found under the land. Leases are subject to terms and conditions. These are restrictions derived from legal statutes and measures to minimize adverse impacts to other resources and are generally characterized in a lease as ***stipulations***. Stipulations modify the rights the government grants to a lessee. The stipulations are known by potential lessees prior to any lease sale, and must be applied at the time of APD. *Standard Lease Terms* can be modified by special or supplemental stipulations, which may be attached to the lease. Additional special stipulations can be developed specifically to meet resource concerns that cannot be mitigated by existing stipulations. All stipulations which may be applied when implementing the Forest Supervisor's decisions are detailed in Appendix C.

The Rocky Mountain Regional Coordinating Committee published "Uniform Format for Oil and Gas Stipulations" in March 1989. A uniform format for stipulations was developed for the categories of: (1) no surface occupancy, (2) timing or seasonal restriction, and (3) controlled surface use. This guidance includes the use of lease notices. There is also provision for special administration or unique stipulations, such as those required by prior agreements between agencies or other instances when standardized forms are not appropriate. These formats have been adopted for nationwide use by the Chief (2820 letter; 5/31/89).

The *No Surface Occupancy (NSO)* stipulation is intended for use only when other stipulations are determined insufficient to adequately protect the public interest. *No Surface Occupancy* means just that. No roads, buildings, well pads, and pipelines would be allowed. No disturbance or use of the surface would be allowed in those *Affected Environments* where the *No Surface Occupancy* stipulation is selected, except if waived, excepted or modified. (See Waivers, Exceptions and Modifications, below.)

The *Timing Limitation* stipulation prohibits oil and gas mineral exploration and development activities for time periods less than yearlong. This stipulation does not apply to the operation and

BLM_0047997

Oil and Gas Leasing Analysis FEIS

maintenance of production facilities unless the analysis findings demonstrate the continued need for such mitigation and that less stringent, project-specific mitigation measures would be insufficient, i.e., this stipulation may be applied to operation and maintenance of production facilities if the need is identified in the APD and subsequent NEPA documents.

For example, a *Timing Limitation* might be used to protect an elk calving area during the elk calving period, or to prevent excessive soil erosion and stream sedimentation resulting from construction activities during periods when soils are saturated. The *Timing Limitation* would not allow surface use during a prescribed period of time on all or a portion of the lease. The *Timing Limitation* may also specify that the restrictions apply when certain surface conditions exist, such as water saturated soils or during spring thaws when road beds are too soft to allow traffic without unacceptable damage to the road.

The *Controlled Surface Use (CSU)* stipulation is intended for use when oil and gas development is generally allowed on all or portions of the lease area year-round, but because of special values, or resource concerns, lease activities must be strictly controlled. The *CSU* stipulation is used to identify constraints on surface use or operations which may otherwise exceed the mitigation provided by section 6 of the *Standard Lease Terms* (see BLM form 3100-11 [June 1988], in Appendix B), existing regulations and Onshore Oil and Gas Orders.

The use of *CSU* stipulations should be limited to areas where restrictions and controls are necessary for specific types of activities within the specific *Affected Environments*, rather than all activity on the lease. The stipulation should clearly describe the activity to be controlled or what operational constraints are required and must identify the applicable area and the reason for the requirement.

For example, a *CSU* stipulation might be used to protect the visual quality objectives of an area or to protect semi-primitive recreation values. To protect those resources, a *CSU* stipulation might be attached to the lease which specifies that access to the leasehold be restricted to the established road system. In this example, no new road construction would be allowed. The lessee would have to use the existing road system to conduct operations on his leasehold.

A *Lease Notice* is attached to leases to transmit information at the time of lease issuance to assist the lessee in submitting acceptable plans of operation, or to assist in administration of leases. *Lease Notices* do not involve new restrictions or requirements; they identify specific concern(s) that may impact lease operations on a given lease. Any requirements contained in a *Lease Notice* must be fully supported in either a law, regulation, *Standard Lease Terms*, or Onshore Oil and Gas Orders.

Special administration stipulations are used where the three uniform stipulation forms or *Lease Notices* do not adequately address the concern. They should be used only when special external conditions, such as pre-existing agreements with other agencies, require use of a one-of-a-kind stipulation that is not used in any other area or situation. The resource use or value, location, and specific restrictions must be clearly identified.

### *Waivers, Exceptions and Modifications*

An operator submitting a SUPO may request the authorized Forest Officer to authorize the BLM to modify (permanently change), waive (permanently remove), or grant an exception (case-by-case exemption) to a stipulation included in a lease at the direction of the Forest Service. Compliance with NEPA is required. The authorized Forest Officer may authorize the BLM to modify, waive, or grant an exception to a stipulation provided:

1. The action would be consistent with applicable Federal laws;

2. The action would be consistent with the current Forest Plan;

BLM_0047998

3. The management objective which led the Forest Service to require the inclusion of the stipulation in the lease can be met without restricting operations in the manner provided for by the stipulation given a change in the present condition of the surface resources involved, or given the nature, location, timing, or design of the proposed operations;

4. The action is acceptable to the authorized Forest Officer based upon environmental review (36 CFR 228.104).

Decisions to modify, waive, or grant an exception to a lease stipulation shall be subject to administrative appeal only in conjunction with an appeal of a decision on a Surface Use Plan of Operations (36 CFR 228.104 (d)(2)). Waiver, modification, or exception to a restrictive stipulation may result in application of a less restrictive stipulation. For example an exception for NSO may result in a *Timing Limitation* to protect a resource or use that was previously covered by *NSO*.

The lease also requires that the lessee meet stipulation conditions or avoid activities within all, or an identified part, of the leasehold. All leases on NFS lands contain the "Stipulation for Lands of the National Forest System Under Jurisdiction of Department of Agriculture" (Appendix D) requiring the lessee to comply with the rules and regulations of the Department of Agriculture. All leases are subject to regulations and formal orders of the Secretaries of the Interior and Agriculture in effect at the time of issuance.

## *Implementation: The Staged Decision Process*

Implementation is part of a four stage decision process. The U.S. Supreme Court in Robertson v. Methow Valley Citizens Council, 104 L.Ed.2d 351 (1989), upheld the use of more than one stage of NEPA compliance after a Forest Plan is issued. In the Methow Valley situation, there was a permit stage (which allowed no ground-disturbing activities) and a faster development plan stage which involved another NEPA process and decision by the Forest Service before ground-disturbing activities would be experienced. This is very similar to the situation that is involved here.

Forest Service policy is to generally support oil and gas activities, but proposed activities must not unduly harm the environment or disproportionately interfere with other uses of NFS lands. A regulatory framework has been created to meet industry's needs while protecting other resources. The regulations include staged permitting of oil and gas exploration and development. Those stages include public disclosure at the following decision points: (1) the determination of lands available for leasing, (2) the authorization to lease specific lands, (3) Application for Permit to Drill (APD) and (4) amendment of the permit to drill if field development occurs. Each decision is based on environmental analysis and disclosure of the probable effects is in accord with NEPA requirements and is appealable to the responsible Federal agency. Note that neither of the first two decisions authorizes ground-disturbing activities and that only decision points 1 and 2 are addressed in this document. Decisions regarding APD approval for individual wells or for wells drilled to develop a discovered field would be addressed in subsequent NEPA analyses.

Stage one identifies those lands available for leasing based on disclosure and analysis provided in a *Leasing Analysis*. The *Leasing Analysis* is a "programmatic" rather than a "site-specific" or "project" level activity. The *Leasing Analysis* is a plan level decision which will determine which, if any, lands will be identified as available for leasing and under what terms and stipulations. No rights are granted by the government to other parties when the *Leasing Analysis* is completed and the leasing availability decision described in the regulations (36 CFR 228.102(d)) is made. The BLM and Forest Service are cooperating agencies in the *Leasing Analysis*.

This decision enables the oil and gas industry to know which NFS lands may be available now or in the future for leasing, and with what stipulations. Forest Service publication of these decisions is

BLM_0047999

intended to enable the oil and gas industry to undertake long-range planning. However, at this point, the Forest Service makes no irreversible or irrevocable decisions to lease these lands.

Stage two makes leasing decisions for specific lands. As discussed above, the Leasing Reform Act also provides for authorization by the Forest Service to the BLM to offer and issue oil and gas leases for specific lands.

The Forest Supervisor may decide to authorize lease of all the lands described as "administratively available" in the *Leasing Analysis*, or to lease only a portion of the "available" lands. The actual authorization of BLM to advertise specific leases is considered to be an implementation step and will not be granted until the lease parcel has been identified.

The Forest has decided to administratively combine the leasing decision, with stage two, the leasing specific lands decision. Both of these decisions will be documented in the ROD. Once these decisions have been made and provided to the BLM they will work with industry to identify specific lease parcels to the Forest Service. At the time that the ROD is signed for the availability and specific lands decision, authority is not granted to the BLM to authorize a specific lease parcel. Authority to lease is granted only after a specific lease proposal has been received and reviewed by the Forest Service. The Forest Service may authorize or deny the lease parcel advertisement.

When the Forest Service receives a lease request and parcel identification from the BLM, the resource and stipulation maps, the *Leasing Analysis*, the availability determination , and authorization decisions will be reviewed. If the lands have been adequately addressed in a NEPA document with the proper stipulations attached and occupancy can be provided somewhere on the lease parcel, the Forest Service will notify the BLM and authorize the advertising of the parcel. If occupancy cannot be provided based on the review, the BLM will deny the request for leasing and work with the interested party and the Forest Service to determine if the parcel boundaries can be redefined to allow for occupancy or the parcel can be offered with a *No Surface Occupancy* stipulation. Even though the Forest Service consents to the offering of an oil and gas lease, the lease may ultimately not be issued by the BLM. At the time of offering no individual or firm may be interested in the parcel.

Stage three of the process is the Application for Permit to Drill (APD). Once the Forest Service authorizes the BLM to lease a specific parcel and the parcel has been sold, the rights to apply for permission to drill are granted to the lessee. However, prior to any ground disturbing activities the lessee must have an APD approved by the BLM. The APD includes a site-specific Surface Use Plan of Operations (SUPO). The BLM will then forward the application and the proposed SUPO to the Forest Service. The type, timing, size, and intensity of the proposed operations and the sensitivity of the surface resources that would be affected by the proposed operations determine the level of detail and the amount of information which the operator should include in the proposed SUPO. However, any SUPO submitted by an operator shall contain the information specified by Onshore Oil and Gas Orders in effect when the SUPO is submitted.   An onsite review of the proposal is conducted prior to a final decision on the SUPO. Prior to approval, modification, or denial of the SUPO, the proposal will be analyzed by the Forest Service in a NEPA document (subject to appeal). If the proposal is denied, the lessee may make another proposal. It is only after the APD and SUPO are received, analyzed, and approved that the lessee receives the approval to begin ground disturbing activities. The SUPO review process is described in 36 CFR 228.107. The SUPO may be modified, approved, or even denied at this stage.

Appendix K is a table listing Federal, State and local permits necessary for oil and gas activities.

Lessees do not automatically or immediately drill exploratory wells on their leaseholds. Exploration for oil and gas resources is costly and speculative. Exploration firms consider what is known geologically about an area and available technology, capital, equipment, and market conditions in evaluating the risk of a drilling operation. Costly equipment, land rights, and expensive environmental protection measures may be required to carry out an oil and gas exploration program. As a result, oil

BLM  0048000

and gas leases are bought, relinquished, expire, and may be bought and sold again many times without ever being drilled upon.

If an APD is granted, the well or wells authorized may or may not be drilled. If the well is drilled, there is no guarantee that it will result in a discovery of oil or gas. Only about 15 percent of exploratory wells drilled in the United States result in a paying discovery of oil or gas. This is a major distinction between oil and gas leasing and other uses which are authorized by the Forest Service. Most other activities are reasonably certain to proceed to development after the permit or contract is issued.

Stage four. Submission of additional APD's is required for wells proposed to develop oil and gas resources found through exploratory activities. Operators may request approval of additional or supplemental SUPO's to allow development activities. At that time the Forest Service must analyze the effects of these proposals and issue a decision document stipulating conditions of use and development. In other words, after a discovery of oil or gas resources, an operator may request approval of additional APD's and SUPO's to develop the resources found. The analysis and decision made will be documented in a NEPA analysis.

# Reasonably Foreseeable Development

In the assessment of environmental effects of an action, it is important to first clearly understand in detail what the action entails. The decision to grant lease rights on public lands conveys to the holder the right to explore for and to develop the oil and gas resources found there. In the most development possible scenario this could result in an intensely developed and roaded landscape, with all of the associated effects of this development. In such a case, the cumulative environmental effects discussed in Chapters II and IV of this EIS would be much greater.

However, the likelihood of such development levels is extremely remote. The factors of mountainous terrain, low producing gas reserves and low level of demand relative to other sources, combine to make the area covered in this EIS relatively unattractive for development. These and other factors affecting the levels of likely development are discussed in detail in Chapter II where the RFD is presented, and in Chapter VI where public comments are answered.

The regulations governing the preparation of this analysis repeatedly use the concept of what is *"reasonably foreseeable"*. In addressing "incomplete and unavailable information", the 40 CFR 1500 regulations (at 1502.22) talk about *"evaluating reasonably foreseeable significant adverse effects"*. In addressing cumulative impacts at 1508.7, the regulations refer to *"past, present, and reasonably foreseeable future actions..."*. We believe that this NEPA language ties directly to the requirements of the 36 CFR 228 regulations also governing the preparation of this EIS.

The Forest Service is required by the regulations, at 36 CFR 228.102(c)(3 and 4), to *"Project the type/amount of post-leasing activity that is reasonably foreseeable as a consequence of conducting a leasing program consistent with that described in the proposal and for each alternative and analyze the reasonable foreseeable impacts of post-leasing activity "* as a part of the analysis.

BLM staff specialists have projected the probable amount and pattern of future exploration and development. They have provided a "reasonably foreseeable development" (RFD) scenario to describe when and where oil and gas activities may take place. The RFD for this *Leasing Analysis* is in Appendix E.

The Reasonably Foreseeable Development Scenario (RFD) predicts the level of oil and gas exploration and development which will occur on the Forest in the next 15 years. This information is important in assessing the overall environmental, as well as social and economic impacts of such

BLM_0048001

development. Under the possible different programs represented by Alternatives 1 through 5, it is conceivable that more or less oil and gas activity would occur. Under the more restrictive Alternatives (3 & 5), the industry may choose to divert their activities elsewhere in the Forest, the State, or even the world. One of our regulatory obligations is to disclose the consequence of our decisions to the reasonably foreseeable amount of post-leasing activity (36 CFR 228.102(c)(3)). Assessing the impact of the 5 alternatives on the RFD allows us to do that.

The RFD does not suggest specific locations of potential wells beyond indicating a general area of anticipated occurrence (such as 5 wells in the area of moderate potential for oil and gas resources). Thus the RFD does not provide a basis for site specific discussion of environmental consequences. Recall that at the first level of our analysis, we are deciding whether areas are available and authorized for lease. That means we must have considered the hypothetical siting of a well hole and access on each Affected Environment and we must have considered the environmental effects.

The RFD does offer some indication of spacing for the purpose of doing the site specific analysis. Other than that, the RFD is divorced from this site specific analysis. Our decision for a given area consists of considering the typical activities associated with exploration, access and siting, and developing oil and/or gas resources on that area. (Typical activities are described in detail in Appendix G.) It is this description coupled with the specific *Affected Environments* which is the basis for the discussion of environmental effects of lease options in the first phase of the analysis (documented on pages IV-1 to IV-38 of Chapter IV).

Consideration of the RFD at the Forest Program level is discussed in appropriate detail at the second phase of the analysis (pages IV-39 to IV-86 of Chapter IV).

## Forest Plan Amendments

Existing Forest Plan direction for oil and gas leasing, exploration and development activities is in Appendix H. This direction is inadequate to implement the Leasing Reform Act. As a result of the *Leasing Analysis*, changes to Forest Plan direction have been proposed, and are listed in Appendix H.

When a change to the Forest Plan is needed the Forest Supervisor will prepare an amendment and conduct an environmental analysis. Non-significant amendments may be approved by the Forest Supervisor. Significant amendments must be approved by the Regional Forester, and the development and approval of a significant amendment must follow the same procedures as were required for developing and approving the current Forest Plan. "Significance" is defined, in this case, by the National Forest Management Act regulations, and is different than "significance" as defined by the National Environmental Policy Act.

The Forest Supervisor may amend, or recommend to amend the Forest Plan at any time. An amendment may result from:

1. Recommendations of an interdisciplinary team, based on the results of monitoring and evaluation.

2. Decisions by the Forest Supervisor that existing or proposed permits, contracts, cooperative agreements, or other instruments authorizing occupancy and use are appropriate, but are not consistent with the Forest Plan.

3. Changes in proposed implementation schedules, resulting from differences between Forest Plan projected funding levels and actual funds appropriated.

4. Administrative appeal decisions.

BLM 0048002

5. Planning errors found during plan implementation.

6. Changes in physical, biological, social, or economic conditions.

7. Implementation of new legislation.

The information and decisions disclosed in this document and Record of Decision will be incorporated into the Land and Resource Management Plan for the Grand Mesa, Uncompahgre, and Gunnison National Forests, as an amendment to the Plan. The time period the decisions will be in effect, and processes for review, revision, implementation, and monitoring will be identified.

# Issue Identification

### *Public Involvement and Scoping*

The Forest Service invited written comments concerning this *Leasing Analysis* in a Notice of Intent to Prepare an Environmental Impact Statement, published in the Federal Register, Volume 55, No. 207, Thursday, October 25, 1990. The Notice of Intent also announced an open house to be held November 14, 1990 in Montrose, Colorado.

The Montrose open house and two other meetings were announced in the Montrose Daily Press, the Grand Junction Sentinel, and the Delta County Independent. Meetings were held in Montrose on November 14, 1990; in Paonia, Colorado on November 28, 1990; and in Grand Junction, Colorado on December 5, 1990. In addition to the public meetings, a meeting was held with the Delta County Commissioners on December 17, 1990. A second round of open house meetings was conducted April 7, 8 and 9, 1992, in Grand Junction, Paonia and Montrose, Colorado.

The Forest received a total of 20 letters from various members of the public, industry, and environmental groups.

Additionally, informal meetings to discuss the progress of the EIS, our analysis process, and issues were held with representatives of the Colorado Environmental Coalition and the Colorado Mountain Club, on February 20, 1992, and with representatives of the Rocky Mountain Oil and Gas Association and the Independent Petroleum Association of Mountain States, on February 21, 1992. Both meetings were in Denver, Colorado.

To perform the environmental analyses for the leasing decisions, an interdisciplinary (ID) team was assembled. The core team includes a soil scientist, a wildlife biologist, a landscape architect, a transportation planner (engineer), an oil and gas leasing specialist, and a geologist. Other specialists involved in the process includes a fisheries biologist, a range conservationist, a forester, a hydrologist, and a sociologist/economist.

The ID team reviewed literature associated with oil and gas exploration and production and with environmental impacts of these activities. They visited oil and gas drilling, production, and reclamation activities currently taking place on the Forest, and consulted with experts in the BLM, the Colorado Division of Wildlife, the U.S. Fish and Wildlife Service, and other Federal and State agencies. They also consulted with the public to learn about possible environmental, social and economic issues associated with such activities. Finally, they identified and mapped the environmental characteristics of the NFS lands to learn how these lands might be affected by these activities.

The DEIS was published in August, 1992. Four open houses were held September 2, 3, 8 and 10, 1992, in Grand Junction, Paonia, Denver  and Montrose, respectively, to discuss the DEIS with

BLM_0048003

interested publics. Forest Service representatives met with members of Western Colorado Congress, September 16, 1992, in Montrose. The Forest Rescue group in Crested Butte, Colorado, requested that Forest Service representatives speak at their meeting September 24, 1992.

The public comment period extended from August 17, 1992 through October 13, 1992. The Forest received 270 letters from various individuals, industry, environmental groups, local, State and Federal agencies. Comments and responses can be found in Chapter VI.

These various background study activities are termed *scoping* in NEPA procedural regulations. These scoping activities were conducted to help identify the elements of the environment likely to be affected by the leasing decisions, determine what the significant environmental issues are associated with these decisions, and to determine what information and analyses are needed to make these decisions.

## *Consultation with Other Agencies*

The Bureau of Land Management (BLM), as a cooperating agency, provided expertise in the areas of oil and gas operations, geology and groundwater, geographic information systems (GIS), and provided the Reasonably Foreseeable Development Scenario (RFD). Montrose District Office (BLM) personnel were consulted on a regular basis and attended some of the interdisciplinary team and management team meetings.

The Colorado Division of Wildlife (CDOW) was contacted for information and recommendations on wildlife "critical habitats" and other concerns related to the potential effects on wildlife as a result of oil and gas activities. A meeting with representatives of the CDOW was held on May 19, 1992 to discuss their concerns with the potential for oil and gas activity on the various wildlife ranges on the Forest. They also provided their wildlife inventories for inclusion and analysis in the BLM geographic information system.

The Routt and White River National Forests are also in the process of conducting oil and gas *Leasing Analyses*. Meetings were held with them to discuss consistency in the application of stipulations across Forest boundaries. The meetings were held in Glenwood Springs, Colorado on February 11 and 26, 1992; in Montrose, Colorado on November 9, 1992; in Rifle, Colorado on January 6, 1993; and again in Glenwood Springs on January 12, 1993.

### *Issues*

The scoping process helped to identify the issues involved in oil and gas leasing activities. The responses from the public, along with concerns of the ID team discussed during scoping meetings were used to formulate and define the pertinent issues. Note that some of the issues listed below are related to other issues. For example, the issue of road, pipeline, and drilling pad construction is closely related to the issues of wildlife and wildlife habitat, water quality, visual resources, and unroaded areas. The issues are listed below by category. Issues identified by the public and/or other agencies are noted with an asterisk.

## Wildlife, Fisheries, and Range Issues

1. What would be the effect of oil and gas activities (disturbance - a greater human presence) on wildlife? *

2. How would wildlife security cover be affected?

3. What would be the effect on wildlife and fisheries sensitive areas?

4. What are the potential cumulative effects on wildlife and fisheries as a result of oil and gas activities? *

5. What would be the impact of road construction on deer, elk, raptors and other wildlife? What would be the effect of reduced forage from road and well pad construction on wildlife? *

6. What would be the effect on poaching levels (especially of T & E species) from oil and gas activities?

7. What timing restrictions for the protection of wildlife would be required?

8. What would be the effect of oil and gas activities on deer, elk, and other wildlife winter range? *

9. What would be the effect on fur-bearers (potential increase in trapping due to increased access opportunities)?

10. What would be the effect on animal numbers? What would be the effect on wildlife habitat (some components of habitat are listed above as separate issues)?

11. What would be the effect on the fishery? What would be the effect on fish numbers?

12. What would be the effect on old growth habitats? (Plant and animal)

13. What would be the effect on biodiversity? (Plant and animal)

14. What would be the effect on threatened, endangered and sensitive wildlife, fish and plant species and critical habitat for those species? Since there is a lack of an adequate inventory on the Forest, how can we adequately address this issue? *

15. What would be the effect of increased road levels on livestock movement and accessibility to additional forage?

16. How would the spread of noxious weeds be affected by oil and gas operations? How would the spread of noxious weeds be controlled?

## Recreation Issues

1. What would be the effect on hunting and fishing qualities?

2. How would developed and dispersed recreational use and aesthetics be affected?

3. How would Wilderness and lands with "wilderness qualities" be affected? *

4. What would be the effect on existing undeveloped areas with primitive access (areas without a road system) i.e., what would be the impacts of new roaded access? *

5. What would be the effect on the Roadless Areas as identified in the Forest Plan? What would be the effect on Roadless Areas as identified in RARE II? What would be the effect on solitude in those undeveloped/Roadless Areas? *

6. What would be the effect on developed recreation sites and along public highways?*

7. What would be the effect on Scenic Byways? *

BLM_0048005

Oil and Gas Leasing Analysis FEIS

8. What would be the effect on Research Natural Areas? *

9. What would be the effect on recreational qualities, i.e., sights, sounds, smells, etc.? What would be the effect on recreational experiences?

10. What would be the effect on the Recreation Opportunity Spectrum (ROS) character from oil and gas activities? Can access be provided while maintaining the semi-primitive non-motorized (SPNM) ROS experience? i.e., is oil and gas exploration and development compatible with semi-primitive recreation values and opportunities? *

11. What would be the effect on recreation users with increased industrial traffic on the road system?

12. What would be the effect on outfitters and guides and other permitted special uses?

13. What would be the effect on wild and scenic rivers? (Note that East River and Taylor River were identified as potential wild and scenic, but were determined not eligible - see page II-27 of the Forest Plan amendment.)

14. What would be the direct and cumulative effects on visual resources? What would be the effect on the visual quality of Grand Mesa as viewed from below (Grand Junction and public highways)? What would be the affect on the visual quality along the Kebler Pass road?

15. What would be the effect on trails, trail heads, and special areas?

16. What would be the impacts to the Curecanti National Recreation Area and Black Canyon National Monument?

## Watershed Issues

1. What would be the effect of oil and gas activities on municipal watersheds? *

2. Would cumulative watershed effects occur? * (How can we model watershed cumulative effects?)

3. What reclamation standards would be applied? What is the capability of the land for revegetation?

4. What would be the effect on surface and groundwater quality and quantity (yield)?

5. What would be the effect on sediment yield? What would be the effect on the soil resource? How much soil would be displaced?

6. Assuming increased sedimentation from oil and gas activities what would be the effect on the life expectancy of the Paonia Dam? *

7. What would be the effect on slope stability and geologic hazards?

8. What would be the effect on riparian areas, floodplains, and wetlands? *

9. What would be the effect of hazardous material accidents/spills? *

10. Do Best Management Practices (BMP's) cover O & G operations? The R2 BMP's are in the draft stage.

BLM_0048006

### Management/Administration Issues

1. How would the EIS be tiered to the Forest Plan?

   a. standards and guidelines

   b. management areas

   c. suited timberlands

   d. grazing levels

   e. recreation and wildlife operation and maintenance funds

   f. Forest-wide O & G standards and guidelines

2. How will the Forest Plan be amended?

3. How will the EIS relate to the Regional guide? (the Forest Plan amendment is under the old guide)

4. How much control does the Forest Service have over future development? Can we limit the number of wells/development?

5. Are current management prescriptions appropriate? Do we need an oil and gas prescription?

6. Is there consistency in our dealings, practices and standards with the O & G and timber industries? For example, do we allow oil and gas operations on a parcel of land that is not suited for timber production?

7. What would be the effect on Forest Service workloads considering current funding levels?

8. Under what circumstances will the FS grant an exception, modification, or waiver to a stipulation? *

9. Will and do we need to be consistent with adjacent forests and the BLM in our stipulations and standards and guidelines?

10. What would be the effect of our stipulations and standards and guidelines on industries ability to explore, develop and produce oil and gas? *

11. How will we manage areas of low, moderate, high and unknown potential for oil and gas? *

12. To what extent should we identify mitigation measures rather than use of lease stipulations to achieve the desired resource protection? *

## Road Issues

*(Road related issues are also discussed under watershed, recreation, and wildlife, fisheries and range issues.)*

1. What would be the loss in suitable timber and/or range land due to road and well pad construction?

2. What would be the loss of forage with road and well pad construction?

BLM_0048007

3. Who pays and how much do they pay for road maintenance on roads with mixed industrial use (timber and oil and gas)?

4. What road standards would be needed for an oil and gas transportation system? The "gold" book (Surface Operating Standards for Oil and Gas Exploration and Development) has guidelines for roads and access ways. Do we need to vary from these published standards?

5. What would be the effect on road maintenance costs to the counties (and the Forest Service) due to increased traffic levels?.

6. How would the road systems be managed?

7. How would the construction of roads affect timber suitability? Road access may change some previously unsuitable timber land to suitable. There would be an opportunity to add to the Forest's timber base.

8. What would be the potential conflicts between special uses of the Forest for utility corridors and oil and gas leasing? Would/could powerline roads be used for access?

## Socioeconomic Issues

1. What would be the effect on tourism?

2. What would be the effect on the local, regional and State economies?

3. Would jobs be created?

4. How much revenue would be generated from oil and gas leasing? How much royalty money would be generated for the Federal treasury and local governments (the treasury would receive 1/8 share of value)? Would energy impact monies be available? What would be the effect on property taxes?

5. What is the demand for oil and gas resources? *

## Oil and Gas Operations Issues

1. What, if any, time constraints would/could be placed on servicing new and existing wells? (timing during the day)

2. What is the potential for "blow-out" and what effects would occur on the surface and in the subsurface?

3. What would be the sources and effects of increased noise levels (short and long term)? Compressors, traffic, etc..

4. What would be the potential for hazards to the public from proposed oil and gas leasing and development? Hazards include fire, industrial activity, hazardous materials (hydrogen sulfide gases, etc.), and increased industrial traffic. What is the potential for an oil or gas well fire? Who would suppress such a fire and how would it be suppressed?

5. How would on-site waste disposal be handled? What sanitary facilities would be required? How would litter be controlled?

6. What type of reserve pit system (open or closed) would be used?

BLM_0048008

7.  What would be the effect of oil and gas leases on lands previously leased for coal?

8.  Would subsidence occur as a result of the removal of oil and gas resources?

9.  What standards for pipeline location would be required?

## Miscellaneous Issues

1.  What would be the effect on air quality from dust and potential releases of carbon dioxide, sulfur dioxide, hydrogen sulfide, and methane? Can and should we address the global warming issue?

2.  How much timber would be harvested? What would be the effect on aspen stands from a visual and recreational perspective?

3.  What would be the rate and density of development as estimated by the Reasonably Foreseeable Development (RFD) scenario?

4.  What would be the effect on cultural resources?

5.  What would be the effect on FS administrative sites?

*The following issues will be addressed at the APD (project level) stage:*

1.  Buffers around specific campgrounds.

2.  Old-growth/biodiversity will be tiered to the Forest Plan (if we can do this and still address the issues).

3.  Road use issues on specific roads.

4.  Timing restrictions on specific roads.

5.  Specifics of waste disposal .

6.  Road use conflicts on specific roads.

7.  Closures of specific roads.

8.  Subsidence as a result of removal of oil and gas resources.

9.  Quantification of soil loss/displacement.

### *The Major Issues*

The ID team identified five major issues. These issues will be used to compare the effects that implementation of an alternative will have on the environment relative to that of another alternative. They are:

1.  Slope stability and geologic hazards.

2.  Roadless and undeveloped areas.

3.  Wildlife and wildlife habitat.

4.  Recreational activities and experiences.

5.  Cumulative impacts to wildlife, fisheries, watershed values, timber and oil and gas resources.

BLM_0048009

BLM_0048010

# Chapter II - Alternatives

BLM_0048011

BLM_0048012

# Table of Contents

| | |
|---|---|
| Introduction | II-1 |
| Activities and Assumptions Relating to Oil and Gas Development | II-1 |
| Typical Oil and Gas Activities | II-1 |
| Analysis Assumptions | II-1 |
| Assumptions For Any Oil and Gas Lease | II-1 |
| Assumptions on the Forest for Direct and Indirect Effects | II-3 |
| Connected Actions | II-7 |
| Descriptions of Alternatives | II-8 |
| Lease Options (First Level Analysis and Decisions) | II-8 |
| Program Alternatives (Second Level Analysis and Decision) | II-8 |
| Alternative 1 - No Action | II-11 |
| Alternative 2 - Preferred | II-12 |
| Alternative 3 - No Lease | II-12 |
| Alternative 4 - Lease with Standard Lease Terms | II-13 |
| Alternative 5 - No Lease in Roadless and SPNM | II-13 |
| Mitigation | II-13 |
| Comparison of Alternatives | II-14 |
| Summary Comparison of Lease Options | II-14 |
| General Forest | II-15 |
| Floodplains | II-19 |
| Aquatic/Riparian/Wetland Habitats | II-20 |
| Alpine/Tundra Area | II-22 |
| High Geologic Hazard | II-24 |
| Moderate Geologic Hazard | II-25 |
| Roadless Areas | II-26 |
| Research Natural Areas | II-27 |
| Sensitive Areas | II-28 |
| Retention VQO | II-29 |
| Retention VQO and Low VAC | II-30 |
| Scenic Byway Corridors | II-31 |
| Semi-primitive Non-motorized | II-32 |
| Administrative Sites | II-33 |
| Recreation Complexes | II-34 |
| Watersheds of Special Interest to Municipalities | II-36 |
| Slopes 40-60% | II-37 |
| Slopes >60% | II-39 |
| Big Game Winter Range | II-41 |
| Elk Calving Areas | II-42 |
| Big Game Migration Routes & Staging Area | II-44 |
| Bighorn Sheep Lambing/Breeding Areas | II-45 |

BLM_0048013

Oil and Gas Leasing Analysis FEIS

Summer Range (Concentrated Use) — II-46
Sage Grouse Leks — II-47
Utility Corridors/Electronic Sites — II-48
Primary Rangeland (6B Management Area) — II-49
Lands Suited for Timber Harvest — II-50
Summary Comparison of Program Alternatives — II-51
Major Issue Comparison by Alternative — II-56
Major Issue: Slope Stability and Geologic Hazards — II-56
Major Issue: Roadless and Undeveloped Areas — II-56
Major Issue: Wildlife and Wildlife Habitat — II-57
Major Issue: Recreational Activities and Experiences — II-57
Major Issue: Cumulative Effects — II-58

## List of Tables

Table II-1. Sequence of Events in Oil and Gas Development — II-2
Table II-2. Comparison of Predicted Number of Wells for Each Alternative — II-5
Table II-3. Comparison of Total Number of Acres Disturbed for Each Alternative — II-6
Table II-4. Total Long Term Disturbance — II-7
Table II-5. Display of Alternative — II-9
Table II-6. Acres of Lease Options by Alternative — II-11

## List of Figures

Figure II-1. Lease Options within the Analysis Area for Alternative 1 — II-59
Figure II-2. Lease Options within the Analysis Area for Alternative 2 — II-61
Figure II-3. Lease Options within the Analysis Area for Alternative 3 — II-63
Figure II-4. Lease Options within the Analysis Area for Alternative 4 — II-65
Figure II-5. Lease Options within the Analysis Area for Alternative 5 — II-67

BLM_0048014

# Chapter II - Alternatives

## Introduction

This chapter is the heart of the FEIS. This chapter includes a description of the analysis process essential to understanding the rest of the document. Lease options are described, as are the five program-level alternatives and mitigation associated with each alternative. The last part of the chapter is a summary comparison of alternatives, including both a comparison of lease options and of program alternatives.

## Activities and Assumptions Relating to Oil and Gas Development

### Typical Oil and Gas Activities

An understanding of what activities are associated with oil and gas exploration and development is key to anticipating their impacts. Table II-1 is a brief summary of the sequence of activities associated with oil and gas development, as described in Appendix G. Included are some statistics relating to the amount and duration of actual disturbance at each stage of development. Appendix G includes two more detailed descriptions of oil and gas development. The first part is a description of the environment from the perspective of a forest visitor. The second part is a technical description of all associated activities.

### Analysis Assumptions

Analysis assumptions were developed for use in determining the scope of the environmental consequences of oil and gas development activities. The assumptions were developed to describe the effects of the RFD by using data from past oil and gas activities on the Grand Mesa, Uncompahgre and Gunnison National Forests along with guidelines issued in the "Surface Operating Standards for Oil and Gas Exploration and Development--Gold Book" publication.

#### Assumptions For Any Oil and Gas Lease

1. An oil and gas lease grants a right to the lessee to explore, develop, extract and dispose of oil and gas within the lease area subject to the terms, conditions, and stipulations attached to the lease. Somewhere within the lease area the lessee may exercise this right unless *No Surface Occupancy (NSO)* is a stipulation of the lease. With *NSO*, the lessee still has a right to extract the oil and gas, but may not occupy the surface of the leasehold to do so.

BLM_0048015

Oil and Gas Leasing Analysis FEIS

## TABLE II-1. SEQUENCE OF EVENTS IN OIL AND GAS DEVELOPMENT

| | EXPLORATORY DRILLING | DEVELOPMENT | PRODUCTION | | ABANDONMENT |
|---|---|---|---|---|---|
| TYPE | WILDCAT | OIL & GAS | OIL | GAS (Natural Gas, Coal Bed Methane, $CO_2$) | OIL & GAS |
| PURPOSE | Locate oil & gas reserves | Produce oil and gas | Produce oil | Produce gas | Reclaim area |
| WELL SITE | 2-4 ac. pad cleared and leveled, mud pit, mud pumps, diesel engines, pipe rack, tool house, water storage tanks (5000-15,000 gal/day), fuel storage tanks*, 200'x200' staging area*, rig moved in in pieces on rigs up to GVW 80,000 lb., earthmoving equipment. | -Initial drilling same as Wildcat well site -If well productive, remove large rig and use smaller rig to complete drilling -Productive well site same as described to right | 1 ac. pad cleared and leveled, pumpjack, surface/buried pipeline 4-6" dia., oil storage tanks*, water separation tanks/pits* | 1 ac. pad cleared and leveled, valve/gauge ("Christmas tree"), surface/buried pipeline: 2-4" dia. flowline, 6-8" dia. trunk line, 10-36" dia. transmission line, Oil & water separation and storage tanks. | Plug well bore hole - different requirements re: rock formation, subsurface water, etc. Cement cap on well, marked with monument stating location, lease #, operator, name of well. Surface equipment removed. Subsurface pipelines plugged at intervals. |
| ROADS | Construct/reconstruct roads to standard: Arterial 20-24'wide Local  14-18'wide (clearing depends on slope) Past Averages: Reconstruction  0.6 mi./well New Construction 0.7 mi/well | | | | Close, contour, revegetate non-system roads. May occur concurrently with development and production as individual well sites are abandoned. |
| DEPTH | 2000+ feet | | | | N/A |
| TIME | 2 weeks - several months | 15-25 years | 15-25 years | 15-40 years | As non-system roads and well sites are abandoned. |
| ACTIVITY | Engine noise on site during drilling - audible up to 1-2 mi.; dust generated if air cooled drilling; traffic associated with personnel, water and rig transport - Ave. 13 vpd**/well.Activity varies with level of development and production. | See discussions for exploratory and production activities. | Traffic from tankers accessing wells to transport oil. Traffic from personnel maintaining/ monitoring production - Ave. 2 vpd**/well. Up to 1 well/40 ac. or 1-16 wells/section | Traffic from personnel maintaining/ monitoring production - Ave. 2 vpd**/well Up to 1 well/80 ac. or 2-8 wells/section. | Truck mounted equipment used to plug wells. Dozers/graders present during contouring activities. Sites normally fenced after reseeding to allow regeneration. |
| RECLAMATION | Contour and revegetate pad and non-system roads. | Contour, revegetate pad and non-system roads. Partial reclamation may occur during development. | Contour, revegetate as needed.  Partial reclamation may occur during production | | Contour, revegetate as needed. |

* May not be present on site, or may be separate site with common facilities for several wells.
** vpd = vehicle per day.

BLM_0048016

2. Waivers, exceptions, or modifications of stipulations may be allowed when it can be demonstrated that circumstances which required the original stipulation have changed. To modify, waive, or grant exceptions to lease stipulations, the authorized forest officer shall ensure compliance with NEPA and any other applicable laws. The types of potential circumstances that would allow waivers, exceptions, or modifications are identified in Chapter I, page I-16.

3. Crossing riparian areas, wetlands, and areas of high geologic hazard may be unavoidable in some cases to access a well site. However, activity in these areas is subject to prior approval in a Surface Use Plan of Operations. Mitigation measures will be applied to protect these resources.

4. *Standard Lease Terms* allow road, well pad, and pipeline construction on the leasehold, but are subject to reasonable restrictions to protect surface resources and uses.

### Assumptions on the Forest for Direct and Indirect Effects

(Assumptions were developed based on the Reasonably Foreseeable Development scenario [See Appendix E] and past oil and gas activities on the Forest.)

5. The Reasonably Foreseeable Development scenario is the basis of the analysis. Natural gas is the resource most likely to occur. Coal bed methane is not expected to be developed because tax incentives have not been extended and the associated water production increases costs to produce methane.

6. The life expectancy of a wildcat well (a wildcat well is an exploration well) that does not produce is one year (from drilling to abandonment). Abandonment means plugging the hole, restoring the topsoil, and re-seeding the area in accordance with requirements of the surface management agency and Onshore Order #2. Revegetation is expected to be successful in three growing seasons following abandonment.

7. If a wildcat well results in a producer, the average life expectancy of the well is 40 years. Revegetation is expected to be successful within three growing seasons following abandonment.

8. The well spacing will average three wells per section in a fully developed field.

9. Road construction and reconstruction will meet applicable Forest Service Manual and Forest Plan direction for protecting all resource values.

10. Roads constructed for oil and gas development may be closed to general public use, depending on the *Affected Environment* in which oil and gas activity occurs.

11. Oil and saltwater leaks/spills will occur at unpredictable intervals. All areas disturbed by leaks/spill will be reclaimed and revegetated.

12a. A typical well will require one mile of new road construction affecting an average of 4.2 acres/mile (assuming a 35 foot right of way).

12b. A typical well will require one mile of road reconstruction affecting an average of 2.1 acres/mile (assuming that 1/2 of the right of way was already disturbed; therefore, use 17.5 feet of new disturbance for acreage calculations).

BLM_0048017

Oil and Gas Leasing Analysis FEIS

12c. A typical well will require a level pad size of 300 feet by 300 feet with 1 1/2:1 cutslopes and fillslopes. Based on a 20% average slope, the disturbed area will be 3.5 acres/well.

12d. Pipelines will normally be located in the road corridor, causing no additional disturbance; however, occasional cross-country sections will be necessary. Based on past oil and gas development on the Forests, a typical well will result in approximately 0.2 miles of pipeline, or 0.9 acres additional clearing will be needed for pipelines.

> **A typical well will disturb a total of 10.7 acres.**

13. Drilling activity within the Forest will continue at the same conservative levels of 1986 to 1990, and constitute about 3% of the regional activity.

14. Projected well distribution throughout the analysis area is:

> ***Grand Mesa National Forest*** - 12 wells; Six of which will be completed for production. Seven of the 12 wells will be in high potential and five will be located in the moderate potential areas. Eight of the 12 wells will be drilled on existing leases. Four of the 12 wells will be drilled on new leases.

> ***Gunnison National Forest*** - 12 wells; Six of which will be completed for production. All of these wells will be located in high potential areas. Two of these wells are expected on Petro-Energy's existing lease C-30465. Two wells will be drilled on new leases.

> ***Uncompahgre National Forest*** - 3 wells; One of which will be completed for production. All three of these wells will be located in the high potential areas and one of them will be on new leases.

> ***Areas under Unit Agreements*** - 20 wells. There are two exploratory units with predicted activity within the analysis area. A 90% success rate is projected in these units. The units with projected activity are listed below:

> (1) Narrows - Gunnison National Forest - 10 wells.

> (2) Ragged Mountain - Gunnison National Forest - 10 wells.

> **The total number of projected wells over the next 15 years on the Forest is 47.**

Forty-two (42) of the projected wells will be drilled in areas of high potential for oil and gas resources. Five will be drilled in moderate potential.

Of the 47 wells predicted to be drilled over the next 15 years, 40 are expected on existing leases. **Only 7 wells are predicted to be drilled on new leases.** The number of wells drilled for each alternative will remain the same (except for the *No Lease* alternative):

BLM_0048018

| TABLE II-2. COMPARISON OF PREDICTED NUMBER OF WELLS FOR EACH ALTERNATIVE | | | | | |
|---|---|---|---|---|---|
| **NUMBER OF WELLS** | **ALT. 1** | **ALT. 2** | **ALT. 3** | **ALT. 4** | **ALT. 5** |
| Within New Leases | 7 | 7 | 0 | 7 | 7 |
| Within Existing Leases | 20 | 20 | 20 | 20 | 20 |
| Within Existing Units | 20 | 20 | 20 | 20 | 20 |
| **TOTAL** | 47 | 47 | 40 | 47 | 47 |

**The number of wells drilled on existing leases (not subject to the decisions made in this EIS until the lease expires, is relinquished, or is terminated) is constant. Also, the number of wells drilled on new leases is the same with the exception of Alternative 3 - No Lease. Assume that the location of the 7 wells on new leases will shift to those areas where the stipulations are less restrictive by alternative.**

15. The total number of acres disturbed from oil and gas development activity over the next 15 years is projected to be 503 acres of which about 54 acres is projected for the areas of moderate potential for oil and gas resources with the remaining acreage in areas of high potential. The distribution of these acres throughout the Forest and units is:

BLM_0048019

Oil and Gas Leasing Analysis FEIS

**TABLE II-3. COMPARISON OF TOTAL NUMBER OF ACRES DISTURBED FOR EACH ALTERNATIVE**

| ACRES DISTURBED | ALT. 1 | ALT. 2 | ALT. 3 | ALT. 4 | ALT. 5 |
|---|---|---|---|---|---|
| **Grand Mesa N.F.** | | | | | |
| New Leases | 43 | 43 | 0 | 43 | 43 |
| Existing Leases | 86 | 86 | 86 | 86 | 86 |
| **Gunnison N.F.** | | | | | |
| New Leases | 21 | 21 | 0 | 21 | 21 |
| Existing Leases | 107 | 107 | 107 | 107 | 107 |
| Existing Units | | | | | |
| Narrows | 107 | 107 | 107 | 107 | 107 |
| Ragged Mtn. | 107 | 107 | 107 | 107 | 107 |
| **Uncompahgre N.F.** | | | | | |
| New Leases | 11 | 11 | 0 | 11 | 11 |
| Existing Leases | 21 | 21 | 21 | 21 | 21 |
| **TOTAL** | 503 | 503 | 428 | 503 | 503 |

**Total projected disturbance is estimated to be 503 acres**

16. Of the 27 wells to be drilled outside of units, 13 are projected to be completed for production. The remaining 14 will be reclaimed.

A 90% success rate is estimated for the 20 wells projected to be drilled in the 2 areas under unit agreements. 18 wells will be completed for production. The 10% (2 wells) which do not produce will be reclaimed.

The production wells will undergo interim reclamation within a year of completion. A 150 foot by 150 foot level pad is assumed to be left for production activities. This amounts to 0.9 acres as opposed to the original 3.5 acres/well of disturbed area; leaving 2.6 acres/well to reclaim.

Reclamation acreages for well pads are:

Total reclamation for 16 wells @ 3.5 acres/well = 56 acres
Interim reclamation for 31 producer wells @ 2.6 acres/well = 81 acres.

Road reclamation is assumed based on new road construction only. Roads to unsuccessful holes will be reclaimed. Reconstructed roads will not generally be

BLM_0048020

reclaimed.  At 4.2 acres/mile of road, the 16 unsuccessful wells would account for 67 acres of road to reclaim.

Total reclamation of 0.9 acres/well for pipelines on 31 wells is 28 acres.

17.  Total long term disturbance is projected to be:

| TABLE II-4. TOTAL LONG TERM DISTURBANCE | | |
|---|---|---|
| **Total Acres Disturbed** | | 503 |
| Total Well Pad Reclamation | 56 | |
| Interim Well Pad Reclamation | 81 | |
| Road Reclamation | 67 | |
| Pipeline Reclamation | 28 | |
| **Sub-total Reclamation Acres** | 232 | -232 |
| **Long Term Acres Disturbed** | | 271 |

The long term disturbance is the total projected disturbance (503) less the total acres reclaimed (232) for a total of 271 acres.

## *Connected Actions*

In selected areas, oil and gas development is likely to lead to additional activities which also need to be considered in making a decision to allow or not allow such development.  These are connected actions, which although not a part of the original purpose for development, may reasonably follow as a result of the development.

In the case of oil and gas development the greatest opportunity for this kind of cause and effect is in the development of roads into areas which are not now roaded.  This could provide access to timber stands which would otherwise be uneconomical to reach.  This in turn provides the opportunity to harvest more timber than would otherwise occur.  For the purpose of the analysis here, these areas are represented as areas coded in the Forest Plan (Table II-18 on page II-52 and Table F-2 on page F-3) as "3 - High Road Cost/Access".

The assumption built into this analysis is that, if accessed, these areas would become a part of the suited timber base and some average level of timber harvesting would take place.  It is not possible to predict the exact amount of harvest that would occur without conducting analysis that is well outside the scope of this Oil and Gas Leasing Analysis FEIS.  Analysis of possible consequences sufficient to make the decisions at hand is possible assuming harvesting levels represented by other parts of the suited timber base.

Past practices are a good indication of activities which could be expected.  Typically, in the first entry into unharvested aspen forests, 20 to 25 percent of the area is clear-cut.  In conifer stands single tree and group selection harvest is practiced over larger treatment areas, typically covering as much as 50 percent of the area, in the first entry.  These harvest amounts are consistent with Forest Plan standards and guidelines.  An analysis of the environmental consequences of timber harvesting is provided in Chapter IV of the FSEIS for the Amendment of the Land and Resource Management Plan, Grand Mesa, Uncompahgre and Gunnison National Forests.

BLM_0048021

Oil and Gas Leasing Analysis FEIS

In Chapter IV, Environmental Consequences, for those *Affected Environments* where the harvest of additional timber is a possible result of developed access, the consequences to other resources of such activities are discussed. These "3 - High Road Cost/Access" areas unsuited for timber harvest are discussed in the General Forest, Roadless, and 3A Semi-primitive Non-motorized *Affected Environments*.

Timber management activities in areas considered "3-High Road Cost/Access" could result in a slight increase in the Forest's Allowable Sale Quantity (ASQ). This FEIS and the decisions associated with it are not the place to address the specific decision to amend the Forest Plan ASQ. That would take place in the event of actual development of the access described above as hypothetical. Should this development take place, the amendment of the Forest Plan would be considered following appropriate procedures under the National Forest Management Act (NFMA) for doing so. Further, before any timber harvest could take place in these areas additional site specific environmental analysis following appropriate procedures under the National Environmental Policy Act (NEPA) would be conducted, resulting in specific timber management decisions.

# Descriptions of Alternatives

In keeping with the two-tiered analysis process described above, alternatives consist of combinations of Lease Options on various *Affected Environments*. The five lease options are listed below. Next, the Forest program alternatives (1 through 5) are described (Table II-5). Last, those conditions that are common to all alternatives in terms of common mitigation and/or common direction from the Forest Plan are described.

## Lease Options (First Level Analysis and Decisions)

The five lease options are listed below:

- No Lease (NL)

- No Surface Occupancy (NSO)

- Controlled Surface Use (CSU)

- Timing Limitations (TL)

- Standard Lease Terms (SLT)

With the exception of *No Lease*, these have already been described in some detail in Chapter I. You should refer to pages I-15 through I-16 for more information on their meaning and use. An understanding of these lease options is essential to the following analysis.

## Program Alternatives (Second Level Analysis and Decision)

Each program alternative represents a unique package of lease option choices for the *Affected Environments* in the analysis area. Table II-5 displays the lease option combinations which make up the five program alternatives considered in this analysis. Each alternative is briefly described in the following pages. Figures II-1 through II-5 (pages II-59 - II-67) are maps of the lease option combinations, by alternative.

BLM_0048022

| TABLE II-5.  DISPLAY OF ALTERNATIVES | | | | | |
|---|---|---|---|---|---|
| AFFECTED ENVIRONMENT | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
| General Forest | SLT | SLT | NL | SLT | SLT |
| Floodplains * | CSU | NSO | NL | SLT | NSO |
| Aquatic/Riparian/Wetland Habitats * | CSU | NSO | NL | SLT | NSO |
| Alpine/Tundra Areas | CSU | NSO | NL | SLT | NSO |
| High Geologic Hazard | NSO | NSO | NL | SLT | NSO |
| Moderate Geologic Hazard | CSU | CSU | NL | SLT | CSU |
| Roadless Areas: | | | | | |
| - Raggeds | NSO, CSU, TL, SLT | NL,NSO,CSU,TL,SLT | NL | SLT | NL |
| - Drift Creek | NSO, CSU, TL, SLT | NSO, CSU, TL, SLT | NL | SLT | NL |
| - Springhouse Park | CSU, TL, SLT | CSU, TL, SLT | NL | SLT | NL |
| - Electric Mountain | NSO, CSU, SLT | NSO, CSU, SLT | NL | SLT | NL |
| - Clear Creek | NSO, CSU, TL, SLT | NSO, CSU, TL, SLT | NL | SLT | NL |
| - Hightower | NSO, CSU, TL, SLT | NSO, CSU, TL | NL | SLT | NL |
| - Priest Mountain | NSO, CSU, TL, SLT | NL,NSO,CSU,TL,SLT | NL | SLT | NL |
| - Salt Creek | NSO, CSU, TL, SLT | NSO, CSU, SLT | NL | SLT | NL |
| - Battlement Mesa | NSO, CSU, TL, SLT | NSO | NL | SLT | NL |
| - Nick Mountain | NSO, CSU, SLT | NSO, CSU, TL, SLT | NL | SLT | NL |
| - Kannah Creek | NSO, CSU, TL | NL | NL | SLT | NL |
| - West Elk | NSO, CSU, TL, SLT | NL, NSO, CSU, SLT | NL | SLT | NL |
| - Whetstone Mountain | NSO, CSU, SLT | NL | NL | SLT | NL |
| - Flat Top Mountain | CSU | NL | NL | SLT | NL |
| - Roubideau | NSO, CSU, TL, SLT | NL | NL | SLT | NL |
| - Tabeguache | NSO, CSU, TL, SLT | NL | NL | SLT | NL |
| - Kelso Mesa | NSO, CSU, SLT | NSO, CSU, SLT | NL | SLT | NL |
| - Campbell Point | CSU, TL | CSU, TL | NL | SLT | NL |
| - Johnson Creek | NSO, CSU, TL | NSO, CSU, TL | NL | SLT | NL |
| Research Natural Area | CSU | NL | NL | SLT | NL |
| Sensitive Areas | CSU | NSO | NL | SLT | NSO |
| Retention VQO - Low VAC | NSO | NSO | NL | SLT | NSO |
| Retention VQO | CSU | CSU | NL | SLT | CSU |
| Scenic Byway Corridors | CSU | CSU | NL | SLT | CSU |
| Semi-primitive Non-motorized (3A Management Areas) | CSU | NSO | NL | SLT | NL |
| Administrative Sites * | NSO | NSO | NL | SLT | NSO |
| Recreation Complexes | CSU | NSO | NL | SLT | NSO |
| Watersheds of Special Interest to Municipalities | CSU | CSU | NL | SLT | CSU |
| Slopes 40-60% | CSU | CSU | NL | SLT | CSU |
| Slopes > 60% | NSO | NSO | NL | SLT | NSO |

BLM 0048023

Oil and Gas Leasing Analysis FEIS

| TABLE II-5. DISPLAY OF ALTERNATIVES | | | | | |
|---|---|---|---|---|---|
| **AFFECTED ENVIRONMENT** | **Alternative 1** | **Alternative 2** | **Alternative 3** | **Alternative 4** | **Alternative 5** |
| Wildlife Special Habitats: | | | | | |
| - Big Game Winter Range | CSU,TL | CSU,TL | NL | SLT | CSU,TL |
| - Elk Calving Areas | SLT | CSU,TL | NL | SLT | CSU,TL |
| - Migration Routes & Staging Areas | SLT | CSU,TL | NL | SLT | CSU,TL |
| - Bighorn Lambing/Breeding Areas | TL,SLT | NSO | NL | SLT | NSO |
| - Summer Range (Concentrated Use) | SLT | NSO | NL | SLT | NSO |
| - Sage Grouse Leks | SLT | NSO,CSU,TL | NL | SLT | NSO,CSU,TL |
| Threatened and Endangered Species * | Threatened and Endangered species are protected under the Endangered Species Act. Protective measures will be taken under all lease options. | | | | |
| Utility Corridors/ Electronic Sites | NSO | SLT | NL | SLT | SLT |
| Primary Rangeland (6B Management Areas) | SLT | SLT | NL | SLT | SLT |
| Lands Suited for Timber Harvest | SLT | SLT | NL | SLT | SLT |

* Not displayed on FEIS maps because of sensitivity or size.
NL = No Lease, NSO = No Surface Occupancy, CSU = Controlled Surface Use, TL = Timing Limitations, SLT = Standard Lease Terms

Descriptions of Alternatives
Program Alternatives (Second Level Analysis and Decision)

BLM_0048024

Table II-6 summarizes by alternative, the acres of each lease option.

| TABLE II-6. ACRES OF LEASE OPTIONS BY ALTERNATIVE** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **LEASE OPTIONS** | **Alternative 1** | | **Alternative 2** | | **Alternative 3** | | **Alternative 4** | | **Alternative 5** | |
| | Acres* | % | Acres* | % | Acres* | % | Acres* | % | Acres* | % |
| No Lease (NL) | 0 | 0 | 138,270 | 15 | 951,450 | 100 | 0 | 0 | 349,150 | 37 |
| No Surface Occupancy (NSO) | 58,400 | 6 | 151,835 | 16 | 0 | 0 | 0 | 0 | 78,350 | 8 |
| Controlled Surface Use (CSU) | 463,600 | 49 | 215,170 | 23 | 0 | 0 | 0 | 0 | 130,250 | 14 |
| Controlled Surface Use & Timing Limitations | 202,350 | 21 | 239,755 | 25 | 0 | 0 | 0 | 0 | 202,950 | 21 |
| Timing Limitations (TL) | 81,600 | 9 | 80,440 | 8 | 0 | 0 | 0 | 0 | 77,950 | 8 |
| Standard Lease Terms (SLT) | 145,500 | 15 | 125,980 | 13 | 0 | 0 | 951,450 | 100 | 112,800 | 12 |

* Analysis area = 951,450 acres.    ** Acreages do not reflect existing leases.

## *Alternative 1 - No Action*

The No Action alternative is required by NEPA regulations. The No Action alternative is "*current management in accordance with the Forest Plan*". The Forest Plan specifies different lease stipulations for the different *Affected Environments*. Table II-5 displays the lease stipulations specified by the current Forest Plan for each of the Affected Environments. (See Appendix H for current Forest Plan direction.)

The Forest Plan does not specifically address all the *Affected Environments* as delineated in this FEIS. Some interpretation of the Forest Plan was necessary to determine which stipulation may apply to a specific *Affected Environment*. The Forest Plan says "Recommend against or deny consent to the BLM for issuance of leases where operational damages on surface resources... would be irreversible or irretrievable, with no potential for reclamation". The Forest Plan bases no lease recommendations to the BLM on the site specific consideration of the following criteria:

- Slopes steeper than 60 percent.

- High erosion hazard soil ratings.

- High geologic hazard ratings.

BLM_0048025

Oil and Gas Leasing Analysis FEIS

- Low visual absorption capacity that prevents reclamation to established visual quality objectives.

- A conclusion by the Forest Service (FS) and/or the U.S. Fish and Wildlife Service (USFWS) that the action will jeopardize the survival or recovery of Federally listed threatened and endangered (T&E) wildlife or plant species.

- Intrusion upon the identified critical (USFWS) or essential (FS) habitat of a Federally listed (T&E) wildlife or plant species or upon the plant or animal itself.

- Intrusion upon the habitat of individual plant or animal species listed by a State as threatened or endangered.

- Intrusion upon the habitat of individual plant or animal species identified by the Regional Forester as needing special management to prevent the need for listing it as a threatened or endangered species.

With this alternative, all of the analysis area would be available for oil and gas leasing. Floodplains, Alpine/Tundra, Research Natural Areas, Sensitive Areas, Retention VQO, Scenic Byway Corridors, 3A Management Areas, Recreation Complexes (dispersed and developed sites), Watershed of Special Interest to Municipalities, and Slopes 40-60% would have *Controlled Surface Use* stipulations attached to the lease. See Figure II-1 for reduced scale map showing stipulations under this alternative.

## Alternative 2 - Preferred

This alternative does not authorize leasing of some of the legally available land in the analysis area. Those areas with discretionary *No Lease* include the Kannah Creek, Tabeguache, and Roubideau Roadless Areas. These Roadless Areas have been mentioned in recent Wilderness legislation. Additionally the proposed Tabeguache Research Natural Area, Whetstone Mountain, Flat Top Mountain, and parts of West Elk (Snowshoe Mesa, Kebler Pass), Raggeds (Kebler Pass) and Priest Mountain (Flat Tops, et al.) Roadless Areas would not be available for leasing.

The Battlement Mesa Roadless Area would be leased, but with *No Surface Occupancy* stipulations. Other resource concerns within Roadless Areas may effectively protect some of the roadless values, i.e., Slopes over 60% in Roadless Areas would have the *No Surface Occupancy* stipulation attached to the lease.

Areas protected with *No Surface Occupancy* under this alternative include: Sensitive Areas, Alpine/Tundra, Floodplains, areas of Retention VQO and Low VAC, Semi-primitive Non-motorized (3A Management Areas), Recreation Complexes (developed and dispersed sites), Administrative Sites, Slopes over 60%, Bighorn Sheep Lambing and Breeding Areas, and Sage Grouse Leks.

Resources protected with *Timing Limitations* and *Controlled Surface Use* stipulations include: areas with Moderate Geologic Hazards, Retention VQO, Scenic Byway Corridors, major ski trails, Slopes 40-60%, and the nesting area around a Sage Grouse Lek.

The option (the decision maker has) chosen for each of the *Affected Environments* is displayed in Table II-5. (See Figure II-2 and large stipulation map.)

## Alternative 3 - No Lease

With the selection of this alternative, none of the Forest would be administratively available for oil and gas leasing. The Forest would not authorize the BLM to lease the oil and gas resources underlying the Forest. The selection of this alternative would not affect existing leases. However, should an existing lease expire, the parcel would not be available for future leasing. This alternative, since it represents

BLM_0048026

the least potential for ground disturbance, also constitutes the environmentally preferred alternative. Note also, that even if this alternative is chosen, environmental consequences may still occur from those activities on existing leaseholds.

This alternative is required by the Forest Service oil and gas regulations (36 CFR 228.102(c)(2)). This alternative represents the most restrictive alternative to the oil and gas industry. (See Figure II-3.)

## *Alternative 4 - Lease with Standard Lease Terms*

With the selection of this alternative, all legally available lands would be subject to oil and gas leasing with *Standard Lease Terms.* The Forest would authorize the BLM to offer for lease all unleased Federal oil and gas underlying the Forest, within the analysis area (defined in Chapter I, Lands Involved, pages I-5 - I-7).

This alternative represents the least restrictive alternative to the oil and gas industry. (See Figure II-4.)

## *Alternative 5 - No Lease in Roadless and SPNM*

Roadless Areas and areas with a Semi-primitive Non-motorized ROS as a management prescription (3A) in the Forest Plan, would not be administratively available for oil and gas leasing. The goal of this alternative is to protect the roadless character of Roadless Areas and to maintain the Semi-primitive Non-motorized recreation opportunity on the Forest. Since some of the current Roadless Areas and 3A Management Areas are currently leased, the character of those Roadless Areas may change even if this alternative is chosen.

This alternative is the same as Alternative 2, except in it's treatment of Roadless Areas and 3A Management Areas (Semi-primitive Non-motorized ROS by Forest Plan management prescription). All Roadless Areas and 3A Management Areas would not be available for leasing. If existing leases in Roadless Areas and 3A Management Areas expire or are relinquished, they would not be available for leasing for the life of this EIS. (See Figure II-5.)

### *Mitigation*

Mitigation, and standards and guidelines for oil and gas operations on NFS lands are expressed in Section 6 of the standard lease form (Form 3100-11; Offer to Lease and Lease for Oil and Gas, Appendix B), the BLM regulations at 43 CFR 3101.1-2 Surface Use Rights, the Forest Service oil and gas regulations (36 CFR 228.108), Onshore Oil and Gas Orders, the Forest Plan, the "Gold Book" (Oil and Gas Surface Operating Standards for Oil and Gas Exploration and Development) and Conditions of Approval that will be required prior to approval of the APD. Restrictions on surface use may also be imposed by specific nondiscretionary statutes such as: The Endangered Species Act, the Archaeological Resource Protection Act, the National Historic Preservation Act, the Native American Graves Protection and Repatriation Act, the Clean Water Act, and the Clean Air Act. See Appendix H for a discussion of general mitigation that is common to all alternatives except the No Lease alternative.

Common to all alternatives is the fact that the Forest has existing oil and gas leases. None of the alternatives would change the Forest's currently leased lands. The existing leases, as discussed in Chapter I, would remain in effect with existing terms and stipulations until expiration or relinquishment. None of the alternatives would change the current terms or administration of existing leases. The potential for environmental consequences on the existing leases would not change as a result of implementation of any of the alternatives discussed above. However, if existing leases expire or are relinquished the alternative selected in this analysis will dictate the stipulations that will be applied to the parcel if it is offered for lease in the future.

BLM_0048027

Oil and Gas Leasing Analysis FEIS

# Comparison of Alternatives

## Summary Comparison of Lease Options

The Environmental Consequences of each lease option are compared in the following tables, as they relate to the environmental factors of each *Affected Environment*. A complete discussion of these consequences is in Chapter IV.

Note: The indirect effects of greatest consequence are the effects of timber harvesting introduced by roads built to accommodate oil and gas, but which also access timber stands. These effects are documented in detail in the FSEIS for the Forest Plan Amendment, completed in 1991. Reference is made below to these indirect effects, without going into detail. The reader is referred to the FSEIS.

Potential impacts from oil and gas development could occur on existing leases regardless of lease options.

Mitigations measures listed below are examples and are not all inclusive.

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048028

**AFFECTED ENVIRONMENT : <u>General Forest</u>**
**ACRES : <u>951,450</u>**
**MAPS : <u>No</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Biological Diversity** | No effect from O&G activity. | No effect from O&G activity.* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Temporary loss of biodiversity on sites cleared for pads, roads or pipelines. Diversity of veg. species lost from disturbed areas (revegetation usually uses just a few species) - tree vegetation would be lost for years, replaced by early succession species. Potential for future timber management in areas accessed by new roads would adversely change species diversity - impacts vary with tree species managed. |
| **Vegetation** | No effect from O&G activity. | No effect from O&G activity.* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Vegetation removal for pads, roads, pipelines could remove site from wood fiber production. Abandoned drill sites and roads may be restored to tree vegetation over long term. |
| **Soils** | No effect from O&G activity. Continued background levels of erosion. | No effect from O&G activity.* | Lessen impacts of Standard Lease Terms through special mitigation (see below). | Same as Standard Lease Terms except the effects during wet seasons would be mitigated. | Displacement and mixing of soils for construction activities, of both roads and drill sites, consequent loss of natural profile, micro-organisms, irreversible loss of productivity of those sites. Soils exposed during road construction would be subject to greatly accelerated erosion rates . Erosion rates should lessen over time as exposed soil stabilizes. |
| **Air Quality** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts with mitigation. | Impacts would be mitigated with timing limitations. | Increased dust from road use and drilling operations would decrease air quality in localized areas |

BLM_0048029

Oil and Gas Leasing Analysis FEIS

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Water Quality and Quantity** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts of Standard Lease Terms with special mitigation (see below). Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. | Lessen sediment production potential by limiting construction/use to roads and well pads, only in dry soil periods. Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. | Sediment yield from surface disturbance activities/road and well pad use. Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. |
| **Range and Livestock Grazing** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts through placement of O&G developments so existing range developments are not damaged. | Lessen impacts by timing activities when there would be less potential for conflict with livestock movement. | Potential for increased conflict with livestock management by leaving gates open, removing fences, disturbing use patterns. Increased access could provide better trailing routes. |
| **Roads** | No effect from O&G activity. | No effect from O&G activity.* | Potential conflicts between public, O&G operators and timber purchasers if activities coincide on adjacent areas. Indirect effects of improved road maintenance, realignment, etc. as result of O&G development. | Potential conflicts between public, O&G operators and timber purchasers if activities coincide on adjacent areas. Indirect effects of improved road maintenance, realignment, etc. as result of O&G development. | Potential conflicts between public, O&G operators and timber purchasers if activities coincide on adjacent areas. Indirect effects of improved road maintenance, realignment, etc. as result of O&G development. |
| **Visual Resources** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts of Standard Lease Terms with special mitigation (see below). Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. | Same as Standard Lease Terms. Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. | Construction of O&G development/production facilities and presence of commercial vehicles associated with the development would not be compatible with partial retention VQO areas. Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. |
| **Recreation Opportunities** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts of Standard Lease Terms with special mitigation (see below); however there would be some reduction in quality of recreation experience in areas where development and operation occur. Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. | Same as Standard Lease Terms. Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. | There may be a change in the existing ROS as development and production activities/facilities occur. Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. |

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048030

Chapter II - Alternatives

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Cultural and Historical Resources** | No effect from O&G activity. | A cultural survey is required before any ground disturbing activities. Any identified cultural resources must be protected by avoidance or excavated and recorded. If any cultural resources are found during construction, they must be protected and reported. (36 CFR 800, EO 11593, National Historic Preservation Act) | | | |
| **Wildlife** | No effect from O&G activity. | No effect from O&G activity.* | Activities could result in displacement of wildlife. Lessen impacts through special mitigation (see below.) Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. | Timing limitations would mitigate some of the impacts during certain critical time periods (birthing, nesting, wintering, courtship), but activities in wildlife summer ranges could result in displacement of wildlife. Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. | Potential for disturbance to wildlife and wildlife habitat with O&G activities could result in decline in habitat carrying capacity (loss of habitat, overuse of habitat by displaced animals), decreased populations and problems on private lands. Roading previously unroaded areas would allow increased human activity (timber sales, hunting) which would further impact wildlife and habitat. Greatest impacts on species with small home ranges. Potential indirect effects from timber harvesting introduced into areas accessed by oil and gas roads. |
| **Wildfire** | No effect from O&G activity. Indirect effect - lack of access to areas may hinder suppression. | | Same as Standard Lease Terms. | Lessen chance of man-caused fires by restricting uses during high fire danger. | Activity in remote areas may increase chance of man-caused fires. Improved access could aid suppression. |
| **Oil and Gas Resources** | Opportunities to explore for, discover and develop O&G resources would be lost. Loss of Federal, State & local revenues. | The operator where possible would have to access O&G resources from outside the area. Drilling would be much more expensive. | The costs of exploration and development would be higher. Potential loss of revenue from bonus bids. | Recovery of O&G resources but with increased costs for the operator. | Lowest costs for O&G activity. Potential increased profit margin or lower costs to the consumer. |

* No effect unless stipulation waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Water Quality - Restrict off-road vehicle use (when & where); Maintain buffers between all surface drainage features (specify distance from drainage re: slope, type); Stringent rehabilitation standards (anchored mulch, seed mix, fertilizer, water); Road surface requirements (MgCl, NaCl, asphalt, rock/gravel); Requirements for transport, handling and cleanup of hazardous substances; Minimize well pad size.

Visual Resources - In partial retention VQO areas, only allow drill pad development and use where vegetative or land form screening exist. Require all structures (drill rigs, tanks, valves/Christmas trees, buildings) to be colored to blend with the natural environment.

BLM_0048031

Oil and Gas Leasing Analysis FEIS

Recreation Opportunity Spectrum - Protect inventoried SPM areas by limiting drill pad development and roads where directional drilling from adjacent areas is possible.

Wildlife - Restrict road use to operators in previously unroaded areas. Obliterate new roads when work is completed. Avoid critical areas for management indicator species (MIS), i.e. goshawk nests. Design facilities to limit line of sight. Limit new roads in mature ponderosa pine, aspen, or lodgepole/spruce to maintain habitat for MIS, limit chance of future timber sales.

Soils - Restrict motorized traffic to specified drill site and road surfaces.

Air Quality - Dust abatement on access roads.

## TIMING LIMITATIONS IN THIS AFFECTED ENVIRONMENT :

Water Quality & Soils - Restrict activities to times when soils are not saturated.

Air Quality - Restrict activities during poor air quality episodes.

## OTHER FACTORS TO CONSIDER:

Wildlife - Endangered Species Act provides protection for listed species.

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048032

**AFFECTED ENVIRONMENT : <u>Floodplains</u>**
**ACRES : <u>10,200</u>**
**MAPS : <u>No</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | **NO LEASE** | **NSO** | **CSU** | **TIMING** | **STD. LEASE** |
| **Vegetation** | No effect from O&G activity. | No effect from O&G activity.* | Minimize the potential for impacts through limiting amount and location of disturbance. | Same as Standard Lease Terms. | Potential for loss of plant association due to disturbance. |
| **Soils** | No effect from O&G activity. | No effect from O&G activity.* | Minimize the potential for impacts through limiting amount and location of disturbance. | Restricting/eliminating use during wet soil periods would lessen the potential for sedimentation. | Potential for significant and serious impairment of soil productivity, release of measurable amounts of sediment into active waterways, rutting, puddling, displacement of very sensitive soils. |
| **Water Quality** | No effect from O&G activity. | No effect from O&G activity.* | Special mitigation would lessen the potential for impacts of Standard Lease Terms (see below). | Restricting/eliminating use during wet soil periods would lessen the potential for sedimentation. | Removal of vegetation and soil and gravel during excavation could alter hydrologic function of floodplain. Sediment and toxic spills could enter surface and ground water decreasing quality. |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

<u>Water Quality</u> - Prohibit gravel removal within floodplain; No well sites or storage facilities within floodplain; Road or pipeline cross area at right angles; See also management direction for 9A (Appendix H, pages H-9 & H-10).

## OTHER FACTORS TO CONSIDER:

Activities upstream or on adjacent areas.

E.O. 11988 - Direction to avoid adverse impacts to floodplains (to the extent possible).

Possible point of confusion: Floodplains may extend beyond riparian habitat. These effects deal only with floodplain outside riparian habitat. Forest Service regulations (36 CFR 228.108(j)) do not allow the operator to occupy the surface in riparian areas, unless approved in the SUPO.

BLM_0048033

Oil and Gas Leasing Analysis FEIS

**AFFECTED ENVIRONMENT : <u>Aquatic/Riparian/Wetland Habitats</u>**
**ACRES : <u>27,600</u>**
**MAPS : <u>No</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRONMENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Vegetation** | No O&G activities would be allowed within these habitats; however, road construction/ stream crossings may be necessary as access is developed for adjacent lands. (See impacts under Standard Lease Terms.) | Most O&G activities would not be allowed within these habitats; however, road construction/ stream crossings may be necessary. (See impacts under Standard Lease Terms.) | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Vegetation would be cleared during construction of roads and stream crossings. Removing vegetation would temporarily eliminate the natural filter which reduces sediment entry into waterways. |
| **Soils** | No O&G activities would be allowed within these habitats; however, road construction/ stream crossings may be necessary as access is developed for adjacent lands. (See impacts under Standard Lease Terms.) | Most O&G activities would not be allowed within these habitats; however, road construction/ stream crossings may be necessary. (See impacts under Standard Lease Terms.) | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Potential for impairment of soil productivity, release of measurable amounts of sediment into active waterways, rutting, puddling, compaction, displacement of very sensitive soils. |
| **Water Quality** | No O&G activities would be allowed within these habitats; however, road construction/ stream crossings may be necessary as access is developed for adjacent lands. (See impacts under Standard Lease Terms.) | Most O&G activities would not be allowed within these habitats; however, road construction/ stream crossings may be necessary. (See impacts under Standard Lease Terms.) | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Potential for water quality to be negatively impacted as result of increased sediment. |
| **Fisheries & Aquatic Habitat** | No O&G activities would be allowed within these habitats; however, road construction/ stream crossings may be necessary as access is developed for adjacent lands. (See impacts under Standard Lease Terms.) | Most O&G activities would not be allowed within these habitats; however, road construction/ stream crossings may be necessary. (See impacts under Standard Lease Terms.) | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Potential for significant impacts to fisheries and aquatic habitat resulting from road construction/ stream crossings. Introduced sediment would impact: macroinvertebrate spp. populations and composition; eliminate spawning habitat; impact fry mortality. Potential for toxic spills occurring on roads to enter water, seriously impacting plant and animal species. |

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048034

## CSU IN THIS AFFECTED ENVIRONMENT :

Delineate specific aquatic/riparian/wetland habitats on ground when the APD is submitted. See management direction for 9A Management Areas, Appendix H pages H-9 and H-10.

## OTHER FACTORS TO CONSIDER:

Activities upstream or on adjacent areas. Waste water disposal. Sediment contributed from road/pipeline crossings, road drainage. Toxic spills washed off adjacent roads.

The regulations (36 CFR 228.108(j)) do not allow operations in riparian areas and wetlands unless approved in a SUPO (part of APD process).

Fisheries and Aquatic Habitat - Condition of riparian habitat relates to the severity of impacts from surrounding areas. Cumulative effects of other management activities and their impacts on this habitat must be considered with the impacts of oil and gas activities.

BLM_0048035

Oil and Gas Leasing Analysis FEIS

## AFFECTED ENVIRONMENT : <u>Alpine/Tundra Area</u>
## ACRES : <u>2100</u>
## MAPS : <u>Figure III-5</u>

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON- MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Soils** | No effect from O&G activity. | No effect from O&G activity.* | Stipulations may reduce or mitigate soil disturbance described under Standard Lease Terms to within acceptable limits, but the severity of accidents is greatly magnified in this environment. Mitigation would be very costly, and in some cases of uncertain success. Stipulations would have no value in mitigating disturbance and mixing of soils with parent material at construction sites of roads and drill sites. Reclamation could only be partial. | Timing Limitations would limit activity to times when soils are least susceptible to disturbance (winter or mid-summer). Soils exposed during these times would be extremely slow to stabilize and would experience significant loss during ensuing rainy and snow melt periods. Timing would have no value in mitigating disturbance and mixing of soils with parent material at construction sites of roads and drill sites. Reclamation could only be partial. | Beyond soil disturbance described in general forest, likelihood of significant permanent soil damage is great. Any disturbance of alpine soils and vegetation is noticeable for hundreds of years. Micro environments are lost and replaced with sterile and erodible surfaces. Slopes are usually steep and erosion rates magnified. Thin soil mantle which has developed over 10,000 years may be lost in one season. This could be due to a range of activities from introduced traffic on the surface, to reshaping and rehabilitation of dry hole drill sites. Chance of single event, catastrophic soil loss events from high elevation severe thunderstorms would be great. |
| **Vegetation** | No effect from O&G activity. | No effect from O&G activity.* | Special mitigation measures would lessen the impacts. | No mitigation with timing. Same as Standard Lease Terms. | Disturbed sites are hard to reclaim due to shallow soils, harsh climates, and poor seed sources. |
| **Water Quality** | No effect from O&G activity. | No effect from O&G activity.* | Special mitigation would lessen impacts described for Standard Lease Terms (see below). | Timing Limitations would not significantly change potential impacts that would occur under Standard Lease Terms. | Water quality could be decreased as a result of: increased sedimentation from disturbed surface; toxic spills could not be buffered or absorbed by the shallow soils; increased acid drainage from bed rock exposed by excavation; on-site disposal of waste water could contaminate ground and surface water. |

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048036

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| Visual Resources | No effect from O&G activity. | No effect from O&G activity.* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Any O&G development/production activities would be highly visible and detract from the natural setting. |
| Recreational Use and Opportunities | No effect from O&G activity. | No effect from O&G activity.* | Mitigation may lessen potential impacts of oil and gas activity. | Would not be effective mitigation because of very short season of use for both activities (O&G and recreation). | O&G activity would generally result in a lessened recreational experience. Generally it conflicts with recreational use and opportunities. |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Water Quality - Minimize area of surface disturbance; Containment and disposal of both surface and ground water.

Soils & Vegetation - Use of erosion control fabric, matts, geoweb soil support materials, lifting and saving tundra vegetation in chunks of sod to be later placed over disturbed areas, collection of local seeds for revegetation, use of chemical stabilizers, tackifiers and blankets and careful design of water flow over surface.

Recreational Use and Opportunities - Road and well pad location, noise mitigation.

## TIMING LIMITATION IN THIS AFFECTED ENVIRONMENT :

Soils - Limit use to winter or dry summer conditions.

## OTHER FACTORS TO CONSIDER:

Alpine areas within the analysis area are:  Mt. Axtell, Carbon Peak, Whetstone Mountain, Lone Cone, Little Cone and Groundhog Mountain.  Oil and gas activities in these areas is unlikely due to the geology of the area (igneous rocks).

BLM 0048037

Oil and Gas Leasing Analysis FEIS

## AFFECTED ENVIRONMENT : <u>High Geologic Hazard</u>
## ACRES : <u>52,000</u>
## MAPS : <u>Figure III-6</u>

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Geology** | No additional impacts over natural undisturbed condition. | No additional impacts over natural undisturbed condition. | N/A (by regulations) | N/A (by regulations) | N/A (by regulations). Although regulations don't allow the operator to occupy the surface, there is potential for effects if the operator is not made aware of the hazard. |
| **Water Quality** | No effect from O&G activity. | No effect from O&G activity.* | N/A | N/A | N/A |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

The mitigation measures or design measures proposed by an operator in order to have the SUPO or waiver, modification, or exception approved would be site specific and not addressable at this level of analysis.

## OTHER FACTORS TO CONSIDER:

The regulations (36 CFR 228.108(j)) do not allow the operator to occupy the surface in areas subject to mass soil movement, unless approved in the SUPO (part of the APD process). If stipulated or a Lease Notice is attached to the lease, the operator and the administrator are aware of the geologic hazard that exists in the lease parcel.

BLM_0048038

**AFFECTED ENVIRONMENT : <u>Moderate Geologic Hazard</u>**
**ACRES : <u>629,000</u>**
**MAPS : <u>Figure III-7</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | **NO LEASE** | **NSO** | **CSU** | **TIMING** | **STD. LEASE** |
| **Geology** | No additional impacts over natural conditions. | No additional impacts over natural conditions. | Potential for activation of landslides, earthflows and mudflows is lessened. | Timing would not provide mitigation over Standard Lease Terms. | Potential for activation of landslides, earthflows and mudflows. |
| **Water Quality** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts of Standard Lease Terms with special measures (see below). | Timing Limitations would not significantly lessen impacts of Standard Lease Terms. | Increase in sedimentation into nearby drainages would decrease water quality. Potential for ground water contamination if mass movement occurs during drilling or production. |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Special road design and well pad site design measures would be necessary. Design should be by qualified geotechnical engineers or engineering geologists. Design must consider drainage, backslope and fillslope ratios, and road grade and standards.

## OTHER FACTORS TO CONSIDER:

Activities in areas of moderate geologic hazard (potentially unstable slopes; stabilized landslides, earthflows and mudflows; and avalanche chutes, etc.) can usually take place without causing unacceptable adverse impacts if the road or well pad site design recognizes the hazard and the design is appropriate for the hazard.

BLM_0048039

Oil and Gas Leasing Analysis FEIS

## AFFECTED ENVIRONMENT : Roadless Areas
## ACRES : 345,030
## MAPS : Figures III-8a and III-8b

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| Recreation/ Visual Resources/ Wilderness Values | No effect from O&G activity. | No effect from O&G activity.* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Construction of roads, well pads, pipelines, etc. would eliminate the roadless character. |
| Suited Timber Lands | No effect from O&G activity. | No effect from O&G activity.* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Potential for conflicts between O&G operators and timber purchasers if activities coincide. |
| Timber Lands Made Suitable | No effect from O&G activity. | No effect from O&G activity. Availability of road network on adjacent areas may allow future vegetative management (timber sales).* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Roads constructed for O&G activities may make areas economically viable for timber harvest; could slightly increase ASQ**; would allow management for wildlife habitat; allow control of insects, disease and wildfires. |
| Wildlife | No effect from O&G activity. | No effect from O&G activity.* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Increased human activity into previously inaccessible area would disturb animals causing some to relocate to less secure/desirable habitats, increasing stress and mortality. Increased trapping pressure on furbearers could eliminate local populations of certain species. |

\* No effect unless stipulation is waived, excepted or modified.
\*\* Would require additional NEPA analysis and Forest Plan amendment before any harvest could occur.

## OTHER FACTORS TO CONSIDER:

What is occurring on adjacent Forests and BLM land?

Roadless character would change if any ground disturbing activities occur within the roadless area. Some roadless areas are more sensitive than others (Tabeguache, Roubideau & Kannah Creek have been mentioned in legislation). Numerous roadless areas have existing leases.

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048040

**AFFECTED ENVIRONMENT : <u>Research Natural Areas</u>**
**ACRES : <u>655</u>**
**MAPS : <u>Figure III-9</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Proposed Tabeguache Natural Area** | No effect from O&G activity. | No effect from O&G activity.* | Ground disturbance within a RNA would conflict with the intended use. | | |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Activity allowed must be in concert with the intended use of an RNA (see below).

## OTHER FACTORS TO CONSIDER:

The intended use of a RNA is for research, study, observations, monitoring and educational activities that are non-destructive and non-manipulative, and that maintain unmodified conditions. RNA's are to be withdrawn from mineral entry and leasing at the time of establishment (FSM 4063.49, R2 Supplement #1).

Generally, physical improvements, such as roads are not permitted (Forest Plan).

BLM_0048041

Oil and Gas Leasing Analysis FEIS

## AFFECTED ENVIRONMENT : <u>Sensitive Areas</u>
## ACRES : <u>29,000</u>
## MAPS : <u>Figure III-10</u>

### ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Recreation Opportunities** | No effect from O&G activity. | No effect from O&G activity.* | The casual forest visitor would only be aware of the O&G activity by seeing the associated traffic. The on-the-ground developments would not be readily visible. | Limiting drill pad development to periods of low recreation use would minimize conflict between industrial development and public. | Potential for conflicts on roads between public, O&G operators and timber purchasers if activities coincide. Visible development may alter the recreation use. |
| **Visual Resources** | No effect from O&G activity. | No effect from O&G activity.* | Impacts from Standard Lease Terms would be lessened through special mitigation (see below). | Same impacts as Standard Lease Terms. | Visual quality would be reduced by presence of O&G development/ production facilities (drill pads, roads, storage tanks, pumpjacks). |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

<u>Visual Resources</u> - Only allow drill pad development and use when vegetation or land form screening would minimize visual impacts. Structures should be colored to blend with natural landscape.

## TIMING LIMITATION IN THIS AFFECTED ENVIRONMENT:

<u>Recreation Opportunities</u> - Limit development to periods of low recreation use.

## OTHER FACTORS TO CONSIDER:

Recent Forest Plan Amendment specifically designates these as not suited for timber harvest because of their value in relatively undisturbed condition.

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048042

**AFFECTED ENVIRONMENT : Retention VQO**
**ACRES : 7800**
**MAPS : Figure III-11**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Visual Resources** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts of Standard Lease Terms through special mitigation (see below). | Same as Standard Lease Terms. | Presence of drill pads, access roads, commercial vehicles, storage tanks, pumpjacks would not meet the adopted visual quality objective. |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Drill pads would only be sited within areas where they would not alter the Retention VQO, and motorized travel would be limited to the existing open road system.  Oil and gas activity would not be evident to the causal forest user.

BLM_0048043

Oil and Gas Leasing Analysis FEIS

**AFFECTED ENVIRONMENT : Retention VQO and Low VAC**
**ACRES : 7210**
**MAPS : Figure III-12**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | **NO LEASE** | **NSO** | **CSU** | **TIMING** | **STD. LEASE** |
| **Vegetation** | No effect from O&G activity. | No effect from O&G activity.* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Vegetation removal would result in loss of screening in an area where the existing screen is important. |
| **Visual Resources** | No effect from O&G activity. | No effect from O&G activity.* | Some mitigation of effects as vegetative and soil disturbance would be minimized. | Same as Standard Lease Terms. | Construction of O&G development facilities would be incompatible with the desired VQO, due to the low VAC. |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Visual Resources - Limit activities to areas of existing disturbance.

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048044

**AFFECTED ENVIRONMENT : Scenic Byway Corridors**
**ACRES : 18,140**
**MAPS : Figure III-13**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Scenic Byway Corridors** | No effect from O&G activity. | No effect from O&G activity.* | Exclusion of drill pad development and operation in foreground seen along heavily used recreation corridors is only mitigation to O&G activities. | Timing Limitations could lessen impacts by: -limit drill pad development to low rec. use periods. | O&G development and production activities along heavily used recreation corridors would degrade the visual quality and use would decrease. Use conflicts between public and O&G operators on road potentially would occur. |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Exclude drill pad development and operation in the foreground seen along scenic byways. Require all structures (drill rigs, tanks, buildings) in middle ground to be colored to blend with the natural landscape.

BLM_0048045

Oil and Gas Leasing Analysis FEIS

## AFFECTED ENVIRONMENT : Semi-Primitive Non-Motorized (3A Mgnt Area)
## ACRES : 13,700
## MAPS : Figure III-14

### ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Recreation Opportunities** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts of Standard Lease Terms through special mitigation (see below); however some reduction in quality of recreation experience would occur. | Same as Standard Lease Terms. | Construction of development/ production facilities would change the SPNM ROS class to a more developed ROS class. Potential for conflicts on roads between public, O&G operators and timber purchasers if activities coincide. |
| **Visual Resources** | No effect from O&G activity. | No effect from O&G activity.* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Inventoried VQO would be changed in retention and partial retention areas. |
| **Timber Lands made Suitable** | No effect from O&G activity. | No effect from O&G activity. Availability of road networks on adjacent areas may allow future vegetative management (timber sales). | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Roads constructed for O&G activities may make areas economically viable for timber harvest; ASQ** could be slightly increased; management could occur for wildlife habitat, insect, disease and wildfire control. |

\* No effect unless stipulation is waived, excepted or modified.

\** Would require additional NEPA analysis and Forest Plan amendment before any harvest could occur.

## CSU IN THIS AFFECTED ENVIRONMENT :

Recreation Opportunities - Oil and gas access roads would be closed to general public use.

## OTHER FACTORS TO CONSIDER:

Forest Plan says mineral exploration and development is compatible if roads are closed to public use.

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048046

**AFFECTED ENVIRONMENT : <u>Administrative Sites</u>**
**ACRES : <u>35</u>**
**MAPS : <u>No</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Admin. Sites** | No effect from O&G activity. | No effect from O&G activity.* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | O&G activities would interfere with use of administrative sites (traffic, noise, etc.). |

* No effect unless stipulation is waived, excepted or modified.

## OTHER FACTORS TO CONSIDER:

Road or pipeline locations.

Standard Lease Terms provide for reasonable mitigation - it would be reasonable to move an operator away from an administrative site.

Administrative sites are generally about 5 acres. A well pad is typically 3 acres.

BLM_0048047

Oil and Gas Leasing Analysis FEIS

**AFFECTED ENVIRONMENT : Recreation Complexes**
**ACRES : 62,975**
**MAPS : Figures III-15, III-16 and III-17**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Developed Recreation** | No effect from O&G activity. | No O&G activities would be allowed within developed recreation sites. Special mitigation (listed below) would be applied to lessen impacts.* | Lessen Standard Lease impacts through special mitigation (see below). Timing stipulations would also be applied. No O&G activities would be allowed within developed recreation sites. Special mitigation (listed below) would be applied to lessen impacts. | Timing Limitations could lessen impacts by: -limit drill pad development to low rec. use periods. | Developed site recreation experience/quality would be significantly impacted by O&G development and production activities and use would decrease. |
| **Dispersed Recreation** | No effect from O&G activity. | No effect from O&G activity.* | Lessen Standard Lease impacts through special mitigation (see below). | Timing limitations would not be effective. Character of area would still be altered. | Construction of roads and drill pads would alter the semi-primitive nature of the area. |
| **Major Trail Systems** | No effect from O&G activity. | No effect from O&G activity.* | Lessen Standard Lease impacts through special mitigation (see below). | Timing limitations would lessen impacts - limit drilling activity to low rec. use periods. Ex: Limit drilling to winter for Crag Crest NRT. Limit drilling to summer for cross country ski trails. | Trail experiences/recreation quality would be impacted by O&G development activities (noise of drilling, views of drill/well sites). |

* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Developed Recreation - Drilling locations must be at least 1 mile from developed sites. Operation may be allowed only during certain times of the day. Noise abatement measures may be required. Special requirements to retain visual quality may be required. Odor reduction measures may be required.

Dispersed Recreation - Locate O&G development outside of dispersed recreation complexes. Limit use of motorized vehicles to existing roads in their current condition.

Major Trail Systems - Drill pad and road location at least 1/4 mi. from cross country ski trails and 1 mi. from Crag Crest NRT. All structures visible from a distance would be colored to blend with natural landscape.

BLM_0048048

## TIMING LIMITATIONS IN THIS AFFECTED ENVIRONMENT:

Developed Recreation - Limit drill pad development to low recreation use periods.

Major Trail Systems - Limit drill activities to winter along Crag Crest National Recreation Trail.  Limit drilling activities to summer along cross country ski trails.

## OTHER FACTORS TO CONSIDER:

Activities on adjacent areas.

BLM_0048049

Oil and Gas Leasing Analysis FEIS

**AFFECTED ENVIRONMENT : <u>Watersheds of Special Interest to Municipalities</u>**
**ACRES : <u>117,000</u>**
**MAPS : <u>Figure III-18</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Vegetation** | No effect from O&G activity. | No effect from O&G activity.* | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Vegetation removal for construction of roads and well pad sites may result in adverse impacts to soil & water resources. |
| **Water Quality and Quantity** | No effect from O&G activity. | Directional drilling has potential to contaminate groundwater if water from different aquifers is allowed to mix or if drilling fluids escape into aquifers. | Impacts associated with Standard Lease terms would be lessened through special mitigation measures (see below). | Restricting use during spring & fall would reduce the potential for sediment production. Other impacts would be similar to Standard Lease terms. | Increased sediment resulting from roads, well pads, pipelines. Risk of contamination from spills on-site and in transport. Acquisition of water for drilling could reduce quantity available downstream. Drilling could contaminate groundwater if aquifers are allowed to mix, or if drilling fluids or produced waters escape into aquifers. |

* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

<u>Water Quality and Quantity</u>: Fuel storage and spill plans required; all reserve mud pits would be closed systems; all road drainage work would be kept current; surfacing required for all roads planned for all weather use; all waste, refuse and trash would be kept in closed containers and regularly removed from watershed; no surface water diversions; no surface use within 1/4 mile of surface water intakes or spring developments. (This includes new and existing roads.).

## OTHER FACTORS TO CONSIDER:

Fourteen (14) municipal watersheds are identified within the analysis area. Presently none are given special protection under the Forest Plan.

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048050

**AFFECTED ENVIRONMENT :** <u>Slopes 40-60%</u>
**ACRES :** <u>33,530</u>
**MAPS :** <u>Figure III-19</u>

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Vegetation** | No effect from O&G activity. | No effect from O&G activity.* | Mitigation listed below may help the rehabilitation effort. | Timing limitations would not mitigate effects. | Diversity of veg. species lost from disturbed areas (revegetation usually uses just a few species) - tree vegetation would be lost for years, replaced by early succession species. Revegetation efforts are much more difficult on steep slopes. |
| **Visual Resources** | No effect from O&G activity. | No effect from O&G activity.* | Mitigation listed below may help the rehabilitation effort. | Timing limitations would not mitigate effects. | Steep slopes expose any activity to view, making their visual impact much greater. Long cut and fill banks are required, creating "scars" which can be seen from long distances. The steeper the slope the more significant the effect. |
| **Soils** | No effect from O&G activity. | No effect from O&G activity.* | Would reduce continuous impact reported under Standard Lease Terms but still presents significant opportunity for accidents or for single event soil loss episodes, and potential for mass failure. | Timing Limitations would lessen the potential for effects during construction. | See Appendix F for amount of area disturbed to construct roads or drill sites under various slope conditions. Activities on steep slopes would result in increased potential for erosion, soil loss and sedimentation. Cut bank and fill would reach into parent materials, offering no developed soil properties. Revegetation would be difficult. Steep slopes exposed and oversteepened during construction would be subject to mass soil movement and loss in single event summer thunder storms. |

\* No effect unless stipulation is waived, excepted or modified.

BLM_0048051

Oil and Gas Leasing Analysis FEIS

## CSU IN THIS AFFECTED ENVIRONMENT :

<u>Vegetation and Soils</u> - Use of erosion control cloths, mats, geoweb soil support materials, lifting and saving local native vegetation in chunks of sod to be later placed over disturbed areas, reseeding disturbed banks with stabilizing seed mix, use of chemical stabilizers, tackifiers and blankets and careful design of water flow over surface.

<u>Visual Resources</u> - Road and well pad location would be placed so Visual Quality Objectives would be retained.

BLM_0048052

**AFFECTED ENVIRONMENT : Slopes >60%**
**ACRES : 3415**
**MAPS : Figure III-20**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Vegetation** | No effect from O&G activity. | No effect from O&G activity.* | Mitigation listed below may help the rehabilitation effort. | Timing limitations would not mitigate effects. | Diversity of veg. species lost from disturbed areas (revegetation usually uses just a few species) - tree vegetation would be lost for years, replaced by early succession species. Revegetation efforts are much more difficult on steep slopes. |
| **Visual Resources** | No effect from O&G activity. | No effect from O&G activity.* | Mitigation listed below may help the rehabilitation effort and reduce the term of the visula impact. | Timing limitations would not mitigate effects. Same as Standard Lease Terms. | Steep slopes expose any activity to view, making their visual impact much greater. Long cut and fill banks are required , creating "scars" which can be seen from long distances. The effects are greatly magnified on steeper than 60% slopes. |
| **Soils** | No effect from O&G activity. | No effect from O&G activity.* | Would reduce continuous impact reported under Standard Lease Terms but still presents significant opportunity for accidents or for single event soil loss episodes, and potential for mass failure. | Timing limitations would lessen the potential for effects during construction. | See Appendix F for amount of area disturbed to construct roads or drill sites under various slope conditions. Activities on steep slopes would result in increased erosion hazard, soil loss and sedimentation. Cut bank and fill would reach far into parent materials, offering no developed soil properties. Revegetation would be difficult. Steep slopes exposed and oversteepened during construction would be subject to mass soil movement and loss in single event summer thunder storms. |

\* No effect unless stipulation is waived, excepted or modified.

BLM_0048053

Oil and Gas Leasing Analysis FEIS

## CSU IN THIS AFFECTED ENVIRONMENT :

Soils - Use of erosion control fabric, matts, geoweb soil support materials, lifting and saving local native vegetation in chunks of sod to be later placed over disturbed areas, reseeding disturbed banks with stabilizing seed mix, use of chemical stabilizers, tackifiers and blankets and careful design of water flow over surface.

Visual Resources - Siting of facilities would take advantage of natural screening.

## OTHER FACTORS TO CONSIDER:

In some locations soils would facilitate engineered cut slopes steeper than a 1:1 or 1 1/2 : 1.

The regulations at 36 CFR 228.108(j)(2) state: *The operator shall take measures to minimize or prevent erosion and sediment production. Such measures include, but are not limited to, siting structures, facilities, and other improvements to avoid steep slopes and excessive clearing of land.*

BLM_0048054

**AFFECTED ENVIRONMENT : <u>Big Game Winter Range</u>**
**ACRES : <u>207,450</u>**
**MAPS : <u>Figure III-21</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Populations & Use** | No effect from O&G activity. | No effect from O&G activity.* | Impacts would be lessened by measures listed below. | Lessen impacts with measure listed below. Human activity along roads during winter would result in displacement of animals, increased stress and mortality. | If O&G activities occurred on winter range during the critical use period (winter), animals would be displaced to less desirable areas or other occupied winter ranges, resulting in increased stress and mortality. Human activity along remaining roads during winter would have the same effect. There would be little direct effect to animals if disturbance occurred during summer. |
| **Habitat Condition** | No effect from O&G activity. | No effect from O&G activity.* | Potential decrease in carrying capacity from vegetation removal. | Potential decrease in carrying capacity from vegetation removal. | Potential decrease in carrying capacity from vegetation removal. |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Limit road use to periods when animals are not present on the winter range. Restrict road use to operators. Recountour and revegetate to prior existing conditions (to the extent possible) new roads when work is completed.

## TIMING LIMITATIONS IN THIS AFFECTED ENVIRONMENT :

Restrict O&G activities during winter when animals are on these areas. (12/1 - 4/30)

## OTHER FACTORS TO CONSIDER:

Activities on adjacent land.

BLM_0048055

Oil and Gas Leasing Analysis FEIS

**AFFECTED ENVIRONMENT : Elk Calving Areas**
**ACRES : 45,230**
**MAPS : Figure III-22**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Populations & Use** | No effect from O&G activity. | No effect from O&G activity.* | Impacts would be lessened. | Timing limitations would mitigate the adverse effects associated with human activity in the area during calving. | If O&G activities occurred in birthing areas during critical periods animals would be displaced to less desirable areas or areas already occupied, resulting in increased stress and mortality. Human activity along roads constructed for O&G activities would have the same effect. There would be little direct effect to animals if use occurred at other times. |
| **Habitat Condition** | No effect from O&G activity. | No effect from O&G activity.* | Potential loss of security cover resulting from direct habitat manipulation and human activity. | Potential loss of security cover resulting from direct habitat manipulation and human activity. Potential decrease in carrying capacity if animals are displaced from adjacent areas. Loss of security cover resulting from direct habitat manipulation and human activity. | Potential decrease in carrying capacity if animals are displaced from adjacent areas. Loss of security cover resulting from direct habitat manipulation and human activity. |

* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Limit road use to periods when animals are not present. Restrict road use to operators. Restrict road construction in critical birthing areas. Recontour and revegetate to prior existing conditions (to the extent possible) new roads when work is complete.

## TIMING LIMITATIONS IN THIS AFFECTED ENVIRONMENT :

Restrict O&G activities during calving periods (4/16-6/30 calving).

Comparison of Alternatives
Summary Comparison of Lease Options

BLM_0048056

Case No. 1:20-cv-02484-MSK   Document 41-3   filed 04/27/21   USDC Colorado   pg 96 of 728

## OTHER FACTORS TO CONSIDER:

Potential timber sale activity following roading for oil and gas activities would impact wildlife habitats through loss of habitat and increased human activity resulting in disturbance, habitat abandonment, increased stress and mortality.

BLM_0048057

Oil and Gas Leasing Analysis FEIS

## AFFECTED ENVIRONMENT : <u>Big Game Migration Routes & Staging Areas</u>
## ACRES : <u>Not applicable</u>
## MAPS : <u>No</u>

### ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Migration Routes & Staging Areas** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts by moving oil and gas activity away from important habitat. | Lessen impacts by protecting habitat during critical use period. | Potential disturbance during critical periods leading to displacement, avoidance, increased stress and mortality. |

* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Physically protect habitat by controlling any new road construction/pad construction or other development in travel corridor. Recontour and revegetate to prior existing conditions (to the extent possible) new roads when work is complete.

## TIMING LIMITATIONS IN THIS AFFECTED ENVIRONMENT :

Prevent activities from occuring during use periods (3/1-5/30 and 11/1-12/31).

## OTHER FACTORS TO CONSIDER:

Potential timber sale activity following roading for oil and gas would impact wildlife habitats through loss of habitat, increased human activity resulting in disturbance, habitat abandonment, increased stress and mortality.

BLM_0048058

## AFFECTED ENVIRONMENT : <u>Bighorn Sheep Lambing/Breeding Areas</u>
## ACRES : <u>9335 (entire range)</u>
## MAPS : <u>Figure III-23</u>

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Bighorn Sheep Lambing/ Breeding Areas** | No effect from O&G activity. | No effect from O&G activity.* | Some mitigation of impacts by moving oil and gas activity away from important habitat area. Potential for loss of important habitat through vegetation manipulation. | Protect habitat during critical use periods. Potential for loss of important habitat through vegetation manipulation. | Potential disturbance during critical periods could result in avoidance, increased stress and mortality. Potential for loss of important habitat through vegetation manipulation. |

* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Limit road use to periods when animals are not present. Restrict road use to operators. Recontour and revegetate to prior existing conditions (to the extent possible) new roads when work is complete.

## TIMING LIMITATIONS IN THIS AFFECTED ENVIRONMENT :

Restrict O&G activities during lambing (5/1-7/15) and breeding (11/1-1/1) periods.

## OTHER FACTORS TO CONSIDER:

Potential timber sale activity following roading for oil and gas would impact wildlife habitats through loss of habitat, increased human activity resulting in disturbance, habitat abandonment, increased stress and mortality.

BLM_0048059

Oil and Gas Leasing Analysis FEIS

**AFFECTED ENVIRONMENT : <u>Summer Range (Concentrated Use)</u>**
**ACRES : <u>81,440</u>**
**MAPS : <u>Figure III-24</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | **NO LEASE** | **NSO** | **CSU** | **TIMING** | **STD. LEASE** |
| **Big Game Summer Range** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts by moving oil and gas activity away from important habitat area. | Protect habitat during critical use periods. | Potential disturbance during critical periods could result in avoidance, increased stress and mortality. Potential for early displacement onto private property. |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Limit road use to periods when animals are not present. Restrict road use to operators. Recontour and revegetate to prior existing conditions (to the extent possible) new roads when work is complete.

## TIMING LIMITATIONS IN THIS AFFECTED ENVIRONMENT :

Restrict oil and gas activities during periods of heavy use.

## OTHER FACTORS TO CONSIDER:

Potential timber sale activity following roading for oil and gas would impact wildlife habitats through loss of habitat, increased human activity resulting in disturbance, habitat abandonment, increased stress and mortality.

BLM_0048060

**AFFECTED ENVIRONMENT : <u>Sage Grouse Leks</u>**
**ACRES : <u>160</u>**
**MAPS : <u>No</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Sage Grouse Leks** | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts by not allowing construction within buffer around lek areas. | Limit oil and gas activities during lek use (3/1 - 5/31). | Potential for loss of habitat, increased human disturbance resulting in area avoidance, reduction of breeding and decrease in reproduction. |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Restrict oil and gas activities within 2.5 miles. Site specific buffers would be established at Application for Permit to Drill stage.

## TIMING LIMITATIONS IN THIS AFFECTED ENVIRONMENT :

Restrict oil and gas activities within buffer during breeding and nesting periods (3/1 - 5/31).

## OTHER FACTORS TO CONSIDER:

Activities on adjacent lands.

BLM_0048061

Oil and Gas Leasing Analysis FEIS

## AFFECTED ENVIRONMENT : <u>Utility Corridors/Electronic Sites</u>
## ACRES : <u>4535</u>
## MAPS : <u>No</u>

### ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| Utility Corridors | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts of Standard Lease through special stipulation (see below). | Same as Standard Lease Terms. | Potential for conflict between drill towers and power transmission lines. |
| Electronic Sites | No effect from O&G activity. | No effect from O&G activity.* | Lessen impacts of Standard Lease through special stipulation (see below). | Same as Standard Lease Terms. | Drilling/production activities would generate electromagnetic disturbances which would conflict with electronic transmissions. |

* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

<u>Utility Corridors</u> - Exclude drill pad development in corridors.

<u>Electronic Sites</u> - Exclude drilling/production activities where electromagnetic disturbances would affect electronic transmissions.

## AFFECTED ENVIRONMENT : <u>Primary Rangeland (6B Management Area)</u>
## ACRES : <u>395,000</u>
## MAPS : <u>Figure III-25</u>

### ENVIRONMENTAL CONSEQUENCES

| ENVIRON MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Vegetation** | No effect from O&G activity. | No effect from O&G activity.* | Mitigation of most of the effects related to new ground disturbance (see below). | Vegetative disturbances would still occur (loss of forage, range carrying capacity, sensitive plant associations and introduction of noxious weeds or less desirable plants). | Loss of forage, range carrying capacity, sensitive plant associations, and noxious weeds or less desirable plants may be introduced. Indirect impacts resulting from timber managment resulting in areas previously unroaded. |
| **Livestock Grazing** | No effect from O&G activity. | No effect from O&G activity.* | People and equipment related disturbances would still occur on existing travelways. | Disturbance would be limited to vegetation and soils. People and equipment related disturbances to livestock would be mitigated. | May conflict to small degree with wildlife needs due to increased competition (less forage available, displaced wildlife). Gates could be left open allowing undesirable livestock movement. Poaching of livestock, vandalism, conflict with recreationists. May provide better access for permitees, moving livestock on/off, and other management. |

\* No effect unless stipulation is waived, excepted or modified.

## CSU IN THIS AFFECTED ENVIRONMENT :

Limit activities to existing road and/or utility corridors.

## TIMING LIMITATIONS IN THIS AFFECTED ENVIRONMENT :

No drilling would occur during 6/1-10/15.

## OTHER FACTORS TO CONSIDER:

Activities on adjacent lands.

BLM_0048063

Oil and Gas Leasing Analysis FEIS

**AFFECTED ENVIRONMENT : <u>Lands Suited for Timber Harvest</u>**
**ACRES : <u>287,000</u>**
**MAPS : <u>Figures III-26a and III-26b</u>**

## ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | LEASE OPTIONS | | | | |
|---|---|---|---|---|---|
| | NO LEASE | NSO | CSU | TIMING | STD. LEASE |
| **Timber Lands Made Suitable** | No effect from O&G activity. | No effect from O&G activity.* Availability of road network on adjacent areas may allow future vegetative management (timber sales). | Same as Standard Lease Terms. | Same as Standard Lease Terms. | Roads constructed for O&G activities may make areas economically viable for timber harvest; could slightly increase ASQ**; would allow management for wildlife habitat, control of insects, disease and wildfires. |

\* No effect unless stipulation is waived, excepted or modified.
\*\* Would require additional NEPA analysis and Forest Plan amendment before any harvest could occur.

## OTHER FACTORS TO CONSIDER:

Concurrent O&G and timber activities.

BLM_0048064

# Summary Comparison of Program Alternatives

## AFFECTED ENVIRONMENT : General Forest

### ENVIRONMENTAL CONSEQUENCES

| ENVIRON-MENTAL FACTORS | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | 1 - NO ACTION | 2 - PREFERRED | 3 - NO LEASE | 4 - STANDARD LEASE TERMS | 5 - NO LEASE ROADLESS AND SPNM |
| **Biological Diversity** | Same as Alternative 4. | No increased impacts to biological diversity on NSO designated areas.* Temporary loss of biological diversity may result on sites cleared for roads, well pads and pipelines. Some loss of biological diversity of wildlife species, especially in areas opened for logging following O&G activities. | Effects only on existing leases. | Temporary loss in biological diversity resulting from roads, well pad and pipeline construction, Loss of biological diversity of wildlife species, especially in areas opened for logging following O&G activity. | No increased impacts to biological diversity in Roadless and SPNM areas. Impacts on remaining areas same as Alternative 2. |
| **Vegetation** | Same as Alternative 4. | Same as Alternative 4. | Effects only on existing leases. | Vegetation removal for pads, roads, pipelines would remove sites from wood fiber and/or forage production. Abandoned drill sites and road locations may be restored to full vegetation over long-term. May result in slightly increased ASQ.** | Same as Alternative 4. |
| **Soils** | Same as Alternative 4. | NSO recommended for sensitive soils in riparian and alpine/tundra environments would prevent irretrievable/irreversible impacts in these areas. Potential for displacement, compaction and mixing on construction locations in remainder of analysis area. | Effects only on existing leases. | Construction activities result in displacement, compaction and mixing of soil material. Increased potential for erosion and slope failures. Impacts vary with slope and soil type. Forest Plan guidelines provide mitigation through road design and revegetation requirements. | No effect from O&G activity in Roadless and SPNM areas. Same impacts as Alternative 2 in remainder of analysis area. |
| **Air Quality** | Minimal impact to air quality. Some dust from road use. | Minimal impact to air quality. Some dust from road use. | Effects only on existing leases. | Minimal impact to air quality. Some dust from road use. | Minimal impact to air quality. Some dust from road use. |

BLM_0048065

Oil and Gas Leasing Analysis FEIS

| ENVIRON-MENTAL FACTORS | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | 1 - NO ACTION | 2 - PREFERRED | 3 - NO LEASE | 4 - STANDARD LEASE TERMS | 5 - NO LEASE ROADLESS AND SPNM |
| **Water Quality** | Some increase in sediment. Overall impact low. Some risk of spills at drill sites and stream crossings. | Some increase in sediment, but most sensitive areas protected. Accidental spills could occur. Overall impact low. | Effects only on existing leases. | Some increase in sediment. No special protection of sensitive areas. Overall impact moderate. Risk of spill similar to other alternatives. | Some increase in sediment. Impacts confined to areas of existing development. Overall, impacts very low. |
| **Range and Livestock Grazing** | Same as Alternative 4. | Same as Alternative 4. | Effects only on existing leases. | Surface disturbance would remove forage. Increased access and activity may result in temporary reduction of permitted livestock or change in management system in areas of activity. Potential for introduction of noxious and undesirable plants along roads, well pads and pipelines. Increased access could aid in range management activities. | No effect from O&G activity in Roadless and SPNM areas. Impacts same as Alternative 4 for remainder of analysis area. |
| **Roads** | Same as Alternative 4. | No impacts in No Lease and NSO stipulated areas. Impacts same as Alternative 4 in remainder of analysis area. | Effects only on existing leases. | Potential for new road construction in entire analysis area. Road reconstruction would generally increase standard of existing road. Road use would increase during exploration and development stages. | No impacts in Roadless, SPNM and other No Lease and NSO areas identified in Alternative 2. Impacts same as Alternative 4 on remainder of analysis area. |
| **Visual Resources** | Alternative 4 impacts lessened through use of vegetative and topographic screening, facility placement, design and color to meet VQO in Retention and Low VAC areas. | Impacts lessened from No Action by retaining VQO in Scenic Byway Corridors in addition to Retention VQO and Low VAC areas. | Effects only on existing leases. | Potential impacts to visual resources greatest during exploratory drilling, less during development and production. Negative impacts to Retention VQO with and without Low VAC (19% of analysis area). | No effect from O&G activity in Roadless and SPNM areas. Impacts same as Alternative 2 in remainder of analysis area. |

Comparison of Alternatives
Summary Comparison of Program Alternatives

BLM_0048066

Chapter II - Alternatives

| ENVIRON-MENTAL FACTORS | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | 1 - NO ACTION | 2 - PREFERRED | 3 - NO LEASE | 4 - STANDARD LEASE TERMS | 5 - NO LEASE ROADLESS AND SPNM |
| **Recreation Opportunities** | Recreation opportunities in developed facilities and SPNM areas would be protected. Potential for ROS class to be changed to more developed class in dispersed recreation and Roadless areas. Potential decrease in backcountry recreation opportunities. | Recreation opportunities would be protected in identified developed, dispersed and major trail recreation complexes and in several Roadless Areas. Potential for ROS class to be changed to more developed class in dispersed recreation and Roadless areas. Potential decrease in backcountry recreation opportunities. | Effects only on existing leases. | Improved road standards and increased traffic will alter ROS class to more developed conditions and potentially decrease recreation experience of Forest visitors. Opportunity for backcountry recreation will be reduced. | No effect from O&G activities in Roadless, SPNM and recreation complexes. Impacts same as Alternative 2 in remainder of analysis area. |
| **Cultural and Historical Resources** | Same as Alternative 4. | Same as Alternative 4. | Effects only on existing leases. | Cultural survey is required prior to any ground disturbing activity. Any identified cultural resources must be protected by avoidance, or recorded and excavated. | No effect from O&G activity in Roadless and SPNM areas. Impacts in remainder of analysis area same as Alternative 4. |
| **Aquatic/ Riparian/ Wetland Habitats** | Same as Alternative 4. | Same as Alternative 4. | Effects only on existing leases. | Potential impacts from road construction, culvert location and stream crossings resulting in vegetation removal and increased sediment loads, which would decrease spawning habitat, result in macroinvertebrate and fish fry mortality. Increased potential for toxic spills entering waterways. | No effect from O&G activity within Roadless and SPNM areas. Impacts in remainder of analysis area same as Alternative 4. |

BLM_0048067

Oil and Gas Leasing Analysis FEIS

| ENVIRON-MENTAL FACTORS | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | 1 - NO ACTION | 2 - PREFERRED | 3 - NO LEASE | 4 - STANDARD LEASE TERMS | 5 - NO LEASE ROADLESS AND SPNM |
| **Wildlife** | Same as Alternative 4. | Impacts to wildlife and habitat mitigated through NSO, CSU and TL in special habitats. Potential for habitat loss, disturbance and displacement to less desirable habitats on areas with SLT. Impacts compounded in areas opened for logging after O&G activity. | Effects only on existing leases. | Forest Plan provides limited protection: -Timing restrictions for bighorn sheep lambing areas; -Timing restriction for raptor nesting; -Road use restrictions to maintain habitat effectiveness in MIS habitat (4B); -Road construction/use restrictions in big game winter range (5A &5B). Remainder of area open to Standard Lease Terms, which would result in habitat loss, disturbance, displacement to less desirable habitats, potential increase in conflicts on private land. Impacts compounded in areas opened for logging after O&G activity. | No direct impacts to wildlife in Roadless and SPNM areas. Impacts same as Alternative 2 on remainder of analysis area. |
| **Wildfire** | Potential for human caused wildfire would be similar for all alternatives, except for Alternative 3, which would have a slightly smaller potential for wildfire, due to less oil and gas activities. Improved access and increased human activity has the potential to result in increasing human caused wildfires. Increased access could allow more efficient suppression of wildfires, however; both man-caused or naturally occurring. | | | | |
| **Economic and Social Setting** | Average of 10 more jobs (above No Lease figure) for 3 months; additional $4,000 State revenue; additional $8,000 County revenue from drilling on new leases. | Average of 10 more jobs (above No Lease figure) for 3 months; additional $4,000 State revenue; additional $8,000 County revenue from drilling on new leases. | Average of 10 full time drilling jobs; $32,000 State revenue; $64,000 County revenue from drilling on existing leases, annually. | Average of 10 more jobs (above No Lease figure) for 3 months; additional $4,000 State revenue; additional $8,000 County revenue from drilling on new leases. | Average of 10 more jobs (above No Lease figure) for 3 months; additional $4,000 State revenue; additional $8,000 County revenue from drilling on new leases. |
| **Reasonably Foreseeable Development Scenario** | The projected activity would occur, but typically in areas least restrictive to industry. | | The 7 projected wells outside existing leases and units would not be drilled. | No effect on the RFD. | The projected activity would shift to areas available for oil and gas leasing. |
| **Oil and Gas Resources - Availability** | All legally available lands within the analysis area would be available for leasing; however, stipulations modify the Standard Lease Terms in some Affected Environments. | Oil and gas resources would be available for leasing except in selected Roadless Areas and Research Natural Areas. Special stipulations modify Standard Lease Terms. | Oil and gas resources within the analysis area would not be available for leasing. Oil and gas resources on existing leases are not effected. | All legally available lands within the analysis area would be available for leasing. No special stipulations would be applied. | Oil and gas resources within Roadless Areas and areas of SPNM would not be available for leasing. Otherwise this alternative is similar to Alternative 2. |
| | 951,450 ac. available. | 813,180 ac. available. | 0 ac. available. | 951,450 ac. available. | 552,300 ac. available. |

Comparison of Alternatives
Summary Comparison of Program Alternatives

BLM_0048068

| ENVIRON- MENTAL FACTORS | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | 1 - NO ACTION | 2 - PREFERRED | 3 - NO LEASE | 4 - STANDARD LEASE TERMS | 5 - NO LEASE ROADLESS AND SPNM |
| Oil and Gas Resources - Effect on Industry | Costs for the recovery of oil and gas resources would be higher than that of Alternative 4, but lower than Alternatives 2 & 5. | Generally, the costs related to the recovery of oil and gas resources would be higher than that of Alternative 4. | No opportunity to recover oil and gas resources (except on existing leases). | Least cost alternative for the recovery of oil and gas resources. May result in more interest in leasing. | Same as Alternative 2, but fewer lands available for leasing. |

\* No effect unless stipulation is waived, excepted or modified.
\*\* Would require additional NEPA analysis and Forest Plan amendment before any harvest could occur.

BLM_0048069

Oil and Gas Leasing Analysis FEIS

# Major Issue Comparison by Alternative

## *Major Issue: Slope Stability and Geologic Hazards*

The *Affected Environments* to consider in the assessment of the potential for slope stability and geologic hazard problems include:  High geologic hazards, moderate geologic hazards, slopes 40-60%, and slopes > 60%.

Alternative 1, 2, and 5 would treat high geologic hazard areas, moderate geologic hazard areas, slopes 40-60% and slopes > 60%, similarly.  Under each of these alternatives on high geologic hazard areas and slopes > 60%, a *No Surface Occupancy* stipulation would be applied to oil and gas leases.  In moderate geologic hazard areas and slopes 40-60% a *Controlled Surface Use* stipulation would be applied.  The potential for slope stability and geologic hazard problems with these alternatives would be minimized through avoidance of these areas and facility design (roads and well pads) would be appropriate for the potential hazard.

Alternative 3 would result in no increased potential (over baseline levels) for slope stability and geologic hazard problems as a result of oil and gas activities.

Alternative 4 would apply *Standard Lease Terms* to high geologic hazard areas, moderate geologic hazard areas, slopes 40-60% and slopes > 60%.  These areas would be available for lease with no special stipulations attached to the lease to specifically protect them from potential adverse environmental impacts.  This alternative has the greatest potential to produce adverse effects, such as the acceleration or triggering of slope failures, excessive soil movement (erosion), and the resultant risk to the aquatic ecosystem if sediment reaches streams.  Although this alternative has the greatest potential for adverse effects (slope stability and geologic hazards), the potential is still considered low, given the Surface Use Plan of Operations approval process.

## *Major Issue: Roadless and Undeveloped Areas*

The *Affected Environments* to consider in the assessment of potential effects to Roadless and undeveloped areas include:  Roadless Areas, Research Natural Areas, and the Semi-primitive Non-motorized areas (3A Management Areas).

Alternatives 1 and 4 would have similar effects to Roadless and undeveloped areas.  In both alternatives, all Roadless Areas (about 345,000 acres) are available for oil and gas leasing with no special stipulations.  In Alternative 1 Research Natural Areas and the Semi-primitive Non-motorized areas (3A Management Areas) would have *Controlled Surface Use* stipulations attached to the lease.  In Alternative 4, these areas would be leased with *Standard Lease Terms* only.  Oil and gas activity, regardless of stipulation in these areas, would have similar effects - the loss or degradation of undeveloped character.

Under Alternative 2, the Kannah Creek, Tabeguache, Roubideau, Whetstone Mountain, Flat Top Mountain and parts of West Elk (Snowshoe Mesa, Kebler Pass), Raggeds (Kebler Pass) and Priest Mountain (Flat Tops et al) Roadless Areas and Research Natural Areas (about 125,000 acres) would not be available for oil and gas leasing.  The Battlement Mesa Roadless Area and Semi-primitive Non-motorized areas (3A Management Areas) would be available for leasing, but with a *No Surface Occupancy* stipulation.  Little or no loss of the undeveloped character would occur in these areas.

Alternative 3 and 5 would result in no additional effects from new leasing to Roadless and undeveloped areas.  Under these alternatives, these areas would not be available for oil and gas leasing.

Comparison of Alternatives
Major Issue Comparison by Alternative

BLM_0048070

### *Major Issue: Wildlife and Wildlife Habitat*

The *Affected Environments* to consider in the assessment of potential effects to wildlife and wildlife habitat include: Aquatic/Riparian/Wetland Habitats, Roadless Areas, Wildlife Special Habitats (big game winter range, elk calving areas, migration routes and staging areas, bighorn lambing and breeding areas, concentrated use summer range, and sage grouse leks), and Threatened and Endangered Species. Threatened and Endangered species are protected under the Endangered Species Act under all alternatives.

Alternative 1 would provide current Forest Plan protection for wildlife and wildlife habitat. This would include *Controlled Surface Use* in Aquatic/Riparian/Wetland Habitats and big game winter range. *Timing limitations* would be applied to big game winter range, as well as bighorn sheep lambing and breeding areas. All other wildlife *Affected Environments* would be available for oil and gas leasing with *Standard Lease Terms* (no special mitigation).

Alternative 2 would provide protection to wildlife and wildlife habitats through the application of special stipulations in wildlife *Affected Environments*. With this alternative, Aquatic/Riparian/Wetland Habitats, concentrated use summer range, sage grouse leks, and bighorn sheep lambing and breeding areas, the Battlement Mesa Roadless Area and Semi-primitive Non-motorized areas (3A Management Areas) would be protected with *No Surface Occupancy* stipulations. Additionally, the Kannah Creek, Tabeguache, Roubideau, Whetstone Mountain, Flat Top Mountain and parts of West Elk (Snowshoe Mesa, Kebler Pass), Ragged (Kebler Pass) and Priest Mountain (Flat Tops, et al) Roadless Areas would not be available for oil and gas leasing. Wildlife in big game winter range, elk calving areas, and migration routes would be protected with *Controlled Surface Use* and *Timing Limitation* stipulations.

Under Alternative 3, none of the wildlife *Affected Environments* in the analysis area would be available for oil and gas leasing.

Under Alternative 4, all of the wildlife *Affected Environments* would be available for oil and gas leasing with *Standard Lease Terms,* only (no special mitigation). The potential for adverse effects to wildlife and wildlife habitats would be the greatest with this alternative.

Under Alternative 5, protection to wildlife and wildlife habitats would be similar to that in Alternative 2, but with additional protection to wildlife and wildlife habitats in Roadless Areas and Semi-primitive Non-motorized areas (3A Management Areas), which would not be available for oil and gas leasing under this alternative.

### *Major Issue: Recreational Activities and Experiences*

The *Affected Environments* to consider in assessing potential impacts to recreational activities and experiences include: Sensitive Areas, Retention VQO - Low VAC, Retention VQO, Scenic Byway Corridors, Roadless Areas, Semi-primitive Non-motorized areas (3A Management Areas), and Recreation Complexes.

Alternative 1 provides protection for recreational activities and experiences with special stipulations in all of the recreation-related *Affected Environments* except for Roadless Areas. No special protection would be afforded Roadless Areas with this alternative. *Controlled Surface Use* stipulations would be applied to Sensitive Areas, Retention VQO areas, Scenic Byway Corridors, Semi-primitive Non-motorized areas (3A Management Areas), and Recreation Complexes. *Controlled Surface Use* in these *Affected Environments* would still likely result in some degradation of the recreational activity and experience. *No Surface Occupancy* would be applied to Retention VQO - Low VAC areas.

Alternative 2 would protect Sensitive Areas, Retention VQO - Low VAC, Semi-primitive Non-motorized areas (3A Management Areas), most Recreation Complexes (cross country ski trails

BLM_0048071

Oil and Gas Leasing Analysis FEIS

would have *Timing Limitations*) and the Battlement Mesa Roadless Area with *No Surface Occupancy* stipulations. Kannah Creek, Tabeguache, Roubideau, Whetstone Mountain, Flat Top Mountain and parts of West Elk (Snowshoe Mesa, Kebler Pass), Raggeds (Kebler Pass) and Priest Mountain (Flat Tops, et al) Roadless Areas would not be available for oil and gas leasing. Retention VQO and Scenic Byway Corridors would have *Controlled Surface Use* stipulations that protect the scenic values in those areas. Recreational activities and experiences would generally be maintained in these areas, under Alternative 2.

Recreational activities and experiences would not be affected with the selection of Alternative 3. Recreational opportunities would remain unchanged.

All recreation-related *Affected Environments* would be available for oil and gas leasing under Alternative 4 and potentially affected by oil and gas activity. *Standard Lease Terms* would do little to mitigate the potential for effects on recreational activities and experiences.

Alternative 5 would result in similar effects as Alternative 2; however, effects on Roadless and Semi-primitive Non-motorized recreation values would be maintained to a higher level, and on more land. Roadless Areas and Semi-primitive Non-motorized areas (3A Management Areas) would not be available for oil and gas leasing.

## *Major Issue: Cumulative Effects*

The potential for cumulative effects to *Affected Environments* is directly related to the location, timing, and amount of activity projected. Alternatives 1, 2, 4, and 5 have the same amount of activity projected, 47 wells. Alternative 3, which emphasizes no new leases, would result in 40 wells drilled. The greatest potential for cumulative effects from oil and gas activities would occur in those areas where concentrated oil and gas activities are projected, such as those areas covered under exploratory unit agreements. If timber sale and other activity, such as concentrated recreational use and livestock grazing also occurs in those areas, the potential for cumulative effects to surface resources would be increased.

Generally, the amount and timing (an average of 3.3 wells/year) of projected oil and gas activity is such that, no significant cumulative effects would be likely to occur. The amount of ground disturbance, about 35 acres per year (10.7 acres/well - see Analysis Assumptions), and oil and gas activity related traffic (an average increase of 13 vehicles per day per well for an average of 60 days) would increase the potential for cumulative effects incrementally. The effects would likely be short-term and not of major significance.

Additional cumulative effects to consider are ongoing and proposed timber sales in the analysis area, plus the potential of additional sales occurring in areas made economically suitable as a result of roads constructed for oil and gas activities. Before any currently uneconomically suited areas can be included in the Forest's ASQ, additional environmental analysis and Forest Plan amendment must occur.

Comparison of Alternatives
Major Issue Comparison by Alternative

BLM_0048072



## LEGEND

- ▨ TIMING LIMITATIONS
- ▨ STANDARD LEASE TERMS
- ▨ NO LEASE
- ▨ NO SURFACE OCCUPANCY STIPULATIONS
- ▨ CONTROLLED SURFACE USE STIPULATIONS

DRAWN BY: DAF

## Lease Options
## Within The Analysis
## Area For Alternative 1

Figure II-1

DATE: 1/93

Comparison of Alternatives

Page II-59

BLM_0048073

Oil and Gas Leasing Analysis FEIS

Blank

Comparison of Alternatives

BLM_0048074



N

LEGEND

TIMING LIMITATIONS

STANDARD LEASE TERMS

NO LEASE

NO SURFACE OCCUPANCY STIPULATIONS

CONTROLLED SURFACE USE STIPULATIONS

DRAWN BY: DAW

## Lease Options Within The Analysis Area For Alternative 2

Figure II-2

DATE: 1/93

Oil and Gas Leasing Analysis FEIS

Blank

Comparison of Alternatives

BLM_0048076



LEGEND

TIMING LIMITATIONS

STANDARD LEASE TERMS

NO LEASE

NO SURFACE OCCUPANCY STIPULATIONS

CONTROLLED SURFACE USE STIPULATIONS

DRAWN BY: DAF

Lease Options
Within The Analysis
Area For Alternative 3

Figure II-3

DATE: 1/93

Comparison of Alternatives

Page II-63

BLM_0048077

Oil and Gas Leasing Analysis FEIS

Blank

Comparison of Alternatives

BLM_0048078



N

**LEGEND**

TIMING LIMITATIONS

STANDARD LEASE TERMS

NO LEASE

NO SURFACE OCCUPANCY STIPULATIONS

GREEN  CONTROLLED SURFACE USE STIPULATIONS

DRAWN BY: DAF

**Lease Options Within The Analysis Area For Alternative 4**

Figure II-4

DATE: 1/99

BLM_0048079

Oil and Gas Leasing Analysis FEIS

Blank

Comparison of Alternatives

BLM_0048080



BLM_0048081

LEGEND

TIMING LIMITATIONS

STANDARD LEASE TERMS

NO LEASE

NO SURFACE OCCUPANCY STIPULATIONS

CONTROLLED SURFACE USE STIPULATIONS

DRAWN BY: DAF

## Lease Options Within The Analysis Area For Alternative 5

Figure II-5

DATE: 1/92

BLM_0048082

# Chapter III -
# Affected Environment

BLM_0048083

BLM_0048084

# Table of Contents

Introduction                                                                        III-1

    The Analysis Area                                                    III-1

    Oil and Gas Potential                                                III-2

    The Current Oil and Gas Leasing Program on the Forest                III-2

    The Reasonably Foreseeable Development Scenario                      III-2

Affected Environments                                                               III-3

  General Forest                                                                   III-3

    Environmental Factor:  Biological Diversity                         III-3

    Environmental Factor: Vegetation (Plant Associations)               III-5

      Forest Condition - Deciduous Forests                           III-5

      Forest Condition - Coniferous Forests                          III-7

      Forest Condition - Mature and "Old Growth" Timber Stands       III-9

      Forest Condition - Woodlands                                   III-10

      Forest Condition - Shrublands                                  III-11

      Forest Condition - Grasslands                                  III-12

      Forest Condition - Forblands                                   III-14

      Forest Condition - Undesirable Plants                          III-15

    Environmental Factor:  Climate                                       III-15

    Environmental Factor:  Geology, Geomorphology and Physiography       III-15

      Hydrocarbon Occurrence                                         III-16

      Prospectively Valuable for Oil and Gas                         III-17

      Oil and Gas Potential                                          III-17

    Environmental Factor:  Soil Resources                                III-18

      Grand Mesa Top                                                 III-19

      Grand Mesa Sideslopes                                          III-19

      Uncompahgre Plateau Area                                       III-20

      The Lone Cone Area                                             III-20

      Soil Erosion                                                   III-21

      Slope Stability                                                III-21

      Soil Productivity                                              III-22

    Environmental Factor:  Air Quality                                   III-22

      Air Quality Regulation                                         III-22

      NAAQS Criteria Pollutants                                      III-23

      Air Quality Monitoring                                         III-24

    Environmental Factor:  Water                                         III-24

      Surface Water                                                  III-24

      Groundwater                                                    III-25

    Environmental Factor:  Water Quantity                                III-29

    Environmental Factor:  Water Quality                                 III-29

    Environmental Factor: Range                                          III-30

BLM  0048085

| | |
|---|---|
| Livestock Grazing | III-30 |
| Environmental Factor: Roads | III-31 |
| State Highways | III-31 |
| Arterial Roads | III-31 |
| Collector Roads | III-32 |
| Local Roads | III-34 |
| Travel Management | III-35 |
| Environmental Factor: Visual Resource / Scenery | III-35 |
| Environmental Factor: Recreation Opportunities | III-37 |
| Developed Recreation | III-37 |
| Dispersed Recreation | III-38 |
| Recreation Opportunity Spectrum (ROS) | III-38 |
| Wild and Scenic Rivers | III-39 |
| Wilderness | III-39 |
| Environmental Factor: Cultural and Historical Resources | III-40 |
| Prehistoric Resources | III-40 |
| Historic Resources | III-41 |
| Environmental Factor: Wildlife | III-43 |
| Big Game | III-44 |
| Upland Game Birds | III-46 |
| Small Game | III-46 |
| Furbearers | HI-46 |
| Other Wildlife | III-47 |
| Management Indicator Species | III-47 |
| Threatened, Endangered and Sensitive Species | III-49 |
| Environmental Factor: Wildfire | III-49 |
| Environmental Factor: Economic Setting | III-49 |
| Floodplains | III-50 |
| Aquatic / Riparian / Wetland Habitats | III-51 |
| Environmental Factor: Fisheries and Aquatic Habitat | III-51 |
| Environmental Factor: Riparian Habitats | III-52 |
| Environmental Factor: Wetlands | III-54 |
| Alpine / Tundra Areas | III-55 |
| Areas of High Geologic Hazard | III-55 |
| Areas of Moderate Geologic Hazard | III-56 |
| Roadless Areas | III-56 |
| Roadless Area 181 - Raggeds | III-58 |
| Roadless Area 182 - Drift Creek | III-62 |
| Roadless Area 184 - Springhouse Park | III-63 |
| Roadless Area 185 - Electric Mountain | III-64 |
| Roadless Area 186 - Clear Creek | III-65 |
| Roadless Area 189 - Hightower | III-67 |
| Roadless Area 191 - Priest Mountain | III-68 |

BLM_0048086

|  |  |
|---|---|
| Currant Creek | III-69 |
| Cunningham Creek | III-70 |
| Priest Mountain | III-70 |
| Hubbard Creek | III-71 |
| Upper Cow Creek | III-72 |
| West Muddy | III-72 |
| Flat Tops | III-73 |
| Bronco Knob | III-74 |
| Upper Leon Creek | III-74 |
| Roadless Area 192 - Salt Creek | III-74 |
| Roadless Area 193 - Battlement Mesa | III-76 |
| Roadless Area 194 - Nick Mountain | III-77 |
| Roadless Area 195 - Kannah Creek | III-79 |
| Roadless Area 196 - West Elk | III-80 |
| Roadless Area 200 - Whetstone Mountain | III-82 |
| Roadless Area 201 - Flat Top Mountain | III-83 |
| Roadless Area 241 - Roubideau | III-84 |
| Roadless Area 242 - Tabeguache | III-86 |
| Roadless Area 243 - Kelso Mesa | III-87 |
| Roadless Areas 246 - Campbell Point, 247 - Johnson Creek | III-88 |
| Research Natural Areas | III-90 |
| Sensitive Areas | III-90 |
| Retention VQO | III-90 |
| Retention VQO and Low VAC | III-91 |
| Scenic Byway Corridors | III-92 |
| Grand Mesa Scenic and Historic Byway | III-92 |
| West Elk Loop Scenic and Historic Byway | III-92 |
| Unaweep/Tabeguache Scenic and Historic Byway | III-92 |
| San Juan Skyway National Scenic Byway | III-92 |
| Semi-primitive Non-motorized (3A Management Areas) | III-93 |
| Administrative Sites | III-93 |
| Recreation Complexes | III-94 |
| Developed Recreation Complexes | III-94 |
| Dispersed Recreation Complexes | III-95 |
| Major Trail Systems | III-96 |
| Watersheds of Special Interest to Municipalities | III-96 |
| Slopes 40-60% | III-98 |
| Slopes >60% | III-98 |
| Wildlife Special Habitats | III-98 |
| Big Game Winter Range | III-98 |
| Elk Calving Areas | III-99 |
| Migration Routes and Staging Areas | III-99 |
| Bighorn Lambing and Breeding Areas | III-100 |

BLM_0048087

Summer Range (Concentrated Use)                                III-100
Sage Grouse Leks                                               III-100
Threatened, Endangered and Sensitive Species                  III-101
Endangered Species                                         III-101
Candidate Species                                          III-101
Sensitive Species                                          III-104
Mammals                                                III-104
Birds                                                  III-104
Fish                                                   III-104
Insects                                                III-104
Amphibians                                             III-104
Utility Corridors / Electronic Sites                          III-105
Primary Rangeland (6B Management Areas)                       III-105
Lands Suited for Timber Harvest                               III-106
Maps of Affected Environments                                 III-107

## List of Tables

Table III-1. Vertical Diversity within Aspen Type                          III-6
Table III-2. Structural Stage Aspen Type                                  III-7
Table III-3. Geologic Units and Hydrogeologic Character,
          Southern Uncompahgre Valley and San Miguel River Basin       III-26
Table III-4. Geologic Units and Hydrogeologic Character,
          Grand Mesa Area                                          III-27
Table III-5. Geologic Units and Hydrogeologic Character,
          Crested Butte Area                                       III-28
Table III-6. Arterial Roads within Analysis Area                           III-32
Table III-7. Collector Roads within Analysis Area                          III-33
Table III-8. Visual Quality Objectives in Analysis Area                     III-36
Table III-9. Recreation Use by Activity                                   III-37
Table III-10. Analysis Area ROS Class Composition                        III-39
Table III-11. Roadless Areas within Analysis Area                         III-57
Table III-12. Number of Acres of Timber Suitability Type within
          Roadless Areas in Analysis Area                           III-59
Table III-13. Administrative Sites within Analysis Area                     III-94
Table III-14. Municipal Watersheds in the Analysis Area                    III-97

## List of Figures

Figure III-1. Analysis Area                                              III-108
Figure III-2. Oil and Gas Potential Zones                                 III-109
Figure III-3. Oil/Gas Existing Leases                                     III-110
Figure III-4. Oil/Gas Unit Areas                                         III-111
Figure III-5. Alpine/Tundra Areas                                        III-112
Figure III-6. High Geologic Hazard Areas                                  III-113
Figure III-7. Moderate Geologic Hazard Areas                             III-114
Figure III-8a. Roadless Areas (North Half)                                III-115
Figure III-8b. Roadless Areas (South Half)                                III-116

BLM_0048088

Figure III-9.  Research Natural Areas                                                          III-117
Figure III-10. Sensitive Areas                                                                 III-118
Figure III-11. Retention VQO                                                                   III-119
Figure III-12. Retention VQO and Low VAC                                                       III-120
Figure III-13. Scenic Byway Corridors                                                          III-121
Figure III-14. Semi-Primitive Non-Motorized (3A Management Areas)                              III-122
Figure III-15. Developed Recreational Areas                                                    III-123
Figure III-16. Dispersed Recreational Areas                                                    III-124
Figure III-17. Major Recreational Trails                                                       III-125
Figure III-18. Municipal Watershed Areas                                                       III-126
Figure III-19. Slopes 40-60%                                                                   III-127
Figure III-20. Slopes Greater Than 60%                                                         III-128
Figure III-21. Big Game Winter Range (Deer & Elk)                                              III-129
Figure III-22. Elk Calving Areas                                                               III-130
Figure III-23. Bighorn Sheep Range                                                             III-131
Figure III-24. Elk Summer Range (Concentrated Use)                                             III-132
Figure III-25. Primary Rangeland (6B Management Areas)                                         III-133
Figure III-26a. Lands Suited for Timber Harvest (Aspen)                                        III-134
Figure III-26b. Lands Suited for Timber Harvest (Conifer)                                      III-135
Figure III-27a. Economically Not Suited for Timber Harvesting (Aspen)                          III-136
Figure III-27b. Economically Not Suited for Timber Harvesting (Conifer)                        III-137
Figure III-28. National Park System Units Near the Analysis Area                              III-138
Figure III-29. Oil/Gas Well Locations                                                          III-139
Figure III-30. Air Quality Monitoring Sites                                                    III-140

BLM  0048089

BLM_0048090

# Chapter III - Affected Environment

## Introduction

This chapter describes the physical, biological, social, and economic aspects of the Forest's environment.

The Affected Environment section of a FEIS is intended to describe the environment of the area that may be affected by the Alternatives under consideration. This section sets the stage for the reader so that he or she will be able to compare the existing situation with the anticipated effects of various alternatives. One technique the reader might employ to help understand the effects of the Alternatives, would be to first read a section from Chapter III and then to turn to the corresponding section in Chapter IV - Environmental Consequences, to consider the consequences of the Alternatives in terms of that resource or issue area. Figures referenced are displayed at the end of this chapter.

An important part of the "existing situation" is the demand analysis for oil and gas resources. This analysis is represented in detail in the Reasonably Foreseeable Development (RFD) Scenario prepared by the Bureau of Land Management Colorado State Office, presented in summary in this chapter and appended in full detail as Appendix E.

### *The Analysis Area*

Figure III-1 is a map at small scale of the area considered in this analysis. The maps included in the map packet as part of this FEIS portray the analysis area at a much larger scale.

Not all of the Forest is included in this analysis. Identification of the analysis area was based on a combination of two factors: 1) Oil and gas resource potential (discussed below); 2) Forest Service policy found in Interim Directive 2820-91-1 (Appendix A)

Only those areas of the Forest with moderate and high potential for oil and gas resources, and those areas of low and no known potential for oil and gas resources in which an interest in leasing has been shown are included in the analysis area. (A two mile zone beyond the boundary of the leased parcels in the low and no known potential for oil and gas resources is also included in the analysis area.) Interest in leasing is defined as: an expression by the oil and gas industry that they have an interest in leasing; there has been oil and gas production nearby; the geologic environment is favorable for oil and gas to have accumulated; there are State, private, or Federal leases in the vicinity; geophysical exploration has been done recently; or the BLM indicates that lands have been nominated for lease (Interim Directive 2820-9-1; 2822.94a, Appendix A).

This limitation of the analysis area was done to reduce costs and speed up the analysis. Areas of real interest which can reasonably be expected to be subject to leasing in the near future, are addressed.

Specifically, the analysis area includes all of the Collbran Ranger District; most of the Paonia Ranger District; the western fringe of the Uncompahgre Plateau and the Grand Mesa part of the Grand Junction Ranger District; most of the Ouray Ranger District on the Uncompahgre Plateau; and part of the Norwood Ranger District west and north of the Lizard Head Wilderness. Twenty-eight (28) square miles in the Carbon Creek/Carbon Peak area of the Taylor River Ranger District and none of the Cebolla Ranger District is included in the analysis area.

BLM_0048091

### *Oil and Gas Potential*

The oil and gas potential of the Forest has been determined in accordance with BLM Manual Section 3021 which describes the criteria for determining lands prospectively valuable for oil and gas resources. Lands underlain by sedimentary rocks shall be classified as prospectively valuable for oil and gas on the basis of the thickness and depth of sedimentary rocks, a favorable structural setting, and evidence of oil and gas potential.

In a sedimentary basin, the minimum thickness of sedimentary rocks considered to be prospectively valuable for oil and/or gas is 1,000 feet, unless a thinner sedimentary section is known to be productive.

The lower limit of potentially productive sedimentary rocks is considered to be 35,000 feet below the surface. Areas having a cover of igneous or metamorphic rocks which has flowed or been thrust over sedimentary rock may be classified as prospectively valuable.

Oil seeps, oil and gas shows in well tests, and past or present production constitute direct evidence of oil and gas potential. Indirect evidence may include seismic information, similarity with known producing rocks, or acceptable levels of thermal maturation. Either direct or indirect evidence may be used in classification.

An area can also be rated as to oil and gas potential (BLM Handbook 1624-H). In areas rated as high for the occurrence of oil and gas resources, there is *demonstrated evidence* of: (1) a source rock for the oil and gas, (2) thermal maturation, (3) reservoir strata possessing permeability and/or porosity, and (4) traps OR the area is part of an oil and gas play as defined by the U.S. Geological Survey.

For an area to be rated as having moderate potential for oil and gas resources there must be a *geophysical or geological indication* that the following are present: (1) a source rock, (2) thermal maturation, (3) reservoir strata possessing permeability and/or porosity, and (4) traps.

In those areas of **low** potential for oil and gas resources, there is *specific indications* that one or more of the following are *not* present: (1) a source rock, (2) thermal maturation, (3) reservoir strata possessing permeability and/or porosity, and (4) traps.

The potential for oil and gas resource rating of **none** (no known) requires that the absence of source rock, or thermal maturation or reservoir rock prohibits the occurrence of oil and/or gas.

Figure III-2 displays oil and gas mineral potential as it is now known for the Forest.

### *The Current Oil and Gas Leasing Program on the Forest*

The current oil and gas leasing program on the Forest is described in detail in "Current Situation", on page I-5 and as the Current Management or "No Action" alternative (Alternative 1) in Chapter II. Figure III-3 displays the existing leases.

### *The Reasonably Foreseeable Development Scenario*

The Reasonably Foreseeable Development (RFD) scenario provided to the Forest by BLM staff specialists predicts a total of 47 wells will be drilled within the analysis area from 1991 through 2005. The RFD assumes that drilling activity will continue at the same conservative levels of 1986 to 1990, and constitutes about 3% of the activity on the Western Slope of Colorado. (The RFD is summarized here - see Appendix E for the entire text of the RFD.) The vast majority, 40 of 47, of the predicted wells will be drilled on existing leases.

BLM_0048092

Twenty (20) of the wells will be drilled in two existing units on existing leases. (This assumes the units will go to full field development). Both of the units are in the North Fork of the Gunnison River drainage. Some of the units overlap onto the White River National Forest and BLM administered lands. However, the 20 wells discussed here are the number of wells that will be drilled in those portions of the units on this Forest. The two exploratory units that will have the drilling activity and the number of wells predicted for each unit is displayed below.

Narrows - 10 wells

Ragged Mountain - 10 wells

Figure III- 4 is a map that shows the location of each unit.

Outside the exploratory units, 27 additional wells are predicted; 12 each on Grand Mesa and in the North Fork of the Gunnison River drainage, and 3 on the Uncompahgre Plateau. Of these 27 wells, an estimated 20 are predicted to be drilled on existing leaseholds. Seven wells are expected to be drilled on new leases.

From the RFD described above, 40 of the 47 wells predicted for the Forest over the period 1991-2005 will be drilled on existing leaseholds. The parcels of National Forest System lands in existing leaseholds are not subject to the decisions made in the ROD for this analysis until the leases expire or are relinquished. Therefore, regardless of the decisions, environmental effects will potentially occur on those leaseholds and mostly in the units described above. These environmental effects are the baseline effects.

> **Additional effects will occur as a result of the 7 wells predicted to be drilled on new leases.**

# Affected Environments

The partitioning of the Affected Environment into those areas described in Table II-5, on pages II-9 through II-10, is maintained through this chapter, as well as Chapter IV. In keeping with the objective to present only information pertinent to the decision, all resources are discussed under the general forest environment. Then for each specific *Affected Environment*, only those resources with a unique relationship to that specific environment, are described.

## General Forest

### Environmental Factor: Biological Diversity

"Diversity" is "the distribution and abundance of different plant and animal communities and species within a [specified area]" (36 CFR 219.3). Diversity, as defined in the National Forest Management Act, has evolved as a concept and is now known as "Biological Diversity." The biological diversity of forest vegetation is important because increased diversity provides an increasing number of habitat niches. This, in turn, can provide greater numbers of wildlife species, but much fewer individuals of some species. This also contributes to the stability of some vegetative communities. Stability is the ability of a community to withstand catastrophe (Margalef, 1969) or to return to its original state after severe alteration (Odum, 1971).

BLM 0048093

The Forest has been given the task of managing the land for biological diversity while maintaining the multiple-use objectives of the Forest Plan (36 CFR 219.25).

Biological diversity includes several biological components: Genetic Diversity, Species Diversity, and Community Diversity. (Draft Biological Diversity Assessment, Rocky Mountain Region USDA Forest Service 11/90; page 3).

Each of these components is discussed in both this section and the Environmental Consequences section of Chapter IV. Diversity is also discussed in sections on vegetation and wildlife since it is important in the assessment of those resources.

*Genetic Diversity:* Genetic diversity describes the ability to maintain natural genetic diversity in a population of plants and animals, and the ability to maintain a barrier free environment which promotes the reproductive exchange of individual species members from different geographic areas. Maintaining genetic diversity demands that management practices which simplify the genetic make-up of a population of plants or animals be avoided.

The genetic diversity of plant species on the Forest is as great or greater than was found 100 years ago. Influences of man have had little effect on the gene pools of plants. While the vegetative composition of stands of trees and grasses may be changed, there has been no significant *genetic* loss in these species. Wildlife species have suffered a loss of genetic diversity through the sheer losses of numbers of animals at the turn of the century. Populations of elk, deer, bighorn sheep and several other species have recovered over the past 40 years from fairly limited populations, and hence a fairly limited gene pool.

*Species Diversity:* Species diversity describes the ability to maintain a diversity of plant and animal species.

When any mature or old growth stand of timber is cut, burned or otherwise altered --- whether it be aspen, spruce-fir, ponderosa pine, lodgepole pine or Douglas fir --- one important element of wildlife diversity can be adversely affected. The primary cavity nesters, including a number of woodpecker species, are dependent on larger trees for cavity excavation. Secondary cavity nesters, including the mountain bluebird, swifts, swallows, wrens, owls, and chickadees, nest in cavities previously made by woodpeckers.

Currently, the Forest has an abundance of these cavity habitats. Forest stands contain multi-layers of forest canopies, which provide habitats for a wide range of species. Many large blocks of mature, even-aged stands of lodgepole pine exist on the Forest.

Large blocks of mature aspen stands have a high level of species diversity (Draft Biological Diversity Analysis, USDA Forest Service Rocky Mountain Region 11/90, page 13). Many aspen stands are now being invaded by conifer trees (roughly 25%). These aspen stands will eventually be completely taken over by the conifers, unless fire or other natural occurrences remove the conifer understory. The conifer-invaded aspen stands have a greater species diversity than either a mixed stand or a pure aspen stand. They also provide important hiding cover to big game species during the summer, and during the fall hunting period.

Old growth in ponderosa pine is rare on the Forest, due to a combination of past logging and mountain pine beetle epidemics.

*Community Diversity:* Community diversity describes the ability to maintain different plant and animal communities at natural levels. Community diversity calls for protecting, restoring, or enhancing rare, unique, endemic, or rapidly declining plant and animal communities.

Affected Environments
General Forest

BLM_0048094

## Environmental Factor: Vegetation (Plant Associations)

The plant communities of the Grand Mesa, Uncompahgre, and Gunnison National Forest are closely linked to elevation, exposure, landform, soil, and water influences. They are complex and diverse in location and physical make up.

For resource inventory, predicting responses, monitoring, and description of vegetative potential, classification of climax vegetative communities into plant associations is a tool of significant value. Daubenmire (1952) describes a plant association as "a kind of plant community represented by stands occurring in places where environments are so closely similar that there is a high degree of floristic uniformity in all layers."

Johnston (1987), by applying the concepts described by Daubenmire, has identified the significant plant associations on the Forests. The following discussion and listing of plant associations represents some of the work done by Johnston.

Vegetative plant associations will be stratified into the general groups associated with coniferous forests, deciduous forests, woodlands, shrublands, grasslands, and forblands, with a composite riparian discussion which transcends all broad stratified communities. The plant associations listed under each general category, are listed from the highest elevation to the lowest.

### *Forest Condition - Deciduous Forests*

These are forests which seasonally (annually) shed their leaves. They are characterized by cold moist climate, short growing season, soil moderately well drained and relatively deep. Vegetation is typically located on benches and moist upper slopes.

Plant Associations:

Aspen *(Populus tremuloides)* / Elk Sedge *(Carex geyeri)*
Aspen *(Populus tremuloides)* / Thurber Fescue *(Festuca thurberi)*
Aspen *(Populus tremuloides)* / Kinnikinnick *(Arctostaphylos adenotricha)*
Aspen *(Populus tremuloides)* / Bracken *(Pteridium aquilinum)*
Aspen *(Populus tremuloides)* / Ligusticum *(Ligusticum spp.)*
Aspen *(Populus tremuloides)* / Arizona Fescue *(Festuca arizonica)*
Aspen *(Populus tremuloides)* / Mountain Snowberry *(Symphoricarpos oreophilus)*
Aspen *(Populus tremuloides)* / Saskatoon Serviceberry *(Amelanchier alnifolia)* - Chokecherry *(Padus spp.)*
Narrowleaf Cottonwood *(Populus angustifolia)* / Thinleaf Alder *(Alnus incana)*

***Aspen (Populus tremuloides):*** The aspen vegetation type typically occurs at lower elevations (7,000 - 11,000 feet) interspersed with grasslands, meadows, mountain brush, and other forest types. Aspen stands on the Forest are typically mature to overmature with high disease and mortality levels.

Aspen is important to recreation use. Aspen form, color and texture contribute to the landscape character through edge contrast between aspen and conifer stands, aspen islands in large meadows, and massive textural blocks, with color being a dominant element. Color contrasts with surrounding coniferous vegetation, nonforest areas, bare rock, water and sky. The color change between seasons attracts many forest visits year round.

Many aspen sites support a luxuriant understory of forbs and grasses, which are used by a large segment of the livestock industry in western Colorado. These sites are important summer range lands for both cattle and sheep.

BLM_0048095

The aspen ecosystem is important to Colorado wildlife. Deer and elk use aspen under six feet in height for forage. They use taller aspen for thermal and hiding cover. Aspen stands are usually in close proximity to conifer stands that can provide cover during aspen regeneration. Aspen sprouts above snow-cover are critical to winter diet in some areas. The grass, forb, and shrub understory provide a summer food source, as more forage is present than in conifer stands. Aspen forests are prime elk calving and deer fawning habitat. This is especially true on south slopes within 1/4 mile of water, between winter and summer range. Young aspen stands in transitory big game range helps support the animals longer in the spring and fall, taking pressure off summer and winter range and providing extra forage during mild winters.

More songbirds are normally observed in aspen forests than in coniferous forests. Aspen and the associated understory provides food, nest sites, and cover for a variety of birds. Small mammals such as shrews, moles and mice use aspen forests. Overmature aspen stands are usually decadent and provide cavities and insects for bird and mammal species. Aspen along riparian zones is the basic food for beaver.

Aspen regenerates almost exclusively through root sprouting, which usually requires a major disturbance that results in the removal of most or all of the existing trees. Wildfire has historically been the primary disturbance initiating root sprouting, although clearcutting is becoming more prevalent. Sprouting results in clones which are genetically identical to the trees from which they originated; and therefore, have similar characteristics. Characteristics often vary widely between clones, due to genetic and site differences.

Aspen forests have been "managed" for more than 100 years on the Forest. Human management of the forests has influenced the vertical diversity of these stands. Most aspen stands are naturally "even-aged" and naturally lack vertical diversity. Self-regenerating aspen stands generally exhibit some vertical diversity; however, this is limited by the number of age classes within the stand. Some stands have many age classes while other stands have only one. Conifer-invaded aspen stands contain the highest degree of vertical diversity of these three structural types. Table III-1 indicates the Forest's vertical diversity within the aspen type.

| TABLE III-1. VERTICAL DIVERSITY WITHIN ASPEN TYPE | | |
|---|---|---|
| ASPEN TYPE | VERTICAL DIVERSITY | *APPROXIMATE ACRES |
| Even-aged | Least | 176,341 |
| Conifer Invaded | Most | 93,431 |
| Self-Regenerating | Some | 76,012 |
| TOTAL | | 345,784 |

\* This includes aspen within the tentatively suited timber land base.

Horizontal diversity within the aspen type has also been affected. During the past 70-100 years most of the aspen stands on the Forest have reached maturity because they have been protected from wildfire and have not been logged for forest products. As a result, the aspen stands have progressed into a more homogenous and less diverse vegetative mosaic than would occur naturally. This has resulted in a low degree of horizontal diversity. Table III-2 indicates the large percentage of aspen acres in the mid and late structural stages:

Affected Environments
General Forest

BLM_0048096

| TABLE III-2. STRUCTURAL STAGE ASPEN TYPE | | |
|---|---|---|
| STRUCTURAL STAGE ASPEN TYPE | * ACRES | PERCENT (%) |
| Sawtimber | 131,967 | 38 |
| Poletimber | 130,696 | 38 |
| Seed/Sap | 7,109 | 2 |
| Self Regenerating | 76,012 | 22 |
| **TOTAL** | 345,784 | 100 |

* This includes all aspen acres on the Forest, except Wilderness, for which no data is available.

### *Forest Condition - Coniferous Forests*

Some areas on the Forest are managed to provide natural to near natural forest conditions. Vegetative treatment is prohibited on some of these areas and others stress resource values that are not compatible with vegetative treatment. Other areas of the Forest emphasize resource values which may generate treatment activities. In areas where human-induced changes are kept to a minimum, natural to near natural conditions will continue on the Forest. These areas add to the Forest's structural and plant diversity as they slowly move toward climax forest conditions. Typical conditions for older forest will be found in the density, health, vigor, age distribution, and species composition (diversity) of the Forest. The degree of horizontal and vertical diversity of an area varies according to both the vegetative type and the structural stage of the area. Naturally occurring spruce-fir stands exhibit high levels of vertical diversity while lodgepole pine presents low levels.

Diversity created by human activities results from a given kind of treatment. Generally, clearcutting and shelterwood activities result in even-aged stands and selection activities result in uneven-aged stands.

***Subalpine Forest:*** Elevations 11,200-12,300 feet. Subalpine forest-alpine tundra interface, forming the krummholz forest. Subalpine fir (*Abies lasiocarpa*) and Engelmann Spruce (*Picea engelmannii*) dwarfed or shrub like.

Plant Association:

Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* / Grayleaf Willow *(Salix glauca)*.

***Montane/Subalpine Forest:*** Elevations above 9,000, near timberline and below.

Plant Associations:

Bristlecone Pine *(Pinus aristata)* / Thurber Fescue *(Festuca thurberi)*
Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* / Rocky Mtn. Whortleberry *(Vaccinium myrtillus)*
Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* / Current *(Ribes spp.)*
Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* / Heartleaf Arnica *(Arnica cordifolia)*
Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* / Arrowleaf Groundsel *(Senecio triangularis)*

BLM_0048097

Oil and Gas Leasing Analysis FEIS

    Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* /
      Elk Sedge *(Carex geyeri)*
    Lodgepole Pine *(Pinus contorta)* / Grouse Whortleberry *(Vaccinium scoparium)*
    Lodgepole Pine *(Pinus contorta)* /Common Juniper *(Juniperus communis)*
    Engelmann Spruce *(Picea engelmannii)* / Moss
    Lodgepole Pine *(Pinus contorta)* / Elk Sedge *(Carex geyeri)*
    Bristlecone Pine *(Pinus aristata)* / Arizona Fescue *(Festuca arizonica)*
    Ponderosa Pine *(Pinus ponderosa)* / Arizona Fescue *(Festuca arizonica)*    (rare)

***Montane Forest:*** Elevations generally below 9,000 feet.

Plant Associations:

    Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* /
      Common Juniper *(Juniperus communis)*
    Bristlecone Pine *(Pinus aristata)* / Common Juniper *(Juniperus communis)*
    Douglas Fir *(Pseudotsuga menziesii)* / Kinnikinnick *(Arctostaphylos adenotricha)*
    Douglas Fir *(Pseudotsuga menziesii)* / Myrtle Pachistima *(Paxistima myrsinites)*
    Douglas Fir *(Pseudotsuga menziesii)* / Idaho Fescue *(Festuca idahoensis)*
    Douglas Fir *(Pseudotsuga menziesii)* / Engelmann Spruce *(Picea engelmannii)* /
      *(Calamagrostis spp.)*
    Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* / moss
    Colorado Blue Spruce *(Picea pungens)* - Douglas Fir *(Pseudotsuga menziesii)* /
      Arizona Fescue *(Festuca arizonica)*
    Subalpine Fir *(Abies lasiocarpa)* / Elk Sedge *(Carex geyeri)*
    Lodgepole Pine *(Pinus contorta)* / Rocky Mtn. Whortleberry *(Vaccinium myrtillus)*
    Douglas Fir *(Pseudotsuga menziesii)* / Elk Sedge *(Carex geyeri)*
    Douglas Fir *(Pseudotsuga menziesii)* / Cliff Jamesia *(Jamesia americana)*
    Douglas Fir *(Pseudotsuga menziesii)* / Antelope Bitterbrush *(Purshia tridentata)*
    Limber Pine *(Pinus flexilis)* / Common Juniper *(Juniperus communis)*
    Limber Pine *(Pinus flexilis)* / Thurber Fescue *(Festuca thurberi)*
    Ponderosa Pine *(Pinus ponderosa)* / Idaho Fescue *(Festuca idahoensis)*
    Douglas Fir *(Pseudotsuga menziesii)* / Greenleaf Manzanita *(Arctostaphylos patula)*
    Ponderosa Pine *(Pinus ponderosa)* / Gambel Oak *(Quercus gambelii)*
    Ponderosa Pine *(Pinus ponderosa)* / Greenleaf Manzanita *(Arctostaphylos patula)*

***Engelmann Spruce/Subalpine Fir (Picea engelmannii/Abies lasiocarpa):*** The Engelmann spruce and subalpine fir type occurs at high elevations and represents the climax on the majority of the sites it occupies. It usually occupies moist sites. Spruce can grow to over 300 years and fir to 250 years. There is currently a skewed distribution of age classes or structural stages. Sixty percent of the type is overmature, but occasionally stands occur in 2, 3, or multi-story stands. It's dense forest growth and layered appearance provides outstanding scenic views. It is also valued for wildlife habitat, watershed protection and production, and wood products.

As the spruce and fir type matures, the trees become susceptible to insect and disease infestations. Subalpine fir is infected first, followed by spruce.

The spruce/fir type reproduces by seed. It will reproduce itself naturally if not treated. The reproduction will retain the same age class distribution as currently exists. If a natural catastrophe occurs such as a major fire, the site will probably revert to aspen or lodgepole pine.

***Ponderosa pine (Pinus ponderosa):*** This vegetation type is located almost entirely on the Uncompahgre Plateau, between 7,000 and 9,000 feet. Ponderosa pine usually grows in pure stands, but can be associated with aspen and oak brush. Although occurring rather infrequently, natural regeneration requires the combination of a good seed crop, favorable seedbed condition, and ample

Affected Environments
General Forest

BLM_0048098

moisture the spring following seed fall (and several subsequent springs), to assure germination and seedling survival.

Historically, low-intensity wildfires burned through ponderosa pine stands at frequent intervals. These fires had little effect on established trees since the thick bark makes ponderosa pine somewhat fire resistant. Fires prevented the buildup of heavy duff accumulations, kept competing vegetation in check, and maintained seedbed conditions favorable to ponderosa pine. Fire suppression over the past several decades has resulted in a buildup of organic litter, making seedbed conditions less favorable for ponderosa pine. Currently the type is mature to overmature, open grown and poorly stocked. There are some uneven aged stands which are the result of past cutting activity.

Ponderosa pine is important for timber harvest, livestock grazing, and wildlife habitat. Elk Calving Areas can be located in this type, at lower elevations.

Ponderosa pine is considered a climax species on many of the sites on which it occurs, particularly near the center of its elevational range. Major disturbances, such as high-intensity fires, heavy logging, or widespread mortality from insect or disease infestations may cause ponderosa pine sites to revert to lower seral stages such as aspen, oak brush or grass. The mountain pine beetle is currently at epidemic levels in some localized areas, but the rate of spread generally appears to be decreasing.

***Douglas-fir (Pseudotsuga menziesii):*** The Douglas-fir type typically occurs on steep, north-facing slopes at lower elevations and is frequently the only conifer vegetation in a large area. On south-facing slopes, Douglas-fir occurs sparsely on rocky ridges, steep hillsides, and canyon slopes.

Douglas-fir is a long-lived species which is valued for wildlife habitat diversity, scenic quality, and cover on big game winter range. Douglas-fir also contributes to watershed protection and is a desired commercial tree species. The Douglas-fir type has been treated in the past, resulting in mostly mature and overmature stands. Very little acreage of early successional stages of Douglas-fir are known to exist on the Forest.

Douglas-fir is a climax species that reproduces from seed. Currently the stands have a relatively uniform age structure. Natural succession will perpetuate the current uniform distribution.

***Lodgepole pine (Pinus contorta):*** Lodgepole pine occurs on the Forest primarily in even-aged stands of fire origin. Lodgepole pine is an aggressive pioneer into disturbed sites, but is typically a seral species which, in the long-term absence of major disturbance, will be replaced by more shade-tolerant species--generally Engelmann spruce and subalpine fir. On some sites, however, where site conditions or lack of a seed source prevent the establishment of more shade tolerant species, lodgepole may form a virtual climax. Lodgepole pine provides scenic beauty, wildlife habitat, firewood and other wood products.

As lodgepole pine matures and loses vigor, it becomes highly susceptible to attack by the mountain pine beetle. Mistletoe also heavily infects large amounts of lodgepole pine on the Forest. All of the suitable lodgepole pine stands occur on the Gunnison National Forest. Following disturbance, natural regeneration is often so prolific that the stand is overstocked to a level that growth ceases if it is not thinned.

### *Forest Condition - Mature and "Old Growth" Timber Stands*

Old growth forests are an important part of the ecosystem because they perpetuate the climax of natural processes. Old growth forests are not characterized merely by the presence of old trees. A more important element is that they have achieved a delicate balance of biological forces that keep the soil, water, insects, mammals, birds, grasses, shrubs, and trees in a natural, perpetuating condition. Many species of plants and animals are dependent to some degree on old growth conditions for their survival. Some require large, undisturbed areas. Conversely, many species thrive on disturbance and the

BLM_0048099

presence of early successional forests — those created by fire, insect epidemics, and logging. Both young and old growth forests are important components of a healthy forest-wide ecosystem.

**Definition:**  Old growth forests are ecosystems distinguished by mature trees and their related structural attributes. Old growth encompasses the late stages of stand development and typically differs from the early stages in such characteristics as tree size, accumulations of large pieces of dead, woody material, the number of canopy layers, species composition, and ecosystem function.

Old growth is typically distinguished from younger growth by possessing several of the following attributes:

1. Large trees for the species or site.
2. Wide variations in tree size or spacing.
3. Higher accumulations of large dead, standing and fallen trees compared to earlier forest stages.
4. Decadence in the form of broken or deformed tree tops, or bole and root decay.
5. Multiple canopy layers.
6. Canopy gaps and understory patchiness.

Rates of change in composition and structure of old growth forests are slow when compared to younger forests. Different stages or classes of old growth will be recognizable in many forest types. The structure and function of an old growth ecosystem will also be influenced by its size, landscape position, and context.

Sporadic, low to moderate severity disturbances are an integral part of old growth forests. Canopy openings resulting from the death of overstory trees often give rise to patches of small trees, shrubs, and herbs in the understory.

*Old Growth Inventory:*  Currently, no extensive inventory has been conducted on the Forest to identify these old growth characteristics for particular timber stands. However, many of the biological characteristics are found in the older-aged trees for which data is available. Although the age of a stand should not be used as a sole criteria for assessing the old growth potential of the Forest, age can provide a good indication. Alternative 1A in Figures IV-1 through IV-4, pages IV-14 through IV-17 in the FSEIS for the Amendment of the Land and Resource Plan, Grand Mesa, Uncompahgre and Gunnison National Forests, provide an indication of the number of acres in each timber type in the older age classes (91+ years) that currently exist on the Forest. Although many stands older than 90 years may not provide the biological characteristics described above for old growth, the acreage figures can be used to show the Forests' potential to provide old growth habitat needs for certain wildlife species.

### Forest Condition - Woodlands

Woodlands are open canopy Pinyon-Juniper forests, characterized by relatively small trees with rounded crowns, adapted to low precipitation, and shallow rocky soils.

Plant Associations:

Pinyon Pine *(Pinus edulis)* - Utah Juniper *(Juniperus osteosperma)* /
Mountain Big Sagebrush *(Artemisia tridentata)*
Utah Juniper *(Juniperus osteosperma)* / Fremont Mahonia *(Mahonia fremontii)*
Utah Juniper *(Juniperus osteosperma)* / Indian Ricegrass *(Oryzopsis hymenoides)*
Utah Juniper *(Juniperus osteosperma)* / Pinyon Pine *(Pinus edulis)* /
Bluebunch Wheatgrass *(Roegneria spicata)*

*Pinyon/Juniper (Pinus edulis/Juniperus osteosperma):*  This vegetation type is a scrub woodland composed of pinyon pine and juniper. It is a widespread type generally occupying the lowest elevations on the Forest (5500 to 7000 feet), below the elevation limit of Gambel oak.  Since the pinyon-juniper

BLM_0048100

type occurs on the driest sites on the Forest, it is the least productive type. Vegetation is characterized by small size and low growth rate.

It provides forage for wildlife and livestock, adds scenic variety to the landscape, and furnishes products such as firewood, posts, and Christmas trees. It is important cover on Big Game Winter Range. Most of the type is estimated to be in the intermediate and late structural stages which reflects the lack of recent natural disturbance. Grazing has destroyed much of the small sized understory.

### *Forest Condition - Shrublands*

Shrublands consist of woody, deciduous, vegetation ranging in height from several inches to 12-14 feet. Shrublands are widely distributed from elevations less than 6,000 feet to over 12,000 feet. Plant form, soil type, landform, and climate vary significantly over the broad range of shrubland plant associations.

Plant Associations:

Grayleaf Willow *(Salix glauca)* - Willows *(Salix spp.)* / Sedges *(Carex spp.)*

Golden Avens *(Dryas octopetala)* / Rock Sedge *(Carex rupestris)*

Grouse Whortleberry *(Vaccinium scoparium)* - Dwarf Blueberry *(V. cespitosum)* / Alpine Sandwort *(Lidia biflora)*

Golden Avens *(Dryas octopetala)* / Netleaf Willow *(Salix reticulata)*

Planeleaf Willow *(Salix phylicifolia)* / Cliff Sedge *(Carex scopulorum)*

Planeleaf Willow *(Salix phylicifolia)* / Water Sedge *(Carex aquatilis)*

Grayleaf Willow *(Salix glauca)*-Barren Ground Willow *(Salix brachycarpa)* / Tufted Hairgrass *(Deschampsia cespitosa)*

Gooseberry Current *(Ribes montigenum)* / Skunkleaf Polemonium *(Polemonium pulcherrimum)*

Common Juniper *(Juniperus communis)* - Current *(Ribes spp.)* / Thurber Fescue *(Festuca thurberi)*

Bog Birch *(Betula glandulosa)* / Skunkleaf Polemonium *(Polemonium pulcherrimum)*

Planeleaf Willow *(Salix phylicifolia)* / Elkslip Marshmarigold *(Caltha leptosepala)*

Shrubby Cinquefoil *(Pentaphylloides floribunda)* / Yellowdot Saxifrage *(Ciliara austromontana)l*

Dwarf Blueberry *(Vaccinium cespitosum)* / Pine Dropseed *(Blepharoneuron tricholepis)*

American Red Raspberry *(Rubus idaeus)* / Colorado Columbine *(Aquilegia coerulea)*

Bog Birch *(Betula glandulosa)* / Cliff Sedge *(Carex scopulorum)*

Mountain Big Sagebrush *(Artemisia tridentata)* / Thurber Fescue *(Festuca thurberi)*

Shrubby Cinquefoil *(Pentaphylloides floribunda)* / Thurber Fescue *(Festuca thurberi)*

Gambel Oak *(Quercus gambelii)* / Mountain Snowberry *(Symphoricarpos oreophilus)*

Gambel Oak *(Quercus gambelii)* / Saskatoon Serviceberry *(Amelanchier alnifolia)*

Mountain Big Sagebrush *(Artemisia tridentata)* / Idaho Fescue *(Festuca idahoensis)*

Silver Sagebrush *(Artemisia cana)* / Thurber Fescue *(Festuca thurberi)*

Thinleaf Alder *(Alnus incana)* - Drummond Willow *(Salix drummondiana)* / Field Horsetail *(Equisetum arvense)*

Wax Current *(Ribes cereum)* / Idaho Fescue *(Festuca idahoensis)*

Skunkbush Sumac *(Rhus aromatica)* / Mountain Muhly *(Muhlenbergia montana)*

Bush Rockspirea *(Holodiscus dumosus)* / Wax Current *(Ribes cereum)*

Drummond Willow *(Salix drummondiana)* / Bluejoint Reedgrass *(Calamagrostis canadensis)*

American Red Raspberry *(Rubus idaeus)* / Littleleaf Alumroot *(Heuchera parvifolia)*

Bearberry Honeysuckle *(Distegia involucrata)* / Bluejoint Reedgrass *(Calamagrostis canadensis)*

BLM_0048101

Oil and Gas Leasing Analysis FEIS

Saskatoon Serviceberry *(Amelanchier alnifolia)* - Chokecherry *(Padus virginianus)* / American Vetch *(Vicia americana)*

Chokecherry *(Padus virginianus)* - Mountain Snowberry *(Symphoricarpos oreophilus)* / Wheatgrass *(Elymus spp.)*

Gambel Oak *(Quercus gambelii)* - Chokecherry *(Padus virginianus)* / Thurber Fescue *(Festuca thurberi)*

Shrubby Cinquefoil *(Pentaphylloides floribunda)* / Thurber Fescue *(Festuca thurberi)*

Red-osier Dogwood *(Swida sericea)* / Bearberry Honeysuckle *(Distegia involucrata)*

Geyer Willow *(Salix geyeriana)* - Willows *(Salix spp.)* / Bluejoint Reedgrass *(Calamagrostis canadensis)*

Antelope Bitterbrush *(Purshia tridentata)* - Mountain Big Sagebrush *(Artemisia tridentata)* / Idaho Fescue *(Festuca idahoensis)*

Red-osier Dogwood *(Swida sericea)* / Whitestem Gooseberry *(Ribes inerme)*

Thinleaf Alder *(Alnus incana)* / Red-osier Dogwood *(Swida sericea)*

Serviceberry spp. *(Amelanchier spp.)* / Mountain Snowberry *(Symphoricarpos oreophilus)* - Mountain Big Sagebrush *(Artemisia tridentata)*

Mountain Snowberry *(Symphoricarpos oreophilus)* / Thurber Fescue *(Festuca thurberi)*

Squaw Apple *(Peraphyllum ramosissimum)* - Mountain Snowberry *(Symphoricarpos oreophilus)* / Mahonia *(Mahonia spp.)*

Gambel Oak *(Quercus gambelii)* - Chokecherry *(Padus virginianus)* / Myrtle Pachistima *(Paxistima myrsinites)*

***Gambel Oak (Quercus gambelii):*** The oak brush vegetation type commonly occurs at lower elevations on the Forest. At its lower elevation range, it is frequently associated with the pinyon-juniper vegetation type. At its upper elevation range, it is often interspersed with aspen, Douglas-fir, or ponderosa pine. Currently, the majority of the Gambel oak type is estimated to be in an early seral stage.

The Gambel oak type provides watershed protection, retards snowmelt, provides browse for wildlife and domestic stock, and is a popular firewood species. Gambel oak is capable of reaching tree size on some sites. This savannah type provides highly productive usable forage for wildlife and livestock. The mature trees provide cavities for small mammal dens and non-game bird nests. Food production for deer and turkey is highest on these sites. When Gambel oak stands are thick, animal mobility is severely restricted and the more palatable grasses and forbs are shaded out.

***Mountain Shrub:*** This vegetation type is dominated by one or more of the following species: serviceberry, rabbitbrush, snowberry, and mountain-mahogany. It is located in combination with other brush types and some of the drier forest types. The primary value of the type is for wildlife habitat and domestic sheep range. It has particular importance when available for use as Big Game Winter Range. There is a significant imbalance in the structural stages on the Forest, with most of the type in intermediate and late stages.

### Forest Condition - Grasslands

Of all the plants of the earth, grasses are of the greatest good to the human race, as well as contributing significantly to the habitat requirement of a multitude of wildlife species. The fibrous root systems and resilient stems and leaves provide excellent soil holding capabilities, which results in reduced sedimentation and improved water quality.

They also represent one of the most widely distributed families of flowering plants on the Forests, existing from the xeric landscapes of the cold desert, to the mesic alpine tundra along the crest of the Rockies. Different grasses, like other kinds of plants, thrive best under certain conditions of soil, moisture, temperature, exposure, and altitude.

Affected Environments
General Forest

BLM_0048102

Each grass species is found growing over a rather definite geographic area, but within this area it is confined to its particular habitat.

In mountain regions, altitude is an important factor in modifying the range of various species. Each species thrives within certain limits of altitude and can predictably be found on adjacent mountain ranges in similar habitats and similar elevations.

Plant Associations:

Blackroot Sedge *(Carex elynoides)* / Golden Avens *(Acomastylis rossii)*
Tufted Hairgrass *(Deschampsia cespitosa)* / Golden Avens *(Acomastylis rossii)*
Rock Sedge *(Carex rupestris)* / Bellard Kobresia *(Kobresia myosuroides)*
Blackroot Sedge *(Carex elynoides)* / Whiproot Clover *(Trifolium dasyphyllum)*
Siberian Kobresia *(Kobresia sibirica)* / Viviparous Bistort *(Bistorta vivipara)*
Cliff Sedge *(Carex scopulorum)* / Elkslip Marshmarigold *(Caltha leptosepala)*
Rock Sedge *(Carex rupestris)* / Alpine Sandwort *(Lidia biflora)*
Bellard Kobresia *(Kobresia myosuroides)* / Golden Avens *(Acomastylis rossii)* - Rock Sedge *(Carex rupestris)*
Hepburn Sedge *(Carex nardina)* / Alpine Kittentails *(Besseya alpina)*
Blackroot Sedge *(Carex elynoides)* / Spikemoss Selaginella *(Selaginella densa)*
Cloud Sedge *(Carex haydeniana)* / Arctic Bluegrass *(Poa arctica)*
Engelmann Sedge *(Carex engelmannii)* / Netleaf Willow *(Salix reticulata)*
Purple Pinegrass *(Calamagrostis purpurascens)* / Morton Alpine Oat *(Helictotrichon mortonianum)*
Blackroot Sedge *(Carex elynoides)* / Oreoxis *(Oreoxis spp.)*
Tufted Hairgrass *(Deschampsia cespitosa)* / Drummond Rush *(Juncus drummondii)*
Drummond Rush *(Juncus drummondii)* / Sibbaldia *(Sibbaldia procumbens)*
Silvertop Sedge *(Carex foenea)* / Golden Avens *(Acomastylis rossii)*
Water Sedge *(Carex aquatilis)* / Elephant Head Lousewort *(Pedicularis groenlandica)*
Black Alpine Sedge *(Carex nigricans)* / Rushes *(Juncus spp.)*
Purple Pinegrass *(Calamagrostis purpurascens)* / Greenland Bluegrass *(Poa glauca)*
Pyrenea Sedge *(Carex pyrenaica)* / Blackheaded Fleabane *(Erigeron melanocephalus)*
Timber Danthonia *(Danthonia intermedia)* / Tufted Hairgrass *(Deschampsia cespitosa)*
Thurber Fescue *(Festuca thurberi)* / American Vetch *(Vicia americana)* - Aspen Peavine *(Lathyrus leucanthus)*
Thurber Fescue *(Festuca thurberi)* / Alpine Oreoxis *(Oreoxis alpina)*
Water Sedge *(Carex aquatilis)* / Beaked Sedge *(Carex utriculata)*
Timber Danthonia *(Danthonia intermedia)* / Varileaf Cinquefoil *(Potentilla diversifolia)*
Teachers Sedge *(Carex praeceptorum)* / Water Sedge *(Carex aquatilis)*
Timber Danthonia *(Danthonia intermedia)* / Letterman Needlegrass *(Stipa lettermanii)*
Idaho Fescue *(Festuca idahoensis)* / Slender Wheatgrass *(Elymus trachycaulus)*
Bluejoint Reedgrass *(Calamagrostis canadensis)* - Cliff Sedge *(Carex scopulorum)* / Bluebells *(Mertensia spp.)*
Tufted Hairgrass *(Deschampsia cespitosa)* / Sedges *(Carex spp.)*
Parry Danthonia *(Danthonia parryi)* / Idaho Fescue *(Festuca idahoensis)*
Thurber Fescue *(Festuca thurberi)* / Parry Danthonia *(Danthonia parryi)*
Rough Fescue *(Festuca scabrella)* / Idaho Fescue *(Festuca idahoensis)*
Tufted Hairgrass *(Deschampsia cespitosa)* / Elkslip Marshmarigold *(Caltha leptosepala)*
Thurber Fescue *(Festuca thurberi)* / Arizona Fescue *(Festuca arizonica)*
Arizona Fescue *(Festuca arizonica)* / Mountain Muhly *(Muhlenbergia montana)*

BLM_0048103

Oil and Gas Leasing Analysis FEIS

Water Sedge  *(Carex aquatilis)* / Hood Sedge *(Carex hoodii)*
Baltic Rush *(Juncus arcticus)* / Sedges *(Carex spp.)*
Mountain Muhly  *(Muhlenbergia montana)* / Arizona Fescue *(Festuca arizonica)*
Parry Danthonia *(Danthonia parryi)* / Arizona Fescue *(Festuca arizonica)*
Tufted Hairgrass *(Deschampsia cespitosa)* / Slender Wheatgrass *(Elymus
    trachycaulus)*
Mountain Muhly  *(Muhlenbergia montana)* / Lanceleaf Bluebells *(Mertensia
    lanceolata)*
Brookgrass *(Catabrosa aquatica)* / Water Sedge  *(Carex aquatilis)*

### *Forest Condition - Forblands*

Forbs are characterized by herbaceous, broad leafed plants, that are primarily non-dominant in a plant association, subsequently they represent important indicators within other plant associations. True forb dominated climax vegetation is primarily limited to the Alpine and Sub-Alpine plant communities.

Because of the tender and succulent nature of most forbs, they provide a significant amount of wildlife forage, especially during the time of lactation or the rearing of broods.

Plant Associations:

Netleaf Willow  *(Salix reticulata)* / Golden Avens  *(Acomastylis rossii)*
Heartleaf Bittercress *(Cardamine cordifolia)* / Elkslip Marshmarigold  *(Caltha
    leptosepala)*
Dwarf Clover *(Trifolium nanum)* / Alpine Sandwort  *(Lidia biflora)*
Dwarf Clover *(Trifolium nanum)* / Pinnate Fleabane *(Erigeron pinnatisectus)*
Parry Clover *(Trifolium parryi)* / Golden Avens  *(Acomastylis rossii)*
Golden Avens  *(Acomastylis rossii)* / American Bistort *(Bistorta bistortoides)*
Alpine Springbeauty *(Claytonia megarhiza)* / Moss Silene *(Silene acaulis)*
Combleaf *(Smelowskia calycina)* / Northern Wormwood *(Artemisia borealis)*
Arctic Willow *(Salix arctica)* / Parry Clover *(Trifolium parryi)*
Alpine Twinpod *(Physaria alpina)* / Harbours Penstemon *(Penstemon harbourii)*
Colorado Eriogonum *(Eriogonum coloradense)* / Droppod Crazyweed *(Oxytropis
    deflexa)*
Parry Primrose *(Primula parryi)* / Tufted Hairgrass  *(Deschampsia cespitosa)*
Gordon Ivesia *(Ivesia gordonii)* / Fendler Sandwort *(Eremogone fendleri)*
Netleaf Willow  *(Salix reticulata)* / Dwarf Blueberry *(Vaccinium cespitosum)*
Arctic Willow *(Salix arctica)* / Blackheaded Fleabane *(Erigeron melanocephalus)*
Whiproot Clover  *(Trifolium dasyphyllum)* / Alpine Sandwort  *(Lidia biflora)*
Alpine Pussytoes *(Antennaria media)* / Arctic Bluegrass *(Poa arctica)*
Sibbaldia *(Sibbaldia procumbens)* / Alpine Sandwort  *(Lidia biflora)* - Moss
Parry Clover *(Trifolium parryi)* / Tufted Hairgrass  *(Deschampsia cespitosa)*
Porter Ligusticum *(Ligusticum porteri)* / Lodgepole Lupine *(Lupinus parviflorus)*
Sticky Polemonium *(Polemonium viscosum)* / Pinnate Fleabane *(Erigeron
    pinnatisectus)*
Elkslip Marshmarigold  *(Caltha leptosepala)* / Rosecrown Stonecrop *(Clementsia
    rhodantha)*
Black Groundsel *(Senecio atratus)* / Varileaf Phacelia *(Phacelia heterophylla)*
Corn Husk Lily *(Veratrum tenuipetalum)* / Common Cowparsnip *(Heracleum
    sphondylium)*
Mountain Bluebells  *(Mertensia ciliata)* / Tufted Hairgrass  *(Deschampsia cespitosa)*
Yellowdot Saxifrage *(Ciliara austromontana)* / Brittle Bladderfern *(Cystopteris
    fragilis)*

BLM_0048104

### *Forest Condition - Undesirable Plants*

Where significant impacts from timber harvesting, road building, livestock, wildlife, or other physical forces have resulted in land disturbance and changes in the plant species composition of the ecosystem, competitive, non-native, and generally less desirable plants often invade. Examples of undesirable plant species which inhabit the study area and give cause for concern include: Bluegrass (*Poa pratensis*), Canada Thistle (*Cirsium arvense*), Leafy Spurge (*Euphorbia esula*), Musk Thistle (*Carduus nutans*), Russian Knapweed (*Centaurea repens*), Dyer's Woad (*Isatis tinctoria*), and Yellow Toadflax (*Linaria vulgaris*), etc.

## Environmental Factor: Climate

The climate of the Forest is a continental mountain climate. Most precipitation on the Forest falls as snow, with afternoon thundershowers contributing some moisture during the summer. Much of the snowfall is due to the orographic lifting of Pacific air masses as they cross the Rockies. Climate is controlled primarily by four factors: 1) latitude - distance north of the equator; 2) continental position - remoteness from large bodies of water and its proximity to large, varied land masses; 3) elevation - ranging from valleys to mountains; and 4) winter storm track position.

Elevations in the analysis area range from 6,000 feet to 12,613 feet at Lone Cone. Suitable timber lands are generally located in the 7,500 to 11,000 foot elevation range. Growing seasons are short. The metabolic rates of growing trees are slow compared to those of lower elevation forests. The contribution of the forests of the entire Rocky Mountain region to the oxygen/carbon dioxide balance in the atmosphere is important. Healthy, vigorous forests process more carbon dioxide and produce more oxygen.

Precipitation in the analysis area ranges from 8 inches at lower elevations to about 40 inches at the higher elevations.

Temperature, like precipitation, varies directly with elevation. In the Colorado River Basin average temperature declines 3.4 ° F. with each 1000 foot increase in elevation ("Colorado Climate", 1977). The average annual temperature ranges from 50 ° F. at lower elevations of the analysis area to 36 ° F. at higher elevations.

The western slope of Colorado is sunny. Grand Junction has sun all or part of the day, 70% of the time. On average, 142 days are clear, 106 days are partly cloudy and 117 days are cloudy. November through May is the time period that tends to be cloudier than average.

## Environmental Factor: Geology, Geomorphology and Physiography

The analysis area is situated along the eastern boundary of the Colorado Plateau physiographic province. The Southern Rocky Mountain province is to the east. As a result, a great variety and complexity of landforms, geomorphic situations and geologic material occur within the analysis area. The broad basins, mesas, and canyonlands of the Colorado Plateau blend into the rugged uplifted Rocky Mountains. The geologic material is also a blend. The shales and sandstones of the Colorado Plateau have been locally uplifted and intruded by a variety of igneous materials and locally overlain by volcanics.

The landforms and slopes of the analysis area have also been influenced by shales of varying geologic ages. The predominant shales (primarily the Mancos Shale and shales of the Wasatch Formation) consist of soft, fine-textured clay materials laid down in ancient seas. These soft shales are often unstable, especially when wet, and may give way as a result of management activities (see also the discussion of the High and Moderate Geologic Hazard *Affected Environments*, this chapter pages III-55 to III-56).

BLM_0048105

Oil and Gas Leasing Analysis FEIS

With the exception of the deep valley bottoms on the Uncompahgre Plateau (such as along Escalante Creek and Roubideau Creek) where very old granitic rocks are exposed, Grand Mesa which is capped by a series of basaltic lava flows, and the intrusive rocks associated with such geomorphic features as Lone Cone and Little Cone; the analysis area is dominated by the sedimentary rocks of the Colorado Plateau. The following sedimentary rock units have been mapped in the analysis area: The Chinle and Wingate Sandstones, the Entrada, Summerville, and Morrison Formations, the Dakota sandstone, the Mancos Shale, the Mesaverde Group, and the Wasatch and Green River Formations.

The Forest is situated within portions of four U.S. Geological Survey (USGS) petroleum resource assessment provinces. Figure 1 in Appendix E, illustrates those portions of the Uinta-Piceance-Eagle, Paradox, San Juan and Albuquerque-Santa Fe-San Luis basins that are within the Forest.

Conventional oil and gas plays defined by the USGS and present within the Forest, are situated within the Uinta-Piceance-Eagle basins and the Paradox basin (Table 1. in Appendix E). No plays have been identified within the San Juan and Albuquerque-Santa Fe-San Luis basins on the Forest.

In addition to the plays designated by the USGS, the lower and middle Paleozoic section, specifically the Leadville Limestone, constitutes a highly speculative play within the southern Piceance basin. Mobil Oil Corporation is currently drilling a 19,500 foot test of the Leadville, south of the town of Silt. Potential traps include unconformities and stratigraphic pinchouts within the Pennsylvanian age rocks along the margin of the Central Colorado trough.

### *Hydrocarbon Occurrence*

Natural gas was first discovered in the analysis area from sandstones in the Mesaverde Group, in 1958, which was designated as the Grand Mesa Field. The field produced only 741 thousand cubic feet of gas (MCFG) and was abandoned in 1973 (Table 2 in Appendix E). Since that time, three additional fields have been discovered with established production from the Cozzette, Corcoran, and Morapos sandstones, as well as undivided sandstones in the Mesaverde Group.

Methane, a natural gas, is present in the Cameo Coals of the Mesaverde Group. Coal beds have long been recognized as a source of natural gas, but only recently were tax incentives given for the recovery of the methane from coal beds. Several coal bed methane wells have been drilled on the Forest, but none have been completed for production.

Several aspects of coal bed methane production are unique, but most are similar or identical to conventional oil and gas development. The technology and methods utilized to drill and complete coal bed methane wells are essentially the same as those which have been used in the oil and gas industry for many years. The drilling method (rotary), blowout prevention equipment, and casing programs are nearly identical to those used in conventional oil and gas operations. The typical casing job is modified slightly so that sufficient cement can fill the entire space around the casing and restrict fluids to their respective zones.

The methane is contained in coal bed fractures and is attached to micropore surfaces. The methane is held in place in the coal bed by confining pressures. It is released when the confining pressure is reduced. The reduction in confining pressure is achieved by pumping water out of the coal bed. Coal bed methane wells tend to produce a large volume of water (See also Appendix G.) Note that on the fringes of the Piceance Basin, coal bed methane wells do not always produce large volumes of water and the water that is produced is not always salty (personal communication, Jerry Jones, BLM).

Oil and gas production is confined to the most northern portions of the Grand Mesa and the Gunnison National Forests, with no drilling on the Gunnison National Forest, south of Township 12 South. Exploratory drilling has been confined to the high and moderate potential areas within the remainder of the analysis area, specifically along the southeastern margin of the Uncompahgre National Forest (Figure 9 in Appendix E), within the Paradox Basin. Eighteen exploratory wells have been drilled

Affected Environments
General Forest

BLM_0048106

on the Uncompahgre National Forest since 1949, with no success; however, there have been some oil and gas shows reported (Table 3 in Appendix E).

### *Prospectively Valuable for Oil and Gas*

Land classified as prospectively valuable (PV) for oil and gas is based on criteria described in Appendix E. PV lands for oil and gas within the Forest are shown in Figure 2 in Appendix E, and generally include lands that have a minimum of 1,000 feet of sedimentary rock, favorable structural setting, and minimum evidence of potential for the occurrence of oil and gas. Areas not designated as PV are rated as having no known potential.

### *Oil and Gas Potential*

Oil and gas potential for the area is shown in Figure III-2 and Figure 3 of Appendix E. In general, areas defined by the USGS as a conventional oil and gas play are assigned a high potential, while lands not classified as PV have no known potential. It should be noted that the plays described below occur within two petroleum provinces and do not cross into the other province, since the provinces are defined on administrative, rather than geologic, boundaries.

Spencer and Wilson (1988) describe three major and two unconventional plays as the Permian-Pennsylvanian sandstone, Uinta-Piceance Tertiary gas, and Uinta-Piceance Upper Cretaceous plays, while the unconventional plays are tight gas sands and Cretaceous coal bed methane.

The Permian-Pennsylvanian sandstone play is relatively unexplored and involves stratigraphic pinchouts within the Weber and correlative sandstones, into relatively impermeable redbed sequences. The play as evaluated by the USGS, also includes lands within Utah (Figure 4 in Appendix E) and is estimated to contain from two to ten undiscovered fields that have at least one million barrels of oil (MMBO). The play may cover a larger area that is shown on the map, and is considered to be speculative for the southern Piceance Basin.

The Tertiary conventional gas play (Figure 5 in Appendix E) consists of stratigraphic and structural traps that have been moderately well explored. Most of the Tertiary rocks in the Piceance basin are thermally immature. Tertiary reservoir gas is interpreted as having migrated from upper Cretaceous source beds, located in the Mesaverde Group (Spencer and Wilson, 1988). Conventional Tertiary reservoirs will be found at depths of from less than 3,000 to about 7,000 feet, and are expected to be unconventional and tight at depths greater than 7,000 feet. The USGS estimates that from 9 to 35 fields remain to be discovered with the play.

Figure 6 in Appendix E, illustrates the location of the Upper Cretaceous gas play. Conventional reservoir production is from fluvial and marginal-marine sandstones in both stratigraphic and combination traps at depths of from 2,000 to 5,000 feet. Reservoirs below 5,000 feet are generally tight, which is attributed to paleoburial of 7,000 feet or more (Spencer and Wilson, 1988). The USGS estimates that 25 to 55 reservoirs of 6 billion cubic feet of gas (BCFG) may remain to be discovered within the play.

The areas designated by the Federal Energy Regulatory Commission as being eligible for tight sand gas production price incentives are shown in Figure 7 (in Appendix E). This designation is for gas produced from the lower Mesaverde Group marginal-marine sandstones. This area has a high potential, while the remainder of the Piceance basin within the Forest has a moderate potential.

Coal bed methane resources of the southern Piceance basin have been studied extensively (Cholate, Jurich, and Saulnier, 1984; Johnson and Nuccio, 1986; Rightmire and Cholate, 1986; Tremain, 1984). Areas rated as having low through high potentials for coal bed methane production are shown in Figure 8. The remainder of the Forest is rated as having no known potential for the occurrence of coal bed methane.

BLM_0048107

Oil and Gas Leasing Analysis FEIS

Lands rated as having a high potential within the Paradox structural basin are shown in Figure 9 (in Appendix E), and includes the four USGS oil and gas plays illustrated in Table 1 (in Appendix E). The speculative lower Paleozoic play of the Piceance basin is also present within the Paradox, as the buried fault blocks, older Paleozoic, Leadville Limestone and McCraken Sandstone. Oil and gas production from this play is represented by the Lisbon Oil Field. This is the largest field in the play and has an estimated ultimate recoverable reserves of 43 MMBO and 250 BCFG. There are five other smaller fields within the play that do not have significant production. Peterson (1989) notes that it is unlikely that any new fields the size of the Lisbon will be discovered, and that present production indicates that new field discoveries will be small and have low gas BTU values.

The second play in the Paradox is the salt anticline flanks, which includes the Permian Cutler Formation and the Pennsylvanian Honaker Trail Formation of the Hermosa Group. Reservoirs are developed in arkosic sandstones of the Cutler and limestones with minor sandstones in the Honaker Trail, that accumulated as thick (i.e., 2,500 to more than 14,000 feet) in synclines along the margins of salt cored anticlines. The Andy's Mesa Field is the only field in the play to have significant production. Cumulative production through 1990 was 21 MB condensate and 18.4 BCFG, from seven wells (Colorado Oil and Gas Conservation Commission, 1991). Three additional one well fields are present within the play.

The Paradox Formation is the objective of the fractured interbeds play and is situated within the deep trough of the Paradox Basin, and also includes the Paradox fold and fault belt. The reservoir rock consists of fine-grained silty dolomite and dolomitic or calcareous black shale, that is also the source rock. Oil and gas shows are usually encountered during drilling through the interbeds to test deeper objectives. Most of the fields developed in this play were discovered during exploratory drilling for deeper objectives and are one well fields, with the largest having produced about 1.2 MMBO (Peterson, 1989).

The last play within the Paradox is the Silverton Delta, Northeast Basin-Honaker Trail Formation. Potential reservoirs are delta-front sandstones that were deposited along the east flank of the basin. The play is speculative with only one well that had a significant show of gas from the Honaker Trail. Any potential field discoveries are expected to be less than 1 MMBO or 6 BCFG in size (Peterson, 1989).

Drilling activity within the Uncompahgre and Gunnison National Forests has been confined to the high oil and gas potential areas, while 22 wells (13 dry and 9 producers) and 6 dry holes were drilled within the high potential and moderate potential areas, respectively within the Grand Mesa National Forest. No wells have been drilled within the low and no known potential areas.

## Environmental Factor: Soil Resources

The soils of the study area are as complex as the landforms and geologic parent material that has helped form them. The specific characteristics that a particular soil will have depends on the interaction of parent material (geology), climate, various living organisms, topography, and time. This is especially true of the canyon, plateau, and mountainous terrain in this analysis area.

Located on the eastern edge of the Colorado Plateau physiographic province and the western edge of the Rocky Mountains, the landforms, geomorphic and geologic situations are very diverse and varied. Add to this the elevational range, vegetation and aspects involved and it's easy to visualize the different soil characteristics that could occur. As a result of these diverse environmental situations, the soil properties of depth, texture, inherent fertility, and age, occur in complex patterns across the landscape. Soil depths vary from shallow on steep canyon sideslopes and ridges, to deep on some upland areas and valley bottoms. Textures range from medium textured loams to fine textured silt loams, silty clays and clays, with varying degrees of coarse fragments of basalt on Grand Mesa and chunks of sandstone on the Uncompahgre Plateau. There is a dominance of fine textured soils, a direct product of parent materials of sandstone, shale and mudstone, and interbedded sandstone and shale.

Affected Environments
General Forest

BLM_0048108

Soils information has been gathered throughout the analysis area as part of the National Cooperative Soil Survey. This was conducted by the Soil Conservation Service from 1979-1992. Soils were inventoried in enough detail to describe the properties, potential limitations and hazards of many kinds of soils. From a study of this information and evaluation of geologic, geomorphic and physiographic information, the analysis area can be grouped into the following four regions:

1. Grand Mesa Top - also includes top of Battlement Mesa

2. Grand Mesa Sideslopes - includes all upper- and mid-slopes of Grand Mesa, Battlement Mesa and the Muddy Basin-Buzzard Divide area

3. Uncompahgre Plateau - covers the southern 1/2 and western fringes of the plateau.

4. Lone Cone - area surrounding and including Lone Cone and Little Cone Peaks.

A brief description of the soil characteristics in these regions follows:

### Grand Mesa Top

The soils in this region have developed from the reworking of basaltic material by gravity, glacial ice and water. Some of the most dominant soils include those of the Doughspoon, Grandmesa, Namela, Mulgon, and Needleton soil series (from the Soil Survey of the Grand Mesa-West Elk soil survey area)

The main top of Grand Mesa is a nearly flat tableland with slopes generally under 30%. There are steeper slopes and large expanses of boulder fields around Crag Crest and the very top of Battlement Mesa.

Major soil features include moderate to deep depth classes and medium to fine textures with generally large amounts of rock fragments in the profile ( 35% by volume). Rock fragments consist of rounded basalt cobbles and boulders. The boulders may be pickup truck size or larger. Often times the subsoil is rather fine textured, with heavy clay loams and clays occurring at depths of 30" and deeper. This results in localized seasonally perched water tables. This occurs mainly in the early part of the growing season, due to infiltration from the melting of heavy winter snows. The perched water tables slowly recede as the season progresses. In general, these soils are of moderate to low fertility. The overall erosion hazard of the majority of this area would be low to moderate. Revegetation may occur slowly because of the harsh growing conditions at these elevations.

### Grand Mesa Sideslopes

This region is rather extensive and covers all the flanks of Grand Mesa and Battlement Mesa, along with landforms on the eastern end of Grand Mesa, and in the Porter Mountain, Hightower, and Huntsman Ridge area. It wraps around south and includes the Raggeds, the north slopes of East Beckwith Mountain, the area between the North Fork of the Gunnison and Minnesota Creek, and on the fringes of the Forest near Crawford, Landsend Peak, Saddle Mountain and the western edge of Black Mesa.

The soils in these regions have developed from Tertiary and Cretaceous shales, mudstones, and siltstones, mainly from the Wasatch, Green River, and Mancos formations. Some of the most dominant soils include those of the Wetopa, Wesdy, Taterheap, and McClure soil series, and are associated with the aspen vegetation zone. Also included, but at lower elevations are the Kolob, Fughes, and Herm soils. These occur in the oakbrush zone. Small portions of pinyon-juniper vegetation occur on the very western edge of Grand Mesa and around Landsend Peak. The soils that occur here are within the Agua Fria, Clapper and Chain series.

BLM 0048109

The landforms in these areas are mainly moderately steep and steep mountain and plateau sideslopes. Large landslide slump blocks occur along the upper portions around the edges of Grand Mesa. The area in general shows much evidence of past mass movement in the form of earthflows, slumps, slides, and mudflows. Some of the more prominent ones are the Lombard slide, the Muddy Basin area, and the McClure Pass mudflow.

Major soil features include deep, dark colored soils that have formed on the residual landforms and the landslide deposits. These soils have high organic matter content in the surface and in most cases have a fine textured subsoil. Generally, these soils are very productive. The overall erosion hazard of the area is moderate to high, due to steep slopes and finer textures. A major limitation in these areas is the susceptibility of the landforms and soils to slope failure. Also the high organic matter content and weakness of the subsoils will not support traffic well when wet. Revegetation success is usually higher in these areas, due to higher fertility of the soil and better growth conditions. The main exception is the soils in the pinyon-juniper areas. These soils have less organic matter and generally more rock fragments on the surface and throughout the profile. Revegetation is harder to accomplish due to a dryer moisture regime.

### *Uncompahgre Plateau Area*

This region covers the southern half of the Uncompahgre Plateau and small fringes on its western edges. Also included is the Naturita Division.

The soils in this region have developed mostly from Cretaceous sandstones, shales and interbedded sandstones and shales of the Dakota and Morrison Formations and the Mancos Shale. Some of the most dominant soils include those of the Ula, Agnesston, Pendergrass, Lamphier, Hapgood, Delson, Kubler, Cerro, Mirand, Arabrab, and Chilson soil families.

The characteristics of these soils vary greatly. Generally, it can be said that they range from shallow to deep and are on the whole, medium to fine textured. Overall erosion hazard is low to moderate, but increases to high on the steeper canyon sideslopes. Revegetation potential varies, depending on the specific area involved, but as a whole can be considered fair. Overall fertility is fair. Some canyon sideslopes are susceptible to slumping and mudflow activity.

The landforms in this area are typical of the canyonlands. They consist of the plateau itself, a high, broad domed upland, dissected by deep steep-walled canyons.

### *The Lone Cone Area*

This area covers the very southwestern portion of the analysis area. It encompasses Lone Cone Peak, Little Cone Peak, and the lands around and in between.

The landform is typical of the canyonlands, with broad smooth uplands, mesas, and plateaus, but in this case they have been domed up and intruded by volcanic material of Tertiary age. The effect is that the peaks of Lone Cone and Little Cone are mountains perched on top of mesas which are dissected by steep walled canyons.

The soils have developed in a mixture of parent materials. In this case it is sandstones and shales on the upland mesas and plateaus, and the canyons, with some influence from the volcanic plugs of granodiorite and rhyolite. Some of the most dominant soils include those of the Callings, Baird Hollow, Tellura, Scout, Seitz, Snowdon, and Needleton soil series, along with large areas of mountain peaks consisting of rock outcrops and talus slopes.

Major soils features vary considerably because of the variety of vegetation, geology, and landforms. But very generally they are deep, medium textured soils. Soil depth decreases on the steeper mountain slopes and amount of coarse fragments increase. Areas that have been influenced by shale parent

Affected Environments
General Forest

material tend to be finer textured. Organic matter is high under aspen vegetation, but decreases as elevation increases. Overall erosion hazard is medium to high with the steeper mountain and canyon slopes being high. Some slumping and earthflow activity has been noticed in areas associated with shale, on slopes greater than 40%, and on canyon sideslopes.

## Soil Erosion

The erosion hazard is a rating given to a soil or activity which indicates how easily the soil erodes or the potential of the activity to cause erosion. In determining the soil erosion hazard for a soil, a number of specific soil characteristics are evaluated. These include the following: texture, organic matter content, structure, permeability, amount of coarse fragments, slope length, slope steepness, and rainfall amount and intensity. Each situation, on any specific area, will have a unique combination of features that create the potential for erosion.

The hazard rating is not a rating of natural erosion occurring on a soil. Instead, this rating assumes that the surface cover of vegetation (or leaf litter) has been disturbed or destroyed and that the bare surface soil has been exposed to the forces of erosion.

Hazard ratings are usually described as low, moderate, or high.

-A rating of *low* means that the soil has a good mixture of sand, silt, and clay and has good organic matter content. These soils are on gentle to moderate slopes and do not usually require costly erosion control measures.

-A rating of *moderate* indicates that the soils have moderate inherent erodibility characteristics and/or occur on moderate to steep slopes. These soils are more easily detached and moved by raindrop impact or by flowing water and may require more planning and expense to control.

-A rating of *high* indicates that the soils have moderate to high inherent erodibility characteristics and occur most often on slopes ranging from moderate to very steep. In these situations the soil particles, after disturbance, are very easily detached and moved by rainfall and overland flow. Areas with this rating usually need special planning and efforts to control erosion.

Due to the variability in materials, slopes and landforms, the erosion hazards for soils on the Forest range from *low* to *high*. Preliminary soils data gathered during the recent soil survey effort indicates that the inherent erodibility of the soils in the area is generally on the low to moderate end of the scale (K values range predominantly from 0.10 - 0.30). The most prevalent erosion hazard rating, however, occurs at the moderate to the high end of the scale. This is due, in part, to the occurrence of steep slopes in the canyons and mountain areas.

## Slope Stability

Large areas of the Forest have experienced and continue to experience slope movement. Much of the analysis area is underlain by unstable shales. The shales are softer and weaker, especially when wet, than most of the other geologic materials. All of the following recognized slope failure features can be found in the area: rockfalls, rockslides, debris slides, slumps, earthflows, rotational slides, translational slides, blockslides, and soil creep.

Examples include the upper reaches of the Muddy Creek drainage and the flanks of Grand Mesa. These areas are still experiencing localized slope movement. See the discussion of High and Moderate Geologic Hazards on pages III-55 - III-56 of this chapter.

BLM 0048111

### *Soil Productivity*

Soil productivity is defined as the inherent capacity of a soil to support a defined level of growth of specific plants, plant communities, or sequence of plant communities. The specific level of productivity depends on available soil moisture, available nutrients for plant uptake, soil texture and structure, organic matter content, climate or length of growing season and, to some degree, the effects of past management practices.

The specific productivity of soils on the Forest varies depending on the plant community, elevation, geologic influence, amount of precipitation, and past treatments and management.

Generally the soils on the Forest possess moderate to moderately high fertility compared to the rest of the region.

The most productive zone of the Forest is in the aspen vegetation type on the western half of the Forest. The geologic materials involved are shales and sandstones. These weather into very productive, resilient soils, and in most cases, revegetate relatively easily.

Other areas, however, are not as productive and do not revegetate as easily. Often, these less fertile areas occur at elevations above 11,000 feet and at lower elevations between 6,000 and 7,000 feet.

## Environmental Factor: Air Quality

Air quality over most of the Forest is good, although a trend of worsening visibility is a growing concern. Impacts from air pollution in this area are mostly associated airborne particulates. However, there is also a potential for air pollution associated with acid deposition.

Air pollution is very mobile and major emission sources hundreds of miles away are capable of impacting air quality on the Forest. The prevailing regional winds through the analysis area is out of the southwest. This means that pollutants will generally migrate toward the northeast.

Visibility is reduced by smog and particulates. The main source of pollutants from Forest activities are, and will continue to be, suspended particulates from wildfire and prescribed burning. Dust from Forest roads and gravel crushing operations are also contributors of particulates. External sources of air pollution are dust from roads, exhaust emissions from internal combustion engines, wood burning stoves, and localized light industry.

Acid deposition, commonly referred to as acid rain, is also an air quality concern of the Forest. Acid deposition occurs when automobile or industrial emissions produce a chemical reaction in the atmosphere that results in acidic precipitation. Over time, input of acid deposition can adversely effect the health of both plant and animal communities. The effects of acid deposition are most pronounced in areas with little vegetation or soil development and a geology of neutral or acidic rock. Typically these are the high alpine areas on the Forest. Areas of sedimentary geology are less vulnerable. The alkaline character of the rock, with pH's greater than 7, have the capability to neutralize acid deposition.

### *Air Quality Regulation*

In 1967 Congress passed the Clean Air Act (42 USC 1857, et seq.) and amendments to the Act were added in 1972, 1977, and 1990. The Act provided for the prevention of significant deterioration (PSD) of air quality. The intent of the PSD is to limit air quality degradation in those areas of the country where the air quality is much better than standards. Through the PSD provisions, Congress established a land classification scheme for areas of the country through the use of air quality standards. Class I allows very little additional deterioration of air quality; Class II allows for more deterioration; and Class III allows for still more. National Parks, Wilderness Areas, and certain Indian reservations were designated as Class I airsheds. All areas of the Forest are currently classified Class II except for the

BLM_0048112

West Elk, La Garita, and Maroon Bells Wilderness. The West Elk Wilderness is located immediately adjacent to the analysis area.

Including the three Wilderness areas mentioned above there are five Class I airsheds in the vicinity of the analysis area. They are the West Elk, La Garita, Weminuche, and the Maroon Bells Wildernesses, and Black Canyon of the Gunnison National Monument. Class I airsheds in the vicinity of the analysis area are displayed on Figure III-30.

### NAAQS Criteria Pollutants

The EPA has established the National Ambient Air Quality Standards (NAAQS) for 6 pollutants, known as criteria pollutants (those affecting health):

**Carbon Monoxide (CO):** Carbon monoxide is strongly related to automobile use and wood burning. The presence of these sources along with poor atmospheric mixing conditions may provide the conditions conducive to producing high concentrations of CO. Highly urbanized areas of the Colorado Front Range and well sheltered mountain valley locations are capable of producing these types of conditions. Denver was the only monitoring station in the state exceeding the NAAQS for CO (only urban areas are monitored for CO). Grand Junction is the only carbon monoxide monitoring site on the Western Slope of Colorado.

**Ozone ($O_3$):** Ozone forms as a result of chemical reactions between certain reactive hydrocarbons and nitrogen oxides that react with each other in sunlight. Sources of reactive hydrocarbons include automobile exhaust, gasoline and oil storage and transfer, industrial use of paint solvents, degreasing agents, cleaning fluids and ink solvents, incompletely burned coal or wood, and plants. Nitrogen oxides are emitted by sources when nitrogen in the air combines with oxygen during high temperature combustion. Areas typically affected by ozone are those suburban areas downwind of major urban areas. No monitoring of ozone is done on the Western Slope of Colorado.

**Nitrogen Dioxide ($NO_2$):** During high temperature combustion, nitrogen in the air reacts with oxygen to produce nitrogen oxides. Nitrogen dioxide is considered to be the most detrimental of the nitrogen oxides to human health. Sources include power plants, motor vehicles, space heating, aircraft and fireplaces and wood stoves. No monitoring for nitrogen dioxide is done on the Western Slope of Colorado.

**Sulfur Dioxide ($SO_2$):** Sulfur dioxide is mainly emitted from stationary sources such as power plants and refineries that burn fossil fuels. Wood, natural gas, propane and other common fuels used for home heating do not contain significant quantities of sulfur and are not considered major sources of sulfur dioxide. Sulfur dioxide can be converted in the atmosphere to sulfuric acid. Monitoring in Colorado is restricted to major metropolitan areas or locations with coal burning power plants where $SO_2$ emissions are likely. No State monitoring of sulfur dioxide is done on the Western Slope of Colorado.

**Particulate Matter (PM10):** Particulate matter consists of tiny particles of solid or semi-solid material found in the atmosphere. Particulate matter smaller than 10 microns is referred to as PM10. It is considered inhalable and for that reason is commonly monitored. Particles larger than 10 microns is usually sand and dirt blown by winds from roads, fields, and construction sites. PM10 particulates are generally created during a burning process and include fly ash from power plants, carbon black from motor vehicle engines, and soot from fireplaces and woodstoves. There are several monitoring sites on the Western Slope of Colorado including the following within the 50 kilometers of the analysis area: Delta, Telluride, Crested Butte,Grand Junction, Fruita, Colorado National Monument, Rifle, Glenwood Springs, Aspen, and Molas Pass. Aspen and Telluride are non-attainment areas for PM10. Total Suspended Particulates (TSP) is monitored at Colorado National Monument.

**Lead:** Lead exists as particulate matter in the PM10 size range. The primary source of lead in the atmosphere is motor vehicles that burn leaded gasoline. Another source is the extraction and

BLM_0048113

processing of metallic ores. The general trend towards less use of leaded gasolines has resulted in fewer problems with atmospheric lead in Colorado. Emphasis is shifting to monitoring stationary sources. Monitoring sites on the western Slope of Colorado are at Leadville and Mesa Verde. These sites are 60 miles and 36 miles from the analysis area, respectively.

Levels of the above pollutants above the standard are considered unhealthful. Several areas in Colorado have been classified as non-attainment for the Federal air quality standards. In the vicinity of the analysis area, only Aspen and Telluride are classified as non-attainment. Both are non-attainment for fine particulates (PM10).

### *Air Quality Monitoring*

In addition to the monitoring of the six criteria pollutants discussed above, several other air quality related values are being monitored in the vicinity of the analysis area. They include acid precipitation, lake chemistry, and visibility. Monitoring sites are displayed on Figure III-30.

**Acid Deposition:** The National Atmospheric Deposition Program (NADP) sites monitor wet deposition (acid rain, snow, and fog). The majority of the deposited acids are nitric and sulfuric, formed by the mixing of nitrogen oxides and sulfates. Coal-fired power plants and motor vehicles are the major sources of acid pollutants in Colorado (Colorado Air Quality Data Report, 1991). NADP monitoring sites within 50 kilometers of the analysis area include: Molas Pass, Engineer Mountain Guard Station, Sunlight Peak, and Four Mile Park.

**Lake Chemistry:** Lake chemistry is monitored by university researchers at the Rocky Mountain Biological Laboratory in Gothic and by the Forest. The Forest has sampled the pH and Acid Neutralizing Capability at 35 lakes on the Forest and is in the process of developing a long-term monitoring program.

**Visibility:** Visibility is monitored at three sites in the vicinity of the analysis area. Sites are currently located at Molas Pass, Lake Irwin, and at Black Canyon of the Gunnison National Monument.

The Forest Service installed a visibility monitoring camera at Lake Irwin just east of Kebler Pass in 1992. It monitors visibility over the West Elk Wilderness.

The National Park Service monitors visibility at the Black Canyon of the Gunnison National Monument. The camera is aimed at Grand Mesa.

Visibility in the Weminuche Wilderness is monitored at Molas Pass on the San Juan National Forest.

## Environmental Factor: Water

### *Surface Water*

Streams, lakes, springs and wetlands provide water for beneficial uses both on the Forest and downstream. Water is important in supporting riparian communities; providing habitat for fish and wildlife; domestic water sources; recreational opportunities; power generation and salinity reduction. Historically, agriculture has been the primary industry on the west slope, and it continues to be very important. Water flowing from the Forest has been used for irrigation for over 100 years. Water resources have been intensively and extensively developed for the purpose of meeting irrigation needs. Most of the streams are classified by the State, and carry standards for recreation and cold water aquatic communities. A few are classified by the State for domestic use.

The entire analysis area lies within the Colorado River Basin, with the majority being part of the Gunnision River drainage. The character of the water resources does vary within the analysis area.

BLM_0048114

The analysis area can be broken up into three areas with similar water resource features: the Grand Mesa, North Fork of the Gunnison, the Uncompahgre Plateau.

The Grand Mesa is a large flat top mountain covered with numerous lakes and wetlands that were created by glaciation. Water resources have been intensively developed on the Mesa over the last 100 years, in order to meet irrigation needs in the valleys. Most of the lakes have been enlarged using earthen dams. A network of ditches and pipelines criss-cross the Mesa, moving water from one lake and watershed, to another. Streams are not that common on the Mesa top, due to its nearly flat topography. The flanks of the Mesa fall away steeply to the lower valleys, and have well defined drainages. The major streams flowing off the Mesa include; Surface Creek, Leroux Creek, Buzzard Creek, Leon Creek, Big Creek, Cottonwood Creek, Bull Creek, Coon Creek, and Kannah Creek. Natural streamflows have been altered to varying degrees because of diversions and reservoir regulation.

The North Fork of the Gunnison originates on the Forest, within the analysis area. Unlike the Grand Mesa, it is more typical mountain topography with a well developed drainage network, separated by steep slopes and ridges. Natural lakes are not common and are limited to high elevation cirque basins. Several irrigation reservoirs exist on the Forest, within the analysis area, with Overland Reservoir being the most significant. Several large ditches intercept streamflows in the upper third of the watersheds and transport water to either Overland Reservoir or off the Forest. Major streams in this area are: Terror Creek, Hubbard Creek, West Muddy Creek, East Muddy Creek, Anthracite Creek and Coal Creek. Seeps and springs are common along contact zones of different geologic formations. These saturated zones, along with unstable slopes, have resulted in numerous slumps and landslides.

The Uncompahgre Plateau area also includes the area to the north and east of Lone Cone Peak and the Naturita Division. It is the driest portion of the analysis area and consequently has no lakes and only small streams, many of which are intermittent. Some diversions exist on Forest, but are mostly small. An exception is the Gurley Ditch that captures a good portion of the water flowing in the headwaters of Beaver Creek. The streams flow off the Plateau to either the west or east and typically lie in deep canyons, separated by mesas. Major streams draining off the Plateau and Naturita Divison are: Tabeguache Creek, Horsefly Creek, McKenzie Creek, Spring Creek, Roubideau Creek, Naturita Creek and Beaver Creek.

### *Groundwater*

Early reports of the groundwater resources in the upper Colorado River region estimated that there may be as much as 115 million acre feet of recoverable groundwater in the upper 100 feet of saturated rocks, although up to 70% may be saline (Price, 1974). It was further estimated that only 2% of the water consumed in the region is groundwater. Most of the groundwater development that does occur is in the lower populated valleys. Wells are generally in the alluvium and less than 200 feet deep. There is comparatively very little development and use of groundwater within or immediately adjacent to the Forest. Almost all use in close proximity to the Forest, is for limited domestic and/or livestock purposes. Most of these wells are also shallow (less than 200') in depth.

For the purposes of this groundwater discussion, the analysis area is broken into three hydrogeologic areas. More specific descriptions about each area follow. Summary tables of the major rock and hydrogeologic units and the principal aquifers are presented for each area. In all areas the alluvium generally provides a better aquifer than the bedrock, due to its higher water yields and better water quality. There are scattered occurrences of wells tapping bedrock aquifers other than the principal aquifer where local conditions and isolated secondary fracturing create favorable conditions.

BLM_0048115

Oil and Gas Leasing Analysis FEIS

| TABLE III-3. GEOLOGIC UNITS AND HYDROGEOLOGIC CHARACTER SOUTHERN UNCOMPAHGRE VALLEY AND SAN MIGUEL RIVER BASIN | | | | |
|---|---|---|---|---|
| **GEOLOGIC AGE** | **ROCK UNIT** | **MAXIMUM THICKNESS (FT.)** | **LITHOLOGY** | **WATER BEARING PROPERTIES** |
| QUATERNARY | Alluvium, Colluvium, Landslide, Glacial Drift, Eolian Deposits | 200 (?) | Silt, Sand, Gravel | Expect dissolved solid concentrations less than 1000 mg/l with most wells less than 400 mg/l. Most yields between 8-25 gpm. |
| TERTIARY | Volcanic Rock | | Tuffs, Acidic Andesites, Rhyolites | Confining beds. |
| CRETACEOUS | Mesa Verde Group | 1100 | Sandstone, shale, coal | |
| | Mancos Shale | 2950 | Carbonaceous Marine Shale | |
| | Dakota Sandstone, Burro Canyon Formation | 200 | Interbedded Sandstone, Shale, Coal | Yields range from 1-216 gpm. Most wells yield less than 10 gpm. |
| JURASSIC | Morrison Formation | 850 | Shale, Sandstone, Conglomerate | Yields from 3 wells ranged 0-130 gpm. |
| | San Rafael Group | 410 | Siltstone, Sandstone | Possible aquifers, but no data. |
| | Glen Canyon Group | 640 | Sandstone, Siltstone | |
| TRIASSIC | Chinle Formation | 590 | Siltstone | Confining Beds |
| | Moenkopi Formation | 295 | Siltstone | |
| PERMIAN | Cutler Formation & Rico Formation | 10,700 | Sandstone, Siltstone, Shale | |
| PENNSYL-VANIAN | Hermosa Formation | 7,500 | Limestone, Shale, Thick Beds of Evaporites in Middle Paradox Member | |
| | Molas Formation | 100 | Shale, Limestone | |
| MISSISSIPPIAN | Leadville Limestone | 400 | Limestone, Dolomite | Possible aquifers, but no data. Depth and potential quality generally preclude use. |
| DEVONIAN | Ouray Limestone | 160 | Dolomitic Limestone | |
| | Elbert Formation | 180 | Dolomite, Limestone, Sandstone | |

(After Ackerman & Rush, 1984)

***Southern Uncompahgre Valley and San Miguel River Basin:*** Table III-3 gives a brief overview of the major rock and hydrogeologic units in this area. The principal aquifers in the area are the alluvium and the Dakota Sandstone. The lower sandstone of the Dakota generally yields greater amounts than the upper sandstone. For water wells in the alluvium, yields range between 1 1/2 - 25 gallons per minute (gpm) and total dissolved solids concentrations are usually less than 400 milligrams per liter (mg/l). For water wells in the bedrock aquifers, yields range from 0 - 216 gpm and average less than 10 gpm. Total dissolved solid concentrations are usually greater than 400 mg/l in the bedrock aquifers.

All major rock units abut or dip away from the Uncompahgre Plateau highland. General groundwater flow follows the dip towards the Uncompahgre River and San Miguel River valleys. Recharge into the aquifers occurs on the Uncompahgre Plateau from percolation of water into the outcrops. Tributary valleys such as Spring Creek reduce the net effect of the recharge by draining the

Affected Environments
General Forest

BLM 0048116

dissected formations through springs. To the east of the Plateau, the major valleys at the base and parallel to the Plateau have eroded through the Dakota. Consequently recharge of the Dakota at the lower elevations occurs where alluvium and irrigation canals are in contact with the formation.

### TABLE III-4. GEOLOGIC UNITS AND HYDROGEOLOGIC CHARACTER GRAND MESA AREA

| GEOLOGIC AGE | ROCK UNIT | MAXIMUM THICKNESS (FT.) | LITHOLOGY | WATER BEARING PROPERTIES |
|---|---|---|---|---|
| QUATERNARY | Alluvium, Colluvium, Landslide, Glacial Drift | 100 ? | Silt, Sand, Gravel | Dissolved solid concentrations range from 63-2970 mg/l. Yields range between 2-1000 gpm and average about 20 gpm. |
| TERTIARY | Extrusive Volcanics | 200 | Basalt | Aquitard |
|  | Uintah Formation, Green River Formation | 1000 | Siltstone, Sandstone, Marlstone | No data. Yields of 1-5 gpm may be expected from sandstone. |
|  | Wasatch Formation | 3400 | Claystone, Siltstone, Sandstone, Lignite, Conglomerate | Limited data indicates possible yields of 25 gpm from sandstone and conglomerate. |
| CRETACEOUS | Mesa Verde Group | 3000 | Sandstone, Shale, Coal | Yields are generally less than 10 gpm and range from 1-24 gpm. dissolved solid concentrations range from 206-3360 mg/l and average 880 mg/l. |
|  | Mancos Shale | 4500 | Carbonaceous Marine Shale | Generally a confining bed. Some water in fractures, but quality mostly unsuitable with dissolved solid concentrations up to 8200 mg/l. |
|  | Dakota Sandstone, Burro Canyon Formation | 350 | Sandstone, Shale, Conglomerate, Coal | Yields range from 5-26 gpm. Dissolved solid concentrations range from 56-3200 mg/l. |
| JURASSIC | Morrison Formation | 580 | Mudstone, Sandstone | No data. |

(After Ackerman & Brooks, 1986)

**Grand Mesa:** Table III-4 gives a brief overview of the major rock and hydrogeologic units in this area. The principle aquifers in the area are the alluvium, the Mesa Verde Formation, the Dakota Sandstone and the Burro Canyon Formation. The Dakota Sandstone and Burro Canyon Formation are generally considered a single hydrogeologic unit. The well yields and water quality are highly variable within the area. The range of available information is presented in the accompanying table. Reports of some water samples showed concentrations of dissolved solids, sulphate, chloride, fluoride, iron, manganese and selenium that exceeded EPA drinking water standards (Ackerman, 1986).

The recharge area of the Mesa Verde Group occurs along outcrops in the North Fork of the Gunnison River valley. In general, the steep terrain limits infiltration. The Rollins Sandstone Member at the base of the Mesa Verde, could conduct water, but its near vertical exposures inhibit recharge. Groundwater flow is generally northward and down dip. To the east of Grand Mesa, in the Crystal River drainage near Redstone, there is reportedly some recharge into the Maroon Formation (Brogden, 1976). These rocks are steeply dipping to the west and southwest, and groundwater flow would be in the same direction. However, no specific groundwater information was found or reported for the Maroon

BLM  0048117

Oil and Gas Leasing Analysis FEIS

Formation, in the study area.  The alluvium aquifers locally recharge and discharge.  Where alluvial aquifers are in contact with bedrock aquifers they are probably hydraulically connected and some intermixing of the two aquifers can be expected.

| TABLE III-5. GEOLOGIC UNITS AND HYDROGEOLOGIC CHARACTER CRESTED BUTTE AREA | | | | |
|---|---|---|---|---|
| **GEOLOGIC AGE** | **ROCK UNIT** | **MAXIMUM THICKNESS (FT.)** | **LITHOLOGY** | **WATER BEARING PROPERTIES** |
| **QUATERNARY** | Alluvium, Colluvium, Landslide, Glacial Drift | 140 ? | Silt, Sand, Gravel | Yields range from 2-100 gpm and average 20 gpm. |
| **TERTIARY** | Intrusive and Extrusive Volcanics | - | Basalt, Breccia, Tuffs, Granodiorites, Quartz Monzonite, Granite | May be confining layer, but yields of 20 gpm occur from locally fractured basalts and tuffs. |
| | Wasatch Formation | 2200 | Sandstone, Shale, Conglomerate | |
| **CRETACEOUS** | Mesa Verde Group | 2300 | Sandstone, Carbonaceous Shale, Coal | Data for 1 well - 9 gpm. |
| | Mancos Shale | 5000 | Carbonaceous Marine Shale | Yields range from 1-5 gpm. |
| | Dakota Sandstone, Burro Canyon Formation | 300 | Sandstone, Shale, Conglomerate, Coal | Yields range from 5-60 gpm. |
| **JURASSIC** | Morrison Formation | 400 | Shale, Sandstone, Limestone | |
| | Junction Creek Sandstone | 180 | | |
| | Entrada Sandstone | 85 | Sandstone | |
| **PERMIAN** | Maroon Formation | 3500 | Sandstone, Shale, Limestone, Conglomerate | Locally may be aquifers near outcrop areas.  Yields are less than 15 gpm. |
| **PENNSYL-VANIAN** | Gothic Formation | 1750 | | |
| | Beldon Formation | 650 | | |
| **MISSISSIPPIAN** | Leadville Limestone | 300 | Limestone | |
| **CAMBRIAN** | Peerless Formation, Sawatch Quartzite | 300 | Quartzite | |
| **PRECAMBRIAN** | Crystalline Rocks | - | Granites, Granodiorite, Quartz, Monzonite, Gneiss | Locally yields from 1-3 gpm where fractured. |

(After Giles, 1980)

**Crested Butte:**  Table III-5 gives a brief overview of the major rock and hydrogeologic units in this area.  The rock units of Jurassic and early Cretaceous age: the Entrada Sandstone, Junction Creek Sandstone, Morrison Formation, Burro Canyon Formation and Dakota Sandstone are grouped as a single hydrogeologic unit.  This unit and the alluvium are the principal aquifers in the area.  For water wells in the principal bedrock aquifers, yields range from 5 - 60 gpm and total dissolved solids concentrations range from 55 - 830 mg/l.  For water wells in the alluvium, yields range from 2 - 100 gpm and average about 20 gpm.  Reports of some water samples showed concentrations of fluoride and selenium that exceeded EPA drinking water standards (Giles, 1980).

Affected Environments
General Forest

BLM 0048118

The alluvial aquifers recharge and discharge locally. Recharge of the bedrock aquifers is generally at the outcrop and groundwater flow is down dip to the west and southwest. Confining conditions can be created where the Dakota and Entrada Sandstones are overlain by the Mancos Shale and Morrison Formation. Flowing wells are found in the Ohio Creek and Gunnison River valleys.

## Environmental Factor: Water Quantity

The importance of water in the arid west is receiving increasing attention as demand increases substantially and the available supply remains relatively constant. The water yield from the Forest accounts for an estimated 40% of the Colorado River flow at the Colorado and Utah border (2.87 million acre feet/year). It is estimated that the analysis area is responsible for 20% of that figure (715,000 acre feet/year). Natural annual average water yields within the analysis area vary by precipitation zone and vegetation. They range as high as 17 inches to as low as 2.5 inches. In terms of the general areas discussed above (under Surface Water), the Grand Mesa typically produces 12 inches of runoff and the North Fork of the Gunnison and the Uncompahgre Plateau produce 9.5 and 6.5 inches, respectively.

Research has proven that water yields can be increased by manipulating vegetative cover, increasing surface runoff by reducing infiltration and management of the snowpack. Manipulation of vegetative cover, either through timber harvest or fire, is the element most influenced by National Forest activities. As with natural water production, water yield increases also varies with vegetation type. Aspen treatments have the highest increase potential at 31%, spruce-fir has 22% and aspen mixed conifer has 25%. Ponderosa pine, which is common on the Uncompahgre Plateau, is not considered in water yield increase calculations, because snowfall accumulations are generally low. Water yield increases are temporary, and recovery begins with the re-establishment of trees on the site. Past management activities across the analysis area are believed to have increased water production only about 1% or 7000 acre feet/year. This figure represents an average from year to year, recognizing that actual water yields can vary up or down, based upon the level of vegetative manipulation each year, where it is located and recovery of past disturbed sites.

## Environmental Factor: Water Quality

Water quality on the Forest is principally a function of the geology the water flows over or through, the flow regime and surface management activities. While water on the Forest is generally of good quality it does vary across the analysis area. The two water quality parameters with recognized concern are sediment and salinity.

In reviewing the history of water quality monitoring on the Forest, the first period of record that could be found was 1970 to 1972. During that period streamflow, dissolved oxygen, temperature, pH, turbidity and bacteria data were collected. From 1979 to 1983, water quality data was collected on numerous Forest streams. Temperature, conductivity, pH, alkalinity, hardness, turbidity, suspended sediment, dissolved oxygen, and fecal coliform were the parameters collected. This data has been assembled into notebooks and is readily available. The data has not been analyzed to define baseline water quality character, but this may be done in the future. From 1983 to 1987, data was collected at five sites strategically located across the Forest, with the objective of characterizing water quality that could then be extrapolated across the Forest. The assessment of water quality in this document is a reflection of what was learned in these baseline studies.

Sediment is a water quality pollutant most associated with natural resource management activities. Erosion is a fundamentally physical process in the natural environment. Erosion rates vary by site, and are influenced by climate, vegetative cover, slope, geology and soil type. Accelerated erosion occurs when sites are physically disturbed by removing vegetation and exposing bare ground. Excavation of soil cover and concentration of water will increase erosion rates. Sedimentation is a result of transporting soil particles by water, wind or gravity to streamcourses, where it can adversely impact beneficial uses. Channel bed and bank erosion are also responsible for sediment increases.

BLM_0048119

Oil and Gas Leasing Analysis FEIS

Within the analysis area, the rocks are principally sedimentary. Water quality varies according to whether the parent materials consist of sandstones or shales. Sandstones generally weather to a coarser textured material than shales. The coarser the average particle size, the higher the percentage of sediment moved is bedload. The finer the particle size, the greater the suspended sediment. Turbidity is caused by very fine clay-size particles in suspension. This turbidity is most noticeable in streams that drain the Wasatch shale, such as Muddy Creek and Buzzard Creek. Those streams can become very discolored with only modest increases in streamflow. The Mancos Shale is exposed at lower elevations surrounding the Uncompahgre Plateau and along the southern and western flanks of the Grand Mesa. The streams in these areas can also become quite turbid during the spring, but do not carry the extreme silt loads common in streams draining areas underlain by the Wasatch shale.

The higher elevations on the Uncompahgre Plateau and Grand Mesa are underlain by sandstone and basalt, respectively, which are much more resistant than shale. In many instances, sediment derived from these materials has been transported down channel and make up much of the channel bed, even in the zones dominated by shale.

Conductivity and Total Dissolved Solids vary inversely to streamflow. These two parameters are good indicators of salinity, which is a recognized problem in areas of Mancos Shale. During high flows when surface runoff is the principal contributor to streamflow, conductivity ranges from 60 to 160 micromhos. During base flow conditions when groundwater is a significant contributor to streamflow, conductivity is considerably higher, ranging from 360 to 420 micromhos. Surface water is hard (high calcium carbonate) and slightly alkaline, within the analysis area. The hardness and alkalinity is even more pronounced at low flows because of groundwater contributions. Trace metals found in waters on the Forest include aluminum, barium, cadmium, copper, manganese, molybdenum, nickel, lead, and zinc. The concentrations of these metals are well within State standards. The exception to this is in areas of sulfide mineralization outside the analysis area, where acid rock drainage has resulted in pH's low enough to put significant concentrations of metals into solution.

Water temperatures vary over the season, with minimum temperatures approaching $0^\circ$ C. during the winter, and 15 to $17^\circ$ C. at lower elevations on the Forest, during August and early September.

Lakes and reservoirs make up a sizable portion of the surface water resource on the Forest. The quality of these water sources is generally very good. One noteworthy difference between streams and waterbodies is the potential for contamination of waterbodies by livestock. Livestock, particularly cattle, typically concentrate around water during the hot season; due to the availability of water, shade, and more palatable forage. High nutrient and bacteria levels have been documented at several reservoirs on the Grand Mesa. High nutrient loads, produce an increase in algae and aquatic plants. During the winter, decomposition of plant material reduces the levels of dissolved oxygen, which if low enough, results in fish mortality.

## Environmental Factor: Range

### *Livestock Grazing*

Livestock grazing is a significant use on the public land potentially affected by oil and gas exploration and development, in the analysis area. Ranchers, who graze livestock under conditions specified in a grazing permit, depend on the forage produced on the National Forests to supply 20 to 30 percent of their annual forage needs.

Grazing normally occurs under a grazing management system designed to perpetuate and sustain plant growth, and achieve land management objectives prescribed in the Forest Plan and Allotment Management Plans. Such prescriptive use incorporates specific direction for grazing on a certain parcel of land called a "grazing allotment". Direction varies significantly, dependent upon class of livestock, slope, water, management objectives, and the condition of the soil and vegetative resource.

Affected Environments
General Forest

BLM 0048120

Within the analysis area there are 69 cattle allotments and 16 sheep allotments, which are typically grazed from June 1 to October 15, each year. This includes approximately 102,000 cattle and 17,000 sheep.

## Environmental Factor: Roads

The detailed maps included with this FEIS show most of the State Highways, arterial roads and collector roads discussed below.

### *State Highways*

Two State highways pass through the analysis area: State Highways (SH) 65 and 133. SH 65 crosses the Grand Mesa National Forest providing access to much of the Grand Mesa. SH 133 passes through a small portion of the analysis area, at McClure Pass.

In addition, there are several other Federal and State highways that are not within the planning area, but provide access to it. They are:

- US 50 connecting Grand Junction, Delta, and Montrose, providing access to the west end of Grand Mesa and the Uncompahgre Plateau, from the east side.

- SH 330 linking the town of Collbran with SH 65, providing access to the Muddy Basin country and Grand Mesa, from the north.

- SH 141 running west from Whitewater, through Unaweep Canyon and the town of Naturita, providing access to the Uncompahgre Plateau, from the west side.

- SH 145 extending from Telluride through Norwood, providing access to the south end of the Uncompahgre Plateau and the area south of Norwood.

- SH 92 beginning in Delta and passing through Hotchkiss and Crawford, providing access to portions of Grand Mesa and the area west of the West Elk Wilderness.

### *Arterial Roads*

Arterial roads are Forest Development Roads (FDR) that provide access to major areas of the forest. All of the Forest's arterial system is in place. The only work taking place on these roads is minor reconstruction and maintenance activities, including correcting drainage and surfacing.

The Forest's arterial system is used for all forms of recreation activities, as well as commercial activities such as timber haul and minerals exploration and development. It is estimated that 95% of the traffic on these roads is recreational and 5% is commercial traffic. All of these roads receive seasonal use, from early summer to late fall. The average daily traffic (ADT) volumes for these roads vary from approximately 50 vehicles per day to a high of 300 vehicles per day.

There are approximately 358 miles of arterial road leading into or within the analysis area: 38 miles are paved, 253 miles have an aggregate surface, and 67 miles have a native soil surface.

BLM 0048121

Oil and Gas Leasing Analysis FEIS

| TABLE III-6.  ARTERIAL ROADS WITHIN ANALYSIS AREA | | | |
|---|---|---|---|
| **ROAD NUMBER** | **ROAD NAME** | **MAINT. LEVEL*** | **NUMBER OF LANES** |
| 12 | Kebler Pass | 4 | 2 |
| 90 | Old Highway 90 | 4 | 2/1 |
| 100 | Lands End | 5/4 | 2/1 |
| 121 | Trickle Park | 5/4 | 2 |
| 123 | Old Grand Mesa | 4/3/2 | 2 |
| 128 | Leroux Creek | 5/3 | 2/1 |
| 265 | Buzzard Divide | 4 | 1 |
| 270 | Silt | 4 | 2 |
| 402 | Divide | 4 | 1 |
| 503 | Delta-Nucla | 4 | 1 |
| 510 | Dave Wood | 4 | 2/1 |
| 530 | Sanborn Park | 4 | 1 |
| 607 | Hamilton | 3 | 1 |
| 608 | McKee Draw | 3 | 1 |
| 610 | Dolores to Norwood | 5/4 | 2 |
| 611 | Beaver Park | 4 | 1 |
| 618 | Fall Creek | 4 | 1 |
| 701 | Stevens Gulch | 5/4 | 2/1 |

Note:  Where more than one lane or road width is shown, the road standard changes along it's length.
* Maintenance levels described in Appendix J.

### *Collector Roads*

The collector road system consists of Forest Development Roads that generally take off of the arterial system and provide access to smaller areas, such as individual drainages.  Nearly all of the collector road system is in place, with only a few new miles of road being built each year; mostly for special purpose activities, such as timber sales.  The current Five-year Timber Sale Action Plan shows 7.8 miles of new collector road to be constructed over the next five years.

Affected Environments
General Forest

BLM_0048122

There are 290 miles of collector road within the analysis area: 2.5 miles are paved, 93 miles have an aggregate surface and 194 miles have a native surface. All of these roads are single lane with turnouts.

The Forest's collector system has similar use patterns as the arterial road system. Collector roads are used for all forms of recreational activities, as well as commercial activities such as timber haul and minerals exploration and development. It is estimated that 90% of the traffic on these roads is recreational, and 10% is commercial traffic. All of these roads receive seasonal use, only opening up in early summer and being closed out by snow in late fall. The average daily traffic volumes for these roads vary from approximately 10 vehicles per day to a high of 100 vehicles per day.

| TABLE III-7.  COLLECTOR ROADS IN ANALYSIS AREA | | | |
|---|---|---|---|
| ROAD NUMBER | ROAD NAME | MAINT. LEVEL* | NUMBER OF LANES |
| 105 | Anderson Reservoirs | 2 | 1 |
| 109 | Flowing Park | 3 | 1 |
| 110 | Pipeline | 2 | 1 |
| 112 | Doughspoon | 2 | 1 |
| 116 | Island Lake | 4 | 1 |
| 125 | Surface Creek | 3 | 1 |
| 126 | Weir & Johnson | 4 | 1 |
| 127 | Leon Lake | 2 | 1 |
| 128 | Leroux Creek | 3 | 1 |
| 129 | Hay Park | 4 | 2 |
| 257 | Cottonwood Lakes | 4 | 1 |
| 260 | Lambert | 3 | 1 |
| 262 | Park Creek | 2 | 1 |
| 263 | Willow | 2 | 1 |
| 266 | Porter Flat | 2 | 1 |
| 268 | Owens Creek | 3 | 1 |
| 275 | Kimball | 2 | 1 |
| 403 | Big Creek | 3 | 1 |
| 508 | Transfer | 3 | 1 |

BLM 0048123

Oil and Gas Leasing Analysis FEIS

| TABLE III-7.  COLLECTOR ROADS IN ANALYSIS AREA | | | |
|---|---|---|---|
| **ROAD NUMBER** | **ROAD NAME** | **MAINT. LEVEL\*** | **NUMBER OF LANES** |
| 510 | Dave Wood | 4 | 2 |
| 512 | Hanks Valley | 2 | 1 |
| 513 | Craig Point | 3 | 1 |
| 516 | Good Enough | 3 | 1 |
| 521 | Sanborn School | 3 | 1 |
| 537 | Horsefly | 3 | 1 |
| 602 | Copper King | 3 | 1 |
| 603 | Houser | 3 | 1 |
| 609 | Naturita | 3 | 1 |
| 615 | West Beaver | 3/2 | 1 |
| 618 | Fall Creek | 3 | 1 |
| 619 | Specie Creek | 3 | 1 |
| 631 | Mid Beaver | 2 | 1 |
| 703 | Shoneman Park | 2 | 1 |
| 704 | Hubbard Canyon | 3 | 1 |
| 705 | Overland Reservoir | 3 | 1 |
| 706 | Lost Lake | 4 | 1 |
| 710 | Minnesota Creek | 3 | 1 |
| 711 | Dry Fork | 2 | 1 |
| 798 | Lone Cabin | 2 | 1 |
| 844 | Piute | 3 | 1 |

Note:  Where more than one lane or road width is shown, the road standard changes along it's length.
\* Maintenance levels described in Appendix J.

### *Local Roads*

Local roads are generally short spur roads that take off from the arterial and collector roads, generally providing access for a single purpose, such as campgrounds, fishing sites, trail heads, timber

Affected Environments
General Forest

BLM 0048124

cutting units, and oil and gas drill sites. Local roads are almost always single lane roads, with few exceptions, such as two-lane roads in campgrounds.

There are approximately 827 miles of local roads in the analysis area most of which have a native surface. Many of these local roads have been gated and closed after the term of their intended use.

Local roads are currently being constructed within the analysis area for timber access. The current Five-year Timber Sale Action Plan shows an average of 25 miles of local road will be constructed within the analysis area, each year, for the next five years. Most of these roads will be closed for resource protection once the timber has been removed.

### *Travel Management*

The Travel Management Plan delineates roads and trails that are open, closed or restricted either seasonally or by motorized vehicle type. Wilderness areas, Research Natural Areas, and special interest areas are closed to all motorized vehicles. Major arterial and collector roads are usually open, with the exceptions of seasonal or wet weather closures to protect the road investment and reduce resource damage such as erosion and siltation. Where roads are within restricted travel management areas, they remain open for access to private land or multiple-use activities. These activities can include oil and gas activities, logging, firewood access, reservoir administration and hunter access. Roads may be closed in a restricted area to further enhance wildlife seclusion, prevent unacceptable resource damage, avoid high hazard locations, or to reduce maintenance costs. All single purpose, newly constructed, local roads are closed. Roads in open areas may be either open or closed based on the same criteria used above for roads within restricted areas. Additional considerations to those criteria are:

1. Four-wheel drive recreation roads that are designated in the Forest transportation inventory should remain open.

2. Roads should usually remain open within areas that have the following management emphasis:
- Semi-primitive Motorized recreation.
- Roaded Natural recreation.
- Wildlife habitat management, but with a Semi-primitive Motorized recreation opportunity.

3. Seasonal closures are used where resource damage or road investment may be mitigated with such a closure.

Roads and trails are open, closed or restricted, based on management goals of the area through which they pass, the land's characteristics, and the prevention of unacceptable resource damage. Additional closures may occur due to insufficient maintenance funds.

## Environmental Factor: Visual Resource / Scenery

The analysis area contains a great variety of landscapes, which accounts for it's high visual resource value. Natural features include: high mountain peaks, mesa tops, deep canyons, distinctive gorges, lakes, streams, a variety of forest types, meadows, fall aspen color, and wildlife.

These landscapes are grouped into six areas of land with similar landform, vegetation and soil characteristics. These six areas are called landscape character sub-types and are used as a frame of reference in classifying the physical features of an area into visual variety classes. The six landscape character sub-types are:

Collbran Valley Brushlands
Uncompahgre Plateau Pinyon Juniper Lands

BLM 0048125

Oil and Gas Leasing Analysis FEIS

San Juan Range Forestlands
Uncompahgre Plateau Forestlands
West Elk Range Forestlands
Grand Mesa Forestlands

These landscapes are visible from many viewer locations which include highways, roads, trails, developed recreation sites, lakes and rivers, mountain tops, ridges, and communities. The most sensitive viewer locations in the analysis area are:

State Highways 65, 90, 133, 141, and 145
Gunnison County Road 12 (Kebler Pass Road)
FDR 100 (Lands End Road)
FDR 121 (Trickle Park Road)
FDR 503 (Delta/Nucla Road)
Crag Crest National Recreation Trail
Crag Crest National Recreation Ski Trail
Mesa Lakes Recreation Facilities Complex
Island/Ward Lakes Recreation Facilities Complex
Alexander Resort
Powderhorn Ski Area Resort

In 1977, the Forest Service developed a visual management system to identify and manage the visual resource and protect it's values. The result of this system was a set of Visual Quality Objectives (VQO) based on characteristic landscape, the physical features of the land, people's concern for scenic quality and the opportunity of people to see the land. The Visual Quality Objectives for the analysis area are listed in the following table:

| TABLE III-8.  VISUAL QUALITY OBJECTIVES IN ANALYSIS AREA | | |
|---|---|---|
| VQO | PERCENT OF ANALYSIS AREA | PERCENT OF FOREST |
| Preservation | 0 | 15 |
| Retention | 4 | 6 |
| Partial Retention | 17 | 19 |
| Modification | 72 | 56 |
| Maximum Modification | 7 | 4 |

In the visual management system the development of VQO's is the first step. The second step is to identify the relative difficulty of achieving the VQO's on the ground. This is done by identifying the capability of the landscape to absorb visual impacts. The result of this inventory is a set of visual absorption capability (VAC) based on biological and physical factors, observer related factors, and the existing visual condition. The VAC for the analysis area is made up of the following percentages:

High - 41%
Moderate - 33%
Low - 26%

Affected Environments
General Forest

BLM 0048126

The Forest Service Manual, 2311.11 Exhibit 1, displays the ranges of VQO that correspond to adopted Recreation Opportunity Spectrum (ROS) Classes. The Forest ROS class inventory is a baseline inventory and has not been adopted by management as an ROS class direction. Until the ROS class inventory is adopted by management, the crosswalk between VQO and ROS will be analyzed at the project level.

## Environmental Factor:  Recreation Opportunities

Outdoor recreation is an important contributor to economies in the vicinity of the analysis area. The Forest ranks in the top 25% of all National Forests in recreation use. The analysis area includes approximately 1/3 of the Forest and 1/3 of its recreational use. It provides for a wide range of recreational activities. We expect this demand for recreation opportunities to continue to increase. The popularity of recreation activities on the analysis area for 1990, is summarized below.

| TABLE III-9.  RECREATION USE BY ACTIVITY, 1990 | | |
|---|---|---|
| **ACTIVITY GROUPING** | **TOTAL FOREST RVD's* (thousands)** | **ANALYSIS AREA RVD's (thousands)** |
| Camping, Picnicking and Swimming | 550.9 | 139.2 |
| Mechanized Travel and Viewing Scenery | 1,023.8 | 324.1 |
| Hiking, Horseback Riding and Water Travel | 341.5 | 84.5 |
| Winter Sports | 614.9 | 77.8 |
| Resorts, Cabins and Organization Camps | 140.6 | 109.8 |
| Hunting | 604.6 | 302.4 |
| Fishing | 261.2 | 177.1 |
| Nonconsumptive Fish and Wildlife Use | 14.8 | 9.4 |
| Other Recreation Activities | 157.2 | 84.2 |
| **Grand Total** | 3,709.5 | 1,308.5 |

* RVD = Recreation Visitor Day, 12 hour period

### *Developed Recreation*

Existing developed recreation sites in the analysis area include: 2 visitor centers, 2 interpretive sites, 20 family campgrounds, 4 picnic grounds, 2 organizational camps, 3 privately owned lodges/resorts, 47 privately owned recreation residences and 1 privately owned resort ski area. These developed recreation sites have a capacity of approximately 4500 people at one time (PAOT), with 1800 PAOT's being accommodated in the 20 family campgrounds and 1800 skiers at one time (SAOT) being accommodated at Powderhorn Ski Area. No State of Colorado recreation area or County recreation areas are located within the analysis area. Five State of Colorado recreation areas are located adjacent to the area (Vega Reservoir, Ridgway Reservoir, Paonia Reservoir, Crawford Reservoir, and Miramonte Reservoir). Two National Park Service areas (Black Canyon National Monument, Curecanti National

BLM  0048127

Oil and Gas Leasing Analysis FEIS

Recreation Area) are adjacent to the analysis area, and the Colorado National Monument is nearby. (Figure III-28) It is estimated that 85% of the developed use in the analysis area occurs on Grand Mesa.

### *Dispersed Recreation*

Dispersed recreation activities account for an estimated 75% of all recreation use in the analysis area.

The leading dispersed recreation activity is automobile travel for scenic enjoyment, which is about 25% of the total. The high incidence of this activity can be attributed to the exceptional scenery along travel routes. Hunting and fishing are the next two most popular activities, followed by camping.

There are over 600 miles of trails, in a variety of settings available to non-motorized and motorized users. The Crag Crest trail and Crag Crest ski trail (County Line ski trail) are two National Recreation Trails in the analysis area. The proposed Dominguez - Escalante National Historic Trail crosses the analysis area on the south end of the Uncompahgre Plateau and through the Hubbard Creek and Buzzard Divide area of the Forest. This route was designated by Congress for study as a National Historic Trail. A Draft EIS was prepared by the National Park Service. The Forest Service recommended "high potential segments" be identified a National Historic Trail and location criteria be developed. A Final EIS has been completed and submitted to the Environmental Protection Agency. The administration recommends that no Federal action be taken at this time, due to the general lack of public support for the trail and the present national budgetary constraints. The proposed route for the American Discovery Trail crosses the Grand Mesa. In October 1992, a law was passed mandating a study of the American Discovery Trail, to determine it's suitability for inclusion in the National Trails System. The National Park Service has three years to complete the study. On it's route from California to Delaware, the trail passes through the analysis area. The trail will cross Grand Mesa following the Kannah Creek Trail, the Crag Crest National Recreation Trail, and the Sunlight-Powderhorn Snowmobile Trail. At this time the Charter for the trail has not been finalized, i.e., how much protection from development will the trail receive.

There are over 1,500 miles of roads with approximately 425 miles classified as graded or paved. Off-highway vehicle (OHV) use in the analysis area is estimated to be 5% of the total recreation use.

State Highway 65 over Grand Mesa, State Highway 133 and County Road 12 over McClure Pass and Kebler Pass (the West Elk Loop), respectively, and State Highway 145 across the southwest corner of the Uncompahgre Plateau are designated Colorado Scenic Byways. The former two are proposed as National Forest Scenic Byways. Beautiful fall colors of aspen and oakbrush reward those who drive Forest roads during the fall. Several areas are noted Statewide and are visited annually by those seeking viewing and photographic opportunities.

### *Recreation Opportunity Spectrum (ROS)*

Forest Service recreation planners use the Recreation Opportunity Spectrum (ROS) as described in the ROS Users Guide. ROS provides a framework for defining or describing different classes of outdoor recreation environments, activities, and experiences possible on the Forest. ROS classes include Primitive (P), Semi-primitive Non-motorized (SPNM), Semi-primitive Motorized (SPM), Roaded Natural (RN), Roaded Modified (RM), Rural (R), and Urban (U). The ROS Class composition is summarized in table III-10.

Areas which are managed under the different ROS classes can absorb only as much impact from oil and gas exploration and development or other management activities as is compatible with the corresponding recreation opportunities featured in these areas.

Affected Environments
General Forest

BLM 0048128

For example, in areas designated as primitive, appropriate access would generally be by non-motorized cross country travel. Because the Visual Quality Objective is Retention, all management activities must not be noticeable to the casual forest visitor.

In Semi-primitive Non-motorized areas, trails and some primitive roads are compatible. Although management activities can take place, they must blend with the surrounding landscape.

In Semi-primitive Motorized areas access is by primitive and controlled access roads. Management activities must blend with the surrounding landscape. They may, on occasion, dominate the landscape but should blend with the line, form, color, and texture of the surrounding landscape.

In Roaded Natural, Roaded Modified, Rural, and Urban areas, controlled access roads and full access roads are compatible. Management activities may be visible to observers and the management activities at times may even dominate the landscape, but the line, form, color and texture created must blend with the surrounding landscape character.

The ROS class may change as a result of activities within an area.

| TABLE III-10. ANALYSIS AREA ROS CLASS COMPOSITION | |
|---|---|
| **ROS CLASS** | **PERCENT (%) OF ANALYSIS AREA** |
| Urban (U) | 0 |
| Rural (R) | 1 |
| Roaded Natural (RN) | 22 |
| Roaded Modified (RM) [subclass of RN] | 4 |
| Semi-primitive Motorized (SPM) | 47 |
| Semi-primitive Non-motorized (SPNM) | 24 |
| Primitive (P) | 2 |

### *Wild and Scenic Rivers*

Two rivers on the Forest were listed as potential Wild and Scenic rivers by the Heritage Conservation and Recreation Service (now the National Park Service) in its nationwide rivers inventory. These two rivers are not in the analysis area.

### *Wilderness*

Three (3) Wilderness areas are adjacent to the analysis area. They are: 1) Raggeds Wilderness, 2) West Elk Wilderness and 3) Lizard Head Wilderness. BLM Wilderness Study Areas adjacent to the analysis area include the Tabeguache Creek, Camel Back and Adobe Badlands. No Wilderness areas, Wilderness Study Areas or Further Planning Areas for Wilderness exist in the analysis area.

BLM_0048129

## Environmental Factor:  Cultural and Historical Resources

There are cultural (prehistoric and historic) as well as natural resources on the Forest.  In most cases, the location is kept confidential to protect these resources from vandalism, and to preserve them for scientific and educational purposes.  The Forest's complete historic overview is in three volumes, prepared jointly by the BLM and Forest Service.  Work is proceeding on the prehistoric overview.  Until the prehistoric overview is finished, data will be adapted from the completed BLM prehistoric overview of the surrounding areas.

The USDA Forest Service has developed a policy (FSM 2361.04) of performing cultural surveys on all areas of proposed ground disturbing activities before such activities commence, in order to comply with 36 CFR 800, EO 11593, and the National Historic Preservation Act of 1966, as amended.  The main objective of these inventories is to locate and assess cultural resources in identified project areas, with regards to the National Register of Historic Places.  The located resources also have interpretive and educational opportunities values that illustrate important aspects of American cultural heritage.

As of June 1991, approximately 500,717 acres of the Forest have been surveyed for cultural resources (approximately 17%).  Within the Forest boundary, approximately 98 eligible and 328 potentially eligible sites to the National Register of Historic Places have been identified.  Numerous significant cultural resources, covering roughly the last 10,000 years of human history, and one of the most significant paleontological resources in North America,  dating back to about 150,000,000 years ago, have been located.  Currently, however, no sites on the forest have official National Register status; but one historic and four prehistoric National Register Archaeological Districts have been proposed.

The following summary lists the categories of significant and potentially significant cultural and paleontological resources that are located within the study area.

### *Prehistoric Resources*

Prehistoric aboriginal groups have apparently occupied West Central Colorado since the early Holocene (10,000 B.P.).  The period of occupation can be subdivided into several stages based on variation through time in the material culture and postulated lifeway of the prehistoric inhabitants.  The major chronologic subdivisions are as follows:  Paleo-Indian (8,000-5,500 B.C.); Archaic (5,500 B.C.- 450 A.D.); Formative (1-1,200 A.D.); Protohistoric/Historic Aboriginal (1,200-1,880 A.D.).  Evidence of Paleo-Indian occupation is sparse and mostly restricted to areas outside the analysis area, around present day Montrose, Colorado.  The evidence of Archaic and Formative occupations of the area is abundant and found throughout the analysis area.

Several types of Prehistoric sites have been identified in the analysis area.  Many of the sites can fall into more than one type.  Types of sites that can be encountered in the analysis area:  (1) Lithic/Tool Scatters, (2) Lithic Quarrying Locations, (3) Rockshelters, (4) Wickiups and Wickiup Villages, (5) Circular Dry-laid Masonry Structures and Villages, (6) Small Adobe Pueblos,  and (7) Scarred Trees.

Cultural resources have been located throughout the analysis area.  They have been encountered at any elevation and in almost all environmental contexts.  Most often they have been found in open or semi-open meadow contexts.   Postulated campsites are frequently encountered on generally flat benches, mesas, and ridges in close proximity to water and lithic resources.  Lithic/tool scatters are by far the most frequently encountered resource type on the forests.  The scatters can range in composition from just a few flakes to 1,000's of flakes and numerous formal tools.  They range in size from less than an acre to several hundred acres.  Lithic scatters are generally classified as limited activity areas, short term camps and habitation sites.

Significant and potentially significant prehistoric archaeological resources located in the analysis area are presented below.

BLM_0048130

*Proposed Englehart Park Archaeological District:* The district is 664 acres of the NFS land on the Grand Mesa. It contains nine prehistoric sites and twenty-six isolated finds. It has been nominated to the National Register of Historic Places. The Forest's recommendation is that it be protected by avoidance until it can be studied and interpreted.

*Proposed Sheep Flats/Grove Creek Archaeological Districts:* Two potential districts have been proposed in the Sheep Flats area of the Grand Mesa. The north district contains eleven resources and covers 248 acres, and the south district contains six resources and covers 89 acres. The Forest's recommendation is that these districts be protected by avoidance until they can be studied and interpreted.

*Proposed Horsefly Creek Burn Archaeological Districts:* Two potential districts have been proposed along Horsefly Creek on the Uncompahgre Plateau. The Albin Draw District contains five prehistoric sites and covers 89 acres. The Logging Camp Draw District contains four large prehistoric sites and covers 259 acres. The Forest's recommendation is that these districts be protected by avoidance until they can be studied and interpreted.

*Proposed Patterson Mountain Archaeological District:* This district is located on Patterson Mountain on the Uncompahgre Plateau. It includes twenty-one sites clustered together and covers 335 acres. The Forest's recommendation is that it be protected by avoidance until it can be studied and interpreted.

### Historic Resources

The historic period for the analysis area can be broken down into several overlapping chronologic themes. These are: (1) Spanish Exploration (1750-1776), (2) Fur Trading (1775-1850), (3) Government Exploration (1845-1870), (4) Contact and Ute Removal (1850-1881), (5) Mining (1860-1880), (6) Transportation (1882-1891), (7) Urbanization (1881-1900), (8) Farming and Stock Raising (1878-Present), (9) Federal Activity (1892-Present), (10) The Depression and CCC Activities (1930-1941), (11) New Mining and Energy Exploration (1900-1950), (12) Recreation and Tourism (1892-Present).

The historic period on the Forest began in 1750 when the first contact was made between aboriginal inhabitants and the Spanish, with the signing of the Spanish and Indian Treaty. Don Juan Rivera crossed the south end of the Uncompahgre Plateau at least once, and possibly three times between 1761 and 1765. He is known to have traveled as far as the confluence of the Uncompahgre and Gunnison Rivers at present day Delta, Colorado, before returning to New Mexico. In 1775, three of Rivera's companions on the expedition traveled and traded down the Gunnison River as far as its confluence with the Colorado River, at present day Grand Junction, Colorado.

The Spanish friars Dominguez and Escalante followed Rivera's route to the San Miguel River, in search of a route to Monterey, California, in 1776. They are believed to have crossed the south end of the Uncompahgre Plateau through Horsefly Canyon. They were then guided by the Utes up the North Fork Valley and Hubbard Creek and into Hubbard Park and the West Muddy Pass area on the east end of the Grand Mesa.

In the early 1800's, European fur trappers and traders incurred into the area. Antoine Robidoux established Fort Uncompahgre at the confluence of the Uncompahgre and Gunnison Rivers, near present day Delta, Colorado, to trade with the Utes in the area. No remains exist of the fort today. Another famous trapper known to have frequented the area was Kit Carson. The Gunnison survey party explored the area in 1853, but was later wiped out by a retaliatory Indian attack in eastern Utah. These early trappers, traders, and explorers left little trace of their passing, other than their notes, maps, diaries and the occasional historic artifact left on the ground.

The transition from the Prehistoric period to the Historic period was from approximately 1875 to 1881, with the removal of the Utes and rapid immigration of miners, homesteaders, and stockmen into

BLM_0048131

the area. The first settlers in the Norwood area began arriving in 1878 and were primarily stock growers and homesteaders. Little mining activity occurred in the analysis area. (Most mining was primarily restricted to precious metal mining in areas south [San Juans] and east [Lake City and Gunnison area]). Placer mining by early prospectors did occur on a very limited basis, in the early 1880's, in the Ragged Mountain area of the North Fork Valley. The remains of this activity are primarily restricted to occasional deteriorated cabins, historic artifacts associated with mining activities, and tales of lost gold mines and discovered Spanish gold. Mining began in earnest in the North Fork Valley, with the discovery of coal by I. Sanborn, in 1883, which led to the opening of the Somerset and Bowie coal mines in the Late 19th/Early 20th Century. The coming of the railroad to the North Fork Valley, in 1902, opened up new markets for the coal, and the area continued to grow and develop. Other early coal mining operations in the area were the Bardine-Anthracite Community above the Somerset mine and the Floresta coal camp near Kebler Pass. Floresta opened in the 1880's and closed in 1926. Coal mining continues in the North Fork Valley today.

The Uncompahgre Plateau and Grand Mesa were used freely in these early settlement years as grazing lands for cattle and sheep. Stockmen began moving into these areas before the final Ute removal in 1881. The heyday of the large stock growing outfits in the analysis area was from roughly 1881 to the Panic of 1893. The establishment of the Battlement Mesa Timber Land Reserve in 1892 restricted grazing use of the Grand Mesa and no doubt contributed to the downfall of the "Cattle Baron" era. Free use of the Uncompahgre Plateau continued a little longer until the Uncompahgre National Forest was established in 1906. Homesteading began in earnest in the North Fork Valley and surrounding areas around 1906, and reached its height from 1910-1916. Early ranching communities within this area include West Muddy, Pilot Knob, Hubbard and Terror Creeks, and Stephens Gulch. Disputes between cattlemen and sheepmen within the analysis area were numerous but never developed into range wars as seen in other parts of the west.

Fort Crawford, south of present day Montrose, was built in 1880 to manage the removal of the Utes from the area. The towns of Montrose and Delta were established in 1881. Numerous roads were constructed by lumbermen, stock growers and freighters in the 1880's, primarily over the Uncompahgre Plateau. Some of these that are still in use today are the Divide Road, the Dave Wood Road, the Delta-Nucla Road and Highway 90. The first road to the top of the Grand Mesa was built in 1891 and was used primarily to move cattle to high summer pastures. In 1925 the first automobile was driven to the top. The road over Kebler Pass was constructed from 1917-1920 and was intended to be a railroad grade to move coal out of the North Fork Valley. Lack of investors led to an abandonment of the idea.

Early sawmills were located throughout the analysis area. On the Uncompahgre Plateau, the Darling sawmill supplied lumber to the growing communities of Delta and Montrose, and to Fort Crawford. The Roatcap and Edner sawmills around Kebler Pass, supplied lumber to local settlers and to the developing coal mines in the North Fork Valley in the late 1890's and early 1900's.

Federal activity in the area began in 1892 with the creation of the Battlement Forest Reserve, which included the Grand Mesa. It was later renamed the Grand Mesa National Forest when the National Forest System was created in 1905.

Most of the early historic resources on the Forest date to this Late 19th Century/Early 20th Century time period, and are related to homesteading, stock raising, and lumbering activities. Historic resources in the analysis area include abundant ditches with associated flumes and sluices, homesteaders and stockmen's cabins (especially in the Norwood/Lone Cone and West Muddy Pass areas), cow camps and corrals, sawmills, developed natural springs, carved aspen tree art and historic trash dumps. Other historic resources on the Grand Mesa built in the Early 20th Century are the Leon Peak Fire Lookout (1911-1912), the Leon Tunnel (1900) and several reservoirs. The Leon Peak Fire Lookout and Leon Tunnel have been recommended as eligible for the National Register of Historic Places.

The last major historic periods represented in the study area are the CCC construction period and the recreation and tourism period. CCC construction projects are found throughout the Uncompahgre

BLM_0048132

Plateau and Grand Mesa. These construction projects include Forest Service Guard Stations such as Silesca, Lone Cone, and Columbine on the Uncompahgre Plateau, and Lands End Observatory, Mesa Lakes, Ward Lake and Collbran Guard Stations on the Grand Mesa. Other CCC era historic resources on the Grand Mesa include the Lands End Road and CCC camps at Coon Creek, Skyway, Trickle Park, and Lands End. On the Uncompahgre Plateau, another CCC era resource is the Divide CCC camp. The Lands End Observatory has been recommended as eligible to the National Register of Historic Places.

The recreation and tourism period is represented on the Grand Mesa by the remains of numerous early recreational cabins and lodges constructed around Ward Lake, Alexander Lake and Mesa Lakes. In 1891, a commercial fishing operation was established at Alexander Lake by W. Alexander and R. Forrest. Theirs was one of the first resorts established on the Grand Mesa, the other being Mesa Lakes, which is mentioned as a resort as early as 1887. Forrest and Alexander sold their facilities and lakes to a man named Radcliff in 1896 who built Alexander Lake Lodge and several cabins, and subsequently closed Alexander Lake to fishing by the public. After an incident over a trespasser being shot, the lodge and associated cabins were burned by angry local residents and Radcliff never returned.

The Grand Mesa Resort Company acquired Radcliff's interests on the Grand Mesa and combined it with land they already had, in 1911, creating a 320 acre recreation unit. Numerous privately owned recreational cabins found around Alexander and Eggleston lakes, were part of this resort and are still in use today during the summer months. Other commercial operations currently operating under special permit with the Forest Service are the Grand Mesa Lodge, built in 1947; and Spruce Lodge, built in the 1930's. Recreational use of the Grand Mesa has continued up to today with the establishment of the Mesa Ski Area in 1938 and the Powderhorn Ski Area in 1966. The Mesa Ski Area closed in the 1950's, but Powderhorn Ski Area continues to operate today. None of these recent structures, cabins and features are currently considered eligible to the National Register of Historic Places.

***Proposed Silesca Ranger Station Complex Historic District:*** This Ranger Station has been determined eligible to the National Register of Historic Places. The garage/office combination building, barn, rail worm fence, and features are all contributing elements to this proposed district. The Silesca Ranger Station was the first one built on the newly created Uncompahgre National Forest in 1906. It was also the residence of the first forest ranger on the Uncompahgre National Forest. The features around the pond are believed to be associated with an early socialistic settlement. The combination building and barn were built by the CCC in the 1930's and are largely unmodified. The complex covers 185 acres of the Forest.

## Environmental Factor: Wildlife

The Forest is located within the Rocky Mountain Forest Ecoregion of the Highland province, and includes four major climatic and vegetation zones: lower montane forest, upper montane forest, subalpine forest, and alpine vegetation.

Common vegetation types occurring from low to high elevation are: sagebrush; pinyon-juniper; Gambel oak (oakbrush); ponderosa pine; Douglas fir; aspen; Engelmann spruce/subalpine fir and alpine. Some white fir and lodgepole pine stands are found within the analysis area, but are rather limited. These vegetation types provide habitat for a large number of wildlife species.

Riparian zones traverse through all of the vegetation types and are the most important single habitat type for wildlife. These riparian zones are used as travel routes, as foraging areas, cover areas, and as a source of water.

Generally a diverse mosaic of vegetation and physical land features provides for excellent habitat for wildlife. The Forest's varied habitat supports approximately 300 wildlife species. Approximately 90 of these species are hunted or trapped. The remaining species provide wildlife viewing opportunities, in addition to their role as components of the ecosystem in which they are found.

BLM_0048133

Oil and Gas Leasing Analysis FEIS

## Big Game

***Mule Deer (Odocoileus hemionus):*** Mule deer are found throughout the entire analysis area and are the most common big game animal within the analysis area. They can be found at all elevations in summer and fall, and concentrate on winter ranges during winter and spring. Mule deer are found in forested habitats and open shrub habitats such as oakbrush, pinyon-juniper, sagebrush, and mixed browse habitats. The largest concentrations can be found on the Uncompahgre Plateau and the Grand Mesa. The area has one of the largest mule deer populations in the United States. The extent of mule deer winter range is limited on the Forest; hence, it is critical for these animals. Winter ranges usually feature a combination of browse species, favorable southern exposure, and topographic and vegetative features that provide thermal cover, security, and escape cover. The mule deer herd is somewhat stable or in a slightly downward trend, despite a series of mild winters in recent years. The reasons for this population trend have not been determined, but may be related to competition, access, hunting pressure, habitat conditions, etc. Mule deer concentrate in small groups to large herds on their winter ranges, where they browse primarily on Gambel oak, sagebrush, mahogany, serviceberry, bitterbrush, chokecherry, juniper and other browse species. Sagebrush is a key food and cover species during the winter months.

***Mountain Lion (Felis concolor):*** The mountain lion is a relatively common species within the analysis area. The healthy mule deer population subsequently supports a good mountain lion population, particularly on the Uncompahgre Plateau, in the West Elk area, and elsewhere, where deer concentration areas exist. The lion occupies all habitat types within the analysis area. Lions, particularly males, have extremely large home ranges that can encompass territories of up to 100 square miles. Young, two to three, are usually born in mid summer but may be born during any part of the year. Young bearing and rearing usually occurs in rugged rocky country where natural caves or rock overhangs are present. Key habitats include: denning areas and mule deer concentration areas.

***Bighorn Sheep (Ovis canadensis canadensis):*** Bighorn sheep are found in the Battlement Mesa area on the north end of the analysis area. This herd once numbered over 200 animals but now may number only about 25 sheep (Cunningham, 1991). Reasons for the decline may be attributed to vegetative changes, intensive livestock grazing in the 1950's, poaching, and an increasing elk herd. This bighorn sheep herd resides on both sides of Battlement Mesa, which is administered by the Grand Mesa, Uncompahgre and Gunnison National Forests and the White River National Forest. Because the species is in such a decline, the entire range of this species is deemed critical for its survival. Winter ranges for the species are generally located west of Anderson Gulch and summer range is north and east of Anderson Gulch.

During the winter, the bighorns are concentrated at lower elevations where grasses, forbs, and browse species are plentiful.

The Battlement Mesa herd is unique in that it is one of the few Rocky Mountain sheep herds that is found at an elevation more typical of desert bighorn habitat. Small body size and small tightly curled horns characteristic of this herd are also not typically found in Rocky Mountain bighorns. This may be a characteristic of a herd that is in decline and of low vigor (Cunningham, 1991). Key habitats include: migration routes, lambing ranges, winter range, bedding sites, breeding sites, sources of water, and mineral licks.

***Desert Bighorn Sheep (Ovis canadensis nelsonii):*** The desert bighorn has been reintroduced into the Roubideau Canyon area on the Uncompahgre Plateau, within the analysis area. This reintroduction took place in the fall of 1991. At least two more supplemental transplants will occur within the next year to augment this herd. This, once indigenous species, was eliminated from its historic range by the turn of the century. These animals' habitat requirements are similar to those of the Rocky Mountain bighorn sheep except that they can withstand drier habitat conditions. Needs for escape cover, forage and security habitat are similar to those of the Rocky Mountain bighorn. It is

Affected Environments
General Forest

BLM 0048134

expected that this species will occupy the entire Roubideau drainage and expand into adjacent suitable habitat. Key habitats are similar to those of the Rocky Mountain bighorn sheep.

**Elk (Cervus elaphus):** Rocky Mountain elk are found in substantial numbers in all portions of the analysis area where habitat provides security and forage to meet its needs. The elk herd on the Forest is one of the largest herds in North America and is extremely important, both from an economic and esthetic standpoint. Sport hunting of elk is of major economic importance to this area.

Wildlife viewing is also of major importance and becomes more popular each year. Elk prefer secure habitats with an abundance of thick cover for security, ample forage, and very limited accessibility by humans. Habitat effectiveness is strongly influenced by the amount of human use and associated activities that occur within a particular area. The frequency and timing of disturbances are important factors. Elk congregate in large herds during the winter, at lower elevations on south or southwest facing slopes. Their preferred food is grass throughout the entire year. Herds during the winter may number up to 300 animals or more, and are frequently found wintering on bare grassy ridges or hillsides in pinyon-juniper, sagebrush, or Gambel oak habitat types. A substantial amount of the analysis area is within the winter range of elk on Grand Mesa, the south end of the Uncompahgre Plateau, and in the Crawford and Paonia areas. In spring, the elk move fairly rapidly to the higher country as snow cover recedes. Elk calving occurs from early-May to late-June. The oakbrush, sagebrush, and aspen ecosystems contain most of the calving areas. Aspen and oak areas interspersed with small ponds are important calving and nursery sites. After calving the cows and calves gather into large nursery groups at higher elevations where disturbance from humans is very low. During the summer and early fall, elk are generally found at high elevations where fall breeding activity occurs. Spruce-fir habitats where roads or other human activity is minimal is preferred habitat. Elk can easily be prematurely moved to their winter ranges by human related activity, early snowfalls, or a lack of forage. Migration to winter ranges is often very fast and over distinct migration routes and travel corridors. These migration routes have been mapped in some locations. Key habitats include summer concentration areas, elk wallowing areas, winter ranges, migration routes, calving areas, and fall breeding areas.

**Mountain Goat (Oreamnos americanus):** The mountain goat is found only in the Marcellina Mountain and Ragged Peak areas within the area under analysis. The mountain goat population is very small and roams the high rocky alpine terrain of these and adjacent peaks during the summer and fall. In late fall the goats move to lower slopes and wind blown ridges. Breeding usually occurs from November to early December. Mountain goats are generally confined to very steep rocky country where they feed on high elevation grasses and grasslike plants. In winter and early spring they will make use of some mahogany, mountain maple, willow, and aspen. Young, usually one, are born in traditional kidding areas from May 15th to June 15th. Key habitats include natural mineral licks where important minerals are obtained, kidding grounds, traditional wintering areas and migration routes that are used year after year.

**Black Bear (Ursus americanus):** The black bear is fairly common throughout the entire analysis area. Oakbrush habitats are the most commonly used habitat type within the analysis area. Black bear are especially common in the West Elk Mountains and on the Uncompahgre Plateau. A black bear study in the analysis area found that the black bear density was estimated at 1 bear/5.6 square kilometers (Beck, 1991). Home ranges ranged up to 200 square kilometers for females and 400 square kilometers for males. Mast, the fruit acorn of the Gambel oak, is a primary food source for black bears within the analysis area. Berry producing shrubs such as chokecherry, serviceberry, and currant are also important components of bear habitat. Black bears den primarily in rock caverns and enter these dens in late October or early November. Young black bear, usually one, are born in these dens in January and remain in the den until emergence in April. Illegal killing of black bear is increased where unrestricted access occurs through prime foraging habitat. Key habitats include: denning habitat, mast producing areas, and secure fall foraging areas.

**Wild Turkey (Meleagris gallopavo):** Wild turkey are found primarily in the Gambel oak and ponderosa pine habitat types in all areas covered in this analysis. Fair to good populations of wild turkey

BLM 0048135

are found on the Uncompahgre Plateau, Grand Mesa, Battlement Mesa, and around Crawford. Populations at one time were very high, but were reduced by disease and are just now making a comeback. Nesting occurs in the ponderosa pine or Gambel oak habitats from April to June. Optimum nesting habitat contains downfall from ponderosa pine that provides nest concealment. Mast is a primary source of food within the aspen, ponderosa pine, and Gambel oak habitat types. Key habitats are mast producing oaks, roost sites, and winter foraging areas where snow depths are not excessive.

*Pronghorn Antelope (Antilocapra americana):* Antelope can be found in the lower elevational areas of the Forest that consist of grassland habitats adjacent to the pinyon-juniper habitat type. The range of this species on the Forest is somewhat limited because of its habitat preference for open grasslands, sagebrush ecosystems, and shrublands found at lower elevations. However, some populations occur within the analysis area on the Uncompahgre Plateau and on the Grand Mesa. Forbs, shrubs, and some grasses are the primary food items for this species. Because this animal is found at lower elevations there is not a great distance between summer and winter ranges. In some areas the species is a year-round resident. Antelope fawns, usually twins, are born between the 1st and 15th of June. Sagebrush habitats are preferred for fawning because of the cover it provides the young when first born. Water is an important feature of antelope habitat. Water holes are used more that once daily. Key habitat features include winter foraging areas, water holes, and fawning sites.

*Moose (Alces alces):* Moose have been recorded in the historic files from the Grand Mesa and Paonia areas. Apparently a few moose inhabited or wandered through this area from populations to the North. These infrequent inhabitants were apparently wiped out in the early 1900's. Moose have been transplanted to adjacent Forests and will undoubtedly become more numerous in the future. Moose are generally sedentary animals and are associated with riparian willow bottoms.

### Upland Game Birds

A wide variety of game birds reside within the analysis area. The white-tailed ptarmigan *(Lagopus leucurus)* can be found in alpine habitats in the Lone Cone area, the Raggeds and on the highest mountains on the east end of Grand Mesa. Blue grouse *(Dendragapus obscurus)* can be found in the spruce-fir, ponderosa pine, and aspen ecosystems throughout the analysis area. Lower elevational habitats such as the pinyon-juniper and sagebrush are also often used, especially during the spring nesting season.

Chukars *(Alectoris graeca)* and Gambel's quail *(Lophortyx gambelii)* are found in localized areas within the analysis area at lower elevational zones in the driest of habitats. A localized population of sharp-tailed grouse *(Pedioecetes phasianellus)* occurs on the north end of the Uncompahgre Plateau. These birds seen to prefer brush draws with deciduous vegetation.

Sage grouse *(Centrocercus urophasianus)* are also present and are discussed under Management Indicator Species.

### Small Game

Small game mammals within the analysis area include: both desert and mountain cottontail rabbit *(Sylvilagus auduboni* and *S. nuttalli)* can be found in all habitat types except the alpine (desert cottontail in lower elevations, mountain cottontail in higher elevations); the snowshoe hare *(Lepus americanus)* inhabits all forested habitats; and the red squirrel *(Tamiasciurus hudsonicus)* is most commonly found in the spruce-fir habitat.

### Furbearers

A number of furbearers are found within the analysis area and include the red fox *(Vulpes fulva)*, beaver *(Castor canadensis)*, coyote *(Canis latrans)*, badger *(Taxidea taxus)*, longtail weasel *(Mustela frenata)*, ermine *(M. erminea)*, mink *(M. vison)* and bobcat *(Lynx rufus)*.

BLM 0048136

Riparian habitats are very important to several of these species. The ponds constructed by beavers provide very beneficial habitat for a large number of bird, mammal, fish and amphibian species. The marten *(Martes americana)* is discussed under Management Indicator Species and lynx *(Felis lynx canadensis)* and wolverine *(Gulo gulo luscus)* are discussed under Threatened and Endangered Species.

### *Other Wildlife*

In all there are approximately 300 species of fish and wildlife found in the various habitats represented on the Forest.

### *Management Indicator Species*

Certain wildlife species found in specific vegetation types have been selected to represent the habitat needs of a larger group of species requiring similar habitats. The Forest Plan has identified these as management indicator species. These species were selected because they have special habitat needs that may be influenced significantly by management practices resulting from land use allocations, and because these species represent the habitat requirements of other species or groups of species. These are the management indicator species which represent the late successional stages of the various vegetation types found within the area being analyzed:

*Colorado River Cutthroat Trout (Oncorhynchus clarki pleuriticus), Rainbow Trout (Oncorhynchus mikis) and Brown Trout (Salmo trutta):* The Colorado River cutthroat trout, rainbow trout and brown trout are listed in the Forest Plan as indicator species because of their sensitivity to changes in aquatic and/or riparian habitat conditions. Rainbow trout are important indicators because of their economic value, brown trout are important as indicators of the environmental requirements of other aquatic species and Colorado River cutthroat trout are important as representatives of TE&S fish species. All of these trout species prefer aquatic habitat with good water quality, clean substrate and moderate stream temperatures with abundant overhead and instream cover. Because of their sensitivity to environmental disturbances, these species are quick to respond to external perturbations.

*Pine Marten (Martes americana):* The pine marten represents the late successional stage of old growth spruce-fir forests, particularly the down woody component of these forests. The marten is generally nocturnal and is active throughout the year. It is most abundant in mature to old growth spruce, fir, and lodgepole pine forests. It will also utilize aspen forests that are intermixed with spruce and fir. Young (1-4) are born in April in natal dens found in logs, stumps, and large snags. The red-backed vole *(Clethrionomys rutilus)* and the meadow vole *(Microtus pennsylvanicus)* are staple food prey. Red squirrels and other small mammals are also important food items. Population densities of marten in good habitat vary by geographic location. In Glacier National Park, in Montana, mean home range size was estimated to be 1.0 square miles for resident males and 0.27 square miles for resident females (Hawley and Newby 1957, Burnett 1981). Larger home range sizes have been reported in other areas: in Minnesota, six square miles for males and 1.7 square miles for females was recorded (Mech and Rogers 1977). Marten are easily trapped and are susceptible to overharvesting by trappers. One of the greatest threats to viable populations of pine marten is the construction of roads into their habitat.

*Goshawk (Accipiter gentilis):* The goshawk represents the mature aspen successional stage and is a good indicator of certain types of old growth habitat. It occupies coniferous and mixed forest habitats, in addition to the aspen ecosystems. Goshawks seem to select for specific structural characteristics in nest trees and nesting stands. Goshawk nesting territories include 2-5 nest trees per nest territory. These nest trees are almost always within 0.6 miles of each other (Reynolds, 1975). Goshawk nest stands have consistently been described as mature to old growth. Forest stands selected for nesting may be either multi-storied or single story. Stands are characterized by having high basal areas, open understory, gently to moderately steep slopes, on northerly aspects, and are fully stocked with trees. Nest trees are often in very old large aspen trees that have an understory of coniferous trees.

BLM 0048137

Oil and Gas Leasing Analysis FEIS

Prey items include red squirrels, Abert's squirrels *(Sciurus aberti)*, snowshoe hares, cottontail rabbits, ground squirrels, blue grouse, woodpeckers, jays, robins *(Turdus migratorius)*, and others. Goshawk home ranges can be from 1-4 miles apart (Shuster and others, 1976).

***Abert's Squirrel (Sciurus aberti):*** The Abert's squirrel is found primarily on the south end of the Uncompahgre Plateau and south of Norwood in the Naturita and Lone Cone areas. The Abert's squirrel is unique in that it is almost totally dependent on the ponderosa pine - its food and cover requirements are met solely by this species of pine tree. The Abert's is very closely associated with the mature ponderosa pine vegetation type. Stands that average between 11 and 13 inches diameter at breast height and have a basal area of between 150 and 200 square feet/acre are preferred nesting sites (Patton, 1977). A few Abert's squirrels can also be found on the north end of the Plateau. Ideal habitat for this squirrel is an all-aged stand of ponderosa pine. They prefer to build their nests 30-50 feet above the ground in mature ponderosa pine trees. Abert's squirrels have and use more than one nest in their home range. Stick nests, tree cavities, and witches brooms are used for young rearing. The primary food of the Abert's squirrel include seeds, buds, terminal twigs, cones, and inner bark of ponderosa pine. A ground cover of 80% or more in ground litter is desirable.

***Red Crossbill (Loxia curvirostra):*** The red crossbill is an management indicator species for coniferous forest types, particularly the mature spruce and Douglas-fir forests. However, this species is common to ponderosa pine, pinyon, and other pine forests in the area. The species often flies in flocks, feeding on the seed of the coniferous cones. They have specialized bills to extract seeds from unopened cones of coniferous trees. Nests are well concealed in coniferous trees, usually ten feet or more off the ground and often near the tops of the trees.

***Hairy Woodpecker (Dendrocopos villosus):*** The hairy woodpecker is a primary cavity nesting species which represents the mature lodgepole pine vegetative type. However, the hairy woodpecker is also associated with the aspen, spruce-fir, and mixed deciduous and coniferous forests of this area. This woodpecker feeds on boring insects under the bark of trees. This woodpecker excavates new nesting cavities each year. Abandoned cavities provide suitable nesting sites in subsequent years for a large number of secondary cavity nesting species such as the mountain bluebird *(Sialia currucoides)*, mountain chickadee *(Parus gambeli)*, tree swallow *(Iridoprocno bicolor)*, purple martin *(Progne subis)*, and many others.

***Lewis' Woodpecker (Asyndesmus lewis):*** The Lewis' woodpecker is an semi-colonial species that represents the mature mountain shrub vegetative association, particularly where ponderosa pine and Gambel oak stands are present. Open park-like stands of trees with brushy understories are the preferred habitat for the species.

The species is also a primary cavity nester, preferring trees that are at least 15" in diameter. Insects form the principle food items in spring and summer. Fruits and berries are also eaten in the summer, and Gambel oak acorns are utilized during the winter. The species migrates altitudinally within the analysis area as a result in changes in it's food supply.

***Sage Grouse (Centrocercus urophasianus):*** The sage grouse represents the late successional sagebrush vegetation association. Sage grouse can be found in the sagebrush/grassland habitats on the Forest. Sage Grouse Leks or traditional strutting/breeding grounds are extremely important to the survival of the species in any particular area. Some leks have been identified, however, leks can still be found and must be protected. Leks generally range is size from five to forty acres. While leks are usually surrounded by sagebrush, the strutting area may be somewhat sparsely to moderately vegetated with sagebrush. Barring the complete elimination of the physical lek itself, the leks are used generation after generation. In late February and March, male sage grouse begin to gather from wintering sites to traditional leks.

Breeding generally occurs on the leks during late March and April. This is subsequently followed by nesting and young rearing in May, June, and July. Sage grouse hens will build the nests in the vicinity

Affected Environments
General Forest

of a lek, within 7-10 days following breeding. These nests are normally under sagebrush plants where they are protected from late spring storms. The young feed on insects such as beetles and ants and gradually begin to forage on succulent plants. As summer approaches the sage grouse move to higher elevations where more succulent green vegetation is still plentiful; however, they never get too far from the sagebrush ecosystem. As winter approaches, the sage grouse move to lower elevations or wind blown slopes where snow depths are shallow. The extent of winter movement depends solely on food and cover availability as it relates to snow depths. Sage Grouse Leks have been identified in the Miramonte Reservoir area.

*Pinyon Jay (Gymnorhinus cyanocephalus):* The pinyon jay is a management indicator species for the mature pinyon-juniper vegetation association. It is a colonial nester in the pinyon-juniper habitats within the analysis area. The pinyon jay feeds primarily on the seeds of the pinyon pine. Mature cone bearing trees are important habitat as they provide the primary source of food for this pinyon pine dependent bird. Pinyon-juniper habitats are very common at the lower elevational zones on both sides of the Uncompahgre Plateau and on the Grand Mesa.

### Threatened, Endangered and Sensitive Species

See discussion on page III-101 of this chapter.

## Environmental Factor: Wildfire

Natural fuels are reaching excessive levels in locations scattered throughout the Forest, as a result of mortality due to root and stem rots, insects, diseases, blowdown, and suppression of naturally-occurring fire. Fuel levels in stands managed for timber harvest are high after logging, until such sale activities as fuelwood removal, site preparation (piling, crushing, burning), and slash disposal (burning of landing residues) are completed. In the long term, however, managed timber stands have a lower fuel buildup than natural stands. Fuel build-up along roads is also low, since firewood gatherers routinely remove dead timber within 200 feet of either side of a road. Approximately 10% (210,000 acres) of the Forest's timber lands (2,094,093 acres) have been logged in the past, and another 6% (125,450 acres) of the Forest's timber lands are along roads. This leaves the remaining 84% (1,760,000 acres) in a natural fuels condition.

Fire occurrence on the Forest is cyclic in nature, due to drought cycles. The years 1982 to 1987 had relatively high moisture levels and a low number of acres burned. The years 1988 to 1990 were drought years during which the Western United States and this Forest experienced a high number of acres burned.

Generally, during drought years natural fuels present a high fire hazard and create a high probability of having fires larger than 1,000 acres on the Forest.

## Environmental Factor: Economic Setting

The area is generally rural and sparsely settled, with the exception of the commercial and population centers at Grand Junction and Montrose. Other communities in the area, such as Delta, Collbran, Norwood and Paonia have populations less than 5,000.

Agriculture is a dominant land use in the area. The area surrounding the analysis area was first settled in the late 1800's by ranchers and farmers. Ranching and farming are still important and basic industries dependent on the Forest for livestock grazing and water resources. In response to agricultural needs and community growth, water resources have been developed on the Forest for irrigation and domestic use.

Coal, uranium, and hard rock mining has occurred in and about the Forest since the area was first settled. Some communities are still somewhat dependent on the mining industry. Oil and gas

BLM  0048139

exploration has generally been a seasonal activity and has not contributed much to maintaining a stable workforce.

Timber is not a major industry in the area; however, it is a significant industry in some communities. Timber harvest on the Forest contributes receipts to the counties based on the gross receipts from timber sales. Counties also receive funds from other activities on the Forest, such as land use and recreation permits, mineral permits, leases and sales, recreation user fees and grazing fees.

In the past, communities in the area have been dependent on single industries. Diversification of the local economies has occurred through the development of light industry, retail and wholesale trade, and tourism. Tourism ranks as a major employer in the area. Tourists are attracted yearround to recreational opportunities that include big game hunting, fishing, skiing, sightseeing and camping. The attraction is based mostly on the natural, unpolluted environment. Retirees are settling in the area for some of the same reasons.

# Floodplains

There are approximately 10,200 acres of this environment within the analysis area.

This is the strip of relatively smooth land adjacent to a river channel, constructed by the present river in its existing regimen and covered with water when the river overflows its banks. It is built of alluvium carried by the river during floods and deposited in the sluggish water outside the influence of the swiftest current. A river has only one floodplain but may have one or more terraces representing abandoned floodplains.

Within the analysis area, floodplains will vary from very wide, when associated with low gradient, high sinuosity meadow streams, to almost non-existent when associated with steep, low sinuosity headwater streams. Floodplains may be well vegetated or barren gravel bars. Alpine and montane floodplain vegetation is dominated by a number of herbaceous and woody shrub species, with cottonwood and spruce being the most common tree species. Floodplain alluvium varies from very fine clay size material to large boulders, depending upon position within the watershed, valley gradient, watershed geology and recent flooding history.

A river needs access to its floodplain to allow for energy dissipation during flood events, in order to preserve the stability of the low flow channel. Floodplains aid in the absorption of flood flows and reducing downstream impacts. They also serve as important links in the recharging of groundwater aquifers. Floodplains are the physical feature on the landscape that most often support a variety of beneficial uses associated with rivers and streams. In many instances, floodplains qualify as wetlands and almost always are considered riparian areas.

Floodplain management and protection responsibilities for Federal agencies was established by Executive Order 11988, signed by President Carter on May 24, 1977. It directs the Forest Service and all other Federal agencies to avoid to the extent possible, the long and short term adverse impacts associated with the occupancy and modification of floodplains, and to avoid direct or indirect support of floodplain development wherever there is a practicable alternative.

By controlling what part of the floodplain may be used or what type of use may occur, the potential for water quality impacts can be reduced. The shallow groundwater table within floodplains is easily contaminated. This water is an important contributor to late season base flows in the nearby stream. The outer portions of a floodplain may be inundated only once every 50 to 100 years. Access roads within this portion of a floodplain would not contribute appreciably to water quality impacts during these rare flood events. Some incidental uses may be acceptable along the outer edges of the floodplain. However, location of well sites or storage sites within the floodplain, with all the potential pollutants contained

BLM_0048140

therein, would not be appropriate. Removal of gravel from floodplains would also be an inappropriate practice.

# Aquatic / Riparian / Wetland Habitats

## Environmental Factor: Fisheries and Aquatic Habitat

Aquatic ecosystems are the stream channel, lake or estuary bed, water, biotic communities and the habitat features that occur therein (FSM 2526.05). The Forest's aquatic resources consist of 3,657 miles of perennial stream (fisheries) habitat. These stream miles are associated with approximately 89,000 acres of riparian habitat. In addition to this, there are 1,400 miles of major intermittent streams associated with over 24,000 acres of riparian habitat. These "major" intermittent streams normally have the potential to support an extensive riparian ecosystem, the condition of which varies throughout the Forest. There are approximately 1,500 miles of streams and nearly 3,000 surface acres of lakes within the analysis area.

The Forest's fisheries resources consist primarily of the various trout species, such as brook *(Salvilinus fontinalis)*, brown *(Salmo trutta)*, rainbow *(Oncorhynchus mikis)* and cutthroat *(O. clarki)*. Non-game fish species include suckers, dace and sculpin which occur in a variety of aquatic habitats throughout the analysis area. These species are found in a variety of coldwater habitats which range from *riverine habitats,* characterized by clear, cold water; a silt free rocky substrate in riffle-run areas; an approximately 1:1 pool riffle ratio with areas of slow, deep water; well vegetated stream banks; abundant instream cover; and relatively stable water flow, temperature regimes and streambanks; to *lacustrine habitat,* which is characterized by clear, cold, deep lakes that are typically oligotrophic, but may vary in size and chemical quality, particularly in reservoir habitats.

Many of the stream miles and lake acres may not fall within these "optimal" descriptions because of land use activities resulting in increased sediment loads, vegetative loss, increased stream temperatures, wide shallow stream profiles and silt-choked substrates. However, there are no current inventories that adequately describe the conditions of these streams and lakes, so a description of the physical habitat would range from a low gradient, meandering stream with a silt/sand/gravely substrate to ones with a steeper gradient and a gravel/rubble/cobble substrate. Stream profiles range from well confined, cascading step-pool types, to unconfined, wide and shallow streams.

The Colorado Division of Wildlife has an extensive fish stocking program throughout the Forest, and much of their emphasis is on the lakes and streams found in the analysis area. The existing resident fisheries are supplemented through CDOW's stocking efforts to enable these fisheries to support the heavy recreational use in the area. This program will probably continue in the future and is expected to increase as the recreating public increases the demand on these resources.

The Forest is cooperating with the Colorado Division of Wildlife in developing a conservation plan for the Colorado River cutthroat trout *(Oncorhynchus clarki pleuriticus)*. This species is a U.S. Fish and Wildlife Category 2 candidate species, listed in the Federal Register, Vol. 54, No. 4, Friday, January 6, 1989. Historically, this species was found throughout the analysis area, but these populations have been extirpated and, at the current time, there are only isolated populations found outside the analysis area. Many of the stream miles associated with the analysis area provide suitable habitat for the Colorado River cutthroat trout, and these streams are the target for future inventories.

The streams and lakes within the analysis area provide habitat for other aquatic organisms, as well as fish. The many aquatic and semi-aquatic macroinvertebrates are an integral part of the aquatic resources of the Forest, and provide the major food source for fisheries throughout the Forest, as well as the analysis area. These organisms also function as indicators of environmental health and will respond to subtle changes in aquatic habitat much more dramatically than the resident fish populations.

BLM_0048141

Oil and Gas Leasing Analysis FEIS

The various functional groups found in healthy communities are reflective of habitat quality and are widely used in monitoring the over-all condition of aquatic systems.

The recreational fisheries within the analysis area, especially those lake fisheries on the Grand Mesa, are becoming high use areas for the many resident and non-resident anglers that visit the area. The Forest is planning extensive recreational developments and habitat improvements to draw more recreationists into the area and improve user distribution. Many of the streams coming off Grand Mesa are outstanding recreational fisheries and are getting increased use.

In general, the current condition of the aquatic habitat associated with the analysis area has not been established. The Forest is now in the process of inventorying the aquatic and riparian resources to determine what their condition is. The only aquatic inventories that have been conducted, historically, have been associated with site specific project work and may not reflect the general condition of the aquatic ecosystems within the analysis area. Once the on-going inventories have been completed, determinations can be made concerning present condition.

## Environmental Factor: Riparian Habitats

The Forest's riparian resources consist of nearly 185,000 acres of riparian vegetation, made up primarily of willow, cottonwood, alder, grasses and forbs, sedges and rushes, conifers and other species. Within the analysis area, there are approximately 32,000 acres of riparian area associated with the 1,400 miles of stream. These areas are not portrayed on maps in this document because of the scale of such mapping. They generally follow stream courses and water bodies observable on 1:24,000 scale maps produced by U.S. Geological Survey.

The riparian ecosystems are "transitional areas" between the aquatic ecosystem and the adjacent terrestrial ecosystem; identified by soil characteristics or distinctive vegetation communities that require free or unbound water, or a high water table, at some time during the growing season. They are characterized by species and/or life forms that are different from those of the immediately surrounding non-riparian climax area, and include streams, lakes and wet areas, and the adjacent vegetative communities which are predominantly influenced by their association with water.

Riparian plant associations have been previously discussed as elevational components of the conifer, deciduous, woodland, shrubland, grassland, and forbland plant communities. Because of the high level of sensitivity and management concerns related to the riparian life zones, plant associations, specifically common to riparian habitats, are repeated here and stratified by elevation.

Plant Association:

Alpine and Sub-Alpine

Netleaf Willow *(Salix reticulata)* / Golden Avens *(Acomastylis rossii)*
Heartleaf Bittercress *(Cardamine cordifolia)* / Elkslip Marshmarigold *(Caltha leptosepala)*
Parry Primrose *(Primula parryi)* / Tufted Hairgrass *(Deschampsia cespitosa)*
Grayleaf Willow *(Salix glauca)* - Willows *(Salix spp.)* / Sedges *(Carex spp.)*
Water Sedge *(Carex aquatilis)* / Elephant Head Lousewort *(Pedicularis groenlandica)*
Elkslip Marshmarigold *(Caltha leptosepala)* / Rosecrown Stonecrop *(Clementsia rhodantha)*
Planeleaf Willow *(Salix phylicifolia)* / Elkslip Marshmarigold *(Caltha leptosepala)*
Siberian Kobresia *(Kobresia sibirica)* / Viviparous Bistort *(Bistorta vivipara)*
Cliff Sedge *(Carex scopulorum)* / Elkslip Marshmarigold *(Caltha leptosepala)*
Planeleaf Willow *(Salix phylicifolia)* / Cliff Sedge *(Carex scopulorum)*
Planeleaf Willow *(Salix phylicifolia)* / Water Sedge *(Carex aquatilis)*

Affected Environments
Aquatic / Riparian / Wetland Habitats

BLM_0048142

Black Alpine Sedge *(Carex nigricans)* / Rushes *(Juncus spp.)*

Bog Birch *(Betula glandulosa)* / Skunkleaf Polemonium *(Polemonium pulcherrimum)*

Teachers Sedge *(Carex praeceptorum)* / Water Sedge *(Carex aquatilis)*

Tufted Hairgrass *(Deschampsia cespitosa)* / Sedges *(Carex spp.)*

Water Sedge *(Carex aquatilis)* / Beaked Sedge *(Carex utriculata)*

Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* / Arrowleaf Groundsel *(Senecio triangularis)*

### Montane

Bog Birch *(Betula glandulosa)* / Cliff Sedge *(Carex scopulorum)*

Water Sedge *(Carex aquatilis)* / Hood Sedge *(Carex hoodii)*

Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* / Rocky Mountain Maple *(Acer glabrum)*

Baltic Rush (Juncus articus) / Sedges *(Carex spp. )*

Thinleaf Alder *(Alnus incana)* / Drummond Willow *(Salix drummondiana)* / Field Horsetail *(Equisetum arvense)*

Subalpine Fir *(Abies lasiocarpa)* - Engelmann Spruce *(Picea engelmannii)* / Bluejoint Reedgrass *(Calamagrostis canadensis)*

Brookgrass *(Catabrosa aquatica)* / Water Sedge *(Carex aquatilis)*

Red-osier Dogwood *(Swida sericea)* / Bearberry Honeysuckle *(Distegia involucrata)*

Geyer Willow *(Salix geyeriana)* - Willows *(Salix spp.)* / Bluejoint Reedgrass *(Calamagrostis canadensis)*

Thinleaf Alder *(Alnus incana)* / Red-osier Dogwood *(Swida sericea)*

Colorado Blue Spruce *(Picea pungens)* / Saskatoon Serviceberry *(Amelanchier alnifolia)* - Red-osier Dogwood *(Swida sericea)*

Narrowleaf Cottonwood *(Populus angustifolia)* / Coyote Willow *(Salix exigua)* - Water Birch *(Betula fontinalis)*

Bearberry Honeysuckle *(Distegia involucrata)* / Bluejoint Reedgrass *(Calamagrostis canadensis)*

Bluejoint Reedgrass *(Calamagrostis canadensis)* - Cliff Sedge *(Carex scopulorum)* / Mountain Bluebell *(Mertensia ciliata)*

Tufted Hairgrass *(Deschampsia cespitosa)* / Elkslip Marshmarigold *(Caltha leptosepala)*

Mountain Bluebells *(Mertensia ciliata)* / Tufted Hairgrass *(Deschampsia cespitosa)*

Drummond Willow *(Salix drummondiana)* / Bluejoint Reedgrass *(Calamagrostis canadensis)*

Narrowleaf Cottonwood *(Populus angustifolia)* / Thinleaf Alder *(Alnus incana)* / Red-osier Dogwood *(Swida sericea)*

The condition of the riparian acres on the Forest ranges from poor to good. The Forest is in the process of conducting inventories to determine the current condition of these areas and, once established, will be able to document trend. The only data available that can be used to address the current conditions of the habitat types are historical data or monitoring results associated with site specific activities. No data are presently available that would allow the Forest to state, with any degree of certainty, the over-all current condition of the riparian ecosystems associated with the analysis area.

Soils in riparian areas are frequently young, in a geologic sense, and are usually formed in alluvial deposits. However they may be found in narrow headwater and broad valley positions, as well as land depressions not associated with running water. True riparian soils are considered hydric soils, which means they are periodically saturated, flooded or ponded long enough during the growing season to develop anaerobic conditions in the upper portion of the soil profile. Another common characteristic is an accumulation of organic matter. These conditions result in a soil called a Histosol, which means being derived from organic materials (the term histic epipedon is used to describe the heavy accumulations of organic material in the upper portions of the soil). In these situations, the upper part

BLM_0048143

of the profile is saturated for 30 or more days, during the growing season. Because of their moisture content, soils in riparian areas are susceptible to damage by a variety of ground disturbing activities.

Riparian areas provide habitat for a variety of aquatic, semi-aquatic and terrestrial species of wildlife. Fish and other aquatic organisms are highly dependent on healthy riparian systems which provide cover, temperature control, organic input, filtering of pollutants and resting and rearing habitat for a variety of species. The importance of these areas for wildlife habitat, as well as domestic use, has been well documented throughout the literature. Healthy riparian systems are an integral part of the functioning of the total watershed, in that they help maintain water quality, protect soils from erosional processes, provide forage for wildlife and domestic use and preserve the stream channel and watershed stability.

## Environmental Factor: Wetlands

There are approximately 27,600 acres of this environment within the analysis area.

Unlike floodplains, wetlands is not a term for a physical landform feature, but rather comprises an entire ecosystem, determined by a number of physical and biological factors. Wetlands can be found in conjunction with almost any surface and shallow subsurface water feature. There is considerable overlap in definition between wetlands and riparian areas. Most literature indicates that the term wetland is more limited than riparian. In other words, all wetlands would qualify as riparian areas, but not all riparian areas would qualify as a wetland.

Wetlands are extremely productive and important ecosystems. The availability of solar energy, nutrients and water creates an environment that produces tremendous biological diversity, in both plants and animals. Many of these are at the bottom of the food chain and thus are critical to supporting other animals. In addition to the food base, wetlands provide habitat needs for many fish and wildlife species. Wetlands can protect or improve water quality by filtering out sediment and heavy metals. They also have the capability of removing nutrients, particularly nitrogen and phosphorus, through uptake by wetland plant communities. They are also effective at reducing impacts from floods, by reducing velocity and absorbing water. In addition to these basic values they are attractive places frequently used by Forest visitors, who enjoy a variety of activities associated with wetlands. Some of the more popular activities include nature viewing and study, environmental education, fishing, hunting, canoeing and hiking.

Wetlands has a more legal and regulatory context than riparian areas. This is based upon Executive Order 11990, which was also signed by President Carter on May 24, 1977. For the purpose of regulating activities that potentially may impact wetlands, a Federal Manual was developed jointly by the U.S. Corp of Engineers, the Soil Conservation Service, the Environmental Protection Agency and the U.S. Fish and Wildlife Service. This manual defines jurisdictional wetlands and was adopted in January of 1989. At the present time, modifications to the manual are proposed, but nothing has been finalized. In general, wetlands are defined by the presence of: permanent or seasonal water; water loving vegetation; and soil characteristics influenced by saturated conditions. All three of these conditions must exist in order to qualify as a wetland.

Wetlands within the analysis area are found in conjunction with streams, lakes, springs, bogs and marshes. These range from areas permanently submerged with emergent vegetation to areas which are only seasonally saturated at the surface following snowmelt and vegetated by sedges, rushes and willows. The top of the Grand Mesa has extensive wetlands, although many have been lost as a result of inundation behind dams. Glacial action over the gentle topography on top of Grand Mesa resulted in many shallow depressions remaining after the ice melted. Abundant snowfall provides water to fill these depressions, which over time, became wetland ecosystems. Other areas within the analysis area have fewer acres of wetland and they are for the most part associated with streams. Most of these streams are small, with moderate to steep gradient which results in narrow floodplain development where wetlands are most likely to occur.

Affected Environments
Aquatic / Riparian / Wetland Habitats

BLM 0048144

## Alpine / Tundra Areas

There are approximately 2100 acres of this environment within the analysis area. Figure III-5 is a reduced scale map showing the approximate location of these areas.

Alpine ecosystems occur on three high elevational areas in the southwest portion of the area. These include Lone Cone, Groundhog Mountain, and Little Cone. In these cases, the alpine ecosystem starts at around 11,300 feet and goes to the top of the mountains. Additional alpine ecosystems can be found on Carbon Peak, Mount Axtell and Whetstone Mountain. Alpine ecosystems on these locations start a 11,500 feet.

Alpine ecosystems occur from what is referred to as timberline, to the tops of high mountain peaks, ridges, and crests. These areas have extremely short growing seasons, cold overall temperatures, very large daily temperature fluctuations, high intensity solar radiation exposure, and are subject to periodic high winds. Due to these very harsh conditions, the soil forming process is extremely slow. Very little soil development has occurred in the 10 to 15 thousand years since glaciers have ceased to be a major geomorphic agent in the analysis area. The soil that is there is usually shallow to moderately deep, relatively acidic, contains large amounts of gravel, cobble and stone, and is usually very low in fertility. Due to these environmental factors, alpine areas are very fragile ecosystems.

Alpine vegetation consists of a variety of low-growing herbaceous, forbs, grasses, shrubs, and lichen species that have adapted specifically to the harsh growing conditions. Large unvegetated areas of rock outcrop, talus slopes and rock glaciers also occur.

Alpine areas are valued for their scenic qualities, high elevational recreational and educational opportunities; and in the west, possible barometers of the effects of air pollution. Because of the lack of any vegetation for screening, any disturbances are obvious.

The wildlife habitat provided by this type supports elk, bighorn sheep and mountain goats. Ptarmigan and pika are unique to the type.

Livestock, particularly sheep, graze the alpine in designated range allotments.

Due to extremely harsh growing conditions, low soil fertility and unavailability of appropriate adapted vegetative materials or seed sources, these areas are extremely hard to revegetate. This can be visually observed in disturbances that date back 100-120 years ago. It may take 200-300 years, if ever, until the ecosystem is back to a predisturbance state.

## Areas of High Geologic Hazard

There are approximately 52,000 acres of this environment within the analysis area. Figure III-6 is a reduced scale map showing the approximate location of these areas.

A geologic hazard is "a naturally occurring or man-made geologic condition or phenomenon that represents a risk or is a potential danger to life and property" (American Geological Institute Glossary of Geology). A geologic hazard inventory of most of the Forest and all of the analysis area, has been completed. The geologic hazards were identified through aerial photograph interpretation, review of existing geologic literature, and a general knowledge of the geology of the Forest. Only very limited ground truthing was done. Field investigation may be required to verify the geologic hazards that were mapped based on aerial photograph interpretation. Changes may be necessary, based on subsequent field checking. The methods and guidelines for geologic hazard mapping that were used to map the Forest are those employed by the US Geological Survey and Colorado Geological Survey. Note also, that earthflows, mudflows and landslides which have a general north-facing aspect or occur in heavy vegetation are difficult to map relying solely on the methods used. In other words, there may be some

BLM  0048145

Oil and Gas Leasing Analysis FEIS

areas that should be mapped as High Geologic Hazard that may not have been, due to the limitations of the methods used, or some of the areas mapped as High Geologic Hazard may not be so. These issues will be resolved at the APD, site-specific stage, when the lessee submits a proposed Surface Use Plan of Operations for approval.

A High Geologic Hazard area has a high level of major geologic or geomorphic activity or instability, or has a high potential for such activity, either naturally or due to disturbance by management activities. Major disturbances in these areas have a high probability of causing unacceptable resource damage. Active mudflows, earthflows, and landslides, and areas prone to avalanche are categorized as High Geologic Hazard areas.

## Areas of Moderate Geologic Hazard

There are approximately 629,000 acres of this environment within the analysis area. Figure III-7 is a reduced scale map showing the approximate location of these areas.

Moderate Geologic Hazards are those failed slopes that are no longer active (stabilized earthflows, mudflows, and landslides); those slopes adjacent to failed slopes or active earthflows, mudflows or landslides and avalanche chutes; areas of rockfall; flash flood zones, and areas with potential mining related problems (i.e. subsidence, acid drainage). There may be some areas that should be mapped as Moderate Geologic Hazard that may not have been due to the limitations of the methods used, or some of the areas mapped as Moderate Geologic Hazard may not be identified as such during the field review. These issues will be resolved at the APD, site-specific stage, when the lessee submits a proposed Surface Use Plan of Operations for approval.

Moderate Geologic Hazards are found throughout the analysis area, but are commonly found associated with those areas of High Geologic Hazard. Those areas underlain by the Mancos Shale, the Wasatch Formation, and clay soils derived from the Morrison Formation are potentially subject to slope failure, as a result of management activities. The contact zone between the Mancos Shale and the overlying Mesaverde Group rocks also tends to be prone to slope failure.

Areas above past and present coal mining activities may be subject to subsidence. The majority of the coal mining in the analysis area occurs within the Mesaverde Group along the flanks of Grand Mesa, and in the North Fork of the Gunnison River valley around Paonia and to the east towards McClure Pass.

## Roadless Areas

Table III-11 summarizes the acres of Roadless Areas within the analysis area. Figures III-8a and III-8b are maps with the individual Roadless Areas identified.

The RARE I and RARE II processes, completed in 1979, inventoried and evaluated for possible Wilderness designation, 19 Roadless Areas in the analysis area. In 1980, approximately 157,530 acres of RARE II inventoried lands in the analysis area were classified as Wilderness by the Colorado Wilderness Act (Public Law 96-560). The act did not identify any additional study areas in the analysis area. All other lands inventoried as roadless in the RARE I and II processes were released for non-Wilderness management.

BLM 0048146

| TABLE III-11.  ROADLESS AREAS WITHIN ANALYSIS AREA | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Roadless Area Number - Name | 1 Net Acres | 2 Acres Designated Wilderness | 3 Net * Analysis Area Acres | 4 Wilderness Attribute Rating ** | 5 MAUM's | 6 Timber MMBF | 7 Areas of High Public Interest | 8 Acres Under Current Oil & Gas Lease | 9 Areas with Planned Timber Management |
| 181 - Raggeds | 96,760 | 43,060 | 16,300 | H | 1.4 | 70.0 | | 5,025 | |
| 182 - Drift Creek | 13,800 | 0 | 9,100 | M | .3 | 107.5 | | 4,875 | X |
| 184 - Springhouse Park | 17,045 | 0 | 17,045 | L | .8 | 169.0 | | 0 | X |
| 185 - Electric Mountain | 7,850 | 0 | 7,850 | L | .3 | 120.0 | | 590 | X |
| 186 - Clear Creek | 41,350 | 0 | 41,350 | H | 2.3 | 348.0 | X | 30,765 | X |
| 189 - Hightower | 4,100 | 0 | 4,100 | M | .1 | 0 | | 995 | |
| 191 - Priest Mountain | 92,955 | 0 | 92,955 | M | 4.5 | 1002.5 | X | 28,295 | X |
| 192 - Salt Creek | 11,305 | 0 | 11,305 | M | .8 | 173.5 | | 4,705 | X |
| 193 - Battlement Mesa | 36,290 | 0 | 36,290 | H | 1.8 | 191.5 | | 9,970 | |
| 194 - Nick Mountain | 10,845 | 0 | 10,845 | M | .8 | 114.5 | | 3,720 | X |
| 195 - Kannah Creek | 34,575 | 0 | 34,575 | M | 1.2 | 120.0 | X | 990 | |
| 196 - West Elk | 206,940 | 176,000 | 28,295 | H | .5 | 44.0 | X | 705 | |
| 200 - Whetstone Mountain | 15,400 | 0 | 13,100 | M | .5 | 216.5 | X | 1,915 | |
| 201 - Flat Top Mountain | 19,800 | 0 | 110 | M | .9 | 34.0 | | 0 | |
| 241 - Roubideau | 19,800 | 0 | 6,485 | M | 1.0 | 89.5 | X | 0 | |
| 242 - Tabeguache | 10,200 | 0 | 8,385 | H | .5 | 66.0 | X | 964 | |

BLM_0048147

Oil and Gas Leasing Analysis FEIS

| Roadless Area Number - Name | 1 Net Acres | 2 Acres Designated Wilderness | 3 Net * Analysis Area Acres | 4 Wilderness Attribute Rating ** | 5 MAUM's | 6 Timber MMBF | 7 Areas of High Public Interest | 8 Acres Under Current Oil & Gas Lease | 9 Areas with Planned Timber Management |
|---|---|---|---|---|---|---|---|---|---|
| 243- Kelso Mesa | 28,430 | 0 | 1,205 | M | 1.7 | 11,375 | | 0 | |
| 246 - Campbell Point | 11,300 | 0 | 395 | M | .1 | 7.8 | | 0 | |
| 247 - Johnson Creek | 10,300 | 0 | 5,340 | M | .1 | 10.2 | | 1,115 | |
| **TOTAL** | | | 345,030 | | | | | 94,629 | |

**TABLE III-11.  ROADLESS AREAS WITHIN ANALYSIS AREA**

1. Net acres in Roadless condition (Source: 1991 Plan Amendment)

2. Acres of Congressionally designated Wilderness

3. Acres of this area within the Analysis Area for this EIS which are in roadless condition

* Net Analysis Area acres may not be the mathematical sum of previous two columns.  This is because not all acres of each Roadless Area are within the analysis area.

4. Wilderness Attribute Rating from RARE II.

**Rating shown as:  H = High (19+), M = Medium (16-18), L = Low (15-)

5. AUM's - Average annual grazing use of entire Roadless Area (including designated Wilderness)

6. Timber - Total standing volume of merchantable timber within Roadless Area (does not account for possible unsuitability of land for timber harvest for other reasons).

7. Areas with high public interest - areas which have been mentioned in proposed legislation in the past 10 years

8. Acres under current oil and gas leases.

9. Areas within which timber harvest activities have been scheduled under the current Forest Plan.

## *Roadless Area 181 - Raggeds*

*Size and Location:*  As inventoried in RARE II, the Raggeds Roadless Area was approximately 134,000 acres.  This included approximately 14,000 acres on the White River National Forest.  The Raggeds Wilderness was created by P. L. 96-560 (12/22/80).  Approximately 43,000 acres on the Grand Mesa, Uncompahgre and Gunnison National Forests and 16,400 acres on the White River National Forest were designated Wilderness.  Approximately 16,000 acres of the Raggeds Roadless Area remain within the analysis area.

This remaining area is split into two separate segments.  The larger is east of Paonia Reservoir, lying between the Forest boundary and the Raggeds Wilderness boundary.  It extends north to the vicinity of Lee Creek and State Highway 133 (McClure Pass).  To the south, it extends to Erickson Springs Campground.

The smaller segment is located north of the Kebler Pass Road, near Horse Ranch Park, approximately 3 miles northwest of Kebler Pass.  This segment also abuts the boundary of the Raggeds Wilderness.

*Oil and Gas Leasing:*  There are eight existing oil and gas leases occupying approximately 5,025 acres within the Roadless Area.  There has been no ground disturbing activity within the Roadless Area on these leases.  All of the leases are in the area east of Paonia Reservoir.  None of the leases are in the Horse Ranch Park segment.

The potential for oil and gas within the area is high on 10,000 acres and low on 6,000 acres.

BLM 0048148

*Suitable Timber:* The Forest Plan identifies suitable timber acres in the north end of the Roadless Area east of Paonia Reservoir, at the head of Chair Creek. No timber sales are currently scheduled for this area.

The area also contains timber that is currently not suitable because of economics. The segment near Horse Ranch Park contains timber not suitable because of the sensitivity of the area.

| TABLE III-12. NUMBER OF ACRES BY TIMBER SUITABILITY TYPE WITHIN ROADLESS AREAS IN ANALYSIS AREA | | | | | | |
|---|---|---|---|---|---|---|
| | | **Timber Suitability** | | | | |
| **Roadless Area Number - Name** | **Total Acres within Analysis Area** | **Suitable** | | **Economically Not Suitable** | | **Sensitive Not Suitable** |
| | | **Aspen (Acres)** | **Conifer (Acres)** | **Aspen (Acres)** | **Conifer (Acres)** | |
| 181 - Raggeds | 16,300 | 1,305 | 550 | 1,910 | 275 | 200 |
| 182 - Drift Creek | 9,100 | 1,545 | 0 | 2,550 | 125 | 0 |
| 184 - Springhouse Park | 17,045 | 6,310 | 410 | 2,310 | 35 | 0 |
| 185 - Electric Mountain | 7,850 | 1,995 | 800 | 1,290 | 1,645 | 0 |
| 186 - Clear Creek | 41,350 | 7,285 | 3,615 | 6,845 | 1,905 | 335 |
| 189 - Hightower | 4,100 | 1,495 | 0 | 0 | 0 | 0 |
| 191 - Priest Mountain | 92,955 | 10,870 | 16,445 | 0 | 3,815 | 1,400 |
| 192 - Salt Creek | 11,305 | 1,185 | 2,690 | 0 | 235 | 0 |
| 193 - Battlement Mesa | 36,290 | 0 | 0 | 9,190 | 0 | 0 |
| 194 - Nick Mountain | 10,845 | 0 | 1,770 | 0 | 390 | 1,360 |
| 195 - Kannah Creek | 34,575 | 0 | 745 | 0 | 0 | 4,170 |
| 196 - West Elk | 28,295 | 0 | 0 | 0 | 0 | 1,780 |
| 200 - Whetstone Mountain | 13,100 | 885 | 1,515 | 700 | 5,325 | 70 |
| 201 - Flat Top Mountain | 110 | 55 | 5 | 35 | 0 | 0 |

BLM 0048149

Oil and Gas Leasing Analysis FEIS

| TABLE III-12. NUMBER OF ACRES BY TIMBER SUITABILITY TYPE WITHIN ROADLESS AREAS IN ANALYSIS AREA | | | | | | |
|---|---|---|---|---|---|---|
| Roadless Area Number - Name | Total Acres within Analysis Area | Timber Suitability | | | | |
| | | Suitable | | Economically Not Suitable | | Sensitive Not Suitable |
| | | Aspen (Acres) | Conifer (Acres) | Aspen (Acres) | Conifer (Acres) | |
| 241 - Roubideau | 6,485 | 810 | 630 | 0 | 0 | 0 |
| 242 - Tabeguache | 8,385 | 160 | 690 | 0 | 0 | 1,000 |
| 243 - Kelso Mesa | 1,205 | 0 | 0 | 845 | 100 | 0 |
| 246 - Campbell Point | 395 | 0 | 0 | 0 | 0 | 0 |
| 247 - Johnson Creek | 5,340 | 70 | 0 | 0 | 0 | 0 |
| TOTAL | 345,030 | 33,970 | 29,865 | 25,675 | 13,850 | 10,315 |

*Management Direction:* The Forest Plan Management Areas included within the segment east of Paonia Reservoir are: 2A Semi-primitive Motorized Recreation, 4B Wildlife Habitat for Indicator Species, and 6B Livestock grazing.

The segment near Horse Ranch Park includes 2,565 acres of management area 3A Semi-primitive Non-motorized Recreation.

*Natural Integrity:* In the segment east of Paonia Reservoir, natural process have been influenced by the construction of irrigation systems near Tomahawk Reservoir and Williams Lake, the dozer constructed Munsey-Ruby Stock Driveway, and a road (FDR 898) from McClure Pass to private land near Grouse and Buck Creeks. While all of the Roadless Area is open to grazing, natural processes in the areas away from the direct influence of this construction are intact and continuing.

Natural processes are likewise intact and continuing in the Horse Ranch Park area. This area is open to sheep grazing. The Dark Canyon Trail (830) was once a jeep trail but is now restricted to non-motorized travel.

*Apparent Naturalness:* Once away from the construction described under Natural Integrity, the area east of Paonia Reservoir appears natural.

The Horse Ranch Park area lacks the constructed improvements found east of Paonia Reservoir. The removal of motorized use from Trail 830 is returning it to a more natural appearance. The area appears natural.

*Remoteness:* Vehicle use in both segments is restricted to designated routes. FDR 898 and a portion of Trail 820, both east of Paonia Reservoir, are designated as open. There are no open routes in the Horse Ranch Park area.

East of Paonia Reservoir, there is no public access across the private land onto the National Forest. The only public access is along FDR 898 at the north end of the area and along the trails leading into the area from BLM land in the middle of the area, and from Erickson Springs, at the south end of the area.

Affected Environments
Roadless Areas

BLM_0048150

The Horse Ranch Park area is accessed by Trail 830 from the Horse Ranch Park Trailhead; by Trail 837 from Lake Irwin, approximately 1.5 miles to the east; and by an informal mountain bike trail. Vehicle travel along the Kebler Pass Road can be heard within the area. The subdivision on the private land near Floresta is visible from vantage points along The Dyke. The Horse Ranch Park Trailhead is among the highest use trailheads on the Paonia District. These factors combine to diminish the sense of remoteness in this area.

**Solitude:** East of Paonia Reservoir, the lack of access lends a sense of solitude. The private land to the west is ranch land. Fall big game outfitters day pack into the area from this private land; but summer ranching activities do not detract from the feeling of solitude.

The National Forest to the east is the Raggeds Wilderness. This portion of the Wilderness is the steep rocky face of the Raggeds. Travel within this portion of the Wilderness is very difficult, approaching technical rock climbing. Little use occurs in this portion of the Wilderness which include both the Pristine (8A management prescription) and Primitive (8B management prescription) settings. The solitude present within the Wilderness influences the sense of solitude in the adjacent Roadless Area.

The feeling of solitude is lessened by the motorized recreation use on the designated open routes, mechanized maintenance of the constructed improvements described under Natural Setting, and the ongoing subdivision of the private land (into 40 Acre cabin sites) accessed by FDR 898 . Solitude is lessened at the points of public access by the increased number of human encounters at these locations. The feeling of solitude is less during the fall big game seasons when overall recreation use increases within the area.

The Horse Ranch Park area is managed for a Semi-primitive Non-motorized recreation setting. Areas with this setting generally have greater opportunities for experiencing solitude. However, the existing trail system and the summertime use that occurs on the trails, limits the feeling of solitude. There is a high probability of encountering others while within the area.

**Special Features:** An area of mass slope instability lies north of Tomahawk Reservoir. The one mile wide, 3 mile long area slipped during 1986.

Within the Horse Ranch Park area the ponds along Trail 830 are an attraction for fishing and recreation. Trailhead registrations indicate that they are a frequent destination of trail users.

The Dyke contributes to the mountainous and scenic character of this area.

**Manageability/Boundaries:** East of Paonia Reservoir the Roadless Area is long and narrow (2 to 4 miles wide, 11 miles long) and lies between the private land and the Raggeds Wilderness. Established irrigation systems, motorized routes and private land within the area break up this narrow remnant of Roadless Area 181. The existing Raggeds Wilderness boundary avoids these features.

The Horse Ranch Park segment lies between the Kebler Pass Road to the west and south, Lake Irwin and its associated roads and campground to the east and the Raggeds Wilderness to the north. It's management for a Semi-primitive Non-motorized (3A Management Area) setting is similar to that of the adjacent Wilderness.

**Special Places/Special Activities:** Old growth aspen of 80 to 120 years, found in the vicinity of Horse Ranch Park, generates special feelings for this area. This was evident during the review of the recent Forest Plan Amendment.

A special use permit for entomological research is located very near the Roadless Area, at Horse Ranch Park. The area of 22 acres is permitted to Michael Zimmerman of Oberlin College, Oberlin, Ohio. Permits of this type have been located here since 1979.

BLM_0048151

### *Roadless Area 182 - Drift Creek*

*Size and Location:* As inventoried in RARE II, the Drift Creek Roadless Area was approximately 13,800 acres. This included approximately 4,700 acres on the White River National Forest and 9,100 acres on the Grand Mesa, Uncompahgre and Gunnison National Forests. None of the Roadless Area has been designated Wilderness.

All of the Roadless Area on the Forest is within the analysis area.

The area is located to the north of State Highway 133 (McClure Pass). The highway separates it from the Raggeds Roadless Area to the south. A one mile wide corridor separates it from the Clear Creek Roadless Area 186 to the north. The hydrologic divide between Muddy Creek and the Crystal River marks the boundary between the White River and Grand Mesa, Uncompahgre and Gunnison National Forests and forms the eastern boundary of the analysis area. The Roadless Area crosses the forest boundaries in this location. The remainder of the Roadless Area is bounded by the Forest boundary with private land.

*Oil and Gas Leasing:* There are nine existing oil and gas leases occupying approximately 4,875 acres within the Roadless Area. There has been no ground disturbing activity on these leases.

The potential for oil and gas within the area is high.

*Suitable Timber:* The Forest Plan identifies suitable timber scheduled for commercial timber sales within the area, during the next decade. Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

*Management Direction:* The Forest Plan Management Areas included within the area are: 2A Semi-primitive Motorized Recreation, 2B Roaded Natural and Rural Recreation Opportunities (along the highway corridor to McClure Pass), and 6B Livestock Grazing.

*Natural Integrity:* In addition to being leased for oil and gas, portions of the Roadless Area have been leased for coal. Coal exploration has occurred during the 1950s, 1960s and 1980s. The Mid-Continent Coal Mine is located on the White River National Forest and produces high BTU coking coal. Most surface mine facilities are located on private land within the White River National Forest. Natural processes are intact and continuing, but could be affected by subsidence caused by coal mining.

Irrigation systems are located within the area near the private land boundary and Roberts and Drift Creeks. These improvements affect natural process immediately adjacent to them.

*Apparent Naturalness:* Once away from the evidence of coal exploration and the irrigation systems the area appears natural. Some roads from coal exploration are visible when looking into the area, from above.

*Remoteness:* Access into the area remains difficult because the coal mine and the presence of private land, both on the White River and this Forest, block public access. Public access is available from McClure Pass or from the Clear Creek area to the west. The area is managed as open to off-road and off-trail travel. ATV use occurs within the area.

*Solitude:* Use of the area is heaviest during the fall big game seasons. The sense of solitude is less then than during the summer season, when there is little use because of the lack of attractions. The area nearest to the McClure Pass Highway is affected by the sight and sound of traffic, lessening the feeling of solitude.

Affected Environments
Roadless Areas

***Special Features:*** The lack of road access open to the public makes the area attractive to wildlife; which in turn attracts hunting use during the fall big game seasons. This area is also visible from Highway 133.

***Manageability/Boundaries:*** The boundaries formed by the private land and the McClure Pass highway are well defined. There is no private land within the area on the Forest. The White River portion is broken by the Mid-Continent Coal mine and its private land. A continuous stringer of private land bisects the area, extending from Placita along Highway 133, to Huntsman Mountain, to the north.

The potential for activities on existing oil and gas leases and on existing coal leases limits the potential to manage the area to maintain its roadless character.

***Special Places/Special Activities:*** None.

### Roadless Area 184 - Springhouse Park

***Size and Location:*** As inventoried in RARE II, the Springhouse Park Roadless Area was approximately 17,000 acres. The Roadless Area is entirely on the Forest. None of the Roadless Area has been designated Wilderness.

All of the Roadless Area is within the analysis area.

The area is located two miles north of Somerset. Springhouse Park is in the geographic center of the area. The east, south and west boundaries of the area are formed by the National Forest boundary abutting private and BLM administered land. The north boundary is a line separating the Roadless Area from roaded National Forest System land in the West Muddy Creek and Pilot Creek drainages.

***Oil and Gas Leasing:*** There are no existing oil and gas leases within the Roadless Area.

The potential for oil and gas within the area is high.

***Suitable Timber:*** The Forest Plan identifies suitable timber within the area, scheduled for commercial timber sales during the next decade. Approximately 7,000 acres are suitable. Another 2,300 acres are not suitable because of uneconomical access. Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

No timber sales have yet occurred.

The Floating Lake timber sale is tentatively schedule for FY 94. Preliminary scoping for this sale has occurred. Preparation of an EIS is underway. The proposed sale consist of 885 acres and 8.8 MMBF of aspen harvest. An estimated 18 miles of road would be constructed.

***Management Direction:*** The Forest Plan Management Areas included within the area are: 4D Aspen Management, and 6A and 6B Livestock Grazing.

***Natural Integrity:*** The coal mines located near Somerset do not extend into the Roadless Area.

Open roads within and adjacent to the area include numbers 503, 704, and 783. FDR 503 extends into the center of the Roadless Area, to Springhouse Park. Trails 804 and 806 are open to motorized trail vehicles. Two plugged and abandoned coal bed methane wells are located near the north boundary of the area. The gravel well pads were reclaimed for dispersed recreation and are used as parking areas accessed by FDR 704.4A.

The area is open to grazing.

BLM 0048153

A solar powered Forest Service radio site is located within the area, approximately 1 mile west of Springhouse Park.

Once away from the constructed facilities described above, natural process are intact and operating.

**Apparent Naturalness:** Once away from the constructed facilities described under Natural Integrity, the area appears natural.

**Remoteness:** The area is not remote. The previously described open routes provide ready access into the area. Access along routes coming from the south requires four wheel drive. From the north, routes are passable with two wheel drives. Vehicle use is restricted to routes designated as open.

**Solitude:** Use of the area is heaviest during the fall big game seasons. The sense of solitude is less during the hunting season than during the summer season, when there is little use within the area, because of the lack of attractions. The ease of motorized access eliminates the feeling of solitude.

**Special Features:** There are no special features is this Roadless Area.

**Manageability/Boundaries:** The area is broken by the established motorized use on the access routes previously described.

**Special Places/Special Activities:** None identified.

### Roadless Area 185 - Electric Mountain

**Size and Location:** As inventoried in RARE II, the Electric Mountain Roadless Area was approximately 7800 acres. The Roadless Area is entirely on the Forest. None of the Roadless Area has been designated Wilderness.

All of the Roadless Area is within the analysis area.

The area is located 10 miles northwest of Somerset. Electric Mountain is near the center of the area. The south boundary of the area is the National Forest boundary. The other boundaries are formed by roads and private land inholdings that encircle Electric Mountain.

**Oil and Gas Leasing:** There are existing oil and gas leases within the Roadless Area. These leases occupy approximately 590 acres.

The potential for oil and gas within the area is high.

**Suitable Timber:** The Forest Plan identifies suitable timber within the area, scheduled for commercial timber sales during the next decade. Approximately 2,800 acres are suitable. Another 2,900 acres are not suitable because of uneconomical access. Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

No timber sales have yet occurred.

**Management Direction:** The Forest Plan Management Areas included within the area are: 6B Livestock Grazing, and 7A Wood Fiber Production.

A Utility Corridor (Management Area 1D) lies immediately to the west of the Roadless Area. One mile of this corridor forms the Roadless Area boundary. This corridor is currently occupied by one 230 KV powerline.

The area is open to grazing.

BLM 0048154

*Natural Integrity:* Roads surround the area. The powerline and its associated road are adjacent to a portion of the area. An irrigation ditch near Beaver Creek, is within the area. One trail, open to motorized trail vehicles, crosses through the area. There are no other developments within the area.

Natural processes are intact and continuing.

*Apparent Naturalness:* Once away from the constructed facilities described under Natural Integrity, the area appears natural.

*Remoteness:* Though the area currently retains its roadless character it is not remote because it is surrounded by roads. Vehicle travel within the area is not restricted by the current travel plan.

*Solitude:* Use of the area is heaviest during the fall big game seasons. The sense of solitude is less during the hunting season than during the summer season. Hunting camps would be encountered frequently around the edges of the area. Encounters could be expected within the area. There would not be much sense of solitude.

There are no attractions that stimulate summer use. The feeling of solitude would be greater during the summer.

*Special Features:* There are no special features within the area.

*Manageability/Boundaries:* Though the area is small and is surrounded by roads, the roads do not penetrate into the area. It is possible to manage its roadless character by not constructing roads into the area.

*Special Places/Special Activities:* None identified.

### Roadless Area 186 - Clear Creek

*Size and Location:* As inventoried in RARE II, the Clear Creek Roadless Area was approximately 41,300 acres. The Roadless Area is entirely on the Forest. None of the Roadless Area has been designated Wilderness.

All of the Roadless Area is within the analysis area.

The area is located 20 miles north of Paonia. It contains the headwaters of the East Fork of Muddy Creek, the Clear Fork , Crooked Creek, and Crane Creek.

A portion of the boundary of the Roadless Area is formed by the Forest boundary with the White River National Forest. Other boundaries avoid the nearby roads, such as Buzzard Divide (FDR 265) and Owens Creek (FDR 268). Also along the western boundary, paralleling the Buzzard Divide road, is a Utility Corridor containing a 230 KV powerline.

The area is separated from Roadless Area 182 by a one mile wide corridor in Henderson Creek. It is contiguous with Roadless Area 183, located on the White River National Forest, which consists of 22,200 acres. It is separated from Roadless Area 189 by a narrow corridor along the Owens Creek Road.

*Oil and Gas Leasing:* There are thirty existing oil and gas leases within the Roadless Area. These leases occupy approximately 30,765 acres.

The potential for oil and gas within the area is high.

Four producing gas wells are located within or immediately adjacent to the Roadless Area. Gas pipelines servicing these wells have been constructed within the Roadless Area. An additional well was

BLM 0048155

drilled, plugged and abandoned within the area. One additional Application for Permit to Drill (APD) has been approved.

*Suitable Timber:* The Forest Plan identifies suitable timber within the area, scheduled for commercial timber sales during the next decade. Approximately 11,000 acres are suitable. Another 9,000 acres are not suitable because of uneconomical access. Another 335 acres are not suitable because of visual sensitivity.

Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

The Ruth Mountain timber sale, locate between Ruth Mountain and Owens Creek adjacent to the northwest corner of the Roadless Area, is currently active. The Crooked Creek timber sale, located within the Roadless Area east of Buzzard Creek and south of Ruth Mountain, is tentatively scheduled for FY 94. Data collection on this proposed sale took place during 1992. Preparation of an EIS began during the fall of 1992.

*Management Direction:* The Forest Plan Management Areas included within the area are: 6B Livestock Grazing, and 7A Wood Fiber Production. Management Area 3A Semi-primitive Non-motorized Recreation occurs on approximately 1,600 acres. Management Area 1D Utility Corridor, forms approximately seven miles of the western boundary of the Roadless Area. This corridor is occupied by a 230 KV powerline and associated roads.

The area is open to grazing.

*Natural Integrity:* The area has been affected by oil and gas exploration, the drilling of producing wells, and the construction of gas pipelines to service them. A gas pipeline enters the area from the White River National Forest, approximately two miles northwest of Elk Knob. Approximately four miles of road were built to a gas well from the White River National Forest. This well was located near the confluence of Second Creek and the Clear Fork. The well was plugged and abandoned and the road was closed. Approximately four miles of water transmission ditch exist in that same area.

Away from these disturbances, natural processes are intact and continuing.

*Apparent Naturalness:* Once away from the constructed facilities described under Natural Integrity, the area appears natural.

*Remoteness:* Most of the area is managed as open to motorized travel only on designated routes. The roads constructed as part of oil and gas exploration are not open to general travel, but are restricted to oil and gas and administrative use. Roads open to public use surround the area but do not penetrate to its interior.

The drainages of Crane Creek, Crooked Creek and Turner Creek are open to travel both on and off roads and trails.

The 3A Management area south of Spruce Mountain and including Muddy Basin, is managed for a Semi-primitive Non-motorized recreation setting.

The size of the area and the limited access retain a feeling of remoteness in the area away from the direct influence of the constructed facilities.

*Solitude:* Once away from the ongoing oil and gas activity, the area continues to provide opportunities for solitude. Restriction on motorized access and the lack of motorized access into the center of the area maintains these opportunities.

*Special Features:* Many places within the area contain unstable soils.

Affected Environments
Roadless Areas

BLM 0048156

The area provides summer habitat for elk and is popular during the fall big game seasons. Four outfitters use the area. Two of these outfitter have base camps within the area. The other two day pack into the area.

On the Paonia District, this is the most roadless Roadless Area.

***Manageability/Boundaries:*** The area is large enough to maintain its naturalness. Open roads do not penetrate into the area. Continued oil and gas development, especially the continued drilling of producing wells, could alter the character of the area so much that it would loose its remoteness, solitude and overall roadless character.

***Special Places/Special Activities:*** The area is special in that it is a proven producer of natural gas. The potential for further development is very high.

### Roadless Area 189 - Hightower

***Size and Location:*** As inventoried in RARE II, the Hightower Roadless Area was approximately 32,000 acres. This included approximately 27,000 acres on the White River National Forest and 4100 acres on the Grand Mesa, Uncompahgre and Gunnison National Forests. None of the Roadless Area has been designated Wilderness.

All of the Roadless Area on the Forest is within the analysis area.

The area is located north of the Buzzard Divide and Owens Creek Roads. It extends from these roads up to and across the forest boundary with the White River National Forest.

***Oil and Gas Leasing:*** There are existing oil and gas leases occupying approximately 995 acres within the portion of the Roadless Area on this Forest. There has been no ground disturbing activity within the Roadless Area on these leases. An APD was submitted but not implemented.

The potential for oil and gas within the area is high.

***Suitable Timber:*** The Forest Plan identifies suitable timber within this area. Table III-12 displays the number of acres by timber suitability type, within the Roadless Area.

The currently active Ruth Mountain timber sale is adjacent to the eastern portion of the Roadless Area.

***Management Direction:*** The majority of the Roadless Area is in Forest Plan Management Area 6B Livestock grazing. A Utility Corridor (Management Area 1D) forms a portion of the Roadless Area boundary. The Buzzard Divide Road FDR 265 has been relocated from its original location near Buzzard Creek to near this Utility Corridor and the edge of the Roadless Area.

***Natural Integrity:*** The Utility Corridor is currently occupied by a 230 KV power line and its associated roads. This power line forms the boundary of the Roadless Area. The Ruth Mountain timber sale is adjacent to but outside what remains of the originally inventoried Roadless Area. An irrigation system taking water out of Owens Creek is likewise adjacent to but outside the Roadless Area. Since these disrupting influences are outside the Roadless Area, the Roadless Area has retained its natural integrity.

***Apparent Naturalness:*** Once away from the 230 KV powerline the area appears natural.

***Remoteness:*** The portion of the area on the Forest is not remote. It is adjacent to the Utility Corridor, Buzzard Divide Road and Owens Creek road. There are numerous non-system travel ways

BLM_0048157

that are used by ATV's and motorcycles. The fence separating the White River National Forest and this Forest is paralleled by a non-system route passable to pickup trucks.

*Solitude:* The area does not offer an opportunity for experiencing solitude. Use is very heavy during the fall big game seasons. Use of the area during the summer is light because there are no summer attractions. Although there will be few encounters with others during the summer, the sense of solitude is diminished by the nearby Buzzard Divide and Owens Creek Roads.

*Special Features:* There are not special features within the Grand Mesa, Uncompahgre and Gunnison National Forests' portion of the Roadless Area, other than this area provides good summer big game range.

*Manageability/Boundaries:* The remaining Roadless Area within the Forest is small and bounded by roads, timber activity and the Utility Corridor. It is not manageable by itself for its roadless characteristics.

*Special Places/Special Activities:* The specialness of the Forest's portion of the Roadless Area appears to be its desirability for fall big game hunting.

### Roadless Area 191 - Priest Mountain

*Size and Location:* As inventoried in RARE II, the Priest Mountain Roadless Area was approximately 102,600 acres. The area is currently mapped as occupying approximately 93,000 acres. The Roadless Area is entirely on the Forest. As a result of RARE II, Priest Mountain received a non-wilderness recommendation. None of the Roadless Area has been designated Wilderness.

All of the Roadless Area is within the analysis area.

The area is located 12 miles southeast of Collbran. This large area is spread out over three Ranger Districts (Grand Junction, Paonia, and Collbran). It includes the areas of the Flat Tops, the East Fork of Leon Creek, Currant Creek, Cunningham Creek, Cow Creek above Overland Reservoir, and Priest Mountain.

*Oil and Gas Leasing:* There are existing oil and gas leases within the Roadless Area. These leases occupy approximately 28,295 acres and are concentrated in the north end of the Roadless Area.

The potential for oil and gas within the area is high.

*Suitable Timber:* The Forest Plan identifies suitable timber sales during the next decade, within this area. Approximately 11,000 acres of suitable aspen and 16,400 acres of suitable conifer are included in the Roadless Area. Approximately 3800 acres are not suitable for economic reasons, and 1400 acres are not suitable because of visual sensitivity. Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

The proposed Monument timber sale is located in the northeast corner of the Roadless Area, north of Bronco Knob but south of Willow Creek. This sale is tentatively scheduled for FY 97. Access to the sale would come from Buzzard Creek and the Willow Creek Road FDR 263.

The Terror Creek Second Decade Vegetation Treatment Environmental Assessment and the Stevens Gulch Road and Related Timber Sales Environmental Impact Statement describe a series of timber sales scheduled for the Cunningham Creek, Terror Creek, Middle Hubbard and Little Dyke Creek areas. These sales are located below the Overland Ditch and are scheduled from 1992 to beyond 1997.

BLM 0048158

***Management Direction:*** The Forest Plan Management Areas included within the area are: 3A Semi-primitive Non-motorized Recreation, 4B Wildlife Management, 4D Aspen Management, 6B Livestock Grazing, and 7A Wood Fiber Production.

The area is open to grazing.

The 3A prescription occupies 4800 acres within the Roadless Area, in the upper Cow Creek drainage.

Different portions of the area vary in their retention of roadless qualities. The least affected areas include the 3A Management Area, the Currant Creek vicinity and the Flat Tops. The most modified areas include the areas east and south of the of the Overland Ditch, the vicinity of the Stevens Gulch Road FDR 701, and Cunningham Creek.

Rather than describing each roadless quality (Natural Processes, Natural Appearance, Remoteness, Solitude, etc.) for Priest Mountain as a whole, it is easier to discuss the area location by location, describing the roadless qualities of each location. (See Figure III-8a)

### *Currant Creek*

***Location:*** Currant Creek is located in the southwest corner of the Roadless Area. It is bordered on the west and south by the Forest boundary with private land. It is separated from the remainder of the Priest Mountain Roadless Area by a corridor around the Green Mountain Trail. Its east boundary avoids Patterson Reservoir and the road leading to it.

***Natural Integrity:*** Natural processes are in place and continuing. There is little evidence of human induced change.

***Apparent Naturalness:*** The area looks natural.

***Remoteness:*** The area is bordered on the south by the National Forest boundary with private land. There is no public access across this private land.

To the north, this area is bounded by the Green Mountain Trail. Access into the Currant Creek vicinity must come down from this trail. While the trail is open to ATV and motorcycle use, motorized travel off of the trail is prohibited.

The lower one third of the area includes steep oak brush canyons. Cross country travel is difficult.

The difficulty of access makes this area remote.

***Solitude:*** Summer use of the area is light because there are no attractions for the summer user. Opportunities to experience solitude are present. This opportunities are lessened during the fall big game seasons, when use increases.

***Special Features:*** There are no identified special features within the Currant Creek vicinity.

***Manageability/Boundaries:*** The Currant Creek area contains approximately 8000 acres. Its size and shape allow it to be managed in its present condition.

***Special Places/Special Activities:*** The DOW considers this area important wildlife habitat. Its location on the south side of the Grand Mesa makes its wildlife value more important.

There is public interest is keeping this area the way it is.

BLM_0048159

One outfitter is permitted within this area. The outfitter utilizes a camp located on the Forest as the base of his operation.

### Cunningham Creek

**Location:** Cunningham Creek is located in the southeast corner of the Priest Mountain Roadless Area. On the south, it is bordered by the Nation Forest boundary with private land. To the east, it avoids the Stevens Gulch Road FDR 701. To the north and west it follows the hydrologic divides between Cunningham Creek and West Hubbard Creek and Leroux Creek.

**Natural Integrity:** Natural processes here have been affected by the various improvements that have been constructed in the area. These include the Overland Ditch, FDR 703, FDR 486, the Betty Park Road, Holy Terror Reservoir, and the Pitkin Mesa Pipeline.

Proposed timber sales, for which there are approved NEPA documents, will further alter the natural processes below the Overland Ditch.

**Apparent Naturalness:** Once away from the constructed facilities described under Natural Integrity, the area appears natural. Proposed timber sales will alter this appearance.

**Remoteness:** The Cunningham Creek area is not remote. It is bordered by the Stevens Gulch Road FDR 701 and is accessed by three system roads. The area is open to motorized travel off roads and trails.

**Solitude:** There is little opportunity for experiencing solitude within this area.

**Special Features:** FDR 703 leads to the Shoneman Ditch Cabin, which is under special use permit to the Overland Ditch Company.

**Manageability/Boundaries:** Roads and other improvements cross through and penetrate the area, and have removed its roadless character. It is not manageable as roadless.

**Special Places/Special Activities:** The Pitkin Mesa Pipeline transports potable water from a series of springs to a subdivision on Pitkin Mesa. This pipeline parallels FDR 846. The springs are located approximately 1/4 mile north of the Overland Ditch.

### Priest Mountain

**Location:** Priest Mountain is located at the head of Leroux Creek. Its southern boundary avoids the roads and development around Dog Fish, Doughty, Bailey, and Hanson Reservoirs. It is separated from Upper Leon Creek by the hydrologic divide that forms the Delta/Mesa County line. It is separated from Currant Creek by the corridor surrounding the Green Mountain Trail. The hydrologic divide extending from Crater Peak to the County line forms its remaining boundary.

**Natural Integrity:** Natural processes are in place and continuing.

**Apparent Naturalness:** The area appears natural.

**Remoteness:** Portions of Priest Mountain are near the developments of Doughty, Dog Fish and Goodenough Reservoirs. These facilities are serviced by roads open to public use and are not remote.

Other portions of this subdivision of the larger Priest Mountain Roadless Area are contiguous with Upper Cow Creek (an area managed for Semi-primitive Non-motorized Recreation), and the Flat Tops. These areas are more remote. The portion of Priest Mountain closest to these other areas shares these remote characteristics.

BLM 0048160

*Solitude:* The activities around the reservoirs and roads described under remoteness, limit the opportunities for experiencing solitude. In the same way that the portions of the area contiguous with Upper Cow Creek and the Flat Tops are more remote, the opportunities for solitude are greater in areas contiguous with Upper Cow Creek and the Flat Tops.

Trails 720 and 730 pass through the area and are open to motorized trail vehicles. Opportunities for solitude are lessened around these trail corridors.

*Special Features:* There are no identified special features.

*Manageability/Boundaries:* The boundary separating this portion of the Roadless Area from the developments in the remainder of Leroux Creek does not follow any geographic feature and is not recognizable on the ground. Priest Mountain is approximately 7000 acres. Its shape hampers its manageability for its roadless character. This portion of the Roadless Area is only one half mile wide in one location .

Other boundaries are contiguous with portions of the Roadless Area that retain their roadless character over large blocks of land. When combined with these other areas, Priest Mountain becomes manageable as roadless.

A corridor along the Green Mountain Trail separates Priest Mountain from Cunningham Creek. With both Priest Mountain and Cunningham Creek manageable for their roadless character, this corridor becomes suitable for the same management.

*Special Places/Special Activities:* None identified.

### Hubbard Creek

*Location:* The Hubbard Creek portion of the Roadless Area includes the drainages of West, Middle, and Main Hubbard Creeks and Elk Creek. It is bordered on the the North by the Overland Reservoir, to the east by the Stevens Gulch Road, to the south by the Cunningham Creek area previously described.

This portion of the Priest Mountain Roadless Area is bisected by the Overland Ditch, which runs north to south through the area.

*Natural Integrity:* The area has been affected by the Overland Ditch and the construction of the new Stevens Gulch Road. A series of timber sales are planned for the area east of the Overland Ditch. These sales include: Hubbard 2, 1993, 5 MMBF; Cow 2, 1996, 3.2 MMBF; Elk 2, after 1997, no volume estimate. These timber sales were described in the Stevens Gulch Road and Related Timber Sales EIS (EIS 02-04-85-02) and Record of Decision, dated 9/12/86. These timber sales and their related roads will disrupt the natural processes within their boundaries.

*Apparent Naturalness:* Except for the construction of the Overland Ditch through the center of the area, it appears natural. The Stevens Gulch Road and powerline, running along the eastern edge of the area, do not appear natural. Planned timber sales and road construction will disrupt the natural appearance of the area east of the Overland Ditch.

*Remoteness:* Much of the area is not remote. There is road access along the east boundary of the area, and to Overland Reservoir, on the north. These roads have their greatest influence east of the Overland Ditch. West of the ditch the area is more remote, sharing the characteristics of the contiguous Cow Creek area, to the west.

BLM_0048161

*Solitude:* As with remoteness, the sense of solitude ranges from virtually none adjacent to the Stevens Gulch Road and Overland Reservoir to much higher opportunities for experiencing solitude adjacent to the Cow Creek Area. The sense of solitude is greater west of the Overland Ditch.

*Special Features:* There are no identified special features.

*Manageability/Boundaries:* The area east of the Overland Ditch will be affected by proposed timber sales and will loose its roadless character. Timber sales will be confined to this portion of the area and will not affect the area west of the ditch. This portion of Hubbard Creek will retain its roadless character.

*Special Places/Special Activities:* To the members of this Hubbard Park Subdivision, located in the vicinity of Hubbard Creek, the retention of the area's roadless character is desirable.

### Upper Cow Creek

*Location:* Located west of the Overland Reservoir, this area contains Crater Lake and the headwaters of Cow Creek. It coincides with the 3A Management area. It is contiguous with the Hubbard Creek area, Priest Mountain area, Upper Leon Creek area and West Muddy area.

*Natural Integrity:* Natural processes are intact and continuing.

*Apparent Naturalness:* The area extends down Cow Creek to Overland Reservoir, the reservoir being outside the Roadless Area. The vicinity of the reservoir does not appear natural. However, within this portion of the Roadless Area the appearance is natural.

*Remoteness:* Adjacent to Overland Reservoir the area is not remote. The area becomes more remote further away from the reservoir. The area provides a Semi-primitive Non-motorized recreation setting. Except for snowmobiles operating on snow, it is closed to motor vehicles operating off designated routes. Since there are no designated open routes, the area is essentially closed to motor vehicles.

*Solitude:* The area offers a moderate level of opportunities for solitude. The feeling of solitude is less near Overland Reservoir. It is also less during the big game seasons when use increases.

*Special Features:* There are no identified special features.

*Manageability/Boundaries:* The 3A management area occupies 4800 acres. It is contiguous with other segments of the Priest Mountain Roadless Area that also retain their roadless attributes. It is manageable for retention of its roadless character.

*Special Places/Special Activities:* No special places or activities identified.

### West Muddy

*Location:* The West Muddy area contains the headwaters of Peter, Dyke and West Muddy Creeks. It is northwest of Overland Reservoir and shares a boundary with the 3A Management area in Upper Cow Creek. It also shares a boundary with the Flat Tops portion of this Roadless Area.

*Natural Integrity:* Natural processes are intact and continuing. Though suitable timber is identified within the area no timber sales have occurred. The area is within the 7A Wood Fiber Production management area.

*Apparent Naturalness:* The area appears natural.

BLM 0048162

***Remoteness:*** The West Muddy area by itself, is not remote. It is two miles wide and bordered by Overland Reservoir. FDR's 705 and 265 provide vehicle access near the area.

The west boundary of the area is common with the Flat Tops and Upper Cow Creek. This is where the West Muddy area is most remote. When viewed as part of Flat Tops and Upper Cow Creek (as it would be by a cross country traveler entering it from the west) the nearby road access would be unnoticed and the area would feel remote.

***Solitude:*** Around the Overland Reservoir and the nearby roads, opportunities for solitude are limited. Adjacent to the Flat Tops and Upper Cow Creek opportunities for solitude are greater.

***Special Features:*** None identified.

***Manageability/Boundaries:*** Because of its size and shape, West Muddy by itself is not manageable as roadless. If managed as an extension of the Flat Tops and Upper Cow Creek, it becomes manageable as roadless.

***Special Places/Special Activities:*** None identified.

### Flat Tops

***Location:*** From north to south, the Flat Tops area extends from the National Forest boundary near Vega Reservoir, to the hydrologic divide that forms the Delta/Mesa County line. From east to west, it extends from FDR's 265, 263, and 266 to FDR 280, along Leon Creek.

***Natural Integrity:*** Most of the area retains its natural integrity. Constructed improvements within the area include Monument No. 1 and No. 2 Reservoirs, their associated ditches and approximately 1/2 mile of FDR 263. There are also four trails open to motorized use, within the area.

***Apparent Naturalness:*** Away from the constructed improvements the area appears natural.

***Remoteness:*** Much of the area is remote. Portions of the area closest to the bordering roads and the National Forest Boundary are less remote.

The majority of the area restricts motorized vehicles to trails (515, 517, 518, and 730).

***Solitude:*** Even at the current level of motorized trail use, the area provides opportunities for experiencing solitude. Opportunities for experiencing solitude are less, adjacent to the nearby roads.

***Special Features:*** The Flat Tops contains an area speculated to be an old wildfire that eliminated enough tree cover to elevate the water table. Now the elevated water table prevents the reestablishment of trees in low-lying areas. Trees have only become established on dryer mounds scattered throughout the area.

Good fishing is found in Monument Creek and the Monument Reservoirs.

***Manageability/Boundaries:*** The area is large enough to be managed for its roadless qualities. The portion of the area north of the Silver Spruce Trail is not manageable for its roadless qualities. Also not manageable for its roadless character is that portion of the area affected by FDR 256.

***Special Places/Special Activities:*** The area is popular with motorized trail rides, horseback riders, and wildlife photographers. Horse use increases during the hunting seasons. It is crossed by the Sunlight-Powderhorn snowmobile route.

BLM 0048163

Oil and Gas Leasing Analysis FEIS

### *Bronco Knob*

*Location:* Bronco Knob is adjacent to the Flat Tops. It is bordered by FDR's 263, 265, and the Delta/Mesa County line.

*Natural Integrity:* The area retains its natural integrity. The proposed Monument timber sale, previously mentioned would disrupt the areas natural processes.

*Apparent Naturalness:* The area appears natural.

*Remoteness:* Bronco Knob itself, and the nearby Buzzard Park are remote. Access is difficult. Though the area is open to off road travel, it is heavily timbered, limiting cross country motorized access. Other portions of the area adjacent to the access roads are not remote.

*Solitude:* Opportunities for experiencing solitude are greatest near the adjacent Flat Tops area. Bronco Knob and Buzzard Park are in this location. Adjacent to FDR's 263 and 265 opportunities are less.

*Special Features:* None identified.

*Manageability/Boundaries:* As an extension of the Flat Tops the area is manageable for its roadless character.

*Special Places/Special Activities:* Important summer elk habitat.

### *Upper Leon Creek*

*Location:* Upper Leon Creek is located west of the Flat Tops, in the area surrounding Hunter Reservoir. Its west boundary avoids FDR 127 and Colby Horse Park Reservoir.

*Natural Integrity:* The area's natural processes are intact and continuing. They have been disrupted only in the immediate vicinity of Hunter Reservoir and FDR 280.

*Apparent Naturalness:* Away from the road and reservoir the area appears natural.

*Remoteness:* The area is not remote. FDR 280 penetrates through the middle of the area.

*Solitude:* Opportunities to experience solitude are limited, due to the activity that takes place along FDR's 127 and 280.

*Special Features:* None identified

*Manageability/Boundaries:* The shape and size of the area, coupled with the presence of roads within and immediately to the west, make the area unmanageable as roadless.

*Special Places/Special Activities:* Attraction is Leon Creek and open valley vistas.

## *Roadless Area 192 - Salt Creek*

*Size and Location:* As inventoried in RARE II, the Salt Creek Roadless Area was approximately 11,300 acres. All of the Roadless Area is within the Forest and within the analysis area.

Recent inventory data suggest that the area remaining roadless is only 8700 acres (Collbran Ranger District RIS data).

Affected Environments
Roadless Areas

BLM_0048164

The area, located 6 miles southeast of Collbran, is bounded on the north and west by BLM and private lands. The south boundary avoids FDR 279. The east boundary avoids the Park Creek Road FDR 262. The Park Creek Road separates the Salt Creek Roadless Area from the Priest Mountain Roadless Area, to the east.

The area received a non-wilderness recommendation as the result of RARE II. None of the area has been designated Wilderness.

*Oil and Gas Leasing:* There are existing leases occupying approximately 4700 acres within the Roadless Area. There are two producing gas wells within the area, both near the external boundary: One in the northeast corner, adjacent to the Park Creek Road; the other is along the Forest boundary near East Salt Creek. A third producing well is within 100 feet of the Roadless Area near the head of Oak Creek. There are no pending APD's within the area.

The potential for oil and gas within the area is high.

*Suitable Timber:* The Forest Plan identifies suitable timber scheduled for harvest during the next decade. Suitable timber is identified on a total of 3900 acres. Approximately 200 acres of economically not suitable timber is also identified.

Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

The timber sales tentatively scheduled for the area include Grove Creek (FY 93), Valley View (FY 93), and Sheep Flats (FY 94). An EIS is being prepared for these timber sales.

*Management Direction:* The Forest Plan Management Areas included within the Roadless Area are: 5A Big Game Winter Range, 6B Livestock Grazing, and 7A Timber Production.

*Natural Integrity:* The extreme north edge of the area drops down steep slopes to the Forest boundary. This portion of the area has retained its natural integrity. The steep slope dropping into Leon Creek has also retained its natural integrity.

There are numerous non-system travelways within the area that have disrupted the natural integrity of meadows found in the remainder of the area. The Anderson Ditch extends from the Anderson Brothers Reservoir and is paralleled by a road open to public use.

*Apparent Naturalness:* The north face of the area and the slope into Leon Creek appear natural.

Because of the number of non-system routes within the area's meadows, the remainder of the area does not appear natural.

*Remoteness:* The Park Creek Road FDR 262 was improved by Exxon for access to a well near Monument Creek. That portion of the Roadless Area closest to this road (within Leon Creek and adjacent to the road) has lost its remoteness.

The north face of the area remains difficult to travel in, but its remoteness is limited due to the motorized use by ATV's, jeeps and trucks coming into the Roadless Area from the south. Most of the area is easily accessed by vehicle. When dry, the area is accessible by two wheel drive.

As a result, the area is not remote.

*Solitude:* With the easy access, most of the area contains little opportunity for solitude. As with other areas, use is greatest and solitude the least during the fall big game seasons.

BLM_0048165

*Special Features:* Proposed Sheep Flats and Grove Creek archaeological districts along the Sheep Flats Road FDR 279 encompass 248 and 89 acres, respectively. Historic and prehistoric sites have been found here that extend into the Roadless Area.

*Manageability/Boundaries:* While portions of the Roadless Area, such as the north face and Leon Creek, retain some of their roadless character, the majority of the area is not manageable as roadless.

*Special Places/Special Activities:* The north face of the area and Leon Creek are the special places of this Roadless Area.

### Roadless Area 193 - Battlement Mesa

*Size and Location:* As inventoried in RARE II, the Battlement Mesa Area was approximately 71,000 acres. This included 34,000 acres on the White River National Forest and 37,000 acres on this Forest.

All of the Roadless Area on the Forest is within the analysis area.

The area is located 40 miles north of Collbran. The Forest's portion of the Roadless Area is bounded on the south by BLM and private lands, and on the north by the Forest boundary with the White River National Forest.

The area is long and narrow. East to west it is approximately 24 miles long. It ranges from 1 mile to 5 miles wide.

The area received a non-wilderness recommendation as the result of RARE II. None of the area has been designated Wilderness.

The area can be divided into two segments. The Sunnyside segment includes the western half of the area. The Battlement Mesa segment includes the eastern half.

*Oil and Gas Leasing:* There are existing leases occupying approximately 9,970 acres within the Forest's portion of the Roadless Area. No drilling has occurred in the Sunnyside portion of the area. Drilling has occurred on private land adjacent to the Battlement Mesa area. (Producing gas wells are located on BLM lands west of Sunnyside, on lands adjacent to the White River National Forest portion of the Roadless Area, and along the Plateau Creek Valley, in which the town of Collbran is located.)

The potential for oil and gas within the area is high.

*Suitable Timber:* The Forest Plan identifies no suitable timber in the Sunnyside area. The Battlement Mesa portion include 9200 acres of economically not suitable aspen.

Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

*Management Direction:* The Forest Plan Management Areas included within the Sunnyside area are: 4B Wildlife Habitat Management and 5A Big Game Winter Range. The Battlement Mesa area includes 5A Big Game Winter Range and 6B Livestock Grazing.

*Natural Integrity:* In the Sunnyside area, natural processes are intact and continuing.

The Battlement Mesa area has received extensive controlled burning to increase big game and livestock forage. This burning has imitated natural processes, but is the result of human intervention. McCurry Reservoir and numerous irrigation systems are located in the Battlement Mesa area. Natural processes have been modified.

BLM_0048166

*Apparent Naturalness:* The Sunnyside area appears natural.

The Battlement Mesa area appears natural to a slightly lesser degree. Irrigation systems and the system of open trails detract from the natural appearance, but once away from these modifications the natural appearance returns.

*Remoteness:* The Sunnyside area is very steep and inaccessible. Travel is difficult even on horseback. A person traveling on foot, struggling into the area, has a feeling that it is quite remote.

The Battlement Mesa area is also remote, though it contains a trail system open to motorized use (ATV's and motorcycles), travel off the trail system is difficult. Motorized travel off of the trail system is prohibited.

There is limited access to either area. FDR 275 reaches the area and marks the dividing point between the Sunnyside and Battlement Mesa segments. FDR 272 reaches the middle of the Battlement Mesa segment. FDR 271, a four wheel drive road, reaches the east end of the Battlement Mesa segment. The Sunnyside Road, also a rough four wheel drive route, reaches the west end of the Sunnyside segment. These access points are interconnected within the Roadless Area, except for the Sunnyside Road, which has no connection.

*Solitude:* A user of the Sunnyside area will experience solitude.

The sense of solitude will be less in the Battlement Mesa area. During the summer it will still be possible to experience solitude. During the fall big game seasons, this sense of solitude will be greatly diminished during periods of peak use.

*Special Features:* An isolated herd of bighorn sheep is found in the Sunnyside area. The Battlement Mesa area is also important habitat for mule deer and elk.

The geology of the Sunnyside area is an interesting feature.

*Manageability/Boundaries:* Because of the limited public access , the ruggedness of the area and the difficulty of travel within the area the area is manageable for its roadless qualities.

*Special Places/Special Activities:* The area contains important wildlife habitat. The water transported from the area is of vital importance to the adjacent private land owners who rely on it for irrigation. It is also an area of known oil and gas potential, with the Debeque gas field lying to the west and numerous producing gas wells to the north along the Colorado River/I 70 corridor.

## Roadless Area 194 - Nick Mountain

*Size and Location:* As inventoried in RARE II, the Nick Mountain Roadless Area is approximately 11,000 acres. All of the Roadless Area is within the Forest and within the analysis area.

The area is located 10 miles southwest of Collbran. The Roadless Area is bounded on the north and west by BLM and private lands. The southern boundary avoids FDR 254 and other developments near Twin Basin Reservoir and Bull Basin Reservoir No. 2. The east boundary is near the penstock that transports water from various reservoirs to the Bureau of Reclamation's Collbran Project.

The area received a non-wilderness recommendation as the result of RARE II. None of the area has been designated Wilderness.

*Oil and Gas Leasing:* There are existing leases occupying approximately 3720 acres within the Roadless Area. No drilling has occurred in the Roadless Area.

The potential for oil and gas within the area is high.

**Suitable Timber:** The Forest Plan identifies suitable timber scheduled for harvest during the next decade. Suitable conifer is identified on 1770 acres. Approximately 400 acres of economically not suitable and 1400 acres not suitable due to visual sensitivity are also identified.

Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

A portion of the Long Slough timber sale (scheduled for 1995) extends into the Roadless Area from Long Slough and Twin Basin Reservoir.

**Management Direction:** The Forest Plan Management Areas included within the Roadless Area are: 4B Wildlife Habitat Management, 5A Big Game Winter Range, and 6B Livestock Grazing.

A special order, not shown on the current Grand Mesa Travel Map, closes the western half of the area to motorized use.

**Natural Integrity:** Several thousand acres near Nick Mountain itself have been controlled burned for wildlife habitat improvement.

Crum Reservoir is man made. The operator of Crum Reservoir has motorized access to the reservoir from the north. Other irrigation systems extend into the area from Twin Basin Reservoir, Coon Creek, Water Dog Reservoir, and the Bull Reservoirs. A ditch comes out of Cottonwood Creek between Nick and Bald Mountains and runs north for approximately 1/4 mile to the Forest boundary.

An abandoned reservoir is located in section 10 southeast of Nick Mountain.

A penstock, road and 12.5 KV powerline form the east edge of the Roadless Area.

These activities have modified natural processes in their immediate area. Away from these influences, natural processes are intact and continuing.

**Apparent Naturalness:** Away from the constructed improvements described under Natural Integrity, the area appears natural.

**Remoteness:** Travel is difficult within the area. There are few trails. The west half of the area is closed to motorized vehicles both on and off roads.

Access to the area from the north is difficult. There is no public access across the private land. Cross country access through the BLM is difficult.

The area feels remote.

**Solitude:** Summer recreation use is low, but the sense of solitude is tempered by use that occurs in the vicinity of FDR 254 and the reservoirs to the south, and by the range permittees and water users within the area. There is little to attract summer recreation users within the Roadless Area.

The sense of solitude is less during the fall big game seasons. The area is popular with hunters. Daily encounters during the hunting season could exceed 12 per day. Hunting camps are concentrated around the edge of the area. Some interior camps are accessed with horses or jeeps from the south.

**Special Features:** There are no special features within the area.

**Manageability/Boundaries:** The southern boundary of the Roadless Area is indistinct. The other boundaries are well defined. It is possible to manage the area as roadless, but areas closer to the

BLM 0048168

southern edge will have fewer roadless characteristics (less solitude, less remoteness) due to the improvements, access, timber sales, and level of activity.

***Special Places/Special Activities:*** The water transported in the Bureau of Reclamation's penstock is used to generate power and is then sold to the Ute Water Conservation District.

### Roadless Area 195 - Kannah Creek

***Size and Location:*** As inventoried in RARE II, the Kannah Creek Roadless Area was approximately 34,600 acres. The Roadless Area is entirely on the Forest. Though the area received a Wilderness recommendation as a result of RARE II, none of the Roadless Area has been designated Wilderness.

All of the Roadless Area is within the analysis area.

The area is located on the west end of the Grand Mesa. To the north it is bounded by the Lands End Road FDR 100. To the west and south, its boundary is the National Forest boundary. The east boundary roughly parallels the rim of Grand Mesa. It contains the headwaters of the Kannah Creek.

A very small portion of the south boundary is shared with the BLM Adobe Badlands WSA. The Adobe Badlands WSA received a non-Wilderness recommendation from the BLM.

***Oil and Gas Leasing:*** There are existing oil and gas leases within the Roadless Area. These leases occupy approximately 990 acres. No drilling has occurred on these leases.

The potential for oil and gas within the area is high.

***Suitable Timber:*** The Forest Plan identifies 745 acres of suitable conifer timber within this area. Another 4,170 acres are not suitable because of sensitivity. The Forest Plan indicates that a timber sale is planned along the eastern boundary of the Roadless Area during the next decade. The Flowing Park timber sale extended into the Roadless Area in the area southwest of Flowing Park Reservoir.

Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

***Management Direction:*** The Forest Plan Management Areas included within the area are: 4B Wildlife Habitat Management, 5A Big Game Winter Range, 6B Livestock Grazing, and 7A Wood Fiber Production.

The Mesa Point Electronic Site is located in the southwest corner of the Roadless Area (T13S, R97W, 6thPM, Section 34). There are four transmitters at the site.

The area is open to grazing.

***Natural Integrity:*** Natural processes have been modified in the vicinity of the Flowing Park timber sale. In other areas within the Roadless Area natural processes are intact and continuing.

***Apparent Naturalness:*** Once away from the Flowing Park timber sale, the Electronic Site and the trails described under Remoteness, the area appears natural.

***Remoteness:*** The area is accessed by a system of foot and horse trails. The current travel management plan for the area shows the majority of the area, including these trails, closed to motorized use. That portion of the area east of the Grand Mesa rim, is open to snowmobiles operating on snow. There are no roads open to public use within the area, though the boundary of the area comes very close to the Lands End Road. Topography limits access into the area from the Lands End Road.

BLM_0048169

The Mesa Point Electronic Site is accessed by a road extending onto the Forest from adjacent BLM lands. This road is located in Wells Gulch. A buried powerline servicing the Electronic Site follows the road corridor.

Away from the influence of the Lands End Road, the Mesa Point Electronic Site and the activity around Flowing Park and Chambers Reservoirs, the area feels remote. This remoteness is greatest below the Grand Mesa rim and in the Kannah Creek basin.

*Solitude:* The trail system within the area receives use during the summer season as well as the fall big game seasons. Encounters with non-motorized users occur along this trail system but are not at a level that detracts from the sense of solitude experienced within the area. The sense of solitude is greatest within the Kannah Creek Basin. East of the Grand Mesa rim, near Flowing Park and Chambers Reservoirs, this feeling of solitude is lessened. This sense of solitude is also lessened at the Mesa Point Electronic Site.

*Special Features:* Kannah Creek provides municipal water for the City of Grand Junction.

*Manageability/Boundaries:* The rim of the Grand Mesa provides an easily defined boundary and physical barrier separating the core of the Roadless Area from the Flowing Park/Chambers Reservoir area.

*Special Places/Special Activities:* Public interest in maintaining the roadless character of the Kannah Creek basin is high.

Spectacular views into the basin and the valley beyond are possible from along the Grand Mesa rim.

### Roadless Area 196 - West Elk

*Size and Location:* As inventoried in RARE II, the West Elk Roadless Area was approximately 209,000 acres. This included approximately 87,000 acres that received a non-wilderness recommendation and 122,000 acres that received a Wilderness recommendation.

All of the Roadless Area was on the Forest.

P. L. 96-560 (12/22/80) added to the existing Wilderness from lands included in the RARE II inventory. West Elk Wilderness now totals approximately 176,000 acres.

Of the remaining inventoried Roadless Area approximately 28,000 acres are within the analysis area. This remaining area is split into six separate segments, located either along the Kebler Pass Road, on Snowshoe Mesa, on Coal Creek Mesa, north of Mount Lamborn, or southwest of Landsend Peak. (See Figure III-8a.)

*Oil and Gas Leasing:* There are existing oil and gas leases occupying approximately 705 acres within the Roadless Area. One of these leases is in the Snowshoe Mesa area. The other in the Mount Lamborn area.

The potential for oil and gas within the area is high on 17,240 acres, moderate on 10,960 acres, and no known potential on 95 acres.

*Suitable Timber:* The Forest Plan identifies no suitable timber acres within the Roadless Area. Approximately 1800 acres are identified as unsuitable because of visual sensitivity.

Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

BLM_0048170

***Management Direction:*** The Forest Plan Management Areas included within the Roadless Area in the analysis area are: 3A Semi-primitive Non-motorized Recreation, 4B Wildlife Habitat for Indicator Species, 5A Big Game Winter Range, and 6B Livestock grazing.

Approximately 1600 acres are within the 3A management area.

All of the area is open to grazing.

***Natural Integrity:*** The west half of the Coal Mesa area is leased for coal and is underlain by active mining. The east half of this area is included in an active coal exploration permit. Dozens of exploratory holes have been drilled. Subsidence of approximately one foot has occurred in the north west corner of this area. FDR 711 and its spurs are open, within the area. These factors combine to disrupt the natural integrity of the Coal Mesa area.

Natural processes in the remainder of the Roadless Area within the analysis area are intact and continuing.

***Apparent Naturalness:*** The Coal Mesa area appears to be modified by human influence. The remaining areas appear natural.

***Remoteness:*** The most remote portion of the Roadless Area is within the 3A Management Area. Other areas exhibit different levels of remoteness.

Areas adjacent to the West Elk Wilderness are more remote. Areas adjacent to the human activity that surrounds the Wilderness are less remote. A user leaving the Wilderness who has not yet encountered the human influences that surround the Wilderness may still experience a feeling of remoteness. A user leaving the human activity behind and traveling into the Wilderness my not have the same feeling of remoteness when in the same location.

Because of the road system in the Coal Creek Mesa area, this segment is not remote.

***Solitude:*** There is little opportunity for solitude within the Coal Creek Mesa area because of the roads associated with coal exploration.

The area southeast of Lost Lake, near Kebler Pass, is crossed by a system of trails that connect Lost Lake, Dollar Lake and Horse Ranch Park. This is a popular area where the number of encounters will limit the sense of solitude.

Like the feeling of remoteness, the sense of solitude will vary throughout the remainder of the area. The best opportunities for solitude have already been included within the West Elk Wilderness or within the 3A Management Area. Locations near the Wilderness boundary or the 3A Management Area will have greater opportunities for solitude than areas adjacent to the surrounding roads.

The sense of solitude will also vary with the user's frame of reference. A user entering the area from an urban environment will have a different sense of solitude than a user returning for several days of no encounters within the Wilderness.

***Special Features:*** The Kebler Pass Scenic Byway Corridor is adjacent to portions of the area. The visual quality of the Roadless Area as viewed from the byway is important.

Landsend Peak and Mount Lamborn are landmarks of special importance to residents of the Paonia, Hotchkiss and Crawford areas.

Wiley Springs, in the Landsend segment, provides water to the community of Crawford.

BLM_0048170

Oil and Gas Leasing Analysis FEIS

*Manageability/Boundaries:* The remaining Roadless Area is broken into small segments, by roads. The Wilderness and the 3A Management area contain the remnants most manageable for roadlessness. The segments adjacent to the Wilderness boundary retain at least some of their manageability as roadless. The Wilderness acts as a unifying tie between these small segments.

*Special Places/Special Activities:* Scenic views along the Kebler Pass Road, especially those involving stands of aspen, are special to the public.

### Roadless Area 200 - Whetstone Mountain

*Size and Location:* As inventoried in RARE II, the Whetstone Mountain Roadless Area was approximately 15,400 acres. All of the Roadless Area is on the Forest. None of the Roadless Area has been designated Wilderness. Approximately 13,100 acres of the Roadless Area are within the analysis area.

The Roadless Area is bordered on the north by the Kebler Pass Road and the National Forest boundary, two miles south of Crested Butte. The east boundary is Squaw Gulch. The west boundary avoids the Ohio Pass and Splain Gulch Roads. The southern boundary follows the Forest boundary and avoids roads leading to private land within and adjacent to the Roadless Area.

*Oil and Gas Leasing:* There is one existing oil and gas lease within the Roadless Area, occupying approximately 1900 acres. There has been no drilling in the Roadless Area.

The potential for oil and gas within the area is low and no known.

*Suitable Timber:* The Forest Plan identifies approximately 2400 acres of suitable timber within the portion of the Roadless Area in the analysis area. Another 6000 acres not suitable because of economics are also identified. Seventy acres are identified as not suitable because of visual sensitivity. Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

There are no timber sales planned during the next decade.

*Management Direction:* The Forest Plan Management Areas in the portion of the Roadless Area within the analysis area include: 2A Semi-primitive Motorized Recreation, 6B Livestock Grazing and 7A Wood Fiber Production.

The area is open to grazing.

*Natural Integrity:* There have been no timber sales, controlled burns or other vegetative treatments within the area. The area is crossed by both system and non-system roads and trails. The Bulkley Mine, just northeast of the area, was mined for gold and other hard rock minerals. Other mining remains may be found within the area. Away from these disturbances natural processes are in place and continuing.

*Apparent Naturalness:* Once away from roads that border the area and the travel routes within it, the area appears natural.

*Remoteness:* The terrain is steep and rugged. Portions of the area are heavily timbered. Cross country travel between the Green Lake area (over Mt. Axtel and Gibson Ridge) and the remainder of the Roadless Area is difficult. The area surrounding Whetstone Mountain itself, is difficult to access.

These factors create a feeling of remoteness in parts of the area. This remoteness is diminished in other portions of the area because of the system and non-system travel routes surrounding and within the Roadless Area.

Affected Environments
Roadless Areas

BLM 0048172

The trail leading to Carbon Peak is not on the transportation system but is traveled by mountain bicycles. FDR 737 provides access to 160 acres of private land located roughly in the center of the area. FDR 563, which borders the southeastern portion of the area, has been improved to a log truck standard for timber removal from private land outside the Roadless Area. The Kebler Pass and Ohio Pass Roads are all weather passenger car roads. FDR 730.1D penetrates into the area 1 mile, from the Ohio Pass Road. From here on it becomes Trail 436 and connects with FDR 737. The route extending southwest from the Bulkley Mine is not on the transportation system. The route to Green Lake from the Kebler Pass Road, is passable to 4x4 trucks for most of its length. A non-system route ties Green Lake to BLM and private lands. This route is popular with mountain bicyclists.

With is variety of access routes surrounding and penetrating the Roadless Area, it is not remote.

*Solitude:* The area offers mixed opportunities for solitude.

Green Lake, with its access route and popularity with fishermen, offers little opportunity for solitude. The other extreme within the Roadless Area is Whetstone Mountain. It's distance from a public access point, the lack of public access to Highway 135, and the difficulty of cross country travel from Green Lake, permit this portion of the Roadless Area to provide good opportunities for experiencing solitude.

Solitude within the remainder of the area is tempered by the presence of travel routes and the activity on them. Opportunities for solitude decrease during the fall big game season as hunting camps are placed along the travel routes.

Overall the area offers a moderate opportunity for solitude.

*Special Features:* The route of FDR 730.1D was at one time a railroad grade.

*Manageability/Boundaries:* The shape and size of the area permit its management as roadless. Roads within the area would have to be closed to manage the area in this way.

*Special Places/Special Activities:* Green Lake is popular for fishing.

The town of Crested Butte, located two miles northeast of the Roadless Area, is a focus point for mountain bicycling. The Roadless Area is popular for mountain biking.

### Roadless Area 201 - Flat Top Mountain

*Size and Location:* As inventoried in RARE II, the Flat Top Mountain Roadless Area was approximately 19,800 acres. Only 110 acres of the Roadless Area is in the analysis area. None of the Roadless Area has been designated Wilderness.

The Roadless Area is broken into three segments by existing roads. The segment in the analysis area is bordered on the south by FDR 829. On the north it is bordered by private land inholdings and the road that accesses them. The west boundary of the segment is the National Forest boundary. The east boundary is formed in part by the Forest boundary.

The area is located 14 miles north of Gunnison and 9 miles east of the West Elk Wilderness.

*Oil and Gas Leasing:* There are no existing oil and gas leases within the Roadless Area.

The potential for oil and gas within the area is low and no known.

*Suitable Timber:* The Forest Plan identifies 60 acres of suitable timber within the portion of the Roadless Area within the analysis area. Another 35 acres not suitable because of economics, are also

BLM_0048173

Oil and Gas Leasing Analysis FEIS

identified. Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

There are no timber sales planned during the next decade.

***Management Direction:*** The Forest Plan Management Areas within that portion of the Roadless Area within the analysis area include 2A Semi-primitive Motorized Recreation, 4B Wildlife Habitat Management and 6B Livestock Grazing.

The area is open to grazing.

***Natural Integrity:*** Natural processes are in place and continuing.

***Apparent Naturalness:*** Once away from roads that border the area to the south and north, and the subdivided private land, the area appears natural.

***Remoteness:*** The area is not remote.

The area is approximately 1 mile wide and 4 miles long. The northeast corner of the area is the furthest removed from the roads described under Size and Location, but most of the area is within 1/2 mile of a road.

***Solitude:*** The portion of the area within the analysis area is adjacent to a 2-wheel drive road accessing the private land to the north. To the south, FDR 829 is a 4-wheel drive road leading to Big Alkali Lake and a permitted cow camp. This area receives year round use that peaks during the fall big game seasons. Opportunities for solitude are limited.

***Special Features:*** There are not special features within the Roadless Area.

***Manageability/Boundaries:*** The RARE II area is broken into three segments. The shape, size and proximity of roads and private land subdivisions detract from the manageability of the segment within the analysis area as roadless.

***Special Places/Special Activities:*** The area provides good elk summer range and is popular for elk hunting.

### Roadless Area 241 - Roubideau

***Size and Location:*** As inventoried in RARE II, the Roubideau Roadless Area was approximately 19,800 acres. The Roadless Area is entirely on the Forest. Though the Roadless Area received a Wilderness recommendation as a result of RARE II, none of the Roadless Area has been designated Wilderness.

Approximately 6,500 acres of the Roadless Area is within the analysis area.

The area is located 18 miles west of Montrose.

The north boundary of the Roadless Area is formed by the Forest boundary with lands administered by the BLM. These lands are within the BLM's Camel Back Wilderness Study Area. This study area has received a non-wilderness recommendation from the BLM. The east boundary avoids the nearby Transfer Road FDR 508 and Roatcap Road FDR 542. The south and west boundaries avoid other roads extending toward the Roadless Area from the Divide Road FDR 402.

***Oil and Gas Leasing:*** There are no existing oil and gas leases within the Roadless Area. The potential for oil and gas within the area is high on 6435 acres, low on 50 acres.

BLM 0048174

The adjacent BLM Camel Back WSA is not available for oil and gas leasing until its status as a Wilderness Study Area is resolved.

*Suitable Timber:* The Forest Plan identifies suitable timber scheduled for harvest in the portion of the Roadless Area that is within the analysis area. Approximately 800 acres are suitable aspen. Another 600 acres are suitable conifer. Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

*Management Direction:* The Forest Plan Management Areas included within the Roadless Area are: 4B Wildlife Habitat, 4D Aspen Management, 5A Big Game Winter Range, 6B Livestock Grazing, and 7A Wood Fiber Production.

The area is open to grazing.

*Natural Integrity:* An ongoing program of controlled burning, done cooperatively with the Colorado Division of Wildlife, has burned several of the oak brush basins within the Roadless Area, including: Horseshoe Basin and East Basin. The Davis Point area has also been burned. This burning has sought to improve Big Game Winter Range by restoring fire to the area, mimicking natural processes.

In other portions of the Roadless Area, natural processes are in place and continuing.

One permitted irrigation system diverts water from the Roubideau Creek drainage, above the Roadless Area. This system diverts water only during the spring snow melt. Current amounts of diversion have no effect on the natural processes within Roubideau Creek.

*Apparent Naturalness:* Several trails within the Roadless Area, as well as some stock trails and low standard roads have been dozer constructed. The great majority of the Roadless Area is away from these facilities and appears natural.

*Remoteness:* The area is accessed by the Pool Creek, Roubideau, Transfer, Traver, and Ben Lowe Trails. These routes and the area off the trail system are open to motorized travel. Trail alignment and the surrounding terrain limit the amount of motorized use that occurs both on and off the trails. The Tabeguache Trail (a mountain bicycle route through the Forest which links together roads and trails) avoids the Roadless Area.

Full size vehicle access is possible into the fringes of the Roadless Area, but difficult into the area's basins. Foot and horse are the most frequent forms of access into the Roadless Area.

Due to the difficulty of access, the area remains remote. Locations within the canyon core of the Roadless Area along Roubideau Creek are the most remote.

*Solitude:* The canyon core receives little summer use. It is possible to visit the area and experience no encounters with others. The sense of solitude is great.

Hunting seasons increase the use of the area. Encounters are more frequent. The sense of solitude is less.

*Special Features:* On the Uncompahgre Plateau, the Roubideau Roadless Area is one of the most remote and difficult to access.

*Manageability/Boundaries:* The area is large enough to maintain its naturalness and remoteness. While portions of the Roadless Area boundary do not follow any distinct landform, once away from the fringe, steep sandstone slopes rim most of the area.

BLM_0048175

Oil and Gas Leasing Analysis FEIS

*Special Places/Special Activities:* The area has been included in several recent Wilderness proposals. Interest in making this area a Wilderness is high.

The one permitted outfitter operating in the area is keenly interested in making the area a Wilderness.

The area's remoteness, wildlife value, scenery, and solitude are important to those favoring Wilderness designation. As a Wilderness the area would include mid and lower elevation plant communities not well represented in existing higher elevation Wilderness.

### Roadless Area 242 - Tabeguache

*Size and Location:* As inventoried in RARE II, the Tabeguache Roadless Area was approximately 10,200 acres. The Roadless Area is entirely on the Forest. Though the Roadless Area received a Wilderness recommendation as a result of RARE II, none of the Roadless Area has been designated Wilderness.

Approximately 8400 acres of the Roadless Area is within the analysis area.

The area is located 6-8 miles northeast of Nucla.

The west boundary of the Roadless Area is formed by the Forest boundary with lands administered by the Bureau of Land Management. These lands are within the BLM's Tabeguache Wilderness Study Area. Almost all of this study area (7748 acres) has received a Wilderness recommendation from the BLM.

On the National Forest, the boundary of the Roadless Area follows the rim of Tabeguache Creek and the North Fork of Tabeguache, while avoiding the main Delta-Nucla and Divide Roads. The boundary also avoids road in the Pinto Mesa, Copper King and Spruce Mountain areas.

The Tabeguache Roadless Area has been included in several Wilderness proposals. At least one of these proposals extended the area being considered for Wilderness beyond the boundary of the inventoried RARE II area, to include lands north and north east of Spruce Mountain. This proposed Wilderness boundary is shown on a map entitled, Tabeguache Wilderness Proposal, Map Date, February 1, 1992, contained within the project file.

*Oil and Gas Leasing:* There are four existing oil and gas leases within the Roadless Area occupying approximately 1000 acres.

Oil and gas potential in that portion of the Roadless Area within the analysis area is high.

The adjacent BLM Tabeguache WSA is not available for oil and gas leasing until its status as a Wilderness Study Area is resolved. If it becomes Wilderness it will not be available for leasing.

*Suitable Timber:* The Forest Plan identifies approximately 800 acres of suitable timber within the portion of the Roadless Area in the analysis area. Approximately 1000 acres are identified as not suitable because of visual sensitivity. Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

*Management Direction:* The Forest Plan Management Areas included within the Roadless Area are: 4B Wildlife Habitat, 5A Big Game Winter Range, 6B Livestock Grazing, 7A Wood Fiber Production, and 10A Research Natural Area.

The area is open to grazing.

BLM 0048176

***Natural Integrity:*** Natural processes are in place and operating within the Roadless Area. There is little evidence of human induced change.

Outside of the Roadless Area, as defined by RARE II, but within the area proposed for Wilderness in the previously cited map dated February 1, 1992 is a series of clearcuts and their associated roads. Natural processes have been altered in this part of the Roadless Area.

***Apparent Naturalness:*** Except within the vicinity of the timber sales just described, the area appears natural.

***Remoteness:*** Access is limited. Travel is difficult. The area is remote.

The area is accessed by the Indian Trail 500. Motorized travel is allowed both on and off trails, but terrain and trail condition limits motorized use. The trail was difficult to find until it was recently maintained. Foot and horse are the typical modes of access.

Roads lead up to the Roadless Area boundary through private land below the National Forest, at The Meadows Ranch. These roads are not open to public use.

Once into the canyon the nearby roads such as those on Pinto Mesa, Copper King, and the Delta-Nucla Road do not detract from the areas remoteness. The exception to this feeling of remoteness is the area near the clearcuts north and east of Spruce Mountain.

***Solitude:*** The canyon receives little summer use. It is possible to visit the area and experience no encounters with others. The sense of solitude is great. Some increase in summer use has been observed during the last year because people had heard of the Tabeguache Wilderness and wanted to find it.

Hunting seasons increase the use of the area, but only slightly.

***Special Features:*** The proposed Tabeguache Research Natural Area (Management Area 10A) is within the Roadless Area.

***Manageability/Boundaries:*** Though very narrow (only one mile wide in places), a well defined topographic boundary can be created around the Roadless Area. Especially in conjunction with the BLM lands proposed for Wilderness, below the National Forest. The area is manageable for its roadless qualities.

***Special Places/Special Activities:*** Public interest in making this area Wilderness continues to be expressed. It continues to be included in Wilderness proposals before Congress. As Wilderness, it would contain vegetation types not well represented in current Colorado Wilderness area. It also would not be a headwaters Wilderness.

### Roadless Area 243 - Kelso Mesa

***Size and Location:*** As inventoried in RARE II, the Kelso Mesa Roadless Area was approximately 34,000 acres. The area received a non-wilderness recommendation. None of the Roadless Area has been designated Wilderness.

Approximately 1200 acres in the southwest corner of the Roadless Area are within the analysis area.

The area is located on the east side of the Uncompahgre Plateau, approximately 24 miles southwest of Delta.

BLM 0048177

Oil and Gas Leasing Analysis FEIS

***Oil and Gas Leasing:*** There are no existing oil and gas leases within the Roadless Area.

There is no known potential for oil and gas within the area.

***Suitable Timber:*** The Forest Plan identifies no suitable timber within that portion of the Roadless Area in the oil and gas analysis area. There are 945 acres currently not suitable because of economics, within the analysis area. Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

***Management Direction:*** The Forest Plan Management Areas included within the area are 4B Wildlife Habitat and 6B Livestock Grazing.

***Natural Integrity:*** Natural processes are in place and continuing throughout the Roadless Area.

There is little human induced change.

***Apparent Naturalness:*** The area appears natural.

***Remoteness:*** Access into the area is difficult. Private land in the vicinity of Middle Point blocks access into the area from the Divide Road. Private land southwest of Escalante Forks blocks access from the north. Access is difficult and although the area is open to motorized vehicle travel (both on and off roads and trails), most of the access into the area is by foot or horse. The area is remote.

***Solitude:*** Use of the area is heaviest during the fall big game seasons. The sense of solitude is less then than during the summer season when there is little use within the area because of the lack of attractions.

***Special Features:*** The lack of roads and the difficulty of access makes the area attractive to wildlife, which in turn attracts hunting use during the fall big game seasons. One permitted outfitter operates into the area from the private land near Middle Point. Elk hunting is good because of the remoteness and lack of access.

***Manageability/Boundaries:*** The size, shape, and boundaries of the area make it possible to manage it to preserve its roadless character.

***Special Places/Special Activities:*** No other area of this size with the remoteness and difficulty of access is found on the Uncompahgre Plateau. The other inventoried Roadless Areas on the Plateau are one third to two thirds this size.

### Roadless Areas 246 - Campbell Point
### 247 - Johnson Creek

***Size and Location:*** The Campbell Point and Johnson Creek Roadless Areas both lie on the west side of the Uncompahgre Plateau, approximately ten miles northeast of Uravan. They are separated by a narrow corridor surrounding FDR 411, the Campbell Point Road. Both Roadless Areas border the Forest boundary with BLM lands. They are similar enough to be discussed together.

As inventoried in RARE II, Campbell Point Roadless Area was approximately 11,300 acres. Only 395 acres of the Roadless Area are within the oil and gas analysis area. RARE II inventoried the Johnson Creek Roadless Area as 10,300 acres. Approximately 5,340 acres are within the analysis area.

Both areas received non-wilderness recommendations. Neither has been designated Wilderness.

BLM_0048178

***Oil and Gas Leasing:*** There are no existing oil and gas leases within the Campbell Point Roadless Area. There are three leases within the Johnson Creek Roadless Area, occupying 1100 acres. There has been no ground disturbing activity within the Roadless Area on these leases.

The potential for oil and gas within the portion of the Campbell Point area in the analysis area, is moderate. The potential for the Johnson Creek area is moderate on 4245 acres and no known on 1090 acres.

***Suitable Timber:*** Within the analysis area, the Forest Plan identifies no suitable timber within the Campbell Point area, and 70 acres of suitable aspen within the Johnson Creek area.

Table III-12 displays the number of acres by timber suitability type within the Roadless Area.

***Management Direction:*** The Forest Plan Management Areas included in these two Roadless Areas are: 4B Wildlife Habitat for Indicator Species, 4D Aspen Management, 5A Big Game Winter Range, and 7A Timber Management. Both areas are open to grazing.

***Natural Integrity:*** An area along the northeast edge of the Campbell Point Roadless Area was included in the completed Long Canyon timber sale. Long Canyon has also been included in a prescribed fire.

Within the Johnson Creek Roadless Area, Mesa Creek has been burned to improve wildlife forage.

Natural processes are intact and continuing in the remainder of both areas.

***Apparent Naturalness:*** Once away from the timber activity near Long Canyon, the areas appear natural.

***Remoteness:*** There are trails in each area. Terrain limits travel predominately to horse and foot. This is unlike the BLM lands below the Campbell Point Roadless Area, which are heavily roaded as a result of uranium exploration. The presence of this dense road system lessens the feeling of remoteness within the Campbell Point Roadless Area.

A portion of the Campbell Point Roadless Area is closed to motorized travel off of designated routes.

***Solitude:*** There are no attractions within the areas to draw summer users. The areas are hot and dry. Summer use is light and the chance for solitude is great. Use increases during the fall big game seasons. Use of the areas is greater near their upper boundaries, where roads permit vehicle access close to the Roadless Areas, from the Divide Road.

***Special Features:*** The most important feature of these Roadless Areas is the wildlife habitat that they provide. Mountain lion hunting is a potential activity within the areas. This is an activity that has only a limited occurrence on the Forest.

Vantage points within the areas can provide views into Utah and the La Sal Mountains, to the west.

***Manageability/Boundaries:*** The two Roadless Areas are long and narrow (2 to 3 miles wide, 15 miles long) and lie between the roaded BLM land to the west, and roaded National Forest along the Divide Road to the east. The two areas are split by FDR 411.

The roads on the National Forest are confined to the flatter terrain to the east and do not descend the steep slopes into the Roadless Areas. In the absence of oil and gas leasing, it would be possible to continue their condition as roadless.

BLM_0048179

Oil and Gas Leasing Analysis FEIS

***Special Places/Special Activities:*** No special places or activities have been identified in these Roadless Areas.

# Research Natural Areas

There are approximately 655 acres of this environment within the analysis area. Figure III-9 is a reduced scale map showing the approximate location of these areas.

There are no established Research Natural Areas in the analysis area; however, a Tabeguache Research Natural Area, located nine miles north of Nucla, has been proposed. This 655 acre site contains ponderosa pine. Management prescription 10A is assigned to Research Natural Areas.

A Research Natural Area is a physical or biological unit in which current natural conditions are maintained insofar as possible. These conditions are ordinarily achieved by allowing natural physical and biological processes to prevail without human intervention. However, under unusual circumstances, deliberate manipulation may be utilized to maintain the unique feature that the Research Natural Area was established to protect (FSM 4063.05). In Research Natural Areas, the emphasis is on research, study, observations, monitoring and educational activities that are non-destructive and non-manipulative, and that maintain unmodified conditions.

At the time a research natural area is established, procedures for withdrawal from mineral entry and leasing will be initiated (FSM 4063.49, R2 Supplement No. 1).

# Sensitive Areas

There are approximately 29,000 acres of this environment within the analysis area. Figure III-10 is a reduced scale map showing the approximate location of these areas.

Between the draft and final SEIS for the Amended Plan, the Forest evaluated all tentatively suited (for timber harvest) lands on a site-specific basis, using 1:24,000 scale topographic maps together with field verification and on-the-ground knowledge of Ranger District personnel. One of the criteria in this evaluation included lands proposed for resource uses that precluded intensive land development, such as timber harvest. The lands identified in this category were called Sensitive Areas. Nine Sensitive Areas identified in the 1991 amended Forest Plan are in the analysis area. They are:

1. Kebler Pass area
2. Raggeds Bench area
3. Powderhorn Ski Area
4. Bull Reservoir area
5. Upper Hotel Lake/Crag Crest area
6. Kannah Creek area
7. Tabeguache area
8. Beaver Ponds/Eureka area
9. Carson Lake area

# Retention VQO

There are approximately 7,800 acres of this environment within the analysis area. Figure III-11 is a reduced scale map showing the approximate location of these areas.

Retention VQO (visual quality objective) provides for management activities which are not visually evident to the casual forest visitor. Under Retention, activities may only repeat the form, line, color and

BLM_0048180

texture found in the natural landscape. Changes in the visual qualities of size, amount, intensity, direction, pattern, etc. of the natural landscape should not be evident. Management activities can take place, but their design must be such that landscape modification, such as the cutting of trees or the construction of a road would not be noticeable at first glance.

Major highways, high use area, and water bodies in areas where the landform, rock form, vegetation patterns, water forms, and lakes and streams have distinctive scenic qualities, are typically assigned a Retention VQO. In the analysis area, Retention VQO can be found along the Grand Mesa and West Elk Loop Byways, along the Crag Crest National Recreation Trail, in the Alexander Lodge and Granby Lakes areas, and in the cliff portions of the flanks of Grand Mesa. There is no Retention VQO mapped on the Uncompahgre Plateau portion of the analysis area.

# Retention VQO and Low VAC

There are approximately 7,210 acres of this environment within the analysis area. Figure III-12 is a reduced scale map showing the approximate location of these areas.

These are areas of Retention VQO that also have a low visual absorption capability (VAC). Retention VQO is discussed above. An area may be assigned a Low VAC because of a combination of physical and biological, observer, or existing visual quality factors. An area of Low VAC could not be modified without that modification being obvious to the viewer.

The physical and biological factors considered in determining the VAC of a landscape includes: Slope, vegetative pattern variety, vegetative screening ability, vegetative regeneration potential, and the soil characteristics of productivity, color and erosion potential.

As the slope increases, the VAC decreases because it is more difficult to regenerate steep slopes, activities are more highly visible on steep slopes, and on steep slopes openings become more evident.

The greater the diversity or complexity of a landscape, the better it can accept modification without visual degradation, i.e., disturbance of a homogenous landscape stands out.

Increased density and height of vegetative cover increases the screening potential, and thus the VAC.

Lands that can revegetate rapidly will have a higher VAC. A dry, arid, compacted site would have a Low VAC because of its low regeneration potential.

On productive lands, scars will heal relatively fast. Where slopes are oversteepened, activity scars may never heal, due to constant soil movement. Lands with light colored soils are more noticeable when exposed during disturbance, and therefore would have a lower VAC than dark colored soils.

Observer related factors include: the distance the observer is from the disturbance, where the observer is in relation to the disturbance (both horizontally and vertically), the length of time the observer views the landscape, the speed of travel, and the number of times the observer can see the particular landscape from key viewpoints.

The existing visual quality refers to the absence or extent of modification which has already occurred, i.e., the naturalness of the landscape due to man's activities.

In the analysis area, the combination of Retention VQO and Low VAC occurs in scattered areas along major roads on Grand Mesa, and along the Kebler Pass road.

BLM_0048181

Oil and Gas Leasing Analysis FEIS

## Scenic Byway Corridors

There are approximately 18,140 acres of this environment and 55 miles of byway roads within the analysis area. Figure III-13 is a reduced scale map showing the approximate location of these areas.

There are three (3) Scenic Byways that pass through and one (1) that is adjacent to the analysis area. The three Scenic Byways that pass through the analysis area are: 1) Grand Mesa Scenic and Historic Byway, 2) West Elk Loop Scenic and Historic Byway, and 3) Unaweep/Tabeguache Scenic and Historic Byway. The San Juan Skyway National Scenic Byway is adjacent to the analysis area.

### Grand Mesa Scenic and Historic Byway

The 65 mile route across Grand Mesa was designated by the State of Colorado Transportation Commission as a State Scenic and Historic Byway on September 21, 1991 with the northern extension being added on February 20, 1992. It was also designated by Forest Service Chief Dale Robertson as a National Forest Scenic Byway in March 1992. Thirty four (34) miles of this route are within the analysis area. The byway (State Highway 65), extends from Interstate 70 on the northwest, through Plateau Creek Canyon, up onto the Grand Mesa and back down to the town of Cedaredge on the south. It includes a 13 mile spur out the Lands End Road to Lands End Observatory (Lands End Visitor Center). Grand Mesa is the "world's largest flat top mountain"; a place the Ute Indians call Thunder Mountain. It is in reality a massive forested mesa surrounded by semi-arid lowlands. It is a hidden oasis of more than 300 lakes and reservoirs, a garden of wildflower meadows and a forest of aspen and spruce. The area is rich in cultural resources, ranging from early ranching to the country's first Forest Ranger, Civilian Conservation Corps, and recreation use.

### West Elk Loop Scenic and Historic Byway

The 205 mile route around the West Elk Wilderness and adjacent to the Raggeds Wilderness is proposed for National Forest Scenic Byway designation. It was designated by the State of Colorado Transportation Commission as a State Scenic and Historic Byway on September 21, 1991. Twenty (20) miles of this route are within the analysis area. The route passes through scenic river valleys, over mountain passes with far reaching vistas, down through river canyons and out onto open valley floors which abound with working cattle ranches and fruit orchards. In the fall, stately stands of aspen groves found on the mountain passes, provide a colorful contrast to the red hues of scrub oak in the lower terrain. Alpine meadows on McClure Pass and Kebler Pass abound with wildflowers during the summer months. Cultural resources along the way include Dominguez and Escalante exploration, coal mining, railroading, and ranching.

### Unaweep/Tabeguache Scenic and Historic Byway

The 138 mile byway highlights western Colorado's canyon and ranch country. It was designated by the State of Colorado Transportation Commission as a State Scenic and Historic Byway on October 18, 1990. One mile of this route passes through the analysis area. This Byway traverses some spectacular sandstone canyon and arid ranch country of western Colorado. Cultural resources include Dominguez and Escalante exploration, uranium mining, ranching, and utopian town development.

### San Juan Skyway National Scenic Byway

The 232 mile route through the San Juan Mountains of southwestern Colorado, including the historical section of the "Million Dollar Highway", was designated by Forest Service Chief Dale Robertson as a National Forest Scenic Byway on November 11, 1988. It was also designated by the State of Colorado Transportation Commission as a State Scenic and Historic Byway on September 22, 1989. Forty-seven (47) miles of this route, from Ridgway to Lizard Head Pass, are adjacent to the

BLM_0048182

analysis area. This was the first designated  National Scenic Byway in the State.  This nationally popular drive connects the historic towns of Durango, Silverton, Ouray, Ridgway, Telluride, Rico and Cortez.  The Byway traverses some of the most spectacular, rugged and primitive landscapes in America.  The area is rich in cultural resources ranging from the Archaic and Anasazi habitations, to the colorful mining era of the San Juan Mountains in the 1800's, including the development of the narrow gauge railways through the area.

## Semi-primitive Non-motorized (3A Management Areas)

There are approximately 13,700 acres of this environment within the analysis area.  Figure III-14 is a reduced scale map showing the approximate location of these areas.

Semi-primitive Non-motorized recreation is the management emphasis for these areas, in both roaded and unroaded areas.  Recreation opportunities such as hiking, horseback riding, hunting, cross-country skiing, etc. are available.  Visual resources are managed so that development activities are not visually evident or remain visually subordinate.  Retention VQO is the norm in 3A Management Areas.  Partial Retention VQO is inconsistent with the management prescription and the ROS class.  User density is controlled by access.  There are five (5) 3A management areas in the analysis area.  They are:

1. Crater Lake area, located west of Overland Reservoir in the headwaters of Cow Creek, a tributary of West Muddy Creek. This is also one of the Dispersed Recreation Complex areas.  It covers approximately 3,700 acres.

2. Muddy Basin area, located in the headwaters of East Muddy Creek.  It covers approximately 1,250 acres.

3. Horse Ranch Park area, located west of Kebler Pass, is adjacent to the Raggeds Wilderness area.  It covers approximately 2,550 acres.

4. Beckwith Peaks area, north of the West Elk Wilderness area and south of Lost Lake. It covers approximately 2,900 acres.

5. Crag Crest National Recreation Trail, on Grand Mesa, covers approximately 2,700 acres in the analysis area.

## Administrative Sites

There are 10 building sites in the analysis area.  Eight (8) of them are Administrative Sites and two (2) are recreation visitor centers.  The two recreation visitor centers are identified under recreation.  The eight Administrative Sites are displayed in the following table.

BLM_0048183

Oil and Gas Leasing Analysis FEIS

| TABLE III-13. ADMINISTRATIVE SITES WITHIN ANALYSIS AREA | | | | |
|---|---|---|---|---|
| **SITE NUMBER** | **SITE NAME** | **DISTRICT** | **NUMBER OF BUILDINGS > 100 SQ.FT.** | **TOTAL SQ.FT. BUILDING SPACE** |
| 1 | Hightower | Collbran | 1 | 540 |
| 2 | Lone Cone | Norwood | 2 | 1,920 |
| 3 | Mesa Lakes | Collbran | 5 | 4,940 |
| 4 | Sanborn (4 trailer spaces - to be phased out) | Norwood | - | 0 |
| 5 | Silesca | Ouray | 2 | 1,632 |
| 6 | Tab Basin (1 trailer) | Norwood | 2 | 1,104 |
| 7 | Ward Lake | Grand Junction | 5 | 3,897 |
| 8 | West Muddy | Paonia | 2 | 1,329 |

# Recreation Complexes

There are approximately 62,975 acres of this environment within the analysis area.

Recreation Complexes are areas of high density recreation use, mixed kinds of recreation use, sensitive recreation areas, or specialized recreation use. They include groups of facilities such as campgrounds, picnic grounds, visitor centers, interpretive sites, overlooks, permitted recreation residences, permitted lodges/resorts, permitted ski areas and Administrative Sites. Recreation Complexes have been grouped into three types. They are: 1) Developed Recreation Complexes, 2) Dispersed Recreation Complexes, and 3) Major Trail Systems. Sensitivity levels were subjectively set based on use (numbers of PAOT), amount of development, and proximity to State and Nationally designated sites.

## *Developed Recreation Complexes*

Ten Developed Recreation Complexes have been identified in the analysis area. Figure III-15 is a reduced scale map showing the approximate location of these areas. They are:

1. The Powderhorn Ski Area complex, located on the north side of the Grand Mesa. It has a capacity of 1800 SAOT's. This is a highly sensitive Recreation Complex. (16,005 acres)

2. The Mesa Lakes complex, located on the north side of Grand Mesa. It includes two campgrounds (210 PAOT), two picnic grounds (95 PAOT), 33 recreation residences (132 PAOT), one lodge - resort (90 PAOT), and an Administrative Site. It is a highly sensitive Recreation Complex. (1825 acres)

Affected Environments
Recreation Complexes

BLM_0048184

3. The Island/Ward lake complex, located on the south side of Grand Mesa. It includes one visitor center (75 PAOT), five campgrounds (700 PAOT), two picnic grounds (40 PAOT), one boat ramp (35 PAOT), two Trailheads (85 PAOT), one interpretive site (35 PAOT), seven recreation residences (28 PAOT), two lodges - resorts (235 PAOT), and an Administrative Site. It is a highly sensitive Recreation Complex. (1870 acres)

4. The Grand Mesa complex, located south of Baron Lake, on the south side of Grand Mesa. It includes one campground (60 PAOT) and one organizational camp (150 PAOT). This is a moderately sensitive Recreation Complex. (1710 acres)

5. The Big Creek Reservoir complex, located on the northeast side of Grand Mesa. It includes one campground (130 PAOT). This is a moderately sensitive Recreation Complex. (580 acres)

6 . The Cottonwood Lake complex, located on the north side of Grand Mesa. It includes one campground (210 PAOT). This is a moderately sensitive Recreation Complex. (980 acres)

7. The Leon Peak complex, located on the east end of Grand Mesa. It includes two campgrounds (125 PAOT) and the dispersed area around Leon Lake. This is a moderately sensitive Recreation Complex. (2335 acres)

8. The Lost Lake complex, located near Kebler Pass. It includes one campground (65 PAOT), one lodge - resort (35 PAOT), and seven recreation residences (20 PAOT). This is a moderately sensitive Recreation Complex. (1115 acres)

9. The McClure Pass complex  includes one campground (95 PAOT). It is a highly sensitive Recreation Complex. (1360 acres)

10. The Lands End Complex, located at the Lands End Observatory and in Whitewater Basin (at the westernmost end of Grand Mesa). It includes an overlook and visitor center (35 PAOT). It is a highly sensitive Recreation Complex. (2385 acres)

### *Dispersed Recreation Complexes*

Five Dispersed Recreation Complexes have been identified in the analysis area. Figure III-16 is a reduced scale map showing the approximate location of these areas. They are:

1. The Kannah Creek Primitive area, on the west side of Grand Mesa. It is the only area outside of designated Wilderness that is classified as a Primitive (P) ROS class. The nearest roads are 3 miles away or separated from it by the rim of Grand Mesa. This is a highly sensitive Recreation Complex. (10,550 acres)

2. The Granby Reservoir area on the south side of Grand Mesa, is a popular 4 wheel-drive - backcountry fishing area and is classified as a Semi-primitive Motorized (SPM) ROS class. This is a highly sensitive Recreation Complex. (3720 acres)

3. The Flat Tops area on the northeast side of Grand Mesa, is classified as Semi-primitive Non-motorized (SPNM) and Semi-primitive Motorized (SPM) ROS classes. This is a moderately sensitive Recreation Complex. (16,105 acres)

4. The Crater Lake complex, west of Overland Reservoir, is classified as a Semi-primitive Non-motorized (SPNM) ROS class. This is a moderately sensitive Recreation Complex. (6410 acres)

BLM_0048185

5. The Priest Mountain Area, at the head of Leroux Creek. It is classified as Semi-primitive Non-motorized (SPNM) and Semi-primitive Motorized (SPM) ROS classes. This is a moderately sensitive Recreation Complex. (4895 acres)

### Major Trail Systems

Five Major Trail System complexes have been identified in the analysis area. Figure III-17 is a reduced scale map showing the approximate location of these areas. They are:

1. The Crag Crest National Recreation Trail, a 10 mile loop trail offering many scenic vistas and a unique display of geologic history on the Grand Mesa. It includes one trailhead (50 PAOT), two campgrounds (85 PAOT), and one boat ramp (25 PAOT). It is a highly sensitive Recreation Complex. (2280 acres) (Approximately ___ % of this area is currently leased.)

2. The Crag Crest National Recreation Ski Trail (County Line Cross Country Ski Trail), a winter time extension of the Crag Crest National Recreation Trail. It is a series of four loop trails varying in length from .75 miles to 4.1 miles, offering many scenic vistas to the south. This trail is maintained and groomed by volunteers. This is a moderately sensitive Recreation Complex. (1080 acres)

3. The Skyway Cross Country Ski Trail, north of the County Line Cross Country Ski Trail. It is a series of 3 loop trails, varying in length from 2.15 to 2.8 miles, offering many scenic vistas to the north. It has a 2.3 mile link to the County Line Ski Trail. This trail is maintained and groomed by volunteers. This is a moderately sensitive Recreation Complex. (1110 acres)

4. The Ward Lake Cross Country Ski Trail, adjacent to the Island/Ward Lakes complex. It provides a wide range of trail loops and difficulty classes. This trail is maintained and groomed by volunteers. This is a moderately sensitive Recreation Complex. (1060 acres)

5. The proposed American Discovery Trail route crosses Grand Mesa following the Kannah Creek Trail, the Crag Crest National Recreation Trail and the Sunlight-Powderhorn Snowmobile Trail. This is a moderately sensitive Recreation Complex.

## Watersheds of Special Interest to Municipalities

There are approximately 117,000 acres of this environment within the analysis area. Figure III-18 is a reduced scale map showing the approximate location of these areas.

Historically, cities and towns located in the valleys below the Forest have depended on the Forest for supplying high quality water for domestic use. This water was relatively cheap since treatment costs were low or non-existent, and water was delivered by gravity feed systems. The Forest Service has recognized the importance of this use, and in some instances, adopted special management provisions for domestic supply watersheds. In other instances, Congress has designated certain watersheds for limited or single purpose use, in order to safeguard water supplies. However, it is not reasonable to expect that management practices alone will eliminate the need to treat water supplies prior to domestic use. The Forest has a management area designation (10E) for municipal watersheds, in the Forest Plan. Under the present Plan, only those areas that had existing administrative designation as municipal watersheds were assigned to 10E. No watersheds within the analysis area have been assigned to 10E, but there are a number of watersheds which serve as community water supply sources.

BLM_0048186

Within the analysis area, there are fifteen watersheds or areas that provide water to nearby communities. The relative sensitivity of each of these watersheds differs, depending on whether they are surface or groundwater supplies; whether the water is taken directly off the Forest or below the Forest boundary; the number of people the system services; and whether it is a primary, secondary or future supply of water for the community.

The following table identifies some of the characteristics of the municipal water supplies used to classify the watersheds.

| TABLE III-14. MUNICIPAL WATERSHEDS IN THE ANALYSIS AREA | | | | |
|---|---|---|---|---|
| **NAME** | **COMMUNITY** | **SOURCE TYPE** | **SUPPLY TYPE** | **INTAKE PT. LOCATION** |
| Leroux Ck. | Hotchkiss | Surface | Primary | Well below N.F. |
| Surface Ck. | Cedaredge | Surface | Primary | On N.F. |
| Ward Ck. | Orchard City | Surface | Primary | On N.F. |
| Doughspoon Ck. | Delta | Surface | Secondary | On N.F. |
| Oak Ck. | Delta | Surface | Secondary | On N.F. |
| Dirty George Ck. | Delta | Surface | Secondary | On N.F. |
| Kannah Ck. | Grand Junction | Surface | Primary | N.F. boundary |
| N.Fk. Kannah Ck. | Grand Junction | Surface | Primary | N.F. boundary |
| Whitewater Ck. | Grand Junction | Surface | Future | No intake |
| Wiley Spring | Crawford | Groundwater | Primary | On N.F. |
| Bell Springs* | Paonia | Groundwater | Primary | On N.F. |
| West Terror Springs | Pitkin Mesa | Groundwater | Primary | On N.F. |
| Big Ck. | Rural Grand Junction | Surface | Primary | Well below N.F. |
| Cottonwood Ck. | Rural Grand Junction | Surface | Primary | Well below N.F. |
| Coal Ck. | Crested Butte | Surface | Primary | On N.F. |

* Adjacent to analysis area.

In all the municipal watersheds in the analysis area, authorized uses such as livestock grazing, ORV/ATV use, dispersed recreation, and timber harvest are ongoing. Some watersheds have only limited use, while in others the use is extensive. None of the municipal watersheds being considered in the analysis area have been afforded special protection under the current Forest Plan. Grand Junction is on record as being concerned about activities ongoing and planned within the Kannah Creek and Whitewater watersheds. Generally speaking, protection of water quality is the issue, however for those

BLM 0048187

situations where springs are the source of water, the quantity of water flowing from the spring is also of potential concern.

## Slopes 40-60%

There are 33,530 acres with 40 to 60 % slopes in the analysis area. Figure III-19 is a reduced scale map showing the approximate location of these areas.

These slopes are not unique to any particular vegetation types, soil conditions or geologic formations. They are dispersed over the Forest in no particular pattern. These slopes, in nearly all cases, are covered with vegetation undisturbed by the activities of man. This is primarily because of the expense and engineering challenges of doing anything on such steep ground. Road building is the one exception. Some segments of roads do exist on these slopes, because no other route could be found.

For the majority of the soils in the analysis area on the 40-60% slope range, the erosion hazard will be a high.

These areas are particularly sensitive to the human activities. Any disturbance has a disproportionately high potential for soil loss and mass movement. Revegetation of these areas is difficult because of soil and seed loss. Activities on steep slopes may be visible from long distances.

## Slopes >60%

There are 3415 acres with Slopes greater than 60% in the analysis area. Figure III-20 is a reduced scale map showing the approximate location of these areas.

As with 40 to 60% Slopes, these slopes are not unique to any particular location on the Forest. The expense and engineering challenges of doing anything on such steep ground has precluded past activities. Many of these slopes do not have vegetative cover beyond occasional grasses and lichens.

Large scale disturbances on these slopes will result in exposing large amounts of surface area to accelerated erosion. Any disturbance produces a high potential for soil loss and mass movement. In most cases, disturbance can be considered an irreversible and irretrievable commitment of resources. Revegetation potential of these slopes is extremely poor, due to poor soil development. Disturbances are highly visible.

## Wildlife Special Habitats

### *Big Game Winter Range*

There are approximately 207,450 acres of Big Game Winter Range within the analysis area. Figure III-21 is a reduced scale map showing the approximate location of these areas.

Much of the identified winter range is included in Forest Plan Management Areas 5A and 5B, which have a management emphasis on Big Game Winter Range; however, these management areas do not encompass all the identified winter range. Most of the winter range utilized by the big game found in the analysis area, is located on private and BLM administered lands, below the Forest. Only a small percentage (7%) of the total winter range is within the analysis area (on National Forest System lands).

BLM_0048188

Winter range habitat capability, or carrying capacity, is a major limiting factor on big game populations. Because there is such a small percentage of this critical habitat within the analysis area, it is of particular importance in evaluating the effects of oil and gas development, among other forest management activities. One of the Forest Plan goals is to increase winter range carrying capacity for elk and deer on National Forest System lands.

The current winter range carrying capacity (within the analysis area) is approximately 2,000 elk and 5,800 deer (these values were determined in cooperation with the Colorado Division of Wildlife). The existing deer and elk populations exceed these capacities.

Most Big Game Winter Range occurs at lower elevations (6,000 - 8,000 feet). Characteristics of this habitat include presence of browse species, general southern exposures, and topographic and vegetation features that provide thermal, security and escape cover. These characteristics are normally found within the pinyon-juniper, Gambel's oak and mountain brush communities. Within the analysis area, these communities tend to be localized along the Forest boundary. Previous discussions on vegetation indicate that the pinyon-juniper and mountain brush communities are in intermediate to late seral stages, while much of the oakbrush community is in early seral stages. Generally, better forage is available in early and intermediate seral stages. Later seral stages provide better cover. A mixture of different plant communities, at varying stages is the desired condition.

Animals concentrate on winter ranges from as early as October, until late February or March, depending on climatic conditions and human disturbances. Mule deer and elk utilize winter ranges throughout the analysis area. Deer rely almost exclusively on browse species, like Gambel's oak, sagebrush, mountain mahogany, serviceberry, bitterbrush, choke cherry and juniper. Elk prefer grass, but will use browse when grass is unavailable during periods of heavy snow and in late winter. Because elk are larger animals than mule deer, they can use higher winter range areas.

Other big game species use more localized winter range areas. A small herd of bighorn sheep (approximately 25 animals) winters west of Anderson Gulch, on Battlement Mesa. Desert bighorn sheep have recently been reintroduced into the Roubideau drainage (1991), and additional transplants are planned for the future. Preferred winter range areas will be identified as these animals establish use patterns in this drainage. Both species utilize areas where grasses, forbs, and browse species are present.

Mountain goats are only found in the Marcellina Mountain and Ragged Mountain areas, both located within the Ragged Wilderness. Winter range for these animals is also within the Wilderness area, located on steep, wind-swept ridges where grass and browse species occur.

### Elk Calving Areas

There are approximately 45,230 acres of Elk Calving Areas within the analysis area. Figure III-22 is a reduced scale map showing the approximate locations of these areas.

Elk Calving Areas are typically located in transitional habitat between winter and summer ranges - in the Gambel's oak/mountain brush/aspen plant communities. An ideal elk calving area is in aspen with a dense understory, interspersed with grass and sagebrush openings and scattered small ponds. Calving can occur from mid-May through late-June.

### Migration Routes and Staging Areas

These areas vary with climatic condition. As a result, no acreage figures are available for these *Affected Environments*. As more knowledge is gained, traditional use areas may be identified.

BLM_0048189

In spring, mule deer make a slow migration toward their summer range through the Gambel oak and aspen habitat types. During the summer aspen, spruce-fir, and subalpine habitats are heavily used. The aspen habitat type is by far the most heavily utilized. As fall approaches a rapid migrational movement is made to winter ranges in early October. This process can be accelerated by hunting pressure and climate. During the fall the oak and pinyon-juniper habitats are most heavily utilized especially where these habitats are interspersed with sagebrush.

Elk move fairly rapidly to the higher country as snow cover recedes in the spring. The oakbrush, sagebrush, and aspen ecosystems contain most of the calving areas. Aspen and oak areas interspersed with small ponds are important calving and nursery sites. After calving the cows and calves gather into large nursery groups at higher elevations where disturbance from humans is very low. Elk can easily be prematurely moved to their winter ranges by human related activity, early snowfalls, or a lack of forage. Migration to winter ranges is often very fast and over distinct migration routes and travel corridors. These migration routes have been mapped in some locations.

### Bighorn Lambing and Breeding Areas

As identified in an earlier discussion, a small herd of bighorn sheep inhabits Battlement Mesa. Breeding usually occurs on traditional areas between October and February with the peak period occurring in late November to mid-December. Breeding areas are part of the winter range, located west of Anderson Gulch. Young, usually one, are born on traditional lambing grounds after a slow spring migration toward their summer range, generally located east and north of Anderson Gulch (see Figure III-23). The same bedding grounds are used every year on their summer-fall ranges and are easily disrupted by disturbance.

### Summer Range (Concentrated Use)

Big game summer range is found throughout the analysis area. There are approximately 81,440 acres of elk summer concentration areas (concentrated use summer range) within the analysis area. Figure III-24 is a reduced scale map showing the approximate locations of these areas for elk. The majority of these areas are on Grand Mesa.

Big game animals concentrate on these areas from mid-June through mid-August. High quality forage, security and lack of disturbance are characteristics of these areas. Animals require these areas during the periods of lactation, calf rearing, antler growth and for building fat reserves necessary to survive the coming winter. Spruce-fir habitats intermixed with meadows, where roads or other human activity is minimal, is preferred habitat. These areas are important as hiding cover to afford protection and security from disturbance, and to keep big game animals on the summer range as long as possible. Though these areas have not yet been classified as critical habitat by the CDOW, the CDOW feels it is just a matter of time until concentrated use summer range is classified as critical habitat.

### Sage Grouse Leks

Sage Grouse Leks or traditional strutting/breeding grounds are extremely important to the survival of this species. One lek has been identified within the analysis area, near Miramonte Reservoir. The lek and surrounding nesting area encompass approximately 160 acres, within the analysis area. Additional leks may be found during field checks at the APD stage. Leks generally range in size from five to forty acres, but some are much larger. While leks are usually surrounded by sagebrush, the strutting area may be somewhat sparsely to moderately vegetated with sagebrush. Barring the complete elimination of the physical lek itself, the leks are used generation after generation. In late February and March male sage grouse begin to gather on traditional leks.

Breeding generally occurs on the leks during late March and April. This is subsequently followed by nesting and young rearing in May, June, and July. Sage grouse hens will build the nests in the vicinity

BLM_0048190

of a lek (usually within a 2 1/2 mile radius), within 7-10 days following breeding. Nests are normally under sagebrush plants where they are protected from late spring storms. The young feed on insects such as beetles and ants and gradually begin to forage on succulent plants. As summer approaches the sage grouse move to higher elevations where more succulent green vegetation is still plentiful, however, they never get too far from the sagebrush ecosystem. As winter approaches, the sage grouse move to lower elevations or wind blown slopes where snow depths are shallow. The extent of winter movement depends solely on food and cover availability as it relates to snow depths.

# Threatened, Endangered and Sensitive Species

## Endangered Species

**Spineless hedgehog cactus (Echinocereus triglochidiatus var. inermis):** This cactus species is the only listed endangered plant species (at this time) occurring on the Uncompahgre Plateau and on Grand Mesa. The plant is found in partial shade, in duff accumulations under pinyon pine trees and infrequently among sagebrush, on cool exposures between 5,000 and 8,000 feet. Plants are believed to be susceptible to grazing and trampling by livestock. Pinyon clearing projects and removal by plant collectors has also led to the species' decline.

**Uncompahgre Fritillary Butterfly (Boloria acrocnema):** The known range of this butterfly lies outside the area covered by this analysis. This butterfly is found on only a couple known sites in alpine habitats above 12,000 feet. These sites are located south and west of the analysis area.

**Peregrine Falcon (Falco peregrinus):** The peregrine falcon nests on large cliffs overlooking or situated near streams, rivers, and possibly lakes. There are no known active nesting sites on National Forest System lands within the analysis area; however, a number of sites within the analysis area have potential habitat for peregrine falcons. Intensive surveys have not been conducted to determine if potential nest sites are occupied. Peregrines prey on birds (which are taken in flight), so cliff nesting habitat near large streams or rivers with extensive riparian habitat is considered to be optimum habitat. These riparian habitats are rich in bird life. Habitat surveys were done in the summer of 1992. Human presence or disturbance at any nest site can cause abandonment of the eyrie. Occupation of the many potential nesting sites will become more likely as the population recovers throughout Colorado.

**Bald Eagle (Halieetus leucocephalus):** The bald eagle is known to occur year-round within the analysis area, however, no known nesting sites have been found on National Forest System lands within the analysis area. Bald eagles are also common migrants through the area during spring and fall. In addition, there are many bald eagles which winter in the main river drainages both on and off the Forest. Winter habitat is characterized by an abundant, readily available food supply in conjunction with one or more suitable night roost sites. Roosting sites occur in large trees along these rivers. The bald eagle is primarily a fish eater, particularly during the summer. In winter, food consists of waterfowl, fish, carrion and small mammals. During the nesting season bald eagles have been observed around several lakes on Grand Mesa. Nesting is possible and will become likely as recovery of bald eagle populations continues throughout the United States. Nest trees are usually large trees with heavy crowns capable of supporting their large nest, which can be six feet or more in width and height. The nest tree is usually located along or near water, but nests have been located quite some distance from water.

## Candidate Species

The U.S. Fish and Wildlife Service has identified a number of Candidate species, for which the Service currently has substantial information on hand to support the biological appropriateness of proposing to list as either endangered or threatened. The following species within this category are found or are suspected to occur on the Forest in the area under analysis:

BLM_0048191

Oil and Gas Leasing Analysis FEIS

***Colorado River Cutthroat Trout (Oncorhynchus clarki pleuriticus):*** The Colorado River cutthroat trout is a USFWS Category 2 candidate species. Of all the trout species known to exist on the Forest, this is the most sensitive to changes in habitat quality and the most limited in it's range , in terms of habitat quality and quantity. Historically, this species occupied most of the streams in the analysis area, but due to habitat loss, competition from introduced species and changes in habitat quality, their numbers have steadily declined. The Forest is currently in the process of cooperating with the CDOW in preparing a conservation plan designed to keep this species from becoming listed as endangered.

***Mexican Spotted Owl (Strix occidentalis lucida):*** The Mexican Spotted Owl has already been proposed for listing as an threatened species on the portion of the Forest that is included in this analysis. To date, no spotted owl sightings or nests have been confirmed on the Forest. However, nests have been found in Mesa Verde National Park and on the San Juan, Rio Grande, and Pike/San Isabel National Forests. Based on 10 Mexican spotted owl nests in Colorado, suitable habitat can be categorized as prime and possible habitat.

Prime Habitat consists of: deep, narrow canyons characterized by sheer, often tiered walls. Vegetation may be dominated by pinyon-juniper in an old age class, or with a mixed conifer component such as Douglas-fir, ponderosa pine, white fir, spruce, and limber pine. A typical nest site might be along or beneath a canyon rim or cliff especially where a smaller drainage comes into the main canyon. The area has pinyon-juniper on the tops of the rims and mixed conifer in the actual drainages themselves and also may have some oak or cottonwood trees mixed in the forested stands.

Possible Habitat consists of: any steep slope over 20%, with mixed conifer vegetation could be spotted owl habitat (based on New Mexico and Arizona nesting data).

Preliminary studies indicate spotted owls prefer dense mature conifer stands and steep slopes. It is not yet known if it requires old growth forests. Three owl nests have been located in montane (mixed conifer) forests on steep slopes and four from steep-walled canyons with montane and pinyon-juniper forests. Nest sites could be in an old raptor or magpie nest, large tree cavity or where a large limb broke off the main trunk of a tree, woodrat nest on cliff ledge or in tree, or in an "witches broom" mistletoe defect. Nests are often located inside the hollow top of a broken tree bole. Roosting occurs during the day when these owls retire to a secluded roost on a limb in a large shady tree or to a ledge of a cave. The spotted owl preys upon bushy-tailed woodrats, rabbits, gophers, squirrels, mice, bats, large insects and other prey species. Potential spotted owl habitat has been identified and mapped on the entire Uncompahgre Plateau and in the Lone Cone area. In 1990, a spotted owl report was filed for the Battlement Mesa area. The area was revisited but the reported sighting was never verified.

***Northern Goshawk (Accipiter gentilis):*** See discussion under Management Indicator Species, page III-47.

***Boreal Western Toad (Bufo boreas boreas):*** The boreal western toad is a species that has rapidly declined over its range in the southern Rocky Mountains. This toad was once widespread on the Grand Mesa and areas to the east. Grand Mesa, the Uncompahgre Plateau, and the West Elk Mountains still have these toads present. The preferred habitat of this species is willow patches, sedge meadows, abandoned beaver ponds, and in shallow water near mud flats around lakes, ponds, marshes, and wet meadows at elevations above 8000 feet. It is found near water but not generally in it, except in the tadpole stage. Breeding habitat includes both permanent and temporary water sources. Breeding occurs in late May or June. In late July and August masses of black tadpoles are found in shallow water that is inaccessible to fish. This toad is expected to be placed on the endangered species list in the near future.

***North American Wolverine (Gulo gulo luscus):*** The wolverine is the largest terrestrial member of the weasel family. It is on the State list of endangered species in Colorado. Wolverines once occupied the area in low numbers and likely still occur in some areas within the analysis area.

Affected Environments
Threatened, Endangered and Sensitive Species

BLM_0048192

Wolverines are a naturally low-density species throughout their range. They are a solitary animal with large home ranges and have a low reproductive potential. Hornocker (1981), estimated a density of one wolverine per 25 square miles on a study area in northwest Montana. Young (2-3) are born every two or three years at den sites in February, March or April. Wolverines feed on small mammals, forest grouse, ptarmigan, fish, fruits, and ungulate carrion. The wolverine inhabits coniferous forests and alpine areas during the summer and move to somewhat lower elevations during the winter, where carrion or weak big game animals could be present. Riparian zones are preferred feeding areas. This species prefers large unroaded areas where contact with humans is minimal. Current threats to its survival include intentional and unintentional trapping, incidental poisoning, and logging and road development in its existing habitat.

***North American Lynx (Felis lynx canadensis):*** The lynx is also on the Colorado State endangered species list. While never abundant in Colorado it has suffered population declines across most of its southern range. The lynx prefers boreal forest situations consisting of spruce, fir, lodgepole pine, and mixed aspen-conifer stands. Coniferous forest thickets are preferred feeding sites because it's principal prey species, the snowshoe hare, frequents these sites. The snowshoe hare makes up the majority of the lynx's diet while mice, small mammals, and birds make up the rest. Lynx densities are also low, ranging from 6-10 square miles per individual. While dense stands of young conifers are used for feeding, mature stands of conifers are used for denning, cover, and as travel corridors. Like the wolverine, the lynx's range has dwindled due to hunting and trapping pressure, predator control programs, and loss of Wilderness forests. Continued threats to the lynx include: forest fragmentation caused by roading and logging of timber. Roads result in increased accessibility for trappers on foot or on snowmobiles.

***Ferruginous Hawk (Buteo regalis):*** The ferruginous hawk inhabits unbroken grassland prairies, plains, and broken hills. Within the analysis, this habitat is found along the lower Forest boundaries around the base of Grand Mesa and on both sides of the Uncompahgre Plateau. No nests have been identified on the Forest at this time. Nesting occurs in April and May. Breeding pairs are extremely sensitive to human activity near their nests and will easily abandon their nests. Loss of native grassland and shrubland habitat has resulted in the decline of this species.

***White-faced ibis (Plegadis chihi):*** This species is probably not found on the Forest in the area covered by this analysis.

***Long-billed curlew (Numenius americanus):*** At this time it is not known whether this species' habitat extends onto the Forest.

***Skiff milkvetch (Astragalus microcymbus):*** This plant has been identified as present in the Elk Mountains and is likely to be present within the analysis area. Habitat at known sites is in sandy soils on sagebrush slopes, at elevations around 7,000 to 8,000 feet. Little is known about the plant at this time and it has been found only in a few locations.

***Grand Mesa Penstemon (Penstemon mensarum):*** The Grand Mesa penstemon has been found only in Mesa and Delta Counties on the Grand Mesa and surrounding areas. It is found in the Gambel oak and aspen plant associations at elevations from 7,200 to 9,500 feet.

***Degener beardtongue (Penstemon degeneri):*** This penstemon is one of the rarest and least known penstemons in Colorado. The plant has been identified from Grand Mesa and only a few other sites in the State of Colorado. It is most likely to be found in the pinyon-juniper woodlands.

***Paradox lupine (Lupinus crassus):*** Known only from western Montrose County on the west side of the Uncompahgre Plateau, it grows beneath junipers on fairly open ground, and within stands of mixed pinyon and juniper. It usually grows in sandy soils derived from the Dakota, Burro Canyon, and Chinle Formations. It can also be found on adobe hills. Mining and road construction are the greatest threats to the habitat of this species.

BLM_0048193

The gray wolf *(Canis lupis)* and the grizzly bear *(Ursus arctos)* are listed as endangered species in the State of Colorado. It is doubtful that either of these species are still found within the analysis area even though reports of these species occasionally occur.

### *Sensitive Species*

The following species have been proposed for listing as sensitive species on the Grand Mesa, Uncompahgre and Gunnison National Forests:

## Mammals

River Otter *(Lutra canadensis)*
Colorado Hognosed Skunk *(Conepatus mesoleucus figginsi)*
Wolverine *(Gulo gulo luscus)*
Lynx *(Felis lynx canadensis)*
Spotted Bat *(Euderma maculatum)*
Abert's Squirrel *(Sciuris aberti)*

## Birds

Mexican Spotted Owl *(Strix occidentalis lucida)*
Boreal Owl *(Aegolius funereus)*
Flammulated Owl *(Otis flammeolus)*
White-faced Ibis *(Plegadis chihi)*
Columbian Sharp-tailed Grouse *(Pedioecetes phasianellus columbianus)*
Southwestern Willow Flycatcher *(Empidonax trailii extimus)*

## Fish

Colorado River Cutthroat Trout *(Oncorhynchus clarki pleuriticus)*

## Insects

Uncompahgre Fritillary Butterfly *(Boloria acrocnema)*
Great Basin Silverspot Butterfly *(Speyeria nokomis nokomis)*

## Amphibians

Boreal Western Toad *(Bufo boreas boreas)*

While the Region does not have an "official" sensitive species list, these species have nevertheless been proposed by either the Region or the Forest to be on such a list. Several of these species have already been discussed under Management Indicator Species or under Candidate Species. Several of the remaining species could be affected by oil and gas development activities and are briefly discussed below:

The spotted bat may be found in a variety of habitats including open ponderosa pine, desert shrub, and pinyon-juniper woodlands. They roost alone in rock crevices high up on steep cliff faces. Cracks and crevices 1-2" wide in limestone or sandstone cliffs are critical roosting sites. They are found in relatively remote, undisturbed areas suggesting that they may be sensitive to human disturbance.

The boreal owl is closely associated with high elevation spruce-fir and lodgepole pine forests due to their dependence on these forest types for foraging year round, as it does not migrate during the winter. Nesting habitat structure consists of forests with a relatively high density of large trees, open understory, and multi-layered canopy. These owls nest in cavities made by woodpeckers or in natural

BLM_0048194

holes in snags. They feed chiefly on small forest mammals such as the red-backed vole. These owls have been documented on the Grand Mesa. They may also occur on the Plateau and in the West Elk Mountains. Nesting activity begins with calling in February and young are hatched in April, May, or June. The owl is sensitive to human disturbance.

The flammulated owl is found in all areas of the analysis area in mixed forests from pine and oak to aspen, spruce, and fir. They nest in natural or woodpecker made cavities. This owl is entirely insectivorous in its food habits. Nesting begins in May and June.

The river otter has been reintroduced into the Gunnison and San Miguel River systems. It spends most of its time in or adjacent to the river. It feeds mostly on fish.

The Southwestern willow flycatcher inhabits deciduous woods and riparian zones within the area covered by this analysis. Nesting occurs in May and June. Very little is known about the population of this species in this area at the present time.

## Utility Corridors / Electronic Sites

There are approximately 4535 acres of this environment within the analysis area

The analysis area has approximately 57 miles of existing Utility Corridor and 5 miles of proposed Utility Corridor. These corridors include 46 miles of existing 345 KV power transmission line, 20 miles of existing 10 inch gas pipeline and 25 miles of proposed 22 inch gas pipeline. The Utility Corridor is located in four separate corridor's. They are:

1. Stevens Gulch to Hightower corridor crosses Hubbard Park and Buzzard Divide. It is an existing 24 mile 345 KV power transmission line corridor.

2. Old Highway 90 corridor crosses the Uncompahgre Plateau. It is an existing 16 mile 345 KV power transmission line corridor, an existing 20 mile 10" gas pipeline corridor and a proposed 20 mile 22" gas pipeline corridor. The different utilities in this corridor run parallel to each other for about 9 miles across the plateau and split on each end.

3. Flatiron corridor crosses the south end of the Uncompahgre Plateau. It is an existing 6 mile 345 KV power transmission line corridor.

4. Naturita corridor crosses the Naturita Division of the Forest. It is a proposed 7 mile 22" gas pipeline corridor.

There are seven electronics sites in the analysis area. Raspberry, is a major electronics site which includes a Forest Service Microwave Base Radio and 17 special use permittees. Mesa Point, includes a Forest Service Microwave Base Radio and two special use permittees. Two sites, Mud Hill and Pilot Knob, are Forest Service repeater stations. The remaining three sites; Scales Lake, Terror Creek and Indian Point, are single special use permittee.

## Primary Rangeland (6B Management Areas)

There are approximately 395,000 acres of this environment within the analysis area. Figure III-25 is a reduced scale map showing the approximate location of these areas.

Approximately 35 percent of the study area is currently classified in the 6B Management Prescription in the Forest Plan, which provides for an emphasis on livestock grazing. The 6B prescription area constitutes what is known as "primary range", which denotes an area used by livestock

BLM_0048195

in a preferential manner and is the Primary Rangeland used in calculating the grazing carrying capacity of an allotment. Any activity which substantially alters the livestock carrying capacity of the grazing allotment will require careful consideration and mitigation.

Rangelands are defined as groups of ecological plant communities, dominated by herbaceous and low growing woody vegetation, which provide forage and cover, for domestic livestock and numerous species of wildlife. Rangelands, when properly managed, also contribute significantly to reduced overland water flows, reduced soil movement, improved water quality, improved biodiversity of both plant and animals, and can contribute to improved visual quality.

Rangelands on this Forest are dominated by plant associations affiliated with and dominated by various species of grasses, sedges, forbs, and shrubs. The rangeland plant communities constitute the primary food supply for most wildlife species and seasonally dependent livestock. Primary Rangelands provide the majority (up to 80%) of the available forage within the analysis area.

Primary Rangelands vary significantly in vegetative composition , varying in terms of physical plant make up, condition and production. Plant associations range from the alpine zone above 13,000 feet in elevation, to the cold desert grasslands and shrublands of the mountain foothills, at an elevation of 6,000 feet.

Historical use of the Forests rangelands, primarily by domestic livestock has resulted in significant change from the original native vegetation. Where past use was abusive, soil loss occurred, reducing the range site productivity, and allowing less desirable plant species to invade. For example, significant dominance by big sagebrush in most rangeland sites today, reflects a disproportionate percentage of big sage in the plant community. Such changes have resulted in reduced productivity, increased soil movement, reduced water quality, and greater management challenges to reverse the less than desirable trend.

Ecologically, and for classification purposes, rangelands have been separated into plant associations, represented by criteria associated with the climax vegetative plant community. Climax is defined as the highest development of plant succession occurring in the plant community. The condition or relative health of the existing plant community is compared against the "climax" to determine rangeland condition or seral stage. Any natural physical change or man-induced change on those factors which control the condition or seral stage of the plant community can be monitored by evaluating the site against the climax plant association.

For monitoring purposes and ready reference, the rangeland plant associations of this Forest are broken down into shrublands, grasslands, and forblands which are keyed from the highest elevation down to the lowest (Johnston, 1987).

## Lands Suited for Timber Harvest

There are approximately 287,000 acres of this environment within the analysis area. Figures III-26a and III-26b are reduced scale maps showing the approximate locations of suited aspen and conifer, respectively.

The land base determined to be suited for timber harvest was modified in the Forest Plan Amendment, completed in 1991. Procedures used for identifying suited lands are well described in the Supplemental EIS associated with this Plan Amendment.

Financially efficient timber stands are those from which the estimated total receipts equal or exceed the direct timber costs. Estimated receipts are the high bid value of the timber (the cash paid plus the effective timber purchaser road credit). Direct timber costs include the costs of setting up and administering timber sales, the costs for planning and building logging roads, the timber support costs

BLM_0048196

from other resource specialists, and the costs for reforestation, thinning, and other silvicultural treatments. In general, financial efficiency determines whether or not logging will produce a profit for the Forest.

Economically efficient timber stands are those from which the total economic benefits of harvest (including such values as assigned value benefits from increased water production) exceed the costs of harvest activities.

This analysis has not been done specifically for the oil and gas analysis area. On the entire Forest none of the acres of tentatively suited timber lands are financially efficient, while 19% of the tentatively suited lands are economically efficient.

Much of the cost of timber removal is concentrated in the construction of roads. Access provided by oil and gas roads has the potential to make certain timber stands which have heretofore been unsuited because of economics, suited. There are approximately 61,000 acres within the analysis area that fall into this category. These acres were typed as "Category 3" in the recent Plan Amendment suitability analysis and are shown in Figures III-27a and III-27b. These areas could not be added to the suited timber base *until* a detailed environmental analysis was done, followed by a Forest Plan amendment process as prescribed by the National Forest Management Act and its regulations.

## Maps of Affected Environments

The following figures are maps of the *Affected Environments* referenced in the previous discussions.

BLM 0048197

**Analysis Area**

Figure III-1

Drawn By: DAF   7/92

LEGEND

FOREST BOUNDARY

ANALYSIS AREA

145   STATE HIGHWAY

70   INTERSTATE HIGHWAY

50   U.S. HIGHWAY

702   FOREST ROAD

0  5  10  20  30
SCALE IN MILES

Affected Environments
Maps of Affected Environments



Oil and Gas
Potential Zones

Figure III-2

Drawn By · DAF   7/92

Affected Environments
Maps of Affected Environments

Chapter III - Affected Environment

BLM_0048199



# Oil/Gas Existing Leases

Figure III-3    Drawn By : DAF    2/19/93

**LEGEND**

- OIL/GAS EXISTING LEASE AREAS
- FOREST BOUNDARY
- ANALYSIS AREA
- STATE HIGHWAY
- INTERSTATE HIGHWAY
- U.S. HIGHWAY
- FOREST ROAD

SCALE IN MILES
0  5  10  20  30



# Oil/Gas Unit Areas

**LEGEND**

OIL/GAS UNIT AREAS
FOREST BOUNDARY
ANALYSIS AREA
STATE HIGHWAY
INTERSTATE HIGHWAY
U.S. HIGHWAY
FOREST ROAD

0  5  10    20    30
SCALE IN MILES

**Figure III-4**

Drawn By : DAF    7/92

Affected Environments
Maps of Affected Environments



**Alpine/Tundra Areas**

**Figure III-5**

Drawn By : DAF     7/92

LEGEND

- ALPINE/TUNDRA AREAS
- FOREST BOUNDARY
- ANALYSIS AREA
- 145 STATE HIGHWAY
- 70 INTERSTATE HIGHWAY
- 50 U.S. HIGHWAY
- 700 FOREST ROAD

0 5 10 20 30
SCALE IN MILES

BLM_0048202



**High Geologic Hazard Areas**

Figure III-6

Drawn By : DAF   7/92

Page III-113

Affected Environments
Maps of Affected Environments

Affected Environments
Maps of Affected Environments



## LEGEND

| | |
|---|---|
| ▨ | MODERATE GEOLOGIC HAZARD AREAS |
| — | FOREST BOUNDARY |
| ▫ | ANALYSIS AREA |
| (145) | STATE HIGHWAY |
| (70) | INTERSTATE HIGHWAY |
| (50) | U.S. HIGHWAY |
| (703) | FOREST ROAD |

SCALE IN MILES
0  5  10  20  30

# Moderate Geologic Hazard Areas

**Figure III-7**

Drawn By · DAF    7/92

BLM_0048204



# Roadless Areas (North Half)

**Figure III-8a**

Drawn By : DAF    11/92

## LEGEND

| 191 | ROADLESS AREA NUMBER |
| ROADLESS AREAS |
| FOREST BOUNDARY |
| ANALYSIS AREA |
| STATE HIGHWAY |
| INTERSTATE HIGHWAY |
| U.S. HIGHWAY |
| FOREST ROAD |

| 181 | RAGGEDS | 191-B | FLAT TOPS NORTH | 192 | SALT CREEK |
| 182 | DRIFT CREEK | 191-C | FLAT TOPS EAST | 193 | BATTLEMENT MESA |
| 184 | SPRINGHOUSE PARK | 191-D | FLAT TOPS SOUTH | 194 | NICK MOUNTAIN |
| 185 | ELECTRIC MOUNTAIN | 191-E | UPPER LEON CREEK | 195 | KANNAH CREEK |
| 186 | CLEAR CREEK | 191-F | WEST MUDDY | 196 | WEST ELK |
| 189 | HIGHTOWER | 191-G | UPPER COW CREEK | 196-A | COAL MESA |
| 191(A-K) | PRIEST MOUNTAIN | 191-H | PRIEST MOUNTAIN | 196-B | SNOWSHOE MESA |
| 191-A | BRONCO KNOB | 191-I | CURRANT CREEK | 196-C | KEBLER PASS |
| | | 191-J | HUBBARD CREEK | 200 | WHETSTONE MOUNTAIN |
| | | 191-K | CUNNINGHAM CREEK | 201 | FLATTOP MOUNTAIN |

Collbran

Paonia

Delta

SCALE IN MILES



Affected Environments
Maps of Affected Environments

BLM_0048206

**LEGEND**

**246** ROADLESS AREA NUMBER

ROADLESS AREAS

FOREST BOUNDARY

ANALYSIS AREA

(145) STATE HIGHWAY

(70) INTERSTATE HIGHWAY

(50) U.S. HIGHWAY

(705) FOREST ROAD

# Roadless Areas
# (South Half)

| 198 | WEST ELK |
| 241 | ROUBIDEAU |
| 242 | TABEGUACHE |
| 243 | KELSO MESA |
| 246 | CAMPBELL POINT |
| 247 | JOHNSON CREEK |

0  2.5  5      10      15
SCALE IN MILES

**Figure III-8b**

Drawn By : DAF   7/92



LEGEND

| | RESEARCH NATURAL AREAS |
| | FOREST BOUNDARY |
| | ANALYSIS AREA |

STATE HIGHWAY
INTERSTATE HIGHWAY
U.S. HIGHWAY
FOREST ROAD

SCALE IN MILES
0   5   10   20   30

**Research Natural Area
(10A Management Area)**

Figure III-9

Drawn By: DAF   7/82

Affected Environments
Maps of Affected Environments



**Sensitive Areas**

**Figure III-10**

Drawn By: DAF    7/92

LEGEND

SENSITIVE AREAS
FOREST BOUNDARY
ANALYSIS AREA
STATE HIGHWAY
INTERSTATE HIGHWAY
U.S. HIGHWAY
FOREST ROAD

0  5  10   20    30
SCALE IN MILES

BLM_0048208



BLM_0048209

Affected Environments
Maps of Affected Environments

Page III-119

**LEGEND**

RETENTION VQO

FOREST BOUNDARY

ANALYSIS AREA

STATE HIGHWAY

INTERSTATE HIGHWAY

U.S. HIGHWAY

FOREST ROAD

0  5  10      20      30
SCALE IN MILES

**Retention VQO**

**Figure III-11**

Drawn By : DAF   7/92

Affected Environments
Maps of Affected Environments



**Retention VQO and Low VAC**

**Figure III-12**

Drawn By : DAF    7/92

LEGEND

- RETENTION VQO & LOW VAC
- FOREST BOUNDARY
- ANALYSIS AREA
- STATE HIGHWAY
- INTERSTATE HIGHWAY
- U.S. HIGHWAY
- FOREST ROAD

0  5  10    20    30
SCALE IN MILES

BLM_0048210



# Scenic Byway Corridors

**Figure III-13**

Drawn By : DAF   7/98

Affected Environments
Maps of Affected Environments

BLM_0048212

**Semi-Primitive
Non-Motorized
(3A Management Areas)**

Figure III-14

Drawn By : DAF    7/92

LEGEND

SEMI-PRIMITIVE
NON-MOTORIZED
(3A MGN'T AREAS)

FOREST BOUNDARY

ANALYSIS AREA

STATE HIGHWAY

INTERSTATE HIGHWAY

U.S. HIGHWAY

FOREST ROAD

0  5  10  20  30
SCALE IN MILES



**Developed Recreational Areas**

Figure III-15

BLM_0048213



**Dispersed Recreational Areas**

Figure III-16

Drawn By : DAF    7/92

LEGEND

DISPERSED RECREATIONAL AREAS

FOREST BOUNDARY

ANALYSIS AREA

145  STATE HIGHWAY

70  INTERSTATE HIGHWAY

50  U.S. HIGHWAY

702  FOREST ROAD

0  5  10    20    30
SCALE IN MILES

BLM_0048214



# Major Recreational Trails

**Figure III-17**

Drawn By : DAF    7/99

LEGEND

- MAJOR RECREATIONAL TRAILS
- FOREST BOUNDARY
- ANALYSIS AREA
- STATE HIGHWAY
- INTERSTATE HIGHWAY
- U.S. HIGHWAY
- FOREST ROAD

SCALE IN MILES
0  5  10    20    30



**Municipal Watershed Areas**

**Figure III-18**

Drawn By: DAF   7/92

LEGEND

- MUNICIPAL WATERSHEDS
- FOREST BOUNDARY
- ANALYSIS AREA
- STATE HIGHWAY
- INTERSTATE HIGHWAY
- U.S. HIGHWAY
- FOREST ROAD

0  5  10    20    30
SCALE IN MILES

BLM_0048216



## Slopes Between 40 and 60%

Figure III-19

Drawn By : DAF    7/92

LEGEND

SLOPES BETWEEN 40 AND 60 PERCENT

FOREST BOUNDARY

ANALYSIS AREA

145  STATE HIGHWAY

70  INTERSTATE HIGHWAY

50  U.S. HIGHWAY

702  FOREST ROAD

SCALE IN MILES
0  5  10  20  30

Affected Environments
Maps of Affected Environments

Page III-127

Chapter III - Affected Environment



LEGEND

| | |
|---|---|
| | SLOPES GREATER THAN 60 PERCENT |
| | FOREST BOUNDARY |
| | ANALYSIS AREA |
| | STATE HIGHWAY |
| | INTERSTATE HIGHWAY |
| | U.S. HIGHWAY |
| | FOREST ROAD |

**Slopes Greater Than 60%**

Figure III-20

Drawn By : DAF    7/92

0  5  10    20    30
SCALE IN MILES



Big Game Winter Range (Deer and Elk)

Figure III-21

Drawn By : DAF   7/92

Affected Environments
Maps of Affected Environments

BLM 0048219

Affected Environments
Maps of Affected Environments



## LEGEND

- ◨ ELK CALVING AREAS
- — FOREST BOUNDARY
- ▢ ANALYSIS AREA
- ⬡ STATE HIGHWAY
- ⬡ INTERSTATE HIGHWAY
- ⬡ U.S. HIGHWAY
- ⬡ FOREST ROAD

SCALE IN MILES
0  5  10   20    30

# Elk Calving Areas

**Figure III-22**

Drawn By : DAF   7/98

BLM  0048220



Bighorn Sheep Range

Figure III-23

Drawn By : DAF        7/92

LEGEND

Bighorn Sheep Range (Birthing, Summer and Winter)

Forest Boundary

Analysis Area

State Highway

Interstate Highway

U.S. Highway

Forest Road

SCALE IN MILES

0  5  10    20    30

Affected Environments
Maps of Affected Environments



**LEGEND**

- ELK SUMMER RANGE (CONCENTRATED USE)
- FOREST BOUNDARY
- ANALYSIS AREA
- (145) STATE HIGHWAY
- (70) INTERSTATE HIGHWAY
- (50) U.S. HIGHWAY
- (700) FOREST ROAD

0  5  10  20  30
SCALE IN MILES

# Elk Summer Range (Concentrated Use)

**Figure III-24**

Drawn By : DAF    7/92

BLM_0048222



Primary Rangeland
(6B Management Areas)

Figure III-25

Drawn By · DAF   7/92

LEGEND

PRIMARY RANGELAND
(6B MGN'T AREAS)

FOREST BOUNDARY

ANALYSIS AREA

145  STATE HIGHWAY

70  INTERSTATE HIGHWAY

50  U.S. HIGHWAY

700  FOREST ROAD

0  5  10  20  30
SCALE IN MILES

Affected Environments
Maps of Affected Environments

BLM_0048224



**LEGEND**

| | |
|---|---|
| (hatched) | LANDS SUITED FOR TIMBER HARVEST (ASPEN) |
| —— | FOREST BOUNDARY |
| (shaded) | ANALYSIS AREA |
| 145 | STATE HIGHWAY |
| 70 | INTERSTATE HIGHWAY |
| 50 | U.S. HIGHWAY |
| 762 | FOREST ROAD |

0  5  10    20    30
SCALE IN MILES

**Lands Suited For Timber Harvest (Aspen)**

Figure III-26a          Drawn By : DAF     7/92



LEGEND

LANDS SUITED FOR
TIMBER HARVEST
(CONIFER)

FOREST BOUNDARY

ANALYSIS AREA

STATE HIGHWAY

INTERSTATE HIGHWAY

U.S. HIGHWAY

FOREST ROAD

0  5  10    20    30

SCALE IN MILES

# Lands Suited For
# Timber Harvest (Conifer)

**Figure III-26b**     Drawn By : DAF     7/92



Economically Not Suited For Timber Harvesting (Aspen)

Figure III-27a

Drawn By : DAF   v/88

LEGEND

ECONOMICALLY NOT SUITED FOR TIMBER HARVESTING (ASPEN)

FOREST BOUNDARY

ANALYSIS AREA

STATE HIGHWAY

INTERSTATE HIGHWAY

U.S. HIGHWAY

FOREST ROAD

SCALE IN MILES

0  5  10  20  30

BLM_0048226



# Economically Not Suited For Timber Harvesting (Conifer)

**Figure III-27b**

Drawn By : DAF   7/92

**LEGEND**

- ECONOMICALLY NOT SUITED FOR TIMBER HARVESTING (CONIFER)
- FOREST BOUNDARY
- ANALYSIS AREA
- (145) STATE HIGHWAY
- (70) INTERSTATE HIGHWAY
- (50) U.S. HIGHWAY
- (703) FOREST ROAD

0  5  10  20  30
SCALE IN MILES



**National Park System Units Near The Analysis Area**

Figure  III-28

BLM_0048228



**Oil/Gas Well Locations**

**Figure 29**

Drawn By : DAF   12/92

LEGEND

| | |
|---|---|
| + | DRY WELL |
| △ | GAS WELL |
| ▢ | OIL WELL |
| ◇ | OIL/GAS WELL |
| — | FOREST BOUNDARY |
| (shaded) | ANALYSIS AREA |
| 145 | STATE HIGHWAY |
| 70 | INTERSTATE HIGHWAY |
| 50 | U.S. HIGHWAY |
| 700 | FOREST ROAD |

SCALE IN MILES
0  5  10   20   30



AIR QUALITY MONITORING SITES

Figure III-80

# Chapter IV - Environmental Consequences

BLM 0048231

BLM_0048232

# Table of Contents

Introduction                                                                                    IV-1
    Impacts of a Lease                                                        IV-1
Environmental Consequences of Lease Options                                                     IV-1
    General Forest                                                            IV-1
        Environmental Factor: Biological Diversity       IV-1
        Environmental Factor: Vegetation                 IV-2
            Old Growth Timber Stands  IV-2
        Environmental Factor: Soils                      IV-3
        Environmental Factor: Air Quality                IV-4
        Environmental Factor: Water Quality and Quantity IV-4
        Environmental Factor: Range and Livestock Grazing IV-5
        Environmental Factor: Roads                      IV-5
        Environmental Factor: Visual Resources           IV-5
        Environmental Factor: Recreation Opportunities   IV-6
            Developed Recreation      IV-6
            Dispersed Recreation      IV-7
            Recreation Opportunity Spectrum (ROS) IV-7
            Wild and Scenic Rivers    IV-8
            Wilderness                IV-8
        Environmental Factor: Cultural and Historical Resources IV-8
        Environmental Factor: Wildlife                   IV-8
            Big Game                  IV-8
            Upland Game, Small Game, Furbearers, Non-game Wildlife IV-10
            Management Indicator Species IV-11
        Environmental Factor: Wildfire                   IV-12
        Environmental Factor: Economics - Cost to Industry IV-12
    Floodplains                                                               IV-13
    Aquatic / Riparian / Wetland Habitats                                     IV-13
        Environmental Factor: Vegetation                 IV-14
        Environmental Factor: Soils                      IV-14
        Environmental Factor: Water Quality and Quantity IV-14
        Environmental Factor: Fisheries and Aquatic Habitat IV-15
        Environmental Factor: Riparian (Wetlands)        IV-15
    Alpine / Tundra Areas                                                     IV-16
        Environmental Factor: Vegetation                 IV-16
        Environmental Factor: Soils                      IV-16
        Environmental Factor: Water Quality              IV-17
        Environmental Factor: Visual Resources           IV-17
        Environmental Factor: Recreational Use and Opportunities IV-18
    Areas of High Geologic Hazard                                             IV-18

BLM  0048233

| | |
|---|---|
| Environmental Factor: Geology | IV-18 |
| Environmental Factor: Water Quality | IV-19 |
| Areas of Moderate Geologic Hazard | IV-19 |
| Environmental Factor: Geology | IV-19 |
| Environmental Factor: Water Quality | IV-20 |
| Roadless Areas | IV-20 |
| Environmental Factor: Recreation/Visual Resources/Wilderness Values | IV-20 |
| Environmental Factor: Timber Lands Made Suitable | IV-22 |
| Environmental Factor: Wildlife | IV-22 |
| Research Natural Areas | IV-23 |
| Environmental Factor: Proposed Tabeguache Research Natural Area | IV-23 |
| Sensitive Areas | IV-23 |
| Environmental Factor: Recreation Opportunities | IV-23 |
| Environmental Factor: Visual Resources | IV-24 |
| Retention VQO | IV-24 |
| Environmental Factor: Visual Resources | IV-24 |
| Retention VQO and Low VAC | IV-24 |
| Environmental Factor: Vegetation | IV-24 |
| Environmental Factor: Visual Resources | IV-25 |
| Scenic Byway Corridors | IV-25 |
| Semi-primitive Non-motorized (3A Management Areas) | IV-25 |
| Environmental Factor: Recreation Opportunities | IV-25 |
| Environmental Factor: Visual Resources | IV-26 |
| Environmental Factor: Timberlands Made Suitable | IV-26 |
| Administrative Sites | IV-26 |
| Recreation Complexes | IV-27 |
| Environmental Factor: Developed Recreation | IV-27 |
| Environmental Factor: Dispersed Recreation | IV-27 |
| Environmental Factor: Major Trail Systems - Crag Crest NRT | IV-27 |
| Environmental Factor: Major Trail Systems - Cross Country Ski Trails | IV-28 |
| Watersheds of Special Interest to Municipalities | IV-28 |
| Environmental Factor: Water Quality and Quantity | IV-28 |
| Slopes 40-60% | IV-29 |
| Environmental Factor: Vegetation | IV-29 |
| Environmental Factor: Soils | IV-29 |
| Environmental Factor: Visual Resources | IV-30 |
| Slopes >60% | IV-30 |
| Environmental Factor: Vegetation | IV-30 |
| Environmental Factor: Soils | IV-30 |
| Environmental Factor: Visual Resources | IV-31 |
| Wildlife Special Habitats | IV-31 |
| Big Game Winter Range | IV-31 |
| Environmental Factor: Populations and Use | IV-31 |

BLM 0048234

| | |
|---|---|
| Environmental Factor: Habitat Condition | IV-32 |
| Elk Calving Areas | IV-32 |
| Environmental Factor: Populations and Use | IV-32 |
| Environmental Factor: Habitat Condition | IV-33 |
| Migration Routes and Staging Areas | IV-33 |
| Bighorn Sheep Lambing and Breeding Areas | IV-33 |
| Summer Range (Concentrated Use) | IV-34 |
| Sage Grouse Leks | IV-34 |
| Threatened, Endangered and Sensitive Species Habitats | IV-35 |
| Utility Corridors / Electronic Sites | IV-36 |
| Primary Rangeland (6B Management Areas) | IV-37 |
| Environmental Factor: Vegetation | IV-37 |
| Environmental Factor: Livestock Grazing | IV-37 |
| Lands Suited for Timber Harvest | IV-38 |
| Environmental Factor: Timberlands Made Suitable | IV-38 |
| Environmental Consequences of Alternatives | IV-39 |
| General Forest | IV-39 |
| Environmental Factor: Biological Diversity | IV-39 |
| Environmental Factor: Vegetation | IV-41 |
| Environmental Factor: Soils and Geology | IV-42 |
| Environmental Factor: Air Quality | IV-43 |
| NAAQS Criteria Pollutants | IV-44 |
| Effects to Class I Airsheds | IV-45 |
| Visibility | IV-45 |
| Acid Precipitation/Lake Chemistry | IV-45 |
| Environmental Factor: Water Quality | IV-45 |
| Environmental Factor: Water Quantity | IV-48 |
| Environmental Factor: Groundwater | IV-48 |
| Environmental Factor: Range | IV-50 |
| Environmental Factor: Roads | IV-50 |
| Road Construction/Reconstruction | IV-50 |
| Road Use | IV-52 |
| Road Maintenance | IV-52 |
| Environmental Factor: Visual Resources | IV-52 |
| Environmental Factor: Recreation Opportunities | IV-54 |
| Environmental Factor: Cultural and Historical Resources | IV-56 |
| Environmental Factor: Wildlife | IV-56 |
| Environmental Factor: Wildfire | IV-59 |
| Environmental Factor: Social and Economic Conditions | IV-60 |
| Federal, State & Local Mineral Receipts | IV-60 |
| Rentals | IV-60 |
| Royalties | IV-60 |
| State of Colorado Severance Tax | IV-61 |

BLM 0048235

Oil and Gas Leasing Analysis FEIS

|  |  |  |
|---|---|---|
| County Personal Property Drilling Rig Tax | IV-61 |
| County Value Added Tax | IV-61 |
| County Personal Property Pipeline Tax | IV-61 |
| Population, Employment, and Personal Earnings (Income) | IV-62 |
| Social Conditions | IV-62 |
| Floodplains | IV-63 |
| Aquatic (Fisheries) / Riparian / Wetland Habitats | IV-64 |
| Alpine / Tundra Areas | IV-67 |
| Areas of High Geologic Hazard | IV-67 |
| Areas of Moderate Geologic Hazard | IV-68 |
| Roadless Areas | IV-68 |
| Research Natural Areas | IV-74 |
| Sensitive Areas | IV-75 |
| Retention VQO, Retention VQO and Low VAC, and Scenic Byway Corridors | IV-76 |
| Semi-Primitive Non-Motorized (3A Management Areas | IV-77 |
| Administrative Sites and Utility Corridors/Electronic Sites | IV-77 |
| Recreation Complexes | IV-78 |
| Watersheds of Special Interest to Municipalities | IV-78 |
| Slopes 40-60% | IV-79 |
| Slopes >60% | IV-80 |
| Wildlife Special Habitats | IV-80 |
| Big Game Winter Range | IV-80 |
| Elk Calving Areas | IV-81 |
| Migration Routes and Staging Areas | IV-82 |
| Bighorn Lambing and Breeding Areas | IV-82 |
| Summer Range (Concentrated Use) | IV-83 |
| Sage Grouse Leks | IV-84 |
| Utility Corridors / Electronic Sites | IV-84 |
| Primary Rangeland (6B Management Areas) | IV-84 |
| Lands Suited for Timber Harvest | IV-85 |
| Additional Discussions | IV-86 |
| Effects of Alternatives on Consumers, Civil Rights, Minority Groups and Women | IV-86 |
| Effects of Alternatives on Prime Farm Land, Range Land and Forest Land | IV-86 |
| Effects of Alternatives on Wetlands and Floodplains | IV-86 |
| The Preferred Alternative | IV-87 |
| Irreversible and Irretrievable Commitment of Resources | IV-87 |

## List of Tables

| Table IV-1. Visual Quality Objectives Under Standard Lease Terms | IV-6 |
|---|---|
| Table IV-2. ROS Class Composition Under Standard Lease Terms | IV-8 |
| Table IV-3. Miles of New Road Construction | IV-51 |
| Table IV-4. Lease Option Percentages in Roadless Areas, By Alternative | IV-69 |

BLM 0048236

# Chapter IV - Environmental Consequences

## Introduction

This chapter describes the estimated effects of selecting each of the lease options and program alternatives as presented in Chapter II. The environmental consequences of the lease options on each of the *Affected Environments* is discussed, followed by a discussion of the overall environmental consequences of choosing a program alternative.

### Impacts of a Lease

The authorization of a lease does not, in itself, create any environmental effects. However, authorization implies that oil and gas exploration and development may take place at a future time. The Forest Service oil and gas regulations direct us to consider the subsequent actions which would be authorized by a lease, and their potential environmental effects, as *connected actions*. This includes the Reasonably Foreseeable Development scenario and the activities described in Appendix E. These actions also meet the definition of connected actions in the procedural requirements for the National Environmental Policy Act (40 CFR 1502).

These expected actions are the basis of the environmental analysis from which the leasing decisions will be made. The decision on the lands that will be administratively available, and the subsequent decision authorizing leases, are based upon analysis of the likely environmental effects of the connected actions.

## Environmental Consequences of Lease Options

## General Forest

This section describes the environmental consequences of lease options in the General Forest. For an understanding of the overall organization of this chapter, refer to the description of the analysis process in Chapter I.

### Environmental Factor: Biological Diversity

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no increased impacts to biological diversity. Opportunities to create biological diversity through vegetative manipulation and the location of oil and gas facilities would be lost.

***Controlled Surface Use, Timing Limitations, and Standard Lease Terms:*** *Controlled Surface Use, Timing Limitations,* and *Standard Lease Terms* would result in similar impacts to biological diversity. Temporary loss of biodiversity may result on sites cleared for roads, drill pads, and pipelines. Road and drill pad cut and fill slopes and pipeline corridors would probably be revegetated with grass species. Trees would be missing from these sites until early successional species are established. Indirectly, areas made viable for timber sales because of access provided by the oil and gas activity, could suffer some loss in biodiversity as a result of timber management activity.

BLM_0048237

## Environmental Factor: Vegetation

***No Lease:*** *No Lease* would result in no change to the coniferous or deciduous forest environment. The aspen areas classified in the Forest Plan as appropriate suited lands which are currently not managed due to high road system cost, would remain in the natural state. Management on these areas for wood fiber production, wildlife habitat, visual quality, plant and animal diversity, and control of insects, disease and wildfire would continue to be curtailed.

Conflicts between the public, timber purchasers, and oil and gas operators regarding road use and maintenance would not arise in areas which are *No Lease*.

***No Surface Occupancy:*** *No Surface Occupancy* may result in some small change to the aspen environment. When an area of *No Surface Occupancy* lies adjacent to an area other than *No Lease*, the viability of vegetation management activities may be effected if a road system is designed in the adjacent area. An area which is classified in the Forest Plan as appropriate suited land which is currently not managed due to high road system cost, may become economically viable. The restrictions of *No Surface Occupancy* for oil and gas activity may not preclude vegetation management activity. If such a scenario develops, additional effects listed in the alternatives with stipulations or *Standard Lease Terms* would apply. Coniferous species are unaffected by this type of land classification change. Lands suited for timber harvest may become more viable for vegetation management activities, due to a more extensive road system.

***Controlled Surface Use, Timing Limitations, and Standard Lease Terms:*** *Controlled Surface Use, Timing Limitations,* and *Standard Lease Terms* may result in a change to the aspen environment. Areas which are classified in the Forest Plan as appropriate suited lands which are currently not managed due to high road system cost, may have a road system developed which may make the area economically viable. Any activity within this land classification may increase the Allowable Sale Quantity (ASQ), slightly (would first require environmental analysis and a Forest Plan amendment). Management for wood fiber production, wildlife habitat, visual quality, plant and animal diversity, and control of insects, disease, and wildfire can occur. Generally, coniferous species are unaffected by this type of land classification change. Lands suited for timber harvest may become more viable for vegetation management activities due to a more extensive road system.

Conflicts between the public, timber purchasers, and oil and gas operators regarding road use and maintenance would arise in areas where coincidental activities occur during oil and gas development. Lands which are in timber sales or other vegetation management contracts may also be under an oil and gas lease. Conflicts would occur with coincident operations relating to such aspects as harvest, hauling, road building, and timing of operations.

Vegetation removed for roads, drill pads, and well sites would be temporarily out of production for wood fiber, wildlife habitat, and plant and animal diversity.

### Old Growth Timber Stands

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no adverse impacts on "old growth" timber stands.

***Controlled Surface Use, Timing Limitations and Standard Lease Terms:*** *Controlled Surface Use, Timing Limitations,* and *Standard Lease Terms* would result in similar impacts to "old growth" timber stands. Any removal of timber for road, well pad, or pipeline construction would result in a net loss of "old growth" timber. The resultant loss of "old growth" would result in loss of habitat for those species dependent on "old growth" timber stands.

BLM_0048238

## Environmental Factor: Soils

Oil and gas exploration and development activities heavily impact the soil resource. When activities such as clearing, leveling, scraping, and shaping are conducted with heavy machinery, the soil resource is obviously impacted. The soil mantle is cut into, displaced, mixed, and reworked as needed to make the area suitable for the facility (road, drill pad, or pipeline) under construction. The result is that the natural equilibrium that a soil had with its setting is irreversibly altered. Physical soil characteristics that are altered by these activities are: the layering sequence of soil, the natural soil structure density, the soil's porosity, infiltration and permeability rates, internal shear strength, water holding capacities, organic matter distribution, and soil water flow characteristics. The soil also has trillions of organisms and micro-organisms per cubic yard. With large disturbances, these organisms are disrupted or destroyed, depending on the disturbance and the organism. Along with these impacts, construction activities remove protective vegetative and duff layers, and expose mineral soil to the forces of erosion (i.e., all forms of erosion: sheet, rill, gully, slumping and earthflows). With new construction of roads and related areas, it is not uncommon to increase the rate of erosion 80-100 times the natural rate.

The overall impact activities associated with oil and gas exploration and development would have on the soil depends on the type, magnitude, nature and duration of the disturbance, along with the individual soil characteristics of a particular site.

Soils are discussed further in those *Affected Environments* that have sensitive soils, such as "Aquatic/Riparian/Wetland Habitats", "Alpine/Tundra Areas", "Slopes 40-60%" and "Slopes >60%".

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would prevent new impacts to the soil resource in the general forest soil areas. There would be no new land areas pulled out of production or subject to reduced production levels as as result of construction disturbances.

***Controlled Surface Use:*** With the *Controlled Surface Use* option, oil and gas activities would be allowed, but only with prescribed mitigation measures or control measures. Excessive soil resource damage would occur if activities are conducted without special measures. The mitigation described (Appendix H) to protect the soil resource would lessen the impacts to the soil resource, as described below under *Standard Lease Terms*.

***Timing Limitations:*** *Timing Limitations* would limit oil and gas construction activities during certain times of the year. Certain soils within the analysis area are especially susceptible to detrimental impacts of heavy equipment traffic and construction activities when saturated and at optimum soil moisture content for compaction. This situation occurs during spring and early summer snow melt periods and during long rainy spells in the summer. Unsurfaced roads are extremely susceptible to deep rutting and detrimental displacement and puddling during these periods. This may lead to hazardous situations for equipment and personnel. Under saturated conditions the soil is subject to accelerated erosion and easily washes off site as sediment. Construction activities and travel on unsurfaced roads would be controlled when the soils are saturated. *Timing Limitations* at the appropriate time of the year would result in lessened impacts to the soil resource and associated resources such as water and those plants and animals dependent on Aquatic habitats.

***Standard Lease Terms:*** *Standard Lease Terms* would result in the potential for the adverse affects described above in the introduction to the environmental consequences for the soil resource. Road, well pad, and pipeline construction activities would result in displacement and mixing of soils and consequent loss of the natural soil profile, microorganisms, and irreversible loss of soil productivity. Soils exposed would be subject to increased erosion rates and potential transportation to streams. However, the General Forest environment is located sufficiently distant from water courses that sediment should not readily enter streams. The operator would be required to conduct his operations and apply reasonable mitigation measures to minimize adverse soil impacts. Reasonable and prudent

BLM_0048239

measures to protect the soil resource are found in Megahan, 1977; USDA Forest Service, 1990; and Burroughs and King, 1989.

## Environmental Factor: Air Quality

*No Lease and No Surface Occupancy:* *No Lease* and *No Surface Occupancy* would result in no additional effect on the air quality of an area.

*Controlled Surface Use:* *Controlled Surface Use,* such as not allowing the operator to pile and burn slash associated with road, well pad, or pipeline construction would mitigate air quality impacts. Dust abatement would lessen impacts from traffic on unpaved roads.

*Timing Limitations:* *Timing Limitations* requiring the operator to burn construction related slash during certain times of the year or under certain atmospheric conditions would lessen potential air quality impacts.

*Standard Lease Terms:* *Standard Lease Terms* would result in potential air quality impacts associated with burning slash, dust from traffic on unpaved roads, and construction of roads, well pads, and pipelines.

## Environmental Factor: Water Quality and Quantity

*No Lease and No Surface Occupancy:* *No Lease* and *No Surface Occupancy* would result in no additional oil and gas activities occurring. In most cases, no activity corresponds to no effect on water quality. However, oil and gas activities may represent an opportunity to correct existing water quality problems. This would most likely occur as a result of upgrading an existing road that is contributing to water quality degradation. The upgrading may involve improvement by installing proper drainage, revegetation of cuts and fills, and surfacing. Or it may involve relocating and rehabilitating a poorly located road. In this instance, *No Lease* would result in a lost opportunity to correct an existing problem.

*Controlled Surface Use:* Since the General Forest environment excludes all the high risk areas or areas that are of special concern regarding water quality, such as Riparian areas and Wetlands, water quality degradation would not be likely to occur. However, any ground disturbance carries a risk of impacting water quality. Applying a *Controlled Surface Use* stipulation would reduce the already low risk. For example, restricting off-road vehicle use, maintaining buffers between all surface drainage features, stringent reclamation standards, requirements to surface all roads, design of drilling operations, and special guidelines for handling and transporting hazardous substances would all contribute to lessening the potential for adverse water quality impacts.

*Timing Limitation:* *Timing Limitations* would reduce impacts by restricting activities to certain times of the year. Sediment is the greatest concern associated with ground disturbance. Erosion and sediment problems are greatest during the wet seasons when the ground is soft and water is available to transport disturbed material. Sediment contributions would be reduced by restricting construction and use activities on roads and well pads during the wet seasons, which is typically late fall and spring.

*Standard Lease Terms:* *Standard Lease Terms* would result in the greatest potential for impact to water quality. However, for the General Forest environment, impacts to water quality are not expected to be great for oil and gas activities operating under the *Standard Lease Terms.* Sediment is the primary concern and the General Forest environment is not expected to be a significant contributor of sediment. The General Forest environment is located sufficiently distant from water courses that sediment and spills of toxic substances should not readily enter streams.

BLM_0048240

## Environmental Factor:  Range and Livestock Grazing

Range and livestock grazing is covered as a separate *Affected Environment*.  See Primary Rangelands on pages IV-37 through IV-38 of this chapter.

## Environmental Factor:  Roads

Road use is not typically subject to the lease options as described in this FEIS, except where road use would need to be controlled to protect the road, a capital investment, from damage.  Road location and design are determined by lease options applied to resources like soils, water quality and wildlife habitat.  However, many of the Forest roads have not been built to an all-weather standard.  In other words, roads not built to adequately support the traffic loads associated with oil and gas activities may be closed during certain critical times of the year, such as the spring thaw, to prevent damage to the road.  As an alternative to a seasonal shut-down, the operator may be allowed to build or reconstruct the road to an all-season standard.  The specific road system requirements in addition to those discussed under mitigation (Appendix H) will be identified at the time of an APD.

## Environmental Factor:  Visual Resources

*No Lease and No Surface Occupancy: No Lease* and *No Surface Occupancy* would result in no net change to visual resources in the General Forest environment.

*Controlled Surface Use:* The visual resources in Retention VQO and those areas of Retention VQO and Low VAC are discussed as separate *Affected Environments*.  Of the remaining VQO categories in the General Forest environment, only Partial Retention areas would require additional mitigation measures to maintain the adopted VQO. *Controlled Surface Use* would consist of only allowing drill pad development and use in Partial Retention VQO areas where vegetative or land form screening exist.  This would minimize the visual impacts for the casual forest visitor along collector and arterial roads.

*Timing Limitations: Timing Limitations* would generally make no difference in terms of mitigation of impacts to visual resources in the General Forest environment.  The primary factors involved in maintaining Visual Quality Objectives relate to the scale and amount of development, ground disturbance, and vegetation removal, large commercial vehicles, and the visual sensitivity of the recreational user.  Limiting activity to a certain time period would not change the factors involved.

*Standard Lease Terms: Standard Lease Terms* would result in a major portion of Partial Retention VQO areas not meeting their adopted Visual Quality Objective.  Some opportunity for mitigation of the potential adverse impacts to Partial Retention VQO areas exist, but only where adequate screening is present within the leasehold, and only when it does not infringe on the lessees rights as granted on the standard lease form (Appendix B).  The estimated future visual condition would be approximately:

BLM_0048241

| TABLE IV-1.  VISUAL QUALITY OBJECTIVES UNDER STANDARD LEASE TERMS | |
|---|---|
| **VQO** | **PERCENT OF ANALYSIS AREA** |
| Preservation | 0 |
| Retention | 3 |
| Partial Retention | 12 |
| Modification | 74 |
| Maximum Modification | 10 |

## Environmental Factor: Recreation Opportunities

### *Developed Recreation*

Note:  Developed Recreation Complexes are discussed as a separate *Affected Environment*.  See page IV-27 of this chapter.

***No Lease:***  *No Lease* option would result in no net change to the developed recreation resource. However, there would be a slight potential for siting a drill pad or access road close enough to a developed recreation site that the recreational experience and setting at the site would be degraded.

***No Surface Occupancy:***  *No Surface Occupancy* in this case would consist of requiring drill pad development and use to be located at least 1 mile from developed sites to lessen the noise and buffer the oil and gas activity from the developed site.  It is possible that at the APD stage a specific timing stipulation (time of day for operation) would be determined to be needed.

***Controlled Surface Use:***  *Controlled Surface Use* within a developed recreation site would result in little mitigation of the effects that would occur within the developed site.  Developed recreation sites are designated for high density recreational use.  Any oil and gas activity in a developed recreation site is in basic conflict with the intended use of the recreation site.

***Timing Limitations:***  *Timing Limitations,* imposed to limit activity at a developed recreation site to the recreational off-use season, when developed sites such as campgrounds are closed, would lessen the impacts to the recreational user of those sites.  Other developed sites such as those discussed under Recreational Complexes receive year-round use, and *Timing Limitations* would do little to mitigate the impacts of an industrial activity within a recreational site.

***Standard Lease Terms:***  Under the *Standard Lease Terms* the developed site experience/recreation quality would potentially be significantly impacted from oil and gas activity.  The result would be a potential decrease in use.  However, the sensitive oil and gas operator would not likely propose operations in a developed recreation site.  *Standard Lease Terms* allow reasonable mitigation; it would be reasonable to expect an operator to conduct activities outside a developed recreation site.  However, there would be a potential for siting a drill pad or access road close enough to a developed recreation site that the recreational experience and setting at the site would be degraded.

BLM_0048242

### *Dispersed Recreation*

Note:  Dispersed Recreation Complexes are discussed as a separate *Affected Environment*.  See page IV-27 of this chapter.

*No Lease and No Surface Occupancy:*  *No Lease* and *No Surface Occupancy* options would result in no net change to the dispersed recreation resource.  However, there would be a potential for siting a drill pad or access road close enough to a dispersed recreation site that the recreational experience and setting at the site would be degraded.

*Controlled Surface Use:*  *Controlled Surface Use* would locate development outside of special Dispersed Recreation Complexes and therefore limit major conflict with recreationists.  Some reduction in quality of recreation experience and setting would still take place as development and operation of leases takes place adjacent to dispersed sites and to dispersed recreation in general.

*Timing Limitations:*  The timing limitation in this case would consist of limiting drill pad development to low recreation use periods and therefore minimizing the conflict between industrial development and recreation use.  *Timing Limitations* would still result in a reduction in the dispersed recreation experience/recreation quality and setting for most recreationists.

*Standard Lease Terms:*  Under the *Standard Lease Terms* some quality degradation of recreation experience and setting would take place.  This would generally not be significant except in those special Dispersed Recreation Complexes as discussed as a separate *Affected Environment*.

### *Recreation Opportunity Spectrum (ROS)*

*No Lease and No Surface Occupancy:*  *No Lease* and *No Surface Occupancy* options would result in no net change to the recreation opportunity spectrum.

*Controlled Surface Use:*  The *Controlled Surface Use* stipulation would consist of protecting inventoried General Forest Semi-primitive Motorized areas by limiting drill pad development and roads to existing travel routes.  (Semi-primitive Non-motorized areas are discussed as a separate *Affected Environment*.)  Some reduction in quality of recreation experience and setting would still take place as exploration, development, and operation occurs.

*Timing Limitations:*  *Timing Limitations* would make no difference in terms of mitigation of consequences, as the primary factors of impact are related to the presence of drill pads and roads (setting), versus dispersed SPM (backcountry) recreational experience.  The presence of oil and gas activity would detract from the natural appearing setting.

*Standard Lease Terms:*  *Standard Lease Terms* would result in a change in the inventoried Recreation Opportunity Spectrum.  Based on the proposed activities in the RFD, access and intrusion of motorized use, the standard of developments (roads, in particular) and the distance from access would alter the existing ROS classes in the analysis area.  The estimated future ROS inventory would be approximately:

BLM 0048243

| TABLE IV-2.  ROS CLASS COMPOSITION UNDER STANDARD LEASE TERMS | |
|---|---|
| **ROS CLASS** | **PERCENT (%) OF ANALYSIS AREA** |
| Urban (U) | 0 |
| Rural (R) | 1 |
| Roaded Natural (RN) | 25 |
| Roaded Modified (RM) [subclass of RN] | 14 |
| Semi-primitive Motorized (SPM) | 44 |
| Semi-primitive Non-motorized (SPNM) | 16 |
| Primitive (P) | 0 |

### *Wild and Scenic Rivers*

None of the lease options would result in a change to the *Affected Environment*.  No wild and scenic rivers have been identified in the analysis area.

### *Wilderness*

None of the lease options would result in a change to the *Affected Environment*.  No Wilderness areas, Wilderness Study Areas or Further Planning Area for Wilderness exist in the analysis area.

## Environmental Factor:  Cultural and Historical Resources

All options would consist of avoidance of significant prehistoric and historic archaeological resources (the five proposed archaeological districts).  None of the lease options would result in a change to the *Affected Environment*.  Under all lease options, at the APD stage a cultural survey is required to be performed on all areas proposed for ground disturbing activities before such activities commence (for further discussion see Cultural and Historical Resources in Chapter III).  If a cultural resource is identified by the survey, it would be protected by avoidance or excavation and recordation.  Furthermore, the standard stipulations require the lessee to report and protect all cultural resources found during construction.  These requirements are for compliance with 36 CFR 800, EO 11593, and the National Historic Preservation Act of 1966, as amended.

## Environmental Factor:  Wildlife

### *Big Game*

The five lease options are discussed as they relate to the following big game species in the General Forest environment:  mule deer, elk, desert bighorn, Rocky Mountain bighorn, mountain goat, antelope, black bear, mountain lion, and wild turkey. (Habitats i.e. Big Game Winter Range, elk calving areas, Migration Routes and Stating Areas, Summer Concentration Areas, Bighorn Sheep Lambing and

BLM 0048244

Breeding Areas are discussed later in this Chapter.) Specific mitigation measures to minimize adverse effects on these species and their habitat, will be identified when an Application for Permit to Drill (APD) has been filed for a specific area.

*No Lease:* *No Lease* would provide complete protection of the big game resources. *No Lease* would result in no adverse impacts to big game.

*No Surface Occupancy:* Big game and their habitat under the *No Surface Occupancy* would not be as adversely affected as those areas under the other lease options. Line of sight noise from exploration or development on adjacent land could displace big game for several miles or at least one or two drainages away from their traditional use areas. This disturbance factor would have the greatest effect on those species with the smallest home ranges such as the wild turkey, mule deer, desert bighorn sheep and the Rocky Mountain Bighorn Sheep. The pronghorn antelope and the elk could experience this disturbance to a greater degree. The black bear and mountain lion would be the least affected because they have the largest home ranges and the greatest flexibility to move away from any disturbance. The greatest effect on these two species could come from movement of their prey, which would then affect the lion or bear.

*Controlled Surface Use:* *Controlled Surface Use* would be applied where necessary to protect wildlife resources from potential adverse impacts from well location or new road construction. *Controlled Surface Use* would be used to physically protect critical big game habitat such as wild turkey roosting sites, bighorn sheep nursery, and bedding sites, antelope fawning sites, known black bear and mountain lion denning sites, mineral licks, critical watering or feeding sites, elk wallows, etc. (Also, see discussions on additional critical habitats discussed separately.) Development would be located where terrain or vegetation would serve as buffers between oil and gas activities and the habitats to be protected. These mitigation measures would lessen the effects on big game.

*Timing Limitations:* *Timing Limitations* would lessen the potential for adverse impacts to big game species. The following is a list of *Timing Limitations* designed to protect big game and their "critical habitats" (not discussed elsewhere) during certain critical time periods of their life cycle:

| | |
|---|---|
| Pronghorn Antelope Fawning Areas | May 1 to July 15 |
| Mule Deer Fawning Areas | May 1 to July 15 |
| Mountain Goat Kidding Areas | May 1 to July 15 |
| Desert Bighorn Sheep Lambing Areas | March 15 to June 1 |
| Black Bear Spring Range | March 15 to July 1 |
| Wild Turkey Nesting Areas | April 1 to May 30 |

*Standard Lease Terms:* *Standard Lease Terms* are the least restrictive of all the lease options. Disturbance to big game and degradation of habitat could occur to any of the big game species found in the area. The effects of oil and gas activities on big game and their habitat varies considerably, depending on the stage of the activity being performed. Impacts from the drilling of exploratory wells would be greatly increased on big game and their habitats, because of the much longer period of disturbance. Continued displacement from preferred habitat and traditional home ranges forces the animals to move into more marginal habitats or onto already occupied optimum habitat, resulting in overcrowding and over utilization of the range and greatly increasing the threat of disease transmittal. The direct loss of habitat due to road construction and drill pad layout is also a consideration. However, this direct loss of habitat can be somewhat mitigated by trying to locate these sites away from critical or preferred habitat. The actual loss of habitat from road construction is not as important as the effects of increased traffic and human activity associated with the road itself.

*Standard Lease Terms* would not mitigate all of the most detrimental impacts to crucial wildlife habitat from oil and gas development. Detrimental impacts that could occur under the *Standard Lease Terms* include: (1) disturbance to big game birthing habitat and crucial winter range habitat; (2) new

BLM 0048245

road construction into unroaded or isolated areas; (3) impacts to Aquatic, Riparian, and Wetland habitats.

### Upland Game, Small Game, Furbearers, Non-game Wildlife

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would provide complete protection from the impacts of oil and gas activities for small gamebirds and mammals, waterfowl, shorebirds, raptors, and non-game wildlife and their critical habitats, in the analysis area.

***Controlled Surface Use:*** *Controlled Surface Use* would be used here if it is felt that additional roading into an area would cause direct population loss to a species or group of wildlife species. If additional roads were built into an area it would have to be assumed that other cause and effect connected actions such as timber sales would be initiated and this action would potentially have more effect on these species than would the actual oil and gas development.

***Timing Limitations:*** *Timing Limitations* would lessen the potential for adverse impacts to upland game birds, small game, waterfowl, raptors, shorebirds, passerines (song birds), and raptors. Human activity associated with oil and gas exploration or development should be restricted one month prior to nest selection to one month after hatching for large raptor species. The following is a list of *Timing Limitations* designed to protect these species and their "critical habitats" during certain critical time periods of their life cycle:

| | |
|---|---|
| Golden Eagle | March 1 to August 15 |
| Ferruginous Hawk | February 1 to August 15 |
| Osprey | April 1 to August 15 |
| Prairie Falcon | February 1 to August 15 |
| Canada Geese | March 1 to May 30 |
| Greater Sandhill Crane | March 1 to October 16 |

***Standard Lease Terms:*** Impacts to these species from oil and gas exploration and development activities could result in nest or den abandonment, actual destruction of nesting and denning sites and habitat, and the elimination of one or more of a species key habitat components necessary for the survival of the species. Key habitat components requiring protection include: roosting sites, nesting grounds, breeding areas, important feeding sites, prey species habitats, and old growth forests. Drilling operations during a species courtship display periods, nest or den construction periods, egg laying/incubation or young bearing time periods could cause a species to abandon any further attempts to produce young. Some birds exhibit behavioral responses which are greatly influenced by humans and human related activity. For example the response of large raptors to human activity may vary considerably from species to species and from individual to individual. For many species, like the golden eagle, nest abandonment is most likely to occur prior to or during the egg laying process rather than after young have been hatched and are being fed routinely. Disturbance to birds and mammals at their nesting or denning sites can cause excessive cooling of eggs or chilling of young birds and mammals, because parent birds and mammals remain away from the young, due to the presence of people. Premature fledging or movement away from nesting and denning sites can cause death to birds falling from nests or can result in the young being preyed upon by other birds or mammals. Raptors such as eagles, hawks, falcons, and owls are especially sensitive to human related activity or disturbance. Impacts to the young of many mammal species may not be as common because mammals tend to hide nests out of sight of man, or underground. While the nests of birds, especially cliff dwelling and tree nesting species are often very visible. The impacts to many amphibians and reptiles is largely unknown at this time, because many of these species make small dens underground, which may be afforded better protection. The assessment of impacts on small forest birds and mammals, waterfowl and shorebirds are less know. Small forest birds and mammals have relatively small home ranges and would not be adversely affected unless roads or drill pad construction areas were constructed directly on or adjacent to their individual home ranges.

BLM_0048246

This leasing option would provide little protection to a large variety of both game/non-game mammals and birds. Key habitat components, such as cliffs, caves, rock outcrops, areas adjacent to Wetlands, wintering zones, and other habitats would remain unprotected.

### *Management Indicator Species*

The effects of oil and gas exploration and development activities on the Management Indicator Species (MIS) would vary considerably depending on which species is being addressed. The effects anticipated can be related to the size of the home range of the species, whether the species is migratory or non-migratory, or if the species has a very narrow habitat type dependency. The five lease options are discussed as they relate to the management indicator species:

*No Lease: No Lease* would maintain all habitat components for those species with smaller home ranges and would protect at least a portion of those habitat components of the species with large home ranges or that are migratory in nature. *No Lease*, if used for any MIS or its habitat, would protect areas of critical importance to a species or a group of species.

*No Surface Occupancy: No Surface Occupancy* would protect any habitat component felt to be critical to the survival of a localized population of animals.

*Controlled Surface Use: Controlled Surface Use* would protect the habitat of species like the pine marten, goshawk, or Abert's squirrel. These three species would lose the most by allowing new roads in previously unroaded habitat. Restrictions in mature ponderosa pine habitats would lessen impacts to Abert's Squirrels. Avoiding known goshawk nesting sites when selecting road and drill pad locations would reduce impacts to these raptors. Controlling access into conifer stands lessens the potential for increasing trapping pressure on pine martins and other furbearers they represent.

*Timing Limitations: Timing Limitations* would lessen the potential for adverse impacts to Management Indicator Species and/or the species and habitat they represent. The following is a list of *Timing Limitations* designed to protect these species and their "critical habitats" during certain critical time periods of their life cycle:

| | |
|---|---|
| Sage Grouse Wintering Areas | December 16 to March 15 |
| Goshawk Nest Site | March 15 to July 31 |
| Pine Marten Den/Young Rearing Sites | April 1 to June 30 |
| Abert's Squirrel Nest Sites | April 1 to June 30 |

*Timing Limitations* alone, would not prevent habitat loss due to oil and gas activities being conducted outside these time periods.

*Standard Lease Terms: Standard Lease Terms* would provide little or no protection to any of the Management Indicator Species or their key habitat components. Oil and gas activity would result in an increased potential for adverse impacts to MIS and/or the species and habitat they represent.

Oil and gas activity in itself, would have less of an effect on the pine marten than the connected action of potential timber harvests in previously unroaded areas. Timber harvest would fragment old growth stands, making habitat much less capable of supporting healthy pine marten populations. Timber harvest would also destroy habitat for the red-backed vole, one of the chief prey species for the pine marten. New roads would allow increased trapper access. Habitat loss and direct mortality due to trapping could potentially deplete or exterminate pine marten populations.

Disturbance from any human related activity could cause goshawk to abandon nests, especially in the early stages of egg laying and incubation.

BLM 0048247

The Abert's squirrel has a very narrow range of habitat use, requiring mature ponderosa pine forests exclusively, for its livelihood. Individuals have very small home ranges and would be adversely affected by new road construction or drill pad construction in mature or old growth stands of ponderosa pine. This would result in a loss of already very limited habitat. Roads through prime habitat would result in direct mortality of animals crossing these roads.

Red crossbill individuals could be adversely affected by oil and gas road construction or drill pad development, but this species and similar species would be more adversely affected by timber harvesting connected actions.

The Hairy and Lewis' woodpeckers would be only slightly impacted by road or pad construction.

## Environmental Factor: Wildfire

*No Lease and No Surface Occupancy: No Lease* and *No Surface Occupancy* would result in no additional threat of wildfire as a result of increased human activity in an area. However, access that may have been provided to an area with oil and gas activities would not be available to assist in the control of wildfire.

*Controlled Surface Use and Standard Lease Terms:* Oil and gas activities would result in an increased potential for wildfire occurrence as a result of human activities in an area. Access provided by the activities would result in improved access to previously inaccessible areas and would aid in the suppression of wildfire. Operators would be required to have and maintain in good operating condition, fire control equipment commensurate with the size of their operations.

*Timing Limitations: Timing Limitations* restricting activity during periods of high fire hazard would lessen the potential for impacts related to oil and gas activity

## Environmental Factor: Economics - Cost to Industry

*No Lease: No Lease* would result in an area not being available for oil and gas leasing and the subsequent activity related to the search for oil and gas resources. Opportunities for capital gains as a result of discovering oil and gas resources would be lost from the areas of *No Lease.*

*No Surface Occupancy: No Surface Occupancy* stipulated on a certain piece of ground, would require the operator to access the oil and gas resources from outside the area. Directional drilling techniques would have to be employed to recover oil and gas resources beneath an area stipulated as *No Surface Occupancy.* These directional drilling techniques are much more expensive, in terms of the equipment and number of personnel involved in the activity. The risk for missing the target formation would also be higher. The costs and the risk involved in directional drilling may preclude exploration for oil and gas resources in the area. *No Surface Occupancy* has an adverse affect on the oil and gas industry.

*Controlled Surface Use:* The mitigation measures specified for the various *Affected Environments* discussed in this Chapter and in Appendix H, would result in higher exploration, road, well pad, and pipeline construction, and operating costs to the operator, than would *Standard Lease Terms.* In some cases, the costs may be so high that the operator may not choose to drill until oil and/or gas prices would be high enough to justify the additional costs.

*Timing Limitations: Timing Limitations* on an operator compresses the time available for exploration and development activities to occur on a leasehold. This may result in a need for a larger workforce to accomplish the work and any required reclamation prior to late fall and winter. In many areas of the Forest, because of the harsh climatic conditions found at the higher elevations, operators typically cannot work from the first of February through May because of snow and poor road conditions. *Timing Limitations* outside that window would likely increase costs to the operator.

Environmental Consequences of Lease Options
General Forest

BLM 0048248

***Standard Lease Terms:*** *Standard Lease Terms* would be the least impacting to the oil and gas industry in terms of operating costs. Reasonable mitigation measures, as provided by *Standard Lease Terms,* would be an additional financial burden on industry, as compared with operating costs on non-federal lands.

NOTE: The next section describes the environmental consequences of lease options in those unique Affected Environments identified in Chapter III. For an understanding of the overall organization of this chapter, refer to the description of the analysis process in Chapter I. Only those environmental factors which are uniquely affected in a given *Affected Environment,* are discussed under each of the following *Affected Environment* discussions. Affects, in terms of other environmental factors are covered in the discussions of environmental consequences in the General Forest.

## Floodplains

Habitats in Floodplains are also generally discussed below under Aquatic/Riparian/Wetland Habitats. Regardless of the lease option, oil and gas activity within Floodplains are subject to approval in a Surface Use Plan of Operations. The majority of the impacts would occur from road construction and location. Timing of activities and mitigation efforts may also influence how significant or severe these impacts may be.

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would effectively eliminate surface water quality impacts in the Floodplain environment.

***Controlled Surface Use:*** *Controlled Surface Use* in the Floodplain environment would not allow the placement of well pads, tank batteries, pipelines or gravel sources within the Floodplain. Location of facilities and the potential pollutants outside the Floodplain would result in a decreased potential and risk for water quality impacts.

***Timing Limitations:*** During the wet times of the year the ground is saturated or flooded, which would result in increased soil disturbance and potential for transport of pollutants to the nearby stream. Restricting or eliminating use in the Floodplain during those wet seasons would prevent unnecessary water quality degradation.

***Standard Lease Terms:*** *Standard Lease Terms* could allow the operator to site facilities within the Floodplain, subject to reasonable mitigation measures. Within the realm of reasonable mitigation measures, the Forest authorized officer, with sufficient reasons, could require the operator to site facilities outside the Floodplain. Road, well pad, and pipeline construction, removal of vegetation, drilling activities, and the storage of potentially toxic materials within a Floodplain would potentially result in water quality degradation. The Floodplain is an extension of the stream itself and its contamination or alteration would have a direct impact upon the water quality and hydrologic function of the stream.

## Aquatic / Riparian / Wetland Habitats

For the purposes of this discussion, "Riparian areas" include the Aquatic ecosystem (includes fisheries habitat), Riparian ecosystem and Wetlands. Regardless of the lease option, oil and gas activity within Riparian areas and Wetlands are subject to approval in a Surface Use Plan of Operations. The majority of the impacts would occur from road construction and location, culvert placement and stream crossings. Timing of activities and mitigation efforts may also influence how significant or severe these impacts may be.

BLM  0048249

Further discussion of the importance and function of these *Affected Environments* (Aquatic, Riparian and Wetlands) is included in the discussion of the effects of the program alternatives on pages IV-64 to IV-67 of this chapter.

## Environmental Factor: Vegetation

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no additional effect to vegetation in Aquatic habitats, Riparian areas, and Wetlands within the analysis area, except where road or pipeline crossings are approved in a SUPO.

***Controlled Surface Use, Timing Limitations and Standard Lease Terms:*** *Controlled Surface Use, Timing Limitations*, and *Standard Lease Terms* could allow vegetation removal within this environment. This would lead to an increased potential for water quality impacts as some of the natural sediment filtering mechanism that vegetation provides would be removed.

## Environmental Factor: Soils

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no increase in impacts except where road and pipeline crossing through these areas are approved in a SUPO. Mitigation measures would be applied to lessen these impacts.

***Controlled Surface Use, Timing Limitations and Standard Lease Terms:*** Because of the sensitivity of these areas, *Controlled Surface Use, Timing Limitations* and *Standard Lease Terms* would result in relatively major disturbance and would have a high potential for causing substantial impairment of soil productivity, releasing large amounts of sediment into active waterways, lakes or ponds. These soils, due to generally high water tables and large amounts of organic matter, are very sensitive and susceptible to rutting, displacement, puddling and erosion. Large scale disturbances resulting in rutting, displacement, puddling, or erosion would be potentially detrimental to long-term productivity and the integrity of the entire ecosystem.

## Environmental Factor: Water Quality and Quantity

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* within Aquatic habitat, Riparian areas, and Wetlands would result in no additional effects to existing water quality. On occasion Riparian crossings by roads or pipelines would be unavoidable. Recognizing that these exceptions would occur there would be potential for impacts to water quality. Sediment would be the most significant potential water quality effect. Disturbance adjacent to and within the channel and road fill placement during construction, make crossings typically high, short-term sediment producers. Long-term impacts also occur from sediment transported down the road bed, ditches, and fill slopes and deposited directly into the stream.

Other water quality risks associated with stream crossings pertain to the traffic on the road and the material transported. There is always potential for an accident that would spill chemicals such as fuel, drilling mud agents, condensate and waste water into the stream. Many of these are considered hazardous and toxic materials. An operator is required to have a Spill Prevention Control and Countermeasure Plan in place prior to any activities, which is designed to minimize potential impacts.

Protection of Riparian areas and Wetlands would also help to reduce water quality impacts, which could occur from activities on the General Forest. Riparian areas are important buffers and filters which prevent pollutants from entering stream courses and bodies of water.

***Standard Lease Terms:*** Riparian areas and Wetlands are identified as areas of *No Surface Occupancy* under Forest Service oil and gas regulations. Because of the close proximity to surface water sources and shallow groundwater tables, water quality is easily degraded within this environment. Loss

BLM 0048250

or decline in condition of Riparian and Wetland areas would also reduce their effectiveness in improving the water quality contributed by upstream areas. Water quality impacts would occur directly as a result of the activities associated with exploration, development and production of oil and gas. Long term impacts could also occur indirectly, through the loss of Riparian/Wetland function.

## Environmental Factor: Fisheries and Aquatic Habitat

*No Lease: No Lease* would result in no additional adverse impacts on the Aquatic habitat and the fisheries and aquatic organisms associated with it. *No Lease* would allow for maintenance of the existing conditions, and would provide for Aquatic and Riparian protection.

*No Surface Occupancy: No Surface Occupancy* would generally provide for protection of the fisheries and Aquatic system, by disallowing any activities within the Riparian area (stream ecosystem and Riparian ecosystem). However, the potential for impacts from activities which occur outside the Aquatic/Riparian corridor is high. Also, this option may not preclude the need for roads through stream and Riparian systems and thus, the impacts associated with road construction would be unavoidable and would be mitigated. This potential exists with all the lease options, and does not necessarily mean that because there is *No Surface Occupancy* or *No Lease*, there would be no possibility of impacting the resources these options are designed to protect.

*Standard Lease Terms: Standard Lease Terms* have the greatest potential for impacting the Aquatic and Riparian ecosystems than any of the other lease options. The potential for significant long-term impacts is increased considerably, because this lease option is dependent on the agency's ability to administer and monitor the oil and gas leasing activities and enforce the regulations associated with this option. Because of the inherent sensitivity of these Aquatic and Riparian ecosystem and their interdependence upon each other for maintaining habitat quality, the potential for irreversible impacts from this lease option are high. Depending on the "current conditions" of the Aquatic and Riparian habitats, this lease option may not provide enough protection from activities adjacent to the Aquatic/Riparian corridor, and from existing leases.

## Environmental Factor: Riparian (Wetlands)

*No Lease: No Lease* would provide for the protection of the Aquatic as well as the Riparian resources. The major functional attributes referred to on page IV-13, would be preserved and the over-all health of the Riparian area would be maintained. Consideration must be given, however, to activities which are allowed in areas adjacent to these Riparian areas that may result in impacts to the Aquatic and Riparian resources downstream or adjacent to the oil and gas operation sites. Activities such as road construction, culvert placement and stream crossings would still be permitted under the *No Lease* option, and these activities may have direct impacts on the Aquatic and Riparian resources. This is especially critical when dealing with areas where the Riparian area is in a less than desirable condition as a result of past activities, and is not able to function effectively in the manner referred to previously. If this is the case, then there is an increased possibility that the Aquatic resource will be impacted.

*No Surface Occupancy:* This lease option may help to preserve the integrity of the Aquatic/Riparian system, but would not provide adequate protection where the oil and gas activities are closely associated with the Riparian areas. There is still the potential for "off site" impacts from sediment flow, mass wasting and spill of hazardous materials, that have to be considered.

*Standard Lease Terms:* Again, as under the "Fisheries and Aquatic Habitat" section, this lease option is the least restrictive of the five and has the potential to have the greatest impact(s) on the Riparian area (Aquatic and Riparian ecosystems). Even with specific stipulations and mitigation, this lease option may have the potential to cause irreversible damage to the Aquatic and Riparian habitats. The other options are designed to prevent loss or damage to the Riparian and stream systems, where this particular option is dependent on proper mitigation techniques and the agency's ability to closely

BLM 0048251

Oil and Gas Leasing Analysis FEIS

monitor the activities taking place. Too often, the impacts are at a level where mitigation is not effective and the subsequent impacts to the resources are long-term and significant.

# Alpine / Tundra Areas

## Environmental Factor: Vegetation

**No Lease and No Surface Occupancy:** *No Lease* and *No Surface Occupancy* would result in no net change to the *Affected Environment*. No disturbance of Alpine/Tundra vegetation would occur.

**Controlled Surface Use:** *Controlled Surface Use* would partially mitigate some of the impacts to vegetation. Revegetation techniques in alpine areas have not been totally proven effective, but practices that have shown limited success are: lifting and saving the tundra vegetation in chunks of sod to be later placed over the disturbed areas usually works for short time periods of disturbance (up to two months), intense collection of local seeds for later revegetation and purchasing of special high-elevation seed (not readily available), the use of chemical stabilizers, tackifiers and blankets. All of this, with very close control of water flow over the site and continual monitoring of effectiveness would help to mitigate impacts to vegetation.

Most attempts at mitigation and rehabilitation would result in an environment modified from natural conditions.

**Timing Limitations:** *Timing Limitations* during those times of the year when the alpine ecosystem is most susceptible to damage, would mitigate some of the effects to vegetation in these areas. Winter drilling or drilling on snow and avoidance of activities during saturated soil conditions, would be required to lessen the effects of activities on soils and thus, vegetation in Alpine/Tundra areas. However, some vegetation removal and disturbance would still occur.

**Standard Lease Terms:** The use of *Standard Lease Terms* would result in long-term environmental consequences. The overall harsh conditions, high potential for water and wind erosion, and extremely low revegetation potential, would result in a disturbance that would irreversibly alter the Alpine/Tundra ecosystem.

## Environmental Factor: Soils

**No Lease and No Surface Occupancy:** *No Lease* and *No Surface Occupancy* would result in no net change to Alpine/Tundra areas. They would protect the resource values of alpine areas. No accelerated erosion would occur, and ecosystems would remain intact. The natural soil environment would remain undisturbed. These are the only lease options that would leave alpine ecosystems in an unaltered condition.

**Controlled Surface Use:** *Controlled Surface Use* would partially mitigate some of the impacts on the soil resource. Due to the harsh conditions and high moisture conditions at times, very intense state of the art erosion control measures would be required, (i.e., geotextiles, erosion control fabric, mats, geoweb soil support materials, etc.) to maintain erosion at acceptable limits.

Most attempts at mitigation and rehabilitation would result in an environment modified from natural conditions.

**Timing Limitations:** *Timing Limitations* during those times of the year when the alpine ecosystem is most susceptible to damage would mitigate some of the effects to the soil resources in these areas. Winter only drilling or drilling on snow only and avoidance of activities during saturated soil conditions would be required to lessen the effects of activities in Alpine/Tundra areas.

BLM 0048252

*Standard Lease Terms:* Without mitigation, the use of *Standard Lease Terms* would result in long-term environmental consequences. The overall harsh conditions, high potential for water and wind erosion, and extremely low revegetation potential, would result in a disturbance that would irreversibly alter the alpine ecosystem.

## Environmental Factor: Water Quality

These areas generally receive abundant precipitation. Due to harsh climate and shallow soils, Alpine/Tundra areas are very susceptible to damage, and slow to recover. Water quality is easily impacted within these fragile ecosystems. Sediment and acid rock drainage are water quality parameters which are most at risk of being adversely impacted within this environment.

*No Lease and No Surface Occupancy:* *No Lease* and *No Surface Occupancy* would result in no environmental consequence to water quality.

*Controlled Surface Use:* *Controlled Surface Use* stipulations would include measures to minimize and eliminate surface disturbance. In addition containment and disposal of both surface and groundwater would be important in protecting water quality. The shallow soils would provide poor absorption and buffering capacity in the event of spills. Extraordinary measures such as those discussed above in "Environmental Factor: Soils" would be necessary in order to achieve adequate reclamation to protect water quality.

*Timing Limitations:* *Timing Limitations* during those times of the year when the alpine ecosystem is most susceptible to damage would mitigate some of the effects to water quality in these areas. Winter drilling or drilling on snow and avoidance of activities during saturated soil conditions would be required to lessen the effects of activities on soils, and thus, water quality in Alpine/Tundra areas. However, some vegetation removal and disturbance would still occur.

*Standard Lease Terms:* Under the *Standard Lease Terms* water quality effects may be both significant and long term. Typical operations and mitigation would not be very effective at preventing adverse impacts to water quality in Alpine/Tundra areas.

## Environmental Factor: Visual Resources

*No Lease and No Surface Occupancy:* *No Lease* and *No Surface Occupancy* would result in no additional effect on the visual resources in Alpine/Tundra areas.

*Controlled Surface Use:* The impacts of oil and gas activities on the visual resources in Alpine/Tundra areas would be lessened by the use of the mitigation measures specified for the soil and vegetation resources. However, some long-term affect on the visual resources in these areas would be expected, due to the harsh climatic conditions, the short growing season, the lack of screening vegetation, and shallow soils. In other words, soil disturbance and vegetation removal from oil and gas activity in these areas would be slow to heal and hard to hide.

*Timing Limitations:* *Timing Limitations* during those times of the year when the alpine ecosystem is most susceptible to damage would mitigate some of the effects to visual resources in these areas. Winter drilling or drilling on snow and avoidance of activities during saturated soil conditions would be required to lessen the effects of activities on soils and vegetation in Alpine/Tundra areas. However, soil disturbance and vegetative impacts would likely occur as a result of road and drill pad construction, and impact visual resources.

*Standard Lease Terms:* Impacts to visual resources in Alpine/Tundra areas would likely be long-term due to the harsh climatic conditions, the short growing season, lack of screening vegetation, and shallow soils. Scars from oil and gas activities in these areas would be highly visible and would detract from the natural setting.

BLM 0048253

## Environmental Factor:  Recreational Use and Opportunities

*No Lease and No Surface Occupancy:*  *No Lease* and *No Surface Occupancy* would allow existing recreational use and opportunities to continue in Alpine/Tundra areas without disturbance from oil and gas activity.

*Controlled Surface Use:*  The potential impacts to recreational uses and opportunities may be somewhat lessened by the use of mitigation measures that strictly control noise and visual impacts. Generally, industrial activity in this environment would degrade the recreational experience and would likely result in decreased use by recreationists.

*Timing Limitations:*  The season of use for both activities, oil and gas and recreation, is very short due to adverse weather conditions.  A *Timing Limitation* on the oil and gas industry that covers the recreational use period could effectively eliminate the potential oil and gas activity.  The length of time on either end of the *Timing Limitation* would probably be too short for oil and gas operations to occur.  The oil and gas operations would be up against adverse weather, which could jeopardize both their operations and the environment.

*Standard Lease Terms:*  The potential impacts to recreational uses and opportunities may be somewhat lessened by the use of mitigation measures that strictly control noise and visual impacts. Generally, industrial activity in this environment would degrade the recreational experience and would likely result in decreased use by recreationists.  *Standard Lease Terms* may be somewhat less effective than *Controlled Surface Use* in providing the mitigation and the strict control that would be required in this sensitive environment.

# Areas of High Geologic Hazard

## Environmental Factor:  Geology

Forest Service regulations at 36 CFR 228.108(j) do not allow an operator to conduct operations in areas subject to mass soil movement except as approved in a Surface Use Plan of Operations.

*No Lease:*  *No Lease* in High Geologic Hazard areas would result in no increased impacts over natural baseline levels of mass soil movement.

*No Surface Occupancy:*  *No Surface Occupancy* would result in a slightly increased potential for impacts over natural levels.  If approved in a SUPO, an operator could occupy the surface of an area subject to mass soil movement.  The potential for effects as a result of operations in an area subject to mass soil movement would be greater than if the area was not leased (even assuming the operator would have to propose acceptable mitigation and design measures in areas subject to mass soil movement in order to have his SUPO approved).

*No Surface Occupancy* attached to the lease would put the requirement of *No Surface Occupancy* up front with the lease.  The Forest Service administrator of the lease would not have to rely solely on the regulations to adequately protect the resources (water quality and soil productivity) that could potentially be adversely affected by the acceleration of slope movements such as landslides, mudflows, and earthflows.  The area would be identified in the stipulation, whereas if not stipulated, the operator may not be aware that there is an area on the leasehold that he cannot occupy.

*Timing Limitations:*  *Timing Limitations* would do little to reduce the potential for mass soil movement.  Ground-disturbing activity in an area subject to mass soil movement greatly increases the potential for acceleration of slope failure, regardless of when it occurs.

BLM 0048254

***Standard Lease Terms:*** *Standard Lease Terms* would result in a slightly increased potential for acceleration of slope movement over background levels. With this option a stipulation specifically addressing High Geologic Hazards would not be attached to the lease. Although areas subject to mass soil movement are protected by Forest Service regulation, the potential for adverse impacts is slightly higher due to lack of prior identification and acknowledgment of High Geologic Hazard in the area, i.e., the Forest Service administrator and the lessee may not be aware of the geologic hazard. Even with mitigation measures as specified in a SUPO, the potential for adverse impacts to soil and water resources would be greater than if the site was not occupied.

## Environmental Factor: Water Quality

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no additional effects to water quality. Activities outside a leasehold could result in acceleration of slope movement, especially if the hydrologic influence zone of the landslide extends outside the leasehold. Activity within the hydrologic influence zone could contribute to acceleration of slope movement. Also, vibration within a rock strata underlying an unstable area could initiate movement.

***Controlled Surface Use:*** *Controlled Surface Use,* such as no new road construction or well pads, would eliminate much of the potential for impacts to water quality. The location of well pads in unstable areas would likely impact water quality due to undercutting or overloading slopes, and thus increase the probability of a failure occurring. Shifts and movement within the regolith could result in damage to the drill pipe and casing, which would then threaten contamination of groundwater.

***Timing Limitations:*** *Timing Limitations* would do little to reduce the potential for mass soil movement. Ground disturbing activity in an area subject to mass soil movement greatly increases the potential for acceleration of slope failure and water quality degradation, regardless of when it occurs.

***Standard Lease Terms:*** *Standard Lease Terms* would result in an increase in sediment delivered to nearby drainages. These are areas with high natural erosion rates that are easily accelerated by surface disturbing activities. Areas prone to mass movement are characterized by dissected topography with high drainage densities. This increases the likelihood of sediment reaching streams.

# Areas of Moderate Geologic Hazard

## Environmental Factor: Geology

***No Lease:*** *No Lease* in Moderate Geologic Hazard areas would result in no increased impacts over natural baseline levels of mass soil movement.

***No Surface Occupancy:*** *No Surface Occupancy* would result in a potential increase over baseline slope movement levels. The potential for effects would be similar to that described below for *Controlled Surface Use.* This assumes the operator would have to propose adequate mitigation and design measures to have a waiver, exception, or modification to the *No Surface Occupancy* stipulation approved.

***Controlled Surface Use:*** With special road and well pad design by qualified engineers or engineering geologists, the potential for adverse impacts in areas of Moderate Geologic Hazard would be lessened, compared to *Standard Lease Terms.* The design must consider drainage, backslope and fillslope ratios, and road grade and standards relative to the engineering properties of the materials at the site. Even with design appropriate for the soil conditions, ground disturbing activities in Moderate Geologic Hazard areas increases the potential for activation of landslides, earthflows, and mudflows over that of a natural, undisturbed site.

BLM  0048255

***Timing Limitations:*** *Timing Limitations* would do little to reduce the potential for mass soil movement. Ground disturbing activity in an area subject to mass soil movement greatly increases the potential for failure regardless of when it occurs.

***Standard Lease Terms:*** The use of *Standard Lease Terms* in areas of Moderate Geologic Hazards fails to recognize the potential for adverse impacts to surface resources. Without consideration of the potential for slope failure, slope failure would likely occur. The majority of the slope failures would probably be small, affecting only the cut and fill slopes of newly constructed roads or well pads. However, the potential for triggering a massive slope failure would be greatly increased, especially in those areas of active and past active slopes.

## Environmental Factor: Water Quality

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* of areas with Moderate Geologic Hazards would result in no additional effects to water quality.

***Controlled Surface Use:*** The use of a *Controlled Surface Use* stipulation would eliminate much of the impacts to water quality. The location of well pads in unstable areas would likely impact water quality due to undercutting or overloading slopes, and thus increase the probability of a failure occurring. Shifts and movement within the regolith could result in damage to the drill pipe and casing which would then threaten contamination of groundwater.

***Timing Limitations:*** *Timing Limitations* would do little to reduce the potential for water quality contamination, which is high in this environment.

***Standard Lease Terms:*** *Standard Lease Terms* would result in an increase in sediment delivered to nearby drainages. These are areas with high natural erosion rates that are easily accelerated by surface disturbing activities. Areas prone to mass movement are characterized by dissected topography with high drainage densities. This increases the likelihood of eroded materials reaching stream courses as sediment.

# Roadless Areas

## Environmental Factor: Recreation/Visual Resources/Wilderness Values

Opportunities for Semi-primitive to Primitive recreation experiences are currently being provided by the Roadless Areas in the analysis area. These experiences vary according to the specific area (refer to specific descriptions in Chapter III). Effects are a function of whether exploration and development are allowed or not, rather than of which leasing stipulation is imposed. The lease option stipulations have limited true mitigating effects on the character of the area. Essentially any development would significantly effect the nature of the recreation experience, reducing what is now a Semi-primitive or Primitive environment (see ROS Users Guide for definitions of these environments), to a Roaded Natural one, in that portion of the affected Roadless Area. Even areas with closed roads, once roads and drill pads are in place, do not meet the appearance and experience criteria to be called Semi-primitive or Primitive. Operations and maintenance traffic would further detract from the solitude/remoteness/naturalness associated with the Semi-primitive and Primitive ROS classes.

Another consequence of the development of Roadless Areas for oil and gas is the impact on opportunities for high quality, guided hunting and camping experiences. Outfitter/guides focus the majority of their activities in remote and inaccessible areas. Each of the Roadless Areas in the analysis area has some of this type of activity permitted in it. Reduction in the unroaded character or remoteness of these areas would significantly reduce the quality of the experience for people now willing to pay substantial fees for camping and hunting with an outfitter/guide, in a "backcountry" environment. Oil and gas activities could significantly degrade the attractiveness of the overall experience that a

Environmental Consequences of Lease Options
Roadless Areas

BLM_0048256

particular outfitter/guide offers, and result in significant loss of financial opportunities for him. It would also reduce the overall amount of this type of experience available in the area.

Specific descriptions in Chapter III of each of the Roadless Areas in the analysis area, allow for the consideration of the character of each Roadless Area, and the true nature of wilderness opportunities lost in the event of a choice to develop oil and gas resources in them.

Where stipulations are attached to a lease to protect roadless values in Roadless Areas (such as *NSO* applied to the Battlement Mesa Roadless Area) waivers, exceptions and modifications will be considered only if the proposed activity would protect the roadless value and character of the area. Under this EIS, *NSO* is the only stipulation used to protect the roadless character of a Roadless Area.

***No Lease:*** With *No Lease* in this *Affect Environment*, Roadless Areas would not be available for oil and gas leasing. No impacts from oil and gas activity would occur to Roadless Areas not available for leasing (except for potential activity in those areas already leased). No roads would be allowed in Roadless Areas not available for leasing.

***No Surface Occupancy:*** Roadless Areas with *NSO* would be available for leasing, but surface occupancy would not be allowed. However, surface resources may be impacted if a waiver, exception, or modification of this stipulation were granted. A waiver, exception or modification of this stipulation allowing road construction would result in some loss of roadless values.

***Controlled Surface Use and Standard Lease Terms:*** Development associated with oil and gas exploration results in direct loss of roadless character. The result is a lost opportunity for that area to be added to the National Wilderness System in a roadless and undeveloped state.

Under any of the three lease options allowing development and surface occupancy, oil and gas development in these areas could amount to no more than a single access road and drill pad, resulting in a dry hole which is plugged and abandoned. The road would then be obliterated. However, in the event of a successful find, coupled with increasing prices for natural gas, full field development could result in a "Most Development Possible" scenario. The amount of roads, drill pads and pipelines under this scenario would certainly change the character of the Roadless Area and would eventually reach that described in the "Description of Typical Oil and Gas Activities - A Layman's Experience" in Appendix G.

The selection of either of these lease options for Roadless Areas would result in surface use within the leasehold. Roads, well pads, buildings, and possibly pipelines would be allowed. Under *Controlled Surface Use*, the Forest Service have control over certain aspects of the operation, as defined in the stipulation attached to the lease. Examples might be road locations and design, drill pad placement, and the types and design of facilities on drill sites. Access for exploration may be restricted. Full field development could ensue following a successful find.

*Controlled Surface Use* would not mitigate the consequences as the primary factor that makes a roadless area a Roadless Area, is the lack of roads. Any road construction in a Roadless Area would result in loss of roadless recreation, visual resource, and Wilderness values of natural integrity, apparent naturalness, remoteness and solitude.

***Timing Limitations:*** *Timing Limitations* generally would not mitigate the effects that could change the character of a Roadless Area. The presence of a road gives the user a different perception of the area and changes their expectations. A road gives the area a feeling that man has been there and has somehow altered the qualities of the area. *Timing Limitations* may, however, restrict use in the area to certain time periods and could mitigate some of the impacts that would occur as a result of a greater human presence.

BLM_0048257

Development associated with oil and gas activities results in direct loss of roadless character. The opportunity for that area to be added to the National Wilderness System in a roadless and undeveloped state is a foregone result.

## Environmental Factor: Timber Lands Made Suitable

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no effect to timber lands made suitable. However, access provided to adjacent areas may allow for future timber sale.

***Controlled Surface Use, Timing Limitations and Standard Lease Terms:*** *Controlled Surface Use*, *Timing Limitations*, and *Standard Lease Terms* would generally allow road construction for oil and gas operations. The road may make areas that were not suitable because of high road costs, suitable and subject to future timber sales. The increased access would also allow for other management activities to take place, such as wildlife habitat improvements and control of insects, disease, and wildfire. The effects of timber harvest which could occur following oil and gas access are extensively documented in the Grand Mesa, Uncompahgre and Gunnison National Forest 1991 Forest Plan Amendment Final Supplemental Environmental Impact Statement.

## Environmental Factor: Wildlife

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no additional effects to wildlife and wildlife habitat in Roadless Areas.

***Controlled Surface Use, Timing Limitations and Standard Lease Terms:*** *Controlled Surface Use*, *Timing Limitations, and Standard Lease Terms* would change wildlife habitat characteristics significantly. Access provided into areas now roadless, would fragment existing blocks of older-aged forests. Wildlife species which thrive on edge ecosystems would be attracted. The cow bird, which moves in and then parasitizes other bird nests, is an example. The ecology of these areas would change as a result. Roads would provide access, bringing with it the associated negative effects on habitat effectiveness. (See discussion under Biological Diversity, pages IV-39 through IV-41.)

New road construction into previously unroaded habitat can be a very detrimental impact on big game and their habitat. Unroaded habitat is relatively undisturbed country and serves as a sanctuary for wildlife. These areas provide security habitat for all big game species and are relatively free of human related disturbances. As access is established in these areas, security is lost to a large extent. Permanent closure of these roads does provide renewed security, but not to the level of the area when it was unroaded.

Roads built and closed, would provide access corridors which would in turn be used by hunters and trappers on horseback, on bicycles, on ATV's, on snowmobiles and on foot. Traffic associated with simple maintenance and operation of producing wells would result in periodic and regular disturbance of what is now essentially undisturbed habitats. The roading and the access provided are especially detrimental to wildlife species which require large blocks of undisturbed habitat, such as wolverine, lynx and pine marten. The only way to regain security nearly equal to the historic levels, is to physically obliterate the road and recontour the slope.

Loss of security habitat found in the remaining unroaded slopes, would likely result in big game animals moving down onto private land earlier in the fall, compounding an increasing problem for private land owners and the Colorado Division of Wildlife (animal damage claims).

The Battlement Mesa Roadless Area contains critical habitat for Rocky Mountain bighorn sheep. Oil and gas activities in that particular Roadless Area could significantly reduce the habitat effectiveness of the area with direct effects on the herd itself.

BLM_0048258

## Research Natural Areas

### Environmental Factor:  Proposed Tabeguache Research Natural Area

*No Lease:* *No Lease* would protect the intended use of a Research Natural Area. The Tabeguache is proposed to be designated as a Research Natural Area. *No Lease* would protect this area from potential oil and gas activity until it is formally designated a Research Natural Area. At that time, procedures to withdraw the area from mineral entry and mineral leasing will be initiated.

*No Surface Occupancy:* *No Surface Occupancy* would protect surface resources within the Research Natural Area from ground disturbing activity from oil and gas operations. However, Research Natural Areas are generally withdrawn from mineral entry and mineral leasing. This option would not be consistent with the Forest Service Manual direction to withdraw Research Natural Areas from mineral leasing.

*Controlled Surface Use, Timing Limitations and Standard Lease Terms:* Any ground disturbance from oil and gas activity within a Research Natural Area would conflict with the intended uses of these areas (see Chapter III, page III-90).

## Sensitive Areas

### Environmental Factor:  Recreation Opportunities

*No Lease and No Surface Occupancy:* *No Lease* and *No Surface Occupancy* would result in no net change to recreational opportunities within Sensitive Areas.

*Controlled Surface Use:* With the measures specified to protect the visual resources, such as careful facility screening, the casual forest visitor would only be aware of oil and gas activity by seeing traffic associated with the activity. Generally, the on-the-ground facilities would not be readily visible. If industrial traffic volumes in these areas is greatly increased over levels prior to oil and gas activities, a perception of decreased recreational opportunities may be experienced by the recreationist.

*Timing Limitations:* Limiting oil and gas activities to periods of low recreation use would minimize the potential for conflict between the industrial use and recreational use of the area. However, there are also recreationists that use these areas that wait until the peak use season is over. *Timing Limitations* would do little to "protect" their recreational experience.

*Standard Lease Terms:* Visible oil and gas facilities may alter the recreational use in these areas. Previous perceptions of the area may be changed, which could result in changed or decreased use. The potential for conflict between the traditional recreational user of these areas and the industrial user would be greater.

Oil and gas activities in these areas may result in increased and improved access for the recreationist. The road systems may need to be improved to accommodate the mixed industrial and recreational traffic, resulting in not only a smoother, graded road, and increased recreational user comfort, but a changed recreational experience because of the road improvements.

## Environmental Factor: Visual Resources

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no net change to Sensitive Areas.

***Controlled Surface Use:*** *Controlled Surface Use* would consist of only allowing drill pad development and use when vegetative or land form screening exists, and therefore minimizing the visual impacts to the casual forest visitor from arterial and collector road system. This stipulation would still create a reduction in the quality of these Sensitive Areas. The *CSU* stipulation could also consist of limiting road use to established open roads; thereby maintaining the existing road character of the area.

***Timing Limitations:*** *Timing Limitations* in this case would consist of limiting drill pad development to periods of low recreation use and therefore minimizing the conflict between industrial development and the general public. This stipulation would still result in a reduction in the visual quality of these Sensitive Areas.

***Standard Lease Terms:*** Under the *Standard Lease Terms*, Sensitive Areas would potentially be significantly impacted by the presence of facilities (well pads, roads, pipeline corridors, and storage tanks) related to oil and gas exploration, development, and production.

# Retention VQO

## Environmental Factor: Visual Resources

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no net change to the Retention VQO portion of the visual resource.

***Controlled Surface Use:*** *Controlled Surface Use* would allow drill pads to be sited where they would not alter the Retention VQO, and motorized travel would be limited to the existing open road system. With these measures, oil and gas activity would not be evident to the casual forest user, although some increase in traffic related to the activities may be apparent. This would generally maintain the VQO for these areas.

***Timing Limitations:*** *Timing Limitations* would generally make no difference in terms of mitigation of consequences. The primary factors that change the VQO are related to the scale and amount of development, large commercial vehicles, and the visually sensitive recreationist; not the timing of the activity.

***Standard Lease Terms:*** Under the *Standard Lease Terms*, a major portion of the Retention VQO areas would not meet their adopted visual quality, and the amount of Retention VQO in the analysis area would decrease. The presence of well pads, roads and related facilities would not meet the adopted Visual Quality Objective.

# Retention VQO and Low VAC

## Environmental Factor: Vegetation

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would protect the Visual Quality Objective.

***Controlled Surface Use, Timing Limitations and Standard Lease Terms:*** Removal of vegetation would result in the loss of screening in an area where maintaining existing screening is very

BLM 0048260

important. Roads and drill pads may become more visible to the casual forest user and may result in a reduced Visual Quality Objective and recreational experience.

## Environmental Factor: Visual Resources

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would protect the visual resources and Visual Quality Objectives in these areas.

***Controlled Surface Use, Timing Limitations and Standard Lease Terms:*** *Controlled Surface Use, Timing Limitations,* and *Standard Lease Terms* would generally make no difference in terms of mitigating effects. The primary factors in maintaining the VQO of an area relate to the scale and amount of development, the capability of the land to absorb or recover from development, and the visually sensitive recreationist. Any ground disturbance in these areas would result in the Forest Plan adopted Retention VQO not being met.

# Scenic Byway Corridors

***No Lease and No Surface Occupancy:*** No leasing option would result in no net change to the Scenic Byway Corridors.

***Controlled Surface Use:*** *Controlled Surface Use* would consist of 1) excluding drill pad development and operation in the foreground area seen from Scenic Byway Corridors, and 2) require all structures such as drill rigs, tanks, and buildings in middle ground seen areas to be colored to blend with the natural landscape. With this mitigation, the result would be no net change to the Scenic Byway Corridor as viewed by the casual forest user, i.e., the activities would not be readily apparent.

***Timing Limitations:*** *Timing Limitations* could lessen the visual impacts related to oil and gas activity by scheduling activities during low recreational use periods. However, some oil and gas activity, such as operation and maintenance of the facilities, would occur year-round. Timing would not mitigate the effects from those activities, but those effects are also thought to be generally of little significance in Scenic Byway Corridors, i.e., one or two vehicles per day would not add appreciably to existing traffic levels in Scenic Byway Corridors.

***Standard Lease Terms:*** *Standard Lease Terms* would not mitigate the effects to Scenic Byway Corridors. The primary factor that could change a Scenic Byway Corridor is the construction and operation of industrial facilities in an area promoted for its scenic attributes, and the high visual sensitivity of the recreational user of the byways. Oil and gas activities along these heavily used scenic/recreation routes would potentially result in decreased use, conflicts between users, and potentially adverse impacts to those communities dependent on tourism.

# Semi-primitive Non-motorized (3A Management Areas)

## Environmental Factor: Recreation Opportunities

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would not affect recreational opportunities in 3A Management Areas.

***Controlled Surface Use and Standard Lease Terms:*** *Controlled Surface Use* and *Standard Lease Terms* would generally allow the construction of roads, well pads, and pipelines. Depending on whether or not oil or gas resources were found, these activities would potentially result in a change from the current Semi-primitive Non-motorized ROS class to a more developed ROS class. The number of acres of Semi-primitive Non-motorized ROS class on the Forest would also potentially be reduced.

BLM_0048261

With development, a reduction in the quality of the recreational experience would occur to the traditional users of the area and those seeking the Semi-primitive Non-motorized experience. The physical setting would potentially change from predominantly natural or natural appearing, to predominantly natural appearing with moderate evidences of sights and sounds of man.

***Timing Limitations:*** *Timing Limitations* would not lessen the impacts significantly, because the presence of a road in a previously unroaded area, not the timing of the associated traffic or activities, is the primary factor that affects the recreation opportunities in 3A Management Areas.

## Environmental Factor: Visual Resources

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would not affect visual resources in 3A Management Areas.

***Controlled Surface Use:*** *Controlled Surface Use* would lessen the impacts to visual resources in 3A Management Areas if the stipulation contained provisions that would allow well pad siting where they would not alter the VQO and motorized travel would be limited to the established open road system in Retention VQO areas; and in Partial Retention VQO areas, only allow drill pad development and use in areas where vegetation or landform would screen the ground disturbance.

***Timing Limitations:*** *Timing Limitations* would not mitigate the effects to visual resources in 3A Management areas.

***Standard Lease Terms:*** *Standard Lease Terms* would potentially result in a change to the inventoried VQO in Retention and Partial Retention areas.

## Environmental Factor: Timberlands Made Suitable

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no direct effects to timber suitability in 3A Management Areas. However, the availability of a road network on adjacent land may affect timber suitability in these areas.

***Controlled Surface Use, Timing Limitations and Standard Lease Terms:*** *Controlled Surface Use, Timing Limitations* and *Standard Lease Terms* would generally allow the construction of roads in 3A Management Areas. Roads constructed may make timber previously unsuitable due to high access costs, economically viable for timber harvest. This could result in a slightly higher ASQ for the Forest. Increased access could also allow for wildlife habitat management and the more efficient control of insects, disease, and wildfire.

# Administrative Sites

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no effect to Forest Service Administrative Sites.

***Controlled Surface Use, Timing Limitations and Standard Lease Terms:*** *Controlled Surface Use, Timing Limitations* and *Standard Lease Terms* would make no difference in terms of mitigating effects, as the primary factor in change is the construction and operation of industrial facilities on a site developed for Forest Service administrative purposes. Oil and gas activity within an Administrative Site would interfere with the use of the site. Traffic, noise, and the general commotion around the drill site would disrupt administrative activity. These sites are typically less than five acres and would need to be relocated if a three acre well pad were to be constructed on them.

BLM_0048262

## Recreation Complexes

### Environmental Factor:  Developed Recreation

*No Lease:  No Lease* would result in no net change to the Developed Recreation Complexes.

*No Surface Occupancy:  No Surface Occupancy* in this case, would consist of requiring drill pad development and use to be located at least 1 mile from developed facilities; therefore, limiting the noise from the drill pad operation in the Developed Recreation Complex.  It is possible that during the APD stage, specific timing stipulation (time of day for operation) would also be determined to be needed in combination with this *No Surface Occupancy*.

*Controlled Surface Use:  Controlled Surface Use* would not generally mitigate the effects of activity within a developed recreation site.   The primary factor is the construction and operation of industrial facilities and its conflict with the high density recreational use of the area (see *Standard Lease Terms*).

*Timing Limitations:  Timing Limitations* in this case would consist of limiting drill pad development to low recreation use periods or when the developed facilities are closed.   This would minimize the conflict between industrial development and recreation use.  For most recreationists, this would result in potential degradation of the developed facility experience/recreation quality from the mere presence of oil and gas production facilities at a developed recreation site.

*Standard Lease Terms:*   Under the *Standard Lease Terms* the developed site experience/recreation quality would potentially be significantly impacted and use would potentially decrease.  The noise, traffic, and general visual impact at the recreation site are the primary factors that would affect the quality of the recreational experience at developed recreation sites.

### Environmental Factor:  Dispersed Recreation

*No Lease and No Surface Occupancy:  No Lease* and *No Surface Occupancy* would result in no net change to the Dispersed Recreation Complex.

*Controlled Surface Use:  Controlled Surface Use* would consist of 1) locating development outside of Dispersed Recreation Complexes and 2) limiting the use of motorized vehicles to existing roads in their current condition.  This would limit the potential for major conflict with backcountry recreationists using the dispersed recreation sites.  The backcountry (semi-primitive) character of the sites would generally be maintained.

*Timing Limitations and Standard Lease Terms:  Timing Limitations* and *Standard Lease Terms* would not mitigate the effects of oil and gas activities at dispersed sites.  The primary factors are development of drill pads and roads versus dispersed backcountry (semi-primitive) recreation.  The presence of a road or well pad at a Dispersed Recreation Complex would change the physical setting and recreation experience at the site.

### Environmental Factor:  Major Trail Systems - Crag Crest NRT

*No Lease:  No Lease* would result in no net change to the Crag Crest National Recreation Trail.

*No Surface Occupancy:  No Surface Occupancy* consisting of drill pad development and use at least one mile away from the Crag Crest National Recreation Trail, would limit potential impacts to users of the trail.  Trail-users would be buffered from potential noise from operations on the well pad. Structures such as drill rigs, tanks and buildings that can be seen from a distance would be required to

BLM 0048263

be colored to blend with the natural landscape. Although the facilities may be visible, they would not dominate the landscape.

***Controlled Surface Use and Standard Lease Terms:*** *Controlled Surface Use* and *Standard Lease Terms* would do little to mitigate the effects of oil and gas activities near the Crag Crest National Recreation Trail. Any ground disturbing or noisy activity within proximity of the trail would result in adverse impacts to the user experience and recreation quality. Trail use would potentially decrease.

***Timing Limitations:*** *Timing Limitations* restricting oil and gas activity to the winter months, would mitigate some of the effects associated with oil and gas activity in the vicinity of the Crag Crest Trail. The trail user wouldn't hear the noise or see ongoing oil and gas exploration activity. However, some impacts to the visual resource in the form of road and pipeline corridors and well pads would potentially be long lasting and would be apparent during the trail's high use season.

## Environmental Factor: Major Trail Systems - Cross Country Ski Trails

***No Lease:*** *No Lease* would result in no additional effect to the cross country trail systems in the analysis area.

***No Surface Occupancy:*** *No Surface Occupancy* within a 1/4 mile of a designated cross country ski trail (those discussed in Chapter III, pages III-96) would result in potential visual impacts to the recreation user of the trail. Depending on the extent of the facilities, the user would experience some degradation of recreation experience and may go somewhere else to ski, next time.

***Controlled Surface Use:*** *Controlled Surface Use* mitigation measures over and above reasonable mitigation under *Standard Lease Terms*, would probably do little more to reduce the impacts to the trail user.

***Timing Limitations:*** *Timing Limitations* restricting oil and gas exploration and development activities to May through November, would eliminate the potential conflict between industrial use of the area and recreational use of the area. The trail users and the oil and gas activity would occupy the trail corridor at different times of the year. The oil and gas activity would not directly affect the trail user. Ground disturbance would not be readily apparent to the trail user because of snow cover. Some facilities such as tank batteries and dehydration towers would be visible at the site if oil and/or gas resources are discovered.

***Standard Lease Terms:*** *Standard Lease Terms* potentially would result in conflict between recreational and industrial use. If drilling operations took place during the winter months, the trail user would hear the sounds, see the sights, and possibly smell the odors associated with oil and gas drilling. This would result in decreased recreational quality and experience. Use may decrease as a result. After the drilling is complete, if oil and/or gas resources are found, some facilities would remain at the site. The presence of the facility near the trail corridor would potentially result in a changed physical setting, a decreased recreational experience, and decreased trail use.

# Watersheds of Special Interest to Municipalities

## Environmental Factor: Water Quality and Quantity

***No Lease:*** *No Lease* would protect municipal watersheds from potential adverse impacts from oil and gas activity.

***No Surface Occupancy:*** *No Surface Occupancy* would eliminate the majority of potential impacts to water quality. The lessee has the option of using directional drilling. There would be potential for groundwater contamination from directional drilling. High quality aquifers could be contaminated

Environmental Consequences of Lease Options
Watersheds of Special Interest to Municipalities

BLM_0048264

from water from poor quality aquifers or drilling fluids, as a result of drilling operations. (See discussion under Groundwater, pages IV-48 and IV-50.)

**Controlled Surface Use:** Potential increases in sediment are likely even with the *Controlled Surface Use* restrictions identified in Appendix C (the *CSU* stipulation for Municipal Watersheds). These increases are likely to be very minor and generally of no real adverse impact to the value of these watersheds for domestic purposes. Of greatest concern are the risks associated with spills at the well pad or in transportation to and from the site. (Operators are required to have a Spill Prevention Control and Countermeasures Plan in place prior to any activity, designed to minimize potential impacts.) Also, sanitation assumes greater importance within municipal watersheds.

**Timing Limitations:** *Timing Limitations* would be applied during spring and fall periods when roads become saturated. This would lessen the potential for damage to the roads (mainly rutting), which would lessen the potential for accelerated erosion, sediment production, and turbid water.

**Standard Lease Terms:** *Standard Lease Terms* would result in a high probability that oil and gas operations would result in increased risk to the quality of municipal water supplies. Impacts would be primarily sediment associated with roads, well pads, pipelines and other surface disturbing activities. In addition, the risk of contamination due to spills and other accidents related to oil and gas exploration, development and production would be higher. Acquisition of water needed during drilling operations from onsite or nearby sources within the watershed would reduce the quantity of water delivered downstream to dependent communities.

## Slopes 40-60%

### Environmental Factor: Vegetation

**No Lease and No Surface Occupancy:** *No Lease* and *No Surface Occupancy* would result in no additional effect to vegetation on Slopes 40-60%.

**Controlled Surface Use:** *Controlled Surface Use* would generally allow the removal of vegetation for road, drill pad, or pipeline construction. The use of erosion control measures and the saving of native vegetation would help speed the reclamation process. However, some of the effects described below for *Standard Lease Terms* would still occur.

**Timing Limitations:** *Timing Limitations* would not mitigate the effects on vegetation on Slopes 40-60%.

**Standard Lease Terms:** *Standard Lease Terms* would allow vegetation removal for the construction of roads, well pads, and pipelines. Loss of vegetation would likely also result in some loss of vegetation biodiversity. Revegetation usually uses a minimum number of species. Understory vegetation would be dominant until trees have been re-established on the site. Because of high erosion potential, revegetation efforts are also much more difficult on steep slopes.

### Environmental Factor: Soils

**No Lease and No Surface Occupancy:** *No Lease* and *No Surface Occupancy* would result in no additional effect on Slopes 40-60%.

**Controlled Surface Use:** *Controlled Surface Use* assures adequate mitigation measures would be applied to minimize soil erosion. The measures needed in these situations would be above and beyond *Standard Lease Terms* to keep erosion rates within tolerable limits, i.e., erosion would still occur, but would be at acceptable levels. This would be especially important <u>near drainageways, ponded water areas, Riparian areas and Wetlands.</u>

BLM  0048265

Oil and Gas Leasing Analysis FEIS

***Timing Limitations:*** *Timing Limitations* would protect these high-erosion hazard sensitive soil areas during wet periods of time. Soils on Slopes 40-60% are extremely sensitive to accelerated erosion and sediment transport. Road construction and/or other activity that results in large soil disturbances, would be required to stop when the soils are saturated.

***Standard Lease Terms:*** *Standard Lease Terms*, in most cases, would generally not provide adequate protection to control erosion at acceptable levels. The use of *Standard Lease Terms* could cause significant or permanent impairment of soil productivity, or result in large quantities of soil to be deposited in streams. As the slope steepens, the amount of soil disturbed for road, well pad or pipeline construction increases greatly (See Appendix F).

## Environmental Factor: Visual Resources

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no additional effect on the visual resources on Slopes 40-60%.

***Controlled Surface Use:*** *Controlled Surface Use* mitigation measures would take advantage, where possible, of topography and vegetation screening opportunities to lessen the overall visual impact of oil and gas operations and facilities. Some degradation of the visual resource would likely occur from the construction of roads, well pads, and pipelines that would be difficult to hide on Slopes 40-60%.

***Timing Limitations:*** *Timing Limitations* would not mitigate visual impacts on Slopes 40-60%.

***Standard Lease Terms:*** Any road, well pad, or pipeline construction on these slopes would result in an adverse impact to visual resources. Cut and fill slopes would be visible from long distances. The steeper the slope, the greater the visual impact.

# Slopes > 60%

## Environmental Factor: Vegetation

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no additional effect to vegetation on Slopes greater than 60%.

***Controlled Surface Use:*** *Controlled Surface Use* would generally allow the removal of vegetation for any number of reasons (road, drill pad, or pipeline construction). The use of erosion control measures and the saving of native vegetation would help speed the reclamation process. However, some of the effects described below for *Standard Lease Terms* would still occur.

***Timing Limitations:*** *Timing Limitations* would generally not mitigate the effects on vegetation.

***Standard Lease Terms:*** *Standard Lease Terms* would allow vegetation removal for the construction of roads, well pads, and pipelines. Loss of vegetation would likely also result in some loss of vegetation biodiversity. Revegetation usually uses a minimum number of species. Understory vegetation would be dominant until trees have been re-established on the site. Because of high erosion potential, revegetation efforts are also much more difficult on steep slopes.

## Environmental Factor: Soils

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no additional effect on Slopes greater than 60%.

BLM_0048266

***Controlled Surface Use:*** *Controlled Surface Use* would result in excessive damage to the soil resource on these slopes. The slope of 60% is above or close to the angle of repose for most soil materials. Soil disturbance on Slopes greater than 60%, would result in a high potential for mass soil movement, soil erosion, and loss of soil productivity. Construction of a road or well pad on Slopes greater than 60% would result in an area that has been irreversibly and irretrievably disturbed. The site probably could not be restored to it's original ground contours without considerable time and expense.

***Timing Limitations:*** The potential for soil erosion is so severe that *Timing Limitations* would do little to mitigate the effects of activities.

***Standard Lease Terms:*** *Standard Lease Terms* would result in soil resource damage. Activities such as road, well pad, and pipeline construction would result in a greatly increased potential for soil erosion, mass soil movement, loss of soil productivity, and sedimentation. Cut slopes would reach deep into the soil profile and bedrock and would result in slopes that would be very difficult to revegetate.

## Environmental Factor: Visual Resources

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no additional effect on the visual resources on Slopes greater than 60%.

***Controlled Surface Use:*** *Controlled Surface Use* mitigation measures would take advantage, where possible, of topography and vegetation screening opportunities to lessen the overall visual impact of oil and gas operations and facilities. Some degradation of the visual resource would likely occur anyway from the construction of roads, well pads, and pipelines that would be difficult to hide on Slopes greater than 60%.

***Timing Limitations:*** *Timing Limitations* would not mitigate visual impacts.

***Standard Lease Terms:*** Any road, well pad, or pipeline construction on these slopes would result in an adverse impact to visual resources. Cut and fill slopes would be visible from long distances. The steeper the slope, the greater the visual impact.

# Wildlife Special Habitats

## *Big Game Winter Range*

## Environmental Factor: Populations and Use

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would generally result in no additional effect to big game populations and use of their winter range. However, displacement of animals from adjacent areas may result in overuse and a potential decrease in carrying capacity.

***Controlled Surface Use:*** *Controlled Surface Use* would lessen the impacts by restricting road use to operators and to periods when animals are not on winter range and restricting new road construction.

***Timing Limitations:*** *Timing Limitations* would lessen the impacts by restricting oil and gas activities during winter when animals are on their winter range.

| Big Game Winter Range | December 1 to April 30 |
|---|---|

BLM 0048267

Exploratory and development operations would be restricted to periods when animals are not on the ranges. Maintenance activities would be limited to periods of the day when animals are less active (e.g. 10 a.m. - 2 p.m.).

**Standard Lease Terms:** Critical life cycle periods include wintering times. Activity such as blasting and helicopter traffic during a species critical life cycle period can be very crucial to the survival of some individuals, especially young. Disturbance during any of these time periods can cause displacement from preferred, optimum, or secure habitats to marginal habitats lacking the elements necessary for their survival. Activity of any kind during critical periods causes stress and unnecessary expenditure of energy reserves. Increased mortality may be a direct result because of energy reserves lost, increased chances of predation, or accidents resulting from disbursement. Road, well pad, and/or pipeline construction in winter range would result in a potential loss of winter range habitat and a decrease in the carrying capacity. Increased stress and harassment on big game species would occur without seasonal limitation protection during the winter months. Crucial winter range habitat would be lost without replacement (BLM, 1991).

## Environmental Factor: Habitat Condition

**No Lease and No Surface Occupancy:** *No Lease* and *No Surface Occupancy* would result in no additional effect to the habitat condition on Big Game Winter Ranges.

**Controlled Surface Use:** *Controlled Surface Use* would likely result in some disturbance and removal of vegetation. This would result in a potential loss of security cover. There would also be a potential loss of habitat carrying capacity if animals displaced by activities on adjacent lands use these areas.

**Timing Limitations:** *Timing Limitations* would not lessen the impacts of the potential loss of security cover.

**Standard Lease Terms:** *Standard Lease Terms* would likely result in some disturbance and removal of vegetation. This would result in a potential loss of security cover. There would also be a potential loss of habitat carrying capacity if animals displaced by activities on adjacent lands use these areas.

### *Elk Calving Areas*

## Environmental Factor: Populations and Use

**No Lease and No Surface Occupancy:** *No Lease* and *No Surface Occupancy* would generally result in no additional effects to elk calving areas. However, displacement of animals from adjacent areas may result in increased habitat use and animal stress.

**Controlled Surface Use:** *Controlled Surface Use* would lessen the impacts on elk calving areas by restricting road use to operators (close roads to the public), by restricting new road construction and by relocating roads where terrain or vegetation will provide a buffer between activities and the critical habitat.

**Timing Limitations:** *Timing Limitations* would lessen the impacts by restricting oil and gas activities during calving periods:

Elk Calving                          April 16 to June 30

There would be little direct effect if activities take place outside these time periods.

BLM_0048268

***Standard Lease Terms:*** *Standard Lease Terms* would result in the displacement of animals to less desirable birthing areas or areas already occupied. This would potentially result in increased stress and possible mortality. Human activity along roads through these areas would have a similar effect.

Significant impacts resulting from oil and gas development could occur to big game species during the birthing seasons if timing restrictions allowed by *Standard Lease Terms* are not long enough to cover these periods.

## Environmental Factor: Habitat Condition

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no additional effect to the habitat condition in deer and elk birthing areas.

***Controlled Surface Use:*** *Controlled Surface Use* would likely result in some disturbance and removal of vegetation. This would result in a potential loss of security cover. There would also be a potential loss of habitat carrying capacity if animals displaced by activities on adjacent lands use these areas.

***Timing Limitations:*** *Timing Limitations* would not lessen the impacts of the potential loss of security cover.

***Standard Lease Terms:*** *Standard Lease Terms* would likely result in some disturbance and removal of vegetation. This would result in a potential loss of security cover. There would also be a potential loss of habitat carrying capacity if animals displaced by activities on adjacent lands use these areas.

### *Migration Routes and Staging Areas*

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no additional effects to Migration Routes and Stating Areas.

***Controlled Surface Use:*** *Controlled Surface Use* would protect Migration Routes and Stating Areas by controlling locations of new road, well pad, or pipeline construction in the main animal travel corridor. The effects would be lessened because the oil and gas activity would be moved to the fringes of this habitat.

***Timing Limitations:*** *Timing Limitations* during high use periods:

| | |
|---|---|
| Migration Routes | March 1 to May 30 |
| | November 1 to December 31 |
| Staging Areas | October 15 to December 31 |

would effectively mitigate the disturbance and displacement of the animals.

***Standard Lease Terms:*** *Standard Lease Terms* would result in potential disturbance to the animals during critical periods. This could lead to avoidance and increased stress and mortality. Disturbance may displace big game off-Forest earlier than normal, and could result in damage to private property and claims against the Colorado Division of Wildlife.

### *Bighorn Sheep Lambing and Breeding Areas*

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no additional effect to bighorn sheep lambing and breeding areas.

BLM_0048269

Oil and Gas Leasing Analysis FEIS

**Controlled Surface Use:** *Controlled Surface Use* would lessen some of the effects on bighorn sheep lambing and breeding areas by closing roads to public travel and obliteration of roads when the oil and gas activities are completed.

**Timing Limitations:** *Timing Limitations* during high use periods would lessen the disturbance and displacement of bighorn sheep.

        Bighorn Sheep Lambing             May 1 to July 15
        Bighorn Sheep Breeding           November 1 to January 1

**Standard Lease Terms:** *Standard Lease Terms* would likely result in some disturbance to bighorn sheep lambing and breeding areas. Vegetation removal from the construction of roads, well pads, and pipelines would potentially result in loss of this important habitat. Disturbance during critical periods could result in avoidance, increased stress and mortality. Habitat loss and additional stress on the already weakened herd in the Battlement Mesa area may lead to its demise.

### Summer Range (Concentrated Use)

**No Lease and No Surface Occupancy:** *No Lease* and *No Surface Occupancy* would result in no additional effects to summer range.

**Controlled Surface Use:** *Controlled Surface Use* would lessen impacts to areas of concentrated use summer range, by controlling road location, closing oil and gas roads to public travel and by obliterating roads after the activity has been completed. Impacts to summering herds would lessened, but there would still be potential for disturbance and displacement off Grand Mesa and onto private land.

**Timing Limitations:** *Timing Limitations* during high big game use periods would lessen the disturbance and displacement of the animals.

**Standard Lease Terms:** *Standard Lease Terms* would result in an increase in the potential for disturbance to the animals. Summering animals are subject to disturbance from other activity in their summer range, such as timber harvest, livestock grazing, ATV/ORV use, and increased auto touring in the Forest. Oil and gas activity in these areas, in addition to the other activities, could result in increased stress, mortality, habitat abandonment and displacement off their summer range and onto private property earlier than is desirable from a wildlife management perspective.

### Sage Grouse Leks

**No Lease and No Surface Occupancy:** *No Lease* and *No Surface Occupancy* would result in no additional effects to Sage Grouse Leks. Protection with a *No Surface Occupancy* stipulation would encompass the entire lek and a one-half mile around the lek. Lek sizes vary with the size of each population; therefore, *NSO* stipulation could vary from a minimum of one-half mile radius to six miles radius on the larger lek sites.

**Controlled Surface Use:** *Controlled Surface Use* would require the use of the existing road systems within the nesting habitat around a lek. Road locations would be controlled. This would lessen the potential for impacts to sage grouse, directly, or through habitat destruction.

**Timing Limitations:** *Timing Limitations* would lessen the potential for adverse impacts to Sage Grouse Leks during the breeding and nesting periods.

        Sage Grouse Lek Activity           March 1 to May 31

Environmental Consequences of Lease Options
Wildlife Special Habitats

BLM_0048270

***Standard Lease Terms:*** *Standard Lease Terms* would not provide any special consideration for the protection of Sage Grouse Leks. There would be a potential loss of habitat from the construction of roads, well pads, and pipelines. Increased human disturbance from oil and gas activity would potentially result in avoidance of the area, a reduction in breeding, and a decrease in reproduction and population.

# Threatened, Endangered and Sensitive Species

All oil and gas activities are subject to the provisions of the Endangered Species Act. To comply with the requirements of the Endangered Species Act, all oil and gas activities would be cleared for species occurrence, prior to ground disturbance at the operational stage (APD's), on a case by case basis, rather than at the leasing stage. Oil and gas exploration and development has the potential to adversely affect threatened, endangered, and sensitive plant and animal species on the Forest unless species and their habitat are protected where they are known to occur, and provisions are made to protect new populations, new species, and new habitat when located.

Threatened and endangered species are protected by law, regardless of lease stipulations. Therefore, the use of a lease stipulation to protect them is not necessary. Where biological evaluations indicate that these species could be adversely affected, appropriate measures would be required to prevent impacts.

The Colorado River cutthroat trout is a USFWS Category 2 candidate species. The Forest is currently in the process of cooperating with CDOW in preparing a conservation plan designed to keep this species from becoming listed. While there are two populations which have been established in areas outside the analysis area, and none are known to exist within the analysis area, there is a significant amount of suitable habitat available within the area and these sites will have to be evaluated prior to any activities being approved.

The peregrine falcon (endangered), Mexican spotted owl (candidate species), ferruginous hawk (candidate species) and the bald eagle (endangered) are highly susceptible to disturbance at their nesting sites. Disturbance during the nest building, egg laying, and egg incubation periods can easily cause the abandonment of all nesting activities. At the present time there are no known nests of these species on the Forest. Except for some spotted owl surveys on the Uncompahgre Plateau, there have been no intensive surveys done for these raptors.

However, some restrictions around known nesting and/or roosting sites are required for peregrine falcons, bald eagles, Mexican spotted owls, and ferruginous hawks. They are:

Peregrine falcon: No activity within a half mile of a nesting area from March 16 through July 31.

Bald eagle: No activity within a half mile of a nesting area from February 15 through June 15 and no activity within a half mile of a roosting area from November 16 through April 15.

Mexican spotted owl: No activity in the core area of 1480 acres around a nest site from February 1 through July 31.

Ferruginous hawk: No activity within a half mile of a nesting area from March 1 through July 31.

Bald eagle roosting sites can be found along all the major river bottoms, both on and off the National Forest. Restrictions are necessary to protect bald eagle courtship behavior and nesting habitat. This time period is extremely sensitive to human disturbance and may cause nest abandonment and desertion of long established nesting territories. Bald eagle winter roosting sites are extremely important to

BLM_0048271

sustaining bald eagles over the winter months when food supplies are severely limited. Buffer strips around these areas are essential to the maintenance of bald eagle habitat.

Peregrine falcon cliff nesting complexes require restrictive stipulations because of the sensitivity of these areas to disturbance and desertion. Buffer zones must be established around these areas to adequately protect the nesting sites. Probably the biggest threat to these species is the potential disturbance to nesting territories from exploration and road construction to proposed development sites.

The Mexican Spotted Owl has been proposed for listing as a threatened species to the U.S. Fish and Wildlife Service. Management guidelines and restrictions will be used to protect the Mexican spotted owl. Potential Mexican spotted owl habitat has been mapped in the Lone Cone area and on the Uncompahgre Plateau. Some surveys have been conducted in the area, but more need to be completed. When spotted owl nesting territories have been located, they will be protected by establishing core habitat areas. These core habitat areas will consist of nesting, feeding, and roosting areas and are not considered to be overlapping. Where Mexican spotted owls are sighted, seismic and surface disturbing activities may be restricted within the 450 acres of the total territory of 2000 acres (Fletcher, 1990). In the remaining area, other surface activities may be allowed pending impact assessments through the NEPA process. In areas where a confirmed nest and roost site is identified, all surface management activities will be limited. The core area of a confirmed nest site is 1,480 acres where surface disturbance activities are restricted.

One plant species, the Spineless Hedgehog cactus, has been found on Grand Mesa and may also be found on the Uncompahgre Plateau. Locations where this plant are known to occur must be protected from any surface disturbing activity. As with any other proposed, threatened, or endangered species, a survey will be necessary when any site specific proposal for oil and gas exploration or development proposal has been filed.

The boreal toad could be adversely affected by any road or drill pad construction, if it is above 9,000 feet and in or near any wet bogs or ponds. North American wolverine and lynx may inhabit the Forest and their habitat would be dramatically degraded with the construction of any new roads in previously unroaded habitat. These are backcountry "roadless" type species that are very sensitive to the presence of man. Any new road construction proposals need address these two species. These two species and their habitats would also be affected by cause and effect connected actions such as possible logging of forested stands, as a result of roads constructed for oil and gas activities. Increased trapping of these two furbearing species could also occur as a result of easier access to their habitat, even if roads are closed to vehicle travel.

The possibility exists that additional inventories will be required to document the presence or absence of any proposed, threatened, endangered, sensitive, or candidate species. These inventories will be conducted prior to the issuance of any APD where the potential exists that any of these species may occur in the area. Specific inventories may be required in lease areas, prior to any development. Provisions in the oil and gas lease provide for requiring inventories so that activities can be relocated to avoid threatened, endangered, and proposed listed Federal species of animals and plants. Locations of previously inventoried species in these categories are afforded protection through *Timing Limitations* and *No Surface Occupancy* stipulations on the lease.

## Utility Corridors / Electronic Sites

***No Lease and No Surface Occupancy:*** *No Lease* and *No Surface Occupancy* would result in no net change to Utility Corridors or Electronic Sites.

***Controlled Surface Use:*** *Controlled Surface Use* would exclude the location of drill pads within a Utility Corridor and would therefore maintain the corridor for additional utilities and minimize

BLM 0048272

conflicts between drill towers and power transmission lines. (Road use and construction would still be allowed.)

Electronic sites are managed under special use permits. Oil and gas activity could create magnetic interference and could potentially interfere with the current use of Electronic Sites.

*Timing Limitations and Standard Lease Terms: Timing Limitations* and *Standard Lease Terms* would not mitigate the potential for impacts and conflicts between intended uses of Utility Corridors. Drill towers may present a safety problem if allowed within a Utility Corridor.

# Primary Rangeland (6B Management Areas)

## Environmental Factor: Vegetation

*No Lease and No Surface Occupancy: No Lease* and *No Surface Occupancy* would result in no additional effect to vegetation in Primary Rangeland.

*Controlled Surface Use: Controlled Surface Use* limiting activity to the existing road corridors would mitigate the effects to vegetation in Primary Rangeland. Little additional ground disturbance or vegetation removal would occur.

*Timing Limitations: Timing Limitations* would not mitigate the effects of ground disturbance and vegetation removal.

*Standard Lease Terms: Standard Lease Terms* would allow the removal of vegetation for roads, well pads, and pipelines. This removal of vegetation would result in a loss of forage, range carrying capacity, and sensitive plant associations. A potential increase in the spread of noxious weeds or less desirable vegetation would also potentially occur.

## Environmental Factor: Livestock Grazing

*No Lease: No Lease* would continue the status quo, with livestock grazing occurring on the suitable rangeland areas without the disturbance of development and construction activities. Rangeland stocking capabilities would be determined by the use of undisturbed plant communities and appropriate management system. Conflicts with wildlife for forage carrying capacity would not be accelerated. Opportunities for ease of facilitating large structural range improvements and permittee administration would be negated as a result of no additional road access.

*No Surface Occupancy: No Surface Occupancy* would generate minimal impact on livestock grazing. Any anticipated impact would be generated from those areas where the *Affected Environment* would be disturbed. Opportunities foregone and stocking considerations would be similar to those described under *No Lease*.

*Controlled Surface Use: Controlled Surface Use* would generally not mitigate the resource disturbing impacts associated with normal oil and gas leases such as road, well pad, and pipeline construction. Such impacts affect livestock grazing. However, *Controlled Surface Use* could limit resource disturbing impacts to existing roads. This would result in a minimal impact to livestock grazing.

*Timing Limitations: Timing Limitations* from from June 1 through October 15 would mitigate the impacts on livestock grazing from people oriented and equipment related disturbances. Specific impacts could in part, be mitigated by coordinating grazing use to avoid oil and gas activities for temporary periods of time. Such impacts are considered minor when contrasted to the resource disturbing impacts of vegetation removal originating from road, well pad, and pipeline construction.

BLM_0048273

*Standard Lease Terms: Standard Lease Terms* allowing road, well pad, or pipeline construction would impact livestock grazing. In some situations, forage loss would be temporary, provided reclamation measures are successful in restoring the disturbed environment. In other cases, reclamation could result in satisfactory forage and ground cover, but some loss of sensitive plant associations may not be mitigated, due to ecosystem disturbance associated with vegetation and soil loss.

Road access which intercepts existing allotment and division fences, would require placement of cattle guards and gates. Road construction which results in cut banks in excess of two feet may serve as impediments to the movement of livestock. It may also result in difficulty in restoration of plant cover on overused cut and fill slopes, and may funnel livestock into areas of low vegetative productivity or sensitive soil. Road construction, as well as drill pad disturbance, removes the native plant association and opens up the soil, thus reducing native plant competition and promotes the introduction of less desirable plants or noxious weeds. Any activity resulting in ground disturbance would require desirable plant seed introduction within a month of disturbance.

Full field development would accentuate the existing conflict for forage between wildlife and livestock. Stocking levels of both wildlife and livestock may require adjustment, contingent upon the specifics and the extent of the desired development. However, full field development would also facilitate access and may enhance water development and transmission possibilities. Range administration for both the permittee and the land manager would be positively facilitated by improved access. But, opportunities for vandalism, livestock theft, and conflict with recreation users would also increase.

# Lands Suited for Timber Harvest

## Environmental Factor: Timberlands Made Suitable

*No Lease and No Surface Occupancy: No Lease* and *No Surface Occupancy* would not effect the suitability of timber.

*Controlled Surface Use, Timing Limitations and Standard Lease Terms: Controlled Surface Use, Timing Limitations* and *Standard Lease Terms* would result in similar effects. Access to areas previously delineated as not suitable for timber harvest because of cost prohibitive road construction, would or could become suitable if a road was built for oil and gas activity. This could result in a slightly higher Forest ASQ (would first require environmental analysis and a Forest Plan amendment). Access would also allow other forest management activities such as prescribed burning for wildlife habitat enhancement and the more efficient control of insects, disease, and wildfire.

BLM_0048274

# Environmental Consequences of Alternatives

The environmental consequences of the various alternatives relate to the anticipated seven (7) wells that will be drilled on new leases. The environmental consequences of the predicted forty (40) wells that may be drilled on existing leases are discussed in the Cumulative Effects sections under each *Affected Environment.*

## General Forest

This section describes the environmental consequences of program Alternatives, as described in Chapter II, on the General Forest environment. For an understanding of the overall organization of this chapter, refer to the description of the analysis process in Chapter I.

### Environmental Factor:  Biological Diversity

In the simplest of terms, biological diversity is the variety of life and its processes. It includes the variety of living organisms, the genetic differences among them, and the communities and ecosystems in which they occur. Biological diversity is comprised of genetic diversity, species diversity, and community diversity. Conserving biological diversity includes perpetuating all native species in numbers and distributions that provide a high likelihood of continued existence. The increased number of threatened and endangered species indicates a loss of genetic variability and a decline of natural communities. Species extinction is only the most extreme manifestation of the loss of biological diversity. Biological diversity declines with the loss of genotypes of populations, reductions in the distribution and abundance of species, and the elimination or degradation of natural communities. Natural communities that once covered immense areas have been largely reduced to fragments. Biological diversity is best exemplified by natural biological ecosystems that have not been altered or manipulated by humans. Biological diversity will be affected by all the alternatives, to varying degrees. Alternatives which will result in the issuance of oil and gas leases in existing Roadless Areas will have the greatest adverse impact and loss of biological diversity in natural ecosystems. Roading of these areas will result in the irretrievable loss of natural ecosystems. These areas are refuges of natural plant and animal populations that provide genetic variability, species and community variety of plants and animals. These areas, especially where they are adjacent to other Roadless Areas or Wilderness, are especially important as potential habitat for extirpated populations of once native species such as the peregrine falcon, bald eagle, gray wolf, grizzly bear, river otter, wolverine, lynx, Colorado River cutthroat trout, Uncompahgre fritillary butterfly, spineless hedgehog cactus, and other animal and plant species. Many of these species require large home ranges of natural habitats unaltered by humans. Protection of these roadless lands from any development, including oil and gas development, will help maintain these species where they are still present and will provide potential re-introduction sites for species that have been extirpated. The effects are briefly discussed for each of the alternatives.

Developed areas where vegetative manipulation has occurred will often also support a large number of plant varieties. However, these areas are often invaded by plants which are not native. While this increases the diversity in numbers of plant species, this increase in variety is usually to the detriment of the native plant populations. Increases in younger age classes of forest vegetative types would occur in areas where oil and gas roads were used to harvest mature or old growth forest stands. Young stands would replace the mature stands, causing a temporary shift of vegetation into younger age classes. This would result in an increase in some wildlife species dependent on the more open vegetative cover at the expense of species dependent upon mature or old growth ecosystems. These younger age class stands tend to have more human activity. The shift in vegetative age classes would see a corresponding shift in animal species from those less tolerant of human activity to more tolerant species. Species benefited by roading and subsequent timber harvest are not species that are in declining states throughout their range.

BLM 0048275

Oil and Gas Leasing Analysis FEIS

### *Alternative 1 - No Action Alternative*

Under this alternative all Roadless Areas would be leased with only the *Standard Lease Terms* option. All of these Roadless Areas could be lost as existing natural communities and would be lost as potential re-introduction sites for native indigenous species which have been extirpated or drastically reduced in number. Short term increases in early successional stage dependent plants and animals may occur where timber harvest follows as a result of roading activity for oil and gas development. This alternative would be detrimental to biological diversity.

### *Alternative 2 - Preferred Alternative*

Under this alternative, the Kannah Creek, Roubideau, Tabeguache, Whetstone Mountain, Flat Top Mountain, parts of Priest Mountain (Flat Tops, et al), West Elk (Snowshoe Mesa, Kebler Pass), Raggeds (Kebler Pass) and Battlement Mesa Roadless Areas would be maintained as natural communities. The remaining Roadless Areas could be lost as existing natural communities and potential re-introduction sites for threatened or endangered species if oil and gas development does occur. Short term increases in some plant and animal species dependent upon early successional stage vegetation may occur where road construction or timber harvest occurs in Roadless Areas not protected by the *No Surface Occupancy* stipulation and/or not available for oil and gas leasing.

### *Alternative 3 - No Lease*

Under this alternative all of the Roadless Areas would remain in a natural roadless state, as far as oil and gas development is concerned, and would provide habitat for those species that currently reside there and could potentially provide habitat for species that may be re-introduced in the future. This alternative would benefit biological diversity in natural ecosystems by maintaining these habitats.

### *Alternative 4 - Lease with Standard Lease Terms*

Under this alternative, no Roadless Areas would be protected from development and impacts would be similar to Alternative 1 in adverse effects on biological diversity. All of these Roadless Areas could be lost as natural communities and as potential re-introduction sites for threatened or endangered species. This alternative would be extremely detrimental to existing biological diversity.

Early successional stage dependent species of plants and animals would benefit because of Roadless Areas potentially being made available for timber harvest activities. These Roadless Areas would be susceptible to the invasion of noxious weeds and undesirable vegetation as a result of vehicle access.

### *Alternative 5 - No Lease in Roadless and SPNM*

Under this alternative, all of the Roadless Areas would remain in a natural roadless situation, as far as oil and gas development is concerned, and would provide habitat for those species that currently reside there and could potentially provide habitat for species that may be re-introduced in the future. This alternative would be very beneficial to biological diversity in natural ecosystems by maintaining these habitats.

### *Cumulative Effects*

The leasing of any Roadless Area to oil and gas activity will significantly change the natural character of the area because of the road access that is necessary to conduct oil and gas activities. The cumulative impact resulting from potential oil and gas activities on existing leases, the subsequent connected actions of timber harvest, increased human use, recreational developments, and trapping as a result of the road will forever change the area as a natural community. Species like the goshawk, pine marten, lynx, wolverine and many others are very dependent on these areas as the core area of their

Environmental Consequences of Alternatives
General Forest

BLM 0048276

home ranges. Entering into these areas, combined with all the other Forest activities going on in adjacent areas, would continue the loss of habitat for these species, which is necessary for their survival.

Several wildlife species would benefit from oil and gas development and subsequent timber harvest activity. Red-tailed hawks would benefit from clearcutting activity in aspen stands. However, the red-tail hawk is increasing in numbers throughout it's range. Goshawks, which depend on mature aspen stands, would be negatively impacted by clearcutting, and this species is declining throughout it's range.

## Environmental Factor: Vegetation

Disturbed acres and reclaimed acres for the projected Reasonably Foreseeable Development are discussed in the analysis assumptions in Chapter II.

Clearings for oil and gas wells, roads, and pipelines directly affect the forest vegetation resource. Post-leasing activities would cause a minor, short-term loss of timber on cleared areas for an estimated four to forty-four years. Tree planting would be required on sites suitable for timber harvest, if conditions are not naturally conducive to obtaining minimum stocking within five years after well abandonment. The Forest Plan identifies land suitable for timber harvest. Cleared sites would also be temporarily out of production for livestock and wildlife forage, reducing visual quality, plant and animal diversity.

The RFD predicted activity and general locations of wells would not cause a significant effect on the forest vegetation. Disturbed acres would be a minor portion of unsuited as well as suited lands for timber harvest.

All alternatives which would authorize leasing of National Forest lands would result in a short-term loss in grass, forb, timber, or other vegetative production. Although the production may be lost from four to forty-four years, additional access may be gained for vegetative treatment activities, to provide wildlife habitat, visual quality, wood fiber production, plant and animal diversity, and control of insects, disease and wildfire.

Because of the relatively small number of acres potentially affected, relative to the size of the analysis area overall, the losses are not considered to be significant under any of the alternatives analyzed. Areas which are expected to be affected would be representative of the general forest since the projection is for seven wells on new leases.

### Alternative 1 - No Action,
### Alternative 2 - Preferred,
### Alternative 4 - Lease with Standard Lease Terms, and
### Alternative 5 - No Lease in Roadless and SPNM

These alternatives would result in about 75 acres disturbed (7 wells and 10.7 acres/well disturbed, see Analysis Assumptions, page II-1). The location of the wells may vary, but the extent of impact to vegetation from disturbance should be similar. Areas which are classified in the Forest Plan as appropriate suited lands and are currently not managed due to high road system cost, may have a road system developed by the oil and gas activity which may make the area economically viable for timber harvest. Any activity within this land classification may increase the Allowable Sale Quantity, slightly. Activity within suited lands may become more viable for vegetation management activities, due to a more extensive road system.

Conflicts between the public, timber purchasers, and oil and gas lessees regarding road use and maintenance, would arise in areas where coincidental activities occur during oil and gas development. Lands which are in timber sales or other vegetation management contracts may also be under an oil and gas lease. Conflicts would occur with coincident operations relating to such aspects as harvest, hauling, road building, and timing of operations.

BLM 0048277

### *Alternative 3 - No Lease*

This alternative would create no change to the coniferous or deciduous forest environment resulting from expanded leasing. The aspen areas classified in the Forest Plan as appropriate suited lands which are currently not managed due to high road system cost, would remain in the natural state. Management on these areas for wood fiber production, wildlife habitat, visual quality, plant and animal diversity, and control of insects, disease and wildfire would continue to be curtailed.

Conflicts between the public, timber purchasers, and oil and gas permittees regarding road use and maintenance would not occur.

### *Cumulative Effects*

The combined effects of 47 wells are similar in individual scope to the effects of the seven wells previously discussed, with regard to forest vegetation. The total cleared acres would be greater, and therefore the effects of the additional wells would be expanded proportionately.

The effects of an additional seven wells to be drilled on new leases would not likely result in adverse cumulative effects. Forty of the 47 wells are predicted to be drilled on existing leases or in unitized areas. An average of 10.7 acres of land is assumed to be disturbed per well, for well pads, roads, and pipelines (see Analysis Assumptions, page II-1), for a total of 428 acres of land disturbed of vegetation, in the short-term. Not all of this would be disturbed at one time however, as the RFD projection is for activity over the next 15 years. Some revegetation would be expected to occur between the first and the last of the 47 wells drilled. Projected oil and gas activity on existing leases would result in an estimated 29 acres per year, of ground disturbance. The analysis area consists of nearly 1 million acres. The seven additional wells would result in another 75 acres of ground disturbance (5 acres per year). This clearing represents approximately five hundredths of a percent (0.05 %) of the analysis area. To put these figures in perspective, timber sales on the Forest in the next 15 years would result in approximately 110,985 acres disturbed from current and planned (in Forest Plan) timber harvest and timber sale roads. Any potential increase in the ASQ would result in a commensurate increase in impacts to vegetation.

## Environmental Factor: Soils and Geology

Oil and gas construction activities heavily impact the soil resource at the point and area of disturbance. The specific impact depends on the activity, the soil characteristics at the site, the geomorphic and topographic relationships, basic position, and climatic conditions. In most cases construction activities result in displacement, compaction, and mixing of the soil material. It may increase the potential for accelerated erosion in the forms of sheet, rill and gully erosion, and may lead to slope failures such as earthflows, mudflows, debris flows and various forms of landslides. Since the precise location of the RFD projected activities is unknown at this level of analysis, the description of the effects on the soil resource are general in nature. Basically, the more area disturbed, the higher the potential for detrimental soil alterations.

### *Alternative 1 - No Action*

Wherever activities occur, under this alternative, some affected soil environments could be severely altered. Although *Controlled Surface Use* would be specified for Riparian areas and Wetlands, the effects should be the same as *No Surface Occupancy*, due to the requirements of the regulations, i.e., activity in Riparian areas and Wetlands must be approved in the Surface Use Plan of Operations.

The fact that high erosion hazard areas would be *Controlled Surface Use* would help maintain soil damage by erosion, to within tolerable limits. However, on the flanks of Grand Mesa and in the Muddy Basin area of the Paonia Ranger District, special facility design may be required, due to the finer textured soils and potentially higher erosion situations that occur.

### *Alternative 2 - Preferred*

Wherever oil and gas construction activities occur, the soil resource would be impacted. This alternative however, recommends *No Surface Occupancy* for the sensitive soil areas of Riparian and Alpine/Tundra environments. This would prevent these activities from causing irreversible and irretrievable damages. This is based on the very logical and recognized soil and water conservation concept of avoiding extremely sensitive areas.

### *Alternative 3 - No Lease*

This alternative would result in no additional disturbance to soil resources. Based on the RFD, the seven wells predicted to be drilled on new leases, would not be drilled. Soil productivity would be maintained and resources would not be needed to bring areas back into vegetative productivity or used to control erosion.

### *Alternative 4 - Lease with Standard Lease Terms*

For the proposed seven new wells that may occur throughout the analysis area, the use of *Standard Lease Terms* would cause disturbances in sensitive soil areas that would result in unacceptable soil resource damage. These sensitive areas need measures that are above and beyond *Standard Lease Terms*, to control and mitigate soil damage. Without the extra measures, damage to the soil would potentially exceed tolerable limits. The result would be an area that is irretrievably and irreversibly altered.

### *Alternative 5 - No Lease in Roadless and SPNM*

This alternative would result in no additional effect to soil resources in identified Roadless Areas. Outside Roadless Areas, the effects would be similar to those discussed in Alternative 2.

### *Cumulative Effects*

Cumulative soil impacts could occur in areas where large concentrations of wells are predicted. The area with the highest potential for detrimental damage to soils is the participating areas of the Ragged Mountain Unit. There is a moderate to high potential for detrimental soil damage to occur in the high potential areas of Grand Mesa and the North Fork of the Gunnison, and the Petro leases. The soils in these areas are also fine textured and susceptible to slumping, but less activity is estimated to occur in them. The lowest potential for detrimental soil damage to occur is in the moderate potential on Grand Mesa, the Narrows unit, the Naturita, and Uncompahgre-Lone Cone areas. The soils in these areas are slightly less susceptible to damage, but also the amount of projected activity is very small.

Significant soil resource damage may occur in sensitive soil areas already leased. Based on development assumptions this may occur on 40 well sites throughout the area. The areas subject to a high potential for significant soil resource degradation will be the areas with the highest concentrations of activities. This would mainly be within the Grand Mesa and Gunnison National Forest areas of the analysis area.

## Environmental Factor: Air Quality

Air pollution is controlled through the National Ambient Air Quality Standards and permit requirements established under the Federal Clean Air Act and is administered by the Colorado Department of Health. The primary air contaminants associated with oil and gas activity on the Forest are: dust from construction and traffic; diesel fumes from heavy equipment operations and drilling rigs; and combustion by-products from the flaring of gas during testing operations.

BLM 0048279

Air pollutants generated by oil and gas activities are expected to have minimal effects on local or regional air quality. With the exception of the no new lease alternative, all alternatives are expected to have the effects described below. The no new lease alternative will have no additional impacts to the air resource. Air quality impacts would occur from activity on existing leases under all alternatives.

Economic activity and population growth as a result of the projected oil and gas activity on the Forest, as discussed elsewhere in the EIS, would be insignificant and not likely to affect air quality in Class I and II airsheds.

### NAAQS Criteria Pollutants

**Carbon Monoxide:** Sources of carbon monoxide related to oil and gas activity are limited to motor vehicles, slash burning, and the flaring of waste gas. All of these sources are minor in number and duration. Those non-attainment areas for carbon monoxide within 50 km of the analysis area would not likely be affected by any carbon monoxide created as a result of oil and gas activity. Their air quality episodes typically occur in the winter (ski season), while most oil and gas activity will occur from late spring through fall.

**Ozone:** No high concentrations of ozone would be expected to occur as a result of oil and gas activity. Some minor sources of the components necessary for the production of ozone may be produced as a result of oil and gas activity. The concentrations would not likely exceed National Ambient Air Quality Standards. Ozone problems are not typically found associated with a rural mountainous environment far from a major urban area with few local sources of reactive hydrocarbons and nitrogen oxides.

**Nitrogen Dioxide:** Nitrogen dioxide would likely be emitted in short-term intervals during the flaring process described below for sulfur dioxide.

**Sulfur Dioxide:** Waste gas flaring is a common practice during the completion and testing phases of drilling. It is not typically done after the well is connected to a pipeline. Oil wells more commonly flare gas, but that practice is discouraged by the BLM to conserve resources. The majority of the wells on the Forest are expected to be gas wells. Flaring usually lasts a day or two, but could last as long as a week. Sulfur dioxide is typically not associated with the flaring of gas from wells on the Forest because of the very low sulfur content of gases produced from the wells.

Hydrogen sulfide ($H_2S$) has not been noted in the wells drilled on the Forest. If it would occur, it would likely be in low concentrations. Disposal of low concentrations of $H_2S$ is usually accomplished by flaring. If flaring of $H_2S$ occurs, sulfur dioxide will be produced in the flaring process. Onshore Order #6 (BLM regulation 43 CFR 3160) addresses the requirements for conducting operations in a hydrogen sulfide environment and the release of sulfur dioxide during flaring.

**Particulate Matter (PM10):** Particulate emissions vary substantially from day to day, depending on the level of activity, the specific operations, and the weather. However, the concentrations would not likely affect air quality at any of the monitoring sites scattered in and around the analysis area, nor would air quality in Class I airsheds be adversely affected. Localized effects may occur immediately adjacent to the sources of the particulates, i.e., next to a road or construction site.

Long-term air quality impacts associated with oil and gas activities are primarily dust related. Dust will be generated by construction work on roads, well pads, and pipelines. Since road, well pad, and pipeline construction is short-term, access road use is the only long-term source of fugitive dust. Road use has the potential to contribute a significant amount of dust for the life of the activity on native surface roads and to a lesser extent gravel roads during the dry seasons. The amount of dust will vary by soil type and moisture conditions. This impact can be largely mitigated by requiring dust abatement if the problem is judged significant.

Environmental Consequences of Alternatives
General Forest

BLM 0048280

Another potential source of particulates (PM10) is from the burning of slash cleared from roads, well pads, and pipelines. Because of air quality concerns, the disposal of construction slash by burning is no longer a common practice. Slash disposal is usually accomplished by scattering or burying. However, it may be permitted under weather conditions suitable for good dispersal of smoke.

PM10 from exhaust emissions from gasoline and diesel engines is not expected to be significant nor have any significant air quality impacts off site. The drilling phase of oil and gas activity has the most engines involved and the number of vehicles is minor. Onsite there will be some odor associated with exhaust emissions.

*Lead (Pb):* The activities associated with oil and gas exploration, production, and development do not typically produce lead emissions. Oil and gas activity would not likely have any effect on lead levels present in ambient air.

### Effects to Class I Airsheds

No significant adverse impacts will occur to Class I airsheds located in the vicinity of the analysis area under any of the alternatives.

### Visibility

Dust, because of it's size, is not a contributor to visibility-related problems (Colorado Air Quality Data Report, 1991). Since there are few sources of PM10 related to oil and gas activity, visibility would not likely be affected by oil and gas activity. If construction slash burning occurs it would be on days with weather conditions allowing for the dispersal of smoke. Visibility in Class I airsheds should not be affected by oil and gas activity.

### Acid Precipitation/Lake Chemistry

Sources of sulfur dioxide are limited in oil and gas activity that could occur within the analysis area. Therefore, the activity would not likely contribute to acid precipitation and the potential acidification of lake water.

### Cumulative Effects

Air quality impacts as a result of projected oil and gas activity would contribute a relatively minor addition to air quality degradation. Short-term and localized cumulative effects would occur in areas of concentrated management and recreational activity. The most noticeable effect would likely be a result of dust or would be in combination with burning, either prescribed or wildfire.

## Environmental Factor: Water Quality

Oil and gas activities could adversely impact water resources, particularly water quality. The ground disturbance, which has been described in previous sections, has a high potential for increasing sediment delivery to stream channels. This could adversely impact the stability and hydrologic function of the channel. Activities could also impact beneficial uses of the water, both on Forest and downstream. Oil and gas operations generally use material and produce substances that can be harmful to the environment if not properly used and contained. The use of gasoline and diesel engines would require the use of large quantities of fuel that must be hauled to the site, and in some cases stored onsite. This always presents the possibility of spills, both large and small. In addition, use and maintenance of mechanized equipment would require the use of lubricants, that if not properly handled, could also contaminate water quality from surface runoff at construction sites. Drilling fluids contain toxic substances that could pollute the surface water and groundwater if not properly contained. Salt water is sometimes found in association with oil and gas bearing formations. This salt water could cause

BLM  0048281

contamination of high quality groundwater aquifers and surface waters, plus impact aquatic life and vegetation.

One of the important aspects of exploration activities is the waste water generated. Often produced water is strongly saline. The total dissolved solids (TDS) in produced water ranges from several hundred parts per million, to over 150,000 parts per million. However, the total dissolved solids in produced water from coal bed methane wells on and adjacent to the Forest has ranged from about 4,000 to 12,000 parts per million. Sea water, by comparison, is typically about 35,000 parts per million TDS. Produced water also contains trace quantities of petroleum hydrocarbons, metals, and additives used in the production process. The primary issue associated with the produced water is the potential for contamination of surface and groundwater, soil, vegetation, and animals. Oil and gas wastes from exploration, development and production activities include sediment, brine, drilling fluids, well bore cuttings and chemical additives related to the drilling and well completion process, hydrocarbons and sanitary wastes.

Another potential effect on water quality is increased sediment. Sediment transport is a natural stream process. The amount of sediment moved varies in direct response to streamflow. Each stream can transport a maximum amount of sediment without substantially adjusting its dimensions, slope or pattern; this maximum amount is called the sediment threshold. Sediment in excess of this limit is stored in the channel, is not easily displaced, and disrupts the dynamic equilibrium between the streamflow, the sediment load, and the channel. The channel may degrade (downcut), aggrade (build up) or migrate laterally around a deposit, resulting in accelerated bank erosion. Identifying what the theoretical sediment threshold for each stream is difficult and arguably very subjective. No sediment threshold limits have been identified in this analysis and given the minimal acreage to be disturbed and the mitigation that would be required, oil and gas activities would not be generating enough sediment to impact stream channels.

Sediment can also have a direct effect on aquatic life and habitat features. Excessive sediment beyond what the stream is capable of transporting can fill the voids in the gravel stream bottom. This reduces or eliminates the production of certain aquatic insects that are an important food base for fish. It also reduces the value of gravel beds for spawning habitat. Sediment may fill pools that are important resting and over wintering habitat for fish.

### Alternative 1 - No Action

This alternative would result in a slight potential for adversely impacting water quality. Activities would be permitted in Floodplains, although *Controlled Surface Use* applies. Because of their close proximity to stream courses there is a higher risk that sediment or spill contaminants could be easily transported from activity areas to the stream.

Some development in Roadless Areas is expected, and with *Standard Lease Terms* applied, some increased sediment is likely to occur. Although the increases above natural levels would be so slight as to be of no significance.

### Alternative 2 - Preferred

This alternative does the best job of combining water quality protection while permitting the greatest area for leasing availability. Areas of water quality sensitivity; Floodplains, Wetlands, Riparian, High Geologic Hazard and Slopes Greater than 60% are protected with a *No Surface Occupancy* stipulation.

Under this alternative the Kannah Creek Roadless Area (much of which is the primary water supply for Grand Junction) and Coal Creek (water Supply for Crested Butte) would not be available for lease. All or parts of nine of the nineteen Roadless Areas within the analysis area would not be available for surface disturbing activities. The Battlement Mesa Roadless Area would have *No Surface*

BLM 0048282

*Occupancy.* This is an area with a high potential for surface erosion. By not permitting surface development in the Battlements, potential impacts to water quality are reduced.

### Alternative 3- No Lease

This alternative would result in no additional adverse impacts to water quality. There are situations where this would result in a lost opportunity to relocate or reconstruct an existing road for use by oil and gas activity, that is presently substandard and contributing to water quality degradation. The majority of forest roads are not surfaced and some local roads have inadequate drainage. Typically these would be the first deficiencies corrected if the road was to be used for oil and gas purposes.

### Alternative 4 - Lease with Standard Lease Terms

This alternative would provide the least protection for water quality while making the greatest area available for leasing. No special protection would be provided in those environments which have been identified as being at the greatest risk or most sensitive in terms of contributing to water quality degradation. No special measures would be applied to protect domestic water supply areas. All Roadless Areas would be available for leasing under *Standard Lease Terms*.

### Alternative 5 - No Lease in Roadless and SPNM

This alternative does the best job of protecting water quality, except for the no leasing option, but does not make as much area available for leasing as the preferred. The effects of this alternative in regard to water quality, are identical to Alternative 2, with the exception of its treatment of roadless and SPNM. The nineteen Roadless Areas considered in this analysis would not be available for lease. Roadless Areas make up approximately 1/3 of the total acreage within the analysis area. In addition to being roadless, many of these areas have high erosion hazard and a moderate to high potential for sediment production; they are steep; and contain areas of sensitive soils and High Geologic Hazard. Consequently these areas are generally among the most sensitive to water quality impacts within the study area. Predicting effects is made difficult because of the high level of uncertainty on exactly which lands will be acquired under lease and where on those leases activities will occur. Assuming in the future there is an equal chance of oil and gas activity occurring within the roadless component as there is in non-roadless, then a disproportionate amount of the impacts would accrue there. Once again it is significant to recognize that the RFD only projects a total of 75 acres of disturbance, and while there may be some theoretical differences among the alternatives in relative terms, those differences become insignificant.

### Cumulative Effects

The RFD projects that activities will be heavily concentrated on the two exploratory units; Ragged Mountain - 10 wells and the Narrows - 10 wells. Although this suggests a fairly high density of activity, and disturbance and is certainly far greater than what is predicted to occur outside the existing units or leases, the total number of acres disturbed within the units is relatively small. One hundred seven (107) acres of the Narrows and Ragged Mountain Units would be disturbed. Disturbance would likely be spaced out over the 15 years in the planning period. This would mitigate some of the impacts to water quality. The units all lie within areas of moderate to high watershed sensitivity. This sensitivity is a function of the erosion potential, slope stability and topographic character of an area.

Based upon these considerations, there is a reasonably high risk that water quality would be modified, although the change should be slight and seasonal. The principal effect will be to increase sediment delivery to surface drainages. Sediment production would increase as a result of road and well pad construction. However, in most instances the contribution of management induced sediment will still be less than that contributed by natural sources and is not expected to jeopardize the classified beneficial uses of the water. In order to minimize additional sediment contribution to the extent feasible, Best Management Practices will need to be incorporated into the APD's. Those lands currently leased

BLM 0048283

Oil and Gas Leasing Analysis FEIS

do not have the environmental protection as that which will likely be made a part of future leases. Occasional spills of waste water and fuel are to be expected, although this should happen infrequently and remedial action would be prompt.

In addition to the effects of oil and gas activities are the effects that would occur as a result of planned timber harvest over the next decade. Timber harvesting is a connected effect because once a road is built into an area the economics of timber often become more favorable. Road access could change the economic suitability of timber for harvest. However, before previously unsuited timber could be considered for harvest, the Forest Plan would have to be amended - a process that involves the public. This is particularly true with regard to several of the Roadless Areas, including but not limited to: Clear Fork, Springhouse Park, Priest Mountain, Electric Mountain and Salt Creek. The environmental sensitivity of many of these Roadless Areas is high. Should an area be roaded to one extent or another for oil and gas, it should be fully expected that timber sales will soon be considered within the area if suited timber if present. In many instances dual road use is a possibility and could help alleviate additive impacts. Each timber sale would require its own environmental analysis in which site specific effects will be examined and the status of oil and gas activities will be considered.

## Environmental Factor: Water Quantity

The direct effects of oil and gas activities on water production from the unleased portion of the analysis area will be inconsequential. With the assumption that each well will impact 10.7 acres and the RFD only projects seven wells on new leases, the total area impacted is less than 80 acres. Project level watersheds are on the order of 10,000 acres, which means that even if all the projected activity was to occur within one watershed (which it won't), the total percent impacted would be less than 1%. Even considering the 40 wells predicted on existing leases and units, the water yield increase is not enough to be of any significance. This consequence is directly related to the vegetative alteration associated with road, well pad and pipeline construction (in areas dominated by mature trees).

It is not expected that oil and gas activities would have an effect on local water supplies. Some consumptive use of water is expected for drilling operations and possibly dust abatement. Whether the water is secured on the Forest or brought in from other sources, operators must comply with water use requirements of the Colorado Division of Water Resources.

### *Cumulative Effects*

Water yield increases are judged to be a non-issue relative to oil and gas activities. However, when combined with potential timber sales temporary water yield increases would likely occur.

## Environmental Factor: Groundwater

*Alternative 1 - No Action*
*Alternative 2 - Preferred*
*Alternative 4 - Lease with Standard Lease Terms*
*Alternative 5 - No Lease in Roadless and SPNM*

Shallow groundwater may be affected by the drilling and operation of the oil and gas wells, water source wells, water disposal wells, cathodic protection holes, geophysical shot holes and/or core test holes. Potential groundwater impacts from oil and gas activities could occur from migration of drilling fluids, poorer quality water and/or methane gas along the well bore to aquifers containing relatively higher quality water. During drilling, zones of varying pressure may be encountered. If problems arise in controlling the pressure, there would be a potential for interzonal migration of fluids from one zone to another. During production and abandonment, interzonal migration could occur due to corroded or poorly cemented well casings or improperly set cement plugs.

Environmental Consequences of Alternatives
General Forest

BLM_0048284

Groundwater effects related to coal bed methane wells include the potential disposal of the produced water and the potential contamination of groundwater by the seepage of released methane from the coal beds. Large quantities of water may be produced from a coal bed methane well for up to five years. Water may be disposed of in several ways, depending on its quality: surface discharge, direct use, surface evaporation pits and underground injection wells. Surface discharge must comply with Colorado Department of Health Water Quality Control Division, Colorado Discharge Permit System requirements. Water may or may not need special treatment before quality meets the required standard. Direct use is regulated under the Clean Water Act. Evaporation pits must meet specifications administered by the BLM, Colorado Oil and Gas Commission (COGC) and Colorado Department of Health. Underground injection wells must be permitted under the underground injection control (UIC) program of the COGC, and meet strict testing requirements to insure the water quality in the injection zone is less than the water being injected and special precautions have been taken to prevent interzonal migration of water.

Water disposal into deep wells would not likely cause adverse impacts on usable aquifers, due to the presence of thick interbeds of shale and the great depth differential. However, it is unclear how shallow disposal may affect usable aquifers. The effects may be site specific, varying depending on site characteristics. Based on experience in the vicinity of the analysis area, the quality of water produced is generally good (within State Clean Water quality standards). If so, the produced water would probably be discharged into evaporation ponds or surface waters. Depending on the volume of water produced, discharges into streams would have varying effects. High volumes of water discharged into streams may increase the potential for increased erosion.

Migration of methane along uncemented well bores have the potential to contaminate usable aquifers. Old wells in the vicinity of coal bed methane wells, which have inadequate cement, may provide an avenue for the upward migration of methane and the potential contamination of aquifers.

Oil and gas operators are regulated to protect fresh water zones with a total dissolved solids concentration of 10,000 milligrams/liter (mg/l) or less. (Primacy for the administration of water disposal or injection wells rests with the State of Colorado under an approved plan with EPA.) All these holes must be constructed to preclude the interzonal migration of fluids. In general, this is achieved by correct setting of casing, cement plugs, packers and/or other down hole devices. Occasionally, problems do arise which jeopardize or breach the integrity of a well bore. When problems are detected through monitoring, current regulations and onshore orders require prompt remedial work. Consequently, there is only a low potential for any impacts to the groundwater resource. If any impacts should occur, their significance would be minimal.

Construction of access roads and gas pipelines or gathering lines may have an impact on groundwater. Often times this construction occurs in the same right-of-way. The potential impact is low since the construction would not directly penetrate groundwater aquifers. Potential short term impacts that could occur include surface spills of fuels and other fluids used during construction activities. The magnitude and duration of these impacts would most likely be minimal since spills would be small, localized and remedial actions quickly initiated.

The potential impacts to groundwater from the use of access roads consist of spills and/or leaks from tank trucks hauling fuels and other fluids used in the equipment or hauling produced water for disposal. The magnitude and duration of any of these impacting groundwater is low, since any spill or leak would be localized and contained. Any major spill or leak must be immediately reported to the Forest Service and BLM and remedial action taken to lower potential impacts. Because of the controls required for reporting and cleaning up of any spills or leaks, potential impacts to groundwater are expected to be minimal.

There could be a moderately greater risk to potable water in the municipal watershed areas. This is especially true in the Wiley Spring (Crawford), Bell Springs (Paonia) and West Terror Springs (Pitkin Mesa) areas where the springs, which are considered part of the shallow groundwater system for the

BLM_0048285

purpose of this analysis, are the primary source of supply. Under these alternatives, the watersheds of special interest to municipalities would be open to surface occupancy. If impacts occurred from failures of casing or plugs, there could be adverse impacts to water quality.

### Alternative 3 - No Lease

Under this alternative, the effects would be similar to those described above, but they would be limited to existing leases, only.

### Cumulative Effects

Oil and gas operations are currently operating within the study area. These operations have not adversely impacted the groundwater quality or groundwater levels. If the required stipulations, regulations, standard engineering practices and appropriate mitigation measures are followed, additional oil and gas development activities should not result in long term cumulative impacts to groundwaters.

## Environmental Factor: Range

See the discussion under Primary Rangelands on page IV-84 of this chapter.

## Environmental Factor: Roads

### Road Construction/Reconstruction

Because the majority of oil and gas activity is predicted on existing leases, there is only a very slight difference in the effects that would occur to the transportation systems for each alternative described in this analysis.

Alternatives 1, 2, 4, & 5 would all have the same effects with providing access to the seven wells predicted on new leases, whereas alternative 3 would not require any additional access.

Even though alternatives 1, 2, 4, & 5 show the same number of miles, there are differences that need to be addressed. Below is a brief summary of potential for new road construction, by alternative. All alternatives share the same requirement that access be allowed to existing leases. The oil and gas operator would bear the cost of all required road construction/reconstruction.

### Alternative 1 - No Action

This alternative would allow for roads to be constructed within all of the Roadless Areas, Research Natural Areas, Sensitive Areas, Retention VQO areas, Semi-primitive Non-motorized areas, Recreation Complexes, Watersheds of Special Interest to Municipalities, and wildlife areas.

### Alternative 2 - Preferred

The difference between this alternative and Alternative 1 is that specific Roadless Areas such as Battlement Mesa, Kannah Creek, Roubideau, Tabeguache, Whetstone Mountain, Flat Top Mountain and parts of West Elk, Raggeds and Priest Mountain would not be subject to new road construction under either *No Lease* or *No Surface Occupancy*. (This does not apply to existing leases). All other Roadless Areas would be subject to new road construction. Also under this alternative, Research Natural Areas and Sensitive Areas would not have any new roads constructed on them. (Again with exception to existing lease areas.)

BLM 0048286

### Alternative 3 - No Lease

Under this alternative, all new road construction would be limited to providing access to areas with existing leases.

### Alternative 4 - Lease with Standard Lease Terms

This alternative would allow for new road construction in all areas of the Forest, with exception of Wilderness. Control of the roads would be provided by the *Standard Lease Terms.*

### Alternative 5 - No Lease in Roadless and SPNM

This alternative differs from Alternative 2, by not allowing any new road construction in the Roadless Areas and SPNM areas.

### Cumulative Effects

The table below shows the miles of road construction and reconstruction. The road miles are broken down into existing units, existing leases, new leases and proposed timber sales. The amount of new road construction needed for oil and gas operations on the Forest is minimal and would not add significantly to the cumulative effects of roads within or adjacent to the analysis area. New roads on the Forest generally will be closed to public travel, lessening the impacts to wildlife, wildlife habitats and recreational use. Further analysis of the cumulative effects of roads will be done at the time the NEPA work for the SUPO is done.

| TABLE IV-3. MILES OF NEW ROAD CONSTRUCTION | | | | | | |
|---|---|---|---|---|---|---|
| | **AREA** | **ALT. 1** | **ALT. 2** | **ALT. 3** | **ALT. 4** | **ALT. 5** |
| **UNITS** | Narrows | 10 | 10 | 10 | 10 | 10 |
| | Ragged Mtn | 10 | 10 | 10 | 10 | 10 |
| **EXISTING LEASES** | Petro Leases | 2 | 2 | 2 | 2 | 2 |
| | Other Leases | 18 | 18 | 18 | 18 | 18 |
| **NEW LEASES** | Total Analysis Area | 7 | 7 | 0 | 7 | 7 |
| **TIMBER SALES*** | Entire Forest | 240 | 240 | 240 | 240 | 240 |
| **TOTAL** | | 287 | 287 | 280 | 287 | 287 |

* Sales identified in the Forest Plan for the next decade, for the entire Forest.

The miles of road reconstruction would be the same as the miles of new road construction.

Cumulative effects of roads are also discussed under other *Affected Environments* in this chapter, i.e. General Forest, Wildlife Special Habitats.

BLM_0048287

### *Road Use*

For each well drilled in the analysis area, there would be an increase of approximately 13 vehicles per day, during the exploratory drilling period. The exploratory drilling will normally go on for about 60 days. During production, the increase in traffic would only be about one vehicle per day.

The road with the largest expected increase in use would be the Buzzard Divide Road FDR 265. It is estimated that this road would provide access for approximately 20 wells. This would result in an estimated peak traffic increase of approximately 13 vehicles per day over the 15 year period.

The roads listed would be accessing wells in existing units and leases and would therefore have the same impacts on all alternatives.

Under all alternatives, some impact would occur to the State Highways that provide access to the analysis area. Highway 133 (McClure Pass), 65 (over Grand Mesa) and 330 (Collbran) are the highways that would be most likely to experience an impact as a result of oil and gas activity. The increase in traffic would be relatively minor and in all cases, short-term. In addition to the 13 or so vehicles per day estimated to occur daily for the two months during drilling, a pulse of heavy truck traffic would occur just before and after drilling. Heavy trucks would generally make two loaded trips over the highway - to and from the drill site. The truck traffic may cause some disruption of the normal flow of traffic on State Highways, especially when traversing steep grades.

A permit will be required from the State to build any access road directly from a State Highway.

### *Road Maintenance*

Prior to commercial use of Forest Development Roads, the operator must have a road use permit. This permit has specific requirements for any work to be done on roads they would be using, including any maintenance requirements.

This permit would require the operator to do maintenance work commensurate with their share of road use.

Included in the maintenance requirements is a schedule for surface rock replacement. From prior analysis and studies on the Forest, it has been determined that the associated traffic from four wells would result in one inch of gravel loss from the road surface.

Roads such as the Buzzard Divide road would need to be resurfaced one to two times over the 15 year period. The biggest impacted area would be the Buzzard Divide area, as described above in road use. There are no known aggregate sources on the Forest in this area. All gravel would be hauled in from private sources.

Road maintenance costs are shared based on traffic volume of each user. For example, if the oil and gas operations amount to 50% of the traffic, then their share would be 50% of the road maintenance cost.

## Environmental Factor: Visual Resources

The oil and gas development activities that are most likely to have a significant visual impact are those that take place during exploratory drilling, field development and production. Activity associated with exploratory drilling is likely to cause the most significant change to the visual resource. Activities in the development and production stage may be less intrusive, but typically are longer lasting.

During exploration, a road and well pad are typically constructed to accommodate the drilling rig. An oil derrick on a drilling rig typically may be as high as 150 feet. The drill rig and site is lighted at

BLM_0048288

night for safety and around the clock work. On average, a well rig can be expected to be in place and operating 30 to 60 days. This would be a short term visual impact.

Once the exploratory drilling is completed, the drill rig and the oil derrick are removed. If oil and gas resources are found, some permanent facility would be required at the site. If oil and/or gas from the well does not flow naturally, a pumping unit may be required. These pumping units are generally twelve to fourteen feet high. If the well flows naturally, a unit described as a "Christmas tree" would be used to regulate the flow of oil and gas to the surface. The Christmas tree unit can range from four to eight feet high. The potential for visual impacts are minimized with the use of Christmas trees rather than the pumping units. These facilities would not, in most cases be a significant visual impact.

Other permanent facilities at the well site include the treater and/or separator tanks, storage tanks, tool shed, generators and pipe racks. The separator tanks have a vertical orientation and can be as high as twenty feet. Storage tanks are typically fifteen feet high. Tool shed, generators and pipe racks vary between eight and twelve feet high.

Any new roads or upgrading of existing roads can also have a visual impact. Roads on steep slopes would result in cut slopes that could potentially be seen from long distance. Transmission pipelines can also have a visual impact, creating linear opening in vegetation which can be seen from long distance.

Oil and gas exploration activities in adopted Partial Retention VQO areas, particularly if they are viewed in foreground or near-middle ground (1/4 to 3 miles from the viewer) situations, are the areas most likely not to meet its VQO. The structures necessary for the exploration activity would appear to dominate the landscape. Generally beyond 3-5 miles the visual impacts can be mitigated. Site specific effects on the visual resources will be determined at the project proposal stage, possibly with the use of computer generated perspective plots.

Of the seven wells within the RFD scenario, the four on the Grand Mesa National Forest are most likely not to meet their adopted VQO. This is because of the number of proposed new wells and its high concentration of Retention VQO, Scenic Byway Corridors, and other viewer platforms.

### *Alternative 1 - No Action*

This alternative includes *No Surface Occupancy* for Retention VQO - Low VAC areas and *Controlled Surface Use* for Retention VQO areas. With these stipulations the adopted VQO's for the analysis area would generally be met except for potential minor impacts within Scenic Byway Corridors.

The overall effects on scenery within the analysis area would be more than Alternative 2, however it would still be minimal. This alternative would result in the area generally retaining its natural characteristics.

### *Alternative 2 - Preferred*

This alternative includes *No Surface Occupancy* for Retention VQO - Low VAC areas and *Controlled Surface Use* for Retention VQO areas and Scenic Byway Corridors. With these stipulations the adopted VQO's for the analysis area would generally be met.

The overall effects on scenery within the analysis area would be minimal. This alternative would result in the area generally retaining its natural characteristics.

### *Alternative 3 - No Lease*

This alternative would result in no additional leasing for oil and gas within the analysis area. This alternative would have no environmental consequences on the visual resource (scenery). This alternative would maintain most of the visual resource in its existing visual condition.

BLM 0048289

Oil and Gas Leasing Analysis FEIS

### *Alternative 4 - Lease with Standard Lease Terms*

This alternative would have the most potential for impact to the visual resource of any of the alternatives. It allows the entire analysis area to be leased using *Standard Lease Terms*. With this stipulation the adopted VQO's for 19% of the analysis area may be adversely impacted.

This alternative could result in much of the area changing from what is now a natural appearing visual condition to one that is heavily modified during the exploration phase. The activity described under the RFD could feasibly occur anywhere within the analysis area. The adopted VQO's would not be met in Retention and Partial Retention areas during the exploration phase.

### *Alternative 5 - No Lease in Roadless and SPNM*

This alternative is the second best alternative for maintaining visual resources (scenery). Only alternative 3, is better. This alternative would not allow new leases in Roadless Areas or 3A management areas (Semi-primitive Non-motorized). It's treatment of Retention VQO - Low VAC areas, Retention VQO areas, and Scenic Byway corridors is the same as Alternative 2 and the effects in those areas would be the same as described in Alternative 2.

### *Cumulative Effects*

Most of the existing leases, where the majority of the oil and gas exploration and development is projected, are not in Retention or Partial Retention VQO areas. The remaining area covered in this leasing analysis has experienced a low level of oil and gas exploration and development. The RFD only predicts seven exploration wells will be drilled on new leases. Because of the absence of wells in Retention and Partial Retention VQO areas and the low number of wells being projected, the anticipated cumulative effects of this leasing decision on the visual resource at both the exploration and production stages would likely be minimal.

## Environmental Factor: Recreation Opportunities

Analysis of the impacts of oil and gas development on the recreation resources is based on typical historical and projected oil and gas activity at the well site, on new pipelines and on new roads. Changes in recreation opportunity and use are described for each alternative. This description includes a discussion on Developed Recreation Complexes, Dispersed Recreation Complexes, Major Trail System complexes, and 3A Management (SPNM) areas.

The oil and gas development activities that are most likely to have a significant impact are those that would take place during exploratory drilling, field development and production. Drilling is likely to cause the most significant change to the recreation resource. Activities in the development and production (operation and maintenance) stage may be less intrusive, but typically last longer.

During exploration, a road and well pad are typically constructed to accommodate the drilling rig. Until the well pad is completed and the drilling rig removed, there would be some traffic to and from the site. The average traffic to the well pad is estimated to be thirteen vehicles per day. This traffic would increase the dust on and near roads in the vicinity of the drill site. Drilling requires many support activities and once started, it usually continues seven days a week, 24 hours a day. During this time period large diesel engine are used which may be heard up to a mile from the drill site. On average, a well rig can be expected to be in place and operating 30 to 60 days. These activities, are short term but could potentially conflict with recreational use, resulting in a reduced recreational experience, a change in the physical setting of the area, and ultimately reduced use.

Once the drilling is completed the well rig and the oil derrick are removed. If oil and gas resources are found, some permanent facility would be required at the site. Traffic associated with routine

Environmental Consequences of Alternatives
General Forest

BLM 0048290

maintenance of the production facilities may conflict with some types of recreational use (sightseeing, auto touring, hunting, etc.)

Any new roads or upgrading of existing roads can also have a recreation impact. Roads on steep slopes may require cut slopes that can be seen from far distances. Transmission pipelines can also have a impact, creating linear openings in vegetation which can be seen from far distances.

### *Alternative 1 - No Action*

This alternative would include *Controlled Surface Use* for the Recreation Complexes and the 3A areas. While this would protect the developed recreation facilities, some visual and audio impacts may occur to their settings which may result in a reduction of the visitors recreation experience and or use.

The overall effects on recreation within the analysis area would be more than Alternative 2 and could be significant. Opportunities for dispersed backcountry recreation such as hunting may be reduced. Of the seven wells within the RFD scenario, the four on the Grand Mesa are most likely to impact the developed recreation setting quality. This is because of the number of proposed new wells and the high concentration of recreation development and use.

### *Alternative 2 - Preferred*

This alternative would result in *No Surface Occupancy* in Recreation Complexes and 3A management areas. This would protect most of the developed recreation facilities in the analysis area. Facilities at a few concentrated use sites such as Antone Springs Campground, Iron Springs camp area, and Trickle Park camp area could be impacted. Some dispersed hunting areas may become roaded and reduce the quality of the current hunting experience for some hunters.

The overall effects on recreation within the analysis area would be minimal. This alternative would generally retain the natural character of the high density use areas (Developed Recreation Complexes) and the sensitive recreation environmental areas (Dispersed Recreation Complexes, Major Trail System Complexes and 3A Management - SPNM areas). Opportunities for dispersed backcountry recreation such as hunting may be reduced.

### *Alternative 3 - No Lease*

This alternative would result in no additional leasing for oil and gas within the analysis area. This alternative would have no environmental consequences on the recreation resource. This alternative would maintain the recreation resource in its existing setting.

### *Alternative 4 - Lease with Standard Lease Terms*

This alternative would potentially impact the recreation resource the most of any of the alternatives. It allows the entire analysis area to be leased with *Standard Lease Terms*. With *Standard Lease Terms* the recreation resource could be significantly impacted. Opportunities for dispersed backcountry recreation such as hunting may be reduced.

This alternative could result in much of the area changing from what is now a natural appearing setting to one that is heavily modified during the exploration phase. This would potentially affect the quality of recreation and may result in relocation of use or a loss in use. The activity described under the RFD could feasibly occur anywhere within the analysis area.

### *Alternative 5 - No Lease in Roadless and SPNM*

This alternative is second only to Alternative 3 in the protection of recreation resources. It includes no leases in Roadless Areas and 3A Management Areas (Semi-primitive Non-motorized ROS); and *No*

BLM  0048291

Oil and Gas Leasing Analysis FEIS

*Surface Occupancy* in Recreation Complexes. Opportunities for dispersed backcountry recreation would be maintained. Effects outside roadless would be similar to Alternative 2.

### Cumulative Effects

Historically, most of the existing leases, where the majority of the oil and gas exploration and development is proposed, are not within or adjacent to the Recreation Complexes or 3A management areas. The remaining area covered in this leasing analysis has experienced a low level of oil and gas exploration and development. The RFD only predicts seven exploration wells will be drilled. Because of the absence of wells in these areas and the low number of wells being proposed in these areas, the anticipated cumulative effects of this leasing decision on the recreation resource at both the exploration and production stages would be minimal.

However, a significant portion of the Forests dispersed recreation use such as hunting does occur within and around existing leases. The anticipated cumulative effects of this leasing decision on the recreation resource at both the exploration and production stages could be significant.

## Environmental Factor:  Cultural and Historical Resources

Most of the historic, architectural and archaeological values of cultural sites can be protected effectively through application of the National Historic Preservation Act (NHPA) of 1966 as amended and the Archaeological Resources Protection Act (ARPA) of 1979 as amended in the event of oil and gas activity. However, the NHPA may not protect all historic values associated with a cultural property, especially if the property has more than scientific worth. Cultural sites may contain educational and recreational values that are not protected by NHPA or ARPA; these values are the ones most endangered by oil and gas activity as they are not protected by law or the current Forest Plan. *Standard Lease Terms* may not be sufficient to protect these resources with recreational, educational, and interpretive values because of the linear extent of these resources.

Traditional landscapes important to American Indian cultures would potentially be impacted by oil and gas activity. These are areas that may include geologic features, watersheds, habitat, plant areas or combinations of these features that are valued by aboriginal people because they are sacred. Such areas are used for religious, spiritual, and/or cultural purposes; they have ancestral significance to American Indian peoples. These areas are not currently protected by law.

### Cumulative Effects

Oil and gas activity combined with planned and potential timber harvest may result in degradation of these resources or of the sensory environment associated with these resources, or create conflicts with recreation and traditional user of these resources and areas.

## Environmental Factor:  Wildlife

The potential effects of oil and gas development on wildlife in wildland environments can be both numerous and varied in their intensity. The severity of the effect is site-specific and depends on such factors as: (a) the sensitivity of the species affected; (b) the type of disruption; (c) the characteristics and importance of the affected habitat and; (d) the availability and condition of alternate habitat (Bromley, 1985).

Oil and gas activities will adversely impact some wildlife species or their habitat wherever they occur. Ungulates, carnivores, and raptors may be more affected because of their sensitivity to disturbance. While small birds and mammals may be affected in large numbers locally, they are more capable of rapid recovery because of their higher reproductive rate and wide distribution. Response to disturbances varies among species and even individuals depending on the type, duration, and severity of the disturbance. These effects may be most critical (a) during times when the animals are already

Environmental Consequences of Alternatives
General Forest

BLM  0048292

stressed by natural conditions, (b) in habitats traditionally used by populations during critical periods of their life cycles, (c) for species whose social organization or behavior makes them susceptible to disturbance, and (d) for certain sex or age groups of animals (Bromley, 1985). This is either a permanent or temporary effect depending on the type of activity. A well pad in essential habitat is a permanent effect for the plant or animal species involved. A seismic blasting operation may be a temporary effect on a species because the activity would result in only a temporary displacement of the animal into an adjacent area until the disturbances have subsided.

### *Alternative 1- No Action*

Under this alternative, current Forest Plan direction would be used to identify special stipulations related to wildlife habitats within the general forest *Affected Environment*. Only general direction is provided, concerning road construction and use as it affects Management Indicator Species and Big Game Winter Range. This direction may be grossly interpreted as *Controlled Surface Use* or *Timing Limitations* stipulations on a few areas and activities. Specific *Timing Limitations* are identified for bighorn sheep lambing areas and select raptor species nesting sites (see Appendix H). The use of specific direction would likely result in *Standard Lease Terms* being applied to wildlife habitats. All Roadless Areas, which are important refuges for many wildlife species, would be open for oil and gas activity. This could be detrimental to those wildlife species that are dependent upon security habitat and inaccessibility from humans. The effects would be as described under *Standard Lease Terms*, on pages IV-8 to IV-12.

### *Alternative 2 - Preferred*

Under this alternative, wildlife would be afforded more protection than those in Alternative 1, because *Controlled Surface Use* stipulations would be applied in addition to *Timing Limitations* in Big Game Winter Range, deer and elk birthing areas, and Migration Routes and Stating Areas.

Rocky Mountain and desert bighorn lambing and breeding ranges and Sage Grouse Leks would have *No Surface Occupancy* stipulations applied which would protect these traditionally used sites. Wildlife within the Battlement Mesa, Kebler Pass Corridor, Whetstone Mountain, Flat Top Mountain, Kannah Creek, Roubideau, Tabeguache and parts of the Priest Mountain Roadless Areas would be protected from the potential effects of oil and gas activity because these areas would not be leased or would have the *No Surface Occupancy* stipulation applied.

Other resource concerns within Roadless Areas will effectively protect wildlife resource values, i.e. *NSO* for Concentrated Use Summer Range.

### *Alternative 3 - No Lease*

This alternative would result in no additional adverse impacts to wildlife or their habitat. While only seven new wells are expected to occur on new leases, it would still be a lower level of impact to wildlife than would be expected to occur on the existing leases plus any new lease areas. This alternative would be be most favorable from a wildlife standpoint.

### *Alternative 4 - Lease with Standard Lease Terms*

Under this alternative, "reasonable measures", as provided by *Standard Lease Terms* and the Forest Plan standards and guidelines would result in this alternative having the same effects as Alternative 1 - No Action. It does not provide protection above and beyond the Forest Plan to bighorn sheep breeding areas, Sage Grouse Leks, or critical habitats of species other than Management Indicator Species. Roading would likely result in additional human activity such as timber harvest, recreational activities, trapping, and poaching.

BLM 0048293

Oil and Gas Leasing Analysis FEIS

### *Alternative 5 - No Lease in Roadless and SPNM*

This alternative is the same as Alternative 2 for wildlife special environments. *Timing Limitations* and *Controlled Surface Use* stipulations would be applied to Big Game Winter Range, deer and elk birthing areas, and Migration Routes and Stating Areas. Sage Grouse Leks and bighorn sheep lambing and breeding areas would have *No Surface Occupancy*.

The major and extremely significant difference for wildlife with this alternative is the protection of wildlife habitat in all Roadless Areas. This would be extremely beneficial to all wildlife and their habitat that occur in Roadless Areas. Without any oil and gas development, and its necessary road access, these areas would not be subject to increased human encroachment. Timber harvest, recreational development, poaching, and trapping would not be additional impacts to native wildlife populations and their habitat. These areas would remain as refuges for species requiring large home ranges, large expanses of secure habitat, and those species intolerant of humans and their activities. This alternative would be beneficial to threatened and endangered species, as these areas would remain potential re-introduction sites.

This alternative would be the most desirable from a wildlife standpoint, after Alternative 3 - No Lease.

### *Cumulative Effects*

The cumulative effect of oil and gas leasing and development, combined with potential connected actions and planned projects in the analysis area, may be significantly greater than the effect of oil and gas activities considered alone. Forty-seven (47) oil and gas wells are projected to be drilled in the analysis area in the next 15 years. Seven new wells are expected to be drilled on new leases. The remaining 40 wells projected under the Reasonably Foreseeable Development (RFD) scenario, will be drilled on existing leases and units. Thirty-eight (38) of these wells are planned on the Grand Mesa and Gunnison National Forests, within close proximity of each other. Much of this predicted activity could occur in Roadless Areas and could have adverse effects on wildlife and their habitats (See discussion below).

Drilling for oil and gas creates wildlife impacts that can be separated into two functions: 1) the activity itself and; 2) the subsequent increase in access (Stubbs, 1979).

Drilling activity results in an increase in the number of new roads constructed into an area. This could dramatically increase the amount of both legal and illegal hunting. This would result in a overall reduction in ungulate wildlife numbers and other species that are trapped or hunted. Dramatic undesirable changes in big game animal sex ratios may also occur. The male segments of the populations could be drastically reduced because of the increased hunting pressure associated with increased access. Bull elk and buck deer would become more vulnerable. Direct mortality due to roads is always a possibility, because of vehicle/animal collisions and poaching of game that always occurs where roads are present.

The cumulative effects on wildlife, including threatened and endangered species, of oil and gas leasing, connected actions, adjacent or succeeding actions such as timber sales, recreational developments, subdivision and land development is largely unknown at this time. The connected action of timber harvest in previously unroaded habitat would be especially detrimental for many wildlife species, particularly big game and furbearers and other species requiring large home ranges, secure habitat, and/or strict cover requirements. One activity considered alone may cause a temporary displacement of an animal species, but when several activities are occurring simultaneously in adjacent drainages, permanent displacement or outright elimination of the population could occur because of a lack of essential habitat.

Environmental Consequences of Alternatives
General Forest

BLM 0048294

If Roadless Areas are entered with oil and gas activities, the roads would provide access to suitable timber stands, including old growth, that were previously uneconomical because of high road costs. (Environmental analysis and a Forest Plan amendment would be required before such stands could be managed for timber production.) This could have a very negative effect on the variety and density of wildlife species which use these areas as security habitat or as the only habitat where they can survive. Some of the species which are dependent upon these areas for all or most of their habitat requirements include the lynx, wolverine, pine marten, goshawk, black bear, mountain lion, red crossbill, hairy woodpecker, Lewis' woodpecker, and Mexican spotted owl. The most detrimental effect on the goshawk and its habitat could come from timber harvest along roads constructed for the oil and gas activities. Clearcutting of aspen stands converts goshawk habitat into habitat well suited to the red-tailed hawk, which is not experiencing population declines. Timber harvest in previously inaccessible mature ponderosa pine stands would be very detrimental to the future existence of the Abert's squirrel, which is already declining in numbers. The red crossbill has a fairly large home range over thick coniferous forests and would be more impacted by the possible connected action of timber sale activity over its habitat than actual oil and gas exploration and development. However, potential timber harvest as a connected action would have a more far-reaching effect on woodpecker populations (primary cavity nesters) and a large group of other birds and small mammals that nest or den in the cavity excavations of the woodpecker family. These cavity excavators rely on large mature or old growth ponderosa pine, Douglas fir, aspen, lodgepole pine, Engleman spruce, and subalpine fir trees for their nesting habitat. In addition, species such as the elk, bighorn sheep, mountain goat, mule deer, and wild turkey use these areas for a portion of their life cycle to find solitude or escape from hunters. Roads would result in reduced security cover and increased access by hunters, making all wildlife species more vulnerable to hunters or poachers. Roads and associated timber harvest would cause forest fragmentation, resulting in the disappearance of wildlife species requiring large home ranges in natural communities.

Furbearers are especially vulnerable to trapping in previously unroaded habitats. Many furbearers such as the lynx, wolverine, pine marten, bobcat, coyote, fox and mink would become more vulnerable to local extirpation and extinction as evidenced by the eradication of these and other species in the Rocky Mountains as development occurs. Roads would provide access routes to trappers who could easily "trap out" small remaining localized populations of lynx, wolverine, and pine marten. Mitigation would involve strictly controlling public access by closing the roads to all motorized vehicles during operations and the physical permanent closure or obliteration of the roads after the operations are complete.

The combined effect of all these activities would be much more impactive on wildlife species than just the planned activity of oil and gas development.

## Environmental Factor: Wildfire

Potential for wildfire would be similar under all alternatives. Oil and gas activity which could result in wildfire would be the similar under all alternatives. Alternative 3, the No Lease Alternative would result in a slightly smaller chance for wildfire because it would build fewer roads. Improved access provided by oil and gas activity would result in a higher potential for man caused fire, but it could also provide for more efficient suppression of wildfire.

### *Cumulative Effects*

The level of projected oil and gas activity and associated ground disturbance is such that no significant cumulative effect to fuel loading and the potential for wildfire would occur. The potential for subsequent timber harvest to occur in areas roaded for oil and gas would provide additional roads which could be available for future fire suppression activities.

BLM 0048295

Oil and Gas Leasing Analysis FEIS

## Environmental Factor:  Social and Economic Conditions

Impacts from oil and gas development could affect social and economic conditions in Mesa, Gunnison, Delta, Montrose, Ouray, San Miguel, Hinsdale, and Saguache counties in south western Colorado. Drilling in the analysis area would occur in Delta, Gunnison, Mesa, Montrose, and San Miguel counties, according to the Reasonably Foreseeable Development scenario projected for the Forest. The three remaining counties (i.e., Ouray, Hinsdale, and Saguache) are considered to be within the Forest social and economic zone of influence.

The magnitude of the impacts on social and economic conditions would depend on the number of drilling operations, number of production wells, and the distribution of drilling activity at one time. Under the Reasonably Foreseeable Development scenario for each alternative 40 wells will be drilled in the next 15 years on existing leases, or less than 3 wells, annually.  In addition under each lease alternative, an additional seven wells will be drilled in the next 15 years on new leases, or a well every other year. The RFD estimates 28 of the 40 existing-lease wells will be completed for production, while 3 of the seven new-lease wells will be completed for production.

While an average of .5 wells per year would be drilled on new leases, drilling activity will likely fluctuate above or below the average from year to year. Over the last thirty years a maximum of 5 wells have been drilled on the Forest in a single year.  Total future average drilling activity on the Forest is predicted to be significantly larger (3.1 wells annually) than past drilling activity (1.4 wells annually from 1986-1990 and .8 wells annually from 1958-1990). Drilling on new leases will be a small (15%) part of total drilling activity on the Forest.

### Federal, State & Local Mineral Receipts

The estimation of Federal, State, and local mineral receipts from oil and gas leasing is a complex and difficult task. Many different laws, regulations, jurisdictions and formulas are involved. The following information describes the rentals, royalties and taxes resulting from a single production well on the Forest.

### Rentals

The lessee is required to pay rental fees for the use of Federal land for oil and gas activities. Failure to pay the rental fee will invalidate the lease. Rental rates have varied over the years, but the current rates are $1.50 per acre per year, for the first five years, and $2.00 per acre per year after that.  The Forest currently has approximately 250,000 acres under lease for oil and gas. Assuming an average of $1.50 per acre per year for oil and gas lease rental fees, the return to the Federal treasury is about $375,000 per year.  The fees are required even if there is no oil and gas activity on the leasehold.

### Royalties

Federal royalties are 12.5% (one eighth) of the value of oil and gas from Federal oil and gas leases. Payments to the State are one half of Federal royalties.  In addition, Colorado imposes a progressive severance tax on oil and gas production.  Drilling equipment, pipeline and oil and gas produced are all taxed by the counties they are located in as personal property.

Oil is currently selling at around $20.00 per barrel and gas $1.50 per thousand cubic feet (MCF). The most recently drilled well on the Forest is Petro-Energy's 1-26 well on the Paonia Ranger District which produced 237,250 MCF of gas in its first year and is expected to decline in production at an 8% rate.  Using the Petro-Energy well as an example, the 1990 gross value of gas produced from the 1-26 well was $355,875. The Federal royalty is $44,484 of which half ($22,242) goes to the State of Colorado.

Environmental Consequences of Alternatives
General Forest

BLM_0048296

### *State of Colorado Severance Tax*

The State of Colorado imposes a progressive severance tax on the gross value of oil and gas production. The severance tax is as follows:

* 2% of the first $25,000 gross value

* $500 plus 3% of the gross value over $25,000 and less than $100,000

* $2,750 plus 4% of the gross value over $100,000 and less than $300,000

* $10,750 plus 5% of the gross value over $300,000 (Colorado Department of Revenue)

The State of Colorado severance tax for the Petro-Energy well would be $13,543.75 for 1990.

### *County Personal Property Drilling Rig Tax*

Drilling rigs used on the Forest generally have a capability of drilling 8,000 feet and are valued at $101,120 according to standard State of Colorado valuation tables. Such a rig is taxed on 29% of its value at an average mill levy of .065 or $1,980 for a full year or $5.42 per day. The actual tax is based the number of days a drilling rig resides in a particular county. The average well takes approximately 60 days to drill and would be taxed at the County level an average of $325.20 per hole drilled.

### *County Value Added Tax*

Gas and oil production is also taxed by counties on a mill levy based on seven eighths of gross value (gross value minus Federal royalty). As mentioned above the average mill levy is .065. County property tax on the first year's production of $355,875 would be $20,240.39.

### *County Personal Property Pipeline Tax*

The pipeline which takes the oil and gas to market is also taxed based on 97% of the cost of putting in the pipeline and allowing for 3% depreciation annually thereafter. Assuming pipeline costs average $100,000 per mile to lay and 2.5 miles of pipeline are needed to tap into the nearest trunk line. The total value of the pipeline is $250,000 and the first year County tax would be $15,762.5. An additional complication is that the Federal Government gives a tax credit from Federal royalty payments for pipeline construction. Therefore, the first year of production would occur without having to pay full Federal royalties. Actual royalties would be $13,234.38 [($355,875 - $250,000)*12.5%] of which $6,617.19 goes to Colorado.

In summary the gross value of Petro-Energy well's first year of production is estimated to be $355,875. The allocation of the first year receipts would be as follows:

* $13,234.38 in Federal royalties of which $6,617.19 goes to Colorado (3.7%)

* $11,319.53 in Colorado severance tax (3.2%)

* $20,240.39 in value added tax to the resident County (5.7%)

* $16,087.70 in personal property drilling rig and pipeline tax to the resident County (4.5)

* $294,993.00 (83%) to the owner to cover the cost of drilling and maintaining the well, corporate income taxes, and profit.

There are some additional taxes to be paid, but the majority of taxes are explained above.

BLM 0048297

Assuming the Petro-Energy well is an average well, taxes and royalties from new leases could provide $4,000 to the State of Colorado and $8,000 to local counties assuming the average rate of .5 wells per year and a success ratio of three-out-of-seven wells drilled. Assuming all seven wells are drilled in a single year and the same three-out-of-seven success ratio, the taxes and royalties would be $55,000 and $110,000 respectively. Likewise, taxes and royalties from existing leases would be $35,000 and $70,000 the first year assuming an average rate of drilling and a 28-out-of-40 success ratio. If all 40 wells were drilled in a single year taxes and royalties would be $500,000 and $1,020,000.

Due to the location of County boundaries and likely well sites, Delta County would likely provide a majority of services, while Gunnison and Mesa Counties will receive most of the tax receipts distributed to counties. Delta County is the most likely access route to a majority of well sites requiring additional road maintenance funds. Delta County has the closest and most logical access to police, fire, lodging, medical and other services. Few well sites would actually be located in Delta County. Delta County may experience more costs from oil and gas operations than it receives in oil and gas royalties and taxes.

### Population, Employment, and Personal Earnings (Income)

None of the alternatives would cause major changes from current conditions in population, employment, and personal earnings for the local and regional zones of influence. Under the Reasonably Foreseeable Development scenario, it is assumed that there would be no critical boom-bust cycle that would cause major demographic changes. The population would generally continue at current levels, although there may be some short-term fluctuations related to drilling activity over the 15-year period.

A typical drilling crew of 10 workers can drill a well in about 60 days with expenditures of approximately $1 million for equipment, goods, and services related to drilling activities. The expenditures would occur in the economies of the local and regional zones of influence, as well as larger, nationwide trade areas. A drilling crew can drill approximately 4 wells a year, which would require 10 workers. If all seven wells on new leases were drilled in a single year, 20 drilling workers would be needed, but not for the entire year. In Delta County alone, the 1991 average employment was 7,700 people, and the average number of unemployed people was 800 (Colorado Labor Force Review - Data Supplement - 1992, page 46). The addition of 20 jobs would not significantly affect employment in Delta County or the Forest influence zone as a whole even if all 20 jobs were filled by local workers. This is unlikely as drilling crews usually come from outside the area with the drilling rig.

On an average annual basis, drilling seven wells over a 15-year period in the study area would provide fewer than 10 part-time jobs annually. A single 10 person drilling crew could drill 4 wells annually over the next 15 years. Current levels of employment and income would not significantly change during the next 15 years due to drilling seven additional wells on new leases or the 40 wells on existing leases.

### Social Conditions

There would not be significant changes from current social conditions under any of the alternatives. The number of new people in the area (less than 20) would not affect local social conditions.

As described above in the section on population, it is not anticipated that there would be any major long-term changes in population as a result of the projected oil and gas activity. Factors that affect lifestyles, attitudes, beliefs, values, social organization, and settlement patterns would therefore not likely change from current conditions. Demand for housing, schools, water, sewage systems, law enforcement, emergency facilities, and recreation would not increase significantly.

Counties and communities in the local and regional zones of influence have prior experience with oil and gas exploration and development.

BLM_0048298

Existing farm families, small-town residents, and local business people, would experience few changes to their daily lives as a result of the projected oil and gas activity in the study area. Oil and gas operations have been ongoing in the area for at least 30 years and have become a periodic factor in the community. Traditional values and uses of the land and resources, such as preservation of family farm, ranch, and business operations would not be affected by changes in population. Long-term local residents would not confront large numbers of newcomers as outsiders, and communities would not experience conflict over the effects of outsiders on local conditions.

Local business and service activities also would not experience significant increases in the economies of the local or regional zones of influence.

Some small businesses dependent on a roadless setting outside of Wilderness may go out of business. A number of outfitter-guides who lead small hunting parties in remote areas may not be able to sustain their businesses if those areas are roaded (see effects of leasing on outfitter guides in Roadless Area, page IV-20).

None of the alternatives would result in major changes in current social conditions. Existing facilities and services are expected to be adequate to meet the increased demands of the relatively small work force needed to drill on newly leased lands.

### *Cumulative Effects*

While total future drilling activity is expected to increase significantly from 1.4 wells annually to about 3.3 wells annually, drilling on new leases would not significantly affect future local Federal mineral receipts, Federal payments to State and County governments, employment and income, or social conditions. The effects from fluctuations in oil and gas prices, and the amount of activity from the anticipated 40 existing-lease wells will mask the effects of the anticipated seven new-lease wells. The annual average and the cumulative level of oil and gas activity over the planning period would be consistent with current conditions under all alternatives. Consequently, it would be unlikely that local conditions would change dramatically as a result of the projected oil and gas activity in the study area.

## Floodplains

The potential impacts on Floodplains would generally be similar to those described for Riparian areas. Most of the time, in the analysis area, the Riparian zone and Floodplain of a stream encompass the same area. However, there may be places where the Floodplain lies outside the Riparian zone.

### *Alternative 1 - No Action*

Activities in Floodplains would be restricted due to controlled surface occupancy. Road, well pad, and pipeline construction would be allowed, but location and design would be controlled. The potential for impacts would be lessened over the potential under *Standard Lease Terms*. The facilities in the Floodplain would be potentially impacted by a flood event. Flooding of a well pad or road could result in adverse impacts to surface and groundwater quality, potential property damage, and loss of life. Design appropriate for site conditions would lessen the potential for those impacts.

### *Alternative 2 - Preferred*
### *Alternative 5 - No Lease in Roadless and SPNM*

This alternative would not allow surface occupancy in the Floodplain. This would lessen the potential for adverse impacts as a result of activities within the Floodplain environment.

BLM 0048299

### *Alternative 3 - No Lease*

This alternative would not allow oil and gas activity to occur within the Floodplain. The potential for adverse impacts would be the lowest with this alternative.

### *Alternative 4 - Lease with Standard Lease Terms*

This alternative would allow oil and gas activities within the Floodplain to occur without any special consideration for the potential impacts that could occur as a result of siting within the Floodplain. Of all the alternatives, this one has the highest potential for adverse impacts due to the flooding of a well pad or road. Water quality, both surface and subsurface, capital investments, and worker safety could be potentially affected.

### *Cumulative Effects*

See cumulative effects discussion under the Aquatic (Fisheries) / Riparian / Wetlands Habitats on pages IV-66 and IV-67 of this chapter.

## Aquatic (Fisheries) / Riparian / Wetland Habitats

Aquatic, Riparian, and Wetland ecosystems, generally thought to be the most important and productive habitat types found on the Forest, make up only a very small percentage of the analysis area (1-2%). Because of their importance, they are afforded protection under the various legislative authorities, executive orders and Forest policies and regulations. By regulation, "except as otherwise provided in the approved Surface Use Plan of Operations, the operator shall not conduct operations in areas subject to mass soil movement, Riparian areas and Wetlands". "Riparian areas", by definition, include the Aquatic ecosystem and the Riparian ecosystem and, for purposes of this discussion, Wetlands.

The potential for effects from oil and gas activities on fisheries, Aquatic habitat, water quality, Riparian habitat and Wetlands varies by alternative. Wetlands usually experience similar impacts as Riparian areas.

The majority of the potential impacts to Riparian areas would occur from road construction and location, culvert placement and stream crossings. These impacts can be compounded, depending on the time of year these activities are taking place, the mitigation efforts associated with these activities and what is happening in adjacent environments. Increased sediment loads, resulting from construction activities associated with oil and gas exploration and development would have the potential to cause the most adverse impacts on the Aquatic and Riparian resources.

Fisheries habitat would be impacted by the introduction of sediment which would "cement" the gravels by filling the interstitial spaces between the gravel particles. This would have severe impacts on the quality of spawning habitat and the rate of survival of the emerging fry. The timing of oil and gas activities could also have significant impacts on fry survival.

Other aquatic organisms would also be impacted, depending on the type of activities taking place, their location in relation to the stream channel and Riparian area and the time of year. Aquatic macroinvertebrates, the primary source of food for fish species, could be heavily impacted by the introduction of increased sediment loads. These organisms are much more sensitive to changes in environmental quality and would be more likely to be impacted by more subtle changes in habitat conditions. Because of their importance as a food source for fish, and in their functional roles in the processing of organic litter (allochthonous material), it is critical to consider the macroinvertebrate community when assessing impacts on Aquatic (and Riparian) ecosystems. The total biomass of aquatic macroinvertebrates may possibly remain the same, but the diversity of the community and thus the stability and quality of the food base may be significantly altered over the long-term by the increased

BLM_0048300

sediment loads, changes in temperatures, vegetative loss and overall impacts to water quality and physical habitat.

In addition to the obvious impacts from increased amounts of sediment and loss of vegetation, there is also the potential risk to habitat quality from the possibility of toxic materials being released into the Aquatic system from construction activities near or adjacent to the stream channel. Any spill of hazardous materials resulting from oil and gas exploration or development activities that ends up in the channel would have potentially significant impacts on the overall quality of the fisheries, including the fish species, macroinvertebrates and aquatic plants.

The importance of a healthy Riparian ecosystem to aquatic and terrestrial wildlife and for maintaining the integrity of the Aquatic ecosystem has been researched and discussed by Platts, Thomas, Davis, etc. When these Riparian ecosystems are disturbed, altered or destroyed, their functional role is also affected. These systems function in several ways: 1) they act as a filter in preventing silt and sediment from entering the Aquatic system; 2) they protect the watershed from erosional forces and reduce or modify the risk of flooding; 3) they preserve the normal stream channel cross-section and water table and provide for groundwater re-charge; 4) they provide for forage and cover for livestock and wildlife; 5) they provide fish food in the form of the various terrestrial invertebrates and provide habitat and food (detritus) for aquatic, semi-aquatic and terrestrial insects; and 6) they are the source of large organic debris, an essential contributor to aquatic diversity and stability.

Impacts to Aquatic/Riparian/Wetlands are considered in terms of what is happening in the Floodplains and the areas with Slopes 40-60%, Slopes > 60%, and Geologic Hazards.

## Comparison of Alternatives

Least Potential for Impacts.............................................................Most Potential for Impact

| Alt. 3. | Alt. 5 | Alt. 2 | Alt. 1 | Alt. 4 |
|---------|--------|--------|--------|--------|
| No Lease | No Lease - Roadless and SPNM | Preferred | No Action | Lease with Standard Lease Terms |

### Alternative 1 - No Action

Under this alternative, the Aquatic, fisheries, Riparian and Wetland areas and Floodplains would be managed under *Controlled Surface Use*. It is expected that with the regulations that do not allow surface occupancy except as approved in a Surface Use Plan of Operations in Riparian areas, Wetlands and High Geologic Hazard areas, and Forest Plan standards and guidelines combined with the enforcement of the *Controlled Surface Use* stipulations, the impacts to these resources would be minimized. There is a potential for impacts to occur from activities associated with 40-60% Slopes, depending on the Riparian area's ability to "buffer" these impacts.

### Alternative 2 - Preferred

This alternative falls in the moderate range for impacts to the Aquatic, Riparian and Wetland resources. Under this alternative, there would be *No Surface Occupancy* in Aquatic and Riparian areas and in Floodplains and areas with Slopes Greater than 60%. However, the stipulations associated with areas with Slopes 40-60% (*CSU*) and Moderate Geologic Hazard (*CSU*) may have the potential to cause some long-term significant impacts to Riparian areas and Floodplains. Depending on the nature of the activity, and the juxtaposition of 40-60% Slopes and Moderate Geologic Hazards to the Aquatic/Riparian resources, there is the potential for increased sediment loads to enter the Aquatic system and for the introduction of toxic materials. This would result in some significant impacts to fish and Aquatic organisms and their habitat.

BLM_0048301

### Alternative 3 - No Lease

This would be the least impacting, to the Aquatic and Riparian systems, of all the alternatives.

### Alternative 4 - Lease with Standard Lease Terms

This alternative would have the potential to have the greatest impacts on the Aquatic and Riparian systems. Application of *Standard Lease Terms* to all the *Affected Environments*, especially those not protected by law, regulation or Forest Plan standards and guidelines would result in significant long-term impacts to Aquatic, Riparian, Wetlands and Floodplains. This is due primarily to the fact that *Standard Lease Terms* are dependent on the agency's ability to administer and monitor oil and gas leasing activities and enforce regulations. Because of the inherent sensitivity of these Aquatic and Riparian ecosystems and their interdependence upon each other for maintaining habitat quality, the potential for irreversible impacts from this alternative is high.

### Alternative 5 - No Lease in Roadless and SPNM

In terms of providing protection to the Aquatic and Riparian areas, this alternative would result in greater benefits to these resources than would the Alternative 2 - Preferred. This difference is related to the manner in which the Roadless Areas would be managed. *No Lease* in Roadless Areas would result in long-term benefits to the Aquatic and Riparian resources, over and above the current situation. Floodplains, Aquatic/Riparian and Wetlands, High Geologic Hazard, Slopes 40-60% and Slopes > 60% are given the same consideration under Alternative 2 - Preferred and this alternative.

### Cumulative Effects

Impacts to Riparian areas (including the Aquatic ecosystem, Riparian ecosystems and Wetlands) are caused primarily from the introduction of sediment caused by road construction and location, culvert placement and stream crossings. These increased sediment loads can also be a result of increased traffic, better access for recreationists, and the overall ability of the Riparian vegetative complex to function in protecting the Aquatic and Riparian resources.

In order to estimate the potential impacts to the Aquatic and Riparian ecosystem, it is critical to consider how other *Affected Environments*, such as Floodplains, High Geologic Hazard, Slopes 40-60% and Slopes Greater than 60% are treated. In addition to the specific *Affected Environments*, an assessment should be made of the potential impacts resulting from increased activities brought on by increased access opportunities. Indirect impacts from road construction, additional timber harvest, increased traffic, livestock grazing, a rise in hunting and fishing activities, increased ORV use and dispersed camping can all have long-term cumulative impacts on the Aquatic and Riparian habitats.

In the ideal situation, Riparian areas would be in good to excellent condition throughout the analysis area enabling them to function properly in filtering sediments, providing cover, stabilizing stream banks, controlling temperatures, and providing organic input and habitat for aquatic, semi-aquatic and terrestrial organisms. However, in the analysis area, the condition of Riparian areas varies from poor (due to recreation and livestock use) to good, with some in excellent condition. As a result, the cumulative impacts, based on the current condition of the Riparian areas, may be more severe in some areas than in others.

Stipulations applied to current leases are generally not as restrictive as those proposed under the preferred alternative, therefore, any increased cumulative impacts would probably be minimal compared to the potential impacts currently being experienced under the existing situation. The potential for increased cumulative impacts is primarily a result of the relationship between additional road construction, increased public access, projected timber sale activities and recreational use, and increased ORV use. All of these uses compound the potential for increased sediment into the Aquatic Riparian system, greater loss and damage to the Riparian area, causing it to become nonfunctional in

BLM 0048302

terms of the protection provided to the Aquatic resources, and the potential for increased pollutants into the Aquatic system.

The overall cumulative impacts resulting from the new leases may be considered insignificant when looking at the potential for continued impacts caused from existing leases. However, when considering the increased activities as a result of improved access, the impacts may take on a greater significance.

# Alpine / Tundra Areas

### *Alternative 1 - No Action*

There exists a very high potential for irreparable soil and ecosystem damage to occur in the Alpine/Tundra environment under current management concepts of *Controlled Surface Use.* Any construction activities in these areas would drastically alter them into situations that are irreversible and irretrievable. The overall risk for this to occur is low, however, because of a low level of proposed drilling activity in Alpine/Tundra areas.

### *Alternative 2 - Preferred*
### *Alternative 5 - No Lease in Roadless and SPNM*

These alternatives would protect the Alpine/Tundra environment from surface disturbance *(NSO).* Oil and gas activities would not be allowed in these areas.

### *Alternative 3 - No Lease*

This alternative would result in no additional effect to Alpine/Tundra environments.

### *Alternative 4 - Lease with Standard Lease Terms*

The use of *Standard Lease Terms* would cause disturbances in Alpine/Tundra areas that would result in unacceptable soil, visual, and vegetation resource damage. Even with mitigation measures discussed for Alpine/Tundra areas, some long term scars from ground disturbance are likely to result from oil and gas activities. Without mitigation measures, damage to the other resources would exceed tolerable limits. The potential result is an area that is irretrievably and irreversibly altered.

### *Cumulative Effects*

Very little activity, other than recreational use occurs in Alpine/Tundra areas. The effects in Alpine/Tundra from oil and gas (if allowed to occur) would likely be direct effects - not cumulative effects.

# Areas of High Geologic Hazard

Regardless of alternative, High Geologic Hazard areas, as previously discussed, are subject to Forest Service regulations which do not allow the operator to occupy the surface, unless as approved in a Surface Use Plan of Operations (36 CFR 228.108(j)).

These areas are very susceptible to ground disturbing activities. Changes in the distribution of the soil and/or rock mass could result in acceleration of the slope movement. Road, well pad, or pipeline construction across these areas need to be very carefully designed and constructed. Alternatives including avoidance should be considered.

BLM_0048303

### *Cumulative Effects*

The potential for cumulative effects in High Geologic Hazard areas is low. Under all alternatives, the Forest Service oil and gas regulations do not allow surface occupancy unless approved in a SUPO. The approval process would address the potential for slope failure through appropriate design and mitigation measures.

## Areas of Moderate Geologic Hazard

### *Alternative 1 - No Action*
### *Alternative 2 - Preferred*
### *Alternative 5 - No Lease in Roadless and SPNM*

These alternatives allow activity in areas of Moderate Geologic Hazard under a *Controlled Surface Use* stipulation. Road, well pad, and pipeline construction through these areas would be subject to design by qualified engineers or engineering geologists. Even with special design and careful location of facilities, there would be potential for the occurrence of mass soil movement in the form of landslides, earthflows, and mudflows. As a result of mass soil movement, sediment may be deposited in streams, facility maintenance costs may increase, land would be taken out of vegetative production, and it may result in a long-term eyesore.

### *Alternative 3 - No Lease*

This alternative would result in no additional effect to areas with a Moderate Geologic Hazard.

### *Alternative 4 - Lease with Standard Lease Terms*

This alternative could result in roads, well pads, and pipelines constructed through areas of Moderate Geologic Hazard without consideration of the potential for mass soil movement as a result of the construction. Usually facilities can be constructed through these areas without causing adverse environmental impacts if special consideration is given to the soil properties, slope aspect and steepness, and groundwater. If not, as allowed with this alternative, the potential for adverse affects to the soil, water, and other resources remains high.

### *Cumulative Effects*

The potential for cumulative effects in Moderate Geologic Hazard areas is low. In areas of concentrated activity (both past and current), i.e., oil and gas drilling, road construction and timber harvest, the potential for cumulative effects would be considered in project design. This would mitigate the potential for adverse cumulative effects to areas prone to slope failure.

## Roadless Areas

The effects of oil and gas activities in Roadless Areas are discussed in detail earlier in this chapter under lease options. Those alternatives under which oil and gas activity would be authorized in Roadless Areas could result in impacts as described. Impacts to Roadless Areas are discussed relative to whether or not leasing would be allowed. If Roadless Areas are available and authorized for leasing for oil and gas resources, it is assumed that the decision to develop the Roadless Area has been made. The lease grants the lessee the right to build and maintain necessary improvements in the drilling for oil and gas subject to, among other requirements, stipulations attached to the lease. Alternatives allowing development in a Roadless Area would result in a loss of the roadless character and potential for inclusion in the National Wilderness System. The range of possible activity described in the RFD shows a possible additional seven wells somewhere in the entire analysis area. Whether industry would choose to put

BLM  0048304

one or more of these in Roadless Areas, if leased, is conjectural at this point. However, there is that possibility. In that event those areas entered would be lost as roadless and potential Wilderness resources.

Fourteen of the nineteen Roadless Areas within the analysis area currently have leases. Regardless of the alternative chosen in this EIS, activity could occur in the Roadless Areas with existing leases. As stated elsewhere in the EIS, additional NEPA analysis would be done prior to ground disturbance such as road construction, drilling, etc. Under current direction, an EIS would be required.

Table IV-4 summarizes by alternative the percentage of each lease option in each Roadless Area, for all *Affected Environments* present in the Roadless Area.

| TABLE IV-4.  LEASE OPTION PERCENTAGES IN ROADLESS AREAS, BY ALTERNATIVE | | | | | | |
|---|---|---|---|---|---|---|
| Roadless Area Number - Name | Lease Options | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
| 181 - Raggeds | NL | 0 | 19 | 100 | 0 | 100 |
| | NSO | 6 | 7 | 0 | 0 | 0 |
| | CSU | 33 | 16 | 0 | 0 | 0 |
| | CSU + TL | 60 | 57 | 0 | 0 | 0 |
| | TL | <1 | 0 | 0 | 0 | 0 |
| | SLT | <1 | 1 | 0 | 100 | 0 |
| 182 - Drift Creek | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 1 | 7 | 0 | 0 | 0 |
| | CSU | 46 | 46 | 0 | 0 | 0 |
| | CSU + TL | 52 | 46 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 1 | 1 | 0 | 100 | 0 |
| 184 - Springhouse Park | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 0 | 0 | 0 | 0 | 0 |
| | CSU | 34 | 34 | 0 | 0 | 0 |
| | CSU + TL | 32 | 32 | 0 | 0 | 0 |
| | TL | 10 | 10 | 0 | 0 | 0 |
| | SLT | 14 | 14 | 0 | 100 | 0 |
| 185 - Electric Mountain | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 3 | 3 | 0 | 0 | 0 |
| | CSU | 86 | 86 | 0 | 0 | 0 |
| | CSU + TL | 0 | 0 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 11 | 11 | 0 | 100 | 0 |

BLM 0048305

Oil and Gas Leasing Analysis FEIS

| TABLE IV-4.  LEASE OPTION PERCENTAGES IN ROADLESS AREAS, BY ALTERNATIVE | | | | | | |
|---|---|---|---|---|---|---|
| Roadless Area Number - Name | Lease Options | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
| 186 - Clear Creek | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 3 | 13 | 0 | 0 | 0 |
| | CSU | 65 | 57 | 0 | 0 | 0 |
| | CSU + TL | 22 | 20 | 0 | 0 | 0 |
| | TL | 1 | 1 | 0 | 0 | 0 |
| | SLT | 10 | 9 | 0 | 100 | 0 |
| 189 - Hightower | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 2 | 15 | 0 | 0 | 0 |
| | CSU | 54 | 45 | 0 | 0 | 0 |
| | CSU + TL | 43 | 39 | 0 | 0 | 0 |
| | TL | 0 | 1 | 0 | 0 | 0 |
| | SLT | 1 | 0 | 0 | 100 | 0 |
| 191 - Priest Mountain | NL | 0 | 57 | 100 | 0 | 100 |
| | NSO | 3 | 11 | 0 | 0 | 0 |
| | CSU | 80 | 28 | 0 | 0 | 0 |
| | CSU + TL | 4 | 2 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 13 | 3 | 0 | 100 | 0 |
| 192 - Salt Creek | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 2 | 83 | 0 | 0 | 0 |
| | CSU | 58 | 13 | 0 | 0 | 0 |
| | CSU + TL | 15 | 0 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 26 | 4 | 0 | 100 | 0 |
| 193 - Battlement Mesa | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 18 | 100 | 0 | 0 | 0 |
| | CSU | 62 | 0 | 0 | 0 | 0 |
| | CSU + TL | 19 | 0 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 1 | 0 | 0 | 100 | 0 |

Environmental Consequences of Alternatives
Roadless Areas

BLM 0048306

| TABLE IV-4. LEASE OPTION PERCENTAGES IN ROADLESS AREAS, BY ALTERNATIVE | | | | | | |
|---|---|---|---|---|---|---|
| Roadless Area Number - Name | Lease Options | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
| 194 - Nick Mountain | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 3 | 62 | 0 | 0 | 0 |
| | CSU | 96 | 36 | 0 | 0 | 0 |
| | CSU + TL | 0 | 1 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 1 | 1 | 0 | 100 | 0 |
| 195 - Kannah Creek | NL | 0 | 100 | 100 | 0 | 100 |
| | NSO | 27 | 0 | 0 | 0 | 0 |
| | CSU | 25 | 0 | 0 | 0 | 0 |
| | CSU + TL | 48 | 0 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 0 | 0 | 0 | 100 | 0 |
| 196 - West Elk | NL | 0 | 26 | 100 | 0 | 100 |
| | NSO | 9 | 10 | 0 | 0 | 0 |
| | CSU | 77 | 53 | 0 | 0 | 0 |
| | CSU + TL | 2 | 0 | 0 | 0 | 0 |
| | TL | 1 | 0 | 0 | 0 | 0 |
| | SLT | 11 | 11 | 0 | 100 | 0 |
| 200 - Whetstone Mountain | NL | 0 | 100 | 100 | 0 | 100 |
| | NSO | 35 | 0 | 0 | 0 | 0 |
| | CSU | 57 | 0 | 0 | 0 | 0 |
| | CSU + TL | 0 | 0 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 8 | 0 | 0 | 100 | 0 |
| 201 - Flat Top Mountain | NL | 0 | 100 | 100 | 0 | 100 |
| | NSO | 0 | 0 | 0 | 0 | 0 |
| | CSU | 100 | 0 | 0 | 0 | 0 |
| | CSU + TL | 0 | 0 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 0 | 0 | 0 | 100 | 0 |

BLM_0048307

Oil and Gas Leasing Analysis FEIS

| TABLE IV-4. LEASE OPTION PERCENTAGES IN ROADLESS AREAS, BY ALTERNATIVE | | | | | | |
|---|---|---|---|---|---|---|
| Roadless Area Number - Name | Lease Options | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
| 241 - Roubideau | NL | 0 | 100 | 100 | 0 | 100 |
| | NSO | 1 | 0 | 0 | 0 | 0 |
| | CSU | 53 | 0 | 0 | 0 | 0 |
| | CSU + TL | 26 | 0 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 20 | 0 | 0 | 100 | 0 |
| 242 - Tabeguache | NL | 0 | 100 | 100 | 0 | 100 |
| | NSO | 4 | 0 | 0 | 0 | 0 |
| | CSU | 2 | 0 | 0 | 0 | 0 |
| | CSU + TL | 83 | 0 | 0 | 0 | 0 |
| | TL | 7 | 0 | 0 | 0 | 0 |
| | SLT | 4 | 0 | 0 | 100 | 0 |
| 243 - Kelso Mesa | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 2 | 2 | 0 | 0 | 0 |
| | CSU | 53 | 53 | 0 | 0 | 0 |
| | CSU + TL | 0 | 0 | 0 | 0 | 0 |
| | TL | 0 | 0 | 0 | 0 | 0 |
| | SLT | 45 | 45 | 0 | 100 | 0 |
| 246 - Campbell Point | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 0 | 0 | 0 | 0 | 0 |
| | CSU | 0 | 0 | 0 | 0 | 0 |
| | CSU + TL | 55 | 55 | 0 | 0 | 0 |
| | TL | 45 | 45 | 0 | 0 | 0 |
| | SLT | 0 | 0 | 0 | 100 | 0 |
| 247 - Johnson Creek | NL | 0 | 0 | 100 | 0 | 100 |
| | NSO | 21 | 22 | 0 | 0 | 0 |
| | CSU | 6 | 6 | 0 | 0 | 0 |
| | CSU + TL | 71 | 71 | 0 | 0 | 0 |
| | TL | 2 | 1 | 0 | 0 | 0 |
| | SLT | 0 | 0 | 0 | 100 | 0 |

Environmental Consequences of Alternatives
Roadless Areas

BLM_0048308

| TABLE IV-4. LEASE OPTION PERCENTAGES IN ROADLESS AREAS, BY ALTERNATIVE | | | | | | |
|---|---|---|---|---|---|---|
| Roadless Area Number - Name | Lease Options | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
| **TOTAL** | NL | 0 | 36 | 100 | 0 | 100 |
| | NSO | 9 | 22 | 0 | 0 | 0 |
| | CSU | 60 | 27 | 0 | 0 | 0 |
| | CSU + TL | 21 | 10 | 0 | 0 | 0 |
| | TL | 1 | 1 | 0 | 0 | 0 |
| | SLT | 8 | 4 | 0 | 100 | 0 |

### *Alternative 1 - No Action*
### *Alternative 4 - Lease with Standard Lease Terms*

These alternatives would make all Roadless Areas in the analysis area available for oil and gas leasing. The roadless character and the areas potential for inclusion in the National Wilderness System would potentially be lost.

### *Alternative 2 - Preferred*

This alternative would not allow leasing in the Tabeguache, Roubideau, and Kannah Creek Roadless Areas. *No Surface Occupancy* would be applied in the Battlement Mesa Roadless Area. The Kebler Pass and Snowshoe Mesa portion of the West Elk Roadless Area, as well as the Kebler Pass portion of the Raggeds Roadless Area would not be available for leasing. This is also true of the Flat Tops south of the Silver Spruce Trail, the Currant Creek, the Upper Cow Creek, and the Priest Mountain portions of the Priest Mountain Roadless Areas (see Figure III-8a). This alternative would maintain the roadless character and attributes of the areas described above, but the remainder of the Roadless Areas would be available for leasing and subject to potential impacts to the roadless character of all or part of the Roadless Area. Thirty-six percent (36%) of the Roadless Area acreage in the Analysis Area would not be available for oil and gas leasing. Eleven percent (11%) of the Roadless Area in the Analysis Area would be available, but with *NSO* to protect the roadless values (Battlement Mesa).

### *Alternative 3 - No Lease*

With this alternative, none of the analysis area, including Roadless Areas, would be available for oil and gas leasing. None of the Roadless Areas would lose roadless character as a result of oil and gas activity. Those Roadless Areas already under lease would potentially be subject to oil and gas activity and the impacts associated with activity.

### *Alternative 5 - No Lease in Roadless and SPNM*

This alternative would have similar effects to that of Alternative 3, but this alternative would allow oil and gas activity outside of Roadless Areas and those areas with a Semi-primitive Non-motorized management prescription (3A).

### *Cumulative Effects*

The existence of Roadless Areas and Wilderness within a reasonable distance of the analysis area is summarized in Appendix I. This lends some perspective to the impact that the potential losses of Roadless Areas to oil and gas development would have on the availability of roadless and Wilderness recreation opportunities within 100 miles of Delta, Colorado.

As development occurs on the Forest, more and more Roadless Areas are becoming subject to commodity driven development of natural resources. Outside of Wilderness, fewer and fewer opportunities exist for primitive and semi-primitive recreational experiences. Those providers of primitive and semi-primitive recreational opportunities such as outfitters, are being squeezed into smaller and smaller areas where they can take their customers for that type of recreational experience. Most of the Roadless Areas within the analysis area are currently leased and subject to the potential for environmental effects relating to the loss of roadless character and attributes.

See also the Cumulative Effects discussion under Wildlife, pages IV-58 and IV-59.

### *Connected Actions*

The affects of possible connected actions such as timber sales following oil and gas access is discussed under lease options (pages IV-20 through IV-22). See also discussion page II-7.

***Economics as Affected by Roadless Area Decisions:*** There is no measurable difference among alternatives in terms of local economies. The seven additional wells predicted in the RFD would remain the same regardless of whether all or none of the Roadless Areas were made available and authorized for leasing. The only effect would be the displacement of drilling activities.

The economic loss which would result from removal of each of, or all of, these Roadless Areas from availability for oil and gas development is impossible to precisely calculate. Even the presence of oil or gas resources is conjectural. It is reflected, to the best of our knowledge, in the maps showing areas of oil and gas potential (Figure III-2), in Chapter III. However, the amount of activity anticipated by the RFD would result in the placement of seven wells somewhere in the analysis area. Alternatives range from 951,450 to 0 acres of lands available and authorized for leasing under standard stipulations. Even if the RFD were incorrect by 300%, placement of seven to 21 wells somewhere in this area, excluding Roadless Areas does not, in our opinion, cause any economic loss to the industry. The decision to not make these Roadless Areas available for leasing does not result in any permanent commitment of resources, but rather indefinitely defers allowing activities in them while protecting the roadless/Wilderness values. Oil and gas resources which may be important to the nation at some time in the future would not be lost, but rather just not available at this time.

It is possible that some individual or company has had a particular interest in a parcel which is within these Roadless Areas, and that not being able to lease that particular parcel will seem damaging to that individual interest. However we do not have access to any such information (such information is closely guarded by prospective lessees in the competitive leasing market). Further we have no reason to believe that the economic interest of such an individual would not be just as well served by leasing and drilling in some other location on the Forest with the same "potential" for the presence of oil and gas resources.

## Research Natural Areas

### *Alternative 1 - No Action*

Alternative 1 would allow oil and gas activity to occur within a Research Natural Area under a *Controlled Surface Use* stipulation. Activity may be restricted and specific mitigation required. However, any activity such as road, well pad, or pipeline construction within an RNA would not be compatible with the intended use of the RNA. RNA's typically are reserved for study of a natural, undisturbed by man, environment.

BLM_0048310

### *Alternative 2 - Preferred*
### *Alternative 3 - No Lease*
### *Alternative 5 - No Lease in Roadless and SPNM*

These alternatives would result in no effect on Research Natural Areas. *(No Lease)*

### *Alternative 4 - Lease with Standard Lease Terms*

Oil and gas activities would be allowed in a Research Natural Area under this alternative. No special mitigation measures, outside of "reasonable" as provided by *Standard Lease Terms* could be required. Oil and gas activity such as road, well pad, and pipeline construction would likely alter the natural character of the area and result in an altered environment. This would be in conflict with the intended uses of the RNA.

### *Cumulative Effects*

Very little ground disturbance occurs in Research Natural Areas. If oil and gas activity were to occur, the effects would likely be direct, rather than cumulative.

## Sensitive Areas

### *Alternative 1 - No Action*

*Controlled Surface Use* in Sensitive Areas would result in some loss of the attributes that make these areas sensitive. Typically, it would be a loss in scenic values that are important to a broad cross section of the American public. There is strong negative feelings towards timber harvest and road building within these Sensitive Areas (Forest Plan ROD). Logically, the same would be true of oil and gas activities that result in some timber harvest and the construction of roads.

Activity would potentially result in some loss to the recreation industry that depends on the maintenance of these kinds of environments in Western Colorado.

### *Alternative 2 - Preferred*
### *Alternative 5 - No Lease in Roadless and SPNM*

These alternatives would not allow surface occupancy within a Sensitive Area. Access to oil and gas resources would have to come from outside the area. These alternatives would result in no additional impact to Sensitive Areas.

### *Alternative 3 - No Lease*

Sensitive areas would not be available for leasing with this alternative and thus no additional effects would occur to Sensitive Areas as a result of oil and gas activity.

### *Alternative 4 - Lease with Standard Lease Terms*

The effects of this alternative would be similar to, if not greater than the effects of Alternative 1.

### *Cumulative Effects*

Very little ground disturbance has occurred or is likely to occur in the future in Sensitive Areas . As a result, any effect of oil and gas activity would likely be direct and not cumulative. Traffic associated with oil and gas activity on lands adjacent to Sensitive Areas may appear to create a cumulative effect

BLM_0048311

if it occurs at the same time and place as timber and recreation-related traffic. However, the effect would likely be short-term and localized.

# Retention VQO, Retention VQO and Low VAC, and Scenic Byway Corridors

Analysis of the impacts of oil and gas activity on Retention VQO areas, Retention VQO - Low VAC areas and Scenic Byway corridors is based on typical historical and projected oil and gas activity at the well site, on new pipelines and on new roads.

The oil and gas development activities that are most likely to have a significant visual impact are those that take place during exploratory drilling, field development and production. Exploratory drilling is likely to cause the most significant change to the visual resource. Activities in the development and production stage may be less intrusive, but typically are longer lasting.

During exploratory drilling roads may need to be constructed to the site and a three acre level area or pad constructed. Until the well pad is completed and the drilling rig tested and (ultimately) removed, there will be some traffic to and from the site. An oil derrick on a drilling rig typically might be 150 feet high. The drill rig and site is lighted at night for safety and around the clock work. On average, a well rig can be expected to be in place and operating 30 to 60 days.

If the drilling is successful, operations will move into the development and production phases. If the oil and gas from the well does not flow naturally, a pumping unit may be required. These pumping units are generally twelve to fourteen feet high. If the well flows naturally, valves and pipes, ("Christmas tree") would be used to regulate flow. The Christmas tree unit can range from four to eight feet high. The visual impacts of development and production are less with a Christmas trees than with the pumping units.

Other facilities on the well site during the development and production phases include the treater and/or separator tanks, storage tanks, tool shed, generators and pipe racks. The separator tanks have a vertical orientation and can be as high as twenty feet. Storage tanks are typically fifteen feet high. Tool shed, generators and pipe racks vary between eight and twelve feet high. Pipelines interconnect the flow or pumping unit, the separators and the storage tanks.

Any new roads or upgrading of existing roads can also have a visual impact. Roads on steep slopes and pipelines with their linear openings in vegetation can be seen from long distance.

### Alternative 1 - No Action
### Alternative 2 - Preferred
### Alternative 5 - No Lease in Roadless and SPNM

These alternatives would include a *No Surface Occupancy* stipulation for Retention VQO - Low VAC areas and a *Controlled Surface Use* stipulation for Retention VQO areas and Scenic Byway Corridors. With these stipulations the adopted VQO's for the analysis area would generally be met except for minor impacts within Scenic Byway Corridors.

The overall effect on scenery within the analysis area would be minimal. These alternatives would result in the area generally retaining its natural characteristics. Further effects on the visual resources will be determined at the APD stage. Computer generated perspective plots would be useful in determining affects on visual resources. Of the seven wells within the RFD scenario, the four on the Grand Mesa National Forest are most likely not to meet their adopted VQO. This is because of the number of proposed new wells and its concentration of Retention VQO, scenic byways and other viewer platforms.

BLM_0048312

### *Alternative 3 - No Lease*

This alternative would result in no additional leasing of oil and gas parcels within the analysis area. This alternative would have no environmental consequences on the visual resource (scenery). This alternative would maintain most of the visual resource in its existing visual condition.

### *Alternative 4 - Lease with Standard Lease Terms*

This alternative would have the most potential to impact to the visual resource of any of the alternatives. With this stipulation the adopted VQO's for 19% of the analysis area may be adversely impacted. (See also pages IV-5 and IV-6.)

This alternative could result in much of the area changing from what is now a natural appearing visual condition to one that is heavily modified during the exploration phase. The activity described under the RFD could occur anywhere within the analysis area. The adopted VQO's would not be met in Retention and Partial Retention areas during the exploration phase.

### *Cumulative Effects*

Historically, most of the existing leases, where the majority of the oil and gas exploration and development is proposed, are not in Retention or Partial Retention VQO areas. The remaining area covered in this leasing analysis has experienced a low level of oil and gas exploration and development. The RFD only predicts seven exploration wells will be drilled. Because of the absence of wells in Retention and Partial Retention VQO areas and the low number of wells being proposed in these areas, the anticipated cumulative effects of this leasing decision on the visual resource at both the exploration and production stages would be minimal.

## Semi-primitive Non-motorized (3A Management Areas)

Discussed under recreation pages IV-54 to IV-56 of this chapter.

## Administrative Sites and Utility Corridors/Electronic Sites

Analysis of the impacts of oil and gas development on Administrative Sites and Utility Corridors/Electronic Sites is based on typical historical and projected oil and gas activity at the well site, on new pipelines and on new roads. Utility corridors include electric transmission lines and oil and gas transmission pipelines.

The oil and gas development activities that are most likely to have a significant impact are those that take place during exploratory drilling, field development and production. Exploratory drilling has the most potential to cause significant impacts to Utility Corridors/Electronic Sites and administrative facilities. Activities in the development and production stage may be less intrusive, but typically are longer lasting.

### *Alternative 1 - No Action*
### *Alternative 4 - Lease with Standard Lease Terms*

These alternatives would lease Utility Corridors/Electronic Sites and Administrative Sites under the *Standard Lease Terms*. Well pads and roads would be located to save existing structures etc., but the effects of oil and gas activity such as noise, odors, and visual distractions may reduce the quality of the local environment. These alternatives would have the most potential for impact of any of the alternatives to Utility Corridors/Electronic Sites and Administrative Sites. Significant effects could

BLM  0048313

occur if a drill tower were to come in contact with one of the electric transmission lines, punctures a gas line or runs a diesel engine around the clock next to employee living quarters.

### *Alternative 2 - Preferred*
### *Alternative 5 - No Lease in Roadless and SPNM*

These alternatives stipulate *No Surface Occupancy* for Administrative Sites and *Standard Lease Terms* for Utility Corridors and Electronic Sites. While this would protect the capital investments, some visual and audio impacts may occur.

Two of the Administrative Sites, Mesa Lakes and Ward Lakes, are included in Developed Recreation Complexes and the effect on them would be minimal based on the protection provided Recreation Complexes. The other Administrative Sites may be impacted by the sights, sounds and dust of an adjacent drill pad. Sites would be located to protect existing structures etc., but the effects of noise, odors, and visual distractions may reduce the quality of the local environment. Where these sites provide employee housing such as at Silesca, impacts on the quality of employee housing would be reduced.

### *Alternative 3 - No Lease*

This alternative would result in no additional leasing of oil and gas parcels within the analysis area. This alternative would have no environmental consequences on the Administrative Sites or Utility Corridors and Electronic Sites. This alternative would maintain these sites in their existing setting.

### *Cumulative Effects*

Historically, most of the existing leases, where the majority of the oil and gas exploration and development is proposed, are not within or adjacent to Utility Corridors, Electronic Sites or administrative facilities. The RFD only predicts seven exploration wells will be drilled. Because of the absence of wells in this environment and the low number of wells being proposed in this environment, the anticipated cumulative effects of this leasing decision on this environment would be minimal.

## Recreation Complexes

Discussed under recreation, pages IV-54 to IV-56 of this chapter.

## Watersheds of Special Interest to Municipalities

None of the domestic supply watersheds include the exploratory units where the majority of new wells are forecast. Some of the domestic watersheds do have existing leases; Kannah Creek - 10%, North Kannah Creek - 52%, Whitewater Creek - 37%, Big Creek - 42%, Cottonwood Creek - 22%, Dirty George Creek - 43%, Leroux Creek - 11%, Surface Creek - 11%, Bell Creek - 3% and Ward Creek - 96%. There would likely be some activity on these existing leases, but it would not be of sufficient intensity to jeopardize the water supplies to dependent communities. However, it will be important to recognize the importance of these watersheds at the time a APD is submitted and to safeguard water quality by including necessary conditions of approval and mitigation measures.

### *Alternative 1 - No Action*
### *Alternative 2 - Preferred*
### *Alternative 5 - No Lease in Roadless and SPNM*

Domestic supply watersheds would all be fully protected with *Controlled Surface Use* stipulations. This would result in the strict control of location of certain facilities in relationship to important features

BLM_0048314

within the domestic supply watershed. An example would be the control over well pad locations. Under *Controlled Surface Use* we could require that well pads be located a specified distance from water intakes.

### Alternative 3 - No Lease

This alternative would result in no additional impacts to domestic watersheds.

### Alternative 4 - Lease with Standard Lease Terms

Domestic supply watersheds would not receive any special protection in their entirety, but as mentioned above those water quality sensitive environments within the watersheds would be protected. Mitigation will be specified under Conditions of Approval to the APD that further protect water quality in domestic supply areas. However, our ability to control location of certain facilities would be lacking.

### Cumulative Effects

The projected level of oil and gas activity and related ground disturbance is so low that when added to the effects of timber sale and recreational activity (including past, present and future) in municipal watersheds, no cumulative watershed effects would be likely to occur. See also Water Quality discussion pages IV-45 through IV-48.

## Slopes 40-60%

### Alternative 1 - No Action
### Alternative 2 - Preferred
### Alternative 5 - No Lease in Roadless and SPNM

These alternatives stipulate *Controlled Surface Use* on Slopes 40-60%. The location and design of well pads, roads or pipelines on these slopes would be carefully studied. With mitigation measures as described in Appendix H the potential for adverse impacts would be minimized.

### Alternative 3 - No Lease

This alternative would result in no additional impacts to Slopes 40-60%. Oil and gas activities would not be allowed on these slopes.

### Alternative 4 - Lease with Standard Lease Terms

For the proposed seven new wells that may occur throughout the analysis area, the use of *Standard Lease Terms* would cause disturbances in sensitive soil areas that would result in unacceptable soil resource damage. These sensitive areas need measures that are above and beyond those in a typical standard lease option to control and mitigate soil damage. Without the extra measures, damage to the soil would exceed tolerable limits. The result would be an area that is irretrievably and irreversibly altered.

### Cumulative Effects

Very little activity such as road construction and timber harvest is allowed to occur on these steep slopes. Oil and gas activity on Slopes 40-60% would be subject to Forest Service approval. No adverse cumulative effects would be likely to occur as a result of oil and gas activity, as the activity would be strictly controlled.

BLM 0048315

Oil and Gas Leasing Analysis FEIS

# Slopes >60%

### Alternative 1 - No Action
### Alternative 2 - Preferred

The *No Surface Occupancy* stipulation on Slopes > 60% would maintain slope stability, erosion rates and environmental integrity to within natural rates.

### Alternative 3 - No Lease

*No Lease* would result in no additional impacts to slopes in excess of 60%.

### Alternative 4 - Lease with Standard Lease Terms

For the proposed seven new wells that may occur throughout the analysis area, the use of *Standard Lease Terms* would cause disturbances in sensitive soil areas that would result in unacceptable soil resource damage. These sensitive areas need measures that are above and beyond those in a typical standard lease option to control and mitigate soil damage. Without the extra measures, damage to the soil would exceed tolerable limits. The result would be an area that is irretrievably and irreversibly altered.

### Cumulative Effects

Very little activity such as road construction and timber harvest is allowed to occur on these steep slopes. Oil and gas activity on Slopes > 60% would be subject to Forest Service approval. No adverse cumulative effects would be likely to occur as a result of oil and gas activity, as the activity would be strictly controlled.

# Wildlife Special Habitats

## Big Game Winter Range

### Alternative 1 - No Action

Current Forest Plan direction can be interpreted to restrict road use and construction on winter range management areas 5A and 5B, to reduce impacts of human activity on wintering animals and limit the loss of habitat. This translates into *Controlled Surface Use* and *Timing Limitation* stipulations.

### Alternative 2 - Preferred
### Alternative 5 - No Lease in Roadless and SPNM

*Controlled Surface Use* and *Timing Limitations* would specifically be applied to "critical" winter range areas, as identified by the Colorado Division of Wildlife (see Figure III-15). Similar Forest Plan direction would be applied to 5A and 5B management areas. Oil and gas activities would be conducted to limit impacts to wintering animals and existing habitat.

The effect of *No Lease* in Roadless Areas would result in big game remaining in these areas as long as weather conditions would allow, before these animals would move onto winter ranges.

### Alternative 3 - No Lease

This alternative would result in no increased impacts to Big Game Winter Range as a result of oil and gas activities.

BLM_0048316

### *Alternative 4 - Lease with Standard Lease Terms*

*Standard Lease Terms* may not provide the *Timing Limitations* needed to protect wintering big game. Big game would potentially be severely disrupted on their winter ranges and moved to less desirable habitats. This coupled with stress and a loss of fat reserves from movement, could result in the death of a large number of individuals.

Increased pressure on already overcrowded private ranches would result in concentrated herds which would increase the loss of individuals to disease, stress, and reduced food energy intake. These actions would significantly affect the economic benefits of having healthy wildlife populations from a sport hunting and wildlife viewing aspect to the local economies. Wildlife species requiring large home ranges, large areas of secure habitat, and strict cover requirements would be most adversely affected by this alternative because all Roadless Areas would be available for leasing and the potential for the subsequent roading of these secure wildlife habitats.

### *Cumulative Effects*

The cumulative effects of oil and gas leasing and development, increased access and human activity would directly result in increased disturbance to animals; increasing stress and energy requirements. Animals can also be displaced into more marginal habitats or onto already occupied optimum habitat. This can result in overcrowding, forage over utilization, and increased chances of disease transmittal. Animals would seek refuge on private lands, compounding the current problem of animal damage claims against the CDOW. Access to private land is limited, which can result in lower hunter success and game management objectives may not be achieved.

## Elk Calving Areas

### *Alternative 1 - No Action*
### *Alternative 4 - Lease with Standard Lease Terms*

The Forest Plan provides only general direction relating to providing cover buffers around elk calving areas, which fall within *Standard Lease Terms*. *Standard Lease Terms* would result in displacement of animals to less desirable birthing areas, or overcrowding of currently used areas. Animal movement during the critical periods of birthing and rearing, expose the animals to increased predation and stress. Direct habitat loss as a result of oil and gas activities would reduce habitat effectiveness.

### *Alternative 2 - Preferred*
### *Alternative 5 - No Lease in Roadless and SPNM*

*Controlled Surface Use* would protect the birthing area habitat; *Timing Limitations* would restrict oil and gas activities during the birthing periods.

Due to the remoteness of Roadless Areas, birthing areas are often found in these areas. Additional protection of these areas would be achieved under Alternative 5. This alternative would also protect large acreages of security habitat adjacent to birthing areas.

### *Alternative 3 - No Lease*

This alternative would result in no increased impacts to elk calving areas as a result of oil and gas activities.

BLM 0048317

### *Cumulative Effects*

The cumulative effects of oil and gas leasing and development, and connected actions of increased access and timber sales has the potential to dramatically effect deer and elk birthing areas. Disruption of life cycles could cause a temporary or permanent displacement of wildlife populations. This disruption of normal activities and displacement could result in long term cumulative population losses because of reduced carrying capacity and increased mortality. Additional pressure would be placed on private lands to provide secure wildlife habitat. These private lands are already being sought after by big game populations because of the dwindling amount of secure undisturbed habitats on public lands.

## Migration Routes and Staging Areas

### *Alternative 1 - No Action*
### *Alternative 4 - Lease with Standard Lease Terms*

Under these alternatives, special wildlife environments such as big game Migration Routes and Stating Areas would not be granted special protection. *Standard Lease Terms* would probably not mitigate the potential for effects these areas. Wildlife populations would be temporarily or permanently displaced, resulting in forage overuse, increased stress levels, and increased mortality. Additional pressure would be placed on private lands to provide secure wildlife habitat. These private lands are already being sought after by big game populations because of the dwindling amount of secure undisturbed habitats on public lands.

### *Alternative 2 - Preferred*
### *Alternative 5 - No Lease in Roadless and SPNM*

Migration routes and staging areas would be protected under these alternatives *(CSU, TL)*. Activities will be restricted during the periods animals are using these areas. Having Roadless Areas protected will also reduce the animal pressure on these areas, because they will be able to utilize undisturbed areas for longer periods of the year.

### *Alternative 3 - No Lease*

This alternative would result in no increased impacts to big game Migration Routes and Stating Areas.

### *Cumulative Effects*

The cumulative effects of oil and gas leasing, anticipated oil and gas development, and connection actions of timber sales and increased human access will likely displace animals from existing Migration Routes and Stating Areas, into less desirable habitat, resulting in increased animal mortality, decreased habitat carrying capacity and potential increases in animal damage claims against the CDOW.

## Bighorn Lambing and Breeding Areas

### *Alternative 1 - No Action*
### *Alternative 4 - Lease with Standard Lease Terms*

Rocky Mountain bighorn sheep lambing sites would be provided protection by Forest Plan standards and guidelines (restrictions on activity within a mile of these sites from May 1 through June 30).

BLM 0048318

### Alternative 2 - Preferred
### Alternative 5 - No Lease in Roadless and SPNM

Protection (*No Surface Occupancy*) would be granted to the year-round range of the Battlement Mesa bighorn sheep herd under this alternative.

### Alternative 3 - No Lease

This alternative would result in no increased impacts to bighorn sheep lambing and breeding areas as a result of oil and gas activities.

### Cumulative Effects

The cumulative effects of oil and gas leasing, anticipated oil and gas development, and connection actions such as timber sales and increased human access could ultimately result is the disappearance of the Battlement Mesa bighorn sheep herd.

## Summer Range (Concentrated Use)

### Alternative 1 - No Action
### Alternative 4 - Lease with Standard Lease Terms

Under this alternative, concentrated summer use areas would not be granted special protection. *Standard Lease Terms* would probably mitigate the potential for effects on these areas. Disruption of normal activities and displacement could result in long term cumulative population losses because of reduced carrying capacity. Additional pressure would be placed on private lands to provide secure wildlife habitat. These private lands are already being sought after by big game populations because of the dwindling amount of secure undisturbed habitats on public lands.

### Alternative 2 - Preferred

This alternative would protect concentrated use summer range areas with a *No Surface Occupancy* stipulation. No increased impacts to summering elk would occur as a result of implementation of this alternative.

### Alternative 5 - No Lease in Roadless and SPNM

Much of the summer concentrated use areas occur in Roadless Areas. Protection of these areas would continue to provide large acreages of hiding and security habitat. The availability of these areas would result in animals remaining on the summer range as long as weather conditions allow. This would keep animals off the winter ranges and private lands for long periods.

### Alternative 3 - No Lease

This alternative would result in no increased impacts to big game summer range as a result of oil and gas activities.

### Cumulative Effects

The cumulative effects of oil and gas leasing, anticipated oil and gas development, and subsequent timber sales and increased human activities within summer concentrated use areas would adversely effect big game populations. Animals will be displaced to areas offering security - this is often private lands. The net results will include: decreased carrying capacity of habitats animals move into; increased stress, chance of disease transmission, and animal mortality; potential for increased animal damage claims; inability of achieving big game management objectives.

BLM 0048319

## Sage Grouse Leks

The sage grouse represents species dependent on the sagebrush vegetative community. Sage grouse breeding grounds (leks) and winter habitat are most likely to be adversely affected by exploration or development.

### *Alternative 1 - No Action*
### *Alternative 4 - Lease with Standard Lease Terms*

These alternatives would allow oil and gas activities to occur in Sage Grouse Leks. This would result in disruption of the sage grouse at a critical time during it's life cycle. Braun (1987) stated that "with the discovery of oil and gas resources, especially in the 1930's and 1940's, impacts of energy development on wildlife resources in Western North America increased". Studies in North Park, Colorado (Colorado Division of Wildlife, unpublished data) suggest that sage grouse populations, as measured by counting males on leks, decreased dramatically during initial stages of oil field development. The decrease is related to loss of habitat caused by site preparation, road development and associated human disturbance. Leks are sagebrush vegetated areas where courtship, breeding, nesting, and brood rearing take place. Leks are traditional and absolutely necessary to the local sage grouse population. These areas and wintering grounds are essential habitat components necessary to maintain quality sage grouse habitat.

### *Alternative 2 - Preferred*
### *Alternative 5 - No Lease in Roadless and SPNM*

These alternatives protect Sage Grouse Leks by placing a *No Surface Occupancy* stipulation on the lek and within a 1/2 mile of the lek. Further protection is provided for nesting with *Controlled Surface Use* and *Timing Limitations* (3/31 - 5/31) within 2 1/2 miles of the lek. These measures would effectively mitigate the potential for adverse effects from oil and gas activities on these habitat areas.

### *Alternative 3 - No Lease*

This alternative would result in no increased impacts due to oil and gas activities to Sage Grouse Leks.

### *Cumulative Effects*

Oil and gas activity, in addition to past, present and future timber sales, recreation and range uses could potentially result in adverse cumulative effects to sage grouse and their leks.

## Utility Corridors / Electronic Sites

See discussion on page IV-77 of this chapter.

## Primary Rangeland (6B Management Areas)

### *Alternative 1 - No Action*
### *Alternative 2 - Preferred*
### *Alternative 4 - Lease with Standard Lease Terms*
### *Alternative 5 - No Lease in Roadless and SPNM*

These alternatives would result in Primary Rangelands being open to oil and gas leasing under the standard stipulations. Under this scenario is must be recognized that many grazing allotments, management systems, and livestock stocking rates, currently do not meet the ecological and use

BLM_0048320

conditions specified in the Forest Land and Resource Management Plan. Subsequently, any surface related disturbance which may remove or modify the forage produced on the Primary Rangelands may potentially compound such issues.

Activity on Battlement Mesa, if it occurs, would have the greatest potential to impact existing management systems and livestock stocking rates. The potential wells and associated road access and possible transmission corridors may have an impact on the Primary Rangelands and stocking rates associated with the Kimball, Hawxhurst, Brush Creek, Cheney, and Buzzard cattle allotments.

Under the projected scenario , it is estimated that a temporary reduction of less than 1 percent of existing permitted livestock numbers would result and require some form of mitigation.  It is also anticipated that after construction, road access would have to be closed to the public to circumvent vandalism, and people harassment, in order to maintain existing management systems.

Throughout the study area, any earth disturbing activities associated with roads, drill pads, transmission corridors, etc., will increase the occurrence probability of noxious or undesirable plants. Without prompt mitigation treatment, the probability is estimated to increase from 50 percent, the first year after the disturbance, to 90 percent after three years.

With proper coordination, increased road access can be an asset to the permittee, in facilitating the construction of needed range improvements, and assisting with distribution and management of livestock.

### *Alternative 3 - No Lease*

Limiting leases to the status quo would result in no negative environmental consequences to the vegetative cover comprising the Primary Rangelands of the study area. Issues associated with increased access, vandalism, theft, and people related disturbance to permitted livestock, would be maintained at current levels.

Opportunities would be foregone to capitalize on increased access from oil and gas development roads to transport range improvement materials, and facilitate ease of access associated with management of livestock and grazing permit administration.

### *Cumulative Effects*

As more and more ground disturbance takes place on Primary Rangelands, the amount of forage and livestock carrying capacity declines. The level of activity projected from oil and gas would not likely result in an adverse cumulative effect on Primary Rangeland, unless the activity is concentrated in an area of extensive past, present and future timber harvesting.

## Lands Suited for Timber Harvest

All lease alternatives would make Lands Suited for Timber Harvest available with *Standard Lease Terms*.  Potentially, some of these lands may become more economically viable for timber harvest due to access provided by oil and gas exploration and development. This could result in some increase in the Forest's ASQ.  (Before the Forest ASQ could be increased, environmental analysis and public participation would need to occur to amend the Forest Plan.) Note however, that these lands may also have resource values that would not allow the use of *Standard Lease Terms*.

The amount of timber harvested directly as a result of oil and gas activity (the construction of the road, well pad and pipeline corridor) would be related to the type of timber stand (if any) the construction activities would occur in.  For the purposes of the analysis, 10.7 acres was used as an average amount of disturbance per well. Forty-seven (47) wells each having 10.7 acres of disturbance (possible timber

BLM_0048321

Oil and Gas Leasing Analysis FEIS

harvest) and an average of 10 mbf/acre would result in 5,029 mbf over the next 15 years, or 335 mbf/year. The Forest's ASQ is 38,800 mbf/year. The timber harvested as a result of oil and gas activity would count towards meeting the Forest's timber target although it amounts to less than 1% of the ASQ.

Alternative 3, would result in no additional effects to Lands Suited for Timber Harvest.

### *Cumulative Effects*

It is not known how much timber might become suitable as a result of access to an area of previously economically not suitable timber (due to high road costs). There are approximately 61,000 acres of economically not suitable timber within the analysis area. At most, 610,000 mbf of timber (using an average of 10 mbf/acre) could become suitable if all the economically not suitable timber was accessed by oil and gas development roads. These acres could be added to the suitable base of 287,000 acres in the analysis area. This would be a maximum increase of 21%. As discussed earlier, any addition to the suitable base would have to be accomplished through a Forest Plan amendment.

The cumulative effect of road construction from the projected oil and gas activity could potentially result in a slightly increased Forest ASQ. See also the Connected Actions discussion on page II-7.

# Additional Discussions

## *Effects of Alternatives on Consumers, Civil Rights, Minority Groups and Women*

None of the alternatives would affect civil rights, minority groups or women.

Any alternative could affect consumers if oil and gas prices are kept lower or higher due to increased or decreased supplies of these items. Alternative 3 would remove all NFS lands from future leasing. The resultant loss of revenues could affect consumers during the 15 year planning period.

## *Effects of Alternatives on Prime Farm Land, Range Land and Forest Land*

"Prime" range land and "prime" forest land does not apply to lands in the analysis area. None of the alternatives would affect prime farm land. Under all alternatives, National Forest System lands would be managed with a sensitivity to the effects on adjacent lands.

## *Effects of Alternatives on Wetlands and Floodplains*

The 36 CFR 228 regulations preclude surface occupancy of Riparian areas. The management of Wetlands and Floodplains are subject to Executive Orders 11990 and 11988, respectively. The purpose of the executive orders are to avoid to the extent possible the long and short term adverse impacts associated with the destruction or modification of Wetlands and Floodplains. Development of oil and gas wells in Riparian areas could cause significant effects to the water quality and Aquatic habitat. See pages IV-13 through IV-16, and IV-63 through IV-67.

BLM_0048322

### *The Preferred Alternative*

The preferred alternative is Alternative 2.  This alternative provides the greatest resource protection while leaving the majority of the National Forest System lands available for leasing.  As discussed in more detail in Chapter 1 and the introduction to this Chapter, the Record of Decision will document three related decisions: a) Forest Plan Amendment; b) land availability decision; and c) specific lands authorization decision.  The specific lands decision will be made for all lands administratively available for leasing, subject to monitoring prior to lease advertisement and sale, and another site-specific NEPA decision at the Application for Permit to Drill (APD) stage.

## *Irreversible and Irretrievable Commitment of Resources*

An irreversible commitment of resources results from actions altering an area to the extent that future options are lost.  The term "irreversible" applies primarily to the effects of use of nonrenewable resources, such as minerals, or to factors such as soil productivity that are renewable only over long periods of time.  An irretrievable commitment of resources results from the loss of production, harvest or use of natural resources.  Irretrievable losses are not necessarily irreversible losses.

*Vegetation:*  Well pad constructions and road building would cause an insignificant irretrievable loss of timber production.  This irretrievable loss would be insignificant even if all RFD wells actually occurred on sites suitable for timber harvest.

None of the alternatives would cause an irreversible effect on the vegetation resource, given monitoring requirements and the application of site-specific mitigation.  However, revegetation mitigation would likely be costly and potentially long-term on the well sites.

*Soils:*  Oil and gas activities could cause irreversible and irretrievable impacts on soil productivity on steep slopes and fragile soils associated with mountainous terrain if mitigation were to fail and accelerated erosion were to occur.  These areas can be revegetated but the mitigation measures would be expensive.  Shallow soils could also be subjected to irreversible and irretrievable losses in soil productivity, due to the high erosion rates and low reclamation potential. Mitigation would be expensive.

*Water Quality:*  There is always the potential of a spill of wastes such as oil, salt water and drilling fluids, associated with oil and gas development.  Mitigation measures are designed to make this potential as small as possible.  However, any spill in a Riparian area would have direct and immediate impacts on the water resource due to the high water table.  Any drilling would have the potential to impact groundwater resource.  Such impacts would be long-term, irreversible and irretrievable.

*Aquatic and Riparian:*  There are possible irreversible and irretrievable impacts to fishery and Riparian resources under Alternatives 1 and 4.  This is due to the sensitive nature of Riparian areas that if not fully protected may not recover.  Sediment and chemical spills may cause similar impacts to the fishery resources.

*Range:*  All alternatives would cause a relatively minor short-term loss of forage production on most disturbed sites.  Irretrievable long-term losses of forage production would occur where production facilities are constructed (tank batteries, system roads, etc.).  Revegetation mitigation would minimize this effect.

*Wildlife Habitat:*  The loss of forage production, mentioned above would have minimal impacts on wildlife habitat.  The associated road construction, particularly in currently undeveloped areas would result in an irretrievable loss of habitat effectiveness resulting from forest fragmentation, for those species requiring large areas of secure habitat.  Impacts would be minimized by limiting public access on new roads, and reclaiming these roads upon completion of oil and gas activities.

BLM_0048323

*Roadless Areas:* An irretrievable loss of roadless character would occur in any currently undeveloped area that is entered by oil and gas activities.

*Minerals:* The production of oil and gas under any of the alternatives would be an irreversible commitment of the oil and gas mineral resources. Under alternatives that apply *No Lease* and *No Surface Occupancy* stipulations, there may be an irretrievable commitment of these resources because they would not be available for development during the life of this document.

BLM_0048324

# Chapter V - List of Preparers

BLM_0048325

BLM_0048326

# Table of Contents

The Interdisciplinary Team                                                                V-1

Additional Preparers                                                                      V-3

BLM 0048327

BLM_0048328

# Chapter V -
# List of Preparers

## The Interdisciplinary Team

### John Almy - Forest Hydrologist

B.S. Forest Hydrology

Five years experience as Forest Hydrologist in several Regions; four years experience as District Resource Assistant; two years experience as Liaison Officer for a powerline construction; two years as Hydrologist on a Planning Team.

Provided input on air quality, and water quality and quantity for General Forest, Riparian Areas, Wetlands, and Watersheds of Special Interest to Municipalities.

### Ken Anderson - Timber Staff Officer

B.S. Forest Management Science

Two years Range Conservationist with the BLM at Resource Area level; seven years Sale Preparation Forester at District and Supervisor's Office (FS); five years as Appraisal Specialist at Regional Office; and one year in current position.

Provided input on forest vegetation and timber suitability.

### A. Clair Baldwin - Forest Range Staff Officer

B.S. Range Management

Twenty-eight years experience in various positions at the District and Supervisor's Office level.

Provided input on rangeland vegetation, noxious weeds, and livestock grazing.

### Jeff Burch - Planner

B.S. Forestry, M.S. Forestry

Twelve years as Planner at several Forest Supervisors Offices and a Regional Office; two years as forester for International Paper Company; one year as forester/planner for Tlingit and Haida Indian Tribes of Alaska.

Provided input on NEPA process, formulated alternatives, and facilitated open houses and the management team/interdisciplinary team decision meetings.

BLM_0048329

Oil and Gas Leasing Analysis FEIS

### Jeff Cameron - Forest Fisheries Biologist

B.S. Biological Sciences, Graduate School Fisheries Biology & Entomology

Three years Assistant District Fisheries Biologist; eight years District Fisheries Biologist; four years Zone Fisheries Biologist.

Provided input on aquatic resources for the Aquatic/Riparian/Wetlands discussions.

### Paul Dastrup - Transportation Planner

B.S. Civil Engineering

Eleven years civil engineer; three years Zone Engineer

Provided information on transportation system.

### Daryl L. Gusey - Forest Geologist

B.S. Geology, M.S. Geology

Eleven years District Geologist; one year timber sale planner; and one year Forest Geologist.

Interdisciplinary Team Leader.

### Tom Holland - Forest Wildlife Biologist

B.S. Wildlife Biology

One year Research Wildlife Biologist; one year Forester; seven years Zone Wildlife Biologist; seven years Forest Wildlife Biologist.

Provided information on wildlife and threatened and endangered species.

### Terry Hughes - Forest Soil Scientist

B.S. Forestry, Soil Science Minor

Four years as field soil scientist with the Soil Conservation Service; sixteen years Forest Soil Scientist.

Provided information on soils.

### John W. Oien - Landscape Architect

B.S. Environmental Design

Twenty-five years Landscape Architect; member of Forest Service Interdisciplinary Team.

Provided information on visual resources, developed and dispersed recreation, roadless areas, utility corridors, electronic sites, and administrative sites.

BLM_0048330

**Mike Ward - Minerals and Lands - Paonia Ranger District**

B.S. Forestry

Twenty-five years experience at the District level in timber, lands and recreation. The past 10 years in administration of energy mineral exploration and development.

Provided information on past oil and gas activity on the Forest.

# Additional Preparers

**Dulaney Barclay - Archaeologist**

B.S. Geology, M.A. Anthropology

Three years experience as archaeologist on Grand Mesa, Uncompahgre and Gunnison National Forests.

Provided input on cultural and historic resources for the EIS.

**Douglas Fehlmann - Geologist**

B.S. Geology

Seven years experience as petroleum geologist in the oil and gas industry, two years experience as Geological Technician with Forest Service and three years experience as Cartographer, Cadastral Surveyor and GIS Digitizer with the BLM.

Mapped geologic hazards and completed all resource digitizing associated with EIS.

**Lewis M. French - Forester - Ouray Ranger District**

B.S. Forestry

Twenty years Forest Service experience: five years in timber management, 15 years in recreation, lands and minerals.

Prepared Roadless Area affected environment write-ups.

**Carol S. Howe - Writer/Editor**

B.S. Wildlife Science, Soil Science Minor

Three years Forest Service experience as Wildlife Biologist at District and Supervisor's Office level; six years experience as computer programmer with private industry.

Responsible for editing, writing and coordination of EIS.

BLM 0048331

**Jerry Jones - Geologist (BLM)**

B.S. Geology

Five years industry (consulting); sixteen years geologist with the BLM at various District Offices in Arizona, Oregon, and Colorado.

Provided input on ground water, geology, and oil and gas operations.

**Jeffrey L. Ulrich - Operations Research Analyst**

B.S. Biochemistry, M.S. Park & Recreation Resources, M.S. Forest Management

Fourteen years Forest Service experience at the District and Supervisor's Office levels.

Prepared socioeconomic analysis for EIS.

**Bob Vlahos - Geographic Information System Coordinator (BLM)**

B.S. Forest and Range Management

Ten years range conservationist; four years planning team; five years GIS Coordinator.

Provided GIS analysis and mapping.

**Kermit Witherbee - Senior Technical Specialist - Petroleum Geologist (BLM)**

B.S. Geology, M.A. Geology

Six years industry exploration geologist; ten years geologist with the BLM at various levels in the organization.

Provided the Reasonably Foreseeable Development scenario.

BLM 0048332



United States
Department of
Agriculture

**FOREST SERVICE**

DELTA, COLORADO



# FINAL
# OIL AND GAS LEASING
# ENVIRONMENTAL
# IMPACT STATEMENT

## GRAND MESA,
## UNCOMPAHGRE
## AND GUNNISON
## NATIONAL FORESTS

# Volume  II



**APRIL 1993**



Cooperating Agency
**USDI BUREAU OF LAND MANAGEMENT**

BLM_0048333

# Chapter VI - Response to Public Comments

BLM_0048334

# Table of Contents

| | |
|---|---|
| Introduction | VI-1 |
| Response to Comments | VI-3 |
| Letters from Federal, State and Local Agencies and Organizations | VI-68 |
| List of Reviewers | VI-111 |
| Mailing List | VI-114 |

BLM_0048335

# Chapter VI - Response to Public Comments

## Introduction

This chapter includes our response to the comments we received; copies of the letters we received from other governmental agencies, the oil and gas industry, and organizations; a list of reviewers keyed to the comments and responses; and the mailing list.

Other aspects of public participation are discussed in Chapter I.

Letters were received from various governmental agencies, oil and gas companies, industry advocacy groups, several local and regional environmental organizations, and other interested organizations and people. 270 letters were received from 263 reviewers. The majority of the comments were from local communities. Comments were received from the following areas:

| | |
|---|---|
| Crested Butte/Gunnison area | 39.2% |
| Paonia and vicinity | 15.3% |
| Grand Junction and vicinity | 12.2% |
| Denver Metro area | 6.7% |
| Boulder | 6.2% |
| Other Forest Communities | 5.9% |
| Fort Collins | 3.5% |
| Other Colorado towns | 4.3% |
| Other States | 6.7% |

Four letter writing campaigns and one petition drive generated the majority of the comment letters. These campaigns were organized by:

Forest Rescue: Support Alt. 3 - No Lease anywhere, no timber harvest following oil and gas activity.

Western Colorado Congress, Colorado Environmental Coalition, et al.: Support Alt. 5 - No Lease in Roadless Areas, never waive stipulations.

Western Slope Energy Research Center, Black Canyon Audubon Society: Above, plus RFD too low, coal bed methane impacts not addressed.

Chuck Davies/Dick Pennington Outfitters: 1113 signatures, 62 form letters. No oil and gas development in Clear Fork/Muddy drainages.

Industry comments were received from:

Independent Petroleum Association of Mountain States: Preferred alternative too restrictive, violates multiple-use, adequate resource protection under SLT.

Arco Oil & Gas Co.: Preferred alternative okay, but with less restrictions in Roadless Areas.

BLM_0048336

Texaco Exploration & Production Inc.: Analysis underestimates economic benefits, *SLT* everywhere.

The following State and Federal agencies commented on the DEIS:

Colorado Division of Parks & Outdoor Recreation: Support protection of Tabeguache RNA.

Colorado Department of Transportation: Need to discuss impacts to State highways, list required DOT permits.

Environmental Protection Agency: Concern over impacts to water quality, air quality, riparian et al., suggests additional mitigation measures.

NOAA Ecology and Conservation Division: Protect geodetic survey monuments.

US Department of Health & Human Services: Elaborate on spill contingency plan.

USDI Office of Environmental Affairs: Supports Alt. 5 with changes; *NL* in alpine/tundra, need more on air quality impacts, consider impacts to mineral resources, *NL* in geologic hazard areas, do not waive etc. special stipulations.

US Fish and Wildlife Service: Supports Alt. 5, concern over T&E species, do not waive etc. special stipulations.

Additional comments were received from the following organizations (not previously mentioned):

Colorado Mountain Club: Supports Alt. 5, concern with impacts to biodiversity, loss of backcountry recreation opportunities.

Colorado Outfitters Association: No development in Clear Creek/Muddy, loss of backcountry recreation, do not lease undeveloped lands.

High Country Citizens Alliance: Supports Alt. 5 because they know Alt. 3 would not be selected, protect Kebler Pass, concern areas opened for oil and gas will be closed to general public.

Sierra Club: Preferred alternative does not protect Roadless Areas, RFD is too low, keep oil and gas roads closed to public.

Thunder Mountain Wheelers: Supports Alt. 2, no special protection in Roadless Areas.

Wilderness Study Group: Supports Alt. 5, currently studying Roadless Areas for biodiversity values - want development held until study complete and recommendations made for area protection.

Colorado Wildlife Society: Supports Alt. 5, concern about impacts to riparian and wildlife, no timber harvest following oil and gas development.

The major areas of concern identified from these letters included: Roadless Areas; biodiversity; water and air quality; the alpine/tundra ecosystem; aquatic, riparian, and wetland habitats; municipal watersheds; recreation complexes; wildlife habitat; the RFD; coal bed methane development; the potential for timber harvest; the effects of oil and gas on recreation use, opportunities and experiences; and the granting of waivers, exceptions, and modifications to stipulations. The Roadless Area issue was easily the biggest issue. The potential for increased timber sales as a result of access provided by oil and gas activity was a concern expressed quite often.

BLM_0048337

# Response to Comments

Individual comments were identified from all the letters received. These comments are listed below (pages VI-3 through VI-67). Comments are numbered to identify general categories and subcategories. For example: AEG02 refers to the second comment in the Affected Environment category, General Forest subcategory. Where the numerical sequence is broken (i.e. AEG24 is followed by AEG27), comments were combined as the comment analysis process proceeded.

Each individual/agency/organization who commented has been assigned an index number. A list of these reviewers and their index numbers begins on page VI-111. The list is indexed alphabetically. These index numbers are the numbers listed after the heading *Reviewer(s):*, under each comment. To find a comment from a given reviewer, first look up their index number on pages VI-111 through VI-113. This index number appears in the *Reviewer(s)* list after each comment made by that given reviewer.

### AE3A01   Affected Environment   3A - SPNM

Was oil and gas potential considered in identifying Semi-primitive Non-motorized management areas?

*Reviewer(s): 178*

RESPONSE: No. 3A Management Areas (Semi-primitive Non-motorized recreation) were previously designated in the Forest Planning effort. Many of the 3A Management Areas are leased or have been leased.

### AEAT01   Affected Environment   Alpine/Tundra

Allow no leasing in alpine/tundra affected environment.

*Reviewer(s): 99, 133, 177, 242, 243*

RESPONSE: The *No Surface Occupancy (NSO)* stipulation applied to Alpine/Tundra areas is designed to protect the Alpine/Tundra environment. Approval of a waiver of the stipulation would be considered only if the lessee/operator could meet the purpose of the *NSO* stipulation. The purpose of the *NSO* stipulation in Alpine/Tundra areas is displayed on page C-10, i.e., the operator would have to demonstrate that they could:

a. Prevent significant or permanent impairment of soil productivity.

b. Maintain or improve water quality to meet Federal or State standards.

c. Minimize the potential for significant or cumulatively significant impacts in alpine ecosystems, per 40 CFR 1508.27(b)(7).

d. Minimize visual quality impacts.

e. Maintain the integrity of associated ecosystems.

See page I-16 for a discussion of waivers, modifications, and exceptions. Waivers, exceptions or modifications are considered only at the time operations are proposed (APD) and will be subject to the Forest Plan in effect at the time of consideration and will be subject to applicable regulatory and environmental compliance requirements. Granting of a waiver, exception and modification is discretionary action which the agency will not routinely consider.

BLM_0048338

Oil and Gas Leasing Analysis FEIS

### AEAT02  Affected Environment  Alpine/Tundra

We support *NSO* in fragile alpine areas.

*Reviewer(s): 46, 47, 88, 151*

RESPONSE: See the response to Comment #: AEAT01.

### AEAT03  Affected Environment  Alpine/Tundra

The DEIS is deficient in analyzing the impacts of oil and gas activities in Alpine/Tundra areas by not discussing the impacts on recreation use and opportunities in these areas.

*Reviewer(s): 46*

RESPONSE: Impacts to recreation use and opportunities in Alpine/Tundra areas have been added on pages II-23 and IV-18.

### AEEC01  Affected Environment  Economics

The DEIS minimizes the socio-economic impact of lost opportunities for oil and gas development. This needs to be discussed in further detail under each alternative.

*Reviewer(s): 237*

RESPONSE:  The number of wells drilled (potential economic activity) is the same for all alternatives. The difference in jobs and other social effects is explained between action and no action alternatives on pages IV-60 through IV-63.

### AEEC02  Affected Environment  Economics

The document is inaccurate and underestimates the economic impacts under Alternative 4.

*Reviewer(s): 237*

RESPONSE:  Table S-4 and the Summary Comparison of Program Alternatives on pages II-51 through II-55 under the Economic and Social Setting Environmental Factors have been revised.  The effects described under Alternative 3 - No Lease, are common to all alternatives.  The assumption is that 40 wells will be drilled on existing leases under all alternatives, and 7 wells will be drilled on new leases under alternatives 1, 2, 4 and 5.  The effects described for alternatives 1, 2, 4 and 5 are in addition to those described for Alternative 3 - No Lease.  See also the discussion of Social and Economic Conditions on pages IV-60 throug IV-63 for more on the economic benefits to local communities.

### AEEC03  Affected Environment  Economics

Some discussion is needed comparing differences between employment projections in the draft and in earlier more generic studies of energy resource development.

*Reviewer(s): 41*

RESPONSE:  Employment projections used in the EIS are those local jobs occurring in the project area.

### AEEC04  Affected Environment  Economics

The document needs to address the adverse economic effects of low oil and gas prices on alternative energy and energy conservation and on the high cost to consumers resulting from pricing policies which favor pollution control over prevention.

*Reviewer(s): 225*

BLM_0048339

RESPONSE: Decisions made in the ROD to this EIS will not significantly affect oil and gas prices. The volume of gas produced from the Forest is insignificant when compared to the volume of gas available in the world and national marketplace. Other decisions which may affect oil and gas prices are made at the national level (Congress, FERC, etc.) and are beyond the scope of this document.

## AEEC05   Affected Environment   Economics

You need to show costs and what market price would be necessary to allow oil and gas extraction, similar to the market demand simulation done in the timber amendment [to the Forest Plan].

*Reviewer(s): 185*

RESPONSE: Oil and gas exploration and development is a free market enterprise on which we have little affect. Oil and gas extraction is dependent on the volume of the resource and the rate of recovery of the resource. It is a speculative, risky business and there is no guarantee of the presence of the resource in volumes that make it economical.

## AEG01   Affected Environment   General Forest

Biodiversity values and issues must be addressed in the FEIS on both a Forest-wide and site specific basis.

*Reviewer(s): 43, 47*

RESPONSE: Biodiversity issues and values are discussed on pages III-3 through III-4 and the effects are discussed on pages IV-1 and IV-39 through IV-41.

## AEG02   Affected Environment   General Forest

Old-growth values and issues must be addressed in the FEIS.

*Reviewer(s): 13, 43*

RESPONSE: Old growth is discussed on pages III-9 - III-10. The effects on old growth are discussed on pages IV-2 and IV-58 - IV-59. At this stage of the leasing process we do not know where oil and gas activity will occur. We can only make generalized statements about the effects to old growth. Old growth issues and effects will be discussed further in the environmental documentation for an APD and SUPO.

## AEG03   Affected Environment   General Forest

Ecosystem management values and issues must be addressed in the FEIS.

*Reviewer(s): 43*

RESPONSE: Ecosystem management values and issues are discussed throughout Chapters III and IV. Effects on biodiversity, forest fragmentation, wildlife habitats, wildlife and man's use, both consumptive and non-consumptive are discussed in Chapter IV. *Affected Environments* such as Alpine/Tundra, Aquatic/Riparian/Wetland Habitats, and certain Roadless Areas represent unique ecosystems. A discussion of their values and issues and effects are discussed in Chapter IV, but not in the context of "ecosystem management".

## AEG04   Affected Environment   General Forest

What is the potential for serious water and other contamination from burying reserve pits and fuel spills?

*Reviewer(s): 43*

BLM_0048340

RESPONSE: The potential for serious water and other contamination from reserve pits and fuel spills is very low because of the environmental mitigations that are required. (See Mitigation Appendix H.)

## AEG05   Affected Environment   General Forest

Biodiversity would be altered as a result of oil and gas exploration and development.

*Reviewer(s): 12, 13, 34, 46, 47, 64, 66, 68, 89, 94, 99, 105, 106, 114, 143, 149, 153, 160, 161, 175, 197, 199, 204, 206, 209, 212, 213, 217, 238, 252, 258, 259*

RESPONSE: Some alteration of biodiversity would occur as a result of oil and gas activity. This is discussed on pages IV-1 and IV-39 - IV-41 and as part of the wildlife section on pages IV-56 - IV-59.

## AEG06   Affected Environment   General Forest

Air quality would be degraded as a result of oil and gas exploration and development.

*Reviewer(s): 12, 13, 21, 33, 54, 64, 66, 68, 89, 94, 105, 106, 114, 124, 153, 160, 189, 193, 197, 207, 209, 212, 217, 238*

RESPONSE: Some local short-term degradation of air quality would occur. See page IV-4.

## AEG07   Affected Environment   General Forest

Water quality would be degraded as a result of oil and gas exploration and development.

*Reviewer(s): 12, 13, 21, 33, 34, 54, 64, 66, 68, 89, 94, 96, 105, 106, 114, 124, 145, 153, 160, 161, 189, 193, 197, 207, 209, 212, 217, 238*

RESPONSE: Some local short-term degradation of water quality would occur. See page IV-4, IV-14 - IV-15, IV-17, IV-19, IV-20, IV-28, IV-45 - IV-48 and IV-63.

## AEG08   Affected Environment   General Forest

Oil and gas exploration would remove trees as a result of constructing developments.

*Reviewer(s): 33, 157*

RESPONSE: Yes, the construction of roads, well pads and pipelines would likely result in the removal of trees. 10.7 acres of land are estimated to be disturbed per well site (this includes the road and pipeline corridor and the well pad). The number of trees removed would depend on the density of the trees along the proposed road or pipeline corridor or well site. The construction may or may not be in a forested area.

## AEG09   Affected Environment   General Forest

New roads for oil and gas activities will increase erosion resulting in increased dissolved solids in water, robbing water of oxygen required by fish and aquatic insects.

*Reviewer(s): 13, 59, 107, 152, 171, 189*

RESPONSE: Some short-term increase in erosion would likely occur. The greatest impact from erosion would be an increase in sediment load, especially during spring runoff and storm events. An increase in fine sediment may smother the gravel beds that fish have spawned in or normally spawn in, resulting in less reproductive viability for those species affected. Some increase in dissolved solids may also occur, depending on the physical and chemical characteristics of the soil being eroded.

## AEG10   Affected Environment   General Forest

The DEIS does not address possible air quality impacts to National Park System resources adjacent to the analysis area.

BLM_0048341

*Reviewer(s): 242*

RESPONSE:  See revised air quality discussion (pages III-22 - III-24).

## AEG11   Affected Environment   General Forest

The FEIS should include a cumulative air quality analysis related to projected oil and gas activities.

*Reviewer(s): 242*

RESPONSE:  See revised air quality discussion (pages IV-43 - IV-45).

## AEG12   Affected Environment   General Forest

Air quality mitigation measures need to be specified in the FEIS.

*Reviewer(s): 242*

RESPONSE:  Mitigation measures are discussed in Appendix H.  Site specific air quality mitigation measures will be specified at the time of an APD and SUPO.

## AEG13   Affected Environment   General Forest

The document should address water quality impacts in more terms than just erosion and road construction.

*Reviewer(s): 185, 247*

RESPONSE: The potential for water quality impacts are most closely tied to the ground disturbing activities such as road, well pad and pipeline construction.  The potential for local water quality impacts is greatest from erosion.  The effects are not considered to be significant.  Other water quality impacts are less predictable and much less likely to occur (spills, leaks, etc.).  Impacts from these occurrences are addressed on pages IV-45 through IV-48.

## AEG14   Affected Environment   General Forest

The document should address water quality impacts on the basis of an RFD closer to 1000 wells.

*Reviewer(s): 247*

RESPONSE: There is no justification to address water quality impacts on the basis of a RFD closer to 1000 wells.  The RFD represents the best information available regarding future oil and gas activity on the Forest over the next 15 years.  It was prepared by an expert in the field, and considers past trends, future prices and future supply and demand.

## AEG15   Affected Environment   General Forest

Many locations in the analysis area are not designated as Roadless or 3A Management Areas but offer potential for solitude and backcountry experiences.  These areas need to be inventoried and protected.

*Reviewer(s): 91*

RESPONSE: The Forest Plan made land allocations based on the numerous resource values found on the Forest.  Protection of the type of areas you mentioned may or may not occur.  Protection would be based on the Forest Plan management prescription for those areas.  Roadless Areas are not designated by a management prescription.  The Roadless Areas displayed in this document are generally the RARE II areas slightly modified by our knowledge of road construction that has occurred since 1979.

BLM_0048342

**AEG16   Affected Environment   General Forest**

The Forest Service does not have inventories of all resources that will be effected by oil and gas activities. How can we make management decisions without knowledge of existing resources?

*Reviewer(s): 13, 86, 91*

RESPONSE: It is true that inventories of all resources may not exist and may not ever exist on a Forest-wide basis. Section 6 of the standard lease form (BLM FORM 3100-11 - Offer to Lease and Lease for Oil and Gas) specifies that the lessee may be required to conduct inventories or special studies to determine the extent of impacts to other resources. Special studies may be required as a Condition of Approval of the lessees proposed Surface Use Plan of Operations when submitting an Application for Permit to Drill (see page H-14, Pre-Activity Inventories).

**AEG17   Affected Environment   General Forest**

The phrase "expecting no impact" is questioned because some impact occurs as a result of any activity.

*Reviewer(s): 1*

RESPONSE: Some impact does occur as a result of any activity. In the context of this document the effects were described relative to a specific *Affected Environment*.

**AEG18   Affected Environment   General Forest**

The Final EIS needs to contain a map and discussion of forest fragmentation and how each alternative will affect it.

*Reviewer(s): 47*

RESPONSE: A map of forest fragmentation is not available at this time.

**AEG19   Affected Environment   General Forest**

The Grand Mesa should be added to the list of sensitive areas. There needs to be a cumulative effects analysis of the timber harvest, roads, oil and gas activities and extensive motorized vehicle use in this area.

*Reviewer(s): 47*

RESPONSE: Sensitive areas as defined in this document are lands proposed for resource use that precludes intensive development. Portions of the Grand Mesa are designated as sensitive (see pages III-90 and Figure III-10). The Forest Plan has allocated portions of Grand Mesa as suitable for timber harvest and recreational developments. Assigning the entire Grand Mesa as a sensitive area would not be an appropriate allocation of the multiple resources found there. Cumulative effects analyses of activities on Grand Mesa are being done as projects are proposed.

**AEG21   Affected Environment   General Forest**

*No Lease* should be the designation where water pollution can be a problem.

*Reviewer(s): ,*

RESPONSE: Those *Affected Environments* potentially most affected by oil and gas operations (Riparian/Aquatic/Wetland habitats) and related water pollution are stipulated in the preferred alternative and by Forest Service oil and gas regulation (36 CFR 228.108(j)) to be *No Surface Occupancy*. Even though they are *NSO* some effects will be expected to occur to those *Affect Environments*. It is likely that roads will cross these areas. Mitigation measures will be applied to minimize the potential for adverse impacts. Mitigation measures will be specified in the approval of the SUPO.

BLM_0048343

**AEG22   Affected Environment   General Forest**

Would it be reasonable to inventory and evaluate the oil and gas resources as other resources (like soils, slopes, etc.) have been evaluated in this document?

*Reviewer(s): 178*

RESPONSE: The oil and gas potential map represents the "inventory" of those resources. Unlike soils, slopes, etc., we do not know that oil and gas resources will be found in any particular area of the Forest. The potential for oil and gas resources takes into consideration the factors that are normally associated with the presence of oil and/or gas resources like geologic formations with suitable source and reservoir rocks, thermal maturation and traps. However, there is no assurance, short of drilling, that those resources are present in paying quantities.

**AEG23   Affected Environment   General Forest**

The document underestimates the impact of oil and gas development on vegetation. It should reflect that plugged wells have been known to leak oil and salt water, contaminating soils and preventing vegetation from growing.

*Reviewer(s): 225*

RESPONSE: The impact to vegetation in the vicinity of the well head was considered in the DEIS. The impact to vegetation from leaks, as you suggest, would likely be confined to the well pad - an area already disturbed. Leaks are uncommon and the impacts from them would likely be short term.

**AEG24   Affected Environment   General Forest**

To date what amount of spills have occurred and detail their effects. Give historical information on past oil and gas activity impacts and previously used mitigation procedures.

*Reviewer(s): 78, 96*

RESPONSE: Several incidents have occurred, none of which caused any significant impact to vegetation, surface water, or other surface resources. Reserve pits have overflowed in the spring during heavy rains and snowmelt; an operator spread mud from a reserve pit on a road for dust abatement (without approval); a reserve pit was breached and about 20 barrels of water and mud flowed about 100 yards downslope; and a water truck rolled. In one case, the State of Colorado took the operator to court and the BLM issued an Incidence of Noncompliance. In the case of the rolled water truck, it was either empty at the time or was hauling produced water. In reviewing photographs of the accident scene, there was no evidence of a spill.

These incidents took place several years ago. Based on these experiences, the Forest now requires reserve pits to be closed by November 1 or requires a closed system. Accidents can still happen, but to date they have been minor and have done very little environmental damage.

**AEG27   Affected Environment   General Forest**

*No Lease* stipulations were not addressed to old growth stands.

*Reviewer(s): 96*

RESPONSE: The amount of old growth timber affected would not result in the Forest Plan standard and guideline being violated. The standard is "5-12% or more of a diversity unit will be in old growth classification (where biologically feasible)". At the most, only 500 acres will be disturbed over the next 15 years by oil and gas activity (47 wells - 10.7 acres/well). It is unlikely that all the disturbance would be in old growth. Old growth issues will be discussed further at the site specific APD - SUPO stage.

BLM_0048344

### AEG28   Affected Environment   General Forest

We assume that *SLT* for wildlife summer range under Alternative 5 on Table S-2 is a printing error.

*Reviewer(s): 252*

RESPONSE: You are correct, it is a typographical error. It should be *NSO*.

### AEG29   Affected Environment   General Forest

Significant environmental impacts are identified in the DEIS for the projected 47 wells. What will the impacts be if more activity occurs?

*Reviewer(s): 252*

RESPONSE: If more activity occurs, the effects would be commensurately greater. The effect of each individual well would be similar to that discussed in the DEIS. The greatest potential for adverse environmental effects would occur if wells are concentrated. Some concentration of activity is expected in the unitized areas (the Narrows and the Ragged Mountain Unit).

### AEG30   Affected Environment   General Forest

The impacts of emissions of sulfer dioxide from waste gas flaxing and tail gas incineration from oil and gas processing operations are not addressed.

*Reviewer(s): 78*

RESPONSE: See revised air quality discussion pages III-22 - III-24 and IV-43 - IV-45.

### AEG31   Affected Environment   General Forest

The impact of fugitive hydrogen sulfide emissions are not discussed in the Draft EIS.

*Reviewer(s): 78*

RESPONSE: See revised air quality discussion pages III-22 - III-24 and IV-43 - IV-45.

### AEG32   Affected Environment   General Forest

The DIES inadequately deals with intact late seral ecosystems, particularly since an old growth inventory is not complete. Cumulative effects on old growth need to be addressed.

*Reviewer(s): 185*

RESPONSE: See response to Comment #: AEG27.

### AEG33   Affected Environment   General Forest

Page IV-3 states road construction would increase the rate of erosion 80-100 times normal. This coupled with the fact that large areas of the Forest are subject to mass movement indicates potential for further soil and water degradation.

*Reviewer(s): 185*

RESPONSE: The area involved in the construction of roads for oil and gas activity is small compared to the area subject to mass soil movement. The erosion rate of 80-100 times normally is a short-term effect. The increase in erosion would not be significant relative to natural rates across the analysis area.

BLM_0048345

### AEG34   Affected Environment   General Forest

In the face of declining water quality and increased use and demand for quality and quantity of water, the impacts to water quality from the proposed oil and gas activity is unacceptable.

*Reviewer(s): 185*

RESPONSE: This document does not propose oil and gas activity. It makes certain land available for oil and gas leasing. Mitigation measures will be required to lessen any impacts to water quality. Operators will be required to maintain water quality at or above Clean Water Act and State standards. Operators may be subject to civil and criminal action if water quality is degraded as a result of their activity to below state and Federal standards for water quality. See also the response to Comment #: AEG33.

### AEG35   Affected Environment   General Forest

The DEIS inadequately treated water quality issues of sedimentation, drilling waste and cumulative effects of potential timber harvest following oil and gas activities.

*Reviewer(s): 185*

RESPONSE: Impacts to water quality are discussed on pages IV-4, IV-14, IV-17, IV-19, IV-20, IV-28, IV-45 through IV-48 and IV-63. A cumulative effects discussion relative to impacts to water quality resulting from timber harvest is on page IV-48. Mitigation measures that will be employed to lessen impacts to water quality are in Appendix H.

### AEGE01   Affected Environment   Geology

The sections of land in T49N R6W near Cimarron Point are shown as having moderate hydrocarbon potential in the DEIS; however, geological maps suggest no potential would be more appropriate for this area.

*Reviewer(s): 242*

RESPONSE: The moderate hydrocarbon potential rating is based on the BLM's Oil and Gas Potential Rating Criteria displayed in Appendix B. The potential was based on review of the "Geologic Map of Colorado" (Tweto, 1979). Geologic mapping on that map is displayed at a scale of 1:500,000, a scale sufficient to make a generalized determination of oil and gas resource potential.

An area is rated as moderate potential if there is geophysical or geological indication that the following are present: (1) source rock, (2) thermal maturation, (3) reservoir strata possessing permeability and/or porosity, and (4) traps. All of the above may or may not be present in your area of concern. Based on further site specific investigation or the area, a rating of no potential may well be more appropriate. However, that is beyond the needs of this document. The potential for oil and gas resources is relevant generally only in the context of determining the area of analysis for this EIS. Rating an area as having no known potential for hydrocarbons does not preclude an area from being leased. Lands outside the analysis area are subject to leasing on a case by case basis, i.e., if a lease is requested for a parcel outside the analysis area (low or no known potential for oil and gas resources) the Forest Service will determine the availability of the parcel and whether to authorize the BLM to lease the parcel. These determinations will be documented in the decision document for a NEPA analysis (ROD or FONSI).

### AEGE02   Affected Environment   Geology

The DEIS does not address potential impacts to other mineral resources resulting from oil and gas activities. The possible long-term impacts on other mineral resources in the areas proposed to be restricted or closed to leasing should be addressed in the FEIS.

*Reviewer(s): 242*

BLM_0048346

RESPONSE: Locatable minerals, generally those hardrock minerals which are mined and processed for the recovery of metals, are subject to disposal under the General Mining Law of May 10, 1972 (17 Stat. 91, as amended; 30 USC 22 et seq.). Restricting oil and gas activities or closing an area to oil and gas activity does not preclude the location of mining claims in those areas, assuming those areas have not been withdrawn from mineral entry. A mining claimant may stake a claim and mine according to an approved plan of operations in areas where the Forest Service has exercised it's authority not to lease for oil and gas (again, if not withdrawn and/or subject to valid existing rights). Exploration and development activities for locatable minerals would not be affected by closing an area to oil and gas leasing. Mitigation measures for the locatable activity would be required based on the surface resource values of the area.

Salable minerals include sand, stone, gravel, pumicite, cinders, pumice (except pumice with special properties), clay and petrified wood. Like leasable minerals, disposal of salable minerals is discretionary. Salable minerals would likely be impacted in a manner similar to leasables in areas where oil and gas activities are controlled or not allowed. It is likely that in the areas where oil and gas activity is restricted or not allowed, salable mineral activity would be restricted or not allowed.

## AEGH01   Affected Environment   Geologic Hazard

Allow no leasing in high to moderate geologic hazard sites.

*Reviewer(s): 152, 242, 243*

RESPONSE: High geologic hazard sites are subject to *No Surface Occupancy (NSO)* stipulations and moderate geologic hazard sites are subject to the terms of *Controlled Surface Use (CSU)* stipulations. Prior to approval of activity in these areas an interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques will be required (see page C-1). *NSO* stipulations on high geologic hazard areas effectively protect these areas and associated resources from the potential effects of oil and gas activities.

## AEGH02   Affected Environment   Geologic Hazard

There are concerns over steep slope sitings of wells which would require large cut and fill slopes, resulting in erosion and slides.

*Reviewer(s): 82*

RESPONSE: As with geologic hazard areas, steep slopes (>40%) are stipulated with the intent of strictly controlling construction methods and mitigation measures and minimizing the potential for erosion and slides. However, some erosion is likely to occur immediately following construction when the cut and fill slopes have yet to be stabilized by vegetation and/or erosion control devices. Slides may also occur in spite of careful slope design. Whether these occurrences result in adverse impacts to streams or other water bodies depends on the site location and distance to the stream or water body.

## AEMW01   Affected Environment   Municipal Watersheds

The Forest is a municipal watershed that needs to serve in this capacity in as pure a state as possible. Oil and gas activities will impact watersheds.

*Reviewer(s): 8, 32, 65, 105, 130, 152, 207, 210*

RESPONSE: The impacts to water quality and quantity are discussed on pages IV-4, IV-14, IV-17, IV-19, IV-20, IV-28, IV-45 to IV-48 and IV-78. Mitigation measures are displayed in Appendix H. *Controlled Surface Use* stipulations for Municipal Watersheds are designed to minimize impacts to water quality and quantity (see page C-4).

BLM_0048347

### AEMW02  Affected Environment  Municipal Watersheds

There are concerns about disposal of highly saline water resulting from drilling and its possible impacts on increasing salinization of the Colorado River drainage.

*Reviewer(s): 32, 65, 152, 171*

RESPONSE: Highly saline water can result from drilling. Discharge of saline waters into surface waters has been allowed by the State in instances where the saline water is no more saline than the water in which it would be discharged. The Forest has required that water produced by the drilling operation be hauled to an EPA approved disposal site. Other methods, such as evaporation ponds and re-injection wells have also been used for the disposal of produced water. Evaporation ponds have not been used on the Forest because of the cooler temperatures, adverse weather conditions, and short summer season. Note also, that not all wells produce high quantities of water, saline or not. See page IV-46 for a discussion of past water production and disposal. See also the response to Comment #: OGCBM8.

### AEMW03  Affected Environment  Municipal Watersheds

If the potential for the Cimarron Point area (T49N R6W) is not changed to no potential, then CSU or *NSO* stipulations should be applied to protect the Curecanti water supply from chemical or oil spills in this area.

*Reviewer(s): 242*

RESPONSE:  Project level protections and mitigations are considered sufficient to negate significant risk. The stipulations as proposed in the preferred alternative in this document and the requirements of the Clean Water Act are adequate to protect the Curecanti water supply.

### AEMW04  Affected Environment  Municipal Watersheds

The document needs to address the potential of polluting domestic water wells or groundwater as a result of drilling. How will aquifers be protected?

*Reviewer(s): 40, 78, 252*

RESPONSE: The potential is very low given the legal requirements for the separation of aquifers with plugs, casing and the cementing of wells. There are very few water wells in the analysis area. The majority of the wells are in the valley bottoms and generally away from the majority of the projected activity.

### AEMW05  Affected Environment  Municipal Watersheds

Bell Creek Springs, the water source for Paonia, should be identified as a municipal watershed and should be *No Lease*.

*Reviewer(s): , 167, 252*

RESPONSE: Bell Creek Springs was identified in the DEIS as a municipal watershed. Bell Creek Springs are actually outside the analysis area. Only the portion of the watershed that is below the springs are included in the analysis area. The *Controlled Surface Use* stipulations are adequate to protect the watershed.

### AEMW06  Affected Environment  Municipal Watersheds

The Coal Creek watershed should be included as being among the Watersheds of Special Interest to Municipalities, since it is the water source for Crested Butte.

*Reviewer(s): 41, 103*

BLM_0048348

RESPONSE: The Coal Creek watershed has been added to the discussion of Watersheds of Special Interest to Municipalities.

### AEMW07   Affected Environment   Municipal Watersheds

Existing leasing in some municipal watersheds indicate a potential for oil and gas activity in these areas. *NL* and *NSO* should be applied to these areas. *CSU* is not adequate protection from spills and accidents.

*Reviewer(s): 96, 252*

RESPONSE: Existing leases are subject to the terms and conditions of the lease at the time. Oil and gas activity may occur in those areas regardless of the stipulation applied to the area in this document. If any oil and gas activity is proposed on an existing lease, the Forest Service will work with the operator through the SUPO to protect water resources. CSU provides adequate protection of the water resources in the municipal watersheds (see the language of the stipulation on page C-4).

### AEMW08   Affected Environment   Municipal Watersheds

There is special concern about impacts to water quality in the Muddy Creek watershed as a result of concentrated oil and gas activity in the area.

*Reviewer(s): 252*

RESPONSE: Mitigation measures will be applied in the Muddy Creek watershed, as well as all watersheds, to protect water quality. Site specific analysis will be done at the time an APD for full field development in the Muddy Creek watershed is proposed. The next APD which would require significant road, pipeline and well pad construction will likely require an EIS to address the effects of what the Forest Service considers to be a proposal for full field development. Mitigation of potential water quality impacts will be required.

### AEMW09   Affected Environment   Municipal Watersheds

The hydrogeologic chapter lacked information concerning what aquifer formations supply municipal drinking water and which, if any, have waste water pumped into them. What will future use of aquifers be?

*Reviewer(s): 78, 96*

RESPONSE: No aquifers supplying municipal drinking water will have waste water pumped into them. It is unlikely that much development of aquifers would occur. It is unknown what the future uses of aquifers will be.

### AEMW10   Affected Environment   Municipal Watersheds

Does waste water end up accidentally being pumped in the wrong formation because of porosity and permeability problems?

*Reviewer(s): 96*

RESPONSE: No. Cement plugs or packers are used to isolate the formation or zone. The formations are tested prior to injection.

### AER01   Affected Environment   Aquatic/Riparian/Wetlands

Strictly enforce *No Surface Occupancy* stipulations in riparian areas.

*Reviewer(s): 83, 88, 99, 110, 151, 177, 242, 243*

BLM_0048349

RESPONSE: The Forest Service recognizes the importance of wetlands and riparian areas. The Forest Service regulations at 36 CFR 228.108(j) state that unless otherwise authorized in the approved Surface Use Plan of Operations, the operator shall not conduct operations in areas subject to mass soil movement, riparian areas and wetlands. A lessee has the right to access a well site. As stated on page II-3, "Crossing riparian areas, wetlands and areas of high geologic hazard may be unavoidable in some cases to access a well site." Proposed activity in the riparian area will be subject to a NEPA analysis - part of the approval process of an Application for Permit to Drill and Surface Use Plan of Operations. Mitigation measures designed to minimize the impacts to riparian areas will be determined on a site specific basis. Possible mitigation measures are listed in Appendix H.

### AER02   Affected Environment   Aquatic/Riparian/Wetlands

Leasing under Alternative 2 will harm wetlands and riparian areas.

*Reviewer(s): 8, 47, 199, 210, 212*

RESPONSE: The estimated impacts to Aquatic/Riparian/Wetland Habitats are discussed on page IV-13 through page IV-16 and page IV-64 through IV-67. See also the response to Comment #: AER01.

### AER03   Affected Environment   Aquatic/Riparian/Wetlands

It is not clear in the DEIS whether oil and gas activities will be allowed to occur in wetlands, floodplains and riparian areas.

*Reviewer(s): 256*

RESPONSE: Wetlands, floodplains and riparian areas are all *No Surface Occupancy (NSO)*. Activities would be allowed in a wetland, floodplain or riparian area if approved in the Surface Use Plan of Operations. A waiver, exception or modification of the *NSO* stipulation would have to be approved prior to operations in these areas. Proposed activity in these areas would be subject to the NEPA analysis that would occur for approval of the Surface Use Plan of Operations filed when the operator submits an Application for Permit to Drill (APD).

### AER04   Affected Environment   Aquatic/Riparian/Wetlands

Wetland areas should be *No Lease*.

*Reviewer(s): 46, 133, 168*

RESPONSE: See the response to Comment #: AER01.

### AER05   Affected Environment   Aquatic/Riparian/Wetlands

Aquatic resources information should be summarized on the third order river basin level, including name, length/size, stream order, uses, current quality, etc.

*Reviewer(s): 78*

RESPONSE: This information has not been compiled for the Forest.

### AER06   Affected Environment   Aquatic/Riparian/Wetlands

It is not clear what the section entitled "Effects of Alternatives on Wetlands and Floodplains" (page S-19), means.

*Reviewer(s): 78*

RESPONSE: Forest Service Handbook 1909.15 Environmental Policy and Procedures, requires that the environmental effects on Floodplains and Wetlands be considered.

BLM_0048350

Oil and Gas Leasing Analysis FEIS

### AER07   Affected Environment   Aquatic/Riparian/Wetlands

Does the statement "decisions are being made to a map resolution of about 40 acres" (page I-9) imply wetlands/riparian areas are mapped to a resolution of 40 acres?

*Reviewer(s): 78*

RESPONSE:  Wetlands and Riparian areas have not been mapped.  The Forest is in the process of mapping these areas.

### AER08   Affected Environment   Aquatic/Riparian/Wetlands

Page III-50 discussion is confusing regarding apparent interchange of riparian and wetland terms.

*Reviewer(s): 78*

RESPONSE:  Our discussion of Riparian and Wetlands is accurate and reflects definitions used in our Forest Plan.

### AER09   Affected Environment   Aquatic/Riparian/Wetlands

Page III-54 should also note EPA as one of the authors of the 1989 Federal wetlands manual.

*Reviewer(s): 78*

RESPONSE:  The EPA's efforts are now noted.

### AER10   Affected Environment   Aquatic/Riparian/Wetlands

Page IV-13 discussion needs to address impacts from pipelines and potential discharges into floodplains and waters.

*Reviewer(s): 78*

RESPONSE:  The impacts from the construction of pipelines would be similar to that of road construction.  The pipeline, in most cases, would be constructed within a road corridor.  The pipelines would be gas pipelines.  Little or no oil resources are expected to be found in the analysis area.

### AERC03   Affected Environment   Recreation Complexes

Allow no leasing in Crag Crest area.

*Reviewer(s): 242, 243*

RESPONSE:  The Crag Crest National Recreation Trail is protected with *No Surface Occupancy (NSO)* stipulations designed to protect the recreational experience from the trail and in the vicinity of the trail.  The trail is treated as a highly sensitive recreation complex consisting of the trail, trailheads, two campgrounds and one boat ramp.  The *NSO* corridor extends a quarter mile around the complex.  *NSO* stipulations will adequately protect the recreational experiences in the area and allow exploration for oil and gas resources via directional drilling from outside the *NSO* block.

It should also be noted that about 105 acres of the complex is currently leased.  The lease expires in 1994.

### AERC04   Affected Environment   Recreation Complexes

Some major recreation trails, such as Bell Creek (#834), Horse Ranch Park (#830) and Raggeds (#820) are not identified in Fig III-17.

*Reviewer(s): 252*

BLM_0048351

RESPONSE: These trails are not identified as major recreational complexes based on the amount of use, size of sites, and are not considered significant on the basis of analysis area size (they are not National Recreation Trails).

## AERC05  Affected Environment  Recreation Complexes

Much more of the Analysis Area than is shown in Fig. III-16 should be considered dispersed recreational areas.

*Reviewer(s): 252*

RESPONSE: The whole analysis area supports dispersed recreation. The areas displayed in Fig. III-16 and discussed on pages III-95 - III-96 of the FEIS are the major complexes where dispersed recreation is concentrated.

## AERNA1  Affected Environment  Research Natural Area

The Colorado Natural Areas Program supports the proposed *No Lease* status for the Tabeguache proposed Research Natural Area.

*Reviewer(s): 31*

RESPONSE: Thank you for your comments.

## AES01  Affected Environment  Slopes

Exploration & development would occur on slopes >40%, even though many parts of the Forest exhibit high erosion and slump potential. Timber harvest is not allowed on slopes >40%. It is unwise to road or develop steep slopes for oil and gas.

*Reviewer(s): 185*

RESPONSE: Exploration and development on slopes > 40% will be controlled by the use of stipulations. Construction on slopes > 40% will require the use of various mitigative measures to minimize the potential for adverse impacts to the soil and water resources. These measures have proven to be effective in the reduction of impacts to soil and water. Regarding timber harvest, 40% is the upper limit of the ground-based equipment used in the harvest activities on this Forest.

## AETE01  Affected Environment  T,E & S Species

Special stipulations should be applied where Threatened, Endangered and Sensitive species may occur.

*Reviewer(s): 242, 243*

RESPONSE: All oil and gas activities are subject to the requirements of the Endangered Species Act (ESA). Threatened, endangered and sensitive species are protected by ESA, regardless of lease stipulation. Therefore, the use of a lease stipulation to protect them is not necessary. The Forest will consult with the Fish and Wildlife Service at every phase of oil and gas exploration and activity. Additional NEPA analysis will occur at the time an Application for Permit to Drill and Surface Use Plan of Operations is submitted.

## AETE02  Affected Environment  T,E & S Species

Oil and gas activity should not be allowed where Threatened or Endangered species occur.

*Reviewer(s): 243*

RESPONSE: Biological evaluations concerning Threatened and Endangered species will be completed prior to any ground disturbing activity.

BLM_0048352

## AETE03  Affected Environment  T,E & S Species

If the Forest Service determines that a project may adversely affect listed species then formal Section 7 consultation with the US Fish and Wildlife Service will be required.

*Reviewer(s): 242*

RESPONSE: Yes, this is correct.

## AETE04  Affected Environment  T,E & S Species

Page IV-35, acreage restrictions for activities in Mexican spotted owl habitat are too little and indefensible.

*Reviewer(s): 185*

RESPONSE: Acreage restrictions are based on the recommendations of Fletcher (1990).

## AEV01  Affected Environment  Visuals

The VQO's appear to have been adopted without NEPA documentation. We feel it is a mistake to make leasing decisions that will change the character of much of the Forest based on decisions made without public participation.

*Reviewer(s): 252*

RESPONSE: The existing VQO's were adopted as part of the Forest Plan in 1983. General direction in the Plan was to apply the Visual Management System to all NFS lands (see page III-12 of the Plan amendment). Although the VQO's were not displayed, the technical inventory was part of the Plan. Desired Future Condition (VQO) has not been determined but will receive public participation when developed.

## AEW01  Affected Environment  Wildlife

Continuous habitat values and issues must be addressed in the FEIS.

*Reviewer(s): 43*

RESPONSE: Forest fragmentation is discussed on pages IV-11, IV-22, IV-39, IV-59 and IV-87. See also the response to Comment #: RDW02.

## AEW02  Affected Environment  Wildlife

Oil and gas exploration and/or development will result in loss of wildlife habitat. (Plus 62 form letters.)

*Reviewer(s): 8, 12, 13, 21, 33, 47, 54, 64, 66, 68, 72, 89, 94, 99, 105, 105, 106, 114, 122, 130, 131, 135, 145, 152, 153, 157, 160, 161, 172, 185, 187, 189, 197, 199, 209, 210, 212, 217, 228, 232, 238, 252, 258*

RESPONSE: Some loss of wildlife habitat will occur as a result of the construction of roads, pipelines and well pads. It is estimated that 10.7 acres of land will be disturbed per well. This equates to a direct loss of 10.7 acres of wildlife habitat per well. However, the presence of road and pipeline corridors and well pads disrupts wildlife habitat for some distance outside of the corridors and well pad. That distance varies based on the topography and vegetative cover present in the area.

## AEW03  Affected Environment  Wildlife

Oil and gas activities will interfere with elk calving grounds.

*Reviewer(s): 8, 21, 189, 210, 212*

BLM_0048353

RESPONSE: Oil and gas exploration and development activity will not be allowed in elk calving areas from April 16 to June 30. However, operation and maintenance activities are generally not subject to *Timing Limitations*. Mitigation will be addressed at the APD stage. Operation and maintenance activities are generally of lesser disturbance (1 or 2 vehicles per day). See also response to Comment #: STP18.

### AEW04   Affected Environment   Wildlife

Information in the DEIS concerning elk summer range is not correct in the Clear Creek/Muddy area.

*Reviewer(s): 39, 124, 152, 234*

RESPONSE: The information on elk summer range (concentrated use) was provided by the Colorado Division of Wildlife and is the best information we have on elk summer range (concentrated use).

### AEW05   Affected Environment   Wildlife

Oil and gas activities will harm elk migration routes.

*Reviewer(s): 8, 130, 210*

RESPONSE: Some disruption of migration routes will occur. Effects are discussed on pages IV-33 and IV-82.

### AEW06   Affected Environment   Wildlife

Exclude bighorn sheep lambing areas from oil and gas development.

*Reviewer(s): 256*

RESPONSE: The bighorn sheep range in the Battlements will be protected from oil and gas development. It is within the Battlement Mesa Roadless Area which is available for oil and gas leasing, but with *No Surface Occupancy* stipulations.

### AEW07   Affected Environment   Wildlife

Exclude sage grouse leks and breeding areas from oil and gas development.

*Reviewer(s): 173, 256*

RESPONSE: Only one sage grouse lek and nesting area is located partially within the analysis area. The lek is protected with *No Surface Occupancy (NSO)* stipulations. The *NSO* stipulation extends a half mile beyond the lek. Further protection is provided for nesting with *Controlled Surface Use* and *Timing Limitations* within 2 1/2 miles of the lek.

### AEW08   Affected Environment   Wildlife

The DEIS does not map elk and deer migration routes and staging areas near Cimarron Point (T49N R6W).

*Reviewer(s): 242*

RESPONSE: Elk and deer migration routes and staging areas are not mapped. Migration routes and staging areas will be protected with *Timing Limitations*. They will be identified at the time an operator submits an Application for Permit to Drill and Surface Use Plan of Operations.

### AEW09   Affected Environment   Wildlife

The document should examine effects to wildlife from a larger RFD perspective.

BLM_0048354

*Reviewer(s): 45, 247*

RESPONSE: In Wildlife Special Habitats, those areas where animals are most susceptible to stresses brought on by human disturbances, the preferred alternative places *Timing Limitations* and *Controlled Surface Use* and/or *No Surface Occupancy* stipulations on the lease operations. In these areas, regardless of the degree of Reasonably Foreseeable Development, the animals are protected during the time periods when they are most vulnerable to disturbance. These habitats include Big Game Winter Range, Elk Calving Areas, Migration Routes and Staging Areas, Bighorn Sheep Lambing and Breeding Areas, summer range (areas of Concentrated Use), and Sage Grouse Leks and nesting areas. Threatened and endangered species are protected under the Endangered Species Act.   Protective measures are required by law.

## AEW10   Affected Environment  Wildlife

Did you consider the adaptability of elk to oil and activities when deciding on NSO for elk summer range?

*Reviewer(s): 178*

RESPONSE: Yes. The Colorado Division of Wildlife recommended that elk summer range (concentrated use areas) be stipulated *NSO*. They feel that the effects of oil and gas activity in combination with all the other human activity (such as timber harvesting and recreational uses), the elk would be driven off their summer range earlier than desired. The adaptability of elk to oil and gas and other activities is an underlying implication.

## AEW11   Affected Environment  Wildlife

If roads are put into undeveloped areas for oil and gas there will be a problem of illegal hunters killing game from their trucks.

*Reviewer(s): 181*

RESPONSE: Operators and their crews will not be allowed to have firearms on the job or in their camps. This mitigation measure has been added to the mitigation displayed in Appendix H.

## AEW12   Affected Environment  Wildlife

Some big game winter range areas are not indicated on Fig. III-21, including portions of Coal Creek and along the Forest boundary south of the North Fork of the Gunnison River.   Elk calving and concentrated summer use areas are also missing.

*Reviewer(s): 252*

RESPONSE: The information on wildlife habitats was provided by the Colorado Division of Wildlife. This information will be reviewed at each APD and any new information will be incorporated into the Forest's database.

## AEW13   Affected Environment  Wildlife

The DEIS does not quantify the effects of oil and gas activity on Management Indicator Species, or other wildlife species.

*Reviewer(s): 185*

RESPONSE: Quantification of the effects on Management Indicator Species is not possible at this stage of the process.   We do not know where oil and gas activities will occur, their concentration or duration.

Response to Comments

BLM 0048355

## AEW14   Affected Environment   Wildlife

No where in the DEIS is there a discussion of the effects current oil and gas activities have had on wildlife.

*Reviewer(s): 185*

RESPONSE:  The effects discussed in Chapter IV are based on past experience with oil and gas and timber activity.

## AEW15   Affected Environment   Wildlife

Page III-45 states the greatest threat to pine marten populations (an old growth indicator species) is roading.  Given the intensive invasion of Roadless Areas under this proposal you fail to provide assurance of protecting wildlife.

*Reviewer(s): 185*

RESPONSE:  There is no proposal for an intensive invasion of Roadless Areas with oil and gas activity.  There is no way of knowing at this time the level of activity in any one area.  Some Roadless Areas will be made available for oil and gas leasing, but there is no assurance that they will be leased or if they are leased that they will incur oil and gas activity.  Wildlife mitigation measures will be applied to oil and gas operations, as needed (discussed in Appendix H).

## AEW16   Affected Environment   Wildlife

Encroachment on 7% of an already inadequate critical habitat (page III-98) is too much, particularly when coupled with the potential cumulative effects of timber harvest or more roaded recreation.

*Reviewer(s): 185*

RESPONSE:  At most, 7% of the winter range utilized by big game found in the analysis area would be affected by oil and gas activity.  Activities would not be allowed during the time the animals are using winter range.  In most cases, weather and road conditions would preclude activity during this time.  Roads in winter range would be closed to public travel during the time the animals are on the winter range, and perhaps year round.

## ALT01   Alternatives        General

There should be an alternative that attempts to integrate existing leases and proposed leases into logical units for efficient development and production likely in full field development, including consolidating leases into blocks held by single producers

*Reviewer(s): 247, 252*

RESPONSE:  Industry typically does this through unitization.  Unitization is an agreement lessees enter in to jointly operate an entire producing reservoir as a single entity without regard to individual lease boundaries, and allows the maximum recovery of production from the reservoir.  Unit agreements require BLM approval and the BLM must determine that the unit agreement is necessary or advisable in the public interest.  Unitized lands are considered to be one lease with a single operator.  See the discussion on pages G-12 - G-13.

## ALT02   Alternatives        General

Leases (existing and potential) could be consolidated in a way to preserve Roadless Areas, yet still allow for efficient exploration and development of oil and gas resources.

*Reviewer(s): 34, 252*

BLM_0048356

RESPONSE: See the response to Comment #: ALT01 and the discussion on unitization on pages G-12 - G13.

## ALT03  Alternatives       General

The amount of land proposed for leasing is many times greater than that needed to satisfy the projected demand.

*Reviewer(s): 14*

RESPONSE: That is correct.

## ALT101  Alternatives       Alternative 1

Alternative 1 - No Action is unacceptable.

*Reviewer(s): 43*

RESPONSE: The Forest Service appreciates your comments.

## ALT201  Alternatives       Alternative 2

We favor Alternative 2 - Preferred.

*Reviewer(s): 1, 164, 165, 226, 231, 239, 257*

RESPONSE: The Forest Service appreciates your comments.

## ALT202  Alternatives       Alternative 2

The existing leases (leased under *SLT*) make the restrictions imposed in the preferred alternative meaningless.

*Reviewer(s): 8, 91, 247*

RESPONSE: Existing leases cover less than 1/4 of the analysis area. The existing leases are contracts between the lessee and the government. As such the contracts may not be unilaterally changed. However, negotiation with the lessee could occur and the concerns and/or restrictions identified in this document may be agreed upon. Approximately half of the existing leases are expected to expire during the life of this document. At expiration, the lands if they are to be re-leased would be subject to the stipulations identified in this document.

## ALT203  Alternatives       Alternative 2

Alternative 2 offers little protection to Roadless Areas.

*Reviewer(s): 40, 46, 47, 94, 105, 225, 234*

RESPONSE: In the DEIS, Alternative 2 provided *No Lease* protection to the Kannah Creek, Tabeguache and Roubideau Roadless Areas. Public comment and further review has resulted in the Whetstone Mountain Roadless Area and parts of the Priest Mountain, Raggeds, West Elk and Flat Top Mountain Roadless Areas being added to the list of *No Lease* Roadless Areas. Additionally, the Battlement Mesa Roadless Area is stipulated *No Surface Occupancy* to protect it's roadless character. Other resource values within Roadless Areas, such as Slopes > 60%, Floodplains, Aquatic/Riparian/Wetland Habitats, Alpine/Tundra, High Geologic Hazard Areas, and Wildlife Special Habitats are protected by the stipulations specified in Table II-5. However, it should be noted that several of these Roadless Areas are currently leased and may be subject to oil and gas exploration and development in accordance with the lease rights granted to the lessee.

BLM_0048357

**ALT204   Alternatives       Alternative 2**

Rewrite Alternative 2 to protect identified areas (primarily Roadless Areas and scenic corridors) of concern.

*Reviewer(s): 183*

RESPONSE:  Alternative 2 has been revised.  See Chapter II and the response to Comment #: ALT203.  The Kebler Pass corridor is now *No Lease*, as well as several other Roadless Areas.

**ALT205   Alternatives       Alternative 2**

Alternative 2 violates the Forest Service multiple use mandate by making vast areas off limits or available under restrictions for oil and gas development.

*Reviewer(s): 126, 178*

RESPONSE:  The Forest Service oil and gas regulations were created to assure that oil and gas production on NFS lands continues, but only in an environmentally sound manner.  We feel, based on our and other agency and public knowledge of the surface resources of the Forest, that in some areas other resource values (surface) are more important than the oil and gas resource values.

**ALT206   Alternatives       Alternative 2**

The Forest Service claim that Alternative 2 provides the greatest resource protection (on page S-19) is not justified due to impacts that will occur in Roadless Areas.

*Reviewer(s): 225, 252*

RESPONSE:  The sentence has been revised to more clearly reflect the Forest Service mission. See also response to Comment #:  ALT205.  (See page S-30.)

**ALT207   Alternatives       Alternative 2**

*CSU* would provide more protection to Roadless Areas while still allowing oil and gas activity and should be applied to these areas under Alternative 2.

*Reviewer(s): 78*

RESPONSE: Allowing oil and gas activity within a Roadless Area would result in some degradation of roadless values.  *No Surface Occupancy*, *Controlled Surface Use* and *Timing Limitations* have been applied to other resource values within the analysis area, on Slopes > 60% in Roadless Areas, a *NSO* stipulation would be attached to the lease.

**ALT208   Alternatives       Alternative 2**

The preferred alternative is flawed because it opens up most of the Forest to *Standard Lease Terms*.

*Reviewer(s): 185*

RESPONSE:  Under Alternative 2, only 13% of the analysis area is available with *Standard Lease Terms* only.  See Table II-6 on page II-11.

**ALT301   Alternatives       Alternative 3**

We favor Alternative 3 - No Lease.

*Reviewer(s): 8, 11, 12, 13, 21, 26, 33, 42, 49, 51, 54, 56, 57, 59, 63, 68, 75, 86, 89, 91, 98, 101, 105, 106, 107, 111, 112, 114, 121, 123, 124, 127, 130, 132, 138, 141, 153, 160, 161, 171, 176, 182, 185, 186, 191, 193, 197, 198, 199, 207, 209, 210, 212, 217, 218, 224, 225, 253, 258, 259, 260*

BLM_0048358

RESPONSE:  The Forest Service appreciates your comments.

**ALT302  Alternatives      Alternative 3**

Alternative 3 - No Lease, is not banning oil and gas exploration permanently but is holding these resources for a later date.

*Reviewer(s): 63, 225*

RESPONSE:  At a later date those areas of *No Lease* could be re-allocated for leasing (provided they have not been formally withdrawn from mineral leasing).  Re-allocation would require an amendment to the Forest Plan and associated environmental documentation.

**ALT303  Alternatives      Alternative 3**

Because of the number of existing leases it is not necessary to make any more available, especially with such minimal development being proposed.

*Reviewer(s): , 34, 35, 49, 64, 66, 68, 86, 94, 96, 105, 123, 124, 160, 189, 197, 212, 252, 259*

RESPONSE:  Forest Service policy is to encourage and facilitate the orderly exploration, development and production of mineral and energy resources.  The existence of leases does not guarantee the presence of oil and gas resources or oil and gas development.  See also pages I-2 and I-3.

**ALT304  Alternatives      Alternative 3**

Alternative 3 is unjustified because it is inconsistent with Forest Service policy to impose the "least restrictive" measures that will adequately protect resource values.

*Reviewer(s): 237*

RESPONSE:  Thank you for your comments.  See also the response to Comment #:  ALT401.

**ALT401  Alternatives      Alternative 4**

Alternative 4 provides sufficient management authority over surface operations (under *Standard Lease Terms*) to adequately protect resource values in areas listed as *NL* or *NSO* in Alternative 2.

*Reviewer(s): 126, 237*

RESPONSE:  The Forest Service does not agree.  We feel additional management authority is needed to protect the resource values (*Affected Environments*) described in the EIS.

**ALT402  Alternatives      Alternative 4**

We favor Alternative 4 - Standard Lease Terms everywhere.

*Reviewer(s): 237*

RESPONSE:  Thank you for your comments.

**ALT403  Alternatives      Alternative 4**

With the low amount of predicted surface disturbance, Alternative 4 should be adapted and the Forest Service should work closely with lessees to ensure proper environmental considerations are carried out.

*Reviewer(s): 126*

RESPONSES:  We feel that it is important for the lessee to know what surface protection measures will be required at the time of the lease.  It also lets the lessee know, up front, what surface resource

BLM_0048359

values are present in the leasehold. We intend to work closely with the lessees to ensure that our stipulations and mitigation measures are followed. Additional environmental considerations may also be identified at the time the operator submits an APD and SUPO for approval.

## ALT501   Alternatives      Alternative 5

We favor Alternative 5 - No Lease in Roadless Areas and Semi-primitive Non-motorized areas.

*Reviewer(s): 3, 4, 6, 10, 15, 18, 19, 22, 23, 30, 37, 38, 41, 46, 47, 53, 62, 65, 69, 77, 80, 82, 87, 90, 92, 96, 99, 102, 104, 109, 113, 117, 118, 120, 125, 128, 129, 133, 136, 137, 142, 143, 144, 146, 147, 148, 149, 150, 151, 158, 159, 162, 166, 169, 170, 172, 173, 174, 175, 179, 183, 188, 194, 195, 196, 201, 203, 204, 208, 213, 214, 215, 221, 222, 224, 228, 230, 234, 236, 240, 242, 243, 244, 245, 246, 248, 249, 255, 256, 263*

RESPONSE: The Forest Service appreciates your comments.

## ALT502   Alternatives      Alternative 5

There is no need to place all available land up for lease at this time.

*Reviewer(s): 22, 41, 63, 188*

RESPONSE: All available land on the Grand Mesa, Uncompahgre and Gunnison National Forests has not been put up for lease. Only about a third of the land available for leasing on the Forest was included in the analysis area for this EIS. On about 2 million acres of the Forest no decision will have been made regarding oil and gas leasing. Eighteen (18%) of the analysis area, including certain Roadless Areas and the Tabeguache Research Natural Area have been designated as *No Lease* and as such are not available for oil and gas leasing.

## ALT503   Alternatives      Alternative 5

Alternative 5 will protect Roadless Areas and still allows for oil and gas development in an environmentally safe manner.

*Reviewer(s): 5, 10, 15, 18, 23, 36, 37, 47, 62, 77, 82, 92, 113, 120, 128, 129, 130, 134, 149, 150, 158, 170, 175, 190, 195, 203, 215, 219, 240, 255*

RESPONSE: That is correct.

## ALT504   Alternatives      Alternative 5

Alternative 5 is meaningless because of the existing leases in Roadless Areas which guarantee oil and gas development.

*Reviewer(s): 237, 247*

RESPONSE: The presence of a lease does not guarantee development. The holder of a lease may or may not drill for oil and gas resources on his leasehold. The lease gives the lessee the exclusive rights to explore for oil and gas resources on the lease. Several of the Roadless Areas currently have no leases (see Table III-11), several have leases about to expire and several have leases that amount to less than 10% of the Roadless Area.

## CE01   Cumulative Effects

The DEIS does not address cumulative effects of oil and gas activities on existing leases well enough.

*Reviewer(s): 34, 78, 167, 232*

RESPONSE: The existing leases are not subject to the decisions that will be documented in the Record of Decision (ROD) for this EIS. The document does discuss the cumulative effects of the seven wells predicted to be drilled on new leases in addition to the 40 wells predicted to be drilled on existing

BLM 0048360

leases.  The effects of oil and gas activities on existing leases is discussed in the context of cumulative effects for each *Affected Environment*.  At this stage in the process, we do not know where or when activities will occur.  We have to rely on analysis assumptions to estimate the effects and the cumulative effects of oil and gas leasing.  The timing and location of post-leasing activity are key to cumulative effects analysis.  If activity is concentrated in both space and time, the potential for cumulative effects may be greater than if activity is spaced out both in time and location.

## CE02   Cumulative Effects

Page II-6 shows the total acres disturbed over the next 15 years is consistent in all but Alt. 3.  This cannot be accurate given activities in Roadless Areas will occur in previously undisturbed areas.

*Reviewer(s): 225*

RESPONSE:  The figures displayed in Table II-3 on page II-6 represent figures developed based on the analysis assumptions.  The assumptions are averages based on past activity on the Forest.  Activities outside Roadless Areas may also occur in previously undisturbed areas.

## CE03   Cumulative Effects

The document does not assess the environmental impacts correctly because the impacts from coal bed methane development proposed by the Dept. of Energy and the Trans-Colorado pipeline have not been considered.

*Reviewer(s): 14*

RESPONSE:  Discussion of the potential impacts of coal bed methane wells was included in the DEIS and has been improved in the final.  We are not aware of any coal bed methane wells proposed by the Department of Energy.  The effects of the Trans-Colorado are not specifically addressed in this document.  The Trans-Colorado pipeline EIS says it's construction is expected to stimulate construction of gathering pipelines to shut-in wells and additional drilling in the Piceance Basin.  What the indirect effects will be on the Forest is not known.  The Trans-Colorado pipeline passes through the Forest where oil and gas activity is projected to be light (the Uncompahgre Plateau).

## CE04   Cumulative Effects

Discussion of wetlands et al should note existing impacts and causes, planned restoration (if any), and any special protection required.  This information should be mapped and available at leasing stage.

*Reviewer(s): 78*

RESPONSE:  The Forest does not have an inventory of wetlands and their condition.  Location of wetlands and special protection will be identified when an operator submits an APD and Surface Use Plan of Operations for approval.  USGS quadrangle maps generally show the location of Wetlands (streams, lakes and swamps.)

## CE05   Cumulative Effects

The cumulative effects discussion inadequately addresses the issues of roads built in Roadless Areas for oil and gas activities making timber harvest more economically efficient.

*Reviewer(s): 185*

RESPONSE:  Within the Roadless Areas in the analysis area there is approximately 39,600 acres of timber that is unsuitable because of high road costs.  Of that, 12,100 acres are not available for oil and gas leasing (*No Lease*); 27,500 acres are in areas available for oil and gas leasing.  We do not know how much of that timber, if any, would become available for harvest as a result of roading by oil and gas activity.  Determination of timber suitability is beyond the scope of this document and would be

BLM_0048361

speculation at this point. The Forest Plan would have to be amended to add timber to the suited base. See also the response to Comment #: RD05.

**CE06   Cumulative Effects**

The potential impacts of oil and gas activities that could occur are excessive compared to the Federal revenues that will be generated.

*Reviewer(s): 185*

RESPONSE: Forest Service policy is to "encourage and facilitate the orderly exploration, development and production of mineral and energy resources" in an environmentally sound manner. The use of special stipulations, discretionary *No Lease*, and the application of mitigation measures in Appendix H will ensure that the impacts of oil and gas activity will be minimized while ensuring a return to Federal, State and local economies.

**CE07   Cumulative Effects**

The cumulative effects discussion relative to water quality must be expanded to include effects of probable timber sales.

*Reviewer(s): 185*

RESPONSE: Cumulative effects on water quality from potential future timber sales are discussed on pages IV-48 and IV-64.

**GS01   Geodetic Survey**

All oil and gas projects need to be reviewed to determine if any Coast and Geodetic Survey locations will be impacted. The C&DS requires no less than 90 days notification prior to the activity to plan for site relocation.

*Reviewer(s): 50*

RESPONSE: Projects will be reviewed for C&DS locations at the time an operator submits an Application for Permit to Drill (APD) and Surface Use Plan of Operations for approval. Avoidance should be relatively easy to accomplish.

**GS02   Geodetic Survey**

Funding for oil and gas projects should include cost for any required monument relocation.

*Reviewer(s): 50*

RESPONSE: If relocation is required, the cost of the relocation will be borne by the lessee or operator.

**MAP01   Maps**

A map showing National Park System units needs to be included in the FEIS.

*Reviewer(s): 242*

RESPONSE: A map showing NPS units has been included in the FEIS as Figure III-28.

**MAP02   Maps**

The Alternative stipulation maps need to differentiate between *Standard Lease Terms* (in white) and areas outside the analysis area (also in white).

*Reviewer(s): 242*

BLM_0048362

RESPONSE: The maps have been changed to make the distinction you have noted. *Standard Lease Terms* are not displayed in yellow. Areas shown in white are outside the analysis area.

## MAP03   Maps

Apparent differences between Table S-2 Display of Alternatives and Figure II-2 Lease Options for Alternative 2 need to be explained.

*Reviewer(s): 47*

RESPONSE: Where *Affected Environments* overlap, the most restrictive lease option applies. For example, where Concentrated Summer Use (*NSO*) occurs in a Roadless Area that would otherwise be *Standard Lease Terms, NSO* is the lease option that would apply, and that is shown on the map. The maps were included to give the reader a general idea of the amount and distribution of the lease options throughout the analysis area. Please refer to the 1/2" = 1 mile scale stipulation map included in the map pocket in the back of the document.

## MAP04   Maps

Figure III-8A does not list Area 189 (Hightower) in the legend and Battlement Mesa is mislabled as 183.

*Reviewer(s): 164*

RESPONSE: These corrections have been made. Thank you for pointing them out.

## MAP05   Maps

Page III-1, no where is there a map showing where the moderate vs. high potential oil and gas opportunities exist.

*Reviewer(s): 185*

RESPONSE: The potential for oil and gas resources is displayed on Figure III-2, on page III-109, and on Figure 3 in Appendix E on page E-11.

## NP01   NEPA

Public feels involvement has no effect on Forest Service management.

*Reviewer(s): 7, 39, 52, 253*

RESPONSE: Numerous changes were made to the EIS based on public feedback and comment.

## NP02   NEPA

Thank you for opportunity to comment.

*Reviewer(s): 1, 12, 21, 44, 45, 46, 62, 85, 91, 105, 113, 117, 119, 129, 142, 152, 164, 183, 196, 234, 256, 259*

RESPONSE: The Forest Service believes that public involvement is necessary for balanced and informed decision making.

## NP03   NEPA

Current scoping process is dishonest and does not get true input from the general public.

*Reviewer(s): 39, 200*

RESPONSE: The issues that the public raised have been addressed in the EIS. Many of the general public never visit National Forest System lands so they typically are unaware of forest

BLM_0048363

management issues. The Forest Service issues news releases to local newspapers in an effort to get information about Forest Planning issues to the public. The comments we have received indicate there is no consensus about oil and gas leasing.

## NP04   NEPA

How will public input be addressed and evaluated? The FS must address the concerns of the citizens of the western slope before a Final EIS can be released.

*Reviewer(s): 39, 252*

RESPONSE: Each letter has been read and evaluated for comments. Comments are categorized and responses are written. If the DEIS appears deficient as suggested by public input, the FEIS will reflect the changes. At the beginning of the Summary and Chapter I is a section describing the changes made between the Draft and Final EIS.

## NP05   NEPA

Crested Butte should have been included in the scoping process prior to preparing the DEIS and during the comment period for the DEIS.

*Reviewer(s): 8, 123, 210, 258*

RESPONSE: The Forest Service agrees, a scoping meeting should have been held in Crested Butte. The oversight was corrected in a meeting held on September 24, 1992, which was held in time for formal public comment to be received within the comment period.

## NP06   NEPA

Residents and businesses in Crested Butte experience both the environmental and economic impacts of Forest Service decisions virtually immediately, making them uniquely qualified to evaluate the value-related tradeoffs involved.

*Reviewer(s): 42, 207*

RESPONSE: The Forest Service appreciates the comments we have received from Crested Butte. As a result of the comments we received, Alternative 2, the preferred alternative has been modified: That part of the analysis area in the immediate vicinity of Crested Butte (Kebler Pass and the Whetstone Mountain area) is no longer available for oil and gas leasing.

## NP07   NEPA

The Forest Service willfully mislead the public with a low RFD prediction.

*Reviewer(s): 25, 26, 119, 252*

RESPONSE: The RFD is the best information we have. It was developed by a BLM staff specialist with 16 years experience in oil and gas, in industry and with the government. He has done the majority of the RFD's for Forest Service oil and gas leasing EIS's in Colorado. A geologist in the Forest Service's Washington Office, who independently reviewed the RFD, felt the projections were somewhat high, but reasonable.

## NP08   NEPA

The Forest Service should start over with a new RFD and new alternatives.

*Reviewer(s): 9, 65, 119, 135, 154*

RESPONSE: See response to Comment #: NP07.

BLM_0048364

## NP09   NEPA

We agree with the analysis area excluding low and no (known) potential areas where industry has shown no interest.

*Reviewer(s): 46*

RESPONSE: Thank you for your comment.

## NP10   NEPA

The DEIS is flawed because the "d" (administratively available) and "e" (leasing) decisions are treated as one decision which is very confusing. The document only addresses the "d" decision.

*Reviewer(s): 46*

RESPONSE: The lands administratively available will also be authorized for leasing by the BLM, unless otherwise stated in the ROD.

## NP11   NEPA

Making the "e" (leasing) decision for specific lands with no site-specific impact analysis is a violation of Forest Service regulation which specify this decision will be made when specific lands are being considered for leasing.

*Reviewer(s): 46*

RESPONSE: The *Affected Environments* discussions throughout the document are the site specific impact analyses. The site-specificity of the *Affected Environment* discussions is adequate to make the leasing decisions. Additional locality specific analysis will be done when an operator submits and APD and SUPO for approval.

Analyses respecting the availability and specific lands decisions are combined in the EIS. The Forest Service has no information about specific well hole locations or other ground disturbing activities at the time of either decision, whether they are made together or separately in environmental analyses. The level of resource information known about the lands being analyzed is the same for both decisions. Both decisions are made considering the location and development that has occurred on existing leases.

The primary difference between the two decisions is that a proposed boundary is known when monitoring the specific lands decisions for a proposed lease parcel. At neither time is a specific well site identified.

The specific lands decision required by 36 CFR 228.102(e), is not implemented until the Forest Service has reviewed the land parcel being considered for lease and validated the decision prior to authorizing the BLM to offer the lease tracts. Although the Forest Supervisor's decision commits Federal resources to an offering through lease advertisement, a specific lease parcel is not actually offered and issued until it has been determined that the information disclosed in the FEIS is accurate for a proposed parcel, and that the required stipulations are applied.

## NP12   NEPA

The Final EIS must either include additional site-specific analysis and make separate "d" and "e" decisions, or call the existing DEIS the "d" decision and state that the "e" decision will be made in future NEPA documents.

*Reviewer(s): 46*

Response to Comments

BLM_0048365

RESPONSE: The "d" and "e" decisions will be made in the ROD to the FEIS; and unless otherwise stated in the ROD, the lands available for leasing will also be authorized for leasing. See also the response to Comment #: NP11.

## NP13   NEPA

The FEIS and ROD for this leasing analysis should state what will happen if oil and gas activity on the Forest exceeds the levels outlined in the RFD scenario.

*Reviewer(s): 46*

RESPONSE: On a well by well basis the impacts would be similar (based on the analysis assumptions). Cumulatively the impacts may be greater depending on the location of the activity, the amount of activity in any one area, and the environments affected. These impacts would be addressed at the review state to verify if an area should be leased based on this leasing analysis (EIS), and when additional NEPA is done for the APD and SUPO.

## NP14   NEPA

Forest fragmentation, altered biodiversity and loss of roadless and undeveloped areas should be added to the list of irreversible commitment of resources.

*Reviewer(s): 47, 111*

RESPONSE: Irreversible (Forest Service Handbook 1909.15) is a term that describes the loss of future options. It applies primarily to the effects of use of nonrenewable resources, such as minerals or cultural resources, or to those factors such as soil productivity, that are renewable only over long periods of time. Forest fragmentation, altered biodiversity and the loss of roadless and undeveloped areas do not fall within the definition of irreversible. However, these could be considered irretrievable commitments of resources. Cumulative effects of oil and gas activity combined with potential timber harvest would have some impact on the resources discussed. Further discussion has been added to the FEIS. See page IV-87.

## NP15   NEPA

Industry commends the analysis combining the available ("d") and specific lands ("e") decisions into one document.

*Reviewer(s): 237*

RESPONSE: Thank you for your comments.

## NP16   NEPA

The Forest Service should guarantee that development and activity assumptions presented in the document are not exceeded.

*Reviewer(s): 225*

RESPONSE: The assumptions presented in the document represent the best information we have on the amount of activity that is reasonably foreseeable over the next 15 years. The assumptions allow for analysis of the potential for impacts. Leases grant the lessee the right to explore for and develop the oil and gas resources on their lease. The Forest Service cannot deny operators the right to develop these resources. Should oil and gas activity exceed the anticipated levels, this will be considered prior to authorizing the BLM to offer more leases. Further NEPA may be required.

## NP17   NEPA

Due to the document length and content more time should be allowed for review and comment.

BLM_0048366

*Reviewer(s): 220, 252*

RESPONSE: The formal comment period ended October 13, 1992 (58 days). We also accepted comments beyond the end of the comment period.

### NP18   NEPA

The Final EIS should provide an inventory-type of resource summary from which subsequent site-specific analyses can be readily tiered.

*Reviewer(s): 78*

RESPONSE: It would be desirable to have inventories of all our resources. However, we do not have inventories of all resources and those we do have would be voluminous and generally beyond the needs of this EIS.

### NP19   NEPA

The Final EIS should provide a concise statement of purpose and need.

*Reviewer(s): 78*

RESPONSE: A paragraph has been added. See page I-1.

### NP20   NEPA

The DEIS does not meet NEPA requirements as there is no comparison of economic cost and benefits, and PNV's (present net value), by alternative.

*Reviewer(s): 185*

RESPONSE: The NEPA regulations (40 CFR 1502.23) state "the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost/benefit analysis and should not be when there are important qualitative considerations". The environmental effects of the alternatives outweigh the economic considerations.

### NP21   NEPA

The reader feels that site-specific analysis should occur in the EIS and not wait until project level NEPA (EA) is done.

*Reviewer(s): 185*

RESPONSE: The discussion of the effects on *Affected Environments* is the site-specific analysis contained in the EIS. Further, more locality specific analysis will be done when there is a proposal for ground disturbing activity (APD-SUPO stage). The NEPA documentation at the time may be an EA or an EIS, depending on the scope of the activity proposed and the resources that may be impacted.

### OG01   Oil & Gas

Drilling and production can be accomplished with little or no permanent environmental impacts.

*Reviewer(s): 20, 226*

RESPONSE: It is generally true that drilling and production can be accomplished without long-lasting environmental impacts. The environmental impacts that potentially could occur depend on site-specific conditions such as soil productivity, rainfall, vegetation, topography, etc. Some sites may be more easily reclaimed than other sites.

BLM_0048367

## OG02    Oil & Gas

Oil and gas leasing should be allowed as a multiple use of National Forest land.

*Reviewer(s): 20, 165, 229*

RESPONSE:  The Forest Service agrees that oil and gas leasing and production is a valid use of the National Forest System lands.  We recognize that a component of the nation's energy supplies must come from the public resources on National Forests and rangeland, and also recognize the mandate to conserve the environmental quality of these regions.

## OG03    Oil & Gas

There should be a profit for the lessor (U.S. government) resulting from a lease.

*Reviewer(s): 165*

RESPONSE:  The Federal government receives minimum bid and rental payments from the lessee. Rental payments are required even if there is no oil and gas activity on the leasehold.  If production occurs, the Federal government receives royalties amounting to 12 1/2 percent of the value of the production.  Half of the monies received by the Federal government is distributed to the State.

## OG04    Oil & Gas

Oil and gas leasing and development should not be allowed on National Forest System land.

*Reviewer(s): 17, 33, 42, 72, 84, 93, 97, 100, 105, 114, 140, 145, 156, 157, 171, 180, 202, 216, 229, 236*

RESPONSE:  Oil and gas leasing and development is a valid use of the National Forest System lands.  See the Forest Service minerals management policy displayed on pages I-2 and I-3, as well as the response to Comment #:  OG02.

## OG05    Oil & Gas

National Defense is no longer a viable reason for developing a non-renewable resource.

*Reviewer(s): 180, 199*

RESPONSE:  This country is dependent on foreign sources for a majority of its oil and gas needs. If foreign sources become unavailable because of world events, the national defense may well be at risk, as well as all the economies dependent on oil and gas resources.

## OG06    Oil & Gas

Will operators be responsible and held accountable for site cleanup?

*Reviewer(s): 41, 43, 225, 256*

RESPONSE:  Operators are responsible for site cleanup and reclamation.  They are required to have a bond in the amount that would accomplish site cleanup and reclamation.  The Forest Service, at any time, may review the operator's bond amount and increase the amount as necessary to cover the costs for reclamation.

## OG07    Oil & Gas

Will Forest Service personnel be on-site during drilling, cleanup and reclamation?

*Reviewer(s): 41, 43, 154*

BLM_0048368

RESPONSE: Yes. Forest Service personnel will monitor all phases of the activity to ensure compliance with the Surface Use Plan of Operations. If in the conduct of operations unanticipated environmental effects occur, additional mitigation will be applied.

## OG08   Oil & Gas

Areas disturbed by oil and gas activities cannot be restored to predisturbance states.

*Reviewer(s): 17, 41, 59, 108, 111, 155, 184, 225*

RESPONSE: At the cessation of oil and gas activity, lands disturbed will be reclaimed for other uses. Reclamation may not achieve a predisturbance state in all instances, immediately. Over time, as vegetation is re-established on the site, it will approximate predisturbance states.

## OG09   Oil & Gas

The DEIS does not address the acres that will be disturbed for pipelines.

*Reviewer(s): 82, 85*

RESPONSE: In most cases, pipelines will occupy the same corridor as the road system. Disturbance resulting from pipelines is addressed on page II-4 of the FEIS. Forest experience indicates, that on average, approximately 0.2 miles of pipeline corridor outside the road corridor is required, per well. This results in an additional 0.9 acres of disturbance, per well.

## OG10   Oil & Gas

As a trade off (mitigation?) for oil and gas development, additional disturbed areas should be restored to original natural states, over and above reclaiming sites disturbed by oil and gas activities.

*Reviewer(s): 45, 85, 198*

RESPONSE: If the environmental document for the APD-SUPO specified certain mitigation measures to be completed prior to further ground disturbance in an area, to protect watershed values (for example), and as long as those requirements did not interfere with the lease rights of the lessee, it could be specified as a Condition of Approval.

## OG11   Oil & Gas

We need an energy conservation policy that calls for less consumption of fossil fuels and the development of alternative energy resources.

*Reviewer(s): 13, 28, 30, 42, 54, 59, 60, 61, 72, 74, 75, 93, 116, 124, 124, 129, 137, 147, 157, 199, 212, 225, 238, 248, 254, 258*

RESPONSE: This is beyond the scope of this document.

## OG12   Oil & Gas

Oil and gas leasing should not occur except in the case of a national emergency.

*Reviewer(s): 163*

RESPONSE: See Forest Service Minerals Management Policy, pages I-2 and I-3.

## OG13   Oil & Gas

Do not lease undeveloped land.

*Reviewer(s): 6, 19, 47, 48, 55, 75, 90, 147, 149, 177, 193, 194, 213, 214, 246, 263*

RESPONSE: The Forest Service appreciates your comments.

BLM_0048369

### OG14   Oil & Gas

Further energy development is a threat to our way of life in many ways.

*Reviewer(s): 76, 137*

RESPONSE: Beyond the scope of this analysis.

### OG15   Oil & Gas

No more oil and gas leases should be created on the Forest.

*Reviewer(s): 86, 116, 207, 217, 233, 254*

RESPONSE: The Forest Service appreciates you comments. See also response to Comment #: ALT303.

### OG16   Oil & Gas

Use of public lands for private gain does not serve the public good.

*Reviewer(s): 21, 32, 80, 115, 222, 223*

RESPONSE: The public not only receives revenues from the use of National Forest System lands (timber, grazing, skiing, camping, outfitter guides, oil and gas leasing, etc.), but generally receives access, recreational facilities, natural resources (raw materials such as wood fiber, oil and gas, minerals) and food. Without the use of public lands for private gain, much of the Forest would be inaccessible for recreational use.

### OG17   Oil & Gas

Do not allow additional oil and gas leasing to encourage development of other energy sources.

*Reviewer(s): 73, 86, 87, 112, 210, 223*

RESPONSE: The Forest Service appreciates your comments.

### OG18   Oil & Gas

Do not renew or allow any new oil and gas leasing in the Clear Fork/Muddy Basin area.

*Reviewer(s): 39, 200*

RESPONSE: Many of the leases in this area are presently held by production and are not likely to expire in the foreseeable future.

### OG20   Oil & Gas

No leases should sell at below market rate.

*Reviewer(s): 152*

RESPONSE: All lands available for leasing are offered for competitive bidding. No evaluation of the worth of the parcel is made by the BLM or the Forest Service. Market forces are the sole determinant of value. If no one bids on the parcel on the day of the sale, the parcel is available over the counter the first business day after the sale for minimum rates.

### OG21   Oil & Gas

What would the environmental impacts be from a catastrophe like the Exxon Valdez?

*Reviewer(s): 132*

BLM_0048370

RESPONSE:  Beyond the scope of this analysis.  Most of the petroleum resource on the Forest is natural gas.

## OG22    Oil & Gas

There is concern that areas opened for oil and gas development would be closed to the general public.

*Reviewer(s): 11, 87, 118*

RESPONSE:  Depending on the management prescription of an area, the resource concerns of the area, and the long term needs for the road, most roads built to access oil and gas resources would be closed to public use by motorized vehicles.  Access by non-motorized means would be allowed.

## OG23    Oil & Gas

With the current depressed oil and gas market operators would be able to acquire and hold leases at rock bottom prices, giving them undue competitive advantage over areas where gas is waiting to be put into production.

*Reviewer(s): 161, 185*

RESPONSE:  See response to Comment #: OG20.

## OG24    Oil & Gas

The use of "no potential" is questioned because changing technology is identifying areas with potential that were previously thought to have none.

*Reviewer(s): 1*

RESPONSE:  You are correct.  It is more appropriate to use the term "no known potential".  The document has been changed to reflect the distinction.

## OG25    Oil & Gas

The area of moderate potential on Grand Mesa should be high potential like the surrounding area.

*Reviewer(s): 237*

RESPONSE:  The potential for hydrocarbon occurrence in the area shown as moderate potential on Grand Mesa should be similar to it's surrounding area (high).  As you suggest the sedimentary section below Grand Mesa's basalt cap is the same as the rest of the area.  The potential for oil and gas activity is moderate, since the basalt cap would need to be penetrated.

## OG26    Oil & Gas

Industry experience has shown a typical well disturbs only 1-2 acres.

*Reviewer(s): 237*

RESPONSE:  The well pad when reclaimed (assuming production) is typically 1-2 acres in size.  Experience on this Forest shows that a typical well pad, road construction and reconstruction, and pipeline disturbs almost 11 acres (see Analysis Assumptions pages II-3 and II-4).

## OG28    Oil & Gas

Recommendations in the DEIS will discourage oil and gas development on NFS lands causing energy companies to shift capital overseas and threaten our national security by increasing dependence on foreign oil.

BLM_0048371

*Reviewer(s): 237*

RESPONSE:  Global economics influences oil and gas development on NFS lands.  When the price of oil and gas increase to the point where development on NFS lands is profitable, more development will likely occur.  Forest Service oil and gas regulations were written to assure that oil and gas production continues on NFS lands, but only in an environmentally sound manner.  The environmental constraints identified in the DEIS and changes made as a result of public comments will likely result in more expensive drilling, or in some cases will preclude drilling.

## OG29   Oil & Gas

Priority should be given to leases along existing roads and in areas where impacts will be reduced.

*Reviewer(s): 45, 183, 192*

RESPONSE:  The Forest Service will act on all lease requests in the same manner.  There is no mechanism to prioritize lease requests once the leasing decision has been made.

## OG30   Oil & Gas

All lessees should be made aware of all wildlife concerns at time of leasing and should be required to formally commit to wildlife mitigation as part of the lease.

*Reviewer(s): 45*

RESPONSE:  At the time of leasing, potential lessees will be made aware of stipulations that will be attached to the lease.  The lessees will be required to abide by the terms of the lease and the stipulations attached to the lease.  Depending on the location of the lease parcel, the stipulations may or may not include wildlife mitigation measures.

## OG31   Oil & Gas

Development should be geographically staggered when possible so that buffer areas exist between construction sites.

*Reviewer(s): 45*

RESPONSE:  That may be a desirable way to mitigate some types of impacts; however, there can be no assurance that this goal could be accomplished due to existing leases and the rights granted by the lease allowing the lessee to explore and develop the oil and gas resources on the lease parcel.

## OG32   Oil & Gas

The document needs to specifically describe what higher costs would be realized by industry under more restrictive alternatives.

*Reviewer(s): 41*

RESPONSE:  The more restrictive alternatives would result in higher costs to industry for road construction, design, geotechnical studies, and special construction techniques.  The higher road standards result in higher costs for such items as road surfacing (in lieu of native surface roads), bridges (in lieu of culverts), closed systems instead of open reserve pits, alternative access routes, and reclamation requirements.  Directional drilling takes longer and is riskier - may miss the target. Industry has generally recognized the fact that it may cost them more to operate on National Forest System lands and to provide environmental protection in the forest than in other areas.

## OG33   Oil & Gas

The document should display which leases are held by production and when leases will expire.

BLM_0048372

*Reviewer(s): 252*

RESPONSE: That information is displayed in tabular form.  See Appendix L.

## OG34    Oil & Gas
The document should discuss how unitization occurs and how it effects the Forest.

*Reviewer(s): 252*

RESPONSE:  Unitization is discussed on page G-13.

## OG35    Oil & Gas
What will be the rate and density of oil and gas development?

*Reviewer(s): 185*

RESPONSE:  At this time, there is no way to know what the rate and density of oil and gas development will be on the Forest.  The best information we have on the activity is the Reasonably Foreseeable Development scenario.  It projects 47 wells drilled in the next 15 years; 40 of which will be drilled on existing leases.  Appendix G describes typical oil and gas activities.  Well density varies based on the geology and the nature of the recovery of the petroleum resource.

## OGCBM1   Oil & Gas        Coal Bed Methane
The RFD does not address coal bed methane development that could occur.

*Reviewer(s): , 34, 46, 65, 119, 133, 135, 167, 232, 247*

RESPONSE:  The RFD does not predict any coal bed methane wells.  The impetus for previous coal bed methane development was tax incentives for unconventional fuel in the Crude Oil Windfall Profits Tax Act of 1980.  This tax incentive expired at the end of 1992 and has not been extended.  No additional coal bed methane wells are anticipated on this Forest.  Coal bed methane reserves are present under the analysis area.  Four coal bed methane wells have been drilled on the Forest, none of which are producing.  Additional discussion of coal bed methane has been added to the RFD, see page E-4.

## OGCBM2   Oil & Gas        Coal Bed Methane
The DEIS does not address the salt water pollution that will occur with CBM development.

*Reviewer(s): 9, 14, , 133, 154, 167, 171, 247*

RESPONSE:  See page IV-46. Additional discussion of potential water disposal impacts associated with coal bed methane production has been added to the document.  Conditions of Approval (Appendix H) relating to coal bed methane production have also been added to the document, and will be applied to the APD to mitigate impacts.  See response to Comment #:  AEMW02, also.

## OGCBM3   Oil & Gas        Coal Bed Methane
The RFD failed to consider the Department of Energy's plans to push the development of coal bed methane.

*Reviewer(s): 14, 247*

RESPONSE:  The Forest Service and BLM are not aware of any Department of Energy plans to push the development of coal bed methane.

## OGCBM4   Oil & Gas        Coal Bed Methane
The RFD failed to consider the large tax incentives for the development of coal bed methane.

BLM_0048373

*Reviewer(s): 247*

RESPONSE: The tax incentives were considered - see page E-5, item #6. Existing tax incentives expired at the end of 1992. Extensions to the tax incentives were attached to the recent tax bill but it was not passed by Congress. No further tax incentives are pending.

## OGCBM5   Oil & Gas      Coal Bed Methane

The document does not address the fact that re-injection technology for waste water has resulted in failures at other locations.

*Reviewer(s): 14, 247*

RESPONSE: The Forest Service is not aware of any failures related to waste water re-injection wells. In the San Juan Basin, methane contamination of domestic water wells has been blamed on coal bed methane waste water injection wells. However, methane contamination has been known to occur in water wells in this area since the late 1800's (Oldaker, 1991). The San Juan Basin is underlain by one of the largest gas fields in the country. Methane migrates to the surface through natural fractures in the geologic strata. Gas may also enter shallow aquifers through old oil and gas wells on private land, which were not properly cased or where casing integrity has deteriorated. Testing has shown some of the methane contamination to be biogenic (biological in nature, from vegetative decomposition and/or anaerobic bacterial contamination), rather than thermogenic (hydrocarbon in nature). Domestic water wells in this area do not extend below 200 feet. Waste water is injected below 5000 feet. Interlying impermeable strata does not allow these aquifers to mix.

Disposal wells must meet stringent requirements (see response to Comment #: OGCBM2) before waste water can be injected.

## OGCBM6   Oil & Gas      Coal Bed Methane

Coal bed methane wells have greater impacts than conventional wells and should not be grouped when considering the cumulative effects of each.

*Reviewer(s): 46, 252*

RESPONSE: The effects of coal bed methane wells are similar to conventional wells. The coal bed methane wells drilled on the Forest resulted in no greater impacts than the conventional wells drilled on the Forest.

## OGCBM7   Oil & Gas      Coal Bed Methane

The process of leasing vast amounts of public land without first solving the problem of disposing of the salt that can potentially be generated cannot be allowed to happen.

*Reviewer(s): 14*

RESPONSE: Past conventional oil and gas and coal bed methane drilling on the Forest did not produce vast quantities of salt. Salt bearing water from coal bed methane wells on the Paonia Ranger District was trucked to an approved disposal site at Black Mountain, near Collbran.

## OGCBM8   Oil & Gas      Coal Bed Methane

What is the pH (quality) of waste water being pumped out of coal bed methane formations? How is waste water presently being stored and disposed of? How many gallons per day? Per well?

*Reviewer(s): 96, 252*

RESPONSE: Produced (waste) water from the coal bed methane wells on the Forest was slightly alkaline with the pH ranging from 7.17 to 8.17. The Forest does not have any records of the volume of

BLM_0048374

produced water from the coal bed methane wells drilled on the Forest. The conventional wells produce variable amounts of water, with one well producing almost 2,000 barrels of water in FY92. Most producing wells produced less than 150 barrels of water in FY92. coal bed methane wells on the White River National Forest produce 550 barrels/day/well (Divide Creek EIS). The water is stored on-site in large tanks until there is enough water to fill a truck. The waste water produced from the past coal bed methane wells was trucked to Black Mountain for disposal by evaporation.

**OGM01   Oil & Gas        Mitigation**

What State/local/Federal regulations govern use and protection of surface and groundwater? How will activities be coordinated between FS and other agencies?

*Reviewer(s): 78, 96, 225*

RESPONSE: On the National Forest, the Forest Service regulates surface disturbing activities. The technical aspects of drilling are regulated by the BLM. In case of emergency, the Forest Service can assume responsibility for drilling activity. The State Health Department regulates water quality under the Clean Water Act. See also Appendix L for a list of required permits for oil and gas operations.

**OGM02   Oil & Gas        Mitigation**

Does the mitigation plan call for sounder and better well capping to prevent methane from migrating uphole to drinking water aquifers?

*Reviewer(s): 96*

RESPONSE: Well capping procedures currently used by industry are adequate to prevent contamination of drinking water aquifers.

**OGM03   Oil & Gas        Mitigation**

What is the funding mechanism for mitigation by the Forest Service and the oil companies?

*Reviewer(s): 96, 225*

RESPONSE: The oil companies are responsible to pay for the mitigation measures specified in the approval of the APD and the SUPO.

**OGM04   Oil & Gas        Mitigation**

The FEIS Appendix H - Mitigation needs to clarify that the Abandonment and Rehabilitation Plan will be approved as part of the Surface Use Plan of Operations.

*Reviewer(s): 78*

RESPONSE: See page H-22.

**OGM05   Oil & Gas        Mitigation**

Appendix H - Mitigation needs to specify what materials/fluids are considered "waste water" and how they will be disposed of.

*Reviewer(s): 78*

RESPONSE: Waste water consists of the water produced in conjunction with oil and gas operations. Disposal methods are discussed in Appendix H. Onshore Oil and Gas Order No. 7 (draft) deals with the disposal of produced water.

BLM_0048375

**OGM06   Oil & Gas        Mitigation**

The FEIS Appendix H - Mitigation should note that pipeline trenches need to be constructed so they do not change the natural surface and groundwater flow regime.

*Reviewer(s): 78*

RESPONSE: This has been added. See Appendix H.

**OGM07   Oil & Gas        Mitigation**

Appendix H - Mitigation, page H-19, expand requirement that pads will not be constructed in riparian et al areas to include related features (pits, tanks, etc.). Change "should not" to "shall not" be constructed in these areas.

*Reviewer(s): 78*

RESPONSE: This has been added. See Appendix H.

**OGRF01   Oil & Gas        RFD**

The RFD underestimates the amount of oil and gas activity that could possibly occur in the analysis area. The RFD should be higher.

*Reviewer(s): 9, , 25, 26, 34, 65, 96, 119, 131, 135, 154, 167, 173, 178, 225, 232, 233, 247, 252*

RESPONSE: The RFD is intended to be a reasonable estimate of expected activity. It is based on trends. It is not an estimation of the maximum potential. The projection for the Grand Mesa, Uncompahgre and Gunnison National Forests use was developed by a BLM staff specialist with 16 years experience in oil and gas, in industry and with the government. See responses to Comments #: OGRF02 - OGRF12.

**OGRF02   Oil & Gas        RFD**

The RFD failed to consider the period from 1986-1990 was a slump for the oil and gas industry, due to confusion over deregulation and removal of price controls.

*Reviewer(s): 119, 178, 247*

RESPONSE: Statistics for the Forest (Figure 13, page E-22) and for the Forest Region (Figure 14, page E-23) show that there was not a major slump in and around the Forest during the 1986-1990 time period. There was a minor drop off in activity as compared to the early 1980's. The projection beyond 1990 is at a steeper slope than the 1986-1990 time period, i.e., more wells per year are predicted beyond 1990 than occurred in 1986-1990.

**OGRF03   Oil & Gas        RFD**

The RFD failed to consider the price of gas and the industry has picked up at a fast rate this summer.

*Reviewer(s): 25, 34, 46, 65, 119, 154, 247*

RESPONSE: The summer of 1992 gas price increase represents a departure from the long-term price trend. Exploration companies base their exploration programs on long-term projections and not short-term price "blips". Long-term price trends tend to level out any of the ups and down that occur in the volatile gas market as a result of natural disasters, political turmoil, etc.

**OGRF04   Oil & Gas        RFD**

The RFD failed to consider the Federal Energy bill now before the President will likely confer numerous incentives for oil and gas exploration, production and use, nationwide.

BLM_0048376

Oil and Gas Leasing Analysis FEIS

*Reviewer(s): , 46, 65, 119, 167, 247*

RESPONSE: The Forest Service and the BLM are unaware of any influences the Federal Energy Bill would have on the RFD. Prior to implementation of the Federal Energy Bill, agency implementing regulations would have to be written. This usually takes a few years. It is premature to guess what the impacts of the Federal Energy Bill would be on National Forest management and policy, let alone the number of wells that would likely be drilled on the Forest in the next 15 years.

## OGRF05   Oil & Gas        RFD
The RFD failed to consider the 1990 Clean Air Act which, when implemented gives further incentives for the use of gas as an alternative to oil and coal.

*Reviewer(s): 34, 46, 65, 119, 247*

RESPONSE: Beyond the scope of this analysis to predict.

## OGRF06   Oil & Gas        RFD
The RFD failed to consider efforts by major cities, counties and utilities to provide cleaner air which promote the use of gas for vehicle fleets and may foreshadow widespread use of gas to fuel transportation.

*Reviewer(s): 65, 119, 247*

RESPONSE: Liquified Petroleum Gas (LPG) use by fleets is not considered to have a significant impact on the demand for gas, mainly due to the expense of fleet conversion, the price of gas and the low price of gasoline.

## OGRF07   Oil & Gas        RFD
The RFD failed to consider predictions by major utility organizations that gas-fired power plants will comprise about 1/2 of the new power plants built in the next decade, due to increased efficiency and reduced $CO_2$ output.

*Reviewer(s): 9, 46, 65, 119, 247*

RESPONSE: New gas fired power plants are being proposed in areas that are currently producing gas. It is unlikely the volume of new power plants built in the next 15 years would be large enough to significantly affect the demand for gas from the Grand Mesa, Uncompahgre and Gunnison National Forests.

## OGRF08   Oil & Gas        RFD
The RFD failed to consider the approval of the Trans-Colorado pipeline which if built will create new markets for gas.

*Reviewer(s): 9, 14, , 34, 46, 65, 119, 154, 167, 178, 247*

RESPONSE: The Trans-Colorado pipeline will not create new markets. It is being built for anticipated markets. Demand is built into the forecast by the Gas Research Institute and other utilities, which is reflected in the RFD.

## OGRF09   Oil & Gas        RFD
Did the RFD consider the volume and value of Proven, Probable & Possible Oil and Gas reserves under the analysis area?

*Reviewer(s): 178*

BLM_0048377

RESPONSE: The volume and value of Proven, Probable and Possible resources is beyond the scope of an activity forecast (RFD) and are typically not considered in these assessments.

### OGRF10   Oil & Gas        RFD

Did the RFD consider the value of oil and gas resources in the analysis area to provide jobs, tax base and reduced foreign dependence on fossil fuels?

*Reviewer(s): 178*

RESPONSE: The RFD is a projection of the anticipated oil and gas activity for the next 15 years. The economic analysis in the EIS considers the potential job creations and taxes that could occur as a result of a leasing program on the Forest with this anticipated level of development. The Forest Service policy for minerals management is displayed on page I-2 and specifically mentions the reduction of our dependency on foreign sources of fossil fuels.

### OGRF11   Oil & Gas        RFD

Did the RFD consider the 140 million natural gas consumers in this country as users of the public lands?

*Reviewer(s): 178*

RESPONSE: Demand for oil and gas resources was considered in the RFD.

### OGRF12   Oil & Gas        RFD

RFD predictions of 13 of 27 wells producing on leases and 18 of 20 wells in Units is higher than average success rate of 15% (page I-19). These success rates will increase leasing and APD's. Please review your analysis for higher RFD.

*Reviewer(s): 96*

RESPONSE: In the areas that have been unitized the rate of success will likely be higher than the national average for exploration wells. The units on the Forest are areas where the resource has been found and the drilling there should be considered development, rather than exploration. the RFD has been independently reviewed and is still thought to be a reasonable estimation of the activity for the next 15 years on the Forest.

### RA01     Roadless Areas        General

Do not allow oil and gas activity in Roadless Areas.

*Reviewer(s): 3, 6, 8, 10, 11, 12, 15, , 18, 23, 27, 28, 30, 30, 32, 33, 36, 37, 38, 43, 53, 61, 62, 69, 72, 77, 79, 80, 82, 87, 88, 89, 92, 99, 102, 105, 106, 109, 113, 114, 115, 117, 122, 125, 129, 133, 135, 136, 142, 144, 146, 149, 150, 151, 152, 153, 158, 160, 169, 170, 172, 174, 175, 177, 182, 184, 187, 190, 192, 193, 195, 196, 197, 200, 203, 204, 209, 210, 211, 213, 214, 217, 219, 220, 227, 229, 233, 234, 240, 243, 244, 245, 249, 252, 255, 259, 261, 262*

RESPONSE: With the preferred alternative, the following Roadless Areas are not available for oil and gas leasing: Kannah Creek, Roubideau, Tabeguache, Whetstone Mountain, and parts of West Elk, Raggeds, Flat Top Mountain, and Priest Mountain. The Battlement Mesa Roadless Area is stipulated *No Surface Occupancy.* Approximately 36% of the Roadless Area acreage within the analysis area is not available for oil and gas leasing. An additional 11% (Battlement Mesa) is *No Surface Occupancy,* to protect roadless values. See also Table IV-4 on pages IV-69 - IV-73.

### RA02     Roadless Areas        General

Preservation of Roadless Area recreational values and issues must be addressed in the FEIS.

*Reviewer(s): 3, 12, , 43, 46, 118, 215*

BLM_0048378

RESPONSE: Roadless Area recreational values and issues as discussed in the DEIS will be retained in the FEIS. Roadless Areas are discussed on pages III-56 through III-90, and the effects to Roadless Areas are discussed on pages IV-20 through IV-23, and IV-68 through IV-74.

**RA03    Roadless Areas    General**

Once Roadless Areas are opened to road building for oil and gas exploration, these areas are opened to future motorized access, which will result in loss of biological diversity, aesthetics and non-motorized recreational values.

*Reviewer(s): 65, 69, 94, 96, 102, 104, 171, 188, 248*

RESPONSE: These areas may or may not be opened to motorized access and logging.

**RA04    Roadless Areas    General**

The Forest Service's own analysis shows "No Lease" in Roadless Areas and Semi-primitive Non-motorized areas will not impact the level of oil and gas activity, but shift development to different areas. There is no justification for selecting Alt. 2.

*Reviewer(s): 3, 30, 45, 46, 47, 109, 139, 158, 225, 228, 240, 255, 256*

RESPONSE: The mission of the Forest Service in relation to minerals management is to encourage, facilitate and administer the orderly exploration, development and production of mineral and energy resources on NFS lands to help meet the present and future needs of the nation. Alternative 2 allows for the development of oil and gas resources in a logical and sound manner. Lessees currently holding rights to oil and gas resources may need to acquire adjacent tracts necessary to complete lease blocks that are logical for exploration and development. Not allowing leasing in areas adjacent to existing leases could force lessees to explore and develop their leases in a manner that does not foster the greatest ultimate recovery of the leased oil and gas resources. Much of the predicted activity is in areas where operators have pooled their resources and formed units for the purpose of exploration and development of oil and gas resources. Only seven wells are predicted to be drilled on lands not currently leased. The estimated effects of Alternative 2 on Roadless Areas are similar to those of Alternative 5 because the predominance of activity is expected to be on existing leases.

**RA05    Roadless Areas    General**

What are the effects of road construction on Roadless Areas?

*Reviewer(s): 132*

RESPONSE: The construction of roads in currently Roadless Areas would result in part of the Roadless Area becoming roaded. That portion of the Roadless Area would not have the attributes of a Roadless Area. The effects on the other resources would be similar to those elsewhere. See pages IV-20 through IV-23 and IV-68 through IV-74.

**RA06    Roadless Areas    General**

Roadless areas should only occur in designated Wilderness. All existing Roadless Areas should be considered for oil and gas leasing and development.

*Reviewer(s): 231, 239*

RESPONSE: All existing Roadless Areas within the analysis area were considered for oil and gas leasing. However, based on the attributes of the Roadless Area, planned activity in the Roadless Area, and public comment, several Roadless Areas were determined to be not available for oil and gas leasing. The Roubideau, Tabeguache, Kannah Creek, Whetstone Mountain, and parts of the Priest Mountain, West Elk, Flat Top Mountain, and Raggeds Roadless Areas are not available for oil and gas leasing at this time.

BLM_0048379

**RA07    Roadless Areas      General**

Existing leases in Roadless Areas should not be renewed when they expire or are relinquished.

*Reviewer(s): 242*

RESPONSE: When existing leases expire or are relinquished the land will be subject to the leasing decisions made in the Record of Decision for this document. If the area is *No Lease* as a result of this document, the land covered by the lease will not be available for oil and gas leasing. Otherwise, it will be available with the stipulations specified in the ROD.

**RA08    Roadless Areas      General**

*NSO* stipulations can protect Roadless Areas if not waived; however, if they are waived the only way to protect Roadless values is with a *No Lease* designation.

*Reviewer(s): 46*

RESPONSE: There may be a few instances where the roadless values of a Roadless Area may be protected and allow drilling to occur (helicopter access?). In most cases, however; if the stipulation protecting the roadless character of a Roadless Area is waived, the roadless character of the area may be sacrificed. As a result of public comment, Alternative 2 was modified to exclude several Roadless Areas from oil and gas leasing.

Waiving a stipulation is intended to be an unusual exception, rather than the rule.

**RA09    Roadless Areas      General**

Was oil and gas potential considered in Roadless Area designation?

*Reviewer(s): 47, 178*

RESPONSE: The roadless character of an area is the main consideration in the designation of a Roadless Area. However, the oil and gas (and other mineral) potential is considered by Congress in the designation of a Roadless Area as Wilderness. Areas of high mineral potential typically are not designated as Wilderness.

**RA10    Roadless Areas      General**

How many acres of the Forest are roaded versus unroaded, and what are the criteria for an area considered Roadless?

*Reviewer(s): 263*

RESPONSE: According to the Forest Plan FSEIS, there are approximately 1,523,780 acres of the Forest considered to be Roadless (including Wilderness). The Forest consists of approximately 2,953,186 acres. 52% of the Forest is roadless. The criteria defines a Roadless Area as an area exclusive of improved roads constructed or maintained for travel by means of motorized vehicles intended for highway use. The Roadless Area inventory (RARE II) recognized that areas of land could be included in the Wilderness System even though they may not be entirely free of the imprint of man but are fully capable of providing wilderness benefits to the public. Accordingly, roadless, undeveloped areas could include past timber harvest activities, evidence of old mining, some range improvement, minor recreation sites, water related facilities, etc., if the passage of time or their visibility allowed the area to appear natural.

**RA11    Roadless Areas      General**

The environmental consequences of oil and gas activities will be greater in Roadless Areas because they currently have little permanent impacts.

BLM_0048380

*Reviewer(s): 96*

RESPONSE: The environmental consequences of oil and gas activities in Roadless Areas may appear to be greater than the effects elsewhere, but most likely the effects in Roadless Areas will be similar to those effects elsewhere.

### RA12   Roadless Areas       General

The U of C Wilderness Study group asks that Roadless Areas remain undisturbed during an ongoing study to measure their interior habitat values for biodiversity. They may propose that some of these areas be managed primarily for biodiversity.

*Reviewer(s): 159*

RESPONSE: It is likely that most of the Roadless Areas as displayed in the EIS will remain undisturbed for several years even though they are currently leased or are leased as a result of this analysis.

### RA13   Roadless Areas       General

The preferred alternative prescribes *Standard Lease Terms* for 15 Roadless Areas, which gives too much latitude in previously undisturbed habitats.

*Reviewer(s): 185*

RESPONSE: *Standard Lease Terms* would not likely adequately protect undisturbed habitats in Roadless Areas. Note however, that stipulations (*CSU, TL* and *NSO*) are applied to the many other *Affected Environments* that occur within Roadless Areas. For example, if there are slopes > 60% within the Roadless Area, those slopes will be subject to *No Surface Occupancy* stipulations. If the Roadless Area has moderate geologic hazards then those areas will be stipulated *Controlled Surface Use*. Similarly, if the Roadless Area contains an Elk Calving Ground, that area will have a *Timing Limitation*.

### RA14   Roadless Areas       General

The continued dissection of Roadless Areas by commodity development needs a thorough analysis on a Forest level and should not be relegated to project specific plans.

*Reviewer(s): 185*

RESPONSE: This EIS does this for the analysis area for oil and gas activity. The information on Roadless Areas will probably be used at the project stage for all activities in Roadless Areas requiring NEPA documentation. Roadless Areas will be reviewed at the time of the Forest Plan revision, scheduled to be completed in 1997.

### RA181   Roadless Areas       Raggeds

Do not allow oil and gas activity in Raggeds Roadless Area.

*Reviewer(s): 3, 15, 23, 84, 91, 92, 105, 109, 113, 121, 132, 139, 148, 151, 153, 159, 179, 183, 204, 211, 242, 243, 244, 249, 255, 262*

RESPONSE: Thank you for your comment.

### RA182   Roadless Areas       Drift Creek

Do not allow oil and gas activity in the Drift Creek Roadless Area.

*Reviewer(s): 3, 15, 92, 105, 109, 128, 139, 148, 151, 153, 159, 179, 204, 211, 215, 249, 255*

RESPONSE: Thank you for your comment.

BLM 0048381

**RA184   Roadless Areas      Springhouse Park**

Do not allow oil and gas activity in the Springhouse Park Roadless Area.

*Reviewer(s): 3, 91, 105, 139, 148, 159, 179, 201, 204, 215*

RESPONSE:  Thank you for your comment.

**RA1841   Roadless Areas      Springhouse Park**

Do not allow oil and gas activity near Floating Lake in the Springhouse Park Roadless Area.

*Reviewer(s): 23, 92, 139, 188, 240, 255*

RESPONSE:  Thank you for your comment.

**RA185   Roadless Areas      Electric Mountain**

Do not allow oil and gas activity in Electric Mountain Roadless Area.

*Reviewer(s): 23, 109, 139, 148, 149, 159, 179, 188, 204, 215, 219, 240, 242, 243, 255*

RESPONSE:  Thank you for your comment.

**RA186   Roadless Areas      Clear Creek**

Do not allow oil and gas activity in the Clear Creek Roadless Area.

*Reviewer(s): 23, 39, 109, 139, 148, 164, 179, 204, 215, 240, 255*

RESPONSE:  Thank you for your comment.

**RA1861   Roadless Areas      Clear Creek**

Oil and gas and timber activities should not occur in the Clear Fork and Muddy area, involving Baldy Creek drainages, June Creek, Elk Knob, Jones Creek, Trail Gulch, Clear Fork, Basin Creek, et al. and surrounding areas.

*Reviewer(s): 39, 200,  (Plus 62 ltrs. & 1113 sign.)*

RESPONSE:  Much of the area described is currently leased for oil and gas and timber sales are scheduled.

**RA1862   Roadless Areas      Clear Creek**

With the recent closure and pending reclamation of Mid Continent Mines and associated roads, the Forest Service has the opportunity to expand the Clear Creek Roadless Area onto the White River National Forest.  This needs to be addressed in the FEIS.

*Reviewer(s): 200*

RESPONSE:  Expansion of Roadless Areas is beyond the scope of this document.

**RA1863   Roadless Areas      Clear Creek**

The decision to make the Clear Creek Roadless Area a non-motorized area has improved the recreational value of this area, and it should be retained as a non-motorized area.

*Reviewer(s): 39, 200*

BLM_0048382

RESPONSE: The area will probably be maintained as a non-motorized area, but roads for oil and gas and scheduled timber sale activity will probably also be built. The roads will be closed to public travel (as they are now).

### RA191   Roadless Areas   Priest Mountain

Do not allow oil and gas activity in Priest Mountain Roadless Area.

*Reviewer(s): 3, 23, 91, 92, 105, 109, 139, 143, 148, 159, 179, 185, 204, 215, 219, 235, 240, 242, 243, 255*

RESPONSE: Part of the Priest Mountain Roadless Area is now *No Lease*. These are the areas of the Priest Mountain Roadless Area that were designated *NSO* in the DEIS. However, part of these areas are also currently leased. Activity may occur in those area.

### RA191A   Roadless Areas   Priest Mountain - Bronco Knob

Do not allow oil and gas activity in the Bronco Knob portion of the Priest Mountain Roadless Area.

*Reviewer(s): 92*

RESPONSE: The Bronco Knob portion of the Priest Mountain Roadless Area is available for oil and gas leasing and the activity that may follow the leasing (drilling), under the preferred alternative.

### RA191D   Roadless Areas   Priest Mountain - Flat Tops

More of the Flat Tops portion of the Priest Mountain Roadless Area should be considered *CSU* instead of *NSO* because it is considered as having high potential.

*Reviewer(s): 1*

RESPONSE: The majority of the Flat Tops portion of the Priest Mountain Roadless Area is not available for oil and gas leasing in the FEIS preferred alternative. This change was made to better protect the roadless values of the area. It is high potential, but only 15,250 acres of the 31,500 acres is currently leased.

### RA191F   Roadless Areas   Priest Mountain-West Muddy

Do not allow oil and gas activity in the West Muddy portion of the Priest Mountain Roadless Area.

*Reviewer(s): 153*

RESPONSE: Thank you for your comments.

### RA192   Roadless Areas   Salt Creek

Do not allow oil and gas activity in the Salt Creek Roadless Area.

*Reviewer(s): 23, 92, 109, 139, 148, 179, 204, 215, 240, 255*

RESPONSE: Thank you for your comments.

### RA193   Roadless Areas   Battlement Mesa

Do not allow oil and gas activity in Battlement Mesa Roadless Area.

*Reviewer(s): 3, 10, 23, 109, 128, 139, 146, 148, 159, 179, 185, 188, 201, 204, 211, 213, 215, 240, 242, 243, 255*

RESPONSE: Battlement Mesa is available for leasing, but is stipulated *No Surface Occupancy* to protect roadless and other resource values in the preferred alternative.

**RA194   Roadless Areas        Nick Mountain**

Do not allow oil and gas activity in Nick Mountain Roadless Area.

*Reviewer(s): 23, 92, 109, 115, 139, 148, 149, 179, 204, 215, 240, 242, 243, 255*

RESPONSE: Thank you for your comments.

**RA195   Roadless Areas        Kannah Creek**

We support the decision to not allow oil and gas activity in the Kannah Creek Roadless Area.

*Reviewer(s): 3, 4, 5, 6, 8, 15, 23, 30, 36, 37, 47, 53, 62, 80, 82, 92, 99, 102, 109, 113, 117, 120, 125, 128, 129, 136, 139, 142, 143, 144, 146, 148, 149, 151, 153, 158, 159, 164, 166, 172, 175, 177, 179, 183, 184, 190, 194, 195, 196, 203, 210, 211, 213, 215, 219, 240, 242, 243, 255, 261*

RESPONSE: Thank you for your comments.

**RA195A  Roadless Areas        Kannah Creek**

The Kannah Creek Roadless Area should not be protected with *No Lease* designation.

*Reviewer(s): 1, 231, 237, 239*

RESPONSE: Thank you for your comments.

**RA196   Roadless Areas        West Elk**

Do not allow oil and gas activity in West Elk Roadless Area.

*Reviewer(s): 10, 37, 84, 91, 117, 121, 128, 129, 132, 146, 153, 185, 213, 235, 242, 243, 246*

RESPONSE: That portion of the West Elk Roadless area within the analysis area east along Kebler Pass from Coal Creek, is not available for oil and gas leasing under the preferred alternative.

**RA196A  Roadless Areas        West Elk - Coal Mesa**

Do not allow oil and gas activity in the Coal Mesa portion of the West Elk Roadless Area.

*Reviewer(s): 3, 12, 15, 23, 92, 105, 139, 148, 151, 153, 158, 159, 179, 201, 204, 209, 215, 249, 255*

RESPONSE: The Coal Mesa portion of the West Elk Roadless Area is available for oil and gas leasing under the preferred alternative.

**RA196B  Roadless Areas        West Elk - Snowshoe Mesa**

Do not allow oil and gas activity in the Snowshoe Mesa portion of the West Elk Roadless Area.

*Reviewer(s): 12, 15, 21, 23, 92, 105, 139, 148, 151, 153, 158, 159, 179, 183, 201, 204, 215, 255*

RESPONSE: Snowshoe Mesa is not available for oil and gas leasing (considered part of the Kebler corridor) under the preferred alternative.

**RA196C  Roadless Areas        West Elk - Kebler Pass**

Do not allow oil and gas activity in the Kebler Pass portion of the West Elk Roadless Area.

*Reviewer(s): 3, 12, 15, 23, 38, 92, 105, 113, 139, 148, 151, 159, 179, 183, 204, 209, 215, 244, 249, 255*

RESPONSE: Kebler Pass is not available for oil and gas leasing from Coal Creek, east to the edge of the analysis area, under ther preferred alternative.

BLM_0048384

Oil and Gas Leasing Analysis FEIS

### RA200   Roadless Areas      Whetstone Mountain

Do not allow oil and gas activity in Whetstone Mountain Roadless Area.

*Reviewer(s): 12, 15, 23, 42, 84, 91, 92, 105, 113, 130, 139, 148, 151, 153, 158, 159, 179, 183, 195, 201, 204, 209, 215, 235, 242, 243, 244, 249, 255*

RESPONSE: The Whetstone Mountain Roadless Area and that portion of the analysis area outside of Crested Butte is not available for oil and gas leasing under the preferred alternative.

### RA2001   Roadless Areas      Whetstone Mountain

Do not renew or issue new leases on Whetstone Mountain.

*Reviewer(s): 8, 118, 210*

RESPONSE: The Whetstone Mountain area is not available for oil and gas leasing under the preferred alternative. The existing lease in the area will expire in 1996, unless drilling occurs and the lease can be held by production.

### RA201   Roadless Areas      Flat Top Mountain

Do not allow oil and gas activity in the Flat Top Mountain Roadless Area.

*Reviewer(s): 84, 91, 92, 105, 153, 183, 235*

RESPONSE: The Flat Top Mountain Roadless Area (110 acres in analysis area) is not available for oil and gas leasing under the preferred alternative. It is located to the south of the Whetstone Mountain Roadless Area.

### RA241   Roadless Areas      Roubideau

We support the decision to not allow oil and gas activity in the Roubideau Roadless Area.

*Reviewer(s): 3, 4, 5, 6, 8, 15, 23, 30, 36, 37, 47, 53, 62, 69, 80, 82, 92, 99, 102, 109, 113, 115, 117, 120, 125, 128, 129, 136, 139, 142, 143, 144, 146, 148, 149, 151, 158, 159, 166, 175, 177, 179, 183, 184, 190, 194, 195, 196, 203, 210, 211, 213, 215, 240, 242, 243, 255, 261*

RESPONSE: Thank you for your comments.

### RA241A   Roadless Areas      Roubideau

The Roubideau Roadless Area should not be protected with *No Lease* designation.

*Reviewer(s): 1, 231, 237, 239*

RESPONSE: Thank you for your comments.

### RA242   Roadless Areas      Tabeguache

We support the decision to not allow oil and gas activity in the Tabeguache Roadless Area.

*Reviewer(s): 3, 4, 5, 6, 8, 15, 23, 30, 36, 37, 47, 53, 62, 69, 80, 82, 92, 99, 102, 109, 113, 115, 117, 120, 125, 128, 129, 136, 139, 142, 143, 144, 146, 148, 149, 151, 158, 159, 166, 172, 175, 177, 179, 183, 184, 190, 194, 195, 196, 203, 210, 211, 213, 215, 240, 242, 243, 255, 261*

RESPONSE: Thank you for your comments.

### RA242A   Roadless Areas      Tabeguache

The Tabeguache Roadless Area should not be protected with *No Lease* designation.

*Reviewer(s): 1, 231, 237, 239*

BLM_0048385

RESPONSE:  Thank you for your comments.

**RA243   Roadless Areas       Kelso Mesa**

Do not allow oil and gas activity in Kelso Mesa Roadless Area.

*Reviewer(s): 3, 23, 92, 109, 128, 139, 142, 148, 159, 169, 179, 201, 204, 211, 215, 242, 243, 249, 255*

RESPONSE:  Thank you for your comments.

**RA246   Roadless Areas       Campbell Point**

Do not allow oil and gas activity in Campbell Point Roadless Area.

*Reviewer(s): 211, 242, 243*

RESPONSE:  Thank you for your comments.

**RA247   Roadless Areas       Johnson Creek**

Do no allow oil and gas activity in Johnson Creek Roadless Area.

*Reviewer(s): 3, 23, 92, 109, 128, 139, 142, 148, 159, 169, 179, 188, 201, 204, 211, 215, 242, 243, 249, 255*

RESPONSE:  Thank you for your comments.

**RD01   Roads**

Roads constructed for oil and gas can improve public access to a given area, for the benefit of many.

*Reviewer(s): 165, 226*

RESPONSE:  The Forest Service agrees.  However, in most cases, roads built for oil and gas operations will be closed to public travel.

**RD02   Roads**

No new roads should be built for oil and gas development.

*Reviewer(s): 13, 33, 49, 51, 52, 54, 64, 67, 68, 76, 79, 84, 93, 106, 114, 121, 123, 124, 125, 131, 149, 151, 153, 156, 160, 167, 182, 193, 197, 198, 216, 217, 220, 236, 250, 251, 253, 255, 258, 262, 263*

RESPONSE:  In most cases, if there is not an existing road to the lease or proposed well site, a new road would be required.  The lease grants a right to reasonable access on a lease.  The APD approval constitutes approval of proposed on-leasehold rights-of-way.  Off the lease, no rights exist.  Access to a Federal leaseholding surrounded by Federal land is discretionary on the part of the surface management agency, in this case the Forest Service, and a special use permit is required.

**RD03   Roads**

The government should not subsidize road building or other oil and gas development.

*Reviewer(s): 43, 97, 180*

RESPONSE:  The government does not subsidize road building or any other oil and gas activity.  The operator pays for and constructs the road and other facilities needed in their operations.

**RD05   Roads**

The DEIS does not address cumulative effects of total miles of road for all purposes.

*Reviewer(s): 43*

BLM_0048386

Oil and Gas Leasing Analysis FEIS

RESPONSE: Cumulative effects of roads are addressed under the resources that would be affected, i.e., wildlife, Roadless Areas, etc. See pages IV-59 and IV-74.

## RD06    Roads

Existing roads in the Clear Fork area should be rehabilitated.

*Reviewer(s): 39*

RESPONSE: The existing roads in the Clear Fork area are being used to access gas wells. The Forest Service is not aware of any roads in need of rehabilitation that are not being used.

## RD07    Roads

The DEIS does not address cumulative effects of roads on land adjacent to the Forest.

*Reviewer(s): 43*

RESPONSE: See page IV-51 for a discussion of the cumulative effects of roads on land adjacent to the analysis area.

## RD08    Roads

New oil and gas roads should be closed to the public.

*Reviewer(s): 43, 45, 103, 225*

RESPONSE: Most new roads will be closed to the public.

## RD09    Roads

No new roads should be built or old roads opened in the Clear Creek/Clear Fork area.

*Reviewer(s): 39, 48, 200, (Plus 62 form letters and 1113 petition signatures.)*

RESPONSE: Most of the Clear Creek/Clear Fork area is currently leased. See the response to Comment #: RD02.

## RD10    Roads

Roads accessing dry holes should be reclaimed immediately.

*Reviewer(s): 22, 41, 103*

RESPONSE: Reclamation of roads and the other area disturbed by oil and gas activity must be done in accordance with the Surface Use Plan of Operations.

## RD11    Roads

New roads for oil and gas activity will result in increased traffic.

*Reviewer(s): 47, 58, 124, 220*

RESPONSE: During exploration, oil and gas activity will result in an average of approximately 13 vehicles per day, per well. This normally lasts for about 2 months. If the well is productive, operation and maintenance traffic averages 2 vehicles per day per well. This is in addition to the normal traffic a road may receive from other users. See Table II-1 on page II-2.

## RD12    Roads

More roads will impact backcountry recreation.

BLM_0048387

*Reviewer(s): 172, 236*

RESPONSE: Roads built in areas currently unroaded and used for backcountry recreation will probably affect some of the recreation values that draw the users to those areas. A road may change the area enough that a recreationist may no longer have the same backcountry experience in that area.

### RD13   Roads

Do not build more roads to save the expense of building and maintaining them.

*Reviewer(s): 81, 94, 172*

RESPONSE: The roads are built and paid for by the operator. Maintenance is paid for on a commensurate share basis by the users.

### RD14   Roads

Building roads will degrade the water quality in areas with construction and the extra traffic will increase the dust problem along the main corridors.

*Reviewer(s): 51, 107*

RESPONSE: Some degradation in water quality is likely to occur adjacent to road construction projects. Mitigation measures specified in Appendix H and applied as necessary, will minimize the potential for long-term impacts to water quality. Impacts are generally greatest for the first three years following construction or until the disturbed area is revegetated. Dust abatement measures will be specified in the Surface Use Plan of Operations for an Application for Permit to Drill.

### RD15   Roads

Increased traffic associated with oil and gas activities along main corridors will make travel more hazardous, especially for bicyclists.

*Reviewer(s): 51*

RESPONSE: Any increase in traffic increases the hazards for all road users. Use on specific roads by bicyclists and other users will be identified at the APD stage and mitigation measures may be applied to reduce the potential hazards.

### RD16   Roads

New roads constructed for oil and gas activities will not serve any public interests other than those of energy and timber industries.

*Reviewer(s): 57, 91, 105, 258*

RESPONSE: Roads not closed to public use will likely be used by the public for numerous recreational endeavors, including sight-seeing, wildlife viewing, bicycle riding, hiking/walking, improved access to remote areas, snowmobiling, cross country skiing, etc. Most roads will be closed to motorized travel by the public.

### RD17   Roads

The document does not discuss potential impacts to State highways resulting from oil and gas activities. The document should indicate the State highway system will be impacted beyond its historical use and to what extent.

*Reviewer(s): 44*

RESPONSE: See additional discussion added in Chapter IV on page IV-52.

BLM_0048388

**RD18   Roads**

The Colorado Department of Transportation should be listed as a reviewing and permitting agency for highway access. All new access points will require permits from the DOT and lease applicants should be made aware of this.

*Reviewer(s): 44*

RESPONSE:  The Colorado Department of Transportation is included on the list of permitting agencies (Appendix K).

**RD19   Roads**

A given user group should not be required to subsidize correction of problems created by others, as in example of roads built for oil and gas activities correcting drainage or alignment problems of existing roads.

*Reviewer(s): 41*

RESPONSE:  Roads built or rebuilt for oil and gas activities generally need to be of a higher standard to support the heavy vehicles used in the drilling phase of the operations. Road reconstruction presents an opportunity to correct drainage or alignment problems in existing facilities and generally serves the oil and gas activity traffic needs better.  It may be determined in the site-specific NEPA documentation for the APD that repair of an existing facility that is causing adverse environmental impacts would need to be completed prior to any further disturbance in the area.

**RD20   Roads**

The Final EIS should specify who will build and maintain road access to a leasehold.

*Reviewer(s): 225*

RESPONSE:  See pages IV-50 and IV-52.

**RD21   Roads**

Roads should be constructed to the highest standard to minimize surface degradation.

*Reviewer(s): 225*

RESPONSE:  Forest roads are typically built to accommodate the intended use of the road.  The highest standard road, paved or asphalt stabilized roads, would result in minimal erosion. However, it would be an inappropriate road standard given the amount of traffic and the typically short season of use that would incur the highest traffic volume.  This does not preclude the use of an asphalt stabilized surface where it may be appropriate to protect other resource values, such as at stream crossings or around heavily used recreation sites for dust control.  The standard of the road will be decided at the time the APD and SUPO is approved.

**RD22   Roads**

If timber sales follow oil and gas activity as a result of roading, the timber company should pay part of the cost of the roads.

*Reviewer(s): 95*

RESPONSE: The industry that builds the road pays for the road.  If an oil and gas company builds a road to access their leasehold for drilling, they would pay for the construction of the road.  There is no mechanism for later users of the road to share in the initial construction costs.  If the road needs to be reconstructed for use by the timber sale operator, the timber sale operator would pay for the reconstruction.  Maintenance costs would be shared based on use.  If timber and oil and gas operators

BLM_0048389

needed access to the same area at the same time, an agreement would be reached wherein the road construction costs would be shared.

### RD23 Roads

The DEIS fails to relate the addition of roads for oil and gas activity to the desired future condition given in the Forest Plan. Currently, enough roads exist to meet the roaded recreation demand through 2035 and the Forest has excessive roading, now.

*Reviewer(s): 185*

RESPONSE: The majority of roads will be closed to public travel, i.e., they will not be available for roaded recreation opportunities.

### RD24 Roads General

The statement "potential for new road construction in entire analysis area" (p. II-51) is corrupt given the low probability of significant oil and gas finds.

*Reviewer(s): 185*

RESPONSE: The statement says that new road construction could occur just about anywhere in the analysis area if Alternative 4 was the selected alternative. We do not know where oil and gas operators will drill or find oil and/or gas.

### RD25 Roads General

The DIES does not answer the question of who will pay for the construction and maintenance of roads with mixed industrial use (p. I-26).

*Reviewer(s): 185*

RESPONSE: See the response to Comment #: RD22.

### RD26 Roads

Roads should be subject to lease options, particularly if the roads might later be used to support timber harvest and heavy log truck traffic.

*Reviewer(s): 185*

RESPONSE: A *Timing Limitation* is the only lease option that could logically be applied to a road. This could be used where structural integrity of the road needs to be protected on a seasonal basis. See also the revised discussion on page IV-5.

### RDW01 Roads Wildlife

New roads may disrupt migration corridors.

*Reviewer(s): 43, 51, 132*

RESPONSE: New roads alter habitat in migration corridors. If the road is closed to public use and use by the oil and gas operators during times of migration, the roads would not impact migrating animals. If the road is left open during migration, migration of animals could be affected. See also the discussion on page IV-82.

### RDW02 Roads Wildlife

The DEIS does not address habitat fragmentation associated with proposed new road construction for all purposes.

BLM_0048390

*Reviewer(s): 43*

RESPONSE: The effect of habitat fragmentation differs according to the species involved. For animals like deer and elk, new road construction probably does not affect fragmentation if the road is closed to public travel. For other species, particularly the furbearers, habitat fragmentation from road construction can have significant effects if the roads are not closed to public use. Furbearers are more susceptible to trapping in areas that are roaded. Trappers using snowmobiles on roads have increased access and opportunity to trap furbearers (such as wolverines and pine martens). See also the discussion on page IV-59.

## RDW03   Roads          Wildlife

Placing roads in any timber region develops the area for much greater use by hunters and fishermen.

*Reviewer(s): 108*

RESPONSE: We agree. Roads built anywhere in the National Forest increase use in the area, even if the road is closed to travel with motorized vehicles. Hunters, hikers, mountain bikers, cross country skiers, and fishermen use the roadbed for access into areas previously unroaded.

## RDW04   Roads          Wildlife

You do not adequately describe the potential effects of additional roading and disturbance on bighorn sheep and black bear.

*Reviewer(s): 185*

RESPONSE: See pages IV-33 and IV-82 for discussions concerning bighorn sheep. Potential effects of roading on black bear are discussed on pages IV-9 and IV-56 through IV-59, under big game. The biggest potential effect to black bears as a result of additional roading is poaching. Closing roads to public travel should reduce the potential for poaching of black bears.

## RECG01   Recreation          General

Oil and gas exploration and/or development will compromise heavy recreation use areas.

*Reviewer(s): 187*

RESPONSE: Those areas of heavy recreation use have been grouped as recreation complexes. Recreation complexes are protected by *No Surface Occupancy* stipulations. The stipulation covers all of the recreation area as mapped in the DEIS and a quarter mile buffer around the recreation complexes (see page C-17). The effects on heavy recreation use areas are displayed on pages IV-54 through IV-56. The natural character of these high density use areas would generally be retained.

## RECG02   Recreation          General

The FEIS needs to address the audio impacts of oil and gas development, especially near Wilderness and areas offering primitive and semi-primitive recreation. Noise control limits need to be specified.

*Reviewer(s): 22, 43, 220*

RESPONSE: The nature of audio impacts is such that they are short-term and best addressed at the APD and SUPO stage of the process. Noise impacts will be addressed on a site specific basis. As you suggest, noise impacts may be greater in some areas (such as near Wilderness, campgrounds, etc.) than in other less sensitive areas.

BLM_0048391

## RECG03   Recreation        General

The need to preserve and promote primitive recreation opportunities is important in an age of continued urbanization.

*Reviewer(s): 22, 30, 43, 111, 216, 221*

RESPONSE:  The Forest Service agrees.  Some Roadless Areas in the analysis area are not available for oil and gas leasing under the preferred alternative.  Wilderness is also not available.

## RECG05   Recreation        General

Oil and gas leasing/development will result in a decline in tourism due to environmental impacts.

*Reviewer(s): 8, 34, 72, 73, 79, 96, 99, 156, 183, 205, 207, 210, 217, 246, 250*

RESPONSE:  Minimal effects would occur along scenic byways and other areas of concentrated recreation use, such as the ski areas and recreation complexes discussed in the EIS.  Tourism is not expected to decline as a result of oil and gas leasing.

## RECG06   Recreation        General

We oppose oil and gas activities or timber harvests because they would impact recreationists.

*Reviewer(s): 39, 48 (Plus 62 form letters.)*

RESPONSE:  The majority of recreationists would not notice oil and gas activities.  Some increase in industrial traffic may occur, but it would not be significant.  Campgrounds, ski areas, scenic corridors, and major trails would be protected from the direct impacts of oil and gas activity.  The activity tends to be concentrated in the exploration phase.

## RECG08   Recreation        General

Oil and gas development would reduce backcountry recreational opportunities.

*Reviewer(s): 8, 11, 29, 32, 34, 39, 39, 47, 79, 98, 105, 145, 149, 188, 200, 209, 210, 213, 225, 228, 232, 252, 259*

RESPONSE:  There would be a likely decrease in the amount of unroaded areas as a result of oil and gas development in currently roadless areas.  The types of backcountry recreational opportunities would probably not decline, but the acreage available for backcountry recreational opportunities would be decreased.  This could result in more people trying to have a backcountry experience in less available acreage.

## RECG09   Recreation        General

Existing and potential recreation based jobs will be lost as a result of oil and gas development in this area.

*Reviewer(s): 98*

RESPONSE:  Oil and gas leasing and drilling is not new to this area.  The amount of drilling will only increase slightly from the historical trend in drilling.  The projection for the Reasonably Foreseeable Development scenario is an extension of trends in drilling.  The amount of drilling will not drastically change in the next 15 years.  See also response to Comment #:  RECG05.

## RECG10   Recreation        General

The more land that is protected the more appealing the State is to tourism.

*Reviewer(s): 80*

BLM_0048392

RESPONSE: The areas that attract the majority of tourists to Colorado will not be significantly affected by oil and gas activities. Tourists are attracted to Colorado for skiing, hunting, sight-seeing, scenery, hiking, fishing and biking.

**RECG11   Recreation          General**

Give Horse Ranch Park a *No Lease* designation.

*Reviewer(s): 8, 21, 132, 183, 210*

RESPONSE: As a result of public comment, the Kebler Pass corridor, which includes Horse Ranch Park, is not available for oil and gas leasing, i.e., it has a *No Lease* designation under the preferred alternative.

**RECG12   Recreation          General**

What will be the effects of oil and gas development on unroaded recreation?

*Reviewer(s): 185*

RESPONSE: See response to Comment #: RECG08.

**RECO01   Recreation          Outfitters**

The DEIS understates the economic impacts from oil and gas activity to outfitters and the public they serve.

*Reviewer(s): 39, 71, 252*

RESPONSE: Outfitters that are permitted within current unroaded areas may be affected if oil and gas development occurs in and around their permitted area. The effects on outfitters in Roadless Areas are discussed on pages IV-20 and IV-74.

**RECO02   Recreation          Outfitters**

Outfitters will be put out of business as a result of oil and gas development and subsequent timber harvesting.

*Reviewer(s): 39, 171, 200*

RESPONSE: Some small businesses dependent on a roadless setting outside of Wilderness may be affected. See also the response to Comment #: RECO01. See the discussion on the effects to outfitters on pages IV-20, IV-63 and IV-74.

**RECS01   Recreation          Scenic Areas**

Do not allow oil and gas activity in the McClure Pass area.

*Reviewer(s): 10, 12, 23, 37, 139, 146, 151, 195, 201, 213, 224, 240, 244, 246, 262*

RESPONSE: The McClure Pass areas has *Controlled Surface Use* and *No Surface Occupancy* stipulations to protect the scenic and recreational attributes of the area under the preferred alternative.

**RECS02   Recreation          Scenic Areas**

Do not allow oil and gas activity in the Kebler Pass area.

*Reviewer(s): 13, , 21, 24, 38, 49, 54, 73, 103, 118, 130, 134, 153, 158, 162, 167, 201, 224, 234, 252, 262*

BLM_0048393

RESPONSE: As a result of public comment, Alternative 2 has been modified so that the Kebler Pass corridor is not available for oil and gas leasing, i.e., it has been designated *No Lease* under the preferred alternative.

### RECS03   Recreation        Scenic Areas

Oil and gas activity should not be allowed to disturb visual corridors.

*Reviewer(s): 66, 89, 105, 106, 114, 130, 152, 153, 160, 197, 212, 217, 232*

RESPONSE: Scenic Byways, Retention VQO and Retention VQO - Low VAC *Affected Environments* have been given *Controlled Surface Use* and *No Surface Occupancy* stipulations to protect the visual corridors. See pages C-2, C-3 and C-14.

### RECS04   Recreation        Scenic Areas

Scenic values will be lost in the Clear Fork/Muddy Basin area as a result of oil and gas and timber activities.

*Reviewer(s): 33, (Plus 62 form letters and 1113 petition signatures.)*

RESPONSE: Some loss of scenic values may occur in the Clear Fork/Muddy Basin area as a result of oil and gas and planned timber sale activity. The presence of natural openings and the lay of the land will absorb most oil and gas activity. The presence of drilling equipment will be short-term, typically lasting no more than 60 days.

### STP01   Stipulations       General

All special stipulations should be enforced - no modifications, waivers or exceptions.

*Reviewer(s): 2, 3, 5, 10, 15, 18, 23, 36, 37, 38, 43, 46, 55, 62, 69, 77, 80, 82, 87, 88, 92, 99, 104, 109, 113, 117, 118, 120, 125, 128, 129, 130, 133, 139, 143, 144, 148, 149, 151, 166, 170, 172, 173, 175, 177, 179, 195, 196, 203, 206, 211, 213, 215, 222, 225, 228, 236, 240, 242, 243, 246, 248, 249, 252, 255, 259, 261*

RESPONSE: All special stipulations will be enforced. In some cases, the special stipulations may not be needed because of a change in conditions, incorrect mapping, etc. In other areas, additional stipulations may be needed. For example, the mapping of the slopes > 60% is not very accurate; it is based on the USGS 3 Arc-Second digital elevation models. However, all slopes > 60%, whether they are mapped or not, will be stipulated *NSO*. If a slope > 60% exists in an area it will be stipulated *NSO*.

Modifications, exceptions, and waivers will be considered according to the regulations at 36 CFR 228.104. An operator submitting a Surface Use Plan of Operations may request the authorized officer to authorize the BLM to modify, waive or grant an exception to a stipulation included in a lease at the direction of the Forest Service. The modification, waiver or exception are subject to public comment in connection with the NEPA documentation required in the approval process for the Surface Use Plan of Operations.

### STP02   Stipulations       General

Oil and gas and timber activities should be scheduled so they do not conflict with hunting seasons or other public activities.

*Reviewer(s): 39*

RESPONSE: Timing of oil and gas activities could possibly be adjusted for short periods of time, i.e., limited activities during regular hunting seasons. However, public activities occur year round and some will likely be impacted by oil and gas operations or other Forest management activities.

BLM_0048394

**STP03    Stipulations        General**

    If stipulation waivers will be allowed they must be as narrowly and clearly defined as possible.

*Reviewer(s): 132, 176*

    RESPONSE:  Waivers will be considered as allowed by the regulations (36 CFR 228.104).

**STP04    Stipulations        General**

    The FEIS should specify allowable acreages of disturbed areas (including roads) and timing restrictions in which reclamation of disturbed sites must be done.

*Reviewer(s): 178, 256*

    RESPONSE:  Each well site and road location are different.  The amount of acreage disturbed will vary by the terrain where the activities are proposed.  The specific effects of the construction of a road and well site for a particular project will be determined in the approval process for the Surface Use Plan of Operations (a NEPA decision point).  This EIS does not authorize ground disturbance.

**STP05    Stipulations        General**

    The document should address the likelihood of extensive use of stipulation exemptions, which would render stipulations ineffective.

*Reviewer(s): 247*

    RESPONSE:  Waivers, modifications and exceptions will be considered as allowed by the regulations (36 CFR 228.104).  It is assumed that waivers, modifications and exceptions will occur.  They may well render the stipulation technically ineffective, but that does not mean that significant adverse effects will occur as a result of waiving, modifying or granting an exception to a stipulation.  Crossing Riparian areas, Wetlands and areas of High Geologic Hazard may be unavoidable in some cases to access a well site.  Mitigation measures will be applied to protect these resources.

**STP06    Stipulations        General**

    Leasing stipulations need to be consistent with Naturally Occurring Radioactive Material (NORM) requirements so that these materials, especially drilling fluids, are handled in an environmentally sound manner.

*Reviewer(s): 82, 247*

    RESPONSE:  Operators must comply with all State and Federal laws regarding NORM requirements and the disposal of potentially toxic wastes at the time of use and disposal.

**STP07    Stipulations        General**

    Mandate that all development plans consider Resource Conservation and Recovery Act requirements for Subtitle D disposal in effect at the time of drilling.

*Reviewer(s): 82*

    RESPONSE:  See response to Comment #:  STP06.

**STP09    Stipulations        General**

    Justification for *NL* or *NSO* restrictions are based on perceived environmental impacts and conflicts between resource uses, not necessarily factual or scientific data.  Industry has shown operations can be compatible with other uses without *NL* or *NSO*.

*Reviewer(s): 237*

BLM_0048395

RESPONSE: In most cases, operations can be compatible with other uses. However, for certain sensitive areas, such as Roadless Areas, where we want to protect the roadless values, it would be extremely difficult for industry to operate in a Roadless Area and protect roadless values.

## STP10   Stipulations   General

Revegetation and disturbed sites should include species beneficial to wildlife for both food and shelter. Vertical and horizontal habitat should be considered.

*Reviewer(s): 45*

RESPONSE: Revegetation will consider wildlife needs. In most cases, native plant species will be planted in disturbed areas. The species mix will be specified in the rehabilitation plan, part of the SUPO.

## STP11   Stipulations   General

Directional drilling should occur to minimize amount of drilling.

*Reviewer(s): 45*

RESPONSE: Directional drilling will likely occur where the surface cannot be occupied because of *No Surface Occupancy* stipulations. Directional drilling is more expensive and riskier and may or may not minimize the amount of drilling. Theoretically, it could reduce the amount of ground disturbance. However, it is not practical everywhere.

## STP12   Stipulations   General

The final document should not recommend an alternative that is not consistent with the Grand Mesa travel management planning effort.

*Reviewer(s): 164*

RESPONSE: Grand Mesa travel management issues will need to be resolved within the context of the resource decisions developed from this analysis.

## STP13   Stipulations   General

*No Lease* should be the designation within 1/2 mile from any Wilderness boundary.

*Reviewer(s): 16*

RESPONSE: The Wilderness Bill does not specify a buffer around Wilderness. Multiple use management, including oil and gas activity, can occur right up to the Wilderness boundary.

## STP14   Stipulations   General

*NSO* should be used whenever possible to reduce the amount of roads needed and in important wildlife areas.

*Reviewer(s): 16*

RESPONSE: *NSO* is used in this document to protect resource values such as wildlife, Recreation Complexes, Sensitive Areas, areas of High Geologic Hazard, etc. It may or may not reduce the amount of roads needed, but will likely control where roads are located and ensure that they are located outside these areas of sensitive resource values, or if they are located in these areas ensure that proper and effective mitigation measures are applied.

BLM_0048396

### STP15   Stipulations       General

*Standard Lease Terms* should only be used where no environmental conflicts exist, such as near existing roads.

*Reviewer(s): 16*

RESPONSE: Generally, that is how *Standard Lease Terms* were applied in this document, i.e., where no environmental conflicts exist.

### STP16   Stipulations       General

The Final EIS should provide specific discussion about transport and onsite management of hazardous materials and emergency preparations for accidents involving hazardous materials.

*Reviewer(s): 41*

RESPONSE: All operations are required to have a Spill Prevention Control and Countermeasure Plan. The SPCC plan will be required prior to approval of the APD and SUPO. See also the Forest's "Oil and Hazardous Spills Contingency Plan" (Appendix M).

### STP17   Stipulations       General

Potential resource conflicts resulting from oil and gas development are best addressed with site specific mitigation measures and timing restrictions, not broad restrictions like *NSO* and *CSU*.

*Reviewer(s): 126*

RESPONSE: The Forest Service agrees that potential resource conflicts resulting from oil and gas development are best addressed with site specific mitigation measures and timing restrictions. However, at this stage in the process we do not know exactly where oil and gas activities will be proposed. We have included in the appendix, mitigation measures that may be required to protect different resources. *NSO* and *CSU* restrictions are applied to the different *Affected Environments* based on past experience with road and well pad construction activities and the effects that typically result. The specific mitigation measures will be applied at the time an operator submits an APD and a Surface Use Plan of Operations.

### STP18   Stipulations       General

Wouldn't it be easier to not locate wells near elk calving areas instead of putting more restrictions on the lessee?

*Reviewer(s): 168*

RESPONSE: *Controlled Surface Use* and *Timing Limitation*s will be applied to elk calving areas to minimize impacts from oil and gas activities when these areas cannot be avoided.

### STP19   Stipulations       General

The document needs to elaborate on contingency plans that would be implemented if a major spill were to occur.

*Reviewer(s): 241*

RESPONSE: The Forest's Oil and Hazardous Spills Contingency Plan is included as Appendix M. The operator is also required to have a spill contingency plan. See also the response to Comment #: STP16.

### STP20   Stipulations       General

There should be no areas leased under *Standard Lease Terms*.

BLM_0048397

*Reviewer(s): 96, 252*

RESPONSE: Under the Preferred Alternative 13% of the analysis area is available under *Standard Lease Terms*, only. *Standard Lease Terms* will be adequate to protect resource values in these areas.

## STP21 Stipulations General

As a means of addressing environmental database needs, the EPA suggests using a Lease Notice or equivalent approach to require water quality monitoring be done for project-level planning prior to ground disturbance.

*Reviewer(s): 78*

RESPONSE: *Standard Lease Terms* allow the Forest Service to require special studies or inventories. A Lease Notice is not necessary. Water quality monitoring needs to be done over a long time period to obtain a reliable baseline of quality.

## STP22 Stipulations General

The FEIS should disclose the types of monitoring information that will be required by the USFS and BLM for resource protection at the project level.

*Reviewer(s): 78*

RESPONSE: Specific monitoring information will be identified when the operator submits an APD and SUPO for approval. Further NEPA analysis is required at that point in the process. It would be more appropriate at that time to identify monitoring needs.

## STPC01 Stipulations Controlled Surface Use

*Controlled Surface Use* stipulations are not really protective measures.

*Reviewer(s): 180*

RESPONSE: *Controlled Surface Use* stipulations are protective and mitigative measures that strictly control certain aspects of an operator's activities in areas of special values or resource concerns. See the discussion on page I-16 for examples of the use of *Controlled Surface Use* stipulations.

## STPN01 Stipulations No Surface Occupancy

If Alternative 3 - No Lease is not selected consider extensive use of the *NSO* stipulation.

*Reviewer(s): 146*

RESPONSE: Stipulations will be applied to those *Affected Environments* that need protection beyond that provided by *Standard Lease Terms*. In the FEIS, *NSO* stipulations were applied on approximately 151,835 acres, or about 16% of the analysis area. *No Lease* was applied on 138,270 acres, or about 15% of the analysis area. See Table II-6, Acres of Lease Options by Alternative.

## STPN02 Stipulations No Surface Occupancy

Did you consider how oil and gas resources would be developed under *NSO* areas?

*Reviewer(s): 178*

RESPONSE: The oil and gas resources in those large blocks would be inaccessible except by directional drilling. The limitations on directional drilling made it evident that the large blocks of *NSO* in Roadless Areas were not logical. For that and other management reasons, most *NSO* in Roadless Areas has been changed to *No Lease*. The other *Affected Environment* where *NSO* occurs in large blocks,

BLM_0048398

summer range (Concentrated Use), was left *NSO* given the nature of the resource and the conditions under which we will consider waivers, exceptions and modifications.

### STPN03   Stipulations       No Surface Occupancy

*NSO* stipulation denies access to valuable oil and gas resources.

*Reviewer(s): 178*

RESPONSE: Generally that is true. Access, however, may be gained through directional drilling, where feasible. In areas stipulated *NSO*, the surface resource has been determined to be more valuable than the oil and gas resources.

### STPN04   Stipulations       No Surface Occupancy

Did you consider where pipeline collection systems would be installed and where existing pipelines occur when defining *NSO* areas?

*Reviewer(s): 178*

RESPONSE: Pipelines, in most cases, will be installed along the road corridor that accesses the well site. We realize that pipelines will also be constructed outside the road corridor. This is thought to be the exception rather than the rule.

### STPN05   Stipulations       No Surface Occupancy

The document needs to be consistent in acknowledgment of exceptions to *NSO* stipulations in wetlands wherever they are discussed. Exceptions should be specified concerning what will and will not be allowed.

*Reviewer(s): 78*

RESPONSE: The document has been reviewed and revised as necessary to ensure consistency in the discussion of exceptions to *NSO* in Wetlands.

### STPT01   Stipulations       Timing Limitations

*Timing Limitations* may not be adequate to mitigate impacts to wildlife because they only control oil and gas activities and may not control the potential increase in other human activities resulting from improved access.

*Reviewer(s): 256*

RESPONSE: In most cases, roads accessing well pads will be closed to public travel, not only during the time period specified in the stipulation, but year-round. Human travel would be allowed only by non-motorized means.

### STPT02   Stipulations       Timing Limitations

*Timing Limitations* may not be adequate to mitigate impacts to wildlife because if a well becomes permanent so does its associated disturbance.

*Reviewer(s): 256*

Wildlife is most susceptible to human disturbance at critical times during their life cycle (birthing, breeding, nesting, etc.). See also the response to Comment #: AEW03.

BLM_0048399

### STPT03   Stipulations          Timing Limitations

Timing restrictions within Roadless Areas would be as applicable as elsewhere.

*Reviewer(s): 225*

RESPONSE: The major factor that makes a Roadless Area roadless, is the absence of roads. In most cases, a road is required to provide access to an oil or gas operation. A *Timing Limitation* would not mitigate the presence of a road. Although use could be restricted during certain times of the year, the road would still be there, giving the impression to the recreationist of the presence of man and his machines.

### TM01   Timber

Timber sales should not be offered as a result of new oil and gas roading.

*Reviewer(s): 8, 32, 41, 43, 46, 54, 61, 72, 79, 80, 91, 93, 94, 95, 102, 105, 117, 131, 133, 135, 173, 198, 199, 206, 210, 225, 235, 249, 253, 255, 256*

RESPONSE: Before a timber sale would be held in an area previously unroaded and containing timber that was previously not suitable for timber production because of economics (mainly high road costs), the Forest Plan would need to be amended. The amendment process would involve the public. Those areas where the timber is already suitable and timber sales are scheduled could have the road system constructed by the oil and gas operator. At this point in the process, we know where suitable timber exists, but do not know where oil and gas operations will occur.

### TM02   Timber

In view of the national deficit, it is economically unwise to continue to lose money from timber cutting.

*Reviewer(s): 156, 217*

RESPONSE: This issue is beyond the scope of this document.

### TM03   Timber

Do not allow any timber harvest in the Clear Fork/Muddy Basin area.

*Reviewer(s): 200 (Plus 62 form letters.)*

RESPONSE: Any decision to harvest timber in the Clear Fork/Muddy Basin area is beyond the scope of this document. Timber harvest is already scheduled in part of this area. The scheduled sales are subject to harvest, regardless of the decisions made as a result of this oil and gas leasing EIS.

### TM04   Timber

Raising cutting levels as a result of oil and gas access would betray the public trust resulting from the reduced cutting level proposed in the Plan Amendment.

*Reviewer(s): 46, 87*

RESPONSE: The cutting level in the Plan Amendment was based on the suitable timber base. Timber that is potentially suitable would have to be added to the Forest's timber base through another Plan Amendment. Cutting levels could rise as a result of oil and gas access. The increased ASQ would have to be addressed in an amendment to the Forest Plan. It is beyond the scope of this document to suggest an increased ASQ.

BLM_0048400

Oil and Gas Leasing Analysis FEIS

### TM05    Timber

The FSEIS for the Forest Plan Amendment does not address the effects of timber harvesting following oil and gas access. The cumulative effects of timber harvesting resulting from oil and gas access needs to be addressed in this document.

*Reviewer(s): 16, 46*

RESPONSE: The Forest's ASQ would not increase as a result of this document. The timber harvest for the construction of the facilities needed for oil and gas operations would be counted as part of the Forest's timber target. The cumulative effects of these activities were discussed on pages IV-38 and IV-85 - IV-86.

### TM06    Timber

The document does not adequately discuss why particular locations are presently considered uneconomical for timber harvest.

*Reviewer(s): 41*

RESPONSE: It is beyond the scope of this document to address timber in specific locations and why the timber there is considered uneconomical. Generally, timber harvest is considered uneconomical in areas where the cost to construct roads is high. See the Forest Plan, Table II-18 on page II-52 and Table F-2 on page F-3.

### TM07    Timber

The three Roadless Areas proposed for protection under Alternative 2 have limited timber resources while large amounts of timber are found in Roadless Areas proposed for leasing. This seems to more than just a consequence.

*Reviewer(s): 13*

RESPONSE: The three Roadless Areas proposed for protection (*No Lease*) in the DEIS are among several of the Roadless Areas with limited timber resources. Many of the Roadless Areas that have more of a timber resource are also the areas where timber sales are scheduled according to the Forest Plan timber amendment. There would be no justification to close areas to oil and gas activity where timber sales are currently scheduled. Several of the other Roadless Areas with limited timber resources are available for oil and gas leasing. These areas include Campbell Point, Johnson Creek and Kelso Mesa.

### TM09    Timber

The Forests motivation to allow oil and gas activity in currently undeveloped areas is to access timber.

*Reviewer(s): 185*

RESPONSE: The Forest's motivation is to provide opportunities for the exploration and development of oil and gas resources; resources used by the American public in numerous ways. Timber accessed by oil and gas activity could not be harvested until it is added to the Forest's suitable timber base. Adding timber to the Forest's base is beyond the scope of this document and would have to be handled in an amendment to the Forest Plan.

### TM10    Timber

How much timber might be harvested as a result of oil and gas activities?

*Reviewer(s): 185*

RESPONSE: See the revised discussion on page IV-85.

BLM_0048401

**TM11    Timber**

Page IV-41 tries to say the cumulative effects on vegetation as a result of 47 wells will be minimal. What is the effect of additional timber harvest following oil and gas activity - 110,000 acres proposed in 15-year timber plan, plus what?

*Reviewers: 185*

RESPONSE: See the response to Comment #: TM10.

**WI01    Wilderness**

Do not allow oil and gas activity in Wilderness.

*Reviewers: 17, 70, 132, 152, 186, 229, 251*

RESPONSE: Oil and gas activities, such as drilling and road and well pad construction are not allowed in designated Wilderness areas. Some activities such as exploration may be allowed with terms and conditions to ensure that activities are conducted in a manner compatible with the preservation of the Wilderness environment (FSM 2323.7). Gathering mineral information may be allowed in designated Wilderness. Activities that may be allowed include surface mapping, excavation and sampling with hand tools, seismic, gravity, magnetic, heat flow, resistivity and other geophysical or geochemical surveys; and stream sediment surveys. Activities must involve only very minor surface disturbance and must be compatible with the preservation of the Wilderness environment.

BLM_0048402

Oil and Gas Leasing Analysis FEIS

# Letters Received from Federal, State and Local Agencies and Organizations

Copies of letters received from Federal, State and local agencies and organizations follow. Individual comments have been identified in the left margins. These comment numbers correspond to the comments in the previous section.

BLM_0048403



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Centers for Disease Control
Atlanta GA 30333

October 13, 1992

Oil and Gas Leasing Analysis
ATT: Robert L. Storch
Forest Supervisor
Grand Mesa, Uncompahgre and Gunnison National Forests
2250 Highway 50
Delta, Colorado 81416

Dear Mr. Storch:

We have completed our review of the Draft Environmental Impact Statement
(DEIS) for for Oil and Gas Leasing, Grand Mesa, Uncompahgre and Gunnison
National Forests.  We are responding on behalf of the U.S. Public Health
Service.

We note that oil and gas operations are currently operating within the study
area and adverse impacts have been prevented from occurring to the groundwater
quality and levels.  It is stated that if the required stipulations,
regulations, standard engineering practices and appropriate mitigation
measures are followed, additional oil and gas development activities should
not result in long term cumulative impacts to groundwater.  However, our
specific concern involves the potential risks associated with toxic spills at
the well pads or in transportation to and from the sites.  Our review did not
reveal special contingency plans that would be implemented to minimize effects
of potential spills.  Although it is stated that any major spill must be
immediately reported to the Forest Service and BLM, we suggest that the FEIS
elaborate on existing contingency plans that would be implemented if a major
spill were to occur.

STP19

Thank you for the opportunity to review and comment on this document.  Please
ensure that we are included on your mailing list to receive a copy of the
Final EIS, and future EIS's which may indicate potential public health impact
and are developed under the National Environmental Policy Act (NEPA).

Sincerely yours,

Kenneth W. Holt

Kenneth W. Holt, M.S.E.H.
Special Programs Group (F29)
National Center for Environmental
Health and Injury Control

---

| UNITED STATES | SOIL | ROOM E200C |
|---|---|---|
| DEPARTMENT OF | CONSERVATION | 655 PARFET STREET |
| AGRICULTURE | SERVICE | LAKEWOOD, CO 80215-5517 |

SUBJECT: ECS - Review of Draft Environmental   DATE: September 22, 1991
         Impact Statement
         SCS Environ. Document 1329
         Draft Oil and Gas Leasing
         Environmental Impact Statement,
         Grand Mesa, Uncompahgre and Gunnison
         National Forests

TO: Robert L. Storch, Forest Supervisor    FILE CODE:  190-15-13
    Oil and Gas Leasing Analysis
    Forest Supervisor's Office
    Grand Mesa, Uncompahgre and Gunnison National Forests
    2250 Highway 50
    Delta, Colorado 81416

The Staff Forester and State Soil Scientist have reviewed this document.
We have no additional comment at this time.

DUANE L. JOHNSON
State Conservationist

cc: Lee E. Hill, State Resource Conservationist, Lakewood, CO
    James B. Newman, Director, Ecological Sciences Division,
    Washington D. C.



**United States Department of the Interior**

OFFICE OF THE SECRETARY
OFFICE OF ENVIRONMENTAL AFFAIRS
DENVER FEDERAL CENTER, BUILDING 56, ROOM 1018
P.O. BOX 25007 (D-108)
DENVER, COLORADO 80225-0007          October 8, 1992

ER 92/787

Robert L. Storch, Forest Supervisor
Grand Mesa, Uncompahgre, and
  Gunnison National Forests
2250 Highway 50
Delta, Colorado  81416

Dear Mr. Storch:

The Department of the Interior (DOI) has reviewed the Draft
Environmental Impact Statement (DEIS) for Oil and Gas Leasing
Analysis; Grand Mesa, Uncompahgre, and Gunnison National Forests
(Forests); Delta, Garfield, Gunnison, Mesa, Montrose, Ouray, and
San Miguel Counties, Colorado, and has the following comments.

Fish and Wildlife Resources

ALT501  The Fish and Wildlife Service (FWS) recommends that Alternative 5
be selected because it prevents new oil and gas leases in
"Roadless Areas" and "Semi-Primitive Non-Motorized Areas" and
protects wildlife and natural resource values.  Also, in order to
RA07    protect wildlife values, FWS concurs that existing leases should
not be renewed in these areas when lease permits expire or are
relinquished.

If the Forest Service does not choose Alternative 5, at a
minimum, the following "Roadless Areas" should not be available
for leasing:

RA181
RA185       181   Raggeds
RA191       185   Electric Mountain
RA193       191   Priest Mountain (areas a, b, c, d, f, h, and i)
RA194       193   Battlement Mesa
RA195       194   Nick Mountain
RA200       195   Kannah Creek
RA241       196   West Elk
RA242       200   Whetstone Mountain
RA243       241   Roubideau
RA246       242   Tabeguache
RA247       243   Kelso Mesa
            246   Campbell Point
            247   Johnson Creek

Robert L. Storch                                               2

STP01   All appropriate controlled surface use, no surface occupancy, and
AEAT01  timing restrictions should be enforced.  FWS recommends "no
AEGH01  lease" in tundra/alpine habitats, in high to moderate geological
AERC01  hazard sites, and in the Crag Crest area.  They also recommend
AER01   that the Forest Service strictly enforce no surface occupancy in
AETE01  riparian areas as regulated under 36 CFR 228.  The controlled
        surface use, no surface occupancy, and timing restrictions should
        be applied to areas where threatened, endangered, candidate, and
        sensitive species may occur.  If threatened or endangered species
AETE03  do occur in proposed lease areas, and the Forest Service
        determines that the projects may adversely affect listed species,
        then formal Section 7 consultation with the FWS will be required.

National Park Resources

Air Quality

AEG10   The air quality analysis in the DEIS does not address possible
        impacts to national park system resources.  Three national park
        system units are located near the three Forests:  Colorado
        National Monument (class II), Curecanti National Recreation Area
        (class II), and Black Canyon of the Gunnison National Monument
        (class I).  Impacts to the air quality of these three units
        should be discussed and the Final EIS (FEIS) should include a map
MAP01   locating these units.

        There has been, and is now, limited oil and gas development in
        these National Forests.  The Reasonably Foreseeable Development
        Activity analysis indicates that as many as 67 new wells could be
        drilled in the next 15 years if exploratory drilling is
        successful in each of the high potential area basins.  No
        cumulative air quality analysis was included in the DEIS
        comparing present air quality from existing sources and the
        potential contribution from the new oil and gas development.  The
        Bureau of Land Management (BLM) has determined that an individual
        oil well can be a major source of air pollution, emitting more
        than 250 tons per year of one or more regulated air pollutants
        such as sulfur dioxide, nitrogen oxides, volatile organic
        compounds, carbon monoxide, particulate matter, or hydrogen
        sulfide (See Williston Basin Regional Air Quality Study, November
        1990.  This document is available at the BLM's Dickinson District
        Office, 2933 Third Avenue West, Dickinson, North Dakota 58601.)
AEG11   The FEIS should include a cumulative air quality analysis.

        There were no specific air quality mitigating measures included
        in the DEIS, only references to "Standard Lease Terms" under the
AEG12   "Stipulations" section (yet no standard lease terms were
        included).  There are air quality mitigating measures that, when
        applied, can help to reduce or minimize air pollutant emissions
        from various oil and gas development sources and their impacts on
        the air pollution sensitive resources (air quality-related

Robert L. Storch                                                        3

values) of any nearby class I areas.  Any questions regarding air
quality should be addressed to Erik Hauge, National Park Service
Air Quality Division, at (303) 969-2078.

Curecanti National Recreation Area

The DEIS states (Abstract and page I-3) that "low" and "no
potential" areas are not being considered for future leasing.
This includes most of the Forest near Curecanti National
Recreation Area.  It also states that current or potential
wilderness areas are not included (page IV-8).  However, the map
addendum shows these areas (in white) as proposed for standard
leasing terms.  The map in the FEIS should differentiate these
areas from both the areas of high and moderate potential being
proposed for standard leasing terms (in white) and the high and
moderate potential areas proposed as off limits to leasing (in
red).

MAP02

The areas of greatest concern are the sections of land in T. 49
N., R. 6 W. near Cimarron Point that are managed by the Gunnison
National Forest.  Fourteen of the sections are categorized in the
DEIS as having moderate hydrocarbon potential.  This rating
appears to be unfounded.  Surface geological maps of this area
indicate a thin sedimentary carapace of the Cretaceous Mancos
Formation, Dakota Group, and Jurassic Morrison Formation
overlying exposed crystalline basement.  Regional dip is away
from the scarp faces exposed at Black Canyon, making it
improbable any seal or trap remains intact or not flushed.
Reservoir quality of the Dakota Group is compromised by the
presence of the proximal facies of the Burro Canyon Formation.
This entire assemblage in turn is capped or intruded in places by
Tertiary lavas and ash flow tuffs, making source over-maturation
likely.  In light of these highly nonprospective qualities, the
National Park Service (NPS) believes a "no potential"
classification would be more appropriate for this area.

AEGE01

Should the Forest Service decide not to change its ranking of
these sections, the NPS believes that it would be best if all
sections are placed under controlled surface use, and where
preferred by the Forest Service, no surface occupancy, as opposed
to the present proposal of only portions of each of these
sections receiving such protection.  This is because a major
stream (Crystal Creek) flows through the area and another stream
(Mesa Creek) flows within one-half mile of the area.  All surface
flow enters these two waterways and they, in turn, enter the
reservoir which is the water supply for the Curecanti National
Recreation Area (Area), its visitors, and its residents.  Should
a chemical release or oil spill occur, it is likely that it would
eventually enter the reservoir and degrade the water quality.
Another reason for the added stipulations is that the DEIS does
not map the animal migration routes and staging areas

AEMW03

AEW08

Robert L. Storch                                                        4

(principally elk and deer), nor does it fully analyze them.
Additional protection would help to ensure that wildlife using
both the Area and Forest Service lands are protected.

AEW08

Mineral Resources

Mineral resources, other than oil and gas and coalbed methane,
are not discussed in the DEIS.  However, the proposal for oil and
gas leasing apparently would not directly impact other mineral
resources.  In fact, reopening the Forests to oil and gas leasing
may make some areas of the Forests more accessible for mineral
exploration.  However, the decision to make some areas restricted
or closed for leasing could lead to similar restrictions for
those same areas on exploration and development activities for
other mineral resources.  Therefore, the possible long-term
impacts on other mineral resources in the areas proposed to be
restricted or closed to leasing should be addressed in the FEIS.

AEGE02

Sincerely,

Robert F. Stewart
Regional Environmental Officer

cc:    FWS/Denver
       FWS/Golden
       NPS/Denver
       BOM/IPOC



**UNITED STATES DEPARTMENT OF THE INTERIOR**
*FISH AND WILDLIFE SERVICE*
FISH AND WILDLIFE ENHANCEMENT
Western Colorado Sub-Office
529 25½ Road, Suite B-113
Grand Junction, CO 81505-6199

PHONE: (303) 243-2778          FAX: (303) 245-6933

IN REPLY REFER TO:
FWE/CO:FS:GMUG NF                    FS:  2670
MS 65142 GJ

August 19, 1992

Robert Storch, Forest Supervisor
Grand Mesa, Uncompahgre, Gunnison National Forests
2250 Highway 50
Delta, Colorado  81416

Subject:   Comments on Preliminary Draft Environmental Impact Statement for
           Oil and Gas Leasing on the Grand Mesa, Uncompahgre and Gunnison
           National Forests

Mr. Storch:

The Fish and Wildlife Service (Service) has reviewed the subject preliminary
draft EIS and provides the following comments.  Unless the content of the
draft EIS is significantly altered, these comments should be regarded as
applicable to the draft EIS.

ALT501 | The Service prefers alternative 5.  This alternative prevents new oil and gas
        leases in Roadless Areas and Semi-Primitive Non-Motorized Areas.  Existing
        leases would not be renewed in these areas if lease permits expired or were
        relinquished.  The Service prefers this alternative because we believe that
RA01    areas with Roadless Area designation should remain roadless for their
        wildlife, natural resource, and scenic values.

        If the Forest Service does not choose alternative 5, at a minimum, the
        following Roadless Areas should not be available for leasing:

RA181   181 Raggeds
RA185   185 Electric Mountain
RA191   191 Priest Mountain (areas a,b,c,d,f,h,i)
RA193
RA194
RA195   193 Battlement Mesa
RA196   194 Nick Mountain
RA200   195 Kannah Creek
RA241   196 West Elk
RA243   200 Whetstone Mountain
RA246   241 Roubideau
RA247   242 Tabeguache
        243 Kelso Mesa
        246 Campbell Point
        247 Johnson Creek

STP01  | All appropriate controlled surface use (CSU), no surface occupancy (NSO), and
        timing restrictions (TR) should be enforced.  The Service recommends "no

---

Page 2

AEAT01
AEGH01 | lease" in tundra/alpine habitats, in high to moderate geological hazard sites,
AERC03 | and in the Crag Crest area.  We also recommend that the Forest Service
AER01  | strictly enforce NSO in riparian areas as regulated under 36 CFR 228.  The
         CSU, NSO, and TR should be applied to areas where threatened, endangered,
AETE01   candidate and sensitive species may occur.  If threatened or endangered
AETE02   species do occur in proposed lease areas these areas should be prevented from
         having oil and gas activities.  Potential impacts to threatened, endangered,
         and candidate species will be more closely analyzed upon receipt of the
         biological assessment for the subject oil and gas leasing.

If the Service can be of further assistance, please contact Terry Ireland at
the letterhead address.

                                   Sincerely,

                                   Keith L. Rose
                                   /Assistant Colorado State Supervisor

pc:   FWS/FWE Golden
      FWS/FWE Salt Lake City
      CDOW, Grand Junction





**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION VIII
999 18th STREET - SUITE 500
DENVER, COLORADO 80202-2466

OCT 30 1992

Ref: 8WM-EA

Robert L. Storch, Forest Supervisor
USDA Forest Service
Grand Mesa, Uncompahgre, and Gunnison National Forests
2250 Highway 50
Delta, Colorado 81416

Re: Grand Mesa, Uncompahgre, and Gunnison
National Forests - Draft Environmental
Impact Statement for Oil and Gas Leasing

Dear Mr. Storch:

In accordance with our responsibilities under the National Environmental Policy Act (NEPA) and Section 309 of the Clean Air Act, the Region VIII office of the Environmental Protection Agency (EPA) has reviewed the Draft Environmental Impact Statement (DEIS) for Oil and Gas Leasing in the Grand Mesa, Uncompahgre, and Gunnison National Forests (GMUG), Colorado issued by the U.S. Forest Service (USFS) and the Bureau of Land Management (BLM). We offer the following comments for your consideration in preparing the Final EIS.

**Information Adequacy Concerns**

As a result of recent informative discussions with the Forest Service concerning a number of oil and gas leasing documents, the EPA has gained a better perspective of the general approach being used by the FS in conducting these analyses.

The EPA recognizes that lease analysis documents attempt to provide base information for conducting impact analyses concerning potential development sites dispersed over large geographical areas. Often, this must be performed without specific knowledge of where planned development activities may occur. Further, existing data bases are often inadequate to sufficiently characterize aquatic, terrestrial, and airshed resources, nor the degree to which they are at risk.

Given those conditions, we believe, as the GMUG EIS states, that a leasing document is best suited for a more broad-scale, programmatic level of analysis. This analysis should, at minimum, present an inventory of affected resources (for example, identification of watersheds/significant tributaries) and impact analyses in which the existing resource tolerances/impairments are identified. This should be beneficial in narrowing the focus of subsequent project-level analyses when more definitive

*Printed on Recycled Paper*

information regarding planned locations is available. However, in past practice, due to Agency resource limitations and time constraints once the Application for Permit to Drill (APD) has been submitted, we recognize it has frequently been difficult to collect and analyze sufficient baseline data, prior to ground disturbance, to ensure the effectiveness of proposed mitigation planning.

As a possible means of addressing environmental database needs, the EPA suggests consideration of the following in preparing the Final EIS:

o   Based on discussions with the Manti-La Sal National Forest and USFS Region 4, draft language of a lease notice for water quality monitoring has been prepared for inclusion in the Forest's oil and gas leasing Final EIS and is shown as an example below. The EPA believes the use of a "lease notice" or an equivalent approach serves to provide timely notice of project-level monitoring requirements that should be incorporated into development planning. It also should provide a more realistic timeframe for acquiring pre-ground disturbance baseline data in areas where such information is lacking. In addition to the example shown below, the Shoshone National Forest and USFS Region 2 are currently developing a version of monitoring notices/stipulations for the Shoshone's lease analysis.

STP21

**LEASE NOTICE**

**This lease was issued based on limited available information regarding water resources that may be affected by oil and gas operations. No activities can be approved that would violate the "Clean Water Amendments Act of 1972" as amended and associated Federal and State regulations. In order to assure compliance with the applicable laws and regulations regarding protection and non-degradation of water quality, the lessee may be required to collect flow and quality baseline information for any surface and subsurface waters that could be adversely affected, prior to approval of proposed operations. The lessee will be required to establish a monitoring program capable of identifying and measuring any affects to water flow and quality that may occur as a result of operations.**

**Requirements for baseline data collection and water monitoring will be determined on a site-specific basis.**

2

o   Because of the broad scope of the analysis area and
    resources involved, the leasing document has the potential
    for being very useful in identifying:

    1.   Locations of terrestrial, water, or biological
         resources which have a potentially greater importance
         or sensitivity to impacts, and

    2.   Locations of resources where existing knowledge of the
         resource or its sensitivity is currently lacking.

NP18    The Final EIS should provide an inventory-type of resources
        summary from which subsequent site-specific analyses can be
        readily tiered.  Existing data in areas where development is
        most likely to occur, particularly for existing leases,
        should be more fully analyzed to characterize the quality of
        resources at risk and presented in a summarized format in
        the FEIS.

        This information should be helpful in determining baseline
        and monitoring requirements for individual leases as well as
        for assessing cumulative impacts.  We highly recommend
        referencing the Shoshone National Forest's Oil and Gas
        Leasing EIS for the Forest's approach in cumulative effects
        analysis.

o   The existing database and past drilling history should be
    useful for establishing specific resources monitoring
    programs.  Although site-specific monitoring programs are
    required at the APD stage, the Final EIS should disclose the
STP22   types of monitoring information that will be required by the
        USFS and the BLM for resources protection at the project
        level.

Document Rating

    Based on the procedures EPA uses to evaluate the
environmental impacts and the adequacy of information provided in
EISs of the proposed action and alternatives, the EPA Region VIII
rates the Draft Environmental Impact Statement (DEIS) for Oil and
Gas Leasing on the Grand Mesa, Uncompahgre, and Gunnison National
Forest as category EC-2 (Environmental Concerns, Insufficient
Information).  This rating indicates that EPA has identified
potential environmental impacts which should be avoided in order
to fully protect the environment.  Additionally, the DEIS does
not provide sufficient information to fully assess environmental
impacts that should be avoided and lacks information concerning
monitoring requirements for protection of aquatic, terrestrial,
and air resources.

    The EPA appreciates the opportunity to review and comment on
the Draft EIS.  If you may have questions related to our
comments, please contact Larry Kimmel at (303) 293-1697.
Enclosed are additional detailed comments concerning issues in
the document.

                              Sincerely,

                              Robert R. DeSpain

                              Robert R. DeSpain, Chief
                              Environmental Assessment Branch
                              Water Management Division

Enclosure

cc:  Pam Case, USFS Region 2
     Corky Ohlander, USFS Region 2
     Mike Hanmer, USFS Region 2
     Greg Bevenger, USFS Shoshone National Forest
     Carter Reed, USFS Manti-La Sal National Forest

3                                   4

BLM_0048409

DETAILED SCOPING COMMENTS BY EPA REGION VIII:
DRAFT EIS FOR OIL AND GAS LEASING IN GRAND MESA, UNCOMPAHGRE, AND
GUNNISON NATIONAL FORESTS

**General Comments:**

1. Chapter I - _Purpose and Need_ does not clearly state the underlying "purpose and need" for the proposal as defined by NEPA (40 CFR 1502.13). The purpose and need should specify the need to the which the Forest Service is responding and what the alternatives including the proposed action are designed to address. The Decisions to be Made (p. I-6) and "real DECISIONS TO BE MADE" also do not seem to reflect the purpose as defined on p. I-1. The Final EIS should provide **NP19** a concise statement of purpose and need.

2. With respect to resources protection, Alternative 5 appears to be the most protective of the development alternatives. This alternative differs from the preferred alternatives. Alternative 2, in its treatment of Roadless Areas and Semi-Primitive Non-Motorized (SPNM). Alternative 2 applies a Standard Lease Term (SLT) to such areas, while Alternative 5 makes those areas administratively unavailable (No Lease). It would appear that applying a Controlled Surface Use (CSU) stipulation to Roadless Areas would provide a more **ALT207** protective alternative than the SLT provision used in Alternative 2 that would still allow reasonable access to those areas. On Figure II-2, which shows lease restrictions for Alternative 2, it appears that a major portion of the Roadless Areas already overlap with areas designated for either NSO or CSU restrictions.

3. On page I-14, the document states "The _No Surface Occupancy (NSO)_ stipulation is intended for use only when other stipulations are determined insufficient to adequately protect the public interest. _No Surface Occupancy_ means just that. No roads, buildings, well pads, and pipelines would be allowed. No disturbance or use of the surface would be allowed in those _Affected Environments_ where the _No Surface Occupancy_ stipulation is selected."

   If that definition of NSO were strictly applied, no impacts could occur such as those described on p. S-16 for aquatic/riparian/wetland habitats, where NSO is stipulated. The definition of NSO, as stated in this section, appears misleading given that, within compliance of NEPA, the Forest Service may modify, waive, or grant an exception to a stipulation including the NSO (pages I-15 and I-16). The fisheries and wetlands NSO discussions on page IV-15 clarify permitted exceptions to NSO, such as stream crossings, that may result in potential impacts. For consistency, we

**STPN05** recommend that a brief acknowledgement of exceptions be noted, whenever that may be relevant to the discussion of NSO.

4. The document notes that 220,000 acres are currently under lease and 40 wells are projected for those existing leases. Given our understanding that those wells are projected to be drilled within the 951,450 study area for each option including Alternative 3 (No Lease), in the Environmental Consequences Summary (pages II-50 through II-53) indicating "No effect from O&G activity" is a confusing statement. This would seem to indicate that the oil and gas lease analysis is being conducted only for the 7 wells projected for new leases, rather than being based on the total impacts of the range of 40-47 wells. In addition, Table S-3 (p. S-13) shows "0 acres" in the Standard Lease Term category for Alternative 3, which should contain the acreage **CE01** of existing leases. The Final EIS should clarify these issues.

5. The impact analysis should use historical information **AEG24** regarding past oil and gas activities to project actual impacts, such as sedimentation, spills and accidents. Such information serves to determine the effectiveness of previously used mitigation procedures and lease stipulations in protecting the resources.

6. It is not clear whether impacts from reasonably foreseeable connected actions, such as timber harvests referenced on page IV-46, have been considered in this analysis. Although **TM05** the DEIS notes that those activities will require subsequent site-specific analyses, NEPA also requires that the current analysis consider the effects from all reasonably foreseeable actions.

7. Page H-22 - The discussion regarding the Abandonment and Rehabilitation Plan seems to imply that the plan is agreed **OGM04** upon at the end of the development process rather than in the Surface Use Plan of Operations, prior to ground disturbance. This should be clarified in the FEIS.

8. Page H-17 - The document states "No disposal of wastewater will be allowed by subsurface injection". What **OGM05** materials/fluids are considered as applicable to this restriction? How will disposal be accomplished alternatively? The water quantity discussion should also discuss the disposal of produced water.

9. Page H-21 - The FEIS should note that pipeline trenches need **OGM06** to be constructed in a manner so as to not change the natural surface and groundwater flow regime.

5

6

**Resources Monitoring:**

The EIS contains only limited information in Appendix H regarding mitigation and monitoring requirements. Lease conditions should be as specific as possible for each resource in outlining the monitoring requirements under which the lease is to be granted. The EPA recommends that those requirements include:

1. Baseline information that is sufficient in temporal and geographic extent to quantitatively predict impacts;

2. Monitoring information that is quantitatively sufficient to determine whether the specific predictions of impact were reliable and the extent of deviation from these predictions.

3. Monitoring parameters, collection and analytic procedures, frequencies and quality assurance/quality control (QA/QC) that are compatible with the cumulative impact locations set up by the USFS. The Forest should address criteria to be used for determining compliance/remediation.

**Surface Water Quality:**

1. Aquatic resources information should be characterized and displayed in summary form on no larger than a third order river basin approach. The analysis would be enhanced by accompanying maps presented on a scale that allows assessment of the resources and their sensitivities by no larger than a third order river basin. — AER05

2. The above summary should include:

   - name of waterbody and name of 3rd order basin stream
   - length or size of waterbody
   - stream order
   - state assigned beneficial use of waterbody
   - note whether the waterbody is currently meeting standards and its beneficial use
   - presence of any threatened and endangered species or species of special concern
   - any existing stresses on stream
   - indicate whether the stream has particular importance as a spawning or nursery area

   Where information is not available this should be so indicated.

3. Page IV-14 - The water quality section notes that exceptions to No Surface Occupancy may apply in which there would be potential impacts to water quality. This conflicts with the definition of NSO on p. I-14 which appears to allow no

exceptions.

This section also states that "Sediment would be the most significant potential water quality effect." Although sediment can be a significant water quality and aquatic habitat concern, we would also emphasize that other water quality parameters such as metals, Ph, and temperature are indicators for determining the degree of impairment or stress that a waterbody is currently experiencing as well as its sensitivity to further impacts.

In addition, while sediment may be controlled through use of Best Management Practices (BMPs), less predictable events such as a pipeline or vehicular spill of hazardous and/or toxic material could result in significantly more adverse habitat and water quality impacts. The Forest Service provides a good discussion of those potential effects on page IV-62. The risk of catastrophic events may be best minimized through prior planning including development of effective stipulations, mitigation, and monitoring/contingency programs.

4. The FEIS should emphasize concern over the predictive assessment and the monitoring of cumulative impacts on waterbody water quality, aquatic life, and dependent riparian and wildlife resources. This should emphasize stream basins that may be affected by several factors, including forestry, grazing, and oil and gas development, and the development of databases to calculate loading of potential contaminants as a basis for determining acceptable levels from each contributing activity.

5. Pages S-8 and S-9 - The Connected Actions discussion indicates that construction of new roads for oil and gas development provides the opportunity to harvest more timber than would otherwise occur. Normally the timber management EIS ROD has a defined harvest objective. To increase that objective, or move the planned timber harvest from one area to another, would seem to require reanalysis of the timber management EIS ROD. Of particular concern, the new roads may open areas of high potential for water quality impacts from timber harvest.

**Air Quality:**

The Draft EIS does not adequately address the following potential air quality impacts from oil and gas leasing in the study area and should be discussed in the FEIS. — AEG30

1. Emissions of sulfur dioxide (SO2) from waste gas flaring and tail gas incineration from oil production and natural gas

7

8

processing operations are not addressed. These emissions could be of a considerable magnitude, depending on the level of production. Emissions of SO2 could have adverse effects on down-wind Class I Prevention of Significant Deterioration (PSD) Areas. Such impacts may include direct impacts on flora, increases in acid deposition and impacts on visibility. The emissions may cause the Class I or II PSD increments to be exceeded. The West Elk Wilderness is listed in the DEIS as an adjacent Class I area. This and any other Class I areas within 50 kilometers are of particular concern. In addition, secondary impacts due to increased economic activity and population growth due to the leasing and the impact of this growth on the Class I and II PSD increments is not included.

2.
AEG31 | The impact of fugitive hydrogen sulfide (H2S) emissions are not discussed in the Draft EIS. Such emissions create strong rotten egg odors in low concentrations, and are lethal in high concentrations.

**Wetlands and Riparian Areas:**

1.
AER06 | Page S-19 - The "Effects of Alternatives on Wetlands and Floodplains" does not summarize the effects of the alternatives. It is not clear what this section means.

2.
AER07 | Page I-8 - The first paragraph indicates decisions are being made to a map resolution of about 40 acres. Does this imply that the wetland/riparian areas of the analysis area are mapped to a resolution of 40 acres?

3.
AER08 | Page III-50 - The riparian discussion is confused by what appears to have been a conversion of a typical wetland definition to a riparian, but not wetland, description. In particular, the soils discussion in the riparian description appears to be discussion of a jurisdictional wetland soil.

4.
AER09 | Page III-52 - The Forest Service provides an excellent discussion of wetland resources. It should also be noted that the EPA was one of the authors of the 1989 Federal wetlands manual.

5.
AER10 | Page IV-13 - The "Floodplains" discussion regarding potential impacts is limited to water quality, but should also note potential impacts to habitat. The CSU discussion does not mention that pipelines would be allowed in floodplains. If pipelines are allowed in floodplains, there is a greater potential for impacts due to discharge of pollutants to the floodplains and waters of the United States.

9

The "Aquatic/Riparian/Wetland Habitats" discussion implies that the actual impacts to the resource are dependent on the activities approved in the Surface Use Plan of Operations. As noted previously, this should be clarified in context of the NSO stipulation applied to this resource.

6.
CE04 | Page IV-64 - The cumulative effects discussion of wetlands indicates some riparian resources in the analysis area are currently in poor condition and may be further impacted as a result of the proposed action and its indirect impacts. The FEIS should note the cause and degree of such existing impacts and planned restoration, if applicable. It would also be beneficial to highlight known impacted resources, requiring special protection, on maps that would be available at the leasing stage.

7. Page IV-80 - Based on the discussion throughout the DEIS, the inference that only Alternative 1 would adversely affect wetlands is misleading, since none of the construction alternatives totally prohibit well development in riparian areas.

8. Page C-8 - The NSO stipulation should include reference to the necessary construction techniques and BMP's for stream crossings. The NSO should reference whether roads/pad etc. will be allowed in isolated wetlands. Roads should not be allowed which would intercept and move the water supply for wetlands. The stipulation should clearly state that only roads and pipeline crossings will be allowed in wetlands. The stipulation should clearly state that drill pads, staging/storage areas, etc. will not be allowed in riparian/wetland areas.

9.
OGM07 | Page H-19 - The requirement that pads will not be constructed in riparian areas or floodplains should be expanded to include related development features such as sump pits, tank batteries, etc. It may be beneficial to summarize resource protection requirements such as this within the body of the EIS as well as in the Appendix.

For consistency, in the second sentence of the discussion on "Pits", "should not" should be changed to "Pits shall not be constructed in either riparian or aquatic ecosystems."

**Ground Water Quality:**

1.
AEMW09 | The DEIS provides a useful tabular hydrogeologic summary. The ground water discussion could be improved in the FEIS with the addition of cross-sections and maps to identify potentially impacted aquifers.

10

2.  The document notes that current use of groundwater is
    relatively low.  Describe the reasonably foreseeable future
    uses of ground waters for the analysis area.

3.  What state/local regulations governing use and protection of
    ground water currently apply and how are these regulations
    to be included in the decision-making process for this area?
    How will proposed activities be coordinated with the
    Colorado Department of Health and the Colorado Oil and Gas
    Conservation Commission?

OGM01

4.  What ground waters present in the area serve as discharge /
    recharge zones and what measures will be used to protect
    them?

AEMW04



UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
National Ocean Survey
Coast and Geodetic Survey
Rockville, Maryland 20852

MEMORANDUM FOR:  David Cottingham
                 Ecology and Environmental Conservation Office
                 Office of the Chief Scientist

FROM:            Rear Admiral J. Austin Yeager, NOAA
                 Director, Coast and Geodetic Survey

SUBJECT:         DEIS 9208.02 - Leases for Mineral Extraction:
                 Grand Mesa, Uncompahgre, and Gunnison National
                 Forests, Colorado

The subject statement has been reviewed within the areas of Coast
and Geodetic Survey's (C&GS) responsibility and expertise and in
terms of the impact of the proposed actions on C&GS activities
and projects.

All available information about geodetic control points in the
vicinity of the project is provided on the computer diskette(s)
accompanying this memorandum.  Geodetic control information for
Delta, Garfield, Gunnison, Mesa, Montrose, Ouray, and San Miguel
counties is provided on the diskette(s).

GSB1    This information should be reviewed for identifying the location
        and designation of any geodetic control monuments that may be
        affected by the proposed project.  If there are any planned
        activities which will disturb or destroy these monuments, C&GS
        requires not less than 90 days' notification in advance of such
        activities in order to plan for their relocation.

GS02    C&GS recommends that funding for this project include the cost of
        any relocation required for C&GS monuments.  For further
        information about these monuments, please contact the National
        Geodetic Information Branch, N/CG174, Rockwall Building, Room 24,
        National Geodetic Survey Division, NOAA, Rockville, Maryland
        20852, telephone 301-443-8631.

Attachment

cc:  N/CG1x32 - R. Cohen
     N/CG17 - J. Spencer

11



Letters Received from Federal, State and Local Agencies and Organizations

### STATE OF COLORADO

**DIVISION OF LOCAL GOVERNMENT**
Harold A. Knott, Director

Department of Local Affairs



Roy Romer
Governor

Larry Kallenberger
Executive
Director

October 9, 1992

Mr. Robert L. Storch
Forest Supervisor
U. S. Forest Service
Grand Mesa, Uncompahgre and
   Gunnison National Forests
2250 Highway 50
Delta, CO 81416

SUBJECT:  Oil and Gas Leasing - Grand Mesa, Uncompahgre
          and Gunnison National Forests
          Draft Environmental Impact Statement

Dear Mr. Storch:

The enclosed comments on the above-referenced Draft Environmental Impact
Statement have just been received from the Colorado Department of
Transportation.

Please consider this transmittal as an official addition to the letter
we sent you on October 8, 1992.

Thank you for your attention.

Sincerely,

Margaret Dubas

Margaret Dubas, Staff Assistant
Colorado State Clearinghouse

/md

enclosure

1313 Sherman Street, Room 521, Denver, Colorado 80203   (303) 866-2156 FAX (303) 866-2251

---

### STATE OF COLORADO

**DEPARTMENT OF TRANSPORTATION**

4201 East Arkansas Avenue
Denver, Colorado 80222
(303) 757-9011

October 7, 1992

Ms. Margaret Dubas
State Clearinghouse
1313 Sherman Street, Room 521
Denver, Colorado  80203

Dear Ms. Dubas:

The Colorado Department of Transportation has completed its review of the Draft
Environmental Impact Statement for the Oil and Gas Leasing Analysis in the Grand
Mesa, Uncompahgre and Gunnison National Forests and has the following comments.

**RD17** The Draft EIS lists the State highways which go through the analysis area and
those which provide access to the area.  However, we can see no discussion of
potential impacts to these highways.  We realize it is difficult to assess all
the impacts when the exact locations of leasing and development are not known
but some consideration should be given to the possible impacts to the highway
system when selecting areas where oil and gas leasing will be allowed.

**RD18** We are particularly concerned about the increase in access points to the State
highways and the increase in traffic on the highways which could be caused by
oil and gas leasing.  This document should indicate if the State highway system
will be impacted beyond its historical use and if so, to what extent.  Also, in
all documents such as this the Department of Transportation should be listed as
a reviewing and permitting agency for highway access.  All new access points
will require permits from the Department.  All applicants for oil and gas leases
should be made aware of this.

**NP02** Thank you for the opportunity to provide comments on this document.

Very truly yours,

Rebecca D'Spain

for Kenneth M. Gambrill
Manager
Office of Environmental Services

REG/hs

cc:  Robert L. Storch, USFS ←
     Steve Chapman/Carl Watson, Region 5
     Larry Abbott, Region 3



Chapter VI: Response to Public Comments

## STATE OF COLORADO

**DIVISION OF PARKS AND OUTDOOR RECREATION**
Colorado Natural Areas Program

1313 Sherman Street, Rm. 618
Denver, Colorado 80203
Phone (303) 866-3437
FAX   (303) 866-3206

Roy Romer
Governor

Laurie A. Mathews
Director

James D. Von Loh
Program Administrator
Ken Salazar
Director / DNR

October 19, 1992

Robert L. Storch, Forest Supervisor
Grand Mesa, Uncompahgre and Gunnison National Forests
2250 Highway 50
Delta, Colorado 81416

**RE: Draft Environmental Impact Statement Oil and Gas Leasing Analysis**

Dear Mr. Storch:

The Colorado Natural Areas Program (CNAP) appreciates the opportunity to review the Draft Environmental Impact Statement Oil and Gas Leasing Analysis (DEIS) for the Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG). CNAP is particularly interested in any identified, registered or designated state natural areas which might be affected by oil and gas-related activities.

Tabeguache proposed Research Natural Area is the only site within the analysis area that is either identified, registered, or designated with the CNAP. This 655 acre area is a registered natural area with the CNAP. State designation will depend on final establishment as an RNA by the Forest Service.

**A E R N A 1** The Preferred Alternative of the DEIS proposes no lease status for the Tabeguache area. The Colorado Natural Areas Program wholeheartedly supports this alternative; the no lease status fits perfectly with the intended uses of an RNA. CNAP commends the Forest Service on recognizing the importance of the Tabeguache Research Natural Area and Roadless Area by assigning them a no lease status.

We look forward to reviewing the Final EIS and to working with the GMUG on the establishment and designation of the Tabeguache Research Natural Area. Please contact me at 866-3202 x331 or Janet Coles at x330 if we can offer any assistance.

Sincerely,

James D. Von Loh
Administrator/Biologist

**Colorado Natural Areas Council**
Robert R. Kelley, Member ❖ Helen Traylor, Member
Jose Trujillo, Colorado Board of Parks and Outdoor Recreation
Tina Jones, Member ❖ Louis Swift, Colorado Wildlife Commission
Alden Naranjo, Member ❖ John Wilkes, Colorado Board of Land Commissioners

Printed on recycled paper.

---

**STATE OF COLORADO**
Roy Romer, Governor
**DEPARTMENT OF NATURAL RESOURCES**

# DIVISION OF WILDLIFE

AN EQUAL OPPORTUNITY EMPLOYER

Perry D. Olson, Director
6060 Broadway
Denver, Colorado 80216
Telephone: (303) 297-1192

REFER TO



For Wildlife—
For People

October 9, 1992

Mr. Robert L. Storch
Forest Supervisor
Grand Mesa, Uncompahgre and Gunnison National Forests
2250 Highway 50
Delta, CO 81416

RE: Draft Oil and Gas Leasing Environmental Impact Statement

Dear Mr. Storch:

The Division of Wildlife has reviewed the GMUG DRAFT Oil and Gas Leasing EIS. We offer the following comments on the document: First of all, we would like to compliment the Forest Service and the staff for the excellent job in preparing this document. The document is well organized and easy to read. Wildlife concerns were covered with great detail and accuracy. Tom Holland and Jeff Cameron's input to the evaluation is obvious and well done. We appreciate the significance of having concerned biologists on the interdisciplinary team.

Our agency has raised serious questions on the impacts of oil and gas exploitation in this area for over ten years. In particular we are concerned about the impacts of road development and human encroachment associated with the long term use of the new roads. The cumulative impacts of oil and gas exploration and development, logging, woodcutting, recreation and other general uses will have significant impacts on wildlife. This is particularly true in the areas which are currently roadless. Priority should be given to leases along existing roads and in areas where impacts will be reduced. Roadless areas should be avoided, particularly in light of the minimal drilling that is outlined for much of the area in the EIS. If this is true, the recreational, aesthetic and wildlife values which will be lost as a result of major road construction for a few wells is not good land stewardship. Roads should be managed for the operation and maintenance of the well heads and lines only.

**OG29**

**RA04**

**RD08**

DEPARTMENT OF NATURAL RESOURCES, Kenneth Salazar, Executive Director
WILDLIFE COMMISSION, William R. Hegberg, Member • Eldon W. Cooper, Chairman • Felix Chavez, Member • Rebecca L. Frank, Member
Louis F. Swift, Member • George VanDenBerg, Member • Larry M. Wright, Member • Thomas M. Eve, Member

10-9-92
GMUG Oil & Gas EIS
Page Two

Other primary concerns we have include protection of riparian and wetland areas, avoidance of critical areas during important biologic periods such as birthing, nesting, nursing and wintering. Construction avoidance dates outlined in the document are good. We recommend that lessees be made aware of all wildlife concerns at

OG30 — the time of leasing and should be required to formally commit to wildlife mitigation as part of the lease. Mitigation work should occur concurrently with construction work. Off-site mitigation is

OG10 — acceptable if work can be done in areas which will help relieve big game damage in agricultural areas as a result of activities associated with oil and gas development on the forest. This work should be coordinated with the Habitat Partnership Committee. We will be happy to discuss mitigation work with your staff and the proponents.

OG31 — Development should be geographically staggered when possible so that acceptable buffer areas exist between construction sites.
STP11 — Directional drilling should occur to minimize disturbance. Revegetation on disturbed sites should include species which are

STP10 — beneficial for wildlife in both food and shelter values. Vertical as well as horizontal habitat should be considered during reclamation planning.

AEW09 — We would appreciate being involved anytime new units are opened up for development. Working together with the proponents will assist our agencies in developing plans which will meet our respective goals.

NP02 — Thank you for the opportunity to provide input on the EIS and to review the Draft. Please feel free to contact us if you have any questions on these comments or if we can be of further assistance.

Sincerely,

Rick Sherman
Wildlife Biologist

cc: Clark
    McLain
    Morris
    Young

---

# Town of Crested Butte

### P.O. Box 39

### Crested Butte, Colorado 81224

*—A National Historic District—*

Phone: (303) 349-5338
FAX: (303) 349-6626

October 7, 1992

Oil and Gas Leasing Analysis
Forest Supervisor's Office
Grand Mesa, Uncompahgre and Gunnison National Forests
2250 Highway 50
Delta, CO 81416

Dear Mr. Storch:

The Town of Crested Butte has reviewed the 1992 Draft Oil and Gas Leasing Environmental Impact Statement. We would like to make comment on the Draft EIS based on the reasons people live in and visit Crested Butte.

The primary economy of the Town of Crested Butte is tourism in the winter and summer. Activities on the National Forest affect our residents who chose to live in close proximity to the Forest, and the guests of the town who also visit the Forest. Therefore, we are very concerned about Forest activities.

During our review of the draft Environmental Impact Statement about Oil and Gas Leasing, it became apparent that the preferred alternative, number 2, will have many long range and negative impacts to the forest in addition to the average 10 acre disturbance to sites for oil and gas drilling. The most important impact to the town is opening up 18 of 21 roadless areas by allowing roads to be built for oil and gas drilling. We foresee many additional spurs from these roads for other activities including timbering which will affect the pristine environment found in the roadless areas.

We understand that the lease options are designed to minimize the impacts of oil and gas drilling but we also understand that lease options can be waived by the Forest Service, which will minimize their affect.

ALT301 — Therefore, the Town Council of Crested Butte unanimously encourages the Forest Service to choose Alternative 3 "No additional Oil and Gas leasing" on the Grand Mesa, Uncompahgre and Gunnison National Forests.

Sincerely,

James A. Schmidt, Mayor.

Letters Received from Federal, State and Local Agencies and Organizations

**Gunnison County, Colorado**

Board of
COUNTY COMMISSIONERS

303 • 641-0248
GUNNISON, COLORADO 81230

**November 24, 1992**

Robert L. Storch, Supervisor
Grand Mesa, Uncompahgre and Gunnison
National Forests
2250 Highway 50
Delta, Colorado 81416

RE: Draft EIS, Oil and Gas Leasing in the Gunnison National
Forest and Gunnison County

Dear Mr. Storch:

RECS02 — The Gunnison County Board of Commissioners is opposed to any
activity which would present a long term or short term threat to
the Kebler Pass scenic corridor or to designated wilderness
areas. The Board is likewise opposed to any activity which could
AEMW06 — threaten the municipal watershed of the Town of Crested Butte.
Inasmuch as it is unlikely that any oil and gas exploration could
be carried out without endangering these values, the "no lease"
alternative #3 is preferable for those areas.

We recognize that certain roadless areas, specifically the nor-
thern end of units 181 and 182, 184 and 186 have a high potential
for oil and gas production. We do not propose an outright ban of
oil and gas exploration in these units. The Board does oppose
the use of oil and gas roads for general motorized penetration
RD08 — into roadless areas. Wherever possible, exploration roads should
RD10 — be closed, obliterated and reclaimed. Roads which must remain
open should be limited and carefully controlled. The values of
roadless areas cannot be ignored or underestimated.

Sincerely,

GUNNISON COUNTY BOARD OF COMMISSIONERS

Fred R. Field
Chairman

Mario V. Petri
Vice Chairman

R.A. Santarelli
Commissioner

COURTHOUSE SQUARE   200 EAST VIRGINIA   GUNNISON, COLORADO 81230



**Mesa County Department of Public Works**
**Division of Planning**

FOREST SERVICE
DELTA
RECEIVED

(303) 244-1636

750 Main Street   P.O. Box 20,000 • Grand Junction, Colorado 81502-5022

13 October 1992

Oil and Gas Leasing Analysis
Forest Superviser's Office GMUG National Forests
2250 Highway 50
Delta, CO 81416

RE: Draft EIS - Oil and Gas Leasing

Dear Mr. Storch:

Thank you for the opportunity to comment of the Draft Oil and Gas
Leasing EIS by the U. S. Forest Service. The document is well
written and includes a thorough analysis. Mesa County has an
excellent working relationship with the Bureau of Land Management
through an intergovernmental memorandum of understanding which
includes permitting oil and gas drilling activities. Now the
Forest Service is taking responsibility for leasing oil and gas
resources on the GMUG, we look forward to coordinating oil and gas
permitting with your office.

Mesa County recognizes the value of oil and gas resources to the
local, state. and national economies. We are committed to working
with all involved parties to ensure our natural resources are
utilized in a manner which has the least negative impact on the
residents and environment of Mesa County. The preferred
ALT201 — alternative. Alternative #2, appears to address most of our
RA195 — concerns. We commend the attempt to maintain Kannah Creek, Priest
Mountain. and four other roadless areas as natural communities.
However, some additional roadless areas in Mesa County may deserve
the status of "no surface occupancy", e.g. Clear Creek, Area 186,
RA186 — "the most roadless Roadless Area" where "Continued oil and gas
development...could alter the character of the area so much that it
would  lose  its  remoteness,  solitude  and  overall  roadless
character." (Page III-65 DEIS). Also, please note the map on page
MAP04 — III-113 of the DEIS "Roadless Areas (North Half)", Figure III-8a
includes errors in labels and the legend. e.g. Area 189 (Hightower)
is not in the legend. and is Battlement Mesa Area 183 or 193 ?

Another concern is how this DEIS will be affected by the current
travel management planning effort for the GMUG. The Final EIS
STP12 — should not recommend an alternative which would result in conflicts
between forest trail users and oil and gas resources.

NP02 — Thank you for your time and consideration of these comments.

Sincerely,

Keith B. Fife, AICP
Assistant Director of Planning

**ARCO Oil and Gas Company** ◇

Dallas, United
P.O. Box 509 1803
Ottawa, Texas 79702
Telephone 915-688-5200

October 12, 1992

Oil and Gas Leasing Analysis
ATTN: Robert L. Storch, Forest Supervisor
Grand Mesa, Uncompahgre and Gunnison National Forests
2250 Highway 50
Delta, CO 81416

RE:    DRAFT - Environmental Impact Statement
Grand Mesa, Uncompahgre and Gunnison National Forests

Dear Mr. Storch:

NP02    ARCO Oil and Gas Company appreciates the opportunity to comment on the draft of "Oil and Gas Leasing Environmental Impact Statement" for the Grand Mesa, Uncompahgre and Gunnison National Forest. We have some concerns and suggestions listed below that we offer for your consideration.

RA195A
RA241A    ARCO feels that just because some roadless areas have been mentioned in recent legislation, unless they are actually included in wilderness areas *No Lease* stipulations
RA242A    should not be automatically attached to those areas.

0G24    We question the use of the term *"no potential"*; just because there is no present potential does not mean there will be no future potential. Technology can and is changing, giving industry more opportunities to find additional reserves. A current example is the development and increasing use of 3-D seismic. Oil and gas potential is being identified in areas previously thought to have none.

AEG17    We also question the use of the phrase *"expecting no impact"*; impacts on the environment can be minimized but we feel there is no such thing as no impact. Anytime any activity occurs some type of impact to the environment takes place. The key is to minimize adverse impacts.

RA191D    ARCO feels that possibly more acreage in the Flat Top area might be considered for *Controlled Surface Use* leasing instead of *No Surface Occupancy* or *No Lease*. The area is considered *"high potential"* in your draft. However, we submit this comment realizing we are not familiar with the topography of the area.

ALT201    ARCO in general concurs with the selection of "Alternative 2" as the preferred plan. We believe this will meet the National Forest objectives and will still allow the industry to develop the minerals.

If you have any questions about our comments please contact me at 915/688-5338 or Elizabeth A. Casbeer at 915/688-5570.

Yours very truly,

*Elizabeth S. Bush*

Elizabeth S. Bush
Regulatory & Compliance Coordinator

EAC/ESB

xc: R/C Files

---



**IPAMS**    1214 Denver Club Building • 518 17th Street • Denver, Colorado 80202-4167 • 303-623-0987 • FAX 303-893-0708

Independent
Petroleum
Association
of
Mountain
States

9 October 1992

**OFFICERS & STAFF**

Christian A. Kennedy
*President*

Karin P. Kauffman
*Vice President*

Karen Ostrander-Krug
*Secretary*

Philip E. Day
*Treasurer*

Kevyn L. Plesh
*Executive Director*

Alexander Woodruff
*Director of
Regulatory Affairs*

**EXECUTIVE COMMITTEE**

William J. Barrett
Robert L. Bayless
Eli D. Babcock
Michael Budde
J. C. Bradley
David Bradshaw
Michael R. Carr
Lawton L. Clark
Kathleen L. Cox
William R. Dumbble
Jack Ekstrom
George H. Fancher, Jr.
Lester J. Petry
Paul G. Gagnon
E. H. Ghalcki
John Haupek
Thomas M. Hargreaves
Ronald E. Herzig
William L. Hubbell
L. Roger Hutson
Jacob Jones
Fred C. Julander
Eugene C. Kaczkowski
Don Laupa
Sylvia P. Little
Carter G. Mathies
Jack M. Merritt
Lynn Meyer
David M. Posner
Randall C. Sander
H.E. "Gay" Shasha
L. E. Shaw
William R. Smith
Donald Cory Smith
Conley P. Smith
Ned A. Stanley
Paul R. Stewart
Thomas J. Vessels
James J. Volker
Paul J. Zanuki

Robert L. Storch, Forest Supervisor
Grand Mesa, Uncompahgre, and Gunnison National
Forests
2250 Highway 50
Delta, Colorado 81416

Dear Mr. Storch:

The Independent Petroleum Association of Mountain States (IPAMS) is a non-profit, non-partisan trade association representing the interests of independent oil and natural gas producers, royalty owners, industry consultants, and service/supply companies operating in a ten-state Rocky Mountain area: New Mexico, Wyoming, Colorado, Montana, North Dakota, Utah, Nebraska, South Dakota, Nevada, and Arizona.

IPAMS submits these comments in response to the Draft Environmental Impact Statement Oil and Gas Leasing Analysis for the Grand Mesa, Uncompahgre and Gunnison National Forests. IPAMS welcomes the progress of the oil and gas leasing program initiated by the Forest Service. However, we maintain some concerns regarding the DEIS and the final decision.

The domestic oil and natural gas industry is in a state of crisis. The rig count is at a forty-year low. The major oil and gas companies are leaving the U.S. to develop resources abroad, due largely to unreasonable and burdensome regulations. The independent companies that are left have survived the lean times; they are the future of the domestic industry. Independents drill about 85 percent of all domestic wells — both exploratory and development, onshore and offshore. They produce about 31 percent of all U.S. crude oil and approximately 60 percent of all natural gas and find more than half of all new oil and gas reserves in the United States.

Robert Storch
9 October 1992
Page 2

Oil and gas leasing on federal lands is increasingly becoming a regulatory nightmare. While IPAMS recognizes and respects the critical imperative of maintaining a healthy environment, the Forest Service with its multiple use mandate must recognize and encourage the development of oil and gas on federal lands.

Natural gas abounds in the Rocky Mountain states. The Rockies contain more natural gas than Texas and the Gulf Coast area combined. If these vital resources are to be developed, access to and development on public lands will play a crucial role. Exploration and production of petroleum reserves must be a reasonable venture on public lands. The Forest Service needs to remain a competitive lessor to facilitate this goal. Operators simply cannot stand the immense pressures of overregulation. They will either take their business elsewhere or go out of business.

**ALT401**

**STP17**

After careful consideration of the alternatives, IPAMS finds that the only reasonable alternative is Alternative 4. Standard lease terms and conditions are designed to protect the environment. No surface occupancy and controlled surface use stipulations are broad ranging restrictions placed on leases. Typically, they do not solve the problem or strike a balance between development and preservation. IPAMS believes that potential conflicts are best addressed with site specific mitigation measures and timing stipulations. For example, timing stipulations can be implemented during crucial elk calving periods.

**ALT403**

**ALT205**

Given the low amount of predicted surface disturbance, approximately 503 acres over the next 15 years, IPAMS recommends that the Forest Service adopt Alternative 4 and work closely with the lessees to ensure that proper environmental considerations are carried out. Locking up large tracts of land and denying access to those areas with restrictive stipulations violates the multiple use mandate of the Forest Service.

While IPAMS recognizes that the Forest Service must balance a number of management goals, the Service's "preferred alternative," Alternative 2, is unacceptable to the oil and gas industry. Alternative 2 places many high oil and gas

potential areas under No Surface Occupancy, Controlled Surface Use and No Lease stipulations and conditions. This in effect renders the Forest Service leasing program immaterial to operators. In addition, IPAMS reminds the Forest Service that detailed NEPA analysis takes place again at the Application for a Permit to Drill stage.

In closing, IPAMS objects to the current direction the Forest Service is taking with this Draft Environmental Impact Statement for Oil and Gas Leasing in the Grand Mesa, Uncompahgre and Gunnison National Forests. IPAMS would be pleased to offer any further input or answer questions regarding the draft document. Thank you for this opportunity to comment.

Sincerely,

Alexander Woodruff
Director of Regulatory Affairs



October 12, 1992

**Oil & Gas Leasing Draft EIS**
**Grand Mesa, Uncompahgre and Gunnison National Forests**

Robert L. Storch, Forest Supervisor
Grand Mesa, Uncompahgre and Gunnison National Forests
2250 Highway 50
Delta, Colorado 81416

Dear Mr. Storch:

Texaco has reviewed your oil and gas leasing Draft Environmental Impact Statement [DEIS]. We offer the following comments:

*GENERAL COMMENTS*

NP15 | Texaco commends you for conducting a forest wide analysis and combining the "availability" and "specific lands" leasing decisions [43 CFR 228.102 (d) and (e)]. This is the most efficient use of your budget dollars to complete oil and gas leasing analysis.

We agree with the overall direction of the DEIS in encouraging exploration, development and production of oil and gas in an environmentally responsible manner. We do have some specific concerns as discussed below.

*AFFECTED ENVIRONMENT*

Oil and Gas Potential

OG25 | We disagree with your classification of the elongated area straddling the Delta-Mesa County line in Grand Mesa National Forest as "moderate potential". Why does this area have any less potential than the surrounding high potential area when readily available surface geology suggests the sedimentary section in both areas is the same?

Texaco believes Grand Mesa and adjoining northwestern portion of Gunnison National Forests have high oil and gas potential. Tertiary and Upper Cretatious conventional gas and coalbed methane reservoirs are the most important targets. Production from these reservoirs occurs just north of the forest boundary in Mesa County.



USA
OFFICIAL SPONSOR
OF THE 1992
U.S. OLYMPIC TEAM

DEIS
Grand Mesa National Forest, etal.
Page 2
October 12, 1992

Impacts of Projected Development Scenarois on Affected Enviroments

OG26 | Your "foreseeable development scenario" of 47 wells to be drilled over the next 15 years appears to be fairly reasonable. However, we question your statement that a typical well will disturb 10.7 acres of land. Based on our experience a typical well might disturb at most 1-2 acres. This is significant because anticipated impacts will decrease as assumptions are shown to be exaggerated.

Socio- Economic Impacts

AEEC01 | The DEIS generally minimizes the socio-economic impact of lost opportunities for oil and gas development. This will be discussed in further detail in our discussion of alternatives.

*ALTERNATIVES & ENVIRONMENTAL CONSEQUENCES*

Preferred Alternative

Your "Preferred Alternative" proposes to increase areas for No Lease [NL] and No Surface Occupancy [NSO] by 221,850 acres or 23 % from your current management approach. We believe there are a number of "special management areas" that are included in the NL and NSO category that can be protected and managed with less severe restrictions, such as:

- roadless areas
- sensitive areas
- visual quality areas
- wildlife breeding areas
- recreation areas

ALT401 | These "special management" areas are subjectively defined with little factual data to indicate oil and gas activity has any significant impact on associated resource values. Alternative 4 [Standard Lease Term] provides sufficient management authority over surface operations to adequately protect these resource values. Timing and CSU stipulations may also reduce potential negative impacts.

Justification in the DEIS for NL or NSO restrictions is based on assumptions that oil and gas activity will cause the following:

- temporary loss of biodiversity
- wildlife habitat loss
- damage to "unprotected" sensitive areas
- toxic spills
- impairment of visual resources
- interference with recreational experiences

DEIS
Grand Mesa National Forest, etal.
Page 3
October 12, 1992

**STP09** These assumptions arise out of "perceived" conflicts between various resource uses on public lands and are not necessarily based on factual or scientific data. Texaco and other operators have proven over time that oil and gas operations may be conducted in a manner that is compatible with other resource uses and that NL or NSO restrictions are generally unnecessary.

Moreover, unless the DEIS points to evidence that such negative impacts are likely to occur, the mere fact that some potential for occurrence exists is not sufficient justification for imposing such severe restrictions, particularly in areas of moderate to high to oil and gas potential.

**RA195A**
**RA241A**
**RA242A** We are particularly concerned about your treatment of "roadless areas". Under your Preferred Alternative, you would place the Kannah Creek, Tabeguache, and Roubideau Roadless Areas in a no lease category because they have been mentioned in the Colorado Wilderness Bill. The fact that these areas are included in proposed wilderness legislation should not automatically lead to NL or NSO restrictions. The proposed legislation may never become law and the areas are meanwhile managed as "de facto" wilderness.

Alternative's 3 and 5

**ALT304**
**ALT504** The objectionable features of Alternative 2 [Preferred Alternative] are amplified further in Alternatives 3 and 5. Alternative 3 would impose 100% no leasing and Alternative 5 would impose NL or NSO restrictions on 427,500 acres [45%] of the leasing analysis area. These restrictive approaches are unjustified for the same reasons discussed above and are clearly inconsistent with Forest Service policy to impose the "least restrictive" measures that will adequately protect all resource values.

Alternatives 1 and 4

**ALT402** Texaco prefers Alternative 4 because it would allow for leasing in the entire analysis area with application of "Standard Lease Terms". We believe that standard lease terms provide the Forest Service with enough authority and discretion to impose reasonable mitigation measures adequate to protect all resource values in the area. Our second choice is Alternative 1 [No Action Alternative] which is your current management approach.

In discussing "socio economic" impacts associated with the SLT Alternative [Alternative 4] you conclude in table S-4 that an average of 10 or more jobs for 3 months will create additional $4,000 State revenue and $8,000 in County Revenue [total of $12,000] from drilling on new leases. In the same table you estimate Alternative 3 [No Lease] will average 10 "full time" drilling jobs and create $32,000 in State revenue and $64,000 in County revenue [total of $96,000] from drilling on "existing leases".

DEIS
Grand Mesa National Forest, etal.
Page 4
October 12, 1992

**AEEC02** This analysis is not only skewed in favor of non-development but is inaccurate. First, you incorrectly assume the SLT Alternative will not involve drilling on "existing leases". Second, economic impacts described under the SLT Alternative are significantly understated. Revenues to the State and County are only a small portion of total economic benefit to local communities from the creation of jobs.

*CONCLUSION*

**OG28** You indicate in the DEIS your purpose is to encourage exploration, development and production of oil and gas resources while adequately protecting all resource uses in the analysis area. However, your recommendations and approach are inconsistent with this stated purpose and will actually discourage companies from drilling for oil and gas on National Forest System lands. Increasingly, energy companies are shifting capital overseas where opportunities for exploration and development of oil and gas resources are more accessible.

Unless the government puts more focus on encouraging development through land use planning and other regulatory means, our national security will continue to be threatened due to overdependence on foreign oil and economically the US. will remain at a competitive disadvantage worldwide.

Texaco appreciates this opportunity to comment. Please contact Mr. T. M. Belton at 303-793-4371 if you need further information.

Sincerely,

E. C. Burritt
Chief Geologist

TMB:

**BLACK
CANYON
AUDUBON
SOCIETY**

P.O. Box 1371  •  Paonia, CO 81428

21 October 1992

Oil and Gas Leasing Analysis
Forest Supervisor's Office
Grand Mesa, Uncompahgre, and Gunnison National Forests
2250 Highway 50
Delta, CO 81416

Gentlemen:

The Draft Oil and Gas Leasing Environmental Impact Statement submitted by your office on July 30, 1992 has been examined by officials of the Black Canyon Audubon Society, who have found the document to be entirely irrelevant. First of all, it fails to provide an accurate description of either the scope or the nature of the oil and gas leasing program supposedly covered by the EIS. Secondly, it fails to define the major environmental impact which will result from the implementation of this project. And third, it does not specify which measures, if any, are planned for the mitigation of this impact.

ALT03    To begin with, the amount of land proposed to be opened to oil and gas leasing is many times greater than that needed to satisfy the projected demand for less than fifty new gas wells over the next fifteen years. In a similar vein, the Trans-Colo-rado Pipeline, for which the Bureau of Land Management has pre-

OGRF08    pared a comparable EIS, could not be justified if it were to serve only the limited number of gas wells foreseen by this document. And yet both agencies have treated their respective EIS coverages as if the two projects were separate and indepen-dent entities. As a result, the true environmental impacts of the overall program have been obscured.

How are these two projects really related to each other, and what is their real purpose? This question can be answered by examining certain recent pronouncements made by yet a third U.S. Government agency. The Department of Energy has enthusiastically extolled the potential benefits of developing coalbed methane deposits in the Piceance Basin of northwestern Colorado. They

OGCBM3    cite not only the huge amount of natural gas which is found in this enormous field (which they correctly depict as one of the largest in North America), but they also point out that both the high pressures and high temperatures of the water in which this gas is dissolved can also be tapped as significant sources of energy.

CE03    Both the GMUG leasing program and the Trans-Colorado Pipe-line are integral parts of this greater enterprise. Therefore it would be unrealistic to assess the environmental impacts of any

portion of this project without considering it as a part of the whole.

The geologic Piceance Basin, which covers all the land where this coalbed methane can be found, covers a much greater area than the geographical Piceance Basin, and includes most of the GMUG land proposed for leasing. It extends from the north edge of the West Elk Mountains to the north and west as far as the White River and beyond, covering a total area of some 5000 square miles. The gas in this deposit is different from that in most fields. Instead of being trapped in impervious domes (where the gas can be removed directly through a well), it is dissolved instead in water which permeates the coal beds underlying the entire basin.

The means by which the gas in coalbed methane deposits is recovered is far more complex. First of all, it is the water in which the gas is dissolved, and not just the gas itself, which must be brought to the surface. Since natural gas is soluble in water in large quantities only at high pressures, it is released automatically when the water emerges from a well, and can easily be reclaimed. Then where does the problem lie?

Unfortunately, natural gas is not the only thing that is dissolved in this water. It also contains great quantities of salt. Some twenty years ago, when I was working for a water engineering firm in Denver, we were given the job of analyzing the water from three such wells. We were astounded that it con-tained more than seven percent dissolved salt, almost all in the form of sodium chloride and sodium bicarbonate. What was just as surprising was the fact that the pressure of the water was so high that the wells could not be capped. They were left to flow freely for several years, constituting at the time the greatest single source of pollution in the entire Colorado River basin.

The Forest Service now reveals that other deposits have been found to contain as much as fifteen percent salt, more than four times as much as the ocean. It has been known for years that sodium, the major constituent of these salts, is the primary contaminant of Colorado River water. The sodium content from natural and manmade releases (the latter coming primarily from the leaching of salt-heavy irrigated land) is already so high that the water is only marginally usable for irrigation purposes by the time it reaches its ultimate goal in California's Imperial Valley, southern Arizona, and especially Mexico. Any additional sodium released into the water of this river could destroy its usefulness altogether.

How much salt are we talking about here? DOE has expressed its intention to recover all of the coalbed methane in the depos-it; in fact, it would hardly be reasonable not to. An accurate estimate of the total amount of salt which would be brought to the surface in the process depends on data which are not yet available: the extent and thickness of the coalbeds, the amount of water found in the aquifer, and the salt content at each point

in the basin. It can be stated with certainty, however, that the amount of salt to be removed can be measured in billions of tons. Perhaps this figure becomes more comprehensible if we put it on a volumetric basis: it would be measured in cubic miles!

There is no doubt that dealing with this amount of salt will constitute the biggest toxic waste disposal problem in the history of the world. By comparison, getting rid of all the world's nuclear wastes would be child's play (in fact, all the world's nuclear waste could be satisfactorily stored in the midst of this salt pile). Considering the sensitivity of the Colorado River basin to the addition of any excess salt, it would be difficult to overestimate the seriousness of this problem.

What do the various government agencies involved plan to do with this salt? Neither the Forest Service nor the Bureau of Land Management have even addressed this issue. Apparently they regard the leasing of the land and the construction of the pipeline as projects unrelated to the central issue of the coalbed methane extraction for which both of these prjects are mere accessories. But someone must accept responsibility for the overall effects.

It is apparent that the Department of Energy has no plans for reinjecting the saline water back into the wells from which it is extracted. Otherwise they could not claim the natural water pressure as an auxiliary energy source. Reinjecting the water would require considerably more energy than could ever be derived from this feature. Moreover, there is no evidence that the technology for reinjection under such high pressures exists. It would involve the use of extremely powerful equipment, made of materials able to resist a very corrosive liquid, designed to prevent even the slightest leak, and built and maintained to assure absolute reliability.

**OGCBM5**   In similar gas fields in the San Juan Basin, the waste water was injected into shallower aquifers instead. This process was a failure, since it resulted in the contamination of numerous water wells drilled into the same aquifer. The conditions imposed in the Piceance Basin would be much more severe: the amount of water to be disposed of is much greater, the salt content higher, and the terrain more uncompromising. The Piceance Basin is broken up into many high plateaus and deep canyons. A suitable reservoir would have to lie below all of this. It must also be totally impervious to the flow of groundwater. Otherwise the salt is sure to find its way back into the river in some way. The prospects for finding a site for such measures are extemely remote.

Could the water be stored in evaporation ponds? Once again, the magnitude of the salt supply enters in. Any attempt to do it this way would essentially result in the creation of a second Great Salt Lake. But the relative stability of this lake depends on the fact that it is located in a basin where the average rainfall is only a tiny fraction of the evaporation rate. In the Piceance Basin, average rainfall exceeds evaporation. And even

if a site could be found where this was not true, such storage would be only temporary. During the El Nino years of 1982-84, all of this region experienced precipitation more than double the average. A repeat of this event (which is sure to come) would flood any storage reservoir and release the salt into the Colorado River. It must be noted that the effects of dumping so much salt on downstream lands would be the same whether it occurs a little bit at a time or all at once.

How about purifying the water? Unfortunately, sodium is one of the most persistent of all dissolved elements. Its thermodynamic properties dictate that it is actually easier to remove the water from the salt than to remove the salt from the water! This is what is done in commercial desalination plants. The energy cost is so high in such processes that it is doubtful that all of the coalbed methane in the basin would be sufficient to supply enough energy to desalinate the water in which it is dissolved.

Could the water be piped somewhere else for disposal? The ocean is too far away. Besides, this wastewater is likely to be so badly contaminated that even the ocean would become polluted. Great Salt Lake is a possibility, however. It contains about 25 percent salt already and would actually be diluted by this added flow. It is also subject to severe natural variations in the input of fresh water from tributary streams. But the facilities needed for such an undertaking would be enormous. The outflow from each well would have to be collected, with each pipe then being fed into a large pipeline leading to the lake. This pipeline would have to traverse some extremely rugged country, and the water would eventually have to be pumped over the Wasatch divide. Every component of the system -- pipes, pumps, and everything else -- would have to be made of noncorrosive materials. Each component would also have to deliver the highest reliability to prevent spills.

**OGCBM2**   Of these possible (and impossible) alternatives, which one has the government selected? There is no evidence that DOE or anyone else has even approached the problem. In the absence of any indications to the contrary, one can only assume that present plans call for the waste water simply to be allowed to flow naturally into local drainages and thence into the mainstream of the Colorado River!

What effect would this have on the water resources of the region? To begin with, it would make the water useless for either domestic or irrigation purposes. It would wipe out most or all of the agriculture in the orchard region of the North Fork of the Gunnison River, the Grand Valley surrounding Grand Junction, the Moab Valley, the Imperial Valley of southern California, adjacent portions of Baja California in Mexico, and, most important of all, the portions of Arizona where most of the state's three and one-half million people live.

While it is hard to believe that anyone could be so irresponsible, we must remember that the Los Angeles basin, where all

this gas is destined to be used, has long pursued a policy of building its power plants far away in the Indian country of Arizona and New Mexico. In this way they have been able to lower air pollution in their own region by exporting it to others. Why not do the same with water pollution, even if it would affect a portion of their own state? Can we really expect the natural gas industry to be concerned about what happens to other people when there is such an enormous profit to be made? And how about the Department of Energy itself? This is the same agency that is presently trying to cover up environmental crimes committed by its own officials and its contractors, and uncovered by a grand jury investigating problems at Rocky Flats. As unbelievable as it may seem, we cannot ignore the possibility that such a scenario could be planned.

Does this mean that the coalbed methane in the Piceance Basin can never be safely extracted? Possibly. But there are other alternatives which can be investigated. One of these is the aforementioned water pipeline to Great Salt Lake. Even more reasonable would be the development of technology allowing the removal of the gas from the water underground, without ever bringing the water to the surface. This would not be easy. It would involve the sinking of shafts, instead of wells, so that the necessary equipment could be delivered to the site. It would necessitate the concurrent use of a number of such shafts in a way which would allow the water to circulate underground. It would require the development of various kinds of seals and automatic valves which would prevent any leaks of the pressurized water. And it would demand that all items be made of corrosion-resistant materials, and that all mechanisms be capable of the utmost reliability.

It remains to be seen whether or not such technology can be developed, and whether the cost of producing gas in this way will be economical. But the alternative process, to simply go ahead **OGCBM7** with the construction of a pipeline and the leasing of vast amounts of public land without first solving the horrendous problem of disposing of the salt, is something which simply cannot be allowed to happen.

Respectfully,

James R. Guadagno, Ph.D., P.E.
Black Canyon Audubon Society
P.O. Box 1371
Paonia, CO 81428

cc: Western Colorado Congress
Colorado Environmental Coalition
Rep. Ben Nighthorse Campbell
Colorado Water Conservation District
Embassy of Mexico

---



colorado
environmental
coalition

777 Grant Street, Suite 606
Denver, Colorado 80203-3518 • (303) 837-8701

October 13, 1992

Robert Storch
Forest Supervisor
Grand Mesa-Uncompahgre-Gunnison National Forests
2250 Highway 50
Delta, CO 81416

RE: Draft Oil and Gas Leasing
Environmental Impact Statement
Grand Mesa-Uncompahgre-Gunnison National Forests

Dear Supervisor Storch,

The following comments on the subject Draft Environmental Impact Statement (DEIS) are submitted on behalf of the Colorado Environmental Coalition (CEC). CEC is a not-for-profit conservation organization with over 1,500 individual members and 40 member groups whose combined membership exceeds 50,000 individuals in Colorado. CEC, its member groups, and its individual members have had a long running interest in the wise management and protection of natural values on Colorado's public lands, including the GMUG National Forests. We have been active participants in the oil and gas planning process from pre-leasing decision documents through applications for permit to drill on both Bureau of Land Management and National Forest lands.

CEC would like to compliment you and your staff on the content and readability of the subject DEIS. The idea of breaking down the Forest into various "affected environments" helps considerably in making this programmatic document relate better to on-the-ground resources and actual impacts. By analyzing the impacts of the five lease options for each affected environment the DEIS presents realistic management options, and their impacts, from which the reader can choose. The tables in Chapter II that compare the impacts of various lease options and program alternatives for each affected environment are a tremendous aid in understanding the impacts of various management schemes.

I. LEASING ANALYSIS AREA

CEC is pleased with the realistic leasing analysis area developed by your staff, per Interim Directive 2820-91-1. It is refreshing to see some common sense applied in the development of oil and gas leasing EISs in Region 2. It should go without saying **NP09** that the Forest Service should not expend its limited planning

 recycled paper

1

↙ Member, Community Shares of Colorado

**NP09**

resources attempting to analyze the impacts of future oil and gas development in low and no potential areas where no industry interest or activity has been previously shown. Besides the obvious misdirection of planning resources, opening entire forests to oil and gas leasing places critical lands at undue risk to speculators and creates conflicts with oil and gas interests where none should exist.

CEC believes the leasing analysis area, roughly 950,000 acres or 2/3 of the entire Forest, is a realistic starting point to begin an oil and gas leasing analysis for the Forest. We do not see why industry would have a problem with this approach. If interest in leasing outside the analysis area is indicated in the future by industry, CEC understands the Forest will do a NEPA document/plan amendment with public input to analyze the impacts of oil and gas activity on those lands. Although the oil and gas industry has insisted in the past that entire forests must be made available for immediate oil and gas leasing, CEC and the Colorado environmental community believe there has to be a balance between protecting all the various Forest uses and opening lands to oil and gas activity.

## II. PROTECTING ROADLESS AREAS

Apparently you and your staff recognize the importance of protecting roadless areas since Alternative 2, the preferred alternative, proposes no lease and no surface occupancy designations for some roadless areas. There should be little question in anyone's mind regarding the importance of protecting Roubideau, Tabeguache, and Kannah Creek as no lease areas not only because of their potential inclusion in the National Wilderness Preservation System, but also because of their outstanding primitive recreation opportunities and, in the case of Kannah Creek, important watershed values.

In addition to these no lease areas, Alternative 2 proposes no surface occupancy for some roadless areas, including Battlement Mesa, parts of Priest Mountain, and Kebler Pass. CEC could support no surface occupancy designation for these roadless areas, and many others, if stipulation waivers in the future are prohibited (see stipulation waivers section below). In our opinion, a NSO stipulation that cannot be waived can protect roadless areas. If waivers of NSO stipulations are not prohibited, however, we believe the only way to protect the values of roadless areas is through a no lease designation.

**RA08**

The descriptions of specific roadless areas in the analysis area contained in Chapter III of the DEIS and the brief discussion of the environmental consequences of leasing roadless areas in Chapter IV show that virtually every roadless area would continue to retain its natural integrity if oil and gas leasing, and connected logging activities, were not allowed. With the limited information disclosed in the DEIS for each roadless area and a

2

general knowledge of biological diversity concepts, it is obvious that each and every roadless area plays an important role in maintaining and protecting the overall biological diversity of the Forest. For example, the DEIS states on page IV-22 that oil and gas activity on the Battlement Mesa roadless area "could significantly reduce the habitat effectiveness of the area with direct effects on the (Rocky Mountain bighorn sheep) herd itself." Other severe impacts to specific wildlife populations, and to biological diversity in general, would likely occur on other roadless areas currently proposed for leasing under Alternative 2.

**AEG05**

## III. ALTERNATIVE 5 SHOULD BE THE PREFERRED ALTERNATIVE

CEC believes protection of all the remaining roadless areas on the Forest is critical. Therefore, CEC supports Alternative 5 in the DEIS, which is identical to Alternative 2 except that it makes semi-primitive non-motorized areas and all roadless areas, not just a few, no lease. CEC is pleased to see Alternative 5 considered in the DEIS since we believe it accurately reflects the public's desire to protect what remaining roadless areas exist on the Forest.

**ALT501**

The DEIS discusses the impacts of opening, or not opening, roadless areas in the analysis area to oil and gas leasing. On Page II-53 the summary comparison of program alternatives states that the same level of projected activity is forecasted for Alternatives 2 and 5, but that under Alternative 5 activity would shift to other areas available for leasing. Thus industry would not be limited in producing oil and gas resources from Forest lands, but would simply shift its production off roadless areas to other areas of the Forest. Page II-54 states that the costs to industry of Alternative 5 is the same as Alternative 2. Apparently, a win-win opportunity exists on the Forest where oil and gas development can be allowed without impacting roadless areas under Alternative 5.

**RA04**

The DEIS describes substantial impacts to roadless areas if they are opened to oil and gas leasing as proposed in Alternative 2. On Page II-50 the summary comparison of program alternatives states that under Alternative 2 there will be, "some loss of biological diversity of wildlife species, especially in areas opened for logging following O & G activities." Page II-50 states there will be similar impacts to recreational opportunities, namely a "potential decrease in backcountry recreation opportunities." The analysis in the DEIS clearly indicates that there will be numerous detrimental impacts to roadless areas and their accompanying values on the Forest if they are leased.

**ALT203**

It is time that the GMUG National Forests recognize the value of all roadless areas on the Forest and protect all of them from unnecessary and undue development. Opening the majority of roadless areas in the analysis area to oil and gas leasing, as

**RA02**

3

BLM 0048425

proposed in Alternative 2, does little, if anything, to advance oil and gas activity on the Forest while risking the destruction of almost all the remaining roadless areas on the Forest. Because of these impacts, CEC feels the Forest should make Alternative 5 the preferred alternative in the FEIS and not lease roadless areas.

## IV.   INCREASING THE ALLOWABLE SALE QUANTITY OF TIMBER VIA ROADING FOR OIL AND GAS DEVELOPMENT

TM01

CEC most strongly opposes any increase in the allowable sale quantity (ASQ) of timber. The ASQ is too high already, as the entry of many roadless areas will be required to meet the full ASQ. Thus we are appalled at the suggestion on p. II-7 of the DEIS and elsewhere that oil and gas development might lead to additional lands seeing timber cutting.

These lands would be in areas that are currently roadless. Protection of roadless areas was a key issue in the recently-completed Timber Amendment to the Forest Plan. Almost 100 people who commented on the draft Timber Amendment were specifically concerned about this issue. (See p. VI-33 of the Final Supplemental Environmental Impact Statement.)

TM04

Also, many people opposed the levels of logging that were proposed in the draft Timber Amendment. (See pp. VI-10, 40 of the FSEIS.) Scheduling additional logging in roadless areas invaded by oil and gas development would move toward the logging levels and roadless area invasion to the levels that the public found absolutely unacceptable in the DSEIS. Remember that the environmental community did not administratively challenge the Timber Amendment because the levels of logging proposed were considerably less than what was proposed in the draft. Raising logging levels via a back-door method, i.e. oil and gas exploration, would thus violate the public trust.

Note also that many people who commented on the DSEIS expressed concern about biological diversity (See FSEIS p. VI-11.) It is significant that the FSEIS did not perform any analysis of biological diversity, nor did it even propose to inventory the GMUG Forest's old growth, in spite of the rather large amount of cutting it scheduled. The Forest could thus be decreasing the biological diversity without ever having analyzed the subject. Increasing the cutting and entry of roadless areas would exacerbate this situation. The Draft Oil and Gas EIS even notes the importance of roadless areas for biological diversity:

"Alternatives which will result in the issuance of oil and gas leases in existing roadless areas will have the greatest adverse impact and loss of biological diversity in natural ecosystems. These areas are refuges of natural plant and animal populations that provide genetic variability, species and community variety of plants and

4

animals. These areas, especially where they are adjacent to other Roadless Areas or wilderness, are especially important as potential habitat for extirpated populations of once native species....Species like the goshawk, pine marten lynx, (sic) wolverine and others are very dependent on [roadless areas] as the core area of their home ranges. Entering into these areas, combined with all the other Forest activities going on in adjacent areas, would continue the loss of habitat for these species, which is necessary for their survival" (pp. IV-39, 40).

TM05

If the Forest wishes to raise the Allowable Sale Quantity, a Plan Amendment would have to be done. This amendment would have to thoroughly analyze the impacts of the increased cutting and roading and other activities on biological diversity. It is not true, as stated on Draft Oil and Gas EIS p. IV- 21, that the effects of timber harvesting following oil and gas access were disclosed in the FSEIS for the Timber Amendment. That FSEIS only disclosed the impacts of various proposed levels of cutting. Note that the "Significant Cumulative Effects of the Alternatives" section of that FSEIS, pp. IV-58-63, does not even mention oil and gas development, nor do the sections on roadless areas (p. IV-32, 33) and biological diversity (p. IV-3-6).

## V.   LAND AVAILABILITY AND LEASING SPECIFIC LANDS DECISIONS

The regulations implementing the management of oil and gas resources on National Forest lands are very clear that two decisions must be made before leasing can be allowed. These decisions are the "lands administratively available for leasing" decision (36 C.F.R. 228.102(d)) and the "leasing specific lands" decision—the "d" and "e" decisions (36 C.F.R. 228.102(e)).

The introductory sections of the DEIS make numerous references to making the "d" and "e" decisions. For example, Page S-3 states that the leasing analysis in the DEIS will result in three decisions, including the "d" and "e" decisions. Yet the subject DEIS is fatally flawed because it treats the "d" and "e" decisions as one identical decision throughout the document. It must be more than coincidence that the "d" and "e" decisions for each affected environment in the DEIS are identical. Namely, it appears that

NP10

these two decisions are not looked at separately at all, but are instead conveniently combined in the subject DEIS to the disregard of Forest Service regulations. This approach of combining the "d" and "e" decisions is very confusing to the public and brings the credibility of the Forest Service into question since it has so irrationally and intentionally convoluted its own regulations.

After reading the body of the DEIS in Chapters 3 and 4 it becomes obvious to the reader that the information presented only addresses the "d" decision and has little, if any, site-specific

5

**NP11**

information to justify making an informed and justified "e" decision. Making the "e" decision for specific lands in a pre-leasing document, especially with no site-specific impact analysis, is arbitrary and capricious and is a violation of Forest Service regulations governing oil and gas planning. These regulations specify that the "e" decision shall be made, "(a)t such time as specific lands are being considered for leasing." (36 C.F.R. 228.102(e)). Because no specific lands are now being proposed for leasing, but instead the Forest Service is simply considering all lands in the analysis area generally, the Forest Service is premature in making the "e" decision for the GMUG National Forests at this time. The preamble to the regulations reinforces this conclusion. It says that the Forest Service "will" make the "e" decision "(w)hen those tracts are identified ..." (55 Fed. Reg 10429).

Given the lack of site-specific information in the DEIS for specific land parcels, it is doubtful that the Forest Service will have a rational basis for making an informed, defensible "e" decision. Page I-17 of the DEIS states, "The Forest Supervisor may decide to authorize lease of all the lands described as "administratively available" in the Leasing Analysis, or to lease only a portion of the "available" lands." CEC wonders when and how such decisions will be made, since the subject DEIS provides no basis for making such an "authorization" decision on lands in the analysis area.

**NP12**

The final EIS must either include additional site-specific impact analyses and make distinct and separate "d" and "e" leasing decisions, or it must call the existing analysis in the DEIS by what it really is, the "d" decision, and state that the "e" decision for lands on the Forest will be made in future NEPA documents.

## VI. STIPULATION WAIVERS

The preferred alternative in the DEIS depends upon numerous stipulations to protect other Forest resources from undue damage from oil and gas development activities. However, pages I-15 and I-16 of the DEIS discuss how these protective stipulations can be waived. CEC objects to the use of stipulation waivers because they undermine public participation in the oil and gas development process and undercut the disclosure made in prior impact analyses such as the subject DEIS. As a result, CEC would urge that stipulation waivers be tightly and narrowly restricted, if not absolutely abolished.

**STP01**

**STP08**

The stipulations outlined in Appendix C, especially the no surface occupancy stipulations, must clearly state that there shall be no waivers or else set clearly definable standards under which waivers would be granted. Clear standards benefit both environmentalists and oil and gas developers because they lay out

6

specific ground rules in advance. Any stipulation waivers must be as narrowly and clearly defined as possible.

## VII. REASONABLY FORESEEABLE DEVELOPMENT SCENARIO

Page E-4 of the DEIS states that the Reasonably Foreseeable Development scenario was formulated by incorporating, "historical trends, USGS resource estimates, mineral ownership patterns, location of existing pipelines, and current activity." CEC realizes that developing an RFD scenario is only a "best guess". But in order to make the best guess possible, CEC believes there are other factors that the Forest must consider in order to develop an accurate RFD scenario. These factors are: the effects of Congressionally authorized tax credits to spur oil and gas development, such as the recent tax credit for "unconventional" gas sources like coal-bed methane; the location of proposed pipelines in the future; future trends in energy use in the United States; and the effect of "market shocks" on domestic oil and gas activity such as artificially decreased supplies of fossil fuels from the Middle East.

**OGRF04**
**OGRF05**
**OGRF08**
**OGRF07**
**OGRF03**

**NP13**

The FEIS and ROD for this oil and gas leasing analysis should state what will happen if oil and gas activity on the Forest exceeds the levels outlined in the RFD scenario. CEC assumes that the Forest has a legal obligation to not authorize any oil and gas activity above and beyond that level of activity outlined in the RFD scenario. If the Forest receives additional well proposals beyond what is estimated in the RFD scenario, CEC believes the Forest cannot legally allow additional on-the-ground disturbances until the Forest-wide oil and gas impact analysis is revised.

**OGCBM6**

The RFD analysis in Appendix E alludes to coal-bed methane activity on the Forest. One of the assumptions for the "Drilling Activity Forecast" states that any coal-bed methane wells drilled on the Forest due to any development tax credits are included within the RFD forecast. CEC adamantly opposes the grouping together of conventional and coal-bed methane wells. Coal-bed methane wells typically have a far greater impact on the environment and other Forest resources because of the enormous amounts of produced water that are created. Assuming a coal-bed methane well on the Forest is the same as a conventional well is incorrect and leads to the impacts of oil and gas activity on the Forest being unduly minimized.

**OGCMB1**

The additional impact of coal-bed methane wells needs to be addressed in the impact analysis for oil and gas leasing on the Forest. The DEIS is woefully inadequate regarding impacts from coal-bed methane wells. As stated above, the anticipated number of coal-bed methane wells is not even separated out in the RFD scenario in the DEIS. Consequently, the impacts of such activity are not analyzed in Chapter 4 of the DEIS. This situation must be rectified in the Final EIS.

7

## VIII.  ALPINE/TUNDRA AREAS

AEAT02   CEC supports the NSO stipulation in the preferred alternative for alpine/tundra areas in the analysis area, assuming the stipulation cannot be waived as discussed above in these comments. We believe, however, that the DEIS is deficient in analyzing the impacts of oil and gas activities on alpine/tundra areas by not discussing recreation use as one of the "environmental factors".

AEAT03   Alpine areas, because of their high altitudes and scenic vistas, are popular dispersed recreation areas.  The FEIS needs to correct this deficiency by analyzing the impacts of oil and gas activity on recreation use and opportunities in alpine/tundra areas.

## IX.  AQUATIC/RIPARIAN/WETLAND HABITATS

CEC supports the NSO stipulation in the preferred alternative for aquatic/riparian/wetland habitats in the analysis area, assuming the stipulation cannot be waived as discussed above in these comments.  These fragile, scarce, and biologically important areas need the strongest protection possible to prevent detrimental impacts from oil and gas activity.  However, parts of both Chapter II and Chapter IV state that a NSO stipulation would not allow "most" oil and gas activities, not _all_ oil and gas activities including roads and pipelines.  CEC believes that no surface

AER04   occupancy of these particular lands should not be limited just to well pads, but should apply to all associated oil and gas activities including roads and pipelines.  The NSO stipulation loses much of its meaning if it still allows certain impacting activities associated with oil and gas development on these lands.

## X.  CONCLUSION

NP02   CEC appreciates this opportunity to comment on the subject DEIS.  We look forward to reviewing the FEIS.  If there are any questions on these comments, please do not hesitate to call us.

Sincerely,

_Todd Robertson_

Todd Robertson
Public Lands Coordinator
Rocky Smith
Forest Mgt. Coordinator

8

---



# The Colorado Mountain Club

2530 West Alameda Avenue    Denver, Colorado 80219

(303) 922-8315, Trip Sign-ups, 9-2 M-F; 7-9 p.m. M, T, Th.
(303) 922-8976, Business Calls Only, 9-5 M-F.
(303) 922-3708, General Information, 24 Hours.
1-800-633-4417 (business hours)
(303) 922-7680 (FAX)

October 13, 1992

Bob Storch, Forest Supervisor
Oil and Gas Leasing Analysis
Grand Mesa/Uncompahgre/Gunnison National Forests
2250 Highway 50
Delta, Colorado 81416

Dear Supervisor Storch,

Following are comments from the Colorado Mountain Club regarding the Draft Oil and Gas Leasing Environmental Impact Statement.

**GENERAL COMMENTS**

The Club compliments the GMUG on a exceptional well-written document.  The issues and impacts are clearly laid out.  The Summary and Chapter IV are remarkable in the depth and clarity of discussion regarding impacts from the proposal.  The Forest is candid about what it knows and does not know about the areas, the maps are useful and convey as much information as possible.  The Summary clearly explains the impacts.

The Club has three main concerns:

RA04   1)  The social/economic impacts of Alternative 5, no leasing in roadless areas, are the same as those of Alternative 2, the preferred alternative, while the environmental impacts are much worse.  There is no justification for choosing the preferred alternative over the less environmentally damaging alternative 5.

AEG01   2)  The analysis of biodiversity appears to suffer from the "more is better" approach rather than a recognition of the need to protect large interior forests and thereby protect threatened, endangered sensitive and forest interior species.  Biodiversity has to be analyzed on a forest-wide as well as a site-specific level.

AEG18   3)  In order to truly understand impacts to biodiversity the EIS must contain a map and a discussion of forest fragmentation and how each alternative would affect forest fragmentation

**SPECIFIC COMMENTS**

AEAT02   1)  The Club appreciates and supports the GMUG position that alpine/tundra areas and wetlands are categorized as "no surface occupancy" (NSO).

Groups: Aspen • Boulder • Denver • Denver Juniors • Denver Wilderness Kids • El Pueblo • Enos Mills • Fort Collins • Friends of Colorado • Glenwood • Gore Range • Longs Peak • Pikes Peak • San Juan • Shining Mountains • Weld County • West Elk • Western Slope

  recycled paper

Bob Storch                                                                  2
October 13, 1992

**2) ALL UNENTERED AND RELATIVELY UNDEVELOPED ROADLESS AREAS SHOULD BE CATEGORIZED AS NO LEASE.**

RA195
RA241
RA242

The Club also appreciate and supports the GMUG position that Kannah Creek, Roubideau and Tabequache roadless areas are designated as no lease.  However, it is painful to turn to Table S-2, p. S-11 and see all the other roadless areas with "standard lease terms" (SLT) under the Forest's preferred alternative.  The Club believes that all currently unentered roadless areas and all roadless areas relatively non-impacted by human development should be designated as no lease.  The DEIS gives no good reasons not to do so.

OG13

**3) ALTERNATIVE 5 SHOULD BE THE PREFERRED ALTERNATIVE**

ALT501

The Alternative Consequences Summary is excellent and clearly lays out the impacts of each alternative.  In comparing alternative 2, the preferred alternative, to alternative 5, no leasing in roadless areas, the impacts from alternative 2 are measurably greater in their effects on roadless areas:

AEG05

Biological Diversity - "Loss of biological diversity of wildlife species, especially in areas opened for logging following O&G activities"

RD11

Roads - "Potential for new road construction in entire analysis area.  Road reconstruction would generally increase standard of existing road.  Road use would increase during exploration and development stages."

RECG08

Recreation Opportunities - "Potential for ROS class to be changed to more developed class in dispersed recreation and roadless areas.  Potential decrease in backcountry recreational opportunities."

AER02

Aquatic/Riparian/Wetland Habitats - "Potential impacts ...resulting in vegetation removal and increased sediment loads, which would decrease spawning habitat, result in macroinvertebrate and fish fry mortality.  Increased potential for toxic spills entering waterways."

AEW02

Wildlife - "Potential for habitat loss, disturbance and displacement to less desirable habitats on areas with SLT.  Impacts compounded in areas opened for logging after O&G activity."

Table S-4, pgs. S-12 to S-18, DEIS

Unentered roadless areas have social and ecological values that can not be replaced or imitated when lost.  The forest should make every effort to protect these areas.  According to the DEIS, page S-17, there would be no loss of leasing opportunity with

Bob Storch                                                                  3
October 13, 1992

Alternative 5 because " The projected activity would shift to areas available for oil and gas leasing"

**4)   THERE IS A DISCREPANCY BETWEEN THE MAPS AND THE CHARTS REGARDING THE STIPULATIONS TO BE REQUIRED FOR ROADLESS AREAS**

MAP03

Table S-2, Display of Alternatives P. S-11 lists SLT for most of the roadless areas under alternative 2.  Figure II-2, the colored map, in the Map Errata booklet shows NSO and CSU for most of the roadless areas.  Which is it?

ALT203

**5)  NEITHER STANDARD LEASE TERMS (SLT) NOR CONTROLLED SURFACE OCCUPANCY (CSU) ADEQUATELY PROTECT UNENTERED ROADLESS AREAS**

Much of the roadless areas open for leasing under Alternative 2 is governed by Controlled Surface Use (CSU).  Chapter IV, beginning on page IV-1 clearly lays out the impacts from CSU:

- A net loss of old growth timber, a loss of habitat for old growth dependent species

- some quality degradation of dispersed recreation experience and setting would take place

- some reduction in quality of recreational experience and setting would take place

- in 3A, semi-primitive non-motorized management areas, CSU would generally allow the construction of roads, well pads, and pipelines

- do little to mitigate the effects of oil and gas activity near the Crag Crest National Recreation Trail

Standard lease terms, also described from page IV-1, include the above impacts but also lead to more severe impacts on roadless areas:

- heavy impacts to soil resources

- the greatest potential of all leasing terms for impacts to water quality

- a major portion of partial retention VQR areas would not meet their adopted visual quality objective.

- developed recreational sites would potentially be significantly impacted from oil and gas activity with a potential decrease in use

Bob Storch
October 13, 1992                                    4

- some quality degradation of dispersed recreation experience
and setting

- a change in the inventoried Recreation Opportunity Spectrum
(ROS)

- Disturbance to big game and degradation of habitat could
occur to any of the big game species found in the area

- would not mitigate all of the most detrimental impacts to
crucial wildlife habitat

- impacts to upland game, small game, furbearers, non-game
wildlife could result in nest or den abandonment, actual
destruction of nesting and denning sites and habitat and the
elimination of one or more of a species key habitat components
necessary for the survival of the species

- provide little or no protection to any of the Management
Indicator Species

- in roadless areas results in direct loss of roadless
character; loss of opportunity to be designated wilderness;
impact on opportunities for high quality, guided hunting and
camping experiences

- potential air quality impacts

Controlled surface use gives more protection than standard lease
terms, but given the above information, the Club can not understand
why the Forest believes it is necessary to open unentered roadless
areas to leasing.  The question is particularly relevant because
under Economic and Social Setting on the same table the impacts for
alternative 2 and alternative 5 are identical:

"Average of 10 more jobs (above No Action figure) for 3
months; additional $4,000 State revenue; additional $8,000
county revenue from drilling on new leases."

NEPA states that:

"Federal agencies shall to the fullest extent possible:

...Use all practicable means, consistent with the requirements
of the Act and other essential considerations of national
policy, to restore and enhance the quality of the human
environment and avoid or minimize any possible adverse effects
of their actions upon the quality of the human environment."
40 CFR Sec. 1500.2 (f) emphasis added

---

Bob Storch
October 13, 1992                                    5

ALT503

Both alternatives 2 and 5 have the same social/economic effects,
yet the GMUG's preferred alternative has more adverse environmental
effects than alternative 5.  The Forest Service is required to
maximize net public benefit.  Alternative 5 clearly does this by
protecting important public environmental resources and providing
employment and a product at the same level as the Agency preferred
alternative.  Because Alternative 5 gives more protection to
environmental resources without affecting social/economic
resources, alternative 5 should become the preferred alternative.

6) THE ANALYSIS OF BIODIVERSITY IS NOT CONSISTENT AND APPEARS TO
STRESS THE "MORE IS BETTER" APPROACH RATHER THAN PROTECTION OF
UNIQUE COMMUNITIES SUCH AS FOREST INTERIORS AND UNENTERED ROADLESS
AREAS.  BIODIVERSITY MUST BE ADDRESSED AT THE FOREST LEVEL IN THIS
DEIS

The unentered roadless areas are the key to preserving
biodiversity.  There are plenty of edge species, plenty of species
which do well with human development, plenty of robins, jays and
magpies on the forest.  The concern is for the threatened,
endangered and sensitive species, the interior forest species,
species which do not do well with human disturbance, the warblers
and songbirds.  How the GMUG treats the unentered roadless areas in
its oil and gas leasing program will determine biodiversity on the
forest.

a) The Club is alarmed to see the statement on page I-25 under
Miscellaneous Issues:

"The following will be addressed at the APD (project level) stage":

Old-growth/biodiversity will be tiered to the Forest Plan (if
we can do this and still address the issues).

Biodiversity must be addressed at the Forest Plan level.  If the
Agency waits until a site-specific analysis, the whole issue of
preserving large tracts of interior forests and thereby protecting
T&E, sensitive and interior species can no longer be considered.
The lease will have been issued and if industry wishes it will sue
to develop its private property rights regardless of what the
Forest Service says.

Biodiversity must be addressed in this DEIS.  The Forest Plan does
not do an adequate job.  This oil and gas DEIS contains a much
better analysis of wildlife impacts and impacts to sensitive
species, and from the point of view of biodiversity can not
satisfactorily be tiered to the much older Plan.  The old Plan in
no way addresses the issue.

On page I-2, roadless and undeveloped areas, wildlife and wildlife

Bob Storch                                                                    6
October 13, 1992

habitat, and cumulative impacts to wildlife are listed under "Major
Issues". These are all subsets of biodiversity. If biodiversity
had been adequately addressed by the Forest Plan, the issues would
not now be considered "major issues". If these have been
identified as "major issues" in a forest-wide EIS, they can not
adequately be addressed at the site-specific level.

b) The discussion of biodiversity on pages III-3,4 is good as far
as it goes but the GMUG must take the next step and apply these
concepts on a forest-wide level. The discussion of Management
Indicator Species and T&E and Sensitive Species, pages III-4toIII-
47 and III-99 is excellent, but this must be related to a forest-
wide analysis as to what large areas on the forest are still
available for these species. Songbirds should be added to this
discussion (see enclosed article).

**7) THE GRAND MESA SHOULD BE ADDED TO THE LIST OF SENSITIVE AREAS**

AEG19    The Grand Mesa is threatened with impacts from timber cuts, roads
and oil and gas leasing in roadless areas and extensive,
uncontrolled motorized vehicle use. There needs to be a cumulative
analysis of this area, from the McClure Pass road to the western
edge of the mesa.

NP14  **8) FOREST FRAGMENTATION, BIODIVERSITY, LOSS OF ROADLESS AND
UNENTERED AREAS SHOULD BE ADDED TO THE LIST OF IRREVERSIBLE
COMMITMENT OF RESOURCES**

This DEIS clearly spells out specific impacts to wildlife, wildlife
habitat, old growth, roadless areas and sensitive forest interior
species from oil and gas leasing. Once roaded, it is almost
impossible for the Forest Service to exercise enough control to
return areas to a more or less natural state. Once roaded for
either timber or oil and gas, each activity encourages the other
and encourages widespread motorized recreational use. The Agency
can not now control the existing motorized recreational use.

Tha resources of large interior unentered forests, biodiversity,
roadless and unentered areas, wildlife and wildlife habitat will
suffer irreversible impacts of alternative 2 is chosen. The
document must say so.

**9) THE FINAL EIS MUST LOOK AT THE ISSUE OF FOREST FRAGMENTATION**

Protection of large interior forest areas and large unentered areas
is the only way to protect the unique ecological communities which
do not relate well to human development. The GMUG needs to map, at
a gross level, the remaining unentered and roadless areas in order
to get a handle on forest fragmentation. This map should be in the
FEIS. With this map in the document, the analysis of biodiversity

Bob Storch                                                                    7
October 13, 1992

and protection of unique wildlife habitat and sensitive species
must then be related to the issue of forest fragmentation.

The Colorado Mountain Club would be pleased to discuss these
comments with the ID team at any time. We would like to work
further with the GMUG on these issues before the document is
finalized.

Sincerely,

Anne Vickery

Anne Vickery
Conservation Director

Enc.
cc.  CMC West Slope
     CMC Glenwood
     CEC



**COLORADO OUTFITTERS ASSOCIATION**

P.O. Box 440021 • Aurora, Colorado 80044 • (303) 366-4731

September 25, 1992

Daryl Gusey
GMUG NATIONAL FORESTS
2250 Highway 50
Delta, CO 81416

Dear Mr. Gusey:

RO09 | The Colorado Outfitters Association is opposed to any new roads or opening of old roads in the Clear Creek (Clear Fork) area of the Gunnison National Forest.

RECG06 | We are opposed to oil and gas leases or timber harvests which would severely impact hundreds and possibly thousands of recreation days.

OG13 | This area is heavily used by outfitter clients and others from the general public. In keeping with the Chiefs recreation strategy we request that gas, oil and timber interests be served some where else.

Sincerely,

Dennis Bergstad
Dennis Bergstad,
Executive Director

cc: Bob Storch
    Elizabeth Estill
    Bill Wallace
    Dick Pennington
    Chuck Davies
    Pete Wingle

---

*FOREST RESCUE*
Crested Butte, Colorado

October 6, 1992

Jeff Burch
Oil and Gas Leasing Analysis
Grand Mesa, Uncompahgre, and Gunnison National Forests
2250 Highway 50
Delta,
CO    81416

Dear Sir:

ALT301 | The purpose of this letter is to express our adamant opposition to the adoption of Alternative Two, the Preferred Alternative, in the Oil and Gas Leasing Analysis Draft Environmental Impact Statement. Crested Butte Forest Rescue requests that you adopt Alternative Three, the No Lease Alternative.

The "Preferred Alternative" is insultingly patronizing. To exclude three Roadless Areas, while opening the remainder to development is tantamount to throwing a few scraps to environmentalists while laying waste to the rest of the forest.

AEG15 | Also, many locations within the analysis area are not designated either Roadless or 3A Management Areas, yet they exhibit great potential for solitude and wilderness experience. These areas are needed to serve as buffers for designated wilderness, and as additional areas for wildlife habitat and biodiversity.

AEG16 | The Forest Service has no comprehensive inventory of these undesignated areas, many of which contain old-growth trees and their irreplaceable habitat. By releasing these areas to indiscriminate road construction, we could lose what we don't even know we have.

Oil and gas exploration roads will expand the timber base suitable for harvest. Areas currently uneconomic for timber harvesting will be made economic. The Forest Service's DEIS expresses ignorance at just how much of the forest will be opened by the new roads. Should we approve something the result of which we are ignorant?

RA191
RA184
RA196  | Roadless Areas of special concern to Crested Butte
RA181  | Forest Rescue include Priest Mountain, Springhouse Park, all
RA200  | areas within the West Elk and Raggeds Roadless Areas,
RA201  | Whetatone Mountain and Flat Top Mountain. The construction
RD16   | of new roads within the GMUG would not serve any public
         interests other than those of the energy and timber
         industries.

NP02 | Thank you for this opportunity to comment.

Sincerely,
Forest Rescue
*"Turn it up"*    Crested Butte,
Colo.    81224

Letters Received from Federal, State and Local Agencies and Organizations

Oil and Gas Leasing Analysis FEIS



**HIGH
COUNTRY
CITIZENS'
ALLIANCE**

10/13/92

Supervisor Bob Storch
Oil & Gas Leasing Analysis
GMUG National Forest
2250 Highway 50
Delta, CO 81416

Dear Mr. Storch,

0G22

When outraged citizens protest the erection of an oil rig in Horse Ranch Park, will the GMUG National Forest close the area to all public use? Will the GMUG follow the example of the San Juan National Forest, which closed 35,000 acres of land in the HD Mountains? Here, it would be tough. You would have to close Kebler Pass road to make the closure effective. You would have to significantly detract from the tourism and recreation industry of the Gunnison County community.

Since such protests are quite likely, should an oil rig go up along Kebler Pass, we can reasonably state that the US Forest Service is setting up a situation with high potential for social conflict. This is a significant effect on the environment which the Oil and Gas Leasing DEIS has not disclosed.

Over the past 15 years, Crested Butte citizens have fought hard to protect the scenic beauty and ecological integrity of Horse Ranch Park and Kebler Pass. In 1978, we brought a US Senator to the Park to protest a plan to dump Amax mine tailings there. The plan was dropped. In the 1980 Colorado Wilderness Bill, Congress brought the boundary lines close to the Kebler Pass Road. In the early 1980s, our community defeated a proposal for a powerline across the pass. In 1989, we defeated the proposal to log the adjacent aspen forests. These events demonstrate the depth of community commitment to this area.

We are similarly disposed to protect the land around Whetstone Mountain. Part of the proposed leasing area there is in the Crested Butte drinking watershed. The Town of CB has fought long and hard to protect this watershed.

RECS02
RA2001

HCCA recommends that the GMUG implement a No Leasing policy for the Kebler Pass corridor and lands adjacent, and for Whetstone Mtn-Gibson Ridge-Wildcat Creek.

RA02

HCCA is also concerned generally about the fate of roadless areas on the GMUG. The GMUG has steadfastly refused to give these lands the real protection they deserve. We have noted many times the unique values of these lands. For one, they offer semi-primitive, backcounty recreation to motorcyclists and mountain bicyclists who cannot use Wilderness. If GMUG continues to fail to protect roadless areas, pressure will build to make them Wilderness. Roadless areas a critical to avoiding fragmentation of the forests and ecosystems on GMUG. They are critical to watershed protection.

ALT581

HCCA therefore endorses Alternative 5 of the DEIS.

P.O. BOX 1066, CRESTED BUTTE, COLORADO 81224, 303/349-7104

---

STP01

We note, however, that Alternative 5 could have been constructed less stringently if the waiver provisions of USFS regulations were more stringent. It does no good to declare an area No Surface Occupancy if a decision-maker can later waive that stipulation. There is no real protection when waivers are allowed. If waivers were prohibited, then oil companies could have access to resources lying under sensitive NSO lands through horizontal drilling. These kinds of concerns are equally valid for other stipulations designed to protect surface values. It's a shame that USFS regulations don't allow more of a compromise. If NSO's and other stipulations were not waiveable, HCCA might assent to NSO leasing in roadless areas and other areas of critical environmental or social concern.

We therefore recommend that you change the regulations to eliminate waivers of stipulations.

HCCA also endorses the comments submitted by Forest Rescue and the Town of Crested Butte. They have endorsed Alternative 3, No Leasing on the GMUG. We, too, believe No Leasing is necessary due to the inability of government to stand up to the mighty power of international oil companies. Yet we are willing to accept compromise embodied in Alternative 5. We also endorse concerns about particular areas and procedures expressed by Forest Rescue and the Town of Crested Butte.

Thank you for your consideration of these comments.

Sincerely,

Gary Sprung

Gary Sprung
HCCA President

Sierra Club Uncompahgre Group
c/o Vicki Mercer, P.O. Box 806, Palisade, Colorado 81526

October 12, 1992

Oil and Gas Leasing Analysis
Grand Mesa, Uncompahgre, and Gunnison National Forests
2250 Highway 50
Delta, CO  81416

To Whom It May Concern:

The enclosed contains the Sierra Club Uncompahgre Group's
comments on the Draft Environmental Impact Statement on Oil and
Gas Leasing on the Grand Mesa, Uncompahgre, and Gunnison (GMUG)
National Forests.

The Forest Service recognizes that Alternative 3 is the
environmentally preferred alternative (page II-13).  Sadly, our
country seems incapable of choosing environmentally preferred
alternatives.  In the case of this particular EIS, the failure to
do so stems from our unwillingness to address energy conservation
issues in the most environmentally sound manner.  We fully regret
this dismal state of affairs, and believe it must change soon for
the sake of our beleaguered planet and all of its inhabitants.

The Sierra Club Uncompahgre Group recognizes the demand for oil
and gas from public lands.  Therefore, we support Alternative 5
with modifications indicated herein.  Our support for Alternative
5 is a compromise.  We believe the Forest Service's Preferred
Alternative is much worse, and fails to "provide the public the
greatest benefit" (a stated purpose shown on page I-2).  Clearly,
Alternative 1, No Action, is unacceptable, because maintaining
the status quo exposes the GMUG forests to continued mismanage-
ment vis-a-vis oil and gas leasing.

ALT203   Our most serious concern is that the Forest Service's Preferred
Alternative will encourage new road construction to intrude into
so much roadless acreage.  The motivation for opening roadless
areas to oil and gas leasing appears to be to increase logging in
the GMUG Forests.  The Preferred Alternative will certainly do no
more to help the nation become more self-sufficient in energy
than Alternative 5.

ALT302   The Forest Service seriously overstates "lost opportunities" for
oil and gas exploration and production if roadless areas are not
available for oil and gas exploration and development (page II-
17).  The Plan is for a period of 15 years only; it is not
perpetual.  Roadless areas could be opened up in future.  But
OG08    once roaded, these areas can never become roadless again and will

never recover to their prior condition.  This is especially true
since the Forest Service intends for oil and gas exploration in
roadless areas to directly result in increased logging.  We
reject the notion that it is acceptable for our generation to
preclude options and availability of resources for future
generations.

We must also comment on the content of the GMUG Gazette, Volume
2, Number 1, which the Forest Service states "is published in the
public interest, as a means of providing a brief explanation of
complex issues addressed in the Oil and Gas Draft EIS".  A
publication which fulfills these stated goals is highly
desirable.  However, we are distressed that the issue was used to
promote the Forest Service's Preferred Alternative, rather than
to introduce complex issues contained in the EIS.

Sincerely,

Vicki Mercer

Vicki Mercer
Executive Committee Member
Sierra Club Uncompahgre Group

Enclosure

Sierra Club Uncompahgre Group's Comments on
Draft Oil and Gas Environmental Impact Statement
Grand Mesa, Uncompahgre, and Gunnison National Forests
October 12, 1992

A. **Roadless Acreage Intrusion Issue**

ALT06
We object to the Forest Service's claim that its Preferred Alternative provides the greatest resource protection (page S-19). An additional 349,650 acres of roadless areas (relative to Alternative 5) could become subjected to roads. The resulting resource degradation new roads and timber harvesting will cause is not justified.

RA04
It seems that the Forest Service prefers access to roadless areas in order to increase timber harvesting. We find this entirely unacceptable. Page S-18 shows that Alternative 5 yields the similar effects on the oil and gas industry as the Forest Service's preferred alternative (Alternative 2), without the corresponding negative impacts on the environment within roadless areas. Page II-4 (last paragraph) also shows that the number of wells drilled for Alternative 2 and 5 remain the same. We see absolutely no increased benefit to oil and gas exploration and development to go into roadless areas. In addition, costs of going into current roadless areas will be higher, and would require economic benefits.

TM01
Pages S-9 and I-24 states that the Forest Service's preferred alternative provides an "opportunity", through development of roads not now roaded, to access timber stands otherwise uneconomical to reach and add to the Forest's timber base and harvest more timber than would otherwise occur because of increased road access. We view increasing the timber harvest yield in the GMUG Forests more of a nightmare than an opportunity. Page S-17 states that the impacts of the Forest Service's Preferred Alternative will be compounded in areas opened for logging after oil and gas activity. We believe that the impacts caused by increasing timber harvesting in current roadless areas, pursuant to the Forest Service's preferred alternative, is unacceptable.

RECG08
Page I-16 states that proposed activities must not unduly harm the environment or disproportionately interfere with other uses of NFS lands. We submit that the Forest Service's preferred alternative does unduly harm the environment and disproportionately interferes with other uses of NFS lands. The added impacts are unjustifiable, given that Alternative 5 provides virtually the same benefit to oil and gas exploration and development. Among the unjustifiable impacts are a potential decrease in backcountry recreation opportunities (page S-16).

CE02
Page II-6 shows that the total number of acres disturbed (503 acres) over the next 15 years is constant for all alternatives. This cannot possibly be accurate, given that activities in roadless areas is bound to disturb more acreage than Alternative 5 (which excludes roadless areas from oil and gas exploration and development).

STPT03
Page II-9 states that timing restrictions of other activities in current roadless areas would not apply. We submit that timing restrictions within roadless areas would be as applicable as elsewhere. Also, timing of road construction is appropriate, to minimize erosion and reduce wildlife impacts (second bullet). See also page II-12, next to last paragraph.

B. **Road Construction and Maintenance**

RD20
Page II-3 states that standard lease terms allow road construction on the leasehold. The Final EIS should specify who will build and maintain road access to the leasehold. Also, poor road construction is a primary cause of surface degradation from resource extraction processes. Therefore, roads should be constructed to the highest standards to minimize surface degradation. Measures should also be taken to prevent casual recreational use while roads are

RD21

RD08

---

Sierra Club Uncompahgre Group's Comments                    Page 2 of 3
GMUG Forests, Draft Oil and Gas EIS                         October 12, 1992

legitimately open for oil and gas exploration and drilling (e.g., signs, gates). Page S-15 states that "road use would increase during exploration and development stages". Increased road use will result in additional road maintenance costs, and we question whether these costs have been adequately anticipated.

C. **Areas of Extreme Environmental Sensitivity**

STP01
Page S-6 shows that oil and gas activities will affect areas of extreme environmental sensitivity, including aquatic/riparian/wetland habitats, alpine tundra areas, roadless areas, sensitive areas, recreation complexes, watersheds of special interest to municipalities, elk calving areas, and bighorn sheep lambing and breeding areas. We seriously question whether impacts have been adequately anticipated and whether mitigative factors are adequate to protect these public resources. The impacts shown for Aquatic/Riparian Wetland Habitats are certainly unacceptable (page S-16). Furthermore, our support for Alternative 5 applies if, and only if, the Forest Service agrees to never waive "no surface occupancy" stipulations for such areas.

D. **Rehabilitation**

It is unclear to us if the Forest Service has estimated rehabilitative costs, and whether such costs are included in its economic analysis. The Final EIS should certainly address these costs. The Sierra Club Uncompahgre Group also submits that rehabilitative processes must address the following provisions:

1. Well sites and roads should be returned to the natural contour and to indigenous vegetation.

OGM01
2. There should be protection against subsequent surface or groundwater contamination by salt water and other toxic elements from plugged wells (whether dry or exhausted).

OG06
3. There should be clearly defined and enforceable language which speaks to drillers' responsibilities for rehabilitation. Leases should stipulate the types of penalties for failure to fulfill rehabilitation processes. The Final EIS should state whether these penalties would include civil and/or criminal prosecution.

OGM03
4. Bonds or escrowed amounts must be adequate to allow the Forest Service to rehabilitate areas should a leaser undergo financial failure and lack the resources to fulfill its contractual commitments.

E. **Others Issues**

ALT03
1. The Forest Service's Preferred Alternative encompasses 1/3 of the 3 million acres contained in the GMUG (page ii). This is an excessive amount of public land for one use, especially given stresses the GMUG Forest endures from all of the other multiple uses which the Forest Service promotes.

Page I-12 states that lease rights provide that drilling and development take precedence over rights government may subsequently grant other users. The Draft EIS states that the Forest Supervisor may decide to authorize lease of all lands described as "administratively available" (page I-17). We believe this is totally contrary to the concept of managing public lands in the "best interests of the public". The Forest Service should guarantee that no more than a limited acreage will be unavailable for other appropriate uses of these public lands.

Sierra Club Uncompahgre Group's Comments
GMUG Forests, Draft Oil and Gas EIS

Page 3 of 3
October 12, 1992

AEG23

2. The Summary (page S-15) underestimates the impact of oil and gas development on vegetation. The Summary should reflect that plugged wildcat wells have been known to leak oil and saltwater and contaminate soils, causing situations where vegetation is unable to grow, as indicated on page II-3 (#11).

OGRF01

3. We question the use of assumptions based on continuing drilling at the same conservative levels of 1986-1990 (page II-4). These assumptions will prove to be false if a gas transmission line is in place. We believe that any assumptions used to anticipate impacts (page S-8) should be established as rules governing allowable oil and gas exploration and development. The Forest Service should guarantee that assumptions used in preparing the Draft EIS will not be exceeded. Any deviation in practice would go beyond the impacts considered and allowed under the EIS.

NP16

The Oil and Gas Leasing Plan should stipulate that management of leases will limit drilling activity to Analysis Assumptions #1, which specifies 3% of the regional activity, and does not exceed projected disturbance of 503 acres. The Forest Service should also limit the number of wells to 47 wells over the next 15 years (7 on new leases), which is an assumption given on page I-23 and page II-4.

AEEC04

4. Page S-18 states that "any alternative could affect consumers if oil and gas prices are kept lower or higher due to increased or decreased supplies of these items". This statement begs us to ask "how" the alternatives could affect consumers. The statement as is says absolutely nothing, and is furthermore not supported anywhere within the Draft EIS. The EIS fails to address economic issues; there is no supporting in-depth analyses. Such analyses should include the adverse economic effects of low oil and gas prices, particularly on alternative energy and energy conservation economic sectors of the U.S. economy, and on the high cost to consumers as a result of pricing policies which favor pollution control over pollution prevention.

OG11

5. Page I-1 states that "the Federal Government seeks to reduce its dependency on oil and gas from other nations by continuing to locate and develop its reserves". Conservation and alternative energy would do more to reduce dependency on oil and gas imports. The Forest Service should at least give some recognition to these higher objectives.

---

Kim Kokesh, President
Thunder Mountain Wheelers
860 E Highway 92
Delta, Colorado 81416



October 6, 1992

Oil and Gas Leasing Analysis
Grand Mesa, Uncompahgre, Gunnison NF
2250 Highway 50
Delta CO 81416

ALT201

On behalf of our 140 members, we officially endorse and support your Oil and Gas Leasing DEIS.

The members of our organization enjoy many varieties of outdoor recreation, including all types of motorized recreation. As such, it is our belief that roadless areas should only occur in designated Wilderness Areas; country so uniquely beautiful and special so as to deserve preservation through Congressional action.

RA06

None of the areas considered for oil and gas leasing have these qualities, including the areas that are proposed to receive the "no-lease" designation.

We believe all lands outside formal Wilderness Areas should be available for activities that will benefit all of the people. Oil and gas leasing is one of those activities.

RA195A
RA241A
RA242A

The only change we would suggest to the recommended alternative would be to NOT protect the Kannah Creek, Roubideau, and Tabeguache areas with "no lease" designations. In our opinion, none of these areas have the qualities to be preserved as roadless, ie wilderness, and should be opened to the public for commercial use and motorized recreational enjoyment.

Sincerely,

KIM KOKESH

# Western Colorado Congress

**Main Office**
7 North Cascade, Suite A
P.O. Box 472
Montrose, CO 81402
(303) 249-1978

**Southwest Office**
820 East Seventh Street
Suite B
P.O. Box 2461
Durango, CO 81302
(303) 259-3583

October 28, 1992

Robert Storch
Forest Supervisor
Grand Mesa, Uncompahgre and Gunnison National Forests
2250 Highway 50
Delta, CO 81416

Re: Draft Oil and Gas Leasing Environmental Impact Statement

Dear Mr. Storch:

**NP17** Western Colorado Congress (WCC) and the Western Slope Energy Research Center (WSERC) submit the following comments on the Draft Oil and Gas Leasing Environmental Impact Statement (DEIS) for the Grand Mesa, Uncompahgre and Gunnison (GMUG) National Forests. WCC appreciates the opportunity to submit our comments on the DEIS after the official comment period has ended. Given that oil and gas issues are a relatively new occurrence on the GMUG Forests, WCC would have preferred an extended comment period to allow the public more time to analyze this complex and lengthy document. However, the informal extension of the comment period has undoubtedly allowed for more public response to this important document.

WCC is an organization of individuals and nine community groups from Glenwood Springs to Pagosa Springs. WCC has over 1,200 members, many of whom use and enjoy the GMUG National Forests. Since 1983, WCC has been very active in the planning process for the GMUG Forests. In 1989, WCC provided written comments on the Draft Plan Amendment and DSEIS for the GMUG Forests and again in 1991 on the Final Plan Amendment and FSEIS. In 1986, WCC negotiated an agreement with the Forest Service to limit aspen cutting on the GMUG Forests and in 1988 WCC participated in the creation of the Keystone Agreement. In addition, WCC has been involved in numerous timber sales in its ten-year history.

WCC has also been active in oil and gas issues, mainly in southwestern Colorado. WCC has worked to lessen the impacts of oil and gas drilling on private landowners who do not own the mineral rights to their property. More recently, WCC has been involved in oil and gas leasing in the HD Mountains on National Forest land. WCC believes that the Environmental Impact Statement for drilling in the HD Mountains was inadequately prepared and therefore WCC is opposed to Amoco's drilling.

WCC applauds the Forest Service on the clarity of the DEIS. Dividing the Forest into "affected environments" and then presenting the impacts of the alternatives on each of these "environments" provides a much clearer picture to the reader. WCC has much less appreciation for the *GMUG Gazette*. The Forest Service's use of printed propaganda to attempt to gain public acceptance for the Preferred Alternative is highly questionable and improper. WCC appreciates that the Forest Service has tried to

present the issues in a format that is easier to read than the DEIS. However, it is inappropriate to use the Gazette as a tool to manipulate public opinion before the comment period has ended and the decision made.

Despite the Forest Service's cheerleading for the Preferred Alternative, it was revealed in a recent article in the *Crested Butte Chronicle and Pilot* that the majority of the comments received so far by the Forest Service for the DEIS have not favored the Forest Service's Preferred Alternative. Most responses have indicated support for Alternatives 3 or 5. Also, in an article which appeared in the *Grand Junction Daily Sentinel*, it was stated that outfitters and guides have submitted over 1,000 signatures

**NP04** to the Forest Service in support of Alternative 5. The Forest Service must adequately address the concerns of the citizens of the Western Slope before a Final EIS can be released.

In a recent phone conversation with a WCC member, you said that you would like to have a Final EIS out by the end of the year. Also, in the aforementioned article in the *Chronicle and Pilot*, Forest Service Planner Jeff Burch echoes this desire. WCC believes that there is no way that the Forest Service can mitigate public concerns with the DEIS before the end of the year and asks that you reconsider your timeline taking into account the volume of response that this DEIS has generated.

**ALT286** In general, the DEIS does a good job of describing the consequences of oil and gas leasing on specific environmental factors and forest resources. It is startling however, to realize that the impacts described are the result of only 47 new wells being drilled on the forest, and that of those, only 7 on new leases (see Analysis Assumptions at S-8). What is even more frightening is that the Forest Service could look at these impacts based on said assumptions and then designate Alternative 2 as "Preferred". If industry should express interest in drilling more than 47 wells, then the entire analysis will be wasted.

WCC appreciates this opportunity to comment on the DEIS and looks forward to reviewing the Final EIS. Have a safe and happy holiday season.

Sincerely,

Jerry Swingle
Jerry Swingle
President

☎ **Member group of Community Shares of Colorado**

## TABLE OF CONTENTS

I. INTRODUCTION

II. SPECIFIC DEFECTS, OMISSIONS, ERRORS

III. THE CUMULATIVE IMPACTS TO THE AFFECTED
     ENVIRONMENTS UNDER THE PREFERRED ALTERNATIVE ARE
     UNACCEPTABLE

    1. Biological Diversity

    2. Water Quality

    3. Visual and Recreational Resources

    4. Wildlife

    5. Economics

    6. Roadless Areas

IV. THE DEIS VIOLATES THE NATIONAL ENVIRONMENTAL
    POLICY ACT

V. THE DEIS IS INSUFFICIENT FOR THE DECISIONS REQUIRED BY 36
   CFR, SUBPART E, 228.102

VI. ADDITIONAL RECOMMENDATIONS

ATTACHMENTS

    1. Comments from Steve Hinchman

I. INTRODUCTION

Western Colorado Congress (WCC) is a citizens organization of over 1,200 members and nine community groups spread throughout western Colorado. WCC was formed in 1980 and has been involved in forest management issues since 1983. WCC's membership includes Western Slope residents who use water originating on the Grand Mesa, Uncompahgre and Gunnison (GMUG) National Forests to meet domestic and agricultural needs. Our members also gather firewood, graze sheep and cattle, hunt, fish, and enjoy the beauty of the GMUG National Forests.

For the reasons outlined below, WCC cannot support the Forest Service's Preferred Alternative.

II. SPECIFIC DEFECTS, OMISSIONS, ERRORS

AEMW05  1. The springs that provide municipal water to the Town of Paonia were not identified
AEMW87  on a large scale map the Forest Service displayed at the Paonia Town Hall meeting this
        fall. All municipal watersheds should be unavailable for leasing.

AERC04  2. Some Major Recreation Trails such as Bell Creek (#834), Horse Ranch Park (#830)
        and Raggeds (#820) are not identified in Fig. III-17.

AERC05  3. Much more of the Analysis area than is shown at Fig III-16 would be considered
        Dispersed Recreational Area by anyone familiar with the Forest.

        4. Some Big Game Winter Range areas are not indicated at Fig. III-21. Such areas
        include that portion of Coal Creek within the Analysis Area and along the Forest
        boundary south of the North Fork of the Gunnison River. Historically there was more
AEW12   winter range on the Forest, but pressures from human activities such as timber
        harvesting, longer hunting seasons, etc. have helped change wildlife behavior and
        range utilization patterns. Also, there are more areas than those indicated in Figs. III-22
        and III-24.

AEG28   5. We assume that the SLT for wildlife summer range under Alternative 5 at Table S-2
        is a printing error.

III. THE CUMULATIVE IMPACTS TO THE AFFECTED ENVIRONMENTS
     UNDER THE PREFERRED ALTERNATIVE ARE UNACCEPTABLE

1. Biological Diversity

Alternative 2 would cause the loss of 12 Roadless Areas "as existing natural

communities and as potential reintroduction for threatened or endangered species if oil and gas developement does occur" (DEIS IV-39). These areas are critical habitat for a large variety and number of species, some of which are already experiencing declines in population due to habitat loss and/or fragmentation. Industry may argue that Wilderness Areas already provide the attributes of roadless areas. Most Wilderness Areas, however, are in the alpine to sub-alpine zones while roadless areas tend to range from transition to sub-alpine zones, areas conducive to greater biological diversity. The importance of Roadless Areas to biological diversity and the detriments are clearly identified in the DEIS at IV-40:

AEG05

> The leasing of any Roadless Area to oil and gas activity will significantly change the natural character of the area because of the road access that is necessary to conduct oil and gas activities. The cumulative impact resulting from the subsequent connected actions of timber harvest, increased human use, recreational developments, and trapping as a result of the road will forever change the area as a natural community. Species like the goshawk, pine marten, lynx, wolverine and many others are very dependent on these areas as the core of their home ranges. Entering into these areas, combined with all the other forest activities going on in adjacent areas, would continue the loss of habitat...which is necessary to their survival.

Clearly, Alternative 3 is the best choice when it comes to maintaining biological diversity, followed by Alternative 5.

The DEIS correctly equates the decline of such natural communities with increasing species extinction (DEIS IV-39). The Forest Service is obligated to make management decisions that will at least maintain: 1.) the relative abundance and distribution of natural communities, and 2.) the plant and animal species which are components of those communities. It is therefore most disconcerting that decision-makers could prefer an alternative that will exacerbate the problems of species extinction, habitat loss and fragmentation and decline of natural communities. Given the recent storm of controversy over the northern spotted owl, why would the agency choose a course of such vulnerability?

2. Water Quality

The effects of the Preferred Alternative on water quality described in the DEIS are very disturbing, particularly in light of the very low levels of development projected in the RFD scenario. Special concern arises with the likely concentration of wells in the watersheds tributary to Muddy Creek. In addition to being tributary to the high quality fisheries of the Gunnison River, this creek is the source of irrigation water for over 8,000 acres of farmland in the North Fork Valley. It provides water to the federally-constructed Paonia Reservoir, which was built for flood, control, irrigation sotrage, recreation and fishery. This water is high in sediment washed from the very lands being proposed for leasing, lands that are of moderate to high geologic hazard. To create the "reasonably high risk" of increased sediment loading to Muddy Creek as well as the "expect[ation]...of occasional spills of waste water and fuel" (DEIS IV-46) by extensive leasing is brazenly foolish. The negative effects would impact not only hundreds of recreational boaters and those who fish as well as fisheries and aquatic life. It would contribute perhaps significantly to the salinization of the Colorado River Basin. It would also violate the State of Colorado's stream quality program and perhaps the Clean Water Act.

AEMW08

Another significant concern is with the likelihood of groundwater contamination. The DEIS identifies some of the potential problems but is hazy on the probability of severe situations such as interzonal migration. It may be more instructive to examine the effects of oil and gas development in the San Juan Mountains in recent years and presently. Last year it was discovered that roughly one-quarter of wells tested in La Plata County in southwestern Colorado had contamination from oil and gas drilling. Thus it is disingenous to state that "holes must to be constructed to preclude interzonal migration of fluids" (DEIS IV-47). Such holes have resulted in the irreversible loss of water resources in a nearby area of Colorado. Statements at DEIS IV-47 exemplify the BLM's and Forest Service's attitude that virtually all impacts are mitigable: "Oil and gas operators are regulated to protect fresh water zones..." and "Primacy for the administration of water disposal or injection wells rests with the State of Colorado..." and "Because of the controls required for reporting and cleaning up of any spills or leaks, potential impacts to groundwater are expected to be minimal." We only wish it were so: that because there exists a law or regulation, or because mitigation measures are required, management decisions and activities would not have destructive results and multi-national corporations would not cause incidents like the contaminated wells near Durango, or the Exxon Valdez spill or the Bhopal disaster.

AEMW04

Elsewhere, however, the DEIS admits that mitigation may fail: under the Preferred Alternative "the stipulations associated with areas with slopes 40-60% (CSU) and moderate geologic hazard (CSU) may have the potential to cause some long-term significant impacts to riparian areas and floodplains," (DEIS IV-63). Again, this conclusion is based on the assumption that only 47 wells will be drilled over the next 15 years. How much greater and more widespread will such long-term significant impacts be if the number of wells is three, eight, or twenty times greater?

AEG29

The DEIS should discuss coalbed methane production separately. The potential for production and subsequent disposal and pollution problems of extremely saline water is higher with coalbed methane than with deep sands gas. It is difficult for the public to evaluate the little coalbed methane information because Fig. 8 is totally illegible.

OGCBM5

One would think that experience would lead to more detailed discussions of some items. For example, why didn't the DEIS display the likely quantity of production water from wells already drilled on the Forests? It would be useful to have some quantitative parameters when dealing with such things as discharges of produced water into surface waters (streams), injection wells, and concentration of toxins in production water. The DEIS states that "oil and gas operations...currently operating in the study area...have not adversely impacted groundwater quality or groundwater levels" (IV-47). We wonder about the basis for and the validity of this statement. (Several years ago an oil slick was observed on the Paonia Reservoir but its source was never determined, although a pump jack was operating at the time upstream on Muddy Creek.)

OGCBM8

3. Visual and Recreational Resources

Again we see the proposed sacrifice of amenity resources to commodity output. The DEIS finds that Alternative 3 followed by Alternative 5 are best at protecting both recreation and visual resources. Unfortunately, the analysis is based on two interlocked and highly suspect systems: the Visual Quality Objectives and the Recreation Opportunity Spectrum. (Virtually no one among GMUG personnel can explain these arcane systems.)

AEV01

The VQOs appear to have been adopted without NEPA documentation. One result, we believe, is that many areas classed as modification or maximum modification should be

AEV01 · classed as retention or partial retention. Furthermore, we believe it is a mistake to now make leasing decisions that will forever change the character of much of the Forest based on decisions made without the public participation inherent in NEPA.

RECG88 · The conflicts with most types of recreation and particularly the reduction in dispersed back-country recreation opportunities resulting from the Preferred Alternative are unacceptable.

### 4. Wildlife

AEW02 · While the DEIS identifies the potentially severe impacts to various wildlife populations, it would have us believe that mitigation will minimize these impacts. The degree of mitigation is made suspect by a tendency to fudge the intent of the Preferred Alternative. For example, under Big Game Winter Range and Elk Calving Areas the DEIS equates the efficacy of Timing Limitations and Controlled Surface Use with that of No Lease (DEIS IV-74). That this is untrue is supported elsewhere in the DEIS at Table S-2 where we see that of 21 identified Roadless Areas, 15 would have standard lease terms resulting in the "severe disruptions", "stress", "overcrowding", disruption of life cycles", "animal mortality", "permanent displacement", and "cumulative population losses" to big game described at DEIS IV-74 and 75. Clearly there will be severe and perhaps permanent impacts to big game under Alternative 2 that can only be avoided by not leasing them. (We again point out that Figs. 21, 22 and 24 did not identify all the respective areas they should have.)

We are glad to see that a Forest Service NEPA document finally acknowledges that management actions can cause "additional pressure [to] be placed on private lands to provide secure wildlife habitat." Such movement onto private lands have resulted in millions of dollars of losses to farmers, ranchers, increased road kills and vehicle damage, and increased stress on human populations. That implementation of Alternative 2 would likely exacerbate this situation is unacceptable.

The above discussion of impacts to biological diversity also applies to wildlife.

We strongly urge the GMUG Forest Supervisor to read the sections on wildlife in the DEIS, particularly IV-58, before issuing the ROD.

### 5. Economics

REC001 · The DEIS understates the significance of the potential loss of guide and outfitter business at IV-80. Hunting is one of the top three economic generators in the North Fork Valley and is very important to the communities near the study area. We oppose the loss of these businesses and decline of quality hunting that would be induced by adoption of the Preferred Alternative.

The impacts to water quality could adversely affect thousands of acres of economically important irrigated land. The burden of protecting the quality of water resources rests squarely with the Forest Service.

### 6. Roadless Areas

RA01 · It would be difficult to see how a reasonable person could read the DEIS and then choose to lease any roadless areas. The analysis is compelling: no roadless areas should be leased and as leases expire on Roadless Areas they should not be leased again. Unfortunately, Alternative 5 does not do enough to protect roadless areas.

OG33 · Much of the roadless area is already leased presumably under Standard Lease Terms. (Given the description of impacts under STLs, it was a grave error to have leased these areas at all, let alone leased with STLs.) The Forest Service needs to find a way to regain control over these leased roadless areas. The DEIS is confusing in describing what Alternative 5 really entails. At Tables S-2 and II-5 it appears that under Alternative 5 there would be no leased Roadless Areas. The DEIS should have displayed which leases in Roadless Areas have producing wells, when current leases expire, etc. Instead the public is left with impression that the possibility exists of protecting all roadless areas by not leasing them. It is a key flaw in the DEIS that existing leases tend to distort the leasing options displayed. It is difficult to sort out how they also distort the impacts to the affected environments.

The GMUG planners should review the comments received for the Draft and Final Supplemental EISs for the 1991 Timber Amendment. There, the concern with development of roadless areas and pushing roads further into the Forest was overwhelming.

Additionally, the DEIS discovers that even with the various stipulations imposed under timing restrictions and controlled surface use oil and gas leasing will adversely affect many other resources on the Forest. Vegetation suffers because of the opening of previously unsuited timber lands. "Wherever oil and gas construction activities occur, the soil resource would be impacted," (DEIS IV-42). Areas released with Standard Lease Terms would see "disturbances in sensitive soil areas that would result in unacceptable soil resource damage" and "areas [that would be] irretrievably and irreversibly altered," (DEIS IV-42). The DEIS states that the Allowable Sale Quantity (ASQ) for timber may increase, but in order for the ASQ to increase, the agency must first initiate the NEPA process and amend the Forest Plan.

### IV. THE DEIS VIOLATES THE NATIONAL ENVIRONMENTAL POLICY ACT

NP07 · By using a Reasonably Foreseeable Development scenario that is unrealistic, the Forest Service has skewed the analysis. Fundamental to any EIS are the assumptions chosen upon which to base the analysis. In this case, the Forest Service and Bureau of Land Management have assumed that "drilling activity...will continue at the same conservative levels of 1986 to 1990" (DEIS E-4). While this could be the case, GMUG planners should have at least considered other levels of activity for the reasons stated in Appendix A of these comments. While the environmental consequences of implementing Alternative 2 are bad enough at the assumed development level of 47 new wells, they are unimaginable at a potential development level of hundreds or even thousands of wells.

ALT303 · On the other hand, if we accept the RFD, then there is certainly no reason to lease an additional several hundred thousand acres (and particularly 200,000 acres with Standard Lease Terms) since the seven wells on new leases could be drilled on a few small leases.

### V. THE DEIS IS INSUFFICIENT FOR THE DECISIONS REQUIRED BY 36 CFR, SUBPART E, 228.102

The intent of the agency is to issue a Record of Decision with the Final Oil and Gas

Leasing EIS that will address two decisions: 1.) "which lands are administratively available for leasing and under what stipulations" ('d'), and 2.) to authorize the BLM to offer leases for specific lands ('e'). There is nothing in the DEIS that prepares the Forest Supervisor for making an informed decision.

In summary, the impacts to the various Forest resources under the Preferred Alternative are unacceptably severe, even at the unrealistic development levels assumed in the DEIS. At a more realistic higher level of development, the impacts would be much greater. If we accept the RFD levels of the DEIS, there is no reason to lease more than a few thousand acres to meet industry's interest. And there is certainly no need to lease any Roadless Areas. As leases in Roadless Areas revert to the government, those areas should be made unavailable for leasing.

## VI. ADDITIONAL RECOMMENDATIONS

ALT02  1. All Roadless Areas should be unavailable for leasing. Current leases in Roadless Areas that have no producing wells should not be renewed. Current leases in Roadless areas that have producing wells at the time the lease expires should be redesigned so that any additional drilling would be directional from points near the existing wells or from an appropriate point on the perimeter of the Roadless Area.

2. All municipal watersheds should be unavailable for leasing.

RECS02  3. There should be no leasing in the Kebler Pass corridor.

STP01  4. There should be no waivers of lease stipulations.

OGRF01  5. The DEIS needs to display the impacts associated with a higher level of exploration and development.

OG34  6. The DEIS should reveal how the unitization process occurs and how unitization affects the Forest.

STP28  7. There should be no leases with Standard Lease Terms. The Forest Service relinquishes too much authority and control with SLTs.

ALT01  8. Much of the analysis area is already leased. The Forest Service should analyze an alternative that leases no new lands, does not re-lease non-producing leases, rationalizes existing leases, consolidates existing leases into more manageable blocks, etc.

## Response to the Draft GMUG Oil and Gas EIS

The Oil and Gas Reform Act puts the responsibility for leasing oil and gas on the National Forest on the US Forest Service. The first leases in Region II were contested and due to the requirements of NEPA, all the Forests in Region II are producing EIS documents on oil and gas activities. According to NEPA, the public has a right to know what the likely effects on foreseeable development will be. Further, the U. S. Forest Service must manage this resource along with all the other uses on the forest, and prevent this resource from overwhelming the forest.

A comparison between this document and reality can lead only to one conclusion. This document does not in anyway examine the relationship between future foreseeable demand and the likely effects that demand will have on the ground in the GMUG forest. We are presented daily with articles and advertisements in the media touting the future of natural gas. In the last week two examples that stand out to me are:

OGRF06  1) An ad in House and Garden that California's PG&E is converting its fleet of vehicles to run on natural gas.

OGRF04  2) The passage of the new "Energy Policy" legislation that calls for accelerated development of all phases of natural gas development.

OGRF01  The Reasonable Foreseeable Development level used as the basis for this document is unrealistic by any set of criteria and represent a total waste of time and money. It is my understanding the level of RFD used here comes from the geologist at the BLM, who are held in high regard by the prepares of this document. However, if the means of selecting 7 new leases was not the toss of a dart, it must

OGRF02  have been a linear extrapolation of activity during a time of very low activity. The method used did not take into account even a casual examination of the trends in the marketplace that will

OGRF03  effect the future price of natural gas and hence the level of pressure for development of production capacity for the same.

Some factors not considered in the document are:

1) The trend in commercial power generation toward natural gas as the fuel of choice for new power plants. This is evidenced by the conversion of existing nuclear plants in California and Colorado to natural gas.

OGRF07  2) Electric Utilities are building more natural gas fired power plants than plants using any other fuel.

3) Statements by the Utility Data Institute that one half of all new power plants built in the US in the next 10 years will use natural gas.

OGRF08  4) The current construction of the Trans Colorado Pipeline which will link the existing and proposed wells in the Picance Basin with other major pipelines that serve the metro areas and powerplants of the entire nation. This will obviously greatly increase the market ability of gas produced on the GMUG forest, and consequently the likely-hood increased development here.

OGRF05  5) Natural gas produces less pollution than coal or oil in terms of sulfur oxides and carbon dioxide. There is a global movement to curtail the production of both of these emissions that will enhance the

-1-

market position of natural gas.

6) Public Utility Commissions in California and Nevada already have rules charging utilities for the "externalities" of power production. This means they are being penalized for pollution. Natural gas pollutes less, and hence will be ever more in demand in the coming years.

7) The new Energy Bill streamlines leasing procedures for natural gas, a move clearly aimed at increasing its production.

8) At this moment (Oct 12, 1992) the spot price for natural gas is at an all time high.

9) There is a clear trend developing toward the fleet motor-vehicle conversion of natural gas, as evidenced by the immanent conversion of the nation wide fleet of the United Parcel Service.

10) There is a planned forced conversion away from gasoline and diesel in souther California that could well portend a national trend toward the use of natural gas as a motor fuel.

OGCBM3 | 11) Plans in the Dept. of Energy to push the development of Coal Bed Methane.

OGCBM4 | 12) Large tax incentives for the development of CBM.

13) Rancho Seco Nuclear Generating Station in California and Ft. St. Verain Nuclear generating station in Colorado are converting to natural gas.

### ALTERNATIVES NOT LOGICAL

The alternatives used in this document are not logical and do not represent as sufficiently wide range of alternatives.

1) There is a gross underestimation or RFD used in all the alternatives (see above).

2) One third of the area proposed for leasing is **already** leased.

3) The majority of theses existing leases are Standard Lease Term Leases (SLT), and therefore not subject to any of the mitigation measures proposed in the document.

ALT504 | 4) The existence of these existing leases renders Alternative 5 meaningless. Nominally designed to protect unroaded areas, these existing leases virtually guarantee that these areas will be roaded, opening the areas to any new leases as well.

ALT202 | 5) These existing leases make the restrictions imposed in the preferred alternative similarly meaningless.

STP05 | 6) Also, there is no mention of the common practice of granting exemptions from stipulation after the lease is granted. Extensive use of exemptions from stipulation would obviously render the stipulating ineffective, and the likelihood should addressed.

-2-

STP05 | There will be a lot of pressure to grant exemptions if a lease with exemptions is in the vicinity of a lease with SLT. Without a clear policy statement acknowledging these SLT leases and declaring a policy of no exemptions on future leases, it might even be argued in court that more stringent stipulations intermingled with SLT represents unfair practices of some sort.

ALT01 | 7) There is no attempt to rationalize the existing leases. That is, there should be an alternative that attempts to integrate the existing leases and proposed leases into logical units that can be both efficiently managed and efficiently produced. There should be an attempt to foresee an efficient and minimally environmentally disruptive road infrastructure and efficient pipeline design to service the likely full field development that will far exceed the RFD used here. An effort should also be made to consolidate existing leases into Blocks held by single producers through trading outlying leases for leases nearer existing leases.

### Factors that deserve more consideration

1) The area identified here for leasing is on the southern edge of the Piceance Basin, the largest known natural gas deposit in the country.

2) Full field development sometimes runs as high as 3 wells per square mile. Extrapolated to the area identified for leasing in the draft EIS, this would approach **3,000 well on the GMUG. Although this is hopefully unreasonably high number, it illustrates the absurdity of 7 wells for the RFD.**

3) The trans Colorado pipeline, by its size and location, is obviously not intended to carry gas for domestic consumption.

OGCBM1 | 4) The Piceance Basin contains vast deposits of CBM. There is a high likelihood of significant CBM development in the GMUG. See pg E-2 and E-16 (fig 8). This indicates that a significant portion of the GMUG has high and moderate potential for CBM production. This has been glossed over to an amazing degree. Why are we paying people to do this study if they are so out of step with the realities of the situation, unless they have been ordered to ignore the realities of the geologic situation, and the realities of the by-products of the CBM production process?

OGCBM2 | 5) However, the document acknowledges the possibility of extremely salt-laden production water being brought to the surface. The document **should provide a thorough discussion of all aspects of CBM production, including the environmental consequences of vast quantities of production water that can contain up to 15% salt. This is many times saltier than the ocean.**

6) The consequences of large scale development of CBM and the inherent vast quantities of extremely salty water has been examined elsewhere. Apparently, in an area such as this where rainfall sometimes exceeds evaporation, any surface disposal of salt would eventually be washed into the river drainage system. It is estimated that enough salt could be brought to the surface as a by-product of CBM production to render the waters of the Colorado unusable.

7) The local irrigation water is already borderline from a heavy load of salt and dissolved solids, any degradation would render it poison to crops and soil.

-3-

8) The water that the lower basin states draw from the Colorado is heavily laden with salt and dissolved solids, and any increase would extract a heavy toll from agriculture in those states.

9) The water that reaches Mexico is already of very poor quality. Witness the construction of costly de-salinization plants as a pathetic attempt to uphold the US' obligations to provide Mexico with water suitable for agriculture from the Colorado River. Any increase in the salt load going into Mexico will render the water totally unusable.

10) It has been estimated that pumping the salt from extensive CBM production to the ocean would significantly pollute the ocean.

OGCBM5  11) The document indicates that permits would be required to dispose of production water by injection, but ignore the fact that **the technology to re-inject this brine does not exist**.

The recent attempts at re-injecting brine in the four corners area are largely failures. The deep injection simply did not work, and re-injecting the brine into shallower aquifers resulted in pollution of domestic wells and the seeping of methane into basements, with various consequences.

12) The document should deal with the fact that like nuclear waste, no path exists to dispose of the salt the that will accumulate as a by-product of CBM.

AEG13  13) The document should address much more in terms of water quality than impacts from erosion and road construction.

14) The document should examine the fate of previous cultures that relied on irrigation for their survival, and the role increasing salinity in their soils played in their demise.

AEG14  15) The impacts to water quality from road construction and erosion from production facilities should be calculated on the basis of a RFD of closer to a thousand wells.

AEW09  16) The document should examine the effects on wildlife and bio-diversity form a more realistic RFD.

17) The document predicts that there will be serious degradation of critical wildlife habitat even with the unrealistically low RFD. This must be examined in the light fact that the future will place massive demands for all phases of natural gas production and development on the GMUG forest.

18) If the true scale of likely future development is taken into account, the Forest Service will likely conclude that without a tremendous effort on the part of the Forest Service, this development will overwhelm the GMUG National Forest.

If the final EIS bears any resemblance to the draft, it will likely be found in court to have violated the publics right under NEPA to be informed of the likely consequences of the management decisions of the US Forest Service.

Sincerely, Bill Brunner
P.O. Box 172
Paonia, CO 81428
Co-chair, Western Slope Energy Research Center

-4-



UNIVERSITY OF COLORADO  WILDERNESS STUDY GROUP

October 13, 1992

To:
Oil and Gas Leasing Analysis
Grand Mesa, Uncompahgre, Gunnison N.F.
2250 Highway 50
Delta, Colorado 81416

On behalf of the Wilderness Study Group, we would like to make the following comments on the proposed leasing of roadless areas for potential oil and gas development on the Grand Mesa, Uncompahgre, Gunnison (GMUG) National Forests. In the draft environmental impact statement (DEIS), there are some areas that we feel have been well addressed, and others that we feel need to be re-examined in a further study.

STP01  The DEIS does not propose to lease nearly two million acres of the three million acre Forest because of a low mineral potential. This is bona fide. The recognition of sensitive resource lands such as wetlands and alpine areas, that have been given a "no surface occupancy" stipulation, is also important. These sensitive areas should continue to be protected, and the no surface occupancy stipulations on leases should not be waived under any circumstance by the Forest Service. This would allow for ground disturbing activities in the sensitive areas, and an overall net loss of value on the Forest.

RA04  We, at the Wilderness Study Group, believe that the preferred alternative in the DEIS (which calls for the opening of 350,000 acres of roadless land on the GMUG) should be changed. The Forest Service's own analysis shows that closing these roadless areas to oil and gas leasing will have no impact on the level of oil and gas activity on the Forest in the future, it will only shift the burden to less pristine areas. This is countered with admissions by the F.S. that the proposed (preferred) alternative would result in "some loss of biological diversity" and "reduced opportunities for dispersed back country recreation". To us, there is a fundamental jump in logic that is incongruous. If the DEIS says that by not entering these areas, that no net loss of oil and gas production (activity) will ensue, and then counter that with the statement that a loss in biological diversity and recreation will follow, then it seems reasonable to us that the preferred option that the F.S. selected should not be chosen for the final alternative.

ALT501  The Wilderness Study Group, which sponsored two summer interns to study roadless areas on the GMUG this past summer, would ask that Alternative Five from the DEIS be selected. This designates all roadless areas as "no lease" areas, and
ALT503  still allows for oil and gas mineral development in an environmentally safe manner. We would also like to point to several roadless areas that we feel are in

UNIVERSITY MEMORIAL CENTER 183  BOULDER, COLORADO 80309 (303) 492-6870



**UNIVERSITY OF COLORADO WILDERNESS STUDY GROUP**

HA1841
RA191
RA185
RA194
RA192
RA186    jeopardy. On the Grand Mesa, we have noted Springhouse Park (Flouting Lake),
RA193    Priest Mtn., Electric Mtn., Nick Mtn., Salt Creek, and Clear Creek as critical areas that
RA182    should be protected from roading and development. Battlement Mesa was also
RA181    outlined, as well as Drift Creek and Raggeds in the McClure Pass region. Also
RA196A   worthy of consideration are the north West Elks, including Coal Mesa, Snowshoe
RA196B
RA196C   Mesa, Kebler Pass and Whetstone Mtn. Finally, on the Uncompahgre Plateau, we
RA200    have noted Kelso Mesa and Johnson Creek as sensitive roadless areas.
RA243
RA247

RA195    We would like to thank you for exercising your authority under the 1987 Oil and
RA241    Gas Leasing Reform Act in protecting the Kannah Creek, Roubideau, and
RA242    Tabeguache roadless areas with no lease designations. We would request that all
RD82     other roadless areas (especially the ones listed above), receive that same no lease
         protection. These areas are of special concern to us, as well as to all citizens, for the
         fostering of biological diversity, intact ecosystems, and productive wild lands with
         intact wildlife corridors. The value of these still pristine roadless areas vastly
         outweighs the short-term gain that would be accrued through the prefered
RD82     alternative. We do not want to see roads cut a swath through our shared wild lands.
         The multiple use agenda should be broad enough to respect that, and roads into
TM01     unproductive oil and gas lands should not lead to an inferred 'hidden agenda' that
         would make increased timber volume and sales more economical.

*William W. Martin*

William W. Martin
Wilderness Study Group
Campus Box 207 UMC 183
Boulder, CO 80309

UNIVERSITY MEMORIAL CENTER 183  BOULDER, COLORADO 80309 (303) 492-6870

---

Colorado Chapter of The Wildlife Society

Donald Whittaker, Chairman
Conservation Review Committee
Colorado Chapter of The Wildlife Society

October 9, 1992

Oil and Gas Leasing Analysis
Forest Supervisor's Office
Grand Mesa, Uncompahgre and Gunnison National Forests
2250 Highway 50
Delta, Colorado 81416

Dear Mr. Storch,

The Colorado Chapter of The Wildlife Society (CWS) is an
organization representing over 400 professional wildlife managers
in Colorado employed by various state and federal agencies and
private corporations. We have reviewed the DRAFT OIL AND GAS
LEASING ENVIRONMENTAL IMPACT STATEMENT (Draft EIS) for the Grand
Mesa, Uncompahgre, and Gunnison National Forests. Overall, it
appears that the Draft EIS provides managers with the tools to
protect wildlife resources associated with affected areas and still
utilize the mineral resources of the area. We do, however, have
some specific concerns regarding the Draft EIS.

References are continuously made throughout the document with
respect to suitability of timber for harvest. At times it was
difficult to determine if the Draft EIS is an oil and gas EIS or a
timber management EIS. If timber harvest is a secondary objective
TM01    of this document, it should be stated. Our recommendation would be
        to not allow timber harvest in those areas already impacted by oil
        and gas activities.

AER03   It is not clear in the Draft EIS whether oil and gas activity will
        be allowed to occur in wetlands, floodplains, and riparian areas.
        We are concerned that the document does not specifically state who
OG86    is responsible for reclamation/replacement of these areas if they
        are disturbed.

        We are concerned that the Draft EIS relies on timing limitations
        too much for mitigation of impacts to wildlife. We feel that
STPT01  timing limitations may not be adequate for some areas. These
        limitations are only for oil and gas activities and may do nothing
        to control the potential increase in other human activities
STPT02  stemming from easier access created by oil and gas roads. Also, if
STP04   a well becomes permanent, so does the disturbance. We would like
        to see more stipulations on allowable acreage of disturbed areas,
AEW06   time limits for reclamation/restoration of disturbed sites, and
AEW07   exclusion of highly sensitive areas such as bighorn sheep lambing
        habitats and sage grouse leks and breeding areas from development.

Although the Draft EIS states that new roads as a result of oil and gas development will eventually be removed, we could not find where the document specifies time limits for reclamation of new roads. Roads associated with any development activity can increase other human activity in sensitive areas. We recommend that more specific details be provided concerning development and reclamation of all roads associated with oil and gas activity.

ALT501
FIAB4

We are concerned that the preferred alternative (#2) only protects roadless areas with political implications (those being considered for wilderness designation). Perhaps the better alternative would be alternative #5, No Lease in Roadless and SPWN. This alternative would protect roadless areas in the impacted areas without decreasing potential development (47 wells for both alternatives). At the same time, alternative #5 would decrease the projected acreage affected by about 32,000 acres.

NP02

We appreciate the opportunity to express our views concerning the management of resources in our national forests.

Sincerely,

Donald Whittaker, Chairman
Colorado Wildlife Society
Conservation Review Committee

# List of Reviewers

ARCO Oil & Gas Co. - 1
Carrie Adams - 2
Chuck Adams - 3
Denise Allard - 4
Susan Alto - 5
Jose Alvistur - 6
Mark Andersen - 7
Laura Anderson - 8
Jane Anderson, M.D. - 9
Kelli Anthony - 10
Kirk Apt - 11
Kevin C. Armitage - 12
Kirsten Atkins - 13
Black Canyon Audubon Society - 14
Carolyn Avery-Schichtel - 15
Samuel Brown - 16
Menter G. Baker - 17
Scott Balcock - 18
Jeff Barbee - 19
Joe G. Barnes - 20
Ken Bartlett - 21
Anthony & Lucille Bates - 22
Alexandra Behringer - 23
Mel Bemis - 24
John B. Benjamin - 25
Tamara Hayward- Benjamin - 26
Jimmy Blake - 27
Anthony Bogort - 28
Vaughn Brown - 29
Lowell Bruton - 30
CO Div. of Parks & Outdoor Recreation - 31
Gail Campbell - 32
Jan Caniglia - 33
David B. Carey - 34
James Carr - 35
Michelle LaMay & Charles E. Weiss - 36
Capt. M.W. Chitty - 37
Julie Christenson - 38
Chuck Davies Guide Service - 39
John & Mallory Clark - 40
Ralph E. Clark - 41
Jenny Clifford, et.al. - 42
Michael Cockrell - 43
Colo. Dept. of Transportation - 44
Colorado Division of Wildlife - 45
Colorado Environmental Coalition - 46
Colorado Mountain Club - 47
Colorado Outfitters Assn. - 48
Jennifer Connor - 49

NOAA Ecology and Conservation Division - 50
Steve Cook - 51
Todd A. Cook - 52
James & Barbara Corson - 53
Sandra Cortner - 54
Greg and Addie Cransen - 55
Town of Crested Butte - 56
Crested Butte Chronicle and Pilot - 57
Tim Cunber - 58
Bernadette B. Cunningham - 59
Chris Cunningham - 60
Kirk Cunningham - 61
Joseph Cushing - 62
Richard L. Cuthbert - 63
Lisa Dale - 64
Brad Burritt and Danielle Carre - 65
Kathleen Daugherty - 66
Wesley H. Davis - 67
Lois Oki & Paul De Villiers - 68
Steven L. DeFeyter - 69
Jamie DeMann - 70
Dr. Bruce R. Dietmen - 71
Charlene C. Dills - 72
John Distefano - 73
John Doe 1 - 74
John Doe 2 - 75
Jane Dunbar - 76
Brett Durgen - 77
EPA Regional Office - Region VIII - 78
Eunice Eaton - 79
Rev. Howard "Muzz" Ebright - 80
Eric Edwards - 81
Phillip Egidi - 82
Clint Emore - 83
Chris Estrem - 84
Alvis D. Fetter - 85
Carol Fischer-Boris - 86
M.Theresa Fitzgerald - 87
Robert J. Fletcher, Jr. - 88
Kerry Folger - 89
Cheryl Font - 90
Forest Rescue - 91
Nancy Franklin - 92
Keith Frates - 93
Brian Funk - 94
Chris Gallegos - 95
Caleb Gates - 96
Jacob Geller - 97
George Gers - 98

BLM_0048446

Steven Glazer - 99
W.A. Godwine - 100
Darsey Gordon - 101
Robert F. Green - 102
Gunnison Co. Brd. of Commissioners - 103
Daniel S. Gustafsun - 104
Denis B. Hall - 105
Christina M. Harrison - 106
Jean Harrison - 107
Denzel F. Hartshorn - 108
Scott Hatfield - 109
Danny Haugen - 110
Betsy Heartfield - 111
Andrew J. Heath - 112
Mary L. Hegarty - 113
Marcia E. Hegeman - 114
Brenda Hemming - 115
Ethan E. Hicks - 116
John R. Hicks - 117
High Country Citizens Alliance - 118
Steve Hinchman - 119
Tammy Hinman - 120
Mary & Laura Holder - 121
Pike Howard - 122
Roy Huffstetler - 123
James & Barbi Hunter - 124
Helen Hyde, Micah & Robert Yates - 125
Independent Petroleum Assoc. Mtn States - 126
Jacqueline Ingham - 127
Katie Irby - 128
Britt Helweg Joergensen & Klaus Kracht - 129
Dennis Johns - 130
Justin Johns - 131
Jerry Johnson - 132
Kathie Johnson - 133
Lynn Johnson - 134
Lisa Jones - 135
Scott Jorgensen - 136
Russ Karaus - 137
Erik Kaye - 138
Mitch Kimball - 139
Matt King - 140
Tatia Kinnander - 141
Hulda Armine Kitchen - 142
Jeff Knight - 143
Teresa Kottenstelle - 144
Jason M. Kunes - 145
Kurt Kunkle - 146
K. Kwhar - 147
Kimberly Langmard - 148
Thomas Lehman - 149
Joan Leon - 150
Paul & Vanni Lowdenslager - 151
Zita A. Lynn - 152
Roxie Lypps - 153

Joy MacNulty - 154
Bill Maddax - 155
Robert J. Mann - 156
Lori Mannello - 157
Astrid Matison - 158
Roz McClellan - 159
Marie E. McHale - 160
Thomas F. McIntyre - 161
Kelly McKinnis - 162
Donald J. Meek - 163
Mesa County Dept. of Public Works - 164
Jerry & Nancy Meyring - 165
Carol Miller - 166
Tara Miller - 167
Troy Miller - 168
Tom Minnich - 169
Christine Molloy - 170
Katherine Monroe - 171
Claire Moore - 172
Steven Moore - 173
Ben Morehead - 174
Cousa Moreno - 175
Beth Morris - 176
Daniel Morris - 177
Larry R. Moyer - 178
Norman J. Mullen - 179
Ceil Murray - 180
Richard Myers - 181
Barbara & Moon Myerson - 182
Doriann Mysicka - 183
Jeffery J. Nasif - 184
Dave Naslund - 185
Clark Nelson - 186
Kathryn Northcut - 187
Seth Okeson - 188
Nancy Omasta - 189
Colleen Orth - 190
Hope Osthermen - 191
Lance Oswald - 192
Mary Palho - 193
Alex Parker - 194
John & Sandy Parker - 195
Laura Parker - 196
Marc Pascoe - 197
Sara Pendleton - 198
Marilyn Pengra - 199
Dick Pennington - 200
Andrew Phillips - 201
Kahlie Pinello - 202
Lori M. Poloni - 203
Robert Portmann - 204
Charles A. Prockie - 205
Deanne Pytlinski - 206
Nicholas F. Rayder - 207
Loreta Rea - 208

List of Reviewers

BLM 0048447

Chris Read  -  209
Mark Reaman  -  210
Brenda M. Rich  -  211
Susan & Peter Rinaldi  -  212
Greta Ringsby  -  213
Nathaniel & Veronica Rogers  -  214
David M. Rose  -  215
Jennifer Rose  -  216
Steven and Sandra Rudy  -  217
John Savarese  -  218
William J. Schapley  -  219
Karl & Gailen Schmidt  -  220
Aaron Setzer  -  221
Jeff Shacter  -  222
Steve Shaffer  -  223
Chuck & Vicki Shaw  -  224
Uncompahgre Group Sierra Club  -  225
D.L. Smith  -  226
James M. Smith  -  227
Chris Still  -  228
Mac and Barbara Stratman  -  229
Lucinda Sullivan  -  230
William W. Sutton II  -  231
Jane Syhrain  -  232
Diane Sylvain  -  233
Julie Szymula  -  234
Jim Talbot  -  235
Bill Tembrock  -  236
Texaco Exploration & Production Inc.  -  237
The Hall Family  -  238
Thunder Mountain Wheelers  -  239
Erica Tyler  -  240
US Dept. Health & Human Services  -  241
USDI - Office of Environmental Affairs  -  242
USFWS-W. Colo Sub-Office  -  243
Debra Van Winegarden  -  244
Michael Vodehnal  -  245
Lucia R. Vorys  -  246
Western Slope Energy Research Center  -  247
Nickolas M. Waser & Mary V. Price  -  248
Linda Watkins  -  249
Jahli Webb  -  250
Leonard Weiss  -  251
Western Colorado Congress  -  252
Jennifer Wheeler  -  253
Nancy Jo Wicks  -  254
Univ. of Colorado Wilderness Study Group  -  255
Colorado Chapter, The Wildlife Society  -  256
James Williams  -  257
Donna Wilson  -  258
Patricia Winslow  -  259
Chuck Worley  -  260
John & Carolyn Wright  -  261
Gayle Gaylord & Ilene Younghein  -  262
Kathy Zaiser  -  263

BLM_0048448

Oil and Gas Leasing Analysis FEIS

# Mailing List

## *Federal*

Director's Office
APHIS (PPQ)

ASCS Office - Sagauche Co.

Office of Architecture & Environment
Advisory Council on Historic Preserv.

BLM Grand Junction Resource Area

Barry Tollefson
BLM Gunnison Resource Area

Chip Marlowe
BLM Uncompahgre Resource Area

Area Manager
BLM Uncompahgre Resource Area

B. Curtis Smith Area Manager
BLM White River Resource Area

Attn: Kathy Hall
United States Senator
Honorable Hank Brown

United States Senator
Hon. Ben Nighthorse Campbell

Attn. Dee Jacobsen
Hon. Ben Nighthorse Campbell

David Merritt
Colorado River Water Conser. Dist.

NOAA Ecology and Conservation
Division

EIS Review Coordinator
EPA Regional Office - Region VIII

Resource Liaison Development Staff
EPA, Office of Environmental Review

Chief
Section of Energy and Environment

Administrator Colorado Division
Federal Highway Administration

Environmental Staff
Office of Plan. PLPP GSA

Equal Employ Opp Comm
Office of the Deputy General Counsel

Attn: Ms. Pat Teck
Representative Scott McInnis

John E. Welch Superintendent
NPS Black Canyon of the Gunnison NM

Jimmy Taylor Superintendent
NPS Colorado National Monument

John Chapman Superintendent
NPS Curecanti National Recreation Area

Jeff Handy
NRD, OGC, USDA

Richard Strait Chief, Dv of Planning
National Park Service

Navajo Nation Historic Preservation Dept

OASD (P&L) E

Charles B. Lennahan
Office of General Counsel

Advisor Environ. Qual
Federal Energy Regulatory Commission (FERC)

Rocky Mtn. Forest & Range Exp. Station

Library - FSINFO
Rocky Mtn. Forest & Range Exp. Station

Kenneth Kumor
Rural Electric Admin. (REA)

Asst. Admin for Mgmt.
Rural Electric Admin. (REA)

Soil Conservation Service

Douglas H. Cryer
Soil Conservation Service

John M. Scott Dist.Conservationist
Gunnison Soil Conservation Service

Environ. Coord. Ecol.
USDA Soil Conservation Service (SCS)

Vice Chairman
Southern Ute Tribal Council

Southern Ute Tribe

Gary Davis
US Army Corp of Engineers

ATTN: DAEN-ZCE
Headquarters, US Army Corps of Engineers

Attn. Regulatory Sec.
Sacramento District, US Army Corps of Engineers

Chairman Explosive Safety Board
US Department of Defense

Director Office of Environmental Compliance
US Department of Energy

Policy Evaluation & Research Asst Sec
US Department of Labor

Special Programs Grous (F29) Cntr. for Environ. Health & Injury Cntrl
US Dept. Health & Human Services

Dept Environ Office
US Dept. Health & Human Services

Environmental Officer Region VIII
US Dept. Housing & Urban Dev.

Asst Sec Pol & Intl A
US Dept. of Trans, Envir Div

Environmental Protection Div
Chief Navy Operations US Navy (USN)

Director of Environmental Coordination
USDA Forest Service

USDI Office of Environmental Affairs

Regional Environmental Officer
USDI Office of Environmental Affairs

Forest Supervisor
USFS Arapaho-Roosevelt National Forest

Forest Supervisor
USFS Black Hills National Forest

David Hatfield
USFS Custer National Forest

Forest Supervisor
USFS Manti-Lasal National Forest

District Ranger
Moab District, USFS Manti-Lasal National Forest

Forest Supervisor
USFS Rio Grande National Forest

Rich Hall
USFS Routt National Forest

USFS San Juan National Forest

Barry Burkhardt
USFS Wasatch - Cache National Forest

Forest Supervisor
USFS White River National Forest

LeRoy W. Carlson F&W Enhancement
USFWS - Colo. State Office

Lucy Jordan Ecological Services
USFWS - Western Colorado Office

F&W Enhancement
USFWS-W. Colo Sub-Office

ATTN: Melody Holm
USGS - Denver Federal Center

United States Air Force (USAF)

Ute Mountain Ute Tribe

Uintah & Ouray Indian Reservation
Ute Museum & Archives

## *State*

CSU Documents Department

Ken Salazar Executive Director
Colorado Dept. Natural Resources

Laurence Abbott
Colorado Dept. of Highways

Robin Geddy, Intergovernmental Review Coordinator
Colorado Dept. of Transportation

Colorado Natural Areas Program
Colorado Div of Parks & Outdoor Rec

Director
Colorado Division of Minerals & Geology

Colorado Division of Wildlife

Bob Clark
Colorado Division of Wildlife

Donald Smith
Colorado Division of Wildlife

Jim Garner
Colorado Division of Wildlife

BLM_0048449

Robert Caskey
Colorado Division of Wildlife

Ron Arant
Colorado Division of Wildlife

Director
Colorado Division of Wildlife

NW Regional Mgr.
Colorado Division of Wildlife

Lyle Bennett Wildlife Mgt. Officer
Colorado Division of Wildlife

Barbara Sudler SHPO
Colorado Historical Society

Colorado State Clearing House

Colorado State Forest Service

Pete Barth
Colorado State Forest Service

Chief Engineer Div of Water Res-SNBO
Dept of Conservation & Nat Res

John W. Steck Governmental Affairs
Public Service Co. of Colo.

Governor
Roy Romer

Nate Lund
Western State College

## County

Susan Hansen
Delta County Administrator

Chair
Delta County Commissioners

Ken Nordstrom
Delta County Health Department

Chair
Garfield County Commissioners

Joanne Williams
Gunnison Co Planning Dept.

Chair
Gunnison County Commissioners

Chair
Hinsdale County Commissioners

Chair
Mesa County Commissioners

Robert H. Carman, Commissioner
Mesa County Commissioners

Ass't. Director of Planning
Mesa County Dept. of Public Works

Chair
Montrose County Commissioners

Montrose-Gunnison Co. Assn.

Chair
Ouray County Commissioners

Executive Director
Region 10 LEAP

Chair
Saguache County Commissioners

Chair
San Miguel Board of Comm.

Richard Grice
San Miguel Co. Planning Com

Charlie Hessler
San Miguel Power Assn.

## Local

Carbondale Pulic Library

Mayor
Town of Collbran

Mayor
Town of Crested Butte

Mayor
City of Delta

Robert Engelke City Manager
City of Fruita

Greg Trainer, Public Works
Department
City of Grand Junction

Terry Franklin ,Water Treatment Plant
City of Grand Junction

Pat Bushman
City of Gunnison

Mayor
City of Nucla

Town of Paonia

Mayor
Town of Pitkin

Town of Ridgway

Mayor
Town of Saguache

## Business

Elizabeth S. Bush
ARCO Oil & Gas Co.

Eric Sepulveda
Ana-lab Corp.

Ken Currey
Beartooth Oil and Gas

John Martin
Bio/West

Carroll M. Johnson, Kent Fisher
Black Timber Outfitters

Gary Erickson
Blue Mesa Forest Products

C&N Lumber

Carrick Resources Corp

Jay Neese
Celsius Energy Co.

Steve Baker
Centuries Research, Inc.

Chuck Davies
Chuck Davies Guide Service

John Heidtbrink, Senior Landman
Coastal Oil & Gas Corporation

John W. Rold
Colorado Geological Survey

Crystal Meadows Ranch

Drew Ludwig
ENSR Consulting & Engineering

Stanley Dempsey
Environmental Strategies, Inc.

Dellis Ferrier

Del Flynn

Charlene Camis
Graystone

Jerry W. Danni
Homestake Mining Company

Hubbard Park Outfitters & Pack
Station

Robert Littlejohn
Lakota Guide & Outfitters

Dean Lampton

Dion Luke

R H Simms
Marathon Oil Company

Tom McLeod

Doris Carlsen
Mika Agcorp

Denzel F. Hartshorn
Million H Land & Cattle Co. Inc.

Steve Duffy
Needle Rock Ranch

Northwest Pipeline Corporation

Paids Design Partners Architect

Paonia Garage & Sawmill

Joe Pecharich

Lori Axelson
Petro Energy Exploration, Inc.

Ed Marker
Petroleum Information Corp.

Nancy Nottingham
Phillips Petroleum

Pat Howell
Piute Energy Co.

Mr. & Mrs. William R. Eby
Rendezvous Outfitters & Guides Ltd.

Larry Rose, Sr.

John C. Storch
Southern CO Land & Livestock Co.

Arnold Watson
Saddle Mountain Ranch

Richard Zanett
Savage Mining & Oil Co., Inc.

Sid Simpson

Joe Sperry
Sperry's

Kevin W. Cain/Joseph A. Duda
Stone Forest Ind., Inc.

Terry Belton, Western E & P Region
Texaco Exploration & Production Inc.

Texaco Inc., AERD

Rocky Watson

Western Engineers

BLM_0048450

Oil and Gas Leasing Analysis FEIS

Jay Errabo
Western Slope Environmental Consultants

Don Wilson, Realtor
Wilson Associates Realty

Erving Wolf
Wolf Cattle Co, Inc.

Bill Killam; David Jones
Woodward-Clyde Consultants

## *Organization*

Sandy Shea
Ancient Forest Rescue

Black Canyon Audubon Society

Mesa County Chamber of Commerce

Caroline Hogan, President
Montrose Chamber of Commerce

Paonia Chamber of Commerce

Greg Walcher
Club 20

Bill Hughes, Land Use Coordinator
Colorado Assoc of 4WD Clubs Inc.

Jim Krebs, President
Colorado Assoc of 4WD Clubs Inc.

Cliff Wright
Colorado Environmental Coalition

Rocky Smith, Forest Management Coordinator
Colorado Environmental Coalition

Todd Robertson, Public Lands Coordinator
Colorado Environmental Coalition

Stella Marker, Conservation Chair
Colorado Federation of Garden Clubs

Anne Vickery, Conservation Director
Colorado Mountain Club

Roger Morris, Group Chairman
West Elk Group Colorado Mountain Club

Babs Schmerter, Conservation Chair
West Slope Group Colorado Mountain Club

Nina Williams
Colorado Natural Areas Program

Recreation Resource Committee
Colorado Off-Highway Vehicle Coalition

Brian Macke
Colorado Oil & Gas Conservation Com.

Dennis Bergstad, Executive Director
Colorado Outfitters Assn.

S.R. Broome
Colorado Timber Industry Association

Dudley Millard, President
Colorado Timber Industry Association

Kelly Drake
Colorado Wildlife Federation

Laurie Baker, President
Colorado Women in Timber

Noel E. Andress, President
Concerned Citizens Res. Assn.

Crystal Corridor Association

Delta County Tourism Council

Forest Rescue

Conservation Chrmn.
Grand Valley Audobon Society

Gary Sprung, President
High Country Citizens Alliance

Alexander Woodruff
Independent Petroleum Assoc. Mtn States

Conservation Chairman
Mile-Hi Jeep Club

Anne Heissenbuttel, Public Timber Council
National Forest Products Assoc.

John Horning
National Wildlife Federation

Thomas Lustig
National Wildlife Federation

Jack Ford, President
Ouray County Alliance

Ruth Siemer, Secretary
Ouray County Alliance

Bill Forsythe, Treasurer
Ouray County Alliance

Vice-president
Ouray County Alliance

Ann Cummings
Pioneer ECS

Thomas J. Gibson, President
Ragged Mtn Reserve Landowners Assoc.

Marshall Collins
Rangeland Users Assn.

Alice Frell-Benitez ;Carla Wilson
Rocky Mtn. Oil & Gas Association

Mark Pearson
Rocky Mtn Chapter Sierra Club

Vicki Mercer
Uncompahgre Group Sierra Club

Bill Lewis, Chair
Uncompahgre Group Sierra Club

Dr. Brian L. Horejsi
Speak Up For Wildlife

Donna Phelps
Taylor Park Cattle Assn.

The Colorado Mountain Club

Kim Kokesh, President
Thunder Mountain Wheelers

WSERC

Bill Brunner Co-chair
WSERC

Jerry Swingle, President
Western Colorado Congress

Gordon Blay
Western Colorado Outfitters

Adam Poe
Western Land Group, Inc.

Darrel Knuffke
The Wilderness Society

William W. Martin
Univ. of Colorado Wilderness Study Group

Donald Whittaker, Chair. Conservation Review Committee
Colorado Chap., The Wildlife Society

## *Media*

Aspen Daily News

Associated Press

Chaffee County Times

News Desk
Crested Butte Chronicle and Pilot

News Desk
Delta County Independent

News Desk
Denver Post

News Desk
Fruita Times

News Desk
Gunnison Country Times

Ed & Betsy Marston
High Country News

News Desk
KCZZ Radio

News Desk
KEKB Radio

News Desk
KEXO/KKLY Radio

News Desk
KGUC Radio

News Desk
KJCT-TV

News Desk Reporter
KOTO NEWS

News Desk
KQIL/KQIX Radio

News Desk
KREX-TV

News Desk
KREY-TV

News Desk
KSTR Radio

News Desk
KUBC/KKXK Radio

News Desk
KUSA Western Bureau

News Desk
KVLE Radio

News Desk
Montrose Daily Press

North Fork Times

News Desk
Ouray County Plaindealer

News Desk
Ridgway Sun

Mailing List
Organization

News Desk
Rocky Mountain News

News Desk
Telluride Times Journal

News Desk (Northern Bureau)
Telluride Times Journal

News Desk
The Daily Sentinel

## *Individual*

Carrie Adams
Chuck Adams
Keith & Karen F. Adams
Kimberly Adams
Bill Alexander
Denise Allard
Susan Alto
Tom and Sue Alvey
Jose Alvistur
Mark Andersen
Laura Anderson
Jane Anderson, M.D.
Kelli Anthony
Paul Anthony
Kirk Apt
Kevin C. Armitage
John B. Armstrong
Kirsten Atkins
Carolyn Avery-Schichtel
Don Bachman
Ricky & Austin Baer
Menter G. Baker
Cathy Ballance
Bill Balthrop
Jeff Barbee
George Barlett
Joe G. Barnes
Ken Bartlett
Anthony & Lucille Bates
Prof of Ecology
Bruce A. Bauerle
Lisa Beckstead
Alexandra Behringer
Mel Bemis
Mike Benge
John B. & Tamara Benjamin
Steve Kent and Joan Benson
Deborah Bethell
Wilbur Binder
Jimmy Blake
Mearl & Barbara Blough
Anthony Bogort

Channing Boucher
William E. Bray
S R Broome
Samuel Brown
Vaughn Brown
Lowell Bruton
David L. Bryant
Deborah R. Burch
Brad Burritt and Danielle Carre
Ellen Butzel
Buck Bailey
C.A.B. Enterprises
Robert Chastain
Gail Campbell
Jan Caniglia
Jim Cardamone
David B. Carey
Wayne Carlton
Mrs. Roy F. Carpenter
James Carr
Joy M. and Sam Caudill
Richard Ellis Director
Center for Southwest Studies
Roger Cesario
Mary Lilly & Charley Charley
Capt. M.W. Chitty
John & Mallory Clark
Ralph E. Clark
George Cleaver
Jenny Clifford, et.al.
Michael Cockrell
Tim Comstock
Jennifer Connor
Steve Cook
Todd A. Cook
James & Barbara Corson
Sandra Cortner
Ed and Pat Corwin
Greg and Addie Cransen
Tim Cunber
Bernadette B. Cunningham
Kirk Cunningham
Joseph Cushing
Richard L. Cuthbert
Lisa Dale
Kathleen Daugherty
Phyllis & Paul E. Davis
Wesley H. Davis
Roger Day
Lois Oki & Paul De Villiers
Dave DeBrucque
Steven L. DeFeyter

Jamie DeMann
Tricia Dickinson
Dr. Bruce R. Dietmen
Charlene C. Dills
John Distefano
Jane Dunbar
Dr. & Mrs.E. Frank Dunton
Eunice Eaton
Rev. Howard "Muzz" Ebright
Mike Eddy
Eric Edwards
Phillip Egidi
Clint Emore
Susan Eskew
Chris Estrem
Harlan Feder
Nancy Fenton
Alvis D. Fetter
Lisa Foxwell & Paul Finley
Carol Fischer-Boris
M.Theresa Fitzgerald
Robert J. Fletcher, Jr.
Kurt Flynn
Kerry Folger
Cheryl Font
Paul Foreman
Nancy Franklin
Keith Frates
Greg Freeman
Kenneth R. French
Brian Funk
Bob and Charlene Gann
Caleb Gates
Jacob Geller
George Gers
Tom and Shirley Gibson
Dave & Karen Gillard
Steven Glazer
W.A. Godwine
Art Goodtimes
Darsey Gordon
Dayna C. Gordon
Karen Grah
Robert F. Green
Steve Green
William V. Grigar
Steve Griggs
Harvey P. Grimes
Wilson Groome
J. R. Guadagno
Daniel S. Gustafsun
H.Lawson Hagler

BLM_0048452

Oil and Gas Leasing Analysis FEIS

Margie Haley
Denis B. Hall
Scott & Jacqui Halladay
John Hamblett
Joe Hambright
R.J. Harrington, Jr.
Christina M. Harrison
Jean Harrison
Karen Hart
Scott Hatfield
Danny Haugen
Betsy Heartfield
Andrew J. Heath
Mary L. Hegarty
Marcia E. Hegeman
Brenda Hemming
Jeanne Hemsted
Roger E. Henn
J.D. & Rosie Herman
Steve & Grace Herndon
Jim and Janet Herzstock
Ethan E. Hicks
John R. Hicks
Steve Hinchman
Tammy Hinman
Dan and Judy Hobby
Edward L. Hocker
John N. Hoffman
Mary & Laura Holder
Peter Hovanec
Pike Howard
Phil Howland
LTC Harvey and Pat Hueter
Roy Huffstetler
Sally Hughes
James & Barbi Hunter
Barb Poole & Chris Hutchison
Helen Hyde, Micah & Robert Yates
Jacqueline Ingham
Beth Jacobi
Britt Helweg Joergensen & Klaus Kracht
Dennis Johns
Justin Johns
Dave Johnson
Eric & Sherry Johnson
Jerry Johnson
Kathie Johnson
Lynn Johnson
Lisa Jones
Scott Jorgensen
Jaimie Kahn

Russ Karaus
Pete Kaspar
Caroline Kauffman
Bruce and Sherry Kaye
Erik Kaye
David Keegen
Jack Kelley & Heather Hanst
Bill Kellner
Stephen C. Kent
Shannon Kerr
Virginia Kile
Mitch Kimball
Tatia Kinnander
Hulda Armine Kitchen
Jill Klahn
Jim Kleinsorge
Jeff Knight
Joe Knox
Gary Kocsis
Teresa Kottenstelle
Paul Krabacher
Jason M. Kunes
Kurt Kunkle
Peter Kupferborg
Larry and Vonnie Kuretich
K. Kwhar
Michelle LaMay & Charles E. Weiss
Quintus A. Langstaff
Jim LeFevre
Thomas Lehman
J. Lemmer
Joan Leon
Linda Smisek and Karen Oliva
Kathryn Lindsley
Paul & Vanni Lowdenslager
Cliff and JJ Lowrance
Zita A. Lynn
Roxie Lypps
Joy MacNulty
Bill Maddax
Steve Mahan
Robert J. Mann
Lori Mannello
Dave Mapes
Mark Muldrow and Cathy Olson
Virginia M. & Dorothy Marsh
Bruce Marvin
Barb Mathews
Astrid Matison
John and Edith McCall
Lyn McCalpin
Katherine McCoy

Eileen McGlynn
Richard and Doris McGuire
Ken McKenzie
Scott McKenzie
Kelly McKinnis
Paula Lehr and Art Mears
Donald J. Meek
Gary and Nancy Meinke
Larry Meshew
Jerry & Nancy Meyring
Carol Miller
Glen A. Miller
Tara Miller
Troy Miller
Tom Minnich
Ralph & Jacqueline Mintener
Sam and Carol Mitchell
Christine Molloy
Katherine Monroe
Claire Moore
Steven Moore
Cousa Moreno
Beth Morris
Larry R. Moyer
Bill and Betsey Muldrow
Ceil Murray
Richard Myers
Barbara & Moon Myerson
Doriann Mysicka
Wayne Nailon
Dave Naslund
Clark Nelson
Rick and Virginia Newton
Robin & Gretchen Nicholoff
Ben E. Nichols
Kathryn Northcut
Frank Nunes
F O'Bannon
Richard & Molly Ohlheiser
Seth Okeson
Nancy Omasta
Colleen Orth
Hope Osthermen
Lance Oswald
Ralph Pacini
Mary Palho
John & Sandy Parker
Laura Parker
Marc Pascoe
Sara Pendleton
Marilyn Pengra
Dick Pennington

Mailing List
Individual

BLM_0048453

Andrew Phillips
Kahlie Pinello
Robert Portmann
Jim and Anne Pratt
Dawn Pravsa
Larry Price
Charles A. Prockie
Deanne Pytlinski
Vincent Rossignol
Nicholas F. Rayder
Loreta Rea
Chris Read
Mark Reaman
Molly Reep
Brenda M. Rich
Susan & Peter Rinaldi
Greta Ringsby
Dan Roberts
W.C. Roberts Estate
Michael Robinson
Nathaniel & Veronica Rogers
Ronnie Rogers
Stacey Roman
David M. Rose
Jennifer Rose
Dennis Ross
Mark and Gay Ross
Stephen Rubick
Wayne and Susan Rudd
Steven and Sandra Rudy
Allen Rugg
Eric Sanderson
John Savarese
William J. Schapley
Bob and Betsey Schenck
Karl & Gailen Schmidt
Ron Scott
Aaron Setzer
Jeff Shacter
Jeff Shafer
Jerome L. Shain
Chuck & Vicki Shaw
D.L. Smith
James M. Smith
Mrs. Sue Smith
Ginger Snuggs
Edward F. Miller, Jr.
Software Research, Inc.
Marsha Soucheray
Craig and Jeanne an Springer
Neil and Margaret Springer
Ken Stahlnecker

Mrs. J.C. Steele
Sam & Jo Marie Stewart
Chris Still
Stratman Cattle Co.
Mac and Barbara Stratman
Robert Stuart
Lucinda Sullivan
Bob Sutherland
William W. Sutton II
Jane Syhrain
James Jr. & Kathy Sykes
Diane Sylvain
Julie Szymula
Heather E. Talbot
Jim Talbot
Arthur H. Tanner
George Tatum
Andrew and Naomi Taylor
Bill Tembrock
The Hall Family
The Robbins Trust
Tom and Toni Tooker
Jon Tourville
Tom Turner
Erica Tyler
Debra Van Winegarden
Billy Varner
Ralph and Quendy Veatch
Michael Vodehnal
Lucia R. Vorys
Dr. Ruth L. Willey
Harriet Walck
Nickolas M. Waser & Mary V. Price
Linda Watkins
George Wear
Miles F. Weaver
Jahli Webb
Francis J.& Irene P. Weems
Leonard Weiss
Karl & Thea Wertz
S.A.I.C.
Bob Wheeler
Jennifer Wheeler
Chris White
Ben Wiancko
Nancy Jo Wicks
James Williams
Donna Wilson
Patricia Winslow
Martin and Judy Wise
Wayne and Cindy Wise
Erving Wolf

Brian Wood
Chuck Worley
John & Carolyn Wright
Noel Young
Gaylord,Gayle & Ilene Younghein
Kathy Zaiser
Paul Zogg

BLM_0048454

BLM_0048455

# Chapter VII - Acronyms / Glossary

BLM_0048456

BLM_0048457

# Table of Contents

| | |
|---|---|
| Acronyms | VII-1 |
| Glossary | VII-4 |

BLM_0048458

BLM_0048459

# Chapter VII - Acronyms / Glossary

## Acronyms

| | |
|---|---|
| ADT | Average Daily Traffic |
| AMP | Allotment Management Plan |
| ANSI | American National Standards Institute |
| AO | Authorized Officer |
| APD | Application for Permit to Drill |
| ASME | American Society of Mechanical Engineers |
| ASQ | Allowable Sale Quantity |
| ATV | All Terrain Vehicle |
| AUM | Animal Unit Month |
| BCFG | Billion Cubic Feet of Gas |
| BLM | Bureau of Land Management |
| BMP | Best Management Practices |
| BO | Barrels of Oil |
| BR | Bureau of Reclamation |
| BTU | British Thermal Unit |
| CCC | Civilian Conservation Corps |
| CDOW | Colorado Division of Wildlife |
| CFR | Code of Federal Regulations |
| CEQ | Council on Environmental Quality |
| CNAP | Colorado Natural Areas Program |
| COA | Condition of Approval |
| COGCC | Colorado Oil and Gas Conservation Commission |
| CSU | Controlled Surface Use |
| DEIS | Draft Environmental Impact Statement |
| EA | Environmental Assessment |
| EIA | Economic Impact Areas |
| EIS | Environmental Impact Statement |
| EO | Executive Order |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |

BLM_0048460

Oil and Gas Leasing Analysis FEIS

| | |
|---|---|
| FAN | Final Abandonment Notice |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| FOOGLRA | Federal Onshore Oil and Gas Leasing Reform Act of 1987 |
| FY | Fiscal Year (October 1 - September 30) |
| FDR | Forest Development Road |
| FEIS | Final Environmental Impact Statement |
| FPA | Further Planning Area |
| FS | U.S. Forest Service |
| FSEIS | Final Supplemental Environmental Impact Statement |
| FSH | Forest Service Handbook |
| FSM | Forest Service Manual |
| GIS | Geographic Information System |
| GZ | Geographic Zone |
| IDT | Interdisciplinary Team |
| Kg/ha | Kilograms per hectare |
| KV | Kilovolts |
| LRMP | Land and Resource Management Plan (Forest Plan) |
| MBF | Thousand Board Feet |
| Mcf | Thousand Cubic Feet |
| MIS | Management Indicator Species |
| MM | Thousand Thousand = Million<br>Maximum Modification |
| MMBF | Million Board Feed |
| MMBO | Million Barrels of Oil |
| NEPA | National Environmental Policy Act |
| NF | National Forest |
| NFMA | National Forest Management Act |
| NFS | National Forest System |
| NL | No Lease |
| NOI | Notice of Intent |
| NPDES | National Pollutant Discharge Elimination System |
| NRHP | National Register of Historic Places |
| NSO | No Surface Occupancy |
| NTL | Notice to Lessee(s) |
| O&G | Oil and Gas |
| OHV | Off-highway Vehicles |

Acronyms

BLM_0048461

| | |
|---|---|
| ORV | Off-road Vehicles |
| P | Primitive; Preservation |
| PAOT | People At One Time |
| PL | Public Law |
| R | Rural; Retention |
| R2 | Region 2 - Rocky Mountain Region, USFS |
| RARE II | Roadless Area Review and Evaluation |
| RCRA | Resource Conservation and Recovery Act |
| RFD | Reasonably Foreseeable Development |
| RM | Roaded Modified |
| RMP | Resource Management Plan |
| RN | Roaded Natural |
| RNA | Research Natural Area |
| RO | Regional Office, USFS |
| ROD | Record of Decision |
| ROS | Recreation Opportunity Spectrum |
| ROW | Right-of-Way |
| RVD | Recreation Visitor Day |
| SAOT | Skiers at One Time |
| SCS | Soil Conservation Service |
| SEIS | Supplemental Environmental Impact Statement |
| SLT | Standard Lease Terms |
| SMA | Surface Management Agency |
| SO | Supervisor's Office, USFS |
| SPCC | Spill Prevention Control and Countermeasures (Plan) |
| SPM | Semi-primitive Motorized |
| SPNM | Semi-primitive Non-motorized |
| spp. | Species |
| SUPO | Surface Use Plan of Operations |
| T&E | Threatened and Endangered |
| TDS | Total Dissolved Solids |
| TE&S | Threatened, Endangered and Sensitive (Species) |
| TL | Timing Limitation |
| TSP | Total Suspended Particulates |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USDI | United States Department of Interior |

BLM_0048462

| USFS | U.S. Forest Service |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |
| VAC | Visual Absorption Capability |
| VPD | Vehicles Per Day |
| VQO | Visual Quality Objective |
| WSA | Wilderness Study Area |

## Glossary

A complete and definitive glossary of terminology used in this EIS is found in the Wildland Planning Glossary, C.F. Schwarz, E.C. Thor, and G.H. Elsner, a publication of the USDA Forest Service, Gen. Tech. Report PSW, 13/1979. Forest Plan FSEIS Appendix D contains a glossary of terms that is also useful for further definition of information in this EIS.

## - A -

**Abandonment.** Termination of operations for production from a well. Permanent abandonment involves plugging the well and removal of installations. Conclusively abandoned unpatented oil placer mining claims are subject to conversion into a noncompetitive oil and gas lease pursuant to the Federal Oil and Gas Royalty Management Act of 1982 (30 U.S.C. 188(f)).

**Affected Environment.** Surface or subsurface resources (including social and economic elements) within or adjacent to a geographic area which could potentially be affected by oil and gas activities. The environment of the area to be affected or created by the alternatives under consideration. (40 CFR 1502.15)

**Air Quality Classes.** Classifications established under the Prevention of Significant Deterioration portion of the Clean Air Act which limit the amount of air pollution considered significant within an area. Class I applies to areas where almost any change in air quality would be significant; Class II applies to areas where the deterioration normally accompanying moderate well-controlled growth would be permitted; and Class III applies to areas where industrial deterioration would generally be allowed.

**Allotment Management Plan (AMP).** The plan for long-term use and development of a range allotment.

**Allowable Sale Quantity.** The quantity of timber that may be sold from the area of suited land covered by the Forest Plan for a time period specified by the plan. (36 CFR 219.3)

**Alluvial Soil.** A soil developing from recently deposited alluvium and exhibiting essentially no horizon development or modification of the recently deposited materials.

**Alluvium.** Clay, silt, sand, gravel, or other rock materials transported by flowing water. Deposited in comparatively recent geologic time as sorted or semi-sorted sediment in riverbeds, estuaries, floodplains, lakes and shores, and in fans at the base of mountain slopes.

**Analysis Area.** A delineated area of land subject to analysis of (1) responses to proposed management practices in the production, enhancement, or maintenance of forest and rangeland outputs and environmental quality objectives, and (2) economic and social impacts.

**Animal Unit Month (AUM).** The amount of forage necessary to sustain one cow and one calf or its equivalent for one month.

BLM_0048463

**Application for Permit to Drill (APD)**. An application to drill a well submitted by a lessee or operator to the BLM. The APD consists of a Drilling Plan that discusses downhole specifications and procedures (reviewed by the BLM) and a Surface Use Plan of Operations (SUPO) that examines surface uses, including access roads, wellsite layout, cut/fill diagrams, reclamation procedures, production facility locations, etc. (reviewed by the FS). The approved APD is a contract between the operator and the Federal government and cannot be changed or modified unless authorized by the BLM and FS.

**Aquatic Ecosystem**. All organisms in a water based community plus the associated environmental factors.

**Authorized Officer (AO)**. The Forest Service employee delegated the authority to perform a duty described in these rules. Generally, a Regional Forester, Forest Supervisor, District Ranger, or Minerals Staff Officer, depending on the scope and level of the duty to be performed.

**Available Lands**. Any lands subject to oil and gas leasing under the Mineral Leasing Act.

**Availability for Oil and Gas Leasing**. Availability of NFS lands for oil and gas leasing refers to lands which have not been formally withdrawn from oil and gas leasing activities. The existing Forest Land and Resource Management Plan provided the primary basis for the identification of NFS lands available for consideration for oil and gas leasing. All NFS lands will be subject to determination of compatibility of oil and gas leasing activities with the affected resources as well as the human environment before the Forest Service consents to leasing.

## - B -

**Background.** One of the distance zones of a landscape being viewed. Extends from middleground (3 to 5 miles) to infinity.

**Big Game.** Larger species of wildlife that are hunted, such as mule deer, mountain lion, bighorn sheep, elk, mountain goat, black bear, turkey, pronghorn antelope and moose.

**Big Game Winter Range**. The area available to and used by big game (large mammals normally managed for sport hunting) through the winter season.

**Biological Diversity**. (1) The relative abundance of wildlife species, plant species, communities, habitats, or habitat features per unit of area. (2) The distribution and abundance of different plant and animal communities and species within the area covered by a Land and Resource Management Plan (36 CFR Part 219.3(g)).

**Browse.** That part of the current leaf and twig growth of shrubs, woody vines and trees available for animal consumption.

## - C -

**Candidate Species**. Any species not yet officially listed as threatened, endangered or sensitive, but which are undergoing a status review or are proposed for listing according to Federal Register notices published by the Secretary of the Interior or the Secretary of Commerce.

**Carrying Capacity**.

> **In Range Management** - The maximum stocking rate possible without inducing damage to vegetation or related resources.

> **In Wildlife Management** - The maximum number of individual animals that can survive the greatest period of stress each year on a given land area.

> **In Recreation** - The maximum human use an area can sustain on a long-term basis without unacceptable physical (ecological) deterioration or psychological crowding.

BLM_0048464

**Clearcutting**. The harvest of all trees in a localized area, generally to encourage regeneration of a new, even-aged stand or to meet other specified non-timber resource objectives.

**Condition of Approval (COA)**. Conditions or provisions (requirements) under which an Application for a Permit to Drill or a Sundry Notice is approved.

**Consent for Oil and Gas Leasing**. A consent by the Forest Service for oil and gas leasing on a specified parcel of NFS land. Grants the right to explore, develop, extract, and dispose of a specific mineral or minerals in lands covered by the lease, subject to various terms and conditions.

**Controlled Surface Use (CSU)**. Allowed use and occupancy (unless restricted by another stipulation) with identified resource values requiring special operational constraints that may modify the lease rights. CSU is used as an operating guideline, not as a substitute for NSO or Timing stipulations.

**Cover.**

> **Hiding Cover.** Vegetation capable of hiding 90 percent of a standing adult deer or elk from the view of a human at a distance of 200 feet or less.

> **Thermal Cover.** Cover used by animals for protection against adverse effects of weather.

**Critical Habitat**. Specific areas essential to the conservation of a given species. A biological feature, that if lost, would adversely affect the species.

**Cultural Resources**. Those fragile and non-renewable remains of human activity, occupation, or endeavor reflected in districts, sites, structures, buildings, objects, artifacts, ruins, works of art, architecture, and natural features that were of importance in human events.

**Cultural Resources Inventory Classes**.

> **CLASS I**. An existing data survey. This is an inventory of a study area to (1) provide a narrative overview of cultural resources by using existing information, and (2) compile existing cultural resources site record data on which to base the development of the Forest's site record system.

> **CLASS II**. A sampling field inventory designated to locate, from surface and exposed profile indications, all cultural resource sites within a portion of an area so that an estimate can be made of the cultural resources for the entire area.

> **CLASS III**. An intensive field inventory designed to locate, from surface and exposed profile indications, all cultural resource sites in an area. Upon its completion, no further cultural resources inventory work is normally needed.

**Cumulative Impact**. The impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

## - D -

**Developed Recreation**. Recreation which occurs at man-made developments, such as campgrounds, picnic grounds, resorts, ski areas, trailheads, etc.

**Development and Full-Field Development**.

> **Development well.** Well drilled in proven territory in a field to complete a pattern of production.

> **Full field development.** The drilling of the necessary development wells and associated field facilities, including roads, production facilities, pipelines, injection wells, power lines, etc.

BLM_0048465

**Directional Drilling.** Drilling borehole with course of hole planned before drilling. Such holes are usually drilled with rotary equipment at an angle to the vertical and are useful in avoiding obstacles, or in reaching side areas or mineral estate beneath restricted surface.

**Discovery Well.** A well that yields commercial quantities of oil or gas.

**Dispersed Recreation.** That type of outdoor recreation which tends to be spread out over the land such as hunting, fishing, snowmobiling, hiking, driving for pleasure, cross-country skiing, motorbiking, and mountain climbing.

## - E -

**Economic Impact Areas (EIA).** Subdivision of the analysis area used to calculate economic effects of alternatives.

**Ecosystem.** All organisms in a community plus the associated environmental factors.

**Effects.**

**Direct Effects.** Caused by the action and occur at the same time and place.

**Indirect Effects.** Caused by the action later in time or farther removed in distance, but still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Note: Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**Endangered Species.** Any species which is in danger of extinction throughout all or a significant portion of its range.

**Environmental Assessment (EA).** A concise public document prepared to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. It includes a brief discussion of the need for the proposal, alternatives considered, environmental impact of the proposed action and alternatives, and a list of agencies and individuals consulted.

**Environmental Impact Statement (EIS).** A formal public document prepared to analyze the impacts on the environment of a proposed project or action and released for comment and review. An EIS must meet the requirements of NEPA, CEQ guidelines, and directives of the agency responsible for the proposed project or action.

**Erosion.** 1. The wearing away of the land surface by running water, wind, ice, or other geological agents, including such processes as gravitational creep. 2. Detachment and movement of soil or rock fragments by water, wind, ice, or gravity. The following terms are used to describe different types of erosion:

**Accelerated Erosion.** Erosion much more rapid than normal, natural, or geologic erosion, primarily as a result of the activities of man or animals or natural catastrophes such as fire that expose base surfaces.

**Gully Erosion.** The erosion process whereby water accumulates in narrow channels and, over short periods, removes the soil from this narrow area to considerable depths, ranging from 1 to 2 feet to as much as 75 to 100 feet.

BLM_0048466

**Rill Erosion.** An erosion process in which numerous small channels only several inches deep are formed: occurs mainly on recently cultivated soils.

**Sheet Erosion.** The removal of a fairly uniform layer of soil from the land surface by runoff water.

**Erosion Hazard.** The probability of soil loss resulting from complete removal of vegetation and litter. It is an interpretation based on potential soil loss in relation to tolerance values. Soil loss tolerance rate: An estimate of the amount of erosion which could occur over a short period of time (one year) without causing irreparable damage to the long-term productivity of the soil.

**Exception.** Case by case exemption from a lease stipulation. The stipulation continues to apply to all other sites within the leasehold to which the restrictive criteria applies.

**Exploration or Wildcat Wells** . Wells drilled to test for the presence of oil or gas in a previously undeveloped area. Nine out of ten wildcats are dry holes.

## - F -

**Federal Land Policy and Management Act of 1976 (FLPMA)**. Public Law 94-579 signed by the President on October 21, 1976. Established public land policy for management of lands administered by the Bureau of Land Management. FLPMA specifies several key directions for the Bureau, notably (1) management on the basis of multiple-use and sustained yield, (2) land use plans prepared to guide management actions, (3) public lands for the protection, development, and enhancement of resources, (4) public lands retained in federal ownership, and (5) public participation utilized in reaching management decisions.

**Forage**. All browse and herbaceous foods that are available to grazing animals.

**Foreground.** One of the distance zones of a landscape being viewed. Distance at which details can be perceived, normally within 1/4 to 1/2 mile from viewer. Must be determined on a case by case basis.

**Formally Withdrawn From Oil and Gas Leasing.** A Formal Withdrawal of lands is segregation of public lands from specific management activities by Acts of Congress or other types of administrative regulations subject to valid existing rights. A number of National Forest System lands have been removed from oil and gas leasing as well as other mineral development as a result of Congressional Acts or other forms of withdrawal such as by the Department of Interior. Such lands include designated Wilderness areas, Wilderness Study Area lands which were found to be suitable by the surface management agency for Wilderness designation as identified by the Federal Onshore Oil and Gas Leasing Reform Act, as well as other specially classified lands.

**Formation**. A body of rock identified by lithic characteristics and stratigraphic position; it is prevailingly but not necessarily tabular, and is mappable at the earth's surface or traceable in the subsurface.

## - G -

**Ground Cover**. The area of ground surface occupied by the stem(s) of a range plant, as contrasted with the full spread of its herbage or foliage, generally measured at one inch above soil level.

## - H -

**Habitat**. A specific set of physical conditions that surround a single species, a group of species, or a large community. In wildlife management, the major components of habitat are considered to be food, water, cover, and living space.

BLM_0048467

**Habitat Capability**. The estimated ability of an area, given existing or predicted habitat conditions to support a wildlife, fish or plant population. It is measured in terms of potential population numbers.

**Habitat Effectiveness**. The degree to which a physical wildlife habitat (food, water, shelter) is free from disturbances, and therefore attractive for wildlife occupancy.

**Hydrocarbon**. Any organic compound, gaseous, liquid, or solid, consisting solely of carbon and hydrogen.

## - I -

**Igneous**. Type of rock or mineral that solidified from molten or partly molten material.

**Impact**. The effect, influence, alteration, or imprint caused by an action.

## - K -

**Known Geologic Structures (KGS)**. A trap in which an accumulation of oil and gas has been discovered by drilling and which is determined to be productive. Its limits include all acreage that is presumptively productive (43 CFR 3100.0-5(a)).

**Krummholz**. The belt of discontinuous scrub or groveland at alpine timberlines, composed of species which have the genetic potential of the tree life form, but in this ecotonal belt are both strongly dwarfed and misshapen (Daubenmire 1978). Wind, low effective soil temperatures (also affected by wind), very short growing season, and very small soil pedons are some of the factors involved in formation of the krummholz belt.

## - L -

**Leasable Mineral(s)**. Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. They include coal, phosphate, asphalt, sulphur, potassium, sodium minerals, and oil and gas. Geothermal resources are also leasable under the Geothermal Steam Act of 1970.

**Lease**. A legal contract that provides for the right to develop and produce oil and gas resources for a specific period of time under certain agreed-upon terms and conditions.

**Lease Modification**. Fundamental change to the provisions of a lease stipulation, either temporarily or for the term of the lease. A modification may include an exemption from or alteration to a stipulated requirement. Depending on the specific modification, the stipulation may or may not apply to all other sites within the leasehold to which the restrictive criteria applied.

**Lease Notice**. Provides more detailed information concerning limitations that already exist in law, lease terms, regulations, or operational orders. A Lease Notice also addresses special items the lessee would need to consider when planning operations, but does not impose new or additional restrictions. Lease Notices that are attached to leases should not be confused with formal Information Notices (43 CFR Part 3101.1-3) or Notices to Lessees (43 CFR Part 3160.0-5).

**Lease Options**. One of five possible sets of Lease Stipulations which may be chosen for a given area through this *Leasing Analysis*. Lease options include 1) No Lease, 2) No Surface Occupancy, 3) Controlled Surface Use, 4) Timing Limitations and 5) Standard Lease Terms.

**Lease Stipulations**. Additional specific terms and conditions that change the manner in which operation may be conducted on a lease, or modify the lease rights granted.

**Leasehold**. The area described in a Federal oil and gas lease, communitized, or unitized area.

**Lessee**. A person or entity holding record title in a lease issued by the United States.

BLM_0048468

# - M -

**Macroinvertebrate**. Aquatic insects visible with the naked eye.

**Management Area**. An area with similar management objectives and a common management prescription.

**Management Direction**. A statement of multiple use, other goals, and objectives; and associated management prescriptions, standards, and guidelines for attaining them (36 CFR Part 219.3).

**Management Indicator Species**. Those wildlife species selected in the planning process to monitor the effects of planned management activities on viable populations of all wildlife and fish species including those species that are socially or economically important.

**Mass Wasting (geologic hazard)**. A general term for a variety of processes by which large masses of earth material are moved by gravity either slowly or quickly from one place to another. (American Geological Institute, 1974, p.308) Slow displacements include slumping and soil creep. Rapid movements include slope failures, landslides, debris flows, and rock slides.

**Maximum Modification (MM)**. A visual resource management objective (VQO) in which management activities may dominate the landscape characteristic. When viewed as background they should appear natural. In middleground or foreground they may not completely blend in. Introduced structures should remain subordinate. Contrast reduction should be completed within five years.

**Middleground**. One of the distance zones of a landscape being viewed. This zone extends from the foreground to 3 to 5 miles from the observer. Texture is characterized by masses of trees.

**Mineral Entry**. Claiming public lands (administered by the Forest Service) under the Mining Law of 1872 for the purpose of exploiting minerals. May also refer to mineral exploration and development under the mineral leasing laws and the Material Sale Act of 1947.

**Mineral Potential**. The classification of lands according to the probability of undiscovered mineral resources, delineated as to the type of mineral, the extent of the expected deposit, and the likelihood of its occurrence. The likelihood of occurrence for oil and gas is classified as follows:

> **High Potential.** Describes geologic environment that is highly favorable for discovering oil and gas resources. The area is on or near a producing field and evidence exists that the geologic conditions of reservoir, source, and trap necessary for the accumulation of oil and gas are present.

> **Moderate Potential.** Refers to environment that is favorable for the occurrence of undiscovered oil and gas resources, however one of the geologic conditions necessary for the accumulation of oil or gas may be absent.

> **Low Potential.** Refers to an environment that is not favorable for the accumulation of oil and gas as indicated by geologic, geochemical, and geophysical characteristics. Evidence exists that one of the geologic conditions necessary for the accumulation of oil or gas is absent.

> **No Known Potential.** Refers to a region for which geologic information is insufficient to otherwise categorize potential. This category should be limited to specific areas for which there is a true lack of data and should not be used as a substitute for performing the interpretation.

**Mitigation**. Includes:

> (a) Avoiding the impact altogether by not taking a certain action or parts of an action.

> (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

BLM 0048469

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

**Modification (M).** A visual resource management objective (VQO) in which the characteristic landscape may be dominated by management activities. Vegetative and landform disturbances must borrow from existing line, form, color and texture patterns. Introduction of structures should also borrow from existing patterns to be compatible with surroundings. Reduction in contrast should be completed within one year.

**Multiple-use.** Management of surface and subsurface resources so that they are jointly utilized in the manner that will best meet the present and future needs of the public without permanent impairment of the productivity of the land or the quality of the environment.

## - N -

**National Environmental Policy Act of 1969 (NEPA).** Public Law 91-190. Establishes environmental policy for the nation. Among other items, NEPA requires Federal agencies to consider environmental values in decision-making processes.

**National Forest System (NFS).** All National Forest lands reserved or withdrawn from the public domain of the United States; all National Forest lands acquired through purchase, exchange, donation, or other means, the National Grasslands and land utilization projects administered under Title III of the Bankhead-Jones Farm Tenant Act (7 U.S.C. 1010 et seq.,); and other lands, waters, or interests therein which are administered by the Forest Service or are designated for administration through the Forest Service as a part of the system (16 U.S.C. 1609).

**National Register of Historic Places (National Register, NRHP).** A listing of architectural, historical, archaeological, and cultural sites of local, state, or national significance, established by the Historic Preservation Act of 1966 and maintained by the National Park Service.

**No Lease (NL).** Forest Service discretionary authority to remove sensitive resource lands from oil and gas leasing. Authority must be based on sound management justification. The Federal Onshore Oil and Gas Leasing Reform Act of 1987 expanded the Forest Service authority to include a "discretion" to consent or deny consent on all NFS lands with leasable minerals.

**No Surface Occupancy (NSO).** A fluid mineral leasing stipulation that prohibits occupancy or disturbance on all or part of the land surface to protect special values or uses. The NSO stipulation includes stipulations which may have been worded as "No Surface Use/Occupancy," "No Surface Disturbance," "Conditional NSO," and "Surface Disturbance or Surface Occupancy Restriction by location". Lessees may exploit the oil and gas or geothermal resources under leases restricted by this stipulation through use of directional drilling from sites outside the No Surface Occupancy area.

**Notice to Lessees, Transferees, and Operators.** Written notice issued by an authorized Forest officer. Notices To Lessees, Transferees, and Operators implement regulations and serve as instructions on specific item(s) of importance within a Forest Service Region, National Forest, or Ranger District.

## - O -

**Off-Highway Vehicle (OHV).** Any motorized vehicle capable of or designed for travel on or immediately over land, water, or other natural terrain.

BLM 0048470

Oil and Gas Leasing Analysis FEIS

**Off-Road Vehicle (ORV).** Any motorized vehicle designed for or capable of cross-country travel on or immediately over land, water, snow, ice, marsh, swampland or other natural terrain. It includes, but is not limited to, four-wheel drive or low-pressure-tire vehicles, motorcycles and related two-wheel vehicles, amphibious machines, ground-effect or air-cushion vehicles.

**Oil and Gas Lease.** An oil and gas lease grants the right to explore, develop, extract, and dispose of a specific mineral or minerals in lands covered by the lease, subject to various terms and conditions. Oil and gas leases are issued by the Bureau of Land Management, Department of the Interior.

**Old Growth.** Ecosystems distinguished by old trees and related structural attributes. Attributes vary by forest type and location but may include several of the following: 1) large trees for species and site, 2) wide variation in tree sizes and spacing, 3) accumulation of large-size dead standing and fallen trees, 4) decadence in the form of broken or deformed tops, or bole and root decay, 5) multiple canopy layers and 6) canopy gaps and understory patchiness.

**Onshore Oil and Gas Order.** A formal numbered order issued by or signed by the Chief of the Forest Service that implements and supplements the oil and gas regulations. (36 CFR 228 Subpart e)

**Operations.** Surface disturbing activities that are conducted on a leasehold on National Forest System lands pursuant to a current approved Surface Use Plan of Operations, including but not limited to, exploration, development, and production of oil and gas resources and reclamation of surface resources.

**Operator.** Any person or entity, including, but not limited to, the lessee or operating rights owner, who has stated in writing to the authorized Forest officer the intent to be responsible under the terms of the lease for the operations conducted on the leased lands or a portion thereof.

**Overstory.** That portion of a plant community consisting of the taller plants on the site; the forest or woodland canopy.

## - P -

**Paleontological Resource.** A site containing evidence of non-human life of past geological periods, usually in the form of fossil remains.

**Partial Retention (PR).** A visual resource management objective (VQO) in which management activities remaining visually subordinate to the surrounding landscape. Repetition of line, form, color, and texture is allowed, but changes in qualities, size, amount, intensity, direction, pattern should remain subordinate. New contrast may be introduced but should remain subordinate as well. Reduction in contrast should be accomplished within one year of project completion.

**People At One Time (PAOT).** Used to define recreation capacity which is equal to five persons per family unit for camp and picnic grounds. Other sites vary.

**Plant Association.** A kind of plant community represented by stands occurring in places where environments are so closely similar that there is a high degree of floristic uniformity in all layers. (Daubenmire 1952)

**Preservation (P).** A visual resource management objective (VQO) in which only ecological changes are allowed. Management activities, except low impact recreation facilities are prohibited. This objective applies mainly to Wilderness, primitive areas and areas with special classifications.

**Primitive (P).** A recreation opportunity (ROS) classification term for describing a land area that is almost completely free of management controls. Essentially unmodified natural environment where evidence of other users is low, usually three miles or more from roads. Visitors enjoy hiking, horseback riding, nature study and other non-motorized uses. Visitors experience isolation, independence, closeness to nature, and self-reliance in an environment offering a high degree of challenge and risk.

BLM 0048471

# - R -

**Range Allotment**. A designated area of land available for livestock grazing upon which a specified number and kind of livestock may be grazed under an allotment management plan. It is the basic land unit used to facilitate management of the range resource on National Forest System lands administered by the Forest Service.

**Raptors**. Birds of prey with sharp talons and strongly curved beaks, e.g., hawks, owls, vultures, eagles.

**Reasonably Foreseeable Development (RFD)**. A projection of likely exploration, development, and production within a study area based on existing and credible geologic data, technology, economics, and activity trends.

**Reclamation**. Returning disturbed lands to a form and productivity that will be ecologically balanced and in conformity with a predetermined land management plan.

**Recreation Opportunity Spectrum (ROS)**. Land delineations which identify a variety of recreation experience opportunities in six classes along a continuum from primitive to urban. Each class is defined in terms of natural resource settings, activities and experience opportunities. The six classes are: Urban, Rural, Roaded Natural, Semi-primitive Motorized, Semi-primitive Non-motorized and Primitive.

**Recreation Visitor Day (RVD)**. An RVD is 12 hours of recreation for one person or one hour of recreation for 12 persons or any combination thereof.

**Rehabilitation**. A short-term visual resource management objective used to restore landscapes containing undesirable visual or other resource impacts to the desired visual or other acceptable quality level.

**Research Natural Area (RNA)**. Designated areas of land established by the Chief of the Forest Service under 36 CFR Part 251.23 for research and educational purposes and to typify important forest and range types of the Forest as well as other plant communities that have special or unique characteristics of scientific interest and importance.

**Retention (R)**. A visual resource management objective (VQO) allowing for management activities which are not visually evident. Activities may only repeat line, form color and textures found in the characteristic landscape. Reductions in form, line, color, and texture contrasts should be completed either during or after project completion

**Riparian**. Riparian areas consist of terrestrial and aquatic ecosystems. These areas may be associated with lakes, reservoirs, estuaries, potholes, marshes, streams, bogs, wet meadows, and intermittent or permanent streams where free and unbound water is available.

**Roaded Natural (RN)**. A recreation opportunity (ROS) classification term for describing a land area that has predominately a natural appearing environment with moderate evidence of sights and sounds of humans. Concentration of users is moderate to low. Roads of better than primitive class are usually within 1/2 mile. A broad range of motorized and non-motorized activity opportunities are available. Management activities including timber harvest are present and harmonize with the natural environment.

**Roadless Area.** Area reviewed and evaluated for possible Wilderness designation in the Roadless Area Review And Evaluation (RARE I and RARE II) inventories, completed in 1979.

**Roads**. Vehicle routes which have been improved and maintained by mechanical means to ensure relatively regular and continuous use. (A way maintained strictly by the passage of vehicles does not constitute a road.)

    **Arterial Roads.** Primary travel routes that provide service to a large land area and which usually connect with public highways or other Forest Service arterial roads.

BLM_0048472

Oil and Gas Leasing Analysis FEIS

**Collector Roads.** Roads that serve smaller land areas and are usually connected to Forest arterial roads or public highways. They collect traffic from local roads and terminal facilities. Collector roads are operated for constant use.

**Local Roads.** Roads that connect terminal facilities with collector roads, arterial roads, or public highways. May be developed for either long-term or short-term service.

**Rural (R).** A recreation opportunity (ROS) classification term for describing land areas that are substantially modified. Sights and sounds of others are readily evident. Interactions between users is moderate to high. Numerous facilities are usually present. Challenge and risks are unimportant. Motorized use and facilities are common. Resource management activities may be common and obvious.

## - S -

**Salinity.** Refers to the solids such as sodium chloride (table salt) and alkali metals that are dissolved in water. Often in non-saltwater areas, total dissolved solids is used as an equivalent.

**Scoping Process.** An early and open public participation process for determining particular issues to be addressed and for identifying the significant issues related to a proposed action.

**Semi-primitive.** A recreation opportunity (ROS) classification term for describing land areas that have very few management controls lying between half a mile and three miles from the nearest point of motor vehicle access, excepting four-wheel drive roads and trails, with mostly natural landscapes and some evidence of other people.

**Semi-primitive Motorized (SPM).** A land area classified as semi-primitive that may have primitive roads present and where motorized use is permitted. Settings, activities and opportunities are affected accordingly though there is still a moderate probability of experiencing isolation from sights and sounds of humans. (ROS)

**Semi-primitive Non-motorized (SPNM).** A land area classified as semi-primitive that has a natural environment and motorized use is not permitted. Non-motorized status increases the probability of experiencing isolation, independence, and closeness to nature. Challenge and risk is generally high. Resource management activities may be present; however, natural appearance is still maintained. (ROS)

**Sensitivity Levels.** A measure of people's concern for the scenic quality of the Forest. Sensitivity levels are developed for visitors viewing the Forest as a result of traveling by car, hiking, camping, fishing or boating. Some degree of sensitivity is established for all National Forest System lands.

**Shut-In.** An oil or gas well that is capable of production but is temporarily not producing.

**Significant.** An effect that is analyzed in the context of the proposed action to determine the importance of the effect, either beneficial or adverse. The degree of significance is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment and when the effects on the quality of the human environment are likely to be highly controversial.

**Slope.** The amount or degree of deviation from the horizontal or vertical. Landscape is categorized into three slope classes: 0-15%, 16-40% and greater than 40%. Concerning visual resources, as slope increases, views into a site and the size of the disturbance increase. Generally, the steeper slopes are more visible due to their location in the landscape.

**Soil Fertility.** The quality of a soil that enables it to provide nutrients in adequate amounts and in proper balance for the growth of specified plants when other growth factors are favorable.

**Soil Texture.** The relative proportions of sand, silt, and clay particles in a mass of soil. Basic textural classes, in order of increasing proportion of fine particles, are: sand, loamy sand, sandy loam, loam, silt loam, silt, sandy clay loam, clay loam, silty clay loam, sandy clay, silty clay, and clay.

BLM_0048473

**Stipulation**. A provision that modifies standard lease rights and is attached to and made a part of the lease.

**Stream Bank (and Channel) Erosion**. The removal, transport, deposition, recutting, and bed load movement of material in streams by concentrated water flows.

**Sundry Notice**. Standard form to notify of or approve well operations subsequent to Application for Permit to Drill in accordance with Forest Service regulations.

**Surface Management Agency (SMA)**. Any agency outside the Department of the Interior with jurisdiction over the surface overlying Federally owned minerals.

**Surface Use Plan of Operations (SUPO)**. A plan for surface use, disturbance, and reclamation.

## - T -

**Terrestrial**. Living or growing in or on the land.

**Terrestrial Ecosystem**. All organisms in a land-based community plus the associated environmental factors.

**Threatened Species**. Any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range and which has been designated in the Federal Register by the Secretary of Interior as a threatened species.

**Timber Production**. The purposeful growing, tending, harvesting, and regeneration of regulated crops of trees to be cut into logs, bolts, or other round sections for industrial or consumer use. For planning purposes, the term "timber production" does not include production of fuelwood (36 CFR Part 219.3).

**Timing Limitation (Seasonal Restriction)**. Prohibits surface use during specified time periods to protect identified resource values. The stipulation does not apply to the operation and maintenance of production facilities unless the findings of analysis demonstrate the continued need for such mitigation and that less stringent, project-specific mitigation measures would be insufficient.

**Total Dissolved Solids (TDS)**. Salt, or an aggregate of carbonates, bicarbonates, chlorides, sulfates, phosphates, and nitrates of calcium, magnesium, manganese, sodium, potassium, and other cations that form salts.

**Trailhead**. Developed recreation sites with parking, signing, and other facilities designated to provide a take-off point for trail users at a major access point and terminus of a trail.

## - U -

**Understory**. That portion of a plant community growing underneath the taller plants on the site.

**Unitization**. The agreement to jointly operate an entire producing reservoir as a single entity (**Unit**) without regard to lease boundaries, and allows for the maximum recovery of production from the reservoir and may involve several layers of various contractual and other legal relations.

**Urban (U)**. A recreation opportunity (ROS) classification term for describing a land area that is usually highly modified and contains numerous improvements and large concentrations of humans. Experiencing the natural environment is unimportant.

**Utilization**. The proportion of current year's forage production that was consumed or destroyed by grazing animals; usually expressed as a percentage.

BLM_0048474

Oil and Gas Leasing Analysis FEIS

## - V -

**Vegetation Manipulation.** Planned alteration of vegetation communities through use of prescribed fire, plowing, herbicide spraying, or other means to gain desired changes in forage availability, wildlife cover, species composition, etc.

**Vegetation Type.** A plant community with immediately distinguishable characteristics based upon and named after the current dominant plant species.

**Visual Absorption Capability (VAC).** The relative ability of a landscape to accept management practices without affecting its visual characteristic. The capability to absorb visual change. A prediction of how difficult it will be for a landscape to meet recommended VQO's.

**Visual Quality Objectives (VQO).** Based upon variety class, sensitivity level and distance zone determinations. Each objective describes a different level of acceptable alteration based on aesthetic importance. The degree of alteration is based on contrast with the surrounding landscape.

**Visual Resource.** The composite of basic terrain, geologic features, water features, vegetative patterns, and land use effects that typify a land unit and influence the visual appeal of the unit.

## - W -

**Waiver.** Permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

**Wetlands.** Lands where saturation with water is the primary factor determining the nature of soil development and the kinds of animal and plant communities living under or on its surface.

**Wild and Scenic River System.** A system of selected rivers as provided in the Wild and Scenic Rivers Act of October 2, 1968, as amended, that are authorized by Act of Congress or Act of the State Legislature and designated as Wild, Scenic or Recreational Rivers. They are free flowing streams free of impoundments with varying degrees of accessibility and shoreline development with outstandingly remarkable scenic, recreation, geologic, fish and wildlife, historic, cultural or other similar values, to be preserved for the benefit of present and future generations.

**Wildcat Well.** A well drilled in unproved territory.

**Wilderness.** An area of undeveloped Federal land designated Wilderness by Congress, retaining its primeval character and influence, without permanent improvements or human habitation, protected and managed to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or primitive and unconfined recreation; (3) has at least 5,000 acres or is of sufficient size to make practical its preservation and use in an unimpaired condition; and (4) may also contain features that are of ecological, geological, scientific, educational, scenic, or historical value. These characteristics were identified by Congress in the Wilderness Act of 1964.

**Wilderness Study Area (WSA).** An area included in Section 105(a) of Public Law 96-560 (Colorado Wilderness Bill) which the Secretary of Agriculture shall review. Following review he will report his recommendations on suitability or unsuitability of the lands for inclusion in the National Wilderness Preservation System.

**Withdrawal.** An action which restricts the use of public land and segregates the land from the operation of some or all of the public land and mineral laws. Withdrawals are also used to transfer jurisdiction of management of public lands to other Federal agencies.

BLM_0048475

# Chapter VIII - Bibliography

BLM_0048476

BLM_0048477

# Chapter VIII - Bibliography

Ackerman, D. J., and Brooks, T. 1985. Ground water data from the San Miguel River Basin, southwestern Colorado. U.S. Geological Survey. Open File Report 85-191.

Ackerman, D. J., and Brooks, T. 1986. Reconnaissance of ground water resources in the North Fork Gunnison River Basin, southwestern Colorado. U.S. Geological Survey Water Resources Investigation 85-4320.

Ackerman, D. J., and Rush, F. E. 1984. Hydrogeologic reconnaissance of the San Miguel River Basin, southwestern Colorado. U.S. Geological Survey. Open File Report 84-4133.

Beck, T.D.I. 1991. Black bears of west-central Colorado. Colorado Division of Wildlife. Technical Publication No. 39

Boettcher, A. J. 1972. Ground water occurrence in northern and central parts of western Colorado. U.S. Geological Survey and Colorado River Water Conservation District. Colorado Water Resources Circular 15.

Braun, C.E. 1987. Current issues in sage grouse management. Presented at the Western Association of Fish and Wildlife Agencies meeting, Portland,OR. 10pp.

Brogden, R. F., and Giles, T. F. 1976. Availability and chemical quality of ground water in the Crystal River and Cattle Creek Drainage Basin near Glenwood Springs, west-central Colorado. U.S. Geological Survey. Water Resources Investigation 76-70.

Bromley, M. 1985. Wildlife management implications of petroleum exploration and development in wildland environments. USDA Forest Service. Intermountain Research Station. Ogden, UT. General Technical Report INT-91. 42 pp.

Brooks, T., and Ackerman, D. J. 1985. Reconnaissance of ground water resources in the Lower Gunnison River Basin, southwestern Colorado. Water Resources Investigation 84-4185.

Brooks, T. 1983. Hydrology and subsidence potential of proposed coal lease tracts in Delta County, Colorado. U.S. Geological Survey Water Resources Investigation 83-4069.

Burnett, G.W. 1981. Movements and habitat use of American marten in Glacier National Park, Montana. M.S. Thesis, Montana State Univ., Missoula MT.

Burroughs, E. Jr. and J.G. King. 1989. Reduction of soil erosion on forest roads. USDA Forest Service. Intermountain Research Station. Ogden, UT. Technical Report Int.-264.

Cholate, R., Jurich, D., and Saulnier, G. J., Jr. 1984. Geologic overview, coal deposits, and potential for methane recovery from coal beds, Piceance Basin, Colorado. in., Rightmire, C. T. and Others, eds., Coal Bed Methane Resources of the United States: American Association of Petroleum Geologists, Studies in Geology. No. 17, p. 223-251.

Colorado Department of Health. 1991. Air pollution control division - Colorado air quality data report 1991. 94 pp.

BLM_0048478

Oil and Gas Leasing Analysis FEIS

Colorado Oil and Gas Conservation Commission. 1991. 1990 Oil and gas statistics for the State of
   Colorado: State of Colorado, Department of Natural Resources.

Cunningham, M.L. 1991. The bighorn sheep of Battlement Mesa - a low elevation population. Unpubl.
   Masters Thesis. Colorado State University. 107pp.

Daubenmire, R. 1952. Forest vegetation of northern Idaho and adjacent Washington, and its bearing on
   concepts of vegetation classification. Ecol. Monogr. 22:301-330.

Daubenmire, R. 1978. Plant geography, with special reference to North America. New York, NY.
   Academic Press. 338 pp.

Dwight's Energy Data. 1992. Weekly drilling report - Colorado: Dwight's Softsearch Co., v.92, #25.

Fletcher, K.W. 1990. Habitats used, abundance and distribution of the Mexican spotted owl *(Strix
   occidentalis lucida)* on National Forest System lands. USDA Forest Service. Southwestern Region.

Giles, T. F. 1980. Reconnaissance of ground water resources in the vicinity of Gunnison and Crested
   Butte, west-central Colorado. U.S. Geological Survey Open File Report 80-12.

Hawley, V.D. and Newby, F.E. 1957. Marten home ranges and population fluctuations. J. Mammal.
   38(2):174-184.

Hornocker, M.G. and Hash, H.S. 1981. Ecology of the wolverine in northwestern Montana. Canadian
   Journal of Zoology 59:1286-1301.

Iorns, W. V., Hembree, C. H., and Oakland, G. L. 1965. Water resources of the Upper Colorado River
   Basin - Technical Report. U.S. Geological Survey Professional Paper 441.

Johnson, R. C., and Nuccio, V. F., 1986, Structural and thermal history of the Piceance Creek Basin,
   western Colorado, in relation to hydrocarbon occurrence in the Mesaverde Group, in., Spencer, C. W.,
   and Mast, R. F., eds., Geology of tight gas reservoirs: American Association of Geologists, Studies in
   Geology, no. 24, p. 165-203.

Johnston, B.C. 1987. Plant associations of Region Two, Edition 4. USDA Forest Service. Rocky
   Mountain Region. Publication R2-ECOL-87-2.

Margalef, R. 1969. Diversity & stability. A practical proposal and a model of interdependence. In:
   Diversity & Stability in Ecological Systems. Brookhaven Symposium Biol. 22. Brookhaven National
   Laboratory. Upton, NY. p. 25-37.

Mech, L.D. and Rogers, L.L. 1977. Status, distribution, and movements of martens in northeastern
   Minnesota. USDA Forest Service Research Paper NC-143. 7pp.

Meeks, T. O. 1950. Reconnaissance of ground water conditions in the Uncompahgre Valley Colorado.
   USDA Soil Conservation Service. Bulletin 112 Geological Series 3.

Megahan, W.F. 1977. Reducing erosional impacts of roads. USDA Forest Service. Intermountain Forest
   & Range Experiment Station.

Odum, E.P. 1971. Fundamentals of ecology. 3rd. Ed. W.B. Saunders Co., Philadelphia, PA. p. 576.

Oldaker, P. 1991. Animas Valley hydrogeology study. San Juan Basin Industry Action Team. 11 p.

BLM_0048479

Olendorff, R.R., Miller, A.D. and Lehman, R.N. 1981. Suggested practices for raptor protection on power lines - the state of the art in 1981. Edison Electric Institute. St. Pau., MN 111pp.

Patton, D.R. 1977. Managing southwestern ponderosa pine for the Abert squirrel. Journal of Forestry. Vol. 75, No. 5. 4 p.

Peterson, J.A. 1989. Geology and petroleum resources, Paradox Basin province. U.S. Geological Survey, Open-file Report 88-450u.

Price, D., and Arnow, T. 1974. Summary appraisals of the nation's ground water resources - Upper Colorado Region. U.S. Geological Survey Professional Paper 813-C.

Reynolds, R.T. 1975. Distribution, density, and producitivity of three species of accipiter hawks in Oregon. M.S. Thesis Oregon State University. 39 pp.

Rightmire, C. T., and Cholate, R. 1986. Coal bed methane and tight gas sands interrelation. in., Spencer, C. W., and Mast, R. F., eds., Geology of Tight gas reservoirs: American Association of Petroleum Geologists. Studies in Geology no. 24, p. 165-203.

Schwarz, C.F., Thor, E.C., and Elsner, G.H. 1979. Wildland planning glossary. USDA Forest Service. Gen. Tech. Report PSW, 13/1979.

Spencer, C. W., and Wilson, R. J. 1988. Petroleum geology and principal exploration plays in the Uinta-Piceance-Eagle Basins province: U. S. Geological Survey Open-File Report 88-450-G, 35 p.

Stubbs, C.W.B. and Markham, B.J. 1979. Wildlife mitigative measures for oil and gas activity in Alberta. In: The Mitigation Symposium: A National Workshop on Mitigating Losses of Fish and Wildlife Habitats. USDA Forest Service. Rocky Mountain Forest and Range Experiment Station. General Technical Report RM-65.

Shuster, W.C. 1976. Northern goshawk nesting densities in montane Colorado. Western Birds. 7:108-110.

Tremain, C. A. 1984. Coal bed methane resources of Colorado: Colorado Geologic Survey, Map Series 19, 1:500,000.

USDA Forest Service. 1990. Rocky Mountain Region soil and water conservation measures handbook (Draft).

USDI Bureau of Land Management. 1991. Colorado oil and gas leasing and development, final environmental impact statement. Colorado State Office, Denver, CO.

BLM 0048480

BLM_0048481

# Appendix A -
# Forest Service Manual
# Interim Directive
# 2820-91-1

BLM_0048482

BLM_0048483

## Appendix A

!!ID 2820-91-1  Page 1 of 3
Expiration Date: 7/2/93

**FOREST SERVICE MANUAL**
Washington, D.C.

**INTERIM DIRECTIVE:** 2820-91-1

**EFFECTIVE DATE:** January 2, 1992

**EXPIRATION DATE:** July 2, 1993

**CHAPTER:**  2820 -  MINERAL LEASES, PERMITS AND LICENSES

**POSTING NOTICE:** Last ID was 90-1 to FSM 2820, which is being removed

**REMOVE:** 2820 ID 90-1


This interim directive provides policy and direction by which the Regional Forester or Forest Supervisor may authorize the Bureau of Land Management (BLM) to offer national Forest System (NFS) lands for oil and gas leasing, and replaces Interim Directive 90-1, effective September 14, 1990.  The new direction is set forth in section FSM 2822.9, Oil and Gas Leasing Analyses and Policy.  In carrying out direction in this ID, ensure that related requirements in FSM 1950 Environmental Policy and Procedures and FSH 1909.15 are also met.


/s/ Larry Henson
LARRY HENSON
ASSOCIATE DEPUTY CHIEF

A-1

!!ID 2820-91-1  Page 2 of 3
Expiration Date: 7/2/93

2820 – MINERAL LEASES, PERMITS, AND LICENSES.

2822.9 – Oil and Gas Leasing Analyses and Policy.

2822.91 – Authority.  Title 36, Code of Federal Regulations, 228
Subpart E, Section 228.102.

2822.92 – Policy.  The authorized officer shall make both decisions
described in 36 CFR, Subpart E, 228.102(d) and 228.102(e) in one decision
document upon completion of the leasing analysis described in 228.102(c).
The authorized officer shall authorize leasing upon: 1) verifying the
decision has been adequately addressed in a NEPA document and is
consistent with the Forest Plan,  2) ensuring conditions of surface
occupancy are identified, and 3) determining that operations could be
allowed somewhere on the leased lands except where stipulations prohibit
all surface occupancy.

2822.93 – Responsibility.

2822.93a – Regional Foresters.  Regional Foresters are responsible for:

    1.  Ensuring oil and gas leasing analysis schedules are met.

    2.  Ensuring proper stipulations are attached to leases issued by the
BLM and establishing a system of monitoring their implementation.

    3.  Approving the separation of a Forest into more than one leasing
analysis area.

2822.93b – Forest Supervisors.  Forest Supervisors are responsible for
developing a schedule for analyzing all legally available lands under
their jurisdiction that have not been already analyzed for leasing.

2822.94a – Scheduling Leasing Analyses.  Regulations at 36 CFR,
Subpart E, 228.102(b) require a schedule to be maintained for analyzing
lands for leasing that have not been previously analyzed, or when
existing analyses are deemed inadequate by the authorized officer.   In
complying with 228.102(b) the authorized officer shall;  1) Give priority
to areas of the Forest in which there is interest in leasing, and,
2)  Analyze all contiguous legally available lands of the Forest in one
analysis unless the Regional Forester approves otherwise.

The authorized officer shall consider there to be interest in leasing
if:  an interest in leasing has been expressed by the oil and gas
industry; there has been oil and gas production nearby; the geologic
environment is favorable for oil or gas to have accumulated; there are
State, private, or Federal leases in the vicinity; geophysical
exploration has been done recently; or the Bureau of Land Management
(BLM) indicates that lands have been nominated for lease.

2822.94b – Conducting Leasing Analyses.  Conduct the leasing analysis
required at 36 CFR, Subpart E, 228.102(c) for those lands identified
(FSM 2822.94a).  Conduct a site-specific analysis appropriate for making
leasing decisions and defer the analysis appropriate for ground
disturbing activity to the next decision stage, the Surface Use Plan of
Operations (36 CFR Subpart E, 228.107 and 228.108).  For example,

A-2

!!ID 2820-91-1  Page 3 of 3
Expiration Date: 7/2/93

inventory surface resources that could be affected by lease operations
only if they extend over 40 acres or more.  Identify stipulations that
will apply to areas of 40 acres or more, unless a larger area is
acceptable based on the established legal well spacing.  For example, if
the well spacing rule(s) for a particular area allow only one well for
every 160 acres, do not stipulate land areas smaller than a 160 acre
well spacing.

2822.94c - Leasing Decisions.  The regulation at 36 CFR, Subpart E,
228.102 describes two decisions for leasing.  The first decision
identifies which lands are administratively available for leasing and
under what stipulations (228.102(d)).  The second decision authorizes the
BLM to offer leases for specific lands (228.102(e)).

The authorized officer shall make both leasing decisions in the same
decision document upon completion of a leasing analysis described in
FSM 2822.94b.  The leasing decisions shall include all lands in the
analysis area, whether leased or not leased at the time of the decision,
and lands in which oil and gas ownership is expected to revert to the
Federal government.

When the leasing decision for specific lands is determined not to have
been made in a prior decision document, this decision will need to be
made.  A verification that leasing has been adequately addressed in an
environmental document and is consistent with the Forest Plan must
occur.  If there is significant new information, if leasing has not been
adequately addressed in an environmental document, or if leasing is
inconsistent with the Forest plan, take only those actions necessary to
eliminate the inadequacy or inconsistency to expedite the leasing
decision for specific lands.

2822.94d - Documentation of the Leasing Decision.  Include the following
statements in the scoping documents, notices of intent, environmental
analyses and decision documents:

- Both the administratively available decision, and the leasing decision
for specific lands are being made.

- BLM may offer the specific lands for lease subject to the Forest
Service ensuring that correct stipulations will be attached to leases
issued by BLM.

- Except where stipulations prohibit all surface use, operations and
development may be allowed on the leased lands.  Such activity is
subject to the operator obtaining an approved Surface Use Plan of
Operations from the Forest Service in accordance with 36 CFR, Subpart E,
228.106 and 228.107.

2822.95 - Life of the Leasing Decision for Specific Lands.  The leasing
decision for specific lands shall remain in effect until significant new
information or circumstances cause the existing environmental analysis to
be out of date, at which time the BLM will be notified and the lands will
be scheduled for a new leasing analysis (FSM 2822.94a).

A-3

BLM_0048486

BLM_0048487

# Appendix B - BLM Form 3100-11 (June 1988)

BLM 0048488

BLM_0048489

| Form 3100-11<br>(June 1988) | **UNITED STATES**<br>**DEPARTMENT OF THE INTERIOR**<br>**BUREAU OF LAND MANAGEMENT**<br>**OFFER TO LEASE AND LEASE FOR OIL AND GAS** | Serial No. |
|---|---|---|

The undersigned *(reverse)* offers to lease all or any of the lands in Item 2 that are available for lease pursuant to the Mineral Leasing Act of 1920, as amended and supplemented (30 U.S.C. 181 et seq.), the Mineral Leasing Act for Acquired Lands of 1947, as amended (30 U.S.C. 351-359), the Attorney General's Opinion of April 2, 1941 (40 Op. Atty. Gen. 41), or the

**READ INSTRUCTIONS BEFORE COMPLETING**

1  Name

Street

City, State, Zip Code

2  This application/offer/lease is for: *(Check only One)* ☐ PUBLIC DOMAIN LANDS         ☐ ACQUIRED LANDS (percent U.S. interest _____ )

Surface managing agency if other than BLM: _____ Unit/Project _____

Legal description of land requested:                  *Parcel No.:_____          *Sale Date (m/d/y):_____ / _____ / _____

*SEE ITEM 2 IN INSTRUCTIONS BELOW PRIOR TO COMPLETING PARCEL NUMBER AND SALE DATE.

T.                    R.                    Meridian                    State                    County

Total acres applied for _____

Amount remitted: Filing fee $ _____          Rental fee $ _____          Total $ _____

**DO NOT WRITE BELOW THIS LINE**

3.  Land included in lease:

T.                    R.                    Meridian                    State                    County

Total acres in lease _____

Rental retained $ _____

This lease is issued granting the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas *(except helium)* in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulations and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provisions of this lease.

**NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR 3120 and is subject to the provisions of that bid or nomination and those specified on this form.**

Type and primary term of lease:                          THE UNITED STATES OF AMERICA

☐ Noncompetitive lease (ten years)                     by _____
                                                                                          (Signing Officer)

☐ Competitive lease (five years)                          _____
                                                                     (Title)                              (Date)

☐ Other _____          EFFECTIVE DATE OF LEASE _____

*(Continued on reverse)*                                                          B-1

BLM_0048490

4. (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR 3100 and the leasing authorities; (3) offeror's chargeable interests, direct and indirect in either public domain or acquired lands do not exceed 246,080 acres in Federal oil and gas leases in the same State, of which not more than 200,000 acres are held under option, or 300,000 acres in leases and 200,000 acres in options in either Leasing District in Alaska; (4) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located; (5) offeror is in compliance with qualifications concerning Federal coal lease holdings provided in sec. 2(a)(2)(A) of the Mineral Leasing Act; (6) offeror is in compliance with reclamation requirements for all Federal oil and gas lease holdings as required by sec. 17(g) of the Mineral Leasing Act; and (7) offeror is not in violation of sec. 41 of the Act.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part, unless the withdrawal is received by the proper BLM State Office before this lease, an amendment to this lease, or a separate lease, whichever covers the land described in the withdrawal, has been signed on behalf of the United States.

**This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.**

Duly executed this _____ day of _____ , 19 _____ .  _____

(Signature of Lessee or Attorney-in-fact)

## LEASE TERMS

Sec. 1. Rentals—Rentals shall be paid to proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are:

(a) Noncompetitive lease, $1.50 for the first 5 years; thereafter $2.00;

(b) Competitive lease, $1.50; for primary term; thereafter $2.00;

(c) Other, see attachment, or

as specified in regulations at the time this lease is issued.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified in (a), (b), or (c) for those lands not within a participating area.

Failure to pay annual rental, if due, on or before the anniversary date of this lease (or next official working day if office is closed) shall automatically terminate this lease by operation of law. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2. Royalties—Royalties shall be paid to proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. Royalty rates are:

(a) Noncompetitive lease, 12½ %;

(b) Competitive lease, 12½ %;

(c) Other, see attachment; or

as specified in regulations at the time this lease is issued.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of lessee.

Minimum royalty in lieu of rental of not less than the rental which otherwise would be required for that lease year shall be payable at the end of each lease year beginning on or after a discovery in paying quantities. This minimum royalty may be waived, suspended, or reduced, and the above royalty rates may be reduced, for all or portions of this lease if the Secretary determines that such action is necessary to encourage the greatest ultimate recovery of the leased resources, or is otherwise justified.

An interest charge shall be assessed on late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701). Lessee shall be liable for royalty payments on oil and gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rule, regulation, order, or citation issued under FOGRMA or the leasing authority.

Sec. 3. Bonds—A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4. Diligence, rate of development, unitization, and drainage—Lessee shall exercise reasonable diligence in developing and producing, and shall prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

Sec. 5. Documents, evidence, and inspection—Lessee shall file with proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that supports

costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting offices for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until release of the obligation to maintain such records by lessor.

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552).

Sec. 6. Conduct of operations—Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. Lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. To the extent consistent with lease rights granted, such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short term special studies under guidelines provided by lessor. If in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7. Mining operations—To the extent that impacts from mining operations would be substantially different or greater than those associated with normal drilling operations, lessor reserves the right to deny approval of such operations.

Sec. 8. Extraction of helium—Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessor shall include in any contract of sale of gas the provisions of this section.

Sec. 9. Damages to property—Lessee shall pay lessor for damage to lessor's improvements, and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 10. Protection of diverse interests and equal opportunity—Lessee shall: pay when due all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessee reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920.

Lessee shall comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors shall maintain segregated facilities.

Sec. 11. Transfer of lease interests and relinquishment of lease—As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties.

Sec. 12. Delivery of premises—At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor and, within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells.

Sec. 13. Proceedings in case of default—If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains a well capable of production of oil or gas in paying quantities, or the lease is committed to an approved cooperative or unit plan or communitization agreement which contains a well capable of production of unitized substances in paying quantities. This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default. Any such remedy or waiver shall not prevent later cancellation for the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U.S.C. 1701).

Sec. 14. Heirs and successors-in-interest—Each obligation of this lease shall extend to and be binding upon, and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto.

☆ U.S. GOVERNMENT PRINTING OFFICE: 1988—673-016/95010

B–2

# Appendix C - Stipulations

BLM  0048492

BLM_0048493

## EXAMPLE

Serial No._____

### CONTROLLED SURFACE USE STIPULATION
### MODERATE GEOLOGIC HAZARDS

**Surface occupancy or use is subject to the following special operating constraints.**

Special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques will be required on areas having moderate geologic hazards. (Interdisciplinary team disciplines could include: geotechnical engineer, soils engineer, roads engineer, oil and gas specialist and reclamation specialist.)   Attributes constituting moderate geologic hazard include stabilized earthflows, stabilized mudflows, stabilized landslides; slopes adjacent to failed slopes or active earthflows, mudflows or landslides and avalanche chutes; areas of rockfall; flash flood zones; and areas with potential mining related problems (i.e. subsidence, acid drainage).

**On lands described below:**

All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof.  Any area within the leasehold which is identified as having moderate geologic hazard falls under jurisdiction of this stipulation.

**For the purpose of:**

To insure the stability of facilities required (roads, pipelines, drill pads,etc.) during the oil and gas operations and to insure the stability of lands adjacent to these facilities.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements.  Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1650 and 2820.)**

**Form #/Date**

BLM_0048494

Oil and Gas Leasing Analysis FEIS

EXAMPLE

Serial No._____

## CONTROLLED SURFACE USE STIPULATION
## RETENTION VQO

**Surface occupancy or use is subject to the following special operating constraints.**

When necessary to meet the Retention Visual Quality Objective (VQO), proposed site clearings, roads, collection facilities, structures, utilities and pipelines will be relocated. At the time of an APD, a visual resource assessment will be made considering vegetation, topography, proposed facilities and on-site controls necessary to mitigate expected impacts sufficiently to insure meeting the Retention VQO. A computer generated perspective may be required as part of the visual impact assessment.

**On lands described below:**

All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof. All areas within the leasehold which are identified as having a Retention VQO fall under jurisdiction of this stipulation. Planning scale visual quality maps are on file at the District offices and at the Forest Supervisors Office in Delta, Colorado.

**For the purpose of:**

1. Protecting the visual quality of areas with high visual values.

2. Preventing location of oil and gas related facilities in areas with high visual values when a VQO of retention cannot be met.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1650 and 2820.)**

**Form #/Date**

BLM 0048495

## EXAMPLE

**Serial No._____**

### CONTROLLED SURFACE USE STIPULATION
### SCENIC BYWAY CORRIDORS

**Surface occupancy or use is subject to the following special operating constraints.**

When necessary to meet the scenic, social, cultural and historical values associated with the (specific Scenic Byway) proposed site clearing, roads, collection facilities, structures, utilities and pipelines will be relocated. Exclude drill pad development and operation in the foreground seen along (specific byway). Require all structures (drill rigs, tanks, buildings) in middle ground to be colored to blend with the natural landscape. At the time of an APD, visual and interpretive resource assessments will be made considering vegetation, topography, proposed facilities and on-site controls necessary to mitigate impacts to the (specific byway). A computer generated perspective may be required as part of the visual impact assessment.

**On lands described below:**

All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof. Any area within the leasehold which is within the (specific Scenic Byway) falls under the jurisdiction of this stipulation.

**For the purpose of:**

To protect the scenic, social, historic and cultural resource values associated with the (specific Scenic Byway).

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1650 and 2820.)**

**Form #/Date**

BLM_0048496

Oil and Gas Leasing Analysis FEIS

## EXAMPLE

**Serial No._____**

## CONTROLLED SURFACE USE STIPULATION
## WATERSHEDS OF SPECIAL INTEREST TO MUNICIPALITIES

**Surface occupancy or use is subject to the following special operating constraints.**

A 1/4 mile buffer will be established around each developed surface water inlet and spring development in the watershed. Waterlines will also be protected. At the APD stage special consideration will be given to insure against contamination of groundwater aquifers. All reserve mud pits will be closed systems. All road drainage work will be kept current; surfacing will be required for all roads planned for all weather use. All waste, refuse and trash will be kept in closed containers and regularly removed from the watershed. Fuel storage and spill plans will be required. No disposal of waste water will be allowed by subsurface injection. Water needed to support oil and gas activities, i.e. dust abatement, fire control, drilling mud, etc., will be imported from outside the watershed.

**On lands described below:**

All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof. Any developed domestic facilities within the (Specific watershed) falls under jurisdiction of this stipulation.

**For the purpose of:**

Protecting the water resource in the (Specific watershed) from contamination which would degrade water quality below State and Federal standards for domestic water or reduce water supply to communities.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1650 and 2820.)**

**Form #/Date**

BLM_0048497

## EXAMPLE

**Serial No._____**

### CONTROLLED SURFACE USE STIPULATION
### SLOPES 40-60%

**Surface occupancy or use is subject to the following special operating constraints.**

Special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques will be required on areas with slopes ranging from 40-60%. (Interdisciplinary team disciplines could include engineering, soil scientist, hydrologist, landscape architect, reclamation specialist and oil and gas specialist.)

Mitigation may include use of erosion control cloths, mats, geoweb soil support materials, lifting and saving local native vegetation in chunks of sod to be later placed over disturbed areas, reseeding disturbed banks with stabilizing seed mix, use of chemical stabilizers, tackifiers and blankets and careful design of surface water flow.

**On lands described below:**

All or portions of Sec.\_\_\_,T.\_\_\_,R.\_\_\_,PM\_\_\_ as shown on the attached map which becomes a part hereof. Any area within the leasehold which has slopes ranging from 40-60% falls under jurisdiction of this stipulation.

**For the purpose of:**

Minimizing potential for soil loss, mass land movement, revegetation failure and unacceptable visual impairment.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1650 and 2820.)**

**Form #/Date**

BLM_0048498

Oil and Gas Leasing Analysis FEIS

## EXAMPLE

Serial No._____

### CONTROLLED SURFACE USE STIPULATION
### BIG GAME WINTER RANGE

**Surface occupancy or use is subject to the following special operating constraints.**

Limit road use to periods when animals are not present on the winter range. Restrict road use to operators. Recontour and revegetate to prior existing conditions (to extent possible) new roads when work is complete.

Operation and maintenance of production facilities will be scheduled to minimize adverse effects on big game (Elk, Mule Deer, Big Horn Sheep and Turkey) from December 1 to April 30.

**On lands described below:**

All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof. Any area within the leasehold which is classified as big game winter range for one of the four species listed above falls under jurisdiction of this stipulation.

**For the purpose of:**

Protecting big game winter range for Elk, Mule Deer, Bighorn Sheep and Turkey. These ranges are extremely important for animal survival during winter. Disturbances and habitat losses may place unnecessary stress on the wintering wildlife herds and cause an increase in herd mortality.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1650 and 2820.)**

**Form #/Date**

Page C-6

BLM_0048499

## EXAMPLE

**Serial No._____**

### CONTROLLED SURFACE USE STIPULATION
### SPECIAL WILDLIFE HABITATS

**Surface occupancy or use is subject to the following special operating constraints.**

Limit road use to periods when animals are not present. Restrict road use to operators. Recontour and revegetate to prior existing conditions (to the extent possible) new roads when work is complete.

Operation and maintenance of producing wells will be accomplished during the following time frames to minimize disruption to the species being considered:

| | |
|---|---|
| Elk calving and Mule Deer fawning: | April 15 to July 1 |
| Elk and Mule Deer migration routes: | March 1 to May 30 |
| | November 1 to December 31 |
| Elk and Mule Deer staging areas: | October 15 to December 31 |
| Sage Grouse Leks and nesting areas: | March 1 to June 1 |
| (within a 2 1/2 m radius of the Lek) | |

**On lands described below:**

a. Elk calving and Mule Deer fawning areas.
b. Elk and Mule Deer migration routes and staging areas.
c. Sage Grouse and nesting areas within a 2 1/2 m radius of the Lek.

All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof. All lands categorized as listed in a,b and c above, fall within jurisdiction of this stipulation.

**For the purpose of:**

Preventing human disturbance which would produce increased stress, leading to poor physical condition, winter mortality and/or reduced reproduction. These areas have been identified through a coordinated effort with the Colorado Division of Wildlife (CDOW). Disturbance during the reproductive season may reduce herd productivity. For nesting species, surface disturbance and associated human activity could disrupt breeding and/or cause nest abandonment. Disruption of migration routes or staging areas could result in direct mortality to big game species by disturbing annual normal staging and migration patterns to winter ranges. Animals could be dispersed or delayed in traveling to their winter ranges, causing direct mortality during normal fall/early winter snows.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service

BLM_0048500

Oil and Gas Leasing Analysis FEIS

reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1650 and 2820.)**

**Form #/Date**

BLM 0048501

## EXAMPLE

**Serial No._____**

### NO SURFACE OCCUPANCY STIPULATION
### WETLANDS / FLOODPLAINS / RIPARIAN AREAS

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.___,T.___,R.___,PM___, as shown on the attached map which becomes a part hereof.

Wetlands, Floodplains and Riparian Areas of any defined drainage or location containing these specific ecosystem types come under jurisdiction of this stipulation. Drill pads, staging areas and storage sites will not be allowed in these areas. When road locations must occur in these areas, streams will be crossed at right angles and access across other areas will be held to a minimum. Streams will not be paralleled by roads through these areas.

Location of these areas which is more specific than can be identified on USGS topographic maps will come at the APD stage based on on-the-ground observations.

**For the purpose of:**

The management of wetlands and floodplains are subject to Executive Orders 11990 and 11988, respectively. The purpose of the EO's are to avoid to the extent possible the long and short term adverse impacts associated with the destruction or modification of wetlands and floodplains and to avoid direct or indirect support of new construction in wetlands wherever there is a practical alternative.

Also, it is recognized that there is a direct relationship between impacts on such areas and effects on water quality and aquatic ecosystems. There is a high risk of irreversible and irretrievable impacts on the latter with operation and developments in wetlands, floodplains and riparian areas.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered if it can be shown through environmental analysis and the application of mitigation measures that the impacts to wetland, floodplain and riparian resources will be minimized and that no other alternative route for a road or pipeline is feasible because of environmental effects.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM 0048502

EXAMPLE

Serial No._____

## NO SURFACE OCCUPANCY STIPULATION
## ALPINE / TUNDRA AREAS

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

Land areas above timberline as shown on the attached map which becomes a part hereof. All or portions of Sec.___,T.___,R.___,PM___ are included within the jurisdiction of this stipulation.

**For the purpose of:**

a. Preventing significant or permanent impairment of soil productivity.

b. Maintaining or improving water quality to meet Federal or State standards.

c. Minimizing the potential for significant or cumulatively significant impacts in alpine ecosystems, per 40 CFR 1508.27(b)(7).

d. Minimizing visual quality impacts.

e. Maintaining the integrity of associated ecosystems.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM_0048503

## EXAMPLE

Serial No._____

### NO SURFACE OCCUPANCY STIPULATION
### HIGH GEOLOGIC HAZARD

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.\_\_\_\_\_, T._____, R._____, P.M.\_\_\_\_\_, as shown on the attached map which becomes a part hereof.  Areas of high geologic hazard have been mapped from aerial photographs and are characterized by active mudflows, active earthflows, active landslides and areas prone to avalanche.  All areas within the lease with high geologic hazard are under jurisdiction of this stipulation.

**For the purpose of:**

Avoidance of areas with high geologic hazard to prevent mass slope failure.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements.  Granting of a WEM is a discretionary action which the operator should not routinely expect.  The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM_0048504

Oil and Gas Leasing Analysis FEIS

## EXAMPLE

Serial No._____

### NO SURFACE OCCUPANCY STIPULATION
### BATTLEMENT MESA ROADLESS AREAS

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.___,T.___,R.___,PM.___ as shown on the attached map which becomes a part hereof. All of the leasehold which falls within the Battlement Mesa Roadless Area is under jurisdiction of this stipulation.

**For the purpose of:**

Protecting the roadless character of the area which includes its apparent naturalness, degree of remoteness, solitude, and special features, and to protect other resources of special concern (steep slopes, high geologic hazards, high erosion hazards, revegetation problems, important wildlife habitat, visual resources).

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

Page C-12

BLM_0048505

## EXAMPLE

Serial No._____

### NO SURFACE OCCUPANCY STIPULATION
### SENSITIVE AREAS

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.___,T.___,R.___,PM.___ as shown on the attached map which becomes a part hereof.

**For the purpose of:**

Protection of aesthetic values perceived as highly sensitive by the public.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements.  Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM_0048506

Oil and Gas Leasing Analysis FEIS

## EXAMPLE

Serial No._____

### NO SURFACE OCCUPANCY STIPULATION
### RETENTION VQO AND LOW VAC

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.___,T.___,R.___,PM.___ as shown on the attached map which becomes a part hereof. Any area within the leasehold which has a Visual Quality Objective (VQO) of Retention and Low Visual Absorption Capability (VAC) falls within jurisdiction of this stipulation.

**For the purpose of:**

Protecting the visual quality of areas with significant visual resources.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM_0048507

## EXAMPLE

Serial No._____

### NO SURFACE OCCUPANCY STIPULATION
### SEMI-PRIMITIVE NON-MOTORIZED (3A MANAGEMENT AREAS)

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.___,T.___R.___,PM.___ as shown on the attached map which becomes a part hereof. Any portion of the leasehold which falls within the (specific 3A management) area is within jurisdiction of this stipulation.

**For the purpose of:**

Protecting the Semi-primitive Non-motorized Recreation Opportunities Spectrum (ROS) class character of the area.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM 0048508

Oil and Gas Leasing Analysis FEIS

## EXAMPLE

Serial No._____

## NO SURFACE OCCUPANCY STIPULATION
## ADMINISTRATIVE SITES

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof.

**For the purpose of:**

Protecting the investment and use of facilities at [administrative site].

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

Page C-16

BLM 0048509

## EXAMPLE

Serial No._____

### NO SURFACE OCCUPANCY STIPULATION
### RECREATION COMPLEXES

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec._____, T._____, R._____, P.M._____, as shown on the attached map which becomes a part hereof. This stipulation applies to all recreation complexes identified in Chapter III of the Oil and Gas Leasing EIS, pages III- 94 through III-96, and includes a 1/4 mile buffer around each complex.

**For the purpose of:**

To protect the investment of facilities within the complex, to protect the recreation experience and safety of the visitors, and to protect the natural environment or setting which initially made the complex desirable for development.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM_0048510

Oil and Gas Leasing Analysis FEIS

# EXAMPLE

Serial No._____

## NO SURFACE OCCUPANCY STIPULATION
### SLOPES > 60%

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof. All areas within the leasehold with 60% slopes or greater fall under jurisdiction of this stipulation.

**For the purpose of:**

Protection of areas with slopes greater than 60% to prevent impacts to soil resources through erosion, mass failure, loss of productivity, etc.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

Page C-18

BLM_0048511

## EXAMPLE

Serial No._____

### NO SURFACE OCCUPANCY STIPULATION
### ROCKY MOUNTAIN BIGHORN SHEEP LAMBING AND BREEDING AREAS

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof.

**For the purpose of:**

Protection of Rocky Mountain Bighorn Sheep lambing and breeding grounds.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM_0048512

Oil and Gas Leasing Analysis FEIS

# EXAMPLE

Serial No._____

## NO SURFACE OCCUPANCY STIPULATION
## SUMMER RANGE (CONCENTRATED USE)

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof.

**For the purpose of:**

Protection of concentrated use summer range for elk. To protect hiding cover and security from disturbance and to keep elk on their summer range and off winter range as long as possible. Disturbance in these areas is causing summering elk to be pushed off Grand Mesa a little earlier each year.

**Conditions under which a waiver of this stipulation would be considered:**

1) The magnitude of the proposed operations is such that summering elk would not be disturbed.

2) A site specific study indicates activity in these areas would not cause summering elk to prematurely leave summer range. Mitigation is proposed that would accomplish the purpose of this stipulation.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM 0048513

## EXAMPLE

Serial No._____

### NO SURFACE OCCUPANCY STIPULATION
### SAGE GROUSE LEKS

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

All or portions of Sec.___,T.___R.___,PM___ as shown on the attached map which becomes a part hereof.

**For the purpose of:**

Protecting sage grouse leks.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM_0048514

Oil and Gas Leasing Analysis FEIS

## EXAMPLE

Serial No._____

### TIMING LIMITATION STIPULATION
### BIG GAME WINTER RANGE

**No surface use is allowed during the following time period(s). This stipulation does not apply to operation and maintenance of production facilities.**

    1. Exploration, drilling and development activity will not be allowed during the period from December 1 to April 30.

    2. New oil and gas roads on public lands will be closed yearlong to the public.

**On the lands described below:**

    Winter ranges for big game. (Mule Deer,Elk,Bighorn Sheep and Turkey) All or portions of Sec.___,T.___,R.___,PM___ as shown on the attached map which becomes a part hereof. All lands which are classified as big game winter range fall within jurisdiction of this stipulation.

**For the purpose of (reasons):**

    Preventing unnecessary stress on the wintering wildlife herds and causing an increase in mortality resulting from disturbances and habitat losses. These areas are critical for mule deer, bighorn sheep, elk and turkey during winter. They serve as key concentration areas which support and sustain these species and are extremely important for animal survival.

    Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements. Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

Page C-22

BLM_0048515

## EXAMPLE

Serial No._____

## TIMING LIMITATION STIPULATION
## SPECIAL WILDLIFE HABITATS

**No surface use is allowed during the following time period(s).  This stipulation does not apply to operation and maintenance of production facilities.**

| | |
|---|---|
| Elk calving and Mule deer fawning areas: | April 15 to July 1. |
| Elk and Mule Deer migration routes: | March 1 to May 30 |
| | November 1 to December 3 |
| Elk and Mule Deer staging areas: | October 15 to December 31 |
| Sage Grouse Leks and nesting areas: | March 1 to June 1 |
| (within a 2 1/2 m radius of the Leks) | |

**On the lands described below:**

a. Elk calving and Mule deer fawning areas.
b. Elk and Mule deer migration routes and staging areas.
c. Sage Grouse Leks and nesting areas.

All or portions of Sec.___,T.___,R___,PM___ as shown on the attached map which becomes a part hereof.  All lands categorized as listed in a,b and c above fall within jurisdiction of this stipulation.

**For the purpose of (reasons):**

Preventing human disturbance which would produce increased stress, leading to poor physical condition, winter mortality and/or reduced reproduction.  These areas have been identified through a coordinated effort with the Colorado Division of Wildlife (CDOW). Disturbance during the reproductive season may reduce herd productivity. For nesting species, surface disturbance and associated human activity could disrupt breeding and/or cause nest abandonment.  Disruption of migration routes or staging areas could result in direct mortality to big game species by disturbing annual normal staging and migration patterns to winter ranges.  Animals could be dispersed or delayed in traveling to their winter ranges, causing direct mortality during normal fall/early winter snows.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements.  Granting of a WEM is a discretionary action which the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

BLM_0048516

Oil and Gas Leasing Analysis FEIS

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

BLM_0048517

## EXAMPLE

Serial No._____

## TIMING LIMITATION STIPULATION
## MAJOR TRAILS

**No surface use is allowed during the following time period(s).  This stipulation does not apply to operation and maintenance of production facilities.**

Exploration, drilling and development activity will not be allowed during the period from December 1 to April 15.

**On the lands described below:**

Along major cross country ski trails on Grand Mesa.  The Crag Crest National Recreation Ski Trail (aka County Line Cross Country Ski Trail), the Skyway Cross Country Ski Trail, and the Ward Lake Cross Country Ski Trail are the trails protected by the use of this stipulation.  All or portions of Sec. ___, T ___, R___, PM___ as shown on the attached map which becomes a part hereof.

**For the purpose of (reasons):**

Protecting the recreational use, opportunity, and experience along the trail corridors. These are high use cross country ski trails.

Waivers, exceptions, or modifications (WEM's) to this stipulation will be considered only at the time operations are proposed, and will be subject to the Forest Land and Resource Management Plan in effect at the time of consideration, and will be subject to applicable regulatory and environmental compliance requirements.  Granting of a WEM is a discretionary action which the operator should not routinely expect.  The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**Form #/Date**

Page C-25

BLM_0048518

BLM_0048519

# Appendix D - Stipulation for Lands of the National Forest System Under Jurisdiction of Department of Agriculture

BLM_0048520

BLM_0048521

R2 Supplement 2800-92-.1                    2822.4-2822.65
Effective 10/15/92                       Page 4 of 8

R2-FS-2820-13 (92) a.                Serial No. _____

## STIPULATION FOR LANDS OF THE NATIONAL FOREST SYSTEM
## UNDER JURISDICTION OF
## DEPARTMENT OF AGRICULTURE  (FS-#1)

The permittee/lessee must comply with all the rules and regulations of the Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations governing the use and management of the National Forest System (NFS) when not inconsistent with the rights granted by the Secretary of Interior in the permit.  The Secretary of Agriculture's rules and regulations must be complied with for (1) all use and occupancy of the NFS prior to approval of an exploration plan by the Secretary of the Interior, (2) uses of all existing improvements, such as forest development roads, within and outside the area permitted by the Secretary of the Interior, and (3) use and occupancy of the NFS not authorized by an exploration plan approved by the Secretary of the Interior.

All matters related to this stipulation are to be addressed

to: District Ranger

at:

Telephone:

who is the authorized representative of the Secretary of Agriculture.

### NOTICE

CULTURAL AND PALEONTOLOGICAL RESOURCES - The FS is responsible for assuring that the leased lands are examined to determine of cultural resources are present and to specify mitigation measures.  Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the FS, shall:

1.  Contact the FS to determine if a site specific cultural resource inventory is required.  If a survey is required, then:

2.  Engage the services of a cultural resource specialist acceptable to the FS to conduct a cultural resource inventory of the area of proposed surface disturbance.  The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations.  An acceptable inventory report is to be submitted to the FS for review and approval at the time a surface disturbing plan of operation is submitted.

3.  Implement mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values.  Mitigation may include relocation of proposed facilities, testing, salvage, and recordation or

BLM_0048522

other protective measures.  All costs of the inventory and mitigation will
be borne by the lessee or operator, and all data and materials salvaged
will remain under the jurisdiction of the U.S. Government as appropriate.

The lessee or operator shall immediately bring to the attention of the FS and
BLM any cultural or paleontological resources or any other objects of
scientific interest discovered as a result of surface operations under this
lease, and shall leave such discoveries intact until directed to proceed by FS
and BLM.

ENDANGERED OR THREATENED SPECIES - The FS is responsible  for assuring that the
leased land is examined prior to undertaking any surface-disturbing activities
to determine effects upon any plant or animal species listed or proposed for
listing as endangered or threatened, or their habitats.  The findings of this
examination may result in some restrictions to the operator's plans or even
disallow use and occupancy that would be in violation of the Endangered Species
Act of 1973 by detrimentally affecting endangered or threatened species or
their habitats.

The lessee/operator may, unless notified by the FS that the examination is not
necessary, conduct the examination on the leased lands at his discretion and
cost.  This examination must be done by or under the supervision of a qualified
resource specialist approved by the FS.  An acceptable report must be provided
to the FS identifying the anticipated effects of a proposed action on
endangered or threatened species or their habitats.

D-2

BLM_0048523

# Appendix E - Reasonably Foreseeable Development Activity within the Grand Mesa, Uncompahgre and Gunnison National Forests

BLM_0048524

BLM_0048525

# Appendix E - Reasonably Foreseeable Development Activity Within the Grand Mesa, Uncompahgre and Gunnison National Forests

## Introduction

Forest lands administered by the Grand Mesa (GMNF), Uncompahgre (UNNF) and Gunnison National Forests (GUNF), which are collectively referred to as GMUG are situated within portions of four U. S. Geological Survey (USGS) petroleum resource assessment provinces. Figure 1 illustrates those portions of the Uinta-Piceance-Eagle, Paradox, San Juan, and Albuquerque-Santa Fe-San Luis basins that include National Forest System lands addressed in this report.

Conventional oil and gas plays defined by the USGS and present within GMUG are situated within the Uinta-Piceance-Eagle basins and the Paradox basin (Table 1). No plays have been identified within the San Juan and Albuquerque-Santa Fe-San Luis basins.

In addition to the plays designated by the USGS, the lower and middle Paleozoic section, specifically the Leadville Limestone constitutes a highly speculative play within the southern Piceance basin. Mobile Oil Corporation drilled a 19,500 foot test of the Leadville south of the town of Silt. The rig was reported (Dwights EnergyData, 1992) to have been released on January 28, 1992 with details being held confidential. Potential traps include unconformities and stratigraphic pinchouts within the Pennsylvanian age rocks along the margin of the Central Colorado Trough.

## Hydrocarbon Occurrence

Gas was first discovered in the GMUG from sandstones in the Mesaverde Group in 1958 which was designated as the Grand Mesa Field. The field produced only 741 thousand cubic feet of gas (MCFG) and was abandoned in 1973 (Table 2). Since that time, three additional fields have been discovered with established production from the Cozzette, Corcoran, and Morapos sandstones, as well as undivided sandstones in the Mesaverde. To date, no coal bed methane (CBM) wells have been completed for production within the Forest.

Oil and gas production is confined to the most northern portions of the GMNF and the GUNF, with no drilling on the GUNF south of Township 12 South. Exploratory drilling has been confined to the high and moderate potential areas within the remainder of the GMUG, specifically along the southeastern margin of the UNNF within the Paradox Basin. Eighteen exploratory wells have been drilled on the UNNF since 1949 with no success, however there have been some oil and gas shows reported (Table 3).

BLM_0048526

# Prospectively Valuable for Oil and Gas

Land classified as prospectively valuable (PV) for oil and gas is based on criteria described in Appendix A. PV lands for oil and gas within the GMUG are shown in Figure 2 and generally include lands that have a minimum of 1,000 feet of sedimentary rock, favorable structural setting, and minimum evidence of potential for the occurrence of oil and gas. Areas not designated as PV are rated as having no potential.

# Oil and Gas Potential

Oil and gas potential for the region is shown in Figure 3 and its rating criteria are described in Appendix B and provide the basis for the ratings described below for the GMUG and surrounding area. In general, areas defined by the USGS as a conventional oil and gas play are assigned a high potential, while lands not classified as PV have no potential. It should be noted that the plays described below occur within two petroleum provinces and do not cross into the other province, since the provinces are defined on administrative boundaries, not geologic.

Spencer and Wilson (1988) describe three major and two unconventional plays that occur within the GMUG. The conventional plays are the Permian-Pennsylvanian sandstone, Uinta-Piceance Tertiary gas, and Uinta-Piceance Upper Cretaceous plays, while the unconventional plays are tight gas sands and Cretaceous CBM (Figures 4-9).

The Permian-Pennsylvanian sandstone play is relatively unexplored and involves stratigraphic pinchouts within the Weber and correlative sandstones into relatively impermeable red-bed sequences. The play as evaluated by the USGS, also includes lands within Utah (Figure 4) and is estimated to contain from two to ten fields left to be discovered that have at least one million barrels of oil (MMBO). The play may cover a larger area that is shown on the map and is considered to be speculative for the southern Piceance Basin.

The Tertiary conventional gas play (Figure 5) consists of stratigraphic and structural traps that have been moderately well explored. Most of the Tertiary rocks in the Piceance basin are thermally immature. Tertiary reservoir gas is interpreted as having migrated from upper Cretaceous source beds located in the Mesaverde Group (Spencer and Wilson, 1988). Conventional Tertiary reservoirs will be found at depths of from less that 3,000 to about 7,000 feet, and are expected to be unconventional and tight at depths greater than 7,000 feet. The USGS estimates that from 9 to 35 fields remain to be discovered within the play.

Figure 6 illustrates the location of the Upper Cretaceous gas play. Conventional reservoir production is from fluvial and marginal-marine sandstones in both stratigraphic and combination traps at depths of from 2,000 to 5,000 feet. Reservoirs below 5,000 feet are generally tight, which is attributed to paleoburial of 7,000 feet or more (Spencer and Wilson, 1988). The USGS estimates that 25 to 55 reservoirs of 6 billion cubic feet of gas (BCFG) may remain to be discovered within the play.

The areas designated by the Federal Energy Regulatory Commission as being eligible for tight gas sand production price incentives are shown in Figure 7. This designation is for gas produced from the lower Mesaverde Group marginal-marine sandstones. This area has a high potential, while the remainder of the Piceance basin within the GMUG has a moderate potential.

Coal bed methane (CBM) resources of the southern Piceance basin have been studied extensively (Cholate, Jurich, and Saulnier, 1984; Johnson and Nuccio, 1986; Rightmire and Cholate, 1986; Tremain, 1984). Areas rated as having low through high potentials for CBM production are shown in Figure 8. The remainder of the GMUG is rated as having no potential for the occurrence of CBM.

BLM_0048527

An evaluation of critical production parameters of CBM in the Piceance basin was conducted by the Texas Bureau of Economic Geology under a Gas Research Institute contract. Their evaluation concluded that low coal-seam permeability limits CBM potential of the basin (Tyler and Others, 1991).

Lands rated as having a high potential within the Paradox structural basin are shown in Figure 9 and includes the four USGS oil and gas plays illustrated in Table 1. The speculative Lower Paleozoic play of the Piceance basin is also present within the Paradox as the buried fault blocks, older Paleozoic, Leadville Limestone and McCraken Sandstone. Oil and gas production from this play is represented by the Lisbon Oil Field. This is the largest field in the play and has an estimated ultimate recoverable reserves of 43 MMBO and 250 BCFG. There are five other smaller fields within the play that do not have significant production. Peterson (1989) notes that it is unlikely that any new fields the size of the Lisbon will be discovered and that present production indicates that new field discoveries will be small and have low gas BTU values.

The second play in the Paradox is the salt anticline flanks, which includes the Permian Cutler Formation and the Pennsylvanian Honaker Trail Formation of the Hermosa Group. Reservoirs are developed in arkosic sandstones of the Cutler and limestones with minor sandstones in the Honaker Trail that accumulated as thick (i.e., 2,500 to more than 14,000 feet) in synclines along the margins of salt cored anticlines. The Andy's Mesa Field is the only field in the play to have significant production. Cumulative production through 1990 was 21 MB condensate and 18.4 BCFG from seven wells (Colorado Oil and Gas Conservation Commission, 1991). Three additional one well fields are present within the play.

The Paradox Formation is the objective of the fractured interbeds play and is situated within the deep trough of the Paradox Basin and also includes the Paradox fold and fault belt. The reservoir rock consists of fine-grained silty dolomite and dolomitic or calcareous black shale, that is also the source rock. Oil and gas shows are usually encountered during drilling through the interbeds to test deeper objectives. Most of the fields developed in this play were discovered during exploratory drilling for deeper objectives and are one well fields with the largest having produced about 1.2 MMBO (Peterson, 1989).

The last play within the Paradox is the Silverton Delta, Northeast Basin, Honaker Trail Formation. Potential reservoirs are delta-front sandstones that were deposited along the east flank of the basin. The play is speculative with only one well that had a significant show of gas from the Honaker Trail. Any potential field discoveries are expected to be less that 1 MMBO or 6 BCFG in size (Peterson, 1989).

Drilling activity within the UNNF and GUNF has been confined to the high oil and gas potential areas, while 22 wells (13 dry and 9 producers) and 6 dry holes were drilled within the high potential and moderate potential areas, respectively within the GMNF. No wells have been drilled within the low and no potential areas.

# Oil and Gas Activity

## *Historical Background*

A total of 64 wells has been drilled within lands administered by the GMUG since the first well was drilled in 1949. Of those, 18 wells (28 %) were reported as completed for production and resulted in the development of four formally designated fields (Table 2). There have been 1,948 wells drilled within the six county area (Table 4) surrounding the GMUG that have had oil and gas activity, of which 1,146 wells (60 %) were reported as completed for production. Figures 10, 11, and 12 illustrate the drilling activity on the Grand Mesa, Gunnison, and Uncompahgre National Forests, respectively. At the end of 1990 there were 11 wells from four fields capable of production with cumulative production of 3,721 barrels of oil (BBLS) and 1,593,154 thousand cubic feet of gas (MCFG).

BLM_0048528

Oil and Gas Leasing Analysis FEIS

Table 5 is a summary of drilling activity since 1986 within the counties surrounding the GMUG and within each Forest. Cumulative oil and gas activity within the Forests averages about three percent (%) of the region. During this same time period 53 producing wells (approximately 10 wells per year) were plugged and abandoned.

There are six Federal oil and gas units that contain lands within the GMNF and GUNF. Four of the units (i.e., Ragged Mountain, Coal Basin, Leon Lake, and Old Man Mountain) have established production, while the Aransas and Narrows are still exploratory. Two other exploratory units, Collier Creek and Acapulco, both had unsuccessful wells drilled and have terminated. A portion of the Ragged Mountain Unit may expand in the near future.

AMOCO Production Company formed the Megas Unit during 1986 to test the degasification potential and develop CBM from the Bowie coal member of the Mesaverde in the southern Piceance basin. The unit area included over 150,000 acres and was one of the largest units approved in Colorado. The lands included in the unit were considered by AMOCO to be optimum for the production of CBM. The unit was subsequently terminated due to several factors, which included economics, well performance and seasonal access problems.

Interest for CBM within the Piceance basin has been high, however only 49 CBM wells have been completed for production through 1990, including 4 wells on GMUG lands that were within the Megas Unit, now plugged and abandoned. Barrett Resources Corporation operates the Grand Valley and Parachute fields (located in Garfield County, north of the GMUG) and has been the most active in the basin. Most of their wells are dual completions in Mesaverde (tight gas) sandstones and Cameo coals, but according to William J. Barrett, president of Barret Resources Corporation, they would not have been "fooling with the coals" without extension of tax credit for CBM through 1992 (Lyle, 1990).

# Reasonably Foreseeable Development Scenario (RFD)

Historical trends, USGS resource estimates, mineral ownership patterns, location of existing pipelines, and current activity were incorporated in formulating the RFD. The projection of drilling activity, both wildcat and development is predicated on a continuation of the activity at approximately the same levels as the past and will be confined to the high and moderate potential areas. This assumes that most of the development drilling will occur within the region on lands outside the GMUG, and the Forest will remain the focus of wildcat drilling with associated development of several fields. No activity is forecast for the no potential areas, while the low potential areas may have very minor, if any activity.

The national active rig count is forecast to have an average annual growth rate of about 4% through 2005 and the demand for gas is forecast at about 1.5% (Oil and Gas Journal, 1991). Schleede (1992) notes that natural gas use by electric utilities has declined from a high of 3.98 Tcf in 1972, to a low of 2.6 Tcf by 1988. Demand rose to 2.8 Tcf in 1991, and is expected to rise to 3.2 Tcf in 2000, and 4.1 Tcf by 2010. This represents an annual rate of growth of approximately 2%.

Figures 13 and 14 illustrate the cumulative wells drilled within the region and the GMUG since 1950, respectively. Both graphs also include a projection of growth through 2005. The projection was determined using a trend-comparison model and indicates that there may be between 14 and 27 wells drilled at the upper 95 % confidence level.

BLM_0048529

# Drilling Activity Forecast

## *Trend Analysis*

GMUG cumulative drilling history:

> 7 to 14 wells @ 95 % confidence interval

Region cumulative drilling history:

> 471 to 925 wells @ 95 % confidence interval
> 14 to 27 wells on GMUG (3 %)

## *Assumptions*

1. Drilling activity within each Forest will continue at the same conservative levels of 1986 to 1990 or about a 2 % increase per year, and constitute about 3 % of the regional activity. No drilling activity has taken place within the UNNF since 1974, with any potential activity limited to high potential areas. A total of 47 wells are forecast for the GMUG, including 27 wells as indicated by the trend forecast and an additional 20 development wells in existing oil and gas units.

2. Twenty-seven (27) wells are forecast for the GMUG:

    a. 12 on GMNF, 6 wells completed for production.

    b. 12 on GUNF, 6 wells completed for production.

    c. 3 on UNNF, 1 well completed for production.

3. Unit activity may consist of up to 10 wells in the Ragged Mountain Unit if it is expanded and 10 wells in the Narrows Unit on GMUG lands.

4. Wildcat drilling is not expected within the moderate to no potential areas, however if drilling should occur it will most likely be in the moderate potential area. Five wells may be drilled in those areas that presently contain oil and gas leases. A one to two well field may be developed if commercial quantities of hydrocarbons are discovered.

5. Ten producing wells per year will be plugged and abandoned (P&A) within the region. Five wells within the GMUG will be P&A'd during the life of the plan.

6. The tax credits for the development of CBM are expected to terminate at the end of 1992. If this occurs it is unlikely that very many if any of the wells drilled within the GMUG will be for CBM. Those that would be drilled are included within the forecast.

BLM_0048530

# References Cited

Cholate, R., Jurich, D., and Saulnier, G. J., Jr., 1984, Geologic overview, coal deposits, and potential for
methane recovery from coal beds, Piceance Basin, Colorado, in., Rightmire, C. T. and Others, eds.,
Coal Bed Methane Resources of the United States: American Association of Petroleum Geologists,
Studies in Geology, no. 17, p. 223-251.

Colorado Oil and Gas Conservation Commission, 1991, 1990 Oil and gas statistics for the State of
Colorado: State of Colorado, Department of Natural Resources.

Dodge, C. N., and Bartleson, B. L., 1986, The Eagle Basin: A new exploration frontier, in., Stone, D. S.,
ed., New Interpretation in Northwest Colorado Geology: Rocky Mountain Association of Geologists,
p. 113-121.

Dwight's EnergyData, 1992, Weekly drilling report - Colorado: Dwight's Softsearch Co., v.92, #25.

Johnson, R. C., and Nuccio, V. F., 1986, Structural and thermal history of the Piceance Creek Basin,
western Colorado, in relation to hydrocarbon occurrence in the Mesaverde Group, in., Spencer, C. W.,
and Mast, R. F., eds., Geology of tight gas reservoirs: American Association of Geologists, Studies in
Geology, no. 24, p. 165-203.

Kellogg, H. E., 1977, Geology and petroleum potential of the Mancos B Formation, Douglas Creek arch
area, Colorado and Utah, in., H. V.Veal, ed., Exploration frontiers of the central and southern
Rockies: Rocky Mountain Association of Geologists, p. 167-179.

Lyle, Don, 1990, Tax credits forecast Piceance drilling surge: Western Oil World, vol. 47, no. 12, p.32-35.

Nuccio, V. F., and Schenk, C. J., 1986, Thermal maturity and hydrocarbon source-rock potential of the
Eagle Basin, Northwestern Colorado, in., Stone, D. S., ed., New Interpretation in Northwest
Colorado Geology: Rocky Mountain Association of Geologists, p. 259-264.

Oil and Gas Journal, 1991, Survey of forecasters, Fall 1991, Oil and Gas Journal, Tulsa, OK.

Peterson, J.A. 1989. Geology and petroleum resources, Paradox Basin Province: U.S. Geological Survey
Open-File Report 88-450u.

Rightmire, C. T., and Cholate, R., 1986, Coal bed methane and tight gas sands interrelation, in., Spencer,
C. W., and Mast, R. F., eds., Geology of Tight gas reservoirs: American Association of Petroleum
Geologists, Studies in Geology no. 24, p. 165-203.

Sanborn, A. F., 1981, Potential petroleum resources of northeastern Utah and northwestern Colorado, in.,
Third field conference western slope Colorado guidebook, 1981: New Mexico Geological Society, p.
255-265.

Schleede, G.R., 1992, Competition is essential to win electric generation market share: The American Oil
and Gas Reporter, vol. 35, no. 10, p.64-70.

Spencer, C. W., and Wilson, R. J., 1988, Petroleum geology and principal exploration plays in the
Uinta-Piceance-Eagle Basins province: U. S. Geological Survey Open-File Report 88-450-G, 35 p.

Tremain, C. A., 1984, Coal bed methane resources of Colorado: Colorado Geologic Survey, Map Series 19,
1:500,000.

Tyler, R., Ambrose, W.A., Scott, A.R., Kaiser, W.R., and others, 1991, Coalbed methane potential of the
Greater Green River, Piceance, Powder River, and Raton basins: Gas Research Institute, Topical
Report GRI-91/0315, 244 p.

Waechter, N. B., and DeVoto, R. H., 1989, Tectonic-stratigraphic framework and petroleum potential of
the late paleozoic central Colorado trough, northwestern Colorado, in., J. C. Lorenz, J. C. and Lucas,
S. G., eds., Energy Frontiers in the Rockies:  Albuquerque Geological Society, p. 91-100.

BLM_0048532

## Appendix A

# 3021 - Lands Prospectively Valuable for Leasable Minerals

.2  Classification Criteria.  Each leasable mineral has a unique set of limiting classification criteria, as set forth below, to identify lands prospectively valuable for that specific mineral.

.21  Oil and Gas.

A.  Approval Date.  Criteria for classifying public lands as prospectively valuable for oil and gas were approved by the Director, USGS, on April 22, 1957. Those criteria have been revised and the new standards are presented herein. The approval date of the new classification criteria is the date of this manual release.

B.  Criteria.  Lands underlain by sedimentary rock shall be classified as prospectively valuable for oil and gas on the basis of the thickness and depth of sedimentary rocks, a favorable structural setting, and evidence of oil and gas potential. Although oil and gas normally occur within sedimentary rocks, these minerals may have also accumulated in rocks of other than sedimentary origin. Classification of lands which do not contain sedimentary rocks should be based on knowledge of known accumulations.  Such a determination requires considerable professional judgement.

1.  Mineral Thickness.  In a sedimentary basin, the minimum thickness of sedimentary rocks considered to be prospectively valuable for oil and/or gas is 1,000 feet, unless a thinner sedimentary section is known to be productive.

2.  Maximum Depth.  The lower depth limit of potentially productive sedimentary is considered to be 35,000 feet below the surface.  Areas having a cover of igneous or metamorphic rock which has flowed or been thrust over sedimentary rock may be classified as prospectively valuable.

3.  Evidence of oil and gas potential.  Oil seeps, oil and gas shows in well tests, and past or present production constitute direct evidence of oil and gas potential.  Indirect evidence may include seismic information, similarity with known producing rocks, or acceptable levels of thermal maturation. Either direct or indirect evidence may be used in classification.

BLM_0048533

## Appendix B

## Oil and Gas Potential Rating Criteria

**High,** (a) in this area there is the demonstrated existence of: (1) source rock, (2) thermal maturation, and (3) reservoir strata possessing permeability and/or porosity, and (4) traps or (b) be part of an oil and gas play as defined by the USGS (Open File Report 88-373 or related publication).

**Moderate,** there is as geophysical or geological indication that the following are present: (1) source rock, (2) thermal maturation and (3) reservoir strata possessing permeability and/or porosity, and (4) traps.

**Low,** there are specific indications that one or more of the following are not present: (1) source rock, (2) thermal maturation, or (3) reservoir strata possessing permeability and/or porosity, and (4) traps.

**None,** requires that the absence of source rock, or thermal maturation or reservoir rock prohibits the occurrence of oil and/or gas.

BLM_0048534

E-10



Figure 1.  Location map of U. S. Geological Survey petroleum resource assessment provinces.

BLM_0048535



Not PV for O & G

BLM_0048536

Figure 2.   Lands prospectively valuable for oil and gas.

E-12



| | |
|---|---|
| No Known Potential | |
| Low Potential | |
| Moderate Potential | |
| High Potential | |

Figure 3.  Oil and gas potential of the GMUG region.

BLM_0048537



Figure 4.   Regional Permian Pennsylvania sandstone play.

E—13

BLM_0048538



Figure 5.   Regional Uinta-Piceance Tertiary conventional gas play.

E-14

BLM_0048539



Figure 6.  Regional Uinta-Piceance Upper Cretaceous sandstone conventional play.

E-15

BLM_0048540



Figure 7.   Areas in the Uinta and Piceance basins designated as eligible for receiving tight gas production incentive prices by the Federal Energy Regulatory Commission.

E-16

BLM_0048541



Figure 8.    Coal bed methane content of the southern Piceance Basin.

BLM 0048542

E-18



Figure 9.    Principal oil and gas plays of the Paradox Basin.

BLM 0048543



Figure 10.   Histogram of drilling activity within the Grand Mesa National Forest.

BLM_0048544

E-20



Figure 11.   Histogram of drilling activity within the Gunnison National Forest.

BLM_0048545



Figure 12.   Histogram of drilling activity within the Uncompahgre National Forest.

BLM_0048546

E-22



Figure 13.   Trend forecast of cumulative drilling activity within GMUG.

BLM_0048547



Figure 14.   Trend analysis forecast of regional drilling activity.

BLM_0048548

TABLE 1.   USGS OIL AND GAS PLAYS WITHIN THE GMUG.

| BASIN/ PLAY | RESERVOIR TYPE | RESERVOIR ROCK | TRAPS/ SEALS | EXPLORATION STATUS | DEPTH RANGE |
|---|---|---|---|---|---|
| **Paradox** | | | | | |
| Buried fault block | Dolomitized ls facies most important | Leadville Ls McCracken SS | Paradox evaporates, faults | Moderately explored | 6,000 – 15,000 ft |
| Salt anticline flanks | Carbonates and arkosic ss | Cutler Fm Hermosa Fm | Pinchouts and updip termination against salt diapers | Lightly explored | 5,000 – > 15,000 ft |
| Fractured interbeds | Dolomite and calcareous black shale, fractured | Paradox Ls and evaporite facies | Fractures, salt and shale interbeds | Lightly explored | 5,000 – > 15,000 ft |
| Silverton delta | Arkosic marginal marine facies | Honaker Trail Formation | Combination and stratigraphic | Speculative | 3,000 – 6,000 ft |
| **Piceance** | | | | | |
| Tertiary gas | Sandstones, fluvial and lacustrine | Wasatch, Fort Union, and Green River Formations | Stratigraphic and structural, updip pinchouts | Moderately well explored | 3,000 – > 7,000 ft |
| Permian-Pennsylvanian sandstone | Sandstones, fluvial and lacustrine | Weber Sandstone | Stratigraphic and structural, updip pinchouts | Speculative | 2,000- 8,000 ft |
| Upper Cretaceous gas | Fluvial, marginal marine, marine sandstones and siltstones | Meservede Group sandstones | Structural and combination | Fairly well explored | 2,000 – 5,000 ft |

BLM_0048549

TABLE 2.   OIL AND GAS FIELDS AND CUMULATIVE PRODUCTION.

| FIELD/ RESERVOIR | | | 1990 | | CUMULATIVE | |
|---|---|---|---|---|---|---|
| | | | OIL | GAS | OIL | GAS |
| | SIW[1] | PWR[2] | (BBL) | (MCFG) | (BBLS) | (MCFG) |
| Grand Mesa | | | | | | |
| Mesaverde | 0 | 0 | 0 | 0 | 0 | 741 |
| Field total | 0 | 0 | 0 | 0 | 0 | 741 |
| Sheep Creek | | | | | | |
| Cozzette- | 2 | 0 | 0 | 0 | 0 | 197,433 |
| Morapos | 0 | 0 | 0 | 0 | 0 | 65,190 |
| Mesaverde | 1 | 0 | 0 | 0 | 0 | 13,096 |
| Field total | 3 | 0 | 0 | 0 | 0 | 275,719 |
| Ragged Mtn | | | | | | |
| Corcoran | 0 | 1 | 81 | 29,309 | 1,675 | 292,425 |
| Cozzette- | 4 | 1 | 5 | 79,703 | 971 | 764,244 |
| Field total | 4 | 2 | 86 | 109,012 | 2,646 | 1,056,669 |
| Coal Basin | | | | | | |
| Cozzette- | 1 | 1 | 114 | 36,676 | 1,075 | 260,025 |
| Field total | 1 | 1 | 114 | 36,676 | 1,075 | 260,025 |
| Forest total | 8 | 3 | 200 | 145,688 | 3,721 | 1,593,154 |

[1] - Shut In Well   [2] - Producing Well

E-25

BLM_0048550

E-26

### TABLE 3.   DRY HOLES DRILLED WITHIN THE UNNF.

| Comp Yr | Sec. | Twp | Dir | Rng | TD | FM @ TD | Comments |
|---------|------|-----|-----|-----|------|---------|----------|
| 1949 | 14 | 46 | N | 13 | 5035 | Cambrian | O S Devonian dolomite |
| 1951 | 18 | 47 | N | 14 | 7618 | Ignacio | O&G show Paradox Fm GTS Hermosa Fm |
| 1951 | 18 | 47 | N | 14 | 7618 | Elbert | NS reported |
| 1952 | 13 | 45 | N | 12 | 4335 | Mississippian | Drill S G Pennsylvanian |
| 1953 | 10 | 45 | N | 12 | 2017 | Pennsylvanian | NS reported |
| 1955 | 14 | 46 | N | 13 | 2226 | Molas | NS reported |
| 1956 | 26 | 46 | N | 12 | 1441 | NA | NS reported |
| 1956 | 6 | 46 | N | 12 | 1820 | Precambrian | NS reported |
| 1956 | 21 | 46 | N | 12 | 1200 | NA | NS reported |
| 1957 | 10 | 45 | N | 12 | 1200 | NA | NS reported |
| 1961 | 2 | 45 | N | 12 | 3742 | Devonian | NS reported |
| 1961 | 10 | 45 | N | 12 | 4335 | Mississippian | Sli G S Pennnsylvanian |
| 1962 | 4 | 45 | N | 12 | 2714 | Pennsylvanian | NS reported |
| 1964 | 13 | 44 | N | 14 | 10,220 | Cambrian | DST Hermosa arkose gauged 363 MCFG/1 hr |
| 1966 | 14 | 44 | N | 14 | 5860 | Hermosa | Drilling Show Hermosa Fm |
| 1968 | 10 | 47 | N | 15 | 7994 | Granite | NS reported |
| 1970 | 3 | 47 | N | 15 | 8430 | Mississippiam | NS reported |
| 1974 | 3 | 47 | N | 15 | 6065 | Elbert | NS reported |

note:O=oil,G=gas,N=no,S=show,Fm= formation,TD=total depth

BLM_0048551

TABLE 4.   DRILING STATISTICS OF REGION AND GMUG.

|  | GMUG | GUNF | UNNF | FOREST TOTAL | REGION |
|---|---|---|---|---|---|
| DRY | 19 | 8 | 19 | 46 | 768 |
| GAS | 8 | 9 | 0 | 17 | 1067 |
| O&G | 0 | 0 | 0 | 0 | 56 |
| OIL | 0 | 0 | 0 | 0 | 23 |
| SI | 1 | 0 | 0 | 1 | 34 |
| TOTAL | 28 | 17 | 19 | 64 | 1948 |

E-27

BLM_0048552

TABLE 5.   DRILLING ACTIVITY IN COUNTIES SURROUNDING GMUG AND
WITHIN EACH FOREST.

| COUNTY | WELLS DRILLED 1986 - 1990 | | |
|---|---|---|---|
| | PWR | DRY | TOTAL |
| Delta | 1 | 1 | 2 |
| Dolores | 4 | 4 | 8 |
| Garfield | 183 | 9 | 192 |
| Gunnison | 2 | 0 | 2 |
| Mesa | 21 | 6 | 27 |
| Montrose | 0 | 1 | 1 |
| San Miguel | 4 | 0 | 4 |
| Total | 215 | 21 | 236 |
| FOREST | | | |
| Grand Mesa | 0 | 3 | 3 |
| Gunnison | 1 | 3 | 4 |
| Uncompahgre | 0 | 0 | 0 |
| Total | 1 | 6 | 7 |

E-28

BLM_0048553

# Appendix F - Slope Disturbance Diagrams

BLM 0048554

BLM_0048555

GROUND DISTURBANCE BY SLOPE PERCENT FOR VARIOUS ROAD AND DRILL-PAD CUT AND FILL SLOPES

| SIDE-SLOPE | ROADS | | | | | | | | DRILL-PADS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1:1 CUT-1 1/2:1 FILL | | | | 1 1/2:1 CUT-1 1/2:1 FILL | | | | CUT & FILL SLOPES 1 1/2:1 | | CUT & FILL SLOPES 3:1 | |
| | CLEARING LIMITS | | | | CLEARING LIMITS | | | | CLEARED | | CLEARED | |
| (%) | (FEET) | (ACRES/ MILE) | (CU.YD./ 100FT.) | (CU.YD./ MILE) | (FEET) | (ACRES/ MILE) | (CU.YD./ 100FT.) | (CU.YD./ MILE) | (ACRES) | (CU.YD.) | (ACRES) | (CU.YD.) |
| 10 | 22.9 | 2.8 | 23.7 | 1251 | 23.6 | 2.9 | 24.4 | 1288 | 2.7 | 13900 | 3.5 | 16000 |
| 20 | 27.2 | 3.3 | 54.8 | 2893 | 29.1 | 3.5 | 59.6 | 3147 | 3.5 | 30667 | 5.3 | 39167 |
| 30 | 33.4 | 4.0 | 99.5 | 5254 | 37.9 | 4.6 | 113.2 | 5977 | 4.3 | 50075 | 7.5 | 68250 |
| 40 | 43.4 | 5.3 | 165.8 | 8754 | 53.0 | 6.5 | 207.9 | 10977 | 5.3 | 72367 | 10.0 | 106667 |
| 50 | 62.2 | 7.5 | 275.3 | 14536 | 89.4 | 10.8 | 408.1 | 21548 | 6.3 | 97458 | 12.9 | 150833 |
| 60 | 113.4 | 13.7 | 521.0 | 27509 | 233.2 | 28.3 | 1223.6 | 64606 | 7.5 | 125300 | 16.2 | 202500 |

Road figures are based on data from Engineering Field Tables, EM 7100-10, fourth edition. A width of 20 feet (W=20) was used to account for a 16 foot running surface plus a 3:1 ditch per instructions on page 82. The tables for 1:1 cut slopes are found on pages 116-117 and for 1 1/2:1 cut slopes on pages 94-95.

Cubic yardage for drill-pads are approximate. The objective of this table is not to show exact quantities but rather to show various relationships by sideslope %, i.e., the steeper the sideslope, the greater the amount of disturbance.

A level surface of 300' X 300' is assumed for each drill-pad.

BLM_0048556

BLM_0048557

The figures in this appendix simply illustrate the amount of area, in cross-section, disturbed by locating similar size drill pads on various slopes. Locating drill pads on steeper slopes results in significantly greater area disturbed.

F-2

BLM_0048559



Ground Slope:      10%
Cut Slope:         1.5:1
Cut Height:        20.2'
Disturbed Width:   359.2'



Ground Slope:      20%
Cut Slope:         1.5:1
Cut Height:        47.6'
Disturbed Width:   435.0'



Ground Slope:      10%
Cut Slope:         1:1
Cut Height:        19.3'
Disturbed Width:   346.9'



Ground Slope:      20%
Cut Slope:         1:1
Cut Height:        43.0'
Disturbed Width:   404.3'

BLM_0048560

BLM_0048561



Ground Slope:     30%
Cut Slope:        1.5:1
Cut Height:       90.0'
Disturbed Width: 553.6'

Ground Slope:     40%
Cut Slope:        1.5:1
Cut Height:       164.3'
Disturbed Width: 761.3'

Ground Slope:     30%
Cut Slope:        1:1
Cut Height:       74.7'
Disturbed Width: 485.7'

Ground Slope:     40%
Cut Slope:        1:1
Cut Height:       119.7'
Disturbed Width: 611.7'

BLM_0048562

BLM_0048563



Ground Slope:      50%
Cut Slope:         1.5:1
Cut Height:        327.2'
Disturbed Width: 1218.0'

Ground Slope:      50%
Cut Slope:         1:1
Cut Height:        189.6'
Disturbed Width:  838.6'

BLM_0048564

BLM_0048565



3045.0'

932.0'

Ground Slope:     60%
Cut Slope:        1.5:1
Cut Height:       932'
Disturbed Width:  3045'

1462.5'

316.5'

Ground Slope:     60%
Cut Slope:        1:1
Cut Height:       316.5'
Disturbed Width:  1462.5'

F-6

BLM_0048566

BLM_0048567

# Appendix G - Typical Oil and Gas Activities

BLM 0048568

BLM_0048569

# Appendix G -
# Typical Oil and Gas Activities

## Description of Typical Oil and Gas Activities - A Layman's Experience

You are driving along a one-laned, graveled road, with turnouts, through a mixed aspen-conifer forest, on the Grand Mesa. This is a road you have used in the past, but the last time you were on it, it was not graveled. You round a corner and see the top of a drill rig extending about 70 feet above the 80 foot high forest. As you continue around the corner, you see that approximately 3 1/2 acres of the forest have been cleared and a large level pad has been created. The drill rig you first noticed peaking over the trees, stands before you. It is approximately 150 feet tall, and stands near the center of the cleared area.

Behind the tower, you see several large racks holding many pieces of pipe and casing of varying diameters. These racks are about 3 or 4 feet high, 10-12 feet wide, and 30-50 feet long.

A small metal building is also located near the tower. You see a man come out of the shed carrying some large tool and assume the building is a tool shed. You also see several fluid storage tanks (for reserve pit mud and fuel).

Your window is down and you hear a diesel engine. You had not noticed the noise as you were driving. It only became apparent when you first saw the drill rig above the trees. (The sound is dominant up to a mile away during quiet times of the day, i.e. early morning, late afternoon and at night.)

You notice four or five men are on a platform at the base of the tower, and they are working around a shaft extending above and below them, at the center of the tower. They appear to be working around what looks like a small table surrounding the pipe or shaft. (They are connecting two sections of pipe.)

Lots of power cords and hoses are coiled and piled around the base of the tower. Some of the hoses run to a large (60' X 150') pit next to the tower. The pit is filled with what looks like very muddy water. You see there are hose lines leading into and out of this pit.

A large water truck, a front-end loader, and several pickup trucks are parked on the leveled area, away from the tower and pit. You see six people in the area. While you are stopped another pickup arrives, and two more people get out.

You continue your drive. You are back into the mixed forest as soon as you leave the clearing. The sound of the diesel engines muffles and has disappeared by the time you are 3/4 of a mile away from the area. You round a corner and must stop to let two does cross the road in front of you.

You were looking at a typical well site. This is the type of drilling that may be done in an area after it has been leased for oil and gas development. Drilling activity may last anywhere from 2-3 weeks, up to several months, depending on how deep the well will be drilled. The deeper the well, the longer it takes, the larger the drill rig, the larger the area cleared and leveled, and the more people and traffic required to get the job done.

The route you are taking travels through a productive natural gas field. Side roads intersect the main road every 2-3000 feet. The road right-of-way clearing is approximately 35 feet. The main collector

BLM  0048570

Oil and Gas Leasing Analysis FEIS

pipeline is buried within this right-or-way. Valves and gauges poke above the ground at intervals along this pipeline.

At one point, you notice a 35-foot wide cleared corridor angle away from the road. This path was created when the transmission pipeline took off across country, to travel a more direct route to its destination.

If you look down some of the side roads, you can see pretzels of pipe, gauges and valves in several clearings. These are the well sites. The pipe structures are often called "Christmas trees".

Occasionally there may also be several small tanks on the well sites. Water and oil may also be produced with the gas. These by-products must be separated from the gas, and stored in tanks, before the gas is put into the pipeline.

You begin to notice a sound like a jet airplane, getting louder and louder. You approach a well sight and notice flames coming out of a large pit. A well is being "flared". Flaring is done during initial stages of production, when tests are being run to determine the production capability of a well. The gas produced by the well is piped along the surface, to a pit, where it is ignited. If desired production is achieved, the product is put into a pipeline for transport to market. You also notice a slight oil smell while you are next to this site.

As you travel through the gas field, you also see a drill rig on a site in the distance. A new well is being drilled, with hopes of increasing the gas production.

You pass four pickups heading for the drill site. Shortly after the trucks have passed, you encounter a large water tanker going in the same direction. Dust stirred up by the traffic on the road has caused you to close your window.

You continue your drive. After three miles of mixed forest interspersed with small parks and several stream crossings, the forest opens up into a large park. Ahead you see a large tanker truck pulling onto the main road, from a side road. It is somewhat rare to see tankers here. They are associated more with oil and coal bed methane than with the more common natural gas drilling. You are traveling faster than the tanker and soon catch up to it. When you drive past the side road you see a small sign with "#3 Well" on it. You pass the tanker and continue on your drive.

You come to another intersection with a side road, within 1/2 mile of the first intersection. This junction is also marked with a small sign - "#4 Well". This is also the road to one of your favorite fishing haunts, and you decide to see what effects the well site has had on the area.

You cannot see any facilities from the main road. The side road soon enters the forest, again. It is an open stand of aspen, with a few small conifers in the understory. You come to a 2-3 acre clearing, next to the road. One of those pumpjacks that look like an oversized grasshopper is rocking up and down, pumping up methane mixed with water from a coal bed deep below the forest floor. You hear the drone of a butane-powered engine, which provides the energy to operate the pump. You did not notice the sound until you were at the well site. You see a pipeline, about four inches in diameter, running along the ground's surface, to a large tank. The entire clearing, except for a driveway to the tanks and a small distance immediately around the facilities, is covered with a mix of grasses and forbs. Yellow sweet clover is blooming in small patches scattered throughout the clearing.

You continue on to the little reservoir. You cannot see, hear or smell any evidence of the well site when you get out of your vehicle. You decide to wet you line and test the fishing. Fishing is still good, but the area has been impacted by the increase in use, due to the improved access.

On your way back out to the main road, you see the tanker parked next to the tank at the #4 well site. A large hose runs from the tank to the tanker, emptying its store of water condensate into the truck

BLM_0048571

to be transported off the Forest. (Condensate is hauled off the Forest four or five times a year, depending on the productivity of the well.)

During the course of the six mile drive to the edge of the Forest you pass several clearings which you realize were once well drilling sites. The only evidence of this is the opening in the forest. The ground has been recontoured to the natural lay of the land, and the vegetation is similar to the understory in the surrounding forest. Only the absence of trees indicates that a disturbance has occurred at this spot.

# Oil and Gas Exploration and Development - A Technical Description

Note: This appendix is from the USDI Bureau of Land Management Colorado Oil and Gas Leasing and Development Final Environmental Impact Statement, January 1991. It was included as Appendix A in that document. Only those portions of the document that pertain directly to the Forest Service are reproduced here. Portions have been edited.

Oil and gas exploration and development activities progress through five phases that are, in part, sequential and may overlap in time: preliminary exploration, exploratory drilling, development, production, and abandonment. Leases are obtained before the second phase (exploratory drilling).

## Preliminary Exploration

Petroleum exploration occurs in unexplored portions of areas where petroleum is known or thought to occur in commercial quantities. An area where petroleum is thought to occur in commercial quantities is known as a frontier or rank wildcat area. With declining known oil and gas supplies, it has become profitable to explore for oil and gas in less promising geological provinces and in areas where the climate, terrain, depth of deposits, and other obstacles have discouraged previous efforts. Increasingly sophisticated exploration techniques, improved oil and gas drilling, and transportation technologies have also enhanced prospects for locating, extracting, and marketing petroleum resources.

### Geological Exploration

Where the bedrock geology of an area is well exposed, it is often possible to predict where oil might gather. The potential traps (anticlines, faults, or formations with varying porosity) can sometimes be located with the aid of published geologic maps, aerial photos, and landsat imagery. Occasionally, additional data will be gathered by aircraft. Low altitude reconnaissance flights, frequently at elevations of 100 to 500 feet, help identify rock outcrops that can be studied later on the ground. Next, one or more geologists may examine and sample the rock outcrops in the area and map the surface geology. Geological exploration can be performed with little surface damage; four-wheel drive pickups, motorcycles, all terrain vehicles, foot or horse travel can be used to cover the area.

### Geophysical Exploration

Subsurface geology is not always accurately indicated by surface outcroppings. In such cases, geophysical prospecting methods are used to define subsurface structure. Three geophysical survey techniques can be used to define subsurface characteristics through measurements of the gravitational field, the magnetic field, and seismic reflections.

BLM 0048572

Gravity and magnetic surveys indirectly measure course subsurface structure. The field work involves small portable units which are easily transported via light off-road vehicles, such as four-wheel drive pickups and jeeps, or aircraft. Off-road vehicle traffic is common in these two types of surveys. Sometimes, small holes (approximately one inch by two inches by two inches) are hand dug for instrument placement at the survey measure points. These two surveys can make measurements along defined lines but it is more common to have a grid of discrete measurement stations.

Seismic reflection surveys are the most common of the geophysical methods and produce the most detailed subsurface information. The seismic method detects subsurface geologic structural information by producing a source wave at or near the surface that bounces off subsurface layers. The "echoes" or seismic reflections are recorded as a function of time. The deeper the subsurface reflecting layer, the later in time it is detected. The weak seismic reflections are detected at the surface by arrays (groups) of seismometers or geophones that are very similar to microphones. The geophone electrical signals are sent by a connecting cable to the recorder unit where the signals are amplified and then recorded on a multi-track magnetic tape.

The tape is later sent to a computing center where it is rearranged and computer enhanced to present the subsurface reflections in a graphic picture called a seismic section. The seismic reflections are very weak requiring very sensitive geophones. While the geophones can "hear" the desired reflections, they also detect:

- cars and trucks,
- people and animals moving about,
- water wells pumping,
- airplanes (at tens of thousands of feet in the air),
- trains (many miles away),
- the wind blowing, and
- trees and shrubs moving in the wind.

Any of these other activities can produce a "noise" at the geophone which often is stronger than the desired seismic reflections.

The seismic reflection method needs the seismic source and geophone arrays along a straight line. Sometimes it is possible to work along existing roads if the roads are straight. Where practical, existing roads are used to facilitate access to the seismic operations. The geophone arrays are normally straight along the line length. However, in difficult seismic data areas, they may have considerable width. To understand the subsurface structures in three dimensions, it is necessary to have seismic lines recorded in a "cross" or line gridded pattern. The grid spacing between lines can be from a fraction of a mile apart to many miles apart depending on the exploration purpose. The exploration purpose will also determine what latitude, if any, there is in moving these lines.

The work of a seismic crew begins with the Permit Agent obtaining permits from private landowners and government agencies. The survey crew next places pin flags and other markers at uniform intervals along the seismic line and carefully measures the markers in relation to precisely known geographic locations. For a shot hole explosive seismic source, drilling rigs will be working on the seismic line. When the complete seismic line is ready, the geophone crew arrives and places the geophones in arrays in precise locations to the flagging and lay connecting cables between the geophone arrays and the recorder unit. After the seismic reflection data is recorded, the geophone crew picks up all the geophones and connecting cables and cleans up the seismic line. Most of these individual steps involve one or more equipment trucks to travel the seismic line if the terrain is drivable.

The seismic reflection method is usually referred to by the type of seismic source. The most common seismic sources are vibrator, shot hole explosive, and surface explosive.

BLM_0048573

The geophysicist, in determining the seismic exploration program parameters, will pick the most appropriate seismic source based on the depth of exploration interest and the degree of detail needed to define the subsurface structure.

### *Vibrator Source*

The vibrator method uses a 4x4 or 4x6 wheel drive truck or buggy mounted hydraulic vibrator source. Their primary physical feature is a pad (about four feet square) that is slowly lowered from the center of the truck or buggy to make contact with the ground. Connected to the pad is the Reaction Mass. The Reaction Mass is moved a few inches up and down hydraulically in a carefully controlled manner to send a seismic source wave into the ground.

The vibrator is a weak seismic source and requires two to eight vibrators working together to create detectable reflections. Since it is a weak source, it has been used successfully to gather seismic reflection information in difficult high population areas such as Los Angeles and Paris.

To be able to use the vibrator source method, it is required that the seismic line goes along a straight road, or if cross country, over gentle, rolling drivable terrain.

### *Conventional Drilled Shot Hole Source*

The shot hole explosive source requires the drilling of a hole to a predetermined depth, placing explosives at the bottom of the hole and back filling the hole with cuttings if the hole is air filled, or bentonite chips if the hole is naturally water filled.

Shot hole drilling depths will range normally from 25 to 200 feet. The explosive charge size can range from five to fifty pounds. The hole diameter is typically two to six inches. The drill rigs are most often truck or buggy mounted. Cuttings from drilling the hole are normally scattered by hand near the shot hole or put back in the shot hole after explosive charge placement. Proper preplugging of the shot hole with tamped cuttings or bentonite chips prevent the view commonly shown in the movies of holes "blowing out." There are some special source testing situations which need the detonation of charges in open holes. A shot hole that "blows out" causes a very poor seismic source wave which is very detrimental to the seismic reflection method. Detonation of a properly preplugged shot hole will create the best seismic source wave and cause no surface disturbance.

### *Portable Drilled Shot Hole Source*

Special limited depth drill rigs can be moved in pieces by a helicopter. Helicopter portable drills are used where access limitations or topography restraints prevent use of conventional truck or buggy mounted drill rigs. This is a very expensive option which also places significant limits on the depth of drilling, and consequently, the size of the explosive charge. These limits can severely restrict the reflection methods ability to define subsurface structures.

### *Surface Explosive Source*

The surface explosive source method involves placing puds (pouches) of explosives on a number of stakes driven into the ground. This is also called the Poulter method, named after its developer.

The explosive puds range in size from a pound to five pounds. The stakes are typically four to eight feet in height. The number of stakes used in the source array can range from a few to the more common ten. Occasionally the explosives are placed on the ground or snow, but this is a less effective source wave technique. Use of tall (six foot) stakes or placing the explosives on the surface of deep snow results in little visible surface disturbance, in contrast to the noise level of the detonations. The surface explosive method is very mobile. Generally 4x4 vehicles are used for transportation, although it can be supported with animal pack teams or helicopters.

BLM_0048574

### *Mini-hole Explosive Source*

The mini-hole explosive source can be used in favorable conditions. A very small portable unit is used to drill a number (a source array) of small diameter shallow holes. The holes are usually two-to-three inches in diameter, drilled to depths of five-to-fifteen feet and each hole loaded with a small, one pound or less, explosive charge.

These holes are detonated simultaneously to produce a seismic source wave. However, this method is usually limited to defining shallow subsurface structures, and therefore, can not often be substituted for the significantly more effective deep shot holes.

A given area may be explored several times by the same or different companies over a period of time. Multiple exploration is undertaken for a variety of reasons--first attempts may have been unsuccessful, the depth of exploration interest may have changed, other competitive companies want their own information, or improved techniques and/or equipment are used.

All the work required to obtain exploration seismic data does not guarantee that the data will indicate any necessary subsurface structures--let alone a subsurface structure containing hydrocarbons. For the explorationist, the unfortunate reality is that obtaining seismic data most often leads to the decision that an area does not have adequate subsurface structures or structures containing economic hydrocarbons and therefore no drilling will follow.

## Types of Oil and Gas Drilling and Production

Oil and gas wells are drilled primarily with rotary drilling rigs. The rigs use mud or compressed air as a medium to cool the drilling tools, carry cuttings to the surface, and, in the case of mud, to stabilize the drilled hole. In the early days of drilling, the "cable tool" rig was the predominant method of drilling. Cable tools were largely replaced by rotary rigs in the 1950s. Some of the oldest wells still producing in Colorado were drilled with cable tool rigs.

The method of drilling is generally the same regardless of the target production. The depth of the target usually has more to do with the method of drilling than the type of production. In general, deeper wells require larger rigs which in turn require larger drill pads. Because oil is more valuable than gas, gas wells tend to be shallower in depth. The reason being that deeper wells cost more and the lower profitability of gas production means they do not bear the higher cost of deeper wells. The size of the anticipated production also has a bearing on the expense a given production will bear. For example, a very large gas producing reservoir may better bear the cost of deeper drilling than a shallow, low producing oil reservoir. But, all else being the same deeper reservoirs cost more to develop than shallow ones.

The biggest differences among the various types of oil and gas wells occur in the production phase of operations. The same basic rotary drilling methods are used for drilling all types of oil and gas wells.

### *Oil and Gas Co-Production*

Reservoirs that produce both oil and natural gas require the siting of facilities for the production, clean-up, and storage and/or transportation of the products on location (i.e., the well pad). If the well produces naturally, that is the gas and oil flow to the surface under natural pressures, only a series of pipes and valves at the well "head" are required to regulate the flow of product to the surface. If there is no, or insufficient, natural pressure, a pump is installed to lift the product to the surface. Once the oil and gas comes to the surface, it travels through pipes to separation equipment where water and gases such as carbon dioxide are removed, and the gas and oil are separated. The water and oil are piped to respective storage facilities and the gas put into a transmission pipeline. In a few cases, separation/clean-up and/or storage facilities are located off of the well pad for common use by more than

BLM 0048575

one well. But, in the great majority of the wells in the Analysis Area, all facilities are located on the same pad on which the well was drilled.

Gas is transported to market through a network of gathering pipelines from each well to a transmission line. The gathering system usually consists of pipe of two-to-four inches in diameter which is laid on the ground or buried several feet below the surface. BLM most often requires that lines be laid near the access road or buried under it to save additional surface disturbance. Measurement of gas is usually through a differential pressure recorder on the well pad.

Oil is produced into tanks, either on the well pad or into a common tank near the well. The oil is measured for sale from these tanks and transported to distribution points by special truck. In the case of some highly productive fields, oil carrying pipelines may be laid to a distribution point or refinery. In these cases, there is a network of pipelines to each well similar to that for the gas gathering system. The oil gathering lines are usually four to six inches in diameter, and measurement is either through a sales tank or a sales meter attached to the line.

In some areas, hydrogen sulfide (also known as $H_2S$ or sour gas) may be found with the hydrocarbon production. In these cases, special stainless steel pipe is used to contain the production until the hydrogen-sulfide can be separated from the hydrocarbons. The hydrogen sulfide is disposed of by incineration or neutralized by sulfur extraction.

### Oil Production

Typically, oil is produced in association with water and gas; however, in some cases oil is produced with almost no water or associated gas. The facilities to produce such oil are the same as those described above without the equipment for gas clean-up and measurement.

### Dry Gas Production

Dry gas is a term applied to any natural gas produced without oil. It usually has some water associated and may have a small amount of light liquid hydrocarbons, called "drip" or condensate. Dry gas wells typically have only a "Christmas tree" or valve/gauge assembly, showing above ground. Production facilities may include a pit or tank for the collection of separated produced water and a small tank for the storage of the liquid hydrocarbons. As with oil and gas production, there is a gathering pipeline and sales meter for gas distribution.

### Carbon Dioxide Production

Carbon dioxide is produced in a manner similar to dry gas. But, carbon dioxide, in combination with water, may form carbonic acid which is very corrosive. Therefore, the produced gas must be "cleaned," that is have the impurities removed, as soon as possible after it reaches the surface. For that reason, stainless steel piping is used from well head to separator, and separators are placed as close as possible to the well head. Usually a single large separator is located so as to service several wells. The use of some stainless steel pipe and common separators are the two most distinguishing surface features of carbon dioxide production.

### Coal Bed Methane Production

Methane is commonly found in association with coal. It is produced either from the coal beds themselves or from nearby reservoir rock to which it has migrated from coal beds. It is produced by the same drilling and production techniques as other gases. The one difference between coal bed methane and other natural gas production is that where it is produced with associated water, the water production begins at a relatively high rate and declines to a very small amount over the first two to three years while the gas production increases inversely. If production is interrupted, that is the well is "turned off"

BLM 0048576

or shut down; upon re-start the water-gas ratio will be approximately the same as when the well was first produced. This phenomenon means that a great deal of water must again be produced before economic gas production is re-established. Not all coal bed methane production involves large amounts of produced water.

## *Exploratory Drilling*

Drilling does not begin until a lease has been acquired by the operator. When preliminary investigations are favorable and warrant further exploration, exploratory drilling may be justified. Stratigraphic tests and wildcat tests are the two types of exploratory drill holes.

### *Stratigraphic Tests*

"Strat" tests involve drilling relatively shallow holes to supplement seismic data. These tests aid in revealing the nature of near-surface structural features. The holes are usually from 100 to several thousand feet deep, and are drilled primarily by rotary drill rigs. As the rock is drilled, the resulting rock chips are brought to the surface by a high-pressure airflow or circulating drilling mud. Samples of these chips are collected, bagged, and identified as to depth of origin. They are then studied by a geologist to determine such data as rock type, age, and formation.

Truck-mounted drilling equipment for "strat" tests is fairly mobile; therefore, roads and trails to test sites on level solid ground are temporary and involve minimal construction. In hilly or mountainous areas, more road building is necessary, and higher standard roads may be necessary to accommodate anticipated traffic.

A space of about two acres is leveled and cleared of vegetation for the average drill site. If high pressure air is used to remove rock chips or rock cuttings, rock dust may be emitted to the air when samples are not being collected. If mud is used as a drilling fluid, mud pits may be dug; more commonly, portable mud tanks are used. Usually one to three days are required to drill the test holes, depending on depth to and hardness of the bedrock. In areas with shallow, high-pressure, water bearing zones, casing may be required to keep water out of the hole.

After the surface and subsurface geological studies, the seismic, and other geophysical surveys, comes the evaluation of the prospect. Only by drilling a wildcat well (a well drilled in unproved territory) will the oil company know if the rocks in the prospect they have identified contain oil or gas.

### *Wildcat Wells*

Nationally, about one in 16 wildcat wells produces significant amounts of oil or gas. Locally, success ratios may be as high as one in ten. The deeper wells may require several months or more to complete; shallower wells up to a few thousand feet deep may be completed in as little as a few weeks. As a general rule, the deeper the test, the larger the drilling rig and facilities required.

Prior to approval for drilling, on-site inspections are conducted with the proposed drill pad and access road staked out, to assess potential impacts and attach appropriate mitigative measures (Conditions of Approval) to the permit to drill. A drill "pad" (well site) from one to four acres in size is then cleared of all vegetation, and leveled for the drill rig, mud pumps, mud (or reserve) pit, generators, pipe rack, and tool house. Topsoil and native vegetation is usually removed and stockpiled for use in the reclamation process. The mud pit may be lined with plastic or bentonite to prevent fluid loss or prevent contamination of water resources. Other facilities such as storage tanks for water and fuel are located on the pad or are positioned nearby on a separate cleared area. If the well site is not large enough for the equipment required to rig-up (prepare the drilling rig for operation), a separate staging area may be constructed. Staging areas are usually no larger than 200 feet by 200 feet and may simply be a wide flat spot along the access road on which vehicles and equipment are parked.

BLM_0048577

Five thousand to 15,000 gallons of water a day may be needed for mixing drilling mud, cleaning equipment, cooling engines, etc., for each well. A surface pipeline may be laid to a stream or a water well, or the water may be trucked to the site from ponds or streams in the area.

The rigs are very large and may be moved in pieces. In some instances, rigs can be moved short distances on level terrain with little or no dismantling of equipment which will shorten the tearing-down and rigging-up time. Moving a dismantled rig involves use of heavy trucking equipment for transportation, and crews to erect the rig. Gross weight of vehicles may run in excess of 80,000 lb..

If suitable access does not exist to a proposed well site, road construction to prescribed standards will be necessary to provide for that access. Upgrade of existing access routes may also be necessary to accommodate the types and amounts of traffic required during the operation. Bulldozers, graders, and other types of heavy equipment are used to construct and maintain these roads.

The start of a well is called "spudding in." A short piece of tubing called conductor pipe is forced into the ground (sometimes with a pile driver), and cemented in place. This keeps dirt and dirt from sloughing into the well hole. Next, the regular drill bit and drill string (the column of drill pipe) take over. These pass vertically through a heavy steel turntable (the rotary table) on the derrick floor and the conductor pipe. The rotary table is geared to one or more engines, and rotates the drill string and bit. As the bit bores deeper into the earth, the drill string is lengthened by adding more pipe to the upper end.

Once the hole reaches a depth of several hundred feet, another string of pipe (the surface casing) is set inside the conductor pipe and cemented in place by pumping cement between the casing and hole wall. Surface casing acts as a safety device to protect freshwater zones (aquifers) from drilling fluid contamination. To prevent the well from "blowing out" in the event the drill bit hits a high pressure zone, "blowout preventers" (large metal rams) are installed around the surface casing just below the derrick floor. These rams will close on the drill hole, crushing the drill string and sealing the well in the event of a blowout.

After setting the surface casing, drilling resumes using a smaller diameter bit. Depending on well conditions, additional strings of casings (intermediate casing) may be run (installed) before the well reaches the objective depth (total depth or "T.D.").

During drilling, a mixture of water, clay, and chemical additives known as "mud" are continuously pumped down the drill pipe. It exits through holes in the bit and returns to the surface outside the drill pipe. As the mud circulates, it cleans and cools the bit and carries the rock chips (cuttings) to the surface. It also helps to seal off the sides of the hole (thus preventing cave-ins), and to control the pressure of any water, gas, or oil encountered by the drill bit.

The mud is the first line of defense against a possible blowout since it is used to control pressure. It is for this reason that a pit full of "reserve" mud (the reserve pit) is maintained on location. The reserve mud is used in emergencies to restore the proper drilling environment when radical or unexpected changes in down-hole pressure are encountered.

The cuttings are separated from the mud and sampled so that geologists can note and analyze (log) the various strata through which the bit is passing. The rest of the cuttings pass into the reserve pit as waste. Compressed air is sometimes used as the drilling medium. It serves some of the same functions as drilling mud, by cooling and cleaning the bit, and evacuating the cuttings from the hole.

During or at completion of drilling activity, the well is logged. Logging means measuring with geophysical instruments the physical characteristics of the rock formations and associated fluids through which the borehole passed. These instruments are lowered to the bottom of the well, and slowly raised to the surface while recording data. Other measuring procedures include the drill stem test, in which pressures are recorded and fluid samples taken from zones of interest. After studying the data

BLM_0048578

from those logs and tests, the geologist and/or petroleum engineer decide if the well will produce petroleum.

If the well did not encounter oil and gas, it is plugged with cement and abandoned. The well pad and access road are recontoured and revegetated.

If the well will produce, casing is run to the producing zone and cemented in place. A proper cementing of the production casing string is required to provide coverage and prevent interzonal communication between oil and gas horizons and usable water zones. Initially, this is accomplished by placement of steel casing from the ground surface to a depth generally ranging between 200 and 1,000 feet . The actual length of this "surface casing" is dependent on factors such as depth of freshwater zones, anticipated formation pressures, and the length of the next smaller casing to be set. The annular space between the borehole and the exterior of the surface casing is required to be filled with cement. Cement is pumped down the casing and around the bottom until cement is returned to the surface outside of the casing. This ensures cement completely fills the annular space and precludes interzonal migration of formation fluids (i.e., groundwater). Following the placement of surface casing, the hole is drilled deeper and more casing is installed. Cement is placed in a fashion similar to the surface pipe; however, a quantity of cement sufficient to cover and isolate only those zones having hydrocarbons, usable water, or other mineral values is used.

There is an exception to this in some coal-bed methane wells. In order to ensure isolation and protection of all zones between the surface and total depth, cement is required to be circulated from bottom to top on the production casing as well as on the surface casing. If cement is not circulated to surface, shallow water may not be protected.

If the determination is made that water monitoring wells are necessary in a given area, a separate borehole specifically designed as a monitoring well should be completed. Logical placement of a monitoring well would be in a protected location at the edge or just off of the well pad (generally 100-200 feet from producing well bore). It should be noted also that monitoring wells and other relatively shallow boreholes have often had adverse impacts on the most critical groundwater source due to interzonal flows and introduction of bacteria and other contaminants into the system.

After these operations are accomplished the drill rig is usually replaced by a smaller rig which is used for the final phase of completing the well.

### *Development*

If a wildcat well becomes a discovery well (a well that yields commercial quantities of oil or gas), development wells will be drilled to confirm the discovery, to establish the extent of the field, and to efficiently drain the reservoir. The procedures for drilling development wells are about the same as for wildcats, except there is usually less subsurface sampling, testing, and evaluation. If formation pressure can raise oil to the surface, the well will be completed as a flowing well. Several downhole acid or fracture treatments may be necessary to enhance the formation permeability to make the well flow. When a well is "acidized," this refers to the process of placing acid in the well bore across the productive interval which causes the solution of some of the mineral materials (e.g.., calcite, dolomite, etc.) which reside around the pore space. Upon solution and removal of these minerals, porosity and permeability are enhanced. When a well is hydro-fractured, it simply means fluid, usually gelled water, is pumped down the well, through perforations in the casing and into the formation. Pumping pressures are increased to the point where the formation fractures or breaks, and sand is added to the injection fluid to "prop-open" the crack once the pressure is released. The pressures required to fracture a given formation is generally quite predictable based on rock type and depth. For some formations, especially coals, abnormally high pressures are required for fracture. Pressures, volumes, and rates are all measured and monitored during the fracture process. These parameters provide information as to how the formation is behaving and if the fracture is propagating within the desired interval (i.e., staying in zone). This is especially true in coals, as sustained "high" injection pressure indicates the fracture is moving

BLM_0048579

through the coal. If pressures fall off, it indicates the fracture has extended beyond the coals and the operation can be halted. In addition to using the foregoing parameters to monitor fracture behavior, other methods for fracture geometry and extent are available (e.g., tracer and tiltimeter surveys). Control is maintained throughout the fracture operation.

A free-flowing well is simply closed off with an assembly of valves, pipes, and fittings (called a Christmas tree) to control the flow of oil and gas to other production facilities. A gas well may be flared for a short period to measure the amount of gas per day the well can produce, then shut in or connected to a gas pipeline.

If the well is not free-flowing, it will be necessary to use artificial lift (pump) methods. These are explained, along with well production equipment and procedures, in the following section on production. After a pump is installed, the well may be tested for days or months to see if it is economically justifiable to produce the well and to drill additional development wells. During this phase, more detailed seismic work may be run to assist in precisely locating the petroleum reservoir and to improve previous seismic work.

Coal-bed methane wells generally require artificial lift to remove formation water which reduces the confining pressure causing gas to be released (desorbed) from the coals. Once the gas is freed from the coal surfaces, it moves toward the "pressure sink" which is the well bore. Once gas is liberated, it flows preferentially to the water (i.e., relative permeability is higher for gas); thereby reducing water production rates and increasing gas production rates. It is expected that in many cases the artificial lift equipment will no longer be necessary once sufficient gas flow is established.

As with wildcat wells, field development well locations will be surveyed. A well spacing pattern must be established by the State, with approval of the BLM.

Oil well spacing for production from Federal leases is usually a minimum of 40 acres. Most gas well spacing for production from Federal leases uses units of 160, 320, and 640 acres per well. Spacing for both oil and gas wells is based on the characteristics of the producing formation. If a field is producing from more than one formation, the surface location of the wells may be much closer than one per 40 acres. Once well spacing has been approved, development of the lease proceeds.

When lease or unit development is anticipated, an in depth transportation plan is prepared and the road system is greatly expanded as more wells are drilled.

Because it often takes several years to develop a field and determine field boundaries, the road system is usually built in segments based on information developed in the transportation plan.

Access roads are normally limited to an arterial or collector road to serve the lease areas, with a local road to each well. Generally, arterial and collector roads are 20-to-24 feet wide and local roads are normally 14-to-18 feet wide. These dimensions are for the driving surface of the road and do not account for additional surface disturbance related to ditches or cuts and fills. The steeper the side slopes, the more surface disturbance is required for a given driving surface. See tables on page F-1.

When an oil field is developed on the current minimum spacing pattern of 40 acres per well, the wells are 1,320 feet apart in both north-south and east-west directions. If a section (one square mile) is developed with 16 wells, at least four miles of access roads are built. In mountainous terrain, the length of access roads may be increased since steep slopes, deep canyons, and unstable soil areas must often be circumvented in order to construct stable access to the wells.

Surface use in a gas field may be similar to an oil field (though usually less) even though the spacing of wells is usually 160 acres. Though a 160-acre spacing requires only four wells per section, the associated pipeline system often has similar initial surface requirements (acreage of surface disturbance) particularly if pipelines are not placed in road corridors.

BLM 0048580

In addition to roads, other surface uses for development drilling may include flowlines; storage tank batteries; facilities to separate oil, gas and water (separators and treaters); and injection wells for salt water disposal. Some of the facilities may be installed at each producing well site, and others at places situated to serve several wells. These facilities are discussed more in the following production section.

As mentioned earlier, drilling in an undeveloped part of a lease to prevent drainage of petroleum to an offset well on an adjoining lease (protective drilling) is frequently required in fields of intermingled Federal and privately owned land. The terms of Federal leases require such drilling if the offset well is on nonfederal lands, or on Federal lands leased at a lower royalty rate.

Many fields go through several development phases. A field may be considered fully developed and produce for several years, then a well may be drilled to a deeper pay zone. Discovery of a new pay zone in an existing field is a "pool" discovery, as distinguished from a new field discovery. A pool discovery may lead to the drilling of additional wells--often from the same drilling pad as existing wells--with the boreholes separated only by feet or inches. Existing wells may also be drilled deeper.

Usually four-to-six inch diameter pipelines transport the petroleum between the well, the treating and separating facilities, and central collection points. These lines can be on the surface, buried, or elevated. Most pipelines in the Analysis Area are buried.

Trucking and pipelining are the two methods used separately or in conjunction to transport oil out of a lease or unitized area. Trucking is used to transport crude oil from small fields where installation of pipelines is not economical and the natural gas in the field is not economically marketable. It is not practical to truck natural gas.

Pipelines are the most common way to transport oil and gas. If a field has substantial amounts of natural gas, separate pipelines will be necessary for oil and gas. Pipelines move the oil from gathering stations to refineries. As existing fields increase production or new fields begin production, new pipelines may be needed. These new lines usually vary in size from 4 to 16 inches in diameter, and range in length from a few miles to tie into an existing pipeline, to hundreds of miles to supply a refinery. Construction of a pipeline requires clearing the right-of-way of vegetation, excavating the roadway and trench and hauling of equipment and materials. Blasting may be necessary in rocky terrain and construction of pumping stations and compressor stations may also be needed.

Natural gas pipelines transport gas from the wells (gathering or flow lines) to a trunk line then to the main transmission line from the area. Flow lines are usually two-to-four inches in diameter and may or may not be buried. Trunk lines are generally six-to-eight inches in diameter and are buried, as are transmission lines which vary in diameter from 10-to-36 inches. The area required to construct a pipeline varies from about 15 feet wide (for a two-to-four inch surface line) to greater than 75 feet for the larger diameter transmission lines (24-to-36 inches). Surface disturbance is primarily dependent on size of the line and topography of the area on which the line is being constructed.

Compressor stations may be necessary to increase production pressure to the same level as pipeline pressure. The stations vary in size from approximately one acre to as much as twenty acres for a very large compressor system.

Construction techniques for natural gas lines are similar to those used for oil pipelines.

### *Unitization*

Surface use in an oil and gas field may be affected by unitization of the leaseholds. In many areas with Federal lands, an exploratory unit is formed before a wildcat is drilled. The boundary of the unit is based on geologic data. The developers unitize the field by entering into an agreement to develop and

generate it as a unit, without regard to separate ownerships. Costs and benefits are allocated according to agreed terms.

Unitization reduces the surface-use requirements because all wells are operated as though on a single lease. Duplication of field processing facilities is minimized because development operations are planned and conducted by a single unit operator, often resulting in fewer wells.

The rate of development well drilling depends on whether the field is operated on an individual lease basis or unitized, the probability of profitable production, the availability of drilling equipment, protective drilling requirements (drilling requirements to protect Federal land from subsurface petroleum drainage by off-setting nonfederal wells), and the degree to which limits of the field are known. The most important development rate factor may be the quantity of production. If the discovery well has a high rate of production and substantial reserves, development drilling usually proceeds at a fairly rapid pace. If there is some question whether reserves are sufficient to warrant additional wells, development drilling may occur at a much slower pace. An evaluation period to observe production performance may follow between the drilling of successive wells.

Development on an individual lease basis usually proceeds more rapidly than under unitization, since each lessee must drill his own well to obtain production from the field. On a unitized basis, however, all owners within the participating area share in a well's production regardless of whose lease the well is on. Spacing requirements are not applicable to unit wells. The unit is developed on whatever the operator considers to be the optimal spacing pattern to maximize recovery.

## *Production*

Production in an oil field begins just after the discovery well is completed and is usually concurrent with development operations. Temporary facilities may be used at first, but as development proceeds and reservoir limits are determined, permanent facilities are installed. The extent of such facilities is dictated by the number of producing wells, expected production, volume of gas and water produced with the oil, the number of leases, and whether the field is to be developed on a unitized basis.

The primary means of removing oil from a well in the Analysis Area is by pumping jacks (familiar horsehead devices). The pumps are powered by electric motors (power lines required) or if there is sufficient casinghead gas (natural gas produced with the pumped oil), or another gas source is available, it may be used to fuel internal combustion engines.

Some wells drilled in the area produce sufficient water to require disposal during the operation of the well. Although most produced waters are brackish to highly saline, some are fresh enough for beneficial use. If water is to be discharged, it must meet certain water quality standards. Because water may not come from the treating and separating facilities completely free of oil, oil skimmer pits may be established between separating facilities and surface discharge.

Another method of disposing of wastewater is through subsurface injection. In Colorado, injection disposal wells are authorized by the Colorado Oil and Gas Conservation Commission (COGCC) under primacy of the U.S. Environmental Protection Agency. BLM engineers review the proposal for impacts to other minerals and groundwater, but have no approval authority over the well or target zone. When water is disposed of underground, it is always introduced into a formation containing water of equal or poorer quality. It may be injected into the producing zone from which it came or into other producing zones. In some cases, it could reduce the field's productivity and may be prohibited by State regulation or mutual agreement of operators. In some fields, dry holes or depleted producing wells are used for salt water disposal, but occasionally new wells are drilled for disposal purposes. Cement is squeezed between the casing and sides of the well to prevent the salt water from migrating up or down from the injection zone into other formations.

BLM_0048582

Underground oil is under pressure in practically all reservoirs. This pressure is usually transmitted to the oil through gas or water in the reservoir with the oil. When oil is pumped out of the well, pressure is reduced in the reservoir around the drill hole. This allows the gas or water in the reservoir to push more oil into the space next to the well. A reservoir that has mostly gas pushing the oil is called "gas drive," and one that has mostly water pushing the oil is called "water drive." Oil that is recovered under these natural pressures is considered primary production. Primary production accounts for about 25 percent of the oil in a reservoir.

Methods of increasing recovery from reservoirs generally involve pumping additional water or gas into the reservoir to maintain or increase the reservoir pressure. This process is called secondary recovery. Recently, the trend has been to institute secondary recovery processes very early in the development of a field. Surface disturbance from a water flooding recovery system is similar to drilling and development of an oil and gas well itself, i.e., a drill pad and access road are constructed and water pipelines may be built. Surface use is increased substantially since as many as four injection wells may be used for each oil well in the field (there are many different patterns as well as many other methods of secondary recovery).

Tertiary recovery methods increase recovery rates by lowering the viscosity of the oil either by heating it or by injecting chemicals into the reservoir so that the oil flows more easily. Heating of reservoir oil can be accomplished by injecting steam into the reservoir. Tertiary recovery methods are not yet widely used in this area. By the year 2000, ultimate recovery (including secondary and tertiary recovery) from any given oil reservoir is expected to average 40 percent nationally.

Crude oil is usually transferred from the wells to tank storage facilities (a tank battery) before it is transported from the lease. If it contains gas and water, they are separated before the oil is stored in the tank battery. The treating and separating facilities are usually located at a storage tank battery on or near the well site.

After the oil, gas, and water are separated, the oil is piped to storage tanks located on or near the lease. There are normally at least two tanks; so that one tank can be filling as the contents of the other are measured, sold, and transported. The number and size of tanks vary with the rate of production on the lease, and with the extent of automation in gauging the volume and sampling the quality of the tank's contents.

### *Horizontal Drilling*

The recent development of horizontal drilling holds promise of further reductions in disturbance of surface resources and values. Use of directional, horizontal, and multiple-completion drilling technology could further reduce the number of surface locations and provide greater flexibility in siting locations. These techniques will also increase production and ultimately lower costs of production. However, there are many problems with these techniques yet to be solved before they will come into wide spread use. The two most pressing of these problems in Colorado at the moment are interference with spacing patterns and the cost of the operations. Most industry experts agree that the latter will be solved through additional experience and some additional technical advances. The problem of spacing patterns for horizontal holes more directly involves Federal and State policy.

Current spacing patterns are based on the most efficient recovery of the resource. Spacing patterns in Colorado are set by the COGCC. Spacing patterns on Federal lands are also set by the COGCC, but with the concurrence of the BLM, who has the responsibility for Federal lands. If the BLM and State government were to set different spacing patterns, the result would be unsolvable drainage conflicts, lost revenues, and lost resource. It could also mean the drilling of more wells than are necessary as competing companies developed reservoirs under differing jurisdictions.

In Colorado, most fields are developed on a 40, 80, 160, 320, or 640 acre pattern. Forty acres is the spacing pattern authorized for all unspaced areas. However, most new field operators apply for larger

spacing based on reservoir characteristics soon after field discovery. The spacing pattern is based on the calculated area of reservoir rock which one well can drain. The calculations are based on conventional, that is vertical, wells.

Horizontal wells are drilled to the producing formation, or close to it, then proceed horizontally through the producing formation. The advantage to these wells is that much more of the reservoir rock is exposed to the bore hole, and therefore, more product may be produced through one well. In addition, more than one horizontal hole may be extended from the same vertical bore or even from the horizontal portion of the bore, thereby limiting additional surface use. Spacing patterns frequently must be adjusted to permit this type of development.

For example, a field with 40-acre spacing may have one horizontal well drilled in the northwest quarter of the northwest quarter with the horizontal portion running east all the way to the northeast quarter of the northeast quarter. This well would penetrate and produce all four of the northern tier of well spaces, thereby eliminating the need to drill three wells. The elimination of the need to drill three wells would require Federal and State approval to circumvent the spacing order. Real life examples may get much more complicated than this one.

In many cases, such as the simple example given above, the oil and gas operator may have to apply for a variance to the State spacing order. The BLM, FS and COGCC are committed to working with industry on these problems to take full advantage of the new technology.

### *Abandonment*

The life span of fields varies because of the unique characteristics of any given field. Reserves, reservoir characteristics, the nature of the petroleum, subsurface geology, and political, economic, and environmental constraints all affect a field's life span from discovery to abandonment. The life of a typical field is 15 to 40 years. Abandonment of individual wells may start early in a field's life and reach a maximum when the field is depleted.

Well plugging and abandonment requirements vary with the rock formations, subsurface water, well site, and the well. In all cases, all formations bearing usable-quality water, oil, gas, or geothermal resources, and/or prospectively valuable deposits of minerals will be protected. Generally, in a dry (never produced) well, the hole below the casing is filled with heavy drilling mud; a cement plug is installed at the bottom of the casing; the casing is filled with heavy mud, and a cement cap is installed on top. A pipe monument giving the location, lease number, operator, and name of the well is required unless waived by the Authorized Officer. If waived, the casing may be cut off and capped below ground level. Protection of aquifers and known oil and gas producing formations may require placement of additional cement plugs.

In some cases, wells that formerly produced are plugged as soon as they are depleted. In other cases, depleted wells are not plugged immediately but are allowed to stand idle for possible later use in a secondary recovery program. Truck-mounted equipment is used to plug former producing wells. In addition to the measures required for a dry hole, plugging of a depleted producing well requires a cement plug in the perforated section in the producing zone. If the casing is salvaged, a cement plug is put across the casing stub. The cement pumpjack foundations are removed or buried below ground level. Surface flow and injection lines are removed, but buried pipelines are usually left in place and plugged at intervals as a safety measure. After plugging, the drilling rig is removed and the surface, including the reserve mud pit if it has not been previously reclaimed,is restored to the requirements of the surface management agency. This may involve the use of dozers and graders to recontour those disturbed areas associated with the drill pad plus the access road to the particular pad. The reserve pit (the part of the mud pit in which a reserve supply of drilling fluid and/or water is stored) must be evaporated or pumped dry, and filled with soil material stockpiled when the site was prepared. The area will be reshaped to a configuration which will allow revegetation to take place, restore the landform as near as possible to its original contour, and minimize erosion. After grading the subsoil and spreading the stockpiled

BLM_0048584

Oil and Gas Leasing Analysis FEIS

topsoil, the site is seeded with a grass mixture that will establish good growth. A fence is normally erected to protect the site until revegetation is complete, particularly in livestock concentration areas.

BLM_0048585

# Appendix H - Mitigation and Monitoring

BLM 0048586

BLM_0048587

# Appendix H -
# Mitigation and Monitoring

## Mitigation

Mitigation, and standards and guidelines for oil and gas operations on NFS lands are expressed in Section 6 of the standard lease form (Form 3100-11; Offer to Lease and Lease for Oil and Gas), the BLM regulations at 43 CFR 3101.1-2 Surface Use Rights, the Forest Service oil and gas regulations (36 CFR 228.108), Onshore Oil and Gas Orders, the Forest Plan, the "Gold Book" (Oil and Gas Surface Operating Standards for Oil and Gas Exploration and Development) and Conditions of Approval that will be required prior to approval of the APD. Restrictions on surface use may also be imposed by specific nondiscretionary statutes such as: The Endangered Species Act, the Archaeological Resource Protection Act, the Clean Water Act, and the Clean Air Act. The following discussion represents general mitigation that is common to all alternatives except Alternative 3, the No Lease alternative.

## Section 6 of Form 3100-11

Form 3100-11, the "Offer to Lease and Lease for Oil and Gas", referred to as the standard lease form is a contract between the purchaser of a lease and the government. Section 6 of the standard lease form contains provisions for the conduct of operations. The following is Section 6 of the standard lease form:

> *Sec. 6. Conduct of operations - Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. Lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. To the extent consistent with lease rights granted, such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with rights of lessee.*

> *Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of the procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short term special studies under guidelines provided by lessor. If in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.*

The BLM regulations at 43 CFR 3101.1-2 provides some clarification of what constitutes reasonable measures. The regulations state that the authorized officer may require reasonable measures to minimize adverse impacts to other resource values, other uses or users not addressed in the lease stipulations at the time operations are proposed. *To the extent consistent with lease rights granted, such reasonable measures may include, but are not limited to, modification of siting or design of facilities, timing of operations, and specification of interim and final reclamation measures.*

BLM_0048588

Oil and Gas Leasing Analysis FEIS

# Surface Use Requirements
# (Forest Service regulations at 36 CFR 228.108)

Surface use requirements in the Forest Service oil and gas regulations (36 CFR 228.108) are as follows:

*(a) General. The operator shall conduct operations on a leasehold on National Forest System lands in a manner that minimizes effects on surface resources, prevents unnecessary or unreasonable surface resource disturbance, and that is in compliance with the other requirements of this section.*

*(b) Notice of operations. The operator must notify the authorized Forest officer 48 hours prior to commencing operations or resuming operations following their temporary cessation (36 CFR 228.111).*

*(c) Access facilities. The operator shall construct and maintain access facilities to assure adequate drainage and to minimize or prevent damage to surface resources.*

*(d) Cultural and historic resources. The operator shall report findings of cultural and historic resources to the authorized Forest officer immediately and, except as otherwise authorized in an approved surface use plan of operations, protect such resources.*

*(e) Fire prevention and control. To the extent practicable, the operator shall take measures to prevent uncontrolled fires on the area of operation and to suppress uncontrolled fires resulting from the operations.*

*(f) Fisheries, wildlife and plant habitat. The operator shall comply with the requirements of the Endangered Species Act of 1973 (16 USC 1531 et seq.) and its implementing regulations (50 CFR chapter IV), and, except as otherwise provided in an approved surface use plan of operations, conduct operations in such a manner as to maintain and protect fisheries, wildlife, and plant habitat.*

*(g) Reclamation.*

> *(1) Unless otherwise provided in an approved surface use plan of operations, the operator shall conduct reclamation concurrently with other operations.*
>
> *(2) Within 1 year of completion of operations on a portion of the area of operation, the operator must reclaim that portion, unless a different period of time is approved in writing by the authorized Forest officer.*
>
> *(3) The operator must:*
>
> > *(i) Control soil erosion and landslides;*
> >
> > *(ii) Control water runoff;*
> >
> > *(iii) Remove, or control, solid wastes, toxic substances, and hazardous materials;*
> >
> > *(iv) Reshape and vegetate disturbed areas;*
> >
> > *(v) Remove structures, improvements, facilities and equipment, unless otherwise authorized; and*
> >
> > *(vi) Take such other reclamation measures as specified in the approved surface use plan of operations.*

BLM_0048589

*(h) Safety measures.*

*(1) The operator must maintain structures, facilities, improvements, and equipment located on the area of operation in a safe and neat manner and in accordance with an approved surface use plan of operations.*

*(2) The operator must take appropriate measures in accordance with applicable Federal and State laws and regulations to protect the public from hazardous sites or conditions resulting from the operations. Such measures may include, but are not limited to, posting signs, building fences, or otherwise identifying the hazardous site or condition.*

*(i) Wastes. The operator must either remove garbage, refuse, and sewage from National Forest System lands or treat and dispose of that material in such a manner as to minimize or prevent adverse impacts on surface resources. The operator shall treat or dispose of produced water, drilling fluid, and other waste generated by the operations in such a manner as to minimize or prevent adverse impacts on surface resources.*

*(j) Watershed protection.*

*(1) Except as otherwise provided in the approved surface use plan of operations, the operator shall not conduct operations in areas subject to mass soil movement, riparian areas and wetlands.*

*(2) The operator shall take measures to minimize or prevent erosion and sediment production. Such measures include, but are not limited to, siting structures, facilities, and other improvements to avoid steep slopes and excessive clearing of land.*

# Onshore Oil and Gas Orders

All operations on a Federal oil and gas lease by the operator are subject to Onshore Oil and Gas Orders. They can be issued by the Chief of the Forest Service or the Director of the BLM. The objective of oil and gas orders is to promote the orderly and efficient exploration, development and production of oil and gas (43 CFR 3160).

## Order No. 1, Approval of Operations on Onshore Federal and Indian Oil and Gas Leases

Establishes procedures for obtaining approval to drill wells and conduct subsequent operations on oil and gas leases. This includes: requirements of Application(s) for Permit to Drill and Surface Use Plan(s) of Operations which must be submitted and approved prior to drilling a well; subsequent operations requiring additional approval, and the required forms (Notice(s) of Intent and Sundry Notice(s)); operating standards related to cultural and historic resources, endangered species, watershed protection, safety and reclamation.

## Order No. 2, Drilling Operations

Details the standards for minimum levels of performance expected from lessees and operators when conducting drilling and abandonment operations on Federal and Indian lands. Also identifies enforcement actions that will result when violations are found and not corrected in a timely manner.

BLM 0048590

Oil and Gas Leasing Analysis FEIS

## Order No. 3, Site Security

Establishes minimum standards for site security by providing a system for production accountability and covers use of seals, by-passes, self-inspection, transporters' documentation, reporting incidents of unauthorized removal or mishandling of oil and condensate, facility diagrams, record keeping and site security plans. Identifies acts of noncompliance, establishes allowable periods to correct noncompliance, provides for variances. Informs operators of rights under this order.

## Order No. 4, Measurement of Oil

Establishes requirements and minimum standards for the measurement of oil, standard operating practices for lease oil storage and handling. Establishes periods to correct noncompliance, and informs operators of rights under this order.

## Order No. 5, Measurement of Gas

Establishes requirements and minimum standards for measurement of gas on Federal and Indian oil and gas leases. Establishes periods to correct noncompliance and the penalties that will result for failure to correct noncompliance. Also informs operators of rights under this order.

## Order No. 6, Hydrogen Sulfide Operations

Identifies necessary applications, approvals and reports; specific operating requirements for drilling, completion, workover and production operations in a hydrogen sulfide environment. Details enforcement actions and allowed variances from standards.

## Order No. 7, Disposal of Produced Water

Specifies requirements for submittal of application for disposal of produced water; the design, construction and maintenance requirements for pits; the minimum standards to satisfy requirements and procedures for seeking variance from minimum standards. Also specifies noncompliance, corrective actions required and period allowed for correction.

# Forest Plan Requirements for Surface Use

The Forest Plan provides long-range management direction for the Forest. All outstanding and future permits, and other occupancy and use subject to valid existing rights, must be consistent with the Forest Plan. The Forest Plan specifies management direction and standards and guidelines to be applied at the project level. The following are excerpts from the Forest Plan general Forest-wide management direction as applicable to oil and gas operations.

### *Visual Resource Management*

- Blend soil disturbance into natural topography to achieve a natural appearance, reduce erosion, and rehabilitate ground cover.

- Revegetate disturbed soils. In large projects this may have to be done in stages.

- Revegetate disturbed soils by the following growing season.

- Choose facility and structure design, color of materials, location and orientation to meet the adopted visual quality objective for the management area.

BLM_0048591

### *Aquatic and Terrestrial Habitat Management*

- Restrict activities within one mile of known bighorn sheep lambing grounds from May 1 - June 20 if they would cause unacceptable stress to lambing ewes.

- No activities shall be allowed within a quarter mile of an active Ferruginous hawk, Swainson's hawk, goshawk, osprey or prairie falcon nest from March 1 - July 31 if they would cause nesting failure or abandonment.

### *Wildlife and Fisheries Threatened, Endangered, and Sensitive Species*

- No activities shall be allowed within a mile of an active bald eagle or peregrine falcon nest from February 1 to July 31 if they would cause nesting failure or abandonment.

### *Riparian Areas*

- Locate and construct all roads to maintain the basic natural condition and character of riparian areas.

### *Water Resource Improvement and Maintenance*

- Reduce to natural rate any erosion due to management activity in the season of disturbance and sediment yields within one year of the activity through necessary mitigation measures such as water barring and revegetation.

- Allow use of heavy construction equipment, residue removal, etc., during periods when the soil is least susceptible to compaction or rutting.

- Proposed land use facilities (roads and buildings) should not be located within floodplain boundaries for the 100 year flood. Protect present and future facilities that cannot be located out of the 100 year floodplain by structural mitigation deflection structures (riprap, etc.).

### *Soil Resource Management*

- Maintain soil productivity, minimize man-caused soil erosion and maintain the integrity of associated ecosystems.

- Use site preparation methods which are designed to keep fertile, friable topsoil essentially intact.

- Give roads special design considerations to prevent resource damage on capability areas containing soils with high shrink-swell capacity.

- Provide adequate road cross drainage to reduce sediment transport energy.

- Revegetate all areas, capable of supporting vegetation, disturbed during road construction and/or reconstruction to stabilize the area and reduce soil erosion. Use less palatable plant species on cuts, fills, and other areas subject to trampling damage by livestock and big game to discourage grazing by herbivores.

- Prevent livestock and wildlife grazing which reduces the percent of plant cover to less than the amount needed for watershed protection and plant health.

BLM_0048592

- Provide permanent drainage and establish protective vegetative cover on all new temporary roads or equipment ways, and all existing roads which are being removed from the transportation system.

### *Transportation System Management*

- Close all newly constructed roads to public motorized use unless:

   1) Use does not adversely impact other resources.

   2) Use is compatible with the ROS class established for the area.

   3) They are located in areas open to motorized use.

   4) They provide user safety.

   5) They serve an identified public need.

   6) The area accessed can be adequately managed.

   7) Financing is available or can be arranged for maintenance.

### *Local Road Construction and Reconstruction*

- Construct and reconstruct local roads to provide access for specific resource activities with the minimum amount of earthwork.

### *Air Resource Management*

- Comply with State and Federal air quality standards.

## Management Prescription Standards and Guidelines

For each of the management areas on the Forest, general management direction and standards and guidelines have been developed. This information is also displayed in the Forest Plan. The following discussion focuses on oil and gas activities by management area, i.e., the standard and guidelines relate to activities applicable to specific land areas. Note that some of the management areas do not have direction and/or standards and guidelines that relate to the type of activities expected with oil and gas operations.

### *Management Prescription 1D*

The goal of this prescription is to provide transmission corridors that blend with the local environment.

- All design, materials and construction, operation, maintenance and termination practices employed with oil pipelines shall be in accordance with safe and proven engineering practices and shall meet or exceed the following:

   1) USA Standard Code for Pressure Piping, ANSI B 31.4 "Liquid Petroleum Transportation Systems"

   2) Department of Transportation Regulations, 49 CFR part 195, "Transportation of Liquids by Pipeline".

- All design, materials and construction, operation, maintenance and termination practices employed with gas pipelines shall be in accordance with safe and proven engineering practices and shall meet or exceed the following:

BLM_0048593

1) ASME Gas Piping Standards Committee, "Guide for Gas Transmission and Distribution Piping System" (3rd edition, April 1976).

2) Department of Transportation Regulations, 49 CFR part 192, "Transportation of Natural and other Gas by Pipelines: Minimum Federal Safety Standards".

## *Management Prescription 2A*

The goal for this management area is to provide for a semi-primitive motorized recreation experience.

- Design and implement management activities to provide a visually appealing landscape.

- Roads will not exceed design guides specified in FSH 7709.56 for local roads.

- Do not exceed an average open local road density of 2 miles/square mile in fourth order watersheds.

## *Management Prescription 2B*

The goal for this management area is to provide for a rural or roaded natural recreation experience.

- Design and implement management activities to provide a visually appealing landscape.

## *Management Prescription 3A*

The goal for this management area is to provide a semi-primitive non-motorized recreation experience.

- Design and implement management activities to provide a visually appealing landscape.

- Specific land areas or travel routes may be opened seasonally and with specific authorization to accomplish resource management activities.

- Local roads may be constructed for non-recreation purposes. Close local roads to public motorized use, and prohibit off-road vehicle (ORV) use.

## *Management Prescription 4B*

The goal for this management area is to optimize habitat capability for all management indicator species.

- Design and implement management activities to provide a visually appealing landscape.

- Manage road use to provide for habitat needs of management indicator species, including road closures and area closures, and to maintain habitat effectiveness.

BLM 0048594

Oil and Gas Leasing Analysis FEIS

### *Management Prescription 4D*

The emphasis of this management area is on aspen management.

- Manage road use to provide for habitat needs of management indicator species, including road closures and area closures, and to maintain habitat effectiveness.

### *Management Prescription 5A and 5B*

The goals of these management areas are to optimize habitat capability for big game on nonforested and forested winter range, respectively.

- Design and implement management activities to provide a visually appealing landscape.

- Road traffic and road cut or fill slopes must not block big game movement in delineated migration routes or corridors.

- Allow new roads in the management area only if needed to meet priority goals on the management area or to meet big game goals on the management area. Obliterate temporary roads within one season after planned use ends. New permanent or temporary roads constructed in the management area must meet the following criteria:

1) There is no feasible alternative to build the road outside the area, and the road is essential to achieve priority goals and objectives of contiguous management areas, or to provide access to land administered by other government agencies or to contiguous private land.

2) The State Fish and Wildlife agency has been fully involved in the road location planning and alternative evaluation.

3) Planned management of road use during winter will prevent or minimize disturbance of wintering big game animals, or will allow hunting or other management activities needed to meet management objectives.

4) Roads are constructed to the minimum standards necessary to provide safety for the road use purpose.

5) Roads cross the winter range in the minimum distance feasible to facilitate the necessary use.

6) Road traffic and road cut or fill slopes must not block big game movements in delineated migration routes or corridors.

- During winter close existing roads, prohibit off-road vehicle use and manage non-motorized use to prevent stress. Opening of existing roads during winter can be approved if the following criteria are met:

1) There is no reasonable alternative for owners or managers of contiguous private land or public land to reach their lands during winter.

2) Road use, off-road vehicle use, or non-motorized use of the area is essential and is the minimum necessary to meet priority goals and objectives.

3) The State Fish and Wildlife Agency is fully involved in planning human use of the area during winter.

BLM 0048595

### *Management Prescriptions 6A and 6B*

The goal of the 6A management area is to improve soil and vegetation condition and provide forage for livestock production.

The goal of the 6B management area is to maintain soil and vegetation condition and provide forage for livestock production.

- Design and implement management activities to blend with the natural landscape.

### *Management Prescription 9A*

The goal for this management area is to provide for an upper mid-seral self perpetuating plant community. Meet established water quality standards.

- Design and implement management activities which sustain inherent visual values of riparian areas and blend with the natural surrounding landscapes. Do not exceed an adopted visual quality objective of partial retention.

- Proposed new land-use facilities (roads and buildings) will not normally be located within floodplain boundaries for the 100-year flood. Implement mitigation measures when present or unavoidable future facilities are located in the active floodplain to ensure that State water quality standards, sediment threshold limits, bank stability criteria, flood hazard reduction, and instream flow standards are met during and immediately after construction and to protect life and property.

- Limit sediment yield within threshold limits. Prescription-induced water yield increases should not exceed prescribed thresholds of allowable increase nor should the total yield of water and sediment exceed maximum allowable amounts. Treat disturbed areas, resulting from management activities, to limit sediment yields to acceptable levels during the construction field season.

- Require concurrent monitoring during mitigation to ensure that mitigative measures are effective and in compliance with State water quality standards.

- Rehabilitate and stabilize disturbed soil areas where unacceptable impacts would occur.

- Allow use of heavy equipment on a case-by-case basis. If heavy equipment is required for construction, it will be used only when the soil will not be susceptible to permanent damage.

- Minimize detrimental disturbance to the riparian area by mineral activities. Initiate timely and effective rehabilitation of disturbed areas and restore riparian areas to state of productivity comparable to that before disturbance.

1) Prohibit the depositing of soil material from drilling, processing, or site preparation in natural drainageways.

2) Locate the lower edge of disturbed or deposited soil banks outside the active floodplain.

3) Prohibit stockpiling of topsoil or any other disturbed soil in the active floodplain.

4) Prohibit mineral processing activities within the active floodplain.

BLM_0048596

> 5) Discontinue heavy equipment use when soil compaction, rutting and pud-
> dling are present.

- Locate mineral removal activities away from the water's edge or outside the riparian area.

> 1) Locate drilling mud pits outside the active floodplain unless alternate
> locations are more environmentally damaging. If location is unavoidable, seal
> and dike all pits to prevent leakage.

> 2) Drain and restore roads, pads, and drill sites immediately after use is
> discontinued. Revegetate to 80 percent of ground cover in the first year.
> Provide surface protection during stormflow and snowmelt runoff events.

- Locate roads and trails outside riparian areas unless alternative routes have been reviewed and rejected as being more environmentally damaging.

> 1) Do not parallel streams when road location must occur in or adjacent to
> riparian areas except where absolutely necessary. Cross streams at right
> angles.

> 2) Necessary streamcourse crossings will insure fish passage, non-erosive water
> velocities and channel stability, and insure erosion control on cuts, fills and
> road surfaces.

- Create artificial sediment traps with barriers where the natural vegetation is inadequate to protect waterway or lakes from accelerated sedimentation.

> 1) Create temporary sediment traps to prevent construction induced sedimen-
> tation; emphasize the use of natural materials.

- Minimize detrimental disturbance to the riparian area by construction activities.

> 1) Complete or treat active construction projects prior to expected significant
> runoff periods to minimize sediment yields.

> 2) Initiate timely and effective rehabilitation of disturbed areas and restore
> riparian areas so that a vegetation ground cover, or suitable substitute, protects
> the soil from erosion and prevents increased sediment yield.

## *Management Prescription 10A*

The goal of this management area is to provide for Research Natural Areas.

- Generally, physical improvements, such as roads are not permitted.

## *Management Prescription 10E*

The goal of this management area is to provide for municipal watersheds and municipal water supply watersheds.

- Prevent soil surface compaction and disturbance in riparian ecosystems. Allow use of heavy construction equipment for construction, residue removal, etc., during periods when soil is least susceptible to compaction or rutting.

BLM_0048597

- Proposed land use facilities (roads and buildings) should not be located within floodplain boundaries for the 100-year flood. Protect present and future facilities that cannot be located out of the 100-year floodplain by structural mitigation (deflection structures, riprap, etc.)

- Immediately rehabilitate man-caused disturbances and restore burned areas. Inspect rehabilitated areas annually and provide maintenance necessary to protect the watershed.

# The "Gold Book" Surface Operating Standards

The "Gold Book" was prepared by the BLM/Forest Service Rocky Mountain Regional Coordinating Committee (January 1989) to aid the oil and gas operator in permit approval and conduct of oil and gas operations on Federal lands, from exploration to development and production, to abandonment.

## Geophysical Operations

- The operator is required to file an application for a prospecting permit. The application will include maps showing access routes and location of lines and other activities.

## Procedural Guidelines

- Access roads and pipelines outside the leasehold or unitized area require a special-use permit.

- Bonding is required (36 CFR 228.109) to protect the government against losses associated with failure to meet royalty obligations, plugging wells not properly abandoned on a lease, and/or surface restoration and cleanup on abandoned operations.

## Well Sites

- To the extent permitted by the geologic target the locations for well sites, tank batteries, pits, and pumping stations, etc., should be planned to minimize long-term disruption of the surface resources. Design and construction techniques and other practices should be employed that would minimize surface disturbance and effects on other resources, and maintain the reclamation potential of the site.

- Construction procedures must conform to the approved Surface Use Plan of Operations.

- Soil stockpile locations should be located so wind and water erosion are minimized and reclamation potential is maximized.

- Fills should be completed to minimize the chance of slope failure. Snow and frozen soil material shall not be used in the construction of fill areas and pits.

- The drill rig, tanks, heater-treater, etc., are not to be placed on uncompacted fill material. The area used for mud tanks, generators, mud storage, and fuel tanks should be graded for drainage.

## Roads and Access Ways

- All permanent roads constructed by nongovernment entities across NFS lands must be designed by, or constructed under the direction of, a licensed professional engineer.

BLM_0048598

- In areas of high environmental sensitivity, special road location, design and construction techniques may be required.

- When access involves the use of an existing road, the operator may be required to contribute to road maintenance.

- Road survey, design, design drawings and templates, and construction requirements vary by class of road (temporary, local, collector or arterial).

## *Drainage and Drainage Structures*

- The most economical control measure should be designed to meet resource and road management objectives and constraints.

- Ditch grades should be no less than 0.5 percent to provide positive drainage and avoid siltation.

- All culverts should be laid on natural ground or at the original elevation of any drainage crossed. Culverts should be placed on a 3 percent minimum grade; reverse camber is not allowed. The outlet of all culverts should extend at least one foot beyond the toe of any slope.

- 18 inches is the minimum diameter allowable for a ditch relief culvert.

- Engineering approval at the Regional Office will be required for all major culverts and/or bridges with an end opening of 35 square feet or greater.

## *Road Maintenance*

- Users may perform their share of road maintenance or may be required to deposit sufficient funds to provide for their share of road maintenance costs.

- A road maintenance plan for all roads constructed or used in conjunction with the drilling program may be required. Maintenance activities normally required include: blading, surface replacement, dust abatement, spot repairs, slide removal, ditch cleaning, culvert cleaning, brush removal, litter cleanup, weed control, and snow removal.

## *Pipelines and Flowlines*

- Flowline routes should take advantage of road locations wherever practicable to minimize surface disturbance.

## *Drilling Operations*

- All proposed drilling operations and related surface disturbance activities, as well as any change from an approved APD must be approved before such activities are conducted.

- The well location must be staked and access roads to be constructed flagged prior to the onsite predrill inspection. Staking includes the well location, two 200-foot directional reference stakes, the exterior dimensions of the drill pad, reserve pit, other areas of surface disturbance, cuts and fills, and centerline flagging of new roads with

BLM 0048599

road stakes being visible from one to the next. Cut and fill staking is required for the well site,reserve pit and any ancillary facilities.

## *Producing Operations*

- Drilling and production reports are required to be submitted to the Minerals Management Service according to their regulations.

- A Well Completion or Recompletion Report and Log, Form 3160-4, is required to be filed within 30 days after completion of a well either for abandonment or production.

- Subsequent well operations to perform casing repair, alter casing, perform nonroutine fracturing jobs, recomplete a different interval, perform water shut-off, commingling production between intervals and/or conversion to injection or disposal well, etc., will require the submission of a Sundry Notice for prior approval.

- A subsequent report of routine fracturing or acidizing jobs, or recompletion in the same interval operations must be filed on Sundry Notices and Reports of Wells (Form 3160-5) within 30 days of completion of the operations.

- When additional surface disturbance will occur, a description of any subsequent new construction, reconstruction or alteration must be submitted to the authorized officer for environmental review and approval.

- Disposal of produced water by disposal/injection wells requires permit(s) from the State, EPA, the surface management agency (FS or BLM), and must be in accordance with applicable Onshore Oil and Gas Orders.

- All spills or leakages of oil, gas, produced water, toxic liquids or waste materials, blowouts, fires, personal injuries, and fatalities shall be reported by the operator to the BLM/FS in accordance with requirements of Notice to Lessees - 3A (NTL-3A), Reporting of Undesirable Events, or an Applicable Onshore Oil and Gas Orders. The BLM required immediate reporting of all Class I events (more than 100 barrels of fluid/500MCF of gas released or fatalities involved).

- Firewalls/containment dikes are to constructed and maintained around all storage facilities/batteries.

- Inspections of leasehold operations are made to ensure compliance with applicable laws, regulations, lease terms, Onshore Oil and Gas Orders, NTL's and other written orders of the authorized officer.

## *Reclamation and Abandonment*

- A reclamation plan will be part of the Surface Use Plan of Operations. Reclamation may be required of any surface previously disturbed that is not necessary for continued well operations.

- Well abandonment operations may not be started without prior approval of the Sundry Notices and Reports on Wells (Form 3160-5).

- Disturbed areas should be revegetated after the site has been prepared. The operator will be advised as to species, methods of revegetation and seasons to plant. Seeding and/or planting should be repeated until satisfactory revegetation is accomplished, as determined by BLM/FS.

BLM_0048600

- All activities which alter landforms, disturb vegetation or require temporary or permanent structures will comply with visual resource management objectives for the area.

- Pipelines and flowlines will be reclaimed and abandoned in accordance with an approved reclamation plan.

- Well sites will be reclaimed/recontoured to prevent erosion and encourage establishment of vegetation.

- Roads not on the SMA transportation system will be abandoned, closed, and obliterated. Reclamation will involve recontouring and revegetation to conform to the approved reclamation plan.

- A Final Abandonment Notice (FAN) must be filed upon completion of reclamation operations. Final abandonment will not be approved until the surface reclamation work required by the APD had been completed and accepted.

# Conditions of Approval

A Condition of Approval (COA) is an assembly of the provisions or requirements under which an Application for a Permit to Drill (APD) is approved. The mitigation measures listed in this appendix represent the post-lease environmental protection to which the Forest Service is committed as a result of the analysis in this EIS. These COA's may be applied in addition to other requirements such as the Forest Plan, the regulatory and statutory requirements, and the Onshore Oil and Gas Orders. There may be some overlap between the COA's and the mitigation measures described previously in this appendix.

Some or all of these COA's may apply to some or all oil and gas development activities and associated rights-of-way for all alternatives. **The Authorized Officer will choose among these measures at the APD stage to mitigate environmental impacts identified in the site specific analysis. The selection of COA's will be made in the decision document analyzing the effects of the lessee's proposal for ground disturbing activity.**

Note that there is no commitment to the specific wording of a COA. The Authorized Officer is not limited to the COA's shown here. New COA's may be developed based on new information available at the APD stage, as long as the new COA's conform with the limitations of the granted lease rights and are consistent with this EIS and subsequent amendments. COA's are not attached to APD approval documents if they are not applicable on the lease in question.

The COA's shown in this appendix apply to all lease alternatives, and will apply to the alternative chosen in the Record of Decision.

## Standard COA's

### *Pre-activity Inventories*

When ground disturbing activities are proposed, inventories may be required to determine appropriate mitigation. The inventories shall be completed prior to approval of operating plans. Inventories may include:

1. Aquatic biota and riparian areas.
2. Known or realistically potential habitat for threatened or endangered species.

BLM_0048601

3. Sensitive species' habitat such as bighorn sheep lambing areas, elk calving areas, raptors, etc.

4. Areas of identified unstable slopes may require a geotechnical survey.

5. Cultural resource surveys. Guidance is provided in: "Handbook for Cultural Resources Inventory/Mitigation" (Colorado State Office Release 8-13), dated 1990. A Notice to Lessees for Cultural Resource Surveys, NTL-85-1-CO, will be attached to all leases issued by Colorado State BLM.

6. Vegetation. Appropriate survey method will be determined at APD.

7. Baseline water quality data.

## *Mitigation Plans*

The following mitigation plans will be required prior to ground disturbing activities. The Surface Use Plan of Operations will include this information.

A Soil and Water Mitigation Plan shall be prepared for all ground disturbing projects. It is described as follows:

(1) <u>Prior</u> to construction activities, a detailed Erosion Control and Water Quality Monitoring Plan, hereafter called Erosion Control Plan, will be developed by the proponent which includes site-specific location of all mitigation measures. The Plan will be approved by the Forest Service before implementation begins. The Erosion Control Plan will be jointly administered by the Forest Service and the proponent.

(2) The Erosion Control Plan will contain specific measures or best management practices (BMP's) for minimizing or eliminating the nature and degree of specific impacts which may occur from oil and gas leasing activities. The mitigation measures are designed to be practical for on-the-ground implementation. They are not tied to site-specific locations at this time, due to the current broad scope of this project. There are numerous temporary and permanent erosion-control measures available, but mitigation that works well in certain locations may not be acceptable in other areas. BMP's include such measures as soil stabilization practice, re-vegetation, slope stabilization, velocity controls, sediment barriers, retention ponds etc.

Soil stabilization and re-vegetation practices include seeding, mulching, timing of construction activity and fertilization. Slope stabilization practices include netting, surface roughing, mulching, retaining walls, rip rapping. Velocity control practices include slope drains, spreaders, energy dissipaters, check dams, drop structures, diversion berms. Sediment barriers include straw bales, filter fence, inlet protection, siltation berms and siltation traps.

These specific mitigation measures that are identified as part of the Erosion Control Plan will be incorporated in the Surface Use Plan of Operations. Monitoring will be required to ensure that the specific mitigation measures are in place and are effective.

(3) The Erosion Control Plan is developed to address adverse impacts to the soil resource incurred through implementation of oil and gas development, and to protect water quality and aquatic life, as identified in Chapter IV of this EIS.

(4) Mitigation is required by the Forest Service, for impacts on National Forest System lands. The Erosion Control Plan will outline the Forest Service's authority and responsibility and the proponents authority and responsibility for implementing the Mitigation Plan, and for monitoring construction activities and mitigation measures.

BLM_0048602

Cultural resources discovered during the survey will have to be evaluated for significance according to the criteria for National Register eligibility. If determined eligible, the cultural resource should be avoided. A mitigation program will be designed and implemented for all significant cultural properties that cannot be avoided.

All companies will have a Spill Prevention Control and Countermeasure Plan (SPCC plan), Federal Register, Volume 38, No. 237 - Part II, Oil Pollution Prevention. Monitoring techniques, frequency and methodologies will be developed and included in activity plans. The monitoring level will be determined after an evaluation of the resource and potential impacts.

## General Conditions for all Site-Disturbing Activities

Well pads, roads, and facilities will be located to minimize visual impacts.

All operations will be conducted in a manner that avoids jeopardizing protected fisheries, invertebrates, wildlife, plants, and their habitats in compliance with the Endangered Species Act of 1973, and its implementing regulations.

If historic or archaeological materials, cave systems, or paleontological resources are uncovered during construction, the operator shall immediately stop any work that might further disturb such materials and contact the Forest Service. The operator shall immediately bring to the attention of the Authorized Officer any and all antiquities or other objects of historical, paleontological, or scientific interest, including, but not limited to, prehistoric or historic ruins or artifacts discovered as a result of operations. The operator and the Authorized Officer shall consult and determine the best option for avoiding or mitigating site damage.

Operators shall remind all personnel in the area associated with the project that the removal, injury, defacement, or alteration of any object of scenic, archaeological, historical, or scientific interest is a Federal crime and may be punishable by fine and/or jail terms.

All merchantable timber harvested from site clearings shall be purchased by the operator at the appraised price, as determined by the Forest Service.

Fire precautions required of timber sale purchasers will be required of lessees. Refer to timber sale contract provisions FS-2400-6 (T), section BT 7.0 and special provision R2-CT 7.2.

Linear-type facilities such as roads, power lines, and pipelines shall use the same route unless otherwise approved by the Authorized Officer. Surface disturbance will be minimized.

Activities may be curtailed during periods when the soil and/or road subgrade is saturated.

Trash and garbage from all leasing operations must be contained in a closed receptacle and hauled to an approved county landfill. EPA listed nonexempt waste must be contained in a closed receptacle and recycled or disposed of at approved sites.

Raptor nests will be protected from all development activities.

All known populations of sensitive fish, wildlife and plants, and identified high priority remnant vegetation associations will be protected from surface disturbing activities. The area of protection will include the actual location of the populations or occurrences of important associated vegetation and shall be determined in consultation and coordination with the Colorado Natural Areas Program (CNAP).

Those populations/occurrences, which analysis determines needs protection shall be protected by: (1) requiring relocation or rerouting of proposed well sites, pipelines, roads, other surface facilities, etc.,

or (2) applying other protective mitigation (i.e., fencing). Forest Service will require operator to effectively mitigate potential impacts to important populations/occurrences.

Intensive wildlife habitat development schemes and mitigation measures should be implemented by the operator, to increase carrying capacities for wildlife to offset losses incurred during the operations. This will attempt to replace habitat lost through road construction and well site development.

Actions in all riparian types will be managed to maintain: (1) vegetation and soil conditions that sustain over 80% of capable ground cover of plants and litter; and (2) stable stream channels and favorable water quality and aquatic habitat.

Land vehicles in stream channels are prohibited except at designated crossings.

An area specific Waste Management Plan will be required at the time of the APD, as part of the SUPO.

Use filter strips along lakes, wetlands and streams to trap sediment before it reaches water bodies and impairs channel stability or aquatic habitat. Maintain over 80% of capable ground cover of plants and litter in filter strips. Design filter strip width, considering types of actions, vegetation, soils, and topography, to have over an 80% chance of trapping all sand size sediment.

Ensure that all activities maintain instream flows needed to protect channel stability, aquatic habitat, and riparian vegetation.

All reserve mud pits will be closed systems in municipal watersheds.

No roads will be permitted within 1/4 mile of surface water intake or spring developments in municipal watersheds (depending on the terrain).

No well pads, pipelines, storage sites or work areas will be permitted within 1/4 mile of surface water intakes or spring developments in municipal watersheds (depending on the terrain).

No disposal of wastewater will be allowed by subsurface injection. Produced water will be disposed off the National Forest in an EPA approved site unless water quality meets State standards.

No surface water diversions will be permitted.

Locate crew campsites out of key wildlife habitats.

Firearms and dogs for crew personnel should not be allowed in camps or on the job.

The wellsite should not be located on or near key wildlife habitats.

Firearms, ATV, motorcycle and snowmobile use by crew personnel should be prohibited.

When the Forest Service finds that pre-existing special use permit holders, such as outfitter guides, those whose most recent permit issuance date preceeds the issuance of a specific oil and gas lease, are significantly impacted under the "Nonexclusive Use" clause*, the lessee, the Forest Service and the special use permittee shall develop acceptable mitigation through timing activities to avoid impacts, negotiating impact payments to the permittee, relocating the permittee's rights, or other acceptable means. *[Nonexclusive Use Clause: This permit is not exclusive; that is, the Forest Service reserves the right to use or permit others to use any part of the area for any purpose, provided such use does not interfere with the rights and privileges hereby authorized.]

BLM_0048604

Oil and Gas Leasing Analysis FEIS

### *Road Construction and Operations*

Existing roads will be used to the extent possible. Additional roads, if needed, shall be minimized and approved by the Forest Service prior to construction. Upon determination of an impending field development, a transportation plan will be prepared by the proponent to reduce unnecessary access roads, control public access and minimize impacts to previously unroaded habitat.. Roads will be constructed and maintained to Forest Service road standards unless otherwise approved. General standards are contained in the Gold Book.

Locate and design roads and drainage structures to prevent road or slope failure and minimize impacts to water quality. Locate service and refueling areas on ridges or benches upslope from floodplains and terraces, prevent spills offsite.

Roads will be located outside of riparian areas unless alternative routes have been reviewed and rejected as being more environmentally damaging. Cross streams perpendicular to channels on as gentle grades and slopes as possible. Install all crossings in manner that maintains stable channels and favorable water quality and aquatic habitat.

Locate new facilities outside of the 100 year floodplain. If not possible, facilities should be designed for and protected from a 100 year event.

All new roads shall be signed and closed with a lockable gate to prevent general use of the road. Use of closed road segments will be restricted to authorized agents of: 1) the operator and/or the subcontractor(s), 2) the Forest Service, 3) other agencies with a legitimate need (CDOW, other law enforcement agencies, etc.). Unauthorized use or failure to lock gates during specified time frames by the operator or its subcontractors will be considered a violation of the terms of the APD or associated grants. This will apply to all roads on public lands.

The access road to a well pad should be located such that it does not cross key wildlife habitats and should be aligned where sight distances will be minimal (a thick forested area rather than through an opening or sparsely vegetated area). To prevent long lines of sight along the roads themselves the road should be curved every 300 feet unless limited sight distances are already achieved by natural terrain features.

The operator shall regularly maintain all roads used for access to the lease operation. This shall include installation of additional surfacing and surface drainage control structures not foreseen during construction.

Air pollution sources such as dust from unpaved roads and cleared areas will be minimized.

Cattle guards heavy enough to handle proposed road traffic will be installed and maintained as required.

Improvement to existing access will be minimized, limited to a 12-foot running surface, with minimum disturbance of surrounding soil and vegetation. Surfacing material will not be placed on the access road or location without prior Forest Service approval.

The operator may be required to construct waterbars on abandoned roads and pipeline routes. The waterbars shall be constructed to drain freely to the natural ground level and to prevent siltation and clogging. No waterbars will drain directly into a stream without first flowing through a sediment trap.

Slash disposal shall not impede wildlife movements.

Traffic will be limited to roads and drill pads.

BLM_0048605

## *Drill Pad Development*

In planning for well sites, tank batteries, sump, reserve and mud pits, and pumping stations, the operator shall select locations that involve the least disruption to scenic values and other surface resources. This may include:

Construction techniques and design practices, including selection of material, camouflage techniques, and rehabilitation practices that will preserve scenic aesthetic qualities.

Shape and grade drill sites to maintain the natural integrity of the area. Tier the site rather than one large level clearing.

Concentrations of development clearings should reflect the character of natural openings in the area.

Slope the site away from any viewpoints if bright or contrasting soils exist.

Minimize vegetation removal. Lop and scatter slash to a depth no more than 18 inches, or windrow.

Scallop horizontal and vertical edges of vegetation surrounding sites.

Use fencing with a non-reflective finish.

Silt barriers for pads within 200 feet of live water.

Avoid, where possible, development in the foreground zone.

Paint equipment being used to minimize contrast. The color selected shall have a flat, non-reflective finish. The Munsell soil color chart provides good examples. The following guidelines should be used:

| HUE | 10R - 10YR |
| VALUE | 2.5 - 5 |
| CHROMA | 0 - 6 |

Avoid, where possible, areas that will allow the drill rig to be silhouetted above the surrounding or background landscape to prevent "skylighting".

Maintain, where possible, a minimum distance of 1/4 mile from natural features, such as rock outcrops, peaks, cliffs, waterfalls, etc.

Pads and related development facilities (pits, tank batteries, etc.) will not be constructed in riparian areas or floodplains. Pads will be constructed in a manner that minimizes impacts to the areas.

Pads will be constructed with runoff controls.

Steep slopes shall be avoided where possible; the site shall be located on the most level location obtainable that will accommodate the intended use.

BLM_0048606

Oil and Gas Leasing Analysis FEIS

### *Pits*

Excavations used for the permanent impoundment of usable water should be sloped at a 3:1 grade to establish safe access for humans, livestock, and wildlife. Pits shall not be constructed in either riparian or aquatic ecosystems.

Pits shall not be constructed in alpine, riparian or floodplain areas. In addition, pits shall not be constructed in a manner that results in materials seeping or being transported overground to these areas.

A minimum of two feet of free board will be maintained between the maximum fluid level and the top of the berm. These pits will be designed to exclude all surface runoff. The pits will be constructed in cut portion of well pad site.

Final written certification is required that there are no hazardous chemicals on the RCRA list left in the drilling fluids within the mud pit. If the operator cannot provide certification, the drilling fluids and pit liner must be disposed of at a Federally approved hazardous materials site.

Mud, separation pits, and other containments used during the exploration or operation of the lease for the storage of oil and other hazardous materials shall be adequately fenced, posted, and covered. Additional protective measures may be needed to minimize hazards and prevent access to humans, livestock, waterfowl, and other wildlife. The need and type of protective requirement will be determined on a case-by-case basis. Pit liquids should have free oil removed and be sampled for total dissolved solids (TDS) prior to pit closure. Pit liquids with TDS content greater than 3000 ppm should be removed from the reserve pits prior to pit closure.

All pits, cellars, rat holes, and other bore holes unnecessary for further lease operations, excluding the reserve pit, will be backfilled immediately after the drilling rig is released to conform with surrounding terrain. Pits, cellars and/or bore holes that remain on location must be fenced as specified for the reserve pit.

All reserve pits will be made impervious to leaks. Clay can be used to seal pits in areas where synthetic liners are not specifically required.

Synthetic pit liners will be used in areas located within 40 feet of ground water (or greater if soils are extremely permeable).

Pit liners must be approved by the Forest Service, be impermeable and resistant to weather, sunlight, hydrocarbons, aqueous acids, alkalies, salt, fungi, or other substances likely to be contained in the drilling fluids or produced water.

The liner will be underlain by a suitable bedding material, and other measures will be taken as needed to protect the integrity of the liner.

A leak detection system will be installed to monitor lined reserve pits. This system must be installed in order to detect liner leakage. The Leak Detection Plan must be submitted to and approved by the Authorized Officer during APD approval. This plan must include the system design including line installation, Monitoring Plan, and the individual responsible for the required monitoring.

If air or gas drilling, the operator shall control the blooie line discharge dust by use of water injection or other acceptable methods. The blooie line discharge shall be a minimum of 100 feet from the blowout preventer and be directed into the blooie pit so that the cuttings and waste are contained in the pit.

All pits should be covered with netting to prevent animals from falling in.

BLM_0048607

A reserve pit will be allowed between June 15 and October 15. After this date, a closed drilling system will be required. The pit will be lined with an impermeable liner with heat treated seams and a minimum of 125 lbs./sq.in. burst strength. During pit reclamation, the liner will either be folded in and buried in the pit with a minimum of 2 feet of cover, or removed to a certified disposal site. Prior to pit closure, non-exempt materials and liquids which have been placed in the pit must be hauled to a certified disposal site unless another method of disposal is approved in writing by the District Ranger. Initial pit closure must be completed by November 1 of the current drilling year. Trip tickets showing, at a minimum, the date, driver's name and address, company, location hauling from, location hauling to and amount of material being hauled, will be kept and made available to the District Ranger at their request. The reserve pit will be fenced on 3 sides during operations. Variation of dates could occur depending on the location.

## *Pipelines*

Where possible utilize existing corridors.

Linear openings should have a turn or angle every 1/4 mile where practical.

Scallop horizontal and vertical edges of corridors.

Pipeline and transmission corridors should parallel contours on slopes greater than 20%.

Alignment, siting, and reclamation of pipelines and flowlines should be designed to conform to adjacent terrain and to prevent or minimize vehicular travel. If maintenance is necessary in problem areas, consider use of an all terrain vehicle (ATV) or snowcat etc., in lieu of regular truck. Relocation of portions of the line may be necessary to reduce the impact to surface resources.

Pipelines shall be constructed outside of riparian areas except when crossing perpendicular to stream riparian areas. Construction in riparian areas will be conducted in a manner that minimizes impacts to riparian areas at the discretion of the Authorized Officer.

For associated pipeline rights-of-way, except rights-of-way expressly authorizing a road after construction of the facility is complete, the right-of-way holder shall not use the right-of-way as a road for any purpose other than routine maintenance. Necessary routine maintenance will be determined through consultation with the Authorized Officer.

Pipeline routes will be graded to conform to the adjacent terrain, waterbarred, and reseeded in accordance with the Reclamation Plan.

Pipeline construction shall not block, dam, or change the natural course of any drainage. Suspended pipelines will provide adequate clearance for runoff.

Pipeline trenches shall be compacted during backfilling. These trenches will be maintained in order to correct settlement and prevent erosion. Waterbars and other erosion control devices will be repaired as necessary. Pipeline trenches will be constructed in a manner so as to not change the natural surface and groundwater flow regime.

Crossing of pipelines owned by other companies shall be in accordance with an agreement secured with that company.

Existing telephone, telegraph, power lines, pipelines, roads, trails, fences, ditches, and like improvements shall be protected during construction, operation, maintenance, and termination of an oil and gas facility. Damage caused by such activities shall be properly repaired to a condition which is satisfactory to the Authorized Officer.

BLM_0048608

When clearing is necessary, disturbance will be kept to a minimum. Bladed materials shall be placed back into the cleared route upon completion of construction.

Pumping stations shall be kept in a neat and well-maintained condition.

## *Production*

Where electrical power lines are constructed in association with oil and gas development the operator will apply "Suggested Practices for Raptor Protection on Power Lines" (Olendorff, et al., 1981) and ensure power lines are properly grounded to prevent electrocution of raptors.

The BLM manages the venting or flaring of hydrocarbon gases associated with hydrogen sulfide ($H_2S$, sour gas) from Federal leases. Waste disposal and the appropriate equipment and action for hazardous geologic conditions, such as $H_2S$ gas and high pressures, are considerations dealt with in the APD approval process prior to drilling.

Compaction and construction of the berms surrounding tank batteries will be done prior to storage of fluids and designed to prevent lateral movement of fluids through the construction materials. The berms must be constructed to hold at minimum 120 percent of the storage capacity of the largest tank within the berm. All loading lines will be placed inside the berm.

All improvements, including fences, gates, cattle guards, roads, trails, pipelines, bridges, water developments, and control structures will be maintained in a serviceable and safe condition.

Livestock, sewage systems, and petroleum facilities will be located a minimum of 100 feet from all wells. Design all well casings and collars for the lowest practical contamination risk.

Any release of production water on or across the land requires prior approval by the Forest Service. A NPDES permit will be required from the State for point discharge.

Small amounts of produced water which do not meet water quality standards will be disposed of in accordance with Notice To Lessee-2B and/or Environmental Protection Agency (EPA) guidelines (DRAFT Onshore Order #7 Disposal of Produced Water).

If the well or production facility is located within one half mile of residences, appropriate noise mitigation will be required to ensure Federal, State, and local noise standards are adhered to during production.

Within 60 days of completion of construction, the holder shall provide the Authorized Officer an as-built survey of facilities as constructed.

## *Reclamation*

The Abandonment and Rehabilitation Plan will be part of the Surface Use Plan of Operations and must be approved prior to any activities. The plan may include removal of surfacing material from the road, recontouring, replacement of topsoil, seeding, mulching, and planting.

Well drilling equipment and debris will be removed and the site and service roads will be rehabilitated as soon after completion of project as possible. Seasonal weather should be considered for optimum results.

After reshaping the site, topsoil material should be distributed to a uniform depth to allow the establishment of desirable vegetation. The disturbed areas shall be scarified prior to replacement of surface soil material.

BLM_0048609

Lessee must establish a diverse, effective and permanent vegetation cover of the same seasonal variety native to the area of disturbed land and capable of self-regeneration and plant succession at least equal in extent of cover to the natural vegetation of the area. Introduced species may be used where desirable and necessary to achieve goals of the approved Reclamation Plan. Undesirable weedy species such as kuchia, cheatgrass, and other noxious weeds. The operator will continue re-vegetation efforts using any and all cultural methods available until this standard is met.

Immediately after seeding, the stockpiled trees and slash will be lopped and scattered evenly over the disturbed areas. The access will be blocked to prevent vehicular access. Logging slash will also be used to construct filter windrows below all fill slopes.

Seed certification tags from seed used in reclamation will be submitted to the Authorized Officer.

Noxious weeds which may be introduced due to soil disturbance and reclamation will be treated by biological, mechanical or chemical methods to be approved by the Authorized Officer. Should chemical methods be approved, the lessee must submit a Pesticide Use Proposal to the Authorized Officer 60 days prior to the planned application date.

Mulching of the seedbed following seeding may be required under certain conditions (i.e., expected severe erosion), as determined by the surface owner/manager.

Tree planting may be required on disturbed acres which are suitable for timber production. The standard will be to achieve minimum stocking per Chapter 70 of FSH 2409.26b, within 5 years after non-use. Aspen transplanting and portable irrigation or ripping may be required on localized areas to promote aspen regeneration. If aspen regeneration fails, conifer seedlings adapted to the sites will be planted.

Reclamation of riparian areas will be conducted in a manner that restores the impacted area to its original condition, in terms of soils, vegetation and hydrologic conditions. Stream and lake fishery habitat will also be restored to pre-project conditions, based on monitoring of the system. Stream habitat reclamation may include instream habitat improvement, erosion control and species replenishment if deemed appropriate by the Authorized Officer.

If a producing well is developed, the reserve pit and that portion of the location and access road not needed for production or production facilities will be recontoured (one which allows lease operations and avoids steep cut and fill slopes) as soon as possible. All of the topsoil stockpiled will be evenly disturbed over these recontoured areas. Brush cleared prior to construction of the well site shall be scattered back over the recontoured area.

Reserve pit fluids will be allowed to evaporate through the entire summer season (June-August) after drilling is completed, unless an alternate method of disposal is approved. Backfilling of the reserve pit will be done so that the muds and associated solids will be confined to the pit and not squeezed out and incorporated in the surface materials. There will be a minimum of three feet of cover (overburden) on the pit. Lined pits will be effectively folded over and effectively capped. When the work is complete, the pit area will support the weight of heavy equipment without sinking.

Cut and fill slopes shall be reduced and graded to conform the site to the adjacent terrain. The disturbed sites will be prepared to provide a seedbed for reestablishment of desirable vegetation and reshaped to blend with the natural contour. Such practices may include contouring, terracing, gouging, scarifying, mulching, fertilizing, seeding, and planting.

Reclamation and abandonment of pipelines and flowlines may involve; replacing fill in the original cuts, reducing and grading cut and fill slopes to conform to the adjacent terrain, replacing surface soil material, waterbarring, and revegetating in accordance with rehabilitation practices specified by the Forest Service.

BLM_0048610

Surface buildings, supporting facilities, and other structures, which are not required for present or future operations, shall be removed upon termination of use.

## Coal Bed Methane COA's

These conditions may be applied in addition to Standard COA's when developing coal bed methane resources.

A cement bond log (CBL) will be required should cement fail to circulate to surface on the surface and production casing strings. The operator must file one copy of the log (with BLM) should cement fail to circulate.

Minimum pressure testing requirements for ram type BOPE are 250 psi for a low side pressure test and 2000 psi for the high side pressure test.

Operators must provide one copy of the well deviation survey should deviation exceed $10^\circ$ from the vertical or have a rate of change exceeding $1^\circ$ per 100' of depth.

Water quality analysis reports on subsurface water must be filed upon well completion and after adequate wellbore clean-up. The analysis must include major anions, cations, TDS, and conductance of the produced sample.

Operator must record and file static water level with the Well Completion Report (BLM Form 3160-4).

Operator must monitor and record cumulative water production.

Brandenhead testing will be required pursuant to NTL-MDO-91-1.

Those coal bed methane wells proposed adjacent (i.e. within a 1/2-mile radial distance) to existing conventional wells (producing and/or abandoned) may affect conditions in those wellbores due to pressure changes in the formation and/or gas liberation through desorption. Those existing wells will be evaluated and monitored to determine if mitigation/remedial work is necessary to maintain wellbore integrity and prevent migration of fluid between zones.

Should wellbore conditions warrant, primary cementing hardware such as properly spaced, turbulent flow inducing centralizers and reciprocating scratchers will be required. Also, cement slurry design changes such as volume, density, and fluid loss, may be necessary to eliminate possible adverse effects of the wellbore environment and to improve cement sheath effectiveness.

# Monitoring

## Pre-Lease

Prior to the actual authorization of a specific parcel for leasing, the decisions made in the ROD to this document will be monitored to verify that oil and gas leasing on the parcel has been adequately addressed in this EIS and is consistent with the Forest Plan; to ensure that conditions of surface occupancy are properly included as stipulations on the parcel; and to determine that occupancy could be allowed somewhere on the proposed lease parcel, except where stipulations would prohibit all surface occupancy. See also the attached Region 2 NEPA validation/verification/monitoring form.

BLM_0048611

# Post-Lease

Site-specific monitoring requirements will be determined at the APD stage, when the actual location of ground disturbing activities is known. Prior to the approval of the APD, an on-site visit will be held to review the proposed plan of operations and to discuss potential issues.

At the time of an APD, the BLM engineer processing the APD assigns a priority for BLM inspection. APD's may be assigned a high priority for inspection by BLM petroleum technicians under several conditions, including: 1) there is a high risk for serious adverse impacts to public health and safety or subsurface resources; 2) past experience with the operator or contractor indicates the need for a greater presence during the operations.

# Erosion Control and Water Quality Monitoring Plan

The operator may be required to develop an Erosion Control and Water Quality Monitoring Plan prior to any ground disturbance. This plan is subject to Forest Service approval.

# Spill Prevention Control and Countermeasure Plan

The operator is required to develop a Spill Prevention Control and Countermeasure Plan which includes monitoring.

## *During Operations*

During the conduct of operations, i.e., drilling, constructing roads, well pads, or laying pipeline, the operator is required to monitor activity for cultural resources, threatened and endangered species, and substantial unanticipated environmental effects. If any of the above is found during the course of the operations, the operator is required to immediately contact the lessor, in this case, the Forest Service (Section 6 of the Standard Lease Form - BLM Form 3100-11). The Forest Service oil and gas regulations at 36 CFR 228.108 also requires the operator to report findings of cultural and historic resources.

Also during the conduct of operations, Forest Service and BLM oil and gas administrators monitor all activity (road, well pad and pipeline construction and drilling) to ensure that required design and mitigation measures as specified in the Surface Use Plan of Operations were accomplished and effective. Monitoring of operations for impacts to surface resources and the effectiveness of mitigation measures is carried out by Forest Service staff to ensure compliance of approved activities. Infractions of non-compliance are brought to the attention of the operator and the BLM. Corrective action is required within a reasonable time-frame.

Activities in areas of major conflict between oil and gas activities and other significant resources or uses will also result in a greater presence of inspection personnel (Forest Service and BLM) during on-going operations. Although the Forest Service has the authority and responsibility to conduct environmental inspection of the surface, BLM inspectors routinely make observations for environmental concerns while conducting their technical inspections.

The BLM performs plugging inspections on all plugging and abandonment in areas of high environmental concerns, i.e., where there is high concern over the potential for contamination of aquifers.

BLM_0048612

Oil and Gas Leasing Analysis FEIS

## *Post-Operations*

Reclamation as required in the SUPO is also monitored to ensure that the site is reclaimed prior to release of the operator's reclamation bond. (Note that some reclamation may be concurrent with the conduct of operations.) Sites of past oil and gas activity (and other Forest Service management activity) are informally visited by resource specialists to monitor the effectiveness of the mitigation measures that were applied to projects.

BLM_0048613

MINERAL LEASING FLOW CHART

10/92

```
 _____
|                        |
| We receive a request   |
| from industry via BLM to |
| place a parcel on a sale |
| list.                  |
|_____|
            ||
            ||
            \/
 _____        _____        _____
|                    |      |                    |      |                    |
| RO prepares a      |      | Forest sends       |      | District completes |
| report (LRS and    |=====>| report to District.|=====>| report and returns |
| analysis forms) and|      |                    |      | report to SO.      |
| forwards to Forest.|      |                    |      |                    |
|_____|      |_____|      |_____|
                                                                 ||
                                                                 ||
                                                                 \/
 _____        _____        _____
|                    |      |                    |      |                    |
| BLM lists parcel   |      | RO prepares report |      | SO forwards report |
| on next list un-   |<=====| response and for-  |<=====| to RO.             |
| less there are     |      | wards to BLM.      |      |                    |
| problems.          |      |                    |      |                    |
|_____|      |_____|      |_____|
           ||
           ||
           \/
 _____        _____        _____
|                    |      |                    |      |                    |
| Sale list sent in  |      | Sale held.  A      |      | If sold, a new     |
| time to be posted  |=====>| per acre bonus is  |=====>| 10-year lease is   |
| for 45 days prior  |      | paid, plus rental  |      | issued under a     |
| to next sale.      |      | of $2 per acre.    |      | new number.        |
|_____|      |_____|      |_____|
                                                                 ||
                                                                 ||
                                                                 \/
 _____        _____        _____
|                    |      |                    |      |                    |
| If not leased with-|      | If not leased with-|      | If not sold at     |
| in 24 months after |      | in 30 days after   |      | sale, parcel is    |
| sale, cannot be    |      | sale, parcels can  |      | available for OTC  |
| leased without a   |<=====| be broken up and/or|<=====| leases @$1.50/acre |
| new report.  Report|      | combined for leases|      | and for a term of  |
| will be obsolete.  |      | @$1.50/acre and for|      | 10 years.  Parcels |
|                    |      | a term of 10 years |      | are to stay the    |
|                    |      |                    |      | same for 30 days.  |
|_____|      |_____|      |_____|
```

*OTC - Over the Counter

BLM_0048614

## SO PROCEDURES FOR MINERAL REPORTS

10/92

**When a new request for a report is received from the RO, the SO needs to:**

1. If two districts are shown on the Lease Record Sheet (LRS) send copies (which should be attached to request), to each district. If other Forests/Districts are involved, the RO will also send copies to them...coordination with shared Forests/Districts will be up the the lead District (District with most acres). If the area is about the same for each district, determining which district will handle the report will be up to the SO listed first on the LRS. Coordination between shared Districts/Forests will be initiated through that SO.

2. Please note on both the SO copy and the District copy of the LRS, the date the report is being forwarded to the District.

3. File report in Pending on District file.

4. If the request has come to the RO without a serial number, we will give it the date that it has been processed at the RO level, i.e., C*-19921001 (1), (*C, KSNM, SDM, WY)

**When the report comes back from the district, the SO needs to:**

1. Check to see if report is signed by District Ranger. If not signed, return for signature.

2. Pull SO pending file.

3. Check report for accuracy.

   a. Is the NFS acreage filled in on the Lease Record Sheet?
   b. Are the supplemental stips completed and attached?
   c. Are there maps for wilderness and wilderness study areas?
   d. Are maps color coded -- if so, return to district for non-color-code maps or convert to codes other than color.
   e. Audit land descriptions on supplemental stips against lease proposal acreage.

4. Confirm as to Forest Plan and NEPA compliance.

5. Have Supervisor sign and date NEPA Validation/Verification/Modification form. Check that the "Preparer" and the District Ranger have both signed and dated the form.

6. Note on LRS date report returned to RO.

7. Make appropriate copies for SO file.

8. Combine these copies with your "pending in RO" file, discarding the SO's original copy of the LRS.

9. Return original of report to RO.

H-28

BLM_0048615

DISTRICT PROCEDURES FOR MINERAL REPORTS

10/92

**When the request for report is received from the SO, the District:**

1. Determine whether or not the lands are on your district. If not, return request to SO and SO will return to the RO to be sent to the right district. This is necessary to keep the files straight.

2. Determine whether or not the lands involved are NFS lands. If the report is for land that is not NFS, check the appropriate blank on the NEPA Validation/Verification/Monitoring form and return to the SO and the SO will return to the RO. The RO will notify BLM that the area is not Forest Service.

3. As indicated by RO, coordinate with the other district if the lands involve your district and another district. The district with the most acres will be the lead district and will be responsible for returning a report to the RO.

4. Determine if the lands will require a site-specific analysis. If it does, the district returns the Request for Report sheet with the number of the report and the reason for the delay. This should be sent to the SO, the SO will send to the RO, and the RO will notify BLM.

5. Determine if stipulations need to be attached.

6. Check for NEPA and Forest Plan compliance.

7. Complete Title Report Request for acquired minerals.

8. Prepare all necessary maps. Only wilderness area maps need to be sent to the RO -- keep all other maps in the district case file.

9. Prepare Additional Information Sheet.

10. Complete the NEPA Validation/Verification/Monitoring form checking appropriate blanks.

11. Fill in acres blanks on Lease Record Sheet. This requires only a grand total as far as the RO is concerned.

12. Enter a date for "Request for Report Returned to SO" on Lease Record Sheet.

13. Preparer and District Ranger must sign NEPA Validation/Verification/Monitoring form.

14. Make appropriate copies for district files and sends original of report to SO.

H-29

BLM_0048616

Serial Number: _____

## REGION 2
## NEPA VALIDATION/VERIFICATION/MONITORING
for
Oil and Gas Leasing Proposals

I. INTRODUCTION
   A. FOREST: _____
      DISTRICT: _____

      Lease proposal area location:

   B. **Land Status:**
      1. Withdrawals recommended by Forest Plan: _____

      _____

      2. Lease proposal:
         a.  Includes NFS acquired lands?        ( )YES ( )NO
            If yes, attach Title Report Request.
         b.  Includes private land with Federal minerals?  ( )YES ( )NO
            If yes, are NFS issues involved?      ( )YES ( )NO ( )N/A
            If yes, attach Forest Service recommendations for private lands.

II. SPECIFIC LANDS DECISION VALIDATION
   A. **NEPA Verification (36 CFR 228.102 (e)(1))**
      1. Leasing the parcel is consistent with the _____
      _____ Forest Land and Resource Management Plan?
                             ( )YES ( )NO
        If NO, The inconsistency is due to_____

      _____
        If NO, is additional documentation needed to amend or revise the Plan?
                             ( )YES ( )NO

      2. Leasing the parcel has been adequately addressed in the _____
      _____ site-specific NEPA document?
                             ( )YES ( )NO ( )N/A
        If NO, is additional NEPA documentation needed?  ( )YES ( )NO

**(attach additional information sheets behind last page of this form)**

   B. **Conditions of Surface Occupancy (36 CFR 228.102(e)(2))**
      1. Indicate presence or absence of concern or characteristic by "X" in
      appropriate column.  Identify site specific concern/characteristics in the
      Remarks column and identify any required stipulations/lease notices.  Forest
      Service Stipulation 1 and the Standard Lease Terms will be attached to all
      leasing decision validations.  Copies of supplemental stipulations/lease
      notices will be attached as required.

      Stipulations include:
         a. No Surface Occupancy Stipulation  (NSO)
         b. Timing Limitation Stipulation  (TL)
         c. Controlled Surface Use Stipulation  (CSU)
         d. Lease Notice  (LN)

H-30

BLM_0048617

**Serial Number:** _____

## RECORD OF SITE SPECIFIC VALIDATION/VERIFICATION (FIELD) MONITORING

| | IS STIP NEEDED? NO | IS STIP NEEDED? YES | IF YES INDI-CATE SUPP STIP | REMARKS |
|---|---|---|---|---|
| 1. Classified Areas (by basis for classification): | | | | |
| Scenic (state site-specific concern) | | | | |
| Historical | | | | |
| Botanical | | | | |
| Zoological | | | | |
| Paleontological | | | | |
| Geological | | | | |
| Archaeological | | | | |
| Experimental Forest | | | | |
| Research Natural Area | | | | |
| 2. Wilderness Study Area | | | | |
| Further Planning Area | | | | |
| 3. Wild and Scenic River Corridor or Study Area | | | | |
| 4. Slopes:    Greater than 40% | | | | |
| Greater than 60% | | | | |
| 5. High Erosion Hazard | | | | |
| 6. High Geologic Hazard | | | | |
| 7. Areas With Extremely Sensitive/Unstable: | | | | |
| Soils | | | | |
| Water | | | | |
| Wetlands and/or Riparian Lands | | | | |
| Geological Situations | | | | |
| Alpine Vegetation | | | | |
| 8. Low VAC + Retention VQO | | | | |
| 9. Retention VQO | | | | |
| 10.Threatened & Endangered Species | | | | |
| Identify species: | | | | |
| Sensitive species: | | | | |
| 11.Critical Wildlife Habitat Identified in Forest Plan: | | | | |
| Winter Habitat | | | | |
| Birthing Area | | | | |
| Other specify: | | | | |
| | | | | |
| 12.Developed Recreation Sites | | | | |
| 13.Recreation Opportunity Spectrum: | | | | |
| Primitive | | | | |
| Semi-Primitive – motorized | | | | |
| nonmotorized | | | | |
| 14.Range Improvements | | | | |
| 15.Timber Sale Areas | | | | |
| 16.Timber Plantations | | | | |
| 17.Timber Research or Special Study Areas | | | | |
| 18.Seed Production Area | | | | |
| 19.Travel Restrictions Per Travel Management Plan | | | | |
| 20.Areas Eligible For Inclusion In National Register (NRHP) | | | | |
| Identify Eligible Areas: | | | | |
| | | | | |
| 21.Special Use Occupancies | | | | |
| 22.Other Unique Characteristics or Concerns Addressed: | | | | |
| | | | | |
| | | | | |

H-31

2

BLM_0048618

**Serial Number:**

C. **Suface Occupancy (36 CFR 228.102(e)(3))**
   Approximate percent of the parcel available for surface occupancy. _____

IV. **SUMMARY OF VALIDATION ANALYSIS AND RECORD OF CONSENT/DENIAL TO LEASE:**

( )A. Consent to issuance of the lease subject only to Forest Service Stipulation 1 and Standard Lease Terms.

( )B. Consent to issuance of the lease subject to Forest Service Stipulation 1 and Standard Lease Terms.
   _____ No surface Occupancy Stipulation (NSO)
   _____ Timing Limitation Stipulation (TL)
   _____ Controlled Surface Use Stipulation (CSU)
   _____ Lease Notice (LN)

( )C. Object (deny) to lease for all or part of the lease parcel area (description of denied area and reason for denial attached.)

( )D. Defer decision on the lease parcel, as additional NEPA analysis is needed.

V. **PREPARED BY:**

_____,_____,_____
Minerals Specialist          District               Date

VI. **COORDINATED WITH:** (other than Forest Service)

_____,_____,_____
Name                         Organization           Date

VII. **RECOMMENDED BY:**

_____,_____,_____
District Ranger              District               Date

VIII. **APPROVED BY:**

_____,_____,_____
Forest Supervisor            Forest                 Date

H-32

BLM_0048619

# Appendix I - Wilderness/Roadless Opportunities within Reasonable Distance of the Forest Oil and Gas Analysis Area

BLM 0048620

BLM_0048621

WILDERNESS/ROADLESS OPPORTUNITIES WITHIN REASONABLE DISTANCE OF
THE GMUG OIL AND GAS ANALYSIS AREA

| WILDERNESSES ON GMUG | TOTAL NET ACRES | GMUG NF NET ACRES | ADJACENT NF NET ACRES |
|---|---|---|---|
| Big Blue Wilderness | 98,320 | 98,320 | 0 |
| Collegiate Peaks | 166,654 | 48,986 | 117,668 |
| La Garita | 103,986 | 79,822 | 24,168 |
| Lizard Head | 41,189 | 20,387 | 20,802 |
| Maroon Bells – Snowmass | 181,138 | 19,598 | 161,540 |
| Mt Sneffels | 16,505 | 16,505 | 0 |
| Raggeds | 59,519 | 43,062 | 16,457 |
| West Elk | 176,092 | 176,092 | 0 |

| WILDERNESSES ON THE WHITE RIVER WITHIN 100 MILES | TOTAL NET ACRES | WR NF NET ACRES |
|---|---|---|
| Collegiate Peaks | 166,654 | 35,517 |
| Flat Tops | 235,035 | 196,165 |
| Holy Cross | 122,037 | 112,548 |
| Hunter – Fryingpan | 74,250 | 74,250 |
| Maroon Bells – Snowmass | 181,138 | 161,540 |
| Raggeds | 59,519 | 16,457 |

| WILDERNESSES ON THE SAN JUAN WITHIN 100 MILES | TOTAL NET ACRES | SJ NF NET ACRES |
|---|---|---|
| Lizard Head | 41,189 | 20,802 |
| Weminuche | 459,604 | 294,889 |

| WILDERNESSES ON THE RIO GRANDE WITHIN 100 MILES | TOTAL NET ACRES | RG NF NET ACRES |
|---|---|---|
| La Garita | 103,986 | 24,164 |
| Weminuche | 459,604 | 164,715 |

| WILDERNESSES ON THE SAN ISABEL WITHIN 100 MILES | TOTAL NET ACRES | SI NF NET ACRES |
|---|---|---|
| Collegiate Peaks | 166,654 | 82,151 |
| Mt. Massive | 27,980 | 27,980 |

| WILDERNESS STUDY AREAS ON THE GMUG | NET ACRES |
|---|---|
| Oh-Be Joyful | 5,500 |
| Fossil Ridge | 47,400 |

| FUTHER PLANNING AREAS FOR WILDERNESS ON THE GMUG | NET ACRES |
|---|---|
| Cannibal Plateau | 31,990 |

I-1

| ROADLESS AREAS (RARE II INVENTORY) ON GMUG | | NET ACRES* |
|---|---|---|
| | 180 Elk Mountains - Collegiate | 140,540 |
| ** | 181 Raggeds | 120,440 |
| ** | 182 Drift Creek | 1,430 |
| ** | 184 Springhouse Park | 16,000 |
| ** | 185 Electric Mountain | 8,600 |
| ** | 186 Clear Creek | 40,780 |
| ** | 189 Hightower | 5,000 |
| ** | 191 Priest Mountain | 102,580 |
| ** | 192 Salt Creek | 10,880 |
| ** | 193 Battlement Mesa | 36,800 |
| ** | 194 Nick Mountain | 10,400 |
| ** | 195 Kannah Creek | 29,650 |
| ** | 196 West Elk | 206,940 |
| | 198 Beaver - Castle | 62,200 |
| | 199 Gothic Mountain | 6,660 |
| ** | 200 Whetstone Mountain | 15,400 |
| ** | 201 Flat Top Mountain | 19,850 |
| | 202 Boston Peak | 48,640 |
| | 203 Matchless | 35,100 |
| | 204 Crystal Creek | 90,380 |
| | 205 Kreutzer - Princeton | 13,300 |
| | 206 Romley | 8,860 |
| | 207 Canyon Creek | 13,100 |
| | 209 Cochetopa Hill | 65,680 |
| | 210 Cochetopa Dome | 7,000 |
| | 211 Monchego | 3,520 |
| | 212 Sawtooth Mountain | 45,400 |
| | 215 Mineral Mountain | 51,600 |
| | 217 Middle Fork | 6,390 |
| | 218 Cannibal Plateau | 31,990 |
| | 220 Carson Peak | 27,560 |
| | 221 Crystal Peak | 5,300 |
| | 223 Elk Creek | 3,000 |
| | 224 Uncompahgre | 38,840 |
| | 225 El Paso Creek | 3,200 |
| | 226 Cimarron | 15,000 |
| | 228 Baldy Peak | 10,080 |
| | 229 Beaver Creek | 1,480 |
| | 231 Upper W FK Dallas Creek | 1,880 |
| | 232 Iron Mountain | 7,400 |
| | 237 Sunshine Mesa | 1,120 |
| | 238 Wilson Mesa | 1,960 |
| | 239 Ophir Needles | 480 |
| | 240 San Miguel | 9,360 |
| ** | 241 Roubideau | 19,770 |
| ** | 242 Tabeguache | 10,240 |
| ** | 243 Kelso Mesa | 34,340 |
| | 244 Black Point | 10,750 |
| | 245 Ute Creek | 28,160 |
| ** | 246 Campbell Point | 11,300 |
| ** | 247 Johnson Creek | 10,330 |
| | 358 Chipeta | 16,520 |
| | 359 Sneva Mountain | 600 |

\* 1979 acreages - some areas are no longer the same size.
\*\* These are roadless areas which are within the analysis area and for which oil and gas leasing decisions are being made using this analysis.

BLM_0048623

| ROADLESS AREAS ON THE WHITE RIVER WITHIN 100 MILES | NET ACRES |
|---|---|
| 154 Red Dirt | 4,520 |
| 155 Sweetwater | 14,470 |
| 156 Hunns Peak | 13,570 |
| 158 Cow Lake | 2,830 |
| 159 Rurro Mountain | 13,100 |
| 160 White River | 34,550 |
| 163 North Elk | 19,990 |
| 164 Three Forks | 8,420 |
| 165 Butler Creek | 5,890 |
| 166 Main Elk | 48,330 |
| 167 Canyon Creek | 37,170 |
| 168 Grizzly Creek | 42,900 |
| 169 Grand Mesa | 6,340 |
| 170 Holy Cross | 135,870 |
| 171 Gardner Park | 6,660 |
| 172 Adam Mountain | 5,700 |
| 173 Seven Hermits | 6,260 |
| 174 Hardscrabble | 9,300 |
| 175 Red Table North | 18,880 |
| 176 Red Tables | 67,620 |
| 177 Porphyry Mountain | 54,990 |
| 179 Ivanhoe | 2,680 |
| 180 Elk Mountain - Collegiate | 138,530 |
| 182 Drift Creek | 5,890 |
| 183 Perham Creek | 25,980 |
| 187 Baldy Mountain | 6,910 |
| 188 Hourse Park | 9,920 |
| 193 Battlement Mesa | 34,200 |
| 348 Deep Creek | 11,060 |

| ROADLESS AREAS ON THE SAN JUAN WITHIN 100 MILES | NET ACRES |
|---|---|
| 235 Lizard Head | 17,440 |
| 240 San Miguel | 60,240 |
| 291 Graham Park | 12,090 |
| 293 Runlett Park | 6,610 |
| 294 Florida River | 50,380 |
| 296 Tenmile Creek | 380 |
| 297 Whitehead Peak | 600 |
| 298 Cunningham Creek | 1,280 |
| 302 East Animas | 18,220 |
| 303 West Needle | 24,550 |
| 304 Blackhawk Mountain | 17,750 |
| 305 Storm Peak | 52,270 |
| 306 Hermosa | 146,105 |
| 315 Ryman | 9,030 |

| ROADLESS AREAS ON THE RIO GRANDE WITHIN 100 MILES | NET ACRES |
|---|---|
| 220 Carson Peak | 87,630 |
| 278 Wheeler - Wason | 58,910 |
| 279 Bristol Head | 67,900 |
| 280 Deep Creek - Decker Creek | 120,200 |
| 299 Bear Creek | 6,740 |
| 300 Rio Grande Reservoir | 2,770 |
| 301 Ruby Lake | 4,090 |

I-3

BLM_0048624

| ROADLESS AREAS ON THE SAN ISABEL WITHIN 100 MILES | NET ACRES |
|---|---|
| 180 Elk Mountains - Collegiate | 113,980 |
| 205 Kreutzer - Princeton | 37,140 |
| 206 Romley | 6,600 |
| 259 Mount Massive | 26,100 |
| 260 Mount Elbert | 18,340 |
| 261 Mount Antero | 37,840 |

I-4

BLM_0048625

# Appendix J - Road Maintenance Level

BLM_0048626

BLM_0048627

12.3--4

TRANSPORTATION SYSTEM MAINTENANCE HANDBOOK

Exhibit 1

General Relationship Between Maintenance Levels

| PARAMETERS | 1 | MAINTENANCE LEVEL | | | |
|---|---|---|---|---|---|
| | | 2 | 3 | 4 | 5 |
| Service Life | Intermittent Service-Closed Status | Constant Service or Intermittent Service - Open Status (Some uses may be restricted under 36 CFR 261.50) | | | |
| Traffic Type | Open for non-motorized uses. Closed to motorized traffic. | Administrative, permitted, dispersed recreation, specialized, commercial haul. | All National Forest Traffic - General Use. Commercial Haul | | |
| Vehicle Type | Closed-N/A | High clearance, pick-up, 4x4, log trucks, etc. | All types - passenger cars to large commercial vehicles | | |
| Traffic Volume | Closed-N/A | Traffic volume increases with maintenance level | | | |
| Typical Surface | All types | None, Native, or Aggregate -- may be dust abated | Aggregate -- usually dust abated; paved | | |
| Travel Speed | Closed-N/A | Travel speed increases with maintenance level | | | |
| User Comfort and Convenience | Closed-N/A | Not a consideration | Low Priority | Moderate Priority | High Priority |
| Functional Classification | All Types | Local Collector | Local Collector Arterial | Local Collector Arterial | Local Collector Arterial |
| Traffic Service Level | Closed-N/A | D | A, B, C -- Traffic service level increases with maintenance level | | |
| Traffic Management Strategy | Prohibit or Eliminate | Discourage or Prohibit cars. Accept or Discourage high clearance vehicles. | Encourage, Accept | Encourage | Encourage |

*-FSH EFFECTIVE 4/25/90-*

BLM_0048628

BLM_0048629

# Appendix K - Table of Required Permits

BLM_0048630

BLM_0048631

**FEDERAL, STATE AND LOCAL PERMITS, APPROVALS AND AUTHORIZING ACTIONS NECESSARY FOR CONSTRUCTION, OPERATION, MAINTENANCE AND ABANDONMENT OF OIL AND GAS OPERATIONS**

| Issuing Agency/ Permit Name | Nature of Permit | Authority | Applicable Project Component |
|---|---|---|---|
| **Federal Permits, Approvals and Authorizing Actions** | | | |
| *U.S. Department of Agriculture (U.S. Forest Service)* | | | |
| 1. Timber Sales Contract | Accounts for timber cut, damaged or destroyed during mineral-related activities | National Forest Management Act of 1976 (16 USC 472a) and 36 CFR Parts 221 and 223 | All proposed action and alternative surface disturbing activities on NFS lands |
| 2. Special Use Authorization | Occupancy or use of NFS lands, i.e. rights-of-way | National Forest Management Act of 1976 (16 USC 472a) and 36 CFR Parts 221 and 223 | All proposed action and alternative surface disturbing activities on NFS lands, outside of lease boundaries |
| 3. Federal Antiquities Permit | All archaeological investigations on public lands | Archaeological Resource Protection Act of 1979 (16 USC 470); 36 CFR 1215 | All proposed action and alternative surface disturbing activities |
| 4. Surface Use Plan of Operations | Occupancy or use of NFS leased lands in conjunction with all oil & gas operations | Federal Onshore Oil & Gas Leasing Reform Act of 1987 (16 USC 478, 551) and 36 CFR Part 228 | All proposed action and alternative surface disturbing activities on NFS leased land |
| *U.S. Department of the Interior (Bureau of Land Management)* | | | |
| 5. Permit to Drill, Deepen or Plug back (APD) and Sundry Notice | Controls drilling for oil and gas on Federal onshore leases | Mineral Leasing Act of 1920 (30 USC 181 et seq.); Federal Onshore Oil & Gas Leasing Reform Act of 1987 (43 CFR Part 3160) | Wells and production facilities |
| 6. Approval of Unitization | Provides for efficient and timely development and production of Federal oil and gas leases | Mineral Leasing Act of 1920 (30 USC 181 et seq.); 43 CFR 3180 | Combine individual leases into unit. |
| 7. Rights-of-Way Grants and Temporary Use Permits | Right-of-way grants on BLM-managed lands | Mineral Leasing Act of 1920 (30 USC 181 et seq.) | Oil and gas pipelines on BLM-managed lands |

BLM 0048632

Oil and Gas Leasing Analysis FEIS

## FEDERAL, STATE AND LOCAL PERMITS, APPROVALS AND AUTHORIZING ACTIONS NECESSARY FOR CONSTRUCTION, OPERATION, MAINTENANCE AND ABANDONMENT OF OIL AND GAS OPERATIONS

| Issuing Agency/ Permit Name | Nature of Permit | Authority | Applicable Project Component |
|---|---|---|---|
| 8. Rights-of-Way Grants and Temporary Use Permits | Right-of-way grants on BLM-managed lands | Federal Land Policy and Management Act of 1976 (43 USC 1761-1771); 43 CFR 2800 | Roads on BLM-managed lands |
| 9. Approval to Dispose of Produced Water | Control of produced water disposal | Mineral Leasing Act of 1920 (30 USC 181 et seq.); 43 CFR Part 3160 and Federal Land Policy and Management Act, Title V, Section 501 | Disposal of any production water |
| U.S. Department of Interior (U.S. Fish and Wildlife Service) | | | |
| 10. Consultation Process: Endangered or Threatened Species | Preliminary Biological Assessment | Section 7 of the Endangered Species Act of 1973, as amended (16 USC Sec. 1344) | All proposed action and alternative surface disturbing activities |
| Department of Defense (U.S. Army Corps of Engineers) | | | |
| 11. Permit for Dredged or Fill Material (404 Permit); Nationwide | Placement of fill or dredged material in waters of the United States or adjacent wetlands | Section 404 of the Clean Water Act (40 CFR Parts 122-123); 33 USC Section 1344; 33 CFR Parts 323 and 325 | All proposed action and alternative surface disturbing activities affecting waters of the U.S. or wetlands |
| President's Advisory Council on Historic Preservation | | | |
| 12. Consultation & Signed Programmatic Agreement (PA) | Protection of significant cultural resources | Sec. 106 of National Historic Preservation Act (36 CFR 800) | All proposed actions and alternative surface disturbing activities |
| State Permits, Approvals and Authorizing Actions | | | |
| Colorado Department of Health | | | |
| 13. Air Pollutant Emissions Permit (non-PSD) | Permits for emissions from new or modified sources | CRS 25-7-112; 5 CCR 1001-5 | All fuel burning sources associated with proposed action or alternative |
| 14. Open Burning Permit | Control of all open burning | CRS 25-7-123; 5 CCR 1001-3; Reg. No. 1, Section II.C. | Any open burning |

BLM_0048633

| FEDERAL, STATE AND LOCAL PERMITS, APPROVALS AND AUTHORIZING ACTIONS NECESSARY FOR CONSTRUCTION, OPERATION, MAINTENANCE AND ABANDONMENT OF OIL AND GAS OPERATIONS | | | |
|---|---|---|---|
| **Issuing Agency/ Permit Name** | **Nature of Permit** | **Authority** | **Applicable Project Component** |
| 15. Pollutant Discharge System Permit | Issue permits for surface discharge of any pollutant | CRS 25-8-501 through 508; 5 CCR 1002-2 | Any point-source surface discharges |
| 16. Disposal of Production Water | Permits disposal of produced and waste water at authorized disposal site | CRS 25-8-501 through 508; 5 CCR 1002-2 | Disposal of any produced or waste water |
| Colorado Department of Highways | | | |
| 17. Transport Permit | Permits for oversize, overlength and overweight loads | CRS 42-4-409; 2 CCR 602-4 | Transportation of equipment and materials on State highways |
| 18. Access Permit | Permits for access to State highway system | CRS 43-2-147; 2 CCR 601-1; 2 CCR 601-1A | Any proposed access to State highway system |
| Colorado Department of Natural Resources (Division of Mines) | | | |
| 19. Application to Store and Use Explosives | Permit to use, store or transport explosives | CRS 34-47-104; 34-27-101; 2 CCR 403-1, 403-2 | All proposed action and alternative activities requiring the use of explosives |
| 20. Permit to Drill Deepen or Re-enter and Operate an Oil and Gas Well | State approval of drilling on all non-Federal lands within the State | CRS 1973, 34-60-101 et seq.; 2 CCR 404-1 (303, 315) | Wells |
| 21. Permit for Underground Disposal of Water | RegulatesClass II underground injection wells on non-Indian lands | CRS 1973, 34-60-106(2)(d) and 34-60-106(9) | UIC wells |
| 22. Safety Regulations for Oil and Gas Activities | Regulates oil and gas activities to protect public safety | CRS 34-60-106; Oil and Gas Conservation Commission Order No. 1-34 | All proposed action and alternative components |
| Colorado State Historic Preservation Office | | | |
| 23. Consultation & Signed Programmatic Agreement (PA) | Protection of significant cultural resources | Sec. 106 of National Historic Preservation Act (State regs?????) | All proposed action and alternative surface disturbing activities |

BLM_0048634

Oil and Gas Leasing Analysis FEIS

### FEDERAL, STATE AND LOCAL PERMITS, APPROVALS AND AUTHORIZING ACTIONS NECESSARY FOR CONSTRUCTION, OPERATION, MAINTENANCE AND ABANDONMENT OF OIL AND GAS OPERATIONS

| Issuing Agency/ Permit Name | Nature of Permit | Authority | Applicable Project Component |
|---|---|---|---|
| **Local Permits, Approvals and Authorizing Actions** | | | |
| Delta County | | | |
| 24. Utility Permit | Regulates pipeline construction in County right-of-way | Land Development Code | Pipeline construction in County right-of-way |
| 25. Access Permit | Regulates access to County roads | Land Development Code | Any activity requiring access to County roads |
| 26. Special Transport Permit | Regulates moving oversized, overlength or overweight equipment on County roads | Land Development Code | Any transport of oversized, overlength or overweight equipment on County roads |
| 27. Sanitary Waste Permit | Permits construction of septic system | Land Development Code | Onsite sewage disposal in septic system |
| Garfield County | | | |
| 28. Special Use Permit | Permit for extraction and procession on private lands | Land Development Code | All proposed action and alternative components in Garfield County |
| 29. Road Use Permit | Overweight and overlength loads on County Roads | Land Development Code | Transportation of equipment and materials on County roads |
| 30. Building Permit | Controls construction of all structures in the County | Land Development Code | All proposed action and alternative components in Garfield County |
| 31. Solid Waste Permit | Regulates disposal of wastes in the County | Land Development Code | Construction and operational waste |
| Mesa County | | | |
| 32. Special Use Permit | Regulates drilling of gas wells in areas zoned as agriculture, forestry or transition | Land Development Code | Wells in Mesa County |
| 33. Road Use Permit | Overweight and overlength loads on County roads | Land Development Code | Transportation of equipment and materials on County roads |

BLM_0048635

| FEDERAL, STATE AND LOCAL PERMITS, APPROVALS AND AUTHORIZING ACTIONS NECESSARY FOR CONSTRUCTION, OPERATION, MAINTENANCE AND ABANDONMENT OF OIL AND GAS OPERATIONS | | | |
|---|---|---|---|
| **Issuing Agency/ Permit Name** | **Nature of Permit** | **Authority** | **Applicable Project Component** |
| 34. Solid Waste Permit | Regulates disposal of wastes in the County | Land Development Code | All proposed action and alternative components in Mesa County |
| 35. Building Permit | Controls construction of all structures in the County | Land Development Code | All proposed action and alternative components in Mesa County |
| 36. Utility Permit | Regulates pipeline construction | Land Development Code | Any pipelines 10-inches or greater in diameter |
| Montrose County | | | |
| 37. Septic Permit | Permits septic systems | Land Development Code | Any septic systems |
| 38. Building Permit | Permits building construction | Land Development Code | Any building constructed for commercial use |
| 39. Driveway Access Permit | Permits access off County roads | Land Development Code | Any access off County road to erect/store equipment for commercial use |
| 40. Road Cuts Permit | Permit alteration of County road rights-or-way | Land Development Code | Any alteration of County road rights-of-way, as for pipeline construction |

BLM_0048636

BLM_0048637

# Appendix L - Existing Leases

BLM_0048638

BLM_0048639

2/11/93  12:53:21 PM   Database LEASES   Query GMUG_L   Page   1

GM-UNC-GUNNISON LEASES

| SEQ NUM | DISTRICT_1 | LEASE_NO | COUNTY_1 | T_1 | R_1 | SECTIONS_1 | STAT | TOT_AC | EFF_DATE | TERM | HELD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Collbran | C-04461 | Delta | 10S | 91W | 2,3,4,10,11,14 | PD | 2220.00 | 19681101 | P | Held |
| 2 | Collbran | C-10679 | Mesa | 9S | 93W | 34,34 | PD | 1621.72 | 19700501 | P | Held |
| 3 | Collbran | C-12359 | Mesa | 11S | 94W | 3, 4 | PD | 2274.46 | 19710401 | P | Held |
| 4 | Collbran | C-12552 | Mesa | 10S | 94W | 28,29,31-34 | PD | 2448.21 | 19710601 | P | Held |
| 5 | Collbran | C-13547 | Mesa | 11S | 96W | 3,14-18 | PD | 2369.83 | 19711001 | P | Held |
| 6 | Collbran | C-14169 | Mesa | 9S | 92W | 13:N2SE; 14:ALL; | PD | 2080.00 | 19711101 | P | Held |
| 7 | Collbran | C-2384 | Mesa | 9S | 93W | 35,36 | PD | 2174.89 | 19671001 | P | Held |
| 8 | Collbran | C-2385 | Mesa | 10S | 93W | 3,7,8,10,12,17,18 | PD | 2363.60 | 19671001 | P | Held |
| 9 | Collbran | C-26357 | Mesa | 10S | 94W | 23,27,34-36 | PD | 2527.36 | 19710501 | P | Held |
| 10 | Collbran | C-30029 | Gunnison | 9S | 92W | 17:N2, N2SW, NWSE | PD | 440.00 | 19860601 | 10 | |
| 11 | Collbran | C-30461 | Mesa | 9S | 91W | 33:ALL; 34:NW, S2 | PD | 1120.00 | 19810801 | P | Held |
| 12 | Collbran | C-30463 | Delta | 10S | 91W | 10:S2N2; 14:S2N2 | PD | 320.00 | 19811001 | P | Held |
| 13 | Collbran | C-30486 | Mesa | 10S | 94W | 15,16,22 | PD | 1124.70 | 19810601 | 10 | |
| 14 | Collbran | C-31558 | Mesa | 8.5S | 93W | 6:LTS 1-4 | PD | 223.80 | 19810701 | 10 | |
| 15 | Collbran | C-31559 | Garfield | 8W | 94W | 1,2,11,12 | PD | 1140.72 | 19810701 | 10 | |
| 16 | Collbran | C-34935 | Mesa | 10S | 92W | ALL OF HES 283 | PD | 158.57 | 19830701 | 10 | |
| 17 | Collbran | C-35530 | Mesa | 11S | 96W | 9,10,16,17,20 | PD | 798.15 | 19830301 | P | Held |
| 18 | Collbran | C-36211 | Mesa | 8S | 93W | 25,36 | PD | 198.08 | 19830401 | 10 | |
| 19 | Collbran | C-36484 | Mesa | 10S | 92W | 5-8: ALL | PD | 1691.00 | 19830701 | 10 | |
| 20 | Collbran | C-36491 | Garfield | 8S | 94W | 13,24,25 | PD | 1500.70 | 19830701 | 10 | |
| 21 | Collbran | C-36500 | Garfield | 8S | 35W | 13,14,15 | PD | 1263.70 | 19830801 | 10 | |
| 22 | Collbran | C-37569 | Mesa | 8S | 92W | 19, 20, 29, 32, 33 | PD | 3516.24 | 19840301 | 10 | |
| 23 | Collbran | C-38259 | Mesa | 11S | 95W | 4: SESE | PD | 40.00 | 19840401 | 10 | |
| 24 | Collbran | C-38994 | Mesa | 11S | 94W | 13,14,23-27 | PD | 3677.05 | 19840901 | 10 | |
| 25 | Collbran | C-39769 | Mesa | 10S | 91W | 10: S2 | PD | 320.00 | 19850701 | P | Held |
| 26 | Collbran | C-39801 | Mesa | 11S | 96W | 19, 29-33 | PD | 3259.66 | 19850201 | 10 | |
| 27 | Collbran | C-41560 | Mesa | 11S | 92W | 1,4,7-9,12,17,18,27 | PD | 7271.00 | 19851001 | 10 | |
| 28 | Collbran | C-41567 | Mesa | 11S | 95W | 7,18 | PD | 2529.17 | 19851001 | 10 | |
| 29 | Collbran | C-42906 | Mesa | 10S | 93W | 23,27,34: ALL | PD | 1920.00 | 19860801 | 10 | |
| 30 | Collbran | C-43470 | Mesa | 10S | 92W | ALL OF HES 283 | PD | 1131.52 | 19870301 | 10 | |
| 31 | Collbran | C-43983 | Delta | 11S | 96W | 13: LTS 1-8; | PD | 962.53 | 19870301 | 10 | |
| 32 | Collbran | C-44371 | Mesa | 10S | 93W | 15, 21, 22 | PD | 1027.12 | 19870301 | 10 | |
| 33 | Collbran | C-45496 | Mesa | 11S | 95W | 4: SENW | PD | 40.00 | 19870401 | 10 | |
| 34 | Collbran | C-45874 | Mesa | 10S | 92W | 29-32: ALL | PD | 2206.00 | 19871001 | 10 | |
| 35 | Collbran | C-45876 | Mesa | 10S | 93W | 24-26, 35, 36: ALL | PD | 3913.10 | 19871001 | 10 | |
| 36 | Collbran | C-46739 | Mesa | 8S | 94W | 14,15,22,23,25 | PD | 2600.00 | 19871001 | | |
| 37 | Collbran | C-47282 | Mesa | 8.5S | 94W | 3,4,5,6 | PD | 69.46 | 19880701 | 5 | |
| 38 | Collbran | C-47287 | Mesa | 9S | 95W | 9,10,17,18 | PD | 2541.44 | 19880601 | 5 | |
| 39 | Collbran | C-47288 | Mesa | 9S | 95W | 2-6 | PD | 1740.04 | 19880601 | 5 | |
| 40 | Collbran | C-52806 | Mesa | 8S | 93W | 23-26,35 | PD | 2324.89 | 19810601 | | |
| 41 | Collbran | C-52807 | Mesa | 8.5S | 93W | 1: LT 1, 2: LT1-4 | PD | 200.60 | 19810601 | | |
| 42 | Collbran | C-52810 | Mesa | 8S | 94W | 1-36 ALL | PD | 640.00 | 19880405 | | |
| 43 | Collbran | C-53972 | Garfield | 7S | 94W | 24-26 | PD | 230.57 | 19810701 | | |
| *DISTRICT_1 total. | 43 Records | | | | | | | | | | |
| 44 | Grand Junction | C-13509 | Delta | 12S | 94W | 8,11,19-21,28 | PD | 2468.84 | 19711101 | P | Held |
| 45 | Grand Junction | C-13562 | Mesa | 9S | 90W | 20,21,27,28: ALL | PD | 2560.00 | 19711101 | P | Held |
| 46 | Grand Junction | C-13563-A | Delta | 12S | 94W | 12,13,14: ALL | PD | 1920.00 | 19711001 | P | Held |
| 47 | Grand Junction | C-13710 | Mesa | 12S | 97W | | PD | 1787.19 | 19711101 | P | Held |
| 48 | Grand Junction | C-37570 | Delta | 12S | 92W | 6: ALL; 7: ALL | PD | 1548.87 | 19840301 | 10 | |

L-1

BLM_0048640

```
2/11/93  12:53:21 PM   Database LEASES  Query GMUG_L   Page    2

                        GM-UNC-GUNNISON LEASES
```

| SEQ NUM | DISTRICT_1 | LEASE_NO | COUNTY_1 | T_1 | R_1 | SECTIONS_1 | STAT | TOT_AC | EFF_DATE | TERM | HELD |
|---------|------------|----------|----------|-----|-----|------------|------|--------|----------|------|------|
| 49 | Grand Junction | C-38004 | Delta | 11S | 94W | 32: NE,E2NW,N2SE, | PD | 900.55 | 19840301 | 10 | |
| 50 | Grand Junction | C-39787 | Delta | 12S | 94W | 22-27,34-36 | PD | 2511.44 | 19850201 | 10 | |
| 51 | Grand Junction | C-41292 | Delta | 12S | 94W | 3:LTS 5-8, S2N2, S2 | PD | 653.62 | 19860601 | P | Held |
| 52 | Grand Junction | C-41568 | Delta | 12S | 95W | 10, 15, 22: ALL | PD | 1871.36 | 19880801 | 10 | |
| 53 | Grand Junction | C-41571 | Mesa | 12S | 97W | 16: NWNW | PD | 40.00 | 19851001 | 10 | |
| 54 | Grand Junction | C-43224 | Delta | 12S | 93W | 16,19: ALL | PD | 1280.00 | 19861201 | 10 | |
| 55 | Grand Junction | C-43290 | Montrose | 48W | 16W | 1: LTS 1-16, N2S2; | PD | 1406.48 | 19861001 | 10 | |
| 56 | Grand Junction | C-46752 | Montrose | 12S | 97W | 1-4,10-14,24: ALL | PD | 5800.80 | 19880301 | 10 | |
| 57 | Grand Junction | C-46987 | Delta | 12S | 95W | 11-14, 23-36 | PD | 9513.75 | 19880401 | 10 | |
| 58 | Grand Junction | C-47812 | Montrose | 48N | 16W | 2-5,11 | PD | 2489.08 | 19881001 | 10 | |
| 59 | Grand Junction | C-48457 | Delta | 12S | 94W | 17,18 | PD | 713.25 | 19881101 | 10 | |
| 60 | Grand Junction | C-48458 | Delta | 11S | 94W | 33: ALL | PD | 490.93 | 19881101 | 10 | |
| 61 | Grand Junction | C-48459 | Delta | 12S | 94W | 4,5,6,7,8 | PD | 1985.92 | 19881101 | 10 | |
| 62 | Grand Junction | C-48460 | Delta | 12S | 95W | 4,5,6,7,8 | PD | 2359.04 | 19881101 | 10 | |
| *DISTRICT_1 total. | 19 Records | | | | | | | | | | |
| 63 | Norwood | C-34425 | Montrose | 47N | 13W | 7,17,21,27,29 | PD | 2800.00 | 19820901 | 10 | |
| 64 | Norwood | C-36265 | Montrose | 46N | 13W | 17,18,21,28,33 | PD | 1202.00 | 19830401 | 10 | |
| 65 | Norwood | C-36598 | San Miguel | 43N | 13W | 7,16,22,27,28,34 | PD | 2480.04 | 19830601 | 10 | |
| 66 | Norwood | C-36599 | San Miguel | 44N | 13W | 27,33,34 | PD | 1961.69 | 19840401 | 10 | |
| 67 | Norwood | C-37102 | San Miguel | 43N | 13W | 15: NESE; 17: SENE | PD | 80.00 | 19830701 | 10 | |
| 68 | Norwood | C-37105 | San Miguel | 44N | 14W | 10, 11, 12, 13, 33 | PD | 2600.00 | 19830701 | 10 | |
| 69 | Norwood | C-38074 | San Miguel | 43N | 13W | 17: SWNE | PD | 40.00 | 19840301 | 10 | |
| 70 | Norwood | C-39123 | San Miguel | 43N | 13W | 3: SW; 10, NENE, | PD | 360.00 | 19840901 | 10 | |
| 71 | Norwood | C-40038 | Montrose | 46N | 13W | 22, 23, 24, 30, 34 | PD | 1980.00 | 19850401 | 10 | |
| 72 | Norwood | C-41003 | Montrose | 46N | 12W | 20-22,24-26,28,33-36 | PD | 4390.00 | 19850801 | 10 | |
| 73 | Norwood | C-41016 | Montrose | 47N | 14W | 7,8,17,18,20,21 | PD | 1744.61 | 19850701 | 10 | |
| 74 | Norwood | C-41651 | Montrose | 46N | 13W | 24,27 | PD | 920.00 | 19851001 | 10 | |
| 75 | Norwood | C-41652 | Montrose | 46N | 13W | 7: LTS 1-4, E2W2, SE | PD | 481.00 | 19851001 | 10 | |
| 76 | Norwood | C-42253 | Montrose | 47N | 14W | 17,18, 34 | PD | 1282.83 | 19860301 | 10 | |
| 77 | Norwood | C-42985 | Montrose | 48N | 15W | 34: W2 | PD | 332.00 | 19861001 | 10 | |
| 78 | Norwood | C-43555 | San Miguel | 42N | 16W | 4-7, 9 | PD | 1681.37 | 19861201 | 10 | |
| 79 | Norwood | C-45589 | San Miguel | 44N | 13W | 14,15, 23, 26 | PD | 1360.00 | 19871001 | 10 | |
| 80 | Norwood | C-45590 | Montrose | 46N | 13W | 1-6, 13, 14 | PD | 1680.11 | 19871001 | 10 | |
| 81 | Norwood | C-45593 | Montrose | 48N | 15W | 8,9,15,16,23,24 | PD | 1760.00 | 19871001 | 10 | |
| 82 | Norwood | C-45973 | San Miguel | 42N | 12W | 18, 19, 20 | PD | 2548.28 | 19871001 | 10 | |
| 83 | Norwood | C-47875 | Montrose | 47N | 15W | 3,6,7,10,11,14 | PD | 972.47 | 19881201 | 10 | |
| 84 | Norwood | C-48334 | San Miguel | 44N | 13W | 4,5,6,9 | PD | 2574.15 | 19881101 | 10 | |
| 85 | Norwood | C-53998 | Montrose | 47N | 15W | 13:SW4SW4,E2SE4 | PD | 120.00 | 19870901 | 10 | |
| *DISTRICT_1 total. | 23 Records | | | | | | | | | | |
| 86 | Paonia | C-13483 | Gunnison | 11S | 90W | 16-20 | PD | 1866.35 | 19711101 | P | Held |
| 87 | Paonia | C-13484 | Gunnison | 11S | 90W | 3,4,8,9,14,15 | PD | 2401.86 | 19711101 | P | Held |
| 88 | Paonia | C-13561 | Mesa | 9S | 90W | 29,32,33,34: ALL | PD | 2560.00 | 19711101 | P | Held |
| 89 | Paonia | C-13572 | Gunnison | 10S | 90W | 8,9,17,20 | PD | 1600.00 | 19711001 | P | Held |
| 90 | Paonia | C-13573 | Delta | 10S | 91W | 12,13,24,25: ALL | PD | 2558.00 | 19711101 | P | Held |
| 91 | Paonia | C-13599 | Gunnison | 10S | 90W | 4,5,6,7: ALL | PD | 2069.00 | 19711101 | P | Held |
| 92 | Paonia | C-13600 | Gunnison | 10S | 90W | 18,19,30: ALL | PD | 2069.00 | 19711001 | P | Held |
| 93 | Paonia | C-13601 | Gunnison | 10S | 90W | 27:E2; 28:E2; 29:E2 | PD | 2496.00 | 19711001 | P | Held |
| 94 | Paonia | C-13602 | Gunnison | 10S | 90W | 31: E2; 32: E2 | PD | 962.00 | 19711001 | P | Held |

L-2

2/11/93  12:53:21 PM   Database LEASES  Query GMUG_L    Page    3

GM-UNC-GUNNISON LEASES

| SEQ NUM | DISTRICT_1 | LEASE_NO | COUNTY_1 | T_1 | R_1 | SECTIONS_1 | STAT | TOT_AC | EFF_DATE | TERM | HELD |
|---------|-----------|----------|----------|-----|-----|-----------|------|--------|----------|------|------|
| 95 | Paonia | C-13627 | Mesa | 10S | 91W | 1,36: ALL | PD | 722.00 | 19711101 | P | Held |
| 96 | Paonia | C-13934 | Gunnison | 10S | 90W | 1,2,3,10,13 | PD | 1793.01 | 19711101 | P | Held |
| 97 | Paonia | C-13935 | Gunnison | 10S | 90W | 11-16 | PD | 2480.00 | 19711101 | P | Held |
| 98 | Paonia | C-14829 | Gunnison | 9S | 90W | 36: N2, N2S2 | PD | 471.00 | 19720301 | P | Held |
| 99 | Paonia | C-16076 | Gunnison | 11S | 90W | 7, 10 | PD | 677.95 | 19720801 | P | Held |
| 100 | Paonia | C-16186 | Gunnison | 10S | 90W | 34, 35 | PD | 676.10 | 19720701 | P | Held |
| 101 | Paonia | C-16187 | Gunnison | 10S | 90W | 21, 22, 25, 26 | PD | 1914.85 | 19720701 | P | Held |
| 102 | Paonia | C-16188 | Gunnison | 10S | 90W | 13,14,23,24 | PD | 2234.26 | 19720701 | P | Held |
| 103 | Paonia | C-24432 | Gunnison | 10S | 90W | 34,35 | PD | 77.70 | 19810601 | P | Held |
| 104 | Paonia | C-30459 | Gunnison | 10S | 90W | 25:SWNE, WWNW, S2NW; | PD | 480.00 | 19820301 | P | Held |
| 105 | Paonia | C-30465 | Delta | 10S | 91W | 20-23, 26-30: ALL | PD | 5814.00 | 19810501 | P | Held |
| 106 | Paonia | C-30890 | Gunnison | 10S | 90W | 1: LTS 1,2,5,6,W2SE | PD | 532.15 | 19830801 | P | Held |
| 107 | Paonia | C-39762 | Gunnison | 9S | 89W | 21,22,27-34 | PD | 3150.21 | 19850301 | 10 | |
| 108 | Paonia | C-42314 | Gunnison | 11S | 90W | 8: SWNE,NW,SENE,N2NE | PD | 320.00 | 19711101 | P | Held |
| 109 | Paonia | C-42520 | Gunnison | 10S | 89W | 6,7,17-20,29-32 | PD | 4033.07 | 19860301 | 10 | |
| 110 | Paonia | C-43457 | Gunnison | 11S | 89W | 10,11,12,13 | PD | 2520.00 | 19870101 | 10 | |
| 111 | Paonia | C-43458 | Gunnison | 12S | 89W | 24: S2; 25: ALL; | PD | 1280.00 | 19870101 | 10 | |
| 112 | Paonia | C-43972 | Delta | 11S | 91W | 32: ALL; 33: ALL | PD | 1229.00 | 19870301 | 10 | |
| 113 | Paonia | C-44948 | Gunnison | 10S | 89W | 33, 34: ALL | PD | 2105.08 | 19870601 | 10 | |
| 114 | Paonia | C-44951 | Delta | 12S | 91W | 30: ALL; 31: ALL | PD | 1770.66 | 19870601 | 10 | |
| 115 | Paonia | C-45870 | Gunnison | 10S | 89W | 27: ALL; 28: ALL | PD | 1280.00 | 19871001 | 10 | |
| 116 | Paonia | C-45871 | Gunnison | 11S | 89W | 1: LTS 1-12, S2 | PD | 551.35 | 19871001 | 10 | |
| 117 | Paonia | C-46730 | Gunnison | 9S | 90W | 25: S2S2 | PD | 153.50 | 19880401 | 10 | |
| 118 | Paonia | C-46969 | Gunnison | 13S | 89W | 12,13,14,23: ALL | PD | 2560.00 | 19880401 | 10 | |
| 119 | Paonia | C-46975 | Delta | 11S | 92W | 2,3,10,11,13-15, | PD | 7794.00 | 19880501 | 10 | |
| 120 | Paonia | C-54334 | Gunnison | 11S | 89W | 21,22,27,28,33 | PD | 2360.00 | 19810601 | 10 | |
| 121 | Paonia | C-54335 | Gunnison | 11S | 90W | 1:LTS 1-16,E2SW,W2SE | PD | 800.00 | 19810601 | 10 | |
| *DISTRICT_1 total. | | 36 Records | | | | | | | | | |
| 122 | Taylor River | C-46968 | Gunnison | 14S | 86W | 28, 29, 32, 33 | PD | 2360.00 | 19880401 | 10 | |
| *DISTRICT_1 total. | | 1 Records | | | | | | | | | |

Grand Total.   122 Records

220593.65

L-3

BLM_0048643

# Appendix M -
# Oil and Hazardous Spills
# Contingency Plan

BLM_0048644

BLM_0048645

Reviewed 1/22/93
D. Gusey

## OIL AND HAZARDOUS SPILLS CONTINGENCY PLAN
### FOR THE
### GRAND MESA, UNCOMPAHGRE AND GUNNISON NATIONAL FORESTS

A.  Introduction

This plan is for use by all Forest and District personnel who may encounter a spill situation.  The primary emphasis will be on safety by alerting personnel to the hazards of known and unknown spill materials.  Personnel will not be expected to take any direct action in controlling, neutralizing or cleaning up spills.  Their primary responsibilities will be:

1.  Safeguarding themselves and others by providing for a safe security area at a spill site.

2.  Contacting appropriate officials and communicating pertinent information about the situation.

Following are specific definitions:

Spill or Discharge - includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping of oil or hazardous materials.

Oil - means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil.  Any amount constitutes a reportable spill.

Hazardous Material - means any material of any description or origin (other than petroleum related products) which, when discharged into any waters of the State, present an imminent and substantial hazard to public health or welfare, fin-fish, shellfish, or other wildlife and shorelines and shall include all materials so designated by the EPA in their comprehensive hazardous substance list.

The amount of material spilled or discharged that constitutes a hazard varies widely depending on the chemical properties.  Therefore, all spills or discharges will be reported and the determination of hazard and response will be made by the EPA Regional On-Scene-Coordinator at the time a report is made.

Chemicals dumped on the ground, remote from surface water also constitute a hazard and must be reported.

On-Scene-Coordinator - the Federal official pre-designated by the EPA or the U.S. Coast Guard to coordinate and direct the Federal response to spill and discharge removal efforts at the scene of a discharge.

M-1

BLM_0048646

B.   Personnel Assignment and Responsibilities

All Forest and District personnel are expected to take prudent action upon discovery of a spill at any time or location.  On non-National Forest System lands, when an On-Scene-Coordinator is assigned or arrives, responsibility for further involvement will be terminated, except for requested assistance that can be reasonably and safely performed within the scope of the employee's authority.  On National Forest System lands along with the above, the District will be responsible for either interim or final reports covering cleanup and restoration or rehabilitation of the site.  Other responsible agencies such as Division of Wildlife or Water Associations will be responsible for assessing or collecting damages within the scope of their authority.

As no personnel is expected to take direct action in handling spilled material, no specific training is deemed necessary.  It is recommended that all units include and document a review of this plan at least annually at a unit meeting.  Also, it is recommended that verification of the presence of an "Oil and Hazardous Material Spill Report Information Check List" in vehicle log books be made part of annual WCF vehicle inspections.

C.   Hazards and Resources

This Forest has very high possibilities for hazardous spill situations because of many major traffic routes, certain dangerous pass crossings and large amounts of hazardous cargos.  Specific vulnerable areas are Monarch Pass, Cochetopa Canyon and Pass, Blue Mesa Pass, Cerro Summit, Black Mesa, Red Mountain, Unaweep Canyon, McClure Pass and Plateau Creek Canyon. Generally steep stream gradients of Forest streams and significantly high precipitation conditions present the threat of rapid transport of hazardous materials an appreciable distance from spill sites. Consequently, speedy communication and handling of all spill incidents is important.

The primary initial response point will be either the local County Sheriff or State Highway Patrol station.  Contacts should be made directly to these points or relayed through the Ranger District or Supervisor's Office.

D.   Operational Response

Following are actions or procedures to be followed upon discovery of a spill incident:

1.   Provide emergency first aid or rescue that can be done without serious personal self endangerment.

2.   Read and follow instructions on the "Oil and Hazardous Spills Report" document which will be contained in the vehicle log book.

3.   Provide for security of the spill area to control public access except for authorized personnel.

4.   Follow up on contacts to insure that responsible officials have been notified and are responding.

M-2

BLM_0048647

# Appendix N - Biological Assessment

BLM_0048648

BLM_0048649

# GRAND MESA, UNCOMPAHGRE AND GUNNISON NATIONAL FORESTS

## OIL AND GAS LEASING ENVIRONMENTAL IMPACT STATEMENT

### BIOLOGICAL ASSESSMENT

### FOR

### THREATENED, ENDANGERED, AND PROPOSED SPECIES

Prepared by: _Thomas M. Holland_  3/12/93
**THOMAS M. HOLLAND**
**Forest Wildlife Biologist**

Prepared by: _John J. Cameron_  3/12/93
**JOHN J. CAMERON**
**Forest Fisheries Biologist**

Received by: _Robert L. Storch_  3/12/93
**ROBERT L. STORCH**
**Forest Supervisor**

BLM  0048650

Oil and Gas Leasing Analysis FEIS

# Biological Assessment

## Introduction

The Environmental Impact Statement for Oil and Gas Leasing on the Grand Mesa, Uncompahgre, and Gunnison National Forests must include a Biological Assessment to determine what effect, if any, oil and gas leasing will have on any threatened, endangered, or proposed species that may occur within the area under analysis. To properly do this, a species list must be requested of the U.S. Fish and Wildlife Service (USFWS) which identifies any threatened, endangered, or proposed species that may occur in the area of consideration. This list was requested by the Forest Service and was received on July 1, 1992 (Appendix 1) from the USFWS.

The Forest Service must prepare a biological assessment to determine whether any threatened, endangered, or proposed species are likely to be adversely affected by the proposed action. 50 CFR 402.12.

The Draft Oil and Gas Environmental Impact Statement for the Grand Mesa, Uncompahgre, and Gunnison National Forests was completed in August of 1992. A Final Oil and Gas Environmental Impact Statement will be released in March of 1993.

The objective of this biological assessment is to serve as a document for disclosure of potential impacts on threatened, endangered, and proposed species or their habitat as a result of oil and gas leasing and to help identify potential impacts to wildlife from all phases of oil and gas activity that could occur at a later date. This assessment is based on existing information in the EIS, current research findings for the species involved, and existing data on the Grand Mesa, Uncompahgre and Gunnison National Forests.

All oil and gas development and production activities are subjected to the provisions of the Endangered Species Act. To comply with these provisions and requirements, all oil and gas activities would be evaluated first for species occurrence and secondly for the potential effects on any threatened, endangered, or proposed species at the operational stage (Application for Permit to Drill-APD) on a case by case basis, rather than at the leasing stage. However, at the ADP stage a "may affect" situation will automatically arise for the endangered Colorado River fishes because the U.S. Fish and Wildlife Service has determined that any depletion of water in the Colorado River Basin will further endanger these listed fish species.

## Definitions (16 U.S.C. 1532)

***Critical Habitat:*** that habitat which is essential to the conservation of a threatened or endangered species (There is no designated critical habitat anywhere within the National Forest lands covered in this analysis- FWS letter of July 1992).

***Endangered Species:*** a species which is in danger of extinction throughout all or a significant portion of its range.

***Proposed:*** any species proposed for listing as an threatened or endangered species by the U.S. Fish and Wildlife Service.

***Species:*** includes any sub-species of fish, wildlife, or plants and any distinct segment of any vertebrate species of fish or wildlife which interbreeds when mature.

Page N-2

BLM_0048651

**Threatened Species:** a species that is likely to become endangered within the foreseeable future.

# Project Description

The EIS documents the analysis of five alternatives developed for possible management of oil and gas leasing on approximately 1/3 of the 3 million acres administered as the Grand Mesa, Uncompahgre and Gunnison National Forest. Alternatives include: 1) Current management (specified in the current Forest Plan); 2) leasing approximately 125,980 acres under Standard Lease Terms, 687,200 acres under supplemental stipulations, and the discretionary removal of 138,270 acres from leasing; 3) No new leasing Forest-wide; 4) leasing the entire analysis area under Standard Lease Terms; 5) the same as alternative 2 with the exception that all Roadless Areas and Semi-primitive Non-motorized Areas (3A Management Areas) would be No Lease. The analysis area covered in this EIS includes those areas of high and moderate potential for oil and gas resources and those areas of low and no known potential for oil and gas resources that are currently leased. The analysis area contains approximately 951,450 acres and the lease options by alternatives are described in the following table:

| ACRES OF LEASE OPTIONS BY ALTERNATIVE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **LEASE OPTIONS** | **Alternative 1** | | **Alternative 2** | | **Alternative 3** | | **Alternative 4** | | **Alternative 5** | |
| | Acres* | % | Acres* | % | Acres* | % | Acres* | % | Acres* | % |
| No Lease (NL) | 0 | 0 | 138,270 | 15 | 951,450 | 100 | 0 | 0 | 349,150 | 37 |
| No Surface Occupancy (NSO) | 58,400 | 6 | 151,835 | 16 | 0 | 0 | 0 | 0 | 78,350 | 8 |
| Controlled Surface Use (CSU) | 463,600 | 49 | 215,170 | 23 | 0 | 0 | 0 | 0 | 130,250 | 14 |
| Controlled Surface Use & Timing Limitations | 202,350 | 21 | 239,755 | 25 | 0 | 0 | 0 | 0 | 202,950 | 21 |
| Timing Limitations (TL) | 81,600 | 9 | 80,440 | 8 | 0 | 0 | 0 | 0 | 77,950 | 8 |
| Standard Lease Terms (SLT) | 145,500 | 15 | 125,980 | 13 | 0 | 0 | 951,450 | 100 | 112,800 | 12 |

\* Analysis area = 951,450 acres.

Alternative two is the proposed action as identified in the Final Environmental Impact Statement. All of the alternatives will result in the potential development of oil and gas resources. All alternatives are subject to compliance with Forest Plan Standards and Guidelines or guidelines established in this Biological Assessment. The Reasonably Foreseeable Development Scenario (RFD) predicts the level of

BLM_0048652

oil and gas exploration and development which will occur on the Forest in the next 15 years. Under this RFD the projected well distribution on the Forest is expected to be:

- 12 on the Grand Mesa N.F

- 12 on the Gunnison N.F.

- 3 on the Uncompahgre N.F.

- 20 wells on areas already under Unit Agreement.

- Forty-seven (47) wells are projected on the Forest over the next 15 years.

- Only seven (7) wells are predicted to be drilled on new leases.

- A typical well will physically disturb approximately 10.7 acres, and will utilize 0.1 ac. ft. of water.

- Total projected ground disturbance is estimated to be 503 acres.

# Threatened, Endangered and Proposed Species in the Area

All oil and gas activities are subject to the provisions of the Endangered Species Act. To comply with the requirements of the Endangered Species Act, all oil and gas activities would be cleared for species occurrence, prior to ground disturbance at the operational stage (APD) on a case by case basis,rather than at the leasing stage. Oil and gas exploration and development has the potential to adversely affect threatened, endangered, and proposed plant and animal species on the Forest unless species and their habitat are protected where they are known to occur, and provisions are made to protect new populations, new species, and new habitat when located. Threatened, endangered, and proposed species are protected by law, regardless of lease stipulations. Where future biological assessments indicate that these species could be adversely affected, appropriate measures will be required to prevent impacts on any of these species.

The following species are either found on these Forests or habitat exists that may be suitable for these species (U.S. Fish and Wildlife Service Letter dated June 29, 1992):

## Endangered

| | |
|---|---|
| Peregrine falcon | *(Falco peregrinus)* |
| Bald eagle | *(Haliaeetus leucocephalus)* |
| Black-footed ferret | *(Mustela nigripes)* |
| Spineless hedgehog cactus | *(Echinocereus triglochidiatus var. inermis)* |

The following species of fish are not found on National Forest lands, however they are found downstream in the main Colorado River. These species are:

| | |
|---|---|
| Colorado squawfish | *(Ptychocheilus lucius)* |
| Humpback chub | *(Gila cypha)* |
| Bonytail chub | *(Gila elegans)* |
| Razorback sucker | *(Xyrauchen texanus)* |

BLM 0048653

## Threatened

Ute ladies'-tresses orchid                    *(Spiranthes diluvialis)*

## Proposed

Mexican spotted owl                           *(Strix occidentalis lucida)*
(Proposed for listing as a threatened species on Nov. 4, 1991 by the USFWS)

The gray wolf *(Canis lupis)* and the grizzly bear *(Ursus arctos)*, both endangered species, were not included in the species list letter from the USFWS on June 29, 1992 for this analysis area. Neither species has been documented within the analysis area in recent times although reports of these species occasionally occur. Both of these species are indigenous to the area and suitable habitat still exists for the gray wolf and grizzly bear. These species will not be discussed in this Biological Assessment, but future Assessments written at the time a proposal for oil and gas activity is received may include these species if sightings have occurred in that area or if re-introductions have taken place.

## Threatened and Endangered Species Surveys Completed or Proposed

## Peregrine Falcon

The U.S. Fish and Wildlife Service (letter dated June 29, 1992) identifies a confirmed peregrine falcon eyrie in the vicinity of Joe Davis Hill. This eyrie is not on National Forest System lands. The portion of the Uncompahgre National Forest adjacent to this area is administered by the San Juan National Forest. Crested Butte, South Saddle Mountain, and the entire Gunnison Curecanti National Recreation Area are listed as potential peregrine falcon habitat. Peregrine falcon surveys will be conducted in these areas in the spring of 1993 to determine if any peregrine falcon activity is occurring.

## Bald Eagle

Nesting surveys specifically designed for bald eagles have not been conducted because there has been no recent nesting activity documented on these Forests. Bald eagle surveys are planned for early next summer on Grand Mesa where high quality habitat exists for nesting bald eagles. Occasional sightings of bald eagles occur on the Forest during the summer breeding season but no nests have been found. Bald eagle wintering sites will be mapped this winter in an effort to determine more accurately where concentration areas might exist. Bald eagles are known to winter along all major rivers and streams that remain ice free in southwestern Colorado. Wintering bald eagles are quite numerous on big game winter ranges within the analysis area.

## Black-footed Ferret

No surveys have been conducted for black-footed ferrets on the Forests. There have not been any verified sightings of ferrets in recent history in this area. Most of the Grand Mesa, Uncompahgre and Gunnison National Forests are too high in elevation to support prairie dog colonies which are essential for black-footed ferrets. All known prairie dog colonies will be mapped so that potential black-footed ferret habitat can be assessed. At this time there does not appear to be any active prairie dog colonies directly on National Forest System lands. However, several prairie dog colonies are located immediately

BLM 0048654

adjacent to the National Forest. No black-footed ferrets are known to occur on any of these sites at the present time.

## Endangered Fish

No surveys have been conducted for the Colorado squawfish, humpback chub, bonytail chub or the razorback sucker because none of these species are known to occur on National Forest System lands. They are being discussed only as "off site" species that could be affected by the depletion of water from the upper Colorado River caused by any activity which depletes water resources. These fish are found in the main Colorado River downstream from the oil and gas leasing area.

## Spineless Hedgehog Cactus

This plant species is known to exist on Grand Mesa and may possibly occur on the Uncompahgre Plateau. While some site locations are known, there have been no broad area surveys conducted for this species. Most inventories have been conducted in conjunction with site specific project proposals. Inventories on this plant species will continue to be project related because of the extremely large area where this species may occur.

## Ute Ladies'-tresses Orchid

This species was listed as a threatened species on January 17, 1992. It is believed to be found more on the eastern slope of the Rocky Mountains in Colorado than in Western Colorado. However, since so little is known about this species efforts will be made to inventory this species in conjunction with surveys for the spineless hedgehog cactus. All known sites for this species are near major streams or along abandoned meanders, where ample subsurface water percolates through the stream gravels underlying lush meadows. At some locations the orchid actually grows in running water (Colorado Native Plant Society 1989). The Ute ladies'-tresses is found only at elevations less than 6,500 feet (personal communication USFWS 12/4/92).

## Mexican Spotted Owl

Intensive surveys have been conducted on the Forests for this owl during the 1990 and 1991 nesting seasons. No Mexican spotted owls were found and no responses to calling was heard during these surveys. Surveys were concentrated on the Uncompahgre Plateau and on the Naturita Division of the Uncompahgre National Forest. Potential Mexican spotted owl habitat has been identified and mapped in these areas as a result of these surveys and through literature searches of optimum habitat. Efforts were concentrated in these areas because Mexican spotted owls are known to occur on adjacent areas on the Manti-La Sal and San Juan National Forest areas, and these areas typify preferred Mexican spotted owl Habitat.

## Additional Species

The potential exists that additional species may be listed, or species already listed but not known to occur in this area at the present time, will be found here between the time of this writing and the time an APD is received. This situation will result in the necessity to conduct additional inventories to document the presence or absence of these plant or animal species. These inventories will be conducted prior to issuance of an APD in all areas affected by the proposed action. Provisions in the oil and gas lease will provide for requiring inventories to relocate oil and gas activities to avoid threatened, endangered, and proposed listed Federal species of plants and animals.

BLM_0048655

# Background Information on Threatened and Endangered Species in the Area

## Peregrine Falcon

The peregrine falcon utilizes the Grand Mesa, Uncompahgre and Gunnison National Forests primarily as a spring and fall migrant. No active nests are known to occur within the area being considered for oil and gas leasing. However, several areas within the analysis area are considered to be suitable peregrine falcon nesting habitat. The peregrine falcon is generally associated with larger valleys that contain high cliffs suitable for nesting. Valleys are used by the peregrine for preying on small birds and waterfowl.

Peregrine falcons feed almost entirely on birds (Hickey ed. 1969), and it is highly likely that peregrines frequent Forest stream and river bottoms and riparian zones in search of prey during their spring and fall migration. It is also important to note that there are several active eyries on Bureau of Land Management, National Park Service and private lands near or adjacent to the Grand Mesa, Uncompahgre and Gunnison National Forests. Peregrine falcons begin nesting activity in March and continue into July. The peregrine falcon is sensitive to human disturbance activities at or near its nesting site.

## Bald Eagle

Bald eagles utilize the Grand Mesa, Uncompahgre and Gunnison National Forests primarily as a spring and fall migrant and as a winter resident. During migration, the bald eagle uses a wide variety of habitats in search of prey or carrion. Big game winter ranges are frequented in the winter and spring where winter killed big game may be abundant. Fall migrants probably utilize streams or lakes where fish are abundant. Winter residents congregate primarily on the larger streams and rivers where open water is abundant. Associated with these feeding areas are winter roost sites where one or more bald eagles congregate. These areas are extremely important to the bald eagles' winter survival rate. At the present time we have no known bald eagle nesting territories within the oil and gas leasing analysis area. It is not unlikely that bald eagles could or will nest in the future on the Forest, particularly in areas like Grand Mesa where an abundance of open water exists. Bald eagles, like peregrine falcons are very sensitive to disturbance from the initiation of courtship to young fledging. This time period is roughly from mid-December to mid or late June. During this time period bald eagles are extremely sensitive to human disturbance activities because nest abandonment and desertion of long established territories may occur.

## Black-footed Ferret

The black footed ferret is a carnivore that is mostly nocturnal. It is the only ferret native to North America. Its historical range included the area under analysis in this EIS as its range included both western Colorado and Utah. However, black-footed ferrets are not believed to be present on the Grand Mesa, Uncompahgre and Gunnison National Forests. There have been no documented sightings of ferrets in this area of Colorado. No active prairie dog colonies are known to exist on the Forest at the present time. Prairie dogs are the principal prey source for the ferrets. The black-footed ferret is dependent on prairie dogs and their burrows for food and shelter, respectively. Searches for black-footed ferrets have not been conducted on National Forest System lands because of the low probability of expected occurrence and the lack of active prairie dog colonies. However, if any prairies dog colonies were located on the Forest, ferret searches would be initiated in any area where future management activities might occur.

BLM_0048656

# Endangered Fishes

The endangered status of these fishes can be primarily attributed to the construction and operation of large dams and reservoirs beginning in the 1950's, with subsequent concomitant changes in flow and temperature regimes. In addition, a variety of land-use practices, primarily channelization and lower instream flows eliminated access to historic backwater spawning and nursery areas. The introduction of exotic sportfish species within the basin also exacerbated the decline of the endangered fishes through inter-specific competition and predation. At present, water depletions in the upper Colorado River basin have been recognized as a major adverse impact on remaining populations and their habitats.

The four endangered fishes occur in the Colorado River downstream of the boundary of the Grand Mesa, Uncompahgre and Gunnison National Forests. Information on remnant population locations, important habitats, and life history requirements relevant to the proposed action are as follows:

***Colorado squawfish:*** The Colorado squawfish was listed as Endangered on March 11, 1967. Historic range of the Colorado squawfish included the main channels and major tributaries of the entire Colorado River basin. In the upper basin, squawfish occurred on the Colorado River as far upstream as the town of Rifle, CO. Present distribution of this species is restricted to the upper Colorado River system above Glen Canyon Dam.

In general, Colorado squawfish utilize a variety of riverine habitats with varying depths and velocities. Shoreline, eddy, and main channel areas are extensively used by adult squawfish year-round with pool and backwater habitats seasonally important (Holden and Wick, 1982). Spawning occurs in late June and July when water temperatures have reached 20 degrees C for a few days. In Colorado, insufficient instream flows which lower or dewater backwater habitats during the time period when rearing of squawfish fry and juveniles occur is especially of concern in the 15-mile reach of the Colorado River from Palisade, CO to the confluence with the Gunnison River. Pursuant to the criteria identified in the "Colorado Squawfish Recovery Plan" (U.S. Fish and Wildlife Service, 1991a) downlisting would be considered when the reach from Palisade, CO downstream to Lake Powell on the Colorado River has been documented as maintaining a self-sustaining population.

***Bonytail chub:*** The bonytail chub was listed as Endangered in April, 1980. Historic distribution included the main channels and larger tributaries of the Colorado River system. Present distribution and abundance of the bonytail chub in the Upper Colorado River Basin has been described by Holden and Stalnaker (1975a) and Tyus et al (1982a, 1987). The upper limit of bonytail distribution on the Colorado River is the Black Rocks area of Ruby Canyon (Kaeding et al, 1986). Juvenile bonytails have been collected from Desolation Canyon (Green River) and Cataract Canyon (Colorado River); Holden (1978); Valdez (1988). Bonytail recruitment in the upper Colorado River basin has been identified as "nonexistent" or "extremely low" (U.S. Fish and Wildlife Service, 1990).

Habitat requirements and general ecology of the bonytail chub is largely unknown due to only a few individuals which remain in the wild. Miller (1946) reported that the few captures of bonytails in the wild (excluding the lower basin reservoirs) in the past two decades have been in canyons with deep, fast currents. However, the general consensus among researchers is that adult bonytails utilize primarily pool and eddy habitat types with slow currents (Vanicek, 1967; Joseph and Sinning, In: U.S. Fish and Wildlife Service, unpub). No information is available on habitat preferences of juveniles and young-of year bonytails. Bonytail chub diet consists primarily of aquatic and terrestrial invertebrates. Spawning occurs when river temperatures reach approximately 18 degrees C.

Critical habitat for this species has not been identified due to the absence of information available relative to bonytail reproduction and ecological requirements. The USFWS has ranked the bonytail chub as "5C" or "a high degree of threat and a low recovery potential for a species which is in conflict with some form of economic activity."

BLM_0048657

***Razorback sucker:*** The razorback sucker was listed as Endangered on October 23, 1991. Historic range of the razorback sucker in the Upper Colorado River basin is similar to that of the bonytail and squawfish but was always more common within the lower basin. At present, razorbacks have been documented in the Green River (below its confluence with the Yampa River), and the mainstem Colorado River upstream from the confluence of the Green River to De Beque, CO (approximately 30 miles upstream of Grand Junction, CO) (Behnke and Benson 1983). In 1991, razorback suckers were collected near Rifle, CO from a gravel pit once hydrologically connected to the Colorado River (K. Rose, pers. comm.).

Unique morphological characteristics of the razorback sucker suggest it is adapted to a large riverine system with turbulent flows. However, in the upper Colorado River basin the majority of razorback captures have been in low velocity, off-channel areas in low gradient reaches. Food consists primarily of small invertebrates and organic debris on the bottom. Spawning occurs within low velocity backwaters over gravel substrate where predation by non-native fish species may contribute to low survival. Spawning occurs when river temperatures range from 12-16 degrees C.

A "Recovery Plan" for this species which will identify critical habitat has not yet been approved by USFWS. With the exception of the bonytail chub, the razorback is the rarest of the remaining Colorado River endangered fishes. Almost no recruitment within existing senile populations has been documented since the mid 1960's.

***Humpback chub:*** The humpback chub was listed as Endangered in March, 1967. Humpback chubs were the last of the Colorado River fishes to be described in the scientific literature (Miller, 1946). Therefore, little is known of its historic distribution within the Colorado River system. At present, humpback chubs occur in the upper Colorado River. Humpback chubs are found in a variety of habitats but have primarily been documented in areas associated with fast currents, deep pools, and boulders (Ferriole, 1988, In: U.S. Fish and Wildlife Service, unpub). In general, humpback chubs appear to be highly specialized with regard to habitat utilization. Lack of movement by adults out of riverine canyon habitats and relatively low number of other fish species utilizing these reaches indicate that all life history requirements are met exclusively in canyons (Valdez and Wilson, 1982, In: U.S. Fish and Wildlife Service, unpub); Archer et al, 1985). Humpbacks are primarily bottom feeders but will feed on both aquatic and terrestrial invertebrates which occur throughout the water column (U.S. Fish and Wildlife Service, 1990a). Spawning is thought to occur over gravel-cobble substrate in backwaters which are associated with preferred deep canyon habitats when water temperatures approach 16 degrees C. These water temperatures normally coincide with spring runoff conditions (Valdez and Clemmer, 1982).

Recovery goals outlined in the "Humpback Chub Recovery Plan" (U.S. Fish and Wildlife Service, 1990a) target protection and/or restoration of five viable, self-sustaining populations within the entire Colorado River basin and maintenance of the integrity of habitats utilized by these populations. While "Critical Habitat" has not been identified as such in the Plan, the two highest concentration areas for this species (Little Colorado and Colorado Rivers of the Grand Canyon, and the Black/Rocks/Westwater Canyon area of the Colorado River) are recognized as areas which are key to meeting recovery goals.

# Spineless Hedgehog Cactus

The spineless hedgehog cactus is the only plant currently listed as endangered within this analysis area at the present time. The range of this plant is from the Abajo Mountains near Monticello, Utah, north to the Uncompahgre Plateau and Grand Mesa in Colorado. When listed, only four widely dispersed localities were known. Since that time, additional plant localities have been located. The cactus is generally found on mesa tops and the surrounding areas, but inermis is limited to the parts of the mesas and benches in the pinyon pine and Utah juniper woodlands (Blankenship, 1983). The plant may be found in partial shade, in duff accumulations under pinyon pine trees and infrequently among sagebrush, on cool exposures between 5,000 and 8,000 feet in elevation. Plants are believed to be susceptible to grazing and trampling by livestock. The plant's habitat is also threatened by

BLM_0048658

Oil and Gas Leasing Analysis FEIS

energy/mineral exploration, including road construction (Anderson, 1985). Pinyon chaining projects and removal by plant collectors has also led to the species' decline.

The spineless hedgehog cactus seems to occupy such a specific habitat that it is possible to predict where new populations may be found. Sites are characterized by shallow soils with bedrock exposed, usually sandstone strata of the Cretaceous Dakota and Burro Canyon formations (Blankenship, 1983). The datil yucca appears to be the most correlative species associated with the spineless hedgehog cactus.

# Ute Ladies'-tresses Orchid

At the present time it is not known whether the range of this species lies within the area under consideration of this oil and gas EIS assessment. This species is believed to be most likely in habitats located east of the Continental Divide.

# Mexican Spotted Owl

The Mexican spotted owl has been proposed for listing as a threatened species on Nov 4, 1991 by the U.S. Fish and Wildlife Service. To date, no Mexican spotted owl sightings or nests have been confirmed on the Forests. However, the Mexican spotted owl's range may include portions of the Grand Mesa, Uncompahgre and Gunnison National Forests. The Mexican spotted owl has been found in similar habitats to the west and south of this area. Portions of the Uncompahgre National Forest are believed to be suitable habitat for this owl. Nesting pairs of this owl have been located on the Manti-La Sal National Forest, sites near the San Juan National Forest, and in and around Mesa Verde National Park. Habitats where these owls have been nesting are very similar to those found on the Uncompahgre Plateau and on the Naturita Division of the Uncompahgre National Forest. Some habitat in these areas has been identified as potential suitable habitat for the Mexican spotted owl as a result of two years of survey efforts in these areas, even though no documented sightings were observed.

Based on 10 known Mexican spotted owl nests in Colorado, suitable habitat can be categorized as either prime or possible habitat, and are described as:

***Prime habitat*** consists of: Deep, narrow canyons characterized by sheer, often tiered rock walls. Vegetation may be dominated by pinyon-juniper in an old age class, or with a mixed conifer component such as Douglas-fir, ponderosa pine, white fir, spruce, and limber pine. A typical nest site might be along or beneath a canyon rim or cliff, especially where a smaller drainage comes into a main canyon. The area would be characterized as having pinyon-juniper on the tops of the rims and mixed conifer forests in the actual drainages themselves, and also may have some oak or cottonwood trees mixed in these forested stands.

***Possible habitat*** consists of: any steep slope over 20%, with mixed conifer vegetation (based on New Mexico and Arizona data). Preliminary studies indicate that the Mexican spotted owls prefer dense mature conifer stands and steep slopes. It is not yet known if this owl requires old growth forests. Three owl nests have been located in montane (mixed conifer) forests on steep slopes and four from steep-walled canyons with montane and pinyon-juniper forests. A typical nest site might be along or beneath a canyon rim or cliff especially where a smaller drainage comes into a main canyon. Nest sites could be in an old raptor or magpie nest, a large tree cavity or where a large limb has broken off the main tree trunk, a woodrat nest on a cliff ledge or in a "witches broom" mistletoe defect. Nests are often located inside the hollow top of a broken off tree bole. Roosting occurs during the day when the these owls retire to a secluded roost on a limb in a large shady tree or to a ledge of a cave. The spotted owl preys upon bushy-tailed woodrats, rabbits, gophers, squirrels, mice, voles, bats, large insects and other prey species. Potential spotted owl habitat has been identified and mapped on the entire Uncompahgre Plateau and in the Lone Cone and Naturita areas.

BLM_0048659

Case No. 1:20-cv-02484-MSK Document 41-3 filed 04/27/21 USDC Colorado pg 699 of 728

# Affect on Threatened and Endangered Species in the Area

The proposed Federal action is the leasing of National Forest System lands for the purposes of potential oil and gas development. The authorization of a lease, in and of itself, does not create any environmental effects. However, authorization to lease implies that oil and gas development may take place at a future time with identified restrictions as outlined in the EIS. Current Federal regulations direct the Forest Service to consider subsequent actions authorized under a lease and, therefore, are considered to be "connected actions" under NEPA (40 CFR 1502).

Oil and gas development is accomplished in three phases: exploration, field development, and production. All of these phases contain activities that have the potential to directly or indirectly affect wildlife, fish, or plant species and must comply with the Endangered Species Act. Compliance will require that all oil and gas activities are cleared for species occurrences at the APD or operational stage. This will occur on a case-by-case basis rather than at the leasing stage for all Federally listed threatened and endangered species.

Potential effects of the proposed action on Federally listed threatened and endangered species are as follows:

## Peregrine Falcon

One of the greatest effects associated with oil and gas activities upon the peregrine falcon is the potential to preclude use of occupied sites such as nest sites, hunting areas, and perching sites because of oil and gas associated disturbance activities. The peregrine falcon is very sensitive to human disturbance, especially during the nesting period. All phases of oil and gas activity could preclude peregrine nesting if the activity occurred in close enough proximity of a suitable cliff which would cause a disturbance during the nest site selection period, or the nesting period itself. Direct or indirect impacts to migrating peregrine falcons temporarily using the National Forest are assessed as being very minimal in nature. Feeding or roosting sites of peregrines probably vary considerably by year while migrating through the area. The opportunity for these birds to execute temporary displacement, and shift perching and hunting areas away from points of oil and gas related disturbances is high. Disturbance to breeding pairs of peregrine falcons, should they be located, is an important factor to consider from the time of initial courtship displays to the time of young fledging. Peregrine pairs can abandon courtship activities near nesting sites if human related disturbance occurs. After egg laying and young rearing begins, disturbance can cause outright nest abandonment or can cause stress on adults causing them to leave the nest for extended time periods, resulting in egg chilling or predation. Placement of roads and well pads would be most critical if peregrine falcon eyries are located.

Another adverse effect associated with oil and gas activities upon the peregrine falcon is the potential to preclude future occupancy of suitable but unoccupied habitat because of associated disturbance activities. The types of potential impacts identified for the peregrine may be controlled with the use of seasonal activity restrictions and or no surface occupancy leasing in various zones around key habitat. Special management zones should be established around all known peregrine falcon nests or known perching sites to prevent disturbance to these species by any resource activity.

## Bald Eagle

One of the greatest effects associated with oil and gas activities upon the bald eagle is the potential to preclude use of occupied habitat (nest sites, feeding areas, winter roosts, concentrations etc.) because of oil and gas associated disturbance activities. Bald eagles are sensitive to human disturbance,

BLM 0048660

especially at nest sites, and abandonment can easily occur. If a nesting site, feeding area, or roost site is involved, then blasting, helicopter operations, heavy equipment use, vehicle traffic, and human presence could cause abandonment, decreased productivity, or preclude use altogether if the activity was close enough to cause a disturbance during the nesting period or winter roost use period at a roost site, or at feeding concentration areas which may coincide with fall and spring fish runs.

Direct or indirect impact to migrating bald eagles could be of concern if disturbances occurred in key feeding sites. The bald eagle is more limited than the peregrine falcon in areas where it may obtain a ready source of food. Winter roosting sites are extremely important for the bald eagle because these sites are located where a readily available food source is present. Activities must be restricted wherever winter roosting or feeding sites have been located.

Another adverse effect associated with oil and gas activities upon the bald eagle is the potential to preclude future occupancy of suitable, but presently unoccupied habitat, because of associated disturbance activities. Potential impacts identified for the bald eagle may be controlled with the use of seasonal activity restrictions and/or no surface leasing in various zones around key habitats. Special management zones should be established at this time around all known bald eagle nests or concentration sites to prevent disturbance to these species by any resource activity.

## Black-footed Ferret

Any indirect effects or impacts of oil and gas development on ferrets (should they exist or be reintroduced) would likely be as a result from effects to prairie dog colonies themselves. Improved access into areas previously remote could result in increased hunting of prairie dogs by humans. This could result in the direct killing of black-footed ferrets as they were mistaken for prairie dogs. Direct effects of oil and gas leasing and development on prairies dogs could have the potential to increase prairie dog habitat and the associated increase in actual prairie dog town size. Prairie dog habitat may actually be improved through the disturbance of native vegetation and soil (Cartright, 1992). Such disturbances may include oil and gas activities like the construction of roads, pipelines, well sites and powerlines. Soil disturbance in or near prairie dog towns can cause the town to spread since the prairie dogs find it easier to develop burrows in the disturbed soil (Cartright, 1992). Indirect effects of oil and gas activities on the prairie dogs are the potential to increase sport shooting. Sport shooting of prairie dogs is increasing in popularity and the potential of reducing towns though this activity also exists (Clark, 1979).

## Endangered Fish

The Federally listed Endangered Colorado squawfish, humpback chub, bonytail chub, and razorback sucker are not known to occur within the project area. However, these species do occur downstream within the Colorado River basin. Projected oil and gas exploration and gas production activities could adversely effect downstream populations. The two primary adverse impacts associated with oil and gas activities include: 1) potential water quality deterioration (both surface and ground water): and 2) water depletions (both surface and ground water).

Adverse direct, indirect, and cumulative impacts to water quality from sediment, can occur from oil and gas activities. Adverse impacts related to sediment entering streams could occur on local aquatic populations. However, for the downstream endangered fish populations and their habitats, these adverse effects would not be quantifiable. This is due to: 1) the distance downstream of the project to existing populations; and 2) the dilution factor when tributary waters enter the mainstem Colorado River and channel hydraulics.

Potential direct and indirect adverse impacts from oil and gas activities can also be associated with contamination of both ground and surface water and water depletion.

BLM_0048661

### *Groundwater*

Requirements for the protection of groundwater resources from oil and gas operations are provided in several Federal statutes. These include; the Safe Drinking Water Act, Clean Water Act, and Resource Conservation and Recovery Act. Under the Clean Water Act, Sections 319 and 402(p), and the National Pollutant Discharge Elimination System point and non-point surface discharge of water from oil and gas exploration and production operations is regulated. This is important to groundwater quality as watersheds on Federal lands serve as important recharge areas.

Potential adverse indirect effects on groundwater quality can result from the storage of drilling fluids, reserve pit wastes, and other fluid stocks (diesel fuel, mud additives) used on the surface. These contaminants can reach groundwater through the well itself and/or through tank or pit seepage-failure with site runoff and infiltration to shallow aquifers. Unlined reserve and mud pits (especially those constructed below the water table) have the highest potential for contaminating groundwater. Potential adverse impacts to groundwater quality can also result from improperly cased wells or a failure of the casing or cement. The extent of potential adverse impacts to adjacent aquifers would depend on the volume and constituents of escaping fluids, depth of groundwater, and geologic permeabilities of the surrounding area. Potential contaminants include heavy metals, hydrocarbons, and chlorides.

### *Surface Water*

Oil and gas development has the potential to adversely affect surface water quality through the introduction of sediment and toxic substances from drilling, accidental spills, and road construction and maintenance activities. Well pad, road, and pipeline construction could produce sediment which could enter surface waters. When roads, pads and pipelines are properly located, with adequate filter strips, only a fraction of the sediment produced on-site will reach surface waters. Under the proposed action, direct adverse effects from sediment would not be quantifiable on downstream endangered fish populations.

A second potential adverse impact on surface water could occur from reserve and mud pit seepage and overtopping. This could result in migration of contaminants to surface waters. During drilling activities, oily wastes and miscellaneous chemicals (mud additives, diesel oil, lubrication oil, rigwash, etc.) may accumulate in soils. Surface runoff may transport such wastes to surface waters, potentially impacting aquatic populations and degrading surface water quality. The level of adverse impacts depends on the contents of a pit.

Although measures would be in place to protect surface water quality, leaks or a spill of contaminants could occur. Off-site spills can occur from trucking accidents, pipeline leaks, or by a construction mishap. Adverse effects could impact local aquatic populations depending on the timing, duration, and type and concentrations of contaminants entering adjacent waters. As described under "Groundwater" the risk to downstream endangered fish populations would probably not be quantifiable due to the distance downstream from project boundaries, and the dilution of contaminants once they reached the mainstem Colorado River from the small tributaries.

### *Water Depletions*

Water "depletion" is defined by the USFWS as "water which would contribute to the river flow if not intercepted and not returned to the system". This includes both surface and groundwater. When these waters contribute to instream flows in the Upper Colorado River Basin, they are considered "tributary waters". Water is required during drilling of both exploratory and production wells. In addition, a small quantity of water will be required over the life of a production well for maintenance. The estimated amount of water used to drill one well in Colorado (both exploration and production) is approximately 0.10 acre-foot per well. As this quantity of surface or groundwater would not be available for instream flows, this would be considered a "depletion", and may potentially impact downstream fish.

BLM_0048662

Oil and Gas Leasing Analysis FEIS

## Spineless Hedgehog Cactus

Spineless hedgehog cactus habitat has been destroyed or impacted by previous development activities. The potential for future habitat destruction exists wherever this plant exists. Roads into these developments result in more access for plant collectors to illegally take these plants. Adverse impacts to the species can result from these actions. Inventories must be conducted throughout the area affected by an APD to determine if the spineless hedgehog cactus is found in the area prior to any ground disturbing activity. If located, provisions will be necessary so that the plant or its habitat will not be affected by the activity. Indirect effects, such as roads into the general area providing easy access to plant collectors, must also be considered in addition to direct effects.

## Ute Ladies'-tresses Orchid

By the time any APD is received, additional information on this plant and its habitat requirements and geographical range will become available. If it is determined that this plant is found in the area it will receive the same protection that the spineless hedgehog cactus receives. Inventories will be conducted to determine if the plant is located in any area prior to any ground disturbing activity.

## Mexican Spotted Owl

Oil and gas development activities could have the potential to effect the Mexican spotted owl or its habitat because of the potential to preclude use of occupied habitat such as nesting sites, foraging areas, or day roost sites. Prior to any ground disturbing activities a minimum of two years worth of surveys will need to be completed to determine, if in fact, whether this owl species does occur within the area. Some surveys have been conducted in the area under analysis, but additional surveys will need to be completed. Management guidelines and restrictions will be used to protect the Mexican spotted owl. If spotted owl nesting territories are located, they will be protected by establishing core habitat areas. These core habitat areas will consist of nesting, feeding, and roosting areas and are not considered to be overlapping. Mexican spotted owl territories are estimated to be 2000 acres.

Where multiple Mexican spotted owl sightings have occurred, but a confirmed nest site or roosting area has not been located, seismic and surface disturbing activities will be restricted within the 450 acres of the total territory of 2000 acres (BLM, 1991). In the remaining area, other surface activities may be allowed pending impact assessments conducted through the NEPA process. In areas where a confirmed nest or roost site has been identified, all surface management activities will be restricted. The core area of a confirmed nest site is 1,480 acres and all surface disturbing activities within this area will be restricted. There cannot be any exceptions to these restrictions (BLM, 1991).

The Mexican spotted owl's nesting and fledging habitat use occurs from February 1 to July 31. All activities proposed in spotted owl habitat will be restricted during these time periods. Another potential adverse effect associated with oil and gas activities on the Mexican spotted owl is the potential to preclude future occupancy of suitable, but presently unoccupied habitat, because of the associated disturbance and development related activities.

BLM_0048663

# Cumulative Effects - Impacts from Federal, State and Private Projects

Also important to consider is that the cumulative effect of oil and gas leasing and subsequent activities and other projects planned for the Grand Mesa, Uncompahgre and Gunnison National Forests may be greater than the total effect of oil and gas activities considered alone. The cumulative effect of oil and gas leasing and its subsequent activities and adjacent activities (timber sales, subdivisions, recreationists, etc.) on T&E species is largely unknown at this time. Future Biological Assessments for oil and gas activities must be closely coordinated with the Five Year Timber Management Plan, Forest Plan direction, T&E species recovery plans and other existing resource management documents. Developments in T&E species habitat can reduce habitat quality or eliminate the species altogether. One activity considered alone may cause a temporary displacement of wildlife species, but when several activities are occurring simultaneously in adjacent drainages, permanent displacement or outright elimination could occur because of a lack of necessary habitat.

At the present time, threatened and endangered species habitat disturbance activities are occurring on the Grand Mesa, Uncompahgre and Gunnison National Forests. These activities include intensive timber harvest, increased developed and dispersed recreation, subdivision development, road construction, livestock grazing, etc. These activities will complicate the evaluation of future cumulative effects of oil and gas activities. Because of the inability to identify where or when specific oil and gas activities are going to occur, it is impossible to accurately evaluate cumulative effects of future activities at this time. Each specific project Biological Assessment will have to assess cumulative effects of the proposed project in light of the completed or ongoing activities in the zone of influence of the proposed activity. The evaluation of cumulative impacts will be a critical factor in determining the effects of oil and gas activities on the T&E species in the area under analysis. All future Biological Assessments will analyze cumulative effects.

# Mitigation Guidelines at Time of Application for Permit to Drill (APD)

Surveys to document occurrences and potential affects on all listed and proposed species of plants and animals is required at the APD analysis stage and prior to on-the-ground activities. Water depletion issues and possible impacts to T&E fish will be addressed, assessed and resolved at the APD stage for all oil and gas activities that may have the potential to affect these T&E species. In addition, these mitigation guidelines and any others developed at a later date shall apply:

### A. Helicopters:

1. Helicopters should stay far enough away from cliffs and river corridors so as to prevent disturbance or possible mortality to peregrine falcons and bald eagles.

2. Most wildlife species are active during the dawn and dusk hours. Travel in helicopters should be restricted during these time periods.

3. Helicopters should be kept to specific, pre-determined lanes of travel or corridors.

### B. Roads:

1. Roads should be constructed to the minimum standard necessary and placed away from sensitive wildlife, fish or plant habitats.

BLM_0048664

2. Road construction should be severely restricted or prohibited in riparian areas.

3. Oil and gas activity roads should be closed to all other vehicle traffic, except authorized administrative use. Locked gates will be necessary and enforcement, including manning and patrolling, may be necessary.

4. Roads should be permanently closed and rehabilitated once their use for oil and gas has terminated. Physical barriers should be used to close the roads. Close to all motorized vehicles yearlong.

5. Following permanent closure, all roads should be seeded to clover, grasses, and shrubs identified as valuable to wildlife and native to the area if at all possible.

6. Regulate oil and gas activity traffic to control the numbers and timing of vehicles using the roads, especially during sensitive wildlife periods.

7. Straight stretches of roads should be avoided by placing curves at least every 1,000 feet or less, except where line of sight is restricted by natural means.

8. Whenever possible, roads should be placed in timbered areas where visibility into other areas will be limited. This screening will also reduce road traffic noise.

9. Maximum utilization should be given to existing access routes so that new road construction will be held to the absolute minimum.

10. Roads should be properly drained in order to prevent sediment from entering streams.

11. Roads should be constructed so that if trucks carrying potential pollutants go off the road, they will not spill into streams.

12. Roads will be closed to all vehicle travel except administrative and project personnel.

13. Roads will not be located near streams or important wildlife habitats such as prairie dog colonies, sage grouse leks, wallows, mineral licks, nest sites, etc.

14. Roads cannot be placed near any population of endangered plant species that would provide easier access for plant collecting.

## C. Oil and Gas Associated Activities:

1. Seasonal and temporal restrictions of activities should be made during periods of high wildlife use.

2. Oil and gas activities should be restricted so that disturbance is not occurring simultaneously in adjacent drainages.

3. Oil and gas activities should be restricted so that the number of seismic lines, roads, utilities, etc. can be minimized.

4. All oil and gas activities should have timing restrictions to minimize or eliminate disturbances to wildlife (see Appendix 1 for time periods when restrictions may be necessary).

5. Blasting, drilling, helicopters, human activity, etc. must be restricted or prohibited around sensitive wildlife, fisheries and/or plant areas.

BLM_0048665

## D. Water Quality:

1. For point-source discharges the Forest will require that water quality standards as defined in Section 401 of the Clean Water Act be met to ensure protection of downstream aquatic resources.

2. Developments will be located outside of riparian and wetland areas unless alternative routes have been reviewed and rejected as being more environmentally damaging. Pits shall not be constructed in alpine, wetland/riparian, or floodplain areas. In addition, pits shall not be constructed in a manner that results in materials seeping or being transported overground to these areas.

3. Compliance with Executive Orders 11988, Floodplain Management, and 11990 Protection of Wetlands will be required and evaluated, using U.S. Water Resources Council Floodplain Management Guidelines 43 FR 6030 for any proposals that could affect these resources. Locate new facilities outside of the 100 year floodplains (Executive Order 11988).

4. Whenever possible, avoid the addition of muds of known or suspected hazardous additives to protect ground and surface water resources.

5. Casing integrity tests should be required to reduce the potential for migration of fluids between water-bearing zones, as required by the BLM.

6. Install surface casing to below the deepest underground source of drinking water to seal the well from tributary groundwater bearing formations.

7. All operations shall be conducted in such a manner as to prevent damage, interference, or disruption of water flows associated with all springs, wells, lakes, streams and rivers. Unforeseen damage, interference, or disruption will be mitigated appropriately.

## E. Oil and Gas Developments:

1. Powerlines should be designed in such a manner that birds of prey cannot be electrocuted.

2. Pipelines should follow existing roads so that additional loss of habitat will not occur. Pipelines must be placed so that they do not inhibit the movement of wildlife. Slash will be disposed of properly.

3. Drill sites should not be located near riparian zones, streams or wildlife watering areas.

4. Avoid locating drill sites, test holes, etc. near special wildlife habitats such as mineral licks, travel corridors, burns, migration paths, prairie dog colonies (USFWS, 1991), etc.

5. Drill sites and pads should be located within forested areas, wherever possible, to lessen noise levels and reduce disturbances.

6. Sump ponds, settling ponds, or toxic sumps should be fenced, covered, and placed where danger to fish and wildlife is minimized and where breakage, should it occur, could be easily contained.

7. Pipelines and major pipeline rights-of-way should accommodate more than one line to reduce habitat destruction (Stubbs and Markam, 1979)

BLM_0048666

### F. Wildlife/Human Interactions

1. No firearms or pets should be allowed by project personnel during the life of the project. Hunting will not be permitted by project personnel.

2. Travel to and from work sites during high wildlife use periods will be restricted.

### G. Water Depletion:

Water depletion impacts from the proposed project will be compensated for by the Lessee through implementation the following mitigation measures prior to the initiation of any ground disturbing activities:

Payment of Depletion Charge: the Lessee will make a one-time contribution consistent with the "Endangered Upper Colorado River Fishes Recovery Implementation Program" in the amount of $11.50 per acre-foot of the project's average annual depletion. The average annual depletion of water (acre-feet) will be based on the number of exploratory and production wells, including maintenance water, as identified in the Lessee's Application to Drill (APD). This APD is submitted to the Bureau of Land Management (BLM) by the Lessee for approval prior to any surface disturbing activities (43 CFR Part 3160 "Onshore Oil and Gas Order No. 1). In addition, the "Surface Management Agency" (the Forest Service) can require that stipulations or measures be placed on an APD and that permit approval be contingent on implementation (43 CFR 3164.3(c)).

This payment will be calculated by multiplying the project's average annual depletion (X# of acre-feet) by the depletion charge in effect at the time. For fiscal year 1992 (October 1, 1991 to September 30, 1992) the depletion charge was $11.50 per acre-foot of the average annual depletion. This amount is adjusted annually for inflation on October 1 of each year and is based on the previous year's Composite Consumer Price Index. Ten percent of the total payment will be provided to the USFWS at the time of issuance of the APD permit. The balance will be due at the time construction or exploration commences. Payments will be made out to the "National Fish and Wildlife Foundation", accompanied by a dated letter signed by the Lessee. The total payment required by the Lessee will be included as a APD permit stipulation by the Forest Service as a condition of surface occupancy (43 CFR 3164.3(c)).

## Coordination and Additional Data Requirements

Five basic types of information will be required at the time an activity is proposed, to adequately evaluate the effects of oil and gas projects that are being proposed in the area.

1. A determination if any threatened, endangered, or proposed species or its habitat occurs in the area.

2. Identification of the key habitat components in sufficient detail on the ground, so coordination measures can be implemented. This type of data will be gathered in the following manner:

a. General data on importance of specific habitats for the species involved, gleaned from current research findings applicable to the area.

b. Specific locations of important habitat components will, for the most part, be identified at the project specific assessment. The scope of these assessments

BLM_0048667

will consider the dates identified in the stipulations used to protect wildlife and fisheries habitat reflect average conditions. Site specific assessments could identify variances in these distances or dates because of differences in topography, vegetative screening, or reproductive behavior.

3. Refinement of information on effects of oil and gas activities on T&E Species, and specific coordination measures needed to control the identified effects. This type of information will be gathered from current research findings applicable to the area.

4. Specific information on what type and level of oil and gas activities are going to occur and where these activities are proposed. This information can only be obtained from the specific applications for exploration or development permits. This information is essential, and the assessment of effects cannot be undertaken without it.

5. A detailed cumulative effects analysis will be done at the time of an APD, which will include the proposed oil and gas activity, recreation activity, timber harvest, range activities, etc.

Whenever a determination is made that any subsequent oil and gas activity proposal will result in a "May Affect" situation for any threatened, endangered, or proposed species or their habitat, Formal Consultation with the USDI Fish and Wildlife Service will be requested and initiated.

# Determination of Effect and Decision

The recommendation for oil and gas leasing, as identified in the Final Oil and Gas Leasing Environmental Impact Statement, will have "No Effect" on any threatened, endangered, or proposed species or their habitats. This "No Effect" determination is based on the assurance that project specific Biological Assessments and/or Biological Evaluation will be completed before any land disturbance activity can commence (T&E Stipulation); the ability to preclude oil and gas activities to protect T&E Species (T&E Stipulation); and the inclusions of other stipulations, coordination requirements, and guidelines which can control key habitat disturbances, restrict human access, and coordinate activity patterns.

Subsequent oil and gas activity proposals resulting from this recommended leasing action will require a site specific Biological Assessment for each activity or APD that may occur. Any one of these future assessments could conclude that a "May Affect" situation exists for any of the threatened, endangered, or proposed species discussed in that site specific or project related Biological Assessment. These site specific Biological Assessments will discuss all those species discussed here and any other animal, fish, or plant species or their habitat that may be added to the threatened, endangered, or proposed lists issued by the U.S. Fish and Wildlife Service between the present time and when an activity is proposed. Any future "May Affect" determination would be determined by the presence of any threatened, endangered, or proposed species or their habitat in an area where the activity may occur and the subsequent nature of the proposal. Variables such as timing, location, magnitude, restrictions, and mitigation will all be factors in the determination of effects.

Oil and gas development activities could adversely affect the four listed fishes and their critical downstream habitats. If this is the case, these "May Affect" determinations will require formal consultation with the USFWS under Section 7 of the Endangered Species Act and these consultations will be carried out at the APD stage. Section 7 mandates that actions authorized, funded or implemented by a Federal agency will not likely jeopardize the continued existence of a listed Endangered or Threatened species or result in the destruction or adverse modification of critical habitat.

BLM_0048668

The probability that a specific activity "May Affect" any one of these species increases as you progress through the phases toward production, because of the greater length of the potential disturbance periods involved in the later stages of oil and gas development.

At this point in time, there is insufficient information on where specific activities are going to occur to make a determination of effect on any one particular project resulting from leasing. Project specific Biological Assessments will be required and conducted in order to identify where adverse effects could occur and to identify applicable coordination measures to assure compliance with the Endangered Species Act. The incorporation of the T&E species Stipulation in all of the leases assures that the Endangered Species Act will be complied with at all activity phases of oil and gas development. See Appendix 2 for specific elements that should be addressed in all future site specific Biological Assessments.

# Conferencing and Consultation with Fish and Wildlife Service

6/4/92- The Grand Mesa, Uncompahgre and Gunnison National Forests requested a species list from the U. S. Fish and Wildlife Service.

7/1/92- The Forest received letter from Fish and Wildlife Service describing species found within the analysis area.

8/10/92- Informal consultation between Tom Holland (FS) and Terry Ireland (FWS) on their review of the Draft.

12/15/92- Informal consultation between Tom Holland (FS) and Terry Ireland (FWS). Discussion centered around the determination of "Will Not Effect" for the Final "programmatic" EIS. Terry felt that this was an appropriate way to assess and to confirm with Keith Rose. Terry also thought we should include the Ute Ladies'-tresses orchard in our assessment as so little is known about its geographical distribution that we should bring it to attention.

1/22/93- Informal consultation with Keith Rose, Assistant Colorado State Supervisor. Conversation centered around the Final Oil and Gas Leasing EIS's determination of "No Effect". Keith agreed with this determination at the programmatic stage and stated that this procedure was their preference at this time, because there is no site specific information available until an activity is proposed. At that time, the Biological Assessment or Biological Evaluation would then conclude that either a "May Affect" or a "No Effect" situation existed. If so, formal consultation would begin.

# Literature Cited

Anderson, J. 1985. Draft recovery plan for the spineless hedgehog cactus. U.S. Dept. of Interior. 19 pp.

Archer, D.L., L.R. Kaeding, B.D. Burdick, and C.W. McAda. 1985. A study of the endangered fishes of the Upper Colorado River. Final Report-Cooperative Agreement, 14-16-006-82-959. U.S. Department of the Interior, Fish and Wildlife Service, Grand Junction, Colorado. 134pp.

BLM_0048669

Behnke, R.J. and Benson, D.E. 1983. Endangered and threatened fishes of the Upper Colorado River
Basin. Ext. Serv. Bull. 503A, Colorado State University, Fort Collins, Colorado. 38pp.

Blankenship B. 1983. Echinocereus triglochidiatus var. inermis, "the spineless hedgehog cactus," an
endangered species ecological study and monitoring system. The Bureau of Land Management,
Montrose, Colorado and the Student Conservation Association, Charleston New Hampshire. 97 pp.

Cartright, T. 1992. Biological Assessment for proposed oil and gas leasing on t he Thunder Basin
National Grassland. US Forest Service. 11 pp.

Clark,T.W. 1979. The hard life of a prairie dog. National Geographic Vol. No. 2, National Geographic
Society, Washington D.C. pp.270-281.

Colorado Native Plant Society 1989. Rare Plants of Colorado 73 pp.

Hickey, J.J. (ed).1969. Peregrine falcon populations: their biology and decline. University of Wisconsin
Press, Milwaukee WI. 596 pp.

Holden, P.B. 1973. Distribution, abundance and life history of fishes of the upper Colorado River Basin.
Unpublished Ph.D. Thesis, Utah State University, Logan. 59pp.

Holden, P.B. 1978. A study of the habitat use and movement of the rare fishes in the Green River, Utah.
Transactions, Bonneville Chapter of the American Fisheries Society 1978:64-89.

Holden, P.B. and C.B. Stalnaker. 1975a. Distribution and abundance of mainstream fishes of the middle
and Upper Colorado River Basins, 1967-1973. Transactions of the American Fisheries Society
104:217-321.

Holden, P.B. and E.J. Wick. 1982. Life history and prospects for recovery of Colorado squawfish. In W.H.
Miller, H.M. Tyus and C.A. Carlson, Eds, Fishes of the upper Colorado River systems, present and
future. Western Division, Am. Fish Soc., Bethesda, Maryland.

Kaeding, L.R., B.D Burdick, P.A. Schraeder, and W.R. Noonan. 1986. Recent capture of a bonytail (Gila
elegans) and observations on this nearly extinct cyprinid from the Colorado River. Copeia (1986
(4):1021-1023.

Miller, R.R. 1946. Gila cypha, a remarkable new species of cyprinid fish from the Colorado River in
Grand Canyon, Arizona. J. Washington Acad. Sci. 36:409-415.

Stubbs, C.W., and B.J.Markam. 1979. Wildlife mitigative measures for oil and gas activity in Alberta.
The Mitigation Symposium, USDA-Forest Service Technical Report RM-65, 684 pp.

Tyus, H.M., B.D. Burdick, R.A. Valdez, C.M. Haynes, T.A. Lytle, and C.R. Berry. 1982a. Fishes of the
Upper Colorado River Basin: Distribution, abundance and status. Pages 12-70. In Miller, W.H.,
H.M. Tyus, and C.A. Carlson, eds. 1982. Fishes of the Upper Colorado River System: Present and
Future. Western Division, American Fisheries Society, Bethesda, Maryland.

Tyus, H.M., R.L. Jones, and L.A. Trinca. 1987. Colorado River fishes monitoring project. 1982-1985.
Final Report. U.S. Department of the Interior, Fish and Wildlife Service, Vernal, Utah. 127pp.

USDI Bureau of Land Management. 1991. Colorado oil and gas leasing and development, Final
Environmental Impact Statement. Colorado State Office, Denver Co.

U.S. Fish and Wildlife Service. 1990. Bonytail chub recovery plan. U.S. Fish and Wildlife Service,
Denver, Colorado. 35pp.

BLM_0048670

Oil and Gas Leasing Analysis FEIS

U.S. Fish and Wildlife Service. 1990(a). Humpback chub recovery plan. U.S. Fish and Wildlife Service, Denver, Colorado. 43pp.

U.S. Fish and Wildlife Service. 1991. Guidelines for coordinating oil and gas and black-footed ferret recovery in designated management areas. DRAFT. 51 pp.

U.S. Fish and Wildlife Service. 1991a. Colorado squawfish recovery plan. U.S. Fish and Wildlife Service, Denver, Colorado. 56pp.

U.S. Fish and Wildlife Service. 1991b. Initial consultation under the Endangered Species Act. Letter dated November 19, 1991.

U.S. Fish and Wildlife Service(unpublished). Habitat use characteristics of fishes in the Upper Colorado River Basin. U.S. Fish and Wildlife Service, Region 6; Denver, Colorado.

Valdez, R.A. 1988. Cataract Canyon fish study. Final Report: Contract No. 5-CS-40-02820. U.S. Department of the Interior. Bureau of Reclamation, Salt Lake City, Utah. Six sections + 4 appendices (various pagination).

Valdez, R.A. and G.H.Clemmer. 1982. Life history and prospects for recovery of the humpback and bonytail chub. In W.H. Miller, H.M. Tyus, and C.A. Carlson, Eds, Fishes of the upper Colorado River systems, present and future. Western Division, Am. Fish Soc., Bethesda, Maryland.

BLM_0048671

APPENDIX 1: Time periods important to threatened, endangered, or proposed species that will require timing restrictions or coordination:

|  | Habitats Found | Critical Time Periods |
|---|---|---|
| Peregrine Falcon | Cliff Complexes | March 16 to July 31 |
| Bald Eagle | Nesting Habitat | December 15 to June 15 |
|  | Winter Roost Site | November 16 to April 15 |
| Black-footed Ferret | Prairie Dog Colonies | March 1 to August 31 |
| Spineless hedgehog cactus | Drier lower elevations | Yearlong |
| Ute ladies'-tresses orchid | Below 6,500 feet | Yearlong |
| Mexican Spotted Owl | Nesting/Fledging Hab. | February 1 to July 31 |

BLM_0048672

APPENDIX 2: Resource Considerations for Site Specific Project Biological Assessments.

Site specific biological assessments to determine the potential effects upon Threatened, Endangered, and Proposed Species should include an analysis of at least the following:

1. Direct impact from road, drill pad, well site, construction etc. on key habitats utilized. (Appendix 1)

2. Disturbances which could influence the use of key habitats (Appendix 1); e.g. blasting, helicopter operation, heavy equipment operation, vehicle traffic or human presence.

3. Water depletions during the exploration and development of wells and any other activities related to oil and gas development activities, i.e., road construction and use.

4. Increased human disturbance and the probability of human/wildlife conflicts.

5. Direct mortality from oil and gas activities; e.g., toxic sumps, powerlines, illegal shooting, etc.

6. Disruption of wildlife travel corridors and migration routes.

7. Disturbances which could affect nesting success or productivity of the peregrine falcon, bald eagle, or Mexican spotted owl (See Appendix 1).

8. Disturbances which could preclude the use of suitable, currently unoccupied habitat.

9. Comprehensive analysis of cumulative effects.

10. Analysis of habitat modification.

11. Conduct a "May affect" analysis of effects of activities on Colorado squawfish, humpback chub, bonytail chub, and razorback sucker as it relates to water depletion.

12. Two year protocol survey requirements will be required in identified Mexican spotted owl potential habitat.

13. Black-footed ferret searches must be conducted in all prairie dog towns prior to any action to determine if black-footed ferrets are present or absent.

14. The lessee will be responsible to see that thorough searches are made for threatened, endangered, or proposed plants species within any area where activities might occur.

15. The lessee will be responsible to see that bald eagle and peregrine falcon surveys are conducted prior to any activity.

16. Threatened, endangered and proposed plants usually require a specific time window when they can be observed or identified, and some plant taxa require checking several times a year for both flowers and fruits or seeds. Some taxa may require multiple year surveys to determine if the plant does or does not exist within an area. For example, climate conditions may prevent a listed plant from emerging (annuals) or blooming during the year.

BLM_0048673

Appendix 3



# UNITED STATES DEPARTMENT OF THE INTERIOR
## *FISH AND WILDLIFE SERVICE*

FISH AND WILDLIFE ENHANCEMENT

Western Colorado Sub-Office
529 25½ Road, Suite B-113
Grand Junction, CO 81505-6199

PHONE: (303) 243-2778                    FAX: (303) 245-6933



JUL -1 '92

IN REPLY REFER TO:
FWE/CO:FS:GMUG
MS 65412 GJ

June 29, 1992

| SUPERVISOR | |
|---|---|
| EXECUTIVE ASSISTANT | |
| PAO | |
| ADMIN | |
| RWFE/TIMBER/FIRE | |
| LMP/NEPA/SWM | ✓ |
| REC/CULT RES/LANDS | |
| ENGINEERING | |
| RANGERS | |
| | |
| PROMISE CARD | |

Mr. Robert L. Storch
Forest Supervisor
Grand Mesa, Uncompahgre, and Gunnison National Forests
2250 Highway 50
Delta, Colorado  81416

Dear Mr. Storch:

This responds to your June 4, 1992, letter regarding the preparation of an Environmental Impact Statement for oil and gas leasing on portions of the Grand Mesa, Uncompahgre, and Gunnison National Forests.  You have requested a list of federally listed species that may occur in the analysis area.

The following federally listed species may occur within the analysis area.

### FEDERALLY LISTED SPECIES

| | |
|---|---|
| Peregrine falcon | *Falco peregrinus* |
| Bald eagle | *Haliaeetus leucocephalus* |
| Mexican spotted owl[1] | *Strix occidentalis lucida* |
| Black-footed ferret | *Mustela nigripes* |
| Colorado squawfish | *Ptychocheilus lucius* |
| Humpback chub | *Gila cypha* |
| Bonytail chub | *Gila elegans* |
| Razorback sucker | *Xyrauchen texanus* |

Peregrine falcon

A confirmed peregrine falcon eyerie is located in the vicinity of Joe Davis Hill.  Potential peregrine falcon eyeries are designated in the vicinity of Crested Butte, South Saddle Mountain, and along the entire Gunnison Curecanti National Recreation Area.  Your evaluation should, therefore, determine the current status of peregrine falcon at these sites to assess potential impacts. Current status of peregrine falcons at confirmed and potential nest cliffs can be obtained by contacting Jerry Craig with the Colorado Division of Wildlife (303/484-2836).

---

[1] Proposed as threatened 11/4/91 (56 FR 56344)

BLM_0048674

## Bald eagle

We have no records of bald eagle nests at any of the Forest Service sites. However, bald eagles are common winter visitors to Colorado. Bald eagles are known to fly up to 18 miles from night roosts to feeding areas and it is likely that even greater distances are traveled searching for food. The species may therefore occur in the project area. Your biological evaluation should determine whether wintering bald eagles occur at any of the Forest's streams or reservoirs. If they do occur, the Forest Service should evaluate potential impacts.

## Mexican spotted owl

Mexican spotted owls may occur in those areas identified in San Miguel County. Two consecutive years of searches for owls should precede any leasing in these areas.

## Black-footed ferret

The black-footed ferret is dependent on prairie dogs and their burrows for food and shelter, respectively. It is our position that any impact to prairie dogs may impact the ferret unless a ferret search is completed to conclude their absence. Your evaluation should determine whether prairie dogs occur on the Grand Mesa, Uncompahgre, or Gunnison National Forests. If prairie dogs do occur, the Forest Service should conclude that ferrets may also occur and assess potential impacts associated with oil and gas leasing. Please contact this office prior to initiating any black-footed ferret searches.

## Federally listed fish

We consider the depletion of water from the upper Colorado River an adverse impact to habitat for all the above federally listed fish species. Consequently, any activity authorized by the Forest Service that results in a net depletion of water from the upper Colorado River basin should trigger a "may affect" finding by the Forest and formal consultation with this office under authority of the Endangered Species Act.

The Forest Service should review their proposed Federal action and determine if the action would affect any listed species. If the determination is "may affect" for listed species, the Forest Service must request in writing formal consultation from our office. At that time, your agency should provide this office a biological assessment and/or any other relevant information used in making the impact determinations.

## Federal Candidate Species

We believe your evaluation should also consider the following species which are candidates for official listing as threatened or endangered species [(Federal Register, Vol. 55, No. 35, February 21, 1990, and Federal Register, Vol 56, No. 225, November 21, 1991 (copy enclosed))]. While these species presently have no legal protection under the Endangered Species Act, it is

N-26

BLM 0048675

within the spirit of the Act to consider project impacts to potentially sensitive candidate species. Additionally, we wish to make you aware of the presence of Federal candidates should any be proposed or listed prior to the time that all Federal actions related to the project are completed.

The list was compiled from Colorado Division of Wildlife latilong surveys and other general literature. We have no specific records fir the Forest Service properties identified in your letter.

## FEDERAL CANDIDATE SPECIES

| | |
|---|---|
| Ferruginous hawk | Buteo regalis |
| Loggerhead shrike | Lanius ludovicianus |
| Northern goshawk | Accipiter gentilis |
| Baird's sparrow | Ammodramus bairdii |
| Western snowy plover | Charadrius alexandrinus nivosus |
| Black tern | Childonias niger |
| White-faced ibis | Plegadis chihi |
| Flannelmouth sucker | Catostomus latipinnis |
| Roundtail chub | Gila robusta |
| Colorado River cutthroat trout | Oncorhynchus (=Salmo) clarki pleuriticus |
| Penstemon mensarum | Grand Mesa penstemon |

There is no designated critical habitat within the Forest Service properties you identify. Our agency is presently classifying critical habitat for the federally listed fish species. This designation should be proposed in the Federal Register within the next year.

We appreciate your attention to federally listed and candidate species. Please contact Bob Leachman if there are any question.

Sincerely,

Keith L. Rose
Assistant Colorado State Supervisor

cc:   FWS/FWE, Golden
      FWS/FWE, Salt Lake City
      CDOW, Grand Junction
      CDOW, Montrose

N–27

BLM_0048676

BLM_0048677

# Appendix O - Biological Evaluation

BLM_0048678

BLM_0048679

*GRAND MESA, UNCOMPAHGRE AND GUNNISON NATIONAL FORESTS*

*OIL AND GAS LEASING ENVIRONMENTAL IMPACT STATEMENT*

*BIOLOGICAL EVALUATION*

*FOR FEDERAL CANDIDATE SPECIES AND SPECIES OF CONCERN*

Prepared By: _Thomas M. Holland  3/12/93_
**THOMAS M. HOLLAND**
Forest Wildlife Biologist

Received By: _Robert L. Storch  3/12/93_
**ROBERT L. STORCH**
Forest Supervisor

BLM  0048680

# Biological Evaluation

## Introduction

This Environmental Impact Statement for Oil and Gas Leasing on the Grand Mesa, Uncompahgre and Gunnison National Forests includes a Biological Evaluation to document the potential effects oil and gas leasing will have on Federal Candidate, Species of Concern or Sensitive Species that may occur within the area under analysis. To properly do this, a species list must be requested of the U.S. Fish and Wildlife Service (USFWS) which identifies Federal Candidate species that may occur in the area of consideration. This list was requested by the Forest Service and was received on July 1, 1992 (Appendix 3) from the USFWS. In addition, some of the species identified by the Forest Service as proposed Sensitive Species are also addressed within this Biological Evaluation. The purpose of this Biological Evaluation is to discuss whether the potential effects of the proposed leasing are likely to contribute toward the Federal listing of any of these species. No Regional conservation strategies have been completed for any of the species covered by this evaluation.

The Draft Oil and Gas Environmental Impact Statement for the Grand Mesa, Uncompahgre and Gunnison National Forests was completed in August 1992. A Final Oil and Gas Environmental Impact Statement will be released in March 1993. This evaluation is based on existing information in the EIS, current research findings for the species involved, and existing data on the Grand Mesa, Uncompahgre, and Gunnison National Forests.

All oil and gas development and production activities are subjected to the provisions of the Endangered Species Act, other laws, and requirements outlined in the Forest Plan. Some of the species discussed in this Biological Evaluation, especially the Candidate Species, may be listed species under the Endangered Species Act (ESA) at the time of a specific project proposal or Application for Permit to Drill (APD) in the future. At the present time, these species do not legally fall under the protection of the ESA, but since these species have been identified as those whose population levels have dropped in recent years or their habitat is threatened, they are identified and discussed here in relation to the proposed action of oil and gas leasing. To comply with these provisions and requirements, all oil and gas activities would be cleared for species occurrence at the operational stage on a case by case basis, rather than at the leasing stage. A site specific Biological Evaluation for Federal Candidate Species and species the Forest Service identifies as Sensitive will be conducted for each subsequent oil and gas activity as a result of this leasing EIS.

## Definitions (16 U.S.C. 1532)

*Critical Habitat:* That habitat which is essential to the conservation of a threatened or endangered species (There is no designated critical habitat anywhere within the National Forest lands covered in this analysis- FWS letter of July 1992).

*Candidate Species:* Those plant and animal species that, in the opinion of the USFWS, may become threatened or endangered. The USFWS has recognized three categories of Candidate species for listing as endangered or threatened:

a. Category 1 are taxa for which the FWS has substantial information on hand to support the biological appropriateness of proposing to list the species as endangered or threatened. Currently, data are being gathered concerning essential habitat needs, and for some taxa, the precise boundaries for critical habitat designations. Development and publication of proposed rules on such species is anticipated.

BLM 0048681

b. Category 2 are taxa for which information now in possession of the FWS indicates that proposing to list the species as endangered or threatened is possibly appropriate, but for which conclusive data on biological vulnerability and threat(s) are not currently available to support proposed rules.

c. Category 3 are taxa that are no longer being considered for listing as endangered or threatened and are not regarded as candidate species.

***Species of Concern:*** Those plant and animal species identified by the Regional Forester for which population viability is a concern, as evidenced by:

a. Significant current or predicted downward trends in population numbers or density.

b. Significant current or predicted downward trends in habitat capability that would reduce a species' existing distribution.

These species will probably be designated as "Sensitive Species" by the Regional Forester in the future.

***Species:*** Includes any sub-species of fish, wildlife, or plants and any distinct segment of any vertebrate species of fish or wildlife which interbreeds when mature.

## Project Description

The EIS documents the analysis of five alternatives developed for possible management of oil and gas leasing on approximately 1/3 of the 3 million acres administered as the Grand Mesa, Uncompahgre and Gunnison National Forests. Alternatives include: 1) Current management (specified in the current Forest Plan); 2) leasing approximately 125,980 acres under Standard Lease Terms, 687,200 acres under supplemental stipulations, and the discretionary removal of 138,270 acres from leasing; 3) No new leasing Forest-wide; 4) leasing the entire analysis area under standard lease terms; 5) the same as Alternative 2 with the exception that all Roadless Areas and Semi-primitive Non-motorized areas (3A Management Areas) would be No Lease. The analysis area covered in this EIS includes those areas of high and moderate potential for oil and gas resources and those areas of low and no known potential for oil and gas resources that are currently leased. The analysis area contains approximately 951,450 acres.

BLM 0048682

Oil and Gas Leasing FEIS

| ACRES OF LEASE OPTIONS BY ALTERNATIVE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| LEASE OPTIONS | Alternative 1 | | Alternative 2 | | Alternative 3 | | Alternative 4 | | Alternative 5 | |
| | Acres* | % | Acres* | % | Acres* | % | Acres* | % | Acres* | % |
| No Lease (NL) | 0 | 0 | 138,270 | 15 | 951,450 | 100 | 0 | 0 | 349,150 | 37 |
| No Surface Occupancy (NSO) | 58,400 | 6 | 151,835 | 16 | 0 | 0 | 0 | 0 | 78,350 | 8 |
| Controlled Surface Use (CSU) | 463,600 | 49 | 215,170 | 23 | 0 | 0 | 0 | 0 | 130,250 | 14 |
| Controlled Surface Use & Timing Limitations | 202,350 | 21 | 239,755 | 25 | 0 | 0 | 0 | 0 | 202,950 | 21 |
| Timing Limitations (TL) | 81,600 | 9 | 80,330 | 8 | 0 | 0 | 0 | 0 | 77,950 | 8 |
| Standard Lease Terms (SLT) | 145,500 | 15 | 125,980 | 13 | 0 | 0 | 951,450 | 100 | 112,800 | 12 |

* Analysis area = 951,450 acres.

Alternative 2 is the proposed action as identified in the Final Environmental Impact Statement.

All of the alternatives will result in the potential development of oil and gas resources. All alternatives are subject to compliance with Forest Plan Standards and Guidelines or guidelines established in this Biological Evaluation.

The Reasonably Foreseeable Development Scenario (RFD) predicts the level of oil and gas exploration and development which will occur on the Forest in the next 15 years. Under this RFD the projected well distribution on the Forest is expected to be:

- 12 on the Grand Mesa N.F
- 12 on the Gunnison N.F.
- 3 on the Uncompahgre N.F.
- 20 wells on areas already under Unit Agreement.
- Forty-seven (47) wells are projected on the Forest over the next 15 years.
- Only seven (7) wells are predicted to be drilled on new leases.
- A typical well will physically disturb approximately 10.7 acres
- Total projected ground disturbance is estimated to be 503 acres.

BLM 0048683

# Candidate and Proposed Sensitive Species in the Area, and Background Information

## Federal Candidate Species

### Category 1

**Southwestern willow flycatcher *(Empidonax trailii extimus):*** Status Declining. The willow flycatcher is one of eight species in the genus *Empidonax* all of which are very similar in appearance. The southwestern willow flycatcher is the palest in color of the races. Willow flycatchers arrive on their breeding territories in early May when the males begin singing. Nesting occurs between late May and late July. Clutches of 3-4 eggs are laid in mid-June to mid-July. Willow flycatchers are closely associated with riparian habitats such as willow or alder thickets along streams, on the shores of ponds, or bordering marshy areas. They also are found in the brushy margins of fields, along mountain streams, and in shrubby floodplain areas. They prefer areas of high shrub densities interspersed with openings or meadows. The woody component of their habitat is almost exclusively deciduous including willows, alders, cottonwoods, aspens, and shrubs such as chokecherry, hawthorn, sumac, and wild rose. Their breeding territories are approximately 1.5 acres and densities of 9-14 pairs/100 acres can be found. Willow flycatchers migrate in the fall to wintering areas in Central and South America. Habitat loss and brown-headed cowbird *(Molothrus ater)* nest parasitism are the two main causes of willow flycatcher declines. Degradation of riparian habitats by livestock has contributed to riparian habitat loss. Other possible threats include pesticides and degradation of winter habitat. Management of the willow flycatcher should include protection and restoration of riparian areas and control of cowbird populations (Spahr et al.).

### Category 2

#### Fishes

**Colorado River Cutthroat Trout *(Oncorhynchus clarki pleuriticus):*** Status Declining. Of all the trout species known to exist on the Forest, this is the most sensitive to changes in habitat quality and the most limited in it's range, in terms of habitat quality and quantity. Spawning occurs in late spring when the water temperature reaches 45°. This trout requires cool clear water and well vegetated streamsides. It prospers at high elevations. Hybridization with introduced non-native trout has drastically altered the genetic purity of this subspecies. Historically, this species occupied most of the streams in the analysis area, but due to habitat loss, competition from introduced species and changes in habitat quality, their numbers have steadily declined. The Forest is currently in the process of cooperating with the Colorado Division of Wildlife in preparing a conservation plan designed to keep this species from becoming listed as endangered.

**Flannelmouth Sucker *(Catostomus latipinnis):*** Status Declining. The flannelmouth sucker is a native to the Colorado River system and populations are believed to have declined in the past decade. Populations of flannelmouth suckers were found throughout the Colorado River system in rocky pools, runs, and riffle habitat of the medium to large rivers, less often in creeks and small rivers. The construction of dams on the larger rivers has segmented the river system and created barriers to movement, isolating populations into smaller reaches. Similar to the endangered fish of the Colorado River system, declines in populations of flannelmouth sucker have been closely correlated with the construction of dams and reservoirs, the introduction of non-native fishes, and the removal of water from the Colorado River system.

**Roundtail Chub *(Gila robusta):*** Status Declining. The roundtail chub is native to both the Colorado River system in the U.S. and Rio Piaxtla in northwestern Mexico. Roundtail chubs were found

throughout the Colorado River system in rocky runs or pools within creeks or the small to large rivers. The construction of dams on the larger rivers of the Colorado system has segmented the river system and created barriers to movement, isolating populations into smaller reaches. Similar to other native fish of the Colorado River system, declines in populations of the roundtail chub have been closely correlated with the construction of dams and reservoirs, the introduction of non-native fishes, and the removal of water from the Colorado River system.

## Birds

**Loggerhead Shrike *(Lanius ludovicianus)*:**  Status Unknown.  At the present time little is known of the present distribution or abundance of the loggerhead shrike on the Forests, except that it may be present in limited numbers in a variety of habitats.  In this area, it prefers chaparral habitat types such as the ponderosa pine/Gambel oak ecosystem; nests in dense shrubs or trees; may produce two broods of 4-8 young per year; and prefers areas with an abundance of perches that it hunts from. Prey items include insects, and occasionally small birds, mammals, and reptiles.  Population trend is undetermined at the present time.

**Northern Goshawk *(Accipiter gentilis)*:**  Status Stable.  The goshawk represents the mature aspen successional stage and is a good indicator of certain types of old growth habitat.  It occupies coniferous and mixed forest habitats, in addition to the aspen ecosystems.  Goshawks seem to select for specific structural characteristics in nest trees and nesting stands.  Goshawk nesting territories include 2-5 nest trees per nest territory.  These nest trees are almost always within 0.6 miles of each other (Reynolds, 1975).  Goshawks usually show up on their breeding territories in early March and nesting activity is completed when young fledge in July or August.  Goshawk nest stands have consistently been described as mature to old growth.  Forest stands selected for nesting may be either multi-storied or single story.  Stands are characterized by having high basal areas, open understory, gently to moderately steep slopes, on northerly aspects, and are fully stocked with trees.  Nest trees are often in very old large aspen trees that have an understory of coniferous trees.  Prey items include red squirrels, Abert's squirrels, snowshoe hares, cottontail rabbits, ground squirrels, blue grouse, woodpeckers, jays, robins, and others.  Goshawk home ranges can be from 1-4 miles apart (Shuster and others, 1976).

**Baird's Sparrow *(Ammodramus bairdii)*:**  Status Declining.  This sparrow is believed to be an uncommon migrant on the Forest and does not breed on the Forest.  Population numbers are in a downward trend.  It frequents grassy areas with scattered shrubs during migration.

**Western Snowy Plover *(Charadrius alexandrinus nivosus)*:**  Status Declining.  Most of the Forest is above the elevational range of this species.  It can be considered an infrequent migrant to most of the Forest area.

**Black Tern *(Childonias niger)*:**  Status Declining.  The Forest may be within the lower latitudinal range of this species.  It is a breeder on lakes and fresh marshes.  The abundance and distribution of this species on the Forest is largely unknown at this time.  The Forest does not provide the necessary habitat requirements for this species, so it is doubtful this species is a summer breeder on the Forest.

**Mountain Plover *(Charadrius montanus)*:**  Status Unknown.  This species is not known to occur on the Forests within the area covered by this analysis.

**White-faced ibis *(Plegadis chihi)*:**  Status Unknown.  This species is probably not found on the Forest in the area covered by this analysis.

**Harlequin Duck *(Histrionicus histrionicus)*:**  Status Declining.  The Harlequin duck is not known to breed on the Grand Mesa, Uncompahgre and Gunnison National Forests.  However, no surveys have been conducted for this species to verify its population status.  A relatively small duck and the most oddly colored of all North American waterfowl, it arrives on breeding sites by late April through mid-May.

BLM_0048685

They return to the same area each year. Nests contain 3-8 eggs. They feed primarily on clear water benthic aquatic insects. This species is threatened by habitat degradation and human disturbance. Logging near riparian areas and roading is detrimental. Harlequin ducks require relatively undisturbed, low gradient (<3°), meandering mountain streams with dense shrubby riparian areas, (50% streamside vegetation) and woody debris for nesting, loafing and brood rearing (Spahr et al.).

**Columbian Sharp-tailed Grouse** *(Tympanuchus phasianellus columbianus)*: Status Declining. The Columbian sharp-tailed grouse, commonly referred to as the mountain sharptail, was once much more common on the Forest than it's current distribution would indicate. Populations are still known to exist on the north end of the Uncompahgre Plateau and possibly on the north side of Grand Mesa. These populations occur on small open parks generally between 6,500 and 9,000 feet in elevation. Adequate cover is needed by sharptails for nesting, roosting, and escape cover. During the breeding season the sharp-tailed grouse congregate on dancing grounds or leks from March to June. At least 4 leks have been documented on the Uncompahgre Plateau (Rogers, 1969). Nesting begins in April and May when 12 eggs are laid. Food is varied depending on location, but includes buds, leafy vegetation, seeds, fruits, and insects. Lack of shrubs and depletion of grass ranges appear to be factors limiting the habitat of sharptails. Loss of native grassland vegetation appears to be the primary reason for decline in populations. The Sharptail is a very wary bird and is susceptible to disturbance.

## Mammals

**Southwest otter** *(Lutra canadensis sonorae)*: Status Unknown. The river otter has been reintroduced into the Gunnison and San Miguel River Systems. The otter spends most of its time in or adjacent to the river itself, where it feeds on fish it catches. One to five young are born per year. Otters are active both day and night. There is a possibility that river otters have colonized streams within the analysis area.

**North American Wolverine** *(Gulo gulo luscus)*: Status Unknown. The wolverine is the largest terrestrial member of the weasel family. It is on the State list of endangered species in Colorado. Wolverines once occupied the area in low numbers and likely still occur in some areas within the analysis area. Wolverines are a naturally low-density species throughout their range. They are a solitary animal with large home ranges. Hornocker (1981), estimated a density of one wolverine per 25 square miles on a study area in northwest Montana. Young (2-3) are born every two or three years at den sites in February, March or April. This breeding characteristic adds to the wolverine's low reproductive potential. Wolverines feed on small mammals, forest grouse, ptarmigan, fish, fruits, and ungulate carrion. The wolverine inhabits coniferous forests and alpine areas during the summer and move to somewhat lower elevations during the winter, where carrion or weak big game animals could be present. Riparian zones are preferred feeding areas. This species prefers large unroaded areas where contact with humans is minimal. Current threats to its survival include intentional and unintentional trapping, incidental poisoning, and logging and road development in its existing habitat. Because wolverines are a naturally low-density species throughout their range, they have a low viability. Records of sightings exist for Delta, Ouray, and Gunnison Counties. Many historical sightings have come from Grand Mesa (Armstrong, 1972).

**North American Lynx** *(Felis lynx canadensis)*: Status Stable. The lynx is also on the Colorado State endangered species list. While never abundant in Colorado it has suffered population declines across most of its southern range. The lynx prefers boreal forest situations consisting of spruce, fir, lodgepole pine, and mixed aspen-conifer, because it's principal prey species, the snowshoe hare, frequents these sites. The snowshoe hare makes up the majority of the lynx's diet, while mice, small mammals, and birds make up the rest. Breeding occurs from mid March to early April. Females give birth to 3-4 young in late May to early June in rock crevices or in hollow trees or stumps. Lynx densities are also low, ranging from 6-10 square miles per individual. While dense stands of young conifers are used for preying on snowshoe hares, mature stands of conifers are used for denning, cover, and as travel corridors. Like the wolverine, the lynx's range has dwindled due to hunting, trapping pressure, and predator control programs. Lynx densities range 1 lynx per 6-10 square miles. Continued threats to

BLM_0048686

Oil and Gas Leasing FEIS

the lynx include: forest fragmentation caused by roading and logging of timber. Roads result in increased accessibility for trappers on foot or on snowmobiles.

**Spotted Bat** *(Euderma maculatum):*  Status Unknown. The spotted bat may be found in a variety of habitats including open ponderosa pine, desert shrub, and pinyon-juniper woodlands. They roost alone in rock crevices high up on steep cliff faces. Cracks and crevices 1-2" wide in limestone or sandstone cliffs are critical roosting sites. They are found in relatively remote, undisturbed areas suggesting that they may be sensitive to human disturbance. This bat apparently breeds in late February to early April and gives birth to one young in late May to early July. Little is known of this bat's food habits except that it may feed primarily on moths. It may return annually to the same roosting areas. This bat migrates south for winter hibernation. The spotted bat is rare and may be limited by available roosting sites. Limestone cliffs, canyon walls, caves and mine shafts are important to this species of bat.

**Fringed-tailed Myotis** *(Myotis thysanodes phasapensis):*  Status Unknown. This is a colonial bat that lives primarily in caves. Little is known of the population status of this bat in the area. It may not be abundant anywhere within its range. This bat gives birth in the spring to one young per year. It prefers coniferous woodlands and desert shrub situations. Records from Montrose County exist (Armstrong, 1972).

## Butterflies

**Regal Fritillary Butterfly** *(Speyeria idalia):*  Status Declining. This is an orangish-brown butterfly that occurs as scattered local populations. Adults appear mid-June to mid-September. They are found in wet meadows or marshlands. The population status of this species is largely unknown at this time on these Forests.

**Great Basin Silverspot Butterfly** *(Speyeria nokomis nokomis):*  Status Declining. A brownish-orange butterfly, who as adults, appear in late August or September. Known localities are widely separated due to restricted habitat, which consists of boggy streamsides or marshy areas. One known locality is Mount Sneffels in Ouray County. (Tilden and Smith 1986)

## Reptiles and Amphibians

**Boreal Western Toad (Southern Rocky Mountain Population)** *(Bufo boreas boreas):*  Status Declining. The boreal western toad is a species that has rapidly declined over its range in the southern Rocky Mountains. This toad was once widespread on the Grand Mesa and areas to the east. Grand Mesa, the Uncompahgre Plateau, and the West Elk Mountains still have these toads present. The preferred habitat of this species is willow patches, sedge meadows, abandoned beaver ponds, and in shallow water near mud flats around lakes, ponds, marshes, and wet meadows at elevations above 8000 feet. It is found near water but not generally in it, except in the tadpole stage. Breeding habitat includes both permanent and temporary water sources. Breeding occurs in late May or June. In late July and August masses of black tadpoles are found in shallow water that is inaccessible to fish. This toad is expected to be placed on the threatened or endangered species list in the near future.

## Plants

**Gunnison Milkvetch** *(Astragalus anisus):*  Known to occur in one locality in Gunnison County up to 7,700 feet in elevation. It prefers dry sagebrush slopes at lower to middle elevations. Flower appears whitish, plant is 5-10 cm. tall.

**Debeque Milkvetch** *(Astragalus debequaeus):*  White flowered milkvetch growing in sandy areas on bare clay slopes in the vicinity of DeBeque, CO. Since only six populations have been found

BLM 0048687

and all are within a few miles of town, it is believed this species geographical range is well below the Forest boundary.

**Skiff Milkvetch** *(Astragalus microcymbus):* This plant has been identified as present in the Elk Mountains and is likely to be present within the analysis area. Habitat at known sites is in sandy soils on sagebrush slopes, at elevations around 7,000 to 8,000 feet. Little is known about the plant at this time and it has been found only in a few locations. Skiff milkvetch is a rather tall, freely-branching plant with many quarter inch long white flowers. The equally small pendulous fruits look like an inverted skiff; the scientific name translates as "little boat", (Colorado Native Plant Society, 1989).

**Grand Junction Cat's Eye** *(Cryptantha aperta):* Found in 1892 in the Grand Junction area and has never been re-discovered, thus it is presumed to be extinct. If not, its described habitat is well below the National Forest boundary.

**Colorado Desert Parsley** *(Lomatium concinnum):* Found in Delta County near Paonia. Few populations exist in Delta, Montrose and Ouray Counties. Endemic to barren adobe hills derived from the decomposition of the Mancos shale, it grows in saltbush communities. It displays shiny green leaves and yellow flowers. Sometimes occurs with *Penstemon retrorsus* and *Eriogonum pelinophilum.* It is believed all these species habitats lies well below the National Forest boundary. (Colorado Native Plant, 1989).

**Canyonlands lomatium** *(Lomatium latilobum):* Found southwest of Grand Junction on steep rocky talus derived from red sandstone and in cracks on slick rock. It is known only from a few sites in Mesa and Montrose counties. Probably found below National Forest boundary.

**Paradox Valley Lupine** *(Lupinus crassus):* Known only from western Montrose County, it grows beneath junipers on fairly open ground or beneath pinyon-juniper stands in sandy soils. Plants have white flowers with purple tips and bloom in May. Mining and road construction are possible threats to the habitat of this species. (Colorado Native Plant Society, 1989).

**Dolores Skeleton Plant** *(Lygodesmia doloresensis):* Found only in Dolores River Canyon. Domestic livestock grazing has adversely affected the species and it is now only found by shrubs or clumps of prickly pear cactus, or on small sites inaccessible to livestock. About a foot tall, it produces numerous rose to lavender flowers (Colorado Native Plant Society, 1989).

**Grand Mesa Penstemon** *(Penstemon mensarum):* The Grand Mesa penstemon has been found only in Mesa and Delta Counties on the Grand Mesa and surrounding areas. It is found in the Gambel oak and aspen plant associations at elevations from 7,200 to 9,500 feet. Can also be found on open meadows on low creek terraces. Plants are 40-50 cm. tall. Leaves are a dull green. Flower is generally blue, (Harrington 1964). Found in a number of locations on the Grand Mesa and adjacent areas. Intensive surveys for this plant should be conducted when any oil and gas proposal is submitted.

**Adobe beardtongue** *(Penstemon retrorsus):* Known only from north facing slopes on adobe hills derived from Mancos shale in Montrose and Delta Counties. It displays bluish-purple flowers. Plants may be hidden among junipers, yuccas, saltbush, and sagebrush. Greatest threats to the plant are recreational use of ATV's and rangeland vegetation modifications (Colorado Native Plant Society, 1989). Plant's habitat is probably below National Forest lands.

**DeBeque phacelia** *(Phacelia submutica):* Found along Colorado River Valley in dark grey clay soils too dense to support most vegetation, this small plant has cream-colored flowers tinged with yellow to purple. It blooms in May and is found well below the Forest boundary.

**Uinta Basin Hookless Cactus** *(Sclerocactus glaucus):* This species has already been declared as a Threatened Species. It is being covered here and not in the Biological Assessment because it was not listed by the USFWS as an T&E species within the oil and gas Analysis Area. This is a small ball

cactus about 2-3" in diameter and has pink to magenta flowers. It is found on gravely soils of hills and mesas in the Colorado and Gunnison River Valleys, below the National Forest boundary.

**Penland Alpine Fen Mustard *(Eutrema penlandii):*** Found on the Forests but well outside the Analysis Area, it is found in the Upper Gunnison area near Tincup. This species was proposed on 10/15/90 as an Threatened Plant. It occurs above 12,000 feet.

**Clay-loving Wild Buckwheat *(Eriogonum pelinophilum):*** Found in sparsely vegetated shrublands and barren adobe clay soils of the Mancos shale, this species has been declared Endangered by the USFWS, but is discussed here rather than the Biological Assessment for T&E because the USFWS has already determined that the plant is found outside the analysis area, below the Forest boundary.

**Ute Ladies'-tresses Orchid *(Spiranthes diluvialis):*** Listed as a Threatened species by USFWS. Discussed in Biological Assessment.

# Proposed Sensitive Species

While the Region does not have an approved "official" Sensitive Species list, these species have nevertheless been proposed by either the Region or the Forest and are on a Draft Regional Sensitive Species List. Several of the these species that could be affected by oil and gas development activities and are briefly discussed below:

## Birds

**Ferruginous Hawk *(Buteo regalis)*:** The ferruginous hawk inhabits grassland prairies, plains, and broken hills. Within the analysis area, this habitat is found along the lower Forest boundaries around the base of Grand Mesa and on both sides of the Uncompahgre Plateau. No nests have been identified on the Forest at this time. Ferruginous hawks return to their breeding grounds in late March or early April. Nesting begins in late April, when 2-6 eggs are laid. Young normally fledge from the nest in late April. This hawk can have 1-6 nests within each nesting territory. Nests may be reused by the same pair for many years. Nests can occur in tall trees or on the ground, usually on a elevated rock or dirt outcrop. Mammals, birds and reptiles constitute the major prey species. Breeding pairs are extremely sensitive to human activity near their nests and will easily abandon their nests if disturbed before eggs hatch. Loss of native grassland and shrubland habitat has resulted in the decline of this species. These birds migrate to more southerly latitudes during the winter. Ferruginous hawk nesting and fledging habitat is occupied during the time period from February 1 to August 15. The sensitivity of the ferruginous hawk to human associated disturbance activities requires a one-mile buffer zone to avoid nest abandonment (BLM, 1991).

**Boreal Owl *(Aegolius funereus):*** The boreal owl is closely associated with high elevation spruce-fir and lodgepole pine forests due to their dependence on these forest types for foraging year-round, as it does not migrate during the winter. Nesting habitat structure consists of forests with a relatively high density of large trees, open understory, and multi-layered canopy. These owls nest in cavities made by woodpeckers or in natural holes in snags. They feed chiefly on small forest mammals such as the red-backed vole. These owls have been documented on the Grand Mesa. They may also occur on the Uncompahgre Plateau and in the West Elk Mountains. Nesting activity begins with calling in February and young (2-4) are hatched in April, May, or June. Boreal owls occur in low densities ranging from .08-1.5 pairs/250 acres. Boreal owls do not migrate but are somewhat nomadic when searching for prey (Spahr, et al. 1991). They exhibit very low rates of population growth and and appear to be vulnerable to the loss of spruce-fir habitat and the loss of snags, which provide cavities large enough to allow nesting. The owl is sensitive to human disturbance.

**Flammulated Owl *(Otis flammeolus):*** The flammulated owl is found in some habitats within the analysis area, in mixed forests from ponderosa pine and oak to aspen, spruce, and fir up to 10,000

BLM 0048689