feet in elevation. Flammulated owls, particularly northern range owls, migrate south to Mexico or beyond. Males begin arriving on their breeding territories in early May. Nests are in natural tree cavities or in woodpecker excavated holes, where 2-3 eggs are laid. Young fledge in July and adults leave their summer ranges in October. Numerous flammulated owls have been observed or recorded on the Uncompahgre Plateau while conducting surveys for spotted owls. This owl is entirely insectivorous in its food habits. The flammulated owl prefers mature ponderosa pine and Douglas fir forests with open canopies. Territories range in size from 20-59 acres depending on habitat type. Densities of flammulated owls can range from 1-5 owls per 250 acres. This owl avoids stands that have been cut over, suggesting that the cutting of mature ponderosa pine stands is detrimental to flammulated owl populations.

**Merlin *(Falco columbarius):*** The merlin is believed to be an uncommon summer resident on the Forest. Nests are often located in cavities in large trees usually in or near forest openings. This hawk feeds on small birds, mammals, and even insects.

**Northern Harrier *(Circus cyaneus):*** The northern harrier typically inhabits sloughs, wet meadows, and marshy areas with herbaceous or low woody vegetation. It nests in tall grassy areas within these habitats. Small mammals comprise most of the diet of this hawk. These Forests provide a number of areas meeting the habitat requirements suitable for breeding populations of northern harriers (also known as marsh hawks). No nests have been documented on the Forests at the present time.

**Osprey *(Pandion haliaetus):*** Osprey sightings have become more numerous in recent years in this area, particularly on Grand Mesa. However, no nests have been located within the analysis area. This large raptor feeds primarily on fish from either streams or lakes. This species can be sensitive to human activity at its nest site. Nests are constructed on top of snags or poles. Nest sites are generally near water but can be several miles away from their feeding sources. Less than twenty nests occur Statewide, but the population may be increasing slowly.

Young (2-4) are generally fledged in July or August. Osprey nesting and fledging habitat is occupied from April 1 to August 31. The sensitivity of osprey to human associated disturbance activities requires a half-mile buffer zone to avoid nest abandonment (BLM, 1991).

**Western Burrowing Owl *(Anthene cunicularia):*** This small owl of prairies and meadows may be a summer resident on the Forest within the analysis area. This owl is commonly associated with abandoned or active prairie dog colonies. At the present time no nests have been discovered on the Forest. This owl is very sensitive to disturbance near its nesting hole in the ground and has been the target of illegal shooting because of its visibility in open country. It feeds on small mammals, birds, and insects.

**Fox Sparrow *(Passerella iliaca):*** The fox sparrow can be found in dense thickets and in deciduous brush such as willow areas. The population abundance and distribution of this species on the Forest is relatively unknown, except that is does occur in some areas within the analysis area. One individual was captured at the Coon Creek Monitoring Avian Productivity and Survivorship (MAPS) station on the Grand Mesa in the summer of 1992, so it is a summer breeder on the Forest.

**Black Swift *(Cypseloides niger):*** The black swift is known to be a breeder in localized areas of North America. It is considered to be rare or uncommon throughout its entire range. One of these areas is on the Uncompahgre National Forest around the Ouray area. This bird requires ledges and crevices on high cliffs for nesting, often near or behind waterfalls.

**Golden-crowned Kinglet *(Regulus satrapa):*** The golden-crowned kinglet is found in coniferous forests in this area. The distribution and abundance of this species is relatively uncertain in this area, although two individuals were trapped and banded on Grand Mesa on the Coon Creek MAPS trapping station during the breeding season in 1992.

BLM 0048690

**Purple Martin (*Progne subis*):** The distribution and abundance of this species is also relatively unknown, although it is known to occur on the Forest in at least limited numbers. Overall it is considered to be common, locally. One nest has been located in a cavity in an aspen tree in the Muddy Park area on the Collbran Ranger District.

**Pigmy Nuthatch (*Sitta pygmaea*):** This species is believed to be present in limited numbers in coniferous forest types on the Forest, especially in the ponderosa pine forests. It's overall abundance is unknown at this time. It nests in small cavities, preferably in dead trees and feeds on small insects on or beneath tree bark.

**Lewis' Woodpecker (*Melanerpes lewis*):** The Lewis' woodpecker has been declining in overall numbers for reasons yet unknown. It requires dead trees and tall stumps for nesting. The Lewis' woodpecker is a semi-colonial species that represents the mature mountain shrub vegetative association, particularly where ponderosa pine and Gambel oak stands are present. Open park-like stands of trees with brushy understories are the preferred habitat for the species. The species is also a primary cavity nester, preferring trees that are at least 15" in diameter. Insects form the principle food items in spring and summer. Fruits and berries are also eaten in the summer, and Gambel oak acorns are utilized during the winter. The species migrates altitudinaly within the analysis area as a result in changes in it's food supply.

**Three-toed Woodpecker (*Picoides tridactylus*):** This woodpecker can be locally common in some areas; however, its status within this analysis area is relatively unknown. It prefers dead standing trees, particularly where fire has destroyed large stands of dead trees. It forages on these dead trees for wood boring insects. Breeding occurs in May and June. Nests are in tree cavities in both live and dead trees. Generally the population density of this species is very low and is dependent on dead standing trees , particularly those with the bark still on them. Population declines have been linked to snag habitat loss from harvesting and the control of forest fires, which stifles the creation of new habitat.

**American Bittern (*Botaurus lentiginosus*):** The American bittern requires wetlands where tall emergent vegetation such as cattails, bulrushes, and reeds are present. These habitats are generally found in this area at lower elevational areas. However, some of these habitats are found within the area covered by this analysis. Protection of wetlands will continue to provide habitat for this and other wetland inhabitants.

**Greater Sandhill Crane (*Grus canadensis*):** The greater sandhill crane inhabits open habitats near shallow marshes, lakes, ponds, and streams. Occasionally it inhabits relatively small marshes and patches of prairie surrounded by forests, which is the case in this area. Larger mountain parks in the Upper Gunnison basin provide nesting habitat for this species. Most sandhill cranes in the area are migrants that stop over in the lower elevation ponds, lakes, and reservoirs. Whooping cranes are occasionally observed within these flocks of birds, in this area.

**Long-billed Curlew (*Numenius americanus*):** At this time it is not known whether this species' habitat extends onto the Forest. It requires grassland habitats ranging from moist meadowland to upland prairies. Its population is in a downward trend because of a loss of habitat due to grazing practices.

## Mammals

**Ringtail Cat (*Bassariscus astutus*):** The ringtail cat can inhabit areas in western Colorado up to 9,000 feet in elevation. The preferred habitat of this species includes perennial stream bottoms with abundant trees, flanked by rimrock cliffs. This seldom seen mammal may vary from uncommon to common in certain localities. Rock crevices, tree cavities or abandoned buildings are used for denning. This animal breeds in the spring, producing one litter of 1-5 young per year. Omnivorous in feeding habits and nocturnal in nature, it has been documented along the North Fork of the Gunnison as far up

BLM 0048691

as Paonia Reservoir (Delta Co.) and from Taylor Park Reservoir (Gunnison Co). Records also exist from Montrose County.

**Pine Marten *(Martes americana)*:** The pine marten represents the late successional stage of old growth spruce-fir forests, particularly the down woody component of these forests. The marten is generally nocturnal and is active throughout the year. It is most abundant in mature to old growth spruce, fir, and lodgepole pine forests. It will also utilize aspen forests that are intermixed with spruce and fir. Young (1-4) are born in April in natal dens found in logs, stumps, and large snags. The red-backed vole *(Clethrionomys rutilus)* and the meadow vole *(Microtus pennsylvanicus)* are staple food prey. Red squirrels and other small mammals are also important food items. Population densities of marten in good habitat vary by geographic location. In Glacier National Park, in Montana, mean home range size was estimated to be 1.0 square miles for resident males and 0.27 square miles for resident females (Hawley and Newby,; 1957, Burnett, 1981). Larger home range sizes have been reported in other areas: in Minnesota, six square miles for males and 1.7 square miles for females was recorded (Mech and Rogers, 1977). Marten are easily trapped and are susceptible to over harvesting by trappers. One of the greatest threats to viable populations of pine marten is the construction of roads into their habitat.

**Townsend's Big-eared Bat *(Plecotus townsendii)*:** This bat is colonial in nursery groups and when in hibernation, otherwise it may be solitary. These bats are late fliers and can remain undetected in an area unless they are trapped (Lechleitner, 1969). It roosts in caves, abandoned mines, rocky cliffs or buildings. Females have one young per year, usually in June. Little is known of the population distribution of this bat in the area; However, records show that a specimen was taken in the Gothic area.

**Abert's Squirrel *(Sciurus aberti)*:** The Abert's squirrel is found on the south end of the Uncompahgre Plateau and south of Norwood in the Naturita and Lone Cone areas. The Abert's squirrel is unique in that it is almost totally dependent on the ponderosa pine - its food and cover requirements are met solely by this species of pine tree. Stands that average between 11 and 13 inches diameter at breast height and have a basal area of between 150 and 200 square feet/acre are preferred nesting sites (Patton, 1977). A few Abert's squirrels can also be found on the north end of the Plateau. Ideal habitat for this squirrel may be an older stand with all ponderosa pine age classes represented. They prefer to build their nests 30-50 feet above the ground in mature ponderosa pine trees. Home range size in one study area was approximately 5 acres in winter to 24 acres in summer (Pederson, 1976). Abert's squirrels have and use more than one nest in their home range. Young (3-4) are born in May or early June. Stick nests, tree cavities, and witches brooms are used for young rearing. The primary food of the Abert's squirrel include seeds, buds, terminal twigs, cones, and inner bark of ponderosa pine. A ground cover of 80% or more in litter is desirable.

**Pigmy Shrew *(Microsorex hoyi)*:** The pigmy shrew may be found in western Colorado in disjunct or relic populations in boreal forest type habits. Populations may be separated from the main distribution of the species by hundreds of miles (Lechleitner, 1969). It breeds in the spring and summer and can have several litters of 5-7 young. Pigmy shrews can be found in wet or dry wooded areas adjacent to moist meadow clearings. This is a rare mammal and is the smallest mammal in the world. The exact population status of this species is unknown at this time.

**Dwarf Shrew *(Sorex nanus)*:** The dwarf shrew may be found in scattered locations in western Colorado. It is quite rare and can be found in drier habitats than the pigmy shrew. The exact population status of this species is not known on the Forests at this time. Life history of this mammal is not well known. Specimens from this part of Colorado are absent (Armstrong, 1972).

BLM 0048692

## Reptiles and Amphibians

**Northern Leopard Frog *(Rana pipiens)*:** The northern leopard frog typically inhabits the banks and shallow portions of marshes, ponds, lakes, reservoirs, beaver ponds, streams, and other bodies of permanent water, especially those areas having rooted aquatic vegetation. This species can also be found in wet meadows. These frogs become active in March and remain active until October, or into November at lower elevations. It breeds in shallow, non-flowing portions of permanent pools. A typical breeding pool contains vegetation, mats of algae, and fairly clean water (Hammerson, 1982). This once abundant frog species in Colorado is becoming increasingly scarce throughout much of its range for unknown reasons.

**Tiger Salamander *(Ambystoma tigrinum)*:** This species occurs in most habitats that contain non-flowing water suitable for breeding up to 12,000 feet in elevation, in this area. Preferred sites include those ponds that are mud bottomed and at least 18" in depth, with a shallow shoreline. In spring, the tiger salamander leaves its winter dormancy burrows to migrate to the breeding ponds. This occurs from April to July depending on elevation (Hammerson, 1982).

**Smooth Green Snake *(Opheodrys vernalis)*:** The smooth green snake inhabits lush areas of herbaceous vegetation, especially near streams or ponds. However, it can inhabit mountainous areas far from water. This snake is active from May to September in mountainous areas. When in a state of inactivity it stays underground for the most part. Terrestrial insects are a primary food source. Breeding and reproductive activity is largely unknown for Colorado (Hammerson, 1982).

# Other Species of Special Interest or Concern

## Plants

**Degener beardtongue *(Penstemon degeneri)*:** This penstemon is one of the least known penstemons in Colorado. The plant has been identified from Grand Mesa and only a few other sites in the State of Colorado. It is most likely to be found in the pinyon-juniper woodlands. The plant is a foot or more tall and has very few leafy stems. Flowers area dark blue, less than an inch tall.

**Paradox lupine *(Lupinus crassus)*:** Known only from western Montrose County on the west side of the Uncompahgre Plateau, it grows beneath junipers on fairly open ground, and within stands of mixed pinyon and juniper. It usually grows in sandy soils derived from the Dakota, Burro Canyon, and Chinle Formations. It can also be found on adobe hills. Mining and road construction are the greatest threats to the habitat of this species. (Colorado Native Plant Society, 1989).

**Giant helleborne *(Epitactis gigantea)*:** This orchid is found in a few locations in western Colorado. Decomposed granite sandstone around springs, seeps and hanging gardens in canyon country are its preferred habitat. It is distinguished by rich brown marking on a silver dollar size flower.

**Black Canyon Gilia *(Gilia penstemonoides)*:** Scattered over Gunnison, Montrose, and Ouray counties there are thirteen known populations. Trumpet shaped lavender to purple flowers on 4" long stems rise from a dense basal rosette of leaves. It flowers early June to late August.

**Lanceleaf Spring Beauty *(Claytonia lanceolata varflaiva)*:** This flower is found in Western Colorado between 5,000 and 10,000 feet on moist ground. Flowers open only one day and last only that day. A plant with delicate pale pink blossoms, it blooms around snowbanks (Nelson 1970).

BLM 0048693

# Species Surveys Completed or Proposed

It is highly probable that inventories will be required to document the presence or absence of any Candidate or Sensitive species. These inventories will be conducted prior to the issuance of any APD where the unknown potential exists that any of these species may occur in the area. Specific inventories may be required in lease areas prior to any development. Provisions in the oil and gas lease provide for requiring inventories so that activities can be relocated to avoid Candidate or Sensitive species of animals, fish, and plants. Locations of previously inventoried species in these categories are afforded protection through seasonal timing and *No Surface Occupancy* stipulations on the lease.

Some surveys and inventories are currently being performed or are planned for a number of species identified in this Evaluation. A brief summary of ongoing and planned surveys follows:

Southwestern Willow Flycatcher- Inventories are being conducted at two specific locations for neotropical birds. This species will be inventoried at these two sites.

Colorado River Cutthroat Trout- Inventories of this species will begin on the Grand Mesa Area in 1993. Some survey work has already been completed.

Goshawk- Previous goshawk surveys were completed in portions of the analysis area in the late 80's. Goshawk surveys were started in 1991 and were intensified in 1992. As a result, several new nesting sites were located within the analysis area. More intensive surveys are planned for 1993.

Columbian Sharp-tailed Grouse- Surveys are planned for this species on the Uncompahgre Plateau in 1993.

North American Wolverine- A few project specific surveys have been done for the wolverine in 1992. Additional survey work is needed in 1993.

North American Lynx- A few project specific surveys were conducted for this species in 1992. Additional survey work is needed in 1993.

Boreal Toad- Some coordinated survey work has been done on several areas in 1991 and 1992. Additional survey work will be performed in 1993. One population was found last year.

Grand Mesa Penstemon- Inventories have been done on portions of Grand Mesa and several locations have been mapped where this plant is found.

Boreal Owl- Some call surveys have been conducted for the boreal owl in past years. A research project was begun last year to systematically inventory this species on the Forests. Four hundred boxes, suitable for boreal owl nest occupancy were placed on Grand Mesa, the Uncompahgre Plateau, Lone Cone Area, and the Owl Creek Pass area. These boxes will be monitored to determine if a boreal owl population exists and what the population density may be.

Flammulated Owl- This species of owl was found in several locations on the Uncompahgre Plateau and adjacent areas on surveys being conducted in conjunction with Mexican Spotted Owl surveys done in 1990 and 1991.

Osprey- Limited surveys will be conducted on Grand Mesa in 1993 to determine if any breeding pairs occur on the Forest.

BLM 0048694

Oil and Gas Leasing FEIS

Other Plant and Animal Surveys and Inventories have been completed on a limited basis and usually in relation to a specific project. These surveys will continue to be performed throughout the analysis area whenever a project is proposed.

# Affect on Candidate and Species of Concern in the Area

## Wildlife Effects

### *Direct Effects*

The potential effects of oil and gas development on wildlife in wildland environments can be both numerous and varied in their intensity. The severity of the effect is site-specific and depends on such factors as: (a) the sensitivity of the species affected; (b) the type of disruption; (c) the characteristics and importance of the affected habitat and; (d) the availability and condition of alternate habitat (Bromley 1985). Oil and gas activities will adversely impact some wildlife species or their habitat wherever they will occur. Carnivores and raptors may be affected more because of their sensitivity to disturbance. Response to disturbances will vary among species and even individuals depending on the type, duration, and severity of the disturbance. These effects may be most critical (a) during times when the animals are already stressed by natural conditions, (b) in habitats traditionally used by populations during critical periods of their life cycles, (c) for species whose social organization or behavior makes them susceptible to disturbance, and (d) for certain sex or age groups of animals (Bromley 1985). This effect will either be a permanent or temporary effect depending on the type of activity. A well pad on top of essential habitat is a permanent effect for the plant or animal species involved. A seismic blasting operation may be a temporary effect on a larger species because the activity may just result in a temporary displacement of the animal into an adjacent area until the disturbances have subsided. A seismic blast on a site occupied by a rare plant would be much more devastating. For the purpose of this analysis the effects of activities can be addressed for seismic activities, exploratory drilling, field development, and connected actions.

## Seismic

The impact of a seismic activity on wildlife can be separated into two functions: 1) the impact of the activity and; 2) the resultant impact of access if roads are constructed or reconstructed/reopened to allow access for seismic conducting activities. In many situations seismic activity will conflict with wildlife utilization of key habitats (Stubbs 1979). The degree of impact will depend on the intensity of the activity, the number of concurrent activities, the number and extent of seismic lines, and the length of time that key habitats will be affected. Timing restrictions are generally applied to activities so that wildlife or fish will not be disturbed or displaced in their preferred or critical habitats during times of the year when disturbance is least tolerated. These restrictions, if adopted, would minimize or reduce the level of permanent or temporary disturbance on wildlife, or fish or their habitat. Additional restrictions should be adopted for seismic operations to minimize the overall effect of these activities on various wildlife species. These are:

1. Locate crew campsites out of key wildlife and riparian habitats.

2. Firearms should not be allowed in camps or on the job for crew personnel.

3. Helicopters should be kept to specific flight lines or lanes of travel.

4. Require that seismic lines be relocated to preserve special wildlife or fish habitats when they are encountered or identified prior to activity. Special habitats include but

BLM_0048695

are not limited to: mineral licks, fish spawning streams, waterholes, migration routes, bedding sites, nests and dens, etc.

5. Establish helicopter flight corridors along the seismic lines and between the landing zones and the lines. The width should generally not exceed one-half mile in width. Maintain a distance of one main drainage or three tributary drainages between concurrent seismic lines. In a study in Montana radio collared elk move away from helicopters and blasting activity and stayed at least one major ridge or drainage from the disturbance, mostly in heavy cover (Olson, 1983). It is assumed that the larger more mobile animals would do likewise.

## Exploratory Drilling

Drilling for oil and gas creates much the same problems for wildlife as seismic in that the impact can be separated into two functions: 1) the activity itself and; 2) the subsequent increase in access (Stubbs, 1979).

### Activity

Timing:  Timing restrictions placed on drilling are similar in design to those placed on seismic activities. These reduce the harassment factor on wildlife during those times of the year that are critical to the wildlife species involved.

#### Construction/Well Pad Sites

1. The access road to any site should be aligned such that it does not cross key wildlife habitats or streams important to cutthroat trout, and should be located where sight distances will be minimal (a thick forested area rather than through an opening or sparsely vegetated area). To prevent long lines of sight along the roads themselves the road should be curved every 300 feet unless limited sight distances are already achieved by natural terrain features. Roads can increase harvest (legal and illegal), harassment, road mortality, and increased sediment in streams.

2. Campsites, garbage disposal, and control of recreational activities should be addressed similar to that discussed under seismic activities.

3. The well site should not be located on or near key wildlife habitats such as strutting grounds, mineral licks, springs, etc. Wherever possible, they should be located in heavily vegetated areas so that sound disturbance to surrounding areas is minimized.

4. Firearms, ATV's, motorcycles, and snowmobile use by personnel should be prohibited.

### Access

Drilling activity results in an increase in the number of new roads that have to be constructed into an area. This can dramatically increase the number of both legal and illegal hunting that could occur. This can result in a overall reduction in wildlife numbers and other species that are otherwise trapped or hunted. These roads can also result in increased illegal butterfly or plant collecting. Furbearers are especially vulnerable to trapping in previously unroaded habitats. Access routes, even though closed, provide access by snowmobiles and foot to trapline sites which were previously inaccessible to trappers. The main objective then is to strictly control public access through road closures to all motorized vehicles during operations and the physical permanent closure of the roads after the operations are complete. The following access restrictions are recommended:

BLM_0048696

1. Access roads should be signed and closed with a locked gate at all times for the protection of the wildlife and fishery resources. If deemed necessary, the road should be manned on a 24 hour basis during certain time periods, such as during the hunting seasons.

2. Where possible, companies should be required to use each others, or existing already constructed open roads to reduce the degradation of wildlife habitat.

3. Physically close or recontour the road back to original slope. Keep closed to all motorized traffic.

## Field Development

Normal well spacing in western Colorado is three wells every section or square mile. This kind of intensive development can result in serious wildlife conflicts and the substantial reduction of wildlife and their habitat since each well must have road access to it.

1. Wherever possible, existing roads should be used to access well sites. Companies should be required to "double up" using the same access route for more than one well site. While in use, roads should be open only to the oil or gas company unless the route was already open to the public before the activity occurred. Roads should be closed and reclaimed when seismic, wildcat wells, or full field development activity is completed.

2. Pipeline right-of-ways should accommodate more than one line to reduce the amount of wildlife habitat disturbance. Reclaim disturbed routes with palatable forage species unless they are along existing roadways.

3. Development of a transportation plan should be completed so that public access can be limited and not improved in previously unroaded habitat important to wildlife, fish, and plants. Centralized points of access should be established to minimize open routes.

4. Intensive wildlife habitat development schemes and mitigation measures should be implemented to increase carrying capacities for wildlife to offset losses incurred during the operations. This will attempt to replace habitat lost through road construction and well site development.

## Potential Effects on Selected Species

The effects anticipated can be related to the size of the home range of the species, whether the species is migratory or non-migratory, or if the species has a very narrow habitat type dependency.

The potential effects on songbirds and waterfowl species should be very minimal and local in nature because there should be very little or no activity in riparian habitats where the largest numbers of these species congregate. Roads and well sites will reduce the available habitat for a number of species of Forest songbirds.

The Colorado River cutthroat trout should not be adversely affected because activities must be kept out of riparian areas and stream corridors. General increases in sedimentation from road or well pad construction will degrade the quality of streams in some areas. Streams containing this fish should be protected.

The pine marten has a relatively small home range and is dependent upon mature to old growth spruce/fir and lodgepole pine stands. Oil and gas activity in itself will have less of an effect on the pine marten than the cause and effect connected action of potential timber harvest along the roads

BLM  0048697

constructed for oil and gas activities. Timber harvest along these roads will fragment the old growth stands making habitat much less capable of supporting healthy pine marten populations. Timber harvest greatly reduces the habitat of the red-backed vole which is one of the chief prey items of the marten. Adding to this situation is the fact that roads, even when closed to vehicles, provide easy winter access to preferred pine marten habitat by trappers either on foot, skis, or on snowmachines. Habitat loss, coupled with direct mortality due to trapping generally results in greatly diminished or exterminated pine marten populations over time in that particular area. Similar declines can be expected in other furbearing mammals such as the wolverine and lynx. These species require unroaded forested habitats and are adversely affected by any incursions into their habitat. As discussed in detail in other sections of this Evaluation, these species' habitat will be degraded with any road construction or subsequent timber harvest activities. Measures must be taken to protect them.

The Goshawk represents a group of species that utilize mature to old growth aspen and mixed aspen/conifer forest types. The goshawk has a large home range and migrates south during the winter months. The goshawk is a large raptor that nests in old stands of timber and is very sensitive to disturbance at or near it's nest site. They often have several alternate nests in the area of their active nest. Disturbance from any human related activity can cause abandonment of the nesting process especially in the early stages of egg laying and incubation. Known goshawk nesting sites should be avoided when selecting road and drill pad locations. For goshawks, manage road densities at the lowest level possible to minimize disturbance to the nest area (Reynolds 1992). The most detrimental effect on the goshawk and its habitat could come from the cause and effect connected action of timber harvest along roads constructed for the oil and gas activities. Clearcutting of aspen stands converts goshawk habitat into habitat well suited to the red-tailed hawk which is not experiencing population declines. Other raptor species will require habitat protection as well.

Forest owls such as the Boreal and Flammulated are very sensitive to disturbance by man and his activities. These species and their habitat must be protected both from habitat degradation and from noise and other disturbances. It is also critical to protect large dead snags with cavities, upon which these species are totally dependent for their nesting.

The Abert's squirrel has a very narrow range of habitat use in that it requires mature ponderosa pine forests exclusively for its livelihood. Individuals have very small home ranges and would be adversely affected by new road construction or drill pad construction in mature or old growth stands of ponderosa pine. This would result in a loss of already very limited habitat. Roads through prime habitat will result in direct mortality of animals crossing these roads. The cause and effect connected action of possible timber harvest in previously inaccessible mature ponderosa pine stands would be very detrimental to the future existence of the Abert's squirrel which is already declining in numbers.

The Three-toed and Lewis' woodpeckers would be directly impacted to a minor extent by road or pad construction. However, potential timber harvest as a connected action would have a more far-reaching effect on woodpecker populations (primary cavity nesters) and a large group of other birds and small mammals that nest or den in the cavity excavations of the woodpecker family. These cavity excavators rely on large mature or old growth ponderosa pine, Douglas fir, aspen, lodgepole pine, Engleman spruce and subalpine fir trees for their nesting habitat.

The Columbian sharp-tailed grouse breeding grounds (leks) and winter habitat are most likely to be adversely affected by exploration or development. Braun (1987) stated that "with the discovery of oil and gas resources, especially in the 1930's and 1940's, impacts of energy development on wildlife resources in western North America increased". Studies in North Park, Colorado (Colorado Division of Wildlife, unpublished data) suggest that sage grouse populations, as measured by counting males on leks, decreased dramatically during initial stages of oil field development. The decrease is related to loss of habitat caused by site preparation, road development and associated human disturbance. Leks are areas where courtship, breeding, nesting, and brood rearing take place. Leks are traditional and absolutely necessary to the local grouse populations. These areas and wintering grounds are essential

BLM 0048698

Oil and Gas Leasing FEIS

habitat components necessary to maintain quality sharp-tailed grouse habitat. Leks and 1/2 mile areas around them should be protected.

Important bat habitat such as caves or abandoned mines should be considered in the development of oil and gas developments. These habitats should be avoided.

Butterfly habitat is generally very local and would be highly susceptible to habitat degradation, therefore these areas should be avoided.

Species such as amphibians, reptiles and small mammals occupy very localized habitats. These habitats, as with the larger wildlife species' habitats must be protected from development.

Rare plant communities can be degraded or destroyed unless these essential habitats are protected from roads and well sites. Sites can be avoided because these areas will be inventoried prior to activity. Multiple year surveys may be needed for some plants because their presence may not be evident every year, as they may bloom sporatically, depending upon climatic and other factors.

Disturbance from oil and gas exploration and development activities could result in nest or den abandonment, actual destruction of nesting and denning sites and habitat and the elimination of one or more of a species key habitat components which is necessary towards the survival of the species. These key habitat components requiring protection include such things as roosting sites, nesting grounds, breeding areas, important feeding sites, prey species, old growth forests, prey areas, etc. Seismic activities or drilling operations during a species courtship display periods, nest or den construction periods, egg laying/incubation or young bearing time periods could cause a species to abandon any further attempts to produce young. Some birds exhibit behavioral responses which are greatly influenced by humans and human related activity. For example the response of large raptors to human activity may vary considerably from species to species and from individual to individual. For many species, like the goshawk, nest abandonment is most likely to occur prior to or during the egg laying process rather than after young have been hatched and are being fed routinely. Disturbance to birds and mammals at their nesting or denning sites can cause excessive cooling of eggs or chilling of young birds and mammals because parent birds and mammals remain away from the young due to the presence of people. Premature fledging or movement away from nesting and denning sites can cause death to birds falling from nests or can result in the young being preyed upon by other birds or mammals.

Raptors such as hawks, falcons and owls are especially sensitive to human related activity or disturbance. Human activity associated with oil and gas exploration or development should be restricted one month prior to nest selection to one month after hatching for large raptor species. Impacts to the young of many mammal species may not be as common because mammals tend to hide nests out of sight of humans or underground. While the nests of birds, especially cliff dwelling and tree nesting species are often very visible. The impacts to many amphibians and reptiles is largely unknown at this time, although, many of these species make small dens underground which may be afforded better protection. The assessment of impacts on small forest birds and mammals, waterfowl and shorebirds are less know. Small forest birds and mammals have relatively small home ranges and would not be adversely affected unless roads or drill pad construction areas were constructed directly on or adjacent to their individual home ranges. Cause and effect connected actions could be far more detrimental to these species than the oil and gas activities themselves.

The Forest has a number of species that the U.S. Fish and Wildlife Service calls Federal Candidate wildlife, fish, and plant species. The boreal toad could be adversely affected by any road or drill pad construction if it is above 9,000 feet and in or near any wet bogs or ponds. North American wolverine, lynx, and pine marten inhabit the Forest and their habitat would be dramatically degraded with the construction of any new roads in previously unroaded habitat. These are backcountry "roadless" type species that are very sensitive to the presence of man. Any new road construction proposals need address these three species. These three species and their habitats will be additionally affected by cause and

BLM 0048699

effect connected actions such as possible logging of forested stands from roads constructed for oil and gas activities. Increased trapping of these three furbearing species could also occur as a result of easier access to their habitat even, if roads are closed to vehicle travel.

# Cumulative Impacts

Important to consider is that the cumulative effects and impacts of oil and gas leasing and connected actions and effects, as well as other projects planned for the Grand Mesa, Uncompahgre and Gunnison National Forests may be significantly greater than the total effect of oil and gas activities considered alone. The cumulative effect of oil and gas leasing and its connected actions and adjacent or succeeding actions such as timber sales, recreational developments, subdivision and land development on wildlife, is largely unknown at this time. The opening up of unroaded habitat that was previously not available for timber harvest will adversely affect wildlife more than the oil and gas activity itself. Additionally, these roads would allow trapping or poaching in wildlife habitats which were inaccessible to prior to leasing. One activity considered alone may cause a temporary displacement of an animal species, but when several activities are occurring simultaneously in adjacent drainages, permanent displacement or outright elimination of the population could occur because of a lack of essential habitat.

At the present time these species' habitat is being disturbed in some areas because of the various activities occurring on the Forest. These activities include timber harvest, increased developed and dispersed recreation sites, subdivision and development, road construction, livestock grazing and numerous other activities. These activities will complicate the evaluation of future cumulative effects analysis done for future oil and gas project proposals. Because of the inability to identify where or when specific oil and gas activities are going to occur, it is impossible to accurately evaluate cumulative effects of future activities at this time. Each specific project proposal's Biological Evaluation will have to assess cumulative effects of the proposed project in light of the completed or ongoing activities in the zone of influence of the proposed activity. The evaluation of cumulative impacts will be a critical factor in determining the effects of oil and gas activities on the Candidate or Sensitive species in the study area under analysis. Consequently all future Biological Evaluations will include a section on Cumulative Effects.

An example of this type of discussion pertinent to this evaluation follows:

If Roadless Areas are entered with oil and gas development activities there will be a very negative effect on the variety and density of wildlife species which use these areas as security habitat or as the only habitat where they can survive. Some of the species which are dependent upon these areas for all or most of their habitat requirements include the lynx, wolverine, pine marten, goshawk, three-toed woodpecker, Lewis' woodpecker, and other species. Roads will result in reduced security cover and increased access by hunters, making all wildlife species more vulnerable to hunters or poachers. Many furbearers such as the lynx, wolverine, and pine marten will become more vulnerable to local extirpation and extinction as is evidenced by the eradication of these and other species in the Rocky Mountains as more and more development occurs. Roads will provide access routes to trappers who can easily "trap out" small relic localized populations of lynx, wolverine, and pine marten. Roads and associated timber harvest would cause forest fragmentation resulting in the disappearance of a number of wildlife species that require large home ranges of natural communities.

The combined effect of all these activities will be much more impactive on wildlife, fish, and plant species than just the planned activity of oil and gas development. Protection of Roadless Areas in their natural state are preferred so that the health and maintenance of wildlife populations can be achieved.

BLM 0048700

# Mitigation Guidelines at Time of Application for Permit to Drill (APD)

Surveys to document occurrences and potential affects on all listed and proposed species of plants and animals is required at the APD analysis stage and prior to on the ground activities. Water depletion issues and possible impacts to fish will be addressed, assessed and resolved at the APD stage for all oil and gas activities that may have the potential to affect these species. In addition, these mitigation guidelines and any others developed at a later date shall apply:

### A. Helicopters

1. Helicopters should stay far enough away from cliffs and river corridors so as to prevent disturbance or possible mortality to raptors, waterfowl, or shorebirds.

2. Most wildlife species are active during the dawn and dusk hours. Travel in helicopters should be restricted during this time period.

3. Helicopters should be kept to specific, pre-determined lanes of travel or corridors.

### B. Roads

1. Roads should be constructed to the minimum standard necessary and placed away from sensitive wildlife, fish, or plant habitats.

2. Road construction should be severely restricted or prohibited in riparian areas.

3. Oil and gas activity roads should be closed to all other vehicle traffic, except authorized administrative use. Locked gates will be necessary and enforcement, including manning and patrolling, may be necessary.

4. Roads should be permanently closed and rehabilitated once their use for oil and gas has terminated. Physical barriers should be used to close the roads. Close to all motorized vehicles yearlong. In sensitive wildlife areas roads may need to be recontoured to original slope so that the area does not receive summer or winter use.

5. Following permanent closure, all roads should be seeded to clover, grasses, and shrubs identified as valuable to wildlife and native to the area if at all possible.

6. Regulate oil and gas activity traffic to control the numbers and timing of vehicles using the roads, especially during sensitive wildlife periods.

7. Straight stretches of roads should be avoided by placing curves at least every 1,000 feet or less, except where line of sight is restricted by natural means.

8. Whenever possible, roads should be placed in timbered areas where visibility into other areas will be limited. This screening will also reduce road traffic noise.

9. Maximum utilization should be given to existing access routes so that new road construction will be held to the absolute minimum.

10. Roads should be properly drained in order to prevent sediment from entering streams.

BLM 0048701

11. Roads should be constructed so that if trucks carrying potential pollutants go off the road, they will not spill into streams.

12. Roads will not be located near streams where sedimentation can destroy Colorado River cutthroat trout spawning sites or near important wildlife habitats such as Columbian sharptail grouse leks, denning areas, feeding and nesting sites, etc.

13. Roads cannot be placed near any Federal Candidate or sensitive plant species that would provide easier access for illegal plant collecting.

## C. Oil and Gas Associated Activities

1. Seasonal and temporal restrictions of activities should be made during periods of high wildlife use.

2. Oil and gas activities should be restricted so that disturbance is not occurring simultaneously in adjacent drainages.

3. Oil and gas activities should be restricted so that the number of seismic lines, roads, utilities, etc. can be minimized.

4. All oil and gas activities should have timing restrictions to minimize or eliminate disturbances to wildlife (see Appendix 1 for time periods when restrictions may be necessary).

5. Blasting, drilling, helicopters, human activity, etc. must be restricted or prohibited around sensitive wildlife, fisheries and/or plant areas.

## D. Water Quality

1. For point-source discharges the Forest will require that water quality standards as defined in Section 401 of the Clean Water Act be met to ensure protection of downstream aquatic resources.

2. Developments will be located outside of riparian and wetland areas unless alternative routes have been reviewed and rejected as being more environmentally damaging. Pits shall not be constructed in alpine, wetland/riparian, or floodplain areas. In addition, pits shall not be constructed in a manner that results in materials seeping or being transported overground to these areas.

3. Compliance with Executive Orders 11988, Floodplain Management, and 11990 Protection of Wetlands will be required and evaluated, using U.S. Water Resources Council Floodplain Management Guidelines 43 CFR 6030 for any proposals that could affect these resources. Locate new facilities outside of the 100 year floodplains (Executive Order 11988).

4. Whenever possible, avoid the addition of muds of known or suspected hazardous additives to protect ground and surface water resources.

5. Casing integrity tests should be required to reduce the potential for migration of fluids between water-bearing zones as required by the BLM.

6. Install surface casing to below the deepest underground source of drinking water to seal the well from tributary groundwater bearing formations.

BLM 0048702

7. All operations shall be conducted in such a manner as to prevent damage, interference, or disruption of water flows associated with all springs, wells, lakes, streams and rivers. Unforeseen damage, interference, or disruption will be mitigated appropriately.

**E. Oil and Gas Developments**

1. Powerlines should be designed in such a manner that birds of prey cannot be electrocuted.

2. Pipelines should follow existing roads so that additional loss of habitat will not occur. Pipelines must be placed so that they do not inhibit the movement of wildlife. Slash will be disposed of properly.

3. Drill sites should not be located near riparian zones, streams  or wildlife watering areas.

4. Avoid locating drill sites, test holes, etc. near special wildlife habitats such as mineral licks, travel corridors, burns, etc.(BLM 1991).

5. Drill sites and pads should be located within forested areas, wherever possible, to lessen noise levels and reduce disturbances.

6. Sump ponds, settling ponds, or toxic sumps should be fenced, covered, and placed where danger to fish and wildlife is minimized and where breakage, should it occur, could be easily contained.

7. Pipelines and major pipeline rights-of-way should accommodate more than one line to reduce habitat destruction (Stubbs, 1979)

**F. Wildlife/Human Interactions**

1. No firearms or pets should be allowed by project personnel during the life of the project. Hunting will not be permitted by project personnel.

2. Travel to and from work sites during high wildlife use periods will be restricted.

## Decision

The recommendation for oil and gas leasing, as identified in the Final Oil and Gas Leasing Environmental Impact Statement will have no impact on any Federal Candidate or Species of Special Interest (Sensitive Species).  This no impact  determination is based on the assurance that project specific Biological Evaluations will be completed before any land disturbance activity can commence and the inclusions of other stipulations, coordination requirements, and guidelines which can control key habitat disturbances, restrict human access, and coordinate activity patterns will be included.

Subsequent oil and gas activity proposals resulting from this recommended leasing action will require a site specific Biological Evaluation for each activity or APD that may occur.  Any one of these future evaluations could conclude one of the following:

No impact.

May impact individuals but not likely to cause a trend to Federal listing or a loss of viability.

BLM  0048703

Likely to result in a trend to federal listing or loss of viability.

These site specific Biological Evaluations will discuss all those species discussed here and any other animal, fish  or plant species or their habitat that may be added to the Federal Candidate or Sensitive Species lists issued by the U.S. Fish and Wildlife Service and Forest Service respectively,  between the present time and when an activity is proposed.  Any future determinations would be made where the presence of of these species or their habitat occur in an area where the activities are proposed.  Variables such as timing, location, magnitude, restrictions, and mitigation will all be factors in the determination of impacts.

The probability that a specific activity would impact any one of these species increases as you progress through the phases toward production because of the greater length of the potential disturbance periods involved in the later stages of oil and gas development.

At this point in time, there is insufficient information on where specific activities are going to occur to make a determination of impact on any one particular project resulting from leasing.  Project specific Biological Evaluations will be required and conducted in order to identify where adverse impacts could occur and to identify applicable coordination measures to assure their protection.  The incorporation of the Mitigation Measures and Stipulations in all of the leases assures that these species will not be adversely impacted.  See Appendix 2 for specific elements that should be addressed in all future site specific Biological Evaluations.

# Coordination and Additional Data Requirements

Four basic types of information will be required at the time an activity is proposed, to adequately evaluate the effects of oil and gas projects that are being proposed in the area.

1.  A determination if any Federal Candidate or Species of Concern (Sensitive) or its habitat occurs in the area.

2.  Identification of the key habitat components in sufficient detail on the ground so coordination measures can be implemented.  This type of data will be gathered in the following manner:

a. General data on importance of specific habitats for the species involved, gleaned from current research findings applicable to the area.

b. Specific locations of important habitat components will, for the most part, be identified at the project specific assessment.  The scope of these assessments will consider the dates identified in the stipulations used to protect wildlife and fisheries habitat reflect average conditions.  Site specific assessments could identify variances in these distances or dates because of differences in topography, vegetative screening, or reproductive behavior.

3.  Refinement of information on effects of oil and gas activities on T&E Species, and specific coordination measures needed to control the identified effects.  This type of information will be gathered from current research findings applicable to the area.

4.  Specific information on what type and level of oil and gas activities are going to occur and where these activities are proposed.  This information can only be obtained from the specific applications for exploration or development permits.  This information is essential, and the assessment of effects cannot be undertaken without it.

BLM  0048704

Oil and Gas Leasing FEIS

# Conferencing and Consultation with Fish and Wildlife Service

6/4/92- The Grand Mesa, Uncompahgre, and Gunnison National Forest requested a species list from the U. S. Fish and Wildlife Service.

7/1/92- The Forest received letter from Fish and Wildlife Service describing species found within the analysis area.

8/10/92- Informal consultation between Tom Holland (FS) and Terry Ireland (FWS) on their review of the Draft.

12/15/92- Informal consultation between Tom Holland (FS) and Terry Ireland (FWS).

1/22/93- Informal consultation with Keith Rose, Assistant Colorado State Supervisor.

# Literature Cited

Armstrong, D.M. 1969. Distribution of Mammals in Colorado. Monograph of the Museum of Natural History. Univ. of Kansas No. 3. 415pp.

Braun, C.E. 1987. Current Issues in Sage Grouse Management. Presented at the Western Association of Fish and Wildlife Agencies meeting, Portland, Or. 10pp.

Bromley, M. 1985. Wildlife Management Implications of Petroleum Exploration and Development in Wildland Environments. USDA Forest Service, Intermountain Research Station. Ogden UT. GTR Int. 91. 42pp.

Burnett, G.W. 1981. Movements and Habitat Use of American Marten in Glacier National Park, Montana. M.S. Thesis, Montana State Univ., Missoula MT.

Colorado Native Plan Society. 1989. Rare Plants of Colorado 70 pp.

Hammerson, G.A. 1982. Amphibians and Reptiles in Colorado. Colorado Division of Wildlife 131pp.

Harrington H.D. 1964. Manual of the Plants of Colorado. Sage Books. 666 pp.

Hawley, V.D., and Newby, F.E. 1957. Marten Home Ranges and Population Fluctuations. J. Mammal. 38(2):174-184.

Hornocker, M.G. and H.S. Hash. 1981. Ecology of the wolverine in northwestern Montana. Can.J. Zool. 59:1286-1301.

Lechleitner, R.R. 1969. Wild Mammals of Colorado. Pruett Publishing Co. Boulder, Co. 254 pp.

Mech, L.D. and Rogers, L.L. 1977. Status, Distribution and Movements of Martens in Northwestern Minnesota. USDA Forest Service Research Paper NC-143 7pp.

Nelson R.A., 1970. Plants of Rocky Mountain National Park. Rocky Mountain Nature Association, 168 pp.

BLM 0048705

Olson, G. 1981. Effects of Seismic Exploration on Summering Elk in the Two Medicine - Badger Creek, North Central Montana. Montana Dept. of Fish, Wildlife and Parks. 24pp.

Patton, D.R. 1977. Managing Southwestern Ponderosa Pine for the Abert Squirrel. Journal of Forestry. Vol. 75, No. 5. 4p.

Pederson, J.C. 1976. Habitat Requirements of the Abert Squirrel on the Monticello District, Manti-La Sal National Forest of Utah.  Utah State Division of Wildlife. Publication No. 76-9. 107pp.

Reynolds, R.T. 1975. Distribution, Density, and Productivity of Three Species of Accipiter Hawks in Oregon. M.S. Thesis. Oregon State Univ. 39pp.

Reynolds, R.T. et al.  1992. Management Recommendations for the Northern Goshawk in the Southwestern United States.  GTR RM- 217 90pp.

Rogers, G.E. 1969. The Sharp-tailed Grouse in Colorado.  Colorado Game, Fish, and Parks. Tech. Bulletin No. 23. 94pp

Shuster, W.C. 1976. Northern Goshawk Nesting Densities in Montane Colorado. Western Birds. 7:108-110.

Spahr, R. et al. 1991 Threatened, Endangered, and Sensitive Species of the Intermountain Region.

Stubbs, C.W., and B.J. Markam. 1979. Wildlife Mitigative Measures for Oil and Gas Activity in Alberta. The Mitigation Symposium, USDA- Forest Service Technical Report RM-65, 684 pp.

Tilden, J.W. and A.C. Smith, 1986.  A Field Guide to Western Butterflies. Houghton Mifflin Co. Boston 370 pp.

USDI Bureau of Land Management.  1991. Colorado Oil and Gas Leasing and Development, Final Environmental Impact Statement. Colo. State Office, Denver Co.

BLM_0048706

Oil and Gas Leasing FEIS

**APPENDIX 1**: Time periods important to Candidate and Species of Concern that will require timing restrictions or coordination:

|  | Habitats Found | Critical Time Periods |
|---|---|---|
| SW Willow Flycatcher | Riparian Shrubs | May 1 to July 15 |
| Colo. River Cutthroat | Clear Streams | May 1 to August 31 |
| Goshawk | Mixed Forests | March 1 to July 31 |
| Harlequin Duck | Clear Streams | Late April to July |
| Columbia Sharptail Grouse | Small Open Parks | March 1 to June 15 |
| Wolverine | Forest/Alpine | Feb.1 to June30 |
| Lynx | Forests | March 15 to July 15 |
| Spotted Bat | Caves | May 15 to July 15 |
| Regal Fritillary Butterfly | Wet Meadows | June 15 to Sept. 15 |
| Great Basin Silverspot | Boggy Streamsides | Aug. 1 to Sept 30 |
| Boreal Toad | High Elevation Ponds | May 15 to Aug.15 |
| Ferruginous Hawk | Open Prairie | March 15 to June 15 |
| Boreal Owl | High Elev. Forests | Feb.1 to June 30 |
| Flammulated Owl | Ponderosa Forests | May 1 to July 15 |
| Northern Harrier | Marshy Areas | May 1 to July 15 |
| Osprey | Large Lakes | April 1 to July 30 |
| Lewis' Woodpecker | Ponderosa Parkland | May 1 to July 15 |
| Three-toed Woodpecker | Snag Stands | May 1 to July 15 |
| Ringtail Cat | Rimrock Cliffs | May 1 to July 30 |
| Pine Marten | Conifer Forests | April 1 to June 30 |
| Abert's Squirrel | Ponderosa Pine | April 1 to June 30 |
| Plants (all) | All Habitats | Yearlong |

BLM 0048707

APPENDIX 2:   Resource Considerations for Site Specific Project Biological Assessments.

Site specific biological assessments to determine the potential effects upon Threatened, Endangered, and Proposed Species should include an analysis of at least the following:

1. Direct impact from road, drill pad, well site, construction etc. on key habitats utilized. (Appendix 1)

2. Disturbances which could influence the use of key habitats (Appendix 1); e.g. blasting, helicopter operation, heavy equipment operation, vehicle traffic or human presence.

3. Water depletions during the exploration and development of wells and any other activities related to oil and gas development activities, i.e., road construction and use.

4. Increased human disturbance and the probability of human/wildlife conflicts.

5. Direct mortality from oil and gas activities; e.g., toxic sumps, powerlines, illegal shooting etc.

6. Disruption of wildlife travel corridors and migration.

7. Disturbances which could affect reproductive success or productivity of any of the species discussed in this Biological Evaluation. (See Appendix 1).

8. Disturbances which could preclude the use of suitable, currently unoccupied habitat.

9. Analysis of cumulative effects.

10. Analysis of habitat modification.

11. The lessee will be responsible to see that thorough searches are made for Candidate or Species of Concern within any area where activities might occur.

12. The lessee may be responsible to see that all Candidate and other species surveys are conducted prior to any activity.

BLM_0048708

Appendix 3

## UNITED STATES DEPARTMENT OF THE INTERIOR
### *FISH AND WILDLIFE SERVICE*

FISH AND WILDLIFE ENHANCEMENT
Western Colorado Sub-Office
529 25½ Road, Suite B-113
Grand Junction, CO 81505-6199

PHONE: (303) 243-2778                              FAX: (303) 245-6933



FOREST
RECEIVED

JUL - 1 '92

IN REPLY REFER TO:
FWE/CO:FS:GMUG
MS 65412 GJ

June 29, 1992

| SUPERVISOR | |
| EXECUTIVE ASSISTANT | |
| PAO | |
| ADMIN | |
| RWFE/TIMBER/FIRE | |
| LMP/NEPA/SWM | |
| REC/CULT RES/LANDS | |
| ENGINEERING | |
| RANGERS | |
| | |
| PROMISE CARD | |

Mr. Robert L. Storch
Forest Supervisor
Grand Mesa, Uncompahgre, and Gunnison National Forests
2250 Highway 50
Delta, Colorado 81416

Dear Mr. Storch:

This responds to your June 4, 1992, letter regarding the preparation of an Environmental Impact Statement for oil and gas leasing on portions of the Grand Mesa, Uncompahgre, and Gunnison National Forests.  You have requested a list of federally listed species that may occur in the analysis area.

The following federally listed species may occur within the analysis area.

### FEDERALLY LISTED SPECIES

| | |
|---|---|
| Peregrine falcon | *Falco peregrinus* |
| Bald eagle | *Haliaeetus leucocephalus* |
| Mexican spotted owl[1] | *Strix occidentalis lucida* |
| Black-footed ferret | *Mustela nigripes* |
| Colorado squawfish | *Ptychocheilus lucius* |
| Humpback chub | *Gila cypha* |
| Bonytail chub | *Gila elegans* |
| Razorback sucker | *Xyrauchen texanus* |

Peregrine falcon

A confirmed peregrine falcon eyerie is located in the vicinity of Joe Davis Hill.  Potential peregrine falcon eyeries are designated in the vicinity of Crested Butte, South Saddle Mountain, and along the entire Gunnison Curecanti National Recreation Area.  Your evaluation should, therefore, determine the current status of peregrine falcon at these sites to assess potential impacts. Current status of peregrine falcons at confirmed and potential nest cliffs can be obtained by contacting Jerry Craig with the Colorado Division of Wildlife (303/484-2836).

---

[1] Proposed as threatened 11/4/91 (56 FR 56344)

BLM_0048709

## Bald eagle

We have no records of bald eagle nests at any of the Forest Service sites. However, bald eagles are common winter visitors to Colorado. Bald eagles are known to fly up to 18 miles from night roosts to feeding areas and it is likely that even greater distances are traveled searching for food. The species may therefore occur in the project area. Your biological evaluation should determine whether wintering bald eagles occur at any of the Forest's streams or reservoirs. If they do occur, the Forest Service should evaluate potential impacts.

## Mexican spotted owl

Mexican spotted owls may occur in those areas identified in San Miguel County. Two consecutive years of searches for owls should precede any leasing in these areas.

## Black-footed ferret

The black-footed ferret is dependent on prairie dogs and their burrows for food and shelter, respectively. It is our position that any impact to prairie dogs may impact the ferret unless a ferret search is completed to conclude their absence. Your evaluation should determine whether prairie dogs occur on the Grand Mesa, Uncompahgre, or Gunnison National Forests. If prairie dogs do occur, the Forest Service should conclude that ferrets may also occur and assess potential impacts associated with oil and gas leasing. Please contact this office prior to initiating any black-footed ferret searches.

## Federally listed fish

We consider the depletion of water from the upper Colorado River an adverse impact to habitat for all the above federally listed fish species. Consequently, any activity authorized by the Forest Service that results in a net depletion of water from the upper Colorado River basin should trigger a "may affect" finding by the Forest and formal consultation with this office under authority of the Endangered Species Act.

The Forest Service should review their proposed Federal action and determine if the action would affect any listed species. If the determination is "may affect" for listed species, the Forest Service must request in writing formal consultation from our office. At that time, your agency should provide this office a biological assessment and/or any other relevant information used in making the impact determinations.

## Federal Candidate Species

We believe your evaluation should also consider the following species which are candidates for official listing as threatened or endangered species [(Federal Register, Vol. 55, No. 35, February 21, 1990, and Federal Register, Vol 56, No. 225, November 21, 1991 (copy enclosed)]. While these species presently have no legal protection under the Endangered Species Act, it is

O-31

BLM 0048710

within the spirit of the Act to consider project impacts to potentially
sensitive candidate species.  Additionally, we wish to make you aware of the
presence of Federal candidates should any be proposed or listed prior to the
time that all Federal actions related to the project are completed.

The list was compiled from Colorado Division of Wildlife latilong surveys and
other general literature.  We have no specific records fir the Forest Service
properties identified in your letter.

## FEDERAL CANDIDATE SPECIES

| | |
|---|---|
| Ferruginous hawk | Buteo regalis |
| Loggerhead shrike | Lanius ludovicianus |
| Northern goshawk | Accipiter gentilis |
| Baird's sparrow | Ammodramus bairdii |
| Western snowy plover | Charadrius alexandrinus nivosus |
| Black tern | Childonias niger |
| White-faced ibis | Plegadis chihi |
| Flannelmouth sucker | Catostomus latipinnis |
| Roundtail chub | Gila robusta |
| Colorado River cutthroat trout | Oncorhynchus (=Salmo) clarki pleuriticus |
| Penstemon mensarum | Grand Mesa penstemon |

There is no designated critical habitat within the Forest Service properties
you identify.  Our agency is presently classifying critical habitat for the
federally listed fish species.  This designation should be proposed in the
Federal Register within the next year.

We appreciate your attention to federally listed and candidate species.
Please contact Bob Leachman if there are any question.

Sincerely,

Keith L. Rose
Assistant Colorado State Supervisor

cc:  FWS/FWE, Golden
     FWS/FWE, Salt Lake City
     CDOW, Grand Junction
     CDOW, Montrose

O-32

BLM_0048711

# Index

BLM 0048712

BLM_0048713

# Index

**!**

3A Management Areas            I-6, II-8 - II-9, II-12 - II-13, II-32, II-56 - II-58,
                               III-93, IV-25, VI-3, VI-7, S-7, S-10 - S-12
6B Management Areas            I-7, II-10, II-49, III-105, IV-37, IV-84, S-8, S-13

**A**

Abert's squirrel               III-48, IV-11, IV-59
administrative sites           I-6, II-9, II-12, II-33, III-93, IV-26, IV-77, S-7,
                               S-10, S-12
affected environments          I-6, II-9, III-1, VI-3 - VI-20, VI-24, VI-26, VI-28,
                               VI-30, VI-32, VI-59, VI-62 - VI-63, S-6 - S-7, S-10,
                               S-12
air quality                    I-2, II-15, II-18, II-51, III-22, IV-4, IV-43, VI-2,
                               VI-6, VI-10, S-1, S-25
Allowable Sale Quantity (ASQ)  II-8, II-58, IV-2, IV-26, IV-38, IV-42, IV-85, IV-86,
                               VI-65
alpine                         I-6, II-9
alpine / tundra                I-2, II-12, II-22, III-55, IV-16 - IV-17, IV-67,
                               VI-2 - VI-3, VI-5, VI-22, S-1, S-7, S-10, S-12
alternatives                   I-1, I-8 - I-12, I-20, II-1, II-8 - II-13, III-1,
                               IV-39 - IV-85, VI-4, VI-8, VI-10, VI-13, VI-15,
                               VI-20 - VI-25, VI-27, VI-29, VI-32, VI-37,
                               VI-43 - VI-44, VI-46, VI-55, VI-59, VI-63, VI-66,
                               S-8, S-10, S-12, S-25
analysis area                  I-5 - I-6, III-1, VI-6 - VI-7, VI-10 - VI-11, VI-13,
                               VI-16, VI-19, VI-21 - VI-23, VI-25 - VI-27, VI-29,
                               VI-38, VI-41 - VI-44, VI-46, VI-49 - VI-50, VI-52,
                               VI-55, VI-57, VI-63, S-5, S-7
analysis assumptions           II-1 - II-7, VI-26, VI-31, VI-36, S-9
analysis process               I-9, I-11, II-8, S-6, S-8
Application for Permit to Drill (APD)  I-17 - I-19, VI-3, VI-5, VI-7 - VI-9, VI-14 - VI-15,
                               VI-17, VI-19 - VI-20, VI-25 - VI-27, VI-30 - VI-32,
                               VI-34, VI-38, VI-40, VI-43, VI-51, VI-53 - VI-54,
                               VI-56, VI-62 - VI-63
aquatic habitat                I-6, II-9, II-20 - II-21, II-53, II-57, III-51 - III-54,
                               IV-13 - IV-15, IV-64 - IV-66, IV-87, VI-6,
                               VI-14 - VI-15, S-7, S-12, S-27, S-30
aspen                          III-5 - III-6, IV-2, IV-59

**B**

bald eagle                     III-101, IV-35
Battlement Mesa Roadless Area  II-9, II-12, II-56 - II-58, III-57, III-59, III-76,
                               IV-40, IV-57, VI-19, VI-22, VI-28, VI-43, VI-48,
                               S-10, S-12
big game                       III-44, IV-8, VI-20 - VI-21, VI-56
bighorn sheep                  III-44, IV-59, VI-19, VI-56

BLM  0048714

Oil and Gas Leasing Analysis FEIS

| | |
|---|---|
| bighorn sheep lambing and breeding areas | I-7, II-10, II-12, II-45, II-57, III-100, IV-33, IV-82, VI-19 - VI-20, S-7, S-10, S-13 |
| biological diversity | II-15, II-51, III-3, IV-1, IV-39, VI-2, VI-5, VI-31, VI-44, VI-46, S-25 |
| black bear | III-45, IV-9, IV-59, VI-56 |
| boreal western toad | IV-36 |
| Bronco Knob | III-74, VI-48 |
| brown trout | III-47, III-51 |

### C

| | |
|---|---|
| Campbell Point Roadless Area | II-9, III-58, III-60, III-88, VI-51, VI-66, S-12 |
| candidate species | III-101, IV-36 |
| Clear Creek Roadless Area | II-9, III-57, III-59, III-65, VI-47, S-12 |
| climate | III-15 |
| coal bed methane | I-2, III-16 - III-17, III-63, IV-46, IV-49, IV-2, VI-26, VI-38 - VI-39, S-1 |
| Colorado River cutthroat trout | III-47, III-51, III-102, IV-35 |
| Comparison of Alternatives | II-14, IV-65 |
| coniferous forests | III-7 |
| connected actions | II-7, IV-1, IV-58, IV-74, S-9 |
| Controlled Surface Use (CSU) | I-16, II-11, VI-12 - VI-13, VI-19, VI-23, VI-48, VI-58, VI-62 - VI-63, S-14 |
| cultural and historical resources | II-17, II-53, III-40, IV-8, IV-56, VI-31, S-27 |
| cumulative effects | I-2, I-13, I-19, I-23 - I-24, I-27, II-58, IV-39 - IV-40, IV-42 - IV-43, IV-45, IV-47 - IV-48, IV-50 - IV-51, IV-54, IV-56, IV-58 - IV-59, IV-63 - IV-64, IV-66, IV-68, IV-73, IV-75, IV-77 - IV-80, IV-82 - IV-85, VI-8, VI-10, VI-21, VI-25 - VI-26, VI-31, VI-39, VI-51, VI-66 - VI-67, S-1 |
| Cunningham Creek | III-70 |
| Currant Creek | III-69 |

### D

| | |
|---|---|
| deciduous forests | III-5 |
| decisions | I-1 - I-2, I-5, I-7 - I-11, I-13, I-15, I-17, I-20 - I-21, II-8 - II-13, III-3, IV-1, VI-5, VI-16, VI-18, VI-25, VI-29 - VI-31, VI-45, VI-65, S-3 |
| decisions, need for | I-12 |
| Degener beardtongue | III-103 |
| desert bighorn sheep | III-44, IV-9 |
| developed recreation | II-34 - II-35, III-37, III-94, IV-6, IV-27 |
| dispersed recreation | II-34, III-38, III-95, IV-7, IV-27, VI-17 |
| Douglas fir | III-9, IV-59 |
| Drift Creek Roadless Area | II-9, III-57, III-59, III-62, VI-46, S-12 |

### E

| | |
|---|---|
| economics | I-26, II-54, III-49, IV-12, IV-60, IV-74, VI-4, VI-26, VI-29, VI-32, VI-37, VI-43, VI-58, VI-65, S-28 |
| Electric Mountain Roadless Area | II-9, III-57, III-59, III-64, VI-47, S-12 |

BLM 0048715

electronic sites | I-7, II-10, II-48, III-105, IV-36, IV-77, IV-84, S-8, S-13
elk | III-45, IV-59, VI-19, VI-56
elk calving areas | I-7, II-10, II-42, I-57, III-99, IV-32, IV-81, VI-18, VI-20, VI-62, S-7, S-13
Engelmann spruce | III-8, IV-59
environmental consequences | II-14, IV-1 - IV-85, VI-45
exception | I-16 - I-17, II-3, VI-2, VI-3, VI-15, VI-59 - VI-60, VI-64

**F**

Federal Land Policy and Management Act(FLPMA) | I-2
Federal Onshore Oil and Gas Leasing Reform Act | I-3, I-5, I-12 - I-13, I-18, I-20, S-2
ferruginous hawk | III-103, IV-10, IV-35
fisheries | I-22, I-27, II-20 - II-21, III-51, IV-15, IV-64 - IV-66, S-6
Flat Top Mountain Roadless Area | I-2, II-9, III-57, III-59, III-83, IV-40, IV-50, IV-57, VI-22, VI-43, VI-50, S-1, S-10, S-12
Flat Tops | III-73, VI-48
floodplains | I-6, II-9, II-12, II-19, III-50, IV-13, IV-63, VI-15, VI-22, S-7, S-12, S-30
forblands | III-14
forest fragmentation | III-103, IV-11, IV-22, IV-39, IV-59, IV-87, VI-5, VI-8, VI-18, VI-31, VI-55
Forest Plan | I-9 - I-10, I-12 - I-13, I-16, I-20, I-25, I-27, II-7 - II-8, II-11, II-13, III-4, IV-2, IV-41, VI-3, VI-5, VI-7 - VI-9, VI-16, VI-18, VI-24, VI-27, VI-45 - VI-46, VI-55, VI-65 - VI-66, S-3, S-5, S-10
Forest Plan Amendment | I-10, I-20, I-25, II-8, VI-24, VI-65 - VI-66
furbearers | III-46, IV-10, IV-59, VI-56

**G**

Gambel oak | III-12
general forest | I-6, II-8 - II-9, II-15, II-51, III-3 - III-49, IV-1 - IV-12, VI-5 - VI-11, S-7, S-12
geologic hazard, high | II-9, II-11, II-24, II-56, III-55, IV-18, IV-67, VI-12, VI-15, VI-22, VI-60 - VI-61, S-7, S-12
geologic hazard, moderate | II-9, II-12, II-25, II-56, III-56, III-56, IV-19, IV-68, VI-12, S-7, S-11 - S-12
geologic hazards | I-6, I-27, II-3, II-56, VI-12, S-6
geology | II-24 - II-25, III-15, IV-18 - IV-19, IV-42, VI-11, VI-38
goshawk | III-47, IV-11, IV-59
Grand Mesa penstemon | III-103
Grand Mesa Scenic and Historic Byway | III-92
grasslands | III-12
grazing | II-49, III-30, IV-37, VI-35
groundwater | III-25, IV-48, VI-13, VI-40 - VI-41

BLM 0048716

Oil and Gas Leasing Analysis FEIS

## H

Hairy woodpecker    III-48, IV-12, IV-59
Hightower Roadless Area    II-9, III-57, III-59, III-67, VI-28, S-12
Hubbard Creek    III-71

## I

implementation    I-17, VI-30, S-6
issues    I-21 - I-28, II-56 - II-58, VI-43, VI-61, VI-65, S-6

## J

Johnson Creek Roadless Area    II-9, III-58, III-60, III-88, VI-51, VI-66, S-12

## K

Kannah Creek Roadless Area    II-9, II-12, II-26, II-56 - II-58, III-57, III-59, III-79, IV-40, IV-57, IV-73, VI-22, VI-43 - VI-44, VI-49, S-10, S-12
Kebler Pass    I-2, IV-40, IV-57, IV-73, VI-23, VI-29, VI-49, VI-58, S-1
Kelso Mesa Roadless Area    II-9, III-58, III-60, III-87, VI-51, VI-66, S-12

## L

lands suited for timber harvest    I-7, II-10, II-50, III-106, IV-38, IV-85, VI-8, VI-26, VI-65 - VI-66, S-8, S-13
lease notice    I-16, VI-63
lease options    I-8 - I-11, II-8, II-11, II-14, IV-1 - IV-38, VI-28, VI-55, VI-63, S-8, S-14
leasing analysis    I-5 - I-8, I-10, I-12, I-17, I-19 - I-22, II-7, VI-31, S-1, S-3, S-5
leasing process    I-13 - I-18, VI-5
Leasing Reform Act    S-3
    See Federal Onshore Oil and Gas Leasing Reform Act
Lewis' woodpecker    III-48, IV-12, IV-59
lodgepole pine    III-9, IV-59
long-billed curlew    III-103
low VAC    I-6, II-9, II-12, II-30, II-57, III-91, IV-24, IV-76, VI-59, S-7, S-10, S-12

## M

Major Ski Trails    S-11
major trail systems    I-2, II-34 - II-35, III-96, IV-27, VI-16, VI-57, S-2
Management Indicator Species (MIS)    III-47, IV-11, VI-20
maps    I-8, I-10 - I-11, I-18, II-12, III-1, III-107 - III-140, VI-8, VI-11, VI-16, VI-19, VI-26 - VI-27, VI-56, VI-59, VI-67
Mexican spotted owl    III-102, IV-35, IV-59

BLM 0048717

| | |
|---|---|
| migration routes and staging areas | I-7, II-10, II-44, II-57, III-99, IV-33, IV-82, VI-19, VI-55, S-7, S-13 |
| mitigation | II-3, II-13, VI-7 - VI-9, VI-11 - VI-12, VI-14 - VI-15, VI-19 - VI-20, VI-25, VI-27, VI-34, VI-37, VI-40, VI-53, VI-60 - VI-62 |
| modification | I-16 - I-17, II-3, VI-2 - VI-3, VI-15, VI-59 - VI-60, VI-64 |
| moose | III-46 |
| most development scenario | I-2, I-19, IV-21, S-1 |
| mountain goat | III-45, IV-9, IV-59 |
| mountain lion | III-44, IV-59 |
| mule deer | III-44, IV-9, IV-59, IV-19, VI-56 |
| Multiple-use Sustained Yield Act | I-3 |

### N

| | |
|---|---|
| National Environmental Policy Act (NEPA) | I-8, I-11 - I-12, I-16 - I-18, I-20, I-22, II-8, II-11, IV-1, VI-11, VI-15, VI-17, VI-28 - VI-32, VI-46, VI-54, VI-59, VI-63, S-10 |
| Nick Mountain Roadless Area | II-9, III-57, III-59, III-77, IV-49, S-12 |
| No Lease (NL) | II-11 - II-12, VI-8 - VI-9, VI-13 - VI-15, VI-17, VI-22 - VI-26, VI-44 - VI-45, VI-48 - VI-49, VI-58 - VI-61, VI-63, VI-66, S-11, S-14 |
| No Surface Occupancy (NSO) | I-15, II-1, I-11, VI-3, VI-8, VI-10, VI-12 - VI-14, VI-16, VI-19, VI-22 - VI-24, VI-28, VI-43, VI-45, VI-48, VI-56, VI-58 - VI-64, S-14 |
| North American lynx | III-103, IV-36, IV-59 |
| North American wolverine | III-102, IV-36, IV-59, VI-56 |

### O

| | |
|---|---|
| oil and gas resources | II-17, II-54 - II-55, III-1, VI-5, VI-9, VI-11, VI-16, VI-21, VI-23 - VI-25, VI-28, VI-31, VI-33, VI-36, VI-42, VI-44 - VI-45, VI-55, VI-63, S-6, S-29 |
| old growth | III-4, III-9 - III-10, IV-2, IV-59, VI-5, VI-9 - VI-10, VI-21 |

### P

| | |
|---|---|
| Paradox lupine | III-103 |
| peregrin falcon | IV-35 |
| peregrine falcon | III-101 |
| pine marten | III-47, IV-11, IV-59, VI-21, VI-56 |
| pinyon jay | III-49 |
| policy | I-1, I-17, III-1, VI-24, VI-27, VI-33, VI-42 - VI-43, S-2 |
| ponderosa pine | III-8, IV-59 |
| potential | I-5, I-25, II-4 - II-5, III-1 - III-2, III-17, III-58, III-62 - III-65, III-67 - III-68, III-75 - III-76, III-78 - III-80, III-82 - III-84, III-86, III-88 - III-89, VI-3, VI-9, VI-11, VI-45 |

BLM 0048718

Oil and Gas Leasing Analysis FEIS

preferred alternative I-9, I-11, II-12, IV-40 - IV-41, IV-43, IV-46, IV-50, IV-53, IV-55, IV-57, IV-63, IV-65, IV-67 - IV-68, IV-73, IV-75, IV-78 - IV-84, IV-87, VI-22 - VI-23, VI-29, S-10, S-30

Priest Mountain III-70
Priest Mountain Roadless Area I-2, II-9, III-57, III-59, III-68, IV-40, IV-57, IV-73, VI-22, VI-43 - VI-44, VI-48, S-1, S-10, S-12

primary rangeland I-7, II-10, I-49, III-105, IV-37, IV-84, S-8, S-13
pronghorn antelope III-46, IV-9
public involvement I-21, VI-1, S-5

**R**

Raggeds Roadless Area I-2, II-9, III-57 - III-59, IV-40, IV-73, VI-22, VI-43 - VI-44, VI-46, S-1, S-10, S-12

rainbow trout III-47, III-51
range I-22, II-16, II-52, III-30, IV-5, IV-50, IV-87, VI-45, S-26

Reasonably Foreseeable Development (RFD) I-2, I-11, I-19, I-3, I-54, III-1 - III-2, IV-1, IV-41, IV-42, IV-56, IV-58, IV-68, IV-78, VI-2, IV-7, VI-19 - VI-20, VI-29, VI-31, VI-38, VI-41 - VI-43, VI-57, S-1, S-8, S-28

reclamation II-6 - II-7, IV-33, VI-37, VI-47, VI-52, VI-60
Record of Decision (ROD) I-10 - I-11, I-18, I-21, III-3, IV-5, VI-11, VI-25, VI-30 - VI-31, VI-45, S-5

recreation I-23, I-27, II-26, II-57 - II-58, IV-20, IV-3, VI-35, VI-56 - VI-58, S-6

recreation complexes I-6, II-9, II-12, II-34, II-57, III-94 - III-95, IV-27, IV-78, IV-2, VI-16, VI-56, VI-61, S-7, S-10, S-12

recreation opportunities II-16, II-28, II-32, II-53, III-37, IV-6, IV-23, IV-25, IV-54, VI-2, VI-4, VI-52 - VI-53, VI-55, VI-57, S-27

Recreation Opportunity Spectrum (ROS) II-18, III-38, IV-7 - IV-8
red crossbill III-48, IV-12, IV-59
Research Natural Areas I-6,II-9,  II-12, II-27, II-56, III-90, IV-23, IV-74, VI-17, VI-25,  S-7, S-10, S-12

retention VQO I-6, II-9, II-12, II-29, II-57 - II-58, III-90, IV-24, IV-76, IV-59, S-7, S-10, S-12

riparian habitat I-6, II-3, II-9, II-19 - II-20, II-53, II-57, III-51 - III-54, IV-13 - IV-15, IV-64 - IV-66, IV-87, VI-2, VI-5, VI-8, VI-14 - VI-15, VI-22, VI-41, VI-60, S-7, S-12, S-27

Roadless Areas I-6, I-27, II-8 - II-9, II-12 - II-13, II-26, II-56 - II-58, III-56 - III-89, IV-20 - IV-22, IV-40 - IV-41, IV-43, IV-47 - IV-48, IV-51, IV-54 - IV-55, IV-58, IV-63, IV-66 - IV-73, IV-75, IV-78 - IV-84, VI-2, VI-5, VI-7, VI-21 - VI-23, VI-25 - VI-26, VI-43 - VI-50, VI-52, VI-57 - VI-58, VI-61, VI-63, VI-65 - VI-66, S-6 - S-7, S-11 - S-12

roads I-25, II-3, II-6, II-16, II-52, III-31, IV-5, IV-50, VI-6, VI-8, VI-10, VI-18, VI-20 - VI-21, VI-26, VI-36 - VI-37, VI-44 - VI-45, VI-47, VI-51 - VI-56, VI-60 - VI-61, VI-64, VI-66, S-26

roads, arterial III-31

BLM  0048719

| | |
|---|---|
| roads, collector | III-32 |
| roads, local | III-34 |
| roads, state highways | III-31, VI-53 |
| Roubideau Roadless Area | II-9, II-12, II-26, II-56, II-58, III-57, III-60, III-84, IV-40, IV-57, IV-73, VI-22, VI-43 - VI-44, VI-50, S-10, S-12 |

## S

| | |
|---|---|
| sage grouse | III-48, IV-11 |
| sage grouse leks | I-7, II-10, II-12, II-47, II-57, III-100, IV-34, IV-84, VI-19, S-8, S-10, S-13 |
| Salt Creek Roadless Area | III-57, III-59, III-74, VI-48, S-12 |
| San Juan Skyway National Scenic Byway | III-92 |
| scenic byway corridors | I-6, II-9, II-12, II-31, II-57 - II-58, III-92, IV-25, IV-76, VI-57, VI-59, S-7, S-10 - S-12 |
| scoping | I-21 - I-22, VI-28 - VI-29, S-5 |
| Semi-primitive Non-motorized areas | I-6, II-8 - II-9, II-12 - II-13, II-32, II-56 - II-58, III-93, IV-25, IV-40 - IV-41, IV-43, IV-47 - IV-48, IV-51, IV-54 - IV-55, IV-58, IV-63, IV-66 - IV-68, IV-75, IV-77 - IV-84 VI-3, VI-25, VI-44, S-7, S-11 - S-12 |
| sensitive areas | I-6, II-9, II-12, II-28, II-57, III-90, IV-23, IV-75, VI-8, VI-56, VI-61, S-7, S-10, S-12 |
| sensitive species | III-104, IV-36, VI-17 |
| shrublands | III-11 |
| skiff milkvetch | III-103 |
| slopes 40-60% | I-7, II-9, II-12, II-37, II-56, III-98, IV-29, IV-79, S-7, S-10, S-13 |
| slopes >60% | I-7, II-9, II-11 - II-12, II-39, II-56, III-98, IV-30, IV-80, VI-12, VI-17, VI-22 - VI-23, VI-59, S-7, S-10, S-13 |
| small game | III-46, IV-10 |
| soils | II-15, II-18 - II-20, II-22 - II-23, II-37 - II-40, II-51, III-18, III-53, III-55, III-98, IV-3, IV-14, IV-16, IV-29 - IV-30, IV-42, IV-87, VI-3, VI-15, VI-17, VI-31 - VI-32, S-25 |
| spineless hedgehog cactus | III-101, IV-36 |
| Springhouse Park Roadless Area | II-9, III-57, III-59, III-63, VI-47, S-12 |
| Standard Lease Terms (SLT) | I-15, II-3, II-11, II-13, VI-10, VI-22 - VI-24, VI-27, VI-46, VI-62 - VI-63, S-11, S-14 |
| state highways | I-2 |
| stipulations | I-8 - I-9, I-12, I-15 - I-17, II-1, II-3, II-11, IV-66, VI-2, VI-9, VI-12 - VI-14, VI-16 - VI-17, VI-19, VI-22, VI-25, VI-30, VI-37, VI-45, VI-56, VI-58 - VI-64 |
| subalpine fir | III-8, IV-59 |
| summer range | I-7, II-10, II-46, II-57, III-100, IV-34, IV-83, VI-10, VI-19 |
| Surface Use Plan of Operations (SUPO) | I-18 - I-19, II-3, VI-5, VI-7 - VI-9, VI-14 - VI-15, VI-17, VI-19, VI-25 - VI-27, VI-30 - VI-32, VI-34, VI-40, VI-52 - VI-54, VI-56, VI-59, VI-61 - VI-63 |
| surface water | III-24, VI-9, VI-13, VI-40 - VI-41 |

BLM 0048720

Oil and Gas Leasing Analysis FEIS

## T

Tabeguache Roadless Area    II-9, II-12, II-26, II-56 - II-58, III-57, III-60,
III-86, IV-40, IV-57, IV-73, VI-22, VI-43 - VI-44,
VI-50, S-10, S-12

threatened and endangered species    I-15, II-10, II-12, I-57, III-49, III-101 - III-104,
IV-35, VI-17, VI-20, S-13

timber    I-27, II-7 - II-8, II-14, II-26, II-32, II-50, III-32,
III-59, III-62 - III-64, III-66 - III-68, III-75 - III-76,
III-78 - III-80, III-82 - III-83, III-85 - III-86,
III-88 - III-89, IV-22, IV-26, IV-38, IV-59, VI-2,
VI-8 - VI-9, VI-11, VI-17, VI-20 - VI-21, VI-26,
VI-31, VI-35, VI-45, VI-47, VI-53 - VI-55,
VI-57 - VI-58, VI-65 - VI-67, S-6

Timing Limitations (TL)    I-15, II-11, VI-19, VI-23, VI-64, S-14

travel management    III-35, VI-61

tundra    I-6, II-9

typical oil and gas activities    II-1 - II-2

## U

Unaweep/Tabeguache Scenic and Historic Byway    III-92

Uncompahgre fritillary butterfly    III-101

units    II-4, II-6, III-3, IV-47, VI-10, VI-21, VI-38,
VI-43 - VI-44, S-9

upland game birds    III-46, IV-10

Upper Cow Creek    III-72

Upper Leon Creek    III-74

utility corridors    I-7, II-10, I-48, III-105, IV-36, IV-77, IV-84,
S-8, S-13

## V

vegetation    II-15, II-19 - II-20, II-22, II-30, II-36 - II-39, II-49,
II-51, III-5, III-55, III-98, IV-2, IV-14, IV-16, IV-24,
IV-29 - IV-30, IV-37, IV-41, IV-87, VI-9, VI-12,
VI-32, VI-34, VI-67, S-25

Visual Absorption Capability (VAC)    III-36, VI-59

Visual Quality Objectives (VQO)    III-36, VI-6, IV-53, VI-18, VI-59

visual resources    II-16 - II-17, II-23, II-26, II-28 - II-30, II-32,
II-37 - II-40, II-52, III-35, IV-5, IV-17,
IV-20 - IV-21, IV-24 - IV-26, IV-30 - IV-31, IV-52,
VI-18, VI-59, S-26

## W

waiver    I-16 - I-17, II-3, IV-21, VI-2, VI-3, VI-15, VI-45,
VI-59 - VI-60, VI-64

water    III-24

water quality    II-16 - II-17, II-19 - II-20, II-22 - II-25, II-36,
II-52, III-29, IV-4, IV-14, IV-17, IV-19 - IV-20,
IV-28, IV-45, IV-87, VI-3, VI-6 - VI-7, VI-11 - VI-12,
VI-14, VI-27, VI-40, VI-53, VI-63, S-25

BLM 0048721

| | |
|---|---|
| water quantity | II-16, II-36, III-29, IV-4, IV-14, IV-28, IV-48, VI-11 - VI-12 |
| watersheds (municipal) | I-6, I-24, I-27, II-9, II-12, II-36, III-96 - III-97, IV-28, IV-78, VI-2, VI-12 - VI-14, S-6 - S-7, S-10, S-12 |
| West Elk Loop Scenic and Historic Byway | III-92 |
| West Elk Roadless Area | I-2, II-9, III-57, III-59, III-80, IV-57, IV-73, VI-22, VI-43 - VI-44, VI-49, S-1, S-10, S-12 |
| West Muddy | III-72, VI-48 |
| wetland habitat | I-6, II-3, II-9, II-20, II-53, II-57, III-51 - III-54, IV-13 - IV-15, IV-64 - IV-66, VI-2, VI-5, VI-8, VI-14, VI-15, VI-22, VI-26, VI-60, VI-64, S-7, S-12, S-27, S-30 |
| Whetstone Mountain Roadless Area | I-2, II-9, III-57, III-59, III-82, IV-50, IV-57, VI-22, VI-29, VI-43 - VI-44, VI-50, S-1, S-10, S-12 |
| white-faced ibis | III-103 |
| wild and scenic rivers | III-39, IV-8 |
| wild turkey | III-45, IV-9, IV-59 |
| Wilderness | III-39, IV-8, VI-44 - VI-45, VI-56, VI-58, VI-61, VI-67, S-5, S-10 |
| Wilderness values | II-26, IV-20 - IV-21 |
| wildfire | I-54, III-49, IV-12, IV-59, S-28 |
| wildlife | I-22, I-27, II-10, II-17 - II-18, II-26, II-54, II-57, III-4, III-43, III-98 - III-100, IV-8, IV-22, IV-31 - IV-34, IV-56, IV-80 - IV-83, VI-2, VI-5, VI-18 - VI-20, VI-22, VI-37, VI-52 - VI-53, VI-55 - VI-56, VI-61, VI-64, S-6, S-13, S-28 |
| winter range | I-7, II-10, II-41, II-57, III-98, IV-31, IV-80, VI-20 - VI-21, S-7, S-13 |
| woodlands | III-10 |

## X, Y, Z

(none)

BLM  0048722

BLM_0048723

# Grand Mesa, Uncompahgre and Gunnison National Forests

## Oil and Gas Leasing
## Final Environmental Impact Statement

## Record of Decision

### Prepared by:

U.S. Department of Agriculture, Forest Service
Grand Mesa, Uncompahgre and Gunnison National Forests
Rocky Mountain Region
Delta, Garfield, Gunnison, Mesa, Montrose,
Ouray and San Miguel Counties, Colorado

### Cooperating Agency:

U.S. Department of Interior
Bureau of Land Management
Colorado State Office
Montrose District Office

### April, 1993

### Deciding Officer

*Robert L. Storch*       Date 4/19/93

Robert L. Storch
Forest Supervisor
Grand Mesa, Uncompahgre and Gunnison National Forests

BLM_0048725

# I. Introduction

The Federal Onshore Oil and Gas Leasing Reform Act (P.L. 100-203) was enacted in 1987. The implementing regulations for the Bureau of Land Management (BLM) were published in 1988 and the Forest Service regulations were published in 1990. The regulations describe the procedures by which each agency will carry out it's statutory responsibilities in the issuance of oil and gas leases.

The BLM manages all Federally-owned subsurface minerals. In the case of oil and gas, the BLM is responsible for advertising and selling available leases, and for monitoring subsurface activities related to exploration and development. Their monitoring role includes administering all Federal regulations pertaining to subsurface oil and gas.

The Forest Service has the authority and responsibility to determine which National Forest System lands are available for oil and gas leasing, and the specific lands which the BLM may offer for lease. The Forest Service is also responsible for prescribing lease terms that provide reasonable protection to surface resources and values, approving the lessee's Surface Use Plan of Operations (SUPO), and insuring that the requirements of the leases and operating plans are carried out according to their terms. The regulations applicable to the above are found in Title 36, Code of Federal Regulations, Part 228, Subpart E.

The Oil & Gas Leasing Environmental Impact Statement (EIS) for the Grand Mesa, Uncompahgre and Gunnison National Forests was prepared in response to the requirements of the implementing regulations for the Leasing Reform Act. National Forest System lands with high and moderate potential for oil and gas resources, and those with low or no known potential for oil and gas resources that are currently leased have been included in the Analysis Area. Figure 1 displays the Analysis Area for this EIS.

The purpose of this Record of Decision (ROD) is to document Forest Service decisions regarding: 1) which lands will be administratively available for oil and gas leasing in accordance with 36 CFR 228.102(**d**) and 2) which specific lands are authorized for the BLM to advertise for lease in accordance with 36 CFR 228.102(**e**). These decisions include the lease terms and stipulations determined necessary to protect the surface resources based on disclosure of environmental effects in the Oil and Gas Leasing Final EIS and standards and guidelines contained in the National Forest Land and Resource Management Plan (Forest Plan). This ROD also documents the decision to amend the Forest Plan to include the lands determined to be administratively available for oil and gas leasing.

The regulations, 43 CFR 3101.7-2(c), which pertain to leasing of Federal lands administered by an agency outside the Department of Interior, require the BLM to review and accept all reasonable leasing recommendations of the surface managing agency. In this case, these recommendations involve decisions on the administrative availability and authorization of specific lands for leasing, and stipulations needed to protect surface and subsurface resources within the Forest.

# II. Decision

After carefully considering the administrative record of information, the applicable laws and regulations, the anticipated environmental impacts of the alternatives analyzed in the Final EIS, and the public's comments; I have selected Alternative 2 - Preferred as presented in the Final EIS for the Administratively Available decision and the Lease Authorization decision. This corresponds to subparts (d) and (e) respectively of 36 CFR 228.102. My decision will make approximately 813,180 acres of the area analyzed (see Figure 1) administratively available and authorized for oil and gas leasing.

BLM_0048726



Analysis Area

Figure 1

Drawn By : DAF    7/92

LEGEND

— FOREST BOUNDARY
ANALYSIS AREA
(145) STATE HIGHWAY
(70) INTERSTATE HIGHWAY
(50) U.S. HIGHWAY
(703) FOREST ROAD

0  5  10    20      30
SCALE IN MILES

Oil and Gas Leasing Analysis FEIS

GRAND MESA, UNCOMPAHGRE AND GUNNISON NATIONAL FORESTS

ROD-2

BLM_0048727

Approximately 138,270 acres within the Analysis Area will not be available for oil and gas leasing. Lease requests for parcels outside the Analysis Area will be evaluated separately, on a case-by-case basis.

Oil and gas leases issued after my decision will include Standard Lease Terms of the lease form plus any supplemental stipulations identified as necessary for resource protection. The Standard Lease Terms and supplemental stipulations are discussed in Appendix B and C, respectively, of the Final EIS. Table 1, below, displays the acreages I am authorizing for oil and gas leasing that require the use of the supplemental stipulations of Timing, Controlled Surface Use (CSU), and No Surface Occupancy (NSO). Table 2 summarizes the supplemental stipulations that will apply to each Affected Environment. The exact location of these acres and the specific resources that necessitate the use of the supplemental stipulations are displayed on the Stipulation Map included in the Final EIS and in the administrative record.

| Table 1.  Approximate Acres Authorized For Leasing | |
| --- | --- |
| No Surface Occupancy | 151,835 acres |
| Controlled Surface Use | 215,170 acres |
| Controlled Surface Use and Timing Limitations | 239,755 acres |
| Timing Limitations | 80,440 acres |
| Standard Lease Terms Only | 125,980 acres |
| **Total Authorized For Leasing** | **813,180 acres** |

| Table 2.  Supplemental Stipulations And Acres For Each Affected Environment | | |
| --- | --- | --- |
| **Affected Environment** | **Lease Options** | **Acres\*\*** |
| General Forest | SLT | 951,450 |
| Floodplains * | NSO | 10,200 |
| Aquatic/Riparian/Wetland Habitats * | NSO | 27,600 |
| Alpine/Tundra Areas | NSO | 2,100 |
| High Geologic Hazard | NSO | 52,000 |
| Moderate Geologic Hazard | CSU | 629,000 |

BLM_0048728

Oil and Gas Leasing Analysis FEIS

| Table 2. Supplemental Stipulations And Acres For Each Affected Environment | | |
|---|---|---|
| **Affected Environment** | **Lease Options** | **Acres**\*\* |
| Roadless Areas: | | \*\*\* |
| - Raggeds | NL, NSO,CSU,TL,SLT | 16,300 |
| - Drift Creek | NSO, CSU, TL, SLT | 9,100 |
| - Springhouse Park | CSU, TL, SLT | 17,045 |
| - Electric Mountain | NSO, CSU, SLT | 7,850 |
| - Clear Creek | NSO, CSU, TL, SLT | 41,350 |
| - Hightower | NSO, CSU, TL | 4,100 |
| - Priest Mountain | NL,NSO,CSU,TL, SLT | 92,955 |
| - Salt Creek | NSO, CSU, SLT | 11,305 |
| - Battlement Mesa | NSO | 36,290 |
| - Nick Mountain | NSO, CSU, TL  SLT | 10,845 |
| - Kannah Creek | NL | 34,575 |
| - West Elk | NL, NSO, CSU, SLT | 28,295 |
| - Whetstone Mountain | NL | 13,100 |
| - Flat Top Mountain | NL | 110 |
| - Roubideau | NL | 6,485 |
| - Tabeguache | NL | 8,385 |
| - Kelso Mesa | NSO, CSU, SLT | 1,205 |
| - Campbell Point | CSU, TL | 395 |
| - Johnson Creek | NSO, CSU, TL | 5,340 |
| Research Natural Areas | NL | 655 |
| Sensitive Areas | NSO | 29,000 |
| Retention VQO - Low VAC | NSO | 7,210 |
| Retention VQO | CSU | 7,800 |
| Scenic Byway Corridors | CSU | 18,140 |
| Semi-primitive Non-motorized (3A Management Areas) | NSO | 13,700 |
| Administrative Sites \* | NSO | 35 |
| Recreation Complexes | NSO | 62,975 |
| Watersheds of Special Interest to Municipalities | CSU | 117,000 |
| Slopes 40-60% | CSU | 33,530 |
| Slopes > 60% | NSO | 3,415 |
| Wildlife Special Habitats: | | |
| - Big Game Winter Range | CSU, TL | 207,450 |
| - Elk Calving Areas | CSU, TL | 45,230 |
| - Migration Routes & Staging Areas | CSU, TL | N/A |
| - Bighorn Lambing/Breeding Areas | NSO | 9,335 |
| - Summer Range (Concentrated Use) | NSO | 81,440 |
| - Sage Grouse Leks | NSO,CSU,TL | 160 |

BLM_0048729

| Table 2. Supplemental Stipulations And Acres For Each Affected Environment | | |
|---|---|---|
| **Affected Environment** | **Lease Options** | **Acres\*\*** |
| Threatened and Endangered Species\* | N/A | N/A |
| Utility Corridors - Electronic Sites \* | SLT | 4,535 |
| Primary Rangeland (6B Management Areas) | SLT | 395,000 |
| Lands Suited for Timber Harvest | SLT | 287,000 |

\* Not displayed on EIS maps because of sensitivity or size.
\*\* Many environments overlap.  Acreages do NOT add up to the Analysis Area total.
\*\*\* Acres of Roadless Area within Analysis Area.
NL = No Lease, NSO = No Surface Occupancy, CSU = Controlled Surface Use,
TL = Timing Limitations, SLT = Standard Lease Terms.

These decisions require a non-significant amendment to the Forest Plan.  Based on an analysis of the objectives, guidelines and other contents of the Forest Plan, I have determined that this amendment will not result in a significant change in the Plan.

Timing:  While this decision will be implemented immediately (following appropriate notice to the public), the effects of this decision will not be felt until actual lease rights are applied for.  As existing leases expire the decisions made here will take effect.

Location and Size:  This decision is based on analysis of 1/3 of the Forest.  However, only 15% of the area (5% of the Forest) has been changed to No Lease.  The remaining lands have varying degrees of stipulations attached to them.  These stipulations are more restrictive in selected environments (such as sage grouse leks, alpine/tundra or selected Roadless Areas) than under the 1983 Plan.  However, this represents a very limited portion of the Forest, and even within this area, stipulations applied will be similar to those which would have been imposed for each lease area analyzed under the old process of doing individual analysis on each lease parcel proposed by the BLM.

Goals, Objectives and Outputs:  This amendment does not alter any of the long-term relationships between the level of goods and services projected by the Forest Plan, as disclosed in the Oil and Gas Leasing EIS.  Projections in the RFD indicate that the level of oil and gas activity in the area covered by the Forest Plan will not be changed at all by this amendment or by the decisions made in this ROD.

Management Prescriptions:  The only change specific to management prescriptions is to the 3A Management Area.  In this management area the No Surface Occupancy stipulation is imposed.  This amounts to 13,700 acres (approximately one half of a percent of the Forest) which may or may not have had this restriction under the 1983 Forest Plan.  The very limited amount of change in the level of timber harvest which could (but is not planned or certain to) occur would not take place without amendments to the Plan specific to that activity.  The desired future condition has not been altered.  Rather, the decisions in this ROD are designed to protect and enhance surface resource values in conformance with the existing Plan.  Discussion just above illustrates this point (No Surface Occupancy will protect Semi-primitive Non-motorized values).

BLM_0048730

Oil and Gas Leasing Analysis FEIS

My conclusion is that the changes resulting from this amendment are not significant for the purposes of the planning process. Appendix A of this Record of Decision is the Forest Plan amendment.

When an authorized area is considered for leasing, the Final EIS and ROD will be reviewed to:

1. Verify that oil and gas leasing of the specific parcel being considered has been adequately addressed in the Oil and Gas Leasing Final EIS, and is consistent with the Forest Plan.

2. Ensure that conditions of surface occupancy identified in Alternative 2 and required by this decision are properly included as stipulations in resulting leases.

3. Determine that operations and development can be allowed somewhere on each proposed lease, except where stipulations prohibit all surface occupancy.

4. If the above conditions are met, the BLM will be authorized to offer the specific lands for lease. If the review determines that one or more of the above conditions is not satisfied, the BLM will not be authorized to offer the specific parcel for lease until the condition is satisfied by conducting additional environmental analysis and/or by amending the Forest Plan.

My decision does not authorize any ground disturbing activities associated with oil and gas exploration or development to occur. Ground disturbance can only be authorized after another stage of environmental analysis is conducted in compliance with the National Environmental Policy Act (NEPA). This analysis will be initiated when a lease holder submits an Application for Permit to Drill (APD). The analysis will result in a decision that may approve or may deny the permit to drill. This staged decision making is described in the Final EIS pages I-17 to I-19 and is supported by the court ruling Robertson vs. Methow Valley Citizens Council, 104 L. Ed. 2d 351 (1989).

My decision applies to all lands within the Analysis Area shown in Figure 1 of this ROD. Existing leases will not be affected by this decision. However, when current leases expire or terminate, this decision will take effect on those lands and any future leases issued on those lands. The location of current leases is displayed in Figure III-3 and in Appendix L of the Final EIS.

## III. Rationale For My Decision

In making this decision, I recognize that oil and gas leasing, exploration and development are a legitimate, permissible, and viable use of National Forest System lands. This is evidenced by several laws affecting the management of National Forest System lands including the Organic Administration Act of 1897, Mineral Leasing Act, Multiple Use Sustained Yield Act of 1960, and the National Forest Management Act of 1976.

I also recognize that energy and mineral resources will be given the same consideration accorded to other surface resources, land uses, and environmental protection (Rocky Mountain Regional Guide 5/92).

It is for these reasons, and in consideration of the environmental consequences documented in the Final EIS and administrative record, that I have decided to authorize the majority (85%) of the Analysis Area for leasing. This authorization includes stipulations limiting or prohibiting surface occupancy on approximately 85% of the available and authorized lands in the Analysis Area. Stipulations will be applied for environmental or resource protection.

ROD-6

BLM_0048731

The exact location of future ground disturbance associated with oil and gas exploration and development activities is unknown at this time.  However, the Reasonably Foreseeable Development scenario [36 CFR 228.102(c)(3)] has provided a sound basis for estimating environmental consequences. The lease terms and stipulations to be used when leases are issued have been specified.  The effectiveness of mitigation is well known on the types of lands defined in the Affected Environments of the Final EIS. In consideration of these points, I am confident that the adequacy of the analysis documented in the Final EIS is sufficient for analyzing each alternative and for providing a reasonable basis for my decision.

My decision to select Alternative 2 has been coordinated with the White River National Forest.  We coordinated our application of stipulations to achieve consistency along our common border, .

My decision has also been coordinated with the United States Department of Interior, Fish and Wildlife Service, through informal consultation.  The FWS concluded there would be no effect on any threatened and endangered species known to exist in the Analysis Area at this time.

I believe Alternative 2 offers the most balanced management scheme to provide for oil and gas leasing and exploration while protecting the surface and subsurface resources on the Forest.  None of the other alternatives analyzed in this oil and gas leasing analysis offer the same degree of environmental protection while maximizing opportunities for leasing and exploration for oil and gas resources.  Alternative 1 - No Action offers no change over the current Forest Plan direction and does not meet the requirements of the Federal Onshore Oil and Gas Leasing Reform Act of 1987 and its implementing regulations.  Alternative 3 - No Lease, while being very environmentally sound, is much too restrictive and is not consistent with Forest Service policy and multiple use objectives.   The environmental effects for Alternative 4 - Standard Lease Terms are greater and are not justifiable even though the alternative enhances oil and gas leasing and exploration opportunities.  Alternative 5 - No Lease in Roadless and Semi-primitive Non-motorized Areas is environmentally sound, but is not consistent with the Forest Plan which allows timber harvest and other multiple use activities in some Roadless Areas.

It is Forest Service policy to use the least restrictive stipulation that provides the desired environmental protection.  I believe I have.  The regulations [36 CFR 228.102(c)(1)(ii)] say that the use of supplemental stipulations must be justified.  Similarly, the regulations at 36 CFR 228.102(c)(1)(i) require an explanation of the typical standards and objectives to be enforced under Standard Lease Terms.

The Regional Guide and Forest Plan standards and guidelines are the basic standards and objectives to be enforced under Standard Lease Terms [36 CFR 228.102(c)(1)(i)].  The Regional Guide and Forest Plan are the basis for "reasonable mitigation" in the sense that they offer general guidance for mitigating environmental concerns or hazards.  Standard Lease Terms are the lowest common denominator and are the types of mitigation measures which should be applied to nonsensitive Affected Environments.  Special stipulation requirements are over and above Standard Lease Terms and are specific to each Affected Environment.

Supplemental stipulations (No Surface Occupancy, Controlled Surface Use, and Timing Limitations) were used rather than relying on the terms of the standard lease form (Standard Lease Terms) to mitigate the effects of oil and gas activity in many Affected Environments.  This was done for the reasons discussed below and under each Affected Environment:

- **Special resource concerns are identified.**

The surface use requirements of the Forest Service oil and gas regulations and in Section 6 of the Standard Lease Form may provide some protection of the various Affected Environments, but displaying information on the Affected Environments through a stipulation communicates to the potential lessee that there are areas that require special consideration during operations.

Oil and Gas Leasing Analysis FEIS

**- The Standard Lease Terms are not specific.**

Section 6 (Conduct of Operations) of the Standard Lease Form uses general terms. These general terms include: "Minimize adverse impacts", "reasonable measures", "consistent with lease rights", "prevent unnecessary or unreasonable interference", etc. Attaching appropriate stipulations to a lease helps to define some of these terms at the lease stage and allows for more site specific mitigation for known special conditions. Having surface use requirements well laid out will assist all parties in the administration of oil and gas activity.

**- Many operators are unfamiliar with operating conditions in mountainous environments.**

In general, the operators that have worked on the Forest were not familiar with operations in the mountains and fragile mountainous environments. Operations in a mountainous environment require more control than on the plains or foothills. Generally the steeper the slope the greater the amount of earthwork required for the construction of roads, well pads, and pipelines and the greater the potential for erosion, slope stability problems, visual impacts, and public awareness and concern.

**- The Forest Service will have more control over surface disturbing activity.**

Stipulations give our oil and gas administrator more control over oil and gas activity. Surface use requirements as we have defined them are reasonable mitigation measures.

**- The land use allocations may be long-lasting.**

The allocations made in this ROD could effectively last 10 to 40 years. Leased land can remain subject to the lease terms as long as the lessee can hold the lease. The majority of the Forest currently leased was leased in the late 60's and early 70's under the Standard Lease Terms in effect at the time of lease. The fact that the people involved in the current decisions may not be around during implementation due to workforce mobility was also considered. Having an informed lessee and Forest Service administrator will ensure an acceptable job on the ground, both now and in the future.

**- The public wants us to exercise our authority and control.**

The public has been advised over the past two years in several public meetings and publications as to how and where these stipulations will be applied. Public response indicates that they expect stipulations to be applied and strictly enforced. The public is concerned that the Forest Service has control and exercises that control. Many do not believe that Standard Lease Terms are adequate for environmental protection. Likewise, many insist that stipulations not be waived, excepted, or modified.

**- Stipulations should not adversely impact operators.**

Operating costs should be similar under Standard Lease Terms and Controlled Surface Use. Industry may have a perception that their costs would be significantly lower under Standard Lease Terms. I believe the Controlled Surface Use stipulations I have applied are "reasonable mitigation" and would be required under Section 6 of the Standard Lease Terms.

## Stipulation Application

Table 2 of this ROD summarizes the lease option I have chosen for each Affected Environment. Each Affected Environment is listed below and my rationale for choosing the option is displayed. Where Affected Environments overlap, the most restrictive stipulation will apply. For example, in a Roadless Area such as Clear Creek which with my decision has no special stipulation to protect roadless values, but contains areas with moderate geologic hazards, a Controlled Surface Use stipulation would be

ROD-8

BLM_0048733

attached to the lease in those areas of moderate geologic hazards.  If the Roadless Area contained an Administrative Site on the moderate geologic hazard area, the Administrative Site would be stipulated No Surface Occupancy.  The reader is encouraged to review the stipulation map attached to the Final EIS and/or Summary to better understand which stipulations apply to each area.

### General Forest - Standard Lease Terms

The General Forest Affected Environment consists of all the land area outside the other Affected Environments discussed in the EIS.  The General Forest consists of the generally less sensitive environment components and wildlife and wildlife habitats that can be adequately protected with the use of Standard Lease Terms.

Within this Affected Environment, the Wildlife environmental factor is probably the most sensitive. I believe the protection provided by the Standard Lease Terms and the site specific NEPA analysis done at the time of the APD and Surface Use Plan of Operations will result in the application of suitable and effective mitigation to the effects described for those wildlife and wildlife habitats not specifically covered with a stipulation.  Significant impacts to wildlife and wildlife habitats are not likely to occur.

### Floodplains - No Surface Occupancy

The application of No Surface Occupancy to Floodplains highlights the importance of these areas as part of the riparian and wetland ecosystem.  Floodplains in the mountains generally include much of the same area as riparian areas and wetlands.  Executive Order 11988 and our Forest Plan guidance generally preclude development in floodplains.  Allowing oil and gas activity in floodplains will create the potential for discharge of undesirable materials directly into an adjacent stream during flood events.

Floodplains are not displayed on our stipulation map that accompanied the EIS, but the streams displayed on USGS quadrangle maps adequately show the location of this resource.  I believe the mapping meets the intent of the Forest Service oil and gas regulations at 36 CFR 228.102(c)(1)(i) and (ii).

### Aquatic/Riparian/Wetland Habitats - No Surface Occupancy

The Forest Service oil and gas regulations at 36 CFR 228.108(j) preclude surface occupancy in riparian areas and wetlands (as well as areas subject to mass soil movement) unless occupancy is approved as part of the APD and Surface Use Plan of Operations.  This reflects the Forest Service's commitment to the protection of these areas.  Some road construction in the form of stream crossings can be expected to occur, as access to drilling sites will not be able to avoid these areas in all cases.  Strict mitigation will be applied to lessen the impacts to these important areas.  The Forest Plan Management Prescription 9A details riparian and wetland protection and the mitigation listed in Appendix H of the EIS will be applied, as necessary, when crossing these areas is unavoidable.

Aquatic/Riparian/Wetland Habitats are not displayed on the stipulation map that accompanied the EIS, but the streams, lakes, and swamps displayed on USGS quadrangle maps adequately show the location of these resources.  This meets the intent of the Forest Service oil and gas regulations at 36 CFR 228.102(c)(1)(i) and (ii).

### Alpine/Tundra - No Surface Occupancy

The short growing season, harsh climate, and poorly developed soils severely limit the ability to revegetate any disturbance in Alpine/Tundra areas.  Disturbance in this environment would likely be long-lasting due to limitations on revegetation.  For these reasons, less restrictive stipulations would not adequately protect the surface resources in Alpine/Tundra areas.  Additionally, this affected environment is scattered, relatively small in size, and usually consists of intrusive rocks with low or no known potential for oil and gas resources.

BLM_0048734

**High Geologic Hazard** - No Surface Occupancy

As discussed in the EIS, these are areas where slope movement is actively occurring. High Geologic hazard areas include active mudflows, earthflows, landslide and avalanche areas. The Forest Service oil and gas regulations at 36 CFR 228.108(j) specify no surface occupancy in areas subject to mass soil movement unless approved in the Surface Use Plan of Operations. Construction in these areas would likely result in accelerated slope movement and related other resource damage. Less restrictive stipulations are not adequate to mitigate the potential effects of accelerated slope movement as a result of road, well pad, or pipeline construction. The best mitigation in these areas of high geologic hazard is avoidance. High geologic hazards have been mapped and are displayed on maps in the EIS.

**Moderate Geologic Hazard** - Controlled Surface Use

In contrast to areas of high geologic hazard, road, well pad, and pipeline construction in areas of moderate geologic hazard can take place if the geologic hazard is properly considered in the design of the facilities. No Surface Occupancy stipulation is not needed in this environment, but there is a need for special design measures to ensure that these potentially unstable areas do not become an environmental hazard or an economic liability as a result of road, well pad, or pipeline construction (economic liability refers to the costs to reconstruct or the long-term maintenance of a failed road, well pad, etc.). These special design considerations are ensured with the use of the Controlled Surface Use stipulation.

Much of the Analysis Area is classified as having a moderate geologic hazard. On the Forest, moderate geologic hazard areas include: stabilized earthflows, mudflows, and landslides; slopes adjacent to failed slopes or active earthflows, mudflows, and landslides; areas of rockfall; flash flood zones; and areas with potential mining related problems (such as subsidence). These areas have been identified through aerial photo interpretation and are displayed on maps in the EIS.

**Roadless Areas**

Response to the Draft EIS indicated that Roadless Areas are a very sensitive topic. Many of those responding to the Draft EIS want Roadless Areas and their roadless values protected from the potential for oil and gas activity. Roadless values can be protected by applying No Surface Occupancy stipulations or by exercising the Forest Service's discretionary No Lease authority. The use of Controlled Surface Use stipulations, Timing Limitations, and Standard Lease Terms normally would not preclude the construction of roads which would result in loss of roadless values. The decision therefore becomes a choice between no roads (No Lease and No Surface Occupancy) and roads (Standard Lease Terms).

No Lease best protects Roadless Area values. No Surface Occupancy may also protect Roadless Area values. However, waiver, modification, or exception to a No Surface Occupancy stipulation in a Roadless Area may result in loss of roadless values. There is a perception by some that waivers, exceptions, and modifications are routine. The Forest Service oil and gas regulations at 36 CFR 228.104 spell out the criteria for the consideration of waivers, exceptions, and modifications. These criteria will be strictly administered. I have decided that certain Roadless Areas and portions of other Roadless Areas will not be available for oil and gas leasing at this time. This decision does not preclude development occurring on existing leases within these Roadless Areas.

The Roadless Area database used in the EIS was developed during the RARE II inventory (1979). The rationale used to decide how to manage a particular Roadless Area was based on the present degree of roadlessness of the Roadless Area, the potential Forest Service management activities (such as timber sales) likely to occur in a Roadless Area, the likelihood of oil and gas development, the uniqueness of the area, and whether or not the area was physically roadable. I also considered the importance of the Roadless Area to the overall Forest oil and gas leasing program.

BLM_0048735

Many of the Roadless Areas have existing leases and high potential for oil and gas resources. The decisions made here will be reconsidered each time the Forest Plan is revised. A No Lease decision does not preclude future oil and gas leasing, exploration and development if societal demands for these resources significantly increase in the future. However, a decision to lease could result in the loss of future opportunities for Roadless Area or Wilderness designation. Roadless Areas will again be evaluated for Wilderness capability in the Forest Plan revision process, due to be completed in 1997. A No Lease decision may protect future Wilderness options.

Each Roadless Area was assessed using the criteria in California vs. Block 483 F. Supp 465 (E.D Cal 1980); 690 F.2d 753 (9th Cir. 1982), as to the Wilderness and roadless values present. Maintaining the roadless values also protects the important associated resource values of wildlife habitat, biodiversity, and unroaded non-Wilderness non-motorized recreation.

I do not believe it is appropriate to develop all Roadless Areas at this time when so much other area on the Forest is available for oil and gas exploration and development. The Reasonably Foreseeable Development scenario remains essentially unaffected by the removal of Roadless Areas from availability. The demand for Roadless Areas and the values they contain will likely increase as the population increases. Roadless Areas are very important to most of the public that responded to the Draft EIS. With the decisions discussed below for each Roadless Area, 36% of the Roadless Area acreage in the Analysis Area is No Lease (13% of Analysis Area is No Lease for roadless character), leaving the remaining 64% of the Roadless Area acreage available for leasing.

With the above discussions in mind and my desire to be responsive to the needs of the public regarding Roadless Areas, my goal is to protect existing roadless values where it is consistent with other uses of the Roadless Area. Those Roadless Areas in which timber sales are planned in the 1991 Amended Forest Plan are available for lease. Protection of other Affected Environments located in Roadless Areas is similar to that elsewhere (for example, slopes 60% within a Roadless Area are No Surface Occupancy; also see the discussions of other Affected Environments).

Existing uses in Roadless Areas not available for oil and gas leasing will not be affected by the No Lease designation. Motorized trail use and other motorized and permitted uses in these areas will continue, pending completion of travel management plans for the Forest and/or the Forest Plan revision.

My decision for each Roadless Area within the Analysis Area is listed below:

Raggeds - Standard Lease Terms

Portions of the Raggeds Roadless Area contain timber in the Forest's suited timber base. The existing motorized routes, irrigation systems, narrow shape, and private land make this area difficult to manage as roadless.

That portion of the Raggeds Roadless Area that is within the Kebler Corridor, including Horse Ranch Park, is not available for leasing (No Lease). See the discussion of the Kebler Corridor under Sensitive Areas.

Drift Creek - Standard Lease Terms

This area contains no special resource concerns. The area contains timber in the Forest's suited timber base and has timber sales scheduled for this decade in the Forest Plan. It is currently roaded and leased. The area is open to off-road and off-trail travel by motorized vehicles.

BLM_0048736

Oil and Gas Leasing Analysis FEIS

Springhouse Park - Standard Lease Terms

This area contains no identified special features. This area has timber sales scheduled within it, including the Floating Lake Timber Sale. The Floating Lake Timber Sale will potentially result in an extensive road system. The area is also broken by established motorized use.

Electric Mountain - Standard Lease Terms

This area has timber sales scheduled to occur during this decade of the Forest Plan. Roads surround the area and an irrigation ditch passes through the Roadless Area. A trail open to motorized use passes through the area. There are no special features identified in this area.

Clear Creek - Standard Lease Terms

The Clear Creek/Muddy Basin area is a proven producer of natural gas and is very important to the Forest's overall oil and gas leasing program. Almost the whole area is leased. Four producing wells are located within and ten wells capable of production are located immediately adjacent to the area. There are oil and gas well access roads and pipelines and there is a very high potential for further oil and gas development on existing leases. Additionally, Clear Creek has timber sales scheduled to occur during this decade of the Forest Plan.

The Clear Creek Roadless Area was the subject of a petition drive by outfitters who would like to see the current roadless values in the area maintained. Over 1000 signatures were gathered. The outfitters fear further development in the area will result in the loss of their livelihood. No Lease and No Surface Occupancy stipulations were seriously considered for this area based on high public concern. However, the area's importance to the Forest's oil and gas leasing program and the high likelihood of further development on existing leases leads me to not restrict surface occupancy. The Forest will work with the permittee and lessees to minimize the effects of oil and gas activity on outfitters.

Hightower - Standard Lease Terms

This area has timber sales scheduled for this decade of the Forest Plan. It currently has an active timber sale (Ruth Mountain). There are no special features identified in this area and it is not manageable for its roadless characteristics because of existing roads, timber sales, and a utility corridor.

Priest Mountain - No Lease and Standard Lease Terms

Different portions of the Priest Mountain Roadless Area vary in their retention of roadless characteristics. Approximately 52,000 acres are still considered roadless. This Roadless Area was divided into smaller segments to aid in the discussion of the roadless characteristics of the Priest Mountain Roadless Area. Each segment is discussed below:

Currant Creek - No Lease

This portion of the Priest Mountain Roadless Area is still roadless. It's size, shape, and location allow it to be managed as roadless. The Colorado Division of Wildlife considers this area to be important wildlife habitat.

Cunningham Creek - Standard Lease Terms

Roads, reservoirs, and ditches have already severely impacted the roadless values in this part of the Priest Mountain Roadless Area. It is not manageable as roadless.

BLM_0048737

Priest Mountain - No Lease

> This portion of the Priest Mountain Roadless Area is still considered to be roadless. Timber harvest is not expected in the area, as it contains little or no suitable timber. When combined with other portions of the Priest Mountain Roadless Area, it is manageable for it's roadless characteristics.

Hubbard Creek - Standard Lease Terms

> This part of the Priest Mountain Roadless Area has been affected by the construction of the Overland Ditch and the Stevens Gulch Road. Several timber sales are scheduled for this area over the next few years.

Upper Cow Creek - No Lease

> This area is currently roadless. The Forest Plan prescription here is 3A - Semi-primitive Non-motorized. The area does not have any designated routes open to motorized travel. Combined with the Priest Mountain and Flat Tops portions of the Priest Mountain Roadless Areas (described above and below), it is manageable for it's roadless characteristics.

West Muddy - Standard Lease Terms

> This area contains timber included in the Forest's suited timber base. Timber harvest is expected to occur in this area.

Flat Tops - No Lease

> This area is large enough to be managed as roadless. It contains no suited timber, as identified in the Forest Plan. It's high water table prevents the establishment of trees in all but dryer mounds scattered throughout the area.

Bronco Knob - Standard Lease Terms

> This area contains timber identified as suitable in the Forest Plan and timber is scheduled to be harvested (Monument Timber Sale).

Upper Leon Creek - Standard Lease Terms

> The shape and size of this Roadless Area and the presence of roads within and immediately west of the area, make it unmanageable for roadless characteristics.

Battlement Mesa - No Surface Occupancy

The Battlement Mesa Roadless Area is still considered roadless and parts are likely to remain roadless forever, because of the steep and difficult terrain. The area contains important bighorn sheep habitat, areas of high geologic hazard and no suitable timber. No Lease was considered for this Roadless Area, but was not selected. It is an area important to the Forest's oil and gas leasing program. Because of the size and shape of the Roadless Area, the oil and gas resources could potentially be accessed with directional drilling. Less restrictive stipulations were considered but rejected because of the surface resource concerns mentioned above.

BLM_0048738

Oil and Gas Leasing Analysis FEIS

Nick Mountain - Standard Lease Terms

The Nick Mountain Roadless Area has timber identified as suitable and scheduled for harvest during the next decade. No Lease and No Surface Occupancy were considered, but are not consistent with scheduled timber harvest in the area.

Kannah Creek - No Lease

Kannah Creek has been mentioned in past Wilderness legislation. Although the Kannah Creek Roadless Area is not currently being considered for Wilderness, this area is still considered roadless and contains other important surface resource values. The factors considered in making the No Lease decision for this Roadless area include: it has a Primitive Recreation Opportunity Spectrum (ROS) classification, it is the City of Grand Junction's watershed, no timber sales are planned within the Roadless Area, it is currently managed as non-motorized, it has slope stability problems, it is visually sensitive, and there is high public interest in maintaining the roadless character, here. The nature of these factors in this relatively small area preclude the use of the less restrictive stipulations considered for this Roadless Area.

West Elk - No Lease and Standard Lease Terms

The West Elk Roadless Area has been divided into two general areas, the area west of Coal Creek and the area east of Coal Creek. West of Coal Creek existing coal leases, coal exploration activities, and roads and spurs have compromised the roadless values. Standard Lease Terms will apply west of Coal Creek. East of Coal Creek, this part of the West Elk Roadless Area is part of the Kebler Pass Corridor. The decision for the Kebler Pass Corridor is No Lease; see the discussion of the Kebler Pass Corridor under Sensitive Areas below.

Whetstone Mountain and Flat Top Mountain - No Lease

The Whetstone Mountain and Flat Top Mountain Roadless Areas are part of a block of land just south of the Town of Crested Butte. The factors considered in making the No Lease decision in this area include: no timber management is scheduled in this area, the area receives very high recreational use including mountain biking from nearby Crested Butte, it contains the Town of Crested Butte's watershed, it is very steep and rugged, it has low and no known potential for oil and gas resources, this area is not considered important to the Forest's oil and gas leasing program, and there is very strong local support for retention of the roadless values of this area. Less restrictive stipulations were considered, but because of the surface resource values mentioned above and my desire to be responsive to local concerns, No Lease is appropriate.

There is an existing lease in the south central part of the area. Had there been no lease here, the whole area would not have been included in the Analysis Area because of its low and no known potential for oil and gas resources. The lease expires in 1998. However, the lease rights of the existing lessee will not be affected by this decision. The lessee has the right to explore for and develop oil and gas resources on his leasehold in accordance with the terms and conditions of the lease.

Tabeguache and Roubideau Roadless Areas - No Lease

Both the Tabeguache and Roubideau Roadless Areas are still considered roadless. Although mentioned in recent Wilderness legislation, they are not being considered for Wilderness, but in the current Wilderness Bill they would be withdrawn from mineral entry and leasing. No Lease is consistent with withdrawal from mineral entry and leasing. Other factors I considered in deciding not to make these areas available for leasing include: there are no timber sales scheduled in these areas, both areas have areas of high geologic hazard, Roubideau has big game winter range and a newly re-established bighorn sheep herd, and there is strong public support in designating these areas Wilderness.

BLM_0048739

<u>Kelso Mesa</u> - Standard Lease Terms

Only a small portion (1200 acres of 34,000 acres) of this Roadless Area is included in the Analysis Area. It has no known potential for oil and gas resources and the potential for leasing and exploration is low. It was included in the Analysis Area only because it was within two miles of a lease at the time the Analysis Area was formulated. The lease has since expired. Application of stipulations on other Affected Environments will protect resource concerns if this area is leased in the future.

<u>Campbell Point</u> and <u>Johnson Creek</u> - Standard Lease Terms

Only small portions of these Roadless Areas are included in the Analysis Area. Applying stipulations on other Affected Environments will take care of the resource concerns in these Roadless Areas. These areas contain no special features and no comments were received specifically addressing these Roadless Areas. The presence of roads below the Campbell Point Roadless Area lessens the "roadlessness" of the Campbell Point Roadless Area.

**<u>Research Natural Areas</u>** - No Lease

The proposed Tabeguache Research Natural Area (650 acres) is within the Analysis Area. The Forest Service Manual guidance states: At the time a Research Natural Area is established, procedures for withdrawal from mineral entry and mineral leasing should be initiated (FSM 4063.35 - R2 Supplement #1). My "No Lease" designation is consistent with the above FSM direction.

**<u>Sensitive Areas</u>** - No Surface Occupancy

Sensitive areas were identified during the Forest Plan timber amendment. Because of the high public concern, these lands were not included in the suited timber base. No Surface Occupancy is consistent with the level of public concern, although in the case of the Kebler Pass Corridor, No Lease is more appropriate, based on public comment (see below).

<u>Kebler Pass Corridor</u> - No Lease

The Kebler Pass Corridor is a Sensitive Area that receives extremely high recreational use. The corridor is between the West Elk and Raggeds Wildernesses and has very high scenic and recreational values. It is also a designated Scenic Byway. The Kebler Pass Corridor includes small portions of the West Elk and Raggeds Roadless Areas. There is very strong local support to not lease in the Kebler Corridor.

**<u>Retention Visual Quality Objective- Low Visual Absorption Capability</u>** - No Surface Occupancy

These areas occur on highly visible steep slopes along major travelways. Any disturbance in these areas would be highly visible and difficult to rehabilitate. Other stipulations were considered, but given the visual sensitivity of these areas and the difficulty of rehabilitation, No Surface Occupancy best protects the resource.

**<u>Retention Visual Quality Objective</u>** and **<u>Scenic Byway Corridors</u>** - Controlled Surface Use

The objective in these areas is to retain existing visual quality. These areas also have a high Visual Absorption Capability, i.e., they can absorb some development. Controlled Surface Use allows us enough control to mitigate the potential for visual impacts.

BLM_0048740

Oil and Gas Leasing Analysis FEIS

**Semi-primitive Non-motorized (3A Management Areas)** - No Surface Occupancy

These areas have values (Semi-primitive Non-motorized) similar to those in Roadless Areas although they are usually much smaller. Oil and gas activity is not compatible with the recreation uses and experiences in this Affected Environment.

**Administrative Sites** - No Surface Occupancy

At Administrative Sites, the Forest Service generally has a substantial investment in facilities, roads and buildings. These sites are used by Forest personnel throughout the normal operating season for oil and gas activity. Oil and gas activity within the confines of an Administrative Site would likely disrupt administrative use.

**Recreation Complexes** - No Surface Occupancy

Recreation Complexes are high use and high density recreational areas. They include campgrounds, picnic grounds, interpretive sites, visitor centers, overlooks, permitted recreation residences and lodges/resorts, ski areas, and administrative sites. Surface occupancy by oil and gas activities is not compatible with these resources. Less restrictive stipulations would not adequately protect the recreational values here, i.e., oil and gas activity allowed by Controlled Surface Use, Standard Lease Terms, or Timing Limitations would interfere with the recreational uses and experiences in Recreation Complexes.

Major Ski Trails - Controlled Surface Use and Timing Limitations

Due to the season of use for these Recreation Complexes, the use of Controlled Surface Use and Timing Limitations will adequately protect these areas and the recreational experiences that are found there.

**Watersheds of Special Interest to Municipalities** - Controlled Surface Use

Public concern over water quality influenced the special emphasis on the mitigation of potential impacts in this Affected Environment. Other stipulations, such as No Surface Occupancy and Standard Lease Terms were considered, but rejected. Other activities such as timber harvest are allowed in Municipal Watersheds, but the Forest Service controls the location, duration, and intensity of the timber sale related activity. Controlled Surface Use is consistent with the control of other Forest management activities in Watersheds of Special Interest to Municipalities.

**Slopes 40-60%** - Controlled Surface Use

On Slopes 40-60% the amount of earthwork required to construct a road, pipeline or well pad increases significantly. Additionally, the erosion hazard increases to high on slopes greater than 40%. No Surface Occupancy was considered, but it is too restrictive, and adequate protection could be given to the soil resource with appropriate mitigation applied during and immediately following ground disturbance. Standard Lease Terms would not allow enough control over the application and design of mitigative measures.

**Slopes > 60%** - No Surface Occupancy

The erosion hazard on Slopes > 60% is very high and the area that would be disturbed would be excessive, with little potential for successful rehabilitation. There is also a higher potential for mass soil movement. Although not specific to a percent slope, the Forest Service oil and gas regulations (36 CFR 228.108(j) Watershed Protection) supports No Surface Occupancy on "steep slopes". The Controlled Surface Use stipulation was deemed inadequate because of the low rehabilitation potential on these slopes.

ROD-16

### Wildlife Special Habitats

Big Game Winter Range - Controlled Surface Use and Timing Limitations

Big game animals are on their winter range in most years from December 1 to April 30.  Timing Limitations restricting activity from these areas during this time period effectively reduces the impact to wintering big game.  Applying Controlled Surface Use stipulations to control road location in big game winter range lessens the overall impact to the habitat.  Standard Lease Terms may not accomplish the desired mitigation in big game winter range.  Since big game animals are on their winter range for only a portion of the year, stipulations prohibiting surface occupancy are not necessary.

Elk Calving Areas - Controlled Surface Use and Timing Limitations

Elk typically occupy their calving areas on the Forest from April 16 to June 30.  Restricting oil and gas activity during this time period results in little direct effect to elk.  Controlling road location in elk calving areas with Controlled Surface Use stipulations lessens the impact on the calving habitat values.  Standard Lease Terms may not accomplish the desired mitigation and No Surface Occupancy is not necessary since the animals are on their calving grounds for a relatively short period of time.

Migration Routes and Staging Areas - Controlled Surface Use and Timing Limitations

Like Big Game Winter Range and Elk Calving Areas, Migration Routes and Staging Areas are used by big game for only short time periods during the year.  Timing Limitations will be in effect for Migration Routes from March 1 to May 30, and November 1 to December 31; and from October 15 to December 31 for Staging Areas.  Controlled Surface Use stipulations will control the location of roads, pipelines, and well pads in this special wildlife habitat.  These areas will be determined at the APD stage.  Standard Lease Terms may not accomplish the desired mitigation and No Surface Occupancy is not necessary since the animals occupy these areas for short time periods.

Bighorn Sheep Lambing/Breeding Areas - No Surface Occupancy

A bighorn sheep herd of concern is located on Battlement Mesa.  The herd is declining in numbers and may now only number 25 sheep.  The entire range of this species on Battlement Mesa is considered critical to their survival.  Because of the concern for the survival of the species, No Surface Occupancy stipulations will be applied to the entire bighorn sheep range on Battlement Mesa.  Less restrictive stipulations would not accomplish the desired "no effect" to bighorn sheep habitat.

Summer Range (Concentrated Use) - No Surface Occupancy

On the basis of recommendations from the Colorado Division of Wildlife, this Affected Environment will have No Surface Occupancy stipulations applied to mitigate the potential impacts to summering elk herds.  The Colorado Division of Wildlife considers these areas important habitat and believes the cumulative impact of forest activities is driving big game off their summer range too early in the fall.  Avoiding disturbance will keep big game on the summer range as long as possible, and off their winter range.  In most cases these areas of concentrated summer use are adjacent to private land which is winter and transition range.

I will consider waivers, exceptions and modifications to the No Surface Occupancy stipulation when the operator can demonstrate that summering elk would not be prematurely displaced onto their winter range as a result of proposed operations.  This would likely include a study to determine if the operations proposed by the operator will disturb summering elk.  I intend to maintain control over the timing and location of oil and gas activity in these areas through the careful use of waivers, exceptions and modifications.

BLM_0048742

Oil and Gas Leasing Analysis FEIS

<u>Sage Grouse Leks</u> - No Surface Occupancy, Controlled Surface Use and Timing Limitations

The lek is extremely important habitat to the survival of the sage grouse. The lek and a half-mile buffer around it will be No Surface Occupancy. The nesting habitat around the lek will have Controlled Surface Use and Timing Limitations stipulations that will control road location and not allow surface occupancy from March 1 through May 31. Less restrictive stipulations in the lek would result in some loss of this habitat. Since the leks on the Forest are relatively small in size, No Lease is not necessary.

### Threatened and Endangered Species

Threatened and endangered species are protected by the Endangered Species Act. No additional protection of their habitat is required in this decision beyond the protections provided by the Endangered Species Act.

### Utility Corridors/Electronic Sites - Standard Lease Terms

We have sufficient authority with Standard Lease Terms to move a lessee from a specific site. These sites are generally small in size and in most cases will be avoided by industry. A Lease Notice may be attached to the lease if a buffer for a specific site is needed.

### Primary Rangeland (6B Management Areas) - Standard Lease Terms

The level of the projected activity is such that no significant impact to rangeland resources would occur with or without special stipulations. More restrictive stipulations were considered, but were considered unnecessary in this Affected Environment.

### Lands Suited for Timber Harvest - Standard Lease Terms

Special stipulations are not required to protect Lands Suitable for Timber Harvest. Some of these lands may become more economically viable for timber harvest as a result of oil and gas activity.

# IV. Public Involvement

## Initial Scoping and Formulation of Issues

The issues addressed in the Draft Environmental Impact Statement (DEIS) were formulated through analysis of comments received during the public involvement process.

The public involvement process began with the publication in the Federal Register of a Notice of Intent to Prepare an Environmental Impact Statement. The Notice of Intent was published on October 25, 1990 (Volume 55, No. 207 of the Federal Register). Open house meetings were held to scope the project with the public in Montrose on November 14, 1990; in Paonia on November 28, 1990; and in Grand Junction, Colorado on December 5, 1990. A second round of open house meetings were held on April 7, 8, and 9, 1992, in Grand Junction, Paonia, and Montrose, Colorado. Additionally, informal informational meetings were held with environmental groups and oil and gas industry representatives. The issues that surfaced through public involvement are displayed on pages I-22 through I-27 of the FEIS.

BLM_0048743

## Public Input on the Draft EIS

The Draft EIS was released on August 19, 1992. The review and comment period ended on October 13, 1992. Comments received after October 13th were considered in the analysis. A total of 270 letters were received from 263 reviewers, representing 341 comments on the Draft EIS. After the Draft EIS was published, open house meetings were held in Grand Junction, Paonia, Denver, Montrose, and Crested Butte on September 2, 3, 8, 10, and 24, respectively. About 80 people attended the open houses, with the majority (75) in attendance at Crested Butte.

In response to the comments received on the Draft EIS, additional analysis was conducted prior to the issuance of the Final EIS. This additional analysis primarily concerned the Roadless Areas and resulted in the modification of Alternative 2 - Preferred. Chapter VI of the Final EIS displays the responses to each comment reviewed.

## V. Alternatives

Five alternatives for the Oil and Gas Leasing Analysis are identified and described in Chapter II of the Final EIS. The five alternatives analyzed are:

**Alternative 1 - No Action** - This alternative follows the existing management direction in the Forest Plan. Under this alternative, all lands in the Forest are available for leasing, but no lands are authorized for leasing until additional site-specific analysis is conducted on every lease parcel considered for leasing.

**Alternative 2 - Preferred** - This alternative makes available and authorizes about 813,000 acres of the Forest for oil and gas leasing. Approximately 138,000 acres of the Forest would not be available for oil and gas leasing.

**Alternative 3 - No Lease** - None of the Forest would be available or authorized for oil and gas leasing with this alternative.

**Alternative 4 - Lease with Standard Lease Terms** - This alternative would allow all the Analysis Area to be available and authorized for leasing with Standard Lease Terms only.

**Alternative 5 - No Lease in Roadless and SPNM** - This alternative is similar to Alternative 2 - Preferred, except that all Roadless Areas and Semi-primitive Non-motorized Areas would not be available for leasing.

## Environmentally Preferred Alternative

The Council of Environmental Quality (CEQ) Regulation, 40 CFR 1505 (b), requires the identification of an environmentally preferred alternative. Having reviewed the Final EIS and the administrative record, I conclude that Alternative 3 - No Lease would have the least amount of environmental impact to surface resources.

BLM_0048744

Oil and Gas Leasing Analysis FEIS

# VI.  Monitoring and Evaluation

Monitoring needs are discussed in Appendix H of the Final EIS.  Monitoring is the evaluation of project implementation to determine how well the objectives of the Final EIS and Record of Decision are being met and to determine the environmental effects of project implementation.

In order to validate and improve our decision making for future lease issuance under this Final EIS and Record of Decision, leasing progress will be monitored yearly.  The annual Grand Mesa, Uncompahgre, and Gunnison National Forest monitoring report will be used as the method for evaluating this monitoring.

All monitoring programs are designed to insure that impacts to the environment are acceptable, and allow mitigating actions to be taken immediately should unanticipated impacts occur.  The adequacy of the findings and resource data in the Final EIS will be monitored over time to insure that all leases issued in the future will be in conformance with laws, regulations, and resource management requirements.

The monitoring results will be evaluated to determine the following:

- Whether to continue, modify, or discontinue this decision.

- If additional amendments are needed to the Forest Plan or if supplements are needed to this Final EIS.

- Any additional monitoring needs.

# VII.  Implementation

The decision identified in the Record of Decision shall be implemented in the following manner:

1) The decision to amend the Forest Plan will be implemented upon public notice.  This Record of Decision is public notice and will be sent to all parties that have requested notice of Forest Plan amendments and to those who have participated in this analysis process.  In addition, a notice of this Record of Decision will be published in local newspapers.  The Forest Plan amendment is included as Appendix A.  Note that the entire Forest Plan will undergo revision in 1997.  As the revision process occurs, this decision may be modified.

2) In accordance with 36 CFR 228.102(d), I shall promptly notify the BLM as to the leasing decisions that I have made.

3) In accordance with 36 CFR 228.102(e), the leasing decision will be reviewed and the BLM will be authorized to offer specific lands for lease subject to:

a)  Verifying that oil and gas leasing of specific lands has been adequately addressed in a NEPA document and is consistent with the Forest Plan,

b)  Ensuring that conditions of surface occupancy identified in the NEPA document are included as stipulations in resulting leases, and

c)  Determining that operations could be allowed somewhere on each lease, except where stipulations will prohibit all surface occupancy.

BLM_0048745

4) If the lands in the parcels do not receive a bid at a sale, they will be available for non-competitive offers for a two-year period.

5) Following lease issuance, a lessee/operator may submit an Application for Permit to Drill (APD) and Surface Use Plan of Operations (SUPO). A lessee/operator may not conduct on-the-ground actions without an approved APD and SUPO. The BLM will forward the APD and the SUPO to the Forest Service. An environmental analysis, tiered to this Final EIS, will be conducted on the APD and SUPO proposal. The APD and SUPO decisions are not being made in this Record of Decision. The Deciding Officers of that environmental analysis may:

    a) Approve the plan as submitted,

    b) Approve the plan subject to specific conditions of approval; or

    c) Disapprove the plan with stated reasons (36 CFR 228.107)

# VIII.  Right To Administrative Review

This Decision is subject to appeal pursuant to 36 Code of Federal Regulation, part 217, "Requesting Review of National Forest Plans and Project Decisions". Any written Notice of Appeal of the Forest Service decision must be fully consistent with 36 CFR 217.9, "Content of Notice of Appeal." The reasons for appeal must be included and two copies must be filed with the Regional Forester within 45 days beginning the day following the date of publication of the legal notice of this Record of Decision in the Grand Junction Daily Sentinel newspaper. The Notice of Appeal should be sent to:

Elizabeth Estill, Regional Forester
Rocky Mountain Region, USDA Forest Service
11177 West Eighth Ave.
P.O. Box 2512720250
Lakewood, CO   80225

# IX.  Contact Person

For additional information, contact:

Daryl Gusey
Grand Mesa, Uncompahgre and Gunnison National Forests
2250 Highway 50
Delta, CO 81416
Phone (303) 874-7691

BLM_0048746

BLM_0048747

# APPENDIX A

Land and Resource Management Plan
Grand Mesa, Uncompahgre and Gunnison National Forests

April, 1993

Amendment #3-2

## Description of Amendment

Amends the Plan to reflect decisions made in the 1993 Oil and Gas Leasing Analysis of high to moderate oil and gas potential lands.

This amendment applies only to lands included in the Oil and Gas Leasing Final Environmental Impact Statement and Record of Decision, and only to oil and gas leasing decisions on those lands. Lands not analyzed must undergo environmental analysis following guidelines set forth in 36 CFR 228.102 prior to any lease issuance.

## Specific Amendments

1. Reference: 2nd paragraph, page II-59

   Change: Delete paragraph.

2. Reference: 3rd paragraph, page II-59.

   Change: Delete paragraph and add: "The Forest Service is the responsible agency for environmental analysis of proposed operation on mineral leases on National Forest System lands."

3. Reference: Last paragraph, page II-60.

   Change: Delete paragraph.

4. Reference: Second to last paragraph, page II-61.

   Change: Delete paragraph.

   Explanation: Lease percentages are dynamic as leases expire or new ones are obtained. Reader is referred to the 1993 Oil and Gas Leasing EIS for data as of that date.

5. Reference: Pages II-87, paragraph 6 beginning "Table II-29...".

   Change: Replace paragraph with "Table II-29 summarizes the land recommended available for oil and gas leasing within the high to moderate oil and gas potential lands analyzed in 1993. Availability of other lands is determined on a case by case basis as interest in leasing is expressed.

BLM_0048748

Oil and Gas Leasing Analysis FEIS

6.   Reference: Page II-88, first paragraph.

   Change: Delete all but the first sentence.

   Explanation: Leasing restrictions will remain as decided in the 1993 Oil and Gas Leasing Decision, and is decided case by case for other minerals. Wilderness is now closed to leasing.

7.   Reference: Page II-88, Table II-29. Replace with the following:

   Oil and Gas Leasing Summary within High To Moderate Oil and Gas Potential Lands

| Leasing Availability | Wilderness Acres (Forest-wide) | Unclassified Acres (Oil and Gas Analysis Area only) |
|---|---|---|
| No Lease | 467,217 | 138,270 |
| Lease with Surface Occupancy | 0 | 661,345 |
| Lease without Surface Occupancy | 0 | 151,835 |

8.   Reference: Table III-1, page III-7, section entitled "Minerals".

   Change: Delete part of beginning with "Acres Recommended Unsuitable...." to the end of Minerals section of the table.

   Explanation: These projections are not direction which belongs in the Plan. The number of acres within the high to moderate oil and gas potential area of the Forest available for oil and gas leasing is displayed in Table II-6 of the Oil and Gas Leasing EIS. Availability of areas for coal and geothermal leasing and lands not analyzed in the 1993 Oil and Gas Leasing EIS will be determined on a case by case basis, depending upon specific interest by industry.

9.   Reference: Page III-54.

   Change: Delete "Oil and Gas" from the Management Activity Title midway down left side of page.

   Explanation: Oil and gas direction is replaced by direction from 1993 Oil and Gas Leasing EIS and Record of Decision. However, direction for other mineral resources remains unchanged.

10.   Reference: Page III-54. Just above "Minerals Management - Geothermal"

   Change: Add the following:

   "Minerals Management - Oil and Gas
   01 Where there is any potential conflict in direction between specific provisions of this plan and direction contained in the April 1993 oil and gas leasing decision on affected lands, follow direction contained in the April 1993 Oil and Gas Leasing EIS/ROD, including the associated Oil and Gas Leasing Stipulations Map, for administering Oil and Gas leasing program on the Forest."

BLM_0048749

**1. Unclassified Lands (includes lands that have not been classified for specific management purposes such as wilderness classification):**

A. Forest Service authorization of geophysical prospecting will include terms and conditions controlling operating methods and times to prevent or control adverse impacts on surface resources and uses.

B. Authorizations for the BLM to issue leases and permits will include all current standard lease terms and the Regionally approved uniform format for stipulations that may be necessary for additional protection of specific surface resources and uses. The standard lease terms and the uniform format for stipulations are discussed on pages I-15 through I-17 of the Oil and Gas Leasing EIS. The standard lease form is Appendix B and example stipulations are included as Appendix C of the Oil and Gas Leasing EIS. The uniform format for stipulations may be found in the *Surface Operating Standards for Oil and Gas Exploration and Development* "*Gold Book*".

C. Authorizations for the BLM to issue oil and gas leases follow the direction for the use of lease terms and stipulations set forth in the Oil and Gas Leasing EIS and Record of Decision. Where Affected Environments overlap, the more restrictive stipulation will apply.

1. **Standard Lease Terms** listed on USDI, BLM Form 3100-11 apply to all leases. They require the lessee to conduct operations in a manner that minimizes adverse impacts to the land, air, water, cultural, biological, visual, and other resources, land uses or users.

2. **No Surface Occupancy** Stipulation will be applied to leases in the following Affected Environments. See the Oil and Gas Leasing EIS for complete descriptions of these areas.

a. Floodplains

b. Aquatic/Riparian/Wetland Habitats

c. Alpine/Tundra Areas

d. Areas of High Geologic Hazard

e. The Battlement Mesa Roadless Area

f. Sensitive Areas

g. Areas that have Retention VQO and Low VAC

h. 3A Management Areas (Semi-primitive Non-motorized)

i. Administrative Sites

j. Recreation Complexes

BLM_0048750

k. Slopes >60%

l. Bighorn Sheep Lambing/Breeding Areas (Battlement Mesa)

m. Summer Range (Concentrated Use) for big game

3. The **Controlled Surface Use** Stipulations will be applied in the following Affected Environments. See the Oil and Gas Leasing EIS for complete descriptions of these areas.

a. Areas of Moderate Geologic Hazard

b. Areas with Retention VQO

c. Scenic Byway Corridors

d. Watersheds of Special Interest to Municipalities

e. Slopes 40-60%

f. Big Game Winter Range

g. Elk Calving Areas

h. Migration Routes and Staging Areas

i. Sage Grouse Leks

4. **Timing Limitations** will be applied for the following purposes. See the Oil and Gas Leasing EIS for complete descriptions of these areas.

a. Minimizing disturbance to big game during critical use periods on their winter ranges (December 1 through April 30).

b. Minimizing disturbances during the reproductive seasons as follows:

(1) Elk calving and mule deer fawning (April 15 to July 1).

(2) Sage grouse leks and nesting areas (March 1 - June 1).

c. Minimizing disturbance during migration as follows:

(1) Elk and mule deer migration routes (March 1 to May 30 and November 1 to December 31).

(2) Elk and mule deer staging areas (October 15 to Decemeber 31).

5. **Lease Notices** may be applied to leases to transmit information to the lessee at the time of the lease to assist the lessee in submitting an acceptable Surface Use Plan of Operations or to assist in administration of leases.

6. **Conditions of Approval** may be attached to permits authorizing drilling operations based upon site specific analysis of the Surface Use Plan of Operation

BLM_0048751

that accompanies the Application for a Permit to Drill. These conditions may not unduly hinder or preclude the lessee's opportunity to exercise existing lease rights.

7. Federal minerals which underlie private lands are subject to the same mineral leasing laws and requirements as Federal minerals which are beneath Federally owned surface. The Forest Service will inform the Bureau of Land Management if there is no objection to offering a lease consisting of these type of lands within the boundaries of the Grand Mesa, Uncompahgre and Gunnison National Forests. The Forest Service will be responsible for determining the stipulations and Conditions of Approval that are needed to ensure adequate protection of the surface resources when the Federal decision to offer a lease has the potential to affect the surface of adjacent or intermingled National Forest System lands.

D. The following Affected Environments will not be available for oil and gas leasing and the BLM will not be authorized to lease these areas. See the Oil and Gas Leasing EIS for complete descriptions of these areas.

1. All of the following Roadless Areas:

a. Tabeguache

b. Roubideau

c. Kannah Creek

2. Parts of the following Roadless Areas:

a. Priest Mountain - The Flat Tops South, Upper Cow Creek, Priest Mountain, and Currant Creek

3. The area identified as the Kebler Pass Corridor in the Oil and Gas Leasing EIS. This includes parts of the West Elk and Raggeds Roadless Areas and other Affected Environments.

4. The area identified as the Whetstone block in the Oil and Gas Leasing EIS/ROD. This includes the Whetstone Mountain Roadless Area, part of the Flat Top Mountain Roadless Area, and various Affected Environments.

**2. Designated Wilderness, Congressionally designated Wilderness Study Areas, and Further Planning Areas which Congress has not yet taken action:**

A. No oil and gas leases will be issued.

11.   Reference: Page III-110, Second paragraph.

Change: Following "mineral exploration and development", add "where allowed and in accordance with stipulations".

12.   Reference: Appendix H, Title page, Page H-1 and Table of Contents

Change: Change title of the section to "Mineral Leasing Stipulations (Other Than Oil and Gas)". On page H-1 delete "G02" from paragraphs 1 and 5.

BLM_0048752

Oil and Gas Leasing Analysis FEIS

Explanation: New stipulations for Oil and Gas were developed in the 1993 Oil and Gas Leasing Analysis. Appendix H stipulations still apply for all other leasable minerals.

A-6



# GRAND MESA, UNCOMPAHGRE AND GUNNISON National Forest
### Colorado

Oil and Gas Leasing
Stipulation Map
Final - April 1993

**Grand Mesa, Uncompahgre and Gunnison (WestHalf)**
Note: Not all of these Forests were included in this analysis.
See EIS for description of the analysis area.

## Stipulations Legend

- Discretionary No Lease
- No Surface Occupancy (NSO)
- Timing Limitations (Seasonal)
- Timing Limitations and Controlled Surface Use (CSU)
- Controlled Surface Use (CSU)
- Standard Lease Terms

Any changes to these stipulations will be made in accordance with the Land Use Plan and/or the regulatory provisions for each changes.
This map is for general informational purposes. Specific resource and stipulation boundaries are displayed on larger scale maps permanently available at the Forest Supervisor's Office, 2250 Highway 50, Delta, Colorado. (303) 874-7691

VICINITY MAP

LEGEND

MOUNT SNEFFELS WILDERNESS

LIZARD HEAD WILDERNESS

SAN JUAN NATIONAL FOREST

N

BLM_0046734



# GRAND MESA, UNCOMPAHGRE AND GUNNISON *National Forest*
### Colorado

Oil and Gas Leasing
Stipulation Map
Final – April 1993

Grand Mesa, Uncompahgre and Gunnison (West Half)

Note: Not all of these Forests were included in this analysis.
See EIS for description of the analysis area.

## Stipulations Legend

- Discretionary No Lease
- No Surface Occupancy (NSO)
- Timing Limitations (Seasonal)
- Timing Limitations and Controlled Surface Use (CSU)
- Controlled Surface Use (CSU)
- Standard Lease Terms

Any changes to these stipulations will be made in accordance with the Land Use Plan and/or the regulatory provisions for each change.
This map is for general information only. Specific acreages and stipulation boundaries are displayed on larger scale maps permanently available at the Forest Supervisor's Office, 2250 Highway 50, Delta, Colorado. (303) 874-7691

VICINITY MAP

# Protecting People and Sustaining Resources in Fire-Adapted Ecosystems

# A Cohesive Strategy

**The Forest Service Management Response to the
General Accounting Office Report GAO/RCED-99-65
October 13, 2000**

BLM_0048756

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

## Submitted By

*/s/ Lyle Laverty*
**Lyle Laverty**
Report Team Leader
Rocky Mountain Region
Regional Forester

*/s/ Jerry Williams*
**Jerry Williams**
Report Team Co-Leader
Northern Region
Director Fire Management

## Approved By

*/s/ Mike Dombeck*
**Mike Dombeck**
Chief

2

BLM_0048757

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

# Table of Contents

Resilience in Fire-Prone Forests……………………………………… 7

Executive Summary……………………………………………… 9

I  Purpose and Intent of a Cohesive Strategy……………………………… 11

II  Background, Land Use History, and Ecological Change……………… 21

III  Ensuring Clean Air, Clean Water, and Biodiversity
in Fire-Adapted Ecosystems…………………………………………… 29

IV  A Cohesive Strategy to Protect People and Sustain Resources
in Fire-Adapted Ecosystems…………………………………………… 33

V  Consequences of Deferral…………………………………………… 41

VI  Conclusions and Next Steps………………………………………… 49

VII  Team Members……………………………………………………… 53

VIII  Acknowledgements………………………………………………… 55

IX  Glossary…………………………………………………………….. 57

X  References and Supporting Information ………………………… 59

BLM_0048758

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

XI  Appendices

Appendix A:  The Coarse-Scale Assessment and Definition
                   of Fire Regimes and Condition Classes.......................  70

Appendix B:  Recommended Adjustments to Forest Service
                   GPRA Strategic Plan ...........................................  73

Appendix C:  Reconciling Stewardship Objectives --
                   Assessing Values at Risk.......................................  77

Appendix D:  Summary for Future Projections of Condition
                   Classes and Risks...............................................  79

## Figures

Figure 1 – General affected area within the interior West...........................  21

Figure 2 – Figure 3 – Changes in forest structure and condition
                   class over time.................................................  23

Figure 4 – National forest wildland fire acres burned trend in the
                   11 Western states..............................................  24

Figure 5 – Increased density of smaller trees provides fuel for
                   vertical fire spread............................................  25

Figure 6 – Buffalo Creek Fire erosion effects...........................................  26

Figure 7 – Homes burning in the Dude Fire, Arizona, 1990..........................  27

Figure 8 – Changes in projected amount in Condition Classes on
                   Western National Forest System lands.....................  42

Figure 9 – National forest wildland fire acres/suppression costs, 1980-99........  44

Figure 10 – Projected risk to life and property on Western National
                   Forest System lands based on changes in fuel condition...............  45

Figure 11 – Projected amount of degradation or loss of key ecosystem
                   elements from severe wildland fires on National Forest System
                   lands based on changes in fuel condition ...............................  46

BLM_0048759

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

Figure 12 – Projected risk among strategic options to air quality,
native species, and watersheds on Western National Forest
System lands based on changes in fuel conditions.......................  47

Figure 13 – Cohesive Strategy aims to reduce severe insect, disease,
and wildland fire risk........................................................  50

Figure 14 – Forest Service Lands – Fire Regimes I & II.............................  72

## Tables

Tables 1a, 1b, and 1c – 10, 15 and 20-year treatment schedules to increase
the hazardous fuels treatment program....................  39

Table 2 – The Five Historic Natural Fire Regime Groups.............................  70

BLM_0048760

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

BLM_0048761



## *Resilience and the Effects of Restoration Treatments in Fire-Prone Forests*

This photograph illustrates how a treated forest – the green strip running toward the crest of the ridge in the photo's center – can survive a severe wildland fire. It also shows the differences in *resilience* between treated and untreated forests. The untreated forest – the blackened areas located on either side of this green strip – burned in the Wenatchee National Forest's 1994 Tyee Fire.

In this example, treatment was in the form of a "shaded fuel break" (area of green trees in above photo) established several years before. The purpose of these shaded fuel breaks – located in tactically important areas – is to provide firefighters an anchor from which to safely fight fire. The shaded fuel break (pictured) left older-age trees overhead and thinned out the smaller trees beneath them – removing surface fuels to reduce potential fire intensities.

On the Tyee Fire, extreme conditions that included high winds and rapid fire growth, precluded safe attack. No suppression actions were therefore taken in this area. Nevertheless, because the fuels had been reduced and fire intensities did not burn hot enough to kill all of the older trees, much of the treated forest survived the fire – even without the efforts of firefighters.

The cohesive strategy described in this report attempts to achieve improved forest and grassland resilience – as illustrated in this Tyee Fire photo. The strategy provides an approach to reduce fuel loadings in fire-prone forests to protect people and sustain resources.

BLM_0048762

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

BLM_0048763

# Executive Summary

## Premise

This strategy is based on the premise that sustainable resources are predicated on healthy, resilient ecosystems. In fire-adapted ecosystems, some measure of fire use – at appropriate intensity, frequency, and time of year – should be included in management strategies intended to protect and sustain watersheds, species, and other natural resources over the long term.

The strategy is also based on the premise that, within fire-adapted ecosystems, fire-maintained forests and grasslands are inherently safer for firefighters and the public than ecosystems in which fire is excluded.

## Purpose

The strategy establishes a framework that restores and maintains ecosystem health in fire-adapted ecosystems for priority areas across the interior West. In accomplishing this, it is intended to:

- Improve the resilience and sustainability of forests and grasslands at risk,

- Conserve priority watersheds, species and biodiversity,

- Reduce wildland fire costs, losses, and damages, and

- Better ensure public and firefighter safety.

## Priorities

**Wildland-urban interface.**  Wildland-urban interface areas include those areas where flammable wildland fuels are adjacent to homes and communities.

**Readily accessible municipal watersheds.**  Water is the most critical resource in many western states.  Watersheds impacted by uncharacteristic wildfire effects are less resilient to disturbance and unable to recover as quickly as those that remain within the range of ecological conditions characteristic of the fire regime under which they developed.

**Threatened and endangered species habitat.**  The extent of recent fires demonstrates that in fire-adapted ecosystems few areas are isolated from wildfire. Dwindling habitat for many threatened and endangered species will eventually be impacted by wildland

BLM_0048764

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

fire. The severity and extent of fire could eventually push declining populations beyond recovery.

**Maintenance of existing low risk Condition Class 1 areas**. This is especially important in the southern and eastern states where high rates of vegetation growth can eliminate the effects of treatment in 5-10 years. Recent droughts have caused severe wildland fire problems in Florida and Texas.

## Elements

For the purposes of this report, the following are used as the elements of a cohesive strategy:

- Institutional Objectives and Priorities

- Program Management Budgets and Authorities

- Social Awareness and Support

The strategy is based on the alignment of these institutional, program management, and constituency elements. The cohesion of this strategy stands on the collective strength of these three core elements.

Within the Forest Service, ecosystem management concepts continue to evolve into practice. This report describes a cohesive set of actions from which the Forest Service may choose to initiate restoration and maintenance objectives within fire-adapted ecosystems.

BLM_0048765

# I  Purpose and Intent
## of a Cohesive Strategy

> *"The most extensive and serious problem*
> *related to the health of national forests*
> *in the interior West is the*
> *over-accumulation*
> *of vegetation."*
>
> *General Accounting Office Report (99-65)*

## Preface

The 2000 fire season was undoubtedly one of the most challenging on record. As of early October, more than 6.8 million acres of public and private lands burned -- more than twice the 10-year national average. The magnitude of these fires is the result of two primary factors: a severe drought, accompanied by a series of storms that produced thousands of lightning strikes followed by windy conditions; and the long-term effects of almost a century of aggressively suppressing all wildfires that has led to an unnatural buildup of brush and small trees in our forests and rangelands.

On August 8, 2000, President Clinton asked Secretaries Babbitt and Glickman to prepare a report that recommends how best to respond to this year's severe fires, reduce the impacts of those fires on rural communities, and ensure sufficient firefighting resources in the future. On September 8, 2000, President Clinton accepted their report *Managing Impacts of Wildfires on Communities and the Environment.*

Operating principles directed by The Chief of the Forest Service in implementing this report include:

**Firefighting Readiness.**  Increase firefighting capability and capacity for initial attack, extended attack, and large fire support that will reduce the number of small fires becoming large, to better protect natural resources, to reduce the threat to adjacent communities, and reduce the cost of large fire suppression.
**Prevention Through Education.**  Assist state and local partners to take actions to reduce fire risk to homes and private property through programs such as FIREWISE.
**Rehabilitation.**  Focus rehabilitation efforts on restoring watershed function, including the protection of basic soil, water resources, biological communities, and prevention of invasive species.

BLM_0048766

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

**Hazardous Fuel Reduction.**  Assign highest priority for hazardous fuels reduction to communities at risk, readily accessible municipal watersheds, threatened and endangered species habitat, and other important local features, where conditions favor uncharacteristically intense fires.

**Restoration.**  Restore healthy, diverse, and resilient ecological systems to minimize uncharacteristically intense fires on a priority watershed basis.  Methods will include removal of excessive vegetation and dead fuels through thinning, prescribed fire, and other treatment methods.

**Collaborative Stewardship.**  Focus on achieving the desired future condition on the land in collaboration with communities, interest groups, and state and federal agencies. Streamline process, maximize effectiveness, use an ecologically conservative approach, and minimize controversy in accomplishing restoration projects.

**Monitoring.**  Monitor to evaluate the effectiveness of various treatments to reduce unnaturally intense fires while restoring forest ecosystem health and watershed function.

**Jobs.**  Encourage new stewardship industries and collaborate with local people, volunteers, Youth Conservation Corps members, service organizations, and Forest Service work crews, as appropriate.

**Applied Research and Technology Transfer.**  Focus research on the long-term effectiveness of different restoration and rehabilitation methods to determine those methods most effective in protecting and restoring watershed function and forest health.  Seek new uses and markets for byproducts of restoration.

*Managing Impacts of Wildfires on Communities and the Environment* provides an overall framework for implementing fire management and forest health programs. This report provides the strategic framework for reducing hazardous fuels buildup within wildland-urban interface communities, readily accessible municipal watersheds, threatened and endangered species habitat, and other important local features.  The objective of this strategy is to describe actions that could restore healthy, diverse, and resilient ecological systems to minimize the potential for uncharacteristically intense fires on a priority basis.  Methods will include removal of excessive vegetation and dead fuels through thinning, prescribed fire, and other treatment methods.

This report is based on Forest Service experience and analysis. It also responds to Congressional direction to provide a strategic plan to reduce wildland fire risk and restore forest ecosystem health in the interior West. It reflects the findings of the U.S. General Accounting Office (GAO) Report, *Western National Forests: A Cohesive Strategy is Needed to Address Catastrophic Wildland fire Threats (GAO/RCED-99-65).*

The General Accounting Office report concludes, "The most extensive and serious problem related to the health of national forests in the interior West is the over-accumulation of vegetation." The General Accounting Office estimated that the over-accumulation of fuels problem affects approximately 39 million acres in the interior West.

The Chief of the Forest Service chartered the strategy outlined in this report. The National Association of State Foresters and the U.S. Department of the Interior participated with the Forest Service in developing this report.

12

BLM_0048767

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

It is important to note that this is an iterative strategy. It will be refined by: further programmatic and manual direction; ongoing roadless, roads, and planning rulemakings; and environmental impact statements and decision documents for the national grasslands and ongoing regional initiatives.

At the national level the strategy articulates:

- Agency-wide objectives and milestones.

- Geographic priorities, broad management guidance, and performance measures for accountability.

- Alternative schedules to accomplish restoration and maintenance objectives over various timeframes.

Separate action plans, consistent with the strategy and regional assessments and direction, and ongoing national rulemakings, will outline implementation steps at the organization's regional, forest, and ranger district levels.

The acreage and cost estimate numbers used in this report are preliminary and derived from coarse-scale assessments. Further refinement and analysis will initiate appropriate adjustment in the strategy and will occur as more site-specific assessments are completed.

## Focus

The focus of this strategy is on restoring ecosystems that evolved with frequently occurring, low intensity fires. These fires typically occurred at intervals of between 1 to 35 years and served to reduce growth of brush and other understory vegetation while generally leaving larger, older trees intact.

Fire suppression activities and some past management practices over the past 100 years have excluded fire from many of these fire-adapted ecosystems. In the absence of fire, many of these lands have become subject to an over-accumulation of shrubs and small trees, diminishing ecosystem diversity, health, and resiliency and fueling conditions for unnaturally intense fires that threaten communities, air, soil, water quality, and plant and animal species.

## Premise

This strategy outlines approaches to protect communities and restore and maintain land health in fire-adapted ecosystems across the interior West. The report is based on the premise that sustainable resources depend on healthy, properly functioning, resilient ecosystems.

Within fire-adapted ecosystems, fire-maintained forests and grasslands are inherently safer for firefighters and the public than ecosystems in which fire is excluded.

BLM_0048768

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

In fire-adapted ecosystems, some measure of fire use – at the appropriate intensity, frequency, and time of year – should be an essential component of management strategies intended to protect and sustain watersheds, species, and other natural resources over the long term.

## Purpose

The strategy outlines approaches to restore and maintain land health in fire-adapted ecosystems across the interior West. In accomplishing this, it is intended to:

- Improve the resilience and sustainability of forests and grasslands at risk,

- Conserve priority watersheds, species and biodiversity,

- Reduce wildland fire costs, losses, and damages, and

- Better ensure public and firefighter safety.

## Priorities

- **Wildland-urban interface**. Wildland-urban interface areas include those areas where flammable wildland fuels are adjacent to homes and communities.

- **Readily accessible municipal watersheds**. Water is the most critical resource in many western states. Watersheds impacted by uncharacteristic wildfire effects are less resilient to disturbance and unable to recover as quickly as those that remain within the range of ecological conditions characteristic of the fire regime under which they developed.

- **Threatened and endangered species habitat**. The extent of recent fires demonstrates that in fire-adapted ecosystems few areas are isolated from wildfire. Dwindling habitat for many threatened and endangered species will eventually be impacted by wildland fire. The severity and extent of fire could eventually push declining populations beyond recovery.

- **Maintenance of existing low risk Condition Class 1 areas**. This is especially important in the southern and eastern states where high rates of vegetation growth can eliminate the effects of treatment in 5-10 years. Recent droughts have caused severe wildland fire problems in Florida and Texas.

## Present Situation

Most forests and grasslands in the interior West and their associated species are fire-adapted. Some, known as "short interval" fire-adapted ecosystems, evolved from frequent, low-intensity fires that burned surface fuels. These fires recycled nutrients, checked encroachment of competing vegetation, and maintained healthy conditions (see below in top picture).

Generally, the prolonged absence of low-intensity burning in these ecosystems creates a surface fuel buildup and an over-accumulation of small trees and brush that makes forests more susceptible to insect infestations, disease outbreaks, and severe wildland fires.

14

BLM_0048769

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

Before the turn of the last century, livestock grazing, selective logging, and curtailment of burning by Native Americans began to alter the composition, structure, and function of these fire-adapted forest ecosystems. As a result of human influences, fire-intolerant species replaced fire-tolerant species. Forest stands that typically grew 50 larger fire-tolerant trees per acre became encroached with more than 600 mostly small, fire-intolerant trees per acre. Without recurring underburns, seedlings filled in beneath the older trees – transforming open park-like forests into dense forests.



*Artwork Jim Dawson, © National Geographic Society, 1996*

***Over-accumulated vegetation can fuel severe wildland fires.***

Expanded human development, changes in climate, and fire suppression have contributed to substantial accumulations of understory vegetation. This over-accumulated vegetation predisposes some areas to severe wildland fires, potentially leaving watersheds, species, and people at risk.

Today, primarily as a result of prolonged fire exclusion, many of the most serious wildland fire threats and forest ecosystem health issues are concentrated within fire-adapted ecosystems that evolved with frequent, low-intensity fires.

## The Strategy

This report outlines a strategy to reduce wildland fire threats and restore forest ecosystem health in the interior West. The strategy builds on the premise that within fire-adapted ecosystems, reducing fuel levels and using fire at appropriate intensities, frequencies, and time of year are key to: restoring healthy, resilient conditions; sustaining natural resources; and protecting people.

The strategy introduces institutional objectives, establishes program management priorities and cost estimates, and confirms the importance of expanding constituency support. The strategy's success stands on the cohesion and collective strength of these elements.

The strategy places a high priority on treating areas where human communities, watersheds, or species are at risk from severe wildfire. It relies on a variety of treatment options to achieve restoration objectives in wildland-urban interface areas, readily accessible municipal

BLM_0048770

watersheds, and habitats of threatened and endangered species. Immediate treatment efforts would be concentrated in the shorter interval fire-adapted ecosystems. These priority ecosystems are farthest outside the historic range of variability and are in close proximity to human communities.

**Strategy – Ties to Ongoing Planning and Rulemaking Efforts**

First, the strategy meets the requirements of the Forest Service Government Performance and Results Act (GPRA) Strategic Plan (2000 revision) by establishing objectives, milestones, and performance elements for ecosystem restoration and maintenance, and conservation education.

Second, few wildland-urban interface areas are adjacent to inventoried roadless areas making roadless areas a lower priority for treatment.  More over, all of the alternatives currently under consideration in the roadless initiative allow for the construction of roads to suppress fire where public health and safety are at risk.

Third, the ongoing roads policy will ensure that operational decisions relative to implementation – such as which roads should be left open or maintained to enhance firefighting or other fire management activities – are made locally through cooperative planning.

Finally, efforts to revise management plans governing the national forests and grasslands and the Columbia River Basin and Sierra Nevada ecosystems will integrate fire management with other agency multiple-use objectives.  This strategy will be refined and adapted to ensure consistency with the outcomes of these regional conservation efforts.

**Strategy – How Much Treatment Is Needed?**

The strategy does not require that every high, medium or low risk acre be treated, nor does it eliminate all risks. By strategically identifying fuel treatment areas to protect values associated with human communities, municipal watersheds and critical species habitat, the damaging effects of wildland fire can be effectively minimized.

Due to other agency priorities and funding constraints, historic efforts to reduce fire risk often focused treatment efforts on areas that posed the least risk to communities. The result: areas where treatments could be implemented at the least cost often took priority over other areas with higher costs.

The purpose of this report is to establish priorities for treatment. The strategy will be refined as hazardous fuels reduction and restoration priorities are considered in local, regional and national planning efforts.

BLM_0048771

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

### Strategy – Focus on High-Risk Areas

The strategy focuses treatment on high-risk areas, rather than least-cost acres. Existing roads will be used to access high-risk areas. Where roads are scheduled for closure, consideration will be given to accomplishing ecosystem restoration objectives prior to closure.

While emphasizing *restoration* in the interior West, the strategy also supports ongoing efforts to *maintain* healthy ecosystems where they currently exist. For example, in the South, fuels can rapidly accumulate to dangerous levels in the absence of treatment. The Forest Service must therefore continue treating these areas.

Fuel reduction treatment techniques will range from maintenance prescribed burning, where fire is used to maintain forest conditions in lower-risk acres, to restoration treatments in higher-risk areas where mechanical thinning is followed by prescribed burning.  Forest planning and collaboration with states, local governments, tribes and the public will determine the number of acres to be treated and where and how the treatment will occur.

The first priority for restoration will be the millions of acres of already roaded and managed landscapes that are in close proximity to communities. Extensive use of service contracts will provide local jobs and accomplish land management objectives while helping to protect people and property.

In order to maximize effectivenes and minimize controversy, mechanical treatments will be prioritized toward wildland-urban interface areas within already roaded and managed portions of the landscape. Under this strategy, ecologically sensitive areas, such as old growth and late successional forests, will be avoided. In some areas, where old growth characteristics are threatened by the risk of uncharacteristic wildfire effects, the agency may conduct fuel treatments designed to protect older, larger trees while reducing unnatural buildups of understory vegetation.

Better integration of existing program budgets could reduce the amount of money requested. In most cases, any reciepts associated with treatments will not be significant due to the need to reduce the disproportionately large number of small, non-merchantable trees, brush, and shrubs that dominate short interval fire-adapted ecosystems and leave standing the larger, fire-tolerant trees.

### Strategy – Complements Other Efforts

The strategy complements other work, including efforts to protect roadless areas and to better manage the existing road system.  For example, in most places roadless areas are often less affected by past management practices and found at higher elevations with vegetation that evolved with longer fire return intervals.  Furthermore, roadless areas are typically removed from human communities. Thus, fires in these areas may pose less of a threat to lives and property.  The proposed road policy would require that issues such as the need for hazardous fuels treatments be considered prior to making decisions about road decommissioning, upgrading, or new construction.

BLM_0048772

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

The strategy also builds on the Joint Fire Sciences Program. It relies on adaptive management, monitoring, research, and the further integration of social sciences. It encourages development of procedures that bring together and overlay agency objectives for watershed protection, species conservation, ecosystem resilience, and public safety.

Research is needed to support restoration.  The need for assertive action must be coupled with prudence and caution to minimize unintended consequences. Additional research is needed to support managers in prescribing land management treatments to improve forest ecosystem health, as well as to find ways to increase utilization of small diameter material.

## The Consequences of Deferral

The costs of implementing the restoration and maintenance approaches outlined under this strategy are high. Yet, fire suppression costs, public resource losses, private property losses, and environmental damages accruing without treatment are expected to be significantly greater over time.

## Successful Restoration and Maintenance Efforts

The optimum method to ensure success in restoring ecosystems is collaborating with the local public in planning efforts.  Regional planning, including stakeholders in identifying and assessing values at risk, is an important component of the strategy. The Sierra Nevada Ecosystem Management Project and the Interior Columbia River Basin Management Project are examples of regional-scale planning that address resources at risk and establish priorities for broad geographic areas.

More localized planning processes, including Land and Resource Management Plan (forest plan) revisions and amendments, will integrate specific concerns and priorities at a watershed or landscape scale within the context of regional plans and the Forest Service GPRA Strategic Plan.

Across the nation, awareness is growing about the fire-related consequences that occur in untreated forests and grasslands prone to wildland fire. The following are two examples of citizen-based efforts that have been developed to reduce risks within the interior West's urban interface:

- The Grand Canyon Forests Partnership (joining Arizona Game and Fish, U.S. Fish and Wildlife Service, Arizona State Land Department, Coconino County, City of Flagstaff, Northern Arizona University, Grand Canyon Trust and the Nature Conservancy);

- The Priest-Pend Oreille Stewardship Project that focuses on 7,200 acres of wildland-urban interface lands in the Idaho Panhandle National Forest (joining two community project teams with the Forest Service).

To improve forest ecosystem health and reduce wildland fire risks at larger scales, action needs to be expanded over broader areas and coordinated among Forest Service research, state and

BLM_0048773

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

private forestry, and National Forest System programs.  Restoration and maintenance of fire-adapted ecosystems depends on:

- Understanding and valuing ecological processes as the means to sustain ecosystem health.

- An ability to evaluate options and weigh decisions for *long-term* outcomes.

- An understanding and acceptance of the tools needed to accomplish restoration goals.

- A commitment to monitoring, evaluation, and research as the basis for adaptive management.

- Working collaboratively with communities and interested parties to build project plans with broad-based local ownership.

Successful implementation of the approach outlined in this strategy requires strong support from Congress and constituents.  It must also be recognized that success will depend on applying a combination of traditional and newly developed methods and knowledge.

19

BLM_0048774

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

BLM_0048775

# II  Background, Land Use History and Ecological Change

## Background



*Figure 1 – General affected area within the western United States.*

Approximately 134 million acres, or about 70 percent of National Forest System lands are in the western U.S. The area is a fire-influenced environment. For thousands of years, the magnitude of burning that occurred in this area was much greater than today. In the upper Columbia River Basin alone – a small portion of the interior West – scientific assessments indicate that prior to European settlement, more than six million acres per year burned. Today, fewer than one-half million acres burn per year in this same area.

BLM_0048776

Nearly all forests and grasslands in this region evolved and adapted as a result of widespread fire from lightning and burning by Native Americans. These adaptations enabled plant species to survive and regenerate in the presence of fire. Some interior West ecosystems depend on frequently recurring, low-intensity surface burns to cycle nutrients, control pathogens, and maintain healthy, resilient conditions.

These are called "short interval" fire-adapted ecosystems. Before the turn of the century, these forested ecosystems were often described as open and savannah or "park-like," with well-spaced, older-aged trees. Grasses and forbs dominated the understories of these forest communities. They were kept in this condition by frequent, low-intensity fires that swept the forest floor.

## Land Use History

Many of the wildland fire threats and forest ecosystem health issues that confront us today were triggered more than 100 years ago. In the late 1800s and early 1900s, "high grade" logging selectively removed the largest, most valuable trees – often the fire-tolerant ponderosa and other long-needle pine species.

Slash and other brush left behind from logging practices of this era posed tremendous fire risks and contributed to devastating fires in the Great Lakes states and elsewhere. In later years, fire exclusion from plantations of uniform trees of the same age class created conditions conducive to insect and disease infestation and subsequent fires. In later years, logging and other management practices may have further compromised land health by removing overstory trees while leaving smaller trees, slash, and other highly flammable fine fuels behind.

Across open landscapes, early livestock grazing also reduced grass cover and scarified the soil. In forested areas, the bare soil seedbeds that resulted from logging and intensive grazing allowed hundreds of trees to establish on each acre. Without grass fuels to carry surface fires, the number of trees (including fire-intolerant species) multiplied rapidly. These became dense tree stands that foresters termed "dog-hair" thickets. Elsewhere, grasslands often converted to brushlands and woodlands.

In the West, the notion of forest protection has historically been equated with fire exclusion. Thus, a primary function of the Forest Service's overall mission became forest fire suppression.

## Ecological Change

The unintended consequences of logging, livestock grazing, and fire control resulted in significant changes to species composition and structure – especially in short interval fire-adapted ecosystems. These changes, in turn, predisposed extensive areas to many of today's wildland fire and forest ecosystem health problems in the interior West.

BLM_0048777

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

The following photos (figures 2-3), from the Bitterroot National Forest in western Montana, illustrate the changes that have occurred in species composition and forest structure over a 111-year period in a short interval fire-adapted ponderosa pine forest ecosystem. Each photo was taken from the same place, looking at the same forest, at different periods in time. The photos capture the differences that have developed in species composition and forest structure in the prolonged absence of periodic surface burning. Within these ecosystems, these changes become indicators of potential risk.

## Changes in Species Composition and Forest Structure



**1871 Photo**
This serves as the baseline reference of forest stand conditions that evolved from regularly occurring, low-intensity surface burning. The forest was open and dominated by fire-tolerant, fire-adapted ponderosa pine.

*Figure 2  Bitterroot National Forest 1871 Photo*



**1982 Photo**
By 1982, the forest has changed dramatically from the one that existed here in 1871. Over this 111-year period, small trees have established in dense thickets and fire-intolerant tree species now crowd the forest. During drought periods the overabundance of vegetation stresses the site, pre-disposing the forest to insect infestations, disease outbreaks, and severe wildland fire.

*Figure 3  Bitterroot National Forest 1982 Photo*

In the prolonged absence of periodic surface burning, vegetative growth compounds and dead fuels accumulate. Within the forest, this biomass – in the form of multi-layered tree canopies – can carry flames from the surface where dead branchwood burns up into the tree crowns. In drought years, when vegetation dries, these "ladder fuels" contribute to severe, high-intensity wildland fires.

BLM_0048778

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**



**Figure 4 – National forest wildland fire acres burned trend in the 11 Western states.**

Under these conditions, wildland fires exceed nearly all control efforts and often result in long-lasting damage to the soil and to the watershed.

In 1871, practically all of the short interval fire-adapted ecosystems in the interior West were considered to be relatively low risk. They were typically open and because of frequent fire had little fuel accumulation. By 1982, the situation had reversed. This elevated risk is apparent when evaluated in the context of Western wildland fire trends (Figure 4). Since approximately 1987 – despite better firefighting capabilities – the change in fuel conditions has resulted in an increase in wildland fire acres burned.

For the purpose of this strategy, risk conditions are assigned "condition class" descriptors. In short interval fire-adapted ecosystems, Condition Class 1[1] (which corresponds to the 1871 Bitterroot N.F. photo) represents low relative risk. As Figure 2 indicates, the Condition Class 1 trend has few small trees and little ground fuel. The scarcity of fuel tends to limit the intensity of wildland fires. At low intensities, wildland fires typically do not kill the larger fire-tolerant trees but often consume small encroaching trees, other vegetation, and dead fuels.

At low intensities, fire is ecologically beneficial because nutrients are cycled. In addition, the soil's organic layer is not consumed at these low fire intensities. The remaining organic material stabilizes the soil surface and helps prevent erosion.

---

[1] For complete definition, see Appendix A *The Coarse-Scale Assessment and Definition of Fire Regimes and Fire Classes.*

BLM_0048779

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

Because fires in Condition Class 1 areas are low-intensity within these ecosystems, they leave the soil intact and functioning normally. These fires generally pose little risk and have positive effects to biodiversity, soil productivity, and water quality.



*Figure 5 – Increased density of smaller trees provides fuel for vertical fire spread.*

Condition Class 2 situations develop as one or more fire return intervals are missed, primarily due to well-intentioned suppression efforts, while understory vegetation continues to grow, becoming denser.  If this accumulating vegetation is not treated, fires begin to burn more intense -- making them more difficult to suppress.  The impact of fires to biodiversity, soil productivity and water quality become more pronounced.

In Condition Class 3 areas within these same ecosystems, fires are relatively high risk. As Figure 5 indicates, the forest is littered with considerable amounts of dead material and is choked with hundreds of small trees that reach into the crowns of the larger, older-age forest above. During drought years, small trees and other vegetation dry out and burn along with the dead material – fueling severe, high intensity wildland fires. At these intensities, wildland fires kill all of the trees – even the large ones that, at lower fire intensities, would normally survive.

BLM_0048780

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

Within Condition Class 3 in these short interval fire-adapted ecosystems, wildland fires usually damage key ecosystem components, including the soil. High-intensity fires consume the soil's organic layer and burn off or volatilize nutrients. When small twigs, pine needles, and other litter are consumed, water runs unimpeded over the surface. Under these circumstances, the soil becomes more susceptible to erosion (Figure 6).





**Figure 6 – Buffalo Creek Fire, Colorado**
These photos, of Colorado's Buffalo Creek Fire aftermath, illustrate soil severely burned and left exposed to rain and runoff. This produced the subsequent 1996 flash flood event that claimed two lives. The ensuing erosion also washed topsoil off the hillsides, clogging downstream watercourses. This erosion reduced future storage capacity of reservoirs and silted over the river's gravel beds – significantly reducing spawning habitat.

At extreme fire intensities, the soil's capacity to absorb water is often lost. The fine, powder-like ash that follows a severe wildland fire on these sites makes water bead on the surface. These so-called "hydrophobic conditions" result in highly erodable soils.

Condition Class 3 is classified as high risk because of the danger it poses to people and the severe, long-lasting damage likely to result to species and watersheds when a fire burns – particularly in drought years. Firefighters are especially cognizant of hazards in Condition Class 3 situations. In a national survey (Tri-data, 1995), nearly 80% of all firefighters identified fuel reduction as the single-most important factor for improving their margin of safety on wildland fires.

BLM_0048781

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

In Condition Class 3, fires become more costly when homes are involved. Throughout much of the interior West, short interval fire-adapted ecosystems are typically located in valley-bottoms where homes and human development are most concentrated. Just as building homes in floodplains exposes homeowners to risk of floods, if hazardous fuels accumulations persist, development in fire-adapted ecosystems may pose a tangible risk to communities.

An example from the 2000 fire season demonstrates the increased costs of fighting fire near people and homes. The Skalkaho Fire on the Bitterroot National Forest covered 64,000 acres of forest interspersed with homes. It employed 755 firefighting personnel at a cost of $7.2 million dollars. Meanwhile, on the same forest within the Selway-Bitterroot Wilderness Area, a fire that burned about the same acreage (63,0000 acres) only required 25 firefighters at a cost of approximately $709,999.

Efforts to reduce hazardous fuels on federal lands must be coupled with efforts to assist private landowners to take preventative action in their own communities.  Creating defensible perimeters around homes, improving building codes, and employing fire resistant landscaping will help reduce fire risk to communities.  These and other such actions can help prevent wildland fires from burning homes, reduce insurance premiums, and reduce suppression cost.



The Dude Fire burned in central Arizona in Condition Class 3 stand conditions. Although the fire only burned a few days, it resulted in the death of six firefighters and cost $7.5 million to control. It destroyed 75 homes, resulting in property loss of $12 million. No estimate is available on the resource losses involved.

*Figure 7 – Homes burning in the Dude Fire, Arizona, 1990.*

BLM_0048782

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

BLM_0048783

# III  Ensuring Clean Air, Clean Water and Biodiversity in Fire-Adapted Ecosystems

*Sustainability:*

*"Meeting the needs of the current generation without compromising the ability of future generations to meet their needs. Ecological sustainability entails maintaining the composition, structure and processes of a system, as well as species diversity and ecological productivity. The core element of sustainability is that it is future oriented."*

Committee of Scientists Report, 1999

## The Legal Basis for Sustainability

A suite of federal laws and regulations guide management of National Forest System lands and fire-related activities on those lands. These include the Organic Act, Clean Air Act, Clean Water Act, Endangered Species Act, National Environmental Policy Act, and National Forest Management Act. Long-term sustainability is a consistent theme embodied within these laws.

Sustaining natural resources in short interval fire-adapted ecosystems is a basis of the cohesive strategy outlined in this report.

29

BLM_0048784

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

---

### Legal Basis for Sustainability

**Endangered Species Act**
*"The purposes of this Act are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved..."*

**Clean Water Act**
*"(a) Restoration and maintenance of chemical, physical and biological integrity of the nation's waters...The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the nation's waters."*

**Clean Air Act**
*"(1) to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population."*

**National Forest Management Act (NFMA)**
*"(6) the Forest Service . . . has both a responsibility and an opportunity to be a leader in assuring that the nation maintains a natural resource conservation posture that will meet the requirements of our people in perpetuity."*

**National Environmental Protection Act (NEPA)**
*"(a) Creation and maintenance of conditions under which man and nature can exist in productive harmony."*

---

The Forest Service Government Performance and Results Act (GPRA) Strategic Plan (2000 revision) bridges law and Forest Service activities. This report's cohesive strategy anchors to the following GPRA Strategic Plan's specific objectives:

- Improve watershed conditions and restore hydrological processes;

- Improve habitat quality; and conserve fish, wildlife and plant populations;

- Improve ecosystem resiliency associated with fire adapted ecosystems; and

- Reduce the relative risk of damage to human communities associated with wildland fire.

The overarching purpose of the GPRA Strategic Plan, consistent with these laws, is to maintain healthy, diverse ecosystems that meet human needs on a long-term basis. Sustaining healthy, diverse conditions requires consideration of entire landscapes in the *context* of specific ecosystems and their ecological dynamics.

BLM_0048785

# The Need for Adaptive Management

Increased human population growth, expanded land-use development, and changes in natural ecosystems affect ecosystem dynamics and processes. In the short interval fire-adapted systems, over-accumulated fuels indicate that more wildland fires in the future may burn with uncharacteristic fire effects. This trend may result in higher corresponding threats to human life and property, as well as potentially more degraded ecosystems.

Planning in fire-adapted ecosystems requires an integration and understanding of: fire history, potential fire behavior, past management actions, land-use change, watershed needs, species viability, and relative risk to human communities. Uncertainties associated with these considerations are addressed through monitoring, research, and adaptive management. During planning and implementation of restoration activities, the best available science and frequent monitoring must be used to reduce uncertainty and to facilitate learning. In addition, public outreach and collaboration will be critical components to successful ecosystem restoration.

While some ecosystems are adapted to infrequent high-intensity burning, the short interval fire-adapted ecosystems are not. The primary emphasis of the strategy is ensuring protection of human values and the sustainability of natural resources *in the context of short interval fire-adapted ecosystems*

## Active Management Improves Habitat

Most research involving relationships between fire and wildlife has focused on mammals and birds, with an emphasis on habitat, rather than populations (Smith, 2000). The cause and effect relationships between fire and wildlife are only correctly understood in the context of specific ecosystems.

Research reveals that active management can improve habitat quality for some species dependent on fire-adapted ecosystems, such as Kirtland's warbler (Probst and Weinrich, 1993) and the red cockaded woodpecker. For example, the relationship between fire and bobwhite quail populations served as an important factor in initiating the prescribed burning program in the South's fire-adapted forests.

The effectiveness of ecosystem restoration in contributing to species conservation is dependent on the extent to which landscape patterns and processes support population persistence over the long term (Wilcove, 1999). For example, sage grouse population dynamics are dependent on landscape patterns (Knick, 1999); yet many factors affect the integrity of sagebrush ecosystems across landscapes following fire (such as the expansion of cheat grass).

Considering the extent of habitat alteration that has occurred over the past century, management for species conservation in fire-adapted ecosystems is complicated. In many areas, habitat is currently at risk of long-term loss from severe wildland fires. In some cases, further reduction of habitat due to severe wildland fires may threaten species viability.

BLM_0048786

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

Integrating ecosystem restoration goals with species conservation priorities will require coordinated effort between planned land uses to improve the quantity and quality of potentially suitable, but presently unoccupied habitat. This must occur prior to treating any areas that serve as refugia for remnant populations (Noss et al. 1997).

### Using Adaptive Management to Evaluate Results

The type, intensity and frequency of management activity in fire-adapted ecosystems will influence the ability to provide for clean air, clean water, and biodiversity over the long term. A considerable amount of science supports an understanding of fire-adapted ecosystems. Some uncertainty, however, surrounds management treatments. It is therefore essential that an adaptive management framework involving the public be used in designing, monitoring, and evaluating activities. Assumptions associated with management approaches across broad landscapes need to be clearly identified and articulated as a part of the adaptive management process.

In developing manual direction and regional and local level plans for implementing the strategy, it is essential that monitoring be conducted to validate assumptions, reduce uncertainties, and measure progress. Upon completion of these actions, the agency will determine whether to continue pursuing ongoing management, modified management approaches, or to propose new actions in response to what was learned through monitoring. The strategy will evolve as planning decisions are made on the ground and results are evaluated. While some uncertainties exist, implementing this strategy may help to avoid serious consequences that are certain to occur if fuel reduction treatments are deferred.

BLM_0048787

# IV  A Cohesive Strategy
## to Protect People and Sustain Resources
## in Fire-Adapted Ecosystems

This cohesive strategy provides a broad national framework for aligning the social, program management, and institutional elements that will be required to restore fire-adapted ecosystems. These three elements underpin this strategy.

Implementation will be based on regional assessments, integrated planning processes, public input, and collaboration with other agencies. Environmental documentation for on-the-ground projects will contain many of the "how to" actions necessary to move the strategy forward in a manner that is consistent with law, regulations, and Forest Service policy.

**Priorities for Restoration**

Specific areas of emphasis in the strategy include reducing risk within the wildland-urban interface, readily accessible municipal watersheds, and threatened and endangered species habitat. However, it is equally important to maintain existing low risk areas from developing into moderate or high-risk. To this end, the following priorities will apply when designating areas for treatment.

- **Wildland-urban interface**. Wildland-urban interface areas include those areas where flammable wildland fuels are adjacent to homes and communities.

- **Readily accessible municipal watersheds**. Clean water is the most critical resource in many western states. Watersheds impacted by uncharacteristic wildfire effects are less resilient to disturbance and unable to recover as quickly as those that remain within the range of ecological conditions characteristic of the fire regime under which they developed.

- **Threatened and endangered species habitat**. The extent of recent fires demonstrates that in fire-adapted ecosystems few areas are isolated from wildfire. Dwindling habitat for many threatened and endangered species will eventually be impacted by wildland fire. The severity and extent of fire could eventually push declining populations beyond recovery.

- **Maintenance of existing low risk Condition Class 1 areas**. This is especially important in the southern and eastern states where high rates of vegetation growth can eliminate the

BLM_0048788

effects of treatment in 5-10 years.  Recent droughts have caused severe wildland fire problems in Florida and Texas.

## Supporting Scientific Evidence

Considerable scientific evidence supports use of prescribed fire and other management treatments in fire-adapted ecosystems to reduce risk of catastrophic wildland fire, improve ecosystem resilience, and restore plant community composition, structure, and landscape patterns.

Several examples of small-scale watershed improvement projects exist in national forests in fire-adapted systems. Virtually all use prescribed fire and mechanical treatments to improve watershed conditions. Fuel reduction work can reduce potential fire severity, which, in turn, can reduce potential erosion. Conditions that favor low intensity burning on these sites help prevent erosion and leave more organic material that filters water and improves water quality characteristics.

At landscape scales, the effectiveness of treatments in improving watershed conditions has not been well documented. Many scientists, however, agree that careful application of treatments across larger scales can restore water quality.

Degraded air quality associated with long-duration wildland fires has been widely experienced in the West. Because wildland fires tend to occur at the driest time of year when dead fuels and vegetation is also driest, they are more completely consumed and typically produce three to five times more emissions than early or late-season prescribed fires.

In Condition Class 3 and some Condition Class 2 situations, the strategy advocates mechanical thinning of small trees, brush and shrubs to reduce fire intensities and particulate emissions during prescribed burning. This practice, although expensive, opens prescription windows of opportunity – enabling managers to capitalize on better weather conditions for smoke ventilation and dispersal.

The extent to which management for ecosystem resilience can improve air quality over the long term is not completely known. Present regulatory policies measure prescribed fire emissions, but not wildland fire emissions. The emissions policy tends to constrain treatments and – in short interval fire systems – may act to inadvertently compound wildland fire risks. A growing body of scientific evidence suggests that mechanical treatments followed by prescribed fire can reduce the overall adverse impacts to air quality by reducing the amount of fuel that would otherwise be available during the wildland fire season.

BLM_0048789

# The Three Cohesive Elements

## Social

- Establish an objective for conservation awareness in the Forest Service Government Performance and Results Act (GPRA) Strategic Plan (2000 revision). Emphasize the need to increase public awareness of the role of ecological processes in ecosystem sustainability (Appendix B).

- Initiate collaborative planning with stakeholders to identify and evaluate ecosystem restoration and maintenance needs and opportunities. Utilize science-based assessments of present and projected ecosystem conditions as a basis for determining restoration needs.

- To promote fire-safe local planning, zoning, and building requirements, establish partnerships with other federal agencies, states, communities, and the insurance industry.

Encourage and assist communities to take responsibility for sharing in risk reduction and fire prevention efforts.

## Institutional

### Long-Term Policy Assessment

- Establish objectives, strategies, and milestones for restoration and maintenance of fire-adapted ecosystems in the Forest Service GPRA Strategic Plan. Emphasize integration in objectives for public safety, watershed protection, species conservation, and ecosystem resilience. (Appendix B.)

- Establish ecosystem restoration as a performance element in the Forest Service Annual Performance Plan. Use changes in condition class as one of the measures for annual performance and accountability. (Appendix B.)

- Establish assessment procedures that integrate considerations of current ecosystem condition (status), probability of degradation from disturbance events (risk), and alternatives to reduce risk or improve conditions (opportunity). Include objectives at the national, regional and local scales for: watershed protection, species conservation, ecosystem resilience, and public safety. Coordinate information across all program areas.

BLM_0048790

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

## Program Management

### At the National Level

- Concentrate projects in the shorter interval fire-adapted ecosystems (Fire Regimes I and II), with emphasis in Condition Classes 2 and 3. (GPRA 1c.)

- Establish the interior West as a priority for restoration. (GPRA 1c.)

- Direct funds – in an integrated fashion – to highest values to be protected, especially for: watersheds (GPRA 1a), species (GPRA 1b), ecosystems (GPRA 1c), and human communities (GPRA 4b).

- Explore innovative use of existing authorities for grants, agreements, and contracts for project execution such as service contracts to hire local people.

- Emphasize long-term training and community development opportunities through restoration activities.

- Establish program reviews at regular intervals to determine if adjustments are needed. Take into account: budget, the findings of regional assessments, finer-scaled risk and hazard mapping, and other planning efforts.

### At the Regional Level

- Conduct regional assessments, establishing restoration and maintenance priorities consistent with values to be protected (watersheds, species, human communities) in collaboration with other federal agencies, tribes, state and local government, and constituents.

### At the National Forest and Grassland Level

- In Land and Resource Management Plan amendments and revisions: identify land by condition class categories, discuss the resources to be protected from catastrophic wildland fire including human communities, watersheds, threatened and endangered species habitats, and establish landscape goals to achieve sustainable ecosystems. Goals should be included to reduce acres at risk.

- Establish monitoring and evaluation programs and measures in Land and Resource Management Plan revisions for restoration activities in fire-adapted ecosystems.

- Consistent with Land and Resource Management Plans, develop fire management plans that provide for suppressing fires that would threaten public safety, communities, species habitat, or degrade ecosystems. Increase the management of natural ignitions for resource benefits where values and resources will be increased or improved.

BLM_0048791

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

State and Private Forestry

- Expand efforts such as the Firewise Communities Program to assist communities and homeowners in the urban wildland interface to take preventative and corrective actions to protect lives and property from fire.  Provide assistance in conducting risk and hazard assessments in developing community disaster plans, and in educating the public about measures they can take to protect their property.

Research and Development

- Strengthen Forest Service research programs to evaluate ecological, social, and economic tradeoffs and other issues; develop more effective prediction systems; and quantify disturbance effects and ecological interactions in fire regimes. Continue funding the Joint Fire Sciences Program.

- Study, document and monitor examples of various treatments and their effectiveness in restoring ecological processes, protecting communities, and protecting key ecosystem components.

- Research the long-term results of rehabilitation techniques and help determine those most effective at restoring ecological processes and habitats.

Funding

- Establish an integrated budget structure that facilitates an accomplishment of the GPRA Strategic Plan elements: Watershed Restoration, Species Conservation, Ecosystem Processes, and the Protection of Human Communities.

- Wildland fire preparedness funding requests should be made at the most efficient level, as defined by the National Fire Management Analysis System.

BLM_0048792

## Actions Requiring External Collaboration

### Long-Term Policy Assessment

Collaborate with the Environmental Protection Agency, National Marine Fisheries Service, and the U.S. Fish and Wildlife Service in addressing *long-term* impacts, tradeoffs, and issues to air quality, watershed resilience, species conservation, ecosystem integrity, and public safety as a result of each agency's respective policy in the *context* of fire-adapted ecosystems. Identify opportunities for improved coordination between regulatory and land management agencies in achieving restoration and maintenance objectives to protect people and sustain resources in fire-adapted ecosystems.

### Economic Feasibility Assessment for Fuel Utilization

Because understory biomass has little or no value, disposing of it becomes problematic. Small diameter material, however, may become more economically feasible if assessments for its utilization more comprehensively evaluate tradeoffs and risks to watershed and species values, public health and safety, and other factors that may benefit from reducing fuels in fire-adapted ecosystems. Projected wildland fire costs, resource losses, and environmental damage, all suggest that developing and supporting markets for utilization of over-accumulated biomass may be desirable.

Consistent with Executive Order 13134 "Developing and Promoting Biobased Products and Bioenergy", collaborate with other agencies and organizations to conduct economic feasibility analyses of increased biomass utilization.

The FY 2001 budget includes a Presidential bio-based products and bio-energy initiative. This initiative supports research and development, demonstration and commercialization, and outreach and education activities. The Forest Service will take a leadership role in this effort.

BLM_0048793

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

## Projected Treatment Schedule at Full Program Implementation

Different treatment schedules are displayed below. The strategy does not include a treatment target of a fixed number of acres within a set period of time. The number of acres actually treated will depend on different circumstances, including available funding.  The treatment schedule displayed below illustrates potential costs over varying time frames.  Actual treatment costs and rates will depend on a variety of circumstances.

The purpose of the report is to establish priorities and a rationale for restoration. Local Land and Resource Management Plans and community involvement will help to guide the types and locations of treatment actions. Enhancing forest ecosystem health is best accomplished at the local level with on-site examination and experience.

Tables 1a, 1b, and 1c provide estimates of a potential annual program to achieve restoration goals within 10, 15, and 20-year time periods.

This information was developed using regional input based on Land and Resource Management Plan and other assessments. Strategy implementation will be consistent with forest plan direction and other ongoing initiatives. Acreage estimates give consideration to regulatory obligations for clean air, clean water, and threatened or endangered species habitat. These goals are expected to change as the Forest Service refines these data. More accurate regional and sub-regional assessments, integrated planning processes, and public collaboration may refine these figures.

### 10-YEAR TREATMENT SCHEDULE

| Regions 1-6 Treatment Schedule (acres) | | | | |
|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4-10 |
| CC1 | 200,000 | 400,000 | 600,000 | 800,000 |
| CC2 | 500,000 | 850,000 | 1,400,000 | 2,500,000 |
| CC3 | 300,000 | 700,000 | 1,100,000 | 1,650,000 |
| Total | 1,000,000 | 1,950,000 | 3,100,000 | 4,950,000 |

| Regions 8-9 Treatment Schedule (acres) | | | | |
|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4-10 |
| CC1 | 770,000 | 1,000,000 | 1,150,000 | 1,250,000 |
| CC2 | 220,000 | 350,000 | 470,000 | 640,000 |
| CC3 | 50,000 | 60,000 | 60,000 | 60,000 |
| Total | 1,040,000 | 1,410,000 | 1,680,000 | 1,950,000 |

*Table 1a – 10-year schedule to increase the annual hazardous fuels treatment program.*

BLM_0048794

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

## 15-YEAR TREATMENT SCHEDULE

### Regions 1-6 Treatment Schedule (acres)

|       | Year 1  | Year 2    | Year 3    | Year 4-15 |
|-------|---------|-----------|-----------|-----------|
| CC1   | 150,000 | 250,000   | 400,000   | 500,000   |
| CC2   | 450,000 | 700,000   | 1,100,000 | 1,500,000 |
| CC3   | 200,000 | 500,000   | 750,000   | 1,000,000 |
| Total | 800,000 | 1,450,000 | 2,250,000 | 3,000,000 |

### Regions 8-9 Treatment Schedule (acres)

|       | Year 1  | Year 2    | Year 3    | Year 4-15 |
|-------|---------|-----------|-----------|-----------|
| CC1   | 750,000 | 780,000   | 780,000   | 780,000   |
| CC2   | 200,000 | 380,000   | 380,000   | 380,000   |
| CC3   | 300,000 | 400,000   | 400,000   | 400,000   |
| Total | 980,000 | 1,200,000 | 1,200,000 | 1,200,000 |

*Table 1b – 15-year schedule to increase the annual hazardous fuels treatment program.*

## 20-YEAR TREATMENT SCHEDULE

### Regions 1-6 Treatment Schedule (acres)

|       | Year 1  | Year 2    | Year 3    | Year 4    | Year 5-20 |
|-------|---------|-----------|-----------|-----------|-----------|
| CC1   | 100,000 | 150,000   | 225,000   | 325,000   | 375,000   |
| CC2   | 400,000 | 600,000   | 750,000   | 900,000   | 1,100,000 |
| CC3   | 200,000 | 300,000   | 400,000   | 550,000   | 750,000   |
| Total | 700,000 | 1,050,000 | 1,375,000 | 1,775,000 | 2,000,000 |

### Regions 8-9 Treatment Schedule (acres)

|       | Year 1  | Year 2  | Year 3  | Year 4  | Year 5-20 |
|-------|---------|---------|---------|---------|-----------|
| CC1   | 400,000 | 400,000 | 450,000 | 500,000 | 620,000   |
| CC2   | 120,000 | 150,000 | 200,000 | 250,000 | 300,000   |
| CC3   | 25,000  | 25,000  | 30,000  | 30,000  | 30,000    |
| Total | 545,000 | 575,000 | 680,000 | 780,000 | 950,000   |

*Table 1c – 20-year schedule to increase the annual hazardous fuels treatment program.*

BLM_0048795

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

# V  Consequences of Deferral

*". . . in many of the interior West forests, the costs and risks of inaction are greater than the costs and risks of remedial action."*

Concluding comments from academic and agency scientists. Assessing Forest Ecosystem Health in the Inland West Workshop (November, 1993)

This chapter projects suppression costs, natural resource and private property losses, and environmental damages expected under present treatment schedules and compares them with the costs, losses and damages anticipated for the mid-range treatment schedule shown on Table 1c.  If treatment schedules are accelerated, objectives may be met sooner.  If treatment schedules are extended, results may be deferred. Three alternative treatment timeframes are presented in the strategy.  For demonstrative purposes, changes over time are projected using the 15-year treatment schedule (figures 8,10, 11, and 12).

Commodity values are well established. Non-commodity values, however, are more difficult to determine. Economic research is ongoing to better describe and quantify amenity values including ecosystem components, natural resources, and safety considerations involved in tradeoff analysis. Tradeoff analysis measures the costs, benefits, and risks under different protection strategies.  It is one way to compare the expected outcomes of different management scenarios.

Fire-adapted ecosystems are dynamic. With any treatment schedule, live vegetation will continue to grow and dead wood will continue to accumulate. Risk conditions will continue to increase as some forests and grasslands areas migrate from lower-risk conditions to higher-risk conditions. During this same time period, severe wildland fires will continue to occur – reducing high-risk acres, but also potentially damaging ecosystem components and natural resources.

BLM_0048796

## Areas at Risk

As human populations continue to expand, threats to species viability, watershed health, and ecosystem integrity will grow. The situation will be exacerbated as forest fuels accumulate and fire risks increase. Even at current levels of treatment, risks to species, watersheds, forest health, and human communities throughout the interior West are escalating due to increasing fuels buildups (vegetation) in fire-prone environments. The answer is not in bigger and better firefighting apparatus. At very high fuel loadings, fire behavior overwhelms even the best fire suppression efforts. Under extreme conditions, control of fire becomes dependent on relief in weather or a break in fuels.

Reducing fuels and restoring fire's ecological role in fire-adapted ecosystems can reverse many adverse trends that serve as important indicators of ecosystem sustainability. To demonstrate the strategy's benefits, graphs from a recent assessment of several indicators for the Western states were developed to illustrate trends (figures 8, 10, 11, 12). These graphs reflect assessments from a recently completed national-scale evaluation (see Appendix D). They are based on coarse-scale data that model averages for the area under study. They cannot be directly applied to areas smaller in scale than the analysis area. The data are not directly applicable to fine-scale analysis; they serve to evaluate relative risk trends among different management options.



*Figure 8:*

BLM_0048797

The assessment was based on a projection using the 15-year treatment schedule.  Results for the 10 and 20-year treatment schedules will vary from this only in the time required to achieve the same level of results.  *At 100 years, the social, economic, and ecological benefits of restoration treatments become exponentially greater.* And, as treatments shift from restoration to maintenance, treatment costs will go down.

At the current rate of treatment (0.75 million acres/year), the acres at high risk in the interior West will increase over the next 15 years. Implementing the approaches outlined in this strategy can increase levels of treatment and decrease moderate and high-risk categories (Condition Classes 2 and 3). It will restore proportionately more low-risk areas (Condition Class 1). The strategy therefore substantially reduces risk over the current rate of fuel reduction treatment.

Without increased restoration treatments in these ecosystems, wildland fire suppression costs, natural resource losses, private property losses, and environmental damage are certain to escalate as fuels continue to accumulate and more acres become high-risk.

## Suppression Costs

Suppression strategies (and their associated costs) are determined using the Wildland Fire Situation Analysis (WFSA), a required assessment process on federal lands. Under this system, suppression costs are calculated from an array of alternatives prior to selecting a fire suppression strategy. The analysis weighs values to be protected. Firefighter and public safety always serves as the first criteria. As a general rule, depending on the circumstances surrounding a particular wildland fire, resource or private values to be protected are typically two to five times greater than the expected suppression costs, as calculated using the WFSA.

The Line Officer selects the most appropriate strategy and, in doing so, approves the expected suppression costs. If the strategy fails or if costs exceed the expected level, the Line Officer must reevaluate alternatives and approve any changes.

Suppression costs and wildland fire acres burned (Figure 9) have increased due to over-accumulation of fuels and a corresponding increase in high-risk acreage and drought conditions. In recent years, large fires have become more damaging and more costly. *Unless the rate of restoration is increased, larger burned acreages and higher wildland fire suppression costs should be expected.*

BLM_0048798

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**



*Figure 9*

## Loss to Private Property and Resource-Based Commodities

As human populations grow and shifting demographics concentrate more people in or adjacent to wildlands, more private property will be at risk to catastrophic wildland fires.

According to the National Fire Protection Association, wildland-urban interface fires from 1985 to 1994 destroyed 8,925 homes. During dry years or under adverse weather conditions, because they occur in high-risk fuels, many wildland-urban interface fires exceed firefighting capabilities.

No forest can be made fireproof. As homes and communities are built in the wildland interface, they face added risk of fire. Efforts to reduce hazardous fuels on federal lands must be coupled with efforts to assist private landowners to take preventative action in their own communities.

Research suggests that the most effective way to reduce risk of fire to homes in the wildland-urban interface is through fuels treatment carried out within 200 feet of building structures (Cohen, 1999). Homes with high ignitibility factors, such as pine needle accumulation on roofs

BLM_0048799

and in yards and firewood piles next to houses, frequently suffer more severe fire damage than other areas.

When fuel loadings are reduced, protection of life and property is significantly improved (Fischer, 1988).



*Figure 10*

The National Research Council and the Federal Emergency Management Agency (FEMA) recognized wildland fires in California (1993) and Florida (1998) as among the defining natural disasters of the 1990s. In terms of damage, the magnitude of these catastrophic fires were compared with the Northridge earthquake, Hurricane Andrew, and flooding of the Mississippi and Red rivers.

The 1991 Oakland, California fire was ranked by insurance claims as one of the ten most costly all-time natural catastrophes. More wildland fire disasters of this scale can be expected in the absence of a mitigation strategy. FEMA is emphasizing mitigation and prevention to state and local governments to address the growing losses from natural disasters such as hurricanes and flooding. The strategy outlined in this report complements the efforts to forestall disaster-related costs and losses.

BLM_0048800

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

Damage to commodity resources such as wood fiber and watersheds often result from severe wildland fire. These losses can be significant. For example, the Big Bar Fire Complex, consisting of five fires that burned during the late summer of 1999 in northern California. The Complex burned 141,000 acres on and adjacent to the Six Rivers National Forest. The Big Bar Complex cost $81 million to suppress and $6 million for burned-area rehabilitation. It resulted in a preliminary estimate of $122 million in resource losses, including loss of marketable timber.

## Environmental Damage

Any restoration strategy should be evaluated in the context of the ecosystem under consideration. Wildland fires occurring in the shorter interval fire-adapted ecosystems where fuels have accumulated over several missed fire cycles often burn with uncharacteristic wildfire effects. Consequently, habitats, soils, and watersheds are burned beyond their adaptive limits. The severity of these fires pose threats to species persistence and watershed integrity. The damage from these fires is often long-lasting and, within some ecosystems, may be irretrievable.



*Figure 11*

BLM_0048801

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

With an increasing number of large, uncharacteristically damaging wildland fires in short interval fire systems, we can eventually expect:

- Loss of critical habitat for fish, wildlife, and plant species at risk.
- Soil erosion and loss of site stability and productivity.
- Changes in temperatures and moisture regimes on certain sites.
- Increased spread of invasive weeds or non-native plants.



*Figure 12*

On the 1999 Big Bar Complex, adverse effects were most commonly found where the fires burned at higher intensities. Impacts from the fires included:

- Prolonged exposure of local communities to unhealthy smoke concentrations.
- Increased soil erosion and stream course sedimentation.
- Loss of old-growth trees that provide significant wildlife habitat.
- Degradation and loss of fish habitat, especially in the New River's tributaries.

## Public and Firefighter Safety

In fire-adapted forests adjacent to human communities, concerns for public *health* often compete with concerns for public and firefighter *safety*. Treatments that use prescribed burning raise health issues related to smoke. Although this strategy would employ mechanical thinning

BLM_0048802

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

prior to prescribed burning in some areas to reduce particulate emissions, air quality will remain an important concern.

Current regulatory policies "count" prescribed fire emissions in measuring air quality, but do not include wildland fire emissions. Constraining prescribed fire use in fire-adapted ecosystems to ensure public health may inadvertently increase risks to human safety.

Stagnant atmospheric conditions during the late summer and early fall often inhibit smoke dispersal from wildland fires. Although these episodes are exempt from regulatory control, they exceed public health standards. In 1977 and 1987, southern Oregon and northern California experienced long-term, unhealthy smoke concentrations. The 1999 Big Bar Fire Complex in northern California and the 1994 Wenatchee, Washington wildland fires also caused prolonged exposure of local communities to unhealthy smoke levels.

In recent years, several tragedies have occurred as firefighters tried to control wildland fires threatening human developments. In 1991, the Dude wildland fire near Payson, Arizona killed six firefighters as they attempted to protect a rural subdivision. The South Canyon fire in 1994 resulted in the death of 14 firefighters who were suppressing a wildland fire that was approaching homes near Glenwood Springs, Colorado.

Among the general public, loss of life due to wildland fire is rare but not unknown. In 1991, 25 lives were lost, 150 people injured, and more than 3,000 structures were destroyed in a wildland fire in the hills near Oakland, California. On March 8, 2000, three motorists lost their lives and many more were injured in a multi-car pileup in Florida – the result of wildland fire smoke obscuring visibility on a highway.

While fuel treatments across the interior West have increased in the last few years, further increases are needed to protect communities, watershed health, species viability, and ecosystem resilience.

BLM_0048803

# VI  Conclusions and Next Steps

*"Moving toward sustainability is a two-part process:*

*First, revising the uses of the ecosystem so that environmental values take an economically relevant place in policy and practice;*

*Second, incorporating the well-being of the ecosystem into the way management is conceived and implemented."*

Kai N. Lee
Compass and Gyroscope, 1993

The cohesive strategy outlined in this report is based on the premise that, within fire-adapted ecosystems, fire – at the right intensities, frequency, and season – is fundamentally essential for healthy, sustainable resources and the protection of nearby human communities. The strategy clarifies agency goals and objectives, establishes milestones and performance measures, and outlines an approach for setting restoration priorities.

The strategy directs treatments to high-risk areas, specifically, the wildland-urban interface, readily accessible municipal watersheds, and threatened and endangered species habitat. Implementing it will reduce the area in the interior West considered at highest risk of loss or damage. It prioritizes treatment of additional acres to prevent them from developing into high-risk conditions. It relies on a variety of treatments – including thinning, some harvest, other mechanical treatments and prescribed burning – to reduce fuels and the consequent risks of loss or long-lasting damage resulting from wildland fire.

The strategy provides an iterative approach, based on adaptive management and incremental steps. Actual treatment schedules will be developed using regional input based on Land and Resource Management Plans and other more recent assessments.

The strategy is responsive to regulatory responsibilities for clean air, clean water, and threatened and endangered species. Over the long term, the agency believes strategy implementation will better ensure ecosystem integrity for the benefit of future generations. The strategy does not attempt to treat all acres, nor does it eliminate all risks. While it does not aim to return forests and grasslands to pre-European settlement conditions – it does reduce risks by reducing over-accumulated fuels (Figure 13).The strategy will continue to evolve as the agency works with states, tribes, local communities and others.

BLM_0048804

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

The strategy also maintains that constituency support and collaboration with tribal, other federal, state, local agencies, and the public is an essential cornerstone for restoration work. It is consistent with the guiding principles of the Federal Wildland Fire Management Policy (approved by the Secretaries of Interior and Agriculture in 1995). In addition, it supports federal and state initiatives aimed at improving forest ecosystem health on public lands.

This strategy effectively reduces risk on a scale that makes a difference, but is potentially expensive and will take time and collaborative planning to implement. The costs, losses, and damages that will occur without this strategy are not always quantifiable or precisely known. When evaluated against recent trends and projections, however, wildland fire costs, loses, and damages, are expected to compound and exceed treatment costs – unless the rate of treatment is accelerated.

Large wildland fires will continue to occur. This cohesive strategy aims to reduce losses and damages from these wildland fires by concentrating treatments where human communities, watersheds, and species are at risk.  Until restoration efforts are significantly expanded in fire-adapted ecosystems, the risks to watersheds, species, and people will continue to increase.



*Figure 13 – The cohesive strategy outlined in this report aims to reduce severe insect, disease, and wildland fire risk.*

BLM_0048805

## Next Steps

This report provides a broad iterative approach to restore fire-adapted ecosystems and protect human values.

The coarse-scale assessments that establish the basis for the strategy will be refined as finer scale data become available to conduct forest-level planning. Implementation will occur consistent with Land and Resource Management Plan direction and other ongoing initiatives. More accurate assessments, integrated planning processes, public input, and collaboration with other agencies are all included in the work ahead.

Strategy actions to be addressed immediately:

- Refine coarse-scale assessments for wildland fuel risks.

- Develop regional implementation plans, integrating the status and risk information included in the Western Watershed Initiative, Human Population Density Maps, and Species at Risk Analysis into forest planning efforts at national, regional, and local levels as applicable.

- Incorporate recommended adjustments to the Forest Service Government Performance and Results Act (GPRA) Strategic Plan (2000 revision).

- Identify funding for priority projects.

- Frame a research program to strengthen monitoring and evaluation during the strategy's implementation.

- Coordinate with states, tribes, and local communities for work in the urban-wildland interface to help in risk reduction and hazard mitigation.

- Continue efforts to develop markets and ideas for small-diameter material utilization.

BLM_0048806

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

BLM_0048807

Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy

# VII  Team Members

**Team Leaders**

**Lyle Laverty,** Regional Forester, Rocky Mountain Region,
USDA Forest Service

**Jerry Williams,** Director, Fire and Aviation Management, Northern Region,
USDA Forest Service

**Team Facilitator**

**Joe Michaels,** Field Representative Forester, State and Private Forestry,
Northeast Area, USDA Forest Service

**Core Team**

**Michael Hilbruner**, Applied Fire Ecologist, Washington Office,
USDA Forest Service

**Timothy Sexton**, Fire Ecologist, Fire Program Management Program Center,
USDI National Park Service

**Monica Schwalbach**, Assistant Director, Wildlife and Terrestrial Ecology,
Washington Office, USDA Forest Service

**James Morrison,** Staff Assistant, Interregional Ecosystem Management
Coordination Group, Northern Region, USDA Forest Service

**Andrea Tuttle,** Director, California Department of Forestry and Fire Protection

**David Burich,** Assistant Director, Financial Management, Washington Office,
USDA Forest Service

**William Bradshaw,** Assistant Director, Strategic Planning and Assessment,
Washington Office, USDA Forest Service

**David Cleaves**, Program Leader, Forest Fire Systems Research,
Washington Office, USDA Forest Service

BLM_0048808

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

**Support Team**

**Mark Beighley**, Strategic Fuels Planner, Washington Office,
USDA Forest Service

**Doug MacCleery,** Assistant Director, Forest Ecosystems and Planning,
Washington Office, USDA Forest Service

**Gene Blankenbaker,** Staff Specialist, Legislative Affairs,
Washington Office, USDA Forest Service

**Michael da Luz**, Branch Chief, Fire Ecology and Operations,
Rocky Mountain Region, USDA Forest Service

**Marlin Johnson,** Assistant Director of Forestry, Southwestern Region,
USDA Forest Service

**Galen Hall,** Regional Budget Officer, Northern Region,
USDA Forest Service

**Paul Keller**, Writer-Editor, Pacific Northwest Region,
USDA Forest Service

BLM_0048809

# VIII  Acknowledgements

**R. Neil Sampson,** President, The Sampson Group, Inc., Alexandria, Virginia.

**James Hubbard,** State Forester, Colorado State Forest Service.

**David Bunnell,** National Fire Use Program Manager, National Interagency Fire Center, USDA Forest Service.

**Colin Hardy,** Research Forester, Rocky Mountain Research Station, Fire Sciences Laboratory, USDA Forest Service.

**Wendell Hann,** Fire/Landscape Ecologist, Washington Office, Fire and Aviation Management, USDA Forest Service.

**Laurie Perrett** (Pacific Northwest Region); **Sue Husari** (Pacific Southwest Region); **Bob Meuchel** (Northern Region); **Maggie Pittman** (Northern Region); **Steve Pedigo** (Rocky Mountain Region) for organizing and hosting the "Sounding Boards."

The Cohesive Strategy Team also wishes to thank all those who participated and provided feedback at the Sacramento, Denver and Missoula "Sounding Boards." The team also thanks the people who reviewed drafts and provided comments during development and revision of this report.

BLM_0048810

**Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – A Cohesive Strategy**

BLM_0048811

# IX  Glossary

**Uncharacteristic Wildfire Effects**
An increase in wildfire size, severity and resistance to control, and the associated impact to people and property, compared to that which occurred in the native system.

**Ecosystem Process**
The actions or events that link organisms and their environment, such as predation, mutualism, successional development, nutrient cycling, carbon sequestration, primary productivity, and decay. Natural disturbance processes often occur with some periodicity *(From Webster's dictionary, adapted to ecology.)*

**Ecosystem**
The complex of a community of organisms and its environment functioning as an ecological unit in nature. *(Webster's dictionary.)*

**Ecosystem Integrity**
The completeness of an ecosystem that, at multiple geographic and temporal scales, maintains its characteristic diversity of biological and physical components, spatial patterns, structure, and functional processes within its approximate range of historic variability. These processes include: disturbance regimes, nutrient cycling, hydrologic functions, vegetation succession, and species adaptation and evolution. Ecosystems with integrity are resilient and capable of self-renewal in the presence of the cumulative effects of human and natural disturbances. *(Proposed Rule, Section 219.36, 1999.)*

**Ecosystem Management**
The careful and skillful use of ecological, economic, social, and managerial principles in managing ecosystem integrity and desired conditions, uses, products, and services over the long term.

**Fire-Adapted Ecosystem**
An ecosystem with the ability to survive and regenerate in a fire-prone environment.

**Fire Regime**
A generalized description of the role fire plays in an ecosystem. It is characterized by fire frequency, seasonality, intensity, duration and scale (patch size), as well as regularity or variability. *(Agee, as modified by Sexton.)*

BLM_0048812