**Table S0-oa. Riggins 2006 economic profile**

| Industry | Jobs | Percent | Labor income ($1,000) | Percent | Sales ($1,000) | Percent | LIPW[a,b] ($1,000) |
|---|---|---|---|---|---|---|---|
| Accommodation and food services | 82 | 11.7 | 831 | 5.8 | 2,386 | 4.6 | 10 |
| Administrative and waste services | <10 | N/A | 71 | 0.5 | 133 | 0.3 | 8 |
| Agriculture, forestry, fishing, and hunting | 127 | 18.2 | 1,444 | 10.0 | 6,169 | 11.9 | 11 |
| Arts, entertainment, and recreation | 15 | 2.1 | 145 | 1.0 | 414 | 0.8 | 9 |
| Construction | 45 | 6.4 | 1,016 | 7.0 | 2,312 | 4.4 | 22 |
| Educational services | 12 | 1.7 | 246 | 1.7 | 444 | 0.9 | 21 |
| Finance and insurance | <10 | N/A | 168 | 1.2 | 572 | 1.1 | 38 |
| Government | 175 | 25.1 | 5,707 | 39.5 | 25,176 | 48.4 | 32 |
| Health care and social assistance | 48 | 6.9 | 1,126 | 7.8 | 2,000 | 3.8 | 23 |
| Information | <10 | N/A | 18 | 0.1 | 53 | 0.1 | 23 |
| Management of companies | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 |
| Manufacturing | <10 | N/A | 88 | 0.6 | 376 | 0.7 | 39 |
| Mining | 13 | 1.9 | 707 | 4.9 | 2,526 | 4.9 | 56 |
| Other services (excluding public administration) | 17 | 2.4 | 203 | 1.4 | 361 | 0.7 | 12 |
| Professional and technical services | <10 | N/A | 159 | 1.1 | 234 | 0.4 | 47 |
| Real estate and rental and leasing | 56 | 8.0 | 905 | 6.3 | 5,201 | 10.0 | 16 |
| Retail trade | 68 | 9.7 | 1,086 | 7.5 | 2,321 | 4.5 | 16 |
| Transportation and warehousing | 13 | 1.9 | 379 | 2.6 | 937 | 1.8 | 28 |
| Utilities | <10 | N/A | 60 | 0.4 | 230 | 0.4 | 130 |
| Wholesale trade | <10 | N/A | 78 | 0.5 | 198 | 0.4 | 15 |
| | | | | | | | |
| Total[c] | 698 | 100.0 | 14,440 | 100.0 | 52,043 | 100.0 | 21 |

*Source*: EMSI
[a] Due to rounding division may not reconcile
[b] LIPW = Labor Income per Worker
[c] Totals may not sum due to rounding

## Weiser

The Weiser economic profile is shown in Table SO-qa. Weiser's largest industry in terms of employment is agriculture, forestry, fishing, and hunting (26.9 percent), which provides the community with 1,185 jobs, $17.5 million in labor income, and $51.6 million in sales. Of these jobs, 428 (36 percent) are in production agriculture and 756 (64 percent) are in agriculture and

forestry support services. The next largest industry in terms of employment is government (14.5 percent) followed by manufacturing (13.2 percent). Weiser has a diverse economy with strong wood products and agricultural sectors. In total, Weiser has 4,398 jobs, $106.6 million in annual labor income, and $406 million in annual sales.

**Table SO-qa. Weiser 2006 economic profile**

| Industry | Jobs | Percentage | Labor income ($1,000) | Percentage | Sales ($1,000) | Percentage | LIPW[a,b] ($1,000) |
|---|---|---|---|---|---|---|---|
| Accommodation and food services | 209 | 4.8 | 1,740 | 1.6 | 5,203 | 1.3 | 8 |
| Administrative and waste services | 61 | 1.4 | 847 | 0.8 | 2,084 | 0.5 | 14 |
| Agriculture, forestry, fishing, and hunting | 1,185 | 26.9 | 17,485 | 16.4 | 51,578 | 12.7 | 15 |
| Arts, entertainment, and recreation | 48 | 1.1 | 933 | 0.9 | 2,169 | 0.5 | 19 |
| Construction | 209 | 4.8 | 5,306 | 5.0 | 12,071 | 3.0 | 25 |
| Educational services | <10 | N/A | 41 | 0.0 | 83 | 0.0 | 27 |
| Finance and insurance | 60 | 1.4 | 2,345 | 2.2 | 8,379 | 2.1 | 39 |
| Government | 638 | 14.5 | 23,001 | 21.6 | 140,882 | 34.7 | 36 |
| Health care and social assistance | 296 | 6.7 | 6,121 | 5.7 | 10,744 | 2.6 | 21 |
| Information | 22 | 0.5 | 635 | 0.6 | 2,174 | 0.5 | 29 |
| Management of companies | <10 | N/A | 52 | 0.0 | 84 | 0.0 | 36 |
| Manufacturing | 580 | 13.2 | 21,983 | 20.6 | 101,333 | 25.0 | 38 |
| Mining | <10 | N/A | 45 | 0.0 | 153 | 0.0 | 15 |
| Other services (excluding public administration) | 103 | 2.3 | 1,573 | 1.5 | 3,174 | 0.8 | 15 |
| Professional and technical services | 162 | 3.7 | 3,763 | 3.5 | 7,893 | 1.9 | 23 |
| Real estate and rental and leasing | 176 | 4.0 | 2,564 | 2.4 | 15,730 | 3.9 | 15 |
| Retail trade | 348 | 7.9 | 7,203 | 6.8 | 15,388 | 3.8 | 21 |
| Transportation and warehousing | 193 | 4.4 | 7,274 | 6.8 | 16,291 | 4.0 | 38 |
| Utilities | <10 | N/A | 275 | 0.3 | 1,891 | 0.5 | 253 |
| Wholesale trade | 100 | 2.3 | 3,380 | 3.2 | 8,606 | 2.1 | 34 |
| | | | | | | | |
| Total[c] | 4,398 | 100.0 | 106,568 | 100.0 | 405,910 | 100.0 | 24 |

*Source*: EMSI
[a] Due to rounding division may not reconcile
[b] LIPW = Labor Income per Worker
[c] Totals may not sum due to rounding

**Wilder**

The Wilder economic profile is shown in Table SO-r. Wilder's largest industry in terms of employment is agriculture, forestry, fishing, and hunting (39.1 percent), which provides the community with 800 jobs (39.1 percent), $18.6 million in labor income, and $76.8 million in sales. Of these jobs, 704 (88.0 percent) are in production agriculture. The next largest industry in terms of employment is manufacturing (25.3 percent) followed by government (10.4 percent).

BLM_0049068

Wilder has a diverse economy that has strong food processing and agricultural sectors. In total, Wilder has 2,048 jobs, $59.6 million in labor income, and $281.5 million in sales.

**Table SO-r. Wilder 2006 economic profile**

| Industry | Jobs | % | Labor income ($1,000) | % | Sales ($1,000) | % | LIPW[a,b] ($1,000) |
|---|---|---|---|---|---|---|---|
| Accommodation and food services | 21 | 1.0 | 278 | 0.5 | 832 | 0.3 | 13 |
| Administrative and waste services | 13 | 0.6 | 299 | 0.5 | 539 | 0.2 | 23 |
| Agriculture, forestry, fishing, and hunting | 800 | 39.1 | 18,587 | 31.2 | 76,802 | 27.3 | 23 |
| Arts, entertainment, and recreation | 14 | 0.7 | 224 | 0.4 | 694 | 0.2 | 16 |
| Construction | 111 | 5.4 | 3,012 | 5.1 | 6,853 | 2.4 | 27 |
| Educational services | <10 | N/A | 1 | 0.0 | 2 | 0.0 | 8 |
| Finance and insurance | <10 | N/A | 344 | 0.6 | 1,367 | 0.5 | 45 |
| Government | 214 | 10.4 | 8,606 | 14.5 | 52,645 | 18.7 | 40 |
| Health care and social assistance | 105 | 5.1 | 626 | 1.1 | 1,149 | 0.4 | 6 |
| Information | <10 | N/A | 13 | 0.0 | 40 | 0.0 | 36 |
| Management of companies | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 |
| Manufacturing | 519 | 25.3 | 20,313 | 34.1 | 120,672 | 42.9 | 39 |
| Mining | <10 | N/A | 9 | 0.0 | 23 | 0.0 | 39 |
| Other services (excluding public administration) | 49 | 2.4 | 1,376 | 2.3 | 3,293 | 1.2 | 28 |
| Professional and technical services | 18 | 0.9 | 307 | 0.5 | 580 | 0.2 | 17 |
| Real estate and rental and leasing | 37 | 1.8 | 558 | 0.9 | 3,594 | 1.3 | 15 |
| Retail trade | 36 | 1.8 | 705 | 1.2 | 1,507 | 0.5 | 20 |
| Transportation and warehousing | 40 | 2.0 | 1,365 | 2.3 | 3,445 | 1.2 | 34 |
| Utilities | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 |
| Wholesale trade | 63 | 3.1 | 2,931 | 4.9 | 7,463 | 2.7 | 46 |
| Total[c] | 2,048 | 100.0 | 59,555 | 100.0 | 281,500 | 100.0 | 29 |

*Source*: EMSI
[a] Due to rounding division may not reconcile
[b] LIPW = Labor Income per Worker
[c] Totals may not sum due to rounding

## Contributions from Sheep Grazing on the Payette National Forest

The assessment of current Payette National Forest grazing levels reveals that 3.95 jobs (Riggins), 24.86 jobs (Weiser), and 8.40 jobs (Wilder) (direct, indirect, and induced jobs[5]) are provided to these communities (Table SO-7a). These contributions make up less than 1 percent of total

---

[5] The direct employment resulting from Forest head months first benefit grazing operators and their families, therefore directly affecting the local economy. Additional indirect and induced contributions (i.e., ripple effects) are generated by the direct activities. Combined, the direct, indirect, and induced contributions comprise the total economic contribution to the impact area.

BLM_0049069

employment in these communities. However, 2.7 jobs (Riggins), 12.9 jobs (Weiser), and 5.8 jobs (Wilder) in the livestock industry are directly provided to these communities (Table SO-7a). These jobs account for 2.7 percent (Riggins), 3.0 percent (Weiser), and 0.8 percent (Wilder) of the production agriculture-related industries in these communities. Within the larger grazing impact area, current Payette National Forest grazing levels account for 21.5 jobs.

**Table SO-7a. Current employment and labor income contributions from sheep grazing**

| City | Employment | Labor Income ($) |
|------|------------|------------------|
|  | Direct, Indirect, and Induced |  |
| Riggins | 3.95 | 40,519 |
| Weiser | 24.86 | 442,589 |
| Wilder | 8.40 | 188,527 |
| **Community model total** | **37.22** | **672,635** |
| Regional model | 45.71 | 1,252,729 |
| Difference | 8.5 | 580,094 |

## Recreation Related to Potentially Affected Bighorn Sheep

Since the economic effects from potential changes in the bighorn sheep population extend beyond the immediate Payette National Forest area, recreation-related information is presented for the Payette National Forest and area National Forests that overlap potentially affected bighorn sheep populations.

From October 2002 through September 2003, the Payette National Forest and area National Forests participated in the National Visitor Use Monitoring (NVUM) survey process, which was implemented to better understand recreational use occurring on NFS lands. NVUM data indicate that 1,855,219 total visits occurred on the Nez Perce (731,535), Payette (619,094), and Wallowa-Whitman (504,590) National Forests during the survey period from October 2002 through September 2003.

While most recreation visits to area forests are only peripherally connected to bighorn sheep populations, a portion of the hunting and viewing wildlife visits are directly attributed to bighorn sheep. Therefore, activity participation in only the hunting and viewing wildlife categories are shown in Table SO-7b. Hunting was the second most popular main activity (respondents who indicated this activity was their main activity) on the Nez Perce National Forest (14.2 percent) and Payette National Forest (13.2 percent) and the most popular main activity on the Wallowa-Whitman National Forest (19.3 percent) (Table SO-7b). Viewing wildlife was the sixth most popular main activity on the Wallowa-Whitman National Forest (5.3 percent) and the fourteenth most popular on the Payette National Forest (1.9 percent) (Table SO-7b).

BLM_0049070

**Table SO-7b. Activity participation on the Payette, Nez Perce, and Wallowa-Whitman National Forests (USDA Forest Service 2008)**

| Activity | Total Activity Participation[a] (% of visits) | Total Activity Participation[a] (number) | Main Activity[b] (% of NF visits) | Main Activity[b] (number) |
|---|---|---|---|---|
| **Nez Perce National Forest** | | | | |
| Hunting | 20.5 | 41 | 14.2 | 28 |
| Viewing wildlife | 0 | 0 | 0 | 0 |
| **Payette National Forest** | | | | |
| Hunting | 15.1 | 126 | 13.2 | 112 |
| Viewing wildlife | 33.4 | 240 | 1.9 | 14 |
| **Wallowa-Whitman National Forest** | | | | |
| Hunting | 24.6 | 47 | 19.3 | 39 |
| Viewing wildlife | 52.4 | 348 | 5.3 | 14 |

[a] The number in this column is based on the number of survey respondents who indicated participation in this activity.
[b] The number in this column is based on the number of survey respondents who indicated this activity was their main activity.

In addition to visitation data, the NVUM effort included a separate economics survey administered to approximately one-fourth of the individuals sampled to gather spending information and develop spending profiles for forest visitors. Analyses of the expenditures reported by National Forest visitors indicate the primary factor determining the amount spent by a visitor was the type of trip taken not the specific activity or National Forest visited (Stynes and White 2005). Therefore, recreation visits were distinguished for local visitors (individuals residing within 30 miles of the National Forest boundary) and nonlocal visitors (individuals residing more than 30 miles from the National Forest boundary). Results for the Payette National Forest indicated that approximately 48 percent of recreation visitors were local and 40 percent were nonlocal. The remaining 12 percent were classified as nonprimary visitors: those who indicated that recreating on the Payette National Forest was not their primary purpose (Stynes and White 2006).

Local and nonlocal visitors were further divided by those staying overnight and those on day trips. The four trip type segments are listed below:

    (1) Nonlocal residents on day trips
    (2) Nonlocal residents staying overnight
    (3) Local residents on day trips
    (4) Local residents staying overnight

BLM_0049071

NVUM economic data sample sizes were too small at the individual Forest level to reliably portray visitor spending profiles on individual Forests. To account for spending differences, spending profiles were estimated by grouping Forests with above or below average spending, which were identified by comparing spending averages for each Forest with the national average[6]. Of all the National Forests sampled, the following spending averages emerged:

- 48 National Forests had visitor spending averages that were not significantly different from the national average
- 44 National Forests had below-average spending
- 28 National Forests had above-average spending

The Nez Perce and Payette National Forests were identified as average-spending forests, while the Wallowa-Whitman National Forest was above average (Stynes and White 2006). These expenditures-per-visit are shown in Table SO-7c for segment shares of hunting and viewing wildlife activities[7].

Between all activities on the Nez Perce and the Payette National Forests, nonlocal hunters staying overnight spend the fourth highest per visit ($116.32), while nonlocal hunters staying overnight on the Wallowa-Whitman National Forest spend the third most of all activity types ($151.05) (Table SO-7c) (USDA Forest Service 2008). While expenditures per visit give some comparison between activity types, the economic impacts of these activities depend on the economic characteristics of the recreation impact area discussed above in the methods section.

**Table SO-7c. Expenditures per visit by activity and trip type (USDA Forest Service 2008)**

| | Expenditures ($ per visit) | | | | |
|---|---|---|---|---|---|
| | Nonlocal Day Use | Nonlocal Overnight | Local Day Use | Local Overnight | Nonprimary |
| **Nez Perce National Forest and Payette National Forest** | | | | | |
| Hunting | 38.10 | 116.32 | 30.00 | 79.47 | 25.50 |
| Viewing wildlife | 20.80 | 82.59 | 10.80 | 53.75 | 10.00 |
| | | | | | |
| **Wallowa-Whitman National Forest** | | | | | |
| Hunting | 48.10 | 151.05 | 33.53 | 96.32 | 28.50 |
| Viewing wildlife | 26.40 | 99.26 | 12.00 | 65.00 | 11.11 |

**<u>Response Coefficients for Hunting and Viewing Wildlife</u>**

The estimated employment and labor income response coefficients (employment and labor income per 1,000 visits) by activity types for the three National Forests is shown in Table SO-7d.

---

[6] Day and overnight visitor spending averages (excluding nonprimary visitors) were estimated based on the sample of visitors on each forest. To control for differences between day and overnight visitor trips across forests, a standardized average was computed for each forest, assuming a fixed mix of 60 percent for day trips and 40 percent for overnight trips. The standardized average for each forest was compared to the national standardized average.

[7] Expenditures per visit were obtained by dividing average expenditures per party trip by average party size. Party sizes by primary activity are reported in Appendix A of Stynes and White (2006).

BLM_0049072

The response coefficients indicate the number of full and part-time jobs and dollars of labor income generated per 1,000 visits by activity type (the total employment and labor income contribution from hunting and viewing wildlife are divided by visits in these activities and multiplied by 1,000). The response coefficients are useful for understanding the economic effects tied to a given use level and for understanding the differences in employment and labor income effects by activity type (per 1,000 visits). These response coefficients are unique to the recreation impact area.

The following generalizations are shown in Table SO-7d:

- Local hunting and viewing wildlife generates lower employment and labor income effects per 1,000 visits that nonlocal visits because local visitors spend less per visit.
- Economic effects vary across hunting and viewing wildlife activity types. The lowest employment and labor income contribution is tied to local day users hunting and the largest contribution is associated with nonlocal wildlife viewers who stay overnight.

It is important to note that while response coefficients may be greater for certain activity types, the economic effects to the recreation impact area also depend on the number of visitors participating in the activity types. In addition, these response coefficients reflect an economic structure that is a snapshot in time and, therefore, are not applicable to visitation numbers that are dramatically different from current recreation levels. If recreational activities and/or visits were to change radically, there would be a structural shift in the economy as spending patterns changed and these response coefficients would no longer reflect underlying economic processes.

**Table SO-7d. Employment and labor income response coefficients by activity type**

| | | Employment | | Labor Income (2008 Dollars) | |
| | | (Jobs per 1,000 Visits) | | ($ per 1,000 Visits) | |
| | | Direct Effects | Indirect and Induced Effects | Direct Effects | Indirect and Induced Effects |
|---|---|---|---|---|---|
| Hunting | Local Day | 0.247 | 0.087 | 6,005 | 2,641 |
| | Local OVN[a] | 0.698 | 0.253 | 16,547 | 7,764 |
| | *Nonlocal Day* | 0.314 | 0.111 | 7,637 | 3,359 |
| | *Nonlocal OVN* | 1.196 | 0.394 | 26,087 | 11,761 |
| | Nonprimary | 0.210 | 0.074 | 5,104 | 2,245 |
| Viewing wildlife | Local Day | 0.423 | 0.140 | 9,909 | 3,992 |
| | Local OVN | 2.762 | 0.828 | 53,810 | 24,543 |
| | *Nonlocal Day* | 0.981 | 0.289 | 19,874 | 8,255 |
| | *Nonlocal OVN* | 4.362 | 1.351 | 89,594 | 39,532 |
| | Nonprimary | 0.392 | 0.130 | 9,175 | 3,697 |

[a] OVN = overnight

## Contributions from Hunting and Viewing Wildlife

The response coefficients shown in Table SO-7d and recreation visits from NVUM were used to estimate the economic contributions from hunting and viewing wildlife for the three area National Forests. Hunting visitation on the three area National Forests was responsible for

BLM_0049073

approximately 161.1 of the total average annual jobs (direct, indirect, and induced; and full-time, temporary, and part-time) and $4 million total labor income (direct, indirect, and induced) in the recreation impact area. The total direct, indirect, and induced contributions from viewing wildlife accounted for 103.7 jobs and $2.4 million in labor income within the recreation impact area. Contributions from hunting and viewing wildlife account for less than 1 percent of total employment and labor income in the recreation impact area. All jobs and the income attributable to recreation on the three National Forests contribute less than 1 percent of total employment and labor income in the recreation impact area. These estimates indicate that while hunting and viewing wildlife contribute to the attractiveness, lifestyles, and customs of many local residents and visitors, actual economic contributions to the overall recreation impact area are quite small. However, these job and income contributions can be more important at the local level. For example, the FEIS shows that Forest Service recreation could account for 6 to 7 percent of all jobs and 4 to 5 percent of income for 2000, 2005, and 2010 in all communities analyzed (USDA Forest Service 2003b, p. 3-956). Additionally, only a portion of these contributions can be attributable to bighorn sheep hunting and wildlife viewing.

## Economic Values and Trends for Viewing Wildlife

Viewing, photographing, or observing nature is the fastest growing type of nature-based recreational activity for Americans. New technologies such as digital cameras and cell phones with cameras may be fueling this increased interest. In the United States, the number of people viewing or photographing wildlife other than birds increased 21 percent from 2000 to 2007 (Cordell 2008). The USFWS (2006) indicates that, a total of 187,000 hunters spent $259,718,000 in Idaho with an average trip-per-day expenditure of $123 in 2006. Wildlife watching, however, had 754,000 participants who spent $265,383,000 in Idaho with an average trip-per-day expenditure of $51 (Table SO-7e). In Idaho and Oregon, the average trip-per-day expenditure for hunters is more than wildlife watchers. However, in all states, the total trip-associated expenditures are greater for wildlife watchers. Hunters may spend more per day, but wildlife watchers spend more overall (U.S. Department of Interior and Department of Commerce 2006).

**Table SO-7e. State-level expenditures and visitation for wildlife watching and hunting**

|  | Idaho | Oregon | Washington |
|---|---|---|---|
| **Wildlife-watching** | | | |
| Total wildlife watching expenditures | $265,383,000 | $776,414,000 | $1,502,311,000 |
| Wildlife watching participants | 754,000 | 1,484,000 | 2,331,000 |
| Percent of wildlife associated recreation participation | 75% | 81% | 85% |
| Total days wildlife watching | 5,165,000 | 8,162,000 | 9,104,000 |
| Average trip per day expenditure | $51 | $95 | $165 |
| **Hunting** | | | |
| Total hunting expenditures | $259,718,000 | $373,613,000 | $313,134,000 |
| Total hunting participants | 187,000 | 237,000 | 182,000 |
| Percent of wildlife associated recreation participation | 19% | 13% | 7% |
| Total days hunting | 2,117,000 | 2,759,000 | 2,126,000 |
| Average trip per day expenditure | $123 | $135 | $147 |

*Source*: U.S. Department of Interior and Department of Commerce 2006

BLM_0049074

While expenditures specific to viewing bighorn sheep or the value of the viewing experience are not available, trends in boating activities provide insight on changes in the importance of these values in the recreation impact area. Commercial outfitters for jet and private boating depict bighorn sheep in their marketing material, and tourists consider bighorn sheep viewing as an important part of their experience. Boater activity participation occurs for several reasons, but examining the role of boating in the area provides insight on its importance to the recreation impact area economy.

The HCNRA is managed by the Wallowa-Whitman National Forest and provides bighorn sheep and other wildlife viewing opportunities. These activities are an important part of the boating experience and provide local economic revenue. Boating visits from 1995 to 2008 are shown in Figure SO-6. While visit numbers are down for most boating types, the length of stay per visit has increased. This increase indicates that visitor use days may be stable or decreasing (HCNRA staff, pers. comm.).

BLM_0049075

**Figure SO-6. Number of boater visits in Hells Canyon National Recreation Area (HCRNA 2008)**



For many Salmon River users the value of experience depends on bighorn sheep and other wildlife viewing opportunities as well. The Salmon River has a controlled boating season from June 20 to September 7. During this time, boaters enjoy private and commercially operated trips on rafts and jet boats. Jet boating is a big draw, and area businesses laud the importance of seeing bighorn sheep (Nez Perce National Forest staff, pers. comm.) Commercial and private float boating use on the Salmon River has increased steadily, with a brief decrease in 2007 due to a large fire in the area (Figure SO-7). User day data for commercial jet boat trips permitted by the Nez Perce and Salmon-Challis National Forests from 2003 to 2006 indicate use has remained stable over this period (Nez Perce and Salmon-Challis National Forests 2009).

BLM_0049076

**Figure SO-7. Number of float boater visits and user days on the Salmon River during the controlled boating season (Salmon-Challis National Forest 2008)**



## Economic Values and Trends in Bighorn Sheep Hunting

The information presented on hunting provides a useful frame of reference for the general role of hunting in the area. However, only a portion of the activity participation presented in Table SO-7b can be attributed to bighorn sheep opportunities. Distinguishing bighorn sheep hunts makes sense because these hunts are unique and considered once-in-a-lifetime opportunities due to the remote likelihood of drawing a tag. Bighorn sheep hunts often cost more than general hunting and involve a different set of expenditures that provide a different economic contribution to the area. Therefore, the unique nature of a bighorn sheep hunt and its role in the recreation impact area should be distinguished.

The value of a bighorn sheep hunt is significant. Auction costs of bighorn sheep permits provide insight into the unique value of these hunts. The cost of an auctioned Hells Canyon bighorn sheep tag between 1989 and 2009 ranged from $40,000 (1997) to $193,000 (2005), with an average cost of $74,000[8] (State of Idaho 2009b). The cost of an auctioned bighorn sheep permit by the ODFW ranged from $36,500 (1997) to $139,500 (2005), with an average cost of $91,000 (State of Oregon 2009). Tags are limited and demand exceeds supply due to the limited populations of bighorn sheep. In 2008, 374 hunters applied for 2 tags in Hells Canyon Hunt Area 11 in Idaho (USDA Forest Service 2008, p. 3-99). In the state of Washington's Mount Hull, Wenaha, and Asotin hunts, 3,587 residents applied for 4 resident tags and 749 nonresidents applied for another 4 nonresident tags. In Oregon, 32,045 applicants applied for 85 resident tags and 620 nonresidents applied for another 5 nonresident tags. In Idaho, 1,037 residents applied for 54 tags and 631 nonresidents applied for 7 tags.

---

[8] All values adjusted for inflation to 2009 dollars.

BLM_0049077

The annual number of bighorn sheep tags issued in the three area states corresponds to disease outbreaks that occurred in the late 1980s and early 1990s. In Idaho, the largest statewide decrease in tags issued (72 percent) occurred between 1991 (262 tags issued) and 2003 (73 tags issued) (Figure SO-8). In Oregon, a 46 percent decrease occurred in tags issued between 1995 (109 tags issued) and 2002 (59 tags issued). Though data for Washington in the late 1980s and early 1990s are not available, information for game units that overlap the bighorn sheep population range (Figure SO-9) indicates that the number of issued tags peaked in 1992.

**Figure SO-8. Bighorn sheep tags issued in Oregon, Idaho, and Washington**



BLM_0049078

**Figure SO-9. Payette National Forest Recreation Impact Area**



According to IDFG, WDFW, and ODFW, 78 Rocky Mountain bighorn sheep permits were issued in 2006 for units that overlap the bighorn sheep population range (Figure SO-9). While the number of permits issued depends on herd size and state policy, 2006 use levels are representative of hunting levels within the affected population and are used to estimate current contributions. In total, 64 hunts occurred in Idaho, 12 in Oregon, and 2 in Washington. Based on the number of hunters who applied for these permits, the number of annual hunts could increase if bighorn sheep populations increase.

Information from the ODFW suggests that in 2006 hunters spent an average of $1,530 per trip on lodging, restaurants, and other incidentals and miscellaneous gear. This amount is more than 10 times the general hunting expenditures reported in Table SO-7c. Many bighorn sheep hunters hire local outfitters who charge from $6,100 to $8,600 per hunter (DSEIS IDT and Cooperators 2008) with occasional trips costing almost $25,000. Assuming 50 percent of hunts are guided (IDFG, ODFW, and WDFW, pers.comm.), the average trip expenditure for all bighorn sheep hunts in 2009 dollars is $7,776. Based on this information, response coefficients were generated for the recreation impact area for bighorn sheep hunting and management (Table SO-7f). Compared to response coefficients for general hunting, bighorn sheep hunting response coefficients are far greater than those for general hunting per 1,000 visits in any visitor segment. The largest visitor segment response coefficients for general hunting are nonlocal overnight hunters who generate 1.2 direct jobs and 0.4 indirect/induced jobs. These hunters also generate $26,087 in direct labor income and $11,761 in indirect/induced labor income in the recreation impact area (Table SO-7d). While response coefficients are greater per 1,000 visits, only 78 bighorn sheep hunts occurred in hunting units that overlap the bighorn sheep population range shown in Figure SO-9. Therefore, employment and labor income associated with current

BLM_0049079

levels of bighorn sheep hunting are small compared to general hunting contributions in the recreation impact area (Table SO-7g).

**Table SO-7f. Employment and labor income response coefficients for bighorn sheep hunting**

| | Employment (Full- and Part-time Jobs) | | Labor Income (2009 Dollars) | |
|---|---|---|---|---|
| | Direct Effects | Indirect and Induced Effects | Direct Effects | Indirect and Induced Effects |
| | (Jobs per 1,000 Visits) | | (Labor Income per 1,000 Visits) | |
| Bighorn sheep hunts | 47.4 | 88.5 | 655,548 | 1,949,307 |

**Table SO-7g. Employment and labor income effects for bighorn sheep hunting, general hunting, and viewing wildlife**

| | Employment (Full- and Part-time Jobs) | | Labor Income (2009 Dollars) | |
|---|---|---|---|---|
| | Direct Effects | Indirect and Induced Effects | Direct Effects | Indirect and Induced Effects |
| Bighorn sheep hunts | 3.7 | 6.9 | 51,133 | 152,046 |
| General hunting | 119.8 | 41.4 | 2,756,753 | 1,249,561 |
| Viewing wildlife | 79.1 | 24.5 | 1,639,919 | 715,721 |

While total contributions from bighorn sheep hunting (10.6 jobs and $203,179 in labor income) are small relative to total employment and income in the recreation impact area (89,942 jobs and $3 billion in labor income), these contributions may be more important for communities within the recreation impact area that depend more on hunting-related activities. In addition, increased populations of bighorn sheep under the alternatives could accommodate more hunting opportunities and generate greater contributions to the recreation impact area economy.

**Economic Efficiency and Nonmarket Economic Value**

The value of resource goods traded in a market can be obtained from information on the quantity sold and market price. However, markets do not exist for some resources, such as recreational opportunities, environmental services, or the value some place on wildlife such as bighorn sheep. Recognizing bighorn sheep related non-market value is important because without estimates, these resources may be implicitly undervalued. Therefore, decisions affecting bighorn sheep populations could be made without considering these values. Because these recreational and environmental values are not traded in markets, they can be characterized as nonmarket values.

Nonmarket values can be broken into two categories: use values and nonuse values. The use value of a nonmarket good is the value to society from the direct use of the asset. Within the recreation impact area, this direct use occurs through activities such as hunting and wildlife watching. The use of nonmarket goods often requires consumption of associated market goods such as lodging, gas, and equipment.

Nonuse values of a nonmarket good reflect the value of an asset beyond any use. These values can be described as existence, option, and bequest values. Existence values represent the amount

BLM_0049080

society is willing to pay to guarantee that an asset simply exists. An existence value of bighorn sheep might be the value someone places on knowing they exist in the HCNRA even though that person may never see them. Other nonuse values are thought to originate in society's willingness to pay to preserve the option for future use; these nonuse values are referred to as option values and bequest values. Option values exist for something that has not yet been discovered, such as the future value of a plant as medicine, while bequest values apply to the value of satisfaction from preserving a natural environment, or in this case bighorn sheep, for future generations.

While use and nonuse values exist for the recreation impact area, evaluating those values is not always feasible during the planning process. However, this limitation does not preclude their consideration. Direction in 40 CFR §1502.23 and the Forest Service Handbook 1909.15 and 22.35 provides for the use of qualitative analysis to evaluate nonmarket effects. Therefore, nonmarket values are discussed qualitatively where appropriate and also described in other resource sections of this document and associated specialist reports.

The following comment received on the DSEIS, and other similar comments, demonstrate that relevant nonmarket values exist and should be considered:

"I know that you are trying to manage these forests in the best ways you know how, but please know that there are many of us who love wild sheep. If my children and grandchildren are to ever have the opportunity to experience these wonderful animals, managers like you will need to take these protective actions now."

In addition, the bighorn sheep values held by area tribes can be characterized as nonmarket values. Bighorn sheep have been highly valued by members of area tribes for traditional and cultural purposes. For example information received from the Nez Perce Tribe, Nez Perce and other tribal hunters craft distinctive bows made from sections of the bighorn sheep's curled horns. Accounts of the Medicine Tree also demonstrate value held by the Nez Perce Tribe associated with bighorn sheep. The Medicine Tree was a large pine tree in the Bitterroot Valley in which the large horn of a bighorn sheep was embedded. The tree has served as a source of spiritual power to the Nez Perce Tribe and other tribal people for generations (Josephy 1997).

## Environmental Justice

EO 12898 requires Federal agencies to, "identify and address the disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." EO 12898 also directs agencies to consider patterns of subsistence hunting and fishing when an agency action may affect fish or wildlife. EO 12898 further stipulates that agencies conduct their programs and activities in a manner that does not have the effect of excluding persons from participation in opportunities, denying persons the benefits of opportunities, or subjecting persons to discrimination because of their race, color, or national origin.

According to the Council on Environmental Quality's (CEQ's) environmental justice guidelines for NEPA (1997),

> minority populations should be identified where either: (a) the minority population of the affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of

BLM_0049081

geographic analysis…..a minority population also exists if there is more than one minority group present and the minority percentage, as calculated by aggregating all minority persons, meets one of the above stated thresholds.

Therefore, the ethnic and racial composition of counties in the analysis area is of interest. Between 2000 and 2008, estimates show that the shares of all nonwhite races increased in all counties in the analysis area, while the population share identified as White Alone decreased. In 2008 the population shares described as Black or African American Alone were greater in Ada, Canyon, Elmore, and Washington Counties than the state of Idaho (Table SO-7h). Population shares described as Asian Alone were greater than the state of Idaho in Ada, Elmore, and Washington Counties. Those identified as Native Hawaiian and Other Pacific Islander Alone were greater in Ada, Canyon, Elmore, and Washington Counties than the state of Idaho. American Indian and Alaska Native population shares were greater in Adams, Idaho, Lewis, Nez Perce, and Washington Counties than the state of Idaho. Those identifying with Two or More Races were greater in Ada, Boise, Canyon, Elmore, Nez Perce, and Washington Counties than in Idaho. In addition, Canyon, Elmore, and Payette Counties' share of those of Hispanic Origin was greater than the state of Idaho, while Garfield and Asotin Counties' share was greater than the state of Washington share (U.S. Census Bureau 2008). While the difference in shares between the counties and states is sometimes small and may not be considered "meaningful" as defined by the CEQ, larger concentrations of these groups probably exist at smaller scales within each county. Therefore, populations in the analysis area can probably be defined as minority populations according to the CEQ's definition. Given the probable presence of these populations, potential impacts to their patterns of resource and other subsistence uses are relevant. In addition, tribal interest in subsistence uses is of interest to the Nez Perce, Shoshone Bannock, and Shoshone Piute Tribes and Confederated Tribes of the Umatilla Indian Reservation.

BLM_0049082

**Table SO-7h. Population by race and ethnicity in 2008**

| | White Alone (%) | Black or African American Alone (%) | American Indian and Alaska Native Alone (%) | Asian Alone (%) | Native Hawaiian and Other Pacific Islander Alone (%) | Two or More Races (%) | Hispanic Origin (%) |
|---|---|---|---|---|---|---|---|
| **Idaho** | **94.6** | **0.9** | **1.5** | **1.1** | **0.1** | **1.7** | **10.2** |
| Ada County | 93.4 | 1.5 | 0.9 | 2.1 | 0.2 | 2.0 | 6.8 |
| Adams County | 96.9 | 0.1 | 1.6 | 0.2 | 0.0 | 1.2 | 9.8 |
| Boise County | 96.5 | 0.2 | 0.9 | 0.4 | 0.1 | 1.9 | 4.4 |
| Canyon County | 94.4 | 1.4 | 1.1 | 1.0 | 0.2 | 1.8 | 21.5 |
| Elmore County | 89.6 | 4.2 | 1.3 | 2.1 | 0.2 | 2.6 | 13.6 |
| Gem County | 96.9 | 0.2 | 1.0 | 0.5 | 0.1 | 1.3 | 8.2 |
| Idaho County | 93.9 | 0.2 | 3.8 | 0.4 | 0.0 | 1.6 | 4.0 |
| Lemhi County | 97.4 | 0.1 | 0.8 | 0.2 | 0.0 | 1.5 | 3.3 |
| Lewis County | 92.2 | 0.4 | 5.3 | 0.5 | 0.1 | 1.6 | 2.8 |
| Nez Perce County | 90.9 | 0.6 | 5.6 | 1.0 | 0.1 | 1.9 | 3.9 |
| Payette County | 96.1 | 0.3 | 1.0 | 1.0 | 0.0 | 1.6 | 15.0 |
| Valley County | 97.1 | 0.5 | 0.8 | 0.3 | 0.1 | 1.3 | 7.6 |
| Washington County | 84.3 | 3.7 | 1.7 | 6.7 | 0.5 | 3.1 | 9.8 |
| **Oregon** | **90.1** | **2.0** | **1.4** | **3.6** | **0.3** | **2.5** | **11.0** |
| Baker County | 96.3 | 0.3 | 1.3 | 0.5 | 0.0 | 1.6 | 3.0 |
| Union County | 94.0 | 0.7 | 1.0 | 1.4 | 1.1 | 1.9 | 3.1 |
| Wallowa County | 97.3 | 0.1 | 0.9 | 0.3 | 0.0 | 1.5 | 2.6 |
| **Washington** | **93.4** | **4.1** | **1.9** | **7.4** | **0.5** | **3.4** | **3.2** |
| Asotin County | 95.6 | 0.4 | 1.5 | 0.7 | 0.0 | 1.8 | 4.2 |
| Columbia County | 95.4 | 0.3 | 1.3 | 0.8 | 0.1 | 2.2 | 2.8 |
| Garfield County | 97.3 | 0.0 | 0.6 | 0.4 | 0.0 | 1.6 | 17.7 |

*Source*: US Census Bureau 2008
*Note*: Race and ethnicity shares do not add to 100 percent because Hispanics can be of any race.

In addition to race, concentrations of people living below the poverty level are of interest when considering the environmental justice implications of the Final SEIS. CEQ guidance on identifying low-income populations states that, "agencies may consider as a community either a group of individuals living in geographic proximity to one another, or a set of individuals (such as migrant workers or Native Americans), where either type of group experiences common conditions of environmental exposure or effect." With the exception of Ada, Elmore, and Valley Counties, the population share living below the poverty level was greater in all counties than their respective states (Table SO-7i) and was greater for the entire analysis area than shares in these states. The census data indicate that low-income populations, as defined by the CEQ, probably exist within the analysis area. In addition, the exception of multiple counties across the

BLM_0049083

analysis area have shares of their minority population whom are living below the poverty level which are greater than their states (U.S. Census Bureau 2000).

**Table SO-7i. Population living below poverty by race and ethnicity**

| | Share Below Poverty | White | Black or African American | American Indian & Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Some Other Race | Two or More Races | Hispanic or Latino |
|---|---|---|---|---|---|---|---|---|---|
| **Idaho** | **11.9** | **10.9** | **18.6** | **25.2** | **10.5** | **20.4** | **24.3** | **17.6** | **24.2** |
| Ada County | 7.7 | 7.0 | 19.3 | 18.8 | 6.8 | 9.9 | 5.3 | 7.7 | 7.0 |
| Adams County | 15.1 | 14.8 | 0 | 26.3 | 0 | 100.0 | 0 | 14.9 | 3.3 |
| Boise County | 12.9 | 12.9 | 0.0 | 11.1 | 0.0 | N/A | 9.7 | 12.9 | 12.9 |
| Canyon County | 12.0 | 10.1 | 12.7 | 19.1 | 7.4 | 23.0 | 15.9 | 12.0 | 10.1 |
| Elmore County | 11.2 | 10.1 | 14.5 | 27.5 | 18.2 | 0.0 | 15.3 | 11.2 | 10.1 |
| Gem County | 13.1 | 12.4 | N/A | 21.5 | 11.9 | 88.9 | 23.1 | 13.1 | 12.4 |
| Idaho County | 16.3 | 15.8 | N/A | 27.6 | 0 | N/A | 13.7 | 23.0 | 32.1 |
| Lemhi County | 15.3 | 14.8 | 0 | 0 | 0 | N/A | 41.5 | 35.2 | 38.8 |
| Lewis County | 12.0 | 11.4 | 66.7 | 25.0 | 0 | 0.01 | 4.5 | 15.3 | 19.6 |
| Nez Perce County | 12.2 | 11.1 | 25.6 | 25.5 | 32.6 | 78.6 | 12.4 | 19.9 | 20.6 |
| Payette County | 13.2 | 12.1 | 20.0 | 12.3 | 4.4 | 0.0 | 16.5 | 13.2 | 12.1 |
| Valley County | 9.3 | 8.7 | N/A | 66.7 | 8.3 | 0 | 50.8 | 2.6 | 27.1 |
| Washington County | 13.3 | 13.1 | 100.0 | 26.9 | 2.8 | N/A | 16.6 | 10.3 | 21.8 |
| **Washington** | **10.9** | **9.2** | **19.2** | **24.0** | **12.8** | **15.8** | **26.7** | **16.6** | **24.8** |
| Asotin County | 15.4 | 14.9 | 23.8 | 25.5 | 46.2 | 0 | 7.2 | 29.2 | 15.7 |
| Columbia County | 12.6 | 12.6 | 0 | 0 | 12.2 | N/A | 17.9 | 14.5 | 20.4 |
| Garfield County | 14.2 | 13.5 | N/A | 66.7 | 0 | 100.0 | 37.5 | 47.1 | 40.9 |
| **Oregon** | **11.6** | **10.2** | **24.1** | **22.2** | **12.5** | **18.2** | **26.8** | **18.1** | **24.9** |
| Baker County | 14.7 | 14.1 | 7.3 | 40.0 | 17.1 | 100.0 | 33.1 | 23.9 | 29.0 |
| Union County | 13.8 | 13.3 | 24.3 | 20.9 | 16.2 | 35.4 | 17.6 | 24.9 | 24.2 |
| Wallowa County | 14.0 | 13.8 | N/A | 15.4 | 0 | 100.0 | | 23.6 | 33.3 |

*Source*: U.S. Census Bureau 2000

*Note*: N/A indicates the share of the minority population for whom poverty status was determined was zero in that county. A zero indicates that the minority population existed in that county however none of that population lived below the federally defined poverty level.

BLM_0049084

Consistent with 36 CFR §219.20(a), the following paragraphs will supplement the Impact of Forest Service Range Management on Local Economies section, pages 3-948 through 3-958, of the Chapter 3 Socio-Economic Environment section of the 2003 Southwest Idaho Ecogroup Land and Resource Management Plans Final Environmental Impact Statement.

## ENVIRONMENTAL CONSEQUENCES

## Employment and Income

### The Impact of Forest Service Range Management on Local Economies

*Bighorn Sheep Management on the Payette National Forest*

**Methodology for Analysis**

The economic effects analysis considers employment and labor income. Market values, such as the value of sheep grazing and costs of implementation to the government and allottees, are important considerations. However, site-specific information that is not available at this scale of analysis makes assessment impractical. Value changes associated with the alternatives are qualitatively discussed relative to nonmarket values. Nonmarket values—such as the value of recreational experiences and ecological services—are difficult to quantify. Direction provided in 40 CFR §1502.23 and Forest Service Handbook 1909.15 and 22.35 provides for using qualitative analysis to evaluate the effects of these nonmarket values. Not having monetary value assigned to these values does not lessen their importance in the decision-making process. Helpful inferences can still be made from estimated effects on available bighorn sheep tags and acres of suitable bighorn sheep habitat under the alternatives. These two factors allow the determination of how the alternatives potentially degrade, maintain, or enhance nonmarket values associated with affected bighorn sheep. In addition, other nonmarket aspects of each alternative are described in other resource sections of this document and specialist reports.

This analysis offers a consistent measure for comparing alternatives, but it should not be viewed as a complete answer. Considering these impacts alongside additional social, ecological, or other nonmarket values provide a complete comparison of the alternatives.

Economic impacts are used to evaluate potential direct, indirect, and induced effects on the economy. The analytical technique used by the Forest Service to estimate employment and income impacts is an "input-output" analysis. Input-output analysis (Miernyk 1965) is a way to examine economic relationships between businesses and between businesses and final consumers. For example, the direct employment and labor income resulting from head months first benefit grazing operators and their families, therefore directly affecting the local economy. Additional indirect and induced multiplier effects (i.e., ripple effects) are generated by the direct activities. Combined, the direct and multiplier effects comprise the total economic impact to the local economy. In this manner, input-output analysis captures all monetary market transactions for consumption in a given time period. The resulting mathematical representation estimates the effect of a change in one or several activities on an area's economy.

## Methods Specific to Estimating Sheep Grazing Effects

Sheep grazing–related economic impacts were examined using a regional economic model constructed by EMSI (described above as the grazing impact area). Impacts of the alternatives on

BLM_0049085

the regional grazing impact area are compared to economic impacts of the community economic models. A comparison of the community and regional models' totals in terms of employment and wage/salary impacts is shown in Table SO-17a.

**Table SO-17a. Comparison of employment and labor income effects in community and regional models**

| Total Jobs By Alternative[a] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| City | 1B, 2, 5, 7 | 3, 4, 6 | 7E | 7G | 7L | 7M | 7N | 7O | 7P |
| Riggins | 3.95 | 3.79 | 0.00 | 0.59 | 1.54 | 0.83 | 0.66 | 0.01 | 0.67 |
| Weiser | 24.86 | 22.72 | 0.00 | 11.92 | 18.94 | 16.25 | 12.63 | 11.20 | 16.94 |
| Wilder | 8.40 | 8.40 | 0.00 | 3.73 | 6.80 | 3.94 | 4.12 | 3.45 | 4.12 |
| Community model total | 37.22 | 34.9 | 0.00 | 16.24 | 27.3 | 21.0 | 17.4 | 14.7 | 21.7 |
| Regional model | 45.71 | 43.1 | 0.00 | 19.55 | 33.2 | 25.0 | 21.0 | 17.5 | 25.8 |
| Difference | 8.5 | 8.2 | 0.00 | 3.3 | 5.9 | 4.0 | 3.6 | 2.8 | 4.1 |
| Total Labor Income By Alternative[a] | | | | | | | | | |
| City | 1B, 2, 5, 7 ($) | 3, 4, 6 ($) | 7E ($) | 7G ($) | 7L ($) | 7M ($) | 7N ($) | 7O ($) | 7P ($) |
| Riggins | 40,519 | 38,866 | 0 | 6,061 | 15,753 | 8,532 | 6,815 | 76 | 6,839 |
| Weiser | 442,589 | 405,253 | 0 | 212,656 | 337,889 | 289,869 | 225,332 | 199,740 | 302,253 |
| Wilder | 188,527 | 188,473 | 0 | 83,745 | 152,566 | 88,427 | 92,447 | 77,475 | 92,447 |
| Community model total | 671,635 | 632,592 | 0 | 302,462 | 506,208 | 386,828 | 324,594 | 277,291 | 401,538 |
| Regional model | 1,252,729 | 1,181,103 | 0 | 535,726 | 910,650 | 684,851 | 575,912 | 478,836 | 706,409 |
| Difference | 581,094 | 548,511 | 0 | 233,263 | 404,442 | 298,023 | 251,318 | 201,545 | 304,871 |

*Source*: EMSI
[a] *Includes the direct, indirect, and induced impacts (i.e., multiplier effects)*

**<u>Head months</u>**

Head months of estimated permitted domestic sheep grazing under the alternatives were calculated by Payette National Forest staff (Table SO-17b). The calculations were performed using Payette National Forest rangeland inventory of permitted use by allotment and acres suitable for grazing per alternative. Domestic sheep head months range from 64,385 in Alternatives 1B, 2, 5, 7 to 0 in Alternative 7E. These head month estimates were then used to calculate the direct effects (i.e., the actual number of jobs or labor income in the sheep production industry dependent on grazing allotments) and total effects (i.e., direct, indirect, and induced multiplier effects) of domestic sheep grazing per alternative. Finally these grazing impacts were distributed throughout relevant communities (Table SO-17c).

BLM_0049086

**Table SO-17b. Sheep head months by alternative**

| Alternative | Total Head Months |
|---|---|
| 1B, 2, 5, and 7 | 64,385 |
| 3, 4, and 6 | 60,704 |
| 7E | 0 |
| 7G | 27,534 |
| 7L | 46,804 |
| 7M | 35,199 |
| 7N | 29,600 |
| 7O | 24,610 |
| 7P | 36,307 |

**Table SO-17c. Number of sheep head months**

| City | Alternatives | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1B, 2, 5, 7 | 3, 4, 6 | 7E | 7G | 7L | 7M | 7N | 7O | 7P |
| Riggins | 8,236.0 | 7,900.0 | 0 | 1,232.0 | 3,201.8 | 1,734.1 | 1,385.2 | 15.4 | 1,390.0 |
| Weiser | 38,650.0 | 35,311.1 | 0 | 18,529.0 | 29,440.4 | 25,256.3 | 19,633.2 | 17,403.4 | 26,335.4 |
| Wilder | 17,499.0 | 17,492.6 | 0 | 7,773.0 | 14,161.5 | 8,208.0 | 8,581.1 | 7,191.4 | 8,581.1 |
| **Total** | 64,385.0 | 60,703.7 | 0 | 27,534.0 | 46,803.6 | 35,198.5 | 29,599.5 | 24,610.1 | 36,306.5 |

The Forest Service establishes permitted limits for head months on allotments. This limit is the maximum number of head months that could be offered under ideal forage conditions. While this analysis uses permitted use levels, actual use of head months depends on factors such as drought, financial limitations on operators, and market conditions. The *Area Economic Conditions Related to Sheep Grazing* section notes that actual use is less than permitted use. Due to an inability to project actual use related to these other factors, this analysis examines estimated permitted use rather than actual use. Therefore, employment and earning effects represent the maximum possible effect if all permitted grazing were to occur on allotments. Changes in estimated permitted use relative to the average of actual use levels (between 2007 and 2009) are also presented for each alternative.

**Grazing Fee Impacts**

The grazing fee charged in 2009 for domestic livestock (cattle) grazing was $1.35 per head month. The Forest Service uses a factor of 5 (5 sheep = 1 cow) to assess fees for sheep grazing, which put the fee at $0.27 per sheep head month ($1.35/5 = $0.27) in 2009. Grazing fees used to estimate effects in the community models are shown in Table SO-17d. The regional model grazing fees are the total of the three communities (Table SO-17d).

BLM_0049087

**Table SO-17d. Grazing fees used in the community models and the regional model**

| City | Alternatives | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1B, 2, 5, 7 ($) | 3, 4, 6 ($) | 7E ($) | 7G ($) | 7L ($) | 7M ($) | 7N ($) | 7O ($) | 7P ($) |
| Riggins | 556 | 533 | - | 83 | 216 | 117 | 94 | 1 | 94 |
| Weiser | 2,609 | 2,384 | - | 1,251 | 1,987 | 1,705 | 1,325 | 1,175 | 1,778 |
| Wilder | 1,181 | 1,181 | - | 525 | 956 | 554 | 579 | 486 | 579 |
| Total | 4,346 | 4,098 | - | 1,859 | 3,159 | 2,376 | 1,998 | 1,661 | 2,451 |

## Methods Specific to Estimating Recreation Effects

Bighorn sheep hunting effects were determined using information collected by the ODFW survey previously discussed. The survey collected expenditure information from bighorn sheep hunters in specific spending categories. Additional spending categories specific to guided trip expenditures were created from additional information supplied by IDFG and WDFW (USDA Forest Service 2008, p. 3-100). These spending categories were allocated to the appropriate industry within an input-output model for the recreation impact area described above. The analytical technique used by the Forest Service to estimate employment and income impacts is an input-output analysis using the IMPLAN Pro software system (IMPLAN 2007). The total economic impact for all industries provides a response coefficient generated for every 1,000 bighorn sheep hunts. The response coefficient gives the economic effect specific to the recreation impact area. These response coefficients were combined with the information on potential tag availability to give economic impacts of bighorn sheep hunting in the recreation impact area. Potential tag availability was calculated for a range of values based on projected bighorn sheep populations at the 10 and 100 percent effective contact with domestic sheep. Economic impacts associated with viewing bighorn sheep are discussed qualitatively because information on recreation associated specifically with bighorn sheep viewing is unavailable. Effects on other cultural and social values of bighorn sheep are also discussed qualitatively in the *Role of Nonmarket Values* sections below. The value of bighorn sheep–associated recreational experiences cannot be characterized solely on their market transactions. Therefore, the nonmarket values section is the most appropriate place for their consideration.

### Incomplete and Unavailable Information

Insufficient information exists to project changes that may result in viewing wildlife or other activities associated with bighorn sheep following implementation of the proposed action or alternatives analyzed in this report. Any predictions would be highly speculative and would likely be minimized by regional and national recreational trends. Estimated economic contributions presented for the affected environment are calculated for existing viewing wildlife use levels and include all watchable wildlife opportunities (e.g., bighorn sheep). Analyzing the impacts of the alternatives focuses on changes in opportunities and the potential direction of change from the No Action Alternative (Alternatives 1B, 2, 5 and 7).

While implementation costs for the government and permittees may vary between the alternatives, information is unavailable for a complete cost comparison. Changes in other associated costs—such as enforcement and allotment maintenance—are unavailable, making assessment impractical at this programmatic level of analysis. Future site-specific planning under this document will assess costs associated with management actions.

BLM_0049088

## Effects Common to All Alternatives

### Sheep Grazing

The total employment and labor income effects from changes in head months per alternative for the community and regional models are shown in Table SO-17a. The economic impacts of the regional model outputs were larger in every case. The net difference in jobs ranged from 0 (Alternative 7E) to 8.5 jobs (Alternatives 1B, 2, 5, 7 [current scenario]). The differences in labor income between the two models ranged from $0 (Alternative 7E) to $580,094 (Alternatives 1B, 2, 5, 7 [current scenario]).

The economic impact of grazing fees in both the community and regional models are shown in Table SO-17e Employment effects range from 0 (Alternative 7E) to 0.44 jobs (Alternatives 1B, 2, 5, 7) for the total of the three community economic models and from 0 (Alternative 7E) to 0.40 jobs (Alternatives 1B, 2, 5, 7) for the regional economic model. In terms of labor income, effects range from $0 (Alternative 7E) to $11,704 (Alternatives 1B, 2, 5, 7) for the community economic models and $0 (Alternative 7E) to $15,819 (Alternatives 1B, 2, 5, 7) for the regional economic model.

The labor income impacts were higher while jobs impacts were slightly lower in the regional economic model than the community economic model. The slight employment decline in the regional model occurs because the income per worker is higher in the regional model due to the model's inclusion of Ada County and the city of Boise.

**Table SO-17e. Comparison of grazing fee effects in community and regional models**

| City | | Alternatives | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1B, 2, 5, 7 | 3, 4, 6 | 7E | 7G | 7L | 7M | 7N | 7O | 7P |
| **Community Models** | | | | | | | | | | |
| Riggins | Jobs | 0.02 | 0.01 | 0.001 | 0.01 | 0.01 | 0.01 | 0.01 | 0.001 | 0.01 |
| | Income | $349 | $335 | $0 | $52 | $136 | $74 | $59 | $1 | $59 |
| Weiser | Jobs | 0.07 | 0.07 | 0.001 | 0.04 | 0.05 | 0.05 | 0.04 | 0.03 | 0.05 |
| | Income | $1,832 | $1,673 | $0 | $878 | $1,395 | $1,197 | $930 | $825 | $1,248 |
| Wilder | Jobs | 0.03 | 0.03 | 0.001 | 0.01 | 0.02 | 0.01 | 0.01 | 0.01 | 0.01 |
| | Income | $745 | $745 | $0 | $331 | $603 | $350 | $366 | $306 | $366 |
| **Total** | Jobs | 0.11 | 0.10 | 0.001 | 0.05 | 0.08 | 0.06 | 0.05 | 0.04 | 0.06 |
| | Income | $2,926 | $2,753 | $0 | $1,261 | $2,134 | $1,620 | $1,355 | $1,132 | $1,672 |
| **Regional Models** | | | | | | | | | | |
| Region | Jobs | 0.10 | 0.09 | 0.00 | 0.04 | 0.07 | 0.06 | 0.05 | 0.04 | 0.06 |
| | Income | $3,955 | $3,729 | $0.00 | $1,691 | $2,875 | $2,162 | $1,818 | $1,512 | $2,230 |

*Source*: EMSI

### Environmental Justice

While alternatives are expected to result in small changes in employment and labor income relative to current conditions, these changes would be spread throughout the population and

BLM_0049089

would not disproportionately affect minority and low-income populations. These contributions will likely remain a small share of total employment and labor income within the planning area, but may be more important for smaller communities within the planning area.

Access to bighorn sheep habitat would be accommodated under all alternatives. This access would continue to provide uses valuable to communities within the planning area, thereby sustaining lifestyles, traditions, and ceremonies.

Actions under the alternatives have potential effects on the area bighorn sheep population and could affect environmental justice populations within the analysis area. Harvest ability depends on the bighorn sheep population available for hunting. Since the effect on harvest ability would be spread between all segments of the general population, tribal, other minority, or low-income communities would not be disproportionately affected. Therefore, disparate effects to environmental justice populations within the analysis area are not anticipated. Effects to harvest ability are discussed further as they relate to tribal interests in the Tribal Rights and Interests section.

Additionally, public involvement efforts for this project have been inclusive, and the agency has considered input from persons or groups regardless of race, color, national origin, income, or other social and economic characteristics.

## Alternatives 1B, 2, 5, 7

Alternatives 1B, 2, 5, 7 designate all acres on the Payette National Forest as suitable for domestic sheep grazing. All trailing routes remained open in these alternatives.

### Sheep Grazing

Under the Alternatives 1B, 2, 5, 7, 21.5 jobs are directly employed in the sheep production industry (Table SO-17f), while 37.2 total jobs (direct, indirect, and induced jobs) are supported in all three communities on an average annual basis (Table SO-17a). In the regional model, an additional 8.5 jobs are supported for a total of 45.7 jobs (direct, indirect, and induced jobs) supported on an average annual basis (Table SO-17a). Correspondingly, total income is $581,094 (direct, indirect, and induced) more than the community model total income.

Since grazing management would not change under this alternative, the maximum allowed head months would remain at 64,385 (Table SO-17c), and this alternative would support recent levels of actual billed use (average 50,994 head months between 2007 and 2009) with favorable market conditions and willing permittees.

**Table SO-17f. Direct Jobs from Sheep Grazing by Alternative**

| City | Alts 1B, 2, 5, 7 | Alts 3, 4, 6 | Alt 7E | Alt 7G | Alt 7L | Alt 7M | Alt 7N | Alt 7O | Alt 7P |
|------|------------------|--------------|--------|--------|--------|--------|--------|--------|--------|
| Riggins | 2.7 | 2.6 | 0.0 | 0.4 | 1.1 | 0.6 | 0.5 | 0.0 | 0.5 |
| Weiser | 12.9 | 11.8 | 0.0 | 6.2 | 9.8 | 8.4 | 6.5 | 5.8 | 8.8 |
| Wilder | 5.8 | 5.8 | 0.0 | 2.6 | 4.7 | 2.7 | 2.9 | 2.4 | 2.9 |
| **Total** [a] | 21.5 | 20.2 | 0.0 | 9.2 | 15.6 | 11.7 | 9.9 | 8.2 | 12.1 |

*Source*: EMSI
[a] Totals may not sum due to rounding

BLM_0049090

Ranching has played an historic role in the community and many would like to see this tradition continue. Since permitted use would be greater than recent levels of actual billed use, quality of life associated with grazing on the Payette National Forest could continue under this alternative. In addition, associated quality of life could be higher under this alternative than the others since the preference limit is higher than the other alternatives and could thus accommodate increases in use with favorable market conditions and willing permittees.

## Bighorn Sheep–associated Recreation

The range of potentially available bighorn sheep tags is displayed in Table SO-17g. Since grazing use on the Payette National Forest would not change under this alternative, disease would continue to spread at rates greater than the other alternatives because of greater of contact rates (Table W-11). Consequently, available bighorn sheep tags would be lower than the other alternatives (Table SO-17g) and viewing wildlife opportunities would also be lower than the other alternatives. Therefore, decreased contributions to local economies are anticipated relative to the current situation, resulting in 6.5 to 8.1 jobs (direct, indirect, and induced jobs) (down from 10.6 [Table SO-7g]) and $124,976 to $155,146 in labor income (direct, indirect, and induced) depending on the percent effective contact (down from $203,179 [Table SO-7g]) (Table SO-17h).

**Table SO-17g. Potential bighorn sheep tag availability at 10 percent and 100 percent effective contact**

| Alternative | 100 Percent Effective Contact | 10 Percent Effective Contact |
|---|---|---|
| 1B, 2, 5, 7 | 48 | 60 |
| 3, 4, 6 | 50 | 61 |
| 7E[a] | 305 | 305 |
| 7G | 56 | 69 |
| 7L | 55 | 69 |
| 7M | 57 | 71 |
| 7N | 61 | 74 |
| 7O | 64 | 75 |
| 7P | 59 | 72 |

[a] Under Alternative 7E tag availability is 305 under both 100 and 10 percent effective contact since no domestic sheep grazing would occur on the Payette National Forest.

BLM_0049091

**Table SO-17h. Employment and labor income effects for bighorn sheep hunting by alternative for the recreation impact area model (IMPLAN 2007)**

| Alternative | 100 Percent Effective Contact | | 10 Percent Effective Contact | |
| --- | --- | --- | --- | --- |
| | Employment (Full- and Part-time Jobs) | Labor Income (2009 dollars) | Employment (Full- and Part-time Jobs) | Labor Income (2009 dollars) |
| 1B, 2, 5, 7 | 6.5 | $124,976 | 8.1 | $155,146 |
| 3, 4, 6 | 6.8 | $130,732 | 8.3 | $158,662 |
| 7E | 41.5 | $795,159 | 41.5 | $795,159 |
| 7G | 7.6 | $145,307 | 9.3 | $178,644 |
| 7L | 7.5 | $143,516 | 9.3 | $178,656 |
| 7M | 7.8 | $148,893 | 9.7 | $185,071 |
| 7N | 8.3 | $159,619 | 10.1 | $192,928 |
| 7O | 8.7 | $167,502 | 10.2 | $195,612 |
| 7P | 8.0 | $152,962 | 9.8 | $188,464 |

Similarly, decreased employment and labor income changes from other bighorn sheep-associated recreation (e.g., wildlife viewing) are anticipated since the population would likely decrease over time with continued disease spread.

**Role of Nonmarket Values**

The economic analysis assesses the economic effects of the direct use of resources in terms of jobs and income. This type of analysis does not include other types of economic value often referred to as nonmarket values. Nonmarket values are difficult to quantify, and insufficient data exist to assess the effects of management actions on these values. However, the fact that no monetary value is assigned to these values does not lessen their importance in the decision-making process. Helpful inferences can still be made from estimated effects on available bighorn sheep tags (Table SO-17g) and acres of protected bighorn sheep habitat (Table W-10) under the alternatives.

If the number of acres designated as suitable for domestic sheep grazing does not change and all trailing routes remain open, the bighorn sheep population would likely decrease along with their associated nonmarket values. Therefore, visitors and areas residents would not experience the past level of value associated with higher population levels of bighorn sheep in the absence of disease. In addition, nonmarket values associated with this alternative would be lower than the other alternatives given its higher incidence of bighorn sheep contact with domestic sheep (Table W-11), lower tag availability (Table SO-17g), and fewer acres of protected summer source habitat (Table W-10).

## Alternatives 3, 4 6

Alternatives 3, 4, and 6 would designate zero acres of suitable rangeland portions of the Smith Mountain Allotment overlapping current bighorn sheep habitat are available for domestic sheep grazing. All trailing routes would remain open.

BLM_0049092

**Sheep Grazing**

Under Alternatives 3, 4, and 6, 20.2 jobs are directly supported in the sheep production industry (Table SO-17f), while 34.9 total jobs (direct, indirect, and induced jobs) are supported in all three communities on an average annual basis. In the regional model, an additional 8.2 jobs (direct, indirect, and induced jobs) are supported for a total of 43.1 jobs supported on an average annual basis. Correspondingly, total income is $548,511 (direct, indirect, and induced) more than the community model total income of $632,592 (Table SO-17a).

This alternative would support less employment and income relative to the current situation described under Alternatives 1B, 2, 5, 7. A decrease in total employment of 2.3 local jobs or 2.6 regional jobs could occur. In addition, total labor income could decrease by $39,043 locally or $71,626 regionally (Table SO-17a). For these decreases to occur, permitted use would have to equal actual use. As previously discussed, actual use of Forest Service grazing depends on factors such as drought, financial limitations on operators, and market conditions. These changes reflect a maximum potential effect that does not consider these other factors. This alternative would support 2007 levels of actual billed use (31,611 head months) with favorable market conditions and willing permittees. Consequently, this alternative could accommodate increased grazing use relative to recent levels of actual billed use (average 50,994 head months between 2007 and 2009) because the maximum permitted use levels of 60,704 head months (Table SO-17c) is 19 percent greater than average actual billed use.

Ranching has played an historic role in the community and many would like to see this tradition continue. Since permitted use would be greater than recent levels of actual billed use, quality of life associated with grazing on the Payette National Forest could continue under this alternative. In addition, associated quality of life could be higher under this alternative than the others since the preference limit is higher than the other alternatives and could thus accommodate increases in use with favorable market conditions and willing permittees.

**Bighorn Sheep–associated Recreation**

Changes in domestic sheep grazing on the Smith Mountain Allotment and within MA #1 provide less risk of contact (Table W-11) and potentially higher availability of bighorn sheep tags than would be experienced under Alternatives 1B, 2, 5, 7. Consequently, more bighorn sheep permits would be issued than under Alternatives 1B, 2, 5, 7 (Table SO-17g), and some increase in other bighorn sheep–associated recreation would be anticipated relative to these alternatives. As a result, 6.8 to 8.3 jobs (direct, indirect, and induced full- and part-time jobs) and $130,732 to $158,662 in labor income (direct, indirect, and induced income in 2009 dollars) would be provided, depending on the percent of effective contact (Table SO-17h). Similarly, employment and labor income increases, relative to these alternatives, would be anticipated as other bighorn sheep–associated recreational opportunities were enhanced. For example, employment would increase by less than one job (direct, indirect, and induced) for every 1,000 wildlife viewing trips made by local day users and could increase by almost six jobs for every 1,000 visits made by nonlocal visitors staying overnight (Table SO-17d). Similarly, labor income would increase by $13,901 (direct, indirect, and induced) (local day users) and $129,126 (nonlocal overnight visitors) for every 1,000 wildlife viewing visits. Regardless of the increases in area economic activity, the incidence of contact and subsequent bighorn sheep population losses would support less bighorn sheep–associated recreation than Alternatives 7G and 7L through 7P.

BLM_0049093

**Role of Nonmarket values**

Acres of protected bighorn sheep summer source habitat (Table W-10) under these alternatives would support slightly greater bighorn sheep–associated nonmarket values than Alternatives 1B, 2, 5, 7. However, visitors and area residents would not experience the level of nonmarket values associated with higher populations of bighorn sheep experienced in the absence of disease. In addition, nonmarket values associated with this alternative would be lower than Alternatives 7G and 7L through 7P with their lower incidence of contact between bighorn sheep and domestic sheep (Table W-11), higher availability of tags (Table SO-17g), and greater acres of protected summer source habitat (Table W-10).

## Alternatives 7E

Alternative 7E would designate zero acres within the Payette National Forest as suitable for domestic sheep grazing and would leave no trailing routes open to use within the entire Payette National Forest.

**Sheep Grazing**

Employment and income would not be supported by sheep grazing on the Payette National Forest under Alternative 7E due to the absence of grazing on the Payette National Forest (Table SO-17c). Relative to the current situation under Alternatives 1B, 2, 5, 7, this alternative would represent a decrease of 37.2 jobs in total employment locally or a 45.7 job decrease regionally. In addition, total labor income would decrease by $671,635 locally or $1,252,729 regionally (Table SO-17a). Measured against past observed grazing use, this alternative would not support recent levels of actual billed use (average 50,994 head months between 2007 and 2009).

Since no grazing would be permitted under this alternative, quality of life associated with sheep grazing on the Payette National Forest would decrease. In some cases, individual producers likely depend on Payette National Forest allotments for a larger portion of their forage than other producers. While decreases in available grazing would appear to impact a portion of all operations, the quality of life of individual operators could be impacted to a greater degree.

Since allotments on the Payette National Forest are a valuable source of production for area operators, private land may not be able to compensate for this lost NFS rangeland, and quality feed and bucking conditions may be reduced, potentially affecting overall sheep production for operators (Rangeland Resources section titled "Acres Deducted due to Bighorn Sheep Habitat"). However the National Forest has taken actions to mitigate possible loss and provide substitute summer forage and compensation for operators. In addition, other sources of forage exist on State, other Federal or private land and provide a low-cost and important complement to some producers' operations.

**Bighorn Sheep–associated Recreation**

Eliminating domestic sheep grazing on the Payette National Forest eliminates the risk of contact and provides the highest estimated bighorn sheep population of all the alternatives. Consequently, current numbers of hunting permits and levels of other bighorn sheep–associated recreation could potentially increase. As a result, current employment and labor income contributions associated with hunting and bighorn sheep would increase. Table SO-17h indicates that with the absence of contact with domestic sheep, employment and income associated with

BLM_0049094

hunting could reach as many as 41.5 jobs and as much as $795,159 in labor income. Similarly, additional employment and labor income increases would be anticipated as other bighorn sheep–associated recreational opportunities were enhanced. For example, employment would increase by less than one job (direct, indirect, and induced) for every 1,000 wildlife viewing trips made by local day users and could increase by almost six jobs for every 1,000 visits made by nonlocal visitors staying overnight (Table SO-17d). Similarly, labor income would increase by $13,901 (direct, indirect, and induced) (local day users) and $129,126 (nonlocal overnight visitors) for every 1,000 wildlife viewing visits. The employment and labor income supported by bighorn sheep–associated recreation under this alternative would be greater than all of the other alternatives.

### Role of Nonmarket values

This alternative would provide levels of bighorn sheep–associated nonmarket values closest to past perceived levels. Nonmarket values associated with this alternative would be the highest of all the alternatives with its lower incidence of bighorn sheep contact with domestic sheep (Table W-11), higher availability of hunting permits (Table SO-17g), and greater acres of protected summer source habitat (Table W-10).

## Alternative 7G

Alternative 7G would designate zero acres within the Hells Canyon and Salmon River geographic population ranges (GPR) as suitable for domestic sheep grazing. This alternative would leave no trailing routes open within the GPRs.

### Sheep Grazing

Under Alternative 7G, 9.2 jobs would be directly supported in the sheep production industry (Table SO-17f) and 16.2 total jobs (direct, indirect, and induced jobs) would be supported in all three communities on an average annual basis. In the regional model, an additional 3.3 (direct, indirect, and induced) jobs would be supported for 19.5 total jobs supported on an average annual basis (Table SO-17a). Correspondingly, total labor income is $233,263 (direct, indirect, and induced) more than the community model total of $302,462 (Table SO-17a).

This alternative would support less employment and income relative to the current situation under Alternatives 1B, 2, 5, 7. A decrease in total employment of 21.0 local jobs or 26.2 regional jobs could occur. In addition, total labor income would decrease by $369,173 locally and $717,003 regionally (Table SO-17a). For these decreases to occur, permitted use would have to equal actual use. As previously discussed, actual use of Forest Service grazing depends on factors such as drought, financial limitations on operators, and market conditions. Therefore, these changes reflect a maximum potential effect that does not consider these other factors. This alternative allows a maximum of 27,534 sheep head months (Table SO-17c). Measured against past observed grazing use, this alternative would not support recent levels of actual billed use (average 50,994 head months between 2007 and 2009). Permitted grazing under this alternative could support 54 percent of average past use with favorable market conditions and willing permittees.

Ranching has played an historic role in the community and many would like to see this tradition continue. Since less grazing would be permitted under this alternative than recent levels of actual use, quality of life associated with sheep grazing on the Payette National Forest could decrease.

BLM_0049095

In some cases, individual producers likely depend on Payette National Forest allotments for a larger portion of their forage than other producers. Thus, while decreases in available grazing would appear to impact a portion of all operations, the quality of life of individual operators could be impacted to a greater degree.

Since allotments on the Payette National Forest are a valuable source of production for area operators, private land may not be able to compensate for this lost NFS rangeland, and quality feed and bucking conditions may be reduced, potentially affecting overall sheep production for operators (Rangeland Resources section titled "Acres Deducted due to Bighorn Sheep Habitat"). However, the National Forest has taken actions to mitigate possible loss and provide substitute summer forage and compensation for operators. In addition, other sources of forage exist on State, other Federal or private land and provide a low-cost and important complement to some producers' operations.

**Bighorn Sheep–associated Recreation**

Changes in domestic sheep grazing under Alternative 7G imply a lower risk of contact and higher populations than Alternatives 1B, 2, 5, 7; 3, 4, 6; and 7L, but a greater risk of contact and fewer bighorn sheep than Alternatives 7E, 7M, 7N, 7O, and 7P. Consequently, fewer sheep hunting permits would be issued under this alternative than would under Alternatives 7E, 7M, 7N, 7O, and 7P (Table SO-17g). As a result, 7.6 to 9.3 jobs (direct, indirect, and induced full- and part-time jobs) and $145,307 to $178,644 in labor income (direct, indirect, and induced income in 2009 dollars) would be provided, depending on the percent of effective contact (Table SO-17h). Similarly, employment and labor income increases would be anticipated as other bighorn sheep–associated recreational opportunities would be enhanced compared to Alternatives 1B, 2, 5, 7; 3, 4, 6; and 7L. For example, employment would increase by less than one job (direct, indirect, and induced) for every 1,000 wildlife viewing trips made by local day users and could increase by almost six jobs for every 1,000 visits made by nonlocal visitors staying overnight (Table SO-7d). Similarly, labor income would increase by $13,901 (direct, indirect, and induced) (local day users) and $129,126 (nonlocal overnight visitors) for every 1,000 wildlife viewing visits. Regardless of the increases in area economic activity, increased risk of contact and subsequent lower bighorn sheep populations would support less bighorn sheep-associated recreation than Alternatives 7E, 7M, 7N, 7O, and 7P.

**Role of Nonmarket values**

Acres of protected summer source habitat (Table W-10) under Alternative 7G would support slightly greater bighorn sheep-associated nonmarket values than Alternatives 1B, 2, 5, 7; 3, 4, 6; and 7L. However, visitors and area residents would not experience the past level of values associated with higher populations of bighorn sheep in the absence of disease. In addition, nonmarket values available with this alternative would be lower than Alternatives 7E, 7M, 7N, 7O, and 7P, which have a lower risk of contact between bighorn sheep and domestic sheep (Table W-11), higher availability of hunting permits (Table SO-17g), and greater acres of protected summer source habitat (Table W-10).

# Alternative 7L

Alternative 7L was designed to remove only the very highest risk areas from domestic sheep grazing and keep as much suitable rangeland open.

BLM_0049096

**Sheep Grazing**

Under Alternative 7L, 15.6 jobs would be directly supported by the sheep production industry (Table SO-17f) and 27.3 total jobs (direct, indirect, and induced jobs) would be supported in all three communities on an average annual basis. In the regional model, an additional 5.9 jobs (direct, indirect, and induced jobs) would be supported for a total of 33.2 jobs on an average annual basis (Table SO-17a). Correspondingly, total labor income would be $404,442 (direct, indirect, and induced) more than the community model total of $506,208.

This alternative would support less employment and income relative to the current situation under Alternatives 1B, 2, 5, 7. A decrease in total employment of 9.9 local jobs or 12.5 regional jobs could occur. In addition, total labor income would decrease by $165,427 locally or $342,079 regionally (Table SO-17a). For these decreases to occur, permitted use would have to equal actual use. As previously discussed, actual use of Forest Service grazing depends on factors such as drought, financial limitations on operators, and market conditions. Therefore, these changes reflect a maximum potential effect that does not consider these other factors. Alternative 7L would support 2007 levels of actual billed use (31,611 head months) with favorable market conditions and willing permittees. This alternative allows a maximum of 46,803 sheep head months (Table SO-17c). Measured against past observed grazing use, this alternative would not support recent levels of actual billed use (average 50,994 head months between 2007 and 2009). Permitted grazing under this alternative could support 92 percent of average past use with favorable market conditions and willing permittees (Table SO-17c).

Ranching has played an historic role in the community and many would like to see this tradition continue. Since less grazing would be permitted under this alternative than recent levels of actual use, quality of life associated with sheep grazing on the Payette National Forest could decrease. In some cases, individual producers likely depend on Payette National Forest allotments for a larger portion of their forage than other producers. Thus, while decreases in available grazing would appear to impact a portion of all operations, the quality of life of individual operators could be impacted to a greater degree.

Since allotments on the Payette National Forest are a valuable source of production for area operators, private land may not be able to compensate for this lost NFS rangeland, and quality feed and bucking conditions may be reduced, potentially affecting overall sheep production for operators (Rangeland Resources section titled "Acres Deducted due to Bighorn Sheep Habitat"). However the National Forest has taken actions to mitigate possible loss and provide substitute summer forage and compensation for operators. In addition, other sources of forage exist on State, other Federal or private land and provide a low-cost and important complement to some producers' operations.

**Bighorn Sheep–associated Recreation**

Changes in domestic sheep grazing under Alternative 7L imply similar risk of contact and population levels as 7G, which suggest less risk and higher population levels than Alternatives 1B, 2, 5, 7 and 3, 4, 6. However, this alternative provides greater risk of contact and fewer bighorn sheep than Alternatives 7E, 7M, 7N, 7O, and 7P. Consequently, fewer hunting permits would be issued than under Alternatives 7E, 7M, 7N, 7O, and 7P (Table SO-17g). As a result, 7.5 to 9.3 jobs (direct, indirect, and induced full- and part-time jobs) and $143,516 to $178,656 in labor income (direct, indirect, and induced income in 2009 dollars) would be provided depending on the percent of effective contact (Table SO-17h). Similarly, employment

and labor income increases would be anticipated as other bighorn sheep–associated recreational opportunities were enhanced relative to Alternatives 1B, 2, 5, 7 and 3, 4, 6. For example, employment would increase by less than one job (direct, indirect, and induced) for every 1,000 wildlife viewing trips made by local day users and could increase by almost six jobs for every 1,000 visits made by nonlocal visitors staying overnight (Table SO-7d). Similarly, labor income would increase by $13,901 (direct, indirect, and induced) (local day users) and $129,126 (nonlocal overnight visitors) for every 1,000 wildlife viewing visits. Regardless of the increases in area economic activity, the risk of contact and subsequent bighorn sheep population levels would support less bighorn sheep–associated recreation than Alternatives 7E, 7M, 7N, 7O, and 7P.

**Role of Nonmarket values**

Acres of protected summer source habitat (Table W-10) under Alternative 7L would support similar bighorn sheep–associated nonmarket values as Alternative 7G and values greater than Alternatives 1B, 2, 5, 7 and 3, 4, 6. However, visitors and area residents would not experience the past level of values associated with higher populations of bighorn sheep in the absence of disease. In addition, nonmarket values associated with this alternative would be lower than Alternatives 7E, 7M, 7N, 7O, and 7P, which have a lower risk of contact between bighorn sheep and domestic sheep (Table W-11), higher availability of hunting permits (Table SO-17g), and greater acres of protected summer source habitat (Table W-10).

## Alternative 7M

Alternative 7M was designed to remove more risk from the landscape and keep grazing outside of the CHHR areas.

**Sheep Grazing**

Under Alternative 7M, 11.7 jobs would be directly supported by the sheep production industry (Table SO-17f) and 21.0 total jobs (direct, indirect, and induced jobs) would be supported in all three communities on an average annual basis. In the regional model, an additional 4 (direct, indirect, and induced jobs) jobs would be supported for a total of 25.0 jobs on an average annual basis. Correspondingly, total labor income (direct, indirect, and induced) would be $298,023 more than the community model total of $386,828 (Table SO-17a).

This alternative would support less employment and income relative to the current situation described under Alternatives 1B, 2, 5, 7. A decrease in total employment of 16.2 local jobs or 20.7 regional jobs could occur (Table SO-17a). In addition, total labor income would decrease by $284,807 locally or $567,878 regionally. For these decreases to occur, permitted use would have to equal actual use. As previously discussed, actual use of Forest Service grazing depends on factors such as drought, financial limitations on operators, and market conditions. Therefore, these changes reflect a maximum potential effect that does not consider these other factors. This alternative would support 2007 levels of actual billed use (31,611 head months) with favorable market conditions and willing permittees. This alternative allows a maximum 35,198 sheep head months (Table SO-17c). Measured against past observed grazing use, this alternative would not support recent levels of actual billed use (average 50,994 head months between 2007 and 2009). Permitted grazing under this alternative could support 69 percent of average past use with favorable market conditions and willing permittees (Table SO-17c).

BLM_0049098

Ranching has played an historic role in the community and many would like to see this tradition continue. Since less grazing would be permitted under this alternative than recent levels of actual use, quality of life associated with sheep grazing on the Payette National Forest could decrease. In some cases, individual producers likely depend on Payette National Forest allotments for a larger portion of their forage than other producers. Thus, while decreases in available grazing would appear to impact a portion of all operations, the quality of life of individual operators could be impacted to a greater degree.

Since allotments on the Payette National Forest are a valuable source of production for area operators, private land may not be able to compensate for this lost NFS rangeland, and quality feed and bucking conditions may be reduced, potentially affecting overall sheep production for operators (Rangeland Resources section titled "Acres Deducted due to Bighorn Sheep Habitat"). However, the National Forest has taken actions to mitigate possible loss and provide substitute summer forage and compensation for operators. In addition, other sources of forage exist on State, other Federal or private land and provide a low-cost and important complement to some producers' operations.

## Bighorn Sheep–associated Recreation

Changes in domestic sheep grazing under Alternative 7M imply less risk of contact and higher bighorn sheep populations than Alternatives 1B, 2, 5, 7; 3, 4, 6; 7G; and 7L but a greater risk of contact and fewer bighorn sheep than Alternatives 7E, 7N, 7O, and 7P. Consequently, fewer hunting permits would be issued for Alternative 7M than Alternatives 7E, 7N, 7O, and 7P (Table SO-17g). As a result, 7.8 to 9.7 jobs (direct, indirect, and induced full- and part-time jobs) and \$148,893 to \$185,071 in labor income (direct, indirect, and induced income in 2009 dollars) would be provided, depending on the percent of effective contact (Table SO-17h). Similarly, employment and labor income increases would be anticipated as other bighorn sheep–associated recreational opportunities were enhanced relative to Alternatives 1B, 2, 5, 7; 3, 4, 6; and 7L. For example, employment would increase by less than one job (direct, indirect, and induced) for every 1,000 wildlife viewing trips made by local day users and could increase by almost six jobs for every 1,000 visits made by nonlocal visitors staying overnight (Table SO-7d). Similarly, labor income (direct, indirect, and induced) would increase by \$13,901 (local day users) and \$129,126 (nonlocal overnight visitors) for every 1,000 wildlife viewing visits. Regardless of the increases in area economic activity, the risk of contact and subsequent bighorn sheep populations would support less bighorn sheep-associated recreation than Alternatives 7E, 7G, 7N, 7O, and 7P.

## Role of Nonmarket values

Acres of protected summer source habitat (Table W-10) under Alternative 7M would support greater bighorn sheep–associated nonmarket values than Alternatives 1B, 2, 5, 7; 3, 4, 6; and 7L. However, visitors and area residents would not experience the past level of nonmarket values associated with higher populations of bighorn sheep in the absence of disease. In addition, nonmarket values associated with this alternative would be lower than Alternatives 7E, 7N, 7O, and 7P, which have a lower risk of bighorn sheep contact with domestic sheep (Table W-11) and higher availability of hunting permits (Table SO-17g). Non market values would also be lower under this alternative than alternatives 7E and 7O, which protect more acres of summer source habitat (Table W-10).

BLM_0049099

## Alternative 7N

Alternative 7N was designed to remove most of the high risk area and replace grazing areas of lower risk.

### Sheep Grazing

Under Alternative 7N, 9.9 jobs would be directly supported by the sheep production industry (Table SO-17f) and 17.4 total jobs (direct, indirect, and induced jobs) would be supported in all three communities on an average annual basis. In the regional model, an additional 3.6 jobs (direct, indirect, and induced jobs) would be supported for a total of 21.0 jobs on an average annual basis. Correspondingly, total labor income (direct, indirect, and induced) would be $251,318 more than the community model total of $324,594 (Table SO-17a).

This alternative would support less employment and income relative to the current situation described under Alternatives 1B, 2, 5, 7. A decrease in total employment of 19.8 local jobs or 24.7 regional jobs could occur. In addition, total labor income would decrease by $347,041 locally or $676,817 regionally (Table SO-17a). For these decreases to occur, permitted use would have to equal actual use. As previously discussed, actual use of Forest Service grazing depends on factors such as drought, financial limitations on operators, and market conditions. Therefore, these changes reflect a maximum potential effect that does not consider these other factors. This alternative allows a maximum of 29,599 sheep head months (Table SO-17c).Measured against past observed grazing use, this alternative would not support recent levels of actual billed use (average 50,994 head months between 2007 and 2009). Permitted grazing under this alternative could support 58 percent of average past use with favorable market conditions and willing permittees.

Ranching has played an historic role in the community and many would like to see this tradition continue. Since less grazing would be permitted under this alternative than recent levels of actual use, quality of life associated with sheep grazing on the Payette National Forest could decrease. In some cases, individual producers likely depend on Payette National Forest allotments for a larger portion of their forage than other producers. Thus, while decreases in available grazing would appear to impact a portion of all operations, the quality of life of individual operators could be impacted to a greater degree.

Since allotments on the Payette National Forest are a valuable source of production for area operators, private land may not be able to compensate for this lost NFS rangeland, and quality feed and bucking conditions may be reduced, potentially affecting overall sheep production for operators (Rangeland Resources section titled "Acres Deducted due to Bighorn Sheep Habitat"). However the National Forest has taken actions to mitigate possible loss and provide substitute summer forage and compensation for operators. In addition, other sources of forage exist on State, other Federal or private land and provide a low-cost and important complement to some producers' operations.

### Bighorn Sheep–associated Recreation

Changes in domestic sheep grazing under Alternative 7N imply less risk of foray contact and higher populations than all alternatives except 7E and 7O. Consequently, fewer hunting permits would be issued than Alternatives 7E and 7O (Table SO-17g). As a result, 8.3 to 10.1 jobs (direct, indirect, and induced full- and part-time jobs) and $159,619 to $192,928 in labor income (direct, indirect, and induced income in 2009 dollars) would be provided, depending on the

BLM_0049100

percent of effective contact (Table SO-17h). Similarly, employment and labor income increases would be anticipated as other bighorn sheep-associated recreational opportunities were enhanced compared to all alternatives except 7E and 7O. For example, employment would increase by less than one job (direct, indirect, and induced) for every 1,000 wildlife viewing trips made by local day users and could increase by almost six jobs for every 1,000 visits made by nonlocal visitors staying overnight. Similarly, labor income (direct, indirect, and induced) would increase by $13,901 (local day users) and $129,126 (nonlocal overnight visitors) for every 1,000 wildlife viewing visits (Table SO-7d). Regardless of the increases in area economic activity, the risk of contact and subsequent bighorn sheep populations for this alternative would support less bighorn sheep-associated recreation than Alternatives 7E and 7O.

### Role of Nonmarket values

Acres of protected summer source habitat (Table W-10) under Alternative 7N would support greater bighorn sheep–associated nonmarket values than all alternatives except 7E and 7O. However, visitors and area residents would not experience the past level of nonmarket values associated with higher populations of bighorn sheep in the absence of disease. Nonmarket values associated with this alternative would be lower than Alternatives 7E and 7O, which have a lower risk of contact between bighorn sheep and domestic sheep (Table W-11) and higher availability of hunting permits (Table SO-7g). Nonmarket values would also be lower under this alternative than alternatives 7E, 7M, and 7O, which protect more acres of summer source habitat (Table W-10).

## Alternative 7O

Alternative 7O was designed to remove all areas of major risk and keep allotments as intact as possible while reducing monitoring to minimal levels.

### Sheep Grazing

Under Alternative 7O, 8.2 jobs would be directly supported in the sheep production industry (Table SO-17f) and 14.7 total jobs (direct, indirect, and induced jobs) would be supported in all three communities on an average annual basis. In the regional model, an additional 2.8 jobs (direct, indirect, and induced jobs) would be supported for a total of 17.5 total jobs supported on an average annual basis. Correspondingly, total labor income would be $201,545 (direct, indirect, and induced) more than the community model total of $277,291 (Table SO-17a).

This alternative would support less employment and income relative to the current situation described under Alternatives 1B, 2, 5, 7. A decrease in total employment of 22.5 local jobs or 28.2 regional jobs could occur. In addition, total labor income would decrease by $394,344 locally or $773,893 regionally (Table SO-17a). For these decreases to occur, permitted use would have to equal actual use. As previously discussed, actual use of Forest Service grazing depends on factors such as drought, financial limitations on operators, and market conditions. Therefore, these changes reflect a maximum potential effect that does not consider these other factors. This alternative allows a maximum of 24,610 sheep head months (Table SO-17c). Measured against past observed grazing use, this alternative would not support recent levels of actual billed use (average 50,994 head months between 2007 and 2009). Permitted grazing under this alternative could support 48 percent of average past recent use with favorable market conditions and willing permittees.

BLM_0049101

Ranching has played an historic role in the community and many would like to see this tradition continue. Since less grazing would be permitted under this alternative than recent levels of actual use quality of life associated with sheep grazing on the Payette National Forest could decrease. In some cases, individual producers likely depend on Payette National Forest allotments for a larger portion of their forage than other producers. Thus, decreases in available grazing would appear to impact a portion of all operations however the quality of life of individual operators could be impacted to a greater degree.

Since allotments on the Payette National Forest are a valuable source of production for area operators, private land may not be able to compensate for this lost NFS rangeland, and quality feed and bucking conditions may be reduced, potentially affecting overall sheep production for operators (Rangeland Resources section titled "Acres Deducted due to Bighorn Sheep Habitat"). However the National Forest has taken actions to mitigate possible loss and provide substitute summer forage and compensation for operators. In addition other sources of forage exist on State, other Federal or private land and provide a low cost and important complement to some producers' operations.

**Bighorn Sheep–associated Recreation**

Changes in domestic sheep grazing under Alternative 7O imply less risk and higher population than all alternatives except 7E. Consequently, fewer hunting permits would be issued than this alternative (Table SO-17g). As a result, 8.7 to 10.2 jobs (direct, indirect, and induced full- and part-time jobs) and $167,502 to $195,612 in labor income (direct, indirect, and induced income in 2009 dollars) would be provided depending on the percent effective contact (Table SO-17h). Similarly, employment and labor income increases would be anticipated as other bighorn sheep-associated recreational opportunities were enhanced relative to all alternatives except 7E. For example, employment would increase by less than one job (direct, indirect, and induced) for every 1,000 wildlife viewing trips made by local day users and could increase by almost six jobs for every 1,000 visits made by nonlocal visitors staying overnight. Similarly, labor income would increase by $13,901 (direct, indirect, and induced) (local day users) and $129,126 (nonlocal overnight users) for every 1,000 wildlife viewing visits(Table SO-7d). Regardless of the increases in area economic activity, the incidence of contact and subsequent bighorn sheep population levels would support less bighorn sheep-associated recreation than Alternative 7E.

**Role of Nonmarket values**

Acres of protected summer source habitat (Table W-10) under Alternative 7O would support greater bighorn sheep-associated nonmarket values than all alternatives except 7E. However, visitors and areas residents would not experience the past level of nonmarket values associated with higher populations of bighorn sheep in the absence of disease. In addition, nonmarket values associated with this alternative would be lower than Alternative 7E, which has a lower risk of contact between bighorn sheep and domestic sheep (Table W-11), higher availability of hunting permits (Table SO-17g), and more acres of protected summer source habitat (Table W-10).

## Alternative 7P

Alternative 7P was designed to designate many of the high risk area as unsuitable for domestic sheep grazing but retain lower risk areas, thus maximizing bighorn sheep protection and the amount of suitable range land available.

BLM_0049102

**Sheep Grazing**

Under Alternative 7P, 12.1 jobs would be directly supported by the sheep production industry (Table SO-17f) and 21.7 total jobs (direct, indirect, and induced jobs) would be supported in all three communities on an average annual basis. In the regional model, an additional 4.1 jobs (direct, indirect, and induced jobs) would be supported for a total of 25.8 jobs on an average annual basis (Table SO-17a). Correspondingly, total labor income (direct, indirect, and induced) would be $304,871 more than the community model total of $401,538.

This alternative would support less employment and income relative to the current situation described under Alternatives 1B, 2, 5, 7. A decrease in total employment of 15.5 local jobs or 19.9 regional jobs could occur. In addition, total labor income would decrease by $270,096 locally or $546,320 regionally. For these decreases to occur, permitted use would have to equal actual use. As previously discussed, actual use of Forest Service grazing depends on factors such as drought, financial limitations on operators, and market conditions. Therefore, these changes reflect a maximum potential effect that does not consider these other factors. This alternative would support 2007 levels of actual billed use (31,611 head months) with favorable market conditions and willing permittees. This alternative allows a maximum of 36,306 sheep head months (Table SO-17c) Measured against past observed grazing use, this alternative would not support recent levels of actual billed use (average 50,994 head months between 2007 and 2009). Permitted grazing under this alternative could support 71 percent of average past use with favorable market conditions and willing permittees.

Ranching has played an historic role in the community and many would like to see this tradition continue. Since less grazing would be permitted under this alternative than recent levels of actual use, quality of life associated with sheep grazing on the Payette National Forest could decrease. In some cases, individual producers likely depend on Payette National Forest allotments for a larger portion of their forage than other producers. Thus, while decreases in available grazing would appear to impact a portion of all operations, the quality of life of individual operators could be impacted to a greater degree.

Since allotments on the Payette National Forest are a valuable source of production for area operators, private land may not be able to compensate for this lost NFS rangeland, and quality feed and bucking conditions may be reduced, potentially affecting overall sheep production for operators (Rangeland Resources section titled "Acres Deducted due to Bighorn Sheep Habitat"). However, the National Forest has taken actions to mitigate possible loss and provide substitute summer forage and compensation for operators. In addition, other sources of forage exist on State, other Federal or private land and provide a low-cost and important complement to some producers' operations.

**Bighorn Sheep–associated Recreation**

Changes in domestic sheep grazing under Alternative 7P imply a lower risk of foray contact and higher populations than all alternatives except 7E, 7N, and 7O. Consequently, fewer hunting permits would be issued for Alternative 7P than Alternatives 7E, 7N, and 7O (Table SO-17g). As a result, 8.0 to 9.8 jobs (direct, indirect, and induced full- and part-time jobs) and $152,962 to $188,464 in labor income (direct, indirect, and induced income in 2009 dollars) would be provided, depending on the percent effective contact (Table SO-17h). Similarly, employment and labor income increases would be anticipated as other bighorn sheep-associated recreational opportunities were enhanced compared to all alternatives except 7E, 7N, and 7O. For example,

BLM_0049103

employment would increase by less than one job (direct, indirect, and induced) for every 1,000 wildlife viewing trips made by local day users and could increase by almost six jobs for every 1,000 visits made by nonlocal visitors staying overnight (Table SO-7d). Similarly, labor income (direct, indirect, and induced) would increase by $13,901 (local day users) and $129,126 (nonlocal overnight visitors) for every 1,000 wildlife viewing visits. Regardless of the increases in area economic activity, the risk of contact and subsequent bighorn sheep populations would support less bighorn sheep-associated recreation than Alternatives 7E, 7N, and 7O.

**Role of Nonmarket values**

Acres of protected summer source habitat (Table W-10) under Alternative 7P would support greater bighorn sheep-associated nonmarket values than all alternatives except 7E, 7N, and 7O. However, visitors and area residents would not experience the past level of nonmarket values associated with higher populations of bighorn sheep in the absence of disease. In addition, nonmarket values associated with this alternative would be lower than Alternatives 7E, 7N, and 7O, which have a lower risk of contact between bighorn sheep and domestic sheep (Table W-11), higher availability of hunting permits (Table SO-17g), and more acres of protected summer source habitat (Table W-10).

Consistent with 36 CFR §219.20(a), the following paragraphs will supplement the Cumulative Effects section, pages 3-970 through 3-976, of the Chapter 3 Socio-Economic Environment section of the 2003 Southwest Idaho Ecogroup Land and Resource Management Plans Final Environmental Impact Statement.

## ENVIRONMENTAL CONSEQUENCES

## Cumulative Effects

The economy can be affected by a variety of factors, including population growth, interest rate changes, location of new magnet industries, recession, new sector growth, tax policy, and State economic policy. When compared to these types of variables, managing bighorn sheep on the Payette National Forest has a relatively small regional effect. Since the changes in economic activity previously discussed would be largely unnoticeable regionally, there should be no cumulative economic effects across the region. However, for smaller areas within the grazing and recreation impact areas, the cumulative effects are noteworthy.

Comments and area communities expressed concern that the traditional and historical role sheep grazing has played is declining. This decline is confirmed by decreasing state and county inventories as previously noted above. While the level of grazing differs between the alternatives, the average of recent actual use is 92 percent of authorized use (the level of grazing allowed depending on forage condition). In addition to current excess supply, permitted and authorized use has increased between 2005 and 2010. Since decreasing trends in county inventory have occurred alongside increases in supply of forage provided by the Payette National Forest, area decreases in inventory and concern regarding declining traditional and historical roles of grazing are largely outside the spectrum of Payette National Forest management. Regardless, levels of actual billed use observed between 2007 and 2009 would be supported under Alternatives 1B, 2, 5, 7 and 3, 4, 6.

The FEIS indicates that area urban communities will look to Ecogroup National Forests with an increased need and desire to provide recreational and undeveloped areas (USDA Forest

BLM_0049104

Service 2003b, p. 3-944). Also, Forest Service recreation visitor days are projected to increase over time (USDA Forest Service 2003b, Table SO-18). This growth in recreation use may create additional recreation-related jobs in area communities (USDA Forest Service 2003b, p. 3-955). These additional jobs may buffer recreation-related effects to industries and communities dependent on bighorn sheep-associated recreation should bighorn sheep populations continue to decline.

Sheep grazing management on other lands (e.g., private, Bureau of Land Management) will cause additional bighorn sheep cumulative economic effects. Changes to the bighorn sheep populations from domestic sheep management on these other lands could potentially affect other forms of bighorn sheep-associated recreation, such as wildlife viewing and boating use. While assuming some change in these recreation types is reasonable, the magnitude of these effects is beyond reasonable assumption.

## Summary of Effects

Under all of the action alternatives, employment and income associated with estimated permitted sheep grazing would be less than the employment and income associated with current levels of permitted grazing. While this analysis uses estimates of permitted use for grazing, actual use of these head months depends on factors such as drought, financial limitations on operators, and market conditions. Given an inability to project actual use related to these other factors, this analysis examines permitted use instead of actual use. Therefore, employment and earning effects represent the maximum possible effect if all permitted grazing occurred on allotments. Several of the alternatives would support 2007 levels of actual billed use (Alternatives 1B, 2, 5, 7 and 3, 4, 6), and could accommodate increases in use (relative to 2007 actual billed use) with favorable market conditions and willing permittees.

The employment and labor income impacts associated with bighorn sheep hunting and other associated recreation would likely continue to represent a very small proportion of the recreation impact area economy. However, predicting if wildlife-viewing recreationists would change their activities as a result of the alternatives is difficult since there is little evidence to suggest that one species would cause recreationists to reduce their visitation or choose not to participate in that activity. Continued population growth in the area will lead to more recreation visitation on the Payette National Forest, and it is unlikely that the regional area will experience a significant economic effect from the alternatives. However, the alternatives could cause changes in smaller areas within the recreation impact area. If bighorn sheep populations are maintained, the unique nature of these hunts, demand for bighorn sheep permits, and increasing popularity of nature-based tourism suggest that the role bighorn sheep play in local recreation economies could remain stable or increase.

BLM_0049105

# Chapter 4.
# List of Preparers

> Consistent with 36 CFR §219.20(a), the following pages will supplement Chapter 4, List of Preparers, pages 4-1 through 4-12, of the 2003 Southwest Idaho Ecogroup Land and Resource Management Plans Final Environmental Impact Statement.

## List of Preparers

The following Forest Service Employees and Federal Contractors comprised the Interdisciplinary Team (IDT) which prepared the environmental analysis for this update process:

| | |
|---|---|
| Patricia Anderson Soucek | Payette National Forest |
| Christine Bradbury | Clearwater National Forest |
| Pete Grinde | Payette National Forest |
| Chans O'Brien | Payette National Forest |
| Darcy Pederson | Nez Perce National Forest |
| Tim Schommer | Wallowa-Whitman National Forest |
| Melanie Woolever | Rocky Mountain Regional Office |
| Henry Eichman | USFS TEAMS Enterprise |
| Christine Hescock | Payette National Forest |
| Sue Dixon | Payette National Forest |
| Maura Laverty | Payette National Forest |
| Clint McCarthy | Intermountain Regional Office |
| Dr. Tim Carpenter | UC Davis, Davis, CA |
| Dr. Claire Thunes | UC Davis, Davis, CA |
| Josh Obrien | UC Davis, Davis CA |
| Dr. Steven Peterson | Economic Management Systems, Inc., Moscow, ID |

## Contractor Support

The following individuals assisted the Payette National Forest with meeting facilitation, meeting documentation and/or document preparation:

| | |
|---|---|
| Susan Hayman | North Country Resources, Inc., Boise, ID |
| Erica Jensen | Peak Science Communications, LLC, Boise, ID |
| Jeff Pearson | Peak Science Communications, LLC, Boise, ID |
| Nikole Pearson | Peak Science Communications, LLC, Boise, ID |
| Loren Roberts | Peak Science Communications, LLC, Boise, ID |
| James Parker | McCall, ID |
| Kimberly Brandel | McCall, ID |

BLM_0049106

## Cooperators

The States of Idaho, Washington and Oregon acted as Cooperators in this update process along with the tribal governments of the Nez Perce and Shoshone-Bannock Tribes. Following are the individuals that participated as technical representatives for the update:

| | |
|---|---|
| Steven Goodson | State of Idaho—Governor's Office |
| Cal Groen | Idaho Department of Fish and Game |
| Dale Toweill | Idaho Department of Fish and Game |
| Frances Cassirer | Idaho Department of Fish and Game |
| Glen Weiser | University of Idaho |
| Donny Martorello | Washington Department of Fish and Wildlife |
| Paul Wik | Washington Department of Fish and Game |
| Craig Ely | Oregon Department of Fish and Wildlife |
| Vic Coggins | Oregon Department of Fish and Wildlife |
| Brooklyn Baptist | Nez Perce Tribe |
| Rebecca Miles | Nez Perce Tribe |
| Mike Lopez | Nez Perce Tribe |
| Keith Lawrence | Nez Perce Tribe |
| Curt Mack | Nez Perce Tribe |
| Leander Watson | Shoshone-Bannock Tribes |
| Claudeo Broncho | Shoshone-Bannock Tribes |
| Yvette Tuell | Shoshone-Bannock Tribes |
| Chad Colter | Shoshone-Bannock Tribes |

## Tribal Consultation

Formal tribal consultation has been requested and has occurred with the updated process with the following tribes:

Nez Perce Tribe
Shoshone-Bannock Tribes
Shoshone-Paiute Tribes

BLM_0049107

# Glossary

Consistent with 36 CFR §219.20(a), the following pages will supplement the Glossary, pages GL-1 through GL-44, of the 2003 Southwest Idaho Ecogroup Land and Resource Management Plans Final Environmental Impact Statement.

**Big Game Management Unit**—Units designated by the Idaho Department of Fish and Game for big game management purposes, such as hunting recommendations and setting population and demographic objectives.

**Core Herd Home Range**—The area within which most herd individuals spend most (95 percent) of their time.

**Core Herd Home Range Analysis**—Analysis used to estimate core herd home ranges from telemetry observations of individual bighorn sheep. First, fixed kernel analyses are used to estimate the home ranges of all observed individuals in a herd, and then those estimates are aggregated. The core herd home range is the area within the 95th volume contour of the aggregated home range estimates.

**Disease Model**—A simulation model that uses the estimated rate of contacts between bighorn sheep and domestic sheep allotments to estimate the populations dynamics of bighorn sheep herds in the Salmon River and Hells Canyon metapopulations. The model incorporates estimates of current population sizes as well as demographic and disease impact parameters drawn from the literature on bighorn sheep biology.

**Effective Contact**—Any contact between domestic and bighorn sheep resulting in the transmission of disease from the domestic sheep to the bighorn.

**Fixed Kernel Analysis**—A method of mapping the core herd home range of an individual on the landscape that uses a standard bivariate normal (i.e., Gaussian) kernel density estimator (i.e., utilization distribution). Polygons are calculated from the volumes of the curve under different portions of the utilization distribution. Polygons are also calculated using a fixed-kernel approach which assumes the width of the standard bivariate normal kernel placed at each observation is the same throughout the plane of the utilization distribution.

**Herd**—A group of bighorn sheep that remain together as a loose group with a tighter group of breeding ewes as the core. Most of the Hells Canyon herds are named and identified based on the group of reintroduced animals from which they descend.

**Foray**—A movement of a bighorn sheep outside of the core herd home range. Rams, in particular, make occasional long distance foray movements.

**Foray Analyses**—Analyses of the frequency and pattern of foray movements. For animals of each sex, and during each season ("Summer" = May–October, "Winter"= November–April), telemetry observations are used to determine the probability of a foray movement and the distribution of distances traveled in those forays.

**Metapopulation**—A collection of populations that interact with each other due to occasional movement of animals between populations.

**Population**—Interchangeable with the term "herd". (See above).

BLM_0049108

**Risk of Contact Model**—A model for predicting contact between bighorn sheep and domestic sheep expressed either as the expected number of contacts per year, or as the percent probability of at least one contact per year. The model uses the source habitat, core herd home range, and foray analyses results to generate the output.

**Sensitive Species**—"Those plant and animal species identified by a Regional Forester for which population viability is a concern, as evidenced by significant current or predicted downward trend in population numbers, or habitat capability that reduce a species existing distribution." (2670.5). Objectives for sensitive species include "special management emphases to ensure viability and to preclude trends toward endangerment that would result in the need for Federal listing" (FSM 2672.1).

**Source Environment**—The composite of all environmental conditions occurring in a specified area and time that result in stationary or positive population growth.

**Source Habitat**—Those characteristics of macrovegetation and topography that contribute to positive population growth for a species in a specified area and time. Distinguished from habitats associated with species occurrence: such habitat may or may not contribute to long-term population persistence. Source habitats contribute to source environments.

**Source Habitat Capacity**—All acres with the potential to provide habitat for bighorn sheep, based only on their requirement for escape terrain.

**Source Habitat Model**—GIS modeling, validated with telemetry observations, used to map areas of winter and summer bighorn source habitat. The model uses vegetation cover type and structure, along with topological variables (elevation, slope and aspect) to identify areas qualifying as bighorn source habitat.

**Volume Contour**—A component of a Fixed Kernel Analysis that depicts the level of activity (i.e., 50 percent contour means that half of the herd activity falls within that contour).

**Viability**—Relative to Forest Service regulations (Code of Federal Regulations, Title 36, Section 219.19): Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area.

BLM_0049109

Case No. 1:20-cv-02484-MSK   Document 41-6   filed 04/27/21   USDC Colorado   pg 44 of 224

Consistent with 36 CFR §219.20(a), the following pages will supplement the Literature Cited, pages 1 through 49, of the 2003 Southwest Idaho Ecogroup Land and Resource Management Plans Final Environmental Impact Statement.

# Literature Cited

**Akenson, J. J., and H. A. Akenson**. 1992. Bighorn sheep movements and summer lamb mortality in central Idaho. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 8, 14–27.

**Aune, K., N. Anderson, D. Worley, L. Stackhouse, J. Henderson, and J. Daniel.** 1998. A comparison of population and health histories among seven Montana bighorn sheep populations. In: Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council, vol. 11, 46–69.

**Bailey, V.** 1936. The mammals and life zones of Oregon. North American Fauna No. 55. U.S. Department of Agriculture, Bureau of Biological Survey. Washington, DC.

**Beecham, J. J., Jr., C. P. Collins, and T. D. Reynolds**. 2007. Rocky Mountain bighorn sheep (*Ovis canadensis*): A technical conservation assessment. USDA Forest Service, Rocky Mountain Region. http://www.fs.fed.us/r2/projects/scp/assessments/ rockymountainbighornsheep.pdf (accessed December 13, 2007).

**Bentz, J. A., and P. M. Woodard**. 1988. Vegetation characteristics and bighorn sheep use on burned and unburned areas in Alberta. *Wildlife Society Bulletin* 16(2):186–193.

**Berger, J**. 1990. Persistence of different sized populations: an empirical assessment of rapid extinctions in bighorn sheep. *Conservation Biology* 4:91–98.

**Berry, C. R., Jr**. 1979. Impact of sagebrush management on riparian and stream habitat. In: Proceedings of the sagebrush ecosystem: A symposium, 192–209. Utah State University, College of Natural Resources, Logan, UT.

**Beyer, H. L**. 2004. Hawth's Analysis Tools for ArcGIS. Available at: http://www.spatialecology.com/htools.

**Biberstein, E. L**. 1979. The pasteurelloses. In: CRC Handbook of Zoonoses, vol. 1, Sec. A, 495–514. CRC Press, Boca Raton, FL.

**Blaisdell, J. P., R. B. Murray, and E. D. McArthur**. 1982. Managing intermountain rangelands—sagebrush-grass ranges. USDA, Forest Service, Intermountain Forest and Range Experiment Station, Ogden, UT. General Technical Report INT-134

**Bleich, V. C., J. D. Wehausen, and S. A. Holl**. 1990. Desert-dwelling mountain sheep: Conservation implications of a naturally fragmented distribution. *Conservation Biology* 4: 383–390.

BLM_0049110

**Bleich, V. C., J. D. Wehausen, R. R. Ramey II, and J. L. Rechel**. 1996. Metapopulation theory and mountain sheep: Implications for conservation. In: Metapopulations and wildlife conservation, ed. D. R. McCullough, 353–373. Island Press, Washington DC.

**Bleich, V. C., R. T. Bowyer, and J. D. Wehausen**. 1997. Sexual segregation in mountain sheep: Resources or predation? *Wildlife Monographs* 134:1–50.

**Blood, D. A**. 1961. An ecological study of California bighorn sheep (*Ovis canadensis californiana* Douglas) in southern British Columbia. M.S. thesis, University of British Columbia.

**Bonenfant, C., J. M. Gaillard, T. Coulson, M. Festa-Bianchet, A. Loison, M. Garel, L. E. Loe, P. Blanchard, N. Pettorelli, N. Owen-Smith, J. Du Toit, and P. Duncan.** 2009. Empirical evidence of density-dependence in populations of large herbivores. In: Advances In Ecological Research, vol. 41, ed, H. Caswell, 313–357. Elsevier.

**Boyce, M. S., P. R. Vernier, S. E. Nielsen, and F. K. A. Schmiegelow**. 2002. Evaluating resource selection functions. *Ecological Modeling* 157:281–300.

**Brosnan, C. J**., 1918. History of the State of Idaho. C. Scribner's sons, 1918. 237 pages

**Buechner, H. K**. 1960. The bighorn sheep in the United States, its past, present, and future. *Wildlife Monographs* 4:1–174.

**Bunch, T. D., W. Boyce, C. P. Hibler, W. R. Lance, T. R. Spraker, and E. S. Williams**. 1999. Diseases of North American wild sheep. In: Mountain sheep of North America, eds. R. Valdez and P. R. Krausman, 209–237. University of Arizona Press, Tucson, AZ.

**Callan, R. J., T. D. Bunch, G. W. Workman, and R. E. Mock**. 1991. Development of pneumonia in desert bighorn sheep after exposure to a flock of exotic wild and domestic sheep. *Journal of the American Veterinary Medical Association* 198:1052–1056.

**Cassirer, E. F. and A. R. E. Sinclair.** 2007. Dynamics of pneumonia in a bighorn sheep metapopulation. *Journal of Wildlife Management* 71:1080–1088.

**Cassirer, E. F., K. M. Rudolph, P. Fowler, V. L. Coggins, D. L. Hunter, and M. W. Miller**. 2001. Evaluation of ewe vaccination as a tool for increasing bighorn lamb survival following pasteurellosis epizootics. *Journal of Wildlife Diseases* 37:49–57.

**Cassirer, E. F., L. E. Oldenburg, V. L. Coggins, P. Fowler, K. Rudolph, D. L. Hunter, and W. J. Foreyt**. 1996. Overview and preliminary analysis of a bighorn sheep die-off, Hells Canyon 1995–96. In: Proceedings of the biennial symposium Northern Wild Sheep and Goat Council, vol. 10, 78–86.

**Clary, W. P., N. L. Shaw, J. G. Dudley, V. A. Saab, J. W. Kinney, and L. C. Smithman**. 1996. Response of a depleted sagebrush steppe riparian system to grazing control and woody plantings. USDA Forest Service, Intermountain Research Station, Ogden, UT. Research Paper INT RP-492.

BLM_0049111

**Clifford, D. L., B. A. Schumaker, T. R. Stephenson, V. C. Bleich, M. Leonard-Cahn, B. J. Gonzalez, W. M. Boyce, and J. A. K. Mazet**. 2007. Modeling risks of disease transmission from domestic sheep to bighorn sheep: Implications for the persistence and restoration of an endangered endemic ungulate. Final Report. U.C. Davis Wildlife Health Center, Department of Fish and Game Resource Assessment Program, Davis, CA.

**Clifford, D. L., B. A. Schumaker, T. R. Stephenson, V. C. Bleich, M. L. Cahn, B. J. Gonzales, W. M. Boyce, and J. A. K. Mazet**. 2009. Assessing disease risk at the wildlife-livestock interface: a study of Sierra Nevada bighorn sheep. *Biological Conservation* 142:2559–2568.

**Cordell, Ken**, 2008. The latest on trends in nature-based outdoor recreation. Forest History Today. Spring 2008.

**Coggins, V. L.** 1988. The Lostine Rocky Mountain bighorn sheep die off and domestic sheep. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 6, 57–64.

**Coggins, V. L.** 2002. Rocky Mountain bighorn sheep/domestic sheep and domestic goat interactions: a management perspective. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 13, 165–174.

**Cook, J. G. 1990**. Habitat, nutrition, and population biology of two transplanted bighorn sheep populations in southcentral Wyoming. PhD diss., University of Wyoming.

**Coulson, T., T. H. G. Ezard, F. Pelletier, G. Tavecchia, N. C. Stenseth, D. Z. Childs, J. G. Pilkington, J. M. Pemberton, L. E. B. Kruuk, T. H. Clutton-Brock, and M. J. Crawley.** 2008. Estimating the functional form for the density dependence from life history data. *Ecology* 89:1661–1674.

**Dassanayake, R. P., S. Shanthalingam, C. N. Herndon, P. K. Lawrence, E. F. Cassirer, K. A. Potter, W. J. Foreyt, K. D. Clinkenbeard, and S. Srikumaran.** 2009. *Mannheimia haemolytica* serotype A1 exhibits differential pathogenicity in two related species, *Ovis canadensis* and *Ovis aries*. *Veterinary Microbiology* 133:366–371.

**Dassanayake, R. P., D. R. Call, A. A. Sawant, N. C. Casavant, G. C. Weiser, D. P. Knowles, and S. Srikumaran.** 2010. *Bibersteinia trehalosi* inhibits the growth of *Mannheimia haemolytica* by a proximity-dependent mechanism. *Applied and Environmental Microbiology* 76:1008–1013.

**DeCesare, N. J. and D. H. Pletscher**. 2006. Movements, connectivity, and resource selection of Rocky Mountain bighorn sheep. *Journal of Mammalogy* 87:531–538.

**Desert Bighorn Council Technical Staff**. 1990. Guidelines for management of domestic sheep in the vicinity of bighorn habitat. *Desert Bighorn Council Transactions* 34:33–35.

**Diaz, H.F. and J.K. Eischeid**. 2007. Disappearing ''alpine tundra'' koppen climatic type in the western United States. *Geophys. Res. Ltrs.* 34:L18707, doi:10.1029/2007GL051253.

3

**Diem, M**. 2003. Rangeland resources affected environment, plan direction, & consequences. USDA Forest Service, Intermountain Region, Ogden UT. Technical Report #3.

**Dodd, N. L., and W. W. Brady**. 1986. Cattle grazing influences on vegetation of sympatric desert bighorn range in Arizona. *Desert Bighorn Council Transactions* 30:8–13.

**Douglas, C. L., and D. M. Leslie**. 1999. Management of bighorn sheep. In: Mountain sheep of North America, eds. R. Valdez and P.R. Krasusman, 238–262. University of Arizona Press, Tucson, AZ.

**Donachie, W**. 2007. Pasteurellosis. Pages 224-235 In: Diseases of sheep, ed, I. D. Aitken. Blackwell Publishing, Oxford, U.K.

**Draft Supplemental Environmental Impact Statement Interdisciplinary Team (DSEIS IDT) and Cooperators.** 2007. Summaries of meetings between the DSEIS IDT and Cooperators. USDA Forest Service, Intermountain Region, Payette National Forest, McCall, ID.

**Draft Supplemental Environmental Impact Statement Interdisciplinary Team (DSEIS IDT) and Cooperators.** 2008. Summaries of meetings between the DSEIS IDT and Cooperators. USDA Forest Service, Intermountain Region, Payette National Forest, McCall, ID.

**Dubay, S., H. Schwantje, J. C. deVos, Jr., and T. McKinney**. 2002. Bighorn sheep (*Ovis canadensis*) diseases: a brief literature review and risk assessment for translocation. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 13, 134–152.

**Enk, T. A., H. D. Picton, and J. S. Williams**. 2001. Factors limiting a bighorn sheep population in Montana following a die-off. *Northwest Science* 75:280–291.

**Epps, C.W., D.R. McCullough, J.D. Wehausen, V.C. Bleich, and J.L. Rechel**. 2004. Effects of climate change on population persistence of desert-dwelling mountain sheep in California. *Conservation Biology* 18(1):102–113.

**Festa-Bianchet, M**. 1986. Site fidelity and seasonal range use by bighorn rams. *Canadian Journal of Zoology* 64:2126–2132.

**Festa-Bianchet, M**. 1988. A pneumonia epizootic in bighorn sheep, with comments on preventive management. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 6, 66–76.

**Festa-Bianchet, M**. 1989. Individual differences, parasites, and the costs of reproduction for bighorn ewes (*Ovis canadensis*). *Journal of Animal Ecology* 58:785–795.

**Foreyt, W. J**. 1989. Fatal *Pasteurella haemolytica* pneumonia in bighorn sheep after direct contact with clinically normal domestic sheep. *American Journal of Veterinary Research* 50:341–344.

BLM_0049113

**Foreyt, W. J**. 1990. Pneumonia in bighorn sheep: Effects of *Pasteurella haemolytica* from domestic sheep and effects on survival and long-term reproduction. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 7, 92–101.

**Foreyt, W. J**. 1992a. Failure of an experimental *Pasteurella haemolytica* vaccine to prevent respiratory disease and death in bighorn sheep after exposure to domestic sheep. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 8, 155–163.

**Foreyt, W. J. 1992b**. Experimental contact association between bighorn sheep, elk and deer with known *Pasteurella haemolytica* infections. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 8. p. 213–218.

**Foreyt, W. J. 1994.** Effects of controlled contact exposure between healthy bighorn sheep and llamas, domestic goats, mountain goats, cattle, domestic sheep, or mouflon sheep. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 9, 7–14.

**Foreyt, W. J. and J. E. Lagerquist.** 1996. Experimental contact of bighorn sheep (*Ovis canadensis*) with horses and cattle, and comparison of neutrophil sensitivity to *Pasteurella haemolytica* cytotoxins. *Journal of Wildlife Diseases* 32:594–602.

**Foreyt, W. J**. 1998. Evaluation of a multivalent *Pasteurella haemolytica* toxoid-bacterin in protecting bighorn sheep from pneumonia after exposure to domestic sheep. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 11, 18–26.

**Foreyt, W. J., and D. A. Jessup**. 1982. Fatal pneumonia of bighorn sheep following association with domestic sheep. *Journal of Wildlife Diseases* 18:163–168.

**Foreyt, W. J., and R. M. Silflow**. 1996. Attempted protection of bighorn sheep (*Ovis canadensis*) from pneumonia using a nonlethal cytotoxic strain of *Pasteurella haemolytica*, biotype A, serotype 11. *Journal of Wildlife Diseases* 32:315–321.

**Foreyt, W. J., K. P. Snipes, and R. W. Kasten**. 1994. Fatal pneumonia following inoculation of healthy bighorn sheep with *Pasteurella haemolytica* from healthy domestic sheep. *Journal of Wildlife Diseases* 30: 137–145.

**Frank, G. H., M. W. Miller, and A. C. S. Ward**. 2004. A review of *Pasteurella* pneumonia in domestic and wild sheep. Wyoming State-wide Bighorn/Domestic Sheep Interaction Working Group. Appendix J.

**Gaillard, J.-M., M. Festa-Bianchet, N. G. Yoccoz, A. Loison, and C. Toïgo.** 2000. Temporal variation in fitness components and population dynamics of large herbivores. *Annual Review of Ecology and Systematics* 31:367–393.

**Gaillard, J. M., M. Festa-Bianchet, and N. G. Yoccoz.** 1998. Population dynamics of large herbivores: variable recruitment with constant adult survival. *Trends in Ecology & Evolution* 13:58–63.

5

BLM_0049114

Garde, E., S. Kutz, H. Schwantje, and A. Veitch. 2005. Examining the risk of disease transmission between wild Dall's sheep and mountain goats, and introduced domestic sheep, goats and llamas in the Northwest Territories. The Northwest Territories Agricultural Policy Framework and Environment and Natural Resources, Government of the Northwest Territories, Canada.

Gedalof, Z., D. L Peterson, and N. J. Mantua. 2005. Atmospheric, climatic and ecological controls on extreme wildfire years in the northwestern United States. *Ecol. Appl.* 15(1): 154-174.

George, J. L., D. L. Martin, P. M. Lukacs, and M. W. Miller. 2008. Epidemic Pasteurellosis in a bighorn sheep population coinciding with the appearance of a domestic sheep. *Journal of Wildlife Diseases* 44:388–403.

Gilpin, M. E., and I. Hanski, eds. 1989. Metapopulation dynamics: Empirical and theoretical investigations. Academic Press San Diego, CA.

Gilmour, N. J. L. and J. S. Gilmour. 1989. Pasteurellosis of sheep. In: *Pasteurella* and pasteurellosis, eds., C. Adlam and J. M. Rutter, 223–254. Academic Press, London.

Goodson, N. J. 1982. Effects of domestic sheep grazing on bighorn sheep populations: a review. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 3, 287–313.

Gotelli, N. J. 2008. A Primer of Ecology, Fourth Edition. 4th edition. Sinauer Associates, Inc., Sunderland, MA.

Grinnell, G. B. 1928. Mountain sheep. *Journal of Mammalogy* 9:1–9.

Gross, J. E., F. J. Singer, and M. E. Moses. 2000. Effects of disease, dispersal, and area on bighorn sheep restoration. *Restoration Ecology* 8:25–37.

Hall, E. R. 1981. The mammals of North America. 2nd ed. John Wiley, New York, NY.

Hanski, I. 1998. Metapopulation dynamics. *Nature* 396:41–49.

Hells Canyon Bighorn Sheep Restoration Committee (HCBSRC). 1997. The Hells Canyon Initiative: Restoration of bighorn sheep to Hells Canyon. Idaho Department of Fish and Game, Oregon Department of Fish and Wildlife, Washington Department of Fish and Wildlife, U.S. Forest Service, Bureau of Land Management, Foundation for North American Wild Sheep. Idaho Department of Fish and Game, Lewiston, ID.

Hells Canyon Bighorn Sheep Restoration Committee (HCBSRC). 2004. The Hells Canyon Initiative: Hells Canyon bighorn sheep restoration plan. Idaho Department of Fish and Game, Oregon Department of Fish and Wildlife, Washington Department of Fish and Wildlife, U.S. Forest Service, Bureau of Land Management, Foundation for North American Wild Sheep. Idaho Department of Fish and Game, Lewiston, ID.

BLM_0049115

**Hells Canyon Bighorn Sheep Restoration Committee (HCBSRC)**. 2005. Hells Canyon Initiative annual report FY 05. Idaho Department of Fish and Game, Oregon Department of Fish and Wildlife, Washington Department of Fish and Wildlife, U.S. Forest Service, Bureau of Land Management, Foundation for North American Wild Sheep. Idaho Department of Fish and Game, Lewiston, ID.

**Hells Canyon National Recreation Area (HCNRA)**, 2008. Data on visitation provided by visitor center staff.

**Hobbs, N. T., and M. W. Miller**. 1992. Interactions between pathogens and hosts: Simulation of pasteurellosis epizootics in bighorn sheep populations. In Wildlife 2001: Populations, eds. D. R. McCullough and R. H. Barrett, 997–1007. Elsevier Science Publishers, Ltd., London.

**Hockaday, J. M**. 1968. History of the Payette National Forest. USDA Forest Service, Payette National Forest, McCall, ID.

**Honess, R. F., and N. M. Frost**. 1942. A Wyoming bighorn sheep study. Wyoming Game and Fish Department, Cheyenne, WY. Bulletin Number 1.

**Hudson, W. E. ed**. 1991. Landscape linkages and biodiversity. Island Press, Washington DC.

**Idaho Department of Fish and Game (IDFG).** 1985 Bighorn sheep species management plan 1986–1990. IDFG, Boise, ID.

**Idaho Department of Fish and Game (IDFG)**. 2004a. Bighorn sheep study I, Job 4. Project W-170-R-28, Progress Report. IDFG, Boise, ID.

**Idaho Department of Fish and Game (IDFG)**. 2004b. Hells Canyon bighorn sheep; Study I: Hells Canyon Bighorn Sheep Restoration Plan. Project W-160-R-31, Progress Report. IDFG, Boise, ID.

**Idaho Department of Fish and Game (IDFG)**. 2005. Idaho comprehensive wildlife conservation strategy. Idaho Conservation Data Center. http://fishandgame.idaho.gov/cms/tech/CDC/cwcs.cfm.

**Idaho Department of Fish and Game (IDFG)**. 2006. Bighorn sheep study I, Job 4 Idaho Department of Fish and Game, Boise, ID. Project W-170-R-30, Progress Report.

**Idaho Department of Fish and Game (IDFG).** 2008**.** Bighorn sheep study I, Job 4. Idaho Department of Fish and Game, Boise, ID. Project W-170-R-32, Progress Report.

**IMPLAN**, 2007. Minnesota IMPLAN Group 2007.

**Jaeger, J. R**. 1994. Demography and movements of mountain sheep (*Ovis canadensis nelsoni*) in the Kingston and Clark mountain ranges, California. M.S. thesis, University of Nevada, Las Vegas, NV.

**Jaworski, M. D., D. L. Hunter, and A. C. S. Ward**. 1998. Biovariants of isolates of *Pasteurella* from domestic and wild ruminants. *Journal of Veterinary Diagnostic Investigation* 10:49–55.

BLM_0049116

**Jenkins, E., S. J. Kutz, A. M. Veitch, B. Elkin, M. Chirino-Trejo, and L. Polley**. 2000. Pneumonia as a cause of mortality in two Dall's sheep in the Mackenzie mountains, Northwest Territories, Canada. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 12, 40–53.

**Jessup, D. A**. 1985. Diseases of domestic livestock which threaten bighorn sheep populations. *Desert Bighorn Council Transactions* 1985:29–33.

**Jones, F. L**. 1980. Competition. In: The desert bighorn, eds, G. Monson and L. Sumner, 197–216. University of Arizona Press, Tucson, AZ.

**Jones, L. C., and D. E. Worley**. 2004. Evaluation of lungworm, nutrition, and predation as factors limiting recovery of the Stillwater bighorn sheep herd, Montana. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 9, 25–34.

**Jones, M**. 1989. Early livestock grazing on the Payette National Forest. USDA Forest Service, Payette National Forest, McCall, ID.

**Josephy, A. M.**, 1997. The Nez Perce Indians and the opening of the northwest.

**Jorgenson, J. T., M. Festa-Bianchet, J. M. Gaillard, and W. D. Wishart**. 1997. Effects of age, sex, disease, and density on survival of bighorn sheep. *Ecology* 78:1019–1032.

**Kornet, S. D**. 1978. An ecological survey of the White Mountain bighorn. *Desert Bighorn Council Transactions* 23:57–61.

**Kovalchik, B. L., and W. Elmore**. 1992. Effects of cattle grazing systems on willow-dominated plant associations in central Oregon. In Proceedings—Symposium on Ecology and Management of Riparian Shrub Communities, Sun Valley, ID, May 29-31, 1991, eds. W. P. Clary, E. D. McArthur, D. Bedunah, C. L. Wambolt. Ogden, UT: USDA Forest Service, Intermountain Research Station. General Technical Report INT-GTR-289.

**Krausman, P. R., and B. D. Leopold**. 1986. The importance of small populations of desert bighorn sheep. In: Proceedings of the Transactions of the North American Wildlife and Natural Resources Conference, vol. 51, 52–61.

**Krueper, D .J**. 1993. Effects of land use practices on western riparian ecosystems. In Status and Management of Neotropical Migratory Birds: Estes Park, CO, September 21–25, 1992, eds. D. M. Finch and P. W. Stangel. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO. General Technical Report RM-229.

**Lawrence, P.K., Shanthalingam, S., Dassanayake, R.P., Subramaniam R., Herndon, C.N., Knowles D.P., Rurangirwa, F.R., Foreyt, W.J., Wayman, G., Marciel, A.M., Highlander, S.K., and Srikumaran, S**. Forthcoming. Transmission of *Mannheimia haemolytica* from domestic sheep (*Ovis aries*) to bighorn sheep (*Ovis canadensis*): 8 unequivocal demonstration with green fluorescent 9 protein-tagged organisms. *Journal of Wildlife Diseases*.

BLM_0049117

**Levins, R., T. Awerbuch, U. Brinkman, I. Eckardt, P. Epstein, N. Makhoul, C.A. de Possas, C. Puccia, A. Speilman, and M. E. Wilson**. 1994. The emergence of new diseases. *American Scientist* 82:52–60.

**Manly, B. F., L. McDonald, and D. L. Thomas**. 1993. Resource selection by animals: Statistical design and analysis of field studies. Chapman & Hall, London. p. 177.

**Marsh, H**. 1938. Pneumonia in Rocky Mountain bighorn sheep. *Journal of Mammalogy* 19:214–219.

**Martin, K. D., T. Schommer, and V. L. Coggins**. 1996. Literature review regarding the compatibility between bighorn and domestic sheep. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 10, 72–77.

**McCarty, C. W., and M. W. Miller**. 1998. Modeling the population dynamics of bighorn sheep: a synthesis of literature. Colorado Division of Wildlife, Denver, CO. Special Report Number 73.

**McGranahan, D**. 1999. Natural amenities drive population change. USDA Economic Research Service, Agricultural Economics. Report #781.

**McQuivey, R. P**. 1978. The desert bighorn sheep of Nevada. Nevada Department of Wildlife, Las Vegas, NV. Biology Bulletin No. 6.

**McWhirter, D., S. Smith, E. Merrill, and L. Irwin**. 1992. Foraging behavior and vegetation responses to prescribed burning on bighorn sheep winter range. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 8, 264–278.

**Miernyk, W. H.** 1965. The elements of input-output analysis. Random House New York, NY.

**Miller, M. W**. 2001. Pasteurellosis. In Infectious Diseases of Wild Mammals, eds. E. S. Williams and I. K. Barker, 330–337. Iowa State University Press, Ames, IA.

**Miller, M. W., B. J. Kraabel, J. A. Conlon, H. J. McNeil, and J. M. Bulgin**. 1995. Strategies for managing infectious diseases in mountain sheep populations. Wildlife Research Report, Mammals Research, Federal Aid Projects, Job Progress Report, Project W-153-R-8, WP2a, J4. Colorado Division of Wildlife, Fort Collins, CO. p. 151–161.

**Miller, M. W., J. E. Vayhinger, D. C. Bowden, S. Roush, T. Verry, A. Torres, and V. Jurgens**. 2000. Drug treatment for lungworm in bighorn sheep: Reevaluation of a 20-year-old management prescription. *Journal of Wildlife Management* 64:505–512.

**Miller, M. W., N. T. Hobbs, and E. S. Williams**. 1991. Spontaneous pasteurellosis in captive Rocky Mountain bighorn sheep. (*Ovis canadensis canadensis*): Clinical, laboratory, and epizootiological observations. *Journal of Wildlife Diseases* 27:534–542.

**Monello, R. J., D. L. Murray, and E. F. Cassirer.** 2001. Ecological correlates of pneumonia epizootics in bighorn sheep herds. *Canadian Journal of Zoology-Revue Canadienne De Zoologie* 79:1423–1432.

9

BLM_0049118

**NatureServe**. 2004. International ecological classification standard: Terrestrial ecological systems of the United States. Natural Heritage Central Databases. NatureServe, Arlington, VA.

**NEPA** 1997. Council on Environmental Quality. 1997. Environmental justice guidance under the National Environmental Policy Act. Dated December 1997

**Nez Perce and Salmon Challis National Forest** 2008. Data on visitor use provided by national forest recreation staff.

**Nez Perce and Salmon Challis National Forest** 2009. Data on visitor use provided by National Forest recreation staff.

**Noss, R.** 2001. Beyond Kyoto: forest management in a time of rapid climate change. *Conservati Biology* 15(3):578–590.

**Noss, R. F**. 1987. Corridors in real landscapes: a reply to Simberloff and Cox. *Conservation Biology* 1:159–164.

**Nunney, L., and K. A. Campbell**. 1993. Assessing minimum viable population size: Demography meets population genetics. *Trends in Ecology and Evolution* 8:234–239.

**Onderka, D. K., and W. D. Wishart**. 1984. Experimental contact transmission of *Pasteurella haemolytica* from clinically normal domestic sheep causing pneumonia in Rocky Mountain Bighorn Sheep. *Journal of Wildlife Diseases* 24(4):663–667.

**Onderka, D. K., and W. D. Wishart**. 1988. A major bighorn sheep die-off from pneumonia in southern Alberta. *Biennial Symposium of the Northern Wild Sheep and Goat Council* 4:356–363.

**Onderka, D. K., S. A. Rawluk, and W. D. Wishart**. 1988. Susceptibility of Rocky Mountain bighorn sheep and domestic sheep to pneumonia induced by bighorn and domestic livestock strains of *Pasteurella haemolytica. Canadian Journal of Veterinary Research* 52:439–444.

**Ough, W. D., and J. C. deVos, Jr**. 1984. Intermountain travel corridors and their management implications for bighorn sheep. *Desert Bighorn Council Transactions* 28:32–36.

**Palisade Corporation.** 2009. @Risk. 5.5. Palisade Academic Software, Ithaca, NY.

**Portier, C., M. Festa-Bianchet, J.-M. Gaillard, J. T. Jorgenson, and N. G. Yoccoz.** 1998. Effects of density and weather on survival of bighorn sheep lambs (Ovis canadensis). *Journal of Zoology* 245:271–278.

**Post, G**. 1962. Pasteurellosis of Rocky Mountain bighorn (*Ovis canadensis canadensis*). *Wildlife Disease* 23:1–14.

**Potts, M. K**. 1937. Hemorrhagic septicemia in the bighorn of Rocky Mountain National Park. *Journal of Mammalogy* 18:105–106.

BLM_0049119

**Queen, C., A. C. S. Ward, and D. L. Hunter**. 1994. Bacteria isolated from nasal and tonsillar samples of clinically healthy Rocky Mountain bighorn sheep and domestic sheep. *Journal of Wildlife Diseases* 30:1–7.

**Raphael, M. G., M. J. Wisdom, M. M. Rowland, R. S. Holthausen, B. C. Wales, B. M. Marcot, and T. D. Rich**. 2001. Status and trends of habitats of terrestrial vertebrates in relation to land management in the Interior Columbia River Basin. Forest Ecology and Management. 153:63–88.

**Risenhoover, K. L. and J. A. Bailey**. 1985. Foraging ecology of mountain sheep: Implications for habitat management. *Journal of Wildlife Management* 49(3):797–804.

**Rishenhoover, K. L., J. A. Bailey, and L. A. Wakelyn**. 1988. Assessing the Rocky Mountain bighorn sheep management problem. *Wildlife Society Bulletin* 16:346–352.

**Rodgers, A.R., A.P. Carr, H.L. Beyer, L. Smith, and J.G. Kie**. 2007. HRT: home range tools for ArcGIS. Ontario Ministry of Natural Resources, Centre for Northern Forest Ecosystem Research, Thunder Bay, Ontario, Canada.

**Ryder, R. J., E. S. Williams, K. W. Mills, K. H. Bowles, and E. T. Thorne**. 1992. Effect of pneumonia on population size and lamb recruitment in Whiskey Mountain bighorn sheep. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 8, 136–146.

**Sappington, J.M., K.M. Longshore, D.B. Thomson**. 2007. quantifying landscape ruggedness for animal habitat analysis: A case study using bighorn sheep in the Mojave Desert. *Journal of Wildlife Management* 71(5): 1419–1426.

**Schommer, T. J.**, 2009. Evaluation of "best management practices." USDA Forest Service, Wallowa-Witman National Forest, Baker City, OR.

**Schommer, T. J., and M. Woolever**. 2001. A process for finding management solutions to the incompatibility between domestic and bighorn sheep. USDA Forest Service, Wallowa-Whitman National Forest, Baker City, OR.

**Schrag, S. J., and P. Wiener**. 1995. Emerging infectious diseases: What are the relative roles of ecology and evolution? *Trends in Ecology and Evolution* 10:319–324.

**Schwantje, H. M.** 1986. A comparative study of bighorn sheep herds in southeastern British Columbia. In: Proceedings of the biennial symposium of the Northern Wild Sheep and Goat Council, vol. 5, 231–252.

**Schwartz, O. A., V. C. Bleich, and S. A. Holl**. 1986. Genetics and the conservation of mountain sheep. *Biology Conservation* 37:179–190.

**Scott, M. E**. 1988. The impact of infection and disease on animal populations: Implications for conservation biology. *Conservation Biology* 2:40–56.

**Shackleton, D**. 1999. Hoofed mammals of British Columbia. Royal British Columbia Museum and University of British Columbia Press, Vancouver, British Columbia, Canada.

BLM_0049120

**Shanthalingam, S. and S. Srikumaran.** 2009. Intact signal peptide of CD18, the beta-subunit of beta(2)-integrins, renders ruminants susceptible to *Mannheimia haemolytica* leukotoxin. In: Proceedings of the National Academy of Sciences of the United States of America, vol. 106, 15448–15453.

**Shaffer, M. L., L. H. Watchman, W. J. Snape III, and I. K. Latchis.** 2002. Population viability analysis and conservation policy. In: Population Viability Analysis, S. R. Beissinger, and D. R. McCullough, eds, 123–145. University of Chicago, Chicago, IL.

**Shaw, N. L**. 1992. Recruitment and growth of Pacific willow and sandbar willow seedlings in response to season and intensity of cattle grazing. In Proceedings of the Symposium on Ecology and Management of Riparian Shrub Communities, Sun Valley, ID. May 29-31, 1991, eds. W. P. Clary, E. D. McArthur, D. Bedunah, C. L. Wambolt. USDA Forest Service, Intermountain Research Station, Ogden, UT. General Technical Report INT-GTR-289.

**Silflow, R. S., and W. J. Foreyt**. 1994. Susceptibility of phagocytes from elk, deer, bighorn sheep, and domestic sheep to *Pasteurella haemolytica* cytotoxins. *Journal of Wildlife Diseases* 30(4):529–535.

**Silflow, R. S., W. J. Foreyt, S. M. Taylor, W. W. Laegreid, H. D. Liggitt, and R. W. Leid**. 1989. Comparison of pulmonary defense mechanisms in Rocky Mountain bighorn sheep (*Ovis canadensis canadensis*) and domestic sheep. *Journal of Wildlife Diseases* 25:514–520.

**Silflow, R. S., W. J. Foreyt, S. M. Taylor, W. W. Laegreid, H. D. Liggitt, and R. W. Leid**. 1991. Comparison of arachidonate metabolism by alveolar macrophages from bighorn and domestic sheep. *Inflammation* 15:43–54.

**Simberloff, D., and J. Cox**. 1987. Consequences and costs of conservation corridors. *Conservation Biology* 1:63–71.

**Singer, F. J., and M. A. Gudorf**. 1999. Restoration of bighorn sheep metapopulations in and near 15 national parks: Conservation of a severely fragmented species. Midcontinent Ecological Science Center, U.S. Geological Survey, Fort Collins, CO. Open File Report 99-102.

**Singer, F. J., V. C. Bleich, and M. A. Gudorf**. 2000a. Restoration of bighorn sheep populations in and near western national parks. *Restoration Ecology* 8:14–24.

**Singer, F. J., M. E. Moses, S. Bellew, and W. Sloan**. 2000b. Correlates to colonizations of new patches by translocated populations of bighorn sheep. *Restoration Ecology* 8:66–74.

**Singer, F. J., E. Williams, M. W. Miller, and L. C. Zeigenfuss**. 2000c. Population growth, fecundity, and survivorship in recovering populations of bighorn sheep. *Restoration Ecology* 8:75-84.

**Singer, F. J., C. M. Papouchis, and K. K. Symonds.** 2000d. Translocations as a tool for restoring populations of bighorn sheep. *Restoration Ecology* 8:6-13.

BLM_0049121

**Singer, F. J., L. C. Zeigenfuss, and L. Spicer**. 2001. Role of patch size, disease, and movement in rapid extinction of bighorn sheep. *Conservation Biology* 15:1347–1354.

**Skinner, M. P**. 1928. The elk situation. *Journal of Mammalogy* 9:309–317.

**Smith, D. R**. 1954. The bighorn sheep in Idaho: Its status life history and management. Idaho Department of Fish and Game, Boise, ID.

**Spraker, T. R., C. P. Hibler, G. G. Schoonveld, and W. S. Adney**. 1984. Pathologic changes and microorganisms found in bighorn sheep during a stress-related die-off. *Journal of Wildlife Diseases* 20:319–327.

**State of Idaho** 2009a. Idaho Agricultural Statistics, Compiled by United States Department of Agriculture, National Agricultural Statistics Service, Idaho Field Office. Can be accessed at http://www.nass.usda.gov/Statistics_by_State/Idaho/Publications/Annual_Statistical_Bulletin /2009%20bulletin%20complete%20internet.pdf

**State of Idaho**, 2009b. Idaho Department of Fish and Game Foundation for North American Wild Sheep Idaho Special Bighorn Sheep Permit/Tag Lottery and Auction Revenue History. revised 2/27/09

**State of Oregon**, 2009. Oregon Department of Fish and Wildlife, big game auction hunts, past auction hunt sales Available at http://www.dfw.state.or.us/resources/hunting/auctions_raffles/ (accessed \June 17, 2009)

**Srikumaran, S**. 2007. Molecular basis for the enhanced susceptibility of bighorn sheep to pneumonia: How much do we know? Paper presented at Respiratory disease in mountain sheep: Knowledge gaps and future research. University of California, Davis, CA.

**Steinkamp, M. J**. 1990. The effect of seasonal cattle grazing on California bighorn sheep habitat use. M.S. thesis, Utah State University. Salt Lake City, UT.

**Stynes, D.J. and E. White**, 2005. Spending Profiles of National Forest Visitors, NVUM Four Year Report. Report to USDA Forest Service. Department of Park, Recreation and Tourism Resources, Michigan State University, East Lansing, MI.

**Stynes, D.J. and E. White**, 2006. Spending Profiles for National Forest Recreation Visitors by Activity. Report to USDA Forest Service. Department of Park, Recreation and Tourism Resources, Michigan State University, East Lansing, MI.

**The National Map LANDFIRE.** 2006. LANDFIRE National Existing Vegetation Type layer. (2006, September—last update). U.S. Department of Interior, Geological Survey. Available at: http://gisdata.usgs.net/website/landfire/ (accessed February 8, 2007).

**Tomassini, L., B. Gonzales, G. C. Weiser, and W. Sischo**. 2009. An ecologic study comparing distribution of *Pasteurella trehalosi* and *Mannheimia haemolytica* between Sierra Nevada bighorn sheep, White Mountain bighorn sheep, and domestic sheep. *Journal of Wildlife Diseases* 45:930–940.

13

BLM_0049122

**Thompson, G. G**. 1991. Determining minimum viable populations under the Endangered Species Act. U.S. Department of Commerce, National Oceanic and Atmospheric Association Technical Memo NMFS F/NWC-198.

**Thorne, E. T**. 1982. Diseases of wildlife in Wyoming. 2nd ed. Wyoming Game and Fish Department, Cheyenne, WY.

**Toweill, D. E., and V. Geist**. 1999. Return of royalty: Wild sheep of North America. Boone and Crockett Club and Foundation for North American Wild Sheep, Missoula, MT.

**U.S. Census Bureau**, 2000. Census 2000. SF3 Table P5.

**U.S. Census Bureau**, 2008. US Census Bureau, population division. Available at: http://www.census.gov/popest/counties/asrh/ (accessed June 18, 2009)

**USDA Forest Service**. 1988. Payette National Forest land and resource management plan. USDA Forest Service, Intermountain Region, Ogden, UT.

**USDA Forest Service**. 1997. Preliminary Analysis of the Management Situation. USDA Forest Service, Intermountain Region, Ogden, UT.

**USDA Forest Service**. 2003a. Payette National Forest land and resource management plan. Revised. USDA Forest Service, Intermountain Region, McCall, ID.

**USDA Forest Service**. 2003b. Final environmental impact statement southwest Idaho Ecogroup land and resource management plans. Revised. USDA Forest Service, Intermountain Region, Ogden, UT.

**USDA Forest Service. 2006**. Risk analysis of disease transmission between domestic sheep and bighorn sheep on the Payette National Forest. USDA Forest Service, Intermountain Region, Ogden, UT.

**USDA Forest Service**. 2007. Letter from Sally Collins for Abigail Kimball, Chief of the Forest Service, to Governor of Idaho and Director, Oregon Department of Fish and Game. State, local, and tribal governments as cooperating agencies under NEPA. USDA Forest Service, Washington Office, Washington, DC.

**USDA Forest Service**. 2007–2008. FS Agreement No. 07-MU-11041200-041-State of Idaho, FS Agreement, No. 07-MU-11041200-042, State of Oregon, FS Agreement No. 07-MU-11041200-051, Nez Perce Tribe, FS Agreement No. 08-MU-11041200-001, State of Washington.

**USDA Forest Service.** 2008. Southwest Idaho Ecogroup land and resource management plans draft supplemental environmental impact statement. USDA Forest Service, Intermountain Region, Ogden, UT.

**USDA Forest Service.** 2008. Natural Resource Information System, Human Dimensions Module, National Visitor Use Monitoring Data.

BLM_0049123

Case No. 1:20-cv-02484-MSK   Document 41-6   filed 04/27/21   USDC Colorado   pg 58 of 224

**USDA Forest Service.** 2010. Southwest Idaho Ecogroup land and resource management plans update to the draft supplemental environmental impact statement. USDA Forest Service, Intermountain Region, Ogden, UT.

**USDA Forest Service and USDI Bureau of Land Management (USDA Forest Service and USDI BLM)**. 1998. Economic and social conditions of communities: economic and social characteristics of Interior Columbia basin communities and an estimation of effects on communities from the alternatives of the Eastside and Upper Columbia River Basin DEIS. ICBEMP, Walla Walla, WA.

**U.S. Department of the Interior Department of Commerce**, 2006. regional economic information system. Bureau of Economic Analysis, U.S. Department of Commerce.

**U.S. Department of Interior, Fish and Wildlife Service and U.S. Department of Commerce, Census Bureau(USFWS and Department of Commerce).** 2006. National fishing, hunting, and wildlife-associated recreation—Idaho, p. 4.

**Valdez, R., and P. R. Krausman**. 1999. Description, distribution, and abundance of mountain sheep in North America. In *Mountain sheep of North America*, eds. R. Valdez and P. R. Krausman, 3–22. University of Arizona Press, Tucson, AZ.

**Wakelyn, L**. 1987. Changing habitat conditions on bighorn sheep ranges in Colorado. *Journal of Wildlife Management* 51:904–912.

**Ward, A. C. S., D. L. Hunter, M. D. Jaworski, P. J. Benolkin, M. P. Dobel, J. B. Jeffress, and G. A. Tanner**. 1997. *Pasteurella* spp. in sympatric bighorn and domestic sheep. *Journal of Wildlife Diseases* 33:544–557.

**Westerling, A. L., H. G. Hidalgo, D. R. Cayan, and T. W. Swetnam.** 2006. Warming and earlier spring increase western U.S. forest wildfire activity. *Science* 313:940–943.

**Wilson, L. O**. 1968. Distribution and ecology of desert bighorn sheep in southeastern Utah. Utah Department of Natural Resources, Utah Division of Fish and Game, Salt Lake City, UT. Publication No. 68-5.

**Wisdom, M. J., R. S. Holthausen, B. C. Wales, C. D. Hargis, V. A. Saab, D. C. Lee, W. J. Hann, T. D. Rich, M. M. Rowland, W. J. Murphy, and M. R. Eames.** 2000. Source habitats for terrestrial vertebrates of focus in the Interior Columbia Basin: Broad-scale trends and management implications. USDA Forest Service, Pacific Northwest Research Station, Portland, OR. General Technical Report PNW-GTR-485.

**Worton, B. J.** 1995. Using Monte-Carlo simulation to evaluate kernel-based home-range estimators. *Journal of Wildlife Management* 59:794–800.

**Young, B., E. Byers, K. Gravuer, K. Hall, G. Hammerson, and A. Redder.** 2009. Guidelines for using the NatureServe Climate Change Vulnerability Index (v. 1.0). NatureServe, Boulder, CO. 39 pp.

BLM_0049124

BLM_0049125

# Index

Alternatives
    Alternative 7A..................................................................................................2-5
    Alternative 7E..xiv, 2-9, 2-14, 2-16, 2-17, 2-18, 2-22, 3-55, 3-56, 3-58, 3-59, 3-60, 3-61, 3-62,
        3-77, 3-78, 3-79, 3-82, 3-85, 3-86, 3-87, 3-89, 3-92, 3-94, 3-95, 3-97, 3-104, 3-105, 3-114,
        3-115, 3-117, 3-119, 3-146, 3-149, 3-152, 3-154, 3-155, 3-163
    Alternative 7G..xiv, *2-2, 2-4*, 2-6, 2-10, 2-22, 2-58, 3-59, 3-60, 3-61, 3-62, 3-66, 3-67, 3-68, 3-
        96, 3-105, 3-156, 3-157, 3-159
    Alternative 7L ... 2-10, 2-11, 3-58, 3-59, 3-60, 3-61, 3-62, 3-66, 3-68, 3-69, 3-70, 3-105, 3-157,
        3-158, 3-159
    Alternative 7M 2-11, 2-17, 3-58, 3-59, 3-60, 3-61, 3-62, 3-70, 3-71, 3-72, 3-105, 3-116, 3-118,
        3-159, 3-160
    Alternative 7N. 2-11, 2-12, 3-58, 3-59, 3-60, 3-61, 3-62, 3-74, 3-75, 3-77, 3-106, 3-115, 3-161,
        3-162
    Alternative 7O. xvi, 2-12, 2-17, 3-58, 3-59, 3-60, 3-61, 3-62, 3-74, 3-76, 3-77, 3-106, 3-114, 3-
        115, 3-117, 3-119, 3-162, 3-163
    Alternative 7P .2-12, 2-13, 2-17, 3-58, 3-59, 3-60, 3-61, 3-62, 3-72, 3-73, 3-74, 3-86, 3-107, 3-
        115, 3-116, 3-118, 3-164, 3-165
    Alternatives 1B, 2, 5, 7 2-8, 2-16, 2-17, 2-22, 3-55, 3-56, 3-58, 3-59, 3-60, 3-61, 3-62, 3-64, 3-
        66, 3-79, 3-82, 3-83, 3-85, 3-86, 3-87, 3-95, 3-96, 3-146, 3-149, 3-151, 3-153, 3-154, 3-155,
        3-156, 3-157, 3-158, 3-159, 3-160, 3-161, 3-162, 3-164, 3-166
    Alternatives 3, 4, 6 .................................................2-9, 3-58, 3-59, 3-60, 3-61, 3-62, 3-64, 3-65
Confederated Tribes of the Umatilla Indian Reservation .................. xiv, xix, 3-110, 3-111, 3-142
Core herd home range analysis ...................................................xiii, xiv, xvi, xvii, *2-1, 2-3*, 2-20
Effective Contact .........................................................................................3-42, 3-152, 1
Environmental Justice................................................................... xiii, xiv, 3-141, 3-150
Fixed Kernel Analysis............................................................................................ 1, 2
Geographic Population Range ............................................................................xiv, *2-3*, 3-105
Hells Canyon Management Area ......................................................................................... *1-2*
    Hells Canyon MA ................................................................................ xv, *1-2, 1-3, 1-6*
Hells Canyon National Recreation Area Act ................................ i, xiii, *1-2, 1-5*, 2-20, 2-23, 3-96
*Mannheimia haemolytica* .......................................................................... xx, xxii, 3-7, 3-14, 3, 9, 12, 14
National Forest Management Act ........................................................ i, xiii, xv, *1-2, 2-1*
Nez Percexiv, xix, *2-2*, 2-18, 3-27, 3-31, 3-44, 3-92, 3-110, 3-111, 3-117, 3-120, 3-121, 3-130, 3-
    131, 3-132, 3-136, 3-141, 3-142, 3-143, 3-144, 4-1, 4-2, 8, 10, 14
*Pasteurella* ........................xx, 3-6, 3-7, 3-8, 3-11, 3-12, 3-13, 3-14, 3-18, 4, 5, 6, 8, 10, 12, 14, 15
Riggins ........................xiv, 3-120, 3-126, 3-127, 3-129, 3-130, 3-146, 3-147, 3-148, 3-150, 3-151
Shoshone-Bannock .........................................................................xiv, xix, *2-2*, 3-110, 3-111, 4-2
Shoshone-Paiute .................................................................. xiv, xix, 3-110, 3-111, 4-2
Source Habitat.. 2-15, 3-22, 3-38, 3-55, 3-63, 3-65, 3-67, 3-69, 3-71, 3-73, 3-75, 3-76, 3-78, 3-81,
    3-85, 3-103, 2
Source habitat model............................... xiii, xvi, xvii, *2-1, 2-3, 2-4*, 2-13, 3-22, 3-23, 3-38, 3-55
Weiser xiv, xix, 2-7, 3-51, 3-120, 3-126, 3-127, 3-128, 3-129, 3-130, 3-146, 3-147, 3-148, 3-150,
    3-151, 4-2, 3, 14
Wilder ........................xiv, 3-120, 3-126, 3-128, 3-129, 3-130, 3-146, 3-147, 3-148, 3-150, 3-151

BLM_0049126

BLM_0049127

# Appendix A

# Public Involvement

BLM_0049128

BLM_0049129

# Table of Contents

Public Involvement on the DSEIS and the Update to the DSEIS ................................................... 2

    Content Analysis for the DSEIS and the Update to the DSEIS ................................................11

Response to Public Comments on the DSEIS and  Update to the DSEIS ................................... 21

    100    Legal and Administrative Framework (violations, lack of disclosure, decision making, laws, regulations, policy) ...........................................................................................21

    102–108   Issues Pertaining to the Alternatives ......................................................................37

    110    Standards, Guidelines, Goals, and Objectives ...............................................................65

    130    Adequacy of Analysis and Data (content, use of information/data, conclusion not supported by data, need for additional analysis) .........................................................74

    160    Cumulative Effects Analysis .......................................................................................101

    170    Desired Future Conditions (DFC) ..............................................................................109

    175    Historical Range of Variability (HRV) .......................................................................110

    200    Monitoring ...................................................................................................................110

    250    Public Involvement .....................................................................................................116

    270    Social and Economic ...................................................................................................118

    280    Management Indicator Species (MIS) .........................................................................136

    340    Funding and Budget Constraints .................................................................................137

    380    Soils ............................................................................................................................137

    520    Vegetation Management) Diversity, Inventory, Restoration, Habitat, Botanical) ........138

    540    Noxious Weeds (Non-native Plants) ...........................................................................138

    570    Wildlife Habitat ...........................................................................................................139

    640    Rangeland Management (Livestock Grazing) .............................................................197

    700    Recreation Management ...............................................................................................212

    800    Tribal Interests (Treaties, trust obligation, fishing rights) ...........................................213

    990 Outside the Scope of Forest Plan and Miscellaneous .......................................................223

Agency, Elected Officials, and Tribal Comment Letters ........................................................... 224

    Agency, Elected Officials and Tribal Letters on the DSEIS .................................................224

    Agency, Elected Officials and Tribal Letters on the Update to the DSEIS ...........................225

Literature Cited ........................................................................................................................ 227

BLM_0049130

BLM_0049131

# Introduction

In 2008, the Payette National Forest published a Draft Supplemental Environmental Impact Statement (DSEIS) (USDA Forest Service 2008) to the 2003 *Southwest Idaho Ecogroup Land and Resource Management Plans Final Environmental Impact Statement* (FEIS) (USDA Forest Service 2003) and Record of Decision (ROD). The DSEIS responded to the appeal instructions received from the Chief of the Forest Service on March 9, 2005, pertaining to the issue of bighorn sheep viability. The assessment contained several alternatives to the selected Alternative 7 in the FEIS. These alternatives were developed to analyze effects to bighorn sheep viability, rangeland resources, tribal rights and interests, and socio-economics.

The DSEIS was released for public review and comment in October 2008; its release was followed by public meetings. Over 14,000 comments were received on the document and its analysis. The Forest Service completed a content analysis on the comments received. In response to the comments on the DSEIS, the Payette National Forest updated some analysis methods and models to better address the concerns that were raised and released an *Update to the Draft Environmental Impact Statement* (USDA Forest Service 2010) in March 2010 for a 45-day comment period. The Updated to the DSEIS included 1) a core herd home range analysis; 2) habitat models; 3) sensitive species listing by Region 4 Regional Forester; 4) disease spread models; 5) quantitative content analysis; 6) a community and regional socio-economic analysis; 7) an environmental justice analysis and; 8) new alternatives. The Forest Service completed a content analysis on the 11,867 comments that were received on the Update to the DSEIS.

Many methods were used to involve and inform the public, such as newsletters, website updates, public meetings, and presentations to groups upon request. Coordination, interaction, and consultation occurred with other federal, state, county, and tribal government officials, and with special interest groups, interested individuals, and the general public. In addition, cooperating status was requested and granted beginning in August 2007 to the States of Idaho, Oregon, and Washington; and the Tribal governments of the Nez Perce, Shoshone-Bannock, Shoshone-Paiute, and the Confederated Tribes of the Umatilla Indian Reservation. Many public meetings, briefings, conference calls, intergovernmental working meetings, and one-on-one information exchanges were held in and around the Payette National Forest.

Following is a summarization of the activities that occurred from the release of the DSEIS through release of the Final Supplemental EIS and Plan Amendment. A summary of the comments received on the DSEIS and the Update to the DSEIS, and the Forest Service response to those comments is also included in this appendix, followed by Agency, elected officials and tribal comment letters.

BLM_0049132

# Public Involvement on the DSEIS and the Update to the DSEIS

Public involvement and participation was important throughout the process for the DSEIS and the Update to the DSEIS, and the communication strategy was adjusted as timeframes and issues evolved. The following list conveys the key opportunities presented for information sharing, participation, and involvement:

- Personal contacts were made with key individuals, organizations, other agencies, Tribal governments, and elected officials to explain the process and receive input;

- News releases and paid advertisements let the public know about the public meetings and the public participation opportunities;

- Newsletters were mailed to the mailing list and also posted on the Payette NF website. The newsletters helped inform people of the project timeline, public participation opportunities, alternative formulation, and changes to the documents;

- Public meetings were held to inform the public about the information in the documents and receive comments. They were designed for a presentation by Forest Service personnel and for the public to visit one-on-one with Forest Service specialists conducting the analysis, provide displays of the new analysis and maps, and to provide information to the line officer for decision making;

- Information meetings were held with specific groups, tribes, and organizations;

- Information meetings were held at project milestones for County Commissioners and Idaho Congressional delegation to provide project updates;

- Information was made available on the Payette National Forest's website. All public released information was posted on the website, including the opportunity to download documents, view alternatives and maps, and provide comment;

- Employee briefings provided employees with information on the status of the project and what changes were being made based on public comment.

Numerous meetings were held with various groups, interested parties, organizations, agencies, Tribes, counties, congressional representatives, and the general public to share information about the DSEIS and the Update to the DSEIS; and update them about the process and timeline. Following is a list of these meetings/briefings that were conducted beginning with the release of the DSEIS through the release of the Update to the DSEIS:

| Development of the DSEIS and the Update to the DSEIS | | |
|---|---|---|
| **Date** | **Location** | **Meeting With** |
| **Cooperator Meetings** | | |
| 8/14/2007 | McCall, ID | Cooperators |
| 9/25/2007 | McCall, ID | Cooperators |
| 10/15/2007 | McCall, ID | Cooperators |
| 10/29/2007 | McCall, ID | Cooperators |
| 1/31/2008 | Boise, ID | Cooperators |
| 2/28–2/29/2008 | McCall, ID | Cooperators |
| 4/1–4/2/2008 | McCall, ID | Cooperators |
| 6/25/2008 | Video Teleconference | Cooperators |
| 4/30/2009 | Video Teleconference | Cooperators |

BLM_0049133

| Date | Location | Meeting With |
|---|---|---|
| **Development of the DSEIS and the Update to the DSEIS** | | |
| 5/12–5/14/2009 | McCall, ID | Cooperators |
| 5/21–5/22/2009 | McCall, ID | Cooperators |
| 5/28/2009 | Video Teleconference | Cooperators |
| 6/24–6/25/2009 | McCall, ID | Cooperators |
| 8/19/2009 | Video Teleconference | Cooperators |
| 10/19–10/20/2009 | McCall, ID | Cooperators |
| 12/14/2009 | Conference Call | Cooperators |
| 1/4/2010 | McCall, ID | Cooperators |
| **Congressional and Elected Official Meetings** | | |
| 6/15/2006 | Conference Call | Lane Jollife, Governor Otter's Staff |
| 9/21/2006 | McCall, ID | Lane Jollife, Governor Otter's Staff |
| 1/7/2008 | Boise, ID | Governor's Office, State Department of Agriculture, Governor's BHS / DS Working Group |
| 7/27/2006 | Boise, ID | Congressional Briefing |
| 12/11/2006 | Boise, ID | Dustin Miller, Senator Craig's Staff, Lane Jollife, Governor Otter's Staff, Wool Growers Association, Soulen Family |
| 6/12/2007 | Conference Call | Jack Troyer—Regional Forester, Mike Freese—Senator Craig's Staff |
| 6/22/2007 | Boise, ID | Congressional Briefing |
| 8/8/2007 | McCall, ID | Dustin Miller, Senator Craig's Staff, Vince Moreno, Congressman Sali's Staff |
| 1/3/2008 | Weiser, ID | Congressman Bill Sali, Ron Shirts, Frank Shirts |
| 4/22/2008 | Conference Call | Dustin Miller & Jeff Sayre, Senator Craig's Staff |
| 6/23/2008 | McCall, ID | Congressional Briefing |
| 9/11/2008 | Boise, ID | Bonnie Butler, Governor's Office |
| 9/23/2008 | Boise, ID | Governor's BHS / DS Working Group |
| 9/23/2008 | Boise, ID | Governor's BHS / DS Working Group |
| 2/26/2009 | Boise, ID | Governor's BHS / DS Working Group |
| 3/16/2009 | Boise, ID | State Senate Natural Resource Committee |
| 9/9/2009 | Boise, ID | Congressional Briefing |
| 1/29/2010 | Boise, ID | Congressional Briefing |
| 2/12/2010 | Boise, ID | Idaho State Natural Resources Sub-committee |
| 4/20/2010 | Washington DC | Congressional Briefing |
| 4/21/2010 | Washington DC | Congressional Briefing |
| 5/8/2009 | Boise, ID | John Chatburn, Governor's Office |
| 6/5/2009 | Conference Call | Brian Ricker, Senator Crapo's Staff |
| 8/18/2009 | Conference Call | Governor's Office |
| 1/25/2010 | Slate Creek RD | Senator Crapo's Staff, Senator Risch's Staff, Nez Perce NF Staff |
| **Tribal Meetings** | | |
| 8/22/2006 | McCall, ID | Nez Perce Tribe, Informal Consultation |
| 12/5/2006 | Lapwai, ID | Nez Perce Tribe—Tribal Council, Formal Consultation |
| 1/9/2007 | Lapwai, ID | Nez Perce Tribe, Informal Consultation |
| 12/12/2007 | Boise, ID | Nez Perce Tribe—Tribal Council, Formal Consultation |
| 3/27/2008 | Lapwai, ID | Nez Perce Tribe—Tribal Council, Formal Consultation |
| 4/3/2008 | Fort Hall, ID | Shoshone-Bannock Tribes—Tribal Council, Formal Consultation |

BLM_0049134

| Development of the DSEIS and the Update to the DSEIS | | |
|---|---|---|
| **Date** | **Location** | **Meeting With** |
| 8/14/2008 | Boise, ID | Shoshone-Paiute Tribes, Wings & Roots, Formal Consultation |
| 8/20/2008 | McCall, ID | Nez Perce Tribe, Informal Consultation |
| 1/14/2009 | Fort Hall, ID | Shoshone-Bannock Tribes—Tribal Council, Formal Consultation |
| 3/26/2009 | Lewiston, ID | Six Forest Meeting with Nez Perce Tribe |
| 4/28/2009 | Lapwai, ID | Nez Perce Tribe—Tribal Council, Formal Consultation |
| 6/11/2009 | Boise, ID | Shoshone-Paiute Tribes, Wings & Roots, Formal Consultation |
| 8/25/2009 | Lapwai, ID | Nez Perce Tribe—Tribal Council, Formal Consultation |
| 9/10/2009 | Boise, ID | Shoshone-Paiute Tribes, Wings & Roots, Formal Consultation |
| 1/28/2010 | Fort Hall, ID | Shoshone-Bannock Tribes—Tribal Council, Formal Consultation |
| 2/11/2010 | Boise, ID | Shoshone-Paiute Tribes, Wings & Roots, Formal Consultation |
| 2/23/2010 | Lapwai, ID | Nez Perce Tribe—Tribal Council, Formal Consultation |
| 4/8/2010 | Boise, ID | Shoshone-Paiute Tribes, Wings & Roots, Formal Consultation |
| 6/4/2010 | McCall, ID | Nez Perce Tribe, Informal Consultation |
| 7/8/2010 | Boise, ID | Shoshone-Paiute Tribes, Wings & Roots, Formal Consultation |
| 7/13/2010 | Lapwai, ID | Nez Perce Tribe—Tribal Council, Formal Consultation |
| 7/15/2010 | Fort Hall, ID | Shoshone-Bannock Tribes—Tribal Council, Formal Consultation |
| **Federal, State and Other Agency Meetings** | | |
| 6/30/2006 | McCall, ID | Jeff Rohlman, Idaho Dept. of Fish & Game |
| 10/5/2006 | Boise, ID | Steve Huffaker, Idaho Dept. of Fish & Game |
| 10/13/2006 | Hells Canyon, ID | IDT Field Review |
| 12/14/2006 | Ogden, UT | Regional Forester & R4 Directors |
| 1/26/2007 | Conference Call | Ken Paur - OCG, Frank Roth - RO, Pattie Soucek - PNF |
| 1/30/2007 | Conference Call | Regional Forester |
| 3/1/2007 | Ogden, UT | Regional Forester & R4 Directors |
| 4/30/2007 | McCall, ID | Interdisciplinary Team (IDT) Meeting |
| 5/3/2007 | Boise, ID | Hearing with Judge Winmill |
| 5/4/2007 | Conference Call | Ken Paur - OGC, R4 Directors |
| 5/21/2007 | Weiser, ID | Washington County Commissioners |
| 6/13/2007 | Conference Call | Hearing with Judge Winmill |
| 6/15/2007 | Ogden, UT | Regional Forester |
| 6/11/2007 | Conference Call | Ken Paur - OGC |
| 6/23/2007 | Conference Call | Regional Forester & WO Directors |
| 8/30/2007 | McCall, ID | IDT Meeting |
| 12/3/2007 | Ogden, UT | Regional Forester & R4 Directors |
| 2/12/2008 | Conference Call | Idaho Dept. of Fish & Game |
| 2/27/2008 | Conference Call | Bill LeVere—R4 Natural Resources Director, Brent Larson - |
| 5/16/2008 | McCall, ID | Payette NF District Rangers & Staff |

BLM_0049135

| Development of the DSEIS and the Update to the DSEIS | | |
|---|---|---|
| **Date** | **Location** | **Meeting With** |
| 5/23/2008 | Conference Call | Regional Office Staff |
| 6/9/2008 | Ogden, UT | Regional Forester |
| 6/18/2008 | Conference Call | Regional Forester |
| 6/23/2008 | Video Teleconference | Brent Larsen—RO, WO Staff |
| 7/16/2008 | Boise, ID | State of Oregon |
| 7/16/2008 | Boise, ID | State of Idaho, Idaho Dept. of Fish & Game |
| 7/17/2008 | Conference Call | WO Deputy Chiefs |
| 7/28/2008 | Conference Call | Deputy Regional Forester |
| 9/11/2008 | Boise, ID | John Foster & Tom Rinkes, Bureau of Land Management |
| 9/12/2008 | Conference Call | Jeff Foss, US Fish & Wildlife Service |
| 11/24/2008 | Council, ID | Adams County Natural Resource Committee |
| 12/8/2008 | McCall, ID | IDT Meeting |
| 2/18/2009 | Odgen, UT | Regional Forester, Deputy Regional Forester, & R4 Directors |
| 5/8/2009 | Boise, ID | Cal Groen, Idaho Dept. of Fish & Game |
| 5/27/2009 | McCall, ID | IDT Meeting |
| 6/18/2009 | McCall, ID | IDT Meeting |
| 7/13–7/15/2009 | McCall, ID | Deputy Regional Forester |
| 7/17/2009 | McCall, ID | IDT Meeting |
| 7/30/2009 | McCall, ID | IDT Meeting |
| 8/4/2009 | McCall, ID | IDT Meeting |
| 8/12/2009 | McCall, ID | IDT Meeting |
| 8/12/2009 | Video Teleconference | Harv Forsgren, Regional Forester |
| 8/28/2009 | McCall, ID | WO Specialists |
| 9/1/2009 | Video Teleconference | WO & RO Staff |
| 9/2/2009 | McCall, ID | Payette NF District Rangers |
| 9/22/2009 | McCall, ID | IDT Meeting |
| 9/28–9/29/2009 | McCall, ID | IDT Meeting |
| 10/8/2009 | McCall, ID | IDT Meeting |
| 11/3/2009 | McCall, ID | IDT Meeting |
| 11/13/2009 | Conference Call | Regional Forester |
| 11/19/2009 | Conference Call | Forest Service Chief, Regional Forester |
| 11/20/2009 | Boise, ID | Bureau of Land Management |
| 12/1/2009 | Conference Call | NRE |
| 12/3/2009 | McCall, ID | IDT Meeting |
| 12/10/2009 | McCall, ID | IDT Meeting |
| 12/15/2009 | McCall, ID | Payette NF Leadership Team |
| 1/11/2009 | Conference Call | Regional Forester, Gloria Manning, Associate Deputy Chief NFS, Meryl Harrell, NRE |
| 1/27/2009 | Boise, ID | State of Idaho, Dept. of Fish & Game, Dept. of Agriculture, Governor's Staff |
| 3/3/2010 | Boise, ID | IDT Meeting |
| 3/12/2010 | Salem, OR | Oregon Governor's Office, Oregon Dept. of Fish & Wildlife, and Fish & Game Commission |
| 4/13/2010 | Video Teleconference | WO—Gordon Blum, Ralph Giffen, Gene DeGayner |
| 4/15/2009 | Conference Call | IDT Meeting |
| 4/19/2010 | Washington DC | Forest Service Chief Tom Tidwell |
| 4/19/2010 | Washington DC | WO - Doug Crandall, Joel Holtrop, Gloria Manning, Janette Kaiser, Anne Zimmerman, Kevin Lawrence |
| 6/14/2010 | McCall, ID | IDT Meeting |

| Development of the DSEIS and the Update to the DSEIS | | |
|---|---|---|
| **Date** | **Location** | **Meeting With** |
| 6/17/2010 | Conference Call | RO Directors |
| 7/7/2010 | Boise, ID | Jeff Foss - BLM |
| 7/8/2010 | Boise, ID | Boise / Sawtooth / Salmon-Challis National Forests |
| 7/12/2010 | McCall, ID | Wallowa-Whitman National Forest |
| 7/13/2010 | Grangeville, ID | Nez Perce National Forest |
| **Special Interest Groups and Other Meetings** | | |
| 6/26/2006 | Boise, ID | Idaho Conservation League, The Wilderness Society |
| 6/28/2006 | McCall, ID | Craig Gehrke, The Wilderness Society |
| 1/10/2007 | Lewiston, ID | Jeff Sayer, Senator Craig's Staff, Nez Perce Tribe, Pattie Soucek, Boyd Hartwig, Larry Jacobs, Forest Plan Appellants |
| 2/1/2007 | Weiser, ID | Sheep Grazing Permittees, Pete Grinde - PNF |
| 3/9/2007 | Nampa, ID | Affected Parties |
| 4/7/2007 | Boise, ID | FNAWS, Bighorn Sheep Meeting |
| 3/7–3/8/2008 | Boise, ID | 2008 Sheep Research Symposium, Idaho Wool Growers |
| 9/19/2008 | Weiser, ID | Sheep permittees, Idaho Wool Growers Association |
| 9/22/2008 | Boise, ID | Forest Plan Appellants |
| 9/22/2008 | Boise, ID | Idaho Media |
| 12/6/2008 | Boise, ID | Idaho Sporting Caucus |
| 12/22/2008 | McCall, ID | Debra Ellers, Western Watershed Project |
| 2/23/2009 | McCall, ID | Margaret Soulen |
| 4/7/2010 | McCall, ID | McCall Rotary Club |
| **DSEIS Public Meetings** | | |
| 09/29/2008 | McCall, ID | Public meeting |
| 10/06/2008 | Boise, ID | Public meeting |
| 11/24/2008 | Boise, ID | Public meeting |
| **Update to the DSEIS Public Meetings** | | |
| 2/11/2010 | Boise, ID | Public meeting on the Update to the DSEIS |
| 2/16/2010 | McCall, ID | Public meeting on the Update to the DSEIS |
| 2/18/2010 | Wieser, ID | Public meeting on the Update to the DSEIS |
| 2/24/2010 | Lewiston, ID | Public meeting on the Update to the DSEIS |

Copies of the DSEIS and UDSEIS were mailed to the following organizations and individuals:

# A

A.L. Cattle Inc., Brailsford, Aggie
Adams County Commissioners
Advocates for the West, Inc., Rule, Laurie
Alaska Dept. of Fish & Game, Schwanke, Rebecca
Alexander, Dave
Alliance for the Wild Rockies
Alliance for the Wild Rockies, Ecosystems Defense

American Lands Alliance
Andrus, Kermit
Assoc. Logging Contractors Inc.

# B

Backcountry Recreation Club, Johnstone, Becky
Bailey, Donald & Marlene
Baird, Dan
Barr, Quinton
BLM Cottonwood, Connolly, Steph
BLM Idaho State Office, Rinkes, Tom

BLM_0049137

BLM Coeur D'Alene District
BLM Four Rivers Field Office
BLM Idaho State Office, Martin, John
Bliss, Steve
Bloxham, Roy
Blue Ribbon Coalition
Boise Cascade Corp
Boise National Forest, Nutt, Lisa
Boise Parks & Recreation, Weston, C.H.
Boise River Adjudication Team,
    Collette, Michael
Boise State University
Borel, Michael
Bott, Edward
Branch, Ric
Branstetter, Alice
Branstetter, Stan
Bright, W.A.
Brown's Industries, Inc.
Brundage Mountain Resort, Deboer,
    Judd
Brundage Realty, Bayse, Michelle
Buhl Public Library
Burkhardt,Wayne

## C

Camp, James
Cantlon, John
Caribou-Targhee NF, Mickelsen, Robb
Caribou-Targhee NN, Redman, Robbin
Carlson Livestock, Carson, Mick & Gail
Carlson, Richard
Cavner, Betty & Leland
Center for Biological Diversity
Cole, Kelly
Confederated Tribes of the Umatilla,
    Sheeler, Carl
Council Valley Library
County Commissioners Washington
Crist, Roger
Critfc, Rhodes, Lou

## D

Dept. of Environmental Quality
Dixon, Gail
Doyle, Phil

Duck Valley Indian Reservation,
    Perugini, Carol
Dumas, Shelley

## E

Eberle, Don
Edmunson, John
EMSI, Crapuchettes, Andrew
EPA
EPA Office of Federal Activities
EPA Region 10

## F

Ford Ranch
Foruria, David
FSEEE Policy Advocate

## G

Gallant, Fred
Geddie, John
Gooding Public Library
Goolsby, Larry
Grangeville Cent. Library
Grannan, Shirley Ann
Gray, Kevin
Greater Weiser Area Chamber of
    Commerce
Green, Wendy
Greer, Jerry

## H

Hardy, Gene & Pat
Harrington, Everett
Harshfield, Steven
HCPC, Dyson, Greg
Hells Canyon Preservation Council,
    Coordinator, Ecosystem
Herrington, Ruth
Hickey, Calvin
Holland & Hart, Myers Iii, William
Holmes, Jim
Holmes, Joseph
Holsinger Law, LLC, Holsinger, Kent
Hucks, John
Hull, Pat

BLM_0049138

Humboldt-Toiyabe NF, Carson Ranger District

# I

Idaho Aviation, Patrick, Robert
Idaho Cattle Association, Bennett, George
Idaho County Commissioners
Idaho Dept. of Lands, Wilson, Eric
Idaho Dept. of Agriculture, Kay, Ron
Idaho Dept. of Parks & Recreation, Cook, Jeff
Idaho Farm Bureau, Butler, Wally
Idaho Farm Bureau, Hendricks, Russ
Idaho Fish & Game, Compton, Brad
Idaho Fish & Game, Cassirer, Frances
Idaho Fish & Game, Owsiak, Anna
Idaho Fish & Game, Rohlman, Jeff
Idaho Fish & Game, Toweill, Dale
Idaho Fish & Game, Ward, Rick
Idaho Fish & Game SW Region, Van Vooren, Al
Idaho Outfitters & Guides Assoc.
Idaho Power Company, Dumas, Brett
Idaho Rivers United, Lewis, Kevin
Idaho Sporting Congress
Idaho State Historical Society, Davis, Mary Anne
Idaho Statesman, Barker, Rocky
Idaho Wildlife Federation
Idaho Wool Growers, Boyd, Stan
Intermountain Forest Association
Irwin, John
ISAA, Bonar, Bob

# J

Johnson, Craig
Johnson, Laurence
Jordan, Joe & Cindy
Justice, Jim

# K

Kaiser, Steve
KBCI TV, Ray, Jeff
Ketz, Pearl
Koskella, Howard

# L

Lancaster, James
Lancaster, Jim
Lettin, Dale and Kapus
Little, B.
Lukesh, Betty & Ron

# M

Mayor, Council
Mcclintock, Ralph
Mccoy, H.L.
Mceachern, J.E.
Mcgee, Mike
Mcpherson, Don
Menichetti, Syl
Messenger Index
Meyr, Herb
Miller, Evert
Moldenhauer, Frank
Morris & Wolff, P.A.
Mountain Properties, Audette, Floyd

# N

Nachbar, Dick
Nampa Public Library, Taylor, Stephanie
National Marine Fisheries Service, Region, Northwest
National Wildlife Federation, Northern Rockies NRC
Neighbors of Cuddy Mountain, Bilbao, Cecil
Nez Perce NF, Russell, Scott
Nez Perce Tribe, Ariwite, Rod
Nez Perce Tribe, Baird, Patricia
Nez Perce Tribe, Johnson, Dave
Nez Perce Tribe, Miles, Aaron
Nez Perce Tribe, Penney, Honorable Samuel
Nez Perce Tribe, Sonneck, Vera
Nez Perce Tribe DFRM, Hendrix, Amanda
Nichols, Paul
NOAA Fisheries Service

BLM_0049139

North Umpqua Ranger District, Wildlife
    Biologist
NRCS
Nybakken, Gerald

# O

Office of Congressman Mike Simpson,
    Watts, Nikki
Office of the Governer
Office of the Governor, Butler, Bonnie
Office of the State Controller, Jones,
    Donna
Ogden, Shawn & Betsy
Old, Tom
Olsen, Andrea
Olson, Marilyn
Oregon Dept. of Fish & Wildlife,
    Keister, George
Oregon Dept. of Fish & Wildlife,
    Coggins, Vic

# P

Payette Grazing Association, Branch,
    Welden
Pearce, Monty
Penland, Munther, Boardman, Goodrum,
    Forrest
Phillips, Frank
Phillips, Jake
Powers, Harold A.

# Q

Quilliam, L.M.

# R

Rainey, Brock
Rocky Mountain Power
Rubelt, Jack
Ruse, Gary
Ryberg, Erik

# S

Salmon Air
Sanders, Sig
Sauer, Gregory

Schroeder, Diane
Senator, Crapo, Mike
Senator, Risch, Jim
Shelton, Tim
Shepherd, Paul
Shepp Ranch Outfitters, LLC
Sherer, Alicia & Jerry
Shoshone-Bannock Tribes of Fort Hall,
    Coby, Alonzo
Shoshone-Bannock Tribes of Fort Hall,
    Tuell, Yvette
Shoshone-Paiute Tribes of Duck Valley,
    Egan, Nancy
Shoshone-Paiute Tribes of Duck Valley,
    Howard, Ted
Snake River Fish & Wildlife
Spalding, Curt
Spradling, Bj
Stultz, Bill
Sutton, Howard
Sutton, John
Sutton, Tom

# T

Tamarack Resort LLC
Taylor Ranch Field Station, Akenson,
    Jim & Holly
The Ecology Center, Juel, Jeff
The Ecology Center, Buckley, Lauren
The Star News
The Wilderness Society, Idaho Regional
    Office
Thomas, Rachel
Thompson, Johnie
Three Rivers Timber, Hanna, Mike

# U

US Fish & Wildlife Service, Turner,
    Allison
USDA NRCS, Fink, Frank
USDA Nat. Ag Library, Acquisitions &
    Serials Branch

# V

Valley City Board of Commerce
Van Denakker, Dick

BLM_0049140

# W

Wagner WA Dept. Of Fish & Game,
    Martorello, Donny
Wallowa Whitman NF, Mason, Bob
Wallowa-Whitman NF, Countryman,
    Katie
Walters, Jerry
Ward, Victor & Christy
Warren, Stephen
WDFW, Wik, Paul
Weiser Irrigation District, Edwards, Jay
Western Watershed, Fitch, Katie
Western Watersheds Project, Carter,
    John
Western Watersheds Project, Marvel,
    Jon
White, Ben
Wiles, Wilbur
Wiles, Wilbur
Williams, Jack
Winter, David
Woods, John
Woods, Robert
Woody, Sheryl
Worlund, John
Wright, Jack
WSU, Microbiology & Pathology,
    Foreyt, Dr. William

# XYZ

Zacharin, Linda
Zena Creek Ranch, Adkins, James
Zettel, Steve

BLM_0049141

## CONTENT ANALYSIS FOR THE DSEIS AND THE UPDATE TO THE DSEIS

Content analysis is a method of eliciting meanings, ideas, and other information from written text, pictures, or audio or video messages. It is a systematic process that analyzes both qualitative and quantitative information and is designed to track all comment letters, identify individual comments by subject in each comment letter, evaluate similar comments from different comment letters, and summarize like-comments into specific PCs. Through this process, analysts strive to identify all relevant issues, not just those represented by the majority of commenters.

The comments that were most helpful were those that were unique, substantially different, and were specifically related to the analysis disclosed in the Update to the DSEIS. In addition to capturing unique and substantially different comments, this report attempts to reflect the emotion and strength of public sentiment in order to represent the public's values and concerns as fairly as possible. When an individual raised multiple concerns within the same letter, each unique comment was numbered and tracked separately and each comment was assigned a unique tracking number and coded by subject or topic. It is important to keep in mind that even though the PCs attempt to capture the full range of public issues and concerns, they should be reviewed with the understanding that there is no limitation on who submits comments. Therefore, the comments received do not necessarily represent the sentiments of the public as a whole. This report attempts to provide fair representation of the wide range of views submitted. Every comment has the same value, whether expressed by many, or by one respondent. Analyzing comments is not a vote-counting process. The Forest Service response to the public comments, which in some cases resulted in changes to the DEIS, was not determined by majority opinion but rather by the substance of the comments. The content analysis process that was used ensured that every comment was read, analyzed, and considered.

All of the comment letters were analyzed using the content analysis process and was completed by a different third-party contractor for each document (for more details, refer to the individual Content Analysis reports on the Payette National Forest website). In addition to the reports produced from the content analysis process, the Forest Supervisor of the Payette National Forest and Interdisciplinary Team (IDT) members read all the comment letters.

- The Draft Supplemental EIS was released on October 3, 2008 with the comment period ending March 16, 2009. Comment letters that were received during the comment period totaled 14,089; which included 509 original comment letters, 5 public meeting comment forms, and 13,575 organized campaign letters (form letters).

- The Update to the DSEIS for Bighorn Sheep Viability Analysis and Plan Amendment was released on February 5, 2010 for a 45-day comment period ending on March 22, 2010. Comment letters that were received during this comment period totaled 11,867; which included 118 original comment letters and 11,749 organized campaign letters (form letters).

BLM_0049142

- Following the list of commenters below, are the Concern Statements, which are a summary of the comments received on the DSEIS and Update to the DSEIS, along with a response developed by the IDT for each of the Concern Statements.

## FEDERAL AGENCIES

US DOI Office of Environmental Policy, Preston Sleeger
US Environmental Protection Agency Region 10, Christine Reichgott
US EPA, NEPA Review Unit, Christine Reichgott

## STATE OFFICIALS

House of Representatives, State of Idaho, John Stevenson
House of Representatives, State of Idaho, Ken Andrus
Idaho Governor, Otter, Butch

## AMERICAN INDIAN TRIBAL GOVERNMENTS

Boulder-White Clouds Council, Lynne Stone
Kootenai, Shoshone Farm Bureau, Elmer Mundt
Nez Perce Tribe: C. Adams; Patricia Angle; Marguerite Ankney; Ceclia Bawyew; Pauline Bisbei; Frank Blackeagle; Jessica Blair; Catty Brook; Jackie Carson; Cecil Charles; Della Cree; John Dis; Carla Domebo; Rachel Edwards; Elaine Ellenwood; V. Endicott; Lori Enick; Patricia Ferple; Greg France; Thomas Full; Tina Fuller; Gwendolyn Gates; H. Goodteal; Jalon Greene; Larry Greene; Melissa Guzman; Chloe Halfmoon; Loretta Halfmoon; Mollie Harris; Vena Harrison; Leslie Hendrick; Tony Henry; Aileen Henry; Sandra Holt; Hope Johnson; Raphael Jol; DanKane; M. King; Randall King; Ivory Leary; Jackie M.; Joanna Marek; Jane Mcatty; Patti Mccormack; Robert Mccormack; Joyce Mcfarland; Casey Mcloenard; Rebecca Miles; Alan Miles; Gabrielle E. Moses; Marcus Oatman Jr.; Jon Parsons; Barbara Pike; Christine Porter; Crystal Ralgo; Rich Ramsey; Mildred Rumy; Sydel Sawk; Debbie Seideman; Steven Sobotta; Angel Sobotta; C. Sobotta; Alice Spauldy; Wilhemina Stevens; Verna Taylor; Kathy Taylor; Robert Terry; Franklin Types; Kay V.; Jonathon Van Wouke; Peggy Vanwoerkom; Sonia Vanwoerkom; Bess Wah; Christine Walker; Roy Wallace; Victoria Wallace; Frank Weasks; Caroline Weaskus; Janice White; Patricia Wicks; Roxanne Wilson; Benita Witters; Samuel Penney;
Shoshone Paiute Tribes
Shoshone-Bannock Tribes, Alonzo Coby

## STATE AGENCIES

Bureau of Land Management, Idaho State Office, Thomas Dyer
Idaho Dept. of Fish and Game, Jeff Gould
State of Oregon, Michael Carrier
State of Washington, Dept. of Fish and Game, Phil Anderson
WA Dept. of Fish and Wildlife, Philip Anderson
Weiser River Soil Conservation District, Vicki Lukehart

BLM_0049143

## LOCAL GOVERNMENTS

Board of County Commissioners Washington County, ID, Michael Hopkins
Board of County Commissioners Washington County, ID, Rick Michael
Board of County Commissioners Washington County, ID, Roy Mink

## INTEREST GROUPS, BUSINESSES, ORGANIZATIONS

### A

Alberta Outfitters Association, Matthews, Dewy
American Sheep Industry Assn, Myers III, William
American Sheep Industry Assn, Orwick, Peter
American Sheep Industry Association, Hinson, Margaret
American Sheep Industry Association, Johnson, Burdell
American Sheep Industry Association, Krebs, Clint

### C

C D Ranches, Dredge, Alicia
Colorado Woolgrowers Association, Brown, Bonnie
Colorado Wool Growers Association, Theos, Anthony

### D

Defenders of Wildlife, Timberlake, Jesse

### F

Foundation for North American Wild Sheep, Houston, George
Foundation for North American Wild Sheep Oregon Chapter, Houston, George
Foundation for North American Wild Sheep Washington Chapter, Landrus, Glen

### G

Gallatin Wildlife Assn., Hockett, Glen

### H

Hells Canyon Preservation Council, Sandrock, Pete

### I

Idaho Chapter of the Wild Sheep Foundation, Batie, Dennis
Idaho Sportsmen's Caucus Advisory Council, Bell, Mark
Idaho Sportsmen's Caucus Advisory Council, Henry, P
Idaho Wild Sheep Foundation, Stewart, Peter
Idaho Wool Growers Assn, Wixom, Ken
Idaho Wool Growers Association, Boyd, Stanley

### M

Middle Snake Group, Sierra Club, Larson, Scott
Midland/Dunton Sheep Company, Arambel, Pete
MT Fish Wildlife and Parks Region 3 Citizens Advisory Council, Mealer, William

### N

National Wildlife Federation, Idaho Wildlife Federation, Feller, Joseph
Nevada Wildlife Federation, Gaudet, Robert
Nighthawk Ranch, Carlson, James

### P

Packer Victory Family Heritage, Victory, Irene

BLM_0049144

# S

Secesh Wildlands Coalition, Medberry, Mike

Secesh Wildlands Coalition, Medberry, Mike

Shingle Creek Llc, Deveny, Bill

Shirt Brothers Sheep, Shirts, Ronald and Leslie

Sierra Club Middle Snake Group, Rusnak, Richard

Soulen Livestock Company, Soulen, Phil

Sports Afield Magazine, Rupp, Diana

Sustainable Growth Inc., Gore, Ray

# T

The Wilderness Society and the Sierra Club,

The Wilderness Society Hells Canyon Preservation Council Idaho Conservation League, Gehrke, Craig

The Wildlife Society, Penninger, Mark

# U

University of Idaho, Hammel, John

University of Idaho Caine Veterinary Teaching Center, Bulgin, Marie

Upper Snake River Tribes Commission, Small, Nathan

# W

Western Watersheds Project, Ellers, Debra

Western Watersheds Project, Marvel, John

Wild Sheep Foundation, Thornton, Gray

Wild Sheep Foundation, Thagard, Neil

Wild Sheep Society of British Columbia, Glaicar, James

Wilderness Watch, Serra, Dawn

# INDIVIDUALS

# A

Adams, Kirk

Adamson, Grant

Alderson, George and Frances

Allen, Edwina

Anspacher-Meyer, Karen

Arthur, Tom

Ashmore, Andrew

# B

Babcock, Isaac

Babcock, Bjornen

Baird, Patrick

Baird, Dennis

Balch, Karen & Olin

Balch, Olin

Baldwin, Lee

Ball, Robert

Barker, Jon

Barker, Rodman

Barker, Elise

Barney, Jeff

Barnowe-Meyer, Kerey

Barstad, Donald

Barto, Diane

Batie, Dennis

Bechdel, Les

Becker, Al

Becker, Albert

Belding, Mel

Bennett, Terry

Bennett, Kay

Benson, David

Berry, Lowell

Blackburn, Del

Blair, Theresa

Bledsoe, Michael & Sarah

Blenden, Mike

Boatright, Isaac

BLM_0049145

Bohnee, Gabriel
Boice, Patricia
Boulafentis, Johna
Bowler, Anne
Bowron, Arthur "Win"
Brackney, Elisabeth
Braun, Steve
Brenner, Margaret
Brigham, William
Broncheau, Richard
Brown, Kerry
Brown, Norma
Brown, Horace
Brown-Coon, Lewis
Brusuen, Paul
Bry Ph.D., Brenna
Buchanan, Tracy
Burica, Davie
Burke, Rob
Burton, C
Busby, Michael

## C

Callaway, Todd
Carlile, Glory
Carlisle, Steve & Kim Mazik
Carlson, James
Carosone, Rick
Carpellotti, Gina
Carr, Mike
Carr, Laraine
Carufel, Lou
Casey, Shirley
Caswell, Joan
Cauffman, Nick
Cauffman, Linda & Randall
Caywood, John
Caywood, John
Chambers, Jack
Chesarek, Scott
Childers, Gary
Christie, Christopher
Ciejka, Larry
Clancy, Dyan
Clark, Marvin
Clarke, Charles and Joyce

Colavito, Dave
Colby, Janene
Cole, John
Crawford, Tanya
Cremin, Juanette
Cremin, Janet
Crupi, Kevin
Cummings, Dave
Curry, Joe

## D

Davis, Monty
Dawson, Paul
Delaney, Claudia
Demotte, Melissa
Deren, Matthew
Devries, John
Digrazia, Robert
Digrazia, Robert
Downs, Wendy
Dunn, Charles
Dyke, Bill

## E

Eck, Doug
Edwards, Derek
Eisenach, Kurt
Ellison, W. Richard
Emery, M
Erickson, Alana
Etcheverry, Henry

## F

Fairchild, Vernon
Fairchild, Telia
Farnam, Jim
Fields, David
Fisher, W. Eugene & Niki
Fitch, Rob
Flanagan, Michael
Florence, Fred
Foreyt, William
Friel, Bob
Fritts, Terri & Michael
Fuller, Ellen

BLM_0049146

## G

Garvey, Lydia
Giffin, Del
Ginn, Troy
Glemser, Shirley
Goyden, Kay
Graham, Rick
Grindstaff, Nancy Stover
Grindstaff, Nancy
Grindstaff, Nancy
Gross, Jerry
Grunke, Jim & Judy
Gudgell, Heidi
Gudgell, Gery
Guzman, Alan

## H

Hale, William
Hall, Lori
Hamilton, Joy
Hamilton, Ron
Hampton, Michael
Hankla, James
Hanks, Marvin
Hansen, Lowell
Harrington, Dean & Ginger
Harris, James
Harris, Ken
Hart, Tim & Mary
Harwood, Lorance
Hasselblad, Kristin
Hatch, Sharon
Hathhorn, Jason
Hayes, Linda
Hayes, Dave
Helmich, Jade
Hendrickson, Borg
Henry, Vance
Hesse, Jay
Higby, Jo Ann
Hirsch, Harry
Hocevar, Michael
Holyan, Jim
Hooban, Roger
Horton, Harmon & Terry & Brandi

Hovey, Will
Howard, Judd
Hudelson, Eric
Huffman, Ty
Hufnagel, Thomas
Humphries, John

## J

Jacobs, Larry
James, Jimmie
Jastremsky, Harriett
Jayne, Jerry
Jeffress, Jim
Jeffress, Matthew
Jenkins, Scot
Jennings, William
Jensen, Mark
Jessup, Sarah
Johnson, Rose Mary
Johnson, Rebecca
Johnson, Chris
Johnson, June
Johnstone, Becky
Jolley, Shane
Jones, Alan
Jones, Jack
Josephsen, Mark

## K

Kamps, Bernie
Kane, Julie
Keller, Wesley
Keller, Warren
Kerby, Dave
Key, Michael
King, George
Kinzer, Brooke
Kinzer, Ryan
Kish, Linda
Kovach, Milan & Sharon
Kovalicky, Tom
Kowalski, Beryl
Krenz, Claudia
Kronemann, Loren
Kronenberg, Jeff
Kucera, Paul

BLM_0049147

# L

Lambeth, Larry
Larkin, Carol
Larkin, Mike
Larkin, Hal and Carol
Latham, Zach
Lauer, Bill
Lee, Phoebe
Leusch, Peter
Lever, Brandon
Lewinski, John
Lewinski, John
Lewis, Robert
Light, Ted
Lind, M.
Little, David
Litton, Donald
Lomkin, Meribeth
Loos, Cindy
Louderback, Bill
Loutzenhiser, C.E.
Love, Steven
Lynde, Ann
Lynde, Eddie
Lyons, Barney

# M

Maia, Maia
Mansisidor, PJ
Mantel, Burk
Marks, Ron
Martell, Wendy
Martin, Greg
Martin, Paul
Martin, Jeremy
Martinez, Carol
Mathews, Mark
Matlock, Marty
Matthews, Jonathon
Mccarthy, John
Mcclintock, Ralph
Mccracken, Mary
Mccully, Shawn
Mcgee, Michael
Mcleod, Bruce

Mcmillian, Kelly
Metcalf, Tim
Metcalf, Kristine
Middleton, Chuck
Mildrexler, David
Miller, Ike
Mills, Dave & Sheila
Minter, Robert
Moffett, Joel
Moore, Bryan
Morton, Mark
Mucklestone, Mary Jane
Mucklestone, Susan
Mueller, Carol
Mumma, John & Myra
Murphy, Mike
Murphy, Jesse
Musselman, Rp
Muta-Lung, Kathleen
Myers, William

# N

Nashbar, Richard
Nashbar, Richard
Nipp, Mary Ann

# O

Oatman, Mccoy
Oldenburg, Lloyd
Oleary Carey, Cathy
O'neill, Kelly
Oxarango, Rochelle

# P

Padilla, Bill
Panbi, E
Paulson, Steve
Peek, James
Penney, Robert
Peterson, John
Peterson, Oly
Peterson, John
Picard, Lori
Pickett, Don
Poorman, Gayle Buhrer
Popko, Richard

BLM_0049148

Pressman, Scott & Beverly
Pritchard, Tom

# Q

Quigley, Dale
Quilliams, Lori

# R

Rabe, Craig
Ramsey, Guy
Reardon, James
Reed, James & Mary
Rees, Carolyn
Reiswig, Barry
Reynolds, Jeanette
Richard, Michael
Rickabaugh, W
Rilling, Gerald
Robinson, James & Liz
Robison, Kenneth
Robison, John
Roland, Daniel
Rose, Allen
Rose, Jan
Ross, Chris
Rossman, Angela
Rostock, Tom
Rupers, Barbara

# S

Sandberg, Shantara
Sandrock, Pete
Sayre, Jeff
Sayre, Jeffrey
Scharnhorst, Louie
Schultz, Wendy
Schwartz, Troy
Schwartz, Alicia
Schwartz, Frank
Schwartz, Mary Beth
Schwartz, Jacquelyn
Schwartz, Vince
Schwartz, Vince
Schwenkfelder, Royce
Seekamp, Erin
Sevy, Alice

Seymour, Brad
Shade, Betsy
Shannon, Justin
Shiffman, Cristina
Shirt, Tim
Shirts, Leslie
Shirts, Ron
Shirts, Trish
Shirts, Dave
Shirts, Leslie & Ron & Frank, Jr.
Shirts, Frank
Smith, Dana
Smith, L.B.
Smith, Shauna
Smothers, Melissa
Soulen Hinson, Margaret
Spalding, Curtis
Spates, Georgeanne
Speakes, Leland
Spear, Peter
Srholec, John
Stachowski, Kathleen
Steele, Valdasue & Jack H. Bell
Steitz, Jim
Stephenson, Jim
Stewart, Peter
Stinson, Stan & Becky
Strong, Rob
Sykes, Dan & Nelda

# T

Tatschl, Pete
Them, Catherine
Thiele, Barbara
Thomas, Sally Ferguson
Thomas, Kenny
Thompson, Lawrence
Thurman, Todd
Tillemans, Brian
Tlachac, Greg
Tolmie, Connie
Tombleson, Barbara
Torti, Anna
Turnipseed, Jeff

BLM_0049149

# U

Urbigkit, Cat

# V

Vasko, Teresa
Veldhuizen, Tony
Vestal, Robert

# W

Walbridge, Charlie
Warner, Joe
Warnock, Mike
Weiser, Glen
Welsh, Robert
Welty, Julie and Jared Alexander
Westlake, Russ
Wetzel, David
Wheaton, John
Whitaker, William
Whitman, Ernie
Wiley, Carol
Williams, Roger
Williams, Darryl
Williams, Dewayne
Wilson, Dennis
Winjum, Jim
Wolfe, Marlin
Wolfe, Karl
Wolfe, Jim & Carol
Wood, Douglas
Woody, Wes
Woody, Norma
Woosley, Charles
Woosley, Charles and Gail
Woslum, Edd
Wuerthner, George

# XYZ

Young, John
Young Jr, Rulon
Zimowsky, Pete
Zollinger, Linda
Zubizarreta, Joe

BLM_0049150

BLM_0049151

# Response to Public Comments on the DSEIS and Update to the DSEIS

## 100   LEGAL AND ADMINISTRATIVE FRAMEWORK (VIOLATIONS, LACK OF DISCLOSURE, DECISION MAKING, LAWS, REGULATIONS, POLICY)

**Concern Statement 100.23**

*The Forest Service should discuss the viability requirement found in the NFMA of 1976 because this requirement is one of the foundations for the SEIS and Forest Plan Amendment.*

**Response to Concern 100.23**

This legal requirement is addressed on pages 1-4 through 1-5 in the DSEIS and viability determinations are discussed on page 2-13 in the Update to the DSEIS. Further discussion is on pages 1–5 through 1–6 in the FSEIS.

> *Sample Public Comment for 100.23*
>
> > [Page 3-29] What is the viability requirement expressed in the law and has that law been changed? Must adjacent uncontrollable factors be accounted for? (DSEIS Ltr #11608)

**Concern Statement 100.24**

*The Forest Service should clarify how Executive Order 13443 pertains to the analysis in the SEIS. (PC 1. z).*

**Response to Concern 100.24**

Executive Order 13443 pertains to this analysis as bighorn sheep are a huntable big game species. Therefore, the Payette National Forest must consider it in this analysis as it does several other applicable laws. Also, see the legal section in this document and the legal section in the FEIS for the Forest Plan for numerous other Federal laws that apply to Forest Service management.

> *Sample Public Comment for 100.24*
>
> > Executive Order 13443: This order is cited but how it is tied or causes certain actions are not explained in any way. Legal requirements are usually confirmed by interpreting their role in the information and discussion that implements that order or law. (DSEIS Ltr #11608)

**Concern Statement 100.25**

*The Forest Service should withdraw the DSEIS because it does not meet the requirements of NFMA or NEPA. (PC 4. a)*

BLM_0049152

**Response to Concern 100.25**

The Forest Service believes that the DSEIS responds to the instructions from the Forest Service Chief and meets both the requirements of NFMA and NEPA. This comment did not indicate where the respondent felt the DSEIS was flawed. The Payette National Forest will expand upon the discussion of legal compliance in the FSEIS.

> *Sample Public Comment for 100.25*
>
> The Draft Supplemental Environmental Impact Statement (DSEIS) is inadequate and does not meet the requirements of either the National Forest Management Act (NFMA) or the National Environmental Policy Act (NEPA). This DSEIS should be withdrawn and the Forest Service should manage the National Forest System in accordance with the 2003 FEIS and ROD, or the forest management planning that existed prior to that date. (DSEIS Ltr #12943)

**Concern Statement 100.26**

*The Forest Service should not look at the desires of special interest groups from any side of the issue because doing so does not meet the requirements of NFMA, HCRNAA, and the MUSYA. (PC 5. p; PC 18. a, b; PC 26. z; PC 35. m)*

**Response to Concern 100.26**

The Forest Service must review all submitted comments and respond to those that are found to be substantive. The Forest Service has reviewed and conducted a content analysis of the comments received. This analysis has been conducted in an objective manner, considering and disclosing the effects on bighorn sheep viability, rangeland resources, economics, and Tribal Rights and Interests through rigorous assessment of an adequate range of alternatives. Included in the analysis was a review of peer-reviewed and published science, bighorn sheep telemetry data, and input from the cooperators of the States of Idaho, Oregon, and Washington; the Tribes of the Nez Perce, Shoshone Bannock, and Shoshone Paiute; and the Confederated Tribes of the Umatilla Indian Reservation.

> *Sample Public Comment for 100.26*
>
> Take a breath and start managing the lands for the good of the public, rather than special interest groups. You have the power, to say nothing of the mission. (DSEIS Ltr #13622)

**Concern Statement 100.27**

*The Forest Service should reimburse the domestic sheep permittees for the legal costs of defending themselves against the actions of the Forest Service. (PC 26. t)*

**Response to Concern 100.27**

Legal fees are awarded through the legal system and not included in an environmental analysis.

BLM_0049153

### Sample Public Comment for 100.27

It should be further resolved that not only are the grazers held "harmless" to bighorns but also should be reimbursed for the losses created defending themselves from this adverse decision. (DSEIS Ltr #13081)

---

**Concern Statement 100.28**

*The Forest Service should consider that management direction that focuses solely on bighorn viability is inconsistent with the MWSA, NFMA, MUSYA, and the HCRNA Act. (PC 26. z; PC 35. b)*

**Response to Concern 100.28**

The FEIS for the 2003 Forest Plan for the Payette National Forest provides direction for all resources. The SFEIS and Forest Plan Amendment focus solely on bighorn sheep viability in response to appeal instructions from the Chief of the Forest Service (DSEIS pages 1-2 through 1-5). In review of the appeal, the Payette National Forest was found to have not adequately responded to a significant issue that was identified in the FEIS for the 2003 Forest Plan that dealt with disease transmission between domestic sheep and bighorn sheep. Viability requirements in NFMA ask for habitat well distributed across the planning unit and available to bighorn sheep. The habitat should also be contiguous to allow for reproducing individuals to come into contact. Tribal governments have requested bighorn populations be available in areas they historically occupied so Treaty Rights can be exercised.

The assumption in the analysis is that habitat is not available to bighorn sheep so long as domestic sheep occupy that habitat. Further discussion of legal compliance can be found in the legal section in the Payette Forest Plan FEIS and in the FSEIS for this analysis.

### Sample Public Comments for 100.28

The DSEIS has been constructed with a presumption that bighorn populations must exist and be expanded in all regions of the Payette National Forest, and that domestic sheep grazing must be eliminated in order to accomplish this objective. This goal of population growth and expansion is contrary to the NFMA, HCNRA Act, the Multiple-Use Sustained Yield Act, and the purpose and need for agency action. (DSEIS Ltr #12943)

BLM_0049154

Comment #4, pg. 1-1: The DSEIS fails to comply with the Multiple-Use Sustained-Yield Act, the National Forest Management Act and the Hells Canyon National Recreation Area Act. The PNF stated that the analysis in the 2008 DSEIS "was to be thorough enough to determine compliance with applicable laws and regulations, specifically the HCNRA Act, 36 C.F.R. § 219.19, and 36 C.F.R. § 292.48." 2008 DSEIS at 1-4. Specifically, the 2008 DSEIS was to present additional information concerning the following: Compliance with the Hells Canyon National Recreation Area (HCNRA) Act (PL 94-199); Compliance with 36 C.F.R. § 292.48 (domestic livestock grazing activities on Other Lands, Wild and Scenic Rivers, and Wilderness Lands in the HCNRA) Compliance with the National Forest Management Act (NFMA); Compliance with 36 C.F.R. § 219.19 (ecological, social, and economic sustainability) 2008 DSEIS at vii, 1-3 through 1-5. The updated DSEIS does not update this information from the 2008 DSEIS. Besides compliance with the laws and regulations provided in the 2008 DSEIS, the PNF must present information in the updated DSEIS on compliance with the following: Multiple-Use Sustained-Yield Act (MUSYA) (16 U.S.C. §§ 528-531); National Forest Management Act (NFMA) (16 U.S.C. §§ 472A, 476, 500, 513-516, 518, 521b, 528 (note), 576B, 594-2 (note), 1600 (note), 1601 (note), 1600-1602, 1604, 1606, 1608-1614); Hells Canyon National Recreation Area (HCNRA) Act (16 U.S.C. §§ 460gg-460gg-13) The DSEIS does not contain any discussion of compliance with these laws in the "Purpose and Need" section. See DSEIS at 1-1. This section needs to be updated to indicate compliance with these laws. Specifically, the following must be addressed: Multiple-Use Sustained-Yield Act (MUSYA) (16 U.S.C. §§ 528-531) The MUSYA provides that "it is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528 (emphasis added). In other words, the national forests are to be administered for "multiple use," which includes management of range resources, along with management of wildlife. See 36 C.F.R. § 219.12 ("National Forest System lands are generally suitable for a variety of multiple uses, such as…range…and wildlife and fish purposes."); see also 36 C.F.R. § 219.1(b) (National Forest System to be managed for multiple uses). The preferred alternative in the DSEIS does not manage for "multiple use" as it completely eliminates range resources for sheep grazing. Under the MUSYA, the PNF must provide range resources for grazing. National Forest Management Act (NFMA) (16 U.S.C. §§ 472A, 476, 500, 513-516, 518, 521b, 528 (note), 576B, 594-2 (note), 1600 (note), 1601 (note), 1600-1602, 1604, 1606, 1608-1614) The NFMA references the MUSYA, 16 U.S.C. §§ 528–531, and requires that plans developed for units of the National Forest System "provide for multiple use and sustained yield of the products and services obtained there from … and [must] include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness[.]" 16 U.S.C. § 1604(e)(1). "Thus, the NFMA is explicit that wildlife viability is not the Forest Service's only consideration when developing site-specific plans for National Forest System lands." The Lands Council v. McNair, 537 F.3d 981, 990 (9th Cir. 2008). Further, nothing in NFMA requires the Forest Service "to improve a species' habitat to prove that it is maintaining wildlife viability." Id. at 995. The NFMA does not mandate viability of species. The DSEIS is inconsistent with NFMA because the PNF only considers wildlife viability and does not give any consideration to the continuation of domestic sheep grazing on the PNF. Further, the PNF's proposed alternative and management direction in the DSEIS are targeted at "improving" bighorn sheep habitat, which is not required under NFMA to establish that the PNF is maintaining wildlife viability. Consequently, the PNF's proposed termination of grazing allotments to improve bighorn sheep habitat is unwarranted and inconsistent with NFMA. Thus, the PNF must revise its preferred alternative and management direction to allow for the

BLM_0049155

continuation of domestic sheep grazing on the PNF. Hells Canyon National Recreation Area (HCNRA) Act (16 U.S.C. §§ 460gg-460gg-13) The HCNRA Act provides that the Secretary shall promulgate rules and regulations to accomplish the purposes of the Act, and such rules and regulations shall include "standards for such management, utilization, and disposal of natural resources on federally owned lands, including, but not limited to, timber harvesting by selective cutting, mining, and grazing and the continuation of such existing uses and developments as are compatible with the provisions of this Act." 16 U.S.C. § 460gg-7. The HCNRA Act clearly recognizes that grazing and existing uses (such as grazing) which are compatible with the Act are to continue. See id.; see also id. § 460gg-10. According to 36 C.F.R. § 292.48(b), "[w]here domestic livestock grazing is incompatible with the protection, restoration, or maintenance of fish and wildlife or their habitats … the livestock use shall be modified as necessary to eliminate or avoid the incompatibility." (emphasis added). "In the event an incompatibility persists after the modification or modification is not feasible, the livestock use shall be terminated." 36 C.F.R. § 292.48(b) (emphasis added). Has domestic livestock grazing on the PNF been proven incompatible with the protection, restoration, or maintenance of fish and wildlife or their habitats? If the PNF determines there is such an incompatibility, which the PNF has not proven in the DSEIS, then "livestock use shall be modified as necessary to eliminate or avoid the incompatibility." 36 C.F.R. § 292.48(b). Under 36 C.F.R. § 292.48(b), the PNF is only first authorized to "modify" livestock use when an incompatibility is identified. The preferred alternative in the DSEIS does not "modify" livestock use, but completely eliminates such use across most of the PNF. Such wholesale elimination of grazing is in violation of 36 C.F.R. § 292.48(b). Rather than eliminating grazing on the PNF, the PNF must "modify" livestock use or minimize and mitigate the impacts of livestock use. Numerous best management practices and mitigation measures are available to "modify" livestock use. Only in the event that an incompatibility persists "after the modification" the livestock use shall be terminated. 36 C.F.R. § 292.48(b). The PNF has not demonstrated that a modification is infeasible, nor does the preferred alternative in the DSEIS employ modifications to livestock use prior to eliminating such use as is required under 36 C.F.R. § 292.48(b). The preferred alternative in the DSEIS thus violates the HCNRA Act and 36 C.F.R. § 292.48(b). Consequently, the PNF must revise the preferred alternative. (Update to DSEIS Ltr# 20070)

**Concern Statement 100.29**

*The Forest Service should meet the requirements of NEPA as they have failed to do so because the analysis focuses on only one wildlife species rather than considering the environment as a whole. (PC 26. z)*

**Response to Concern 100.29**

This analysis tiers to and supplements the FEIS for the 2003 Forest Plan for the Payette National Forest. The Forest Plan FEIS contains an assessment that covers all of the applicable resources and issues thorough disclosure and analysis of the environment as a whole. Also, as a programmatic decision, site specificity is not a requirement, as the direction applies to the Payette National Forest as a whole.

BLM_0049156

### Sample Public Comment for 100.29

Generally, the management direction for rangeland resources should focus on maintaining domestic sheep allotments on the Payette National Forest, rather than terminating them. Management direction that focuses solely on bighorn viability is inconsistent with the MWSA, NFMA and the HCNRA Act. (DSEIS Ltr #13550)

---

**Concern Statement 100.30**

*The Forest Service should fulfill their obligation to respond to public comments, as directed in 40 CFR 8 1503.4(a), and "discuss at appropriate points in the final EIS any responsible opposing view which was not adequately discussed in the draft EIS and indicate the agency's response to the issues raised." (PC 33. b)*

**Response to Concern 100.30**

The Forest Service conducted an extensive content analysis on all of the comments that were received on the DSEIS and the Update to the DSEIS and the response to all substantive comments can be found in Appendix A in the FSEIS. Opposing viewpoints are also discussed in Chapter 3 of the FSEIS.

### Sample Public Comment for 100.30

In addition to its general obligation to respond to public comments under 40 C.F.R. 8 1503.4(a), the PNF must specifically "discuss at appropriate points in the final [EIS] any responsible opposing view which was not adequately discussed in the draft [EIS] and . . . indicate the agency's response to the issues raised." Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1167 (9th Cir. 2003) (quoting 40 C.F.R. 5 1502.9(b)). A failure to do so is itself a NEPA violation. Id. at 1168. (DSEIS Ltr #13550)

---

**Concern Statement 100.31**

*The Forest Service has violated the NFMA by relying on the Forest Service RADT Committee report and the Payette Principles Committee report. (PC 35. a)*

**Response to Concern 100.31**

The RADT specialist report and the statements from the Science Panel (Payette Principles Committee) meeting are not used in either the Update to the DSEIS or in the FSEIS. This analysis adheres to NFMA.

### Sample Public Comments for 100.31

The PNF has violated the National Forest Management Act and must set aside the Forest Service's RADT Committee and its Report and the Payette Principles Committee and its Report. These Reports must not be relied on in the Final SEIS. (DSEIS Ltr #13550)

BLM_0049157

Comment #3, pgs. 1, 2-6, 3-7, 3-12, 3-80, Appendix B pg. 67, general: The findings of the RADT Committee and the Payette Principles Committee and the reports from those committees violate Federal Advisory Committee Act and the National Forest Management Act and should not be relied upon in the DSEIS. On July 1, 2009, U.S. District Court Judge B. Lynn Winmill issued a decision in Idaho Wool Growers Association and Dr. Marie S. Bulgin v. Ed Shaffer, et al., 08-cv-394-S-BLW (D. Idaho). Plaintiffs challenged the Forest Service's establishment and use of two committees and their reports as violations of FACA, NFMA, and the APA. These committees, known as the RADT Committee and the Payette Principles Committee, and their reports are referenced in the DSEIS as USDA Forest Service 2006a and 2006b. See DSEIS, Appendix B at 67. Judge Winmill entered an order granting plaintiffs' motion for summary judgment. In so doing, Judge Winmill wrote "The issue here is whether the Forest Service's Committees violated FACA's and NFMA's procedural requirements and, if so, whether the Committees' reports should be utilized for any future Forest Service Decisions." Idaho Wool Growers Association and Dr. Marie S. Bulgin v. Ed Shaffer, et al., at pages 15-16. The Court ordered that "The Committees' findings and/or conclusions are not to be relied upon by the Forest Service with respect to any future agency decisions." Id. at 23. This includes any future decisions to issue a Final SEIS or revise the Payette LRMP. Despite Judge Winmill's decision, the Forest Service still relies upon the findings and conclusions of the RADT and Payette Principles Committees in the DSEIS. See DSEIS, Appendix B at 67. The findings and conclusions of the RADT and Payette Principles Committees must not be relied upon in the Final SEIS. In the absence of these "findings," the Payette National Forest must provide other reasons to support its final environmental analysis and ultimate record of decision on revision of the LRMP for the Payette National Forest. Additionally, the agency's preferred alternative, Alternative 7G, states that "[t]he GPR was developed utilizing the 2006 Risk Analysis that is no longer in effect for the updated to the DSEIS." DSEIS at 2-6. Any use of the 2006 Risk Analysis is specifically barred by the federal district court's Order. The Forest Service must abandon its management recommendations and the agency's preferred alternative 7G developed in reliance on the illegal findings. Moreover, the Introduction of the DSEIS provides that "[t]he qualitative 2006 Risk Analysis for Disease Transmission between Bighorn Sheep and Domestic Sheep on the Payette National Forest was completely replaced and is no longer utilized in this effort." DSEIS at 1. Not only is the PNF precluded from utilizing this analysis, but it is also precluded from relying on the findings of the Payette Principles Committee and the report from the Payette Principles Committee. Ensure that the findings and report from the Payette Principles Committee were not utilized in the DSEIS and provide a statement indicating the same. Lastly, the analysis of risk of contact between domestic sheep and bighorn sheep on the PNF uses published literature and "expert knowledge." DSEIS at 3-7. Does this "expert knowledge" result from the RADT Committee or the Payette Principles Committee? Similarly, the DSEIS provides that models in the document "updated the previous analyses conducted for the DSEIS." DSEIS at 3-12. Do any of these previous analyses rely on the findings of the RADT Committee or the Payette Principles Committee? (Update to DSEIS Ltr# 20070)

BLM_0049158

**Concern Statement 100.32**

*The Forest Service should be consistent with the HCNRA Act of 1975 and not allow grazing of domestic sheep. (PC 26 z; PC 35. e)*

**Response to Concern 100.32**

According to the HCNRA Act, grazing is identified as one of several traditional and valid uses of the HCNRA, and the continuation of grazing may occur as it is compatible with the provisions of the HCNRA Act (DSEIS page 1-5). The Payette National Forest is required by the HCRNA Act to manage livestock in the Hells Canyon Management Area in a manner compatible with the protection and maintenance of bighorn sheep or their habitat within the HCNRA. The Forest Service followed this direction when developing and analyzing alternatives in the DSEIS (ibid) and the update to the DSEIS and the FSEIS. The Chief of the Forest Service instructed the Regional Forester and the Payette National Forest to analyze the viability of bighorn sheep in Management Area 1 (Hells Canyon) and to make changes to Forest Plan direction as necessary to ensure their continued protection (DSEIS pages 1-3).

The alternatives and the analysis in the FSEIS consider the effects to the HCNRA and compliance with the HCNRA Act is discussed in Chapter 2. Consistency determinations with the HCNRA Act are the responsibility of the Wallowa-Whitman National Forest, and the Payette National Forest has received such determination.

> *Sample Public Comment for 100.32*
>
> Generally, the management direction for rangeland resources should focus on maintaining domestic sheep allotments on the PNF, rather than terminating them. Management direction that focuses solely on bighorn viability is inconsistent with the MWSA, NFMA and the HCNRA Act. (DSEIS Ltr #13550)

**Concern Statement 100.33**

*The Forest Service should ensure that the proposed amendment is consistent with the MUSYA and Administrative Procedures Act because eliminating domestic sheep grazing is in violation of these two Acts. (PC 37. b)*

**Response to Concern 100.33**

NFS lands are not reserved for the exclusive use of any one use or to emphasize any one resource value to the detriment of other uses or values. It is appropriate for different areas of the National Forest to provide opportunities for different uses and to emphasize different values. Decisions on where uses are to occur are to be made with full involvement of interested governments and publics. The analysis in the DSEIS, the Update to the DSEIS, and the FSEIS; the resulting proposed amendment is a supplement to the FEIS for the 2003 Forest Plan for the Payette National Forest, which considers many different allocations of resources and uses, and additionally the public has been involved since its inception in 1997, which is compliant with the MUSYA. Compliance with legal requirements is discussed in the FSEIS and the Forest Plan FEIS. The Payette

BLM_0049159

National Forest believes it is consistent with the Administrative Procedures Act as this analysis neither involves rule making nor adjudication.

### Sample Public Comment for 100.33

The amendments are inconsistent with multi-use management and arbitrarily and capriciously eliminate grazing from Payette National Forest, in violation of the Administrative Procedure Act. (DSEIS Ltr #13614)

---

**Concern Statement 100.34**

*The Forest Service should manage public land for multiple use and the benefit of all people, rather than managing public land to benefit a few private sheep ranchers who could reasonably be expected to provide their own land for grazing. (PC 38. a, b, c, d, h, i)*

**Response to Concern 100.34**

This analysis and resulting proposed amendment is a supplement to the FEIS for the 2003 Forest Plan for the Payette National Forest, which considers many different allocations of resources and uses, and additionally, the public has been involved since its inception in 1997 to the present via the SEIS. During the 13-year public involvement effort, the issues have not been resolved or gone away. The issues, however, have been further refined and analyzed to determine the best approach to address them.

### Sample Public Comments for 100.34

As a trustee of public lands the U.S. Forest Service has an obligation to manage these lands in the best interest of all the people. (DSEIS Ltr #13298)

The zeal and determination to eliminate domestic sheep grazing in order to prevent comingling of domestic sheep with Bighorn Sheep will undermine the economic viability of Idaho Counties, such as Washington County. The multiple use concepts of federal lands in conjunction with local private partnership of lands within the County served to enhance the viability by allowing the use of federal lands to provide profitable operations that in turn allowed a continued and reasonably predictable tax base for the County, and the State as a whole. The multiple use concepts allow the use of nontaxable federal lands to provide funding by ranching, logging, recreation and mining for the good of all citizens These facts need to be reiterated and not forgotten- The history before the adoption of the multiple use concepts that allowed productive use of federal lands for the good of all is not a pleasant history. Without the ability to legitimately use federal lands, they become "off limits" and a liability to local governments that have such properties within their boundaries. This fact also cannot be forgotten in the storm of controversies that surround the question of the Bighorn Sheep, and other interactions between human activities and animals. (Update to DSEIS Ltr# 20102)

BLM_0049160

**Concern Statement 100.35**

*The Forest Service should not view the need to manage for multiple use as an excuse for sanctioning activities that degrade natural resources. (PC 38. j)*

**Response to Concern 100.35**

The Forest Service believes that some degradation of natural resources may occur when managing for multiple use, but the land should not be permanently impaired (e.g., species viability). The balance of uses and acceptable levels of degradation are determined during project analysis through dialogue with Agency specialists, coordination with other Federal, tribal, and State representatives, and involvement of interested and affected publics.

*Sample Public Comment for 100.35*

It is of utmost importance that the concept of multiple use not be viewed as a surrogate for approving any activity applied for, especially if that activity degrades other activities and natural resources. (DSEIS Ltr #13107)

**Concern Statement 100.36**

*The Forest Service should interpret policy with a greater emphasis on environmental stewardship. (PC 38. k; PC 41. d)*

**Response to Concern 100.36**

The Forest Service believes that guiding policy emphasizes balancing environmental stewardship and competing uses of NFS land in a manner that is environmentally sustainable over the long term.

*Sample Public Comment for 100.36*

Why does the Forest Service see a compelling need to close the Public Lands to the multiple uses of everyone? This is only one of the many ways that the Forest Service is trying to control our given rights as the public. (DSEIS Ltr #63)

**Concern Statement 100.37**

*The Forest Service should support groups that protect wilderness values for all Americans, rather than groups that manage for profit. (PC 39. c)*

**Response to Concern 100.37**

The Forest Service believes that guiding policy emphasizes balancing environmental stewardship and competing uses of NFS land in a manner that is environmentally sustainable over the long term. This project is not analyzing any changes to Wilderness management.

BLM_0049161

### Sample Public Comment for 100.37

That's why we are endorsing the campaign by groups interested in protecting wilderness values for all Americans, not just those who can profit from it or locals who exploit the land that belongs to all of us. (DSEIS Ltr #1753)

---

### Concern Statement 100.38

*The Forest Service should take steps to reinforce trust and credibility into its actions and not interfere with private business. (PC 44. d)*

### Response to Concern 100.38

Holders of domestic sheep grazing permits are operating under the authority of the Federal Government and as such permits are a privilege. These permits are operated under terms and conditions that the Forest Service deems necessary to prevent other resource degradation. If other resource damage cannot be prevented or continues to occur at unacceptable levels, permits can be adjusted or withdrawn at anytime under emergency closure procedures.

### Sample Public Comment for 100.38

The government needs to stay out of independent business owner's business. (DSEIS Ltr #12565)

---

### Concern Statement 100.39

*The Forest Service should ensure that it does not attempt to manage the wildlife, but instead wildlife habitat because management of wildlife is the responsibility of the State of Idaho. (PC 45. a, c, d, e)*

### Response to Concern 100.39

The Payette National Forest is managing bighorn sheep habitat, and in the SEIS analysis process is determining how much habitat is required under NFMA to provide for viable populations (refer to Chapter 2 and 3 of the FSEIS).

### Sample Public Comment for 100.39

The Forest Service does not have the authority to make game management decisions for the state of Idaho, though that is exactly what it is attempting to do in this DSEIS. Idaho will manage its own wildlife. (DSEIS Ltr #13766)

---

### Concern Statement 100.40

*The Forest Service should choose the alternative that best encourages the health of bighorn sheep by implementing a decision in a timely manner that eliminates the risk of contact between bighorn sheep and domestic sheep because. Delays would only further jeopardize bighorn recovery and increase the risk of severe population losses if contact with domestic sheep continues.*

BLM_0049162

**Response to Concern 100.40**

Forest Service regulations (36 CFR 219.19) require that habitats be managed to support viable populations of native and desired non-native species. This requirement does not infer that all risk of interspecies contact between domestic sheep and bighorn sheep necessarily be eliminated. Therefore, any alternative that provides habitats that support viable populations is considered an acceptable alternative. The FSEIS does evaluate the effects of several alternatives, including a "no contact" alternative, and evaluates these for the likelihood of interspecies contact and persistence of bighorn sheep populations. Although a no contact decision would provide the greatest likelihood for providing bighorn sheep population persistence, other alternatives provide scenarios that allow population persistence. Alternatives that provide for bighorn sheep population persistence, and are phased in or implemented in a timely manner, are considered acceptable.

> *Sample Public Comment for 100.40*
>
> A decision to eliminate the risk of contact between bighorns and domestic sheep must be implemented in a timely manner, certainly within a year of the decision. Delays would only further jeopardize bighorn recovery and increase the risk of severe population losses if contact with domestics occurs. (Update to DSEIS Ltr# 20088)

**Concern Statement 100.41**

*The Forest Service should ensure that it does not take on projects that are the responsibility of the State of Idaho and include discussion about an adaptive management and separation strategy per the MOU with the State of Idaho in the DSEIS.*

**Response to Concern 100.41**

The amendment of the Payette National Forest 2003 Forest Plan is the full legal responsibility of the Forest Service and not the State of Idaho. Under Cooperating Agency Status, all of the Cooperators, including the State of Idaho, had opportunities to provide information for the Forest Service to consider including adaptive management strategies, Forest Plan direction, monitoring requirements, and separation strategies, in addition to feedback on numerous aspects of the project as it proceeded. Any and all suggestions provided by the State of Idaho are captured in the notes from these Cooperator meetings and considered to their fullest by the Forest Service. However, it must be understood that consideration to the fullest does not necessarily lead to application as each and every suggestion is weighed against numerous criteria. The criteria include legality of the suggestion under Federal law, cost to adopt, effectiveness of the suggestion, proven track record of the suggestion, or whether or not it addresses the issue or meets the purpose and need of the project. The Payette National Forest believes that the Memorandums of Understanding with the Cooperators were followed.

BLM_0049163

### Sample Public Comment for 100.41

Comment #8, general: The DSEIS does not discuss or implement any adaptive management or separation strategies prepared by the State of Idaho. The PNF entered a memorandum of understanding (MOU), "Memorandum of Understanding between the State of Idaho and the United States Department of Agriculture Forest Service, Payette National Forest," in 2007 that provides a framework for cooperation between the State of Idaho and the PNF in preparation of the DSEIS. See FS Agreement No. 07- MU-11041200-041. The MOU states that the PNF shall provide the opportunity for the State of Idaho to develop adaptive management strategies that will be considered for the LRMP amendment and that information provided by the State will be considered to the maximum extent possible. MOU at 2. Further, the MOU provides that the State shall, among other things, develop adaptive management strategies for occupation of bighorn sheep habitat and develop separation strategies between bighorns and domestic sheep. MOU at 2. The DSEIS does not contain discussion of any adaptive management strategies or separation strategies prepared by the State of Idaho in consultation with affected permittees in 2008. Has the PNF considered these strategies, if any, for the LRMP amendment? The DSEIS must contain a discussion on how the PNF and State of Idaho have met their obligations in the MOU and how the DSEIS complies with the terms of the MOU. (Update to DSEIS Ltr# 20070)

---

**Concern Statement 100.42**

*The Forest Service should maintain the existing grazing rights and allotments of sheep ranchers on Federal land and address the inconsistencies in management direction between the HCNRA Comprehensive Management Plan (CMP), HCNRA Act, Interior Columbia Basin Strategy, Forest Service Open Space Conservation Strategy, Directive from Mark Rey (USDA Under Secretary), and the DSEIS.*

**Response to Concern 100.42**

The Payette National Forest has been following the current policy direction for amending a Forest Plan and for working on bighorn sheep–domestic sheep issues. The Payette National Forest has worked to promote and protect the integrity of the bighorn sheep populations within the influence area of the Forest. The Payette National Forest has considered potential economic impacts to the grazing industry affected by the various management alternatives, which are disclosed in the Economics Section in Chapter 3 of the FSEIS. The Payette National Forest is unaware of inconsistencies between the efforts mentioned in the comment.

On September 23, 2008, the Chief of the Forest Service received the following letter from the Under Secretary of Agriculture:

BLM_0049164

10/09/2008 16:17 FAX                                                          ☑001



United States Department of Agriculture
Office of the Secretary
Washington, D.C. 20250

SEP 2 3 2008

Abigail R. Kimbell, Chief
USDA Forest Service
201 14ᵗʰ Street, SW
Washington, DC 20024

Dear Ms. Kimbell:

Federal land management agencies are in the process of reviewing and updating their respective management policies where domestic sheep and goats graze in proximity to wild sheep, with the intention of developing a federal policy framework consistent with state wildlife objectives. Due to the presence of federal lands managed by various agencies within wild sheep ranges and the high risk of disease transmission from domestic sheep and goats to wild sheep, a consistent set of management policies for minimizing this risk is desirable. Through these policies, the agencies will seek to promote and protect the ecological integrity of wild sheep, as well as support the economic sustainability of sheep producers where these animals potentially co-mingle.

Until an action plan to address the risk of disease transmission is developed with the relevant state wildlife agencies, I am directing the Forest Service to suspend participation in, or support of efforts to, transplant wild sheep onto National Forest System lands in areas where there is a likelihood that wild sheep might come into contact with domestic sheep or goats.

Sincerely,

MARK REY
Under Secretary
Natural Resources and Environment

*A-34*

On September 23, 2008, USDA Under Secretary for Natural Resources and Environment (NRE) Mark Rey directed the Forest Service to suspend participation in or support of efforts to transplant wild sheep onto NFS lands until action plans were developed to address the risk of wild sheep coming into contact with domestic sheep or goats. The direction also encourages cooperation between State and Federal agencies to work together to promote the ecological integrity of wild sheep, as well as support the economic sustainability of sheep producers. A copy of this direction is below.

> While working closely with the States, tribes, and the public regarding transplant proposals, I ask that you seek to provide effective separation between domestic sheep and goats and wild sheep to minimize the likelihood of disease transmission to wild sheep. This includes careful review of the Payette Principles http://www.mwvcrc.org/bighorn/payetteprinciples.pdf and the Western Association of Fish and Wildlife Agencies (WAFWA) June 21, 2008, report entitled: Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat: http://www.mwvcrc.org/bighorn/wafwawildsheepreport.pdf.

> We recognize the rights of States and their jurisdiction over wildlife; this direction does not apply to them. However, review of the Payette Principles and WAFWA report will help guide your participation with the States while implementing NRE direction.

> The sheep industry and bighorn sheep advocates generally agree that it is in everyone's best interest to prevent disease transmission. I believe that earnest collaboration with the States is essential to address this issue and I encourage you to promote this collaboration at every opportunity.

The Payette National Forest is not involved in any transplant efforts of bighorn sheep. The Payette National Forest believes that compliance with the instructions is occurring aside from utilization of the Payette Principles.

BLM_0049166

### Sample Public Comment for 100.42

Comment #5, general: The DSEIS fails to comply with the Directive from Mark Rey, Under Secretary, United States Department of Agriculture, to Abigail R. Kimbell, Chief, Forest Service. On September 23, 2008, Mark Rey, Under Secretary, Natural Resources and Environment, United States Department of Agriculture, sent a letter to Abigail R. Kimbell, Chief, Forest Service, United States Department of Agriculture, stating the following: Federal land management agencies are in the process of reviewing and updating their respective management policies where domestic sheep and goats graze in proximity to wild sheep, with the intention of developing a federal policy framework consistent with state wildlife objectives. Due to the presence of federal lands managed by various agencies within wild sheep ranges and the high risk of disease transmission from domestic sheep and goats to wild sheep, a consistent set of management policies for minimizing this risk is desirable. Through these policies, the agencies will seek to promote and protect the ecological integrity of wild sheep, as well as support the economic sustainability of sheep producers where these animals potentially co-mingle. Until an action plan to address the risk of disease transmission is developed with the relevant state wildlife agencies, I am directing the Forest Service to suspend participation in, or support of efforts to, transplant wild sheep onto National Forest System lands in areas where there is likelihood that wild sheep might come into contact with domestic sheep or goats. This directive makes clear that the Forest Service is not currently authorized to develop a plan to address the risk of disease transmission. Rather, an action plan to address the risk of disease transmission is to be developed with the relevant state wildlife agencies. Why is the PNF developing an action plan when it has not been authorized to do so? Further, why is the PNF developing an action plan when, clearly, an action plan is to be developed with the relevant state wildlife agencies? The PNF is not complying with the directive from Mark Rey to Abigail R. Kimbell. The PNF must ensure that the DSEIS complies with this directive, and cease development of an action plan to address the risk of disease transmission on the PNF, until an action plan to address the risk of disease transmission has been developed with the relevant state wildlife agencies. (Update to DSEIS Ltr# 20070)

---

**Concern Statement 100.43**

*The Forest Service should comply with the NFMA and HCNRA Act by not selecting any of the action alternatives because they violate the HCNRA Act, which is contrary to the Payette National Forest's conclusions in the Update to the DSEIS.*

**Response to Concern 100.43**

The document simply reiterates the consistency determination that was made by the authorizing official from the Wallowa-Whitman National Forest. The Wallowa-Whitman National Forest requested that monitoring continue to occur to in and near the core herd home range and adjust accordingly when bighorn sheep are observed. Monitoring of the area in question is planned for and documented in the monitoring section of the Forest Plan Amendment.

BLM_0049167

### Sample Public Comment for 100.43

Because any of the action alternatives would likely result in the eventual extirpation of the Upper Hells Canyon band, the selection of any of the action alternatives as the final decision would violate the HCNRAA, contrary to the PNF's conclusions on pgs. 2-14-18. The Update's conclusions that the recently developed action alternatives 7M, 7N 70 and 7P comply with the HCNRAA are based on the memorandum from Wallowa-Whitman Forest Supervisor Steven A. Ellis dated January 6, 2010 to Supervisor Rainville. (Appendix G). Supervisor Ellis notes on p. 3 of his memorandum that "In all four alternatives, grazing would continue within 2 miles of the modeled bighorn sheep herd home range. If that grazing continues near herd home range, we recommend some effective monitoring both inside and outside of herd home ranges to help detect bighorn sheep before contact is made." (Update to DSEIS Ltr# 20099)

---

**Concern Statement 100.44**

*The Forest Service should revise the DSEIS and disclose if information was included from the Payette Principles document, and if so, include discussion regarding what portion of that information was used to report findings or draw conclusions.*

**Response to Concern 100.44**

The *Summary of the Science Panel Discussion: Disease Transmission Between Domestic Sheep and Bighorn Sheep on the Payette National Forest* (Payette Principles) document was not used in the update to the DSEIS or in the FSEIS.

### Sample Public Comment for 100.44

Were any portions of the information included in the Payette Principals document the Payette National Forest prepared in direct violation of FACA Law used in preparation of this new DSEIS? If so, what parts or portions and were they used to report findings or draw conclusions? (Update to DSEIS Ltr#20037)

## 102–108   ISSUES PERTAINING TO THE ALTERNATIVES

---

**Concern Statement 102.18**

*The Forest Service should select the Preferred Alternative (Alternative G) in the DSEIS because it provides for adequate separation of domestic sheep and bighorn sheep. (PC 6. a, b)*

**Response to Concern 102.18**

Alternatives will continue to be developed and refined between the DSEIS and FSEIS and the decision maker will weigh a variety of factors before selecting an alternative. The rationale for that selection will be documented in the ROD based on the analysis in the FSEIS.

BLM_0049168

### Sample Public Comment for 102.18

I concur with the direction in the preferred alternative which proposes reductions in domestic sheep grazing to create separation of domestic sheep and bighorn sheep. (DSEIS Ltr #12995)

### Concern Statement 102.19

*The Forest Service should not select the Preferred Alternative (Alternative G) in the DSEIS because:*

*A) It does not provide adequate separation of domestic sheep and bighorn sheep and it would leave the sheep permittees without work (PC 7. a, c)*

*B) Eliminating domestic sheep grazing has proven to be ineffective on the Oregon side of the HCNRA where bighorn sheep die offs still occur*

*C) The 6-mile buffer around the HCNRA is not adequate—a 9-mile buffer is recommended; no consideration is given to the adequacy of maintaining separation if the population levels increase therefore, it is not compliant with the HCNRA CMP; it is based on the GPR concept which is no longer in place; it poses a risk to the Main Salmon South Fork and the Upper Hells Canyon herds; if population levels increase it would require more NEPA analysis; and no assurance is given regarding monitoring*

### Response to Concern 102.19

Alternatives will continue to be developed and refined between the DSEIS and FSEIS and the decision maker will weigh a variety of factors before selecting an alternative. The rationale for that selection will be documented in the ROD based on the analysis in the FSEIS.

Given the interconnectivity of the bighorn sheep herds in Hells Canyon, closure of more than just the Oregon Allotments may be necessary.

### Sample Public Comments for 102.19

Experts recognize the danger of bighorns contacting domestic sheep along their migration routes. PNF's preferred alternative, 7G, leaves bighorn sheep too much at risk of contracting Pasteurella and fails to protect this icon of such a unique landscape. (DSEIS Ltr #13107)

Comment #20, pg. 2-7: The preferred alternative in the DSEIS has already been shown to be ineffective. The preferred alternative in the DSEIS has already been shown to be untenable. Sheep grazing was eliminated on the Oregon side of the HCNRA and bighorn sheep still experienced a die-off. This indicates that removal of grazing acreage does not work to establish or maintain bighorn populations. The PNF should not adopt the approach in the preferred alternative, which has already been proven to be a flawed and unsuccessful alternative. (Update to DSEIS Ltr# 20070)

BLM_0049169

**Concern Statement 102.20**

*The Forest Service should select either Alternative 7H or 7E because*

*A) they are the only alternatives that provide for an acceptable level of risk of contact (PC 7.b); or*

*B) the Forest should select an alternative that has a 5 percent or less risk of contact between domestic sheep and bighorn sheep to comply with the HCNRA Act and offer the best chance of recovery (PC 11.a); and*

*C) and, the Forest should also include a plan to assess risk in the future if bighorn populations expand. (PC 35.k)*

**Response to Concern 102.20**

Alternatives will continue to be developed and refined between the DSEIS and FSEIS and the decision maker will weigh a variety of factors before selecting an alternative. The rationale for that selection will be documented in the ROD based on the analysis in the FSEIS. The analysis is designed to allow for differing population sizes to be analyzed for their risk of contact and other effects. The risk for contact doubles if the bighorn sheep herd doubles but nothing else changes.

> *Sample Public Comment for 102.20*
>
> Alternatives 7E and 7H are estimated to reduce the risk of contact between the species to 4% or less based on current bighorn populations. However, "[a]s bighorn sheep numbers increase and populations expand their geographic range, probabilities of domestic sheep contact could increase (Clifford et al. 2007)." I recommend that the Forest [Service] assess how great the risks will be if bighorn populations rebound and whether you should develop a management strategy to mitigate increased risk. The estimated risks for the three other alternatives are unacceptably high, at least four-times greater than for 7E and 7H. (DSEIS Ltr #1707)

**Concern Statement 102.21**

*The Forest Service should select Alternative 7E because*

*A) it is the only viable option to safeguard bighorn sheep and their habitat from the risk of disease transmission and grazing competition by eliminating domestic sheep grazing; (PC 8. a, b, c, e, f)*

*B) it gives appropriate recognition to Tribal Rights because harvest opportunities increase in traditional hunting locations and the alternative provides maximum fulfillment of cultural practices involving bighorn sheep; (PC 8. d)*

*C) it would not require additional monitoring or reporting; (PC 8. I)*

*D) it complies with applicable laws and regulations regarding bighorn sheep viability, specifically the HCNRA Act, 36 CFR 219.19, and 36 CFR 292.48 by eliminating the disease risk to the Hells Canyon metapopulation; (PC 35. j)*

BLM_0049170

*E) BMPs have proven ineffective; and*

*F) it provides for the expansion of bighorn sheep home ranges as the population increases.*

**Response to Concern 102.21**

Alternatives will continue to be developed and refined between the DSEIS and FSEIS and the decision maker will weigh a variety of factors before selecting an alternative. The rationale for that selection will be documented in the ROD based on the analysis in the FSEIS.

*Sample Public Comments for 102.21*

Bighorns, as native wildlife in Idaho including the Payette National Forest, should be protected from diseases carried by nonnative domestic livestock. I believe that Alternative 7E offers the best protection offered by closing all domestic sheep allotments. (DSEIS Ltr #13628)

I have commented before on the many places I have been on the Payette forest from Marble Creek to Hells Canyon and have come to the same conclusion that the report comes up with--where there is domestic sheep grazing the bighorn population soon dies off. This conclusion leads to the result that the only sure viable option to safeguard those sheep is alternative 7E--completely remove the sheep from the Payette National Forest. Alternatives 7N and 7O are alternatives that may be considered if it becomes politically untenable to completely remove the sheep. But even those two alternatives give the likelihood of domestic and wild sheep contact in about one out of every seven or ten years. When that happens, the report admits, the sheep will die off again. Just remove the sheep. (Update to DSEIS Ltr# 20004)

**Concern Statement 102.22**

*The Forest Service should select Alternative 7H in the DSEIS because it provides for adequate separation of domestic sheep and bighorn sheep by establishing a 9-mile buffer. (PC 9. a, b)*

**Response to Concern 102.22**

Alternatives will continue to be developed and refined between the DSEIS and FSEIS and the decision maker will weigh a variety of factors before selecting an alternative. The rationale for that selection will be documented in the ROD based on the analysis in the FSEIS. The Payette National Forest is trying to look more at removing risk on the landscape than simply applying a straight–line buffer as documented in the development of Alternatives 7L–7P.

*Sample Public Comment for 102.22*

The Forest Service should adopt Alternative 7H, which establishes a 9-mile buffer between occupied bighorn. (DSEIS Ltr #14009)

BLM_0049171

**Concern Statement 102.23**

*The Forest Service should not select Alternative 7H in the DSEIS because it does not adequately protect the bighorn sheep. (PC 10. a)*

**Response to Concern 102.23**

Alternatives will continue to be developed and refined between the DSEIS and FSEIS and the decision maker will weigh a variety of factors before selecting an alternative. The rationale for that selection will be documented in the ROD based on the analysis in the FSEIS.

> *Sample Public Comment for 102.23*
>
> While the Payette Forest's considered Alternative 7.h. will provide the most protection for bighorns from domestic sheep contact, it is insufficient to protect and grow bighorns, even if the predicted four percent annual probability of contact is accurate. (DSEIS Ltr #12504)

**Concern Statement 102.24**

*The Forest Service should revise the alternatives in the DSEIS because the Idaho Woolgrowers Association agreed to the reintroduction of the bighorn sheep and, therefore, a mutually beneficial alternative should be developed. (PC12. a)*

**Response to Concern 102.24**

Alternatives 1B, 2, 5, and 7 do consider the 1997 Letter and agreement. The reintroduction of bighorn sheep began prior to 1997, and some sheep were reintroduced before the agreement was entered. In addition, there are changed circumstances and new information that has been developed since 1997 as a result of bighorn sheep crossing the Snake River, reservoirs, and dams. The bighorn sheep that have crossed into Idaho were not controlled as anticipated in 1997. In addition, bighorn sheep have subsequently been identified as a Sensitive Species by the Regional Forester. Any decision made by the Forest Service must be consistent with federal laws and regulations currently in effect, and account for circumstances that presently exist.

> *Sample Public Comment for 102.24*
>
> In recognition of the Idaho Woolgrowers Association good faith at the inception of the bighorn sheep re-introduction project the USFS DSEIS for Alternative 7 should be disregarded in favor of a more mutually beneficial option. (DSEIS Ltr #51)

BLM_0049172

**Concern Statement 102.25**

*The Forest Service should revise the alternatives in the DSEIS because Best Management Practices were not considered in a wider range of alternatives. (PC 12. b, e)*

**Response to Concern 102.25**

Six alternatives were considered in the DSEIS but eliminated from detailed study (7A, 7B, 7C, 7D, 7F, and 7I). Twelve alternatives were considered in detail (1B, 2, 5, 7, 3, 4, 6, 7E, 7G, 7H, 7J, and 7K). The Payette National Forest felt this to be an adequate range of alternatives for the draft analysis, but has considered another 5 alternatives in detail (7L, 7M, 7N, 7O, and 7P) in preparation of the FSEIS. In 2007, two of the permittees developed 13 additional management practices and implemented them that grazing season. One of the permittees has continued to implement the 13 additional management practices willingly. The Forest Service has monitored these additional management practices and found them mostly successful in providing separation between the domestic sheep and bighorn sheep, but not 100 percent. Wolves scattered a band of sheep and two of the ewes were discovered four months later (after the grazing season) wandering in Hells Canyon, proving the additional measures to be inadequate. The implementation of these 13 additional management practices was considered when developing all of the alternatives. The Payette National Forest recognizes other Forests have isolated populations of bighorn sheep that may be separated from domestic sheep more effectively, however there is proven connectivity between the herds of bighorn sheep on the Payette National Forest. The BMPs have not been researched nor studied to demonstrate 100 percent effectiveness.

> *Sample Public Comments for 102.25*
>
> Any objective analysis of the draft EIS would suggest that it was prepared with inadequate effort to objectively explore a reasonable range of alternatives to manage both domestic and bighorn sheep on the Payette National Forest as required by NEPA, which statute requires a "full and fair" discussion of significant environment impacts so as to inform decision makers and the public of the reasonable alternatives. 40 C.F.R.5 1502.1. Best Management Practices appear to be working in other forests, and there is no clear reason provided that similar practices cannot be implemented on the Payette. It almost appears that the draft EIS was crafted to solicit the preferred outcome. (DSEIS Ltr #13689)
>
> Comment #18, pgs. 2-4 - 2-9: The Final SEIS must consider implementation of best management practices and mitigation measures for a reasonable range of alternatives. For a reasonable range of alternatives, the DSEIS must consider implementation of best management practices and mitigation measures, rather than simply concluding that domestic sheep grazing allotments must be closed. The PNF has not provided any discussion of recommended best management practices in the DSEIS, nor has it included any alternatives that would implement such practices. As a result, the range of alternatives considered in the DSEIS is deficient. The PNF should consider best management practices and other mitigation measures in the Final SEIS, rather than jumping to the conclusion that domestic sheep grazing allotments on the PNF must be closed. (Update to DSEIS Ltr# 20070)

BLM_0049173

**Concern Statement 102.26**

*The Forest Service should revise the alternatives in the DSEIS because the range of alternatives is inadequate and is prejudicing potential decisions and/or outcomes (PC 12. c)*

**Response to Concern 102.26**

The purpose and need for this analysis is very focused on one specific significant issue from the FEIS for the Payette Forest Plan: effects of disease transmission from domestic sheep to bighorn sheep on the viability of the bighorn sheep population. Based on NFMA, adequate habitat for viable populations of bighorn sheep must be provided on the Payette National Forest. All alternatives that are analyzed must be evaluated on how well they meet this requirement. The decision maker weighs alternatives developed during the analysis process and makes a reasoned decision as to which of these alternatives will provide an adequate range within the decision space created by the purpose and need, and significant issues.

> *Sample Public Comments for 102.26*
>
> The choice of alternatives (inclusions and omissions) by the Forest Service in this DSEIS is prejudicing the potential decisions/outcomes. A revised DSEIS should be produced which includes a complete analyses of alternatives and impacts for the above listed areas). All existing analyses should be revised and new analyses prepared only when the supporting science (answering fundamental questions of actual causes of and contributions to bighorn mortality, sources and transmission mechanisms of disease, etc.) is available and incorporated into the analysis. (DSEIS Ltr #12943.)

BLM_0049174

Comment #22, pgs. 2-3 through 2-9: The DSEIS does not describe and analyze a proper range of alternatives and does not contain a reasonably thorough discussion of mitigation measures. None of the alternatives considered by the PNF involve implementation of best management practices or mitigation measures to prevent contact between domestic sheep and bighorns. The only measures proposed by the PNF involve termination of domestic sheep grazing allotments. An EIS must describe and analyze a proper range of alternatives. 40 C.F.R. § 1502.14. This includes the requirement to rigorously explore and objectively evaluate all reasonable alternatives. Id. There is also a requirement to include appropriate mitigation measures. Id. Without an alternative that describes and analyzes the implementation of mitigation measures to prevent contact between domestic sheep and bighorn sheep, instead of simply eliminating domestic sheep allotments, the DSEIS contains an inadequate range of alternatives. Alternatives considering best management practices and mitigation measures are both reasonable and feasible under the circumstances, and must be analyzed in the DSEIS. Specifically, with regard to mitigation measures, CEQ regulations require the PNF to discuss possible mitigation measures when defining the scope of the EIS, in identifying the consequences of the proposed action, and in explaining the PNF's ultimate decision. 40 C.F.R. §§ 1502.16(h), 1505.2(c) and 1508.25(b). The regulations define "mitigation" to include the following: (a) Avoiding the impact altogether by not taking a certain action or parts of an action; (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation; (c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment; (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; (e) Compensating for the impact of replacing or providing substitute resources or environments. 40 C.F.R. § 1508.20. An EIS must include a reasonably thorough discussion of mitigation measures. Here, the DSEIS fails to discuss mitigation measures. The Final SEIS must include proper range of alternatives and must discuss appropriate mitigation measures. (Update to DSEIS Ltr# 20070)

---

**Concern Statement 102.27**

*The Forest Service should select an alternative that closes domestic sheep allotments in Hells Canyon and the Salmon River Canyon to protect and perpetuate bighorn sheep populations. (PC 13. a)*

**Response to Concern 102.27**

All of the alternatives carried into detailed study are being assessed for viability potential of bighorn sheep herds and potential persistence of populations over 100 years.

*Sample Public Comment for 102.27*

Please choose the alternative that stops domestic sheep grazing in favor of wild bighorns in Hell's Canyon and the Salmon River Canyon. There are many options and alternatives to continue and perpetuate domestic sheep production. There is only one choice to protect and perpetuate wild bighorns. (DSEIS Ltr #6)

BLM_0049175

**Concern Statement 102.28**

*The Forest Service should consider an alternative that provides supplemental selenium or other methods for bighorn sheep to boost their immunity. (PC 13. b; PC 17. f)*

**Response to Concern 102.28**

The Forest Service is not responsible for managing bighorn sheep, but they are required to provide for viable bighorn sheep habitat. Supplementing their diet is outside the scope of the Forest Service's management authority.

> *Sample Public Comment for 102.28*
>
> Prudent long-term health management dictates that population immunity be the primary tool to promote the viability of bighorn sheep on the PNF. The Final SEIS must analyze and discuss the possible use of selenium on the PNF and its incorporation into the alternatives presented in the DSEIS. (DSEIS Ltr #13550)

**Concern Statement 102.29**

*The Forest Service should select the No Action Alternative in the FSEIS. (PC 14. a, b, c)*

**Response to Concern 102.29**

The No Action Alternative in the original FSEIS for the Forest Plan treats management of disease transmission between bighorn sheep and domestic sheep identical to the selected Alternative 7. The No Action Alternative in the FSEIS cannot be selected because it does not address the instructions the Payette National Forest received from the Appeal Reviewing Officer, which was to maintain bighorn sheep viability (see the DSEIS pages 1-2 through 1-5, and Chapter 1 of the FSEIS). In addition, the appeal decision declared that the No Action Alternative violates NFMA and probably violates the HCNRA Act. Therefore, the No Action Alternative cannot be selected.

> *Sample Public Comment for 102.29*
>
> It is my opinion that none of the alternatives in the DSEIS are warranted or acceptable. Please implement the No Action alternative in the original final EIS. (DSEIS Ltr #13746)

**Concern Statement 102.30**

*The Forest Service should proceed with a decision and management direction that ensures the viability of bighorn sheep in Hells Canyon, the main Salmon River Canyon, and the Payette National Forest. (PC 15. r)*

**Response to Concern 102.30**

The Payette National Forest has analyzed a wide range of alternatives in the DSEIS, the Update to the DSEIS, and FSEIS to allow the decision maker to select the alternative that

BLM_0049176

best provides for the viability of bighorn sheep on the Payette National Forest (see Chapter 2 of the SEIS).

### Sample Public Comment for 102.30

The agency now needs to proceed with a decision and management direction that ensures the viability of bighorn sheep in Hells Canyon, the main Salmon River Canyon, and the Payette National Forest. (DSEIS Ltr #13676)

### Concern Statement 102.31

*The Forest Service should design an alternative that eliminates all risk of disease transmission between domestic sheep and bighorn sheep on the Payette National Forest. (PC 15. ii)*

### Response to Concern 102.31

Alternative 7E in the DSEIS, Update to the DSEIS, and FSEIS eliminates all risk of contact, which removes disease transmission potential between permitted domestic sheep and bighorn sheep on the Payette National Forest.

### Sample Public Comment for 102.31

Because the current bighorn sheep populations on the PNF are, in the Tribe's view, not viable; the PNF must select a final alternative and adopt forest plan direction that will provide sufficient source habitat for bighorn sheep population restoration and range expansion. Preserving the status quo is unacceptable to the Tribe and will fail to provide long-term viability for the species. (Update to DSEIS Ltr# 20072)

### Concern Statement 102.32

*The Forest Service should ensure that the selected alternative provides long-term protection to the bighorn sheep. (PC 17. d)*

### Response to Concern 102.32

The Payette National Forest will complete a direct, indirect, and cumulative effects analysis for all alternatives carried into detailed study. A determination of viability by alternative is discussed by alternative in Chapter 2.

### Sample Public Comment for 102.32

A long term solution to protect the bighorn sheep is imperative. (DSEIS , Ltr #13299)

BLM_0049177

**Concern Statement 102.33**

*The Forest Service should consider an alternative that confines bighorn sheep between Granite Creek to the south and Cougar Creek to the north because there are no grazing allotments in these areas. (PC 24. v)*

**Response to Concern 102.33**

The area that you are requesting to be included is outside the proclaimed and administrative boundary of the Payette National Forest. The Payette National Forest Supervisor has no authority to make management decisions in the area that you have asked to have included in this analysis. Therefore, the area is not included in the alternative section of the FSEIS. In addition, the Forest Service does not make decisions on confinement of wildlife.

> *Sample Public Comment for 102.33*
>
> What other options/methods can be analyzed to achieve separation between domestic and bighorn sheep? Confine the bighorn sheep area to between Granite Creek on the South, and Cougar Creek to the North. This area is void of most domestic animals, except for recreational use. (DSEIS Ltr #2883)

**Concern Statement 102.34**

*The Forest Service should revise the Preferred Alternative (Alternative 7G) because it does not adequately ensure protection of the Treaty Rights of the Nez Perce Tribe. (PC 46. a)*

**Response to Concern 102.34**

The Treaty Rights of the Nez Perce and other affected tribes will be considered and discussed in the Tribal Rights and Interests section of the FSEIS (see pages 3-79 through 3-85 in the DSEIS, and pages 3–110 through 3–119 in the FSEIS.) Several alternatives have been developed, analyzed and documented in the FSEIS.

> *Sample Public Comment for 102.34*
>
> I do not believe the preferred alternative contains enough safeguards to assure protection of the treaty rights of the Nez Perce Tribe. I believe you must take additional steps to eliminate contact between domestic sheep and bighorn sheep. (DSEIS Ltr #14051)

BLM_0049178

**Concern Statement 102.35**

*The Forest Service should select Alternative 7H because it removes all risk of contact between bighorn and domestic sheep and therefore assures protection of the Nez Perce Tribe's Treaty Rights and meets the Agency's responsibilities under the NFMA. (PC 46. u)*

**Response to Concern 102.35**

Because of reworking the contact risk and foray models, Alternative 7H no longer maintains a no contact risk. Other alternatives have been developed to better assess the risk of contact and are displayed in the FSEIS in Chapter 3.

> *Sample Public Comment for 102.35*
>
> When you are considering how to protect bighorn sheep habitat please select an alternative like "H" that removes all risk of contact between bighorn sheep and domestic sheep. I believe you are required to select a "no contact" alternative to assure protection of the treaty rights of the Nez Perce Tribe as well as meet your responsibilities under the National Forest Management Act Planning regulations. (DSEIS Ltr #13724)

**Concern Statement 102.36**

*The Forest Service should select Alternative 7G because the Tribe supports important elements which include: it is science based; it uses a separation strategy approach; and it removes domestic sheep grazing within identified currently occupied bighorn sheep range (GPRs). (PC 46. v)*

**Response to Concern 102.36**

For the analysis methods that were used for the DSEIS, Alternative 7G did not allow grazing in the home range for bighorn sheep and does not present those same results using the quantitative analysis methods that were developed for the FSEIS. Alternative 7G now does allow for grazing in the recalculated core herd home range.

> *Sample Public Comment for 102.36*
>
> Further, the Tribe supports important elements of Alternative 7G including that we feel must be retained in the final Record of Decision: 1. It is science-based. 2. It uses a separation strategy approach. 3. It removes domestic sheep grazing within identified currently occupied bighorn sheep range (GPRs). (DSEIS Ltr #13413)

BLM_0049179

**Concern Statement 102.37**

*The Forest Service should select Alternative 7G if it is accompanied by the Forest Plan standards recommended by the Nez Perce Tribe. (PC 46. w)*

**Response to Concern 102.37**

The Payette National Forest will consider all action alternatives when making a final selection for implementation. Tribal Rights and Interests will be considered during that selection.

> *Sample Public Comment for 102.37*
>
> The Nez Perce tribe supports Alternative G as long as it is accompanied by the forest plan standards recommended by the Tribe. (DSEIS Ltr #13413)

**Concern Statement 102.38**

*The Forest Service should not select the Preferred Alternative (Alternative 7G) because it has a high potential of resulting in an outbreak that may functionally extirpate bighorn sheep populations over the next 70 years and this level of risk is unacceptable to the Tribes. (PC 46. x)*

**Response to Concern 102.38**

Risk of contact between domestic and bighorn sheep, and a discussion regarding the effects of disease transmission for each alternative are discussed in Chapter 3 of the FSEIS and will be used as one factor in consideration of selecting the alternative to implement.

> *Sample Public Comment for 102.38*
>
> The PNF has identified a preferred alternative which has a high potential of resulting in an outbreak that may functionally extirpate bighorn sheep populations over the next 70 years. This level of risk is unacceptable to the Tribes and request the Forest Service select the alternative from the DSEIS which ensures the long-term viability of the bighorn sheep (DSEIS Ltr #14170)

**Concern Statement 102.39**

*The Forest Service should disclose the authority by which they have prepared an SEIS, rather than initiating a new EIS because there was never a valid FEIS or ROD for the Forest Plan.*

**Response to Concern 102.39**

The ROD for the FEIS of the 2003 Forest Plan is a valid decision instrument. In the appeal instructions received from the Chief of the Forest Service, the only part of the decision overturned and remanded back to the Payette National Forest was the part tied to bighorn sheep management.

BLM_0049180

### Sample Public Comment for 102.39

Comment #1, pgs. ix - x, 2, general: The PNF must prepare a new EIS, not simply prepare a supplemental EIS. What is the purpose for completing an SEIS and where does the PNF get the authority to complete an SEIS in these circumstances? The PNF states that the DSEIS is a supplemental analysis to the 2008 DSEIS and the FEIS for the PNF LRMP, and that the DSEIS does not change the proposed action or purpose and need as described in the LRMP FEIS. See Letter from Suzanne Rainville, Jan. 25, 2010, at 1; Letter from Suzanne Rainville, Sept. 18, 2008, at 1; DSEIS at 2 (indicating that Alternative 7 was the selected alternative in the ROD for the FEIS tied to the 2003 Forest Plan); DSEIS at 1-1 (indicating no change to purpose and need of 2008 DSEIS). In several instances, the PNF states that the FEIS was approved in the ROD, except for "a small portion of the selected alternative—bighorn sheep viability on the Payette National Forest." DSEIS at 2; 2008 DSEIS at ix; see also Decision for Appeal of the Payette National Forest Land and Resource Management Plan Revision, Mar. 9, 2005, at 4. In fact, the PNF reports that Alternative 7, as described in the ROD has been, and is being, implemented. See Letter from Suzanne Rainville, Sept. 18, 2008, at 1 ("the [2008] DSEIS does not change the proposed action described in the LRMP FEIS"). Yet, the DSEIS states that the Chief of the Forest Service found the FEIS inadequate and reversed the ROD. 2008 DSEIS at ix. Further, the Chief of the Forest Service instructed the Regional Forester to amend the FEIS. 2008 DSEIS at ix; see also Decision for Appeal of the Payette National Forest Land and Resource Management Plan Revision (Appeal Decision), Mar. 9, 2005, at 4, available at http://www.fs.fed.us/r4/payette/publications/big_horn/appealdec.pdf (last visited Jan. 16, 2009). These statements indicate that the FEIS was found inadequate and that the ROD was reversed regarding bighorn sheep management. In other words, there was never a valid FEIS or ROD related to bighorn sheep. If the original EIS was inadequate, or never finalized, then how can there be a supplement to that EIS? Or, in the case of the DEIS here, a supplement to the supplement to that EIS? In order to complete an SEIS, there must first be an approved and final EIS. That does not appear to be the situation here. Council on Environmental Quality (CEQ) regulations for implementing the National Environmental Policy Act (NEPA) provide that an agency must prepare a supplemental EIS in two situations: (1) if "the agency makes substantial changes in the proposed action that are relevant to environmental concerns," or (2) if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §§ 1502.9(c)(1)(i), (ii). Which one of these concerns applies in this situation? Or, is the PNF preparing an SEIS under 40 C.F.R. § 1502.9(c)(2) to further the purposes of NEPA? Regardless, the SEIS here is a supplement to either a draft or final EIS. See 40 C.F.R. § 1502.9(c)(1); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 373 (1989) (discussing requirement of supplemental EIS "after the EIS is finalized"). If there is not a valid FEIS here, then there cannot be an SEIS. The PNF must prepare a new EIS, not simply prepare a supplemental EIS. (Update to DSEIS Ltr# 20070)

BLM_0049181

**Concern Statement 102.40**

*The Forest Service should not limit the choice of reasonable alternatives by improperly foreclosing consideration of alternatives other than Alternative 7.*

**Response to Concern 102.40**

The Payette National Forest was asked to conduct a viability analysis for bighorn sheep to be included as part of the Forest Plan FEIS as that analysis was missing in the original assessment. Then, the FEIS was to be supplemented to include the required disclosure. Because the viability analysis was missing, all of the alternatives from the FEIS needed to be analyzed. All alternative from the forest plan were included in this supplemental analysis as were the additional alternatives developed by the ID Team. However, selecting Alternative 7 for the Forest Plan lead to the additional alternatives to tier from the original decision.

> *Sample Public Comment for 102.40*
>
> Comment #2, pgs. ix - x, general: The PNF has improperly foreclosed consideration of alternatives other than alternative 7. If the FEIS was valid and alternative 7 as described in the ROD has been implemented, then a SEIS may be appropriate. This contradicts the Appeal Decision of the Chief. But, assuming it is possible, how in the DSEIS may the alternatives from the FEIS—1B, 2, 3, 4, 5, 6, and 7—be considered? By choosing and implementing alternative 7 as described in the ROD, the PNF has already foreclosed consideration of alternatives other than alternative 7. See Letter from Suzanne Rainville, Sept. 18, 2008, at 1 ("the DSEIS does not change the proposed action described in the LRMP FEIS"). Before issuing its final decision, the PNF is prohibited from taking any action that "limit[s its] choice of reasonable alternatives" identified in the decision-making process. 40 C.F.R. § 1506.1(a)(2). Such prohibition extends to "commit[ting] resources" which would prejudice the Forest Service's selection of alternatives. Id. § 1502.2(f). Here, the PNF has already implemented alternative 7 and has committed resources. The PNF appears to have already made an "irreversible and irretrievable commitment of resources" in violation of 40 C.F.R. § 1502.5. Only an amended alternative 7 would appear to be reasonable here, prejudicing all the other alternatives from the FEIS. Thus, the PNF has violated NEPA in preparation of the DSEIS. (Update to DSEIS Ltr#20070)

**Concern Statement 102.41**

*The Forest Service should add the definition of the terms "old-forest" and "stand initiation stage" to the glossary, as these are found on page 3-12 of the Update to the DSEIS.*

**Response to Concern 102.41**

These words are defined in the glossary for the Forest Plan FEIS.

BLM_0049182

### Sample Public Comment for 102.41

Of some interest was the use of the term "old-forest" and "stand initiation stage" at page 3-12. Since these are not in the glossary it is difficult to know how these terms are used, especially since you have developed several terms in your sheep model. (Update to DSEIS Ltr# 20031)

---

**Concern Statement 102.42**

*The Forest Service should correct the statement found on page 3-2 of the Update to the DSEIS, "Human settlement of Idaho in the mid-1800s increased harvest of bighorn sheep and introduced domestic sheep onto these landscapes", to reflect the correct meaning, as noted in previous Tribal comments.*

**Response to Concern 102.42**

That reference has been corrected to say "European" in the FSEIS.

### Sample Public Comment for 102.42

The reference on page 3-2 of the DSEIS remains in spite of numerous references in formal Tribal comment letters, "Human settlement of Idaho in the mid-1800s increased harvest of bighorn sheep and introduced domestic sheep onto these landscapes", The reference is clearly in error and should be restated to better reflect the obvious meaning, as noted in previous Tribal comments. Please correct this statement. (Update to DSEIS Ltr# 20069)

---

**Concern Statement 102.43**

*The Forest Service should reevaluate the issues for alternative development because they are too general. For example, calling grazing management, or the protection of such, an issue is raising it in importance to equal that of protecting an actual resource (i.e., bighorn sheep).*

**Response to Concern 102.43**

By design, these issues are general in nature because they are developed for a programmatic level document. Because this is a supplement to an existing FEIS, the issues as they are described in that document are used in this analysis. The Payette National Forest does not place any one significant issue over another in importance.

BLM_0049183

### Sample Public Comment for 102.43

Given the 2003 plan did not adequately address Bighorn Sheep viability, and the large number of comments to the 2008 DSEIS favoring bighorn persistence, the issues for alternative development (p 2-2) seem too general. It seems the existing condition (1B257) and two or three other alternatives that addressed the substantive issues would have sufficed. Terrestrial wildlife habitat is not the issue. The issue is bighorn sheep vulnerability to disease upon contact with domestic sheep. Similarly, Rangeland Resources is not an issue. Rangeland resources (grasses, forbs, etc and the soils on which they depend) are not threatened by not grazing livestock. Curtailment of grazing to protect bighorn sheep is the issue. But calling grazing management, or the protection of such, an issue is raising it in importance to equal that of protecting an actual resource, bighorn sheep. (Update to DSEIS Ltr# 20111)

### Concern Statement 102.44

*The Forest Service should analyze criteria other than "risk of contact" to develop alternatives because other strategies may be effective for managing bighorn sheep.*

### Response to Concern 102.44

The Payette National Forest understands that there are other factors that could be considered in developing alternatives in the NEPA process. For this assessment the significant issue that the Payette National Forest was directed to analyze was the risk for disease transmission between domestic sheep and bighorn sheep and the viability of bighorn sheep on the Payette National Forest. To develop alternatives, the Payette National Forest not only looked at high risk for contact areas, but also considered manageability of the implemented alternative. In this situation, manageability was considered to be identifiable locations on the ground for the alternative boundary, such as hydrologic features of draws and ridgelines. Currently, there is no effective vaccine developed to remedy the disease transmission issue, and therefore it is not appropriate to consider it an alternative development.

### Sample Public Comment for 102.44

Comment #17, pgs. 2-4 through 2-9: The Final SEIS must analyze criteria other than "risk of contact" to develop the alternatives. "Risk of contact" was chosen as the sole criteria for development of the "alternatives." Are there any other strategies that may be effective for managing bighorn sheep populations other than controlling contacts with domestic sheep? For example, could vaccination be used?
Additional criteria, other than just "risk of contact" must be used to develop a reasonable range of alternatives in the DSEIS. (Update to DSEIS Ltr# 20070)

BLM_0049184

**Concern Statement 102.45**

*The Forest Service should describe in the FSEIS the positive and negative environmental effects of proposed agency action and cite alternative actions rather than solely presenting agency facts that will guide the decision.*

**Response to Concern 102.45**

Chapter 3 of the document contains positive and negative information of alternatives to bighorn sheep viability and population persistence, rangeland resources, economics, and tribal rights and interests.

> *Sample Public Comment for 102.45*
>
> According to law, an EIS/SEIS/DSEIS describes the positive and negative environmental effects of proposed agency action and cites alternative actions. It should include the positive and negative reports and documents on the matter involved in the DSEIS and provide all points and facts included on the issue. Not just the facts the agency wants to provide or direction the agency or employees want to steer the issue. This DSEIS has not. (Update to DSEIS Ltr# 20037)

**Concern Statement 102.46**

*The Forest Service should consider that Alternatives 7M, 7N, 7O, and 7P all have a ≤4 percent risk rating; all four alternatives are in compliance with the HCNRA CMP; and that full consideration is given to the impacts these alternatives would have on individual sheep operations.*

**Response to Concern 102.46**

All action alternatives are equally considered when evaluating an alternative. The decision criteria include considering HCNRA compliance, rangeland resources economics, and industry economics. Forest Plan programmatic decisions do not consider site-specific impacts, such as individual sheep operations. Instead, the impacts considered domestic sheep grazing as a whole, combining the impacts of all permittees. The Payette National Forest cannot predict exactly how any of the permittees will adjust their operations based on the final decision.

> *Sample Public Comment for 102.46*
>
> According to the Payette's updated EIS analysis alternatives, 7M, 7N, 7O, and 7P all have a 4 percent or less risk rating, indicating a mixing of the two species would occur every 25 years or less, which is considered a low risk of disease transmission. All four alternatives are in compliance with the Hell's Canyon National Recreation Area Comprehensive Management Plan. I would ask the Payette National Forest when making their decision to fully consider the impacts to the individual sheep operations and their employees. (Update to DSEIS Ltr# 20040)

BLM_0049185

**Concern Statement 102.47**

*The Forest Service should consider the risk of contact due to the lack of buffer strips between active allotments and bighorn sheep herd areas for Alternatives 7G, 7L, 7M, 7O, and 7P when making their decision resulting in the potential listing of bighorn sheep as threatened or endangered.*

**Response to Concern 102.47**

Alternative 7L allows grazing within the core herd home range (CHHR), Alternative 7G has a slight buffer of less than 1.0 kilometer between the CHHR and the allotment, and Alternatives 7M, 7N, 7O, and 7P have grazing adjacent to the CHHR. With the exception of Alternative 7L, all of the areas adjacent to CHHR is non-habitat and of low risk of contact.

Active allotments border the mapped CHHR of the Upper Hells Canyon herd in all alternatives except 7E. However, despite the lack of a buffer, the risk of contact in some of these alternatives is judged by the foray model to be low. Examination of Figure 6 in *Modeling and Analysis Technical Report* (Appendix L), which overlays telemetry observations and mapped CHHR indicates how this occurs. Relative to many other herds (e.g., Imnaha, Figure 4 or Main Salmon/South Fork, Figure 13 in the *Modeling and Analysis Technical Report* [Appendix L]), the area mapped as CHHR for the Upper Hells Canyon Herd is large and extends well beyond any observed telemetry locations. The reason the large size and extension is because radio-collared animals of the McGraw herd—whose movements the CHHR for the Upper Hells Canyon herd were based—made many long movements during the time they were observed. Therefore, the perimeter of the Upper Hells Canyon CHHR is large relative to the 85 animals currently in it.

If a bighorn sheep leaves the CHHR, which happens in a given year for approximately 1 in 7 rams and 1 in 60 ewes (Table W-3a in FSEIS), it may leave in any direction. Given the large perimeter of the Upper Hells Canyon CHHR, if a small part of the CHHR borders an allotment then the probability of a foray movement into that particular allotment (i.e., in that direction) may be quite small. Additionally, the foray model includes bighorn sheep habitat availability in its assessment of contact probabilities. Figure W–0m in the FSEIS, indicates that most of the area in the Smith Mountain and Boulder Creek Allotments that border the CHHR are areas of non-habitat (mapped using a green). The blue areas that border the CHHR to the north are habitat and connectivity areas, both of which are much more likely to be used by bighorn sheep and are areas where the foray model projects that movements will be much more likely.

A combination of these factors goes into the relatively low risk of contact projected by the foray model for these allotments. However, the Forest Service does not rely solely on the model in decision making, and is also aware that contact can be caused by straying domestic sheep, not just bighorn sheep engaging in foray movements. Refer to forest plan amendment direction for management actions that may be implemented to address the risk of contact.

BLM_0049186

### Sample Public Comment for 102.47

New Alternatives, Maps, and Buffers Strips. Several additional alternatives have been added-7L through 70. When comparing the written descriptions of the new alternatives with the maps provided for each, including which portions of which allotments would be left open, the reader is left with the conclusion that there are not even buffer strips between active allotments and identified bighorn herd areas for alternatives 7G, 7L, 7M, 70, and 7P. The risk of contact, due to the wandering nature of young bighorns and occasionally domestic sheep, is very high, and flies in the face of the Sensitive Species mandate to not allow any Forest Service actions which lead to the listing of bighorns as Threatened or Endangered. (Update to DSEIS Ltr# 20061)

## Concern Statement 102.48

*When making their decision, the Forest Service should consider Alternative 7E for providing the best separation of domestic and bighorn sheep, followed, in order, by Alternatives 70, 7N, 7M, 7P, 7L, and 7G.*

## Response to Concern 102.48

Alternative 7E provides the best opportunity for bighorn sheep viability and restoration, and provides no opportunities for domestic sheep grazing.

The FSEIS does rank alternative 7E against other alternatives and recognizes that this alternative would reduce interspecies contact to near zero on the Payette National Forest.

### Sample Public Comment for 102.48

The PNF's own rankings of these alternatives show that Alternative 7E is the best mechanism to provide for separation, as it is rated # 1 in the relative rankings of alternatives. Table 2-1 (p. 2-10). 70 and 7N provides the next best with relative rankings of 2/3, with 7M and 7P calculated at 4/5, and 7L and 7G at 6/7. (Update to DSEIS Ltr# 20099)

## Concern Statement 102.49

*The Forest Service should disclose which alternative or alternatives they are recommending.*

## Response to Concern 102.49

In accordance with the CEQ Regulations, the Payette National Forest identified Alternative 7G as the preferred alternative in the DSEIS. The selected alternative will be disclosed with rationale in the ROD for the FSEIS.

### Sample Public Comment for 102.49

What alternative or alternatives are you recommending? (Update to DSEIS Ltr# 20035)

BLM_0049187

**Concern Statement 102.50**

*The Forest Service should select Alternative 7L because it would allow Soulen Livestock Company to maintain their current grazing program.*

**Response to Concern 102.50**

The Payette National Forest's Deciding Officer considers and weighs many factors in selecting an alternative, and economic impact is a factor that is considered.

> *Sample Public Comment for 102.50*
>
> Alternative "L" would allow Soulen Livestock Company to maintain their current grazing program. None of Soulen Livestock's allotments are within bighorn sheep herd home range areas. While alternative L reduces the Hershey-Lava allotment by 75%, Soulen Livestock had voluntarily limited the use on this allotment in 2007. According to the Risk Analysis all of Soulen Livestock's allotments were of low to very low risk except for Hershey-Lava which was ranked of moderate risk. (Update to DSEIS Ltr# 20040)

**Concern Statement 102.51**

*The Forest Service should not select Alternative 7L because it poses the most risk to bighorn sheep viability by removing only the highest risk areas from domestic sheep grazing and leaving a risk of contact for the Main Salmon South Fork and Upper Hells Canyon herds. In addition, Alternative 7L does not comply with NFMA, HCNRAA, and Tribal Treaty rights.*

**Response to Concern 102.51**

The Payette National Forest's Deciding Officer considers and weighs many factors in selecting an alternative. The contact risk level, Tribal Treaty rights, and NFMA and HCNRA Act compliance are factors that are considered.

> *Sample Public Comment for 102.51*
>
> Alternatives 7L, 7M, 7N, 7O, and 7P are problematical in that they are first based on human convenience, as they use landmarks such as roads and allotment boundaries, and second, because they will essentially guarantee extirpation of all bighorn populations within 200 years (Comments made at McCall public information meeting held 2/16/10). Out of these alternatives, Alternative 7L poses the most risk to bighorn viability, as it removes "only the very highest risk areas from domestic sheep grazing," and has a risk of contact for the Main Salmon South Fork herd of 31 % per year and for the Upper Hells Canyon Herd of 113% per year. (Id.) Alternative 7L should be disregarded, as it is not based on the best available science and does not comply with various mandates for bighorn viability and cultural opportunities the PNF has under legal authorities, including but not limited to, NFMA, HCNRAA and tribal treaties. (Update to DSEIS Ltr# 2099)

BLM_0049188

**Concern Statement 102.52**

*The Forest Service should modify Alternative 7M by leaving the Pearl Creek and Outlet Creek areas in the Twenty Mile allotment open for grazing because this alternative currently does not allow grazing in core herd home range areas. Then, this alternative would be beneficial to the permittees.*

**Response to Concern 102.52**

Alternative 7M does not provide for viable populations of bighorn sheep. Opening more areas to domestic sheep grazing would reduce this alternative's ability to provide for viable bighorn sheep populations. Other alternative such as 7L leave these areas open and the effects are captured in the analysis.

> *Sample Public Comment for 102.52*
>
> Alternative "M" reduces Soulen Livestock's Hershey-Lave allotment by 75%, the Twenty-Mile allotment by 75% and the Jughandle allotment by 10%. Soulen Livestock would be able to maintain their current herd size under Alternative M if the closure on the Twenty Mile allotment left the areas of Pearl Creek and Outlet Creek open for grazing. This alternative does not allow for grazing in core herd home range areas. (Update to DSEIS Ltr# 20040)

**Concern Statement 102.53**

*The Forest Service should not select Alternative 7M or 7N because they do not ensure bighorn sheep viability as they pose risk to the Little Salmon, Main Salmon South Fork, and Upper Hells Canyon herds; they don't meet the Chief of the Forest Service's remand standard; the two mile buffer is inadequate for separation between domestic sheep and bighorn sheep; and they do not comply with the HCNRAA, NFMA, and Tribal Treaty rights.*

**Response to Concern 102.53**

The Payette National Forest's Deciding Officer considers and weighs many factors in selecting an alternative. The contact risk level, Tribal Treaty rights, and NFMA and HCNRA Act compliance are factors that are considered.

> *Sample Public Comment for 102.53*
>
> TWS, HCPC, and ICL disagree with some of the conclusion regarding certain alternatives in the Update. Alternatives 7M and 7P are characterized as "middle ground" alternatives, but the disease model suggests that the Little Salmon, Main Salmon South Fork and Upper Hells Canyon bighorn populations "may not persist under these alternatives" (pg. 2-13). How can these alternatives be characterized as "middle ground" when key populations "may not persist?" The Update also states that "(a)s two of these are significant contributors to bighorn sheep populations on the Forest, the results are considered severe" (pg.2-13). Alternatives that conclude that populations "may not persist" and "results...considered severe" would suggest that these alternatives will not meet the Chief's remand standard of "ensuring bighorn viability" and therefore cannot be chosen. (Update to DSEIS Ltr#20088)

BLM_0049189

**Concern Statement 102.54**

*The Forest Service should not select Alternative 7N because it does not ensure bighorn viability by posing a risk to the Upper Hells Canyon herd and the Payette National Forest; it doesn't meet the Chief of the Forest Service's remand standard; it would reduce the Soulen Livestock Company's operation by 25 percent; it would concentrate domestic sheep grazing and lead to intensive utilization of the range; it does not comply with the HCNRAA, NFMA, and Tribal Treaty rights; and the two mile buffer is inadequate for separation.*

**Response to Concern 102.54**

The Payette National Forest's Deciding Officer considers and weighs many factors in selecting an alternative. The contact risk level, Tribal Treaty rights, and NFMA and HCNRA Act compliance are factors that are considered.

> *Sample Public Comment for 102.54*
>
> Alternative "N" would cause Soulen Livestock to reduce their sheep operation by 25%. Soulen Livestock would need to utilize the fall allotments during the summer and move off of the forest following shipping the end of September. Soulen Livestock would need to run their remaining sheep as follows: Allotment/Time of Use - Bill Hunt/Brundage/July 10–Sept 30; Slab Mountain/July 10–Sept 30; Josephine/July 10–Sept 30; Twenty-Mile/July 10–Sept 30; Jughandle/July 10–Sept 30; Cougar/July 10–Sept 30. This alternative would concentrate the sheep more and lead to more intensive utilization of the range. (Update to DSEIS Ltr# 20040)

**Concern Statement 102.55**

*The Forest Service should select Alternative 7O because it provides grazing on 70 percent of the suitable lands, it ensures bighorn sheep viability, it has a low risk of disease spread, it ensures habitat connectivity for the Hells Canyon and Salmon River herds, it protects the Salmon River herd's genetic stock, and it reduces the level of monitoring needed and funding.*

**Response to Concern 102.55**

The Payette National Forest's Deciding Officer considers and weighs many factors in selecting an alternative. The contact risk level, Tribal Treaty rights, and NFMA and HCNRAA compliance are factors that are considered.

> *Sample Public Comment for 102.55*
>
> Alternative 7O has distinct advantages of: Low risk of disease spread; Helps ensure potential and likely metapopulation interconnectivity between Hells Canyon and Salmon River bighorn sheep populations. Will not contribute to 'listing' of this sensitive species, and should actually help prevent 'listing'. Protects the native Salmon River bighorn genetic stock (we are lucky we still have). Reduces the costly level of monitoring needed that would annually compete for Forest funded priorities. (Update to DSEIS Ltr# 20079)

BLM_0049190

**Concern Statement 102.56**

*The Forest Service should not select Alternative 7O because it would reduce the Soulen Livestock Company's operation by 38 percent; it would concentrate domestic sheep grazing; there is a potential for conflict with recreational use; there is a potential for contact in the two herds that contribute to the largest populations; it does not ensure bighorn sheep viability; it does not comply with the HCNRAA, NFMA, and the Tribal Treaty rights; and the two mile buffer is inadequate for separation.*

**Response to Concern 102.56**

The Payette National Forest's Deciding Officer considers and weighs many factors in selecting an alternative. The contact risk level, economics, Tribal Treaty rights, and NFMA and HCNRA Act compliance are factors that are considered. Potential conflicts with recreational use and the effects of concentrating domestic sheep are outside the scope of this analysis and are not disclosed in this document.

> *Sample Public Comment for 102.56*
>
> Alternative O would cause Soulen Livestock to reduce their sheep operation by 38%. Again Soulen Livestock would need to utilize the fall allotments during the summer and move off of the forest early. They would utilize the remaining allotments similar to Alternative N but without the band on Josephine. Again this alternative concentrates the grazing and could potentially lead to conflicts with recreational users. (Update to DSEIS Ltr# 20040)

**Concern Statement 102.57**

*The Forest Service should not select Alternative 7P because it would allow Soulen Livestock Company to maintain their current herd size; it does not allow domestic sheep grazing within the core herd home range; it does not ensure bighorn sheep viability by posing a risk to the Little Salmon, Main Salmon South Fork, and Upper Hells Canyon herds; the two mile buffer is inadequate for separation; and it does not comply with the HCNRAA, NFMA, and the Tribal Treat rights.*

**Response to Concern 102.57**

The Payette National Forest's Deciding Officer considers and weighs many factors in selecting an alternative. The contact risk level, Tribal Treaty rights, rangeland resources, and NFMA and HCNRA Act compliance are factors that are considered.

> *Sample Public Comment for 102.57*
>
> Alternative P would allow Soulen Livestock to maintain their current herd size provided that the 25% remaining on the Twenty Mile allotment included the areas of Pearl Creek and Outlet Creek. This alternative does not allow for any grazing within core herd home ranges. (Update to DSEIS Ltr# 20040)

BLM_0049191

**Concern Statement 102.58**

*The Forest Service should develop an alternative that utilizes a series of fences at intervals of 30 feet apart with lockable gates as a separation option for domestic sheep grazing.*

**Response to Concern 102.58**

The exuberant cost of fencing at 30-foot intervals on every allotment is unaffordable by the permittees and the Forest Service. Fencing contracts typically cost a minimum of $5,000 per mile for labor and materials for a 3-strand barbed wire let-down fence. The fence would have to be higher than the standard 48 inches to prevent either species from crossing, which would increase the cost. This design would prevent other wildlife from crossing as well, and may fence wolves in with other big game species. Hunters and other recreationists would have to deal with the fences in addition to a reduction of the open landscape's current scenic value. Fencing contracts have not been a priority for ARRA funding. If the Forest Service took on the cost of purchasing the materials and having the fences built with a contract, the permittee would be responsible for setup, let-down, and fence maintenance. This is a cost that they may not be able to incur. Sheep allotment permittees do not typically have fences to maintain since sheep are easily herded. Goats are being treated the same as domestic sheep in this analysis. Noxious weeds will continue to be treated with herbicides and equipment where accessible and with biological controls in canyon country without vehicle access.

The Payette National Forest did consider tall fences at 30 feet apart as a potential mitigation measure. The concept was dismissed as not being practical to erect and maintain, in addition to the high level of impact to other wild animals that use the landscape (e.g., deer, elk, moose, and bear).

> *Sample Public Comment for 102.58*
>
> But how about a couple of fences, 30 feet apart, with gates distributed along the way to be locked and unlocked, before and after the domestic grazing seasons. Perhaps before they are unlocked, a prescriptive goat grazing run through to deal with noxious weeds. That, of course, is another issue your agency has to deal with. The fence building could fit in with ARRA job creation, at least temporarily. Ron and Frank Shirts, along with the other sheep operations, could stay in business, which benefits our local economies way beyond the number of jobs connected to them. The Forest Service would still have the stewardship management tool of domestic grazing that does help deal with the noxious weed battle and forest underbrush/wildfire management. (Update to DSEIS Ltr# 20003)

BLM_0049192

**Concern Statement 102.59**

*The Forest Service should select Alternative 7O and strengthen the Forest Plan language to ensure to its successful implementation in the 2011 grazing season with the following modifications: implement a no grazing buffer on the west side of the Payette National Forest where domestic sheep grazing is permitted adjacent to bighorn sheep core herd home range to reduce the risk of contact, allowances should be given for bighorn sheep restoration and range expansion, and consider the potential impacts from the wandering sheep policy. If selected, Alternative 7O modified would require less monitoring and provide sufficient risk of contact across source habitats, thereby ensuring the long-term viability of bighorn sheep while retaining domestic sheep grazing.*

**Response to Concern 102.59**

The foray analysis was designed to estimate contact rates by considering more information than just the distance of active allotments from the mapped bighorn sheep CHHR. In addition to that distance, the model integrates information about the number of bighorns in the CHHR and the amount and quality of bighorn sheep source habitat in allotments relative to the amount and quality of source habitat in other areas surrounding the CHHR.

Alternatives 7O and 7P leave open parts of the Smith Mountain and Boulder Creek allotments that directly border the Upper Hells Canyon CHHR on the west side of the Payette National Forest. However, as previously discussed in the response to Concern 102.47, these allotments contain little mapped source habitat relative to other areas bordering the CHHR (e.g., the large areas of source habitat mapped in blue surrounding the northern part of the Upper Hells Canyon CHHR in Figure W–0m in the FSEIS). As a result, the probability of a foray into Smith Mountain and Boulder Creek allotments is modeled to be relatively small. Another example that distance is not the sole variable determining risk in the foray model is the estimated risk of contact with the Grassy Mountain Allotment being similar to the risk for contact with Smith Mountain and Boulder Creek allotments. Despite being 13 km from the Upper Hells Canyon CHHR, the Grassy Mountain Allotment's greater abundance of source habitat and connectivity areas make it a relatively attractive target for foray movements. The Grassy Mountain Allotment is left open in Alternative 7P but not in 7O, which largely accounts for the difference in total risk of contact estimated for the two alternatives (i.e., 0.05 vs. 0.03 forays per year intersecting open allotments at current population levels).

However, the Forest Service does not rely solely on the model in decision making and is aware that contact can be caused by straying domestic sheep, not just bighorn sheep engaging in foray movements. Refer to forest plan amendment direction for management actions that may be implemented to address the risk of contact.

BLM_0049193

### Sample Public Comment for 102.59

After a thorough review of the new analysis contained in the UDSEIS, the Tribe will support alternative 0 with modifications, as discussed below as the final alternative selected in the ROD. Based on the new analysis, alternatives N and 0 are the minimal alternatives assuring some certainty of long-term viability for bighorn sheep while providing continued domestic sheep grazing on the PNF. The analyses indicate all other action alternatives, excluding alternative E, do not reduce the risk of contact to an acceptable level, would not provide for long-term bighorn sheep viability, and would foreclose meaningful restoration efforts. When comparing alternatives N and 0, the Tribe advocates for alternative 0 as the selected alternative in the ROD because alternative N leaves a substantial amount of risk of contact on the landscape, while alternative 0 provides significant increases in protections afforded bighorn sheep with a minimal decrease in suited rangeland for domestic sheep (see Specific Comments). Alternative 0 still retains a 9% modeled risk of contact which we argue is an underrepresentation of the true risk (see Specific Comments). The Tribe believes maintaining long-term bighorn sheep viability under Alternative 0, as proposed, would be questionable, and suggest modification of this alternative to further reduce the risk of contact. We are particularly concerned about the area on the west side of the forest where active domestic sheep grazing is permitted immediately adjacent to modeled bighorn sheep Core Herd Home Range (CHHR). This is an example of trying to manage risk rather than remove risk through effective spatial separation. The Tribe urges the PNF to focus on efforts that remove risk through effective spatial separation rather than attempting to managing risk. We suggest application of a no-grazing buffer in this area to further separate the two species (see Specific Comments). We also suggest the forest plan language must be strengthened as outlined below to insure the successful implementation of alternative O. (Update to DSEIS Ltr# 20072)

---

**Concern Statement 102.60**

*The Forest Service should select Alternative 7O with the following modifications: establish a well-defined buffer that has been determined on the ground by bighorn sheep experts between core herd home ranges and occupied domestic sheep habitat; reduce the risk level for the Upper Hells Canyon Herd to near zero; and further modify the westside domestic sheep allotments to reduce risk levels. If selected, Alternative 7O modified would reduce grazing conflicts, place domestic sheep on other grazing allotments, and it would comply with the HCNRAA.*

**Response to Concern 102.60**

As discussed in response to Concern Statement 102.59, the foray analysis was explicitly designed to allow management decisions based on more information than just the distance of active allotments from mapped CHHRs. Additionally, for reasons discussed in response to Concern Statement 102.47, the CHHR of Upper Hells Canyon (Figure 6 in the *Modeling and Analysis Technical Report* [Appendix L]) is large relative to the number of points in it, and its boundaries are relatively far from most of the observations of animals that have occurred within it (for comparison with the CHHR of the Imnaha and Main Salmon/South Fork herds see Figures 4, and 13 in the *Modeling and Analysis Technical Report* [Appendix L]). As a result of the Upper Hells Canyon CHHR's large

BLM_0049194

perimeter and the lack of source habitat in the open allotments bordering the area in Alternatives 7O and 7P, the risk of forays reaching those allotments is estimated to be low. However, the Forest Service does not rely solely on the model in decision making and is also aware that contact can be caused by straying domestic sheep, not just bighorn sheep engaging in foray movements. Refer to Forest Plan amendment direction for management actions that may be implemented to address the risk of contact.

### Sample Public Comment for 102.60

In reviewing the updated DSEIS, we feel that the best alternative for reducing this conflict, providing adequate protection for Oregon bighorn sheep, and minimizing impacts to domestic sheep grazing is Alternative 7-0 with the following modifications: 1) This alternative needs a well defined buffer between herd home ranges and occupied domestic sheep habitat. The distance needs to be determined on the ground by personnel familiar with bighorn sheep habitat and movements. 2) The risk level of .03 for the Upper Hells Canyon Herd (table 3-5, Alternative 7- 0) needs to be reduced to near O. Westside domestic sheep allotments may need further modifications to reduce risk levels. 3) A disease outbreak in Upper Hells Canyon would likely affect many Hells Canyon herds because of well documented bighorn movement between herds. (Update to DSEIS Ltr #20113)

### Concern Statement 102.61

*The Forest Service should select Alternative 7O with the following modifications: incorporate a buffer around the 95 percent core herd home range boundary for the Upper Hells Canyon herd based on the ram foray data; reduce the risk of contact to less than 0.09 contacts per year; and dedicate funding for monitoring the status and movements of bighorn sheep, domestic sheep Annual Operating Instruction implementations, and the status of disease research.*

### Response to Concern 102.61

The methods for estimating CHHR boundaries are explicitly designed to exclude some observations from the CHHR. The CHHR is meant to include areas that an animal uses with some regularity, while excluding areas that an animal rarely visits.

BLM_0049195

### Sample Public Comment for 102.61

In our review of the update to the DSEIS, the Department prefers Alternative 70, with some modifications to further reduce risk. We understand that the Forest Supervisor can make modifications from the draft to the final version of the SEIS. We would like to request the following modifications to ensure the viability of the upper Hells Canyon herds, which are directly linked to the populations under our management authority: Incorporate a buffer around the 95% Core Herd Home Range boundary of the Upper Hells Canyon herd. I understand the methods used to calculate the "core herd home range" represent occupied bighorn sheep range. However, by definition, the 95% contour does not include an animal's entire home range (i.e., excludes the 96–100% contour band) (Millspaugh and Marzluff2001, Worton 1989). Grazing domestic sheep directly adjacent to the 95% contour is still grazing within the herd home range and is inconsistent with the objective for bighorn sheep viability. I recommend a buffer around the 95% core herd home range boundary based on the ram foray data on pages 3-24 through 3-27 in the update to the DSEIS. Reduce the risk of contact to less than the 0.09 contacts/year. There is no empirical data indicating what percentage of contacts are "effective," therefore I believe it is prudent to reduce the risk of contact to less than the 0.09 contacts per year. I believe incorporating a buffer around the 95% Core Herd Home Range boundary will reduce the contact rate to ensure long-term viability. Dedicate funding to monitor bighorn sheep status and movements. The effectiveness of any of the Alternatives that may be chosen is dependent upon effective monitoring. Monitoring must be done on the status and movements of bighorn sheep, domestic sheep AOI implementations, and status of disease research. Your plan states a dependence upon annual surveys (WIOB14) to assess changes in bighorn sheep habitat use. I recommend that you dedicate funding to accomplish this objective. Since bighorn sheep are a wildlife resource that frequently crosses political and jurisdictional boundaries, Washington strongly believes that there is a multi-state and multi-agency responsibility to protect this resource for the future, as directed by treaty, federal law, and state management authorities. Thank you for the opportunity to comment on update to the DSEIS. I look forward to working with you on this issue as the PNF implements the final SEIS. (Update to DSEIS Ltr# 20115)

## 110   STANDARDS, GUIDELINES, GOALS, AND OBJECTIVES

### Concern Statement 110.08

*The Forest Service should revise the DSEIS and draft Forest Plan Amendment because the proposed Forest Plan standards, goals, and objectives are inadequate and need to be strengthened to ensure recovery of bighorn sheep on the Payette National Forest. (PC 1. d; PC 24. r)*

### Response to Concern 110.08

This concern was addressed in the DSEIS in response to the purpose and need for the SEIS and Amendment to the Forest Plan (DSEIS: National or Regional Issues, pages 1–4). The draft Forest-wide Management Direction can be found in the Draft Amendment released at the same time as the DSEIS. The adequacy of the Forest Plan direction proposed as a result of the analysis in the DSEIS and documented in the draft Forest Plan Amendment will be reviewed during the preparation of the FSEIS and final Forest Plan

BLM_0049196

Amendment. Final Forest Plan Amendment language has been rewritten to implement the decision selected, is discussed in the ROD, and can be found in the document.

### Sample Public Comments for 110.08

The DSEIS largely does a good job of laying out the issues regarding bighorn sheep and the disease risk caused by domestic sheep. We are, however, extremely disappointed in the proposed forest plan objectives, standards, and guidelines. None of the proposed guidelines are adequate to ensure recovery of bighorns on the Payette National Forest. (DSEIS Ltr #13676)

The proposed objectives under Rangeland Resources are inadequate and would likely be found illegal. The goal of providing "reasonable assurance of separation and lack of contact between bighorn sheep and domestic sheep and goats" is an immediate violation of the Chief's remand. The Chief did not say "provide reasonable assurance," he said "ensure bighorn viability." The proposed Rangeland Resources goals are an entrenchment of the out-dated management approach and philosophies that triggered this process in the first place. The management objective for Rangeland Resources should mirror those under Wildlife Resources: "Eliminate all risk of contact with domestic sheep." (Update to DSEIS Ltr# 20088)

### Concern Statement 110.09

*The Forest Service should combine Forest Plan Goals RAG007 and RAG008 and make them consistent with Standard RAST10 to read, "Manage domestic sheep and goat allotments to provide for effective separation to eliminate risk of contact between bighorn sheep and domestic sheep and goats."*

### Response to Concern 110.09

The Payette National Forest is reviewing comments received on the draft Forest Plan Amendment language and making adjustments to assist with maintaining no contact between the bighorn sheep and domestic sheep.

BLM_0049197

### Sample Public Comment for 110.09

The DSEIS and the Update to the DSEIS do a thorough job in accessing impact and evaluating changes but I do not see this carried forward to the Management Direction in the Update to the Draft Forest Plan Amendment. I expressed concern in my Feb. 21, 2009 comments and do so again. Even though it is not an expressed NFMA regulatory requirement, nor a required law, I strongly feel there is a need for more quantitative and qualitative standards, goals, objectives and guidelines in the update to the Draft Amendment to the LRMP. Management direction needs to be more closely tied to the DSEIS and the Update. Under Wildlife Resources the objectives should at least state the instruction of the Chief of the FS- that being to ensure bighorn sheep viability. His direction states "Changes to the management direction of the Payette NFMP for MA#1 (Hells Canyon) and adjacent areas shall be evaluated and adopted as necessary to ensure bighorn sheep viability." Also- of particular concern are goals RAG007 and RAG008. These could be combined and should read; Manage domestic sheep and goat allotments to provide for effective separation to eliminate risk of contact between bighorn sheep and domestic sheep and goats. As it now reads (to provide reasonable assurance of separation and lack of contact), it appears to be in conflict with RAST10 which reads; Actions will be taken to ensure separation between bighorn sheep and domestic sheep and goats. I don't believe your Management Direction for Rangeland Resources is managing in a way that ensures bighorn sheep viability. (Update to DSEIS Ltr# 20048)

---

**Concern Statement 110.10**

*The Forest Service should revise Forest Plan Objectives WIOB13, WIOB14, and WIOB17 to be consistent with multiple use management and other stated objectives and comply with MUSYA, NFMA, and the HCNRA Act management requirements. Revisions should be made to Standard WIST08 and Guideline WIGU16 that provide for declines in core herd home range and the need for separation should an effective vaccine be developed.*

**Response to Concern 110.10**

One of the decisions made during Forest Planning is the suitability of the landscape for grazing. In making the decision for this analysis, areas of the Payette National Forest are going to be classified as unsuited for domestic sheep grazing. Resource issues are a valid reason for considering suitability. For this analysis, areas that have permitted domestic sheep grazing are not available to bighorn sheep. The range of alternatives developed for this analysis vary by delineating different areas or amount of areas as not suited for domestic sheep grazing and then assessing the effects to bighorn sheep viability, rangeland resources, economics, and tribal rights. The Payette National Forest does not believe this process to be arbitrary and capricious as the alternatives were developed in an informed manner and the Line Officer is fully aware of the effects, both positive and negative.

The science and the scientists are clear in their recommendation that separation of the two sheep species is warranted to stop disease transmission from domestic sheep to bighorn sheep. To provide for viability of bighorn sheep, the Payette National Forest must make available source habitat for the bighorn sheep to occupy that is free of domestic sheep.

BLM_0049198

NFMA regulations instruct the Payette National Forest to provide for habitat that is connected and well distributed across the planning unit.

The Payette National Forest did not assume the existing bighorn sheep populations are free of disease as discussed in the modeling technical report.

Suggested best management practices can be listed in the Forest Plan to have included in any domestic sheep grazing permit. The effectiveness of best management practices is so variable that you cannot predict which ones are going to work in which location.

Development of a vaccine is outside the scope of this analysis and therefore will not be part of this analysis. Should an effective vaccine be developed, the adaptability language contained in the amendment will allow for reconsideration of rangeland suitability via another NEPA effort.

BLM_0049199

### Sample Public Comment for 110.10

Comment #49, pgs. III-1: The management direction for wildlife resources is inconsistent with multiple-use management and arbitrarily and capriciously attempts to eliminate grazing from the PNF. Objective WIOB13 improperly assumes that separation between bighorns and domestic sheep is a logical and appropriate management tool to avoid or reduce disease transmission. A separation strategy requires several unfounded and unexplained assumptions such as (1) bighorn sheep are free of disease before they contact domestic sheep and (2) that the only vector of disease among bighorns is domestic sheep. These assumptions are incorrect. The FSEIS must thoroughly establish the evidence for any such assumptions. Further, how is this objective reflected in the DSEIS? The preferred alternative terminates grazing acreage, rather than focusing on actions to "maintain separation," such as best management practices. If grazing allotments are not to be terminated and ranchers are to be allowed to implement practices to "maintain separation" between bighorns and domestic sheep, then the preferred alternative must reflect this and the Final SEIS must discuss practices to "maintain separation." Objective WIOB14 is inconsistent with multiple use management of the PNF. Under this objective, as bighorns expand their territory and enter new habitat and the CHHR is expanded accordingly, domestic sheep will be forced off the PNF. Wholesale termination of grazing on the PNF violates management requirements under the MUSYA, NFMA and the HCNRA Act. Objective WIOB17 appears contrary to the other stated objectives of the management direction. How is the PNF to expand and enhance hunting of a bighorn population that is reportedly at risk? Killing bighorns does not seem like a prudent approach to achieving bighorn viability. Objective WIOB18 should be the focus of the PNF, that is, the development and implementation of a vaccine. As the objective provides, the need for separation between bighorn sheep and domestic sheep or goats should be re-evaluated when a vaccine is produced. However, there is no need to wait to re-evaluate the need for separation until "an effective vaccine is produced for bighorn sheep that ensures a zero transmission risk." None of the alternatives in the DSEIS ensure a zero transmission risk, so why does this need to be a prerequisite for vaccine implementation? The moment an effective vaccine is produced for bighorn sheep that ensures any reduction in transmission risk, it should be implemented and the need for separation re-evaluated. Standard WIST08 calls for reassessment for the risk of contact when bighorn sheep are located within previously undocumented areas or new herd units are documented. This reassessment appears to allow for the CHHR to expand. There should be a provision that allows for CHHR to be reduced if bighorns are not located within previously documents areas. Guideline WIGU16 should be revised to provide for the recalculation of the need for separation if a vaccine is developed that decreases the risk for disease transmission between bighorn sheep and domestic sheep. There is no need for the vaccine to completely eliminate risk for disease transmission before recalculation takes place. (Update to DSEIS Ltr# 20070)

BLM_0049200

**Concern Statement 110.11**

*The Forest Service should revise Forest Plan Standard NPST13 to allow the use of domestic sheep and goats as an environmentally friendly and cost-effective method for controlling invasive plant species.*

**Response to Concern 110.11**

The use of domestic sheep and goats in areas not used by bighorn sheep are still allowed with that standard.

> *Sample Public Comment for 110.11*
>
> Comment #50, pg. III-2: The management direction for non-native plants is overreaching. By implementing Standard NPST13 the Forest Service is eliminating one of the most environmentally friendly, cost effective methods of controlling invasive species. The standard should allow for the use of sheep and goats for weed control with appropriate separation strategies implemented into the grazing plan. (Update to DSEIS Ltr# 20070)

**Concern Statement 110.12**

*The Forest Service should revise Forest Plan Goal RAGO07, Objective RAOB04, and Standard RAST11 to provide for the management of domestic sheep allotments; the implementation of adaptive management strategies; and to be consistent with MUYSA, NFMA, the HCNRA and Sustained Yield Acts.*

**Response to Concern 110.12**

The Payette National Forest believes that the supplemental analysis, as tiered to the FEIS for the Forest Plan, is consistent with all Federal law that directs the agency to look at effects of actions at the programmatic scale. A variety of resources and issues are looked at in Forest Plan revision and certain "Need for Change" areas will be addressed through standards in the Forest Plan. The agreements made between the State of Idaho and Payette National Forest grazing permittees are voluntary and completed on an annual basis. The Payette National Forest cannot direct the Idaho Department of Fish and Game to do any action. The only instrument the Payette National Forest has the authority over is the grazing permit, which is the instrument that is affected. To meet the viability requirement of providing bighorn sheep source habitat in adequate amounts well distributed across the planning unit requires that domestic sheep not be present in the same habitat. The Payette National Forest developed a large range of alternatives to review and analyze for disclosure of effects.

BLM_0049201

### Sample Public Comment for 110.12

Comment #51, pg. III-3: The management direction for rangeland resources is overreaching. Goal RAGO07 calls for the management of domestic sheep allotments to provide reasonable assurance of separation and lack of contact between bighorns and domestic sheep. However, the preferred alternative eliminates nearly all grazing on the PNF. Rather than eliminating grazing on the PNF, the preferred alternative should allow for management of domestic sheep allotments, rather than just terminating these allotments.

Objective RAOB04 provides a reasonable approach to managing domestic sheep allotments on the PNF. Why aren't adaptive management strategies discussed in the DSEIS? The PNF should not terminate domestic sheep allotments on the PNF, rather the PNF should implement adaptive management strategies to manage domestic sheep allotments, such as the agreements reached between Shirts Brothers Sheep and the State of Idaho and Carlson Livestock Company and the State of Idaho.

Generally, the management direction for rangeland resources should focus on maintaining domestic sheep allotments on the PNF, rather than terminating them. Management direction that focuses solely on bighorn viability is inconsistent with the MUYSA, NFMA and the HCNRA Act. Standard RAST11 makes the assumption that bighorn sheep take precedence over grazing by domestic sheep. This is inconsistent with the National Forest Management Act and the Multiple Use and Sustained Yield Act. This standard needs to be eliminated. (Update to DSEIS Ltr# 20070)

---

**Concern Statement 110.13**

*The Forest Service's Forest Plan standards and guidelines should establish an adaptive management approach that provides for bighorn sheep restoration opportunities and range expansion, maintains long-term effective spatial separation, and incorporates an effective monitoring program.*

**Response to Concern 110.13**

The Payette National Forest believes that the Forest Plan Amendment contains direction that will provide for effective implementation of the decision and allow for viable bighorn sheep populations.

BLM_0049202

### Sample Public Comment for 110.13

Management direction standards and guidelines are critical for successful implementation of the final selected alternative as they guide day to day management activities. To successfully maintain long-term bighorn sheep viability, it is important forest plan standard and guidelines effectively and clearly establish an adaptive management approach to allow for responsive and appropriate management actions in response to changing future conditions. Such an adaptive management approach must: (I) provide for bighorn sheep restoration opportunities and range expansion, (2) maintain long-term effective spatial separation between bighorn and domestic sheep, and (3) incorporate an effective monitoring program (see Specific Comments). The Tribe, in prior comments on the DSEIS, submitted extensive recommendations for standards and guidelines. Draft language in the UDSEIS does not fully reflect Tribal concerns and suggested recommendations. The Tribe re-affirms our recommendation submitted in earlier comments and urges the PNF to reconsider those comments. The Tribe is particularly concerned about potential impacts• from the State of Idaho's policy to remove bighorn sheep in close proximity to domestic sheep. In light of this policy, the Tribe believes long-term bighorn sheep viability can only be achieved through a combination of: (1) selecting a final alternative that removes sufficient source habitat from suited rangeland for domestic sheep to provide for bighorn sheep expansion and (2) establishing an effective adaptive management approach in the forest plan direction that insures continued opportunities for bighorn sheep restoration. (Update to DSEIS Ltr# 20072)

### Concern Statement 110.14

*The Forest Service should revise Forest Plan Objective WIOB13 to pertain to all NFS lands within the Payette National Forest. Objective WOIB14 should be revised to consider the use of non-telemetry approaches for monitoring the distribution of bighorn sheep. Objective WIOB18 and Guideline WIGU16 should be omitted because they are too restrictive. Standard WIST09 should include the development of an effective monitoring plan. The language in Goal RAG007 should be revised to the following: "Manage domestic sheep and goat allotments to ensure effective spatial separation and lack of contact between bighorn sheep and domestic sheep and goats". The language in Objective RAOB04 should be revised to, "...designed to prevent contact between...". Standard RAST10 should provide for the development of an effective Emergency Response Plan.*

### Response to Concern 110.14

The Payette National Forest has taken another hard look at the Forest Plan Amendment direction and has settled on goals, objectives, standards, and guidelines that the Forest Service believes will implement the decision adequately.

BLM_0049203

### Sample Public Comment for 110.14

The Tribe has already submitted specific recommendations for forest Plan standards and suggests the PNF review our previous comments on this issue submitted for the DSEIS. Wildlife Resources : Objective WIOB13 - This objective should pertain to all lands within the PNF, not just the Hells Canyon National Recreation Area. ObjectiveWIOB14—The future of availability of radio collared bighorn sheep will more than likely wane. It may be difficult to continue to use a radiotelemetry approach in monitoring the changes in distribution of bighorn sheep on the forest. Future monitoring may require other non-telemetry approaches. Objective WIOB18 - Suggest omitting this objective. This objective is too prescriptive and restrictive. It assumes a definitive solution without rationale or justification. It also advocates for a single solution while ignoring all other possible solutions without rationale or justification. If this objective is not omitted from the ROD, suggest language such as "insure, through an adaptive management approach, management of domestic sheep and goats and bighorn sheep remains consistent with evolving science related to the interactions of these species". Standard WIST09 - Would strengthen this standard to commit the PNF to develop an effective monitoring plan.

Guidelines WIGU16 - Suggest omitting this guideline. This guideline is too prescriptive and restrictive. It assumes a definitive solution without rationale or justification. It also advocates for a single solution while ignoring all other possible solutions without rationale or justification. If this objective is not omitted from the ROD, suggest language such as "regularly reassess management direction, through an adaptive management process, to reflect evolving science related to interactions between domestic sheep and goats and bighorn sheep". Rangeland Resources: Goals RAG007 - Suggest changing language to "Manage domestic sheep and goat allotments to insure effective spatial separation and lack of contact between bighorn sheep and domestic sheep and goats". Objective RAOB04—Suggest changing language to " ...designed to prevent contact between..." Standard RAST10—The emergency actions identified in the standard as proposed are not sufficient to insure effective long-term spatial separation. Suggest including a standard that commits the PNF to develop an effective Emergency Response Plan or including such a plan in the ROD. (Update to DSEIS Ltr# 20072)

---

### Concern Statement 110.15

*The Forest Service should clearly disclose the changes to the Forest Plan that result from this amendment.*

### Response to Concern 110.15

The lawsuit brought against the Forest Service led to an out-of-court agreement for certain grazing practices. These practices were formulated into Alternative 7K and analyzed in the DSEIS for effects and disclosure. What happens during Annual Operating Instructions is outside the scope of this analysis and is therefore not contained in this document. Programmatic level analyses are not designed to address nor intended to analyze specific grazing permit actions.

BLM_0049204

### Sample Public Comment for 110.15

The Emergency provision used by the Forest Service to revoke grazing privileges on some Payette allotments in 2007 may have been legitimate for the first year (had it been properly authorized as required by the regulations), but after that first year, it is no longer an emergency, but instead has become the new "management plan." This matter should be explained to the public in the Final SEIS. (Update to DSEIS Ltr# 20093)

### Concern Statement 110.16

*The Forest Service should revise the draft Amendment standard WIST08 so that it protects three or more groups of bighorn sheep in a 10-year period to protect the bighorn sheep if populations start expanding to the edges of the GPR. (PC 17. k)*

### Response to Concern 110.16

That Standard has been completely revised.

### Sample Public Comment for 110.16

Standard WIST08 would be better served if you changed it to read 3 or more groups (one or more) of bighorn sheep in a ten year period. I believe the intent or this standard is to draw back domestic sheep grazing from the GPR if bighorn sheep are showing signs of recolonizing site-specific bighorn sheep habitat. (DSEIS Ltr #13495)

## 130   ADEQUACY OF ANALYSIS AND DATA (CONTENT, USE OF INFORMATION/DATA, CONCLUSION NOT SUPPORTED BY DATA, NEED FOR ADDITIONAL ANALYSIS)

### Concern Statement 130.19

*The Forest Service should review and revise the DSEIS. (PC 1. b, c)*

### Response to Concern 130.19

The Forest Service will follow the NEPA process and has revised the document to incorporate new analysis and modeling tools that better assess the issue. Another revision that had been made was to not include use of information such as the 2006 *Risk Analysis of Disease Transmission Between Domestic Sheep and Bighorn Sheep on the Payette National Forest* and the outcomes from the 2006 Science Panel meeting in the FSEIS.

### Sample Public Comment for 130.19

I would respectfully request that the Forest Service review and revise this DEIS. (DSEIS Ltr #13175)

BLM_0049205

**Concern Statement 130.20**

*The Forest Service should revise the DSEIS because the analysis of the scientific data is flawed. There is inadequate support for the determination that disease transmission occurs between bighorn sheep and domestic sheep. The model assumptions are flawed due to inconsistent and incomplete data inputs for home range and GPR models; unrealistic inputs for domestic and wild sheep contact risk; and the assumption of expanding bighorn sheep populations in the future. (PC 1. a, f, g, h, i, j, k, l, t; PC 5. m, o, q; PC 12. d; PC 26. e, f, g, h, m)*

**Response to Concern 130.20**

The Forest Service is considering and incorporates the most up-to-date scientific studies and has developed new analysis and modeling techniques for the FSEIS, as well as development and analysis of additional alternatives. The scientific data used to develop alternatives in the DSEIS has been further validated and refined in the intervening time period. All models involving source habitat, populations, and risk of contact are updated and improved. All of the updated work involves published literature and measurements of all known data. All assumptions have been taken directly from known data or published literature. All of the source habitat, populations, and risk of contact models have been run to correspond with the timing of the grazing season. All available science is being considered in a disease model being developed by national experts in animal disease epidemiology. The assumption that disease transmission occurs between the two species will continue to be a foundation for the analysis in the FSEIS.

The timing of bighorn sheep use on the allotments or within the vicinity of the allotments was considered in relation to when and where domestic sheep are permitted. One of the analyses incorporated telemetry data, which documented on more than one occasion, actual presence of bighorn sheep on the domestic sheep allotments during the authorized grazing season in areas where bucking occurred. This data is neither flawed nor inadequate as it answers the question of whether the bighorn sheep have the opportunity to make contact with the domestic sheep. The telemetry data also documented a bighorn ram returning to his herd after being located in the bucking area with the domestic sheep, thus having the opportunity to spread disease to his herd. Because bighorn and domestic sheep utilize the same habitat, and there is documented presence of bighorn sheep in the allotment when the domestic sheep are permitted, the Payette National Forest believes this analysis is representative of actual conditions. The fact that there are few collared bighorn sheep may be interpreted to mean that there are even more bighorn sheep on the allotments during the domestic sheep grazing season than the Forest Service know about. The collared bighorn sheep represent a small percentage of the actual population. Although domestic sheep use of the allotments may vary from year to year, the documented occurrences of bighorn sheep on the allotment during the grazing season serve as point that it takes just one contact to spread disease.

The Forest Plan EIS relied on the best scientific information available to develop alternatives that were based on the assumption that disease transmission can occur, and those assumptions are not changing for this analysis because no new studies have conclusively proven disease transmission does not occur. The preponderance of evidence

suggests that disease transmission can occur. The Payette National Forest continues to provide separation between the two species to prevent any potential disease transmission. The risk for disease transmission will be evaluated when considering continued use of the domestic sheep allotments.

### Sample Public Comment for 130.20

The scientific research claims pathogens exist which bighorns and domestic sheep can share. The same research does not document (1) that disease transmission occurs between bighorns and domestic sheep, (2) that the bighorns themselves are free from these offending pathogens and (3) that the domestic sheep on the allotments are carriers of the offending pathogens. Without the above facts, the USFS needs to redo its DEIS and maintain existing domestic sheep grazing on the PNF. (Ltr #13728)

---

### Concern Statement 130.21

*The Forest Service should revise the DSEIS because the purpose and need is too narrow. (PC 1. e; PC 33. a)*

### Response to Concern 130.21

The purpose and need for the project, found in Chapter 1 of the DSEIS, were formulated in response to direction from the Appeal Reviewing Officer to address concerns about the viability of bighorn sheep populations. The Regional Forester was directed to do an analysis that came with very specific instructions that limit the scope of this assessment to addressing disease transmission issues between domestic sheep and bighorn sheep, and analyzing bighorn sheep viability. In addition, there was direction in the instructions to add language to the 2003 Forest Plan for the Payette National Forest that "ensures" bighorn sheep viability.

### Sample Public Comment for 130.21

The stated purpose and need is vague and narrow, which has resulted in an incomplete and biased set of alternatives and analysis. (DSEIS Ltr #12943)

---

### Concern Statement 130.22

*The Forest Service should show land ownership both on and off the Payette National Forest because other disease vectors may be present on private ground. (PC 1. w)*

### Response to Concern 130.22

Land ownership that is not NFS land is displayed and the potential effects to bighorn sheep viability because of domestic sheep grazing occurring and not occurring on those lands is analyzed in the FSEIS. However, the Payette National Forest only has control over land officially managed by the Agency and more specifically, this decision is only associated with management on the Payette National Forest. All known sources of potential disease will be accounted for in the cumulative effects analysis. The sources of

BLM_0049207

disease will include not only private lands, state, and other Federal allotments, but also the disease status of the bighorn sheep herds.

### Sample Public Comment for 130.22

Eliminating one questionable potential source of a potential disease vector certainly does not assure bighorn viability. To illustrate this difficulty a better map that shows various ownerships internally and externally of the Payette Forest would be very helpful. (DSEIS Ltr #11608)

---

### Concern Statement 130.23

*The Forest Service should revise and clarify the relative risk rating tables and discussion because it is confusing in the DSEIS. (PC 1. ee)*

### Response to Concern 130.23

The methods for comparing risk between the alternatives have been changed for the FSEIS.

### Sample Public Comment for 130.23

The relative risk of contact is displayed in many forms in Chapter 3. The only risk rating I really understand is Table W-37. I suggest you try to simply or summarize all of the tables. If you could only have one or two tables that compared alternative risk rating, what would it look like? Use that table only. (DSEIS Ltr #13495)

---

### Concern Statement 130.24

*The Forest Service should add a provision to the FSEIS allowing for the recalculation of the GPR when bighorn sheep are found to occur outside already designated GPRs. (PC 1. ii, oo)*

### Response to Concern 130.24

The direction in the Forest Plan amendment regarding recalculating GPRs has been removed. The analysis and subsequent direction is instead, looking at core herd home ranges and foray movements of bighorn sheep outside of the core. Monitoring to detect presence in areas not yet documented in the data will be periodically reviewed for changes in the movement patterns.

BLM_0049208

### *Sample Public Comment for 130.24*

Wildlife Resources Standards WIST08. Concern(s): a. Standard appears to only address bighorn sheep sightings within an established GPR. b. Standard does not allow for other information indicating occupied range to be used to recalculate GPR. Recommendations: Recalculate GPR when observations of bighorn sheep occur outside of GPRs. Suggested Language: "To allow for bighorn sheep population restoration and range expansion, recalculate and remap a bighorn sheep GPR when 3 or more bighorn sheep are located between the 90-100 percentile volume contour within a GPR, or when 1 or more bighorn sheep are located outside of an existing GPR, or when other information suggests recolonization or occupancy of new habitats (observation of bighorn lambs, rutting and/or mating behavior of bighorn rams, collection of bighorn fecal pellets, etc...) by bighorn sheep." (DSEIS Ltr #13413)

### Concern Statement 130.25

*The Forest Service should specify which court settlements drove the design of Alternative 7K because it is not clear in the DSEIS. (PC 1. jj)*

### Response to Concern 130.25

Alternative 7K has been dropped from detailed consideration in the FSEIS. Alternative 7L is a re-design of 7K using the risk for contact analysis developed and provided for public comment in the update to the DSEIS. The docket number for the initial case was CV-07-151-BLW.

### *Sample Public Comment for 130.25*

The PNF has foreclosed consideration of alternatives other than alternative 7K or similar alternatives that proposed to close more allotments to domestic sheep use than those proposed to be closed under alternative 7K. The PNF states that it has entered into "recent court settlements" that determine areas as unsuitable for domestic sheep grazing. See DSEIS at 2-12. Alternative 7K implements these recent court settlements. See id. The PNF should specify exactly what court settlements it is referring to, by court action and docket number, including any court orders approving those settlements. (DSEIS Ltr #13550)

### Concern Statement 130.26

*The Forest Service is failing to honor the commitment made in 1997 with the Idaho Wool Growers Association and formalized in Idaho State Code. This commitment stated that domestic sheep grazers would not be held accountable for any problems, which resulted from the reintroduction of bighorn sheep into Hells Canyon. (PC 1. pp; PC 34. a, b, c, d, e, f, g; PC 35. c; PC 44. a, b, c)*

### Response to Concern 130.26

Alternatives 1B, 2, 5, and 7 do consider the 1997 Letter and agreement. The reintroduction of bighorn sheep began prior to 1997, and some sheep were reintroduced before the agreement was entered. In addition, there are changed circumstances and new information that has been developed since 1997 as a result of bighorn sheep crossing the

BLM_0049209

Snake River, reservoirs, and dams. The bighorn sheep that have crossed into Idaho were not controlled as anticipated in 1997. In addition, bighorn sheep have subsequently been identified as a Sensitive Species by the Regional Forester. Any decision made by the Forest Service must be consistent with Federal laws and regulations currently in effect, and account for circumstances that presently exist.

### Sample Public Comments for 130.26

Attachment 1: A news release produced by Ron Shirts and Frank Shirts Jr., stating that the Draft SEIS omits commitments made in 1997 between the Idaho Wool Growers Association and the Forest Service and does not include adequate scientific analysis regarding the transmission of disease between domestic sheep and bighorn sheep. (DSEIS Ltr #117)

BLM_0049210

Comment #9, general: The Forest Service is required by the Hells Canyon Initiative, Idaho state statute, and the letter agreement between the Forest Service and the Idaho Wool Growers Association to hold domestic sheep grazing harmless from bighorn sheep transplants. In the DSEIS, the PNF circumvents the letter agreement of the state and federal governments with the Idaho Wool Growers Association regarding the impact of bighorn sheep on domestic sheep operators. The Final SEIS must discuss this letter's impact on the responsibilities of the Forest Service, and the domestic sheep industry must be held harmless for any health risks associated with domestic sheep and bighorn sheep interaction. Domestic sheep operators should not be held accountable for or liable for any such risk. This means that domestic sheep grazing allotments must not be closed because of health risks associated with domestic sheep and bighorn sheep interaction. The Forest Service agreed that this would not be the result of bighorn sheep transplanting. In the Chief's Appeal Decision on the PNF Forest Plan, the Chief stated that he could not understand why the PNF LRMP discussed the 1997 Memorandum of Agreement as support for protecting the Wool Growers on the PNF outside of Hells Canyon. See Appeal Decision, footnote 46, at 13. The Chief was confused about the facts, resulting in a confused decision. The Chief misunderstood what was meant by the PNF LRMP's reference to the "1997 agreement reached by members of the Hells Canyon Bighorn Sheep Restoration Committee with the Idaho Wool Grower Association." See Appeal Decision, footnote 46, at 13. The Chief misunderstood this "1997 agreement" to mean the interagency MOA that preceded the Hells Canyon Initiative when in fact it meant the 1997 letter agreement between the Hells Canyon Initiative committee and the Idaho Wool Growers Association, discussed above.

By focusing on the non-substantive MOA instead of the subsequent, substantive letter agreement with the Idaho Wool Growers Association, the Chief issued a factually-baseless decision. Had the Chief appropriately focused on the Hells Canyon Initiative committee agreement with the Wool Growers, the Chief would have seen that the Hells Canyon Initiative Project Area encompassed sheep grazing allotments on the PNF including allotments at issue in the DSEIS. A correct understanding of the 1997 agreement would have clarified for the Chief the discussion in both the LRMP and the FEIS as to the importance of the Hells Canyon

Initiative and the agreement with the Wool Growers. It would also have clarified that the proposed management of the PNF lands was in fact covered by the 1997 agreement and its Project Area, including domestic sheep operations in or adjacent to the Hells Canyon complex. See Decl. of Robert M. Richmond at 4. Based on the foregoing, the Forest Service's agreement to hold domestic sheep grazing harmless from bighorn sheep transplants as required by the Hells Canyon Initiative, the Idaho state statute, and the letter agreement between the Forest Service and the Wool Growers, must be upheld. The PNF has agreed not to close grazing allotments on the PNF as a result of bighorn sheep transplants, thus, the Final SEIS and proposed management direction must not involve the closure of grazing allotments on the PNF. (Update to DSEIS Ltr# 20070)

BLM_0049211

**Concern Statement 130.27**

*The Forest Service should base the analysis in the FSEIS on sound science supported by current research. The FSEIS should be particularly thorough when assessing the literature on the causal relationship of disease transmission between domestic sheep and bighorn sheep. (PC 5. a, b, c, d, e, f, g, i, j, m, o)*

**Response to Concern 130.27**

The Forest Service has attempted to use all available sound science to inform our analyses and decision making. As discussed in the draft documents and in the FSEIS, a large number of studies presenting a variety of different types of evidence indicate that domestic sheep can and do transmit respiratory diseases to bighorn sheep. In addition, some of these transmissions can induce population-level die-offs.

The Forest Service has not found studies indicating that disease transmission does not occur between domestic sheep and bighorn sheep. Some studies indicate that bighorn sheep sometimes suffer die-offs in the absence of contact with domestic animals. Other studies and experience with domestic sheep show that other factors such as stress, bad weather, and high-population density can increase susceptibility to disease. While these studies show that domestic sheep contact with bighorn sheep is not the sole factor involved in respiratory disease in bighorn sheep, the studies in no way call into question the evidence that in other cases domestic sheep contact with bighorn sheep does result in bighorn sheep die-offs.

If the Forest Service were claiming that domestic sheep were the only cause of respiratory disease in bighorn sheep, many studies would rebut that claim. Rather, the Forest Service is acting based on numerous studies that indicate that domestic sheep can, and often have in the past, transmitted disease pathogens to bighorn sheep that can cause population-threatening die-offs of respiratory disease.

This analysis and subsequent decision is designed for and applicable to the Payette National Forest. The FEIS for the LRMP identified the potential for disease transmission as an assumption for analysis. This assumption was never challenged and continues to be used in this process.

> **Sample Public Comment for 130.27**
>
> This situation is not unique to the State of Idaho. Surrounding states also have domestic sheep grazing on public land, and have an overlap with bighorn sheep territory. The Forest Service needs to examine and take into consideration the lack of disease transmission in these other states as well as the scientific evidence showing no diseases transmission between the two species. (DSEIS Ltr #12475)

BLM_0049212

**Concern Statement 130.28**

*The Forest Service should consider the telemetry studies that have been conducted over the last five grazing seasons. (PC 5. h)*

**Response to Concern 130.28**

All of the available data for the herds was utilized in the analysis—not just for the last five years—to review and document patterned behaviors. Therefore, the more years of information used results in more accurate results.

> *Sample Public Comment for 130.28*
>
> It should consider the telemetry studies over the last five grazing seasons and an unbiased view of the science involved in disease transmission between bighorn and domestic sheep. (DSEIS Ltr #52)

**Concern Statement 130.29**

*The Forest Service should expand the discussion of risk of contact because the DSEIS is unclear and it is difficult to understand what a 2 percent risk of contact means. (PC 7. b)*

**Response to Concern 130.29**

The risk of contact referred to here is the expected number of contacts per year. A contact rate of 0.02 means that at current population levels, an average of 0.02 contacts occur in a given year, an average of about one contact every 50 years. Also, contacts per year translates approximately but not exactly into the average number of years between contacts because in some years there can be more than one contact. For example, if the average number of contacts per year is one, in some years there will be one contact, in some years two or three contacts, and in other years zero contact. Therefore, the average number of years between contacts will be slightly more than one.

> *Sample Public Comment for 130.29*
>
> The only two alternatives to ensure viable populations for bighorn sheep are 7H and 7E. The level of risk of contact is acceptable to me for only these two alternatives. I would be very surprised if any bighorn sheep biologist would accept the risk you have outlined in 7G (with mitigations) as meeting viability. It is hard to understand what this 2% risk of contact really means. Is it once in 50 years and at what scale? I suggest you use some examples to clarify what a 2% risk of contact really means. (DSEIS Ltr #13495)

BLM_0049213

**Concern Statement 130.30**

*The Forest Service should consider using adaptive management strategies to manage interactions between bighorn sheep and domestic sheep. (PC 24. q)*

**Response to Concern 130.30**

The Payette National Forest plans on utilizing adaptive management strategies to manage risk of disease transmission between domestic sheep and bighorn sheep. The final Forest Plan Amendment addresses this concern.

### Sample Public Comments for 130.30

The DSEIS does not propose to implement any adaptive management used in other forests to manage interaction between Bighorns and domestic sheep. (DSEIS Ltr #13674)

We appreciate the refined data on behavior of bighorn sheep, modeling of potential contact with domestic sheep and relative ranking of alternatives based on modeled contact. While this information is extremely useful, the document stresses multiple times that it is critical to avoid contact in order to reduce the spread of disease. Under "Management Recommendations" (pg 5) the SEIS states that, "separation, either spatially, temporally, or both of bighorn sheep from domestic sheep has been recommended by leading bighorn sheep disease experts." We acknowledge the difficulty in balancing the need to manage land for multiple use and protect natural resources. From our review, we understand that a high probability of contracting disease (namely bacterial pneumonia) occurs from contact of bighorn sheep with domestic sheep and the SEIS notes that the spread of these bacteria has been reported as the number one cause for bighorn sheep population declines throughout North America. Because of this threat we continue to have concerns with alternatives that could result in population decline of individual herds. We have rated this updated SEIS Environmental Concerns (EC). Based on our review, we believe that a high level of protection is needed to promote the viability of bighorn sheep populations and support avoiding contact between bighorn sheep and domestic sheep. We believe it will be extremely important to continue research and collect site specific monitoring data if an alternative is selected that maintains a level of risk of contact. We recommend that Forest Service utilize adaptive management as more data becomes available on bighorn sheep behavior and disease occurrence. (Update to DSEIS Ltr# 20085)

**Concern Statement 130.31**

*The Forest Service should consider that the assumption that the bighorn sheep population must exist and be expanded to provide more opportunities for hunting by Tribal members and the public is flawed. (PC 35. d)*

**Response to Concern 130.31**

Viability requirements in NFMA ask for adequate habitat to be well distributed across the planning unit and available to bighorn sheep. The habitat should also be contiguous to allow for reproducing individuals to come into contact. Tribal governments have requested bighorn sheep populations be available in areas they historically occupied so

BLM_0049214

that Treaty Rights can be exercised. This is part of the Forest Service response to Tribal Treaty Trust responsibilities.

### Sample Public Comment for 130.31

The DSEIS states, in multiple places, that the goal is to expand the bighorn populations (contribute to positive population growth) and provide more harvest opportunities for tribal members (and potentially other citizens). The DSEIS has been constructed with a presumption that bighorn populations must exist and be expanded in all regions of the Payette National Forest, and that domestic sheep grazing must be eliminated in order to accomplish this objective. This goal of population growth and expansion is contrary to the NFMA, HCNRA Act, the Multiple-Use Sustained Yield Act, and the purpose and need for agency action. The alternatives and analysis in the DSEIS, which are built around this premise, is therefore flawed. The proposals would sacrifice domestic livestock grazing in an attempt to expand bighorn sheep numbers and range. (DSEIS Ltr #12943)

---

**Concern Statement 130.32**

*The Forest Service should consider that the proposed amendments to the Payette Forest Plan are based upon a flawed DSEIS and therefore, are similarly flawed. (PC 37. a)*

**Response to Concern 130.32**

The analysis conducted is prepared in accordance with Federal Law and responds to the appeal direction received from the Appeal Reviewing Officer of the Forest Service. The Payette National Forest does not believe that the analysis is flawed.

### Sample Public Comments for 130.32

The proposed amendments to the Payette National Forest's Land and Resource Management Plan are based upon the flawed DSEIS and therefore are similarly flawed. (DSEIS Ltr #13614)

I also urge the Forest to adopt an adaptive management strategy so that you can continue to protect the herds if their populations increase and expand their ranges. (Update to DSEIS Ltr# 20073)

---

**Concern Statement 130.33**

*The Forest Service should comply with the Forest Service Open Space Conservation Strategy in the DSEIS, as it has currently failed to do so. (PC 35. l)*

**Response to Concern 130.33**

This analysis is prepared as a supplement to the FEIS for the 2003 Forest Plan for the Payette National Forest. The Forest Plan analysis contained disclosure regarding Open Space. The Open Space analysis was not challenged. No instructions to supplement the open space documentation were received from the Appealing Officer for the Chief of the Forest Service.

BLM_0049215

### Sample Public Comment for 130.33

The DSEIS fails to comply with the Forest Service Open Space Conservation Strategy. (DSEIS Ltr #13550)

---

**Concern Statement 130.34**

*The Forest Service should provide other documentation to justify their pertinent findings and preferred Alternative G in the DSEIS because the Western Association of Fish and Wildlife Agency's Wild Sheep Working Group Report (WAFWA) and Payette Principles report that were used have been barred from use by a Federal district court order or they were created in reliance upon illegal reports.*

**Response to Concern 130.34**

For the FEIS, Alternative 7G is not found as pertinent because of the WAFWA Guideline, the Payette Principles, and the 2006 Risk Assessment. The Payette National Forest has moved from the 2006 qualitative risk analysis to a quantitative risk analysis supported by the existing data on bighorn sheep movements and use patterns of the landscapes in and around the Payette National Forest. Therefore, reliance on the previously noted documents does not occur.

BLM_0049216

### Sample Public Comment for 130.34

On July 1, 2009, U.S. District Court Judge B. Lynn Winmill issued a decision in Idaho Wool Growers Association and Dr. Marie S. Buigin v. Ed Shaffer, et ai., 08-cv- 394-S-BLW (D. Idaho). Plaintiffs challenged the Forest Service's establishment and use of these two committees and their reports as violations of F ACA, NFMA, and the APA. Judge Winmill entered an order granting plaintiffs' motion for summary judgment. In so doing, Judge Winmill wrote "The issue here is whether the Forest Service's Committees violated FACA's and NFMA's procedural requirements and, if so, whether the Committees' reports should be utilized for any future Forest Service Decisions." Id. at pages 15-16. The Court ordered that "The Committees' findings and/or conclusions are not to be relied upon by the Forest Service with respect to any future agency decisions." Id. at 23. This includes any future decisions to issue a Final SEIS or revise the Payette LRMP. Additionally, the Payette National Forest is relying upon another committee's report that in turn relied upon the Risk Assessment and Payette Principles committees and reports. This additional committee's report must likewise be disregarded. Specifically, the Payette National Forest is relying upon the Western Association of Fish and Wildlife Agency's Wild Sheep Working Group Report and Recommendations dated June 21, 2007. The DSEIS acknowledges that the WAFWA working group concurred with the statements in the Payette Principles report and that those statements formed the foundation for WAFWA's report and recommendations. DSEIS at 3-14.Clearly, since the W AFW A Working Group used the illegal Payette Principles report as the foundation for its recommendations, the WAFWA Working Group's recommendations in turn must not be used by the Forest Service in the Final SEIS or subsequent decisions on the LRMP. The WAFW A June 21, 2007 report and the Payette Principles report featured so prominently in the DSEIS that they earned specific and exclusive discussion under the heading "Pertinent Findings" within the DSEIS' s Introduction. See DSEIS at pages xiii and xiv. They are similarly referenced in the Introduction as the basis for the "management recommendations" at page xv. The WAFWA report is referenced repeatedly in the DSEIS, is included in the list of references at page R-1 0, and was utilized by the Forest (page 2-3). Any other scientific reviews on disease transmission referenced by the Payette National Forest in its DSEIS that rely upon the illegal reports must similarly be disregarded. In summary, the Pertinent Findings used by the Payette National Forest to justify the DSEIS are either specifically barred from use by the federal district court's Order or were created in reliance upon the illegal reports and recommendations. In the absence of these "findings," the Payette National Forest must provide other reasons to support its final environmental analysis and ultimate record of decision on revision of the LRMP for the Payette National Forest. The Forest Service must abandon its management recommendations and the agency's preferred alternative 7G developed in reliance on the illegal findings. (Update to DSEIS Ltr# 20001)

BLM_0049217

**Concern Statement 130.35**

*The Forest Service should consider the following regarding the use of scientific reports, include this information in the FSEIS, and/or delay the final decision for a five year period to allow time for the research effort to address the bighorn sheep health issue:*

*A)     Evidence linking disease outbreaks to domestic sheep is inconclusive*

*B)     Studies documenting disease transmission between the two species have been done in controlled environments*

*C)     Not all disease events can be attributed to contact with domestic sheep bacteria and viruses are carried and transmitted by other animals and bighorn sheep*

*D)     Stress could be a precursor to the onset of sickness*

*E)     The presence of bighorn sheep in the vicinity of domestic sheep grazing allotments is unsubstantiated.*

**Response to Concern 130.35**

In response to item (A): The SEIS recognizes uncertainty associated with these issues, and specifically responds to them in Chapters 2 and 3. The disease review sections of this document, particularly Chapter 3, consider a large body of peer reviewed and published literature spanning several decades that redresses most of these statements. While there clearly are gaps in the knowledge base on the causal factors and mechanisms of bighorn sheep die-offs and disease transmission between these species, the vast majority of literature supports the potential for disease transmission between the species, documents bighorn sheep die-offs near domestic sheep, and supports the management option of keeping these species separate to prevent disease transmission. Furthermore, there is no peer reviewed literature that suggests bighorn sheep can be grazed with domestic sheep without concern for disease transmission between the species. Scientists from both sides of the issue also recommend that the species be kept separate until the disease transmission science is better understood. The analysis conducted in this document recognizes these uncertainties but clearly focuses on the Forest Service's responsibility to provide habitats that support viable populations of bighorn sheep, particularly given the risks that the species currently faces relative to the impacts of disease on population persistence.

In response to item (B): Evidence of transmission comes from many different sources, and inoculation and pen studies are only two types. Carefully controlled experimental conditions in such studies are needed to demonstrate that Pasteurellaceae transmitted from domestic sheep to bighorn sheep really is the cause of sickness and death in bighorn sheep. Evidence that transmission actually does take place outside of the lab is necessarily more circumstantial and less controlled, taking the form of observations of contact or proximity of the species prior to die-offs, or correlational studies relating the distance between the species to the probability of die-offs or extirpation.

BLM_0049218

In response to item (C): The Forest Service does not pretend that contact with domestic sheep is the only source of disease or die-offs in bighorn sheep, but rather only that it is one source of risk. Even though other events may lead to die-offs of bighorn sheep, the Forest Service still has a responsibility to address the risk of disease posed by its management decisions relating to domestic sheep grazing.

In response to item (D): Even if other factors (e.g., stress, harsh weather, dust, or endemic disease organisms) also contribute to bighorn sheep disease susceptibility, the Forest Service still needs to address the additional or interacting risk posed by the possibility of contacts with domestic sheep.

In response to item (E): As discussed in the document, the Forest Service has analyzed an extensive database of telemetry locations of bighorn sheep. Bighorn sheep have been observed in many of the allotments on the Payette National Forest, and the foray analysis calculates the risk that bighorn sheep will reach other allotments.

### Sample Public Comment for 130.35

The documents included in the 2010 DSEIS seem to be one sided reports. The only documents listed in the findings and reports appear to show that the spread of pasteurella or shared pasteurella diseases between Domestic Sheep and Bighorn Sheep only comes from the Domestic Sheep in controlled experiments in controlled environments. Why were other documents that show other causes for the onset of the pasteurella left out of the DSEIS? (Update to DSEIS Ltr# 20037)

---

**Concern Statement 130.36**

*The Forest Service should assess Best Management Practices that are currently working on other forests, such as the Humbolt-Toiyabe in California.*

**Response to Concern 130.36**

In 2007, two of the Payette National Forest permittees developed 13 additional management practices and implemented them that grazing season. One of the permittees has continued to implement the 13 additional management practices willingly. The Forest Service has monitored these additional management practices and found them mostly successful in providing separation between domestic sheep and bighorn sheep, but not 100 percent successful. Wolves scattered a band of domestic sheep and two of the ewes were discovered four months later (after the grazing season) wandering in Hells Canyon, which proves the additional measures are inadequate. The implementation of these 13 additional management practices was taken into consideration when developing all alternatives. The Payette National Forest recognizes other Forests have isolated populations of bighorn sheep that may be separated from domestic sheep more effectively, however there is proven connectivity between the herds of bighorn sheep on the Payette National Forest.

The Humboldt-Toiyabe National Forest authorized domestic sheep grazing in a portion of two allotments that are in proximity of the endangered Sierra Nevada Bighorn Sheep through the 2008 grazing season. Therefore, grazing was not authorized on the two allotments in 2009. Because of the consultation with U.S. Fish and Wildlife Service,

BLM_0049219

several minimizing measures were required by the permittee. The Forest Service did not analyze the effectiveness of minimizing measures as they applied to maintaining separation between the domestic sheep and wild sheep. However, the Forest Service determined that the permittee could implement the minimizing measures on the allotments.

### Sample Public Comment for 130.36

Why did Mr. Tim Schoomer's report on "Best Management Practices" only show what he thinks will not work and did not include the practices that are in fact working on other USFS lands and in California on the Humbolt-Toiyabe where domestic sheep herders have been allowed to return to grazing on the National Forest with BMP's? The BHS there are a listed ESA species. The BHS in Idaho at question here are not. Mr. Schoomer's report should list all the National Forest that BMP's are being used on. It should also include the Environmental Officer or Range Officers reports from those forests using BMP's on how those specific BMP's are being used and their effectiveness or ineffectiveness in those specific instances. (Update to DSEIS Ltr# 20037)

### Concern Statement 130.37

*The Forest Service should collaborate with universities throughout the western United States and the domestic sheep industry to form a Bighorn and Domestic Sheep Research Center that collates all the data and in turn the most current data is used in your analysis.*

### Response to Concern 130.37

According to the court order received from U.S. District Court Judge B. Lynn Winmill in Idaho Wool Growers Association and Dr. Marie S. Bulgin v. Ed Shaffer, et ai., 08-cv-394-S-BLW (D. Idaho), the Payette National Forest cannot set up meetings and work with state employees in a setting such as that suggested without being in violation of FACA. Setting up such an approved advisory group is outside the scope of this project.

### Sample Public Comment for 130.37

There are other documents in the science world that show this is not just Domestic Sheep causing the issue at hand. There are many other factors included in this biological occurrence. The science at WSU and the U of Idaho are exploring the tip of the iceberg if you will. I believe there is way more to what appears to be happening here than meets the eye. Much more. I have also recently discovered that a similar problem is occurring in Iran and Spain with Ibex Sheep. Science is being done on this issue all over the west. Why doesn't the USFS team up with them all and make a BHS/Domestic Sheep Research Center to pull all the data together and team up with the Domestic Sheep Industry to find the answers to what is really happening here? (Update to DSEIS Ltr# 20037)

BLM_0049220

**Concern Statement 130.38**

*The Forest Service should incorporate the findings of the following recently published, peer reviewed papers: Bibersteninia Trehalosi Inhibits Growth of Mannheimia Hamolytica by Dr. S. Srikumaran and Transmission of Mannheimia haemolytica from Domestic Sheep to Bighorn Sheep: Unequivocal Demonstration with Green Fluorescent Protein Tagged Organisms by Dr. S. Srikumaran, which shows that for transmission and then for disease to occur extensive contact is required.*

**Response to Concern 130.38**

We have incorporated the findings reported in both of these manuscripts (Dassanayake et al., 2010, and Srikumaran, *in press*) in the FSEIS.

The first paper reports that *Bibersteinia trehalosi* outgrows *Mannheimia haemolytica* when the two are grown together in vitro. Within six hours of co-culture, *B. trehalosi* came to predominate to such an extent that *M. haemolytica*, while still present, was not detectable by conventional method based on colony morphology. The authors raise the possibility that their finding may help explain in part the puzzling inability of researchers to identify a single pathogen from the lungs of pneumonic bighorn sheep. While *M. haemolytica* is the only pathogen that has been shown to consistently cause fatal pneumonia in bighorn sheep, it is not consistently found in the lungs of field-collected bighorn sheep during die-offs. However, the authors' findings raise the possibility that even if *M. haemolytica* is the cause of disease, it may not be detected. As the authors indicate (p. 1011, Dassanayake et al. 2010):

> Collectively, these findings suggest that it is possible that the failure to consistently detect *M. haemolytica* in BHS pneumonic lungs is due to both overgrowth of *B. trehalosi* and simultaneous reduction in cell density of *M. haemolytica*.

The second paper describes a pen experiment that was carefully designed to investigate if disease transmission can occur between domestic sheep and bighorn sheep. Using fluorescently tagged *M. haemolytica*, the researchers (Srikumaran et al., *in press*):

> unequivocally prove[d] transmission of M. haemolytica from domestic sheep to bighorn sheep, resulting in pneumonia and death of the bighorn sheep

However, the study was not primarily designed to address the question of what degree of physical contact is necessary for transmission of disease from domestic sheep to bighorn sheep. Our disease model presumes that physical contact is necessary for transmission. Even if separation of 30 feet were enough to prevent transmission, nothing exists on the Payette National Forest to prevent animals that are within 30 feet of each other from walking up to and making direct contact each other.

BLM_0049221

### Sample Public Comment for 130.38

The Payette needs to incorporate into their analysis two peer reviewed papers that have recently been published: 1) "Bibersteninia Trehalosi Inhibits Growth of Mannheimia Hamolytica" by Dr. S. Srikumaran and 2) Transmission of Mannheimia haemolytica from Domestic Sheep to Bighorn Sheep: Unequivocal Demonstration with Green Fluorescent Protein Tagged Organisms" by Dr. S. Srikumaran. The second paper demonstrates that, yes, disease transmission can occur when domestic and bighorn sheep are closely commingled. However, with separation of 30 feet transmission does not occur. When bighorn sheep and domestic sheep are placed with only a fence line between them transmission of Pasturella organisms did occur. However, this transmission did not result in disease within the bighorns. Dr. Srikumaran's work shows that for transmission and then for disease to occur extensive contact is required. (Update to DSEIS Ltr# 20040)

## Concern Statement 130.39

*The Forest Service should select an alternative that absolutely provides for "no contact", as this is the only solution and is supported by the references that are documented in the DSEIS.*

## Response to Concern 130.39

See response to Concern 100.40.

### Sample Public Comment for 130.39

References listed in the DSEIS and the publications and testimony cited provide overwhelming documentation that nothing other than absolute "no contact" alternatives have worked elsewhere. (Update to DSEIS Ltr#20064)

## Concern Statement 130.40

*The Forest Service should document how the best available science was used in the planning process within the context of the issues being considered, and document that all the science was appropriately interpreted and applied.*

## Response to Concern 130.40

The disease review section of the document presents several lines of evidence supporting the conclusion that disease transmission from domestic sheep can pose a significant threat to bighorn sheep populations. The Forest Service is required to consider this threat in its management decisions. More generally, Chapter 3 and the Technical Appendix present the scientific evidence that the Payette National Forest has based its decisions.

The disease review does address other interpretations of the science and acknowledges that factors other than contact with domestic sheep can lead to disease in bighorn sheep populations. The fact that some bighorn sheep populations carry endemic disease or that other wildlife species might transmit disease to bighorn sheep does not, however, imply that the Forest Service does not need to manage the risk of disease transmission from domestic sheep.

BLM_0049222

Finally, bighorn sheep's lack of resistance to some diseases carried by domestic sheep cannot, at this time, be easily remedied. As a result, reducing the probability of contact between the species remains the Forest Service's main available means of reducing disease transmission risk.

### Sample Public Comment for 130.40

Comment #12, pgs. 2-3 - 2-4, 2-13: The PNF should not rely on assumptions concerning disease transmission and must rely on best available science. The DSEIS states that "[o]ne key assumption carried over from the 2003 FEIS is that disease transmission from domestic sheep to bighorn sheep is a threat to the wild sheep species." DSEIS at 2-3; see also DSEIS at 2-13 ("The severity of the outcomes from the disease model is largely dependent on assumptions . . . ."). Why is the PNF basing management decisions on an assumption? What is the PNF doing to prove or disprove this assumption? The scientific research needs to document that disease transmission occurs between bighorns and domestic sheep. Forest Service regulations require that "best available science" be taken into account in planning. 36 C.F.R. § 219.11(a). In taking "best available science" into account, the Forest Service must "(1) [d]ocument how the best available science was taken into account in the planning process within the context of the issues being considered and (2) [d]ocument that the science was appropriately interpreted and applied." Id. "Under the final planning rule there is no firm, established definition of what is best available science." 73 Fed. Reg. at 21498. "It is important to realize there can be more than one source for science or more than one interpretation of the science." Id. "What constitutes the best available science might vary over time and across scientific disciplines. The best available science is a suite of information and the suite of information does not dictate that something can only be done one way." Id. In the DSEIS, the PNF makes the one-sided assumption that disease transmission from domestic sheep to bighorn sheep is a threat to the wild sheep species. This assumption does not rely on best available science, because, among other things, it fails to account for other interpretations of the science; it fails to account for the fact that bighorns already carry disease; it fails to account for the fact that other wildlife may transmit disease to bighorns; and it fails to
account for the fact that the bighorns may have a reduced immunity to disease that can be improved. Thus far, the PNF has dictated that interpretation of the science must lead to separation of domestic sheep and bighorns on the PNF. The DSEIS fails to present baseline data on bighorn health. Here, the best available science does not dictate such an outcome. In the DSEIS, the PNF bases its decisions solely on its one-sided interpretation of the science on disease transmission from domestic sheep to bighorn sheep and ignores other aspects of decision-making. In the Final SEIS, the PNF must look to other factors including input from ranchers and the established grazing uses on the PNF, as well as the best available science, to make its decision on the preferred alternative. (Update to DSEIS Ltr# 20070)

BLM_0049223

**Concern Statement 130.41**

*The Forest Service should not consider the testimony or research of Dr. Marie Bulgin, University of Idaho scientist at Canine Center in Caldwell because it has had limited review and contradicts research by many other scientists.*

**Response to Concern 130.41**

Throughout this public comment process, the Payette National Forest has aimed to consider and weigh all relevant research. The Payette National Forest does not and will not exclude from consideration research carried out by any individual. The articles referenced in the FSEIS include many that are coauthored by Dr. Bulgin or other members of the Caine Veterinary Teaching Center (CVTC). Many other studies included in the Literature Cited section relied on the CVTC to perform isolation and characterization of *Pasteurella* spp. or other kinds of bacteria and viruses.

> *Sample Public Comment for 130.41*
>
> The 373-page PNF Update summarizes that "field observations suggest that bighorn sheep have a high probability of contracting fatal pneumonia following contact with domestic sheep, which has led to numerous independent experiments. The results of these experiments provided strong corroboration that bighorn sheep have a high probability of contracting fatal pneumonia following contact with domestic sheep." In contrast, Dr. Marie Bulgin, University of Idaho scientist at Caine Center in Caldwell, testified in April 2009 before the Idaho Senate Resources & Environment Committee that "there has been no scientific evidence that domestic sheep have caused the die-offs." Dr. Bulgin's position that "there has been no scientific evidence that domestic sheep have caused the die-offs" flies in the face of the great majority of scientific expertise on this subject and historic evidence of severe die-off and extirpation across much of the US. The very fact that there are no progeny of domestic and wild sheep unions after more than a century of exposure between these two theoretically compatible species should dramatically confirm the obvious—even causal exposure of bighorns to domestic sheep spells death for the former. In my opinion, the University of Idaho did a disservice to the State of Idaho when they conducted a very limited and narrow review of Dr. Bulgin's public stance and found her scholarly conduct satisfactory as a spokeswoman for their university and as a disinterested expert on public policy. (Update to DSEIS Ltr#20082)

BLM_0049224

**Concern Statement 130.42**

*The Forest Service should reconsider the results of an unpublished scientific paper, which indicates that domestic sheep transmitted fatal disease to bighorn sheep because this research is flawed. A total of 16 bighorn sheep were found with domestic sheep and transported to the Wildlife Laboratory in Caldwell, Idaho between 1996 and 2003. Six of the 16 died of pneumonia, with only two of the bighorn sheep having similar organisms to the domestic sheep that were found with them.*

**Response to Concern 130.42**

The Payette National Forest has not relied on or even referenced the findings reported in this unpublished manuscript.

> *Sample Public Comment for 130.42*
>
> During the summer of 2009, an unpublished paper surfaced which supposedly proved that domestic sheep transmitted fatal disease to bighorns. The paper, rejected by the Journal of Wildlife Diseases, reports on two separate bighorns captured in the company of domestic sheep and then transported to the Wildlife Laboratory at Caldwell, Idaho. Both animals were cultured as were some of the domestic animals with which they were found. Cultures showed they were sharing an identical organism with their domestic counterparts. Both died of pneumonia within 10 days of arriving at the Wildlife lab. However, the paper did not report the extreme stress experienced by the two BHS. One spent the entire time at the Wildlife Laboratory throwing herself at the fence until she finally died. The other animal was roped and tied to a tree for a day without food or water until Oregon Fish and Game found him and transported him to the Lab. A week later he died of pneumonia. Interestingly, those two were part of 16 other BHS found with domestic sheep and transported to the Laboratory in the period between 1996 and 2003 and studied by the Idaho Wildlife Lab personnel. A total of 6 died with pneumonia, only two had similar organisms to the domestic sheep they were found with. (Update to DSEIS Ltr# 20083)

**Concern Statement 130.43**

*The Forest Service should consider the published report by Ward AC, et. al. (1997) Pasteurella spp. in sympatric bighorn and domestic sheep. Journal of Wildlife Diseases, 33(3): pages 544-557; and Dr. John Wehausen's study of the Sierra bighorn sheep herd, which indicated several instances where the domestic sheep comingled with bighorn sheep with no adverse affects, even when they shared the same organisms.*

**Response to Concern 130.43**

This paper describes research conducted after four instances in which one or more domestic sheep were known to have strayed into areas near bighorn sheep. The incidents took place in four different mountain ranges in Nevada, and in two of the cases one or two domestic sheep were actually observed with bighorn sheep. The paper describes in

BLM_0049225

detail the *Pasteurella spp.* bacteria isolated from domestic sheep and bighorn sheep in the four mountain ranges, characterizing them by species, biogroup, biotype, serotype, and results of restriction enzyme analysis and ribotyping of bacterial DNA.

In the two herds mentioned in this comment, the bighorn sheep herds did not show population declines following removal of the stray domestic sheep. The other two bighorn sheep herds examined in the article (in the Tobin and East mountain ranges) were extirpated within one to three years following removal of the domestic sheep. As tests of transmission, the analyses seem generally inconclusive and the authors conclude as much. The authors' results are consistent with, but do not either prove or rule out, transmission of disease-causing and non-pathogenic strains of *Pasteurella* from domestic sheep to wild sheep.

The authors conclude that:

> although disease and transmission may not occur in all instances when bighorn sheep contact domestic sheep, recommendations for management of domestic sheep on or near bighorn range should be followed to prevent potential for transmission of diseases to bighorn sheep (Ward et al., 1997, p. 555).

The authors' conclusion is fully in line with the Payette National Forest's approach. The Payette National Forest's analyses do not assume that every domestic sheep and bighorn sheep contact results in transmission and a die-off because there is such uncertainty about the percentage of contacts that result in die-offs. Therefore, the Payette National Forest runs separate simulations in which that percentage ranges from 5% to 100%.

### Sample Public Comment for 130.43

> Then there was a published report by Ward et. al. (1997) *Pasteurella* spp. in sympatric bighorn and domestic sheep. Journal of Wildlife Diseases, 33(3): pages 544–57, which reviewed several instances where the domestic sheep comingled with bighorn sheep with no adverse affects, even when they shared the same organisms. In October 1992, a single castrated male lamb that stayed with bighorn sheep on the Granite Range did not cause a die-off of the bighorn sheep. The entire bighorn herd and the domestic lamb were captured and tested for Pasteurella.. Although the bighorn and domestic sheep tested positive for Pasteurella Biotype 3 organisms, the bighorn herd has increased rather than dying-off. In fact the herd has tripled in size. A similar event in the Desatoya Range was documented in 1992. Contact among a domestic ewe, her lamb, and a bighorn herd was witnessed. The entire bighorn herd and the domestic sheep were tested and found to have Biotype 3 Pasteurella organisms. The bighorn herd has continued to thrive. However, those bighorns were released, not stressed by being captured and transported hundreds of miles to a small enclosure close to human habitation and fed unfamiliar feed, as in many other captive studies. (Update to DSEIS Ltr# 20083)

BLM_0049226

**Concern Statement 130.44**

*The Forest Service should obtain an objective review by an outside, independent expert scientist of all models and assumptions contained in the Update to the DSEIS.*

**Response to Concern 130.44**

The Payette National Forest intends to have the processes and models utilized in this assessment peer reviewed and published. This effort has not been completed yet.

> *Sample Public Comment for 130.44*
>
> The Department urges responsible officials to secure an objective review of all models and assumptions contained in the Update as soon as possible. Objective review by independent outside experts may be critical to support any decisions resulting from this information and any legal challenges that may result. (Update to DSEIS Ltr# 20089)

**Concern Statement 130.45**

*The Forest Service should consider the mortality counts taken from Annual Reports of the Hells Canyon Initiative, which indicate annual lamb mortality is the single most significant factor in the sustained downward trend decline in population throughout the region. The proposed alternatives which do not eliminate all risk of contact between the two species are assured to keep the risk of disease highly recurrent in the region metapopulation and should be considered in the final ROD.*

**Response to Concern 130.45**

The effects of low lamb recruitment after a disease event was taken into account within our disease model to determine the persistence of the bighorn sheep herds for the various alternatives. The disease model variables were based on documented disease events and the lamb mortality after effects.

BLM_0049227

### Sample Public Comment for 130.45

The DSEIS document makes reference to the seven major die-offs recorded in Hells Canyon since 1971 when the first bighorn transplant was made. Please take into consideration the following additional mortality counts taken from Annual Reports of the HELLS CANYON INITIATIVE. A review of the study can be found at the agency website www.fishandgame.idaho.gov, if you are not already aware of the findings of this long-term initiative. The annual lamb mortality is the single most significant factor in the sustained downward trend decline population throughout the region. This additional mortality data pertaining to the Hells Canyon Region, may prove relevant and worth further deliberation when making the final record of decision. It is important to note the referenced mortality counts are derived from four of the most recent years of the 15 years of study initiated since the 1995 major die-off in the Asotin, Washington area. The recurring low lamb recruitment is the condition contributing to the continual state of mortality events in the canyon. These documented losses were derived ONLY for lambs born of radio collared ewes which measures a small percentage of the overall population. We can reasonably ascertain, if the number of lambs born of non-radio collared ewes which died were measured, the incurred losses would be substantially higher. Further of note, in some years (2000) adult mortality of radio collard bighorns reached 23% (22 of 95 radio collared ewes and rams). During the most recent years of 2003, 2004 and 2006 there were 43, 43, and 48 lamb deaths respectively. The total lamb mortality for these four years alone reached 244. The largest number of lamb mortality to date, was an alarming count of 110, recently observed in 2009. The collective results found in the 14th year of the long term study confirms that once a metapopulation is subject to a die off, the impacts of disease are persistent, far- reaching and continue a cyclical pattern for an extensive period of time. The proposed alternatives which do not eliminate all risk of contact between the two species are assured to keep the risk of disease highly recurrent in the region metapopulation. For example, if the risk was only five percent and contact with domestic sheep was made only once every twenty years, the likelihood of disease continuing to kill a significant percentage of lamb production every year is all but guaranteed. (Update to DSEIS Ltr# 20096)

### Concern Statement 130.46

*The Forest Service should explain the difference between "viable" and "healthy" because viable populations of bighorn sheep may be unhealthy.*

### Response to Concern 130.46

Forest Service regulation specifies that habitats must be provided to support viable populations of native and desired non-native species (36 CFR 219.19). Viability can be measured in terms of population persistence, and this is a regulatory requirement of management. Health is a nebulous term which is much more difficult to define as a management metric. Obviously, healthy bighorn sheep herds are desirable, and may even be required for long-term persistence. Ideally, management should provide habitat conditions that reduce or eliminate disease outbreaks, which would lead to improved herd health and performance. Population recovery is an anticipated outcome. Although the literature indicates that bighorn sheep herds can recover from disease epizootics, long-term recurrent disease outbreaks have a high probability of leading to a population's extirpation. The disease model does evaluate factors that are considered useful in

BLM_0049228

assessing population recovery and persistence—such as contact frequency, probability that a contact results in a disease outbreak, implications of disease outbreaks on survival and recruitment rates, and a host of other factors. Although these factors are indicators of herd health, they are also used in assessing the likelihood of herd persistence.

### Sample Public Comment for 130.46

Comment #16, pg. 2-1: The Final SEIS must explain the difference between "viable" and "healthy" populations of bighorns and consider that the bighorns on the PNF may be viable, yet unhealthy. As provided in the DSEIS at 2-1, the PNF is preparing to implement management strategies to provide for the "viability" of bighorn sheep on the PNF. The DSEIS emphasizes its concern for the "viability" of bighorns, but fails to point out the difference between "viable populations" and "healthy populations" of bighorns. Bighorn populations may be "viable," yet "unhealthy" at times. Certain species of wildlife maintain "viable" populations despite periods of increased mortality due to disease. For instance, certain populations of rabbit, skunk and raccoon have regular intervals of substantial mortality due to disease, yet these populations remain "viable." Bighorns exhibit similar population behavior. For instance, the Lostine River herd of bighorns experienced substantial mortality in the 1980s, but is now considered one of the most "viable"
bighorn populations. The example of the Lostine River herd illustrates that bighorn populations may experience periods when they are temporarily "unhealthy," yet these populations remain "viable" in the long run. Similar to the Lostine River, bighorns on the PNF may experience periods of temporary ill-health. This is especially so where bighorns are adjusting to new habits. Because bighorns
are experiencing ill-health for a period of time does not mean that a bighorn sheep population is "unviable." The Final SEIS must explain the distinction between "viability" and "health" and explain how the bighorns on the PNF may only be experiencing a period of ill-health due to newly transplanted populations or other factors, rather than concluding that the bighorn sheep population on the PNF is "unviable." (Update to DSEIS Ltr# 20070)

---

**Concern Statement 130.47**

*The Forest Service should disclose the history of bighorn sheep transplants on and around the Payette National Forest and explain how transplanted bighorn sheep may be the ultimate cause of disease transmission amongst bighorn sheep on the Payette National Forest.*

**Response to Concern 130.47**

The FSEIS does not include an expanded discussion of transplants as a source of disease for two reasons. Firstly, the Forest Service does not transplant or manage bighorn sheep. However, the Forest Service does manage domestic sheep permits and bighorn sheep habitat. The current analysis is designed and required to address the risk posed by contact with domestic sheep. Also, it is worth mentioning that planning documents of the Hells Canyon Bighorn Sheep Restoration Committee, which is responsible for reintroductions of bighorn sheep in Hells Canyon, lay out a protocol for disease testing of animals prior to transplantation (HCBSRC 2004).

BLM_0049229

Secondly, there is little evidence that transplants have been the source of most disease die-offs in the Hells Canyon metapopulation. One of the seven die-offs reported in the DSEIS was associated with disease introduced by transplanted sheep. This die-off in 1988 involved sheep in Cottonwood Creek on Washington state's Grande Ronde River and was attributed to drought and infection by scabies parasites introduced during a transplant of sheep from Idaho (HCSBRC 1997). Five bighorn sheep were circumstantially associated with contact with domestic sheep while the seventh bighorn sheep was possibly associated with contact with a goat (HCSBRC 2004).

Documents cited in the FSEIS (HCSBRC 1997; HCSBRC 2004) report the details of 40 bighorn sheep transplants in Hells Canyon that occurred between 1971 and 2002. Most animals came from outside of the Hells Canyon metapopulation but 11 of the releases involved animals from the Lostine population (9 transplants prior to the 1986-87 die-off and two others more than 12 years after the die-off). Except for the animals moved to Cottonwood Creek in 1988, none of these transplantations have been the source of a recognized disease outbreak.

BLM_0049230

### Sample Public Comment for 130.47

Comment #30, pgs. 3-4 through 3-5: The Final SEIS must explain the history of bighorn transplants on and around the PNF and explain how transplanted bighorns may be the ultimate cause of disease transmission amongst bighorns on the PNF. The DSEIS, at page 3-4, discusses the history of bighorn sheep die-offs in the Hells Canyon area. The DSEIS reports that seven die-offs have occurred since bighorns were transplanted into Hells Canyon and that five of these die-offs have been "circumstantially linked to domestic sheep." DSEIS at 3-4. What was the cause of the two other die-offs? And, what were the "circumstantial" links between the five die-offs and domestic sheep grazing? The PNF should provide greater detail regarding the cause of these die-offs in the Final SEIS. Further, the DSEIS indicates that Coggins reported in 1988 that die-offs were occurring within the Hells Canyon metapopulation. Id. If die-offs related to bighorn sheep transplants into the Hells Canyon area were occurring as early as 1988, why were transplants of bighorns continued well into the 1990s? Further, why were there no die-offs reported between 1988 and 1995? Prior to the "major die-off" in Hells Canyon reported in 1995 to 1996, see DSEIS at 3-4, bighorns from the Lostine Herd were transplanted in Hells Canyon. This population of bighorns had already experienced a die-off prior to being transplanted. Why were previously infected bighorns transplanted into Hells Canyon? What was the effect of transplanting previously infected bighorns into an area where bighorns may not have been infected? It appears that the Lostine Herd may have developed an immunity to certain diseases following the die-off within that population. However, by transplanting members of this previously infected herd into an area with bighorns without similar immunity, it appears that the act of transplanting bighorns actually may have caused a die-off amongst non-immune bighorns in the Hells Canyon area. The PNF must analyze and discuss in the Final SEIS how the transplantation of infected or disease-carrying bighorns has resulted in die-offs in the Hells Canyon metapopulation. Further, the PNF must acknowledge and discuss that bighorn die-offs may be caused by transplanting infected or disease-carrying bighorns amongst non-immune bighorns or by transplanting bighorns that are not compatible with the environment into which they are being transplanted. Bighorns may be dying because they have been infected by other bighorns or because they are not compatible with their new environment, not because of contact with domestic sheep. To determine the correlation between die-offs and bighorn sheep transplants, the PNF must provide a detailed explanation of all transplant activity that went on within the Hells Canyon area. This discussion should include details on where the bighorns were transplanted from, whether the transplanted bighorns came from populations with a history of disease, and whether the bighorns that were transplanted were tested for diseases, including Pasteurella. Further, the Final SEIS should discuss whether the transplanted bighorns were compatible with the habitat which they were being transplanted to. If transplanted bighorns were infected by disease or susceptible to stressors in their new environment, how were they to survive? The Final SEIS must consider that it is not domestic sheep that have caused bighorn sheep die-offs, rather disease transmission amongst bighorns themselves, or inherent susceptibility to habitat in Hells Canyon by the transplanted bighorns may have caused bighorn sheep die-offs. (Update to DSEIS Ltr# 20070)

BLM_0049231

## 160   CUMULATIVE EFFECTS ANALYSIS

**Concern Statement 160.08**

*The Forest Service should make sure that all potential linked activities are considered in the cumulative effects analysis of the final SEIS (PC 2. l). At a minimum, the following list should be considered:*

A)   *Competition from other wildlife for habitat, especially critical forage*

B)   *Continued predation by existing and introduced predators*

C)   *Use of recreational pack stock including goats and llamas, and other untested animals*

D)   *Continued and increasing disturbance of bighorn sheep by recreationists during critical life periods*

E)   *The inability to influence potential disease vectors arising from adjacent lands*

F)   *Climate change effects*

G)   *Effects of wildland fires and drought on bighorn sheep stress levels (PC 2. a, d, k)*

H)   *Other potential disease vectors (e.g., snails transmitting lungworm) (PC 5. k)*

**Response to Concern 160.08**

While these activities have the potential to affect bighorn sheep, this analysis, as instructed, assesses the effects of disease transmission between domestic sheep and bighorn sheep. Many of these are considered outside the scope of this analysis and, therefore, are not included in the disclosure of effects. Effects from adjacent ownerships are uncontrollable influences and do not vary by alternative. Many of these items are discussed in the cumulative effects analysis.

BLM_0049232

### Sample Public Comments for 160.08

In your letter soliciting review and comments of the document you asked what level of risk of contact is acceptable. If you truly evaluate the Forest Service's ability and desire to control what you have analyzed as risk elements to the viability of bighorn sheep elimination of domestic sheep grazing is a very minor step that does little to assure the viability of wild sheep. The cumulative risks that come from a host of other factors are overlooked. Competition from other wildlife for habitat especially critical forage; continued predation plus introduction of an additional predator; allowed use of recreational stock as potential vectors(goats, llamas and other untested animals); continued and increasing disturbance of bighorns by recreationists during critical periods; in-ability to influence potential vectors of diseases on included and adjacent lands; and desire to use sheep and goats to help the control of invasive plants and minimize fire potential and risk, these are but a few of the items that are not considered but dramatically influence your risk and viability assessment. Without property easements, agreements and other forms of control the removal of domestic sheep and the closing of allotments will not in any significant way alter the viability of bighorn sheep in either of the river drainage habitat areas. (DSEIS Ltr #11608)

There are some key factors (individual BHS translocation, habitat improvement, harvest, weather, nutrition, fire, inter species competition, and predation), some " that can be managed and some that cannot, that can influence bighorn sheep population viability. Why was this matter not addressed in the DSEIS? (Update to DSEIS Ltr# 20037)

---

### Concern Statement 160.09

*The Forest Service should clearly state the analysis area for project and cumulative effects. (PC 2. b)*

### Response to Concern 160.09

The Payette National Forest will review the analysis area discussions for the FSEIS and revise as needed. Cumulative effects are disclosed in Chapter 3.

### Sample Public Comment for 160.09

My comments address two elements of the DSEIS. The first element is the cumulative impacts analysis. The second element identifies clarification of data depicted on various maps in the document. The Final Supplemental EIS (FSEIS) needs to be very clear that the document pertains exclusively to lands within the Payette National Forest, not to the other Ecogroup Forests or the surrounding National Forest or Bureau of Land Management (BLM) lands (page 2-9, paragraph 7 of DSEIS). The cumulative effects analysis needs to address the surrounding National Forest, BLM, State, and private lands. (DSEIS Ltr #14168)

BLM_0049233

**Concern Statement 160.10**

*The Forest Service should be aware of the fact that the BLM Cottonwood Office is currently revising grazing permits for BLM lands within the cumulative effects analysis area of the bighorn sheep SEIS. (PC 2. c)*

**Response to Concern 160.10**

The Payette National Forest recognizes any decision made to continue or discontinue domestic sheep grazing will have an impact on the BLM sheep allotments, as well as if the BLM decides to continue or discontinue domestic sheep grazing on BLM lands. The Payette National Forest will continue to coordinate with potentially affected parties and consider impacts of continued or discontinued BLM domestic sheep grazing in the cumulative effects analysis. The Payette National Forest recognizes there are tracts of private land adjacent to NFS lands in which the Forest Service has no authorization for management of domestic sheep grazing. These parcels of land with known domestic sheep grazing will be addressed in the Cumulative Effects analysis as well. The Payette National Forest is aware that the Nez Perce National Forest and the BLM are assessing their allotments in the Main Salmon River drainage.

> *Sample Public Comment for 160.10*
>
> The BLM manages three domestic sheep allotments (Partridge Creek Allotment, Marshall Mountain Allotment, and Hard Creek Allotment) that are adjacent to Payette National Forest Sheep Allotments. Two of the above allotments (Marshall Mountain and Hard Creek Allotments) are used in common with domestic sheep grazing occurring in the Payette National Forest The BLM Marshall Mountain Allotment is used in common and interrelated with the Payette National Forest Marshall Mountain Allotment The BLM Hard Creek Allotment is used primarily when domestic sheep are trailing to the Payette National Forest Grassy Mountain Allotment. Several domestic sheep trailing routes crossing BLM lands are critical for providing access to adjacent Payette National Forest Sheep Allotments. It should be noted that we are currently revising the Cottonwood Resource Management Plan that provides management direction for the entire Cottonwood Field Office. No decision has been made at this time as to domestic sheep grazing use on any allotments in the Cottonwood Field Office by BLM. (DSEIS Ltr #14168)

**Concern Statement 160.11**

*The Forest Service should consider that domestic sheep have been known to swim the Snake River and this may be a potential source of infection of bighorn sheep on the Payette National Forest. (PC 2. f; PC 15. jj)*

**Response to Concern 160.11**

Only the Payette National Forest has active domestic sheep allotments in Hells Canyon. The potential for contamination via bighorn sheep swimming the river was considered in the FSEIS. For the purpose of the home range and foray analysis the river was not considered a barrier.

BLM_0049234

The effect of domestic sheep outside of the Payette National Forest was analyzed in the cumulative effects section in the final document.

### Sample Public Comment for 160.11

It will be necessary to eliminate domestic sheep on the other side of the Snake River if you are to protect the Idaho herd, as they apparently swim the river and infect each other. (DSEIS Ltr #7702)

---

**Concern Statement 160.12**

*The Forest Service should consider the effects that predators and the reintroduction of wolves have had on the bighorn sheep. (PC 2. g, h, i)*

**Response to Concern 160.12**

The effects of other pertinent animal species on bighorn sheep habitat and viability will be discussed in general terms in the Cumulative Effects analysis in the FSEIS. These impacts are not the focus of this analysis; disease transmission is the focus.

### Sample Public Comment for 160.12

Since a stated purpose of this DSEIS is to conduct a bighorn viability analysis, a complete set of environmental factors must be considered. There is a failure of the DSEIS to present data and analysis associated with the current and future impact of predators on the bighorn population. Predator pressure causes stress in bighorns. Stress has been identified in a number of studies as a trigger for disease progression and bighorn die-offs. Predators are a significant contributor to stress in bighorns. With the large populations of predators in the Payette National Forest, particularly the now very large and growing wolf populations associated with all of what has been defined as the bighorn "source habitat," the impacts (present and future) of these predators on the bighorn populations must be analyzed in this PEIS. (DSEIS Ltr #12943)

---

**Concern Statement 160.13**

*The Forest Service should clarify the cumulative effects analysis area in the DSEIS and maps and discussion need to be improved in the FSEIS. (PC 2. j)*

**Response to Concern 160.13**

Maps and diagrams are in the cumulative effects section of the FSEIS of chapter 3.

### Sample Public Comment for 160.13

The Cumulative Effects Analysis is not clear about what area it is making decisions for causing confusion the the reader. Clean up the maps and expand on the discussion. (Internal Comment)

BLM_0049235

**Concern Statement 160.14**

*The Forest Service should make every effort to protect the bighorn sheep by ensuring a genetically diverse mix of plants and animals that provides more opportunities when facing unforeseen future challenges such as climate change. (PC 15. y)*

**Response to Concern 160.14**

The project analysis includes a discussion on climate change and the potential effects on bighorn sheep in central Idaho. This section in Chapter 3 recognizes that species show greater adaptability to climate change effects if habitats are managed in a way that provides ecosystem resilience. Given the high amount of suitable source habitats for bighorn sheep, the connectivity of these habitats, and the projected climate change predictions for this part of Idaho, we believe that bighorn sheep are currently resilient to climate change impacts. The single greatest issue identified is related to potential contact with domestic sheep and disease outbreaks resulting from such contact. This contention is supported by a vast literature source, and therefore was the primary focus of the analysis.

*Sample Public Comment for 160.14*

We cannot predict all the ramifications of climate change we will be faced with in the future. What we do know is that the more diverse gene pools we have to draw from in both plants and animals, the better chance we have of survival. Allowing disease-ridden domestic animals to wipe out wild populations limits our opportunities to adjust to unforeseen challenges in the future. (DSEIS Ltr #12928)

**Concern Statement 160.15**

*The Forest Service should coordinate with all management agencies in Idaho and the surrounding states and adopt management strategies to prevent further decline of the bighorn sheep. (PC 17. a, h, i, j)*

**Response to Concern 160.15**

Though this comment has merit, a multi-agency plan is not the focus of this analysis. The Payette National Forest will provide habitat on NFS lands with the decision for this SEIS.

*Sample Public Comment for 160.15*

While the Forest Service is focusing on habitat, the animal's safety remains a huge concern since it is governed by different agencies. There is a great need to tie together all entities at all levels to create a comprehensive plan to protect the wild sheep. (DSEIS Ltr# 146)

BLM_0049236

**Concern Statement 160.16**

*The Forest Service should monitor the use, both legal and illegal, of the Payette National Forest by domestic goats because they are also capable of passing disease to bighorn sheep. (PC 25. a)*

**Response to Concern 160.16**

The private use of pack goats and other stock on the Payette National Forest is not the focus of this analysis. Illegal outfitter and guiding or grazing can be addressed through enforcement.

> *Sample Public Comment for 160.16*
>
> I have witnessed goat herders trailing up to 32 feeder and breeder goats to pasture on public lands illegally on the guise of traveling through. They also carry diseases that kill indigenous wild sheep. More scrutiny is necessary in the back country as well. (DSEIS Ltr #89)

**Concern Statement 160.17**

*The Forest Service should consider that the Idaho Department of Fish and Game may ban domestic sheep grazing on lands, including private land, that border the Payette National Forest. (PC 27. a)*

**Response to Concern 160.17**

The Payette National Forest does not have any authority to make decisions regarding private land and will not attempt to do so with this effort.

> *Sample Public Comment for 160.17*
>
> I am surrounded by federal ground. What concerns me is that the Federal Game Department of Idaho will do like Arizona-ban sheep from private land bordering National Forest. I love my home, have worked hard to live here. (DSEIS Ltr #150)

**Concern Statement 160.18**

*The Forest Service should disclose the effects from hunting bighorn sheep over the past 10 years in the Salmon and Hells Canyon areas, and the data source from which these effects were derived in the Cumulative Effects analysis.*

**Response to Concern 160.18**

Assessing the effects on bighorn sheep from hunting over the past 10 years is outside the scope of this analysis, which is focused on the impacts of disease transmission to bighorn sheep populations on the Payette National Forest. The Payette National Forest does not set the hunting levels or regulations on bighorn sheep. That responsibility lies with the Idaho Fish and Game.

BLM_0049237

### Sample Public Comment for 160.18

In 2007, 30 Bighorn Sheep were hunted and killed in Idaho. What effect does this have on the "viability" study and the overall viability of the Bighorn Sheep in the Salmon and Hells Canyon areas? Was this data and that from the past 10 years to 2000 looked at from Idaho Fish & Game data? If not, why not. Does hunting have an effect on the viability of the Idaho herds in question here? Can the USFS stop hunting of BHS on USFS lands if the viability of BHS is truly a factor and hunting directly effects the long term viability of the Idaho BHS in these areas effected? (Update to DSEIS Ltr#20037)

**Concern Statement 160.19**

*The Forest Service should analyze the viability of bighorn sheep considering the continuation of domestic sheep operations on adjacent private lands, even if domestic sheep grazing is eliminated on the Payette National Forest in the Cumulative Effects analysis.*

**Response to Concern 160.19**

The Payette National Forest has conducted a cumulative effects analysis for the FSEIS as disclosed in Chapter 3 of the document. The effects analysis discloses the impacts to the bighorn sheep populations from private and public lands in and around the Payette National Forest. By law, the Payette National Forest must assess and disclose these impacts. The Payette National Forest is also aware that, as decided in a court of law, it cannot simply add to the negative effects on bighorn sheep but must instead provide habitat for a viable population even if the species is not present. Alternative 7E does not allow domestic sheep grazing on the Payette National Forest and does disclose what the cumulative effects would be from grazing on adjacent ownerships.

### Sample Public Comment for 160.19

While the update for the Payette EIS refined the models for the herd home ranges and the source habitat maps on or adjacent to the Payette National Forest the document does not accurately reflect the persistence of bighorn populations in light of the Payette National Forest's inability to address domestic sheep populations on private lands adjacent to the Payette. If assessing viability of bighorn populations on the Payette National Forest is the goal of the Supplemental EIS then the Payette needs to analyze the persistence of bighorns in light of continuation of sheep operations on adjacent private lands even if domestic sheep grazing is eliminated on the Payette as part of the required "cumulative effects" assessment. This calls for a broader more comprehensive solution. The statement on page 3-67 clearly identifies the need for the Payette National Forest to look for a more comprehensive solution: "Domestic sheep are currently grazed on adjacent National Forests, the BLM, and private farm flocks. Therefore, disease could still be a factor for bighorn sheep populations on the Payette National Forest, regardless of how much domestic sheep grazing remains outside of the alternatives." (Update to DSEIS Ltr# 20040)

BLM_0049238

**Concern Statement 160.20**

*The Forest Service should not limit the scope of the analysis for the preferred alternative in the Cumulative Effects analysis to the Payette National Forest. The discussion should include the interested land management agencies where bighorn sheep are found, particularly the Salmon River metapopulation.*

**Response to Concern 160.20**

The Payette National Forest has included the disclosure of cumulative effects in Chapter 3 of the FSEIS, which include private and non-private ownerships.

> *Sample Public Comment for 160.20*
>
> The Tribes have an issue with the preferred alternative because of the scope of analysis is limited to the Payette. The Cumulative Effects analysis, notes land management strategies and private activities may have an impact on metapopulations. Although the Tribes realize the limited authority the Payette Forest wields over activities beyond its boundaries, there is a definite need to broaden the discussion to the interested land management agencies where bighorn sheep are found, in particular the Salmon River metapopulation. (Update to DSEIS Ltr# 20069)

**Concern Statement 160.21**

*The Forest Service should analyze the effects from the sale of private lands and the potential for residential development on wildlife habitat in the Cumulative Effects analysis.*

**Response to Concern 160.21**

In the cumulative effects analysis, the Payette National Forest is to include all reasonable foreseeable actions. The Payette National Forest is not aware of any potential land sales or residential developments scheduled in bighorn sheep habitat in the vicinity of the analysis area. The analysis regarding open space was conducted in the FEIS for the Forest Plan and was not reproduced for this effort as the situation had not changed nor was it challenged in the appeals to the Forest Plan FEIS.

BLM_0049239

### Sample Public Comment for 160.21

Comment #41, pgs. 3-82 through 3-83; general: The PNF must analyze the impact of private land sell-offs and potential residential development on wildlife habitat. The DSEIS acknowledges that suitable rangeland for domestic sheep will be lost on the PNF and provides that "[t]his lost NFS rangeland may not be able to be substituted by private lands, and therefore qualify feed and lambing conditions may be reduced, potentially affecting the overall sheep production." DSEIS at 3-83. This is an understatement of the impacts on domestic sheep production. Because most sheep producers rely heavily on NFS rangeland, the PNF is likely to force many sheep producers out of business. Further, a factor that needs to be considered in the Final SEIS is the possibility of private land sell offs by the sheep producers whose operations may heavily rely on the availability of Forest Service allotments. Is it possible that if sheep producers find it uneconomical to maintain their land without access to public grazing land, they may choose to sell their land, potentially giving way to real estate development in the form of low density residential or commercial development (which has been shown to be an important factor for wildlife habitat suitability)? (Update to DSEIS Ltr# 20070)

## 170  DESIRED FUTURE CONDITIONS (DFC)

**Concern Statement 170.01**

*The establishment of Desired Future Conditions (DFC) is the single most important input to the planning process. The DFC targets that were developed were based solely on interpretation of HRV and the intent of each alternative. The Forest Service should develop a DFC modeling process that is biologically sound and achievable, so monitoring results can be meaningful and serve the purpose of suggesting necessary adjustment to management, utilizing the adaptive management concept. DFCs should not be used in the planning process as a means to limit all multiple uses of forest resources for the next 500 years, which is the actual result under the DEIS. The establishment of the DFC should have been developed under a facilitated, structured process using the knowledge of stakeholders and all interested parties, so a balanced view of the final DFC could be established. DFC goals should undergo a full public review prior to any further development of the LMPs.*

**Response to Concern 170.01**

Desired Future Conditions were established during the Forest Plan revision effort and remain that same for this analysis effort. Public scoping and need for change topics were developed using public input and legal requirements. Full public review of the DFCs occurred during the Forest Plan revision.

BLM_0049240

## 175   HISTORICAL RANGE OF VARIABILITY (HRV)

**Concern Statement 175.03**

*The Ecogroup does not present any reasonable data ascertaining the HRV for any parameter or ecological process within the three forests. There is no scientifically established HRV for riparian areas and other aquatic resources, fish habitats, and fish populations that is based on credible statistical analysis of frequency data. Management based on HRV is unsupported by science and is, therefore, arbitrary.*

**Response to Concern 175.03**

Scientific research was used in determining the HRV for vegetation. HRV is a concept not used for resources other than vegetation, thus is not used for fish populations, habitats, or other aquatic resources. A thorough discussion of HRV development and use for vegetation is provided in Concern Statement 175.02 (found in the 2003 Forest Plan FEIS, Appendix A).

## 200   MONITORING

**Concern Statement 200.11**

*The Forest Service should include a rigorous monitoring plan to track population changes due to habitat changes. (PC 19. a, b)*

**Response to Concern 200.11**

The Payette National Forest agrees that monitoring will be a critical tool in the implementation of the final Forest Plan Amendment. The Final Forest Plan amendment documentation includes a number of items to be monitored. However, tracking population changes is not the focus of the monitoring. The focus is on habitat use near or adjacent to permitted domestic sheep grazing on the Payette National Forest because the desire is to eliminate contact between bighorn sheep and domestic sheep.

> *Sample Public Comment for 200.11*
>
> The Forest Service should include a rigorous monitoring plan to track changes in bighorn populations and leave room for bighorn sheep restoration in suitable areas. (DSEIS Ltr #12596)

**Concern Statement 200.12**

*The Forest Service should reduce the cost of monitoring by designing adequate buffers between the occupied habitat and domestic grazing allotments. (PC 19. a, c)*

**Response to Concern 200.12**

The cost of monitoring the alternatives is a consideration included by the decision maker for selecting the final alternative.

BLM_0049241

### Sample Public Comment for 200.12

Expensive monitoring outside of the GPR could be reduced if the Forest Service adopts the use of adequate buffers between the occupied habitat and the domestic grazing allotments. (DSEIS Ltr #13413)

**Concern Statement 200.13**

*The Forest Service should monitor the movements of bighorn sheep outside the geographic population ranges identified in the FSEIS to determine if contacts with domestic sheep are occurring. (PC 19. d)*

**Response to Concern 200.13**

The Payette National Forest will be monitoring high risk areas across the Forest

### Sample Public Comment for 200.13

If bighorns start to re-populate areas outside the GPR, then the Forest Service can evaluate what actions to take should these recolonized areas increase the risk of contact with domestic sheep. The Forest Service will need to monitor movement of bighorns outside the GPR to ensure that contact with domestic sheep is detected. (DSEIS Ltr #13676)

**Concern Statement 200.14**

*The Forest Service should monitor wildlife and domestic sheep on the allotments to see if they are interacting, and to determine the role wolves play in domestic sheep viability. (PC 19. e, f)*

**Response to Concern 200.14**

Population viability regulations are germane to the management of wildlife habitats (36 219.19) and do not include domestic livestock as part of the concept. Monitoring efforts for the selected alternative are found in the Forest Plan amendment. Determining the role that wolves play in domestic sheep viability is beyond the scope of this analysis.

### Sample Public Comment for 200.14

I do not see bighorns in the Forest when I work out there, only wolves. (Translated) (Internal Comment)

BLM_0049242

**Concern Statement 200.15**

*The Forest Service should monitor the effectiveness of the current pre-decisional Annual Operating Plan (AOP) management tools by placing two observers on each side of the Payette National Forest to see if current management is keeping the bighorn and domestic sheep separate. (PC 24. u; PC 28. r)*

**Response to Concern 200.15**

It is outside the scope of this analysis to assess the effectiveness of best management practices.

> *Sample Public Comment for 200.15*
>
> [Suggestions for practices for maintaining separation] These practices need to be monitored and quantified, however, we have the 2009 grazing season to assess these practices and verify how effective they are in maintaining separation. Placing two observation coordinators on the Payette Forest, one on the east and one on the west side, to monitor for bighorns and to assess the effectiveness of on the ground separation strategies will provide valuable information to be used in a final decision. Herders - The bands of sheep on the Payette National Forest are herded at all times, but there is a need for an education program for herders on hazing bighorns away from domestic sheep if they should come within close proximity to domestic bands. Protocols to assess dangerous situations should be developed and contact numbers provided to the herders to report any bighorn sightings. (DSEIS Ltr #13547)

**Concern Statement 200.16**

*The Forest Service should disclose how the monitoring standards listed under Rangeland Resources Standards (RAST) 10 through 12 will be implemented, including responsibility, methodology, and funding.*

**Response to Concern 200.16**

The Forest Plan Amendment discloses the monitoring that will be conducted for implementation. The Payette National Forest will conduct monitoring. The funding sources are not identified because there is a standard in the amendment that states that domestic sheep grazing will not occur if monitoring is not conducted as planned.

> *Sample Public Comment for 200.16*
>
> In the Management Direction Chapter III, Rangeland Resources portion under standards there is a complete lack of discussion of whom and how the elements, RAST 10 thru 12 will be carried out. Monitoring is an element but who & how it will be carried out and what could influence actually carrying on the monitoring. How much notice could a permittee expect if monitoring was not capable of being carried out? Who will pay for the monitoring? (Update to DSEIS Ltr# 20031)

BLM_0049243

**Concern Statement 200.17**

*The Forest Service should allocate funding to collaborate with the Nez Perce Tribe, BLM, Idaho Department of Fish and Game, and use permittees during monitoring.*

**Response to Concern 200.17**

Allocation of funding for collaborative efforts is beyond the scope of this analysis. The Payette National Forest continues to work with permittees on gathering information regarding domestic sheep locations and observations on bighorn sheep.

> *Sample Public Comment for 200.17*
>
> RAST12 states "domestic sheep and goat grazing within areas suited for domestic sheep grazing may only be permitted when identified monitoring for bighorn sheep presence is conducted." It is essential that the Forest Service allocate funds for the appropriate monitoring. It also is important to recognize the monitoring work that is currently being conducted in conjunction with the Nez Perce Tribe, BLM, and Idaho Fish and Game. The Forest Service also has the opportunity to work with permittees and their employees to gather additional on the ground information. Providing GPS units to each herder to record daily the band locations and comparing this information to the telemetry data and observation data gathered on bighorn locations would help ensure that separation is being maintained. (Update to DSEIS Ltr# 20040)

**Concern Statement 200.18**

*The Forest Service should develop a more effective monitoring and evaluation strategy.*

**Response to Concern 200.18**

The Payette National Forest has included an effective monitoring plan and strategy in the Final Forest Plan Amendment.

> *Sample Public Comment for 200.18*
>
> I was also disappointed to see that monitoring would only be done through an annually survey. To me this is not an effective monitoring and evaluation strategy. (Update to DSEIS Ltr# 20048)

**Concern Statement 200.19**

*The Forest Service should consider collaborating with the Tribes for monitoring if Alternative 7E is selected.*

**Response to Concern 200.19**

The Payette National Forest has developed a monitoring plan for Alternative E as it did for all of the alternatives that provide for some level of viability.

BLM_0049244

### Sample Public Comment for 200.19

If 7E is selected, and conditioned on bighorn numbers increasing, there will be new risks to analyze. The Tribes, as a co-manager, would be willing to track the issue and provide management recommendations based on sound science, in the best interest of this special species. (Update to DSEIS Ltr# 20069)

**Concern Statement 200.20**

*The Forest Service should develop a detailed and effective monitoring plan that documents the recolonization of new source habitat as bighorn sheep populations rebound and expand their range. The monitoring data should be used to alter domestic sheep grazing patterns to maintain long-term spatial separation between the two species. See the table in letter 20072, comment 30 for a conceptual matrix as an example for assessing management actions.*

**Response to Concern 200.20**

The Forest Plan Amendment contains a monitoring section that outlines the effort that will be undertaken to observe occupation or use of areas within close proximity to domestic sheep grazing on the Payette National Forest.

### Sample Public Comment for 200.20

Monitoring - A common misconception of the risk management approach is that increased monitoring can reduce the risk of contact. Although monitoring is vitally important for evaluating effectiveness of alternative implementation (effectiveness monitoring) to assure long-term• spatial separation, it should not be relied upon to reduce the inherent risk of contact or rationale for adopting an alternative with unaccepted levels of risk. Because timely detection of bighorn sheep presence across the forest is realistically infeasible regardless of monitoring effort, monitoring should not be relied upon to reduce risk across the landscape. The ability to detect the presence of bighorn sheep in a timely fashion (prior to contact) wanes with increased proximity of domestic and bighorn sheep (with increased risk of contact). Monitoring may alert managers to potential comingling events, but documenting contact does not reduce the risk of contact. A recent example includes radio collared bighorn sheep R14. Despite being radio collared and increased monitoring by tribal, federal, state, and private personnel, this animal came into contact with domestic sheep and could not be removed despite daily efforts for 2 weeks. Increased monitoring did not reduce - the risk of contact to acceptable levels, separation could not be maintained, and the potentially infected bighorn sheep could not be removed from the population until he had comingled with the rest of his ram group for an extended period of time. Increased monitoring only alerted wildlife managers that contact had occurred. (Update to DSEIS Ltr# 20072)

BLM_0049245

**Concern Statement 200.21**

*The Forest Service should subcontract the Hells Canyon portion of the monitoring program to the Idaho Department of Fish and Game, and the Salmon River portion to the Nez Perce Tribe.*

**Response to Concern 200.21**

The Payette National Forest has outlined the intended monitoring effort in the Forest Plan Amendment. Assuring that the monitoring is carried out is the ultimate responsibility of the Payette National Forest.

> ### Sample Public Comment for 200.21
>
> I suggest that when the Monitoring Plan is developed that the Payette National Forest possibly subcontract the Hells Canyon portion of the monitoring to another agency like the IDF&G and the Salmon River portion to the Nez Perce Tribe. (Update to DSEIS Ltr# 20108)

**Concern Statement 200.22**

*The Forest Service should consider the use of monitoring in conjunction with best management practices to attain long-term separation.*

**Response to Concern 200.22**

Best management practices are not based upon science nor have they been tested for effectiveness of maintaining separation between the domestic sheep and bighorn sheep. Individual situations will make the best management practices more or less likely to succeed. Until the science is available that shows that best management practices are effective in maintaining separation, the Payette National Forest cannot use them as a sole basis for authorizing grazing in close proximity to bighorn sheep populations.

The SEIS analysis focused primarily on the likelihood of contact between the species as the primary metric for assessing probabilities for bighorn sheep persistence. BMPs and monitoring have been used in limited situations (e.g., Sierra Nevada bighorn sheep). This approach to management has not been prescribed in the literature to date and carries a high degree of uncertainty in its effectiveness. These limitations are exacerbated by the vast amount of source habitat in the Hells Canyon and Salmon River metapopulations (several hundred thousand acres), the severity of the terrain, and the wide distribution of bighorn sheep across that landscape. Although monitoring and BMPs may play a role in short-term management decisions, the cost and efficacy of long-term applications is unrealistic.

BLM_0049246

### Sample Public Comment for 200.22

The conclusion (p 3-83) that eliminating domestic sheep grazing on the forest may prevent contact and disease transmission between the two species "in the-short term" because bighorn may expand into areas outside the forest is misleading. It implies a "what's-the-use" attitude. If monitoring and best management practices are adopted, as the analysis suggests, then long-term separation may be assured as well. Best management practices could mean destroying any bighorns that leave their expanded safe ranges on the forest and other public lands. (Update to DSEIS Ltr# 20111)

## 250   PUBLIC INVOLVEMENT

### Concern Statement 250.10

*The Forest Service should extend the comment period on the DSEIS because there has not been adequate time for all individuals to comment. Extension of the comment period will also allow time for the State to complete its Bighorn Sheep Management Plan. (PC 1. kk; PC 3. a, b, c).*

### Response to Concern 250.10

The comment period end date was extended from January 3, 2009 until March 16, 2009 in response to several requests from the public. The State Bighorn Sheep Management Plan will be considered if it is completed in a timely manner prior to review and update for the FSEIS. The Payette National Forest released the Update to the DSEIS, which again provided opportunity for interested parties to provide review and comment. As of the finalization of the FSEIS, the Payette National Forest had not received a collaborative recommendation from the group that had formed between the American Sheep Industry, the Wild Sheep Foundation, and the Nez Perce Tribe. Twenty months have elapsed since the issuance of the DSEIS.

### Sample Public Comment for 250.10

Prior to the issuance of the DSEIS for public comment, our association joined in a collaborative effort with the Nez Perce Tribe and the Wild Sheep Foundation regarding the issues involving domestic sheep grazing on the Payette National Forest. This collaborative group plans to finalize recommendations that will be useful to the agency on the very issues that the agency is seeking public comment in the DSEIS. The 90-day extension is necessary for the collaborative discussions to yield recommendations for the agency. Additionally, as you know, there are state level collaborations underway that are to be available for submission as comments if the extension is granted. (DSEIS Ltr #1752)

BLM_0049247

**Concern Statement 250.11**

*The Forest Service should allow the participation of stakeholder groups such as the American Sheep Industry, Idaho Woolgrowers, Idaho Farm Bureau, Idaho Cattleman's Association, and other sheep and cattle industry representatives to participate in the preparation of the SEIS. (PC 26. j).*

**Response to Concern 250.11**

All stakeholder groups and stakeholders have been notified of comment periods on the DSEIS and the Update to the DSEIS to allow them to participate and provide their views and comments on the proposed action. Several public venues were offered to all interested stakeholders to obtain information and to provide feedback and comment.

> *Sample Public Comment for 250.11*
>
> The Forest Service must allow participation of stakeholder groups (such as American Sheep Industry, Idaho Woolgrowers, Idaho Farm Bureau, Idaho Cattleman's Association, other sheep and cattle industry representatives) in the preparation of the DSEIS, in accordance with the NFMA Section 14(b). (DSEIS Ltr #13766)

**Concern Statement 250.12**

*The Forest Service should conduct additional public meetings prior to the comment period ending to assist reviewers in understanding the Updates to the DSEIS in order to make better informed comments.*

**Response to Concern 250.12**

The Payette National Forest offered four public meetings in different locations across the western half of Idaho and everyone was invited to continue asking questions. Additionally, information was provided on the Payette National Forest Web site for interested parties to review.

> *Sample Public Comment for 250.12*
>
> The public meeting (I attended the Boise session) to introduce the DSEIS was well done and helpful. Although that meeting was not well attended, I think the agency should consider conducting follow-up meetings to answer questions (prior to the comment period ending) so that reviewers could make better informed final comments. (Update to DSEIS Ltr# 20111)

BLM_0049248

**Concern Statement 250.13**

*The Forest Service should extend the comment period to allow more time for review of the Update to the DSEIS because this document is larger than the original DSEIS.*

**Response to Concern 250.13**

The Payette National Forest offered a 45-day comment period for the Update to the DSEIS, four public meetings, and material posted on the Payette National Forest Web site. During the public meetings, a thorough explanation of what was included in the analysis and how the analysis was conducted was presented to all who attended in addition to an opportunity to ask questions.

### Sample Public Comment for 250.13

The Idaho Wool Growers Association requests at least a 30 day extension of time for comments to be received by the Payette National Forest on the Update to the Draft Supplemental Environmental Impact Statement. This document is larger than the original Draft Supplemental Environmental Impact Statement issued in September, 2008. The 45 day comment period allowed for comment does not allow a thorough examination of this document. (Update to DSEIS Ltr# 20032)

## 270   SOCIAL AND ECONOMIC

**Concern Statement 270.23**

*The Forest Service should consider all relevant input needed to determine the effects of the alternatives in the socio-economic analysis in the DSEIS. In addition, the analysis should also consider economic and social impacts to Tribal communities and effects to Treaty Rights, environmental index values, and the cost/benefit of administering the grazing program. (PC 1. m, n, o, p)*

**Response to Concern 270.23**

While the DSEIS focused on community-level impacts, the geographic scope in the FSEIS has expanded to cover community, county, and regional levels of analysis. The economic effects from potential changes in the bighorn sheep population and allotment closures extend beyond the immediate vicinity of the Payette National Forest. Thus, the SEIS role within the larger region must be addressed while not masking potential change within counties and communities in the area. Therefore, area information is presented at the regional, county, and community level.

The Payette National Forest has solicited information from Tribal Governments for input to help develop an effects analysis. If information can be obtained on subsistence, traditional, and cultural uses, then an analysis strategy can be pursued with the appropriate indicators. Thus, the analysis is dependent upon the extent of information received. The Payette National Forest will quantify analysis based on the extent of information received, however qualitative analysis may be all that is attainable.

BLM_0049249

While implementation costs to government and permittees may vary amongst the alternatives, insufficient information exists for a complete cost comparison. While the extent of available AUMs may give some indication of the level of cost, increases in other associated costs (e.g., enforcement and allotment maintenance) are unavailable making assessment impractical at this programmatic level of analysis. Receipts received from livestock grazing were included in the financial analysis of the socio-economic portion of the Forest Plan (FEIS, 3-888). This analysis is not repeated here since no new information can be presented. In addition, changes in economic efficiency may result from the alternatives as non-market resources and values (e.g., value of natural resources such as soil, water quality, watershed health) are affected. These costs and benefits, not considered in the financial efficiency analysis, are by their nature very difficult to quantify. Direction in 40 CFR 1502.23 and the Forest Service Handbook 1909.15, (7/6/04) and 22.35 (01/14/05) provides for the use of qualitative analysis to evaluate the effects of these non-market values. Therefore, the non-market aspects of the alternatives are discussed qualitatively where appropriate and are also described in other resource sections of the SEIS and specialist reports.

### Sample Public Comment for 270.23

The socio-economic impacts required by NEPA are poorly addresses in that the study into this type of impact as described in the draft EIS is geographically inadequate. (DSEIS Ltr #13689)

---

**Concern Statement 270.24**

*The Forest Service should consider the relative value of hunting and tourism versus domestic sheep grazing to local economies in the socio-economic analysis in the FSEIS. (PC 15. l)*

**Response to Concern 270.24**

The FSEIS includes additional information on effects to local economies from changes to hunting use and wildlife viewing as a result of bighorn sheep population changes. Economic effects from different levels of grazing use are also examined under the alternatives. While these effects may be small on a regional and county scale, employment and labor income provided may be more important for smaller communities.

### Sample Public Comment for 270.24

Hunting use generates many dollars to the local economy and far outweighs use by domestic sheep. (DSEIS Ltr #7)

BLM_0049250

**Concern Statement 270.25**

*The Forest Service should not interfere in domestic sheep grazing because it negatively affects family financial welfare and communities. (PC 26. l, m)*

**Response to Concern 270.25**

Permitted domestic sheep grazing on National Forest lands is managed by the Forest Service and can be adjusted due to resource concerns, including effects to bighorn sheep viability. Sheep grazing on federal land is a privilege and not a right. The FSEIS considers the economic and social effects of limits on domestic sheep grazing under the alternatives.

> *Sample Public Comment for 270.25*
>
> I am writing to let you know that I thoroughly object to the interference of the Federal Government disallowing domestic sheep grazing where Big Horns have been transplanted. Especially when it puts family financial welfare in jeopardy. (DSEIS Ltr #23)

**Concern Statement 270.26**

*The Forest Service should not be persuaded by FNAWS to remove domestic sheep from Hells Canyon because there will be economic impacts in Washington County and the state of Idaho from such an action. (PC 26. bb)*

**Response to Concern 270.26**

This concern is captured in a range of alternatives. The Payette National Forest supports multiple uses and has been tasked with providing habitat for viable bighorn sheep populations. A balance of species would be preferred. Economic analysis is conducted for both range and recreation. Social and economic consequences are just two factors of many taken into consideration for a decision providing habitat for viable bighorn sheep populations. The preponderance of scientific evidence is being utilized in this analysis to determine if the Payette National Forest is providing adequate habitat for viable bighorn sheep populations.

BLM_0049251

### Sample Public Comment for 270.26

As a means of removing domestic sheep from Hells Canyon, the FNAWS and other environmental groups are using the big horns as the means to their goals. I was a past member and board member of the Idaho Chapter in the 1990's. In 1993 I harvested a trophy big horn ram. The bottom line is this, the FNAWS are a great group of guys who like to hunt and kill wild big horn sheep. Some of the members nationally have very deep pockets, and every other year try to out bid each other at the annual auction for a chance to kill a big horn in Hells Canyon. Their effort to promote the big horns is admirable, but their real desire would be to kill the biggest ram in the canyon. The FNAWS would lead the public to believe that the big horns in Hells Canyon are some type of exotic species of ovine. Actually the FNAWS pooled their money with other environmental groups and bought them from Canada about 40 years ago. Yes, Canada, where we buy the wolves, (that eat the sheep)! As a percentage, the number of people who hunt sheep in Idaho is very small compared to other big game species. I certainly do not believe this small group of well meaning people should persuade Payette National Forest to remove domestic sheep from Hells Canyon. To Washington County and the state of Idaho, the direct economic loss would be hard felt in difficult economic times. (DSEIS Ltr #13213)

### Concern Statement 270.27

*The Forest Service should realize that most of workers in sheep ranching are not from this country and therefore, most of the income goes to other economies rather than the local economy. (PC 28. j)*

### Response to Concern 270.27

Input-output modeling performed by EMSI considers leakage (i.e., the loss of income-related expenditures outside the impact area). While some workers spend less in the impact area, others spend their entire income in the area. For example, ranchers who live in the area likely spend a greater portion of their income in the area and make more than workers tending the herds. Therefore, the leakage of income-related expenses serves as a reasonable proxy for all labor-related leakage.

### Sample Public Comment for 270.27

There is no community help from sheep ranching if all of the workers in the industry are not even from this country and are sending their money back to Peru. This sheep ranching business is one of the last vestiges of feudalism in the world. (DSEIS Ltr #8)

### Concern Statement 270.28

*The Forest Service should realize that the sheep ranching business is one of the last vestiges of feudalism in the world. (PC 28. q)*

### Response to Concern 270.28

The commentor is relating a political opinion about the role of grazing on public land and using feudalism as a pejorative; assuming the commentor is referring to feudalisms as a political system where a "ruling class" maintains power through control of land and a repressed lower class bound by servitude. Therefore, this comment is a protest of the

BLM_0049252

sociopolitical role of grazing in the area. This is outside the scope of our analysis since the scope of the FSEIS does not examine grazing as a viable use of public land but examines grazing's role in maintaining viable bighorn sheep populations. However, the FSEIS examines the social and economic consequences of decreases in grazing use.

### Sample Public Comment for 270.28

This sheep ranching business in one of the last vestiges of feudalism in the world. (Internal Comment)

### Concern Statement 270.29

*The Forest Service should reconsider the Socio-Economic analysis in the Update to the DSEIS because it does not account for profit maximizing behavior, it fails to address other components of social welfare, and is based on an input-output model which treats prices as fixed. The analysis should address more than the employment component of social welfare by adding consumer and producer welfare, and the real estate market.*

### Response to Concern 270.29

While input output modeling assumes fixed prices, changes in the level of grazing under the alternatives will not change prices of sheep and associated products since prices are regionally determined and the relative size of change is regionally insignificant (see discussion added to FSEIS in affected environment). As noted in the comment, profit maximizing behavior includes substation when feasible. Information on the behavior of individual operators is beyond the scope of this analysis given a lack of site specific information at this programmatic scale of analysis. Detailed analysis will be undertaken as part of future site specific implementation. In addition changes in the level of grazing under the alternatives uses permitted grazing levels which is represents the maximum potential effect since actual use cannot be projected. As a conservative estimate of effects this serves as an informative measure of effects of the alternatives relative to one another and does not claim to consider profit maximizing behavior of actual use and consequent effects to individual operators as this information is not available at this programmatic scale of analysis.

Other dimensions of social welfare mentioned by the commentor include consumer and producer welfare, and the real estate market. Consumer welfare will be maintained as local supply of sheep products is dependent on national and international markets. Efforts to maintain producer welfare have been undertaken by the Payette National Forest by offering substitute grazing arrangements and compensation to operators and will continue to be offered in order to mitigate effects. The degree to which the local real estate market is considered linked to the 4 operators dependent on grazing on the Payette National Forest cannot be determined. In addition, as stated above, projections of actual decreases are not included and the effects of site specific changes in net welfare is beyond the scope of this programmatic analysis; consequently the ranch value implications of the alternatives is not appropriate at this level of analysis. Future site specific planning will consider costs to operators that may have ranch value implications.

BLM_0049253

### Sample Public Comment for 270.29

Comment #46, pgs. 3-89 through 3-130: The socio-economic analysis is flawed because it does not account for profit maximizing behavior and it fails to address other components of social welfare. The economic analysis is based on an input-output type of modeling which treats prices as fixed. Such models do not take into account price implications of alternative scenarios and do not take into account market substitution possibilities that come from maximizing behavior. The relationship between range availability and economically optimal herd size is not necessarily linear. How will producers adjust to grazing reductions? Such models are not based on profit maximization behavior and are not always applicable for simulating economic activities for scenario analysis. In fact, the analysis here only addresses employment component of social welfare. Other dimensions like consumer and producer welfare, real estate market, may be important to incorporate. (Update to DSEIS Ltr# 20070)

### Concern Statement 270.30

*The Forest Service should reconsider and fully analyze the social setting and people that are and will be affected in the future by the Payette National Forest's decision in the Social and Economic section in the Update of the DSEIS.*

### Response to Concern 270.30

Discussion has been added to the FSEIS examining the social consequences of changes in grazing under the alternatives.

### Sample Public Comment for 270.30

Comment #44, pgs. 3-89 through 3-130: The DSEIS does adequately analyze the social settings and people that will be affected by the PNF's decisions. ASI Comments - page 36 The title of this section, "Socio-Economic Environment," is misleading. There is minimal, if any, analysis of the social settings and people that are being affected now, and will be further affected in the future, by the PNF's decisions. (Update to DSEIS Ltr# 20070)

### Concern Statement 270.31

*The Forest Service should reconsider their economic conclusions in the Regional Socio-Economic Livestock/Range County Analysis in the Update of the DSEIS because a report not previously used was included that commented on the loss of jobs by foreign workers resulting from the reduction or elimination of domestic sheep grazing but not the quality of these jobs. In addition, specifics regarding the loss of welfare to the affected ranchers and any associated benefits from that loss need to be considered.*

### Response to Concern 270.31

Information on the degree to which the operations on the Payette National Forest are dependent on foreign workers is not available. While employment of foreign workers may be affected as a result of changes under the alternatives, the effects considered in this

BLM_0049254

analysis considers loss of employment from direct (operators), indirect (employees of operators that could include foreign workers, and other employment effects to other industries that supply factors of production to operators), and induced (effects from wage related spending). Information on the "quality" of these jobs is not explicitly discussed however unique qualities of these jobs, such as wages and expenditure patterns, are included in the input output model used to examine effects. The suggestion that analysis should include an assessment of net welfare loss or gain is beyond the scope of this programmatic level of analysis given a lack of site-specific information. Detailed analysis will be undertaken as part of future site-specific implementation.

### Sample Public Comment for 270.31

There was an economic analysis that was included in this report that was not included in the others. This report, as I understood it, said there would be considerable loss of jobs in affected counties if sheep were removed but it did not comment on the quality of those jobs. The jobs lost would be mostly itinerant foreign sheepherders that send their wages out of the country. The loss of welfare to the five affected ranchers would be boon to country as it would destroy a special interest payoff that has damaged the country for decades. (Update to DSEIS Ltr# 20004)

---

**Concern Statement 270.32**

*The Forest Service should reconsider their economic conclusions in the Regional Socio-Economic Livestock/Range County Analysis in the Update of the DSEIS because the economic effects resulting from the reduction or elimination of domestic sheep grazing is too narrowly focused and the cumulative economic effects are global.*

**Response to Concern 270.32**

Cumulative effects resulting from decreases in grazing under the alternatives are considered in the FSEIS. The effects on land use patterns are not discussed given incomplete information on the degree to which site-specific implementation will affect individual operators. Effects to individual operators are beyond the scope of this programmatic level of analysis given a lack of site-specific information. Detailed analysis will be undertaken as part of future site-specific implementation. Efforts to provide substitute grazing arrangements have been undertaken by the Payette National Forest. Detail on the importance of domestic sheep in cultural and spiritual practices of local ethnic groups has been added to the FSEIS.

BLM_0049255

### Sample Public Comment for 270.32

The economic effect of removing domestic sheep from the National Forest reaches further than the economic discussion in the document. The wealth created through grazing of domestic livestock, in this case sheep, provides jobs and money to the producer. The money keeps the ranches from being subdivided, which saves the county money since subdivision are usually a cost to taxpayers based on the services requested. Indirectly imports are influenced so trade levels are influenced. Many ethnic communities of this country rely on domestic sheep for various celebrations as well as a protein source. As these organic flocks from these Forest flocks are lost countries like New Zealand and Australia are called upon to meet the demand. Asian countries where trade deficits often occur also export the lamb and mutton from the Forest flocks to meet their needs. The impacts of removing domestic sheep from productive suitable grazing lands of the National Forests have far greater impact than the licenses and guiding fees that support a few individuals and the fish and game department. (Update to DSEIS Ltr# 20031)

### Concern Statement 270.33

*The Forest Service should clarify economic conclusions in the Regional Socio-Economic Livestock/Range County Analysis in the Update of the DSEIS because there are inconsistencies in the DSEIS concerning the economic effects of Alternative 7E and the discussion of 7E's risk of disease transmission.*

### Response to Concern 270.33

The lack of employment and income associated with grazing in the regional and community level models is not inconsistent with the claim on page 3-67 recognizing that risk of disease transmission remains. Employment and income are only discussed as they relate to grazing levels on the Payette National Forest as stated in the first sentence of the section titled "Contributions from Sheep Grazing on the Payette National Forest". Thus, while Alterative 7E provides no jobs or income as a result of grazing on the Payette National Forest, domestic sheep grazing on other lands would still present a risk to bighorn sheep.

### Sample Public Comment for 270.33

The SEIS states that alternative 7E would result in a complete loss of income from grazing and the jobs associated with it, However, on page 3-67 the document claims that a risk of transmission remains on the landscape due to private, state and BLM sheep grazing activities. A point of clarification is requested for this due to the seemingly inconsistent messages in the analysis. In one section the FS is claiming alternative 7E would fundamentally destroy the grazing industry in the region and in another the FS is clearly stating that grazing would continue, just on other lands, thereby modifying the economic impact of removing sheep allotments on the Payette; as laid out in alternative 7E. (Update to DSEIS Ltr# 20069)

BLM_0049256

**Concern Statement 270.34**

*The Forest Service should reconsider their economic conclusions in the Regional Socio-Economic Livestock/Range County Analysis in the Update of the DSEIS because the calculation of $84.10 price per sheep is used as opposed to University of Idaho's gross revenue per ewe of $138.80, thus it under estimates the reduction in output resulting from the Payette National Forest's choice of alternatives. In addition, the NASS sheep count for Canyon County needs to be included.*

**Response to Concern 270.34**

The $84.10 value is no longer cited in the FSEIS. In addition, the University of Idaho's gross revenue per ewe estimate of $138.80 does not cite a source or explain a method by which their estimate was obtained. While Wilder is included in the community level of analysis given important economic connections to the sheep grazing industry, it is not directly affected since operators dependent on Payette National Forest forage are not located in Canyon County.

> *Sample Public Comment for 270.34*
>
> Concerning the income from sheep and lamb production in Idaho discussed in the DSEIS at page 3-92, the calculation of a "price per sheep" of $84.1 is flawed and as used will tend to under-estimate the reduction in output resulting from the PNF's choice of alternatives. There is no possible way to validate this figure in the marketplace, nor does it reflect the lamb, sheep and wool markets, nor changes in them occurring over time. By comparison, University of Idaho cost of production studies for range sheep operations (available at: http://www.cals.uidaho.edu/aers/PDF/ Livestock/ EEB%202004/EBB-SR1-06.pdf ) indicate gross revenue per ewe of $138.81. How this compares to the "price per sheep" value of $84.1 is anyone's guess? Further, the lack of a NASS sheep count for Canyon County is troublesome, given the fact that Wilder is one of the communities of interest in this analysis. (Update to DSEIS Ltr# 20070)

**Concern Statement 270.35**

*The Forest Service should reconsider their economic conclusions in the Regional Socio-Economic Livestock/Range County Analysis in the Update of the DSEIS because the analysis of grazing fees concentrates on gross revenue and ignores the fact that 25 percent of these fees are distributed per a mandated formula back to local governments.*

**Response to Concern 270.35**

The commentor is correct. EMSI was instructed to only consider local share of contribution from fees. However, it is apparent this was not done and the correction has been made in the FSEIS.

BLM_0049257

### Sample Public Comment for 270.35

The grazing fee analysis in the DSEIS concentrates on gross revenue from fees. This ignores the fact that Forest Service fees are distributed through a legislatively-mandated formula and contribute to local governments. Twenty-five percent of the fees on Forest Service lands are distributed back to the state/county government of origin. (Update to DSEIS Ltr# 20070)

---

**Concern Statement 270.36**

*The Forest Service should reconsider their economic conclusions in the Regional Socio-Economic Livestock/Range County Analysis in the Update of the DSEIS and must analyze the full socio-economic impacts of reducing sheep AUMs.*

**Response to Concern 270.36**

Economic effects linked to changes in forage were estimated using established input-output techniques and did not use the "strait-line method" described in the public comment. See the methods section for more detail on methods used to examine the relationship between headmonths and employment. Commentor concern regarding exponential effects to production from the loss of Payette National Forest is also addressed in the FSEIS. Discussion has been added noting that in some cases, individual producers likely depend on Payette National Forest allotments for a larger portion of their forage than other producers. Thus, while decreases in available grazing would appear to impact a portion of all operations, the quality of life of individual operators could be impacted to a greater degree. In addition, the FSEIS also notes that private land may not be able to compensate for losses in NFS rangeland, and quality feed and bucking conditions may be reduced, potentially affecting overall sheep production for operators (Rangeland resources Section titled Acres Deducted due to Bighorn Sheep Habitat). Therefore, the potential for these effects is recognized qualitatively. However, the quantitative effects to individual operators are beyond the scope of this programmatic level of analysis given a lack of site-specific information. Additionally, the effects on land use patterns and ranch value are not discussed given incomplete information on the degree to which site-specific implementation will affect individual operators. However, detailed analysis will be undertaken as part of future site-specific implementation. Many of these potential effects may be mitigated by efforts undertaken by the Payette National Forest to provide substitute grazing arrangements to operators.

BLM_0049258

### Sample Public Comment for 270.36

Comment #45, pgs. 3-95 through 3-100: The DSEIS does not adequately analyze the impact of reducing sheep AUMs. The socio-economic analysis in the DSEIS is faulty on several fronts. First, there is no indication of how the PNF estimated the ranch-level impacts that will drive the regional modeling effort. It appears that the PNF used a straight-line method of coming up with the impacts (i.e. ¼ of the forage lost translates into ¼ of the employment (probably) and/or gross revenue from the sheep producers). The reduction in sheep AUMs compared to employment or gross revenue is not a straight-line relationship. The summer forage that is being impacted by the PNF's decision is critical to the operations to a much greater extent than is included in the DSEIS. The Final SEIS must adequately analyze the exponential impact of reducing sheep AUMs on employment and/or gross revenue.

A critical assumption that the PNF makes is that head month estimates are directly related to jobs in the sheep production industry depend on grazing allotments. DSEIS at 3-93. It is unclear what this relationship is because the DSEIS does not explain it. The DSEIS should provide the relationship used between head month estimates and direct jobs used to calculate the direct effects and total effects of domestic sheep grazing per alternative. For instance, in Table 3-29, DSEIS at 3-95, how are these numbers on "total jobs per scenario" developed? To the extent the DSEIS uses a straight-line relationship similar to that employed in the 2008 DSEIS at 3-91 (assuming there is one worker per 900 head of sheep), it should be corrected to account for the realities of lost forage. Rather than using a straight-line method, a more appropriate method should be used, such as some sort of a step function. Loss of forage can be worked around to a certain point (some percent loss) and then whole-scale sell-off of sheep occurs, along with retirement of other grazing permits, loss of open space, etc. In other words, the ranch ceases to operate. There is no recognition of this in the DSEIS, nor is there anything on permit/ranch value impacts. For example, the effect to alternatives at DSEIS at 3-95 through 3-100, assume that jobs in the sheep production industry will continue to be supported in the event grazing allotments on the PNF are reduced. This fails to account for ranch closures and complete elimination of the sheep production industry, which is likely with large scale reductions in grazing allotments on the PNF. The Final EIS must analyze the full socio-economic impacts of reducing sheep AUMs. This includes exponential employment and gross value losses with reduction of sheep AUMs as well as broader impacts. The vast termination of sheep AUMs on the Payette NF as proposed in the preferred alternative may result in complete closure of ranching operations. This impact must be analyzed. Further, the impact of ranch closure and corresponding predictable subdivision of ranches should be reviewed. It is likely that the overall impact on wildlife, including bighorns, will be damaging if ranch land is developed for other uses than grazing. (Update to DSEIS Ltr# 20070)

BLM_0049259

**Concern Statement 270.37**

*The Forest Service should reconsider their economic conclusions in the Regional Socio-Economic Livestock/Range County Analysis in the Update of the DSEIS because consideration must be given to the potential effects that could happen if the permittees no longer have a viable business. The Forest Service should pay for improvements made to the allotment and provide for other grazing opportunities.*

**Response to Concern 270.37**

The analysis for the Forest Plan FEIS include a review of the loss of open space. The Forest Service continues to look for other grazing opportunities to offer to the permittees and payment for grazing improvement is beyond the scope of this analysis.

### Sample Public Comment for 270.37

Comment #48, general: The Final SEIS must address the concerns of the Soulen Livestock Company. The following section regarding the Soulen Livestock Company illustrates the problems with the DSEIS and the unwarranted effects a negative decision could have. Permittees on the Payette National Forest and elsewhere share many of the concerns raised in these comments and have their own perspectives to add. For example, the Shirts Brothers and Mick Carlson have been in prolonged discussion and litigation. The Forest Service should discuss the consequences if these permittees are run out of business—such as Mick Carlson's opportunity for commercial development of large tracts of his private land in purported bighorn sheep range. Also, is the Forest Service prepared to pay for the permittee's range improvements pursuant to FLPMA, 43 U.S.C. § 1752(g)? compliment their private holdings to create a year-round operation that would provide a sustainable ranching operation. (Update to DSEIS Ltr# 20070)

**Concern Statement 270.38**

*The Forest Service should reconsider and clearly display their economic conclusions in the Regional Socio-Economic Livestock/Range County Analysis in the Update of the DSEIS because the analysis should focus on local versus county or state data; actual use versus permitted use; and compare economic benefits of sheep allotments to all costs, including program administration cost, environmental rehabilitation costs, and the loss of recreational tourism revenue in Oregon and Idaho.*

**Response to Concern 270.38**

State-level information provided in the table on page 3-89 of the DSEIS has been condensed and is now included in the FSEIS to provide context for the employment, income and grazing payments specific to allotments on the Payette National Forest. In addition, both the DSEIS and the FSEIS include a discussion of actual use level associated with past levels of grazing relative to the differences in permitted use levels under the alternatives. Comparing the benefits and costs of sheep grazing and recreation under the alternatives is not feasible given a lack of site-specific information at this programmatic scale of analysis. Detailed analysis will be undertaken as part of future

BLM_0049260

site-specific implementation. In addition, a comparison of grazing and recreation cannot be made given unavailable information on the benefits of bighorn sheep-related recreation (e.g., wildlife viewing). Regardless, a qualitative discussion of these nonmarket values is included but it does not allow comparison with grazing costs or benefits. This qualitative discussion is consistent with Forest Service guidance as discussed in the second paragraph of the regulatory framework section which states:

> Direction provided in 40 CFR 1502.23 and Forest Service Handbook 1909.15 (July 6, 2004) and 22.35 (January 14, 2005) provides for qualitative analysis to evaluate the effects of nonmarket values. Therefore, the alternatives' nonmarket aspects are discussed qualitatively where appropriate and are described in other re source sections of the SEIS.

### Sample Public Comment for 270.38

> The economic analysis of portion of the Update on beginning on p. 3-89, particularly that under the heading "Income, from Sheep and Lamb Production in Idaho," p. 3-92&94, while interesting, seems woefully inadequate, and/or irrelevant in many areas. The analysis needs to focus on the income (including income of the permittees), and taxes, derived from the use of the allotments in question, not on what comes from some counties or the whole state. It should also focus on actual use, not permitted use. It should compare the economic benefits of the sheep allotments to all the costs, including program administration cost, environmental rehabilitation costs, and to the loss of recreational tourist dollars in both Oregon and Idaho (among other costs), and show them clearly in a table, so that readers don't become lost in pages of seemingly irrelevant statistics. (Update to DSEIS Ltr# 20084)

---

**Concern Statement 270.39**

*The Forest Service should reconsider and clearly display their economic conclusions in the Regional Socio-Economic Livestock/Range County Analysis in the Update of the DSEIS because the analysis does not consider the impacts the preferred alternative will have on the termination of the sheep industry and the associated history and culture.*

**Response to Concern 270.39**

Information on the history and culture related to the domestic sheep industry has been added and is now included in the FSEIS. In addition, the effects of social factors have also been added.

BLM_0049261

### Sample Public Comment for 270.39

Comment #47, pgs. 3-89 through 3-130: The Final SEIS must discuss and address impacts on the cultural, historical and social interests of ranchers and the domestic sheep industry. The PNF's DSEIS points out the historical and cultural significance of the bighorn sheep to the Nez Perce Tribe, as well as the Tribe's reserved treaty rights. But the DSEIS fails to acknowledge the rich history, unique culture and permitted rights of the domestic sheep industry. The sheep industry played an important role in the settlement of the United States. On September 4, 1565 Admiral Pedro Menendez de Aviles anchored off the mouth of the St. Johns River with a fleet of eleven ships. The next day he sailed down the coast to an inlet he christened St. Augustine. Amongst his cargo were six hundred sheep and lambs, and thus launched the sheep industry in that section of the country. Three hundred years later sheep were trailing through Idaho on their way to the mining camps of California, Oregon, and Montana. The 1870's saw small flocks establishing in Idaho. The 1880's was a period of growth for the sheep industry in Idaho with an estimated 357,712 head of sheep in 1890. The next several decades lead to the establishment of large commercial flocks with a census of over 2.7 million head of sheep in Idaho at one time.

The Idaho Woolgrower's Association was formed in 1894 in Mountain Home, Idaho. The list of past presidents and leaders in the industry reads like the book of "Who's Who." Indeed, many of the long time families in Idaho can trace their roots back to the sheep industry. As Louise Shadduck's book, "Andy Little, Idaho Sheep King" states, "Idaho's sheepmen have made many contributions to our state. Among the heads of the Idaho sheep business are great men of American history, captains of industry and leaders of our nation." One of the more famous among them is Senator Len Jordan. Senator Jordan and his wife owned the Kirkwood Ranch in Hell's Canyon. A campaign advertisement highlighting his ranching background, a picture which clearly The sheep industry in Idaho is a shadow of its former self. In 1915 the PNF permitted 174,445 head of sheep to graze, today, the permitted numbers are only around 19,000 head with much of the PNF closed to grazing. The preferred alternative in the DSEIS will essentially put the remaining four permittees on the PNF out of business, and another important chapter in Idaho's history will be closed. The Final SEIS must account for the end of the sheep industry on the PNF and the termination of the culture of the sheep industry on and around the PNF. No discussion is provided in the DSEIS of the acute impacts that the preferred alternative will have on the history and culture on and around the PNF. (Update to DSEIS Ltr# 20070)

---

**Concern Statement 270.40**

*The Forest Service should reconsider their economic conclusions in the Regional Socio-Economic Non-market Recreation County Analysis in the Update of the DSEIS because an assessment of the revenue generated from hunting bighorn sheep when their population has recovered is needed.*

**Response to Concern 270.40**

The number of tags auctioned by state agencies managing the affected population is determined by state policy and will not change with changes in the population level of bighorn sheep (personal communication with Idaho Department of Fish and Game (IDFG), Washington Department of Fish and Wildlife (WDFW), and the Oregon Department of Fish and Wildlife (ODFW)). A comprehensive financial efficiency

BLM_0049262

assessment of costs incurred and revenues received under the alternatives is not feasible at this programmatic scale of analysis given a lack of site-specific information. However, information presented in the DSEIS has been revised to demonstrate the potential for increases in recreation-related employment and income under Alternative 7E.

### Sample Public Comment for 270.40

In 2005, over 19,000 domestic sheep grazed on the PNF. Last year, the grazing fee for one sheep was 27 cents monthly. Combined gross income from 2008 sheep and lamb production in Idaho and Washington Counties was nearly $1.7 million; statewide production neared $20 million. Additionally, an estimated 46 jobs are supported in the region by sheep industry. In 2008, bighorn sheep hunting brought in slightly more than $0.5 million and provided 25 jobs in the same counties with predicted growth in areas where bighorns thrive. A tag to hunt bighorn sheep in Idaho averages $74,000 at auction. Loss of domestic sheep grazing will likely and sadly cost the region some jobs and may deprive some ranchers of their generational occupations. Historic sheep raisers will have to retool their operations to survive on private land. However, the number of jobs associated with bighorn sheep viewing and hunting will likely increase with larger numbers of wild sheep. (Update to DSEIS Ltr# 20082)

---

**Concern Statement 270.41**

*The Forest Service should reconsider their economic conclusions in the Regional Socio-Economic Non-market Recreation County Analysis in the Update of the DSEIS because it underestimates the recreational revenue generated from bighorn sheep.*

**Response to Concern 270.41**

Information presented in the DSEIS has been revised to demonstrate the potential for increases in recreation-related employment and income under Alternative 7E. Regardless, the overall regional role economic employment relates to recreation associated with bighorn sheep potentially affected by grazing changes on the Payette National Forest is still small. As discussed in the existing condition section titled "Contributions from Hunting and Viewing Wildlife":

Contributions from hunting and viewing wildlife account for less than 1 percent of total employment and labor income in the recreation impact area. All jobs and the income attributable to recreation on the three National Forests contribute less than 1 percent of total employment and labor income in the recreation impact area… Additionally, only a portion of these contributions can be attributable to bighorn sheep hunting and wildlife viewing.

Regardless, it is stated throughout the social and economic section of the document that employment and income associated with bighorn sheep-associated recreation can be more important at the local level.

BLM_0049263

### Sample Public Comment for 270.41

The analysis summary of Recreational Socio-Economics that "…it is likely the regional area will not experience a significant economic effect from the alternatives" and "the role bighorn sheep play in local recreation economics could remain stable or increase" (p 3-130) are both understatements. One could argue that return to near historic numbers of bighorns on the Payette National Forest would have significant economic effects. (Update to DSEIS Ltr# 20111)

### Concern Statement 270.42

*The Forest Service should reconsider their economic conclusions in the Regional Socio-Economic Non-market Recreation County Analysis in the Update of the DSEIS because the comparison of livestock production economics with recreational willingness to pay estimates associated with bighorn sheep were derived using different approaches and are not comparable. However, if they don't reconsider, the Forest Service should discuss in the preface of the Recreational Socio-Economic's section in the FEIS.*

### Response to Concern 270.42

No willingness to pay estimates are included in the analysis as discussed in second paragraph of the regulatory framework section which states:

Direction provided in 40 CFR 1502.23 and Forest Service Handbook 1909.15 (July 6, 2004) and 22.35 (January 14, 2005) provides for qualitative analysis to evaluate the effects of nonmarket values. Therefore, the alternatives' nonmarket aspects are discussed qualitatively where appropriate and are described in other re source sections of the SEIS.

In addition, no comparison is made between livestock production value with recreational value per the Forest Service policy guidance cited above.

BLM_0049264

### Sample Public Comment for 270.42

Of greatest concern with the analysis in the DSEIS is the apparent mixing of "apples and oranges" associated with livestock production economics and recreational willingness to pay (WTP) estimates associated with the bighorns. Recreational WTP estimates of benefits dwarf the production losses from the basic industries affected by this decision. The implication being that recreational benefits associated with the bighorn sheep will overcome the costs associated with the loss in domestic sheep production. This ignores the fact that these estimates were derived using very different approaches and are not comparable. The recreational opportunities have no direct ties to market systems as do livestock production systems. By the same token, there are minimal (if any) estimates of WTP for range livestock forage. If it is the desire of federal managers to make this comparison, then efforts should be made to put the economic estimates on the same yardstick. This can be done by either surveying recreational service providers on visitor services, rates, etc., associated with activities related solely to bighorn sheep. The other alternative would be to develop willingness to pay estimates for rangeland livestock forage. Past efforts involving WTP estimates for livestock forage have failed due to response bias from ranchers (see for example, Hof, J.G.., J.R. McKean, R.G. Taylor, E.T. Bartlett, Contingent valuation of a Quasi-market good: An exploratory case study of federal range forage, USDA Forest Service, Rocky Mountain Station, Fort Collins, CO, Research Paper RM- 283, 1989) which resulted in "all or nothing" bids by buyers and sellers of federal livestock forage in Colorado. At the very minimum strong disclaimers should preface the Recreational Socio-Economics section, which begins on page 3-100 of the DSEIS. (Update to DSEIS Ltr# 20070)

---

**Concern Statement 270.43**

*The Forest Service should reconsider their economic conclusions in the Regional Socio-Economic Non-market Recreation County Analysis in the Update of the DSEIS because data indicates that ranching jobs provide more economic stability and benefit than tourism-based jobs.*

**Response to Concern 270.43**

Employment and income gains are not compared between domestic sheep grazing and recreation-related to bighorn sheep. While information on employment and income are presented in the analysis, no direct comparison is made given differences in the analysis areas examined and unavailable information on the full range quantitative effects.

### Sample Public Comment for 270.43

The assessment of recreational socioeconomics is inaccurate and benefits are overstated. Bighorn revenues will never be significant to the communities and will never come close to those revenues lost through the reduction or elimination of domestic sheep grazing on the Payette. (Update to DSEIS Ltr# 20093)

BLM_0049265

**Concern Statement 270.44**

*The Forest Service should evaluate the direct economic impact to communities such as Lewiston, McCall, and Boise, and the American Sheep Industry from the loss of domestic grazing on public lands in the Social and Economic analysis of communities section of the Update of the DSEIS.*

**Response to Concern 270.44**

As noted by the commentor, the analysis considers economic effects of loss in wage related spending but the DSEIS did not consider social benefits, such as community identity and youth education supported by local sheep grazing. Additional social and community benefits related to the role that sheep grazing plays in the area has been added to the FSEIS.

*Sample Public Comment for 270.44*

During lambing season, Ron Shirts and Frank Shirts hire several teenagers and neighborhood children to help with docking. That money certainly finds its way back into the local economy, or goes towards those youngsters' educational savings accounts. They also attend area county fairs, bidding on and purchasing youth 4-H and FFA project animals, again contributing to those kids' future educations, or immediate financial needs, like paying the project feed bill at the local feed store. In 20+ years of involvement with the Washington County Fair, I haven't noticed the same contribution from the recreational sector. I'm sure the economist has already factored the retail operating expenses paid out by the operations and how they filter on through the economy. (Update to DSEIS Ltr# 20003)

**Concern Statement 270.45**

*The Forest Service should support their decision with the Environmental Justice Section and Regional Economic analyses for Non-Market Recreation in the Socio-Economic section to the Update of the DSEIS.*

**Response to Concern 270.45**

Along with information from other resource sections, this information will be used by the line officer to make an informed decision amongst the alternatives. It should not be viewed as a complete answer, but considered alongside effects articulated in other resource sections of the FSEIS.

*Sample Public Comment for 270.45*

Environmental Justice. The new section on Environmental Justice added to the economic analysis is complete and adequate. The expanded non-market value economic analysis is also sufficient to support a decision. (Update to DSEIS Ltr# 20094)

BLM_0049266

**Concern Statement 270.46**

*The Forest Service should consider the economic impacts to the Peruvian sheepherders who are employed by the permittees under the guest worker program in the Environmental Justice section of the Update to the DSEIS.*

**Response to Concern 270.46**

The environmental justice section recognizes that environmental justice populations, as defined by the Council on Environmental Quality (CEQ), exist in the analysis area. Furthermore, the effects section notes that while minority and low income populations may be affected, these effects will be distributed amongst all segments of the population. Therefore, a disparate effect to these populations is not anticipated.

*Sample Public Comment for 270.46*

The Environmental Justice section of the document speaks to the minority populations of the local areas, but does not take into account the impacts to the Peruvian sheepherders who are employed by the permittees on the Payette National Forest. Under the guest worker program the Peruvian herders come over to work for three years at a time, sending their hard earned money home to support and educate their children. Many of the herders have been with their employer for several decades. These jobs are the difference between relative prosperity in Peru and poverty. (Update to DSEIS Ltr# 20040)

## 280   MANAGEMENT INDICATOR SPECIES (MIS)

**Concern Statement 280.09**

*The Forest Service should consider the designation of bighorn sheep as a sensitive or management indicator species. (PC 15. dd)*

**Response to Concern 280.09**

The Regional Forester designated the bighorn sheep an R4 Sensitive Species on July 29, 2009. Designation of management indicator species was done in the Forest Plan FEIS (USDA Forest Service 2003) and this list will be updated with the Wildlife Conservation Strategy (WCS) process that is currently underway.

*Sample Public Comment for 280.09*

We also request that the following issues be considered and analyzed in the context of this SEIS process: Sensitive Species Status designation for bighorn sheep, including bighorn sheep as a Management Indicator Species for the Forest. (DSEIS Ltr #13676)

BLM_0049267

## 340   FUNDING AND BUDGET CONSTRAINTS

### Concern Statement 340.01

*The achievement of future forest conditions will not be achieved without full funding.*

### Response to Concern 340.01

The Payette National Forest modeled attainment of desired condition for vegetation using two different methods. The first method ran the model unconstrained by budget to set the benchmark for timber harvest levels. This run is required by the National Forest Management Act and illustrates what harvest levels could possibly be reached if there were no limitations on the amount of funding appropriated by the U.S. Congress. The second method ran the model utilizing a realistic budget level as a constraint to the models efforts to try and achieve desired vegetative conditions. In this case, desired conditions are achievable over a long period of time (i.e., 150 years). The vegetative diversity section of the FEIS discusses this topic further. This concern was also addressed by a sensitivity run that limited the budget to 90 percent of the current budget. Since the length of time to achieve DFC took longer, fire hazard and insect hazard were reduced at a slower rate. If future budget levels drop, it will take longer to achieve desired future conditions. Attainment of desired condition is also dependent on many factors other than appropriated budget levels. The same holds true for reaching desired future condition tied to bighorn sheep viability. Without adequate funding to conduct needed monitoring, domestic sheep grazing may not continue to be permitted on the Payette National Forest.

## 380   SOILS

### Concern Statement 380.05

*The Forest Service should consider the effects on erosion that result from domestic sheep trails.*

### Response to Concern 380.05

An evaluation of erosion effects from domestic sheep grazing is outside the scope of this analysis so it was not covered in this assessment. Also, the effects to soils were covered in the FEIS for the Forest Plan.

> *Sample Public Comment for 380.05*
>
> Erosion: if you have seen where the domestics carve trails through woods and through springs to watersheds in general, we need not sell out our national forests for the sake of domestic sheep. (Update to DSEIS Ltr# 20034)

BLM_0049268

# 520   VEGETATION MANAGEMENT) DIVERSITY, INVENTORY, RESTORATION, HABITAT, BOTANICAL)

**Concern Statement 520.27**

*The Forest Service should actively restore native plants and riparian areas, which have been damaged by past livestock grazing. (PC 1. s)*

**Response to Concern 520.27**

The restoration of native plants and riparian habitat is outside the scope of this action. However, the FEIS for the Forest Plan did contain a thorough analysis of riparian areas which resulted in considerable direction in the Forest Plan for management of native plants and riparian areas.

> ### Sample Public Comment for 520.07
>
> The plan also fails to address the active restoration needed to restore native plants and riparian areas decimated by over 100 years of intensive sheep grazing. (DSEIS Ltr #1578)

# 540   NOXIOUS WEEDS (NON-NATIVE PLANTS)

**Concern Statement 540.03**

*The Final EIS must fully disclose the role and significance of ground-disturbing activities and use associated with timber harvest, road construction, road maintenance, grazing, and fire suppression in the spread of noxious or exotic weeds. The Final EIS must also include data or data summaries describing the impacts of such activities on noxious weed dispersal and the specific amount of current infestation that can be attributed to each activity at a sub-basin or watershed level. A more comprehensive and aggressive weed control plan must be developed that includes greater focus on prevention (includes reducing forest activities) and monitoring and creates more effective mitigation measures. The plan should address chemical, biological, and cultural control methods that will not adversely affect human health and the environment. The Forest Service should restrict the use of aerial and broadcast methods as much as possible to avoid deleterious effects on non-target plants and wildlife.*

*As part of the weed control plan, the Ecogroup forest must incorporate a monitoring program to continuously detect and monitor noxious weed infestation.*

**Response to Concern 540.03**

The effects of noxious weeds and the activities and contribute to their spread was fully analyzed in the LRMP FEIS.

BLM_0049269

## 570   WILDLIFE HABITAT

**Concern Statement 570.27**

*The Forest Service should make every effort to ensure the protection and survival of bighorn sheep: (PC 15. a, b, c, d, e, m, u, v; PC 16, e)*

*A) Providing a safe, disease-free environment (PC 15. f, g, h, j; PC 16. c; PC 17. e)*

*B) Ensuring their survival into future generations (PC 15. M, ee)*

**Response to Concern 570.27**

A) This analysis is focused on developing alternatives which will ensure bighorn sheep viability on the Payette National Forest with the effects of several of these alternatives disclosed in Chapter 3 of the FSEIS.

B) Viability analysis is contained in the document, as is disclosure of the population persistence over time.

### Sample Public Comments for 570.27

As a life member of the Wild Sheep Foundation I urge you to please take whatever steps are necessary to ensure that our wild bighorn populations remain a viable and huntable resource. (DSEIS Ltr #35.)

I was relieved to learn that you will take steps to protect the bighorn in this area. Too often wild species are crowded out of their natural environment by people staking claims to the same land for the upkeep of domestic animals. I feel that we have already lost or endangered too many species in our attempts to turn all the available land to the benefit of humans and their pursuits. (Update to DSEIS Ltr#20002)

**Concern Statement 570.28**

*The Forest Service should make every effort to ensure the protection and survival of bighorn sheep because the value of a healthy herd of wild bighorn sheep is substantial. (PC 15. i, x)*

**Response to Concern 570.28**

The SEIS contains additional information on the bighorn sheep's value found in this document's Social and Economic section. This includes estimating the importance they play in the local economy and their value from both a market and non-market perspective. The value of resource goods traded in a market can be obtained from information on the quantity sold and market price, however markets do not exist for some resources, such as recreational opportunities, environmental services, or the value some place on wildlife like bighorn sheep. Bighorn sheep-related non-market values include recreation, hunting, subsistence, traditional, and cultural. Recognizing these values is important, since without estimates, these resources may be implicitly undervalued and decisions regarding their use may not accurately reflect their true value to society. Non-market values by their nature are difficult to quantify. Direction provided in 40 CFR

*A-139*

BLM_0049270

1502.23 and the FSH 1909.15, (7/6/04) and 22.35 (01/14/05) provides for the use of qualitative analysis to evaluate the effects of these non-market values. Therefore, the non-market aspects of the alternatives are discussed qualitatively where appropriate and are also described in other resource sections of the SEIS and specialist reports.

### Sample Public Comments for 570.28

The value of a healthy herd of wild bighorn sheep is substantial and if allowed a pristine habitat, the sheep will increase in number and value over time. (DSEIS Ltr #36)

Genetic Viability-Native plant restoration, noxious weed removal, stringent ORV management, botanical climate change dynamics and the elimination of domestic sheep disease infestations should all be priorities in the framework of the final EIS. Scientific data has documented Bighorn fecundity is negatively affected for years after infection by domestic carriers of numerous pathogenic bacterial pneumonias. One can only surmise the positive influence on the bighorns ability to survive repeated bacterial infection brought about by an improved native plant community, following stringent native plant management and less grazing. (Update to DSEIS Ltr#20036)

---

**Concern Statement 570.29**

*The Forest Service should make every effort to ensure the protection and survival of wild bighorn sheep because their presence benefits many including hikers, wildlife watchers, nature photographers, and hunters, as opposed to sheep grazing which only benefits the permittee's business. (PC 15. k, l, w)*

**Response to Concern 570.29**

The SEIS will include additional information on effects to local economies as a result of changes to sheep grazing while also adding information on the value of bighorn sheep. This includes estimation of the importance they play in the local economy and their value from a market and non-market perspective. The value of resource goods traded in a market can be obtained from information on the quantity sold and market price, however markets do not exist for some resources, such as recreational opportunities, environmental services or the value some place on wildlife like bighorn sheep. Bighorn sheep related non-market values include recreation, hunting, subsistence, traditional, and cultural. Recognizing these values is important, since without estimates, these resources may be implicitly undervalued and decisions regarding their use may not accurately reflect their true value to society. Non-market values by their nature are difficult to quantify. Direction provided in 40 CFR 1502.23 and Forest Service Handbook 1909.15, (7/6/04) and 22.35 (01/14/05) provides for the use of qualitative analysis to evaluate the effects of these non-market values. Therefore, the non-market aspects of the alternatives are discussed qualitatively where appropriate and are also described in other resource sections of the SEIS and specialist reports.

BLM_0049271

### Sample Public Comment for 570.29

I have sympathy for the sheep grazers in these areas as it is probably their livelihood. Unfortunately, their profits from the public's lands benefit only them. The presence of bighorn sheep benefits wildlife watchers, nature photographers, hunters, and those who view their presence as an environmental plus. (DSEIS Ltr# 7)

**Concern Statement 570.30**

*The Forest Service should manage bighorn sheep to return them to their historic range. (PC 15. n)*

**Response to Concern 570.30**

This analysis is focused on developing alternatives which will ensure bighorn sheep viability on the Payette National Forest through provision of adequate habitat.

### Sample Public Comment for 570.30

Wild Sheep are a wonderful animal to see in the wild and I would very much like to see them returned to their historic range. I believe the vast majority of forest users would rather see wild sheep than domestic sheep in the forest and that this opportunity is being removed to placate the interests of only four permitees. (DSEIS Ltr #8)

**Concern Statement 570.31**

*The Forest Service should manage bighorn sheep habitat with a buffer to prevent contact between domestic and bighorn sheep. (PC 15. o, t)*

**Response to Concern 570.31**

A variety of alternatives have been developed and analyzed for their effectiveness in providing for no contact. Through development of alternatives, straight distance buffers were reviewed but found to not be as effective as more strategically placed area to remove from domestic sheep grazing. These strategic areas included areas of high risk for contact between domestic sheep and bighorn sheep.

### Sample Public Comment for 570.31

The needs of the bighorn sheep should clearly supersede those of sheep growers on the Payette, and the domestic sheep allotments should be allowed to remain only where there is clearly a sufficient geographic buffer to reliably prevent disease transmission. (DSEIS Ltr #13004)

BLM_0049272

**Concern Statement 570.32**

*The Forest Service should recognize that the habitat occupied by bighorn sheep currently is much smaller than it would be if domestic sheep had not grazed on the Payette National Forest, and therefore the Forest should manage for larger blocks of habitat than that which is currently occupied. (PC 15. p, q)*

**Response to Concern 570.32**

The analysis does include the potential for population growth and expansion of habitat use. The Forest Plan amendment language allows for herd expansion.

The analysis includes the potential for population growth and expansion. Forest Plan direction accounts for the event should it happen. Deference is given to the bighorn sheep as "no contact" is the desired future outcome.

> *Sample Public Comment for 570.32*
>
> [O]ccupied habitat at this time" for bighorns is smaller than it would be if domestic sheep had not grazed on the PNF. Because the current populations at issue here are depressed and acknowledged by bighorn biologists to be below viable levels, the PNF must provide habitat necessary to sustain the larger, viable populations and therefore must provide more habitat than just the habitat occupied at this time. (DSEIS Ltr #13216)

**Concern Statement 570.33**

*The Forest Service should recognize that the Salmon River Mountain metapopulation is especially important, because it is native, has never been extirpated, and provides a significant genetic resource. (PC 15. p, s)*

**Response to Concern 570.33**

The Payette National Forest is aware of this and brought it to everyone's attention. This is also disclosed in the SEIS.

> *Sample Public Comment for 570.33*
>
> The agency now needs to proceed with a decision and management direction that ensures the viability of bighorn sheep in Hells Canyon, the main Salmon River Canyon, and the Payette National Forest. (DSEIS Ltr #13676)

**Concern Statement 570.34**

*The Forest Service should recognize the value of all native species including predators and bighorn sheep (PC 15. z; PC 39. a)*

**Response to Concern 570.34**

This assessment is not focused on an all-species analysis. This assessment is focused on providing for bighorn sheep viability by offering adequate habitat that is free of domestic sheep on the Payette National Forest.

BLM_0049273

### Sample Public Comment for 570.34

Our society cannot survive in the long run unless we do all we can to insure the survival of other native species. The top predators come first…Big Horn Sheep come in just under the top predators like Grizzlies and wolves and Mountain Lions. Sheep survival and expansion bodes well for the entire ecosystem. (DSEIS Ltr #9491)

**Concern Statement 570.35**

*The Forest Service should recognize that the extirpation or extinction of bighorn sheep would have a chain reaction in the ecosystem. (PC 15. aa; PC 38. g)*

**Response to Concern 570.35**

The impacts on other species from the extirpation of bighorn sheep on the Payette National Forest were beyond the scope of this effort and thus not analyzed. This analysis is focused on providing adequate bighorn sheep habitat on the Payette National Forest to provide for a viable population of the species.

### Sample Public Comment for 570.35

Please continue to help save the Bighorn sheep population. The possible extinction of the Bighorn sheep can and will have a chain reaction affect on many other species. (DSEIS Ltr #10987)

**Concern Statement 570.36**

*The Forest Service should recognize that the Payette National Forest population of bighorn sheep is important because it provides a significant genetic resource and can be used for transplants to other areas. (PC 15. bb)*

**Response to Concern 570.36**

The SEIS recognizes the importance of bighorn sheep populations on and adjacent to the Payette National Forest. The Salmon River metapopulation is the only native extant herd in the state of Idaho, and therefore represents a valuable genetic and historic resource. The Hells Canyon populations reflect repeated transplant endeavors from several source populations and, due to the size of the existing population, may be an important source for reintroductions into other western U.S. habitats where the species has been extirpated.

### Sample Public Comment for 570.36

These bighorns represent an irreplaceable source of genetic diversity that will be important to future transplants and population augmentation efforts in Idaho, Washington and Oregon. (DSEIS Ltr #1)

BLM_0049274

**Concern Statement 570.37**

*The Forest Service should maintain the geographic population range management areas over time to protect the bighorn sheep and its ecosystem. (PC 15. cc; PC 38. f, g)*

**Response to Concern 570.37**

The concept of the Geographic Population Area is still tied to Alternative 7G but this alternative does not provide for the viability of bighorn sheep on the Payette National Forest. However, the Payette National Forest developed alternatives that better remove a variety of levels of high-risk contact areas.

*Sample Public Comments for 570.37*

I have read and studied the SEIS concerning Bighorn sheep. You must never shrink the GPRs [geographic population range]. The Bighorn sheep is an ecological indicator. When they are well the ecological systems are well. (DSEIS Ltr #89)

It is my believe that the Forest Service has all ready selected Alternative 7E, but is portraying Alternative 7G as the agency preference. The basis for that statement is found in Appendix H which updates the management direction and plan implementation. Interpreting that direction simply prolongs the period during which any domestic sheep may be grazed to 5 possibly 15 years. Ultimately the plan appears to be to remove them through inferences associated with bighorn sheep. This is especially conceivable if the management focus remains on separation of bighorn sheep and domestic sheep without any determination of the limits of that expansion for the wildlife species. This is especially true since Idaho Fish and Game has never complied with the original multiple agency agreement when bighorns were being introduced into Hells Canyon. Without some discussions about habitat extent for some wildlife species wildlife management agencies will continue to foster expansion because these commodities provide their livelihood. The Forest Service has no vested interest because most commodities from their managed lands seldom provide any budgetary support or sustenance for them. Any loss of resources tends to be minimized for them but the greatest loss is to the U.S. Treasury and dependent communities.(Update to DSEIS Ltr# 2031)

**Concern Statement 570.38**

*The Forest Service should restore bighorn sheep populations. (PC 16. a, b, c, f, g, h)*

**Response to Concern 570.38**

The Forest Service manages wildlife habitat and is conducting the analysis to determine how much habitat the Payette National Forest should provide to ensure viable populations of bighorn sheep. State Fish and Game and the Fish and Wildlife Service Agencies manage the population and are directly responsible for population management efforts, including translocation of populations.

*Sample Public Comment for 570.38*

Please take successful measures to humanely and respectfully restore bighorn populations. (DSEIS Ltr #766)

BLM_0049275

**Concern Statement 570.39**

*The Forest Service should manage for significant numbers of bighorn sheep in the breaks of the Salmon River up through the Secesh, Needles, French Creek, Cottontail Point, Patrick Butte, and Rapid River roadless areas. This habitat connects occupied habitat in the Frank Church River of No Return Wilderness and the Hells Canyon National Monument. (PC 16. a, c, d, f)*

**Response to Concern 570.39**

The Payette National Forest is analyzing the amount of connected habitat needed to provide for viable populations and prevention of contact with permitted domestic sheep on the Payette National Forest. We will monitor current bighorn sheep populations and areas of concern for new populations. The monitoring requirements for this effort are designed to document bighorn sheep use of the landscape and allow for increased use of the area.

> *Sample Public Comment for 570.39*
>
> As you might imagine, the Secesh Wildlands Coalition and CIRC [Central Idaho Recreation Coalition] prefer to see significant numbers of bighorn sheep living in the stretch of land along the breaks of the Salmon River and the land that reaches south through the Secesh, Needles, French Creek, Cottontail Point, Patrick Butte, and Rapid River roadless areas where bighorn sheep originally roamed in the absence of livestock. This habitat connects the occupied habitat in the Frank Church River of No Return Wilderness with that currently occupied habitat in Hells Canyon National Monument. It is the critical landscape for migration of bighorn sheep and many other animals up and downstream on the Salmon River and up and down the slopes of adjacent mountain ranges. (DSEIS Ltr #14052)

**Concern Statement 570.40**

*The Forest Service should develop a comprehensive bighorn sheep health policy. (PC 20. a)*

**Response to Concern 570.40**

Agency policy is not developed at the Forest level. The health of the animals is managed by Idaho Department of Fish and Game, and the U.S. Fish and Wildlife Service.

> *Sample Public Comments for 570.40*
>
> The Forest Service lacks a comprehensive bighorn health policy. (DSEIS Ltr #13713)

BLM_0049276

Comment #19, pgs. 2-3 through 2-9, general: The PNF should develop and the Final SEIS should provide for a comprehensive bighorn health policy. The PNF should develop a comprehensive bighorn health policy which has population immunity and agreed upon nutritional standards at its center. A bighorn health plan should include agreed upon nutritional standards (which are applied to habitat choices for translocation or population growth goals), disease surveillance, appropriate quarantine with diagnostics before translocation and vaccination. Should there be needs in terms of diagnostics, nutritional unknowns and vaccinations, clearly defined research should be developed. (Update to DSEIS Ltr#20070)

**Concern Statement 570.41**

*The Forest Service should develop a plan to expand the Geographic Population Range (GPR) area for the future because as populations of bighorn sheep grow, the GPR will need to expand. The Forest Service should also not reduce the GPR after five years because of the low population numbers and low reproduction rate of the bighorn sheep. (PC 1. U, v; 21. a, b, c; PC 22. a.)*

**Response to Concern 570.41**

The analysis for the FSEIS is designed to allow for differing population sizes to be analyzed for their risk of contact and effects. The concept of a GPR is not carried into the decision for this analysis except for as a simple alternative boundary outline for Alternative 7G.

For the FSEIS, the GPR is defined by risk of contact. Options for the risk will include no decline in current populations. This language is not contained in the final Forest Plan language.

*Sample Public Comment for 570.41*

An option I would like to see is not to reduce the GPR after the first 5 years for wild sheep because of their low numbers and low reproduction rate. The GPRs adopted in this plan are done with these low numbers of bighorn sheep that the US Forest Service agrees are not viable. (DSEIS Ltr #34)

**Concern Statement 570.42**

*The Forest Service should acknowledge that domestic sheep have infected bighorn sheep with disease. (PC 24. l, m, o)*

**Response to Concern 570.42**

The possibility is an assumption for this analysis that has been carried forward from the FEIS for the 2003 Forest Plan for the Payette National Forest. This issue was identified as a need for change topic in Forest Plan revision and as a significant issue in the FEIS.

*Sample Public Comment for 570.42*

I talked to Idaho Fish and Game officials at the time and they suspected that a disease from domestic sheep had wiped out the herd. (DSEIS Ltr #8)

BLM_0049277

**Concern Statement 570.43**

*The Forest Service should allow the bighorn sheep to live without intervention and without changing domestic sheep permits. (PC 26. d)*

**Response to Concern 570.43**

Natural consequences may require the removal of the non-native human induced effects, such as domestic sheep grazing. This would eliminate the possibility of future contact and potential disease transmission, not including any contacts already made between the two species. Domestic sheep are permitted if the effects to other resources are within management requirements.

> *Sample Public Comment for 570.43*
>
> I feel that the bighorn sheep should be left to the natural consequences of their environment. (DSEIS Ltr #13190)

**Concern Statement 570.44**

*The Forest Service should move the bighorn sheep elsewhere rather than moving the domestic sheep. (PC 26. f)*

**Response to Concern 570.44**

See Response to Concern 530.38. The Forest Service is responsible for managing habitats and does not manage the populations of species occurring on its lands. Wildlife populations, including bighorn sheep, are the responsibility of the state wildlife agencies, in this case the Idaho Department of Fish and Game. The state has the purview over species transplant efforts. Therefore, this concern is beyond the scope of this document.

> *Sample Public Comment for 570.44*
>
> In all your studies, you have not proven that domestic sheep pass on diseases that cause bighorn sheep to die. [If] they can't survive in that area then they should be moved somewhere else. Therefore, we feel that no domestic sheep allotments should be eliminated in the Payette National Forest. (DSEIS Ltr #12914)

**Concern Statement 570.45**

*The Forest Service should consider that the bighorn sheep had been extirpated from Hells Canyon because the habitat does not meet all their requirements. (PC 26. f, x)*

**Response to Concern 570.45**

Historically, there were large populations of native bighorn sheep in Hells Canyon and there are large quantities of quality habitat in the canyon. The Payette National Forest disclosed in the document that the reason for their extirpation was threefold: (1) disease transmission from domestic sheep, (2) forage competition due to the large number of domestic sheep grazing in the canyon, and (3) overhunting. The Payette National Forest

BLM_0049278

is not assessing what habitat is missing for bighorn sheep viability, it is assessing if the Payette National Forest is providing for it. The two species prefer and share similar habitat and if domestic sheep are using the habitat, it is not available to bighorn sheep.

### Sample Public Comment for 570.45

The bighorns were not in Hell's Canyon for a reason. Plain and simple, the habitat is missing something that they require. (DSEIS Ltr #107)

### Concern Statement 570.46

*The Forest Service needs to protect the bighorn sheep because there are so few left. (PC 38. e)*

### Response to Concern 570.46

The Payette National Forest is analyzing and determining the amount of habitat needed to ensure viability of the bighorn sheep on the Payette National Forest.

### Sample Public Comment for 570.46

Now that there are only an estimated 2,000 bighorns statewide, we need to ramp up our efforts to protect them for our families, for our future. (DSEIS , Ltr #13218)

### Concern Statement 570.47

*The Forest Service should consider that human beings are the most powerful species on the planet and should use this power to protect other living species. (PC 39a)*

### Response to Concern 570.47

The Payette National Forest is analyzing and determining the amount of habitat needed to ensure viability of the bighorn sheep on the Payette National Forest.

### Sample Public Comment for 570.47

It is our duty as the most powerful species to exist on this planet to use our might to protect the integrity of our life support systems for the benefit of all living things. (DSEIS Ltr #11674)

BLM_0049279

**Concern Statement 570.48**

*The Forest Service should recognize that the emphasis on the development and industry expressed in the government policies of the last eight years has been rough on wildlife and populations should recover if we allow them to. (PC 38. e; PC 39. b; PC 40. a)*

**Response to Concern 570.48**

The Payette National Forest is analyzing and determining the amount of habitat needed to ensure viability of the bighorn sheep on the Payette National Forest. Recognizing the effects of politics on wildlife species is beyond the scope of this analysis.

> *Sample Public Comment for 570.48*
>
> The damage that has been done to the wildlife of the USA over the last eight years is tragic. It is time to correct the [imbalance] in nature that the avarice of industry has done. (DSEIS Ltr #12664)

**Concern Statement 570.49**

*The Forest Service should acknowledge that if we don't change our ways by the end of this century, there will be no animals left in the wild larger than a bread box. (PC 41. a)*

**Response to Concern 570.49**

The Payette National Forest is analyzing and determining the amount of habitat needed to ensure viability of the bighorn sheep on the Payette National Forest. Determining if only small animals will be left by the end of the century is beyond the scope of this analysis.

> *Sample Public Comment for 570.49*
>
> I have repeatedly read predictions that, if we don't change our ways, by the end of this century there will be no animals left in the wild other than those that are about the size of a bread box or smaller. (DSEIS Ltr# 10632)

**Concern Statement 570.50**

*The Forest Service should consider that ranchers and hunters should not dictate management of our remaining large mammals. (PC 41. b)*

**Response to Concern 570.50**

The Forest Service manages wildlife habitat. The State of Idaho and US Fish and Wildlife manage the animals. This comment refers to matters outside the scope of this analysis. Federal laws direct the Payette National Forest to provide for adequate habitat that will provide for a viable population of bighorn sheep on the forest.

BLM_0049280

### Sample Public Comment for 570.50

We cannot afford to allow ranchers and hunters to continue to dominate what we do with the remaining large mammals. (DSEIS Ltr# 10632)

---

**Concern Statement 570.51**

*The Forest Service must continue to manage for wildlife habitat, not just domesticated animals. (PC 41. c)*

**Response to Concern 570.51**

This analysis focuses on management of bighorn sheep habitat. Management of habitat for other species is outside the scope of this analysis.

### Sample Public Comment for 570.51

There must be room on this continent for the wild things. (DSEIS Ltr# 10632)

---

**Concern Statement 570.52**

*The Forest Service should establish policy that landowners adjacent to NFS lands should shoot any wildlife that enters their property to protect their animals from disease. (PC 42. a)*

**Response to Concern 570.52**

The Payette National Forest only manages NFS lands, thus this comment is outside the scope of this analysis as the Agency cannot dictate what will happen on non-Forest Service lands.

### Sample Public Comment for 570.52

If domestic livestock are kicked off federal lands, then we must protect our livestock from the disease ridden wildlife that trespasses on our private land. All wildlife found on private land are to be shot on sight. That includes wolves that may carry rabies and sage hens that may be carriers of the avian flu. (DSEIS Ltr #13090)

---

**Concern Statement 570.53**

*The Forest Service should include local government representation in wildlife management decisions, such as relocation. (PC 43. a)*

**Response to Concern 570.53**

This action is not proposing or analyzing relocation of bighorn sheep, therefore this comment is outside the scope of the analysis.

### Sample Public Comment for 570.53

What suggestions are there to improve implementation of standards and guidelines? Local governments should be involved in the decision to relocate animals such as bighorn sheep. (DSEIS Ltr #2883)

BLM_0049281

**Concern Statement 570.54**

*The Forest Service should not treat bighorn sheep as though it is an endangered species. (PC 45. b)*

**Response to Concern 570.54**

This analysis is not treating bighorn sheep as an endangered species, but it is considering the bighorn sheep's current sensitive species status. The analysis is responding to concerns about bighorn sheep viability as discussed on pages 1-4 and 1-5 in the FSEIS. On July 29, 2009, the Region 4 Regional Forester designated the bighorn sheep as a sensitive species. The analysis in the FSEIS will reflect this designation as the population has declined approximately 90 percent in the last 100 years and 50 percent in the recent past.

> *Sample Public Comment for 570.54*
>
> The bighorn is not an endangered species - however the Forest Service is treating it as such in this DSEIS. (DSEIS Ltr #12943)

**Concern Statement 570.55**

*The Forest Service should realize that bighorn sheep on the Payette National Forest is in immediate threat of extirpation due to the presence of domestic sheep within areas that have been delineated as occupied bighorn sheep habitat. (PC 41d)*

**Response to Concern 570.55**

The Payette National Forest is acutely aware of the situation and is modeling and analyzing the effects of a variety of management strategies. The risk for contact between bighorn sheep and domestic sheep allotments on the Payette National Forest has been analyzed. Effective disease transmission rates have been calculated at a variety of levels to account for field conditions. Bighorn sheep population persistence has also been calculated and displayed in the FSEIS for each of the action alternatives.

> *Sample Public Comment for 570.55*
>
> Policy must be adjusted to see to the survival of our wild heritage. (DSEIS Ltr #10632)

**Concern Statement 570.56**

*The Forest Service should ensure that adequate coordination occurs between Idaho Department of Fish and Game, the Forest Service, and Tribal Governments because of the inter-related management issues of various wildlife species (e.g., wolves and bighorn sheep). (PC 48. a)*

**Response to Concern 570.56**

The Forest Service is conducting coordination within the bounds of legal requirement. Consultation with Tribes is being conducted to abide by our Tribal Trust Responsibilities and briefings are being conducted with States, as requested. Several briefings have

BLM_0049282

occurred with other Forest Service units, the Bureau of Land Management, the States and Congressional Staffers. Numerous tribal consultations have been conducted.

### Sample Public Comment for 570.56

In the draft supplement you indicate that part of the effort to enhance the bighorn sheep viability and expand both numbers and occupied habitat were to meet tribal desires based on their treaties. A similar tribal concession was made by IDFG [Idaho Department of Fish and Game] in their wolf management plans. In fact, the tribe was provided concessions in harvest and management level of the wolf population. This was not part of the discussion in dealing with viability of the bighorn sheep population. Yet as I have pointed out above this predator can substantially alter the viability and use of habitat by the bighorn. It would appear that this lack of management coordination is entirely political in nature and a solution should be made clear before any decisions are made that would influence grazers on the Payette Forest. (Internal Comment)

### Concern Statement 570.57

*The Forest Service should build upon the success of the Pittman-Robertson Act of 1937 which restored the bighorn sheep to many areas in the west. (PC 36. a)*

### Response to Concern 570.57

This act is discussed in the legal compliance section of the FSEIS.

### Sample Public Comment for 570.57

Wild sheep were introduced on many areas in the west as a result of funding under the Pittman-Robertson Act of 1937. That was a tremendous wildlife restoration effort with state wildlife agencies and funds contributed by the Wild Sheep Foundation. This has been a very successful program and we can ill afford to jeopardize this valuable resource with domestic sheep grazing. (DSEIS Ltr #13082)

### Concern Statement 570.58

*The Forest Service should disclose how removing domestic sheep could lead to a loss of quality forage in the Core Herd Home Range Analysis section of the Update to the DSEIS.*

### Response to Concern 570.58

The SEIS analysis discloses the methods used to define source habitats potentially suitable for bighorn sheep. Habitats in the Hells Canyon and Salmon River drainages are considered highly suitable for this species. The primary concern affecting habitats important to bighorn sheep is the potential for disease transmission resulting from contact with domestic sheep. This is the primary premise in the EIS and SEIS, and is well-supported by the published literature. Although habitat quality is important, it was not identified as a limiting factor in this analysis.

BLM_0049283

### Sample Public Comment for 570.58

An interesting and perhaps erroneous perception is that by reducing or eliminating domestic sheep grazing suitable rangeland and a loss of quality forage will occur (p 3-83). The rangeland will remain and very likely the forage quality could be improved by removing domestic sheep. Nothing in the description of the current condition or affected environment documents how removing domestic sheep would lead to loss of forage quality. (Update to DSEIS Ltr# 20111)

## Concern Statement 570.59

*The Forest Service should include areas like the Little Salmon and the South Fork of the Salmon in the Core Herd Home Range Analysis section of the Update to the DSEIS as these areas are occupied by bighorn sheep based on the judgment of the professional wildlife managers assisting in this analysis.*

**Response to Concern 570.59**

The areas of the Little Salmon and the South Fork of the Salmon River are accounted for in the analysis as "Areas of Concern". The "Areas of Concern" are not given the same weight as a full herd because there are only occasional observations of bighorn sheep in those areas. Animals in the Little Salmon are effectively included in the disease model as a satellite population of the Main Salmon/South Fork herd, as described in Chapter 3 and the Technical Appendix. The determination will be changed when and if there is more information to determine that those areas contain bighorn sheep herd.

### Sample Public Comment for 570.59

The weakness of the analysis is the areas where you apparently have insufficient data. I believe the Payette National Forest, in the UDSEIS, in an attempt to have a quantitative analysis has possibly tried to exclude professional judgment from the analysis wherever possible. While I applaud the effort to make the maximum use of the data I have contributed funds to help obtain, the problem is you do not have data regarding all the bighorn sheep populations on your forest. Having developed the best quantitative analysis you possibly can, I feel you need to once again consider the direction of the Chief of the Forest Service in his directions in the remand. Separation of the species is the key to ending disease transmission on the forest. This means that you need not only to keep the domestic sheep separate from the bighorn sheep populations you have radio collared data regarding their movements and habitat selection, you need to use the professional judgment of the Wildlife Managers from the States and Tribes, that are among the Cooperators supporting the development of the USDEIS, to help you devise additional protections for the bighorn sheep that were documented in the Little Salmon and the South Fork of the Salmon River. I believe that now that you have used the data as much as you can, you need to add extra protection for the areas where you know there are bighorn sheep, but you do not have sufficient data to describe their year round movements or apply the risk of contact model you have developed. I believe that is an appropriate use of expert opinion and I suggest you develop areas that are not Core Herd Home Ranges, but are areas that are occupied by bighorn sheep, based on the judgment of the professional wildlife managers assisting you in this analysis, especially for the little Salmon and the South Fork of the Salmon. (Update to DSEIS Ltr# 20108)

BLM_0049284

**Concern Statement 570.60**

*The Forest Service should not include private land holdings in the core herd home range nor should those lands be part of a separation buffer in the Core Herd Home Range Analysis section of the Update to the DSEIS.*

**Response to Concern 570.60**

The areas within the core herd home range that are not administered by the Payette National Forest are accounted for in the cumulative effects section in the final document.

> *Sample Public Comment for 570.60*
>
> The new definition of herd home range also includes significant private land holdings, which the Forest Service does not control, but does not account for in it's analysis of proposed alternatives that would include those lands as part of the "buffer" created by the alternative between domestic and wild sheep. And there are already domestic sheep on many of these private lands. (Update to DSEIS Ltr# 20093)

**Concern Statement 570.61**

*The Forest Service should clarify the basis for the Foray Model and differentiate movements between resident and transplanted bighorn sheep in the Core Herd Home Range Analysis section of the Update to the DSEIS.*

**Response to Concern 570.61**

All of the new models are fully explained in the technical reports.

> *Sample Public Comment for 570.61*
>
> The Update presents a number of newly developed models for source habitat, forays outside of source habitat, and risk of disease transfer. For the reader to understand and critically evaluate these models, each model and the data on which it is based must be clearly described, as must any changes from data presented earlier. Similarly, the basis for the "Foray Model" (e.g., the number of individuals and animal-years on which the model is based) should be clarified. Were there differences in movements between resident and translocated animals? (Update to DSEIS Ltr# 20089)

**Concern Statement 570.62**

*The Forest Service should clarify the definition and use of the terms "foray" and "wandering" in the Core Herd Home Range Analysis section of the Update to the DSEIS.*

**Response to Concern 570.62**

At the beginning of the Foray Analysis section, forays are defined as "any short-term movement of an animal away from and back to its herd's core herd home range". In the same section, foray movements are presented as a normal and characteristic behavior of

BLM_0049285

bighorn sheep. Foray movements put bighorn sheep at particular risk of contact with domestic sheep, even at some distance from the bighorn sheep's core herd home range.

There is no implication or understanding by the Forest Service that animals engaging in foray movements are aberrant, nonessential, or subject to removal. In fact, foray movements are understood to be an important adaptation of bighorn sheep to their environment. Whatever term is used to describe them, exploratory movements outside of their core herd home ranges are an important component of bighorn sheep's use of the landscape, and need to be considered as a possible source of contact between domestic sheep and bighorn sheep.

The Forest Service recognizes that some movements outside of the core herd home range will result in colonization of new areas. The habitat, foray, and disease models do not attempt to model recolonization, but the Forest Plan will include directions for adjusting management decisions should herds become established in new areas.

### Sample Public Comment for 570.62

Use of Term "Foray" and "Wandering" -..: The term "Foray" implies exploratory and/or infrequent or aberrant movements outside areas normally used by individuals. In addition, the UDSEIS was referred to "bighorn sheep travelling outside of their home ranges" again implying aberrant movements (UDSEIS, page 3-84). The Tribe feels it is important to clearly define these terms, as aberrant movements, are usually associated with individual sheep that are thought to be expendable or nonessential to the health of their herd, because they are removed from and no longer closely associated with their herds, are found outside of typical bighorn sheep habitat, and likely pose management risks making them subject to removal. Many times aberrant movements are associated with young dispersing bighorn sheep which are no longer or loosely tied to their herd as opposed to resident bighorn sheep which are closely tied to the herd. The Tribe is concen1ed, by characterizing all movements outside of a CHHR as forays, gives the impression all bighorn sheep located outside of CHHR are expressing aberrant movements, are therefore nonessential to their herd, may pose a management risk, and may or should be subject to management action including removal. This line of thought will preclude meaningful opportunities for bighorn sheep restoration and range expansion. Although we understand the Foray Model tries to capture such movements, we feel describing all movements outside the CHHR as forays is misleading in a way that dismisses the importance of; (1) resident bighorn sheep found outside the 95% volume contour, but still within their normal herd home range, to the health of their herd, and (2) bighorn sheep recolonizing new source habitats as herds expand. Mote clearly and accurately .characterizing movements of bighorn sheep outside of CHHRs would be helpful in the ROD. We suggest the PNF avoid describing bighorn sheep movements as forays or identifying bighorn sheep as wandering sheep, unless these terms specifically refer to bighorn sheep that are exhibiting aberrant movements. (Update to DSEIS Ltr# 20072)

BLM_0049286

**Concern Statement 570.63**

*The Forest Service should include a qualitative analysis that recognizes the documented presence of uncollared bighorn sheep in the Little Salmon and Main Salmon South Fork herds in the Core Herd Home Range Analysis section of the Update to the DSEIS.*

**Response to Concern 570.63**

See Response to Concern 570.59

> *Sample Public Comment for 570.63*
>
> Paucity of Radiotelemetry Data and Sightings of Uncollared Bighorn Sheep - Modeled results for the Little Salmon and Main Salmon South Fork herds may further be underestimated because of the paucity of available radio telemetry data and inability to model documented sightings of uncollared bighorn sheep. The Tribe suggests there is not sufficient radiotelemetry data to fully understand bighorn sheep distribution within the ranges of these two herds. Given the paucity of radiotelemetry data for these two herds, the documented presence of uncollared ewes in areas outside those currently used by radio collared animals is particularly important in understanding the potential risk for contact within these two herds. The Tribe requests the PNF assess the possibility of augmenting the UDSEIS analysis to include a qualitative approach that recognizes and accounts for the documented presence of uncollared bighorn sheep in the Little Salmon and Main Salmon South Fork herds. (Update to DSEIS Ltr# 20072)

**Concern Statement 570.64**

*The Forest Service should use the information in the Core Herd Home Range Analysis section of the Update to the DSEIS in the decision making process as it is scientifically sound.*

**Response to Concern 570.64**

The Forest Service agrees that the core herd home range analysis is scientifically sound and is being used in the final decision.

> *Sample Public Comment for 570.64*
>
> After review, we believe the home range analysis and foray modeling is scientifically sound, represents a best approximation of bighorn sheep movements based on available data, and provides an improvement over the approach in the DSEIS. (Update to DSEIS Ltr# 20082)

BLM_0049287

**Concern Statement 570.65**

*The Forest Service should reevaluate foray movement because it is not uniform and is most likely determined by topography, landscape, and the location of other herds in the Core Herd Home Range Analysis section of the Update to the DSEIS.*

**Response to Concern 570.65**

Our foray analysis does take into consideration the distribution of source habitat in estimating the probability of foray movements reaching different areas. As described in Chapter 3 of the FSEIS in the section titled "Probability a Bighorn Sheep will Intersect an Allotment", analysis of all telemetry points found outside of the core herd home ranges (CHHRs) shows that bighorn sheep are more than 34 times more likely to be found in a given area of source habitat than in an equal area of non-habitat, and nearly 6 times more likely to be found in source habitat than in connectivity area. The probability of a foray reaching a given area is a combination of the area's distance from the CHHR, its suitability as bighorn habitat, and the distribution of habitat and non-habitat at the same distance in other directions from the CHHR. Figure W–0m in the FSEIS, which illustrates the probability of foray movements to areas surrounding the Upper Hells Canyon CHHR, shows a case in which foray movements are modeled as much more probable in some directions (colored with various shades of blue) than in others (colored green and yellow).

The definition of source habitat incorporates topographic and landscape factors so the effects of these factors are accounted for in our habitat model. Similarly, to the extent that other herds are found in areas with a large amount of source habitat and connectivity areas, foray movements will be modeled as being more likely to occur toward those herds.

More detailed treatments of the directionality of foray movements, including cost surface analysis, were considered but rejected due to the limited amount of data on foray movements that were available, even in the extensive telemetry data set that was available to us.

*Sample Public Comment for 570.65*

Comment #25, pgs. 4, 2-3, 3-8 - 3-13, 3-19, 3-24: The PNF must obtain additional information and include it in the DSEIS. The DSEIS appears to assume that foray movement occurs uniformly in every direction from core herd home range, hence foray movement is mapped according to "concentric rings that emanated from core herd home range areas." DSEIS at 3-24. This foray analysis overestimates the potential from contact between domestic sheep and bighorn sheep. It is highly unlikely that bighorns foray beyond core herd home range at random, in every direction. Rather foray movement is likely determined by factors such as topography, landscape and the location of other herds. The DSEIS states that bighorn sheep occupy certain source habitat, see DSEIS at 3-12 through 3-14, but ignores the fact that bighorn sheep occupy this habitat when employing the foray analysis. The foray analysis should be based on the actual movements of bighorn sheep. (Update to DSEIS Ltr# 20070)

BLM_0049288

**Concern Statement 570.66**

*The Forest Service should reassess the foray distance, data source, and telemetry locations used in the detection and documentation of individual foray events and reassess this separately for the Hells Canyon and the Salmon River herds, in the Core Herd Home Range Analysis section of the Update to the DSEIS.*

**Response to Concern 570.66**

A discussion of systematic biases in the collection of the telemetry data has been added to the FSEIS. The foray analysis clearly does underestimate, to some extent, the frequency and distances of foray movements.

The telemetry data set includes 140 radio-collared rams, from whom 5,010 locations were collected over 12 years, with 212 of the telemetry locations outside of the home range. Although one ram was observed at a distance of 32.4 km from the boundary of its home range, none of the other individuals was ever located more than 26 km beyond the CHHR. While bighorn sheep in other places have been observed to travel greater distances, the fact that none have been observed in a data set as comprehensive the one analyzed here indicates that such movements are at least quite rare.

The movements cited in the article by Akenson and Akenson (1992) include a large migratory component, with animals moving up to 40 to 50 km between wintering and lambing grounds. In the current analysis, such regular movements would be captured by the home range, falling within the 95th isopleth of habitat utilization.

> *Sample Public Comment for 570.66*
>
> Sampling bias associated with the detection and documentation of individual foray events is not discussed but may dramatically impact foray analyses. From experience, bighorn movements through forested areas complicate monitoring efforts due to line of sight issues, signal bounce, signal interference, and time constraints. Field personnel more often fail to document collared individuals in these circumstances. Also, it is misleading to limit the maximum foray distance to 35 km (the maximum observed in the data) unless there is evidence to suggest that individual was observed at its maximum foray distance. A more appropriate and defensible maximum distance would be 75 km, the maximum observed for bighorn in this area previously (Akenson and Akenson 1994). Sampling limitations and assumptions such as these may significantly bias foray analyses, underestimating the frequency and distance of foray events and overstating the degree to which contact risk is minimized. (Update to DSEIS Ltr# 20046)

BLM_0049289

**Concern Statement 570.67**

*The Forest Service should reevaluate resource selection or preference in the foray analysis because animal movement through low quality habitat weakens the applicability of models that incorporate habitat selection information, in the Core Herd Home Range Analysis section of the Update to the DSEIS.*

**Response to Concern 570.67**

Like the commenter, the modelers expected that the resource selection function of animals on forays would be different than those moving within the core herd home range; animals on forays are likely to be more willing to cross areas of non-habitat, and may thus spend more time outside of mapped source habitat than animals within the CHHR. Thus, as described in the FSEIS, they calculated resource selection functions for telemetry points within the CHHR, and for points found outside of the CHHR. That analysis found that animals moving outside of the CHHR did in fact have higher "preference" for non-habitat and connectivity areas. Consequently, the resource functions used in the foray analysis were the ones fitted to actual observations of animals moving outside of their CHHRs, and took into account the characteristic behavior of animals on exploratory movements.

> *Sample Public Comment for 570.67*
>
> The foray analysis has several shortcomings which greatly limit its applicability and utility. Most generally, attempting to incorporate resource selection or 'preference' in a foray analysis is problematic because forays, by definition, involve unexpected animal movements and atypical habitat selection. During exploratory or even migratory movements, individuals of many big game species often move through extensive and contiguous low-quality habitat, weakening the applicability of models incorporating habitat selection information. (Update to DSEIS Ltr# 20046)

**Concern Statement 570.68**

*The Forest Service should reevaluate the smoothing parameter (Href) and potentially use cross-validation or at least squares cross-validation, which would more accurately identify home range core areas, in the Core Herd Home Range Analysis section of the Update to the DSEIS.*

**Response to Concern 570.68**

In the exploratory stage of the core herd home range analysis, several methods of determining kernel bandwidth were explored. Unfortunately, the telemetry observations for individual animals are highly non-independent, and CVh and LSCVh resulted in bandwidths that were unrealistically small.

If there had been only one individual per herd or if data points for all individuals had been lumped together in the calculation of a single value of hRef, the analysis would have missed the multimodality of the bighorn core herd home ranges.

BLM_0049290